1

**BLANK ROME LLP**
Arash Beral (SBN 245219)
arash.beral@blankrome.com
Todd M. Malynn (SBN 181595)
todd.malynn@blankrome.com
Victor Sandoval (SBN 344461)
victor.sandoval@blankrome.com
2029 Century Park East | 6th Floor
Los Angeles, CA 90067
Telephone:   424.239.3400
Facsimile:   424.239.3434

2

3

4

5

6

7

Attorneys for Defendants, Counterclaimants, and
Third Party Plaintiffs PCJV USA, LLC, PCI
TRADING LLC, POTATO CORNER, LA
GROUP, LLC, GK CAPITAL GROUP, LLC,
NKM CAPITAL GROUP, LLC and GUY
KOREN, and Defendants J & K AMERICANA,
LLC, J&K LAKEWOOD, LLC, J&K
OAKRIDGE, LLC, J&K VALLEY FAIR, LLC, J
& K ONTARIO, LLC, J&K PC TRUCKS, LLC,
HLK MILPITAS, LLC, and GK CERRITOS, LLC

8

9

10

11

12

13

**UNITED STATES DISTRICT COURT**

14

**CENTRAL DISTRICT OF CALIFORNIA**

15

16

SHAKEY'S PIZZA ASIA VENTURES, INC, a Philippines corporation,

17

Plaintiff,

18

vs.

19

PCJV USA, LLC, a Delaware limited liability company; PCI TRADING , LLC, a Delaware limited liability company; GUY KOREN, an individual; POTATO CORNER LA GROUP, LLC, a California limited liability company; NKM CAPITAL GROUP, LLC, a California limited liability company; J & K AMERICANA, LLC, a California limited liability company; J&K LAKEWOOD, LLC, a California limited liability company; J&K VALLEY FAIR, LLC, a California limited liability company; J & K ONTARIO, LLC, a California limited liability company; HLK MILPITAS, LLC, a California, limited liability company; GK CERRITOS, LLC, a California limited liability company;  J&K PC TRUCKS, LLC, a California limited liability company; and, GK CAPITAL GROUP, LLC, a California

20

21

22

23

24

25

26

27

28

Case No. 2:24-CV-04546-SB(AGRx)

*Hon. Stanley Blumenfeld, Jr.*

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT PCJV USA, LLC'S MOTION FOR:**

1. **SANCTIONS AGAINST PLAINTIFF SHAKEY'S PIZZA ASIA VENTURES, INC. UNDER FRCP RULE 37(B)(2)(A); AND**
2. **PAYMENT OF EXPENSES AGAINST PLAINTIFF AND ITS COUNSEL OR RECORD UNDER FRCP RULE 37(B)(2)(C)**

**FOR FAILURE TO COMPLY WITH THE MAGISTRATE JUDGE'S COURT ORDER DATED MARCH 12, 2025 (DKT. NO. 128)**

i

| | | |
|---|---|---|
| limited liability company and DOES 1 through 100, inclusive, | Date: | May 22, 2025 |
| | Time: | 1:30 p.m. |
| Defendants. | Location: | Zoom Video Conference |
| | Complaint Filed: | May 31, 2024 |
| | Trial Date: | August 4, 2025 |

PCJV USA, LLC, a Delaware limited liability company; PCI TRADING LLC, a Delaware limited liability company; POTATO CORNER LA GROUP LLC, a California limited liability company; GK CAPITAL GROUP, LLC, a California limited liability company; NKM CAPITAL GROUP LLC, a California limited liability company; and GUY KOREN, an individual,

Counter-Claimants,

v.

SHAKEY'S PIZZA ASIA VENTURES, INC, a Philippines corporation,

Counter Defendant.

PCJV USA, LLC, a Delaware limited liability company; PCI TRADING LLC, a Delaware limited liability company; POTATO CORNER LA GROUP LLC, a California limited liability company; GK CAPITAL GROUP, LLC, a California limited liability company; NKM CAPITAL GROUP LLC, a California limited liability company; and GUY KOREN, an individual,

Third Party Plaintiffs,

v.

PC INTERNATIONAL PTE LTD., a Singapore business entity; SPAVI INTERNATIONAL USA, INC., a California corporation; CINCO CORPORATION, a Philippines corporation; and ROES 1 through 10, inclusive,

Third Party Defendants.

# <u>TABLE OF CONTENTS</u>

MEMORANDUM OF POINTS AND AUTORITIES ..............................1

I.    INTRODUCTION ...................................................................................1

II.   BACKGROUND ....................................................................................8

III.  SANCTIONS UNDER RULE 37(b) ARE NEEDED AND WARRANTED.....................................................................................15

    A.    Plaintiff's Disobedience is Willful....................................17

    B.    Plaintiff's Disobedience is Unduly Prejudicial.............................19

    C.    Sanctions Are Appropriate.................................................20

        1.    Order Striking or Dismissing Plaintiff's Claims for Misappropriation of Trade Secrets ......................................20

        2.    Order Prohibiting Plaintiff from Introducing at Trial Any Documents Not Produced by April 11, 2025 .....................21

        3.    Order Deeming Matters at Issue and Designated Facts Established ........................................................................21

        4.    Order Awarding Attorneys' Fees Against Plaintiff and its Counsel .............................................................................22

        5.    For Such Further Appropriate Relief, Including a Finding of Contempt.........................................................................22

IV.   CONCLUSION .......................................................................................22

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**CASES**

*Consumer Fin'l Protection Bureau v. Morgan Drexen, Inc.,*
  101 F.Supp.3d 856 (CD Cal. 2015) ................................................................ 16

*Dale K. Barker Co., P.C. v. Valley Plaza, ,*
  541 Fed. Appx. 810 (10th Cir. 2013) ......................................................... 17, 21

*Flagg v. City of Detroit,*
  715 F3d 165 (6th Cir. 2013) ............................................................................ 17

*Henry v. Gill Industries, Inc.,*
  983 F2d 943 (9th Cir. 1993) ............................................................................ 16

*Hyde & Drath v. Baker,*
  24 F3d 1162 (9th Cir. 1994) ....................................................................... 17, 22

*Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,*
  456 US 694 (1982) ...................................................................................... 17, 22

*Lew v. Kona Hosp.,*
  754 F2d 1420 (9th Cir. 1985) .......................................................................... 15

*Marquis v. Chrysler Corp.,*
  577 F.2d 624 (9th Cir.1978) ............................................................................ 16

*Network Computing Services Corp. v. Cisco Systems, Inc.,*
  223 FRD 392 (D S.C. 2004) ............................................................................ 17

*Residential Funding Corp. v. DeGeorge Fin'l Corp.,*
  306 F.3d 99 (2d Cir. 2002) ......................................................................... 17, 22

*Sentry Ins. A Mut. Co. v. Brand Mgmt., Inc.,*
  295 FRD 1 (E.D.N.Y. 2013) ............................................................................ 17

*United States ex rel. Wiltec Guam, Inc. v. Kahaluu Const. Co., Inc.,*
  857 F2d 600 (9th Cir. 1988) ............................................................................ 15

*Von Brimer v. Whirlpool Corp.,*
  536 F.2d 838 (9th Cir. 1976) ........................................................................... 16

**Rules**

Fed. R. Civ. Proc. 37(b)(2 ................................................................................ 15

Fed. R. Civ. Proc. 37(b)(2)(A) ......................................................................... 16

Fed. R. Civ. Proc. 37(b)(2)(A)(i) ................................................................. 17, 22

Fed. R. Civ. Proc. 37(b)(2)(A)(ii) .................................................................... 16

Fed. R. Civ. Proc. 37(b)(2)(C) .................................................................... 17, 22

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

PCJV USA, LLC ("PCJV" or "Defendant") is the first continuous user of "Potato Corner" USA trademarks and the agreed-upon vehicle through which the Potato Corner brand expanded into the United States. PCJV is now ultimately owned by Guy Koren ("Koren") via a settlement with the original trademark registrant Cinco Corporation ("Cinco") and parties affiliated with Cinco. Before that, PCJV's owners comprised two sets of partners under a joint venture agreement—Koren's domestic "LA Group" and Cinco's "Cinco Group" in the Philippines. Shakey Pizza Asia Ventures, Inc. ("SPAVI" or "Plaintiff") claims to have purchased global trademark rights from Cinco out from underneath PCJV's common law and PCJV's domestic joint venture parties' contractual rights, including consent rights prohibiting such a transaction.[1]

PCJV seeks relief against SPAVI, which has not produced a single document or provided any meaningful discovery despite this case being a year old and despite a March 12 Order (Dkt. No. 128), which PCJV painstakingly obtained. On that date, the Court ordered SPAVI to: (1) file a protective order by March 14; (2) serve an interrogatory response by March 21; and (3) commence a rolling production of documents (with certain scope limitations and understanding of good faith efforts would be made to confer thereafter over custodians and search terms) the week of March 24 (including documents SPAVI represented it had already gathered and agreed to produce) with the production to be completed by April 11. The Court set an April 4 status conference to resolve any issues over search terms and custodians after PCJV had an opportunity to review the initial production.

---

[1] SPAVI does not own any trademark rights to the "Shakey's Pizza" brand or marks in the United States. It is a common example of how trademark rights are territorial and predicated on first continuous use or contractual rights, which sometimes results in separate ownership of a trademark in different countries.

1

SPAVI violated every single element of this Order. SPAVI did not file a protective order by March 14, serve an interrogatory response by March 21, or begin a rolling production the week of March 24, or the next week, or the week thereafter (or at all). SPAVI thwarted the purpose of the April 4 hearing because it had done nothing to comply with the March 12 Order except belatedly file a protective order on March 31 (after deleting an immaterial provision from the already approved-for-filing document) and belatedly serve an interrogatory response on April 9. And then, although belatedly representing at the April 4 hearing that it was prepared to produce documents, SPAVI still refused to do so as ordered by April 11.[2] As of today, April 14, SPAVI still has not produced anything.[3]

PCJV seeks remedies for the unfair prejudice caused by Plaintiff's refusal to comply with its discovery obligations and violations of the Magistrate Judge's March 12, 2025 Order. The purpose of discovery is to elicit the truth by requiring parties to produce documents and respond to questions relevant to the case-in-chief and defenses thereto. A party's case-in-chief cannot be believed, let alone fairly evaluated for trial or settlement, when the party suppresses directly relevant evidence and violates discovery orders.

There is and was a direct nexus between the requested discovery and Plaintiff's case-in-chief. Defendant propounded discovery bearing on Plaintiff's ultimate burden on its trademark infringement claims to prove that it has superior

---

[2] It is no justification that Defendants, who are subject to a preliminary injunction and complied with court deadlines, refuse to prejudice themselves by reopening deadlines and continuing the trial. The District Court's standing order is clear that trials are not continued absent diligence and a timely request. Plaintiff rejected and refused in November, December, January, and early February to meet and confer on the case management order before deadlines expired, and have lacked diligence in discovery before making an untimely request. Malynn Decl. ¶¶ 20-21, Ex. 14.

[3] On Friday night, April 11, Plaintiff made a meaningless "proposal" to allow attorneys from Blank Rome to review only the asset purchase agreement in a "monitored" conference room at Plaintiff's counsel's office without any electronic equipment, notes, phones, writing pads, etc. Malynn Decl. ¶ 22, Ex. 15.

rights to use and control the U.S. Potato Corner trademarks. Defendant prevails on Plaintiff's trademark claims in one of three ways:

1. *Ownership:* By Plaintiff failing to carry its burden of proving that it actually acquired the U.S. trademark rights at issue after Defendant rebuts the presumption of ownership afforded an assignment of U.S. registrations in the middle of litigation where the assignor (Cinco) and any third party acting in concert or participation (including SPAVI) were enjoined from, *inter alia,* acting on threats to terminate the trademark rights of the U.S. franchisor (PCJV) then jointly owned by, *inter alia,* Cinco and Koren, and interfering with U.S. franchisor's use and control of the U.S. trademarks and communicating with U.S. franchisees any alleged superior right to use or control the U.S. trademarks;

2. *Written long-term license rights*: By Plaintiff failing to carry its burden of proving that it acquired ownership of the U.S. trademarks free and clear of long-term trademark rights supporting the state-court injunction and evidenced by written agreements signed by PCJV and PCJV's foreign and domestic joint venture partners years before any dispute arose between Cinco and Koren;[4] and

3. *Defenses against trademark enforcement:* By PCJV proving defenses such as (a) assignment in gross (where SPAVI's alleged ownership of the U.S. marks was separated from PCJV's control of the marks), (b) naked license (where SPAVI allegedly acquired rights as licensor when PCJV had control of the marks and SPAVI was enjoined from interfering with PCJV's control of the marks), and

---

[4] After Cinco agreed to joint venture with Koren to create a U.S. franchise system and U.S. franchisor, PCJV's joint venture partners bound Cinco to multiple written agreements as part of one transaction (the "Written Agreements"), including a joint venture agreement ("JVA") and first amendment thereto ("AJVA"), PCJV's operating agreement ("Operating Agreement"), and a non-royalty bearing master license agreement ("MLA") with a 20-year term and three 10-year options that Cinco's counsel DLA Piper drafted, that Cinco approved as documented in board minutes, that PCJV operated under in sub-licensing the U.S. marks, and that was referenced for 15 years in Franchise Disclose Documents initially drafted by Cinco's counsel DLA Piper and approved by Cinco as PCJV's majority owner.

(c) unclean hands (where SPAVI allegedly acquired rights by inducing Cinco to breach contracts prohibiting a transfer of rights without Koren's consent).[5]

In support of each of the foregoing, PCJV's RFP Nos. 1 to 21 sought the transactional related documents giving rise and meaning to (so as to cross-examine) the assignment between PCJV's joint venture partner Cinco and SPAVI that occurred in the middle of litigation where an injunction prohibited interference with PCJV's use and control of the U.S. trademarks to, *inter alia,* confirm or support the following facts before the discovery cut-off:

1.     That SPAVI did not acquire any ownership interests in PCJV; thus, Cinco still co-owned PCJV's pre-existing rights as the first continuous user of the U.S. marks and vehicle through which Potato Corner trademark rights expanded into the United States;[6]

2.     That SPAVI did not acquire, as Cinco had no ability to sell, rights Cinco vested in PCJV and co-owned by PCJV's joint venture partners, including the right of PCJV to control the use of the U.S. trademarks

---

[5] The JVA/AJVA and Operating Agreement prohibited Cinco from transferring any U.S. trademark rights enjoyed by PCJV without Koren's written consent until Cinco agreed to the MLA, which is the only Written Agreement that authorized Cinco to transfer U.S. trademark rights to a third-party, such as SPAVI. During the state-court litigation, SPAVI represented to PCJV and Koren in writing that its international transaction with Cinco did not violate the Written Agreements before Koren settled the state-court litigation and promised to pay Cinco money and to release Cinco from liability for (a) all of Cinco's "Interests" in PCJV as a joint venture partner, (b) all of Cinco's rights "attached" to those Interests, including any and all rights as a licensor, (c) representations/warranties that PCJV did not require any new "license" from any third party, and (d) a broad indemnity obligation if PCJV and Koren were sued by SPAVI trying to revoke PCJV's long-term trademark rights under the Written Agreements and now settlement. Three days after the settlement, SPAVI blindsided PCJV and Koren with the federal lawsuit claiming that it was no longer bound by the state-court's injunction and interpretation of the Written Agreements, that the MLA's 20-year term and three 10-year options were not enforceable, that the AJVA and Operating Agreement did not prohibit Cinco from transferring the U.S. marks to the SPAVI, and that SPAVI as assignee/licensor did not step into Cinco's shoes and owe contractual and fiduciary obligations to PCJV and Koren.

[6] Under the Written Agreements, Cinco had no right to control PCJV's use of the U.S. trademarks (other than as an owner of PCJV or a licensor under the MLA).

4

under the Written Agreements unless the MLA was enforceable—
Koren's consideration under the Written Agreements;

3. That SPAVI did not acquire any right to terminate PCJV's rights to use of the U.S. trademarks as any such sale of U.S. trademark rights by Cinco would have breached the Written Agreements unless SPAVI acquired U.S. trademark rights pursuant to the written authorization in the MLA (which SPAVI has denied);

4. That SPAVI knowingly acquired U.S. registrations and whatever interests defined in the transaction documents giving rise to and informing the assignment covering the U.S. trademarks used and controlled by PCJV and the Potato Corner USA franchise system subject to any and all prior common law and contractual rights of PCJV and PCJV's joint venture partners;

5. That in acquiring Cinco's international Potato Corner trademark portfolio, SPAVI did not pay adequate consideration to Cinco for U.S. trademark rights (rather, standing to attempt to enforce U.S. registrations was merely included in the transaction);

6. That SPAVI was fully aware of the risk and expense of litigation over whether PCJV and PCJV's domestic joint venture partners had superior rights to use and control the U.S. trademarks for at least well over 20 years pursuant to the terms of Written Agreements, which formed the basis of the state court's injunction;

7. That the consideration SPAVI paid to Cinco for the international Potato Corner trademark portfolio reflected the risk and expense of litigation over whether PCJV or PCJV's domestic joint venture partners had superior rights to use or control the U.S. trademarks for at least well over 20 years pursuant to the terms of Written Agreements, which formed the basis of the state court's injunction;

5

8.   That SPAVI paid Cinco less consideration for the assignment covering the U.S. trademarks used by PCJV and the Potato Corner USA franchise system than it would have had to pay to both PCJV's foreign and domestic joint venture partners for U.S. trademark rights;

9.   That SPAVI had full knowledge of PCJV's franchise agreements with third-party U.S. franchisees, including that those agreements were (a) for the benefit of PCJV and both its foreign and domestic joint venture partners, and (b) approved by PCJV's Board, which included both the foreign and domestic joint venture partners of PCJV; and

10.   That SPAVI had full knowledge that (a) Koren's rights as PCJV's President and controlling owner of the LA Group to operate PCJV and control the U.S. marks, as found by the state court in response to Cinco's claim that the MLA was unenforceable, were protected by the AJVA and Operating Agreement, and (b) Cinco would be in breach of the Written Agreements as enforced by the state court if it sold U.S. trademark rights to a third party without Koren's consent unless Cinco agreed to the MLA authorizing such a transaction.

Defendants prevail on Plaintiff's claims for misappropriation of trade secrets if Plaintiff cannot prove the following elements of its case-in-chief, which form the subject matter of PCJV's RFP Nos. 22 to 27 and Interrogatory No. 1:

1.   That the contents and labeling of the seasoning packages are trade secrets and not publicly available and purchased by third parties;

2.   That reasonable steps since 2009 were taken to maintain the alleged secrecy of the contents and labeling of the seasoning packages;

3.   That SPAVI owns or possesses the alleged trade secrets and provided them to Defendants, who allegedly misappropriated them through "reverse engineering" (a nonsensical claim); and

6

4.    That SPAVI has been damaged as a result of competition mimicking the flavors of the seasonings it uses to flavor french fries.

Notably, the Written Agreements were the subject of six years of litigation in state court that Cinco settled with Koren. Under the settlement, Koren acquired *all* of Cinco's rights under the Written Agreements. Tellingly, Plaintiff did not timely serve *any* discovery prior to the cut-off. Why? Plaintiff, who is represented by the same counsel as Cinco in the state-court litigation, had access to *all* the discovery in the state-court action. Plaintiff's witnesses have declared that they did due diligence on the U.S. litigation before acquiring Cinco's trademark portfolio. As Cinco's effective successor-in-interest and being represented by the same counsel and having access to all prior discovery, Plaintiff obviously felt it did not need discovery in this action and it was more beneficial if there was no discovery on its trademark and trade secrets claims, which it has effectively achieved.

In contrast, it was imperative for a fair trial that prior to the discovery cut-off Defendants obtain requested discovery relevant to the issues the parties did not undertake discovery upon in state court, including documents that Plaintiff disclosed it intended to use at trial. Although SPAVI possesses these documents, SPAVI has refused to produce any correspondence, due diligence, draft/final transaction documents, or any other documents that led or give meaning to the trademark assignment or that supports its allegations of trade-secret misappropriation or that demonstrate SPAVI's interference with PCJV's contractual relationships with its franchisees and vendors. Not even any of the following broadly described documents in SPAVI's initial disclosures requested by Defendant's RFP Nos. 1 to 27 were produced before the discovery cut-off: "Documents relating to intellectual property comprising the Potato Corner brand,… including documents showing SPAVI's ownership of the Potato Corner brand…, documents evidencing SPAVI's trade secrets included within the Potato Corner Intellectual Property, protectability

of any of the Potato Corner Intellectual Property (including the maintenance of secrecy of any confidential, proprietary, and/or trade secret information);…."

Plaintiff has self-created the highly prejudicial and unfair situation that it has all the documents it needs for trial before the discovery cut-off but Defendants only have discovery from the prior action and none of the documents relevant to SPAVI's claims—including the core documents responsive to PCJV's RFP Nos. 1 to 27 lying at the heart of this case and within Plaintiff's initial disclosures—or support SPAVI's tortious interference. Because SPAVI intentionally withheld these documents and knowingly failed to fulfill its discovery obligations prior to the discovery cut-off, including in violation of the Magistrate Judge's March 12 Order, Defendants have been unfairly prejudiced, especially since the discovery cut-off has passed and they are under a preliminary injunction. Sanctions under Rule 37(b) are just, necessary and appropriate.

## II.    BACKGROUND

This case involves the franchise business Potato Corner USA, which created, developed, operated and sold branded kiosk-style restaurant franchise outlets across the United States selling flavored french fries and other food and beverage items. The brand "Potato Corner" and related trademarks, including the word mark "Potato Corner" (USPTO Reg. No. 3760041), the tagline "World's Best Flavored French Fries" (USPTO Reg. No. 3760041), and the logo mark (USPTO Reg. No. 3760041) (collectively, the "Marks"), symbolize the consumer goodwill PCJV's U.S. Potato Corner franchise system created, grew and maintained for 15 years.

Based on Cinco's verified pleading in the prior state-court action over control of the U.S. franchisor PCJV LASC Case No. BC701075, there was no dispute how the Potato Corner brand expanded into the United States. Cinco agreed to joint venture with Koren to create a U.S. franchise system and in exchange for Koren's agreement to create, develop, operate and grow the U.S. franchise system, Cinco literally contributed long-term rights in the brand to the joint venture. Pursuant to

the Written Agreements, PCJV's Board had 100% control of the U.S. trademarks until there was an enforceable written master license agreement.

Originally, the brand was created in the Philippines to promote handcarts or "hot-dog" style stands selling french fries seasoned with flavors purchased from and publicly sold by third-party Ferna Corporation ("Ferna") (shown below):



After securing written long-term trademark rights, Koren's led LA Group designed and managed the kiosk-style restaurant franchise outlets (shown below), including the entire new look for the Potato Corner brand, word mark (USPTO Reg. No. 3760041), menu items, as to which PCJV had 100% control.



        In response to dueling motions for a preliminary injunction, including Cinco's
assertion that the MLA was unenforceable and that it might try to unilaterally
terminate PCJV's rights to use the U.S. trademarks if it was not granted control of
PCJV, the state court enforced the Written Agreements and enjoined Cinco and any
party acting in concert or participation with Cinco from (a) interfering with Koren's
delegated rights as PCJV's President, including the right to control the Potato
Corner marks in the United States and (b) communicating with U.S. franchisees that
Cinco had superior rights to use or control the U.S. trademarks. In 2021, the state
court commandeered the parties to mediation, through which the case ultimately
settled resulting in dismissals with prejudice and Defendants' defense of *res
judicata* and collateral estoppel as informed by the settlement agreement.

        In the middle of settlement discussions, SPAVI announced its acquisition of

Cinco's international trademark portfolio, to which Defendants objected as violative of the Written Agreements and a nonevent relative to Defendants' prior common law and contractual rights securing their use of the U.S. trademarks. To avoid escalating the state-court action and thwarting any opportunity to settle the case, SPAVI wrote a letter representing that its announced international transaction did not breach the Written Agreements and it would be bound by a settlement between Defendants and Cinco. SPAVI signed a three-way tolling agreement enabling three-way discussions and individual discussions with Defendants if Cinco separately settled, so that the parties could potentially reach a business resolution.

After SPAVI delayed settlement for over a year and Cinco and Defendants settled the state court litigation, SPAVI blindsided Defendants with the federal action three days after the settlement alleging it was no longer bound by the state court's injunction and interpretation of the Written Agreements as Cinco's successor-in-interest. The District Court did not bar SPAVI's claims and interpreted the Written Agreements differently than the state court, including ruling that Cinco was not one of PCJV's joint venture partners and the LA Group's consideration did not include written long-term trademark rights. The Ninth Circuit has set oral argument on the preliminary injunction appeal for May 15.

In accordance with the District Court's case management order, Defendants timely served discovery on December 6, 2025, after the preliminary injunction skirmishes. To evaluate and cross examine Plaintiff's trademark and trade secret claims, PCJV sought the best evidence of Plaintiff's alleged trademark and trade secret rights, and propounded the following RFP and interrogatory:

- No. 1: All documents and communications referring to or evidencing the agreements related to the sale of Potato Corner assets;
- No. 2: All documents and communications relating to the business opportunity of acquiring the Potato Corner assets;
- No. 3: All documents and communications relating to the valuation of

11

the business opportunity of acquiring the Potato Corner assets;

- No. 4:  All documents and communications relating to the negotiations of the sale of the Potato Corner assets;

- No. 5:  All documents and communications relating to the discount, if any, SPAVI requested or received due to any risk of litigation;

- No. 6:  All documents and communications relating to the due diligence conducted in connection with the acquisition of Potato Corner assets;

- No. 7:  All documents and communications relating to any risk assessment of acquiring Potato Corner assets, including any risk of litigation in the United States;

- No. 8 & 19:  All regulatory filings in connection with the acquisition of Potato Corner assets and all documents relating to compliance with any legal or regulatory requirements;

- No. 9:  All meeting minutes, resolutions or other documents and communications reflecting decisions SPAVI's board of directors or any committee made regarding the acquisition of Potato Corner assets, including documents relating to (a) how the business opportunity came to the board or any committee thereof, (b) initial or subsequent asset or business valuations related to the business opportunity, (c) any updates, progress reports, delays or setbacks in or during negotiations to acquire Potato Corner assets, (d) any discounts or offers of value related to any actual, perceived or possible litigation risk connected with any Potato Corner assets, and (e) due diligence requested by or presented to the board or any committed thereof;

- No. 10 & 18:  All external communications with any other party regarding the acquisition of the Potato Corner assets;

- Nos. 11 & 17:  All internal communications regarding the acquisition of the Potato Corner assets;

- No. 12:  All financial documents related to the acquisition of the Potato Corner assets;
- No. 13:  All documents and communications related to the transfer of intellectual property to SPAVI;
- No. 14:  All press releases, public announcements and other public communications regarding the acquisition of the Potato Corner assets;
- No. 15: All internal reports, analyses, and presentations prepared by or for SPAVI regarding the acquisition of the Potato Corner assets;
- No. 16: All legal opinions in connection with the acquisition of the Potato Corner assets, including on regulatory compliance, intellectual property and contractual obligations;
- No. 20:  All audit reports related to the acquisition of the Potato Corner assets;
- No. 21:  All documents and communications related to the U.S. franchisees, including with the U.S. franchisees;
- No. 22:  All documents and communications related to SPAVI's allegation that specific ingredients and proportions of ingredients, as well as recipes for preparation, are (a) deeply guarded trade secrets and (b) SPAVI's property;
- No. 23:  All documents and communications relating to the allegation that Defendants were developing a competing business;
- No. 24:  All documents and communications relating to the allegation that SPAVI provided confidential and proprietary information to Defendants, including the recipes, ingredients, and ingredient allocations for its proprietary flavorings, the identities of its suppliers, and other know-how procedures, and processes used and employed at Potato Corner outlets;

- No. 25:  All documents and communications related to the allegation that as a proximate cause of Defendants' alleged misappropriation of trade secrets SPAVI had suffered millions of dollars in damages;

- No. 26 & 27:  All documents identifying and evidencing SPAVI's alleged trade secrets; and

- Interrogatory No. 1: Identify the alleged trade secrets with reasonable particularity.

*See* Malynn Decl., Ex. 5.

After Plaintiff demanded and received an extension, Plaintiff served a response to Interrogatory No. 1 on January 16, 2025. After a further extension, Plaintiff served responses to PCJV's RFP 1 to 27 on January 21, 2025.

Defendants timely sent meet and confer emails to Plaintiff:

- On January 17, 2025, PCJV sent an email requesting a meeting and objecting to Plaintiff's incomplete and evasive interrogatory response in a "reverse engineering" case where SPAVI does not even own or know the alleged trade secret recipes or ingredient allocations; and

- On January 24, 2025, PCJV sent emails objecting to Plaintiff's failure to respond to PCJV's January 17 email and requesting a meeting on Plaintiff's incomplete and evasive RFP responses, wherein SPAVI simply objected to RFP Nos. 1-2, 4, 9-12, 14-20, 22, 24, 26-27, only promised limited productions in response to RFP Nos. 3, 6-8, 13 and 21, denied having documents responsive to RFP No. 5 as rewritten by SPAVI to narrow the request, and agreed to produce all non-privilege responsive documents in response to only RFP Nos. 23 and 25.

On January 31, 2025, the parties met and conferred on Plaintiff's responses, reached an impasse on Interrogatory No. 1, but had a productive discussion with regard to RFP Nos. 1 to 27, which Defendants documented on February 4, 2024. Among other things, (a) a distinction was made between responsive documents

14

relating and not relating to the United States, (b) Plaintiff agreed to circulate a proposed productive order "this week," which was subsequently approved by Defendants but not filed by Plaintiff; (c) Plaintiff agreed to make an initial production and would inform Defendants "this week" where it drew the line, and (d) Defendants agreed to table their request for all responsive documents until after it reviewed Plaintiff's initial production. Defendants documented the meeting on February 4, 2025. Malynn Decl. ¶¶ 11-12, Ex. 9. Unfortunately, Plaintiff's counsel back-tracked on his promises on February 6, even objecting to producing U.S. related documents within Plaintiff's own initial disclosures. *Id.* ¶¶ 6-7, 13.

On February 13, in a point-by-point response, Defendants inquired whether Plaintiff was standing upon its objections. *Id.,* Ex. 10. On February 14, Plaintiff confirmed the discoverability of documents responsive to RFP Nos. 1 to 27 by making Rule 26 disclosures broadly covering them. Malynn Decl, Ex. 4. After Plaintiff did not respond to the February 13 email or confer further on PCJV's RFP Nos. 1 to 27, PCJV sought and was granted relief—but to no avail.

## III.   SANCTIONS UNDER RULE 37(B) ARE NEEDED AND WARRANTED

Broad sanctions are authorized against a party for failure to obey a court order compelling discovery. Fed. R. Civ. Proc. 37(b)(2); *United States ex rel. Wiltec Guam, Inc. v. Kahaluu Const. Co., Inc.,* 857 F2d 600, 602 (9th Cir. 1988). Even a negligent failure to produce relevant discovery may be punished. *Lew v. Kona Hosp.,* 754 F2d 1420, 1426 (9th Cir. 1985); *Marquis v. Chrysler Corp.,* 577 F.2d 624, 642 (9th Cir.1978). The Court may issue the following orders it finds "just" under the circumstances:

> (i)   directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

15

(ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

(iii) striking pleadings in whole or in part;

(iv) staying further proceedings until the order is obeyed;

(v) dismissing the action or proceeding in whole or in part;

(vi) rendering a default judgment against the disobedient party; or

(vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

Fed. R. Civ. Proc. 37(b)(2)(A).

Striking or dismissing a claim is warranted when disobedience is willful or in bad faith. All that is required to demonstrate "willfulness" or "bad faith" is "disobedient conduct *not shown to be outside the control of the litigant*." *Henry v. Gill Industries, Inc.*, 983 F2d 943, 948 (9th Cir. 1993) (finding delay and failure to appear resulting from "misunderstandings" are not outside party's control) (emphasis added); *Consumer Fin'l Protection Bureau v. Morgan Drexen, Inc.,* 101 F.Supp.3d 856, 868 (CD Cal. 2015) (discussing standard).

Alternatively, the Court may issue an order prohibiting the disobedient party from supporting claims or opposing defenses, or from introducing documents into evidence. Fed. R. Civ. Proc. 37(b)(2)(A)(ii); *Von Brimer v. Whirlpool Corp.*, 536 F.2d 838, 844 (9th Cir. 1976). Such an order is warranted to preclude the belated production of documents. *Dale K. Barker Co., P.C. v. Valley Plaza*, 541 Fed. Appx. 810, 816 (10th Cir. 2013) (affirming sanction prohibiting the use of documents not produced during discovery in support of case-in-chief); *Sentry Ins. A Mut. Co. v. Brand Mgmt., Inc.*, 295 FRD 1, 5 (E.D.N.Y. 2013) (preclusion order).

When documents are suppressed to avoid undermining a party's case-in-chief or to stymy cross-examination, issue sanctions are an appropriate remedy. The court may order the matters at issue or any designated facts "established" for purposes of

16

the action. Fed. R. Civ. Proc. 37(b)(2)(A)(i); *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 US 694, 695 (1982). An adverse inference instruction may issue when the disobedience was merely negligent, rather than intentional. *Residential Funding Corp. v. DeGeorge Fin'l Corp.,* 306 F.3d 99, 107 (2d Cir. 2002); *Flagg v. City of Detroit*, 715 F3d 165, 178 (6th Cir. 2013). Similar, a jury may be informed of the discovery violation. *Network Computing Services Corp. v. Cisco Systems, Inc.,* 223 FRD 392, 399 (D S.C. 2004).

In addition to the orders above, "the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. Proc. 37(b)(2)(C). Rehashing arguments or lack of willfulness/bad faith is not substantial justification. *Hyde & Drath v. Baker,* 24 F3d 1162, 1171 (9th Cir. 1994).

## A.    Plaintiff's Disobedience is Willful

Plaintiff's alleged ownership of the Potato Corner brand arises from a transaction with Cinco that occurred in the middle of litigation Cinco filed against Koren as its joint venture partner when Cinco was enjoined by the state court as Koren's joint venture partner. Among other things, including product specimens, PCJV propounded RFP Nos. 1 to 27 to discover, as phrased by Plaintiff's own Rule 26 disclosures, all "[d]ocuments relating to intellectual property comprising the Potato Corner brand,… including documents showing SPAVI's ownership of the Potato Corner brand…, documents evidencing SPAVI's trade secrets included within the Potato Corner Intellectual Property, protectability of any of the Potato Corner Intellectual Property (including the maintenance of secrecy of any confidential, proprietary, and/or trade secret information),…."

A party that refuses to produce responsive documents falling within its own initial disclosures is intentionally suppressing evidence. It is willful disobedience, *i.e.,* conduct not shown to be outside the control of the litigant, when that party then

17

violates a court order to produce those documents by a date certain (April 11, 2025), including to begin a rolling production weeks earlier (by no later than March 24) of the documents it had already gathered so as to enable the receiving party to comment upon and supplement custodian of records and search terms in advance of a hearing (April 4), so as to ensure complete production of all compelled responsive documents by the date certain (April 11).

In violation of the March 12 Order, Plaintiff did not produce any documents the week of March 24, 2025. Plaintiff did not produce any documents prior to the hearing on April 4, 2025. Plaintiff did not produce any documents by the April 11, 2025 deadline either. Plaintiff still has not produced a list of search terms or record custodians, let alone the ordered means to evaluate the same. Plaintiff thumbed its nose at the Order's directive to file a protective order by March 14 and serve an interrogatory response by March 21. This was purposeful.[7]

Plaintiff did not seek relief from the March 12 Order. Plaintiff simply violated the Order. The reasons Plaintiff told Defendants before the April 4 hearing were control and cost savings. Plaintiff only wanted to conduct one additional document search and wanted to conduct it before Defendants were able to review documents already gathered and then comment on custodian of records and search terms. No explanation was provided for Plaintiff's refusal to produce documents already gathered—other than Plaintiff's refusal to file the already approved protective order as ordered. No explanation was provided for Plaintiff's refusal to use the subject matter of each RFP as search terms. Malynn Decl. ¶ 17, Exs. 11-12.

At the April 4 hearing, Plaintiff's experienced counsel stated for the first time that the gathering and production of documents relating to one transaction— evidence of which Plaintiff has known since it announced the transaction during the

---

[7] Plaintiff was trying to delay and to "create" prejudice so that Defendants would agree to extend the case management order deadlines after Plaintiff rejected doing so for months (indeed, three full months before discovery cut-off).

state court litigation would have to be gathered and produced in the federal action —was somehow more cumbersome than anticipated. This explanation is belied by the fact that, not only has Plaintiff had months if not years to gather these relevant documents, Plaintiff failed to produce *any* documents by March 24, as ordered, by the April 4 hearing, and by April 11 deadline. Malynn Decl. ¶¶ 16, 22.

## B.    Plaintiff's Disobedience is Unduly Prejudicial

Defendants need and cannot delay the trial against SPAVI. As a result of SPAVI's interference with PCJV and Koren's contractual rights with Cinco and Cinco's fiduciary obligations as one of PCJV's joint venture partners when an injunction enforcing the Written Agreements was pending, Defendants have temporarily lost the right to use the Potato Corner brand and Plaintiff is willfully interfering with PCJV's relationships, attempting to co-opt them for itself. Because PCJV is enjoined until trial from using the Potato Corner brand, most of PCJV's franchisees claimed to have left PCJV and joined SPAVI's organization, thus gutting PCJV's revenue and enterprise value. In other words, not only has SPAVI failed to provide discovery to enable PCJV to adequately defend itself, SPAVI has used the status quo *it* created to declare business warfare against PCJV.

Defendants needed the requested and compelled documents, including the documents within Plaintiff's initial disclosures, during discovery not after the cut-off. Defendants should not have to negotiate with a party who has intentionally suppressed evidence in violation of a court order over the documents Plaintiff should have produced without a court order.

It is no remedy to continue the trial against SPAVI. It is no remedy to obtain documents at this point, *i.e.,* after April 11, 2025. That is not due process. That is not how the truth is discovered. Plaintiff filed this case on May 31, 2024; it then obtained a preliminary injunction order without discovery. It has refused to produce documents and has violated a court order for litigation advantage after receiving a preliminary injunction. It should have supported the District Court's rulings by

timely producing the documents falling within its Rule 26 disclosure and by complying with the March 12 Order compelling documents.

The litigation advantage Plaintiff has obtained by suppressing evidence during discovery is not and cannot be remedied by the belated, selective production of documents over which the Court and Defendants should not have to spend resources and concern themselves at this point. Plaintiff knew the consequences of violating a court order by willful disobedience. It is spelled out in Rule 37.

### C.    Sanctions Are Appropriate

As an initial matter, Plaintiff should be held in contempt. Additionally, PCJV seeks the following remedies for the following reasons:

### 1.    Order Striking or Dismissing Plaintiff's Claims for Misappropriation of Trade Secrets

Because Plaintiff has not produced a single document in support of its claims for misappropriation of trade secrets during discovery, an order striking its claims or dismissing them with prejudice is appropriate. Plaintiff has not produced documents in support of its case-in-chief: (1) that it owns any trade secret or confidential recipes or ingredient allocations, let alone provided them to Defendants; (2) that the labeling and contents of flavored seasonings packages "reversed engineered" by Defendants were not publicly sold and available on the open market; (3) that reasonable steps since 2009 have been taken to maintain the alleged secrecy of the labeling and contents of the seasoning packages; and (4) that SPAVI has been damaged as a result of competition mimicking the flavors seasonings. There is no justification for a lesser sanction. Plaintiff has intentionally suppressed evidence falling squarely within its Rule 26 disclosures and has willfully violated a court order requiring the production of this evidence by April 11, 2025.[8]

---

[8] SPAVI's belated interrogatory response does not fare any better. Ignoring the Magistrate Judge's guidance at the March 12 hearing, it fails to reasonably identify the claimed trade secrets and creates even more uncertainty, rather than lessen it.

### 2.    Order Prohibiting Plaintiff from Introducing at Trial Any Documents Not Produced by April 11, 2025

Because Plaintiff has not produced a single document evidencing its acquisition of the Potato Corner trademarks, including Plaintiff's evaluation of the business opportunity and litigation risks, let alone any other due diligence during discovery, an order prohibiting Plaintiff from introducing documents not produced in discovery is necessary and appropriate. Indeed, it is a common remedy to avoid unfair prejudice at trial from the belated, selective production of documents after the close of discovery. *See Dale K. Barker Co., P.C.*, 541 Fed. Appx. at 816 (affirming sanction prohibiting the use of documents not produced during discovery in support of case-in-chief).

### 3.    Order Deeming Matters at Issue and Designated Facts Established

Plaintiff's suppression of evidence and willful violation of a court order was designed to prevent Defendants from overcoming the preliminary injunction at trial through the cross-examination of Plaintiff's case-in-chief. Plaintiff plainly stated at the March 12 hearing that it wanted the assignment of trademark registrations as the only evidence of Plaintiff's acquisition of the trademarks in the middle of litigation when Cinco and SPAVI were enjoined from interfering with PCJV and Koren's use and control of the U.S. trademarks and communicating with U.S. franchises any claim to superior trademark rights. Issue sanctions are warranted because an order prohibiting Plaintiff from introducing into evidence documents it has suppressed does not remedy the suppression and violation of the court order.

Rather, issue sanctions are the appropriate remedy for suppressing evidence in discovery in violation of a court order. Fed. R. Civ. Proc. 37(b)(2)(A)(i); *Insurance Corp. of Ireland, Ltd.,* 456 US at 695. The Court should deem as established the facts embraced by RFP Nos. 1 to 21 set forth in the notice and detailed above. A lesser sanction such as an adverse inference is not warranted

because Plaintiff's suppression of evidence was intentional, not negligent. *Cf. Residential Funding Corp.,* 306 F.3d at 107; *Flagg*, 715 F3d at 178.

### 4.    Order Awarding Attorneys' Fees Against Plaintiff and its Counsel

Rule 37(b)(2)(C) requires an award of reasonable attorney's fees caused by the violation of a court order, where, as here, there is no substantial justification or other circumstance making just the suppression of evidence falling within Rule 26 disclosures in violation of a court order. Plaintiff and its counsel cannot justify the suppression of evidence by its refusal to file an approved protective order. Plaintiff and its counsel cannot justify their violation of a court order by rehashing arguments or claiming a lack of willfulness or bad faith. *Hyde & Drath,* 24 F3d at 1171.

Put simply, Plaintiff's and its counsel's refusal to produce documents during discovery in violation of a court order lacks justification. Accordingly, Defendant are entitled and requests reasonable attorney's fees in the amount of no less than $85,370 as supported in the Malynn Decl. (at ¶ 23) for Plaintiff's failure to comply with the March 12, 2024 Order.

### 5.    For Such Further Appropriate Relief, Including a Finding of Contempt

In addition to the foregoing, PCJV requests such other reasonable or appropriate relief the Court deems necessary, such as a finding of contempt for Plaintiff's willful violation of the March 12 Order. Defendants should have an even playing field at trial.

## IV.  CONCLUSION

For the foregoing reasons, the motion should be granted.

DATED:  April 14, 2025          **BLANK ROME LLP**


By:/s/ *Arash Beral*
_____
         Arash Beral
         Todd Malynn
    Attorneys for Defendants, Counterclaimants,
    and Third Party Plaintiffs PCJV USA, LLC,
    PCI TRADING LLC, POTATO CORNER,
    LA GROUP, LLC, GK CAPITAL GROUP,
    LLC, NKM CAPITAL GROUP, LLC and
    GUY KOREN, and Defendants J & K
    AMERICANA, LLC, J&K LAKEWOOD,
    LLC, J&K OAKRIDGE, LLC, J&K
    VALLEY FAIR, LLC, J & K ONTARIO,
    LLC, J&K PC TRUCKS, LLC, HLK
    MILPITAS, LLC, and GK CERRITOS, LLC

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned counsel of record for Defendants certifies that this brief contains 6,558 words, which complies with the word limit of Local Rule 11-6.1.

DATED:  April 14, 2025

                                        */s/ Arash Beral*
                                        Arash Beral