1  MICHAEL D. MURPHY
   mdmurphy@foxrothschild.com
2  FOX ROTHSCHILD LLP
   Constellation Place
3  10250 Constellation Boulevard, Suite 900
   Los Angeles, California 90067
4  Telephone:  310.598.4150
   Facsimile:   310.556.9828
5
   Attorneys for Plaintiff and Counterclaim
6  Defendant SHAKEY'S PIZZA ASIA
   VENTURES, INC. and Third-Party Defendants
7  CINCO CORPORATION, PC
   INTERNATIONAL PTE LTD., and SPAVI
8  INTERNATIONAL USA, INC.

9              UNITED STATES DISTRICT COURT

10             CENTRAL DISTRICT OF CALIFORNIA

11

12  SHAKEY'S PIZZA ASIA VENTURES,        Case No. 2:24-CV-04546-SB(AGRx)
    INC, a Philippines corporation,
13                                        *The Hon. Stanley Blumenfeld, Jr.*
                 Plaintiff,
14                                        **PLAINTIFF SHAKEY'S PIZZA
         v.                               ASIAN VENTURES, INC.'S
15                                        OPPOSITION TO DEFENDANT
    PCJV USA, LLC, a Delaware limited     PCJV USA, LLC'S MOTION FOR
16  liability company; PCI TRADING,       1. SANCTIONS AGAINST
    LLC, a Delaware limited liability     PLAINTIFF SHAKEY'S PIZZA
17  company; GUY KOREN, an individual;    ASIA VENTURES, INC. UNDER
    POTATO CORNER LA GROUP, LLC,          FRCP RULE 37(B)(2)(A) AND 2.
18  a California limited liability company; PAYMENT OF EXPENSES
    NKM CAPITAL GROUP, LLC, a             AGAINST PLAINTIFF AND ITS
19  California limited liability company;  COUNSEL OF RECORD UNDER
    J & K AMERICANA, LLC, a California    FRCP RULE 37(B)(2)(C) FOR
20  limited liability company; J&K        FAILURE TO COMPLY WITH
    LAKEWOOD, LLC, a California           THE MAGISTRATE JUDGE'S
21  limited liability company; J&K        COURT ORDER DATED MARCH
    VALLEY FAIR, LLC, a California        12, 2025 (DKT. NO. 128)**
22  limited liability company; J & K
    ONTARIO, LLC, a California limited
23  liability company; HLK MILPITAS,      Date:  May 22, 2025
    LLC, a California, limited liability   Time: 1:30 p.m.
24  company; GK CERRITOS, LLC, a
    California, limited liability company;
25  J&K PC TRUCKS, LLC, a California
    limited liability company; and, GK    Complaint Filed:    May 31, 2024
26  CAPITAL GROUP, LLC, a                 Trial Date:         August 4, 2025
    California limited liability company and DOES 1
27  through 100, inclusive,

28             Defendants.

                                   1

PCJV USA, LLC, a Delaware limited liability company; PCI TRADING LLC, a Delaware limited liability company; POTATO CORNER LA GROUP LLC, a California limited liability company; GK CAPITAL GROUP, LLC, a California limited liability company; NKM CAPITAL GROUP LLC, a California limited liability company; and GUY KOREN, an individual,

                    Counter-Claimants,

        v.

SHAKEY'S PIZZA ASIA VENTURES, INC, a Philippines corporation,

                    Counter Defendant.

PCJV USA, LLC, a Delaware limited liability company; PCI TRADING LLC, a Delaware limited liability company; POTATO CORNER LA GROUP LLC, a California limited liability company; GK CAPITAL GROUP, LLC, a California limited liability company; NKM CAPITAL GROUP LLC, a California limited liability company; and GUY KOREN, an individual,

                    Third Party Plaintiffs,

        v.

PC INTERNATIONAL PTE LTD., a Singapore business entity; SPAVI INTERNATIONAL USA, INC., a California corporation; CINCO CORPORATION, a Philippines corporation; and DOES 1 through 10, inclusive,

                    Third Party Defendants.

# **Tabel of Contents**

Page

I.    INTRODUCTION ............................................................... 7

II.   RELEVANT FACTS AND PROCEDURAL HISTORY ................................. 9

A.   Relevant Underlying Facts Supported by Evidence in the Record. ............... 10

B.   Defendant's Litigation Strategy to Bury Plaintiff in an Avalanche of Paper
     Arguing Frivolous Theories Based on Unprovable Facts. ............................ 11

C.   Defendants Repeatedly Request A New CMO and Trial Date, to Which
     Plaintiff Agreed, and the Court Indicated it Would Support. ...................... 13

D.   The March 12 Hearing Wherein Under Great Pressure Counsel Had to Make
     Decisions Without Clients Available and Under False Pretenses Created by
     Defendants' Counsel. ...................................................... 15

  1.   The Magistrate Invited Plaintiff's Concessions While Disagreeing with the
       Scope of Defendants' Requests and Justifications. ..................................... 15

  2.   Counsel for Plaintiff Agreed to Review and Produce Documents With a
       Wildy Short Time, Based on Facts and Assumptions that He and the
       Magistrate Reasonably Believed to be True, and were Not; Most of Which
       was Knowingly Induced by Defendants' Counsel. ...................................... 17

E.   Defendants' Motion Conceals Their Own Conduct Interfering with
     Compliance, Including the *Day After* Issuance of the Order, ...................... 19

F.   In Less than Two Weeks – by March 24, 2025 – Defendants had Repudiated
     a need for a New CMO, Refused to Meet and Confer, and Rejected Plaintiff's
     Request for More Time to Comply ................................................. 19

G.   Defendants' Motion Simply Lies About What they Received, Confirming
     they Do not Want any of this Information at Issue, they Just Want
     Sanctions. ...................................................................... 20

H.   Defendants Failed to Meet and Confer Prior to Filing this Motion. .......... 21

III.  PLAINTIFFS' MOTION SHOULD BE DENIED IN FULL. .......................... 21

A.   THE FULL, COMPLETE, AND ACCURATE LEGAL STANDARD ........ 21

B.   The Various Procedural Flaws Require that this Motion be Denied. ............ 22

C.   The Motion Should be Denied because the Full Proof Shows that Plaintiffs' Alleged Violations Did Not Constitute Willful Disobedience, but Instead, it was *Defendants* that Misrepresented, and Knowingly Violated the Order....23

D.   The Motion Should be Denied because Defendants Fail to Provide any Actual Proof of Prejudice, when, in Fact, it was Their Conduct that Prejudiced Plaintiffs. ...........................................................................24

E.   The Specific Sanctions Sought are So Unrelated to Any Order or Effect of Non-Compliance with Any Order that they Would Violate Due Process Even if the Other Elements Were Satisfied. ............................................25

   1.   This Court Should Not Strike or Dismiss Plaintiff's Claims for Misappropriation of Trade Secrets. ..............................................25

   2.   An Order Prohibiting Plaintiff from Introducing at Trial Any Documents Not Produced by April 11, 2025 is Unwarranted. .....................................26

   3.   An Order Deeming Matters at Issue and Designated Facts Established is Unwarranted. .......................................................................26

F. An Order Awarding Attorney's Fees Against Plaintiff and its Counsel is Unwarranted. ........................................................................26

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Coleman v. American Red Cross*
   (6th Cir. 1994) 23 F3d 1091 ....................................................................... 26

*Fair Housing of Marin v. Combs*,
   285 F.3d 899 (9th Cir.), 154 L.Ed.2d 425 (2002) ............................... 23

*Harmon v. CSX Transportation, Inc.*
   (6th Cir. 1997) 110 F3d 364 ..................................................................... 26

*Henry v. Gill Industries, Inc.*,
   983 F2d 943 (9th Cir. 1993) ....................................................................... 24

*Marchand v. Mercy Medical Center*
   22 F.3d 933 (9th Cir.1994) ......................................................................... 23

*Markham v. Colonial Mortg. Service Co., Associates, Inc.*,
   605 F.2d 566 (C.A.D.C., 1979) ............................................................... 23

*Odigwe v. National Mentor Healthcare, LLC*,
   616 Fed. Appx. 262 (9th Cir. 2015) ..................................................... 28

*Toth v. Trans World Airlines, Inc.*,
   862 F.2d 1381 ................................................................................................... 28

*Unigard Security Ins. Co. v. Lakewood Engineering & Mfg. Corp.*
   (9th Cir. 1992) 982 F2d 363 ..................................................................... 23

**Other Authorities**

Fed. R. Civ. P. 37(c)(1).................................................................................... 25

Fed. R. Civ. P.Rule 37 ...................................................................................... 23

Fed. R. Civ. P.  37(b)(2)(A) and 37(b)(2)(C) ......................................... 23

Fed. R. Civ. P. 37(B)(2)(A) .............................................................................. 8

Fed. R. Civ. P. Rule 37(B)(2)(C).................................................................... 8

Fed. R. Civ. P. Rule 26 .................................................................................... 28

Fed. R. Civ. P. Rule 26(e) .................................................................................... 25

Fed. R. Civ. P. Rule 37 ....................................................................... 9, 10, 19, 28

Fed. R. Civ. P. Rule 37(a) .............................................................................. 23, 24

Fed. R. Civ. P. Rule 37(b) ..................................................................................... 24

Fed. R. Civ. P. Rule 37(b)(2)(A) .......................................................................... 23

Fed. R. Civ. P. Rule 37(b)(2)(C) ........................................................... 23, 27, 28

7 James W.M. Moore, *et al., Moore's Federal Practice* § 37.63 (3d ed.
   2009) ................................................................................................................ 25

8B Charles Alan Wright, Arthur R. Miller & Richard L. Marcus,
   Federal Practice and Procedure § 2289 (3d ed. 2010) ...................................... 28

L.R. 11-6.1 .............................................................................................................. 30

SHAKEY'S PIZZA'S OPPOSITION TO PCJV'S RULE                    CASE NO. 2:24-CV-04546-SB(AGRX)
37 MOTION FOR SANCTIONS
171897628.2

1    Plaintiff Shakey's Pizza Asia Ventures, Inc. ("Plaintiff" or "SPAVI"),

2   through its attorneys, oppose Defendant PCJV USA, LLC's (the "Defendant")

3   Motion For (1) Sanctions against Plaintiff Shakey's Pizza Asia Ventures, Inc. under

4   FRCP Rule 37(B)(2)(A); and (2) Payment of Expenses against Plaintiff and its

5   Counsel of Record under FRCP Rule 37(B)(2)(C) for Failure to Comply with The

6   Magistrate Judge's Court Order Dated March 12, 2025 (Dkt. No. 128) (the

7   "Motion"), as follows: [1]

8   **I.    <u>INTRODUCTION</u>**

9    The Court should deny Defendants' Motion for what it is—an ill-disguised

10   attempt to weaponize a discovery order entered into **voluntarily** by SPAVI, after an

11   discovery conference with the Magistrate on March 12, 2025 (the "Order" at Dkt.

12   128). Notwithstanding that most of the discovery at issue sought information that is

13   irrelevant to any fact to be tried in this case, and all of it was wildly overbroad and

14   lacking in any proportionality – such that SPAVI was confident of its objections –

15   for the purpose of cooperation and removing distractions of unnecessary discovery

16   briefing (!), SPAVI agreed to produce documents pursuant to a protocol and

17   limitations agreed to by all parties.

18    SPAVI's counsel entered into this agreement – and voluntary order – after a

19   discussion on the record addressing the complication of the fact that the agreements

20   on document production would have to be completed into a short period of time

21   given the current discovery cutoff date – a conversation in which Mr. Murphy was

22   express about his not having all the information needed to predict timing (and,

23

24   ---
[1] Initially it was contemplated that this Opposition would be filed concurrently with
a Cross-Motion for Reconsideration as to the Discovery Order at issue and, as such,
April 25, 2025 was the date on which that Cross-Motion and this Opposition was to
be filed. Given the serious defects of the Motion responded to herein, that must be
resolved before the Order itself may be reconsidered, Plaintiffs are not filing a
motion to reconsider. Plaintiff's counsel asked Defendants' counsel to alter this
briefing schedule so that it reverts to the typical Opposition deadline of 14 days
prior, however, Defendants counsel was unwilling to agree to that stipulation while
not explaining his basis for doing so. (Murphy Decl., filed concurrently herewith at
¶¶ 68-70; Exh. 17.) As such, Plaintiff asks leave of his Court to consider a filing
late as per Dkt 144 but timely under standard motion practice

25

26

27

28

7

indeed, the search terms had not yet been set). (Declaration of Michael Murphy in

Opposition to Rule 37 Motion ("Murphy Decl.,") ¶ 30; Exh. 16 (Transcript of

March 12, 2025 Discovery Conference at 95:9-101:3).)

The following statement was made on the record that was neither repudiated

nor denied by Defendants' counsel:

> MR. MALYNN: Yeah. Our problem is that the
>
> crossclaims, third-party claims have now brought in
>
> additional parties, and the trade secret claim is somewhat
>
> new. **And so there was always kind of an**
>
> **understanding, we're going to have get a new**
>
> **scheduling order**. So -- and I actually have an e-mail
>
> ready to send to them about our proposal, but I don't
>
> think we can really tie it to that because we all know it's
>
> going to be changed.

(Exh. 16 at 97:7-14.) This statement (in addition to the prior, repeated, requests by

Defendants to revise the CMO) to which there was no distancing by Defendants'

counsel, caused SPAVI's counsel to believe that it could enter into the voluntary

order because if the document production turned out to be more voluminous, the

stipulation to a new CMO plus the requirements for meeting and conferring built in,

gave Plaintiff enough pressure release valves to agree.

Once the March 12, 2025 Order was entered, Defendants set out on a course

designed to ensure Plaintiff's inability to comply, a strategy that included: burying

Plaintiff in briefs and other paper while refusing extensions; refusing to meet and

confer as to search terms, refusing to agree on extensions to compliance deadlines

(while not actually asking the reason), ignoring proposals that would circumvent

the first 20 Requests at issue, and, of course, the rapid 180-degree turnaround on the

scheduling order. Their sudden, and stunning, reversal on the scheduling order was

expressly (indeed, Defendants' counsel admitted this) to capitalize on the strategic

8

value of having induced Plaintiff into believing they would agree, and they are
changing course at the moment they knew Plaintiff's reliance would have caused it
prejudice.

As set forth herein, these are not the circumstances by which sanctions are to
be ordered under Rule 37. Putting aside that Plaintiff can find no case in which a
voluntary stipulation pursuant to a discovery conference before a Magistrate (when
no motion to compel has ever been filed), results in sanctions of any kind, had
Plaintiff known that Defendants would change their position as to the CMO, and
would refuse to meet and confer, or cooperate and allow for reasonable extensions
– all designed to set Plaintiff up to fail – Plaintiff would have refused, and simply
demanded that Defendant pursue discovery motions justifying the absurd discovery.

As shown herein, Defendants do not actually want the discovery at issue.
They have been offered proposals that would give them more than what was agreed
to and declined to respond. They refused to provide input on the search terms they
previously claimed were so important. They refused to consider the need for extra
time. This has all been a charade, designed to trap Plaintiff into a voluntary
discovery order and, who, the record clearly shows, has been desirous of producing
documents, so long as SPAVI's rights are protected. Indeed, Defendants have not
produced a single document, other than an expert report and his supporting papers
(pursuant to the Magistrate's April 4, 2025 ruling).

## II.     RELEVANT FACTS AND PROCEDURAL HISTORY

SPAVI is a restaurant chain and food service company that is the sole owner
of the "Potato Corner" brand, an international fast food outlet chain that proudly
sells a variety of flavored fries and other menu items. At issue in this case is
Defendant PCJV USA, LLC's ("PCJV") loss of rights to use the brand, on May 31,
2024, after a decade and a half of being the sole licensee in the United States, and
opening nearly 40 stores, without paying a single thin cent for the rights to the
brand. PCJV ignored the termination of its license, and continued using the Potato

9

Corner brand, causing this lawsuit to be filed against PCJV and its principal (Defendant Guy Koren) who owns and controls the remaining Defendants who operate Potato Corners under sublicenses with PCJV (that also terminated).

PCJV desperately wants to prove that its rights to use the brand continued after May 31, 2024 (even though there was no written license agreement). Those efforts have failed spectacularly, as PCJV and Koren have since been enjoined from using the Potato Corner brand, and their knowing refusal to comply with that order has resulted in one contempt ruling. (Dkt. Nos. 56, 155.)

Nevertheless, PCJV is keen on lobbing the same alleged facts and legally untenable arguments rejected during the injunction, particularly in contexts like this, in which it is not bound by the obligation to substantiate a fact with competent evidence or support its legal arguments with good law.

**A.**     **Relevant Underlying Facts Supported by Evidence in the Record.**

"Potato Corner" was previously owned by Cinco, and as one of its founders, Jose P. Magsaysay, Jr. testifies, it began with one potato corner cart in 1992 and soon became a worldwide phenomenon. (Dkt. 44-3 (Magsaysay Decl., ¶ 2-12.)

In December 2021, SPAVI entered into a transaction to acquire the Potato Corner Intellectual Property ("PCIP") from the founders, including the international registrations for the Potato Corner Standard Characters Mark, the Potato Corner Logo Mark, one tag line mark, and all of the rights thereto, from Cinco. (Dkt. 44-10 through 44-15). That transaction closed during the first half of 2022. [x]

The dates of first use arise from Cinco's first use, and despite having said, repeatedly, they used the marks first, this is untrue. Defendants have no proof that they used the marks first, except in the context of the absurd argument that they, as licensees of SPAVI used the marks in the United States first (on behalf of Cinco, the licensor). This apparent claim, adverse possession by a licensor, is ludicrous and, if it were the law, would collapse the entire trademark licensing regime by making licensors and licensee adverse competitors.

SPAVI spent more than two years from the announcement of its acquisition of the Potato Corner Intellectual Property attempting to enter into a written license agreement with PCJV and PCIT. (Dkt 44-5 (Leong-Tan Decl. ¶ 33-66; and Dkt 44-6 (Alvero Decl. at ¶¶ 10-19). Despite SPAVI's good faith negotiations, Koren abandoned the negotiations and was unwilling to enter a commercially viable license agreement, refusing to produce financials for his stores. (Dkt 44-5, Leong-Tan Decl. ¶ 52-66.) For these reasons, on May 31, 2024, SPAVI terminated the at-will license currently enjoyed by PCJV, PCIT, and the Koren Affiliates that operate Potato Corner franchisees of PCJV.

On May 31, 2024, Plaintiff filed its Complaint against Defendants (Dkt. 1), hours after Plaintiffs terminated the at will license of Defendant PCJV (licensee), and its owner (Koren), the supply chain affiliate (PCIT), and sublicensees (the remaining Defendants) refused to cease using the Trademarks. In fact, none of the Defendants, let alone Koren, reached to communicate with SPAVI after receipt of the letter, not even to ask to discuss the document – they pretended it never happened. (Dkt. 38-1 (Gregorio Decl., 73.)

    **B.**     **<u>Defendant's Litigation Strategy to Bury Plaintiff in an Avalanche of Paper Arguing Frivolous Theories Based on Unprovable Facts.</u>**

For SPAVI, protection of its brand is key and a primary purpose of this litigation. (Murphy Decl., ¶¶ 3-7) Moreover, SPAVI must have the market cleared of the damage caused to the brand by Defendants, who, at the end of the day, are nothing holdover licensees who refuse to give up the rights they lost to someone else's brand.

On September 6, 2024, this Court expressed caution to all parties that if any party, including Defendants, wanted to seek injunctive relief, that party needed to try to obtain actual proof of irreparable harm, because the Court was disinclined to presume such harm so long as a scintilla of proof rebutting it is raised. (Murphy Decl., ¶¶ 8-9) The Plaintiff set out to catalog and prove its actual irreparable harm

11

from, Defendants wanton use of a brand to which they have no rights (including loss of control over brand standards leading to use of expired flavoring, failure to protect bran from other infringers, etc.). (Id at ¶¶ 8-9; *see also* Dkt 44 (describing same).

Meanwhile, on September 19, 2024, Defendants gave notice for a truly absurd Ex Parte Application seeking a mandatory injunction requiring Plaintiffs to ship their proprietary flavorings to Defendants. (Dkt. 37.) Opposing this Motion cost Plaintiffs tens of thousands of dollars alone, and the facts and law on which it was based utterly  lacking in probable cause, and promptly denied (Murphy Decl., ¶ 10; Dkt. 37-39.)

Plaintiff's successful injunction motion soon followed, which was, and remains the first time any party has put actual, competent, and conclusive evidence establishing using each element of the trademark claims and as was discovered during the search for new evidence, proof that Defendants were now taking flavoring packages for which they have no rights, and reverse engineering them. (Dkt. 44 -44-45.) The Opposition provided no evidence or law to oppose the Motion, offering outlandish theories based on manufactured legal theories and unsupportable facts. (Dkt. 48-48-10). The Injunction was granted (Dkt.56) even after Defendants were given the chance to identify this mysterious order, they claim to effect claim and issue preclusion of this whole case, and failed (Dkt, 52, 53, 56.)[2]

Having now revealed that their factual assertions have no evidentiary support, and that their legal theories are manifestly frivolous, unequivocally unwarranted (indeed *contradicted* by the very law they cite, the strategy of Defendants was now revealed: bury Plaintiff in so many motions, ex parte applications, causes of action, and briefs containing outrageous distortions of law

---

[2] Defendants, they continue to wave a preliminary injunction ruling from the prior case with Cinco, claiming issue or claim preclusion, unconcerned with the various reasons why the Cour shot that down (i.e. That Order dos not say what the claim, preliminary injunctions have no preclusive effect, etc.)

and fact, so that Plaintiff does not have the time or bandwidth to participate in discovery, or fully protect the marks, given that fighting a contemptuous knock off brand requires a full time army of lawyers.

Between September 20, 2024 and January 31, 2025, Plaintiffs were forced to oppose ten Motions, Requests for Orders, or Requests for Emergency Orders (including two in the Ninth Circuit and one in front of SCOTUS. (Murphy Decl., ¶¶ 121-14; Dkt Nos. 41, 46, 58-61, 63-64, 71, 72-72, 75-78, 80, 85, 88-89, 92, 94, 95.) Half of these had to be briefed over Thanksgiving weekend, and the Christmas holiday (professional courtesies soundly denied by Defendant's counsel). (*Id.*)

Plaintiff, however, had multiple orders reaffirming the likelihood of success in this action on the trademark claims, and an injunction. However, the injunction was being so brazenly disregarded, an OSC re contempt was necessary. And that lengthy process ensued from December 26, 2024 through April 15, 2025 (Dkt. 155.)

Defendants' brazen strategy of burying the owner of the IP they are stealing with frivolous motions, disregarding Court orders in a contemptuous way, using frivolous theories and allegations of fact that are lacking in any probable cause in filing, after filing, has forced Plaintiffs to incur multiple 6-figures in attorneys' fees just to attempt to obtain injunction orders and coerce compliance – which Defendants still refuse. (Murphy Decl., ¶¶ 14-15.)

C.    <u>**Defendants Repeatedly Request A New CMO and Trial Date, to Which Plaintiff Agreed, and the Court Indicated it Would Support.**</u>

The moment Plaintiffs filed their Amended Complaint, alleging a new claim of trade secret misappropriation (based entirely on the admissions of Defendants themselves, Dkt.65, ¶¶ 88-92, and 170-176.) Plaintiffs moved ex parte to have the claim stricken. (Dkt. 72.) The Court, in denying the Application, stated a footnote 2 (Dkt. 80, p.2), that a new Case Management Order would be considered if the new

claim affected deadline compliance. Within a day or so after that Order came
Defendants' first request to obtain a new trial schedule. (Murphy Decl., ¶¶ 16-17.)
At first Plaintiff was not sure, however, given the inability to focus on discovery
because of continued contempt. (Murphy Decl., ¶ 16-17.)

Defendants subsequently requested agreement on a new CMO both verbally,
as well as at least three or four in writing. (Murphy Decl., ¶¶ 16-22;  Exhs. 1, 3.)
Defendants sought reassurance (at the worst possible time, during the LA fires), and
then asked for a more specific continuance of "90 days"). (Murphy Decl., ¶¶ 18-
20.)

On February 21, 2025, SPAVI's counsel switched law firms, such that it was
hard to get anything done other than, of course, finding more acts of contempt
which was presented at the February 28, 2025 hearing. (Murphy Decl., ¶¶ 21-23;
Dkt. 115-117.)

At a Court ordered meet and confer at the offices of Mr. Murphy's new firm
on March 5, 2024, the need for a new Case Management Order was raised, but now,
Defendants' counsel insisted that it was Plaintiff that was obligated to propose a
new order. (Murphy Decl., ¶ 22.) Given the ongoing contempt briefing, and this
discovery proceeding, it could not be done that week. (*Id*.)

Various contemporaneous acts of Defendants confirmed their continuing
agreement to a new CMO such as (1) the naming of three new Third Party
Defendants (Cinco, PC international PTE, Ltd., and SPAVI International USA, Inc.
none of whom have had the right to any discovery or dispositive motions
(obviously Defendants knew a new trial date was required; and (2) Defendants
served their initial disclosures on February 28 2025, less than thirty days before the
close of discovery. (Murphy Decl., ¶¶ 25-29; Exh.5 (Defendants' Initial Disclosures
served less than 30 days before the close of discovery).)

To date, other than an expert report, and court ordered expert document,
Defendants have not produced any documents whatsoever. (Murphy Decl., ¶ 29.)

1  Defendant refused to respond to any of Plaintiffs' requests for production (Exhibit 4
2  hereto) and have not produced a single responsive document. (*Id*.)

3     **D.    The March 12 Hearing Wherein Under Great Pressure Counsel**
4            **Had to Make Decisions Without Clients Available and Under False**
5            **Pretenses Created by Defendants' Counsel.**

6          On March 12, 2025, this Court conducted the Discovery Conference at issue,
7  in which Defendants demanded full compliance with all twenty-eight of its
8  Requests for Production, and a new response to Interrogatory No. 1. The Magistrate
9  never ordered this, and yet, this is the Order Defendants think they were entitled to
10 compliance with. Indeed, the Motion doesn't reference the Order at all, instead, it
11 suggests compliance with all 27 Requests for Production that was ordered.
12 Defendants should first be forced to prove the propriety of each such Request, and,
13 at a minimum, with respect to each specific aspect of Order, explain as to how they
14 have been prejudiced by that specific alleged noncompliance.

15     **1.    The Magistrate Invited Plaintiff's Concessions While**
16            **Disagreeing with the Scope of Defendants' Requests and**
17            **Justifications.**

18         Defendants spent much of the hearing complaining as they do in their Motion
19 (falsely) that SPAVI has produced "no evidence" of its ownership of the PCIP. To
20 the contrary, **SPAVI produced documents establishing *conclusively* that it owns**
21 **the marks**. Specifically, SPAVI has produced: (1) testimony from Cinco's founder
22 and CEO during 2021 and 2022 (Mr. Magsaysay) that it sold to SPAVI the PCIP
23 that Defendants are using (Dkt 44-3 (Magsaysay Decl., ¶¶ 2, 13-16, 61)); (2)
24 testimony from SPAVI's General Counsel (Ms. Ybanez) and CEO (Mr. Gregorio)
25 that SPAVI acquired from Cinco the PCIP that Defendants are using (Dkt 44-2
26 (Ybanez Decl., ¶¶ 2-6); Gregorio Decl., ¶¶ 10-13); (3) *notarized* deeds submitted to,
27 accepted by, and posted on the website of the United States Patent and Trademark
28 Office ("USPTO"). Those deeds – sworn declarations of ownership by a seller and

a buyer – describe expressly what was transferred, and each states, expressly, the Potato Corner Defendants are using was owned by Cinco and is now owned by Shakey's Pizza Asia Ventures, Inc. – a fact further confirmed by looking at the registrations SPAVI has also produced, and that were authenticated by Ms. Ybanez. (Dkt. 44-10-16); Ybanez Decl., ¶¶ 2-6.) **This is conclusive proof of ownership.**

Defendants peddled the preposterous and logically impossible theory (perpetuated in their Injunction Opposition and now their frivolous counter and third-party claims (Dkt. 45, 108)) that –Cinco's sale actually excluded the "US Registrations" because Cinco and SPAVI both secretly knew that Koren had either ownership of or permanently license rights to the "US registrations." Of course, US Registrations with international registration numbers do not carve out individual jurisdictions as fiefdoms; indeed, that is what the Madrid Protocol (imposing an international trademark regime) was designed to avoid.[3]

The primary focus of the hearing was Defendants' RFP Nos.1-20, seeking every aspect of the transaction between Cino and SPAVI, wherein the Potato Cortner IP was sold. There is no relevance to the documents as there is no dispute that SPAVI owns, the Potato Corner IP. Moreover, the requests were drafted in an objectionable way, and, most importantly, Defendants are competitors of Plaintiff, and were demanding to see sensitive business financial, marketing, operational data of a sensitive nature that no competitor should see. (Murphy Decl.,¶¶ 30-36.)

A reflected in Exhibit 16, unimpressed, and unwilling to insist that the

---

[33] Defendants' fn. 1 is nonsense and designed to mislead as support for its defense of this case. Shakey's is a brand whose US trademark registrations are the same as its international registration number(Exhs 6and 7 hereto), which are owned by Shakey's USA, Inc. SPAVI does indeed have the right to use the marks internationally, but only because Shakey's USA, Inc. ***licensed*** to SPAVI the rights to use the marks in those territories.  In this case, Plaintiff owns the international registration numbers for Potato Corner, giving it the right to use the marks anywhere in the world. Had PCJV negotiated the right to use the marks in the US, it would have the right to do so in this territory. But the suggestion that there is a "US Registration" or "US rights" conferred by the USPTO is false and a misstatement of trademark law. Territorial rights are a function of agreements between licensee and licensor.

1    entirety of the transaction related requests be complied with, the Magistrate

2    nevertheless urged Plaintiff to consider allowing access to transaction documents

3    that refer to the US operations, PCJV, the prior litigation, or sale of the intellectual

4    property, generally. (Murphy Decl., ¶¶ 39-40.) The parties agreed to focus the

5    transactional documents on anything referring to US Operations, or that refer

6    specifically to the sale of trademarks and IP and that search terms revealing the

7    same would have to be negotiated between the parties. (Murphy Decl.,¶40.)

8        With respect to the remaining requests related to trade secret theft, the

9    Magistrate asked Plaintiff to agree to produce evidence of the trade secret after

10   revising Interrog. 1 (essentially the same as a Trade Secret Disclosure under the

11   CUTSA), re-starting what its trade secrets are that are alleged to have been stolen –

12   such that all that remained would be agreement between the parties as to the search

13   terms to be applied. (Murphy Decl., ¶ 41.) Other categories were simply not

14   controversial in substance – the procedure was the issue.

15        **2.**    **<u>Counsel for Plaintiff Agreed to Review and Produce</u>**

16            **<u>Documents With a Wildy Short Time, Based on Facts and</u>**

17            **<u>Assumptions that He and the Magistrate Reasonably</u>**

18            **<u>Believed to be True, and were Not; Most of Which was</u>**

19            **<u>Knowingly Induced by Defendants' Counsel.</u>**

20        Plaintiffs' counsel believes it approached the March 12 hearing in good faith,

21   wanting to avoid motion, and to produce as much as possible. Nevertheless,

22   Defendants are now competitors of Plaintiff – having purportedly replaced Potato

23   Corner with "Undercover Fries," although the marketing has effectively attached

24   itself to Potato Corer in a manner that reveals  continued desire to use the Potato

25   Corner branding in violation of Court orders. (Murphy Dec., ¶ 34; Exhs. 14-15.)

26        The bigger issues, however, resulted from the fact that he search terms

27   actually employed yielded 40,000+ documents, echo e of which had to be looked at

28   by a lawyer or privilege ad privacy, and, as to the trade secret documents a huge

17

flaw in the production was revealed (Murphy Dec., ¶ 43.). Specifically, Defendants

have admitted to reverse engineering but have never disclosed which flavors they

reverse engineered. As such it is impossible to produce the specific packages that

were reverse engineered because Defendants have concealed this information.

SPAVI's counsel entered into this agreement – and voluntary order – after a

discussion on the record addressing the complication of the fact that the agreements

on document production would have to be completed into a short period of time

given the current discovery cutoff date – a conversation in which Mr. Murphy was

express about his not having all the information needed to predict timing (and,

indeed, the search terms had not yet been set). (Exh. 16 (Transcript of March 12,

2025 Discovery Conference at 95:9-101:3).)

The biggest problem confront compliance was that, when it was discovered

thew short deadline to complete this task, the following statement was made on the

record that was neither repudiated nor denied by Defendants' counsel:

> MR. MALYNN: Yeah. Our problem is that the
>
> crossclaims, third-party claims have now brought in
>
> additional parties, and the trade secret claim is somewhat
>
> new. **And so there was always kind of an**
>
> **understanding, we're going to have get a new**
>
> **scheduling order**. So -- and I actually have an e-mail
>
> ready to send to them about our proposal, but I don't
>
> think we can really tie it to that because we all know it's
>
> going to be changed.

(Exh 16 at 97:7-14.) This statement (in addition to the prior, repeated, requests by

Defendants to revise the CMO) to which there was no distancing by Defendants'

counsel, caused SPAVI's counsel to believe that it could enter into the voluntary

order because if the document production turned out to be more voluminous, the

stipulation to a new CMO plus the requirements for meeting and conferring built in,

18

gave Plaintiff enough pressure release valves to agree. (Murphy Decl., ¶¶ 44-48.)

**E.** **Defendants' Motion Conceals Their Own Conduct Interfering with Compliance, Including the _Day After_ Issuance of the Order,**

The day after the Order was issued, Plaintiffs' counsel remembered that there were a variety of onerous discovery Requests due that day (Interrogatories and Requests for Production). (Murphy Decl. ¶¶ 49-57; Exh. 8.) As such, he asked for an extension, and Defendants **_refused_**, and persisted with the refusal even after he disclosed, he would have to stay up all night so as to ensure that the person verifying would be able to review (being in Manila). (Exh. 8.)

In the face of this egregious lack of professionalism, Mr. Murphy did indeed stay up all night answering the discovery and writing with a verifying party in Manila to complete them. (Murphy Decl., ¶ 53-56.) Given his exhaustion and having now ignored other clients for two full business days, he was unable to begin the work necessary in Special Interrogatory No. 1 by the deadline of early the following week.

Significantly that same day, and in that same email, **March 13, 2025, Plaintiffs' counsel asked to meet and confer about search terms right away, rather than wait**. (_See_ Exh. 8, pp.8-9 Malynn's response at 12:09 to the prior email by Plaintiff's counsel ). In the same email exchange, Defendants simply refused, expecting Plaintiff to guess what it was they wanted the search terms to be for their own discovery. (Murphy Decl., ¶¶ 54-57.) This absurd process would require Plaintiff to go back and forth now multiple times for searches when one around could be avoided, if they would just meet and confer

An inauspicious beginning and hinting at Defendants' real goals.

**F.** **In Less than Two Weeks – by March 24, 2025 – Defendants had Repudiated a need for a New CMO, Refused to Meet and Confer, and Rejected Plaintiff's Request for More Time to Comply**

The final comment in the first email from Defendants' counsel the day after

19

1  the Order, on March 13, 2020 (Exh. 8, December 13, 2025 at 12:09 pm), was

2  alarming, as it phrased the CMO issue as being something that had been proposed

3  by Plaintiff, to them and then ignored (contrary to the record).

4      Accordingly, counsel for Plaintiff drafted a new CMO and presented it in an

5  email a week later and asked to meet and confer about that, as well as Plaintiffs'

6  need for more time to comply with the Order. (Exh, 9, p.5-6.)

7      Defendants' response was to refuse to meet and confer about anything. (Exh.

8  9.) They refused to consider the request for more time (without asking why, for

9  example). Had they asked why, Plaintiffs' counsel would have explained the

10  voluminous result from the search terms (that Defendants refused to meet and

11  confer upon), and the need for attorneys' eyes on every page. Defendants simply

12  refused.

13      In that same email, Defendants' counsel, mind bogglingly, rejected any need

14  for a new trial date. The entirety of the email exchange is truly astonishing,

15  particularly Mr. Beral's recitation of the facts suggesting that they decided in

16  December to forgo a new CMO. (Exh 9.)

17  **G.    Defendants' Motion Simply Lies About What they Received,**

18  **Confirming they Do not Want any of this Information at Issue,**

19  **they Just Want Sanctions.**

20      The Motion clams "Plaintiff still has not produced a list of search terms or

21  record custodians, let alone the ordered means to evaluate the same." (Dkt 53-1. Pp

22  22:10-11). "**This is *provably* false**. as revealed in Exh 10 – an April 4, 2025 email

23  and the attachment, in which Plaintiffs most certainly did disclose the search terms

24  and custodians they had used to conduct a search. (Murphy Decl., ¶¶ IONSDERT;

25  Exhs. 10 and 10.1.) Notably, and again, the refusal by Defendant to meet and confer

26  resulted in Plaintiffs using these terms and it resulted in a catch of 40,000+

27  documents, that still have not been reviewed, in full.  (Murphy Decl.., ¶¶ 64-67.)

28      Other than the snarky response reflected in Exh.11, Defendants ignored this

20

email and never discussed search terms ever again. (Murphy Decl., ¶ 62; Exh.11.) And yet they want sanctions because they argue they did not receive it? This is the definition of an abusive, and crazy-making, motion

Finally, and most astonishingly, on April 11, 2024, Plaintiff sent a proposal for Defendant to see the transactional document – Exh. 12 – ***the entire deal***. (Murphy Decl., ¶¶ 54-57.) It did have restrictions, but this is the crown jewel of Defendants' theory and, although Plaintiff would likely have prevailed on the disclosure of the entire document, saw the value to everyone in Defendants actually seeing the deal. **Defendants never responded**. Thery refused to even express an objection to the procedure or propose alternatives. They ignored the proposal until filing a motion for sanctions.

This confirms that Defendants never wanted to see the transaction. They didn't want any of these documents. They do not care. This is about sanctions.

Indeed, the very assertion in the Motion that compliance after April 11, 2025 is not acceptable belies their true goal. Tere is nothing magic about April 11, 2025. The plaintiff is still preparing for trial. This was all about a manufactured deadline, reinforced by the deceitful lure of a new CMO,

H. **Defendants Failed to Meet and Confer Prior to Filing this Motion.**

This Motion has a meet and confer requirement, and Defendants make no effort to establish that they satisfied the requirement. To the contrary, as set forth herein (Exhs. 8-12), Plaintiff has been begging to meet and confer over search terms, deadlines, inspection of the transactional documents, and Defendants' counsel has refused. This confirms that this motion is not about discovery, it is about sanctions.

III. **PLAINTIFFS' MOTION SHOULD BE DENIED IN FULL.**

A. **THE FULL, COMPLETE, AND ACCURATE LEGAL STANDARD**

Whether to impose a sanction under Federal Rules of Civil Procedure Rule

21

1  37 is a matter of the Court's discretion. *See Marchand v. Mercy Medical Center* 22

2  F.3d 933 (9th Cir.1994). The purpose of the Rule is to deter discovery abuse and

3  promote full and efficient discovery. *See Id.* Further, sanctions "are appropriate

4  only in 'extreme circumstances' and where the violation is 'due to willfulness, bad

5  faith, or fault of the party'." *Tacori Enterprise*, 253 F.R.D. at 582 (*quoting Fair*

6  *Housing of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir.), *cert. denied,* 537 U.S.

7  1018, 123 S.Ct. 536, 154 L.Ed.2d 425 (2002)).

8        To have sanctions imposed against an opposing party under Rule

9  37(b)(2)(A), the discovering party must first prevail on a motion to compel and

10  obtain an Order pursuant to Rule 37(a). Courts have held that motions for sanctions

11  for failure to comply with discovery requests can be denied where the motion was

12  made prior to a motion to compel. *Markham v. Colonial Mortg. Service Co.,*

13  *Associates, Inc.*, 605 F.2d 566, 571 (C.A.D.C., 1979); *Unigard Security Ins. Co. v.*

14  *Lakewood Engineering & Mfg. Corp.* (9th Cir. 1992) 982 F2d 363, 367.

15        Rule 37(b)(2)(C) requires that a district court, instead of or in addition to

16  nonmonetary sanctions allowed in Rule 37(b)(2)(A), "order the disobedient party,

17  the attorney advising that party, or both to pay the reasonable expenses, including

18  attorney's fees, caused by the [discovery] failure, unless the failure was

19  substantially justified or other circumstances make an award of expenses unjust."

20  Fed. R. Civ. P. 37(b)(2)(C).

21        This Court should deny Defendant's motion for sanctions pursuant to Federal

22  Rules of Civil Procedure 37(b)(2)(A) and 37(b)(2)(C) since Defendant was not

23  prejudiced and, despite Defendant's allegations to the contrary, Plaintiff's conduct

24  was neither willful nor in bad faith.

25        **B.    The Various Procedural Flaws Require that this Motion be**

26        **Denied.**

27        First, Defendants should have prevailed on a motion to compel and obtain an

28  Order pursuant to Rule 37(a) to obtain relief under Rule 37(b). Despite all

22

1  Defendants' allegations, PCJV never filed an initial Motion to Compel prior to

2  filing this motion for sanctions. As alluded to above, if Discovery Conferences

3  could be used by a party to create traps for their opponent top violate agreements

4  toc comply with objectionable discovery, the entre informal discovery conference

5  process would be undermined.

6       Second, Rule 37(a) of the Federal Rules requires a good faith meet and

7  confer that is certifie3d by the Motion itself. Defendants make no such certification,

8  nor could it, given that Exhs. 8-12 reveal the opposite: Defendants were not

9  concerned about meet and conferring, they were obsessed with the date of April 11.

10 They would not budge if that date were not satisfied. The failure to meet and confer

11 alone, is grounds to deny.

12      Third, Defendants' Motion fails to identify any specific aspect of the Order

13 that they claim was not complied with, and that prejudice them. Instead, their

14 histrionic motion prtee4ntdsthat their RFPs were ordered, in full, and they

15 misrepresent their oibligat6ion to meet and confer about search terms, etc. The

16 failure of Defendants to ground their Motion in the Order itself, is a fatal defect.

17      **C.**     **<u>The Motion Should be Denied because the Full Proof Shows that</u>**

18         **<u>Plaintiffs' Alleged Violations Did Not Constitute Willful</u>**

19         **<u>Disobedience, but Instead, it was *Defendants* that Misrepresented,</u>**

20         **<u>and Knowingly Violated the Order.</u>**

21      Willfulness is disobedient conduct "*not shown to be outside the control of the*

22 *litigant.*" *Henry v. Gill Industries, Inc.*, 983 F2d 943, 948 (9th Cir. 1993). However,

23 all Plaintiff's alleged "disobedient conduct" directly resulted from the conduct of

24 Defendants—which is completely outside the control of Plaintiff. As described

25 above, Defendants repeatedly create roadblocks for Plaintiff to hinder its

26 performance of full and efficient discovery. Moreover, as revealed by Exh. 16, Mr.

27 Murphy was unsure about what would be revealed from the searches, but was

28 reliant on the agreement of opposing counsel that they would agree to a new

1   CMKO, so as to allow the parties to extend dates of compliance. As supported in

2   the Murphy Declaration, Defendants refused to meet and confer on search terms,

3   deadlines, or even Plaintiffs' offer to show them the transactional documet6ns that

4   werte4 t6he bass for RFP Nos. 1-20.

5       Defendants instead resort to patent falsifications to this Court such as, for

6   example that "Plaintiff still has not produced a list of search terms or record

7   custodians, let alone the ordered means to evaluate the same." On April 4, 2025,

8   Plaintiff's counsel timely delivered to Defendants the requested search terms as

9   well as list of record custodians. (Exh. 10.)

10      Finally, and most significant, Defendants' Motion fails to adduce any

11  evidence of any aspect of the March 12, 2025 Order that was not compliant with

12  and willfully so Overall, this Court should not, and cannot find evidence to support

13  any claim Plaintiff's alleged disobedience is willful, nor can it ignore Defendants'

14  repeatable role in all of this

15      **D.**    **The Motion Should be Denied because Defendants Fail to Provide**

16      **any Actual Proof of Prejudice, when, in Fact, it was Their Conduct**

17      **that Prejudiced Plaintiffs.**

18      Second, the Defendants have failed to demonstrate that it was prejudiced by

19  any failure to comply with any specific aspect of the March 12., 2025 Oder

20  [Plaintiffs document production efforts. *See* Fed. R. Civ. P. 37(c)(1) ( ". . . unless

21  the failure [to comply with Rule 26(e)] ... is harmless"); 7 James W.M. Moore, *et*

22  *al., Moore's Federal Practice* § 37.63 (3d ed. 2009) (sanctions may not be imposed

23  if a party's failure to provide information as required by Rule 26(e) was harmless).

24      Indeed, what specifically is the injury Defendants have suffered? All that can

25  be gleaned is that they did not receive a complete production by April 11, 2025.

26  How did this prejudice them? There is no explanation. What discovery were they

27  prevented from obtaining? What proof a trial?

28      At the end of the day, Plaintiff has produced relevant Board Minutes, the

24

1    financial statements and public filings, and public statements, and, as such, all that

2    remains is a review of the 40,000+ emails consisting of documents tagged by the

3    search terms, from which Plaintiff's counsel is searching for communications with

4    franchisees, references to confidentiality, as well as references to the purchase and

5    sale transaction (to the extent it refers to US operations and ale of IP). That is a

6    slow process, and the productions will continue through the next few weeks. How

7    these productions and their timing have produced Defendants have yet to be

8    explained in their Motion. This is fatal

9          Interestingly, Plaintiff has yet to receive a single response to its

10    Interrogatories and Requests for Production from Defendants prior to the close of

11    discovery. Therefore, if any unfair prejudice has occurred, it is against Plaintiff to

12    conduct efficient discoveries to support its case in chief.

13    **E.**    **The Specific Sanctions Sought are So Unrelated to Any Order or**

14           **Effect of Non-Compliance with Any Order that they Would**

15           **Violate Due Process Even if the Other Elements Were Satisfied.**

16           **1.**    This Court Should Not Strike or Dismiss Plaintiff's Claims for

17                  Misappropriation of Trade Secrets.

18          Violation of a discovery order does not warrant dismissal of the client's case

19    unless the opposing party shows it was *prejudiced* thereby. See *Coleman v.*

20    *American Red Cross* (6th Cir. 1994) 23 F3d 1091, 1095—violation of protective

21    order by plaintiff's lawyer did not justify dismissal of action; see *Harmon v. CSX*

22    *Transportation, Inc.* (6th Cir. 1997) 110 F3d 364, 368—dismissal upheld where

23    counsel's *neglect* in failing to respond to interrogatories *prejudiced* defendant's trial

24    preparation.

25          As explained above, Defendants have failed to demonstrate that it was

26    prejudiced by Plaintiffs document production efforts which have included the

27    gathering of 40,000+ documents using search terms that Defendants refused to meet

28    and confer about. The other issue as to production of the specific trade secrets

25

1  themselves is a problem, caused by Defendants. (Murphy Decl., ¶ 43.)

2      The actual facts, and Plaintiffs actual attempts to meet and confer and

3  comply have not prejudiced Defendants one bit, and the idea that Plaintiff would be

4  prevented from trying this part of the case because it was delayed in producing

5  documents int voluntarily agreed to produce has no support in the governing rules

6  and authority.

7        **2.**    An Order Prohibiting Plaintiff from Introducing at Trial Any

8                Documents Not Produced by April 11, 2025 is Unwarranted.

9      This aspect of the Order makes no sense, particularly in the context of

10  Defendants' counsel having agreed on the record on March 12, 2025 that the CMO

11  would have to be changed, and all these dates modified, giving Plaintiff more time.

12  There I nothing meaningful about April 11, 2025; an arbitrary date that Defendants

13  have failed to explain has any bearing on what they can produce at trial.

14      Moreover, the over-inclusiveness of this demand is astonishing: any

15  document even if not requested, and even if not called for by the Mar4ch 12, 2025

16  Order would now be excluded. That evidentiary windfall has no support in the law.

17        **3.**    An Order Deeming Matters at Issue and Designated Facts

18                Established is Unwarranted.

19      This request for relief is not rooted in a purported discovery order at all.

20  Indeed, the matters to be designated have no relationship to any supposed violation

21  of the March 12, 2025 Order. This must be rejected.

22      **F.**    **<u>An Order Awarding Attorney's Fees Against Plaintiff and its</u>**

23          **<u>Counsel is</u> <u>Unwarranted</u>.**

24      One problem with the amount of Defendant's requested expenses under Rule

25  37(b)(2)(C) is that they are not limited to those "caused by the failure" of Plaintiff

26  to allegedly adhere to the March 12 order. Instead, Defendant's request includes

27  attorney's fees incurred in preparing their Motion. This goes beyond what is

28  permitted by Rule 37(b)(2)(C). See *Toth v. Trans World Airlines*, Inc. 862 F.2d

26

1381, 1386 (9th Cir. 1988); *Odigwe v. National Mentor Healthcare, LLC*, 616 Fed.
Appx. 262 (9th Cir. 2015); 8B Charles Alan Wright, Arthur R. Miller & Richard L.
Marcus, Federal Practice and Procedure § 2289 (3d ed. 2010) ("The expenses that
may be recovered under [the rule] are those 'caused by the failure' to obey an order
and therefore do not include the expense of obtaining the order itself."). Precedent
clearly holds that reasonable expenses do not include actual costs incurred in
bringing Defendant's Motion for Sanctions. See *Toth v. Trans World Airlines, Inc*.,
862 F.2d 1381, 1386.

Moreover, Rule 37 precludes an award of attorney's fees where no court
order was violated or, in the event there was some violation: (1) where any failure
to comply was substantially justified; (2) where other circumstances make the
award unjust and/or (3) where the moving party's attorney's fees were not "caused
by the failure" to obey the court order.

There are clear, substantial justifications for any alleged failure to comply
with a discovery order by Plaintiff. First, Defendants waited to serve their Rule 26
Initial Disclosures until February 28, 2025, which was specifically designed to
make it impossible for Plaintiff to use the disclosures as a basis and framework for
discovery requests effectively, undermining Rule 26.

Second, on or around November and December 2024, Defendants requested
a continuance of the trial date and dubiously informed Plaintiff they will propose
the continuance to this Court. From January 8 to March 13, 2025, Defendants
represented their agreement to an amended Case Management Order. Only until
March 20, 2025, did Defendants' counsel inform Plaintiff they no longer intended
to amend the trial date and overall Case Management Order.

Lastly, as mentioned previously, Defendants failed to diligently provide
responses to Plaintiff's discovery requests in good faith compliance with applicable
provisions of the Federal Rules of Civil Procedure.

1

2    Dated:  May 9, 2025                          FOX ROTHSCHILD LLP

3

4                                                 /s/ Michael D. Murphy
                                                  Michael D. Murphy
5                                                 Attorneys for Plaintiff and Counterclaim
                                                  Defendant SHAKEY'S PIZZA ASIA
6                                                 VENTURES, INC. and Third Party
                                                  Defendants CINCO CORPORATION,
7                                                 PC INTERNATIONAL PTE LTD., and
                                                  SPAVI INTERNATIONAL USA, INC.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned, counsel of record for Plaintiff SHAKEY'S PIZZA ASIA VENTURES, INC, certifies that this brief contains 6912 words, which complies with the word limit of L.R. 11-6.1.

<em>/s/ Michael D. Murphy</em><br>
Michael D. Murphy

1

## **CERTIFICATE OF SERVICE**

2          The undersigned certifies that, on April 25, 2025, the foregoing document

3  was electronically filed with the Clerk of the Court for the United States District

4  Court, Central District of California, using the Court's ECF filing system. I further

5  certify that all counsel for all parties to this action are registered CM/ECF users and

6  that service will be accomplished by the CM/ECF system.

7          I certify under penalty of perjury that the foregoing is true and correct.

8

9  Dated:  May 9, 2025                          **FOX ROTHSCHILD LLP**

10

11                                              _/s/ Michael D. Murphy_

12                                              Michael D. Murphy
                                                Attorneys for Plaintiff and Counterclaim
13                                              Defendant SHAKEY'S PIZZA ASIA
                                                VENTURES, INC. and Third-Party
14                                              Defendants CINCO CORPORATION,
                                                PC INTERNATIONAL PTE LTD., and
15                                              SPAVI INTERNATIONAL USA, INC.

16

17

18

19

20

21

22

23

24

25

26

27

28