MICHAEL D. MURPHY
mdmurphy@foxrothschild.com
FOX ROTHSCHILD LLP
Constellation Place
10250 Constellation Boulevard, Suite 900
Los Angeles, California 90067
Telephone: 310.598.4150
Facsimile: 310.556.9828

Attorneys for Plaintiff and Counterclaim Defendant SHAKEY'S PIZZA ASIA VENTURES, INC. and Third-Party Defendants CINCO CORPORATION, PC INTERNATIONAL PTE LTD., and SPAVI INTERNATIONAL USA, INC.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHAKEY'S PIZZA ASIA VENTURES, INC, a Philippines corporation,<br><br>Plaintiff,<br><br>v.<br><br>PCJV USA, LLC, a Delaware limited liability company; PCI TRADING, LLC, a Delaware limited liability company; GUY KOREN, an individual; POTATO CORNER LA GROUP, LLC, a California limited liability company; NKM CAPITAL GROUP, LLC, a California limited liability company; J & K AMERICANA, LLC, a California limited liability company; J&K LAKEWOOD, LLC, a California limited liability company; J&K VALLEY FAIR, LLC, a California limited liability company; J & K ONTARIO, LLC, a California limited liability company; HLK MILPITAS, LLC, a California, limited liability company; GK CERRITOS, LLC, a California, limited liability company; J&K PC TRUCKS, LLC, a California limited liability company; and, GK CAPITAL GROUP, LLC, a California limited liability company and DOES 1 through 100, inclusive, | Case No. 2:24-CV-04546-SB(AGRx)<br><br>*The Hon. Stanley Blumenfeld, Jr.*<br><br>**DECLARATION OF MICHAEL MURPHY IN OPPOSITION TO THE MOTION FILED BY DEFENDANT PCJV USA, LLC FOR SANCTIONS FOR FAILURE TO COMPLY WITH A MARCH 12 2025 VOUNTARY DISCOVERY ORDER (DKT. 128)**<br><br>Date: May 22, 2025<br>Time: 1:30 p.m.<br><br>Complaint Filed: May 31, 2024<br>Trial Date: August 4, 2025 |

1

|   |   |
|---|---|
| | Defendants. |
| | PCJV USA, LLC, a Delaware limited liability company; PCI TRADING LLC, a Delaware limited liability company; POTATO CORNER LA GROUP LLC, a California limited liability company; GK CAPITAL GROUP, LLC, a California limited liability company; NKM CAPITAL GROUP LLC, a California limited liability company; and GUY KOREN, an individual, |
| | Counter-Claimants, |
| | v. |
| | SHAKEY'S PIZZA ASIA VENTURES, INC, a Philippines corporation, |
| | Counter Defendant. |
| | PCJV USA, LLC, a Delaware limited liability company; PCI TRADING LLC, a Delaware limited liability company; POTATO CORNER LA GROUP LLC, a California limited liability company; GK CAPITAL GROUP, LLC, a California limited liability company; NKM CAPITAL GROUP LLC, a California limited liability company; and GUY KOREN, an individual, |
| | Third Party Plaintiffs, |
| | v. |
| | PC INTERNATIONAL PTE LTD., a Singapore business entity; SPAVI INTERNATIONAL USA, INC., a California corporation; CINCO CORPORATION, a Philippines corporation; and DOES 1 through 10, inclusive, |
| | Third Party Defendants. |

2

DECLARATION OF MICHAEL MURPHY ISO OF SHAKEY'S PIZZA'S OPPOSITION TO PCJV'S RULE 37 MOTION FOR SANCTIONS

CASE NO. 2:24-CV-04546-SB(AGRX)

171199542.2

# DECLARATION OF MICHAEL D. MURPHY, ESQ.

As provided for in 28 U.S.C. § 1746, I, Michael D. Murphy, hereby declare, based upon personal knowledge, the following:

I, Michael D. Murphy, declare as follows:

1. I am an attorney who is duly admitted to practice before this Court. I am a partner with Fox Rothschild LLP, attorneys of record for Plaintiff Shakey's Pizza Asia Ventures, Inc. ("SPAVI"), as well as the newly named Third-Party Defendants: Cinco Corporation, PC International PTE Ltd, and SPAVI International USA, Inc.

2. I have personal knowledge of the facts set forth herein, except to those stated on information and belief and, as to those, I am informed and believe that they are true.

## My Participation in these Matters Prior to May 31, 2024.

3. Prior to 2022, the negotiations for a written license between Defendants and the owner of the marks, Cinco, was in the context of mediation of another lawsuit. Once SPAVI became the owner of the marks, the negotiations split: the mediation focused solely on how to get Cinco out of PCJV, now that it has nothing to do with Potato Corner and SPAVI, with whom there was no litigation, negotiated the license terms with Koren in the context of a business negotiation.

4. I did not participate in the negotiations between SPAVI and Koren, as this was a negotiation of business terms

5. Koren essentially vanished from the negotiations in 2024. I remember when discussing the negotiations as to Cinco's equity in the mediation, I advised Arash Beral, his counsel, in the first month or so of 2024 that SPAVI has been trying to get a hold of Guy because they needed to finish their negotiation on business terms for the license.

6. On May 31, 2025, after the termination letter was sent from SPAVI to Koren, advising him that the license to use the Potato Corer brand had terminated, I confirmed that Koren had not ceased or desisted from using the brand. As such, we filed suit.

7. Protection of SPAVI's brand is key and a primary purpose of this litigation. Moreover, SPAVI is in the process of introducing a network of new stores around the country, and it must have the market cleared of the damage caused to the brand by Defendants, who have no rights to use the brand and, as confirmed by the District Court in its Injunction ruling Defendants are actually causing irreparable harm.

**Defendant's Litigation Strategy to Bury Plaintiff in an Avalanche of Paper Arguing Frivolous Theories Based on Unprovable Facts.**

8. On September 6, 2024, this Court expressed caution to all parties that if any party, including Defendants, wanted to seek injunctive relief, we needed to try to obtain actual proof of irreparable harm, because the Court was disinclined to presume such harm so long as a scintilla of proof rebutting it is raised.

9. For the next four weeks, we complied with the Court's directive, assembling evidence of actual irreparable harm (loss of control over brand standards leading to use of expired flavoring, failure to protect bran from other infringers, etc.) We filed our Motion on October 10, 2024, which was granted on November 14, 2024 (Dkt. 56). This means that Defendants have been prohibited from using the Potato Corner trademarks by Court order since November.

10. Meanwhile, on September 19, 2024, Defendants gave notice for a truly absurd Ex Parte Application seeking a mandatory injunction requiring Plaintiffs to ship their proprietary flavorings to Defendants (even though Defendants have lost their license, and thus, authority to possess let alone exploited to be proprietors of fries using those flavors). (Dkt. 37.) Opposing this Motion required an

4

extraordinary amount of my own time, in which I worked over an entire weekend, being forced to respond to a frivolous Ex Parte that was denied rapidly, costing our client tens of thousands of dollars.

11. From the Rule 16 conference in September through January 31, 2024, we opposed 10 Motions, Applications, or Appeals this case, each one more frivolous than the last. I have never seen such an avalanche of paper filled with ludicrous theories, false facts, and made-up law.

12. A snapshot of Plaintiff's strategy of overwhelming Plaintiff with one demand for a frivolous order after another, can be revealed simply by looking at Dkt Nos. 41, 46, 58-61, 63-64, 71, 72-72, 75-78, 80, 85, 88-89, 92, 94, 95.)

13. These ten or so Motions, Requests for Orders, or Requests for Emergency Orders included two in the Ninth Circuit and one in front of SCOTUS. Our entire Thanksgiving weekend was consumed responding to some of these, as was our Christmas holiday. Indeed, I spent Christmas day responding to the frivolous petition for a stay filed with the Supreme Court.

14. The goal has been to distract and overwhelm us. It has failed because we have won every option except on little insignificant issues like date of briefs.

15. What it has done, however, is limit my resources to review documents in discovery. Moreover, in responding to all of these nonstop motions has cost my client over six figures – well over.

**Defendants Have been Demanding a New Trial Date Until March 24, 2025 Month**

16. Defendants have asked, or demanded, or begged, for a new trial date and CMO at least ten times between me and my associates.

17. The first were in December 2024 communicated orally after the Court allowed our trade secret theft claim to proceed in December 2024. At first, I was

5

DECLARATION OF MICHAEL MURPHY ISO OF
SHAKEY'S PIZZA'S OPPOSITION TO PCJV'S RULE
37 MOTION FOR SANCTIONS
171199542.2

CASE NO. 2:24-CV-04546-SB(AGRX)

not sure of this was a good idea but given the delays in prosecuting our case as a result of Defendants' strategy to bury us in frivolous filings, and their refusal to comply with the injunction, forcing us to waste time compelling compliance, I eventually agreed.

18. On January 8, 2025, we had to ask for extensions on discovery given that my colleague, Mr. Hsu, as well as my parents, among others at our firm were displaced, or under threat of destruction from, the Eaton and Palisades fire. In response, we received an email from Mr. Bral, a true and correct copy of which is attached hereto as Exhibit 1.

19. At some point over the next month, after an in person meet and confer, it was suggested that the CMO be altered by extending everything to 90 days. I do not remember whose idea it was, but it had some issues given the dates on which specific deadlines fell.

20. Exh. 3 is a true and correct copy of an email I received from Defendant on February 13, 2025 asking or a new trial date, this time in the context of a 90-day continuance.

21. I changed forms on February 21, 2025 – a disruptive upheaval to my entire docket and client base, limiting my ability to take on much more than the tasks in front of me -including my discovery of **more acts of contempt** as discussed with the Court on February 28, 2025.,

22. At a Court ordered meet and confer at my new offices on March 5, 2024, the need for a new Case Management Order was raised, and everyone agreed to it, but now, Defendants' counsel insisted that it was my office that was obligated to propose a new order. Given the ongoing contempt briefing, and this discovery proceeding, as well as my change of firms, which was impossible.

23. I did not before March take on the task of preparing the CMO. I had assumed Defendants would propose something, given their insistence on a new CMO, and our agreement.

24. This appears to have been part of the Defendants' strategy: lull us into believing they would propose a CMO, only to change their mind after prejudice has been suffered by our client.

### Defendants Actions in February 2025 Reinforce
### that a New CMO was Agreed

25. On February 20, 2025 – weeks before discovery was set to close under the CMO – Defendants finally answered the First Amended Complaint, which included claims against SPAVI, as well as claims against three new parties that had never before appeared: Cinco, PC International PTE, Ltd, and SPAVI International US, Inc..

26. These Third-Party Defendants who I now represent did not appear until they answered the Third-Party Complaint on April 15, 2025 – Dkt. 156. This was, of course, after the discovery had closed and after the motion cut off.

27. It is inconceivable that Defendants could have believed they could name three new parties as Defendants, and that the Court would allow trial to proceed against the with no discovery or Rule 12 rights, among other things. This confirmed for me that Defendants were indeed agreeing to a new CMO.

28. On February 28, 2025, Defendants laughably served their "Initial" diplodocuses under Rule 26. A copy of their disclosures is attached hereto as Exhibit 5. This confirmed for me that Defendants were intent on amending the CMO, because otherwise, by serving them less than 30 days before the close of discovery, Defendants effectively rendered them useless and prevented me from pursuing any follow up discovery or depositions based on the disclosures.

7

DECLARATION OF MICHAEL MURPHY ISO OF SHAKEY'S PIZZA'S OPPOSITION TO PCJV'S RULE 37 MOTION FOR SANCTIONS
171199542.2

CASE NO. 2:24-CV-04546-SB(AGRX)

29. To date, other than the expert report attached to the late Disclosures, and the expert's work papers ordered by the Magistrate on April 4, 2025 to be produced, Defendants have not produced one single document to Plaintiff. Not one. Attached hereto as Exhibit 4 are our Requests for Production served on February 14, 2025. Defendants have not complied with any of these requests and have refused to produce one responsive document.

### The March 12, 2025 Discovery Conference

30. I approached the hearing in good faith a revealed by the transcript, a true and correct copy of which is attached hereto as Exhibit 16.

31. I thought the discovery at issue was a distraction and would never lead to admissible evidence at trial, but the goal is to minimize disputes, not increase them, so I set out prepared to negotiate with the guidance of my colleague Ms. Zolliecoffer.

32. Many issues plagued Defendants' discovery. For example, they were demanding invasive documents relating to the acquisition of Potato Corner by SPAVI which would be invasive and disclosure sensitive business information. This was the focus of the hearing (Request Nos. 1-20.)

33. Our objections based on relevance, and proportionality, and overbreadth were well stated, and I stand by them. Defendants have yet to explain any relevant or admissible information that could be found in those documents.

34. Moreover, Defendants are now actual competitors of Plaintiff – having purportedly replaced Potato Corner with "Undercover Fries," although the marketing has effectively attached itself to Potato Corer in a manner that violates the injunction order. The Undercover Fry business model appears to depend upon the Potato Corner brand. Indeed, its color schemes are the same as reflected in the recent Instagram posts by PCJV (a recent post made in the past week that I took a

8

1  snapshot of on April 24, 2025 – a true and correct copy of which is attached hereto
2  as Exhibit 14 – s referring to the "same taste" (same as PC, obviously), almost
3  bragging about having secretly taken the flavorings for reverse engineering by a
4  person or supplier they have yet to disclose (if it was legal shouldn't the supplier
5  and reverse engineer be in their Rule 26 disclosures?).

6       35.    Then, add on top of the gimmickry, if you actually go to the stores,
7  they still say "Potato Corner, "as reflected Exhibit 15, which is a photograph taken
8  by someone I know , which is an accurate deposition of the Lakewood store
9  currently – an outlet operated by Defendant J&K Lakewood at the permission of
10 Koren and P.

11      36.    Indeed, competition using unfair and illegal means persists. That
12 matters here because my clients are being asked to show these same people internal
13 and detailed data and information about Potato Corner operations.

14      37.    Nevertheless, Jordan and I were there to problem solve. Moreover, we
15 knew that we would be here soon when defendants do not comply with our
16 discovery, and we know if we behave cooperatively and think about ways to get
17 information to our opponents rather than fight and refuse, maybe we can get
18 somewhere.

19      38.    After hearing Malynn go on about his theory that Plaintiffs actually
20 own the brand (rejected by the Court), and he made false accusations that we have
21 not produced documents (we have), the Magir5ate brought us to a conclusion where
22 the following, as I recall them, agreements, occurred.

23      39.    There were three substantive areas to address: (1) the documents
24 pertaining to the acquisition of PC by SPAVI, which I deemed irrelevant and
25 believed we would have good grounds to object, in full; (2) the trade secret
26 documents, which, although of course we do have to produce, it is the sheer volume
27 of data we are going to uncover that is the issue, and, given they do not understand
28

our claim, their asks are disingenuous and designed to cause expense and delay and to overwhelm,; and (3) the communications with franchisees and SPAVI.

40. As for the transaction issue, I was very rigid going about this. The Magistrate advised Defendant' counsel that going too far on the scope of this will not succeed so Defendant backed down on certain demands, and invited everyone to focus on two categories of documents related to the PC Sale by Cinco: sale related documents that refer to US operations (Koren, ECJ, Americana, etc. ) and those that refer to the sale of IP generally (since that is the issue). That seemed reasonable to us. The trick would be to agree on search terms.

41. The trade secret issuer required the Magistrate to force Defendant to agree to narrow what it is seeking, resulting in narrowed categories that could be complied with so long as Plaintiff and Defendants have agreed upon search terms and custodians, and that everyone agrees on the search terms.

42. The latter – communications with PCJV franchisees we had always agreed to produce. The problem with this Request is there are interrelated issues of confidentiality and business sensitivity, and moreover, beginning in October, Defendants have been threatening me, plus the franchisees and our clients with litigation for interference and other torts. During the meet and confer Defendants were not willing to agree that these limitations on production exist. AS such, this Request is difficult only because of the amount of time required to do a privilege review given number of attorneys involved (and Koren had threatened us all with being sued), and there is private financial data involved (being shown to an angry competitor), requiring designation under the protective order.

43. Problems I did not anticipate when agreeing to these various items was as follows: (1) the search terms we used (that Defendants refused to meet and confer upon) yielded many kore documents than I had anticipated (more than 40,000 unique document; (2) essentially each of them have to be reviewed, because

10

there was always a layer present during due diligence and because there are serious privacy interests at issue when a competitor is asking about our financial, operation, strategic information, and analysis; an (3) a to the trade secret issue, we discovered that, because Defendants have never disclosed what flavorings they reverse engineered, it is actually impossible for us to produce the specific packages that were even though Defendants have admitted that they did, indeed engage in reverse engineering.

44. When deciding upon the deadline for compliance the Judge noted the looming trial date and close discovery (two weeks away.) She paused and asked how we were going to do this. The following statement was made on the record:

> MR. MALYNN: Yeah. Our problem is that the crossclaims, third-party claims have now brought in additional parties, and the trade secret claim is somewhat new. **And so there was always kind of an understanding, we're going to have get a new scheduling order**. So -- and I actually have an e-mail ready to send to them about our proposal, but I don't think we can really tie it to that because we all know it's going to be changed. (Exh 16 at 97:7-14.)

45. This statement (in addition to the prior, repeated, requests by Defendants to revise the CMO) to which there was no distancing by Defendants' counsel, caused SPAVI's counsel to believe that it could enter into the voluntary order because if the document production turned out to be more voluminous, the stipulation to a new CMO plus the requirements for meeting and conferring built in, gave Plaintiff enough pressure release valves to agree.

46. Although the Defendants did explain they had continued to follow the CMO, that was in contrast to my explanation as to why I believed going past the

11

cutoff was ok, was because I take people at their word, I trust peoples intention ns, and I value our system of adversarial testing.

47. At no point did Defendants reject my statement that they had agreed to a continuance as well. This fact was key for me and perhaps the single most significant reason I agreed to this. Had we not had multipole communications about seeking continuance over the prior few weeks and days, I would not have been as confident. The Magistrate was misled by Defendants, as was I.

48. I also entered into these agreements ending up as orders because the Defendant actually wants this information and actually is intending to litigate this case. I trusted that they too would cooperate with these orders.

**The Key Barrier to Completing Interrogatory No 1 in Time was Defendants' Own Lack of Professionalism**

49. The day after the Order was issued, I remembered that there were a variety of onerous discovery Requests due that day (one set of Interrogatories and another set of Requests for Production). (Murphy

50. Attached hereto as Exhibit 8 is a true and correct copy of an email exchange that included an email on March 13, 2025 at 12:09 pm, when I asked for an extension and was refused. This as shocking to me as Id extended every courtesy they asked for. Moreover, that was the day I had allocated to write a new Response to Special Interrogatory No. 1 in compliance with our agreement in the Order. I explained in the email that this would keep me up all night given that the people I need to work with to get this done live in Manila, particularly the person verifying the response. Defendants refused to

51. As such, he asked for an extension, and Defendants refused, and persisted with the refusal even after he disclosed, he would have to stay up all night

12

so as to ensure that the person verifying would be able to review (being in Manila). Murphy.

52.   In the face of this egregious lack of professionalism, I did indeed stay up all night answering the isometry and working with a verifying party in Manila to complete them.

53.   On Friday the 14th, I was exhausted and had ignored so many clients for two full days, when I was not sleeping, I was dealing with other matters. But I was wiped out and not very productive.

54.   What was unfortunate is that I had planned to spend a lot of time (not all night) but substantial time putting in motion what we had talked about the day before the Conference with the Magistrate. Now I was behind. Had I known the Defendants would impose unprofessional roadblocks to compliance with the aspect of the Order requiring a short turnaround for the revised Interrogatory, I would never have agreed to such a short compliance window.

55.   Significantly that same day, and in that same email, **March 13, 2025, I counsel asked to meet and confer about search terms right away, rather than wait**. (*See* Exh. 8, pp.8-9 Malynn's response at 12:09 to the prior email by me ). My request made sense because as I had thought about the conference overnight, I realized that the documents I had already gathered were as a result of targeted searches, not the use of broad search terms. I was (correctly) worried that the search terms may blow up the number of documents caught io the net. I thought it was better to meet and confer on the search terms now, rather than wait.

56.   Int the same email exchange, Defendants' counsel simply refused, expecting me to guess what it was they wanted the search terms to be for their own discovery.

13

**In Less than Two Weeks Defendants had Repudiated a need for a New CMO, Refused to Meet and Confer, and Rejected My Request for More Time to Comply and Now they Lie About What Transpired**

57. The final comment in the first email from Defendants' counsel the day after the Order, on March 13, 2020 (Exh. 8, December 13, 2025 at 12:09 pm), was alarming to me, as it phrased the CMO issue as being something that had been proposed to them and then ignored. This is contrary to the evidence I have attached to this Declaration for the Magistrate to review.

58. Accordingly, I drafted and circulated a new CMO and presented it in an email a week later and asked to meet and confer about that, as well as my need for more time to comply with the Order. A true and correct copy of this exchange is attached hereto as Exhibit 9 (p.5-6.)

59. I needed more time because, absent Defendant' meeting and conferring on search terms, I was conducting spot checks of certain custodians in Manila and realizing that there were going to be tens of thousands of documents to review. This was an impossibility by April 11.

60. As revealed nu Exh. 9, Defendants response was to refuse to meet and confer, reject the request for more time (indeed, they did not even ask why there was a need for more time to comply), and them mind bogglingly, rejected any need for a new trial date.

61. I was shocked by Mr. Beral's emails of March 24, 2025 (Exh. 9). A review of the other evidence I have attached, his statements are contrary to what has transpired, all to justify his deceit and strategic misuse of this process.

**Defendants' Motion Simply Lies About What they Received, Confirming they Doi not Want any of this Information at Issue, they Just Want Sanctions.**

62. The Motion claims that we Plaintiff never provided custodians and search terms. This is false. Attached hereto as Exhibit 10 is a true and correct copy

14

of Ms. Zollicoffer's April 4, 2025 email (and 10.1 the attachment) showing that we did just that: produced the search terms and custodians. **Other than the snarky response, Defendants ignored this email and never discussed raised or mentioned search terms ever again**. An

63. On April 11, 2024, I sent a proposal for Defendant to see the transactional documents that they have been demanding for months. I could have continued to reuse, but I began to see the value of them looking, and seeing how nothing in that agreement helps them. My proposal contained in an email a true and correct copy of which is attached hereto as Exhibit 12. My proposal dd have restrictions, but this is the crown jewel of Defendants' theory. **Defendants never responded**. Never objected to the rules proposed, never made a counter, never said a word. They ignored the proposal until filing amotion for sanctions.

### The Status of Our Production and Timelines

64. A few of the categories we agreed to on March 12, 2025 were more narrow, and have since been complied with, such as the press releases, board minutes, financial statements, and public filings. Those have, to my knowledge, all been produced.

65. What remains are the 40,000 documents pulled from our search using search terms we used (without Defendants' input). This giant pool of documents includes:

    A. Communications with franchisees, each one of which must be reviewed with an attorney eyes so as to protect from disclosing sensitive business information on a competitor, and to protect joint defense privileges given that Guy Koren had threatened to sue the franchises, my clients, and me for their having left PCJV.

15

    B. Communications regarding trade secrets and confidentiality.

    C. Communications regarding the transaction between Cinco and SPAVI, which have to be reviewed by an attorney's' eyes so as to ensure that we are only disclosing the narrow categories of information agreed to (references to the US operations and also to the sale of IP), and are protecting attorney client privilege and confidentiality. Indeed, there were attorneys on nearly all of these communications.

  66. Ms. Zolliecoffer and I engaged, as we speak, in reviewing these documents for privilege, application of the protective order, and relevance. I anticipate that about half of it will have been reviewed, and the results produced by the May 22, 205 hearing. I have not heard a word from Defendants since they filed their Motion about documents. As such, I can only assume they are satisfied with that they are receiving. Now, I just wonder when they will produce information.

## Request for Leave to Consider this Filing

  67. The parties have been hard at work on this case, including an extensive settlement conference two days ago that remains active.

  68. Pursuant to Dkt 144, it was contemplated that this Opposition would be connected to a Cross-motion to reconsider the March 12, 2025 Order. Given what I view as serious defects in this Motion, and our substantial compliance and continuing compliance with the March 12 2025 Order we have elected not to move to reconsider the March 12, 2025 Order. Indeed, that Order should be changed, but it should be so by reasonable counsel operating professionally and rationally. I intend to conduct a further meet and confer next week on March 12, 2025 Orde, in the hope that cooler heads will prevail.

69. Today, I sent an email to counsel for Defendants, asking if he would agree to revise the schedule for briefing s that our Opposition is filed t50day, 14 days before the hearing, and we would agree to him filing his reply 7 days before – a standard briefing schedule. That exchange is attached hereto as Exhibit 17 – wherein Defendants' counsel would not even agree to something so basic and simple.

70. This has plagued our case – Defendants constant refusal to grant basic courtesies and extensions causing great hardship and expense on my side, whereas I grant every extension requested, because that is the human and decent thing to do. Given the corresponding deluge of paper and false facts and law being thrown at u at all times, this remains one of the more challenging cases of my career.

I declare under penalty of perjury that the foregoing is true and correct. Executed May 9, 2025, in Los Angeles, California.

/s/Michael Murphy
Michael Murphy