# Exhibit 16

1                    UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3

4    SHAKEY'S PIZZA ASIA VENTURES,  ) Case No. LA CV 24-04546-SB-
     INC.,                         )                          AGR
5                                  )
                                   )
6            Plaintiff,            )
                                   ) Los Angeles, California
7    vs.                           )
                                   ) Wednesday, March 12, 2025
8    PCJV USA, LLC, ET AL,         )
                                   ) (10:04 a.m. to 12:28 p.m.)
9            Defendants.           )
     _____)

10

11          TRANSCRIPT OF PROCEEDINGS: ORDER ON MOTION FOR
                ORDER RE DISCOVERY MATTER VIA ZOOM
12        BEFORE THE HONORABLE JUDGE ALICIA G. ROSENBERG
                 UNITED STATES MAGISTRATE JUDGE

13

Appearances:                  See next page.
14

Court Reporter:               Recorded; CourtSmart
15

Courtroom Deputy:             Isabel Martinez
16

Transcribed by:               Jeane Hoehner
17                            Echo Reporting, Inc.
                              9711 Cactus Street, Suite B
18                            Lakeside, California 92040
                              (858) 453-7590
19

20

21

22

23

24

25   Proceedings recorded by electronic sound recording;
     transcript produced by transcription service.

*Echo Reporting, Inc.*

2

```
 1  APPEARANCES:

 2  For the Plaintiff:              MICHAEL D. MURPHY, ESQ.
                                    JORDAN K. ZOLLIECOFFER, ESQ.
 3                                  Fox Rothschild, LLP
                                    10250 Constellation Boulevard
 4                                  Suite 900
                                    Los Angeles, California 90067
 5                                  (213) 213-1211

 6  For the Defendants:             TODD M. MALYNN, ESQ.
                                    ARASH BERAL, ESQ.
 7                                  Blank Rome, LLP
                                    2029 Century Park East
 8                                  Sixth Floor
                                    Los Angeles, California 90067
 9                                  (424) 239-3400

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1  <u>Los Angeles, California; Wednesday March 12, 2025 10:04 a.m.</u>

2                        --o0o--

3                    (Call to Order)

4          THE CLERK:  Please come to order.  This United

5  States District Court is now in session.  The Honorable

6  Alicia G. Rosenberg, United States Magistrate Judge,

7  presiding.

8          Calling Case CV 24-4546, Shakey's Pizza Asia

9  Ventures, Inc. v. PCJV USA, LLC, et al.  Counsel, please

10 state your appearances beginning with the Plaintiff.

11         MR. MURPHY:  Good morning, your Honor.  Michael

12 Murphy from Fox Rothschild, and I have my colleague, Jordan

13 Zolliecoffer, with me as well.

14         THE COURT:  All right.

15         MR. MALYNN:  Good morning, your Honor.  Todd

16 Malynn on behalf of Defendants, and I have my colleague,

17 Arash Beral.

18         THE COURT:  All right.  So, in terms of the joint

19 agenda, so I did look at it yesterday, but it appears that

20 the document requests that were attached were the incorrect

21 requests.  Actually, they were supposed to be responses but

22 the requests themselves were the wrong ones.  So I have now

23 received the correct ones but I have not had a chance to

24 review them.  So I don't know -- I don't really have the

25 background of the dispute.

4

1       So, other than naming the document requests, I
2  guess it's one through 20 and 22 through 27, but I don't
3  really have an idea of what the dispute actually is.  What
4  is it about these documents requests?  Is there some kind of
5  overarching theme or do we just go request by request?
6          MR. MURPHY:  Your Honor, may I answer?
7          THE COURT:  Sure.
8          MR. MURPHY:  So our concern is this.  We have a --
9  a overarching theme is really proportionality with respect
10 to the scope of the requests, and I have yet to understand
11 how the scope has any relationship to material issues at --
12 you know, in a claim or a defense even now that I've seen
13 the cross-claims.
14      So, if you look at the way these are phrased, it
15 is an extraordinary amount of information for -- we
16 represent a multi-national corporation, and the burden is
17 astonishing.  And the other related theme is this.  So,
18 Defendant PCJV now views itself as a competitor of ours.
19 Developed actually its competitive brand while using our
20 brand, that's another issue, but here we are.
21      A competitor is now asking for very invasive
22 documents about its competitor.  They want to see the
23 transactional documents setting forth kind of the skeleton
24 of how our company purchased the brand that they are now
25 competing with.  So we have that additional issue of whether

5

1 or not requests that seek very invasive information about a

2 competitor if they don't really have a relationship to a

3 claim or defense should be produced.

4          THE COURT:  Okay.  Well, as I said, I'm just

5 looking at the request for the first time minutes before the

6 hearing commences.  But, for example, the document request

7 one, I guess I thought maybe because there was some mention

8 of the Plaintiff having acquired the trademarks at issue,

9 whether this request one was actually directed to the

10 acquisition documents for the trademarks that were at issue.

11 That was my guess, but I --

12          MR. MALYNN:  Well, your Honor, you're --

13          THE COURT:  What you're saying, it sounds as

14 though that may not be the case.

15          MR. MURPHY:  Well, no, your Honor.

16          MR. MURPHY:  Well, the problem --

17          MR. MALYNN:  That is exact -- Mike, it's my turn

18 now.

19          MR. MURPHY:  I want to finish my -- the problem,

20 your Honor, just with respect to that request, I don't have

21 it in front of me because I wasn't copied on the e-mail that

22 was sent to your Court --

23          THE COURT:  Okay.

24          MR. MURPHY:  -- so I don't know what we're

25 actually looking at.  But my recollection is that request

6

1  number one, the way they've talked about related to, the

2  scope of it, if you look at what they're actually for, is

3  more than just the transactional documents, right.  They're

4  asking about a lot more.

5          Moreover, the transactional documents themselves

6  are highly sensitive.  You know, there are some that were

7  disclosed in EDGAR filings because this is a publicly traded

8  corporation, but there are other aspects of this that are

9  not, and that are most certainly personal and have actually

10  third-party financial information in them.  And I can --

11          THE COURT:  Okay.  Well, you know, for example,

12  with the ownership of the trademarks, the documents may be

13  sensitive, but on the other hand, they directly relate to an

14  issue on which the Plaintiff would bear the burden of proof.

15  So I guess what I should have looked as is, is there a

16  protective order in this action?

17          MR. MURPHY:  So, we have discussed one.  We

18  proposed it weeks ago.  Defendant's counsel got back to us

19  last week.  I think we should -- probably an order of

20  business should be to enter that today.  But I will say, the

21  ownership is not really, legitimately in dispute, and that's

22  part of our proportionality problem.  Because there's no

23  actual question, right.  We have a deed -- and which we'll

24  get to them.  The actual -- well, let me back up.

25          We have proposed that those aspects of the

7

1  transactional documents that relate to U.S. operations, that

2  mention U.S. operations, or that have any relevance to the

3  ownership, we have proposed that those be disclosed.  But

4  the whole package, you know, how things were in Malaysia and

5  Indonesia, all that stuff is irrelevant, but we have

6  proposed a limited set.

7          MR. MALYNN:  Your Honor, can I jump in?

8          THE COURT:  Yes.  So what about that proposal to

9  limit, for example, document request number one, to those

10 provisions of the agreements that apply to the United

11 States?

12         MR. MALYNN:  A couple things.  We've met and

13 conferred on that request and we don't agree with it, and I

14 want to give you -- I want to answer your question about

15 (indiscernible) and then answer your direct question why.

16         How they treated other jurisdictions are directly

17 relevant to how they treated the United States differently.

18 We're entitled to discover that in the acquisition.  So, at

19 the heart of this case is who owns the trademarks.  Who has

20 superior rights to the trademarks?

21         And whether you call it ownership, a perpetual

22 license with restrictions on transfer, there's the case

23 Minter from the federal circuit which says, an assignment --

24 or something labeled a license, that the legal effect is an

25 assignment.  It's an assignment.  So the label of the

8

1  document doesn't really control, it's the provisions of the

2  document.

3          Here, the preexist -- the agreement that existed

4  at the time of the purchase agreement was a joint venture

5  agreement.  Our clients had a joint venture agreement with

6  the original foreign trademark holder, the foreign rights

7  holder.

8          Way -- the way they used the trademark in the

9  United States, they created a U.S. franchisor via a joint

10  venture.  That's the first continuous and exclusive use for

11  15 years was this U.S. franchisor joint venture.  It was

12  owned by our clients.  It was owned by the foreign rights

13  holder.

14          Now, in the middle of a lawsuit between these

15  joint venture partners, where an injunction was issued

16  preventing any transfer or any interference with our

17  clients' rights under the joint venture agreement, and they

18  acknowledge that they could not transfer the IP during --

19  because of the prior injunction in the state court

20  litigation.

21          What they did do during the middle of the state

22  court litigation was -- and let me clarify.  They could not

23  act upon any alleged rights unilaterally that would

24  interfere with our clients' joint venture agreement.

25          What they did do was in the middle of a settlement

9

discussion, they transferred the entire international

portfolio from Cinco to Spavi, Shakey's Pizza U.S. -- Asia.

And included in that we are told is the assignment of U.S.

registrations.

The -- in prior transaction is -- all the

documents are one transaction.  They are used to interpret

each other.  So the assignment is part of a transaction, and

to understand the assignment you have to understand the

transaction.  It's part and parcel.

The assignment says it's transferring good will.

The problem with that is the good will is owned by the joint

venture from our point of view.  It's the joint venture that

first used the mark, and exclusively used the mark, the

first continuous user, and, therefore, as -- in the -- under

U.S. trademark law the rights were created under the joint

venture.

There -- in the joint venture agreement, there

were restrictions of transfer.  There was a right of first

refusal, there was a consent that no rights or obligations

under the joint venture agreement would be transferred.

Under the joint venture agreement there was obligations to

license the rights.  By the way, there is a written license.

The parties just dispute the enforceability of that.  But

first you had the joint venture agreement, with part of the

consideration being that the joint venture gets long-term

10

1  rights to the trademark.  We're in the middle of litigation.

2  They purchase subject with full knowledge of our preexisting

3  contractual rights.

4          So, with full knowledge about preexisting

5  contractual rights, we want to see the due diligence that

6  went into this transaction.  We believe the transaction

7  breached our rights under the joint venture agreement.  We

8  believe there was a tort inducing breach of contract and

9  interference.

10         We want to know what legal opinions, what

11 analyses, what risk assessment, what evaluation of the

12 business opportunity.  We could have asked one request.  The

13 first 20 requests all relate to the transaction.  We could

14 have asked one request, all documents related to the

15 transaction.

16         Instead we parsed it and we said specifically in

17 each document request, one request is for board minute

18 meetings, one request is for financial analysis, one request

19 is for legal opinions, one request is related to risk

20 assessment.  So we parsed the different little things that

21 we thought would be relevant.

22         Now, with respect to your initial question, we

23 believe the treatment of the Philippines, and maybe

24 Indonesia or Europe or some other jurisdictions, where there

25 was no dispute as to ownership of the trademarks, the amount

11

1  of due diligence that they did in -- with respect to those

2  jurisdictions would be relevant to the -- we would suspect,

3  the much greater amount of due diligence that was done in

4  connection with purchasing -- allegedly purchasing an asset

5  in the middle of litigation.

6        It's always been our position that if they wanted

7  the U.S. rights, they couldn't just buy it from one joint

8  venture partner, they had to buy out the other joint venture

9  partner.  They made the decision to litigate instead of

10 buying us out.  We believe we had a buyout right under the

11 joint venture agreement, and they opted to litigate under

12 their theory of the case.  We believe it's barred by res

13 judicata, by the way, but that's a different story for --

14 that's for the Ninth Circuit to decide.

15       We believe we have the prevailing interpretation

16 of the contract.  We prevailed on the very interpretation of

17 the contract in state court.  The court -- the federal

18 circuit -- I don't -- the district court interpreted it

19 differently.  We don't think -- we don't think that was --

20 is permitted under the full faith and credit clause.  But be

21 that as it may, the relevance of the transaction and all the

22 20 requests are one simple theme, the purchase agreement

23 that allegedly is this wellspring of their rights and how do

24 these trump our preexisting rights.

25       THE COURT:  Okay.  No, understood.  So I think the

12

first step probably is a protective order, if you don't
already have one.  Just based on what you've told me, it
seems to me that a protective order is appropriate in this
case.

MR. MALYNN:  We've agreed to one, we've just been
waiting for them to send it to us.  They sent it to us, we
-- we said there's some pagination issues.  I looked at the
burden of proof and I looked at the designations.  It was
pretty straightforward, you know, a -- two-tiered,
confidential --

THE COURT:  Okay.

MR. MALYNN:  -- and attorneys eyes only.

THE COURT:  Got it.

MR. MALYNN:  So we're all on agreement that there
should be one --

THE COURT:  Okay.

MR. MALYNN:  -- we just haven't gotten it back
from them.

THE COURT:  Okay.  All right.  So that should be
the first order of business.

In terms of what gets produced, you know, the
difficulty is, without knowing how the transaction -- what
the transactional documents look like, I'm not sure Mr.
Murphy's proposal works in this sense.  There may be, you
know, some paragraphs or some exhibits that relate solely to

13

1  Indonesia or the Philippines or what have you, and I think

2  those in the first instance could be redacted.  If those

3  provisions relate solely to something out -- to a territory

4  outside the United States, but, you know, many provisions

5  are not written that way.  And so, I'm not sure how this

6  proposal works, but --

7           MR. MALYNN:  Didn't I have a carve-out on that?

8           THE COURT:  -- in the -- a carve-out form?

9           MR. MALYNN:  IP.  We would like to see their

10 treatment IP because we think their treatment in other

11 jurisdictions on IP -- we -- you know, there are other

12 issues that might be involved in this transaction that are

13 unrelated to IP, but we're focused on IP.

14           THE COURT:  Right.  But in other words, the

15 purchase of the trademarks in some other country, how is

16 that going to relate to the United States?

17           MR. MALYNN:  The amount of due diligence --

18           THE COURT:  Maybe, you know, other -- I mean the

19 law may be different in the Philippines than in the United

20 States.  I mean, how are we going to delve into this?  I

21 don't see the relationship.

22           MR. MALYNN:  Okay.  If there is no dispute in the

23 Philippines as to ownership, I'm assuming due diligence

24 might have been quick work.  Whereas, when you're purchasing

25 IP that subject of a lawsuit and a joint venture agreement

14

and preexisting licenses, whether you think they're

enforceable or not enforceable, there might be a whole host

of due diligence that you won't see in other jurisdictions.

So to compare and contrasting I think would be

relevant to a jury to see that they spent two hours to do

due diligence in the Philippines, but they've spent two

weeks or two months doing due diligence in the United

States.

THE COURT:  That seems to me to be a stretch.

First of all, we don't --

MR. MALYNN:  Okay.  Well, that was your estimate.

THE COURT:  Yeah.  That's -- yeah, that seems to

me to be a stretch, and I'm not sure to what extent anyone

is going to allow comparisons between whatever legal system

they have in one country versus another, and how you would

compare the due diligence, and what if there are lawsuits in

other countries, and how do you access those.  I mean, we

could be, you know, going down a rabbit hole that --

MR. MALYNN:  Well, I appreciate you hearing me

out.

THE COURT:  -- that is so tangential to the issues

here that I think -- I'm not inclined to go there.  I think

better -- the more difficult question's going to be what Mr.

Murphy is proposing.  Because you would only be able to

redact those portions that relate solely to another country.

15

1          MR. MURPHY:  So, your Honor, if I may?

2          THE COURT:  Yeah.

3          MR. MURPHY:  I've actually -- I've seen the deal

4    documents, and it's -- it is a very large transaction.  I

5    mean, this was a lot of money that changed hands here.  So,

6    I have looked at it, and I do believe it's possible to -- to

7    provide access to those -- every -- the full scope of what

8    would affect this case.  The trademark rights, what was

9    assigned and what was sold and anything that relates to the

10   United States.  I don't think anything else matters.

11         And I will say this, just to -- two more points.

12   First, I would like -- just because we have a protective

13   order -- and this is kind of a comment I'd like to make just

14   to preface the rest of the discussion, doesn't mean that our

15   competitor gets to see things.  Well, you've got a

16   protective order, stamp it, because the --

17         THE COURT:  I agree with you on that.

18         MR. MURPHY:  Yeah.  Okay.  So, the other issue is

19   this.  I know that defense counsel really wants to make

20   whether or not we purchased or have ownership of the

21   trademarks at issue.  The problem is, is that I've asked in

22   our meet and confer, you are not a party to the contract, we

23   all agree that.  So, you're trying to do a collateral attack

24   almost on the agreement.  How is -- I've never seen that

25   done, so do you have any authority for that?

16

1          Moreover, if I have the deed that assigns the good

2     will, and we've presented it to the Court.  It's in that

3     preliminary injunction ruling.  We have a deed that states

4     the good will, and the USPTO identifies us as having

5     obtained all ownership and the good will, what else could

6     you find that would undermine that?

7          What -- like what -- tell me a document or an

8     authority that would -- that would undermine those evidence?

9     The seller says they sold it.  We're the buyer, we say we

10    own it.  No one else is questioning it.  So --

11         THE COURT:  Well, but I can't force a party to

12    stipulate to something.  I mean, it's still going to be part

13    of your claim and your element and your burden of proof, and

14    so he would be entitled to do discovery.  I can't say to

15    him, well, are you really going to dispute this or whatever.

16    I mean, I -- there's no way for the Court to short-circuit

17    the discovery process unless the parties voluntarily do

18    that, but that doesn't sound like it's happening here.

19         So I think we have to go forward on the basis that

20    this is a disputed topic.  The issue of who owns the

21    trademarks is in dispute, and you will be able to present

22    your arguments to the district judge and so will the other

23    side.  My task is simply discovery.  So I just need to

24    ensure that both sides get the information they need in

25    order to present whatever arguments they're going to present

17

1  to the district judge.

2          If there's a stipulation, that's a different

3  story, but I'm not hearing one here.  Unless I'm

4  misinterpreting the comments, but I'm not seeing any

5  agreement between the parties on the ownership issue.  I

6  think we just need to proceed on the basis that this is

7  going to be in dispute, and that Plaintiff is going to have

8  to come forward with the evidence to show that it owns.

9          MR. MALYNN:  May I ask -- may I ask a quick

10 question just about kind of how we're -- the perspective

11 that we're here is -- I guess my -- my understanding is,

12 we're as kind of the  informal conference to try to come to

13 some agreements in advance of potentially having to file a

14 motion, the Defendants, which then would be ruled upon by

15 your Honor.

16         So, I have a question for how we look at that

17 ultimate question.  Is it not the case that if a -- if there

18 isn't actually any possible evidence that could undermine

19 what I view as pretty conclusive evidence that the Court

20 found was likely to succeed, if you -- if there is no

21 possible evidence out there, then isn't that relevant to a

22 determination of proportionality and scope, right?

23         If -- I guess -- and I ask that really because if

24 you notice that since counsel kind of started talking about

25 more than just deal (indiscernible), he even mentioned legal

18

1  opinions.  I don't understand how they get legal opinions,

2  but -- and so they're -- they are actually trying to break

3  this out into a much larger scope, and I just wonder to what

4  end?

5            THE COURT:  Well --

6            MR. MALYNN:  Your Honor -- okay.

7            THE COURT:  -- let me just -- because I don't want

8  to get too much into the merits here.  We've done a lot of

9  that just to get kind of background.  But I think what I

10 would say is, you know, in terms of discovery, we look at

11 the factors in Rule 26(b)(1), but I don't require -- I don't

12 know of any authority that requires people to come forward

13 with evidence to support their position in order to get

14 discovery.

15            In other words, we look at proportionality based

16 on the claims and defenses as they exist.  It's not as

17 though I can require a party to -- you know, we're not doing

18 a mini summary judgment here or a mini trial on discovery

19 requests.  That's not the point, because that's not my role.

20            So I think we have to get away from what showing

21 does the Defendant need to make on the merits in order to

22 get the discovery.  I'm not going to do that here.  I don't

23 have mini trials or mini evidentiary hearings or -- you

24 know, just to discuss proportionality.  That's not how we

25 work it.

19

1          So, I think what I'm trying to get is -- that's

2    why I was asking about any overarching views that might help

3    us deal with -- instead of going document request by

4    document request, often time there's a theme here.  And

5    maybe this one thing that we're discussing right now is one

6    that can cut across at least the first 20, which is -- and

7    the Plaintiffs in the first instance, once there's a

8    protective order in place, can go through the transactional

9    documents and redact out provisions that relate solely to

10   another country.

11         Now, many of the provisions might not, and you

12   seem to be -- you, Mr. Murphy, may have alluded to one,

13   which may be that there is one price paid, and then what

14   does it cover.  Well, you'd need the price and what it

15   covers.  If it covers the United States, it may not -- the

16   price paid may not have been separated by country.  That's

17   what I'm talking about.

18         So I'd say that it's difficult sometimes, because

19   while you can take out provisions that relate solely to

20   another country, you -- sometimes you have provisions that

21   don't, and then additional discovery needs to be done in

22   order to figure out if there was any valuation placed on the

23   United States separate and apart from the other countries,

24   and that's -- you have to delve into more than just the

25   transactional document.  You may need some additional

20

1  discovery.

2          So, I think that in the first instance, I think

3  Mr. Murphy's proposal maybe as modified by me may work.

4  Let's see what it produces.  But is that all we need to

5  discuss in terms of document requests one through 20, or is

6  there something else?  Again, I didn't have a chance to

7  really look at it in any depth before the hearing.

8          MR. MURPHY:  So, your Honor, unfortunately, I

9  don't have the -- I don't know what you're looking at

10 because I didn't get copied on it.  So I've asked by e-mail

11 like five times this morning --

12         THE COURT:  This would be -- what I have --

13 because I think what was attached were the wrong document

14 requests entirely.  But can we just --

15         MR. MURPHY:  I understand, but I don't know what

16 you're looking at and --

17         THE COURT:  What I'm looking at.  Okay.  So it

18 should be --

19         MR. MURPHY:  I wish -- I wish that we would just

20 get the reports.

21         THE COURT:  Yes, I asked him to do that.

22         MR. MALYNN:  I'm doing it right now.

23         THE COURT:  By the way, we --

24         MR. MALYNN:  I'm doing it right now.

25         THE COURT:  -- we have -- because my clerk

21

1  noticed, my CRD noticed that it wasn't -- it wasn't copied

2  to you.  So, I directed her to contact defense counsel and

3  ask him to send that on, because we shouldn't -- first of

4  all, I think we will need to get an amended joint agenda on

5  the docket so that we are -- we all know what we are looking

6  at.  So that's one thing.  This will need to get on the

7  docket.

8         But, also, please do not send to my CRD, unless

9  we're talking about, you know, settlement conference, that

10 kind of -- they're all confidential situations, but in terms

11 of discovery, that should not happen.  So, please, always

12 copy the other side on any communications to my CRD.

13        Okay.  So what I have, just so you know, it would

14 be Spavi's response to PCJV's request for production of

15 documents set one.

16        MR. MURPHY:  I understand.  I understand.  I just

17 wish I had the actual --

18        MR. MALYNN:  It's in your in box, Mike.

19        MR. MURPHY:  Okay.  So, if I could just open up

20 what you were --

21        THE COURT:  Exactly.

22        MR. MURPHY:  Okay.  So, in these -- so -- so, I

23 want -- actually want to bring this up.  So, we have

24 actually proposed that if you -- these other requests, they

25 get broader and broader and broader.  So other than

22

1  privileged stuff, which I don't really think we should have

2  to talk about today because it's obvious, like legal things.

3          But when they ask for all documents related to due

4  diligence, for example, due diligence was a long process of

5  two multi-national corporations regarding the transaction.

6  It was massive.  Potato Corner U.S. was less than five-

7  percent of the -- like the total number of stores, so it

8  wasn't like, you know, the major priority.

9          So I have suggested that we -- that we limited the

10 gathering and production to those documents in due diligence

11 or letters of intent or anything that mention the United

12 States, the -- we can come up with search terms that are

13 specific to the United States, or that the ownership or

14 licensing as it relates in the United States.  I have

15 proposed that.  And it's actually easier -- it's easier for

16 me to instruct my client as to how to conduct a search for

17 that than, you guys need to produce all documents related to

18 due diligence.

19         Well, first of all, attorneys were on due

20 diligence, the whole thing, so that's a very challenging

21 thing.  But all documents related to letters of intent or

22 how you learned about the opportunity.  Well, I don't know

23 how to tell my clients to search their whole company for

24 that, right, but I do know how to tell them to search for

25 documents that refer to PCJV U.S., right, anything like

23

1  that.  And we can talk about search terms that are specific

2  to the United States.  I have suggested that.

3          MR. MALYNN:  Your Honor, the timing of the

4  transaction it speaks volumes.  It's in the middle of

5  litigation when we -- we are having our own communications

6  with Cinco to acquire -- to potentially acquire the same set

7  of assets.  So, it's not -- this is -- it's not -- I don't

8  think it's fair to say that it has nothing to do with the

9  U.S. or very little do with the U.S.  I think this whole

10 transaction has everything to do with the U.S.

11         But with regard to due diligence, they've already

12 submitted three declarations that speak to due diligence,

13 but they don't attach any due diligence.  They just say, you

14 know, we did due diligence and here's our opinion about it.

15 So, of course we're going to ask for the documents

16 underlying their testimony that they put in the -- into the

17 record.

18         MR. MURPHY:  The limitation that I've described,

19 your Honor, would allow those documents to be disclosed as

20 highly -- under the highly confidential stamp.  But any

21 documents that refer to the U.S. or trademarks that are used

22 in the U.S., that -- those documents would be covered.

23         MR. MALYNN:  Your Honor, can I just quickly add

24 something from a factual standpoint.  I heard Mr. Murphy say

25 that the U.S. only accounted for five-percent of the total

24

1  stores internationally.  I'd just like the Court to

2  understand that each one unit in the United States accounts

3  for perhaps 10 to 20 times the revenue of one unit

4  internationally.

5          So the United States, yes, there's a thousand

6  locations worldwide.  A lot of them are street cart stands

7  and things of that sort internationally, whereas the United

8  States' units are units within malls, major malls like

9  Westfield, Meijorich, Simon.  And so they're a big piece of

10 the financial pie involved in the United States.

11         THE COURT:  Okay.  So then I think we have an

12 approach for request number one, but for request two through

13 20, it's more challenging.

14         So the issue is really how to capture the United

15 States in the search, because we don't -- again, the

16 documents may not be limited to the United States.  So you

17 may have discussions, for example, if there's the business

18 opportunity and the valuation, which is, I think two and

19 three, you know, the document itself may deal with overall

20 business opportunity, and then the United States may be

21 mentioned in there.

22         MR. MALYNN:  So --

23         THE COURT:  But I don't know that you're going to

24 be able to isolate the documents that way, or, you know,

25 again, redaction is possible, but I'm not sure that the

25

1  search for the documents will be any different.

2        MR. MALYNN:  So, may I -- if I may comment on

3  that.

4        THE COURT:  Yes.

5        MR. MURPHY:  So, the -- I think now is when we get

6  the proportionality.  Because if we step back, I don't

7  really know how discovery of the business opportunity has

8  anything to do with the claims at issue.  They are violating

9  our trademarks by continuing to use our trademarks after

10 termination.

11       What we talked about in 2021, about the -- this is

12 a great deal.  Who cares.  It's not going to the jury and

13 it's not going to lead to anything that will go to the jury.

14 Same thing with, you know, due diligence.  If we -- if it

15 refers to the United States, you know, this is what's going

16 on in the U.S.  This is how it affects value, right, of

17 course that -- we would produce that under the protective

18 order.  I've proposed that.

19       But as far as, you know, how the Malaysia stores

20 operations and whatever entity they have is going to be

21 allocated whatever, I don't really know how a discussion

22 about that --

23       THE COURT:  Yeah.  Again, if you can -- the parts

24 of documents that relate solely to another country is one

25 thing, but I'm not sure that that's going to -- that's the

26

1  redaction process.  I'm not sure it's going to affect what

2  documents you are looking for.

3          MR. MURPHY:  So we're --

4          THE COURT:  Many of them may be related to more

5  than one country, including the United States.  So it's not

6  the collection, but that -- the problem we are talking about

7  is redaction.  But in terms of how you collect the

8  documents, I'm not sure that the collection process is going

9  to be any different.

10         MR. MURPHY:  I understand --

11         THE COURT:  I think that you're wrong.  I think

12 you need to talk to your people to see how they did this.

13         MR. MURPHY:  I actually do and I have.  I actually

14 know -- I do know, and I can report to the Court and to

15 defense counsel that, you know, putting aside what I believe

16 is the fundamental problem, which each of these two through

17 20, it's hard to justify how that specific category of

18 documents will have any relevance to this case, which means,

19 why should I be asking my client to do this search for

20 documents on how they discovered the opportunity, because I

21 don't know what that matters.

22         Putting that aside, I can tell you that there

23 wasn't much discussion about the United States.  There

24 wasn't much discussion about how things going on in the

25 United States would affect all of this.  There -- this is --

27

1  you know, this was largely --

2          THE COURT:  Okay.

3          MR. MURPHY:  -- a transaction regarding assets in

4  other countries.  It was -- that's kind of what we were

5  dealing with.  It wasn't this -- the United States just

6  wasn't a big focus.  And actually, ownership of the marks

7  wasn't a big focus, because it was assumed as kind of the

8  fundamental part of the deal, we're buying the trademarks.

9  And so --

10         THE COURT:  Okay.  But there may be

11 representations that you got from the other side as to

12 ownership.

13         MR. MURPHY:  Sure.  Absolutely.

14         THE COURT:  There may have been some discussion of

15 being in litigation, maybe, maybe not, over the joint

16 venture, et cetera.  I mean, that seems to be what the

17 Defendants want to know, what did you know about --

18         MR. MURPHY:  We will produce that.

19         THE COURT:  -- the --

20         MR. MURPHY:  And that is absolutely within the

21 scope of what I'm proposing.  But I guess what I'd like us

22 to remember is, we're -- the scope of the deal.  It was a

23 global deal.  And what was going on in the United States, we

24 all knew what was going on in the United States, right.

25 There was a litigation they were trying to settle.  And so

28

1   that was -- the scope of the due diligence was kind of,

2   what's happening in litigation?  They're negotiating a

3   license.  What's our -- what's our position on the license

4   terms being negotiated was really the extent of it.  And

5   so --

6           THE COURT:  Okay.  So then it sounds as though you

7   may have already collected these documents.

8           MR. MURPHY:  I've done -- I've done a lot of work.

9   I just haven't told my client to finish it because I'm not

10  quite sure the scope, and I'm concerned about their

11  resources that would be allocated if I were to say, I guess

12  we're producing all the due diligence documents.

13          And, you know -- and, again, we haven't addressed

14  this, but, again, I want to remind us all that the

15  Defendants are our competitors now.  And so I don't know why

16  we should be providing the innards of our entire brand and

17  operations to a competitor if it doesn't really relate, but

18  I haven't just -- we haven't completed the search because

19  I'm not quite sure of the scope.

20          THE COURT:  Well, the beginning -- the document

21  requests that we're talking about now after number one,

22  don't relate to the current operations, unless that was --

23          MR. MURPHY:  It's very recent.  We were buying --

24  they were buying -- this is just a couple years ago.  So

25  when you're kind of talking about due diligence as to how

29

1  this global brand is operating, I don't want to produce that

2  to a competitor unless I really have to and it's like

3  central to the case. But, you know, and that's kind -- what

4  I was thinking -- as I was going through these requests,

5  what I wanted to do was, I was actually thinking about -- I

6  totally disagree with Defendants' positions, and I think the

7  Court and the injunction ruling was right. But if -- let's

8  say they had a colorable basis for these. What would I

9  search for and how could I limit this so I'm not telling my

10 client, you've got to produce everything? And so that is

11 how we came up with the proposal.

12          THE COURT: Okay. I think that the -- I think

13 we're kind of saying the same thing as to all of these --

14 the requests, maybe two through 20, is that you will be

15 going through these, but producing only what relates -- what

16 can apply to the United States.

17          So the same idea that we talked with in number

18 one, which is, you know, excluding documents or parts of

19 documents that relate solely to other countries.

20          MR. MURPHY: Correct. And I -- I would -- it's

21 interesting. When we had our meet and confer with defense

22 counsel, I actually used the example of, you know, a food

23 inspector in a village in Malaysia, right. And, you know,

24 the request eight asks for all -- or it was one -- all

25 regulatory filings. But what if some -- one store in

30

1  Malaysia had to file a report regarding food safety, like

2  that -- this request would call for that.  And I --

3          THE COURT:  Right.  No, no.  Regulatory filings --

4          MR. MURPHY:  -- potential -- yeah.

5          THE COURT:  -- should be limited to the United

6  States.

7          MR. MURPHY:  Right.  But I made that comment and

8  the response was, I'm being unreasonable and thinking about

9  the extremes, except I do have to tell my client how to

10 search for things.

11         THE COURT:  Right.  No, no, no.  I think -- I

12 think that we have an approach to two through 20, which

13 would be to produce the documents that apply in these -- in

14 these various categories, the valuation, for example.

15 There's a discount for PCJV or a communication.

16         MR. MURPHY:  There was no discount.  There was no

17 discount

18         THE COURT:  Okay.  Then maybe there's nothing

19 that's responsive to that --

20         MR. MURPHY:  Well --

21         THE COURT:  -- the due diligence portion that

22 applies to the United States.

23         MR. MURPHY:  Yeah.

24         THE COURT:  So, I think that if -- with that

25 approach on two through 20, we ought to be able to do it.

31

It sounds like you have collected the documents, it's just a
question of going through them and excluding the portions
that relate solely to some other country.  So if these are
regulatory filings in Malaysia or wherever, I think you can
exclude them.

MR. MURPHY:  (Indiscernible.)

THE COURT:  Regulatory filings in the United
States, however, is a different story.

MR. MURPHY:  If we could -- it doesn't capture all
the problems.  I'd like to go to request number 10, and this
is a different set of problems.

THE COURT:  Hold on.  Let me get to number 10.
Yes.

MR. MURPHY:  And, remember, "you" means every
person who works for this multi-national corporation.

THE COURT:  Right.

MR. MURPHY:  I mean, if a person in Indonesia
sends an e-mail saying, we just bought Potato Corner, right,
I mean, I don't -- I need to be able to -- to -- I'm not
asking my client to do a search company wide for e-mails
that refer to Potato Corner.

THE COURT:  I was going to suggest for something
like this -- first of all, again, we're talking about the
acquisition of Potato Corner assets in the United States.
But in terms of communications with anyone, I think with

32

1   number 10, you may also want to consider who the custodian

2   should be for that.  Because, you know, you can't ask every

3   single person in the company to search for this kind of

4   document.  But I think once you do the production as to the

5   other ones, let's say two through nine, for example, you

6   will probably get a handle on who actually was involved in

7   these negotiations, and that might enable you to come up

8   with a manageable list of custodians to search in response

9   to number 10.

10          MR. MURPHY:  That didn't deal with proposed --

11  kind of what I believed to be those custodians at the

12  outset, and then we're gathering documents based on that.

13  And then if defense counsel says, we believe there are other

14  custodians, here they are or here are the categories of

15  custodians, then we can negotiate that.  And I'm not drawing

16  a very -- I'm drawing a somewhat broad scope around who

17  those custodians would be.

18          MR. MALYNN:  We obviously have no visibility on

19  the custodian side.

20          THE COURT:  Right.

21          MR. MALYNN:  When we see the transaction-related

22  documents, that's -- at least that relate to the U.S.,

23  that's going to give us the insight.  I don't see why they

24  wouldn't be -- correspond to those people.

25          THE COURT:  Right.  I think what all he's saying

33

1   is, is that rather than do this -- rather than postpone

2   number 10 until the other documents are produced, Plaintiff

3   will chose custodians in the first instance, and include

4   that production.  And then the Defendants can come back and

5   say, you know, we've looked at your list and we think you

6   should add this person or that person for whatever reason,

7   but he just doesn't want to do this in two stages.

8           They'll just give you their choice of custodians

9   and produce those documents, and then you can -- you are

10  free to come back and add somebody based on something else

11  that you see.

12          MR. MALYNN:  We're fine with that approach, your

13  Honor.

14          THE COURT:  Okay.  Great.  All right.  So that

15  works for number 10.

16          Was there any other one that had that kind of a

17  problem?

18          MR. MURPHY:  Let me just try to skim through.

19  Eleven would be similar.

20          MR. MALYNN:  Eleven would be similar.  Right.  And

21  -- okay.  Yeah.  So request 14, "all public communications

22  made by you."  It's related but a little bit different.

23          THE COURT:  I'm not sure.  That one seems to be --

24          MR. MURPHY:  Well, public communication could be

25  -- I mean, if -- the way they -- okay.  Part of it is a

34

drafting problem.  You know, it's -- these suffer from a

little bit of the over-inclusiveness in definition.  I'll --

THE COURT:  But if you limit this to -- I see what

you're saying.  Was there some entity within the Plaintiff

that makes kind of press releases?  Maybe you could just

search that entity.

MR. MURPHY:  If we limit it press releases, you

know, or statements -- maybe statements made officially as a

part of the public relations of Spavi or something, I could

-- we -- I could work with that, but I just was concerned

about the definition of public communications.  Like if our

CEO, Vic, is out, you know, giving a speech, for example, at

a benefit on management's side --

THE COURT:  Right.  That's -- that's what I was

thinking, too.  Is sometimes people get interviewed, and

that -- does that include this?  But I think what it would

depend on, is there some central repository?

MR. MALYNN:  Yeah.  I think --

THE COURT:  So, something like press releases or

if there's a public relations.  I just don't know how the

Plaintiff is organized.  But maybe -- again, this is one

where you -- in response to number 14, you can tell them,

you know, we searched this particular database of press

releases, and this is what we're producing.

MR. MURPHY:  (Indiscernible.)

35

1          MR. MALYNN:  I'm assuming you have a file that
2  gathers these type of public communications and they'd all
3  be in the same spot.  And if they're not, that's what I was
4  -- that's what we were contemplating, your Honor.
5          THE COURT:  Okay.
6          MR. MURPHY:  I'm pretty sure that as a -- the SEC
7  guidelines and regulations have requirements on public
8  disclosures, because you always have to worry about forward
9  looking statements, blah-blah-blah.  So, I'm pretty sure if
10  we limit it to those types of statements, I -- we can comply
11  with that as well.
12          THE COURT:  Yeah.  So at least in the first
13  instance.  Like I said, there may be custodians that come up
14  later, but I would say why don't you start with the press
15  releases that you mentioned or the SEC requirements.  I
16  think that makes sense.
17          MR. MURPHY:  Let's see.  Yeah, that's the "us."
18  All communications amongst you and your employees.  If we
19  limit it to the -- that's 17.  If we limit this to the, you
20  know, to the custodian agreement we have.  And that actually
21  might be helpful for Defendants because they might see other
22  people who they think are custodians as well, and we can
23  talk about that.
24          In the case between you and third parties, limit
25  it to custodians, that will help.  Eighteen -- nineteen,

36

"all documents related to compliance with any legal or regulatory requirements in connection with the acquisition of Potato Corner assets." Yeah. I think if we limit it to anything that -- you know, out of the two categories we've talked about before, location specific or --

THE COURT: I'm sorry. I'm -- I've lost you.

MR. MURPHY: I'm --

THE COURT: I saw 17 and 18, but where are you now, 19?

MR. MURPHY: Nineteen." Yeah, 19. All documents --

THE COURT: Okay. With 19, however, even within the United States, I'm not sure which regulatory requirements. So, I mean, because, again, with an individual store, there may be regulatory requirements in terms of, you know, ADA compliance. I mean, who knows.

MR. MURPHY: They weren't talking about individual stores. They know -- honestly, it was -- it was, we're buying the trademarks in the United States.

MR. MALYNN: We --

MR. MURPHY: (Indiscernible) loss.

MR. MALYNN: And at that point in time when these requests were made -- propounded, all the individual stores were with us.

THE COURT: Okay. So, in that case then, number

37

1  19 is just going to be related to the acquisition.  So it

2  will be whatever, you know, maybe SEC -- I don't know what

3  filings you made in order to announce this.

4          MR. MALYNN:  So it would --

5          MR. MURPHY:  Go ahead.

6          MR. MALYNN:  It would be that, your Honor, as well

7  as any attempts to create their own franchise in the United

8  States, the regulatory compliance if they tried to do that.

9  We don't know that they did.  It's my understanding that

10 they haven't, but that would be responsive if they tried to

11 create a competing franchise system in the United States,

12 what requirements were they complying with to do that.

13         MR. MURPHY:  I don't know -- hold on.  That I'm --

14         THE COURT:  No, 19 had to do with the legal or

15 regulatory requirements in connection with the acquisition

16 of the Potato Corner assets in the United States.  But if

17 what you're saying is, at that time what they would have

18 been acquiring, right, would have been --

19         MR. MALYNN:  If they were acquiring any --

20         MR. MURPHY:  Acquiring --

21         MR. MALYNN:  Anything related -- you're right,

22 your Honor.  It's probably not there, but if they -- it

23 wouldn't be limited to SEC if part of the acquisition was a

24 promised franchise system.

25         MR. MURPHY:  In the United States.  Okay.

38

1          THE COURT:  Yes.

2          MR. MURPHY:  I think our prior -- this is -- we

3    can do this.

4          THE COURT:  Okay.  All right.  Then I think there

5    isn't really a separate problem with 19 or 20.  It's going

6    to be limited to the United States, and that's enough in

7    terms of -- that over -- what we've been calling the

8    "overarching limitation" should be enough to deal with

9    numbers 19 and 20.

10         So then as I understand it, the parties agreed on

11   number 21, is that right?

12         MR. MURPHY:  Yes.  So, your Honor, here -- this --

13   it goes on -- affects another issue that -- that defense

14   counsel put as a proposed agenda, and it's this.  I asked

15   early on in the -- in the negotiation whether or not --

16   well, let me back up.  If you'd note, it says, "all

17   documents and communications related to the franchisees."

18   Okay.  So related is -- right, we've just gone from

19   referring to to related to, so that means communications

20   with counsel.

21         So I asked, before I do the search, can we please

22   agree that communications with trial counsel don't have to

23   be logged, because then it leaves -- that's a steering

24   agreement.  And I didn't get a response, and I did ask

25   again.  So I just want to know, if we can agree to that,

39

1  then I can then complete the search for this -- this set of

2  documents and we can produce them, but -- and tell them,

3  it's a hard to do.

4          MR. MALYNN:  Hold on.  First of all, it's not

5  accurate.  We did respond.  Arash e-mailed you a specific

6  proposal that you never got back to us on that.

7          Arash, you want to read what that proposal was?

8          MR. BERAL:  I don't have it.

9          MR. MURPHY:  When did you e-mail this?  Was it

10  when I was changing firms, because I might -- I might not

11  have received it.

12          MR. MALYNN:  Okay.  So there's -- there's an issue

13  here, and we tried to navigate it, trying to thread a

14  needle, is Mr. Murphy has been soliciting our franchisees.

15  So, this isn't about communications in connection with the

16  lawsuit, this is about communications with him contacting

17  our franchisees to flip sides.

18          MR. MURPHY:  I --

19          MR. MALYNN:  So, that's -- you're wearing two

20  different hats.

21          THE COURT:  Wait, wait, wait, wait.  Because 21 is

22  not limited to communications with the franchisees.  I think

23  that is a --

24          MR. MURPHY:  That's my problem.

25          THE COURT:  Yeah.  I mean, if we're talking about

40

1  communications with the franchisees, I don't --

2          MR. MURPHY:  Operation.

3          THE COURT:  Mister -- yeah, he's going to produce

4  those.  I think the problem is for internal communications.

5          MR. MALYNN:  Well, internal communications can be

6  listed on a privilege log.

7          MR. MURPHY:  No, I'm not listing all of my

8  communications --

9          MR. MALYNN:  Well, we made a proposal to you on

10 that.

11         Arash, can you find that?

12         MR. BERAL:  Yeah.  I don't have it in front of me.

13 I can go find it, but I think what we were trying to

14 establish is, look, if Mr. Murphy -- if, you know, he was --

15         MR. MURPHY:  Well, I did respond to this.  I did.

16 Go ahead.  I now remember my -- I know the proposal in my

17 response.

18         MR. MALYNN:  He was litigation counsel in the

19 state court action.  To the extent he was working as

20 litigation counsel, sure, it doesn't need to be logged.

21 That was be insane for him to log all his e-mails and

22 communications as litigation counsel.  But to the extent his

23 law firm as transactional counsel relating to the

24 transaction, and they believe something is privileged, I

25 believe we're entitled to know what that is.  I think that

41

1  was our -- the sum and substance of our proposal.

2          MR. MURPHY:  So if I might just provide a little

3  context, so the Court understands what is being talked

4  about.  So, when my client -- when our client terminated the

5  license on May 31 of last year, at the same time it was

6  concerned about the effect any injunction would have on

7  third-party franchisees who didn't ask for any of this.

8          And so -- and that was -- and so we sent letters.

9  I did -- and I'll produce those.  We sent letters to the

10 franchisees, to the extent we knew where they were, saying,

11 you're -- the license has been terminated.  There's a

12 lawsuit.  There's going to be an injunction.  And so we want

13 to work with you so that you business is not disrupted.

14         So, yes, it had a business aspect, but it was

15 always in the context of, I'm about to file a motion that

16 might shut your business down, so you might want to talk to

17 these people about -- about getting it done.

18         So I guess the transactional versus litigation

19 counsel, it's hard for me to know how you draw that line

20 because I always viewed my role as a litigator trying to

21 make sure that third parties didn't get -- weren't part of

22 the body count, so.

23         THE COURT:  Yeah.  I'm not sure how to do that

24 because it sounds like these communications occurred in the

25 course of this litigation, correct?

42

1          MR. MURPHY:  Yes, 100-percent.

2          THE COURT:  Okay.  Well, you don't have any

3  problem producing the communications with the franchisees

4  themselves, right, back and forth?

5          MR. MURPHY:  Yeah.  Although -- well, let me back

6  up.  Up until the -- I guess in December at a certain point,

7  defense counsel started raising accusations of interference

8  and colluding, right, and then they were at the same time

9  issuing threat letters to the franchisees that were similar.

10  So we do at that point have a -- have the common interest

11  privilege.

12          So if a -- you know, if I'm talking to the lawyer

13  of a franchisee who's just gotten a demand letter, and I'm

14  also getting a personal letter saying I'm going to be sued

15  for interference, there is kind of a common interest there,

16  and I -- that's something that we can talk about in the

17  common interest privilege.  I will log those for sure, but I

18  don't think those are -- I think those are potentially

19  privileged, particularly under Defendants' understanding of

20  the joint defense scope.  So --

21          THE COURT:  Okay.  So there were communications

22  also between Defendants and these same franchisees is what

23  you're saying?

24          MR. MALYNN:  There were --

25          MR. MURPHY:  Yeah.  No -- yes, there were.  There

43

 1   were -- they got a letter from another lawyer in -- at Blank

 2   Rome kind of telling them that you can't -- you know, they

 3   -- the franchisees sent a letter saying, we rescind our

 4   license because you have in your FTD these representations

 5   that you had a license that -- for 20 year or 50 years, and

 6   what you really had was a terminable at will.  We would have

 7   never entered into this agreement but for that.

 8            So they sent a letter rescinding, and then a

 9   lawyer from Blank Rome, not here today, sent a letter to all

10   of them saying, you can't do that and we will sue you.  And

11   at the same time they were also making representations to us

12   that they intended to sue our client for interference, and

13   potentially me.

14            MR. MALYNN:  There was never a cease and desist

15   letter to the franchisees prior to them rescinding.  There

16   was never a cease and desist letter to begin with from us,

17   but there was a response to their letter claiming a

18   rescission of the -- to their franchise agreements.

19            THE COURT:  Okay.

20            MR. MURPHY:  I --

21            THE COURT:  So let's do this, because I think this

22   will come up on both sides.  Produce the communications with

23   franchisees --

24            MR. MURPHY:  Yes.

25            THE COURT:  -- or at least log those

44

1  communications with franchisees that you are withholding.

2          MR. MURPHY:  Correct.

3          THE COURT:  So you'll either produce them --

4          MR. MURPHY:  Yes.

5          THE COURT:  -- or log them.  And then we can

6  address whether, you know they're covered by some privilege

7  or not.  But we're not going to be able to do that in the

8  abstract.  We're going to have to do that, you know, on a

9  document-by-document basis, or maybe we can categorize them.

10 But step number one is going to be understanding what is

11 actually being withheld, if anything.

12         MR. MURPHY:  Yes.

13         THE COURT:  So I would say with 21, let's go with

14 producing the communications with franchisees or log them.

15         MR. MURPHY:  Yes.

16         THE COURT:  You know, produce whatever you're

17 going to produce, whatever you withhold, put them on a

18 privilege log.

19         MR. MURPHY:  Yes, I will do that.

20         THE COURT:  In terms of the internal

21 communications, let's say among lawyers, where you may -- or

22 you may be communicating with clients, so there may be

23 attorney/client issues.  There may be attorney work product

24 issues in the sense of what a law firm internally

25 communicates.  Let's say if it's more than one person

45

1  involved or memos to file, something like that, I don't see

2  a need to log that.  I mean, ordinarily we would not log

3  information during a litigation.  Is there some reason why

4  someone would want that information -- a log of that

5  information?

6              MR. MALYNN:  It would only be with respect to this

7  narrow set of communications with franchisees which is --

8              THE COURT:  I understand.

9              MR. MALYNN:  -- which is --

10             THE COURT:  But let's say somebody does a draft

11  letter, and then says to somebody, you know, what do you

12  think and what -- I mean, why are we logging this?  Is there

13  any question that this is going to be work product?

14             MR. MALYNN:  We don't need to log those.

15             THE COURT:  Okay.

16             MR. MURPHY:  But --

17             THE COURT:  Yeah.  Because, I mean, it may --

18  that's going to be an issue on both sides.  That's why I

19  mean I think we need to have kind of a ground rule that we

20  begin with.

21             So, produce whatever communications with the

22  franchisees that you are going to produce, and then log the

23  documents that -- communications with the franchisees that

24  you are withholding.  And then let's see if there's any

25  challenge, but that's what we'll do with number 21.

46

1          MR. MURPHY:  And I would just have one limitation

2   to that.  That is if the known parties to the -- if you know

3   the communication -- the participants.  And I say only

4   because of this.  I know there were phone calls and

5   conference calls that involved counsel for Defendants and

6   Defendants and the franchisees, as they were then

7   constituted, and it wasn't quite clear who was listening in.

8   Like it might have been, you know, a manager of a store.  I

9   -- it wasn't clear because you didn't have to identify that

10  in the call.

11         So I'm not quite sure yet that that is -- that

12  there is a joint defense privilege.  I know they're going to

13  claim that, because I think it might have been waived.  So

14  if there's -- you know, I am going to have questions there,

15  but I --

16         MR. MALYNN:  I have no idea what you're talking

17  about.  You're talking about our privileged communications

18  with our franchisees?

19         MR. MURPHY:  I'm talking about --

20         MR. MALYNN:  That you took active --

21         THE COURT:  He's talking about, apparently, there

22  was a communication with Plaintiffs --

23         MR. MURPHY:  No.

24         THE COURT:  -- Defendants and --

25

47

1           MR. MURPHY:  No.  Defendants' counsel and all of

2    the franchisees, they had like a conference call.  They had

3    multiple, right, and people would call in.  And so I don't

4    know --

5           MR. MALYNN:  At the beginning of each call, we --

6    at the beginning of each call where me and Arash attended,

7    there was a roll call taken, and everyone agreed it was

8    common interest privilege with our franchisees, until the

9    rescission -- or alleged rescission occurred.

10          Prior to that, everyone would get -- there would

11   be a roll call.  There was announced that this was

12   privileged.  Everything was agreed, so we could speak freely

13   with our franchisees.

14          THE COURT:  Okay.

15          MR. MALYNN:  Now I'm hearing that he has

16   communications related to that.  Of course we want to see

17   that.

18          MR. MURPHY:  No, no, that wasn't the question.  My

19   question was --

20          THE COURT:  Yeah, that's what I think -- maybe

21   there -- maybe we misheard or you misspoke.  I -- it sounded

22   like the Plaintiffs were involved in this.

23          MR. MURPHY:  No.  My -- yeah, I misspoke.  The

24   issue is, I know that counsel Blank Rome and Defendant, like

25   Guy Koren, had a -- had this conference call.  And I do -- I

48

1  do believe that Mr. Malynn is correct, that there was -- you

2  know, we believe (indiscernible) privilege, and everyone

3  said, aye-aye, right, but I don't -- but they didn't have a

4  visual on everyone there.  They don't know who was listening

5  in.  It was people calling in.  So I'm not quite sure that

6  there wasn't a waiver, notwithstanding people saying, this

7  is joint --

8          THE COURT:  Look.  This is -- that's something you

9  will raise at a later point in time.  Right now, we are

10 talking about producing communications with franchisees.

11 Creating a log of communications with franchisees that you

12 are withholding, okay.

13         So that's how we're going to deal with the

14 document request number 21.  And then if there's a challenge

15 later, you know, we won't be able to do -- to resolve it in

16 a discovery conference.  I mean, usually privilege issues

17 require briefing because I need to make findings, and I

18 won't be able to do that just on the fly.

19         So I think for number 21, let's go with what I've

20 said, and I think that will resolve the issue.  The issue

21 with Defendants may be more complicated, but I still don't

22 think speculation is going to override a privilege if it

23 applies just because, gee, somebody could have been hacking

24 in or somebody could have been on there that nobody knows

25 about.  I mean, I don't see how I'm going to deal with that

49

1  kind of speculation, or how we would ever get to the bottom

2  of it.  I don't think speculation is enough.  But I think we

3  have an approach on 21.  So let's move on, because I have a

4  settlement conference this afternoon, so we're going to have

5  to get through this.

6          Is there -- now we have 22 through 27.  Is there a

7  common theme --

8          MR. MALYNN:  For --

9          THE COURT:  -- that goes through the --

10         MR. MALYNN:  Mostly deal with trade secrets or

11 allegations.

12         MR. MURPHY:  And this actually -- the big concern

13 came down to what we've been discussing.  So, I think if

14 we're -- actually, no.  So, 22's interesting.  So -- so,

15 this is, "all documents and communications related to the

16 allegation in our complaint that these specific ingredients

17 and purports" -- just saying, your Honor, their -- Potato

18 Corner has seven proprietary flavorings.

19         They are -- they are prepared by one supplier, now

20 two, by -- but it's regulated within the company.  There are

21 only two suppliers.  Everyone in the world that's their same

22 spices from the same two suppliers, and you go through Spavi

23 Central.  Back in the day they went through Cinco.  So

24 that's the context of this.

25         So -- and there's an allegation in the complaint

50

about that the -- a reverse engineering of these seasonings
after the termination of the license, which Defendants
dispute was valid, what constituted a trade secret trade.
So that's kind of -- so it's about reverse engineering of a
seasoning.  So --

            THE COURT:  Okay.

            MR. MURPHY:  -- the request was:

                "All documents and communications

                related to the allegations that the

                specific ingredients and proportions of

                the ingredients, as well as the recipe

                for preparation for each, are a deeply

                guarded secret and are your property."

            So, it -- which is a fair question, except the way
this was drafted is pretty broad, and I'll explain why.  The
-- this -- because this is a global brand, there is
confidentiality that -- that is global, right?  So you can't
be a master franchisor in, you know, Saudia Arabia, if you
don't have an agreement that you've got to protect
confidentiality, and that they're protecting confidentiality
in the umbrella (indiscernible).

            So, and I don't -- again, let's go to the Malaysia
food cart.  If the Malaysian food cart has entered into an
agreement with the franchisor of Malaysia that they will --
that they will keep things confidential, do I -- and then I

51

1  have to produce all document communications related to that.

2  So this can get very large if you think about the rational

3  conclusions of the definitions.

4          If we could limit it to -- you know, somehow, I

5  don't know how.  Maybe counsel for Defendants has an idea,

6  but that could be -- it's pretty extraordinary how that --

7  how broad that is.  Because every agreement, in fact, I

8  think every e-mail says, you shall keep this -- right.  So,

9  I don't know.

10         THE COURT:  Well, it might be easier if you have

11 confidentiality agreements that govern the recipe.

12         MR. MURPHY:  Yeah, that we can do.  Of course.

13 The specific -- you know, but, see, here's the thing.  So

14 the packages -- this is one layer of complexity.  The

15 packages of the seasonings that every store gets -- so, if

16 you're a -- if I'm a Potato Corner store, I'm only open

17 because I've been approved by central, right, through maybe

18 a master franchisor.  And I've agreed to keep everything

19 confidential.  I've got in my agreements that these

20 seasonings are trade secret, all of that exists.

21         So I get this package and I know that I'm governed

22 by that.

23         THE COURT:  Right.

24         MR. MURPHY:  The package lists the ingredients,

25 but it doesn't list proportions and it doesn't --

52

1           THE COURT:  Right.

2           MR. MURPHY:  -- list the recipe.  So every

3    franchisee actually has access to the list.  So, that list

4    is protected though because they've also agreed to

5    confidentiality.

6           So our problem is, is that after termination of

7    the license, they no longer have the right to use those, and

8    then by taking action after that it was unauthorized.  So

9    that is the crux, because every store has agreed to

10   confidentiality of the spices.

11          MR. MALYNN:  Let's -- let me back up.

12          THE COURT:  Could you -- okay.

13          MR. MALYNN:  Let me back up, because he's not

14   giving you the full picture.  The full picture is, Ferna,

15   who created the seasoning, is not Spavi and not Cinco.

16   Cinco is -- we learned through the first litigation that

17   they -- Cinco never owned the seasonings.  Cinco bought the

18   seasonings in an arms' length transaction from a different

19   developer who owns the spices, who sells the spices over the

20   internet.

21          So, it -- we're looking very fundamental to begin

22   with.  I'm not saying what Mr. Murphy told you was wrong.

23   I'm interested in that, too, but I'm also looking at this

24   very fundamental.  How did something that Ferna created and

25   owed become your property under -- and when did Ferna

53

1  transfer it to Spavi?

2         THE COURT:  Well, but see, that's what I'm trying

3  to say when I asked, aren't there confidentiality agreements

4  that govern the recipe?  I think that's what 22 is getting

5  to.

6         MR. MALYNN:  No, it --

7         THE COURT:  There may be an agreement.  There may

8  not be an -- I don't know if there's an agreement between

9  Spavi and the creator of the seasonings, but that's what I

10 thought 22 was getting at.

11        MR. MALYNN:  Well --

12        THE COURT:  If there's a third party, right?  If

13 there's a third party that created this recipe, then the

14 question is, you know, what are the agreements, if any,

15 between Spavi and that third party that relate to either the

16 ownership of it or the confidentiality of it.  I don't know

17 what is -- I don't know, does that mean Spavi owns it or

18 does that mean that the third party owns it, but is under

19 some kind obligation not to disclose it or not to distribute

20 it?  I mean, you know, the possibilities are many.  I don't

21 know what it -- what the answer is, but I thought what 22

22 was trying to get to are the documents that would apply

23 here.

24        MR. MURPHY:  Your Honor, I -- you are right.  The

25 problem is that it talks about related to, right, and so

54

1  then you've expanded it.  If it -- if we're talking about

2  just the core documents between the supplier and Spavi, yes,

3  we can do that.  I'm happy to do that.  But when we talk

4  about all documents related to the -- because it's that the

5  ingredients are a deeply guarded secret.  Well, the deeply

6  guarded secret is global.  So they --

7          MR. MALYNN:  Well, they -- part of their burden is

8  to prove under the --  said they're traveling under the

9  California Uniform Trade Secret Act, is that they took

10 reasonable efforts to maintain the secrecy of it.  So we're

11 looking for documents that establish their burden of proof,

12 what are they going to present at trial, and what can we

13 cross-examine if we didn't -- if we just said, give me the

14 documents you're going to use at trial, how are we going to

15 cross-examine those documents?

16         THE COURT:  Right.  No, no, that won't work.  I

17 think what we're talking about in 22 are the confidentiality

18 agreements or whatever they are.  I mean, I'm saying

19 "confidentiality agreements," and I don't know what -- what

20 this is.  I don't know how they did it.

21         So, it would be the agreements regarding the

22 recipes with the supplier.  And then are there any

23 confidentiality agreements that would cover this with the

24 franchisees or the stores?  Because you're saying that they

25 don't get the recipes, so I'm not -- I'm not clear what

55

1  would be responsive here.

2      MR. MURPHY:  So that -- so just to answer your

3  question.  So, let me give you an example.  Every franchise

4  agreement that PCJV entered into with third parties says,

5  you, franchisee, agree that the ingredients, the recipes,

6  everything that goes into the seasonings, is a trade secret.

7  They actually define it as a "Potato Corner trade secret."

8      So, that is with -- and so, that --

9      THE COURT:  Okay.  Okay, okay.  Got it.  All

10  right.  So then in terms of agreements with the franchisees,

11  do we need to go beyond the United States, or do you want

12  the franchisee agreement -- or confidentiality agreements,

13  because it's apparently the same seasonings across the

14  globe, do you need the agreements with every franchisee?

15      MR. MALYNN:  I would like any documents that

16  suggest reverse engineering would be inappropriate.  Because

17  the second supplier that he referred to was a product of our

18  client reverse engineering it.

19      MR. MURPHY:  (Indiscernible.)

20      MR. MALYNN:  And so it's already been reverse

21  engineered once, and nobody said boo.  This notion that all

22  of the sudden the packaging is -- that's publicly out there,

23  that's publicly sold, these packaging is not limited to the

24  stores, as much as he wants to put the horse back in the

25  barn.  What's listed on this packaging has never been

56

1 treated confidential, so we want -- we want documents

2 showing all of the sudden that publicly sold packaging is

3 all of the sudden confidential.

4          THE COURT:  Is it --

5          MR. MURPHY:  Your Honor --

6          THE COURT:  -- is it the case that the -- because

7 maybe what you could do is just produce one sample in the

8 countries outside the United States.  In other words, I

9 don't think -- if it's, you know, five documents and they

10 all say the same thing, I don't know that that's necessary.

11         Maybe you could just say, okay, we have this

12 agreement, whatever it is, that governs the confidentiality

13 with the franchisee, and this is the standard agreement we

14 use in Malaysia.  And this is the standard agreement we use

15 in, wherever, Singapore.  And this one is -- and then in the

16 United States, you can produce all of them.  But you will

17 need to produce the agreements -- I mean, you're talking

18 about two suppliers, so you definitely need to produce the

19 agreements with the two suppliers.

20         MR. MURPHY:  None of --

21         THE COURT:  Now you think with the franchisees,

22 Mr. Malynn, don't you think you just need one sample in each

23 country other than the United States?

24         MR. MALYNN:  That, yes, but I'd also like any

25 communication with any franchisee in any country or any -- I

57

guess it's really a franchisor set up in those countries,

that says, reverse engineering is bad.  I'm not aware of any

such communication.  Or maybe a little more specific.  That

the packaging that has -- that lists the ingredients but not

recipes, is all of the sudden confidential, like Mr. Murphy

just alluded to.

            THE COURT:  Okay.  So 22 actually goes not just to

confidentiality, but also if there's a mention of reverse

engineering in those agreements.  And we don't know --

            MR. MALYNN:  It goes to -- it goes to --

            THE COURT:  -- or not.

            MR. MALYNN:  -- taking steps -- if you think

something is a trade secret, you have to take steps to

protect it.  If you've never told anybody that the packaging

is confidential, and that reverse engineering is bad, when

everybody knows they reverse engineered it once, to complete

against their own supplier.

            THE COURT:  No, but wait a minute.

            MR. MALYNN:  I think that their correct --

            THE COURT:  Now we are getting -- we are getting

further afield maybe then what --

            MR. MALYNN:  Well, we're going to cover it in

these next requests.

            MR. MURPHY:  May I just address this, because I

can put this to rest very easily.  So I --

58

1          THE COURT:  Okay.

2          MR. MURPHY:  The difference between the two events

3    was that before Guy Koren was a licensee and was governed by

4    confidentiality, right, and his -- his stores were governed

5    by confidentiality.  After we terminated the licenses, they

6    shouldn't have been operating Potato Corner, so they

7    shouldn't have had the seasonings and they shouldn't have

8    been using them because that -- the relationship had ended.

9    So that's the difference.  So, when you are --

10          MR. MALYNN:  Confidentiality never covers other --

11          THE COURT:  Again, we're getting into the -- to

12   the merits of the case.  I don't think we want to do that

13   here.

14          I think the question is, what does -- what is the

15   scope of 22?  And so, it sounds like it's not just a

16   question of the agreements that we just discussed, but I

17   think maybe it's the agreements, and then you would need to

18   look at any communications about these -- in other words,

19   what is covered by the agreement?

20          MR. MURPHY:  So here's my -- my problem -- here's

21   my problem.  Any time anyone sends a copy of a franchise

22   agreement, that franchise agreement -- in any part of the

23   world, that agreement will refer to Potato Corner trade

24   secret's proprietary spices, whatever, whatever lingo

25   they're using.  I know in the United States, Guy Koren's

59

1   folks called it the proprietary -- or trade secret -- Potato

2   Corner trade secret seasonings or something.

3             So, any time they're sending or receiving that

4   agreement, it would be triggered.  So, I guess my concern is

5   that -- or maybe we can do this.  We do the -- a sample from

6   each country.  I can do that.

7             THE COURT:  Yes.

8             MR. MURPHY:  And if the words "reverse

9   engineering" or maybe we can talk about search terms that

10  are kind of --

11            MR. MALYNN:  Active labeling.

12            MR. MURPHY:  "Active labeling."  I mean, I don't

13  know you -- that's -- I mean --

14            MR. MALYNN:  That is a core --

15            MR. MURPHY:  This is a search term issue.  We're

16  talking about search term.  We'll negotiate that.  But if

17  the focus is on finding communications that would reveal

18  whether reverse engineering as a topic was discussed, we can

19  negotiate that -- those search terms.  I'm okay with that.

20            MR. MALYNN:  It's more of an enforcement issue,

21  how did you protect your trade secret.  And if you're trying

22  -- if you're saying all of a sudden packaging is a trade

23  secret, there should be communications that packaging should

24  -- confidentiality does not -- it reads something that's

25  already been publicly disclosed freely.

60

1          MR. MURPHY:  Yeah.  I know.  I'm just -- my

2  problem is that since each one of your client's agreements

3  with the franchisees would -- just says that these

4  seasonings are trade secrets.  So that's just saying --

5          MR. MALYNN:  None of it --

6          THE COURT:  All right.  So --

7          MR. MALYNN:  There's not an agreement that said

8  packaging is -- packaging is trade secret.

9          THE COURT:  Right.  I mean, I think -- first of

10  all, 22 is talking about the ingredients and the

11  proportions, so I'm not -- it's not clear to me whether the

12  trade secret covers only the ingredients.  I mean, many

13  people disclose ingredients on their packaging.  What the

14  don't disclose is exactly how much of each thing, and how to

15  make it.  So, I --

16          MR. MURPHY:  I can find -- I can bill five

17  documents on earth that have that.  I can tell you that.

18  Literally five documents that either the suppliers, and then

19  like, you know, under a lock and key in a couple places.

20          THE COURT:  Right.  Exactly.  So that's why --

21  okay.  So beyond I think the agreements that we've all

22  covered.  So you're going to produce the agreements with the

23  two suppliers, the agreements with the franchisees in the

24  United States, and outside the United States, one sample in

25  each country, assuming that there is a sample.  I mean, I'm

61

1 just assuming with the franchisees, let's say in one

2 country, each one signs the same --

3          MR. MURPHY:  Or similar agreement.  Yes.

4          THE COURT:  -- about the -- yeah, about, you know,

5 what -- however you define the proprietary ingredients or

6 whatever, it's all going to be the same in one country.  So

7 one sample outside -- for each country outside the United

8 States.

9          And then you will confer about the, you know,

10 search terms, and possibly custodians for what you do

11 outside agreements in response to 22.  Because I don't know

12 how you're going to do that.  There may be -- I don't know

13 how many people would be communicating with franchisees, and

14 I don't even know whether this has ever come up.  Were there

15 communications about what specifically these terms meant or

16 reverse engineering, I don't know, but you'd have to work on

17 that.

18          If you're going to look for communications across

19 the, you know, the globe, you're going to need to talk about

20 search terms and custodians.  And so you may want to first

21 see the production of agreements before you delve further,

22 because that might give you some hints about who was

23 involved.

24          MR. MURPHY:  And, your Honor, I think --

25          MR. MALYNN:  I think enforcement -- enforcement

62

1  communications typically come from in-house or somebody in

2  charge of protecting trade secrets.  So, I don't know who

3  that custodian is, but it's -- you know, this is a common

4  element in a trade -- in a trade secret misappropriation

5  case.  What steps did you take to protect your alleged trade

6  secrets?  It's on this day, this is the first time this

7  issue has ever been arisen.  And if we're wrong, we want to

8  see the discovery that you've done this before, or somebody

9  else has been --

10          THE COURT:  I see.  I see.  So that -- well, that

11  may be.

12          So from the Plaintiff's perspective, I don't know

13  if you've looked into that.  Is there someone in charge of

14  enforcement of these trade secrets, such that there are

15  communications about enforcement?

16          MR. MURPHY:  So every -- because it's a tiered

17  system, for example, let's say the PCJV in another country,

18  the master franchisor, would be obligated to do that

19  enforcement in that jurisdiction.  Sometimes there might be

20  communications with upstream, but -- so that's the problem,

21  but I don't think we have -- that's -- Or I think we do the

22  sample of the agreements, and the other two categories that

23  your Honor mentioned, I actually might do one step further

24  and just -- now that I know kind of what is being asked for,

25  and they really don't want every communication that refers

63

1  to trade secret, but they're really focused on the reverse

2  engineering question.

3          THE COURT:  Yes.

4          MR. MURPHY:  Now I can do some due diligence on my

5  end to kind of figure out what that would look like.  So

6  this has been a helpful discussion.

7          THE COURT:  Okay.  All right.  Let's see what --

8  the next one was a different topic, as I recall.  Twenty-

9  three was something else, which was the development.  That

10 the Defendants were simultaneously developing a competing

11 business.

12         MR. MURPHY:  This -- your Honor, this is totally

13 an attorney/client privilege, where it goes on the privilege

14 log issue.  Now that we've resolved that, this -- this is

15 resolved as well.  Because basically --

16         MR. MALYNN:  How is that?  You alleged it in a

17 complaint.  And you've argued in this --

18         MR. MURPHY:  I'm not fighting --

19         MR. MALYNN:  -- you've argued in this --

20         MR. MURPHY:  -- I'm not fighting with you.  No,

21 just let me finish.

22         MR. MALYNN:  Okay.

23         MR. MURPHY:  I wasn't finished.  You've got to not

24 interrupt me.

25         MR. MALYNN:  Okay.

64

1          MR. MURPHY:  I can answer --

2          MR. MALYNN:  Go ahead.

3          MR. MURPHY:  So the issue is, this was a --

4   something that was learned in the middle of litigation,

5   right.  And so, much of the communications related to this

6   allegation are between counsel -- litigation counsel.  Once

7   we strip that out, and we're not -- I'm not -- I don't have

8   to log those, I can respond to this.  We can go ahead.

9          THE COURT:  Okay.

10         MR. MALYNN:  Or there's been a waiver.  If you're

11  saying that the substance of this allegation is a disclosure

12  from counsel, you waived the privilege.

13         MR. MURPHY:  I didn't say that.  I'm talking about

14  your -- the request says, "all documents and communications

15  related to the allegation."  There are a lot of

16  communications between trial counsel that would have to --

17         THE COURT:  Right.  So what he's saying is, now

18  that --

19         MR. MALYNN:  Okay.

20         THE COURT:  -- he doesn't have to log those --

21         MR. MALYNN:  Understood.  Understood.

22         THE COURT:  -- he can now produce this.  So number

23  23 is not ripe for a dispute anymore.

24         And -- but I think with 24, we go back to this

25  issue of the trade secrets.

65

1          MR. MALYNN:  Yeah.  This one is a just a little

2  bit more broad, but it covers the same issues that we've

3  already discussed.

4          MR. MURPHY:  So, I'll -- yeah.  I guess I -- so,

5  let me -- I guess here's my question.  So, there was, you

6  know, the first store that was opened by PCJV was in 2012.

7  And so -- and the information feeding went back to 2009.

8  And so I guess we're talking a lot -- and so that

9  relationship between Cinco and PCJV was quite a long time.

10          And so I'm not quite sure what it is that we are

11  being asked to produce as it relates to the allegations in

12  this case.  I want to comply obviously, but I don't know

13  what specifically they're asking for.

14          MR. MALYNN:  In 24?

15          MR. MURPHY:  Yeah.  I don't -- because --

16          THE COURT:  Yeah.

17          MR. MURPHY:  Yeah.

18          MR. MALYNN:  What you provide -- what you allege

19  you provided to Defendants that you're claiming is

20  misappropriated.

21          MR. MURPHY:  So here's the -- so, I guess -- let

22  me be more specific.  So, we did not start -- we did not --

23  we were not a part of creating PCJV because we weren't even

24  around because -- with Spavi, Cinco was.  And the problem is

25  this.  As of -- let's say as May 31st, 2024, there can be no

66

1  dispute that PCJV was in possession of a host -- a universe

2  of Potato Corner documents, and some of those derived from

3  things they received from Cinco.  But I don't know what they

4  have because I'm not Cinco, I'm Spavi.

5          And now I did ask -- Vic did asked in a letter,

6  the CEO, in a letter, please provide us with an inventory of

7  all the documents you have related to this and we can figure

8  out who owns what, right, and we never had a response.

9          And so it's hard for me to know what I don't know.

10 I don't know all the things they have because it wasn't been

11 disclosed to me, but I do know they have confidential stuff,

12 but it's hard for me to know that because I wasn't Cinco.

13 And there -- you know, you see the confusion.

14         THE COURT:  And Cinco's files remain with Cinco or

15 were their files transferred to Spavi?

16         MR. MURPHY:  There were some that were

17 transferred, some that -- I don't really -- I actually don't

18 know the -- I haven't asked the specific question, you know,

19 what is in the folder of things you got from Spavi.

20 Obviously they got documents.

21         Now Cinco was named as a cross-defendant, so at a

22 certain point there's going to be discovery on them I'm

23 assuming, but -- but I guess as far as what Spavi has, it --

24         THE COURT:  That's my question.

25         MR. MURPHY:  Yeah.

67

1          THE COURT:  In other words, was -- when you say

2    Cinco and Defendants had communications, or Cinco would have

3    been the one to communicate information, does that mean it

4    is not in Spavi's possession, custody and -- or control?

5          Now, this is with Cinco now, not -- this is not

6    something that got transferred over to Spavi?  Sometimes in

7    these acquisitions -- because I don't know how this worked,

8    some information is then transferred over, but that may not

9    have occurred here if you were purchasing not all of Cinco,

10   but specific things.

11         MR. MURPHY:  So, I guess -- you know what, I think

12   we should table this one, because I do think kind of our

13   discussions about other issues I think cobbled together

14   assist me in responding to this one.  So I actually -- I

15   should actually go -- I need to ask some other questions

16   internally to kind of figure out, based upon what we've

17   already discussed today, how I can tailor up a proposal on

18   this.

19         THE COURT:  Okay.

20         MR. MALYNN:  Let me -- let me --

21         MR. MURPHY:  In fact, quickly --

22         MR. MALYNN:  No, Mike, I think this is

23   straightforward.  If you -- documents were transferred to

24   you that are responsive to this, produce it.  And if you

25   don't have it, tell us you don't have it.  I mean, these are

68

1  -- this is your allegation about what we -- you -- we

2  allegedly got from you.  And if you're saying we got nothing

3  from you, and you -- and that's fine.  We'll figure out what

4  we allegedly got from Cinco.  But I don't want -- I want

5  the --

6        MR. MURPHY:  Well --

7        MR. MALYNN:  -- as it exists.

8        MR. MURPHY:  Okay.  So let me -- this is helpful.

9  So, I -- so if you limiting this to things that Shakey's

10 Pizza Asia Ventures is saying gave to Defendants, I can do

11 that, right.

12       MR. MALYNN:  I'm being clear.  You -- this is your

13 allegation and your burden of proof that you put trade

14 secrets in our possession.  I'm asking you to prove it.  If

15 you can't prove it, or you're going to try to prove it some

16 other way, but right now, what can you prove you gave us?

17 That's the -- that's responsive to the request.

18       THE COURT:  And if I might put this in more of a

19 Rule 34 context, the question's going to be, what is in

20 Spavi's possession, custody or control?  The Ninth Circuit's

21 definition of "control" is, that you can obtain these

22 documents -- I'm sorry.  It's a better way to put it is,

23 that you have the legal right to obtain these documents on

24 demand.  We sometimes have issues about, okay, you can make

25 the -- you can have the request and demand them, and then

69

1  whether the third party gives it to you is another story.

2  But Rule 34 at least requires you to make that demand, if

3  you have the legal right to do so.

4          Now, you're going to have to look at the agreement

5  you have with Cinco to see whether that is in fact the case.

6  If you have the legal right to the trade secrets, right, to

7  make -- if you have the legal entitlement to demand that

8  they give you the documents, not that they have discretion

9  or, you know, it's not -- you have the practical ability --

10 you know, the Ninth Circuit's rejected that notion of, you

11 know, you have the practical ability to obtain it.  that's

12 not going to be the issue.

13         The issue is literally, do you have the legal

14 right to demand the production of documents on demand, not

15 the exercise of discretion or, you know, we've known each

16 other a long time.  Why don't you do me a favor.  That's not

17 what we're looking at.

18         So that's what I think you need to consider in

19 answering Rule 24 (sic), and you should look into that

20 issue, along with everything else you're looking into.

21         MR. BERAL:  Your Honor, may I -- may I -- sorry.

22         THE COURT:  I'm sorry.  We can't get both of you.

23         Mr. Beral, did you want to make a comment?

24         MR. BERAL:  Thirty seconds, your Honor.  Mr.

25 Murphy has been representing Cinco since 2018, okay.  He

70

1  represented Cinco for six years in the state court

2  litigation.  He has everything that Cinco has.

3         In fact, there was a period of time when Cinco was

4  represented by his predecessor counsel, DLA Piper, where

5  Cinco went into PCJV's offices and took everything, copied

6  everything, e-mail accounts, documents, everything.  Mr.

7  Murphy had absolutely everything in his possession.

8         THE COURT:  Hold on a second, because this request

9  went to Spavi.  So, if you are talking -- so it's what Spavi

10 has, not what the law firm has, unless you are subpoenaing

11 the law firm separately.  That's a different -- so, right

12 now I have a document request to Spavi.  So it's going to be

13 Spavi's legal right to demand the documents.  If you

14 subpoena the law firm as counsel for Cinco, that's a

15 different issue.

16        MR. MURPHY:  That -- and we can -- I don't agree

17 with the representation there, but we can talk about that.

18        THE COURT:  Yeah.  I mean that's a different thing

19 that you may want to address, but right now all I have in

20 front me is Spavi.  So that's why I'm phrasing it the way I

21 am, because that's all I have in front of me.

22        Now if, you know, Mr. Murphy was counsel for Cinco

23 and you have a separate subpoena, either to Cinco or to the

24 law firm, that's a different issue, but that's not before me

25 today.  Okay, just to be clear --

*Echo Reporting, Inc.*

71

1          MR. MURPHY:  Understood, your Honor.

2          THE COURT:  -- on 24, what we're dealing with.

3          MR. MURPHY:  We were talking the legal ability to

4    possession, custody or control, but --

5          MR. MALYNN:  Obviously --

6          THE COURT:  But it's Spavi, it's not -- you know,

7    here's the law firm and -- once you -- it's not -- once you

8    are a law firm representing a party in a litigation, and you

9    serve a document request on the party, the fact that his

10   lawyer may have represented 20 other companies in the last

11   five years doesn't mean that that document request now

12   applies to all entities that that lawyer represented outside

13   of this litigation.

14          So when I talk about possession, custody or

15   control, I'm talking about the -- of the responding party.

16          MR. BERAL:  I understand that, your Honor.

17   There --

18          THE COURT:  Okay.  That's what -- that's all I'm

19   saying.  That --

20          MR. MALYNN:  There may have been joint

21   representation, which makes it a little bit different.

22          MR. BERAL:  Yeah, it makes it a little different

23   in this context because Mr. Murphy was in the middle of all

24   this transaction.  So we believe that Mr. Murphy --

25          THE COURT:  Right.  Just --

72

1          MR. MALYNN:  In fact, he represented joint

2    clients.

3          THE COURT:  Consider whether it would be easier if

4    you submitted -- or served a document request on Cinco, so

5    that we don't have to go through Rule 34 and do a lot of

6    briefing on how far this can reach.

7          MR. MALYNN:  Understood.

8          THE COURT:  That's my problem.  I just -- you

9    know, let's just make this simple.

10          MR. MURPHY:  Yeah.  I --

11          THE COURT:  Okay.

12          MR. MURPHY:  If we --

13          THE COURT:  I mean, you guys can work this out

14    yourself, but I'm just saying from a -- if you don't work

15    this out from the Court's perspective, if you're trying to

16    use just the document request to Spavi, it gets into a lot

17    of complications, and I am telling you right now, I will

18    require briefing.

19          MR. MURPHY:  Yeah, I'm not --

20          THE COURT:  You can -- as you can see with the

21    legal standard the Ninth Circuit uses, but if you're going

22    to try to expand this to counsel's work in other litigation

23    in the state court or some other jurisdiction, I would need

24    briefing on whether 34 can stretch that far.  And that's why

25    I'm saying, consider if Cinco's a party in this litigation

73

just serving a document request on them, and kind of by-
passing all the legal complexities that appear to be
unnecessary.

All right.  So we're getting --

MR. MALYNN:  Twenty-five.

THE COURT:  -- kind of late where you're going to
start losing me.  So is there anything in 25, 26 and 27 that
we need to address?  And 25 is --

MR. MALYNN:  Twenty-five is damages.

THE COURT:  -- damages.  So --

MR. MURPHY:  So 26, yes.  This is actually core.
"All documents evidencing your alleged trade secret."  So, I
asked -- here's one.  There is a secret sauce.  And I told
you that secret sauce is memorialized in less places than I
have fingers on my hand.  And so -- and that's because we
don't want anyone to see them, let alone copy them.

So that -- I asked last time -- when we had a meet
and confer last week on other issues, I asked Defendants'
counsel, would you ever be open to a procedure whereby --
because, again, Defendants are our competitor now.  Whereby
a -- you could have a view that's highly confidential,
attorneys eyes only, and you can't bring pencils, pens,
cameras, you can't write anything down, you just look,
because I've done that before in other cases.  I mean, this
is like the core of why we have the trade secret rules in

74

discoveries that we do.  And I was told, no.  And I think
that's --

       MR. BERAL:  That's not what you said, Mike.  Come
on.

       MR. MALYNN:  First of all -- first of all, there's
a threshold issue of whether they -- those five documents
are even in their possession, custody or control.  I think
they're in Ferna's possession, custody or control, or
they're in Newlyweds (phonetic).  I don't know what, if any,
is in actually Spavi's possession, custody or control.  If
they happen to have the secret sauce in Spavi's content
(sic), that would be news to us, and that's the point of the
request.

       MR. MURPHY:  Well, the secret -- well, I'm honored
-- I love that you think you have as much information as you
do, but this -- that is not true.

       MR. MALYNN:  As a threshold matter, we need to
know whether the secret cause is something they're claiming
we misappropriated.  We don't -- we've never been -- nobody
from my clients have ever seen recipes or been furnished
with recipes or the -- how much, you know, this level of
ingredients or this or that.

       We've never seen that, so we just -- I guess -- I
suppose maybe we should work backwards.  Maybe to go to the
interrogatory and determine what it is that they're claiming

75

1  we misappropriated, and then go back to the document

2  demands.

3          THE COURT:  Well, that makes some sense.

4          MR. MURPHY:  Can we -- I really would like to --

5          THE COURT:  Are you saying that they have

6  misappropriated the recipe?

7          MR. MURPHY:  I think if you take -- if you are not

8  authorized to be in possession of a package of stuff, and

9  you take that stuff and you give it to someone else, and

10 then they reverse engineer that thing that you weren't

11 supposed to have to begin with, yeah, that's

12 misappropriation of trade secrets.  It's -- you know, it's

13 corporate espionage, reverse engineering of things you

14 shouldn't have.  Yeah, of course, and --

15         THE COURT:  But you're not saying that they

16 actually misappropriated the recipe itself?

17         MR. MURPHY:  No.  No one went into, you know, into

18 a safe somewhere and stole the document that has the -- no,

19 I'm not -- of course not.  We're not saying that.  But we

20 are saying that the proportions of the ingredients and what

21 is in them and in each seasoning package is a trade secret.

22 And that if you have -- if you have the package and you

23 shouldn't have it, and you give it to someone else and say,

24 hey, reverse engineer this.  Let's see if we can create the

25 formula for Coke or whatever, right.  I think that --

76

1          THE COURT:  Okay.  I -- all right.  So -- but that

2    is different, that's different than saying that the -- what

3    you're calling the "secret sauce" was actually stolen.

4    You're not saying that they, you know, somehow got a hold of

5    the recipe and stole it?

6          MR. MURPHY:  Let's look at the request though.

7    The request says, "all documents evidencing your alleged

8    trade secrets."  Now, first as a threshold matter, Spavi has

9    trade secrets beyond Potato Corner.

10         THE COURT:  Right, but that's what I'm trying to

11   get at --

12         MR. MURPHY:  But what I'm saying is --

13         THE COURT:  -- is that, are you alleging that

14   they've actually stolen the recipe itself?

15         MR. MURPHY:  We are not alleging that someone went

16   and took a copy of a document that Spavi has possession of

17   and wrote down what's on that document, which is the recipe

18   and the proportions of ingredients.  No, we are not.

19         THE COURT:  Okay.  So then -- then 26 should be

20   limited to the trade secrets that are alleged to be

21   misappropriated for one thing, because I -- otherwise, why

22   are you producing every trade secret you have in the

23   company?

24         So, I think it should be limited to what's been

25   misappropriated here.  It doesn't sound to me as though it

77

1  is a misappropriation of the recipe itself.  So it sounds as

2  though it's the reverse engineering.  What they're saying

3  the misappropriation was, was a -- the packet.

4          And sometimes in these cases what people do is

5  produce a sample of the packet -- or what it is that you --

6  if it's a physical object, they will produce a sample of it.

7  So let's say if it's three packets, three different packets

8  or five different packets, you have one like a joint exhibit

9  or something, of these are the five packets.

10          So I don't know who ended up producing that, but

11  that's often --

12          MR. MURPHY:  I can -- we -- I can work with that.

13          THE COURT:  -- people doing, instead of trying to

14  describe it.

15          MR. MURPHY:  I can work with that.

16          THE COURT:  Does that work?  Now, I'm not sure

17  that covers everything that you're alleged -- you're

18  alleging they misappropriated.

19          MR. MURPHY:  No, I get -- you know, it's all --

20  the -- I understand what you're saying and I can work with

21  that, if Defendants agree, just from a kind of a logical

22  trade secret trial practice concept.

23          The -- there is overlap, right, I mean, because at

24  the end of the day the core trade secret is their recipe,

25  right, and how -- and so, it does relate to it.  So I always

78

1  view this as being a little bit more gray area than black

2  and white, but if we're going to limit it to that, that's

3  fine, right?

4          THE COURT:  Well, maybe let's start with that,

5  because it sounds as though it's not the recipe that they

6  took.  You're saying they took these packets that contained

7  whatever it is that they contained.

8          MR. MALYNN:  By the way, we purchased these

9  packets.  We purchased the packets.

10         THE COURT:  Okay.  You purchased it, but then he's

11  saying you --

12         MR. MALYNN:  We purchased them even after the --

13         THE COURT:  -- purchased it after --

14         MR. MALYNN:  After we were terminated --

15         THE COURT:  Yes.

16         MR. MALYNN:  -- we purchased some.

17         THE COURT:  Right.  So that's what he's saying,

18  that --

19         MR. BERAL:  Your Honor --

20         THE COURT:  -- you have the package after May 31st

21  of 2024.

22         MR. MALYNN:  We purchased them in July 2024.

23         THE COURT:  You used the package -- I'm sorry?

24         MR. MALYNN:  We purchased some in July 2024.

25         THE COURT:  Okay.

79

1          MR. MALYNN:  It has to be --

2          THE COURT:  That's fine.

3          MR. MURPHY:  But did you say, we're going to

4 reverse engineer these?

5          MR. MALYNN:  No.

6          MR. BERAL:  Your Honor, may --

7          MR. MALYNN:  We had no -- we no relationship with

8 you ever.

9          MR. BERAL:  -- may I visually show you what we're

10 talking about?

11          THE COURT:  Well, no, it's okay.  I'm -- all my

12 point is, is that there's no allegation that the -- that the

13 recipe itself was misappropriated.

14          MR. MURPHY:  Right.  Correct.

15          THE COURT:  The allegation is that what was

16 misappropriated are these packets that were then used to

17 reverse engineer.  That's a different concept.  I mean,

18 sometimes people -- it doesn't have to be something that you

19 surreptitiously took.  You know, people will buy something

20 in the market and then try to reverse engineer it.

21          So it's -- I don't want to get hung up on how you

22 obtain it, but I think the point is just to preserve the

23 actual -- at least one of these packets, so that we know

24 what it is that you're alleged to have -- what it is you're

25 alleged to have taken, which was not directly --

80

1          MR. BERAL:  I can show that, your Honor.

2          THE COURT:  But the package themselves.  So

3    somebody needs to have it.

4          MR. MALYNN:  What are the samples of the seven

5    super secret -- there's seven -- there's seven flavors,

6    seven packets, or there's multiple examples of packets in

7    different sizes or different packets that we allegedly had

8    inappropriately obtained.

9          THE COURT:  Yeah.  So, a sample of the seven

10   flavors.  So if there's seven flavors, seven packets.  I

11   mean, whether they're large or small, I don't know that you

12   want to preserve each size.  But think about it anyway,

13   because sometimes time goes on.  By the time you get to

14   trial, you know, nobody has a packet anymore.

15         And so, just think about producing whatever it is

16   you claim Defendants misappropriated, to preserve at least

17   one of each of the seven packets so that this doesn't get

18   lost somewhere.  That's all I'm suggesting, as I've seen

19   other people do in other cases.

20         MR. MALYNN:  Right.  And then 27 is a very simple

21   request, is looking for documents that say these packets are

22   trade secrets.

23         MR. MURPHY:  Okay.  Every franchise agreement that

24   you have with your franchisees.  Okay.

25         MR. MALYNN:  Those are the only documents that say

81

1 these packets are trade secrets, then produce them.

2          MR. MURPHY:  So let me ask you this, just so while

3 we're on that topic though.  Something may include within

4 its ambit that prohibition without saying it.  So, I mean,

5 it's a little too cute to say, anything that says these

6 specific words, because that's why we have policies.

7 Policies cover things that may not be --

8          MR. MALYNN:  Whatever you're going to rely upon at

9 trial, that's what we're -- identifying your trade secrets.

10 We want to know what you're going to try to use to prove

11 your case in chief at trial here.

12          THE COURT:  Right.  Now I don't want to get

13 confused with the interrogatory.  Rule 34 does not require

14 anyone to create documents.  You're only producing what

15 already exists.  So, this is not about creating a document

16 that identifies the trade secrets.  I mean, that we can't do

17 under Rule 34.

18          So, if there's -- and since this is -- seems to be

19 limited to the package themselves, then you can confer about

20 how to search for this.  You've got the policies, but you're

21 already producing that in response to another document

22 request.  But maybe this is about any communications with

23 the franchisors, other than the -- other than those

24 confidentiality agreements, if there's some other kind of

25 communication that says, that talks specifically about the

82

packets.

MR. MURPHY:  Yeah.  So -- and so, yeah, I mean, because I don't -- sure.  That's fine.  I can work with that.

THE COURT:  Okay.

MR. MURPHY:  If it were not in -- if we're limiting to specifically referring to the packets, okay, I can do that.

MR. MALYNN:  Your Honor, here's my problem.  Trade secret is defined under the CUTSA as information.

THE COURT:  Right.

MR. MALYNN:  A packet is a physical object.  What information are we talking about?  What is the trade secret?  It can't be the packet.  Packet's are a physical --

THE COURT:  No, it's the contents of the packet.  I'm just referring to the packet because I don't want to lose -- but I didn't -- if that was confusing, let me be clear.  It's not the packaging when I was talking about the packet.

What I want to make sure is people have preserved the contents of the packet, and the packet itself.  I mean, I -- you know, it makes it easier obviously than -- because something has to hold it.  But I want to make sure that you understand what I mean to -- is that the parties should find a way to preserve what is inside the packets at the time

83

1  frame that the Plaintiff is talking about.

2          MR. MALYNN:  The -- I -- the packet --

3          MR. MURPHY:  The packet in only --

4          MR. MALYNN:  -- the packet discloses the

5  ingredients that are inside the packet.

6          THE COURT:  In that case, I would preserve the

7  packet with the contents.  If you're -- people are going to

8  rely -- be relying on the out -- the exterior of the packet

9  and the contents, preserve both.  And that's as best as we

10 can do.  Under Rule 34, you could produce documents and

11 tangible objects, which is what we're talking about, but

12 beyond that, we -- I think we'd have to use the

13 interrogatory.

14         MR. MURPHY:  We can do that.

15         THE COURT:  Okay.  All right.  So that leaves us

16 with the interrogatory, number one.  And so what is the

17 dispute about that one?

18 Well, as a threshold matter, the disclosure -- this is what

19 they gave us to commence their discovery under -- under CAL

20 UTSA you have to have a disclosure to commence discovery.  I

21 don't think the disclosure that they gave to commence

22 discovery is the same as the disclosure they need to verify

23 in a interrogatory to be a complete and straightforward

24 response.  And here --

25         THE COURT:  Well, I think, first of all, number

84

 1  one may not be -- you know, as we've discussed it, I don't

 2  think it was a misappropriation of the recipe.  So I'm --

 3  that's I think maybe -- but maybe what he's talking about is

 4  the reverse engineering.

 5          MR. MALYNN:  Well, you can't tell what --

 6          THE COURT:  So, if sounds like the --

 7          MR. MALYNN:  We don't know what we're being

 8  accused of by this answer.

 9          MR. MURPHY:  You're accused of reverse engineering

10  based upon something that you didn't have the right to give

11  to someone else to --

12          MR. MALYNN:  Well, what is that something?  Like,

13  what is that something?

14          THE COURT:  The -- the contents of the packet.

15          MR. MALYNN:  The contents --

16          MR. MURPHY:  (Indiscernible), your Honor.

17          MR. MALYNN:  Your Honor, the contents of the

18  packet --

19          THE COURT:  That's it.

20          MR. MALYNN:  The contents of the package is

21  powder.

22          MR. MURPHY:  Yeah.

23          THE COURT:  Yes.  There you go.

24          MR. MALYNN:  The same powder that's on the french

25  fries.  That's what everybody tastes.

85

1        MR. BERAL:  That's not information.  Every

2   consumer in the United States gets that powder when they

3   order french fries. That's not information.  What we need to

4   know is what --

5        THE COURT:  Well, I can't address that because

6   that's a merit's argument that you will address to the

7   district judge.  It's not something that I can do.  I can

8   only ask them to disclose what it is that they are claiming.

9        MR. MALYNN:  Number --

10        THE COURT:  And maybe this is not clear enough,

11   but I -- as I understand what he's saying is, the

12   misappropriation is the contents of the packet.

13        MR. MURPHY:  Yes.  Well, your Honor, this is basic

14   corporate espionage.  This is -- you know, and so we're --

15        MR. MALYNN:  Okay.  Then can we get an amended

16   response that tells us what he's accusing us of?

17        MR. MURPHY:  It's in the complaint.

18        MR. MALYNN:  We don't have recipes, which is

19   number one.  We don't have specific ingredients, quantities

20   of such ingredients, relative proportions.  We don't have

21   number two.

22        MR. MURPHY:  Well, here's --

23        THE COURT:  What he's saying is, reverse

24   engineered number two from the contents of the packet.

25   Maybe the number one could be made more clear, so it's not

86

1  that they misappropriated the recipe itself, because they

2  don't seem to have ever had that recipe.  But that they --

3  they have taken the contents and reverse engineered --

4          MR. MURPHY:  Yeah.  I mean it's -- yeah.  I mean,

5  at the end of the day it's --

6          THE COURT:  -- the taste is what it said.

7          MR. MURPHY:  It's in our complaint, but they want

8  us to put that -- I can certainly revise this to kind of

9  mold it to what we've been discussing here today.  Sure.

10          MR. MALYNN:  All right.

11          THE COURT:  Okay.

12          MR. MALYNN:  Another -- another issue on --

13          THE COURT:  And so they were reverse engineering

14  the taste is what I'm hearing?

15          MR. MURPHY:  Yeah.  And --

16          THE COURT:  But then what is number three, this

17  method of preparing?

18          MR. MURPHY:  Yeah.  I guess it all -- here's the

19  thing.  Reverse engineering is a -- the logical inference of

20  that is you're trying to reverse to get back to point A,

21  right.  And if you're really good at your reverse

22  engineering, then you're going to be really good at getting

23  back to point A, which means you're kind of getting close to

24  these things without actually having received a copy.

25  That's just what reverse engineering is.  And that's why

87

1  I've kind of related back to that original concept.  But we

2  can be more --

3          THE COURT:  But how -- but I -- is it -- what's

4  the difference then between two and three?  I mean, the

5  method of preparing, I don't understand what that means.

6          MR. MURPHY:  Because every work -- so, when Ferna

7  was -- and by the way, I do have a request about Ferna,

8  which I'd like to make at the end of this discussion.  But

9  for the first of this discussion, Ferna, when they were

10 brought on a long time ago, they had to prove themselves,

11 right.  And so there's that -- there is a thing that Ferna

12 does that we have -- it's all part of the process, and that

13 is what makes the flavors the flavors, right.

14          So, again, it's all about reverse engineering to

15 get back to that point.  I don't think the allegations and

16 the facts at issue are confusing, they're just -- they're

17 taking issue with how we've worded this, and I can modify.

18          THE COURT:  Yeah.  That's right.

19          MR. MALYNN:  There's another -- there's an

20 important issue here.  You just mentioned Ferna.  I'll bet

21 you dollars to donuts -- and I don't know this, it's

22 speculation.  That Ferna's method is different than the

23 Newlyweds' method, the one that created -- that matched the

24 taste.  So we were having a -- our client in the United

25 States was having a distribution issue, waiting for

88

1  shipments to come from the Philippines.  They didn't want to

2  be dependent upon shipping delays from the Philippines.

3  Newlyweds is in the United States, so our client had

4  contracted with Newlyweds to have Newlyweds reverse

5  engineer.  That's how -- that's how they got the second

6  supplier.

7          We have no idea how Newlyweds matched the taste.

8  They have their own method.  They decided using their own

9  ingredients.  Maybe they followed the packaging, but

10 whatever they did, they matched the taste to the client's

11 satisfaction.  And so whatever Ferna does and whatever

12 Newlyweds does I doubt is the same.  They both came up with

13 the taste separately, and one through reverse engineering.

14         Now what I don't understand is in response to this

15 interrogatory, when they claim trade secrets, because we

16 asked for too much, according to them, too -- what we want

17 in terms of disclosure is far more specific than they want

18 to provide to us, right.

19         My problem is, I don't think they can -- they can

20 hide under confidentiality, under a trade secret allegation,

21 the fact that they don't know the method.  That they don't

22 know the recipe themselves.

23         MR. MURPHY:  I don't know how would you -- how

24 could you know that?  That's not what --

25         MR. MALYNN:  They confuse --

89

1          THE COURT:  Wait a minute.  Hold on.  First of

2   all, you're not --

3          MR. MALYNN:  You take --

4          THE COURT:  You misappropriated the recipe, but

5   that was my question about number three, is that, what does

6   this mean to misappropriate the methods of making it?  I

7   don't understand that.

8          MR. MURPHY:  So -- okay.  So what -- but, again --

9   so, as Mr. Beral referenced, when Guy Koren was part of the

10  approved structure within the Potato Corner operations, and

11  was governed by confidentiality, he and the CEO of Cinco did

12  talk about reverse engineering and they did attempt to.

13         I don't know what he has in his possession from

14  that whole experience, and that certainly was within the

15  confidentiality.  Did he keep it or did he -- and then give

16  it to someone?  I don't know.  But that moment in time is

17  really what's relevant here, because, again, I don't know

18  exactly what they took with them.  And so this is relating

19  really to that topic.  And -- okay.

20         THE COURT:  And as I don't know, I -- okay.  So

21  you're introducing something that I did not know.  So is

22  this a conversation or communications between the Defendants

23  and Cinco at a certain point in time, and we're -- you're

24  talking about what Cinco communicated to the Defendants

25  about the method of preparation?

90

         MR. MURPHY:  And also there was an approved

process by which -- within Potato Corner, approved by Potato

Corner's owner, that Guy Koren was a part of an attempt to

-- it was like self-reverse engineering.  Can we do that,

right, and that resulted in some product.  And that is

something that Guy Koren has remained in possession of this

whole time.  That is protected.

         And now I do know that they -- there's no dispute

that in -- that there's this second reverse engineering,

which is the core of our case, which is after they lost

their rights, then they attempted again outside of Potato

Corner to reverse engineer, which is our problem.  But did

they also take as part of the look-back the stuff that they

shouldn't have been using and bring it outside and then give

it to a third party?  I don't know.  But it's all within the

ambit of trying to develop their own flavors that mimic

ours, right?

         THE COURT:  I -- that's what I get.  I get the

taking the contents of the packet and reverse engineering to

create the same or substantially similar flavor, but the --

I just don't know what the -- that third part of it means.

What is that --

         MR. MURPHY:  You know, I don't --

         MR. MALYNN:  Your Honor --

         MR. MURPHY:  Because I don't know, your Honor.

91

1          MR. MALYNN:  -- your Honor, there's something
2    basic --
3          MR. MURPHY:  I don't know, your Honor.
4          MR. MALYNN:  -- that I'm trying to get to.
5          MR. MURPHY:  (Indiscernible.)
6          THE COURT:  I think I'm not sure what -- what
7    actually -- I'm not sure what the Defendant is trying to
8    get.  I think in terms of paragraphs one and two, the
9    Plaintiff is going to supplement and clarify what it is it
10   is contending here, so that we understand that.  I just am
11   like exploring more that -- because sub one and two seem
12   clear to me what they are contending, but the item number
13   three, in terms of the method is -- I'm not sure of today.
14   But maybe it's they don't understand or know yet what
15   methods were used in this second attempt of reverse
16   engineering.  There may be no methods involved.  I mean,
17   there's some methods, but I think they're -- it's not clear
18   yet what methods were used, either by the, you know, the two
19   suppliers or by the Defendants or --
20         MR. MALYNN:  There was no method used by
21   Defendants.
22         THE COURT:  -- having disposable -- see, this is
23   the issue maybe you need to investigate.  If you are
24   starting from the contents of the package, are you saying
25   you're necessarily going to use the same methods or not?

92

1          MR. MURPHY:  I'm not -- I don't understand --

2          MR. MALYNN:  Exactly, your Honor.

3          MR. MURPHY:  -- I don't understand the question.

4  I don't --

5          THE COURT:  Yeah.  I just don't know -- I don't

6  know how one -- I don't know how that item number three is

7  different from items one and two.

8          MR. MURPHY:  Well, we can work with that.  I'll

9  work with defense counsel to clarify the responses in a way

10 that matches our discussion.

11         MR. MALYNN:  Your Honor, I'm going to give you an

12 analogy.

13         THE COURT:  Okay.  I mean, I think that's --

14 that's fair.  Okay.  In terms of the interrogatory number

15 one --

16         MR. MALYNN:  I've got one final point.

17         THE COURT:  -- would you be able to supplement

18 your response within what period of time?

19         MR. MURPHY:  A week.

20         THE COURT:  "A week."  Okay.  Well, that's not

21 bad.

22         MR. MALYNN:  Your Honor, I want one disclosure as

23 part of their response.  And it's the same -- it's an

24 analogous as if you -- if a photographer takes a photograph,

25 the photographer is the author and owner of the photograph

93

1  even if he allows other people to license it.

2          Here, if they -- you -- to have a complete and

3  straightforward interrogatory response, they can't claim

4  confidentially they have something that they don't know.

5  They can't claim a trade secret that they don't own.  And if

6  the recipes and --

7          THE COURT:  Well, but in this interrogatory you're

8  asking them to identify -- hold on.

9          MR. MALYNN:  And as a complete and straightforward

10 response is -- I've been in situations where I've gone

11 through a discovery conference, and at the end of the day

12 the judge overrules an objection, and then we get a response

13 where there are no documents.

14         Here --

15         THE COURT:  Yeah, but we're not supposed to have

16 that problem anymore, because after December of -- December

17 1 of 2015, they require people to disclose if they are

18 withholding something in response to an objection.  So that

19 I agree with you, it was very frustrating in the old days

20 because you'd go through -- you know, you'd read a 200-page

21 joint stipulation, and at the end of it there was nothing to

22 compel anyhow.  So --

23         MR. MALYNN:  That's exactly what we --

24         THE COURT:  -- we don't have that problem here.

25         MR. MALYNN:  No, we do have that problem here --

94

1          THE COURT:  We -- wait, wait, wait.  We don't,

2  because your interrogatory number one asks them to identify

3  with reasonable particularity the Plaintiff's alleged trade

4  secrets.  I'm narrowing that to the trade secrets that are

5  alleged to have been misappropriated in this case, okay.

6          MR. MALYNN:  But the concept is reverse

7  engineering, if the powder is owned by -- if the taste -- if

8  the taste is actually owned by Newlyweds or Spavi -- and not

9  Spavi.  If it's owned by Ferna, how does Spavi get to say

10  they're the owners and sue us for something that we copied

11  that somebody else owns?

12          THE COURT:  I hear your argument, but that's not

13  directed to me.  I'm just your discovery Judge.

14          MR. MALYNN:  Okay.

15          THE COURT:  So, all I need to get is the

16  Plaintiff's answer to the question, which is, identify the

17  trade secrets that you allege were misappropriated?  That's

18  how I'm narrowing number one, that you contend are

19  misappropriated.

20          Now, if they disclose something that you believe

21  they have no right to, then that's your argument ultimately

22  on the merits, but it's not made to me.  All I need is an

23  answer.  What you do with that answer, that's up to you.

24  But that's your -- you're going to be addressing that issue

25  once I exit my stage of this case.

95

1        So, that's all I'm saying.  I just need them to
2 answer the question.  What you do with it, that's up to you,
3 and that will happen later.

4        So we are going to get an answer, let's say by --
5 why is my calendar --

6        MR. MURPHY:  That's for the interrogatory.  Yeah.

7        THE COURT:  Yeah.  So interrogatory number one by
8 March 21.

9        And then now we go back to the documents, because
10 you still have a fair amount to do with this.  This is --
11 you know, and it's -- some of this is going to be electronic
12 discovery.  So how long do you think it will take you to
13 work with your client to produce the documents and any
14 privilege log that you need to create in response to a
15 couple of these requests?

16        MR. MURPHY:  Well, it's obviously going to be a
17 rolling production, and I can --

18        THE COURT:  Yes.

19        MR. MURPHY:  And so here's what I'd propose.  I
20 will -- we haven't an agreement on the protective order.  We
21 send it back to the judge.  We act as if it's signed. That's
22 what you do when it's a form protective in federal court.
23 So you just presume it's going to be signed, because it's
24 based on the form.

25        THE COURT:  Yeah.

96

1          MR. MURPHY:  And then we act, and then I can begin

2    our rolling production next week, right.  Now I'm not going

3    to get to the -- all the granular parts that we talked to

4    you today, but I can begin the production.  And -- yeah.

5          THE COURT:  Do you think in terms of the rolling

6    production, do you think that's something that -- I mean,

7    you can start next week or thereabouts.  But in terms of an

8    end goal, do you need to talk with your client and then come

9    back to the other side with an estimated date of completion?

10   Because I'm sure there's going to be --

11         MR. MURPHY:  Yes.

12         THE COURT:  -- interested in that.

13         MR. MURPHY:  Yeah.  Because I -- I have to process

14   kind of what we talked about today and kind of step back and

15   think about how am I going to kind of globally approach this

16   with Jordan and kind of figure out.  You know, so I can't

17   put my arms around that right now, because I've been kind of

18   request by request.  So once I step back, it's going to

19   require to go to our client and talk.  I'm not going to wait

20   around and do it --

21         MR. MALYNN:  Just an FYI, that was our original

22   meet and confer was giving us that end date, and you've been

23   promising us that end date for weeks now.

24         MR. MURPHY:  Now after we --

25         THE COURT:  Right.  Well now I think we've --

97

1  we've worked through the requests, but what -- let me just

2  look back for -- I should have written in my notes the

3  discovery cutoff date, but unfortunately --

4          MR. MURPHY:  Now we're going to have to -- so the

5  problem is --

6          MR. BERAL:  It's a Friday.

7          MR. MALYNN:  Yeah.  Our problem is that the cross-

8  claims, third-party claims have now brought in additional

9  parties, and the trade secret claim is somewhat new.  And so

10 there was always kind of an understanding, we're going to

11 have get a new scheduling order.

12         So -- and I actually have an e-mail ready to send

13 to them about our proposal, but I don't think we can really

14 tie it to that because we all know it's going to be changed.

15         MR. BERAL:  Well, I'm -- I am not so confident.

16 I --

17         THE COURT:  Right.  So I have a problem because I

18 have no authority to change the cutoff date.  So I can't

19 order production unless the district judge's order --

20         MR. MALYNN:  April 11th is when we have to have a

21 motion in front of the judge if we can't do this without

22 motion.

23         MR. BERAL:  Every --

24         THE COURT:  April 11 is the deadline for a motion?

25         MR. BERAL:  Yes.  Every motion hearing, April 11th

98

1  is the deadline.  Discovery cutoff is this Friday, March

2  14th.

3            MR. MALYNN:  For propounding discovery.

4            MR. BERAL:  Well, actually, no.

5            THE COURT:  In -- now that I think --

6            MR. BERAL:  It's cutoff.

7            THE COURT:  District courts, you have --

8            MR. MALYNN:  Yeah.  Okay.  You're right.  Correct.

9            THE COURT:  Well, that's a major problem.  Why are

10 people coming to me so late?

11            MR. MALYNN:  We propounded this discovery months

12 ago, your Honor.  It's just been --

13            THE COURT:  I understand that, but coming to the

14 court two days before the discovery cutoff date, how would

15 anyone be able to produce anything in two days?

16            MR. BERAL:  Well, we've been guided by the

17 discovery motion hearing deadline, which is April 11th,

18 which would require us to file a motion by this Friday.  So,

19 we tried to bring this to you.  We've been trying to meet

20 and confer with Mr. Murphy, but we haven't gotten any

21 documents or discovery, unfortunately.

22            THE COURT:  Yeah.  So a hearing by Friday, well,

23 that wouldn't help.

24            MR. MURPHY:  Well --

25            THE COURT:  You saying that all we'd have to do --

99

1    hold on a second.

2              MR. MALYNN:  No, the hearings would be April 11th.

3              THE COURT:  Hold on a second here.  I need to get

4    the standard order.  I -- let me scroll back up.

5              MR. BERAL:  Document number 29 for Judge

6    Blumenfeld, a case management order.

7              MR. MURPHY:  I mean, there are parties that

8    haven't even been served now.  So, I -- yeah.  I -- maybe --

9    let me make a proposal.  I think -- well, let me ask you

10   this.

11             Mr. Beral or Mr. Malynn, have you -- you haven't

12   received the summons yet on the new parties added in your

13   third-party complaint, right?

14             MR. BERAL:  We have not.

15             MR. MURPHY:  Okay.  So, we have seven predicate

16   issues.  So my thought is that over the next 24 hours, Mr.

17   Beral, Mr. Malynn, Jordan and I, will work some of these

18   procedural issues, like getting the summons for the third

19   parties, which I've agreed to assist them in getting to the

20   third parties.  Work on our new schedule that takes into

21   account these third-party issues.  And I think that we can

22   probably within short order get these in front of Judge

23   Blumenfeld.

24             Assuming that is the case, then maybe we should

25   have a follow-up hearing with your Honor just to talk about

100

process and timing once those kind of pegs are in place as

far as dealing with a trial calendar, given that we have new

parties added to this.

MR. MALYNN:  Your Honor, we're not interested in

that.

THE COURT:  I think you need -- let me put it this

way.  I think what I will do is work on that April 11 date,

which I -- I'm trying to understand how he anticipates this

working.  If that's the hearing date for a discovery matter,

I mean is that --

MR. MALYNN:  I --

THE COURT:  Hearing deadline is by April 11, and

then you have to figure in the completion, right, of

discovery, if ordered.  Because the deadline for expert

discovery is also April 11.  So you don't have a lot of time

here, and I don't know if your experts are going to need

this.  So I -- here's what I'll do.  Why don't I --

MR. MALYNN:  Our experts don't need this, your

Honor.

THE COURT:  Okay, they don't.  All right.  So that

helps.

So why don't we use --

MR. MALYNN:  Well, I take -- I take that back.

There's one -- the purchase price would be relevant to our

expert.

101

1          THE COURT:  I feel comfortable using the April 11,
2    2025 date, unless you get relief from the district judge to
3    extend the discovery cutoff beyond that.

4          MR. MURPHY:  That's right.

5          MR. MALYNN:  We're comfortable with that as well,
6    your Honor.  And we believe there's plenty of time --
7    there's not a lot of discovery here.  The first -- the 20 --
8    the first 20 requests all relate to one issue.  I think your
9    compromises we're willing to live by.  I -- from what I
10   hear, Mr. Murphy's willing to live by it.

11         There's only one transaction.  This isn't a case
12   of 20 transactions --

13         THE COURT:  Right.

14         MR. MALYNN:  -- that we're seeking discovery on.
15   There's one interrogatory that you handled, and there's some
16   contentions relating to trade secrets.  So, I think this is
17   a very limited set of discovery.  I'm not saying it's -- I
18   don't know what burden they have to go through on their end,
19   but this is probably very organized, at least as far as the
20   completed documents.

21         THE COURT:  Exactly.  I think he will be able to
22   do the -- because a lot of this has already been gathered.
23   So, I think that, you know, most of this will probably get
24   done by and produced by April 11.

25         And when what -- the parts  where you're going to

102

1  confer about custodians and/or search terms, that may

2  require a little bit more time, but, you know, depending on

3  how quickly you can get this done.

4        So let me do this.  So I have -- here's my

5  situation.  I have a discovery -- I'm sorry, a settlement

6  conference this afternoon.  So the minute order that I will

7  prepare will likely not get on the docket until tomorrow

8  morning.

9        MR. MURPHY:  We have taken good notes.

10       MR. MALYNN:  Okay.

11       MR. MURPHY:  We can --

12       THE COURT:  Okay.  So you can just get started.

13  But that's all I'm saying is, that, you know, I'm likely to

14  be in the settlement conference all afternoon into the

15  evening.  And so I -- you won't see this this -- don't

16  expect to see it this afternoon.  The earliest you will see

17  it is tomorrow morning.  And then you have good notes.  Just

18  check to make sure that we're all on the same page, and then

19  just proceed from there.

20       MR. MALYNN:  So, not to propose a two-week end

21  date?

22       THE COURT:  So, no, the -- well, for the

23  interrogatory, the service of the supplemental response is

24  March 21.  For the documents, you're going to start a

25  rolling production with an end date of April 11, 2025.

103

1          MR. MURPHY:  Yes.

2          THE COURT:  You're going to start in -- you know,

3   you said next week, but I'll just have it as starting the

4   week of March 24, just to be on the safe side.

5          MR. MALYNN:  Can we -- can we build a little bit

6   of room to come see you, at least a week or 10 days before

7   11.  So maybe April 1st, just so we get an end date?

8          MR. MURPHY:  I mean, I could -- I can make this

9   agreement.  I can be able to represent as of a week before

10  April 11th, the extent to which the majority, the

11  substantial majority, substantial compliance and what is

12  remaining to produce, you have it.

13         MR. MALYNN:  If there's something on the privilege

14  log, I'm trying to build a little bit more time.  If we

15  could get it on April 1st, that gives him the large bulk of

16  March to get us -- I think two weeks should be enough for

17  production.

18         THE COURT:  Well, the best I can do in terms of

19  getting you back on calendar, because I'm going to be out

20  that week of March 24.  So, it would have to be the next

21  week, and right now you know how it is when you are out.  We

22  may be able to get on calendar April 3rd.

23         MR. MALYNN:  Let's do that, your Honor.

24         THE COURT:  But that would be as a status

25  conference, and then I would need you to let me CRD know if

104

1  you don't need that status conference.

2          MR. MALYNN:  Still could --

3          MR. MURPHY:  Wait.  One --

4          MR. MALYNN:  You would need a joint report now in

5  advance of April 3rd, if we have it (indiscernible) to you?

6          MR. MURPHY:  I just have -- again, I don't think

7  I'm available on April 3rd, just so we're -- we're clear.

8          THE COURT:  You're not available on April 3rd?

9          MR. MURPHY:  I'm not.  So, I'm available to make

10 the representation we're talking about, but I -- I don't

11 think I can do April 3rd.

12         THE COURT:  How about -- well, I'm not duty on

13 April 4, but if we could do -- we could start at 10:00 a.m.,

14 I could probably do the status conference on April 4, but it

15 would have to -- I couldn't start later than 10:00.

16         MR. MURPHY:  I can do that, your Honor.  Thank

17 you.

18         THE COURT:  Okay.  April 4, 10:00 a.m., everybody

19 available via Zoom?

20         MR. MALYNN:  Great.  And when would you like --

21         MR. BERAL:  Yes.

22         MR. MALYNN:  If we need -- if we don't need that

23 hearing because we resolved all issues, we'll let you know.

24         THE COURT:  Okay.

25         MR. MALYNN:  And if we do, do you want a joint

105

1  report prior to that?

2         THE COURT:  Yeah.  Maybe the day before or the

3  evening before, whatever, just give me an update if there

4  are any disputes that still need to be resolved.

5         MR. MALYNN:  So --

6         THE COURT:  That would be helpful.  So if we have

7  it, let's say, April 3rd by 1:00 p.m.

8         MR. MALYNN:  Okay.

9         MR. MURPHY:  And, your Honor, if I may ask, just

10 for future reference.  So, your order on the joint agenda, I

11 just want to make sure.  Was that kind of within what you

12 were looking for?  You know, Mr. Malynn and I had kind of a

13 back and forth about, you know, what -- you know, what are

14 joint agendas versus joint report.  And so I know we kind

15 of --

16        THE COURT:  All right.  So the joint agenda --

17 generally when I dealing with discovery disputes, so the

18 joint agenda lists each dispute.

19        MR. MURPHY:  Got it.  Got it.

20        THE COURT:  Just, for example, the -- you know,

21 possession, custody and control, there's a dispute about

22 whether the party has legal control over the following

23 document, you know, categories.  And so it's that kind of

24 thing, so that I understand what the disputes are about.  Or

25 it can be -- not my favorite category, but, you know, we

106

 1  can't fix a date for a deposition or some odd --

 2          MR. MURPHY:  Yeah.

 3          THE COURT:  You know, so, I mean, I always expect

 4  counsel to resolve those, but sometimes I get those.

 5          So it's literally just a list, because otherwise I

 6  get people showing up at the discovery conference and one

 7  side says, you know, the other side never mentioned that

 8  before today.  So I don't want surprises.  I don't want

 9  things coming up at the conference where nobody has ever

10  thought of it before because it's never been raised.  But

11  it's also helpful to have a listing of the disputes, so that

12  you know what is the issue.

13          Less helpful is document requests one through 27,

14  where I don't know what's the dispute about document

15  requests one through 27.  I mean, is it one dispute, is it

16  five disputes?  So, you know, that's -- people do that, but

17  sometimes when I look at the request or the response, it's

18  not immediately obvious to me, because people have, you

19  know, 10 objections, but they may not be withholding

20  documents in response to those objections.  So those are

21  less helpful.

22          I prefer if you can articulate the dispute.

23  That's the most helpful.  But, yeah, I don't want argument

24  because if I need briefing, then I set the briefing schedule

25  at the discovery conference.  You know, if it's one issue

107

1    and it's fairly simple, maybe you do simultaneous briefs in

2    five days.  If it's more complicated, like a motion to

3    compel documents that are on a privilege log, we may do

4    motion, opposition, reply and hearing.

5            So I leave it -- the reason I don't have the

6    argument in the joint agenda is that my thought is, in the

7    discovery conference we identify those issues we cannot

8    resolve, and the I set a briefing and hearing schedule with

9    counsel.

10           Now, that all happens if you're not talking to me

11   two days before the discovery -- you know, the cutoff date.

12   That assumes we have time.  When we don't have time, you

13   know, sometimes I can -- I find that it's untimely.  I mean,

14   just don't have enough time to resolve the issue.

15           So be careful about that.  You know, so there's a

16   limited amount of things that we're going to be able to do

17   on April 4 if you have not previously gotten an extension.

18   So I will -- we'll reconvene and see where things stand on

19   April 4 at 10:00 a.m.  But, yeah, what you did is -- you

20   know, which brings me back to this point I made before.  I

21   would like whoever filed the joint agenda to please file an

22   amended one that attaches the correct Exhibit 1.

23           MR. BERAL:  Will do.

24           THE COURT:  Okay.  Because we didn't -- you know,

25   I just want to make sure there's a clear record of what we

108

1  did.

2          MR. BERAL:  Yes.

3          THE COURT:  Okay.  Great.  Thank you very much.

4          MR. MALYNN:  What I --

5          THE COURT:  I'm ready to sign off now.  I --

6          MR. MALYNN:  No, no, the end date.  Can we agree

7  that March 28th is the end date for production, so we can

8  review it and possibly moot out any need for a hearing?

9          MR. MURPHY:  I can't --

10         THE COURT:  According to what Plaintiff told me,

11  the answer is, no.  He can't do it by March 28.  April 11 --

12         MR. MALYNN:  Well, we need -- we need it before

13  the 3rd so we can tell you, we don't need the hearing.

14         MR. MURPHY:  I can represent -- I can -- we can

15  meet and confer about this, Todd.  I'll -- I can tell you

16  whether we're substantially done, about how much is done,

17  what is left.  We'll have an --

18         THE COURT:  Right.  So I think on the April 3rd,

19  the joint agenda, if there's still disputes or if there's an

20  issue about, you know, finishing the production, that should

21  all be in that April 3rd report.

22         So, Mr. Murphy, you're going to have to give them

23  a status update of where you are.  If you're done, you're

24  done.  If you're not done, you need to tell when what parts

25  of it are not completed.

109

1          MR. MURPHY:  Yes.

2          THE COURT:  I think some of that will become

3   obvious when you are conferring about search terms and

4   custodians.

5          MR. MURPHY:  Thank you, your Honor.

6          THE COURT:  You know, at that point you'll be able

7   to say, look, I can't -- you know, collecting these

8   documents from three custodians will add a certain amount of

9   time.  And, you know, both of you have had enough experience

10  with electronic discovery to know how much time it takes

11  when you're collecting all the e-mails for, you know, three

12  custodians, and then you have to go -- you know, your vendor

13  will give you -- even if you haven't gone through this, your

14  vendor will give you estimates about how long this is going

15  to take.  So, I think the issue about the end date point

16  will all become obvious when you confer.

17          The other documents where it looks as though the

18  Plaintiff has already collected them, like the due

19  diligence, it's going to be a question or how long does it

20  take to redact or eliminate the documents that relate

21  exclusively to a country other than the United States.  So,

22  I think all of this will come out in the meet-and-confer

23  process.

24          MR. BERAL:  Thank you.

25          THE COURT:  All right.  Now I really do have to

110

1  go.  I'm so sorry.  Okay.  There's one more question.

2            MR. BERAL:  All right.  It will --

3            THE COURT:   That's it, one more question.

4            MR. BERAL:  This will only take five seconds.

5  It's not controversial.  I just wanted to give you -- give

6  your Honor a heads up about our settlement conference

7  deadline, which is May 9th.  It's a magistrate judge

8  settlement conference.  Perhaps we can discuss it at -- on

9  the April 4th hearing about scheduling.

10            THE COURT:  You have a settlement conference

11  before me?

12            MR. BERAL:  Yes.

13            MR. MALYNN:  Yeah.

14            MR. MURPHY:  Yes.

15            THE COURT:  I'm sorry.  I didn't realize that.  I

16  didn't see that on my --

17            MR. MALYNN:  No, we need to schedule one.

18            MR. BERAL:  It hasn't been scheduled.  We have a

19  deadline of May 9th to get the settlement conference done.

20  I just --

21            THE COURT:  Okay.  So, I generally do them -- I

22  start them in the afternoon.  I generally find that the --

23  doing an afternoon is enough.  I mean, sometimes -- I say,

24  "afternoon."  I start at 1:30.  Sometimes this goes 8:00,

25  9:00 p.m., but hopefully not.  But it gives us an idea of

111

1  whether the issues can be resolved, if more sessions are

2  needed.  I don't have a limit on sessions.  I try to do it

3  all in one session, but, you know, sometimes I have two,

4  three sessions, depending on how things go.

5           So plan on starting -- first of all, I do them by

6  Zoom unless I have a request to do them in person.

7           MR. MURPHY:  So -- well, our parties are in

8  Manilla, so we would have to do it be by Zoom.

9           THE COURT:  Yeah, by Zoom.  That's -- you know,

10 I've found that that's actually doable.  I -- you know, I've

11 done them all -- for people joining all over the world, it's

12 an inconvenience in that they are in a different time zone,

13 and usually in the middle of the night for them, but I just

14 do these by Zoom.

15           And so I generally -- first day we'll start at

16 1:30 p.m., and we go as long as we can.  And, let me see.

17 Please contact my CRD with your proposed dates and times.

18 Have at least two proposals, and then I will look on my

19 calendar and see if -- when we can fit you in.

20           Your deadline is May 9?

21           MR. BERAL:  Yes, your Honor.

22           THE COURT:  Okay.  So, give us a couple of dates

23 before then.

24           MR. MALYNN:  We will connect with Mr. Murphy.

25           MR. MURPHY:  Let's see.  Man, I --

112

1        MR. MALYNN:  We have to get to -- with our
2  clients.  I assume you have to connect with your clients.
3        MR. MURPHY:  Yeah, I've got to talk to my clients,
4  because, you know, this will -- because I -- there are a
5  couple folks that I have there.
6        THE COURT:  Yeah.  So you need -- look at your
7  calendar and I will look at mine, and then just contact my
8  CRD.  We don't have to do that now.  Just talk with your
9  client, see what their availability is, because we do need
10 people who have authority to settle.  And then just talk
11 with my CRD and give us a couple proposed dates.  If we can
12 do them, fine.  If not, we will give you proposed dates
13 back.
14       MR. MURPHY:  Great.  Thank you, your Honor.
15       THE COURT:  All right.  Great.  Thank you.  I'm
16 really --
17       MR. MALYNN:  Thank you.  Nice to meet you.
18       THE COURT:  Thank you very much.
19       THE CLERK:  Court is adjourned.
20       THE COURT:  Okay.  Great.  Bye-bye.
21       (Proceedings concluded.)
22
23
24
25

113

1          I certify that the foregoing is a correct

2   transcript from the electronic sound recording of the

3   proceedings in the above-entitled matter.

4

5   /s/Jeane Hoehner                    4/25/2025
    Transcriber                         Date
6
    FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:
7

8
    /s/L.L. Francisco
9   L.L. Francisco, President
    Echo Reporting, Inc.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Echo Reporting, Inc.*