# EXHIBIT A

| | |
|---|---|
| **From:** | Beral, Arash |
| **Sent:** | Tuesday, June 4, 2024 4:04 PM |
| **To:** | 'Michael D. Murphy' |
| **Cc:** | 'Kenneth Hsu'; 'Ayesha Rector' |
| **Subject:** | RE: SPAVI |
| **Attachments:** | Complaint.pdf |
| | |
| **Importance:** | High |

Mike:

We were able to pull from PACER the attached Complaint that you and your office filed on behalf of Shakey's Pizza Asia on Friday. Kindly note that, among other things, under our arduously negotiated settlement agreement with the "Cinco Parties," each of the "Cinco Parties" (namely, Cinco Corporation, Potato Corner International, Inc., Highfive Corporation, Jose P. Magsaysay, Jr., Jose Miguel Ma. Montinola, Ricardo Enrique K. Montelibano, Ma. Victoria O. Bermejo, John Edward Hernandez, Chad Dominic Hernandez, Miguel Raymundo Hernandez, Myrose Victor, Marivic Del Pilar, Jose Marco Del Pilar, Dia Lacaba, Nicardo Falcis, Bernabe M. Hernandez, Alma Veronica Abcede, Maria Christina V. Dizon, Cesar T. Hernandez, Valens Capital Ventures Inc., and Clayderman Holdings Corporation) is required to defend (with counsel of the Koren Parties' choice using Laffey Matrix hourly rates) the Koren Parties, as well as to indemnify and hold the Koren Parties harmless from the Cinco Parties' acts, conduct or omissions, including those that are complained about in the attached lawsuit. Therefore, please consider this as the Koren Parties' demand for defense and indemnity with respect to the attached lawsuit. If we use May 31, 2024 (the date of the Complaint as well as the date when Shakey's Pizza Asia took the position that PCJV no longer has a "license" to use Potato Corner IP) as the date triggering the indemnity obligation, the following rates would apply (as opposed to what-would-likely-be higher rates had Shakey's Pizza Asia waited one more day to issue its letter and file its Complaint). (We now see that the urgency in filing on Friday, May 31 [in violation of our Tolling Agreement and the covenant of good faith and fair dealing underlying it] seems to have been intentional so as to trigger lower rates.)

| Years Out of Law School * | | | | | | | |
|---|---|---|---|---|---|---|---|
| Year | Adjustmt Factor** | Paralegal/ Law Clerk | 1-3 | 4-7 | 8-10 | 11-19 | 20 + |
| 6/01/23- 5/31/24 | 1.059295 | $239 | $437 | $538 | $777 | $878 | $1057 |

In your email to me on Saturday morning, you alleged not to know how or why written consent was required for Cinco to engage in a transaction involving its IP. Although I find that incredible to believe, I'll address it again with reference to the following pertinent and basic facts:

- In the 2009-2012 period, at a time when the Cinco Group looked to Mr. Koren to get them out of legal trouble and to grow Potato Corner in the United States with no more than a $30,000 investment from the Cinco Group (despite millions of dollars in incurred and to-be-incurred expenses), PCJV and its members, managers, agents, and attorneys (inclusive of Cinco) engaged in various steps to ensure that PCJV maintains the proper licenses and is registered and authorized to do business as Potato Corner's master franchisor in the United States. These steps included entry into, among other things, the: (a) "Potato

1

Corner USA Joint Venture Agreement," (b) "Trademark, Copyright, and Know-How License Agreement," (c) "Limited Liability Company Agreement of PCJV USA, LLC," and (d) "PCJV USA LLC Joint Venture Agreement (First Amendment to the JV Agreement)" (collectively, the "Agreements").

- Pursuant to each of the Agreements (leaving aside for the moment the question of which of these Agreements is/are operative), PCJV was to receive, and Cinco was *obligated* to provide, a license for PCJV (and, by extension, PCI Trading, and others affiliated with PCJV) to use all "Potato Corner" intellectual property rights in its granted territory. Over the course of the parties' relationship, the parties agreed that PCJV was not to and never did pay a fee for an IP license as evidenced by the parties' mutual written, implied-in-fact, and verbal agreements, as well as written company documents, and course of conduct. For example, among other things, Paragraph 3 of the Agreement identified in "b" above is left blank evidencing the agreement of the parties that PCJV was not to pay a fee. (And contrary to the assertions in your Complaint, "b" was drafted by Cinco and its agents, and the language "do we still charge" was inputted by them, not the Koren Parties. This was a clear reference to an agreement by the parties that PCJV was not to pay a percentage fee.) As a matter of fact, PCJV never paid a traditional license fee, and knowing of the tiny investment it had made with no real other assistance forthcoming, Cinco took affirmative steps to ensure that no fee would be paid. Indeed, the PCJV Board Meeting Minutes dated October 16, 2012 evidence an agreement that no license fee would be paid to Cinco but that Cinco elected to receive distributions (upon PCJV's election to issue distributions) in lieu of a license fee ("Board has approved that this will not be an expense in the P & L of PCJV but shall be given as part of its distributive income"). Cinco has since assigned and transferred its rights to distributions and profits to GK Capital Group for a handsome payment, well over the amount of the contractual RFR formula. In assigning/transferring that right to GK Capital, Cinco (and Shakey's Pizza Asia, if it is deemed to be Cinco's effective successor) is no longer entitled to a fee.

- The Agreements referenced in sections "a," "c" and "d" above unequivocally required that Cinco obtain the LA Group's prior written consent before assigning any of Cinco's obligations to a third party (i.e., "Neither Party shall assign any of its ... obligations under this Agreement ... without the prior written consent of the other Party"). In other words, Cinco's obligation to provide PCJV an IP license could not have been assigned without the LA Group's prior written consent. <u>We cannot be any clearer about this.</u> The Agreement referenced in section (b) above, however, carries a term of 20 years with three successive 10-year extension options, contains a provision stating: "Licensor may assign this Agreement without restriction." (But you claim that "b" is not a real agreement.)

- As you know, since 2018, the Cinco Parties and the Koren Parties have been engaged in litigation. While that litigation was pending, we were told that Shakey's Pizza Asia acquired intellectual property assets from Cinco. To date, however, no party has furnished us with all the documents evidencing the purported acquisition. But it is an admitted fact that Cinco did <u>not</u> seek the LA Group's or Koren's prior written consent before purportedly assigning its obligations under the Agreements to Shakey's Pizza Asia.

- The Agreements unequivocally entitle PCJV to a license of Potato Corner's intellectual property rights. If "b" controls (contrary to your allegations), then PCJV maintains a license for an initial 20-year term with three successive 10-year extension options. If either of "a," "c," or "d" control, then PCJV must be given a license until either our side terminates it or upon mutual agreement as set forth in those Agreements. I further note that the Cinco Group is obligated to "use their best efforts to cooperate for the success of the business of [PCJV]," and "to perform all acts and execute and deliver all documents or instruments required or necessary to fully implement or consummate" the intent of the Agreements.

- Once we receive all of the Shakey's Pizza Asia-Cinco transactional documents, we may be able to assess whether Shakey's Pizza Asia was assigned rights *subject to* PCJV, et al.'s rights. If Shakey's Pizza Asia took an assignment subject to our rights (which I seem to recall you at one point taking some sort of position that it did), then it stands in Cinco's shoes and is *obligated* to provide PCJV a license under the terms of the

2

written, implied-in-fact, and verbal agreements, as well as written company documents, and course of conduct. If it did not take subject to our rights, then *Cinco* is obligated to provide us the necessary license and Shakey's Pizza Asia must look to *Cinco*, not the Koren Parties, to ensure that these alleged issues (that Shakey's Pizza Asia itself has manufactured) are sorted out immediately.

This communication is not in any way intended to diminish or condone Shakey's Pizza Asia's role in, among other things, interfering with and inducing Cinco's breaches of contract or aiding and abetting the Cinco Group's breaches of fiduciary duty. We will address those and other matters at the appropriate time. For now, as Shakey's Pizza Asia's lawsuit directly triggers the Cinco Parties' indemnity and defense obligations, please provide this demand to the Cinco Parties immediately so that they could engage my firm to represent the defendants in the attached lawsuit.

Nothing herein is intended as a waiver of any of the Koren Parties' rights, remedies, and claims. And this goes without saying again, but your clients are not to interfere with the Koren Parties' contracts and relationships with their franchisees, vendors, employees, etc. We will take seriously any such attempt at interference.

Thank you. Mr. Koren intends to write Messrs. Tan and Gregorio separately.

Best regards,

Arash

**Arash Beral** | BLANKROME
2029 Century Park East | Los Angeles, CA 90067
[Arash Beral | Blank Rome LLP](#)

---

**From:** Michael D. Murphy
**Sent:** Saturday, June 1, 2024 9:31 AM
**To:** Beral, Arash
**Cc:** Kenneth Hsu ; Ayesha Rector
**Subject:** RE: SPAVI

Arash:

I am not sure I understand your email. You seem to believe there was a coordinated strategy between SPAVI and Cinco (there was not), but to figure out how you get there, I need to understand a few of your accusations. I would like answers to these because maybe I have missed something. As you know, I am always willing to be proven wrong.

1. You say "it was your first set of clients [Cinco] that "caused" your second set of clients [SPAVI] the alleged harm to begin with by engaging in a transaction behind our backs without our contractually required consent." Are you saying Cinco was prohibited from engaging in a sale of Potato Corner IP and assets to SPAVI without your consent? If so, **please provide me with the contract or document – anything – that establishes that Guy's consent was required prior to any sale by Cinco of its IP**. If that is not what you are saying, please clarify what you mean by "[Cinco] engag[ed] in a transaction behind our backs without our contractually required consent."

2. You have, I think for the third time, accused our client SPAVI of "refus[ing] to get back to Mr. Koren despite promises." I have asked you twice, specifically, to identify the last time Mr. Koren communicated with SPAVI and the last time he was promised by SPAVI they would get back to him and they failed to do so. I will ask for this one more time. If you continue to make that accusation without backing it up, I will assume you

3

do not actually know this to be a fact. So, again: **please provide me with the correspondences from Koren or SPAVI in 2024 showing that Koren communicated with SPAVI and they did not respond, or that SPAVI promised information or to respond to Koren and did not do so**.

3. You accuse SPAVI of rejecting "reasonable offers." **Please provide me with the last offer Mr. Koren made that you claim was reasonable**.

4. You have accused SPAVI of tortiously interfering with PCJV's contracts. **Please specify when SPAVI has interfered with PCJV's contracts**.

5. You suggest SPAVI did not study the market. I do know that SPAVI provided Mr. Koren that very research on July 12, 2023. **Please provide me with correspondence in which Mr. Koren provided comparables based on his own research as to what a master licensor is paid by a master franchisor**. It would seem to me if Mr. Koren had disagreed with SPAVI's research, he would have provided his own. I would love to see it.

6. Why would SPAVI sue Cinco? What possible claims do they have against Cinco?

7. Finally, you suggest Cinco's ploy was to get paid by Koren to get out. Your client obtained 60% of PCJV – a controlling share – for $450,000 paid out over 10 years (with a current day money value of approximately $375,000). Cinco is getting paid, then, $375,000 for having given up the 60%. If you think PCJV's valuation accurately corresponds to the $450k paid for 60% of PCJV equity over 10 years, and that Cinco got a great deal, then you must also believe that PCJV is worth $625,000-$750,000. If that is the case, let SPAVI buy PCJV for that amount. I bet I could even convince our client to bump that number up a bit.

Given the accusations you have made, I need to know on what you base those accusations. Accordingly, I urge you to provide me with this information. If you do not, I will just assume it does not exist.

Note the absence of personal attacks in my email. Maybe you can engage without making this personal and angry. It would be more productive in figuring out answers to our clients' problems. That is our job, right?

Best,

**Michael D. Murphy**

ERVIN COHEN & JESSUP LLP

9401 Wilshire Boulevard, 12th Floor | Beverly Hills, CA 90212-2974
(310) 281-6367 *(t)* | (310) 859-2325 *(f)*
www.ecjlaw.com | mmurphy@ecjlaw.com | About me | LinkedIn

The information contained herein is confidential and privileged attorney-client information or work product intended only for the individual or entity to whom it is addressed. Any unauthorized use, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify me immediately.

**From:** Beral, Arash
**Sent:** Saturday, June 1, 2024 1:36 AM

**To:** Michael D. Murphy
**Cc:** Kenneth Hsu ; Ayesha Rector
**Subject:** Re: SPAVI

Ah, I see what's going on. You had one set of clients get paid, secure releases for themselves and relinquish their membership interests in PCJV, so that your other set of clients could then seek to: (a) tortiously interfere with PCJV's contracts and relationships; and (b) drown PCJV in litigation for their own self-serving motivations ... all the while, it was your first set of clients that "caused" your second set of clients the alleged harm to begin with by engaging in a transaction behind our backs without our contractually required consent. In the meantime, your second set of clients refused reasonable offers, refused to get back to Mr. Koren despite promises, refused to study the American market, refused to understand the difference between a market rate for a master licensor-master franchisor agreement (which we would have here if your clients were actually interested in it) vs. a franchisor-franchisee agreement (which we categorically do not have here) and made non-sensible demands that would put PCJV out of business all to concoct this "cease and desist" and a complaint, which you still haven't sent me but which I'm willing to bet doesn't include Cinco as a defendant.

I don't know what Mr. Koren will authorize me to do here, but don't for a second believe that I'm buying what you're selling.

Good night.

> On Jun 1, 2024, at 12:12 AM, Michael D. Murphy <mmurphy@ecjlaw.com> wrote:
>
> 1. The Cinco settlement has nothing to do with this. Spavi could have filed the Complaint any time. You keep connecting them but they are different issues. Cinco is not in Potato Corner anymore. This is about a license that our client has been trying to negotiate for a long time. If, as you nonsensically suggest, the settlement had something to do with this, why did Guy not reach out after the settlement was signed and say, settlement is done let's negotiate. He did not. Our client has not heard from him since February 17, 2024.
>
> 2. You cannot keep accusing me of manufacturing facts unless you have something to back it up. Please, please, show me the emails showing "[Mr. Koren] has been waiting for SPAVI to get back to him for months, after repeated attempts." Until you do, I will assume you have not seen any such thing either. You keep repeating that, but, when I provide you with specific dates and specific emails your client ignored, you have no answer. You have not done your due diligence here before spouting off with personal attacks against me.
>
> 3. Even if your client had responded to emails, which he hasn't, he made an absurd offer last year which was rejected, and he made no attempts to move towards SPAVI's expectations. He had no intent of ever offering a deal that would be commercially sensible. He wants a free license for himself, and a nominal license fee for the other franchisees. Look, you and I both know the problem, as you yourself admitted it last year: Guy made promises to investors that they would not have to pay royalties for licenses. Except he did not check with the actual licensor. He is in a bind. I get it. But that is not a bind our client will fund. SPAVI will be paid for use of its IP, and it will be paid at least near market rates. Not the facacta 0.5% Guy proposed.
>
> 4. The cease and desist is attached.
>
> 5. Your attacks on my professional integrity are noted. Disappointing, but noted.

5

Best,

**Michael D. Murphy**

ERVIN COHEN & JESSUP LLP

9401 Wilshire Boulevard, 12th Floor | Beverly Hills, CA 90212-2974
(310) 281-6367 *(t)* | (310) 859-2325 *(f)*
www.ecjlaw.com | mmurphy@ecjlaw.com | About me | LinkedIn

The information contained herein is confidential and privileged attorney-client information or work product intended only for the individual or entity to whom it is addressed. Any unauthorized use, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify me immediately.



**From:** Beral, Arash <arash.beral@blankrome.com>
**Sent:** Friday, May 31, 2024 10:45 PM
**To:** Michael D. Murphy <mmurphy@ecjlaw.com>
**Cc:** Kenneth Hsu <khsu@ecjlaw.com>; Ayesha Rector <arector@ecjlaw.com>
**Subject:** Re: SPAVI

You've obviously been planning this for a while. Preparing a "cease and desist" and a complaint (which you still haven't sent any of which to me) to spring it upon us on the same week we settle. You give me a break. You delayed the settlement with Cinco, ignored email after email from me, until such time your "complaint" and "cease and desist" were ready until you agree to "close" and file this new action. No warning. No communication about it. Nothing. In the meantime, my client has been waiting for SPAVI to get back to him for months, after repeated attempts. Your plan is obvious and no effort at manufacturing some alternative factual universe will work (and it never did in the past). This is not an "odd" reaction. This is exactly the reaction you expected and wanted. You got your wish.

If you want to talk next week, we can talk next week assuming I get engaged to deal with this. But I still need the documents. Thanks. Good night.

> On May 31, 2024, at 10:30 PM, Michael D. Murphy <mmurphy@ecjlaw.com> wrote:
>
> Arash:
>
> This is an oddly personal reaction. I do respect you and thought it was important to stand up for both of us in front of Highberger. I also think the settlement was good

6

for our clients. That endless morass needed to end. Everything I said on Tuesday was accurate and sincere.

I am not quite sure how that has anything to do with the fact that your client failed to negotiate in good faith a license with a different party. SPAVI was not a part of that litigation, and has been trying desperately to negotiate with

Please, tell me what about my below email is incorrect. I am happy to be told where I am wrong.

Also, tone down the personal stuff. We have been doing this too long to take our client's issues personally. "After 6 years of dealing with you, I thought we were beyond this nonsense . . ."

Give me a break, my man.

Mike

---

**Michael D. Murphy**

ERVIN COHEN & JESSUP LLP

9401 Wilshire Boulevard, 12th Floor | Beverly Hills, CA 90212-2974
(310) 281-6367 *(t)* | (310) 859-2325 *(f)*
www.ecjlaw.com | mmurphy@ecjlaw.com | About me | LinkedIn

---

The information contained herein is confidential and privileged attorney-client information or work product inter only for the individual or entity to whom it is addressed. Any unauthorized use, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify me immedia

---

**From:** Beral, Arash <arash.beral@blankrome.com>
**Sent:** Friday, May 31, 2024 7:08 PM
**To:** Michael D. Murphy <mmurphy@ecjlaw.com>
**Cc:** Kenneth Hsu <khsu@ecjlaw.com>; Ayesha Rector <arector@ecjlaw.com>
**Subject:** Re: SPAVI

You can't possibly be serious with this. There you were on Tuesday with your flowery language to the judge and emails to me, and on Friday, filing a complaint? Your narrative below is so out of bounds and lacks any sense of reality. After 6 years of dealing with you, I thought we were beyond this nonsense, but I guess we're not.

Send me whatever "cease and desist" you concocted together and whatever pleadings were filed. You and your clients just seem to want to litigate.

On May 31, 2024, at 6:38 PM, Michael D. Murphy <mmurphy@ecjlaw.com> wrote:

Arash:

I am not sure what you are referring to as SPAVI's "plan all along." If you are saying SPAVI always intended to sue, nothing could be farther from the truth. If that was the case, they would have sued in 2022, when they discovered there was no written license for a term in place. What I can tell you is that the "plan all along" was to negotiate a deal with Mr. Koren. Our client bent over backwards, flying out here, offering concessions below market, etc. They wanted this to work. It was Mr. Koren who botched the negotiation. And he did so in a truly astonishing way.

When you say SPAVI made "promises that it was going to get back to Guy regarding several of the items discussed with Guy during their negotiations," you are misinformed. The opposite is true.

Nearly 11 months ago, Mr. Koren made a proposal containing commercially unreasonable terms (including royalty rates that were so low as to be effectively nominal) that was rejected immediately by SPAVI. Our client followed up and requested a zoom with Mr. Koren which took place on July 6, 2023, during which it was explained by SPAVI why Mr. Koren's proposal was rejected, and SPAVI explained what it must have in any acceptable deal. As is typical for SPAVI, they nevertheless engaged Mr. Koren as to why he believes the royalty rates he was asking for were reasonable. He claimed poverty by the franchisees, and, so, SPAVI asked him to support those assertions with financials. SPAVI agreed to provide some comps in the marketplace for similarly situated brands. After the zoom, SPAVI followed up with an email (July 12, 2023) confirming what was discussed and restating their request for further information (including financials) from Mr. Koren to justify the nominal royalty rates he was insisting on, and offering some additional information SPAVI agreed to provide (including comparables). SPAVI even provided a worksheet for Mr. Koren to use to work through a new proposal. Everything SPAVI was asked to provide, it did. Almost a year ago.

Mr. Koren, on the other hand, having promised to provide financials and other information went radio silent for the rest of 2023. Which was unacceptable. SPAVI could have deemed the negotiations abandoned then, but decided to give it another shot. So, in January of this year, they sent an email urging Mr. Koren to provide the financials he promised and urging him to negotiate. He said he would within a week, but waited three weeks. Upon receipt of the partially complete financials he provided on February 17, 2024, our client reviewed them and sent an email on February 27, 2024 to Mr. Koren asking for further information, explaining why that additional

8

information was necessary, and again urging that the negotiation proceed.

SPAVI has not heard from Mr. Koren since.

Think about that. He is a licensee of a valuable brand, and while supposedly in the middle of a negotiation with the licensor, ignored them completely. So, it has now been more than three months, and SPAVI has not heard from him, and all SPAVI has to show for its efforts is a ridiculous proposal from June of 2023. This too is unacceptable.

It has been two years since SPAVI started negotiating with Mr. Koren, and the negotiation has not advanced any further than where they were a year ago when they were very far apart.

There are only two conclusions that can be drawn: (1) Mr. Koren abandoned the negotiation; or (2) Mr. Koren believes he can continue to use SPAVI's IP without compensation as long as he wants, and ignore SPAVI, resting on a year old rejected offer.

Either way, our client is done having its IP used without compensation and without a written license agreement.

When the tolling agreement was entered into, SPAVI still had hope that Mr. Koren would actually engage the negotiation with proposals that were commercially viable, that took into account the needs of SPAVI, and that were supported by information and financials and backup. He did not. SPAVI did not agree to being ignored, and disregarded, and left with useless proposals such as that which they rejected last summer. The timeline I have set forth above reveals that SPAVI has engaged this negotiation in good faith. But it cannot force Mr. Koren to, notwithstanding the multiple chances they gave Mr. Koren to do so.

Mr. Koren's terms were unacceptable. He knew that. He should have made a new proposal taking into account what SPAVI explained were the necessary minimums they require and justify his numbers with the financials and other information our client was requesting. He declined to do so.

SPAVI ran out of runway and patience, and saw the writing on the wall, that Mr. Koren was never going to make a commercially reasonable proposal and was never going to share information that is necessary for any negotiation. As such, SPAVI now deems the negotiation closed.

Did Mr. Koren even tell you about the cease and desist that was sent early this morning? Something tells me you are not getting all the information.

We will forward to you conformed copies of the pleading.

Best,

**Michael D. Murphy**

ERVIN COHEN & JESSUP LLP

9401 Wilshire Boulevard, 12th Floor | Beverly Hills, CA 90212-2974
(310) 281-6367 *(t)* | (310) 859-2325 *(f)*
www.ecjlaw.com | mmurphy@ecjlaw.com | About me | LinkedIn

The information contained herein is confidential and privileged attorney-client information or work prod
only for the individual or entity to whom it is addressed. Any unauthorized use, distribution or copying of
communication is strictly prohibited. If you have received this communication in error, please notify me i



**From:** Beral, Arash <arash.beral@blankrome.com>
**Sent:** Friday, May 31, 2024 5:03 PM
**To:** Michael D. Murphy <mmurphy@ecjlaw.com>
**Cc:** Kenneth Hsu <khsu@ecjlaw.com>; Ayesha Rector <arector@ecjlaw.com>
**Subject:** RE: SPAVI

Hi Mike:

I've been tied up all afternoon. I'm surprised that any lawsuit has been filed before the tolling agreement expires and the parties have continued their negotiations (certainly was not the contemplation of the parties based on my memory), nor was it the contemplation for SPAVI to "file first" anyway even if a lawsuit were to be filed before the tolling expires. It's really upsetting that this appears to have been SPAVI's "plan" all along, despite its promises that it was going to get back to Guy regarding several of the items discussed with Guy during their negotiations. I don't really understand what SPAVI's thinking is, other than potentially just being desirous of "filing first." Regardless, care to send me a copy of whatever was filed? I will then confer with the group of defendants and determine if we can shore up engagements with my firm for each named defendant, and get back to you. Thanks.

Arash

**Arash Beral** | BLANKROME
2029 Century Park East | Los Angeles, CA 90067
Arash Beral | Blank Rome LLP

**From:** Michael D. Murphy <mmurphy@ecjlaw.com>
**Sent:** Friday, May 31, 2024 1:19 PM
**To:** Beral, Arash <arash.beral@blankrome.com>
**Cc:** Kenneth Hsu <khsu@ecjlaw.com>; Ayesha Rector <arector@ecjlaw.com>
**Subject:** SPAVI

Arash:

SPAVI has filed a Complaint against Mr. Koren, PCJV, PCIT, and each of Mr. Koren's Potato Corner affiliates (the J&Ks, NKM, GK, LA Group, LLC).

Are you authorized to accept service on behalf of Mr. Koren, or any of the other entities identified above?

Thank you,

**Michael D. Murphy**

ERVIN COHEN & JESSUP LLP

9401 Wilshire Boulevard, 12th Floor | Beverly Hills, CA 90212-2974
(310) 281-6367 *(t)* | (310) 859-2325 *(f)*
www.ecjlaw.com | mmurphy@ecjlaw.com | About me | LinkedIn

The information contained herein is confidential and privileged attorney-client information or work prod only for the individual or entity to whom it is addressed. Any unauthorized use, distribution or copying of communication is strictly prohibited. If you have received this communication in error, please notify me i

************************************************************************************************

This message and any attachments may contain confidential or privileged information and are only for the use of the intended recipient of this message. If you are not the intended recipient, please notify the Blank Rome LLP or Blank Rome Government Relations LLC sender by return email, and delete or destroy this and all copies of this message and all attachments. Any unauthorized disclosure, use, distribution, or reproduction of this message or any attachments is prohibited and may be unlawful.

************************************************************************************************