1              UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3

4  SHAKEY'S PIZZA ASIA VENTURES,  ) Case No. LA CV 24-04546-SB-
   INC.,                         )                      (AGRx)
5                                )
                                 )
6          Plaintiff,            )
                                 ) Los Angeles, California
7  vs.                           )
                                 ) Friday, June 27, 2025
8  PCJV USA, LLC, et al.,        )
                                 ) (9:58 a.m. to 12:02 p.m.)
9          Defendants.           )
   _____)

10

11              TRANSCRIPT OF VIDEO HEARING RE:
              NOTICE OF MOTION IN SUPPORT OF
12     DEFENDANT PCJV USA, LLC.'S MOTION FOR SANCTIONS
         BEFORE THE HONORABLE JUDGE ALICIA G. ROSENBERG
13              UNITED STATES MAGISTRATE JUDGE

14  Appearances:              See next page.

15  Court Reporter:           Recorded; CourtSmart

16  Courtroom Deputy:         Isabel Martinez

17  Transcribed by:           Jordan Keilty
                              Echo Reporting, Inc.
18                            9711 Cactus Street, Suite B
                              Lakeside, California 92040
19                            (858) 453-7590

20

21

22

23

24
    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.

2

```
 1  APPEARANCES:

 2  For the Plaintiff:          MICHAEL D. MURPHY, ESQ.
                                MATTHEW R. FOLLETT, ESQ.
 3                              Fox Rothschild, LLP
                                10250 Constellation Boulevard
 4                              Suite 900
                                Los Angeles, California 90067
 5                              (213) 213-1211

 6  For the Defendants:         TODD M. MALYNN, ESQ.
                                ARASH BERAL, ESQ.
 7                              Blank Rome, LLP
                                2029 Century Park East
 8                              Sixth Floor
                                Los Angeles, California 90067
 9                              (424) 239-3400

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

<u>Los Angeles, California; Friday, June 27, 2025 9:58 a.m.</u>

--o0o--

(Call to Order)

THE CLERK:  This United States District Court is once again in session, the Honorable Alicia G. Rosenberg, United States Magistrate Judge, presiding.

Calling Item Number 2, Case Number CV-24-4546-SB-AGR, Shakeys Pizza Asia Ventures, Incorporated versus PCJV USA, LLC, et al.

Counsel, can you please state your appearances for the record.

MR. MURPHY (via Zoom):  Michael Murphy, here for the Plaintiff and Counterclaim Defendant and Third Party Defendants.

MR. MALYNN:  Matthew --

THE COURT:  We have more counsel, guys.

THE CLERK:  Please state your name, Mr. Follett.

MR. FOLLETT (via Zoom):  Matthew Follett with Fox Rothschild, on behalf of the same, Plaintiffs and -- Plaintiffs, Counter-Defendants and Third Party Defendants.

THE COURT:  All right.  Thank you.

And now for the Defendants.

MR. MALYNN (via Zoom):  Todd Malynn and Arash Beral on behalf of Defendants, Counter Claimants, and Third Party Plaintiffs.

4

1          THE COURT:  All right.  Okay.  So, let me first

2    begin by saying in terms of the Defendants' motion for

3    sanctions, so, many of the requests for sanctions involve

4    issues that would be dispositive of one or more claims.  So,

5    under those circumstances, the Magistrate Judge's role is to

6    write a report and recommendation to the District Judge.

7    The District Judge is the one who makes the ultimate

8    decision.  The Magistrate Judge, unless it's a consented

9    case, which this is not, but the Magistrate Judge does not

10   have authority to do that.  So, I wanted to make sure people

11   understood that I would be preparing a report and

12   recommendation, particularly as to the request for sanctions

13   that would be dispositive of one or more claims.

14          So, with that out of the way, I wanted to make

15   sure that I had the status of the discovery correct.  So,

16   let -- I want to turn to that in terms -- and I'm talking

17   about the document production.  I think the papers are

18   pretty clear.  Well, the docket is clear about when the

19   protective order is filed.  The papers are clear about when

20   the supplemental response to interrogatory Number 1 was

21   served.  So, I think the only issues that I want to address

22   in terms of the status of the discovery is the document

23   request.  So, if you see me looking over to my left, it's

24   because I'm looking over at my notes.

25          So, I'm going to go over this and make sure that

5

1   what I have is -- is what you have in terms of the document

2   -- the documents that have been produced and the document

3   requests covered by them.

4           So, I will first go through what I discerned from

5   the record as having been produced.  So, there was -- there

6   were a series of requests.  I think -- I have them down as

7   Document Request 8, 14, and 19, which were narrowed by the

8   Court in the March 12, 2025 order, but together call for the

9   production of press releases, company statements, and I

10  believe they were also SEC filings that were covered by

11  these three.

12          It appeared to me, reading the Plaintiff's papers

13  and the Defendants' papers, that these documents, the press

14  releases, the SEC filings, and I don't know if that's

15  different from company statements but probably not if this

16  is an SEC case, that those documents had, in fact, been

17  produced.

18          Starting with you, Mr. Murphy?

19          MR. MURPHY:  Yes.  And I -- I -- I go back to the

20  order, and the order was about -- we talked at the hearing

21  about -- sorry.  We talked at he hearing about the -- the --

22  this is a publicly traded company.  So, statements are --

23  are -- there's a -- has a -- it's a loaded term.  This is

24  not an SEC case.

25          THE COURT:  Right.

6

1          MR. MURPHY:  And, so, we agreed that it would be

2   anything that was an official statement under the respective

3   Securities Acts would be produced, and we have, yes.

4          THE COURT:  All right.  So, in your view, that

5   production is complete?

6          MR. MURPHY:  Yes.  Yes.

7          THE COURT:  Okay.  Now, I -- before I ask the

8   Defense on the same question, I just want to say I don't

9   have a date on those.  I was just going to use produced by

10  -- by the date of your declaration.

11         MR. MURPHY:  Yes.

12         THE COURT:  Unless you have something else that

13  you want me to use.  But, otherwise, I would just use by the

14  date of your --

15         MR. MURPHY:  Okay.

16         THE COURT:  -- declaration.

17         MR. MURPHY:  Okay.  May I say something in that

18  regard then, your Honor?

19         THE COURT:  Okay.

20         MR. MURPHY:  Because, so, we have this complicated

21  issue here in that the position taken by the Defendants is

22  that after April 5th or April 15th, what the last day was,

23  they didn't -- it was too late, right.

24         Now, I disagree with that, but I was -- you know,

25  but I also noted that they had an obligation that your Honor

7

1  pointed out to produce documents, for example, that would

2  have been responsive to their initial disclosures.  And they

3  did not.  No documents were produced.

4         So, I felt -- I thought, you know, these guys are

5  taking the position that discovery's over, so even if you

6  have an obligation, the obligation is over, because they --

7         THE COURT:  Well -- well, we'll get to Rule 26(e)

8  and the --

9         MR. MURPHY:  I know, but, so, it's --

10        THE COURT:  -- but I don't want to --

11        MR. MURPHY:  I know.

12        THE COURT:  Right now I just want to get a

13  sense --

14        MR. MURPHY:  Here's --

15        THE COURT:  -- what has been produced.

16        MR. MURPHY:  Right, but my --

17        THE COURT:  This is the first category.

18        MR. MURPHY:  There's a point, though.

19        THE COURT:  I believe you --

20        MR. MURPHY:  There's a --

21        THE COURT:  I -- I understand.  I read the papers.

22  I've read the papers.  I have the arguments in mind.

23        MR. MURPHY:  So, I just wanted --

24        THE COURT:  What is not as clear -- and that's why

25  I want to go through the record here -- is I want to make

8

1  sure that my notes from the record before the Court is the

2  same as what you are thinking you have communicated to me in

3  terms of the status of discovery.  So, in the absence of any

4  other information, I will use the date of your declaration.

5            So, now, turning to the Defense side, it seemed as

6  though you agreed with the point that the press releases and

7  the regulatory filings had been produced.  Do I have that

8  right?

9            MR. MALYNN:  We received -- we received regulatory

10 filings.  I cannot sign off on press releases or company

11 statements.  But, yes, we did receive public filings.

12           THE COURT:  Okay.  All right.

13           MR. MALYNN:  And I -- I have no --

14           THE COURT:  And -- but the Plaintiff --

15           MR. MALYNN:  -- idea how to judge completeness.

16           THE COURT:  So, Mr. Murphy, you're saying there

17 isn't anything that you are withholding in the press release

18 category?

19           MR. MURPHY:  Right.  I'm not withholding anything.

20           THE COURT:  Okay.  All right.  So, that's --

21 that's that one.

22           Now let me -- hold on one second.  Let me just

23 look back at my notes.  Next category I have was Document

24 Request Number 9, which was the Board of Directors minutes

25 and if there were --

9

1          MR. MURPHY:  We --

2          THE COURT:  -- any resolutions having to do with

3  the acquisition of the Potato Corner assets.

4          MR. MURPHY:  If --

5          THE COURT:  Mr. Murphy, you --

6          MR. MURPHY:  -- if it refers --

7          THE COURT:  -- stated that -- somewhere in here

8  that you had produced the Board of Directors minutes.

9          MR. MURPHY:  So --

10          THE COURT:  Is that correct?

11          MR. MURPHY:  It -- so, our limitation was this.

12  We -- and this was in the hearing -- that these -- all these

13  categories were to be confined by to the extent it refers to

14  PCJV and the U.S. rights.

15          THE COURT:  Right.

16          MR. MURPHY:  And there aren't any.

17          MR. MALYNN:  Hold on.  Your Honor, you said if it

18  was -- it was international --

19          THE COURT:  It was -- right.  If it -- if it

20  applies to an area solely -- that does not include the

21  United States, does that change the Board of Directors

22  minutes?

23          MR. MURPHY:  So, I -- I -- my notes are that if --

24  that -- so, the demand -- 1 through 18 was for all the deal

25  documents, and I had taken the position and still do that

10

1 there's no -- the -- that's not proportional.  It's not an

2 issue.  It's not debatable.

3          THE COURT:  Right, right, right.  No, no, No.

4      (Simultaneous speaking.)

5          THE COURT:  This is -- again, I'm --

6          MR. MURPHY:  So, when you said, can we negotiate

7 and I said, Okay.  So, why don't we talk about to the extent

8 they mention PCJV or -- or specifically U.S. rights unique

9 as to everyone else, and I said, I think I can do that.

10          THE COURT:  All right.  But in your declaration,

11 you mentioned that the Board of Directors minutes had been

12 produced.  What are the -- if it's not about the Potato

13 Corner assets, then what is it about?  What -- what were the

14 Board of Directors minutes about?

15          MR. MURPHY:  So, to the extent an SEC filing

16 refers to or contains board resolutions, we have to produce

17 them.  But there is nothing else that is specific to Potato

18 Corner that the Board of Directors discussed.

19          THE COURT:  There's nothing -- okay.  Just making

20 sure I got that.  There's nothing -- you're saying there's

21 nothing responsive in the Board of Directors minutes about

22 the acquisition of Potato Corner assets?

23          MR. MURPHY:  Correct.  It's -- there's no -- this

24 wasn't a topic of conversation.  So, it wasn't really like,

25 What are we going to do about the U.S.?  And that's -- so,

11

1  that's a separate privilege issue that's complicating all of

2  it.  So --

3          MR. MALYNN:  That wasn't the scope.  The scope was

4  he could carve out non-U.S.  But we are entitled to get the

5  deal.

6          THE COURT:  No, no, no.  I -- we're not at the

7  deal yet.  We're just at the Board of Directors --

8          MR. MALYNN:  No, but the board minutes --

9          THE COURT:  -- minutes --

10          MR. MALYNN:  -- approving the deal is the deal.

11  The board minutes discussing --

12          THE COURT:  Okay.  I want to kind of distinguish

13  this because there are specific document requests about

14  that, for example, the asset purchase agreement.  So, I

15  don't want to mix this up.  I -- I want to get a clear

16  picture, and you -- you can see through hearing why this has

17  been difficult for me to get from the documents themselves,

18  but so I want to make sure we're really clear about --

19          MR. MALYNN:  I -- I appreciate that --

20          THE COURT:  -- that.  Back --

21          MR. MALYNN:  -- your Honor.

22          THE COURT:  -- to you, Mr. Murphy.  The board --

23  when you say there's nothing responsive in the Board of

24  Directors minutes about the acquisition of Potato Corner

25  assets, are we talking about the acquisition of Potato

12

1  Corner assets generally or just in the United States?

2          MR. MURPHY:  I have to tell you I'm going to --

3  here's my problem.  I very specifically remember the

4  limitation during the informal conference about things that

5  refer or are specific to the U.S. or trademark rights

6  generally that would affect the U.S.  That was my

7  understanding.  Those don't exist.

8          Now, there were board minutes and -- or references

9  to board minutes in the SEC filings, which we have produced.

10  So -- so, yes, there have been board minutes produced, but

11  there aren't any that fall within that category.  The board

12  didn't have a discussion, for example, about PCJV and bad

13  corn.  It didn't happen.

14          THE COURT:  Or, for example, when you're talking

15  about the acquisition of trademark rights in the Potato

16  Corner marks, did the -- do you recall Board of Directors

17  minutes addressing that subject?

18          MR. MURPHY:  No.  There -- I -- no, there was not,

19  because that wasn't their charge, no.  This is --

20          THE COURT:  Okay.  So, then I will say it -- at

21  this point it seems as though nothing but you would need to

22  confirm.

23          UNIDENTIFIED SPEAKER:  Your Honor, can I chime in

24  on this point?

25          THE COURT:  Okay.

13

```
 1          UNIDENTIFIED SPEAKER:  The obligation then is to
 2   tell us on April 4th what -- by April 4th that -- or at
 3   least by April 11th where they don't have responsive
 4   documents based upon your guidance on March 12th.  To be
 5   told on  June --
 6          THE COURT:  I want to get --
 7          UNIDENTIFIED SPEAKER:  -- 27th --
 8          THE COURT:  Can we just postpone this, because I
 9   really --
10          UNIDENTIFIED SPEAKER:  Yes, your Honor.
11          THE COURT:  -- you know, I need to get through
12   where the --
13          UNIDENTIFIED SPEAKER:  Yes, your Honor.
14          THE COURT:  -- discovery is.  And because the
15   counsel and the papers don't focus on that, that -- all the
16   arguments are there, but the predicate facts are hard to
17   glean.  So, I've got to get through the predicate facts
18   because I'm the one, as I said, to prepare a report and
19   recommendation.  So, I have to be able to describe this, and
20   right now I'm -- I'm not sure what I'm describing.
21          So, that was Document Request --
22          MR. MURPHY:  Well, because I'm --
23          THE COURT:  -- Number 9 --
24      (Simultaneous speaking.)
25          MR. MURPHY:  On March 12th, you said the important
```

14

1  point of the opposition was to do what we're doing right

2  now.  They didn't do that in their opposition.  They didn't

3  show --

4           THE COURT:  I -- I --

5           MR. MURPHY:  -- substantial --

6           THE COURT:  Okay.  Can't --

7           MR. MURPHY:  Okay.  Yes, yes, your Honor.  I --

8  I'll --

9           THE COURT:  This is going to take four -- okay.

10  I'm just telling you now my afternoon calendar starts at

11  2:00 p.m.  In order for us to get through this hearing,

12  you're going to have to let me get through my notes here of

13  what I need to ask.  If we stop and have an argument at

14  every single point in time -- well, maybe we won't need

15  argument at the end, but I'm still --

16           UNIDENTIFIED SPEAKER:  Thank you, your Honor.  I

17  hear you.

18           THE COURT:  -- stuck trying to go through this.

19  Okay.

20           So, that first category was 8, 14, and 19.  For

21  anyone else keeping track, the Board of Directors minutes,

22  according to my notes, are Document Request Number 9.

23           We now move to Document Request Numbers 12 and 25,

24  and this was where -- this is -- these two, I put them

25  together.  They're about the financials.

15

1          Now, Mr. Murphy, again, starting with you, you

2  mentioned in your declaration that you have produced

3  financial statements.

4          MR. MURPHY:  I -- I -- oh, yes.  Yes, I did, yes.

5          THE COURT:  Okay.  So, then I want to go through

6  12 and 25 just to make sure that I understand which request

7  those would be responsive to and, you know, maybe both of

8  them.  But one of them -- so, 25, that may be the easiest

9  one.  Twenty-five had to do with financials in support of

10  your damages claims.  Are those the financial statements

11  that you're talking about that you have produced?

12          MR. MURPHY:  No, I haven't -- they were produced

13  by my opponents at -- in the -- in the expert --

14          THE COURT:  No, no, no.  I'm not talking about the

15  Defendants' production.  I'm talking about the Plaintiff's

16  production.

17          MR. MURPHY:  At the time, I didn't have any

18  because that should have -- I didn't have any because I

19  needed their financials of the subsidiaries of PCJV other

20  than the PCJV public filings that we all have, but it's --

21  that's -- that's for the damages.

22          THE COURT:  Okay.  So, in terms of the financials

23  that would support Plaintiff's claims for damages, has that

24  been produced as of this moment?

25          MR. MURPHY:  Everyone has them, yes.

16

1          THE COURT:  Okay.  But --

2          MR. MALYNN:  They did not produce any financials,

3  your Honor.  He's relying upon our -- the financials that we

4  produced.

5          THE COURT:  Well, he could rely on that if that's

6  what is supporting the Plaintiff's damage claim.  Is --

7          MR. MALYNN:  I'm just --

8          THE COURT:  -- that what you're saying?

9          MR. MALYNN:  -- bringing -- the answer to your

10  question.

11          THE COURT:  No, the --

12          MR. MALYNN:  I don't --

13          THE COURT:  Okay.  I don't know that you can have

14  personal knowledge to answer the question.  So, I have to

15  get this from Mr. Murphy because this is Plaintiff's damages

16  claim.

17          So, I need to know when you say you produced

18  financials, Document Request Number 25 asks for the

19  financials underlying the Plaintiff's claims for damages.

20          MR. MURPHY:  Correct.  So, here's --

21          THE COURT:  Okay.  So, then that's my question.

22  Have those financials been produced in support of your

23  client's claims for damages?

24          MR. MURPHY:  Yes, but, so, I just want to make

25  sure we understand the law.  So -- that wasn't meant to be

17

1  insulting.  But just so we're clear on the law on damages

2  here, I have multiple options at trial.  I could do lost

3  profits.  All of our financials are in the SEC filings.

4  Okay.  That's why we produced those.  They're very

5  important.

6          Then I also can do disgorgement.  Disgorgement

7  requires the -- the -- my opponents -- Plaintiffs -- at the

8  time, I had not taken -- or at the time of the -- the last

9  date of the -- as of the declaration -- let me back up.

10          THE COURT:  Okay.

11          MR. MURPHY:  I didn't have possession of their

12  financials until they produced Jason Engels (phonetic)

13  documents at his expert deposition on April 11th.  At that

14  point, I did have them.  So, did I print -- put Bates

15  numbers on them and -- and send them back?  No, I did not.

16          THE COURT:  Okay.  So, the disgorgement claim --

17  what you're saying is the disgorgement claim is based up the

18  Defendants' documents?

19          MR. MURPHY:  Right.

20          THE COURT:  All right.  And then, to the extent

21  you are claiming lost profits, if you do decide to claim

22  them, you are relying upon the financials in the SEC

23  filings?

24          MR. MURPHY:  Yes.

25          THE COURT:  Okay.  Now, let's go to Document

18

Request Number 12 is a different request.  It's for the financials, if there are any, regarding the acquisition of Potato Corner assets.

MR. MURPHY:  So, we had a limitation because we guard these zealously.  And I would have fought for a motion if I though that I was going to be in this situation because I don't think there's any reasonable particularity there.  However, we have a specific limitation that it was to the extent they mentioned, specific -- the trademarks rights or PCJV and -- and -- so, those are in the SEC reports.  I mean, there's a -- there's a -- we produced, you know, financials that say this is how much the acquisition was worth.  This is how much we value the goodwill.  This is how much we value -- so, now --

THE COURT:  Right.

MR. MURPHY:  -- yeah --

THE COURT:  But then is there anything that caught -- that identifies valuation in the United States separate and apart from the overall deal?

MR. MURPHY:  No, because that's not how these deals work, nor does, you know, valuation because --

THE COURT:  Okay.  But, regardless of why, the answer is no?

MR. MURPHY:  The answer is no.

THE COURT:  So, the SEC filings have identified

19

1  the overall valuation, but you're saying there is nothing

2  responsive about the U.S. separately?

3              MR. MURPHY:  Correct.  That's correct.

4              THE COURT:  Okay.  Got it.  All right.  Let me

5  see.  I think there was one other -- no.  There were a

6  couple more.  Okay.

7              Document Request Number 13 called for the Potato

8  Corner trademark assignments and transfers.  Plaintiff cited

9  to Document -- Docket Entry 44-10 through 44-15, which is

10 part of the motion.  For those of you who've not memorized

11 the docket entries, part of the motion for preliminary

12 injunction.

13             You also attached two documents.  I didn't check

14 to see whether they are duplicative, but I guess my question

15 to you is are there any trademark assignments or transfers

16 that you have not produced?

17             MR. MURPHY:  That -- that would be applicable to

18 the U.S.?  No.

19             THE COURT:  Yes.

20             MR. MURPHY:  No.

21             THE COURT:  So, that has been completed.  Again,

22 for all that are keeping track, that's Document Request 13,

23 and you're telling me that that was completed.

24             Okay.  All right.  Let me go back to my notes.

25 Give me a moment.

20

1      (Pause.)

2           THE COURT:  All right.  So, now let's go to

3  Document Request Number 1 which called for the production of

4  the agreement that covered the sale of Potato Corner assets

5  to Spavi.

6           Now, I had said that Plaintiff could produce a

7  redacted copy.  What I have is Plaintiff's proposal of April

8  11 to produce the entire agreement for the inspection of the

9  Defendants.

10          Has anything happened since then?  So, let me be

11  specific about that.  Mr. Murphy, did you go ahead and

12  produce a redacted copy of the asset purchase agreement?

13          MR. MURPHY:  So, again, we have a limitation, and

14  the limitation was specific to the U.S. and PCJV and that --

15  that has a -- a trademark related agreement that would be --

16  that would implicate the U.S. separately (indiscernible).

17  Now, that was my understanding.  I would have produced a

18  blacked-out agreement.  Honestly, there's -- there -- and

19  that's why I -- I proposed this, because I thought I --

20  there -- nothing is going to make my opponents angrier than

21  sending them a very --

22          THE COURT:  A blank piece of paper.

23      (Simultaneous speaker.)

24          MR. MURPHY:  -- it's going to make them mad.  So,

25  why don't we do this?  Now, I understand now as of the

21

1  filing of their motion that they -- they rejected it.  But

2  come on, guys.  You got to -- I mean, this is part of my

3  meet and confer problem.  Like, I'm trying -- I actually was

4  trying to help them and help their legal theory because

5  they're going to see that there's nothing there, and under

6  the law, the deed supersedes the agreement.  It doesn't

7  matter what it says.  There's a deed, and they have it.

8  It's in the record in this case.

9          THE COURT:  All right.  Okay.  So, then let me

10 just make sure on the Defense side that what Plaintiff

11 represented is the case, that the last word on this subject

12 was the April 11 proposal and that nothing has occurred

13 since then?

14          MR. MALYNN:  We disagree, your Honor.  We wanted

15 that doc -- we wanted anything he was going to produce.  I'm

16 happy to show the jury a blacked-out document.  That is not

17 accurate.  They just didn't produce it, and we get the

18 opportunity to show witnesses on the stand whatever doc --

19 what ever the purchase agreement is and that was being

20 withheld from us.  Just because their point of view of -- of

21 what is relevant and what is not relevant, we have a -- you

22 know we have a disagreement on what is relevant, and --

23          THE COURT:  Correct.

24          MR. MALYNN:  -- they can't unilaterally decide not

25 to comply with your order.

22

1          THE COURT:  But my -- so, my point is that since

2    the April 11 proposal, nothing has happened on Document

3    Request Number 1.  Is that correct?

4          MR. MALYNN:  That is correct.  They did not comply

5    with your order.  We asked them to comply.

6          THE COURT:  Okay.  So, let me just make a note.

7       (Pause.)

8          THE COURT:  Okay.  Now, that leaves us with the

9    largest group.  So, this is the one where, Mr. Murphy, you

10   are describing the application of the search terms returned

11   over 40,000 unique documents.

12         Now, I have specific questions.  Let me make sure

13   I have my notes.

14      (Pause.)

15         THE COURT:  Very frustrating.  I have too many

16   pieces of paper lying around here.  Yeah.  Okay.  The 40,000

17   unique documents, now, there is a difference -- are these

18   40,000 unique pages of documents or are these unique

19   documents?  In other words, one document could be 50 pages?

20      (Pause.)

21         THE COURT:  I -- you're muted.  So, I can't hear

22   you.

23         MR. MURPHY:  Forty thousand pages -- I'm sorry --

24   40,000 documents, not pages.

25         THE COURT:  Not pages.  Okay.  So, we have 40,000

23

1   -- over 40,000 unique documents, not pages.  Okay.  So, it

2   could be that the number of pages is more unless every --

3          MR. MURPHY:  Correct.

4          THE COURT:  -- single document is one page, which

5   is highly unlikely.

6          All right.  Now, you mentioned that you did some

7   of the review -- I'm going to forget the name of -- I'm

8   sorry.  I'm having a --

9          MR. MURPHY:  Oh, my colleague, Jordan

10  Zolliecoffer, did some of the reviews also.

11         THE COURT:  Yes, that's it.  Thank you.

12         All right.  Did you have anyone else involved in

13  that review?

14         MR. MURPHY:  I -- I -- I don't have the budget for

15  -- to staff --

16         THE COURT:  To do that, right.

17         MR. MURPHY:  You know, I --

18      (Simultaneous speaking.)

19         THE COURT:  But there's you.  There's -- there's

20  Mr. Zolliecoffer.  Did you have any --

21         MR. MURPHY:  That's $1500 an hour.

22         THE COURT:  -- people helping you?

23         MR. MURPHY:  No.  I'm -- I don't -- we don't allow

24  legal assistants to do review like that because here's the

25  problem --

24

1          THE COURT:  You have attorney-client privilege.

2          MR. MURPHY:  Yes.

3          THE COURT:  I -- I get that.

4          MR. MURPHY:  And --

5          THE COURT:  So, in terms of the attorney-client

6   privilege, it was you and Mr. Zolliecoffer --

7          MR. MURPHY:  Ms. Zolliecoffer, yes.

8          THE COURT:  Anyone else?  I have the wrong -- I'm

9   sorry.  I really apologize if I have the wrong name.

10         MR. MURPHY:  That's okay.

11         THE COURT:  I didn't write it down, and I should

12  have because I would mispronounce it.  So, my apologies to

13  your -- your colleague.

14         Any -- anyone else that you can think of that was

15  involved in this, an attorney?

16         MR. MURPHY:  No, no, I did not have another

17  attorney involved.

18         THE COURT:  Okay.

19         MR. MURPHY:  Oh, actually, my -- the general

20  counsel of my counsel, yes.

21         THE COURT:  Okay.  General --

22         MR. MURPHY:  There was --

23         THE COURT:  And -- and the general counsel.  All

24  right.

25         MR. MURPHY:  And --

25

```
 1            THE COURT:  You --
 2            MR. MURPHY:  General counsel's office, yes.
 3            THE COURT:  Or general counsel's office, but you
 4  -- you're saying it's one attorney?
 5            MR. MURPHY:  No.  There are -- they've got, I
 6  don't know, 10 attorneys, yeah.
 7            THE COURT:  Okay.
 8            MR. MURPHY:  So --
 9            THE COURT:  Okay.  So, can we refer to the general
10  counsel's office --
11            MR. MURPHY:  Yeah, yeah.  Yeah, yeah.
12            THE COURT:  -- however -- okay.  Thank you.  They
13  were involved in the review.  Okay.
14            All right.  So, then, the issue I guess the --
15  that you raised -- Mr. Murphy, the issue that you raised in
16  your declaration is that given what the search terms
17  produced, namely, over 40,000 hits of documents, not just
18  pages but documents, that it was impossible to comply with
19  the order that I issued.
20            MR. MURPHY:  It --
21            THE COURT:  Are there any -- so, I've gone through
22  the documents versus pages.  I've gone through the number of
23  attorneys.  Is there anything else that you would like to
24  add that I have not thought to ask?
25            MR. MURPHY:  Yes.  The -- on -- when was it?  On
```

26

1   April -- I'm sorry -- March 24th, you said they were

2   entitled to -- on March 24th, I sent an email, said we tried

3   to meet and confer with you.  And this is Document 173-10,

4   and I'm on page nine, my email.  I said:

5              "I tried to meet and confer with

6         you on search terms which are better

7         decided now.  You refuse.  I asked for a

8         courtesy for -- time for other separate

9         responses so I could get this

10        production.  You refused.  And this

11        forced me to drop everything and work on

12        this.  Right.  At a certain point the

13        refusal by you -- by your side to extend

14        any courtesies whatsoever is beginning

15        to look like a substantive strategy.  We

16        will begin producing this week.  I'm

17        sorry how you've decided --

18        You know, so, there's -- I don't

19   (indiscernible) --

20        THE COURT:  Right.

21        MR. MURPHY:  But --

22        THE COURT:  So, you're now --

23        MR. MURPHY:  -- I was trying --

24        THE COURT:  -- transitioning --

25        MR. MURPHY:  -- to talk to them.

27

1          THE COURT:  You are now transitioning to my next

2    set of questions.

3          MR. MURPHY:  Yes.  How can I -- I -- it's a

4    complete -- right out of the gate, I realized as I was

5    walking out -- this was -- I realized as I'm walking -- not

6    walking out, but we turned off Zoom on March 12th, but I

7    didn't even have my client here.  So, I don't really know

8    what this is going to entail.  So, because it's nighttime in

9    Manilla, I had to call, and that was why like within a short

10   amount of time I called them -- or I sent an email to Mr.

11   Malynn, and I explained that we need to meet and confer on

12   these search terms now, and he wouldn't.  So, we went ahead.

13   And then we get this dump, and it's just, no, it's

14   privileged, and it's all this highly confidential stuff, and

15   we've got (indiscernible) privileges.  So, I didn't know

16   what to do.  So, I just started reviewing.

17          So, Jordan, me, and the general counsel's office

18   -- and it was not -- I was just wanting to get it done.  Had

19   they met and conferred --

20          THE COURT:  Right.  No, next time --

21          UNIDENTIFIED SPEAKER:  Your Honor --

22          THE COURT:  This is just for the future, when you

23   are in that kind of situation, might I suggest if you end up

24   with a Magistrate Judge who has procedures similar to mine,

25   that you contact the clerk and the other side and ask for a

28

1  discovery conference to address what you are faced with,

2  because this happens.  People -- I mean, it's probably

3  unusual.  I haven't seen one case yet where the first set of

4  search terms actually works.  It's usually over-inclusive.

5  Sometimes it's under-inclusive.  But that's less common.

6  More common is what you re describing, which is the first

7  set of search terms produces a large number of hits, and

8  then counsel usually work together to try and reduce it, et

9  cetera, et cetera, et cetera.

10         So, that's just for the future.  Now let's get

11  back to this case.

12         So, your transition --

13         MR. MALYNN:  Your Honor, can --

14         THE COURT:  -- to my next question -- hold on.

15  Not yet because I got to get through my list.  I've got to

16  get through --

17         MR. MALYNN:  You heard a --

18     (Simultaneous speaking.)

19         THE COURT:  -- document request no matter what.

20         MR. MALYNN:  I'll stick a pin --

21         THE COURT:  I mean, I am on a mission --

22         MR. MALYNN:  I'll stick a pin in it.

23         THE COURT:  -- here to finish my questions.  And

24  then I will --

25         MR. MALYNN:  I'll stick a pin in it.

29

1          THE COURT:  -- open the floor.  I promise you, but

2   I've got to get through this, and we're almost there,

3   because this last category is the search terms, and it's

4   actually -- I divided it -- for those of you keeping track,

5   I divided it into different groups of documents.

6          So, let me see how many groups.  I think I put

7   them into four groups.  One was the transaction itself,

8   which is Document Request Numbers 2 through 7 and Number 20.

9   I then put in a category of 10, 11, 17, and 18, which are

10  facially overbroad, but I -- I took a stab at it anyway at

11  the discovery conference.

12         Document Request 21, which is the communications

13  between Plaintiff and Potato Corner Franchisees other than

14  PCJV, and then Document Request Numbers 22, 24, 26, and 27,

15  which broadly deal with the trade secret allegations.

16         So, these are the document requests that are

17  encompassed by the search term problem.  Okay.  So, now what

18  I need to find out or at least confirm, according to what is

19  in Mr. Murphy's declaration -- that's why I bring this up.

20  Correct me if I'm wrong -- Mr. Murphy, did you actually make

21  production of any of the documents in the -- what I will

22  call the search term category?  Because it sounds as though

23  in your declaration you might have.  I just -- I cannot be

24  clear.  I'm not clear about that.

25         MR. MURPHY:  Yes.

30

1          THE COURT:  Okay.  So, can you tell me if you

2  started the review of the 40,000 plus unique documents, how

3  far you have gotten?

4          MR. MURPHY:  Well, it's slow going right now

5  because everything's confused, right.  So --

6          THE COURT:  Yes.  Everything is confused, but --

7          MR. MURPHY:  -- I -- and, so, I --

8          THE COURT:  -- in terms of --

9          MR. MURPHY:  I will -- I will tell you this.  I

10  will tell you this.

11          THE COURT:  Okay.

12          MR. MURPHY:  Jordan Zolliecoffer is still

13  reviewing them, and we have a big problem.  I need to -- one

14  of the reasons why I wanted to meet and confer with them is

15  we have a joint defense problem, and I need to meet and

16  confer with them as to the -- as to dates, right, because

17  here's the issue.  My prior firm has most of the documents

18  that I would identify as non-cover -- non-covered by a joint

19  defense privilege.  And I've actually asked four times --

20  I'm actually legitimately trying to get these documents from

21  them, and I keep getting PFC files that are -- that don't

22  have anything.

23          And, so -- so, these are like just issues that

24  happened, right.  So --

25          THE COURT:  Okay.  So, with the former -- when you

31

1  say former counsel, you mean your former --

2            MR. MURPHY:  My former firm.

3            THE COURT:  -- law firm?

4            MR. MURPHY:  I moved on February 21st, in the

5  middle of all of this.

6            THE COURT:  Okay.  So, what you're trying to get

7  from your former law firm is what?

8            MR. MURPHY:  I'm trying to get those

9  communications -- well, actually, I'm trying to get all --

10 like the entire -- my entire email out -- inbox and outbox.

11 And -- and part of that -- so, we have -- there's a

12 complicated -- for the clients --

13           THE COURT:  Yes.

14           MR. MURPHY:  -- that do come with me, you've got

15 -- you have to have authorizations.  Not all of them came

16 with me.  So, it's very complicated.  And the -- they don't

17 have the resources to go through my entire email inbox --

18 it's giant -- and pull those things out.  And, so, I -- I

19 have -- I have -- I just don't have a lot in my possession,

20 and I'm working on it.  So, you know, in a normal discovery,

21 you know, June 27th, we wouldn't be crammed up against

22 trial, and I could actually have, you know, engaged in this

23 more, maybe even go to their offices, but I'm also doing,

24 you know -- you know, exhibit lists and all that kind of

25 stuff.  So --

32

1          THE COURT:  Right.  Okay.  So, I mean, I don't

2   know what we can do in terms of third party --

3          MR. MALYNN:  Your Honor, we have not --

4          THE COURT:  -- you know, client.

5          MR. MALYNN:  -- received --

6          THE COURT:  I don't think they are likely to make

7   that kind of authorization, but so we have the issue of the

8   former law -- law firm and what it may have.  You may --

9          UNIDENTIFIED SPEAKER:  What's in my possession.

10          THE COURT:  -- your colleague is -- is continuing

11   to review the documents.  Can you give us an idea -- you

12   know, obviously I'm not going to ask you to describe what it

13   is you have produced, but are you, you know, a quarter of

14   the way through, halfway through?

15          MR. MURPHY:  I don't know.  I'd have to ask

16   Jordan.  It is much slower, I will tell you, once -- you

17   know, the motion got filed.

18          I do know that like a week ago we had a meeting

19   about it, whatever.  So, I know it's ongoing, but --

20          THE COURT:  Okay.  But you don't have a percent --

21   you can't give the Court an idea of how far along you are?

22          MR. MURPHY:  No, I cannot.

23          THE COURT:  Do you have any dates of --

24          MR. MALYNN:  Your Honor --

25          THE COURT:  -- production -- I'm sorry.  One more.

33

1  Do you have any approximate dates of production that you

2  have made of these documents after April 11?

3          MR. MURPHY:  I don't -- I'm not -- I wish I was

4  prepared to talk about that.  I -- I'm writing an email to

5  Jordan right now to see if I can get dates.

6          THE COURT:  Okay.  If you wouldn't mind

7  interrupting him and see if we can get an idea of the dates

8  of production and if he knows, you know, maybe how much

9  there is left to go in terms of the review.

10          Okay.

11          MR. MALYNN:  Your Honor, I need to make two

12  points.  I really need to make two points that clarify

13  things that you have said and -- and Mr. Murphy has said.

14          And, first, he filed a declaration with the Court

15  saying his transition -- substitution of counsel would not

16  delay this case, and now we're hearing that his sub -- his

17  moving firms, contrary to his declaration with the Court, is

18  causing delay.

19          Second, this search term negotiation, you heard

20  half a loaf.  And what's very important here he told me that

21  he is not using the actual document request as search terms.

22  He told me point blank in our discussion to have a

23  discussion about search terms that he will not use our

24  document request as search terms, and I said, Then what is

25  there to talk about?  If we're not going to get the

34

documents we requested, I have no clue what search terms

you're using.  So, I asked him to provide me the search

terms, and he wanted to negotiate what they would be.

That's not how your order was set up.  We were supposed to

get a rolling production --

        THE COURT:  Well, I'm --

        MR. MALYNN:  -- in March.

        THE COURT:  -- sorry if it sounded like I was

precluding the parties from negotiating over search terms.

That was never my intention.  There's a certain way --

        MR. MALYNN:  That's not what I'm saying.

        THE COURT:  -- that electronic discovery --

        MR. MALYNN:  That's --

        THE COURT:  -- takes place, but I don't see -- I

looked at the search term list that was attached to Mr.

Murphy's declaration dated April 1, 2025, and I don't see

that the -- I mean, I don't know what you mean by using

document requests for search terms.  I'm not familiar with

that.  But I'm looking at the search terms that he proposed

using, and I --

        MR. MALYNN:  We did not use that list, your Honor.

        THE COURT:  -- am not sure what you think would be

excluded from this that would be -- I mean, I don't -- I

don't know what that means to use document requests as

search terms.

35

1          MR. MALYNN:  I asked him for that list, and he did

2     not provide that list.  What he was talking about was

3     negotiating -- I said send me a list that we can consider

4     that what you are using for your rolling production --

5          THE COURT:  Right.

6          MR. MALYNN:  -- to gather documents.  He did not

7     give me that list until we had to file the motion because

8     they violated the order.  So, this list is totally after the

9     fact.

10         THE COURT:  Well, the list I have is --

11         MR. MALYNN:  This is not --

12         THE COURT:  -- April 1 of 2025.  I believe it was

13    transmitted to you no later than April 4 of 2025.  I mean,

14    you -- according to the emails that either you or he or

15    maybe both of you --

16        (Simultaneous speaking.)

17         THE COURT:  -- this was transmitted, but I don't

18    see -- you know, there hasn't been any argument that these

19    search terms were somehow under-inclusive.  I think the only

20    argument I saw was that it turned out to be over-inclusive,

21    and kind of looking at this, I -- I guess I could see why.

22    But, on the other hand, you know, sometimes that's what

23    happens.  But, so, okay.

24         I think we've gone through what I needed to -- at

25    least as much information as there is on the status of

36

discovery.  So, now let me open the -- the floor to hearing

kind of the, you know, legal arguments or application of law

to facts, et cetera.  We start with you, Mr. Malynn.

MR. MALYNN:  Your Honor, there is no surprise in

this case that the purchase agreement and due diligence from

day one was relevant to this case.  They pled in their

complaint about the acquisition, and contrary to what Mr.

Murphy's saying, the acquisition doc -- you cannot interpret

the assignment without the purchase agreement.  The

assignment does not answer.  It's ambiguous.  It does not

answer many critical issues in this case, and we're entitled

to obtain discovery as to their knowledge.  They did due

diligence in the middle of litigation between joint venture

part -- partners.

Now, we have different views on who the joint

venture partners are, but their deal was with -- both sides

were dealing with Cinco and PCI, and both sides are dealing

with trademark rights that were at issue.  Now, they say it

wasn't in the pleadings.  It was clearly at issue at the

preliminary injunction hearing in the State Court.  And it

was at issue in the settlement discussions.  It -- in their

own federal complaint, they talk about the acquisition.  Of

course we're going to seek the acquisition document.  In

connection with the preliminary injunction motion, they

testified to due diligence.  They test -- they put due

37

1  diligence directly at issue in the preliminary injunction

2  proceedings.  They submitted two declarations talking about

3  due diligence.  So, we propounded document requests to see

4  the due diligence.  Nothing.  We don't see the purchase --

5  we don't see the purchase agreement.  We don't see the due

6  diligence.

7          We don't see the due diligence that they asked

8  Cinco to provide them.  They're in a multi-million-dollar

9  transaction, has the closing binder, and they've got to get

10  discovery -- they have to get due diligence from Cinco.

11  Jurisdiction by jurisdiction, in some jurisdictions, they're

12  acquiring the entire business, not just this -- the

13  trademark separate from the business.

14          In California they made a decision to just --

15  according to testimony, because we haven't seen the

16  documents substantiating this.  As far as we know, it --

17  it's not my job -- it's the jury's job to test -- to test

18  the veracity of testimony.  It's my job to cross examine

19  witnesses.  They've deprived me of the documents to cross

20  examine witnesses.  I'm entitled to do that at deposition.

21  I'm entitled to do that at trial.  And at least at trial I

22  need the documents, and they were to be produced during

23  discovery.  They knew they were at issue.  They -- they --

24  they -- there was -- they fall with -- the only relevance of

25  the initial disclosures, because each side disclosed what

38

1  they were going to use at trial.  There's no -- there's no

2  objection that the -- the initial disclosures were

3  inadequate.  The initial disclosures were fine.  They told

4  us what they want to prove at trial and what documents they

5  wanted to use, and we told them the same.

6          The problem is they didn't produce the documents

7  that we requested that fall within their disclosures, among

8  other documents.  Now, you've said we've asked for some that

9  go to international, and -- and we -- we're not going to get

10 those or they can redact the international stuff.  But the

11 domestic stuff you were very clear that we get, and if -- if

12 they didn't parse out the United States, we get the deal

13 points generally.  We just --

14         THE COURT:  Right.  I think -- first of all, I

15 just want to ask you.  You mentioned depositions, but in

16 this case, the request for the discovery conference came

17 late in the case.  So, you were never going to be able to

18 take depositions based upon documents produced by the

19 Plaintiffs, isn't that right?

20         MR. MALYNN:  That is a hard choice.  That's part

21 of the prejudice and the choice that we had to make.  We

22 early on -- and he makes a big deal about this -- we were

23 asked -- we were the ones that were meeting and conferring

24 on changing deadlines on the CMO so -- so both sides could

25 have depositions, get the documents in.  We were ghosted.

39

1  They didn't meet and confer.  By the end of the day, they

2  ran the clock.  We should have had these documents timely.

3  We shouldn't have had the discovery fight over them.  These

4  are -- you shouldn't have relevancy fights in discovery.

5              THE COURT:  But sort of the --

6              MR. MALYNN:  But most of the --

7         (Simultaneous speaking.)

8              THE COURT:  -- motion for sanctions is based upon

9  the failure to comply with my court order.  But at the --

10             MR. MALYNN:  Yes.

11             THE COURT:  -- point in time --

12             MR. MALYNN:  And the prejudice that we --

13             THE COURT:  -- which -- which my hearing occurred

14 two days before the discovery cutoff date, you were not

15 going to be able to use these documents at deposition even

16 if I issued an order ordering the production of documents.

17 That's what I'm --

18             MR. MALYNN:  But we'd be able to evaluate the case

19 for purposes of settlement discussions.  We'd be able to

20 evaluate the case for purposes of trial, to --

21             THE COURT:  Okay.

22             MR. MALYNN:  -- prepare the case --

23        (Simultaneous speaking.)

24             THE COURT:  Then --

25             MR. MALYNN:  -- for trial.

40

1          THE COURT:  -- we're on the same page.  We're on

2   the same page.

3          MR. MALYNN:  Right.  And we -- we can't cross

4   examine witnesses.

5          THE COURT:  Right.

6          MR. MALYNN:  And we shouldn't --

7          THE COURT:  You cannot --

8          MR. MALYNN:  -- have --

9          THE COURT:  You would not have been able to use

10  the documents in deposition anyway.  That's -- that's what I

11  was trying to point out --

12         MR. MALYNN:  That's the --

13         THE COURT:  -- about depositions.

14         MR. MALYNN:  And I'm telling you that's -- that's

15  the tough choice that we had to make.  And, one, I don't

16  think the Judge -- and I think the Judge has been very clear

17  at multiple conferences, including the most recent one, that

18  the time to ask for a continuance was last year or the

19  beginning of this year, and I think you indicated that.

20  And, so, we had to make the tough decision.  He has a very

21  clear standing order about what you have to do to get a

22  trial continuance.

23         THE COURT:  Well --

24         MR. MALYNN:  By the end of the case --

25         THE COURT:  -- let me just ask because I don't --

41

1  you know, what happened in front of the District Judge is --

2  is fine, but I think my focus is sort of on what happened

3  before me.  On March 12, I --

4          MR. MALYNN:  We're on the same --

5          THE COURT:  -- had the impression --

6          MR. MALYNN:  -- page, your Honor, that --

7          THE COURT:  -- that from --

8          MR. MALYNN:  -- we --

9          THE COURT:  -- from both sides --

10         MR. MALYNN:  -- had the choice --

11     (Simultaneous speaking.)

12         THE COURT:  -- since they were going to make a

13 proposal to change the scheduling order.  Something changed

14 in the week afterwards.  Is that --

15         MR. MALYNN:  No.

16         THE COURT:  Isn't that right?

17         MR. MALYNN:  That is not true.

18         UNIDENTIFIED SPEAKER:  No, your Honor.

19         MR. MALYNN:  No, that is not true.  At the March

20 12 hearing, he's -- your Honor, I've never had opposing

21 counsel attribute to me something that they've said.  They

22 said that at the hearing.  Mr. Arash (sic) was in -- I did

23 not participate in that colloquy.  Absolutely we opposed the

24 -- on March 12th, we said in the record that we opposed.  We

25 -- we met and conferred in his office and told them --

42

1          THE COURT:  So, the --

2          MR. MALYNN:  -- it's too late.

3          THE COURT:  -- the part of the transcript that

4  attributes to you certain remarks you're saying actually was

5  not you?

6          MR. MALYNN:  It's -- of course it's not me.  It's

7  Mr. Murphy's own statements.  Those aren't mine, your Honor.

8  And the fact that he attributes to me is -- well, is a low

9  blow.  He --

10          THE COURT:  Well, no.  I mean, I -- I think -- you

11  know, I -- I can see relying upon the transcript of the

12  hearing, but what you're saying --

13          MR. MALYNN:  When you --

14          THE COURT:  -- is the transcript is incorrect?

15          MR. MURPHY:  The transcript --

16          MR. MALYNN:  The transcript is incorrect, and when

17  you read the transcript, you know it's a dialog between Mr.

18  Arash Beral and Mr. Murphy, and the context of it makes it

19  very clear that that's Mr. Murphy's statement.  That is not

20  ours.  Mr. Arash has been clear since February that, one,

21  circumstances had changed, the loss of the revenue from the

22  19 locations.  We -- the parties had not been diligent and

23  prompt in seeking relief.  We did not think the Judge was

24  going to do it.  So, we made the tough decision to floor

25  those depositions, to go to trial on the documents we got by

43

April -- the rolling production you ordered in March and the
documents that we got by January 11.  And if we didn't --
whatever we got was in the can by January 11 and we were
going to go to trial.  That's the decision that we made, and
-- and that -- and, so, we -- and we didn't get the
documents in the rolling production.

THE COURT:  Right.  So, now --

MR. MALYNN:  And the --

THE COURT:  -- if you wouldn't --

MR. MALYNN:  -- delay --

THE COURT:  If you wouldn't mind --

MR. MALYNN:  -- the delay --

THE COURT:  -- addressing the issue that Mr.
Murphy raised, which is that the court order of March 12,
2025 was impossible to comply with.

MR. MALYNN:  It's not impossible, your Honor.  If
you do your job at the beginning of the case -- and he told
you on March 12th he had a rolling -- he had documents in
his possession ready to be produced.  That's why you ordered
a rolling production, because he already had documents ready
to go.  In fact, he told me back in December that he had
documents.  He was holding as hostage documents that were
directly relevant because he wanted us to make compromises.
And I said to him in meet and confer correspondence you
don't hold hostage documents that you have to produce

44

because you don't want to produce other documents.  You

don't try to leverage compromises from me.  What you do is

produce what's relevant now.   And then we negotiate where

the -- there the line's drawn.

The -- the proper way of doing this is back in

December, I get the directly relevant documents that fall

within his initial disclosures.  Instead, he --

THE COURT:  But this --

MR. MALYNN:  -- waits --

THE COURT:  -- Court was not involved -- this

Court was not involved until the March 12 discovery

conference.  So, that's --

MR. MALYNN:  That's correct, but it's not --

THE COURT:  -- what I have to address.  What he's

saying is running the search terms produced over 40,000

unique documents.  We don't know how many pages but over

40,000 unique documents and that it was not possible to

review those and produce them and create a privilege log by

April 11th.  That's --

MR. MALYNN:  Hold on.

THE COURT:  -- what he's saying.

MR. MALYNN:  Your Honor (indiscernible) -- I know

it's what he's saying, but that's a false premise.  You're

supposed to be prepared -- you're not supposed to be waiting

until March 12th to do your job.  They knew what their

45

obligations were when they --

        THE COURT:  Well --

        MR. MALYNN:  -- filed this case in May.

        THE COURT:  Okay.  I think that that's --

        MR. MALYNN:  Your Honor, the point is this.  If there are non-objectionable documents, domestic documents that go to the transaction that you put at issue, that go to the due diligence that you've testified about, you produce those.  You fight about the international ones.  You fight about the international ones.  You fight about what related means, but you produce the poor documents that nobody has a dispute on.  Those ones shouldn't have been subject to this delay.  We should have had those on -- on March 13th.  They should have been prepared and ready to go.  You ordered a rolling production because you knew there would be some that they would have to engage in the search terms, that they wouldn't have ready to go, that wouldn't -- that didn't fall within your initial disclosures, that -- that wasn't about a position of domestic rights, that if it was about acquisition of domestic rights, if it was about the due diligence that they testified to at the preliminary injunction, those should have been ready on March 12th to be turned over, that start the rolling production in March.

        The additional ones on top of that that maybe they couldn't have anticipated you ordering, that's the only ones

46

1    that are subject to delay.  Everything else that they

2    couldn't -- if they could anticipate you ordering it, they

3    should have been ready to go, and it shouldn't take a month.

4              I've been in plenty of cases, your Honor.  It

5    shouldn't take more than a month.  You gave them a month to

6    complete.  And if they can't complete it in the month,

7    there's no -- you invited them to come back and redo the

8    deadline.  They didn't ask.  They didn't timely file an

9    opposition or request from you to redo the deadlines.  They

10   wait -- they -- they -- they just didn't comply.  You -- you

11   said to them, You've got a month.  They didn't come back and

12   say, A month is not enough time.  You -- you then invited

13   them for recon -- on April 4th, you said, If the -- if my --

14   you should have come to me sooner, but whatever.  You said

15   on April 4th, If you want to seek reconsideration of my

16   deadlines, file that.  They didn't.

17             Your Honor, it's been several months.  It's not --

18   a month was plenty of time.  They're not doing their job.

19   They're not doing the work.  They -- this is about

20   prejudicing us and hiding the ball.  They've suppressed

21   evidence.  It's unclear -- it's -- it's absolutely clear

22   that they've suppressed evidence on purpose.

23             UNIDENTIFIED SPEAKER:  Your Honor, may I just add

24   one thing, 10 seconds if I may.  I don't necessarily agree

25   with the premise that we couldn't have taken a deposition.

47

1  I think if your Honor's orders were complied with in March

2  or April, we could have had an avenue to go in ex parte with

3  Judge Blumenfeld to allow us to take a deposition of Spavi

4  given the production of documents at that point in time, so

5  long as we didn't extend any of the other deadlines like the

6  trial dates and things because Judge Blumen --

7            THE COURT:  Well, anyone could have asked for a

8  continuance.  I think that's -- but I'm saying under the

9  existing case management order, the premise of the March 12

10 order that I issued was that there weren't going to -- there

11 was not going to be an opportunity to take depositions

12 unless the schedule was moved, which was what, frankly, I

13 understood people were going to be doing.  Maybe I was

14 wrong.  Certainly it turned out to be wrong, but, you know,

15 that -- that was, I thought, the discussion.  But,

16 obviously, different.  But I think what you're saying is the

17 same thing, that the -- the issue is, you know, either side

18 could have gone in and asked for more time to accomplish

19 more discovery, and I think that's obviously true.  I mean,

20 you always have that option of seeking relief.  I think we

21 would agree on that.

22            MR. MALYNN:  I will say this.  There has only been

23 one point in this entire case, and in sitting in the

24 District courtroom, seeing other cases proceed, there's only

25 been one time, one event where the District Court actually

48

1  said that it might move deadlines, not the trial date, but

2  it might move deadlines to give our side relief because Mr.

3  Murphy had added new claims in his amended pleading at one

4  point in time.

5          THE COURT:  Right.  And I think I mentioned that

6  order.

7          MR. MALYNN:  It was a footnote, and it allowed us

8  to seek relief after a meet and confer.  We invited Mr.

9  Murphy to meet and confer.  We got ghosted.  Ultimately, we

10 decided let's move forward.  There was a point in time where

11 he asked for discovery extensions.  I emailed him back.  I

12 said, Okay.  Provided that you agree to move the CMO

13 deadlines, we'll give you an extension.  And he told me, How

14 dare you condition my discovery extension on this deadline.

15 So, we took that to mean he's not going to agree, and then

16 after sitting in the District Court's courtroom time and

17 time again and we saw that the District Court was not

18 willing to move trial dates and deadlines -- certainly as

19 every day passes, it's going to be less and less clear that

20 it's going to be moved -- on February 28th, we were -- we

21 were in the courtroom when Mr. Murphy took me aside in the

22 attorney conference room to ask me to stipulate to move the

23 trial date into December or January.  I told him, Look, I

24 don't have the authority to do that, and I don't think the

25 Court is going to do that, but if you guys are willing to do

49

1  a stay of the proceedings until the Ninth Circuit rules on

2  our appeal, then that's something I could float to my

3  client, and he got immediately angry and upset and said, No,

4  we're never going to do that.  And then we went -- we went

5  forward.

6          That was it.  There was never any other attempt or

7  -- or insinuation by us that we're going to agree to

8  stipulate.  In fact, every time after that, we were very

9  clear with him that the District Court -- even if we were --

10 even if we had the authority to stipulate, which we didn't,

11 because we're under a preliminary injunction and our clients

12 want to move this forward to trial.  Any delay is bad for

13 them -- even if we could stipulate, we were very clear with

14 Mr. Murphy that the District Court's not going to agree at

15 this point to move any dead -- any trial date or deadlines

16 -- maybe deadlines, but not the trial date.  So, I don't

17 know where this sense of, Hey, these guys were willing to

18 stipulate and agree and then they -- they reversed.  No,

19 that -- that didn't happen.  We told them as early as

20 February, we told them, Look, that's not going to happen

21 anymore.  We could have moved in November, but they ghosted

22 us for three months and wouldn't agree to anything.  In

23 fact, they told us in connection with the discovery

24 extension request, How dare you condition a CMO extension on

25 -- on our discovery request continuance.

50

1          So, that's the -- that's the record, your Honor.

2          THE COURT:  Okay.

3          MR. MALYNN:  There is an ex parte -- I don't know

4  if you saw it, but there is an ex parte application that

5  they filed yesterday to continue the trial.  We're going to

6  oppose it unless the Court summarily dismisses it today.  I

7  -- I don't -- or denies it today.  We'll see.  But that's

8  what --

9          THE COURT:  Okay.  All right.  So, now, Mr.

10  Murphy, I don't know.  First, let me ask you do you have an

11  update on the questions I asked about the status of the

12  review of the emails or the --

13         MR. MURPHY:  No, I don't.  I don't.  I --

14         THE COURT:  Okay.

15         MR. MURPHY:  Yeah.

16         THE COURT:  All right.  So, now, would --

17         MR. MURPHY:  Can I ask a favor?  I didn't -- I am

18  so -- I'm very sick, and I'm so parched, and there's -- I

19  was yelling to my husband to see if he was --

20         THE COURT:  Yes.  If you want to drink --

21      (Simultaneous speaking.)

22         THE COURT:  -- some water, that's fine with me.

23         MR. MURPHY:  Thank you.  I'm going to just go get

24  some water.

25         THE COURT:  Yes, absolutely.  I don't -- this is

51

1  -- absolutely.  I understand.

2      (Pause.)

3          MR. MURPHY:  Thank you for that courtesy.

4          THE COURT:  Okay.

5          MR. MURPHY:  I'm ready as soon as you are.

6          THE COURT:  All right.  Please proceed.

7          MR. MURPHY:  So, let me back up and first address

8  some of the kind of stuff that's atmospheric and outside the

9  motion because it does affect us, like the continuance

10 request and all that kind of stuff.

11          So, our position to the Court now, just so you're

12 clear, is I'm ready to go to trial on my claims that were

13 ready to go -- or that were filed more than -- I'm ready to

14 go to trial on any claim that was filed more than 30 days

15 before the close of discovery.  I think that's a fair thing.

16          Now, if they don't want to go to trial, you cannot

17 -- and they -- notice, you never hear the counsel for PCJV

18 address this following question.  Cinco was not in this case

19 when the CMO was ordered and didn't appear until April.  How

20 can it be bound by a CMO, first of all, and on what -- I can

21 -- I have yet to see an authority that says the Fifth

22 Amendment and the 14th Amendment permit Cinco to go -- well,

23 force it to go to a jury trial.  I mean, I don't know that

24 case.  It doesn't exist.  Same thing with Spavi

25 International and the same thing with PC International.

1          So, when we were at your hearing in March 12th, I

2  was operating on earth, which is, of course, the Judge is

3  going to grant it.  You just got to present it to him

4  because he's going to look at it and say, of course.  This

5  is a constitutional issue.  You cannot put these third

6  parties to trial.

7          So, that has been kind of my assumption and why I

8  -- I always thought it was kind of -- I thought it was

9  because we were all busy.  So, when we were at the March

10  12th hearing, I said there's -- you know, I'm requesting a

11  continuance.  Now, I remember walking out of the hearing,

12  and I remember thinking to myself they just basically

13  assented to the case management because his email before was

14  like lawfully, but I was like going he didn't say a word,

15  and I remember thinking that, and then I saw the transcript,

16  and I was like, well, maybe he did, because that's even

17  worse to say that.

18          Okay.  So, then Todd -- Todd Malynn in his

19  opposition -- although casting aspersions on me -- I read

20  transcripts all day.  I'm not going to question if the

21  person is the person.  I guess maybe now I will in Federal

22  Court.  I don't know.  But I looked at it and said, Okay,

23  I'm going to read this thing again and take out that Todd

24  Malynn reference.  Excuse me.  I would like -- and I've

25  asked this, please tell me -- you -- they say we were

53

1  express and unequivocal at the March 12th hearing that we
2  were not going to agree to it.  It's not in there, and I've
3  asked them please tell me what page and line, where are you
4  expressly stating that you do not agree, because they don't.
5  So, when I left, I was like, Okay, well, I guess we're good.
6  And then I -- and obviously we're good.  So, then three days
7  later, I -- or seven days later -- I think it was March 20th
8  -- I gave them the proposed schedule, and that was when it
9  got -- it just -- they were like no, no, no.  And I -- I was
10 kind of confused by this because it's so obvious.

11         So, I kept meeting and conferring because here's
12 the other problem.  We're -- we were at a moment in this
13 case where Judge Blumenfeld was very upset at how we engaged
14 with each other.  And I thought it was better for us to go
15 in jointly on something this obvious rather than me come in
16 and say we had these agreements on extensions and whatever
17 and -- and they were putting me in this position where I had
18 to, and I -- God, I really didn't want to.  So, I just
19 thought they would -- I just thought reasonable minds would
20 prevail.  Plus, the more I thought about it, I was like, you
21 know, they can't take these parties to trial.  They can't.

22         So, I have -- so, that's our position.  I think
23 the transcript -- if they can tell me where that is, I --
24 I'll change my mind.  Maybe I'm wrong, but I don't see it,
25 and I think I remember everyone who wasn't on their side,

54

1  wasn't lulled into thinking that they were agreeing to --

2  that they were in agreement.  Silence is the same thing as

3  agreement.

4          So, that's the big concern.  I do want to say one

5  thing.  This comment that, you know, we could have had

6  depositions if -- if -- you know, because they could have

7  asked me or -- on Exhibit 10 -- 173-10, and this is my

8  email, and -- but I think it was an email before that where

9  I asked for an extension on my -- on my special

10 interrogatory responses which kind of set all of this off.

11 It was like the next day, right.  I have interrogatory

12 responses due, and I asked them for more time because I --

13 I'm going to be up all night, guys.  And they said no,

14 because judge -- the judge will never allow us to do this.

15 So, they said no.  So, I had to stay up all night, which was

16 a huge problem for me.

17         So -- so, I don't -- I -- I don't understand the

18 theme here.  It's that we would agree to things if it

19 benefits us but we won't agree to things if it's

20 fundamentally under the Constitution.

21         All right.  I'm going to put that aside because

22 there are so many inconsistencies in the atmospherics of

23 this.  But our presentation to the Court today was, you

24 know, we're ready to go, but -- but I think there will have

25 to be orders prohibiting any attempts to assert any evidence

55

1  or witnesses against -- on the counterclaims or third party

2  claims.  Spavi International is going to subject itself to

3  trial for millions on interference claims that are defective

4  as a matter of law?  No.  There's actually one case that

5  defeats almost all of their claims and the -- and the

6  counterclaims.  It's funny.  And I have no doubt he's going

7  to suggest that because we -- they appeared after the filing

8  deadline for Rule 12.

9          So, let's get to the case -- or to this issue.

10  There are three defects in the -- in their motion.  The

11  first defect is due process.  I mean, this is a very serious

12  motion, very very serious.  This is a motion I have to take

13  to my general counsel or a revenue lawyer at this firm, and

14  -- and there's such a disconnect between that and -- and

15  what I'm doing.  I'm busting my -- my -- I was working so

16  hard on this trying to get everything out, all this -- and

17  I'm also trying to figure out a way forward with counsel to

18  be -- so we're operating in a way that's, you know, more

19  professional, but at the same time I'm getting these crazy

20  positions.  There are just -- I can't understand how you

21  could say that, for example -- and this is relevant.  They

22  keep -- their whole motion -- or their whole claim about

23  needing the deal documents is premised on a false position

24  of law.  And I -- I explain this in our brief.  There is no

25  such thing as U.S. rights.  Our clients obtained an

56

1  international registration.  That international registration

2  confers the right to use that mark internationally.  If my

3  client negotiates with someone and agrees on a -- on a

4  territory exclusion, then there are U.S. rights, but it is

5  not inherent to the registration.

6          There is no agreement that exists that carves out

7  the U.S.  Now, they will cite to the AJVA, but here's the

8  problem.  The -- that's been interpreted by the District

9  Court.  It's been interpreted by the Ninth Circuit, and I

10 haven't seen anything new from my opponents that would

11 suggest they have anything new to offer as to why at trial

12 the ruling wouldn't be exactly the same.

13         So, they have -- there's a problem there.  So,

14 there is no such thing as U.S. rights, but they keep

15 suggesting as if there was something back handed that

16 (indiscernible).  No.  And this is why it's relevant.  There

17 is a deed.  That deed is comprehensive, unilateral, and it

18 is already in the record.  When you do an injunction,

19 documents are already in the record once they're admitted.

20         So, that deed, I think it's among the first -- I

21 think it was the first exhibit of Joy Ibanez (phonetic),

22 who's the general counsel.  And, so, that deed is

23 unequivocal and comprehensive.  And it confers all the

24 rights through those registrations to my clients and over to

25 Spavi.  That is definitive.

57

1          And -- and there's so much law that says if you

2   have a deed and the deed is at odds with the contract, the

3   contract merges into the deed, and the deed is the contract.

4   The deed is it.  So, I asked, because I was bothered by

5   these requests because they were asking for legal memos.

6   They were asking for -- I mean, it was -- and -- and I think

7   the deal documents are -- there's no -- given the size of

8   them -- because it's a big deal.  I mean, we're dealing with

9   global rights here.  The -- I could not figure out the --

10  the proportionality of these requests and their relevance.

11  Now, that's important here because here's what happened.

12          So, I go to this discovery conference on -- on

13  March 12th, and I say I don't want a motion.  So, let's see

14  what we can do.  But, man, if I had known I would be here, I

15  wouldn't have agreed to anything because I -- I want to

16  challenge each of those requests as being that you don't get

17  them.  You don't get them.  You don't get to ask about them

18  because they're not relevant to your case.  They've never

19  been expected or asked to prove the relevance of these.

20  Why?  Because I agreed to something at an informal discovery

21  conference just to move on.

22          So -- so, when you file the 37 motion seeking

23  sanctions, this -- sanctions in the form of you cannot prove

24  -- like argue this thing at trial, you have to be specific,

25  and it has to be specific from beginning to end.  You have

58

1  to first start with the request, and it is true -- they are

2  -- my opponents are correct -- you can -- the way the --

3  there's a couple of cases that suggest any order can be

4  subject to 37.  So, I agree with that.  But from a logical

5  standpoint, you're going to be harder pressed to find

6  evidence of willfulness and prejudice if I have not been

7  given the opportunity to require them to prove prejudice.

8          So, they make all these statements about you can't

9  prove, you know, that -- that you won't -- that you don't

10 own the marks.  Well, they didn't provide any case law that

11 says that the documents that they didn't get would preclude

12 them from introducing evidence on something that is relevant

13 and material at trial.  But they want this Court to just

14 take this, I mean, cloud of words and then say, Yep, you

15 can't go to trial on this.  Yep, you can't go to trial on

16 this.  That's not how it works.

17         So, you have to have a request that is specific

18 and that is proper because if it's not proper, you're not

19 prejudiced.  Those are connected.

20         So, then you have to show prejudice and

21 willfulness as to specific parts of the order.  But, see,

22 they don't do that, your Honor, and the reason why is

23 because if you go through the order, which we did today,

24 I've done everything I can do as of the date we were

25 supposed to.  I did.

59

1          Now, I suppose I could have -- you know, I don't

2    -- there's literally nothing else I could have done.  I was

3    at my wits end.  I probably averted a divorce barely because

4    I was working so hard.

5          So, we have -- so, you have to then tie to the

6    order, which they don't do -- they go back to the request --

7    as if you had ordered compliance with all the document

8    requests.  We know that did not happen.  We know that some

9    of the arguments that -- that were made by defense counsel

10   were -- were not convincing, and, as a result, my goal was

11   let's just negotiate.  Let's try -- I don't -- I don't want

12   any discovery motions, because I just don't like them.

13          And then I try multiple times as I see problems

14   arising to communicate with them, all the while thinking

15   that on March 12th, I know I -- I -- the -- this may be more

16   than I can handle, but I'm sure that we're going to have an

17   extension because everyone knows we have to, and they

18   haven't said no.  So, we'll just re -- redo the dates

19   obviously.  And then they changed, and I have suspicions

20   about why, but it's not really relevant, and we have really

21   tried in this argument to not cast aspersions or use things

22   like ghosted or angry.  I just don't think it's helpful, and

23   I think Judge Blumenfeld is correct about that.  But there

24   have been really frustrating things that have gone on here.

25          So -- so, that's the -- so, and then you have to

60

have something that you didn't get that was specifically
ordered that then prejudiced you as to some element that you
have to prove.  I have not seen that with anything, and I am
going to get to the -- well, they -- they do go through a
big litany about the financial documents.  I've already kind
of previewed my argument there.  I'll get to it in a minute.
But then you have to show that my not giving it to them was
willful.  I don't know how you could possibly look at this
record and say that I was avoiding things.  You can't.  I
was doing the opposite.  I was under an avalanche thinking I
was going to get -- we were going to get an extension, and
then they refused, and then it just -- it was a mess.

        So, I -- and I was juggling with a lot of
considerations.  So, what I decided to do was try to get as
much done as I can, and -- and I don't have -- I didn't have
time to really do much else except, you know, focus on my
plate, being responsive.

        So -- so, I -- you can't show willfulness, and --
and I think when you add on top of that the -- the failure
to explain in the reply why they didn't meet and confer with
me -- I don't care what a judge says in an order.  You can
always meet and confer.  You can meet and confer on every --
on anything.  You know, we agree that we're just going to do
-- to have discovery up till the end.  We'll modify -- you
can do anything you want with a stipulation.  The judge can

61

1  say no, but you always meet and confer, and it was mind

2  boggling to me the -- and when we had a meet and confer, it

3  was me, Jordan and -- and Todd and I think one that was

4  Jordan alone with Todd and an associate, but it was always

5  we're going to produce this date, and I was trying to

6  explain to him I would like to talk about this, but, I mean,

7  he wouldn't.  It was all about do this thing by this date

8  and wouldn't let me even explain what the problems were with

9  the extensive, sometimes double triple privilege issues that

10 we have in these documents.

11         That's not -- that's -- that's -- that's them

12 creating an issue.  What I find interesting is that the

13 response to the April 11th email offering the entire

14 document, now, I wasn't saying that was the end of the road,

15 but I was saying maybe if you satisfy yourself, take as long

16 as you want looking through this thing.  I'm not going to

17 let you make any copies.  You -- if you want to question,

18 fine, but you're not going to put any of those words down on

19 paper or anywhere else.  Just look at it, and you'll see

20 what I see, which is there's nothing there.

21         And -- which is why the deed is enough, and that's

22 my point at the end of the day.  I have produced it.  This

23 is merged into the deed, and they had the deed from the

24 beginning.

25         So, when he didn't respond and then in his motion

62

1  says I should be sanctioned, that was an astonishing

2  crystallization of the problem because if they actually

3  wanted to know what the contract says and whether it gave

4  them any arguments, they would have said, Yeah, we'll do

5  that.  I mean, we -- we disagree with you about all these

6  problems.  Please -- you know, please do this, whatever.

7          That would have been -- that would have made sense

8  because that would show they actually want it.  By not

9  answering, that just showed me that they actually didn't

10 want it and maybe they don't believe it.  They don't believe

11 this argument.  I don't know, but the silence is deafening.

12         And that leads me to the final problem -- well,

13 the final -- the first event.  The due process is just

14 problematic from A to Z.

15         So, they have to show willfulness.  They didn't.

16 They have to show prejudice.  They didn't.  And then they

17 have to tie some of the relief to those prejudices and

18 specific facts that were ordered by the Court that they

19 didn't get and were prejudiced.  And they don't.  It's just

20 this mishmash word salad of -- of punish them.

21         So, I don't see anything that falls within any of

22 those specific leaps of specificity required to get a

23 sanctions motion.  In fact, one of my -- I'm going to talk

24 about why I didn't file my motion now because I actually

25 believed that the sanctions were on the other end, and I

63

couldn't file a motion to redo the order for two reasons.
First, I was going to be asking for a new order, but these
guys are acting like they don't care anymore, right.  The --
and April 15th is the end.  And I'm not going to put myself
in a situation where I'm continuing orders that could be
used under Rule 37 to try to default me out.  I'm not doing
it.  I'm not doing it.  In fact, this case, if we do get a
discovery continuance, I -- I'm going to be really hard
pressed on -- on -- on agreements and informal discovery
conferences because of this.

        So -- so, that's the -- so -- so, I did -- and
then second, when I was looking at -- well, (indiscernible)
thinking about it, I think that there's sanctions that are -
- I -- someone could argue for sanctions.  I didn't want to
do it because I do think it's us.  So, they didn't want to
do it.

        But I do think the reply was confirming of some
things.  For example -- and this goes to the fatal defect to
-- which I've already touched on a lot of these.  They don't
address many of the arguments we made.  They don't address
what I say is their role in this happening, particularly
with the -- the larger set of requests that required search
terms that this -- that they -- they set us up for failure
themselves by not meeting and conferring. That's
sanctionable.  It's -- I don't see how you can then file a

64

1    motion, right, for us to be sanctioned when you didn't even

2    meet and confer on any of these.  That -- that is -- to me,

3    that was really bothering me.  It was troubling.

4            Then they don't -- you know, this -- this -- I --

5    I was shocked by this one.  I almost think that maybe they

6    didn't read our motion because we attached the email from

7    Jordan attaching the -- the search terms.  I received the

8    email.  So, I know it was transmitted, and I know Todd

9    Malynn got it.

10            So, for them to say they didn't get the search

11   terms -- so, they said that in the motion, and then in our

12   opposition, we were like, yeah, you kind of did.  And then

13   in our reply, they don't say anything.  And then your Honor

14   brings it up again, and they say, We didn't.  So, either one

15   or two things.  Either they didn't read it, our motion, our

16   opposition or, two, something else.  And I -- I don't know.

17   What I do know is that any aspect of their motion that was

18   based upon search term related requests, that obviously

19   that's their fault, and that's what I would have to put in

20   my sanctions order and in a -- in a new motion.  I didn't

21   want to do it.

22            So -- so, here's -- so, fatal defect two is just

23   they -- they haven't addressed a lot, and I could go through

24   everything that we raised that they didn't, and I'm not

25   because my -- my motion has probably -- or the opposition

65

1  probably has 20 different independent bases upon which you

2  could deny this motion, but they just didn't.

3          So, fatal defect three, they don't explain -- now,

4  I understand -- I mean, and we make some points in ours.

5  It's like how is this right that we are scrambling and

6  reviewing and search terms and all of this and they aren't

7  doing anything?  How is that -- how is that happening,

8  because that to me seems highly inequitable, and they --

9  that's not what the Rules are intended.  And, you know, so,

10 I don't understand that.  I don't understand how it is that

11 this Court had to order production of the documents from Mr.

12 Engel.  I don't know how.

13         So, at the end of the day, I go back to my -- one

14 of my points in the beginning, which is think about the

15 consequences generally or the impact of what Magistrate

16 Judges do, because I have not -- without exception, I've

17 found the Magistrate Judge improvement into the system,

18 because I'm old enough where I remember when you guys

19 weren't doing all this, is probably one of the most

20 significant changes in -- in -- in litigating in Federal

21 Court.  It has been so effective.

22         Think about what happens.  The first discovery con

23 -- so, an order comes out.  If on the first discovery

24 conference you've got requests that the party being

25 requested was going to take to a motion and probably going

66

1  to lean on only some of them or a lot of them and had good

2  arguments, Judge agrees to produce some things and under a

3  really short timeline and tries to meet and confer, but the

4  other side won't because they're stuck with the order, and

5  then they file a Rule 37 motion.  You will never see anyone

6  agree under -- to an informal discovery conference ever

7  again.  You won't.  Or they'll just be useless, and you're

8  going to find yourself wondering am I not getting an

9  agreement because of that.

10         So, that's not a threat.  It's just I know what

11  I'm going to be thinking next time I'm in front of a

12  Magistrate Judge and they're asking me to agree on

13  something, because asking me for legal memos, I was

14  surprised they even asked for it, right.  And then to be

15  told that I should get sanctioned for not producing them, I

16  don't -- I'm not -- I'm troubled by that.  So --

17         THE COURT:  So, let me follow up on a couple of

18  things.  One is I take it your client is not waiving the

19  attorney-client privilege?

20         MR. MURPHY:  My client is not waiving the

21  attorney-client privilege, correct.

22         THE COURT:  Okay.  And then you mentioned that the

23  Defendants have not produced documents other than the expert

24  -- excuse me -- the expert related documents.  So, I think

25  in your brief you mentioned the initial disclosures that the

67

1    -- as far as you know, the Defendants have not produced the

2    documents described in their initial disclosures or

3    documents that you have agreed --

4              MR. MURPHY:  Correct.  There's another set.  So --

5    so --

6              MR. MALYNN:  Your Honor, they have all the

7    documents that we're going to rely on.

8              THE COURT:  Hold on.  I'm just asking Mr. Murphy

9    to explain what -- what his argument is.  Is he talking

10   about documents that the Plaintiff has requested, is he

11   talking about the Defendants' initial disclosures that were

12   served in February --

13             MR. MURPHY:  Two -- two --

14             THE COURT:  Let me get clarification.

15             MR. MURPHY:  That's right.  So, first, there are

16   two -- two answers.  First, the initial disclosures.  For

17   example, my opponents have taken the position that  they

18   were perfectly allowed to reverse engineer the -- the

19   ingredients of the packets.  They have yet to specify which

20   ones they are.  So, if that's your defense, then you are

21   obligated to produce information as to who that was.  I --

22   they haven't produced it.  I don't know who did the reverse

23   engineering.  I don't know what flavor this was.  I don't

24   know which packet it was.  So, it could be different

25   (indiscernible) options.  So, that's a -- that -- so, it's

68

1  that kind of stuff.

2           So, yes, their initial disclosures I didn't

3  anything.  And had they produced it so late, I couldn't have

4  filed a motion.

5           So, then we have this problem.  As proof of the

6  fact that I legitimately thought we were going to get an

7  extension on the CMO, we served our request, and they just

8  refused -- they just -- on -- you know, discovery closed,

9  and like two days later would have been the due date, and

10 they just said, Objection.  Not responding.

11          And, so -- because of the discovery cutoff.  And

12 they were good requests.  We're going to have to deal with

13 that if there is a continuance because that's a -- that's a

14 problem for me.  I hope they've been gathering documents

15 since then because the expectation of one would be the same

16 as to the other.  So, that's the answer.

17          MR. BERAL:  Your Honor, may I address --

18          THE COURT:  Hold on one second.  There was some

19 issue.  I'm going back through my notes.  I thought there

20 was another -- something that I flagged.  No.

21          Okay.  So, then, Mr. Beral, you're going to

22 respond?

23          MR. BERAL:  I just need to minutes to --

24          THE COURT:  Okay.

25          MR. BERAL:  Procedurally, what has happened -- and

69

1  Mr. Malynn can handle the substantive points, because I know

2  your Honor hasn't been with us and hasn't lived this case

3  the way we have, but I think it's -- it -- I need to address

4  these points with your Honor so that you have a better idea

5  of what actually occurred.

6           So, first and foremost, this is what we call part

7  two of litigation between, you know, various parties in

8  California and various parties in the Philippines.  There

9  was a State Court litigation that ended on May 28th, 2024,

10 settled, reported to the Judge, and done.  Three days later,

11 Mr. Murphy filed this lawsuit and sent a demand -- or notice

12 of termination of IP rights and things to -- to our client.

13          That weekend there was various communications

14 between Mr. Murphy and me in an email, including why Cinco

15 is involved and why Cinco, including a demand for indemnity

16 from Cinco of our clients.  There are emails about all the

17 claims and defenses and everything, our position basically,

18 legal positions, in that -- in those emails.

19          So, for him to say, We had no idea that you were

20 going to bring Cinco into the case, that's not true.  I

21 informed Mr. Murphy of that well before in that -- that --

22 as soon as this case was filed.

23          Then there was meeting of counsel, scheduling

24 conference, all those kinds of things with Judge Blumenfeld.

25 We hadn't even appeared in the case at that point, but we

70

1  voluntarily agreed to participate in those proceedings.  As

2  part of those proceedings, we filed with the Court the Rule

3  26 report which went on for pages and pages.

4           THE COURT:  I -- I'm sorry.  You're saying that at

5  the scheduling conference, your -- the Defendants were not

6  in the case?

7           MR. BERAL:  We had not appeared.  Our deadline to

8  respond was a month after the scheduling conference.  So, we

9  filed our motion to --

10          UNIDENTIFIED SPEAKER:  You were (indiscernible) --

11          MR. BERAL:  We filed our motion to dismiss no

12  September 30th.  The scheduling conference was September 6.

13          THE COURT:  Okay.  I -- now I understand.

14          MR. BERAL:  So, we hadn't filed a responsive

15  pleading in other words.

16          THE COURT:  Okay.  All right.

17          MR. BERAL:  We -- we voluntarily agreed to

18  participate in the scheduling conference.  And as part of

19  this Rule 26 report, we addressed and included our claims,

20  our positions, our witnesses, our documents.  Everything

21  that Spavi needed to know, it knew back in August 27 of

22  2024.  Okay.

23          THE COURT:  I'm not sure what that means.  Is

24  there some dispute that the Cinco entity -- that this Court

25  acquired jurisdiction of Cinco after the -- the cutoff

71

1    dates?

2          UNIDENTIFIED SPEAKER:  There were -- we weren't in

3    Federal Court, your Honor.

4          THE COURT:  Is there a dispute there?  I --

5          MR. BERAL:  So --

6          THE COURT:  I'm not sure where this is going.

7          MR. BERAL:  Well, I just want to be -- I just want

8    to make sure that your -- your Honor understands where

9    things are going.  Cinco wasn't in the case at that point

10   because we hadn't yet answered or counterclaimed in the

11   lawsuit, right.

12         THE COURT:  Okay.

13         MR. BERAL:  So --

14         THE COURT:  Right.

15         MR. BERAL:  -- Spavi -- Spavi -- I -- Cinco could

16   have brought the claim too, but they didn't.  It was Spavi.

17   All right.  So, in any event, but Cinco was part of the

18   State Court litigation, represented by Mr. Murphy.  They had

19   an indemnity demand out to them.  They certainly knew and

20   were aware of this litigation all along.  All right.

21         As soon as we filed our motion to dismiss, I

22   reached out to Mr. Murphy and his then colleague, Mr. Hsu,

23   and I said that we did not address at the scheduling

24   conference the deadline for the parties to serve their

25   initial disclosures.  Let's set up something to talk about

72

that.  Nothing happened after that.  There was no party.

There was no -- Spavi didn't approach us to say, Let's serve

initial disclosures.  Let's do this.  Let's do that.  Let's

set a deadline.  Nothing.

So, we just relied on the Joint Rule 26 report

that had been filed in August where the parties had

essentially disclosed documents, witnesses, their claims,

their positions, and things of that sort.

We then served discovery in December 2024.

THE COURT:  I'm not sure I understand.  So, if --

the default is 14 days after the Rule 26 conference unless

a different time is set by stipulation or court order.  So,

are you saying there's no stipulation or court order?

Wouldn't then the time for initial disclosures be 14 days

after the --

UNIDENTIFIED SPEAKER:  I have the answer.

THE COURT:  -- Rule 26 conference by default?

MR. BERAL:  No, your Honor, because in the Joint

Rule 26 report, there was a dispute about when the initial

disclosure should be due.  There was a difference of opinion

about -- from Plaintiffs and Defendants about whether the

initial disclosure deadline should be stayed pending a

motion or whether they should be due two weeks or three

weeks.  I forget what Plaintiff's position was, but the

Court, Judge Blumenfeld, the District Court, did not address

73

1  that issue --

2          THE COURT:  Okay.  Got it.

3          MR. BERAL:  -- on --

4          THE COURT:  All right.  So, then that was -- got

5  it.  Now I --

6          UNIDENTIFIED SPEAKER:  We were very clear on the

7  record about our objection to this.

8          THE COURT:  Okay.

9          MR. BERAL:  It just -- it just wasn't addressed,

10 all right.  We served discovery requests in December very

11 diligently.  The motion that -- the discovery deadline

12 cutoff was March 14th, as everybody knows.  We got, you

13 know, demands for extensions and things.  Plaintiff then

14 amended their complaint and added more parties and more

15 claims.  We had this whole issue about whether we needed to

16 continue the deadlines.  Ultimately, Mr. Murphy basically

17 suggested and insinuated that he would not agree to continue

18 any deadlines.  Meanwhile, at the same time, we -- we -- we

19 now know that Mr. Murphy's client was out there trying to

20 convert our client's franchisees for itself to do business

21 with it and so on and so forth.

22          So, at the same time we're dealing with injunction

23 proceedings and various things.  I even invited Mr. Murphy

24 to take the depositions of our clients in that -- in that --

25 during those whole proceedings.  I have emails about this.

74

1          (Simultaneous speaking.)

2               MR. MURPHY:  We should not go down this road

3   because you're -- this is a -- I will have to --

4               THE COURT:  You know, I think this is kind of

5   getting into the merits.  I think we are very far afield of

6   the motion for sanctions.

7               UNIDENTIFIED SPEAKER:  (Indiscernible.)

8               THE COURT:  So, I really can't address this.  You

9   know, whatever proceedings you had in front of Judge

10  Blumenfeld, if he ruled, didn't rule, I mean, that --

11              MR. BERAL:  I'll finish in --

12              THE COURT:  There's nothing I can do with this.

13              MR. BERAL:  I'll finish in 10 seconds because it's

14  relevant.

15              MR. MURPHY:  Your Honor, I -- I object to this.

16              MR. BERAL:  Your Honor --

17              MR. MURPHY:  I get to have a chance to respond.

18              THE COURT:  I'm not going to -- I'm not going to

19  be able to do anything with this anyhow, but if you want 10

20  seconds, you've got it.

21              MR. BERAL:  Ten seconds.  Spavi did not serve any

22  discovery requests until February 14th.  It was late.  All

23  right.  Their deadline to serve discovery requests was

24  February 11th.

25          (Simultaneous speaking.)

75

1          MR. BERAL:  It wasn't until they realized that

2   they were late in serving discovery requests when they

3   changed their position to now say, We need a CMO extension.

4   I just want the Court to be aware of that.

5          MR. MURPHY:  Your Honor --

6          MR. BERAL:  They also did not --

7          THE COURT:  Okay.  So, I've got that point.  So --

8          MR. MURPHY:  Your Honor --

9       (Simultaneous speaking.)

10          THE COURT:  Why don't we -- hold on.  Hold on.

11   Hold on.  Hold on.  We need to get to Mr. Malynn.

12          So, you're going to deal with the substance of

13   what Mr. Murphy's argument was.

14          MR. MALYNN:  Yes.

15          THE COURT:  So, you have the floor now.

16          MR. MALYNN:  All right.  There's a lot to unpack

17   there.  I'm going to start where he started.  There's no such

18   thing as international trademark rights in the United States.

19   Your -- your Honor, there's international pathways to get

20   rights in the United States, but you still have to comply

21   with all the requirements of the United States law, and the

22   rights you get in the United States are territorial.  It's

23   always been territorial.  It's jurisdictional, geographical.

24   It's -- it's about likelihood of confusion, your Honor, in

25   the territory where you -- the market in which you do

76

business, and they claim nationwide rights.  It's the United

States.  You don't get grant -- you don't get international

rights until you prove you have domestic rights.  There's no

such thing as international -- this global intellectual

property.  That's a misnomer.  Don't believe it.

Second, the issue under Sengoku (phonetic) is

precisely dealing with a foreign trademark registrant against

an exclusive domestic user.  Both of them qualify as a single

source and origin.  The question is did the -- the exclusive

domestic user agree to give their use to the benefit of the

foreign trademark registrant.  That is what is at issue in

this case, did PCJV, the first continuous user and exclusive

user for 15 years, agree to give the rights to the foreign

registrant.  And that's going to be litigated.

You cannot answer that question from a deed of

assignment.  You can't.

THE COURT:  I cannot answer that question at all.

So, these are the arguments you're going to be making in

front of --

MR. MALYNN:  No, no.

THE COURT:  -- the District Judge.  So, I think,

instead --

MR. MALYNN:  No, no.  Prejudice -- the prejudice

point, he was saying that we didn't suffer prejudice

precisely because of this point.  He says that he can meet

77

1  his burden of proof just with a deed.  That is absolutely a

2  fallacy.  It is wrong.  The deed does not answer any of the

3  questions on the flowchart that we provided you.  We needed

4  those documents.  He -- if he had done -- he is a very smart

5  man.  He knows what his obligations were.  I didn't have to

6  tell him what his obligations in discovery -- what his

7  obligations on the case in chief are.  He cannot meet his

8  burden of proof without the documents he suppressed.  He

9  suppressed them for a reason, and I don't care if it's

10 negligence or -- it's absolutely --

11         THE COURT:  I want to give you -- I'm sorry to

12 interrupt you, but I got to get you on to a specific issue

13 that I would like you to address, the one that he started

14 with, which is actually a due process argument.  And, so,

15 that's the one that I think I would like to focus on in your

16 response before -- I -- I'm not stopping you from talking

17 about anything else, but I would like you to address this due

18 process argument.  And, specifically, since we went through

19 -- I went through carefully the facts of the underlying

20 production and the timing as best as I could from the record,

21 the due process argument about compliance with an order,

22 which I issued on March 12 -- and I understand your statement

23 about the history.  I'm not asking you to repeat the history.

24 But I've got to look at the issue of compliance with the

25 court order.  And --

1       MR. MALYNN:  Yes.

2       THE COURT:  -- the factors that he has raised in

3  his declaration and the argument here is that the -- the

4  order could not be complied with as it turns out, and that --

5  it does raise a due process argument.  So, that's -- you

6  know, he's mentioned it a few times.  I want to tell you that

7  that's something I am looking at, due process, for obvious

8  reasons.  And, so, I wan to give you -- I want to tell you

9  that.  I want to give you an opportunity to respond, and then

10  tell me anything else you want to tell me.

11       MR. MALYNN:  Okay.  Your Honor, this -- your

12  question overlays with the willfulness standard.  The

13  willfulness standard is -- is easily met in this case.  The

14  standard -- we can talk about bad faith, which is a higher

15  standard than willfulness.  The willfulness standard is

16  easily met in this case.  You -- your order was very clear.

17  Your order gave due process.  Your order overruled objections

18  that he's still repeating.  He should not be repeating those

19  objections.  That's not substantial compliance.  He's

20  repeating his objections.  Those objections were ruled upon.

21  His -- his task was to comply with the order.

22       Due process is if you can't comply, you come in and

23  seek relief.  He said he could comply.  He -- on March 12th,

24  he said, We already have documents ready to go, and that's

25  why you ordered the rolling production.  You didn't order

79

rolling production before he said he had documents ready to
go.  You ordered -- you said start those in mid March and
then complete by April 11th.  And you -- you said set up
April 4th to solve problems.

        The problems you heard on April 4th is he hadn't
produced anything.  We couldn't review search terms
meaningfully.  We couldn't review custodians of records
meaningfully because he hasn't produced anything.  All he
wanted to do was negotiate and us to give compromises.  But
-- but, Judge, you had already ruled on what was produced --
already produced and what wasn't.  There was no further
compromises --

            THE COURT:  But at that --

            MR. MALYNN:  -- to be had.

            THE COURT:  -- at that April 4, you know, he did
say that he was going to seek a change in the order and
previewed a -- I saw in the email where he said that the
search terms were overbroad in an email that he sent to
someone.  At that point -- but let's say he doesn't --

            MR. MALYNN:  Your Honor --

            THE COURT:  -- file an affirmative motion to vacate
certain portions of the order.  He could have done that.  I
agree with you.  But under due process --

            MR. MALYNN:  There's two -- two things --

            THE COURT:  -- doesn't --

80

1          MR. MALYNN:  -- he could have done.

2          THE COURT:  -- impossibility factor in here

3    regardless of whether he files an affirmative motion or not?

4          MR. MALYNN:  There's not impossibility here, your

5    Honor, because there are a core set of documents that could

6    have always been done timely.  He -- he doesn't have to

7    produce everything at once.  You ordered a rolling

8    production.  You gave them a month to produce something.

9          THE COURT:  Well, but --

10          MR. MALYNN:  They produced nothing.

11          THE COURT:  -- the only documents that we are still

12    left with after my inquiries is this -- what we call the

13    search term group that is being reviewed even on an ongoing

14    basis.  So, that's the only group of documents that you have

15    not yet received all of.

16          MR. MALYNN:  Your Honor, it's not -- that's -- I

17    don't think that's a fair characterization of the record.  We

18    got none of the purchase agreement.  We got none of the due

19    diligence documents.  We got none of the risk assessment, and

20    the legal memo that they're privileged, we did not get a

21    privilege log.  There's a purpose for a privilege log.  He's

22    offended that I asked for doc -- there -- there is two

23    separate parties, Cinco and Spavi, negotiating a business

24    deal.  The business deal includes risk.  They're in the

25    middle of a litigation.  You've seen the flowchart.  All

81

those issues have to be resolved.  The go to is right there on the ownership level to deal with a domestic exclusive user versus a foreign rights holder.  That's the whole point of the go to.  He acts like it's irrelevant, but that's not your issue.

Secondly, even if there's ownership, it's --

THE COURT:  Oh, I think we've lost him.  Can you -- ah, there.  We've got you back.

MR. MALYNN:  The only thing a deed (Zoom glitch). I'm back.  The only thing a deed proves (Zoom glitch), and even if they prove ownership, even if their ownership argument prevailed, it does not -- it's ambiguous.  It does not answer the questions that go to the affirmative defenses. It does not answer the question of use rights, license rights, control rights.  It -- it doesn't -- it doesn't address preexisting rights at all.  Assignment does not tell you what rights existed before the assignment and how you're dealing with those in the purchase agreement.  They are absolutely -- were there.  They were part of the State Court litigation.  They knew they had to be addressed in the transaction documents.  What do we do with -- with our client's assertion?  We object -- before the -- before their deal closed, months before their deal closed, it was announced in December.  Their deal closed March or April. Arash objected to the transaction with the mediator.  The

82

1  mediator demanded a letter describing the transaction because

2  they didn't want to produce the purchase agreement at --

3          THE COURT:  You know, I --

4          MR. MALYNN:  -- that point.  The --

5          THE COURT:  -- am concerned about is there a

6  problem with discussing what happened during a mediation in

7  State Court?

8          MR. MALYNN:  It's already been -- it's already --

9  all of it has been -- they submitted it to the District

10  Judge.  The District Judge knows what happened in the State

11  Court.

12          THE COURT:  Oh.

13          MR. MALYNN:  It's already --

14          MR. MURPHY:  I -- I'm fine with it.  It doesn't

15  bother me.

16          THE COURT:  Okay.  All right.

17          MR. MURPHY:  If it doesn't bother the Court.

18          MR. MALYNN:  The point -- the point is whether they

19  agree or disagree with our client's preexisting rights,

20  they're in the due diligence documents.  So, presumably -- I

21  don't see how you close a transaction without saying, Cinco,

22  I'm the buyer.  You're the seller.  Give me all the following

23  due diligence -- we want to see what they requested in due

24  diligence.  We want to see what Cinco provided in due

25  diligence.  That's not privileged -- about the United States.

83

They had an existing litigation going on where we were

asserting superior rights before they closed the transaction.

How did they deal with our assertion of rights

before they closed the transaction?  Were they traveling

under the master license agreement that they subsequently

denied?  Were they traveling under the joint venture

agreement?  If they're not trans -- if they're not traveling

under the written documents, did they acquire rights under

the written documents?  If they didn't acquire rights under

the written documents, we acquired them from Cinco.  They

sold them to us.  These are questions a deed of assignment

cannot and never would answer.  Spavi knew it from day one

when they did due diligence.  None of the questions in our

flowchart are answerable by an assignment alone.  It's

ambiguous.  And the case law is absolutely clear.  We

included it in the footnote.  We will fully brief it with the

District Judge.  It's a separate ground.  It has nothing to

do with -- it's a relevancy issue that -- that, one, does

prove our prejudice.  But, two, it's a separate ground for

exclusion at trial.  And we're going to have this issue with

the -- with the Magistrate.  You don't -- I mean, with the

District Court.

THE COURT:  I was going to say --

MR. MALYNN:  You can't --

THE COURT:  -- with the District Judge, motions in

84

1   limine go before him.

2           MR. MURPHY:  That's also --

3           MR. MALYNN:  And objections to evidence --

4       (Simultaneous speaking.)

5           MR. MALYNN:  And -- and the point is when a deed of

6   assignment is ambiguous as to an element in their case in

7   chief, they can't meet their burden of proof, and that's the

8   prejudice that we're suffering because he's deprived of -- of

9   all these documents that not only go to his burden of proof,

10  but the underlying documents, correspondence, draft

11  agreements -- your Honor, we didn't get draft agreements that

12  informed the purchase agreement.  We didn't get --

13          THE COURT:  I'm not sure why --

14          MR. MALYNN:  -- negotiations --

15          THE COURT:  -- we are talking about the draft.  I

16  think we were talking about the actual document.  So, I --

17  I'm -- I don't want to go --

18          UNIDENTIFIED SPEAKER:  We also asked for draft --

19          THE COURT:  -- far afield here --

20          UNIDENTIFIED SPEAKER:  -- agreements --

21          THE COURT:  -- but I -- I think -- all right.

22          MR. MALYNN:  We -- the point --

23          THE COURT:  The -- so, we're -- we're talking about

24  you --

25          MR. MALYNN:  So, they made a --

85

1          THE COURT:  -- seem to be focusing --

2          MR. MALYNN:  -- willful decision --

3          THE COURT:  -- on the agreement and the due

4    diligence.

5          MR. MALYNN:  They made an intentional decision not

6    to comply with your order.  And now they're claiming

7    impossibility, and that's not true, your Honor.  They had an

8    entire month to do this.  They just didn't dedicate the

9    resources to get it done, and what you're hearing is that

10   they put their resources elsewhere.  They didn't do the --

11         THE COURT:  Well --

12         MR. MALYNN:  -- job, but it's not impossible in a

13   month to produce documents, and, your Honor --

14         THE COURT:  Well, to produce documents, no.  But

15   search terms returned for over 40,000 unique documents that

16   have to be reviewed for privilege, doesn't he have an

17   argument that that is not a viable thing to do in the -- in

18   the short time between March 12 -- because, first of all, you

19   have to come up with the search terms.  And then you have to

20   run them, and then you have to, you know, collect the

21   documents, and then you have to review them, and then I will

22   ask Mr. Murphy about this more specifically but review them

23   for privilege and create a privilege log and determine what

24   it is that you can produce.  I --

25         MR. MALYNN:  Your Honor, three responses directly

86

1  to that.  One, not for the core documents that they knew from

2  day one the purchase agreement, drafts thereof, and due

3  diligence related thereto and board minutes about assessment,

4  those ones should have been -- those are directly responsive,

5  and they fall within their initial disclosures.  That's the

6  relevance on --

7           THE COURT:  Now, he's saying differently by my --

8           MR. MALYNN:  -- the initial disclosures.

9           THE COURT:  By the way, you understand that the

10  diligence documents are within the email search term

11  category?

12           MR. MALYNN:  No.

13           THE COURT:  Well, that's what he has said.  I mean,

14  I just want to make sure you understand that.  The agreement

15  is a different one.  That's Document Request Number 1.  But

16  you're focusing in terms of prejudice on the Document Request

17  Number 1 and the due diligence.  It sounds like those are the

18  two core --

19           MR. MALYNN:  When you testify -- your Honor, when

20  you testify at a preliminary injunction hearing that due

21  diligence is why you should get a preliminary injunction, you

22  can't hide behind and say they're no longer relevant.  They

23  should have been teed up and ready to go.

24           Now, with respect to documents that aren't part --

25  that they disclosed to us that they may use at trial, that

87

1  they, in fact, did use in the preliminary injunction hearing,

2  with respect to other documents, if they couldn't -- if one

3  month wasn't enough, you invited them a -- a procedural way

4  out, and they didn't avail themselves of it.  So, you got to

5  discredit their after-the-fact, Oh, don't sanction us when

6  you gave them a path forward and they didn't choose it.

7            Now, with respect to their third position that, Oh,

8  ho, one month, and I'm sorry we didn't ask for more time and

9  a reconsideration, but we still -- it's still June 27th, and

10 we haven't done the work yet, your Honor, that's not sincere.

11 They haven't done the work because they have no intention of

12 complying.  They would -- they want to do as little as they

13 can do before trial.

14            If they really were trying not to violate the

15 Judge's order, they'd produced the core documents, they'd ask

16 for relief on the search terms that aren't the core

17 documents, but when they do neither of those, they tell you

18 by their reply brief substantial compliance.  And giving us

19 public record documents that we already have in our

20 possession, because they're public records, your Honor, they

21 didn't move the needle one iota in this case.  Those are

22 publicly available filed.  They didn't produce anything that

23 wasn't already public record.  That is unfair prejudice.

24 That is in violation of this order.  They had no diligence to

25 -- for -- you can't say substantial compliance as of June

88

1  27th.  That is not substantial compliance.  That's just not.

2  You ordered it April 11th.  You gave them a path forward.

3  They didn't take it, and what?  The end of April, the end --

4  the middle of May --

5          THE COURT:  I guess the question --

6          MR. MALYNN:  -- we are now June 27th.

7          THE COURT:  -- is now for -- Mr. Murphy, I have a

8  question for you about the attorney-client privilege.  So,

9  he's mentioned the due diligence between Spavi and Cinco.  Is

10 there a question about the application of attorney-client

11 privilege from your perspective?

12         MR. MURPHY:  No.  Well, yes.  There -- there are

13 two -- there are a lot of issues.  First of all, when you're

14 doing due diligence for a publicly traded company, guess

15 who's always on every email?  General counsel's on those

16 because they're always providing advice.  It's not business.

17 They're providing legal advice.  So, that is one big glaring

18 issue.  Even if I wanted to produce due diligence documents,

19 I don't, but I agreed I would if there were any nonprivileged

20 due diligence documents that referred to PCJV or some stuff.

21         So, they may -- I -- they may be in there, the ones

22 that don't mention -- that don't have lawyers involved.  I

23 haven't gotten through all the documents.  I don't know, but

24 I will say this.  I don't think they should be produced, and

25 if I had known this, I would have taken this to a motion.

89

1              THE COURT:  Okay.  The other question --

2              MR. MALYNN:  Your Honor --

3              THE COURT:  -- have you received any word from --

4       (Simultaneous speaking.)

5              THE COURT:  -- your -- I'm sorry.  Just one more.

6              Mr. Murphy, have you received any information from

7   your colleagues --

8              MR. MURPHY:  I -- I have -- so, I have in my -- in

9   my email box the emails from the internal like where we were

10  ready for these to be produced, but I -- those are kind of

11  privileged work product, and, so, I don't have the outgoing

12  email because I'm not on that email.  So -- I don't think.

13  So, I just don't have them is the answer to that.

14             THE COURT:  Okay.

15             MR. MURPHY:  But I --

16             THE COURT:  I -- I'm wondering if --

17             MR. MURPHY:  I understand that --

18             THE COURT:  -- it would be helpful -- you know, I

19  don't -- I know there's a time crunch here.  So, I want to be

20  able to prepare my report and recommendation as soon as

21  possible to the District Judge and to the parties.  So, I

22  don't want to delay this, but I'm wondering if maybe by

23  Monday Plaintiff could give the Court an update on how far

24  you got.  In other words, did you produce any documents out

25  of that search term group and, if so, about when?  I mean --

90

1          MR. MURPHY:  So, I'm going to -- you know what?

2   Because I -- I feel -- I want this -- I want to just

3   finish -- so, I'm going to tell you --

4          THE COURT:  Well, you can just tell me on the

5   record now.  You don't have to -- I'm not asking you to

6   forward any internal law firm, you know, communications.  You

7   can just tell me on the record.

8          MR. MURPHY:  Yeah.  So --

9          THE COURT:  That would be -- accept that -- but --

10  or maybe you could, you know, do that by Monday or something.

11     (Simultaneous speaking.)

12          THE COURT:  I just want to have it for the record.

13  It's not that it's going to be, you know, the centerpiece of

14  anything.  It's just that I -- I think it would be helpful --

15          MR. MURPHY:  I know --

16          THE COURT:  -- for the Judge -- the District Judge

17  to know where things stand now.

18          MR. MURPHY:  We have produced documents.  We are

19  reviewing documents.  It has been an ongoing process on our

20  end consistently.  You can have that on the record.  I have

21  approved batches of documents to be produced, and I -- and,

22  so, I approved them on multiple dates.  So, I know that has

23  been the case.

24          THE COURT:  So, you know it --

25          MR. MURPHY:  I know that --

*Echo Reporting, Inc.*

91

1          THE COURT:  -- has been an ongoing --

2          MR. MURPHY:  I know that we are --

3          THE COURT:  -- production and?

4          MR. MURPHY:  Yes, absolutely.  Yes, 100 percent.

5          THE COURT:  All right.  So, okay.

6          MR. MURPHY:  That's correct, and to report --

7          MR. MALYNN:  But there's been one production of

8  publicly records -- of public records, your Honor.  That's

9  all we've gotten.

10          THE COURT:  So, I -- okay.  There's a dispute about

11  that.  If -- if there is some -- you know, if there are dates

12  on which you -- you produced documents and could give the

13  maybe Bates stamp numbers or something, that might be

14  helpful.  I just -- I -- because I want to be able to say one

15  way or another if there have been documents produced from the

16  search term group or not.  I mean --

17          MR. MURPHY:  Oh, they're --

18      (Simultaneous speaking.)

19          THE COURT:  -- maybe -- if we can't do it, we can't

20  do it.  I really --

21      (Simultaneous speaking.)

22          THE COURT:  You know something?  I've changed my

23  mind. I think that because of the deadlines here and it's a

24  short time, I think it's more important for me to be able to

25  write the report and recommendation based on what I have, and

92

1  then the parties are always free to supplement.  It's really

2  only the search term group.  So --

3           MR. MURPHY:  Can I just say -- I just want to say,

4  so, I -- I have -- I know for a fact that post my

5  declaration, there -- I remember one of those productions

6  because it -- it was a little -- things got a little wacky

7  internally as far as the process.  But I -- I -- I can tell

8  you that after my declaration, we produced documents from

9  that search term group.  I can tell you for the record that

10 after my declaration -- and it continued up through last week

11 -- to review the documents to have them ready to produce,

12 and, so, it is -- it didn't stop at all.  So --

13           THE COURT:  Okay.  That's enough then, through last

14 week.

15           UNIDENTIFIED SPEAKER:  Your Honor, and I --

16           THE COURT:  Post your declaration --

17           MR. MALYNN:  They --

18           THE COURT:  And --

19           MR. MALYNN:  They have not produced anything.

20           THE COURT:  -- after the declaration up until last

21 week.  Do I have that right?

22           MR. MURPHY:  Yes.  And we're continuing to review,

23 absolutely, 100 percent.

24           MR. BERAL:  May I help -- may I help the Court,

25 your Honor, if I may?

93

1          THE COURT:  Sure.

2          MR. BERAL:  We received a production of documents

3   on April 22nd, 2025.

4          THE COURT:  Okay.

5          MR. BERAL:  Those --

6          MR. MURPHY:  More than that.

7          THE COURT:  That is not after this declaration.

8          MR. MURPHY:  It's more than that.

9          THE COURT:  That doesn't completely help.  Can you

10  give me -- do you have dates, Mr. Murphy?

11         MR. BERAL:  We did not receive anything after that.

12         MR. MURPHY:  That's not true.  That is not true.

13         THE COURT:  Okay.  So, Mr. Murphy, what dates do

14  you have?

15         MR. MURPHY:  I -- I don't -- the problem is that

16  Jordan -- I know that -- Jordan Zolliecoffer is actually

17  studying for the Bar.  So, she is just going to --

18         THE COURT:  Oh, I see.  I see.  No, no.  I --

19     (Simultaneous speaking.)

20         THE COURT:  I understand.

21         MR. MURPHY:  So, I can tell you for the record --

22  and this is what is important in my opinion is that I have

23  been -- with your order and with those documents and the

24  search terms, I have been reviewing at $800 an hour when I

25  shouldn't be.  You don't have a lawyer at $800 an hour

94

1  reviewing documents, but I have been so that I can get it

2  done.  So, that actually is all that I think needs to be said

3  because the -- the claim that I have -- that willfulness is

4  obvious, I don't know where you have any evidence of

5  willfulness in anything --

6           THE COURT:  Right.

7           MR. MURPHY:  -- (indiscernible).

8           THE COURT:  This is literally just to give a sense

9  of the status of the production.  So, I think we --

10          MR. MURPHY:  It's going to go --

11          THE COURT:  -- will just --

12          MR. MURPHY:  -- right up until trial.

13          THE COURT:  Let's just leave it there because

14 there's obviously -- you're saying there were documents

15 produced after your declaration up until last week.

16 Defendants are saying they haven't received anything in that

17 time frame.  So, we just leave it there.

18          MR. MURPHY:  Yeah.

19          THE COURT:  We don't -- we don't have the ability

20 to get any further clarification of that issue.  So, I -- I

21 think we just leave it there, honestly.  I think we just

22 leave it, and I will go ahead and prepare a report and

23 recommendation.  That's the next step, and I will do that as

24 soon as possible.

25          All right.  Thank you everyone.

1          MR. MALYNN:  Your Honor, there's no billing records
2  or verification of any time reviewing documents before you.
3          MR. MURPHY:  That is -- is that what we're doing
4  now?  We're --
5          THE COURT:  I'm just -- I'm just going to -- as I
6  said, I'm going to just leave that as the status.  That's all
7  I was trying to get at in this last set of questions is what
8  is the status.  I'm not going to hold a trial on that issue.
9  I will note the -- I will note the dispute.  I will say, you
10  know, Plaintiffs represent this.  Defendants represent that.
11  And we will leave it there because I don't want to delay the
12  report and recommendation on this issue.
13          MR. MURPHY:  May I make one -- I just have two
14  things, only two things to respond to, if I may.  This will
15  be quick.
16          I -- we -- we did not wait when we realized we
17  missed.  And we asked them for depositions, and they didn't
18  produce them.  What we were waiting for was their initial
19  disclosures because that's how it works.  You get your
20  initial disclosures, and then you write your discovery
21  because that's what --
22          THE COURT:  Yeah, I don't think we need to go back
23  over this.
24          MR. MURPHY:  My -- my request is a big -- I have a
25  request for -- for your Honor in a big picture.  This is

96

1  actually a -- something for us to consider structurally, and

2  there are no rules on what we do when we evaluate compliance

3  with informal discovery conference orders when it's the first

4  time around, and I think that we should set some standards.

5  I think there -- you should have to be able to prove that you

6  -- that you -- there is a good request that would have won a

7  motion to compel.  I think we should -- maybe this is an

8  opportunity for us to actually do something that provides

9  guidance because maybe an unknowing person has had a motion

10  like this, probably knows some -- I don't know.  But I think

11  it would be helpful.

12          THE COURT:  Probably not.  I mean, I could -- you

13  know, I've been on the bench 18 years.  I don't think I've

14  had a motion like this based on the first discovery

15  conference.  So, you know, I take your point, but I think

16  that that is addressed, as far as I can see, in your due

17  process argument, you know.  The issue is what do we do with

18  these document requests, and --

19          (Simultaneous speaking.)

20          THE COURT:  -- the search term ones, which are the

21  ones that are still outstanding.  But I think that that is --

22  that is part of your due process argument, and I do -- you

23  know, I -- I understand what you're -- the overall -- I'm

24  going to take this back for a moment, but I understand what

25  you're saying about the impact of motions for sanctions on

97

that first order in terms of disrupting how we do things.  I

-- I hear what you're saying.  I don't think this is the

case.  I mean, I don't think that this is the case where I

address that on a big picture because we have a lot of

pressing issues.

            UNIDENTIFIED SPEAKER:  Yes.

            THE COURT:  We may get to that depending on the

outcome of your ex parte application.  That's another issue,

but I -- I understand what you're saying.  I don't know

whether there's any guidance for this.  You know, December 1,

2015 is when Rule 16 was revised to say expressly that courts

could require discovery conferences before the filing of a

motion to compel.  What that means is something that we will

need to address.  But, as far as I know, I mean, this has not

come up in my experience before this case.  So, you know,

maybe it has somewhere else.  I -- I'm not aware of it, and I

don't know how we would look for it.  So --

            MR. MALYNN:  Your Honor, one point --

            THE COURT:  -- that's that.

      (Simultaneous speaking.)

            MR. MALYNN:  No.  Hold on.  My turn, Mr. Murphy.

      (Simultaneous speaking.)

            MR. MALYNN:  My turn.  You raised the due process.

I'd like to respond to the due process --

            THE COURT:  Now, there is a -- there is a due

98

1  process issue, but I don't know that it's --

2      (Simultaneous speaking.)

3          THE COURT:  -- this is the one that we need to

4  address in this case.  The due process issues he's raised, as

5  I said to you, is the impossibility of compliance.  He raised

6  other ones, but that's obviously the centerpiece of his

7  declaration.

8          MR. MURPHY:  Can I make my last point?

9          MR. MALYNN:  I just want to be clear --

10          MR. MURPHY:  I have a point.

11          MR. MALYNN:  -- that Rule 26 --

12          THE COURT:  We need Mr. Malynn first.

13          MR. MALYNN:  Rule 26 absolutely defeats -- Rule 26

14  is designed to protect the party like in -- in Defendants'

15  shoes from being ambushed at trial and unfair surprise at

16  trial.  And you can't have a due process objection if the

17  documents that are responsive to a document request and a

18  court order fall squarely within their case in chief, and

19  that you can't answer -- you can't resolve their case in

20  chief without cross examining witnesses on an ambiguous

21  assignment that does not answer the questions.

22          MR. MURPHY:  So, my --

23          THE COURT:  All right.  Mr. Murphy, you wanted one

24  last point?

25          MR. MURPHY:  Yes.  I would just invite the -- your

99

Honor to think about kind of the dynamics that you observed
and kind of the -- the -- the -- what was going on at the
time.  You've seen the kind of April 8th through April 15th
stuff.  It was -- there was a lot going on.  At the same time
as I also am now dealing with three parties that I'm actually
trying to get into the case as quickly as possible to
eventually stipulate to certain things that are now being
told that they're -- they have to accept going to trial.
And, so, I'm dealing with all of this at the same time I'm
dealing with the order, and I -- and I'm trying to do so in a
way that is professional and calm, and I get these
accusations and all this stuff.  It's really difficult.  It
makes it very hard.  So, I -- not only was I not willfully --
I was actually complying with the order under very difficult
circumstances.  So --

        THE COURT:  All right.  Thank you.  We will --

        MR. BERAL:  Your Honor, I'm so sorry.  I just want
to address the transcript issue on March 12th.

        MR. MURPHY:  Oh, yeah.

        MR. BERAL:  It's page 97, line seven.  It
attributes words to Mr. Malynn.  It really is, in fact, Mr.
Murphy who is speaking.  I'm wondering if the Court could
enter an order striking Mr. Malynn and adding Mr. Murphy.

        MR. MURPHY:  But where do you -- where do you say
we will --

100

```
1          THE COURT:  Not before the report and
2  recommendation, but I can -- I've got to get the recording.
3  I can't rely on the representation.  I have to get the
4  recording myself and listen to the recording.  And, you know,
5  at some future date we may be able to do that.  I'm not sure
6  that I will be able to do that before I get the report and
7  recommendation out, but I hear your request.
8          MR. MURPHY:  Did -- did --
9          MR. BERAL:  Thank you, your Honor.
10          MR. MURPHY:  Counsel, could you find where in the
11  record you said we don't agree to the continued case
12  management --
13          THE COURT:  Well, that he didn't say.  He said only
14  to -- to -- that he wants a change in the transcript as to
15  who was speaking on --
16          MR. MURPHY:  I know, but I --
17          THE COURT:  -- line seven.  Okay.
18          MR. MURPHY:  But he says --
19          MR. MALYNN:  Mr. Beral right in that same paragraph
20  says that he's going to be --
21          MR. BERAL:  I'll address Mr. Murphy.  Same page,
22  page 97, when Mr. Murphy is speaking -- it says Mr. Malynn,
23  but when Mr. Murphy is speaking, I chime in and then say,
24  Well, I'm not so confident -- when he's speaking about the
25  CMO being changed, and then the Court came in right after
```

101

1  that and said:

2          "Right.  So, I have a problem

3          because I have no authority to change the

4          cutoff date."

5          What I was going to say is I'm not so confident

6  that the Court -- that the District Court is going to amend

7  any deadlines in this case.  I was just --

8          MR. MURPHY:  And you never said that to me.

9          THE COURT:  Right. No, no.  I --

10         MR. MURPHY:  He didn't say we're not agreeing.  I

11 don't see that.

12         THE COURT:  No.  You're -- you're talking to to me

13 about the District Judge -- we don't know what the District

14 Judge is going to do.  I guess we will find out shortly.

15         Okay.  All right.  I will --

16         UNIDENTIFIED SPEAKER:  Right.  And on April 4th,

17 you --

18         THE COURT:  -- write down the --

19         UNIDENTIFIED SPEAKER:  -- didn't tell anybody --

20         THE COURT:  -- request.  If you don't see it in the

21 order, you know, feel free to bring it up again, but I'm

22 making a note of the request to correct the transcript.

23         ALL:  Thank you, your Honor.

24         THE COURT:  Okay.  All right.  Thank you everyone.

25         UNIDENTIFIED SPEAKER:  Thank you.  Have a great

102

1  weekend.

2          THE COURT:  Thank you.  And then we are in recess

3  until the afternoon calendar.  Thank you.

4      (Proceedings concluded.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

103

1          I certify that the foregoing is a correct

2 transcript from the electronic sound recording of the

3 proceedings in the above-entitled matter.

4

5 /s/Jordan Keilty                      7/17/2025
  Transcriber                          Date
6
  FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:
7

8
  /s/L.L. Francisco
9 L.L. Francisco, President
  Echo Reporting, Inc.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25