**BLANK ROME LLP**
Todd M. Malynn (SBN 181595)
todd.malynn@blankrome.com
Arash Beral (SBN 245219)
arash.beral@blankrome.com
Todd M. Malynn (SBN 181595)
jamison.gilmore@blankrome.com
2029 Century Park East | 6th Floor
Los Angeles, CA 90067
Telephone:  424.239.3400
Facsimile:   424.239.3434

Attorneys for Defendants, Counterclaimants, and Third Party Plaintiffs PCJV USA, LLC, PCI TRADING LLC, POTATO CORNER LA GROUP, LLC, GK CAPITAL GROUP, LLC, NKM CAPITAL GROUP, LLC and GUY KOREN, and Defendants J & K AMERICANA, LLC, J&K LAKEWOOD, LLC, J&K OAKRIDGE, LLC, J&K VALLEY FAIR, LLC, J & K ONTARIO, LLC, J&K PC TRUCKS, LLC, HLK MILPITAS, LLC, and GK CERRITOS, LLC

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SHAKEY'S PIZZA ASIA VENTURES, INC, a Philippines corporation,<br><br>Plaintiff,<br><br>vs.<br><br>PCJV USA, LLC, a Delaware limited liability company; PCI TRADING , LLC, a Delaware limited liability company; GUY KOREN, an individual; POTATO CORNER LA GROUP, LLC, a California limited liability company; NKM CAPITAL GROUP, LLC, a California limited liability company; J & K AMERICANA, LLC, a California limited liability company; J&K LAKEWOOD, LLC, a California limited liability company; J&K VALLEY FAIR, LLC, a California limited liability company; J & K ONTARIO, LLC, a California limited liability company; HLK MILPITAS, LLC, a California, limited liability company; GK CERRITOS, LLC, a California, limited liability company;  J&K PC TRUCKS, LLC, a California limited liability company; and, GK CAPITAL GROUP, LLC, a California | Case No. 2:24-CV-04546-SB(AGRx)<br><br>*Hon. Stanley Blumenfeld, Jr.*<br><br>**DECLARATION OF ARASH BERAL RESPONDING TO ORDER TO SHOW CAUSE – DKT. NO. 238**<br><br>Complaint Filed:   May 31, 2024<br>Trial Date:           August 18, 2025 |

160850.00001/154448422v.1

**DECLARATION OF ARASH BERAL RE: ORDER TO SHOW CAUSE – DKT. NO. 238**

| | |
|---|---|
| limited liability company and DOES 1 through 100, inclusive, | |
| Defendants. | |
| PCJV USA, LLC, a Delaware limited liability company; PCI TRADING LLC, a Delaware limited liability company; POTATO CORNER LA GROUP LLC, a California limited liability company; GK CAPITAL GROUP, LLC, a California limited liability company; NKM CAPITAL GROUP LLC, a California limited liability company; and GUY KOREN, an individual, | |
| Counter-Claimants, | |
| v. | |
| SHAKEY'S PIZZA ASIA VENTURES, INC, a Philippines corporation, | |
| Counter Defendant. | |
| PCJV USA, LLC, a Delaware limited liability company; PCI TRADING LLC, a Delaware limited liability company; POTATO CORNER LA GROUP LLC, a California limited liability company; GK CAPITAL GROUP, LLC, a California limited liability company; NKM CAPITAL GROUP LLC, a California limited liability company; and GUY KOREN, an individual, | |
| Third Party Plaintiffs, | |
| v. | |
| PC INTERNATIONAL PTE LTD., a Singapore business entity; SPAVI INTERNATIONAL USA, INC., a California corporation; CINCO CORPORATION, a Philippines corporation; and ROES 1 through 10, inclusive, | |
| Third Party Defendants. | |

160850.00001/154448422v.1

1

**DECLARATION OF ARASH BERAL RE: ORDER TO SHOW CAUSE – DKT. NO. 238**

## DECLARATION OF ARASH BERAL

I, Arash Beral, declare as follows:

1. I am a partner at Blank Rome LLP, counsel of record for PCJV USA, LLC, Guy Koren, and their affiliated entities. I have personal knowledge of the facts set forth in this declaration, and if called upon to testify under oath, I could and would testify competently thereto.

2. I submit this declaration in response to the Court's July 30, 2025 Order (Dkt. No. 238).

3. At the outset, I want to emphasize that I do not intend to create any unnecessary tension with opposing counsel through this declaration. I have exercised care in my prior statements and continue to do so now. I recognize the importance, however, of providing the Court with additional information in response to the Order.[1]

4. With respect to any questions concerning my professionalism or civility, I respectfully invite the Court to contact Judge Andrew J. Guilford (ret.), who can attest to my conduct and professionalism. I also invite the Court to contact Judge Maame Ewusi-Mensah Frimpong, before whom I conducted a jury trial in August 2023. If the Court deems it necessary, I can provide additional references—including opposing counsel—who can speak to my professionalism in other matters. By way of example, attached hereto as **Exhibit A** is a true and correct copy of an unsolicited email from opposing counsel in a significant, alleged $200 million business dispute, in which both attorneys on the other side expressed their appreciation for my professionalism and cooperation throughout the litigation as they were substituting out as counsel. I have redacted this email to preserve their identities and to protect certain irrelevant or settlement-related communications, but

---

[1] I also respectfully propose that the Court consider meeting privately with the non-lead attorneys in this matter (specifically, those other than myself, Mr. Malynn, and Mr. Murphy) to obtain a clearer understanding of the dynamics in this case.

1  I am prepared to disclose their identities to the Court should the Court wish to
2  contact them.
3       5.   As for this case, I must begin by saying that the past few days have been
4  largely pleasant, civil and professional. Without a doubt, this positive atmosphere is
5  due to Ms. Tirtasaputra taking over the meet and confer responsibilities on
6  Plaintiff's side. Our communications with Ms. Tirtasaputra, both remotely and via
7  email, have been productive and constructive. When errors arose in the pretrial
8  documents, for example, we addressed them promptly and collaboratively. Aside
9  from some last-minute directives and changes—presumably at Mr. Murphy's
10 insistence—that disrupted our progress, we encountered no significant issues and
11 have enjoyed working with Ms. Tirtasaputra, an attorney I personally have had
12 familiarity since 2021 involving another case. She is productive, diligent, and
13 deadline-driven.[2] Attached hereto collectively as **Exhibit B** are a sampling of our
14 email communications with Ms. Tirtasaputra this week, demonstrating cooperation
15 and professionalism between us.
16      6.   My one other experience with Fox Rothschild LLP occurred
17 approximately a decade ago, when I (at a former firm) went to trial against one of
18 their clients in *Pollara v. Radiant Logistics Inc., et al.*, C.D. Cal. Case No. CV 12-
19 344-GAF (JEM), before the Honorable Gary A. Feess (ret.) (who could be another
20 potential reference, but whom I doubt remembers the case given the length of time
21 which has passed). Despite the litigation being intensely contested and emotionally
22 charged, proceeding through a jury trial—after which Judge Feess set aside the

---

[2] As an aside, in our other case, Ms. Tirtasaputra recently visited our building on July 18 to personally serve us with certain motion papers. I understand that she initially had some difficulty reaching Blank Rome LLP personnel who could grant her access to our suite, but I happened to be at the Starbucks located in the basement level of our building and saw some email correspondence regarding the attempted service. I went to the lobby, met Ms. Tirtasaputra in person and, alongside my assistant, accepted service of the documents. It was a routine, professional exchange between counsel—something I have participated in numerous times throughout my legal career.

jury's verdict, a decision that was subsequently appealed and affirmed—counsel consistently maintained a collegial and professional relationship throughout the proceedings.

7. In my interactions with other Fox Rothschild attorneys, such as Matthew Follett, I also have enjoyed positive and friendly exchanges. On occasion, I have relied on Mr. Follett to help facilitate communication between our side and Mr. Murphy (and before Mr. Follett, others at Mr. Murphy's prior firm, Ervin Cohen & Jessup) because on occasion, communications with Mr. Murphy could become challenging, and it has sometimes been difficult to reach consensus or maintain a constructive tone.

8. For instance, during a remote video conference with Mr. Murphy on July 24, 2025—which Mr. Follett attended in part—Mr. Murphy's behavior made everyone on the call uncomfortable, especially our associate, Jamison Gilmore. In an attempt to keep the situation calm, I suggested that Mr. Murphy step away from the call so that we could continue the discussion at another time. Mr. Murphy refused and instead began a tirade, repeatedly using profanities. He also accused me of using my "calm voice" to de-escalate the situation; I am unsure what alternative response he expected from me in that moment. After this incident, I asked Mr. Follett to act as an intermediary between our team and Mr. Murphy on matters the next day.

9. In my experience, Mr. Murphy could be highly emotional and responds negatively when opposing counsel expresses a different view. He appears to focus on advancing his own narrative at the expense of objective facts. This always is counter-productive and assuredly engenders necessary corrective submissions, which draws the Court's attention to those disputes for the wrong reasons.

10. When faced with criticism, Mr. Murphy frequently responds by making accusations and attempting to shift blame onto opposing counsel. Instead of taking responsibility for his actions, he engages in behavior aimed at diverting attention

from the real issues and constructing an alternative narrative intended to foster hostility toward opposing counsel. For example, on July 29, Mr. Murphy accused me of "trying to divert this case to issues that are not real on law that does not exist to avoid liability" after providing case-neutral and undisputed facts as a proposed set of stipulation of facts. Attached hereto as **Exhibit C** is a true and correct copy of that email communication.

11.  Mr. Murphy also tends to act vindictively, particularly when he is publicly criticized. Mr. Murphy has, at times, attempted to intimidate and discourage me from raising concerns about his conduct with the Court or otherwise berates me after I do raise any concerns. This has made it difficult to know how to proceed, since raising these matters often leads to additional complications. Despite my reservations about including these concerns in this declaration, I feel obligated to communicate them honestly, and I do so without any intent to harm Mr. Murphy, but rather in the hope that he will view this feedback constructively, rather than to seek retribution.[3]

12.  I will say, however, that Mr. Murphy could also be pleasant to work with at times. For example, in 2018, when our clients' interests were aligned in an interpleader action filed by Wells Fargo Bank concerning the funds of PCJV USA LLC and PCI Trading LLC, we collaborated effectively to resolve the issues in that matter. There have also been occasions during this action when our interactions have been professional and pleasant (but, unfortunately, short-lived).

13.  It is challenging to fully capture the intricacies of Mr. Murphy's approach to litigation and his mindset. He consistently employs a calculated mix of strategy and opportunism, often seeking to exploit situations—many of which he

---

[3] If Mr. Murphy's filings in response to the Order call into question the professionalism or civility of my firm or the Defendants, I respectfully request the chance to respond in writing and to submit additional evidence or testimony to the Court as needed. Regrettably, based on the content of his recently filed "amended" declaration, I anticipate that Mr. Murphy's submissions may contain representations, which must be rebutted.

has deliberately created. For instance, he will remain silent when it serves his or his clients' interests, even going so far as to intentionally disregard court orders to produce discovery in order to bolster his efforts to postpone trial dates. Conversely, he becomes outspoken when it benefits him, such as labeling Mr. Koren a liar who defrauded franchisees, despite knowing that his own clients—the majority owners of PCJV at the relevant time—were responsible for and authorized those representations in the FDDs. He also drafts lengthy emails to manufacture pretexts when advantageous and advocates for issues he believes will provide leverage against his adversary or appeal to the Court, as seen with the contempt proceedings in this case. Each of his actions is purposeful, designed to create obstacles or impose disadvantages on the opposing party.

14. Given his approach, I am firmly convinced that when issues are contested, Mr. Murphy does not participate in communications with opposing counsel with a genuine intent to resolve issues collaboratively. Instead, his focus is consistently on how best to manipulate the facts to create a favorable record for the Court, rather than engaging in meaningful dialogue. My January 10, 2025 declaration at Dkt. No. 93-3, for example, attested to these issues. Exhibit D to that declaration (Dkt. No. 93-7) evidences my ongoing frustration with Mr. Murphy's anger and asked him to show us respect: "Mike: Your anger is not doing anybody any good, nor is manufacturing these lop-sided narratives. Dial it back please. I've been nothing but respectful, cordial, and friendly with you; you haven't shown me the same respect."

15. Despite these challenging circumstances, I have done my best to remain patient and calm, which reflects my usual demeanor. In addition to my professional responsibilities, I am the father of three young children—a role I consider my most important. I also am an active member of our community, serving on the board of directors for both the Southwestern Law School Alumni Association and the Beverly Hills Basketball League, which provides youth basketball programs to more

than 1,100 children. Most recently, I was honored to be included in the Los Angeles Business Journal's 2025 "Leaders of Influence: Litigators and Trial Attorneys" list. https://labusinessjournal.com/issues/leaders-of-influence/leaders-of-influence-litigators-trial-attorneys-2025/. I lost my father in November 2024, and just prior to that, I faced some personal medical challenges. Throughout this difficult period, I have continued to engage professionally in this action.

16. I respectfully submit that, were the Court in our position dealing with Mr. Murphy, its patience would likely have worn thin long ago. On the other hand, if the Court were in Mr. Murphy's position dealing with us, this matter would be litigated professionally and cooperatively, with any significant "disputes" limited to good-faith debates over legal or mixed legal-factual issues. While I recognize that it is difficult for the Court to fully appreciate the out-of-court dynamics involved, I believe it is important to emphasize that we do not—and I personally have never—approached any case with the intention of being difficult, harming opposing counsel, or using professional communications to manipulate the narrative.

17. At a previous hearing, Mr. Murphy made complimentary remarks about me but directed criticism toward my colleague, Mr. Malynn. For instance, he has accused Mr. Malynn of "yelling," when in reality Mr. Malynn simply has a naturally high speaking tone (whether in court or on the telephone). Then when Mr. Malynn or I, and more recently Mr. Gilmore, remind Mr. Murphy of deadlines and court orders, it is he—Mr. Murphy—who yells to shut down conversations.[4]

---

[4] In Paragraph 27 of my June 29, 2025 declaration (Dkt. No. 203-1), I describe a February 28, 2025 interaction with Mr. Murphy in the attorney conference room. On that morning, Mr. Murphy was visibly angry, raised his voice at me, and ultimately left the room abruptly, while I remained calm throughout. He was attempting to harass me concerning issues over contempt, while threatening escalating sanctions, and acting as though the Court would do anything Mr. Murphy asks it to do. I must point out that, due to his successes on the preliminary injunction, contempt, anti-SLAPP, and discovery sanction matters in this case, it is my opinion that Mr. Murphy thinks that he can do no wrong, or that misconduct on his part will not carry the same weight or consequences as the relief he has been able to obtain against Defendants in this case.

18. Additionally, it is fair to note that after Mr. Malynn's lobectomy and more recently due to complications in recovery, Mr. Malynn's breathing has been labored at times. That causes his voice to rise in pitch until he is able to synchronize and breathe normally again. In my experience working with Mr. Malynn on several other matters, no opposing counsel has ever accused him of yelling; they understand that his tone of voice is simply his natural manner of speaking. This is simply an example of Mr. Murphy "accusing others of that which he himself is guilty."[5]

19. I respectfully submit that the Court should evaluate any paper or argument submitted by Mr. Murphy with this context in mind.

20. We need look no further than Mr. Murphy's belatedly filed Amended Declaration of August 4, 2025, as evidence. Dkt. No. 242. Mr. Murphy asserts that he is submitting a corrected declaration "upon discovering that the declaration filed on August 1, 2025 erroneously omitted the additional discussion ordered by this Court in Dkt. 226." It appears, rather, that Mr. Murphy reviewed my declaration at Dkt. No. 241 and realized that he had not complied with the requirements of Dkt. No. 226. As a result, he spent the weekend and the following Monday correcting this oversight and, in effect, "responding" to my declaration.

21. As for his motions *in limine*, instead of addressing why he failed to meet the Court's deadlines—such as the June 18 deadline to serve a letter regarding motions *in limine*, the June 23 deadline to serve the moving papers, and the June 30

---

[5] While we were in state court, I vividly remember Mr. Murphy yelling at me outside Judge Highberger's department, a time when my mother was in the hospital. Others witnessed this incident too and in one of my emails to Mr. Murphy earlier in this case, I reminded him of that incident and his constant harassment of me: "Mike: What is not acceptable are your statements. I don't want to say this again: I do not appreciate your harassment and slanderous statements. You won a preliminary injunction. Congratulations. Doesn't mean you get to harass and denigrate me, and browbeat me with it. Defendants are doing everything in their power to comply with the Court's order. I, too, have satisfied my obligations as defense counsel. Stop the harassment. I had enough of it for 6 years, even including on a day you were yelling at me outside Judge Highberger's courtroom while my mother was in the hospital suffering from a stroke. When is 'enough' enough for you?" *See*. Dkt. No. 87-5 at p. 9 of 15.

deadline to serve an opposition, or otherwise properly comply with these deadlines if the ultimate filing deadline was adjusted to align with the new pretrial conference date—Mr. Murphy improperly shifts responsibility onto Defendants. He claims that he was compelled to file his motions unilaterally because "Defendants have regularly asserted that Plaintiff's conduct amounted to waiver or default…" and that he needed to "protect the record from Defendants' accusations of tardiness and waiver." Rather than simply acknowledging his missed deadlines and requesting the Court's leniency, Mr. Murphy chooses to deflect blame onto others for his own procedural failures.

22. This pattern persists in his assertion that the July 25 deadline was missed due to "Defendants' delays" or "Defendants' unreasonable demands" regarding the Joint Exhibit List, Jury Instructions, and Pretrial Order, while omitting critical factual context that the Court would likely find essential for evaluating such a significant allegation. More troublingly, he advances claims about Defendants that are false and misleading.

23. Regarding the joint exhibit list, Mr. Murphy initially informed us by email on June 20, 2025, that he would have 290 exhibits. However, the exhibit list that was ultimately filed that day (Dkt. No. 200) reflected only 118 exhibits on his side. Many of these were grouped together in a non-specific manner, such as under broad categories like "Financials" or "Photographs," rather than being listed separately. Our list contained 484 exhibits, which did not significantly change from the amended exhibit list at Dkt. No. 237-1, with changes we specifically disclosed to Mr. Murphy beforehand.

24. The issue here did not arise from any amended exhibit list; in fact, Mr. Murphy wanted to amend his list too. Moreover, Mr. Murphy was aware that we had approximately 500 exhibits as early as June 20, which is not unusual for a high-stakes case of this nature. Instead, the problem stemmed from Mr. Murphy's repeated failure to follow through on his commitments. The parties met and

conferred several times in early to mid-July to coordinate the exchange of exhibits. During these discussions, Mr. Murphy agreed to exchange exhibits by July 11. As it turns out, he was never prepared to do so by that date. Our team made multiple requests for his exhibits, with at least six separate requests between July 22 and July 24. The actual exchange of exhibits did not occur until July 24, and even then, several of Mr. Murphy's exhibits were missing from his production. That same evening, Mr. Gilmore made five additional requests for the missing exhibits. Ultimately, we did not receive a complete set of Mr. Murphy's exhibits until July 25 at 11:09 a.m.

25. Regarding the jury instructions, instead of addressing why he failed to serve any instructions by the May 23 deadline, object to ours, or propose any instructions until July 28, Mr. Murphy shifts blame to Defendants, claiming, "The Jury Instructions were also not completed in time, and this too was an issue that was caused by Defendants …" He also incorrectly asserts that "Defendants refused" to meet and confer on July 24. We never refused to meet and confer on that date or at any other time. During the call we had with Mr. Murphy that day (which I describe above), we requested that Mr. Murphy send us his proposed instructions in advance to ensure a more productive discussion, and he agreed to do so.[6] In fact, in a 9:11 a.m. email earlier on July 24, Mr. Murphy stated, "Tonight, you will receive revised jury instructions." However, we did not receive any proposed instructions from his side until July 28. As a result, we were left with a significant volume of additional redlined material to review and address in a compressed timeframe.

26. From July 28 to August 5, we engaged in an extensive process to finalize the joint jury instructions, despite a variety of obstacles. On July 28, Mr.

---

[6] In hindsight, we see that his request to talk about jury instructions before he delivered his proposed instructions was intended to fabricate the very pretext on which he complains now. Mr. Murphy's claim that we could have had "a long meeting" on July 24 is also belied by the fact that his emotions on that call were out of control.

1  Murphy provided a revised set of instructions, modifying or deleting some of our
2  proposals without raising formal objections. This prompted us to circulate a list
3  distinguishing between disputed and undisputed instructions, setting the stage for
4  each side to prepare objections, supporting statements, and alternative proposals.
5  Over the following days, we exchanged multiple drafts, with each round addressing
6  new objections, clarifying positions, and making substantive revisions. On August
7  1, Mr. Murphy's office separated the instructions into three categories: jointly
8  agreed, SPAVI-proposed but disputed, and PCJV-proposed but disputed, and also
9  made unilateral edits to PCJV's proposals. Our efforts then focused on consolidating
10 these sets into a single, compliant document, as required by court order. We had
11 multiple emails on August 4 and August 5 on these instructions with Ms.
12 Tirtasaputra as we collaborated well to get the final product filed with the Court.[7]

13        27.   Mr. Murphy's assertions regarding the pretrial conference order also are
14 insincere. We repeatedly made efforts to comply with the Court's July 25 and July
15 29 deadlines, and exchanged multiple drafts of the order during the marathon work
16 session we had on July 28-29 (after Mr. Murphy's side first delivering their
17 "skeleton" draft at 3:47 p.m. on July 28). At 9:50 p.m. on July 28, we sent our
18 redlined edits to the draft, adding our proposed sections, but we received nothing
19 back from Mr. Murphy until the next day at 3:37 p.m., long after the filing deadline.
20 We turned edits around within an hour and sent back our revision at 4:37 p.m. Mr.
21 Murphy, however, never did file it, and went on to engage in further delay and last-
22 minute changes to this document before it was ultimately filed on August 5.

---

[7] I recognize that the final version of the jury instructions may not fully satisfy the Court, but this is primarily a result of Mr. Murphy's firm position that our proposed instructions reflect "bad law" or "false facts." Despite not having taken any percipient witness depositions in either state or federal court, nor having conducted timely discovery in this matter, Mr. Murphy appears confident in his assessment of the case and is intent on limiting the issues to those addressed in the preliminary injunction record and ruling. This approach has made it difficult for us to present our clients' claims and defenses comprehensively within the jury instructions.

28. Mr. Murphy also has placed blame on Defendants, alleging that we failed to agree on stipulated facts. In reality, we provided a set of proposed stipulated facts, organized chronologically, for presentation to the jury. Mr. Murphy subsequently modified these proposed facts, removing important context and introducing a completely different narrative that distorted the facts and turned the stipulation into advocacy. Nevertheless, on July 29, I circulated two versions of proposed stipulated facts: one concise and another more detailed. Mr. Murphy declined to agree to either version or to participate in a meet and confer regarding them. At the last moment, Mr. Murphy attempted to shift responsibility to us for the absence of stipulated facts in the pretrial conference order, and Mr. Malynn ultimately persuaded Ms. Tirtasaputra not to include such inflammatory statements in the order.

29. With respect to the July 24 stipulation, the draft provided by Mr. Murphy included statements that we could not agree to. In truth, by that stage, the need for an extension was entirely due to the SPAVI Parties' failure to timely provide pretrial documents. We did not believe it would be accurate to represent to the Court that the SPAVI Parties were "hard at work meeting and conferring, in good faith…" at that time. As a result, we revised the stipulation.

30. With respect to the joint statement of the case, at 2:55 a.m. on July 29, Mr. Murphy's office circulated a proposed joint statement. Within 18 minutes, at 3:13 a.m., I sent back a revised version. We heard nothing until 8:51 a.m. when Mr. Murphy's office said it would be filing dueling statements of the case rather than redline our 3:13 a.m. draft. On August 4, I circulated a wholly new version of the joint statement of the case at 11:23 a.m. Ms. Tirtasaputra returned a redline at 2:21 p.m., and I approved it at 3:23 p.m., resulting in a 4:03 p.m. filing that day.

31. As for the verdict form, we did not receive Plaintiff's version until around an hour before it was to be filed jointly (at 12:48 p.m. on July 29). I raised this issue in an objection I inserted into that document and returned it to counsel at

1:23 p.m. (so that we could meet the 2:00 p.m. filing deadline). In that 1:23 p.m. email to counsel, I wrote: "Please see attached. You may file for now but note my request to the Court to further meet and confer on this. If you are going to respond to my objections, I would appreciate an agreement from Plaintiff to agree to meet and confer further (after we all get some much-needed sleep). I'm on a 30+ hour day." Mr. Murphy's office delayed the filing, however. At 4:25 p.m. on July 29 (and now, well passed the 2 p.m. deadline), they emailed me stating: "Arash, we accepted your redlines to the verdict form and added in a Plaintiff's position. We will file the attached, unless we hear otherwise."

32.   In reviewing their draft, I noticed that they frontloaded Plaintiff's position so that our position goes last and creates a misleading narrative. I objected to this, but Mr. Murphy would not relent. At 4:45 p.m., Mr. Murphy wrote me to say: "Your claims do not exist and we should not be considering verdict forms for claims based on bad law and false facts." I responded to Mr. Murphy at 5:03 p.m.: "Mike, Saying this gently and politely. The parties are more than 3 hours late on these filings after multiple extensions. If you had objections to our verdict form, you had plenty of time since May 23 to serve them on us. You waited until 1 hour before the 2 pm filing deadline today to drop new stuff on our laps, only then to, several hours later, try and preempt our objections with unfounded accusations. I don't want you to hold up this filing any longer or to drop more last minute stuff on our laps. We've been courteous. We've been kind. But you can't possibly expect to cause all these delays, violate deadline after deadline, create issue after issue in the last minute, and manufacture ugly threats against us about "bad law" or "false facts" to distract attention away from all this. I'm sorry, Mike. This is not being courteous or kind to us. Again, please get this document filed ASAP. Please also address Todd's needs asap. I'm leaving the office. If you need me again, I'm on my cell. Todd is staying on and is in front of his computer (even though we are both very, very tired). Arash"

33. From August 1 through August 5, we worked collaboratively with Ms. Tirtasaputra to prepare and file both parties' proposed verdict forms. As with the jury instructions, I acknowledge that this document requires further collaboration and refinement. We do not believe that the SPAVI parties could present a general verdict in a case of this complexity, which involves numerous contested issues of law and fact, nor do we believe it would be appropriate to attempt to narrow the issues that the jury must decide. Mr. Murphy, however, maintains that Defendants' claims "do not exist" and are "based on bad law and false facts." This position has made it difficult to resolve professional disagreements with opposing counsel, as such a mindset impedes meaningful discussion and compromise.

34. In my August 1, 2025 declaration (Dkt. No. 241), I addressed many of the issues that the Court raised in Dkt. No. 238. While preparing this declaration, I made an effort to avoid repeating the details already provided in my August 1 declaration. I want to emphasize that the failure to meet the July 25 and July 29 deadlines was entirely the result of delays and conduct on the part of Plaintiff. We have a substantial number of emails that we could submit to the Court, which clearly demonstrate our diligence at every stage with respect to each item that required joint filing. Despite the repeated delays and last-minute revisions from Plaintiff, we consistently turned around redlines promptly.[8]

35. I have not been, and I am not aware of anybody on my side ever being, sanctioned by any court or agency for failing to follow any court rule or order.

///

---

[8] The Court expressed concern regarding our inclusion of certain proposed voir dire questions and objections to exhibits. We acknowledge the Court's admonition and regret that these items were included in a rushed manner. We wish to assure the Court that our actions were motivated by a good faith effort to advocate for our clients. In response to the Court's concerns, we withdraw any proposed voir dire questions that the Court considers inappropriate. Furthermore, we have taken this opportunity to conduct a thorough review of our objections to exhibits. As a result, we have withdrawn numerous objections, as reflected in the revised challenged exhibits table and proposed pretrial conference order that have been filed with the Court.

36. Prior to the issuance of any order to show cause, I attempted to bring several of these concerns to the Court's attention beginning with my October 18, 2024 declaration (Dkt. No. 48-2), which began with, "We have great concerns with the record that has been presented to this Court by Plaintiff," and concluded with, "I will not engage any further as I intend to continue to honor my duties under the Court's Standing Order, § 1.a." I recognize that, given the early stage of the case, the Court may not have been able to fully appreciate the significance of my statements at that time. However, I respectfully submit that, in light of the context provided above, a review of our prior submissions may help clarify the challenges that we and our clients have faced in this matter, as well as in the prior state court proceedings.

37. In support of the context surrounding the delays and challenges in this litigation, I reference the Declaration of Stephen Caine, a seasoned attorney who served as independent counsel for PCJV USA, LLC and PCI Trading LLC in the prior related state court action. Mr. Caine's declaration (which is his own draft without any edits from me) details his direct observations of the parties' conduct in that matter, which involved many of the same individuals and entities as the present case. He explains that, throughout the course of the Cinco litigation, delays in the preparation of joint pretrial documents and settlement materials were primarily attributable to Mr. Murphy and his clients' slow and often unresponsive communication. Mr. Caine confirms that neither I nor my clients were the source of these delays; rather, we were consistently professional, timely, and well-prepared. He further notes that the same patterns of delay and non-cooperation by the plaintiff's side that frustrated the court in that litigation appear to persist in the current action. Mr. Caine's independent and neutral perspective reinforces that the difficulties in meeting deadlines and preparing joint submissions are not the result of any lack of diligence or professionalism on our part or that of my clients.

38. In further support, the Declaration of Todd M. Lander, a partner at Ellis George LLP and my former law partner at a prior law firm is concurrently filed (which also is his own draft without edits from me). Mr. Lander participated in and was privy to early communications with opposing counsel in the state court case, including during contentious and highly disputed proceedings such as the preliminary injunction hearing which he argued.[9]

I declare under penalty of perjury that the foregoing is true and correct. Executed August 6, 2025, within the United States, its territories, possessions, or commonwealths.

/s/ Arash Beral
Arash Beral

---

[9] To the extent the Court is considering issuing significant monetary sanctions against us or our clients (which I sincerely hope is not the case), we respectfully request an opportunity to further address any concerns with additional submissions of evidence.