**BLANK ROME LLP**
Todd M. Malynn (SBN 181595)
todd.malynn@blankrome.com
Arash Beral (SBN 245219)
arash.beral@blankrome.com
Jamison T. Gilmore (SBN 322100)
jamison.gilmore@blankrome.com
2029 Century Park East | 6th Floor
Los Angeles, CA 90067
Telephone: 424.239.3400
Facsimile: 424.239.3434

Attorneys for Defendants, Counterclaimants, and Third Party Plaintiffs PCJV USA, LLC, PCI TRADING LLC, POTATO CORNER, LA GROUP, LLC, GK CAPITAL GROUP, LLC, NKM CAPITAL GROUP, LLC and GUY KOREN, and Defendants J & K AMERICANA, LLC, J&K LAKEWOOD, LLC, J&K OAKRIDGE, LLC, J&K VALLEY FAIR, LLC, J & K ONTARIO, LLC, J&K PC TRUCKS, LLC, HLK MILPITAS, LLC, and GK CERRITOS, LLC

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

SHAKEY'S PIZZA ASIA VENTURES, INC, a Philippines corporation,

Plaintiff,

vs.

PCJV USA, LLC, a Delaware limited liability company; PCI TRADING , LLC, a Delaware limited liability company; GUY KOREN, an individual; POTATO CORNER LA GROUP, LLC, a California limited liability company; NKM CAPITAL GROUP, LLC, a California limited liability company; J & K AMERICANA, LLC, a California limited liability company; J&K LAKEWOOD, LLC, a California limited liability company; J&K VALLEY FAIR, LLC, a California limited liability company; J & K ONTARIO, LLC, a California limited liability company; HLK MILPITAS, LLC, a California, limited liability company; GK CERRITOS, LLC, a California, limited liability company; J&K PC TRUCKS, LLC, a California limited liability company; and, GK CAPITAL GROUP, LLC, a California

Case No. 2:24-CV-04546-SB(AGRx)

*Hon. Stanley Blumenfeld, Jr.*

**DECLARATION OF TODD M. MALYNN**

Complaint Filed: May 31, 2024
Trial Date: August 18, 2025

limited liability company and DOES 1 through 100, inclusive,

Defendants.

PCJV USA, LLC, a Delaware limited liability company; PCI TRADING LLC, a Delaware limited liability company; POTATO CORNER LA GROUP LLC, a California limited liability company; GK CAPITAL GROUP, LLC, a California limited liability company; NKM CAPITAL GROUP LLC, a California limited liability company; and GUY KOREN, an individual,

Counter-Claimants,

v.

SHAKEY'S PIZZA ASIA VENTURES, INC, a Philippines corporation,

Counter Defendant.

PCJV USA, LLC, a Delaware limited liability company; PCI TRADING LLC, a Delaware limited liability company; POTATO CORNER LA GROUP LLC, a California limited liability company; GK CAPITAL GROUP, LLC, a California limited liability company; NKM CAPITAL GROUP LLC, a California limited liability company; and GUY KOREN, an individual,

Third Party Plaintiffs,

v.

PC INTERNATIONAL PTE LTD., a Singapore business entity; SPAVI INTERNATIONAL USA, INC., a California corporation; CINCO CORPORATION, a Philippines corporation; and ROES 1 through 10, inclusive,

Third Party Defendants.

**DECLARATION OF TODD M. MALYNN**

I, Todd M. Malynn, declare as follows:

1. I am a partner at Blank Rome LLP, counsel of record for Defendants, Counterclaimants, and Third Party Plaintiffs ("Defendants" or "PCJV USA Parties"). I am licensed to practice law in the State of California. I provide this declaration in response to the Court's Order dated July 30, 2025 (Dkt. #238) regarding the conduct of counsel. I have personal knowledge of the facts set forth in this declaration, and if called upon to testify under oath, I could and would testify competently thereto.

**Prior Case History**

2. Attached as **Exhibit 1** is a true and correct copy of a Westlaw search I conducted. It reports that I am or was counsel of record in connection with eighty-four orders or decisions, including seventy-six from federal courts (fifty-three from federal courts in California) and eight from appellate state courts (seven from appellate courts in California).

3. I am in my 30th year of practicing in the legal profession. I have not previously been sanctioned by a court or agency or subject to an order to show cause for failing to follow a court rule or order.

4. The practice of law and my ethical obligations are very important to me. I calendar matters and go into meetings with counsel with the objective of resolving issues pursuant to court orders, deadlines and rules as an officer of the court. I hope for fair treatment and work productively and collaboratively towards dispute resolution. I do not expect opposing counsel to change or comport with personal proclivities and am not affected by unfair or onerous treatment by others. Cases proceed to resolution whether opposing counsel is difficult or acts professionally. My personal feelings are not germane and I harbor no negative feelings towards opposing counsel who view being difficult effective advocacy.

5. I summarize below my training and legal practice as it is germane to the instant proceeding and OSC regarding counsel's conduct and professionalism.

6. I began the practice of law at Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden Arps"), in its Los Angeles office, first as a summer associate in 1994, then working during my final year at Loyola Law School in Los Angeles, before taking, passing and becoming a member of the California State Bar in 1995. During my tenure at Skadden Arps, I defended my first client, GHD Enterprises, Inc. d/b/a EZ Flow Nail Systems, in a trademark infringement action under the Lanham Act in the Central District of California before the late Hon. Harry L. Hupp, prevailing on a motion for summary judgment, which was appealed to the Ninth Circuit before it was voluntarily dismissed. Danny Haile, the founder of EZ Flow Nail Systems, which was acquired by American International Industries, Inc., is the founder of Nail Alliance, LLC, the owner of GELISH brand gel polish and POLYGEL nail enhancement. Mr. Haile and his companies remain clients today.

7. In 1997, I joined Loeb & Loeb LLP ("Loeb & Loeb") as an associate, where I worked under David Grace, a partner and trademark counsel to numerous companies. With Mr. Grace, I prosecuted enforcement actions protecting brands such as DURAFLAME and 99¢ ONLY STORES. During my tenure at Loeb & Loeb, I also began to represent Pacesetter, Inc., an Alfred E. Mann company that was acquired by St. Jude Medical, Inc. and began doing business in the Cardiac Rhythm Management Division of St. Jude Medical ("St. Jude Medical CRMD"). For nearly 20 years, I represented St. Jude Medical CRMD until St. Jude Medical, Inc. was acquired by Abott Laboratories in 2017 and its Senior Vice President and General Counsel of St. Jude Medical CRMD, Ronald A. Rolnick, retired.

8. In 2002, I joined as a partner and opened the Los Angeles office of Feldman Gale & Weber PA, later known as Feldman Gale PA, an intellectual property boutique. I continued to work with Mr. Rolnick at Feldman Gale and, in addition to handling trademark, false advertising and unfair competition matters for

clients under the Lanham Act and Federal Trade Commission Act, I represented St. Jude Medical CRMD as well as other former Alfred E. Mann companies, such as Advanced Bionics, LLC before it was acquired by Boston Scientific Corporation, in patent matters, trade secret cases, actions involving covenants not to compete, and matters arising under the Medical Device Amendments of 1976 ("MDA") to the Food, Drug & Cosmetic Act ("FDCA"). On behalf of St. Jude Medical CRMD and Advanced Bionics, Feldman Gale was involved in precedential decisions under Business and Professions Code section 16600 and the MDA to the FDCA.

9. In 2017, I joined Polsinelli LLP as a partner in its Los Angeles office after litigating against attorneys at Polsinelli in a matter that was resolved by the Missouri Supreme Court via a peremptory writ in favor of Nail Alliance, whose sales division is headquartered in Kansas City, Missouri. In 2017, we prevailed on a motion for summary judgment against PolyGel, L.L.C., a registered trademark owner and alleged senior user of the POLYGEL mark who had expanded into the cosmetic market, in an action entitled *Nail Alliance, LLC v. Poly-Gel, L.L.C*, Case No. 17-CV-01026-FJG (W.D. Mo. 2017). We brought the action under the Lanham Act to protect Nail Alliance's ownership of the brand POLYGEL in its market.

10. I practiced at Polsinelli for six years before joining Blank Rome LLP, to lead the intellectual property practice in Blank Rome's Los Angeles office. After joining Blank Rome, we prevailed in a Lanham Act dispute entitled *URAWA Corporation Co., LTD. v. KUPA Incorporated*, 8:22-cv-01370-JVS-DFM (C.D. Cal. 2022) (Selna, J.), which resulted in the transfer of a registered trademark for the color PURPLE as a symbol identifying a nail-filing machine under the Ninth Circuit's *Sengoku* decision. The action also resulted in a financial settlement of false advertising "bait-and-switch" claims. The Hon. Andrew J. Guilford (Ret.) meditated the dispute after the close of discovery, expert witness depositions, and the dispositive motion deadline.

11. Attached as **Exhibits 2 through 4** are Declarations from David Grossman, a partner of Loeb & Loeb, Adam Daniels, a partner at Polsinelli, and Rob T. McKay, the former executive director of Feldman Gale. I worked with and mentored Messrs. Grossman and Daniels when they were associates before they became partners at Loeb & Loeb and Polsinelli, respectively. Mr. McKay oversaw the practice and professionalism of every attorney at Feldman Gale.

12. Since September 2024, I have been battling lung cancer while handling my responsibilities in this case and other cases. This is my third cancer diagnosis. I battled Hodgkin's disease (cancer affecting the lymphatic system) before and after graduating from the University of California, Los Angeles (UCLA). I was later diagnosed with and battled Hidradenocarcinoma (cancer arising from sweat glands), which might have been a complication from my cancer treatments in the 1980s. My lung cancer is believed to have the same pathology as my prior stint with Hodgkin's disease. In October 2024, I had a lobectomy. After surgery, I began chemotherapy in December 2024 and finished in February 2025. I had a complication in my recovery that resulted in two additional medical procedures in April 2025 and hospitalizations at Cedars-Sinai for 20 days. Since then, I have been undergoing pulmonary rehabilitation and targeted therapy for my pathology. I kept my medical condition private. I did not leverage it for extensions or as an excuse not to meet deadlines or obligations. I managed my condition along with my professional obligations and responsibilities as I understood them.

**Denial of Rule 37 Motion for Sanctions**

13. The Court referred counsel of record to a special master when it denied PCJV USA, LLC's ("PCJV") Rule 37 motion for sanctions against Plaintiff for discovery violations. The Court ruled that my partner, Arash Beral, and I misled the Hon. Magistrate Judge Alicia G. Rosenberg in interpreting the Case Management Order ("CMO").

There Was No Intent to Mislead the Magistrate Judge

14. While I was undergoing chemotherapy in December 2024 to February 2025, Mr. Beral and I expected Plaintiff to agree to and jointly move for a trial continuance, given the status of the pleadings and party appearances. To our surprise, Plaintiff did not do so in December 2024 and January 2025. In January and February, PCJV USA met and conferred on discovery served in December after granting extensions and reviewing Plaintiff's responses. PCJV USA did not delay to bring a motion to compel but tried to informally resolve objections in the meet and confer process. Plaintiff's counsel did not notify us of a change in position regarding a trial continuance until after circumstances had changed regarding the status of U.S. franchisees, and until around when Plaintiff dug in and began to refuse to produce any documents in discovery, after which we took steps to meet deadlines to enforce Plaintiff's discovery obligations before parties had even made appearances. The stated desire for a trial continuance was used to justify the failure to produce documents falling within Plaintiff's own initial disclosures and to oppose sanctions for failing to comply with court orders even though Plaintiff did not file a motion for a continuance as the Magistrate Judge had prompted.

15. At the March 12, 2025 discovery conference, deadlines under the CMO to complete discovery and hear discovery motions arose. I read the CMO. I apologize for my misunderstanding of the deadline for hearing a motion for sanctions or a motion to compel non-expert discovery. It was my understanding that it was appropriate to move to compel the production of documents at a discovery conference prior to March 14, 2025, no differently than an oral motion to compel, and, if necessary, a Magistrate Judge could proceed with briefing and hearing the motion prior to April 11, 2025. I also believed that a Magistrate Judge could enforce a discovery order or issue a recommendation on a motion for sanctions due to non-compliance with an order issued prior to March 14, not that a motion for sanctions also had to be heard by March 14. I understood the discovery conference procedure

as expediting dispute resolution, not as a means to delay discovery obligations or hearings on motions to compel. I misspoke. I had no intent to mislead Magistrate Judge Alicia G. Rosenberg regarding my understanding of the CMO.

16. Opposing counsel did not contend that Defendants' efforts to obtain discovery via the discovery conference or thereafter in order to resolve the case on the merits was untimely. Nor did Plaintiff appeal the March 12 Order, which established discovery obligations in March through April 11, the deadline for expert discovery. Magistrate Judge Rosenberg was aware of the CMO deadlines as the Magistrate Judge denied our request to compel discovery in response to a second set of discovery and directed the PCJV USA Parties to voluntarily make their damages expert available for deposition on or before April 11, 2025, which we did. After obtaining the March 12 Order, Mr. Beral and I, opposing counsel and Magistrate Judge Rosenberg labored under a misunderstanding of the CMO.

**The OSC re Striking Motions *in Limine***

17. After PCJV USA Parties' counsel met and conferred on five motions *in limine* after serving a substantive letter identifying the evidence and argument they sought to exclude at trial, PCJV USA Parties proceeded with and served only one motion in accordance with the Case Management Order.

18. Plaintiff did not serve an opposition after being served with PCJV USA Parties' moving portion of the joint motion *in limine*. PCJV USA Parties filed their unopposed motion after Plaintiff did not oppose, obviating the need for a reply portion of the joint motion *in limine*. Plaintiff did not inform PCJV USA Parties that it intended to file a late opposition (or one with its motions *in limine*).

19. PCJV USA Parties' counsel did not anticipate Plaintiff filing motions *in limine* the same day its counsel met and conferred upon them, let alone forty-five minutes after the conference of counsel. During the meet and confer, in response to my objection to not receiving a prior letter identifying the evidence sought to be excluded and authorities in support thereof, I requested the opportunity to consider

and fully address Plaintiff's position in the meet and confer process. In response, Plaintiff's counsel stated that he was going to serve "work product" on PCJV USA Parties (not final copies) to further meet and confer. Instead, Plaintiff unilaterally filed the motions in violation of the CMO.

20. The Order striking all three motions *in limine* faults both parties for failing to meet and confer and filing motions without oppositions in them. As to PCJV USA Parties, the Court's Order notes that a different option than filing an unopposed motion *in limine* should have been undertaken. Research had indicated that compliance with expressed deadlines was a proper course of action, rather than presuming or implying a continuance.

21. I am not trying to convey "no harm, no foul" as no opposition was filed. Rather, my intent here is to detail why there is a material difference between PCJV USA Parties' belief that their motion was unopposed and filed in accordance with the CMO, and Plaintiff's knowing failure to comply with the CMO.

22. Plaintiff's counsel was aware of the CMO's prohibition against generally asserted objections to "all" evidence and disguised motions for summary adjudication. He knew of PCJV USA Parties' objections to his disguised motions for summary adjudication. He even acknowledged during the meet and confer that even if Plaintiff's motions *in limine* were "procedurally defective" he was going to file them anyway after he served "work product" on PCJV USA Parties, so we could review his position and authorities in advance of filing and presumably submitting our opposition to him. Plaintiff did not comply with the CMO and unilaterally filed two motions knowing they were non-compliant. There is both a procedural and substantive difference between the two sides' motions *in limine*.

**The OSC re Meet and Confer Efforts**

23. Who prevails at trial should be based on evidence. How the evidence is viewed by the jury should determine who prevails. There were no percipient witness depositions in this case or the prior case, and testimony will be given, heard and

cross examined for the first time at trial. Yet, Mr. Michael Murphy's meet and confers involving substantive matters such as discovery and pretrial filings have been premised on his expressed opinion of the facts. Mr. Murphy is a strong adversary and knows how to litigate, but his actions are more accurate than his words, and in this case he has conjured up a set of facts and left no room for fallibility or disagreement.

24. The concern being expressed is not that Mr. Murphy repeats his opinion of the facts during meet and confers, it is that his opinion is expressed as if the facts at trial have already been decided, and any contrary view of the evidence, including expected testimony and documentary evidence at trial, constitutes a "Rule 11" violation, is based on "false facts" and thus allegedly misstates the law or is somehow contrary to "law of the case." He proceeds as if Plaintiff won summary adjudication on liability, including to deny discovery and to frame the issues the trier of fact must resolve by feeding legal conclusions in instructions.

25. That is not cooperation. That is not honest advocacy. That is a struggle, interfering with conferences and pretrial obligations. It distracts from resolving the case and is designed to unfairly prejudice PCJV USA Parties, including at trial.

26. That has not been the main problem which has led to violation of court orders, however. It does make the job more and needlessly difficult, especially when counsel is undergoing medical procedures and prolonged hospitalizations and therapies while trying to meet deadlines and obligations.

27. The main problem has been Plaintiff's failure to prosecute the case in accordance with the Case Management Order and Civil Pretrial Oder. Even if PCJV USA Parties had not moved to compel compliance with court orders and discovery obligations, they timely served discovery seeking documents lying at the heart of Plaintiff's case, not just within Plaintiff's initial disclosures. Plaintiff refused to produce them in discovery even after multiple opportunities.

28. Plaintiff then failed to prepare or exchange the first set of trial documents in support of its case-in-chief, including jury instructions, verdict forms, exhibits, substantive letters and motions *in limine*. Although the parties had multiple meet and confer conferences, Plaintiff did not do any of the following: (i) timely serve jury instructions or verdict forms, (ii) timely object to PCJV USA Parties' timely served jury instructions or verdict forms, (iii) timely submit any opposition to the one motion *in limine* that was timely served upon him, (iv) timely serve any motions *in limine*, itself, or (v) timely exchange trial exhibits on several agreed-upon dates to exchange and meet and confer upon exhibits well in advance of the deadline for the preparation of the second set of pretrial filings.

29. Mr. Murphy refused for undisclosed reasons to comply with exchange requirements and did not respond to inquiries regarding the same.

30. Compliance with the exchange requirements in the Case Management Order and Civil Pretrial Oder are designed to ensure no unfair prejudice and surprise at trial. And there was no unfair surprise or burden on Plaintiff to prevent it from meeting Plaintiff's pre-trial obligations. It was entirely within Mr. Murphy's control with his team of attorneys at Fox Rothschild copied on pre-trial-filing correspondence to meet the CMO deadlines.

31. As the Friday, July 25, 2025 deadline arrived for the second set of pre-trial filings, Defendants had not received drafts of Plaintiff's portions of the pre-trial filings even before the Court granted the stipulation to extend the Friday close-of-business deadline to 9:00 am on Tuesday, July 29, 2025. After receiving the extension, Mr. Beral provided a plan to meet the extended deadline:

    a. *By Friday at 4:30 pm:* PCJV USA Parties to receive Plaintiff's portions of all the documents for inclusion in the trial binder required by the Court's Civil Pretrial Order;

b. *Monday morning:* PCJV USA Parties work over the weekend to provide their portions of, or feedback on, all the pretrial documents for Plaintiff's review Monday morning;

c. *All day Monday*: The parties work together to finalize the pretrial documents and reach necessary or appropriate compromises; and

d. *Tuesday morning*: Timely file the second set of pre-trial documents.

Attached as **Exhibit 5** is Mr. Beral's July 25, 2025 email to opposing counsel.

32. PCJV USA Parties received no response to Mr. Beral's proposed plan.

33. PCJV USA Parties did not receive any documents on Saturday or Sunday before Monday, July 29, 2025.

34. PCJV USA Parties did not begin to receive pre-trial documents until Monday. My colleagues, Mr. Beral and Mr. Jamison Gilmore, and I then worked over twenty-four hours straight to revise and send documents back to Mr. Murphy's team in order to meet the Tuesday, 9:00 am deadline. Suffice it to say, working over twenty-four hours straight to meet a deadline does not result in ideal work product.

35. Notwithstanding a further extension to 2:00 pm to finish filings, Mr. Murphy or his team ran the clock, again. Although some documents were filed, by 5:00 pm, we still had not received back from Plaintiff a proposed final Pre-Trial Conference Order. We also had not received a full draft of Jury Instructions with Plaintiff's substantive positions supporting objections or supporting proposed instructions we had just received for the first time on Monday.

36. When I finally received Plaintiff's portions of the Pre-Trial Conference Order, I promptly completed Defendants' portions and provided them to Mr. Murphy's team. That left the jury instructions, which I did not receive until approximately 7:00 pm; however, the document I received looked very different from the one circulated earlier in the day that only included Plaintiff's originally asserted proposed instructions without Plaintiff's substantive positions.

37. As to the jury instructions being proposed by Plaintiff, it was as if the prior circulated document that defense counsel had spent all the previous night working on went for naught. There were new proposed jury instructions and new objections to PCJV USA Parties' proposed jury instructions that we thought were not opposed and for which I then had to draft substantive responses. In addition, I had to review and address Plaintiff's newly inserted substantive positions. By the time I got my head around the task, I had hit the proverbial wall. I needed sleep.

38. I started working on the jury instruction at 6:30 am the next morning. I completed them a little after 2:30 pm and forwarded them to my colleague Mr. Gilmore to review and circulate to Plaintiff's team so we could finalize and get documents on file. I subsequently saw and read the Court's OSC regarding pre-trial documents that were already filed and the failure to timely file the Pre-Trial Conference Order and Jury Instructions.

**Mr. Murphy's August 4, 2025 Corrected Declaration**

39. Mr. Beral and I, to PCJV USA Parties' prejudice, have had to respond to repeated attacks, finger pointing and material omissions by Mr. Murphy. It is not the first time in my career I have had to litigate against opposing counsel like Mr. Murphy. Because of the importance of the Court's inquiry, I will address Mr. Murphy's unauthorized declaration filed on August 4, 2025.

40. The declaration is not factual, but an argument designed to avoid accountability and cast aspersions on PCJV USA Parties' counsel. For example, in real time, Mr. Murphy did not object that "Defendants did not follow the Court's guidelines regarding the filing of motions *in limine*." I apologize for any misunderstanding. PCJV USA Parties' filing of an unopposed motion, however, had no bearing on Plaintiff's subsequent filings, which Mr. Murphy knew violated substantive rules and procedural requirements in the CMO.

41. The July 25, 2025 deadline was not met due to Mr. Murphy's failure to comply with the CMO's exchange requirements. The "three primary reasons" argued in his amended declaration are not factual but omit critical facts.

**Exhibit List**

42. There was no unfair surprise to Mr. Murphy regarding exhibits. He had PCJV USA Parties' portion of the exhibit list for months. At the initial meet and confer regarding exhibits, Mr. Murphy pointed out the Court's order requires the parties to break out exhibits that include multiple documents. I assumed he saw or knew that PCJV USA Parties had multiple exhibits listed in state-court and federal filings in need of being broken out. In breaking out and reorganizing PCJV USA Parties' portion of the exhibit list, PCJV USA Parties' discovered that they inadvertently omitted a few verified state-court pleadings and took steps to correct that mistake.

43. To be clear, Mr. Murphy did not object in the meet-and-confer process to amending the exhibit list. He wanted to amend his portion of the list as well. He also did not object to the inclusion of PCJV USA Parties' 2025 financial records, which were referenced during the expert deposition and in his report, but which were not available when the initial exhibit list was filed. They were PCJV USA Parties' only "new" Exhibits not disclosed in discovery or in the prior litigation and not referenced on the initial exhibit list, and I understood Mr. Murphy wanted them.

44. PCJV USA Parties repeatedly set dates to exchange exhibits. Mr. Murphy kept promising to exchange exhibits and kept not doing so.

45. PCJV USA Parties prepared draft objections to Plaintiff's exhibits to the extent we knew we had them in our possession. We informed Mr. Murphy we needed to exchange exhibits that were unknown to complete the task. We assumed for good reasons he was also preparing his case as well. He did not object or say he could not prepare objections to documents already in his possession, until he needed an excuse for not being prepared to meet the July 25, 2025 deadline.

46. Mr. Murphy's opinion regarding the number of exhibits this case requires is argument, not factual. To begin with, it is based on Plaintiff's suppression of evidence, which has substantially reduced Plaintiff's exhibit count. Plaintiff is trying to prosecute trademark claims based on rebuttable presumptions. To the extent that a rebuttable presumption applies, which is an issue in the case, PCJV USA Parties would bear a burden of production that requires more documentation, which PCJV USA Parties are prepared to provide to the jury. Five hundred exhibits, most marked with asterisks for use when and as necessary, is relatively small for a case involving 15 years of formation, course of performance, waiver and ratification claims and defenses.

47. There was nothing "impenetrable" about PCJV USA Parties' exhibit list or actual Exhibits. If believed, Mr. Murphy waited to begin preparing objections until after the Exhibit exchange, which he repeatedly delayed, causing his own problem and the very problem about which he attempts to shift the blame to PCJV USA Parties.

48. Mr. Gilmore addresses the misleading accusations directed towards him regarding his telephone conference with Mr. Murphy on July 24, 2025, the day before the July 25 deadline. Suffice it to say, complying with the Court's order about marking Exhibits with asterisks is not a "concession" that those documents will not be used at trial. Also, Mr. Gilmore was directed to take and undertook steps to remove "duplicates," which were not "intentionally" filed. He had documents run through e-discovery platforms and hand reviewed documents to eliminate several duplicates. Documents were reorganized in light of expected questioning by counsel, but that is a separate issue, which Mr. Murphy is discussing out of context to fault opposing counsel when a timely exchange of exhibits avoids these issues. A timely exchange of exhibits enables PCJV USA Parties to remove "duplicates" on the parties' two lists. Inter-party duplicates never prevented Plaintiff from meeting its obligations.

49. Mr. Murphy's objection to receiving an amended Exhibit list in advance of the Exhibit exchange also buries the lead. Had Mr. Murphy exchanged Exhibits on the multiple times previously agreed, there is little or no issue.

50. Both sides had to engage in hard work. Having to engage in hard work is why the Court's pre-trial order contemplates timely exchanges between counsel, not counsel waiting to the last second to meet obligations, only to complain that counsel had to engage in hard work to meet a deadline.

51. Mr. Murphy's sequence of events is mistaken and blurred. During the meet and confer process Mr. Murphy did not raise the Rule 37 motion as a reason not to exchange Exhibits listed on Plaintiff's Exhibit list. To the extent changes needed to be made from the as-filed Exhibit list, that plainly could have been handled after the listed Exhibits were exchanged.

**Jury Instructions**

52. Mr. Murphy suggests that he "put off finishing jury instructions" until he finished objections to exhibits, which is not accurate. Pursuant to the Court's order, Mr. Murphy was supposed to exchange jury instructions and objections months before the issues he discusses in his declaration.

53. The Court will review the parties' respective jury instructions. PCJV USA Parties' proposed instructions did not cause delay. Plaintiff simply did not do the work and provide a set of jury instructions, including trademark instructions, until July 28, 2025, less than 24 hours before the July 29, 2025 deadline.

54. Mr. Murphy's arguments regarding "false statements," "bad law," "distortions of the Ninth Circuit instructions," and "instructions for which there is no evidence" or somehow violate preliminary rulings are wrong, did not delay Plaintiff in fulfilling its obligation, and do not belong in a declaration.

55. Mr. Murphy's July 24, 2025 "zoom" meet and confer request was not rejected. He was accusing Defendants' counsel of "Rule 11" violations and citing other doctrines upon which Plaintiff, for good reason, did not move for summary

judgment or adjudication, as that would have given PCJV USA Parties the opportunity to frame and support the issues for trial and remove Mr. Murphy's ability to levy these accusations and to swing them around like a cudgel against PCJV USA Parties.

56. To be productive, PCJV USA Parties needed to see Plaintiff's set of instructions and basis for his objections. As of July 24, 2025, Mr. Murphy had not submitted jury instructions or objections as required by the Court's orders to meet and confer upon. He put the "cart before the horse" to set up a proffered excuse for his failure to timely circulate proposed jury instructions and objections and subsequent failure to timely provide supporting positions for objections and additional jury instructions.

57. Mr. Murphy's actions bear out that he had little or no interest in issue resolution. He avoided meeting and conferring on the parties' jury instructions and objections after he finally drafted and served Plaintiff's jury instructions and later served objections, additional jury instructions and supporting positions. Multiple requests to discuss the same were ignored by him in the process.

**Final Pre-Trial Conference Order**

58. Mr. Murphy's failure to timely prepare and circulate his portion of the Final Pretrial Order was a consequence of his own doing. His opinion about PCJV USA Parties' portion of the documents, including objections to exhibits, is not a justification to delay the preparation and circulation of his portions.

59. To aid Mr. Murphy in the process, I originally drafted a proposed set of stipulated facts. Mr. Beral edited them and circulated a draft set to Mr. Murphy, who proceeded to completely re-write them. While Mr. Beral addresses this more fully in his declaration, Mr. Murphy's entirely re-worked proposal altered not only proposed facts, but he took other claimed statements out of context in order to change their meaning, or risk changing their meaning at trial. I have witnessed Mr. Murphy manipulate ambiguities disregarding the truth multiple times.

60. I thank the Court for the opportunity to be heard. I welcome the special master's investigation. I hope for a fair and productive trial.

I declare under penalty of perjury under the law of the United States that the foregoing is true and correct. Executed on August 6, 2025, in Los Angeles, California.

*/s/ Todd M. Malynn*
Todd M. Malynn