**BLANK ROME LLP**
Todd M. Malynn (SBN 181595)
todd.malynn@blankrome.com
Arash Beral (SBN 245219)
arash.beral@blankrome.com
Jamison T. Gilmore (SBN 322100)
jamison.gilmore@blankrome.com
2029 Century Park East | 6ᵗʰ Floor
Los Angeles, CA 90067
Telephone:   424.239.3400
Facsimile:   424.239.3434

Attorneys for Defendants, Counterclaimants, and
Third Party Plaintiffs PCJV USA, LLC, PCI
TRADING LLC, POTATO CORNER, LA
GROUP, LLC, GK CAPITAL GROUP, LLC,
NKM CAPITAL GROUP, LLC and GUY
KOREN, and Defendants J & K AMERICANA,
LLC, J&K LAKEWOOD, LLC, J&K
OAKRIDGE, LLC, J&K VALLEY FAIR, LLC, J
& K ONTARIO, LLC, J&K PC TRUCKS, LLC,
HLK MILPITAS, LLC, and GK CERRITOS, LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHAKEY'S PIZZA ASIA VENTURES, INC, a Philippines corporation,<br><br>Plaintiff,<br><br>vs.<br><br>PCJV USA, LLC, a Delaware limited liability company; PCI TRADING , LLC, a Delaware limited liability company; GUY KOREN, an individual; POTATO CORNER LA GROUP, LLC, a California limited liability company; NKM CAPITAL GROUP, LLC, a California limited liability company; J & K AMERICANA, LLC, a California limited liability company; J&K LAKEWOOD, LLC, a California limited liability company; J&K VALLEY FAIR, LLC, a California limited liability company; J & K ONTARIO, LLC, a California limited liability company; HLK MILPITAS, LLC, a California, limited liability company; GK CERRITOS, LLC, a California, limited liability company;  J&K PC TRUCKS, LLC, a California limited liability company; and, GK CAPITAL GROUP, LLC, a California | Case No. 2:24-CV-04546-SB(AGRx)<br><br>*Hon. Stanley Blumenfeld, Jr.*<br><br>**THE PCJV USA PARTIES' TRIAL BRIEF (L.R. 16-10)**<br><br>Complaint Filed:   May 31, 2024<br>Trial Date:          August 18, 2025 |

1  limited liability company and DOES 1 through 100, inclusive,

2                          Defendants.

3  _____

4  PCJV USA, LLC, a Delaware limited liability company; PCI TRADING LLC, a
5  Delaware limited liability company; POTATO CORNER LA GROUP LLC, a
6  California limited liability company; GK CAPITAL GROUP, LLC, a California
7  limited liability company; NKM CAPITAL GROUP LLC, a California limited liability
   company; and GUY KOREN, an individual,
8
                        Counter-Claimants,
9
           v.
10
11 SHAKEY'S PIZZA ASIA VENTURES, INC, a Philippines corporation,

12                     Counter Defendant.

13 _____

14 PCJV USA, LLC, a Delaware limited liability company; PCI TRADING LLC, a
15 Delaware limited liability company; POTATO CORNER LA GROUP LLC, a
   California limited liability company; GK
16 CAPITAL GROUP, LLC, a California limited liability company; NKM CAPITAL
17 GROUP LLC, a California limited liability company; and GUY KOREN, an individual,
18
19                   Third Party Plaintiffs,
20         v.
21 PC INTERNATIONAL PTE LTD., a Singapore business entity; SPAVI
22 INTERNATIONAL USA, INC., a California corporation; CINCO CORPORATION, a
23 Philippines corporation; and ROES 1 through 10, inclusive,
24
                     Third Party Defendants.
25
26
27
28

THE PCJV USA PARTIES' TRIAL BRIEF

# **TABLE OF CONTENTS**

I.    RESPONSE TO INTRODUCTION ........................................................1

    A.    SPAVI Parties Mischaracterize the Trial ........................................5

    B.    SPAVI Parties Mischaracterize the Nature of the Dispute ..............7

II.   RESPONSE TO SUMMARY OF SPAVI'S TRADEMARK AND UNFAIR COMPETITOIN CLAIMS, ELEMENTS AND KEY EVIDENCE (COUNTS I TO VIII)............................................................8

    A.    Proper Legal Analysis of Trademark Ownership ...........................8

    B.    Proper Legal Analysis of Trademark Licensing ...........................11

    C.    Remedy, If Any, Should Be Limited to Injunctive Relief ............13

III.  RESPONSE TO SUMMARY OF SPAVI'S QUANTUM MERUIT CLAIM, ELEMENTS, AND KEY EVIDENCE ....................................15

IV.   RESPONSE TO SUMMARY OF SPAVI'S MISAPPROPRIATION OF TRADE SECRETS CLAIM, ELEMENTS, AND KEY EVIDENCE.....16

V.    RESPONSE TO SPAVI'S SUMMARY OF COUNTERCLAIMS ........17

VI.   EVIDENTIARY ISSUES........................................................................19

VII.  DISPUTED ISSUES OF LAW & ABANDONMENT OF ISSUES.......19

VIII. BIFURCATION ...................................................................................19

IX.   ATTORNEYS' FEES............................................................................19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Cases**

*American Circuit Breaker Corp. v. Oregon Breakers Inc.*,
406 F.3d 577 (9th Cir. 2005) ............................................................... 5

*Cosmonova, LLC v. BioFilm, Inc.*,
763 F. Supp. 3d 1157 (S.D. Cal. 2025) ................................................ 16

*In re De Laurentiis Ent. Grp. Inc.*,
963 F.2d 1269 (9th Cir. 1992) ............................................................ 15

*Precision Door Service, Inc. v. Bell*,
No. C 02–01108 CW, 2002 WL 655053 (N.D. Cal April 18, 2002) ...................... 9

*Yuga Labs, Inc. v. Ripps*,
Case No. CV 22-4355-JFW(JEMx), 2023 WL 7089922
(C.D. Cal. Oct. 25, 2023) .................................................................... 14

**Other Authorities**

*McCarthy on Trademarks and Unfair Competition,* § 18:15 (5th ed.) .............. 10, 14

In accordance with L.R. 16-10(c), and to assist the Court in understanding the differing legal and factual positions of the parties, PCJV USA, LLC and its related parties (collectively, "Defendants" or the "PCJV USA Parties") respectfully submit this Trial Brief in response to the memorandum of contentions of law and fact ("Contentions") filed by Shakey's Pizza Asia Ventures Inc. ("Plaintiff" or "SPAVI") and its related parties (collectively, the "SPAVI Parties") at Dkt. No. 199.

## I.    RESPONSE TO INTRODUCTION

As background, SPAVI filed this lawsuit—claiming that the PCJV USA Parties became "holdover licensees" years after "negotiations" (which were based on a representation from SPAVI that it would be bound by any agreement the PCJV USA Parties made with Cinco) failed to produce a new agreement by the time of dismissal of the state court action—three days after the PCJV USA Parties settled with Cinco, the original trademark registrant and former joint venture partner.

Testimony and a comprehensive written evidentiary record will establish at trial the parties' mutual intentions and the development of their business relationship from its inception. The history is complex and, at times, confusing, but the documentary evidence provides a clear narrative. The context of the parties' understandings, their course of dealing, and their evolving agreements—particularly given the start-up nature of the U.S. business—are critical to understanding the case. The key chronological events are as follows:

1. In 2008, the parties first expressed a shared intention to introduce the Potato Corner brand to the United States.

2. In 2009, before any Potato Corner restaurant opened, the parties executed the NKM Master License Agreement, granting NKM exclusive license rights. NKM paid for rights to open 10 restaurants.

3. Later in 2009, before the first Potato Corner opened in Santa Anita, the relationship shifted from a simple license arrangement to a joint venture partnership after Cinco was advised that a new franchise system would need to be developed

1

and implemented to comply with California franchise law. Instead of undertaking the development of the franchise system on its own, Cinco relied on Koren and his group—came to be known as the "LA Group"—to take on this responsibility. This transition occurred prior to the formal establishment of PCJV.

4. When PCJV was officially formed in July 2010, the parties already had agreed that PCJV and LA Group was granted rights to use, control and license the intellectual property, and that those rights were "vested" rights.

5. Starting in 2011 and continuing periodically, the parties appear to have objectively and mutually operated under a license agreement known as the "Trademark License Agreement" for a 50-year term,[1] which was referenced and ratified in annual Franchise Disclosure Documents (FDDs) and regulatory filings. The SPAVI Parties claim that the "Trademark, Copyright, and Know-How License Agreement" (which Koren previously reported the parties had entered based on his knowledge[2]) is unenforceable. The SPAVI Parties failed to produce a "Trademark License Agreement" and disavow any such agreement.

6. In June 2012, the parties executed a Master Services Agreement authorizing the LA Group to license and sublicense the brand for an indefinite

---

[1] Evidence will establish that the parties agreed and reported that the partnership had indefinite, perpetual, or lifetime rights. DLA Piper advised, however, that if the parties were to execute a license agreement, that a term must be included.

[2] As a side note, the SPAVI Parties are laboring under a significant misconception by claiming that the parties were required to "execute" a license agreement, rather than simply "enter" into one for Cinco's benefit. Even assuming there were an obligation to "execute" for Cinco's benefit, several points undermine SPAVI's position. First, Koren did execute the agreement he was presented with by Cinco's agent, even if it was not the correct version. Second, the parties or their agents executed certain FDD-related documents, which confirmed the accuracy of the information contained within them. Third, the parties are contractually bound to "perform all acts and execute and deliver all documents or instruments required or necessary to fully implement or consummate the transactions contemplated in and the intent underlying [their agreements]." If the dispute centered solely on an unsigned Trademark License Agreement, SPAVI (and/or Cinco) still would be required to execute it in accordance with the terms disclosed in the FDDs. The real issue in this case arises from SPAVI's assertion that it did not assume any burdens or obligations in PCJV, which has led to a complex legal dispute involving questions of ownership rights, first use, control, naked licenses, an assignment in gross, and related matters.

duration, reflecting the parties' mutual understanding and the operational structure of the Potato Corner business in the United States.

7. In August 2012, the parties executed both the Joint Venture Agreement ("JVA") and the LLC Agreement. They made the JVA operative October 1, 2009. In October 2012, they executed a "First Amendment" to the JVA to address specific governance modifications, while the LLC Agreement remained unchanged.

8. On October 16, 2012, the parties reached an agreement that the "30/30 share of Franchise Fees and Royalties" would be included as part of PCJV's distributive income, rather than being paid out under their previous expectations, which would have, among other things, conflicted with franchise regulations. Indeed, PCJV was undercapitalized and faced challenges in providing required franchisee support to maintain a U.S. franchise system, making it financially unfeasible to pay out 60% of the franchise fees and royalties collected (split 30/30 between the respective groups). Therefore, the parties agreed to forego these fees and only would receive distributions from PCJV when the company was financially able to make them. Each year, during the audit process, the parties jointly waived any entitlement to income under any license or services agreement.[3]

9. In 2013, the LA Group formalized its own role within PCJV and PCJV's governing documents by executing a written partnership agreement relying on the authority granted and vested to it in the LLC Agreement.

10. Between 2015 and 2018, the parties have ongoing communications and board minutes document discussions about operational challenges, undercapitalization, restructuring proposals, and negotiations for a new master license agreement in exchange for changes in ownership structure that would benefit the LA Group (*i.e.,* provide the LA Group 100% ownership of PCJV).

---

[3] The SPAVI Parties also labor under the misconception that the LA Group collected services fees. The LA Group never did collect service fees. Those who worked for PCJV, rather, collected salaries which always was independent of service fees owed to the LA Group under the Master Services Agreement.

11. In April 2018, a board meeting and subsequent resolution triggered state court litigation. The meeting minutes, resolution, verified pleadings, declarations, and court filings from this period go into the parties' respective positions and understandings as to their mutual meetings of the minds.

12. Despite the ongoing disputes, the parties continued to ratify their agreements and operational practices through annual FDDs, regulatory filings, and correspondence with state agencies, demonstrating continued mutual recognition of the franchising structure and long-term rights.

The evidence will show that PCJV USA Parties have long-standing, pre-existing rights—regardless of how they are characterized—to use, control, and exercise exclusive quality control over the U.S. Potato Corner marks. The PCJV USA Parties also objected to the purported transaction between SPAVI and Cinco, particularly given that these entities shared officers, directors, and legal counsel both before and after the transaction. At the time, the PCJV USA Parties were actively seeking to acquire Cinco's 60% interest and any associated licensor rights in the same Potato Corner USA assets.

SPAVI contends that the PCJV USA Parties' exercise of their established rights to the U.S. Potato Corner trademarks would "destroy SPAVI's [U.S.] Potato Corner acquisition." In truth, it is SPAVI that is attempting to take over the Potato Corner business in the United States—a franchise operation that the PCJV USA Parties built and developed over the past 15 years. SPAVI claims to be unclear about the issues for trial, and accuses Defendants—without citing legal authority—of "falsely" asserting well-settled principles of trademark law, including the fundamental rule that trademark rights in the United States are territorial and arise from lawful first use. SPAVI further alleges, again without specificity, that Defendants are advancing other "false propositions of law."

The territorial nature of U.S. trademark law is well established. For example, The Jacmar Companies' ownership of the Shakey's Pizza brand in the United States

is based on this principle. As the Ninth Circuit explained in *American Circuit Breaker Corp. v. Oregon Breakers Inc.*, 406 F.3d 577, 581-82 (9th Cir. 2005), citing the Supreme Court's *Katzel* decision: "The [1923 U.S. Supreme Court] Katzel decision marked a dramatic change in trademark law by adopting the principle of 'territoriality' of trademarks and moving away from the rule of 'universality.'… Under the territoriality principle, a trademark has a separate legal existence in each country and receives the protection afforded by the laws of that country."

SPAVI directly challenges well-established principles of U.S. trademark law, likely because it is undisputed—even by SPAVI at the preliminary injunction stage—that Cinco was not the first lawful user of the U.S. trademarks. Rather than address this fundamental issue, SPAVI attempts to distract from the core facts by attacking the PCJV USA Parties, despite clear Supreme Court precedent holding that there are no "international" trademark rights recognized in the United States.[4]

Put simply, it is SPAVI that is misrepresenting the law in an apparent attempt to mislead the jury. Under U.S. law, trademark rights are based on senior use within the United States and on ownership being maintained through continuous use and ongoing quality control. Without evidence of senior use and proper maintenance of ownership, SPAVI's trademark registrations are invalid and should be transferred to the rightful owner.

## A.    SPAVI Parties Mischaracterize the Trial

The SPAVI Parties fundamentally misrepresent the nature and focus of the upcoming trial. Contrary to their assertions, the trial will address the core issues of ownership, the right to use, and control over registered and unregistered U.S. Potato Corner trademarks. These rights were allegedly wrongfully acquired out from under PCJV USA Parties in March 2022 and subsequently terminated on May 31, 2024.

---

[4] While there are mechanisms available to foreign trademark holders to pursue registration in the United States through certain international pathways, which essentially allow for the filing of "intent to use" applications—the route that Cinco originally took with the United States Patent and Trademark Office—lawful first use in the United States still controls priority and trademark rights.

The proceedings will also examine the SPAVI Parties' alleged liability for conspiring to: (a) usurp the PCJV USA Parties' superior trademark rights; (b) breach, aid and abet, or induce breaches of fiduciary and contractual obligations; and (c) disrupt established contractual relationships and interfere with the economic advantages derived from PCJV's U.S. Potato Corner franchise system.

At the heart of this dispute is the longstanding joint venture (PCJV), the scope and duration of trademark rights as defined by their partnership and PCJV's governing and related agreements, and the legal ramifications of SPAVI's alleged acquisition and termination of U.S. trademark rights from the original registrant, Cinco. The evidence and applicable law support the PCJV USA Parties' claims to superior rights in the marks—whether those rights arise from contract, the parties' course of performance, or common law. The jury will be tasked with resolving critical factual disputes, including the intent of the joint venture partners, the structure and terms of their agreements, the conduct that shaped their relationship over more than a decade, and the nature of ownership and licensing rights—whether express or implied. The trial will also address breaches of fiduciary and contractual duties resulting from the alleged acquisition in March 2022 and the alleged termination in May 2024, as well as the resulting damages.

Moreover, aside from the acquisition of supplies—which were available on the open market, fully paid for by PCJV USA Parties, and which SPAVI agreed to continue supplying even after the alleged termination—there is no voluntary relationship between PCJV USA Parties and SPAVI. SPAVI is alleged to have acquired U.S. trademark rights over the objection of the PCJV USA Parties, without assuming Cinco's fiduciary and contractual obligations and in the midst of ongoing litigation. Notably, for 15 years, neither license fees nor service fees were paid by the joint venture. The law and evidence to be presented at trial will refute SPAVI's unsupported claims of quantum meruit and misappropriation of trade secrets.

6

In sum, the trial will focus on the true nature of the parties' rights and obligations under the joint venture, the legitimacy of SPAVI's acquisition and termination of trademark rights, and the resulting legal and factual consequences. The PCJV USA Parties will demonstrate, through both law and evidence, their superior rights in the U.S. Potato Corner trademarks and the SPAVI Parties' liability for the alleged wrongful conduct (with or without trademark ownership).

### B.    SPAVI Parties Mischaracterize the Nature of the Dispute

This case does not concern a so-called "holdover license," despite SPAVI's repeated assertions and the preliminary injunction ruling, which was based on a limited evidentiary record and did not fully address the parties' mutual intent or the scope of their rights and obligations regarding the U.S. Potato Corner trademarks. At trial, the Court and jury will be presented with comprehensive testimony and documentary evidence establishing the key facts as described above.

It will be for the jury to determine, in light of SPAVI's disavowal of any purchase of interests, rights, or obligations in PCJV (including those under the parties' agreements and mutual understanding), whether PCJV is the true owner of the U.S. Potato Corner marks—at common law, under the PCJV agreements or under the settlement agreement with Cinco.

Indeed, PCJV was the product of careful negotiation, balancing legal, tax, immigration, and operational considerations. The shift from licensing to franchising was a major strategic and regulatory milestone. For over a decade, the parties' conduct, agreements, and mutual understanding reflected a commitment to long-term, co-owned trademark rights—not a mere license, let alone a "holdover license." The evidence at trial will demonstrate that PCJV's rights in the U.S. Potato Corner trademarks are rooted in partnership, fiduciary duty, and the parties' express and implied agreements—not in any at-will or holdover arrangement.

The LA Group had full control over building and overseeing the Potato Corner brand in the United States for the mutual benefit of all partners. The parties'

conduct, including the design and operation of U.S. Potato Corner restaurants, was consistent with this understanding. It is for the jury to resolve whether PCJV, in light of SPAVI disavowing that it purchased any interests, rights or obligations in PCJV, including obligations under the parties' meeting of the minds and PCJV's governing documents relating to trademark use and licensing, is the true owner of the U.S. Potato Corner marks at common law, under any or all PCJV agreements, or under Koren's settlement agreement with Cinco.

## II.    RESPONSE TO SUMMARY OF SPAVI'S TRADEMARK AND UNFAIR COMPETITOIN CLAIMS, ELEMENTS AND KEY EVIDENCE (COUNTS I TO VIII)

SPAVI's submissions regarding its trademark claims fail to address the core legal issues and instead focus on disparaging Defendants. Rather than providing substantive legal analysis or engaging with the elements and evidence relevant to the claims at issue, SPAVI's contentions are largely composed of accusations and attempts to sidestep a full and fair jury trial on the merits as set forth in the pleadings. This approach does not advance the resolution of the actual legal and factual disputes.

### A.    Proper Legal Analysis of Trademark Ownership

The threshold issue in SPAVI's trademark claims is the question of ownership. This case presents competing claims to ownership between SPAVI, who asserts rights as an assignee, and PCJV, who claims to be the first lawful, continuous, and exclusive user of the U.S. trademarks. Both parties trace their claims to Cinco, the original registrant, but it is undisputed that Cinco never made lawful trademark use of the marks in the United States. This is important because, under U.S. law, trademark rights are established by first lawful use in commerce within the United States, not merely by registration.

SPAVI's Contentions rely heavily on the presumption of ownership that comes with a registration certificate, but this presumption is rebuttable. The proper

legal analysis requires two key factual determinations: (1) whether Cinco actually owned any U.S. trademark rights that it could transfer in 2022, and (2) whether SPAVI acquired a superior claim to those rights in 2022. The PCJV USA Parties dispute SPAVI's claim to ownership and assert that they either owned the marks or acquired them in 2024. Under the Lanham Act, and as clarified by relevant case law, ownership in a scenario involving a long history of use, assignments, and agreements is determined by a multi-step analysis:

   *Step 1: Determining the Senior User*

   The first step is to identify the senior user of the mark, which is governed by the two-step analysis set forth in *Sengoku Works Ltd. v. RMC International, Ltd. See Precision Door Service, Inc. v. Bell,* No. C 02–01108 CW, 2002 WL 655053, at *6 (N.D. Cal April 18, 2002) (applying *Sengoku* to franchises).[5] This analysis is particularly relevant when a foreign registrant and an exclusive domestic user are involved, as in this case, when the initial contracts are or might not be dispositive, including when the foreign registrant disavows the terms and conditions upon which the domestic exclusive user's first lawful and continuous use might inure to its benefit. Courts first look at the parties' contracts governing the first lawful use in the United States; if not dispositive, courts apply a multi-factor analysis which balances first use arguments, with contractual expectations and consumer associations with the brand. Here, the evidence will show that PCJV, through LA Group, was vested with licensing and quality control authority for the U.S. trademarks, and that the brand's goodwill in the U.S. was associated with PCJV. As such, PCJV is the senior user under *Sengoku*, and Cinco could not transfer rights it did not possess. As McCarthy notes, "Trademark ownership may be assigned, but

---

[5] Exclusive domestic users of trademarks registered by foreign entities, by statutory definition, are alleged "related companies" of the foreign registrants—that is the basic *Sengoku* fact pattern. The Ninth Circuit's *Sengoku* decision necessarily recognizes that exclusive domestic users have the right to rebut the presumption afforded by a registration under the "related company" statute, so as to prove that their use of the registered trademark actually inured to their own benefit as true owners of the trademarks, not to the benefit of a foreign registrant.

the assignor may transfer only what it owns." J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition,* § 18:15 (5th ed.)

*Step 2: Effect of Subsequent Conduct and Agreements*

Once the senior user is established, the next inquiry is whether any subsequent conduct or agreements altered the ownership landscape. If the jury finds that PCJV was not the senior user but was instead a related company licensee, then the analysis shifts to whether Cinco engaged in a "naked license" (*i.e.,* failed to exercise quality control) or whether SPAVI's acquisition in 2022 was an assignment in gross (*i.e.,* without the associated goodwill). If so, SPAVI would not have acquired valid trademark rights, and the PCJV USA Parties would have acquired the marks in 2024 through their settlement with Cinco.

If SPAVI did acquire the trademarks in 2022, it would have done so subject to all pre-existing licensing obligations and restrictions, including any injunctions. As McCarthy explains, "'It is elementary ancient law that an assignee never stands in any better position than his assignor,' [meaning that] once an assignee has notice of an injunction against the assignor, it is bound to comply." McCarthy, *supra,* § 18:15 (citation omitted).

The Membership Interest Purchase Agreement ("MIPA") is strong evidence that SPAVI, who denies being obligated by licensing burdens of its assignor, did not acquire the licensing burdens attached to the U.S. trademarks, as it states that all "attached" rights (*i.e.,* Cinco's licensing obligations) were sold to the PCJV USA Parties. The MIPA expressly states that the rights were transferred "unencumbered" to Koren, with no requirement for a license from SPAVI. This is consistent with the governing documents of PCJV, which prohibit the transfer of rights or obligations without prior written consent—consent that was not given.

*Step 3: Related Company and Quality Control Issues*

If PCJV was not or did not become the U.S. trademark owner in 2022 or 2024, there must be a determination whether PCJV was a related company licensee,

10

whether SPAVI engaged in a naked license, or whether another defense to enforcement applies. If a defense is established, priority of use again controls.

The evidence will show that PCJV was not a related company licensee, particularly after 2022. Cinco did not exercise quality control over PCJV's use of the marks, and SPAVI never had or exercised such control. There is no evidence that SPAVI had a contractual right to control PCJV, nor did it ever seek to exercise such control, including through the courts. Moreover, the PCJV USA Parties actively objected to Cinco's and SPAVI's attempts to circumvent the joint venture and PCJV's trademark rights.

In summary, the proper legal analysis of trademark ownership in this case requires a fact-intensive inquiry into a partnership, history of use, the nature of an assignment, the existence (or lack) of quality control, and the effect of subsequent agreements. The evidence will show that SPAVI's reliance on recorded documents alone will fall short on ownership, and that PCJV's rights as the senior user, or as the party acquiring rights in 2024, are superior under U.S. trademark law.

## B.    Proper Legal Analysis of Trademark Licensing

The second element of SPAVI's trademark claims centers on whether the PCJV USA Parties continued to use the U.S. trademarks without authorization after May 31, 2024—three days after their settlement with Cinco—even though a tolling agreement with SPAVI was in place. SPAVI asserts that it will rely on Mr. Koren's testimony to establish unauthorized use. However, even if SPAVI could prove by a preponderance of the evidence that it acquired enforceable trademark rights in 2022, SPAVI cannot prevail unless it also demonstrates that PCJV did not possess a pre-existing, long-term, or non-terminable trademark license. This includes consideration of Cinco's fiduciary and contractual obligations—both express and implied—not to deprive or interfere with the benefit of the LA Group's bargain, which was struck when Messrs. Koren and Magsaysay restructured and partnered to

create the U.S. Potato Corner franchise system. Any rights SPAVI may have acquired would remain subject to PCJV's prior rights.

The record is devoid of any evidence that the parties ever intended to create "at-will" rights. In fact, the evidence overwhelmingly demonstrates that the parties reached a meeting of the minds regarding long-term rights, conducted business accordingly for over a decade, and publicly reported this intent through Franchise Disclosure Documents (FDDs).

<u>Key Evidence Supporting Long-Term Licensing Rights</u>

- *Vesting of Branding Rights in the Joint Venture*: Cinco's initial promise was to convert its unlawful license to NKM into long-term franchisee rights, with Koren also owning and operating the U.S. franchisor. Cinco "vested" branding rights at the franchisor level in the joint venture, which served as the vehicle for expanding Potato Corner in the United States.

- *Negotiations and Agreements*: The parties' negotiations resulted in the LA Group securing long-term branding rights under various agreements. While Cinco's consideration included entry into a master license agreement, PCJV's rights were vested and structured to be lifetime rights, terminable only by a supermajority vote or further agreement among PCJV's partners. Alternatively, PCJV owned common law rights based on the parties' conduct, as recognized under *Sengoku*.

- *Rejection of At-Will Rights*: In 2009, Koren, and in 2010, the LA Group, expressly rejected at-will branding rights, precluding any implied right of at-will termination. Such a right would also violate fiduciary duties and the implied covenant of good faith and fair dealing underlying the PCJV agreements, which was designed to protect the LA Group's benefit of the bargain.

- *Long-Term Rights*: When DLA Piper drafted a 10-year term, the LA Group demanded and obtained, with Magsaysay's support, "lifetime" branding

rights in the joint venture. The parties later agreed to a trademark license agreement with a 20-year term and three 10-year renewal options, offered by Cinco to address legal concerns about indefinite, perpetual rights.

- *Course of Performance*: For over a decade, the parties' course of performance—documented in FDDs and Board minutes—demonstrated a mutual waiver of license and service fees in favor of growth and regulatory compliance, further confirming their understanding and agreement regarding long-term rights.

Whether established by written, verbal, or implied-in-fact agreement, course of performance, fiduciary obligations, the implied covenant of good faith and fair dealing, detrimental and reasonable reliance, waiver, estoppel, etc., the evidence shows that the PCJV USA Parties held an enforceable long-term, or at minimum, a non-terminable-at-will right to use the U.S. trademarks. As a result, SPAVI cannot meet its burden of proof by a preponderance of the evidence that PCJV's use after May 31, 2024, was unauthorized. The totality of the evidence supports the conclusion that PCJV's rights to use the trademarks were not subject to unilateral termination by SPAVI, and any rights SPAVI may have acquired were necessarily subordinate to these pre-existing, long-term rights.

## C.  Remedy, If Any, Should Be Limited to Injunctive Relief

SPAVI has not established a proper foundation for damages, and its Contentions reflect a misunderstanding of the applicable burden of proof. Under the Lanham Act, the standard for liability is likelihood of confusion, and, where there is a showing of likely irreparable harm, the typical remedy is injunctive relief—not monetary damages. The mere existence of a likelihood of confusion does not equate to proof that the plaintiff has actually suffered damages or that the defendant has been unjustly enriched. To recover damages or disgorgement, there must be evidence of actual confusion, willful intent to infringe, or similar equitable basis based on a demonstrable, unfair or harmful change in circumstances caused by the

alleged infringer and not caused by the plaintiff's own conduct. *See Yuga Labs, Inc. v. Ripps*, Case No. CV 22-4355-JFW(JEMx), 2023 WL 7089922, at *10 (C.D. Cal. Oct. 25, 2023) (stating totality of the circumstances are considered, however a "defendant's mental state is 'a highly important consideration….'").

In this case, there is no evidence of lost sales attributable to the alleged infringement. For over 15 years, no royalties were paid, and for good reason: PCJV operated as both a joint venture partnership and the U.S. franchisor. The structure of the business precluded the lawful extraction of royalties from the franchise system, and any contemplated royalty payments to Cinco were always tied to an equal payment of service fees to the LA Group for its role in creating, developing, and growing the Potato Corner brand in the United States—a benefit that now accrues to SPAVI. Again, "[i]t is elementary ancient law that an assignee never stands in any better position than his assignor…." McCarthy, *supra*, § 18:15 (citation omitted).

There is also no basis for a claim of unjust enrichment. Cinco never asserted a breach of contract claim for failure to pay royalties, and SPAVI itself benefited from PCJV's use of the trademarks prior to the preliminary injunction by maintaining and expanding the brand's market presence—an asset SPAVI sought to acquire. Additionally, although the Magistrate Judge ordered SPAVI to produce all communications with PCJV's U.S. franchisees, SPAVI did not do so. After the preliminary injunction, SPAVI apparently had more communications with these franchisees than Defendants did, and SPAVI apparently authorized third-party franchisees to continue using the U.S. marks. By refusing to produce its own communications with franchisees, SPAVI deprived Defendants of the ability to verify which franchisees had SPAVI's authorization to use the Potato Corner brand, leaving no basis to hold Defendants responsible for the actions of third parties.

Finally, Defendants have consistently maintained a good faith belief in their superior rights to use the trademarks. Their refusal to waive pre-existing rights under PCJV's governing documents and the settlement agreement is protected, and

there is no evidence of willful trademark infringement in the traditional sense. The Court is fully capable of enforcing its own preliminary and permanent injunction orders under the Federal Rules of Civil Procedure, without resorting to the extraordinary remedies of the Lanham Act. Accordingly, if SPAVI obtains any remedy in this case, it should be limited to injunctive relief, as monetary damages or disgorgement are not supported by the facts or the law.

## III.    RESPONSE TO SUMMARY OF SPAVI'S QUANTUM MERUIT CLAIM, ELEMENTS, AND KEY EVIDENCE

The evidence at trial will demonstrate that SPAVI's quantum meruit claim is unfounded and cannot be sustained under the law or the facts. Quantum meruit is a quasi-contractual remedy that allows a plaintiff to recover the reasonable value of requested services that were rendered to a defendant only when necessary to prevent unjust enrichment. *See In re De Laurentiis Ent. Grp. Inc.*, 963 F.2d 1269, 1272 (9th Cir. 1992). Here, SPAVI cannot establish the essential elements of quantum meruit for three independent reasons: (a) Defendants did not request any services from SPAVI; (b) SPAVI did not provide qualifying "services" to Defendants; and (c) SPAVI had no reasonable expectation of payment.

It is undisputed that Defendants never requested services from SPAVI. The record shows that SPAVI inserted itself into the affairs of Defendants over their express objection. Defendants sought to acquire Cinco's interests in PCJV and the associated rights to the U.S. trademarks, not to engage with SPAVI. Instead, SPAVI's actions facilitated and encouraged Cinco's breach of fiduciary and contractual duties and interfered with Defendants' contractual and prospective business relationships within the Potato Corner U.S. franchise system. There is no authority—nor does Plaintiff cite any—supporting a quantum meruit claim based on an involuntary or unwanted relationship. The law requires the defendant to request, not be involuntarily subjected to services, which is not the case here.

Next, SPAVI's own cited authority, *Cosmonova, LLC v. BioFilm, Inc.*, 763 F. Supp. 3d 1157 (S.D. Cal. 2025), confirms that quantum meruit does not extend to actions taken for, or primarily for, the plaintiff's own benefit. The court in *Cosmonova* held that conduct undertaken for one's own advantage does not constitute "services" for purposes of quantum meruit, even if the plaintiff hoped for additional benefits. Here, SPAVI's conduct was not for the benefit of Defendants, but rather to advance its own interests. Defendants continued to operate as they had for 15 years—remitting up-charges on supplies to SPAVI (and previously to Cinco) and managing the U.S. Potato Corner business. There was no change in the status quo or new benefit conferred on Defendants by SPAVI's actions. And finally, there is no basis for SPAVI to claim a reasonable expectation of payment for the same reasons that preclude recovery under the Lanham Act.

## IV.   RESPONSE TO SUMMARY OF SPAVI'S MISAPPROPRIATION OF TRADE SECRETS CLAIM, ELEMENTS, AND KEY EVIDENCE

The evidence at trial will establish that SPAVI's claim for misappropriation of trade secrets is without merit and cannot satisfy the required legal elements. SPAVI's presentation of this claim omits or glosses over the fundamental elements necessary to prevail under the law.

A threshold requirement for any trade secret misappropriation claim is for plaintiff to assert what the alleged "information" is that was misappropriated. SPAVI has failed to do that here. To this day, Defendants do not know what "information" it is that they misappropriated allegedly. SPAVI has tried to create the perception that "flavors" are trade secrets, but it has failed to identify the actual "information" SPAVI claims Defendants took, used, or disclosed.

Even if it could establish some "information" allegedly taken, used, or disclosed, SPAVI cannot establish that it owns any such trade secret, or that even if it is pursuing some sort of knowledge-based "possession" theory (as opposed to "fee simple" ownership) there is no proof of that either. Nor is there any proof that any

such trade secret was actually kept secret. The alleged "flavors" always have been publicly available and sold over the Internet, making them accessible to anyone, including consumers and competitors. There is no evidence that the true owner of any recipes has taken any meaningful steps—let alone reasonable ones—to prevent reverse engineering or public disclosure. In fact, in the Australian market, Cinco used a different supplier to reverse engineer the flavors because the original supplier would not provide Cinco the recipes.

Further undermining this so-called trade secret claim, reverse engineering (a) was specifically discussed and authorized, and (b) is in any event a lawful and accepted form of competition. Anybody creating a competing flavored french fry chain could duplicate these "flavors" (or buy them directly from Ferna Corporation and others).

Moreover, SPAVI's references to franchise agreements and FDDs are irrelevant. An alleged confidentiality obligation in a contract does not transform publicly available or easily reverse-engineered information into a trade secret, nor does it create a misappropriation claim in favor of a party to whom no such obligation is owed. SPAVI has not asserted a breach of contract claim, nor has it established that Defendants owed it any confidentiality duty by virtue of stepping into Cinco's shoes. If that were not enough, SPAVI has failed to present any evidence of damages, let alone any basis to calculate the same in discovery or disclosures, resulting from the alleged misappropriation.

In sum, SPAVI's misappropriation of trade secrets claim is unsupported by the facts and the law. The claim should be rejected in its entirety.

## V.    RESPONSE TO SPAVI'S SUMMARY OF COUNTERCLAIMS

The SPAVI Parties feign ignorance regarding the relief sought by way of the counterclaims and third party complaint, even though these claims have been explained to them multiple times over (despite their failure to timely conduct any

discovery). In a nutshell, PCJV USA Parties' claims assert legal theories and claims based primarily on the following list of wrongdoings:

1. SPAVI purporting to acquire IP rights from Cinco, including U.S. IP rights, without obtaining the required prior written consent from LA Group, Koren, or PCJV, in violation of the JVA/AJVA/LLC Agreement.

2. SPAVI failing to assume the associated obligations under the parties' agreements, such as recognizing PCJV's use and termination rights, cooperating for PCJV's success, executing necessary documents, and acknowledging PCJV's 50-year license or, at minimum, continued use rights under the terms of the franchise agreements entered with franchisees.

3. SPAVI refusing to acknowledge PCJV's right to reverse engineer flavors, as established in PCJV board meeting minutes and by law.

4. SPAVI denying Koren-affiliated stores' right to withhold royalty payments, as provided in the JVA/AJVA/LLC Agreement and other evidence establishing the parties' mutual intent on this point.

5. SPAVI disregarding the mutual waiver of royalties between LA Group and Cinco/PCI Group for franchise fees or royalty income collected by PCJV from non-Koren-affiliated stores, as set forth in the JVA/AJVA/LLC Agreement and FDDs.

6. SPAVI failing to honor the settlement in which Koren/GK acquired all of Cinco's interests, despite prior representations.

7. SPAVI's deliberate undermining of PCJV's franchise network, solicitation of PCJV's franchisees, interference with supply chain and relationships, exploitation of Potato Corner USA, and claimed ownership of PCJV's goodwill.

Cinco is a party to certain of the claims to the extent it acted independently or jointly and severally with SPAVI to commit the alleged harms. Additionally, the PCJV USA Parties intend seek declaratory relief and injunctive relief from the Court, requesting a judicial determination of the parties' rights and obligations under the relevant agreements and permanent injunctive relief following a favorable verdict, to ensure compliance with the Court's declaration.

The parties' "Claims to be Tried" document, which is due for filing on August 12, expands on these claims, their elements, and evidence in support.

## VI.   EVIDENTIARY ISSUES

SPAVI Parties' Contentions ignore PCJV USA Parties' prior asserted objections, to be addressed before or at trial as needed.

## VII.  DISPUTED ISSUES OF LAW & ABANDONMENT OF ISSUES

The parties' "Claims to be Tried" document, which is due for filing on August 12, will address this point.

## VIII. BIFURCATION

PCJV USA Parties contemplate that the Court, as needed, will make rulings on equitable claims and defenses after the jury renders a special verdict. PCJV USA Parties are abandoning their accounting claim.

## IX.   ATTORNEYS' FEES

PCJV USA Parties deny that there is a basis under the Lanham Act for finding that their exercise of First Amendment rights in not waiving pre-existing trademark rights under PCJV's governing documents and related documents and detrimental reliance on 15 years of course of performance makes this case exceptional.

1    DATED:  August 11, 2025        **BLANK ROME LLP**

2

3                                    By: */s/ Todd M. Malynn*
                                     _____
                                         Todd M. Malynn
4                                        Arash Beral
                                         Jamison T. Gilmore
5                                    Attorneys for Defendants, Counterclaimants,
                                     and Third Party Plaintiffs PCJV USA, LLC,
                                     PCI TRADING LLC, POTATO CORNER,
6                                    LA GROUP, LLC, GK CAPITAL GROUP,
                                     LLC, NKM CAPITAL GROUP, LLC and
7                                    GUY KOREN, and Defendants J & K
                                     AMERICANA, LLC, J&K LAKEWOOD,
8                                    LLC, J&K OAKRIDGE, LLC, J&K
                                     VALLEY FAIR, LLC, J & K ONTARIO,
9                                    LLC, J&K PC TRUCKS, LLC, HLK
                                     MILPITAS, LLC, and GK CERRITOS, LLC

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned counsel of record for PCJV USA Parties, certify that this brief contains 6,113 words, which complies with the word limit of Local Rule 11-6.1.

DATED:  August 11, 2025

_/s/ Todd M. Malynn_
TODD M. MALYNN

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on August 11, 2025, the foregoing document was electronically filed with the Clerk of the Court for the United States District Court, Central District of California, using the Court's Electronic Case Filing (ECF) system.  I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I certify under penalty of perjury that the foregoing is true and correct. Executed on August 11, 2025.


By:   _/s/AJ Cruickshank_____