**BLANK ROME LLP**
Todd M. Malynn (SBN 181595)
todd.malynn@blankrome.com
Arash Beral (SBN 245219)
arash.beral@blankrome.com
Jamison T. Gilmore (SBN 322100)
jamison.gilmore@blankrome.com
2029 Century Park East | 6th Floor
Los Angeles, CA 90067
Telephone:   424.239.3400
Facsimile:   424.239.3434

Attorneys for Defendants, Counterclaimants, and Third Party Plaintiffs PCJV USA, LLC, PCI TRADING LLC, POTATO CORNER, LA GROUP, LLC, GK CAPITAL GROUP, LLC, NKM CAPITAL GROUP, LLC and GUY KOREN, and Defendants J & K AMERICANA, LLC, J&K LAKEWOOD, LLC, J&K OAKRIDGE, LLC, J&K VALLEY FAIR, LLC, J & K ONTARIO, LLC, J&K PC TRUCKS, LLC, HLK MILPITAS, LLC, and GK CERRITOS, LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHAKEY'S PIZZA ASIA VENTURES, INC, a Philippines corporation,<br><br>Plaintiff,<br><br>vs.<br><br>PCJV USA, LLC, a Delaware limited liability company; PCI TRADING , LLC, a Delaware limited liability company; GUY KOREN, an individual; POTATO CORNER LA GROUP, LLC, a California limited liability company; NKM CAPITAL GROUP, LLC, a California limited liability company; J & K AMERICANA, LLC, a California limited liability company; J&K LAKEWOOD, LLC, a California limited liability company; J&K VALLEY FAIR, LLC, a California limited liability company; J & K ONTARIO, LLC, a California limited liability company; HLK MILPITAS, LLC, a California, limited liability company; GK CERRITOS, LLC, a California, limited liability company;  J&K PC TRUCKS, LLC, a California limited liability company; and, GK CAPITAL GROUP, LLC, a California | Case No. 2:24-CV-04546-SB(AGRx)<br><br>*Hon. Stanley Blumenfeld, Jr.*<br><br>**THE PCJV USA PARTIES' SUBMISSION RE: ASSIGNMENT IN GROSS AND WAIVER**<br><br>Complaint Filed:   May 31, 2024<br>Trial Date:            August 19, 2025 |

1  limited liability company and DOES 1
   through 100, inclusive,

2                          Defendants.

3  _____

4  PCJV USA, LLC, a Delaware limited
   liability company; PCI TRADING LLC, a

5  Delaware limited liability company;
   POTATO CORNER LA GROUP LLC, a

6  California limited liability company; GK
   CAPITAL GROUP, LLC, a California

7  limited liability company; NKM CAPITAL
   GROUP LLC, a California limited liability

8  company; and GUY KOREN, an individual,

9                     Counter-Claimants,

10        v.

11 SHAKEY'S PIZZA ASIA VENTURES,
   INC, a Philippines corporation,

12                  Counter Defendant.

13 _____

14 PCJV USA, LLC, a Delaware limited
   liability company; PCI TRADING LLC, a

15 Delaware limited liability company;
   POTATO CORNER LA GROUP LLC, a

16 California limited liability company; GK
   CAPITAL GROUP, LLC, a California

17 limited liability company; NKM CAPITAL
   GROUP LLC, a California limited liability

18 company; and GUY KOREN, an individual,

19                 Third Party Plaintiffs,

20        v.

21 PC INTERNATIONAL PTE LTD., a
   Singapore business entity; SPAVI

22 INTERNATIONAL USA, INC., a California
   corporation; CINCO CORPORATION, a

23 Philippines corporation; and ROES 1 through
   10, inclusive,

24                Third Party Defendants.

25 _____

26

27

28

THE PCJV USA PARTIES' SUBMISSION RE: ASSIGNMENT IN GROSS AND WAIVER

# I.   **INTRODUCTION**

As a threshold matter, the PCJV USA Parties submit that questions concerning assignment in gross and waiver largely stem from SPAVI's position that in 2022, it assumed no express or implied contractual or fiduciary obligations to the PCJV USA Parties and obtained no right to control the subject trademarks through PCJV's management board and executive officers. Having advanced that contention, SPAVI is now judicially estopped from disavowing it, and at the trial of this action, the following questions must be resolved:

    i.    Whether the 2022 transaction between Cinco and SPAVI effected a valid transfer of the U.S. Potato Corner trademarks or, instead, was an invalid assignment in gross that severed the marks from the goodwill PCJV and its related businesses created and owns; and

    ii.    Whether Cinco and SPAVI waived their ability to enforce any purported U.S. trademark or trade-secret rights against the PCJV USA Parties by over a decade-long course of conduct, repeated affirmations of PCJV's franchise authority, and SPAVI's post-acquisition inaction and disavowals.

The evidence summarized below—testimony, contracts, board minutes, settlement documents, and uncontested regulatory filings—is compelling: (a) at best, Cinco transferred nothing more than naked registrations to SPAVI, rendering the assignment void, and (b) both Cinco and SPAVI intentionally relinquished any right to challenge PCJV's use of the U.S. Potato Corner brand.

# II.   **ASSIGNMENT IN GROSS**

## A.   **Applicable Standard and Burdens of Proof**

Under 15 U.S.C. § 1060 and controlling Ninth Circuit authority, a trademark may be assigned only together with the goodwill of the business in which the mark is used. *Glow Indus., Inc. v. Lopez,* 273 F. Supp. 2d 1095, 1107 (C.D. Cal. 2003) (citing 15 U.S.C. § 1060); *E. & J. Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280, 1289 (9th Cir.1992)  A transfer of the registration alone—divorced from the

2

business, its customers, and its attendant obligations—constitutes an assignment in gross and extinguishes enforceable rights in the mark. *Id.*

Both sides bear a burden of proof in connection with proving or disproving the alleged transfer of goodwill from Cinco to SPAVI in March 2022. In addition to proving that Cinco owned the goodwill via a registration, which the PCJV USA Parties could rebut both under *Sengoku* and by proof of a naked license, SPAVI has to prove that Cinco, in fact, transferred the goodwill to SPAVI in 2022 without SPAVI assuming the associated burdens.

Before the question of an impermissible assignment in gross arises, SPAVI must first establish a *prima facie* showing that Cinco conveyed the goodwill embodied in the trademarks. SPAVI cannot bear this burden. *See Federal Treasury Enterprise Sojuzplodoimport v. Spirits Intern. N.V.*, 623 F.3d 61, 68 (2d Cir. 2010); *Glow Industries, Inc.*, 273 F. Supp. 2d at 1108; *Hallmark Hardwoods, Inv. V. Omni Wood Product, LLC*, 2011 WL 13176098, *15 (C.D. Cal. 2011); *In re Impact Distributors, Inc.*, 260 B.R. 48, 53-55 (S.D. Fla. 2001); *Money Store v. Harriscorp Fin., Inc.*, 689 F.2d 666, 670 (7th Cir. 1982).

**B.    The Goodwill at Issue is the Potato Corner USA Franchise System**

Cinco's registrations (Trial Exh. Nos. 1, 3, 5) cover "restaurant and catering services." Consequently, all goodwill embodied in those marks resides exclusively in the U.S. quick-service restaurants created by the PCJV USA Parties.

In PCJV's LLC Agreement (Trial Exh. No. 1051) executed August 8, 2012, Cinco Group agreed that it had "granted" and "vested" (past tense) all U.S. branding in the PCJV partnership and all quality-control functions in PCJV's President, management, and executive officers. The Joint Venture Agreement evidences Cinco Group's primary contribution: the grant of a "master license" (which means an exclusive grant of rights to use the marks in the United States and Israel) in exchange for 60% ownership of PCJV; the LA Group's consideration was to create and grow the U.S. business in exchange for a 40% interest in PCJV.

Notwithstanding the 60/40 split, each group remained an *equal* participant in the use of the exclusively granted/vested trademarks, solely under which trademarks franchisees and licensees were required to pay franchise and royalty fees to PCJV. That agreement required each group to collect an equal amount, *i.e.,* 30%, of all franchise and royalty fees paid to PCJV. As discussed below, both sides agreed to a 0/0% split instead in favor of growth and future distributions from PCJV. They not only expressed this intent in an October 16, 2012 meeting minutes, but they also expressed that intent through annual audits, approved by both groups and signed under penalty of perjury.

The 2018 FDDs, for example, contain the note:

> *The Company has a contractual obligation to remit 30% of all initial franchise fees and continuing royalty fees collected to certain members who own approximately 40% of the Company and provide management services on behalf of the Company. Additionally, the Company has a contractual obligation to remit 30%, as licensing fees, of all initial franchise fees and continuing royalty fees collected to certain members who own approximately 60% of the Company. Both obligations have been waived by the respective parties for the years ended December 31, 2017, 2016 and 2015.*

In exchange for granted and vested trademark rights to control the U.S. Potato Corner brand pursuant to the terms and conditions of their partnership agreements (pre-license agreement), PCJV, not Cinco: (a) designed the U.S. store prototype, (b) authored the U.S. operations and training manuals, (c) developed U.S.-specific menus, (d) marketed under the d/b/a "Potato Corner USA," and (e) fielded any consumer complaints. U.S. consumers consistently associated the brand with PCJV, directing praise and complaints to PCJV—not to Cinco (or SPAVI).

## C.    The 2022 Transfer was a Naked Assignment

It is certainly plausible that the trier of fact could find that Cinco held the goodwill associated with the trademarks in 2022 by virtue of having and exercising

adequate control over the trademarks through its representation on PCJV's management and executive officers. It also is plausible that the trier of fact could find that PCJV held the goodwill.

The purported Deeds of Assignment recorded at the USPTO (Trial Exh. Nos. 4, 6) transferred only Cinco's "right, title, and interest it now has" in the registrations. *See* J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition,* § 18:15 (5th ed.) ("'It is elementary ancient law that an assignee never stands in any better position than his assignor,' and thus once an assignee has notice of an injunction against the assignor, it is bound to comply.") (citation omitted). SPAVI here has disavowed acquiring (i) PCJV membership interests, (ii) franchise agreements, (iii) supply-chain contracts, (iv) franchisee relationships, (v) regulatory obligations, or (vi) any other obligations in PCJV or any related business. It likewise has refused to assume other contractual or fiduciary duties, all of which the trier of fact could find was essential for Cinco to be the senior user under *Sengoku* and to have properly maintained the trademarks at the USPTO.

Three days before SPAVI sued, the entire family of Cinco and Cinco-connected individuals and entities entered a Settlement Agreement and Membership Interest Purchase Agreement ("MIPA") assigning all of their interests in PCJV and its related businesses—including "all rights attached thereto"—to Koren-controlled entities, confirming that the goodwill embodied in the Potato Corner USA franchise business was passing to PCJV, and was not previously transferred to SPAVI.

The PCJV USA Parties firmly believe that because the 2022 deeds severed the registrations from the franchised business that created their goodwill, the transfer is void. SPAVI, thus, could not have acquired enforceable U.S. trademark rights, and any subsequent enforcement attempt is barred.

Oral and documentary evidence will establish that the goodwill symbolized by the Potato Corner brand in the United States was associated with PCJV's Potato Corner USA's franchised restaurants:

5

1.      Cinco registered the U.S. Potato Corner trademarks for "restaurant and catering services;"

2.      U.S. consumers associate "restaurant and catering services" with restaurants, in this case Potato Corner USA franchised restaurants;[1]

3.      Cinco Group and LA Group entered into a partnership to create a "business of establishing, operating, managing, licensing and franchising 'Potato Corner' stores/outlets" (Trial Exhibit 1050) as the vehicle through which the Potato Corner brand would expand in the United States;[2]

4.      Cinco, the foreign trademark holder and U.S. registrant, agreed to contribute to the partnership and granted both exclusive lifetime and trailing trademark rights essential and integral to the purpose of the partnership in PCJV (the LA Group's consideration) (Trial Exhibit 1050 ¶¶ 1(a), 4(a)-(b) and Trial Exhibit 1051 ¶¶ 3.1, 9.2.1);

5.      Cinco vested quality control obligations in (a) PCJV's President to license the U.S. trademarks and franchise Potato Corner restaurants (Trial Exhibit 1050 ¶¶ 3(l) (i-iii)), (b) PCJV's executive officers to manage Potato Corner USA's business and property (*id.* ¶ 3(f)), and (c) PCJV's Management to approve franchisee agreements, including as disclosed in FDD (*id.* ¶ 3(e) (iv));

6.      The vested lifetime rights and obligations, including branding rights and obligations, were not transferable by Cinco without LA Group's prior written consent (Trial Exhibit 1050 ¶ 2(d); Trial Exhibit 1051 ¶ 3.3);

---

[1] "Potato Corner USA" originally was the coined name for PCJV's LA Group (Trial Exhibit 1017); then PCJV used and affixed the name to Potato Corner restaurants in the United States, including registering www.potatocornerusa.com and a d/b/a Potato Corner USA, which is property owned by LA Group and PCJV.

[2] While efforts were made to avoid reporting violations of California franchise law after DLA Piper notified Cinco of the need to create a U.S. franchisor and convert license agreements into franchisee agreements, DLA Piper eventually filed a Notice of Violation and the State of California's Department of Business Oversight sanctioned PCJV (not Cinco) for opening up three Potato Corner outlets, including the first in Santa Anita, before PCJV had filed a FDD (Trial Exhibit 1257).

THE PCJV USA PARTIES' SUBMISSION RE: ASSIGNMENT IN GROSS AND WAIVER

7.    In reliance thereon, PCJV created the goodwill associated with Potato Corner in the United States, including creating an entirely new Potato Corner brand, starting from scratch to create an entirely new quick-service restaurant and business model for the U.S. brand, which it could franchise, including:

    a.  Designing entirely new Potato Corner restaurants for U.S. venues;

    b.  Creating entirely new Potato Corner USA restaurant training and operation manuals; and

    c.  Designing and updating Potato Corner USA's menus, including adding new food and beverage items then not available in Potato Corner outlets in other countries;[3]

8.    U.S. consumers associated Potato Corner in the United States with PCJV, to whom complaints, if any, were lodged; and

9.    PCJV plainly held the goodwill of Potato Corner in the United States for over a decade, to which there was no dispute, until SPAVI took steps to manufacture disputes, change the *status quo*, and disrupt the market.

By claiming the benefits of without acquiring any interest in the franchise partnership and without assuming the corresponding burdens in 2022, SPAVI could not have obtained "the good will of the business in which the mark is used, or with that part of the good will of the business connected with the use of and symbolized by the mark." *Glow Indus., Inc.,* 273 F. Supp. 2d at 1107. It engaged in a naked assignment.[4]

---

[3] Cinco did not know the U.S. market and landlord requirements; in other countries, Cinco used lesser quality food as well as different menu items and the restaurant design Cinco proposed was rejected as "ugly" by Westfield (Santa Anita).

[4] Testimony will also establish that Cinco Group was forewarned in or about 2016-2017 about engaging in a naked license if it were to assign their 60% interest in PCJV to the LA Group in exchange for a new license agreement it was proposing as a means to restructure the PCJV relationship.

## III.    **WAIVER**

### A.    **Waiver by Cinco (Inherited by SPAVI)**

From 2010 to 2022, Cinco (and its related entities/individuals) never demanded royalties (and literally waived them), never sought to terminate PCJV's license rights, and affirmatively approved (including under penalty of perjury) FDDs that stated that PCJV held a 50-year Trademark License Agreement. PCJV, itself, could not waive royalties or service fees promised to its partners.

In 2018, Cinco sued for control of PCJV rather than terminate an alleged "at-will" license, judicially admitting PCJV's long-term rights (and its own standing to sue for control of PCJV's business and property) in the state court action. Moreover, by sitting idle for more than ten years while PCJV operated and expanded the brand and franchise system (including never once claiming trade secret misappropriation), Cinco waived all rights, including any right to claim that the parties failed to fulfill any alleged ministerial obligation to execute (rather than just enter) a license agreement (there was never an obligation to execute a license agreement).

By approving, consenting to, and ratifying annual FDDs affirming a 50-year "Trademark License Agreement," Cinco waived any right to unilaterally terminate for its own self-interest PCJV's right to use the U.S. trademarks (as opposed to fulfilling its fiduciary and contractual obligation to grant Potato Corner USA license terms necessary to support its existing franchise system, if needed). In conspiring with SPAVI in the middle of state court litigation to deny and disavow in two courts the acquisition of the PCJV partnership's pre-existing trademark rights and Cinco's corresponding trademark obligations, including under the "Trademark License Agreement," Cinco, thereafter, knowingly assigned and transferred all of its rights and obligations to Koren-led entities in the 2024 settlement, and released and waived known and unknown claims. SPAVI inherited all of these waivers; an assignment does not revive waived rights.

## B.   Independent Waiver by SPAVI

During 2021-22 diligence, SPAVI assured PCJV it would be bound by any settlement reached with Cinco, yet later repudiated that promise. To avoid PCJV USA Parties from going to court, SPAVI represented on February 10, 2022: "Although Cinco and its affiliates retain the right to negotiate this deal, as the Acquisition has not closed, upon closing, SPAVI would be bound by any agreements related to the licensing of Potato Corner intellectual property in the US." Trial Exh. No. 1156. In that same document, SPAVI claimed it is the "assignee of all global licensing agreements (*including the assignment to SPAVI of all licensing agreements with PCJV*)."[5] *Id.*

For the years that followed, SPAVI allowed Cinco to negotiate a settlement with PCJV through its legal counsel, Mr. Murphy. In other words, SPAVI deputized Cinco to act as its agent and resolve the state court litigation over Potato Corner USA. As the agent of the real party in interest, Cinco not only settled the state court action but also signed the release and MIPA releasing any and all interests in PCJV and PCI Trading, and any and all rights "attached" to those interests, unencumbered, without the need for a license. Cinco (as deputized by SPAVI) also represented and warranted that the transaction would not result in the termination of any license (another waiver of any rights in SPAVI to terminate any license as an assignee of Cinco) including three days later in a conspiracy with SPAVI (trying to accomplish indirectly what Cinco's fiduciary and contractual obligations under PCJV's partnership documents prohibited Cinco from doing directly).

During that over two-year period, SPAVI took no steps to assume quality-control functions or seek relief from the state-court injunction that barred interference with PCJV's operations. SPAVI's delay in seeking to change the *status*

---

[5] Obviously, it, too, knew that licensing agreements, *i.e.,* meetings of the minds on the terms and conditions upon which the PCJV partnership's use of the U.S. trademarks would inure to Cinco's benefit, already existed.

*quo* from its announced deal with Cinco in December 2021 to the federal injunction proceedings, coupled with Cinco's broad releases and SPAVI's repeated denial of acquiring any PCJV interests or obligations, is a knowing relinquishment of contractual enforcement rights underlying its claims.

Also over this near three-year period, PCI Trading continued to purchase seasonings and supplies from a company whose ownership changed hands to SPAVI, including after the alleged termination. Not once did SPAVI (who denies and disavows assuming a fiduciary and contractual relationship with the PCJV USA Parties) require PCI Trading (or PCJV) to keep confidential any alleged trade secrets (whatever they may be) at issue in this case.

### C.   Evidence Supporting Waiver

#### i.  Trademarks

The Trial Exhibits make clear that:

- There was no prior written consent by the LA Group to the assignment of any fiduciary or contractual "obligations" to anyone—a condition that remained required by both set of operating agreements the parties were operating under (JVA and LLC Agreement);

- There was no prior written consent by LA Group's voting members of PCJV that Cinco could unilaterally assign voting rights from the Cinco Group to a "wholly-owned" subsidiary with no trademark rights or obligations (LLC Agreement ¶ 3.3);

- There was no intent to transfer any rights to a separate entity (JVA 4th Recital & First Amendment 4th Recital);

- There is no written assignment among the Trial Exhibits from Cinco to an entity called "Potato Corner International" ("PCI") let alone to a "wholly-owned" subsidiary transferring even a 60% economic interest in PCJV; and

- There is no written novation of Cinco Group's fiduciary obligations; rather, Cinco continued to approve FDDs, participate in Board meetings, amend documents, rely on the LLC Agreement (which specifies members being part of the "Cinco Group" and "LA Group") and took other actions objectively manifesting that it was still bound by the JVA and LLC Agreements and its duties to the partners.

A neutral witness, Erlinda Bartolome, who was hired by and worked for years directly with *Cinco* and also interfaced with DLA Piper, as well as serving as PCJV's Corporate Secretary (at Cinco's request), will testify to the limited purpose and intent of the First Amendment (which she drafted) and will corroborate testimony of other witnesses. She will confirm that it was meant to only partially amend only the JVA as specifically reflected in the board meeting minutes. Trial Exh. No. 1052. Cinco always remained a partner and fiduciary and among the contracting "Parties" at all times. At best, the LLC Agreement enabled PCI to acquire an "economic interest" under Paragraph 8.1, but not to acquire voting rights or rights to information in PCJV. Trial Exh. No. 1051. All three are required in order to be a fully fledged "member" of an LLC. For these reasons, the LLC Agreement never was amended to add PCI as a fully fledged member. Nor is there evidence of any prior written consent to any transfer of obligations in the JVA (the First Amendment is not *prior* written consent; in fact, it continues to express the mutual intentions of the parties that no obligations could be assigned).

Moreover, under the JVA, Cinco knew that the LA Group owed a ministerial duty to execute further documents if required. If Cinco desired an "executed" rather than, simply, an "entered" license agreement, it asked and Koren delivered. But the issue of the "unsigned" Trademark, Copyright, and Know-How Agreement is a distraction. For over a decade, Cinco never claimed that a Trademark License Agreement did not exist. On the contrary, it was reported year after year in PCJV's FDDs at its own behest that one existed. It is quite possible that somewhere within

Mr. Magsaysay's files there is a document called "Trademark License Agreement" that was signed or otherwise subscribed by him. The evidence shows that Cinco and DLA Piper were vested with complete control over memorializing the parties' existing agreements and that Cinco and DLA Piper helped PCJV pass stringent yearly audits and made under-oath representations in those FDDs.

It also is plausible that the parties agreed, adopted or ratified the JVA or LLC Agreement as the true, existing and ongoing right-to-use agreement, containing all the material terms for vested, non-transferable control rights and long-term, indefinite licensing rights and obligations subject to termination rights set forth in those documents, which are fully executed and supported by consideration. Those agreements also contain the consideration element (30% to Cinco Group for granting a license, and 30% to LA Group for contributing services).

If there truly is no vested partnership right to use and control the U.S. trademarks and no express or implied license agreement, then factually, two waivers flow from Cinco's knowing failure to enforce any right to obtain a license agreement. First, it waived any right to assert that the LA Group breached the JVA or LLC Agreement for allegedly failing to enter into the referenced license agreement. Second, it waived any right to terminate "at-will" PCJV's right to use and control the marks based on a demand it never made for over ten years.

Testimony at trial will demonstrate that no "at-will" right could exist absent a breach of the JVA and LLC Agreement—a claim not made, but settled and released:

- In promising to convert Cinco's initial unlawful license (to NKM) into long-term franchise rights, where Koren would also co-own and operate the U.S. franchisor, Cinco "vested" branding rights (at the U.S. franchisor level) in their joint venture as the "vehicle" through which Potato Corner would expand in the United States;

- Subsequent negotiations resulting in the LA Group securing long-term branding rights under a written joint venture agreement, where Cinco's consideration (not the LA Group's) included entry into a master license agreement, but for which PCJV had indefinite rights absent a super majority vote or further agreement by PCJV's partners, or owned common law rights based on the parties' conduct under *Sengoku*;

- Written rejection of at-will branding rights by Koren in 2009 and the LA Group in 2010 precluding any implied at-will termination right, which also would be contrary to fiduciary obligations and the implied covenant of good fair dealing under the joint venture agreement protecting the LA Group's benefit of the bargain;

- In response to a 10-year term inserted by DLA Piper in one of the draft JVA documents, the LA Group demanded, obtained and Magsaysay also desired "lifetime" branding rights in the joint venture, changing the termination provision to "indefinite" rights; later the parties agreed to enter a master license agreement with a 20-year term plus three 10-year options, offered by Cinco to satisfy their lawyers' concerns about indefinite rights in the master license agreement while also providing Cinco the right to transfer the license (under only the terms and conditions of the license agreement); and

- Course of performance, as documented in FDDs, emails, and board minutes, both waiving equal license and service fees to each group in favor of growth and to avoid regulatory scrutiny, and confirming the parties' understanding and agreements.

Whether by written or verbal agreement, course of performance, fiduciary obligations, the implied covenant of good faith and fair dealing, or detrimental reliance, the PCJV USA Parties had enforceable long-term trademark rights secured during contract negotiations and course of performance for the mutual benefit of the Cinco Group and LA Group. Cinco waived, including by inaction for a decade, the exercise of the ministerial duty clause to execute and deliver documents if needed, and any right to claim that PCJV only had an "at-will" implied license.

### ii.  Trade Secrets

SPAVI's initial burden was to "identify the trade secrets and carry the burden of showing they exist." *InteliClear, LLC v. ETC Global Holdings, Inc.*, 978 F.3d 653, 658 (9th Cir. 2020). Trade secrets can only comprise "information, including a formula, pattern, compilation, program, device, method, technique, or process." Cal. Civ. Code § 3426.1(d). A flavor is an idea, not a protectable trade secret. *See InteliClear, LLC*, 978 F.3d at 658; *Silvaco Data Systems v. Intel Corp.*, 184 Cal. App. 4th 210, 220 (2010).

Moreover, SPAVI must prove that it "owns" the trade secrets sued upon—meaning that the plaintiff either has title to the alleged trade secrets or knowledge of allegedly sensitive know how and licensed it with a confidentiality obligation. *See*

*Sinclair v. Aquarius Electronics, Inc.,* 42 Cal.App.3d 216, 225-228 (1974) (trade secret licensing involves sharing sensitive, undisclosed information). SPAVI also cannot retroactively make secret that which has is already in the public domain, whether directly by Ferna or Newly Weds, themselves, publicly selling packaged seasonings into the market, or Cinco selling packaged seasonings or permitting others to sell packaged seasonings to generate revenue that would otherwise be lost to competitors selling the same or substantially the same flavors in the market.

In this case, there is no dispute that Cinco did not own any flavors. There also is no dispute that neither Ferna nor Cinco or its successor-in-interest ever shared any secret recipes or information about how to create the flavors. There also was never any trade secret license listed in the Trial Exhibits that obligated Cinco to keep secret seasoning packages Ferna has publicly sold since the 1990's. Rather, evidence at trial will show that Ferna, Cinco and others with permission from Cinco publicly sold seasoning packages, and Ferna's seasoning packages have been "knocked off" for years. They are all over the Internet not only by competitors, but also by Ferna and by alter egos of Ferna. Cinco, itself, retained another manufacturer, Newly Weds, to mimic the taste.

Having, itself, both publicly sold or authorized the sales of seasoning packages and knocked off Ferna's seasoning packages, Cinco waived any right to bring a trade secret claim against the PCJV USA Parties.[6] SPAVI, Cinco's successor-in-interest, has no right or ability to "put the horse back in the barn." An assignment does not revive rights already waived by the assignor. Besides, for over two years (including after this lawsuit was filed), SPAVI was fulfilling orders from

---

[6] Plenty of documents and testimony will also corroborate that the Cinco Group and LA Group were constantly strategizing about duplicating Ferna's flavors and sourcing them from the United States. In 2010, they met U.S.-based suppliers. In 2017, Cinco authorized LA Group to duplicate the flavors in the United States. There is no trade secret; even if there is, any claimed right has been waived.

the PCJV USA Parties without any corresponding trade secret confidentiality agreement. It also waived all rights to any alleged trade secrets.

DATED:  August 18, 2025      **BLANK ROME LLP**


By: */s/ Todd M. Malynn*
    Todd M. Malynn
    Arash Beral
    Jamison T. Gilmore
    Attorneys for Defendants, Counterclaimants, and Third Party Plaintiffs PCJV USA, LLC, PCI TRADING LLC, POTATO CORNER, LA GROUP, LLC, GK CAPITAL GROUP, LLC, NKM CAPITAL GROUP, LLC and GUY KOREN, and Defendants J & K AMERICANA, LLC, J&K LAKEWOOD, LLC, J&K OAKRIDGE, LLC, J&K VALLEY FAIR, LLC, J & K ONTARIO, LLC, J&K PC TRUCKS, LLC, HLK MILPITAS, LLC, and GK CERRITOS, LLC

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on August 18, 2025, the foregoing document was electronically filed with the Clerk of the Court for the United States District Court, Central District of California, using the Court's Electronic Case Filing (ECF) system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I certify under penalty of perjury that the foregoing is true and correct. Executed on August 18, 2025.

By:   _/s/AJ Cruickshank_____