EXHIBIT D

**BLANK ROME LLP**
Arash Beral (SBN 245219)
arash.beral@blankrome.com
Todd M. Malynn (SBN 181595)
todd.malynn@blankrome.com
Victor Sandoval (SBN 344461)
victor.sandoval@blankrome.com
2029 Century Park East | 6th Floor
Los Angeles, CA 90067
Telephone:   424.239.3400
Facsimile:   424.239.3434

Attorneys for Defendants, Counterclaimants, and Third Party Plaintiffs PCJV USA, LLC, PCI TRADING LLC, POTATO CORNER, LA GROUP, LLC, GK CAPITAL GROUP, LLC, NKM CAPITAL GROUP, LLC and GUY KOREN, and Defendants J & K AMERICANA, LLC, J&K LAKEWOOD, LLC, J&K OAKRIDGE, LLC, J&K VALLEY FAIR, LLC, J & K ONTARIO, LLC, J&K PC TRUCKS, LLC, HLK MILPITAS, LLC, and GK CERRITOS, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHAKEY'S PIZZA ASIA VENTURES, INC, a Philippines corporation,<br><br>            Plaintiff,<br><br>        vs.<br><br>PCJV USA, LLC, a Delaware limited liability company; PCI TRADING , LLC, a Delaware limited liability company; GUY KOREN, an individual; POTATO CORNER LA GROUP, LLC, a California limited liability company; NKM CAPITAL GROUP, LLC, a California limited liability company; J & K AMERICANA, LLC, a California limited liability company; J&K LAKEWOOD, LLC, a California limited liability company; J&K VALLEY FAIR, LLC, a California limited liability company; J & K ONTARIO, LLC, a California limited liability company; HLK MILPITAS, LLC, a California, limited liability company; GK CERRITOS, LLC, a California, limited liability company;  J&K PC TRUCKS, LLC, | Case No. 2:24-CV-04546-SB(AGRx)<br><br>*Hon. Stanley Blumenfeld, Jr.*<br><br>**SUPPLEMENTAL INITIAL DISCLOSURES PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 26(A)(1)**<br><br>Complaint Filed:   May 31, 2024<br>Trial Date:          August 4, 2025 |

a California limited liability company; and,
GK CAPITAL GROUP, LLC, a California
limited liability company and DOES 1
through 100, inclusive,

Defendants.

_____

PCJV USA, LLC, a Delaware limited
liability company; PCI TRADING LLC, a
Delaware limited liability company;
POTATO CORNER LA GROUP LLC, a
California limited liability company; GK
CAPITAL GROUP, LLC, a California
limited liability company; NKM CAPITAL
GROUP LLC, a California limited liability
company; and GUY KOREN, an individual,

Counter-Claimants,

v.

SHAKEY'S PIZZA ASIA VENTURES,
INC, a Philippines corporation,

Counter Defendant.

_____

PCJV USA, LLC, a Delaware limited
liability company; PCI TRADING LLC, a
Delaware limited liability company;
POTATO CORNER LA GROUP LLC, a
California limited liability company; GK
CAPITAL GROUP, LLC, a California
limited liability company; NKM CAPITAL
GROUP LLC, a California limited liability
company; and GUY KOREN, an individual,

Third Party Plaintiffs,

v.

PC INTERNATIONAL PTE LTD., a
Singapore business entity; SPAVI
INTERNATIONAL USA, INC., a California
corporation; CINCO CORPORATION, a
Philippines corporation; and ROES 1 through
10, inclusive,

Third Party Defendants.

_____

1

**SUPPLEMENTAL INITIAL DISCLOSURES PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 26(A)(1)**

Defendants, Counterclaimants, and Third Party Plaintiffs PCJV USA, LLC, PCI TRADING LLC, POTATO CORNER, LA GROUP, LLC, GK CAPITAL GROUP, LLC, NKM CAPITAL GROUP, LLC and GUY KOREN, and Defendants J & K AMERICANA, LLC, J&K LAKEWOOD, LLC, J&K OAKRIDGE, LLC, J&K VALLEY FAIR, LLC, J & K ONTARIO, LLC, J&K PC TRUCKS, LLC, HLK MILPITAS, LLC, and GK CERRITOS, LLC (collectively, the "Defendants") hereby supplement their initial disclosures served on February 28, 2025, as follows:

Defendants do not represent that they are identifying every document, tangible thing, or witness possibly relevant to this action. Defendants expressly reserve all rights to object to the production of any information below, including on the grounds that such information is protected from disclosure by the attorney-client privilege, the attorney work product doctrine, or other applicable privileges. Defendants also reserve the right to object to the admissibility of any of the information below.

Out of an abundance of caution, Defendants represent that they may use for their claims and defenses the declarations and exhibits filed in this action (or its related appeal), including any communications or other documents between or among the parties or between Plaintiff (or affiliates/agents of Plaintiff) and any other party or non-party relating to the subject matters of this action. As well, Defendants may use public records, online data, public filings and materials relevant to the subject matters of this action, including the records and files (and the document productions of the various parties made, the settlement agreements, transfer documents, and tolling agreements) in the state court cases, *Cinco Corporation v. Guy Koren, et al.*, Los Angeles Superior Court Case No. BC701075 and *Wells Fargo Bank National Association v. PCJV USA, LLC, et al.*, Los Angeles Superior Court Case No. BC706000, specifically, the declarations and associated compendia filed in those cases and evidentiary hearing exhibits, trial testimony,

**SUPPLEMENTAL INITIAL DISCLOSURES PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 26(A)(1)**

transcripts, orders, judgments, and the like. As far as compendia go, Defendants attach hereto the Compendium of Evidence in Support of Defendants and Cross-Complainants Guy Koren and Potato Corner LA Group, LLC's Joint Motion for Summary Adjudication filed August 17, 2020 as an example of the compendia Defendants intend to rely upon, specifically its exhibits (and also, potentially, the testimony of the witnesses disclosed in those exhibits).

To the extent not already disclosed, Defendants will also rely on the exhibits filed in connection with their Counterclaim/Third Party Complaint and any parole evidence relating to any agreement alleged in the pleadings (including parole evidence as produced and/or filed in the state court cases identified above). Defendants may also rely on financial documents, statements, reports of any of the Defendants. Defendants may also rely on order information, invoices, payments, including after May 2024 from Plaintiff.

Defendants are informed and believe that Plaintiff's counsel, Michael D. Murphy, is in possession of the documents filed or exchanged in this action and filed or exchanged in the state court actions either by virtue of acting as Plaintiff's counsel in this action or as Cinco Corporation's counsel in state court.

DATED:  March 14, 2025        **BLANK ROME LLP**

By: */s/ Arash Beral*
_____
Arash Beral
Todd Malynn
Victor Sandoval
Attorneys for Defendants, Counterclaimants, and Third Party Plaintiffs PCJV USA, LLC, PCI TRADING LLC, POTATO CORNER, LA GROUP, LLC, GK CAPITAL GROUP, LLC, NKM CAPITAL GROUP, LLC and GUY KOREN, and Defendants J & K AMERICANA, LLC, J&K LAKEWOOD, LLC, J&K OAKRIDGE, LLC, J&K VALLEY FAIR, LLC, J & K ONTARIO, LLC, J&K PC TRUCKS, LLC, HLK MILPITAS, LLC, and GK CERRITOS, LLC

3

1  ARASH BERAL (BAR NO. 245219)
   arash.beral@ffslaw.com
2  JOHN D. STANLEY (BAR NO. 301308)
   john.stanley@ffslaw.com
3  FREEMAN, FREEMAN & SMILEY, LLP
   1888 Century Park East, Suite 1500
4  Los Angeles, California 90067
   Telephone:  (310) 255-6100
5  Facsimile:  (310) 255-6200

6  Attorneys for Defendants and Cross-
   Complainants GUY KOREN and THOMAS
7  HODGSON and Defendant GK CAPITAL
   GROUP, LLC

8
9  VEDDER PRICE (CA), LLP
   Eric R. McDonough, Bar No. 193956
   emcdonough@vedderprice.com
10 Deborah A. Hedley, Bar No. 276826
   dhedley@vedderprice.com
11 1925 Century Park East, Suite 1900
   Los Angeles, California 90067
12 T:  +1 424 204 7700
   F:  +1 424 204 7702

13
14 *Attorneys for Defendants and Cross-
   Complainants J&K AMERICANA, LLC et al.*

15

16              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

17              **COUNTY OF LOS ANGELES, CENTRAL DISTRICT**

18

19 CINCO CORPORATION, a Philippines        Case No. BC701075
   corporation; POTATO CORNER             [Related with Case No. BC706000]
20 INTERNATIONAL, INC., a Delaware
   corporation,                           **Assigned for All Purposes to the**
21                                         **Hon. William F. Highberger, Dept. 10**
                 Plaintiffs,
22                                         **COMPENDIUM OF EVIDENCE IN**
            vs.                            **SUPPORT OF DEFENDANTS AND**
23                                         **CROSS-COMPLAINANTS GUY KOREN**
   GUY KOREN, an individual; NKM           **AND POTATO CORNER LA GROUP,**
24 CAPITAL GROUP, LLC, a California limited **LLC'S JOINT MOTION FOR SUMMARY**
   liability company; J & K AMERICANA,    **ADJUDICATION**
25 LLC, a California limited liability company;
   J & K CULVER, LLC, a California limited  *Filed Concurrently with Notice of Motion and*
26 liability company; J&K LAKEWOOD, LLC,   *Motion for Summary Adjudication,*
   a California limited liability company; J&K *Declaration of Guy Koren, Declaration of*
27 OAKRIDGE, LLC, a California limited      *Erlinda S. Bartolome, Request for Judicial*
   liability company; J&K VALLEY FAIR,     *Notice, Appendix of Decisional Authorities,*
28 LLC, a California limited liability company;

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

4632901.1                          1

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  J & K CAPITAL 2, LLC, a California limited liability company; J & K ONTARIO, LLC, a
2  California limited liability company; J&K PC TRUCKS, LLC, a California limited liability
3  company; J&K CONSULTANTS GROUP, LLC, a California limited liability company;
4  GK CAPITAL GROUP, LLC, a California limited liability company; POTATO
5  CORNER LA GROUP, LLC, a California limited liability company; ALON KOREN, an
6  individual; THOMAS HODGSON, an individual; EMILY GARCIA, an individual;
7  and DOES 1 through 25, inclusive,

8            Defendants,

9            – and –

10  PCJV USA, LLC, a Delaware limited liability company,

11            Nominal Defendant.

12  _____

13  PCJV USA, LLC, a Delaware limited liability company; PCI TRADING LLC, a Delaware
14  limited liability company; POTATO CORNER LA GROUP, LLC, a California limited
15  liability company; NKM CAPITAL GROUP, LLC, a California limited liability company; J
16  & K AMERICANA, LLC, a California limited liability company; J&K LAKEWOOD, LLC, a
17  California limited liability company; J & K CULVER, LLC, a California limited liability
18  company; J&K OAKRIDGE, LLC, a California limited liability company; J&K
19  VALLEY FAIR, LLC, a California limited liability company; J & K CAPITAL 2, LLC, a
20  California limited liability company; J & K ONTARIO, LLC, a California limited liability
21  company; J&K PC TRUCKS, LLC, a California limited liability company; J&K
22  CONSULTANTS GROUP, LLC, a California limited liability company; GK CAPITAL
23  GROUP, LLC, a California limited liability company; GUY KOREN, an individual;
24  ALON KOREN, an individual; THOMAS HODGSON, an individual; EMILY GARCIA,
25  an individual; ASHLEY GRUDNOWSKI, an individual,

26            Cross-Complainants,

27       vs.

28  _____

*and [Proposed] Order Granting Summary Adjudication*

Date:     September 21, 2020
Time:     10:00 a.m.
Dept.:    10

Action Filed:    April 10, 2018
Trial Date:      None

4632901.1                              2

COMPENDIUM OF EVIDENCE IN SUPPORT OF DEFENDANTS AND CROSS-COMPLAINANTS GUY KOREN AND POTATO CORNER LA GROUP, LLC'S JOINT MOTION FOR SUMMARY ADJUDICATION

1 │ CINCO CORPORATION, a Philippines
corporation; POTATO CORNER
2 │ INTERNATIONAL, INC., a Delaware
Corporation; HIGHFIVE CORPORATION, a
3 │ Philippines corporation; JOSE P.
MAGSAYSAY, JR., an individual; JOSE
4 │ MIGUEL MA. MONTINOLA, an individual;
RICARDO ENRIQUE K. MONTELIBANO,
5 │ an individual; MA. VICTORIA O.
BERMEJO, an individual; BEN OLIVAS, an
6 │ individual; JOHN EDWARD HERNANDEZ,
an individual; CHAD DOMINIC
7 │ HERNANDEZ, an individual; MIGUEL
RAYMUNDO HERNANDEZ, an individual;
8 │ MYROSE VICTOR, an individual; MARIVIC
DEL PILAR, an individual; JOSE MARCO
9 │ DEL PILAR, an individual; DIA LACABA,
an individual; NICARDO FALCIS, an
10 │ individual; AMIR JACOBY, an individual;
INBAL JACOBY, an individual; and ROES 1
11 │ through 500, inclusive,

12 │              Cross-Defendants.

13

14      Defendants and Cross-Complainants Guy Koren and Potato Corner LA Group, LLC

15  hereby submit this Compendium of Evidence in support of their Joint Motion for Summary

16  Adjudication, as follows:

| DATE | DESCRIPTION | EX. |
|------|-------------|-----|
| 04/02/2009 | April 2-3, 2009 Email Communications Between Guy Koren and Jose Magsaysay RE Review of NKM License Agreement | 1 |
| 04/28/2009 | NKM Master License Agreement dated on April 28, 2009 | 2 |
| 04/09/2010 | PCE Management LLC's Articles of Organization filed on April 9, 2010 | 3 |
| 04/09/2010 | PCE Trading LLC's Articles of Organization filed on April 9, 2010 | 4 |
| 12/10/2016 | The Philippine Star's December 10, 2016 Article | 5 |
| 07/11/2018 | F&B Report's July 11, 2018 Article | 6 |
| 05/02/2017 | May 2, 2017 Email from Ismael G. Khan to Erlinda Bartolome RE Letter of Appreciation to Guy Koren | 7 |
| 04/19/2010 | April 19, 2010 Meeting Minutes | 8 |

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

COMPENDIUM OF EVIDENCE IN SUPPORT OF DEFENDANTS AND CROSS-COMPLAINANTS GUY
KOREN AND POTATO CORNER LA GROUP, LLC'S JOINT MOTION FOR SUMMARY ADJUDICATION

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

| DATE | DESCRIPTION | EX. |
|---|---|---|
| 04/20/2010 | April 20, 2010 Meeting Minutes | 9 |
| 04/20/2010 | April 20, 2010 Email from Erlinda Bartolome to Amit Nemanim and Guy Koren with the attached "Working Draft" of the Joint Venture Agreement | 10 |
| 04/21/2010 | April 21 – April 23, 2010 Meeting Minutes | 11 |
| 04/27/2010 | April 27, 2010 Meeting Minutes | 12 |
| 04/29/2010 | April 29, 2010 Meeting Minutes | 13 |
| 05/01/2010 | May 1, 2010 Meeting Minutes | 14 |
| 05/11/2010 | May 11, 2010 Email from Jose Magsaysay to LA Group RE JV Agreement | 15 |
| 05/15/2010 | May 15, 2010 Email from Jose Magsaysay to Erlinda Bartolome RE Embracing DLA Piper | 16 |
| 05/18/2010 | May 18, 2010 Email from Jose Magsaysay to Amit Nemanim RE "SF Attorneys" Handling the JV Agreement | 17 |
| 05/18/2010 | May 18, 2010 Email from Erlinda Bartolome to Amit Nemanim, et al. RE The First Board Meeting of PCE Management on May 30, 2010 | 18 |
| 05/30/2010 | May 30, 2010 Meeting Minutes | 19 |
| 06/01/2010 | June 1, 2010 Email from Jose Magsaysay to Guy Koren, et al. with the Attached Draft JV Agreement | 20 |
| 06/02/2010 | June 2, 2010 Email from Mark Tung to Guy Koren with His Comments on the Attached Draft JV Agreement | 21 |
| 06/10/2010 | June 10, 2010 Email from Jose Magsaysay to Amit Nemanim and Erlinda Bartolome RE LLC and Corporation | 22 |
| 06/11/2010 | June 11, 2010 Email from Erlinda Bartolome to Jose Magsaysay, et al. with Her Comments to the Attached Draft JV Agreement | 23 |
| 06/14/2010 | June 14, 2010 Email from Jose Magsaysay to Erlinda Bartolome RE Rejecting Mark Tung for the JV Company | 24 |
| 06/28/2010 | June 28, 2010 Email Communications  amongst Cinco Group, LA Group, and DLA Piper with the attached Further Revised JV Agreement | 25 |

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

| DATE | DESCRIPTION | EX. |
|---|---|---|
| 07/02/2010 | July 2, 2010 Email from Erlinda Bartolome to Ben Olivas RE Cinco Group's Comments to the draft JV Agreement | 26 |
| 08/2010 | Erlinda Bartolome's August 2010 Report | 27 |
| 09/16/2010 | September 16, 2010 Email from Erlinda Bartolome to Jose Magsaysay, et al. with the Attached Final Draft JV Agreement | 28 |
| 09/16/2010 | September 16, 2010 Email from Jose Magsaysay to Erlinda Bartolome RE Final Draft JV Agreement | 29 |
| 10/01/2010 | October 1, 2010 Email from Kim Lambert to Erlinda Bartolome RE Franchisor Entity Not Holding Any Assets to Any Stores | 30 |
| 08/18/2011 | August 18, 2011 Email from Jose Magsaysay to Amit Nemanim RE Lack of Financial Resources | 31 |
| 01/04/2011 | January 4, 2011 Email from Ben Olivas to Erlinda Bartolome, cc Jose Magsaysay RE Info for Singer Lewak | 32 |
| 01/17/2011 | January 17, 2011 Email from Erlinda Bartolome to Ben Olivas and Kim Lambert with the Attached PCJV's FY2010 Financial Statement | 33 |
| 02/07/2011 | PCJV's February 7, 2011 FDD | 34 |
| 10/01/2010 | Trademark Copyright, and Know-How License Agreement dated on October 1, 2010 | 35 |
| 02/27/2011 | February 27, 2011 Email from Erlinda Bartolome to Kim Lambert RE Directors/Shareholders of NKM and PCJV | 36 |
| 04/10/2011 | April 10, 2011 Email from Erlinda Bartolome to Med Quiambao RE Ownership of PCJV | 37 |
| 08/16/2011 | DLA Piper's August 16, 2011 Invoice (Invoice No. 2609883) | 38 |
| 08/16/2011 | DLA Piper's August 16, 2011 Invoice (Invoice No. 2609884) | 39 |
| 08/16/2011 | DLA Piper's August 16, 2011 Invoice (Invoice No. 2609885) | 40 |
| 08/16/2011 | DLA Piper's August 16, 2011 Invoice (Invoice No. 2609887) | 41 |
| 11/10/2013 | An Email Chain Beginning June 10, 2013 and Ending November 10, 2013 RE DLA Piper Outstanding Invoices | 42 |

COMPENDIUM OF EVIDENCE IN SUPPORT OF DEFENDANTS AND CROSS-COMPLAINANTS GUY KOREN AND POTATO CORNER LA GROUP, LLC'S JOINT MOTION FOR SUMMARY ADJUDICATION

| DATE | DESCRIPTION | EX. |
|---|---|---|
| 10/6/2010 | An Email Chain Beginning September 27, 2011 and Ending October 6, 2011 RE Mr. Magsaysay's Visa application and PCJV Membership Certificates | 43 |
| 02/28/2012 | February 28, 2012 Email from Ben Olivas to Guy Koren, et al. RE No Additional Payments to Open 9 New Stores | 44 |
| 06/18/2012 | Master Services Agreement dated on June 18, 2012 | 45 |
| 06/29/2012 | June 29, 2012 Email from Kim Lambert to Ben Olivas RE Operating Agreement | 46 |
| 07/10/2012 | July 10, 2012 Email from Amir Jacoby to Jose Magsaysay RE Complaining about DLA Piper | 47 |
| 07/23/2012 | July 23, 2012 Email from Erlinda Bartolome to Guy Koren RE Request for Papers for the Cinco Board | 48 |
| 08/07/2012 | August 7, 2012 Email from Singer Lewak to Guy Koren RE LLC Agreement with the Attached Audit Report | 49 |
| 08/08/2012 | Joint Venture Agreement | 50 |
| 08/08/2012 | LLC Agreement | 51 |
| 10/16/2012 | October 16, 2012 PCJV Board Meeting Minutes | 52 |
| 10/17/2012 | Amended Joint Venture Agreement | 53 |
| 03/01/2013 | PCJV-LA Group Partnership Agreement | 54 |
| 05/25/2015 | May 25, 2015 Email from The Cinco Group (Ben Olivas) to Guy Koren, et al. with the Attached Cinco's Counter-Proposal to LA Group | 55 |
| 08/08/2015 | Ricardo Montelibano's August 8, 2015 Letter To Guy Koren and Amir Jacoby | 56 |
| 11/04/2015 | LA Group's November 4, 2015 Letter to Cinco Group Board of Directors | 57 |
| 11/12/2015 | November 12, 2015 PCJV Meeting Minutes | 58 |
| 12/10/2016 | A String of Emails amongst Guy Koren, Mabuhay (Lito Sibayan) and Jose Magsaysay, concerning a Potential Transaction | 59 |
| 11/02/2016 | Draft Letter of Intent from Mabuhay | 60 |

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

| DATE | DESCRIPTION | EX. |
|------|-------------|-----|
| 02/24/2017 | LA Group's February 24, 2017 Letter to Cinco Group | 61 |
| 03/08/2017 | March 8, 2017 Reply Letter from Ricardo Montelibano to LA Group's February 24, 2017 Letter | 62 |
| 09/14/2017 | September 14, 2017 Email from Guy Koren to Patricia Anatalio RE Stores not paying royalties | 63 |
| 10/21/2017 | October 11, 2017 Email from Guy Koren to Chad Hernandez and October 21, 2017 Reply Email from Chad Hernandez to Guy Koren | 64 |
| 12/03/2017 | December 3, 2017 Email from Amir Jacoby to Guy Koren, et al. RE the November 28, 2017 Meeting Minutes | 65 |
| 02/13/2018 | February 13, 2018 Email from Guy Koren with attached Term Sheet | 66 |
| 03/08/2018 | March 8, 2018 Email from Amir Jacoby to Jose Magsaysay, et al. RE Troubling Developments in PCJV USA [AJ 00077-00079] | 67 |
| 03/09/2018 | March 9, 2018 Email from Myrose Victor to Amir Jacoby RE Voiced Concern to Ben Olivas [AJ 00081-00085] | 68 |
| 01/17/2019 | Amir Jacoby's Privilege Log | 69 |
| 03/26/2018 | March 26, 2018 Email from Jose Magsaysay to Inbal Jacoby RE April 9 Members Meeting | 70 |
| 03/16/2018 | March 16, 2018 Email from Inbal Jacoby to Cinco/Hernandez Groups, et al. RE Her Narrative Against Koren [IJ 00039-00040] | 71 |
| 03/20/2018 | March 20, 2018 Email from Dom Hernandez to Guy Koren, et al. RE PCJV Letter of Intent | 72 |
| 04/03/2018 | April 3, 2018 Letter from Guy Koren to Jose Magsaysay RE Transfer of Bank Accounts | 73 |
| 03/27/2018 | March 27, 2018 Email from Jose Magsaysay to Guy Koren, et al. RE Requesting Meeting | 74 |
| 04/09/2018 | April 9, 2018 Purported Meeting Minutes | 75 |
| 04/10/2018 | Verified Complaint of Cinco Corporation, filed April 10, 2018 | 76 |
| 08/24/2018 | First Amended Complaint of Cinco Corporation and Potato Corner International, Inc., filed August 24, 2018 | 77 |

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

COMPENDIUM OF EVIDENCE IN SUPPORT OF DEFENDANTS AND CROSS-COMPLAINANTS GUY KOREN AND POTATO CORNER LA GROUP, LLC'S JOINT MOTION FOR SUMMARY ADJUDICATION

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

| DATE | DESCRIPTION | EX. |
|------|-------------|-----|
| 12/18/2018 | Verified Second Amended Complaint of Cinco Corporation and Potato Corner International, Inc., filed December 18, 2018 | 78 |
| 06/28/2019 | Verified Third Amended Complaint of Cinco Corporation and Potato Corner International, Inc., filed June 28, 2019 | 79 |
| 05/08/2018 | Verified Cross-Complaint of Cross-Complainant Guy Koren, filed May 8, 2018 | 80 |
| 10/10/2018 | Verified First Amended Cross-Complaint of Cross-Complainants PCJV USA, LLC, PCI TRADING LLC, POTATO CORNER LA GROUP, LLC, NKM CAPITAL GROUP, LLC, J & K AMERICANA, LLC, J&K LAKEWOOD, LLC, J & K CULVER, LLC, J&K OAKRIDGE, LLC, J&K VALLEY FAIR, LLC, J & K CAPITAL 2, LLC, J & K ONTARIO, LLC, J&K PC TRUCKS, LLC, J&K CONSULTANTS GROUP, LLC, GK CAPITAL GROUP, LLC, GUY KOREN, ALON KOREN, THOMAS HODGSON, EMILY GARCIA, and ASHLEY GRUDNOWSKI, filed October 10, 2018 | 81 |
| 07/22/2019 | Cross-Complaint Guy Koren's Verified Second Amended Cross-Complaint, filed July 22, 2019 | 82 |
| 05/30/2018 | Defendant and Cross-Complainant Guy Koren's Opposition to Brief to Cinco Corporation's *Ex Parte* Application for Order to Show Cause Re: Preliminary Injunction | 83 |
| 05/15/2019 | Declaration of Jose P. Magsaysay, Jr. filed In Support Of Plaintiff Potato Corner International, Inc.'s Motion for Preliminary Injunction, filed May 15, 2019 | 84 |
| 05/15/2019 | Declaration of John Edwards Hernandez filed In Support Of Plaintiff Potato Corner International, Inc.'s Motion for Preliminary Injunction, filed May 15, 2019 | 85 |
| 12/19/2018 | Declaration of Jose P. Magsaysay, Jr. filed In Support Of Plaintiff Potato Corner International, Inc.'s Motion for Summary Adjudication filed December 19, 2018 | 86 |
| 12/19/2018 | Declaration of John Edward Hernandez filed In Support Of Plaintiff Potato Corner International, Inc.'s Motion for Summary Adjudication, filed December 19, 2018 | 87 |
| 12/19/2018 | Plaintiff Cinco Corporation and Potato Corner International, Inc.'s Motion to File Under Seal Certain Exhibits In Support of Motion for Summary Adjudication, filed December 19, 2018 | 88 |

| DATE | DESCRIPTION | EX. |
|------|-------------|-----|
| 10/26/2018 | Verified Response of Cross-Defendant Amir Jacoby to Demurrer to Cross-Defendant PCJV USA, LLC, GUY KOREN, NKM CAPITAL GROUP, LLC, J & K AMERICANA, LLC, J&K CULVER, LLC, J&K LAKEWOOD, LLC, J&K OAKRIDGE, LLC, J&K VALLEY FAIR, LLC, J & K CAPITAL 2, LLC, J & K ONTARIO, LLC, J&K PCJV TRUCKS, LLC, J&K CONSULTANTS GROUP, LLC, GK CAPITAL GROUP, LLC, AND POTATO CORNER LA GROUP, LLC to the First Amended Complaint of Plaintiffs CINCO CORPORATION AND POTATO CORNER INTERNATIONAL, INC. filed October 26, 2018 | 89 |

DATED: August 17, 2020        FREEMAN, FREEMAN & SMILEY, LLP

By: _____

TODD M. LANDER
ARASH BERAL
Attorneys for Defendants and Cross-Complainants GUY KOREN, GK CAPITAL GROUP, LLC, ALON KOREN, THOMAS HODGSON, and EMILY GARCIA, and Cross-Complainant ASHLEY GRUDNOWSKI

DATED: August 17, 2020        VEDDER PRICE (CA), LLP

By: ___/ s / Eric R. McDonough___

Eric R. McDonough
Deborah A. Hedley
Attorneys for J&K AMERICANA, LLC et al.

9

COMPENDIUM OF EVIDENCE IN SUPPORT OF DEFENDANTS AND CROSS-COMPLAINANTS GUY KOREN AND POTATO CORNER LA GROUP, LLC'S JOINT MOTION FOR SUMMARY ADJUDICATION

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

# EXHIBIT 1

## Re: revised

Jose P. Magsaysay, Jr. <josemagsaysay@yahoo.com>
Thu 4/2/2009 5:25 PM
**To:** guy koren <guyk23@hotmail.com>
**Cc:** Linda 1 Bartolome <esbartolome@gmail.com>

Guy,

I will see what I can do.  But cannot promise you that some or all of what you further request will be accepted by my company.  Whatever I email back to you next week will be final and will not be negotiable anymore.

Thank you

jo

---

**From:** guy koren <guyk23@hotmail.com>
**To:** "Jose CEO of potato corner P. Magsaysay, Jr." <josemagsaysay@yahoo.com>
**Sent:** Friday, April 3, 2009 4:21:01 AM
**Subject:** revised

 Hey Joe,

Hope all is well. Our corp is being formed as we speak, called KNM Holdings which should be done in about 7 business days.  The money is ready to go as soon as we revise this agreement.  At that point we can finalize things with our investor and be ready to go.  The changes were made in the attachment and our thoughts on each change is broken down below.

The changes that we discussed while you were in LA were for some reason not implemented in the revised copy, which makes it difficult for us to forward it to our investors attorneys. We are trying to avoid any sort of roadblocks with our investor. We do not want to get sucked into a "legal blackhole". Basically we need to reword some parts of the agreement to make our investor feel more comfortable about his six figure investment, like we discussed.

In paragraph 2 section C:

we might need more time in terms of opening the first location.  Even if we find the perfect spot, the city might still take a month to issue all permits before we can even begin construction. Obviously we want things started asap but we we are looking at worst case scenerio.
We are looking at ways to start promoting the brand right away with mobile turbo broilers and carts at private high end events.

In paragraph 3:

If we choose to sub-license in order to expand, or block out competition (the way you guys did) we cant afford to split it with you 50/50.  If we are the ones taking all the risk and proving this concept as well paying 3k for an outlet and 5% of total sales, (which all sub-licensee are also paying) we will need to retain the upfront fee in order to offset any management and brand developing costs.

In paragraph 5:

In terms of the Trademark, we need to make sure we can obtain it for CA asap.

In paragraph 6:

We just added that all products approved by you should be at "reasonable market prices"

In paragraph 9:

Discontinuance of use of Trademarks should be based upon the agreement. The line:

"should it become advisable at anytime, in licensor's sole discretion, for licensor to modify or discontinue use of Trademarks"

is risky for us as the company that is investing this type of cash on branding and marketting.  What is to assure us years from now that we will not loose the license simply due to a better offer by a third party. This clause should be more 2 sided and assure the definite approval of the continuance (given there is no breach)  for the whole CA territory.  Our investor will surely wonder what is stoping you guys from letting us take all the risk, and at some point stepping in and marketing the brand yourself.  We will also need assurance that you guys will not be engaged in any negotiations for CA territory at anytime while this agreement is still in effect.

In Paragraph 10

you forgot to change 6 outlets in 2 years, not 1 year.

Also, $650 average per day is too much for us to committ taking in consideration there is no proof of concept yet.

In Paragraph 12

In case either party is going to require legal counsel, we should each be held responsible for the our own legal fees.

In paragraph 13:

In regard with rights to assign shareholding within our company, you know we are here for the long term, at the same time with assigning shares of our company, we need complete control. We abviously understand your concern of one day dealing with "joe shmo" so we can base this one the premise that Guy and Amit will always maitain <51% of the Inc. at all times unless agreed by all parties.

Also when the agreement is terminated with us for any reason, the sub license's rights are not automatically assigned to you.  They provide assurance for us when it comes to renewing this agreement.

In regard to your rights to assign these Trademark Rights, we want to let the investor know we are on the same team. Include some good faith clause with regard to assgning and renewing this agreement.

In Paragraph 14 & 15:

In regard to termination, we are going to have leases that will be minimum 3 years at a time.  Termination of trade rights in the middle of a lease contract will create problems for us as the leaseholders.  If termination of license is neccessary, the licensee should be able to proceed with business untill the end of the location's lease.  Immediate termination should occur only if agreement is breached or is agreed by both parties (because there are costs and penalties to terminating long term leases early, It is risky for us). Reasonable steps have to be taken to reach amicable solution before proceeding with an immediate termination. At the case of termination,  a third party shall be considered to take over operations from

licensee at licensors approval but not at licensee's expense, all equipment at location is owned by licensee.

We erased the paragraph that gives rights for the Licensor to take over licensee's operations at any point. In case of the termination the licensor shall take over operations as long as an amicable agreement has been reached by all parties. (our investment has to be protected).

In paragraph 17:

Rights to renew should be performance based. Meaning as long as all the terms are met, and we openned a minimum of 30 outlets (we have no idea what the attrition rate in the states will be) renewal should be approved.

In paragraph 21 & 30:

We discussed that this contracts serves as guidelines rather then exact compliance. Exact Compliance should be rephrased to general guidelines given all parties are acting in good faith. No attorney will recommend for us or an investor to sign off on this clause, especially when paragraph 30 talks about "licensee acknowledges that all provisions are fair and reasonable."
Somehow we have to make sure that at no point can "the rug be pulled from under our feet". For example few years from now after we have spent thousands of hours and dollars building a brand in CA, a new CEO should be not able to renegotiate other terms. Strict compliance will create countless loopholes with could cause problems for us in the future. Basically making the contract more 2 sided.

In paragraph 23:

Changes to Rules and regulations should be reasonable.

Also we need a clause defining the realtionship between Potato Corner in philippines and the corp in honk kong, and state that both companies are bound by this terms.

That's all we came up with . At this point we didn't even want to start dealing with attorneys knowing that things will only get more complicated. We hope that by the next revised agreement we can sign everything and send you the money right away. We are also putting together a game plan to start promoting the brand at popular local events and children parties. We are thinking of a mobile Turbo Broiler Cart. That would resolve all the fryer and grease issues. It will also build a second income stream for us. The potential here in at LA hot spots in huge, and we would obviously use all these mini outlets to promote our Grand Opening.

Please send us your thoughts right away on how fast we can move forward. We also would like do conference call with you and our investor in order to make him feel more comfortable and part of the team. Amit and I are so excited about this adventure we have been making fries on a daily bases and getting amazing feedback.

Jo please understand the we are going to put our lives into building this business and we are eager to get going and just want this contract to be safe for us.

P.S - Thanks for the pictures!!!! we are getting them framed :)

Sincerely,

Guy Koren
310-593-1581

Quick access to your favorite MSN content and Windows Live with Internet Explorer 8. Download
FREE now!

# EXHIBIT 2

## Potato Corner
## Master License Agreement

Agreement made and executed at _Beverly Hills, Los Angeles County_, this _28th_ day of _April_____, 2009, by and between: _California_

**Potato Corner Global Company Limited, Hong Kong,** a corporation duly organized and existing under and by virtue of Hong Kong laws, with principal office situated at unit 8 19/F Cheuk Nang 21st Century Plaza, 250 Hennessy Rd., Wanchai, Hong Kong, represented herein by its President, Jose P. Magsaysay, Jr., and hereinafter referred to as the "Licensor;"

-   and –

_NKM Capital group LLC_, a corporation duly organized and existing under and by virtue of the laws of _California US_ with principal office at _1478 S crest Dr, LA, CA 90035_, represented herein by its _CEO_, _Guy Koren_, and hereinafter referred to as the "Licensee".

Whereas:

WHEREAS, Licensor is the owner of trademark "**Potato Corner and Device**" and owns proprietary know-how relating to and has created, designed, and developed a chain of **Potato Corner** outlets specializing in the marketing, preparation, and sale of French Fries, potato varieties and other food products.

WHEREAS, the Licensor has developed and has exclusive rights and authority to use the trademark "**Potato Corner and Device**" and to the other service marks, trademarks, logos, and trade secrets (hereinafter referred to as "Trademarks") used in conjunction therewith.

WHEREAS, the Licensee desires to acquire from Licensor, and Licensor is willing to grant Licensee a master license to operate "**Potato Corner**" outlets (hereinafter called as "Outlets") and to use the Trademarks, upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, for and in consideration of the foregoing premises and the covenants and stipulations hereinafter stated, the Licensor hereby grants unto the Licensee, the license to establish and operate Outlets, sell "**Potato Corner**" food lines, use the Trademarks, under the following terms and conditions, to wit:

1   **NOTARIAL CERTIFICATE ATTACHED** 03/24/09

1. **Territory.** The license herein granted shall be exercised or availed of within the County of Los Angeles, USA (the "Territory"), subject to the terms and conditions of this Agreement.

2. **Term of License.** This Agreement shall commence only upon the execution of the following: a) signing of this Agreement by both parties and b) payment to the Licensor of US$ 15,000.00 by the Licensee US$ 5,000.00 upon the signing of this Agreement and US$ 10,000.00 thirty (30) days before the scheduled opening of the first outlet. Should Licensee fail to make the foregoing payments this Agreement shall commence on the fifth month from the date of the signing of this Agreement. This Agreement  shall expire upon the expiration of the term of the License granted herein the term of the License granted herein shall be for ten (10) years. For purposes of computing the ten (10) year period, it shall commence upon the date of the formal opening of the first outlet or 5 months from the date this Agreement was signed by the Licensee whichever comes first.  Licensor shall have the option to renew this Agreement for another term of ten (10) years, subject to such terms and conditions as prescribed in this and the new Agreement.

3. **Grant of Sub-Licensee.** Licensee may be entitled to appoint Sub-Licensees to operate other Outlets under the Trademarks. This right shall be granted to Licensee after the opening of the 5th  Outlet and based on its performance as Licensee for the first 6 months of this Agreement. However, upon mutual agreement by the parties herein contained in a subsequent written document, the Licensee may appoint Sub-Licensee even before the opening of the 5th Outlet based on its performance

   Licensee acknowledges and agrees that its appointment of a Sub-Licensee is entirely at Licensee's own risk and that Licensor will not be responsible in any way for the conduct or performance of any Sub-Licensee.

   The appointment of any Sub-Licensee shall not diminish or affect any of the Licensee's obligations owed to Licensor.

   All Sub-License fees that are non-hard asset in nature such as service fees and management fees, and fees for use of property right and trademarks and the like paid by any Sub-Licensee shall be split 80/20. 80% going to the Licensee and 20% going to the Licensor. However, the monthly fee per Outlet of  the Sub-Licensees of US $200.00 or 5% (whichever is higher) of the Outlet sales, whichever is higher, shall be split 50/50 between the Licensor and Licensee.

   The Licensee shall, within ten (10) business days from execution of any Sub-License

**NOTARIAL CERTIFICATE ATTACHED**

Agreement, furnish the Licensor with a duly executed copy of said agreement, together with the fees mentioned in the next preceding paragraph.

In the event that a Sub-License Agreement with any Sub-Licensee is terminated for any reason, resulting in Licensee not being in compliance with its continuous operation, Licensee will use its best efforts to find a new Sub-Licensee as expeditiously as possible, without prejudice to the right of Licensor to terminate this Contract. The Sub-License Agreement shall contain the terms and conditions of this Agreement and shall not exceed the term hereof. Licensee shall see to it that its Sub-Licensees comply with the terms and conditions of the Sub-License Agreement.

4. **Location.** Licensee shall build and operate Outlets, including those of the Sub-Licensees, only in locations approved by the Licensor that will maintain an image and reputation of high quality and uniformity consistent with the image and reputation of the Trademarks as approved by the Licensor.

5. **Obligations of Licensor.** During this Agreement, Licensor shall:

Use reasonable and diligent efforts to register the Trademarks in the Territory. However, Licensee understands and acknowledges that there is no assurance that the Licensor will succeed in obtaining such registration.

Grant Licensee the license to use the Trademarks and sell products bearing the Trademarks in the Territory, subject to the terms and conditions of this Agreement.

Provide consultation and advice to Licensee in connection with the usage of the Trademarks and sale of products bearing the Trademarks in the Outlets.

Visit the Licensee's Outlets once a year for the purpose of audit and confirming royalty payments, at Licensor's expense

6. **Obligations of Licensee.** During this Agreement, the Licensee will:

Sell products with due regard for the suggested retail price for such products in the region.

Purchase all proprietary and non proprietary blends, flavorings, sauces, raw materials, paper, and packaging products only from Licensor or its accredited supplier, subject of an accreditation agreement, to ensure product quality

Purchase other consumable raw, uncooked, cooked semi-cooked, semi-finished

NOTARIAL CERTIFICATE ATTACHED          03/24/09

3

or finished materials from local suppliers that has been accredited  by the Licensor, subject of an accreditation agreement .

Buy equipment needed for the proper operation of the Outlets, with guidance from Licensor and in accordance with all applicable laws and regulations.

Procure all necessary insurance for the Outlets as provided for in this Agreement.

Secure all required licenses and permits necessary for the operation of the Outlets.

Keep appropriate records of all sales transactions as provided for in this Agreement and required by pertinent law and regulations.

Provide right wages and benefits to employees of the Outlets as mandated by pertinent laws and regulations.

Oversee the day to day operations of the Outlets and ensure clean, sanitary, attractive, and efficiently operated Outlets offering high quality food products and courteous and helpful service.

Develop marketing and branding plans for the Trademarks and Outlets in accordance with Licensor's guidelines for advertising its Trademarks.

Set up a minimum of six (6) Outlets in the Territory within the first two (2) years of the term of this Agreement.

Use the Trademarks exclusively for the operation of the licensed Outlets.

Immediately notify the Licensor of any infringement of the Trademarks.

Refrain from utilizing the Trademarks or any part thereof or any similar names or marks as part of its own name (including domain name) or style.

Send monthly sales, individual and corporate (Licensor's company) financial reports, financial statements, income statements, product movements/mix reports not more than 30 days after the end of the month, submit a yearly marketing and business plan two months before the start of the years plans. Submit sub-licensee's reports similar to the ones the Licensee submits to the Licensor.

Refrain from representing itself as being Licensor or an agent or partner of

03/24/09

NOTARIAL CERTIFICATE ATTACHED

Licensor.

At the Licensee's expense send a representative from the Licensor, at least once a year, to do operational, marketing, training and financial check-ups and conduct business reviews with the Licensor. One visit every year starting July 2010 until the validity of this agreement.

7. **Annual Review and Audit.**

**Annual Review** – Once each calendar year, at a time designated by Licensor, Licensee's representative shall be obligated at Licensee's expense to meet with representatives of Licensor at Licensor's principal office, for the purpose of discussing and reviewing Licensee's use of the Trademarks. Licensee shall likewise conduct an annual review with respect to its Sub-Licensees. This may be done via teleconference.

**Licensor's Right to Audit** – Licensor shall have the right once a year, during business hours, to inspect and audit, or cause to be inspected and audited, the business records, bookkeeping and accounting records, sales and income tax records and returns, and other records of the Outlets for the purpose of confirming royalty payments.    Licensee and its Sub-Licensees shall fully cooperate with representatives of Licensor and independent accountants hired by Licensor to conduct such inspection or audit.

8. **Records.** The Licensee and its Sub-Licensees shall make its records available to scrutiny and inspection by the Licensor's representatives during the latter's annual visit for the purpose of confirming royalty payments.

9. **Trademarks**

**Ownership and Goodwill** – Licensee and its Sub-Licensees acknowledge that their right to use the Trademarks and to sell products via the Outlets is derived solely from this Agreement and is limited to the conduct of business by Licensee and its Sub-Licensees pursuant to and in compliance with this Agreement and all applicable standards and specifications prescribed by Licensor from time to time during the term of this Agreement.

**Limitations on Use of the Trademarks** – Licensee and its Sub-Licensees agree to use the Trademarks as the sole identification of the Outlets, provided that they shall identify themselves as the independent owner thereof in the manner prescribed by Licensor.    Licensee and its Sub-Licensees shall not use the

NOTARIAL CERTIFICATE ATTACHED

Trademarks as part of any corporate or trade name or with any prefix, suffix, or other modifying words, terms, designs, or symbols (other than logos licensed to Licensee hereunder), or in any modified form, nor may Licensee and its Sub-Licensees use any Trademarks in any manner not expressly authorized in writing by Licensor. Licensee and its Sub-Licensees agree to prominently display products and other supplies and packaging materials. All Trademarks shall be displayed in the manner prescribed by Licensor.

**Modification/Discontinuance of Use of Trademarks** – Licensor shall not be obligated to compensate Licensee and its Sub-Licensees for any costs incurred in connection with such modification should it become advisable at any time, in Licensor's sole discretion, for Licensor to modify the use of any Trademark, and/or use one or more additional or substitute trade or service directions to modify the use of such Trademark within reasonable time after notice thereof by Licensor. The foregoing also applies to the discontinuance of the use of the Trademark in extraordinary cases in consultation with the Licensee.

**Preservation of Trademarks** – In order to preserve and protect the image and the goodwill associated with the Trademarks, Licensee and its Sub-Licensees shall refrain from any act or omission that impairs or threatens to impair the image, goodwill, or stature or reputation of the Trademarks or Licensor's business.

**10. Right of First Refusal.** Licensor shall give Licensee the first option to obtain exclusive licenses of the entire state of California; provided Licensee complies with the following:

Licensee has opened six (6) Outlets within the Territory during the first 2 years of the term of this Agreement and Licensee pays the license fees for the 6th up to the 10th Outlets during the first 2 years of the term of this Agreement . Licensee has established a good working relationship with Licensor.

Licensee has achieved an average daily sale per Outlet of at least US$ 350.00 over a period of one year for all opened Outlets.

The grant of an exclusive license for the entire state of California in favor of the Licensee shall be covered by a separate Agreement under terms and conditions to be mutually agreed by the parties herein.

**11. Fees.** In consideration of the license and other rights granted hereunder, the Licensee shall pay to the Licensor a license fee of US$ 30,000 for ten (10) outlets to be opened within the first 2 years of this Agreement, which is US$ 3,000 per Outlet. Upon signing of

NOTARIAL CERTIFICATE ATTACHED

this Agreement, Licensee shall pay Licensor US$ 15,000 representing 50% of the license fee for ten (10) outlets.

**For the 6th up to the 10th Outlets to be opened within the first 2 years of this Agreement, Licensee shall pay the corresponding license fee thereto prior to the opening of said Outlets.**

Licensee shall pay Licensor a license fee of US$3,000 prior to the opening of each Outlet beyond the initial ten (10) outlets provided for in this Agreement.

Licensee shall also pay Licensor an on-going monthly fee per Outlet of US$200 or 5% of Outlet sales, whichever is higher. For Outlets of Sub-Licensees, the said fee shall be split 50-50. The foregoing fee shall be paid to the Licensor every 20th day of the succeeding month.

All withholding and other taxes levied by any authority on the payments by the Licensee to the Licensor under this Agreement shall be borne solely by the Licensee.

All payments made under this agreement shall be made by wire transfer using a bank or other financial institution specified by Licensor, except as expressly provided in this agreement, any and all fees and monies paid by Licensee to the Licensor shall not be withheld, set off, or deducted, and shall not be refunded to the Licensee under any circumstances whatsoever.

12. **Indemnity.** In the event that either party to this Agreement is required to employ legal counsel or to incur other expense to enforce any obligation of any party hereunder, or to defend against any claim, demand, action, or proceeding by reason of any of the parties' failure to perform any obligation imposed by this Agreement, and provided that legal action is filed and such action establishes a party's default hereunder; then the aggrieved party shall be entitled to recover in said action from the defaulting party the amount of all reasonable attorneys' fees of such counsel and all other expenses incurred in enforcing such obligation, or in defending against such claim, demand, action, or proceeding, whether incurred prior to, or in preparation for, or in contemplation of the filing of such action or thereafter.

13. **Right to Assign.** Licensee shall not assign any of its rights or obligations under this Agreement without the prior written consent of the Licensor. Any change in the shareholding or partnership or sole proprietorship or control of management of the Licensee shall be considered an assignment.

NOTARIAL CERTIFICATE ATTACHED

**14. Termination.** This agreement shall be terminated upon its expiry date and may be terminated at any time, with notice of at least thirty (30) days to the other party:

> By either party, if the other party hereto breaches any of the terms and conditions hereunder or fails to perform any of its obligations or covenants contained in this agreement and that breach or failure to perform is not remedied within thirty (30) days after written notice of such breach or failure to perform has been given to it; or

> By the Licensor, if the Licensee is dissolved, shall become bankrupt, insolvent, or go into liquidation, whether compulsorily or voluntarily, or enter into any arrangement or composition with its creditors, or has a receiver or similar officer appointed over any part of its assets or undertaking.

**15. Effects of Termination.** Upon termination of this Agreement for any reason whatsoever:

> The Licensee and Sub-Licensees shall immediately thereafter cease to use the Trademarks.

> Licensee and Sub-Licensees must return all items with proprietary trademarks to Licensor.

> The Licensor and/or Licensee shall accordingly notify in writing the Sub-Licensees of the termination of this Agreement, the terms and conditions of which form part of the Sub-Licensees' agreement with the Licensee.

**16. Restrictions.** On termination of this agreement, the Licensee shall not:

> At any time after the termination of this agreement reveal or use, for its own benefit or for the benefit of any third party, any trade secret or confidential information of Licensor or any other trade secret or confidential information acquired from the Licensor in connection with this agreement;

> For a period of one (1) year thereafter solicit, interfere with, or endeavor to entice away, employ, or contract for the provision of services of any employee or consultant of the Licensor or any employee of or person who has entered into a contract with the Licensor.

NOTARIAL CERTIFICATE ATTACHED

During the period of this agreement, the Licensee shall not be involved, directly or indirectly in any way, in any business which competes with, or is similar to, or in any way can be mistaken for or thought to be related to Licensor, the Trademarks, or Outlets.

Except for the rights expressly granted herein during the term of this agreement, the Licensee undertakes that it will not, as well as ensure that none of its officers, employees, or agents will, at any time, either during the term of this agreement or after termination of this agreement or the concerned employee's employment with the Licensee (as the case may be), use or register any of the Trademarks or the trade name or any trademark, tradename, logo, symbol, device, or other item whatsoever which is in any way similar to, competitive, or in conflict with any of the Trademarks or the trade names, or otherwise in any way resemble or attempt to pass off as any of the Trademarks or trade names for any purpose whatsoever.

17. **Option to Renew.** Upon the expiry of the term of this Agreement, the Licensor may, upon written request of the Licensee made not less than six (6) months before the expiry date of this agreement, renew the agreement, covered by a new agreement under terms and conditions stated therein, for another ten (10) years, taking into consideration the following :

> There is no breach of any of the terms of this agreement by the Licensee, either during the term of this Agreement or at its expiration;
>
> The Licensee has performed satisfactorily during the term of this Agreement; and
>
> Licensee has established at least fifty (50) Outlets within the term of this Agreement.

However, upon mutual agreement by the Licensor and Licensee, they may renegotiate the terms and conditions of this Agreement at the end of the 5th year of the term of this Agreement.

18. **Joint and Several Liability.** Should Licensee consist of more than one person, the liability of such persons to Licensor shall be joint and several.

19. **Illegality.** If, for any reason, any provision herein is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation, such shall not impair the operation of or affect the remaining provisions of this Agreement, and the latter will continue to be given full force and effect and bind the parties hereto; and said invalid

NOTARIAL CERTIFICATE ATTACHED

provisions shall be deemed not part of this Agreement; Provided, however, that if Licensor determines that said finding of illegality adversely affects the basic consideration of this Agreement, Licensor may, at its option, terminate this Agreement.

20. **Force Majeure.** Whenever a period of time is provided in this Agreement for either party to do or perform any act or thing, except the payment of monies, neither party shall be liable or responsible for any delays due to strikes, lockouts, casualties, acts of God, war, governmental regulation or control, or other causes beyond the reasonable control of the parties, and in any event, said time period for the performance of an obligation hereunder shall be extended for the amount of time of the delay. This clause shall not apply or not result in an extension of the term of this Agreement.

**Waiver.** No failure of Licensor / Licensee to exercise any power reserved  hereunder, or to insist upon strict compliance with any obligation or condition hereunder, and no custom or practice of the parties in variance with the terms hereof, shall constitute a waiver of their right to demand exact compliance with the terms of this Agreement.

21. **Confidentiality.** At all times and notwithstanding the termination of this agreement, all information relating to the Outlets and Trademarks, whether written or oral, supplied or made known directly or indirectly by the Licensor to the Licensee, shall be retained in strict confidence and shall not, except with the prior written approval of the Licensor and for purposes in accordance with this agreement, be used or divulged to any other person, firm, or company.  Licensee will keep, and will ensure that its officers, employees, and agents keep, such information, techniques, and know-how strictly confidential at all times.

All product specifications and trademark usage issued by the Licensor shall throughout the period of this Agreement and thereafter remain the property of Licensor and may not be reproduced in any way by the Licensee or any of its officers, employees, or agents.

22. **Rules and Regulations.** The Licensee shall comply with the existing and subsequent rules and regulations of the Licensor in connection with its trademarks and products and such rules and regulations shall bind the Licensee upon and from the date on which notice in writing thereof is given to the Licensee by the Licensor, unless otherwise stated by the Licensor.  Any breach by the Licensee of any of the said rules and regulations shall be deemed to be a breach of the terms and conditions of this agreement.

NOTARIAL CERTIFICATE ATTACHED

23. **No Partnership.** This Agreement is an agreement between two distinct and different entities or personalities and does not create a fiduciary relationship between the parties, nor does it constitute Licensee as an agent, legal representative, joint venturer, partner, employee, or servant of Licensor for any purpose whatsoever. It is understood between the parties hereto that Licensee shall be an independent contractor and is in no way authorized to make any contract, agreement, warranty, or representation on behalf of Licensor, nor to incur any debt, or to create any obligation, express or implied, on behalf of Licensor. Likewise, the Licensor shall not be responsible for the conduct of the employees and/or personnel of the Licensee.

24. **Notice.** Any notice required to be given hereunder shall be in writing and shall be either mailed by certified mail, return receipt requested, or delivered by a recognized courier service, receipt acknowledged.

Alternatively, any report, notice, request, demand, or other communication required or permitted under this Agreement shall be deemed to be have been properly given by the sender and received by the addressee (1) if personally delivered; (2) if a confirmation receipt is faxed back containing the signature of an authorized person, when sent by fax; or (3) if an email reply is sent back by the receiver confirming receipt, when emailed. Notices and correspondence through facsimile or email requiring the transmission of original documents must be followed by such transmission of original copies via courier mail.

Any notice to comply with the provisions shall be deemed to be given five (5) business days after mailing, or on the date of receipt, whichever is earlier. Each party shall have the right to designate any other address or addressee for such notices by giving notice thereof in the foregoing manner, and in such event all notices to be mailed after receipt of such notice shall be sent to such other address or addressee.

All email notices as provided for in this Agreement shall be sent to the following email addresses:

Licensor: josemagsaysay@yahoo.com
Licensee: _guyk23@hotmail.com_
         _damitneman@yahoo.com_

25. **Entire Agreement.** This Agreement, along with any exhibit attached hereto, and the documents referred to herein, shall be construed together and constitute the entire, full, and complete agreement between Licensor and Licensee concerning the subject matter hereof; and supersedes all prior agreements. No amendment, change, or variance from this Agreement shall be binding on either party, unless executed in writing by both

NOTARIAL CERTIFICATE ATTACHED

parties.

26. **Governing Law and Jurisdiction.** This agreement shall be interpreted and construed under the laws of the Hong Kong Special Administrative Region, People's Republic of China.

Any action sought to be brought by either party shall be brought before the Hong Kong courts, which shall have exclusive jurisdiction, and the parties do hereby waive all questions of personal jurisdiction or venue for the purposes of carrying out this provision.

27. **Arbitration.** If any matter, dispute or claim cannot be settled amicably between the parties within thirty (30) days after the same has been discussed by their authorized representatives, then the matter, dispute, or claim will be submitted for arbitration to the Hong Kong International Arbitration Centre, in accordance with the rules of the United Nations Commission on International Trade Law (UNCITRAL). Nothing contained herein shall, however, be construed to limit or to preclude Licensor from bringing any action in any court of competent jurisdiction for injunctive or provisional relief as Licensor deems to be necessary or appropriate to compel Licensee to comply with its obligations hereunder or to protect Licensor's rights. In addition, nothing contained herein shall be construed to limit or to preclude Licensor from joining with any action for injunctive or provisional relief all monetary claims that Licensor may have against Licensee which arise out of the acts or omissions giving rise to the action for injunctive or provisional relief. The arbitration provision shall be deemed self-executing, and in the event that Licensee fails to appear at any properly noticed arbitration proceeding, award may be entered against Licensee notwithstanding Licensee's failure to appear.

Nothing herein contained shall bar the right of the parties to seek and obtain temporary injunctive relief from a court of competent jurisdiction in accordance with applicable laws against threatened conduct that will cause loss or damage, pending completion of the arbitration.

The arbitration proceedings shall be held in Hong Kong Special Administrative Region, People's Republic of China at such venue within as may be specified by the arbitrator.

The arbitration proceedings shall be conducted in the English language.

The decision and award of the arbitrator shall be final and binding on the Parties.

NOTE: CERTIFICATE ATTACHED          03/24/09

28. **Insurance.** Licensee shall, at Licensee's expense and no later than upon commencement of the business contemplated by this Agreement, procure and maintain in full force and effect throughout the term of this Agreement all types of insurance as may be required by Licensor under this or subsequent agreements, or as mandated by government agencies, which shall be for a minimum period of one (1) calendar year and in such amounts as Licensor or a government agency may require from time to time, and shall designate Licensor as an additional name insured. The types of insurance may include, but is not limited to, Fire, Theft and Broadwater Damage Insurance, and Comprehensive General Liability Insurance;

   Licensee shall make timely delivery of certificates of all required insurance to Licensor, each of which shall contain a statement by the insurer that the policy will not be cancelled or materially altered without at least thirty (30) days prior written notice to Licensor.

   Should Licensee, at any time, fail or refuse to maintain in effect any insurance coverage required by Licensor or a government agency pursuant to this Agreement, or to furnish satisfactory evidence thereof, Licensor may, but is not obligated to, obtain such insurance coverage on Licensee's behalf. Licensee must then promptly pay upon Licensor's demand any costs and premiums Licensor has incurred in this respect. The payment of these costs is non-refundable.

29. **Acknowledgements.** Licensee hereby acknowledges the exclusive rights of Licensor to the products and Trademarks.

   Licensee further acknowledges that Licensor does not give any guarantee or warranty in connection with profitability or any other aspect of the proposed business.

   Licensee acknowledges that it has been advised by the Licensor to seek other appropriate independent advice and that the decision to enter into this agreement has been taken solely on the basis of the personal judgment and experience of the Licensee and its having taken such independent advice. Accordingly, the Licensee acknowledges that no representation, warranty, inducement or promise, express or implied, has been made by Licensor to induce Licensee to enter into this agreement, save for those written, annexed to, and incorporated in this agreement.

   It is hereby expressly agreed between the parties that each of the restrictions contained in this agreement is reasonably necessary for the protection of the Licensor and its other licensees, the trade names and the Trademarks, and does not unreasonably interfere with the freedom of action of the Licensee who enters into this agreement with benefit of legal advice in full knowledge of all the provisions hereof; and the Licensee acknowledges that all such provisions are fair and reasonable.

Licensee further acknowledges that to the best of the Licensor's information, knowledge and belief, none of the Trademarks infringe upon any rights of any third party and that the Licensor has given no warranty as to the validity of any rights in any of the Trademarks in the Territory.

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound here-by, have duly executed, sealed and delivered this Agreement in triplicate the day and year first above written.

**Potato Corner Global Company Limited**

*NKM Capital Group LLC*

BY:

Jose P. Magsaysay, Jr.
President

*Guy Koren*
President

Signed in the Presence of:

*Guy Koren*

*Amit Nemanim*

ACKNOWLEDGEMENT

BEFORE ME, a Notary Public for the City of *Beverly Hills* personally appeared the following persons:

| Name | Identification Card No. | Date and Place of Issue |
|------|------------------------|------------------------|
| Guy Koren | DL# 34924397 | California 03 27.09 |
| Amit Nemanim | DL# A 9480000 | CA 05/27/11 |

known to me and to me known to be the same persons who executed the foregoing License Agreement consisting of __14__ (__) pages, including the page where this Acknowledgement is written, and they acknowledged that the same is their true and voluntary act and deed and that of the corporation which they represent.

WITNESS MY HAND SEAL, this __29th__ day of __2009__ at __April__.

**NOTARIAL CERTIFICATE ATTACHED**

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of Los Angeles

On April 29th 2009 before me, Todd E. Peters "Notary Public",
Date                                   Here Insert Name and Title of the Officer

personally appeared Amit Nemanim AND Guy Koren
                                    Name(s) of Signer(s)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

**TODD E. PETERS**
Commission # 1690486
Notary Public - California
Los Angeles County
My Comm. Expires Aug 29, 2010

WITNESS my hand and official seal.

Signature _____
            Signature of Notary Public

Place Notary Seal Above

---------- **OPTIONAL** ----------

Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.

**Description of Attached Document**

Title or Type of Document: Potato Corner Master License Agreement

Document Date: April 29th 2009         Number of Pages: 14 pgs And certificate attached

Signer(s) Other Than Named Above: _____

## Capacity(ies) Claimed by Signer(s)

Signer's Name: Amit Nemanim
☐ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☒ Other: Managing Member

Signer Is Representing: _____

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

Signer's Name: Guy Koren
☐ Individual
☒ Corporate Officer — Title(s): President
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

Signer Is Representing: _____

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

©2007 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org   Item #5907   Reorder: Call Toll-Free 1-800-876-6827

## ACKNOWLEDGMENT

REPUBLIC OF THE PHILIPPINES )
MAKATI CITY ) S.S.

BEFORE ME, a Notary Public, in and for the City of Makati, on this day personally appeared Jose P. Magsaysay Jr., with his Philippine Passport No. PP 0753283 issued on January 26, 2005 at Manila and valid until January 26, 2010 known to me and to me known to be the same person who executed the foregoing Master License Agreement consisting of 16 pages, including the page where this Acknowledgement is written, and acknowledged to me that the same is his own free will and voluntary act and deed and that of the corporation he represents.

WITNESS MY HAND AND SEAL this 20th day of May 2009 at Makati City.

Doc. No.: 8
Page No.: 3
Book No.: I
Series of : 2009

NOTARY PUBLIC

Felicite C. Cordero
Notary Public for Makati City
Appt. No. M-133 until December 31, 2010
2nd Floor SEDCCO Bldg. Rada cor. Legaspi Sts.
Attorney's Roll no. 56041
PTR No. 1572293 - 01/07/09 - Makati City
IBP No. 769758 - 01/07/09 - Makati City
TIN No. 187-221-693

# EXHIBIT 3

LLC-1    File # **201010210221**



## State of California
### Secretary of State

## LIMITED LIABILITY COMPANY
## ARTICLES OF ORGANIZATION

**FILED**
In the Office of the Secretary of State
of the State of California

APR **0 9** 2010

A $70.00 filing fee must accompany this form.

**IMPORTANT – Read instructions before completing this form.**

This Space For Filing Use Only

**ENTITY NAME** (End the name with the words "Limited Liability Company," or the abbreviations "LLC" or "L.L.C." The words "Limited" and "Company" may be abbreviated to "Ltd." and "Co.," respectively.)

1.   NAME OF LIMITED LIABILITY COMPANY

PCE Management LLC

**PURPOSE** (The following statement is required by statute and should not be altered.)

2.   THE PURPOSE OF THE LIMITED LIABILITY COMPANY IS TO ENGAGE IN ANY LAWFUL ACT OR ACTIVITY FOR WHICH A LIMITED LIABILITY COMPANY MAY BE ORGANIZED UNDER THE BEVERLY-KILLEA LIMITED LIABILITY COMPANY ACT.

**INITIAL AGENT FOR SERVICE OF PROCESS** (If the agent is an individual, the agent must reside in California and both items 3 and 4 must be completed. If the agent is a corporation, the agent must have on file with the California Secretary of State a certificate pursuant to Corporations Code section 1505 and Item 3 must be completed (leave Item 4 blank).)

3.   NAME OF INITIAL AGENT FOR SERVICE OF PROCESS

Mark Tung

4.   IF AN INDIVIDUAL, ADDRESS OF INITIAL AGENT FOR SERVICE OF PROCESS IN CALIFORNIA    CITY    STATE    ZIP CODE

8950 W. Olympic blvd, suite 563    Beverly Hills **CA**    90211

**MANAGEMENT** (Check only one)

5.   THE LIMITED LIABILITY COMPANY WILL BE MANAGED BY:

[✓] ONE MANAGER

[ ] MORE THAN ONE MANAGER

[ ] ALL LIMITED LIABILITY COMPANY MEMBER(S)

**ADDITIONAL INFORMATION**

6.   ADDITIONAL INFORMATION SET FORTH ON THE ATTACHED PAGES, IF ANY, IS INCORPORATED HEREIN BY THIS REFERENCE AND MADE A PART OF THIS CERTIFICATE.

**EXECUTION**

7.   I DECLARE I AM THE PERSON WHO EXECUTED THIS INSTRUMENT, WHICH EXECUTION IS MY ACT AND DEED.

4/e/10

DATE    SIGNATURE OF ORGANIZER

Mark Tung

TYPE OR PRINT NAME OF ORGANIZER

LLC-1 (REV 04/2007)    APPROVED BY SECRETARY OF STATE

# EXHIBIT 4

LLC-1    File #**2 0 1 0 1 0 2 1 0 2 2 6**



## State of California
### Secretary of State

### LIMITED LIABILITY COMPANY
### ARTICLES OF ORGANIZATION



**FILED**
In the Office of the Secretary of State
of the State of California

APR 09 2010

A $70.00 filing fee must accompany this form.

**IMPORTANT – Read instructions before completing this form.**

This Space For Filing Use Only

**ENTITY NAME** (End the name with the words "Limited Liability Company," or the abbreviations "LLC" or "L.L.C." The words "Limited" and "Company" may be abbreviated to "Ltd." and "Co.," respectively.)

1. NAME OF LIMITED LIABILITY COMPANY

PCE Trading LLC

**PURPOSE** (The following statement is required by statute and should not be altered.)

2. THE PURPOSE OF THE LIMITED LIABILITY COMPANY IS TO ENGAGE IN ANY LAWFUL ACT OR ACTIVITY FOR WHICH A LIMITED LIABILITY COMPANY MAY BE ORGANIZED UNDER THE BEVERLY-KILLEA LIMITED LIABILITY COMPANY ACT.

**INITIAL AGENT FOR SERVICE OF PROCESS** (If the agent is an individual, the agent must reside in California and both Items 3 and 4 must be completed. If the agent is a corporation, the agent must have on file with the California Secretary of State a certificate pursuant to Corporations Code section 1505 and Item 3 must be completed (leave Item 4 blank).

3. NAME OF INITIAL AGENT FOR SERVICE OF PROCESS

Mark Tung

4. IF AN INDIVIDUAL, ADDRESS OF INITIAL AGENT FOR SERVICE OF PROCESS IN CALIFORNIA    CITY    STATE    ZIP CODE

8950 W. Olympic blvd, suite 563    Beverly Hills   CA    90211

**MANAGEMENT** (Check only one)

5. THE LIMITED LIABILITY COMPANY WILL BE MANAGED BY:

[✓] ONE MANAGER

[ ] MORE THAN ONE MANAGER

[ ] ALL LIMITED LIABILITY COMPANY MEMBER(S)

**ADDITIONAL INFORMATION**

6. ADDITIONAL INFORMATION SET FORTH ON THE ATTACHED PAGES, IF ANY, IS INCORPORATED HEREIN BY THIS REFERENCE AND MADE A PART OF THIS CERTIFICATE.

**EXECUTION**

7. I DECLARE I AM THE PERSON WHO EXECUTED THIS INSTRUMENT, WHICH EXECUTION IS MY ACT AND DEED.

DATE

SIGNATURE OF ORGANIZER

Mark Tung
TYPE OR PRINT NAME OF ORGANIZER

LLC-1 (REV 04/2007)    APPROVED BY SECRETARY OF STATE

# EXHIBIT 5

A very interesting entrepreneurial start | philstar.com



# A very interesting entrepreneurial start



- Rey Gamboa (The Philippine Star) - December 10, 2016 - 12:00am

Potato Corner is a wholly-owned Filipino company that is now one of the most successful local businesses that is also reaping success in other countries. It can be found in all malls and the brand has gone from just kiosks to stand-up stores. Its amazing success, like most other success stories, started with a leap of faith and has gone on to establish it as one of the most profitable franchises in the country.

One of the original founders of Potato Corner, Joe Magsaysay, shared with Business & Leisure the company's humble beginnings over 20 years ago. It started with four partners: Ricky Montelibano, Joe's brother-in-law, and friends Danny Bermejo, George Wieneke and their wives.

Ricky was the first to start the flavored popcorn in the Philippines which became a craze among young Pinoys. With only two flavors, barbecue and cheese, Ricky was making so much money that he could afford a new car and a new cell phone back when these were very new and very expensive in the country.

AD

Joe, on the other hand, was working with Wendy's, a modestly successful foreign brand here, but he needed a "sideline" to earn more for his growing family. With Ricky's flavored popcorn business as model, the idea was born:

Sponsored Content


2019's Best Credit Cards, Backed By Hours of Research
NerdWallet


This Free Upgrade Makes Amazon Prime Even Better
Honey


Is Aspirin a Wonder Drug? Discover These Health Benefits
Bayer


How Covering Up Your Grays Could Impact Your Cancer…
HealthCentral

flavored fries.

The group needed to put up P150,000 as starting capital for Potato Corner. Joe remembers that he didn't have the money and had to scrounge around for P37,500, his 25 percent share in the business. Like him, the other members of the group also had to borrow to come up with their share of the total starting capital.



Meanwhile, Joe, who had been working with Wendy's for nine years, was confronted with a choice — it was Wendy's or Potato Corner. He couldn't have both, so Joe made his incredible leap of faith right there and then and left the safety of a stable corporate job for the unknown.

That was in 1992, and they opened their first store in October of that same year. It was a only a cart in Mandaluyong because, as Joe simply said, they couldn't afford anything bigger. In just 30 days, Joe was able to pay back the P37,500 loan he got, and so did the rest of the group. This was phenomenal success for their novel product and the group saw the opportunities that were open to them. That was the time to expand, and franchising was certainly the most promising option they considered seriously because, with very little funds at their disposal, franchising seemed to be their only option to raise additional capital.

At that time, franchising was a still a novel idea here, and the group did not have the advantage of our current entrepreneurs who have the support of organized bodies like our national franchising associations. Joe knew about the mechanics of franchising through his old job at Wendy's, which is a local franchise.

Undaunted, he read books and researched on franchising. Armed with only the basics of the mechanics of franchising, the group accepted their first franchisee, with a franchise agreement that they copied on the net. Their first three franchises were closed on mere handshakes, Joe recalls, and they had no manuals to go by to guide them. Their gut feel for the business was so strong that they plunged into it without second thoughts.

As things turned out, their franchise business grew faster than their company-owned stores. This was because the group was bent on raising funds for their planned expansion. "It's because of franchising that we were able to dominate the market," Joe said.

Fast forward to 2006. There was an Indonesian student who studied here, got a degree and eventually went back to his native country in 2003. Joe received a call from him expressing his interest to bring Potato Corner's flavored fries to

Recommended by

DAILY BREAD



Consider the clouds
Do you know how the clouds hang

MORE DAILY BREAD

SOCIAL SPOTLIGHT



**House freezes ABS-CBN franchise, firm takes movies to China market**
The House of Representatives has frozen the bill, which seeks to renew the legislative franchise of broadcasting giant ABS-CBN Corp. The franchise expires in nine months or on March 20,...

14 h      philstar.com



CROWDYNEWS



THE FIRST SURVIVOR OF ALZHEIMER'S DISEASE IS OUT THERE.
alzheimer's association
Join the fight at alz.org

Indonesia. Joe was not yet interested because they were still developing the local market. The persistent student called again in 2004, in 2005 and finally in 2006 when Joe relented and entertained the idea of bringing the brand to a foreign country. That same year, they opened their first store in Indonesia.

In 2010, they brought the brand to the United States. It was also another student whose father used to head the security of the Israeli Embassy here who was instrumental in bringing Potato Corner to the land of French fries. The student who studied at the International School and lived in a condo along Ayala Avenue used to walk every day to Glorietta to buy from Potato Corner and wanted to bring it to the US. Joe and his group studied the market there and talked with a marketing guru in the US who actually advised him against it, likening the prospect to selling ice cream to an ice cream house. Their group, however, had more faith in his gut feel and went ahead with Potato Corner's invasion of the land of French fries.

Today, Potato Corner has over 100 stores in Indonesia, 45 stores in the United States and several others in various countries. Panama is one of these countries, and it was incidentally also a foreign student studying at the Poveda who made the first step here. In all of these countries, Potato Corner was the first to offer flavored fries.

Starting with only a service crew of four, the enterprise now employs over 200 hundred in their corporate offices and company-owned stores. Some of them who have been with the company when it started in 1992 continue to serve up to this day. The company now sends the deserving ones to earn their masteral degrees in schools like the Ateneo. Joe himself turned 55 in August of this year and decided to retire early. It's time, he says for the company to take care of him now. Their company continues to grow and they are looking forward to having 150 company-owned stores before the year ends and more stores in other countries. They are also looking forward to their 25th anniversary in 2017.

His advice to would-be entrepreneurs? "Consider franchising, and don't wait until the "fad", the strong market acceptance fades. If you have a good product, aim to achieve market dominance at the soonest time, and continue to find ways to control the business."

Mabuhay!!! Be proud to be a Filipino.

For comments & inquiries (email) sunshine.television@yahoo.com



SAMSUNG
Galaxy Book2

Lasts longer.
Works harder.

Galaxy Book2 with up to
20 hours of battery life.

Lasts longer than Galaxy Book
S-Pen & keyboard included

Windows 10

SPONSORED ARTICLES

# EXHIBIT 6

Case 2:24-cv-04546-SB-AGR    Document 274-4    Filed 08/18/25    Page 46 of 808    Page ID #:11893

CONTACT US    ADVERTISE

Search and hit enter…



NEWS    FEATURES    VIDEOS    EVENTS      

FEATURES

# Potato Corner owner: Businesses don't always have to innovate

**How making fast decisions turned a humble French fry stall into an international brand**

Privacy & Cookies: This site uses cookies. By continuing to use this website, you agree to their use.
To find out more, including how to control cookies, see here: Privacy Policy

Close and accept



*Photos by Danica Condez and courtesy of Potato Corner*

 by : Jaclyn Clemente-Koppe | July 11, 2018 **SHARE**   

Joe Magsaysay, or Jomag, as he is commonly known, seems unfazed by the public's adulation. In the 26 years since he and his partners put up the first Potato Corner stall in SM Megamall, he has encountered his fair share of loyal, sometimes obsessive fans. The company's steady international expansion is due to its global fan base that has tried the product and wishes to share it with people back home. "For all of our international franchises, we never approached anyone abroad. We were always the ones

Privacy & Cookies: This site uses cookies. By continuing to use this website, you agree to their use.
To find out more, including how to control cookies, see here: Privacy Policy

Close and accept

Case 2:24-cv-04546-SB-AGR Document 274-4 Filed 08/18/25 Page 48 of 808 Page ID #:11895

COO Dom Hernandez narrates, "Our US franchise, for instance. We were approached by the son of an expat who lived in Pacific Plaza (along Ayala Avenue, Makati). He told us how he skateboarded to Glorietta every day to get his Potato Corner fries." It's that craving for crisp, freshly cooked fries dusted in flavored powder that is responsible for the 1,100 branches all over the world. The newest branch opening soon in Bali will be the 100th store in Indonesia. Growth of the brand in Panama, which was once less explosive than in other markets, is now on a steady rise. Who would have known that a simple formula adapted from flavored popcorn would turn into the global brand it is today?

Hernandez did. That's why he and his family bought into Potato Corner in May 2017 after he experienced firsthand working with Magsaysay on their Nacho Bimby venture. "When I found out that Jomag wanted to sell shares of the company, I convinced my family that it's an easy and simple business and it can be very profitable in the right locations," says Hernandez whose family owns the bus company Victory Liner. But, more than their belief in the product, they know they are heavily investing in Magsaysay. "He's a visionary."

**RUNNING GAME**

Privacy & Cookies: This site uses cookies. By continuing to use this website, you agree to their use.
To find out more, including how to control cookies, see here: Privacy Policy

Close and accept



Privacy & Cookies: This site uses cookies. By continuing to use this website, you agree to their use.
To find out more, including how to control cookies, see here: Privacy Policy

Close and accept

> **Hernandez explains, "A very big part of Jomag's business philosophy depends on acting quickly and boldly. Like in basketball, it's a running game. Bawal mabagal." He shares how Magsaysay gifted his executives with Vespa scooters. "He wants us to get out more, experience more of what's happening in our surroundings," Hernandez says. "He thought we were too boxed in."**

Since starting the company with his brother-in-law and a few friends in 1992, Magsaysay confesses that the wheels of Potato Corner haven't stopped turning since. After he opened a couple of branches, interested parties had already approached him to put up franchises. He did not hesitate. "Even if we didn't have a franchise contract." Wasn't he afraid of getting screwed? "For what? A few thousand pesos? Even college students can borrow money from their parents to buy their own franchise, *kayang kaya. Maliit na* investment *lang.*"

Hernandez explains, "A very big part of Jomag's business philosophy depends on acting quickly and boldly. Like in basketball, it's a running game. *Bawal mabagal.*" He shares how Magsaysay gifted his executives with Vespa scooters. "He wants us to get out more, experience more of what's happening in our surroundings," Hernandez says. "He thought we were too boxed in."

**ORIGINITY VS. INNOVATION**

Privacy & Cookies: This site uses cookies. By continuing to use this website, you agree to their use.
To find out more, including how to control cookies, see here: Privacy Policy

Close and accept

Case 2:24-cv-04546-SB-AGR   Document 274-4   Filed 03/18/25   Page 51 of 808   Page ID #:11898



Potato Corner's success seems bulletproof. Magsaysay abides by designing a process that works for the business and sticking to it. To this day, his inventory has not changed. The stalls, after some tweaking during Potato Corner's early stages, are still basically made up of a deep fryer, some trays, and plastic *garapons* to shake the fries and flavored powder in. Did he ever think of diversifying? "That's one misconception people have in the food industry—that you always need to change things up. You have to innovate. You don't, *eh.* You just have to be original. Other industries might need to constantly innovate, but that's not the case with food," he says.

True enough, many have tried to copy Potato Corner's model, but the original is too difficult to beat. Chuckling, Magsaysay continues, "*Dati pa,* neighboring stalls would give me advice. I should add more items, or how I

Privacy & Cookies: This site uses cookies. By continuing to use this website, you agree to their use.
To find out more, including how to control cookies, see here: Privacy Policy

Close and accept

**OUTLIVE, OUTLAST**

Potato Corner might be steamrolling over the competition now, but not without bumps on the road. There was a time they suffered a slump when Magsaysay took on a post at the Agustines-owned Ramcar Corporation heading the local franchise of Mister Donut in 2001. "When I saw Potato Corner's sales were suffering, I asked my partners if I could come back and run the business," Magsaysay narrates. Armed with new knowledge from his training at the Asian Institute of Management, he devised a new business plan, which he presented to his partners. And, with it, of course, was Magsaysay's signature juggernaut style of management.

Privacy & Cookies: This site uses cookies. By continuing to use this website, you agree to their use.
To find out more, including how to control cookies, see here: Privacy Policy

Close and accept



Privacy & Cookies: This site uses cookies. By continuing to use this website, you agree to their use.
To find out more, including how to control cookies, see here: Privacy Policy

Close and accept

"There were mistakes along the way, of course," Hernandez admits, "but Jomag is not the type to brood. He insists on never being idle, just always being on the go and figuring out the next move." Magsaysay admits that the nature of this business allows them to quickly recover from a loss. "If a store closes, okay *lang*. It doesn't really hurt us since the investment is so minimal. Unlike a full restaurant or a bar where you might spend millions. If it fails, you'll really feel it. That's not the case with us."

Looking forward, Magsaysay sees a large future in microbusinesses like Potato Corner. He believes in investing in startups with their company acting as an "incubator" for new small concepts. "The pitch just needs to be sincere and passionate," Magsaysay says. "I really have a soft spot for startups." But, of course, the focus will remain on Potato Corner, and "how to keep it relevant for the next 25 years."

*Subscribe to our weekly newsletter to receive all the tools and solutions entrepreneurs need to stay updated on the latest news in the industry*

TAGS :    DOM HERNANDEZ . FRANCHISES . FRANCHISING . FRIES . JOE MAGSAYSAY . POTATO CORNER

‹ Previous Article

**Starbucks to ban plastic straws across its 28,000 stores**

Next Article ›

**Inside the business of sustainable service uniforms**

YOU MIGHT ALSO LIKE

Privacy & Cookies: This site uses cookies. By continuing to use this website, you agree to their use.
To find out more, including how to control cookies, see here: Privacy Policy

Close and accept

# EXHIBIT 7

**From:** "Atty. Ismael G. Khan, Jr." <atty.nas.khan@gmail.com>
**Received(Date):** Tue, 2 May 2017 12:04:10 +0800
**Subject:** Re: Official Word from PCJV Lawyer
**To:** Lyndah Bartolome <lyndahbpci@gmail.com>
**Cc:** "Jose Magsaysay, Jr." <jomag28@gmail.com>, Jose Montinola <josemontinola@yahoo.com>,
"ricky_montelibano@yahoo.com.ph" <ricky_montelibano@yahoo.com.ph>, Marivic Bermejo
<marvsbermejo@yahoo.com>, Chad Dominic Hernandez <cdjhernandez@gmail.com>,
"banzbanzon@yahoo.com" <banzbanzon@yahoo.com>, Santiago Dumlao <santidumlaojr@gmail.com>,
Ted Estacio <tedestacio@yahoo.com>, "guy@potatocornerusa.com" <guy@potatocornerusa.com>

Good news indeed considering that businessmen in the US are reputed to be litigious by nature. I
suggest that we send a letter of appreciation to Guy.
Nas

On Tuesday, May 2, 2017, Lyndah Bartolome <lyndahbpci@gmail.com> wrote:

GOOD NEWS!
I was just on the phone with Guy a few minutes and it is official from Barry, PCJV Lawyer,
the 90 day period for franchisees to rescind their franchise agreement is over as of today. As
a testimony to the relationship Guy has with franchisees, no one of those sent notices filed a
rescission.

This indeed is a big,big release for all of us.

Now, PCJV can move forward in its expansion.


Cheers and Blessed Day to all!


Lyndah


--
Atty. Ismael G. Khan, Jr.
Labor Law
Construction Arbitration

# EXHIBIT 8

# US TRIP APRIL – LA TEAM

**April 19, 2010(Monday)    11:00 – 4:00 Manila and LA Team
                            Santa Anita Mall Food Court**

                    **Corporate Set-Up**
                     **1. Schematic Diagrams:**
                    **a. US**
                    **b. Los Angeles and California**
                    **c. San Francisco**

*PRESENTED AND DISCUSSED NEW DEVELOPMENTS:*

- *Discussion with DLA Piper Law Firm in the US revealed that it will be necessary to franchise Potato Corner in the US.*
- *The sooner the disclosures statements are prepared and submitted to government the better for all parties concerned.*

*The soo*

- *Meanwhile for all branches to be opened prior disclosure statements, they are to be treated as company stores where PC US shall own 51%.*
- *Lawyer's Fee for preparing the disclosure statement will be US 25,000.00*
- *Franchisor in the US shall be the Joint Venture Company between Manila and the LA Team.*
- *LA Team to review the Joint Venture Agreement prepared.*
- *Changes in Fee allocation: from all Initial Fees and Royalties:*
    - *30% PC Manila*
    - *30% PCE*
    - *40% JV Company*

- *Clarification with the Lawyers will be made on the 51% ownership of branches of sub-licensees.*
  - o *Recommendation JVA will be signed by the sub-licensees*
  - o *Sub licensees will register own LLC and sign with the Mall.*
  - o *JVA will indicate assignment of shares to sub-licensees.*

- *Expenses of the Franchise Company shall be charged to the JV Company.*
- *For PCE, lock out of fees for company owned stores at US 3,000.00 but shall be fully remitted to PC Manila including the initial US 30,000.00 for 10 stores covered by the initial Master License Agreement. However, all royalties shall go to the JV.*
- *San Francisco has signed a Master License Agreement.*
  - o *San Francisco will be treated separately and uniquely. All initial fees for the first 4 stores shall all be remitted to PC Manila.*
  - o *When they sub license, San Francisco retains 50% of initial fees and royalties. The remaining 50% follow the % distribution PC Manila, PCE and JV Company.*
  - o *Sub Licensees follow current initial fees.*
  - o *San Francisco was given the opportunity to apply for another county. Letter of Intent was sent to PC Manila for Santa Clara County.*
  - o *JV Company shall support San Francisco.*
- *Rationalization of Set-Up and Agreements:*
  - o *All initial and exclusivity fees for the initial contracts with LA and San Fo revert to PC Manila to enable PC Manila recover its US development costs.*

o *While the LA Team likewise is the Master Licensee for California, the 50% retention was removed in view of the JV for the entire US.*

2. PCE Management
   a. Incorporators: Rationalization

   *Incorporators for the JV Company shall be Amit, Guy and Amir in their individual capacity since Potato Corner would like to establish a lasting relationship with these individuals. They could invite other investors in their own LLC Company but the JV will always be with them individually.*

   b. Joint Venture Agreement
   *This was given and for review of the LA Team.*
   c. Master License Agreement for the United States
   *This will change in view of the change from licensing to franchising. This will be the Agreement between PC Manila and the JV Corporation on the rights to the trademark and the business system.*

   d. Planning for PCE Management:
      i. Mission/Vision
      - *To be the dominant and the most innovative potato company in the United States.*
      - *To provide profits to our partners and other stakeholders.*
      - *Source of fun and livelihood for our employees*

- *To be the benchmark for customer service and quality.*
- *To entice children with unique fun and treasured experiences such as buzz wire and regular spudster balloons*
- *Check suppliers from China for lineup of toys for children.*

ii. **Goals/Targets**
- *Store Opening Target*
  - *2010*
    - *PCE – 2*
    - *Sub – 2*
    - *Master – 1*
  - *2011*
    - *PCE – 6*
    - *CA Sub – 8*
    - *US 20*
  - *Total by 2011 - 39*

iii. **Plan of Action**
iv. **Responsibilities**

1. *JV Company shall manage the franchise organization.*
2. *Board:  4 Cinco Munila, 3 LA Team*
3. *Officers:*
   a. *Chairman: JPM*

   b. *Pres/CEO: Amit*

   c. *Treasurer:  Jojo M.*


   d. *Sec: Guy*

4. *Meetings:*
   a. *1 shareholders meeting yearly*
   b. *Monthly Exe Com*
   c. *Quarterly Board*
5. *Responsibilities to Franchisee:*
   a. *Monitoring Program*
   b. *Accounting Services*
   c. *On Line Application Process –*
      *Applicants can view stores online with*
      *password*
6. *Products:*
   a. *Check on food color of Chili Bar b*
      *Que.  Affects body waste.*
   b. *Will order following:*
         i. *Sweet Corn*
         ii. *Aprons*
   c. *New Packaging for development:*
      i. *Bags:*
         1. *Take Out for Jojo Chips*
            a. *Lined Bags*
            b. *One size (12)2 Giga*
            c. *With window*
            d. *Sticker with flavor*
               *bigger than current*
               *one*
         2. *Take Out Bags*
            a. *Substitute for take*
               *home bags*
            b. *Size 8 and 12*
            c. *LA uses white now*
               *and cost is US.28*
         3. *Clear Plastic Glass with*
            *Logo*
         4. *Cones*
         5. *Products for Development*

        a. *Slazee*
        b. *Mashed Potato*
        c. *New Flavors: Garlic, Jalapeno,Cinnamon, Sea Salt and Vinegar*
        d. *Taters*
        e. *Sweet Potato Taters*
        f. *Sweet Potato Jojo Chips*

    v. **Marketing: Funds for Marketing (1%)**
        1. *Agreement was to have 3% Marketing Fund: 2% for system wide and 1% for local store marketing*
    vi. **Financial Planning**

1. **Office**
2. **Program for hiring**
3. **Licensees Investment Matrix**
    a. *US 120K to 150K Build Out: Initial Fee of US 15K, 70K Kiosk, Equipment 30K, Permits/Expediter 4K, LLC 500,Initial Inventory 4,500*
    b. *Plus Working Capital 2 months US 33K*

4. **License Fees/Ongoing Fees (6%)**
    a. *Initial Fee at US 15K*
    b. *Ongoing Fee-Royalty*
        i. *2.5% first 3 months*
        ii. *5% on the 4th month*
    c. *Marketing Support Fund*
        i. *2% with option to increase*

        ii. *First 6 months all for local store marketing of franchisee*
        iii. *7th month: 1% for system wide and 1% for local store*

3. **Agreement on Communication Channels**
        i. *For all franchise matters – Amit*
        ii.     *For store operations - Guy*

4. **Agenda for meeting with Lawyer and schedule**
5. **Other Matters: Pending Matters from Manila: Cones and Paper Packaging**
6. **Summary of Discussions and Agreements**

**4:00 – 6:00 Meeting with Ralph: Santa Anita Mall**
1. *Meet with Ralph and Amie*
2. *Proposed location is Victoria Garden in Rancho Cucamonga*
3. *Proceeded to visit the Place*
4. *Two possible locations: in the food court and in the entertainment area.*
5. *Food court will only be allowed if Mall allows opening of windows by the street for street side selling.*

# EXHIBIT 9

**APRIL 20, 2010 (Tuesday)**

*Meeting in Topanga Mall*
*A. Meeting with Sherwin and Jocelyn Lim*
    *a. Applicant for Topanga Mall*
    *b. Location was awarded to the LA Team since it is a Westfield Mall.*
    *c. LA Team is willing to give the location to the Filipino couple.*
    *d. Applicant has been suppliers of marble for the last 17 years.*
    *e. Process was explained as well as the transition status of Potato Corner from license to franchise.*
    *f. They are willing to sign and take the location.*
    *g. Target opening will be July.*

**1. PCE**
    **a. Corporate Structure**
        i. *PCE shall be the main company of the LA Team*
        ii. *JNK shall be under PCE and shall hold the license for CA.*
        iii. *Under PCE shall be the different companies operating the different branches such as NKM that operates Santa Anita Mall*
    **b. Investors**
        i. *Investors of the LA Team shall invest in PCE.*
        ii. *Mark will come in with 600K and shall own 15% of PCE*

c. Different companies: e.g. Owner of Santa Anita
d. Person Responsible for PCE: *Guy shall be responsible*
e. Goals and Targets: *5 stores*
f. Time lines
g. Agenda for Meeting with Investors: Mark is scheduled for April 20 – TUESDAY pm
    i. *Meeting with Mark*
    ii.
h. Funds Due: Fees and Supplies
i. Other Matters

### 2. Santa Anita

a. Sales Performance
    i. Feb/March
b. Customer Feedback
c. Product Quality
d. Employees: Training and Performance
e. Equipment
f. Suppliers
g. Operational Assessment
h. Relationship with Mall
i. Sales Targets
j. Plans for Marketing
k. Designation of Santa Anita as the Prototype Branch
l. Documentation of Operations
m. Product Shots

# EXHIBIT 10

## JV dRAFT

Erlinda Bartolome <esbartolome@gmail.com>

Tue 4/20/2010 7:54 PM

**To:** amitneman@yahoo.com <amitneman@yahoo.com>; guyk23@hotmail.com <guyk23@hotmail.com>

📎  1 attachments (81 KB)

JV USA working draft.doc;

Please find attached draft of the JV Agreement.  Pls forward to Amir as I seen not to have his e mail.

Thanks

--
ERLINDA SABIO BARTOLOME, CFE
MANAGING DIRECTOR
GMB FRANCHISE DEVELOPERS

**JOINT VENTURE AGREEMENT**

KNOW ALL MEN BY THESE PRESENTS:

      This Joint Venture Agreement (the "Agreement") dated _____ is made and entered into in _____, by and between:

      Cinco Corporation, a corporation duly existing and registered by virtue of and under the laws of the Republic of the Philippines with office address at _____, represented herein by its duly authorized representative, _____,per Secretary's Certificate dated _____ attached hereto as Annex "1" hereof , and hereinafter referred to as Cinco

-and-

_____, a corporation duly organized and existing under and by virtue of the laws of _____, with office address at _____, represented herein by its duly authorized representative, _____, per Secretary's Certificate dated _____attached hereto as Annex "2" hereof, and hereinafter referred to as _____

WITNESSETH THAT:

WHEREAS, the Parties hereto have agreed to form a corporation (hereinafter referred to as the "Company") to be incorporated under the laws of _____ and duly registered with the Securities and Exchange Commission, with the primary objective / purpose of engaging in the business of establishing, operating, managing and licensing "Potato Corner" stores/outlets in the United States of America and Israel, except in the County of Los Angeles, USA and the County of San Francisco, USA and Tanforan Mall.

WHEREAS, the Parties herein have agreed to enter into this Agreement which sets forth the terms and conditions with respect to the organization, incorporation and operation of the Company and defines their respective rights, duties and obligations in the Company.

NOW, THEREFORE, for and in consideration of the foregoing premises, the Parties hereby agree as follows:

1.     ORGANIZATION AND INCORPORATION OF THE COMPANY

     1.1     The Parties herein agree to organize and incorporate, within _____ (____) days from the date of this Agreement, a corporation to be called "_____" ( hereinafter referred to as the Company) for the primary objective /  purpose of engaging in the business of establishing, operating, managing and licensing "Potato Corner" stores/outlets in the United States of America and Israel, except in the County of Los Angeles, USA and the County of San Francisco, USA and Tanforan Mall.

1.1.1    Anent the above, Cinco, as the lawful and/or registered owner in the United States of America, among other territories, of the trademark, service mark and trade name "POTATO CORNER" as well as various trademarks, service marks, trade names, slogans, designs, insignias, emblems, symbols, color schemes, package features, logo and other propriety identifying characteristics used in relation and in connection with the "Potato Corner" Products and the System, has assigned the right to use in the United States of America and Israel the trademark, service mark and trade name "POTAO CORNER" , as well as other intellectual property rights in connection with the :POTATO CORNER" Products and Systems to Potato Corner Global Company Limited, Hong Kong, a corporation duly organized and existing under and by virtue of the laws of Hong Kong Special Administrative Region, People's Republic of China, which in turn, shall grant in favor of the Company  a Master License for the establishment , operation, licensing and sub-licensing of "Potato Corner" stores/outlets to be covered by a Master License Agreement containing  the terms and conditions thereof.

1.1.2    Relative to the grant of a Master License in favor of the Company, Potato Corner Global Company Limited, Hong Kong shall be entitled to twenty five (25%) percent of all fees paid to/ collected by the Company for licensing / sub-licensing, operational, management, maintenance and all other activities in connection with the "POTATO CORNER" outlets/stores. All withholding and other applicable taxes levied by any authority on the payments by the Company to Potato Corner Global Company Limited, Hong Kong under this Agreement shall be borne solely by the Company. Payments made to Potato Corner Global Company Limited, Hong Kong under this Agreement shall be made by wire transfer using a bank or other financial institution specified by it within ten (10) days from receipt of the fees by the Company.

1.1.3    In turn, __(LA group)___ shall also be entitled to twenty five (25%) percent of all the fees paid to/ collected by the Company for licensing / sub-licensing, operational, management, maintenance and all other activities in connection with the "POTATO CORNER" outlets/stores. All withholding and other applicable taxes levied by any authority on the payments by the Company to___(LA group)___ under this Agreement shall be borne solely by the Company.

1.2    The incorporators of the Company who shall also be the incorporating directors shall be seven (7), namely:

| | |
|---|---|
| JOSE P. MAGSAYSAY, JR. | MA. VICTORIA O. BERMEJO |
| JOSE MARIA  MONTINOLA | RICARDO K. MONGTELIBANO |
| AMIT NEMANIM | GUY KOREN |
| AMIR JACOBY | |

1.3    The Treasurer-in-Trust of the Company shall be _(Amit / Guy /Amir)_, who shall receive for the Company all payments for subscriptions which are due pursuant to this Agreement.

1.4    The principal office of the Company shall be at  _____.

1.5    The annual general meeting of the stockholders of the Company shall be held every _____ at the principal office of the Company.  The Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses of the following stockholders, namely ; Jose P. Magsaysay, Jr., Jose Maria Montinola, Ma. Victoria O. Bermejo and Ricardo K. Montelibano relative to the said annual general meeting of stockholders.

1.6    The fiscal year of the Company shall begin on January 1 and end on December 31 of each year.

1.7    The Company shall immediately upon incorporation obtain a "Liability Insurance" for the Company the amount and scope of coverage to be determined by the Board of Directors.

2

1.8    All costs, fees and expenses incurred in connection with the organization and incorporation of the Company shall be for the account of the Company.

2.    CAPITALIZATION/OWNERSHIP OF THE COMPANY

2.1    At the time of its incorporation, the Company shall have a total authorized capital stock amounting to _____, divided into _____shares with a par value of _____ (Php_____) per share. The Parties agree that the authorized capital stock shall be fully subscribed and the subscription fully paid.

2.2    For purposes of incorporation, each Party and/or its nominees, agrees to subscribe to the following number of shares indicated below:

| Subscribers | No. of Shares Subscribed | Value of Shares Subscribed |
|---|---|---|
| Amit Nenamin Guy Koren | | |
| Ma. Victoria O. Bermejo | | |
| Jose P. Magsaysay, Jr. | | |
| Amir Jacoby | | |
| Jose Maria Montinola | | |
| Ricardo K. Montelibano | | |
| Cinco Corporation | | |
| | | |
| | | |
| TOTAL | | |

2.3    The Parties hereby agree that Cinco, Jose P. Magsaysay, Jr., Jose Maria Montinola, Ma. Victoria O. Bermejo and Ricardo K. Montelibano shall collectively own sixty (60%) percent of the Company while  Amit Nenamin, Guy Koren and Amir Jacoby shall collectively own the remaining forty (40%) percent.

2.4    The Parties hereby agree that by reason of the goodwill of and the grant of the master license to use, in the United States of America and Israel, except in the County of Los Angeles, USA and the County of San Francisco, USA and Tanforan Mall the trademark, service mark and trade name "POTATO CORNER" as well as of various trademarks, service marks, trade names, slogans, designs, insignias, emblems, symbols, color schemes, package features, logo and other propriety identifying characteristics used in relation and in connection with the "Potato Corner" Products and the System , Cinco, Jose P. Magsaysay, Jr., Jose Maria Montinola, Ma. Victoria O. Bermejo and Ricardo K. Montelibano shall be entitled to sixty (60%) percent ownership / equity in the Company at no cost to Cinco, Jose P. Magsaysay, Jr., Jose Maria Montinola, Ma. Victoria O. Bermejo and Ricardo K. Montelibano.

2.5    The Parties hereby agree that the sixty (60%) percent equity / ownership in the Company and/or the stock subscriptions of Cinco, Jose P. Magsaysay, Jr., Jose Maria Montinola, Ma. Victoria O. Bermejo and Ricardo K. Montelibano, as well as the projected working capital / operating expense for the first year of operations in the amount of _____ shall be paid by and/or shall be for the account of __(LA group)_____.

2.5.1    The Parties hereby agree that there will be no capital call or increase in the authorized capital stock for ten (10) years from the grant of the Master License Agreement referred to in paragraph 1.1.1 of this Agreement.

2.5.2   The _____(LA group) shall not assign any of its/their rights or obligations under this Agreement without the prior written consent of Cinco. Any change in the shareholding or partnership or sole proprietorship or control or management of the ____(LA group)_____shall be considered an assignment.

3.   MANAGEMENT OF THE COMPANY

3.1     The Board of Directors of the Company shall be composed of seven (7) members. The officers of the Company shall consist of a President, a Corporate Secretary and a Treasurer, and such other officers as the Board of Directors may appoint or designate. The President shall either be Amit Nenamin, Guy Koren or Amir Jacoby pursuant to their appointment in paragraph 3.2 hereof. The Chairman of the Board of Directors, Corporate Secretary and Treasurer shall always be either Ma. Victoria O. Bermejo, Jose P. Magsaysay, Ricardo K. Montelibano or Jose Maria Montinola.

3.1.1   The Board of Directors shall regularly meet on a monthly basis. The regular monthly board meeting may be done via teleconference or through the internet.. However, the Board of Directors shall convene and meet at the principal office of the Company every quarter of every fiscal year. The Company shall shoulder the expenses for air fares, hotel accommodation and incidental expenses of the directors relative to the said quarterly board meetings.

3.1.2   The Parties hereby expressly agree that any and all contracts in the name and on behalf of the Company must have the prior approval of the Board of Directors of the Company.

3.2     The Parties hereby appoint Amit Nenamin, Guy Koren or Amir Jacoby as President of the Company to manage  the business and property of the Company, and to market the business, in accordance with and pursuant to the directives of and policies set by the Board of Directors of the Company. The Board of Directors of the Company can recall and/or withdraw aforesaid appointment.

3.3     The President of the Company shall render the following services  and  shall perform   the  following duties for the Company in a faithful, diligent  and  efficient manner:

(a)   The President shall be responsible for all management,   operational, marketing,  establishment, maintenance, licensing  and sub-licensing activities with respect to the "Potato Corner" outlets/stores in the United States of America and Israel. The President shall use his best efforts at all times during the term of this Agreement  to operate  and  maintain  the "Potato Corner" outlets/stores in the United States  of America and Israel according  to the highest standards  achievable consistent  with  the overall plan of the  Board of  Directors  of  the Company. The President shall comply with the rules,    policies and procedures approved by the Board of Directors of the Company from time to time.

(b)   The President shall advertise, market and promote the "Potato Corner" outlets/stores with the goal of causing public knowledge, awareness and patronage of the "Potato Corner" outlets/sites.

(c)   The President shall maintain a comprehensive system of records, books and accounts, with respect to the licensing and sub-licensing activities, operation, establishment, management, maintenance and other activities of the "Potato Corner" outlets /stores in the United States of America and Israel. All records shall be subject to examination by Cinco, or its authorized agents, attorneys and accountants.

(d)   No later than the twentieth (20th) day of each month,  with respect to the preceding  month, the President shall  render  a statement  of  receipts and disbursements,  a  schedule of accounts  receivable  and  payable, and a schedule of fees collected and distributed, together  with a reconciled bank statement as of the last day of the month; and

4

(e)  To the extent the President is lawfully  able to do so, the President shall take such action as may be necessary to comply  promptly with any  and all laws, ordinances,  orders or other  requirements  of any federal, state, county or municipal authority having jurisdiction  of the Company and affecting the Company.

3.4    The compensation package for the directors, and of the officers, senior management and key personnel as determined by the Board of Directors shall be approved by the Board of Directors of the Company.

3.5    The Treasurer shall have oversight functions over the Accounting and Finance Departments that shall be exercised independent of the President.

3.5.1  The      Parties     hereby     agree     that     the     Accounting System/Procedures/Software/Method to be used by the Company must be approved by the Board of Directors of the Company.

3.5.2  All disbursements of Company funds for the fiscal year shall be in accordance with and in line with approved budget for the said fiscal year. Disbursements and expenses not specifically included in the approved budget for the said fiscal year shall require the prior approval of the Board of Directors of the Company.

4.    DURATION OF AGREEMENT

4.1    This Agreement shall become effective from the date of execution hereof and shall continue in full force and effect until the Company shall have stopped operations or otherwise ceased to exist as a separate corporate entity.

5.    BREACH OR DEFAULT

5.1    The Parties hereby agree that all the provisions herein contained shall be deemed conditions as well as covenants and that if default or breach be made of any such covenants and conditions, then this Agreement, at the discretion of the Non-Defaulting Party, may be terminated and cancelled forthwith and the Defaulting Party shall in addition to any liquidated damages, be liable for any and all damages, actual and consequential, resulting from such default and termination.

5.2    Should a Non-Defaulting Party be compelled to seek judicial relief against the Defaulting Party, the latter shall in addition to any damages stated elsewhere in this Agreement, pay an amount equivalent to twenty five percent (25%) of the amount claimed in the complaint as attorney's fees, aside from the costs of the litigation and other expenses which the law may entitle the Non-Defaulting Party to recover from the Defaulting Party.

6.    GENERAL PROVISIONS

6.1    This Agreement may not be altered, changed, supplemented or modified except by a written instrument duly signed by the Parties.

6.2    The Parties shall use their best efforts to cooperate for the success of the business of the Company. The Parties further agree to perform all acts and execute and deliver all documents or instruments required or necessary to fully implement or consummate the transactions contemplated in and the intent underlying this Agreement.

6.3    The Parties shall, to the extent feasible, cause the Articles of Incorporation and the By-Laws of the Company to reflect the mutual covenants and provisions contained in this Agreement.

6.4    All notices and other communications required or permitted to be given hereunder shall be given in writing (and for this purpose shall include emails or fax transmissions) and shall be addressed to the appropriate Party at the address of such Party as heretofore designated, or at such address as such Party may designate subsequently in writing.

6.5    The failure of any Party at any time to require performance by the others of any provision of this Agreement shall not affect, in any way, the right of such Party to require performance of that or any other provision, and any waiver by any Party of any breach of this Agreement shall not be construed as a waiver of any continuing or succeeding breach of such provision, or a waiver of any other right under this Agreement.

6.6    This Agreement shall constitute the entire agreement between the Parties and shall supersede any previous agreements, written or otherwise, with respect to the same subject matter which may have been made by the Parties prior hereto.

6.7    The invalidity of any portion of this Agreement will not and shall not render the entire Agreement void, nor affect the validity of the rest of the provisions of this Agreement.

6.8    This Agreement shall be governed by the laws of _____.

6.9    At all times and notwithstanding the termination of this Agreement, all information relating to the Outlets and Trademarks, whether written or oral, supplied or made known directly or indirectly by the Cinco to the__ (LA group) __, shall be retained in strict confidence and shall not, except with the prior written approval of Cinco and for purposes in accordance with this Agreement, be used or divulged to any other person, firm, or company.  The ___(LA group)___ and the Company shall keep, and shall ensure that their stockholders, partners, officers, employees, and agents keep, such information, techniques, and know-how strictly confidential at all times.

6.10    All product specifications and trademark usage issued by Cinco shall throughout the period of this Agreement and thereafter remain the property of Cinco and may not be reproduced in any way by the __(LA group)__ and the Company or any of their  stockholders, partners, officers, employees, or agents.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date and in place first mentioned.


By: _____

_____
President

_____
By:

_____


SIGNED IN THE PRESENCE OF:

_____          _____


ACKNOWLEDGMENT

6

# EXHIBIT 11

April 21, 2010                **Manila and LA Team**

**Day is set aside for meetings with Investors and Lawyer**

## WE WILL REQUEST THE LA TEAM TO DO THE SCHEDULE WITH MARK AND THE LAWYER.

**Proposed Agenda with Investors**

1. Introductions
2. Presentation of Potato Corner
3. Getting to Know the Investors
4. Plans for Moving Forward


**Proposed Agenda with the Lawyer**
1. Introductions
2. Presentation of Potato Corner
3. Getting to Know the Lawyer and Law Firm
4. Legal Positiouing of Potato Corner
5. Joint Venture Company and Agreement
6. Rates of Lawyer and Law Firm

April 21, 2010                10:00 – 12:00 Manila Team

                              **Meeting with Suppliers**

                              1.  **Supplier of Flavors: Garlic, Cinnamon, Jalapeno and others**

                              **2:00 – 4:00 – Manila and LA Team**

                              1.  **PCE Trading**
                                  a.  **Corporate Structure: Incorporators**
                                  b.  **Time to Incorporate**
                                  c.  **Person Responsible**
                                  d.  **Goals and Targets**

April 22, 2010                **Opening to Closing**

                              **Whole Day in Potato Corner Branch**

April 23, 2010                 **10:00 Manila and LA Team**

                              **Wrap Meeting**

# EXHIBIT 12

*April 27, 2010 – with LA Team*

1. **Handling of New Inquiries**
   a. *Set up of website*
   b. *Process of reply*
   c. *Include Investment Package*
   d. *Forms given to the LA Team: Qualification Form and Market Study.*

      i. *Forms sent to Sherwin and Jocelyn and to Sam.*
   e. *Applicants will be asked to meet Amit in the store for initial talk.*
      i. *Set of questions will be provided to Amit.*
      ii. *Script on what will be discussed will be given to Amit.*
      iii. *Applicants will be requested to visit the store at least 5 times*
      iv. *Qualification Form will be given.*
   f. *When there is a location identified, next meeting after the stores visits will be done in the location maximum of 2 meetings.*
   g. *JPM shall make final decision on location.*
   h. *Market Study Form shall be given to applicant.*

      *i. Credit Investigation will be done as soon as the Qualification Form is submitted. Cost is about 100US.*

2. *Development Schedule*
   a. *Inquiry*
   b. *Forms to be Given*
   c. *Initial Meetings*
   d. *Credit Investigation*
   e. *Location Approval*
   f. *MOU*
   g. *Franchise Agreement*

      *A to g shall be Amit's responsibility and will take 15 hours and duration to be about 3 weeks.*

   h. *Plans for Construction*
   i. *Sourcing of Designer, General Contractor, Equipment Supplier and Supplies – Provide list of Accredited Suppliers*

      *h and I shared responsibility of Amit, Guy and Amir – total of 30 hours combined.*

   j. *Training – I week, cost 100US per day per person*
   k. *Acceptance of the Branch*
   l. *Opening Person – 2 weeks/ 8 hrs per day at US 15 per day*

      *J to l shall be Guy or the Manager assigned*

m. *Opening Person Cost for Out station locations- 100 miles outside Los Angeles – US 2,250 for 2 weeks*

2. *Initial Marketing*

a. *Company for Local Store Marketing US 1,000.00*
b. *Franchisor shall provide royalty cards, promo cards and coupons.*

3. *On Going Support*

a. *First year – first 3 months 2x visits, 4th month onwards monthly visit.*
b. *2nd Year – once every 2 months*
c. *next years – quarterly*

*Cost shall be US 15 per hour for the franchise service person.*

d. *Mystery Shoppers Program*
e. *Ongoing re training*
f. *Seminars and Conferences*

### 4. Franchise Development

a. Process of franchise development was explained to the LA Team.

b. There were of course apprehensions and concerns on why, how and what.

c. It was explained that franchising was not also part of the immediate plans of Potato Corner but had to be done per advice of the lawyers.

d. Apologies were offered since all of a sudden the LA Team faces a huge task and role – franchising.

e. The situation was not very comfortable since GMB had to offer its services for franchise development.

f. To address some concerns, GMB proposed that the LA Team should scout around for other franchise developers to determine their comfort level.

g. If decision is made for GMB then, the decision was based not only because we are already a part of the process but decision was arrived at after looking at competitors.

h. LA Team can get quotations from professional franchise developers in the US and GMB can work on charging 50% of costs.

# EXHIBIT 13

*MEETING - April 29, 2010- Thursday*

*With Guy and Amit at Guy's Residence*

1. *CCTV and monitoring*
   a. *Investment for franchisees – US 1,300.00*
      i. *4 camera system US 400*
      ii. *DVR 4 channels US 400*
      iii. *Installation Costs/Connection and Wires US 500*
   b. *Recording triggered through motion in the branch.*
   c. *Initial Monthly Costs for franchisees US 100.00. Manila shall recomputed monthly costs.*
   d. *Outsourced monitoring in Manila. Company shall determine ways and frequency of review and analysis of tapes based on the need of the franchise system.*
   e. *One branch shall have 1 monitor in Manila.*
   f. *Franchisee will have a monitor.*
   g. *Outsourced office can Manila can tape and rewind recordings for documentation.*

2. *Phone Discussion with Ben Olivas*
   a. *Payment scheme for preparation of the disclosure documents can be prorated in three (3) months time starting July, Aug and Sept.*
   b. *Ben reiterated the reason why he did not recommend formation of a Potato Corner company in the US which is for tax purposes.*
   c. *On the JV Company, Ben would like to review the Articles of Incorporation prepared by the Lawyer in LA.*

d. *It was explained that follow up with Kim was not done until the issue of payment scheme can be discussed*

e. *Ben was requested to prepare the Operating JV Agreement with sub-licensees in relation to the 51%company ownership.*

f. *Ben suggested calling Kim for concerns and questions.*

3. *Phone Discussion with Kim Lambert*

   a. *We explained our hesitance to call her until settlement of payment issue.*

   b. *Clarifications with Kim:*

      i. *Should PC Management be part of the LLC Company of the sub-licensees?*

         1. *Strictly speaking, yes PC Mgt. should be part of the LLC Company of sub.*

         2. *There can just be complications when full franchise is done.*

      ii. *If PC Mgt shall not be part of the LLC Company, what will happen when government sees that the LLC has operated and has used the PC trademarks prior to franchising?*

         1. *This will be a complication since government will see this since LLC is also registered with the government.*

   c. *Kim's best recommendation:*

      i. *Prepare the checklist for franchise agreement immediately.*

      ii. *Topanga Mall should open when the FA and disclosures are done.*

      iii. *Nevada for Las Vegas is not as strict as CA*

      iv. *Will expect the checklist for FA from us by May 12.*

4. *Trading Company*

      i. *Will check on who can be incorporators with Kim.*

      ii. *Mark up shall be determined for franchised branches.*

      iii. *Franchisees can either pick up stocks from trading company warehouse or will be charged delivery costs. Delivery Costs shall be part of the Operating Expense of franchised branches and not cost of sales.*

5. *Supplies*

      i. *Samples of packaging materials were given*

      ii. *Price of Baked Potato packaging is .27cents and Santa Anita sells 4 to 5 orders per day.*

      iii. *Combo Plates plus lids – 10 orders per day.*

      iv. *To go Bags – cost is .40 cents – usage 30 per day*

      v. *Cones – 20 per day*

      vi. *32 oz beverage cups – usage 30 per day*

      vii. *Costs of cups in the US .9 cents with minimum of 25,000 orders.*

      viii. *Jojo chips bags – projected usage 20 per day*

      ix. *Clear plastic packaging small – now clear but recommendation to be with logo – 30 per day*

      x. *Napkins with logo – 1,000 per day*

6. *Security Deposit from franchisee*

      i. *This was explained to the LA Team.*

      ii. *Will check with Kim if this is allowed in the US.*

7. *Payment terms of franchisees – trading company*

      i. *Price for COD and price with terms*

      ii. *Penalties will be paid for unpaid supplies.*

# EXHIBIT 14

*MEETING – May 1, 2010*

*With Amit and Guy – Santa Anita Mall*

1. On Zuhair
   a. He will be requested to send a formal letter of intent for Jordan.
   b. Forms will be sent:  Qualification Form and Market Study Form.
   c. Manila will handle Zuhair but since he is a UD citizen, we will be required to give him disclosure documents.
2. LA Team has decided to appoint Mike as Manager for Santa Anita and salary shall be US 15 per hour with benefits. 40 hours per week or a total of US 2,400 monthly.
3. Crew Salary is US 11 per hour x 135 hours per week or US 1,485 per crew x 4 is US 5,940 total crew salary per month.
4. Mark will review the JV Agreement. The lawyer had a lot of comments on the Master License Agreement.  It was explained that the MLA will also change as Potato Corner moves to full franchising.
5. Accounting Software: cost is US 1,800 plus US 260 per location.  While this is needed, we need to attain a number of branches to spread the costs.
6. FA Checklist will be review and filed out from May 3 – 9 by both Manila and LA.
7. Franchise Development breakdown will be sent.
8. A PLU report was given and Xcel Inventory report will be sent by Guy.

# EXHIBIT 15

**Fw: JV Agreement**

ajacoby88@gmail.com

Tue 5/11/2010 10:49 AM

**To:**  Koran Guy <guyk23@hotmail.com>

📎 1 attachments (14 KB)

image001.png;

Hi Partner!

Congratulations on your new record sales!

Below are my thoughts and answers:

1) Definitions for revenue have to be more detailed.

I cannot understand this question?

2) Lists 7 incorporators (CA filings do not work this way)

Will send you this list from our side ASAP, 4 from our company and then the 3 of you.

3) Lists 7 board members ( none of which involve the Great Wall folks). Also, what happens if the named individuals cannot/should not serve?

Will send you this list from our side ASAP, 4 from our company plus Lyndah and then the 3 of you. Lyndah will be our independent Director. I cannot understand what you mean by "what happens if the named individuals cannot/should not serve?"

4) Names specific people as officers (Does not address issues of people need to be removed, incorrectly details their responsibilities, etc)

Cannot understand this

5) Does not allow anyone to sell or otherwise transfer shares.

Cannot understand this

6) Excludes California

Cannot understand this

7) Does not have any ownership for Great Wall.

Cannot understand this

8) % ownership seems clearly incorrect

Cannot understand this

9) Does not have key definitions, like "Master License". i.e. what are the rights that are supposed to be received? Where are the reps, warranties and indemnifications?

Cannot understand this

10) Excessively regulates the day-to-day functioning of the company

Cannot understand this

11) Specifically assigns work to particular individuals. (This should be under employment agreements that are flushed out and attached, with details for removal ,compensation etc)

Cannot understand this

Some of the more minor, but time intensive issues:

a) Needs to be rewritten to reflect US law and US contract practice. The contract is based off a British contract and some of the language is not the same as used in the US.
b) Factually incorrect in many places (For example, it assumed the company will be created as compared to have been created. Also what has been create has not been and cannot be created the way they want (for example 7 incorporators).
c) Many of these provisions would be typically significantly more details, for example the language regarding confidentiality.

We will let our USA lawyers, DLA Piper do all our contracts so that they will marry seamlessly with our franchise direction, specially because DLA Piper are the ones setting up our Franchise system laws/requirements. If we use another lawyer other than DLA Piper we stand the chance of re-doing contracts or agreements because of miss-matching with our franchise direction.

If the question above where I do not understand refers to the agreement, the existing one, I agree that this should be replaced with one that will be suitable for USA and the Franchise system.

Thank you

See you soon Amit

Regards

jo

---

**From:** "amitneman@yahoo.com" <amitneman@yahoo.com>
**To:** Jo Magsaysay <josemagsaysay@yahoo.com>
**Sent:** Tue, May 11, 2010 11:12:01 AM
**Subject:** Fw: JV Agreement

Hello Partner,

Hope all is well, we had a great mother'sday weekend, did $1626 on Saturday which was a new record.. Everything is good and getting better..

We sat down with Mark today to press him to move forward. We need at least 40K in order to prepare

everything for massive expansion. He agreed.

Bellow are the comments from his attorney. What are your thoughts about how to move forward?

Amit.

Sent via BlackBerry from T-Mobile

---

**From:** "Julian Chan" <julianchan@msn.com>
**Date:** Mon, 10 May 2010 18:31:46 -0700
**To:** 'Mark Tung'<mark@madehollywood.com>; 'Amir Jacoby'<ajacoby88@gmail.com>; 'amit neman'<amitneman@yahoo.com>; 'guy koren'<guyk23@hotmail.com>
**Subject:** RE: JV Agreement

This is not a complete list of the issues but here are some of the bigger issues.

1) Definitions for revenue have to be more detailed.
2) Lists 7 incorporators (CA filings do not work this way)
3) Lists 7 board members ( none of which involve the Great Wall folks). Also, what happens if the named individuals cannot/should not serve?
4) Names specific people as officers (Does not address issues of people need to be removed, incorrectly details their responsibilities, etc)
5) Does not allow anyone to sell or otherwise transfer shares.
6) Excludes California
7) Does not have any ownership for Great Wall.
8) % ownership seems clearly incorrect
9) Does not have key definitions, like "Master License". i.e. what are the rights that are supposed to be received? Where are the reps, warranties and indemnifications?
10) Excessively regulates the day-to-day functioning of the company
11) Specifically assigns work to particular individuals. (This should be under employment agreements that are flushed out and attached, with details for removal ,compensation etc)


Some of the more minor, but time intensive issues:

a) Needs to be rewritten to reflect US law and US contract practice. The contract is based off a British contract and some of the language is not the same as used in the US.
b) Factually incorrect in many places (For example, it assumed the company will be created as compared to have been created. Also what has been create has not been and cannot be created the way they want (for example 7 incorporators).
c) Many of these provisions would be typically significantly more details, for example the language regarding confidentiality.


=================================================

 JULIAN L. CHAN

       Attorney at Law

Phone:    (310) 995-9006
EFax:      (310) 861-5049

E-mail:    julianchan@msn.com

Website: www.julianchanlegal.com

===============================================

NOTICE: This E-Mail (including attachments) is covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521, is confidential and may be legally privileged. If you are not the intended recipient, you are hereby notified that any retention, dissemination, distribution or copying of this communication is strictly prohibited. Please reply to the sender that you have received this message in error, then delete it. Thank you for your
cooperation.

IRS CIRCULAR 230 DISCLOSURE: To ensure compliance with requirements imposed by the IRS, we inform you that any tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

---

**From:** markytung@gmail.com [mailto:markytung@gmail.com] **On Behalf Of** Mark Tung
**Sent:** Monday, May 10, 2010 5:57 PM
**To:** Amir Jacoby; amit neman; guy koren; julianchan@msn.com
**Subject:** JV Agreement

Julian,

What are some of the concerns with this agreement?

Its a lil tricky, this agreement is between CINCO (flip corp company) and PCE Manangement LLC, where CINCO is majority owner of PCE Management LLC, but PC US Enterprise Inc is the sole managing partner.  So think of the agreement from those views.

--
Mark Tung

MADE Hollywood Inc.
www.MadeHollywood.com
mark@MadeHollywood.com
office: 323.463.1473
fax: 323.463.0485
cell: 323.472.0743

Thursday - Industry
Friday - Les Deux
Saturday - Opera + Crimson
Sunday - Guys & Dolls

OPIUM Productions [www.OpiumHollywood.com]
Friday @ Opera + Crimson
Saturday @ Les Deux

| www.AuGroupLA.com | www.LivElevated.com| www.LaVidaHollywood.com |

# EXHIBIT 16

## Re: Phone Discussions

Jose Magsaysay Jr. <josemagsaysay@yahoo.com>

Sat 5/15/2010 12:37 AM

**To:** erlyndah <esbartolome@gmail.com>
**Cc:** amitneman@yahoo.com <amitneman@yahoo.com>; guy LA <guyk23@hotmail.com>; AmirJacoby <ajacoby88@gmail.com>; Marvs Bermejo <marvsbermejo@yahoo.com>

To All:

Using DLA Piper with it's prestige and credibility will be good for us, short and long term. Whatever DLA Piper will do for us they will defend it in a US court of Law with all their might.

Whereas an "out of the box" franchise developer, specially those willing to do "piece meal" work on this franchise development is to my mind wanting in caution. Hidden charges or additional charges are a thing to watch out for. I've worked with many franchise developers already and dud some consultancy myself.

I disagree on using a $ 6,000.00 consultant for a manual because, as Lyndah pointed out, they are just "cut and paste" and most of the work will still be done by us.

If cost is a concern, let's get from the worldwide web a copy of a franchise and operations manual and other documents meeded and use this as a template. Lyndah and I can do this, all we need is a guide or a format to follow. Give me a template to follow and I will do the Manual if you like

Lyndah is a CFE, a certified franchise executive, that is USA specs, IFA and University of Noviscosia. I am too, just haven't filed my papers to get a certificate. Lyndah and I have almost 40 years experience in franchising and the CFE masters degree is US applied franchise laws.

Lyndah and Butz should give a formal quote on franchise development, in detail minus what we've engaged DLP Piper to do.

Let's get this done quick

I'd like to see timelines, not only of tasks to be completed but also a timeline representing a proposed cash flow of payments and other expenses needed to franchise and set up our USA company. Together with this we have to plan a new plan to plot cash inflows so that we have an idea what we need to do to pay for ll the cash outflows

Thank you

Jo

sent via iPhone

On May 16, 2010, at 4:46 AM, erlyndah <esbartolome@gmail.com> wrote:

Dear All.

This is to summarize the phone discussions with Guy - May 14 and Amit- May 15.

1.  The San Francisco Lawyer as nominated by Cinco Manila shall handle the following:
Review and final drafting of the JV Agreement.  This is a big priority since Mark is waiting for this document prior release of funds.
Incorporation of the JV Company.  Name PCE Management has been handled and done by the LA Lawyer.
All the franchise disclosure statements.
While we all know that other lawyers like frandocs can do the disclosures for very much less the price..US6,000 for frandocs and US 25,000 for the San Francisco lawyers, I have pointed out the following:
The disclosure statements are documents submitted and registered with the government and as such we cannot keep changing these documents.
While the initial cost maybe high, we need a certain confidence level on the law firm that did our disclosures since these are also the documents that we will give and provide all our franchise applicants.
There will definitely be credibility in our franchise offering when we say a professional and international law firm has done our disclosures.
A big law firm carries with it also its reservoir of experience in franchising and Kim was part of the initial team that did the franchise rules.
We also recommended that they do the JV Agreement and the Incorporation of the JV LLC Company since they have to guide us on how the company will be formed to comply with the franchise rules.
Please note that the JV LLC is the franchisor in the US.
Guy and Amit I believe agreed with me on all the points mentioned above.
As such I strongly recommend involving DLA Piper  for our disclosures.


2.  On the Operations Manual
Consideration has to be made on the time constraints that we have.  When the disclosure statements are submitted, we have to either declare we have an Operations Manual or not.  If we do then we have to be ready to produce our Operations Manual.
Constraints on funds, the JV has funds as of the moment.


   OPTIONS:
To go ahead and get the services of frandocs or another franchise developer who can provide template manuals since the cost will be very low.
PC US and Manila can come up with the template Operations Manual. Our office _ GMB can assist you come up with a template Operations Manual which can be cheaper than a customize one.
These were the discussions we had over the phone
Please discuss the above and Jo and I will discuss these matters on Monday during our meeting.  I should be able to give you an indication on what is the option to take.

Thanks and kindest regards to all.

# EXHIBIT 17

## Fw: FedEx Shipment Notification

Jose P. Magsaysay, Jr. <josemagsaysay@yahoo.com>

Tue 5/18/2010 1:03 AM

**To:** amitneman@yahoo.com <amitneman@yahoo.com>
**Cc:** Guy koren <guyk23@hotmail.com>; Amir Jacoby <ajacoby88@gmail.com>; Lyndah Bartolome <esbartolome@gmail.com>; Marvs Bermejo <marvsbermejo@yahoo.com>; ricky_montelibano@yahoo.com.ph <ricky_montelibano@yahoo.com.ph>; Jojo G. Montinola <josemontinola@yahoo.com>

📎 3 attachments (3 MB)
BUZZ WIRE CHALLENGE_0003.wmv; 1.80MCartWithLCDe.jpg; Buzz wire shirt design with glow.jpg;

Hi Amit!

What a morning!  When I got out of bed this morning the whole room spun around, I had vertigo.  Stayed home the whole morning because I was dizzy.  I am in the office now but still dizzy and light headed.  Before I left the house I checked my blood pressure, 160/95.  This is high for me, the average BP this morning after 4 reading spread thru the whole morning was 152/94.  Is age catching up hmmmmmm, but hey when I remembered I had to reply this email of your, this got me out of bed and to the office emailing you now.  You see, Potato Corner USA is my priority.

Yes, JV agreement is being done as I write this.  The SF attorneys are the ones doing this

I agree, we are so happy to with such sharp people and hard working partners like you

As far as delays are concerned, I understand completely.  Don't worry about it

See you soon.  We are arriving on the evening of the 20th and it will be great if we can have dinner with the Potato Corner USA Team on  the 21st.  I will take my Partners to see Santa Anita around 11am on the 21st, and if you are there we can have some initial updates/meeting.  We are so looking forward to seeing you.

On the 22nd we fly to Chicago to attend the NRA show.  We will be back in LA on the 27th.

This week we got a visit again from our Indonesia partner, the agenda was for her to finally meet our flavors/seasoning supplier/partner and put in place a franchise system so that we can now start franchising this year in indonesia.  Artini, our Indonesian Partner approved Lyndah to do this for our company there.  we are going to try a new seasoning/flavor in Indonesia - garlic and spring onion

We are going bring some seasoning/flavors with us for you to try.  We are now working to do the flavors/seasoning of the world and below is our list of flavors of the month

Parmesan Flavor
Chocolate Flavor
Teriyaki Flavor
Ketchup Flavor
Honey Mustard Flavor
Garlic Cheese Flavor

Mocha Caramel Flavor
Strawberry Flavor
Bacon Cheese Flavor
Pizza Flavor

We are also now trying to test soft serve yogurt ice cream in a couple of outlets

Attached is a picture of our 1.8m size cart with LCD monitor, future outlets will have this and
the older ones will follow

Kids are loving the buzzwire, we are doing it for all our children party bookings and the
buzzwire is going around the outlets for the buzzwire challenge.

Regards,


jo



----- Forwarded Message ----
**From:** "amitneman@yahoo.com" <amitneman@yahoo.com>
**To:** Jo Magsaysay <josemagsaysay@yahoo.com>
**Cc:** Guy Koren <guyk23@hotmail.com>; Amir Jacoby <ajacoby88@gmail.com>
**Sent:** Sun, May 16, 2010 11:03:51 AM
**Subject:** Fw: FedEx Shipment Notification


Hi Partner!!

Hope you and your family are doing well.

Just wanted to let you know our TA is finally on the way.

We apologize for the delay
but getting $20,000 from Westfield is not an easy task.

We are all in agreement with your decision in regard to the FDD. We want to make sure we are protected.

How are we coming along with the JV papers? Are we going to have attorneys from SF attorneys draft
the contract? Mark came to Santa Anita with another investor today. He is eager to start contributing time
and effort but he keeps going back to finalizing the JV agreement. We are very lucky to be in a business
where super sharp people want to participate and they are pushing us to close the deals. =)

G-d Bless,

See you soon Partner!!

Potato Corner USA Team.

Sent via BlackBerry from T-Mobile

**From:** ajacoby88@gmail.com

**Date:** Fri, 14 May 2010 23:14:07 +0000
**To:** Neman Amit<amitneman@yahoo.com>
**Subject:** Re: FedEx Shipment Notification

I will believe it when I see it :)

Sent via BlackBerry from T-Mobile

---

**From:** amitneman@yahoo.com
**Date:** Fri, 14 May 2010 22:36:45 +0000
**To:** Guy Koren<guyk23@hotmail.com>; Amir Jacoby<ajacoby88@gmail.com>
**Subject:** Fw: FedEx Shipment Notification

TA will be here in 2 days!!

Sent via BlackBerry from T-Mobile

---

**From:** TrackingUpdates@fedex.com
**Date:** Fri, 14 May 2010 17:12:34 -0500 (CDT)
**To:** <amitneman@yahoo.com>
**Subject:** FedEx Shipment Notification

---

This tracking update has been requested by:

```
Company Name:            Westfield Corp
Name:                    Minda Papa
E-mail:                  mpapa@westfield.com
```

---

```
Minda Papa of Westfield Corp sent Amit Neman of NKM Capital Group, LLC 1 FedEx 2Day
package(s).
```

This shipment is scheduled to be sent on 05/14/2010.

Reference information includes:

```
Reference:               10008
Special handling/Services:  Deliver Weekday
Status:                  Shipment information sent to
                         FedEx

Tracking number:         798666930966
```

To track the latest status of your shipment, click on the tracking number above,
or visit us at fedex.com.

Learn more about new ways to track with FedEx.

This tracking update has been sent to you by FedEx on the behalf of the
Requestor noted above. FedEx does not validate the authenticity of the
requestor and does not validate, guarantee or warrant the authenticity of the

Case 2:24-cv-04546-SB-AGR     Document 234-4     Filed 08/18/25     Page 102 of 808
Page ID #:11949

request, the requestor's message, or the accuracy of this tracking update. For
tracking results and fedex.com's terms of use, go to fedex.com.

Thank you for your business.

# EXHIBIT 18

## Re: Joining the IFA

erlyndah <esbartolome@gmail.com>

Tue 5/18/2010 2:48 AM

**To:** Amit Neman <amitneman@yahoo.com>
**Cc:** joemag <josemagsaysay@yahoo.com>; guy LA <guyk23@hotmail.com>; AmirJacoby <ajacoby88@gmail.com>; Marvs Bermejo <marvsbermejo@yahoo.com>

Hi Amit, this was fast.  Yes, we can discuss this as the benefits and savings looks like substantial.

Also, since the the Board of Cinco will be in LA, Jo would like to have the first Board Meeting of PCE Management on May 30.  Seems like we have to prepare for the Agenda for this and prepare documents to be discussed.

Tentatively, my suggested agenda would be:

1. Summary of the JV Agreement.
2. Salient points of the Franchise Agreeement
3. Goals and targets of the Company - timelines
4. Organizational Structure - timing of hiring and roles
5. Financial Projections
6. Status Report on franchised branches
7. Status Report of PCE
8. Status Report of San Francisco
9. Status Report of Applicants
10. Status of FDD
11. PCE Trading
12. IFA Membership - West Coast Franchise Show

Thanks Amit and cheers,


Lyndah


On 5/17/2010 6:58 PM, Amit Neman wrote:

Hi Lyndah,

Here is the link for Joining the IFA, the "2 year introduction fee" is $3000. Below is a list of benefits and since we are definitely planning on having a strong presence at the West Coast Franchise Expo (at the Los Angeles Convention Center – November 5-7, 2010) we should join as soon as possible.  You and I will have to start working on the JV financial planning right away. I will also finish what I can for the Franchise Disclosure Document this week like we discussed.


**Franchise Development**

**4 Listings in IFA's** *Franchise Opportunities Guide* **(two years of coverage) $2,600**

Internet Link from IFA's Web site to your company's Web site (two years of coverage) $2,000

IFA Member Discount on Exhibits International Franchise Expos (Single Booth, 2 expos over 2 years) $1,080

## IFA Member Discounts on Exhibits West Coast Franchise Expo (Single Booth, 2 expos over 2 years) $ 780

IFA Member Discounts on Franchise Expo South (Single Booth, 2 expos over 2 years) $ 780

### Education and Publications

IFA International Franchise Annual Convention Registration $ 899

IFA Franchise Development Seminar $ 345

Subscriptions to *Franchising World* for you and your corporate staff (12@$50 each) $ 600

Subscriptions to *IFA Insider* $ 120

Subscription to *IFA SmartBriefs E-Newsletter* $ 120


 Here are some links if Guy and Amir want to do more research.

http://www.franchise.org/uploadedFiles/Prospective_Franchisee/About/2yrIntro_Progrm07-10_07.pdf

http://www.franchise.org/join.aspx


We'll also get something like this:


http://franchise.org/Einstein_Bros_Bagels_franchise.aspx


Best,


Amit Neman

www.PotatoCornerUSA.com

# EXHIBIT 19

PCJV USA LLC

FIRST BOARD OF DIRECTORS MEETING

May 30, 2010 – Santa Anita Mall, Arcadia City, Pasadena California, USA

3:00pm – 6:00pm


Directors Present:

Jose P. Magsaysay

Jose Miguel M. Montinola

Ricardo K. Montelibano

Maria Victoria O. Bermejo

Amit Nemanim

Guy Koren

Amir Jacoby

Erlinda S. Bartolome – Corporate Secretary


1. Officers of PCJV

   The Board approved the following officers of PCJV:

   Chairman – Jose P. Magsaysay

   President and CEO – Amit Nemanim

   Treasurer – Jose Miguel M. Montinola

   Corporate Secretary – Erlinda S. Bartolome

2. As the first Board Meeting, the Directors were requested to give their thoughts on the partnership forged between the two groups.
   a. Amit – Expressed his thanks for this opportunity to do something big with huge market. Hard to express our gratitude for the 100% trust of JPM. Thank you Jo.
   b. Marivic – Happy to see the growth of Potato Corner.

c. Ricky – Gratitude to the LA Partners for the trust and love shown.

d. Lyndah – there is a different fulfillment when we see clients grow and expand beyond the horizons seen at the start of their business. This is truly a defining moment in Potato Corner's business history.

e. Guy – thanks for the opportunity. He has never gotten into an opportunity like this. JPM lit the fire and hope that we can deliver.

f. Amir – happy to be part of the group. Each one is a piece of the puzzle and together we complete the puzzle. We want you to be proud of the right choice of partners.

g. Jojo – we went through years of entertaining the idea of expanding to the US. Finally we found you. We see ourselves in you when we started Potato Corner 17 years ago. We were ready to sacrifice and risk. We want to be successful for us and for our families. We are flexible and we want a long term relationship. We would like to have a company where there is flexibility and trust among ourselves and with our franchisees. Let us listen to our franchisees. Let us look forward beyond Potato Corner.

h. Jo – we were forewarned by people about partnership with Jews. But the decision to partner with you was an out-of-the-box decision. We have managed to grow Potato Corner since we always seek new ways of looking at things. At Potato Corner, we reinvent, we do not survive in looking for what other companies have done but we grow by taking the untrodden path to decisions and partnerships. We found the right partners.

3. Packaging
   a. Take Out bags – to check one (1) size and checkered
   b. Check packaging for baked potatoes with lids.
   c. Suggestion for all paper bowls and beverage cups to have "Keep Environment Clean".

4. Taglines
   a. The World's Best Flavored Fries
   b. The World's Best Flavored Fries and More

5. Trading Company
   a. Officers:

        i. Chairman – Amir

       ii. President – Guy

     iii. Treasurer – Jojo

     iv. Corp Sec – Lyndah

b. Stock up of the Trading Company – 90 days

c. Guy will determine the mark up for the trading company

Board Meeting Adjourned at 6:00 pm

# EXHIBIT 20

## Potato Corner JV Agreement

Jose Magsaysay Jr <josemagsaysay@yahoo.com>

Tue 6/1/2010 9:46 AM

**To:** Amit 1 direct <amitneman@yahoo.com>; Guy koren <guyk23@hotmail.com>; Amir Jacoby <ajacoby88@gmail.com>

📎 1 attachments (82 KB)

Potato Corner - JV Agreement DRAFT.doc;


sent via iPhone

Begin forwarded message:


      **From:** "Olivas, Ben" <Ben.Olivas@dlapiper.com>
      **Date:** May 31, 2010 9:45:32 PM

**DRAFT
06/14/2019**

**JOINT VENTURE AGREEMENT**

This Joint Venture Agreement (the "Agreement") dated _____ is made and entered into on _____, by and between:

Cinco Corporation, a corporation duly existing and registered by virtue of and under the laws of the Republic of the Philippines with office address at _____, represented herein by its duly authorized representative, _____ (hereinafter "Cinco");

-and-

AMIT NEMANIM, GUY KOREN, AMIR JACOBY, all of whom are U.S. citizens and residents and collectively referred to as the "LA Group.:

RECITALS

WHEREAS, the Parties hereto have agreed to form a corporation (hereinafter referred to as the "Company") to be incorporated under the laws of the State of Delaware, with the primary purpose of engaging in the business of establishing, operating, managing, licensing and franchising "Potato Corner" stores/outlets in the United States of America and Israel, except in the County of Los Angeles, USA and the County of San Francisco, USA and Tanforan Mall (hereinafter, "Territory").

WHEREAS, the Parties herein have agreed to enter into this Agreement which sets forth the terms and conditions with respect to the organization, incorporation, operation and management of the Company and defines their respective rights, duties and obligations of the parties to this Agreement.

NOW, THEREFORE, for and in consideration of the foregoing premises, the Parties hereby agree as follows:

1) ORGANIZATION AND INCORPORATION OF THE COMPANY

   a) The Parties herein agree to organize and incorporate, within _____ (____) days from the date of this Agreement, a corporation to be called "_____" ( hereinafter referred to as the Company) for the primary purpose of engaging in the business of establishing, operating, managing, licensing and franchising "Potato Corner" stores/outlets in the Territory.

   b) The incorporators and initial directors of the Company shall be the following:

   JOSE P. MAGSAYSAY, JR.              MA. VICTORIA O. BERMEJO

   JOSE MARIA  MONTINOLA              RICARDO K. MONTELIBANO

   AMIT NEMANIM                       GUY KOREN

   AMIR JACOBY

   c) The principal office of the Company shall be at  _____.

**DRAFT**
**06/14/2019**

d) The annual general meeting of the stockholders of the Company shall be held every year at the principal office of the Company.  The Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses of the following stockholders incurred in attendance of the annual stockholders' meeting: Jose P. Magsaysay, Jr., Jose Maria Montinola, Ma. Victoria O. Bermejo, and Ricardo K. Montelibano.

e) The fiscal year of the Company shall begin on January 1 and end on December 31 of each year.

f) The Company shall immediately upon incorporation obtain a "Liability Insurance" for the Company the amount and scope of coverage to be determined by the Board of Directors.

g) All costs, fees and expenses incurred in connection with the organization and incorporation of the Company shall be for the account of the Company.

h) The Articles of Incorporation and By-Laws of the Corporation shall reflect the terms and conditions set forth in this Agreement between the Parties.

2) CAPITALIZATION/OWNERSHIP OF THE COMPANY

a) At the time of its incorporation, the Company shall have a total authorized capital stock amounting to _____ divided into _____shares with a par value of _____ (USD _____) per share. The Parties agree that the authorized capital stock shall be fully subscribed and the subscription fully paid.

b) The Parties hereby agree that Cinco shall collectively own sixty (60%) percent of the Company while the LA Group shall own the remaining forty (40%) percent.

c) The Parties hereby agree any increase in the authorized capital stock of the Company shall require an affirmative vote of majority of all of the members of the Board of Directors.  In the event an increase in the Company's authorized capital stock is approved by the Board of Directors, both Parties shall have rights of pre-emption so that their pro rata ownership share in the Company shall be maintained, provided that, either Party shall have thirty (30) days within which to confirm in writing that it is willing and able to subscribe and fully pay its pro rata share of the increase in capital.

d) The LA Group shall not assign any of its rights or obligations under this Agreement without the prior written consent of Cinco. In the event any of the three (3) above-named members of the LA Group desire to transfer or sell his pro rata share ownership in the Company to a person outside of the LA Group, it shall be obligated to sell the same first to Cinco, which has have thirty (30) days within which to exercise its rights of first refusal from the date of receipt of a written notice to sell from the LA Group.  For this purpose, the Parties hereby agree that Cinco shall have the right to acquire such shares in an amount equal to the following formula:  The average of the Company's revenues for the last

2

**DRAFT**
**06/14/2019**

<mark>___ (  ) years multiplied by 5 times, and further multiplied by the percentage of share ownership subject to such right of first refusal over total authorized shares.</mark>

3) MANAGEMENT OF THE COMPANY

a) The Board of Directors of the Company shall be composed of seven (7) members.  Upon the formation of the Company, the following shall be named as the members of the Board of Directors: Jose P. Magsaysay, Jr., Jose Maria Montinola, Ma. Victoria O. Bermejo, Ricardo K. Montelibano, Amit Nemanim, Guy Koren, and Amir Jacoby.  The Chairman of the Board of Directors shall always be any of the following directors:  Ma. Victoria O. Bermejo, Jose P. Magsaysay, Ricardo K. Montelibano or Jose Maria Montinola.

b) The Board of Directors shall regularly meet on a monthly basis. The regular monthly board meeting may be done via teleconference or through the internet... However, the Board of Directors shall convene and meet at the principal office of the Company every quarter of every fiscal year. The Company shall shoulder the expenses for air fares, hotel accommodation and incidental expenses of the directors relative to the said board meetings.

c) Upon the incorporation of the Company, it shall have the following executive officers: President, Corporate Secretary and Treasurer, and the following shall be elected by the Board of Directors to serve these positions:

i) President -- The President shall be any one of the following: Amit Nenamin, Guy Koren or Amir Jacoby.
ii) Corporate Secretary – Erlinda Bartolome.
iii) Treasurer – Jose Maria Montinola
(1) The Treasurer shall have oversight functions over the Accounting and Finance Departments that shall be exercised independent of the President.

d) Additional executive officers may be appointed by the Board of Directors as it may deem necessary.

e) It is hereby agreed that the rights and responsibilities of the  Board of Directors shall include the following:

i) Approval of the compensation package for the directors, executive offices and key personnel.
ii) Approval of the Accounting System/Procedures/Software/Method to be used by the Company.
iii) Approval of the operating budget of the Company, and any changes to it. Any disbursement and expenses previously approved by the Board of Directors shall require their approval before any funds can be disbursed.

f) The executive officers shall manage the business and property of the Company, and to market the business, in accordance with and pursuant to the directives of and policies set by the Board of Directors of the Company. The Board of Directors of the Company can recall and/or withdraw the appointment of any executive officer, as it deems necessary.

**DRAFT**
**06/14/2019**

g)  The Parties hereby expressly agree that any and all contracts in the name and on behalf of the Company must have the prior approval of the Board of Directors of the Company.

h)  Within _____ (   ) days from incorporation, the Company shall enter into a  Master License Agreement with Cinco (or an affiliated company to be designated by Cinco) which shall include the following terms and conditions:

   i)  The Company agrees to license the "POTATO CORNER" intellectual property rights from Cinco or an affiliated company to be designated by Cinco) consisting of (i) the trademark, service mark and trade name "POTATO CORNER"; and (ii) various trademarks, service marks, trade names, slogans, designs, insignias, emblems, symbols, color schemes, package features, logo and other propriety identifying characteristics used in relation and in connection with the "Potato Corner" Products and the System [NOTE:  The terms "Product" and "System" needs to be defined]; and (iii) as well as other intellectual property rights in connection with the "POTATO CORNER" intellectual property rights, for use in the Territory.

   ii)  The Company agrees to pay, as an arm's length license fee, the following amounts:

      (1)  With respect to the licensing / sub-licensing or franchising the "POTATO CORNER" intellectual property rights in connection with the "POTATO CORNER" outlets/stores, an amount equal to thirty percent (30%) of all fees paid to/ collected by the Company.  Payments shall be made to Cinco (or an affiliated company to be designated by Cinco) by wire transfer using a bank or other financial institution specified by it within ten (10) days from receipt of the fees by the Company.

      (2)  With respect to "POTATO CORNER" outlet and stores operated and managed by the Company for its own account in the Territory, an amount equal to thirty percent (30%) of all net sales recognized by the Company. Payments shall be made to Cinco (or an affiliated company to be designated by Cinco) by wire transfer using a bank or other financial institution specified by it within ten (10) days from _____.

      (3)  All withholding and other applicable taxes levied by any authority on the payments by the Company shall be borne solely by the Company.

i)  The Company agrees to engage the LA Group to provide its management and strategic experience and expertise during the duration of this Agreement.  Within _____ (   ) days from incorporation, the Company shall enter into a  Master Services Agreement with the LA Group which shall include the following terms and conditions:

   i)  In consideration for the provision of its services under the Master Services Agreement, the LA Group shall be entitled to a services fee equal to thirty (30%) percent of all the fees paid to/ collected by the Company .

   ii)  All withholding and other applicable taxes levied by any authority on the payments by the Company to the LA Group under this Agreement shall be borne solely by the Company.

**DRAFT
06/14/2019**

    iii) The LA Group shall faithfully, diligently and efficiently exercise its obligations and responsibilities under the Master Services Agreement.

    iv) The LA Group shall maintain and protect the Confidential Information belonging to Cinco or the Company, and such undertaking shall apply to all of its partners, officers, employees, or agents.

j) The President of the Company shall render the following services and shall perform the following duties for the Company in a faithful, diligent and efficient manner:

    i) The President shall be responsible for all management, operational, marketing, establishment, maintenance, licensing and sub-licensing activities with respect to the "Potato Corner" outlets/stores in the Territory. He shall use his best efforts at all times during the term of this Agreement to operate and maintain the "Potato Corner" outlets/stores in the Territory according to the highest standards achievable consistent with the overall plan of the Board of Directors of the Company. The President shall comply with the rules, policies and procedures approved by the Board of Directors of the Company from time to time.

    ii) The President shall advertise market and promote the "Potato Corner" outlets/stores with the goal of causing public knowledge, awareness and patronage of the "Potato Corner" outlets/sites.

    iii) The President shall maintain a comprehensive system of records, books and accounts, with respect to the licensing and sub-licensing activities, operation, establishment, management, maintenance and other activities of the "Potato Corner" outlets /stores in the Territory. All records shall be subject to examination by Cinco, or its authorized agents, attorneys and accountants.

    iv) No later than the twentieth (20th) day of each month, with respect to the preceding month, the President shall render a statement of receipts and disbursements, a schedule of accounts receivable and payable, and a schedule of fees collected and distributed, together with a reconciled bank statement as of the last day of the month.

    v) No later than three (3) months after the end of a fiscal year, the President shall cause the Company to issue audited financial statements, and shall provide a copy of the same to all the members of the Board of Directors, and Cinco.

    vi) To the extent the President is lawfully able to do so, the President shall take such action as may be necessary to comply promptly with any and all laws, ordinances, orders or other requirements of any federal, state, county or municipal authority having jurisdiction of the Company and affecting the Company.

4) DURATION OF AGREEMENT

a) This Agreement shall become effective from the date of execution hereof and shall continue for a period of ten (10) years unless otherwise terminated by a written agreement between the Parties, unless terminated in for cause or convenience in accordance with this Agreement.

**DRAFT**
**06/14/2019**

b) This Agreement may be terminated by the mutual written agreement of the Parties at any time.

c) This Agreement may be terminated by any Party with respect to another Party ("Breaching Party"), if the Breaching Party is in material breach of this Agreement and fails to cure such breach within thirty (30) days following receipt of written notice of such breach.

d) Upon any termination of this Agreement either upon mutual agreement of the Parties or for cause:

    i) All rights granted under the Master License Agreement shall terminate and the Company shall cease the use of the Potato Corner Intellectual Property Rights, and Confidential Information, provided however, that the Company shall be permitted to use any of the foregoing as is reasonably required in order to comply with its obligations under its sub-licensing or franchising agreements, but only to the extent of the duration of sub-licensing or franchising agreements in existence at the time of the termination of this Agreement.

    ii) The LA Group shall be subject to a non-compete arrangement and hereby agrees that, within two (2) years from the date of termination of this Agreement, it shall not engage in the business of establishing, operating, managing, licensing and franchising identical or similar products sold by the Company, using the intellectual property rights identical or similar to those used by the Company, at the time of the termination of this Agreement.

    iii) The Parties hereby agree that all the provisions herein contained shall be deemed conditions as well as covenants and that if default or breach be made of any such covenants and conditions, then this Agreement, at the discretion of the Non-Defaulting Party, may be terminated and cancelled forthwith and the Defaulting Party shall in addition to any liquidated damages, be liable for any and all damages, actual and consequential, resulting from such default and termination.

    iv) Should a Non-Defaulting Party be compelled to seek judicial relief against the Defaulting Party, the latter shall in addition to any damages stated elsewhere in this Agreement, pay an amount equivalent to twenty five percent (25%) of the amount claimed in the complaint as attorney's fees, aside from the costs of the litigation and other expenses which the law may entitle the Non-Defaulting Party to recover from the Defaulting Party.

5) GENERAL PROVISIONS

a) This Agreement may not be altered, changed, supplemented or modified except by a written instrument duly signed by the Parties.

b) The Parties shall use their best efforts to cooperate for the success of the business of the Company. The Parties further agree to perform all acts and execute and deliver all documents or instruments required or necessary to fully implement or consummate the transactions contemplated in and the intent underlying this Agreement.

**DRAFT**
**06/14/2019**

c) The Parties shall, to the extent feasible, because the Articles of Incorporation and the By-Laws of the Company to reflect the mutual covenants and provisions contained in this Agreement.

d) All notices and other communications required or permitted to be given hereunder shall be given in writing (and for this purpose shall include emails or fax transmissions) and shall be addressed to the appropriate Party at the address of such Party as heretofore designated, or at such address as such Party may designate subsequently in writing.

e) The failure of any Party at any time to require performance by the others of any provision of this Agreement shall not affect, in any way, the right of such Party to require performance of that or any other provision, and any waiver by any Party of any breach of this Agreement shall not be construed as a waiver of any continuing or succeeding breach of such provision, or a waiver of any other right under this Agreement.

f) This Agreement shall constitute the entire agreement between the Parties and shall supersede any previous agreements, written or otherwise, with respect to the same subject matter which may have been made by the Parties prior hereto.

g) The invalidity of any portion of this Agreement will not and shall not render the entire Agreement void, nor affect the validity of the rest of the provisions of this Agreement.

h) This Agreement shall be governed by the laws of _____.

i) Parties acknowledge that, from time to time, one Party (the "Discloser") may disclose to the other Party (the "Recipient") information: (a) relating to the Potato Corner outlets and sites; (b) relating to the Potato Corner Intangible Property Rights; (c) Potato Corner product specifications and related information; (d) which is marked with "confidential" or a similar legend; (e) which is described orally and designated as confidential; or (f) which would, under the circumstances, be understood by a reasonable person to be confidential ("Confidential Information"). Upon subsequent disclosure of previously disclosed Confidential Information to the Recipient by the Discloser, the information will remain Confidential Information even if not identified as Confidential Information at the subsequent disclosure. Recipient shall retain such Confidential Information in confidence, and shall not disclose it to any Third Party or use it for other than the purposes of this Agreement without the Discloser's prior written consent. Each Party shall use at least the same procedures and degree of care with respect to such Confidential Information which it uses to protect its own confidential information of like importance, and in no event less than reasonable care. The Recipient will immediately give written notice to the Discloser of any unauthorized use or disclosure of the Discloser's Confidential Information, and the Recipient will assist the Discloser in remedying such unauthorized use or disclosure.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date and in place first mentioned.

**DRAFT**
**06/14/2019**

By:                                                     By:

_____       _____
President                                                  (Title)

SIGNED IN THE PRESENCE OF:

_____       _____

<u>ACKNOWLEDGMENT</u>

# EXHIBIT 21

## Re: Fw: Potato Corner JV Agreement

Mark Tung <markytung@gmail.com>

Wed 6/2/2010 3:11 AM

**To:** guyk23@hotmail.com <guyk23@hotmail.com>

📎 1 attachments (63 KB)

Potato Corner - Agreement Changes.doc;

my comments are in the red.  but alot of things are missing

On Tue, Jun 1, 2010 at 10:22 AM, <guyk23@hotmail.com> wrote:

> Sent via BlackBerry from T-Mobile
>
> _____
>
> **From:** Jose Magsaysay Jr <josemagsaysay@yahoo.com>
> **Date:** Tue, 1 Jun 2010 09:46:03 -0700 (PDT)
> **To:** Amit 1 direct<amitneman@yahoo.com>; Guy koren<guyk23@hotmail.com>; Amir Jacoby<ajacoby88@gmail.com>
> **Subject:** Potato Corner JV Agreement
>
>
>
> sent via iPhone
>
> Begin forwarded message:
>
>> **From:** "Olivas, Ben" <Ben.Olivas@dlapiper.com>
>> **Date:** May 31, 2010 9:45:32 PM

--

Mark Tung

MADE Hollywood Inc.
www.MadeHollywood.com
mark@MadeHollywood.com
office: 323.463.1473
fax: 323.463.0485
cell: 323.472.0743

Thursday - Industry
Friday - Les Deux
Saturday - Opera + Crimson
Sunday - Guys & Dolls

OPIUM Productions [www.OpiumHollywood.com]
Friday @ Opera + Crimson
Saturday @ Les Deux


| www.AuGroupLA.com | www.LivElevated.com| www.LaVidaHollywood.com |

**DRAFT
06/14/2019**

**JOINT VENTURE AGREEMENT**

This Joint Venture Agreement (the "Agreement") dated _____ is made and entered into on _____, by and between:

Cinco Corporation, a corporation duly existing and registered by virtue of and under the laws of the Republic of the Philippines with office address at _____, represented herein by its duly authorized representative, _____ (hereinafter "Cinco");

-and-

AMIT NEMANIM, GUY KOREN, AMIR JACOBY, MARK TUNG all of whom are U.S. citizens and residents and collectively referred to as the "LA Group.: LA Group should be referred to as PC US Enterprise Inc.

RECITALS

WHEREAS, the Parties hereto have agreed to form a corporation (hereinafter referred to as the "Company") to be incorporated under the laws of the State of Delaware why state of Delaware?, with the primary purpose of engaging in the business of establishing, operating, managing, licensing and franchising "Potato Corner" stores/outlets in the United States of America and Israel, except in the County of Los Angeles, USA and the County of San Francisco, USA and Tanforan Mall (hereinafter, "Territory").

WHEREAS, the Parties herein have agreed to enter into this Agreement which sets forth the terms and conditions with respect to the organization, incorporation, operation and management of the Company and defines their respective rights, duties and obligations of the parties to this Agreement.

NOW, THEREFORE, for and in consideration of the foregoing premises, the Parties hereby agree as follows:

1) ORGANIZATION AND INCORPORATION OF THE COMPANY

   a) The Parties herein agree to organize and incorporate, within _____ (___) days from the date of this Agreement, a corporation to be called "_____" ( hereinafter referred to as the Company) for the primary purpose of engaging in the business of establishing, operating, managing, licensing and franchising "Potato Corner" stores/outlets in the Territory.

   b) The incorporators and initial directors of the Company shall be the following:

   JOSE P. MAGSAYSAY, JR.              MA. VICTORIA O. BERMEJO

   JOSE MARIA  MONTINOLA              RICARDO K. MONTELIBANO

   AMIT NEMANIM                       GUY KOREN

   AMIR JACOBY                        MARK TUNG

**DRAFT**
**06/14/2019**

c)  The principal office of the Company shall be at  _____.

d)  The annual general meeting of the stockholders of the Company shall be held every year at the principal office of the Company.  The Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses of the following stockholders incurred in attendance of the annual stockholders' meeting: Jose P. Magsaysay, Jr., Jose Maria Montinola, Ma. Victoria O. Bermejo, and Ricardo K. Montelibano.

e)  The fiscal year of the Company shall begin on January 1 and end on December 31 of each year.

f)  The Company shall immediately upon incorporation obtain a "Liability Insurance" for the Company the amount and scope of coverage to be determined by the Board of Directors.

g)  All costs, fees and expenses incurred in connection with the organization and incorporation of the Company shall be for the account of the Company.

h)  The Articles of Incorporation and By-Laws of the Corporation shall reflect the terms and conditions set forth in this Agreement between the Parties.

2)  CAPITALIZATION/OWNERSHIP OF THE COMPANY

a)  At the time of its incorporation, the Company shall have a total authorized capital stock amounting to _____ divided into _____shares with a par value of _____ (USD _____) per share. The Parties agree that the authorized capital stock shall be fully subscribed and the subscription fully paid.

b)  The Parties hereby agree that Cinco shall collectively own sixty (60%) percent of the Company while the LA Group shall own the remaining forty (40%) percent.Is this breakdown final?

c)  The Parties hereby agree any increase in the authorized capital stock of the Company shall require an affirmative vote of majority of all of the members of the Board of Directors.  In the event an increase in the Company's authorized capital stock is approved by the Board of Directors, both Parties shall have rights of pre-emption so that their pro rata ownership share in the Company shall be maintained, provided that, either Party shall have thirty (30) days within which to confirm in writing that it is willing and able to subscribe and fully pay its pro rata share of the increase in capital.

d)  The LA Group shall not assign any of its rights or obligations under this Agreement without the prior written consent of Cinco. In the event any of the three four (3) above-named members of the LA Group desire to transfer or sell his pro rata share ownership in the Company to a person outside of the LA Group, it shall be obligated to sell the same first to Cinco, which has have thirty (30) days within which to exercise its rights of first refusal from the date of receipt of a written notice to sell from the LA Group. For this purpose, the Parties hereby agree that Cinco shall have the right to acquire such shares in an amount equal

2

**DRAFT**
**06/14/2019**

to the following formula:  The average of the Company's revenues for the last ___ (  ) years multiplied by 5 times, and further multiplied by the percentage of share ownership subject to such right of first refusal over total authorized shares.

3) MANAGEMENT OF THE COMPANY

a) The Board of Directors of the Company shall be composed of seven eight (7) members.  Upon the formation of the Company, the following shall be named as the members of the Board of Directors: Jose P. Magsaysay, Jr., Jose Maria Montinola, Ma. Victoria O. Bermejo, Ricardo K. Montelibano, Amit Nemanim, Guy Koren, and Amir Jacoby.  Mark Tung  The Chairman of the Board of Directors shall always be any of the following directors:  Ma. Victoria O. Bermejo, Jose P. Magsaysay, Ricardo K. Montelibano or Jose Maria Montinola.  How can only they be the chairman of the board when we are suppose to be the managing partner?

b) The Board of Directors shall regularly meet on a monthly basis. The regular monthly board meeting may be done via teleconference or through the internet... However, the Board of Directors shall convene and meet at the principal office of the Company every quarter of every fiscal year. The Company shall shoulder the expenses for air fares, hotel accommodation and incidental expenses of the directors relative to the said board meetings.

c) Upon the incorporation of the Company, it shall have the following executive officers: President, Corporate Secretary and Treasurer, and the following shall be elected by the Board of Directors to serve these positions:

   i) President -- The President shall be any one of the following: Amit Nenamin, Guy Koren or Amir Jacoby.
   ii) Corporate Secretary – Erlinda Bartolome.
   iii) Treasurer – Jose Maria Montinola
      (1) The Treasurer shall have oversight functions over the Accounting and Finance Departments that shall be exercised independent of the President.  Why are they in charge of accounting?

d) Additional executive officers may be appointed by the Board of Directors as it may deem necessary.

e) It is hereby agreed that the rights and responsibilities of the  Board of Directors shall include the following:

   i) Approval of the compensation package for the directors, executive offices and key personnel.
   ii) Approval of the Accounting System/Procedures/Software/Method to be used by the Company.
   iii) Approval of the operating budget of the Company, and any changes to it. Any disbursement and expenses previously approved by the Board of Directors shall require their approval before any funds can be disbursed.

f) The executive officers shall manage the business and property of the Company, and to market the business, in accordance with and pursuant to the directives of and policies set by the Board of Directors of the Company. The Board of Directors of the

3

**DRAFT**
**06/14/2019**

Company can recall and/or withdraw the appointment of any executive officer, as it deems necessary.

g) The Parties hereby expressly agree that any and all contracts in the name and on behalf of the Company must have the prior approval of the Board of Directors of the Company.

h) Within ____ (  ) days from incorporation, the Company shall enter into a  Master License Agreement with Cinco (or an affiliated company to be designated by Cinco) which shall include the following terms and conditions:

    i) The Company agrees to license the "POTATO CORNER" intellectual property rights from Cinco or an affiliated company to be designated by Cinco) consisting of (i) the trademark, service mark and trade name "POTATO CORNER"; and (ii) various trademarks, service marks, trade names, slogans, designs, insignias, emblems, symbols, color schemes, package features, logo and other propriety identifying characteristics used in relation and in connection with the "Potato Corner" Products and the System [NOTE:  The terms "Product" and "System" needs to be defined]; and (iii) as well as other intellectual property rights in connection with the "POTATO CORNER" intellectual property rights, for use in the Territory.

    ii) The Company agrees to pay, as an arm's length license fee, the following amounts:

        (1) With respect to the licensing / sub-licensing or franchising the "POTATO CORNER" intellectual property rights in connection with the "POTATO CORNER" outlets/stores, an amount equal to thirty percent (30%) of all fees paid to/ collected by the Company.  Payments shall be made to Cinco (or an affiliated company to be designated by Cinco) by wire transfer using a bank or other financial institution specified by it within ten (10) days from receipt of the fees by the Company.

        (2) With respect to "POTATO CORNER" outlet and stores operated and managed by the Company for its own account in the Territory, an amount equal to thirty percent (30%) of all net sales recognized by the Company. Payments shall be made to Cinco (or an affiliated company to be designated by Cinco) by wire transfer using a bank or other financial institution specified by it within ten (10) days from _____.

        (3) All withholding and other applicable taxes levied by any authority on the payments by the Company shall be borne solely by the Company.

i) The Company agrees to engage the LA Group to provide its management and strategic experience and expertise during the duration of this Agreement.  Within ____ (  ) days from incorporation, the Company shall enter into a  Master Services Agreement with the LA Group which shall include the following terms and conditions:

    i) In consideration for the provision of its services under the Master Services Agreement, the LA Group shall be entitled to a services fee equal to thirty (30) percent of all the fees paid to/ collected by the Company .

**DRAFT**
**06/14/2019**

ii) All withholding and other applicable taxes levied by any authority on the payments by the Company to the LA Group under this Agreement shall be borne solely by the Company.

iii) The LA Group shall faithfully, diligently and efficiently exercise its obligations and responsibilities under the Master Services Agreement.

iv) The LA Group shall maintain and protect the Confidential Information belonging to Cinco or the Company, and such undertaking shall apply to all of its partners, officers, employees, or agents.

j) The President of the Company shall render the following services and shall perform the following duties for the Company in a faithful, diligent and efficient manner:

i) The President shall be responsible for all management, operational, marketing, establishment, maintenance, licensing and sub-licensing activities with respect to the "Potato Corner" outlets/stores in the Territory. He shall use his best efforts at all times during the term of this Agreement to operate and maintain the "Potato Corner" outlets/stores in the Territory according to the highest standards achievable consistent with the overall plan of the Board of Directors of the Company. The President shall comply with the rules, policies and procedures approved by the Board of Directors of the Company from time to time.

ii) The President shall advertise market and promote the "Potato Corner" outlets/stores with the goal of causing public knowledge, awareness and patronage of the "Potato Corner" outlets/sites.

iii) The President shall maintain a comprehensive system of records, books and accounts, with respect to the licensing and sub-licensing activities, operation, establishment, management, maintenance and other activities of the "Potato Corner" outlets /stores in the Territory. All records shall be subject to examination by Cinco, or its authorized agents, attorneys and accountants.

iv) No later than the twentieth (20th) day of each month, with respect to the preceding month, the President shall render a statement of receipts and disbursements, a schedule of accounts receivable and payable, and a schedule of fees collected and distributed, together with a reconciled bank statement as of the last day of the month.

v) No later than three (3) months after the end of a fiscal year, the President shall cause the Company to issue audited financial statements, and shall provide a copy of the same to all the members of the Board of Directors, and Cinco.

vi) To the extent the President is lawfully able to do so, the President shall take such action as may be necessary to comply promptly with any and all laws, ordinances, orders or other requirements of any federal, state, county or municipal authority having jurisdiction of the Company and affecting the Company.

4) DURATION OF AGREEMENT

a) This Agreement shall become effective from the date of execution hereof and shall continue for a period of ten (10) years unless otherwise terminated by a

written agreement between the Parties, unless terminated in for cause or convenience in accordance with this Agreement. 10 years? What happens after ten years? We are left with nothing?

b) This Agreement may be terminated by the mutual written agreement of the Parties at any time.

c) This Agreement may be terminated by any Party with respect to another Party ("Breaching Party"), if the Breaching Party is in material breach of this Agreement and fails to cure such breach within thirty (30) days following receipt of written notice of such breach.

d) Upon any termination of this Agreement either upon mutual agreement of the Parties or for cause:

   i) All rights granted under the Master License Agreement shall terminate and the Company shall cease the use of the Potato Corner Intellectual Property Rights, and Confidential Information, provided however, that the Company shall be permitted to use any of the foregoing as is reasonably required in order to comply with its obligations under its sub-licensing or franchising agreements, but only to the extent of the duration of sub-licensing or franchising agreements in existence at the time of the termination of this Agreement.

   ii) The LA Group shall be subject to a non-compete arrangement and hereby agrees that, within two (2) years from the date of termination of this Agreement, it shall not engage in the business of establishing, operating, managing, licensing and franchising identical or similar products sold by the Company, using the intellectual property rights identical or similar to those used by the Company, at the time of the termination of this Agreement.

   iii) The Parties hereby agree that all the provisions herein contained shall be deemed conditions as well as covenants and that if default or breach be made of any such covenants and conditions, then this Agreement, at the discretion of the Non-Defaulting Party, may be terminated and cancelled forthwith and the Defaulting Party shall in addition to any liquidated damages, be liable for any and all damages, actual and consequential, resulting from such default and termination.

   iv) Should a Non-Defaulting Party be compelled to seek judicial relief against the Defaulting Party, the latter shall in addition to any damages stated elsewhere in this Agreement, pay an amount equivalent to twenty five percent (25%) of the amount claimed in the complaint as attorney's fees, aside from the costs of the litigation and other expenses which the law may entitle the Non-Defaulting Party to recover from the Defaulting Party.

5) GENERAL PROVISIONS

a) This Agreement may not be altered, changed, supplemented or modified except by a written instrument duly signed by the Parties.

b) The Parties shall use their best efforts to cooperate for the success of the business of the Company. The Parties further agree to perform all acts and

**DRAFT**
**06/14/2019**

execute and deliver all documents or instruments required or necessary to fully implement or consummate the transactions contemplated in and the intent underlying this Agreement.

c) The Parties shall, to the extent feasible, because the Articles of Incorporation and the By-Laws of the Company to reflect the mutual covenants and provisions contained in this Agreement.

d) All notices and other communications required or permitted to be given hereunder shall be given in writing (and for this purpose shall include emails or fax transmissions) and shall be addressed to the appropriate Party at the address of such Party as heretofore designated, or at such address as such Party may designate subsequently in writing.

e) The failure of any Party at any time to require performance by the others of any provision of this Agreement shall not affect, in any way, the right of such Party to require performance of that or any other provision, and any waiver by any Party of any breach of this Agreement shall not be construed as a waiver of any continuing or succeeding breach of such provision, or a waiver of any other right under this Agreement.

f) This Agreement shall constitute the entire agreement between the Parties and shall supersede any previous agreements, written or otherwise, with respect to the same subject matter which may have been made by the Parties prior hereto.

g) The invalidity of any portion of this Agreement will not and shall not render the entire Agreement void, nor affect the validity of the rest of the provisions of this Agreement.

h) This Agreement shall be governed by the laws of _____.

i) Parties acknowledge that, from time to time, one Party (the "Discloser") may disclose to the other Party (the "Recipient") information: (a) relating to the Potato Corner outlets and sites; (b) relating to the Potato Corner Intangible Property Rights; (c) Potato Corner product specifications and related information; (d) which is marked with "confidential" or a similar legend; (e) which is described orally and designated as confidential; or (f) which would, under the circumstances, be understood by a reasonable person to be confidential ("Confidential Information"). Upon subsequent disclosure of previously disclosed Confidential Information to the Recipient by the Discloser, the information will remain Confidential Information even if not identified as Confidential Information at the subsequent disclosure. Recipient shall retain such Confidential Information in confidence, and shall not disclose it to any Third Party or use it for other than the purposes of this Agreement without the Discloser's prior written consent. Each Party shall use at least the same procedures and degree of care with respect to such Confidential Information which it uses to protect its own confidential information of like importance, and in no event less than reasonable care. The Recipient will immediately give written notice to the Discloser of any unauthorized use or disclosure of the Discloser's Confidential Information, and the Recipient will assist the Discloser in remedying such unauthorized use or disclosure.

**DRAFT**
**06/14/2019**

IN WITNESS WHEREOF, the parties have executed this Agreement on the date and in place first mentioned.

By:                                                                    By:

_____                    _____
President                                                          (Title)

SIGNED IN THE PRESENCE OF:

_____                    _____

ACKNOWLEDGMENT

# EXHIBIT 22

## Fw: LLC and Corporation

**Amit Neman** <amitneman@yahoo.com>

Thu 6/10/2010 6:33 AM

**To:** guy koren <guyk23@hotmail.com>; Amir Jacoby <ajacoby88@gmail.com>

Lets forward this to Jay asap, also to Mark..



Amit Neman
310-908-9273


----- Forwarded Message ----
**From:** "Jose P. Magsaysay, Jr." <josemagsaysay@yahoo.com>
**To:** amitneman@yahoo.com; Lyndah Bartolome <esbartolome@gmail.com>
**Cc:** ben olivas <benolivas@yahoo.com>; Ben Olivas <Ben.Olivas@dlapiper.com>
**Sent:** Thu, June 10, 2010 12:56:45 AM
**Subject:** Fw: LLC and Corporation

Amit, Lyndah,

I am inclined to use the proposal of Ben below;

"Given the divergent interests of the parties, it may well be that the JV entity is an LLC, to accommodate the objectives of the LA Group.  At the same time, Cinco may consider forming a US corporation to hold its 60% interest in the LLC.  This means that the income attributable to its 60% interest will be subject to US taxation.  However, the license fees will be licensed separately by Cinco.  Since it will not be owning the LLC interest directly, it will not be treated as engaged in a US trade or business.  Thus, the license fees will only be subject to a 15% US withholding tax rate.  Finally, should the US corporation make a dividend distribution to Cinco, the distribution will be subject to a 20% US withholding tax.   Of course, the US corporation could choose not to make a dividend distribution and keep/invest the income here in the US.  In this case, any additional income (including interest income) generated by the US corporation will be subject to full US taxation.  Finally, I note that the income held by the US corporation belongs to it, and not readily accessible by the shareholders. "

Given this, lets do what we can ASAP to finish incorporating PCEM, Lyndah can you kindly put a time table on this, including Cinco Corp setting up a local (USA) company, maybe DLA Piper can help us here.

Thank you

jo


----- Forwarded Message ----
**From:** "Olivas, Ben" <Ben.Olivas@dlapiper.com>
**To:** Erlinda Bartolome <esbartolome@gmail.com>
**Cc:** "Jose P. Magsaysay, Jr." <josemagsaysay@yahoo.com>
**Sent:** Thu, June 10, 2010 1:13:46 AM

**Subject:** RE: LLC and Corporation

Hi Lyndah,

Just picked up your message.  I am currently on vacation this week in Lake Tahoe, and had trouble picking up messages until now.

Re the choice of entity, my recommendation per our prior meetings and as I confirmed to Jojo a couple of weeks ago is to use a Delaware corporation as the JV entity.  I understand that the LA Group suggests a US LLC instead.  Here is my brief comparative analysis of both:

1.   With respect to the LA Group, the LLC is the preferred vehicle since they will avoid a corporation-level tax at the JV entity.  Rather, they will be taxed with respect to their 40% pro rata share of the JV profits.  At the same time, to the extent the JV entity has start-up losses, they will be able to take these in their personal tax return.  Thus, overall the LLC provides the best option for them.

2.   On the other hand, with regard Cinco (and its Philippine-based investors), the LLC will subject its 60% pro rata share of the JV entity profits to US taxation.  This is because for US tax purposes, the LLC is taxed as a partnership rather than as a corporation.  This means that there is no entity-level income tax imposed, but rather the LLC members are taxed directly on their pro rata shares of the LLC profits/losses.

Moreover, as a foreign (non-US) partner in a US partnership, Cinco will be deemed to be engaged in a US trade or business and will be taxed on its distributive share from the LLC activities.  This means the following: a) the 60% distributive share of Cinco will be subject to regular US corporate income taxes (maximum of 35% federal tax rate, and 6% effective California tax rate). In addition, with regard to the license fees paid by the JV entity to Cinco for the use of the Potato Corner IP rights, since the IP licensed will be used in the US, then the source of the income for US tax purposes is also US.  Thus, it will be likely that the license fees will also be subject to full US taxation (35% federal tax, and 6% effective California tax).

In contrast, if the JV entity were a Delaware corporation instead, the consequences are as follows:  a) the JV entity will be subject to US corporate tax; b) Cinco's distributive share will be subject to a 20% US withholding tax; and c) the license fees will be subject to a 15% US withholding tax rate.

I think you will need to run a numerical analysis to consider what is more favorable to Cinco, but it would seem to me that in the LLC scenario, Cinco share of the profits will be subject to a the full 41% tax (US plus California).

3.   A minor point, which may not apply if the JV entity will have significant income at inception.  For California tax purposes, the LLC is taxed based on gross receipts that maxes at $11,790 for gross receipts of $5M or more, regardless of profit/losses.  On the other hand, a corporation is taxed at a minimum of $800 if it has losses,   Thus, depending on the results, the LLC may give rise to a higher California tax in the earlier years.

Given the divergent interests of the parties, it may well be that the JV entity is an LLC, to accommodate the objectives of the LA Group.  At the same time, Cinco may consider forming a US corporation to hold its 60% interest in the LLC. This means that the income attributable to its 60% interest will be subject to US taxation.  However, the license fees will be licensed separately by Cinco.  Since it will not be owning the LLC interest directly, it will not be treated as engaged in a US trade or business.  Thus, the license fees will only be subject to a 15% US withholding tax rate.  Finally, should the US corporation make a dividend distribution to Cinco, the distribution will be subject to a 20% US withholding tax.  Of course, the US corporation could choose not to make a dividend distribution and keep/invest the income here in the US.  In this case, any additional income (including interest income) generated by the US corporation will be subject to full US taxation.  Finally, I note that the income held by the US corporation belongs to it, and not readily accessible by the shareholders.

As I mentioned, I am on vacation this week and back next week.  How about we discuss anytime next week?  If we need to do it earlier, I can also do it.  I am in California still for the rest of the week.

Thanks and best regards.

Ben



**Ben R. Olivas**
**DLA Piper US LLP**
2000 University Avenue
East Palo Alto, California 94303

650.833.2080 **T**
650.687.1133 **F**
415.309.9648 **M**
ben.olivas@dlapiper.com

www.dlapiper.com

**Circular 230 Notice**: In accordance with Treasury Regulations which became applicable to all tax practitioners as of June 20, 2005, please note that any tax advice given herein (and in any attachments) is not intended or written to be used, and cannot be used by any taxpayer, for the purpose of (i) avoiding tax penalties or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

# EXHIBIT 23

**Final JV Agreement draft**

Lyndah Bartolome <esbartolome@gmail.com>

Fri 6/11/2010 12:56 AM

**To:** joemag <josemagsaysay@yahoo.com>; Jojo G. Montinola <josemontinola@yahoo.com>; Marvs Bermejo <marvsbermejo@yahoo.com>; amitneman@yahoo.com <amitneman@yahoo.com>; guy LA <guyk23@hotmail.com>; AmirJacoby <ajacoby88@gmail.com>

📎 1 attachments (72 KB)
Potato_Corner_-_JV_Agreement__DRAFT[1].doc;

To all PCEM Board,

Please find attached JV Agreement final draft for your review and comments prior to my sending to Ben Olivas for finalization.  The JV has all the changes during our meetings and the last meeting with Mark.

Will appreciate feedback by Monday.

PS. Jo, I do not know the e mail address of Ricky.

Thanks

Lyndah

**DRAFT
06/13/2019**

**PCEM BOARD FINAL DRAFT  06/11/10**

## JOINT VENTURE AGREEMENT

This Joint Venture Agreement (the "Agreement") dated _____ is made and entered into on _____, by and between:

> Cinco Corporation, a corporation duly existing and registered by virtue of and under the laws of the Republic of the Philippines with office address at _____, represented herein by its duly authorized representative, _____ (hereinafter "Cinco");

> -and-

> AMIT NEMANIM, GUY KOREN, AMIR JACOBY, all of whom are U.S. citizens and residents and collectively referred to as the "LA Group.:

### RECITALS

WHEREAS, the Parties hereto have agreed to form a corporation (hereinafter referred to as the "Company") to be incorporated under the laws of the State of Delaware, with the primary purpose of engaging in the business of establishing, operating, managing, licensing and franchising "Potato Corner" stores/outlets in the United States of America and Israel, except in the County of Los Angeles, USA and the County of San Francisco, USA and Tanforan Mall (hereinafter, "Territory").

WHEREAS, the Parties herein have agreed to enter into this Agreement which sets forth the terms and conditions with respect to the organization, incorporation, operation and management of the Company and defines their respective rights, duties and obligations of the parties to this Agreement.

NOW, THEREFORE, for and in consideration of the foregoing premises, the Parties hereby agree as follows:

1) ORGANIZATION AND INCORPORATION OF THE COMPANY

    a) The Parties herein agree to organize and incorporate, within _____ (____) days from the date of this Agreement, a corporation to be called "_____" ( hereinafter referred to as the Company) for the primary purpose of engaging in the business of establishing, operating, managing, licensing and franchising "Potato Corner" stores/outlets in the Territory.

    b) The incorporators and initial directors of the Company shall be the following:

| | |
|---|---|
| JOSE P. MAGSAYSAY, JR. | MA. VICTORIA O. BERMEJO |
| JOSE MARIA  MONTINOLA | RICARDO K. MONTELIBANO |
| AMIT NEMANIM | GUY KOREN |
| AMIR JACOBY | |

**DRAFT**
**06/13/2019**

*BEN, we would like to add the following as Independent/non-voting Directors: Mark Tung or a Corporation that is nominated and Erlinda S. Bartolome*

c)  The principal office of the Company shall be at  _____.

d)  The annual general meeting of the stockholders of the Company shall be held every year at the principal office of the Company.  The Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses of the following stockholders incurred in attendance of the annual stockholders' meeting: Jose P. Magsaysay, Jr., Jose Maria Montinola, Ma. Victoria O. Bermejo, and Ricardo K. Montelibano.

*JUNE 1: Annual Meeting in the United States will depend on the financial situation of the Company.*

e)  The fiscal year of the Company shall begin on January 1 and end on December 31 of each year.

f)  The Company shall immediately upon incorporation obtain a "Liability Insurance" for the Company the amount and scope of coverage to be determined by the Board of Directors.

g)  All costs, fees and expenses incurred in connection with the organization and incorporation of the Company shall be for the account of the Company.

h)  The Articles of Incorporation and By-Laws of the Corporation shall reflect the terms and conditions set forth in this Agreement between the Parties.

2)  CAPITALIZATION/OWNERSHIP OF THE COMPANY

a)  At the time of its incorporation, the Company shall have a total authorized capital stock amounting to _____ divided into _____shares with a par value of _____ (USD _____) per share. The Parties agree that the authorized capital stock shall be fully subscribed and the subscription fully paid.

b)  The Parties hereby agree that Cinco shall collectively own sixty (60%) percent of the Company while the LA Group shall own the remaining forty (40%) percent.

c)  The Parties hereby agree any increase in the authorized capital stock of the Company shall require an affirmative vote of majority of all of the members of the Board of Directors.  In the event an increase in the Company's authorized capital stock is approved by the Board of Directors, both Parties shall have rights of pre-emption so that their pro rata ownership share in the Company shall be maintained, provided that, either Party shall have thirty (30) days within which to confirm in writing that it is willing and able to subscribe and fully pay its pro rata share of the increase in capital.

d)  The LA Group shall not assign any of its rights or obligations under this Agreement without the prior written consent of Cinco. In the event any of the three (3) above-named members of the LA Group desire to transfer or sell his pro rata share ownership in the Company to a person outside of the LA Group, it

**DRAFT**
**06/13/2019**

shall be obligated to sell the same first to Cinco, which has have thirty (30) days within which to exercise its rights of first refusal from the date of receipt of a written notice to sell from the LA Group.  For this purpose, the Parties hereby agree that Cinco shall have the right to acquire such shares in an amount equal to the following formula:  The average of the Company's revenues for the last ___ ( ) years multiplied by 5 times, and further multiplied by the percentage of share ownership subject to such right of first refusal over total authorized shares.

The above provision should apply to both Cinco and the LA Group.

3) MANAGEMENT OF THE COMPANY

a) The Board of Directors of the Company shall be composed of seven (7) members.  Upon the formation of the Company, the following shall be named as the members of the Board of Directors: Jose P. Magsaysay, Jr., Jose Maria Montinola, Ma. Victoria O. Bermejo, Ricardo K. Montelibano, Amit Nemanim, Guy Koren, and Amir Jacoby.  The Chairman of the Board of Directors shall always be any of the following directors:  Ma. Victoria O. Bermejo, Jose P. Magsaysay, Ricardo K. Montelibano or Jose Maria Montinola.

b) The Board of Directors shall regularly meet on a monthly basis. The regular monthly board meeting may be done via teleconference or through the internet... However, the Board of Directors shall convene and meet at the principal office of the Company every quarter of every fiscal year or by teleconference. The Company shall shoulder the expenses for air fares, hotel accommodation and incidental expenses of the directors relative to the said board meetings.

c) Upon the incorporation of the Company, it shall have the following executive officers: President, Corporate Secretary and Treasurer, and the following shall be elected by the Board of Directors to serve these positions:
Chairman – Jose P. Magsaysay
   i) President -- The President shall be any one of the following: Amit Nenamin, Guy Koren or Amir Jacoby.  President – Amit Nemanim
   ii) Corporate Secretary – Erlinda Bartolome.
   iii) Treasurer – Jose Maria Montinola
      (1) The Treasurer shall have oversight functions over the Accounting and Finance Departments that shall be exercised independent of the President.
BEN, can we put a provision specifying the the management of the Corporation will always be vested on any one of the three (Amit, Guy or Amir).

d) Additional executive officers may be appointed by the Board of Directors as it may deem necessary.

e) It is hereby agreed that the rights and responsibilities of the  Board of Directors shall include the following:

   i) Approval of the compensation package for the directors, executive offices and key personnel.
   ii) Approval of the Accounting System/Procedures/Software/Method to be used by the Company.

**DRAFT**
**06/13/2019**

iii) Approval of the operating budget of the Company, and any changes to it. (Any disbursement and expenses previously approved by the Board of Directors shall require their approval before any funds can be disbursed.) to be removed.

f) The executive officers shall manage the business and property of the Company, and to market the business, in accordance with and pursuant to the directives of and policies set by the Board of Directors of the Company. The Board of Directors of the Company can recall and/or withdraw the appointment of any executive officer, as it deems necessary.

g) The Parties hereby expressly agree that any and all contracts in the name and on behalf of the Company must have the prior approval of the Board of Directors of the Company. (Only franchise agreements and lease agreements will need approval from the Board).

h) Within _____ (  ) days from incorporation, the Company shall enter into a  Master License Agreement with Cinco (or an affiliated company to be designated by Cinco) which shall include the following terms and conditions:

i) The Company agrees to license the "POTATO CORNER" intellectual property rights from Cinco or an affiliated company to be designated by Cinco) consisting of (i) the trademark, service mark and trade name "POTATO CORNER"; and (ii) various trademarks, service marks, trade names, slogans, designs, insignias, emblems, symbols, color schemes, package features, logo and other propriety identifying characteristics used in relation and in connection with the "Potato Corner" Products and the System [NOTE:  The terms "Product" and "System" needs to be defined]; and (iii) as well as other intellectual property rights in connection with the "POTATO CORNER" intellectual property rights, for use in the Territory.

ii) The Company agrees to pay, as an arm's length license fee, the following amounts:

(1) With respect to the licensing / sub-licensing or franchising the "POTATO CORNER" intellectual property rights in connection with the "POTATO CORNER" outlets/stores, an amount equal to thirty percent (30%) of all initial/franchise fees and on going royalty fees paid to/ collected by the Company.  Payments shall be made to Cinco (or an affiliated company to be designated by Cinco) by wire transfer using a bank or other financial institution specified by it within ten (10) days from receipt of the fees by the Company. Change 10 to 30 days.

(2) With respect to "POTATO CORNER" outlet and stores operated and managed by the Company for its own account in the Territory, an amount equal to thirty percent (30%) of all net sales recognized by the Company. Payments shall be made to Cinco (or an affiliated company to be designated by Cinco) by wire transfer using a bank or other financial institution specified by it within ten (10) days from _____.( Remove completely no.2)

(3) All withholding and other applicable taxes levied by any authority on the payments by the Company shall be borne solely by the Company.

4

**DRAFT**
**06/13/2019**

i) The Company agrees to engage the LA Group to provide its management and strategic experience and expertise during the duration of this Agreement.  Within _____ (   ) days from incorporation, the Company shall enter into a  Master Services Agreement with the LA Group which shall include the following terms and conditions:

    i) In consideration for the provision of its services under the Master Services Agreement, the LA Group shall be entitled to a services fee equal to thirty (30%) percent of all initial/franchise fee and continuing royalty  fees paid to/ collected by the Company .

    ii) All withholding and other applicable taxes levied by any authority on the payments by the Company to the LA Group under this Agreement shall be borne solely by the Company.

    iii) The LA Group shall faithfully, diligently and efficiently exercise its obligations and responsibilities under the Master Services Agreement.

    iv) The LA Group shall maintain and protect the Confidential Information belonging to Cinco or the Company, and such undertaking shall apply to all of its partners, officers, employees, or agents.

j) The President of the Company shall render the following services and shall perform the following duties for the Company in a faithful, diligent  and efficient  manner:

    i) The President shall be responsible for all management, operational, marketing, establishment, maintenance, licensing   and sub-licensing activities with respect to the "Potato Corner" outlets/stores in the Territory.  He shall use his best efforts at all times during the term of this  Agreement  to operate and  maintain  the "Potato Corner" outlets/stores in the Territory according  to the highest standards achievable  consistent  with the  overall plan  of the Board  of Directors  of the Company. The President shall comply with the rules, policies and procedures approved by the Board of Directors of the Company from time to time.

    ii) The President shall advertise market and promote the "Potato Corner" outlets/stores with the goal of causing public knowledge, awareness and patronage of the "Potato Corner" outlets/sites.

    iii) The President shall maintain a comprehensive system of records, books and accounts, with respect to the licensing and sub-licensing activities, operation, establishment, management, maintenance and other activities of the "Potato Corner" outlets /stores in the Territory with the assistance of the Corporate Secretary. (All records shall be subject to examination by Cinco, or its authorized agents, attorneys and accountants.) to be removed.

    iv) No later than the twentieth (20th) day of each month, with respect to the preceding month, the President shall render a statement of receipts and disbursements, a schedule of accounts receivable and payable, and a schedule of fees collected and distributed, together with a reconciled bank statement as of the last day of the month with the assistance of the Corporate Secretary.

    v) No later than three (3) months after the end of a fiscal year, the President shall cause the Company to issue audited financial statements, and shall provide a

**DRAFT**
**06/13/2019**

copy of the same to all the members of the Board of Directors with the assistance of the Corporate Secretary and the hired accountant.

vi) To the extent the President is lawfully able to do so, the President shall take such action as may be necessary to comply promptly with any and all laws, ordinances, orders or other requirements of any federal, state, county or municipal authority having jurisdiction of the Company and affecting the Company.

4) DURATION OF AGREEMENT

a) This Agreement shall become effective from the date of execution hereof and shall continue for a period of ten (10) years unless otherwise terminated by a written agreement between the Parties, unless terminated in for cause or convenience in accordance with this Agreement.

BEN, the Board has agreed not to put term to the Agreement, is this legally possible?

b) This Agreement may be terminated by the mutual written agreement of the Parties at any time.

c) This Agreement may be terminated by any Party with respect to another Party ("Breaching Party"), if the Breaching Party is in material breach of this Agreement and fails to cure such breach within thirty (30) days following receipt of written notice of such breach.

BEN, the Board would like the breach to be on the President or Managing Partner since the breach will basically be on the management of the Company.

d) Upon any termination of this Agreement either upon mutual agreement of the Parties or for cause:

i) All rights granted under the Master License Agreement shall terminate and the Company shall cease the use of the Potato Corner Intellectual Property Rights, and Confidential Information, provided however, that the Company shall be permitted to use any of the foregoing as is reasonably required in order to comply with its obligations under its sub-licensing or franchising agreements, but only to the extent of the duration of sub-licensing or franchising agreements in existence at the time of the termination of this Agreement.

ii) The LA Group shall be subject to a non-compete arrangement and hereby agrees that, within two (2) years from the date of termination of this Agreement, it shall not engage in the business of establishing, operating, managing, licensing and franchising identical or similar products sold by the Company, using the intellectual property rights identical or similar to those used by the Company, at the time of the termination of this Agreement.

iii) The Parties hereby agree that all the provisions herein contained shall be deemed conditions as well as covenants and that if default or breach be made of any such covenants and conditions, then this Agreement, at the discretion of the Non-Defaulting Party, may be terminated and cancelled forthwith and the Defaulting Party shall in addition to any liquidated damages,

**DRAFT**
**06/13/2019**

be liable for any and all damages, actual and consequential, resulting from such default and termination. <span style="color:red">Can this be removed?</span>

iv) Should a Non-Defaulting Party be compelled to seek judicial relief against the Defaulting Party, the latter shall in addition to any damages stated elsewhere in this Agreement, pay an amount equivalent to twenty five percent (25%) of the amount claimed in the complaint as attorney's fees, aside from the costs of the litigation and other expenses which the law may entitle the Non-Defaulting Party to recover from the Defaulting Party. <span style="color:red">( Another mechanism for this)</span>

5) GENERAL PROVISIONS

a) This Agreement may not be altered, changed, supplemented or modified except by a written instrument duly signed by the Parties.

b) The Parties shall use their best efforts to cooperate for the success of the business of the Company. The Parties further agree to perform all acts and execute and deliver all documents or instruments required or necessary to fully implement or consummate the transactions contemplated in and the intent underlying this Agreement.

c) The Parties shall, to the extent feasible, because the Articles of Incorporation and the By-Laws of the Company to reflect the mutual covenants and provisions contained in this Agreement.

d) All notices and other communications required or permitted to be given hereunder shall be given in writing (and for this purpose shall include emails or fax transmissions) and shall be addressed to the appropriate Party at the address of such Party as heretofore designated, or at such address as such Party may designate subsequently in writing.

e) The failure of any Party at any time to require performance by the others of any provision of this Agreement shall not affect, in any way, the right of such Party to require performance of that or any other provision, and any waiver by any Party of any breach of this Agreement shall not be construed as a waiver of any continuing or succeeding breach of such provision, or a waiver of any other right under this Agreement. <span style="color:red">Can this be removed?</span>

f) This Agreement shall constitute the entire agreement between the Parties and shall supersede any previous agreements, written or otherwise, with respect to the same subject matter which may have been made by the Parties prior hereto.

g) The invalidity of any portion of this Agreement will not and shall not render the entire Agreement void, nor affect the validity of the rest of the provisions of this Agreement.

h) This Agreement shall be governed by the laws of _____.

i) Parties acknowledge that, from time to time, one Party (the "Discloser") may disclose to the other Party (the "Recipient") information: (a) relating to the Potato Corner

**DRAFT
06/13/2019**

outlets and sites; (b) relating to the Potato Corner Intangible Property Rights; (c) Potato Corner product specifications and related information; (d) which is marked with "confidential" or a similar legend; (e) which is described orally and designated as confidential; or (f) which would, under the circumstances, be understood by a reasonable person to be confidential ("Confidential Information"). Upon subsequent disclosure of previously disclosed Confidential Information to the Recipient by the Discloser, the information will remain Confidential Information even if not identified as Confidential Information at the subsequent disclosure. Recipient shall retain such Confidential Information in confidence, and shall not disclose it to any Third Party or use it for other than the purposes of this Agreement without the Discloser's prior written consent. Each Party shall use at least the same procedures and degree of care with respect to such Confidential Information which it uses to protect its own confidential information of like importance, and in no event less than reasonable care. The Recipient will immediately give written notice to the Discloser of any unauthorized use or disclosure of the Discloser's Confidential Information, and the Recipient will assist the Discloser in remedying such unauthorized use or disclosure.

BEN, since I do not know where to add these provisions, I just placed them here. The Board would like to add the following provisions:

1. The dissolution of the Company will require 2/3's vote or 66.6 plus 1.
2. Master Service Agreement will be signed with PCE the company of the LA Group.
3. When possible locations are identified for company owned stores, PCEM will have the first choice and JNK will be second.
4. For JNK( company of the LA Group), all company owned stores within California will pay a franchise fee of US 3,000.00 payable to Cinco and stores outside of California will be subject to the current franchise fee and shall be paid to PCEM. All on going monthly fees shall be paid to PCEM.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date and in place first mentioned.


By:                                                              By:

_____          _____
President                                                   (Title)




SIGNED IN THE PRESENCE OF:

_____          _____

8

**DRAFT
06/13/2019**

ACKNOWLEDGMENT

# EXHIBIT 24

## Fwd: JV Agreement

Jose Magsaysay Jr <josemagsaysay@yahoo.com>

Mon 6/14/2010 2:05 AM

**To:** Lyndah Bartolome <esbartolome@gmail.com>
**Cc:** Amit 1 direct <amitneman@yahoo.com>; Guy koren <guyk23@hotmail.com>; Amir Jacoby <ajacoby88@gmail.com>; C
Marivic Bermejo <marvsbermejo@yahoo.com>; Jojo G. Montinola <josemontinola@yahoo.com>; c Ricky Montelibano
<ricky_montelibano@yahoo.com.ph>; c Banz Banzon <banzbanzon@yahoo.com>; ben olivas <benolivas@yahoo.com>

Lyndah,

It will be the LA group who will furnish Marl copy of the JV agreement, not us.

At this point Mark is not an officer, owner, shareholder or agent of the JV company.

We will not put in the JV agreement about Mark being a non-voting independent director since I am
now leaning towards changing my mind about him being part of the board of the JV company when
to this point he has not proven, to my satisfaction, that he thinks like us and the LA group (Amit, Guy
and Amir).

We begun on mutual trust and this will be a key value the the JV company shall have.  Any person
bringing distrust to start a relationship with the JV company should be looked at with concern.

The time we proffesionalize and have proffesional managers running things for us is the time we
should let contracts and agreements with lawyers concern be  ahead of trust.

That's why to those who join our journey at this point when all we have is trust, I value them and their
partnership and we should reep the benefits if trusting as blindly.

Suggested name PC Company, PCMC

Jo


sent via iPhone

Begin forwarded message:


**From:** Lyndah Bartolome <esbartolome@gmail.com>
**Date:** June 14, 2010 4:09:27 PM GMT+08:00
**To:** Jose Magsaysay Jr <josemagsaysay@yahoo.com>,  "Jojo G. Montinola"
<josemontinola@yahoo.com>, Marvs Bermejo <marvsbermejo@yahoo.com>,  Ricky
Montelibano <ricky_montelibano@yahoo.com.ph>, "amitneman@yahoo.com"
<amitneman@yahoo.com>, guy LA <guyk23@hotmail.com>,  AmirJacoby
<ajacoby88@gmail.com>
**Subject: JV Agreement**

To the JV Co Board:

It is Monday here in Manila and will be Monday tomorrow in the US, so I would like to make a final call for all reactions, comments and feedback on the JV Agreement I sent to all last week. If by tomorrow I do not get any e mail from you, I will conclude that is this fine with all of you and I will proceed in sending the draft to Ben for finalization.

- Please note that we will be paying for Ben's time to do the final JV Agreement and we do not want to incur more expense if there will be other revisions after the final Agreement is done.
- To the LA Team, I remembered Amit wanted to give Mark a copy, I will request a follow up on his final thoughts on this. I think this draft should be sufficient since we already included matters we discussed over lunch in Los Angeles.
- Jojo already sent his feedback and will include his notes.

On the JV Company, I would like to summarize the points raised in all the exchange of e mails:

- We get the services of Ben DLA Piper or another company that will start the registration process of the JV Company.
- We will get a new name for the JV Company as we will no longer use the PCEM registered company originally. Any suggestions?
- Would welcome any suggestion on a company that does registration of LLC Companies besides DLA Piper.

Will appreciate feedback from you.

Kindest regards.

Lyndah


On 6/13/2010 10:36 PM, Jose Magsaysay Jr wrote:

> Thank you for the update Partner :  )
>
> We appretiate all the effort and hard work you ate doing
>
> Take care
>
> Jo
>
> sent via iPhone
>
> On Jun 14, 2010, at 12:08 PM, amitneman@yahoo.com wrote:
>
>
> Hey Partner,

Just wanted to give you a quick update, had a great day!

I have no problems filling for our own LLC with Ben. All we have to do is come up with a name...

Had 2 good meetings today. Getting the next batch of franchisees ready so we can close them out as soon as Kim allows us to. Closed out at Fri at 880, Sat 1588 and today at 1310 so things are heating up.

We are going to keep working on all the procedures. We will need a to decide on our food display and heat lamps this week.

We are also finalizing everything with Topanga and starting to train them this week, having some "problems" with Sam but we'll work it out..

Hope all is well and I'll send you more details this week.

Amit

Sent via BlackBerry from T-Mobile

---

**From:** Jose Magsaysay Jr <josemagsaysay@yahoo.com>
**Date:** Sun, 13 Jun 2010 00:59:25 -0700 (PDT)
**To:** Amit Neman<amitneman@yahoo.com>
**Cc:** ben olivas<benolivas@yahoo.com>; Ben Olivas<Ben.Olivas@dlapiper.com>; Lyndah Bartolome<esbartolome@gmail.com>; Lyndah Bartolome<esbartolome@gmail.com>; Jojo G. Montinola<josemontinola@yahoo.com>; ricky_montelibano@yahoo.com.ph<ricky_montelibano@yahoo.com.ph>; Marvs Bermejo<marvsbermejo@yahoo.com>; Amir Jacoby<ajacoby88@gmail.com>; Guy koren<guyk23@hotmail.com>
**Subject:** Re: New Fax Message from (818) 881-2804 on 06/09/2010 at 10:45 AM

Amit,

Mark's involvement in the set-up of this company as an organizer or as an Agent of Process is not acceptable.

Thank you

Jo

sent via iPhone

On Jun 13, 2010, at 2:44 PM, Amit Neman
<amitneman@yahoo.com> wrote:

> To All Concerned:
>
> I wanted to apologize for this little confusion, I sent
> (and verified) the wrong documents.
>
> Attached are the Articles for PCE Management LLC,
> where Mark is only an "Organizer" and "Agent of
> Process".   Ben, is this ok?
>
> On a brighter note, we closed out today at $1588 and
> we are meeting 2 potential franchisees tomorrow.
>
> Amit
>
> ---
>
> **From:** "Jose P. Magsaysay, Jr."
> <josemagsaysay@yahoo.com>
> **To:** ben olivas <benolivas@yahoo.com>; Ben Olivas
> <Ben.Olivas@dlapiper.com>; Lyndah Bartolome
> <esbartolome@gmail.com>
> **Cc:** Lyndah Bartolome <esbartolome@gmail.com>; Amit 1
> direct <amitneman@yahoo.com>; Jojo G. Montinola
> <josemontinola@yahoo.com>;
> ricky_montelibano@yahoo.com.ph; Marvs Bermejo
> <marvsbermejo@yahoo.com>; Amir Jacoby
> <ajacoby88@gmail.com>; Guy koren
> <guyk23@hotmail.com>
> **Sent:** Sat, June 12, 2010 9:23:37 AM
> **Subject:** Re: Fwd: New Fax Message from (818) 881-2804
> on 06/09/2010 at 10:45 AM
>
>
> To All Concerned:
>
> I am rejecting this document because it has Mark
> Tung all over this document and I see him as an
> Incorporator in this document.
>
> Lyndah, Can we find another party to incorporate
> this JV mgmt company.
>
> jo
>
> ---
>
> **From:** Jose Magsaysay Jr <josemagsaysay@yahoo.com>
> **To:** ben olivas <benolivas@yahoo.com>; Ben Olivas
> <Ben.Olivas@dlapiper.com>
> **Cc:** Lyndah Bartolome <esbartolome@gmail.com>; Amit 1
> direct <amitneman@yahoo.com>
> **Sent:** Thu, June 10, 2010 6:59:34 AM
> **Subject:** Fwd: New Fax Message from (818) 881-2804 on

06/09/2010 at 10:45 AM

Hi Ben,

Forwarding to you incorporation documents of PCEM sent to me by Amit, PCEM-CEO.

Regards

Jo

sent via iPhone

Begin forwarded message:

> **From:** amitneman@yahoo.com
> **Date:** June 10, 2010 1:54:52 AM GMT+08:00
> **To:** "Jo Magsaysay" <josemagsaysay@yahoo.com>, "Lyndah" <esbartolome@gmail.com>
> **Subject: Fw: New Fax Message from (818) 881-2804 on 06/09/2010 at 10:45 AM**
> **Reply-To:** amitneman@yahoo.com
>
>
> Hi Guys,
>
> Hope all is well! Looks like we have a great franchisee for some locations in Long Beach.
>
> Here are the incorporation documents for PCEM.
>
> Please forward to Ben. Amir has the originals.
>
> Amit
>
> Sent via BlackBerry from T-Mobile
> _____
> **From:** "RingCentral" <notify@ringcentral.com>
> **Date:** Wed, 9 Jun 2010 10:45:50 -0700
> **To:** Amit Nemanim<amitneman@yahoo.com>
> **Subject:** New Fax Message from (818) 881-2804 on 06/09/2010 at 10:45 AM

**You Have a New Fax Message**

| From: | (818) 881-2804 |
| Received: | Wednesday, June 09, 2010 at 10:45 AM |
| Pages: | 11 |
| To: | (888) 810-1174 (Amit Nemanim) |

To view this message, please open the attachment or login to your RingCentral account by clicking here.

Thank you for using *RingCentral*.

<PCEM DOCUMENTS.pdf>

# EXHIBIT 25

## Fwd: Potato Corner - Joint Venture Agreement [DRAFT] v2

Lyndah Bartolome <esbartolome@gmail.com>

Mon 6/28/2010 6:44 PM

**To:** amitneman@yahoo.com <amitneman@yahoo.com>; guy LA <guyk23@hotmail.com>; AmirJacoby
<ajacoby88@gmail.com>; Jojo G. Montinola <josemontinola@yahoo.com>; Ricky Montelibano
<ricky_montelibano@yahoo.com.ph>; Marvs Bermejo <marvsbermejo@yahoo.com>

📎 2 attachments (199 KB)
Potato Corner - Joint Venture Agreement [DRAFT] v2.DOC; Potato Corner - Joint Venture Agreement [DRAFT] V2
REDLINED.DOC;

Dear All,

Please find attached the JV Agreement from Ben after our discussion yesterday.  We explained to him
all the changes we wanted per our meeting in LA.  Please review so we could give Ben our final
feedback prior to his finalizing the Agreement.

We informed Ben of the following:
1.  The Board will sign the JV Agreement as we discussed.
2.  The JV Agreement will be incorporated in the Operating Agreement of the LLC Company or the PC
JV USA.

Will appreciate your feedback by Friday (July 2) at which time I shall forward to Ben final  comments
and feedback.  I am looking at next week for the final JV to be signed by the Board.

Thanks and kindest regards.

Lyndah

-------- Original Message --------
**Subject:** Potato Corner - Joint Venture Agreement [DRAFT] v2
  **Date:** Mon, 28 Jun 2010 20:18:10 -0400
  **From:** Olivas, Ben <Ben.Olivas@dlapiper.com>
    **To:** joemag <josemagsaysay@yahoo.com>, 'Lyndah Bartolome' <esbartolome@gmail.com>

Hi Jo/Lyndah,

Kindly see attached for your review/comments.  I am sending both a clean version and a redlined version with all the
changes I made based on your comments and our discussion last night.  A few points:

1.   I added the 4 individuals as signatories to the Agreement.
2.   Section 2(c) -- I specified a 66 2/3% voting requirement for any increase in capital accounts.
3.   Section 3(b) -- Not sure you need the provision re quarterly meetings, since monthly meetings may be done in
person or by teleconference.
4.   Section 4 -- I modified this section to now provide only two causes for termination:  vote by 66 2/3% or mutual
agreement by the parties.

5.    Section 5(e) -- I did not change this provision. The reason for this provision is to ensure that in case a party does not perform, and the other party does not do anything regarding the nonperformance, this lack of action will not be used as basis in the future to allow repeated or continued nonperformance.

6.    Section 5(h) -- Need to specify the governing law. If okay with you, I suggest "State of California."

We can discuss tomorrow if you have any further questions/comments. Best regards.

Ben



**Ben R. Olivas**
**DLA Piper US LLP**
2000 University Avenue
East Palo Alto, California 94303

650.833.2080 **T**
650.687.1133 **F**
415.309.9648 **M**
ben.olivas@dlapiper.com

www.dlapiper.com

**Circular 230 Notice**: In accordance with Treasury Regulations which became applicable to all tax practitioners as of June 20, 2005, please note that any tax advice given herein (and in any attachments) is not intended or written to be used, and cannot be used by any taxpayer, for the purpose of (i) avoiding tax penalties or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

Please consider the environment before printing this email.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

**DRAFT**
**06/13/2019**

## POTATO CORNER USA
## JOINT VENTURE AGREEMENT

This Joint Venture Agreement (the "Agreement") dated _____ is made and entered into on _____, by and between:

      Cinco Corporation, a corporation duly existing and registered by virtue of and under the laws of the Republic of the Philippines with office address at _____, represented herein by its duly authorized representative, _____ (hereinafter "Cinco"), and its directors, Jose P. Magsaysay, Jr., Jose Miguel Ma. G. Montinola, Ma. Victoria O. Bermejo, Ricardo K. Montelibano, all of whom are Philippine citizens and resident, and collectively referred to as the "Cinco Group";

      -and-

      AMIT NEMANIM, GUY KOREN, AMIR JACOBY, all of whom are U.S. citizens and residents and collectively referred to as the "LA Group:

### RECITALS

WHEREAS, the Parties hereto have agreed to form a limited liability company (hereinafter referred to as the "Company") under the laws of the State of Delaware, with the primary purpose of engaging in the business of establishing, operating, managing, licensing and franchising "Potato Corner" stores/outlets in the United States of America and Israel, except in the County of Los Angeles, USA and the County of San Francisco, USA and Tanforan Mall (hereinafter, "Territory").

WHEREAS, the Parties herein have agreed to enter into this Agreement which sets forth the terms and conditions with respect to the organization, incorporation, operation and management of the Company and defines their respective rights, duties and obligations of the parties to this Agreement.

WHEREAS, the Parties agree that the LLC operating agreement to be entered by them shall reflect the terms and conditions as set forth in this Agreement.

WHEREAS, Cinco may assign and or all of its rights to the joint venture company formed under this Agreement to a wholly-owned subsidiary as it deems fit.

NOW, THEREFORE, for and in consideration of the foregoing premises, the Parties hereby agree as follows:

1) ORGANIZATION AND FORMATION OF THE COMPANY

    a) Within _____ (____) days from the date of this Agreement, the Parties herein agree to organize and form, a limited liability company to be called "PCJV USA" ( hereinafter referred to as the Company) for the primary purpose of engaging in the business of establishing, operating, managing, licensing and franchising "Potato Corner" stores/outlets in the Territory.

**DRAFT**
**06/13/2019**

b) The initial members of the Company shall be the following:

   i) Cinco Group
     (1) Cinco
     (2) Jose P. Magsaysay, Jr.
     (3) Jose Miguel Ma. G. Montinola
     (4) Ma. Victoria O. Bermejo
     (5) Ricardo K. Montelibano

   ii) LA Group
     (1) Amit Nemanim
     (2) Guy Koren
     (3) Amir Jacoby

c) The principal office of the Company shall be at  _____.

d) The annual general meeting of the members of the Company shall be held every year at the principal office of the Company.  The members may, at their discretion, invite non-members to join the annual general meeting, but only as non-voting observers.  Further, to the extent allowed by the financial condition of the Company, and as agreed upon by a majority of all member interests, the Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses incurred by the following members in attendance of the annual members' meeting: Jose P. Magsaysay, Jr., Jose Maria Montinola, Ma. Victoria O. Bermejo, and Ricardo K. Montelibano.

e) The fiscal year of the Company shall begin on January 1 and end on December 31 of each year.

f) The Company shall immediately upon formation obtain a "Liability Insurance" for the Company the amount and scope of coverage to be determined by the managers.

g) All costs, fees and expenses incurred in connection with the organization and formation of the Company shall be for the account of the Company.

h) The operating agreement of the Company shall reflect the terms and conditions set forth in this Agreement between the Parties.

2) CAPITALIZATION/OWNERSHIP OF THE COMPANY

a) At the time of formation, the Company shall have a total capital account of _____, which shall be fully subscribed and paid at the time of formation.

b) Unless other agreed to in writing, the Parties hereby agree that the Cinco Group shall own sixty (60%) percent of the Company's capital accounts, while the LA Group shall own the remaining forty (40%) percent.

c) The Parties hereby agree any increase in the capital account shall require an affirmative vote of 66 2/3 of all of the members' percentage interests in the

**DRAFT**
**06/13/2019**

Company. In the event an increase in the Company's capital accounts is approved by the members, both Parties shall have rights of pre-emption so that their pro rata ownership share in the Company shall be maintained, provided that, either Party shall have thirty (30) days within which to confirm in writing that it is willing and able to subscribe and fully pay its pro rata share of the increase in capital.

d) Neither Party shall assign any of its rights or obligations under this Agreement, nor his/its member interests in the Company without the prior written consent of the other Party. In the event either Party desire to transfer or sell his/its pro rata members interest in the Company to a person other those specifically named in Section 1(a) of this Agreement, such Party shall be obligated to sell the same first to the other Party, which has have thirty (30) days within which to exercise its rights of first refusal from the date of receipt of a written notice to sell. For this purpose, the Parties hereby agree that the right of first refusal may be exercised in accordance with the following formula: The average of the Company's earnings before interest, depreciation, taxes and amortization (EBITDA) for the last two (2) years multiplied by 5 times, and further multiplied by the percentage of member interest subject to such right of first refusal over total outstanding member interests.

3) MANAGEMENT OF THE COMPANY

a) As will be provided in the operating agreement, the business and affairs of the Company shall be managed and all of the Company powers shall be exercised by or under the direction of the managers (collectively referred to as "Management"). Unless otherwise agreed to by the parties in Section _____, the Management shall be composed of seven (7) members, four (4) of whom shall be designated by the Cinco Group, and three (3) designated by the LA Group. Upon the formation of the Company, the following shall be named managers: Jose P. Magsaysay, Jr., Jose Maria Montinola, Ma. Victoria O. Bermejo, Ricardo K. Montelibano, Amit Nemanim, Guy Koren, and Amir Jacoby.

b) The Management shall regularly meet on a monthly basis. The regular monthly board meeting may be done via teleconference or through the internet. However, the Management shall convene and meet at the principal office of the Company every quarter of every fiscal year, either in person or via teleconference. The members may, at their discretion, invite non-members to join member meetings, but only as non-voting observers. Further, to the extent allowed by the financial condition of the Company, and as agreed upon by a majority of all member interests, the Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses incurred by the members named in Section 1(d) in attendance of said meetings.

c) Upon the formation of the Company, it shall have the following executive officers: President, Corporate Secretary and Treasurer, and the following shall be elected by the members to serve these positions:

i) Chairman of the Board of Members – Jose P. Magsaysay

ii) President – At any given time, the President shall be any one of the following members: Amit Nenamin, Guy Koren or Amir Jacoby, and the first president will be Amit Nemanim

iii) Corporate Secretary – Erlinda Bartolome.

iv) Treasurer – Jose Maria Montinola

   (1) The Treasurer shall have oversight functions over the Accounting and Finance Departments that shall be exercised independent of the President.

d) Additional executive officers may be appointed by Management as it may deem necessary.

e) It is hereby agreed that the rights and responsibilities of the Management shall include the following:

   i) Approval of the compensation package for the managers, executive offices and key personnel.

   ii) Approval of the Accounting System/Procedures/Software/Method to be used by the Company.

   iii) Approval of the operating budget of the Company, and any changes to it.

   iv) Approval of all franchising agreements, and lease agreements.

   v) Approval of all purchases and disbursements in excess of $10,000, provided that such amount may be changed or modified by Management as it deems necessary.

f) The executive officers shall manage the business and property of the Company, and to market the business, in accordance with and pursuant to the directives of and policies set by the Management of the Company. The Management of the Company can recall and/or withdraw the appointment of any executive officer, as it deems necessary.

g) Within _____ (   ) days from formation, the Company shall enter into a  Master License Agreement with Cinco (or an affiliated company to be designated by Cinco) which shall include the following terms and conditions:

   i) The Company agrees to license the "POTATO CORNER" intellectual property rights from Cinco or an affiliated company to be designated by Cinco) consisting of (i) the trademark, service mark and trade name "POTATO CORNER"; and (ii) various trademarks, service marks, trade names, slogans, designs, insignias, emblems, symbols, color schemes, package features, logo and other propriety identifying characteristics used in relation and in connection with the "Potato Corner" Products and the System; and (iii) as well as other intellectual property rights in connection with the "POTATO CORNER" intellectual property rights, for use in the Territory.

   ii) The Company agrees to pay, as an arm's length license fee, the following amounts:

   (1) With respect to the licensing / sub-licensing or franchising the "POTATO CORNER" intellectual property rights in connection with the "POTATO CORNER" outlets/stores, an amount equal to thirty percent (30%) of all

initial/franchise fees and ongoing royalty fees paid to/ collected by the Company.  Payments shall be made to Cinco (or an affiliated company to be designated by Cinco) by wire transfer using a bank or other financial institution specified by it within thirty (30) days from receipt of the fees by the Company.

(2) All withholding and other applicable taxes levied by any authority on the payments by the Company shall be borne solely by the Company.

h) The Company agrees to engage the LA Group to provide management and strategic experience and expertise during the duration of this Agreement.  Within _____ (   ) days from formation, the Company shall enter into a  Master Services Agreement with the LA Group (or a corporation to be designated by the LA Group) which shall include the following terms and conditions:

i) In consideration for the provision of its services under the Master Services Agreement, the LA Group shall be entitled to a services fee equal to thirty (30%) percent of all initial/franchise fee and continuing royalty  fees paid to/ collected by the Company .

ii) All withholding and other applicable taxes levied by any authority on the payments by the Company to the LA Group under this Agreement shall be borne solely by the Company.

iii) The LA Group shall faithfully, diligently and efficiently exercise its obligations and responsibilities under the Master Services Agreement.

iv) The LA Group shall maintain and protect the Confidential Information belonging to Cinco or the Company, and such undertaking shall apply to all of its partners, officers, employees, or agents.

i) The President of the Company shall render the following services and shall perform  the following duties for the Company in a faithful, diligent  and  efficient manner:

i) The President shall be responsible for all management, operational, marketing,    establishment, maintenance, licensing    and sub-licensing activities with respect to the "Potato Corner" outlets/stores in the Territory. He shall use his best efforts at all times during the term of this  Agreement  to operate  and   maintain  the "Potato Corner" outlets/stores in the Territory according  to the highest standards  achievable  consistent  with the overall plan of the Management of the Company. The President shall comply with the rules, policies and procedures approved by the Management of the Company from time to time.

ii) The President shall advertise market and promote the "Potato Corner" outlets/stores with the goal of causing public knowledge, awareness and patronage of the "Potato Corner" outlets/sites.

iii) The President shall maintain a comprehensive system of records, books and accounts, with respect to the licensing and sub-licensing activities, operation,

establishment, management, maintenance and other activities of the "Potato Corner" outlets /stores in the Territory with the assistance of the Corporate Secretary.

iv) No later than the twentieth (20th) day of each month, with respect to the preceding month, the President shall render a statement of receipts and disbursements, a schedule of accounts receivable and payable, and a schedule of fees collected and distributed, together with a reconciled bank statement as of the last day of the month with the assistance of the Corporate Secretary.

v) No later than three (3) months after the end of a fiscal year, the President shall, with the assistance of the Corporate Secretary and external accountant hired by Management, cause the Company to issue audited financial statements, and shall provide a copy of the same to all the members of Management.

vi) To the extent the President is lawfully able to do so, the President shall take such action as may be necessary to comply promptly with any and all laws, ordinances, orders or other requirements of any federal, state, county or municipal authority having jurisdiction of the Company and affecting the Company.

j)  Consistent with its fiduciary duty to the Company, the members and managers shall exercise the duty of care and shall, at all times, ensure that all corporate opportunities consistent with the objectives of this Agreement shall be pursued on behalf of, and for the benefit of the Company.  As such, with respect to the establishment of Company-owned stores, whenever potential locations are identified by any member or manager, it shall be promptly brought to the attention of the Management.  At all times, and within thirty (30) days from receipt of this information, the Management shall decide to either build a Company-owned store at the identified location.  In the event the Company chooses to build a Company-owned store at the identified location, it shall have the right to do so, to the exclusion of any of the members or managers.  However, in the even the Company decides not to build a Company-owned store at the identified location, it shall notify the members and managers of its decision in writing.  In such case, the LA Group shall have the right to build a store at the identified location, provided that it shall enter into a franchising agreement with the Company, and shall pay the franchise fees and ongoing royalty fees as set forth in the Company's standard franchising agreement.

4) DURATION OF AGREEMENT

a)  This Agreement shall become effective from the date of execution hereof and shall continue indefinitely unless otherwise terminated by (i) an affirmative vote of 66 2/3 percent of all member interests, or (ii) upon mutual agreement by the Parties in writing.

b)  Upon termination of this Agreement, the effects of termination shall be as follows:

**DRAFT**
**06/13/2019**

i)   All rights granted under the Master License Agreement shall terminate and the Company shall cease the use of the Potato Corner Intellectual Property Rights, and Confidential Information, provided however, that the Company shall be permitted to use any of the foregoing as is reasonably required in order to comply with its obligations under its sub-licensing or franchising agreements, but only to the extent of the duration of sub-licensing or franchising agreements in existence at the time of the termination of this Agreement.

ii)  The LA Group shall be subject to a non-compete arrangement and hereby agrees that, within two (2) years from the date of termination of this Agreement, it shall not engage in the business of establishing, operating, managing, licensing and franchising identical or similar products sold by the Company, using the intellectual property rights identical or similar to those used by the Company, at the time of the termination of this Agreement.

5)  GENERAL PROVISIONS

a)  This Agreement may not be altered, changed, supplemented or modified except by a written instrument duly signed by the Parties.

b)  The Parties shall use their best efforts to cooperate for the success of the business of the Company. The Parties further agree to perform all acts and execute and deliver all documents or instruments required or necessary to fully implement or consummate the transactions contemplated in and the intent underlying this Agreement.

c)  The Parties shall, to the extent feasible, cause the operating agreement of the Company to reflect the mutual covenants and provisions contained in this Agreement.

d)  All notices and other communications required or permitted to be given hereunder shall be given in writing (and for this purpose shall include emails or fax transmissions) and shall be addressed to the appropriate Party at the address of such Party as heretofore designated, or at such address as such Party may designate subsequently in writing.

e)  The failure of any Party at any time to require performance by the others of any provision of this Agreement shall not affect, in any way, the right of such Party to require performance of that or any other provision, and any waiver by any Party of any breach of this Agreement shall not be construed as a waiver of any continuing or succeeding breach of such provision, or a waiver of any other right under this Agreement.

f)  This Agreement shall constitute the entire agreement between the Parties and shall supersede any previous agreements, written or otherwise, with respect to the same subject matter which may have been made by the Parties prior hereto.

g)  The invalidity of any portion of this Agreement will not and shall not render the entire Agreement void, nor affect the validity of the rest of the provisions of this Agreement.

**DRAFT**
**06/13/2019**

h) This Agreement shall be governed by the laws of _____.

i) Parties acknowledge that, from time to time, one Party (the "Discloser") may disclose to the other Party (the "Recipient") information: (a) relating to the Potato Corner outlets and sites; (b) relating to the Potato Corner Intangible Property Rights; (c) Potato Corner product specifications and related information; (d) which is marked with "confidential" or a similar legend; (e) which is described orally and designated as confidential; or (f) which would, under the circumstances, be understood by a reasonable person to be confidential ("Confidential Information"). Upon subsequent disclosure of previously disclosed Confidential Information to the Recipient by the Discloser, the information will remain Confidential Information even if not identified as Confidential Information at the subsequent disclosure. Recipient shall retain such Confidential Information in confidence, and shall not disclose it to any Third Party or use it for other than the purposes of this Agreement without the Discloser's prior written consent. Each Party shall use at least the same procedures and degree of care with respect to such Confidential Information which it uses to protect its own confidential information of like importance, and in no event less than reasonable care. The Recipient will immediately give written notice to the Discloser of any unauthorized use or disclosure of the Discloser's Confidential Information, and the Recipient will assist the Discloser in remedying such unauthorized use or disclosure.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date and in place first mentioned.


By:                                          By:

_____          _____
President                                    (Title)




SIGNED IN THE PRESENCE OF:


_____          _____




ACKNOWLEDGMENT

**DRAFT**
**06/13/2019**

## POTATO CORNER USA
## JOINT VENTURE AGREEMENT

This Joint Venture Agreement (the "Agreement") dated _____ is made and entered into on _____, by and between:

Cinco Corporation, a corporation duly existing and registered by virtue of and under the laws of the Republic of the Philippines with office address at _____, represented herein by its duly authorized representative, _____ (hereinafter "Cinco"), and its directors, Jose P. Magsaysay, Jr., Jose Miguel Ma. G. Montinola, Ma. Victoria O. Bermejo, Ricardo K. Montelibano, all of whom are Philippine citizens and resident, and collectively referred to as the "Cinco Group";

-and-

AMIT NEMANIM, GUY KOREN, AMIR JACOBY, all of whom are U.S. citizens and residents and collectively referred to as the "LA Group:

RECITALS

WHEREAS, the Parties hereto have agreed to form a limited liability company (hereinafter referred to as the "Company") under the laws of the State of Delaware, with the primary purpose of engaging in the business of establishing, operating, managing, licensing and franchising "Potato Corner" stores/outlets in the United States of America and Israel, except in the County of Los Angeles, USA and the County of San Francisco, USA and Tanforan Mall (hereinafter, "Territory").

WHEREAS, the Parties herein have agreed to enter into this Agreement which sets forth the terms and conditions with respect to the organization, incorporation, operation and management of the Company and defines their respective rights, duties and obligations of the parties to this Agreement.

WHEREAS, the Parties agree that the LLC operating agreement to be entered by them shall reflect the terms and conditions as set forth in this Agreement.

WHEREAS, Cinco may assign and or all of its rights to the joint venture company formed under this Agreement to a wholly-owned subsidiary as it deems fit.

NOW, THEREFORE, for and in consideration of the foregoing premises, the Parties hereby agree as follows:

1) ORGANIZATION AND FORMATION OF THE COMPANY

    a) Within _____ (____) days from the date of this Agreement, the Parties herein agree to organize and form, a limited liability company to be called "PCJV USA" ( hereinafter referred to as the Company) for the primary purpose of engaging in the business of establishing, operating, managing, licensing and franchising "Potato Corner" stores/outlets in the Territory.

**DRAFT**
**06/13/2019**

b) The initial members of the Company shall be the following:

   i) Cinco Group
     (1) Cinco
     (2) Jose P. Magsaysay, Jr.
     (3) Jose Miguel Ma. G. Montinola
     (4) Ma. Victoria O. Bermejo
     (5) Ricardo K. Montelibano

   ii) LA Group
     (1) Amit Nemanim
     (2) Guy Koren
     (3) Amir Jacoby

c) The principal office of the Company shall be at _____.

d) The annual general meeting of the members of the Company shall be held every year at the principal office of the Company. The members may, at their discretion, invite non-members to join the annual general meeting, but only as non-voting observers. Further, to the extent allowed by the financial condition of the Company, and as agreed upon by a majority of all member interests, the Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses incurred by the following members in attendance of the annual members' meeting: Jose P. Magsaysay, Jr., Jose Maria Montinola, Ma. Victoria O. Bermejo, and Ricardo K. Montelibano.

e) The fiscal year of the Company shall begin on January 1 and end on December 31 of each year.

f) The Company shall immediately upon formation obtain a "Liability Insurance" for the Company the amount and scope of coverage to be determined by the managers.

g) All costs, fees and expenses incurred in connection with the organization and formation of the Company shall be for the account of the Company.

h) The operating agreement of the Company shall reflect the terms and conditions set forth in this Agreement between the Parties.

2) CAPITALIZATION/OWNERSHIP OF THE COMPANY

a) At the time of formation, the Company shall have a total capital account of _____, which shall be fully subscribed and paid at the time of formation.

b) Unless other agreed to in writing, the Parties hereby agree that the Cinco Group shall own sixty (60%) percent of the Company's capital accounts, while the LA Group shall own the remaining forty (40%) percent.

c) The Parties hereby agree any increase in the capital account shall require an affirmative vote of 66 2/3 of all of the members' percentage interests in the

**DRAFT**
**06/13/2019**

Company.  In the event an increase in the Company's capital accounts is approved by the members, both Parties shall have rights of pre-emption so that their pro rata ownership share in the Company shall be maintained, provided that, either Party shall have thirty (30) days within which to confirm in writing that it is willing and able to subscribe and fully pay its pro rata share of the increase in capital.

d) Neither Party shall assign any of its rights or obligations under this Agreement, nor his/its member interests in the Company without the prior written consent of the other Party. In the event either Party desire to transfer or sell his/its pro rata members interest in the Company to a person other those specifically named in Section 1(a) of this Agreement, such Party shall be obligated to sell the same first to the other Party, which has have thirty (30) days within which to exercise its rights of first refusal from the date of receipt of a written notice to sell.  For this purpose, the Parties hereby agree that the right of first refusal may be exercised in accordance with the following formula:  The average of the Company's earnings before interest, depreciation, taxes and amortization (EBITDA) for the last two (2) years multiplied by 5 times, and further multiplied by the percentage of member interest subject to such right of first refusal over total outstanding member interests.

3) MANAGEMENT OF THE COMPANY

a) As will be provided in the operating agreement, the business and affairs of the Company shall be managed and all of the Company powers shall be exercised by or under the direction of the managers (collectively referred to as "Management").  Unless otherwise agreed to by the parties in Section _____, the Management shall be composed of seven (7) members, four (4) of whom shall be designated by the Cinco Group, and three (3) designated by the LA Group. Upon the formation of the Company, the following shall be named managers: Jose P. Magsaysay, Jr., Jose Maria Montinola, Ma. Victoria O. Bermejo, Ricardo K. Montelibano, Amit Nemanim, Guy Koren, and Amir Jacoby.

b) The Management shall regularly meet on a monthly basis. The regular monthly board meeting may be done via teleconference or through the internet. However, the Management shall convene and meet at the principal office of the Company every quarter of every fiscal year, either in person or via teleconference. The members may, at their discretion, invite non-members to join member meetings, but only as non-voting observers.  Further, to the extent allowed by the financial condition of the Company, and as agreed upon by a majority of all member interests, the Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses incurred by the members named in Section 1(d) in attendance of said meetings.

c) Upon the formation of the Company, it shall have the following executive officers: President, Corporate Secretary and Treasurer, and the following shall be elected by the members to serve these positions:

i) Chairman of the Board of Members – Jose P. Magsaysay

DRAFT
06/13/2019

ii) President – At any given time, the President shall be any one of the following members: Amit Nenamin, Guy Koren or Amir Jacoby, and the first president will be Amit Nemanim

iii) Corporate Secretary – Erlinda Bartolome.

iv) Treasurer – Jose Maria Montinola

(1) The Treasurer shall have oversight functions over the Accounting and Finance Departments that shall be exercised independent of the President.

d) Additional executive officers may be appointed by Management as it may deem necessary.

e) It is hereby agreed that the rights and responsibilities of the Management shall include the following:

i) Approval of the compensation package for the managers, executive offices and key personnel.

ii) Approval of the Accounting System/Procedures/Software/Method to be used by the Company.

iii) Approval of the operating budget of the Company, and any changes to it.

iv) Approval of all franchising agreements, and lease agreements.

v) Approval of all purchases and disbursements in excess of $10,000, provided that such amount may be changed or modified by Management as it deems necessary.

f) The executive officers shall manage the business and property of the Company, and to market the business, in accordance with and pursuant to the directives of and policies set by the Management of the Company. The Management of the Company can recall and/or withdraw the appointment of any executive officer, as it deems necessary.

g) Within _____ (   ) days from formation, the Company shall enter into a  Master License Agreement with Cinco (or an affiliated company to be designated by Cinco) which shall include the following terms and conditions:

i) The Company agrees to license the "POTATO CORNER" intellectual property rights from Cinco or an affiliated company to be designated by Cinco) consisting of (i) the trademark, service mark and trade name "POTATO CORNER"; and (ii) various trademarks, service marks, trade names, slogans, designs, insignias, emblems, symbols, color schemes, package features, logo and other propriety identifying characteristics used in relation and in connection with the "Potato Corner" Products and the System; and (iii) as well as other intellectual property rights in connection with the "POTATO CORNER" intellectual property rights, for use in the Territory.

ii) The Company agrees to pay, as an arm's length license fee, the following amounts:

(1) With respect to the licensing / sub-licensing or franchising the "POTATO CORNER" intellectual property rights in connection with the "POTATO CORNER" outlets/stores, an amount equal to thirty percent (30%) of all

**DRAFT**
**06/13/2019**

initial/franchise fees and ongoing royalty fees paid to/ collected by the Company. Payments shall be made to Cinco (or an affiliated company to be designated by Cinco) by wire transfer using a bank or other financial institution specified by it within thirty (30) days from receipt of the fees by the Company.

(2) All withholding and other applicable taxes levied by any authority on the payments by the Company shall be borne solely by the Company.

h) The Company agrees to engage the LA Group to provide management and strategic experience and expertise during the duration of this Agreement. Within _____ (   ) days from formation, the Company shall enter into a Master Services Agreement with the LA Group (or a corporation to be designated by the LA Group) which shall include the following terms and conditions:

i) In consideration for the provision of its services under the Master Services Agreement, the LA Group shall be entitled to a services fee equal to thirty (30%) percent of all initial/franchise fee and continuing royalty fees paid to/ collected by the Company .

ii) All withholding and other applicable taxes levied by any authority on the payments by the Company to the LA Group under this Agreement shall be borne solely by the Company.

iii) The LA Group shall faithfully, diligently and efficiently exercise its obligations and responsibilities under the Master Services Agreement.

iv) The LA Group shall maintain and protect the Confidential Information belonging to Cinco or the Company, and such undertaking shall apply to all of its partners, officers, employees, or agents.

i) The President of the Company shall render the following services and shall perform the following duties for the Company in a faithful, diligent and efficient manner:

i) The President shall be responsible for all management, operational, marketing, establishment, maintenance, licensing and sub-licensing activities with respect to the "Potato Corner" outlets/stores in the Territory. He shall use his best efforts at all times during the term of this Agreement to operate and maintain the "Potato Corner" outlets/stores in the Territory according to the highest standards achievable consistent with the overall plan of the Management of the Company. The President shall comply with the rules, policies and procedures approved by the Management of the Company from time to time.

ii) The President shall advertise market and promote the "Potato Corner" outlets/stores with the goal of causing public knowledge, awareness and patronage of the "Potato Corner" outlets/sites.

iii) The President shall maintain a comprehensive system of records, books and accounts, with respect to the licensing and sub-licensing activities, operation,

establishment, management, maintenance and other activities of the "Potato Corner" outlets /stores in the Territory with the assistance of the Corporate Secretary.

iv)  No later than the twentieth (20th) day of each month, with respect to the preceding month, the President shall render a statement of receipts and disbursements, a schedule of accounts receivable and payable, and a schedule of fees collected and distributed, together with a reconciled bank statement as of the last day of the month with the assistance of the Corporate Secretary.

v)  No later than three (3) months after the end of a fiscal year, the President shall, with the assistance of the Corporate Secretary and external accountant hired by Management, cause the Company to issue audited financial statements, and shall provide a copy of the same to all the members of Management.

vi)  To the extent the President is lawfully able to do so, the President shall take such action as may be necessary to comply promptly with any and all laws, ordinances, orders or other requirements of any federal, state, county or municipal authority having jurisdiction of the Company and affecting the Company.

j)  Consistent with its fiduciary duty to the Company, the members and managers shall exercise the duty of care and shall, at all times, ensure that all corporate opportunities consistent with the objectives of this Agreement shall be pursued on behalf of, and for the benefit of the Company.  As such, with respect to the establishment of Company-owned stores, whenever potential locations are identified by any member or manager, it shall be promptly brought to the attention of the Management.  At all times, and within thirty (30) days from receipt of this information, the Management shall decide to either build a Company-owned store at the identified location.  In the event the Company chooses to build a Company-owned store at the identified location, it shall have the right to do so, to the exclusion of any of the members or managers.  However, in the even the Company decides not to build a Company-owned store at the identified location, it shall notify the members and managers of its decision in writing.  In such case, the LA Group shall have the right to build a store at the identified location, provided that it shall enter into a franchising agreement with the Company, and shall pay the franchise fees and ongoing royalty fees as set forth in the Company's standard franchising agreement.

4)  DURATION OF AGREEMENT

a)  This Agreement shall become effective from the date of execution hereof and shall continue indefinitely unless otherwise terminated by (i) an affirmative vote of 66 2/3 percent of all member interests, or (ii) upon mutual agreement by the Parties in writing.

b)  Upon termination of this Agreement, the effects of termination shall be as follows:

**DRAFT**
**06/13/2019**

    i)    All rights granted under the Master License Agreement shall terminate and the Company shall cease the use of the Potato Corner Intellectual Property Rights, and Confidential Information, provided however, that the Company shall be permitted to use any of the foregoing as is reasonably required in order to comply with its obligations under its sub-licensing or franchising agreements, but only to the extent of the duration of sub-licensing or franchising agreements in existence at the time of the termination of this Agreement.

    ii)    The LA Group shall be subject to a non-compete arrangement and hereby agrees that, within two (2) years from the date of termination of this Agreement, it shall not engage in the business of establishing, operating, managing, licensing and franchising identical or similar products sold by the Company, using the intellectual property rights identical or similar to those used by the Company, at the time of the termination of this Agreement.

5)  GENERAL PROVISIONS

    a)    This Agreement may not be altered, changed, supplemented or modified except by a written instrument duly signed by the Parties.

    b)    The Parties shall use their best efforts to cooperate for the success of the business of the Company. The Parties further agree to perform all acts and execute and deliver all documents or instruments required or necessary to fully implement or consummate the transactions contemplated in and the intent underlying this Agreement.

    c)    The Parties shall, to the extent feasible, cause the operating agreement of the Company to reflect the mutual covenants and provisions contained in this Agreement.

    d)    All notices and other communications required or permitted to be given hereunder shall be given in writing (and for this purpose shall include emails or fax transmissions) and shall be addressed to the appropriate Party at the address of such Party as heretofore designated, or at such address as such Party may designate subsequently in writing.

    e)    The failure of any Party at any time to require performance by the others of any provision of this Agreement shall not affect, in any way, the right of such Party to require performance of that or any other provision, and any waiver by any Party of any breach of this Agreement shall not be construed as a waiver of any continuing or succeeding breach of such provision, or a waiver of any other right under this Agreement.

    f)    This Agreement shall constitute the entire agreement between the Parties and shall supersede any previous agreements, written or otherwise, with respect to the same subject matter which may have been made by the Parties prior hereto.

    g)    The invalidity of any portion of this Agreement will not and shall not render the entire Agreement void, nor affect the validity of the rest of the provisions of this Agreement.

**DRAFT**
**06/13/2019**

h)  This Agreement shall be governed by the laws of _____.

i)  Parties acknowledge that, from time to time, one Party (the "Discloser") may disclose to the other Party (the "Recipient") information: (a) relating to the Potato Corner outlets and sites; (b) relating to the Potato Corner Intangible Property Rights; (c) Potato Corner product specifications and related information; (d) which is marked with "confidential" or a similar legend; (e) which is described orally and designated as confidential; or (f) which would, under the circumstances, be understood by a reasonable person to be confidential ("Confidential Information").  Upon subsequent disclosure of previously disclosed Confidential Information to the Recipient by the Discloser, the information will remain Confidential Information even if not identified as Confidential Information at the subsequent disclosure.  Recipient shall retain such Confidential Information in confidence, and shall not disclose it to any Third Party or use it for other than the purposes of this Agreement without the Discloser's prior written consent.  Each Party shall use at least the same procedures and degree of care with respect to such Confidential Information which it uses to protect its own confidential information of like importance, and in no event less than reasonable care.  The Recipient will immediately give written notice to the Discloser of any unauthorized use or disclosure of the Discloser's Confidential Information, and the Recipient will assist the Discloser in remedying such unauthorized use or disclosure.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date and in place first mentioned.

By:                                                    By:

_____    _____
President                                              (Title)

SIGNED IN THE PRESENCE OF:

_____    _____

ACKNOWLEDGMENT

# EXHIBIT 26

## Re: Potato Corner - Joint Venture Agreement [DRAFT] v2

Lyndah Bartolome <esbartolome@gmail.com>

Fri 7/2/2010 1:50 AM

**To:** Olivas, Ben <Ben.Olivas@dlapiper.com>
**Cc:** joemag <josemagsaysay@yahoo.com>; Jojo G. Montinola <josemontinola@yahoo.com>; amitneman@yahoo.com <amitneman@yahoo.com>; guy LA <guyk23@hotmail.com>; Amir Jacoby <ajacoby88@gmail.com>; Ricky Montelibano <ricky_montelibano@yahoo.com.ph>; Marvs Bermejo <marvsbermejo@yahoo.com>; Banz Banzon <banzbanzon@yahoo.com>

📎 1 attachments (86 KB)

7210 Potato Corner - Joint Venture Agreement [DRAFT] v2.doc;

Hi Ben, I am sending back the clean version of the JV with very few comments. Hopefully we can finalize this.

I have comments that I indicated in your e mail in MAROON.

On 6/28/2010 5:18 PM, Olivas, Ben wrote:

> Hi Jo/Lyndah,
>
> Kindly see attached for your review/comments. I am sending both a clean version and a redlined version with all the changes I made based on your comments and our discussion last night. A few points:
>
> 1. I added the 4 individuals as signatories to the Agreement. We have comments as indicated in the JV.
> 2. Section 2(c) -- I specified a 66 2/3% voting requirement for any increase in capital accounts. Amit is suggesting 75% so that at least there will be two (2) from their side. I think this should be fine.

3. Section 3(b) -- Not sure you need the provision re quarterly meetings, since monthly meetings may be done in person or by teleconference. Okey Ben let us just have the monthly.

> 4. Section 4 -- I modified this section to now provide only two causes for termination: vote by 66 2/3% or mutual agreement by the parties. Also 75%.
> 5. Section 5(e) -- I did not change this provision. The reason for this provision is to ensure that in case a party does not perform, and the other party does not do anything regarding the nonperformance, this lack of action will not be used as basis in the future to allow repeated or continued nonperformance.
> 6. Section 5(h) -- Need to specify the governing law. If okay with you, I suggest "State of California." Is this okey even if the registration of the LLC is in Delaware?

One other question Ben is the basic difference between an LLC and the Corporation. May we know? Also please assist us on the ownership of Santa Anita Mall. Maybe we can discuss this on the phone. Will text you or e mails possible dates for this. Maybe after you have reviewed the JV. Thanks and kindest regards.

> We can discuss tomorrow if you have any further questions/comments. Best regards.

Ben



**Ben R. Olivas**

**DLA Piper US LLP**
2000 University Avenue
East Palo Alto, California 94303

650.833.2080 **T**
650.687.1133 **F**
415.309.9648 **M**
ben.olivas@dlapiper.com

www.dlapiper.com

**Circular 230 Notice**: In accordance with Treasury Regulations which became applicable to all tax practitioners as of June 20, 2005, please note that any tax advice given herein (and in any attachments) is not intended or written to be used, and cannot be used by any taxpayer, for the purpose of (i) avoiding tax penalties or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

Please consider the environment before printing this email.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

# EXHIBIT 27

**PCJV USA LLC** – FRANCHISOR ENTITY FOR POTATO CORNER in the US

Corporate Set – Up

  a) Corporate Officers

Chairman & " Chief Brand Trainor"   – JOSE P. MAGSAYSAY

- Has been Chief Executive Officer of Cinco Corporation, 869 Katarungan Street, Plainview, Mandaluyong City, Philippines, from 2001 to present.
- POTATO CORNER pioneer cart/kiosk that changed the market scenario when it developed company into a multi chain operations through franchising.
- Was instrumental in growing Cinco to 198 branches: 34 company owned and 164 franchised owned
- Responsible for strategic planning and direction implementation of Cinco.
- "Caretaker" of the brand and company's DNA
- Recommends expansion plans for the Company.
-  Approval of all fund allocation for Cinco.
- Responsible for networking with the Franchise Community.
- Set franchise policy directions.

- Presides over all franchisees meetings and conferences.
- Implementation of all policies and directions set by the Board of Directors.
- Has completed all requirements towards becoming a Certified Franchise Executive from the International Franchise Association, Washington, DC, US.
- Vice- President, Philippine Franchise Association
- Board of Trustees, Philippine Franchise Association.
- Masters Degree in Entrepreneurship from the Asian Institute of Management, Manila, Philippines 2001.
- Board of Director, Vice Chairman – FPD Global Services Inc., 5th Floor, Net 1 Bldg. Bonifacio Global City, Taguig, Metro Manila.
    - Property Services Company that manages commercial centers and also involved in brokering, leasing, business planning, highest and best use studies.

CEO/President - AMIT NEMANIM

- Vice-President, Daxa Design from 2000 to 2008 at 1729 Santee Street, Los Angeles, CA 90015-3629

- Company was involved in the manufacturing of branded tee shirts.
- Over-all supervision of a manpower complement of 50 employees.
- Implementation of policy directions set by the Board of Directors.
- Develops client base for the company by establishing contacts and network.
- Negotiates with clients on prices and orders.
- Monitors quality of items delivered to clients.
- Planning of marketing programs and projects.
- Monitoring of performance and deliverables of the marketing department.
- Develops programs to establish continuing relations with clients.

TREASURER –   Jose Miguel Ma. G. Montinola

- Chairman of the Board of Directors – Cinco Corporation, Manila, Philippines  from 2001 to present
- Presides over monthly meetings of the Board of Directors
- Approves agenda and matters for discussions in Board Meetings.
- Director responsible for financial planning and resource allocation of Cinco.

Vice-President for Operations  &

Corporate Secretary               - ERLINDA S. BARTOLOME

- Managing Director – GMB Franchise Developers from 1993 to present. 808 Bliss Town Homes, Hulo Mandaluyong  City, Philippines
- 17 years experience in Franchising
- A Certified Franchise Executive from the International Franchise Association from 2006.  Has undergone re certification from IFA.
- Board of Advisers, Association of Filipino Franchisors
- Masters in Economics, Center for Research and Communication now University of Asia and Pacific, Pasig, Metro Manila.

- Has provided assistance to over 200 companies in their franchise development both locally and internationally
- Writes articles on franchising in various magazines including  Entrepreneur Magazine, Philippines
- Assistance and support to companies as they develop and launch their franchising programs.
- Develops new directions and strategies for existing franchisors.
- Develops courses and seminars on Franchise Management.
- Conducts franchising seminars for the general public, schools and other private and government entities.
- Oversees preparation of companies' Franchise Systems Manual and Franchise Operations Manual.
- Has provided content input to 2 books on franchising: Overview of Franchising – 2006 and Is Franchising for You? 2010
- Development of International Franchise System for home grown companies.
- Assistance to companies as they become Master Franchisees of International Chains.

B) Shareholders

- Cinco Corporation
- Jose P. Magsaysay
- Jose Miguel Ma. G. Montinola

- Maria Victoria O. Bermejo
  - Has been the Corporate Treasurer of Cinco Corporation since 2000.
  - Director In Charge of Accounting and Treasury
  - Signatories to checks.
  - Monitoring of cash flows and cash position of the Company
  - Coordination with External Auditor of the Company
  - Responsible for all government reportorial documents.
- Ricardo Enrique Kilayko Montelibano
  - Has been President of Cinco Corporation since 2000.
  - Signatory to checks.
  - Coordination with CEO on implementation of directions set by the Board.
  - Reports to the Board on status of programs and projects.
  - 

- Amit Nemanin
- Guy Koren
  - Director for Operations, High Security Systems from 2003 to 2005, 820 S. Robertson Blvd., Los Angeles, CA 90035
    - Company involved in planning and installation of security systems in residences and offices concentrated in Beverly Hills.
    - Developed Operational System of the company.
    - Responsible for training managers on the operational system.
    - Evaluates performance of employees and develops re training programs.

- Determines efficiency of operations on site.
- Conducts assessment of security systems installed based on the identified needs of clients.
- Undertakes yearly planning for Operations and budgets.

- President, Beverly Hills Cellular from 2006 to 2009, 1478 S. Crest Drive, Los Angeles, CA 90035
  - Company retails all types and kinds of cellular phones.
  - Over- all management of the company.
  - Determines various channels of distribution.
  - Handles financial management of the company.
  - Establishes network with suppliers.
  - Develops marketing plan for the company.
  - Evaluates sales performance of employees.
  - Hires/screens/trains employees.
- Amir Jacoby
  - President, Noble Builders from 2006 to present, 4924 Balboa Blvd., #477, Encino CA 91316.
  - Development and Construction Company
  - Responsible for overseeing all construction design and development of High End Custom homes.
  - Makes sure company's business philosophy of building lasting concept is carried on in all aspects of operations.
  - Develops company's strategies at its adherence to continuous improvement of business from operating policies and procedures for safety.

- o Full control of company's productive execution of its construction projects, cost accounting and project cost evaluation.
- o Evaluation of performance of employees verus targets and goals.

C) Corporate Office:

- 850 S. Broadway Suite #801
  Los Angeles, California 90014

D) General Email Address:

- franchise@potatocornerusa.com

E) Principal Telephone No:

- Telephone  No: 800-565-1114
- Fax No: 888-801-1174

F) Shareholdings Distribution

- Cinco Corporation – 56%
- Jose P. Magsaysay – 1%
- Jose Miguel Ma. G. Montinola – 1%
- Ricardo Enrique Kilayko Montelibano – 1%
- Maria Victoria O. Bermejo – 1%

- Amit Nemanim – 16.4%
- Guy Koren – 16.4%
- Amir Jacoby – 7.2%

# EXHIBIT 28

Mail - guy koren - Outlook

## Fwd: Cinco - Potato Corner JV Agreement - FINAL DRAFT

Erlinda Bartolome <esbartolome@gmail.com>

Thu 9/16/2010 7:09 PM

**To:** Jose P. Magsaysay, Jr. <josemagsaysay@yahoo.com>; Amit Neman <amitneman@yahoo.com>; guy koren <guyk23@hotmail.com>; ajacoby88@gmail.com <ajacoby88@gmail.com>; Ricky <ricky_montelibano@yahoo.com.ph>; marvs <marvsbermejo@yahoo.com>; Dennis Lerit <densmktg@gmail.com>

📎 1 attachments (97 KB)

Cinco - Potato Corner JV Agreement - FINAL DRAFT.DOC;

## Dear All,

## Attached please find the final copy of the Joint Venture Agreement from Ben.

## This is the last review we will have.  I hope this will be the final one as we have circulated this several times for comments and review.

## Ben will need our clearance to translate this to the Operating Agreement for our PCJV.

## Hope to hear from you soonest.

## Lyndah

---------- Forwarded message ----------
From: **Olivas, Ben** <Ben.Olivas@dlapiper.com>
Date: Tue, Sep 14, 2010 at 7:21 AM
Subject: Cinco - Potato Corner JV Agreement - FINAL DRAFT
To: Erlinda Bartolome <esbartolome@gmail.com>


Hi Lyndah,

For our discussion later today.  Thanks.

Ben




**Ben R. Olivas**
**DLA Piper US LLP**
2000 University Avenue
East Palo Alto, California 94303

650.833.2080 **T**
650.687.1133 **F**
415.309.9648 **M**
ben.olivas@dlapiper.com

www.dlapiper.com

**Circular 230 Notice**: In accordance with Treasury Regulations which became applicable to all tax practitioners as of June 20, 2005, please note that any tax advice given herein (and in any attachments) is not intended or written to be used, and cannot be used by any taxpayer, for the purpose of (i) avoiding tax penalties or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

Please consider the environment before printing this email.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

# POTATO CORNER USA
# JOINT VENTURE AGREEMENT

This Joint Venture Agreement (the "Agreement") dated _____ is made and entered into on _____, by and between:

Cinco Corporation, a corporation duly existing and registered by virtue of and under the laws of the Republic of the Philippines with office address at _____, represented herein by its duly authorized representative, _____ (hereinafter "Cinco"), and its directors, Jose P. Magsaysay, Jr., Jose Miguel Ma. G. Montinola, Ma. Victoria O. Bermejo, Ricardo K. Montelibano, all of whom are Philippine citizens and resident, and collectively referred to as the "Cinco Group";

-and-

AMIT NEMANIM, GUY KOREN, AMIR JACOBY, all of whom are U.S. citizens and residents and collectively referred to as the "LA Group:

RECITALS

WHEREAS, the Parties hereto have agreed to form a limited liability company (hereinafter referred to as the "Company") under the laws of the State of Delaware, with the primary purpose of engaging in the business of establishing, operating, managing, licensing and franchising "Potato Corner" stores/outlets in the United States of America and Israel, except in the County of Los Angeles, USA and the County of San Francisco, USA and Tanforan Mall (hereinafter, "Territory").

WHEREAS, the Parties herein have agreed to enter into this Agreement which sets forth the terms and conditions with respect to the organization, incorporation, operation and management of the Company and defines their respective rights, duties and obligations of the parties to this Agreement.

WHEREAS, the Parties agree that the LLC operating agreement to be entered by them shall reflect the terms and conditions as set forth in this Agreement.

WHEREAS, Cinco may assign and or all of its rights to the joint venture company formed under this Agreement to a wholly-owned subsidiary as it deems fit.

NOW, THEREFORE, for and in consideration of the foregoing premises, the Parties hereby agree as follows:

1) ORGANIZATION AND FORMATION OF THE COMPANY

   a) Within _____ (____) days from the date of this Agreement, the Parties herein agree to organize and form, a limited liability company to be called "PCJV USA" ( hereinafter referred to as the Company) for the primary purpose of

engaging in the business of establishing, operating, managing, licensing and franchising "Potato Corner" stores/outlets in the Territory.

b) The initial members of the Company shall be the following:

   i) Cinco Group
      (1) Cinco
      (2) Jose P. Magsaysay, Jr.
      (3) Jose Miguel Ma. G. Montinola
      (4) Ma. Victoria O. Bermejo
      (5) Ricardo K. Montelibano

   ii) LA Group
      (1) Amit Nemanim
      (2) Guy Koren
      (3) Amir Jacoby

c) The principal office of the Company shall be at  _____.

d) The annual general meeting of the members of the Company shall be held every year at the principal office of the Company.   The members may, at their discretion, invite non-members to join the annual general meeting, but only as non-voting observers.  Further, to the extent allowed by the financial condition of the Company, and as agreed upon by a majority of all member interests, the Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses incurred by the following members in attendance of the annual members' meeting: Jose P. Magsaysay, Jr., Jose Miguel Ma. Montinola, Ma. Victoria O. Bermejo, and Ricardo K. Montelibano.

e) The fiscal year of the Company shall begin on January 1 and end on December 31 of each year.

f) The Company shall immediately upon formation obtain a "Liability Insurance" for the Company the amount and scope of coverage to be determined by the managers.

g) All costs, fees and expenses incurred in connection with the organization and formation of the Company shall be for the account of the Company.

h) The operating agreement of the Company shall reflect the terms and conditions set forth in this Agreement between the Parties.

2) CAPITALIZATION/OWNERSHIP OF THE COMPANY

a) At the time of formation, the Company shall have a total capital account of _____, which shall be fully subscribed and paid at the time of formation.

b) Unless other agreed to in writing, the Parties hereby agree that the Cinco Group shall own sixty (60%) percent of the Company's capital accounts, while the LA Group shall own the remaining forty (40%) percent.

c) The Parties hereby agree any increase in the capital account shall require an affirmative vote of 75% of all of the members' percentage interests in the Company.  In the event an increase in the Company's capital accounts is approved by the members, both Parties shall have rights of pre-emption so that their pro rata ownership share in the Company shall be maintained, provided that, either Party shall have thirty (30) days within which to confirm in writing that it is willing and able to subscribe and fully pay its pro rata share of the increase in capital.

d) Neither Party shall assign any of its rights or obligations under this Agreement, nor his/its member interests in the Company without the prior written consent of the other Party. In the event either Party desire to transfer or sell his/its pro rata members interest in the Company to a person other those specifically named in Section 1(a) of this Agreement, such Party shall be obligated to sell the same first to the other Party, which has have thirty (30) days within which to exercise its rights of first refusal from the date of receipt of a written notice to sell.  For this purpose, the Parties hereby agree that the right of first refusal may be exercised in accordance with the following formula:  The average of the Company's earnings before interest, depreciation, taxes and amortization (EBITDA) for the last two (2) years multiplied by 5 times, and further multiplied by the percentage of member interest subject to such right of first refusal over total outstanding member interests.

3) MANAGEMENT OF THE COMPANY

a) As will be provided in the Operating Agreement, the business and affairs of the Company shall be managed and all of the Company powers shall be exercised by or under the direction of the managers (collectively referred to as "Management").  Unless otherwise agreed to by the parties, the Management shall be composed of seven (7) members, four (4) of whom shall be designated by the Cinco Group, and three (3) designated by the LA Group.  Upon the formation of the Company, the following shall be named managers: Jose P. Magsaysay, Jr., Jose Miguel Ma. Montinola, Ma. Victoria O. Bermejo, Ricardo K. Montelibano, Amit Nemanim, Guy Koren, and Amir Jacoby.

b) The Management shall regularly meet on a monthly basis. The regular monthly board meeting may be done via teleconference or through the internet.  The members may, at their discretion, invite non-members to join member meetings, but only as non-voting observers.  Further, to the extent allowed by the financial condition of the Company, and as agreed upon by a majority of all member interests, the Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses incurred by the members named in Section 1(d) in attendance of said meetings.

c) Upon the formation of the Company, it shall have the following executive officers: President, Corporate Secretary and Treasurer, and the following shall be elected by the members to serve these positions:

    i)  Chairman of the Board of Members – Jose P. Magsaysay

ii) President – At any given time, the President shall be any one of the following members: Amit Nenamin, Guy Koren or Amir Jacoby, and the first president will be Amit Nemanim

iii) Corporate Secretary – Erlinda Bartolome.

iv) Treasurer – Jose Miguel Ma. Montinola

    (1) The Treasurer shall have oversight functions over the Accounting and Finance Departments that shall be exercised independent of the President.

d) Additional executive officers may be appointed by Management as it may deem necessary.

e) It is hereby agreed that the rights and responsibilities of the Management shall include the following:

i) Approval of the compensation package for the managers, executive offices and key personnel.

ii) Approval of the Accounting System/Procedures/Software/Method to be used by the Company.

iii) Approval of the operating budget of the Company, and any changes to it.

iv) Approval of all franchising agreements, and lease agreements.

v) Approval of all purchases and disbursements in excess of $10,000, provided that such amount may be changed or modified by Management as it deems necessary.

f) The executive officers shall manage the business and property of the Company, and to market the business, in accordance with and pursuant to the directives of and policies set by the Management of the Company. The Management of the Company can recall and/or withdraw the appointment of any executive officer, as it deems necessary.

g) Within _____ (   ) days from formation, the Company shall enter into a  Master License Agreement with Cinco (or an affiliated company to be designated by Cinco) which shall include the following terms and conditions:

i) The Company agrees to license the "POTATO CORNER" intellectual property rights from Cinco or an affiliated company to be designated by Cinco) consisting of (i) the trademark, service mark and trade name "POTATO CORNER"; and (ii) various trademarks, service marks, trade names, slogans, designs, insignias, emblems, symbols, color schemes, package features, logo and other propriety identifying characteristics used in relation and in connection with the "Potato Corner" Products and the System; and (iii) as well as other intellectual property rights in connection with the "POTATO CORNER" intellectual property rights, for use in the Territory.

ii) The Company agrees to pay, as an arm's length license fee, the following amounts:

    (1) With respect to the licensing / sub-licensing or franchising the "POTATO CORNER" intellectual property rights in connection with the "POTATO CORNER" outlets/stores, an amount equal to thirty percent (30%) of all

initial/franchise fees and ongoing royalty fees paid to/ collected by the Company.  Payments shall be made to Cinco (or an affiliated company to be designated by Cinco) by wire transfer using a bank or other financial institution specified by it within thirty (30) days from receipt of the fees by the Company.

(2) All withholding and other applicable taxes levied by any authority on the payments by the Company shall be borne solely by the Company.

h)  The Company agrees to engage the LA Group to provide management and strategic experience and expertise during the duration of this Agreement.  Within ____ (   ) days from formation, the Company shall enter into a  Master Services Agreement with the LA Group (or a corporation to be designated by the LA Group) which shall include the following terms and conditions:

i)  In consideration for the provision of its services under the Master Services Agreement, the LA Group shall be entitled to a services fee equal to thirty (30%) percent of all initial/franchise fee and continuing royalty  fees paid to/ collected by the Company .

ii)  All withholding and other applicable taxes levied by any authority on the payments by the Company to the LA Group under this Agreement shall be borne solely by the Company.

iii)  The LA Group shall faithfully, diligently and efficiently exercise its obligations and responsibilities under the Master Services Agreement.

iv)  The LA Group shall maintain and protect the Confidential Information belonging to Cinco or the Company, and such undertaking shall apply to all of its partners, officers, employees, or agents.

i)  The President of the Company shall render the following services and shall perform  the following duties for the Company in a faithful, diligent  and  efficient manner:

i)  The President shall be responsible for all management, operational, marketing, establishment, maintenance, licensing and sub-licensing activities with respect to the "Potato Corner" outlets/stores in the Territory.  He shall use his best efforts at all times during the term of this  Agreement  to operate and  maintain  the "Potato Corner" outlets/stores in the Territory according  to the highest standards  achievable  consistent  with the overall plan of the Management  of the Company. The President shall comply with the rules, policies and procedures approved by the Management of the Company from time to time.

ii)  The President shall advertise market and promote the "Potato Corner" outlets/stores with the goal of causing public knowledge, awareness and patronage of the "Potato Corner" outlets/sites.

iii)  The President shall maintain a comprehensive system of records, books and accounts, with respect to the licensing and sub-licensing activities, operation,

establishment, management, maintenance and other activities of the "Potato Corner" outlets /stores in the Territory with the assistance of the Corporate Secretary.

iv) No later than the twentieth (20th) day of each month, with respect to the preceding month, the President shall render a statement of receipts and disbursements, a schedule of accounts receivable and payable, and a schedule of fees collected and distributed, together with a reconciled bank statement as of the last day of the month with the assistance of the Corporate Secretary.

v) No later than three (3) months after the end of a fiscal year, the President shall, with the assistance of the Corporate Secretary and external accountant hired by Management, cause the Company to issue audited financial statements, and shall provide a copy of the same to all the members of Management.

vi) To the extent the President is lawfully able to do so, the President shall take such action as may be necessary to comply promptly with any and all laws, ordinances, orders or other requirements of any federal, state, county or municipal authority having jurisdiction of the Company and affecting the Company.

j) Consistent with its fiduciary duty to the Company, the members and managers shall exercise the duty of care and shall, at all times, ensure that all corporate opportunities consistent with the objectives of this Agreement shall be pursued on behalf of, and for the benefit of the Company. As such, with respect to the establishment of Company-owned stores, whenever potential locations are identified by any member or manager, it shall be promptly brought to the attention of the Management. At all times, and within thirty (30) days from receipt of this information, the Management shall decide to either build a Company-owned store at the identified location. In the event the Company chooses to build a Company-owned store at the identified location, it shall have the right to do so, to the exclusion of any of the members or managers. However, in the even the Company decides not to build a Company-owned store at the identified location, it shall notify the members and managers of its decision in writing. In such case, the LA Group shall have the right to build a store at the identified location, provided that it shall enter into a franchising agreement with the Company, and shall pay the franchise fees and ongoing royalty fees as set forth in the Company's standard franchising agreement.

4) DURATION OF AGREEMENT

a) This Agreement shall become effective from the date of execution hereof and shall continue indefinitely unless otherwise terminated by (i) an affirmative vote of 75 percent (75%) of all member interests, or (ii) upon mutual agreement by the Parties in writing.

b) Upon termination of this Agreement, the effects of termination shall be as follows:

i) All rights granted under the Master License Agreement shall terminate and the Company shall cease the use of the Potato Corner Intellectual Property Rights, and Confidential Information, provided however, that the Company shall be permitted to use any of the foregoing as is reasonably required in order to comply with its obligations under its sub-licensing or franchising agreements, but only to the extent of the duration of sub-licensing or franchising agreements in existence at the time of the termination of this Agreement.

ii) The LA Group shall be subject to a non-compete arrangement and hereby agrees that, within two (2) years from the date of termination of this Agreement, it shall not engage in the business of establishing, operating, managing, licensing and franchising identical or similar products sold by the Company, using the intellectual property rights identical or similar to those used by the Company, at the time of the termination of this Agreement.

5) GENERAL PROVISIONS

a) This Agreement may not be altered, changed, supplemented or modified except by a written instrument duly signed by the Parties.

b) The Parties shall use their best efforts to cooperate for the success of the business of the Company. The Parties further agree to perform all acts and execute and deliver all documents or instruments required or necessary to fully implement or consummate the transactions contemplated in and the intent underlying this Agreement.

c) The Parties shall, to the extent feasible, cause the operating agreement of the Company to reflect the mutual covenants and provisions contained in this Agreement.

d) All notices and other communications required or permitted to be given hereunder shall be given in writing (and for this purpose shall include emails or fax transmissions) and shall be addressed to the appropriate Party at the address of such Party as heretofore designated, or at such address as such Party may designate subsequently in writing.

e) The failure of any Party at any time to require performance by the others of any provision of this Agreement shall not affect, in any way, the right of such Party to require performance of that or any other provision, and any waiver by any Party of any breach of this Agreement shall not be construed as a waiver of any continuing or succeeding breach of such provision, or a waiver of any other right under this Agreement.

f) This Agreement shall constitute the entire agreement between the Parties and shall supersede any previous agreements, written or otherwise, with respect to the same subject matter which may have been made by the Parties prior hereto.

g) The invalidity of any portion of this Agreement will not and shall not render the entire Agreement void, nor affect the validity of the rest of the provisions of this Agreement.

h)  This Agreement shall be governed by the laws <u>of the State of California.</u>

i)  Parties acknowledge that, from time to time, one Party (the "Discloser") may disclose to the other Party (the "Recipient") information: (a) relating to the Potato Corner outlets and sites; (b) relating to the Potato Corner Intangible Property Rights; (c) Potato Corner product specifications and related information; (d) which is marked with "confidential" or a similar legend; (e) which is described orally and designated as confidential; or (f) which would, under the circumstances, be understood by a reasonable person to be confidential ("Confidential Information").  Upon subsequent disclosure of previously disclosed Confidential Information to the Recipient by the Discloser, the information will remain Confidential Information even if not identified as Confidential Information at the subsequent disclosure.  Recipient shall retain such Confidential Information in confidence, and shall not disclose it to any Third Party or use it for other than the purposes of this Agreement without the Discloser's prior written consent.  Each Party shall use at least the same procedures and degree of care with respect to such Confidential Information which it uses to protect its own confidential information of like importance, and in no event less than reasonable care.  The Recipient will immediately give written notice to the Discloser of any unauthorized use or disclosure of the Discloser's Confidential Information, and the Recipient will assist the Discloser in remedying such unauthorized use or disclosure.

[The Remainder of This Page is Left Intentionally Blank]

WEST\222455823.1

IN WITNESS WHEREOF, the parties have executed this Agreement on the date and in place first mentioned.

By:                                                    By:

_____                        _____
President                                              (Title)

SIGNED IN THE PRESENCE OF:

_____                        _____

ACKNOWLEDGMENT

# EXHIBIT 29

## Re: Cinco - Potato Corner JV Agreement - FINAL DRAFT

Jose Magsaysay Jr <josemagsaysay@yahoo.com>

Thu 9/16/2010 7:29 PM

**To:** Erlinda Bartolome <esbartolome@gmail.com>
**Cc:** Amit Neman <amitneman@yahoo.com>; guy koren <guyk23@hotmail.com>; ajacoby88@gmail.com
<ajacoby88@gmail.com>; Ricky <ricky_montelibano@yahoo.com.ph>; marvs <marvsbermejo@yahoo.com>; Dennis Lerit
<densmktg@gmail.com>

Lyndah,

I am ok with this

Jo


On Sep 17, 2010, at 10:09 AM, Erlinda Bartolome <esbartolome@gmail.com> wrote:

> **Dear All,**
>
> **Attached please find the final copy of the Joint Venture Agreement
> from Ben.**
>
> **This is the last review we will have.  I hope this will be the final one as
> we have circulated this several times for comments and review.**
>
> **Ben will need our clearance to translate this to the Operating
> Agreement for our PCJV.**
>
> **Hope to hear from you soonest.**
>
> **Lyndah**
>
> ---------- Forwarded message ----------
> From: **Olivas, Ben** <Ben.Olivas@dlapiper.com>
> Date: Tue, Sep 14, 2010 at 7:21 AM
> Subject: Cinco - Potato Corner JV Agreement - FINAL DRAFT
> To: Erlinda Bartolome <esbartolome@gmail.com>
>
>
> Hi Lyndah,
>
> For our discussion later today.  Thanks.
>
> Ben



**Ben R. Olivas**

**DLA Piper US LLP**
2000 University Avenue
East Palo Alto, California 94303

650.833.2080 **T**
650.687.1133 **F**
415.309.9648 **M**
ben.olivas@dlapiper.com

www.dlapiper.com

**Circular 230 Notice**: In accordance with Treasury Regulations which became applicable to all tax practitioners as of June 20, 2005, please note that any tax advice given herein (and in any attachments) is not intended or written to be used, and cannot be used by any taxpayer, for the purpose of (i) avoiding tax penalties or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

Please consider the environment before printing this email.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

<Cinco - Potato Corner JV Agreement - FINAL DRAFT.DOC>

# EXHIBIT 30

RE: FW: Audit

Lambert, Kim <Kim.Lambert@dlapiper.com>
Fri 10/1/2010 9:54 AM

**To:** Erlinda Bartolome <esbartolome@gmail.com>
**Cc:** Amit Neman <amitneman@yahoo.com>; guy koren <guyk23@hotmail.com>; ajacoby88@gmail.com <ajacoby88@gmail.com>; Jose P. Magsaysay, Jr. <josemagsaysay@yahoo.com>; Olivas, Ben <Ben.Olivas@dlapiper.com>

Lyndah,
I just want to clarify that you have retained Jay Saadian to handle the financial aspect of the registration. If so am I authorized to call Jay to explain the franchise registration process to him as it sounds as though he is unfamiliar with this process. Also please confirm that the audit will be of the franchisor entity which will not hold any assets of any stores. Thanks. Kim

---

**From:** Erlinda Bartolome [mailto:esbartolome@gmail.com]
**Sent:** Thursday, September 30, 2010 6:27 PM
**To:** Lambert, Kim
**Cc:** Amit Neman; guy koren; ajacoby88@gmail.com; Jose P. Magsaysay, Jr.; Olivas, Ben
**Subject:** Fwd: FW: Audit

Dear Kim,

Sorry for this. Please let me handle this initially and will forward to you any concerns/issues we could not handle.

This was really an effort to look for an alternative as Amit and Michael is still on the level of tele cons. I requested Amit to give us a brief on talks with Michael's Group.

Thanks and I know identifying an Auditor is really beyond your scope...we really appreciate your assistance.

Kindest regards,

Lyndah

---------- Forwarded message ----------
From: **Jay Saadian, CPA** <jay@jaysaadian.com>
Date: Fri, Oct 1, 2010 at 8:02 AM
Subject: FW: Audit
To: amitneman@yahoo.com, esbartolome@gmail.com

FYI

**From:** JAY SAADIAN [mailto:jsaadian1@verizon.net]
**Sent:** Thursday, September 30, 2010 4:57 PM
**To:** 'Kim.Lambert@dlapiper.com'
**Cc:** 'Amit Neman '; 'Erlinda Bartolome '
**Subject:** Audit
**Importance:** High


Hi Kim,


My name is Jay Saadian.  I'm a CPA working w/ Amit and his investors in Los Angeles.  As you will note, he has forwarded this exchange of emails to me for advice.  I see that "audit" and "review" have been mentioned.  Also a single bank account has been referenced.  Is this request from some agency in CA?  If so, could you please forward the original request/instruction so that I see what exactly is needed and the kind of work involved.  Ant further info will be appreciated.


Sincerely,

Jay


Jay Saadian, CPA

310-310-1690

www.jaysaadian.com


This message is a private/business communication. It may contain information that is confidential and legally protected from disclosure. If you are not an intended recipient, please do not read, copy or use this message or any attachments, and do not disclose them to others. Please notify the sender of the delivery error by replying to this message, and then delete it and any attachments from your system. Thank you.


**From:** Amit Neman [mailto:amitneman@yahoo.com]
**Sent:** Thursday, September 30, 2010 3:15 PM
**To:** jsaadian@gmail.com
**Subject:** Fw: Audit

Jay,

Please review and let me know your thoughts. You are welcome to email Kim Lambert with any questions.

Thanks,

Amit

----- Forwarded Message ----
**From:** "Lambert, Kim" <Kim.Lambert@dlapiper.com>
**To:** "Angie.Boelter@mcgladrey.com" <Angie.Boelter@mcgladrey.com>; "esbartolome@gmail.com" <esbartolome@gmail.com>; "Michael.Stella@mcgladrey.com" <Michael.Stella@mcgladrey.com>
**Cc:** "josemagsaysay@yahoo.com" <josemagsaysay@yahoo.com>; "amitneman@yahoo.com" <amitneman@yahoo.com>; "Olivas, Ben" <Ben.Olivas@dlapiper.com>
**Sent:** Mon, September 20, 2010 10:52:42 AM
**Subject:** Re: Audit

Angela,

I thought that I would clarify that the estimate would be for a snap shot of a balance sheet for a start up entity (essentially verifying a bank deposit). Lyndah is looking for an estimate (and time frame) for reviewed versus audited statements plus an auditors' consent letter for submission to the State of California only. I hope that helps. Kim
Kim A. Lambert
DLA Piper LLP US
555 Mission Street, Suite 2400
San Francisco, CA 94105

T 415-615-6012
F 415-659-7834

Sent via my BlackBerry wireless device.

**From:** Boelter, Angie [mailto:Angie.Boelter@mcgladrey.com]
**Sent:** Monday, September 20, 2010 09:43 AM
**To:** Erlinda Bartolome <esbartolome@gmail.com>; Stella, Michael <Michael.Stella@mcgladrey.com>
**Cc:** Lambert, Kim; Jose P. Magsaysay, Jr. <josemagsaysay@yahoo.com>; Amit Neman <amitneman@yahoo.com>

**Subject**: RE: Audit

Lyndah –

We can speak with you at 6pm (Calfornia time) this evening. Please call the following number:

Dial in: 1.866.398.0556

Confernce code: 3810594467#

We can certainly provide you with a fee estimate regarding the provision of audit or review services, but before we can do that we need more information about the financial statements we would be reporting on in order to adequately scope the project. In this call we'd like to learn more about the specifics of your needs and your current situation.

If you have a recent interim set of financial statements that you could forward to us that would be helpful.

Michael and I are looking forward to speaking with you.

**From:** Erlinda Bartolome [mailto:esbartolome@gmail.com]
**Sent:** Friday, September 17, 2010 5:57 PM
**To:** Stella, Michael
**Cc:** Lambert, Kim; Boelter, Angie; Jose P. Magsaysay, Jr.; Amit Neman
**Subject:** Re: Audit

Hi Michael, thanks for the quick response.

Yes, it is possible to talk with you on Monday.  But since I am in the Philippines, we could do this between 6 pm to 7 pm your time.  I have a VOIP number that I use when calling the US so if the time if fine with you, you could give me the number to call.  However, my contact numbers in Manila are:

Cell: +63.918.938.1965. You could text (SMS) me if you wish.
Office No: (0632) 532 8386

Also to address basic issues during the phone call, may I suggest we exchange e mails prior to the call on basic questions we could address. From my side, I would like an initial response to the questions I posed in my e mail to Angie.

Kindest regards.

Lyndah

On Fri, Sep 17, 2010 at 11:33 PM, Stella, Michael <Michael.Stella@mcgladrey.com> wrote:

Good Morning Lyndah,

Angie Boelter, Audit Partner has forward me you your email.

I wanted to see if there might be a time on Monday, September 20, 2010 , when we can talk, if you can send me your contact information and a time and number to call you.

Thank you for your time and interest,

Regards,

Michael

J. Michael Stella

Director

RSM McGladrey, Inc.

55 Hawthorne St. Ste. 500, San Francisco, Ca 94105

O-415-848-5364 C-415-730-1490

Please note my new email michael.stella@mcgladrey.com

Error! Filename not specified.

Experience the Power of Being Understood.℠

DISCLAIMER:

This e-mail is only intended for the person(s) to whom it is addressed and may contain confidential information. Unless stated to the contrary, any opinions or comments are personal to the writer and do not represent the official view of the company. If you have received this e-mail in error, please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

Circular 230 Disclosure: Any advice contained in this email (including any attachments unless expressly stated otherwise) is not intended or written to be used, and cannot be used, for purposes of avoiding tax penalties that may be imposed on any taxpayer.

Alternative Practice Structure Disclosure: McGladrey is the brand under which RSM McGladrey, Inc. and McGladrey & Pullen, LLP serve clients' business needs. The two firms operate as separate legal entities in an alternative practice structure.

Please consider the environment before printing this email.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

# EXHIBIT 31

### Re: Franchise.com – Revised proposal and Sale Process Overview...

JoMag <josemagsaysay@yahoo.com>

Thu 8/18/2011 9:17 AM

**To:** Amit Neman <amitneman@yahoo.com>
**Cc:** esbartolome@gmail.com <esbartolome@gmail.com>; Jojo Montinola <josemontinola@yahoo.com>; Marvs Bermejo <marvsbermejo@yahoo.com>; Amir Jacoby <ajacoby88@gmail.com>; Guy Koren <guy@potatocornerusa.com>; c Ricky Montelibano <ricky_montelibano@yahoo.com.ph>

Hi Amit,

Let me clarify one thing.  In franchising or why we do franchising.

1). Because we lack financial resources to put up our own stores and we need other people's money, passion and time to help expand our business to achieve critical mass and brand leadership.

2). We lack resources and expertise in looking for sites and franchisee's, once sold to our kind of business, will look for sites themselves.  A franchisor normally looks for sites for their own use.  Franchisees should find their own sites unless we are talking about institutional tie ups like Westfield.

Lets market the brand and product so that our franchise applicants will be our business development arm.

So to my mind, what we should do is find franchise applicants with financial resources,  those with strong networks and are go getters like Ralph and Malik.  Therego this is why franchise brokers are good because they know who these people are as opposed to franchise referral groups who blast away and hope to get a call.

I do not agree on signing someone without a location.  This is dangerous and always leads to sour relationships when no sites are found or sites take too long to come by.

To me, getting this succesful multi franchise and multi chain operators are key to making us succesful.


Given this new mindset in franchise marketing, are you still willing to handle this and presenting to the Board new targets? If not may I ask who can handle this and what you think you like to do as part of the mgmt team?

Have fun in your jury duty.

Regards

JoMag

# EXHIBIT 32

## Fwd: PCJV - Info for Singer Lewak

Erlinda Bartolome <esbartolome@gmail.com>

Thu 4/26/2012 7:27 AM

**To:** guy@potatocornerusa.com <guy@potatocornerusa.com>; Guy Koren <guyk23@hotmail.com>

📎 4 attachments (503 KB)

m46265.pdf; m46265.pdf; Potato Corner Int_l - Initial Capital Structure.pdf; Cinco - PCJV Background Information.pdf;

---------- Forwarded message ----------
From: **Olivas, Ben** <Ben.Olivas@dlapiper.com>
Date: Tue, Jan 4, 2011 at 2:41 AM
Subject: PCJV - Info for Singer Lewak
To: Erlinda Bartolome <esbartolome@gmail.com>
Cc: "Jose P. Magsaysay, Jr." <josemagsaysay@yahoo.com>

Hi Lyndah,

Happy New Year to you.  Please see attached documents which I sent to Singer Lewak in connection with the financial audit requirement.  A few items to note:

1.    I spoke with Amit today and he explained to me that the LA Group intends to invest in PCJV through NKM Capital Group LLC ("NKM").  This a California LLC owned by Amit (36%), Guy (36%), Amir (18%), and minority investors (10%).

From PCJV's perspective, it does not make a difference if the LA Group's investment is made through NKM.  Furthermore, from the LA Group's perspective, their U.S. tax treatment remains the same, as if they invested in PCJV as individuals.  This is because NKM is an LLC and its pro rata share of income (or losses) from PCJV will go directly to its investors.  Amit and I spoke about this, and we both agree that this should affect the JV arrangements.

2.    JV Agreement - Can you confirm the status, if already signed by the parties.  We may need to provide the same to Singer Lewak.

3.    Related party agreements with PCJV

    a.    Do you have a draft Master License Agreement, as mentioned in the JV Agreement?  I can't remember if your lawyers there have or will draft one, for my review here.  Please confirm.  If not, I can just draft one and send to you.

    b.    There is also a Master Services Agreement.  Again, please confirm if there is a draft circulating, or whether I need to draft one for the parties review/comments.

We can speak later today or tomorrow.  Please let me know.  Kind regards.

Ben

Please consider the environment before printing this email.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

---------- Forwarded message ----------
From: "Olivas, Ben" <Ben.Olivas@dlapiper.com>
To: 'Steve Carter' <scarter@singerlewak.com>, 'Michael Wu' <mwu@singerlewak.com>
Cc: "Lambert, Kim" <Kim.Lambert@dlapiper.com>
Date: Mon, 3 Jan 2011 13:27:33 -0500
Subject: PCJV - Background info supporting documents
Kindly see attached.  Regards.  Ben



**Ben R. Olivas**
**DLA Piper US LLP**
2000 University Avenue
East Palo Alto, California 94303
650.833.2080 **T**
650.687.1133 **F**
415.309.9648 **M**
ben.olivas@dlapiper.com

www.dlapiper.com

**Circular 230 Notice**: In accordance with Treasury Regulations which became applicable to all tax practitioners as of June 20, 2005, please note that any tax advice given herein (and in any attachments) is not intended or written to be used, and cannot be used by any taxpayer, for the purpose of (i) avoiding tax penalties or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

---------- Forwarded message ----------
From: "Olivas, Ben" <Ben.Olivas@dlapiper.com>
To: 'Steve Carter' <scarter@singerlewak.com>, 'Michael Wu' <mwu@singerlewak.com>
Cc: "Lambert, Kim" <Kim.Lambert@dlapiper.com>
Date: Mon, 3 Jan 2011 13:23:14 -0500
Subject: Cinco - PCJV Background Information - DRAFT
Hi Steve/Mike,

Happy New Year.  Kindly see attached.  I will send you the documents referred to in the attached draft under separate cover.  Please review and let me know if you have any further questions.

Kind regards.

Ben



**Ben R. Olivas**
**DLA Piper US LLP**
2000 University Avenue
East Palo Alto, California 94303
650.833.2080 **T**
650.687.1133 **F**
415.309.9648 **M**
ben.olivas@dlapiper.com

www.dlapiper.com

**Circular 230 Notice**: In accordance with Treasury Regulations which became applicable to all tax practitioners as of June 20, 2005, please note that any tax advice given herein (and in any attachments) is not intended or written to be used, and cannot be used by any taxpayer, for the purpose of (i) avoiding tax penalties or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

# EXHIBIT 33

## Fwd: PCJV, LLC Draft FS & Management Rep Letter

Erlinda Bartolome <esbartolome@gmail.com>

Mon 1/17/2011 5:09 PM

**To:** Olivas, Ben <Ben.Olivas@dlapiper.com>; Lambert, Kim <Kim.Lambert@dlapiper.com>
**Cc:** Jose P. Magsaysay, Jr. <josemagsaysay@yahoo.com>; Jojo <josemontinola@yahoo.com>; marvs
<marvsbermejo@yahoo.com>; Amit Neman <amitneman@yahoo.com>; guy koren <guyk23@hotmail.com>;
ajacoby88@gmail.com <ajacoby88@gmail.com>

🖈 3 attachments (364 KB)
Representation Letterv1.doc; PCJV USA, LLC FY10 FS.pdf; image001.png;

Hi Ben and Kim,

I cc'd all the directors of PCJV so they could get the draft documents from Singer Lewak for their comments likewise.

My comments are as follows:
1.  The Master License Agreement has been drafted and ready for signing.
2.  Since there is the declaration that 60% of all fees collected will go to Cinco and LA Group, this will show the
Examiners that only 40% of the collected fees will be used to support the franchisees.
     Kim, on No. 2, how will the Examiners look at this arrangement? I know the government evaluates all FDD's
based on the ability of the franchisor to support its franchisees, will 40% be acceptable to them?
When the JV Agreement was drafted, I did not realize that even the sharing of fees among the shareholders will be
declared to Government.

Will need your advise on this.

Thanks.

Lyndah

---------- Forwarded message ----------
From: **Evan Wells** <ewells@singerlewak.com>
Date: Tue, Jan 18, 2011 at 7:58 AM
Subject: PCJV, LLC Draft FS & Management Rep Letter
To: esbartolome@gmail.com, josemagsaysay@yahoo.com, amitneman@yahoo.com,
Kim.Lambert@dlapiper.com, Michael Wu <mwu@singerlewak.com>
Cc: Steve Carter <scarter@singerlewak.com>


All -


In way of introduction my name is Evan Wells and I work for Steve Carter at Singer Lewak.  Please find
the attached financial statement draft for PCJV, LLC along with the management representation letter.
Please feel free to mark up the draft for changes and send them back to me so that we can
review/incorporate them.  Please have all comments back to me by the end of the day tomorrow.

Thanks in advance,

Evan

**PCJV USA, LLC**
**FINANCIAL STATEMENT**
**DECEMBER 31, 2010**

**DRAFT 1/13/2011**

**PCJV USA, LLC**
**Contents**
**December 31, 2010**

**DRAFT 1/13/2011**

|  | Page |
|---|---|
| **INDEPENDENT ACCOUNTANT'S REPORT** | 1 |

**FINANCIAL STATEMENT**

| Balance Sheet | 2 |
| Note to Financial Statement | 3 - 5 |

INDEPENDENT ACCOUNTANT'S REPORT

To the Members
PCJV USA, LLC
Los Angeles, CA

We have reviewed the accompanying balance sheet of PCJV USA, LLC (the Company) as of December 31, 2010, in accordance with Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants.  All of the information included in this balance sheet is the representation of the management of the Company.

A review consists principally of inquiries of Company personnel and analytical procedures applied to financial data.  It is substantially less in scope than an audit in accordance with auditing standards generally accepted in the United States of America, the objective of which is the expression of an opinion regarding the balance sheet taken as a whole.  Accordingly, we do not express such an opinion.

Based on our review, we are not aware of any material modifications that should be made to the accompanying balance sheet in order for it to be in conformity with accounting principles generally accepted in the United States of America.

## DRAFT 1/13/2011

SingerLewak LLP

San Jose, CA
January 21, 2011

**PCJV USA, LLC**
**BALANCE SHEET**
**December 31, 2010**

## DRAFT 1/13/2011

### ASSETS

|  | 2010 |
|---|---|
| **Current assets** | |
| Cash | $ 50,000 |
| **Total assets** | **$ 50,000** |

### MEMBERS' EQUITY

|  | |
|---|---|
| **Members' equity** | $ 50,000 |
| **Total members' equity** | **$ 50,000** |

See accompanying Independent Accountant's Report.
The accompanying notes are an integral part of these financial statements.

2

## DRAFT 1/13/2011

### NOTE 1 – ORGANIZATION AND BUSINESS PURPOSE

#### Nature of the organization (PCJV)

PCJV USA LLC (hereinafter, "PCJV") is a limited liability company formed under Delaware laws on July 16, 2010.  PCJV was formed to engage in the business of franchising the "Potato Corner" food business, as well as to establish and operate company-owned stores in the U.S. In this regard, a Franchise Disclosure Document (FDD) has been prepared and will be filed shortly in order comply with relevant U.S. federal and state franchising laws and regulations, and allow PCJV to commence its franchising business in the U.S.

#### Description of the members

The investors in PCJV are comprised of two groups:

(1) Cinco Corporation (Philippines), and its principal investors, all of whom are citizens and resident of the Philippines:
   a. Jose P. Magsaysay
   b. Jose Miguel Ma. G. Montelibano
   c. Ma. Victoria O. Bermejo
   d. Ricardo K. Montelibano

Collectively, referred to as the "Cinco Group."

(2) The following U.S.-based investors:
   a. Amit Nemanim
   b. Guy Koren
   c. Amir Jacoby

Collectively, referred to as the "LA Group."  These individuals comprising the LA Group are all citizens and residents of the U.S.

#### Nature of the business relationship

The business relationship between the Cinco Group and the LA Group, as regards the capitalization, management, and operations of PCJV is set forth in a Joint Venture Agreement ("JV Agreement) entered into by the parties.

The JV Agreement provides that the parties agree that the initial capitalization of the PCJV is $50,000, which has been funded by the parties as follows:

- Cinco Group = 60%, or $30,000 initial capital contribution
- LA Group = 40%, of $20,000 initial capital contribution

The funds representing this initial capital contribution of $50,000 by the parties have been remitted and deposited in a Wells Fargo Bank account established in the name and for the benefit of PCJV.

See accompanying Independent Accountant's Report.

3

## DRAFT 1/13/2011

**NOTE 1 – ORGANIZATION AND BUSINESS PURPOSE (Continued)**

**Nature of the business relationship (Continued)**
With respect to the investment made by the Cinco Group in PCJV, this was made through Potato Corner International, Inc. ("PC-Int'l), a Delaware C corporation formed on July 16, 2010.

As regards the investment made by the LA Group, Messrs. Nemanim, Koren, and Jacoby have invested directly in PCJV, and their respective share ownership in PCJV is as follows:  Mr. G. Koren = 15.2%, Mr. A. Nemanim = 15.2%, and Mr. A. Jacoby = 9.6%.

**Nature of the business operations**
As mentioned above, PCJV intends to engage in the business of franchising the Potato Corner business in the U.S.  The specifics of the proposed franchising business are set forth in the FDD to be filed by PCJV with the relevant federal and state regulatory agencies.  In addition to its franchising activities, PCJV also intends to establish and operate company-owned stores in the U.S.  To-date, however, PCJV has not engaged in any business operations, and does not plan to do so until the formal approval of the FDD is obtained.

*Related-party transactions*

As set forth in the JV Agreement, PCJV will enter into the following related-party agreements:

- Master Licensing Agreement with the Cinco Group

A Master Licensing Agreement will be executed between Cinco Corporation (Philippines) (as licensor) and PCJV (as licensee) granting license rights to the latter with respect to the following:

- o  the trademark, service mark, and trade name "POTATO CORNER";
- o  (ii) various trademarks, service marks, trade names, slogans, designs, insignias, emblems, symbols, color schemes, package features, logo and other propriety identifying characteristics used in relation and in connection with the "Potato Corner" Products and the System; and
- o  other intellectual property rights in connection with the "POTATO CORNER" intellectual property rights, for use in the U.S.

In consideration for the grant of these rights, PCJV agrees to pay a license fee equal to 30% of all initial/franchise fees and ongoing royalty fees paid to PCJV by third parties.  Further, any withholding taxes due on the license fee paid by PCJV shall be for the account of Cinco Corporation (Philippines).

**DRAFT 1/13/2011**

**NOTE 1 – ORGANIZATION AND BUSINESS PURPOSE (Continued)**

**Nature of the business operations** (Continued)

*Related-party transactions (continued)*

- Master Services Agreement with NKM LLC

As set forth in the JV Agreement, a Master Services Agreement will be executed between NKM LLC (as service provider) and PCJV (as service recipient). The services covered by the Master Services Agreement are all management and operational services performed by NKM LLC (or its members or contractors) in connection with the business of PCJV as set forth in the JV Agreement.

In consideration for these services, PCJV shall pay a service fee equal to 30% of all initial/franchise fees and ongoing royalty fees paid to PCJV by third parties.

Income and Franchise Taxes

PCJV is a limited liability company formed under Delaware laws on July 16, 2010. Upon the filing of its first year tax returns, the Company can elect to be treated as a corporation or partnership for tax purposes. The Company will file a U.S. federal income tax return, as well as franchise tax returns for California and Delaware, all of which are due to be filed in 2011.

**EXHIBIT 34**



## FRANCHISE DISCLOSURE DOCUMENT

**PCJV USA, LLC**
**a Delaware limited liability company**
**1729 Santee Street**
**Los Angeles, California 90015**
**(800) 565-1114**
**e-mail: franchise@potatocornerusa.com**
**website: www.potatocornerusa.com**

The franchise is to operate a store under the "Potato Corner" name that features flavored french fries, baked potatoes, hash browns, loopy fries and related products and services.

The total investment necessary to begin operation of a Potato Corner Store ranges from $134,400 to $322,150. This includes from $30,000 to $40,000 that may be paid to the franchisor or an affiliate.

This Disclosure Document summarizes certain provisions of your Franchise Agreement and other information in plain English. Read this Disclosure Document and all accompanying agreements carefully. You must receive this Disclosure Document at least 14 calendar days before you sign a binding agreement with, or make any payment to, the franchisor or an affiliate in connection with the proposed franchise sale. **Note, however, that no governmental agency has verified the information contained in this document.**

The terms of your contract will govern your franchise relationship. Don't rely on the Disclosure Document alone to understand your contract. Read all of your contract carefully. Show your contract and this Disclosure Document to an advisor, like a lawyer or an accountant.

Buying a franchise is a complex investment. The information in this Disclosure Document can help you make up your mind. More information on franchising, such as "A Consumer's Guide to Buying a Franchise," which can help you understand how to use this disclosure document, is available from the Federal Trade Commission. You can contact the FTC at 1-877-FTC-HELP or by writing to the FTC at 600 Pennsylvania Avenue, NW, Washington, D.C. 20580. You can also visit the FTC's home page at www.ftc.gov for additional information. Call your state agency or visit your public library for other sources of information on franchising.

There may also be laws on franchising in your state. Ask your state agencies about them.

Issuance date of this Franchise Disclosure Document: February 7, 2011

## STATE COVER PAGE

Your state may have a franchise law that requires a franchisor to register or file with a state franchise administrator before offering or selling in your state. REGISTRATION OF A FRANCHISE BY A STATE DOES NOT MEAN THAT THE STATE RECOMMENDS THE FRANCHISE OR HAS VERIFIED THE INFORMATION IN THIS DISCLOSURE DOCUMENT.

Call the state franchise administrator listed in Exhibit A for information about the franchisor or about franchising in your state.

MANY FRANCHISE AGREEMENTS DO NOT ALLOW YOU TO RENEW UNCONDITIONALLY AFTER THE INITIAL TERM EXPIRES. YOU MAY HAVE TO SIGN A NEW AGREEMENT WITH DIFFERENT TERMS AND CONDITIONS IN ORDER TO CONTINUE TO OPERATE YOUR BUSINESS. BEFORE YOU BUY, CONSIDER WHAT RIGHTS YOU HAVE TO RENEW YOUR FRANCHISE, IF ANY, AND WHAT TERMS YOU MIGHT HAVE TO ACCEPT IN ORDER TO RENEW.

Please consider the following RISK FACTORS before you buy this franchise:

1.      THE FRANCHISE AGREEMENT REQUIRES YOU TO RESOLVE DISPUTES WITH US BY ARBITRATION AND LITIGATION ONLY IN LOS ANGELES, CALIFORNIA. OUT-OF-STATE ARBITRATION OR LITIGATION MAY FORCE YOU TO ACCEPT A LESS FAVORABLE SETTLEMENT FOR DISPUTES. IT MAY ALSO COST YOU MORE TO ARBITRATE OR LITIGATE WITH US IN LOS ANGELES THAN IN YOUR OWN STATE.

2.      YOU WILL NOT RECEIVE AN EXCLUSIVE TERRITORY. SEE ITEM 12.

3.      OUR AFFILIATE, PC TRADING, LLC, IS THE SOLE SOURCE FOR THE FOOD PRODUCT AND SUPPLIES. PC TRADING, LLC HAS ABSOLUTE POWER TO SET THE PRICES IT CHARGES FOR FOOD PRODUCTS AND SUPPLIES.

4.      THERE MAY BE OTHER RISKS CONCERNING THIS FRANCHISE.

We do not use the services of any franchise brokers or referral sources to assist us in selling our franchise.

Effective Date: See the next page for state effective dates.

## PCJV USA, INC.
## STATE EFFECTIVE DATES

The following states require that the Franchise Disclosure Document be registered or filed with the state, or be exempt from registration: California, Hawaii, Illinois, Indiana, Maryland, Michigan, Minnesota, New York, North Dakota, Rhode Island, South Dakota, Virginia, Washington, and Wisconsin.

This Franchise Disclosure Document is registered, on file or exempt from registration in the following states having franchise registration and disclosure laws, with the following effective dates:

California            April 15, 2011

In all other states, this Franchise Disclosure Document's effective date is the issuance date of February 7, 2011.

**TABLE OF CONTENTS**

**ITEM**                                                                                      **PAGE**

1    THE FRANCHISOR AND ANY PARENTS, PREDECESSORS, AND
     AFFILIATES.................................................................................................................. 1

2    BUSINESS EXPERIENCE..............................................................................................2

3    LITIGATION....................................................................................................................3

4    BANKRUPTCY ...............................................................................................................3

5    INITIAL FEES..................................................................................................................3

6    OTHER FEES.................................................................................................................. 3

7    ESTIMATED INITIAL INVESTMENT..........................................................................6

8    RESTRICTIONS ON SOURCES OF PRODUCTS AND SERVICES............................9

9    FRANCHISEE'S OBLIGATIONS ................................................................................12

10   FINANCING...................................................................................................................14

11   FRANCHISOR'S ASSISTANCE, ADVERTISING, COMPUTER SYSTEMS,
     AND TRAINING............................................................................................................14

12   TERRITORY.................................................................................................................. 22

13   TRADEMARKS..............................................................................................................24

14   PATENTS, COPYRIGHTS, AND PROPRIETARY INFORMATION.........................25

15   OBLIGATION TO PARTICIPATE IN THE ACTUAL OPERATION OF THE
     FRANCHISE BUSINESS ..............................................................................................26

16   RESTRICTIONS ON WHAT THE FRANCHISEE MAY SELL...................................27

17   RENEWAL, TERMINATION, TRANSFER, AND DISPUTE RESOLUTION ...........27

18   PUBLIC FIGURES.........................................................................................................33

19   FINANCIAL PERFORMANCE REPRESENTATIONS...............................................33

20   OUTLETS AND FRANCHISEE INFORMATION .......................................................34

21   FINANCIAL STATEMENTS.........................................................................................36

22     CONTRACTS..................................................................................................3 6

23     RECEIPTS.....................................................................................................37

## **EXHIBITS**

Exhibit A     List of State Administrators/Agents for Service of Process

Exhibit B     Franchise Agreement

Exhibit C     Financial Statements

Exhibit D     Operations Manual Table Of Contents

Exhibit E     State Addenda And Franchise Agreement Riders

APPLICABLE STATE LAW MIGHT REQUIRE ADDITIONAL DISCLOSURES RELATED TO THE INFORMATION CONTAINED IN THIS DISCLOSURE DOCUMENT.   THESE ADDITIONAL DISCLOSURES, IF ANY, APPEAR IN EXHIBIT E**.**

## Item 1

### THE FRANCHISOR AND ANY PARENTS, PREDECESSORS, AND AFFILIATES

The franchisor is PCJV USA, LLC ("PCJV," "we," "us," or "our"). "You" means the person to whom we grant a franchise. If you are a corporation, partnership, limited liability company, or other entity, your owners must sign our "Guaranty and Assumption of Obligations," which means that all of our Franchise Agreement's provisions (Exhibit B) also will apply to your owners. (See Item 15)

We were formed in the state of Delaware on July 16, 2010. Our principal business address is 1729 Santee Street, Los Angeles, California 90015. We operate under our corporate name and the trademarks described in Item 13 (the "Marks") and no other name. We currently have no parents or predecessors required to be included in this Item. If we have an agent in your state for service of process, we disclose that agent in Exhibit A.

Our affiliate Cinco Corporation, a Philippine corporation ("Cinco") was incorporated in March, 1993 as Quatro Food and Resources, Inc. Cinco launched its operations opening Potato Corner Stores, featuring flavored french fries other products in the Philippines in 1992. Cinco began to franchise Potato Corner Stores in the Philippines in 1993. As of December 31, 2009, Cinco had 34 company-owned and 164 franchised stores in the Philippines. Cinco has also established Potato Corner Stores in Indonesia. Cinco's affiliate, Potato Corner Global Limited was formed in January 8, 2009 for the purpose of establishing Potato Corner stores internationally. Its address is 1/5 Unit B, 19F, Cheuk Nang Plaza, 250 Hennessey Road, Wanchai, Hong Kong.

We were formed to establish, operate and franchise Potato Corner Stores in the United States selling similar types of products and following similar operating procedures under the "Potato Corner" name. Cinco owns the Marks, copyrights, and know how associated with the "Potato Corner Store" concept and has licensed us to use them in operating and franchising Potato Corner Stores in the United States (See Item 13).

We grant franchises for stores operating under the "Potato Corner" name and other Marks. (For reference purposes in this Disclosure Document, we call the stores in our system "Potato Corner Stores"; we call the Potato Corner Store that you will operate the "Store.") Potato Corner Stores offer flavored french fries, baked potatoes, hash browns, loopy fries and related products and services ("Menu Items").

Menu Items are prepared according to specified recipes and procedures and use high quality ingredients, including our specially formulated and specially produced proprietary lines of flavors and sauces and other food products (collectively, "Trade Secret Food Products"). If you acquire a franchise, you must operate your Store according to our business formats, methods, procedures, designs, layouts, standards, and specifications.

Your Store will offer products and services to the general public throughout the year and compete with other fast food outlets, restaurants and food service businesses that offer french fries and potato based and complementary meat products. The market for your type of products and services generally is developed and very competitive. Despite this competition, we believe

that Potato Corner Stores appeal to consumers because we specialize in specific Menu Items and because of our product and service quality.

We will begin offering franchises for Potato Corner Stores with this Disclosure Document. An affiliate of ours, NKM Capital Group, LLC, a California limited liability company, formed in July, 2009 and located at 8950 West Olympic Blvd., Suite 563, Beverly Hills, CA 90211, has operated a Potato Corner Store in Santa Anita Mall, Arcadia, California since February, 2010. We do not operate any Potato Corner Stores, although we may do so in the future.

We have no other business activities and have not offered franchises in other lines of business. Cinco has not offered franchises in any line of business. Our affiliate, PCI Trading, LLC, a Delaware limited liability company, which was formed on November 8, 2010, with a principal business address of 1729 Santee Street, Los Angeles, CA 90015 ("PC Trading") provides certain products and supplies to franchisees for use in the operation of their Potato Corner Stores. (See Item 8.) We have no other affiliates who offer franchises in any line of business or who provide products or services to our franchisees.

There are no regulations that apply specifically to the industry in which Potato Corner Stores operate. However, you must comply with laws that apply generally to all food service businesses. You should investigate these laws.

## Item 2

### BUSINESS EXPERIENCE

#### Chairman and Managing Partner: Jose P. Magsaysay, Jr.

Mr. Magsaysay has been the Chairman and Managing Partner since PCJV's formation on July 16, 2010. Mr. Magsaysay has also been Chief Executive Officer of Cinco from January, 2001 to the present and was instrumental in growing Cinco's operations from 1 to 170 stores in the Philippines.

#### Chief Executive Officer: Amit Nemanin

Mr. Nemanin has been the Chief Executive Officer since PCJV's formation on July 16, 2010. Mr. Nemanin was the Vice President for Marketing of Daxa Design, a manufacturing business, located in Los Angeles, California 90015 from February, 2000 to May, 2008.

#### Director and Chief Financial Officer: Mr. Jose Miguel Ma. G. Montinola

Mr. Montinola has been the Chief Financial Officer of PCJV since its formation on July 16, 2010. Mr. Montinola has also been the Chairman of the Board of Directors of Cinco from 2001 through the present. Mr. Montinola was the Chief Executive Officer of Cinco from January, 1997 to December, 2000.

**Corporate Secretary and Franchise Director: Erlinda Bartolome:**

Ms. Bartolome has been PCJV's Corporate Secretary and Franchise Director since its formation on July 16, 2010. Ms. Bartolome has worked with Cinco to facilitate its franchise expansion in the Philippines and internationally in 1997 and in 2009.

## Item 3

## LITIGATION

No litigation is required to be disclosed in this Disclosure Document.

## Item 4

## BANKRUPTCY

No bankruptcy proceedings are required to be disclosed in this Disclosure Document.

## Item 5

## INITIAL FEES

You must pay us an initial franchise fee in a lump sum when you sign the Franchise Agreement. Our standard initial franchise fee will be $15,000 for the first 5 franchises we grant. Thereafter the initial franchise fee will be $25,000.

Initial franchise fees under Franchise Agreements are fully earned when paid and are not refundable under any circumstances, except as provided below. If we determine that you (or your managing owner) cannot complete initial training to our satisfaction (and he or she, or a replacement cannot satisfactorily complete a repeat training program), we may terminate the Franchise Agreement and keep 1/2 of the initial franchise fee. We will return the other 1/2 to you if you sign our required form of release of claims.

We use the initial franchise fee to cover the costs of evaluating your proposed site, training you and your employees, and helping you develop and open your Store.

## Item 6

## OTHER FEES

| Column 1 | Column 2 | Column 3 | Column 4 |
|---|---|---|---|
| Type of Fee[1] | Amount | Due Date | Remarks |
| Continuing Service and Royalty | 2½% of Store's monthly Gross Sales for the first 3 months of operation and 5% of Gross Sales | Due on the 10th day of each month on Gross Sales for the previous month[2] | "Gross Sales" means all revenue from operating the Store, including but not limited to, all amounts that you receive at or away from the premises of the store, and whether from cash, check, credit and debit card, barter exchange, trade credit or other |

| Column 1 | Column 2 | Column 3 | Column 4 |
|---|---|---|---|
| Type of Fee[1] | Amount | Due Date | Remarks |
| | per month thereafter | | credit transactions, but excluding taxes collected from customers and paid to a taxing authority, and reduced by the amount of any documented refunds, credits, allowances, and chargebacks the Store in good faith gives to customers (if those amounts originally were included in calculating Gross Sales) |
| Grand Opening Advertising | Up to $2000 | During the designated grand opening period | You must spend this amount according to our guidelines |
| Advertising and Development Fund | Up to 2% of Store's weekly Gross Sales, currently 1% of Gross Sales | Due on the 10th day of each month on Gross Sales for the previous month[2] | See Item 11 for a detailed discussion about this Fund |
| Local Advertising | 1% of Store's Gross Sales | As incurred | You must spend this amount on local advertising |
| Cooperative Advertising Programs | Up to 1% of the Store's Gross Sales (will be applied toward local advertising expenditure requirement)[3] | As Cooperative Program directs | See Item 11 for a detailed discussion about Cooperative Advertising Programs |
| Additional Training or Assistance | Currently, we charge per day plus expenses for training at our headquarters, and $100 per person per day expenses for training at your Store | When training or assistance begins | We provide initial training for up to 4 people at no cost and charge for training additional people, newly-hired personnel, refresher training courses, the annual convention, and additional or special assistance or training you need or request |
| Transfer | 60% of our then current initial franchise fee | Before transfer completed | No charge if Franchise Agreement transferred to an entity you control |
| Product and Service Purchases | See Item 8 | See Item 8 | You will buy products and services from us, our affiliates, designated and approved vendors whose items meet our standards and specifications, and/or other suppliers to the industry |

| Column 1 | Column 2 | Column 3 | Column 4 |
|---|---|---|---|
| Type of Fee[1] | Amount | Due Date | Remarks |
| Testing | Costs of Testing | When billed | This covers the costs of testing new products or inspecting new suppliers you propose |
| Computer Systems, Maintenance, and Support | Costs of Service | As incurred | We do not currently designate a proprietary software for use by you but may do so in the future in which case an initial and ongoing maintenance fees may be charged annually.  Certain services may be provided through a third party that offers an Internet-based reporting system for which it currently charges a monthly fee of $300. |
| Public Offering | $10,000 plus out-of-pocket expenses | When billed | Due to renew your offering materials if you seek to raise money through certain type of stock or other offerings |
| Audit | Cost of inspection or audit | 15 days after billing | Due if you do not give us reports, supporting records, or other required information or understate required Royalties or Fund contributions by more than 2% |
| Interest | Lesser of 1.5% per month or highest commercial contract interest rate law allows | 15 days after billing | Due on all overdue amounts |
| Maintenance and Refurbishing of Store | You must reimburse our expenses | 15 days after billing | If, after we notify you, you do not undertake efforts to correct deficiencies in the Store's appearance, then we can undertake the repairs and you must reimburse our costs |
| Insurance | You must reimburse our costs | 15 days after billing | If you fail to obtain insurance, we may obtain insurance for you and you must reimburse us |
| Insufficient Funds Processing Fee | $100 | As incurred | Due if you have insufficient funds in your EDTA to cover a payment, or, if you pay by check, a check is returned for insufficient funds |
| Management Fee | $500 per person per day (plus costs and expenses) | As incurred | Due when we (or a third party) manage the Store after your or your managing owner's death or disability or after your default or abandonment |
| Costs and Attorneys' Fees | Will vary under circumstances | As incurred | Due when you do not comply with the Franchise Agreement |

| Column 1 | Column 2 | Column 3 | Column 4 |
|---|---|---|---|
| Type of Fee[1] | Amount | Due Date | Remarks |
| Indemnification | Will vary under circumstances | As incurred | You must reimburse us if we are held liable for claims from your Store's operation |

[1] Except for product and service purchases described in Item 8, and except as otherwise noted in this Item 6, all fees are imposed and collected by and payable to us. Except as noted above, all fees are uniform and non-refundable.

[2] Before your Store opens, you must sign and deliver to us the documents we require to authorize us to debit your business checking account automatically for the Royalty, Fund contributions, and other amounts due under the Franchise Agreement and for your purchases from us and/or our affiliates (the "Electronic Depository Transfer Account" or "EDTA"). We will debit the EDTA for these amounts on their due dates. Funds must be available in the EDTA for withdrawal. We may require payment other than by automatic debit, and you must comply with our payment instructions.

If you do not report the Store's Gross Sales, we may debit your EDTA for 120% of the last Royalty and Fund contribution that we debited. If the amounts we debit are less than the amounts you actually owe us, we will debit your EDTA for the balance on the day we specify. If the amounts we debit are greater than the amounts you actually owe us, we will credit the excess against the amounts that we otherwise would debit from your EDTA during the following month.

[3] These Stores will include Potato Corner Stores operated in the "Advertising Coverage Area" by us, or our other affiliates. Each Potato Corner Store operating in the Advertising Coverage Area will have one vote.

## Item 7

### ESTIMATED INITIAL INVESTMENT

### YOUR ESTIMATED INITIAL INVESTMENT

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 |
|---|---|---|---|---|
| Type of Expenditure | Amount | Method of Payment | When Due | To Whom Payment is to be made |
| Initial Franchise Fee (1) | $15,000 – $25,000 | Lump Sum | Upon signing Franchise Agreement | Us |
| Real Estate/Rent (2) | $3,000 – $5,000 | As Agreed | As Incurred | Landlord |
| Utility and Security Deposits (2) | $2,000 – $10,000 | As Agreed | As Incurred | Utility Companies, Landlord |

6

| Column 1<br><br>Type of Expenditure | Column 2<br><br>Amount | Column 3<br><br>Method of Payment | Column 4<br><br>When Due | Column 5<br><br>To Whom Payment is to be made |
|---|---|---|---|---|
| Leasehold Improvements (3) | $35,000 – $150,000 | As Agreed | As Incurred | Outside Suppliers |
| Computer System(4) | $5,000 – $7,500 | As Agreed | As Incurred | Outside Supplier |
| Furniture, Fixtures, and Equipment (5) | $35,000 – $45,000 | As Agreed | As Incurred | Outside Suppliers |
| Signage | $4,000 - $7,500 | As Agreed | As Incurred | Outside Suppliers |
| Professional Fees | $2,500 – $7,500 | As Agreed | As Incurred | Lawyers, Accountants and other Advisors |
| Architectural Plans (6) | $2,000 – $5,000 | As Agreed | As Incurred | Architect |
| Civil Engineer (6) | $2,000 – $5,000 | As Agreed | As Incurred | Civil Engineer |
| Office Equipment and Supplies (7) | $1,500 – $2,500 | As Agreed | As Incurred | Outside Suppliers |
| Business License and Permits | $600 – $1,500 | As Agreed | As Incurred | Government Agencies |
| Opening Inventory and Supplies (8) | $8,000 – $15,000 | As Agreed | As Incurred | Designated and Approved Suppliers, Us, Our Affiliates |
| Grand Opening Marketing (9) | $2,000 – $5,000 | As Incurred | As Incurred | Advertising Sources |
| Additional Training Fee (10) | $0 - $2,250 | Lump Sum | Before Training | Us |
| Training Expenses (out-of-pocket costs for 4 people) | $1,200 – $2,200 | As Incurred | As Incurred | Third Parties |
| Insurance – 3 months (11) | $600 – $1,200 | As Incurred | As Incurred | Insurance Company |
| Additional Funds - 3 months (12) | $15,000 – $25,000 | As Incurred | As Incurred | |

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 |
|---|---|---|---|---|
| Type of Expenditure | Amount | Method of Payment | When Due | To Whom Payment is to be made |
| **TOTAL ESTIMATED INITIAL INVESTMENT (13)** | $134,400 − $322.150 | | | |

## Explanatory Notes

\*      All amounts listed in the above table are nonrefundable, except that a portion of the initial franchise fee is refundable if we determine that you (or your managing owner) cannot complete initial training to our satisfaction (and he or she, or a replacement cannot satisfactorily complete a repeat training program) and we decide to terminate the Franchise Agreement. (See Item 5.)

1.      We describe the initial franchise fee in Item 5.

2.      A Potato Corner Store occupies approximately 200 to 300 square feet of space. Rent depends on geographic location, size, local rental rates, businesses in the area, site profile, and other factors and could be considerably higher in large metropolitan areas. Potato Corner Stores can be located in strip shopping centers, shopping malls, free-standing units, and other venues in downtown commercial areas and in residential areas. We anticipate that you will rent the Store's premises. It is possible, however, that you might choose to buy, rather than rent, real estate on which a building suitable for the Store already is constructed or could be constructed. Real estate costs depend on location, size, visibility, economic conditions, accessibility, competitive market conditions, and the type of ownership interest you are buying. Because of the numerous variables that affect the value of a particular piece of real estate, this initial investment table does not reflect the potential cost of purchasing real estate.

3.      Leasehold improvement costs, including floor covering, wall treatment, counters, ceilings, painting, window coverings, electrical, carpentry, and similar work, and architect's and contractor's fees, depend on the site's condition, location, and size; the demand for the site among prospective lessees; the site's previous use; the build-out required to conform the site for your Store; and any construction or other allowances the landlord grants. The lower figure assumes a lower store area, the higher figure is for a higher store area.

4.      We may specify the purchase and use of a point of sale system and business management software and hardware for use in the Potato Corner Store.

5.      These amounts include equipment that you must purchase from approved and designated suppliers. We will determine the amount of equipment that you will need to purchase. These amounts also include ovens, refrigerators and freezers.

6.    The architect will provide architectural services relating to the Store building. The civil engineer will provide engineering services in conjunction with the architect and contractor.

7.    This includes a small desk and chair, safe, adding machine, fax machine, telephones, CCTV cameras and fryers.

8.    This includes food and beverage products, paper products, cleaning supplies, and printing and other supplies. Some of the food products such as the Trade Secret Food Products must be purchased from us, our affiliates and/or exclusive sources. (See Item 8)

9.    This is the maximum required amount you must spend on grand opening marketing for your Store.

10.   If the franchise is located more than 100 miles from our headquarters, you must pay an additional fee of $2,250 for the on-site training.

11.   You must obtain and maintain certain types and amounts of insurance. (See Item 8) Insurance costs depend on policy limits, types of policies, nature and value of physical assets, gross revenue, number of employees, square footage, location, business contents, and other factors bearing on risk exposure. The estimate contemplates insurance costs for 3 months.

12.   This item estimates your initial start up expenses (other than the items identified separately in the table). These expenses include payroll costs but not any draw or salary for you. These figures are estimates, and we cannot guarantee that you will not have additional expenses starting the business. Your costs depend on how much you follow our methods and procedures; your management skill, experience, and business acumen; local economic conditions; the local market for your products and services; the prevailing wage rate; competition; and the sales level reached during the initial period.

13.   We relied on Cinco's approximately 18 years of operating Stores in the Philippines to compile these estimates plus conducted preliminary due diligence in the United States. You should review these figures carefully with a business advisor before deciding to acquire the franchise. We do not offer financing directly or indirectly for any part of the initial investment. The availability and terms of financing depend on many factors, including the availability of financing generally, your creditworthiness and collateral, and lending policies of financial institutions from which you request a loan.

## Item 8

### RESTRICTIONS ON SOURCES OF PRODUCTS AND SERVICES

You must operate the Store according to our System Standards. System Standards may regulate, among other things, the types, models, and brands of fixtures, furniture, equipment (including a required or recommended computer facsimile, and point-of-sale information system), furnishings, and signs (collectively, "Operating Assets"); design, layout, décor, appearance and lighting of the Stores; periodic maintenance, cleaning and sanitation; periodic remodeling, painting and decorating; types, models, brands and condition of leasehold

improvements and Operating Assets, Products and other items for which we have minimum standards; using interior and exterior signs, emblems, lettering, and logos; purchase, storage, preparation, handling and packaging procedures and techniques for Menu Items and Trade Secret Food Products; inventory requirements and unauthorized and prohibited food products, beverages and services; terms and conditions of the sale and delivery of, and terms and methods for payment for the Menu Items, Trade Secret Food Products, other products and services that you obtain from us and affiliated and unaffiliated suppliers; our affiliates right not to sell you any Trade Secret Food Products, or other products or to provide you with services, or to do so only on a "cash-on-delivery" or other basis, if you are in default under any agreement with us; use and display of the Marks at the Store and on napkins, boxes, bags, wrapping paper, labels, forms, paper and plastic products, and other supplies; issuing and honoring gift certificates; staffing levels for the Store; identifying the Store's personnel; and employee qualifications, training, dress, and appearance; days and hours of operation; participation at your own expense in market research and testing product and service development programs; accepting credit and debit cards and other payment systems, and check verification services; bookkeeping, accounting, data processing, and record keeping systems and forms; formats, content, and frequency of reports to us of sales, revenue, financial performance, and condition; and giving us copies of tax returns and other operating and financial information concerning the Store; any other aspects of operating and maintaining the Store that we determine to be useful to preserve or enhance the efficient operation, image, or goodwill of the Marks and Potato Corner Stores; and use of proprietary software if any and the Franchise System Website.

You must buy all Trade Secret Food Products from PC Trading at the prices PC Trading decides to charge. We restrict your sources of Trade Secret Food Products in order to protect our trade secrets, assure quality, assure a reliable supply of products that meet our standards, achieve better terms of purchase and delivery service, control usage of the Marks by third parties, and monitor the manufacture, packaging, processing, and sale of these items. You must also purchase all equipment, oil, french fries, small wares, sodas, other paper products, CCTV camera, accounting software, sour cream, cheese, sauces, dips, jalapeño and baked potatoes from PC Trading. If PC Trading is unable to provide any of the Trade Secret Food Products we shall immediately designate an alternative supplier.

In the case of Operating Assets and items other than Trade Secret Food Products, suppliers could, at our option, be limited to us, our affiliates, and/or other specified exclusive sources, in which case you would have to buy such Operating Assets and other items only from us, our affiliates, and/or the other specified exclusive sources at the prices we or they decide to charge. We have the absolute right to limit the suppliers with whom you may deal. There are currently no suppliers in which any of our officers owns an interest.

You currently must buy all of your equipment and supplies from approved or from designated suppliers. There are no other goods, services, supplies, fixtures, equipment, inventory, computer hardware and software, real estate or comparable items for establishing or operating the Store that you currently must buy or lease from us (or an affiliate) or designated suppliers. Any purchases from us and our affiliates, whether required or voluntary, generally will be at prices exceeding our costs.

To maintain the quality of the goods and services that Potato Corner Stores sell and our system's reputation, we may condition your right to buy or lease goods and/or services (besides

those described above that you may obtain only from us, our affiliates, and/or other specified exclusive sources) on their meeting our minimum standards and specifications and/or being acquired from suppliers that we approve. We will issue and modify standards and specifications based on our, Cinco's, and our franchise owners' experience in operating Potato Corner Stores. Our standards and specifications may impose minimum requirements for production, performance, reputation, prices, quality, design, and appearance. Our standards and specifications for operating a Potato Corner Store will be communicated to you through our Operations Manual (the "Operation Manual"). We will notify you and, where appropriate, the suppliers, of any changes in our standards and specifications.

If we institute any type of restrictive sourcing program (which, as noted above, we already have done for and may do for other items) and you want to use any item or service that we have not yet evaluated or to buy or lease from a supplier that we have not yet approved or designated, you first must send us a written request for approval of the approved supplier or distributor plus sufficient information, specifications, and samples so that we can determine whether the item or service complies with System Standards or the supplier meets approved supplier criteria. We have the right to inspect the proposed supplier's or distributor's facilities, and to require product samples from the proposed supplier or distributor to be delivered at our option, either directly to us or to an independent, certified laboratory which we designate for testing. Either you or the proposed supplier or distributor must pay us a fee to make the evaluation. We reserve the right to periodically re-inspect the facilities and products of any approved supplier or distributor and to revoke our approval if the supplier or distributor does not continue to meet any of our criteria. We also reserve the right to charge manufacturers or suppliers a royalty for the right to manufacture products for use in Potato Corner Stores. We periodically will establish procedures for your requests and may limit the number of approved items, services, and/or suppliers as we think best.

Supplier approval might depend on product quality, delivery frequency and reliability, service standards, financial capability, customer relations, concentration of purchases with limited suppliers to obtain better prices and service, and/or a supplier's willingness to pay us, Cinco and/or our system for the right to do business with our system. We, Cinco, and any other affiliate have the right to receive payments or other material consideration from suppliers on account of their actual or prospective dealings with you and other franchise owners and to use all amounts that we and our affiliates receive without restriction (unless we and our affiliates agree otherwise with the supplier) for any purposes we and our affiliates deem appropriate. Supplier approval might be temporary until we evaluate the supplier in more detail. We have no obligation to approve any request for a new supplier, product, or service.

Insurance   Besides these purchases or leases, you must obtain and maintain, at your own expense, the insurance coverage that we periodically require and satisfy other insurance-related obligations. You currently must have comprehensive general liability insurance, comprehensive public liability coverage with a minimum of $3,000,000 per occurrence, personal injury coverage of $1,000,000 per occurrence, product liability coverage of at least $1,000,000, property damage insurance, worker's compensation insurance as required by law, and any other coverage required by law or your lease. Premiums depend on the insurance carrier's charges, terms of payment, and your history. All insurance policies must name us as an additional insured party.

Advertising Materials  Before you use them, you must send us for review samples of all advertising, promotional, and marketing materials that we have not prepared or previously approved.  If you do not receive written disapproval within 30 days after we receive the materials, they are deemed to be approved.  You may not use any advertising, promotional, or marketing materials that we have not approved or have disapproved.

Store Development  You are responsible for developing the Store.  We will give you mandatory and suggested specifications and layouts for a Potato Corner Store, including requirements for dimensions, design, image, interior layout, decor, Operating Assets, and color scheme.  These plans might not reflect the requirements of any federal, state, or local law, code, or regulation, including those arising under the Americans with Disabilities Act ("ADA") or similar rules governing public accommodations for persons with disabilities.  You must prepare a site survey and all required construction plans and specifications for the Store's site and make sure that they comply with the ADA and similar rules, other applicable ordinances, building codes, permit requirements, and lease requirements and restrictions.  You must send to us construction plans and specifications for review before you begin constructing the Store and all revised or "as built" plans and specifications during construction.  Our review is only to ensure your compliance with our design requirements.  We may require you to use an approved or designated architect and/or general contractor to design and construct the Store.  Because our review is limited to ensuring your compliance with our design requirements, it might not assess compliance with these laws is your responsibility.  We may inspect the Store during its development.

Store Site  The Store must be at a site that we approve.  We do not anticipate a situation where we would own the site and lease it to you for your operation of the Store.  We have the right to approve the Store's lease or sublease and to require that it include certain provisions (listed in Section 2.B. of the Franchise Agreement), including our right to the Store's site if the franchise is terminated or not renewed or if you lose possession because of your default under the lease.

Collectively, the purchases and leases you must make under our standards and specifications represent approximately 80% to 90% of your overall purchases and leases in establishing the Store and 95% of your overall purchases and leases in operating the Store.  Because we did not grant any franchises in 2010, we and our affiliates did not have any revenue or other material consideration during 2010 from selling items to franchisees nor have we received rebates from any suppliers as we will begin to offer franchises with this Disclosure Document.

There currently are no purchasing or distribution cooperatives.  We may negotiate purchase arrangements with suppliers (including price terms).  We do not provide material benefits to franchisees (for example, renewal or granting additional franchises) based on their purchase of particular products or services or use of particular suppliers.

## Item 9

### FRANCHISEE'S OBLIGATIONS

This table lists your principal obligations under the franchise and other agreements. It will help you find more detailed information about your obligations in these agreements and in other items of this Disclosure Document.

| | OBLIGATION | SECTION IN AGREEMENT | DISCLOSURE DOCUMENT ITEM |
|---|---|---|---|
| a. | Site selection and acquisition/lease | Sections 2.A and B of Franchise Agreement | Items 7, 8, 11, and 12 |
| b. | Pre-opening purchases/leases | Sections 2.C, D, and E and 8 of Franchise Agreement | Items 5, 7, 8, and 11 |
| c. | Site development and other pre-opening requirements | Sections 2.C, D, E, and F of Franchise Agreement | Items 7, 8, and 11 |
| d. | Initial and ongoing training | Sections 4.A and B of Franchise Agreement | Items 6, 7, and 11 |
| e. | Opening | Section 2.F of Franchise Agreement | Item 11 |
| f. | Fees | Sections 2.E, 3, 4.A, B, and C, 9, 11.B, 12.C(7), 12.E(2), 14.C, 16.D, and 17.C of Franchise Agreement | Items 5, 6, and 7 |
| g. | Compliance with standards and policies/operating manual | Sections 4.C and D and 8 of Franchise Agreement | Items 8 and 11 |
| h. | Trademarks and proprietary information | Sections 2.E, 5, and 6 of Franchise Agreement | Items 13 and 14 |
| i. | Restrictions on products/services offered | Sections 1.D and 8.C of Franchise Agreement | Items 8, 11, 12, and 16 |
| j. | Warranty and customer service requirements | Not Applicable | Not Applicable |
| k. | Territorial development and sales quotas | Not Applicable | Not Applicable |

| | OBLIGATION | SECTION IN AGREEMENT | DISCLOSURE DOCUMENT ITEM |
|---|---|---|---|
| l. | Ongoing product/service purchases | Sections 2.D and E and 8 of Franchise Agreement | Items 6 and 8 |
| m. | Maintenance, appearance, and remodeling requirements | Sections 8, 12.C(11) and 13.A(3) of Franchise Agreement | Items 8, 11, 16, and 17 |
| n. | Insurance | Section 8.F of Franchise Agreement | Items 7 and 8 |
| o. | Advertising | Section 9 of Franchise Agreement | Items 6, 7, 8, and 11 |
| p. | Indemnification | Section 16.D of Franchise Agreement | Item 6 |
| q. | Owner's participation/ management/staffing | Sections 1.C, 4.A, and 8.E of Franchise Agreement | Items 11 and 15 |
| r. | Records and reports | Section 10 of Franchise Agreement | Not Applicable |
| s. | Inspections and audits | Section 11 of Franchise Agreement | Items 6 and 11 |
| t. | Transfer | Section 12 of Franchise Agreement | Item 17 |
| u. | Renewal | Section 13 of Franchise Agreement | Item 17 |
| v. | Post-termination obligations | Section 15 of Franchise Agreement | Item 17 |
| w. | Non-competition covenants | Sections 7, 12.C(12), 12.G, and 15.D of Franchise Agreement | Items 15 and 17 |
| x. | Dispute resolution | Sections 17.E, F, G, and H of Franchise Agreement | Item 17 |

## Item 10

### FINANCING

We do not offer direct or indirect financing. We do not guarantee your note, lease, or obligation.

## Item 11

### FRANCHISOR'S ASSISTANCE, ADVERTISING, COMPUTER SYSTEMS, AND TRAINING

**Except as listed below, we are not required to provide you with any assistance.**

Before you open the Store, we will:

1.  Give you our site selection criteria for the Store. The site must meet our criteria for demographic characteristics; traffic patterns; parking; character of neighborhood; competition from, proximity to, and nature of other businesses; other commercial characteristics; size; appearance; and other physical and commercial characteristics. We will use reasonable efforts to help analyze your market area, to help determine site feasibility, and to assist in designating the location, although we will not conduct site selection activities for you. We will approve or disapprove a location you propose within 30 business days after receiving your description of, and evidence confirming your favorable prospects for obtaining, the proposed site. We do not anticipate a situation where we would own the Site and lease it to you for your operation of the Store. (Franchise Agreement – Section 2.A.)

2.  Approve your Store's lease. You must sign a lease for the premises of your Store within 180 days after the effective date of the Franchise Agreement (Franchise Agreement – Section 2.B.)

    If you do not locate and sign a lease or purchase document for an acceptable site for the premises of your Store within 180 days after you sign the Franchise Agreement, we will terminate the Franchise Agreement. (Franchise Agreement – Section 14.B.(2))

3.  Give you mandatory and suggested specifications and layouts for a Potato Corner Store, including requirements for dimensions, design, image, interior layout, decor, fixtures, equipment, signs, furnishings, and color scheme. (Franchise Agreement – Section 2.C.)

4.  As discussed in Item 8, identify the Operating Assets, Trade Secret Food Products, other food products, and supplies that you must use to develop and operate the Store, the minimum standards and specifications that you must satisfy, and the designated and approved suppliers from whom you must or may buy or lease these items (which may be limited to and/or include us, our affiliates, and/or other specified exclusive sources). (Franchise Agreement – Sections 2.D., 2.E., and 8)

5.  Provide you access to one copy of the Operations Manual, the current table of contents of which is Exhibit D. (Franchise Agreement – Section 4.D.)

6.  Advise you on the Store's grand opening advertising program. (Franchise Agreement – Section 9.A.)

7.  Train you (or your managing owner) and 3 other specified employees. (Franchise Agreement – Section 4.A.) We describe this training later in this Item.

15

During your operation of the Store, we will:

1.   Send one of our representatives to the Store to provide opening assistance for 5 days. (Franchise Agreement – Section 4.A.)

2.   Advise you regarding the Store's operation based on your reports or our inspections. We also will guide you on standards, specifications, and operating procedures and methods that Potato Corner Stores use; purchasing required and authorized Operating Assets, Trade Secret Food Products, and other items and arranging for their distribution to you; advertising and marketing materials and programs; employee training; and administrative, bookkeeping, accounting, and inventory control procedures. We will guide you in our Operations Manual, bulletins, or other written materials; by electronic media; by telephone consultation; and/or at our office or the Store.   (Franchise Agreement – Section 4.C.)

3.   Give you, at your request (and our option), additional or special guidance, assistance, and training.  (Franchise Agreement – Section 4.)  (See Item 6)

4.   Continue to provide you access to one copy of the Operations Manual, which could include audiotapes, videotapes, compact disks, computer software, other electronic media, and/or written materials.   The Operations Manual contains mandatory and suggested specifications, standards, operating procedures, and rules ("System Standards") that we periodically require.  We may modify the Operations Manual periodically to reflect changes in System Standards. (Franchise Agreement – Sections 4.D. and 8)

5.   Issue and modify System Standards for Potato Corner Stores.  We periodically may modify System Standards, which may accommodate regional or local variations, and these modifications may require you to invest additional capital in the Store and/or incur higher operating costs. (See Item 16) (Franchise Agreement – Section 8)

6.   Establish, to the fullest extent allowed by applicable law, maximum, minimum, or other pricing requirements with respect to the prices you may charge for products and services. (Franchise Agreement - Section 8.G.)

7.   Inspect the Store and observe its operation to help you comply with the Franchise Agreement and all System Standards. (Franchise Agreement – Section 11.A.)

8.   Let you use our confidential information.  (Franchise Agreement – Section 6)

9.   Let you use our Marks.  (Franchise Agreement – Section 5)

10.  Periodically offer refresher training courses.  (Franchise Agreement – Section 4.B.)  (See Item 6)

## **Advertising and Development Fund**

We have established a formal Advertising and Development Fund (the "Fund") for advertising, marketing, and public relations programs and materials we deem appropriate.  You

must contribute to the Fund the amounts that we periodically require. (See Item 6) Potato Corner Stores that we or our other affiliates own will contribute to the Fund on the same basis as franchise owners. We have the right to collect for deposit into the Fund any advertising, marketing, or similar allowances paid to us by suppliers who deal with Potato Corner Stores and with whom we have agreed that we will so deposit these allowances. (Because the Fund did not exist as of this Disclosure Document's issuance date, it has no operating history.)

We will direct all programs that the Fund finances, with sole control over the creative concepts, materials, and endorsements used and their geographic, market, and media placement and allocation. The Fund may pay for preparing and producing video, audio, and written materials and electronic media; developing, implementing, and maintaining the Franchise System Website and/or related strategies; administering regional and multi-regional marketing and advertising programs, including purchasing trade journal, direct mail, and other media advertising; using advertising, promotion, and marketing agencies and other advisors to provide assistance; and supporting public relations, market research, and other advertising, promotion, and marketing activities. The Fund periodically will give you samples of advertising, marketing, and promotional formats and materials at no cost. We will sell you multiple copies of these materials at our direct cost of producing them, plus any related shipping, handling, and storage charges.

We will account for the Fund separately from our other funds and not use the Fund for our general operating expenses. However, we may use the Fund to pay the reasonable salaries and benefits of personnel who manage and administer the Fund, the Fund's other administrative costs, travel expenses of personnel while they are on Fund business, meeting costs, overhead relating to Fund business, and other expenses that we incur in activities reasonably related to administering or directing the Fund and its programs, including conducting market research; public relations; preparing advertising, promotion, and marketing materials; and collecting and accounting for Fund contributions.

The Fund is not our asset. The Fund also is not a trust. We have a contractual obligation to hold all Fund contributions for the benefit of the contributors and to use contributions only for their permitted purposes (described above). We have no fiduciary obligation to you for administering the Fund. The Fund may spend in any fiscal year more or less than the total Fund contributions in that year, borrow from us or others (paying reasonable interest) to cover deficits, or invest any surplus for future use. We will use interest earned on Fund contributions to pay costs before spending the Fund's other assets. We will not use Fund contributions for advertising that principally is a solicitation for the sale of franchises. However, media, materials and programs, including the Franchise System Website, prepared using the Fund Contributions may describe our franchise program, reference the availability of franchises and related information and process franchise leads. We will prepare an annual, unaudited statement of Fund collections and expenses and give it to you upon written request. We may have the Fund audited annually, at the Fund's expense, by an independent certified public accountant. We may incorporate the Fund or operate it through a separate entity when we think best. The successor entity will have all of the rights and duties described here.

The Fund is to maximize recognition of the Marks and patronage of Potato Corner Stores. Although we will try to use the Fund to develop advertising and marketing materials and programs, and to place advertising and marketing, that will benefit all Potato Corner Stores, we

need not ensure that Fund expenditures in or affecting any geographic area are proportionate or equivalent to Fund contributions by Potato Corner Stores operating in that geographic area or that any Potato Corner Store benefits directly or in proportion to its Fund contribution from the development of advertising and marketing materials or the placement of advertising. We may use collection agents and institute legal proceedings to collect Fund contributions at the Fund's expense. We also may forgive, waive, settle, and compromise all claims by or against the Fund. We assume no other direct or indirect liability or obligation to you for collecting amounts due to, maintaining, directing, or administering the Fund.

We may at any time defer or reduce a franchise owner's Fund contributions and, upon 30 days' prior written notice to you, reduce or suspend Fund contributions and operations for one or more periods of any length and terminate (and, if terminated, reinstate) the Fund. If we terminate the Fund, we will distribute all unspent monies to franchise owners, and to us and our affiliates, in proportion to their, and our, respective contributions during the preceding 12 month period. (Franchise Agreement – Section 9.B.)

**Your Local Advertising**

In addition to your Fund contributions and your grand opening advertising obligation, you must spend at least 1% of the Store's Gross Sales to advertise and promote your Store. You must advertise in at least 1 recommended classified telephone directory within the Store's market area (we prescribe from time to time) and use an approved form of classified telephone directory advertisement. If other Potato Corner Stores are located within the directory's distribution area, you must participate in a collective telephone directory advertisement with those Stores and pay your share. (Franchise Agreement – Section 9.C.) (See Items 6, 8, and 9)

Within 30 days after the end of each month, you must send us, in the manner we prescribe, an accounting of your expenditures for local advertising and promotion during the preceding month. Your local advertising and promotion must follow our guidelines. All advertising and promotional materials developed for your Store must contain notices of our Website's domain name in the manner we designate. You may not develop, maintain, or authorize any Website that mentions or describes you or the Store or displays any of the Marks.

All advertising, promotion, and marketing must be completely clear, factual, and not misleading and conform to both the highest standards of ethical advertising and marketing and the advertising and marketing policies that we periodically require. Before you use them, you must send us or our designated agency for review samples of all advertising, promotional, and marketing materials that we have not prepared or previously approved. If you do not receive written disapproval within thirty days after we or our designated agency receives the materials, they are deemed to be approved. You may not use any advertising, promotional, or marketing materials that we have not approved or have disapproved.

**Cooperative Advertising Programs**

We may designate the ACA – local or regional – in which 2 or more Potato Corner Stores are located in order to seek to establish a cooperative advertising program ("Cooperative Program"). An ACA is the area covered by the particular advertising medium recognized in the

industry. We will require all franchise owners in the ACA to participate. Each Potato Corner Store operating in the ACA will have one vote, including those we or our affiliate operate.

If a Cooperative Program is established for your ACA, you will be required to join, participate in, and actively support the ACA in compliance with its governing document and to contribute up to 1% of your Store's Gross Sales to the Cooperative Program. Any amounts you contribute to a Cooperative Program will be credited toward the 1% of Gross Sales you are required to spend on local advertising.

If the Cooperative Program's members cannot agree on any aspect of the Area Cooperative's formation, administration, or operation, and the disagreement continue for 20 days after written notice to us that a disagreement exists, we have the authority to resolve the matter. Our decision will be final and binding on all members of the Cooperative Program. In any event, we may, whenever we deem best, control the formation, organization, operation, expenditures, and all other aspects of the Cooperative Program.

You agree to send us and the Cooperative Program any reports we require, including, but not limited to, information to confirm your compliance with your minimum contribution obligations. The Cooperative Program will operate only for the purpose of advertising, marketing, and promoting the Potato Corner Stores in the ACA. The Cooperative Program and its members may not use any advertising, marketing, CRM, research or promotional plans or materials without our prior written consent and all activities must comply with our guidelines.

We will make available for your review any records showing payments to and expenses of any Cooperative Program in which you participate.

We do not have a franchise owner advisory council that advises us on advertising policies.

**Franchise System Website**

We and our affiliates may establish one or more websites (1) to advertise, market, and promote Potato Corner Stores, Services and Products and/or the Potato Corner Store franchise opportunity, (2) to create, maintain, update, and administer on-line customer lists and information, (3) through which to operate on-line Product ordering and other fulfillment systems, (4) to process payments for Services and Products (from which we may immediately debit the Royalty and Fund contribution), and (6) for any other purposes we determine are appropriate or necessary for the Franchise System (each a "Franchise System Website"). If we establish a Franchise System Website, we may provide you with a separate webpage that references the Store and/or otherwise allow you to participate in the Franchise System Website. You must give us the information and materials we request to develop, update, and modify your webpage or otherwise necessary to enable you to participate in the Franchise System Website. By providing the information and materials to us, you represent that they are accurate and not misleading and do not infringe any third party's rights. We will own all intellectual property and other rights in the Franchise System Website, your webpage (if any), and all information they contain (including, without limitation, the log of "hits" by visitors and any personal or business data that customers supply).

We will maintain, and may use the Fund's assets to develop, maintain, operate, update, and market, the Franchise System Website, including your webpage (if any). We will update the information on your webpage, if any, or add information that we approve as frequently as we deem appropriate. You must notify us whenever any information on your webpage changes or is not accurate. We have final approval rights over all information on the Franchise System Website, including your webpage (if any). We may implement and periodically modify System Standards relating to the Franchise System Website.

We will maintain your webpage, if any, on the Franchise System Website and/or otherwise allow you to participate in the Franchise System Website, only while you are in substantial compliance with this Agreement and all System Standards (including, without limitation, those relating to the Franchise System Website). If you are in material default of any obligation, on system, then we may, in addition to our other remedies, temporarily suspend your participation in the Franchise System Website until you fully cure the default. We will permanently terminate your access to and participation in the Franchise System Website when the Franchise Agreement expires or is terminated.

All advertising, marketing, and promotional materials that you develop for the Store must contain notices of the Franchise System Website's domain name(s). You may not develop, maintain, link to, or authorize any other website that mentions or describes you or the Store or displays any of the Marks. (Franchise Agreement Section 9.E.)

## Computer System

You must obtain and use in your Store the computer hardware and/or operating software we specify from time to time (the "Computer System"). You may obtain the Computer System from any of our approved vendors. We estimate that your purchase of the Computer System will cost between $5,000 and $7,500 with a monthly maintenance fee of around $300. The types of data to be generated or stored in the Computer System include sales, labor, product mix, and employee statistics. You will be solely responsible for the acquisition, operation, maintenance, and upgrading of the Computer System. We currently do not require that you purchase a maintenance contract to service the Computer System, but we reserve the right to do so in the future. The third parties whose Computer System-related products you purchase or lease have no contractual rights or obligations to provide ongoing maintenance, repairs, upgrades or updates unless you obtain a service contract or a warranty covers the product. You must also have a functioning email address so that we can send you notices and otherwise communicate with you by this method.

We reserve the right to change the Computer System at any time upon 60 days' notice. There are no contractual limitations on the frequency and cost of this obligation. We need not reimburse you for any of these costs. We have independent, unlimited access to the information generated by the Computer System. We or our affiliates may condition any license of proprietary software to you, or your use of technology that we or our affiliates develop or maintain, on your signing the software license agreement or similar document that we or our affiliates prescribe to regulate your use of, and our and your respective rights and responsibilities concerning, the software or technology. We or our affiliates may charge you a monthly or other fee for any proprietary software or technology that we or our affiliates license to you and for other maintenance and support services that we or our affiliates provide during the franchise

term. The Computer System will permit 24 hours per day, 7 days per week electronic communications between you and us, including access to the Internet and our current Franchise System Website, intranet or extranet.

## Opening

We estimate that it will be 270 days after you sign the Franchise Agreement before you open the Store. You must sign a lease for an acceptable site within 180 days after the Franchise Agreement's effective date, and we may terminate the Franchise Agreement if you fail to sign a lease within the 180-day period. The specific timetable for opening depends on the site's condition; the Store's construction schedule; the extent to which you must upgrade or remodel an existing location; the delivery schedule for equipment and supplies; completing training; and complying with local laws and regulations. You may not open the Store until: (1) we notify you in writing that the Store meets our standards and specifications; (2) you complete initial training to our satisfaction; (3) you pay the initial franchise fee and other amounts then due to us; (4) you obtain required licenses and permits and send us copies of the licenses and permits we request; and (5) you give us certificates for all required insurance policies. Subject to these conditions, you must open the Store within 270 days after the Franchise Agreement's effective date. (Franchise Agreement – Section 2.F.)

## Training

If this is your first Potato Corner Store, then before the Store opens, we will train you (or your managing owner) and 3 other designated employees on operating a Potato Corner Store. We will provide approximately 1 week of training (although the specific number of days depends on our opinion of your experience and needs). We will use the Operations Manual and various Train-the-Trainer instructional materials as we conduct the initial training program. If you (or your managing owner) cannot complete initial training to our satisfaction (and he or she, or a replacement, cannot satisfactorily complete a repeat training program), we may terminate the Franchise Agreement and may refund you a portion of the initial franchise fee. (See Item 5.) (Franchise Agreement – Section 4.A.)

Additional people beyond the first 4 may attend initial training if you pay our then current training charge for each additional person. (See Item 6) You also must pay for all travel and living expenses that you and your employees incur and for your employees' wages and workers' compensation insurance while they train at operating Potato Corner Stores.

Training will occur after you sign the Franchise Agreement and while you are developing the Store. Your attendees must complete initial training to our satisfaction before you may open your Store. We plan to be flexible in scheduling training to accommodate our personnel, you, and your personnel. As of the date of this disclosure document, we provide the following initial training:

## TRAINING PROGRAM

| Column 1 | Column 2 | Column 3 | Column 4 |
| Subject | Hours of Classroom Training | Hours of On the Job Training | Location |
| --- | --- | --- | --- |
| Customer Service | 10 | 24 | Franchisor's Training Center |
| Opening Procedures | 5 | 10 | Franchisor's Training Center |
| Closing Procedures | 5 | 10 | Franchisor's Training Center |
| Cleaning and Sanitation | 8 | 15 | Franchisor's Training Center |
| Product Preparation | 10 | 24 | Franchisor's Training Center |
| Record Keeping and Accounting | 12 | 24 | Franchisor's Training Center |

The initial training program will be conducted at our training center in Los Angeles or another location we designate and/or at an operating Potato Corner Store.

Mr. Guy Koren will be in charge of training with Mr. Jose Magsaysay as the Chief Brand Trainer. Mr. Koren has been the Operations Director of the Potato Corner Store located in Santa Anita Mall, Arcadia, California since its opening in February 2010 and Mr. Magsaysay has been the Chief Executive Officer of Cinco since 2001.

After the Store is open, we will, at our cost, send one of our representatives to the Store for up to 5 days to assist with the opening. However you must pay an additional fee if the Store is more than 100 miles from our headquarters. You also must complete this phase of training to our satisfaction.

You (or your managing owner), and/or other previously trained and experienced employees must attend and complete to our satisfaction various training courses that we periodically provide at the times and locations we designate. Besides attending these courses, you must attend an annual meeting of all franchise owners at a location we designate. (See Item 6) You are responsible for all related travel and living expenses and wages incurred in connection with attending these courses and meetings.

We may require Store managers to complete initial and ongoing training programs to our satisfaction. We may charge you a fee for training managers. (See Item 6) You are responsible for all related travel and living expenses and wages incurred in connection with attending these training programs.

## Item 12

### TERRITORY

You will not receive an exclusive territory. You may face competition from other franchisees, outlets we own or other channels of distribution. We also do not have any type of non-exclusive territory. You may operate the Store only at the approved premises and may not relocate the premises without our approval.

We and our affiliates retain all rights with respect to Potato Corner Stores, the Marks, the sale of similar or dissimilar products and services, and any other activities we deem appropriate whenever and wherever we desire, including, but not limited to:

(1)     the right to establish and operate, and to grant to others the right to establish and operate similar businesses or any other businesses offering similar or dissimilar products and services through similar or dissimilar channels of distribution at any locations under trademarks or service marks other than the Marks and on any terms and conditions we deem appropriate;

(2)     the right to provide, offer and sell and to grant others the right to provide, offer and sell goods and services that are identical or similar to and/or competitive with those provided at Potato Corner Stores, whether identified by the Marks or other trademarks or service marks, through dissimilar distribution channels (including grocery stores and the internet or similar electronic media) and on any terms and conditions we deem appropriate;

(3)     the right to establish and operate, and to grant to others the right to establish and operate, businesses offering dissimilar products and services under the Marks and on any terms and conditions we deem appropriate;

(4)     the right to operate, and to grant others the right to operate Potato Corner Stores located anywhere under any terms and conditions we deem appropriate and regardless of proximity to the Store;

(5)     the right to operate and grant others the right to operate Potato Corner Stores at "Non Traditional Sites" on any terms and conditions we deem appropriate. "Non Traditional Sites" are sites that generate customer traffic flow which is independent from the general customer traffic flow of the surrounding area, including military bases, shopping malls, airports, festivals and fairs, stadiums, major industrial or office complexes, hotels, school campuses, train stations, travel plazas, toll roads, casinos, hospitals, events, parties and sports or entertainment venues;

(6)     the right to acquire the assets or ownership interests of one or more businesses providing products and services similar to those provided at Potato Corner Stores, and franchising, licensing or creating similar arrangements with respect to these businesses once acquired, wherever these businesses (or the franchisees or licensees of these businesses) are located or operating;

(7)     the right to be acquired (whether through acquisition of assets, ownership interests or otherwise, regardless of the form of transaction), by a business providing products and services similar to those provided at Potato Corner Stores, or by another business, even if such business operates, franchises and/or licenses competitive businesses; and

(8)     the right to engage in all other activities that this Agreement does not expressly prohibit.

You may not use other channels of distribution, such as the Internet, catalog sales, telemarketing, or other direct marketing to make sales.

You have no options, rights of first refusal, or similar rights to acquire additional franchises.

Although we have the right to do so (as described above), neither we nor our affiliate currently operates, franchises, or has present plans to operate or franchise a business under a different trademark that sells or will sell goods or services similar to those you will sell in your Store.

Continuation of your franchise does not depend on your achieving a certain sales volume, market penetration, or other contingency.

## Item 13

## TRADEMARKS

You may use certain Marks in operating the Store. Cinco registered the principal mark and design "Potato Corner" on the Principal Register of the United States Patent and Trademark Office (the "PTO") on March 16, 2010 (Registration No. 3,760,041). No affidavits or renewal filings are yet due in connection with this registration.

Under a License Agreement with Cinco dated October 1, 2010, Cinco has licensed us to use the Marks and to sublicense them to our franchise owners to use in operating Potato Corner Stores. The license agreement is for 20 years with 3 successive automatic 10 year renewal terms. Cinco can terminate the Trademark License Agreement if we breach the Agreement and fail to cure within 30 days of written notice. We can terminate the Trademark License Agreement anytime upon 60 days' notice. Cinco has the right to approve all proposed uses of the Marks. No other agreement limits our right to use or license the Marks.

You must follow our rules when you use the Marks, including giving proper notices of trademark and service mark registration and obtaining fictitious or assumed name registrations required by law. You may not use any Mark in your corporate or legal business name; with any prefix, suffix or other modifying words, terms, designs, or symbols (except for those we license to you); in selling any unauthorized services or products; as part of any domain name, homepage, electronic address, or otherwise in connection with a website; or in any manner that we have not expressly authorized in writing. If we discover your unauthorized use of the Marks we may require you to destroy all offending items reflecting the unauthorized use (with no reimbursement from us) or otherwise in connection with electronic media.

There are no currently effective material determinations of the USPTO, the Trademark Trial and Appeal Board, the trademark administrator of any state, or any court, and no pending infringement, opposition, or cancellation proceedings or material litigation, involving the principal Marks. We do not actually know of either superior prior rights or infringing uses that could materially affect your use of the Marks in any state.

You must notify us immediately of any apparent infringement or challenge to your use of any Mark, or of any person's claim of any rights in any Mark, and you may not communicate with any person other than us, our attorneys, and your attorneys, regarding any infringement, challenge, or claim. We and Cinco may take the action we deem appropriate (including no action) and control exclusively any litigation, USPTO proceeding, or other administrative proceeding arising from any infringement, challenge, or claim. You must assist us and Cinco in protecting and maintaining our interests in any litigation or USPTO or other proceeding. We will reimburse you for your costs of taking any action that we asked you to take.

If it becomes advisable at any time for us and/or you to modify or discontinue using any Mark and/or to use one or more additional or substitute trade or service marks, you must comply with our directions within a reasonable time after receiving notice. We need not reimburse you for your direct expenses of changing the Store's signs, for any loss of revenue due to any modified or discontinued Mark, or for your expenses of promoting a modified or substitute trademark or service mark.

We will reimburse you for all damages and expenses that you incur in any trademark infringement proceeding disputing your authorized use of any Mark under the Franchise Agreement if you have timely notified us of, and comply with our directions in responding to, the proceeding. At our option, we may defend and control the defense of any proceeding arising from your use of any Mark.

## Item 14

### PATENTS, COPYRIGHTS, AND PROPRIETARY INFORMATION

No patents or pending patent applications are material to the franchise. We and Cinco claim copyrights in the Operations Manual (which contains our trade secrets), advertising and marketing materials, menus, and similar items used in operating Potato Corner Stores. We and Cinco have not registered these copyrights with the United States Registrar of Copyrights, but need not do so at this time to protect them. You may use these items only as we specify while operating your Store (and must stop using them if we so direct you).

There currently are no effective adverse determinations of the USPTO, the United States Copyright Office, or any court regarding the copyrighted materials. No agreement limits our right to use or allow others to use the copyrighted materials. We do not actually know of any infringing uses of our copyrights that could materially affect your use of the copyrighted materials in any state.

We need not protect or defend copyrights, although we intend to do so if in the system's best interests. We may control any action we choose to bring, even if you voluntarily bring the

matter to our attention. We need not participate in your defense and/or indemnify you for damages or expenses in a proceeding involving a copyright.

Our Operations Manual and other materials contain our confidential information (some of which constitutes trade secrets under applicable law). This information includes site selection criteria; recipes for Trade Secret Food Products; training and operations materials; methods, formats, specifications, standards, systems, procedures, food preparation techniques, sales and marketing techniques, knowledge, and experience used in developing and operating Potato Corner Stores; marketing and advertising programs for Potato Corner Stores; knowledge of specifications for and suppliers of Operating Assets, Trade Secret Food Products, and other products and supplies; any computer software or similar technology that is proprietary to us or the system; knowledge of the operating results and financial performance of Potato Corner Stores other than your Store; graphic designs and related intellectual property; and customer information which we are deemed to own.

All ideas, concepts, techniques, or materials concerning a Potato Corner Store, whether or not protectable intellectual property and whether created by or for you or your owners or employees, must be promptly disclosed to us and will be deemed to be our sole and exclusive property, part of the system, and works made-for-hire for us. To the extent any item does not qualify as a "work made-for-hire" for us, you assign ownership of that item, and all related rights to that item, to us and must take whatever action (including signing assignment or other documents) we request to show our ownership or to help us obtain intellectual property rights in the item.

You may not use our confidential information in an unauthorized manner. You must take reasonable steps to prevent its improper disclosure to others and use non-disclosure and non-competition agreements with those having access. We may regulate the form of agreement that you use and will be a third party beneficiary of that agreement with independent enforcement rights.

## Item 15

## OBLIGATION TO PARTICIPATE IN THE ACTUAL OPERATION OF THE FRANCHISE BUSINESS

You (or, if you are an entity, your managing owner) must act as the general manager of the Store with responsibility for direct, on-premises supervision of the Store. You (or your managing owner) must devote full time and efforts to the management and supervision of the Store. You must at all times faithfully, honestly, and diligently perform your contractual obligations and use best efforts to promote and enhance the Store. System Standards may regulate the Store's staffing levels, identifying the Store's personnel, and employee qualifications, training, dress, and appearance. If you are a legal entity, you must appoint a shareholder, member, or partner (as applicable) to be your "Managing Owner," responsible for overseeing and supervising the Store's operation.

You must keep us informed at all times of the identity of any supervisory employees acting as assistant managers of the Store. Your assistant managers need not have an equity interest in the Store or you but must agree in writing to preserve confidential information to

which they have access and not to compete with you, us, and other franchise owners. We may regulate the form of agreement that you use and be a third party beneficiary of that agreement with independent enforcement rights.

If you are a corporation, limited liability company, or partnership, your owners must personally guarantee your obligations under the Franchise Agreement and agree to be bound personally by every contractual provision, whether containing monetary or non-monetary obligations, including the covenant not to compete. This "Guaranty and Assumption of Obligations" is the last page of the Franchise Agreement.

## Item 16

## RESTRICTIONS ON WHAT THE FRANCHISEE MAY SELL

You must offer and sell all Menu Items and perform all services that we periodically require for Potato Corner Stores. You may not offer or sell any products or perform any services that we have not authorized. (See Item 8) Our System Standards may regulate required and/or authorized Menu Items and Trade Secret Food Products; unauthorized and prohibited food products, beverages, and services; purchase, storage, preparation, handling, and packaging procedures and techniques for Menu Items and Trade Secret Food Products; and inventory requirements for Trade Secret Food Products and other products and supplies so that your Store operates at full capacity. We periodically may change required and/or authorized Menu Items and Trade Secret Food Products. There are no limits on our right to do so. (See Item 8)

## Item 17

## RENEWAL, TERMINATION, TRANSFER, AND DISPUTE RESOLUTION

## THE FRANCHISE RELATIONSHIP

**This table lists certain important provisions of the franchise and related agreements. You should read these provisions in the agreements attached to this Disclosure Document.**

|   | PROVISION | SECTION IN FRANCHISE OR OTHER AGREEMENT | SUMMARY |
|---|-----------|------------------------------------------|---------|
| a. | Length of the franchise term | Section 1.D. | 10 years from the effective date of the Franchise Agreement |
| b. | Renewal or extension of the term | Section 13 | If you are in full compliance, you may acquire 1 successor franchise terms of 10 years. Each renewal will be on our then current form of Franchise Agreement (which may be materially different) |

| | PROVISION | SECTION IN FRANCHISE OR OTHER AGREEMENT | SUMMARY |
|---|---|---|---|
| c. | Requirements for franchisee to renew or extend | Section 13 | To "renew," you must give us timely notice; maintain possession of Store premises or find acceptable substitute premises; remodel Store according to our then current standards (regardless of cost); pay a renewal fee and sign our then current franchise agreement, a release (if law allows), and other documents we use to grant franchises.<br><br>The terms of our then current franchise agreement that you sign for renewal of the franchise may differ materially from any and all of those contained in the franchise agreement attached to this Disclosure Document including increased fees. |
| d. | Termination by franchisee | Section 14.A. | If we breach Franchise Agreement and an arbitrator determines that we did not cure default after notice from you |
| e. | Termination by franchisor without cause | Not Applicable | Not Applicable |
| f. | Termination by franchisor with cause | Section 14.B. | We may terminate your franchise only if you or your owners commit one of several violations |

| | PROVISION | SECTION IN FRANCHISE OR OTHER AGREEMENT | SUMMARY |
|---|---|---|---|
| g. | "Cause" defined-curable defaults | Section 14.B. | You have 72 hours to cure health, safety, or sanitation law violations; 10 days to cure monetary defaults and failure to maintain required insurance; 30 days to correct deficiency regarding the appearance and condition of the premises or Operating Assets, pay vendors to the franchise system, vacate an attachment, seizure, writ or warrant levied against the Store, cure operational defaults and other defaults not listed in (h) below; and 90 days to relocate to a new site if you lose possession of the premises |
| h. | "Cause" defined- non-curable defaults | Section 14.B. | Non-curable defaults include: misrepresentation in acquiring the franchise; failure to secure Store's site within 180 days after Franchise Agreement's effective date; failure to open Store within 270 days after Franchise Agreement's effective date; failure to complete training; abandonment; unapproved transfers; conviction of a felony; dishonest or unethical conduct; unauthorized use or disclosure of the Operations Manual or other confidential information; failure to pay taxes; understating Gross Sales; repeated defaults (even if cured); an assignment for the benefit of creditors; appointment of a trustee or receiver; and violation of any anti-terrorism law. |

| | PROVISION | SECTION IN FRANCHISE OR OTHER AGREEMENT | SUMMARY |
|---|---|---|---|
| i. | Franchisee's obligations on termination/nonrenewal | Section 15 | Obligations include paying outstanding amounts; complete deidentification; cancelling fictitious or assumed names; assigning telephone and other numbers; and returning confidential information (also see (o) and (r) below) |
| j. | Assignment of contract by franchisor | Section 12.A. | No restriction on our right to assign; we may assign without your approval |
| k. | "Transfer" by franchisee – defined | Section 12.B. | Includes transfer of Franchise Agreement, the Store (or its profits, losses or capital appreciation) sale of Store's assets, and ownership change in you or your owners |
| l. | Franchisor approval of transfer by franchisee | Section 12.C. | No transfer without our prior written consent. |

| PROVISION | SECTION IN FRANCHISE OR OTHER AGREEMENT | SUMMARY |
|---|---|---|
| m. Conditions for franchisor approval of transfer | Section 12.C. | New franchise owner qualifies; you pay us, our affiliates, and third party vendors all amounts due and submit all required reports; no default during 60-day period before transfer request or during period between request and transfer's proposed effective date; new franchise owner (and its owners and affiliates) are not in a competitive business; training completed; lease transferred; you or transferee signs our then current franchise agreement and other documents; transfer fee paid; you sign release (if law allows); we approve material terms; you subordinate amounts due to you; you deidentify; you correct existing Store deficiencies of which we notify you on punchlist; and transferee agrees to upgrade and remodel Store within specified timeframe after transfer (also see (r) below) |
| n. Franchisor's right of first refusal to acquire franchisee's business | Section 12.G. | We may match any offer for your Store or an ownership interest in you |
| o. Franchisor's option to purchase franchisee's business | Section 15.E. | We may buy the equipment at the Store at the then current book value after the Franchise Agreement is terminated or expires (without renewal) |
| p. Death or disability of franchisee | Section 12.E. | Assignment of franchise or an ownership interest in you to approved party within 9 months; we may manage Store if there is no qualified manager |

| | PROVISION | SECTION IN FRANCHISE OR OTHER AGREEMENT | SUMMARY |
|---|---|---|---|
| q. | Non-competition covenants during the term of the franchise | Section 7 | No diverting business; no ownership interest in, or performing services for, competitive business anywhere ("competitive business" means any business that derives more than 5% of its revenue from selling french fries, baked potatoes, hash browns, pretzels or other snack-like items or any business granting franchises or licenses to others to operate such a business); no interference with our or franchise owner's employees |
| r. | Non-competition covenants after the franchise is terminated or expires | Section 15.D. | No direct or indirect ownership interest in, or performing services for, competing business for 2 years at Store's premises, within 25 miles of premises or within 25 miles of any other Potato Corner Store existing or under construction as of date Franchise Agreement expires or is terminated (same restrictions apply after transfer) |
| s. | Modification of the agreement | Section 17.I. | No modifications generally, but we may change Operations Manual and System Standards |
| t. | Integration/merger clause | Section 17.K. | Only the terms of the Franchise Agreement are binding (subject to state law). However, nothing in the Franchise Agreement or any related agreement is intended to disclaim our representations made in this Disclosure Document |
| u. | Dispute resolution by arbitration or mediation | Section 17.E. | We and you must arbitrate all disputes in Los Angeles, California |
| v. | Choice of forum | Section 17.G. | Subject to arbitration requirement, litigation generally must be in courts in Los Angeles, California |

| PROVISION | SECTION IN FRANCHISE OR OTHER AGREEMENT | SUMMARY |
|---|---|---|
| w.    Choice of law | Section 17.F. | Except for Federal Arbitration Act and other federal law, the law of the state where the store is located governs (subject to state law) |

## Item 18

### PUBLIC FIGURES

We do not use any public figure to promote our franchise.

## Item 19

### FINANCIAL PERFORMANCE REPRESENTATIONS

The FTC Rule permits a franchisor to provide information about the actual or potential financial performance of its franchised and or franchisor – owned outlets if there is a reasonable basis for the information, and if the information is included in the disclosure document. Financial performance information that differs from that included in Item 19 may be given only if: (1) a franchisor provides the actual records of an existing outlet you are considering buying; or (2) a franchisor supplements the information provided in this Item 19, for example by providing information about possible performance at a particular location or under particular circumstances.

We do not make any financial performance representations about a franchisee's future financial performance or the past financial performance of company-owned or franchised outlets. We also do not authorize our employees or representatives to make any such representations either orally or in writing. If you are purchasing an existing outlet, however, we may provide you with the actual records of that outlet. If you receive any other financial performance information or projections of your future income, you should report it to the franchisor's management by contacting PCJV USA, LLC, 1729 Santee Street, Los Angeles, California 90015, (800) 565-1114, the Federal Trade Commission, and the appropriate state regulatory agencies.

## Item 20

### OUTLETS AND FRANCHISEE INFORMATION

Table No. 1

Systemwide Outlet Summary
For years 2008 to 2010

| Column 1<br><br>Outlet Type | Column 2<br><br>Year | Column 3<br><br>Outlets at the Start of the Year | Column 4<br><br>Outlets at the End of the Year | Column 5<br><br>Net Change |
|---|---|---|---|---|
| Franchised | 2008 | 0 | 0 | 0 |
| | 2009 | 0 | 0 | 0 |
| | 2010 | 0 | 0 | 0 |
| Company-Owned | 2008 | 0 | 0 | 0 |
| | 2009 | 0 | 0 | 0 |
| | 2010 | 0 | 0 | 0 |
| **Total Outlets** | **2008** | **0** | **0** | **0** |
| | **2009** | **0** | **0** | **0** |
| | **2010** | **0** | **0** | **0** |

Table No. 2

Transfers of Outlets from Franchisees to New Owners
For years 2008 to 2010

| Column 1<br><br>State | Column 2<br><br>Year | Column 3<br><br>Number of Transfers |
|---|---|---|
| We had no franchises during the last 3 fiscal years | 2008 | 0 |
| | 2009 | 0 |
| | 2010 | 0 |
| **Totals** | **2008** | **0** |
| | **2009** | **0** |
| | **2010** | **0** |

34

Table No. 3

Status of Franchised Outlets
For years 2008 to 2010

| Col. 1<br><br>State | Col. 2<br><br>Year | Col. 3<br><br>Outlets at Start of Year | Col. 4<br><br>Outlets Opened | Col. 5<br><br>Terminations | Col. 6<br><br>Non-Renewals | Col. 7<br><br>Reacquired by Franchisor | Col. 8<br><br>Ceased Operations Other Reasons | Col. 9<br><br>Outlets at End of the Year |
|---|---|---|---|---|---|---|---|---|
| We had no franchises during the last 3 fiscal years | 2008 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2009 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2010 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Taxes | 2008 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2009 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2010 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTALS | 2009 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2009 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2010 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

Table No. 4

Status of Company-Owned Outlets
For years 2008 to 2010

| Col. 1<br><br>State | Col. 2<br><br>Year | Col. 3<br><br>Outlets at Start of Year | Col. 4<br><br>Outlets Opened | Col. 5<br><br>Outlets Reacquired From Franchisee | Col. 6<br><br>Outlets Closed | Col. 7<br><br>Outlets Sold to Franchisee | Col. 8<br><br>Outlets at End of the Year |
|---|---|---|---|---|---|---|---|
| | 2008 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2009 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2010 | 0 | 0 | 0 | 0 | 0 | 0 |
| Totals | 2008 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2009 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2010 | 0 | 0 | 0 | 0 | 0 | 0 |

Table No. 5

Projected Openings of Franchised Outlets For 2011

| Column 1 | Column 2 | Column 3 | Column 4 |
|---|---|---|---|
| **State** | **Franchise Agreements Signed But Outlets Not Opened** | **Projected New Franchised Outlets Iu The Next Fiscal Year** | **Projected New Company-Owned Outlets In the Next Fiscal Year** |
| California | 0 | 3 | 0 |
| All States | 0 | 0 | 0 |
| **Totals** | **0** | **3** | **0** |

The figures in the charts above are as of December 31, 2008, December 31, 2009, and December 31, 2010.

We currently have no franchises. Therefore, there were no franchisees who had outlets terminated, cancelled, or not renewed or otherwise voluntarily or involuntarily ceased to do business under our Franchise Agreement during our last fiscal year, or who have not communicated with us within 10 weeks of this Disclosure Document's issuance date.

If you buy this franchise, your contact information may be disclosed to other buyers when you leave our franchise system.

During our last 3 fiscal years, none of our current or former franchisees have signed provisions restricting their ability to speak openly about their experience with our franchise system.

There are currently no trademark-specific franchisee organizations associated with the System.

## Item 21

### FINANCIAL STATEMENTS

Attached to this Disclosure Document as Exhibit C are our audited financial statements as of December 31, 2010.

## Item 22

### CONTRACTS

The following agreements are exhibits:

(a)     Franchise Agreement — Exhibit B

(b)     State Riders to Franchise Agreement — Exhibit E

## Item 23

## RECEIPTS

Our and your copies of the Franchise Disclosure Document Receipt are located at the last
2 pages of this Disclosure Document.

## EXHIBIT A

### LIST OF STATE ADMINISTRATORS/AGENTS FOR SERVICE OF PROCESS

Listed here are the names, addresses and telephone numbers of the state agencies having responsibility for franchising disclosure/registration laws. We may not yet be registered to sell franchises in any or all of these states.

If a state is not listed, we have not appointed an agent for service of process in that state in connection with the requirements of the franchise laws. There may be states in addition to those listed below in which we have appointed an agent for service of process.

There also may be additional agents appointed in some of the states listed.

### CALIFORNIA

Department of Corporations:
Toll Free: 1 (866) 275-2677

#### *Los Angeles*

Suite 750
320 West 4th Street
Los Angeles, California 90013-2344
(213) 576-7500

#### *Sacramento*

1515 K Street, Suite 200
Sacramento, California 95814-4052
(916) 445-7205

#### *San Diego*

1350 Front Street
San Diego, California 92101-3697
(619) 525-4233

#### *San Francisco*

71 Stevenson Street, Suite 2100
San Francisco, California 94105
(415) 972-8559

### HAWAII

(state administrator)

Business Registration Division
Department of Commerce and Consumer Affairs
P.O. Box 40
Honolulu, Hawaii 96810
(808) 586-2722

(agent for service of process)

Commissioner of Securities
335 Merchant Street, Room 203
Honolulu, Hawaii 96813
(808) 586-2722

### ILLINOIS

Franchise Bureau
Office of the Attorney General
500 South Second Street
Springfield, Illinois 62706
(217) 782-4465

A-1

**INDIANA**

(state administrator)

Indiana Secretary of State
Securities Division, E-111
302 West Washington Street
Indianapolis, Indiana 46204
(317) 232-6681

(agent for service of process)

Indiana Secretary of State
201 State House
200 West Washington Street
Indianapolis, Indiana 46204
(317) 232-6531

**MARYLAND**

(state administrator)

Office of the Attorney General
Securities Division
200 St. Paul Place
Baltimore, Maryland 21202-2021
(410) 576-6360

(agent for service of process)

Maryland Securities Commissioner
200 St. Paul Place
Baltimore, Maryland 21202-2020
(410) 576-6360

**MICHIGAN**

(state administrator)

Consumer Protection Division
Antitrust and Franchise Unit
Michigan Department of Attorney General
670 G. Mennen Williams Building
525 West Ottawa
Lansing, Michigan 48933
(517) 373-7177

(agent for service of process)

Michigan Department of Commerce,
Corporations and Securities Bureau
P.O. Box 30054
6546 Mercantile Way
Lansing, Michigan 48909

**MINNESOTA**

Minnesota Department of Commerce
85 7th Place East, Suite 500
St. Paul, Minnesota 55101
(651) 296-6328

**NEW YORK**

(state administrator)

New York State Department of Law
Investment Protection Bureau
120 Broadway
New York, New York 10271
(212) 416-8000

(agent for service of process)

Secretary of State of New York
41 State Street
Albany, New York 12231
(518) 474-4750

A-2

**NORTH DAKOTA**

North Dakota Securities Department
600 East Boulevard, Fifth Floor
Bismarck, North Dakota 58505
(701) 328-4712

**OREGON**

Department of Business and Consumer
Services
Division of Finance and Securities
Labor and Industries Building
Salem, Oregon 97310
(503) 378-4387

**RHODE ISLAND**

Securities Division
Department of Business Regulations
1511 Pontiac Avenue
John O. Pastore Complex-Building 69-1
Cranston, RI 02920
(401) 222-3048

**SOUTH DAKOTA**

South Dakota Department of Revenue and
Regulation
Division of Securities
445 E. Capitol
Pierre, South Dakota 57501
(605) 773-4823

**VIRGINIA**

(state administrator)

State Corporation Commission
Division of Securities
 and Retail Franchising
1300 East Main Street, Ninth Floor
Richmond, Virginia 23219
(804) 371-9051

(agent for service of process)

Clerk of State Corporation Commission
1300 East Main Street
Richmond, Virginia 23219
(804) 371-9733

**WASHINGTON**

(state administrator)

Department of Financial Institutions
Securities Division
P.O. Box 9033
Olympia, Washington 98507-9033
(360) 902-8760

(agent for service of process)
Director
Department of Financial Institutions
Securities Division
150 Israel Road SW
Tumwater, Washington 98501

**WISCONSIN**

Wisconsin Department of Financial
Institutions
Division of Securities
345 West Washington Avenue, 4th Floor
Madison, Wisconsin 53703
(608) 266-1064

## **EXHIBIT B**

## **FRANCHISE AGREEMENT**

**PCJV USA, LLC**

**FRANCHISE AGREEMENT**

_____

**FRANCHISE OWNER**

_____

**DATE OF AGREEMENT**

_____

**STORE ADDRESS**

_____

_____

# TABLE OF CONTENTS

Page

1.  PREAMBLES, ACKNOWLEDGMENTS, AND GRANT OF FRANCHISE.................1

    A.  PREAMBLES.........................................................................................................1
    B.  ACKNOWLEDGMENTS.....................................................................................2
    C.  CORPORATION, LIMITED LIABILITY COMPANY, OR
        PARTNERSHIP.....................................................................................................3
    D.  GRANT OF FRANCHISE ...................................................................................4
    E.  FRANCHISOR'S RESERVATION OF RIGHTS.................................................4
    F.  MODIFICATION OF FRANCHISE SYSTEM.....................................................5

2.  SITE SELECTION, LEASE OF PREMISES, AND DEVELOPMENT AND
    OPENING OF STORE.....................................................................................................5

    A.  SITE SELECTION.................................................................................................5
    B.  LEASE OF PREMISES..........................................................................................6
    C.  STORE DEVELOPMENT.....................................................................................7
    D.  OPERATING ASSETS ..........................................................................................8
    E.  COMPUTER SYSTEM..........................................................................................8
    F.  STORE OPENING...................................................................................................9

3.  FEES..................................................................................................................................9

    A.  INITIAL FRANCHISE FEE...................................................................................9
    B.  CONTINUING SERVICE AND ROYALTY FEE................................................9
    C.  DEFINITION OF "GROSS SALES"...................................................................10
    D.  LATE FEES AND INTEREST ............................................................................10
    E.  APPLICATION OF PAYMENTS.........................................................................10
    F.  METHOD OF PAYMENT.....................................................................................10

4.  TRAINING AND ASSISTANCE..................................................................................11

    A.  INITIAL TRAINING............................................................................................11
    B.  ONGOING TRAINING.........................................................................................11
    C.  GENERAL GUIDANCE.......................................................................................12
    D.  OPERATIONS MANUAL.....................................................................................12
    E.  DELEGATION OF PERFORMANCE.................................................................13

5.  MARKS............................................................................................................................13

    A.  OWNERSHIP AND GOODWILL OF MARKS.................................................13
    B.  LIMITATIONS ON YOUR USE OF MARKS....................................................13
    C.  NOTIFICATION OF INFRINGEMENTS AND CLAIMS..................................14
    D.  DISCONTINUANCE OF USE OF MARKS........................................................14
    E.  INDEMNIFICATION FOR USE OF MARKS.....................................................14

6.   CONFIDENTIAL INFORMATION.................................................................15

7.   EXCLUSIVE RELATIONSHIP......................................................................16

8.   SYSTEM STANDARDS................................................................................17

    A.   CONDITION AND APPEARANCE OF THE STORE.......................17
    B.   STORE MENU, SPECIFICATIONS, STANDARDS AND
         PROCEDURES..................................................................................18
    C.   APPROVED PRODUCTS, DISTRIBUTORS AND SUPPLIERS ....18
    D.   COMPLIANCE WITH LAWS AND GOOD BUSINESS PRACTICES...........19
    E.   MANAGEMENT OF THE STORE/CONFLICTING INTERESTS..................19
    F.   INSURANCE.......................................................................................19
    G.   PRICING.............................................................................................20
    H.   COMPLIANCE WITH SYSTEM STANDARDS................................20
    I.   MODIFICATION OF SYSTEM STANDARDS.................................21

9.   MARKETING...............................................................................................22

    A.   GRAND OPENING ADVERTISING.................................................22
    B.   ADVERTISING AND DEVELOPMENT FUND...............................22
    C.   BY YOU..............................................................................................24
    D.   COOPERATIVE ADVERTISING PROGRAMS................................24
    E.   FRANCHISE SYSTEM WEBSITE....................................................25

10.  RECORDS, REPORTS, AND FINANCIAL STATEMENTS.....................26

11.  INSPECTIONS AND AUDITS......................................................................27

    A.   OUR RIGHT TO INSPECT THE STORE..........................................27
    B.   OUR RIGHT TO AUDIT....................................................................27

12.  TRANSFER...................................................................................................27

    A.   BY US................................................................................................27
    B.   BY YOU..............................................................................................27
    C.   CONDITIONS FOR APPROVAL OF TRANSFER...........................28
    D.   TRANSFER TO A WHOLLY-OWNED CORPORATION OR LIMITED
         LIABILITY COMPANY....................................................................30
    E.   YOUR DEATH OR DISABILITY......................................................31
    F.   EFFECT OF CONSENT TO TRANSFER..........................................32
    G.   OUR RIGHT OF FIRST REFUSAL...................................................32
    H.   PUBLIC OFFERINGS........................................................................33

13.  SUCCESSOR FRANCHISE .........................................................................34

    A.   YOUR RIGHT TO ACQUIRE A SUCCESSOR FRANCHISE........................34
    B.   GRANT OF A SUCCESSOR FRANCHISE.......................................34
    C.   AGREEMENTS/RELEASES...............................................................35

14.  TERMINATION OF AGREEMENT..............................................................36

    A.   BY YOU..............................................................................................36
    B.   BY US................................................................................................36

C.      ASSUMPTION OF MANAGEMENT...............................................................38

15.   OUR AND YOUR RIGHTS AND OBLIGATIONS UPON TERMINATION OR
      EXPIRATION OF THIS AGREEMENT.........................................................................39

      A.    PAYMENT OF AMOUNTS OWED TO US.....................................................39
      B.    MARKS.............................................................................................................39
      C.    CONFIDENTIAL INFORMATION..................................................................40
      D.    COVENANT NOT TO COMPETE...................................................................40
      E.    OUR RIGHT TO PURCHASE CERTAIN ASSETS OF THE STORE.............41
      F.    CONTINUING OBLIGATIONS........................................................................41

16.   RELATIONSHIP OF THE PARTIES/INDEMNIFICATION......................................41

      A.    INDEPENDENT CONTRACTORS ...................................................................41
      B.    NO LIABILITY FOR ACTS OF OTHER PARTY ...........................................42
      C.    TAXES...............................................................................................................42
      D.    INDEMNIFICATION.........................................................................................42

17.   ENFORCEMENT...........................................................................................................43

      A.    SEVERABILITY AND SUBSTITUTION OF VALID PROVISIONS .............43
      B.    WAIVER OF OBLIGATIONS...........................................................................43
      C.    COSTS AND ATTORNEYS' FEES....................................................................44
      D.    RIGHTS OF PARTIES ARE CUMULATIVE...................................................44
      E.    ARBITRATION .................................................................................................44
      F.    GOVERNING LAW............................................................................................46
      G.    CONSENT TO JURISDICTION........................................................................46
      H.    WAIVER OF PUNITIVE DAMAGES AND JURY TRIAL..............................46
      I.    BINDING EFFECT.............................................................................................46
      J.    LIMITATIONS OF CLAIMS.............................................................................47
      K.    CONSTRUCTION..............................................................................................47

18.   NOTICES AND PAYMENTS .......................................................................................48

19.   COMPLIANCE WITH ANTI-TERRORISM LAWS.....................................................49

20.   ELECTRONIC MAIL ...................................................................................................49

      **EXHIBITS**

      EXHIBIT A    LISTING OF OWNERSHIP INTERESTS
      EXHIBIT B    PREMISES

      GUARANTY AND ASSUMPTION OF OBLIGATIONS

## POTATO CORNER COMPANY
## FRANCHISE AGREEMENT

**THIS FRANCHISE AGREEMENT** (the "Agreement") is made and entered into by and between **PCJV USA, LLC**, a Delaware limited liability company, located at 1729 Santee Street, Los Angeles, California 90015 ("we," "us," or "our"), and _____, whose principal business address is _____ ("you" or "your") as of the date signed by us and set forth opposite our signature on this Agreement (the "Effective Date").

## 1.    PREAMBLES, ACKNOWLEDGMENTS, AND GRANT OF FRANCHISE.

### A.    PREAMBLES.

(1)    We and our affiliates have, over a considerable time period and with considerable effort, developed (and continue to develop and modify) a system and franchise opportunity for the operation of retail businesses offering flavored french fries, baked potatoes, hash browns, loopy fries and related products and services (collectively, the "Menu Items"). The Menu Items are prepared according to our specified recipes and procedures and use high quality ingredients, including our specially formulated and specially produced proprietary lines of flavoring and sauces and other food products (collectively, "Trade Secret Food Products") and other food products. These stores operate under the "Potato Corner" name and other trademarks ("Potato Corner Stores") and have distinctive business formats, methods, procedures, designs, layouts, standards, and specifications, all of which we may improve, further develop, or otherwise modify from time to time.

(2)    We and our affiliates use, promote, and license certain trademarks, service marks, and other commercial symbols in operating Potato Corner Stores, which have gained and will continue to gain public acceptance and goodwill, and may create, use, and license other trademarks, service marks, and commercial symbols for Potato Corner Stores (collectively, the "Marks").

(3)    We grant to persons who meet our qualifications, and are willing to undertake the investment and effort, a franchise to own and operate a Potato Corner Store offering the Menu Items and services we authorize and using our business formats, methods, procedures, signs, designs, layouts, standards, specifications, and Marks (the "Franchise System").

(4)    As a franchise owner of a Potato Corner Store, you will comply with this Agreement and all System Standards (defined below) in order to maintain the high and consistent quality that is critical to attracting and keeping customers for Potato Corner Stores.

(5)     You have applied for a franchise to own and operate a Potato Corner Store.

B.     **ACKNOWLEDGMENTS.**

You acknowledge:

(1)     That you have independently investigated the Potato Corner Store franchise opportunity and recognize that, like any other business, the nature of the business a Potato Corner Store conducts may, and probably will, evolve and change over time;

(2)     That an investment in a Potato Corner Store involves business risks that could result in the loss of a significant portion or all of your investment;

(3)     That your business abilities and efforts are vital to your success;

(4)     That attracting customers for the Potato Corner Store will require you to make consistent marketing efforts in your community through various methods, including media advertising, direct mail advertising, and display and use of in-store promotional materials;

(5)     That retaining customers for the Potato Corner Store will require you to have a high level of customer service and adhere strictly to the Franchise System and our System Standards and that you are committed to maintaining System Standards;

(6)     That you have not received from us, and are not relying upon, any representations or guarantees, express or implied, as to the potential volume, sales, income, or profits of a Potato Corner Store;

(7)     That in all of their dealings with you, our officers, directors, employees, and agents act only in a representative, and not in an individual, capacity and that business dealings between you and them as a result of this Agreement are deemed to be only between you and us;

(8)     That you have represented to us, to induce our entry into this Agreement, that all statements you have made and all materials you have given us are accurate and complete and that you have made no misrepresentations or material omissions in obtaining the franchise;

(9)     That you have read this Agreement and our Franchise Disclosure Document and understand and accept that this Agreement's terms and covenants are reasonably necessary for us to maintain our high standards of quality and service, as well as the uniformity of those standards at each Potato Corner Store, and to protect and preserve the goodwill of the Marks;

(10)     That we will restrict your sources of Trade Secret Food Products and have the right to restrict your sources of other goods and services as well, as provided in various sections of this Agreement, including Subsection 8.C. below;

(11)     That we have not made any representation, warranty, or other claim regarding this Potato Corner Store franchise opportunity, other than those made in this Agreement and our Franchise Disclosure Document, and that you have independently evaluated this opportunity, including by using your business professionals and advisors, and have relied solely upon those evaluations in deciding to enter into this Agreement;

(12)     That you have been afforded an opportunity to ask any questions you have and to review any materials of interest to you concerning the Potato Corner Store franchise opportunity;

(13)     That you have been afforded an opportunity, and have been encouraged by us, to have this Agreement and all other agreements and materials we have given or made available to you reviewed by an attorney and have either done so or waived your right to do so; and.

(14)     That you have a net worth that is sufficient to invest in the Potato Corner Store franchise opportunity represented by this Agreement, and you will have sufficient funds to meet all of your obligations under this Agreement.

## C.     **CORPORATION, LIMITED LIABILITY COMPANY, OR PARTNERSHIP.**

If you are at any time a corporation, limited liability company, or general or limited partnership (collectively, an "Entity"), you agree and represent that:

(1)     You will have the authority to execute, deliver, and perform your obligations under this Agreement and all related agreements and are duly organized or formed and validly existing in good standing under the laws of the state of your incorporation or formation;

(2)     Your organizational documents, operating agreement, or partnership agreement, as applicable, will recite that this Agreement restricts the issuance and transfer of any ownership interests in you, and all certificates and other documents representing ownership interests in you will bear a legend referring to this Agreement's restrictions;

(3)     **Exhibit A** to this Agreement completely and accurately describes all of your owners and their interests in you as of the Effective Date;

(4)     Each of your owners during this Agreement's term will execute a guaranty in the form we prescribe undertaking personally to be bound, jointly and severally, by all provisions of this Agreement and any ancillary agreements between you and us.  Subject to our rights and your obligations under Section 12, you and your owners agree to sign

and deliver to us revised Exhibits A to reflect any permitted changes in the information that **Exhibit A** now contains;

(5)     You will appoint a shareholder, member, or partner, as applicable, to be your "Managing Owner," responsible for overseeing and supervising the operation of the STORE (as defined in Subsection D below). The Managing Owner as of the Effective Date is identified in **Exhibit A**. You may not change the Managing Owner without our prior written consent; and

(6)     The STORE and other Potato Corner Stores, if applicable, will be the only businesses you operate (although your owners may have other, non-competitive business interests).

D.     **GRANT OF FRANCHISE.**

You have applied for a franchise to own and operate a Potato Corner Store at the location identified on **Exhibit B** (the "Premises"). Subject to this Agreement's terms, we grant you a franchise (the "Franchise") to operate a Potato Corner Store (the "STORE") at the Premises, and to use the Franchise System in its operation, for a term beginning on the Effective Date and expiring ten (10) years from that date, unless sooner terminated as provided herein. You may use the Premises only for the STORE. You agree at all times faithfully, honestly, and diligently to perform your obligations under this Agreement and to use your best efforts to promote the STORE.

E.     **FRANCHISOR'S RESERVATION OF RIGHTS.**

You acknowledge that the franchise granted under this Agreement is non-exclusive, that you have no territorial protection, and that we and our affiliates retain all rights with respect to Potato Corner Stores, the Marks, the sale of similar or dissimilar products and services, and any other activities we deem appropriate whenever and wherever we desire. Specifically, but without limitation, we reserve the following rights:

(1)     the right to establish and operate, and to grant to others the right to establish and operate similar businesses or any other businesses offering similar or dissimilar products and services through similar or dissimilar channels of distribution, at any locations under trademarks or service marks other than the Marks and on any terms and conditions we deem appropriate;

(2)     the right to provide, offer and sell and to grant others the right to provide, offer and sell goods and services that are identical or similar to and/or competitive with those provided at Potato Corner Stores, whether identified by the Marks or other trademarks or service marks, through dissimilar distribution channels (including, without limitation, the internet or similar electronic media) and on any terms and conditions we deem appropriate;

(3)     the right to establish and operate, and to grant to others the right to establish and operate, businesses offering dissimilar products and services, under the Marks and on any terms and conditions we deem appropriate;

(4)     the right to operate, and to grant others the right to operate Potato Corner Stores located anywhere under any terms and conditions we deem appropriate and regardless of proximity to the STORE;

(5)     the right to operate and grant others the right to operate Potato Corner Stores at "Non Traditional Sites" on any terms and conditions we deem appropriate. "Non Traditional Sites" are sites that generate customer traffic flow which is independent from the general customer traffic flow of the surrounding area, including, without limitation, military bases, shopping malls, airports, festivals and fairs, stadiums, major industrial or office complexes, hotels, school campuses, train stations, travel plazas, toll roads, casinos, hospitals, events, parties and sports or entertainment venues;

(6)     the right to acquire the assets or ownership interests of one or more businesses providing products and services similar to those provided at Potato Corner Stores, and franchising, licensing or creating similar arrangements with respect to these businesses once acquired, wherever these businesses (or the franchisees or licensees of these businesses) are located or operating;

(7)     the right to be acquired (whether through acquisition of assets, ownership interests or otherwise, regardless of the form of transaction), by a business providing products and services similar to those provided at Potato Corner Stores, or by another business, even if such business operates, franchises and/or licenses competitive businesses; and

(8)     the right to engage in all other activities that this Agreement does not expressly prohibit.

## F.     **MODIFICATION OF FRANCHISE SYSTEM.**

Because complete and detailed uniformity under many varying conditions might not be possible or practical, you acknowledge that we specifically reserve the right and privilege, as we consider to be best, to vary System Standards (defined below) for any franchise owner based upon the peculiarities of any condition that we consider important to that franchise owner's successful operation.  You have no right to require us to grant you a similar variation or accommodation.

## 2.     **SITE SELECTION, LEASE OF PREMISES, AND DEVELOPMENT AND OPENING OF STORE.**

### A.     **SITE SELECTION.**

You agree to obtain our written approval of the STORE's proposed site before signing any lease, sublease, or other document for the site.  We will use reasonable efforts to help analyze your market area, to help determine site feasibility, and to assist in designating the location, although we will not conduct site selection activities for you.  We will not unreasonably withhold our approval of a site that meets our criteria for demographic characteristics; traffic patterns; parking; character of neighborhood; competition from, proximity to, and nature of other

businesses; other commercial characteristics; and the proposed site's size, appearance, and other physical characteristics.

You agree to send us a description of the proposed site, including a summary of the items listed above, along with a letter of intent or other evidence confirming your favorable prospects for obtaining the proposed site. We will use reasonable efforts to approve or disapprove the proposed site within thirty (30) business days after receiving your written proposal. Upon our approval of a site, and after you secure the site, we will insert its address into **Exhibit B**, and it will be the Premises. You may operate the STORE only at the Premises.

You acknowledge and agree that, if we recommend or give you information regarding a site for the Premises, that is not a representation or warranty of any kind, express or implied, of the site's suitability for a Potato Corner Store or any other purpose. Our recommendation indicates only that we believe that the site meets our then acceptable criteria. Applying criteria that have appeared effective with other sites and premises might not accurately reflect the potential for all sites and premises, and demographic and/or other factors included in or excluded from our criteria could change, altering the potential of a site and premises. The uncertainty and instability of these criteria are beyond our control, and we are not responsible if a site and premises we recommend fail to meet your expectations. You acknowledge and agree that your acceptance of the Franchise is based on your own independent investigation of the site's suitability for the Premises.

### B.    **LEASE OF PREMISES.**

You must sign a lease or sublease for the Premises (the "Lease") within one hundred and eighty (180) days after the Effective Date. We have the right to approve the terms of the Lease before you sign it. The Lease must be in a form acceptable to us and must contain certain required terms and provisions (although we will not directly negotiate your Lease), including, but not limited to:

(1)    A provision reserving to us the right to receive an assignment of the Lease upon termination or expiration of the Franchise;

(2)    A provision requiring the lessor to give us all sales and other information we request relating to the STORE's operation with the lessor and allowing us to communicate at any time regarding the status, and your compliance with the terms, of the Lease;

(3)    A provision requiring the lessor concurrently to send us a copy of any written notice of a Lease default sent to you and granting us the right (but without any obligation) to cure any Lease default within fifteen (15) business days after the expiration of your cure period (if you fail to do so);

(4)    A provision evidencing your right to display the Marks according to the specifications in the Operations Manual (subject only to applicable law);

(5)    A provision that the Premises may be used only for the operation of Potato Corner Store; and

(6)   A provision allowing us to enter the Premises upon expiration or termination of this Agreement in order to remove signage and other items bearing our Marks and otherwise, to de-identify the Premises.

You acknowledge that our approval of the Lease is not a guarantee or warranty, express or implied, of the success or profitability of a Potato Corner Store operated at the Premises. Our approval indicates only that we believe that the Premises and the Lease's terms meet our then acceptable criteria. You must deliver to us a signed copy of the Lease within seven (7) days after its execution.

If the Lease expires or is terminated without your fault, or if the site for the Premises is destroyed, condemned, or otherwise rendered unusable, we will allow you to relocate the STORE to a new site acceptable to us. Any relocation will be at your sole expense, and we may charge you for the reasonable costs we incur, plus a reasonable fee (as set forth in the Operations Manual) for our services, in connection with any relocation of the STORE.

## C.   **STORE DEVELOPMENT.**

You are responsible for developing the STORE. We will give you mandatory and suggested specifications and layouts for a Potato Corner Store, including requirements for dimensions, design, image, interior layout, decor, fixtures, equipment, signs, furnishings, and color scheme. These plans might not reflect the requirements of any federal, state, or local law, code, or regulation, including those arising under the Americans with Disabilities Act (the "ADA") or similar rules governing public accommodations for persons with disabilities. It is your responsibility to prepare a site survey and all required construction plans and specifications to suit the Premises and to make sure that these plans and specifications comply with the ADA and similar rules governing public accommodations for persons with disabilities, other applicable ordinances, building codes, permit requirements, and Lease requirements and restrictions.

You agree to send us construction plans and specifications for review before you begin constructing the STORE and all revised or "as built" plans and specifications during construction. We may require you to use an approved or designated architect and/or general contractor to design and construct the STORE. Because our review is limited to ensuring your compliance with our design requirements, it might not assess compliance with federal, state, or local laws and regulations, including the ADA, as compliance with these laws is your responsibility. We may inspect the Premises while you are developing the STORE.

You agree to do the following, at your own expense, to develop the STORE at the Premises:

(1)   secure all financing required to develop and operate the STORE;

(2)   obtain all required building, utility, sign, health, sanitation, business, and other permits and licenses;

(3)   construct all required improvements to the Premises and decorate the STORE according to approved plans and specifications;

(4)    obtain all customary contractors' sworn statements and partial and final waivers of lien for construction, remodeling, decorating, and installation services;

(5)    purchase or lease, and install, all required fixtures, furniture, equipment (including a required or recommended computer, facsimile, and point-of-sale information system), furnishings, and signs (collectively, "Operating Assets") for the STORE; and

(6)    purchase an opening inventory of authorized and approved Trade Secret Food Products, other products, materials, and supplies to operate the STORE.

## D.    **OPERATING ASSETS.**

You agree to use in operating the STORE only those Operating Assets that we approve for Potato Corner Stores as meeting our specifications and standards for quality, design, appearance, function, and performance. You may not install or otherwise operate at the Premises any unauthorized vending or lotto machines. You agree to place or display at the Premises (interior and exterior) only the signs, emblems, lettering, logos, and display materials that we approve from time to time. You agree to purchase or lease approved brands, types, or models of Operating Assets only from suppliers we designate or approve (which may include or be limited to us and/or our affiliates).

## E.    **COMPUTER SYSTEM.**

You agree to obtain and use the computer hardware and/or operating software we specify from time to time (the "Computer System"). We may modify specifications for and components of the Computer System. You also agree to maintain a functioning e-mail address. Our modification of specifications for the Computer System, and/or other technological developments or events, might require you to purchase, lease, and/or license new or modified computer hardware and/or software and to obtain service and support for the Computer System. Although we cannot estimate the future costs of the Computer System or required service or support, and although these costs might not be fully amortizable over this Agreement's remaining term, you agree to incur the costs of obtaining the computer hardware and software comprising the Computer System (or additions and modifications) and required service or support. We have no obligation to reimburse you for any Computer System costs. Within sixty (60) days after you receive notice from us, you agree to obtain the Computer System components that we designate and to ensure that your Computer System, as modified, is functioning properly.

You agree that we or our affiliates may condition any license of proprietary software to you, or your use of technology that we or our affiliates develop or maintain, on your signing of a software license agreement or similar document that we or our affiliates prescribe to regulate your use of, and our and your respective rights and responsibilities with respect to, the software or technology. We and our affiliates may charge you a monthly or other fee for any proprietary software or technology that we or our affiliates license to you and for other maintenance and support services that we or our affiliates provide during this Agreement's term.

Despite the fact that you agree to buy, use, and maintain the Computer System according to our standards and specifications, you will have sole and complete responsibility for:  (1) the acquisition, operation, maintenance, and upgrading of the Computer System; (2) the manner in

which your Computer System interfaces with our and any third party's computer system; and (3) any and all consequences if the Computer System is not properly operated, maintained, and upgraded. The Computer System shall permit twenty-four (24) hours per day, seven (7) days per week electronic communications between you and us, including access to the Internet and our current Franchise System Website, intranet or extranet.

F.    **STORE OPENING.**

You agree not to open the STORE until:

(1)    we notify you in writing that the STORE meets our standards and specifications (although our acceptance is not a representation or warranty, express or implied, that the STORE complies with any engineering, licensing, environmental, labor, health, building, fire, sanitation, occupational, landlord's, insurance, safety, tax, governmental, or other statutes, rules, regulations, requirements, or recommendations nor a waiver of our right to require continuing compliance with our requirements, standards, or policies);

(2)    you (and your Managing Owner) and your other employees satisfactorily complete training;

(3)    you pay the initial franchise fee and other amounts then due to us;

(4)    you obtain required licenses and permits and send us copies of the licenses and permits we request; and

(5)    you give us certificates for all required insurance policies.

Subject to your compliance with these conditions, you agree to open the STORE for business within two hundred seventy (270) days after the Effective Date.

3.    **FEES.**

A.    **INITIAL FRANCHISE FEE.**

You agree to pay us a nonrecurring and, except as specifically provided in this Agreement, nonrefundable initial franchise fee of Fifteen Thousand Dollars ($15,000). This fee is due, and fully earned by us, when you sign this Agreement.

B.    **CONTINUING SERVICE AND ROYALTY FEE.**

You agree to pay us, on or before the tenth (10th) day of each month, (or as the Operations Manual otherwise prescribes), a monthly Continuing Service and Royalty Fee (the "Royalty") equal to two and one half percent (2½%) of the STORE's Gross Sales (defined in Subsection C below) during the first three (3) months of the operation of the STORE. Thereafter, you agree to pay to us a monthly Royalty equal to five percent (5%).

9

C.     **DEFINITION OF "GROSS SALES".**

As used in this Agreement, the term "Gross Sales" means all revenue that you derive from operating the STORE, including, but not limited to, all amounts that you receive at or away from the Premises, and whether from cash, check, credit and debit card, barter exchange, trade credit, or other credit transactions, but (1) excluding all federal, state, or municipal sales, use, or service taxes collected from customers and paid to the appropriate taxing authority and (2) reduced by the amount of any documented refunds, credits, allowances, and charge-backs the STORE in good faith gives to customers (if those amounts originally were included in calculating Gross Sales).

D.     **LATE FEES AND INTEREST.**

All amounts which you owe us for any reason, will bear interest accruing as of their original due date at one and one-half percent (1.5%) per month or the highest commercial contract interest rate the law allows, whichever is less. We may debit your bank account automatically for late fees and interest. You acknowledge that this Subsection is not our agreement to accept any payments after they are due or our commitment to extend credit to, or otherwise finance your operation of, the STORE.

E.     **APPLICATION OF PAYMENTS.**

Despite any designation you make, we may apply any of your payments to any of your past due indebtedness to us. We may set off any amounts you or your owners owe us or our affiliates against any amounts we or our affiliates owe you or your owners. You may not withhold payment of any amounts you owe us due to our alleged nonperformance of any of our obligations under this Agreement.

F.     **METHOD OF PAYMENT.**

Before the STORE opens, you agree to sign and deliver to us the documents we require to authorize us to debit your business checking account automatically for the Royalty, Fund contributions (defined below), and other amounts due under this Agreement and for your purchases from us and/or our affiliates (the "Electronic Depository Transfer Account" or "EDTA"). We will debit the EDTA for these amounts on their due dates. You agree to ensure that funds are available in the EDTA to cover our withdrawals. If there are insufficient funds in the EDTA to cover any such amount owed (or, if you are paying by check and a check is returned for insufficient funds), we will charge you a processing fee of One Hundred Dollars ($100) to compensate us for our additional administrative expenses.

If you fail to report the STORE's Gross Sales, we may debit your EDTA for one hundred twenty percent (120%) of the last Royalty and Fund contribution that we debited (together with the late fee noted in Subsection 3.D. above). If the amounts that we debit from your EDTA are less than the amounts you actually owe us (once we have determined the STORE's true and correct Gross Sales), we will debit your EDTA for the balance on the day we specify. If the amounts that we debit from your EDTA are greater than the amounts you actually owe us, we will credit the excess against the amounts we otherwise would debit from your EDTA during the following month.

We may require you to pay any amounts due under this Agreement or otherwise by means other than automatic debit (*e.g.*, by check) whenever we deem appropriate, and you agree to comply with our payment instructions.

## 4.   TRAINING AND ASSISTANCE.

### A.   INITIAL TRAINING.

If this is your first Potato Corner Store, then before the STORE opens for business, we will train you (or, if you are an Entity, your Managing Owner) and three employees on the material aspects of operating a Potato Corner Store. We will provide the initial training program at a designated training facility of our choice and/or at an operating Potato Corner Store.

We will provide initial training for no additional fee for your four (4) attendees. Additional people beyond these two may attend initial training if you pay our then current training charge for each additional person. You also agree to pay for all travel and living expenses which you (or your Managing Owner) and all of your employees incur and for your employees' wages and workers' compensation insurance while they train at operating Potato Corner Stores.

You (or your Managing Owner) and the employees use designate must satisfactorily complete initial training. If we determine that you (or your Managing Owner) cannot complete initial training to our satisfaction (and he or she, or a replacement, cannot satisfactorily complete a repeat training program), we may terminate this Agreement, in which case we will keep fifty percent (50%) of the initial franchise fee. We will return the other fifth percent (50%) of the initial franchise fee to you if you sign our required form of release of claims.

We will offer one of our personnel to assist for five (5) days with the opening of the STORE at no cost to you. However, you will pay our travel and living expenses for such training. There will be an additional charge if the STORE is more than 100 miles from our headquarters or outside of Los Angeles County.

From time to time you (or your Managing Owner) may request additional training, to be provided at our then current per diem charges, if you (or your Managing Owner) do not feel sufficiently trained in the operation of a Potato Corner Store. We and you will jointly determine the duration of this additional training.

When the STORE is ready to open for business, we will, at our own cost, send one of our representatives to the STORE for a period of five (5) days to assist with its opening. You also must successfully complete this phase of the initial training program. If you request, and we agree to provide, additional or special guidance, assistance, or training during this opening phase, you agree to pay our then applicable charges, including our personnel's per diem charges and travel and living expenses.

### B.   ONGOING TRAINING.

We may require you (or your Managing Owner) and/or other previously trained and experienced employees to attend and complete satisfactorily various training courses that we

periodically choose to provide at the times and locations that we designate. We may charge reasonable registration or similar fees for these courses. Besides attending these courses, you agree to attend an annual meeting of all Potato Corner Store franchise owners at a location we designate. You agree to pay all costs to attend.

We may require that certain employees satisfactorily complete our initial and ongoing training programs. We may charge reasonable fees for such training. You agree to pay all travel and living expenses which you and your employees incur during all training courses and programs. You agree to assist us in training other Potato Corner Store franchise owners. We will reimburse your out-of-pocket expenses for providing this assistance.

You understand and agree that any specific ongoing training or advice we provide does not create an obligation (whether by course of dealing or otherwise) to continue to provide such specific training or advice, all of which we may discontinue and modify from time to time.

## C.   **GENERAL GUIDANCE.**

We will advise you from time to time regarding the STORE's operation based on your reports or our inspections and will guide you with respect to: (1) standards, specifications, and operating procedures and methods that Potato Corner Stores use; (2) purchasing required and authorized Operating Assets, Trade Secret Food Products, and other items and arranging for their distribution to you; (3) advertising and marketing materials and programs; (4) employee training; and (5) administrative, bookkeeping, accounting, and inventory control procedures.

We will guide you in our operations manual ("Operations Manual"); in bulletins or other written materials; by Electronic Media; by telephone consultation; and/or at our office or the STORE. If you request, and we agree to provide, additional or special guidance, assistance, or training, you agree to pay our then applicable charges, including our personnel's per diem charges and travel and living expenses. "Electronic Media" means the Internet, the World Wide Web, or any other similar proprietary or common carrier electronic delivery system as well as materials (such as CD ROM; and USB data storage devices) that facilitate the electronic communication of information.

## D.   **OPERATIONS MANUAL.**

We will loan you during the franchise term one (1) copy of our Operations Manual, which could include audiotapes, videotapes, compact disks, computer software, other Electronic Media, and/or written materials. The Operations Manual contains mandatory and suggested specifications, standards, operating procedures, and rules ("System Standards") that we periodically prescribe for operating a Potato Corner Store and information on your other obligations under this Agreement. We may modify the Operations Manual periodically to reflect changes in System Standards.

You agree to keep access codes to and other information for the Operations Manual current and in a secure location at the STORE. If there is a dispute over its contents, our master copy of the Operations Manual controls. You agree that the Operations Manual's contents are confidential and that you will not disclose the Operations Manual to any person other than STORE employees who need to know its contents. You may not at any time copy, duplicate,

record, or otherwise reproduce any part of the Operations Manual. If we choose to give you a printed copy of the Operations Manual, if your copy of the Operations Manual is lost, destroyed, or significantly damaged, you agree to obtain a replacement copy at our then applicable charge.

At our option, we may post some or all of the Operations Manual on a restricted Website or extranet to which you will have access. (For purposes of this Agreement, "Website" means an interactive electronic document contained in a network of computers linked by communications software, including, without limitation, the Internet and World Wide Web home pages). If we do so, you agree to monitor and access the Website or extranet for any updates to the Operations Manual or System Standards. Any passwords or other digital identifications necessary to access the Operations Manual on a Website or extranet will be deemed to be part of Confidential Information (defined in Section 6 below).

### E. **DELEGATION OF PERFORMANCE.**

You agree that we have the right to delegate the performance of any portion or all of our obligations under this Agreement to third-party designees, whether these designees are our agents or independent contractors with whom we have contracted to perform these obligations. If we do so, such third-party designees will be obligated to perform the delegated functions for you in compliance with this Agreement.

## 5. **MARKS.**

### A. **OWNERSHIP AND GOODWILL OF MARKS.**

Cinco Corporation has licensed the Marks to us to use in connection with the franchising, development, and operation of Potato Corner Stores. Your right to use the Marks is derived only from this Agreement and limited to your operating the STORE according to this Agreement and all System Standards we prescribe during its term. Your unauthorized use of the Marks is a breach of this Agreement and infringes our rights in the Marks. You acknowledge and agree that your use of the Marks and any goodwill established by that use are exclusively for our benefit and that this Agreement does not confer any goodwill or other interests in the Marks upon you (other than the right to operate the STORE under this Agreement). All provisions of this Agreement relating to the Marks apply to any additional proprietary trade and service marks we authorize you to use. You may not at any time during or after this Agreement's term contest or assist any other person in contesting the validity, or our ownership, of the Marks.

### B. **LIMITATIONS ON YOUR USE OF MARKS.**

You agree to use the Marks as the STORE's sole identification, except that you agree to identify yourself as its independent owner in the manner we prescribe. You may not use any Mark (1) as part of any corporate or legal business name, (2) with any prefix, suffix, or other modifying words, terms, designs, or symbols (other than logos we have licensed to you), (3) in selling any unauthorized services or products, (4) as part of any domain name, homepage, electronic address, or otherwise in connection with a Website, or (5) in any other manner that we have not expressly authorized in writing. If we discover your unauthorized use of the Marks, we may require you to destroy all offending items reflecting the unauthorized use (with no

reimbursement from us) or otherwise in connection with Electronic Media (except as provided in Subsection 9.E of this Agreement).

You may not use any Mark in advertising the transfer, sale, or other disposition of the STORE or an ownership interest in you without our prior written consent, which we will not unreasonably withhold. You agree to display the Marks prominently as we prescribe at the STORE and on forms, advertising, supplies, and other materials we designate. You agree to give the notices of trade and service mark registrations that we specify and to obtain any fictitious or assumed name registrations required under applicable law.

## C.   **NOTIFICATION OF INFRINGEMENTS AND CLAIMS.**

You agree to notify us immediately of any apparent infringement or challenge to your use of any Mark, or of any person's claim of any rights in any Mark, and not to communicate with any person other than us, our attorneys, and your attorneys, regarding any infringement, challenge, or claim. We may take the action we deem appropriate (including no action) and control exclusively any litigation, U.S. Patent and Trademark Office proceeding, or other administrative proceeding arising from any infringement, challenge, or claim or otherwise concerning any Mark. You agree to sign any documents and take any other reasonable action that, in the opinion of our attorneys, are necessary or advisable to protect and maintain our interests in any litigation or Patent and Trademark Office or other proceeding or otherwise to protect and maintain our interests in the Marks. We will reimburse you for your costs of taking any action that we have asked you to take.

## D.   **DISCONTINUANCE OF USE OF MARKS.**

If it becomes advisable at any time for us and/or you to modify or discontinue using any Mark and/or to use one or more additional or substitute trade or service marks, you agree to comply with our directions within a reasonable time after receiving notice. We need not reimburse you for your direct expenses of changing the STORE's signs, for any loss of revenue due to any modified or discontinued Mark, or for your expenses of promoting a modified or substitute trademark or service mark.

Our rights in this Subsection D apply to any and all of the Marks (and any portion of any Mark) that we authorize you to use in this Agreement. We may exercise these rights at any time and for any reason, business or otherwise, that we think best. You acknowledge both our right to take this action and your obligation to comply with our directions.

## E.   **INDEMNIFICATION FOR USE OF MARKS.**

We agree to reimburse you for all damages and expenses that you incur in any trademark infringement proceeding disputing your authorized use of any Mark under this Agreement if you have timely notified us of, and comply with our directions in responding to, the proceeding. At our option, we may defend and control the defense of any proceeding arising from your use of any Mark under this Agreement.

14

## 6.    **CONFIDENTIAL INFORMATION.**

We possess and/or have licensed (and will continue to develop, license and/or acquire) certain confidential information, some of which constitutes trade secrets under applicable law (the "Confidential Information"), relating to developing and operating Potato Corner Stores, including (without limitation):

(1)    site selection criteria for Stores;

(2)    recipes and related information regarding for Trade Secret Food Products;

(3)    training and operations materials and manuals;

(4)    methods, formats, specifications, standards, systems, procedures, food preparation techniques, sales and marketing techniques, knowledge, and experience used in developing and operating Potato Corner Stores;

(5)    marketing and advertising programs for Potato Corner Stores;

(6)    knowledge of specifications for and suppliers of Operating Assets, Trade Secret Food Products, and other products and supplies;

(7)    any computer software or similar technology which is proprietary to us or the Franchise System, including, without limitation, digital passwords and identifications and any source code of, and data, reports, and other printed materials generated by, the software or similar technology;

(8)    knowledge of the operating results and financial performance of Potato Corner Stores other than the STORE;

(9)    graphic designs and related intellectual property; and

(10)    customer information which we are deemed to own.

You acknowledge and agree that you will not acquire any interest in the Confidential Information, other than the right to use it as we specify in operating the STORE during this Agreement's term, and that the Confidential Information is proprietary, includes our trade secrets, and is disclosed to you only on the condition that you agree, and you in fact do agree, that you:

(a)    will not use the Confidential Information in any other business or capacity;

(b)    will keep each item deemed to be part of the Confidential Information absolutely confidential, both during this Agreement's term and then thereafter for as long as the item is not generally known in the food-service industry;

(c)     will not make unauthorized copies of any Confidential Information disclosed via Electronic Media or in written or other tangible form; and

(d)     will adopt and implement reasonable procedures to prevent unauthorized use or disclosure of Confidential Information, including, without limitation, restricting its disclosure to STORE personnel and others we specify and using non-disclosure and non-competition agreements with those having access to Confidential Information. We have the right to regulate the form of agreements that you use and to be a third party beneficiary of those agreements with independent enforcement rights.

Confidential Information does not include information, knowledge, or know-how which you can demonstrate lawfully came to your attention before we provided it to you directly or indirectly; which, at the time we disclosed it to you, already had lawfully become generally known in the food-service industry through publication or communication by others (without violating an obligation to us); or which, after we disclose it to you, lawfully becomes generally known in the food-service industry through publication or communication by others (without violating an obligation to us). However, if we include any matter in Confidential Information, anyone who claims that it is not Confidential Information must prove that one of the exclusions provided in this paragraph is fulfilled.

All ideas, concepts, techniques, or materials relating to a Potato Corner Store, whether or not protectable intellectual property and whether created by or for you or your owners or employees, must be promptly disclosed to us and will be deemed to be our sole and exclusive property, part of the Franchise System, and works made-for-hire for us. To the extent that any item does not qualify as a "work made-for-hire" for us, by this paragraph you assign ownership of that item, and all related rights to that item, to us and agree to take whatever action (including signing assignment or other documents) we request to evidence our ownership or to help us obtain intellectual property rights in the item.

## 7.   **EXCLUSIVE RELATIONSHIP.**

You acknowledge that we have granted you the Franchise in consideration of and reliance upon your agreement to deal exclusively with us. You therefore agree that, during this Agreement's term, neither you, any of your owners, nor any of you or your owners' spouses will:

(a)     have any direct or indirect controlling or non-controlling interest as an owner – whether of record, beneficially, or otherwise – in a Competitive Business, wherever located or operating (except that equity ownership of less than two percent (2%) of a Competitive Business whose stock or other forms of ownership interest are publicly traded on a recognized United States stock exchange will not be deemed to violate this subparagraph);

(b)     perform services as a director, officer, manager, employee, consultant, representative, or agent for a Competitive Business, wherever located or operating;

(c)     divert or attempt to divert any actual or potential business or customer of the STORE to a Competitive Business; or

(d)     engage in any other activity which might injure the goodwill of the Marks and Franchise System.

The term "Competitive Business" means (i) any restaurant or other food-service business which derives more than five percent (5%) of its revenue from selling french fries, baked potatoes, hash browns, pretzels or other snack-like items or (ii) any business granting franchises or licenses to others to operate the type of business specified in subparagraph (i) (other than a Potato Corner Store operated under a franchise agreement with us).

You agree to obtain similar covenants from the personnel we specify, including officers, directors, managers and other employees attending our training program or having access to Confidential Information. We have the right to regulate the form of agreement that you use and to be a third party beneficiary of that agreement with independent enforcement rights.

## 8.     SYSTEM STANDARDS.

### A.     CONDITION AND APPEARANCE OF THE STORE.

You agree that:

(1)     you will maintain the condition and appearance of the STORE, its Operating Assets and the Premises in accordance with System Standards and consistent with the image of a Potato Corner Store as an efficiently operated business offering high quality products and services and observing the highest standards of cleanliness, sanitation, efficient, courteous service and pleasant ambiance, and in that connection will take, without limitation, the following actions during the term of this Agreement: (1) thorough cleaning, repainting and redecorating of the interior and exterior of the Premises at intervals we prescribe; (2) interior and exterior repair of the Premises; and (3) repair or replacement of damaged, worn out or obsolete Operating Assets;

(2)     you will place or display at the Premises (interior and exterior) only those signs (including neon), emblems, designs, artwork, lettering, logos, and display and advertising materials that we from time to time approve;

(3)     if at any time in our reasonable judgment, the general state of repair, appearance or cleanliness of the Premises of the STORE or its fixtures, furnishings, equipment or signs does not meet our standards, we have the right to notify you, specifying the action you must take to correct the deficiency. If you do not initiate action to correct such deficiencies within ten (10) days after you receive our notice, and then continue in good faith and with due diligence, a bona fide program to complete any required maintenance or refurbishing, we have the right, in addition to all other remedies, to enter the Premises or the STORE and do any required maintenance or refurbishing on your behalf, and you agree to reimburse us on demand for any expenses we incur in that connection; and

(4)     on notice from us, you agree to remodel, renovate, expand, redecorate, upgrade, reequip and/or refurnish the Premises and the STORE to reflect changes in the operations of Potato Corner Stores which we prescribe and require of new franchisees.

B.   **STORE MENU, SPECIFICATIONS, STANDARDS AND PROCEDURES.**

You agree that: (1) the STORE will offer for sale all Menu Items and other products and services that we specify from time to time, and will only use recipes and methods of food preparation we have specified or approved; (2) the STORE will offer and sell approved products and services only in the manner we have prescribed; (3) you will not offer for sale or sell at the STORE, the Premises or any other location any products or services we have not approved; (4) all products will be offered and sold only at retail and from the Premises and you will not offer or sell any products at wholesale; and (5) you will discontinue selling and offering for sale any products or services that we at any time decide (in our sole discretion) to disapprove in writing.

C.   **APPROVED PRODUCTS, DISTRIBUTORS AND SUPPLIERS.**

We have developed or may develop standards and specifications for types, models and brands of required Operating Assets, Trade Secret Food Products, other products, ingredients, materials and supplies. We reserve the right from time to time to approve specifications or suppliers and distributors of the above products that meet our reasonable standards and requirements. If we do so, you agree to purchase only such products meeting those specifications, and if we require it, only from distributors and other suppliers we have approved, including ourselves or our affiliates.

We may designate a single distributor or supplier (collectively "supplier") for any product, service, equipment, supply or material and may approve a supplier or distributor only as to certain products. The designated supplier may be us or an affiliate of ours.

We and our affiliates may receive payments from suppliers on account of such suppliers' dealings with you and other franchise owners, and may use any amounts so received without restriction and for any purpose we and our affiliates deem appropriate. We may concentrate purchases with one or more suppliers or distributors to obtain lower prices or the best advertising support or services. Approval of a supplier or distributor may be conditioned on requirements relating to product quality, prices, consistency, reliability, financial capability, labor relations, customer relations, frequency of delivery, concentration of purchases, standards of service, including prompt attention to complaints, or other criteria and may be temporary, pending our continued evaluation of the supplier or distributor from time to time.

If you would like to purchase any items from any unapproved supplier or distributor, you must submit to us a written request for approval of the proposed supplier or distributor. (Alternatively, the proposed supplier or distributor may submit its own request.) We have the right to inspect the proposed supplier's or distributor's facilities, and to require product samples from the proposed supplier or distributor to be delivered at our option either directly to us or to any independent, certified laboratory which we designate for testing. Either you or the proposed supplier or distributor must pay us a fee (not to exceed the reasonable cost of the inspection and the actual cost of the test) to make the evaluation. We reserve the right to periodically re-inspect the facilities and products of any approved supplier or distributor and to revoke our approval if the supplier or distributor does not continue to meet any of our criteria. We also reserve the right

18

to charge manufacturers or suppliers a royalty for the right to manufacture products for use in a Potato Corner Stores.

We and our affiliates have developed specially formulated and prepared Trade Secret Food Products for use in the operation of Potato Corner Stores. You must use only the Trade Secret Food Products in the preparation of Menu Items served and sold by the STORE. Currently, you must purchase the Trade Secret Food Products from us or a designated third party supplier.

## D. **COMPLIANCE WITH LAWS AND GOOD BUSINESS PRACTICES.**

You must secure and maintain in force all required licenses, permits and certificates relating to the operation of the STORE and must operate the STORE in full compliance with all applicable laws, ordinances and regulations, including, without limitation, government regulations relating to occupational hazards, health, worker's compensation and unemployment insurance and withholding and payment of federal and state income taxes, social security taxes and sales and service taxes. All advertising and promotion by you must be completely factual and must conform to the highest standards of ethical advertising. The STORE must in all dealings with its customers, suppliers, us and the public adhere to the highest standards of honesty, integrity, fair dealing and ethical conduct. You agree to refrain from any business or advertising practice which may be injurious to our business and the goodwill associated with the Marks and other Potato Corner Stores. You must notify us in writing within five (5) days of the commencement of any action, suit or proceeding, and of the issuance of any order, writ, injunction, award or decree of any court, agency or other governmental instrumentality, which may adversely affect your operation or financial condition or that of the STORE and of any notice of violation of any law, ordinance, or regulation relating to the STORE.

## E. **MANAGEMENT OF THE STORE/CONFLICTING INTERESTS.**

Except as provided below, you (or your Managing Owner) must act as the general manager of the STORE with responsibility for direct, on-premises supervision of the STORE. You must keep us informed at all times of the identity of any supervisory employee(s) acting as assistant manager(s) of the STORE. You (or your Managing Owner) must devote full-time and efforts to the management and supervision of the STORE.

If you (or your Managing Owner) own more than one Potato Corner Store, each Potato Corner Store must be under the direct on-premises supervision of a general manager we have approved and who has completed our training programs.

## F. **INSURANCE.**

During the term of this Agreement you must maintain in force at your sole expense comprehensive public liability, general liability, product liability and motor vehicle liability insurance against claims for bodily and personal injury, death and property damage caused by or occurring in connection with the STORE's operation, all containing the minimum liability coverage we prescribe from time to time. We may periodically increase the amounts of coverage required under these insurance policies and/or require different or additional insurance coverages (including reasonable excess liability insurance) at any time to reflect inflation, identification of

new risks, changes in law or standards of liability, higher damage awards or other relevant changes in circumstances. These insurance policies must name us and any affiliates we designate as additional named insureds and provide for thirty (30) days' prior written notice to us of a policy's material modification, cancellation or expiration. You routinely must furnish us copies of your Certificates of Insurance or other evidence of your maintaining this insurance coverage and paying premiums. If you fail or refuse to obtain and maintain the insurance we specify, in addition to our other remedies, we may (but need not) obtain such insurance for you and the STORE on your behalf, in which event you shall cooperate with us and reimburse us for all premiums, costs and expenses we incur in obtaining and maintaining the insurance, plus a reasonable fee for our time incurred in obtaining such insurance.

## G.  **PRICING.**

We reserve the right, to the fullest extent allowed by applicable law, to establish maximum, minimum, or other pricing requirements with respect to the prices you may charge for products and services.

## H.  **COMPLIANCE WITH SYSTEM STANDARDS.**

You acknowledge and agree that operating and maintaining the STORE according to System Standards are essential to preserve the goodwill of the Marks and all Potato Corner Stores. Therefore, you agree at all times to operate and maintain the STORE according to all of our System Standards, as we periodically modify and supplement them, even if you believe that a System Standard, as originally issued or subsequently modified, is not in the Franchise System's or the STORE's best interests. Although we retain the right to establish and periodically modify System Standards that you have agreed to maintain, you retain the right to and responsibility for the day-to-day management and operation of the STORE and implementing and maintaining System Standards at the STORE.

As examples, and without limitation, System Standards may regulate any one or more of the following, in addition to the items described in Subsections 8.A. through 8.G. above:

(1)     design, layout, décor, appearance and lighting of the Stores; periodic maintenance, cleaning and sanitation; periodic remodeling, painting, and decorating; types, models, brands and condition of leasehold improvements and Operating Assets, Products and other items for which we have minimum standards; and using interior and exterior signs, emblems, lettering, and logos;

(2)     purchase, storage, preparation, handling, and packaging procedures and techniques for Menu Items and Trade Secret Food Products; and inventory requirements for Trade Secret Food Products and other products and supplies so that the STORE may operate at full capacity;

(3)     terms and conditions of the sale and delivery of, and terms and methods of payment for the Menu Items, Trade Secret Food Products, other products, and services that you obtain from us and affiliated and unaffiliated suppliers; and our and our affiliates' right not to sell you any Trade Secret Food Products, or other products or to

provide you with services, or to do so only on a "cash-on-delivery" or other basis, if you are in default under any agreement with us;

(4)    sales, marketing, advertising, and promotional programs and materials and media, including social media websites, used in these programs;

(5)    use and display of the Marks at the STORE and on napkins, boxes, bags, wrapping paper, labels, forms, paper and plastic products, and other supplies;

(6)    issuing and honoring gift certificates;

(7)    staffing levels for the STORE; identifying the STORE's personnel; and employee qualifications, training, dress, and appearance (although you have sole responsibility and authority concerning employee selection and promotion, hours worked, rates of pay and other benefits, work assigned, and working conditions);

(8)    days and hours of operation;

(9)    participation at your own expense in market research and testing and product and service development programs as well as participation in, and dues assessed for, advisory councils;

(10)    accepting credit and debit cards, other payment systems, and check verification services;

(11)    bookkeeping, accounting, data processing, and recordkeeping systems and forms; formats, content, and frequency of reports to us of sales, revenue, financial performance, and condition; and giving us copies of tax returns and other operating and financial information concerning the STORE;

(12)    any other aspects of operating and maintaining the STORE that we determine to be useful to preserve or enhance the efficient operation, image, or goodwill of the Marks and Potato Corner Stores;

(13)    use of proprietary software, if any, and the Franchise System Website; and

(14)    use of CCTV monitoring.

You agree that System Standards we prescribe in the Operations Manual, or otherwise communicate to you in writing or another tangible form (for example, via Franchise System extranet or Website), are part of this Agreement as if fully set forth within its text. All references to this Agreement include all System Standards as periodically modified

### I.    **MODIFICATION OF SYSTEM STANDARDS.**

We periodically may modify System Standards, which may accommodate regional or local variations, and these modifications may obligate you to invest additional capital in the STORE and/or incur higher operating costs. You agree to implement any changes in System

Standards within the time period we request, whether they involve refurbishing or remodeling the Premises or any other aspect of the STORE, buying new Operating Assets, adding new Menu Items and services, or otherwise modifying the nature of your operations, as if they were part of this Agreement as of the Effective Date.

## 9.    MARKETING.

### A.    GRAND OPENING ADVERTISING.

We may require you to advertise and promote the STORE during a grand opening period that we designate. You agree to comply with our guidelines for this grand opening advertising program.

### B.    ADVERTISING AND DEVELOPMENT FUND.

Recognizing the value of advertising and marketing to the goodwill and public image of Potato Corner Stores, we may establish an Advertising and Development Fund (the "Fund") for the advertising, marketing, and public relations programs and materials we deem appropriate. You agree to contribute to the Fund the amounts that we prescribe from time to time, not to exceed two percent (2%) of the STORE's Gross Sales, payable in the same manner as the Royalty.

We have the right to collect for deposit into the Fund any advertising, marketing, or similar allowances paid to us by suppliers who deal with Potato Corner Stores and with whom we have agreed that we will so deposit these allowances. (These payments are different from those which are not designated by suppliers to be used exclusively for advertising or similar purposes and which we and our affiliates therefore may use for any purposes we and they deem appropriate, as provided in Subsection 8.C. above.)

We will direct all programs that the Fund finances, with sole control over the creative concepts, materials, and endorsements used and their geographic, market, and media placement and allocation. The Fund may pay for preparing and producing video, audio, and written materials and electronic media; developing, implementing, and maintaining the Franchise System Website and/or related strategies; administering regional and multi-regional marketing and advertising programs, including, without limitation, purchasing trade journal, direct mail, and other media advertising and using advertising, promotion, and marketing agencies and other advisors to provide assistance; and supporting public relations, market research, and other advertising, promotion, and marketing activities.

The Fund periodically will give you samples of advertising, marketing, and promotional formats and materials at no cost. We will sell you multiple copies of these materials at our direct cost of producing them, plus any related shipping, handling, and storage charges.

We will account for the Fund separately from our other funds and not use the Fund for any of our general operating expenses. However, we may use the Fund to pay the reasonable salaries and benefits of personnel who manage and administer the Fund, the Fund's other administrative costs, travel expenses of personnel while they are on Fund business, meeting costs, overhead relating to Fund business, and other expenses that we incur in activities

reasonably related to administering or directing the Fund and its programs, including, without limitation, conducting market research, public relations, preparing advertising, promotion, and marketing materials, and collecting and accounting for Fund contributions.

The Fund will not be our asset. Although the Fund is not a trust, we will hold all Fund contributions for the benefit of the contributors and use contributions only for the purposes described in this Subsection. We do not owe any fiduciary obligation to you for administering the Fund or any other reason. The Fund may spend in any fiscal year more or less than the total Fund contributions in that year, borrow from us or others (paying reasonable interest) to cover deficits, or invest any surplus for future use. We will use all interest earned on Fund contributions to pay costs before using the Fund's other assets.

We will prepare an annual, unaudited statement of Fund collections and expenses and give you the statement upon written request. We may have the Fund audited annually, at the Fund's expense, by an independent certified public accountant. We may incorporate the Fund or operate it through a separate entity whenever we deem appropriate. The successor entity will have all of the rights and duties specified in this Subsection.

We intend the Fund to maximize recognition of the Marks and patronage of Potato Corner Stores. Although we will try to use the Fund to develop advertising and marketing materials and programs, and to place advertising and marketing, that will benefit all Potato Corner Stores, we need not ensure that Fund expenditures in or affecting any geographic area are proportionate or equivalent to Fund contributions by Potato Corner Stores operating in that geographic area or that any Potato Corner Store benefits directly or in proportion to its Fund contribution from the development of advertising and marketing materials or the placement of advertising and marketing. The Fund will not be used principally to develop materials and programs to solicit franchisees. However, media, materials and programs, including the Franchise System Website, prepared using Fund contributions may describe our franchise program, reference the availability of franchises and related information, and process franchise leads.

We have the right, but no obligation, to use collection agents and institute legal proceedings to collect Fund contributions at the Fund's expense. We also may forgive, waive, settle, and compromise all claims by or against the Fund. Except as expressly provided in this Subsection, we assume no direct or indirect liability or obligation to you for collecting amounts due to, maintaining, directing, or administering the Fund.

We may at any time defer or reduce contributions of a Potato Corner Store franchise owner and, upon thirty (30) days' prior written notice to you, reduce or suspend Fund contributions and operations for one or more periods of any length and terminate (and, if terminated, reinstate) the Fund. If we terminate the Fund, we will distribute all unspent monies to our franchise owners, and to us and our affiliates, in proportion to their, and our, respective Fund contributions during the preceding twelve (12) month period.

C.   **BY YOU.**

You agree to list and advertise the STORE in at least one (1) recommended classified telephone directory distributed within the STORE's market area (in the business classifications we prescribe from time to time) and to use an approved form of classified telephone directory advertisement. If other Potato Corner Stores are located within the directory's distribution area, we may require you to participate in a collective telephone directory advertisement with those other Potato Corner Stores and to pay your share of that collective advertisement.

In addition to your grand opening obligation in Subsection 9.A. above and your Fund contribution obligations in Subsection 9.B. above, you agree to spend at least one percent (1%) of the STORE's Gross Sales to advertise and promote the STORE (this may include the costs of yellow pages advertising). Within thirty (30) days after the end of each month, you agree to send us, in the manner we prescribe, an accounting of your expenditures for local advertising and promotion during the preceding month.

Your local advertising and promotion must follow our guidelines. All advertising and promotional materials that you develop for the STORE must contain notices of our Website's domain name in the manner we designate. You may not develop, maintain, or authorize any Website that mentions or describes you or the STORE or displays any of the Marks. You agree that your advertising, promotion, and marketing will be completely clear, factual, and not misleading and conform to both the highest standards of ethical advertising and marketing and the advertising and marketing policies that we prescribe from time to time.

Before you use them, you agree to send us or our designated agency for approval samples of all advertising, promotional, and marketing materials which we have not prepared or previously disapproved. If you do not receive written disapproval within thirty (30) days after we or our designated agency receives the materials, they are deemed to be approved. You may not use any advertising, promotional, or marketing materials that we have not approved or have disapproved.

D.   **COOPERATIVE ADVERTISING PROGRAMS.**

We may designate an advertising coverage area ("ACA") — local or regional — in which two (2) or more Potato Corner Stores are located in order to establish a cooperative advertising program ("Cooperative Program") for that ACA. An ACA is the area covered by the particular advertising medium recognized in the industry. All franchise owners in the ACA will be required to participate. Each Potato Corner Store operating in the ACA will have one vote, including Potato Corner Stores operated by us or our affiliates.

If a Cooperative Program is established for your ACA, you will be required to (1) join, participate in, and actively supply the ACA in compliance with its governing documents, and (2) to contribute a specified percentage of your monthly Gross Sales to the Cooperative Program. We may require you to contribute to the Cooperative Program the full amount we require you to spend under Subsection 9.C above. That contribution will be credited toward your required marketing expenditures under 9.C above. If the Cooperative Program's members cannot agree on any aspect of the Area Cooperative's formation, administration, or operation, and the

disagreement continues for twenty (20) days after written notice to us that a disagreement exists, we have the authority to resolve the matter. Our decision will be final and binding on all members of the Cooperative Program. In any event, we may, whenever we deem best, control the formation, organization, operation, expenditures, and all other aspects of the Cooperative Program.

You agree to send us and the Cooperative Program any reports that we require, including, but not limited to, information to confirm your compliance with your minimum contribution obligations. The Cooperative Program will operate only for the purpose of advertising, marketing, and promoting the Potato Corner Stores in the ACA. The Cooperative Program and its members may not use any advertising, marketing, CRM, research or promotional plans or materials without our prior written consent and all activities must comply with our guidelines.

E.    **FRANCHISE SYSTEM WEBSITE.**

We and our affiliates may establish one or more websites (1) to advertise, market, and promote Potato Corner Stores, Services and Products and/or the Potato Corner Store franchise opportunity, (2) to create, maintain, update, and administer on-line customer lists and information, (3) through which to operate on-line Product ordering and other fulfillment systems, (4) to process payments for Services and Products (from which we may immediately debit the Royalty and Fund contribution), and (6) for any other purposes we determine are appropriate or necessary for the Franchise System (each a "Franchise System Website"). If we establish a Franchise System Website, we may provide you with a separate webpage that references the STORE and/or otherwise allow you to participate in the Franchise System Website. You must give us the information and materials we request to develop, update, and modify your webpage or otherwise necessary to enable you to participate in the Franchise System Website. By providing the information and materials to us, you represent that they are accurate and not misleading and do not infringe any third party's rights. We will own all intellectual property and other rights in the Franchise System Website, your webpage (if any), and all information they contain (including, without limitation, the log of "hits" by visitors and any personal or business data that customers supply).

We will maintain, and may use the Fund's assets to develop, maintain, operate, update, and market, the Franchise System Website, including your webpage (if any). We will update the information on your webpage, if any, or add information that we approve as frequently as we deem appropriate. You must notify us whenever any information on your webpage changes or is not accurate. We have final approval rights over all information on the Franchise System Website, including your webpage (if any). We may implement and periodically modify System Standards relating to the Franchise System Website.

We will maintain your webpage, if any, on the Franchise System Website and/or otherwise allow you to participate in the Franchise System Website, only while you are in substantial compliance with this Agreement and all System Standards (including, without limitation, those relating to the Franchise System Website). If you are in material default of any obligation under this Agreement or System Standards, then we may, in addition to our other remedies, temporarily suspend your participation in the Franchise System Website until you fully

cure the default. We will permanently terminate your access to and participation in the Franchise System Website upon this Agreement's expiration or termination.

All advertising, marketing, and promotional materials that you develop for the STORE must contain notices of the Franchise System Website's domain name(s) in the manner we designate. You may not develop, maintain, link to, or authorize any other website that mentions or describes you or the STORE or displays any of the Marks.

## 10.   RECORDS, REPORTS, AND FINANCIAL STATEMENTS.

You agree to establish and maintain at your own expense a bookkeeping, accounting, and recordkeeping system conforming to the requirements and formats we prescribe from time to time. We may require you to use a Computer System to maintain certain sales data and other information and to report such information to us via a website or other means. You agree to give us in the manner and format that we prescribe from time to time:

(a)   on or before the fifth $(5^{th})$ day of each calendar month, a report on the STORE's Gross Sales during the preceding calendar month;

(b)   within fifteen (15) days after the end of each calendar quarter, the operating statements, financial statements, statistical reports, purchase records, and other information we request regarding you and the STORE covering the previous calendar quarter and the fiscal year to date;

(c)   by April 15th of each year, annual profit and loss and source and use of funds statements and a balance sheet for the STORE as of the end of the prior calendar year;

(d)   within ten (10) days after our request, exact copies of federal and state income tax returns, sales tax returns, and any other forms, records, books, and other information we periodically require relating to the STORE and the Franchise.

You agree to verify and sign each report and financial statement in the manner we prescribe. We may disclose data derived from these reports, although we will not without your consent (unless required by law) disclose your identity in any materials that we circulate publicly. Moreover, we may, as often as we deem appropriate (including on a daily basis), access the Computer System and retrieve all information relating to the STORE's operation.

You agree to preserve and maintain all records in a secure location at the STORE for at least five (5) years (including, but not limited to, sales checks, purchase orders, invoices, payroll records, customer lists, check stubs, sales tax records and returns, cash receipts and disbursement journals, and general ledgers). We may require you to have audited financial statements prepared annually during this Agreement's term.

## 11.    **INSPECTIONS AND AUDITS.**

### A.    **OUR RIGHT TO INSPECT THE STORE.**

To determine whether you and the STORE are complying with this Agreement and all System Standards, we and our designated agents or representatives may at all times and without prior notice to you: (1) inspect the STORE; (2) photograph the STORE and observe and videotape the STORE's operation for consecutive or intermittent periods we deem necessary; (3) remove samples of any products and supplies; (4) interview the STORE's personnel and customers; and (5) inspect and copy any books, records, and documents relating to the STORE's operation. You agree to cooperate with us fully. If we exercise any of these rights, we will not interfere unreasonably with the STORE's operation.

### B.    **OUR RIGHT TO AUDIT.**

We may at any time during your business hours, and without prior notice to you, examine your (if you are an Entity) and the STORE's business, bookkeeping, and accounting records, sales and income tax records and returns, and other records. You agree to cooperate fully with our representatives and independent accountants in any examination. If any examination discloses an understatement of the STORE's Gross Sales, you agree to pay us, within fifteen (15) days after receiving the examination report, the Royalty and Fund contributions due on the amount of the understatement, plus our service charges and interest on the understated amounts from the date originally due until the date of payment. Furthermore, if an examination is necessary due to your failure to furnish reports, supporting records, or other information as required, or to furnish these items on a timely basis, or if our examination reveals a Royalty or Fund contribution understatement exceeding two percent (2%) of the amount that you actually reported to us for the period examined, you agree to reimburse us for the costs of the examination, including, without limitation, the charges of attorneys and independent accountants and the travel expenses, room and board, and compensation of our employees. These remedies are in addition to our other remedies and rights under this Agreement and applicable law.

## 12.    **TRANSFER.**

### A.    **BY US.**

You acknowledge that we maintain a staff to manage and operate the Franchise System and that staff members can change as employees come and go. You represent that you have not signed this Agreement in reliance on any particular shareholder, director, officer, or employee remaining with us in that capacity. We may change our ownership or form and/or assign this Agreement and any other agreement to a third party without restriction. After our assignment of this Agreement to a third party who expressly assumes the obligations under this Agreement, we no longer will have any performance or other obligations under this Agreement.

### B.    **BY YOU.**

You understand and acknowledge that the rights and duties this Agreement creates are personal to you (or, if you are an Entity, to your owners) and that we have granted you the Franchise in reliance upon our perceptions of your (or your owners') individual or collective

character, skill, aptitude, attitude, business ability, and financial capacity. Accordingly, none of the following may be transferred without our prior written approval: (i) this Agreement (or any interest in this Agreement); (ii) the STORE (or any right to receive all or a portion of the STORE's profits or losses or capital appreciation related to the STORE); (iii) substantially all of the assets of the STORE; (iv) any ownership interest in you (regardless of its size); or (v) any ownership interest in any of your owners (if such owners are legal entities). A transfer of the STORE's ownership, possession, or control, or substantially all of its assets, may be made only with a transfer of this Agreement. Any transfer without our approval is a breach of this Agreement and has no effect.

In this Agreement, the term "transfer" includes a voluntary, involuntary, direct, or indirect assignment, sale, gift, or other disposition. An assignment, sale, gift, or other disposition includes the following events:

(a)     transfer of ownership of capital stock, a partnership or membership interest, or another form of ownership interest;

(b)     merger or consolidation or issuance of additional securities or other forms of ownership interest;

(c)     any sale of a security convertible to an ownership interest;

(d)     transfer of an interest in you, this Agreement, the STORE or substantially all of its assets, or your owners in a divorce, insolvency, or entity dissolution proceeding or otherwise by operation of law;

(e)     if you, one of your owners, or an owner of one of your owners dies, a transfer of an interest in you, this Agreement, the STORE or substantially all of its assets, or your owner by will, declaration of or transfer in trust, or under the laws of intestate succession; or

(f)     pledge of this Agreement (to someone other than us) or of an ownership interest in you or your owners as security, foreclosure upon the STORE, or your transfer, surrender, or loss of the STORE's possession, control, or management. You may grant a security interest (including a purchase money security interest) in the STORE's assets (not including this Agreement) to a lender that finances your acquisition, development, and/or operation of the STORE without having to obtain our prior written approval as long as you give us ten (10) days' prior written notice.

## C.     **CONDITIONS FOR APPROVAL OF TRANSFER.**

If you (and your owners) are fully complying with this Agreement, then, subject to the other provisions of this Section 12, we will approve a transfer that meets all of the requirements in this Subsection.

If you are an entity, your owners may transfer a non-controlling ownership interest in you or your owners (determined as of the date on which the proposed transfer will occur) if: (1) the proposed transferee and its direct and indirect owners (if the transferee is an Entity) are of good

character and otherwise meet our then applicable standards for Potato Corner Store franchise owners (including no ownership interest in or performance of services for a Competitive Business); and (2) you give us prior written notice of the transfer.

For any other proposed transfer (including a transfer of this Agreement, a transfer of a controlling ownership interest in you or one of your owners, or a transfer which is one of a series of transfers (regardless of the time period over which these transfers take place) which in the aggregate transfer this Agreement or a controlling ownership interest in you or one of your owners) all of the following conditions must be met before or concurrently with the effective date of the transfer:

(1)     the transferee has sufficient business experience, aptitude, and financial resources to operate the STORE;

(2)     you have paid all Royalties, Fund and Cooperative Program contributions, and other amounts owed to us, our affiliates, and third party vendors; have submitted all required reports and statements; and have not violated any provision of this Agreement, the Lease, or any other agreement with us during both the sixty (60) day period before you requested our consent to the transfer and the period between your request and the effective date of the transfer;

(3)     neither the transferee nor its owners (if the transferee is an Entity) or affiliates have an ownership interest (direct or indirect) in or perform services for a Competitive Business;

(4)     the transferee (or its Managing Owner) satisfactorily completes our training program;

(5)     your landlord allows you to transfer the Lease or sublease the Premises to the transferee;

(6)     the transferee shall (if the transfer is of this Agreement), or you shall (if the transfer is of a controlling ownership interest in you or one of your owners), sign our then current form of franchise agreement and related documents, any and all of the provisions of which may differ materially from any and all of those contained in this Agreement, including the Royalty and the Fund and Cooperative Program contributions, provided, however, that the term of the new franchise agreement signed will equal ten (10) years as long as the transferee may maintain possession of the Premises during that ten (10) year period;

(7)     you or the transferee pays us a transfer fee equal to sixty percent (60%) of our then current initial franchise fee charged to a franchise owner who is new to the system;

(8)     you (and your transferring owners) sign a general release, in a form satisfactory to us, of any and all claims against us and our shareholders, officers, directors, employees, and agents;

(9)    we have determined that the purchase price and payment terms will not adversely affect the transferee's operation of the STORE;

(10)    if you or your owners finance any part of the purchase price, you and/or your owners agree that all of the transferee's obligations under promissory notes, agreements, or security interests reserved in the STORE are subordinate to the transferee's obligation to pay Royalties, Fund contributions, and other amounts due to us, our affiliates, and third party vendors and otherwise to comply with this Agreement;

(11)    (a) you have corrected any existing deficiencies of the STORE of which we have notified you on a punchlist or in other communications, and/or (b) the transferee agrees (if the transfer is of this Agreement) to upgrade, remodel, and refurbish the STORE in accordance with our then current requirements and specifications for Potato Corner Stores within the time period we specify following the effective date of the transfer (we will advise the transferee before the effective date of the transfer of the specific actions that it must take and the time period within which such actions must be taken);

(12)    you and your transferring owners (and your and your owners' spouses) will not, for two (2) years beginning on the transfer's effective date, engage in any of the activities proscribed in Subsection 15.D. below; and

(13)    you and your transferring owners will not directly or indirectly at any time or in any manner (except with respect to other Potato Corner Stores you own and operate) identify yourself or themselves or any business as a current or former Potato Corner Store or as one of our franchise owners; use any Mark, any colorable imitation of a Mark, or other indicia of a Potato Corner Store in any manner or for any purpose; or utilize for any purpose any trade name, trade or service mark, or other commercial symbol that suggests or indicates a connection or association with us.

We may investigate any potential transferee's qualifications, to analyze and critique the proposed purchase terms, to communicate candidly and truthfully with the transferee regarding the nature of your operation of the STORE, to withhold consent to economically questionable transactions, to review all information regarding the STORE that you give the transferee, to correct any information that we believe is inaccurate, and to give the transferee copies of any reports that you have given us or we have made regarding the STORE. You waive any claim that the action we take in good faith to protect our business interests in connection with a proposed transfer constitutes tortuous interference with contractual or business relationship.

## D.    **TRANSFER TO A WHOLLY-OWNED CORPORATION OR LIMITED LIABILITY COMPANY.**

Despite Subsection C above, if you are fully complying with this Agreement, you may transfer this Agreement to a corporation or limited liability company which conducts no business other than the STORE and, if applicable, other Potato Corner Stores, in which you maintain management control, and of which you own and control one hundred percent (100%) of the equity and voting power of all issued and outstanding ownership interests, provided that all of

the STORE's assets are owned, and the STORE's business is conducted, only by that single corporation or limited liability company. The corporation or limited liability company must expressly assume all of your obligations under this Agreement. Transfers of ownership interests in the corporation or limited liability company are subject to Subsection C above. You agree to remain personally liable under this Agreement as if the transfer to the corporation or limited liability company did not occur.

E.     **YOUR DEATH OR DISABILITY.**

(1)     **Transfer Upon Death or Disability**. Upon your or your Managing Owner's death or disability, you or the Managing Owner's executor, administrator, conservator, guardian, or other personal representative must transfer your interest in this Agreement, or the Managing Owner's ownership interest in you, to a third party (which may be you or the Managing Owner's heirs, beneficiaries, or devisees). That transfer must be completed within a reasonable time, not to exceed nine (9) months from the date of death or disability, and is subject to all of the terms and conditions in this Section 12. A failure to transfer your interest in this Agreement or the Managing Owner's ownership interest in you within this time period is a breach of this Agreement.

The term "disability" means a mental or physical disability, impairment, or condition that is reasonably expected to prevent or actually does prevent you or the Managing Owner from supervising the STORE's management and operation.

(2)     **Operation Upon Death or Disability**. Upon you or the Managing Owner's death or disability, you or the Managing Owner's executor, administrator, conservator, guardian, or other personal representative must within a reasonable time, not to exceed fifteen (15) days from the date of death or disability, appoint a manager. The manager must complete our standard training program at your expense. A new Managing Owner acceptable to us also must be appointed for the STORE, and that new Managing Owner must complete our standard training program, within sixty (60) days after the date of death or disability.

If, in our judgment, the STORE is not being managed properly any time after your or the Managing Owner's death or disability, we may, but need not, assume the STORE's management (or appoint a third party to assume its management). All funds from the STORE's operation while it is under our (or the third party's) management will be kept in a separate account, and all expenses will be charged to this account. We may charge you (in addition to the Royalty, Fund contributions, and other amounts due under this Agreement) Five Hundred Dollars ($500) per day, plus our (or the third party's) direct out-of-pocket costs and expenses, if we (or a third party) assume the STORE's management under this subparagraph. We (or a third party) have a duty to utilize only reasonable efforts and will not be liable to you or your owners for any debts, losses, or obligations the STORE incurs, or to any of your creditors for any products, other assets, or services the STORE purchases, while we (or a third party) manage it.

F.    **EFFECT OF CONSENT TO TRANSFER.**

Our consent to a transfer of this Agreement and the STORE, or any interest in you or
your owners, is not a representation of the fairness of the terms of any contract between you and
the transferee, a guarantee of the STORE's or transferee's prospects of success, or a waiver of
any claims we have against you (or your owners) or of our right to demand the transferee's full
compliance with this Agreement.

G.    **OUR RIGHT OF FIRST REFUSAL.**

If you (or any of your owners) at any time determine to sell or transfer for consideration
an interest in this Agreement and the STORE, or an ownership interest in you (except to or
among your current owners, which is not subject to this Subsection), in a transaction that
otherwise would be allowed under Subsections 12.B. and C above, you (or your owners) agree to
obtain from a responsible and fully disclosed buyer, and send us, a true and complete copy of a
bona fide, executed written offer (which may include a letter of intent) relating exclusively to an
interest in you or in this Agreement and the STORE. The offer must include details of the
payment terms of the proposed sale and the sources and terms of any financing for the proposed
purchase price. To be a valid, bona fide offer, the proposed purchase price must be in a dollar
amount, and the proposed buyer must submit with its offer an earnest money deposit equal to
five percent (5%) or more of the offering price.

The right of first refusal process will not be triggered by a proposed transfer that would
not be allowed under Subsections B and C above. We may require you (or your owners) to send
us copies of any materials or information sent to the proposed buyer or transferee regarding the
possible transaction.

We may, by written notice delivered to you or your selling owner(s) within thirty
(30) days after we receive both an exact copy of the offer and all other information we request,
elect to purchase the interest offered for the price and on the terms and conditions contained in
the offer, provided that:

(1)    we may substitute cash for any form of payment proposed in the offer
(such as ownership interests in a privately-held entity);

(2)    our credit will be deemed equal to the credit of any proposed buyer
(meaning that, if the proposed consideration includes promissory notes, we or our
designee may provide promissory notes with the same terms as those offered by the
proposed buyer);

(3)    we will have an additional thirty (30) days to prepare for closing after
notifying you of our election to purchase; and

(4)    we must receive, and you and your owners agree to make, all customary
representations and warranties given by the seller of the assets of a business or the
ownership interests in a legal entity, as applicable, including, without limitation,
representations and warranties regarding: (a) ownership and condition of and title to
ownership interests and/or assets; (b) liens and encumbrances relating to ownership

32

interests and/or assets; and (c) validity of contracts and the liabilities, contingent or otherwise, of the entity whose assets or ownership interests are being purchased.

If we exercise our right of first refusal, you and your selling owner(s) agree that, for two (2) years beginning on the closing date, you and they will be bound by the non-competition covenant contained in Subsection 15.D. below. We have the unrestricted right to assign this right of first refusal to a third party, who then will have the rights described in this Subsection.

If we do not exercise our right of first refusal, you or your owners may complete the sale to the proposed buyer on the original offer's terms, but only if we otherwise approve the transfer in accordance with, and you (and your owners) and the transferee comply with the conditions in, Subsections B and C above. This means that, even if we do not exercise our right of first refusal (whether or not it is properly triggered as provided above), if the proposed transfer otherwise would not be allowed under Subsections B and C above, you (or your owners) may not move forward with the transfer at all.

If you do not complete the sale to the proposed buyer within sixty (60) days after we notify you that we do not intend to exercise our right of first refusal, or if there is a material change in the terms of the sale (which you agree to tell us promptly), we or our designee will have an additional right of first refusal during the thirty (30) day period following either the expiration of the sixty (60) day period or our receipt of notice of the material change(s) in the sale's terms, either on the terms originally offered or the modified terms, at our or our designee's option.

## H.    **PUBLIC OFFERINGS.**

Despite any other provisions in this Agreement, you (and your owners) may not, without our prior written consent, which we may grant or withhold for any or no reason, attempt to raise or secure funds by selling or offering to sell any ownership interest in you (including, without limitation, common or preferred stock, bonds, debentures, membership interests, or general or limited partnership interests), regardless of its size, in a public offering for which a registration statement must be filed with the Securities Exchange Commission or with any similar state regulatory authority having jurisdiction over the sale of securities where registration is required as a condition of the sale of securities in that state. If we choose to consent to such a transaction, then, in addition to all other conditions that we may require you to satisfy (as provided in this Section 12 and elsewhere in this Agreement), we may require you to pay us at least Ten Thousand Dollars ($10,000), or any greater amount of which we advise you, plus our out-of-pocket expenses, to review the offering materials that you prepare for the transaction. However, our review shall be only to ensure your appropriate use of the Marks and your accurate description of our and your relationship and your rights under this Agreement. Our review will not be for the purposes of opining on the substantive aspects of the transaction or the legal adequacy of the offering materials.

## 13.    SUCCESSOR FRANCHISE.

### A.    **YOUR RIGHT TO ACQUIRE A SUCCESSOR FRANCHISE.**

If you meet certain conditions, then you will have the option to acquire one successor franchise term of ten (10) years.  The qualifications and conditions for the successor term are described below.

When this Agreement expires:

(1)    if you (and each of your owners) have substantially complied with this Agreement during its term;

(2)    if you (and each of your owners) are, both on the date you give us written notice of your election to acquire a successor franchise (as provided in Subsection 13.B. below) and on the date on which the term of the successor franchise would commence, in full compliance with this Agreement and all System Standards;

(3)    provided that (a) you maintain possession of and agree (regardless of cost) to remodel and/or expand the STORE, add or replace improvements and Operating Assets, and otherwise modify the STORE as we require to comply with System Standards then applicable for new Potato Corner Stores, or (b) at your option, you secure a substitute premises that we approve and you develop those premises according to System Standards then applicable for Potato Corner Stores; and

(4)    if you have paid a renewal fee to us equal to fifty percent (50%) of the then current franchise fee,

then you have the option to acquire a successor franchise term of ten (10) years commencing immediately upon the expiration of this Agreement.  You agree to sign the franchise agreement we then use to grant franchises for Potato Corner Stores (modified as necessary to reflect the fact that it is for a successor franchise), which may contain provisions that differ materially from any and all of those contained in this Agreement.

If you (and each of your owners) are not, both on the date you give us written notice of your election to acquire a successor franchise and on the date on which the term of the successor franchise commences, in full compliance with this Agreement and all System Standards, you acknowledge that we need not grant you a successor franchise, whether or not we had, or chose to exercise, the right to terminate this Agreement during its term under Subsection 14.B.

### B.    **GRANT OF A SUCCESSOR FRANCHISE.**

You agree to give us written notice of your election to acquire a successor franchise no more than two hundred twenty (220) days and no less than one hundred eighty (180) days before this Agreement expires.  We agree to give you written notice ("Our Notice"), not more than ninety (90) days after we receive your notice, of our decision:

(1)    to grant you a successor franchise;

(2)    to grant you a successor franchise on the condition that you correct existing deficiencies of the STORE or in your operation of the STORE; or

(3)    not to grant you a successor franchise based on our determination that you and your owners have not substantially complied with this Agreement during its term or were not in full compliance with this Agreement and all System Standards on the date you gave us written notice of your election to acquire a successor franchise.

If applicable, Our Notice will:

(a)    describe the remodeling, expansion, improvements, and/or modifications required to bring the STORE into compliance with then applicable System Standards for new Potato Corner Stores; and

(b)    state the actions you must take to correct operating deficiencies and the time period in which you must correct these deficiencies.

If we elect not to grant you a successor franchise, Our Notice will describe the reasons for our decision. If we elect to grant you a successor franchise, your right to acquire a successor franchise is subject to your full compliance with all of the terms and conditions of this Agreement through the date of its expiration, in addition to your compliance with the obligations described in Our Notice.

If Our Notice states that you must cure certain deficiencies of the STORE or its operation as a condition to our granting you a successor franchise, we will give you written notice of our decision not to grant a successor franchise, based upon your failure to cure those deficiencies, not less than ninety (90) days before this Agreement expires, provided, however, that we need not give you this ninety (90) days' notice if we decide not to grant you a successor franchise due to your breach of this Agreement during the ninety (90) day period before it expires. If we fail to give you:

(i)    notice of deficiencies in the STORE, or in your operation of the STORE, within ninety (90) days after we receive your timely election to acquire a successor franchise (if we elect to grant you a successor franchise under subparagraphs (2) and (b) above); or

(ii)    notice of our decision not to grant a successor franchise at least ninety (90) days before this Agreement expires, if this notice is required,

we may extend this Agreement's term for the time period necessary to give you either reasonable time to correct deficiencies or the ninety (90) days' notice of our refusal to grant a successor franchise. If you fail to notify us of your election to acquire a successor franchise within the prescribed time period, we need not grant you a successor franchise.

C.    **AGREEMENTS/RELEASES.**

If you satisfy all of the other conditions for a successor franchise, you and your owners agree to execute the form of franchise agreement and any ancillary agreements we then

customarily use in granting franchises for Potato Corner Stores (modified as necessary to reflect the fact that it is for a successor franchise), which may contain provisions that differ materially from any and all of those contained in this Agreement. You and your owners further agree to sign general releases, in a form satisfactory to us, of any and all claims against us and our shareholders, officers, directors, employees, agents, successors, and assigns. We will consider you or your owners' failure to sign these agreements and releases and to deliver them to us for acceptance and execution within thirty (30) days after their delivery to you to be an election not to acquire a successor franchise.

## 14.   **TERMINATION OF AGREEMENT.**

### A.   **BY YOU.**

If you and your owners are fully complying with this Agreement and we materially fail to comply with this Agreement and do not correct the failure within thirty (30) days after you deliver written notice of the material failure to us or, if we cannot correct the failure within thirty (30) days, give you within thirty (30) days after your notice reasonable evidence of our effort to correct the failure within a reasonable time, you may terminate this Agreement effective an additional thirty (30) days after you deliver to us written notice of termination. (The time period during which we may cure any material failure to comply with this Agreement after receiving notice from you is called the "Cure Period.") However, if we send you written notice during the Cure Period indicating either that (1) we do not agree that we have materially failed to comply with this Agreement or (2) we have fully corrected the failure, then you may not terminate this Agreement; instead, if you disagree with our position, you agree to submit the dispute to arbitration in accordance with Subsection 17.E. below.

This Agreement will remain in full force and effect during these arbitration proceedings (unless we terminate it under Subsection B below). If the arbitrator determines that we are materially failing to comply with this Agreement, or that we did not fully correct a material failure to comply, then we will have an additional thirty (30) days following the arbitrator's decision to correct the failure. If we fail to do so, then you may terminate this Agreement effective an additional thirty (30) days after you deliver to us written notice of termination.

Your termination of this Agreement other than according to this Subsection 14.A. will be deemed a termination without cause and a breach of this Agreement.

### B.   **BY US.**

We may terminate this Agreement, effective upon delivery of written notice of termination to you, if:

(1)    you (or any of your owners) have made or make any material misrepresentation or omission in acquiring the Franchise or operating the STORE;

(2)    you do not locate, and sign a Lease or purchase document for, an acceptable site for the Premises within one hundred and eighty (180) days after the Effective Date;

(3)    you do not open the STORE for business within two hundred and seventy (270) days after the Effective Date;

(4)    you (or your Managing Owner) and the employees we specify do not satisfactorily complete the initial training program;

(5)    you abandon or fail actively to operate the STORE for three (3) or more consecutive business days, unless you close the STORE for a purpose we approve or because of casualty or government order;

(6)    you (or your owners) make or attempt to make any transfer in violation of Section 12;

(7)    you (or any of your owners) are or have been convicted by a trial court of, or plead or have pleaded no contest to, a felony;

(8)    you fail to maintain the insurance we require and do not correct the failure within ten (10) days after we deliver written notice of that failure to you;

(9)    you (or any of your owners) engage in any dishonest or unethical conduct which, in our opinion, could adversely affects the STORE's reputation or the goodwill associated with the Marks;

(10)    you lose the right to occupy the Premises and fail (a) to begin immediately to look for a substitute site or (b) to locate a substitute site, and to begin operating the STORE from that substitute site, within ninety (90) days;

(11)    you (or any of your owners) knowingly make any unauthorized use or disclosure of any part of the Operations Manual or any other Confidential Information;

(12)    the appearance and condition of the Premises or Operating Assets do not meet our standards and you fail to correct such deficiency within thirty (30) days after we deliver notice; you violate any health, safety, or sanitation law, ordinance, or regulation, or operate the STORE in an unsafe manner, and do not begin to cure the violation immediately, and correct the violation within seventy-two (72) hours, after you receive notice from us or any other party;

(13)    you fail to pay us (or our affiliates) any amounts due and do not correct the failure within ten (10) days after we deliver written notice of that failure to you;

(14)    you fail to pay when due any federal or state income, service, sales, or other taxes due on the STORE's operation, unless you are in good faith contesting your liability for these taxes;

(15)    you understate the STORE's Gross Sales three (3) times or more during this Agreement's term or by more than five percent (5%) on any one occasion;

(16)    you (or any of your owners) (a) fail on three (3) or more separate occasions within any twelve (12) consecutive month period to comply with this Agreement, whether or not we notify you of the failures, and, if we do notify you of the failures, whether or not you correct the failures after our delivery of notice to you; or (b) fail on two (2) or more separate occasions within any six (6) consecutive month period to comply with the same obligation under this Agreement, whether or not we notify you of the failures, and, if we do notify you of the failures, whether or not you correct the failures after our delivery of notice to you;

(17)    you make an assignment for the benefit of creditors or admit in writing your insolvency or inability to pay your debts generally as they become due; you consent to the appointment of a receiver, trustee, or liquidator of all or the substantial part of your property; the STORE is attached, seized, subjected to a writ or distress warrant, or levied upon, unless the attachment, seizure, writ, warrant, or levy is vacated within thirty (30) days; or any order appointing a receiver, trustee, or liquidator of you or the STORE is not vacated within thirty (30) days following the order's entry;

(18)    you or any of your owners' assets, property, or interests are blocked under any law, ordinance, or regulation relating to terrorist activities, or you or any of your owners otherwise violate any such law, ordinance, or regulation;

(19)    you (or any of your owners) fail to comply with any other provision of this Agreement or any System Standard and do not correct the failure within thirty (30) days after we deliver written notice of the failure to you; or

(20)    you fail to pay any vendors to the Franchise System (other than us and our affiliates) any amounts due for your purchases from them and do not correct the failure within thirty (30) days after the vendor delivers written notice of that failure to you, unless you are in good faith contesting your liability for those amounts, you notify us in writing of the reason for your non-payment, and we agree that you have a legitimate reason for the non-payment (although we may, but have no obligation to, pay the vendor by debiting your EDTA).

## C.    **ASSUMPTION OF MANAGEMENT.**

We have the right (but not the obligation), under the circumstances described below, to enter the Premises and assume the STORE's management (or to appoint a third party to assume its management) for any period of time we deem appropriate. If we (or a third party) assume the STORE's management under subparagraphs (1) and (2) below, you agree to pay us (in addition to the Royalty, Fund contributions, and other amounts due under this Agreement) Five Hundred Dollars ($500) per day, plus our (or the third party's) direct out-of-pocket costs and expenses, for up to sixty (60) days after we assume management.

If we (or a third party) assume the STORE's management, you acknowledge that we (or the third party) will have a duty to utilize only reasonable efforts and will not be liable to you or your owners for any debts, losses, or obligations the STORE incurs, or to any of your creditors

for any supplies, products, or other assets or services the STORE purchases, while we (or the third party) manage it.

We (or a third party) may assume the STORE's management under the following circumstances: (1) if you abandon or fail actively to operate the STORE; (2) if you fail to comply with any provision of this Agreement or any System Standard and do not cure the failure within the time period we specify in our notice to you; or (3) if this Agreement expires or is terminated and we are deciding whether to exercise our option to purchase the STORE under Subsection 15.E. below.

If we exercise our rights under subparagraphs (1) or (2) above, that will not affect our right to terminate this Agreement under Subsection 14.B. above.

## 15. OUR AND YOUR RIGHTS AND OBLIGATIONS UPON TERMINATION OR EXPIRATION OF THIS AGREEMENT.

### A. PAYMENT OF AMOUNTS OWED TO US.

You agree to pay us within fifteen (15) days after this Agreement expires or is terminated, or on any later date that we determine the amounts due to us, the Royalties, Fund contributions, interest, and all other amounts owed to us (and our affiliates) which then are unpaid.

### B. MARKS.

When this Agreement expires or is terminated:

(1)     you may not directly or indirectly at any time or in any manner (except with other Potato Corner Stores you own and operate) identify yourself or any business as a current or former Potato Corner Store or as one of our current or former franchise owners; use any Mark, any colorable imitation of a Mark, or other indicia of a Potato Corner Store in any manner or for any purpose; or use for any purpose any trade name, trade or service mark, or other commercial symbol that indicates or suggests a connection or association with us;

(2)     you agree to take the action required to cancel all fictitious or assumed name or equivalent registrations relating to your use of any Mark;

(3)     you agree to deliver to us within thirty (30) days all signs, sign-faces, sign-cabinets, marketing materials, forms, and other materials containing any Mark or otherwise identifying or relating to a Potato Corner Store that we request and allow us, without liability to you or third parties for trespass or any other claim, to enter the Premises and remove these items from the STORE;

(4)     if we do not have or do not exercise an option to purchase the STORE under Subsection E below, you agree promptly and at your own expense to make the alterations we specify in our Operations Manual (or otherwise) to distinguish the STORE

clearly from its former appearance and from other Potato Corner Stores in order to prevent public confusion;

(5)     you agree to notify the telephone company and all telephone directory publishers of the termination or expiration of your right to use any telephone, facsimile, or other numbers and telephone directory listings associated with any Mark; to authorize the transfer of these numbers and directory listings to us or at our direction; and/or to instruct the telephone company to forward all calls made to your numbers to numbers we specify. If you fail to do so, we may take whatever action and sign whatever documents we deem appropriate on your behalf to effect these events; and

(6)     you agree to give us, within thirty (30) days after the expiration or termination of this Agreement, evidence satisfactory to us of your compliance with these obligations.

## C.     **CONFIDENTIAL INFORMATION.**

You agree that, when this Agreement expires or is terminated, you will immediately cease using any of our Confidential Information (including computer software or similar technology and digital passwords and identifications that we have licensed to you or that otherwise are proprietary to us or the Franchise System) in any business or otherwise and return to us all copies of the Operations Manual and any other confidential materials that we have loaned you. You may not sell, trade, or otherwise profit in any way from any Confidential Information, including customer lists, at any time after the expiration or termination of this Agreement.

## D.     **COVENANT NOT TO COMPETE.**

Upon:

(1)     our termination of this Agreement according to its terms and conditions,

(2)     your termination of this Agreement without cause, or

(3)     expiration of this Agreement (if we offer, but you elect not to acquire, a successor franchise, or if we do not offer you a successor franchise due to your failure to satisfy the conditions for a successor franchise set forth in Section 13),

you and your owners agree that, for two (2) years beginning on the effective date of termination or expiration or the date on which all persons restricted by this Subsection begin to comply with this Subsection, whichever is later, neither you nor any of your owners will have any direct or indirect interest (e.g., through a spouse) as an owner (whether of record, beneficially, or otherwise), investor, partner, director, officer, employee, consultant, representative, or agent in any Competitive Business (as defined in Section 7 above) located or operating:

(a)     at the Premises;

(b)     within a twenty five (25) mile radius of the Premises;

(c)     within twenty five (25) miles of any other Potato Corner Store in operation or under construction on the later of the effective date of the termination or expiration of this Agreement or the date on which all persons restricted by this Subsection begin to comply with this Subsection; and

(d)     within five (5) miles of any Potato Corner Store location then operated by us or our affiliates.

These restrictions also apply after transfers, as provided in Section 12.C.(12) above.  If any person restricted by this Subsection refuses voluntarily to comply with these obligations, the two (2) year period for that person will commence with the entry of a court order enforcing this provision. You and your owners expressly acknowledge that you possess skills and abilities of a general nature and have other opportunities for exploiting these skills.  Consequently, our enforcing the covenants made in this Subsection will not deprive you of your personal goodwill or ability to earn a living.

## E.     **OUR RIGHT TO PURCHASE CERTAIN ASSETS OF THE STORE.**

Upon termination of this Agreement, or upon expiration of this Agreement without renewal, we shall have the right and option, but not the obligation, to purchase any equipment from the STORE at a purchase price equal to its then-current book value determined using the straight-line method of depreciation.  If we elect to exercise this option, we will deliver written notice to you of our election within thirty (30) days after the date of termination or expiration of this Agreement.  We will have the right to inspect the equipment at any time during this thirty (30) day period.  If we elect to purchase the equipment, we will be entitled to, and you must provide, all customary warranties and representations relating to the equipment purchase, including, without limitation, representations and warranties as to the maintenance, function and condition of the equipment and your good title to the equipment (including that you own the equipment free and clear of any liens and encumbrances).

## F.     **CONTINUING OBLIGATIONS.**

All of our and your (and your owners') obligations which expressly or by their nature survive this Agreement's expiration or termination will continue in full force and effect subsequent to and notwithstanding its expiration or termination and until they are satisfied in full or by their nature expire.

## 16.    **RELATIONSHIP OF THE PARTIES/INDEMNIFICATION.**

## A.     **INDEPENDENT CONTRACTORS.**

You and we understand and agree that this Agreement does not create a fiduciary relationship between you and us, that you and we are and will be independent contractors, and that nothing in this Agreement is intended to make either you or us a general or special agent, joint venturer, partner, or employee of the other for any purpose. You agree to identify yourself conspicuously in all dealings with customers, suppliers, public officials, STORE personnel, and others as the STORE's owner under a franchise we have granted and to place notices of

independent ownership on the forms, business cards, stationery, advertising, and other materials we require from time to time.

## B.    **NO LIABILITY FOR ACTS OF OTHER PARTY.**

We and you may not make any express or implied agreements, warranties, guarantees, or representations, or incur any debt, in the name or on behalf of the other or represent that our respective relationship is other than franchisor and franchise owner. We will not be obligated for any damages to any person or property directly or indirectly arising out of the STORE's operation or the business you conduct under this Agreement.

## C.    **TAXES.**

We will have no liability for any sales, use, service, occupation, excise, gross receipts, income, property, or other taxes, whether levied upon you or the STORE, due to the business you conduct (except for our income taxes). You are responsible for paying these taxes and must reimburse us for any taxes that we must pay to any state taxing authority on account of either your operation or payments that you make to us.

## D.    **INDEMNIFICATION.**

You agree to indemnify, defend, and hold harmless us, our affiliates, and our and their respective shareholders, directors, officers, employees, agents, successors, and assignees (the "Indemnified Parties") against, and to reimburse any one or more of the Indemnified Parties for, all claims, obligations, and damages directly or indirectly arising out of the STORE's operation, the business you conduct under this Agreement, or your breach of this Agreement, including, without limitation, those alleged to be or found to have been caused by the Indemnified Party's negligence, unless (and then only to the extent that) the claims, obligations, or damages are determined to be caused solely by our gross negligence or willful misconduct in a final, unappealable ruling issued by a court or arbitrator with competent jurisdiction.

For purposes of this indemnification, "claims" include all obligations, damages (actual, consequential, or otherwise), and costs that any Indemnified Party reasonably incurs in defending any claim against it, including, without limitation, reasonable accountants', arbitrators', attorneys', and expert witness fees, costs of investigation and proof of facts, court costs, travel and living expenses, and other expenses of litigation, arbitration, or alternative dispute resolution, regardless of whether litigation, arbitration, or alternative dispute resolution is commenced. Each Indemnified Party may defend any claim against it at your expense and agree to settlements or take any other remedial, corrective, or other actions.

This indemnity will continue in full force and effect subsequent to and notwithstanding this Agreement's expiration or termination. An Indemnified Party need not seek recovery from any insurer or other third party, or otherwise mitigate its losses and expenses, in order to maintain and recover fully a claim against you under this subparagraph. You agree that a failure to pursue a recovery or mitigate a loss will not reduce or alter the amounts that an Indemnified Party may recover from you under this subparagraph.

## 17.    **ENFORCEMENT.**

### A.    **SEVERABILITY AND SUBSTITUTION OF VALID PROVISIONS.**

Except as expressly provided to the contrary in this Agreement, each section, paragraph, term, and provision of this Agreement is severable, and if, for any reason, any part is held to be invalid or contrary to or in conflict with any applicable present or future law or regulation in a final, unappealable ruling issued by any court, agency, or tribunal with competent jurisdiction, that ruling will not impair the operation of, or otherwise affect, any other portions of this Agreement, which will continue to have full force and effect and bind the parties.

If any covenant which restricts competitive activity is deemed unenforceable by virtue of its scope in terms of area, business activity prohibited, and/or length of time, but would be enforceable if modified, you and we agree that the covenant will be enforced to the fullest extent permissible under the laws and public policies applied in the jurisdiction whose law determines the covenant's validity.

If any applicable and binding law or rule of any jurisdiction requires more notice than this Agreement requires of this Agreement's termination or of our refusal to enter into a successor franchise agreement, or some other action that this Agreement does not require, or if, under any applicable and binding law or rule of any jurisdiction, any provision of this Agreement or any System Standard is invalid, unenforceable, or unlawful, the notice and/or other action required by the law or rule will be substituted for the comparable provisions of this Agreement, and we may modify the invalid or unenforceable provision or System Standard to the extent required to be valid and enforceable or delete the unlawful provision in its entirety. You agree to be bound by any promise or covenant imposing the maximum duty the law permits which is subsumed within any provision of this Agreement, as though it were separately articulated in and made a part of this Agreement.

### B.    **WAIVER OF OBLIGATIONS.**

We and you may by written instrument unilaterally waive or reduce any obligation of or restriction upon the other under this Agreement, effective upon delivery of written notice to the other or another effective date stated in the notice of waiver. Any waiver granted will be without prejudice to any other rights we or you have, will be subject to continuing review, and may be revoked at any time and for any reason effective upon delivery of ten (10) days' prior written notice.

We and you will not waive or impair any right, power, or option this Agreement reserves (including, without limitation, our right to demand exact compliance with every term, condition, and covenant or to declare any breach to be a default and to terminate this Agreement before its term expires) because of any custom or practice at variance with this Agreement's terms; our or your failure, refusal, or neglect to exercise any right under this Agreement or to insist upon the other's compliance with this Agreement, including, without limitation, any System Standard; our waiver of or failure to exercise any right, power, or option, whether of the same, similar, or different nature, with other Potato Corner Stores; the existence of franchise agreements for other Potato Corner Stores which contain provisions different from those contained in this Agreement;

or our acceptance of any payments due from you after any breach of this Agreement. No special or restrictive legend or endorsement on any check or similar item given to us will be a waiver, compromise, settlement, or accord and satisfaction. We are authorized to remove any legend or endorsement, which then will have no effect.

Neither we nor you will be liable for loss or damage or be in breach of this Agreement if our or your failure to perform our or your obligations results from: (1) compliance with the orders, requests, regulations, or recommendations of any federal, state, or municipal government; (2) acts of God; (3) fires, strikes, embargoes, war, acts of terrorism or similar events, or riot; or (4) any other similar event or cause. Any delay resulting from any of these causes will extend performance accordingly or excuse performance, in whole or in part, as may be reasonable, except that these causes will not excuse payments of amounts owed at the time of the occurrence or payment of Royalties or Fund and Cooperative contributions due afterward.

## C. **COSTS AND ATTORNEYS' FEES.**

If we incur costs and expenses due to your failure to pay when due amounts owed to us, to submit when due any reports, information, or supporting records, or otherwise to comply with this Agreement, you agree, whether or not we initiate a formal legal proceeding, to reimburse us for all of the costs and expenses that we incur, including, without limitation, reasonable accounting, attorneys', arbitrators', and related fees.

## D. **RIGHTS OF PARTIES ARE CUMULATIVE.**

Our and your rights under this Agreement are cumulative, and our or your exercise or enforcement of any right or remedy under this Agreement will not preclude our or your exercise or enforcement of any other right or remedy which we or you are entitled by law to enforce.

## E. **ARBITRATION.**

We and you agree that all controversies, disputes, or claims between us and our affiliates, and our and their respective shareholders, officers, directors, agents, and/or employees, and you (and/or your owners, guarantors, affiliates, and/or employees) arising out of or related to:

      (1)    this Agreement or any other agreement between you and us;

      (2)    our relationship with you;

      (3)    the scope and validity of this Agreement or any other agreement between you and us or any provision of such agreements (including the validity and scope of the arbitration obligations under this Subsection, which the parties acknowledge is to be determined by an arbitrator and not a court); or

      (4)    any System Standard;

must be submitted for binding arbitration, on demand of either party, to the American Arbitration Association. The arbitration proceedings will be conducted by one arbitrator and, except as this Subsection otherwise provides, according to the then current commercial arbitration rules of the

American Arbitration Association. All proceedings will be conducted at a suitable location chosen by the arbitrator in the Los Angeles, California metropolitan area. All matters relating to arbitration will be governed by the Federal Arbitration Act (9 U.S.C. §§ 1 et seq.). Judgment upon the arbitrator's award may be entered in any court of competent jurisdiction.

The arbitrator has the right to award or include in his or her award any relief which he or she deems proper, including, without limitation, money damages (with interest on unpaid amounts from the date due), specific performance, injunctive relief, and attorneys' fees and costs, provided that the arbitrator may not declare any Mark generic or otherwise invalid or, except as expressly provided in Subsection 17.H. below, award any punitive or exemplary damages against either party (we and you hereby waiving to the fullest extent permitted by law, except as expressly provided in Subsection 17.H. below, any right to or claim for any punitive or exemplary damages against the other).

We and you agree to be bound by the provisions of any limitation on the period of time in which claims must be brought under applicable law or this Agreement, whichever expires earlier. We and you further agree that, in any arbitration proceeding, each must submit or file any claim which would constitute a compulsory counterclaim (as defined by Rule 13 of the Federal Rules of Civil Procedure) within the same proceeding as the claim to which it relates. Any claim which is not submitted or filed as required is forever barred. The arbitrator may not consider any settlement discussions or offers that might have been made by either you or us. We reserve the right, but have no obligation, to advance your share of the costs of any arbitration proceeding in order for such arbitration proceeding to take place and by doing so will not be deemed to have waived or relinquished our right to seek the recovery of those costs in accordance with Subsection 17.C.

We and you agree that arbitration will be conducted on an individual, not a class-wide, basis and that an arbitration proceeding between us and our affiliates, and our and their respective shareholders, officers, directors, agents, and/or employees, and you (and/or your owners, guarantors, affiliates, and/or employees) may not be consolidated with any other arbitration proceeding between us and any other person. Notwithstanding the foregoing or anything to the contrary in this Subsection or Subsection 17.A., if any court or arbitrator determines that all or any part of the preceding sentence is unenforceable with respect to a dispute that otherwise would be subject to arbitration under this Subsection 17.E., then the parties agree that this arbitration clause shall not apply to that dispute and that such dispute will be resolved in a judicial proceeding in accordance with this Section 17 (excluding this Subsection 17.E.).

Despite our and your agreement to arbitrate, we and you each have the right in a proper case to seek temporary restraining orders and temporary or preliminary injunctive relief from a court of competent jurisdiction; provided, however, that we and you must contemporaneously submit our dispute for arbitration on the merits as provided in this Subsection.

The provisions of this Subsection are intended to benefit and bind certain third party non-signatories and will continue in full force and effect subsequent to and notwithstanding this Agreement's expiration or termination.

F.   **GOVERNING LAW.**

**ALL MATTERS RELATING TO ARBITRATION WILL BE GOVERNED BY THE FEDERAL ARBITRATION ACT (9 U.S.C. §§ 1 ET SEQ.). EXCEPT TO THE EXTENT GOVERNED BY THE FEDERAL ARBITRATION ACT, THE UNITED STATES TRADEMARK ACT OF I946 (LANHAM ACT, I5 U.S.C. SECTIONS I051 ET SEQ.), OR OTHER FEDERAL LAW, THIS AGREEMENT, THE FRANCHISE, AND ALL CLAIMS ARISING FROM THE RELATIONSHIP BETWEEN US AND YOU WILL BE GOVERNED BY THE LAWS OF THE STATE WHERE THE STORE IS LOCATED, WITHOUT REGARD TO ITS CONFLICT OF LAWS RULES.**

G.   **CONSENT TO JURISDICTION.**

**SUBJECT TO SUBSECTION 17.E. ABOVE AND THE PROVISIONS BELOW, YOU AND YOUR OWNERS AGREE THAT ALL ACTIONS ARISING UNDER THIS AGREEMENT OR OTHERWISE AS A RESULT OF THE RELATIONSHIP BETWEEN YOU AND US MUST BE COMMENCED IN THE STATE OR FEDERAL COURT OF GENERAL JURISDICTION OF THE LAWS OF THE STATE WHERE THE STORE IS LOCATED, AND YOU (AND EACH OWNER) IRREVOCABLY SUBMIT TO THE JURISDICTION OF THOSE COURTS AND WAIVE ANY OBJECTION YOU (OR THE OWNER) MIGHT HAVE TO EITHER THE JURISDICTION OF OR VENUE IN THOSE COURTS. NONETHELESS, YOU AND YOUR OWNERS AGREE THAT WE MAY ENFORCE THIS AGREEMENT AND ANY ARBITRATION ORDERS AND AWARDS IN THE COURTS OF THE STATE OR STATES IN WHICH YOU ARE DOMICILED OR THE STORE IS LOCATED.**

H.   **WAIVER OF PUNITIVE DAMAGES AND JURY TRIAL.**

**EXCEPT FOR YOUR OBLIGATION TO INDEMNIFY US FOR THIRD PARTY CLAIMS UNDER SUBSECTION 16.D., AND EXCEPT FOR PUNITIVE DAMAGES AVAILABLE TO EITHER PARTY UNDER FEDERAL LAW, WE AND YOU (AND YOUR OWNERS) WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW ANY RIGHT TO OR CLAIM FOR ANY PUNITIVE OR EXEMPLARY DAMAGES AGAINST THE OTHER AND AGREE THAT, IN THE EVENT OF A DISPUTE BETWEEN US AND YOU, THE PARTY MAKING A CLAIM WILL BE LIMITED TO EQUITABLE RELIEF AND TO RECOVERY OF ANY ACTUAL DAMAGES IT SUSTAINS.**

**WE AND YOU IRREVOCABLY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM, WHETHER AT LAW OR IN EQUITY, BROUGHT BY EITHER OF US.**

I.   **BINDING EFFECT.**

This Agreement is binding upon us and you and our and your respective executors, administrators, heirs, beneficiaries, permitted assigns, and successors in interest. Subject to our right to modify the Operations Manual and System Standards, this Agreement may not be modified except by a written agreement signed by both our and your duly-authorized officers.

46

### J.     **LIMITATIONS OF CLAIMS.**

Except for claims arising from your non-payment or underpayment of amounts you owe us, any and all claims arising out of or relating to this Agreement or our relationship with you will be barred unless a judicial or arbitration proceeding is commenced within eighteen (18) months from the date on which the party asserting the claim knew or should have known of the facts giving rise to the claims.

### K.     **CONSTRUCTION.**

The preambles and exhibits are a part of this Agreement which, together with any addenda or riders signed at the same time as this Agreement, constitutes our and your entire agreement, and supersedes all prior and contemporaneous oral or written agreements and understandings between us and you relating to the subject matter of this Agreement. There are no other oral or written understandings or agreements between us and you, or oral or written representations by us, relating to the subject matter of this Agreement, the franchise relationship, or the STORE (any understandings or agreements reached, or any representations made, before this Agreement are superseded by this Agreement). Notwithstanding the foregoing, nothing in this Agreement shall disclaim or require you to waive reliance on any representation made by us in our most recent franchise disclosure document (including exhibits and amendments) delivered to you or your representative.

Any policies that we adopt and implement from time to time to guide us in our decision-making are subject to change, are not a part of this Agreement, and are not binding on us.

Except as provided in Subsections 16.D. and 17.E., nothing in this Agreement is intended or deemed to confer any rights or remedies upon any person or legal entity not a party to this Agreement.

Except where this Agreement expressly obligates us reasonably to approve or not unreasonably to withhold our approval of any of your actions or requests, we have the absolute right to refuse any request you make or to withhold our approval of any of your proposed, initiated, or completed actions that require our approval. The headings of the sections and paragraphs are for convenience only and do not define, limit, or construe the contents of these sections or paragraphs.

References in this Agreement to "we," "us," and "our," with respect to all of our rights and all of your obligations to us under this Agreement, include any of our affiliates with whom you deal. The term "affiliate" means any person or entity directly or indirectly owned or controlled by, under common control with, or owning or controlling you or us. "Control" means the power to direct or cause the direction of management and policies.

If two or more persons are at any time the owners of the Franchise and the STORE, whether as partners or joint venturers, their obligations and liabilities to us will be joint and several. References to "owner" mean any person holding a direct or indirect ownership interest (whether of record, beneficially, or otherwise) or voting rights in you (or a transferee of this Agreement and the STORE or an ownership interest in you), including, without limitation, any

person who has a direct or indirect interest in you (or a transferee), this Agreement, the Franchise, or the STORE and any person who has any other legal or equitable interest, or the power to vest in himself or herself any legal or equitable interest, in their revenue, profits, rights, or assets.

References to a "controlling ownership interest" in you or one of your owners (if an Entity) mean the percent of the voting shares or other voting rights that results from dividing one hundred percent (100%) of the ownership interests by the number of owners. In the case of a proposed transfer of an ownership interest in you or one of your owners, the determination of whether a "controlling ownership interest" is involved must be made as of both immediately before and immediately after the proposed transfer to see if a "controlling ownership interest" will be transferred (because of the number of owners before the proposed transfer) or will be deemed to have been transferred (because of the number of owners after the proposed transfer).

"Person" means any natural person, corporation, limited liability company, general or limited partnership, unincorporated association, cooperative, or other legal or functional entity.

Unless otherwise specified, all references to a number of days shall mean calendar days and not business days.

The term "STORE" includes all of the assets of the Potato Corner Store you operate under this Agreement, including its revenue and the Lease.

This Agreement may be executed in multiple copies, each of which will be deemed an original.

## 18.   NOTICES AND PAYMENTS.

All written notices, reports, and payments permitted or required to be delivered by this Agreement or the Operations Manual will be deemed to be delivered:

(a)     at the time delivered by hand;

(h)     at the time delivered via computer transmission and, in the case of the Royalty, Fund contributions, and other amounts due, at the time we actually receive payment via the EDTA;

(c)     one (1) business day after transmission by facsimile or other electronic system if the sender has confirmation of successful transmission;

(d)     one (1) business day after being placed in the hands of a nationally recognized commercial courier service for next business day delivery; or

(e)     three (3) business days after placement in the United States Mail by Registered or Certified Mail, Return Receipt Requested, postage prepaid.

Any notice to us must be sent to the address specified on the first page of this Agreement, although we may change this address for notice by giving you notice of the new address. Any

notice that we send to you may be sent only to the one (1) person identified on **Exhibit A**, even if you have multiple owners, at the email or postal address specified on **Exhibit A**. You may change the person and/or address for notice only by giving us thirty (30) days' prior notice by any of the means specified in subparagraphs (a) through (e) above.

Any required payment or report which we do not actually receive during regular business hours on the date due (or postmarked by postal authorities at least two (2) days before then) will be deemed delinquent.

## 19.   COMPLIANCE WITH ANTI-TERRORISM LAWS.

You and your owners agree to comply, and to assist us to the fullest extent possible in our efforts to comply, with Anti-Terrorism Laws (defined below). In connection with that compliance, you and your owners certify, represent, and warrant that none of your property or interests is subject to being blocked under, and that you and your owners otherwise are not in violation of, any of the Anti-Terrorism Laws. "Anti-Terrorism Laws" mean Executive Order 13224 issued by the President of the United States, the USA PATRIOT Act, and all other present and future federal, state, and local laws, ordinances, regulations, policies, lists, and other requirements of any governmental authority addressing or in any way relating to terrorist acts and acts of war. Any violation of the Anti-Terrorism Laws by you or your owners, or any blocking of you or your owners' assets under the Anti-Terrorism Laws, shall constitute good cause for immediate termination of this Agreement, as provided in Subsection 14.B.(18) above.

## 20.   ELECTRONIC MAIL.

You acknowledge and agree that exchanging information with us by e-mail is efficient and desirable for day-to-day communications and that we and you may utilize e-mail for such communications. You authorize the transmission of e-mail by us and our employees, vendors, and affiliates ("Official Senders") to you during the term of this Agreement.

You further agree that: (a) Official Senders are authorized to send e-mails to those of your employees as you may occasionally authorize for the purpose of communicating with us; (b) you will cause your officers, directors, and employees to give their consent to Official Senders' transmission of e-mails to them; (c) you will require such persons not to opt out or otherwise ask to no longer receive e-mails from Official Senders during the time that such person works for or is affiliated with you; and (d) you will not opt out or otherwise ask to no longer receive e-mails from Official Senders during the term of this Agreement.

The consent given in this Section 20 shall not apply to the provision of notices by either party under this Agreement pursuant to Section 18 using e-mail unless the parties otherwise agree in a written document manually signed by both parties.

[Signatures on following page.]

**IN WITNESS WHEREOF**, the parties have executed and delivered this Agreement on the dates noted below, to be effective as of the Effective Date.

**PCJV USA, LLC,**
**A Delaware limited liability company**

By:_____

**DATED\*:**_____
(\*Effective Date of this Agreement)

Address:  1729 Santee Street
          Los Angeles, California  90015

**FRANCHISE OWNER**

**(IF YOU ARE TAKING THE**
**FRANCHISE AS A CORPORATION,**
**LIMITED LIABILITY COMPANY, OR**
**PARTNERSHIP):**

_____
[Print Name of Franchisee Entity]

By:_____
[signature of person signing on behalf of entity]

Title of Signator:_____

**DATED**:_____

**(IF YOU ARE TAKING THE**
**FRANCHISE INDIVIDUALLY AND**
**NOT AS A LEGAL ENTITY):**

_____
[signature of individual franchisee]

Print Name:_____

**DATED**:_____

_____
[signature of individual franchisee]

Print Name:_____

**DATED**:_____

Principal Business Address:

_____
_____

## EXHIBIT A

### TO THE FRANCHISE AGREEMENT

**Effective Date:  This Exhibit A is current and complete
as of                  , 200      **

#### You and Your Owners

1.    **Form of Owner**.  (Choose (a) or (b))

(a)    **Individual Proprietorship**.  List individual(s):

_____

_____

_____

(b)    **Corporation, Limited Liability Company, or Partnership.**  (CIRCLE ONE)  You were incorporated or formed on _____, under the laws of the State of _____.  You have not conducted business under any name other than your corporate, limited    liability    company,    or    partnership    name    and    _____ _____.  The following is a list of your directors, if applicable, and officers as of the effective date shown above:

| Name of Each Director/Officer | Position(s) Held |
|---|---|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

2.    **Owners**.  The following list includes the full name of each person who is one of your owners (as defined in the Franchise Agreement), or an owner of one of your owners, and fully describes the nature of each owner's interest (attach additional pages if necessary).

|  | **Owner's Name** | **Percentage/Description of Interest** |
|---|---|---|
| (a) | _____ | _____ |
| (b) | _____ | _____ |
| (c) | _____ | _____ |
| (d) | _____ | _____ |

      3.    **Name and Address of Person to Receive Notice for Franchise Owner**.

(a)    Name:_____

(b)    Postal Address:_____

_____

(c)    E-mail Address:_____

      4.    **Identification of Managing Owner**.  Your Managing Owner as of the Effective Date is _____ (must be one of the individuals listed in paragraph 2 above).  You may not change the Managing Owner without prior written approval.

[Signatures on following page.]

A-2

**PCJV USA, LLC,**
**A Delaware limited liability company**


By:_____
_____, President

**DATED\*:**_____
(\*Effective Date of this Agreement)

Address:  1729 Santee Street
               Los Angeles, California  90015

**FRANCHISE OWNER**

**(IF YOU ARE TAKING THE**
**FRANCHISE AS A CORPORATION,**
**LIMITED LIABILITY COMPANY, OR**
**PARTNERSHIP):**

_____
[Print Name of Franchisee Entity]

By:_____
[signature of person signing on behalf of entity]

Title of Signator:_____

**DATED**:_____


**(IF YOU ARE TAKING THE**
**FRANCHISE INDIVIDUALLY AND**
**NOT AS A LEGAL ENTITY):**


_____
[signature of individual franchisee]

Print Name:_____

**DATED**:_____


_____
[signature of individual franchisee]

Print Name:_____

**DATED**:_____

**EXHIBIT B**
**TO THE FRANCHISE AGREEMENT**
**THE PREMISES**

1.    The Premises of the STORE will be located at:

_____
_____
_____
_____

PCJV USA, LLC,                              **FRANCHISE OWNER**
A Delaware limited liability company
                                            **(IF YOU ARE TAKING THE**
                                            **FRANCHISE AS A CORPORATION,**
By:_____        **LIMITED LIABILITY COMPANY, OR**
_____, President                         **PARTNERSHIP):**

**DATED\*:**_____         _____
(\*Effective Date of this Agreement)        [Print Name of Franchisee Entity]

Address:  1729 Santee Street
          Los Angeles, California  90015    By:_____
                                            [signature of person signing on behalf of entity]

                                            Title of Signator:_____

                                            **DATED**:_____

                                            **(IF YOU ARE TAKING THE**
                                            **FRANCHISE INDIVIDUALLY AND**
                                            **NOT AS A LEGAL ENTITY):**


                                            _____
                                            [signature of individual franchisee]

                                            Print Name:_____

                                            **DATED**:_____


                                            _____
                                            [signature of individual franchisee]

                                            Print Name:_____

                                            **DATED**:_____

## GUARANTY AND ASSUMPTION OF OBLIGATIONS

**THIS GUARANTY AND ASSUMPTION OF OBLIGATIONS** is given this _____
day of _____, 20 __

By (list each guarantor):

_____

_____

_____

_____.

In consideration of, and as an inducement to, the execution of that certain Franchise Agreement (the "Agreement") on this date by PCJV USA, LLC, a Delaware limited liability company ("us," "we," or "our"), each of the undersigned personally and unconditionally (a) guarantees to us and our successors and assigns, for the term of the Agreement (including extensions) and afterward as provided in the Agreement, that _____ ("Franchisee") will punctually pay and perform each and every undertaking, agreement, and covenant set forth in the Agreement (including any amendments or modifications of the Agreement) and (b) agrees to be personally bound by, and personally liable for the breach of, each and every provision in the Agreement (including any amendments or modifications of the Agreement), both monetary obligations and obligations to take or refrain from taking specific actions or to engage or refrain from engaging in specific activities, including the non-competition, confidentiality, transfer, and arbitration requirements.

Each of the undersigned consents and agrees that: (1) his or her direct and immediate liability under this Guaranty will be joint and several, both with Franchisee and among other guarantors; (2) he or she will render any payment or performance required under the Agreement upon demand if Franchisee fails or refuses punctually to do so; (3) this liability will not be contingent or conditioned upon our pursuit of any remedies against Franchisee or any other person; (4) this liability will not be diminished, relieved, or otherwise affected by any extension of time, credit, or other indulgence which we may from time to time grant to Franchisee or to any other person, including, without limitation, the acceptance of any partial payment or performance or the compromise or release of any claims (including the release of other guarantors), none of which will in any way modify or amend this Guaranty, which will be continuing and irrevocable during the term of the Agreement (including extensions), for so long as any performance is or might be owed under the Agreement by Franchisee or its owners, and for so long as we have any cause of action against Franchisee or its owners; and (5) this Guaranty will continue in full force and effect for (and as to) any extension or modification of the Agreement and despite the transfer of any interest in the Agreement or Franchisee, and each of the undersigned waives notice of any and all renewals, extensions, modifications, amendments, or transfers.

Each of the undersigned waives: (i) all rights to payments and claims for reimbursement or subrogation which any of the undersigned may have against Franchisee arising as a result of the undersigned's execution of and performance under this Guaranty; and (ii) acceptance and notice of acceptance by us of his or her undertakings under this Guaranty, notice of demand for

payment of any indebtedness or non-performance of any obligations hereby guaranteed, protest and notice of default to any party with respect to the indebtedness or nonperformance of any obligations hereby guaranteed, and any other notices to which he or she may be entitled.

If we are required to enforce this Guaranty in a judicial or arbitration proceeding, and prevail in such proceeding, we shall be entitled to reimbursement of our costs and expenses, including, but not limited to, reasonable accountants', attorneys', attorneys' assistants', arbitrators', and expert witness fees, costs of investigation and proof of facts, court costs, other litigation expenses, and travel and living expenses, whether incurred prior to, in preparation for, or in contemplation of the filing of any such proceeding. If we are required to engage legal counsel in connection with any failure by the undersigned to comply with this Guaranty, the undersigned shall reimburse us for any of the above-listed costs and expenses we incur.

Subject to the arbitration obligations and the provisions below, each of the undersigned agrees that all actions arising under this Guaranty or the Agreement, or otherwise as a result of the relationship between us and the undersigned, must be commenced in the state or federal court of general jurisdiction in Los Angeles, California, and each of the undersigned irrevocably submits to the jurisdiction of those courts and waives any objection he or she might have to either the jurisdiction of or venue in those courts. Nonetheless, each of the undersigned agrees that we may enforce this Guaranty and any arbitration orders and awards in the courts of the state or states in which he or she is domiciled.

**IN WITNESS WHEREOF**, each of the undersigned has affixed his or her signature on the same day and year as the Agreement was executed.

**Signatures Of Each Guarantor**

**Percentage Of Ownership
In Franchisee**

| | |
|---|---|
| _____ | _____ % |
| _____ | _____ % |
| _____ | _____ % |
| _____ | _____ % |
| _____ | _____ % |

Potato Corner USA's - 2010 Franchise Agreement
WEST\21976838.10

# **EXHIBIT C**

# **FINANCIAL STATEMENTS**

**PCJV USA, LLC**
A DEVELOPMENT - STAGE COMPANY
CONTENTS
December 31, 2010

|  | Page |
|---|---|
| **INDEPENDENT ACCOUNTANT'S REPORT** | 1 |
| **FINANCIAL STATEMENT** | |
| Balance Sheet | 2 |
| Notes to the Financial Statement | 3 - 4 |

THESE FINANCIAL STATEMENTS WERE PREPARED
WITHOUT AN AUDIT. INVESTORS IN AND SELLERS
OF FRANCHISES SHOULD BE ADVISED THAT NO
CERTIFIED PUBLIC ACCOUNTANT HAS AUDITED
THESE FIGURES OR EXPRESSED AN OPINION
WITH RESPECT TO THEIR CONTENTS OR FORM.

 **SingerLewak** LLP

www.SingerLewak.com

Silicon Valley
Los Angeles
Orange County
Woodland Hills
Monterey Park
San Diego

**INDEPENDENT ACCOUNTANT'S REPORT**



To the Members
PCJV USA, LLC
A Development-Stage Company
Los Angeles, CA

We have reviewed the accompanying balance sheet of PCJV USA, LLC, a Development-Stage Company (the "Company") as of December 31, 2010, in accordance with Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants. All of the information included in this balance sheet is the representation of the management of the Company.

A review consists principally of inquiries of Company personnel and analytical procedures applied to financial data. It is substantially less in scope than an audit in accordance with auditing standards generally accepted in the United States of America, the objective of which is the expression of an opinion regarding the balance sheet taken as a whole. Accordingly, we do not express such an opinion.

Based on our review, we are not aware of any material modifications that should be made to the accompanying balance sheet in order for it to be in conformity with accounting principles generally accepted in the United States of America.

*SingerLewak LLP*

SingerLewak LLP

San Jose, CA
February 3, 2011

THESE FINANCIAL STATEMENTS WERE PREPARED
WITHOUT AN AUDIT. INVESTORS IN AND SELLERS
OF FRANCHISES SHOULD BE ADVISED THAT NO
CERTIFIED PUBLIC ACCOUNTANT HAS AUDITED
THESE FIGURES OR EXPRESSED AN OPINION
WITH RESPECT TO THEIR CONTENTS OR FORM.

100 West San Fernando Street, Suite 365  San Jose, CA 95113   T: 408.294.3924   F: 408.295.3925

877.754.4557



**PCJV USA, LLC**
**A DEVELOPMENT - STAGE COMPANY**
**BALANCE SHEET**
December 31, 2010

**ASSETS**

| | | |
|---|---|---|
| **Current assets** | | |
| Cash | $ | 50,000 |
| **Total assets** | $ | **50,000** |

**MEMBERS' EQUITY**

| | | |
|---|---|---|
| Members' equity | $ | 50,000 |
| **Total members' equity** | $ | **50,000** |

THESE FINANCIAL STATEMENTS WERE PREPARED
WITHOUT AN AUDIT. INVESTORS IN AND SELLERS
OF FRANCHISES SHOULD BE ADVISED THAT NO
CERTIFIED PUBLIC ACCOUNTANT HAS AUDITED
THESE FIGURES OR EXPRESSED AN OPINION
WITH RESPECT TO THEIR CONTENTS OR FORM.

See accompanying Independent Accountant's Report.
The accompanying notes are an integral part of this financial statement.

2

**PCJV USA, LLC**
**A DEVELOPMENT - STAGE COMPANY**
**CONTENTS**
**December 31, 2010**

## NOTE 1 – ORGANIZATION AND BUSINESS PURPOSE

### Nature of the organization (PCJV)

PCJV USA, LLC, A Development-Stage Company (hereinafter, "PCJV") is a limited liability company formed under Delaware laws on July 16, 2010. PCJV was formed to engage in the business of franchising the "Potato Corner" food business, as well as to establish and operate company-owned stores in the U.S. In this regard, a Franchise Disclosure Document (FDD) has been prepared and will be filed shortly in order comply with relevant U.S. federal and state franchising laws and regulations, and allow PCJV to commence its franchising business in the U.S. PCJV has had no operations since its inception.

### Description of the members

The investors in PCJV are comprised of the Cinco Corporation ("Cinco Group") and three individual U.S.-based investors (the "LA Group").

### Nature of the business relationship

The business relationship between the Cinco Group and the LA Group, with regards to the capitalization, management, and operations of PCJV is set forth in a Joint Venture Agreement ("JV Agreement") to be entered into by the parties. The JV Agreement provides that the parties agree that the initial capitalization of the PCJV is $50,000.

The funds representing the initial capital contribution by the parties have been remitted and deposited in a Wells Fargo Bank account established in the name and for the benefit of PCJV.

With respect to the investment made by the Cinco Group in PCJV, this was made through Potato Corner International, Inc. ("PC-Int'l), a Delaware C corporation formed on July 16, 2010.

### Nature of the business operations

As mentioned above, PCJV intends to engage in the business of franchising the Potato Corner business in the U.S. The specifics of the proposed franchising business are set forth in the FDD to be filed by PCJV with the relevant federal and state regulatory agencies. In addition to its franchising activities, PCJV also intends to establish and operate company-owned stores in the U.S. To-date, however, PCJV has not engaged in any business operations, and does not plan to do so until the formal approval of the FDD is obtained.

THESE FINANCIAL STATEMENTS WERE PREPARED
WITHOUT AN AUDIT. INVESTORS IN AND SELLERS
OF FRANCHISES SHOULD BE ADVISED THAT NO
CERTIFIED PUBLIC ACCOUNTANT HAS AUDITED
THESE FIGURES OR EXPRESSED AN OPINION
WITH RESPECT TO THEIR CONTENTS OR FORM.

See accompanying Independent Accountant's Report.

**PCJV USA, LLC**
**A DEVELOPMENT - STAGE COMPANY**
**CONTENTS**
**December 31, 2010**

## NOTE 1 – ORGANIZATION AND BUSINESS PURPOSE (Continued)

Nature of the business operations (continued)

*Related-party transactions*

As set forth in the JV Agreement, PCJV and the Cinco Group will enter into a Trademark, Copyright and Trade Agreement granting to PCJV the right to use, and to license to others the right to use the mark, copyrights and know-how.

As set forth in the JV Agreement, a Master Services Agreement will be executed between NKM, LLC (as service provider) and PCJV (as service recipient). The services covered by the Master Services Agreement are all management and operational services performed by NKM LLC (or its members or contractors) in connection with the business of PCJV as set forth in the JV Agreement.

## NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Income and Franchise Taxes

PCJV is a limited liability company formed under Delaware laws on July 16, 2010. Upon the filing of its first year tax returns, the Company will elect to be treated as a partnership for tax purposes. The Company will file a U.S. federal income tax return, as well as franchise tax returns for California and Delaware, all of which are due to be filed in 2011.

## NOTE 3 – SUBSEQUENT EVENTS

PCJV has evaluated subsequent events for recognition or disclosure through the issuance date of these financial statements.

THESE FINANCIAL STATEMENTS WERE PREPARED
WITHOUT AN AUDIT. INVESTORS IN AND SELLERS
OF FRANCHISES SHOULD BE ADVISED THAT NO
CERTIFIED PUBLIC ACCOUNTANT HAS AUDITED
THESE FIGURES OR EXPRESSED AN OPINION
WITH RESPECT TO THEIR CONTENTS OR FORM.

See accompanying Independent Accountant's Report.
4

# EXHIBIT D

## OPERATIONS MANUAL TABLE OF CONTENTS

|  | Pages |
|---|---|
| Introduction | 1 |
| Table of Contents | 2 - 4 |
| How to Use This Manual | 5 |
| Confidential Disclosure Agreements | 6 |

Chapter 2 - Welcome to Potato Corner
| History | 1 - 2 |
|---|---|
| The Company Management Team | 3 - 5 |
| Legal Advisory and Franchisor's Management Support | 6 - 8 |
| Company Mission, Principles & Promises | 9 - 10 |

Chapter 3 - Support Resources
| FRANCHISEE SUPPORT MATRIX | 1 - 3 |
|---|---|
| Franchise Corporate Officers | 4 - 6 |

Chapter 4 - Pre-opening Timetable & Obligations
| Pre-Opening Timetable | 1 |
|---|---|
| Week One | 2 |
| Week Two | 3 |
| Week Three | 4 |
| Week Four | 5 |
| Week Five | 6 |
| Week Six | 7 |
| Week Seven | 8 |
| Week Eight | 9 |
| Week Nine | 10 |
| Week 10 | 11 |

Chapter 5 - Franchisee Training Requirements
| Orientation Training | 1 - 5 |
|---|---|
| Qualified Certifications | 6 - 8 |
| Additional Training / Refresher Courses | 9 - 11 |
| Annual Meeting | 12 |

Chapter 6 - Staffing Your Franchise
| Staffing Your Franchise | 1 - 3 |
|---|---|
| Position Descriptions with Profiles | 4 - 8 |

Chapter 7 – Store Policies
    Setting up Your Store ............................................ 1 - 4
    Quality Standards of Services .................................. 5 - 7
    Service and Courtesy to Guests ................................ 8 - 9
    Handling Typical Complaints and Problems ...................... 10 - 12
    Employee Appearance (Trade Dress) and Hygiene ................. 13 - 14
    Visitors in the Workplace ..................................... 15
    Computer/POS Usage ........................................... 16 - 18

Chapter 8 - STORE Operation and Maintenance
    Opening Procedures ........................................... 1 - 2
    Closing Procedures ........................................... 3 - 4
    Cleaning Procedures .......................................... 5 - 7
    Day-to-Day Franchise Duties and Responsibilities ............. 8 - 11
    Menus, Recipes and Standards ................................. 12 - 20
    Administration Major Activities Listing ...................... 21 - 22
    Administrative Management Checklist .......................... 23 - 26
    Material and Food Safety Data Sheets (MSDS): ................. 27 - 28
    Alarms, Locks, and Keys ...................................... 29
    Inventory Levels and Ordering Policies ....................... 30 - 35
    Safety and food handling procedures .......................... 36 - 40

Chapter 9 - Equipment, POS System, and Supplies
    Food and Paper goods ......................................... 1 - 2
    APPROVED VENDORS ............................................. 3
    Equipment "Starter Package" .................................. 4

Chapter 10 - Administration
    Record Keeping ............................................... 1 - 3
    Accounting ................................................... 4 - 10
    Collections and Accounts Payable Management .................. 11 - 12

Chapter 11 - Reports, Audits & Inspections
    Franchisee Reports ........................................... 1 - 3
    Records and Reports .......................................... 4 - 11
    Failure to Report ............................................ 12
    Audits and Inspections ....................................... 13 - 15

Chapter 12 – STORE READINESS
    THEFT, EMBEZZLEMENT, POS OFFLINE POLICY ...................... 1 - 2
    SECURITY AND EMERGENCY POLICIES .............................. 3 - 5

Chapter 13 - Marketing
    ON SITE AND LOCAL STORE MARKETING ........................... 1 - 5
    Grand opening and Marketing Plan ............................. 6 - 11

Chapter 14 - Sales & Pricing
    SELLING PRODUCTS                                                 1 - 2
    REQUIRED PRODUCT INFORMATION                    3 - 5
    LOCAL PRICING AND 'PRICE FIXING'                6 - 7
    PRICING POLICIES AND FEE STRUCTURES          8 - 11

Chapter 15 - Insurance Requirements & Risk Management
    General and product liability Insurance Coverage       1
    Risk Management                                         2
    Managing Risk at the Franchise Location             3
    Franchisee Site Security                           4
    Reporting Incidents                                 5 - 6

Chapter 16 - Corporate Structure and Financing
    SETTING UP YOUR ENTITY                          1 - 2
    LEGAL BUSINESS STRUCTURES                   3 - 5
    Types of Structures                                6 - 10
    Setting Up the New Corporation                 11 - 12

Chapter 17 - Trademarks and Trade Secrets - Protection Policies
    PATENTS, COPYRIGHTS AND PROPRIETARY INFORMATION     1
    TRADEMARK USAGE AND GUIDELINES           2 - 4
    EXAMPLES OF TRADEMARK MISUSE            5 - 8

Chapter 18 - Field Operations
    Safety First                                      1 - 5
    Outline of sanitation and health code process       6 - 12

Total Pages 207

**EXHIBIT E**

**STATE ADDENDA AND FRANCHISE AGREEMENT RIDERS**

**ADDITIONAL DISCLOSURES FOR THE**
**MULTI-STATE FRANCHISE DISCLOSURE DOCUMENT OF**
**PCJV USA, LLC**

The following are additional disclosures for the Franchise Disclosure Document of PCJV USA, LLC required by various state franchise laws. Each provision of these additional disclosures will not apply unless, with respect to that provision, the jurisdictional requirements of the applicable state franchise registration and disclosure law are met independently without reference to these additional disclosures.

### California

1.      The following paragraph is added at the end of Item 3 of the Disclosure Document:

Except as disclosed above, neither we nor any person identified in Item 2 is subject to any currently effective order of any national securities association or national securities exchange, as defined in the Securities and Exchange Act of 1934, 15 U.S.C.A. Section 78a et seq., suspending or expelling such person from membership in such association or exchange.

2.      THE CALIFORNIA FRANCHISE INVESTMENT LAW REQUIRES THAT A COPY OF ALL PROPOSED AGREEMENTS RELATING TO THE SALE OF THE FRANCHISE BE DELIVERED TOGETHER WITH THE DISCLOSURE DOCUMENT.

3.      OUR WEBSITE, www.potatocornerusa.com, HAS NOT BEEN REVIEWED OR APPROVED BY THE CALIFORNIA DEPARTMENT OF CORPORATIONS. ANY COMPLAINTS CONCERNING THE CONTENT OF THE WEBSITE MAY BE DIRECTED TO THE CALIFORNIA DEPARTMENT OF CORPORATIONS AT www.corp.ca.gov.

4.      The following paragraphs are added at the end of Item 17 of the Disclosure Document:

California Law Regarding Termination and Nonrenewal. California Business and Professions Code Sections 20000 through 20043 provide rights to franchisees concerning termination or nonrenewal of the franchise. If the Franchise Agreement contains any provision that is inconsistent with the law, and the law applies, then the law will control.

Termination Upon Bankruptcy. The Franchise Agreement provides for termination upon bankruptcy. This provision might not be enforceable under federal bankruptcy law (11 U.S.C.A. Sec. 101 et seq.)

Covenant not to Compete. The Franchise Agreement contains a covenant not to compete which extend beyond the termination of the franchise. This provision may not be enforceable under California law.

Arbitration.    The Franchise Agreement requires binding arbitration.    The arbitration will occur at a suitable location in the Los Angeles, California metropolitan area with the costs being borne as the arbitrator determines. Prospective franchisees are encouraged to consult private legal counsel to determine the applicability of California and federal laws (such as Business and Professions Code Section 20040.5, Code of Civil Procedure Section 1281, and the Federal Arbitration Act) to any provision of the Franchise Agreement restricting venue to a forum outside the State of California.

Material Modification.   California Corporations Code, Section 31125 requires the franchisor to give the franchisee a disclosure document, approved by the Department of Corporations, prior to a solicitation of a proposed material modification of an existing franchise.

Releases.   The Franchise Agreement requires you to sign a general release of claims upon renewal or transfer of the Franchise Agreement.    California Corporations Code Section 31512 provides that any condition, stipulation or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of that law or any rule or order thereunder is void.  Section 31512 might void a waiver of your rights under the Franchise Investment Law (California Corporations Code Section 31000 – 31516).   Business and Professions Code Section 20010 might void a waiver of your rights under the Franchise Relations Act (Business and Professions Code Sections 20000 – 20043).

**THE FOLLOWING PAGES IN THIS EXHIBIT ARE
THE FORM OF RELEASE WE
CURRENTLY INTEND TO USE IN CONNECTION WITH
RENEWALS AND TRANSFERS**

## PCJV USA, LLC

## GRANT OF FRANCHISOR CONSENT AND FRANCHISEE RELEASE

**PCJV USA, LLC** ("we," "us," or "our") and the undersigned franchisee,
_____ ("you" or "your"),
currently are parties to a certain Franchise Agreement (the "Franchise Agreement") dated
_____. You have asked us to take the following action or to agree
to the following request: [insert as appropriate for renewal or transfer situation] _____
_____
_____
_____. We
have the right under the Franchise Agreement to obtain a general release from you (and, if
applicable, your owners) as a condition of taking this action or agreeing to this request.
Therefore, we are willing to take the action or agree to the request specified above if you (and, if
applicable, your owners) give us the release and covenant not to sue provided below in this
document. You (and, if applicable, your owners) are willing to give us the release and covenant
not to sue provided below as partial consideration for our willingness to take the action or agree
to the request described above.

Consistent with the previous introduction, you, on your own behalf and on behalf of your
successors, heirs, executors, administrators, personal representatives, agents, assigns, partners,
shareholders, members, directors, officers, principals, employees, and affiliated entities
(collectively, the "Releasing Parties"), hereby forever release and discharge us and our current
and former officers, directors, owners, principals, employees, agents, representatives, affiliated
entities, successors, and assigns (collectively, the "PCJV Parties") from any and all claims,
damages (known and unknown), demands, causes of action, suits, duties, liabilities, and
agreements of any nature and kind (collectively, "Claims") that you and any of the other
Releasing Parties now has, ever had, or, but for this document, hereafter would or could have
against any of the PCJV Parties (1) arising out of or related to the PCJV Parties' obligations
under the Franchise Agreement or (2) otherwise arising from or related to your and the other
Releasing Parties' relationship, from the beginning of time to the date of your signature below,
with any of the PCJV Parties. You, on your own behalf and on behalf of the other Releasing
Parties, further covenant not to sue any of the PCJV Parties on any of the Claims released by this
paragraph and represent that you have not assigned any of the Claims released by this paragraph
to any individual or entity who is not bound by this paragraph.

We also are entitled to a release and covenant not to sue from your owners. By his, her,
or their separate signatures below, your owners likewise grant to us the release and covenant not
to sue provided above.

{Signature Page Follows}

**PCJV USA, LLC**

_____

[Name of Franchisee]

By:_____

Title:_____

By:_____

Date:_____

Title:_____

Date:_____

_____

[Name of Owner]

_____

[Signature]

Date:_____

## Item 23

### RECEIPT

This Disclosure Document summarizes certain provisions of the Franchise Agreement and other information in plain language. Read this Disclosure Document and all agreements carefully.

If PCJV USA, Inc. offers you a franchise, it must provide this Disclosure Document to you 14 calendar days before you sign a binding agreement with, or make a payment to, the franchisor or an affiliate in connection with the proposed franchise sale. **[Maryland, New York, and Rhode Island require that we give you this disclosure document at the earlier of the first personal meeting or 10 business days before the execution of the franchise or other agreement or the payment of any consideration that relates to the franchise relationship. Michigan and Washington require that we give you this disclosure document at least 10 business days before the execution of any binding franchise or other agreement or the payment of any consideration, whichever occurs first.]**

If PCJV USA, LLC does not deliver this Disclosure Document on time or if it contains a false or misleading statement, or a material omission, a violation of federal law and state law may have occurred and should be reported to the Federal Trade Commission, Washington, D.C. 20580 and the state agency listed on Exhibit A.

The franchisor is PCJV USA, LLC, located at 1729 Santee Street, Los Angeles, California 90015. Its telephone number is 800-565-1114.

Issuance date: February 7, 2011 (with the effective dates in franchise registration states appearing on the fourth page of this disclosure document).

The name, principal business address, and telephone number of each franchise seller offering the franchise is as follows (circle those who apply to this transaction): _____, our ___
_____, with his/her principal business address at 1729 Santee Street, Los Angeles, California 90015, (800) 565-1114.

We authorize the respective state agencies identified on Exhibit A to receive service of process for us in the particular state.

I received a Disclosure Document dated February 7, 2011 from PCJV USA, LLC that included the following Exhibits:

A. List of State Administrators/Agents for Service of Process
B. Franchise Agreement
C. Financial Statements
D. Operations Manual Table of Contents
E State Addenda and Franchise Agreement Riders

_____        _____
Date                                                          Prospective Franchisee

(Sign, Date and Keep This Copy for Your        _____
Records)                                                    Authorized Signature

WEST\22061893.9

## Item 23

### RECEIPT

This Disclosure Document summarizes certain provisions of the Franchise Agreement and other information in plain language. Read this Disclosure Document and all agreements carefully.

If PCJV USA, Inc. offers you a franchise, it must provide this Disclosure Document to you 14 calendar days before you sign a binding agreement with, or make a payment to, the franchisor or an affiliate in connection with the proposed franchise sale. **[Maryland, New York, and Rhode Island require that we give you this disclosure document at the earlier of the first personal meeting or 10 business days before the execution of the franchise or other agreement or the payment of any consideration that relates to the franchise relationship.  Michigan and Washington require that we give you this disclosure document at least 10 business days before the execution of any binding franchise or other agreement or the payment of any consideration, whichever occurs first.]**

If PCJV USA, LLC does not deliver this Disclosure Document on time or if it contains a false or misleading statement, or a material omission, a violation of federal law and state law may have occurred and should be reported to the Federal Trade Commission, Washington, D.C. 20580 and the state agency listed on Exhibit A.

The franchisor is PCJV USA, LLC, located at 1729 Santee Street, Los Angeles, California 90015.  Its telephone number is 800-565-1114.

Issuance date:  February 7, 2011 (with the effective dates in franchise registration states appearing on the fourth page of this disclosure document).

The name, principal business address, and telephone number of each franchise seller offering the franchise is as follows (circle those who apply to this transaction): _____, our ___ _____, with his/her principal business address at 1729 Santee Street, Los Angeles, California 90015, (800) 565-1114.

We authorize the respective state agencies identified on Exhibit A to receive service of process for us in the particular state.

I received a Disclosure Document dated February 7, 2011 from PCJV USA, LLC that included the following Exhibits:

       A.    List of State Administrators/Agents for Service of Process
       B.    Franchise Agreement
       C.    Financial Statements
       D.    Operations Manual Table of Contents
       E     State Addenda and Franchise Agreement Riders

_____       _____
Date                               Prospective Franchisee

(Sign, Date and Keep This Copy for Your       _____
Records)                            Authorized Signature

# EXHIBIT 35

## TRADEMARK, COPYRIGHT, AND KNOW-HOW LICENSE AGREEMENT

THIS TRADEMARK, COPYRIGHT, AND KNOW-HOW LICENSE
AGREEMENT (the "Agreement") is made and entered into as of October 1, 2010
(the "Effective Date") (regardless of the dates of the parties' signatures below) by and
between PCJV, LLC, a California limited liability company ("Licensor"), and CINCO
CORPORATION, a Philippine corporation ("Licensee").

### RECITALS

Licensor currently owns and uses certain trademarks, service marks, and commercial
symbols, including, but not limited to, the mark POTATO CORNER (collectively,
the "Marks"), in connection with the operation of Potato Corner Stores;

Licensor also owns and uses certain copyrights for various tangible items used in
connection with the development and operation of Potato Corner Stores (the "Copyrights");

Licensor also owns and uses certain knowhow and other proprietary information in
connection with the development and operation of Potato Corner Stores (the "KnowHow");

Licensee, an affiliate of Licensor, desires to engage in the business of franchising Potato
Corner Stores in the United States and Israel using the Marks, Copyrights, and KnowHow that
Licensor has developed; and

Upon the terms and conditions contained in this Agreement, Licensor desires to grant
to Licensee, and Licensee desires to receive from Licensor, a license of the right to use and
authorize franchisees to use the Marks, Copyrights, and KnowHow in connection with the
promotion, franchising, development, and operation of Potato Corner Stores.

NOW, THEREFORE, in consideration of the mutual covenants, agreements, and
obligations set forth in this Agreement, the parties agree as follows:

1. **Grant of License**. Licensor hereby grants to Licensee, upon the terms set forth in
this Agreement, the non-exclusive right to (a) use the Marks, Copyrights, and KnowHow in
franchising Potato Corner Stores in the United States and (b) authorize franchisees to use the
Marks, Copyrights, and KnowHow in developing and operating Potato Corner Stores.

2. **Term**. The term of this Agreement and the license it grants is twenty (20) years from
the Effective Date. Licensee may renew this Agreement for three (3) successive ten (10) year
terms by written notice ninety (90) days prior to the expiration of the then-current term subject
to current licensing terms of Cinco. When this Agreement expires, or if Licensor or Licensee
terminates this Agreement, Licensee agrees immediately to cease using and sublicensing the
Marks, Copyrights, and KnowHow in any manner, although any Potato Corner Store franchisee
who has been authorized as of that time, pursuant to a signed and effective franchise agreement,
to use the Marks, Copyrights, and KnowHow in connection with its Potato Corner Store
franchise may continue using the Marks, Copyrights, and KnowHow until that franchisee's
then current franchise agreement, and any permitted successor franchise agreement, expire or
are terminated, but only on the condition that the franchisee continues to comply for Licensor's

benefit with all of its obligations in its then current franchise agreement and in any permitted successor franchise agreement during their remaining terms.

3. **Fees.** Licensee shall pay to Licensor the amount of _____ ($_____) and other good and valuable consideration, the sufficiency of which is agreed to. Do we still charge? I think we have to charge a minimum fee of 1% of all fees collected for this to really look like a License Agreement. May I get your feedback on this.

4. **Ownership of Marks, Copyrights, and KnowHow.** Licensee acknowledges that Licensor is the owner of the Marks, Copyrights, and KnowHow, that Licensee's right to use the Marks, Copyrights, and KnowHow is derived solely from this Agreement, and that Licensee's and its franchisees' use of the Marks, Copyrights, and KnowHow, and any goodwill established by that use, will inure exclusively to Licensor's benefit.

5. **Quality Control.** Licensee acknowledges the importance to Licensor of both its reputation and goodwill and maintaining high, uniform standards of quality in the products that Licensee's franchisees offer and sell in their Potato Corner Stores under the Marks and using the Copyrights and KnowHow. Licensee therefore agrees to maintain, and to require its franchisees to maintain, the quality standards that Licensor prescribes from time to time regarding the type, nature, and quality of the products that Licensee's franchisees may offer and sell in their Potato Corner Stores under the Marks and using the Copyrights and KnowHow. To determine whether Licensee and its franchisees are complying with this Agreement and Licensor's quality standards, Licensor has the right at any time during business hours to inspect and observe Licensee's premises and operation, and the premises and operations of all Potato Corner Store franchisees, and to request specimens of their use of the Marks, Copyrights, and KnowHow. Licensee agrees to permit these inspections and observations and to cooperate fully with Licensor's representatives during them. Licensee agrees to require its franchisees to submit to similar inspections and observations.

6. **Form of Use.** Licensee agrees to use, and to cause its franchisees to use, the Marks and Copyrights only as directed by Licensor, in a manner consistent with good trademark and copyright practice, and with all appropriate legends and notices. Licensee further agrees not to use, nor to allow its franchisees to use, any other name or mark in combination with the Marks without Licensor's prior written approval.

7. **Notification of Infringements and Claims.** Licensee agrees to notify Licensor immediately of any apparent infringement, or challenge to Licensee's or any franchisee's use, of the Marks, Copyrights, and KnowHow or any claim by any person of any rights in the Marks, Copyrights, and KnowHow. Licensor has the right both to take any action it deems appropriate (including no action) and to control exclusively any litigation, Patent and Trademark Office proceeding, Copyright Office proceeding, or other proceeding arising out of any infringement, challenge, or claim. Licensee agrees to execute, and to require its franchisees to execute, any and all documents and to take, and to require its franchisees to take, any other action that, in the opinion of Licensor's counsel, are reasonably necessary or advisable to protect and maintain Licensor's interests in any litigation, Patent and Trademark Office proceeding, Copyright Office proceeding, or other proceeding.

8. **Indemnity.** Licensee agrees to reimburse and indemnify Licensor and its other affiliates, and their respective owners, directors, officers, employees, agents, and assignees

(collectively, the "Licensor Parties"), for, and to hold harmless the Licensor Parties from, any losses, liabilities, taxes, or damages (actual, consequential, or otherwise), and all reasonable costs and expenses of defending either any claim brought against any of them or any action in which any of them is named as a party (including, without limitation, reasonable accountants', arbitrators', and attorneys' fees, court costs, other litigation expenses, and travel and living expenses), which any of the Licensor Parties suffers, sustains, or incurs by reason of, arising from, or in connection with Licensee's franchising of Potato Corner Stores or the operation of franchised Potato Corner Stores.

9. **Termination**. Licensee may terminate this Agreement at any time and for any or no reason upon sixty (60) days' prior written notice to Licensor. Licensor may terminate this Agreement immediately, upon delivery of written notice to Licensee, if Licensee breaches this Agreement and fails to cure the breach within thirty (30) days after receiving written notice of the breach from Licensor.

10. **Assignment**. Licensor may assign this Agreement without restriction. Licensee may not assign this Agreement or any of its rights under this Agreement without Licensor's prior written consent.

11. **Waiver**. Either party's waiver of any breach by the other of any provision of this Agreement will not operate or be construed as a waiver of any subsequent breach by the original breaching party.

12. **Binding Effect**. This Agreement is binding upon the parties and inures to the benefit of their respective executors, administrators, heirs, and successors in interest.

13. **Severability**. The invalidity, illegality, or unenforceability of any provision of this Agreement will not in way affect, impair, invalidate, or render unenforceable this Agreement as a whole or any of its other provisions.

14. **Construction**. The paragraph headings are for information only. The recitals to this Agreement, and any quality, trademark, or copyright standards or specifications that Licensor issues, are a part of this Agreement, which constitutes the entire agreement of the parties, and there are no other oral or written understandings, representations, or agreements between Licensor (or any of its other affiliates) and Licensee relating to the subject matter of this Agreement.

15. **Governing Law**. Except to the extent governed by United States trademark and copyright law or other federal law, the validity, construction, and enforceability of this Agreement, and all aspects of the relationship between Licensor and Licensee, will be governed by the laws of the State of California.

[Signature Page Follows]

**IN WITNESS WHEREOF**, the parties have signed this Agreement on the dates specified below but to be effective as of the Effective Date.

**LICENSOR:**                              **LICENSEE:**

**CINCO CORPORATION**, a Philippine        **PCJV, LLC**, a California limited liability
company                                    company

By:                                        By:
  Title:                                 Title:                  Managing partner
  Date: _____ , 2010                Date:  Nov - 30 , 2010

# EXHIBIT 36

## Re: FW: PCJV USA, LLC #993-6449 / 398119

## Erlinda Bartolome <esbartolome@gmail.com>

Sun 2/27/2011 5:51 PM

**To:** Lambert, Kim <Kim.Lambert@dlapiper.com>
**Cc:** Jose P. Magsaysay, Jr. <josemagsaysay@yahoo.com>; Jojo <josemontinola@yahoo.com>; marvs
<marvsbermejo@yahoo.com>; Olivas, Ben <Ben.Olivas@dlapiper.com>; Amit Neman <amitneman@yahoo.com>; guy koren
<guyk23@hotmail.com>; ajacoby88@gmail.com <ajacoby88@gmail.com>

Hi Kim, my responses to your queries.


NKM - License for Los Angeles County

Payments: US 5,000.00 - Partial Payment of Exclusivity Fee - July 2010
                US 10,000.00 - Full Payment of Exclusivity Fee - April 2010

          No Payment has been made for License Fee for Santa Anita Mall Potato Corner Branch
           No Royalty Payments have been made from the start


All payments made to Potato Corner Global Company - Hong Kong Company and payments remitted to HSBC Hong
Kong.


San Francisco- Lopez-Co Seng Group, LLC.

Payments:    US 10,000.00 - February 9, 2010 - Partial Payment of Exclusivity
                  Fee for San Francisco County

          US 10,000.00 - April 21, 2010 - Full Payment of Exclusivity Fee
               for San Francisco County

          Tanforan Potato Corner Store is exempt from payment of                  License Fee.

          Monthly Royalties has not been collected from the start of
           operations.

           All payments have been remitted to HSBC Hong Kong, bank
           of Potato Corner Global Company, LTD

Topanga Potato Corner

          No Agreement has been signed.

          Initial payment of US 3,000.00 - April 2010 - to NKM

          No monthly royalty payments

I hope this will assist you in your discussions with Theresa Leets. While with her, is it possible to check

with her, timetable for processing of our FDD?

Thanks Kim and we will hope and pray that the discussion with Ms. Leets will be for the best of all concerned.

Best of luck.

Lyndah


On Mon, Feb 28, 2011 at 7:16 AM, Lambert, Kim <Kim.Lambert@dlapiper.com> wrote:

Thank you. This is perfect. I forgot to ask what each group paid you and when and if there are ongoing monthly payments. With that final bit of information I will be able have a good discussion with the examiner to wrap this up. Also do the payments go to The Hong Kong entity? Kim

Kim A. Lambert

DLA Piper LLP US

555 Mission Street, Suite 2400

San Francisco, CA 94105


T 415-615-6012

F 415-659-7834


Sent via my BlackBerry wireless device.

---

**From**: Erlinda Bartolome [mailto:esbartolome@gmail.com]

**Sent**: Friday, February 25, 2011 07:00 PM

**To**: Lambert, Kim

**Cc**: Jose P. Magsaysay, Jr. <josemagsaysay@yahoo.com>; marvs <marvsbermejo@yahoo.com>; Jojo <josemontinola@yahoo.com>; Amit Neman <amitneman@yahoo.com>; ajacoby88@gmail.com <ajacoby88@gmail.com>; guy koren <guyk23@hotmail.com>; Olivas, Ben

**Subject**: Re: FW: PCJV USA, LLC #993-6449 / 398119


HI Kim, my answers are contained in your e mail.

Thanks and kindest regards.

Lyndah

On Sat, Feb 26, 2011 at 6:35 AM, Lambert, Kim <Kim.Lambert@dlapiper.com> wrote:

Lyndah,

I hope to speak with Theresa today to get the Notice of Violations going so we can get registered.  I would like to make sure I have the proper information:

1.  The San Francisco Agreement was signed on April 16, 2010 and it opened on November 14, 2010.  We have no relationship with Vicente Lopez and Terrel Seng, they never operated Potato Corner in the Philippines and have no prior restaurant experience. Yes.

2.  The Los Angeles Agreement was signed on April 28, 2009 but is not yet opened.  It is owned by NKM Group (Guy Koren) who is an individual shareholder of the franchisor owning 15.2%.  When will this open? NKM is the owner of Santa Anita Mall.

3.  The Topanga Mall Agreement was signed on April 21, 2000 and was opened on November 22, 2011.  This one was sold by PCE (who is that?) to Sherwin and Jocelyn Lim who also have no prior experience with Potato Corner, have not operated or worked for Potato Corner in the Philippines and have no prior restaurant business. Kim, Topanga Mall did not sign any Agreement with us.  We just allowed them to open without any Agreement. They opened in Nov as stated above.

Thanks.

Kim

---

**From:** Erlinda Bartolome [mailto:esbartolome@gmail.com]
**Sent:** Thursday, February 24, 2011 5:47 PM
**To:** Lambert, Kim
**Cc:** Jose P. Magsaysay, Jr.; Olivas, Ben; Amit Neman; ajacoby88@gmail.com; guy koren; Jojo; marvs
**Subject:** Fwd: FW: PCJV USA, LLC #993-6449 / 398119

Hi Kim, this is great.  They considered the request you made in the letter you forwarded to California.

I will give some of my thoughts on the questions of Theresa and I wrote them in her e mail.  These thoughts are for your consideration as you give her answers.  E mail us if there is any document or assistance you will need.

Thanks and kindest regards.

Lyndah

---------- Forwarded message ----------
**From: Lambert, Kim** <Kim.Lambert@dlapiper.com>
Date: Fri, Feb 25, 2011 at 5:02 AM
Subject: FW: PCJV USA, LLC #993-6449 / 398119
To: Erlinda Bartolome <esbartolome@gmail.com>, "Jose P. Magsaysay, Jr."
<josemagsaysay@yahoo.com>, Amit Neman <amitneman@yahoo.com>
Cc: "Olivas, Ben" <Ben.Olivas@dlapiper.com>

Hello,

I thought I would share with you the first comment letter I received from the California Examiner, Theresa Leets.  Her response was astoundingly quick and I will call her to clear up the other two contracts as well. I will keep you posted.  Thanks.

Kim

**From:** Theresa Leets [mailto:tleets@corp.ca.gov]
**Sent:** Thursday, February 24, 2011 12:59 PM
**To:** Lambert, Kim
**Subject:** PCJV USA, LLC #993-6449 / 398119

Hi Kim,

I have the following initial comments for the above referenced initial franchise registration:

1.   Who sold NKM the Potato Corner Store in the Santa Anita Mall? Were they registered to do so? I assume in was Cinco? We can explain that it was Potato Corner Global Company, LTD in Hong Kong that granted the license.

2.   File a Notice of Violation for the Santa Anita Mall store or explain why one is not required. Can we request non issuance of the Notice of Violation on the grounds that the Directors/Shareholders of NKM are also Directors/Shareholders of PCJV.  Indirectly, the store is owned by the Franchisor considering the shareholders involved.  Santa Anita was used as the prototype to precisely develop the Franchise Business Model of Potato Corner in the US. It will be the training store also of PCJV.

3.   In Item 8, it references PCE. Who is PCE? Did you mean the affiliate PCI? Kim, I saw this after the final review I did, we failed to correct PCE which should be PCI Trading. This is Item 8, page 10, last word of the second paragraph.

4.   In Item 8, if the affiliate is unable to provide the required food products or supplies what recourse does the franchisee have? I believe that on Item 8, 1st paragraph indicates that franchisees can recommend suppliers but PCJV will have to approve these suppliers.

5.   On the State Cover Page, add a risk factor that the territory is not exclusive.

6.   On the State Cover Page, add a risk factor that the affiliate is the sole source for the food product and supplies and disclose whether the affiliate has absolute power to set price. (I think it is important prospective franchisees understand that franchisor can at anytime impact bottom line profits with this exclusive control). I believe, we have to add this as part of the disclosure.  While PCJV will always consider the impact of prices to the bottom line of its franchisees, it would be best to indicate this in the disclosure so that they can consider this as a risk factor when they decide to invest in the franchise of Potato Corner.

Otherwise, this is an outstanding work product. CONGRATULATIONS KIM.  WE ARE REALLY WITH VERY GOOD AND VERY CREDIBLE COUNSEL.

Thank you,

_____

Theresa Leets

Senior Corporations Counsel

Securities Regulation Division

California Department of Corporations

(213) 576-7590

Please consider the environment before printing this email.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

Please consider the environment before printing this email.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

Please consider the environment before printing this email.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

# EXHIBIT 37

## Shareholding of companies

Erlinda Bartolome <esbartolome@gmail.com>

Sun 4/10/2011 10:57 PM

**To:** Med Quiambao <medbquiambao@yahoo.com>
**Cc:** Jose P. Magsaysay, Jr. <josemagsaysay@yahoo.com>; Jojo <josemontinola@yahoo.com>; Amit Neman <amitneman@yahoo.com>; ajacoby88@gmail.com <ajacoby88@gmail.com>; guy koren <guyk23@hotmail.com>

Hi Med, additional information on the share holding of parties:

Potato Corner International:  Cinco Corporation 995 shares, Jose P. Magsaysay, Jose Miguel Ma. G. Montinola, Ma. Victoria Bermejo - 1 share each.

PCJV USA LLC :  60% breakdown: 56% Cinco Corporation, all other directors like Potato Corner International - 1- share each.
                     40% breakdown: 16.4% Amit Nemanin, 16.4% Guy Koren and 7.2% Amir Jacoby.


Thanks Med.

Lyndah

# EXHIBIT 38



DLA Piper LLP (US)
2000 University Avenue
East Palo Alto, CA 94303-2248
T 650-833-2000
F 650-833-2001
W www.dlapiper.com

## PRIVILEGED AND CONFIDENTIAL

Potato Corner Global Company Limited
Attn: Erlinda Bartolome
869 Katarungan St., Barangay Plainview
Mandaluyong City, 1550 Philippines

August 16, 2011

B. Olivas
Matter # 373527-000001
Invoice # 2609883

*For Professional Services Through July 31, 2011:*

*Client:* **Cinco Corporation**
*Matter:* **Potato Corner USA**

| | | |
|---|---|---|
| Current Fees | $ | 18,889.50 |
| Current Disbursements | $ | 2,364.96 |
| Total This Invoice | $ | 21,254.46 |

---

Please send remittance to:    DLA Piper LLP (US)
P.O. Box 64029
Baltimore, Maryland 21264-4029

Or wire remittance to:    M&T Bank                                    *To ensure proper credit, please indicate the*
25 South Charles Street, 18th Floor         *invoice number you are paying on the wire*
Baltimore, MD 21201
Account Name: DLA Piper LLP (US) Operating Account
Account #: 074-8148-5
ABA Transit #: 022000046
Swift Code: MANTUS33INT

Law Firm Tax Identification Number:    52-0616490



**Fees:**

| Date | Description | Timekeeper | Hours |
|---|---|---|---|
| 06/25/10 | Coordinate regarding corporate structure matters. Related follow-up. | Lorenzo, Marty B. | 0.40 |
| 07/16/10 | Revise draft joint venture agreement to incorporate comments by client; discuss requirements for formation of PCJV (LLC) and PC International Delaware with Ms. S. Reynholds. | Olivas, Ben Ramox | 0.80 |
| 07/16/10 | Conference with Ben regarding corporate structure and capitalization issues; e-mail to Ben regarding disclosure requirements regarding these issues; prepare memo to Ben and Lydia regarding capitalization questions raised and State of California requirements regarding capitalization. | Lambert, Kim A. | 3.20 |
| 07/16/10 | Telephone call with Attorney Olivas regarding formation of PCJV USA, LLC and Potato Corner International, Inc.; prepare formation documents regarding same; coordinate filing with Delaware Secretary of State. | Reynholds, Susan M. | 1.00 |
| 07/18/10 | Conference call with Mr. J. Magsaysay, Ms. L. Bartolome and Attorney K. Lambert to discuss Santa Anita stores situation, comments/changes to the draft JV agreement, and next steps for formation of JV structure. | Olivas, Ben Ramox | 1.20 |
| 07/18/10 | Telephone conference regarding corporate structure; existing business and capitalization issues. | Lambert, Kim A. | 1.00 |
| 09/13/10 | Conference call with Attorney K. Lambert, Mr. J. Magsaysay and Ms. E. Bartolome regarding structuring and capitalization of PCJV; discuss changes to JV Agreement. | Olivas, Ben Ramox | 2.00 |
| 10/05/10 | Conference with Attorney Olivas regarding organizational matters. | Reynholds, Susan M. | 1.40 |
| 10/11/10 | Obtain Parasec services for registered agent process services for PC-Intl. | Olivas, Ben Ramox | 0.80 |
| 10/12/10 | Respond to Ms. L. Bartolome's questions regarding visa requirements and revisions to JV agreement. | Olivas, Ben Ramox | 0.50 |
| 10/12/10 | Attention to organization matters. | Reynholds, Susan M. | 0.40 |
| 10/13/10 | Discuss completion of various corporate filings for PC-Intl with Ms. S. Reynholds. | Olivas, Ben Ramox | 0.80 |
| 10/13/10 | Prepare organizational documents including minutes, bylaws, fictitious business name statement, stock purchase | Reynholds, Susan M. | 3.00 |



| Date | Description | Timekeeper | Hours |
|------|-------------|------------|-------|
| | statement for Potato Corner International, Inc.; attention to application for taxpayer ID number regarding same. | | |
| 10/14/10 | Complete fictitious business name and tax ID registration for PC-Intl. | Olivas, Ben Ramos | 0.50 |
| 10/21/10 | Complete investor representation statement; send corporate documents for PC-Intl to Ms. L. Bartolome and discuss next steps for structure implementation. | Olivas, Ben Ramos | 0.60 |
| 10/21/10 | Attention to organizational matters for Potato Corner International, Inc. | Reynholds, Susan M. | 0.50 |
| 10/26/10 | Attention to filing of fictitious business name. | Reynholds, Susan M. | 0.60 |
| 10/27/10 | Attention to organizational matters. | Reynholds, Susan M. | 0.30 |
| 10/29/10 | Revise JV implementation arrangements, including documents required to complete funding and restructuring steps; confirm opening of Wells Fargo bank account with Ms. S. Chu. | Olivas, Ben Ramos | 2.30 |
| 11/02/10 | Update call with Ms. L. Bartolome regarding set up of PCJV. | Olivas, Ben Ramos | 1.00 |
| 11/02/10 | Follow-up with service agent regarding fictitious business name application. | Reynholds, Susan M. | 0.30 |
| 11/04/10 | Attention to name availability in Delaware for regarding new limited liability formation. | Reynholds, Susan M. | 0.40 |
| 11/05/10 | Prepare and file Certificate of Formation for PCI Trading LLC. | Reynholds, Susan M. | 0.50 |
| 11/10/10 | Follow-up on various items regarding set-up of PCJV (audit of balance sheet, trademark registration, various corporate and commercial registrations required). | Olivas, Ben Ramos | 0.50 |
| 11/11/10 | Apply for and obtain employer identification number for PCI Trading, LLC; conferences with Ms. Reynholds regarding same. | Ortiz, Lisa A. | 0.50 |
| 11/15/10 | Respond to Mr. J. Magsaysay's questions regarding Wells Fargo bank account information and fund transfers. | Olivas, Ben Ramos | 0.50 |
| 12/07/10 | Arrange for Wells Fargo bank account deposits for PC-Intl; provide status update to Mr. J. Magsaysay, and Ms. L. Bartolome. | Olivas, Ben Ramos | 1.50 |
| 12/10/10 | Arrange for deposit of funds by PC-Intl to the PCJV account; discuss next steps with Mr. A. Neminum, follow-up with Singer Lewak regarding audit requirements. | Olivas, Ben Ramos | 1.60 |



| Date | Description | Timekeeper | Hours |
|------|-------------|------------|-------|
| 01/03/11 | Finalize JV Agreement and send to client; Singer Lewak. | Olivas, Ben Ramos | 0.50 |
| 01/10/11 | Attention to matters relating to issuance of ownership certificates. | Reynholds, Susan M. | 0.20 |
| 02/02/11 | Attention to matters relating to membership certificates and stock certificates for Potato Corner International, Inc. and PCJV, LLC. | Reynholds, Susan M. | 2.00 |
| 02/04/11 | Revise stock certificates. | Reynholds, Susan M. | 0.30 |
| 02/07/11 | Meet with Mr. J. Magsaysay to discuss, finalize and sign FDD application; transfer of WF's bank accounts for PC-Int'l. | Olivas, Ben Ramos | 1.50 |
| 02/08/11 | Draft letter regarding initial franchise registration filing in California. | Krull, Colin | 0.50 |
| 02/11/11 | Prepare California additional disclosures for registration filing. | Krull, Colin | 0.80 |
| 02/17/11 | Meet with PCJV management to discuss corporate and tax structure. | Olivas, Ben Ramos | 1.00 |
| 03/23/11 | Call with Ms. Pia Marie Dyquiangco regarding L-1 visa issues for Mr. J. Magsaysay. | Olivas, Ben Ramos | 0.80 |
| 04/04/11 | Discuss corporate, franchising and tax issues with Mr. J. Magsaysay. | Olivas, Ben Ramos | 0.80 |
| 04/07/11 | Meet with Mr. J. Magsaysay to discuss various PCJV matters. | Olivas, Ben Ramos | 1.00 |
| 04/08/11 | Review draft tax return for PC-Int'l and provide comments to Ms. L. Bartolome. | Olivas, Ben Ramos | 0.50 |
| 04/27/11 | Update call with Ms. L. Bartolome on various tax and corporate matters. | Olivas, Ben Ramos | 0.50 |
| | **Total Hours** | | **36.30** |
| | **Total Fees** | | **$18,889.50** |



## Timekeeper Summary

| Timekeeper | Title | Hours | Rate | Amount |
|---|---|---|---|---|
| Olivas, Ben Ramos | Partner | 6.60 | 695.00 | 4,587.00 |
| Olivas, Ben Ramos | Partner | 14.50 | 665.00 | 9,642.50 |
| Lorenzo, Mary B. | Partner | 0.40 | 605.00 | 242.00 |
| Lambert, Kim A. | Of Counsel | 3.20 | 400.00 | 1,280.00 |
| Reynholds, Susan M. | Paralegal | 2.50 | 285.00 | 712.50 |
| Reynholds, Susan M. | Paralegal | 7.30 | 275.00 | 2,007.50 |
| Krull, Colin | Paralegal | 1.30 | 235.00 | 305.50 |
| Ortiz, Lisa A. | Paralegal | 0.50 | 225.00 | 112.50 |
| Totals | | 36.30 | | 18,889.50 |

## Disbursements:

| Date | Description | Amount |
|---|---|---|
| 08/24/10 | Corporate/LLC/Partnership Filings - VENDOR: NATIONAL CORPORATE RESEARCH, LTD* FORMULATION/INCORPORATION FILINGS AND STAT REPRESENTATION RE: PCJV, LLC; POTATO CORNER INTERNATIONAL, INC | 900.00 |
| 10/26/10 | Delivery Services - Vendor: UNITED PARCEL SERVICE - FROM: Susan Reynholds TO; Misty-Dawn Riley National Corporate Research 1107 9th St., Ste. 1025 SACRAMENTO CA | 11.84 |
| 12/27/10 | Registered Agent Services - VENDOR: NATIONAL CORPORATE RESEARCH, LTD* ASSUME/FICTITIOUS NAME FILINGS AND PUBLICATIONS RE: POTATO CORNERS INTERNATIONAL, INC (DBA) POTATO CORNERS | 359.00 |
| 12/27/10 | Corporate/LLC/Partnership Filings - VENDOR: NATIONAL CORPORATE RESEARCH, LTD* QUALIFICATION FILING/GOOD STANDING CERT RE: POTATO CORNER INTERNATIONAL INC | 253.00 |
| 12/27/10 | Corporate/LLC/Partnership Filings - VENDOR: NATIONAL CORPORATE RESEARCH, LTD* FORMATION FILING/STATUTORY REPRESENTATION RE: PCI TRADING LLC | 449.00 |



| | | B. Olivas |
|---|---|---|
| Matter # 373527-000001 | | Page: 6 |
| Invoice # 2609883 | | August 16, 2011 |

| Date | Description | Amount |
|---|---|---|
| 03/15/11 | AIR FARE - VENDOR: M&T BANK, N.A,-VISA PURCHASING CARD- BEN RAMOS OLIVAS TRAVEL TO SANTA ANA FOR MEETING ON 02/17/11 | 0.00 |
| 03/17/11 | Hotel - VENDOR: AMERICAN EXPRESS BEN OLIVAS - HOTEL TO ATTEND MEETING WITH CLIENT ON 2/17/11 - 2/18/11 | 0.00 |
| 04/06/11 | Delivery Services - VENDOR: FEDERAL EXPRESS CORPORATION TO MS. SHOKREH ARAM CA DEPARTMENT OF CORPORATIONS 2/11/2011 | 45.27 |
| 04/12/11 | Delivery Services - Vendor: UNITED PARCEL SERVICE - FROM: Business Center TO: MS.LYNDAH BARTOLOME C/OTHE HISTORIC MAYFAIR HOT 1256 WEST 7TH STREET LOS ANGELES CA | 10.85 |
| 06/30/11 | Registered Agent Services - VENDOR: NATIONAL CORPORATE RESEARCH, LTD* RE: PCJV USA, LLC - DELAWARE GOOD STANDING MAY 20, 2011 | 168.00 |
| 06/30/11 | Registered Agent Services - VENDOR: NATIONAL CORPORATE RESEARCH, LTD* RE: POTATO CORNER INTERNATIONAL, INC - DELAWARE AR DELINQUENT, TAX DUE 03/05/11 | 168.00 |

|  | **Total Disbursements** | **$2,364.96** |

|  | **Total Current Charges** | **$    21,254.46** |



B. Olivas

Matter # 373527-000001
Invoice # 2609883                                                                August 16, 2011

## REMITTANCE ADVICE

Current Fees                                                          $        18,889.50

Current Disbursements                                                 $         2,364.96

Total This Invoice                                                    $        21,254.46

*INVOICE IS DUE AND PAYABLE UPON RECEIPT*
*PLEASE RETURN THIS PAGE WITH YOUR REMITTANCE*

Please send remittance to:          DLA Piper LLP (US)
                                     P.O. Box 64029
                                     Baltimore, Maryland 21264-4029

Or wire remittance to:               M&T Bank                              To ensure proper credit, please indicate the
                                     25 South Charles Street, 18th Floor   invoice number you are paying on the wire
                                     Baltimore, MD 21201
                                     Account Name:
                                     DLA Piper LLP (US) Operating Account
                                     Account #: 074-8148-5
                                     ABA Transit #: 022000046
                                     Swift Code: MANTUS33INT
Law Firm Tax Identification Number:  52-0616490

# EXHIBIT 39



DLA Piper LLP (US)
2000 University Avenue
East Palo Alto, CA 94303-2248
T 650-833-2000
F 650-833-2001
W www.dlapiper.com

## PRIVILEGED AND CONFIDENTIAL

Potato Corner Global Company Limited
Attn: Erlinda Bartolome
869 Katarungan St., Barangay Plainview
Mandaluyong City, 1550 Philippines

August 16, 2011

B. Olivas
Matter # 373527-000003
Invoice # 2609884

*For Professional Services Through July 31, 2011:*

Client:    **Cinco Corporation**
Matter    **General Franchise Advice**

| | | |
|---|---|---|
| Current Fees | $ | 16,851.00 |
| Current Disbursements | $ | 0.00 |
| Total This Invoice | $ | 16,851.00 |

Please send remittance to:

DLA Piper LLP (US)
P.O. Box 64029
Baltimore, Maryland 21264-4029

Or wire remittance to:

M&T Bank
25 South Charles Street, 18th Floor
Baltimore, MD 21201
Account Name: DLA Piper LLP (US) Operating Account
Account #: 074-8148-5
ABA Transit #: 022000046
Swift Code: MANTUS33INT

*To ensure proper credit, please indicate the
invoice number you are paying on the wire*

Law Firm Tax Identification Number:    52-0616490



Fees:

| Date | Description | Timekeeper | Hours |
|------|-------------|------------|-------|
| 07/16/10 | Discuss with Attorney K. Lambert Santa Anita stores and potential impact to FDD. | Olivas, Ben Ramos | 0.50 |
| 09/21/10 | Conference with accountant regarding reviewed versus audited statements; send email to accountant. | Lambert, Kim A. | 0.50 |
| 09/22/10 | Review of license agreements; follow up conference with state examiner; conference with Ben regarding Notice of Violation approach. | Lambert, Kim A. | 1.20 |
| 09/23/10 | Discuss solution to potential franchising law violations with Attorney K. Lambert. | Olivas, Ben Ramos | 0.80 |
| 09/28/10 | Call with Ms. L. Bartolome regarding bank accounts and JV agreement. | Olivas, Ben Ramos | 0.50 |
| 10/01/10 | Discuss audit requirements for FDD with Attorney K. Lambert and Mr. A. Neman. | Olivas, Ben Ramos | 0.60 |
| 10/04/10 | Call with Mr. Amit Neman regarding FDD franchising issues; discussion with Attorney K. Lambert and auditors regarding audit requirements for FDD submission; follow-up with Singer Lewak regarding potential audit engagement. | Olivas, Ben Ramos | 1.20 |
| 10/06/10 | Follow-up discussion with Attorney K. Lambert and auditors regarding audit requirements for FDD submission. | Olivas, Ben Ramos | 0.50 |
| 10/06/10 | Conferences and research regarding financial statement requirements and inclusion of footnotes; send California requirements and conference with examiner in follow up to call with accountants. | Lambert, Kim A. | 1.20 |
| 10/08/10 | Conference with CPA Allen Ginsburg regarding GAAP and GAAS requirements as they relate to footnotes; prepare email regarding the same to Ben Olivas; review email from client and accountant. | Lambert, Kim A. | 1.20 |
| 10/27/10 | Open Wells Fargo bank account; review and complete PC-Int'l corporate filings. | Olivas, Ben Ramos | 2.00 |
| 11/17/10 | Review correspondence concerning revised draft franchise agreement; review same; intra-office conference concerning status of amendment of U.S. trademark registration and proposed new trademark to add to agreement. | McLean, Paul A. | 0.50 |
| 12/02/10 | Call with Mr. S. Carter of Singer Lewak regarding interco | Olivas, Ben Ramos | 0.50 |



| Date | Description | Timekeeper | Hours |
|------|-------------|------------|-------|
| | arrangements. | | |
| 12/03/10 | Conference with Ben regarding corporate structure and financial statements conference call with accountants regarding contents of statements and timing for completion; conference regarding footnotes. | Lambert, Kim A. | 0.80 |
| 12/09/10 | Call with Ms. L. Bartolome to discuss next steps for completion of audit requirements for PCTV. | Olivas, Ben Ramos | 0.50 |
| 12/09/10 | Conference with Attorney Olivas regarding timing of filing and availability of financial statements. | Lambert, Kim A. | 0.30 |
| 01/07/11 | Review of proposed footnotes for financial statement sand timing of financial statement availability; conferences with Ben and Lyndah regarding the status of the financial statements and the timeline for filing. | Lambert, Kim A. | 0.80 |
| 01/10/11 | Draft background information requested by Singer Lewak; follow-up discussion with Mr. A. Neman; discuss with Attorney K. Lambert. | Olivas, Ben Ramos | 1.70 |
| 01/12/11 | Review of corporate structure for all related entities and financial statement information and status. | Lambert, Kim A. | 0.50 |
| 01/18/11 | Review of financial statements prepared by accountant; transmit comments regarding the same; review Lyndah's responses to outstanding issues including notarization of application and Hong Kong entity and reply to same; review of date of execution of Trademark License Agreement. | Lambert, Kim A. | 1.20 |
| 01/20/11 | Call with Kim regarding accounting (GAAP) question on footnotes; review of materials before call; review GAAP materials. | Ginsburg, Allen J. | 0.80 |
| 01/21/11 | Edit financial statement notes; e-mail regarding the same; conference with auditor. | Lambert, Kim A. | 0.80 |
| 01/24/11 | Discuss with Mr. E. Wright and Attorney K. Lambert comments regarding draft F/S and additional information requests by Singer Lewak. | Olivas, Ben Ramos | 1.10 |
| 01/24/11 | Review draft F/S and discuss comments with Mr. E. Wells. | Olivas, Ben Ramos | 0.70 |
| 01/25/11 | Discuss draft audited accounts and rep letter with Mr. E. Wells and Mr. A. Neman. | Olivas, Ben Ramos | 0.50 |
| 01/27/11 | Provide financial projection information to Singer Lewak; follow-up discussions with Steve Carter of Singer Lewak, Amit Neman of PCTV, and Lyndah Bartolome of Cinco | Olivas, Ben Ramos | 1.00 |



Matter # 373527-000003
Invoice # 2609884

B. Olivas
Page: 4
August 16, 2011

| Date | Description | Timekeeper | Hours |
|------|-------------|------------|-------|
| | Philippines regarding financial information. | | |
| 01/31/11 | Discuss F/S with Singer Lewak; provide update to client. | Olivas, Ben Ramos | 0.50 |
| 02/01/11 | Review of new financial statements; send auditor's consent letter; conference with Ben regarding outstanding items. | Lambert, Kim A. | 0.50 |
| 02/08/11 | Review of correspondence for completion of financial statements; review of disclaimer to be placed on financial statements. | Lambert, Kim A. | 0.50 |
| 03/22/11 | Call with Ms. L. Bartolome and Attorney K. Lambert regarding CA franchise application and draft notices of violations; call with Ms. L. Bartolome regarding outstanding corporate and tax matters. | Olivas, Ben Ramos | 1.80 |
| 05/10/11 | Review of email; send Texas registration application and instructions to client. | Lambert, Kim A. | 0.80 |
| 05/10/11 | Prepare Texas exemption application. | Krull, Colin | 0.30 |
| 05/13/11 | Emails with Amit and review Texas exemption filing; | Lambert, Kim A. | 0.20 |
| 05/26/11 | Prepare Kentucky and Nebraska exemption applications. | Krull, Colin | 0.50 |
| 06/02/11 | Review of exemption filings; email to Amit. | Lambert, Kim A. | 0.50 |
| 06/06/11 | Email to Lyndah regarding various issues; conference with Ben. | Lambert, Kim A. | 0.50 |
| 06/07/11 | Review the disclosure process and the signing of the receipt; explanation of simultaneous disclosure of Franchise Disclosure Document and /agreement ready to sign. | Lambert, Kim A. | 1.20 |
| 06/30/11 | Call with Ms. L. Bartolome and Attorney K. Lambert regarding franchising issues. | Olivas, Ben Ramos | 0.50 |
| 06/30/11 | Conference call with Ben and Lyndah regarding sales of franchises, waiver of execution of guarantee and available alternatives; expansion plan and use of brokers. | Lambert, Kim A. | 0.50 |
| 07/13/11 | Review email from Lyndah; preparation of Franchisee Questionnaire to be signed by franchisees prior to execution of Franchise Agreement. | Lambert, Kim A. | 1.00 |
| 07/13/11 | Prepare Franchisee Disclosure Questionnaire. | Krull, Colin | 0.50 |
| 07/26/11 | Conference with Guy Koren regarding the sales process and various signatures required throughout the package; send memo. | Lambert, Kim A. | 0.40 |
| | **Total Hours** | | **31.60** |



Matter # 373527-000003
Invoice # 2609884

B. Olivas
Page: 5
August 16, 2011

**Total Fees** $16,851.00

## Timekeeper Summary

| Timekeeper | Title | Hours | Rate | Amount |
|---|---|---|---|---|
| Olivas, Ben Ramos | Partner | 7.30 | 595.00 | 5,073.50 |
| Ginsburg, Allen J. | Partner | 0.80 | 665.00 | 532.00 |
| Olivas, Ben Ramos | Partner | 7.10 | 665.00 | 4,721.50 |
| Lambert, Kim A. | Of Counsel | 9.40 | 415.00 | 3,901.00 |
| Lambert, Kim A. | Of Counsel | 5.20 | 400.00 | 2,080.00 |
| McLean, Paul A. | Associate | 0.50 | 475.00 | 237.50 |
| Krull, Colin | Paralegal | 1.30 | 235.00 | 305.50 |
| **Totals** | | **31.60** | | **16,851.00** |

**Total Current Charges** $ 16,851.00



B. Olivas

Matter # 373527-000003
Invoice # 2609884                                                                August 16, 2011

## REMITTANCE ADVICE

| Current Fees | $ | 16,851.00 |
| Current Disbursements | $ | 0.00 |
| Total This Invoice | $ | 16,851.00 |

*INVOICE IS DUE AND PAYABLE UPON RECEIPT*
*PLEASE RETURN THIS PAGE WITH YOUR REMITTANCE*

Please send remittance to:        DLA Piper LLP (US)
                                  P.O. Box 64029
                                  Baltimore, Maryland 21264-4029

Or wire remittance to:            M&T Bank                                    *To ensure proper credit, please indicate the*
                                  25 South Charles Street, 18th Floor         *invoice number you are paying on the wire*
                                  Baltimore, MD 21201
                                  Account Name:
                                  DLA Piper LLP (US) Operating Account
                                  Account #: 074-8148-5
                                  ABA Transit #: 022000046
                                  Swift Code: MANTUS33INT

Law Firm Tax Identification Number:  52-0616490

# EXHIBIT 40



DLA Piper LLP (US)
2000 University Avenue
East Palo Alto, CA 94303-2248
T 650-833-2000
F 650-833-2001
W www.dlapiper.com

## PRIVILEGED AND CONFIDENTIAL

Potato Corner Global Company Limited
Attn: Erlinda Bartolome
869 Katarungan St., Barangay Plainview
Mandaluyong City, 1550 Philippines

August 16, 2011

B. Olivas
Matter # 373527-000004
Invoice # 2609885

---

*For Professional Services Through July 31, 2011*:

*Client:* **Cinco Corporation**
*Matter:* **Preparation of the Franchise Agreement
and the Franchise Disclosure Document**

| | | |
|---|---|---|
| Current Fees | $ | 6,496.00 |
| Current Disbursements | $ | 0.00 |
| Total This Invoice | $ | 6,496.00 |

---

Please send remittance to:
DLA Piper LLP (US)
P.O. Box 64029
Baltimore, Maryland 21264-4029

Or wire remittance to:
M&T Bank
25 South Charles Street, 18th Floor
Baltimore, MD 21201
Account Name: DLA Piper LLP (US) Operating Account
Account #: 074-8148-5
ABA Transit #: 022000046
Swift Code: MANTUS33INT

To ensure proper credit, please indicate the
invoice number you are paying on the wire

Law Firm Tax Identification Number:
52-0616490



Fees:

| Date | Description | Timekeeper | Hours |
|------|-------------|------------|-------|
| 03/08/11 | Prepare drafts of 3 Notices of Violation based upon the agreement for each and the legal requirements of the California Franchise Investment law; send to client for review. | Lambert, Kim A. | 2.40 |
| 03/16/11 | Redraft of 3 Notices of Violation based upon input from client; revise Franchise disclosure document based upon comments of the examiner. | Lambert, Kim A. | 1.20 |
| 03/17/11 | Review email regarding possible additional stores; respond to same regarding impact on pending registration. | Lambert, Kim A. | 0.40 |
| 03/18/11 | Preparation of email regarding FDD changes, two additional issues and request for direction. | Lambert, Kim A. | 0.20 |
| 03/22/11 | Conversation with Ben and Lynda regarding future franchisees; signing of the notices of violation and timing for registration; conference regarding missing information for notices of violation; review of Notices and additional information. | Lambert, Kim A. | 1.20 |
| 03/26/11 | Finalization of three notices of violation and FDD; send to examiner. | Lambert, Kim A. | 1.20 |
| 03/31/11 | Conference with examiner regarding status of application and need for changes to FDD. | Lambert, Kim A. | 0.30 |
| 04/05/11 | Conference with State Examiner; preparation of Pre-Effective Amendment Certification; email to client regarding the same. | Lambert, Kim A. | 0.50 |
| 04/05/11 | File materials in response to California examiner's comments. | Krull, Colin | 0.80 |
| 04/08/11 | Conference with examiner regarding application forms and notices of violation; prepare alternate notice and applications for two additional violations. | Lambert, Kim A. | 1.20 |
| 04/14/11 | Conference with state examiner regarding applications requested and requested disclosure as well as information regarding the checks for each violation; preparation of disclosure document for Hong Kong Global; submission of Hong Kong Global information to examiner in addition to requested check information; conference with Amit; emails with Lyndah. | Lambert, Kim A. | 2.20 |
| 04/19/11 | Preparation of letter with detailed instructions for use of the | Lambert, Kim A. | 1.40 |



| Date | Description | Timekeeper | Hours |
|---|---|---|---|
| | California Approved Franchise Disclosure Document; conference with examiner regarding the use of the FDD prior to mailing the notices of violation; | | |
| 08/28/11 | Review of Orders of Effectiveness received from the California Department of Corporations; prepare e-mail providing instructions regarding deliver of Notices of Violations and Orders from the State to each purchaser; review of effectiveness. | Lambert, Kim A. | 1.70 |
| 09/01/11 | Review emails and respond to explain process for filing notices of violation. | Lambert, Kim A. | 0.80 |
| 09/06/11 | Conference with Examiner regarding Order of Effectiveness; conference with Chicago office; review of Order of Effectiveness and send to client. | Lambert, Kim A. | 0.50 |
| | **Total Hours** | | **16.00** |
| | **Total Fees** | | **$6,496.00** |

## Timekeeper Summary

| Timekeeper | Title | Hours | Rate | Amount |
|---|---|---|---|---|
| Lambert, Kim A. | Of Counsel | 15.20 | 415.00 | 6,308.00 |
| Krull, Colin | Paralegal | 0.80 | 235.00 | 188.00 |
| | Totals | 16.00 | | 6,496.00 |

**Total Current Charges**          $          6,496.00



**DLA PIPER**

B. Olivas

Matter # 373527-000004
Invoice # 2609885                                                    August 16, 2011

## REMITTANCE ADVICE

| | | |
|---|---|---|
| Current Fees | $ | 6,496.00 |
| Current Disbursements | $ | 0.00 |
| Total This Invoice | $ | 6,496.00 |

### INVOICE IS DUE AND PAYABLE UPON RECEIPT
### PLEASE RETURN THIS PAGE WITH YOUR REMITTANCE

---

Please send remittance to:        DLA Piper LLP (US)
                                  P.O. Box 64029
                                  Baltimore, Maryland 21264-4029

Or wire remittance to:            M&T Bank                              To ensure proper credit, please indicate the
                                  25 South Charles Street, 18th Floor   invoice number you are paying on the wire
                                  Baltimore, MD 21201
                                  Account Name:
                                  DLA Piper LLP (US) Operating Account
                                  Account #: 074-8148-5
                                  ABA Transit #: 022000046
                                  Swift Code: MANTUS33INT

Law Firm Tax Identification Number: 52-0616490

# EXHIBIT 41



**DLA Piper LLP (US)**
2000 University Avenue
East Palo Alto, CA 94303-2248
T 650-833-2000
F 650-833-2001
W www.dlapiper.com

## PRIVILEGED AND CONFIDENTIAL

Potato Corner Global Company Limited
Attn: Erlinda Bartolome
869 Kalarungan St., Barangay Plainview
Mandaluyong City, 1550 Philippines

August 16, 2011

B. Olivas
Matter # 373527-000004
Invoice # 2609887

---

*For Professional Services Through July 31, 2011*

Client: **Cinco Corporation**
Matter: **Preparation of the Franchise Agreement
and the Franchise Disclosure Document**

| | | |
|---|---|---|
| Current Fees | $ | 29,363.50 |
| Current Disbursements | $ | 79.89 |
| Current Fees and Disbursements | $ | 29,443.39 |
| Less Applied Credits | $ | (8,000.00) |
| Total This Invoice | $ | 21,443.39 |

---

Please send remittance to:
DLA Piper LLP (US)
P.O. Box 64029
Baltimore, Maryland 21264-4029

Or wire remittance to:
M&T Bank
25 South Charles Street, 18th Floor
Baltimore, MD 21201
Account Name: DLA Piper LLP (US) Operating Account
Account #: 074-8148-5
ABA Transit #: 022000046
Swift Code: MANTUS33INT

To ensure proper credit, please indicate the
invoice number you are paying on the wire

Law Firm Tax Identification Number:   52-0616490



Fees:

| Date | Description | Timekeeper | Hours |
|------|-------------|------------|-------|
| 06/03/10 | Begin to prepare first draft of Potato Corner franchise agreement. | Lambert, Kim A. | 3.20 |
| 06/07/10 | Continued draft of Potato Corner Franchise Agreement. | Lambert, Kim A | 3.20 |
| 06/18/10 | Review of completed franchise agreement checklist and notes from meeting; draft of Potato Corner franchise agreement. | Lambert, Kim A. | 5.30 |
| 06/22/10 | Continued draft of Potato Corner Franchise Agreement. | Lambert, Kim A. | 2.00 |
| 06/25/10 | Finalize first draft of the Potato Corner Franchise Agreement; prepare e-mail regarding first draft and additional outstanding issues; send to client; review of financial statement requirements for Franchise Disclosure Document. | Lambert, Kim A. | 2.00 |
| 06/28/10 | Review of completed Franchise Disclosure Document Questionnaire; begin to prepare draft of Franchise Disclosure Document. | Lambert, Kim A. | 8.50 |
| 06/29/10 | Continued preparation of Franchise Disclosure Document. | Lambert, Kim A. | 2.00 |
| 06/30/10 | Continued draft of Franchise Disclosure Document; revise Franchise Agreement and send to client with cover memo; send e-mail regarding corporate structure and intellectual property issues. | Lambert, Kim A. | 4.20 |
| 07/02/10 | Finalization of first draft of the Franchise Disclosure Document and review of FDD Questionnaire responses; send e-mail to clients attaching first draft. | Lambert, Kim A. | 3.00 |
| 07/19/10 | Prepare e-mail with additional information regarding capitalization issues and prepare explanation of Cost and Source of Funds required disclosure; prepare samples of Cost and Source of Funds for client. | Lambert, Kim A. | 0.80 |
| 08/27/10 | Review of emails from client regarding capitalization issue and status of project; draft of response including guidance concerning capitalization and registration with the State of California | Lambert, Kim A | 0.80 |
| 09/13/10 | Review of e-mails regarding outstanding items and existing units; conferences with Ben regarding the same; conference call with the client and review of status of project. | Lambert, Kim A. | 1.00 |
| 09/14/10 | Review of California Franchise Investment Law; | Lambert, Kim A. | 1.20 |



| Date | Description | Timekeeper | Hours |
|------|-------------|-----------|-------|
| | conference with state examiner regarding potential violations on any anonymous basis; conference with Ben Olivas; email to client regarding outstanding items, referral to accountant and audited versus reviewed financial statements. | | |
| 09/24/10 | Email to client regarding outstanding issues; | Lambert, Kim A. | 0.20 |
| 09/27/10 | Conference with Lyndah regarding options around existing agreements. | Lambert, Kim A. | 0.20 |
| 09/28/10 | Conference with auditor regarding assets in entity to be audited; prepare email regarding the same. | Lambert, Kim A. | 0.30 |
| 09/29/10 | Revision of Franchise Agreement and Franchise Disclosure Document based upon documentation supplied; conference with auditor; conference regarding corporate formation; prepare cover letter to state; | Lambert, Kim A. | 4.00 |
| 10/01/10 | Conferences and emails regarding requirements under the FTC Rule and the State of California for the financial statements; follow up with emails. | Lambert, Kim A. | 1.20 |
| 10/04/10 | Conferences with Ben and accountants regarding audit versus review for registration in California. | Lambert, Kim A. | 0.70 |
| 10/05/10 | Conference with Ben and with accountants regarding California requirements for financial statements; draft e-mail and send new version of the Franchise Disclosure Document and Franchise Agreement. | Lambert, Kim A. | 1.80 |
| 10/12/10 | Review of information suggested for website and respond to inquiries regarding the same; conference regarding financial statement requirements for initial filing. | Lambert, Kim A. | 0.50 |
| 10/13/10 | Prepare email explaining application process and transmittal of application for registration in the State of California. | Lambert, Kim A. | 0.80 |
| 10/13/10 | Preparation of email and materials for franchise registration in the State of California; send to client. | Lambert, Kim A. | 0.80 |
| 10/20/10 | Review of issue regarding disclosure on website; send email addressing issue. | Lambert, Kim A. | 0.20 |
| 10/26/10 | Revise documents; review of application; conference re: notarization; conference regarding financial statements. | Lambert, Kim A. | 0.50 |
| 10/28/10 | Revision of Franchise Disclosure Document; revision of Franchise Agreement; draft of Trademark, Copyright and Know-how License Agreement; email to Ben regarding | Lambert, Kim A. | 3.80 |



| Date | Description | Timekeeper | Hours |
|------|-------------|------------|-------|
| | information concerning affiliated companies for disclosure purposes. | | |
| 10/29/10 | Finalization of Franchise Agreement, License Agreement and Franchise Disclosure Document; preparation of email response to various outstanding questions; send email regarding pending trademark issues; send documents to client with final checklist. | Lambert, Kim A. | 3.80 |
| 11/02/10 | Review of Lyndah's edits to the Franchise Disclosure Document and Franchise Agreement; incorporate dates for various entities; edits to the both FDD and Agreement and transmittal to the client for final review. | Lambert, Kim A. | 1.20 |
| 11/16/10 | Revise Franchise Disclosure Document per Lyndah's November 8 email; send email with last few requests for information to finalize the documents for filing; note to Dash regarding Item 13 disclosure requirements regarding trademark filings. | Lambert, Kim A. | 0.50 |
| 01/10/11 | Review of last comments on Franchise Disclosure Document and Franchise Agreement; conference with Ben regarding corporate structure and all affiliated companies for Item 1 disclosure; review charts supplied by Ben; redraft Item 1 to reflect the same; preparation of e-mail to client regarding the outstanding Franchise Disclosure Document information and the California Franchise Investment Law exemptions; | Lambert, Kim A. | 2.20 |
| 01/20/11 | Conference regarding notes prepared by accountants and revision to notes under GAAP and GAAS; revision of notes; email to Ben regarding the same; conference with Allen Ginsburg regarding accounting rules and regulations | Lambert, Kim A. | 1.50 |
| 01/25/11 | Prepare and send new set of applications; review revised statements. | Lambert, Kim A. | 0.60 |
| 02/01/11 | Final revision of Franchise Agreement and Franchise Disclosure Document; send to client; send salespersons disclosure forms to client; review of additional materials from accountant; discussion of submission of advertising | Lambert, Kim A. | 1.20 |
| 02/04/11 | Review of e-mails regarding final financial statements and changes to the documentation; e-mail regarding additional state laws. | Lambert, Kim A. | 0.80 |
| 02/11/11 | Final revisions to franchise agreement and franchise disclosure document; preparation of letter to the California Department of Corporations; review of financial statements and placement of legend on reviewed statements; review of | Lambert, Kim A. | 3.20 |



B. Olivas
Matter # 373527-000004                                                          Page: 5
Invoice # 2609887                                                          August 16, 2011

| Date | Description | Timekeeper | Hours |
|------|-------------|------------|-------|
| | salesperson disclosure forms for the application; review of application form and cost of funds information; include State of California Addendum and Riders; conference with examiner at the California Department of Corporations. | | |
| 02/24/11 | Review of California Department of Corporations response to filing and send emails regarding the same. | Lambert, Kim A | 0.40 |
| 03/01/11 | Review of information in response to Ms. Leete's comments. | Lambert, Kim A. | 0.10 |
| 03/03/11 | Conference with Theresa Leets of the California Department of Corporations to negotiate the exclusion of a disclosure of the notices of violation from the Franchise Disclosure Document; confirmation with Ms. Leets that Potato Corner is adequately capitalized and no impound or escrow will be required. | Lambert, Kim A. | 0.80 |
| 03/10/11 | Revise 2011 Franchise Disclosure Document in response to California examiner's comments. | Krull, Colin | 1.20 |
| 03/16/11 | Revise 2011 Franchise Disclosure Document in response to California examiner's comments. | Krull, Colin | 0.50 |
| 04/15/11 | Prepare final PDF version of 2011 Franchise Disclosure Document; draft letter regarding use of 2011 FDD. | Krull, Colin | 1.20 |
| | **Total Hours** | | **74.20** |

Total Fees                                                                $29,363.50

## Timekeeper Summary

| Timekeeper | Title | Hours | Rate | Amount |
|------------|-------|-------|------|--------|
| Lambert, Kim A. | Of Counsel | 10.80 | 415.00 | 4,482.00 |
| Lambert, Kim A. | Of Counsel | 60.50 | 400.00 | 24,200.00 |
| Krull, Colin | Paralegal | 2.90 | 235.00 | 681.50 |
| **Totals** | | **74.20** | | **29,363.50** |



|  |  | B. Olivas |
| --- | --- | --- |
| Matter # 373527-000004 |  | Page: 6 |
| Invoice # 2609887 |  | August 16, 2011 |

**Disbursements:**

| Date | Description | Amount |
| --- | --- | --- |
| 06/01/10 | Air Fare - VENDOR: AMERICAN EXPRESS KIM LAMBERT - TRAVELED TO LOS ANGELES FOR MEETING WITH POTATO CORNER 5/28/10 | 0.00 |
| 04/05/11 | Delivery Services - Vendor: UNITED PARCEL SERVICE - FROM: Colin Krull TO: Corporations Counsel Ms. Theresa Leets California Department of LOS ANGELES CA | 14.92 |
| 04/05/11 | Delivery Services - Vendor: UNITED PARCEL SERVICE - FROM: DLA PIPER US LLP TO: Corporations Counsel Ms. Theresa Leets LOS ANGELES CA | 9.59 |
| 04/28/11 | Delivery Services - VENDOR: FEDERAL EXPRESS CORPORATION TO THERESA LEETS CALIFORNIA DEPT OF CORPORATION 4/05/2011 | 27.69 |
| 05/05/11 | Delivery Services - VENDOR: FEDERAL EXPRESS CORPORATION TO THERESA LEETS CALIFORNIA DEPT OF CORPORATION 4/13/2011 | 27.69 |

**Total Disbursements**      **$79.89**

**Total Current Charges**      **$      29,443.39**



M/ Olivas

Matter # 373527-000004
Invoice # 2609887                                                                    August 16, 2011

## REMITTANCE ADVICE

| | | |
|---|---|---|
| Current Fees | $ | 29,363.50 |
| Current Disbursements | $ | 79.89 |
| **Current Fees and Disbursements** | $ | 29,443.39 |
| Less Applied Credits | $ | (8,000.00) |
| **Total This Invoice** | $ | 21,443.39 |

*INVOICE IS DUE AND PAYABLE UPON RECEIPT*
*PLEASE RETURN THIS PAGE WITH YOUR REMITTANCE*

Please send remittance to:        DLA Piper LLP (US)
                                  P.O. Box 64029
                                  Baltimore, Maryland 21264-4029

Or Wire remittance to:            M&I Bank                          *To ensure proper credit, please indicate the*
                                  25 South Charles Street, 18th Floor   *invoice number you are paying on the wire*
                                  Baltimore, MD 21201
                                  Account Name:
                                  DLA Piper LLP (US) Operating Account
                                  Account #: 074-8148-5
                                  ABA Transit #: 022000046
                                  Swift Code: MANTUS33INT

Law Firm Tax Identification Number:  52-0616490

# EXHIBIT 42

From: **Jose Magsaysay Jr** <jomag28@gmail.com>
Date: Sun, Nov 10, 2013 at 8:56 PM
Subject: Re: DLA Outstanding Invoices
To: Amir Jacoby <ajacoby88@gmail.com>
CC: Guy Koren <guy@potatocornerusa.com>, Adam, potato corner <adamversus@yahoo.com>


Noted Amir

Thanks

I will call Ben in awhile



On Nov 11, 2013, at 11:49 AM, Amir Jacoby <ajacoby88@gmail.com> wrote:

Hi JoeMag,

To be very honest,
We are very disappointed with DLA piper.
It took us months to just get clarifications on
their invoices and the discrepancies in the billing.

Over the last 15 months we communicated
with Kim in regards to the invoice and voiced
our concern over the phone, emails and formal
letters about their quality of paper work
and their completion.
We have yet to get clear answers!!!

On several occasions and even now DLA
piper has put Potato Corner in harms way
with the franchise law.

I am not planning on paying them a single
Penny until I have an attorney look into all
The paper work they drafted and propose
the cost of fixing it and completing it.
I have already consulted with my attorney
and he has found numerous issues
which border major DLA piper negligence
and improper attorney conduct.

I hope Ben is feeling better now but he
was nowhere to be found in many months
now which is understandable.

I will send you the formal letter we sent them
months ago which we are yet to get
a single answer.

I am sorry it has come to that but this is
all on DLA PIPER and Lyndah.
Running bills without monitoring
quality and being unconscious financially
is very easy to do.

For over a year now that we took
over the communication with DLA from Lyndah
we are doing everything on project bases
and in a very organized manner and it's
costing us half the price.

If DLA PIPER have any questions
they know how to reach us...

Best Regards,

Amir J

On Nov 10, 2013, at 7:17 PM, Jose Magsaysay Jr <jomag28@gmail.com> wrote:

Hi Guy and Amir,

May I know status of our bills and relationship with DLA Piper?

Thanks

Joe

On Nov 11, 2013, at 10:46 AM, "Olivas, Ben" <Ben.Olivas@dlapiper.com> wrote:

Hi Jomag,

Kumusta na ba?   I trust you and your family are safe from last week's tragic storm.   Real sad.

Can we speak about our o/s bills this week?  I really need your help to prompt Amit and Guy to settle these once and for all.  Please let me know what works for you, and I really hope we can get all of these behind us.


Kind regards.


Ben


**Ben Olivas**
Partner

**T** +1 650.833.2080
**F** +1 650.687.1133
**M** +1 415.309.9648
**E** ben.olivas@dlapiper.com


<image001.gif>


DLA Piper LLP (US)
2000 University Avenue
East Palo Alto, California 94303-2215
United States
www.dlapiper.com


**From:** Erlinda Bartolome [mailto:esbartolome@gmail.com]
**Sent:** Monday, September 09, 2013 6:42 PM
**To:** Olivas, Ben
**Cc:** Jose Magsaysay
**Subject:** Re: DLA Outstanding Invoices


Hi Ben, I will be in a video conference with Hong Kong tom at 10 p.m. your time and will also be in a meeting on Thursday.


We can set it for another day but just in case you will be free anything today, just e mail us and we will call you.  I will have a meeting with Jomag at his office after 2 hours.


Thanks and hope you continue to feel great.

Lyndah


On Tue, Sep 10, 2013 at 9:28 AM, Olivas, Ben <Ben.Olivas@dlapiper.com> wrote:

Hi Lyndah,


How about tomorrow at 10 pm, my time?  Please call my cell..


Thanks.


Ben

On Sep 9, 2013, at 6:17 PM, "Erlinda Bartolome" <esbartolome@gmail.com> wrote:

Hi Ben, what is the best time to call you and what number will I use.


Thanks.


Lyndah


On Sat, Sep 7, 2013 at 10:56 PM, Olivas, Ben <Ben.Olivas@dlapiper.com> wrote:

Hi Lyndah,


Mabuti naman, all things considered. Will let you know more when we speak. How about
Monday evening my time? Please let me know. Thanks!!


Ben


On Sep 6, 2013, at 11:02 PM, "Erlinda Bartolome" <esbartolome@gmail.com> wrote:

Hi Ben, it is good to have heard from you again.

What is the best time to call you?

Hope you are feeling great now!

Kind regards.

Lyndah

On Thu, Sep 5, 2013 at 3:04 AM, Olivas, Ben <Ben.Olivas@dlapiper.com> wrote:

Hi Jomag/Lyndah,

I just got back to work, after a while.  Can I speak with either of you sometime this week?  I just need your help to close the loop and how best to address Amit's concerns going forward.  Please let me know.

Thanks.

Ben

**Ben Olivas**
Partner

**T** +1 650.833.2080
**F** +1 650.687.1133
**M** +1 415.309.9648
**E** ben.olivas@dlapiper.com

<image001.gif>

DLA Piper LLP (US)
2000 University Avenue
East Palo Alto, California 94303-2215
United States
www.dlapiper.com

**From:** Lambert, Kim
**Sent:** Wednesday, September 04, 2013 11:45 AM
**To:** Amir Jacoby

**Cc:** Hillard, Sarah; esbartolome@gmail.com; josemagsaysay@yahoo.com; guyk23@hotmail.com; Amir Jacoby (amir@potatocornerusa.com); Olivas, Ben; Scheeler, Susan; Wulff, Erik; Schuman, Heather

**Subject:** RE: DLA Outstanding Invoices

Amir,

I understand your concerns.  Our goal was to divide the invoices due from each entity.  Thereafter, our firm will work with you regarding your specific concerns below.  If you could work toward that end with Lyndah so that we have the numbers allocated according to company as soon as possible, we will address the issues you have raised and talk about what is owed specifically from PCJV given those issues.  Thanks. Kim

**From:** Amir Jacoby [mailto:ajacoby88@gmail.com]
**Sent:** Tuesday, August 27, 2013 4:34 PM
**To:** Lambert, Kim
**Cc:** Hillard, Sarah; esbartolome@gmail.com; josemagsaysay@yahoo.com; guyk23@hotmail.com; Amir Jacoby (amir@potatocornerusa.com); Olivas, Ben; Scheeler, Susan; Wulff, Erik; Schuman, Heather
**Subject:** Re: DLA Outstanding Invoices

Hi Kim, I hope all is well and congratulations on your new venture...we will miss you greatly...

This is what i wrote in an email Dated March 11th with an attached document:

**"Hi Kim, I hope all is well...**

**Here is the email tread when we sent the letter back in late December.**

**I would also like to add that most of the agreements drafted by Ben are still missing some parts which are called for in the agreements such as service agreements, management agreement, etc...**

**Please help us resolve this so we can move forward.**

**Thank you for all your hard work.**

**Amir J"**

We are very happy with the work that Kim has done for us in regards to the FDD but in regards to our

contracts/agreements drafted by others we have major deficiencies and issues that needs to be addressed.

Billing rates, rate charges and major inefficiencies were never the only issues we have been raising for many months now.

It took us several months to get DLA piper to answer simple billing issues and at the same time anybody looking at our agreements and contracts is

at awe that a law firm such as DLA Piper will produce such incomplete contracts and agreements.

Since we started working with DLA Piper on per project fee, it has been much more efficient, cost affective and accurate.

For many months now we were open to sit down and go over the billing with a professional  but we always get the response

that we should look over the billing and decide if Cinco or Potato Corner USA should pay. This should not be the approach since

the billing issues are much deeper then just who pays what.

As always, we are looking to resolve this quickly given that this matter is getting its proper attention.

Best Regards,

AMIR J

Potato Corner USA

On Mon, Aug 26, 2013 at 10:55 AM, Lambert, Kim <Kim.Lambert@dlapiper.com> wrote:

Amir and Linda,

I recently met with Amir and Guy in Los Angeles with one of the senior partners in our franchise and distribution group.  I have accepted an offer to join a local franchisor as in-house counsel and one of our senior associates in the San Francisco office, Heather Schuman, will be taking over the relationship with PCJV.  Indeed Heather has already assisted Guy on a couple of matters and I believe that the transition has been smooth.

In terms of the large outstanding balance due and owing from Cinco and PCJV, it has been several months since we requested that Cinco and PCJV review the invoices to determine which entity is responsible for what payment so that we receive the full payment due to DLA Piper on short order.  We have provided charts, copies of invoices and other information to facilitate your review and analysis.  It is essential that this be addressed as soon as possible.  If you require any other additional information or data please contact Sarah Hillard and be sure to copy Ben Olivas and Erik Wulff on your communication.

In the interim, all work will be handled through a Statement of Work.  For ongoing representation, we will request from time to time a retainer we will hold for future work.

Thank you so much for your assistance in resolving these issues and in being such a great client.  I will certainly miss working with all of you and will keep in touch regarding your growth and development efforts through Heather.  Always feel free to reach me on my cell phone at 415-336-2443.

Regards,

Kim

**From:** Lambert, Kim
**Sent:** Friday, June 28, 2013 9:57 AM
**To:** Hillard, Sarah; esbartolome@gmail.com; josemagsaysay@yahoo.com; amit@potatocornerca.com; guyk23@hotmail.com; Amir Jacoby (amir@potatocornerusa.com)
**Cc:** Olivas, Ben; Scheeler, Susan
**Subject:** RE: DLA Outstanding Invoices

Hello Everyone,

I understand that Amir has several issues with the manner in which the operating agreement was drafted and is seeking a reduction in fees.  I would ask that first Cinco and PCJV review what is outstanding and divide the amounts as should be applied to each of the entities.  I will then have our firm work with Amir on his individual issues.  I will be on vacation for the next couple of weeks so it would be helpful if you could complete this project while I am out of the office.  I can then work with each entity to finalize the balance due.  Thank you.

Warm regards,

Kim

**From:** Hillard, Sarah
**Sent:** Monday, June 10, 2013 10:38 AM
**To:** esbartolome@gmail.com; josemagsaysay@yahoo.com; amit@potatocornerca.com; guyk23@hotmail.com
**Cc:** Lambert, Kim; Olivas, Ben; Scheeler, Susan
**Subject:** DLA Outstanding Invoices

Dear All,

My apologies in my delayed response.  Attached, please find an list of open invoices by matter.  If you would like a copy of any of the invoices, please let me know.  Below is a list of payments that have been received and what invoices they have been applied to.  We would appreciate your efforts in deciding which entity will pay what portion of the remaining balance, which has been outstanding for many months.  Thank you so much for your assistance in bringing this account current.

| Invoice | Date | Total | Payments | Paid Date | Payee |
|---------|------|-------|----------|-----------|-------|
| W011513Q | 1/15/2013 | | -392.71 | | Balance remaining from CINCO payment for $7,466.00 |

| | | | | | |
|---------|------|-------|----------|-----------|-------|
| 2503392 | 11/2/2010 | 10,000.00 | -10,000.00 | 12/2/2010 | Payment from CINCO - $18,000.00 |
| | | | | | |

| 2609883 | 8/16/2011 | 21,254.46 | -13,305.00 | 12/5/2011 | Payment from PCJV - $17,000.00 |
| " | | | -7,949.46 | 10/2/2012 | Payment from CINCO - $20,172.84 |
| | | | | | |
| 2609884 | 8/16/2011 | 16,851.00 | -12,223.38 | 10/2/2012 | Payment from CINCO - $20,172.84 |
| " | | | -4,627.62 | 2/19/2013 | Payment from PCJV - $5,000 |
| | | | | | |
| 2609885 | 8/16/2011 | 6,496.00 | -6,496.00 | 8/29/2012 | Payment from CINCO - $9,185.00 |
| | | | | | |
| 2609887 | 8/16/2011 | 29,443.39 | -8,000.00 | 12/2/2010 | Payment from CINCO - $18,000.00 |
| " | | | -2,689.00 | 8/29/2012 | Payment from CINCO - $9,185.00 |
| " | | | -372.38 | 2/19/2013 | Payment from PCJV - $5,000 |
| | | | | | |
| 2619265 | 9/9/2011 | 195.00 | -195.00 | 1/15/2013 | Payment from CINCO - $7,466.00 |
| 2660630 | 12/12/2011 | 1,070.00 | -1,070.00 | 1/15/2013 | Payment from CINCO - $7,466.00 |
| 2673299 | 1/31/2012 | 1,572.29 | -1,572.29 | 1/15/2013 | Payment from CINCO - $7,466.00 |
| 2688974 | 3/13/2012 | 992.00 | -992.00 | 1/15/2013 | Payment from CINCO - $7,466.00 |
| 2697620 | 4/5/2012 | 1,340.50 | -1,340.50 | 1/15/2013 | Payment from CINCO - $7,466.00 |
| 2738528 | 7/19/2012 | 855.00 | -855 | 1/15/2013 | Payment from CINCO - $7,466.00 |
| 2750538 | 8/17/2012 | 1,048.50 | -1,048.50 | 1/15/2013 | Payment from CINCO - $7,466.00 |

**Sarah Hillard**
Legal Secretary

**T** +1 650.833.1578
**F** +1 650.833.2001
**E** sarah.hillard@dlapiper.com

<image001.gif>

DLA Piper LLP (US)
2000 University Avenue
East Palo Alto, California 94303-2215

United States
www.dlapiper.com

**Circular 230 Notice:** In compliance with U.S. Treasury Regulations, please be advised that any tax advice given herein (or in any attachment) was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax penalties or (ii) promoting, marketing or recommending to another person any transaction or matter addressed herein.

--
Guy Koren
Potato Corner USA
President/Managing Partner
(310) 593-1581

# EXHIBIT 43

---------- Forwarded message ----------
From: **Olivas, Ben** <Ben.Olivas@dlapiper.com>
Date: Thu, Oct 6, 2011 at 7:50 AM
Subject: PCJV Membership Certificates - To be signed
To: Amit Neman <amitneman@yahoo.com>
Cc: Joe Magsaysay <josemagsaysay@yahoo.com>, Erlinda Bartolome
<esbartolome@gmail.com>


Hi Amit,

Good to speak with you today.  As discussed, kindly print and sign each of the attached certificates of
membership, in your capacity as President of PCJV.  No need to work about page 2, since this is only
used in the event of a subsequent transfer/assignment.

Please send the signed certificates back to me by mail, and also send copies via pdf or fax (my fax
number below also shows up in my emailbox).

Thanks in advance.

Ben




**Ben R. Olivas**

**DLA Piper US LLP**
2000 University Avenue
East Palo Alto, California 94303

650.833.2080 **T**
650.687.1133 **F**
415.309.9648 **M**
ben.olivas@dlapiper.com

www.dlapiper.com

**Circular 230 Notice**: In accordance with Treasury Regulations which became applicable to all tax
practitioners as of June 20, 2005, please note that any tax advice given herein (and in any
attachments) is not intended or written to be used, and cannot be used by any taxpayer, for the
purpose of (i) avoiding tax penalties or (ii) promoting, marketing or recommending to another
party any transaction or matter addressed herein.

---

**From:** Reynholds, Susan
**Sent:** Wednesday, October 05, 2011 12:09 PM
**To:** Olivas, Ben
**Subject:** RE: Cinco - Stock certificates and stock ledger

Hi Ben,

Yes, we've issued (or I have drafted) the membership certificates (see attached).  Also, attached is a membership ledger.  I will order a good standing certificate and send to you when available (probably tomorrow).


Best regards,



---

**From:** Olivas, Ben
**Sent:** Wednesday, October 05, 2011 11:19 AM
**To:** Reynholds, Susan
**Subject:** Cinco - Stock certificates and stock ledger

Hi Susan,

Not sure if we already did this.  Can you confirm if we already have issued stock certificates (or the equivalent for an LLC) to both Cinco Corporation (60%) and the LA Group (40%)?  If not, can we go ahead and issue this week?  Also need the following:

1.   Stock ledger for PCJV; and
2.   Secretary of State's certificate of good standing for PCJV.

Thanks!!

Ben



**Ben R. Olivas**

**DLA Piper US LLP**
2000 University Avenue
East Palo Alto, California 94303

650.833.2080 **T**
650.687.1133 **F**
415.309.9648 **M**
ben.olivas@dlapiper.com

www.dlapiper.com

**Circular 230 Notice**: In accordance with Treasury Regulations which became applicable to all tax practitioners as of June 20, 2005, please note that any tax advice given herein (and in any attachments) is not intended or written to be used, and cannot be used by any taxpayer, for the purpose of (i) avoiding tax penalties or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**From:** pia@lewislawonline.com [mailto:pia@lewislawonline.com]
**Sent:** Wednesday, October 05, 2011 10:08 AM
**To:** Olivas, Ben
**Subject:** Re: Any news

Can u call me in an hour instead I'm in a client meeting 7144886898. Thanks
Sent via BlackBerry by AT&T

**From:** "Olivas, Ben" <Ben.Olivas@dlapiper.com>
**Date:** Wed, 5 Oct 2011 09:58:50 -0700
**To:** Pia Dyquiangco<pia@lewislawonline.com>
**Subject:** RE: Any news

Hi Pia,

What is your number?  I will call you in 30 minutes.

Thanks.

Ben



**Ben R. Olivas**

**DLA Piper US LLP**
2000 University Avenue
East Palo Alto, California 94303

650.833.2080 T
650.687.1133 F
415.309.9648 M
ben.olivas@dlapiper.com

www.dlapiper.com

**Circular 230 Notice**: In accordance with Treasury Regulations which became applicable to all tax
practitioners as of June 20, 2005, please note that any tax advice given herein (and in any
attachments) is not intended or written to be used, and cannot be used by any taxpayer, for the
purpose of (i) avoiding tax penalties or (ii) promoting, marketing or recommending to another
party any transaction or matter addressed herein.

**From:** Pia Dyquiangco [mailto:pia@lewislawonline.com]
**Sent:** Wednesday, October 05, 2011 9:57 AM

**To:** Olivas, Ben
**Subject:** Re: Any news

Hi Ben

I called you yesterday and realized, it was my afternoon and your evening. What's a good time to call you today?

Thanks
Pia

On Tue, Oct 4, 2011 at 9:39 AM, Olivas, Ben <Ben.Olivas@dlapiper.com> wrote:
Hi Pia,

Please call me this afternoon.  Thanks.

Ben



**Ben R. Olivas**

**DLA Piper US LLP**
2000 University Avenue
East Palo Alto, California 94303

650.833.2080 **T**
650.687.1133 **F**
415.309.9648 **M**
ben.olivas@dlapiper.com

www.dlapiper.com

**Circular 230 Notice**: In accordance with Treasury Regulations which became applicable to all tax practitioners as of June 20, 2005, please note that any tax advice given herein (and in any attachments) is not intended or written to be used, and cannot be used by any taxpayer, for the purpose of (i) avoiding tax penalties or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

---

**From:** Erlinda Bartolome [mailto:esbartolome@gmail.com]
**Sent:** Tuesday, October 04, 2011 1:17 AM
**To:** Pia Dyquiangco; Olivas, Ben
**Cc:** Joe Magsaysay
**Subject:** Re: Any news

Hi Pia, sorry but I missed answering this e mail.  I thought I answered your e mail and was wondering why I have not received a reply from you but lo and behold...I have

not answered, sorry.

My answers on your e mail.

Ben, please can we seek you assistance on these.  I also have some questions in the e mail of Pia.

On Tue, Sep 27, 2011 at 11:31 PM, Pia Dyquiangco <pia@lewislawonline.com> wrote:
Hi Lyndah and Joe

Funny that you contacted me, I was mid email drafting to inform you that we received word last friday via mail from USCIS. It is a request for additional evidence. They are giving us about 89 days to respond but I am sure we can meet these items fairly soon and get the approval. There are just a few items we need to prove further.

As you can see the first item is registering PCJV, LLC as a subsidiary under VIBE which is Dunn and Bradstreeet which is a business website to show that the companies relate. I will review requirements on this and see if Ben can help me in any way.  Ben, please help us with this.  If you are busy, can you nominate somebody who can do this for us or can we request Pia to assist us on this?

Issue Number One; must show that both companies are interrelated:

1. Federal Income Taxes of US Company - we dont have this yet right? PCJV did a filing last March
2. Stock Certificates: This needs to show that stocks held in the LLC so 60% to Cinco and 40% to LA Group. Who has the stock certificates as I dont think I was ever given them? Ben,  how do we handle this since the 60% was contributed by POTATO CORNER INTERNATIONAL but a company owned by Cinco 99%.
3. Stock Ledger Ben, where do we get this?
4. Original wire transfers of the $30,0000 to PCJV, LLC We can show the transfer from POTATO CORNER INTERNATIONAL to PCJV.


Issue number 2: Position in the US
More specific duties int he United States - We need to expand on the job description. I will draft this and send you the draft to fill in percentages and ancillary duties to each duty

US Organizational Chart - Can someone assist with this? (see attached for what is required) I will try to assist you on this.

State Quarterly wage reports from US Company - Should I ask Amit for these? Guy can help you on this.

Issue #3: Position in the Philippines

Submit a more detailed list of duties in the Philippines with a percentage of time doing each duty. Pia, question, for the L1A visa, does this mean that Jomag will no longer work here in Manila or we have to show that he will work both here and in the US.

Foreign Organizational Chart. (see attached for what is required). Will review this.

Please go through the attached and this email and if you could please let me know when I can get these items from you. I will draft and do what I need to do this week. I'd like to submit everything withing 2 weeks so we can still get Joe here by November.

Let me know if this is possible. Remember this is just a small hurdle. Not a big worry, it is typical for USCIS to want to clarify certain items submitted to make sure it warrants approval.

Thank you
Pia

On Tue, Sep 27, 2011 at 7:49 AM, Erlinda Bartolome <esbartolome@gmail.com> wrote:
Hi Pia, how are you?

Is there any development on the L1A visa of Jomag?

Will appreciate feedback please.

Thanks and kindest regards.

Lyndah


--
Best Regards,

*PIA MARIE DYQUIANGCO*
Attorney at Law
The Lewis Law Group, APLC
1851 East First Street Suite 900
Santa Ana, California 92705

Tel: (714) 619-9370
Cell: (714) 488-6898
Website: www.lewislawonline.com

Please consider the environment before printing this email.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of

the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

--
Best Regards,

*PIA MARIE DYQUIANGCO*
**Attorney at Law**
**The Lewis Law Group, APLC**
**1851 East First Street Suite 900**
**Santa Ana, California 92705**

**Tel:** (714) 619-9370
**Cell:** (714) 488-6898
**Website:** www.lewislawonline.com

Please consider the environment before printing this email.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

Please consider the environment before printing this email.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

**EXHIBIT 44**

# PCJV - Revised Joint Venture Agreement Terms

## Olivas, Ben <Ben.Olivas@dlapiper.com>

Tue 2/28/2012 5:22 PM

**To:** guy koren <guyk23@hotmail.com>; Erlinda Bartolome <esbartolome@gmail.com>; Joe Magsaysay
<josemagsaysay@yahoo.com>; Jojo <josemontinola@yahoo.com>

Hi Guy,

Good to speak with you today. I am writing this note to summarize our discussion regarding the revised, and agreed-upon, allocation of the 40% equity interest of the LA Group in PCJV:


1.   In general, the revised equity shares in PCJV are as follows:

Amir = 16% (increased from 8% in the current JV agreement)
Guy = 17% (increased from 16%)
Amit = 7% (decreased from 16%)

This percentages will apply only case of a sale of PCJV. and other events not covered by item 2 and 3 below.

2.   With regard to the 30% management fee received by the LA Group, this will be shared as follows:

Amir = 50%
Guy = 50%
Amit = 0%

3.   With respect to the 40% profits in PCJV (determined after paying the 30% management fee to the LA Group, and the 30% license fee to Cinco), as stated in the JV agreement, this will be shared 60% for the Cinco group, and 40% for the LA Group, but only after the operating expenses are deducted.

The LA Group agrees to share its 40% profit as follows:

Amir = 8%
Guy = 17%
Amit = 15%

If these revised rights are correct, I will draft a revised joint venture agreement to reflect these changes.

4.   The existing license agreement between the LA Group, through NKM LLC (as licensee), and Cinco (as licensor) will be amended as follows:

   a.   The existing Santa Anita store will continue to be owned and operated by NKM LLC.
   b.   Any additional stores within the LA territory will be owned and operated by a new entity, J&K LLC (please confirm name).

I understand that the existing license agreement included an initial payment by NKM LLC to Cinco of $15k for the right to open up to 10 stores in the LA territory. Thus far, only one (Santa Anita) has been opened by NKM. The existing license agreement will further be amended so that the rights to open 9 new stores in the LA territory will be transferred

by NKM LLC to J&K LLC.  No additional payments will be due to Cinco for these rights, apart from those already stated in the existing license agreement.

I understand that the owners of J&K LLC include the same minority shareholders in NKM LLC, and the only difference between the two shareholder groups is that Amit will not be an investor in J&K LLC.

5.    Finally, I recommend that each of the parties involved (Amit, Guy, Amir, NKM LLC, and J&K LLC) sign a quitclaim which releases PCJV, PC-International, and Cinco from any liabilities and obligations as set forth in the prior arrangements between the parties.

Please let me know if this summary is complete and accurate and I will circulate revised draft agreements in the next 2 days.  Also, please send a copy of the existing license agreement between NKM LLC and Cinco.

Kind regards.

Ben



**Ben R. Olivas**
**DLA Piper US LLP**
2000 University Avenue
East Palo Alto, California 94303

650.833.2080 **T**
650.687.1133 **F**
415.309.9648 **M**
ben.olivas@dlapiper.com

www.dlapiper.com

**Circular 230 Notice**: In accordance with Treasury Regulations which became applicable to all tax practitioners as of June 20, 2005, please note that any tax advice given herein (and in any attachments) is not intended or written to be used, and cannot be used by any taxpayer, for the purpose of (i) avoiding tax penalties or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

Please consider the environment before printing this email.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

# EXHIBIT 45

## PCVJ USA, LLC AND LA GROUP MASTER SERVICES AGREEMENT

This Master Services Agreement ("Agreement") dated ___6/18/12___ , is entered into by and between PCVJ USA, LLCa Delaware Limited Liability Company (hereinafter "PCVJ") and Amit Nemanim, Guy Koren and Amir Jacoby (whom are collectively referred to as the "LA Group").

### RECITALS

WHEREAS, PCJVwishes to contract with the LA Group to provide management and strategic experience and expertise.

WHEREAS, the LA Group agrees to provide Services to PCJV as delineated within this Agreement.

NOW, THEREFORE, the Parties hereby agree as follows:

Services:

1. The LA Group shall faithfully, diligently and efficiently exercise the following obligations and responsibilities:
   a. Conduct management, operations, marketing, establishment, maintenance, licensing and sub-licensing activities with respect to the Potato Corner outlets/stores in the Territory.
   b. Use best efforts at all times to operate and maintain the Potato Corner outlets/stores in the Territory according to the highest standards achievable, consistent with the overall plan of PCJV Management.
   c. Comply with the rules, policies and procedures approved by PCJV Management.
   d. Advertise, market, and promote the Potato Corner outlets/stores with the goal of causing public knowledge, awareness and patronage of the Potato Corner outlets/stores.
   e. Maintain a comprehensive system of records, books and accounts, with respect to the licensing and sub-licensing activities, operation, establishment, management, maintenance and other activities of the Potato Corner outlets/stores in the Territory with the assistance of the PCJV Corporate Secretary.
   f. No later than the twentieth (20th) day of each month, with respect to the preceding month, LA Group shall render a statement of receipts and disbursements, a schedule of accounts receivable and payable, and a schedule of fees collected and distributed, together with a reconciled bank statement as of the last day of the month with the assistance of the PCJV Corporate Secretary.
   g. No later than three (3) months after the end of a fiscal year, the LA Group, with the assistance of the PCJV Corporate Secretary and an external accountant



hired by PCJV Management, cause PCJV to issue audited financial statements, and shall provide a copy of the same to all members of PCJV Management.

h.  To the extent that the LA Group is able to do so, the LA Group shall take such action as may be necessary to comply promptly with any and all laws, ordinances, orders or other requirements of any federal, state, county or municipal authority having jurisdiction of PCJV and affecting PCJV.

i.   The LA Group shall have a fiduciary duty to exercise the duty of care and shall, at all times, ensure that all corporate opportunities consistent with the objectives of PCJV shall be pursued. As such, with respect to the establishment of PCVJ-owned stores, whenever potential locations are identified by any member of the LA Group, it shall be promptly brought to the attention of PCJV Management. At all times, and within thirty (30) days from receipt of this information, PCJV Management shall decide whether or not to build a PCJV-owned store at the identified location. In the event PCJV chooses to build a PCJV-owned store at the identified location, it shall have the right to do so, to the exclusion of the LA Group. However, in the event that PCJV decides not to build a PCJV-owned store at the identified location, it shall notify the LA Group of its decision in writing. In such case, the LA Group shall have the right to build a store at the identified location, provided that it shall enter into a franchising agreement with PCJV, and shall pay franchise fees and ongoing royalty fees as set forth in PCJV's standard franchising agreement.

2.  Territory for the purposes of this Agreement is defined as the United States of America and Israel, except in the County of Los Angeles, USA and the County of San Francisco, USA and Tanforan Mall.

3.  The LA Group shall maintain and protect the Confidential Information belonging to PCJV, and such undertaking shall apply to all of its partners, officers, employees, or agents.

4.  In consideration for the provision of its Services the LA Group shall be entitled to a service fee equal to thirty (30%) percent of all initial/franchise fees and continuing royalty fees paid to/collected by PCJV.

5.  All withholding and other applicable taxes levied by any authority on the payments by PCJV to the LA Group under this Agreement shall be borne solely by PCJV.

Confidential Information:



1.  The Parties acknowledge that from time to time, one Party (the "Discloser") may disclose to the other Party (the "Recipient") information : a) relating to the Potato Corner outlets and stores; b) relating to the Potato Corner Intangible Property Rights; c) Potato Corner product specifications and related information; d) which is marked with "confidential" or a similar legend; e) which is described orally and designated as confidential; or f) which would, under the circumstances, be understood by a reasonable person to be confidential ("Confidential Information").

2. Upon subsequent disclosure of previously disclosed Confidential Information to the Recipient by the Discloser, the information will remain Confidential Information even if not identified as Confidential Information at the subsequent disclosure.

3. Recipient shall retain such Confidential Information in confidence, and shall not disclose it to any Third Party or use it for other than the purposes of this Agreement without the Discloser's prior written consent.

4. Each Party shall use at least the same procedures and degree of care with respect to such Confidential Information which it uses to protect its on confidential information of like importance, and in no event less than reasonable care. The Recipient will immediately give written notice to the Discloser of any unauthorized use or disclosure of the Discloser's Confidential Information, and the Recipient will assist the Discloser in remedying such unauthorized use or disclosure.

Duration of Agreement:

1. This Agreement shall become effective from the date of execution hereof and shall continue indefinitely unless terminated by a) mutual written agreement by the Parties or b) breach of any provision of this Agreement by either Party which will result in termination of this Agreement unless cured by the breaching Party within twenty (20) days from the date of the breach.

General Provisions:

1. This Agreement may not be altered, changed, supplemented or modified except by a written instrument duly signed by the Parties.

2. The invalidity of any portion of this Agreement will not render the entire Agreement void, nor affect the validity of the rest of the provisions of this Agreement.

3. This Agreement shall be governed by the laws of the State of California.

4. Neither Party shall assign any of its rights or obligations under this Agreement without the prior written consent of the other Party.



5. The failure of any Party at any time to require performance by the others of any provision of this Agreement shall not affect, in any way, the right of such Party to require performance of that or any provision, and any waiver by any Party of any breach of this Agreement shall not be construed as a waiver of any continuing or succeeding breach of such provision, or a waiver of any other right under this Agreement.

**IN WITNESS WHEREOF,**

**PCJV USA, LLC**

_____          _____
                                          Date

Name: Jose P. Magsaysay

Title:   CEO

**LA Group**

_____          _____
Amit Nemanim                              Date

_____          _____
Guy Koren                                 Date

_____          _____
Amir Jacoby                               Date

# EXHIBIT 46

## Operating Agreement

Lambert, Kim <Kim.Lambert@dlapiper.com>

Fri 6/29/2012 11:46 AM

**To:** Olivas, Ben <Ben.Olivas@dlapiper.com>
**Cc:** guyk23@hotmail.com <guyk23@hotmail.com>

Ben,

Guy needs a signed operating agreement for PCJV that shows the equity of each partner. Lyndah sent a version but it was unsigned. Do you have that agreement? Please forward this to Guy as soon as possible. Thanks! This is the last agreement Guy needs for the audit.


Thanks,

Kim

Please consider the environment before printing this email.


The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

# EXHIBIT 47

**Received(Date):**    Tue, 10 Jul 2012 18:02:49 -0700
**Subject:**   DLA Piper
**From:**    Amir Jacoby <ajacoby88@gmail.com>
**To:**    Jomag28Y <jomag28@yahoo.com>
**Cc:**    Erlinda Bartolome <esbartolome@gmail.com>, guy@potatocornerusa.com

Dear Joe,

I need your help in seeking resolution to outstanding issues involving Potato Corner and
DLA Piper.

DLA Piper was engaged as legal counsel on behalf of PCJV upon the recommendation of
Cinco and others in the Philippines. As you're aware, in the U.S., none of us had any personal or professional
experience with the firm, nor its professionals.

We accepted the recommendation based on an understanding of the following:

a.    DLA Piper would be granting "favored nation" financial terms to any work on our behalf based upon an
existing relationship with Cinco.
b.    DLA Piper's specific expertise in franchise law would provide us with the most expert opinion and protection
against corporate and franchise exposure.
c.    Ben Oliva would be personally available to address key issues with corporate structure.

Recently we were served by DLA Piper with a legal bill in excess of $67,000. These bills were amassed from their
combined work performed for Cinco, PCJV, and NKM. Apart from the total owed, we were shocked to see a billing
rate of $650.00 per hour for counsel.

As we were never informed of any of specific terms, and under the impression that they would be providing a
significant discount on based on personal relationship, we must issue a strong objection.

Could you please let us know if there was a written agreement between DLA Piper and any Potato Corner entity
which would bind us to their defined hourly rate? Could you also let us know who on your end negotiated those
terms?

Beyond the rate itself, we have become increasingly concerned about the value received from their work.

One example is the "blind side" position we found ourselves in relative to the required U.S. FTC audit.
We believed that as counsel, DLA Piper would fully and with sufficient notice provide us with a clear understanding
of the audit process. Such notice would have allowed us to take advance actions that would have better prepared the
company on many levels. In fact, our notice of audit from DLA Piper was presented to us both casually and last
minute – as if the process was relatively simple. As we have all learned it was anything but simple.

Additionally we have found it exceedingly difficult to communicate with or even find Ben Oliva. This lack of
communication, as of current, is holding up receipt of the PCJV Operating Agreement which would allow us to
finish the audit process – and advance U.S. business. While we understand Ben's status within the firm, along with
his professional and personal obligations – it is unacceptable for us to not find a way to expedite this issue.

Joe, I know you recognize how critical it is for us to move Potato Corner to the next level of success in the U.S.
market. Your personal attention to helping us understand and address these issues will allow us to do so.

I look forward to speaking with you.

Best Regards,

Amir J
PotatoCornerUSA

# EXHIBIT 48

## Papers

esbartolome@gmail.com

Mon 7/23/2012 7:25 AM

**To:** guy koren <guyk23@hotmail.com>; guykoren@potatocornerusa.com <guykoren@potatocornerusa.com>
**Cc:** Joe Magsaysay <jomag28@gmail.com>

Hi Guy. I hope you could send me the following papers for the Cinco Board:

1. Resume of Adam and his Job Description in PCJV.

2. Comparison of the accounting service providers with the questionnaire they answered and their formal proposals.

3. Perspective of Century City.

Ben is sending me the signature blocks for the Operating Agreement and will send to you as soon I as I receive it.

Thanks Guy.


Sent from my BlackBerry® wireless handheld

# EXHIBIT 49

From:       Josh Cross <jcross@singerlewak.com>
To:         Guy Koren <guy@potaloco/nerusa.com>
Subject:    Draft Audit Report
Received(Date),      Tue, 7 Aug 2012 21:11:45 +0000
image001.png
Draft - Audit Report.pdf
Draft - Representation Letter 2011.pdf

Guy,


I have a draft of the audit report for you to review. It has gone through the review process and I
have been authorized to release the draft to you. Please review it and let me know any
comments, questions or recommended wording changes you may have. Also included is the
draft of the management representation letter. Please review this document as well and let me
know if you have any questions because before we issue the final report we will need this
document signed by both yourself and Inoal. We can have a soft copy of this letter to release the
report but would also request that you send the hard copy too. I will send you the word version
of this document once you have approved the draft.


Don't forget that we still need the signed LLC Agreement before we are able to issue.


I will be out of the office tomorrow morning but will be back in the afternoon if you want to
discuss.


Thanks,



**Joshua L. Cross | Manager**
**Assurance & Advisory**
jcross@singerlewak.com

100 West San Fernando Street, Suite 365
San Jose, CA 95113
T: 408.899.3902 ext.5147
www.SingerLewak.com

 Please don't post this e-mail unless it's necessary

www.SingerLewak.com

**PCJV USA, LLC AND NKM CAPITAL GROUP, LLC**
CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEAR ENDED
DECEMBER 31, 2011

DRAFT – 08/7/2012

**PCJV USA, LLC AND NKM CAPITAL GROUP, LLC**
CONTENTS
December 31, 2011

## DRAFT – 08/7/2012

|  | Page |
|---|---|
| **INDEPENDENT AUDITOR'S REPORT** | 1 |
| **FINANCIAL STATEMENTS** | |
| Consolidated Balance Sheet | 2 |
| Consolidated Statement of Operations | 3 |
| Consolidated Statement of Members' Equity (Deficit) | 4 |
| Consolidated Statement of Cash Flows | 5 |
| Notes to Consolidated Financial Statements | 6 - 15 |

**PCJV USA, LLC AND NKM CAPITAL GROUP, LLC**

CONSOLIDATED BALANCE SHEET

December 31, 2011

## DRAFT 08/7/2012

### ASSETS

| | | |
|---|---|---|
| **Current assets** | | |
| Cash | $ | 52,205 |
| Advertising and development fund | | 5,049 |
| Accounts receivable | | 17,641 |
| Due from officers | | 17,500 |
| Due from related parties | | 6,050 |
| Inventory | | 2,260 |
| Prepaid expenses | | 3,133 |
| Total current assets | | 113,838 |
| Property and equipment, net | | 89,646 |
| Other assets | | 7,898 |
| **Total assets** | $ | **211,382** |

### LIABILITIES AND MEMBERS' DEFICIT

| | | |
|---|---|---|
| **Current liabilities** | | |
| Accounts payable | $ | 93,938 |
| Deferred franchise fee revenue | | 95,000 |
| Other | | 2,473 |
| Total current liabilities | | 191,411 |
| Note payable to related party | | 15,000 |
| Deferred rent | | 3,133 |
| Deferred rent incentives | | 29,916 |
| **Total liabilities** | | **239,460** |
| Commitments and contingencies (Note 7) | | |
| Members' deficit | | (28,078) |
| **Total liabilities and members' deficit** | $ | **211,382** |

The accompanying notes are an integral part of these financial statements.

2

**PCJV USA, LLC AND NKM CAPITAL GROUP, LLC**
CONSOLIDATED STATEMENT OF OPERATIONS
For the Year Ended December 31, 2011

## DRAFT - 08/7/2012

| | | |
|---|---|---|
| Revenues | | |
| Franchise license fees | $ | 53,000 |
| Royalty fees | | 24,996 |
| Restaurant operations | | 477,362 |
| Total revenues | | 555,358 |
| Restaurant operating costs | | |
| Food and supplies | | 129,659 |
| Operating costs | | 180,243 |
| Total restaurant operating costs | | 309,902 |
| Gross profit | | 245,456 |
| Selling, general and administrative expenses | | 382,801 |
| Loss from operations | | (137,345) |
| Other expense | | |
| Interest expense | | 2,999 |
| Total other expense | | 2,999 |
| Loss before provision for franchise taxes | | (140,344) |
| Provision for franchise taxes | | 3,330 |
| Net loss | $ | (143,674) |

The accompanying notes are an integral part of these financial statements.

3

PCJV USA, LLC AND NKM CAPITAL GROUP, LLC
CONSOLIDATED STATEMENT OF MEMBERS' EQUITY (DEFICIT)
For the Year Ended December 31, 2011

DRAFT - 08/17/2012

| | PCJV USA, LLC | | | | NKM Capital Group, LLC | | | | | Total Members' Equity (Deficit) |
| | Joiner | Cinco | Member 1 | Member 2 | Member 3 | Member 4 | Member 5 | Member 6 | Member 7 | Member 8 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Balance at January 1, 2011 | $ 29,090 | $ 30,000 | $ 31,358 | $ (19,686) | $ 22,828 | $ (28,788) | $ 39,912 | $ 24,828 | $ (1,448) | $ (1,448) | $ 53,688 |
| Members' contribution | | | | | | | +40,000 | | | | 40,000 |
| Distribution to Members (Note 9) | (10,592) | | | | | | | | | | (2,000) |
| Net income (loss) | (75,382) | (3,070) | 41,521 | 11,531 | 1,342 | 18,589 | 672 | 1,342 | 538 | 460 | (193,016) |
| Balance at December 31, 2011 | $ (75,342) | $ (83,072) | $ 32,987 | $ (2,113) | $ 24,171 | $ (7,249) | $ 58,268 | $ 24,170 | $ (563) | $ (802) | $ (28,079) |

The accompanying notes are an integral part of these consolidated financial statements.
4

## PCJV USA, LLC AND NKM CAPITAL GROUP, LLC

### CONOSLIDATED STATEMENT OF CASH FLOWS

For the Year Ended December 31, 2011

**DRAFT - 08/7/2012**

| | | |
|---|---:|---:|
| **Cash flows from operating aclitivites** | | |
| Net loss | $ | (143,674) |
| Adjustments to roconcile net loss to net cash provided by operating activities. | | |
| Depreciation | | 26,276 |
| (ncrease) decrease in assets: | | |
| Anlvertising and development fund | | (5,049) |
| Accounts receivable | | (17,641) |
| Due from related parties | | (6,100) |
| Inventory | | 358 |
| Prepaid expenses | | 7,023 |
| Increase (docrease) in liabilit os: | | |
| Accounts payable | | 70,916 |
| Deferred franchise fee revonue | | 80,000 |
| Deferred rent | | 3,133 |
| Deferred rent incentives | | 4,018 |
| Other | | 2,473 |
| Net cash provided by operating activities | | 31,641 |
| **Cash flows from investing activities** | | |
| Purchase of property and equipment | | (36,436) |
| Net cash used in investing activities | | (36,436) |
| **Cash flows from financing activities** | | |
| Repayment of loans to officers | | (41,500) |
| Borrowings on note payable to related party | | 10,000 |
| Proceeds from issuance of members' units | | 40,000 |
| Net cash provided by financing activities | | 8,500 |
| **Net increase in cash** | | 3,705 |
| **Cash, beginning of year** | | 58,500 |
| **Cash, end of year** | $ | 62,205 |
| **Supplemental disclosure of cash flows information:** | | |
| Interest paid | $ | 2,999 |
| Franchise taxes paid | $ | 3,300 |

The accompanying notes are an integral part of these financial statements.

**PCJV USA, LLC AND NKM CAPITAL GROUP, LLC**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
December 31, 2011

## DRAFT – 8/7/2012

### NOTE 1 – NATURE OF OPERATIONS

PCJV USA, LLC ("PCJV") was organized to engage in the business of franchising the "Potato Corner" food business, as well as to establish and operate franchise and company-owned stores within the United States. PCJV is a limited liability company formed under Delaware law on July 16, 2010. PCJV commenced formal operations within the fiscal year ended December 31, 2011. As of December 31, 2011, franchises have been sold to operate four (4) stores in the western United States. PCJV had granted franchise licenses to franchisees in Southern California, Nevada, New Mexico, and Texas.

NKM Capital Group, LLC ("NKM") is a limited liability company formed under California law on April 22, 2009. NKM presently operates one franchise location in California, which acts as the pilot store for sales of franchises and as a training facility.

### NOTE 2 – CONTINUED OPERATIONS

As of and during the year ended December 31, 2011, PCJV and its variable interest entity, NKM (collectively the "Company") incurred a net loss of $143,674 and a members' deficit of $28,078, respectively. The Company's continued operations are dependent upon its ability to become profitable. Management anticipates the Company will achieve profitability and improve its liquidity through renewal of it licenses to sell franchises in the various states of the United States of America, and the sale and continued growth of new franchises. During 2012, the Company has secured $40,000 of additional funding from two related parties and management believes it has verbal commitments from approximately 12 buyers to sign as many as 18 new franchise agreements in the next eighteen months. If the Company is unable to sign new franchise agreements and is not able to attain required revenue growth, the Company may have to curtail its operations.

### NOTE 3 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

#### Principles of Consolidation
The accompanying consolidated financial statements include the accounts of the Company. All significant intercompany balances and transactions have been eliminated through consolidation. The consolidated entities are under common management and economically interdependent.

#### Basis of Presentation
The accompanying consolidated financial statements are prepared on the accrual basis of accounting in accordance with accounting principles generally accepted in the United States of America ("GAAP").

5

**PCJV USA, LLC AND NKM CAPITAL GROUP, LLC**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
December 31, 2011

## DRAFT – 8/7/2012

### NOTE 3 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

#### Variable Interest Entity

PCJV holds a variable interest in NKM and is the primary beneficiary such that it is required to include NKM's result of operations in its financial statements. PCJV does not have direct ownership of NKM. PCJV has a franchise agreement with NKM and is a part of a franchisor/franchisee relationship. Unlike other franchisees, NKM is 88.5% owned by the decision makers at PCJV. NKM also receives beneficial treatment from PCJV and has been excused from paying the initial franchise fee and any monthly royalties.

#### Use of Estimates

The preparation of consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenue and expenses during the reporting period. Significant estimates include the useful lives of property and equipment. Actual results could differ from those estimates.

#### Fair Value of Financial Instruments

Based on the observability of the inputs used in the valuation techniques, the Company is required to provide the following information according to the fair value hierarchy. The fair value hierarchy ranks the quality and reliability of the information used to determine fair values. As a basis for considering such assumptions, Financial Accounting Standards Board (FASB) Accounting Standards Codification (ASC) Topic 820, "Fair Value Measurements and Disclosures" (ASC 820) establishes a three-tier value hierarchy, which prioritizes the inputs used in the valuation methodologies in measuring fair value. The three levels of the fair value hierarchy are:

- Level 1 - Unadjusted quoted prices in active markets that are accessible at the measurement date for identical unrestricted assets or liabilities.

- Level 2 - Inputs other than Level 1 that are observable, either directly or indirectly, such as quoted market prices for similar assets or liabilities, quoted prices in markets that are not active, or other inputs that are observable or can be corroborated by observable market data for substantially the whole term of the assets or liabilities.

- Level 3 - Prices or valuations that require inputs that are supported by little or no market activity and that are both significant to the fair value measurement and unobservable.

The fair value hierarchy also requires an entity to maximize the use of observable inputs and minimize the use of unobservable inputs when measuring fair value.

Financial instruments on the Company's balance sheet include cash. The carrying amount of cash approximates fair value

## DRAFT – 8/7/2012

### NOTE 3 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

#### Cash

The Company maintains its cash balances in multiple financial institutions. As part of the Dodd-Frank Wall Street Reform and Consumer Protection Act, all funds in non-interest bearing accounts are fully insured and funds in interest bearing accounts are insured up to $250,000 by the Federal Deposit Insurance Corporation ("FDIC"). As of December 31, 2011, the Company did not maintain any deposits in excess of the federally insured amounts. The Company has not experienced any losses in such accounts and believes it is not exposed to any significant credit risk on cash.

#### Accounts Receivable

PCJV's accounts receivable represents primarily royalties and marketing funds due from franchisees. NKM has no accounts receivable since NKM collects funds from sales to store customers immediately when each transaction occurs. The Company expects to fully collect amounts due. As of December 31, 2011, management determined that a reserve for uncollectible accounts was not required.

#### Inventory

Inventory, consisting principally of food, beverage and store supplies, is valued at the lower of cost (computed on the first-in, first-out method) or net realizable value. As of December 31, 2011, management determined a reserve against inventory was not required.

#### Property and Equipment

Property and equipment are stated at cost. Depreciation is computed under the straight-line method for PCJV, and double declining balance method for NKM, over the estimated useful lives of the assets as follows:

| | |
|---|---|
| Store equipment | 7 years |
| Computer equipment | 5 years |
| Furniture and fixtures – | 7 years |
| Leasehold improvements | Lesser of useful life or term of lease |

Maintenance and repair costs are expensed as they are incurred while renewals and improvements of a significant nature are capitalized. At the time of retirement or disposition of property and equipment, the cost and related accumulated depreciation are removed from the accounts and any resulting gain or loss is reflected in the results of operations.

#### Accounting for the Impairment of Long-Lived Assets

Long-lived assets are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amounts of the assets in question may not be recoverable. An impairment loss would be recorded in circumstances where undiscounted cash flows expected to be generated by an asset are less than the carrying value of that asset. As of December 31, 2011, no impairment has been recognized as management expects to fully utilize the Company's long-lived assets.

8

**PCJV USA, LLC AND NKM CAPITAL GROUP, LLC**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
December 31, 2011

---

## DRAFT – 8/7/2012

### NOTE 3 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

#### Franchise Operations

PCJV grants franchisees rights to operate a Potato Corner Store (a "Store"), and to use the Company's business formats, methods, procedures, signs, designs, layouts, standards specifications, trademarks, service marks and commercial symbols (the "Franchise System") in its operation, under franchise agreements for a 10 year term in specified locations. Upon signing Franchise Agreements, the Company intends to receive and initial franchise fee of $15,000 for each of the first five franchise locations, and $25,000 for every subsequent franchise location. The initial franchise fees are subjected to discounts at PCJV management's discretion, and are recognized as income when each Store opens.

#### Deferred Rent

The Company accounts for facilities lease expenses on a straight-line basis over the terms of the related leases. This accounting generally results in a deferred liability recorded on the balance sheet.

#### Deferred Rent Incentives

The Company amortizes landlord provided tenant allowances on a straight-line basis over the term of the related lease. This accounting results in a deferred liability recorded as rent incentives on the balance sheet.

#### Revenue Recognition

##### Franchise Revenue

Revenue from sales of individual franchises is recognized when the Store has been opened by the franchisee.

#### Royalty Fee Income

In addition to the initial franchise fee, each of the franchise locations is required to remit to PCJV a monthly Continuing Service and Royalty Fee (the "Royalty") equal to two and one half percent (2.5%) of the Store's gross sales (as defined in the Franchise Agreement) for the first three months, and five percent (5%) of the Store's gross sales thereafter. If the Store fails to report its current month's gross sales, the Royalty due will be 120% of the last Royalty paid to PCJV. All Royalties owed to PCJV will bear interest accruing as of their original monthly due (as described in the franchise agreement) date at one and one-half (1.5%) per month.

#### Advertising and Development Fund

Each franchisee is required to contribute to an Advertising and Development Fund (the "Fund") an amount equal to 1% of the Store's monthly gross sales. The required contribution can increase up to 2% of the Store's weekly gross sales. In compliance with the Franchise Agreement, the Fund is used for the advertising, marketing, and public relations programs and materials PCJV deems appropriate. PCJV accounts for the Fund separately from other cash and does not use the Fund for general operating expenses. The Fund collected and unused, is recorded in accounts payable on the accompanying balance sheet and is held for future use,

9

**PCJV USA, LLC AND NKM CAPITAL GROUP, LLC**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
December 31, 2011

## DRAFT – 8/7/2012

### NOTE 3 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

Revenue Recognition (Continued)
Store Operations
Revenues from the NKM operated Store are recognized when payment for food purchases by customers is tendered at the time of sale.

Franchise Taxes
The Company files a return for federal and state income taxes. The Company is a limited liability company that has elected to be treated as a partnership for federal income tax purposes. Under federal law, the taxable income or loss of a limited liability company is allocated to its members. Accordingly, no provision has been made for federal income taxes. State franchise taxes for the period from January 1, 2011 through December 31, 2011 are included in provision for franchise taxes.

The Company follows ASC 740-10, Accounting for Uncertainty in Income Taxes. ASC 740-10 provides guidance on recognition, derecognition, measurement, classification, interest, and penalties, disclosure and transition. ASC 740-10 requires an entity to recognize the financial statement impact of tax positions when it is more likely than not that the position will not be sustained upon examination. In addition, ASC 740-10 permits an entity to recognize interest and penalties related to tax uncertainties either as income tax expense or operating expenses. The Company has chosen to recognize interest and penalties related to tax uncertainties as operating expenses.

The Company has concluded that there are no significant uncertain tax positions requiring recognition in its financial statements. As a result, ASC 740-10 does not have a material impact on the Company's results of operations and financial position.

Recently Adopted Accounting Pronouncements
In January 2010, the FASB issued Accounting Standards Update ("ASU") 2010-06, "Improving Disclosures about Fair Value Measurements," which is codified in Topic 820, "Fair Value Measurements and Disclosures." This guidance amends the disclosure requirements related to recurring and nonrecurring fair value measurements and requires new disclosures on significant transfers of assets and liabilities between Level 1 and Level 2 of the fair value measurement hierarchy, including the reasons and the timing of the transfers. Additionally, the guidance requires a rollforward of activities on purchases, sales, issuance and settlements of the assets and liabilities measured using Level 3 measurement. The guidance is effective for the reporting period beginning July 1, 2010, except for the disclosure on the rollforward activities for Level 3 fair value measurements, which became effective for reporting periods beginning July 1, 2011. The Company had no significant transfers of assets or liabilities between Level 1 and Level 2. The adoption of these rules did not have a material effect on the Company's consolidated financial statements.

16

**PCJV USA, LLC AND NKM CAPITAL GROUP, LLC**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
December 31, 2011

## DRAFT – 8/7/2012

### NOTE 3 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

Recently Adopted Accounting Pronouncements (Continued)

In July 2010, the FASB issued Accounting Standards Update No. 2010-20, which amends Receivables (Topic 310) ("ASU 2010-20"). ASU 2010-20 is intended to provide additional information to assist financial statement users in assessing an entity's risk exposures and evaluating the adequacy of its allowance for credit losses. The disclosures are effective for annual reporting periods ending on or after December 15, 2011. The amendments in ASU 2010-20 encourage, but do not require, comparative disclosures for earlier reporting periods that ended before initial adoption. However, an entity should provide comparative disclosures for those reporting periods ending after initial adoption. The adoption of these rules did not have a material effect on the Company's consolidated financial statements.

Recently Issued Accounting Pronouncements

In May 2011, the FASB issued Accounting Standards Update No. 2011-04, *Fair Value Measurements and Disclosures* (Topic 820): *Amendments to Achieve Common Fair Value Measurement and Disclosure Requirements in U.S. GAAP and IFRSs.* The amendments in this Update result in common fair value measurement and disclosure requirements in U.S. GAAP and IFRSs. Consequently, the amendments change the wording used to describe many of the requirements in U.S. GAAP for measuring fair value and for disclosing information about fair value measurements. For many of the requirements, the FASB does not intend for the amendments in this Update to result in a change in the application of the requirements in Topic 820. Some of the amendments clarify the FASB's intent about the application of existing fair value measurement requirements. Other amendments change a particular principle or requirement for measuring fair value or for disclosing information about fair value measurements. For the Company, this guidance is effective for fiscal years, and interim periods within those years, beginning after December 15, 2011. Early adoption is not permitted. Management is currently assessing its implementation of this new guidance, but does not expect a material impact on the Company's consolidated financial statements.

### NOTE 4 – PROPERTY AND EQUIPMENT, NET

Property and equipment consisted of the followings as of December 31, 2011:

| | |
|---|---:|
| Store equipment | $ 105,425 |
| Furniture and fixtures | 16,858 |
| Computer equipment | 11,891 |
| Leasehold improvements | 4,331 |
| Total Cost | 138,474 |
| Less accumulated depreciation | (48,828) |
| Net | $ 89,646 |

**PCJV USA, LLC AND NKM CAPITAL GROUP, LLC**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
December 31, 2011

## DRAFT – 8/7/2012

### NOTE 4 – PROPERTY AND EQUIPMENT, NET (Continued)

Depreciation expense for year ended December 31, 2011 totaled $26,276.

### NOTE 5 – FRANCHISED LOCATIONS

Open Stores

|  | For the Year Ended December 31, 2011 |
|---|---|
| Open at beginning of year | 2 |
| Opened during the year | 3 |
| Terminated or closed during the year | (1) |
| **Open at end of year** | **4** |

Unopened Restaurants
The Company granted nine new franchise licenses during the year ended December 31, 2011. Three of these stores opened and became fully operational at various times during 2011 and the two stores open as of December 31, 2010 signed their franchise agreement, at which time the Company recognized the full franchise fee income on all five of these stores. The remaining five stores are still not operational. Management does not believe services related to these stores are substantially performed and consequently deferred franchise fee income remains for these stores in the amount of $95,000 as of December 31, 2011.

### NOTE 6 – MEMBERS' EQUITY

Description of members
Pursuant to the PCJV Limited Liability Company Agreement (the "PCJV LLC Agreement") and the Joint Venture Agreement (the "PCJV JV Agreement") entered into by the members, the members are classified and designated as either part of the Cinco Corporation (Philippines) (the "Cinco Group") or the LA Group (the "LA Group"). The LA Group was formed by three individual U.S.-based investors. Upon execution of the PCJV LLC agreement each member was to assign, convey, and transfer their respective initial capital contribution to the Company. At the time of formation, PCJV had a total capital account of $50,000 fully subscribed and paid. The Cinco Group contributed $30,000 and owns sixty (60%) percent of PCJV's capital accounts, while the LA Group contributed $20,000 and owns the remaining forty (40%) percent.

**PCJV USA, LLC AND NKM CAPITAL GROUP, LLC**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
December 31, 2011

---

## DRAFT – 8/7/2012

### NOTE 6 – MEMBERS' EQUITY (Continued)

#### Description of members (Continued)

Pursuant to the NKM Limited Liability Company Agreement (the "NKM LLC Agreement"), the members are comprised of three (3) Members with both Class A units and Class B units, and two (2) Members with Class A units, and three (3) Members with Class B units. Upon execution of the NKM LLC Agreement, six of the eight members were to assign, convey, and transfer their respective initial capital contribution to the Company. At the time of formation, NKM had a total capital account of $118,000 fully subscribed and paid. The six new members contributed $40,000, $25,000, $25,000, $20,000, $5,000 and $3,000 respectively to NKM. The eight members owned 37%, 25.75%, 25.75%, 3%, 3%, 2%, 2%, and 1.5% of NKM's ownership.

#### General Distributions

Management may determine a distribution of an excess of cash on hand beyond PCJV's current and anticipated requirements to the members. Such distributions may be made in cash or property or both. The LA Group is entitled to a service fee equal to thirty (30%) percent of all initial franchise fees and Royalties paid to or collected by PCJV.

Income and distributions of PCJV and NMX shall be allocated to the members in proportion to their percentage interests.

#### Liquidating Distributions

Upon the dissolution of PCJV and NKM, liquidation distributions in all cases shall be made in accordance with the positive capital account balances of the members, as determined after taking into account all capital account adjustments for PCJV's and NKM's taxable year during which such dissolution occurs, by the end of such taxable year or, if later, within ninety days after such dissolution.

### NOTE 7 – COMMITMENTS AND CONTINGENCIES

#### Operating Leases

PCJV has an operating lease agreement for its corporate office in Los Angeles, California. The lease term commenced on July 1, 2011 and expires on July 1, 2016. The lease agreement is subject to rent escalations. PCJV is also required to pay real estate taxes, insurance and all repairs on the leased premises. Total rent expense for the corporate office was $23,179 for the year ended December 31, 2011.

**PCJV USA, LLC AND NKM CAPITAL GROUP, LLC**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
December 31, 2011

## DRAFT – 8/7/2012

### NOTE 7 – COMMITMENTS AND CONTINGENCIES (Continued)

#### Operating Leases (Continued)

NKM has an operating lease agreement for its company-owned Store location in Los Angeles, California. The lease term commenced on December 1, 2009 and expires on November 30, 2016. The lease agreement is subject to rent escalations. In addition to the payment of minimum annual rental and additional rent, NKM shall pay the percentage rental equal to the product of the percentage rental rate times the amount by which the Store's gross sales exceed the annual breakpoint ($525,000 as of December 31, 2011). Total rent expense for the Store location was $74,204 for the year ended December 31, 2011.

Future minimum payments under these operating lease agreements as of December 31, 2011 are as follows:

| For the Year Ending December 31, | |
|---|---|
| 2012 | $ 89,467 |
| 2013 | 93,223 |
| 2014 | 97,140 |
| 2015 | 104,858 |
| 2016 | 80,734 |
| Total | $ 465,412 |

### NOTE 8 – RELATED PARTY TRANSACTIONS

The Company has a $15,000 loan from Potato Corner International Trading, LLC ("PCIT"), an affiliate through common ownership. The loan bears interest at the short-term Applicable Federal Rates (0.20% at December 31, 2011) and is not secured by any collateral. The loan was not repaid on the maturity date of May 31, 2012, and PCJV amended the agreement to extend the due date to May 31, 2013.

The Company advanced funds to three of its members to fund the initial capital contribution in the amount of $20,000 required for the 40% ownership of the LA Group. The advances are due on demand and do not bear interest and the Company expects to receive payment within the next twelve (12) months. These advances are presented as an offset to the equity of the Company as shown on the accompanying consolidated statement of members' equity (deficit). The Company also has approximately $3,000 due from Cinco and PCIT for reimbursement of expenses. As of December 31, 2011, amounts receivable from officers and related parties on the accompanying consolidated balance sheet totaled $23,550.

**PCJV USA, LLC AND NKM CAPITAL GROUP, LLC**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
December 31, 2011

## DRAFT – 8/7/2012

### NOTE 9 – CONCENTRATIONS OF RISK

Suppliers

For the year ended December 31, 2011, one unaffiliated supplier represented approximately 72% of food and supply purchases of the Company. As of December 31, 2011, this same one supplier represented approximately 96% of accounts payable.

For the year ended December 31, 2011, PCIT represented approximately 19% of food and supply purchases. The Company buys various supplies, branded materials and the signature spice blend from PCIT. PCIT sells similar products to all other franchisees of the Company.

### NOTE 10 – SUBSEQUENT EVENTS

Management has evaluated subsequent events through July XX, 2012, the date the consolidated financial statements were issued and concluded no subsequent events have occurred which would require recognition in the consolidated financial statements or disclosures in the notes to the consolidated financial statements.

# EXHIBIT 50

## POTATO CORNER USA
## JOINT VENTURE AGREEMENT

This Joint Venture Agreement (the "Agreement") dated _effective 10/1/09_ is made and entered into on ___immediately___, by and between:

Cinco Corporation, a corporation duly existing and registered by virtue of and under the laws of the Republic of the Philippines with office address at 869 Katarungan Street, Plainview Mandaluyong City, Philippines 1550, represented herein by its duly authorized representative, Jose P. Magsaysay (hereinafter "Cinco"), and its directors, Jose P. Magsaysay, Jr., Jose Miguel Ma. G. Montinola, Ma. Victoria O. Bermejo, Ricardo K. Montelibano, all of whom are Philippine citizens and resident, and collectively referred to as the "Cinco Group";

-and-

AMIT NEMANIM, GUY KOREN, AMIR JACOBY, all of whom are U.S. citizens and residents and collectively referred to as the "LA Group:

### RECITALS

WHEREAS, the Parties hereto have agreed to form a limited liability company (hereinafter referred to as the "Company") under the laws of the State of Delaware, with the primary purpose of engaging in the business of establishing, operating, managing, licensing and franchising "Potato Corner" stores/outlets in the United States of America and Israel, except in the County of Los Angeles, USA and the County of San Francisco, USA and Tanforan Mall (hereinafter, "Territory").

WHEREAS, the Parties herein have agreed to enter into this Agreement which sets forth the terms and conditions with respect to the organization, incorporation, operation and management of the Company and defines their respective rights, duties and obligations of the parties to this Agreement.

WHEREAS, the Parties agree that the LLC operating agreement to be entered by them shall reflect the terms and conditions as set forth in this Agreement.

WHEREAS, Cinco may assign and or all of its rights to the joint venture company formed under this Agreement to a wholly-owned subsidiary as it deems fit.

NOW, THEREFORE, for and in consideration of the foregoing premises, the Parties hereby agree as follows:

1) ORGANIZATION AND FORMATION OF THE COMPANY

a) Within ten (10) days from the Effective Date of this Agreement, the Parties herein agree to organize and form, a limited liability company to be called "PCJV USA" ( hereinafter referred to as the Company) for the primary purpose of engaging in the business of establishing, operating, managing, licensing and franchising "Potato Corner" stores/outlets in the Territory.

b) The initial members of the Company shall be the following:

i) Cinco Group
   (1) Cinco
   (2) Jose P. Magsaysay, Jr.
   (3) Jose Miguel Ma. G. Montinola
   (4) Ma. Victoria O. Bermejo
   (5) Ricardo K. Montelibano

ii) LA Group
   (1) Amit Nemanim
   (2) Guy Koren
   (3) Amir Jacoby

c) The principal office of the Company shall be at   1729 Santee St., Los Angeles, California 90015.

d) The annual general meeting of the members of the Company shall be held every year at the principal office of the Company.   The members may, at their discretion, invite non-members to join the annual general meeting, but only as non-voting observers.  Further, to the extent allowed by the financial condition of the Company, and as agreed upon by a majority of all member interests, the Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses incurred by the following members in attendance of the annual members' meeting: Jose P. Magsaysay, Jr., Jose Miguel Ma. Montinola, Ma. Victoria O. Bermejo and Ricardo K. Montelibano.

e) The fiscal year of the Company shall begin on January 1 and end on December 31 of each year.

f) The Company shall immediately upon formation obtain a "Liability Insurance" for the Company the amount and scope of coverage to be determined by the managers.

g) All costs, fees and expenses incurred in connection with the organization and formation of the Company shall be for the account of the Company.

h) The operating agreement of the Company shall reflect the terms and conditions set forth in this Agreement between the Parties.

2) CAPITALIZATION/OWNERSHIP OF THE COMPANY

a) At the time of formation, the Company shall have a total capital account of Fifty Thousand Dollars (US$50,000) which shall be fully subscribed and paid.

b) Unless other agreed to in writing, at the commencement of this Agreement, the Parties hereby agree that the Cinco Group shall contribute Thirty Thousand Dollars (US$30,000) and own sixty (60%) percent of the Company's capital accounts, while the LA Group shall contribute Twenty Thousand Dollars (US$20,000) and own the remaining forty (40%) percent.



2

c) The Parties hereby agree any increase in the capital account shall require an affirmative vote of 75% of all of the members' percentage interests in the Company. In the event an increase in the Company's capital accounts is approved by the members, both Parties shall have rights of pre-emption so that their pro rata ownership share in the Company shall be maintained, provided that, either Party shall have thirty (30) days within which to confirm in writing that it is willing and able to subscribe and fully pay its pro rata share of the increase in capital.

d) Neither Party shall assign any of its rights or obligations under this Agreement, nor his/its member interests in the Company without the prior written consent of the other Party. In the event either Party desire to transfer or sell his/its pro rata members interest in the Company to a person other those specifically named in Section 1(a) of this Agreement, such Party shall be obligated to sell the same first to the other Party, which has have thirty (30) days within which to exercise its rights of first refusal from the date of receipt of a written notice to sell. For this purpose, the Parties hereby agree that the right of first refusal may be exercised in accordance with the following formula: The average of the Company's earnings before interest, depreciation, taxes and amortization (EBITDA) for the last two (2) years multiplied by 5 times, and further multiplied by the percentage of member interest subject to such right of first refusal over total outstanding member interests.

3) MANAGEMENT OF THE COMPANY

a) As will be provided in the Operating Agreement, the business and affairs of the Company shall be managed and all of the Company powers shall be exercised by or under the direction of the managers (collectively referred to as "Management"). Unless otherwise agreed to by the parties, the Management shall be composed of seven (7) members, four (4) of whom shall be designated by the Cinco Group, and three (3) designated by the LA Group. Upon the formation of the Company, the following shall be named managers: Jose P. Magsaysay, Jr., Jose Miguel Ma. Montinola, Ma. Victoria O. Bermejo, Ricardo K. Montelibano, Amit Nemanim, Guy Koren, and Amir Jacoby.



b) The Management shall regularly meet on a monthly basis. The regular monthly board meeting may be done via teleconference or through the internet. The members may, at their discretion, invite non-members to join member meetings, but only as non-voting observers. Further, to the extent allowed by the financial condition of the Company, and as agreed upon by a majority of all member interests, the Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses incurred by the members named in Section 1(d) in attendance of said meetings.

c) Upon the formation of the Company, it shall have the following executive officers: President, Corporate Secretary and Treasurer, and the following shall be elected by the members to serve these positions:

   i)   Chairman of the Board of Members – Jose P. Magsaysay

3

WEST\222455623.2

ii)  President – At any given time, the President shall be any one of the following members: Amit Nenamin, Guy Koren or Amir Jacoby, and the first president will be Amit Nemanim

iii)  Corporate Secretary – Erlinda Bartolome.

iv)  Treasurer – Jose Miguel Ma. Montinola

   (1) The Treasurer shall have oversight functions over the Accounting and Finance Departments that shall be exercised independent of the President.

d)  Additional executive officers may be appointed by Management as it may deem necessary.

e)  It is hereby agreed that the rights and responsibilities of the Management shall include the following:

   i)  Approval of the compensation package for the managers, executive offices and key personnel.

   ii)  Approval of the Accounting System/Procedures/Software/Method to be used by the Company.

   iii)  Approval of the operating budget of the Company, and any changes to it.

   iv)  Approval of all franchising agreements, and lease agreements.

   v)  Approval of all purchases and disbursements in excess of $10,000, provided that such amount may be changed or modified by Management as it deems necessary.

f)  The executive officers shall manage the business and property of the Company, and to market the business, in accordance with and pursuant to the directives of and policies set by the Management of the Company. The Management of the Company can recall and/or withdraw the appointment of any executive officer, as it deems necessary.

g)  The Company shall enter into a Master License Agreement with Cinco (or an affiliated company to be designated by Cinco) which shall include the following terms and conditions:

   i)  The Company agrees to license the "POTATO CORNER" intellectual property rights from Cinco or an affiliated company to be designated by Cinco) consisting of (i) the trademark, service mark and trade name "POTATO CORNER"; and (ii) various trademarks, service marks, trade names, slogans, designs, insignias, emblems, symbols, color schemes, package features, logo and other propriety identifying characteristics used in relation and in connection with the "Potato Corner" Products and the System; and (iii) as well as other intellectual property rights in connection with the "POTATO CORNER" intellectual property rights, for use in the Territory.

   ii)  The Company agrees to pay, as an arm's length license fee, the following amounts:

      (1) With respect to the licensing / sub-licensing or franchising the "POTATO CORNER" intellectual property rights in connection with the "POTATO CORNER" outlets/stores, an amount equal to thirty percent (30%) of all



4

initial/franchise fees and ongoing royalty fees paid to/ collected by the Company. Payments shall be made to Cinco (or an affiliated company to be designated by Cinco) by wire transfer using a bank or other financial institution specified by it within thirty (30) days from receipt of the fees by the Company.

(2) All withholding and other applicable taxes levied by any authority on the payments by the Company shall be borne solely by the Company.

h) The Company agrees to engage the LA Group to provide management and strategic experience and expertise during the duration of this Agreement. The Company shall enter into a Master Services Agreement with the LA Group (or a corporation to be designated by the LA Group) which shall include the following terms and conditions:

  i) In consideration for the provision of its services under the Master Services Agreement, the LA Group shall be entitled to a services fee equal to thirty (30%) percent of all initial/franchise fee and continuing royalty fees paid to/ collected by the Company .

  ii) All withholding and other applicable taxes levied by any authority on the payments by the Company to the LA Group under this Agreement shall be borne solely by the Company.

  iii) The LA Group shall faithfully, diligently and efficiently exercise its obligations and responsibilities under the Master Services Agreement.

  iv) The LA Group shall maintain and protect the Confidential Information belonging to Cinco or the Company, and such undertaking shall apply to all of its partners, officers, employees, or agents.

i) The President of the Company shall render the following services and shall perform the following duties for the Company in a faithful, diligent and efficient manner:

  i) The President shall be responsible for all management, operational, marketing, establishment, maintenance, licensing and sub-licensing activities with respect to the "Potato Corner" outlets/stores in the Territory. He shall use his best efforts at all times during the term of this Agreement to operate and maintain the "Potato Corner" outlets/stores in the Territory according to the highest standards achievable consistent with the overall plan of the Management of the Company. The President shall comply with the rules, policies and procedures approved by the Management of the Company from time to time.

  ii) The President shall advertise market and promote the "Potato Corner" outlets/stores with the goal of causing public knowledge, awareness and patronage of the "Potato Corner" outlets/sites.

  iii) The President shall maintain a comprehensive system of records, books and accounts, with respect to the licensing and sub-licensing activities, operation,



5

establishment, management, maintenance and other activities of the "Potato Corner" outlets /stores in the Territory with the assistance of the Corporate Secretary.

iv) No later than the twentieth (20th) day of each month, with respect to the preceding month, the President shall render a statement of receipts and disbursements, a schedule of accounts receivable and payable, and a schedule of fees collected and distributed, together with a reconciled bank statement as of the last day of the month with the assistance of the Corporate Secretary.

v) No later than three (3) months after the end of a fiscal year, the President shall, with the assistance of the Corporate Secretary and external accountant hired by Management, cause the Company to issue audited financial statements, and shall provide a copy of the same to all the members of Management.

vi) To the extent the President is lawfully able to do so, the President shall take such action as may be necessary to comply promptly with any and all laws, ordinances, orders or other requirements of any federal, state, county or municipal authority having jurisdiction of the Company and affecting the Company.

j) Consistent with its fiduciary duty to the Company, the members and managers shall exercise the duty of care and shall, at all times, ensure that all corporate opportunities consistent with the objectives of this Agreement shall be pursued on behalf of, and for the benefit of the Company. As such, with respect to the establishment of Company-owned stores, whenever potential locations are identified by any member or manager, it shall be promptly brought to the attention of the Management. At all times, and within thirty (30) days from receipt of this information, the Management shall decide to either build a Company-owned store at the identified location. In the event the Company chooses to build a Company-owned store at the identified location, it shall have the right to do so, to the exclusion of any of the members or managers. However, in the even the Company decides not to build a Company-owned store at the identified location, it shall notify the members and managers of its decision in writing. In such case, the LA Group shall have the right to build a store at the identified location, provided that it shall enter into a franchising agreement with the Company, and shall pay the franchise fees and ongoing royalty fees as set forth in the Company's standard franchising agreement.

4) DURATION OF AGREEMENT

a) This Agreement shall become effective from the date of execution hereof and shall continue indefinitely unless otherwise terminated by (i) an affirmative vote of 75 percent (75%) of all member interests, or (ii) upon mutual agreement by the Parties in writing.

b) Upon termination of this Agreement, the effects of termination shall be as follows:

6

i) All rights granted under the Master License Agreement shall terminate and the Company shall cease the use of the Potato Corner Intellectual Property Rights, and Confidential Information, provided however, that the Company shall be permitted to use any of the foregoing as is reasonably required in order to comply with its obligations under its sub-licensing or franchising agreements, but only to the extent of the duration of sub-licensing or franchising agreements in existence at the time of the termination of this Agreement.

ii) The LA Group shall be subject to a non-compete arrangement and hereby agrees that, within two (2) years from the date of termination of this Agreement, it shall not engage in the business of establishing, operating, managing, licensing and franchising identical or similar products sold by the Company, using the intellectual property rights identical or similar to those used by the Company, at the time of the termination of this Agreement.

5) GENERAL PROVISIONS

a) This Agreement may not be altered, changed, supplemented or modified except by a written instrument duly signed by the Parties.

b) The Parties shall use their best efforts to cooperate for the success of the business of the Company. The Parties further agree to perform all acts and execute and deliver all documents or instruments required or necessary to fully implement or consummate the transactions contemplated in and the intent underlying this Agreement.

c) The Parties shall, to the extent feasible, cause the operating agreement of the Company to reflect the mutual covenants and provisions contained in this Agreement.

d) All notices and other communications required or permitted to be given hereunder shall be given in writing (and for this purpose shall include emails or fax transmissions) and shall be addressed to the appropriate Party at the address of such Party as heretofore designated, or at such address as such Party may designate subsequently in writing.

e) The failure of any Party at any time to require performance by the others of any provision of this Agreement shall not affect, in any way, the right of such Party to require performance of that or any other provision, and any waiver by any Party of any breach of this Agreement shall not be construed as a waiver of any continuing or succeeding breach of such provision, or a waiver of any other right under this Agreement.

f) This Agreement shall constitute the entire agreement between the Parties and shall supersede any previous agreements, written or otherwise, with respect to the same subject matter which may have been made by the Parties prior hereto.

g) The invalidity of any portion of this Agreement will not and shall not render the entire Agreement void, nor affect the validity of the rest of the provisions of this Agreement.

7

WEST\222455823.2



8

WEST\222455823.2

IN WITNESS WHEREOF, the parties have executed this Agreement on the date and in place first mentioned.

**Cinco Group:**

Cinco Corporation (Philippines)

Name: Jose P. Magsaysay

Title:    CEO

Jose P. Magsaysay, Jr.,

Jose Miguel Ma. G. Montinola

Ma. Victoria O. Bermejo

Ricardo K. Montelibano,

**L.A. Group:**

Amit Nemanim

Guy Koren,

Amir Jacoby

SIGNED IN THE PRESENCE OF:

ADAM MANDEL

9

ACKNOWLEDGMENT

10

# EXHIBIT 51

LIMITED LIABILITY COMPANY AGREEMENT

of

PCJV USA, LLC

A Delaware Limited Liability Company

THE INTERESTS CREATED BY THIS OPERATING AGREEMENT HAVE NOT BEEN
REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE
SECURITIES ACT OF 1933, AS AMENDED, OR WITH THE SECURITIES AUTHORITIES
OF ANY STATE UNDER ANY STATE SECURITIES LAWS, AND MAY NOT BE SOLD
OR OTHERWISE TRANSFERRED UNLESS REGISTERED UNDER SUCH LAWS OR
UNLESS AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF SUCH
LAWS IS AVAILABLE. THE SALE OR TRANSFER OF SUCH INTERESTS IS SUBJECT
TO CERTAIN ADDITIONAL RESTRICTIONS DESCRIBED IN THIS OPERATING
AGREEMENT.

# TABLE OF CONTENTS

Page

ARTICLE I        DEFINITIONS ......................................................................................... 1

ARTICLE II       FORMATION ........................................................................................ 4

2.1     Purpose .................................................................................................. 4
2.2     Powers ................................................................................................... 4
2.3     Formation and Name ............................................................................ 4
2.4     Principal Place of Business ................................................................... 4
2.5     Registered Office and Registered Agent .............................................. 4
2.6     Records to be Maintained ..................................................................... 5
2.7     Term ...................................................................................................... 5

ARTICLE III      MEMBERS ............................................................................................. 5

3.1     Classification of Members ..................................................................... 5
3.2     Admission of Additional Members ....................................................... 5
3.3     Right of First Refusal ............................................................................ 6
3.4     Amendment of Member Listing ............................................................ 6
3.5     Payment of Costs ................................................................................... 6
3.6     Limited Liability of Members ............................................................... 6
3.7     Voting Rights ........................................................................................ 6
3.8     Meetings of Members ............................................................................ 7
3.9     Right of Inspection; Provision of Records to Members ...................... 10
3.10    Representations and Warranties .......................................................... 12

ARTICLE IV       MANAGEMENT ................................................................................... 12

4.1     Management ........................................................................................ 12
4.2     Number and Qualifications of Manager ............................................. 14
4.3     Election of Managers .......................................................................... 14
4.4     Removal of Managers .......................................................................... 14
4.5     Resignation of Managers ..................................................................... 14
4.6     Term of Office as Manager .................................................................. 14
4.7     Authority of Multiple Managers ......................................................... 14
4.8     Fiduciary Duties Owed by Managers .................................................. 15
4.9     Conduct of Meetings of Managers ...................................................... 15
4.10    Regular Monthly Meetings .................................................................. 15
4.11    Officers ................................................................................................ 15
4.12    Indemnification and Liability Insurance ............................................ 17
4.13    Actions of the Managers ...................................................................... 18
4.14    Meetings of Managers .......................................................................... 18
4.15    Compensation of Manager ................................................................... 19
4.16    Authority of Members to Bind the Company ...................................... 19
4.17    Specific Arrangements with the Cinco Group .................................... 20
4.18    Specific Arrangements with the LA Group ......................................... 20

TABLE OF CONTENTS
(continued)

Page

ARTICLE V     CAPITAL ................................................................................. 21

5.1     Initial Capital Contributions ............................................................. 21
5.2     Capital Accounts ............................................................................... 21
5.3     Adjustment for Distributions in Kind ................................................ 21
5.4     Interest .............................................................................................. 21
5.5     Deficit Capital Account ..................................................................... 22
5.6     Return of Capital ............................................................................... 22
5.7     Optional Adjustments to Capital Accounts ....................................... 22

ARTICLE VI    INCOME AND LOSSES ........................................................... 22

6.1     Allocations ........................................................................................ 22
6.2     Qualified Income Offset .................................................................... 22
6.3     Minimum Gain Chargeback ............................................................... 22
6.4     Contributed Property and Revaluations ............................................ 22
6.5     Timing ............................................................................................... 23

ARTICLE VII   DISTRIBUTIONS ..................................................................... 23

7.1     Operating Distributions .................................................................... 23
7.2     Generally Pro Rata ........................................................................... 23
7.3     Liquidating Distributions .................................................................. 23

ARTICLE VIII  ASSIGNMENT OF INTERESTS ............................................. 23

8.1     Assignment of Interests ..................................................................... 23
8.2     No Dissolution upon Assignment ...................................................... 24
8.3     Information Regarding Assignee ....................................................... 24
8.4     No Release of Liability of Assignor .................................................. 24
8.5     Pledge of Membership Interest ......................................................... 24
8.6     Exercise of Rights upon Death or Incompetency ............................. 24
8.7     Exercise of Rights upon Dissolution or Termination ....................... 24

ARTICLE IX    DISSOLUTION AND WINDING UP ....................................... 24

9.1     Dissolution ........................................................................................ 24
9.2     Effect of Dissolution ......................................................................... 25

ARTICLE X     TAX AND ACCOUNTING MATTERS ................................... 25

10.1    Characterization as a Partnership ..................................................... 25
10.2    No Partnership Intended for Nontax Purposes ................................. 25
10.3    Fiscal Year ........................................................................................ 26
10.4    Accounting Method ........................................................................... 26
10.5    Tax Information ................................................................................. 26
10.6    Basis Adjustment ............................................................................... 36
10.7    Other Elections ................................................................................. 26
10.8    Taxes of Taxing Jurisdictions ........................................................... 26
10.9    Tax Matters Partner ........................................................................... 26

WEST\282\283319.1

## TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| ARTICLE XI | DISSOCIATION OF A MEMBER | 27 |
| 11.1 | Dissociation | 27 |
| 11.2 | Rights of Dissociating Member | 27 |
| ARTICLE XII | MISCELLANEOUS PROVISIONS | 28 |
| 12.1 | Amendment of Operating Agreement | 28 |
| 12.2 | Entire Agreement | 28 |
| 12.3 | Interpretation | 28 |
| 12.4 | Rights of Creditors and Third Parties under Operating Agreement | 28 |
| 12.5 | Valuation of Non-Cash Consideration | 28 |
| 12.6 | Counterpart Execution | 28 |
| 12.7 | Remedies | 28 |
| 12.8 | Successors and Assigns | 29 |
| 12.9 | Severability | 29 |
| 12.10 | Governing Law | 29 |

WEEY:0243033112

LIMITED LIABILITY COMPANY AGREEMENT
of
PCJV USA, LLC

The Limited Liability Company Agreement is made and entered into as of the Effective Date by the Members listed below for the purpose of forming a Delaware limited liability company in accordance with the provisions hereinafter set forth.

## ARTICLE I

### DEFINITIONS

The following terms, as used herein, shall have the following respective meanings:

1.1    Act – The Delaware Limited Liability Company Act, 6 Del.C. §18-101, et seq., as amended from time to time.

1.2    Additional Member – A member other than an Initial Member or a Substitute Member who has acquired a Membership Interest from the Company.

1.3    Assignee – A transferee of a Membership Interest who has not been admitted as a Substitute Member.

1.4    Assignor – A transferor of a Membership Interest.

1.5    Business Day – Any day other than Saturday, Sunday or any legal holiday observed in the State of Delaware.

1.6    Capital Account – The account maintained for a Member or Assignee determined in accordance with Article V.

1.7    Capital Contribution – Any contribution actually made to the capital of the Company pursuant to Section 5.1 by or on behalf of a Member or Assignee. The initial Capital Contribution of the Members shall be US$50,000 which shall be fully subscribed and paid.

1.8    Certificate – The Certificate of Formation of the Company.

1.9    Company – The company named in the introductory paragraph of this Operating Agreement, and any successor thereof.

1.10    Company Liability – Any enforceable debt or obligation for which the Company is liable or which is secured by any Company Property.

1.11    Company Minimum Gain – The extent to which a nonrecourse liability exceeds the adjusted tax basis of the Company Property it encumbers. The amount of Company Minimum Gain shall be determined in accordance with Regulations Section 1.704-2(d) by substituting the terms "Company" and "Holder" for the terms "partnership" and "partner," respectively, in each place they appear therein.

1.12    Company Property – Any Property owned by the Company.

1.13    Contribution – A contribution as defined by the Act.

1.14    Disposition (Dispose) – Any sale, assignment, transfer, exchange, mortgage, pledge, grant, hypothecation, or other transfer, absolute or as security or encumbrance (including dispositions by operation of law).

1.15    Dissociation – Any action which causes a Person to cease to be a Member as described in Article XI hereof.

1.16    Dissolution Event – An event, the occurrence of which will result in the dissolution of the Company under ARTICLE IX unless the Members agree to the contrary.

1.17    Distribution – A distribution of Money or Property made pursuant to this Operating Agreement.

1.18    Economic Interest – A Person's right to share in the income, gains, losses, deductions, credits or similar items of, and to receive Distributions from, the Company, exclusive of any other rights of a Member including, without limitation, the right to vote or to participate in management, or any right to information concerning the business and affairs of the Company.

1.19    Effective Date – The date the Certificate is filed with the Delaware Secretary of State.

1.20    Holder – A Person holding an Economic Interest, whether as a Member or as an Assignee.

1.21    Income and Losses – With respect to a taxable year of the Company (or other period for which Income or Losses must be computed), the Company's taxable income or loss for federal income tax purposes, as determined by the tax advisors employed by the Company for this purpose, except that: (1) any tax-exempt income of the Company as described in IRC Section 705(a)(1)(B) shall be treated as gross income of the Company, (2) any nondeductible noncapital expenditures as described in IRC Section 705(a)(2)(B) shall be treated as a deduction of the Company, and (3) if any Company property is reflected on the books of the Company at a value ("Book Value") different from the adjusted tax basis of such property, any item of Income or Loss with respect to such property shall be computed by reference to such Book Value.

1.22    Initial Capital Contribution – The Capital Contribution agreed to be made by the Initial Members as described in Section 5.1.

1.23    Initial Members – Those persons identified on Exhibit A attached hereto and made a part hereof by this reference who have executed the Operating Agreement.

1.24    IRC – The Internal Revenue Code of 1986, as amended.

2

1.25   Majority – The affirmative vote or consent of Members having Percentage Interests in excess of one-half of the Percentage Interests of all the Members entitled to vote on a particular matter. Assignees and, in the case of approvals to withdrawal where consent of the remaining Members is required, Dissociating Members shall not be considered Members entitled to vote for the purpose of determining a Majority. In the case of a Member who has Disposed of that Member's entire Membership Interest to an Assignee, but has not been removed as provided below, the Percentage Interest of such Assignee shall be considered in determining a Majority and such Member's vote or consent shall be determined by such Percentage Interest.

1.26   Management Right – The right of a Member to participate in the management of the Company, including the rights to information and to consent or approve actions of the Company.

1.27   Manager – A manager selected to manage the affairs of the Company as provided under Article IV hereof.

1.28   Member – A member as defined by the Act, including all Initial Members, Substitute Members and Additional Members (but not including any Assignee or any Member who has Dissociated).

1.29   Membership Interest – A membership interest as defined by the Act.

1.30   Money – Cash or other legal tender of the United States, or any obligation that is immediately reducible to legal tender without delay or discount. Money shall be considered to have a fair market value equal to its face amount.

1.31   Notice – Except as otherwise expressly provided herein, all Notices shall be in writing. Notice to the Company shall be considered given when mailed by first class mail postage prepaid addressed to any Manager in care of the Company at the address of the principal place of business of the Company. Notice to a Member shall be considered given when mailed by first class mail postage prepaid addressed to the Member at the address reflected in the Operating Agreement unless the Member has given the Company a Notice of a different address.

1.32   Operating Agreement – This Limited Liability Company Agreement and all amendments thereto adopted in accordance with this Limited Liability Company Agreement and the Act.

1.33   Organization – A Person other than a natural person. Organization includes, without limitation, corporations (both non-profit and other corporations), partnerships (both limited and general), trusts, joint ventures, limited liability companies, and unincorporated associations, but the term does not include joint tenancies and tenancies by the entirety.

1.34   Percentage Interest – With respect to a Member, the percentage set forth opposite such Member's name on Exhibit A hereto, as such Exhibit is amended from time to time in accordance with Section 3.3 hereof, and with respect to a Holder not a Member, the Percentage Interest or part thereof corresponding to the portion of a Member's Economic Interest such Holder has acquired.

1.35    Person – A person as defined by the Act.

1.36    Proceeding – Any judicial or administrative trial, hearing or other activity, civil, criminal or investigative, the result of which may be that a court, arbitrator, or governmental agency may enter a judgment, order, decree, or other determination which, if not appealed and reversed, would be binding upon the Company, a Member or other person subject to the jurisdiction of such court, arbitrator, or governmental agency.

1.37    Property – Any property real or personal, tangible or intangible, including money and any legal or equitable interest in such property, but excluding services and promises to perform services in the future.

1.38    Regulations – Except where the context indicates otherwise, the permanent, temporary or proposed regulations of the Department of the Treasury promulgated under the IRC as such regulations may be amended from time to time.

1.39    Taxing Jurisdiction – Any state, local, or foreign government that collects tax, interest or penalties, however designated, on any Member's share of the income or gain attributable to the Company.

1.40    Term – As specified in Section 2.7.

## ARTICLE II

## FORMATION

2.1    Purpose. The purpose of the Company is to engage in any lawful act or activity for which a limited liability company may be organized under the Act or the laws of any other jurisdiction in which the Company may do business.

2.2    Powers. The Company shall have all powers necessary to accomplish its purposes without the necessity of their specific enumeration herein including, without limitation, all powers described in Section 18-106 of the Act.

2.3    Formation and Name. The Members have caused to be formed a limited liability company under the name of PCJV USA, LLC (the "Company"), by the filing of the Certificate pursuant to the provisions of Section 18-201 of the Act. The Members desire to govern the affairs of the Company by entering into this Operating Agreement.

2.4    Principal Place of Business. The principal place of business of the Company shall be located at Suite 1110, 6380 Wilshire Blvd, CA 90048 USA, unless changed by the Managers.

2.5    Registered Office and Registered Agent. The Company's registered office is at 615 South DuPont Highway, City of Dover, County of Kent 19901 and the name of its initial registered agent is National Corporate Research, Ltd. The Company may change the registered office and/or the registered agent at such times and from time to time as the Managers may deem advisable.

2.6    Records to be Maintained. The Company shall maintain the following records at its principal place of business:

2.6.1   A current list of the full name and last known business or residence address of each Member and Assignee set forth in alphabetical order, together with a schedule showing the Capital Contribution and Percentage Interest of each Member and Assignee;

2.6.2   A current list of the full name and business or residence address of each Manager, if any;

2.6.3   A copy of the Certificate and all amendments thereto, together with any powers of attorney pursuant to which the Certificate or any amendments thereto were executed;

2.6.4   Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six most recent taxable years;

2.6.5   A copy of this Operating Agreement and any amendments hereto, together with any powers of attorney pursuant to which this Operating Agreement or any amendments hereto were executed;

2.6.6   Copies of the financial statements of the Company, if any, for the six most recent fiscal years;

2.6.7   The books and records of the Company as they relate to the internal affairs of the Company for at least the current and past four fiscal years; and

2.6.8   Any other records to be maintained pursuant to the Act.

2.7    Term. The Term of this Operating Agreement shall commence upon the date the Certificate is filed and shall continue indefinitely unless otherwise terminated by (i) an affirmative vote of 75 percent (75%) of all member interests, or (ii) upon mutual agreement by the Parties in writing.

ARTICLE III

MEMBERS

3.1    Classification of Members. Pursuant to the Joint Venture Agreement entered into by the Members on ___, the Members shall be classified and designated as either part of the Cinco Corporation (Philippines) group (the "Cinco Group") or the LA group (the "LA Group"). Both the Cinco Group and the LA Group agreed to the specific rights and obligations granted to each group, and undertake to fully observe the rights vested to each group under the Operating Agreement.

3.2    Admission of Additional Members. Additional Members may be admitted to the Company upon the consent of the Members required pursuant to Section 3.7, which such consent

may be granted in their sole discretion. The Capital Contribution of any Additional Member shall be determined by the Members consenting to the admission. Each Additional Member shall execute a counterpart of this Operating Agreement, agreeing thereby to be bound by all of the terms and provisions hereof.

3.3     Right of First Refusal. A Member of the Cinco Group or the the LA Group shall not assign any of its rights or obligations nor his/its Member Interests in the Company outside of the Cinco Group and the LA Group, without the prior written consent of the non-assigning group. In the event a Member of either the Cinco Group or the LA Group desire to transfer or sell his/its pro rata members interest in the Company to a person other those in either the Cinco Group or the LA Group, such Member shall be obligated to sell the same first to the existing Members, which has have thirty (30) days within which to exercise its rights of first refusal from the date of receipt of a written notice to sell. For this purpose, the Parties hereby agree that the right of first refusal may be exercised in accordance with the following formula: The average of the Company's earnings before interest, depreciation, taxes and amortization (EBITDA) for the last two (2) years multiplied by 5 times, and further multiplied by the percentage of member interest subject to such right of first refusal over total outstanding Member Interests.

3.4     Amendment of Member Listing. Upon admission of an Additional Member, the Member listing required by Section 2.6 and Exhibit A hereto shall be amended accordingly.

3.5     Payment of Costs. All reasonable expenses, including attorneys' fees, incurred by the Company in connection with the admission of an Additional Member shall be borne by such Additional Member.

3.6     Limited Liability of Members. Members shall not be personally liable for the liabilities of the Company.

3.7     Voting Rights. All Members shall be entitled to vote on any matter submitted to a vote of the Members. Unless otherwise specified herein, actions to be taken by Members require the consent of a Majority of the Percentage Interests represented at a duly held meeting of the Members or, if such action is taken by written consent, by a Majority of all of the Percentage Interests. Notwithstanding the foregoing, the following actions require the consent described below:

| Action | Consent Required |
|---|---|
| Decision to dissolve the Company. | 75% of all Membership Interests |
| Decision to continue the business of the Company after a Dissolution Event. | 75% of all Membership Interests |
| Approval of the transfer of a Membership Interest and admission of an Assignee as a Substitute Member of the Company. | Prior written consent of the other Member |

| Action | Consent Required |
|---|---|
| Approval of the withdrawal and Dissociation of a Member of the Company. | Prior written consent of the other Member |
| Any amendment of the Certificate or this Operating Agreement. | 75% of all Membership Interests |
| Agreement of merger as defined in Section 17551 of the Act. | 75% of all Membership Interests |
| Disposition by the Company of all or substantially all of the Company's assets. | 75% of all Membership Interests |
| Confession of a judgment against the Company in excess of Ten Thousand Dollars. | 75% of all Membership Interests |

3.8    Meetings of Members.

3.8.1    Place of Meetings. Meetings of Members may be held at any place, selected by the Person or Persons calling the meeting. If no other place is stated or fixed, all meetings shall be held at the principal place of business of the Company.

3.8.2    Calling of Meetings. A meeting of the Members may be called at any time by any Manager or by one or more Members with an aggregate Percentage Interest of more than ten percent (10%) for the purpose of addressing any matter on which the Members may vote.

3.8.3    Notice of Meetings. Whenever Members are required or permitted to take any action at a meeting, a Notice of the meeting shall be given not less than ten (10) calendar days nor more than sixty (60) calendar days before the date of the meeting to each Member entitled to vote at the meeting. The Notice shall state the place, date, and hour of the meeting and the general nature of the business to be transacted. No other business may be transacted at such a meeting.

3.8.4    Means of Providing Notice of Meetings. Any Notice of a meeting of the Members shall be given either personally or by mail or other means of written communication, charges prepaid, addressed to the Member at the address of the Member appearing on the books of the Company or given by the Member to the Company for the purpose of Notice, or, if no address appears or is given, at the place where the principal place of business of the Company is located or by publication at least once in a newspaper of general circulation in the county in which the principal place of business is located. The Notice shall be deemed to have been given at the time when delivered personally or deposited in the mail or sent by other means of written communication. An affidavit of mailing of any Notice in accordance with the provisions of this section, executed by a Manager or Member, shall be prima facie evidence of the giving of the Notice.

7

Upon written request to a Manager by any Person entitled to call a meeting of Members, the Manager shall immediately cause Notice to be given to the Members entitled to vote that a meeting will be held at a time requested by the Person calling the meeting, not less than ten (10) calendar days nor more than sixty (60) calendar days after the receipt of the request. If the Notice is not given within twenty (20) calendar days after receipt of the request, the Person entitled to call the meeting may give the Notice or, upon the application of that Person, the superior court of the county in which the principal place of business of the Company is located, or if the principal place of business is not in this state, the county in which the Company's address in this state is located, shall summarily order the giving of the Notice, after Notice to the Company affording it an opportunity to be heard.

The Members may, at their discretion, invite non-Members to join, but only as non-voting observers. Further, to the extent allowed by the financial condition of the Company, and as agreed upon by a majority of all member interests, the Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses incurred by the Members in attendance.

3.8.5    Adjourned Meetings.  When a Members' meeting is adjourned to another time or place, unless the Certificate or this Operating Agreement otherwise requires, and, except as provided in the Act, Notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken. At the adjourned meeting, the Company may transact any business that may have been transacted at the original meeting. If the adjournment is for forty-five (45) calendar days or more, or if after the adjournment a new record date is fixed for the adjourned meeting, a Notice of the adjourned meeting shall be given to each Member entitled to vote at the meeting.

3.8.6    Validation of Meeting Held Without Proper Call or Notice.  The actions taken at any meeting of Members, however called and noticed, and wherever held, have the same validity as if taken at a meeting duly held after regular call and notice, if a quorum is present either in person or by proxy, and if, either before or after the meeting, each of the Members entitled to vote, not present in person or by proxy, signs a written waiver of Notice or consents to the holding of the meeting or approves the minutes of the meeting. All waivers, consents, and approvals shall be filed with the Company records or made a part of the minutes of the meeting. Attendance of a Member at a meeting shall constitute a waiver of Notice of the meeting, except when the Member objects, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Attendance at a meeting is not a waiver of any right to object to the consideration of matters required by this title to be included in the meeting but not so included, if the objection is expressly made at the meeting. Neither the business to be transacted nor the purpose of any meeting of Members need be specified in any written waiver of Notice, unless otherwise provided in the Certificate or this Operating Agreement, except as provided in subsection 3.8.8.

3.8.7    Participation Through Telecommunications Equipment.  Members may participate in a meeting of the Company through the use of conference telephones or similar communications equipment, as long as all Members participating in the meeting

8

can bear one another. Participation in a meeting pursuant to this provision constitutes presence in person at that meeting.

3.8.8   Notice of General Nature of Meeting. Any action approved at a meeting, other than by unanimous approval of those entitled to vote, shall be valid only if the general nature of the proposal so approved was stated in the Notice of meeting or in any written waiver of Notice.

3.8.9   Quorum.

3.8.9.1   Members holding in excess of one-half of the Percentage Interests represented in person or by proxy shall constitute a quorum at a meeting of Members.

3.8.9.2   The Members present at a duly called or held meeting at which a quorum is present may continue to transact business until adjournment, notwithstanding the loss of a quorum, if any action taken after loss of a quorum, other than adjournment, is approved by the requisite Percentage Interests of Members specified in the Certificate, this Operating Agreement, or the Act.

3.8.9.3   In the absence of a quorum, any meeting of Members may be adjourned from time to time by the vote of a majority of the Membership Interests represented either in person or by proxy at such meeting, but no other business may be transacted, except as provided in subparagraph 3.8.9.2 above.

3.8.10 . Action Without a Meeting.

3.8.10.1   Any action that may be taken at any meeting of the Members may be taken without a meeting if a consent in writing, setting forth the action so taken, is signed and delivered to the Company within sixty (60) calendar days of the record date for that action by Members having not less than the minimum number of votes that would be necessary to authorize or take that action at a meeting at which all Members entitled to vote thereon were present and voted.

3.8.10.2   Unless the consents of all Members entitled to vote have been solicited in writing, (A) Notice of any Member approval of an amendment to the Certificate or this Operating Agreement, a dissolution of the Company, or a merger of the Company, without a meeting by less than unanimous written consent shall be given at least ten (10) calendar days before the consummation of the action authorized by such approval, and (B) prompt Notice shall be given of the taking of any other action approved by Members without a meeting by less than unanimous written consent, to those Members entitled to vote who have not consented in writing.

3.8.10.3   Any Member giving a written consent, or the Member's proxyholder, may revoke the consent by a writing received by the Company prior to the time that written consents of Members having the minimum number of votes that would be required to authorize the proposed action have been received

by the Company, but may not do so thereafter. This revocation is effective upon its receipt at the principal place of business of the Company.

3.8.11 Proxies. Every Member entitled to vote shall have the right to do so in person or by one (1) or more agents authorized by a written proxy executed by such Member or his duly authorized agent and filed with the Company. Any proxy executed is not revoked and continues in full force and effect until (i) a writing stating that the proxy is revoked or a duly executed proxy bearing a later date is filed with the Company prior to the vote pursuant thereto, (ii) the Member executing the proxy attends the meeting and votes in person, or (iii) written Notice of the death or incapacity of the maker of such proxy is received by the Company before the vote pursuant thereto is counted; provided that no proxy shall be valid after the expiration of eleven months from the date of its execution, unless the person executing it specifies therein the length of time for which such proxy is to continue in force.

3.8.12 Record Date. In order that the Company may determine the Members of record entitled to Notices of any meeting or to vote, or entitled to receive any Distribution or to exercise any rights in respect of any other lawful action, a Manager, or Members representing more than ten percent (10%) of the Percentage Interests, may fix, in advance, a record date, that is not more than sixty (60) calendar days nor less than ten (10) calendar days prior to the date of the meeting and not more than sixty (60) calendar days prior to any other action. If no record date is fixed:

3.8.12.1 The record date for determining Members entitled to Notice of or to vote at a meeting of Members shall be at the close of business on the business day next preceding the day on which Notice is given or, if Notice is waived, at the close of business on the business day next preceding the day on which the meeting is held.

3.8.12.2 The record date for determining Members entitled to give consent to Company action in writing without a meeting shall be the day on which the first written consent is given.

3.8.12.3 The record date for determining Members for any other purpose shall be at the close of business on the day on which the Managers adopt the resolution relating thereto, or the sixtieth day prior to the date of the other action, whichever is later.

3.8.12.4 The determination of Members entitled to Notice of or to vote at a meeting of Members shall apply to any adjournment of the meeting unless a Manager or the Members who called the meeting fix a new record date for the adjourned meeting, but the Manager or the Members who called the meeting shall fix a new record date if the meeting is adjourned for more than forty five (45) calendar days from the date set for the original meeting.

3.9    Right of Inspection. Provision of Records to Members.

3.9.1   Right of Inspection.  Each Member, Manager and Assignee has the right, upon reasonable request, for purposes reasonably related to the interest of that Person as a Member, Manager, or Assignee, to each of the following at the expense of the Company:

    3.9.1.1   To inspect and copy during normal business hours any of the records required to be maintained by Sections 2.6.1, 2.6.2, 2.6.3 and 2.6.4 above; and

    3.9.1.2   To obtain from a Manager, promptly after becoming available, a copy of the Company's federal, state, and local income tax or information returns for each year.

3.9.2   Additional Rights.  So long as the Company has more than 35 Members:

    3.9.2.1   A Manager shall cause an annual report to be sent to each of the Members not later than one hundred twenty (120) calendar days after the close of each fiscal year. That report shall contain a balance sheet as of the end of the fiscal year and an income statement and statement of changes in financial position for the fiscal year.

    3.9.2.2   Members with an aggregate Percentage Interest of at least five percent (5%), or any three or more Members, may make a written request to a Manager for an income statement of the Company for the initial three-month, six-month, or nine-month period of the current fiscal year ended more than thirty (30) calendar days prior to the date of request, and a balance sheet of the Company as of the end of that period. The statement shall be delivered or mailed to the Members within thirty (30) calendar days thereafter.

    3.9.2.3   The financial statements referred to in this section shall be accompanied by the report thereon, if any, of the independent accounts engaged by the Company or, if there is no report, the certificate of the Treasurer of the Company that the financial statements were prepared without audit from the books and records of the Company.

3.9.3   Copy of Amendment of Certificate and Operating Agreement.  A Manager shall promptly furnish to a Member a copy of any amendment to the Certificate or this Operating Agreement executed by that Manager pursuant to a power of attorney from the Member.

3.9.4   Tax Information.  The Company shall send or cause to be sent to each Holder within ninety (90) calendar days after the end of each taxable year such information as is necessary to complete their respective federal and state income tax or information returns, and, if the Company has thirty-five (35) or fewer Holders, a copy of the Company's federal, state, and local income tax or information returns for the year.

3.9.5   Relationship with Act.  Nothing in this Section 3.9 shall be construed as in any way limiting a Member's right of inspection as set forth in Section 18-305 of the Act.

3.10   Representations and Warranties. Each Member hereby represents and warrants to the Company and each other Member that:

3.10.1   If that Member is a organization, that it is duly organized, validly existing, and in good standing under the law of its state of organization and that it has full organizational power to execute and agree to the Operating Agreement to perform its obligations hereunder;

3.10.2   Such Member is acquiring its interest in the Company for its own account for investment purposes only and not with a view to the resale or distribution of all or any part of such interest and such Member has no present intention, agreement or arrangement to divide its participation with others or to sell, assign, transfer or otherwise dispose of all or any part of such interest. Such Member is aware that the interests have not been registered under the Securities Act of 1933, or any state securities laws, and that such interests may not be resold or otherwise disposed of unless they are registered thereunder or an exemption from registration is available. Accordingly, each Member is aware that it must bear the economic risk of investment in the Company for an indefinite period of time. Each Member is capable of bearing that risk.

## ARTICLE IV

## MANAGEMENT

4.1   Management. Subject to the limitations of the Certificate, the Act, and this Operating Agreement as to actions to be authorized or approved by the Members, the business and affairs of the Company shall be managed and all the Company powers shall be exercised by or under the direction of the Managers. The Managers may delegate the management of the day-to-day operation of the business of the Company to the officers of the Company or other persons provided that the business and affairs of the Company shall be managed and all powers shall be exercised under the ultimate direction of the Managers. Without prejudice to such general powers, but subject to the same limitations, the Managers shall have the following powers:

4.1.1   To approve compensation packages for the managers, executive officers and key personnel.

4.1.2   To approve the Accounting System/Procedures/Software/Method to be used by the Company.

4.1.3   To approve the operating budget of the Company, and any changes to it.

4.1.4   To approve all franchising agreements, and lease agreements.

4.1.5   To approve all purchases and disbursements in excess of Ten Thousand Dollars ($10,000), provided that such amount may be changed or modified by Management as it deems necessary.

4.1.6   To institute, prosecute, and defend any Proceeding in the Company's name;

12

4.1.7 To purchase, receive, lease or otherwise acquire and deal with the Property, wherever located;

4.1.8 To sell, convey, mortgage, pledge, lease, exchange, or otherwise Dispose of Property;

4.1.9 To lend money, invest and reinvest the Company's funds, and receive and hold Property as security for repayment, including, without limitation, the loaning of money to Members, officers, employees, and agents;

4.1.10 To borrow money and incur Indebtedness for the purposes of the Company, and to cause to be executed and delivered therefor in the Company name promissory notes, bonds, debentures, deeds of trust, mortgages, pledges, hypothecations or other evidences of debt and securities therefor;

4.1.11 To change the principal place of business of the Company from one location to another as provided in Section 2.3 hereof, and to fix and locate from time to time one or more subsidiary offices of the Corporation;

4.1.12 To prescribe the forms of Membership Certificates, and to alter the form of such Membership Certificates from time to time as in their judgment they deem best, provided such Membership Certificates shall at all times comply with provisions of law;

4.1.13 To select and remove all of the officers, agents and employees of the Company, to prescribe such powers and duties for them as may not be inconsistent with law, with the Certificate or this Operating Agreement, to fix their compensation, and to require from them security for faithful service;

4.1.14 To pay pensions and establish pension plans, pension trusts, profit sharing plans, and benefit and incentive plans for all or any of the current or former Members, employees, and agents of the Company;

4.1.15 To make donations to the public welfare or for religious, charitable, scientific, literary or educational purposes;

4.1.16 To purchase insurance on the life of any of the Members or Company employees for the benefit of the Company;

4.1.17 To participate in partnership agreements, joint ventures, or other associations of any kind with any person or persons; and

4.1.18 To authorize the issuance of Additional Membership Interests from time upon such terms as may be lawful in consideration of money paid, labor done, services actually rendered to the Company or for its benefit or in its formation or reorganization, debts or securities cancelled, and tangible or intangible property actually received either by the Company or any one of its wholly-owned subsidiaries, if any, or future services.

15

4.2    Number and Qualifications of Managers.  Until changed by amendment of the Certificate or an amendment to this section:

4.2.1    The agreed-upon and authorized number of Managers shall be seven (7), four (4) of whom shall be designated by the Cinco Group, and three (3) designated by the LA Group.

4.2.2    Upon the formation of the Company, the following shall be named and designated as managers:

4.2.2.1    For the Cinco Group:  Jose P. Magsaysay, Jr., Jose Miguel Ma. Montinola, Ma. Victoria O. Bernejo, and Ricardo K. Montelibano.

4.2.2.2    For the LA Group:  Amit Nemanim, Guy Koren, and Amir Jacoby.

4.3    Election of Managers.

4.3.1    Election at Meeting of Members.  In any election of Managers at a meeting of Members duly called and noticed, the Cinco Group shall be entitled to elect four (4) Managers, while the LA Group shall be entitled to elect three (3) Managers. Interests entitled to be voted for them up to the number of Managers to be elected by such Members shall be elected. Elections for Managers need not be by ballot unless a Member demands election by ballot at the meeting and before the voting begins.

4.3.2    Election by Written Consent.  Managers may alternatively be elected by a written consent action of Members made pursuant to Section 3.8.10 executed by a Majority of the Members.

4.4    Removal of Managers.  Any Managers may be removed, with or without cause, by the vote of a Majority of the Members by written consent or at a meeting of Members called expressly for that purpose.  Any removal shall be without prejudice to the rights, if any, of the Manager under any contract of employment.

4.5    Resignation of Managers.  Any Manager may resign as a Manager at any time upon written Notice to the Company, without prejudice to the rights, if any, of the Company under any contract to which the Manager is a party.

4.6    Term of Office as Manager.  Each Manager shall serve until the earliest to occur of (i) the resignation of the Manager; (ii) the removal of the Manager; or (iii) the election of a successor.

4.7    Authority of Multiple Managers.  If, pursuant to Section 4.2 above, more than one manager is authorized, then any one or more Managers may take any action permitted to be taken by any one or more other Managers, unless this Operating Agreement or the Act requires the consent of more than one Manager.

4.8    Fiduciary Duties Owed by Managers. Managers shall owe fiduciary duties to the Company and the Members in the manner prescribed in this Act and under applicable case law.

4.9    Conduct of Meetings of Managers. The Managers may adopt such rules and regulations for the conduct of its meetings and the management of the Company not inconsistent with this Operating Agreement or applicable law.

4.10    Regular Monthly Meetings. The Managers shall meet at least on a monthly basis, and may be done in person, via teleconference or through the internet. The Managers may, at their discretion, invite non-Members to join, but only as non-voting observers.

4.11    Officers.

4.11.1    Officers. The officers of the Company, if any, shall include the following: Chairman of the Board of Members, President, Corporate Secretary, and Treasurer. The Company may also have, at the discretion of the Managers, one or more vice-presidents, one or more assistant secretaries, one or more assistant financial officers, and such other officers as may be appointed in accordance with the provisions of this Operating Agreement. Any number of offices may be held by the same person. Officers need not be Members.

4.11.2    Election. The officers of the Company, except such officers as may be appointed in accordance with the provisions of Section 10.3, shall be chosen by the Managers, and each shall hold his office until he or she shall resign or shall be removed by the Managers or otherwise disqualified to serve, or his successor shall be elected and qualified.

4.11.3    Subordinate Officers. The Managers may appoint, and may empower the President to appoint, such other officers as the business of the Company may require, each of whom shall hold office for such period, have such authority and perform such duties as the appointing authority may designate, subject to any limitations imposed by resolution of the Managers.

4.11.4    Removal. Any officer may be removed, either with or without cause, by the Managers, at any regular or special meeting thereof or, except in case of an officer chosen by the Managers, by any officer upon whom such power of removal may be conferred by the Managers (subject, in each case, to the rights, if any, of an officer under any contract of employment).

4.11.5    Resignation. Any officer may resign at any time by giving Notice to the Managers or to the President or to the Secretary of the Company, but without prejudice to the rights, if any, of the Company under any contract to which such officer is a party. Any such resignation shall take effect at the date of the receipt of such Notice or any later time specified therein; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

4.11.6 Vacancies. A vacancy in any office because of death, resignation, removal, disqualification or any other cause shall be filled in the manner prescribed in this Operating Agreement for regular appointments to such office

4.11.7 President. The President shall be the chief executive officer of the Company and shall, subject to the control of the Managers, have general supervision, direction and control of the business and officers of the Company. The President shall preside at all meetings of the Members and the Managers. He or she shall have the general powers and duties of management usually vested in the office of the President of a corporation, and shall have such other powers and duties as may be prescribed by the Managers or this Operating Agreement. As agreed upon by the Members, at any given time, the President shall be any of the following: Amit Nemanim, Guy Korean, and Amir Jacoby. The initial President of the Company shall be Amit Nemanim. The President of the Company shall render the following services and shall perform the following duties for the Company in a faithful, diligent and efficient manner:

4.11.7.1 The President shall be responsible for all management, operational, marketing, establishment, maintenance, licensing and sub-licensing activities with respect to the "Potato Corner" outlets/stores in the Territory. He shall use his best efforts at all times during the term of this Agreement to operate and maintain the "Potato Corner" outlets/stores in the Territory according to the highest standards achievable consistent with the overall plan of the Management of the Company. The President shall comply with the rules, policies and procedures approved by the Management of the Company from time to time.

4.11.7.2 The President shall advertise market and promote the "Potato Corner" outlets/stores with the goal of causing public knowledge, awareness and patronage of the "Potato Corner" outlets/sites.

4.11.7.3 The President shall maintain a comprehensive system of records, books and accounts; with respect to the licensing and sub-licensing activities, operation, establishment, management, maintenance and other activities of the "Potato Corner" outlets /stores in the Territory with the assistance of the Corporate Secretary.

4.11.7.4 No later than the twentieth (20th) day of each month, with respect to the preceding month, the President shall render a statement of receipts and disbursements, a schedule of accounts receivable and payable, and a schedule of fees collected and distributed, together with a reconciled bank statement as of the last day of the month with the assistance of the Corporate Secretary.

4.11.7.5 No later than three (3) months after the end of a fiscal year, the President shall, with the assistance of the Corporate Secretary and external accountant hired by Management, cause the Company to issue audited financial statements, and shall provide a copy of the same to all the members of Management.

4.11.7.6   To the extent the President is lawfully able to do so, the President shall take such action as may be necessary to comply promptly with any and all laws, ordinances, orders or other requirements of any federal, state, county or municipal authority having jurisdiction of the Company and affecting the Company.

4.11.8   Secretary.   The Secretary shall record or cause to be recorded, and shall keep or cause to be kept, at the principal place of business of the Company and such other place or places as the Managers may order, a book of minutes of actions taken at all meetings of Managers, committees and Members, with the time and place of holding, whether regular or special, and, if special, how authorized, the Notice thereof given, the names of those present at Managers' and committee meetings, the Percentage Interest present or represented at Members' meetings, and the proceedings thereof.

The Secretary shall keep, or cause to be kept, at the principal place of business those records referenced in Section 2.6 above and, if the Company has issued Membership Certificates, a register showing the number and date of each Membership Certificate, and the number and date of each Membership Certificate surrendered for cancellation.

The Secretary shall give, or cause to be given, Notice of all the meetings of the Members and the Managers required by this Operating Agreement or by the Act to be given, and shall have such other powers and perform such other duties as may be prescribed by the Managers or by this Operating Agreement.

4.11.9   Treasurer.   The Treasurer shall keep and maintain, or cause to be kept and maintained, adequate and correct accounts of the properties and business transactions of the Company, including accounts of its assets, liabilities, receipts, disbursements, income, losses, changes in financial position, Capital Accounts, and retained earnings.

The Treasurer shall deposit all moneys and other valuables in the name and to the credit of the Company with such depositories as may be designated by the Managers. He or she shall disburse the funds of the Company as may be ordered by the Managers, shall render to the President and the Managers whenever they request it, an account of all of his transactions as Treasurer and of the financial condition of the Company, and shall have such other powers and perform such other duties as may be prescribed by the Managers or this Operating Agreement.

4.12   Indemnification and Liability Insurance.

4.12.1   The Company may provide indemnification to its Managers, officers and agents to the fullest extent permitted by Delaware law.

4.12.2   The Company shall have the power to purchase and maintain insurance on behalf of any Manager or officer against any liability asserted against or incurred by a Manager or officer in that capacity or arising out of that person's status as a Manager or officer of the Company.

4.13    Actions of the Managers. Each Manager has the power to bind the Company as provided in this ARTICLE IV. If there is more than one Manager, decisions of the Managers shall be made by majority vote of the Managers if at a meeting, or by unanimous written consent. No act of a Member in contravention of such a determination shall bind the Company to Persons having knowledge of such determination.

4.14    Meetings of Managers.

4.14.1   Place of Meetings. Meetings of Managers may be held at any place, selected by the person or persons calling the meeting. If no other place is stated or fixed, all meetings shall be held at the principal place of business of the Company.

4.14.2   Calling of Meetings. A meeting of the Managers may be called at any time by the President or any two Managers.

4.14.3   Notice of Meetings. Notice of the time and place of meetings of Managers shall be personally delivered to each Manager or communicated to each Manager by telephone or mail, charges prepaid, addressed to the Manager's address as is shown upon the records of the Company, or if it is not so shown on such records or is not readily ascertainable, at the place at which the meetings of Managers are regularly held; in the case Notice is mailed, it shall be deposited in the United States mail at least ninety-six (96) hours prior to the time of the holding of the meeting. In the event Notice is delivered personally or communicated by telephone, it shall be so delivered or communicated at least forty-eight (48) hours prior to the time of the holding of a meeting.

Except as otherwise provided by the Act or this Operating Agreement, a Notice need not specify the purpose of the meeting of the Managers. Whenever any Manager has been absent from any meeting of the Manager for which Notice has not been dispensed with, an entry in the minutes to the effect that Notice has been duly given shall be conclusive and incontrovertible evidence that due Notice of such meeting was given to such Manager.

4.14.4   Participation Through Telecommunications Equipment. Managers may participate in a meeting of the Company through the use of conference telephones or similar communications equipment, as long as all Managers participating in the meeting can hear one another. Participation in a meeting pursuant to this provision constitutes presence in person at that meeting.

4.14.5   Adjourned Meetings. When a Managers' meeting is adjourned to another time or place, unless the Certificate or this Operating Agreement otherwise require, and, except as provided in the Act, Notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken. At the adjourned meeting, the Managers may transact any business that may have been transacted at the original meeting. If the adjournment is for forty-eight hours or more, a Notice of the adjourned meeting shall be given to each Member entitled to vote at the meeting.

4 14.6 Validation of Meeting Held Without Proper Call or Notice  The actions taken at any meeting of Managers, however called and noticed, and wherever held, have the same validity as if taken at a meeting duly held after regular call and notice, if a quorum is present either in person or by proxy, and if, either before or after the meeting, each of the Managers signs a written waiver of Notice or consents to the holding of the meeting or approves the minutes of the meeting. All waivers, consents, and approvals shall be filed with the Company records or made a part of the minutes of the meeting. Attendance of a Manager at a meeting shall constitute a waiver of Notice of the meeting, except when the Manager objects, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.

4.14.7 Participation Through Telecommunications Equipment.  Managers may participate in a meeting of the Managers through the use of conference telephones or similar communications equipment, as long as all Managers participating in the meeting can hear one another.  Participation in a meeting pursuant to this provision constitutes presence in person at that meeting.

4.14.8 Quorum.

4.14.8.1    A majority of the Managers in attendance or represented by proxy shall constitute a quorum at a meeting of Managers.

4.14.8.2    The Managers present at a duly called or held meeting at which a quorum is present may continue to transact business until adjournment, notwithstanding the loss of a quorum, if any action taken after loss of a quorum other than adjournment, is approved by the requisite number of Managers specified in the Certificate, this Operating Agreement, or the Act.

4.14.8.3    In the absence of a quorum, any meeting of Managers may be adjourned from time to time by the vote of a majority of the Managers in attendance, but no other business may be transacted, except as provided in subparagraph 4.14.8.2A.14.8.2 above.

4.14.9  Action Without a Meeting.  Any action required or permitted to be taken by the Managers may be taken without a meeting if all the Managers shall individually or collectively consent in writing to such action.  Such consent or consents shall be filed with the minutes of the proceedings of the Managers and shall have the same force and effect as a unanimous vote of the Managers.

4.15    Compensation of Manager.  Each Manager shall be reimbursed all reasonable expenses incurred in managing the Company and shall be entitled to compensation in an amount, if any, to be determined from time to time by the affirmative vote of a Majority of the Members.

4.16    Authority of Members to Bind the Company.  The Members hereby agree that only the Managers and authorized agents of the Company shall have the authority to bind the Company.  No Member other than a Manager shall take any action as a Member to bind the Company, and each Member shall indemnify the Company for any costs or damages incurred by the Company as a result of the unauthorized action of such Member.

WEST\19181119.7                                                         19

4.17    Specific Arrangements with the Cinco Group. As agreed upon in the Joint Venture Agreement, the Company shall enter into a Master License Agreement with Cinco Corporation (Philippines), Inc. (or an affiliated company designated) which shall include the following terms and conditions:

4.17.1    The Company agrees to license the "POTATO CORNER" intellectual property rights from Cinco Corporation (Philippines), Inc. (or an affiliated company designated) consisting of (i) the trademark, service mark and trade name "POTATO CORNER"; and (ii) various trademarks, service marks, trade names, slogans, designs, insignias, emblems, symbols, color schemes, package features, logo and other propriety identifying characteristics used in relation and in connection with the "Potato Corner" Products; and (iii) as well as other intellectual property rights in connection with the "POTATO CORNER" intellectual property rights, for use in the Territory.

4.17.2    The Company agrees to pay, as an arm's length license fee, the following amounts: (i) With respect to the licensing / sub-licensing or franchising the "POTATO CORNER" intellectual property rights in connection with the "POTATO CORNER" outlets/stores, an amount equal to thirty percent (30%) of all initial/franchise fees and ongoing royalty fees paid to/ collected by the Company. Payments shall be made to Cinco (or an affiliated company to be designated by Cinco) by wire transfer using a bank or other financial institution specified by it within thirty (30) days from receipt of the fees by the Company; and (ii) All withholding and other applicable taxes levied by any authority on the payments by the Company shall be borne solely by the Company.

4.18    Specific Arrangements with the LA Group. As agreed upon in the Joint Venture Agreement, the Company agrees to engage the LA Group to provide management and strategic experience and expertise during the duration of this Agreement. The Company shall enter into a Master Services Agreement with the LA Group (or a corporation to be designated by the LA Group) which shall include the following terms and conditions:

4.18.1    In consideration for the provision of its services under the Master Services Agreement, the LA Group shall be entitled to a services fee equal to thirty (30%) percent of all initial/franchise fee and continuing royalty fees paid to/ collected by the Company.

4.18.2    All withholding and other applicable taxes levied by any authority on the payments by the Company to the LA Group under this Agreement shall be borne solely by the Company.

4.18.3    The LA Group shall faithfully, diligently and efficiently exercise its obligations and responsibilities under the Master Services Agreement.

4.18.4    The LA Group shall maintain and protect confidential information belonging to Cinco or the Company, and such undertaking shall apply to all of its partners, officers, employees, or agents.

## ARTICLE V

## CAPITAL

5.1     Initial Capital Contributions.  Upon execution of this Agreement, each Member shall assign, convey and transfer their respective Initial Capital Contribution to the Company. Each Member represents and warrants to the Company that (i) the Member's Shares are free of any mortgage, pledge, lien, security, interest or other encumbrance of any kind or nature, (ii) such Member is the lawful beneficial and record owner of, and has good and marketable title to, the Member's Shares, and (iii) to the best of such Member's knowledge, the Member's Shares are duly authorized, validly issued, fully paid and nonassessable. Additional Members shall make Capital Contributions in the amount, at the time and on the terms determined by the Members consenting to the admission pursuant to Section 3.1 hereof.

5.2     Capital Accounts.  The Company shall establish and maintain a Capital Account for each Holder in accordance with Regulations Section 1.704-1(b)(2)(iv). Accordingly, a Holder's Capital Account shall be increased by (1) the amount of money the Holder contributes to the Company, (2) the fair market value of property the Holder contributes to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under IRC Section 752, and (3) allocations to the Holder of Income (or items thereof), including income and gain exempt from tax and gain as computed for book purposes in accordance with Regulations Section 1.704-1(b)(2)(iv)(g) but excluding any gain separately computed for tax purposes as described in Regulations Section 1.704-1(b)(4)(i). A Holder's Capital Account shall be decreased by (1) the amount of money the Company distributes to the Holder, (2) the fair market value of property the Company distributes to the Holder (net of any liabilities assumed by such distributed property that the Holder is considered to assume or take subject to under IRC Section 752), (3) allocations to the Holder of the Company's nondeductible, noncapital expenditures, and (4) allocations to the Holder of Losses (or item thereof), including loss and deduction, as computed for book purposes in accordance with Regulations Section 1.704-1(b)(2)(iv)(g) but excluding nondeductible, noncapital expenditures and loss and deduction separately computed for tax purposes as described in Regulations Section 1.704-1(b)(4)(i). A Holder's Capital Account in all events shall be adjusted in accordance with the additional rules set forth in Regulations Section 1.704-1(b)(2)(iv). In the event a Holder transfers all or any portion of his interest in the Company, the transferee shall succeed to the individual Capital Account balance of the transferor to the extent such individual Capital Account balance relates to the transferred interest.

5.3     Adjustment for Distributions in Kind.  Any asset of the Company distributed to the Holders in kind shall be valued according to its fair market value. An item of Income or Loss shall be computed as if such asset had been sold at its fair market value, such hypothetical item shall be allocated as provided in Section 6.1, and each Holder's Capital Account shall be credited or charged, as the case may be, with the Holder's share of such hypothetical item prior to any such distribution of assets.

5.4     Interest.  No Capital Contribution or Capital Account balance shall bear interest.

5.5     Deficit Capital Account.  No Holder shall be obligated to restore a Capital Account having a balance of less than zero.

5.6     Return of Capital.  Except as otherwise provided in this Operating Agreement, no Holder shall have any right to withdraw or make a demand for Distribution or withdrawal or return of any Capital Contribution or Capital Account balance.

5.7     Optional Adjustments to Capital Accounts.  Upon (i) a contribution of cash or property (which shall be valued at its fair market value) to the Company by a new or existing Holder for a Membership or Economic Interest, or (ii) a distribution by the Company to a retiring or continuing Holder for a Membership or Economic Interest, the Company may, in the discretion of the Members, increase or decrease the Capital Accounts of the Holders to reflect a revaluation of Company Property on the books of the Company, in accordance with the provisions of Regulations Section 1.704-1(b)(2)(iv)(f).

## ARTICLE VI

## INCOME AND LOSSES

6.1     Allocations.  Except as otherwise provided in this Article VI, Income and Losses, and each item thereof, of the Company shall be allocated to the Holders in proportion to their Percentage Interests.

6.2     Qualified Income Offset.  A Holder whose Capital Account is unexpectedly reduced on account of an adjustment described in Section 1.704-1(b)(2)(ii)(d)(4) of the Regulations, an allocation described in Section 1.704-1(b)(2)(ii)(d)(5) of the Regulations, or a distribution described in Section 1.704-1(b)(2)(ii)(d)(6) of the Regulations, shall be allocated that Holder's pro rata portion of each item of Company income, including gross income, and gain in an amount and manner sufficient to eliminate such deficit balance as quickly as possible.

6.3     Minimum Gain Chargeback.  Notwithstanding any other provision herein, if there is a net decrease in Company Minimum Gain during any taxable year, items of Company income and gain shall be allocated in accordance with the provisions of Regulations Section 1.704-2(f). This provision is intended to comply with Regulations Section 1.704-2(e)(3).

6.4     Contributed Property and Revaluations.  In accordance with IRC Section 704(c), income, gain, loss and deduction with respect to property contributed to the Company by a Holder shall be allocated solely for tax purposes among the Holders so as to take account of any variation between the adjusted basis of the property to the Company and its fair market value on the date of the Contribution. Further, if the book value of any Company asset is adjusted as described in Regulations Section 1.704-1(b)(2)(iv)(f), subsequent allocations for tax purposes of income, gain, loss and deduction with respect to such asset shall take into account any variation between its adjusted tax basis and its adjusted book value. In either case, the Managers shall determine such allocations using a method that qualifies as reasonable within the meaning of Regulations Section 1.704-3. No Holder's Capital Account shall be adjusted for allocations made under this Section.

6.5    Timing.  All allocations of Income or Losses shall be made to the Persons shown on the records of the Company to have been Holders as of the end of business on the last day of the Company's taxable year for which the allocation is made.  Notwithstanding the foregoing, upon the transfer of an Economic Interest or the admission of an Additional Member during a taxable year of the Company, the Income or Losses shall be allocated between the former Holder and the successor, or to the Additional Member, as the case may be, according to the number of days during such year each was a Holder.

## ARTICLE VII

## DISTRIBUTIONS

7.1    Operating Distributions.  The Managers from time to time may determine, in their reasonable judgment, that (i) there is an excess of cash on hand beyond the Company's current and anticipated requirements, including, without limitation, cash flow and reserve requirements, and (ii) a distribution of such excess cash on hand, if any, is permissible under Section 18-607 of the Act.  In that event, the Managers may, in their sole and absolute discretion, make a distribution of all or a part of such excess (an "*Operating Distribution*") to the Holders, provided that no such Distribution shall be declared and paid unless, after such Distribution, the assets of the Company will exceed all liabilities of the Company.  Such Distributions may be made in cash or Property or partly in both, as determined in the sole and absolute discretion of the Managers.

7.2    Generally Pro Rata.  Except as provided in Section 7.3 below, Distributions shall be allocated to Holders in proportion to their Percentage Interests.

7.3    Liquidating Distributions.  Upon the dissolution of the Company, liquidating distributions in all cases shall be made in accordance with the positive Capital Account balances of the Holders, as determined after taking into account all Capital Account adjustments for the Company's taxable year during which such dissolution occurs (other than those made pursuant to this section), by the end of such taxable year or, if later, within ninety (90) days after the date of such dissolution.

## ARTICLE VIII

## ASSIGNMENT OF INTERESTS

8.1    Assignment of Interests.  An Economic Interest is assignable in whole or in part, provided, however, that no Membership Interest may be assigned to any Person (including any assignments for security purposes or other form of pledge) without the consent of Members required pursuant to Section 3.7.  Upon admission, the Assignee shall become a Substitute Member, and shall have the rights and benefits, and is subject to the restrictions and liabilities, of a Member under the Certificate, this Operating Agreement, and the Act.  A Substitute Member is also liable for the obligations of the Assignor to make Capital Contributions, and to return any unlawful distributions made to the Assignor under Chapter VI (commencing with Section 18-601) of the Act.  However, the Substitute Member is not obligated for liabilities unknown to the Substitute Member at the time the Substitute Member became a Member and that could not be ascertained from the Certificate or this Operating Agreement.

8.2    No Dissolution upon Assignment. An assignment of an Economic Interest does not of itself dissolve the Company or, except as otherwise set forth herein, entitle the Assignee to vote or participate in the management and affairs of the Company or to become or exercise any rights of a Member. An assignment of an Economic Interest merely entitles the Assignee to receive, to the extent assigned, the Income, Losses, Distributions and similar items to which the Assignor would be entitled.

8.3    Information Regarding Assigner. Upon the assignment of all or part of an Economic Interest, the Assignor shall provide the Manager or Member of the Company responsible for maintaining the books and records with the name and address of the Assignee, together with details of the interest assigned. Upon receipt of that Notice, the Company shall amend the list required by Section 2.6 accordingly. Until the Assignee becomes a Substitute Member, the Assignor continues to be a Member and to have the power to exercise any rights and powers of a Member, including the right to vote which, in the case of a Member who has assigned his or her or its entire Economic Interest in the Company, shall include the right to vote in proportion to the Percentage Interest that the assigning Member would have, had the assignment not been made.

8.4    No Release of Liability of Assignor. The Assignor is not released from liability as a Member solely as a result of the Assignment. Whether or not an Assignee becomes a Substitute Member, the Assignor is not released from the Assignor's liability to the Company under Subchapter V (commencing with Section 18-501) and Subchapter VI (commencing with Section 18-601) of the Act.

8.5    Pledge of Membership Interest. The pledge of, or granting of, a security interest, lien, or other encumbrance in or against any or all of the Membership Interest of a Member shall not cause the Member to cease to be a Member or to grant to anyone else the power to exercise any rights or powers of a Member.

8.6    Exercise of Rights upon Death or Incompetency. If a Member who is a natural person dies or is adjudged by a court of competent jurisdiction to be incompetent to manage the Member's person or property, the Member's executor, administrator, guardian, conservator, or other legal representative may exercise all of the Member's rights for the purpose of settling the Member's estate or administering the Member's property, including any power the Member had under the Certificate or this Operating Agreement to assign its Membership Interest.

8.7    Exercise of Rights upon Dissolution or Termination. If a Member which is an Organization is dissolved or terminated, the powers of that Member may be exercised by its legal representative or successor.

## ARTICLE IX

## DISSOLUTION AND WINDING UP

9.1    Dissolution. The Company shall and may only be dissolved, and its affairs wound up, upon the first to occur of the following events (which, unless the Members agree to continue the business, shall constitute Dissolution Events):

9.1.1   the expiration of the Term, unless the business of the Company is continued with the consent of those Members required pursuant to Section 3.2;

9.1.2   the vote of such number of Members as is required pursuant to Section 3.7;

9.1.3   the Dissociation of a Member under Article XI, unless the business of the Company is continued with the consent of those Members required pursuant to Section 3.7 within ninety (90) calendar days after such Dissociation; or

9.1.4   the entry of a decree of judicial dissolution pursuant to the Act.

9.2   Effect of Dissolution.   Upon dissolution, the Company shall be dissolved and wound up in accordance with the Act, and the Company Property shall be distributed in accordance with Section 7.3.   In addition, upon dissolution, the following shall immediate apply:

9.2.1   All rights granted under the Master License Agreement shall terminate and the Company shall cease the use of the Potato Corner intellectual property rights, and confidential information, provided however, that the Company shall be permitted to use any of the foregoing as is reasonably required in order to comply with its obligations under its sub-licensing or franchising agreements, but only to the extent of the duration of sub-licensing or franchising agreements in existence at the time of the termination of this Operating Agreement.

9.2.2   The LA Group shall be subject to a non-compete arrangement and hereby agrees that, within two (2) years from the date of termination of this Operating Agreement, it shall not engage in the business of establishing, operating, managing, licensing and franchising identical or similar products sold by the Company, using the intellectual property rights identical or similar to those used by the Company, at the time of the termination of this Operating Agreement.

### ARTICLE X

### TAX AND ACCOUNTING MATTERS

10.1   Characterization as a Partnership.   The Members intend that the Company be classified as a partnership for federal and state income tax purposes.   Accordingly, this Operating Agreement is written and shall be construed in a manner consistent with such intent.

10.2   No Partnership Intended for Nontax Purposes.   The Members have formed the Company under the Act, and expressly do not intend hereby to form a partnership under either the Delaware Uniform Partnership Law or the Delaware Revised Uniform Limited Partnership Act.   The Members do not intend to be partners one to another, or partners as to any third party. To the extent any Member, by word or action, represents to another person that any other Member is a partner or that the Company is a partnership, the Member making such wrongful representation shall be liable to any other Member who incurs personal liability by reason of such wrongful representation.

10.3    Fiscal Year.  The fiscal year of the Company shall end on the last day of December of each year.  The Managers may at any time change the fiscal and taxable year of the Company, subject to any applicable limitation of law or regulation.

10.4    Accounting Method.  The Managers shall select the method of accounting by which the Company books of account shall be maintained and its income, gains, losses, deductions and credits shall be reported, for both financial and tax accounting purposes.  The Managers may at any time change the financial and tax accounting method of the Company, subject to any applicable limitation of law or regulation.

10.5    Tax Information.  As soon as reasonably practicable after the end of the Company fiscal year, the Managers shall cause each Holder to be furnished with a Schedule K-1 for such year and any other schedule or statement required by federal income tax law.

10.6    Basis Adjustment.  In the case of a Distribution of Company Property or a transfer of a Membership Interest, the Managers may cause the Company to file an election under IRC Section 754 to adjust the basis of the Company Property.  As a result of this election, the Managers shall have the right to require, as a condition to the granting of consent to any transfer, the reimbursement of expenditures made by the Company for any legal and accounting fees incurred to make any such basis adjustment.  The Managers shall have the right, in their sole and absolute discretion, to decline to make such an election; and further, the failure to make any election under the IRC in connection with any particular transfer of an interest in the Company shall not affect the right of the Managers to make, or refuse to make, such an election with respect to any subsequent transfer of an interest in the Company.

10.7    Other Elections.  The Company shall have the right, in the sole and absolute discretion of the Managers, to make any other elections or determinations required or permitted for federal or state income tax or other tax purposes.  The Managers may rely upon the advice of the Company's accountants or tax attorneys with respect to the making of any such election.

10.8    Taxes of Taxing Jurisdictions.  To the extent that the laws of any Taxing Jurisdiction requires, each Holder requested to do so by the Managers will submit an agreement indicating that the Holder will make timely income tax payments to the Taxing Jurisdiction and that the Holder accepts personal jurisdiction of the Taxing Jurisdiction with regard to the collection of income taxes attributable to the Holder's income, and interest, and penalties assessed on such income.  If the Holder fails to provide such agreement, the Company may withhold and pay over to such Taxing Jurisdiction the amount of tax, penalty and interest determined under the laws of the Taxing Jurisdiction with respect to such income.  Any such payments with respect to the income of a Holder shall be treated as a distribution to such Holder for purposes of ARTICLE VII.  The Company may, where permitted by the rules of any Taxing Jurisdiction, file a composite, combined or aggregate tax return reflecting the income of the Company and pay the tax, interest and penalties of some or all of the Holders on such income to the Taxing Jurisdiction, in which case the Company shall inform the Holders of the amount of such tax, interest and penalties so paid.

10.9    Tax Matters Partner.  The Managers shall designate one of their number or, if there are no Managers eligible to act as tax matters partner any other Member, as the tax matters

partner of the Company pursuant to IRC Section 6231(a)(7). Any Member designated as tax matters partner shall take such action as may be necessary to cause such other Member to become a notice partner within the meaning of IRC Section 6723. Any Member who is designated tax matter partner may not take any action contemplated by IRC Sections 6222 through 6232 without the consent of the Managers.

## ARTICLE XI

## DISSOCIATION OF A MEMBER

11.1    Dissociation.  A Person shall cease to be a Member upon the happening of any of the following events:

11.1.1  the withdrawal of a Member with the consent of such number of Members as is required pursuant to Section 3.7;

11.1.2  the bankruptcy (as defined by the Act) of a Member;

11.1.3  in the case of a Member who is a natural Person, the death of the Member or the entry of an order by a court of competent jurisdiction adjudicating the Member incompetent to manage the Member's personal estate;

11.1.4  in the case of a Member who is acting as a Member by virtue of being a trustee of a trust, the termination of the trust (but not merely the substitution of a new trustee);

11.1.5  in the case of a Member that is a separate Organization other than a corporation, the dissolution and commencement of winding up of the separate Organization;

11.1.6  in the case of a Member that is a corporation, the filing of a certificate of dissolution, or its equivalent, for the corporation or the revocation of its charter; or

11.1.7  in the case of an estate, the distribution by the fiduciary of the estate's entire interest in the Company.

11.2    Rights of Dissociating Member.  In the event any Member dissociates prior to the expiration of the Term:

11.2.1  if the Dissociation causes a dissolution and winding up of the Company, the Member shall be entitled to participate in the winding up of the Company to the same extent as any other Member except that any Distributions to which the Member would have been entitled shall be reduced by the damages sustained by the Company as a result of the Dissolution and winding up;

11.2.2  if the Dissociation does not cause a dissolution and winding up of the Company, the Member shall not be entitled to receive any amount in consideration of the Member's Membership Interest on account of such Dissociation, unless such Member so

longer holds the corresponding Economic Interest. Otherwise, the Disassociated Member shall continue as Holder of an Economic Interest only.

## ARTICLE XII

## MISCELLANEOUS PROVISIONS

12.1    Amendment of Operating Agreement. This Operating Agreement may be modified upon the vote of Members required pursuant to Section 3.7. No Member or Manager shall have any vested rights in the Operating Agreement which may not be modified through an amendment to the Operating Agreement.

12.2    Entire Agreement. This Operating Agreement represents the entire agreement among all the Members and between the Members and the Company.

12.3    Interpretation. To the extent any provision of this Operating Agreement is prohibited or ineffective under the Act, the Operating Agreement shall be considered amended to the smallest degree possible in order to make the agreement effective under the Act. In the event the Act is subsequently amended or interpreted in such a way to make any provision of the Operating Agreement that was formerly invalid valid, such provision shall be considered to be valid from the effective date of such interpretation or amendment.

12.4    Rights of Creditors and Third Parties under Operating Agreement. This Operating Agreement is entered into among the Company and the Members for the exclusive benefit of the Company, its Members, and their successors and assignees. This Operating Agreement is expressly not intended for the benefit of any creditor of the Company or any other Person. Except and only to the extent provided by applicable statute, no such creditor or third party shall have any rights under this Operating Agreement or any agreement between the Company and any Member with respect to any Capital Contribution or otherwise.

12.5    Valuation of Non-Cash Consideration. For purposes of this Operating Agreement, the procedure for valuing any non-cash consideration shall be as follows: If the parties cannot otherwise agree, each party shall select a qualified appraiser and the appraisers so selected shall jointly select an appraiser, and the valuation of the appraiser so selected shall be binding on all parties. Such valuation shall be based on an arm's length cash sale of the assets. If the non-cash consideration being valued is real property, the selected appraiser shall be an MAI appraiser.

12.6    Counterpart Execution. This Operating Agreement may be executed in any number of identical counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same instrument when each party has signed one (1) such counterpart.

12.7    Remedies. The parties hereto recognize and agree that the breach of any term, provision, or condition of this Operating Agreement may cause irreparable damage, the amount of which is difficult to ascertain and that the award of damages may not be adequate relief to the party aggrieved; the parties therefore agree that, in addition to all other remedies available in the event of a breach of any of the terms or conditions of this Operating Agreement, the party

aggrieved shall have the right, in addition to all other remedies available in the event of a breach of this Operating Agreement, to injunctive or other equitable relief (from any court or other body having appropriate jurisdiction).

12.8    Successors and Assigns.  Except as herein otherwise specifically provided, this Operating Agreement shall be binding upon and inure to the benefit of the parties and their legal representatives, heirs, administrators, executors, successors and assigns

12.9    Severability.  If any provision of this Operating Agreement, or the application of such provision to any Person or circumstance, shall be held invalid, the remainder of this Operating Agreement, or the application of such provision to Persons or circumstances other than those to which it is held invalid, shall not be affected thereby.

12.10   Governing Law.  This Operating Agreement shall be governed by and construed and enforced in accordance with the laws of the State of California without regard to the principles governing conflicts of laws.

IN WITNESS WHEREOF, this Operating Agreement is entered into as of the Effective Date.

INSERT SIGNATURE BLOCKS

IN WITNESS WHEREOF, the parties have executed this Agreement on the date and in place first mentioned.

Cinco Group:

Cinco Corporation (Philippines)

Name: Jojo P. Magsaysay

Title:   CEO

Jose P. Magsaysay, Jr.

Ma. Victoria O. Bermejo

Ricardo R. Montelibano

L.A. Group:

Amit Nemanim

Guy Koren

Amir Jacoby

SIGNED IN THE PRESENCE OF:

November 30, 2010

# EXHIBIT 52



**PCJV BOARD MEETING**
October 16, 2012, PCJV Office Wilshire, Los Angeles
11:00 am to 3:00 pm


In Attendance

Directors:

Jose P. Magsaysay
Jose Miguel Ma. Montinola
Ricardo Enrique Montelibano
Marla Victoria Bermejo
Guy Koren
Amir Jacoby
Inbal Jacoby

Erlinda S. Bartolome – Corporate Secretary


1. Minutes of the last Board Meeting was not read and approved.
2. Board approved Statement of Account from Cinco; as of April 4, 2011 total was US 23,000.00.
   a. Breakdown included: Advances to DLA Piper US 8,000.00, Advances for Salaries of Guy and Amit US 4,000.00 and Consultancy Fee advances to E.S.Bartolome US 11,000.00 (Nov 2010 to Feb 2011).
   b. On ESBartolome's consultancy, Board approved the consultancy through the Board's signature on a written document. To enable PCJV to pay the amount, Consultancy fee will temporarily be increased to US 2,300.00 until the US 11,000.00

from previous months will have been paid. The difference will be paid to Cinco. Consultancy Fee will go back to US 1,300.00 until amount is paid. Inbal given copy of this signed document.

c.The Board approved that the amount of US 23,000.00 be taken up as long – term liability of PCJV.

d. The Board discussed the billings of DLA Piper and Guy and Amir will negotiate with Kim on possible discount on billings.

3. Operating Agreements and Structure

   a. There are two Operating Agreements:

      i.Internal Operating Joint Venture signed by all Directors

      ii.   Limited Liability Operating Agreement of PCJV USA LLC filed with the government.

      iii.   Sections of the Internal Joint Venture are reflected in the LLC Operating Agreement.

   b. NKM and J & K

      liicense Agreement with NKM will be terminated and shall be migrated to an ADA In favor of J & K.

      ii,   Prior to migration to ADA for J & K (Guy and Amir), there is a need for all shareholders of NKM to sign Quit Claim and Memorandum of Understanding.

      iii.   J & K shall be the new company in place of NKM and will sign an ADA with PCJV, Franchise Fee will remain the same US 1,500.00

   iv. Guy will take care of negotiation with Amit.

c. On the 30/30 share of Franchise Fees and Royalties per Joint Venture Agreement:

   i Board has approved that this will not be an expense in the P & L of PCJV but shall be given as part of its distributive income.

   ii. Since Amit is no longer a Managing Partner in PCJV, the 30% share of the LA Group shall be divided between Guy and Amir.

d. Board reviewed and discussed the Joint Venture Agreement. The following revisions were approved:

   i. Section 1 c - Principal Office address will change to reflect present address.

   ii. Section 1 f -LA Group as managing partners shall be responsible in securing the Liability Insurance of PCJV.

   iii. Section 3 a:

    1. Clarification on the present role of Amit in the Management of the Company as a member,

    2 When documents of Amit are done. Inbal Jacoby shall replace Amit in the management of the company or as Board.

   iv. Section 3 c:

    1. Guy Koren to replace Amit Nemamin as President of PCJV.

    2. Maria Victoria Bermejo will replace Jose Miguel Ma. Montinola as Treasurer

    3 Additionally, the Board approved to include the following provision: That a 75% vote will be needed to replace the CEO, President, Treasurer, Corporate

Secretary. Other Senior Officers of PCJV
will need simple majority approval.

4. Dividend or distributive income is projected to be
released by mid 2013. Salary adjustments of the
Managing Partners (LA Group) shall be done after the
first dividends are released.

5. PCI Trading
   a. Operating Agreement should be drawn up and Ben
      Olivas will be requested to do this.
   b. The Board agreed on the following:
      Ownership shall mirror PCJV: 60% Potato
      Corner International and 40% LA Group.
      ii.   Since the LA Group shall be the managing
            partner, profit sharing shall be 50/50.

ERLINDA S BARTOLOME

# EXHIBIT 53

## PCJV USA LLC
## JOINT VENTURE AGREEMENT
(FIRST AMENDMENT TO THE JV AGREEMENT)

This Joint Venture Agreement (the "Agreement") is made and entered into on OCTOBER 17, 2012 at its Principal Office , Suite #1100, 6380 Wilshire Blvd Los Angeles, CA 90048 by and between:

POTATO CORNER INTERNATIONAL, a corporation duly existing and registered by virtue of and under the laws of the State of Delaware, US with office address at 92 Corporate Park Suite C-332, Irvine, California, USA 92606, represented herein by its duly authorized representative, Jose P. Magsaysay (hereinafter "PCI"), and its directors, Jose P. Magsaysay, Jr., Jose Miguel Ma. G. Montinola, Ma. Victoria O. Bermejo, Ricardo K. Montelibano, all of whom are Philippine citizens and resident, and collectively referred to as the "PCI Group";

-and-

GUY KOREN, AMIR JACOBY AND INBAL JACOBY all of whom are U.S citizens and residents and collectively referred to as the "LA Group

### RECITALS

WHEREAS, the Parties hereto have agreed to form a limited liability company (hereinafter referred to as the "Company") under the laws of the State of Delaware, with the primary purpose of engaging in the business of establishing, operating, managing, licensing and franchising "Potato Corner" stores/outlets in the United States of America and Israel, except in the County of Los Angeles, USA and the County of San Francisco, USA and Tanforan Mall (hereinafter, "Territory").

WHEREAS, the Parties herein have agreed to enter into this Agreement which sets forth the terms and conditions with respect to the organization, incorporation, operation and management of the Company and defines their respective rights, duties and obligations of the parties to this Agreement.

WHEREAS, the Parties agree that the LLC operating agreement to be entered by them shall reflect the terms and conditions as set forth in this Agreement.

WHEREAS, Cinco may assign and or all of its rights to the joint venture company formed under this Agreement to a wholly-owned subsidiary as it deems fit.

NOW, THEREFORE, for and in consideration of the foregoing premises, the Parties hereby agree as follows:

1) ORGANIZATION AND FORMATION OF THE COMPANY

a) Within ten (10) days from the Effective Date of this Agreement, the Parties herein agree to organize and form, a limited liability company to be called "PCJV USA" ( hereinafter referred to as the Company) for the primary purpose of engaging in



the business of establishing, operating, managing, licensing and franchising "Potato Corner" stores/outlets in the Territory.

b) The initial members of the Company shall be the following:

   i) Potato Corner International (PCI)
     (1) Jose P. Magsaysay, Jr.
     (2) Jose Miguel Ma. G. Montinola
     (3) Ma. Victoria O. Bermejo
     (4) Ricardo K. Montelibano

   ii) LA Group
     (1) Guy Koren
     (2) Amir Jacoby
     (3) Inbal Jacoby

c) The principal office of the Company shall be at Suite 1100, 6380 Wilshire Blvd. Los Angeles, CA 90048 USA.

d) The annual general meeting of the members of the Company shall be held every year at the principal office of the Company. The members may, at their discretion, invite non-members to join the annual general meeting, but only as non-voting observers. Further, to the extent allowed by the financial condition of the Company, and as agreed upon by a majority of all member interests, the Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses incurred by the following members in attendance of the annual members' meeting: Jose P. Magsaysay, Jr., Jose Miguel Ma. Montinola, Ma. Victoria O. Bermejo and Ricardo K. Montelibano.

e) The fiscal year of the Company shall begin on January 1 and end on December 31 of each year.

f) The Company shall immediately upon formation obtain a "Liability Insurance" for the Company the amount and scope of coverage to be determined by the managers.

g) All costs, fees and expenses incurred in connection with the organization and formation of the Company shall be for the account of the Company.

h) The operating agreement of the Company shall reflect the terms and conditions set forth in this Agreement between the Parties.

2) CAPITALIZATION/OWNERSHIP OF THE COMPANY

a) At the time of formation, the Company shall have a total capital account of Fifty Thousand Dollars (US$50,000) which shall be fully subscribed and paid.

b) Unless other agreed to in writing, at the commencement of this Agreement, the Parties hereby agree that the Cinco Group shall contribute Thirty Thousand Dollars (US$30,000) and own sixty (60%) percent of the Company's capital

2     G. k

accounts, while the LA Group shall contribute Twenty Thousand Dollars (US$20,000) and own the remaining forty (40%) percent.

c) The Parties hereby agree any increase in the capital account shall require an affirmative vote of 75% of all of the members' percentage interests in the Company. In the event an increase in the Company's capital accounts is approved by the members, both Parties shall have rights of pre-emption so that their pro rata ownership share in the Company shall be maintained, provided that, either Party shall have thirty (30) days within which to confirm in writing that it is willing and able to subscribe and fully pay its pro rata share of the increase in capital.

d) Neither Party shall assign any of its rights or obligations under this Agreement, nor his/its member interests in the Company without the prior written consent of the other Party. In the event either Party desire to transfer or sell his/its pro rata members interest in the Company to a person other those specifically named in Section 1(a) of this Agreement, such Party shall be obligated to sell the same first to the other Party, which has have thirty (30) days within which to exercise its rights of first refusal from the date of receipt of a written notice to sell. For this purpose, the Parties hereby agree that the right of first refusal may be exercised in accordance with the following formula: The average of the Company's earnings before interest, depreciation, taxes and amortization (EBITDA) for the last two (2) years multiplied by 5 times, and further multiplied by the percentage of member interest subject to such right of first refusal over total outstanding member interests.

3) MANAGEMENT OF THE COMPANY

a) As will be provided in the Operating Agreement, the business and affairs of the Company shall be managed and all of the Company powers shall be exercised by or under the direction of the managers (collectively referred to as "Management"). Unless otherwise agreed to by the parties, the Management shall be composed of seven (7) members, four (4) of whom shall be designated by the Cinco Group, and three (3) designated by the LA Group. Upon the formation of the Company, the following shall be named managers: Jose P. Magsaysay, Jr., Jose Miguel Ma. Montinola, Ma. Victoria O. Bermejo, Ricardo K. Montelibano, Guy Koren, Amir Jacoby and Inbal Jacoby.

b) The Management shall regularly meet on a monthly basis. The regular monthly board meeting may be done via teleconference or through the internet. The members may, at their discretion, invite non-members to join member meetings, but only as non-voting observers. Further, to the extent allowed by the financial condition of the Company, and as agreed upon by a majority of all member interests, the Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses incurred by the members named in Section 1(d) in attendance of said meetings.

c) Upon the formation of the Company, it shall have the following executive officers: President, Corporate Secretary and Treasurer, and the following shall be elected by the managers/members to serve these positions. Any change in these mentioned executive officers will require a vote of 75% of members' interest.

3          G K 

i)  Chairman of the Board of Members – Jose P. Magsaysay

ii)  President – At any given time, the President shall be any one of the following
members: Guy Koren or Amir Jacoby or Inbal Jacoby and the first president
will be Amit Nemanim now replaced by Guy Koren.

iii)  Corporate Secretary – Erlinda S. Bartolome.

iv)  Treasurer – Maria Victoria O. Bermejo

(1)  The Treasurer shall have oversight functions over the Accounting and
Finance Departments that shall be exercised independent of the
President.

d)  Additional executive officers may be appointed by Management as it may deem
necessary. Replacement and removal will require Managers simple majority vote.

e)  It is hereby agreed that the rights and responsibilities of the Management shall
include the following:

i)  Approval of the compensation package for the managers, executive offices
and key personnel.

ii)  Approval of the Accounting System/Procedures/Software/Method to be used
by the Company.

iii)  Approval of the operating budget of the Company, and any changes to it

iv)  Approval of all franchising agreements, and lease agreements.

v)  Approval of all purchases and disbursements in excess of $10,000, provided
that such amount may be changed or modified by Management as it deems
necessary.

f)  The executive officers shall manage the business and property of the Company,
and to market the business, in accordance with and pursuant to the directives of
and policies set by the Management of the Company. The Management of the
Company can recall and/or withdraw the appointment of any executive officer, as
it deems necessary.

g)  The Company shall enter into a Master License Agreement with Cinco (or an
affiliated company to be designated by Cinco) which shall include the following
terms and conditions:

i)  The Company agrees to license the "POTATO CORNER" intellectual
property rights from Cinco or an affiliated company to be designated by
Cinco) consisting of (i) the trademark, service mark and trade name
"POTATO CORNER"; and (ii) various trademarks, service marks, trade
names, slogans, designs, insignias, emblems, symbols, color schemes,
package features, logo and other propriety identifying characteristics used in
relation and in connection with the "Potato Corner" Products and the System;
and (iii) as well as other intellectual property rights in connection with the
"POTATO CORNER" intellectual property rights, for use in the Territory.

ii)  The Company agrees to pay, as an arm's length license fee, the following
amounts:

4

(1) With respect to the licensing / sub-licensing or franchising the "POTATO CORNER" intellectual property rights in connection with the "POTATO CORNER" outlets/stores, an amount equal to thirty percent (30%) of all initial/franchise fees and ongoing royalty fees paid to/ collected by the Company. Payments shall be made to Cinco (or an affiliated company to be designated by Cinco) by wire transfer using a bank or other financial institution specified by it within thirty (30) days from receipt of the fees by the Company.

(2) All withholding and other applicable taxes levied by any authority on the payments by the Company shall be borne solely by the Company.

h) The Company agrees to engage the LA Group to provide management and strategic experience and expertise during the duration of this Agreement. The Company shall enter into a Master Services Agreement with the LA Group (or a corporation to be designated by the LA Group) which shall include the following terms and conditions:

i) In consideration for the provision of its services under the Master Services Agreement, the LA Group shall be entitled to a services fee equal to thirty (30%) percent of all initial/franchise fee and continuing royalty fees paid to/ collected by the Company

ii) All withholding and other applicable taxes levied by any authority on the payments by the Company to the LA Group under this Agreement shall be borne solely by the Company.

iii) The LA Group shall faithfully, diligently and efficiently exercise its obligations and responsibilities under the Master Services Agreement.

iv) The LA Group shall maintain and protect the Confidential Information belonging to Cinco or the Company, and such undertaking shall apply to all of its partners, officers, employees, or agents.

i) The President of the Company shall render the following services and shall perform the following duties for the Company in a faithful, diligent and efficient manner:

i) The President shall be responsible for all management, operational, marketing, establishment, maintenance, licensing and sub-licensing activities with respect to the "Potato Corner" outlets/stores in the Territory. He shall use his best efforts at all times during the term of this Agreement to operate and maintain the "Potato Corner" outlets/stores in the Territory according to the highest standards achievable consistent with the overall plan of the Management of the Company. The President shall comply with the rules, policies and procedures approved by the Management of the Company from time to time.

ii) The President shall advertise market and promote the "Potato Corner" outlets/stores with the goal of causing public knowledge, awareness and patronage of the "Potato Corner" outlets/sites

5

iii) The President shall maintain a comprehensive system of records, books and accounts, with respect to the licensing and sub-licensing activities, operation, establishment, management, maintenance and other activities of the "Potato Corner" outlets /stores in the Territory with the assistance of the Corporate Secretary.

iv) No later than the twentieth (20th) day of each month, with respect to the preceding month, the President shall render a statement of receipts and disbursements, a schedule of accounts receivable and payable, and a schedule of fees collected and distributed, together with a reconciled bank statement as of the last day of the month with the assistance of the Corporate Secretary.

v) No later than three (3) months after the end of a fiscal year, the President shall, with the assistance of the Corporate Secretary and external accountant hired by Management, cause the Company to issue audited financial statements, and shall provide a copy of the same to all the members of Management.

vi) To the extent the President is lawfully able to do so, the President shall take such action as may be necessary to comply promptly with any and all laws, ordinances, orders or other requirements of any federal, state, county or municipal authority having jurisdiction of the Company and affecting the Company.

j) Consistent with its fiduciary duty to the Company, the members and managers shall exercise the duty of care and shall, at all times, ensure that all corporate opportunities consistent with the objectives of this Agreement shall be pursued on behalf of, and for the benefit of the Company. As such, with respect to the establishment of Company-owned stores, whenever potential locations are identified by any member or manager, it shall be promptly brought to the attention of the Management. At all times, and within thirty (30) days from receipt of this information, the Management shall decide to either build a Company-owned store at the identified location. In the event the Company chooses to build a Company-owned store at the identified location, it shall have the right to do so, to the exclusion of any of the members or managers. However, in the even the Company decides not to build a Company-owned store at the identified location, it shall notify the members and managers of its decision in writing. In such case, the LA Group shall have the right to build a store at the identified location, provided that it shall enter into a franchising agreement with the Company, and shall pay the franchise fees and ongoing royalty fees as set forth in the Company's standard franchising agreement.

4) DURATION OF AGREEMENT

a) This Agreement shall become effective from the date of execution hereof and shall continue indefinitely unless otherwise terminated by (i) an affirmative vote of 75 percent (75%) of all member interests, or (ii) upon mutual agreement by the Parties in writing.

8

G. K

b) Upon termination of this Agreement, the effects of termination shall be as follows:

    i) All rights granted under the Master License Agreement shall terminate and the Company shall cease the use of the Potato Corner Intellectual Property Rights, and Confidential Information, provided however, that the Company shall be permitted to use any of the foregoing as is reasonably required in order to comply with its obligations under its sub-licensing or franchising agreements, but only to the extent of the duration of sub-licensing or franchising agreements in existence at the time of the termination of this Agreement.

    ii) The LA Group shall be subject to a non-compete arrangement and hereby agrees that, within two (2) years from the date of termination of this Agreement, it shall not engage in the business of establishing, operating, managing, licensing and franchising identical or similar products sold by the Company, using the intellectual property rights identical or similar to those used by the Company, at the time of the termination of this Agreement.

5) GENERAL PROVISIONS

a) This Agreement may not be altered, changed, supplemented or modified except by a written instrument duly signed by the Parties.

b) The Parties shall use their best efforts to cooperate for the success of the business of the Company. The Parties further agree to perform all acts and execute and deliver all documents or instruments required or necessary to fully implement or consummate the transactions contemplated in and the intent underlying this Agreement.

c) The Parties shall, to the extent feasible, cause the operating agreement of the Company to reflect the mutual covenants and provisions contained in this Agreement.

d) All notices and other communications required or permitted to be given hereunder shall be given in writing (and for this purpose shall include emails or fax transmissions) and shall be addressed to the appropriate Party at the address of such Party as heretofore designated, or at such address as such Party may designate subsequently in writing.

e) The failure of any Party at any time to require performance by the others of any provision of this Agreement shall not affect, in any way, the right of such Party to require performance of that or any other provision, and any waiver by any Party of any breach of this Agreement shall not be construed as a waiver of any continuing or succeeding breach of such provision, or a waiver of any other right under this Agreement.

f) This Agreement shall constitute the entire agreement between the Parties and shall supersede any previous agreements, written or otherwise, with respect to the same subject matter which may have been made by the Parties prior hereto.

7

g) The invalidity of any portion of this Agreement will not and shall not render the entire Agreement void, nor affect the validity of the rest of the provisions of this Agreement.

h) This Agreement shall be governed by the laws of the State of California.

i) Parties acknowledge that, from time to time, one Party (the "Discloser") may disclose to the other Party (the "Recipient") information: (a) relating to the Potato Corner outlets and sites; (b) relating to the Potato Corner Intangible Property Rights; (c) Potato Corner product specifications and related information; (d) which is marked with "confidential" or a similar legend; (e) which is described orally and designated as confidential; or (f) which would, under the circumstances, be understood by a reasonable person to be confidential ("Confidential Information"). Upon subsequent disclosure of previously disclosed Confidential Information to the Recipient by the Discloser, the information will remain Confidential Information even if not identified as Confidential Information at the subsequent disclosure.    Recipient shall retain such Confidential Information in confidence, and shall not disclose it to any Third Party or use it for other than the purposes of this Agreement without the Discloser's prior written consent.  Each Party shall use at least the same procedures and degree of care with respect to such Confidential Information which it uses to protect its own confidential information of like importance, and in no event less than reasonable care.  The Recipient will immediately give written notice to the Discloser of any unauthorized use or disclosure of the Discloser's Confidential Information, and the Recipient will assist the Discloser in remedying such unauthorized use or disclosure.

[The Remainder of This Page is Left Intentionally Blank]



IN WITNESS WHEREOF, the parties have executed this Agreement on the date and in place first mentioned.

**POTATO CORNER INTERNATIONAL GROUP:**

Jose P. Magsaysay, Jr.

Jose Miguel Ma. G. Monlinola

Ma. Victoria O. Bermejo

Ricardo K. Montelibano.

**L.A. Group:**

Inbal Jacoby

Guy Koren

Amir Jacoby

SIGNED IN THE PRESENCE OF

**ACKNOWLEDGMENT**

9

# EXHIBIT 54

# PCJV-LA GROUP

## PARTNERSHIP AGREEMENT

### Preamble

This Partnership Agreement ("Agreement") is made March 1, 2013, to memorialize the partnership activities and relationship of the partners executing this Partnership Agreement, who shall be referred to in this Agreement individually as a "Partner" and collectively as "Partners."

### RECITALS

A.      The Guy Koren ("Koren"), Amit Nemanim ("Nemanim"), and Amir Jacoby ("Jacoby") collectively initiated negotiations to work together as a group with the individuals constituting the Cinco Group to establish, operate, manage, license and franchise "Potato Corner" stores/outlets in the United States and Israel (other than Los Angeles and San Francisco Counties and Tanforan Mall), pursuant to the terms of the Potato Corner USA Joint Venture Agreement executed on or about   11/2009   ("JV Agreement"), which JV Agreement was subsequently replaced by the PCJV USA, LLC Limited Liability Company Agreement made effective   10/2010   ("PCJV Agreement").

B.      Pursuant to the PCJV Agreement, Koren, Nemanim, and Jacoby were invited to participate in PCJV USA, LLC as the "LA Group", by making a Capital Contribution (as defined in the PCJV Agreement) of $20,000 to PCJV USA, LLC and executing and performing services for PCJV USA, LLC pursuant to a Master Services Agreement ("Master Services Agreement").

C.      This Agreement is intended to memorialize in writing the election by Koren, Nemanim and Jacoby to continue the partnership relationship they initially established in connection with the negotiation of the JV Agreement, to accept the offer made to the LA Group to purchase and hold of a 40% membership interest in PCJV USA, LLC and to accept the offer made by PCJV USA, LLC to the LA Group to provide the services described in the Master Services Agreement.

### Type of Business

1.      The Partners have associated to form a General Partnership for the purpose of holding a membership interest in PCJV USA, LLC and providing services on behalf of PCJV USA, LLC pursuant to the Master Services Agreement, and to engage in such other activities as may be permitted by law and approved by a majority of the Partners.

### Partnership Name

2.      The Partnership name shall be "PCJV-LA Group".

### Partnership Term

3.   .      The Partnership shall be deemed to have commenced as of the execution of this Agreement by the Partners, and shall continue until dissolved by agreement of the Partners or terminated under the provisions of this Agreement.

## Place of Business

4.      The Partnership's principal place of business shall be: 8950 West Olympic Boulevard, Suite 563, Beverly Hills, CA 90211, California 90035. The Partnership shall maintain any other place or places of business agreed upon by the Partners.

## Initial Capital

5.      The Partners shall each be required to contribute to the Partnership their proportional share of the $20,000 Capital Contribution made by the Partnership to PCJV USA, LLC in and for their interest in the Partnership. The Partnership has offered Partnership interests in the Partnership to the following individuals in proportion to their respective capital contributions to the Partnership.. as set forth in Exhibit A to this Agreement. Only those persons contributing a proportion share of this Capital Contribution shall be deemed a continuing Partners of the Partnership, in proportion to their actual contribution.

|     |              |          |
|-----|--------------|----------|
| 5.1 | Guy Koren    | $7,600   |
| 5.2 | Amit Nemanim | $7,600   |
| 5.3 | Amir Jacoby  | $4,800   |

The failure of any Partner to pay their required contribution to this Partnership shall be deemed in default. If the default is not cured following 30 days prior written notice, the other Partners may advance the capital contribution as (i) a loan to the defaulting Partner to bear interest at the rate of 10% per annum until paid in full and secured by the Partner's interest in the Partnership and/or distributions made to such Partner with respect to such interest or (ii) a purchase from the Partnership of the defaulting Partner's allocated interest (or any part thereof) and a corresponding cancellation of such Partner's opportunity to continue as a Partner.

        The Partners will prepare an Exhibit A to this Agreement to reflect the actual contributions made and the proportional Partnership interest thereby obtained.

## Service Commitment

6.      Subject to the allocation of responsibility among the Partners for the performance of the services required of the Partnership under the terms of the Master Services Agreement, each of the Partners shall be responsible for providing a proportional share of the services required (as determined by the Partners). Alternatively, the Partners may agree to compensate individual Partners for the service obligations required under the Master Services Agreement that have been assigned to and assumed and performed by them on behalf of the Partnership.

## Capital Withdrawals

7.      No Partner shall withdraw any portion of the Partnership capital without the other Partners' express written consent.

## Profits and Losses

8.      Net profits and net losses will be allocated to the Partners, and net cash available for distribution by the Partnership will be distributed in proportion to the respective percentage interests of the Partners in the Partnership as described on Exhibit A to this Agreement. The term "net profits," as used in this Agreement, shall mean for tax purposes the Partnership net profits as determined by the accounting method generally and consistently applied by the Partnership, and for purposes of determining the cash available for distribution by the Partnership to the Partners the term "net profits" shall mean the net cash available to the Partnership after establishing such cash reserves as the Partners may determine to be prudent for working capital and any contingent liabilities.

## Books of Account

9.      Partnership books of account shall be accurately kept and shall include records of all Partnership income, expenses, assets, and liabilities. The Partnership books of account shall be maintained on a cash basis. Each Partner shall have the right to inspect the Partnership books during normal business hours at the principal office of the Partnership.

## Fiscal Year

10.     The Partnership's fiscal year shall end on December 31 each year.

## Accountings

11.     Complete accountings of the Partnership affairs at the close of business on the last days of March, June, September, and December of each year shall be rendered to each Partner within thirty (30) days after the close of each such month or as soon thereafter as may be practical with regard to the availability of such information from PCJV USA, LLC. At the time of each accounting, the net profits of the Partnership, if any, shall be distributed to the Partners as provided in this Agreement. Except as to errors brought to the Partners' attention within 15 days after it is rendered, each accounting shall be final and conclusive.

## Time Devoted to Partnership

12.     The Partners shall be required to devote such time and attention to the Partnership business as may be necessary for the Partnership to fulfill its obligations under the Master Services Agreement. Except as the service responsibilities may otherwise be allocated or delegated by the Partners, each of the Partners is required to provide a proportional amount of the service time required by the Master Services Agreement relative to their respective percentage interest in the Partnership. Failure to provide the time required to perform or to perform their respective share of the services required of the Partnership or otherwise allocated or delegated to a Partner shall constitute a breach of the Partnership Agreement. A Partner shall not be deemed in breach of their obligation to provide services on behalf of the Partnership unless and until the Partnership has provided such Partner with at least 30 days prior written notice of the alleged default or breach, and the default or breach as gone uncured during that notice period.

In addition to the services to be provided by the Partners in fulfillment of the Partnership's responsibilities under the Master Services Agreement, the Partners may be individually designated by the Partnership to serve as a Manager of PCJV USA, LLC. If so designated, a Partner shall fulfill their Manager responsibilities on behalf of the Partnership, and if unable or unwilling to do so a Partner shall so advise the Partnership so that they may designate someone else to serve in that capacity. The Partnership shall appoint its Manager designees to PCJV USA, LLC by Majority Approval (as defined below).

### Management and Authority

13.    Partnership decisions and the actions of the Partners shall be determined and approved by the vote or written consent of Partners holding a majority in percentage interest of the Partnership ("Majority Approval"). Individual Partners may not bind the Partnership without obtaining the Majority Approval of the Partners. Any obligation incurred in violation of this provision may be charged to and collected from the Partner who incurred the obligation. Subject to the above authorization requirement, any individual Partner may execute a document on behalf of the Partnership.

Guy Koren has been initially granted the title of "Managing Partner" on behalf of the Partnership in expectation that he will execute documents on behalf of the Partnership.

### Statement of Partnership

14.    The Partners will cause to be filed with the California Secretary of State a Statement of Partnership Authority pursuant to California Corporations Code Section 16303 on form GP-1 in effect at the time of the filing. The Partnership shall cause a Statement of Partnership Authority to be recorded in every county in which the Partnership owns, or contemplates owning, real property.

### Partners' Salaries

15.    Although no salaries are contemplated with respect to a Partner's services as a Manager of PCJV USA, LLC, the Partners providing services on behalf of the Partnership in fulfillment of the Partnership's obligations under the Master Services Agreement shall be entitled to such compensation as may be approved by the Partners by Majority Approval. If the Partnership is unable to pay for the services performed by a Partner, by Majority Approval the Partners the compensation otherwise payable may be accrued and thereafter paid from the first funds made available to the Partnership from PCJV USA, LLC. Compensation payable to a Partner for services provided may be paid as a guaranteed payment as provided under IRC Section 707(c), as payment made to a Partner irrespective of the Partner's percentage interest in Net Profits, the payment of which shall reduce the Net Profits allocable to the Partners in accordance with the Partners' percentage interests. In addition to compensation for their time, Partners shall be entitled to reimbursement for their reasonable business expenses incurred in furtherance of the Partnership business, so long as approved by the Partners by Majority Approval. Any compensation paid to a Partner and any business expenses reimbursed shall be deducted ordinary business expenses prior to computing net profits.

### Withdrawal of Partner

16.     Upon thirty (30) days written notice of intent to the other Partners, a Partner may dissociate from the Partnership by withdrawing as a Partner.

## Option to Purchase Dissociated Interest

17.     On dissociation of a Partner by death, withdrawal, or other act, the remaining Partners may continue the Partnership business by purchasing the outgoing Partner's interest in the Partnership assets and goodwill. The remaining Partners shall have the option to purchase the dissociated Partner's interest by paying to the outgoing Partner or the appropriate personal representative the value of the dissociated Partner's interest as determined under Paragraph 18 of this Agreement. If the remaining Partners do not exercise this option, the Partnership shall be dissolved as provided under Paragraph 21 of this Agreement, unless the remaining Partners have elected to convert the Partnership into an other business entity form and the withdrawing Partner's interest in such other entity is in proportion and comparable to the interest held by the withdrawing Partner immediately prior to withdrawal as provided in Paragraph 21A.

## Purchase Price of Partnership Interest

18.     On exercise of the option described in Paragraph 17 of this Agreement, the remaining Partners shall pay to the dissociated Partner or appropriate personal representative the value of the dissociated Partner's Partnership interest as determined by the last regular accounting preceding the effective date of the withdrawal plus the full unwithdrawn portion of the dissociated Partner's share in net profits earned between the date of that accounting and the date of dissociation. The Partnership shall have the right to offset against the purchase price otherwise payable for a withdrawing Partner's interest the Partner's share of any existing liabilities and accounts receivable incurred prior to the effective date of the withdrawal.

## Liability of Deceased Partner's Estate

19.     If on the death of one Partner, the surviving Partners exercise their option to purchase the deceased Partner's interest under Paragraphs 17 and 18, the liability of the deceased Partner's estate for Partnership obligations incurred during the period of continuation shall be limited to the amount that the deceased Partner had invested or the net value of the Partner's interest in the Partnership at the time of death (and including the unwithdrawn portion of net profits earned since the last accounting), whichever is greater.

## Duties of Purchasing Partners

20.     On any purchase and sale made pursuant to Paragraphs 17, 18, or 19 of this Agreement, the remaining Partners shall assume all Partnership obligations (subject to the right to offset a proportional amount against the purchase price). The remaining Partners shall hold and defend the withdrawing Partner or the deceased Partner's estate and personal representative, as well as any property belonging to either a withdrawing or deceased Partner, free and harmless from all liability for Partnership obligations beyond those reflected in the calculation of the purchase price payable. Immediately upon purchase of a withdrawing or deceased Partner's interest, the remaining Partners shall prepare, file, serve, and publish all notices required by law to protect the withdrawing Partner or the deceased Partner's estate and personal representative from liability for future Partnership obligations. All costs incident to the requirements of this Paragraph shall be borne by the remaining Partners.

## Dissolution

21.     When: (1) the Partnership is dissolved by agreement of the Partners; or (2) a remaining Partner or Partners decline(s) to exercise the option to purchase a dissociated Partner's interest under Paragraph 17; or (3) it is otherwise required by law, the Partnership affairs shall be wound up, the Partnership assets liquidated, its obligations to creditors, including, to the extent permitted by law, Partners who are creditors, shall be paid, and the surplus divided among the Partners according to their rights of distribution of their Partnership accounts.

## Conversion

21A.     Upon the occurrence of an event resulting in a dissociation of a Partner, within 90 days of such event the remaining Partners may elect to convert the Partnership into an other business entity form for which the dissociated Partner's interest will be afforded limited liability from any liability arising after such conversion. Conversion to an other entity form shall be in lieu of the exercise of the option to purchase the dissociated Partner's interest in the Partnership and in lieu of the Partnership dissolution. The dissociated Partner shall receive an interest in the other entity form adopted by the remaining Partners that is proportional and comparable to the held by the dissociated Partner's interest in the Partnership prior to the dissociation event; provided, however, that the dissociated Partner's interest in the other entity need only be in a form that is comparable economically and need not include any voting rights or authority to act on behalf of the other entity in a manner comparable to that held as a Partner (e.g. comparable to an "economic interest" in a limited liability company, as defined in Cal Corp Code Section 17001(o)).

## Notices

22.     All notices between the Partners shall be in writing and shall be deemed served when personally delivered to a Partner, or when deposited in the United States mail, certified, first-class postage prepaid or by overnight courier, addressed to a Partner at the Partner's address set forth on the signature page to this Agreement or to such other place as may be specified in a notice given pursuant to this Paragraph as the address for service of notice on that Partner. Notices may also be deemed duly provided if delivered by e-mail to an e-mail address specified by the receiving Partner and the party giving notice concurrently places a copy thereof in the United States mail (as described above) or delivers a copy by overnight courier, in which event notice shall be deemed given on the date of the delivery of the e-mail.

## Consents and Agreements

23.     All consents and agreements provided for or permitted by this Agreement shall be in writing. Signed copies of all consents and agreements pertaining to the Partnership shall be kept with the Partnership books.

## Governing Law

24.     This Agreement shall be governed by the California Uniform Partnership Act of 1994, as amended, and shall in all respects be a contract under California law.

## Attorney Fees

25.     As between the parties to this Agreement, the prevailing party in any dispute arising from or relating to this Agreement shall be awarded costs and attorney fees whether or not the matter is resolved by trial or appeal.

## Sole Agreement

26.     This instrument contains the Partners' sole agreement relating to their Partnership. It correctly sets out the Partners' rights and obligations. Any prior agreements, promises, negotiations, or representations not expressly set forth in this instrument have no force or effect.

Executed by the undersigned with effect as of the Effective Date defined above, at Orange County, California.

[See Counterpart Signature Pages of the Partners attached hereto]

## EXHIBIT A

### PARTNER CAPITAL CONTRIBUTIONS AND PERCENTAGE INTERESTS
(Proposed)

| PARTNER NAME AND ADDRESS | CAPITAL CONTRIBUTION | PERCENTAGE INTEREST |
|---|---|---|
| GUY KOREN<br>1478 S Crest Dr<br>LA, CA 90035 | $7,600 | 38% |
| AMIT NEMANIM | $7,600 | 38% |
| AMIR JACOBY<br>14320 Ventura Bl #115<br>Sherman Oaks, CA 91423 | $4,800 | 24% |

## EXHIBIT A

### PARTNERS, CAPITAL CONTRIBUTIONS AND PARTNERSHIP INTERESTS

#### (Amended and Updated March 22, 2013)

| NAME OF PARTNER AND ADDRESS | CAPITAL CONTRIBUTION | PARTNERSHIP PERCENTAGE INTEREST |
|---|---|---|
| GUY KOREN | 12,258.04 | 61.3 |
| AMIR JACOBY | 7,741.96 | 38.7 |

## PCJV-LA GROUP,
### a California general partnership

## MEMBER COUNTERPART SIGNATURE PAGE

The undersigned, desiring to enter into the Partnership Agreement made effective
March 1, 2013 (the "Agreement") for PCJV-LA GROUP, a California general
partnership (the "Company"), hereby agrees to all of the terms and provisions thereof.
The undersigned hereby joins and executes the Agreement as a Partner of the Partnership,
and hereby authorizes this Signature Page to be attached thereto in evidence of this
joinder.

WITNESS, the execution hereof by the undersigned, as a Partner of PCJV-LA
GROUP:

_____
Signature of Partner

Address: 14320 Ventura BL #115
         Sherman Oaks, CA 91423

### Spousal Consent

The undersigned is the spouse of the above general partner. I have read and understood
the terms and conditions of the Partnership Agreement of PCJV-LA Group and agree to
be bound by its terms. I agree that my spouse shall have the sole and exclusive power to
manage the partnership interest created by the foregoing Agreement, regardless of
whether that interest was acquired with community property, quasi-community property,
or separate property assets, however so titled or characterized. I further acknowledge and
agree that my spouse may, from time to time, or at any time, amend, restate, sell, transfer,
assign or hypothecate his Partnership interest in any manner whatsoever, with or without
my further consent.

Executed at  LA          County, California.

_____

Date: 3/1/2013

**PCJV-LA GROUP,**
**a California general partnership**

## MEMBER COUNTERPART SIGNATURE PAGE

The undersigned, desiring to enter into the Partnership Agreement made effective March 1, 2013 (the "Agreement") for PCJV-LA GROUP, a California general partnership (the "Company"), hereby agrees to all of the terms and provisions thereof. The undersigned hereby joins and executes the Agreement as a Partner of the Partnership, and hereby authorizes this Signature Page to be attached thereto in evidence of this joinder.

WITNESS, the execution hereof by the undersigned, as a Partner of PCJV-LA GROUP:

_____
Signature of Partner

Address: 1478 S. crest Dr
LA, CA 90035

# EXHIBIT 55

| From: | Olivas, Ben <Ben.Olivas@dlapiper.com> |
|---|---|
| To: | guy@potatocornerusa.com <guy@potatocornerusa.com>;Amit Neman (amitneman@yahoo.com) <amitneman@yahoo.com> |
| CC: | Joe Magsaysay (jornag28@yahoo.com) <jornag28@yahoo.com>;Marivic Bermejo (marvsbermejo@yahoo.com) <marvsbermejo@yahoo.com>;Linda Bartolome (lyndahbpci@gmail.com) <lyndahbpci@gmail.com> |
| Sent: | 5/25/2015 11:35:27 PM |
| Subject: | PCJV - Cinco counter-proposal to LA Group |

Hi Guy, Amir,

Kindly see attached counter-proposal from Cinco for your review and consideration.  Please let me know when you would like to discuss, after you have had a chance to review the attached.  Best regards.

Ben

**Ben Olivas**
Partner

T +1 650.833.2080
F +1 650.687.1133
M +1 415.309.9648
E ben.olivas@dlapiper.com



DLA Piper LLP (US)
2000 University Avenue
East Palo Alto, California 94303-2215
United States
www.dlapiper.com

## LA Group's Proposal going forward
### [With Cinco's counter-offer incorporated]

### <u>Overall Comment from Cinco</u>:

The terms of Cinco's counter-offer as outlined below is made with the following objectives in mind:

- Cinco will work with the LA Group to address and settle with finality all actual and potential liabilities that PCJV may have against franchisees, and obtain quitclaims from any future claims by these franchisees.
- Going forward, Cinco and the LA Group will enter into a licensing agreement for the use of the Potato Corner trademarks on terms and conditions that are mutually acceptable to both parties.

With these objectives in mind, Cinco outlines its counter-proposal which it considers as fair and reasonable to both parties.

1. Trademark license – to cover use by LA Group of Pot ato Corner's logos, trademarks, trade names. Term of use: Perpetual.

   **Cinco Counter-offer**: Trademark license for 10 years, renewable for another 10 years. In addition, the trademark license agreement will include the following terms:

   - Cinco will specify minimum size and placements of trademarks in all packaging and where to put them in stores and what size placed in certain area like signages, menus, uniforms, websites, etc.
   - No modification or alteration of the Potato Corner trademarks and authorized usage, without the written consent of Cinco.
   - PCJV will send blueprints and store designs of all stores before they open, product mix, business development plans for the specific purpose of allowing Cinco to verify that the trademarks are used in accordance with the license agreement. Cinco undertakes that it, except with respect to the proper use of the trademarks in accordance with the license agreements, it shall not have any right to change or modify any of the blueprints and store designs.
   - Cinco will have the right to conduct a license fee audit, and for this purpose, may request relevant information from PCJV, as such but not limited to, copies of the audited financial statements, monthly license fee receipts and report on net revenues per store.
   - The scope of the trademark license will include Potato Corner's logos, trademarks, trade names ("Potato Corner Intellectual Property Rights"), as well as the following which are deemed essential to preserving and enhancing the Potato Corner Intellectual Property Rights:
     - o At all times, at least 75% of each franchisee's monthly revenues shall be from the sale of "flavored French fries." For this purpose, "flavored French fries" means potato that is cut 1/4" with powdered flavoring add ed.

- o All domain names, websites, and similar property ("Potato Corner Domain Names") that is used for the Potato Corner business.
- With respect to the Potato Corner Domain Names, Cinco shall allow PCJV to use these as part of the trademark license agreement and subject to the terms of the agreement. PCJV shall have the right to determine the content and usage of the Potato Corner Domain Names. However, at all times, Cinco reserves the right to ensure the proper use of the Potato Corner Intellectual Property Rights in accordance with the terms of the license agreement.
- Upon the termination of the license agreement, all rights to the Potato Corner Intellectual Property Rights and the Potato Corner Domain Names shall be retained by Cinco, and PCJV shall not have any further right to use these, unless otherwise specified in the license agreement.

2. Payment structure to Cinco for use of trademarks – tiered license payment structure, as follows:

   *a. Choice by Cinco of either an equity stake in PCJV, or an annual license fee*
   b. **Equity stake in PCJV** – 10% equity interest in PCJV, and no monthly license payments due. Cinco's 10% equity interest is subject to dilution in the event of future equity rounds in PCJV from third party investors. However, Cinco may preserve its percentage equity interest by participating pro rata in future equity funding rounds.
   c. **Annual license fee arrangement** – tiered payment structure, based on the number of stores established (to be agreed upon) and royalty fees received by PCJV from franchisees PLUS a 10% share the LA Group's share of any proceeds from the sale of PCJV to a third party buyer.

   As shown in the example below, the amount to be received by Cinco decreases as more franchise stores become operational. Please note that the following is for illustrative only, based on the average license fees received from existing franchisees.

      i. First tier – no license fees due until after 60 franchise stores are established and operational (not necessarily profitable);
      ii. Second tier – After 60 franchise stores and until 100 franchise stores are established and operational, Cinco will receive 5% of gross license fees paid to PCJV. Example #1: Assume 100 franchise stores and PCJV receives gross license fees of $1,200 in month from each franchise store. Cinco will be entitled to $60 per store, or a total of $6,000 ($1,200 x 5% x 100)
      iii. Third-tier – After 100 franchise stores are established and operational, Cinco will receive 2.5% of gross license fees paid to PCJV. Example #2: Assume 200 franchise stores and PCJV receives gross license fees of $1,200 in a month from each franchise store. Cinco will be entitled to $30 per store, or a total of $6,000 ($1,200 x 2.5% x 200).
      iv. Fourth-tier – After X franchise stores are established and operational, Cinco's share of license fees are capped at $10,000 per month. Example #3: Assume 400 franchise stores and PCJV receives gross license fees of $1,200 in a

month from each store. Cinco will be entitled to a maximum license fee of $10,000.

For this purpose, "franchise stores" excludes corporate stores consisting of the following: [INSERT LIST HERE]

**Cinco counter-offer**: LA Group to acquire Cinco's 60% equity interest in PCJV for $750,000, payable at the time the LA Group acquires Cinco equity interest. No equity interest by Cinco in PCJV after the deal closes.

With respect to license fees for the use of the Potato Corner trademarks, a license fee equal to 2% of Net Sales of all stores. For this purpose, "stores" include both franchise stores and corporate stores, since with respect to the latter, upon effective date of the license agreement, these will no longer be corporate stores from Cinco's perspective.

d. License fee due to Cinco upon sale of PCJV to third party buyer
   i. In the event PCJV is sold to a third party buyer, then the payment structure described above terminates, and Cinco agrees to grant the a perpetual, royalty-free trademark license., subject to the contingency immediately described below.
   ii. However, notwithstanding the above, if the LA Group is able to negotiate with a third party buyer a license fee arrangement effective after the sale, then the LA Group and Cinco will agree to share future license fees. The percentage share of each party is to be agreed upon.

**Cinco counter-offer**: Upon sale of PCJV to a third party buyer, Cinco will renew the license agreement for the Potato Corner trademarks for another 10 years from the date the third party acquires PCJV. In addition, the license agreement will be renewed based on the same terms and conditions that is agreed upon by Cinco and the LA Group.

3. Territorial rights granted to PCJV under the trademark license
   a. United States (including Hawaii and Guam)
   b. Israel

   **Cinco counter-offer**: None

4. Territorial rights to be returned to Cinco
   a. Middle East, upon completion of default process and return by existing developer of Middle East rights to PCJV.

   **Cinco counter-offer**: Add an undertaking by the LA Group to complete the return of the Middle East rights at the Closing Date.

5. No provision by Cinco of any marketing plan or system.

> **Cinco counter-offer**: Agree, subject to requirement that at all times, at least 75% of
> each franchisee's monthly revenues shall be from the sale of flavored French fries.

6. Flavorings
   a. The LA Group is free to develop its own formulation for flavorings, and can source
      these flavorings from any supplier it so chooses.
   b. There will not be any requirement for the LA Group to comply with any Cinco
      standard regarding the formulation of the flavorings, and the LA Group will commit
      to use its best efforts so that its flavorings are reasonably close to Cinco's formulation
      for flavorings.

> **Cinco counter-offer**: None

7. No restriction on look and feel of U.S. franchise stores – given the distinct market conditions
   between the U.S. and the Philippines, the LA Group will have full and unrestricted right to
   determine the "look and feel" of franchise stores in the U.S., without any input from Cinco.

> **Cinco counter-offer**: None

8. Settlement of PCI-Trading payables to Cinco – LA Group will agree to pay part of the trade
   payables due from PCI-Trading to Cinco in full settlement of the outstanding amount ($400k
   to $500k). The exact outstanding amount due to be agreed upon by the parties, and the
   portion to be paid by the LA Group to fully settle the obligation to be agreed upon by the
   parties.

> **Cinco counter-offer**: Full payment by PCJV of all trade receivables due. Payment
> terms to be agreed upon by the parties, and may be made in installments payable after
> Closing Date.

**Additional Cinco conditions:**

9. As of Closing Date, and upon settlement of prior years' liabilities on Closing Date based on a
   plan agreed upon by the parties, the LA Group shall issue a written:

   - Quitclaim for any and all claims it may have now or in the future against Cinco (and
     its affiliates), the Cinco officers, directors and designated persons (including
     consultants such as Mr. L. Bartolome).
   - Indemnity for any and all claims (past and future) that a third party (including any
     U.S. federal, state or local authority) may pursue against (and its affiliates), the Cinco
     officers, directors and designated persons (including consultants such as Mr. L.
     Bartolome) in connection with the PCJV business.

10. With respect to any supplies ordered by PCJV from Cinco after Closing Date, these shall be
    subject to the following payment terms: 50% payable on order, and 50% payable upon
    arrival of the shipment in a U.S. port.

11. During the transition period (ending on Closing Date), the parties shall:

- Identify and agree on the scope of potential liabilities that will need to be addressed prior to Closing Date in order for PCJV to commence its franchising business.
- Agree on a plan of action that will address and resolve each and every potential liability identified, including the provision of additional equity in PCJV as may be required for the specific purpose of settling and resolving any of the identified potential liabilities.
- With regard to the provision of additional equity necessary for settling and resolving the liabilities, the parties shall agree to provide this on a 60/40 basis (60% for Cinco, and 40% for the LA Group).
- PCJV shall refrain from contracting with new franchisees until after Closing Date.
- Not take any steps that may potentially create additional liabilities for PCJV, its officers and directors.

# EXHIBIT 56

August 8, 2015

Dear Guy and Amir,

On behalf of the Cinco Board of Directors, I am writing this letter to you regarding the current situation of PCJV LLC. We understand that the external auditors, Marcum LLP, is evaluating the status of their previously issued audited financial statements for PCJV LLC for the fiscal years 2012 and 2013, and considering whether to withdraw them or re-issue them with qualifications, upon presentation of additional supporting documentation.     Further, we understand that the re-evaluation by Marcum LLP of their position arose from your recent disclosure to them regarding the potential franchise law violations that occurred in prior years (covered by their audit) but which were not disclosed to them previously.

The current situation impacts not just PCJV's franchising business, but also any goodwill associated to the Potato Corner trademarks and tradenames. Thus, as the owner/licensor of the Potato Corner trademarks and tradenames (as well as 60% equity holder in PCJV), please keep us appraised of any further development as you work to resolving the current situation. As a process matter, please blind copy us (bcc) on any correspondence with either Marcum LLP or the regulators (in California and other states) on a real-time basis.

As we discussed before, the potential franchise law violations has liability implications not just for PCJV for control persons in PCJV. California Corporations Code Section 31302 assigns liability to

> [e]very person who directly or indirectly controls a personliable under Section 31300 or 31301, every partner in a firm soliable, every principal executive officer or director of acorporation so liable, every person occupying a similar status orperforming similar functions, every employee of a person so liablewho materially aids in the act or transaction constituting theviolation, are also liable jointly and severally with and to the sameextent as such person, unless the other person who is so liable hadno knowledge of or reasonable grounds to believe in the existence ofthe facts by reason of which the liability is alleged to exist.

We note that when these potential violations occurred, the Cinco directors who represented Cinco's interests in PCJV had no knowledge of the potential franchise law violations.

Finally, given the material impact of the current situation to PCJV's operations, our hope and expectation is that this be resolved within the next 3 months. We appreciate your time and effort on this matter. If you would like to discuss further, please do not hesitate to reach out.

Very truly yours,

Ricardo Montelibano

# EXHIBIT 57

LA GROUP
8950 West Olympic Boulevard, Suite 563
Beverly Hills, California 90211

November 4, 2015

Cinco Group Board of Directors
c/o Lyndah Bartolome
Via E-Mail: lyndahbpci@gmail.com

Dear Lyndah:

We received your letter of October 28, and the notice you rushed out to hold a meeting on
November 12. At this point, the actions required are clear. Given the prior failure to
bring to the proposed meeting the individuals with authority to act, we want to find out
who you are having attend the proposed meeting.

This process began long ago. In June 2014, the PCJV USA, LLC officers (members of
the LA Group) presented the Cinco Group with an extensive presentation of the need for
additional capital, pointing out that the Company was seriously undercapitalized and is
unable to meet its ongoing expenses.

Cinco Group, through its legal counsel in California, requested the right to audit the
books and records of the Company and the audit of the Company's books and records
was conducted on Cinco Group's behalf in or around September 2014, including what
your counsel referred to as a "franchise legal audit."

The LA Group repeatedly requested meetings with the Cinco Group to raise the
additional capital. No response was received from Cinco Group until your letter of
August 8, 2015, in response to the audit and restatement of the Company's financial
statements resulting from the discovery that conduct recommended by prior franchise
counsel was inaccurate and exposed the Company to potential liability. In that letter the
Cinco Group sent an express mandate to the Company's officers, in which the LA Group
concurred, that the situation created by the Company's undercapitalization had to be
cleared up within **3 months, i.e. by November 8, 2015.**

The LA Group consulted with its advisors, estimated the minimum additional capital
required to resolve the problem identified in the restated financial statements and by
franchise counsel, and by letter dated August 20, 2015, advised Cinco Group that a
minimum of $500,000 was needed to "resolve" the problem. LA Group committed to
fund its 40% share of that additional capital, and provided Cinco Group with a timeline
by which that funding would be required from Cinco Group were it to choose to fund all
or any portion of its proportional share of the minimum capital required, i.e. 6 weeks

from that date (i.e. end of September 2015). The deadline was provided in order for the Company to obtain alternative financing if Cinco Group was unwilling to exercise its preemptive right to provide the additional capital required by the Company in the proportion of its existing ownership interest.

By letter dated September 7, 2015, Cinco Group expressly acknowledged that additional capital was required. Cinco Group expressly represented that it was going to contribute 60% of the required additional capital in order to preserve its 60% ownership interest. Cinco Group then requested additional information to support the minimum additional capital amount that LA Group had advised Cinco Group in its letter of August 20, 2015. Cinco Group also indicated that a meeting would be arranged by Lyndah Bartolome shortly to address these issues.

By letter dated September 10, 2015, the LA Group provided to the Cinco Group the supporting documentation for the minimum capitalization, i.e. a letter from the Company's franchise counsel with an estimate of the potential liability exposure and our summary how and why a minimum amount (much less than the actual exposure) needed to be made immediately available to resolve the liability claims. Additionally, the LA Group pointed out how the historic undercapitalization of the Company (limited to $50,000 and accruing and unpaid expense obligations) made it essential for the Company and as a regulatory condition to the ability to continue to conduct the Company's franchise business, and referred back to the capitalization analysis provided to Cinco Group in June 2014 and to the current restated financial statements as the basis for the additional minimum working capital required to even be considered a "going concern."

Lyndah Bartolome came to Los Angeles on or about September 14, 2015, ostensibly pursuant to the Cinco Group's letter of September 7, 2015, to conduct the meeting Cinco Group wanted to conduct. However, Lyndah Bartolome did not come to Los Angeles with the authority to actually conduct the proposed meeting, and as a result, no such meeting was held. We would like to make sure that the proposed meeting for November 12, 2015, does not suffer from the same defect. We presume that Lyndah Bartolome, however, used that time in Los Angeles to gather whatever additional information Cinco Group thought may be relevant to the determination of the minimum capitalization required, of which the Cinco Group had previously represented to LA Group and the Company that it would contribute 60% to retain its proportional 60% interest in the Company.

By letter dated September 28, 2015, from the Cinco Group to the LA Group on behalf of the Company, the Cinco Group reconfirmed its agreement and commitment to contribute 60% of the minimum capital required by the Company to address its liability exposure and as and for necessary working capital (i.e. as previously presented), as presumably was confirmed by Lyndah Bartolome on her visit to Los Angeles. Cinco Group was aware of the timeline required for a commitment of the additional capital, which was

identified in the letter of August 20, 2015, as being by the end of September 2015. Cinco Group further represented that "Potato Corner is however aware of the financial need of PCJV," and in that regard committed to extent to PCJV an interest free loan of $50,000. Wire transfer instructions were then immediately provided by PCJV to Cinco Group to provide the $50,000 represented. No such funds were ever provided by Cinco Group or anyone affiliated with Cinco Group. However, the Company continued to rely upon the continued representation by Cinco Group that it would contribute 60% of the minimum additional capital required by the Company within the time period required by the Company, in order to preserve its 60% interest in the Company. Cinco Group further represented in this letter that the delay in providing the required additional capital might be delayed due to foreign exchange restrictions, but would be provided. Finally, Cinco Group, knowing the urgency of the situation, committed to conducting the proposed meeting of members in October 2015, which it made no effort to fulfill.

By letter dated October 13, 2015, the Company advised Cinco Group that LA Group has already provided its $200,000 proportional share of the minimum required additional capital. Further, given the trouble Cinco Group said it had having its members attend a meeting, the Company pointed out that the action which the Cinco Group wanted to confirm could be implemented by written action of the Managers/Members, without requirement of an in-person meeting and without the delays that might otherwise cause.

So, we now find ourselves in November, the Cinco Group having (i) failed or refused to live up to its commitment to provide an initial funding of $50,000, (ii) failing or refusing to take whatever action the Cinco Group still believes is required, and (iii) failing or refusing to begin to provide any portion of the $300,000 that Cinco Group represented in writing several times that it would provide. We have heard no objection to the calculation of the minimum additional capital indicated or input supporting any lesser or larger number, notwithstanding the weeks Cinco Group has had to perform whatever due diligence it believes to be necessary, notwithstanding the information already provided (more than once), notwithstanding the Cinco Group financial and legal audit, notwithstanding Lyndah Bartolome's visit as a representative of Cinco Group to conduct such other and additional due diligence deemed needed, notwithstanding Cinco Group's representations and then election to forego any earlier meeting of the Manager/Members, and notwithstanding the Cinco Group's ability to initiate its own inquiries of the Company's lawyers and accountants.

While the LA Group is willing to participate in the meeting that Cinco Group has elected to call and notice, based upon the Cinco Group's own mandate to resolve the problem within 3 months, action has already been required and action was already taken in reliance upon the earlier and multiple representations of Cinco Group that it would make a proportional contribution. The Company has already received and begun using the $200,000 provided by the LA Group in reliance upon the Cinco Group's representations,

and as the Company has previously advised the Cinco Group, these funds must be treated as additional paid in capital in order to "resolve" the problem.

We think it is also important to point out to the Cinco Group what compels the need for this additional capital. It has now been clearly documented that the Company was and up until now has been clearly undercapitalized. No reasonable person would consider $50,000 sufficient initial capital to conduct a formal franchising operation. Undercapitalization is one of the key determining factors to permit a claimant to "pierce the veil" of limited liability that might otherwise exist with a limited liability company. As a result, failure to provide adequate additional capital will likely result in direct personal liability to the members of the Company. Public policy mandates that the Company's members provide additional capital or personally absorb any liability claims. The LA Group has provided its share of what has been reasonably projects as a "minimum" additional capital contribution, which means that if Cinco Group does not provide its proportional capital contribution or permit the Company to raise that capital from other sources, that the Cinco Group and its members will be exposed to personal liability for any unmet obligations of the Company.

The Company has already agreed with the LA Group and the LA Group has already agreed with the Company that the initial $200,000 funding provided in October would be treated as a loan, but would convert to an equity contribution on or before December 15, 2015, as either additional paid in capital or as and for the purchase of an additional equity interest in the Company based upon its current fair market value, depending on whether the Cinco Group fulfills its written commitment to make its $300,000 additional capital contribution. This action has already been taken and may not now be undone.

So, we can conduct the meeting you have proposed to formalize the above action and/or approve the Company's raising additional funds from third parties to replace those funds that the Cinco Group is unable or unwilling to provide. The Company cannot extend the timing required for this additional capital. The Company cannot refuse to fulfill its public obligation to adequately capital the Company. Any attempt to prevent the Company from fulfilling this obligation will be the direct responsibility of Cinco Group and its members, who shall thereupon assume personal responsibility for any of the Company's unmet obligations.

With the foregoing premises in mind, the Agenda is wholly inadequate and fails to address the issues that would need to be addressed (if not already addressed and resolved). Therefore, please add the following to the Agenda that you set for the meeting of Managers to include the following:

1.    Review of Company capitalization and capital requirements, with a starting reference to the presentation made to Cinco Group June 2014.

2.   Review of Barry Kurtz's letter of July 15, 2015 and the reissued financial statements of PCJV USA, LLC for 2012, 2013, 2014

3.   Review of financing needed by PCJV USA, LLC to (i) satisfy potential liabilities and (ii) qualify as a "going concern" from an accounting standpoint to enable PCJV USA, LLC to continue to offer franchises in the State of California, and of the consequences to PCJV USA, LLC for failure to timely address these issues.

4.   Review form of additional funding required, loans vs. additional capital investment, and discuss impact of loans on PCJV USA, LLC's financial statement and ability to continue to offer franchises vs. capital call to meet legal, financial, and operating requirements.

5.   Discuss Cinco Group fulfillment of commitment to provide additional capital required

In addition, since the Managers have not officially met since July 2013, notwithstanding the monthly meeting requirements in both the Operating Agreement and Joint Venture Agreement, we should also add to the agenda the following:

A.   Need to confirm and ensure steady supply of spices required by franchises and potential back-up plan for any inability of PC International to meet this demand

B.   Need to have flexibility to modify the cup and other designs to match the U.S. marketplace

Please consider the above as Notice of additional agenda items to be covered at the meeting.

Guy Koren:                                Amir Jacoby:

**EXHIBIT 58**

PCJV MEMBERS MEETING
November 12, 2015
Board Room IV
Renaissance Hotel LAX
Los Angeles, CA

1. Call to Order at 10:30 a.m.

2. Attendance Sheet signed by Members

3. Quorum was declared with the following proxies attending for Members:
   a. Ben Olivas proxy for Jose Magsaysay and Jose Montinola
   b. Francisco Banzon for Ricardo Montelibano
   c. Bruce Dzifeld proxy for Inbal Jacoby
   d. Maria Victoria Bermejo – Member
   e. Guy Koren Member
   f. Amir Jacoby – Member
   g. Erlinda S. Bartolome – Corporate Secretary

4. Ben Olivas was asked to preside over the meeting per request of Jose Magsaysay, the Presiding Member.

5. Members were asked if the Minutes will be read and per suggestion of Guy since last Members Meeting was in 2013, minutes will be sent to all members for approval. Corporate Secretary informed the members that the Minutes was already sent to everyone by e mail as Minutes is an Auditor's required document for the audit prior FDD renewal.

6. Ben Olivas suggested that the meeting be positive and be focused on moving forward rather than looking back at the challenges and difficulties of the past.

7. Members decided to go to No 7 item of the Agenda on PCJV Liabilities

   Discussion on PCJV Potential Liabilities was done. Various figures were discussed. However, no exact and final figures could be determined. Guy Koren provided an assessment of contingent liabilities that is based on his personal knowledge of the situation and in his capacity as the day-to-day manager of PCJV as of the date of the meeting. Guy Koren's assessment is that, at this point in time, he cannot estimate the amount of the contingent liability nor can we estimate the probability of claims being made; however, he believes that the probability to be is less than 50%.

    a. On timing of notices issuance, Guy projects this to be in January. This means that all franchisees issued the Notices can take action within 90 days or 3 months, from January to March 2016.

    b. Barry (PCJV Counsel) and Susan (PCI Franchise Counsel) will coordinate on all matters pertaining to the government and regulators.

    c. The members will have a telecon every two (2) weeks. Main agenda will be briefing on the status and development of the notices of violations.

8. Capital Call

    a. Members approved the capital infusion of US 500,000.00. The breakdown is as follows:
        i. US 200K allocated as contingent liability for a single claim by a franchisee.
        ii. US300K allocated for operating capital of PCJV.

    b. Members contribution, breakdown is as follows:
        i. PCI – US 300,000.
            1. US 50,000.00 have been received by PCJV per Guy's confirmation.
            2. US 250,000.00 shall he provided in a few days.
        ii. LA Group – US 200,000.00
            1. Guy informed the group that their share has been remitted to PCJV.
        iii. A Board Resolution to memorialize the decision will be made for signature of all members.
        iv. When the members have made all contribution, the following reports will be sent to members to show the capital contribution.
            1. Trial Balance
            2. Bank Statement
            3. Acknowledgement Receipt from PCJV on the capital contribution.

9. Operating Capital for PCJV
    a. Ben discussed the business plan sent by the Operating Partners of PCJV last year.
    b. Guy explained the details of the US 1M budget sent to PCI.
        i. US 700,000 - budget for ramping up the support system of PCJV to its franchisees.

    ii. US 300,000 – budget for legal, administrative and compliance requirements.

c. Discussion on projected budget for PCJV moving forward. Guy and Amir gave ball park figures as follows:

    i. PCJV would need about 2M per 50 to 45 stores. Best estimate would be 45 stores.

    ii. Breakeven for PCJV will be 125 stores in 7 to 10 years.

    iii. It will only be at 250 stores when PCJV can give substantial dividends to the members.

    iv. The business model presently used is through Area Developers.

10. PC Trading

a. Question was asked on when PC Trading can pay the accounts payable to Cinco. The amount is about US 500,000.00. Guy's answer was there are no funds to pay Cinco at the moment.

b. Portion of the funds was loaned to PCJV and used for operating fund.

c. Guy explained that they would like to contest the amount due to the high cost of the flavors prior to the decrease in price that was granted by the CEO.

d. Also they would like Cinco to consider the expired flavors. Question was asked on the amount of expired flavors and Guy informed PCI that they could directly ask the Accounting Company to provide the financial reports – Pia Chan.

e. Guy and Amir presented their request of lowering the price and security on the supply of flavors.

f. Marivic informed the Members that the flavors have been extended to 7 months and in a month would be extended to 9 months. The flavors are now manufactured in Australia and implementation to do the same in the US is underway.

11. Cups Design

a. Managing Members are requesting improvements in the design to suit the US market.

b. It was emphasized that cup designs are proprietary but the managing partners can submit their recommended design for approval.

Meeting was adjourned at 3:00 p.m.

# EXHIBIT 59

**From:**      Lito Sibayan <jhs@mabuhaycapital.com>
**To:**        Guy Koren <guy@potatocornerusa.com>
**Cc:**        Edward Chua <emc@mabuhaycapital.com>, but <but@mabuhaycapital.com>
**Subject:**   Re: PC
**Received(Date):**      Sat, 10 Dec 2016 07:04:27 +0000

Thank you, Guy, for the response.

We fully agree with you on the process you outlined. We would likely have pursued a similar process if Joe had not wanted us to give you priority, on the basis that his desired EV/EBITDA multiple of 10x for 75% is acceptable.

As already mentioned to you, Joe would have approached his 2 other partners (for the requisite 75%) if he had the signed LOI from you.

With regard to valuation, 10-12x EV/EBITDA for control stakes has become the norm here in the Philippines. We sold 51% of Generika last year for about 11x. You may have heard about the Po's purchase of Shakey's last year for about 15x. Shakey's recently IPO'ed at very high multiples. Another chicken-based food retailing group would like to sell at least 60% of their business for about 11-12x. An exception would probably be NAvegar's purchase of the Bistro Grp 2 years ago at between 6 and 7x.

We will just keep you posted on process when we get new directions from Joe in the next few weeks.

Warm regards,

Lito

**From:** Guy Koren <guy@potatocornerusa.com>
**Sent:** Saturday, December 10, 2016 6:08 AM
**To:** Lito Sibayan
**Cc:** Edward Chua; but
**Subject:** Re: PC

Hi Lito,

Sorry for the delay as the holidays are approaching we have been swamped with the preparations.

We are still interested in this potential acquisition but do not necessarily agree or intend to follow the share value or multiple defined in section (ii) of the LOI.

To be honest, We feel this process is performed backwards. The way my investor and I expected this process to be is as such:

Step 1: Sign NDA.
Step 2: Receive F/S for review.
Step 3: If intent still exist, sign LOI.
Step 4: Seller excepts/Denies or Negotiates LOI
Step 5: If agreement is reached, Initial Term Sheet is drafted.
Step 6: Discovery
Step 7: Final agreement is drafted.

We feel the LOI is premature and would have no value as we haven't seen the F/S yet and can't determine our intent. We also feel the value & multiple ask is way above market average globally and in the Philippines as my investor confirmed.

Moving forward, I can sign the LOI asap but would have to revise or eliminate section (ii) of the attachment or we can follow the process described above and sign an NDA so we can review the F/S and then determine the LOI. Keep in mind when I first discussed with JoMag we also only discussed an NDA and then he would provide the financials for me to review.

Please let me know which way you would like to proceed and I shall do so promptly. If you wish to discuss via phone call then I'm available anytime as well.

Looking forward to your feedback.


Guy Koren

Regards,

Guy Koren
Potato Corner USA
President/Managing Partner
310-593-1581


On Dec 7, 2016 4:34 PM, "Lito Sibayan" <lns@mabuhaycapital.com> wrote:

Hi Guy,

Has there been progress from your end?

Would it be safe to assume that there is no interest for now?

As heads up to you, we probably will launch a formal but discreet process sometime in Jan, 2017.

I leave for Canada on Dec. 17, back on Jan. 3, but will be reachable by email.

Happy Holidays !!

Warm rgds,

Lito

---

**From:** Guy Koren <guy@potatocornerusa.com>
**Sent:** Friday, November 11, 2016 10:40 AM
**To:** Lito Sibayan
**Cc:** Edward Chua; but
**Subject:** Re: PC

Hi Lito,
Thank you for following up. I will let you know if I have any questions. I have a scheduled call coming up with my investor and once we touch base I'll be able to proceed with the LOI.

You should receive in in time assuming there are no questions or concerns.

Regards,

Guy Koren

Potato Corner USA
President/Managing Partner
310-593-1581

On Nov 8, 2016 5:19 PM, "Lito Sibayan" <jhs@mabuhaycapital.com> wrote:

Hi Guy,

Just let us know if you have further questions on our draft LOI.

Otherwise, we look forward to a signed LOI in the next 2 weeks.

Warm rgds,

Lito

---

**From:** Guy Koren <guy@potatocornerusa.com>
**Sent:** Thursday, November 03, 2016 12:16 AM
**To:** but
**Cc:** Edward Chua; Lito Sibayan; wheng
**Subject:** Re: PC

Hi Lito,
Thank you. I'll review and let you know if I have any questions and/or otherwise
adjust, sign and send back.

Regards,

Guy Koren
Potato Corner USA
President/Managing Partner
310-593-1581

On Nov 1, 2016 10:30 PM, "but" <but@mabuhaycapital.com> wrote:

Hi Guy,

As discussed last week, attached is a draft LOI for your investor.

Regards,

Barbie Torres
Mabuhay Capital Corp.

---

**From:** Guy Koren <guy@potatocornerusa.com>
**Sent:** Friday, October 28, 2016 8:52:27 AM
**To:** Lito Sibayan
**Cc:** Edward Chua; wheng; but
**Subject:** Re: PC

Hi Lito,
I'll call you in 8 minutes.

Regards,

Guy Koren
Potato Corner USA
President/Managing Partner
310-593-1581

On Oct 27, 2016 5:40 PM, "Lito Sibayan" <ihs@mabuhaycapital.com> wrote:

Hi Guy,

Talk to you in 20 minutes.

Warm regards,

Lito

---

**From:** Lito Sibayan
**Sent:** Saturday, October 22, 2016 9:18:15 AM
**To:** Guy Koren
**Cc:** Edward Chua; but; wheng
**Subject:** Re: PC

We are confirmed, Guy.

Talk to you FRI 9am our time.

Warm rgds,

Lito

---

**From:** Guy Koren <guy@potatocornerusa.com>
**Sent:** Saturday, October 22, 2016 8:35 AM
**To:** Lito Sibayan
**Cc:** Edward Chua; but
**Subject:** Re: PC

Hi Lito,
That's not a problem.  I will call you at the provided number.

Thank you and looking forward to speaking with you.

Regards,

Guy Koren
Potato Corner USA
President/Managing Partner
310-593-1581

On Oct 21, 2016 4:56 PM, "Lito Sibayan" <jhs@mabuhaycapital.com>
wrote:

   Hi Guy,

Since you are based in LA, I hope you do not mind if we do a 9am call
Manila time.

You can dial into my direct line +632-584-8775.

My colleagues Barbie Torres and Miki Chua will join me.

Warm regards,

Lito

---

**From:** Guy Koren <guy@potatocornerusa.com>
**Sent:** Saturday, October 22, 2016 2:57 AM
**To:** Lito Sibayan
**Subject:** RE: Non disclosure

Hi Lito,
Thank you for reaching out.  I'll be available Oct 28th so please let me
know what time in the morning works for you and which number you
wish to connect on and I'll make sure to be available for a call.

Regards,

Guy Koren
Potato Corner USA
President/Managing Partner
310-593-1581

On Oct 20, 2016 7:13 PM, "Lito Sibayan" <jhs@mabuhaycapital.com>
wrote:

Thank you, Joe, for the intro.

Hi Guy, we still have to check on Potato Corner's FS, legal
structure, and other relevant info to make sure that your Investor

gets the info needed to make a proper investment decision.

We plan to have some useful info for you in 2 weeks since we just officially came on board last night.

We can have a call later next week if you would like to discuss an appripriate process in behalf of your Investor. Oct. 28 FRI morning our time is open.

Warm regards,

Lito Sibayan
President
Mabuhay Capital Corp.
Www.mabuhaycapital.com
Office +632-584-8775
Mobile +63918-909-7419

Sent from my Samsung Galaxy smartphone.

-------- Original message --------
From: "Jose Magsaysay, Jr." <jomag28@gmail.com>
Date: 10/20/16 8:03 PM (GMT+08:00)
To: Guy Koren <guy@potatocornerusa.com>
Cc: Lito Sibayan <jhs@mabuhaycapital.com>
Subject: Re: Non disclosure

Hi Guy,

This is to introduce you to Lito Sibayan who will represent me on a possible buyin or buyout for my shares at Potato Corner.

Best always,

joe

On 11 Oct 2016, at 9:44 AM, Guy Koren <guy@potatocornerusa.com> wrote:

Hi JoMag,

Hope all is well with you.  Is everything ok with you?

Please give me an update as to the NDA & F/S.

JoMag, if you had a change of heart/plan or anything else
that is causing the delay then please let me know.  I'm sitting
idle with no communication from you as to when should I
expect this and/or why this is taking longer then what you
told me.

Please advise,

Regards,

Guy Koren
Potato Corner USA
President/Managing Partner
310-593-1581

On Oct 7, 2016 9:56 PM, "Guy Koren"
<guy@potatocornerusa.com> wrote:

> Hi Jo,
> Following up on the NDA?
>
> My investor is inquiring about the progress of signing
> the NDA so I can then receive the Financials since I
> confirmed with him I will have it this week per your
> email confirmation.  He is asking me regarding progress
> and I have no answer for him.
>
> Regards,
>
> Guy Koren
> Potato Corner USA
> President/Managing Partner
> 310-593-1581
>
> On Oct 2, 2016 7:30 PM, "Jose Magsaysay, Jr."
> <jomag28@gmail.com> wrote:
>
>> this week
>>
>> On 3 Oct 2016, at 2:42 AM, Guy Koren

<guy@potatocornerusa com> wrote:

Ok Jo, Thank you.  Do you know when should I expect it by?

Regards,

Guy Koren
Potato Corner USA
President/Managing Partner
310-593-1581

On Oct 2, 2016 1:28 AM, "Jose Magsaysay, Jr."
<jomag28@gmail.com> wrote:

i am getting your emails Guy

just fixing agreements with the broker i am assigning to you

On 2 Oct 2016, at 5:05 AM, Guy Koren
<guy@potatocornerusa com> wrote:

Hi JoMag,
Sorry auto correct wrote your name as John.

Regards,

Guy Koren
Potato Corner USA
President/Managing Partner
310-593-1581

---------- Forwarded message ----------
From: "Guy Koren"
<guy@potatocornerusa.com>

Date: Oct 1, 2016 2:04 PM
Subject: Fwd: Non disclosure
To: <jomag28@gmail com>
Cc:


Hi John,
Just confirming you are receiving my
emails?

When should I expect the
documents?


Regards,

Guy Koren
Potato Corner USA
President/Managing Partner
310-593-1581

---------- Forwarded message ----------
From: "Guy Koren"
<guy@potatocornerusa.com>
Date: Sep 28, 2016 7:22 PM
Subject: Non disclosure
To: "Jomag28G"
<jomag28@gmail com>
Cc:

Hi JoMag,
It was great to finally speak
with you on Monday and it was
well over due.  Glad we could
touch base and clear the air.

I know I slept better that night
feeling a sense of peace fr om
our conversation knowing your
health is improving and that
you don't need another surgery
currently.

Per our conversation, do you
know when can I expect the
non disclosure paperwork from
your broker so I can sign and
send back? I'd like to move
along while the iron is hot....

Please let me know if there is
anything you need from my
side to help you facilitate this.

Looking forward to your
response. Send my regards to
inez and the kids..

Regards,

Guy Koren
Potato Corner USA
President/Managing Partner
310-593-1581

# EXHIBIT 60

_____, 2016

**Jose P. Magsaysay, Jr.**
President Emeritus
**Potato Corner**
869 Katarungan St., Plainview
Mandaluyong City 1550

<div align="center">

Non-binding Letter of Interest for
Possible Purchase of Shares in Cinco, Inc. ("Company")

</div>

Dear Mr. Magsaysay,

We are [insert name of investor and background information].

It is our understanding that you have expressed intent to sell your ownership in Cinco, Inc., the company that owns the Potato Corner brand. We are interested in exploring the possible purchase of your shares in the Company, subject to the following parameters:

    i.  A minimum of 75% of the Company's shares shall be made available for our purchase;
    ii.  Your 25% shareholding shall be valued at Php700.0 million, equivalent to an indicative price of 9.58x 2016 Earnings Before Interest, Taxes, Depreciation and Amortization ( "EBITDA") of Php292.0 million, or about Php2.8 billion for 100% of the Company. We understand that Php292.0 million is the projected EBITDA for 2016;
    iii.  The final valuation shall be based on the actual EBITDA for 2016 and the satisfactory completion of our due diligence review.

This letter is intended to serve only as an expression of our interest and not as an acceptance, or a binding obligation or to consummate any transactions proposed or contemplated herein or otherwise. None of the parties hereto intend, by the execution, issuance, and/or acceptance of this letter, to be legally bound to the other or to create any legal, equitable, or enforceable obligations between the parties hereto. Any legally binding obligation on the parties shall be created only by the negotiation, execution, and delivery of definitive agreements with respect to the subject matter.

Regards,

_____
[name of investor signatory]

# EXHIBIT 61

LA GROUP
8950 West Olympic Boulevard, Suite 563
Beverly Hills, California 90211

February 24, 2017

Cinco Group
c/o Ricardo Montelibano
Via E-Mail: ricky_montelibano@yahoo.com.ph

Dear Ricardo:

It is our understanding that one or more of Jose P. Magsaysay, Jr., Jose Miguel Ma G.
Montinola, Ma. Victoria O. Bernejo, and/or Ricardo K. Montelibano, each a Member of
PCJV USA, LLC ("Company"), has or is in the process of attempting to sell all or a
portion of their Membership Interest in the Company to a person that is not presently a
Member of the Company, i.e. someone other than the persons named above or Amir
Jacoby or Guy Koren.

Section 3.3 of the Company's Operating Agreement provides that: "*A Member of the
Cinco Group or the LA Group shall not assign any of its rights or obligations nor his/its
Membership Interest in the Company outside the Cinco Group <u>and</u> the LA Group, without
the prior written consent of the non-assigning group.*"

The non-assigning group is the Members of the LA Group. To be clear, the LA Group
does NOT consent to the sale by any Member of the Cinco Group to any person that is
not either an existing Member of the Cinco Group or of the LA Group.

Section 3.3 of the Company's Operating Agreement further provides that: "*In the event
that a Member of either the Cinco Group or the LA Group desire to transfer or sell his/its
pro rata members interest in the Company to a person other [than] those in either the
Cinco Group or the LA Group, such Member shall be obligated to sell the same first to
the existing Members, which [shall] have thirty (30) days within which to exercise its
rights of first refusal from the date of receipt of a written notice to sell.*"

To be clear, no such written notice has been provided, so the time period for the exercise
of this right of first refusal shall continue.

For purposes of clarification, it should be noted that the right of first refusal is exercisable
at a fixed price established in the Company's Operating Agreement, regardless of the
price that might be paid by a proposed non-Member purchaser. The purchase price
would be $4,644.76 per 1% Membership Interest, based upon the following formula in

1040187.1/81153.08003

the Operating Agreement: *"The average of the Company's earnings before interest, depreciation, taxes and amortization (EBITDA) for the last two (2) years multiplied by 5 times, and further multiplied by the percentage of member interest subject to such right of first refusal over total outstanding Member Interests."*

We wish to confirm that any person that is not a current Member of the Company will be prohibited from exercising any rights as a Member of the Company absent specific written consent by the LA Group and the opportunity of the other Members of the Company, including, in particular the LA Group Members, to exercise their right of first refusal to purchase such interests. In addition, the sale of a Membership Interest to a person not currently a Member without following the above procedures would constitute a breach of the Company's Operating Agreement that could result in damages if the purchaser makes claims against the Company that have to be resolve in the California courts.

We just wanted to make sure that we avoided any future conflict coming from someone who may have otherwise have believed they had purchased an interest in the Company only to discover that their proposed purchase will be deemed by the Company as a void transaction. Since the beginning, the Cinco Group always made a point about doing business only with the current Members, and not becoming obligated to accept and become forced to work with an outsider.

If the rumors are not true, then please accept this letter as an affirmative indication of interest by the LA Group to purchase any Member's interests or portion of such interests that any Member of the Cinco Group may wish to offer at the formula purchase price described above.

As you know, the LA Group has wanted to acquire an majority interest in PCJV USA, LLC since it has assumed all of the responsibility for the day to day operation of the Company, but does not have the authority to take timely action on its own to ensure that PCJV USA, LLC remains in compliance with U.S. and State laws applicable to its business. We believe that PCJV USA, LLC should be majority owned by U.S. Citizens residing in the U.S. given the Company's purpose. If the LA Group can acquire a majority interest in PCJV USA, LLC, the LA Group does not care to whom the remainder of the Cinco Group's interest may be sold or for how much.

We would like to use this opportunity to affirmatively offer to purchase an additional 50% of the Membership Interests in the Company held by Members of the Cinco Group to bring the LA Group's total to 90% of the total outstanding Membership Interest. Based upon the right of first refusal valuation formula described above, the purchase price would be 50 times the value of a 1% interest (described above) or $232,238 in aggregate or $4,644.76 per 1% Membership Interest transferred. With the acquisition of this majority Membership Interest, the LA Group would also expect the number and

designation of the authorized Managers to be changed to reflect the proportional change in ownership of the Company.

We hope that you will give this this offer due consideration to ensure the stability and continuity of the Potato Corner business in the United States.

Sincerely,

cc:   Bruce Dizenfeld, Esq.
      Theodora Oringher, PC

# EXHIBIT 62



**Potato Corner International**
92 Corporate Park Suite C-322
Irvine, CA 92606

March 8, 2017

LA Group
Attn: Guy Koren
Via E-Mail:Guy@PotatoCornerUSA.com

Dear Guy,

On behalf of Potato Corner International, Inc. ("PC International") I want to thank you for
your letter dated February 24, 2017 addressing your concerns about a possible sale of its
membership interest in PCJV USA, LLC ("PCJV"). Please rest assured that there has been no
attempt to sell any of its membership interest in PCJV.

In this regard, I would like to make assert the membership structure of PCJV since inception.
First, at inception, the following membership interests in PCJV were established:

-   Membership Certificate No. 01 – Issued in the name of Potato Corner
    International, Inc. as member owning a 60% interest in PCJV.
-   Membership Certificate No. 02 – Issued in the name of Amit Nemanim as
    member owning a 15.20% interest in PCJV.
-   Membership Certificate No. 03 – Issued in the name of Guy Koren as member
    owning a 15.20% interest in PCJV.
-   Membership Certificate No. 04 – Issued in the name of Amir Jacoby as member
    owning a 9.60% interest in PCJV.

We note that subsequent to these Initial Membership Interests, the membership interests of
Mr. Nemanim was transferred to Ms. I. Jacoby, with the consent of PC International. Other
this transfer, no other transfer of Membership Interests in PCJV has been made to-date. In
fact, since the formation of PCJV, a Form 1065 (Schedule K-1) has always been issued by
PCJV to PC International as Member. To-date, PC International remains as Member in PCJV
with a 60% equity interest.

WEED 27EE226402



We note that as provided in Section 4.2 of the Company's Operating Agreement, Mr. Jose P. Magsaysay, Jr., Mr. Jose Miguel Ma. G. Montinola, Ms. Ma. Victoria O. Bermejo, and Mr. Ricardo K. Montelibano were designated as Managers of PCJV. As such, during the last meeting held in Los Angeles in 2015, proxies were executed to enable representatives to act on their behalf as Managers.

As mentioned above, we affirm that PC International will continue to remain as Member in PCJV. No change in the current arrangement is under consideration by PCI International. Should there be any change in plans, we will certainly notify you in advance.

Notwithstanding the foregoing, we concur that a discussion in the near future of the current arrangement is neededto ensure stability and continuity of PCJV's business, and on terms that are mutually beneficial to both parties.

Sincerely,

Ricardo Montelibano

Director, PC International, Inc.

Corporate Office: 869 Katarungan St., Brgy. Plainview, Mandaluyong City | Trunkline: 534-5845 | Telefax: 533-2453
www.potatocorner.com

# EXHIBIT 63

Received(Date):      Thu, 14 Sep 2017 17:37:20 -0700
Subject:    Re: Cloud access
From:       Guy Koren <guy@potatocornerusa.com>
To:         Patricia Louise Anatalio <pat@potatocorner.com>
Cc:         Inbal Jacoby <inbal@potatocornerusa.com>, Chad Dominic Hernandez
<dom@potatocorner.com>, Marco Del Pilar <marco.delpilar@bicolisarog.com>, Amir Jacoby
<ajacoby88@gmail.com>, Myrose Victor <mvictor@potatocorner.com>
2017 FDD FULL (FTC-CA-FL-GA-IL-KY-LA-ME-NE-NC-SC-TX).pdf

Hi Patricia,

Hope this email finds you well. We appreciate your patience as we have a lot going on at the
moment with construction of a couple of stores and finalizing my taxes. Please see below my
answers in RED and once you have reviewed we can schedule a conference shall you want to
discuss in further details.

Hope my answers help you in your assessment.

Regards,

Guy Kore

On Sun, Aug 20, 2017 at 8:39 PM, Patricia Louise Anatalio <pat@potatocorner.com> wrote:

Dear Inbal,

Good day!

We were already able to access the QB via the link provided to us. To further our
understanding of the books, FS and tax return, we have the following questions
regarding the JV:

1. We noted that there were no sales from company-owned stores recorded in the
books of the JV. However, based on Note 4 of the FS, there were certain stores
which were transferred from franchised stores to corporate stores. If these are not
reported under the JV, we would like to ask where these are being reported.

○ The annual Financial Statements & FDD only states how many stores are franchisee
owned vs "Company owned". How many new Franchisee & Company stores opened
during the year and how many transfers occurred if at all. The "company stores"
financials are not recorded in PCJVs Financial statements because they are not owned
by PCJV. They are referred to as "Company stores" because they are over 50%

owned & managed by the members of the "LA Group" which is the managing partner group of PCJV and those stores are also used for franchisee training, product R&D and any & all operational testing & development for PCJV. The company stores do not pay royalties therefor their sales are not reported.

2. Based on the FS, we understand that the JV grants area development agreements to certain franchisees. How are territories grouped for purposes of granting such agreements? What are the criteria used to determine whether an area development agreement is granted to a franchisee and what are the major differences from the standard franchise agreements? Can we request for a sample area development agreement.

○ Currently, PCJV typically grants only an ADA (Area Development Agreement) of a minimum of 5 stores unless the territory market is too small in population to support 5 stores which at that point we will make an exception and grant less then 5 and according to what it can support. Since Potato Corner is primarily a "mall based" concept since it relies on heavy foot traffic real estate, The FDD is composed to grant Franchises in the form of Shopping center territories rather then territories that are determined by city, state, zip code or neighborhood. When a franchisee is granted a franchise or multiple franchises, its granted to specific shopping centers in their interested territory. We only use a geographical territory of a city, state or sub-city to describe the territory from which the particular franchisee can choose the shopping centers he/she wants to develop. We do not typically grant an exclusivity on a territory. When approving franchisees, the applicants go through a qualification process of which we examine if their financial capabilities are adequate for the development requested, if their business experience along with their resources and proposed plan of management & time commitment is acceptable and positions them with a good chance to succeed. They also go through a background check and interviews and then we make a decision based on the collective information. I've attached our FDD/FA/ADA for CA as a sample for your review

3. Aside from the area development agreements granted to certain franchisees, are there varying fee arrangements with the franchisees (i.e., does the franchise agreement follow a standard or are each customized per franchisee)?

○ Our ADA/FA fees are standardized and almost always follow a consistent fee structure depending on the amount of units granted in the development. At certain cases, the development fees are discounted at our discretion, due to specific circumstances that we evaluate and justify for applying a fee discount. You can see fee structure in the attached ADA/FA documents

4. Does the JV receive rebates from all major suppliers? Are these evidenced by an agreement with the supplier?

○ Yes  PCJV does receive rebates from vendors and its disclosed in the FS and FDD
We do have an agreement with each vendor that we do so.

5. What services are within the scope of the service agreement?

○ Which service agreement are you referring to? please elaborate

6. We noted that the $200K provision for contingent loss was recorded in 2015. Is
there any change in this assessment as of date?

○ I need to check our 2015 & 2016 FS and get back to you. I would suggest you check
the 2016 FS and see if it is still there to start with and if its not there then no and if it
is then I can check our 2017 YTD financials and check the current status

We are looking forward to your responses to the matters above and we hope you
are available within the week to discuss further over telcon

Thank you very much.

Sincerely, Pat

# Patricia Louise M. Anatalio, CPA

**Junior Controller, Budget and Planning Manager**  Potato Corner
Finance

p: (632) 531 9891 loc. 102
w: www.potatocorner.com e: pat@potatocorner.com

On Wed, Aug 9, 2017 at 6:11 AM, Myrose Victor Potato Corner
<mvictor@potatocorner.com> wrote:

Thank you, Inbal

Sent from Yahoo Mail for iPhone

On Wednesday, August 9, 2017, 1:05 AM, Inbal Jacoby <inbal@potatocornerusa.com> wrote

Dear Myrose,

Please try to reach personable at their working hours and I'm sure they will be able to assists you with logging in QB. Keep me posted.

Attached please find 2016 audited FS and Cinco's 2016 K-1 for PCJV as you requested.

Please let me know if you have any questions

Kind Regards,


Inbal Jacoby
Chief Accounting Officer
Inbal@potatocornerusa.com
Potato Corner USA
Office: 323-951-1155
Fax: 888-810-1174


CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient(s), and may contain confidential and proprietary information of PCJV USA Corporation and/or its affiliates. Any unauthorized review, use, disclosure, copying, or distribution, is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail as well as admin@PotatoCornerUSA.com, and delete/destroy all copies of the original message.

On Mon, Aug 7, 2017 at 5:25 PM, Myrose Victor Potato Corner <mvictor@potatocorner.com> wrote:

Thanks, Inbal.
We will try calling them again today within the time schedule you advised.

Let us schedule the telecon too so we can properly introduce ourselves and set a regular virtual meeting between our teams. What is your preferred time this week or next week?

Finally, may I ask for a soft copy of the latest audited financial statements and income tax return of our US company?

Thanks again.


Sent from Yahoo Mail for iPhone


On Tuesday, August 8, 2017, 1:40 AM, Inbal Jacoby <inbal@potatocornerusa.com> wrote:

Hello Myrose,

Hope this email finds you well.

As much as I would be happy to help you this is an access that needs to be given by Persenoble as they do it thru remote login. When we have difficulties logging in we also contact the 800-688-4281 Option 2 for technical support.Just called them today and the number is fine. Please make sure you contact them between 9am-5pb PST as that is their work hours.

You can also contact me during our office hours today, Monday or Tuesday and I'll gladly conference you in with them. I'll be available from 9am-5pm PST.


Kind Regards,


Inbal Jacoby
Chief Accounting Officer
Inbal@potatocornerusa.com
Potato Corner USA
Office: 323-951-3155
Fax: 888-810-1174


CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient(s), and may contain confidential and proprietary information of PCJV USA Corporation and/or its affiliates. Any unauthorized review, use, disclosure, copying, or distribution, is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail as well as admin@PotatoCornerUSA.com, and delete/destroy all copies of the original message.

On Mon, Aug 7, 2017 at 2:12 AM, Myrose Victor Potato Corner <mvictor@potatocorner.com> wrote:

Dear Inbal,

Following up on this.
Should online access not be available, I would like to discuss with you via a call our info requirements so we can better understand our US operations. Please let me know when you are free to have this call.
Thank you

Best regards.
Myrose

On Thursday, August 3, 2017, 8:33:49 PM GMT+8, Myrose Victor Potato
Corner <mvictor@potatocorner.com> wrote

Dear Inbal,

We have tried calling the helpdesk but to no avail. We cannot reach them as
the line is always busy.
We still have not accessed the site, even if using other computers.
I hope you can help us so we can access the account. Is it possible for us to
schedule a viber/skype/messenger call?
I am also copying in our Junior Controller, Patricia.
Thank you.

Best regards,
Myrose

On Wednesday, July 26, 2017, 1:16:55 AM GMT+8, Inbal Jacoby
<inbal@potatocornerusa.com> wrote:

Myrose, please call personable help desk - 800-688-4281. Option 2
is technical support.
Tell them you want to get access to your online QB, they will guide
you.
Please let me know if you were able to sign in.

Kind Regards,

Inbal Jacoby
Chief Accounting Officer
Inbal@potatocornerusa.com
Potato Corner USA
Office: 323-951-1155
Fax: 888-810-1174

CONFIDENTIALITY NOTICE: This e-mail message, including any
attachments, is for the sole use of the intended recipient(s), and
may contain confidential and proprietary information of PCJV USA
Corporation and/or its affiliates. Any unauthorized review, use,
disclosure, copying, or distribution, is prohibited. If you are not
the intended recipient, please contact the sender by reply e-mail as
well as admin@PotatoCornerUSA.com, and delete/destroy all

copies of the original message

On Mon, Jul 24, 2017 at 10:29 PM, Myrose Victor Potato Corner
<mvictor@potatocorner.com> wrote:

Inbal, we cannot access the site thru our Windows computers.
Who can we contact re: this?
Thank you.

Sent from Yahoo Mail for iPhone

On Tuesday, July 25, 2017, 11:14 AM, Myrose Victor
Potato Corner <mvictor@potatocorner.com> wrote:

Many thanks for sharing this access. Inbal!
I will try to access now and get back to you on any issues.
Thank you again

Best regards.
Myrose

On Tuesday, July 25, 2017, 1:59:02 AM GMT+8, Inbal Jacoby
<inbal@potatocornerusa.com> wrote:

Hello Myrose,

Hope this email find you well. Here is the new user info to access
PCJV QB account. I've tested it on my computer and everything
looks good.

Access website: http://www.personable.com/kt/l
ogin.asp

If the computer has never had access before, user might
have to add Personable to trusted site first. Also please
note Personable only supports internet explorer.

For any assistance or technical login issues, please call
personable help desk - 800-688-4281.

Personable login:

User : dom@potatocorner.com

PW·PCcinco22

PCJV QB login:

user:PCInternational

PW: PC12345

Please let me know if you have any questions

Kind Regards,

Inbal Jacoby
Chief Accounting Officer
inbal@potatocornerusa.com
Potato Corner USA
Office: 323-951-1155
Fax: 888-810-1174

CONFIDENTIALITY NOTICE: This e-mail message,
including any attachments, is for the sole use of the
intended recipient(s), and may contain confidential and
proprietary information of PCJV USA Corporation and/or
its affiliates. Any unauthorized review, use, disclosure,
copying, or distribution, is prohibited. If you are not the
intended recipient, please contact the sender by reply e-
mail as well as admin@PotatoCornerUSA.com, and
delete/destroy all copies of the original message.

On Tue, Jul 18, 2017 at 11:05 PM, Myrose Victor Potato
Corner <myictor@potatocorner.com> wrote:

Dom, many thanks for the endorsement.
Guy and Inbal, many thanks for accommodating our
request for access into the PCJV QB and for sharing
the PCI 2016 KI. With this, we can jump start our
onboarding on US operations and help us
understand how the Philippine team can further
support international operations. I will wait for your
advice on the availability of the access. Thank you
again.

All the best to you and your entire team.

Best regards,
Myrose

Sent from Yahoo Mail for iPhone

On Wednesday, July 19, 2017, 12:40 PM,
Chad dominic Hernandez
<dom@potatocorner.com> wrote:

Hello Guy and Inbal,
It was also very nice to meet you Inbal, even if
it was such a short while. Next time we visit,
please allow us to invite you for lunch or
dinner.

Thank you very much for sending these over
and thank you in advance for processing the
QB access for us here in the Manila office.

As mentioned during our visit, we would like to
fully support PCJV in all we ways we can. With
this commitment in mind, I would like to take
this opportunity to formally endorse and
introduce Ms. Myrose Victor, our new CFO. We
are confident that with Myrose's vast
experience in Finance from multinationals and
local companies alike, she will be able to
support PCJV in the same way as she is
currently fortifying the Finance department of
Cinco Corporation. We are hoping that we can
create a swift system between Inbal and
Myrose as our Finance group that can further
PCJV's growth.

We are looking forward to working closely with
all of you.

Thank you very much,

Best,

Dom Hernandez

On Wed, Jul 19, 2017 at 3:19 AM, Inbal Jacoby
<inbal@potatocornerusa.com> wrote:

Hello Dom,

It was nice to meet you and we are
looking forward to working together.
We are working on creating an access into
PCJV QB account for PC International. I'll
forward you with the details as soon as I
get it from our accounting firm.

Attached please find PC International
2016 K1.

Please let me know if you have any
questions

Kind Regards,

Inbal Jacoby
Chief Accounting Officer
Inbal@potatocornerusa.com
Potato Corner USA
Office: 323-951-1155
Fax: 888-810-1174

CONFIDENTIALITY NOTICE: This e-mail
message, including any attachments, is
for the sole use of the intended
recipient(s), and may contain confidential
and proprietary information of PCJV USA
Corporation and/or its affiliates. Any
unauthorized review, use, disclosure,
copying, or distribution, is prohibited. If
you are not the intended recipient, please
contact the sender by reply e-mail as well
as admin@PotatoCornerUSA.com, and
delete/destroy all copies of the original
message.

On Fri, Jul 14, 2017 at 1:13 AM, Guy
Koren <guy@potatocornerusa.com>
wrote:

Hi Dom,
Sorry for the delayed response.
Inbal, our Chief administrator &
Board member of PCJV, Will request
QuickBooks to assisst her with how
to  provide you with access to any
and all of our financial information.
Meanwhile, is there any specific
report you would like her to email
you for your convenience? Just reply
with what you would like to review
and we can pull it from QB and email
it you.  Please CC me on all requests
so I can assure we accomidate you
promptly and feel free to contact me
with any questions you have.

Looking forward to to your next visit

and to working together meanwhile
to better Cinco's support to PCJV.

Regards,

Guy Koren

On Jul 10, 2017 1:15 AM, "Chad
dominic Hernandez"
<dom@potatocorner.com> wrote:

Hello Guy!
On behalf of Cinco Corporation,
I would like to thank you and
Amir for your hospitality during
our short stay in LA.

As discussed during our
meeting, I would like to request
for the password/access for the
accounting records of PCJV. I
looped in our CFO Myrose
Victor, she will be an active part
in strengthening the support
that we committed to you from
Cinco Corporation moving
forward.

I hope you can accommodate
our request.

We are looking forward to our
next trip to LA to learn more
about the US business from
PCJV group.

Thank you very much!

Best regards,

Dom



# Dom Hernandez

**Chief Operating Officer**  Potato Corner

p: 6325345846 m: 639178880386

w www.potatocorner.com e dom @potatocorner.com

Get your own signature

# Dom Hernandez

**Chief Operating Officer** Potato Corner

p 6325345846 m 639178880386
w www.potatocorner.com e dom @potatocorner.com

Get your own signature



**Guy Koren**
President / Managing Partner
Potato Corner USA
Office / (323) 951-1755
Cell / (310) 593-1301

Fax / (888) 800-1154
Guy@PotatoCornerUSA.com
www.PotatoCornerUSA.com

Office: 6380 Wilshire Blvd. Suite 1100, Los Angeles, CA 90048
Mailing: 9950 W. Olympic Blvd. Suite 505, Beverly Hills, CA 90211

**CONFIDENTIALITY NOTICE:** This e-mail message, including any attachments, is for the sole use of the intended recipient(s), and may contain confidential and proprietary information of PCJV USA Corporation and/or its affiliates. Any unauthorized review, use, disclosure, copying, or distribution, is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail as well as admin@PotatoCornerUSA.com.

and delete/destroy all copies of the original message

# EXHIBIT 64

From:    Chad dominic Hernandez <dom@potatocorner.com>
Received(Date):    Sat, 21 Oct 2017 19:42:23 +0800
Subject:    Re. New selling price of flavourings for US
To:    Guy Koren <guy@potatocornerusa.com>
Cc:    Amir Jacoby <amir@potatocornerusa.com>, "Jose Magsaysay, Jr " <jomag28@gmail.com>,
Myrose Victor Potato Corner <mvictor@potatocorner.com>, nicko falcis <nfalcis@yahoo.com>, Marco
<marco.delpilar@bicolisarog.com>
Potato Corner USA JV Agreement.pdf
PCJV MEMBERS MEETING - With G. Koren_s Revision - April 13 2016.pdf
Final Agenda for Members Meeting (2)-2.docx

Hello Guy!

Apologies for the late response, as we just finished our strategic planning for the next
five years while preparing for the big 25th anniversary event on Thursday. We will roll
out our "road to 5,000 stores" globally during the said event, I wish you guys could join
us here in Manila. I want to take this opportunity also to share an exciting write up from
Entrepreneur magazine Philippines. Kindly click the link below:

http://www.entrepreneur.com.ph/news-and-events/potato-corner-targers-5-000-branches-in-next-
5-years-a00178-20171015-lfrm

Regarding your queries, Myrose, Nicko and I really took time to review all existing
signed live contracts and agreements for PCJV:

> PC USA JV Agreement
> PC JV Members' Meeting (Minutes of the Meeting) - November 12, 2015
> June 2014 Capitalization Presentation to CINCO Corp

Based on your requests below, here are our inputs:

## Comments regarding Governance Matters

1.    Under the LLC Operating Agreement, there are only 2 members (i.e., shareholders): PCI (60%) and
the LA Group (40%). Technically, our family replaces Ms. Marivic Bermejo's representation, maintaining the
mix of PCI.

2.    Also, under Section 4.2, there will be 7 Managers, 4 to be appointed by Cinco, and 3 by the LA
Group. It further provides the initial 7 Managers at the time of formation. Subsequently, the La Group reduced
their number from 3 to 2, since Amil Nemanim relinquished his equity interest in the LA Group. For the same
reason, I think that Marivic Bermejo's sale of her ownership interest in Cinco means that she is no longer a
manager. We can discuss this more when we meet by end of the week.

    Regarding the claim that a formal and official notice is required to PCJV – or more directly, to the LA
Group – technically, there is nothing in the LLC Operating Agreement that requires this. However, I do agree
that it is the prudent action to take, for us to move forward and ensure that we preserve good relations with the
LA Group.

3.    Our PC Management suggests we nominate a person to replace Marivic Bermejo as a manager of
PCJV during the next board meeting – which will come from our family's side (Hernandez). This should be
included in the agenda.

4.    Line of communication and timely input – This has always been a critical issue for the parties. The

initial JV Agreement (attached) contemplated monthly meetings, even by phone or skype. From our understanding is that, for a variety of reasons, it has not been regularly observed coming from both sides. We would like to rectify this and make sure that the monthly meetings be strictly implemented by both parties moving forward.

5.    Ongoing management matters

Per review of all previous emails, the 2 options outlined has never been agreed to by the parties, though proposed by the LA Group as early as 2014. In this regard, the reason why Cinco agreed to invest another $300k in 2015 was to preserve its 60% equity ownership upon a capital call initiated by the LA Group, and notwithstanding the requests for Cinco to turn over its equity ownership. I think this is very clear already.

6.    Appointment of officers in PCJV

Section 4.11.7 of the LLC Operating Agreement provides that the CEO/President should come from the LA Group. In addition, the JV Agreement provided for the following officers:

        Chairman – Jojo Magsaysay

        Treasurer – Jojo Montelibano

        Secretary – Lyndah Bartolome – we will replace her accordingly - for our discussion by end of the week

Section 4.11 of the LLC Operating Agreement allows for the appointment of additional officers by the managers. Section 4.14.8 requires a quorum of managers to conduct business, and their powers include the selection and removal of officers (See Section 4.1.13)

Lastly, I would like to request for the list of all active stores per State and each stores Average daily sales. We'll send our itinerary later this evening for your reference.

Thank you very much and looking forward to see you next week!

Best,

Donn Hernandez

On Wed, Oct 11, 2017 at 11:20 AM, Guy Koren <guy@potatocornerusa.com> wrote:

Hi Chad,

We wanted to address your desire and request for both a Board meeting and meeting of members. As a practical matter those are the same, as there are only two members: Cinco Group and LA Group, each having designate d members to the Board. Since Cinco's change in structure, there has not been any formal & official notice to PCJV and its members as to the change in Cinco's structure and Board members and neither has there been an official request or proposal for a change in Cinco's designated board members since Marivic is no longer a member & board member.

Governance.

As a matter of form, we would like to get a clear understanding and designation
from the Cinco Group as to who are they Manager designees given the change of
ownership in Cinco Group, and to get a clear understanding of the line of
communication with the Cinco Group. In the past we have struggled with getting
timely input from the Cinco Group, which has impacted the management and
operation of PCJV USA.


Restructuring of U.S. Relationship.

We think the next order of business should be the continuation of the discussion we
have had over many years and again most recently with the reorganized Cinco
Group, involving the conversion of the relationship involving the US Franchising
Operations. Attempting to jointly manage the US Franchise operations through
PCJV USA has been a problem. Having to wait for absentee owners to understand
and then address issues arising in the U.S. has impacted the ability of Potato
Corner to expand in the U.S., e.g. we could not get PCJV USA to increase its
capitalization when it was necessary and had to proceed in unmanageable
increments. W e discussed converting the relationship from the current shared
operation through PCJV USA to that of a licensing arrangement to provide us with
the ability to manage the franchising process locally subject to the terms of a
license agreement with the Cinco Group.


In our first meeting we had agreed that the first order of business is to restructure
PCJV USA through one of two possible options: The First Option, the LA Group
would acquire majority control over PCJV USA (Approx 80%-90%) and redo the
operating agreement; or Second Option, change the shared operation of PCJV
USA to a Master License Agreement between Cinco Group and PCJV USA, with
the LA Group as the 100% owner of PCJV USA. We agreed to complete this
restructure in December before the end of the year.


We would like to get a solid confirmation as to which option/direction Cinco Group
wishes to proceed and any terms the Cinco Group has in mind and a timeline for
the conversion of the relationship.


Operational Issues:

The other agenda items for our meeting are examples of the difficulty of managing the PCJV USA operations where there are communications delays and decisions are either made or not made based upon the view of the franchise from outside of the U.S.

Seasonings.

1) First, we want to confirm the agreement we have been operating under since the inception of PCJV USA, that the seasonings would be purchased by Cinco Group and sold to PCJV at Cinco Group's cost plus shipping and handling, at least until seasoning can be sourced in the U.S. We have concern that notwithstanding our longstanding agreement, that the seasonings are not be sold to us at the agreed upon "cost" basis and we have been unable to get confirmation of those costs from Cinco Group. The representation that there will now be a price reduction on seasonings is not the same thing as confirming that PCJV USA is indeed being charged at a price equal to the "cost" for the seasonings. We need to confirm that this agreement is being performed according to its terms.

2) Second, PCJV USA and its franchisees have suffered in the past when Cinco was unable to provide a timely supply to the U.S. of all of the seasonings upon which the Franchise is based. We have now been attempting for quite some time to get a secondary supplier established in the U.S. to secure a timely supply of seasonings to avoid liability to our franchisees. The historic limited supply and timing issues have hampered our ability to expand in good faith.

We also agreed that PCJV USA will start working with "Newly Weds" spice company for the sourcing of the seasonings from their US plants and the LA Group will negotiate on PCJVs behalf. We have not received any firm date as to when this will happen, as it has been dragged out for months, yet Cinco has sourced local seasonings for the Australian Sub-Master franchisee with Newly Weds Australia in a matter of a couple of months. Can we discuss what is the delay moving forward with sourcing through Newly Weds U.S.?

Packaging.

We discussed and agreed upon the need to introduce new packaging designs in the U.S. to reflect the U.S. market, which is not consistent with what is being used outside the U.S. U.S. franchisees and landlords are complaining about the current

design package, which is again hampering development because there is no U.S. control permitted to respond to these market issues.


LA Group has already provided proposed designs at Cinco Group request months ago, but has not received either approval or direction as to any revisions or any proposed new design from Cinco Group. As a result, PCJV USA's ability to respond to market demands continues to be stifled.  Can we get either approval of our design proposal or the affirmative proposal of other options and a timeline for which the new designs may be implemented in the U.S.


We ask that Cinco arrives with a clear and approved decisions & direction as to how to address the above matters so we can make efficient use of your visit to the US. We have agreed previously when we met , to address these issues listed above first and before moving forward on any other matters at hand. We agreed to reach resolutions on these issues in December before the end of the year and it is already almost mid October. When we meet this month in PCJV's office and address & resolve all of the above matters, we will gladly also address any other matters you wish to address including any information needed by Patricia, Myrose or any other person from Cinco's team.


Please provide us with your desired agenda beyond the above priority list so we can prepare any and all of the information needed for your consideration. Also if you can provide us with your proposed itinerary and personal travelling so we can confirm and plan for the meeting.


Looking forward to your response.


Regards,



Guy Koren



On Fri, Sep 29, 2017 at 12:26 AM, Chad dominic Hernandez <dom@potatocorner.com> wrote:

Dear Guy and Amir,
As previously discussed, i am glad to send you the price reduction memo on flavourings for the US territory

We hope that this development will further strengthen PCJV and it's profitability as a company

I would also like to follow up on your packaging re-design request so we can also discuss this with our Marketing team and move forward together.

Please do not hesitate to contact us anytime. Potato Corner Philippines is more than willing to be of help.

Thank you very much.

Best,

Dom

---

## Dom Hernandez
Chief Operating Officer Potato Corner

p: 63925345846 m: 639178860386
w: www.potatocorner.com  e: dom@potatocorner.com

Get your own signature

---

**Guy Koren**
President / Managing Partner
Potato Corner USA
Office | (323) 951-1155
Cell | (310) 309-1984

Fax | (888) 810-1174
Guy@PotatoCornerUSA.com
www.PotatoCornerUSA.com

Office: 6380 Wilshire Blvd, Suite 1100, Los Angeles, CA 90048
Mailing: 8950 W. Olympic Blvd, Suite 565, Beverly Hills, CA 90211

**CONFIDENTIALITY NOTICE:** This e-mail message, including any attachments, is for the sole use of the intended recipient(s), and may contain confidential and proprietary information of PCJV USA Corporation and/or its affiliates. Any unauthorized review, use, disclosure, copying, or distribution, is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail as well as admin@PotatoCornerUSA.com, and delete/destroy all copies of the original message.

--

# Dom Hernandez

**Chief Operating Officer**  Potato Corner

p: 6325345846 m: 639178880386
w: www.potatocorner.com e: dom@potatocorner.com

Edit your own signature

# EXHIBIT 65

**From:**   Amir Jacoby <ajacoby88@gmail.com>
**Received(Date):**   Sun, 3 Dec 2017 19:39:58 -0800
**Subject:**   US trip minutes
**To:**   Guy Koren <guy@potatocornerusa.com>,Amir Jacoby <amir@potatocornerusa.com>,Chad
dominic Hernandez <dom@potatocorner.com>,Migo Hernandez
<hernandez.miguel@valensventures.org>,edward hernandez <jephernandez@yahoo.com>,Myrose
Victor Potato Corner <mvictor@potatocorner.com>,Marivic del Pilar <mhdelpilar@victoryliner.com>,
inbal@potatocornerusa.com,c Ricky Montelibano <ricky_montelibano@yahoo.com.ph>,Marco
<marco.delpilar@bicolisarog.com>

Hi All,

Please review the following minutes from our meeting and
provide your comments in RED if any.

Best Regards,


Date: November 28, 2017

Time: 10:30am

Place: LA office

Participants:

Guy Koren

Amir Jacoby

Inbal Jacoby

John Edward Hernandez

Marivic del Pilar

Richard Motelibano

Chad Dominic Hernandez

Myrose April Victor

Agenda Items:

I. Introduction/Election of PCJV Members

All members were introduced

II. Appointment of PCJV Managers and Officers

a. Appointment of Mr. Edward Hernandez and Ms. Marivic del Pilar as

Managers

Appointment of Mr. Edward Hernandez and Ms. Marivic del Pilar as

Managers is likely but is being considered at this point by the LA group.

Further confirmation to occur by the end of the year.

b. Appointment of Ms. Pia Marie Dyquiangco as Corporate Secretary

At this point no corporate secretary was decided on and this position will remain vacant until further discussions.

III. Presentation of LA Group of PC USA Plans for 2018
Onwards

LA group describe past difficulties and future plans.

- Lack of clarity and funding has created shortage of staff
  mainly in the franchisee support aspect.
- Additional support is needed for franchisees growth and
  success
- Corporate health insurance for employees is being
  explored but is pending additional funding
- Marketing will be Accelerated Q1 of 2018
- Hiring of COO is scheduled for Q1 of 2018
- Additional accounting staff is being added reporting to
  Inbal Jacoby
- Currently only area development is being considered
- We are planning on opening 5-8 stores by end of 2018
  with further acceleration into 2019 and onwards.
- There is consideration to start a seed program but funding
  clarity is needed before moving forward

IV. Discussion of Wayforward for PC USA

All attendees have agreed that option "C" (100% Ownership
of PCJV by the LA Group + Master License Agreement
between Cinco Corporation (PH Company) and PC USA) will
be the best option to proceed with.

Next steps:

- LA group will draft a Master License Agreement for the Cinco group to review and prepare comments.
- After Agreement is reached both groups will meet at the LA office for signatures.
- Simultaneously, all aspects of changing ownership of PCJV and PCIT will be addressed by both parties attorneys
- The time line both parties are committing for the completion of the finalization of the Master License Agreement is no later then February 2018

A. Status Quo (60% Cinco Group, 40% LA Group)

1) Drafting of Master License Agreement between Cinco Corporation and PCJV

2) Drafting of revised JV Agreement (including appointment of Officers)

3) Drafting of PCJV Operating Agreement and PCIT Sourcing Agreement

B. Change in Ownership (60% LA Group, 40% Cinco Group)

1) Drafting of Master License Agreement between Cinco Corporation and PCJV

2) Drafting of revised JV Agreement (including appointment of Officers)

3) Drafting of PCJV Operating Agreement and PCIT Sourcing

Agreement

C. 100% Ownership of PCJV by the LA Group + Master License Agreement between Cinco Corporation (PH Company) and PC USA

Drafting of Master License Agreement between Cinco Corporation and PC USA entity

V. Discussion of Pending Matters

A. Flavors Sourcing

- currently the Cinco group is working on owning the formula for the flavors and should be done by Q1 of 2018
- Once the Cinco group attained the formula for the flavors, the LA group will approach a US company of their choice and will work on duplicating the flavors using the Formula.
- The LA group will negotiate pricing and terms for the US
- The flavors formula is owned and will stay at the possession of Cinco group at all times
- Newly Weds are the preferred company to produce the flavors but not a requirement
- By December 10th 2018 the LA group will get the pricing for the flavors and their absolute cost.
- By Q1 of 2018 the LA group will get the pricing directly from the supplier at cost plus any freight charges which will need to be agreed upon by the LA group.
- The LA group understands that the Potato Corner flavors are the "Beating Heart " of the brand and will do anything in their power to preserve its integrity.

B. Packaging Design

- Packaging design which was shared with Niko at his previous trip was approved for the combo boxes and the drink cups.
- Yesterday, October 29th we were informed that JoeMag has approved fries cups design we have proposed
- At this point the LA group will start producing the drink cups, fries cups and combo boxes with the new approved design.

VI. Other Matters

- Myrose is working with Inbal to produce all the remaining items which were requested at their previous trip
- Both parties feel that working in synergy will strengthen the brand and learned the company's buying power globally

# EXHIBIT 66

**Received(Date):** Tue, 13 Feb 2018 02:35:33 -0800
**Subject:** Re: US trip minutes
**From:** Guy Koren <guy@potatocornerusa.com>
**To:** Marivic del Pilar <mhdelpilar@victoryliner.com>
**Cc:** Amir Jacoby <amir@potatocornerusa.com>, Chad dominic Hernandez <dom@potatocorner.com>, Inbal Jacoby <inbal@potatocornerusa.com>, Jomag28G <jomag28@gmail.com>, Marco <marco.delpilar@bicolisarog.com>, Migo Hernandez <hernandez.miguel@valensventures.org>, Myrose Victor <myrose_victor@yahoo.com>, c Ricky Montelibano <ricky_montelibano@yahoo.com.ph>, edward hernandez <jephernandez@yahoo.com>
PROPOSED RESTRUCTURE OF PCJV USA.DOC

Hi Marivic & Cinco members,
**Kindly find the attached proposed term sheet listing the general terms, we (the LA group) are proposing to the Cinco group for the purpose of our mutual interest to convert Potato Corner USA's joint venture partnership into a master license agreement for the US territory. Master license is a more mainstream & appropriate partnership structure and will serve both parties' interest of growing the PC brand by enabling the LA group to expand freely and drive their own path while Cinco maintains control of its brand integrity and mutually benefits from PCUSA's growth.**

**Looking forward to your feedback or any questions you may have as well as any items you may want to add on your side.**

**Regards,**

**Guy Koren**

On Mon, Feb 5, 2018 at 1:33 PM, Marivic del Pilar <mhdelpilar@victoryliner.com> wrote:

Thank you for the update. Regards Guy. Hope all is well.

Marivic del Pilar

On Tue, 6 Feb 2018 at 12:03 AM Guy Koren <guy@potatocornerusa.com> wrote:

Hi Myrose,
Thank you checking up with us, your timing is impeccable as we were getting ready to update you on our proposed initial general terms. Our attorney was unavailable during the new year and during January we were reviewing PCJV's "health as a going concern" to determine how best to restructure our relationship in the form of a new license agreement partnership.

We are nearly finalized with our proposal and will have it for Cinco's review this week.

We appreciate your patience and look forward to finalizing the license agreement within Q1 of 2018.

Regards,

Guy Koren
Potato Corner USA
President/Managing Partner
310-593-1581

On Jan 31, 2018 7:05 PM, "Myrose Victor Potato Corner"
<mvictor@potatocorner.com> wrote:

Dear Amir and Guy,

Hope all is well with you and the PC USA Team!
May we get an update please on the action required from your group on
drafting the proposed Master License Agreement?
We hope to finalize this to better support our wayforward for PC USA
Thank you.

Best regards,
Myrose

---

**From:** Amir Jacoby <ajacoby88@gmail.com>
**To:** Guy Koren <guy@potatocornerusa.com>; Amir Jacoby
<amir@potatocornerusa.com>; Chad dominic Hernandez <dom@potatocorner.com>;
Migo Hernandez <hernandez.miguel@valensventures.org>; edward hernandez
<jephernandez@yahoo.com>, Myrose Victor Potato Corner
<mvictor@potatocorner.com>; Manvic del Pilar <mhdelpilar@victoryliner.com>;
inbal@potatocornerusa.com; c Ricky Montelibano <ricky_montelibano@yahoo.com.ph>;
Marco <marco.delpilar@bicolisarog.com>
**Sent:** Monday, December 4, 2017 11:41 AM
**Subject:** US trip minutes

Hi All,

Please review the following minutes from our
meeting and provide your comments in RED if any.

Best Regards,

Date: November 28, 2017

Time: 10:30am

Place: LA office

Participants:

Guy Koren
Amir Jacoby
Inbal Jacoby
John Edward Hernandez
Marivic del Pilar
Richard Motelibano
Chad Dominic Hernandez
Myrose April Victor

Agenda Items:

I. Introduction/Election of PCJV Members

All members were introduced

II. Appointment of PCJV Managers and Officers
a. Appointment of Mr. Edward Hernandez and Ms.
Marivic del Pilar as
Managers

Appointment of Mr. Edward Hernandez and Ms.
Marivic del Pilar as
Managers is likely but is being considered at this
point by the LA group.
Further confirmation to occur by the end of the year.

b. Appointment of Ms. Pia Marie Dyquiangco as
Corporate Secretary

At this point no corporate secretary was decided on and this position will remain vacant until further discussions.

III. Presentation of LA Group of PC USA Plans for 2018 Onwards

LA group describe past difficulties and future plans.

- Lack of clarity and funding has created shortage of staff mainly in the franchisee support aspect.
- Additional support is needed for franchisees growth and success
- Corporate health insurance for employees is being explored but is pending additional funding
- Marketing will be Accelerated Q1 of 2018
- Hiring of COO is scheduled for Q1 of 2018
- Additional accounting staff is being added reporting to Inbal Jacoby
- Currently only area development is being considered
- We are planning on opening 5-8 stores by end of 2018 with further acceleration into 2019 and onwards.
- There is consideration to start a seed program but funding clarity is needed before moving forward

IV. Discussion of Wayforward for PC USA

All attendees have agreed that option "C" (100% Ownership of PCJV by the LA Group + Master License Agreement between Cinco Corporation (PH Company) and PC USA) will be the best option to proceed with.

Next steps:

- •LA group will draft a Master License Agreement
  for the Cinco group to review and prepare
  comments.
- •After Agreement is reached both groups will meet
  at the LA office for signatures.
- •Simultaneously, all aspects of changing
  ownership of PCJV and PCIT will be addressed
  by both parties attorneys
- •The time line both parties are committing for the
  completion of the finalization of the Master
  License Agreement is no later then February
  2018

A. Status Quo (60% Cinco Group, 40% LA Group)
1) Drafting of Master License Agreement between
Cinco Corporation and PCJV
2) Drafting of revised JV Agreement (including
appointment of Officers)
3) Drafting of PCJV Operating Agreement and PCIT
Sourcing Agreement

B. Change in Ownership (60% LA Group, 40%
Cinco Group)
1) Drafting of Master License Agreement between
Cinco Corporation and PCJV
2) Drafting of revised JV Agreement (including
appointment of Officers)
3) Drafting of PCJV Operating Agreement and PCIT

Sourcing Agreement

C. 100% Ownership of PCJV by the LA Group +
Master License Agreement between Cinco
Corporation (PH Company) and PC USA
Drafting of Master License Agreement between
Cinco Corporation and PC USA entity

V. Discussion of Pending Matters

A. Flavors Sourcing

- currently the Cinco group is working on owning
  the formula for the flavors and should be done
  by Q1 of 2018
- Once the Cinco group attained the formula for the
  flavors, the LA group will approach a US
  company of their choice and will work on
  duplicating the flavors using the Formula.
- The LA group will negotiate pricing and terms for
  the US
- The flavors formula is owned and will stay at the
  possession of Cinco group at all times
- Newly Weds are the preferred company to
  produce the flavors but not a requirement
- By December 10th 2018 the LA group will get the
  pricing for the flavors and their absolute cost.
- By Q1 of 2018 the LA group will get the pricing
  directly from the supplier at cost plus any freight
  charges which will need to be agreed upon by
  the LA group.
- The LA group understands that the Potato Corner

flavors are the "Beating Heart " of the brand and will do anything in their power to preserve its integrity.

B. Packaging Design

- Packaging design which was shared with Niko at his previous trip was approved for the combo boxes and the drink cups.
- Yesterday, October 29th we were informed that JoeMag has approved fries cups design we have proposed
- At this point the LA group will start producing the drink cups, fries cups and combo boxes with the new approved design.

VI. Other Matters

- Myrose is working with Inbal to produce all the remaining items which were requested at their previous trip
- Both parties feel that working in synergy will strengthen the brand and learned the company's buying power globally

Manvie Liel Pilar



**Guy Koren**
President - Managing Partner
Potato Corner USA
Office : (323) 988-1155
Cell : (310) 593-1341

Fax : (888) 810-1171
Guy @ PotatoCornerUSA.com
www.PotatoCornerUSA.org

Office : 6380 Wilshire Blvd. Suite 1100, Los Angeles, CA 90048
Mailing : 9350 W. Olympic Blvd. Suite 362, Beverly Hills, CA 90212

**CONFIDENTIALITY NOTICE:** This e-mail message, including any attachments, is for the sole use of the
intended recipient(s), and may contain confidential and proprietary information of PCJV USA Corporation
and/or its affiliates. Any unauthorized review, use, disclosure, copying, or distribution, is prohibited. If you are
not the intended recipient, please contact the sender by reply e-mail as well as admin@PotatoCornerUSA.com,
and delete/destroy all copies of the original message.

PROPOSED RESTRUCTURE OF PCJV USA, LLC

The following is in follow-up to our discussions in November to replace the existing relationship of Cinco Corporation (Philippines) and PCJV LA Group through PCJV USA, LLC

**Master Territorial License for Cinco Interest in PCJV USA, LLC**

1.      It is proposed that PCJV USA, LLC enter into a Master Territorial License Agreement on the terms described below in consideration of the redemption of Cinco Group's Membership Interest in PCJV USA, LLC.

1.1     PCJV LA Group becomes the sole member of PCJV USA, LLC, with the buy-out consideration being:

1.1.1   The proposed Master Territorial License is superior consideration for the provision for license revenue otherwise provided for in the PCJV USA, LLC Operating Agreement, for which there was historically insufficient funds to make any payments.

1.1.2   Cinco Group's capital contributions will be reconciled against the mark-up taken, directly or indirectly, by Cinco Group on the spices and dry goods

1.2     PCJV LA Group maintains PCJV USA, LLC as an ongoing entity, since it is the established and registered franchisor of the Potato Corner stores in the U.S.

1.3     Cinco Group receives a committed stream of income from PCJV USA, LLC in the form of royalties under the Master Territorial License from the PCJV USA, LLC gross revenues, without regard to the net cash flow or profitability of PCJV USA, LLC.

1.3.1   Cinco Group has not received any distributions as a member of PCJV USA, LLC since its inception

1.3.2   Cinco Group has had to help fund development costs and provide funding to avoid liability to the State for the historic undercapitalization of PCJV USA, Inc.

1.3.3   Cinco Group is able to protect its brand through the terms of the Master Territorial License without having to expose itself to direct interaction with the franchise authorities and franchisees.

**Proposed Master License Agreement Terms**

2.      A new Master Territorial License Agreement will be provided by Cinco Group to PCJV USA, LLC.

2.1      In order to help support the development of the Potato Corner network in the U.S., no royalties will be chargeable on PCJV LA Group owned stores (includes majority owned stores and majority owned subsidiaries)("PCJV LA Stores").

2.2      Royalties will be payable on non-PCJV Stores ("Franchise Stores") at an initial rate of 5% of gross royalty payments received by PCJV USA from the Franchise Stores ("Franchisor Royalty") until the Franchise Royalty reaches $1,000,000, then 6% of the next $1,000,000, 7% of the next $1,000,000, and 4% of any additional Franchise Royalty received.

2.2.1   This is roughly anticipated to reflect about 30% of the net profit that Cinco Group would have received from PCJV USA, LLC, but payable as a fixed expense out of the Franchise Royalty gross receipts.

2.2.2   Audit rights exercisable upon reasonable notice so that PCJV USA has time to fully comply

2.2.3   No Franchisor Royalty will be due on the initial franchise fee payable by a Franchise Store in connection with acquiring a Franchise Store or franchise territory; initial franchise fees are required by PCJV USA to perform the franchise set-up services and are required by law to be held and used for such purpose.

2.3      Term of the Master Territorial License Agreement should have a term of 30 years with a right of extension by PCJV USA for an additional 30 years.  Upon termination of the Master Territorial License Agreement for any reason, Cinco Group shall be obligated to purchase the PCJV USA, LLC rights at their fair market value (assuming for the purpose of the valuation a remaining terms under the Master Territorial License Agreement of a minimum of 15 years).  Cinco Group shall have the right to purchase the PCJV LA Stores at their fair market value or permit PCJV LA Group to continue to own and operate such stores.

2.3.1   PCJV USA and LA Group will need the right to transfer all or portions of its rights under the Master Territorial License Agreement to allow for continued growth (i.e. development of sub-territories), but subject to Cinco Group consent not unreasonably withheld

2.4      The territory covered by the Master Territorial License Agreement shall be increased to apply to the entire U.S. and its territories and possessions, with Israel and Canada being added to the territorial rights.

2.5      PCJV USA, LLC shall be given the authority to negotiate spices at our discretion

2.6     PCJV USA, LLC shall be given the authority to source & negotiate paper goods at our discretion

2.7     PCJV USA, LLC shall be given the authority to adapt store designs and any branding elements to fit US current market as it evolves over time

2.8     PCJV USA, LLC shall be given the authority to add complimentary menu items with notice only

2.9     Remedies for a breach of contract will need to include a right to cure and a procedure to resolve disputes without resulting in a termination

2.10     If Cinco Group fails to timely provide any deliverables or approvals, such as may apply to sourcing of spices and paper goods, PCJV USA, LLC shall have the right to establish secondary suppliers for a substitute supply of such items.

2.11     Disputes to be addressed in U.S. Courts in Los Angeles County, California, using alternative dispute resolution procedures

2.12     PCJV USA, LLC will be given protection against Cinco Group's change in ownership affecting the rights of PCJV USA, LLC under the Master Territorial License Agreement, e.g. right of first refusal upon a proposed assignment.

# EXHIBIT 67

Amir Jacoby <ajacoby88@gmail.com>

**PCJV USA - Moving forward**
7 messages

**Amir Jacoby** <ajacoby88@gmail.com>                                                          Thu, Mar 8, 2018 at 5:00 PM
To: jomag28@gmail.com, ricky montelibano@yahoo.com.ph, josemontinola@yahoo.com, ephernandez@victoryliner.com,
mhdelpilar@victoryliner.com, marco.delpilar@bicolisarog.com, mrh@valensventures.org, nfalcis@potatocorner.com,
mvictor@potatocorner.com

Hi All,

I wanted to reach out to you to address troubling developments in PCJV USA, LLC. The purpose of this communication
is to solicit your cooperation to impose standards of management accountability for PCJV USA, LLC and for Potato
Corner International Ventures ("PCIT") to limit our respective exposure to liability. As Managers of PCJV USA, LLC, we
have certain duties and responsibilities not only to the Members but to the franchisees of PCJV USA, LLC.

As you know, my wife Inbal and I are LA Group designated Managers of PCJV USA, LLC and I am a co-owner of the LA
Group. As a result, we are concerned about limiting our risk of exposure to liability for the conduct of PCJV USA,
LLC and PCIT, and the indirect role of Potato Corner LA Group LLC ("LA Group") as the provider of management services
for the conduct of PCJV USA, LLC and PCIT businesses. Based upon our recent and continuing experience, it appears
that the lack of any PCJV USA, LLC Manager oversight over the services provided by the management team of PCJV
USA, LLC and PCIT may now present risks to which I do not want to be exposed and for which I have a proposal,
described below.

BACKGROUND.

By way of background, I financed the development of the first Potato Corner franchise in the U.S., directly and through my
investors in NKM Capital Group, and financed the additional franchised stores developed by NKM Capital Group. When
the business was started it was run through my home, I initially provided ongoing consulting services, involving more time
at the beginning but have spent substantially less time involved in the day to day operations in recent times. My wife,
Inbal, was recruited at the outset to help set up the financial reporting and to coordinate with our accountants the
preparation of the tax returns. She performed this role until recent conflicts arose. Inbal initially performed these services
without compensation, although she did receive some compensation in the recent years once the business could afford to
pay her for her time.

I was involved with the formation of PCJV USA, LLC and PCIT from its inception. When PCJV USA, LLC needed
additional capital for its survival to address the lack of franchisee support and regulatory problems arising from our being
underfunded, I provided the funds contributed by the LA Group in response to that capital call. As a result, I am
substantially invested in PCJV USA, LLC and the Potato Corner franchises and have serious concerns about protecting
my investment.

During the start-up phase of the franchise business, Guy Koren was entrusted with the day to day management of PCJV
USA, LLC's franchise business and the managements services of the LA Group provided on behalf of and for the benefit
of PCJV USA, LLC. Guy is a smart and competent manager, but had no prior franchise or restaurant experience. Guy

AJ 00077

was not responsible for providing any investment, but instead provided his services. Guy was and is compensated for the services he has and is performing, although he would like a raise.

Historically, Cinco Group took a hand's-off approach to the management of PCJV USA, LLC and PCIV and their businesses. As a result, neither Cinco Group or LA Group has ever received a profit distribution, and Cinco Group has never received its 30% license fee. LA Group manages PCJV USA, LLC and PCIT, but is not taking its 30% fee for such management services, but instead simply charges PCJV USA LLC and PCIT for the expenses of the operation, including Guy's compensation. Cinco Group never got involved evaluating the expenses charged or the value received.

## ISSUES

PCJV USA, LLC in the recent past entered into several different area franchise development agreements for which fees were received by PCJV USA, LLC. Each of those proposed area develop agreements failed. At the present time more than half of the PCJV USA, LLC franchises are operating in the red or at break even, which I believe reflects on the franchisor support provided. I am concerned that with the proposed growth of PCJV USA, LLC that PCJV USA, LLC and PCIV will be unable to fulfill the franchisor duties owed to its franchisees. At present, neither PCJV USA, LLC, PCIT, nor LA Group have any procedures to hold management accountable.

I have tried to get Guy to develop a business plan, budgets, projected goals for the business, and a plan for reporting and accountability, so I can evaluate from the LA Group perspective whether the LA Group is fulfilling its obligations to PCJV USA, LLC and PCIV or whether the LA Group needs improvement, and to be able to provide PCJV USA, LLC and its Managers, including Cinco Group, with a means of monitoring the level of service and franchise development taking place.

It is possible that the requirements for the management of PCJV USA. LLC at this stage of its development may require engaging more experienced upper management in addition to or in place of current staff in PCJV USA, LLC or LA Group. At least with some degree of accountability we can evaluate whether it is necessary to change or supplement the staffing. Guy has refused, and since I only own 50% of LA Group I am unable to force Guy to become more accountable or to force the LA Group to develop standards of accountability or to hire qualified staff. The Managers of PCJV USA, LLC have the authority to determine the PCJV USA, LLC expenses and staffing of its business and/or the oversight to be applied to the management of the PCJV USA, LLC business by the LA Group, including the development of performance goals and standards of accountability.

Guy has now requested and unilaterally elected to increase his salary and the salary of his relatives who work for PCJV USA, LLC and/or PCIV, directly or through the LA Group, increasing the cost of operating the business but without providing any performance goals to be achieved and by which to measure the services being performed. Whether the increased compensation is appropriate or not can really only be determined if management is held accountable.

## REQUEST

Unfortunately, unless the Cinco Group and its PCJV USA, LLC Managers become more involved in requiring management accountability, with the concurrence of at least myself and Inbal, as Managers of PCJV USA, LLC we no

AJ 00078

longer want to be associated with the Potato Corner franchise business. I feel the risk of exposure to liability for failure to oversee the PCJV USA, LLC and PCIT businesses. If something is not done I will take whatever action I need to take to extract myself from the business.

Please let me know whether Cinco Group, under its current management, is willing to take a more affirmative role in the oversight of the PCJV USA, LLC and PCIT businesses to require management to provide performance goals, budgets, and otherwise become accountable to the Managers so the Managers can evaluate what PCJV USA, LLC and PCIT require to properly advance their business in the U.S, and to hold the current management accountable to some standard of performance.

Best Regards,

Amir Jacoby

**Mail Delivery Subsystem** <mailer-daemon@googlemail.com>                                    Thu, Mar 8, 2018 at 5:00 PM
To: ajacoby88@gmail.com



## Address not found

Your message wasn't delivered to **nfalcis@potatocorner.com** because the address couldn't be found, or is unable to receive mail.

**LEARN MORE**

The response was:

The email account that you tried to reach does not exist. Please try double-checking the recipient's email address for typos or unnecessary spaces. Learn more at https://support.google.com/mail/?p=NoSuchUser r62sor5607916pfk.35 – gsmtp

Final-Recipient: rfc822; nfalcis@potatocorner.com
Action: failed
Status: 5.0.0
Diagnostic-Code: smtp; The email account that you tried to reach does not exist. Please try double-che A3 00079

# EXHIBIT 68

**Myrose Victor** <myrose.victor@potatocorner.com>                    Fri, Mar 9, 2018 at 3:41 AM
To: Amir Jacoby <ajacoby88@gmail.com>
Cc: Dom Hernandez <dom.hernandez@potatocorner.com>, Edward Hernandez <ephernandez@victoryliner.com>, Jojo
Montinola <josemontinola@yahoo.com>, "Jose Magsaysay, Jr." <jomag28@gmail.com>, Macoy Isarog
<marco.delpilar@bicolisarog.com>, Marivic del Pilar <mhdelpilar@victoryliner.com>, Nicardo Falcis
<nicardo.falcis@potatocorner.com>, Ricky Montelibano <ricky_montelibano@yahoo.com.ph>, "mrh@valensventures.org"
<mrh@valensventures.org>

Dear Amir,

On behalf of the Cinco Board, many thanks for your email.
We understand that this is a very difficult situation, and Dom in fact gave us a similar update a few weeks back regarding
this matter. We are actually now ready to send to you the Memorandum of Agreement/Understanding (MOA/MOU) that
outlines the terms and conditions in the midst of the Cinco and LA Group's negotiations towards changes in the PCJV
Ownership, as well as a Master License Agreement between PCJV and Cinco Corp. However, given your email, we need
to meet and discuss the next best step for all of us.

Please be assured that supporting PCJV is of utmost priority for Cinco. We will come back to you with the concrete action
steps within the coming week.

Thank you very much.

Best regards,
Myrose
[Quoted text hidden]





**Amir Jacoby** <ajacoby88@gmail.com>                                    Mon, Mar 12, 2018 at 5:10 PM
To: Myrose Victor <myrose.victor@potatocorner.com>
Cc: Dom Hernandez <dom.hernandez@potatocorner.com>, Edward Hernandez <ephernandez@victoryliner.com>, Jojo
Montinola <josemontinola@yahoo.com>, "Jose Magsaysay, Jr." <jomag28@gmail.com>, Macoy Isarog
<marco.delpilar@bicolisarog.com>, Merivic del Pilar <mhdelpilar@victoryliner.com>, Nicardo Falcis
<nicardo.falcis@potatocorner.com>, Ricky Montelibano <ricky_montelibano@yahoo.com.ph>, "mrh@valensventures.org"
<mrh@valensventures.org>

Thank you Myrose and the Cinco board for your response.

I am looking forward to your feedback.

Best Regards,

Amir J
[Quoted text hidden]



AJ 00082

 Gmail                                         Amir Jacoby <ajacoby88@gmail.com>

**Intro**
9 messages

> On Mar 20, 2018, at 1:55 PM, Amir Jacoby <ajacoby88@gmail.com> wrote:
>
> Hi Myrose,
>
> I would like to introduce you to Robert who has been in our PCJV USA accounting team for over a year now. Robert and I have been working along side of one another and I have all the confidence in him to provide you with any accounting information you might need for your assessment.

> Hi Robert, please allow me to introduce to Mrs Myrose from the Cinco group who are the majority owners of PCJV USA.

**Inbal Jacoby** <inbal623@gmail.com>                          Wed, Mar 21, 2018 at 8:20 AM
To: Myrose Victor <myrose.victor@potatocorner.com>
Cc: Amir Jacoby <ajacoby88@gmail.com>

Dear Myros,

Attached please find PCJV USA last six months bank statement as you requested.

Amir is checking with the bank in regards to the other items and will get back to you.

Best regards,
Inbal Jacoby

On Tue, Mar 20, 2018 at 10:41 PM, Myrose Victor <myrose.victor@potatocorner.com> wrote:
  Thanks, Inbal.
  Shall I request the documents from our talk from Robert?
  Thank you again.

  Hello, Robert.
  I will let you know should we need anything re: PCJV.
  Thank you in advance.

  Best regards,
  Myrose

  On Wed, 21 Mar 2018 at 12:09 PM Inbal Jacoby <inbal623@gmail.com> wrote:
    Hi Myrose,

AJ 00083

I would like to introduce you to Robert who has been in our PCJV USA accounting team for over a year now. Robert and I have been working along side of one another and I have all the confidence in him to provide you with any accounting information you might need for your assessment.

Hi Robert, please allow me to introduce to you Mrs Myrose from the Cinco group who are the majority owners of PCJV USA. I hope you can accommodate her needs.

Best regards,
Inbal Jacoby

---

12 attachments

PCJV Dec. 2017 Bank.pdf
34K

PCJV FEB. 2018 Bank .pdf
36K

PCJV Jan 2018 Bank .pdf
35K

PCJV Nov. 2017 Bank .pdf
35K

PCJV Oct. 2017 Bank.pdf
33K

PCJV Saving Dec. 2017 Bank.pdf
34K

PCJV SAVING Feb. 2018 Bank .pdf
36K

PCJV Saving Jan 2018 Bank .pdf
35K

PCJV Saving Nov. 2017 Bank .pdf
35K

PCJV Saving Oct. 2017 Bank .pdf
33K

PCJV Saving Sep. 2017 Bank .pdf
24K

PCJV Sep. 2017 Bank.pdf
34K

**Myrose Victor** <myrose.victor@potatocorner.com>                          Wed, Mar 21, 2018 at 9:44 AM
To: Inbal Jacoby <inbal623@gmail.com>
Cc: Amir Jacoby <ajacoby88@gmail.com>

Thanks, Inbal
[Quoted text hidden]

**Inbal Jacoby** <inbal623@gmail.com>                          Wed, Mar 21, 2018 at 9:53 AM
To: Myrose Victor <myrose.victor@potatocorner.com>
Cc: Amir Jacoby <ajacoby88@gmail.com>

Dear Myros,

Attached please find PCJV USA Bank Activities as March 20th.

AJ 00084

Best regards,
Inbal Jacoby
[Quoted text hidden]

---

2 attachments

 Screenshot (52).png
724K

PCJV Bank Activity 03202018.csv
22K

---

**Myrose Victor** <myrose.victor@potatocorner.com>
To: Inbal Jacoby <inbal623@gmail.com>
Cc: Amir Jacoby <ajacoby88@gmail.com>

Wed, Mar 21, 2018 at 9:54 AM

Thanks, Inbal
[Quoted text hidden]

---

**Inbal Jacoby** <inbal623@gmail.com>
To: Myrose Victor <myrose.victor@potatocorner.com>
Cc: Amir Jacoby <ajacoby88@gmail.com>

Wed, Mar 21, 2018 at 9:57 AM

Here is the the account Balance as of March 20th 2018.

[Quoted text hidden]

 Screenshot (53).png
808K

---

**Amir Jacoby** <ajacoby88@gmail.com>
To: Inbal Jacoby <inbal623@gmail.com>
Cc: Myrose Victor <myrose.victor@potatocorner.com>

Wed, Mar 21, 2018 at 2:39 PM

Hi Myrose, I hope all is well...

I checked with Wells Fargo but unfortunately they don't have a system for multiple signatory anymore. They only have it available to much bigger corporations.

As I voiced my concern to Ben Olivia, Guy is using the PCJV account as if it's his personal account. Writing checks over 10k without any required approval and expensing personal expenses.

Best Regards,

Amir J
[Quoted text hidden]

<Screenshot (53).png>

---

**Myrose Victor** <myrose.victor@potatocorner.com>
To: Amir Jacoby <ajacoby88@gmail.com>
Cc: Inbal Jacoby <inbal623@gmail.com>

Wed, Mar 21, 2018 at 4:12 PM

Thank you, Amir
[Quoted text hidden]

# EXHIBIT 69

Updated Privilege Log
Amir Jacoby's Responses to Guy Koren's First Set of Document Production Requests

| LOG NO. | DATE | SENDER(S) | RECIPIENT(S) | CC(S) | PRIVILEGE |
|---|---|---|---|---|---|
| 1. | 3/15/18 | E-mail string beginning with e-mail from Amir Jacoby ("Amir") | Ben Olivas ("Olivas") | None | Attorney Client |
| 2. | 3/16/18 | Amir | Olivas | None | Attorney Client |
| 3. | 3/16/18 | Amir | Olivas | None | Attorney Client |
| 4. | 3/19/18 | Amir | Olivas | None | Attorney Client |
| 5. | 3/20/18 | Amir | Inbal ("Inbal") | None | Spousal Communication; Spousal Testimonial |
| 6. | 3/23/18 | Amir | Olivas | None | Attorney Client |
| 7. | 3/27/18 | E-mail string beginning with e-mail from Amir | Chad Dominic Hernandez ("Hernandez"), Myrose Victor ("Victor") | Olivas | Attorney Client |
| 8. | 3/28/18 | E-mail string beginning with e-mail from Olivas | Amir | Hernandez; Victor | Attorney Client |
| 9. | 3/29/18 | E-mail string beginning with e-mail from Olivas | Amir | Victor; Hernandez | Attorney Client |
| 10 | 3/30/18 | E-mail string beginning with e-mail from Amir | Olivas | None | Attorney Client |
| 11 | 4/2/18 | Kellin Chatfield ("Chatfield") | David Krol ("Krol") | Robert Brownlie ("Brownlie") | Attorney Client; Attorney Work Product; Joint Defense/Common Interest Doctrine (*Citizens for Ceres v. Superior Court* (2013) 217 Cal.App.4th 889; *OXY Resources California, LLC v. Superior Court* (2004) 115 Cal.App.4th 874) |
| 12 | 4/3/18 | Chatfield | Krol | None | Attorney Client; Attorney Work Product; Joint Defense/Common Interest Doctrine |
| 13 | 4/5/18 | E-mail communications between Amir and Olivas | Amir/Olivas | Olivas/Amir | Attorney Client; Attorney Work Product; Joint Defense/Common Interest Doctrine |
| 14 | 4/9/18 | E-mail communications between Amir and Olivas | Amir/Olivas | Olivas/Amir | Attorney Client; Joint Defense/Common Interest Doctrine |
| 15 | 4/9/18 | E-mail string beginning with e-mail from Olivas | Amir | Victor; Chatfield | Attorney Client; Joint Defense/Common Interest Doctrine |
| 16 | 4/9/18 | E-mail string beginning with e-mail from Olivas | Amir, Victor, Chatfield | Edward Hernandez ("Hernandez"); Joe Magsaysay ("Magsaysay"); Marivic del Pilar ("Marivic"); Dom Hernandez ("Dom"); | Attorney Client; Joint Defense/Common Interest Doctrine |

| LOG NO. | DATE | SENDER(S) | RECIPIENT(S) | CC(S) | PRIVILEGE |
|---|---|---|---|---|---|
| | | | | Brandon Lewis ("Lewis"); Pia Maria Dyquiangco ("Dyquiangco") | |
| 17 | 4/9/18 | Olivas | Amir; Victor; Chatfield | None | Attorney Client; Joint Defense/Common Interest Doctrine |
| 18 | 4/10/18 | Amir | Victor | Olivas | Attorney Client; Joint Defense/Common Interest Doctrine |
| 19 | 4/10/18 | Amir | Victor | Olivas | Attorney Client; Joint Defense/Common Interest Doctrine |
| 20 | 4/10/18 | Amir | Barry Kurtz ("Kurtz") | Victor | Attorney Client; Joint Defense/Common Interest Doctrine |
| 21 | 4/11/18 | Amir | Olivas | None | Attorney Client; Joint Defense/Common Interest Doctrine |
| 22 | 4/11/18 | E-mail string beginning with e-mail from Chester Ventura | Victor | Amir; Inbal; Magsaysay; Olivas; Marivic, Edward Hernandez | Attorney Client |
| 23 | 4/12/18 | E-mail string beginning with e-mail from Olivas | Victor; Edward Hernandez ("Hernandez"), Marco; Marivic; Magsaysay; Amir, Inbal | Lewis; Dyquiangco; Grueneberg; Chatfield | Attorney Client; Work Product; Joint Defense/Common Interest Doctrine |
| 24 | 4/12/18 | Olivas | Amir; Inbal; Victor | Chatfield; Lewis; Grueneberg | Attorney Client; Joint Defense/Common Interest Doctrine |
| 25 | 4/12/18 | Olivas | Amir; Inbal | Victor; Lewis; Chatfield; Grueneberg | Attorney Client; Joint Defense/Common Interest Doctrine |
| 26 | 4/13/18 | E-mail string beginning with e-mail from Victor | Chatfield | Amir; Lewis; Robert Brownlie ("Brownlie"); Inbal; Olivas | Attorney Client; Joint Defense/Common Interest Doctrine |
| 27 | 4/13/18 | Chester Ventura | Victor | Amir; Christopher Passmore; Kurtz | Attorney Client; Joint Defense/Common Interest Doctrine |
| 28 | 4/16/18 | Olivas | Amir; Victor | Brownlie; Chatfield; Inbal; Sarah Hillard | Attorney Client; Joint Defense/Common Interest Doctrine |
| 29 | 4/16/18 | Olivas | Amir | Victor; Grueneberg; Lewis | Attorney Client; Joint Defense/Common Interest Doctrine |
| 30 | 4/16/18 | Olivas | Victor; Amir | Grueneberg; Lewis | Attorney Client; Joint Defense/Common Interest Doctrine |
| 31 | 4/16/18 | Amir | Brownlie | Victor | Attorney Client; Joint Defense/Common Interest Doctrine |

| LOG NO. | DATE | SENDER(S) | RECIPIENT(S) | CC(S) | PRIVILEGE |
|---|---|---|---|---|---|
| 32 | 4/17/18 | Olivas | Victor; Amir; Inbal; Hernandez | | Attorney Client; Joint Defense/Common Interest Doctrine |
| 33 | 4/23/18 | Amir | Inbal | None | Spousal communication; Spousal testimonial |
| 34 | 4/24/18 | Olivas | Victor; Amir | Brownlie; Chatfield; David Toner ("Toner") | Attorney Client; Joint Defense/Common Interest Doctrine |
| 35 | 4/24/18 | Victor | Amir | Olivas; Victor; Marivic, Toner; Brownlie | Attorney Client; Joint Defense/Common Interest Doctrine |
| 36 | 4/27/18 | Victor | Olivas | Amir | Attorney Client; Joint Defense/Common Interest Doctrine |
| 37 | 4/30/18 | Amir | Olivas | Victor; Falcis | Attorney Client; Joint Defense/Common Interest Doctrine |
| 38 | 5/1/18 | Olivas | Jim Konstantinides ("Konstantinides"); Amir; Victor; Nicardo Falcis ("Falcis") | None | Attorney Client; Joint Defense/Common Interest Doctrine |
| 39 | 5/2/18 | Amir | Olivas; Brownlie | Victor; Hernandez; Magsaysay; Falcis | Attorney Client; Joint Defense/Common Interest Doctrine |
| 40 | 5/2/18 | Toner | Amir | Victor; Hernandez; Olivas, John Fitzsimmons; Toner; Chatfield; Inbal; Brownlie | Attorney Client; Joint Defense/Common Interest Doctrine |
| 41 | 5/3/18 | Toner | Amir; Victor | Olivas | Attorney Client; Joint Defense/Common Interest Doctrine |
| 42 | 5/3/18 | Olivas | Victor; Falcis; Hernandez | Konstantinides; Amir | Attorney Client; Joint Defense/Common Interest Doctrine |
| 43 | 5/7/18 | Olivas | Hernandez; Magsaysay; Victor; Falcis; Amir | Brownlie; Toner | Attorney Client; Joint Defense/Common Interest Doctrine |
| 44 | 5/10/18 | Brownlie | Krol | None | Attorney Client; Joint Defense/Common Interest Doctrine |
| 45 | 5/10/18 | Toner | Konstantinides; Amir; Victor | None | Attorney Client; Joint Defense/Common Interest Doctrine |
| 46 | 5/11/18 | Sarah Hillard | Amir | Victor; Olivas | Attorney Client; Joint Defense/Common Interest Doctrine |
| 47 | 5/15/18 | Victor | Amir | Forwarding communication from Brownlie to Victor; Olivas; Hernandez | Attorney Client; Joint Defense/Common Interest Doctrine |

| LOG NO. | DATE | SENDER(S) | RECIPIENT(S) | CC(S) | PRIVILEGE |
|---|---|---|---|---|---|
| 48 | 5/17/18 | Amir | Victor | Eana Cubacub; Brownlie, Ed Hernandez; Eumir Santiago | Attorney Client; Joint Defense/Common Interest Doctrine |
| 49 | 6/8/18 | Brownlie | Victor; Amir; Krol | None | Attorney Client; Joint Defense/Common Interest Doctrine |
| 50 | 6/12/18 | Brownlie | Krol | Ani Aroyan ("Aroyan") [Krol's assistant] | Attorney Client; Joint Defense/Common Interest Doctrine; Work Product |
| 51 | 6/13/18 | Victor | Brownlie; Olivas | Amir; Ed Hernandez | Attorney Client; Joint Defense/Common Interest Doctrine; Work Product |
| 52 | 6/14/18 | Brownlie | Krol | None | Attorney Client; Joint Defense/Common Interest Doctrine; Work Product |
| 53 | 6/15/18 | Brownlie | Krol | Jason Jarvis ("Jarvis"); Aroyan | Attorney Client; Joint Defense/Common Interest Doctrine; Work Product |
| 54 | 6/15/18 | Brownlie | Krol | Jarvis; Aroyan | Attorney Client; Joint Defense/Common Interest Doctrine; Work Product |
| 55 | 6/15/18 | Brownlie | Jarvis; Krol | Aroyan | Attorney Client; Joint Defense/Common Interest Doctrine; Work Product |
| 56 | 6/20/18 | Brownlie | Krol | None | Attorney Client; Joint Defense/Common Interest Doctrine; Work Product |
| 57 | 6/26/18 | Brownlie | Krol | Olivas; Victor, Shela Hipolito; Amir | Attorney Client; Joint Defense/Common Interest Doctrine; Work Product |

# EXHIBIT 70

To Whom it May Concern,

Inbal Jacoby is no longer with Potato Corner. Going forward, please send any correspondence to Emily Garcia at emily@potatocornerusa.com.

--
Kind Regards,

Inbal Jacoby
Chief Accounting Officer
Inbal@potatocornerusa.com
Potato Corner USA
Office: 323-951-1155
Fax: 888-810-1174



CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient(s), and may contain confidential and proprietary information of PCJV USA Corporation and/or its affiliates. Any unauthorized review, use, disclosure, copying, or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail as well as admin@PotatoCornerUSA.com, and delete/destroy all copies of the original message.

---

Jose Magsaysay, Jr. <jomag28@gmail.com>                                         Mon, Mar 26, 2018 at 5:22 PM
To: Inbal Jacoby <inbal@potatocornerusa.com>

noted in this Inbal

lets talk soon   will share with you and Amir our plans before the April 9 Members meeting

joe
[Quoted text hidden]

---

Marivic Del Pilar <marivicdelpilar@gmail.com>                                   Mon, Mar 26, 2018 at 7:43 PM
To: "Jose Magsaysay, Jr " <jomag28@gmail.com>
Cc: Amir Jacoby <ajacoby88@gmail.com>, Banz Banzon '16 <banzbanzon@gmail.com>, Ben Olivas <Ben.Olivas@dlapiper.com>, Guy Koren <guy@potatocornerusa.com>, Inbal Jacoby <inbal623@gmail.com> "Jojo G. Montinola" <josemontinola@yahoo.com>, Ricky Montelibano '16
<ricky_montelibano@yahoo.com.ph>, amir PC USA <amir@potatocornerusa.com>,
dom hernandez@potatocorner.com, edward hernandez <jephernandez@yahoo.com>, guy '12 koren <guyk23@hotmail.com>, Inbal PC USA <inbal@potatocornerusa.com>, maroydelpilar@gmail.com, miguelhernandez.mnl@gmail.com, myrose victor@futurevalue.ph

Noted with thanks
[Quoted text hidden]

Marivic Del Pilar

# EXHIBIT 71

Gmail · PCJV USA · Chief Accounting Officer

Gmail



Inbal Jacoby <inbal623@gmail.com>

## PCJV USA - Chief Accounting Officer

3 messages

Inbal Jacoby <inbal623@gmail.com>                                                               Fri, Mar 16, 2018 at 9:17 PM
To: myrose.victor@potatocorner.com, dom.hernandez@potatocorner.com, ephernandez@victoryliner.com, Jojo
<josemontinola@yahoo.com>, Joe Magsaysay <jomag28@gmail.com>, Marco Del Pilar <marco.delpilar@bicolisarog.com>,
mhdelpilar@victoryliner.com, ricardo.falcis@potatocorner.com, Ricky Montelibano <ricky_montelibano@yahoo.com>,
mrh@valensventures.org

Dear All:

By now I understand that you are aware that a conflict exists within the Potato Corner LA Group, and by
extension the conduct of PCJV USA. I wanted to communicate to you an issue about which you should be aware
as the majority owner of PCJV USA and control of the Board of Managers. I am writing to you both as a
designated Manager of PCJV USA and as the person directly involved in the PCJV USA, PCIT USA financial
reporting since its inception.

I started with PCJV USA and PCIT USA as its internal financial person, i.e. controller since the inception of the
business and have continued through today to handle the PCJV USA and PCIT USA internal financial accounting
and coordinated the financial reporting performed by and for PCJV USA by its outside accountants and the audits
they perform. My job has been to hold management accountable for the expenses incurred and to make sure the
expenses are accurately, fairly and truthfully reported.

I appreciate that as PCJV USA grows in size that the management team may need to be modified to incorporate
the skills associated with a larger enterprise, increased reporting, increased supervision of subordinate staff, etc.

Toward the end of last year Guy Koren and I disagreed on, among other things (i) the allocation of the expenses
incurred in connection with the management of PCJV USA as between PCJV USA and Potato Corner LA Group,
as the Manager of PCJV USA, (ii) the allocation of PCJV USA revenue toward the payment of PCJV USA vs
Potato Corner LA Group expenses, and (iii) the documentation I felt was necessary to justify the allocation of
these expenses and their payment by PCJV USA. As had been my job since the inception of PCJV USA, I felt
responsible for ensuring complete transparency and accountability to the Managers and Members of PCJV USA.
Guy did not want to cooperate and simply insisted on how such expense and payment allocations should be
directed and reported. Out of frustration I threatened to resign. Guy coaxed me to remain with the company and
I have done so, continuing to do my historic services internally and externally working with our accountants on
our financial reporting and audit. Guy is now insisting that I actually resigned in November, but somehow
continue to work for PCJV USA until some uncertain date whereby he has planned to insert his brother to
assume my responsibilities at an increased salary level. I have continued to disagree with Guy's assertion and
have intended and intend to continue to work for PCJV USA in my historic position at my historic compensation
rate, but am not sure if that may soon be prevented by Guy's actions.

Apart from whatever employment claims I might have vis-à-vis PCJV USA and Guy if I am prevented from
continuing in my job, I thought you should be aware that the level of reporting and accountability that may have
historically been enjoyed by PCJV USA and PCIT USA may soon be changing should you feel it is incumbent
upon Cinco Group and/or the Managers to take action to preserve the status quo or at least create a standstill
until Cinco Group and its Managers have an opportunity to evaluate what may be best for PCJV USA. I am
willing to live with whatever the Board as a whole may determine and is prepared to accept for the future.

IJ 00039

Gmail - PCJV USA - Chief Accounting Officer

Inbal Jacoby

---

**Jose Magsaysay, Jr.** <jomag28@gmail.com>                                     Mon, Mar 19, 2018 at 7:01 AM
To: Inbal Jacoby <inbal623@gmail.com>
Cc: myrose.victor@potatocorner.com, dom.hemandez@potatocorner.com, ephemandez@victoryliner.com, Jojo
<josemontinola@yahoo.com>, Marco Del Pilar <marco.delpilar@bicolisarog.com>, mhdelpilar@victoryliner.com,
nicardo.falcis@potatocorner.com, Ricky Montelibano <ricky_montelibano@yahoo.com>, mrh@valensventures.org

Dear Inbal,

Thank you for your email. Our legal counsel has been in touch with Amir last week at LA. We will meet our legal counsel in
Manila this week to discuss our next steps.

Thanks for your commitment to PCJV. We will work on this and we hope to resolve the issues the soonest.

Best regards.

joe
(Quoted text hidden)

IJ 00040

# EXHIBIT 72

**From:** Dom Hernandez <dom.hernandez@potatocorner.corn>
**Received(Date):** Tue, 20 Mar 2018 09:24:42 +0800
**Subject:** PCJV Letter of Intent
**To:** amir@potatocornerusa.com, guy@potatocornerusa.corn, inbal@potatocornerusa.com
**Cc:** Jo Magsaysay <jomag28@gmail.corn>, Jose Magsaysay
<jose.magsaysay@potatocorner.com>, "Jose Miguel Ma. Montinola"
<jose.mamontinola@potatocorner.corn>, Ricardo Montelibano
<ricardo.montelibano@potatocorner.com>, Marivic Del Pilar <marivic.delpilar@potatocorner.com>,
Edward Hernandez <edward.hernandez@potatocorner.com>, Miguel Raymundo Hernandez
<miguel.hernandez@potatocorner.com>, Jose Marco Del Pilar <josemarco.delpilar@potatocorner.corn>,
Myrose Victor <myrose.victor@potatocorner.com>, Nicardo Falcis <nicardo.falcis@potatocorner.corn>
Cinco - Letter of Intent - DRAFT.pdf

Dear LA group,

As agreed, we will be working towards a Master License agreement between Cinco Corporation
and PCJV which includes changing ownership in PCJV and PCIT.

To commence the negotiations towards this common goal we propose we sign this letter of intent
as soon as possible. Attached is the draft for your final review.

We are available for video conference via Skype should you want to discuss more on this. Please
let us know ahead of time so we can arrange our schedules accordingly given the time difference
between LA and Manila.

Thank you very much!

Best,

Dom Hernandez



🔲🔲🔲
🔲🔲🔲

**CONFIDENTIAL**🔲🔲🔲

🔲🔲🔲

14 March 2018

The LA GROUP (of PCJV LLC)
Suite 1100, 6380 Wilshire
California, USA 90048

Attention: To the LA Group

Dear Partners:

Based on our meeting on November 28, 2017, we, Cinco Philippines, Inc. ("*Cinco*"), confirm our intention to negotiate with you, the LA Group (" *LA Group* ") for the change in ownership of PCJV LLC and, at the same time, enter into a Master Licensing Agreement that will cover the states that PCJV LLC currently operates in. For purposes of this letter, we will r    efer to the two actions collectively as the "*Transaction*" and shall be set forth in a Definitive Agreement between the Parties. This letter ("*Letter*") summarizes the relevant terms for our discussions.

The negotiation s to enter into a Definitive Agreement shall be subject to the following conditions:

1.     Proposed Terms.  We are attaching a Term Sheet that summarizes the current status of our discussions with you, the LA Group with respec: to the Transaction. The Term Sheet is **only in draft form** , and subject to final agreement between the Parties. The Parties agree to negotiate in good faith for sixty (60) days, starting from the date this Letter is signed by both of us. However, if there is no Definitive Agreement reached by us during that time, t he negotiations shall automatically terminate, without further action by either one of us. In such case, the current ownership arrangements of PCJV LLC shall continue, and the terms set forth in the LLC Operating Agreement for PCJV LLC shall continue to govern the arrangements between the Parties.
🔲🔲🔲

2.     Non-Binding.  The Parties are not obliged to consummate the transaction, until a Definitive A greement is reached, and the negotiation of such definitive agreement is subject to Cinco's completion of due diligence regarding PCJV LLC's business, employees, financial and legal affairs, with the results of such due diligence satisfactory to Cinco in its sole discretion. In the event a Definitive Agreement is signed, the Parties' obligations shall be subject in all respects to the closing conditions in the Definitive Agreement. Except wit h regard to a breach of either P arty's obligations under paragraphs 2 through 9 of this Letter (which survive  s the termination of this Letter), neither Party shall be liable to the other if they fail for any reason to execute a definitive agreement.
🔲🔲🔲

**3.**     Due Diligence .  Cinco and its counsel and advisors shall have reasonable access during normal business hours to all books, records, assets, and contracts of PCJV LLC to complete its diligence investigation for purposes of the Transaction. Key personnel shall be made available by LA Group as requested to assist in this diligence effort

4.     Continuation of Business.  During the negotiation period, the LA Group agrees:

**CONFIDENTIAL**

a. To use its best efforts to preserve and operate the PCJV LLC business in the ordinary course, consistent with past practices, including preserving its relations with its employees.

b. Not to enter into any transaction or agreement or take any actio n out of the ordinary course that relates to PCJV LLC employees, business, intellectual property, capitalization, or otherwise.

c. That any cash or cash equivalents in PCJV books as of the date stated above shall only be used for working capital needs in the ordinary course of PCJV LLC's business, and will not be used for any extra -ordinary transactions, including but not limited to, bonuses to shareholders, officers and employees, or acquisition of capital assets. Any proposed cash disbursement by PCJV in ex cess of $10,000 for operating expenses, or $50,000 for capital expenses shall require the prior written consent by Cinco which, upon written request by the LA Group, shall not be unreasonably withheld. No splitting of disbursements shall be allowed, to circumvent this requirement.

d. Not to enter into major business decisions including: (i) hiring of officers, employees or consultants for PCJV LLC's business, or the re -hiring or renewal of officers, employees or consultants whose agreement with PCJV LLC has expired during the negotiation period; (ii) entering into any agreement with new franchisees, (iii) entering into any agreement for the grant of additional franchise sto res to existing franchisees, (iv) acquir ing directly or indirectly the rights to ex isting stores from existing franchisees , ( v) re -opening stores of existing franchisees or joint ventures, either in the name of PCJV LLC or the LA Group, or (v i) entering into joint venture agreements with any third party with respect to any territory cove red by the existing arrangements between the Parties.

5.   Confidentiality.   All information regarding the Transaction, including the Consideration (as defined in the Term Sheet) and terms described in this Letter and the Term Sheet, and the fact that discussions or negotiations are taking place concerning the Transaction betwee n Cinco and LA Group, are subject to the Mutual Nondisclosure Agreement to be entered into by the Parties on the same date.

6.   Other Negotiations. Between the date this Letter is signed by both Parties, and no later than sixty (60) days after this date (the "***Expiration Date***"), LA Group will not take any action to solicit, initiate, seek, encourage or support any inquiry, proposal or offer from, furnish any information to, or participate in any negotiations with, any corporation, partnership, person or other entity or group (other than discussions with Cinco) regarding any acquisition, sale, license or other disposition (however structured, other than product sales and provision of services in the ordinary course of business) of its assets, any acquisition transaction, merger or consolidation with or involving the LA Group's equity interests in PCJV LLC, or any acquisition of any material portion of the stock or assets of PCJV LLC (any such inquiry, proposal or offer being a "***Third Party Offer***" and any such transaction being a " ***Third Party Acquisition*** "). In no event will LA Group accept or enter into an agreement concerning any such Third Party Acquisition prior to the Expiration Date.

7.   No Public Announcement; No Disclosure . Except as mutually agreed in writing by both parties, the parties shall make no public announcement concerning any Transaction, this Letter, their discussions or any other memos, letters or agreements between the parties relating to any Transaction unless disclosure is required under applicable law or regulation. Under no circumstances will LA Group discuss or disclose the existence or terms of this Letter or the Term Sheet (or that it is holding discussions with Cinco) with or to any third party other than such legal, accounting and financial advisors of LA Group who have a need to know such information solely for purposes of assisting LA Group in regard to the Transaction.

**CONFIDENTIAL**

8.      Governing Law. This Letter and the Term Sheet shall be governed by the inter     nal laws of the State of California applicable to contracts wholly executed and performed therein. Any action or proceeding seeking to enforce any provision of, or based on any right arising from, this Letter and the Term Sheet shall be brought in courts located in the City of Los Angeles, California.

9.      Costs. Each party shall be responsible to pay its own costs, fees and expenses incurred in connection with the Transaction, including all legal and accounting fees and expenses, whether or not the Transacti on is consummated, and any actions taken by either party in reliance on the Term Sheet shall be at such party's sole risk and expense.

10.     Expiration. To be effective, this Letter must be signed and returned via email at your earliest convenience but no late r than 5:00 p.m., Pacific time, on  27 March , 2018 . Please send the signed    Letter    to    the    attention    of    **Chad    Dominic    J.    Hernandez**    at **dom.hernandez@potatocorner.com**.

Please contact me at +63917 526 1088 or Chad Dominic J. Hernandez at +63917 888 0386 if you have any questions regarding this Letter. I lo     ok forward to the successful completion of the discussions contemplated by this Letter and the Term Sheet.

Very truly yours,

Cinco Philippines Inc.

By:_____

**JOSE P. MAGSAYSAY, JR.**
Chief Executive Officer

AGREED TO AND ACCEPTED:

LA GROUP

By:_____.

Title: _____

**CONFIDENTIAL**▨▨
▨▨▨

### EXHIBIT A: TERM SHEET

| | |
|---|---|
| Transaction, Structure, Acquired Assets: | The Transaction will be structured as (i) a purchase by the LA Group of Cinco's 60% equity interest in PCJV LLC, and (ii) the entry by the Parties of a Master License Agreement, on terms to be negotiated by the Parties. <br> ▨▨▨ <br><br> The Parties will enter into a definitive agreement with LA Group (the "***Definitive Agreement***") providing for the Transac tion and including a general release and waiver by LA Group of any claims against Cinco. Further, Cinco will not assume any liabilities of LA Group arising from the conduct by PCJV or its trade or business. |
| Consideration (the "***Consideration***"): | Pursuant to the Definitive Agreement, the aggregate cash consideration paid for Cinco's 60% equity interest in PCJV LLC   is Seven Million Dollars ($7,000,000) (collectively, the "***Cash Payment***"). The Cash Payments will be paid as set forth below. <br><br> [INSERT PAYMENT SCHEDULE HERE] |
| Non-Compete Agreement: | The Definitive Agreement will include mutual non-compete and non - solicit obligations between Cinco and the LA Group with respect to the business in each of their respective territories, as set forth in the Definitive Agreement. |
| Representations and Warranties: | The Definitive Agreement will contain customary representations and warranties for a transaction of this type by Cinco. |
| Indemnification | Appropriate indemnification obligations will be provideD regarding breaches of the representations and warranties and covenants     in the Definitive Agreement. |
| Conditions to Execution of Definitive Agreement: | Cinco and LA Group will not enter into the Definitive Agreement until the following conditions are satisfied: |

- Receipt by Cinco of a business plan from the LA Group regarding which will include, but not be limited to, the following: (i) short -term expansion plans (12 to 18 months from execution of the Definitive Agreement), including projected capital expenditures, targeted store openings and hiring plans; (ii) long -term expansion plans (5-year plan from the execution of the Definitive Agreement), including projected capital expenditures, targeted store openings, hiring plans, financing plan, and potential exit plan.

- Approval of Definitive Agreement and all related agreements by the Board of Directors of Cinco and the LA Group;

- Receipt of executed and effective releases, intellectual property

A-1

**CONFIDENTIAL**☒☒

☒☒☒

transfers and any other documents as may be necessary to
confer full ownership of the 60% equity interest in PCJV LLC
to LA Group at the closing of the Transaction, free of all
liabilities, liens and encumbrances, as may be requested by
Cinco in its sole discretion, with the form and substance of such
documents to be approved by Cinco in its sole discretion;

* Receipt of all necessary governmental or contractual approvals,
  clearances and consents, including any third party consents for
  assignment of contracts (including identified PCJV LLC
  customer contracts), as identified in the sole discretion of Cinco
  after completion of due diligence;

* Execution and delivery of a Master License Agreement;

* Execution and delivery of the non-compete;

* Other customary conditions to closing.

# EXHIBIT 73



`

April 3, 2018

Jo Mag
Board of Directors
PCJV, LLC

Re: PCJV & PCIT Transfer of Bank Accounts

Dear Jo Mag,

Per our telephone conversation last week, I am writing now to confirm that I have transferred the PCJV
and PCIT bank accounts from Wells Fargo to Chase Bank. I just want to reiterate that these accounts
have been established at Chase under the same entity names and were transferred to protect them
from unauthorized access.

I will provide you and any other requested Cinco members with full access to these accounts as
necessary or requested. I have additionally transferred all the Company stores to Chase as a matter of
operational efficiencies since Chase has offered us management solutions and certain beneficial services
better suited for our needs.

I apologize for not giving you formal written notice until now but I was under the impression that the
information discussed in our telephone conversation would be shared with the other members. I want
you to know that I made the decision to transfer these funds, primarily for security reasons, based on
my position as majority member and sole managing member of the PCJV Los Angeles group. As you
know, I have always acted in the best interest of PCJV and the brand. I believed it was necessary to make
these changes only as a security precaution to prevent the unauthorized withdrawal of funds which
Amir has caused to happen on prior occasion from our PCJV Los Angeles group accounts.

Contrary to the letter by Amir's attorney, I have made sure that all funds have been accounted for and
that there have been no NSF checks or any payments otherwise rejected. I have always made every
effort to keep all of our accounts in good standing and have no reason to think they are any less secure
now than before the transfer. In fact, the banking circumstances are an improvement, especially from
an operational point of view, than those previously maintained at Wells Fargo. Again, I will be providing
to you, under separate cover, direct user and password access to the PCJV accounts. I welcome you to
confirm that these accounts are in good standing and are being used as authorized and for the best
interest of our group and its members.

Although your attorney has requested that the Wells Fargo accounts be reestablished, I strongly suggest
the accounts be maintained at Chase where they are secure from any unauthorized access. As you are
well aware, Amir is not involved operationally with PCJV and has not been actively involved in the daily
business affairs of the company for quite some time now. All of the activities associated with these

accounts have been done in a totally transparent manner to the extent that I invite you to review them to your satisfaction. However, if you insist that the Wells Fargo accounts be reestablished please advise me accordingly.   My point of view is that there is a substantial risk of compromising these accounts, as well as our operational stability if access to our financial accounts is not absolutely secure.

The Board has elected me to be the Managing Member.  I have always and will continue to act in good faith for the best interest of the company and our members.  I am confident that my actions regarding our accounts was necessary and likewise in the best interest of the company and our members.  I am just as confident that upon review of the totality of circumstances that you will conclude the same.

Best regards,

Guy Koren
President & Managing Member
PCJV, LLC
dba Potato Corner USA

# EXHIBIT 74

**From:**      "Jose Magsaysay, Jr." <jomag28@gmail.com>
**Received(Date):**      Tue, 27 Mar 2018 08:09:38 +0800
**Subject:**   notice for members meeting
**To:**        Guy Koren <guy@potatocornerusa.com>,guy '12 koren <guyk23@hotmail.com>, amir PC USA
<amir@potatocornerusa.com>,Amir Jacoby <ajacoby88@gmail.com>, Inbal Jacoby
<inbal623@gmail.com>,inbal PC USA <inbal@potatocornerusa.com>,
dom.hernandez@potatocorner.com,myrose.victor@futurevalue.ph, marivicdelpilar@gmail.com,edward
hernandez <jephernandez@yahoo.com>, macoydelpilar@gmail.com,Ricky Montelibano '16
<ricky_montelibano@yahoo.com.ph>,"Jojo G. Montinola"
<josemontinola@yahoo.com>,miguelhernandez.mnl@gmail.com, Banz Banzon '16
<banzbanzon@gmail.com>,Ben Olivas <Ben.Olivas@dlapiper.com>

To our LA Partners,

We would like to request for a Member's meeting on Monday, April 9, 2018, 5:30pm (LA Time)
via teleconference primarily to discuss the Letter of Intent that was sent to the LA Group last
week.

## AGENDA

1. Call to Order.

2. Determination of Quorum/ Attendance.

3. Welcome.

4. Guy Koren: To report 2017;
a) Business Development highlights (new territories, store growth, topline growth, franchise)
b) Store Operations highlights
c) Logistics and Supply Chain operational highlights
d) Marketing and Brand highlights
e) Administration updates
f) Other Matters

5. Inbal Jacoby: To Report on 2017 (and 2016) financial performance

6. Guy Koren and/or Amir Jacoby: To Present 5-year plan for PCJV.

7. Letter of Intent.

8. Matters for Approval.

9. Election of the Board of Directors and Officers of the Board.

10. Other Matters.

11. Adjourment.

Thank you.

Joe

# EXHIBIT 75

**PCJV USA LLC – MEMBERS' AND MANAGERS' MEETING**
**April 9, 2018**
**Via Telephonic Call**

1. **Call to Order at 5:30 pm PDT**

   Meeting was called to order by Mr. Edward Hernandez, Chairman of the Board of PCJV USA LLC

2. **Determination of Quorum/Attendance**

   The following were in attendance in the meeting:

   <u>As Members:</u>

   *For Potato Corner International*, Member – Mr. Edward Hernandez

   *For the LA Group:*
   - Mr. Guy Koren
   - Mr. Amir Jacoby
   - Ms. Inbal Jacoby

   <u>As Managers:</u>

   *For Potato Corner International:*
   - Mr. Edward Hernandez – present in person
   - Mr. Jose Magsaysay, Jr. – present in person
   - Mr. Jojo Montinola – proxy held by Mr. E. Hernandez
   - Mr. Ricky Montelibano – proxy held by Mr. E. Hernandez
   - Ms. Marivic del Pilar – present in person

   *For the LA Group:*
   - Mr. Guy Koren – in person
   - Mr. Amir Jacoby – in person
   - Ms. Inbal Jacoby – in person

   *Others (non-voting participants):*
   - Mr. Marco del Pilar
   - Mr. Dom Hernandez
   - Ms. Myrose Victor
   - Mr. Ben Olivas, acting corporate secretary for the meeting
   - Ms. Kellin Chatfield, assisting Mr. B. Olivas

## 3. Welcome remarks

Mr. E. Hernandez, as Chairman, presided over the meeting. He made brief remarks welcoming the participants to the meeting duly convened.

## 4. Business report by Mr. Guy Koren

a. Status of the FY 2017 audited Financial Statements – A draft of the FY 2017 audited financial statements has been provided by the external auditors, Martini Iosue & Akpovi, CPAs ("MIA"), to Mr. G. Koren for his review and comments. Mr. G. Koren agreed to provide a copy of the draft to PC-International, prior to submitting to MIA for their final sign-off.

b. Status of the 2018 Franchise Disclosure Document ("FDD") – Mr. G. Koren has been working with Mr. Barry Kurtz to finalize the 2018 FDD, for submission to the relevant state regulators, including the California Department of Business Oversight ("DBO"). Mr. G. Koren reported that, in general, the 2018 FDD is the same as the prior year's FDD subject to the following changes: i) the addition of language describing the operation of food trucks, since there have been inquiries from prospective franchisees about food trucks, particularly in the Miami, FL area; ii) minor adjustments in the operating franchisees, due to changes in operating costs, and iii) potential increase in royalties to 6% (discussed further below).

c. Potential increase of royalty rates to 6% – Mr. G. Koren reported that he is considering increasing the royalties charged to 6%, but only for new franchisees. With respect to existing franchisees, per the recommendation of the franchise counsel, Mr. B. Kurtz, existing franchisees will be grandfathered in, and remain subject to a 5% royalty rate.

d. Ms. M. del Pilar inquired regarding the list of states in which PCJV is registered to engage in the franchising business, and Mr. G. Koren agreed to provide a list where PCJV is registered as of 2017. Mr. G. Koren will also provide a list of states it will consider adding this year. Mr. G. Koren explained that in order to saving filing costs, PCJV has decided not to file in all 50 states; rather, to only register in states where it may have substantial presence, and for which it is required to register.

e. Change in supplier from Sysco to Bunzl – Mr. G. Koren reported that he is currently in negotiations with Bunzl, to distribute certain products and supplies to franchisees. The proposed arrangement with Bunzl would be cheaper than distributing through Sysco, under the current arrangements. Further, over time, the arrangement with Bunzl will allow Potato Corner Trading, Inc. ("PC-Trading") to get rid of its warehousing operations, and thus allow the business to focus on franchising operations only.

3

f.  Ms. M. Victor inquired about the 5-year business plan for PCJV, which the LA Group
    agreed to provide in the November 28, 2017 Members' meeting. Mr. G. Koren
    explained the there are no 5-year business plan available. Due to the difficulty in
    projecting the royalties from the current franchisees, Mr. Koren explained that he
    cannot project the revenues and income of the business.

g.  New lease facilities – Mr. Koren reported that the current office lease will expire in
    June 2018. As such, he has negotiated and signed a new lease agreement for a much
    bigger office space that has a term of 8 years. He has also provided the lessor a
    deposit check of $71k, as required by the lease agreement. Mr. M. del Pilar requested
    a copy of the signed lease agreement, which Mr. Koren agreed to provide.

## 5. Other Matters

a.  Unilateral and unauthorized withdrawal of all of PCJV's funds from the Wells
    Fargo bank accounts – Mr. E. Hernandez requested Mr. Koren to explain why he
    withdrew of all of PCJV's cash from the Wells Fargo accounts, without providing
    prior notice or obtaining prior approval by the Managers, and without
    immediately informing Cinco of the whereabouts of the funds (until he was
    enjoined in writing to return the funds under the threat of appropriate legal
    action).

    Mr. Koren explained that, due to his ongoing dispute with Mr. A. Jacoby, with
    respect to matters involving their separate partnership arrangements, he felt that it
    was necessary to take this unilateral action in order to protect the money. He also
    said that Chase offered a better return on the cash, thus justifying the unilateral
    transfer by him in his capacity as President of PCJV.

    After Mr. Koren's explanation of the transfer, Mr. Jacoby took the floor in
    rebuttal. He noted that there was no immediate threat to the PCJV funds, as Mr.
    Koren alleges.

b.  Unilateral and unauthorized signing of the lease agreement – Mr. E. Hernandez
    also requested Mr. Koren to explain why he signed the lease contract by himself,
    without informing the Cinco Group, as required by the LLC Operating
    Agreement. Mr. Koren explained that there was a business necessity to enter into
    the new lease agreement, since the current lease was about to expire, and that
    PCJV has expansion plans.

    In rebuttal, Mr. Jacoby argued that, notwithstanding repeated requests, Mr. Koren
    failed to provide business projections and plans that would justify the need for a
    substantially bigger office space. Mr. Jacoby noted that the rental expense is not
    justified by the current revenues and cash flows of PCJV.

In turn, Mr. Koren refuted Mr. Jacoby's arguments, and asserted that as President of PCJV, has the discretion to enter into the lease agreement, just as he has been managing the business for the 9 years of PCJV's existence.

## 6. Election of Managers and Officers

After the discussion of business developments and other matters, Mr. E. Hernandez then proceeded to the election of Managers and Officers of PCJV LLC. The following Members voted in favor of the following actions:

- PC International
- Amir Jacoby
- Inbal Jacoby

### Removal of the LA Group members as Managers

Mr. E. Hernandez cited the ongoing dispute between the Mr. Koren and Mr. Jacoby (and Ms. Jacoby) as a significant concern that is harmful to the continued health and viability of PCJV business. The ongoing dispute has resulted in a standstill and rendered PCJV unable to more forward effectively in its business. Moreover, due to this dispute, unilateral actions have been taken that, in violation of the procedures and processes set forth and agreed upon in the Operating Agreement (discussed above), have prejudiced the interests of PCJV and Cinco (as the joint venture partner). For instance, when the unilateral and unauthorized use of the funds from the Wells Fargo bank accounts have resulted in overdraft charges.

Further, when asked whether they have any possibility of working together, each one of them explicitly stated that they will not be able to continue working together in the future. Given the irreconcilable conflict between the LA Group members, and its prejudicial effect so far in the business of PCJV, the remaining Members, by 75% vote of all Membership Interests, voted to remove the LA Group members as Managers of PCJV. Further, the remaining Members, by 75% vote of all Membership Interests, voted to take all actions necessary to carry out this resolution.

### Removal of Mr. Guy Koren as President

The remaining Members, by 75% vote of all Membership Interests, voted to remove Mr. Koren as President of PCJV, for cause, due to the unilateral and unauthorized actions he has taken (discussed above), which are in violation of his fiduciary responsibilities to PCJV, as Manager and President. Further, the remaining Members, by 75% vote of all Membership Interests, voted to take all actions necessary, including i) amending Section 4.11.7 of the Operating Agreement, to carry out this resolution, ii) designating Ms. Inbal Jacoby and Mr. Brandon Lewis, on an interim basis, as authorized signatories to the PCJV bank accounts; and iii) designating Ms. Inbal Jacoby, Mr. Brandon Lewis, Ms. Myrose Victor, and Mr. Ben Olivas, as authorized representatives of PCJV during the transition period.

5

Election of Managers

As provided by the LLC Operating Agreement, the following were elected as Managers:

*For the Cinco Group (PC International):*
- Mr. Edward Hernandez
- Mr. Marco del Pilar
- Ms. Marivic del Pilar
- Mr. Jose Magsaysay, Jr.

*For the LA Group:*
- Mr. Amir Jacoby
- Ms. Inbal Jacoby

Election of Officers

The following were elected as officers:

- Mr. Edward Hernandez          Chairman of the Board
- Mr. Jose Magsaysay, Jr.       Chief Executive Officer
- Ms. Marivic del Pilar         Treasurer
- Mr. Ben Olivas                Corporate Secretary

7. **Adjournment**

There being no other business before to be transacted, the meeting was hereby adjourned.

6

IN WITNESS WHEREOF, the undersigned, being the Members (or duly authorized representatives of the Members of PCJV USA, LLC) and Managers of PCJV USA, LLC, hereby approve the meeting minutes as set forth above.

**PCJV USA, LLC Members:**

_____
Potato Corner International, Inc.

By: _____


_____
Amir Jacoby

_____
Inbal Jacoby


**PCJV USA, LLC Managers:**

**The Potato Corner International Group:**

**The LA Group:**

_____
Edward Hernandez

_____
Amir Jacoby

_____
Marco del Pilar

_____
Inbal Jacoby

_____
Marivic del Pilar

_____
Jose Magsaysay, Jr.

Attest:
_____
Ben R. Olivas
(Corporate Secretary)

WEST\281134891.2

**RESOLUTION**
**OF THE MEMBERS**
**OF**
**PCJV USA, LLC,**
A Delaware Limited Liability Company,
April 9, 2018

The undersigned Members representing at least seventy-five percent (75%) of PCJV
USA, LLC's membership interest, do hereby approve and adopt the following resolutions (this
"Resolution") pursuant to the laws of the State of Delaware.

**Removal of LA Group members as Managers**

RESOLVED, that the LA Group members, for cause, consisting of Guy Koren, Amir Jacoby,
and Inbal Jacoby, shall immediately be removed as Managers of PCJV USA, LLC.

**Removal of Guy Koren as President**

RESOLVED, that Guy Koren, for cause, shall immediately be removed as President of PCJV
USA, LLC.

FURTHER RESOLVED, that Section 4.11.7 of the PCJV USA, LLC Operating Agreement shall
be amended as follows:

4.11.7 President. The President shall be the chief executive officer of the Company and
shall, subject to the control of the Managers, have general supervision, direction and
control of the business and officers of the Company. The President shall preside at all
meetings of the Members and the Managers. He or she shall have the general powers and
duties of management usually vested in the office of the President of a corporation, and
shall have such other powers and duties as may be prescribed by the Managers or this
Operating Agreement. As agreed upon by the Members, at any given time, the President
shall be any of the following: Amit Nemanim, Guy Korean, and Amir Jacoby. The initial
President of the Company shall be Amit Nemanim. The President of the Company shall
render the following services and shall perform the following duties for the Company in a
faithful, diligent and efficient manner:

**Election of PCJV USA, LLC Managers**

RESOLVED, that the following individuals are hereby elected to represent Potato Corner
International, Inc. / Cinco Group as Managers of PCJV USA, LLC, until their respective
successors are duly elected and qualified or their earlier resignation or removal:

> Jose P. Magsaysay, Jr.
> Marivic del Pilar
> John Edward Hernandez
> Marco del Pilar

Page 1 of 3

FURTHER RESOLVED, that the following individuals are hereby elected to represent the LA Group as Managers of PCJV USA, LLC, until their respective successors are duly elected and qualified or their earlier resignation or removal:

> Amir Jacoby
> Inbal Jacoby

## Election of Officers

RESOLVED, that the following individuals are hereby elected to serve in the offices of PCJV USA, LLC set forth opposite their respective names until their respective successors are duly elected and qualified or their earlier resignation or removal:

| | |
|---|---|
| Chief Executive Officer: | Jose Magsaysay, Jr. |
| Chairman of the Board: | John Edward Hernandez |
| Treasurer: | Marivic del Pilar |
| Corporate Secretary: | Ben Olivas |

FURTHER RESOLVED, that Section 4.11.1 of the PCJV USA, LLC Operating Agreement shall be amended as follows:

4.11.1 Officers. The officers of the Company, if any, shall include the following: Chairman of the Board of Members, Chief Executive Officer, President, Corporate Secretary, and Treasurer. The Company may also have, at the discretion of the Managers, one or more vice-presidents, one or more assistant secretaries, one or more assistant financial officers, and such other officers as may be appointed in accordance with the provisions of this Operating Agreement. Any number of offices may be held by the same person. Officers need not be Members.

The officers of PCJV USA, LLC, as elected by the Managers, are authorized and directed to insert a copy of this Resolution in the minute book of PCJV USA, LLC.

WEST\281143132.1

IN WITNESS WHEREOF, the undersigned, being the Members or duly authorized representatives of the Members of PCJV USA, LLC, execute this Resolution as of the date set forth above and hereby certify that the foregoing resolutions were passed by a vote of at least seventy-five percent (75%) of PCJV USA, LLC's membership interest.

Potato Corner International, Inc.

By:_____

Amir Jacoby

Inbal Jacoby

WEST\281143132.1

# EXHIBIT 76

1 | ROBERT W. BROWNLIE (Bar No. 138793)
KELLIN M. CHATFIELD (Bar No. 288389)
2 | DLA PIPER LLP (US)
401 B Street, Suite 1700
3 | San Diego, California 92101-4297
Tel: 619.699.2700
4 | Fax: 619.699.2701

5 | Attorneys for Plaintiff
CINCO CORPORATION

6

7

**FILED**
Superior Court of California
County of Los Angeles

**APR 10 2018**

Sherri R. Carter, Executive Officer/Clerk of Court
By _____, Deputy
Glorietta Robinson

8 | SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

9 | CENTRAL DISTRICT

10 | CINCO CORPORATION,                    CASE NO. **BC 7 0 1 0 7 5**

11 |            Plaintiff,                 **VERIFIED COMPLAINT**

12 |      v.

13 | GUY KOREN, an individual; and DOES 1
14 | through 25, inclusive,

15 |            Defendant.

16 | Plaintiff Cinco Corporation ("Cinco Group" or the "Plaintiff") alleges:

17 | **SUMMARY OF COMPLAINT**

18 | 1.      Plaintiff is the international owner of the Potato Corner brand. It brings this action

19 | against Guy Koren ("Koren") to stop him from interfering with and doing further damage to

20 | Plaintiff's franchise operations in the United States.

21 | 2.      Potato Corner is an international fast food brand. Dubbed the World's Best

22 | Flavored Fries, Potato Corner has been a leading brand in the food industry for 25 years with over

23 | 1,100 branches worldwide. Cinco Group, based in the Philippines, owns the brand.

24 | 3.      Cinco Group's franchise is operated in the United States through a limited liability

25 | company, called, PCJV USA, LLC ("PCJV"). Cinco Group owns 60% of PCJV and three

26 | individuals residing in Los Angeles County, Koren, Inbal Jacoby ("Inbal") and Amir Jacoby

27 | ("Amir"), own the remaining 40%. Koren served as President of PCJV. After more than a year

28

BY FAX

ORIGINAL

DLA PIPER LLP (US)
San Diego

WEST\280982577.3                    -1-

VERIFIED COMPLAINT

1    of mismanagement and the looting of PCJV's bank accounts on March 26, 2018 by Koren, on

2    April 9, 2018, Cinco Group and Amir and Inbal Jacoby voted to remove Koren from the

3    management of PCJV.

4         4.      After the vote to remove Koren, Koren claimed he could not be removed and

5    threatened that Cinco Group would have to come to Los Angeles to physically remove him.

6    Koren threatened his removal would "tank the company" and he refused to further participate in

7    the meeting.

8         5.      Cinco Group now brings this action enjoin Koren from taking any action on behalf

9    of PCJV or Potato Corner, holding himself out as a representative of PCJV or Potato Corner,

10    withdrawing funds from or writing checks drawn from PCJV's bank accounts.

11        6.      Defendant's conduct since March 26, including the ransacking of PCJV bank

12    accounts and removal of Plaintiff's officers from the PCJV accounts, creates substantial risk that

13    Defendant will continue to treat PCJV's assets as his own and cause confusion with Plaintiff's

14    franchisees by purporting to act on behalf of PCJV and claiming to act in the interests of the

15    Potato Corner brand. Accordingly, Plaintiff brings this action to enjoin Defendant from holding

16    himself out as an agent o PCJV, taking action on behalf of PCJV, and/or wasting or dissipating

17    PCJV funds.

18                          **JURISDICTION & VENUE**

19         7.      Jurisdiction is proper in the Superior Court because Plaintiff seeks damages in

20    excess of the Superior Court's jurisdictional minimum and seeks injunctive and other equitable

21    relief.

22         8.      Venue is proper within this judicial district because the acts and events alleged

23    herein occurred within Los Angeles County and because the individual defendant resides in Los

24    Angeles County.

25                          **THE PARTIES**

26         1.      Plaintiff Cinco Corporation is headquartered in the Philippines. Cinco Group

27    owns, operates, and franchises flavored French fries outlets in Asia, Europe, and the United States

28    under the brand and trademark, Potato Corner. Cinco Group held a 60% interest in PCJV USA,

1   LLC ("PCJV") through Cinco Group's wholly owned subsidiary, Potato Corner International,

2   Inc. Plaintiff Cinco Group is and at all times was a Member of PCJV, a joint venture between

3   Cinco Group, on the one hand, and Koren and Inbal and Amir (the "LA Group"), on the other

4   hand, to franchise Potato Corner outlets in the United States. Cinco Group holds four Managing

5   seats of the PCJV.

6      2.     Defendant Guy Koren ("Koren") is an individual and a resident of the State of

7   California. Until his removal, Defendant was the President, Managing Partner and a Manager of

8   PCJV.

9      3.     Plaintiff is unaware of the true names and capacities of the defendants sued in this

10   action by the fictitious names DOES 1 through 25. Plaintiff will amend its complaint when those

11   names and/or capacities become known to Plaintiff. Plaintiff is informed and believes that each

12   of the fictitiously named defendants is in some manner responsible for the events and allegations

13   set forth in this complaint.

14      4.     Plaintiff alleges on information and belief that at all material times herein

15   mentioned, each of the defendants was the co-conspirator, agent and/or employee of each of the

16   remaining defendants, and was at all relevant times acting within the course and scope of such

17   conspiracy, agency and/or employment.

18                           **BACKGROUND**

19   *PCJV is Formed*

20      5.     Cinco Group and the Los Angeles Group formed the PCJV as a joint venture to

21   franchise Potato Corner outlets to franchisees within the United States.

22      6.     Pursuant to PCJV's Joint Venture Agreement, Cinco Group and the LA Group

23   both served as Members of PCJV.

24      7.     Cinco Group held the majority, 60%, interest in PCJV. .The LA Group held the

25   other 40%.

26      8.     Cinco Group appointed four Managers for PCJV, while the LA appointed three

27   (Koren, Amir Jacoby, and Inbal Jacoby).

28      9.     Defendant is a member of the LA Group.

10. Defendant was one of seven Managers for the PCJV and, for several years served as Managing Partner of PCJV and Potato Corner USA.

*The Joint Venture Agreement*

11. Pursuant to the Joint Venture Agreement, Defendant could not make disbursements or withdrawals of more than $10,000 from PCJV accounts or assets if the other six Managers disagree. And, any such unauthorized disbursement must be changed or modified if required by the other Managers.

12. Under the Joint Venture Agreement, each Manager (including Defendant) owes fiduciary duties to the Members, including Cinco Group.

13. Under the Joint Venture Agreement, Cinco Group, as the majority interest holder, has the power to remove a Manager, including Defendant.

*The Parties Disagree over Defendant's Management of PCJV and Potato Corner USA*

14. Over the past eighteen months, Plaintiff and Defendant have disagreed over Defendant's actions as Managing Partner for PCJV.

15. Cinco Group, through its appointed Managers, has repeatedly asked Defendant to provide a full accounting and statement of accounts for PCJV. Defendant has failed to comply, even though he is required to provide such information under the Joint Venture Agreement.

16. Plaintiff also asked Defendant, repeatedly, to provide a five-year plan for PCJV, including projections, which Defendant refused to provide.

17. Unable to resolve these disputes over management, in or around November 2017, LA Group (through Mr. Koren and others) proposed to buy Cinco Group's interests in PCJV.

18. Plaintiff proposed a letter of intent to negotiate terms for such a transaction, but the letter of intent remained unsigned by the LA Group.

19. On or around March 27, 2018, Plaintiff, through its four appointed Managers of PCJV, served a notice of meeting to the LA Group, announcing a meeting of the PCJV Managers on April 9, 2018. The meeting agenda included, among other things, an election of officers and a board of directors.

*Defendant Embezzles PCJV's Funds Before his Position is Terminated*

1    20.    While Plaintiff was following the proper channels to resolve outstanding disputes,
2    on March 26, 2018, Defendant emptied PCJV's bank accounts at Wells Fargo by making three in-
3    person withdrawals of approximately $1,000,000.

4    21.    These accounts held funds necessary for PCJV to honor its commitments and
5    obligations to its Potato Corner franchisees, vendors, and other third parties and to honor
6    commitments to each of the Members, including Plaintiff.

7    22.    Plaintiff was forced to retain counsel to force Defendant to return the withdrawn
8    money to the Wells Fargo Accounts. But, even after representing that he did so, Defendant
9    refused repeated requests to restore Plaintiff's authority as a signatory to the account. As a result,
10   Plaintiff could not independently confirm that Defendant restored the full funds, cannot confirm
11   that Defendant has not made additional withdrawals or transfers, and cannot prevent Defendant
12   from making unauthorized withdrawals in the future.

13   23.    Despite repeated requests, Defendant failed to provide a full accounting or
14   adequately explain why he emptied PCJV's accounts in the first place.

15   *The Members Vote to Remove Defendant*

16   24.    In light of Defendant's egregious misconduct and failure to act as a fiduciary of
17   PCJV or Plaintiff, on April 9, 2018, at a regularly noticed Member meeting, 75% of the Member
18   interests of PCJV voted to remove Defendant as Manager.

19   25.    Defendant owns no interest in Plaintiff and holds no ownership of the Potato
20   Corner brand, trademarks, or franchisor rights. His right to hold himself out as a representative of
21   Potato Corner exists solely as a franchisee.

22   26.    Nonetheless, Defendant has failed to make adequate representations that he will
23   respect the majority vote and, upon information and belief, intends to continue to hold himself out
24   as an agent of Plaintiff, Potato Corner, and PCJV and to interfere in the business of PCJV.

25   27.    Indeed, after the vote to remove Defendant, Defendant threatened that his removal
26   would "tank" PCJV and refused to leave. He further threatened that Cinco Group would have to
27   physically remove him.

28   28.    Defendant then left the meeting and refused to further participate.

DLA PIPER LLP (US)    WEST\280982577.3                    -5-
San Diego
                                                              VERIFIED COMPLAINT

1                                  IMMEDIATE AND IRREPERABLE HARM

2        29.    As alleged above, Defendant's fiduciary breaches and acts of unfair competition,

3 unless immediately restrained and enjoined, threaten Plaintiff with immediate, severe and

4 irreparable harm to Plaintiff, its business and reputation.

5        30.    Defendant has already demonstrated that he will not respect his removal from

6 office and has threatened to "tank" PCJV and claimed he must be physically removed from the

7 office.

8        31.    Defendant's conduct, if not enjoined, will cause immediate and irreparable harm

9 because he may permanently dissipate key PCJV assets and records that Cinco Group needs to

10 continue its franchise business in the United States. Defendant may also destroy records and

11 assets that belong to Cinco Group as the owner of the Potato Corner franchise.

12                                      FIRST CAUSE OF ACTION

13                                          (Conversion)

14        32.    Plaintiff realleges and incorporates paragraphs 1-30 as if fully set forth herein.

15        33.    On March 26, 2018, Defendant ransacked PCJV's bank accounts, making three

16 unauthorized withdrawals totaling approximately $1 million.

17        34.    The money in those accounts belonged to PCJV and its Members, including

18 Plaintiff.

19        35.    Plaintiff was a majority member of PCJV and had the right to possession and

20 control of the PCJV accounts and funds.

21        36.    In violation of Plaintiff's rights, Defendant appropriated PCJV funds and exercised

22 complete dominion over them, to the exclusion of all other members.

23        37.    Despite repeated requests that he do so, Defendant failed to provide a complete

24 accounting of the funds that he withdrew. Defendant also failed to account for more all funds

25 removed from the accounts since March 26, 2018.

26        38.    Defendant's actions have deprived Cinco Group of funds to which it is entitled as

27 a Member and Manager of PCJV.

28

39.   Defendant's actions also prevent Cinco Group from complying with its own obligation to manage PCJV and honor its obligations to the Potato Corner franchisees in the United States.

40.   Cinco Group has been harmed in an amount to be proven at trial, including the loss of all money Defendant withdrew and transferred to himself without permission.

## SECOND CAUSE OF ACTION

### (Breach of Fiduciary Duty)

41.   Plaintiff realleges and incorporates paragraphs 1-43 as if fully set forth herein.

42.   Pursuant to the Operating Agreement and Joint Venture Agreement, Defendant, as a Manager of PCJV, owed fiduciary duties to each Member of PCJV, including Cinco Group.

43.   Defendant breached his fiduciary duties to Cinco Group by emptying PCJV's bank accounts of all funds, stripping PCJV of its ability to meet its obligations to third parties and to Plaintiff, Cinco Group.

44.   Defendant further breached his duties by preventing PCJV's other members from accessing the PCJV accounts, preventing them from taking action to protect PCJV and their own interests.

45.   Defendant has, and upon information and belief, will also continue, to misrepresent himself as an agent acting on behalf of PCJV and Potato Corner.

46.   Defendant's actions deprived Cinco Group of funds to which it was entitled as a Member and Manager of PCJV.

47.   Defendant's actions will also cause confusion and interfere with Plaintiff's business operations in the United States and relationship with its Potato Corner franchisees.

48.   Defendant's conduct imposes immediate and irreparable risks to Cinco Group's business, reputation, and goodwill, because Cinco Group is the owner of the Potato Corner brand and trademarks and a Member of PCJV.  As a result of Defendant's conduct, Cinco Group may not be able to meet obligations to Potato Corner franchisees in the United States, or honor obligations to third party vendors and suppliers who contract with PCJV as the U.S. representative of the Potato Corner brand.

## THIRD CAUSE OF ACTION

### (Breach of Contract)

49.     Plaintiff realleges and incorporates paragraphs 1-50 as if fully set forth herein.

50.     Pursuant to the Operating Agreement and Joint Venture Agreement, Defendant, as a Manager of PCJV, owed fiduciary duties to each Member of PCJV, including Cinco Group. The Joint Venture Agreement (signed by Cinco Group and by Defendant) also prevents Defendant from disbursing more than $10,000 in PCJV funds without permission or approval of the other Managers.

51.     Defendant breached his contractual fiduciary duties to Cinco Group by emptying PCJV's bank accounts of approximately $1 million, in excess of his $10,000 limit.

52.     Defendant continues to breach the Joint Venture Agreement by failing to fully restore the funds to PCJV, failing to provide an accounting, and failing to restore Plaintiff's access to the PCJV accounts.

53.     Defendant's actions have deprived Cinco Group of funds to which it is entitled as a Member and Manager of PCJV.

54.     Defendant's actions also prevent Cinco Group from complying with its own obligation to manage PCJV and honor its obligations to the Potato Corner franchisees in the United States.

55.     Defendant's conduct imposes immediate and irreparable risks to Cinco Group's business, reputation, and goodwill, because Cinco Group is the owner of the Potato Corner brand and trademarks and a Member of PCJV.  As a result of Defendant's conduct, Cinco Group may not be able to meet obligations to Potato Corner franchisees in the United States, or honor obligations to third party vendors and suppliers who contract with PCJV as the U.S. representative of the Potato Corner brand.

56.     Cinco Group has been harmed in an amount to be proven at trial, including the loss of approximately $1 million in funds that Defendant withdrew without permission.

## FOURTH CAUSE OF ACTION

### (Anticipatory Breach of Contract)

57.   Plaintiff realleges and incorporates paragraphs 1-55 as if fully set forth herein.

58.   Pursuant to the Joint Venture Agreement, once removed as a Manager, Defendant cannot continue to hold himself out as an agent of PCJV.

59.   Defendant, through his actions, has demonstrated he will not act in accordance with the terms of the Joint Venture Agreement by, inter alia, interfering with Cinco Group's business and franchise rights by continuing to represent himself as an agent of PCJV with franchisees and vendors; refusing to relinquish funds to the other Members; depleting the PCJV accounts before money can be paid to the other members; and establishing competing interests.

60.   Defendant's conduct imposes immediate and irreparable risks to Cinco Group's business, reputation, and goodwill and will interfere with Cinco Group's economic interests and relationships with franchisees and other third parties.

61.   Cinco Group has been harmed in an amount to be proven at trial.

### FIFTH CAUSE OF ACTION

#### (Violations of Business & Professions Code §17200, et. seq)

62.   Plaintiff realleges and incorporates paragraphs 1-62 as if fully set forth herein.

63.   As set forth above, Defendant is engaged in unlawful and unfair business practices by, inter alia, misappropriating and converting funds belonging to PCJV to prevent its Members and other Managers from carrying out their obligations to third parties and to one another; interfering with Cinco Group's business in the United States by withholding funds to which Cinco Group is entitled and causing confusion with Cinco Group's franchisees; misrepresenting himself as an agent of PCJV and Potato Corner; violating the terms of the license of PCJV to Potato Corner trademarks.

64.   As a result of his unlawful business practices, Defendant has been unjustly enriched by obtaining funds which lawfully belong to PCJV and Plaintiff.

65.   Defendant's conduct imposes immediate and irreparable risks to Cinco Group's business, reputation, and goodwill, because Cinco Group is the owner of the Potato Corner brand and trademarks and a Member of PCJV. As a result of Defendant's conduct, Cinco Group may not be able to meet obligations to Potato Corner franchisees in the United States, or honor

1  obligations to third party vendors and suppliers who contract with PCJV as the U.S.

2  representative of the Potato Corner brand.

3                              SIXTH CAUSE OF ACTION

4                                  (Constructive Trust)

5       66.    Plaintiff realleges and incorporates paragraphs 1-66 as if fully set forth herein.

6       67.    As set forth above, Defendant converted approximately $1 million in funds

7  belonging to PCJV on March 26, 2018 and refuses to restore Plaintiff's access to the Wells Fargo

8  accounts.

9       68.    This is money which, properly, belongs to PCJV and its Members. Any excess

10  funds must be paid to Members in accordance with their capital investment.

11      69.    Accordingly, Plaintiff requests that the Court impose a constructive trust over all

12  PCJV funds and prevent Defendant from further appropriating or converting PCJV funds.

13      WHEREFORE, Plaintiff prays for the following relief:

14      1.    A temporary restraining order and preliminary and permanent restraining order

15  restraining and enjoining Defendant from:

16      A.    Destroying, disposing of, discarding, selling, transferring, giving away, or loaning

17  the following items belonging to Cinco Group:

18            1.    All PCJV funds, including the money held in the Wells Fargo Accounts for

19  PCJV;

20            2.    PCJV and Potato Corner Inventory;

21            3.    Computers, hardware, office supplies.

22            4.    Business records;

23            5.    Intellectual Property.

24      B.    Failing or refusing to return to Cinco Group within 24 hours of the service of this

25  order the following items belonging to Cinco Group:

26            1.    All PCJV funds, including the money held in the Wells Fargo Accounts for

27  PCJV;

28            2.    PCJV and Potato Corner Inventory;

|   |   |   |   |
|---|---|---|---|
| 1 |   | 3. | Computers, hardware, office supplies. |
| 2 |   | 4. | Business records; |
| 3 |   | 5. | Intellectual Property. |

4       C.   Further use and/or disclosure to others of Cinco Group's trade secrets and

5   confidential and proprietary information and data, including its customer lists, supplier lists,

6   financial information, inventory lists, etc.;

7       D.   Keeping copies of any and all of Cinco Group's trade secrets and confidential and

8   proprietary information and data;

9       E.   Continuing to take action on behalf of or hold himself out as an agent of PCJV,

10   Potato Corner, or Cinco Group;

11       F.   Doing any other act or thing calculated to, tending to, or likely to compete unfairly

12   with the Company or any other act in breach of Koren's fiduciary duties to Cinco Group; and

13       G.   Harassing, intimidating or otherwise threatening Cinco Group's employees,

14   officers, directors, agents, shareholders, customers or suppliers

15       2.   An award of damages for Defendant's wrongful conduct according to proof;

16       3.   An award of pre-judgment interest to the extent permitted by law;

17       4.   An award of punitive and exemplary damages;

18       5.   An award of Plaintiffs' reasonable attorney's fees and costs to the extent permitted

19   by law;

20       6.   An accounting of all PCJV funds withdrawn by Defendant; and

21       7.   Such other and further relief as the Court deems just and appropriate.

1    Dated: April 10, 2018

2                                    DLA PIPER LLP (US)

3

4                                    By

5                                        ROBERT W. BROWNLIE
                                         KELLIN M. CHATFIELD

6                                    Attorneys for Plaintiff
                                     CINCO CORPORATION
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                                             VERIFIED COMPLAINT

1                          **VERIFICATION**

2       I, Myrose April C. Victor, state that:

3       I am over 18 years of age and am a resident of the Philippines.

4       I am the Chief Financial Officer of Cinco Corporation and am authorized to make this

5 verification on its behalf.

6       I have read Cinco Corporation's Verified Complaint and to the best of my knowledge,

7 based upon my personal knowledge and/or upon information that I have learned or information

8 that was made available to me through the course of my job duties, I verify under penalty of

9 perjury that the foregoing is true and correct.

10 Dated: April 9, 2018

11

12                         Myrose April C. Victor

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DLA PIPER LLP (US)
SAN DIEGO
WEST\280982577.3                        -13-

## INSTRUCTIONS FOR HANDLING UNLIMITED CIVIL CASES

The following critical provisions of the California Rules of Court, Title 3, Division 7, as applicable in the Superior Court, are summarized for your assistance.

### APPLICATION
The Division 7 Rules were effective January 1, 2007. They apply to all general civil cases.

### PRIORITY OVER OTHER RULES
The Division 7 Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

### CHALLENGE TO ASSIGNED JUDGE
A challenge under Code of Civil Procedure Section 170.6 must be made within 15 days after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

### TIME STANDARDS
Cases assigned to the Independent Calendaring Courts will be subject to processing under the following time standards:

### COMPLAINTS
All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days.

### CROSS-COMPLAINTS
Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed. Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

### STATUS CONFERENCE
A status conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint. Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

### FINAL STATUS CONFERENCE
The Court will require the parties to attend a final status conference not more than 10 days before the scheduled trial date. All parties shall have motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested form jury instructions, special jury instructions, and special jury verdicts timely filed and served prior to the conference. These matters may be heard and resolved at this conference. At least five days before this conference, counsel must also have exchanged lists of exhibits and witnesses, and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Three of the Los Angeles Superior Court Rules.

### SANCTIONS
The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Three Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Three Rules. Such sanctions may be on a party, or if appropriate, on counsel for a party.

**This is not a complete delineation of the Division 7 or Chapter Three Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under Trial Court Delay Reduction. Careful reading and compliance with the actual Chapter Rules is imperative.**

### Class Actions
Pursuant to Local Rule 2.3, all class actions shall be filed at the Stanley Mosk Courthouse and are randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be a class action it will be returned to an Independent Calendar Courtroom for all purposes.

### *Provisionally Complex Cases
Cases filed as provisionally complex are initially assigned to the Supervising Judge of complex litigation for determination of complex status. If the case is deemed to be complex within the meaning of California Rules of Court 3.400 et seq., it will be randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be complex, it will be returned to an Independent Calendar Courtroom for all purposes.

# Superior Court of California
# County of Los Angeles



# ALTERNATIVE DISPUTE RESOLUTION (ADR)
# INFORMATION PACKET

The person who files a civil lawsuit (plaintiff) must include the ADR information
Packet with the complaint when serving the defendant. Cross-complainants must
serve the ADR Information Packet on any new parties named to the action
together with the cross-complaint.

There are a number of ways to resolve civil disputes without having to sue
someone. These alternatives to a lawsuit are known as alternative dispute
resolution (ADR).

In ADR, trained, impartial persons decide disputes or help parties decide disputes
themselves. These persons are called neutrals. For example, in mediations, the
neutral is the mediator. Neutrals normally are chosen by the disputing parties or by
the court. Neutrals can help resolve disputes without having to go to court.

LAADR 005 (Rev. 03/17)
LASC Adopted 10-03
Cal. Rules of Court, rule 3.221

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|---|
| TELEPHONE NO.:<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | FAX NO. (Optional): | | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| STIPULATION AND ORDER – MOTIONS IN LIMINE | CASE NUMBER: |
|---|---|

**This stipulation is intended to provide fast and informal resolution of evidentiary issues through diligent efforts to define and discuss such issues and limit paperwork.**

**The parties agree that:**

1. At least _____ days before the final status conference, each party will provide all other parties with a list containing a one paragraph explanation of each proposed motion in limine. Each one paragraph explanation must identify the substance of a single proposed motion in limine and the grounds for the proposed motion.

2. The parties thereafter will meet and confer, either in person or via teleconference or videoconference, concerning all proposed motions in limine. In that meet and confer, the parties will determine:

   a. Whether the parties can stipulate to any of the proposed motions. If the parties so stipulate, they may file a stipulation and proposed order with the Court.

   b. Whether any of the proposed motions can be briefed and submitted by means of a short joint statement of issues. For each motion which can be addressed by a short joint statement of issues, a short joint statement of issues must be filed with the Court 10 days prior to the final status conference. Each side's portion of the short joint statement of issues may not exceed three pages. The parties will meet and confer to agree on a date and manner for exchanging the parties' respective portions of the short joint statement of issues and the process for filing the short joint statement of issues.

3. All proposed motions in limine that are not either the subject of a stipulation or briefed via a short joint statement of issues will be briefed and filed in accordance with the California Rules of Court and the Los Angeles Superior Court Rules.

---

LACIV 075 (new)
LASC Approved 04/11     **STIPULATION AND ORDER – MOTIONS IN LIMINE**
For Optional Use                                                                        Page 1 of 2

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

## The following parties stipulate:

Date:

_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR PLAINTIFF)

Date:

_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR DEFENDANT)

Date:

_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR DEFENDANT)

Date:

_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR DEFENDANT)

Date:

_____
(TYPE OR PRINT NAME)

(ATTORNEY FOR _____ )

Date:

_____
(TYPE OR PRINT NAME)

➤ (ATTORNEY FOR _____ )

Date:

_____
(TYPE OR PRINT NAME)

➤ (ATTORNEY FOR _____ )

## THE COURT SO ORDERS.

Date:  _____

_____
JUDICIAL OFFICER

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.: FAX NO. (Optional): E-MAIL ADDRESS (Optional): ATTORNEY FOR (Name): | | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| STIPULATION – EARLY ORGANIZATIONAL MEETING | CASE NUMBER: |
|---|---|

This stipulation is intended to encourage cooperation among the parties at an early stage in the litigation and to assist the parties in efficient case resolution.

**The parties agree that:**

1. The parties commit to conduct an initial conference (in-person or via teleconference or via videoconference) within 15 days from the date this stipulation is signed, *to discuss and consider whether there can be agreement on the following:*

   a. Are motions to challenge the pleadings necessary? If the issue can be resolved by amendment as of right, or if the Court would allow leave to amend, could an amended complaint resolve most or all of the issues a demurrer might otherwise raise? If so, the parties agree to work through pleading issues so that a demurrer need only raise issues they cannot resolve. Is the issue that the defendant seeks to raise amenable to resolution on demurrer, or would some other type of motion be preferable? Could a voluntary targeted exchange of documents or information by any party cure an uncertainty in the pleadings?

   b. Initial mutual exchanges of documents at the "core" of the litigation. (For example, in an employment case, the employment records, personnel file and documents relating to the conduct in question could be considered "core." In a personal injury case, an incident or police report, medical records, and repair or maintenance records could be considered "core.");

   c. Exchange of names and contact information of witnesses;

   d. Any insurance agreement that may be available to satisfy part or all of a judgment, or to indemnify or reimburse for payments made to satisfy a judgment;

   e. Exchange of any other information that might be helpful to facilitate understanding, handling, or resolution of the case in a manner that preserves objections or privileges by agreement;

   f. Controlling issues of law that, if resolved early, will promote efficiency and economy in other phases of the case. Also, when and how such issues can be presented to the Court;

   g. Whether or when the case should be scheduled with a settlement officer, what discovery or court ruling on legal issues is reasonably required to make settlement discussions meaningful, and whether the parties wish to use a sitting judge or a private mediator or other options as

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

discussed in the "Alternative Dispute Resolution (ADR) Information Package" served with the complaint;

h.  Computation of damages, including documents, not privileged or protected from disclosure, on which such computation is based;

i.  Whether the case is suitable for the Expedited Jury Trial procedures (see information at **www.lacourt.org** under "*Civil*" and then under "*General Information*").

2.  The time for a defending party to respond to a complaint or cross-complaint will be extended to _____ for the complaint, and _____ for the cross-
        (INSERT DATE)                                    (INSERT DATE)
    complaint, which is comprised of the 30 days to respond under Government Code § 68616(b), and the 30 days permitted by Code of Civil Procedure section 1054(a), good cause having been found by the Civil Supervising Judge due to the case management benefits provided by this Stipulation. A copy of the General Order can be found at www.lacourt.org under "*Civil*", click on "*General Information*", then click on "*Voluntary Efficient Litigation Stipulations*".

3.  The parties will prepare a joint report titled "Joint Status Report Pursuant to Initial Conference and Early Organizational Meeting Stipulation, and if desired, a proposed order summarizing results of their meet and confer and advising the Court of any way it may assist the parties' efficient conduct or resolution of the case. The parties shall attach the Joint Status Report to the Case Management Conference statement, and file the documents when the CMC statement is due.

4.  References to "days" mean calendar days, unless otherwise noted. If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day

The following parties stipulate:

Date:

_____          ➤ _____
        (TYPE OR PRINT NAME)                          (ATTORNEY FOR PLAINTIFF)

Date:
                                            ➤
_____          _____
        (TYPE OR PRINT NAME)                          (ATTORNEY FOR DEFENDANT)

Date:
                                            ➤
_____          _____
        (TYPE OR PRINT NAME)                          (ATTORNEY FOR DEFENDANT)

Date:
                                            ➤
_____          _____
        (TYPE OR PRINT NAME)                          (ATTORNEY FOR DEFENDANT)

Date:
                                            ➤
_____          _____
        (TYPE OR PRINT NAME)                          (ATTORNEY FOR _____)

Date:
                                            ➤
_____          _____
        (TYPE OR PRINT NAME)                          (ATTORNEY FOR _____)

Date:
                                            ➤
_____          _____
        (TYPE OR PRINT NAME)                          (ATTORNEY FOR _____)

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:        FAX NO. (Optional): <br> E-MAIL ADDRESS (Optional): <br> ATTORNEY FOR (Name): | | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| COURTHOUSE ADDRESS: | |
|---|---|
| PLAINTIFF: | |
| DEFENDANT: | |

| STIPULATION – DISCOVERY RESOLUTION | CASE NUMBER: |
|---|---|

**This stipulation is intended to provide a fast and informal resolution of discovery issues through limited paperwork and an informal conference with the Court to aid in the resolution of the issues.**

**The parties agree that:**

1. Prior to the discovery cut-off in this action, no discovery motion shall be filed or heard unless the moving party first makes a written request for an Informal Discovery Conference pursuant to the terms of this stipulation.

2. At the Informal Discovery Conference the Court will consider the dispute presented by parties and determine whether it can be resolved informally.  Nothing set forth herein will preclude a party from making a record at the conclusion of an Informal Discovery Conference, either orally or in writing.

3. Following a reasonable and good faith attempt at an informal resolution of each issue to be presented, a party may request an Informal Discovery Conference pursuant to the following procedures:

   a. The party requesting the Informal Discovery Conference will:

      i. File a Request for Informal Discovery Conference with the clerk's office on the approved form (copy attached) and deliver a courtesy, conformed copy to the assigned department;

      ii. Include a brief summary of the dispute and specify the relief requested; and

      iii. Serve the opposing party pursuant to any authorized or agreed method of service that ensures that the opposing party receives the Request for Informal Discovery Conference no later than the next court day following the filing.

   b. Any Answer to a Request for Informal Discovery Conference must:

      i. Also be filed on the approved form (copy attached);

      ii. Include a brief summary of why the requested relief should be denied;

**STIPULATION – DISCOVERY RESOLUTION**

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

    iii.   Be filed within two (2) court days of receipt of the Request; and

    iv.   Be served on the opposing party pursuant to any authorized or agreed upon method of service that ensures that the opposing party receives the Answer no later than the next court day following the filing.

  c.  No other pleadings, including but not limited to exhibits, declarations, or attachments, will be accepted.

  d.  If the Court has not granted or denied the Request for Informal Discovery Conference within ten (10) days following the filing of the Request, then it shall be deemed to have been denied. If the Court acts on the Request, the parties will be notified whether the Request for Informal Discovery Conference has been granted or denied and, if granted, the date and time of the Informal Discovery Conference, which must be within twenty (20) days of the filing of the Request for Informal Discovery Conference.

  e.  If the conference is not held within twenty (20) days of the filing of the Request for Informal Discovery Conference, unless extended by agreement of the parties and the Court, then the Request for the Informal Discovery Conference shall be deemed to have been denied at that time.

4.  If (a) the Court has denied a conference or (b) one of the time deadlines above has expired without the Court having acted or (c) the Informal Discovery Conference is concluded without resolving the dispute, then a party may file a discovery motion to address unresolved issues.

5.  The parties hereby further agree that the time for making a motion to compel or other discovery motion is tolled from the date of filing of the Request for Informal Discovery Conference until (a) the request is denied or deemed denied or (b) twenty (20) days after the filing of the Request for Informal Discovery Conference, whichever is earlier, unless extended by Order of the Court.

It is the understanding and intent of the parties that this stipulation shall, for each discovery dispute to which it applies, constitute a writing memorializing a "specific later date to which the propounding [or demanding or requesting] party and the responding party have agreed in writing," within the meaning of Code Civil Procedure sections 2030.300(c), 2031.320(c), and 2033.290(c).

6.  Nothing herein will preclude any party from applying ex parte for appropriate relief, including an order shortening time for a motion to be heard concerning discovery.

7.  Any party may terminate this stipulation by giving twenty-one (21) days notice of intent to terminate the stipulation.

8.  References to "days" mean calendar days, unless otherwise noted. If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day.

| SHORT TITLE: | CASE NUMBER: |
|---|---|
|  |  |

## The following parties stipulate:

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

➢ _____
(ATTORNEY FOR PLAINTIFF)

➢ _____
(ATTORNEY FOR DEFENDANT)

➢ _____
(ATTORNEY FOR DEFENDANT)

➢ _____
(ATTORNEY FOR DEFENDANT)

➢ (ATTORNEY FOR _____ )

➢ (ATTORNEY FOR _____ )

➢ (ATTORNEY FOR _____ )

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## NOTICE OF CASE ASSIGNMENT - UNLIMITED CIVIL CASE - IC

Case Number _____ BC 7 0 1 0 7 5

### THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT

Your case is assigned for all purposes to the judicial officer indicated below.

| ASSIGNED JUDGE | DEPT | ROOM | | ASSIGNED JUDGE | DEPT | ROOM |
|---|---|---|---|---|---|---|
| Hon. Debre K. Weintraub | 1 | 534 | | Hon. Elizabeth Allen White | 48 | 506 |
| Hon. Barbara A. Meiers | 12 | 636 | | Hon. Deirdre Hill | 49 | 509 |
| Hon. Terry A. Green | 14 | 300 | | Hon. Teresa A. Beaudet | 50 | 508 |
| Hon. Richard Fruin | 15 | 307 | | Hon. Michael J. Raphael | 51 | 511 |
| Hon. Rita Miller | 16 | 306 | | Hon. Susan Bryant-Deason | 52 | 510 |
| Hon. Richard E. Rico | 17 | 309 | | Hon. Howard L. Halm | 53 | 513 |
| Hon. Stephanie Bowick | 19 | 311 | | Hon. Ernest M. Hiroshige | 54 | 512 |
| Hon. Dalila Corral Lyons | 20 | 310 | | Hon. Malcolm H. Mackey | 55 | 515 |
| Hon. Robert L. Hess | 24 | 314 | | Hon. Holly J. Fujie | 56 | 514 |
| Hon. Yvette M. Palazuelos | 28 | 318 | | Hon. John P. Doyle | 58 | 516 |
| Hon. Barbara Scheper | 30 | 400 | | Hon. Gregory Keosian | 61 | 732 |
| Hon. Samantha Jessner | 31 | 407 | | Hon. Michael L. Stern | 62 | 600 |
| Hon. Daniel S. Murphy | 32 | 406 | | Hon. Mark Mooney | 68 | 617 |
| Hon. Michael P. Linfield | 34 | 408 | | Hon. William F. Fahey | 69 | 621 |
| Hon. Gregory Alarcon | 36 | 410 | | Hon. Monica Bachner | 71 | 729 |
| Hon. David S. Cunningham | 37 | 413 | | Hon. Ruth Ann Kwan | 72 | 731 |
| Hon. Maureen Duffy-Lewis | 38 | 412 | | Hon. Rafael Ongkeko | 73 | 733 |
| Hon. Elizabeth Feffer | 39 | 415 | | Hon. Michelle Williams Court | 74 | 735 |
| Hon. David Sotelo | 40 | 414 | | Hon. Gail Ruderman Feuer | 78 | 730 |
| Hon. Holly E. Kendig | 42 | 416 | | | | |
| Hon. Mel Red Recana | 45 | 529 | | | | |
| Hon. Frederick C. Shaller | 46 | 500 | | | | |
| Hon. Randolph Hammock | 47 | 507 | | | | |

Given to the Plaintiff/Cross-Complainant/Attorney of Record on _____ APR. 16 2018
(Date)

SHERRI R. CARTER, Executive Officer/Clerk of Court

By _____, Deputy Clerk

### NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE

**SUM-100**

# SUMMONS
## (CITACION JUDICIAL)

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

APR 10 2018

Sherri R. Carter, Executive Officer/Clerk
By: Glorietta Robinson, Deputy

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
GUY KOREN, an individual; and DOES 1 through 25, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
CINCO CORPORATION,

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*
Los Angeles Superior Court
Central District
111 North Hill Street, Los Angeles, CA 90012

CASE NUMBER:
(Número del Caso):

BC 7 0 1 0 7 5

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Robert W. Brownlie
DLA Piper LLP (US), 401 B Street, Suite 1700, San Diego, CA 92101; Ph: (619) 699-2700

| DATE: APR 10 2018 | Clerk, by | , Deputy |
|---|---|---|
| *(Fecha)* | SHERRI C. CARTER   *(Secretario)*   Glorietta Robinson | *(Adjunto)* |

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*
   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)   ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*

4. ☐ by personal delivery on *(date):*

Page 1 of 1

| Form Adopted for Mandatory Use Judicial Council of California SUM-100 [Rev. July 1, 2009] | **SUMMONS** | American LegalNet, Inc. www.FormsWorkflow.com | Code of Civil Procedure §§ 412.20, 465 www.courtinfo.ca.gov |
|---|---|---|---|

WEST\281021208.1

From: King, Tammy <tammy.king@dlapiper.com>
Sent: Wednesday, April 11, 2018 1:32 PM
To: Nationwide Legal - San Diego <sd@nationwideasap.com>; Nationwide Legal - SD Process Dept.
<sdprocess@nationwideasap.com>
Subject: Cinco Corporation v. Koren - Personal Service

Hello,

Can you please have the following documents (attached) personally served on December Guy Koren at the below
address(es):

- Summons and Complaint;
- Notice of Case Assignment;
- Blank Form Stipulation – Discovery Resolution;
- Blank Form Stipulation – Early Organizational Meeting;
- Blank Form Informal Discovery Conference;
- Blank Form Stipulation and Order – Motions in Limine; and
- Alternative Dispute Resolution Information Packet.

The following are two possible addresses for Guy Koren:

1478 S. Crest Dr
Los Angeles, ca 90035

1139 S. Sherbourne Dr. apt# 5
Los Angeles, ca 90035



Please attempt to serve him at either address, making several attempts at different times of the day beginning with this
afternoon until he is served. Please keep me updated on attempts, and provide me with a completed proof of personal
service once service is completed. The reference number for this job is 373527-000007. Please let me know if you have
any questions.

Thank you,

**Tammy King**
Legal Practice Specialist

T 619.699.3597
F 619.699.2701
E tammy.king@dlapiper.com

**DLA PIPER**

DLA Piper LLP (US)
401 B Street, Suite 1700
San Diego, California 92101-4297
United States
www.dlapiper.com

Please consider the environment before printing this email.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended
recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure,
dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this
communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to
postmaster@dlapiper.com. Thank you.

**Advantages of ADR**

- Often faster than going to trial
- Often less expensive, saving the litigants court costs, attorney's fees and expert fees.
- May permit more participation, allowing parties to have more control over the outcome.
- Allows for flexibility in choice of ADR processes and resolution of the dispute.
- Fosters cooperation by allowing parties to work together with the neutral to resolve the dispute and mutually agree to remedy.
- There are fewer, if any, court appearances. Because ADR can be faster and save money, it can reduce stress.

**Disadvantages of ADR** - ADR may not be suitable for every dispute.

- If ADR is binding, the parties normally give up most court protections, including a decision by a judge or jury under formal rules of evidence and procedure, and review for legal error by an appellate court.
- ADR may not be effective if it takes place before the parties have sufficient information to resolve the dispute.
- The neutral may charge a fee for his or her services.
- If the dispute is not resolved through ADR, the parties may then have to face the usual and traditional costs of trial, such as attorney's fees and expert fees.

**The Most Common Types of ADR**

- **Mediation**

  In mediation, a neutral (the mediator) assists the parties in reaching a mutually acceptable resolution of their dispute. Unlike lawsuits or some other types of ADR, the parties, rather than the mediator, decide how the dispute is to be resolved.

  - **Mediation is particularly effective** when the parties have a continuing relationship, like neighbors or business people. Mediation is also very effective where personal feelings are getting in the way of a resolution. This is because mediation normally gives the parties a chance to express their feelings and find out how the other sees things.

  - **Mediation may not be effective** when one party is unwilling to cooperate or compromise or when one of the parties has a significant advantage in power over the other. Therefore, it may not be a good choice if the parties have a history of abuse or victimization.

LAADR 005 (Rev. 03/17)
LASC Adopted 10-03
Cal. Rules of Court, rule 3.221

- **Arbitration**

  In arbitration, a neutral person called an "arbitrator" hears arguments and evidence from each
  side and then decides the outcome of the dispute. Arbitration is typically less formal than a
  trial, and the rules of evidence may be relaxed. Arbitration may be either "binding" or "non-
  binding." Binding arbitration means the parties waive their right to a trial and agree to accept
  the arbitrator's decision as final. Non-binding arbitration means that the parties are free to
  request a trial if they reject the arbitrator's decision.

  Arbitration is best for cases where the parties want another person to decide the outcome of
  their dispute for them but would like to avoid the formality, time, and expense of a trial. It may
  also be appropriate for complex matters where the parties want a decision-maker who has
  training or experience in the subject matter of the dispute.

- **Mandatory Settlement Conference (MSC)**

  **Settlement Conferences are appropriate in any case where settlement is an option.**
  Mandatory Settlement Conferences are ordered by the Court and are often held near the date
  a case is set for trial. The parties and their attorneys meet with a judge who devotes his or her
  time exclusively to preside over the MSC. The judge does not make a decision in the case but
  assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a
  settlement.

  The Los Angeles Superior Court Mandatory Settlement Conference (MSC) program is free of
  charge and staffed by experienced sitting civil judges who devote their time exclusively to
  presiding over MSCs. The judges participating in the judicial MSC program and their locations
  are identified in the List of Settlement Officers found on the Los Angeles Superior Court website
  at http://www.lacourt.org/. This program is available in general jurisdiction cases with
  represented parties from independent calendar (IC) and Central Civil West (CCW) courtrooms.
  In addition, on an ad hoc basis, personal injury cases may be referred to the program on the
  eve of trial by the personal injury master calendar courts in the Stanley Mosk Courthouse or the
  asbestos calendar court in CCW.

  In order to access the Los Angeles Superior Court MSC Program the judge in the IC courtroom,
  the CCW Courtroom or the personal injury master calendar courtroom must refer the parties to
  the program. Further, all parties must complete the information requested in the Settlement
  Conference Intake Form and email the completed form to mscdept18@lacourt.org.

## Additional Information

To locate a dispute resolution program or neutral in your community:

- Contact the California Department of Consumer Affairs (www.dca.ca.gov) Consumer Information Center toll free at 800-952-5210, or;
- Contact the local bar association (http://www.lacba.org/) or;
- Look in a telephone directory or search online for "mediators; or "arbitrators."

There may be a charge for services provided by private arbitrators and mediators.

A list of approved State Bar Approved Mandatory Fee Arbitration programs is available at http://calbar.ca.gov/Attorneys/MemberServices/FeeArbitration/ApprovedPrograms.aspx#19

To request information about, or assistance with, dispute resolution, call the number listed below. Or you may call a Contract Provider agency directly. A list of current Contract Provider agencies in Los Angeles County is available at the link below.

http://css.lacounty.gov/programs/dispute-resolution-program-drp/

County of Los Angeles Dispute Resolution Program
3175 West 6th Street, Room 406
Los Angeles, CA 90020-1798
TEL: (213) 738-2621
FAX: (213) 386-3995

LAADR 005 (Rev. 03/17)
LASC Adopted 10-03
Cal. Rules of Court, rule 3.221

## VOLUNTARY EFFICIENT LITIGATION STIPULATIONS



**Superior Court of California
County of Los Angeles**



**Los Angeles County
Bar Association
Litigation Section**

**Los Angeles County
Bar Association Labor and
Employment Law Section**



**Consumer Attorneys
Association of Los Angeles**



**Southern California
Defense Counsel**



**Association of
Business Trial Lawyers**



**California Employment
Lawyers Association**

The Early Organizational Meeting Stipulation, Discovery Resolution Stipulation, and Motions in Limine Stipulation are voluntary stipulations entered into by the parties. The parties may enter into one, two, or all three of the stipulations; however, they may not alter the stipulations as written, because the Court wants to ensure uniformity of application. These stipulations are meant to encourage cooperation between the parties and to assist in resolving issues in a manner that promotes economic case resolution and judicial efficiency.

*The following organizations endorse the goal of promoting efficiency in litigation and ask that counsel consider using these stipulations as a voluntary way to promote communications and procedures among counsel and with the court to fairly resolve issues in their cases.*

◆**Los Angeles County Bar Association Litigation Section**◆

◆ **Los Angeles County Bar Association
Labor and Employment Law Section**◆

◆**Consumer Attorneys Association of Los Angeles**◆

◆**Southern California Defense Counsel**◆

◆**Association of Business Trial Lawyers**◆

◆**California Employment Lawyers Association**◆

# EXHIBIT 77

COPY

1 | Michael D. Murphy (SBN 224678)
mmurphy@ecjlaw.com
2 | Banu S. Naraghi (State Bar No. 312754)
bnaraghi@ecjlaw.com
3 | **ERVIN COHEN & JESSUP LLP**
9401 Wilshire Boulevard, Ninth Floor
4 | Beverly Hills, California 90212-2974
Telephone (310) 273-6333
5 | Facsimile (310) 859-2325

6 | Attorneys for Plaintiffs and Cross-Defendants CINCO CORPORATION and POTATO CORNER
INTERNATIONAL, INC.

7 |

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

· AUG 24 2018

Sherri R. Carter, Executive Officer/Clerk
By: Glorietta Robinson, Deputy

ERVIN COHEN & JESSUP LLP

8 | **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9 | **COUNTY OF LOS ANGELES, CENTRAL DISTRICT** .

10 | CINCO CORPORATION a Philippines
corporation; POTATO CORNER
11 | INTERNATIONAL, INC., a Delaware
corporation,
12 |                     Plaintiffs,
13 |              vs.
14 | GUY KOREN, an individual; NKM
CAPITAL GROUP, LLC, a California limited
15 | liability company; J & K AMERICANA,
LLC, a California limited liability company;
16 | J & K CULVER, LLC, a California limited
liability company; J&K LAKEWOOD, LLC,
17 | a California limited liability company; J&K
OAKRIDGE, LLC, a California limited
18 | liability company; J&K VALLEY FAIR,
LLC, a California limited liability company; J
19 | & K CAPITAL 2, LLC, a California limited
liability company; J & K ONTARIO, LLC, a
20 | California limited liability company; J&K PC
TRUCKS, LLC, a California limited liability
21 | company; J&K CONSULTANTS GROUP,
LLC, a California limited liability company;
22 | GK CAPITAL GROUP, LLC, a California
limited liability company; POTATO
23 | CORNER LA GROUP, LLC, a California
limited liability company; and DOES 1
24 | through 25, inclusive,
25 |                     Defendants,
26 |          – and –
27 | PCJV USA, LLC, a Delaware limited liability
company,
28 |                Nominal Defendant.

Case No.: BC701075
Related Case No.: BC706000

Assigned to Hon. Rafael Ongkeko, Dept. 73

**VERIFIED FIRST AMENDED
COMPLAINT**

16544.2:9330787.1

**VERIFIED FIRST AMENDED COMPLAINT**



1     GUY KOREN, an individual,

2                 Cross-Complainant,

3                 vs.

4     CINCO CORPORATION, a Philippines
corporation; POTATO CORNER
5     INTERNATIONAL, INC., a Delaware
corporation; MYROSE VICTOR, an
6     individual; JOHN EDWARD HERNANDEZ,
an individual; JOSE P. MAGSAYSAY, JR.,
7     an individual; MARIVIC DEL PILAR, an
individual; RICARDO ENRIQUE K.
8     MONTELIBANO, an individual; BEN
OLIVAS, an individual; AMIR JACOBY, and
9     individual; INBAL JACOBY, an individual;
and ROES 1 through 100 inclusive,

10

11                 Cross-Defendants.

Complaint Filed:    April 10, 2018
Trial Date:         None Set

12

13   / / /

14   / / /

15   / / /

16   / / /

17   / / /

18   / / /

19   / / /

20   / / /

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

ERVIN COHEN & JESSUP LLP

16544/2.9330787.1

2

VERIFIED FIRST AMENDED COMPLAINT

**INTRODUCTION**

1.      Plaintiff Cinco Corporation ("Cinco"), a corporation based in the Philippines, is the owner of the "Potato Corner" brand, an international fast food chain that proudly promotes itself as the "World's Best Flavored Fries." There are now more than 1,100 Potato Corner locations worldwide selling these flavored fries and other menu items, using the Potato Corner trademarks, trade name, service marks and other intellectual property ("Potato Corner Intellectual Property").

2.      After having gained a foothold in Asia, in or around 2009, Plaintiff Cinco sought to expand its unique brand into the United States. Plaintiff Cinco was willing to share its Potato Corner Intellectual Property, product, and services ("Potato Corner Brand") with a trusted local United States partner, and was willing to share in the proceeds of its expansion into the United States. Unfortunately, the partner selected by Plaintiff Cinco – Defendant Guy Koren ("Defendant Koren") – abused the great trust and confidence conferred upon him by his Filipino partners.

3.      The vehicle through which Plaintiff Cinco and Defendant Koren agreed to expand the Potato Corner Brand in the United States is Nominal Defendant PCJV USA, LLC ("Nominal Defendant PCJV"). During their negotiations both Plaintiff Cinco and Defendant Koren expressed their shared vision that, through Nominal Defendant PCJV, Potato Corner could expand into hundreds of franchised and PCJV-owned stores nationwide. Instead, under Defendant Koren's direction, less than fifty stores have ever been opened (25% of which have since closed), and, other than the stores owned by Defendant Koren and his affiliates (some of which represent company opportunities wrongfully diverted by Defendant Koren), the other franchised Potato Corner outlets have not yielded the financial success that was intended and promised. Plaintiff Cinco and Plaintiff Potato Corner International, Inc. ("Plaintiff PCI") have now learned that this difference in success between Defendant Koren's stores and the other third-party franchisees has been caused by Defendant Koren's disloyal treatment of his own stores preferentially, at the expense of Nominal Defendant PCJV and the third-party franchisees.

4.      After the structure of Nominal Defendant PCJV was agreed to, Plaintiff Cinco established Plaintiff PCI, an American subsidiary of Plaintiff Cinco – and separate legal entity –

///

3

ERVIN COHEN & JESSUP LLP

1  which became a founding member of Nominal Defendant PCJV, owning 60% of its equity

2  ("Membership Interests").

3      5.      The remaining 40% of Nominal Defendant PCJV, LLC Membership Interests were

4  split between Defendant Koren, as well as two other associates of Defendant Koren – Amir Jacoby

5  ("Jacoby," named by Koren as a Cross-Defendant in this proceeding) and Amit Nemanim

6  ("Nemanim"). It was expressly stated by Defendant Koren and Jacoby, as well as others involved

7  in the inception of PCJV, that Defendant Koren, Jacoby, and Nemanim were each, in their

8  individual capacity owning Membership interests reflecting a fraction of the remaining 40%

9  equity.  Nemanim ceased to be a Member of Nominal Defendant PCJV in 2012, thus leaving

10  Defendant Koren, and Jacoby, as the remaining holders of the 40% Membership Interests (the "LA

11  Group").

12      6.      In 2012, Koren became the President – the principal Executive Officer – of

13  Nominal Defendant PCJV, reporting to a managing board of seven (the "PCJV Management" or

14  "Management"), four of which are appointed by Plaintiff PCI, and the remaining three from the

15  LA Group.

16      7.   ·   From that day forward, and continuing to the present, Defendant Koren has

17  brazenly abused his fiduciary duties to Plaintiff PCI and Nominal Defendant PCJV, as well as his

18  contractual and other legal obligations to Plaintiffs and Nominal Defendant PCJV.

19      8.      As alleged herein, Defendant Koren's scheme has been to (1) prevent Plaintiffs

20  from yielding any financial or other benefit from their hoped for expansion into the United States

21  through his deceit and breaches of fiduciary duty; (2) divert Nominal Defendant PCJV's funds,

22  resources, and corporate opportunities to himself for his own personal gain; (3) repudiate PCJV

23  Management's authority; and (4) damage Plaintiffs' goodwill, business, reputation, and

24  relationships, through his mismanagement and waste.

25      9.      For example, as alleged herein, Defendant Koren has prevented Nominal Defendant

26  PCJV from opening certain Potato Corner Stores as company owned, and, instead, diverted those

27  opportunities to separate entities owned by Defendant Koren. Even worse, Defendant Koren has

28  caused Nominal Defendant PCJV to fund and support these and the other stores owned by his

16544.2:9330787.1

4

ERVIN COHEN & JESSUP LLP

1  affiliates, without reimbursement, and through provision of free resources and capital, waivers of

2  fees and royalties, and preferential attention and favor, as if those stores were Company owned

3  operations. Put simply, Defendant Koren has caused Nominal Defendant PCJV to bear the burdens

4  of Defendant Koren's own Potato Corner franchises, while taking the benefits for himself. This is

5  just one of the examples of the disloyal and self-interested transactions Defendant Koren has

6  caused Nominal Defendant PCJV to enter into benefiting Defendant Koren and his affiliates, to

7  the detriment of Plaintiffs, as well as Nominal Defendant PCJV.

8    10. As the result of these and many other acts of self-dealing, breaches of fiduciary

9  duty, breaches of contract, and other wrongdoing, Defendant Koren has prevented Plaintiffs from

10  earning any license fees, royalty fees, or profits whatsoever as the result of its troubled United

11  States venture, whereas Defendant Koren has managed to ensure that he is paid handsomely.

12    11. Unsatisfied with simply using Nominal Defendant PCJV as a vehicle to enrich

13  himself at the expense of his international, and trusting, partners, Defendant Koren has now frozen

14  Nominal Defendant PCJV's governance and management, by taking the outrageous position that

15  (1) he can never be removed as Chief Executive Officer unless his handpicked PCJV Managers

16  agree, and, (2) he is entitled to majority ownership of PCJV, based upon a knowingly frivolous

17  claim arising from a "right of first refusal." Absent this Court's intervention, Nominal Defendant

18  PCJV's governance and control is effectively frozen.

19    12. Plaintiffs are only beginning to learn the extent of Defendant Koren's breaches of

20  fiduciary, legal, and contractual duties, given that, Defendant Koren has also failed to provide

21  comprehensive books and records on a monthly basis including reconciled bank statements and

22  other documents detailing PCJV's financial condition. This failure, in addition to constituting a

23  breach of the contracts he entered into with Plaintiffs, has facilitated, and concealed, his

24  wrongdoing until only very recently.

25    13. Given the above, and the allegations stated herein, Plaintiffs Cinco and PCI

26  (collectively, "Plaintiffs"), have been forced to initiate this action to, among other things, obtain

27  and recover (1) control over the United States Potato Corner operations; (2) judicial confirmation

28  of Plaintiff PCI's (obvious) majority ownership of PCJV and majority control over PCJV

ERVIN COHEN & JESSUP LLP

16544.2:9330787.1

5.

1 | Management; (3) an accounting as to PCJV's operations given the near decade of concealment by
2 | Defendant Koren; (4) damages resulting from the astonishing breaches of loyalty, care, good faith,
3 | deceit, and breaches of contract, all of which have damaged Plaintiffs, as well as Nominal
4 | Defendant PCJV; and (5) establish a constructive trust over the Potato Corner stores owned by the
5 | Koren Affiliate Defendants that (i) should have been presented by Defendant Koren to Nominal
6 | Defendant PCJV as corporate opportunities to consider, and/or (ii) that be enriched disloyally and
7 | wrongfully, using unreimbursed and unapproved resources, capital, and attention from Nominal
8 | Defendant PCJV.

9

10 | **THE PARTIES**

11 | 14.    Nominal Defendant PCJV is a Delaware limited liability company. Nominal
12 | Defendant PCJV's principal place of business is in Los Angeles, California. 60% of the
13 | Membership Interests of Nominal Defendant PCJV are owned by Plaintiff PCI, whereas the
14 | remaining Membership Interests are shared by Defendant Koren, and Jacoby, each in their
15 | individual capacity.

16 | 15.    Plaintiff Cinco is a corporation headquartered in the Republic of the Philippines,
17 | which owns, operates, and franchises its brand name Potato Corner french fries in outlets located
18 | in Asia, the Americas, and the Middle East, and, as alleged herein, through its subsidiary (Plaintiff
19 | PCI) here in the United States. Plaintiff Cinco negotiated the terms of the Nominal Defendant
20 | PCJV structure and governance prior to the formation of Nominal Defendant PCJV.

21 | 16.    Plaintiff PCI is a Delaware corporation with its principal place of business in Los
22 | Angeles County, California. Plaintiff PCI is a subsidiary of Plaintiff Cinco, and separate legal
23 | entity, and is also a founding member of Nominal Defendant PCJV. From Nominal Defendant
24 | PCJV's inception, to the present, Plaintiff PCI has been the sole owner of 60% of the Membership
25 | Interests of Nominal Defendant PCI. Plaintiff PCI has never transferred, sold, assigned, or in any
26 | way ceased to be an owner of the 60% equity represented by the Membership Interests received in
27 | or around July of 2010 when Nominal Defendant PCJV was formed.

28 | ///

ERVIN COHEN & JESSUP LLP

16544.2:9330787.1

6

17.     Defendant Koren is an individual and resident of the County of Los Angeles, in the
State of California. In 2012, Defendant Koren became the President of Nominal Defendant PCJV.

18.     Defendant Potato Corner LA Group, LLC Group is a California limited liability
company entered into by Defendant Koren and Jacoby, as well as Nemanim, who is no longer a
member of Potato Corner LA Group, LLC.

19.     The following Defendants are collectively referred to herein as the "Koren Affiliate
Defendants."

        a.    Defendant NKM Capital Group, LLC, is a California limited liability
           company that Plaintiffs are informed and believe, and thereon allege, to be
           owned, operated, and/or controlled by Defendant Koren.

        b.    Defendant J&K Americana, LLC, is a California limited liability company
           that Plaintiffs are informed and believe, and thereon allege, to be owned,
           operated, and/or controlled by Defendant Koren.

        c.    Defendant J&K Culver, LLC, is a California limited liability company that
           Plaintiffs are informed and believe, and thereon allege, to be owned,
           operated, and/or controlled by Defendant Koren.

        d.    Defendant J&K Lakewood, LLC, is a California limited liability company
           that Plaintiffs are informed and believe, and thereon allege, to be owned,
           operated, and/or controlled by Defendant Koren.

        e.    Defendant J&K Oakridge, LLC, is a California limited liability company
           that Plaintiffs are informed and believe, and thereon allege, to be owned,
           operated, and/or controlled by Defendant Koren.

        f.    Defendant J&K Valley Fair, LLC, is a California limited liability company
           that Plaintiffs are informed and believe, and thereon allege, to be owned,
           operated, and/or controlled by Defendant Koren.

        g.    Defendant J&K Capital 2, LLC, is a California limited liability company
           that Plaintiffs are informed and believe, and thereon allege, to be owned,
           operated, and/or controlled by Defendant Koren.

ERVIN COHEN & JESSUP LLP

16544.2:9330787.1

7

ERVIN COHEN & JESSUP LLP

h.    Defendant J&K Ontario, LLC, is a California limited liability company that Plaintiffs are informed and believe, and thereon allege, to be owned, operated, and/or controlled by Defendant Koren.

i.    Defendant J&K PC Trucks, LLC, is a California limited liability company that Plaintiffs are informed and believe, and thereon allege, to be owned, operated, and/or controlled by Defendant Koren.

j.    Defendant J&K Consultants Group, LLC, is a California limited liability company that Plaintiffs are informed and believe, and thereon allege, to be owned, operated, and/or controlled by Defendant Koren. Plaintiffs are also informed and believe and thereon allege that Defendant J&K Consultants Group, LLC is a recipient of funds wrongfully diverted from Nominal Defendant PCJV by Defendant Koren.

k.    Defendant GK Capital Group, LLC, is a California limited liability company that Plaintiffs are informed and believe, and thereon allege, to be owned, operated, and/or controlled by Defendant Koren. Plaintiffs are also informed and believe and thereon allege that Defendant J&K Consultants Group, LLC is a recipient of funds wrongfully diverted from Nominal Defendant PCJV by Defendant Koren.

20.    Plaintiffs do not know the true names and capacities of Defendants DOES 1 through 25, inclusive, and therefore sues these "Doe Defendants" by such fictitious names pursuant to Section 474 of the California Code of Civil Procedure. Plaintiffs will seek leave of Court to amend this Amended Complaint when the true names and capacities of the Doe Defendants have been ascertained. Plaintiffs are informed and believe, and based thereon allege, that each of the Defendants designated as a Doe herein was the agent and/or alter ego of each of the remaining Defendants, or is in some manner responsible for the events and occurrences herein described, and legally and proximately caused injury and damages to Plaintiffs as herein alleged. (Hereinafter, Defendant Koren, the Koren Affiliate Defendants, and Doe Defendants, inclusive, will be referred to collectively as "Defendants.")

16564.2:9330787.1

8

VERIFIED FIRST AMENDED COMPLAINT

1    21.    Plaintiffs are informed and believe and based thereon allege that all of the
2  Defendants named herein are in some manner responsible for the acts herein alleged, and that each
3  was the agent, servant, representative, alter-ego, principal, employer or master of each other
4  Defendant herein and, further, was acting within the scope of such agency, servitude, employment,
5  representation or capacity and/or for the benefit of each other in doing the acts herein alleged.

6                              **JURISDICTION AND VENUE**

7    22.    This Court has jurisdiction over this lawsuit because the amount in controversy
8  exceeds this Court's jurisdictional amount, exclusive of attorneys' fees, interest and costs.

9    23.    Venue is proper in the County of Los Angeles pursuant to Cal. Code Civ. P. § 395,
10  as Defendant Koren, as well as most, if not all, of the other Defendants reside in the County of Los
11  Angeles.

12                          **FACTS COMMON TO ALL CAUSES OF ACTION**

13    24.    Plaintiff Cinco's first exploration into expanding the Potato Corner Brand in the
14  United States began in or around 2009, when it agreed that Defendant Koren, through Defendant
15  NKM, could open a Potato Corner store in Santa Anita (the "Santa Anita Potato Corner Store").

16    25.    Desiring to build on that first Santa Anita Potato Corner Store, and expand further
17  in America, Plaintiff Cinco decided to entrust Defendant Koren with that expansion through a
18  business structure that had great potential for both Defendant Koren and Plaintiff Cinco. That
19  structure was embodied in two limited liability companies described herein: Nominal Defendant
20  PCJV as well as PCI Trading, LLC ("PCIT"), which was to be the supplier for Potato Corner
21  stores owned or franchised by Nominal Defendant PCJV.

22    26.    Plaintiff Cinco's Chief Executive Officer, Mr. Jose Magsaysay ("Mr. Magsaysay")
23  believed Defendant Koren's sales pitch, in which Defendant Koren represented that he was a
24  trustworthy and hardworking partner who would dedicate himself to expand and build the Potato
25  Corner Brand in America. Mr. Magsaysay, with his heart for entrepreneurship and his trust in
26  growing business opportunities of others (evidenced by his franchisees in Asia and elsewhere),
27  agreed to go into business with Defendant Koren through Nominal Defendant PCJV.

28  ///

9

ERVIN COHEN & JESSUP LLP

27.     Because of the distance between Potato Corner's headquarters in Manila and the United States, the only way this venture could succeed was if Defendant Koren adhered to, respected, and comported himself with the great trust and confidence placed by Plaintiffs in Defendant Koren that he would act loyally, in good faith, and with great care towards Plaintiff PCI, the subsidiary established by Plaintiff Cinco as its American headquarters.

28.     As alleged herein, Defendant Koren knowingly repudiated and breached these duties, in a manner that benefited himself, and his affiliates, at the expense of Plaintiffs Cinco and PCI, as well as the franchisees and the Potato Corner Brand.

29.     Nominal Defendant PCJV – the entity that Plaintiff Cinco and Defendant Koren had previously agreed would serve as the locus from which Potato Corner would expand nationwide – was established on or around July 16, 2010. Prior to its inception, Plaintiff Cinco and Defendant Koren memorialized the structure of the soon to be created limited liability company through a Joint Venture Agreement ("JVA"), the governing document for Nominal Defendant PCJV. A true and correct copy of the JVA is attached hereto as Exhibit A, and incorporated by reference herein.

30.     Because Nominal Defendant PCJV had not yet been created (nor had Plaintiff Cinco's subsidiary, Plaintiff PCI, which would serve as the majority owner), Plaintiff Cinco executed the JVA as holder of the putative 60% equity of the soon-to-be established limited liability company. Defendant Koren, Jacoby and Nemanim, also executed the JVA in their individual capacity.

31.     In section 3(g) of the JVA, Plaintiff Cinco agreed to license the "Potato Corner" Intellectual Property to Nominal Defendant PCJV, in exchange for a license fee of "thirty percent of all initial/franchise fees and ongoing royalty fees paid to/collected by [Nominal Defendant PCJV]" from its franchisees (the "Approved License Fee").

32.     Nearly a decade later, Plaintiff Cinco has never received any Approved License Fee, as the result of the deceit, and breaches of fiduciary duty alleged herein.

///

///

16544.2:9330787.1

10

VERIFIED FIRST AMENDED COMPLAINT

ERVIN COHEN & JESSUP LLP

1    *Allocation of Membership Interests of Nominal Defendant*

2    *PCJV, as Set Forth in Its Governing Document, the JVA*

3        33.    The JVA memorialized that 60% of the still unformed Nominal Defendant PCJV

4    Membership Interests would be owned by Plaintiff Cinco, with the express stipulation that

5    Plaintiff Cinco would have the right to assign all of its interests in the as-of-yet nonexistent

6    Nominal Defendant PCJV to a wholly owned subsidiary (the "Permitted Cinco Equity

7    Assignment"). Plaintiff Cinco took advantage of the Permitted Cinco Assignment, by assigning

8    any and all interests in the transaction to its wholly owned subsidiary – and separate legal entity –

9    Plaintiff PCI. Thus, upon the date Nominal Defendant PCJV was organized and established, after

10   execution of the JVA, and after the Permitted Cinco Equity Assignment, Plaintiff PCI became a

11   founding member of Nominal Defendant, holding 60% of its equity.

12       34.    The JVA memorialized that the remaining 40% of the Nominal Defendant PCJV

13   Membership Interests would be owned by Defendant Koren, Jacoby, and Nemanim, personally

14   and individually.

15       35.    Under the JVA, the owners of Membership Interests in Nominal Defendant PCJV –

16   Plaintiff PCI, Defendant Koren, Jacoby, and Nemanim were prohibited from transferring their

17   equity in Nominal Defendant PCJV, absent compliance with a right of first refusal. (Exh. A, JVA,

18   § 2(d).)

19       36.    Nemanim, who, pursuant to the JVA, was appointed President (the primary

20   executive officer) of Nominal Defendant PCJV, issued Certificates for Limited Liability Company

21   Interests memorializing, documenting, and solidifying this ownership structure, allocating

22   Membership Interests in PCJV as follows: Plaintiff PCI (60%), Nemanim (15.20%), Defendant

23   Koren (15.20%), and Jacoby (9.6%). True and correct copies of the executed Certificates for

24   Limited Liability Company Interests are attached hereto as Exhibit B, and incorporated by

25   reference herein.

26   ///

27   ///

28   ///

16544.2:9330787.1                                    11

VERIFIED FIRST AMENDED COMPLAINT

ERVIN COHEN & JESSUP ᴸᴸᴾ

1     *Governance in Nominal Defendant PCJV is Vested in a Seven Member Management*

2     *Committee, Whereas Day to Day Operations Are Vested in PCJV Officers*

3      37.     Under Section 3 of the JVA (Exh. A), the "business and affairs," and all policy, of

4 Nominal Defendant PCJV are vested in and to be directed by seven Managers (referred to in the

5 agreement as "Management"), four of whom were to be appointed by Plaintiff Cinco (or its

6 assignee, who as alleged herein, is its wholly owned subsidiary, and separate legal entity, Plaintiff

7 PCI). The other three individuals comprising PCJV Management were to be appointed by the three

8 other holders of Membership Interests: Defendant Koren, Amir Jacoby, and Non-Party Nemanim.

9      38.     The initial composition of PCJV Management was set forth in the JVA, and was as

10 follows:

11          a.     Plaintiff PCI's initial four individuals appointed to PCJV Management

12              were: Mr. Magsaysay, Jose Miguel Ma. Montinola ("Mr. Montinola"), Ma.

13              Vitoria O. Bermejo ("Ms. Bermejo"), and Ricardo Monteilbano ("Mr.

14              Monteilbano").

15          b.     Defendant Koren, Amir Jacoby, and Non-Party Nemanim named

16              themselves as the other three Managers.

17      39.     As set forth in the JVA (Section 3) among the powers vested in Management

18 ("Management Powers") are as follows:

19          a.     Management of the business and affairs of Nominal Defendant PCJV;

20          b.     Establishing policies and directives of Nominal Defendant PCJV;

21          c.     Approval of all compensation to "managers, executive offices, and key

22              personnel" of Nominal Defendant PCJV;

23          d.     "Approval of the Accounting System/Procedures/Software/Method" to be

24              used by Nominal Defendant PCJV;

25          e.     Approval of Nominal Defendant PCJV's budget "and any changes to it;"

26          f.     Approval of all franchising agreements, and lease agreements of Nominal

27              Defendant PCJV; and

28 ///

ERVIN COHEN & JESSUP LLP

g.     "Approval of all purchases and disbursements in excess of $10,000," and any modifications to such payments.

40.    As alleged herein, pursuant to Section 3(j) of the JVA, one of the most significant Management Powers, is the right of PCJV Management to be presented with new Potato Corner store opportunities outside of Los Angeles and San Francisco Counties ("New Store Corporate Opportunities"), and to decide if such stores would be owned and operated by Nominal Defendant PCJV. If PCJV Management voted to pass on any particular New Store Corporate Opportunities, only then could Defendant Koren, Jacoby, and Nemanim open a store at that location, but only on the condition that it be operated as a franchise, subject to the same terms and conditions as any other franchise of Nominal Defendant PCJV.

41.    Under Section 3(b) and 3(f) of the JVA, certain individuals named by the Management would be appointed as "executive officers," who are entrusted with managing "the business and property of the Company, and to market the business, in accordance with and pursuant to the directives of and policies set by the Management" of Nominal Defendant PCJV. The JVA also identified the initial appointments to those officer positions:

a.    Chairman of the Board: Mr. Magsaysay, a Manager, and the Chief Executive Officer of Plaintiff Cinco.

b.    President: Nemanim. The JVA also stated that "[a]t any given time, the President shall be any one of the following members: Amit Nemanim, Guy Koren or Amir Jacoby."

c.    Corporate Secretary: Non-Party Erlinda Bartolome.

d.    Treasurer: Mr. Montinola, a Manager.

42.    The JVA expressly authorizes PCJV Management to "recall and/or withdraw the appointment of any executive officer, as it deems necessary." (Exh. A, JVA, § 3(f).)

43.    The JVA further delineates the duties of the President (Exh. A, § 3(i)), all of which are covered by the umbrella requirement of "compl[iance] with the rules, policies and procedures approved by the Management of the Company." These responsibilities include the following:

///

16544.2:9330787.1           13

ERVIN COHEN & JESSUP LLP

a.   "[M]anagement, operational, marketing, establishment, maintenance, licensing and sublicensing with respect to the 'Potato Corner' outlets/stores in the Territory," which was defined as being the United States and Israel, outside of Los Angeles and San Francisco Counties.

b.   Using "best efforts at all times . . . to operate and maintain the 'Potato Corner' outlets/stores in the Territory according to the highest standards achievable consistent with the overall plan of the Management of the Company."

c.   Maintenance of a "comprehensive system of records, books, and accounts, with respect to the licensing and sublicensing activities, operation, establishment, management, maintenance and other activities of the 'Potato Corner' outlets in the Territory with the assistance of the Corporate Secretary."

d.   Production of monthly "statements of receipts and disbursements, a schedule of accounts receivable and payable, and a schedule of fees collected and distributed together with a reconciled bank statement as of the last day of the month" (the "Mandatory Monthly Financial Disclosure").

e.   Issuance of annual audited financial statements.

f.   Taking "such actions as may be necessary to comply promptly with any and all laws, ordinances, orders or other requirements of any federal, state, county, or municipal authority having jurisdiction of the Company and affecting the Company" ("Legal Compliance").

### *The Master Services Agreement Between Nominal*
### *Defendant PCJV and the "LA Group."*

44.   In Section 3(i) of the JVA, it was agreed by all parties that Defendant Koren, Amir Jacoby, and Nemanim (or a "corporation" designated by these three individuals) would be

///

ERVIN COHEN & JESSUP LLP

1   compensated for their duties and obligations arising under that governing agreement, pursuant to a

2   "Master Services Agreement" ("MSA"), which was to be negotiated subsequent to the JVA.

3       45.    Attached hereto, and incorporated herein by reference, as Exhibit C, is a true and

4   correct copy of the MSA later executed on or around June 8, 2012, by all of the named individuals

5   comprising the Management of Nominal Defendant PCJV, in which, Defendant Koren, Jacoby,

6   and Nemanim reaffirmed their specific obligations set forth in the JVA – the duties conferred on

7   the President (which was to be one of the three of them) in Section 3(i) of the JVA, as well as the

8   New Store Corporate Opportunities obligation set forth in Section 3(j).

9       46.    Specifically, in the MSA (Exh. C), Defendant Koren, Jacoby, and Nemanim

10   expressly restated their obligations to satisfy the following responsibilities:

11       a.    "Conduct management, operations, marketing, establishment, maintenance,

12       licensing and sublicensing activities with respect to the 'Potato Corner'

13       outlets/stores in the Territory."

14       b.    "Use best efforts at all times to operate and maintain 'Potato Corner'

15       outlets/stores in the Territory according to the highest standards achievable

16       consistent with the overall plan of PCJV Management."

17       c.    "Advertise, market, and promote the Potato Corner outlets/stores with the

18       goal of causing public knowledge, awareness and patronage of the Potato

19       Corner outlets/stores."

20       d.    "Maintain a comprehensive system of records, books, and accounts, with

21       respect to the licensing and sublicensing activities, operation, establishment,

22       management, maintenance and other activities of the Potato Corner outlets

23       in the Territory with the assistance of the Corporate Secretary."

24       e.    Provide the Mandatory Monthly Financial Disclosure to PCJV

25       Management.

26       f.    Issuance of annual audited financial statements.

27       g.    Consistent with their fiduciary duties of care and loyalty, presentation to

28       Management of New Store Corporate Opportunities, so that the

ERVIN COHEN & JESSUP LLP

16544.2:9330787.1

15

VERIFIED FIRST AMENDED COMPLAINT

1                    Management can vote as to whether that New Store Corporate Opportunity

2                    would be a Company Store, and, if not, and only then, could Defendants

3                    Koren, Jacoby, and Nemanim have the right to build a store at that location,

4                    "provided that [they] shall enter into a franchising agreement with PCJV,

5                    and shall pay franchise fees and ongoing royalty fees as set forth in PCJV's

6                    standard franchising agreement."

7          h.    Maintenance and protection of Confidential Information of PCJV, as

8               defined in the JVA and again in the MSA.

9          i.    Taking "such actions as may be necessary to comply promptly with any and

10            all laws, ordinances, orders or other requirements of any federal, state,

11            county, or municipal authority having jurisdiction of the Company and

12            affecting the Company" ("Legal Compliance").

13     47.    In the JVA, and again in the MSA, Plaintiff PCI, through its representatives, agreed

14 that, in satisfaction of Defendant Koren, Jacoby and Nemanim's duties under the MSA, Defendant

15 Koren, Jacoby and Nemanim would receive "consideration" through a "services fee equal to thirty

16 (30%) percent of all initial/franchise fees and continuing royalty fees paid to/collected by the

17 Company" (the "Approved Management Fee").

18

19                  ***Allocation of Fees Collected by and Profits***

20                     ***Earned by Nominal Defendant PCJV***

21     48.    As set forth herein, the purpose of Nominal Defendant PCJV was established to

22 spread the Potato Corner Brand by franchising stores to third parties, or by operating stores owned

23 by Nominal Defendant PCJV ("Company Owned Stores").

24     49.    Income from franchise stores would be in the form of franchise fees and royalties

25 ("Franchise Fees and Royalties") whereas income from Company Owned Stores would be pure

26 profit to Nominal Defendant PCJV.

27     50.    The JVA set forth a formula by which the income of Nominal Defendant PCJV is

28 allocated. Specifically, Franchise Fees and Royalties are to be distributed as follows: 30% payable

ERVIN COHEN & JESSUP ᴸᴸᴾ

1  to Plaintiff Cinco pursuant to the Approved License Fee, 30% payable to Defendants Koren,
2  Jacoby, and Nemanim pursuant to the Approved Management Fee, and the remainder distributed
3  as profit: 60% to Plaintiff PCI , and the remainder of the 40% distributed to Defendants Koren,
4  Jacoby, and Nemanim.

5      51.    All other profit of Nominal Defendant PCJV is to be distributed as follows: 60% to
6  Plaintiff PCI, and the remainder of the 40% distributed to Defendants Koren, Jacoby and
7  Nemanim.

8      52.    As of the date of this Amended Complaint, neither of the Plaintiffs have ever
9  received a single cent of Approved License Fees or profit, whereas Defendant Koren, and the
10  Koren Affiliate Defendants, have received substantial income. The only way Defendants have
11  been able to earn income has been through the abuse of, and brazen disregard for, Defendant
12  Koren's fiduciary duties required under law, and those that are expressly stated throughout the
13  JVA and MSA.

14      53.    Relief from Defendant Koren's knowing repudiation of his fiduciary, legal, and
15  contractual duties, are at issue and sought herein.

16

17          *Koren Becomes President in 2012, Which Sets in Motion his Plan to Wrest Control*
18          *Of, and Abuse his Duties to Plaintiffs and Nominal Defendant PCJV*

19      54.    In or around October of 2012, PCJV Management approved the replacement of
20  Nemanim as President by Defendant Koren. At the same time, Nemanim withdrew from Nominal
21  Party PCJV Management as an owner of Membership Interests. ·

22      55.    As the result of these changes, the owners of Membership Interests in Nominal
23  Party PCJV became, and remain to this day, as follows: Plaintiff PCI owns 60% of the
24  Membership Interests, whereas the remaining 40% equity of Nominal Party PCJV is owned by
25  Defendant Koren and Amir Jacoby, personally, in their individual capacity.

26      56.    From 2012 onwards, and continuing through the present, Defendant Koren has
27  abused his authority, and fiduciary duties, as President.

28  ///

16544.2:9330787.1                     17
                              VERIFIED FIRST AMENDED COMPLAINT

ERVIN COHEN & JESSUP LLP

1     57.    As explained herein, and as will be proven at trial, Defendant Koren's plan was to

2 divert Nominal Defendant opportunities and resources for his own benefit, and the benefit of the

3 Koren Affiliate Defendants, in the form of opening New Store Corporate Opportunities without

4 fully disclosing to and seeking approval from Nominal Defendant PCJV Management for either

5 (1) opening the store in the first place (instead of a Company Owned Store), and/or (2) the terms

6 of the relationship between the Koren Affiliate Defendant owned stores and PCJV.

7     58.    After opening these stores (some of which were opened without approval from

8 Management as alleged above), Defendant Koren treated his own stores preferentially, to the

9 detriment of the other third party franchisees, by using Nominal Defendant PCJV resources,

10 capital, and attention to benefit and favor those Koren Affiliate Defendant-owned stores –

11 effectively treating them as Company Owned Stores (except that Nominal Defendant PCJV did

12 not receive the financial benefits and profits of those stores). Indeed, Plaintiffs are informed, and

13 believe, and thereon allege, that Defendant Koren even referred to these stores owned by the

14 Koren Affiliate Defendants as "Company-Owned Stores."

15     59.    Defendant Koren's self-dealing with respect to the stores owned by the Koren

16 Affiliate Defendants went even further.

17     60.    For example, each of the PCJV franchisees are obligated to pay 2% of their income

18 into a "marketing fund," which, pooled together is to be used to market all of the PCJV

19 franchisees. Without seeking approval from, or disclosing to, PCJV Management, Defendant

20 Koren waived, on behalf of PCJV, marketing fund fees owed by the Koren Affiliate Defendants,

21 while requiring the other franchisees to continue paying into that fund. Even worse, Defendant

22 Koren caused the Nominal Defendant PCJV's marketing fund to be used to promote and market

23 the Koren Affiliate Defendant stores preferentially and disproportionately, even though they were

24 not paying into that account. This preferential and self-interested use of the PCJV marketing fund

25 was also never disclosed to, or approved by PCJV Management. Put simply, Defendant Koren

26 was forcing third party franchisees to pay for the marketing of his own stores.

27     61.    Defendant Koren's self-dealing extended into other transactions. For example, as

28 alleged herein, the separate company PCIT, also managed by Defendant Koren, was responsible

16544.2:9330787.1       18

ERVIN COHEN & JESSUP LLP

1 | for selling supplies to the American Potato Corner stores. Defendant Koren caused PCIT to sell
2 | supplies at cost (with a heavy discount) to the Koren Affiliate Stores, while charging the third
3 | party franchisees to pay market prices – or sometimes even above market prices.

4 |     62.     Defendant Koren also caused Nominal Defendant PCJV to agree to waive franchise
5 | fees and royalties owed by the Koren Affiliate Stores. The only such waivers that were presented
6 | to, and approved by, PCJV Management, arose from the first two Koren Affiliate Defendant
7 | stores, and those waivers were not to be in perpetuity.

8 |     63.     The other third party franchisees of Nominal Defendant PCJV did not receive this
9 | same preferential treatment granted to those owned by the Koren Affiliate Defendants. Plaintiffs
10 | are informed and believe and thereon allege that these third party franchise stores suffered as the
11 | result of the preferential treatment given to the Koren Affiliate Defendants. Plaintiffs are further
12 | informed and believe, and thereon allege that, as the result of this preferential treatment, Nominal
13 | Defendant PCJV was forced to waive franchise and royalty fees from these other third-party
14 | franchisees, so as to allow them to survive under these austere conditions.

15 |     64.     As a result of this preferential treatment, fees and profits earned by Nominal
16 | Defendant PCJV have been depressed, preventing payment of Approved License Fees and profits
17 | to Plaintiffs, whereas Koren-Affiliate Defendant owned stores have received unreimbursed
18 | resources and benefits from Nominal Defendant PCJV, as well as waived fees and royalties,
19 | earning profits to those stores that Defendant Koren and his affiliates took for themselves. Again,
20 | this kind of preferential treatment, to the detriment of other third-party franchisees, provided by
21 | Defendant Koren to the Koren Affiliate Defendants was not approved by PCJV Management, let
22 | alone a disinterested majority of the Managers.

23 |

24 |         *The JVA Is Amended, However, there is No Meeting of*
25 |         *the Minds as to the Intent of the Amended Terms*

26 |     65.     In or around October of 2012, the JVA was Amended, pursuant to an Amended
27 | Joint Venture Agreement ("AJVA"), which is attached hereto as Exhibit D.
28 | ///

ERVIN COHEN & JESSUP LLP

66.    The AJVA recognizes and acknowledges that Plaintiff PCI is the owner of all transferrable interests in Nominal Defendant PCJV. The AJVA also recognizes the removal of Non-Party Nemanim from Nominal Defendant PCJV. These terms are not in dispute.

67.    Most of the provisions of the AJVA remain unchanged from the JVA.

68.    The principal term to have materially changed from the JVA to the AJVA, was Section 3(c), identifying the specific individuals to serve as executive officers. In addition to naming Defendant Koren as the President, the AJVA, Section 3(c) also inserted the following vague language: "Any change in these mentioned executive officers will require a vote of 75% of members' interests."

69.    The purpose of this new language was to protect executive officers from unilateral action of Plaintiff PCI, given that, Section 3(f) allowed Management to hire and fire executive officers. Because Plaintiff PCI has the unilateral right to name four of the seven individuals comprising Management, Defendant Koren expressed his concern that Plaintiff PCI could effectively dictate who serves as Executive Officers. As a concession to Defendant Koren, Plaintiff PCI agreed that a supermajority of equity owners holding Membership Interests (*i.e.* Plaintiff PCI plus one of the other owners of Membership Interests, Jacoby or Defendant Koren) would be required to decide whether an Executive Officer should be hired or fired.

70.    Plaintiff PCI and Amir Jacoby, on the one hand, and Defendant Koren, on the other, possessed a different intent as to what this new Section 3(c) means.

71.    While Plaintiff PCI and Jacoby intended, upon execution of the AJVA, that, among other things, replacement of Executive Officers required a 75% vote of the holders of Membership Interests in Nominal Defendant PCJV, Defendant Koren apparently believed and intended that replacement of Executive Officers required a 75% vote of the Management (6 out of 7 Managers), and, in combination with his belief that he possesses the sole authority to name three of the seven individuals comprising the Management, Defendant Koren apparently intended that this term insulated him from ever being terminated or replaced as President.

72.    Plaintiff PCI would never have agreed to give Defendant Koren the right to serve as President in perpetuity, nor did they ever intend for that interpretation of this vague term.

ERVIN COHEN & JESSUP LLP

1      73.    These interpretations of the new Section 3(c) are so irreconcilable that they

2  evidence the failure of any meeting of the minds between the signatories to the AJVA, such that

3  this term cannot be enforced.

4      74.    Despite the absence of any meeting of the minds as to Section 3(c) of the AJVA,

5  Defendant Koren has nevertheless taken the position that this unenforceable term has protected

6  him from termination as President, unless six out of seven of the individuals comprising the

7  Management of Nominal Defendant PCJV agree. Again, this preposterous and unconscionable

8  interpretation of the AJVA would insulate him from termination unless he, or his handpicked

9  Managers agree.

10     75.    Despite the absence of any meeting of the minds as to the AJVA, Defendant Koren

11  has nevertheless imposed his unilateral and disputed interpretation of this unenforceable term from

12  the AJVA upon Plaintiff PCI, thus blocking his termination as President of Nominal Defendant

13  PCJV, even in the face of the egregious and brazen self-dealing and wrongful conduct at issue

14  herein.

15

16                  *Defendant Koren Conceals his Wrongdoing by Failing to Satisfy*

17                  *his Obligations of Financial Disclosure and Transparency*

18     76.    From his installation as President, to the present, and continuing as of the filing of

19  this Amended Complaint, Defendant Koren has concealed from Nominal Defendant PCJV, and

20  Plaintiffs, his self-dealing, and breaches of fiduciary duties of good faith and care, as well as his

21  other legal and contractual duties.

22     77.    Defendant Koren accomplished the concealment of his wrongdoing by, among

23  other things:

24           a.    Failing to disclose, and seek approval from a disinterested majority of

25                Management, for each of the self-dealing transactions alleged herein.

26           b.    Failing to provide the detailed Mandatory Monthly Financial Disclosures to

27                Nominal Defendant Management, as required by Section 3(i)(iv) of the

28                JVA.

ERVIN COHEN & JESSUP LLP

1        c.    Failing to provide annual audited financial statements as required by

2              Section 3(i)(v) of the JVA.

3        d.    Causing knowingly false statements to be included in the consolidated

4              financial statement covering 2015-2017. Plaintiffs only recently realized the

5              falsity of the representations contained in that audited financial statement.

6        e.    Failing to comply with and ignoring recent directives of PCJV Management

7              demanding a five year plan.

8     78.    Plaintiff PCI only began to learn of the wrongful acts being committed by

9 Defendant Koren in the Spring of 2018, when, for a temporary period, Plaintiff PCI operated the

10 day to day business of PCJV.

11

12 ***Defendant Koren Takes New Store Opportunities for Himself and Koren Affiliate Defendants***

13 ***and Disloyally Enriches the Koren Affiliate Defendants Using Nominal Defendant Resources***

14     79.    From the opening of the Santa Anita Potato Corner Store through the present only

15 46 Potato Corner Stores have been opened in the United States, twelve of which have since closed.

16 This is woefully below what Plaintiffs ever expected when entering into the Nominal Defendant

17 PCJV transaction with Defendant Koren.

18     80.    Not one of the 46 Potato Corner Stores have been opened as Company Stores,

19 owned and operated by Nominal Defendant PCJV, with profits and earnings owned by Nominal

20 Defendant PCJV. Instead, 37 of those stores were opened by third-party franchisees, whereas nine

21 were opened by Koren Affiliate Defendants. Out of the nine stores opened by the Koren Affiliate

22 Defendants, five have been purchased from existing Nominal Defendant PCJV's Franchisees, the

23 purchase of which was never disclosed to or approved by PCJV Management.

24     81.    Nine of the United States Potato Corner Stores have been opened by Defendant

25 Koren, through his Defendant Affiliates (as collectively referred to herein). Those Defendant

26 Affiliates, and their corresponding stores, are as follows.

27        a.    On February 7, 2010, Defendant NKM Capital Group, LLC, an affiliate of

28              Defendant Koren in which neither Plaintiff possesses any Membership

ERVIN COHEN & JESSUP LLP

16544.2:9330787.1

22

VERIFIED FIRST AMENDED COMPLAINT

1               Interest or governance rights whatsoever, opened the first Santa Anita

2               Potato Corner Store.

3     b.    On December 15, 2010, Defendant J&K Americana, LLC, an affiliate of

4               Defendant Koren in which neither Plaintiff possesses any Membership

5               Interest or governance rights whatsoever, opened the Potato Corner Store at

6               the Americana Mall in Glendale, California.

7     c.    On January 26, 2013, Defendant J&K Culver, LLC, an affiliate of

8               Defendant Koren in which neither Plaintiff possesses any Membership

9               Interest or governance rights whatsoever, opened the Potato Corner Store in

10              Culver City, California.

11    d.    On October 20, 2013, Defendant J&K Lakewood, LLC, an affiliate of

12              Defendant Koren in which neither Plaintiff possesses any Membership

13              Interest or governance rights whatsoever, opened the Potato Corner Store in

14              Lakewood, California .

15    e.    On May 13, 2014, Defendant J&K Oakridge, LLC, an affiliate of Defendant

16              Koren in which neither Plaintiff possesses any Membership Interest or

17              governance rights whatsoever, opened the Potato Corner Store in San Jose,

18              California.

19    f.    Also on May 13, 2014, Defendant J&K Valley Fair, LLC, an affiliate of

20              Defendant Koren in which neither Plaintiff possesses any Membership

21              Interest or governance rights whatsoever, opened the Potato Corner Store in

22              Santa Clara, California.

23    g.    On July 24, 2014, Defendant J&K 2, LLC, an affiliate of Defendant Koren

24              in which neither Plaintiff possesses any Membership Interest or governance

25              rights whatsoever, opened the Potato Corner Store in Sherman Oaks,

26              California. This Potato Corner Store closed on January 8, 2017.

27    h.    On July 23, 2016, Defendant NKM Capital Group, LLC opened a second

28              store in Arcadia ("Santa Anita #2").

16544.2:9330787.1

23

VERIFIED FIRST AMENDED COMPLAINT

i.  On July 25, 2017, Defendant Koren caused the creation of J&K PC Trucks, LLC in or around July 25, 2017, for the purpose of establishing a Potato Corner food truck, without having presented this opportunity to Nominal Defendant PCJV.

j.  On February 25, 2018, just months before this dispute erupted, Defendant J&K Ontario, LLC, an affiliate of Defendant Koren in which neither Plaintiff possesses any Membership Interest or governance rights whatsoever, opened the Potato Corner Store in Ontario, California.

82.  Plaintiffs are informed, and believe, and thereon allege that not one of the Potato Corner Stores outside of Los Angeles County or San Francisco County were presented for approval, consideration, and a vote, by the Management of Nominal Defendant PCJV (let alone a disinterested majority of Management), as required by the JVA, MSA, and AJVA.

83.  With respect to each of the nine stores owned by Defendant Koren and his Defendant Affiliates, Defendant Koren failed to disclose to, or seek approval from a disinterested majority of the Management of Nominal Defendant PCJV, as to some or all of the following self-interested transactions:

a.  Defendant Koren's waiver of franchise fees, marketing fund contributions, and royalties due and owing to Nominal Defendant PCJV from the Defendant Koren Affiliates arising from their ownership of Potato Corner franchises.

b.  Defendant Koren's preferential diversion of unreimbursed Nominal Defendant PCJV human, financial and other resources – and attention – for the benefit of these nine stores owned by the Defendant Koren Affiliates, to the exclusion, and detriment of the other 37 PCJV franchisees owned by third-parties.

c.  Defendant Koren's sale of supplies "at cost" from PCIT to Potato Corner Stores owned by Defendant Koren Affiliates, whereas the other PCJV franchisees were required to pay market or above market prices.

24
VERIFIED FIRST AMENDED COMPLAINT

1    84.    Accordingly, Defendant Koren wrongfully diverted New Store Corporate
2  Opportunities, and, upon opening these and the other Koren Affiliate Defendant stores, Defendant
3  Koren treated the Koren Affiliate Defendant Stores as PCJV Company Owned Stores – giving
4  these stores all the benefits and resources of Nominal Defendant PCJV – without treating them as
5  PCJV Company Owned Stores for the purpose of profits. In essence, Defendant Koren and the
6  Koren Affiliate Defendants reaped all of the rewards and profits of the New Store Corporate
7  Opportunities and other franchises, without reimbursing Nominal Defendant PCJV for the
8  resources contributed to, or at least the profits earned from these Koren Affiliate Defendant-owned
9  stores, let alone the franchise and royalties owed by these outlets.

10    85.    Put simply, Nominal Defendant PCJV has not received one penny in the form of
11  fees, royalties, reimbursement, or profit, from any of the stores owned by Defendant Koren's
12  Affiliates, nor did Nominal Defendant PCJV's Management approve the opening of all of these
13  New Store Opportunities by all of Koren Affiliate Defendants or approve of Defendant Koren's
14  self-dealing transactions with the Koren Affiliate Defendants.

15    86.    The net result of Koren's diversion of corporate opportunities, self-dealing, and
16  preferential treatment of his stores to the detriment of other PCJV franchisees, has caused the
17  Koren Affiliate Defendant stores to be some of the strongest among PCJV's franchisees, whereas
18  the third party franchisees have struggled under this disparate treatment.

19

20  *Defendant Koren's Brazen, Self-Dealing, and Void "Services Agreement," Which Diverted*
21  *Nominal Defendant PCJV Profits to Himself, While Plaintiffs Waived Their Fees*

22    87.    On July 13, 2013, at a meeting of the PCJV Management, Defendant Koren, as
23  President, Manager, and Member of Nominal Defendant PCJV reported to Plaintiff PCI, and the
24  Management, that Nominal Defendant PCJV's income from fees and royalties was insufficiently
25  high to support payment of the Approved License Fee. Specifically, Defendant Koren reported
26  that due to financial constraints, Nominal Defendant PCJV may slow down operations.

27    88.    As the result of Defendant Koren's disclosure regarding the financial health of
28  Nominal Defendant PCJV, Plaintiffs agreed to waive the Approved License Fee, a waiver that was

1  subsequently repeated by Plaintiffs annually. Plaintiffs agreed to waive this income based on
2  Defendant Koren's representation that he and Amir Jacoby would correspondingly also waive
3  Approved Management Fees agreed to in the JVA and MSA.

4      89.    Despite owing fiduciary, legal, and contractual duties to Plaintiffs and Nominal
5  Defendant PCJV, at no point did Defendant Koren disclose facts material to Plaintiffs' agreement
6  to waive these Approved License Fees. An example of material facts not disclosed to Management
7  of PCJV, as well as Plaintiffs, included the fact that Defendant Koren was using Nominal
8  Defendant PCJV resources for the benefit of Koren Affiliate Defendants, while simultaneously
9  causing Koren Affiliate Defendants to be relieved of their duties to pay marketing and other fees,
10  as well as market prices for supplies. Had Defendant Koren disclosed these material facts,
11  Plaintiffs would never have agreed to waive Approved License Fees.

12      90.    When seeking these waivers, and representing that Defendant Koren would cause
13  the Approved Management Fee to also be waived, Defendant Koren failed to disclose that he
14  would secretly cause Nominal Defendant PCJV to divert other PCJV funds for his benefit without
15  approval by Nominal Defendant PCJV Management. Had Defendant Koren disclosed this intent to
16  divert funds of Nominal Defendant PCJV for his benefit, Plaintiffs would never have agreed to
17  waive Approved License Fees.

18      91.    The most brazen step in Defendant Koren's scheme to divert funds from Nominal
19  Defendant PCJV was taken on January 1, 2017, when Defendant Koren executed a "Services
20  Agreement," a copy of which is attached hereto as Exhibit E.

21      92.    In this voidable "Services Agreement," dated January 1, 2017, Defendant Potato
22  Corner LA Group, LLC Group agreed to provide the services that Defendant Koren had already
23  agreed to provide in the MSA, in exchange for an annual "management fee" of $240,000 payable
24  by Nominal Defendant PCJV to Defendant Potato Corner LA Group, LLC Group. Put simply, the
25  "Services Agreement" diverted Nominal PCJV Funds to Defendant Potato Corner LA Group, LLC
26  Group, without offering any consideration other than that to which the LA Group was already
27  supposed to deliver.

28  ///

ERVIN COHEN & JESSUP LLP

93.    Defendant Koren signed this voidable "Services Agreement" transferring funds from Nominal Defendant PCJV to himself and/or Defendant Potato Corner LA Group, LLC Group, however, shockingly, Defendant Koren signed this document on behalf of Nominal Defendant PCJV, even though he failed to ever disclose the "Services Agreement" to, or obtain approval for that transaction from, the Management of Nominal Defendant PCJV.

94.    Accordingly, Defendant Koren did not possess the authority to enter into that "Services Agreement," and executed that document based upon deceit, and a wholesale violation of his fiduciary, legal, and contractual duties. Moreover, because the "Services Agreement" contained a promise by Defendant Koren to deliver the same services he had already contracted to provide, there was no consideration provided to Nominal Defendant PCJV, such that the Services Agreement fails for lack of consideration.

95.    At no point, from January 1, 2017 through the present, did Defendant Koren disclose his self-dealing "Services Agreement" to Nominal Defendant PCJV Management, or Plaintiffs. During the pendency of this "Services Agreement," in which Defendant Koren was diverting Nominal Defendant PCJV funds to himself, Plaintiffs continued to agree to waive rights to Approved License Fees. Had Plaintiffs known about the "Services Agreement," they would never have agreed to waive payment of any fees, royalties, or profits of Nominal Defendant PCJV.

96.    This "Services Agreement" was only discovered by a Plaintiff Cinco internal audit group in the Spring of 2018 (conducted during a temporary period in which Defendant Koren was not serving as President of Nominal Defendant PCJV).

97.    Plaintiffs are informed and believe, and thereon allege, that Defendant Koren has entered into other secret agreements, including "Services Agreement" such as the one reflected in Exhibit E for the years 2015 and 2016. Plaintiffs are informed and believe and thereon allege that these additional void Services Agreement were signed by Defendant Koren on behalf of Nominal Defendant PCJV, without having disclosed those transactions to, or obtained approval from PCJV Management.

98.    Plaintiffs are informed and believe, and thereon allege that, Defendant Koren was diverting substantial sums from Nominal Defendant to himself, in the form of unapproved

16544.2:9330787.1                                                    27
VERIFIED FIRST AMENDED COMPLAINT

1   "management fees" in 2015 and 2016, as well as the 2017 and 2018 fees alleged herein pursuant to

2   these "Services Agreements."

3      99.   At the same time these illegal, and unapproved, self-dealing transactions took

4   place, whereby Defendant Koren was diverting funds to himself, Plaintiffs were waiving their

5   rights to fees and profits, based upon Defendant Koren's representations regarding the financial

6   condition of Nominal Defendant PCJV.

7

8             *Other Breaches of Fiduciary, Contractual, and Legal Duties Owed*

9             *by Defendant Koren to Plaintiffs and Nominal Defendant PCJV*

10      100.   Unsatisfied with diverting Nominal Defendant PCJV funds and resources to

11   himself, and the Koren Affiliate Defendants, for his own benefit, under false and fraudulent

12   pretenses, in violation of his fiduciary, contractual and legal duties, Defendant Koren has engaged

13   in numerous other breaches of contractual, fiduciary, and legal duties. A non-exclusive list of

14   these breaches and wrongful acts are as follows:

15         a.   On March 26, 2018, Defendant Koren withdrew more $1,000,000 from a

16             bank account of Nominal Defendant PCJV, without obtaining approval

17             from the Management, as required under the JVA. These funds were then

18             transferred to a new bank account which he unilaterally opened without

19             approval from the Management.

20         b.   Defendant Koren has authorized bonuses and compensation packages to

21             Nominal Defendant PCJV staff and contractors, without seeking approval

22             from the Management, as required under the JVA. For example, within the

23             last year, Non-Party Thomas Hodgson – who serves an operations role at

24             Nominal Defendant PCJV – was paid an unapproved bonus of $60,000.

25         c.   Defendant Koren has caused flagrant violations of basic franchise rules and

26             regulations in California, which has subjected Nominal Defendant to

27             needless expense, scrutiny, investigation, and other injuries.

28   ///

ERVIN COHEN & JESSUP LLP

ERVIN COHEN & JESSUP LLP

d.  Defendant Koren has caused Nominal Defendant PCJV to ignore and fail to
    sufficiently support third party franchisees, in a manner that has caused
    injury to the goodwill, reputation, and income of Nominal Defendant PCJV.

e.  Defendant Koren has entered into other contracts, including a lease
    agreement, without seeking approval from PCJV Management.

f.  Defendant Koren has failed to use his "best efforts at all times . . . to operate
    and maintain the 'Potato Corner' outlets/stores in the Territory according to
    the highest standards achievable consistent with the overall plan of the
    Management of the Company." This failure has caused PCJV franchises
    and the Potato Corner Brand to suffer.

g.  Defendant Koren has failed to "[a]dvertise, market, and promote the Potato
    Corner outlets/stores with the goal of causing public knowledge, awareness
    and patronage of the Potato Corner outlets/stores." Indeed, Defendant
    Koren's failures have depressed the expansion of Potato Corner to levels
    that fall well below what he promised and what Plaintiffs expected when
    beginning this venture.

h.  Defendant Koren has failed to protect the confidential information of
    Plaintiffs, as required by the governing agreements.

i.  Defendant Koren has refused access to Nominal Defendant PCJV books
    and records, as well as Nominal Defendant PCJV offices.

j.  Defendant Koren harassed and threatened representatives of Plaintiff Cinco
    and Plaintiff PCI at Nominal Defendant PCJV's Office in April 2018.

k.  Defendant Koren's personnel broke into, and wrongfully removed
    documents and records from Nominal Defendant PCJV's office on April 30,
    2018, during a period in which he was not President.

l.  In Summer of 2018, Defendant Koren caused Nominal Defendant PCJV to
    break contracts with contractors hired by Plaintiffs during the short period
    in which Defendant Koren was removed as President, in a manner that has

16544.2:9330787.1

29

1    injured Nominal Defendant PCJV goodwill. Defendant Koren did so as a

2    form of revenge to those contractors who elected to work with Plaintiffs

3    during the short period in which they were operating PCJV.

4    101.    The above list of fiduciary and contract breaches, waste, and mismanagement by

5  Defendant Koren is necessarily incomplete, given Defendant Koren's concealment of his

6  wrongdoing from Nominal Defendant PCJV Management, as well as the majority owner, Plaintiff

7  PCI.

8

9    *Defendant Koren Takes the Outrageous and Unsupportable Position that He and*

10    *Jacoby Are Entitled to Majority Equity Ownership of Nominal Defendant PCJV*

11    102.    The governing agreements of Nominal Defendant PCJV grant to the holders of

12  equity in Nominal Defendant PCJV the right of first refusal should that owner of Membership

13  Interests wish to sell or transfer its ownership.

14    103.    As alleged herein, and evidenced in the Certificates for Limited Liability Company

15  Interests are attached hereto as Exhibit B, Plaintiff PCI is the undisputed owner of 60% of the

16  Membership Interests in Nominal Defendant PCJV. At no point has Plaintiff PCI ever transferred

17  its Membership Interests in Nominal Defendant PCJV to any person whatsoever.

18    104.    Plaintiff PCI is owned by the separate and distinct entity, Plaintiff Cinco. Plaintiff

19  Cinco does not possess any Membership Interests in Nominal Defendant PCJV as the equity is

20  held solely by Plaintiff PCI. Plaintiff Cinco possesses no other interests, rights, equity, or other

21  transferrable interests in Nominal Defendant PCJV, the JVA, or any other aspect of Nominal

22  Defendant PCJV.

23    105.    Despite this simple corporate structure, Defendant Koren has taken the outrageous

24  position that a new shareholder's acquisition of Plaintiff Cinco shares – the corporate parent of

25  Plaintiff PCI – somehow triggered the right of first refusal to which Plaintiff Cinco's subsidiary is

26  obligated. It appears, then, that Defendant Koren believes that any acquisition of stock in Plaintiff

27  Cinco effects a transfer of Plaintiff PCI's equity or interests in PCJV, even though Plaintiffs Cinco

28  ///

16544.2:9330787.1

30

VERIFIED FIRST AMENDED COMPLAINT

1  and PCI are entirely different and separate entities. This claim makes no sense and is contrary to
2  basic corporate law.

3     106.    The reason for Defendant Koren's nonsensical position was confirmed in
4  correspondence from Defendant Koren's counsel in August of 2018, indicating that Defendant
5  Koren's is relying upon this unsupportable and outrageous claim to argue that Plaintiff PCI is now
6  a minority owner of Nominal Defendant PCJV, and, moreover, that Plaintiff PCI is no longer
7  entitled to name four members of the Management of Nominal Defendant PCJV. Defendant Koren
8  has bootstrapped this frivolous accusation into a baseless, malicious, and self-dealing claim for
9  majority ownership and control over Nominal Defendant PCJV.

10     107.    Defendant Koren's frivolous claim to a majority stake in Nominal Defendant PCJV
11 equity and governance has frozen Nominal Defendant PCJV's governance, as Defendant Koren is
12 now refusing to recognize Plaintiff PCI as the majority owner, and is frivolously objecting to
13 Plaintiff PCI's right to name a majority of the individuals comprising the Management of Nominal
14 Defendant PCJV.

15

16                    *The Futility of Presentation of Claims Held by Nominal*
17                    *Defendant PCJV to the Management for Prosecution*

18     108.    As of the filing of this Amended Complaint, the Management of Nominal
19 Defendant PCJV is comprised of seven individuals: four of which were named by Plaintiff PCI.

20     109.    Despite Plaintiff PCI's obvious control over a majority of the Management of
21 Nominal Defendant PCJV, Defendant Koren has repudiated, rejected, and is unwilling to
22 recognize Plaintiff PCI's right to control a majority of the Management of Nominal Defendant
23 PCJV.

24     110.    Defendant Koren refuses to recognize Plaintiff PCI's right to name a majority of
25 the Management of Nominal Defendant PCJV based on his frivolous and unsupportable position
26 that Plaintiff PCI somehow transferred its equity in Nominal Defendant PCJV when Plaintiff
27 PCI's corporate parent sold stock to a third party.

28 ///

16544.2:9330787.1                              31
                              VERIFIED FIRST AMENDED COMPLAINT

ERVIN COHEN & JESSUP LLP

111. Based on the foregoing, any attempt by Plaintiff PCI to make a demand on the Management of Nominal Defendant PCJV to pursue its valid claims against Defendant Koren would be futile, as any vote of the Management would be disputed, rejected, and repudiated by Defendant Koren.

## FIRST CAUSE OF ACTION FOR DECLARATORY RELIEF

### (By Plaintiffs Against Defendants Koren and Potato Corner LA Group, LLC )

112. Plaintiffs re-allege and incorporate by reference the allegations of the preceding paragraphs of this Amended Complaint as if fully set forth herein.

113. An actual dispute and controversy has arisen and now exists between Plaintiffs and Defendants Koren and Potato Corner LA Group, LLC as to:

 a. Whether Plaintiff Cinco possesses any Membership Interests in, equity of, or transferrable rights to, Nominal Defendant PCJV.

 b. Whether any person's acquisition of Plaintiff Cinco stock triggers any right of first refusal by Defendant Koren and/or Amir Jacoby and/or Defendant Potato Corner LA Group, LLC

 c. Whether Defendants Koren and Potato Corner LA Group, LLC, or Amir Jacoby have any right, claim, or legitimate basis to demand ownership of or rights to any of Plaintiff PCI's 60% Membership Interests in Nominal Defendant PCJV.

 d. ·· Whether Plaintiff PCI remains the rightful owner of 60% of the Membership Interests in Nominal Defendant PCJV.

114. A judicial declaration is necessary and appropriate at this time under these circumstances.

115. Accordingly, Plaintiffs seek judicial declarations that:

 a. Plaintiff Cinco possesses no Membership Interests in, equity of, or transferrable rights to, Nominal Defendant PCJV.

///

ERVIN COHEN & JESSUP LLP

ERVIN COHEN & JESSUP LLP

1        b.   The acquisition of Plaintiff Cinco stock does not, and has never, triggered

2            any right of first refusal by Defendant Koren and/or Amir Jacoby and/or

3            Defendant Potato Corner LA Group, LLC.

4        c.   Neither Defendant Koren, Defendant Potato Corner LA Group, LLC, nor

5            Amir Jacoby have any right, claim, or legitimate basis for demand to own

6            any of Plaintiff PCI's 60% Membership Interests in Nominal Defendant

7            PCJV.

8        d.   Plaintiff PCI remains the rightful and sole owner of 60% of the Membership

9            Interests in Nominal Defendant PCJV.

10

11        **SECOND CAUSE OF ACTION FOR DECLARATORY RELIEF**

12    **(By Plaintiff PCI Against Defendants Koren and Potato Corner LA Group, LLC )**

13     116.   Plaintiff PCI re-alleges and incorporates by reference the allegations of the

14  preceding paragraphs of this Amended Complaint as if fully set forth herein.

15     117.   An actual dispute and controversy has arisen and now exists as to:

16        a.   Whether Plaintiff PCI possesses the right to name four of the seven

17           individuals constituting the Management of Nominal Defendant PCJV

18        b.   Whether Defendant Koren (or Defendant Potato Corner LA Group, LLC)

19           has the right to appoint any of the four seats of Nominal Defendant's PCJV

20           Management, which are allocated to Plaintiff PCI under the JVA and/or

21           AJVA.

22     118.   A judicial declaration is necessary and appropriate at this time under these

23  circumstances.

24     119.   Accordingly, Plaintiff PCI seeks judicial declarations that:

25        a.   Plaintiff PCI possesses the right to name four of the seven individuals

26           constituting the Management of Nominal Defendant PCJV.

27        b.   Neither Defendant Koren nor Defendant Potato Corner LA Group, LLC has

28           any right to appoint any of the four seats of Nominal Defendant's PCJV

16544.2:9330787.1             33

1               Management, which are allocated to Plaintiff PCI under the JVA and/or

2               AJVA.

3

4             **THIRD CAUSE OF ACTION FOR DECLARATORY RELIEF**

5             **(By Plaintiff PCI Against Defendant Koren)**

6     120.   Plaintiff PCI re-alleges and incorporates by reference the allegations of the

7  preceding paragraphs of this Amended Complaint as if fully set forth herein.

8     121.   An actual dispute and controversy has arisen and now exists as to:

9          a.   Whether Section 3(c) of the AJVA (Exhibit D), stating that "[a]ny change in

10         these mentioned executive officers will require a vote of 75% of members'

11         interests," refers to (i) 75% of the Membership Interests held by the owners

12         of equity of Nominal Defendant PCJV; (ii) 75% of the votes of the

13         individuals comprising Management, or (iii) is unenforceable.

14         b.   Whether a majority of the individuals comprising PCJV Management may

15         terminate Defendant Koren as President of Nominal Defendant PCJV.

16     122.   A judicial declaration is necessary and appropriate at this time under these

17  circumstances.

18     123.   Accordingly, Plaintiffs seek judicial declarations that:

19         a.   Section 3(c) of the AJVA (Exhibit D), stating that "[a]ny change in these

20         mentioned executive officers will require a vote of 75% of members'

21         interests," either refers to 75% of the Membership Interests held by the

22         owners of equity of Nominal Defendant PCJV, or is unenforceable.

23         b.   A majority of the individuals comprising PCJV Management may terminate

24         Defendant Koren as President of Nominal Defendant PCJV.

25  ///

26  ///

27  ///

28  ///

ERVIN COHEN & JESSUP LLP

**FOURTH CAUSE OF ACTION FOR BREACH OF FIDUCIARY DUTY**

**(By Plaintiff PCI, Derivatively, on behalf of Nominal Defendant PCJV, Against Defendant**

**Koren and DOES 1-25)**

124.    Plaintiff PCI, pleading derivatively, on behalf of Nominal Defendant PCJV, re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Amended Complaint as if fully set forth herein.

125.    At all times relevant to this Amended Complaint, Defendant Koren has owed Nominal Defendant PCJV fiduciary duties of loyalty, good faith, and care, which are codified by California law, as well as the agreements governing Nominal Defendant PCJV.

126.    Defendant Koren has brazenly and repeatedly breached these fiduciary duties owed to Nominal Defendant PCJV, by, among other things:

a.    Diverting New Store Corporate Opportunities to certain Koren Affiliate Defendants without disclosing to, or seeking approval from, PCJV Management, or a disinterested majority of PCJV Management.

b.    Diverting PCJV resources, capital, and attention to benefit stores owned by Koren Affiliate Defendants, without reimbursement or compensation to PCJV, and without disclosing to, or seeking approval from, PCJV Management, or a disinterested majority of PCJV Management, for these self-interested transactions, benefits, and opportunities.

c.    Entering into self-interested transactions, such as the void Services Agreement (Exhibit E hereto), from which Defendant Koren (or the Koren Affiliate Defendants or Defendant Potato Corner LA Group, LLC) benefit, without disclosing to, or seeking approval from, PCJV Management, or a disinterested majority of PCJV Management, of these self-interested transactions.

d.    Failure to treat all franchises of Nominal Defendant PCJV fairly, and without preference, such that, in his differential treatment of third party franchises as compared to his own franchises (owned by the Koren Affiliate

ERVIN COHEN & JESSUP LLP

1    Defendants), Defendant Koren breached his duties of good faith, care, and

2    loyalty to Nominal Defendant PCJV in the operation and maintenance of

3    those franchise relationships and operations.

4    e.    Failure to comply with "all laws, ordinances, orders or other requirements

5    of any federal, state, county, or municipal authority having jurisdiction of

6    the Company and affecting the Company," as he expressly agreed to do in

7    the JVA and MSA.

8    f.    Other acts of mismanagement and waste of Nominal Defendant PCJV.

9    127.    Defendant Koren has concealed from Nominal Defendant PCJV, and its

10   Management, some or all of his breaches of fiduciary duty. This concealment prevented the

11   discovery of the wrongdoing at issue herein until Spring of 2018, during which Plaintiff PCI

12   temporarily had access to Nominal Defendant PCJV's books and records. This concealment of

13   wrongdoing took place as the result of, among other things:

14   a.    Failing to disclose to, and seek approval from, a disinterested majority of

15   PCJV Management, for each of the wrongful acts at issue herein.

16   b.    Failing to provide the detailed Mandatory Monthly Financial Disclosures to

17   PCJV Management, as required by Section 3(i)(iv) of the JVA.

18   c.    Failing to provide annual audited financial statements as required by

19   Section 3(i)(v) of the JVA.

20   d.    Causing knowingly false statements to be included in the consolidated

21   financial statement covering 2015-2017. Plaintiffs only recently realized the

22   falsity of the representations contained in that audited financial statement.

23   128.    Defendant Koren's breaches of fiduciary duty have caused, and continue to cause,

24   proximately, directly, and indirectly, actual economic and non-economic damage to the Nominal

25   Defendant PCJV, in an amount to be established at trial, but that exceeds the jurisdictional

26   minimum of this Court. Defendant Koren's breaches of fiduciary duty were a substantial factor in

27   all harm to Nominal Defendant PCJV for which relief is sought in this action.

28   / / /

16544.2.93130787.1

36

VERIFIED FIRST AMENDED COMPLAINT

ERVIN COHEN & JESSUP LLP

1    129.    In performing the acts described herein, Defendant Koren acted with sufficient

2    malice, wantonness, willfulness, recklessness, oppression, and/or fraud, so as to entitle Plaintiffs

3    to an award of exemplary and punitive damages according to proof.

4    **FIFTH CAUSE OF ACTION FOR BREACH OF FIDUCIARY DUTY**

5    **(By Plaintiff PCI Against Defendant Koren and DOES 1-25)**

6    130.    Plaintiff PCI re-alleges and incorporates by reference the allegations of the

7    preceding paragraphs of this Amended Complaint as if fully set forth herein.

8    131.    At all times relevant to this Amended Complaint, Defendant Koren has owed

9    Plaintiff PCI fiduciary duties of loyalty, good faith, and care, which are codified by California law,

10    as well as the agreements governing Nominal Defendant PCJV.

11    132.    Defendant Koren has brazenly and repeatedly breached these fiduciary duties owed

12    to Plaintiff PCI, by, among other things:

13        a.    Failing to disclose to Plaintiff PCI that he is diverting New Store Corporate

14            Opportunities to certain Koren Affiliate Defendants.

15        b.    Failing to disclose to Plaintiff PCI that he is diverting PCJV resources,

16            capital, and attention to benefit stores owned by Koren Affiliate

17            Defendants, without reimbursement or compensation to PCJV, and in a

18            manner that preferred the Koren Affiliate Defendant Stores over the other

19            third party franchisees.

20        c.    Failing to disclose to Plaintiff PCI that he was entering into self-interested

21            transactions, such as the void Services Agreement (Exhibit E hereto), in

22            which Defendant Koren (or the Koren Affiliate Defendants or Defendant

23            Potato Corner LA Group, LLC) benefitted personally.

24        d.    Misrepresenting that he was waiving Approved Management Fees, without

25            disclosing other secret self-interested transactions in which Defendant

26            Koren benefited personally.

27        e.    Failing to disclose the true facts surrounding Nominal Defendant PCJV's

28            lack of funds sufficient to pay the Approved License Fee.

ERVIN COHEN & JESSUP LLP

16544.2:9330787.1

37

1          f.      Attempting to squeeze Plaintiff PCI out of its majority position on PCJV
2                  Management, and out of its majority equity ownership.

3          133.    Defendant Koren has concealed from Plaintiff PCI some or all of his breaches of
4  fiduciary duty. This concealment prevented the discovery of the wrongdoing at issue herein until
5  Spring of 2018, during which Plaintiff PCI temporarily had access to Nominal Defendant PCJV's
6  books and records. This concealment of wrongdoing took place as the result of, among other
7  things:

8          a.      Failing to disclose to, and seek approval from a disinterested majority of
9                  Management, for each of the wrongful acts at issue herein.
10         b.      Failing to provide the detailed Mandatory Monthly Financial Disclosures to
11                 Nominal Defendant Management, as required by Section 3(i)(iv) of the
12                 JVA.
13         c.      Failing to provide annual audited financial statements as required by
14                 Section 3(i)(v) of the JVA.
15         d.      Causing knowingly false statements to be included in the consolidated
16                 financial statement covering 2015-2017. Plaintiffs only recently realized the
17                 falsity of the representations contained in that audited financial statement.

18         134.    Defendant Koren's breaches of fiduciary duty have caused, and continue to cause,
19  proximately, directly, and indirectly, actual economic and non-economic damage to Plaintiff PCI,
20  in an amount to be established at trial, but that exceeds the jurisdictional minimum of this Court.
21  Defendant Koren's breaches of fiduciary duty were a substantial factor in all harm to Plaintiff PCI
22  for which relief is sought in this action.

23         135.    In performing the acts described herein, Defendant Koren acted with sufficient
24  malice, wantonness, willfulness, recklessness, oppression, and/or fraud, so as to entitle Plaintiff
25  PCI to an award of exemplary and punitive damages according to proof.

26  / / /
27  / / /
28  / / /

ERVIN COHEN & JESSUP LLP

## SIXTH CAUSE OF ACTION FOR DECEIT

### (By Plaintiffs Against Defendant Koren and DOES 1-25)

136. Plaintiffs re-allege and incorporate by reference the allegations of the preceding paragraphs of this Amended Complaint as if fully set forth herein.

137. As alleged herein, Defendant Koren intentionally failed to disclose the following material facts to Plaintiffs:

a. That he is diverting New Store Corporate Opportunities to certain Koren Affiliate Defendants.

b. That he is diverting PCJV resources, capital, and attention to benefit stores owned by Koren Affiliate Defendants, without reimbursement or compensation to PCJV, and in a manner that is preferring his stores (those owned by the Koren Affiliate Defendants) over other third party franchisees.

c. That he is entering into self-interested transactions, such as the void Services Agreement (Exhibit E hereto), in which Defendant Koren (or the Koren Affiliate Defendants or Defendant Potato Corner LA Group, LLC) benefitted personally.

d. Misrepresenting that he was waiving Approved Management Fees, without disclosing other self-interested transactions in which Defendant Koren benefited personally.

e. The true facts surrounding Nominal Defendant PCJV's lack of funds sufficient to pay the Approved License Fee.

138. Defendant Koren possessed a duty to disclose each of the above facts.

139. Each of these facts that Defendant Koren failed to disclose were material to Plaintiffs, such that, had Plaintiffs known these facts, they would have acted differently. For example, Plaintiffs would not have authorized the waiver of Approved License Fees due and owing under the JVA had they known these concealed facts.

///

16544.2:9330787.1

39

VERIFIED FIRST AMENDED COMPLAINT

ERVIN COHEN & JESSUP LLP

140. Defendant Koren's deceit has caused, and continue to cause, proximately, directly, and indirectly, actual economic and non-economic damage to Plaintiffs, in an amount to be established at trial, but that exceeds the jurisdictional minimum of this Court. Defendant Koren's deceit was a substantial factor in all harm to Plaintiffs for which relief is sought in this action.

141. In performing the acts described herein, Defendant Koren acted with sufficient malice, wantonness, willfulness, recklessness, oppression, and/or fraud, so as to entitle Plaintiffs to an award of exemplary and punitive damages according to proof.

## SEVENTH CAUSE OF ACTION FOR BREACH OF CONTRACT

### (By Plaintiffs Against Defendant Koren and DOES 1-25)

142. Plaintiffs re-allege and incorporate herein the allegations of the preceding paragraphs of this Amended Complaint as if fully set forth herein.

143. Plaintiffs are parties to various contracts with Defendant Koren, including the JVA and the MSA.

144. Parties have performed their obligations under the JVA and the MSA.

145. Defendant Koren has breached the JVA and/or the MSA, by, among other things:

    a.    Failing to submit, for approval, New Store Corporate Opportunities before diverting those opportunities to Koren Affiliate Defendants;

    b.    Failing to submit for approval to the PCJV Management compensation of "managers, executive offices, and key personnel;"

    c.    Failing to submit for approval to the PCJV Management all franchising agreements and lease agreements;

    d.    Failing to submit for approval to the PCJV Management all "purchases and disbursements in excess of $10,000;"

    e.    Failing to submit for approval to the PCJV Management a budget;

    f.    Failure to adequately manage PCJV and its franchisees, including, "management, operational, marketing, establishment, maintenance, licensing and sublicensing with respect to the 'Potato Corner' outlets/stores;"

ERVIN COHEN & JESSUP LLP

16544.2:9330787.1

40

VERIFIED FIRST AMENDED COMPLAINT

ERVIN COHEN & JESSUP LLP

g.    Failing to use "best efforts at all times . . . to operate and maintain the 'Potato Corner' outlets/stores in the Territory according to the highest standards achievable consistent with the overall plan of the Management of the Company;"

h.    Failure to produce the Mandatory Monthly Financial Disclosures;

i.    Failure to cause the issuance of annual audited (or accurate) financial statements;

j.    Failure to take "such actions as may be necessary to comply promptly with any and all laws, ordinances, orders or other requirements of any federal, state, county, or municipal authority having jurisdiction of the Company and affecting the Company;"

k.    Failure to sufficiently "[a]dvertise, market, and promote the Potato Corner outlets/stores with the goal of causing public knowledge, awareness and patronage of the Potato Corner outlets/stores."

l.    Failure to protect PCJV's Confidential Information; and

m.    Repudiating and misrepresenting the express terms of the right of first refusal.

146.    Each, some, or all of the above breaches of the JVA and/or MSA by Defendant Koren were a substantial factor in causing injury to Plaintiffs, and none of these breaches were excused.

147.    As such, Defendant Koren's breaches of contract have caused, and continue to cause, proximately, directly, and indirectly, damage to Plaintiff PCI, in an amount to be established at trial, but that exceeds the jurisdictional minimum of this Court.

/ / /

/ / /

/ / /

/ / /

/ / /

ERVIN COHEN & JESSUP LLP

1         **EIGHTH CAUSE OF ACTION FOR RESCISSION**

2    **(By Plaintiff PCI, Derivatively, and on behalf of Nominal Defendant PCJV, Against**

3    **Defendants Koren and Defendant Potato Corner LA Group, LLC, and DOES 1-25)**

4       148.   Plaintiff PCI, derivatively, and on behalf of Nominal Defendant PCJV, re-alleges

5  and incorporates by reference the allegations of the preceding paragraphs of this Amended

6  Complaint as if fully set forth herein.

7       149.   On January 1, 2017, Defendant Koren executed a "Services Agreement," a copy of

8  which is attached hereto as Exhibit E.

9       150.   Defendant Koren signed this "Services Agreement" transferring funds from

10  Nominal Defendant PCJV to himself and/or Defendant Potato Corner LA Group, LLC , however,

11  shockingly, Defendant Koren signed this document on behalf of Nominal Defendant PCJV, even

12  though he failed to ever disclose the "Services Agreement" to, or obtain approval for that self-

13  interested transaction from, the Management of Nominal Defendant PCJV.

14      151.   In this "Services Agreement," dated January 1, 2017, Defendant Koren, on behalf

15  of Nominal Defendant PCJV (but without authority) agreed to accept services that had already

16  been agreed to in the MSA, albeit this time in exchange for a new "management fee" of $240,000

17  payable by Nominal Defendant PCJV to Defendant Koren and/or Defendant Potato Corner LA

18  Group, LLC. Put simply, the "Services Agreement" increased the fee payable to the LA Group,

19  without offering any consideration other than that to which the LA Group was already supposed to

20  deliver.

21      152.   Accordingly, Defendant Koren did not possess the authority to enter into that

22  "Services Agreement," and executed that document based upon deceit, and a wholesale violation

23  of his fiduciary, legal, and contractual duties. Moreover, because the "Services Agreement"

24  contained a promise by Defendant Koren to deliver the same services he had already contracted to

25  provide, there was no consideration provided to Nominal Defendant PCJV, such that the Services

26  Agreement fails for lack of consideration.

27  ///

28  ///

16544.2:9330787.1           42

1    153.    Based upon the foregoing, Plaintiff PCI, on behalf of Nominal Defendant PCJV,

2  hereby provides notice of, and rescinds, the Services Agreement, pursuant to Cal. Civ. Code

3  §§1688 et. seq. Specifically, rescission is proper pursuant to Cal. Civ. Code § 1689(b)(1)-(b)(6).

4    154.    Because Nominal Defendant PCJV provided nothing in exchange for this Services

5  Agreement, there is nothing of value for Plaintiff PCI, on behalf of Nominal Defendant PCJV, to

6  restore.

7    155.    Plaintiff PCI, on behalf of Nominal Defendant PCJV is informed and believes, and

8  thereon alleges that Defendant Koren has entered into other secret and self-interested agreements,

9  signed by Defendant Koren on behalf of Nominal Defendant PCJV, without having disclosed

10  those transactions to, or obtained approval from PCJV Management. Accordingly, Plaintiff PCI,

11  on behalf of Nominal Defendant PCJV shall seek rescission of those additional contracts once

12  they are fully disclosed by Defendant Koren.

13    156.    Pursuant to Cal. Civ. Code § 1692, Plaintiff PCI, on behalf of Nominal Defendant

14  PCJV, seeks disgorgement and restitution from Defendant Koren and/or Defendant Potato Corner

15  LA Group, LLC of all funds and benefits received as the result of this rescinded Services

16  Agreement, as well as any and all consequential damages caused by this void contract.

17    157.    In performing the acts described herein, Defendant Koren acted with sufficient

18  malice, wantonness, willfulness, recklessness, oppression, and/or fraud, so as to entitle Plaintiff

19  PCI to an award of exemplary and punitive damages according to proof.

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

16544.2:9330787.1

43

VERIFIED FIRST AMENDED COMPLAINT

ERVIN COHEN & JESSUP LLP

## NINTH CAUSE OF ACTION FOR AIDING AND ABETTING A BREACH OF

## FIDUCIARY DUTY

(By Plaintiff PCI, Derivatively, on behalf of Nominal Defendant PCJV, Against Defendant

Potato Corner LA Group, LLC; Defendant NKM Capital Group, LLC; Defendant J&K

Americana, LLC; Defendant J&K Culver, LLC; Defendant J&K Lakewood, LLC;

Defendant J&K Oakridge, LLC; Defendant J&K Valley Fair, LLC; Defendant J&K Capital

2, LLC; Defendant J&K Ontario, LLC; Defendant J&K PC Trucks, LLC; Defendant J&K

Consultants Group, LLC; Defendant GK Capital Group, LLC; and DOES 1-25)

158.   Plaintiff PCI, pleading derivatively, on behalf of Nominal Defendant PCJV, re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Amended Complaint as if fully set forth herein.

159.   At all times relevant to this Amended Complaint, Defendant Koren has owed Nominal Defendant PCJV fiduciary duties of loyalty, good faith, and care, which are codified by California law, as well as the agreements governing Nominal Defendant PCJV.

160.   At all times relevant to this action, the Koren Affiliate Defendants knew of the fiduciary duties of loyalty, good faith, and care owed by Defendant Koren to Nominal Defendant PCJV.

161.   Defendant Koren has brazenly and repeatedly breached these fiduciary duties owed to Nominal Defendant PCJV, by, among other things:

      a.   Diverting New Store Corporate Opportunities to certain Koren Affiliate Defendants without disclosing to, or seeking approval from, PCJV Management, or a disinterested majority of PCJV Management.

      b.   Diverting PCJV resources, capital, and attention to benefit stores owned by Koren Affiliate Defendants, without reimbursement or compensation to PCJV, and without disclosing to, or seeking approval from, PCJV Management, or a disinterested majority of PCJV Management, for these self-interested transactions, benefits, and opportunities.

///

16544 2 9330787.1

44

VERIFIED FIRST AMENDED COMPLAINT

ERVIN COHEN & JESSUP LLP

ERVIN COHEN & JESSUP LLP

1      c.    Entering into self-interested transactions, such as the void Services

2          Agreement (Exhibit E hereto), from which Defendant Koren (or certain

3          Koren Affiliate Defendants or Defendant Potato Corner LA Group, LLC)

4          benefit, without disclosing to, or seeking approval from, PCJV

5          Management, or a disinterested majority of PCJV Management, of these

6          self-interested transactions.

7      d.    Failing to treat all franchises of Nominal Defendant PCJV fairly, and

8          without preference, such that, by his differential treatment of third party

9          franchises as compared to his own franchises (owned by the Koren Affiliate

10         Defendants), Defendant Koren breached his duties of good faith, care, and

11         loyalty to Nominal Defendant PCJV in the operation and maintenance of

12         those franchise relationships and operations.

13      e.    Other acts of mismanagement and waste of Nominal Defendant PCJV.

14    162.   Defendant Koren has concealed from Nominal Defendant PCJV, and its

15  Management, some or all of his breaches of fiduciary duty. This concealment prevented the

16  discovery of the wrongdoing at issue herein until Spring of 2018, during which Plaintiff PCI

17  temporarily had access to Nominal Defendant PCJV's books and records. This concealment of

18  wrongdoing took place as the result of, among other things:

19      a.    Failing to disclose to, and seek approval from, a disinterested majority of

20          Management, for each of the wrongful acts at issue herein.

21      b.    Failing to provide the detailed Mandatory Monthly Financial Disclosures to

22          Nominal Defendant Management, as required by Section 3(i)(iv) of the

23          JVA.

24      c.    Failing to provide annual audited (or accurate) financial statements as

25          required by Section 3(i)(v) of the JVA.

26      d.    Causing knowingly false statements to be included in the consolidated

27          financial statement covering 2015-2017. Plaintiffs only recently realized the

28          falsity of the representations contained in that audited financial statement.

16544.2:9330787.1

45

1  163.  The Koren Affiliate Defendants knew of each of these breaches of fiduciary duty of
2  Defendant Koren, and gave substantial assistance or encouragement to Defendant Koren in his
3  breaches of fiduciary duty. For example, the Koren Affiliate Defendants knowingly accepted all of
4  the benefits received from Nominal Defendant PCJV (in the form of New Store Opportunities, as
5  well as unreimbursed or uncompensated resources, capital, and attention, to the exclusion of other
6  PCJV franchisees and funds payable from the "Services Agreement").

7  164.  The aiding and abetting by the Koren Affiliate Defendants of Defendant Koren's
8  breaches of fiduciary duty have caused, and continue to cause, proximately, directly, and
9  indirectly, actual economic and non-economic injury to the Nominal Defendant PCJV. The named
10 Koren Affiliate Defendants' aiding and abetting was a substantial factor in all harm to Nominal
11 Defendant PCJV.

12  165.  As a remedy for the aiding and abetting by the Koren Affiliate Defendants, Plaintiff
13 PCI, on behalf of Nominal Defendant PCJV, seeks disgorgement and restitution from the Koren
14 Affiliate Defendants, as well as imposition of a constructive trust on all (i) money and funds of the
15 Koren Affiliate Defendants wrongfully diverted, and (ii) all Potato Corner stores, outlets and
16 franchises owned by the Koren Affiliate Defendants.

17  166.  In performing the acts described herein, the Koren Affiliate Defendants acted with
18 sufficient malice, wantonness, willfulness, recklessness, oppression, and/or fraud, so as to entitle
19 Nominal Defendant PCJV to an award of exemplary and punitive damages according to proof.

20  **TENTH CAUSE OF ACTION FOR UNFAIR BUSINESS PRACTICES PURSUANT TO**

21  **CAL. BUS. & PROF. CODE § 17200 ET. SEQ.**

22  **(By Plaintiffs against all Defendants and DOES 1-25)**

23  167.  Plaintiffs re-allege and incorporate by reference the allegations of the preceding
24 paragraphs of this Amended Complaint as if fully set forth herein.

25  168.  Defendants, and each of them, are prohibited under California law from engaging
26 in any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

27  169.  Defendants, and each of them, have brazenly violated this rule, by engaging in the
28 numerous and extensive unfair business practices alleged herein. Those unfair business practices

ERVIN COHEN & JESSUP LLP

1 | have injured Plaintiffs, Nominal Defendant PCJV, as well as each of the third party franchisees

2 | owning stores other than those owned by the Koren Affiliate Defendants.

3 | 170.   As a remedy for the numerous violations of Cal. Bus. & Prof. Code § 17200

4 | alleged herein, Plaintiffs seek disgorgement from all Defendants, restitution from all Defendants,

5 | as well as imposition of a constructive trust on all (i) money and funds of the Koren Affiliate

6 | Defendants wrongfully diverted, and (ii) all Potato Corner stores, outlets and franchises owned by

7 | the Koren Affiliate Defendants.

8 | 171.   Plaintiffs also seek other relief in the form of attorneys' fees and other costs

9 | allowable by statute.

10 |

11 | ### ELEVENTH CAUSE OF ACTION FOR ACCOUNTING

12 | **(By Plaintiff PCI, Derivatively, and on behalf of Nominal Defendant PCJV, Against**

13 | **all Defendants and DOES 1-25)**

14 | 172.   Plaintiff PCI, pleading derivatively, on behalf of Nominal Defendant PCJV, re-

15 | alleges and incorporates by reference the allegations of the preceding paragraphs of this Amended

16 | Complaint as if fully set forth herein.

17 | 173.   Defendant Koren is a fiduciary of Nominal Defendant PCJV.

18 | 174.   Each of the Koren Affiliate Defendants possess contractual and/or fiduciary duties

19 | to Nominal Defendant PCJV.

20 | 175.   As the result of the wrongful acts and other transactions between Nominal

21 | Defendant PCJV, on the one hand, and some or all of the Defendants, on the other, a balance is

22 | most certainly due to Nominal Defendant PCJV from Defendants.

23 | 176.   The amount due from Defendants to Nominal Defendant PCJV is not readily

24 | ascertainable. Indeed, the accounts and amounts due are so complicated, that they can only be

25 | ascertained through an accounting.

26 | ///

27 | ///

28 | ///

J6544/2.9330787.1

47.

VERIFIED FIRST AMENDED COMPLAINT

ERVIN COHEN & JESSUP LLP

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against the Defendants, and each of them, as follows:

1.    For judicial declarations as set forth in paragraphs 115, 119, and 123 herein;

2.    For damages, according to proof, whether economic, non-economic, general, special, actual, compensatory, or otherwise;

3.    Restitution and disgorgement;

4.    Rescission of the Services Agreement (Exhibit E), and any and all other self-interested transactions entered into by Defendant Koren on behalf of or injurious to Nominal Defendant PCJV;

5.    Imposition of a constructive trust on all (i) money and funds of the Koren Affiliate Defendants wrongfully diverted, and (ii) all Potato Corner stores, outlets and franchises owned by the Koren Affiliate Defendants;

6.    Punitive and exemplary damages;

7.    For injunctive and other equitable relief;

8.    For an award of costs and attorneys' fees where allowable by statute (such as the Unfair Competition Law), or otherwise;

9.    For pre-judgment and post-judgment interest; and

10.    For such other and further relief as the Court deems just and proper.

DATED: August 23, 2018                ERVIN COHEN & JESSUP LLP

By: _____
Michael D. Murphy
Attorneys for Plaintiffs and Cross-Defendants
CINCO CORPORATION and POTATO
CORNER INTERNATIONAL, INC.

ERVIN COHEN & JESSUP LLP

16544.2:9330787.1                48
VERIFIED FIRST AMENDED COMPLAINT

# VERIFICATION

I have read the foregoing **VERIFIED FIRST AMENDED COMPLAINT** and know its contents.

I am the Chief Executive Officer (CEO) of Cinco Corporation, a Plaintiff and Cross-Defendant in this action. The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

Executed on this 24th day of August 2018, at Manila, Philippines.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

CINCO CORPORATION

JOSE P. MAGSAYSAY, JR.
Its: CEO

ERVIN COHEN & JESSUP LLP

## VERIFICATION

I have read the foregoing **VERIFIED FIRST AMENDED COMPLAINT** and know its contents.

I am the Chief Executive Officer (CEO) of Potato Corner International, Inc., a Plaintiff and Cross-Defendant in this action. The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

Executed on this 24th day of August 2018, at Manila, Philippines.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

POTATO CORNER INTERNATIONAL, INC.

JOSE P. MAGSAYSAY, JR.

Its: CEO



## POTATO CORNER USA
## JOINT VENTURE AGREEMENT

This Joint Venture Agreement (the "Agreement") dated _____ is made and entered into on _____, by and between:

Cinco Corporation, a corporation duly existing and registered by virtue of and under the laws of the Republic of the Philippines with office address at 869 Katarungan Street, Plainview Mandaluyong City, Philippines 1550, represented herein by its duly authorized representative, Jose P. Magsaysay (hereinafter "Cinco"), and its directors, Jose P. Magsaysay, Jr., Jose Miguel Ma. G. Montinola, Ma. Victoria O. Bermejo, Ricardo K. Montelibano, all of whom are Philippine citizens and resident, and collectively referred to as the "Cinco Group";

-and-

AMIT NEMANIM, GUY KOREN, AMIR JACOBY, all of whom are U.S. citizens and residents and collectively referred to as the "LA Group:

### RECITALS

WHEREAS, the Parties hereto have agreed to form a limited liability company (hereinafter referred to as the "Company") under the laws of the State of Delaware, with the primary purpose of engaging in the business of establishing, operating, managing, licensing and franchising "Potato Corner" stores/outlets in the United States of America and Israel, except in the County of Los Angeles, USA and the County of San Francisco, USA and Tanforan Mall (hereinafter, "Territory").

WHEREAS, the Parties herein have agreed to enter into this Agreement which sets forth the terms and conditions with respect to the organization, incorporation, operation and management of the Company and defines their respective rights, duties and obligations of the parties to this Agreement.

WHEREAS, the Parties agree that the LLC operating agreement to be entered by them shall reflect the terms and conditions as set forth in this Agreement.

WHEREAS, Cinco may assign and or all of its rights to the joint venture company formed under this Agreement to a wholly-owned subsidiary as it deems fit.

NOW, THEREFORE, for and in consideration of the foregoing premises, the Parties hereby agree as follows:

### 1) ORGANIZATION AND FORMATION OF THE COMPANY

a) Within ten (10) days from the Effective Date of this Agreement, the Parties herein agree to organize and form, a limited liability company to be called "PCJV USA" ( hereinafter referred to as the Company) for the primary purpose of engaging in the business of establishing, operating, managing, licensing and franchising "Potato Corner" stores/outlets in the Territory.

b) The initial members of the Company shall be the following:

   i)  Cinco Group
     (1) Cinco
     (2) Jose P. Magsaysay, Jr.
     (3) Jose Miguel Ma. G. Montinola
     (4) Ma. Victoria O. Bermejo
     (5) Ricardo K. Montelibano

   ii) LA Group
     (1) Amit Nemanim
     (2) Guy Koren
     (3) Amir Jacoby

c) The principal office of the Company shall be at 1729 Santee St., Los Angeles, California 90015.

d) The annual general meeting of the members of the Company shall be held every year at the principal office of the Company. The members may, at their discretion, invite non-members to join the annual general meeting, but only as non-voting observers. Further, to the extent allowed by the financial condition of the Company, and as agreed upon by a majority of all member interests, the Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses incurred by the following members in attendance of the annual members' meeting: Jose P. Magsaysay, Jr., Jose Miguel Ma. Montinola, Ma. Victoria O. Bermejo and Ricardo K. Montelibano.

e) The fiscal year of the Company shall begin on January 1 and end on December 31 of each year.

f) The Company shall immediately upon formation obtain a "Liability Insurance" for the Company the amount and scope of coverage to be determined by the managers.

g) All costs, fees and expenses incurred in connection with the organization and formation of the Company shall be for the account of the Company.

h) The operating agreement of the Company shall reflect the terms and conditions set forth in this Agreement between the Parties.

2) CAPITALIZATION/OWNERSHIP OF THE COMPANY

a) At the time of formation, the Company shall have a total capital account of Fifty Thousand Dollars (US$50,000) which shall be fully subscribed and paid.

b) Unless other agreed to in writing, at the commencement of this Agreement, the Parties hereby agree that the Cinco Group shall contribute Thirty Thousand Dollars (US$30,000) and own sixty (60%) percent of the Company's capital accounts, while the LA Group shall contribute Twenty Thousand Dollars (US$20,000) and own the remaining forty (40%) percent.



2

c) The Parties hereby agree any increase in the capital account shall require an affirmative vote of 75% of all of the members' percentage interests in the Company. In the event an increase in the Company's capital accounts is approved by the members, both Parties shall have rights of pre-emption so that their pro rata ownership share in the Company shall be maintained, provided that, either Party shall have thirty (30) days within which to confirm in writing that it is willing and able to subscribe and fully pay its pro rata share of the increase in capital.

d) Neither Party shall assign any of its rights or obligations under this Agreement, nor his/its member interests in the Company without the prior written consent of the other Party. In the event either Party desire to transfer or sell his/its pro rata members interest in the Company to a person other those specifically named in Section 1(a) of this Agreement, such Party shall be obligated to sell the same first to the other Party, which has have thirty (30) days within which to exercise its rights of first refusal from the date of receipt of a written notice to sell. For this purpose, the Parties hereby agree that the right of first refusal may be exercised in accordance with the following formula: The average of the Company's earnings before interest, depreciation, taxes and amortization (EBITDA) for the last two (2) years multiplied by 5 times, and further multiplied by the percentage of member interest subject to such right of first refusal over total outstanding member interests.

3) MANAGEMENT OF THE COMPANY

a) As will be provided in the Operating Agreement, the business and affairs of the Company shall be managed and all of the Company powers shall be exercised by or under the direction of the managers (collectively referred to as "Management"). Unless otherwise agreed to by the parties, the Management shall be composed of seven (7) members, four (4) of whom shall be designated by the Cinco Group, and three (3) designated by the LA Group. Upon the formation of the Company, the following shall be named managers: Jose P. Magsaysay, Jr., Jose Miguel Ma. Montinola, Ma. Victoria O. Bermejo, Ricardo K. Montelibano, Amit Nemanim, Guy Koren, and Amir Jacoby.



b) The Management shall regularly meet on a monthly basis. The regular monthly board meeting may be done via teleconference or through the internet. The members may, at their discretion, invite non-members to join member meetings, but only as non-voting observers. Further, to the extent allowed by the financial condition of the Company, and as agreed upon by a majority of all member interests, the Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses incurred by the members named in Section 1(d) in attendance of said meetings.

c) Upon the formation of the Company, it shall have the following executive officers: President, Corporate Secretary and Treasurer, and the following shall be elected by the members to serve these positions:

i) Chairman of the Board of Members – Jose P. Magsaysay

3

    ii) President – At any given time, the President shall be any one of the following members: Amit Nenamin, Guy Koren or Amir Jacoby, and the first president will be Amit Nemanim

    iii) Corporate Secretary – Erlinda Bartolome.

    iv) Treasurer – Jose Miguel Ma. Montinola
        (1) The Treasurer shall have oversight functions over the Accounting and Finance Departments that shall be exercised independent of the President.

d) Additional executive officers may be appointed by Management as it may deem necessary.

e) It is hereby agreed that the rights and responsibilities of the Management shall include the following:

    i) Approval of the compensation package for the managers, executive offices and key personnel.

    ii) Approval of the Accounting System/Procedures/Software/Method to be used by the Company.

    iii) Approval of the operating budget of the Company, and any changes to it.

    iv) Approval of all franchising agreements, and lease agreements.

    v) Approval of all purchases and disbursements in excess of $10,000, provided that such amount may be changed or modified by Management as it deems necessary.

f) The executive officers shall manage the business and property of the Company, and to market the business, in accordance with and pursuant to the directives of and policies set by the Management of the Company. The Management of the Company can recall and/or withdraw the appointment of any executive officer, as it deems necessary.

g) The Company shall enter into a Master License Agreement with Cinco (or an affiliated company to be designated by Cinco) which shall include the following terms and conditions:

    i) The Company agrees to license the "POTATO CORNER" intellectual property rights from Cinco or an affiliated company to be designated by Cinco) consisting of (i) the trademark, service mark and trade name "POTATO CORNER"; and (ii) various trademarks, service marks, trade names, slogans, designs, insignias, emblems, symbols, color schemes, package features, logo and other propriety identifying characteristics used in relation and in connection with the "Potato Corner" Products and the System; and (iii) as well as other intellectual property rights in connection with the "POTATO CORNER" intellectual property rights, for use in the Territory.

    ii) The Company agrees to pay, as an arm's length license fee, the following amounts:

        (1) With respect to the licensing / sub-licensing or franchising the "POTATO CORNER" Intellectual property rights in connection with the "POTATO CORNER" outlets/stores, an amount equal to thirty percent (30%) of all



4

initial/franchise fees and ongoing royalty fees paid to/ collected by the Company. Payments shall be made to Cinco (or an affiliated company to be designated by Cinco) by wire transfer using a bank or other financial institution specified by it within thirty (30) days from receipt of the fees by the Company.

(2) All withholding and other applicable taxes levied by any authority on the payments by the Company shall be borne solely by the Company.

h) The Company agrees to engage the LA Group to provide management and strategic experience and expertise during the duration of this Agreement. The Company shall enter into a Master Services Agreement with the LA Group (or a corporation to be designated by the LA Group) which shall include the following terms and conditions:

i) In consideration for the provision of its services under the Master Services Agreement, the LA Group shall be entitled to a services fee equal to thirty (30%) percent of all initial/franchise fee and continuing royalty fees paid to/ collected by the Company.

ii) All withholding and other applicable taxes levied by any authority on the payments by the Company to the LA Group under this Agreement shall be borne solely by the Company.

iii) The LA Group shall faithfully, diligently and efficiently exercise its obligations and responsibilities under the Master Services Agreement.

iv) The LA Group shall maintain and protect the Confidential Information belonging to Cinco or the Company, and such undertaking shall apply to all of its partners, officers, employees, or agents.

i) The President of the Company shall render the following services and shall perform the following duties for the Company in a faithful, diligent and efficient manner:

i) The President shall be responsible for all management, operational, marketing, establishment, maintenance, licensing and sub-licensing activities with respect to the "Potato Corner" outlets/stores in the Territory. He shall use his best efforts at all times during the term of this Agreement to operate and maintain the "Potato Corner" outlets/stores in the Territory according to the highest standards achievable consistent with the overall plan of the Management of the Company. The President shall comply with the rules, policies and procedures approved by the Management of the Company from time to time.

ii) The President shall advertise market and promote the "Potato Corner" outlets/stores with the goal of causing public knowledge, awareness and patronage of the "Potato Corner" outlets/sites.

iii) The President shall maintain a comprehensive system of records, books and accounts, with respect to the licensing and sub-licensing activities, operation,



5

establishment, management, maintenance and other activities of the "Potato Corner" outlets /stores in the Territory with the assistance of the Corporate Secretary.

iv) No later than the twentieth (20th) day of each month, with respect to the preceding month, the President shall render a statement of receipts and disbursements, a schedule of accounts receivable and payable, and a schedule of fees collected and distributed, together with a reconciled bank statement as of the last day of the month with the assistance of the Corporate Secretary.

v) No later than three (3) months after the end of a fiscal year, the President shall, with the assistance of the Corporate Secretary and external accountant hired by Management, cause the Company to issue audited financial statements, and shall provide a copy of the same to all the members of Management.

vi) To the extent the President is lawfully able to do so, the President shall take such action as may be necessary to comply promptly with any and all laws, ordinances, orders or other requirements of any federal, state, county or municipal authority having jurisdiction of the Company and affecting the Company.

j) Consistent with its fiduciary duty to the Company, the members and managers shall exercise the duty of care and shall, at all times, ensure that all corporate opportunities consistent with the objectives of this Agreement shall be pursued on behalf of, and for the benefit of the Company. As such, with respect to the establishment of Company-owned stores, whenever potential locations are identified by any member or manager, it shall be promptly brought to the attention of the Management. At all times, and within thirty (30) days from receipt of this information, the Management shall decide to either build a Company-owned store at the identified location. In the event the Company chooses to build a Company-owned store at the identified location, it shall have the right to do so, to the exclusion of any of the members or managers. However, in the even the Company decides not to build a Company-owned store at the identified location, it shall notify the members and managers of its decision in writing. In such case, the LA Group shall have the right to build a store at the identified location, provided that it shall enter into a franchising agreement with the Company, and shall pay the franchise fees and ongoing royalty fees as set forth in the Company's standard franchising agreement.

4) DURATION OF AGREEMENT

a) This Agreement shall become effective from the date of execution hereof and shall continue indefinitely unless otherwise terminated by (i) an affirmative vote of 75 percent (75%) of all member interests, or (ii) upon mutual agreement by the Parties in writing.

b) Upon termination of this Agreement, the effects of termination shall be as follows:

6

i) All rights granted under the Master License Agreement shall terminate and the Company shall cease the use of the Potato Corner Intellectual Property Rights, and Confidential Information, provided however, that the Company shall be permitted to use any of the foregoing as is reasonably required in order to comply with its obligations under its sub-licensing or franchising agreements, but only to the extent of the duration of sub-licensing or franchising agreements in existence at the time of the termination of this Agreement.

ii) The LA Group shall be subject to a non-compete arrangement and hereby agrees that, within two (2) years from the date of termination of this Agreement, it shall not engage in the business of establishing, operating, managing, licensing and franchising identical or similar products sold by the Company, using the intellectual property rights identical or similar to those used by the Company, at the time of the termination of this Agreement.

5) GENERAL PROVISIONS

a) This Agreement may not be altered, changed, supplemented or modified except by a written instrument duly signed by the Parties.

b) The Parties shall use their best efforts to cooperate for the success of the business of the Company. The Parties further agree to perform all acts and execute and deliver all documents or instruments required or necessary to fully implement or consummate the transactions contemplated in and the intent underlying this Agreement.

c) The Parties shall, to the extent feasible, cause the operating agreement of the Company to reflect the mutual covenants and provisions contained in this Agreement.

d) All notices and other communications required or permitted to be given hereunder shall be given in writing (and for this purpose shall include emails or fax transmissions) and shall be addressed to the appropriate Party at the address of such Party as heretofore designated, or at such address as such Party may designate subsequently in writing.

e) The failure of any Party at any time to require performance by the others of any provision of this Agreement shall not affect, in any way, the right of such Party to require performance of that or any other provision, and any waiver by any Party of any breach of this Agreement shall not be construed as a waiver of any continuing or succeeding breach of such provision, or a waiver of any other right under this Agreement.

f) This Agreement shall constitute the entire agreement between the Parties and shall supersede any previous agreements, written or otherwise, with respect to the same subject matter which may have been made by the Parties prior hereto.

g) The invalidity of any portion of this Agreement will not and shall not render the entire Agreement void, nor affect the validity of the rest of the provisions of this Agreement.



7

WEST\222456823.2

h)  This Agreement shall be governed by the laws of the State of California.

i)  Parties acknowledge that, from time to time, one Party (the "Discloser") may disclose to the other Party (the "Recipient") Information: (a) relating to the Potato Corner outlets and sites; (b) relating to the Potato Corner Intangible Property Rights; (c) Potato Corner product specifications and related Information; (d) which is marked with "confidential" or a similar legend; (e) which is described orally and designated as confidential; or (f) which would, under the circumstances, be understood by a reasonable person to be confidential ("Confidential Information"). Upon subsequent disclosure of previously disclosed Confidential Information to the Recipient by the Discloser, the Information will remain Confidential Information even if not identified as Confidential Information at the subsequent disclosure.   Recipient shall retain such Confidential Information in confidence, and shall not disclose it to any Third Party or use it for other than the purposes of this Agreement without the Discloser's prior written consent.  Each Party shall use at least the same procedures and degree of care with respect to such Confidential Information which it uses to protect its own confidential information of like importance, and in no event less than reasonable care.  The Recipient will immediately give written notice to the Discloser of any unauthorized use or disclosure of the Discloser's Confidential Information, and the Recipient will assist the Discloser in remedying such unauthorized use or disclosure.

[The Remainder of This Page is Left Intentionally Blank]



WEST\222455873.2

IN WITNESS WHEREOF, the parties have executed this Agreement on the date and in place first mentioned.

**Cinco Group:**

Cinco Corporation (Philippines)

Name: Jose P. Magsaysay

Title:   CEO

Jose P. Magsaysay, Jr.,

Jose Miguel Ma. G. Montinola

Ma. Victoria O. Bermejo

Ricardo K. Montelibano,

**L.A. Group:**

Amit Namanim

Guy Koren

Amir Jacoby

SIGNED IN THE PRESENCE OF:

9

WEST\222465823.2



Exhibit B

## CERTIFICATE FOR LIMITED LIABILITY COMPANY INTERESTS IN
## PCJV USA, LLC

THIS CERTIFICATE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933 OR UNDER THE SECURITIES OR BLUE SKY LAWS OF ANY STATE. THE HOLDER OF THIS CERTIFICATE, BY ITS ACCEPTANCE HEREOF, REPRESENTS THAT IT IS ACQUIRING THIS SECURITY FOR INVESTMENT AND NOT WITH A VIEW TO ANY SALE OR DISTRIBUTION HEREOF. ANY TRANSFER OF THIS CERTIFICATE OR ANY LIMITED LIABILITY COMPANY INTERESTS REPRESENTED HEREBY IS SUBJECT TO THE TERMS AND CONDITIONS OF THE LIMITED LIABILITY COMPANY AGREEMENT (AS DEFINED BELOW).

Certificate No. 01                                    60.00% Percentage Interest

PCJV USA, LLC, a Delaware limited liability company (the "Company"), hereby certifies that Potato Corner International, Inc. (together with any assignee of this Certificate, the "Holder") is the registered owner of Sixty Percent (60.00%) of the limited liability company interests in the Company. The rights, powers, preferences, restrictions and limitations of the interests in the Company are set forth in, and this Certificate and the limited liability company interests in the Company represented hereby are issued and shall in all respects be subject to the terms and provisions of, the Operating Agreement of the Company dated as of _____, 2010, as the same may be further amended or restated from time to time (the "Operating Agreement"). By acceptance of this Certificate, and as a condition to being entitled to any rights and/or benefits with respect to the limited liability company interests evidenced hereby, the Holder is deemed to have agreed to comply with and be bound by all the terms and conditions of the Operating Agreement. The Company will furnish a copy of the Operating Agreement to the Holder without charge upon written request to the Company at its principal place of business. Transfer of any or all of the limited liability company interests in the Company evidenced by this Certificate is subject to certain restrictions in the Operating Agreement and can be effected only after compliance with all of those restrictions and the presentation to the Company of the Certificate, accompanied by an assignment in the form appearing on the reverse side of this Certificate, duly completed and executed by and on behalf of the transferor in such Transfer, and an application for transfer in the form appearing on the reverse side of this Certificate, duly completed and executed by and on behalf of the transferee in such Transfer.

Each limited liability company interest in the Company shall constitute a "security" within the meaning of (i) Section 8-102(a)(15) of the Uniform Commercial Code as in effect from time to time in the States of Delaware and California and (ii) the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995 (and each limited liability company interest in the Company shall be treated as such a "security" for all purposes, including, without limitation perfection of the security interest therein under Article 8 of each applicable Uniform Commercial Code).

This Certificate and the limited liability company interests evidenced hereby shall be governed by and construed in accordance with the laws of the State of Delaware without regard to principles of conflicts of laws.

IN WITNESS WHEREOF, the Company has caused this Certificate to be executed as of the date set forth below.

Dated: November ___, 2010

PCJV USA, LLC
a Delaware limited liability company

By: _____
    Name:  Amit Nomanin
    Title:  President

WEST\23117101.1
373527-000001

10/10/2011   11:44     13104789013                                        PAGE  02/04

## CERTIFICATE FOR LIMITED LIABILITY COMPANY INTERESTS IN PCJV USA, LLC

THIS CERTIFICATE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933 OR UNDER THE SECURITIES OR BLUE SKY LAWS OF ANY STATE. THE HOLDER OF THIS CERTIFICATE, BY ITS ACCEPTANCE HEREOF, REPRESENTS THAT IT IS ACQUIRING THIS SECURITY FOR INVESTMENT AND NOT WITH A VIEW TO ANY SALE OR DISTRIBUTION HEREOF. ANY TRANSFER OF THIS CERTIFICATE OR ANY LIMITED LIABILITY COMPANY INTERESTS REPRESENTED HEREBY IS SUBJECT TO THE TERMS AND CONDITIONS OF THE LIMITED LIABILITY COMPANY AGREEMENT (AS DEFINED BELOW).

**Certificate No. 02**                                      15.20% Percentage Interest

PCJV USA, LLC, a Delaware limited liability company (the "Company"), hereby certifies that Amit Nemanim (together with any assignee of this Certificate, the "Holder") is the registered owner of Fifteen and Two Tenths Percent (15.20%) of the limited liability company interests in the Company. The rights, powers, preferences, restrictions and limitations of the interests in the Company are set forth in, and this Certificate and the limited liability company interests in the Company represented hereby are issued and shall in all respects be subject to the terms and provisions of, the Operating Agreement of the Company dated as of _____, 2010, as the same may be further amended or restated from time to time (the "Operating Agreement"). By acceptance of this Certificate, and as a condition to being entitled to any rights and/or benefits with respect to the limited liability company interests evidenced hereby, the Holder is deemed to have agreed to comply with and be bound by all the terms and conditions of the Operating Agreement. The Company will furnish a copy of the Operating Agreement to the Holder without charge upon written request to the Company at its principal place of business. Transfer of any or all of the limited liability company interests in the Company evidenced by this Certificate is subject to certain restrictions in the Operating Agreement and can be effected only after compliance with all of those restrictions and the presentation to the Company of the Certificate, accompanied by an assignment in the form appearing on the reverse side of this Certificate, duly completed and executed by and on behalf of the transferor in such Transfer, and an application for transfer in the form appearing on the reverse side of this Certificate, duly completed and executed by and on behalf of the transferee in such Transfer.

Each limited liability company interest in the Company shall constitute a "security" within the meaning of (i) Section 8-102(a)(15) of the Uniform Commercial Code as in effect from time to time in the States of Delaware and California and (ii) the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995 (and each limited liability company interest in the Company shall be treated as such a "security" for all purposes, including, without limitation perfection of the security interest therein under Article 8 of each applicable Uniform Commercial Code).

This Certificate and the limited liability company interests evidenced hereby shall be governed by and construed in accordance with the laws of the State of Delaware without regard to principles of conflicts of laws.

IN WITNESS WHEREOF, the Company has caused this Certificate to be executed as of the date set forth below.

Dated: _____, 2010

PCJV USA, LLC
a Delaware limited liability company

By: _____
    Name: Amit Neumanim
    Title: President.

WEST\223117102.1

## CERTIFICATE FOR LIMITED LIABILITY COMPANY INTERESTS IN
## PCJV USA, LLC

THIS CERTIFICATE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE
SECURITIES ACT OF 1933 OR UNDER THE SECURITIES OR BLUE SKY LAWS OF ANY
STATE.   THE HOLDER OF THIS CERTIFICATE, BY ITS ACCEPTANCE HEREOF,
REPRESENTS THAT IT IS ACQUIRING THIS SECURITY FOR INVESTMENT AND NOT
WITH A VIEW TO ANY SALE OR DISTRIBUTION HEREOF. ANY TRANSFER OF THIS
CERTIFICATE OR ANY LIMITED LIABILITY COMPANY INTERESTS REPRESENTED
HEREBY IS SUBJECT TO THE TERMS AND CONDITIONS OF THE LIMITED LIABILITY
COMPANY AGREEMENT (AS DEFINED BELOW).

Certificate No. 03                                              15.20% Percentage Interest

          PCJV USA, LLC, a Delaware limited liability company (the "Company"), hereby
certifies that Guy Koren (together with any assignee of this Certificate, the "Holder") is the registered
owner of Fifteen and Two Tenths Percent (15.20%) of the limited liability company interests in the
Company. The rights, powers, preferences, restrictions and limitations of the interests in the Company are
set forth in, and this Certificate and the limited liability company interests in the Company represented
hereby are issued and shall in all respects be subject to the terms and provisions of, the  Operating
Agreement of the Company dated as of _____, 2010, as the same may be further amended or
restated from time to time (the "Operating Agreement").  By acceptance of this Certificate, and as a
condition to being entitled to any rights and/or benefits with respect to the limited liability company interests
evidenced hereby, the Holder is deemed to have agreed to comply with and be bound by all the terms and
conditions of the Operating Agreement. The Company will furnish a copy of the Operating Agreement to
the Holder without charge upon written request to the Company at its principal place of business. Transfer
of any or all of the limited liability company interests in the Company evidenced by this Certificate is
subject to certain restrictions in the Operating Agreement and can be effected only after compliance with all
of those restrictions and the presentation to the Company of the Certificate, accompanied by an assignment
in the form appearing on the reverse side of this Certificate, duly completed and executed by and on behalf
of the transferor in such Transfer, and an application for transfer in the form appearing on the reverse side of
this Certificate, duly completed and executed by and on behalf of the transferee in such Transfer.

          Each limited liability company interest in the Company shall constitute a "security" within
the meaning of (i) Section 8-102(a)(15) of the Uniform Commercial Code as in effect from time to time in
the States of Delaware and California and (ii) the Uniform Commercial Code of any other applicable
jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by
the American Law Institute and the National Conference of Commissioners on Uniform State Laws and
approved by the American Bar Association on February 14, 1995 (and each limited liability company
interest in the Company shall be treated as such a "security" for all purposes, including, without limitation
perfection of the security interest therein under Article 8 of each applicable Uniform Commercial Code).

          This Certificate and the limited liability company interests evidenced hereby shall be
governed by and construed in accordance with the laws of the State of Delaware without regard to principles
of conflicts of laws.

          IN WITNESS WHEREOF, the Company has caused this Certificate to be executed as of
the date set forth below.

Dated: _____, 2010          PCJV USA, LLC
                                  a Delaware limited liability company

                                  By: _____
                                      Name:  Amit Nemanit.
                                      Title: President

WEST\223137103.1

18/18/2011   11:44   13184709013                                                PAGE 04/04

### CERTIFICATE FOR LIMITED LIABILITY COMPANY INTERESTS IN
### PCJV USA, LLC

THIS CERTIFICATE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE
SECURITIES ACT OF 1933 OR UNDER THE SECURITIES OR BLUE SKY LAWS OF ANY
STATE. THE HOLDER OF THIS CERTIFICATE, BY ITS ACCEPTANCE HEREOF,
REPRESENTS THAT IT IS ACQUIRING THIS SECURITY FOR INVESTMENT AND NOT
WITH A VIEW TO ANY SALE OR DISTRIBUTION HEREOF. ANY TRANSFER OF THIS
CERTIFICATE OR ANY LIMITED LIABILITY COMPANY INTERESTS REPRESENTED
HEREBY IS SUBJECT TO THE TERMS AND CONDITIONS OF THE LIMITED LIABILITY
COMPANY AGREEMENT (AS DEFINED BELOW).

Certificate No. 04                                          9.60% Percentage Interest

PCJV USA, LLC, a Delaware limited liability company (the "Company"), hereby
certifies that Amir Jacoby (together with any assignee of this Certificate, the "Holder") is the registered
owner of Nine and Six Tenths Percent (9.60%) of the limited liability company interests in the Company.
The rights, powers, preferences, restrictions and limitations of the interests in the Company are set forth in,
and this Certificate and the limited liability company interests in the Company represented hereby are issued
and shall in all respects be subject to the terms and provisions of, the Operating Agreement of the Company
dated as of _____, 2010, as the same may be further amended or restated from time to time (the
"Operating Agreement"). By acceptance of this Certificate, and as a condition to being entitled to any
rights and/or benefits with respect to the limited liability company interests evidenced hereby, the Holder is
deemed to have agreed to comply with and be bound by all the terms and conditions of the Operating
Agreement. The Company will furnish a copy of the Operating Agreement to the Holder without charge
upon written request to the Company at its principal place of business. Transfer of any or all of the limited
liability company interests in the Company evidenced by this Certificate is subject to certain restrictions in
the Operating Agreement and can be effected only after compliance with all of those restrictions and the
presentation to the Company of the Certificate, accompanied by an assignment in the form appearing on the
reverse side of this Certificate, duly completed and executed by, and on behalf of the transferor in such
Transfer, and an application for transfer in the form appearing on the reverse side of this Certificate, duly
completed and executed by and on behalf of the transferee in such Transfer.

Each limited liability company interest in the Company shall constitute a "security" within
the meaning of (i) Section 8-102(a)(15) of the Uniform Commercial Code as in effect from time to time in
the States of Delaware and California and (ii) the Uniform Commercial Code of any other applicable
jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by
the American Law Institute and the National Conference of Commissioners on Uniform State Laws and
approved by the American Bar Association on February 14, 1995 (and each limited liability company
interest in the Company shall be treated as such a "security" for all purposes, including, without limitation
perfection of the security interest therein under Article 8 of each applicable Uniform Commercial Code).

This Certificate and the limited liability company interests evidenced hereby shall be
governed by and construed in accordance with the laws of the State of Delaware without regard to principles
of conflicts of laws.

IN WITNESS WHEREOF, the Company has caused this Certificate to be executed as of
the date set forth below.

Dated: _____, 2010

                                    PCJV USA, LLC
                                    a Delaware limited liability company

                                    By: _____
                                        Name: Amit Neimanim
                                        Title: President

WEST\023117104.1



Exhibit C

## PCVJ USA, LLC AND LA GROUP MASTER SERVICES AGREEMENT

This Master Services Agreement ("Agreement") dated ___6/18/12___ is entered into by and between PCVJ USA, LLCa Delaware Limited Liability Company (hereinafter "PCVJ") and Amit Nemanim, Guy Koren and Amir Jacoby (whom are collectively referred to as the "LA Group").

### RECITALS

WHEREAS, PCJVwishes to contract with the LA Group to provide management and strategic experience and expertise.

WHEREAS, the LA Group agrees to provide Services to PCJV as delineated within this Agreement.

NOW, THEREFORE, the Parties hereby agree as follows:

Services:

1. The LA Group shall faithfully, diligently and efficiently exercise the following obligations and responsibilities:
    a. Conduct management, operations, marketing, establishment, maintenance, licensing and sub-licensing activities with respect to the Potato Corner outlets/stores in the Territory.
    b. Use best efforts at all times to operate and maintain the Potato Corner outlets/stores in the Territory according to the highest standards achievable, consistent with the overall plan of PCJV Management.
    c. Comply with the rules, policies and procedures approved by PCJV Management.
    d. Advertise, market, and promote the Potato Corner outlets/stores with the goal of causing public knowledge, awareness and patronage of the Potato Corner outlets/stores.
    e. Maintain a comprehensive system of records, books and accounts, with respect to the licensing and sub-licensing activities, operation, establishment, management, maintenance and other activities of the Potato Corner outlets/stores in the Territory with the assistance of the PCJV Corporate Secretary.
    f. No later than the twentieth (20th) day of each month, with respect to the preceding month, LA Group shall render a statement of receipts and disbursements, a schedule of accounts receivable and payable, and a schedule of fees collected and distributed, together with a reconciled bank statement as of the last day of the month with the assistance of the PCJV Corporate Secretary.
    g. No later than three (3) months after the end of a fiscal year, the LA Group, with the assistance of the PCJV Corporate Secretary and an external accountant

      hired by PCJV Management, cause PCJV to issue audited financial statements, and shall provide a copy of the same to all members of PCJV Management.

h. To the extent that the LA Group is able to do so, the LA Group shall take such action as may be necessary to comply promptly with any and all laws, ordinances, orders or other requirements of any federal, state, county or municipal authority having jurisdiction of PCJV and affecting PCJV.

i. The LA Group shall have a fiduciary duty to exercise the duty of care and shall, at all times, ensure that all corporate opportunities consistent with the objectives of PCJV shall be pursued. As such, with respect to the establishment of PCVJ-owned stores, whenever potential locations are identified by any member of the LA Group, it shall be promptly brought to the attention of PCJV Management. At all times, and within thirty (30) days from receipt of this information, PCJV Management shall decide whether or not to build a PCJV-owned store at the identified location. In the event PCJV chooses to build a PCJV-owned store at the identified location, it shall have the right to do so, to the exclusion of the LA Group. However, in the event that PCJV decides not to build a PCJV-owned store at the identified location, it shall notify the LA Group of its decision in writing. In such case, the LA Group shall have the right to build a store at the identified location, provided that it shall enter into a franchising agreement with PCJV, and shall pay franchise fees and ongoing royalty fees as set forth in PCJV's standard franchising agreement.

2. Territory for the purposes of this Agreement is defined as the United States of America and Israel, except in the County of Los Angeles, USA and the County of San Francisco, USA and Tanforan Mall.

3. The LA Group shall maintain and protect the Confidential Information belonging to PCJV, and such undertaking shall apply to all of its partners, officers, employees, or agents.

4. In consideration for the provision of its Services the LA Group shall be entitled to a service fee equal to thirty (30%) percent of all initial/franchise fees and continuing royalty fees paid to/collected by PCJV.

5. All withholding and other applicable taxes levied by any authority on the payments by PCJV to the LA Group under this Agreement shall be borne solely by PCJV.

### Confidential Information:

1. The Parties acknowledge that from time to time, one Party (the "Discloser") may disclose to the other Party (the "Recipient") information : a) relating to the Potato Corner outlets and stores; b) relating to the Potato Corner Intangible Property Rights; c) Potato Corner product specifications and related information; d) which is marked with "confidential" or a similar legend; e) which is described orally and designated as confidential; or f) which would, under the circumstances, be understood by a reasonable person to be confidential ("Confidential Information").

2. Upon subsequent disclosure of previously disclosed Confidential Information to the Recipient by the Discloser, the information will remain Confidential Information even if not identified as Confidential Information at the subsequent disclosure.

3. Recipient shall retain such Confidential Information in confidence, and shall not disclose it to any Third Party or use it for other than the purposes of this Agreement without the Discloser's prior written consent.

4. Each Party shall use at least the same procedures and degree of care with respect to such Confidential Information which it uses to protect its on confidential information of like importance, and in no event less than reasonable care. The Recipient will immediately give written notice to the Discloser of any unauthorized use or disclosure of the Discloser's Confidential Information, and the Recipient will assist the Discloser in remedying such unauthorized use or disclosure.

Duration of Agreement:

1. This Agreement shall become effective from the date of execution hereof and shall continue indefinitely unless terminated by a) mutual written agreement by the Parties or b) breach of any provision of this Agreement by either Party which will result in termination of this Agreement unless cured by the breaching Party within twenty (20) days from the date of the breach.

General Provisions:

1. This Agreement may not be altered, changed, supplemented or modified except by a written instrument duly signed by the Parties.

2. The invalidity of any portion of this Agreement will not render the entire Agreement void, nor affect the validity of the rest of the provisions of this Agreement.

3. This Agreement shall be governed by the laws of the State of California.

4. Neither Party shall assign any of its rights or obligations under this Agreement without the prior written consent of the other Party.

5. The failure of any Party at any time to require performance by the others of any provision of this Agreement shall not affect, in any way, the right of such Party to require performance of that or any provision, and any waiver by any Party of any breach of this Agreement shall not be construed as a waiver of any continuing or succeeding breach of such provision, or a waiver of any other right under this Agreement.



IN WITNESS WHEREOF,

PCJV USA, LLC

Date  6/18/12

Name: Jose P. Magsaysay

Title:   CEO

LA Group

Amit Nemanim                    Date  06/18/12

Guy Koren                       Date  6/18/12

Amir Jacoby                     Date  6/18/12

05/03/2018

PCJV USA, LLC and LA Group Master Services Agreement
Page 4 of 4



## PCJV USA LLC
## JOINT VENTURE AGREEMENT
(FIRST AMENDMENT TO THE JV AGREEMENT)

This Joint Venture Agreement (the "Agreement") is made and entered into on OCTOBER 17, 2012 at its Principal Office , Suite #1100, 6380 Wilshire Blvd Los Angeles, CA 90048 by and between:

POTATO CORNER INTERNATIONAL, a corporation duly existing and registered by virtue of and under the laws of the State of Delaware, US with office address at 92 Corporate Park Suite C-332, Irvine, California, USA 92606, represented herein by its duly authorized representative, Jose P. Magsaysay (hereinafter "PCI"), and its directors, Jose P. Magsaysay, Jr., Jose Miguel Ma. G. Montinola, Ma. Victoria O. Bermejo, Ricardo K. Montelibano, all of whom are Philippine citizens and resident, and collectively referred to as the "PCI Group";

-and-

GUY KOREN, AMIR JACOBY AND INBAL JACOBY all of whom are U.S. citizens and residents and collectively referred to as the "LA Group:

### RECITALS

WHEREAS, the Parties hereto have agreed to form a limited liability company (hereinafter referred to as the "Company") under the laws of the State of Delaware, with the primary purpose of engaging in the business of establishing, operating, managing, licensing and franchising "Potato Corner" stores/outlets in the United States of America and Israel, except in the County of Los Angeles, USA and the County of San Francisco, USA and Tanforan Mall (hereinafter, "Territory").

WHEREAS, the Parties herein have agreed to enter into this Agreement which sets forth the terms and conditions with respect to the organization, incorporation, operation and management of the Company and defines their respective rights, duties and obligations of the parties to this Agreement.

WHEREAS, the Parties agree that the LLC operating agreement to be entered by them shall reflect the terms and conditions as set forth in this Agreement.

WHEREAS, Cinco may assign and or all of its rights to the joint venture company formed under this Agreement to a wholly-owned subsidiary as it deems fit.

NOW, THEREFORE, for and in consideration of the foregoing premises, the Parties hereby agree as follows:

1) ORGANIZATION AND FORMATION OF THE COMPANY

a) Within ten (10) days from the Effective Date of this Agreement, the Parties herein agree to organize and form, a limited liability company to be called "PCJV USA" ( hereinafter referred to as the Company) for the primary purpose of engaging in

the business of establishing, operating, managing, licensing and franchising "Potato Corner" stores/outlets in the Territory.

b) The initial members of the Company shall be the following:

   i)  Potato Corner International (PCI)
     (1) Jose P. Magsaysay, Jr.
     (2) Jose Miguel Ma. G. Montinola
     (3) Ma. Victoria O. Bermejo
     (4) Ricardo K. Montelibano

   ii)  LA Group
     (1) Guy Koren
     (2) Amir Jacoby
     (3) Inbal Jacoby

c) The principal office of the Company shall be at  Suite 1100, 6380 Wilshire Blvd. Los Angeles, CA 90048 USA.

d) The annual general meeting of the members of the Company shall be held every year at the principal office of the Company. The members may, at their discration, invite non-members to join the annual general meeting, but only as non-voting observers. Further, to the extent allowed by the financial condition of the Company, and as agreed upon by a majority of all member interests, the Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses incurred by the following members in attendance of the annual members' meeting: Jose P. Magsaysay, Jr., Jose Miguel Ma. Montinola, Ma. Victoria O. Bermejo and Ricardo K. Montelibano.

e) The fiscal year of the Company shall begin on January 1 and end on December 31 of each year.

f) The Company shall immediately upon formation obtain a "Liability Insurance" for the Company the amount and scope of coverage to be determined by the managers.

g) All costs, fees and expenses incurred in connection with the organization and formation of the Company shall be for the account of the Company.

h) The operating agreement of the Company shall reflect the terms and conditions set forth in this Agreement between the Parties.

2) CAPITALIZATION/OWNERSHIP OF THE COMPANY

a) At the time of formation, the Company shall have a total capital account of Fifty Thousand Dollars (US$50,000) which shall be fully subscribed and paid.

b) Unless other agreed to in writing, at the commencement of this Agreement, the Parties hereby agree that the Cinco Group shall contribute Thirty Thousand Dollars (US$30,000) and own sixty (60%) percent of the Company's capital





WEST\222455823.2

accounts, while the LA Group shall contribute Twenty Thousand Dollars (US$20,000) and own the remaining forty (40%) percent.

c) The Parties hereby agree any increase in the capital account shall require an affirmative vote of 75% of all of the members' percentage interests in the Company. In the event an increase in the Company's capital accounts is approved by the members, both Parties shall have rights of pre-emption so that their pro rata ownership share in the Company shall be maintained, provided that, either Party shall have thirty (30) days within which to confirm in writing that it is willing and able to subscribe and fully pay its pro rata share of the increase in capital.

d) Neither Party shall assign any of its rights or obligations under this Agreement, nor his/its member interests in the Company without the prior written consent of the other Party. In the event either Party desire to transfer or sell his/its pro rata members interest in the Company to a person other those specifically named in Section 1(a) of this Agreement, such Party shall be obligated to sell the same first to the other Party, which has have thirty (30) days within which to exercise its rights of first refusal from the date of receipt of a written notice to sell. For this purpose, the Parties hereby agree that the right of first refusal may be exercised in accordance with the following formula:  The average of the Company's earnings before interest, depreciation, taxes and amortization (EBITDA) for the last two (2) years multiplied by 5 times, and further multiplied by the percentage of member interest subject to such right of first refusal over total outstanding member interests.

## 3) MANAGEMENT OF THE COMPANY

a) As will be provided in the Operating Agreement, the business and affairs of the Company shall be managed and all of the Company powers shall be exercised by or under the direction of the managers (collectively referred to as "Management"). Unless otherwise agreed to by the parties, the Management shall be composed of seven (7) members, four (4) of whom shall be designated by the Cinco Group, and three (3) designated by the LA Group. Upon the formation of the Company, the following shall be named managers: Jose P. Magsaysay, Jr., Jose Miguel Ma. Montinola, Ma. Victoria O. Bermejo, Ricardo K. Montelibano, Guy Koren, Amir Jacoby and Inbal Jacoby.

b) The Management shall regularly meet on a monthly basis. The regular monthly board meeting may be done via teleconference or through the internet. The members may, at their discretion, invite non-members to join member meetings, but only as non-voting observers. Further, to the extent allowed by the financial condition of the Company, and as agreed upon by a majority of all member interests, the Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses incurred by the members named in Section 1(d) in attendance of said meetings.

c) Upon the formation of the Company, it shall have the following executive officers: President, Corporate Secretary and Treasurer, and the following shall be elected by the managers/members to serve these positions.  Any change in these mentioned executive officers will require a vote of 75% of members' interest.

G.K

i)  Chairman of the Board of Members – Jose P. Magsaysay

ii)  President – At any given time, the President shall be any one of the following members: Guy Koren or Amir Jacoby or Jnbal Jacoby and the first president will be Amit Nemanim now replaced by Guy Koren

iii)  Corporate Secretary – Erlinda S. Bartolome.

iv)  Treasurer – Maria Victoria O. Bermejo

    (1) The Treasurer shall have oversight functions over the Accounting and Finance Departments that shall be exercised independent of the President.

d)  Additional executive officers may be appointed by Management as it may deem necessary. Replacement and removal will require Managers simple majority vote.

e)  It is hereby agreed that the rights and responsibilities of the Management shall include the following:

    i)  Approval of the compensation package for the managers, executive offices and key personnel.

    ii)  Approval of the Accounting System/Procedures/Software/Method to be used by the Company.

    iii)  Approval of the operating budget of the Company, and any changes to it.

    iv)  Approval of all franchising agreements, and lease agreements.

    v)  Approval of all purchases and disbursements in excess of $10,000, provided that such amount may be changed or modified by Management as it deems necessary.

f)  The executive officers shall manage the business and property of the Company, and to market the business, in accordance with and pursuant to the directives of and policies set by the Management of the Company. The Management of the Company can recall and/or withdraw the appointment of any executive officer, as it deems necessary.

g)  The Company shall enter into a Master License Agreement with Cinco (or an affiliated company to be designated by Cinco) which shall include the following terms and conditions:

    i)  The Company agrees to license the "POTATO CORNER" intellectual property rights from Cinco or an affiliated company to be designated by Cinco) consisting of (i) the trademark, service mark and trade name "POTATO CORNER"; and (ii) various trademarks, service marks, trade names, slogans, designs, insignias, emblems, symbols, color schemes, package features, logo and other propriety identifying characteristics used in relation and in connection with the "Potato Corner" Products and the System; and (iii) as well as other intellectual property rights in connection with the "POTATO CORNER" intellectual property rights, for use in the Territory.

    ii)  The Company agrees to pay, as an arm's length license fee, the following amounts:



4

G. K

(1) With respect to the licensing / sub-licensing or franchising the "POTATO CORNER" intellectual property rights in connection with the "POTATO CORNER" outlets/stores, an amount equal to thirty percent (30%) of all initial/franchise fees and ongoing royalty fees paid to/ collected by the Company. Payments shall be made to Cinco (or an affiliated company to be designated by Cinco) by wire transfer using a bank or other financial institution specified by it within thirty (30) days from receipt of the fees by the Company.

(2) All withholding and other applicable taxes levied by any authority on the payments by the Company shall be borne solely by the Company.

h) The Company agrees to engage the LA Group to provide management and strategic experience and expertise during the duration of this Agreement. The Company shall enter into a Master Services Agreement with the LA Group (or a corporation to be designated by the LA Group) which shall include the following terms and conditions:

i) In consideration for the provision of its services under the Master Services Agreement, the LA Group shall be entitled to a services fee equal to thirty (30%) percent of all initial/franchise fee and continuing royalty fees paid to/ collected by the Company.

ii) All withholding and other applicable taxes levied by any authority on the payments by the Company to the LA Group under this Agreement shall be borne solely by the Company.

iii) The LA Group shall faithfully, diligently and efficiently exercise its obligations and responsibilities under the Master Services Agreement.

iv) The LA Group shall maintain and protect the Confidential information belonging to Cinco or the Company, and such undertaking shall apply to all of its partners, officers, employees, or agents.

i) The President of the Company shall render the following services and shall perform the following duties for the Company in a faithful, diligent and efficient manner:

i) The President shall be responsible for all management, operational, marketing, establishment, maintenance, licensing and sub-licensing activities with respect to the "Potato Corner" outlets/stores in the Territory. He shall use his best efforts at all times during the term of this Agreement to operate and maintain the "Potato Corner" outlets/stores in the Territory according to the highest standards achievable consistent with the overall plan of the Management of the Company. The President shall comply with the rules, policies and procedures approved by the Management of the Company from time to time.

ii) The President shall advertise market and promote the "Potato Corner" outlets/stores with the goal of causing public knowledge, awareness and patronage of the "Potato Corner" outlets/sites.

- 5

G.k

iii) The President shall maintain a comprehensive system of records, books and accounts, with respect to the licensing and sub-licensing activities, operation, establishment, management, maintenance and other activities of the "Potato Corner" outlets /stores in the Territory with the assistance of the Corporate Secretary.

iv) No later than the twentieth (20th) day of each month, with respect to the preceding month, the President shall render a statement of receipts and disbursements, a schedule of accounts receivable and payable, and a schedule of fees collected and distributed, together with a reconciled bank statement as of the last day of the month with the assistance of the Corporate Secretary.

v) No later than three (3) months after the end of a fiscal year, the President shall, with the assistance of the Corporate Secretary and external accountant hired by Management, cause the Company to issue audited financial statements, and shall provide a copy of the same to all the members of Management.

vi) To the extent the President is lawfully able to do so, the President shall take such action as may be necessary to comply promptly with any and all laws, ordinances, orders or other requirements of any federal, state, county or municipal authority having jurisdiction of the Company and affecting the Company.

j) Consistent with its fiduciary duty to the Company, the members and managers shall exercise the duty of care and shall, at all times, ensure that all corporate opportunities consistent with the objectives of this Agreement shall be pursued on behalf of, and for the benefit of the Company. As such, with respect to the establishment of Company-owned stores, whenever potential locations are identified by any member or manager, it shall be promptly brought to the attention of the Management. At all times, and within thirty (30) days from receipt of this information, the Management shall decide to either build a Company-owned store at the identified location. In the event the Company chooses to build a Company-owned store at the identified location, it shall have the right to do so, to the exclusion of any of the members or managers. However, in the even the Company decides not to build a Company-owned store at the identified location, it shall notify the members and managers of its decision in writing. In such case, the LA Group shall have the right to build a store at the identified location, provided that it shall enter into a franchising agreement with the Company, and shall pay the franchise fees and ongoing royalty fees as set forth in the Company's standard franchising agreement.

### 4) DURATION OF AGREEMENT

a) This Agreement shall become effective from the date of execution hereof and shall continue indefinitely unless otherwise terminated by (I) an affirmative vote of 75 percent (75%) of all member interests, or (II) upon mutual agreement by the Parties in writing.

6

b) Upon termination of this Agreement, the effects of termination shall be as follows:

   i) All rights granted under the Master License Agreement shall terminate and the Company shall cease the use of the Potato Corner Intellectual Property Rights, and Confidential Information, provided however, that the Company shall be permitted to use any of the foregoing as is reasonably required in order to comply with its obligations under its sub-licensing or franchising agreements, but only to the extent of the duration of sub-licensing or franchising agreements in existence at the time of the termination of this Agreement.

   ii) The LA Group shall be subject to a non-compete arrangement and hereby agrees that, within two (2) years from the date of termination of this Agreement, it shall not engage in the business of establishing, operating, managing, licensing and franchising identical or similar products sold by the Company, using the intellectual property rights identical or similar to those used by the Company, at the time of the termination of this Agreement.

5) GENERAL PROVISIONS

a) This Agreement may not be altered, changed, supplemented or modified except by a written instrument duly signed by the Parties.

b) The Parties shall use their best efforts to cooperate for the success of the business of the Company. The Parties further agree to perform all acts and execute and deliver all documents or instruments required or necessary to fully implement or consummate the transactions contemplated in and the Intent underlying this Agreement.

c) The Parties shall, to the extent feasible, cause the operating agreement of the Company to reflect the mutual covenants and provisions contained in this Agreement.

d) All notices and other communications required or permitted to be given hereunder shall be given in writing (and for this purpose shall include emails or fax transmissions) and shall be addressed to the appropriate Party at the address of such Party as heretofore designated, or at such address as such Party may designate subsequently in writing.

e) The failure of any Party at any time to require performance by the others of any provision of this Agreement shall not affect, in any way, the right of such Party to require performance of that or any other provision, and any waiver by any Party of any breach of this Agreement shall not be construed as a waiver of any continuing or succeeding breach of such provision, or a waiver of any other right under this Agreement.

f) This Agreement shall constitute the entire agreement between the Parties and shall supersede any previous agreements, written or otherwise, with respect to the same subject matter which may have been made by the Parties prior hereto.



7

g) The invalidity of any portion of this Agreement will not and shall not render the entire Agreement void, nor affect the validity of the rest of the provisions of this Agreement.

h) This Agreement shall be governed by the laws of the State of California.

i) Parties acknowledge that, from time to time, one Party (the "Discloser") may disclose to the other Party (the "Recipient") information: (a) relating to the Potato Corner outlets and sites; (b) relating to the Potato Corner Intangible Property Rights; (c) Potato Corner product specifications and related information; (d) which is marked with "confidential" or a similar legend; (e) which is described orally and designated as confidential; or (f) which would, under the circumstances, be understood by a reasonable person to be confidential ("Confidential Information"). Upon subsequent disclosure of previously disclosed Confidential Information to the Recipient by the Discloser, the information will remain Confidential Information even if not identified as Confidential Information at the subsequent disclosure.    Recipient shall retain such Confidential Information in confidence, and shall not disclose it to any Third Party or use it for other than the purposes of this Agreement without the Discloser's prior written consent. Each Party shall use at least the same procedures and degree of care with respect to such Confidential Information which it uses to protect its own confidential information of like importance, and in no event less than reasonable care. The Recipient will immediately give written notice to the Discloser of any unauthorized use or disclosure of the Discloser's Confidential Information, and the Recipient will assist the Discloser in remedying such unauthorized use or disclosure.

[The Remainder of This Page is Left Intentionally Blank]



WEST\222455823.2

IN WITNESS WHEREOF, the parties have executed this Agreement on the date and in place first mentioned.

**POTATO CORNER INTERNATIONAL GROUP:**

Jose P. Magsaysay, Jr.

Jose Miguel Ma. G. Montinola

Ma. Victoria O. Bermejo

Ricardo K. Montelibano,

**L.A. Group:**

Inbal Jacoby

Guy Koren

Amir Jacoby

SIGNED IN THE PRESENCE OF:

**ACKNOWLEDGMENT**

9



SERVICES AGREEMENT

By and between Potato Corner Joint Venture, also known as PCJV USA LLC referred to as "Company", and Guy Koran AND Amir Jacoby known as "LA Group" and referred herein as "Management Partner"

The Company, located at 6380 Wilshire Blvd. Suite 1100 Los Angeles, CA 90048, engages LA Group of 8950 W. Olympic Blvd. #563, Beverly Hills, CA 90211 on the following terms and conditions:

1. Start Date: Engagement shall commence on January 1, 2011 time being of the essence.

2. DUTIES: Management Partner agree to perform the duties set out herein:

A. Management Duties

LA Group as Management Partner shall perform its duties as follows:

Guy Koren shall act as President and Managing Partner; and Amir Jacoby as Managing Partner, and shall develop and direct the business known as Potato Corner in the United States and other available territories as assigned. This will include overall day-to-day management of company efforts to develop the venture into a growing fast-food franchise, day-to-day management of company assets, day-to-day management of company efforts to develop independent franchisee relationships, day-to-day management of Management Partner, and provide direction of the company to increase its revenue and member value as directed by and at the discretion of the company board of directors.

Managing Partner shall perform such further duties as are customarily performed by holding such positions in other businesses of the same or similar nature as that engaged in by Company.

3. COMPENSATION: In consideration of the foregoing, Company shall pay Management Partner a services fee of $240,000 per year, for services, payable on a monthly basis.

ADDITIONAL COMPENSATION: Management Partner shall be entitled to a waiver of any and all royalties and franchise fees due to PCJV USA LLC for any Potato Corner branded stores, units, or other means of sale owned and operated by Management Partner during the entire term of the relationship between Management Partner and PCJV USA LLC.

4. DURATION OF EMPLOYMENT: Management Partner's agreement shall remain in effect until it is terminated by either party, commencing at the date of signature on this agreement.

5. TERMINATION: This agreement may be terminated at will by the company board of directors or earlier upon (1) death of Management Partner or illness or incapacity that prevents Management Partner from performing his/her duties for a period of more than 16 weeks in any calendar year and (2) breach of the agreement by Management Partner. Such option shall be exercised by Employer giving a notice to Management Partner by certified mail, addressed to him at the above named address. With such notice, this agreement shall cease and come to an end five (5) days after in which the notice is mailed.

6. MISCELLANEOUS: (1) Management Partner agrees not to disclose any of Company's trade practices, proprietary information, formulations, or other items classified as trade secrets during or after the employment for a period of up to 48 months. (2) In the event of any dispute over this agreement, it shall be resolved through binding arbitration under the rules of the American Arbitration Association.

In witness whereof, both parties have executed this agreement at 6380 Wilshire Blvd. Suite 1100 Los Angeles, CA 90048, on (date).

PCJV USA, LLC:

Management Partner

Date: Jan 1st, 2017

LA Group, LLC:

Management Partner

Date: 1/4/17

1

## PROOF OF SERVICE

2

### Cinco Corporation v. Guy Koren, et al.
### Case No. BC701075

3

## STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

4

5    At the time of service, I was over 18 years of age and **not a party to this action.** I am employed in the County of Los Angeles, State of California. My business address is 9401 Wilshire Boulevard, Ninth Floor, Beverly Hills, CA 90212-2974.

6

7    On August 24, 2018, I served true copies of the following document(s) described as on the interested parties in this action as follows:

8

## VERIFIED FIRST AMENDED COMPLAINT

9    BY MAIL: I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and

10   mailing, following our ordinary business practices. I am readily familiar with Ervin Cohen & Jessup LLP's practice for collecting and processing correspondence for mailing. On the same day

11   that the correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

12

13   I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

14   Executed on August 24, 2018, at Beverly Hills, California.

15

16   

17   Kevin Parr

18

19

20

21

22

23

24

25

26

27

28

*ERVIN COHEN & JESSUP LLP* (left margin, vertical)

ERVIN COHEN & JESSUP LLP

1

2

**SERVICE LIST**
**Cinco Corporation v. Guy Koren, et al.**
**Case No. BC701075**

3   Robert A. Levinson, Esq.                    Attorneys for Cross-Defendants AMIR
    David Krol, Esq.                            JACOBY and INBAL JACOBY
4   Jason J. Jarvis, Esq.
    LEVINSON ARSHONSKY & KURTZ, LLP
5   15303 Ventura Blvd., Suite 1650
    Sherman Oaks, CA 91403
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 78



1  Michael D. Murphy (SBN 224678)
     mmurphy@ecjlaw.com
2  Banu S. Naraghi (State Bar No. 312754)
     bnaraghi@ecjlaw.com
3  **ERVIN COHEN & JESSUP LLP**
     9401 Wilshire Boulevard, Ninth Floor
4  Beverly Hills, California 90212-2974
     Telephone (310) 273-6333
5  Facsimile (310) 859-2325

6  Attorneys for Plaintiffs and Cross-Defendants CINCO CORPORATION and POTATO CORNER
     INTERNATIONAL, INC.
7

8          **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9          **COUNTY OF LOS ANGELES, CENTRAL DISTRICT**

10  CINCO CORPORATION a Philippines          Case No.: BC701075
      corporation; POTATO CORNER               Related Case No.: BC706000
11  INTERNATIONAL, INC., a Delaware
      corporation,                                           Assigned to Hon. Rafael Ongkeko, Dept. 73
12                   Plaintiffs,
                                                              **VERIFIED SECOND AMENDED**
13          vs.                                               **COMPLAINT**

      GUY KOREN, an individual; NKM
14  CAPITAL GROUP, LLC, a California limited
      liability company; J & K AMERICANA,
15  LLC, a California limited liability company;
      J & K CULVER, LLC, a California limited
16  liability company; J&K LAKEWOOD, LLC,
      a California limited liability company; J&K
17  OAKRIDGE, LLC, a California limited
      liability company; J&K VALLEY FAIR,
18  LLC, a California limited liability company;
      J & K CAPITAL 2, LLC, a California limited
19  liability company; J & K ONTARIO, LLC, a
      California limited liability company; J&K PC
20  TRUCKS, LLC, a California limited liability
      company; J&K CONSULTANTS GROUP,
21  LLC, a California limited liability company;
      GK CAPITAL GROUP, LLC, a California
22  limited liability company; POTATO
      CORNER LA GROUP, LLC, a California
23  limited liability company; ALON KOREN, an
      individual; THOMAS HODGSON, an
24  individual; EMILY GARCIA, an individual;
      and DOES 1 through 25, inclusive,
25                   Defendants,

26          – and –

27  PCJV USA, LLC, a Delaware limited liability
      company,
28                   Nominal Defendant.

16544.2:9330787 1

ERVIN COHEN & JESSUP LLP



ERVIN COHEN & JESSUP LLP

1 PCJV USA, LLC, a Delaware limited liability company; PCI TRADING LLC, a Delaware
2 limited liability company; POTATO CORNER LA GROUP, LLC, a California
3 limited liability company; NKM CAPITAL GROUP, LLC, a California limited liability
4 company; J & K AMERICANA, LLC, a California limited liability company; J & K .
5 CULVER, LLC, a California limited liability company; J&K LAKEWOOD, LLC, a
6 California limited liability company; J&K OAKRIDGE, LLC, a California limited
7 liability company; J&K VALLEY FAIR, LLC, a California limited liability company; J
8 & K CAPITAL 2, LLC, a California limited liability company; J & K ONTARIO, LLC, a
9 California limited liability company; J&K PC TRUCKS, LLC, a California limited liability
10 company; J&K CONSULTANTS GROUP, LLC, a California limited liability company;
11 GK CAPITAL GROUP, LLC, a California limited liability company; GUY KOREN, an
12 individual; ALON KOREN, an individual; THOMAS HODGSON, an individual;
13 EMILY GARCIA, an individual; ASHLEY GRUDNOWSKI, an individual,

14
                    Cross-Complainants,
15
                         vs.
16
    CINCO CORPORATION, a Philippines
17 corporation; POTATO CORNER INTERNATIONAL, INC., a Delaware
18 corporation; HIGHFIVE CORPORATION, a Philippines corporation; JOSE P.
19 MAGSAYSAY, JR., an individual; JOSE MIGUEL MA. MONTINOLA, an individual;
20 RICARDO ENRIQUE K. MONTELIBANO, an individual; MA. VICTORIA O.
21 BERMEJO, an individual; BEN OLIVAS, an individual; JOHN EDWARD HERNANDEZ,
22 an individual; CHAD DOMINIC HERNANDEZ, an individual; MIGUEL
23 RAYMUNDO HERNANDEZ, an individual; MYROSE VICTOR, an individual;
24 MARIVIC DEL PILAR, an individual; JOSE MARCO DEL PILAR, an individual; DIA
25 LACABA, an individual; NICARDO FALCIS, an individual; AMIR JACOBY, an
26 individual; INBAL JACOBY, an individual; and ROES 1 through 500 inclusive,
27
                    Cross-Defendants.
28

Complaint Filed:    April 10, 2018
Trial Date:         None Set

16544 2:9330787.1
2
VERIFIED SECOND AMENDED COMPLAINT

**INTRODUCTION**

1.    Plaintiff Cinco Corporation ("Cinco"), a corporation based in the Philippines, is the owner of the "Potato Corner" brand, an international fast food chain that proudly promotes itself as the "World's Best Flavored Fries." There are now more than 1,100 Potato Corner locations worldwide selling these flavored fries and other menu items, using the Potato Corner trademarks, trade name, service marks and other intellectual property ("Potato Corner Intellectual Property").

2.    After having gained a foothold in Asia, in or around 2009, Plaintiff Cinco sought to expand its unique brand into the United States. Plaintiff Cinco was willing to share its Potato Corner Intellectual Property, product, and services ("Potato Corner Brand") with a trusted local United States partner, and was willing to share in the proceeds of its expansion into the United States. Unfortunately, the partner selected by Plaintiff Cinco – Defendant Guy Koren ("Defendant Koren") – abused the great trust and confidence conferred upon him by his Filipino partners.

3.    The vehicle through which Plaintiff Cinco and Defendant Koren agreed to expand the Potato Corner Brand in the United States is Nominal Defendant PCJV USA, LLC ("Nominal Defendant PCJV"). During their negotiations both Plaintiff Cinco and Defendant Koren expressed their shared vision that, through Nominal Defendant PCJV, Potato Corner could expand into hundreds of franchised and PCJV-owned stores nationwide.  Instead, under Defendant Koren's direction, less than fifty stores have ever been opened (25% of which have since closed), and, other than the stores owned by Defendant Koren and his affiliates (some of which represent company opportunities wrongfully diverted by Defendant Koren), the other franchised Potato Corner outlets have not yielded the financial success that was intended and promised. Plaintiff Cinco and Plaintiff Potato Corner International, Inc. ("Plaintiff PCI") have now learned that this difference in success between Defendant Koren's stores and the other third-party franchisees has been caused by Defendant Koren's disloyal treatment of his own stores preferentially, at the expense of Nominal Defendant PCJV and the third-party franchisees.

4.    After the structure of Nominal Defendant PCJV was agreed to, Plaintiff Cinco established Plaintiff PCI, an American subsidiary of Plaintiff Cinco – and separate legal entity – which became a founding member of Nominal Defendant PCJV, owning 60% of its equity

16544.2.9330787 1

3

ERVIN COHEN & JESSUP LLP

1  ("Membership Interests").

2      5.      The remaining 40% of Nominal Defendant PCJV, LLC Membership Interests were
3  split between Defendant Koren, as well as two other associates of Defendant Koren – Amir Jacoby
4  ("Jacoby," named by Koren as a Cross-Defendant in this proceeding) and Amit Nemanim
5  ("Nemanim"). It was expressly stated by Defendant Koren and Jacoby, as well as others involved
6  in the inception of PCJV, that Defendant Koren, Jacoby, and Nemanim were each, in their
7  individual capacity owning Membership interests reflecting a fraction of the remaining 40%
8  equity. Nemanim ceased to be a Member of Nominal Defendant PCJV in 2012, thus leaving
9  Defendant Koren, and Jacoby, as the remaining holders of the 40% Membership Interests (the "LA
10  Group").

11      6.      In 2012, Koren became the President – the principal Executive Officer – of
12  Nominal Defendant PCJV, reporting to a managing board of seven (the "PCJV Management" or
13  "Management"), four of which are appointed by Plaintiff PCI, and the remaining three from the
14  LA Group.

15      7.      From that day forward, and continuing to the present, Defendant Koren has
16  brazenly abused his fiduciary duties to Plaintiff PCI and Nominal Defendant PCJV, as well as his
17  contractual and other legal obligations to Plaintiffs and Nominal Defendant PCJV.

18      8.      As alleged herein, Defendant Koren's scheme has been to (1) prevent Plaintiffs
19  from yielding any financial or other benefit from their hoped for expansion into the United States
20  through his deceit, concealment, and breaches of fiduciary duty; (2) divert Nominal Defendant
21  PCJV's funds, resources, and corporate opportunities to himself for his own personal gain;
22  (3) repudiate PCJV Management's authority; and (4) damage Plaintiffs' goodwill, business,
23  reputation, and relationships, through his mismanagement and waste.

24      9.      For example, as alleged herein, Defendant Koren has prevented Nominal Defendant
25  PCJV from opening certain Potato Corner Stores as company owned, and, instead, diverted those
26  opportunities to separate entities owned by Defendant Koren. Even worse, Defendant Koren has
27  caused Nominal Defendant PCJV to fund and support these and the other stores owned by his
28  affiliates, without reimbursement, and through provision of free resources and capital, waivers of

16544.2:9330787.1                                          4

ERVIN COHEN & JESSUP LLP

1   fees and royalties, and preferential attention and favor, as if those stores were Company owned

2   operations. Put simply, Defendant Koren has caused Nominal Defendant PCJV to bear the burdens

3   of Defendant Koren's own Potato Corner franchises, while taking the benefits for himself. This is

4   just one of the examples of the disloyal and self-interested transactions Defendant Koren has

5   caused Nominal Defendant PCJV to enter into benefiting Defendant Koren and his affiliates, to

6   the detriment of Plaintiffs, as well as Nominal Defendant PCJV.

7       10.     As the result of these and many other acts of self-dealing, breaches of fiduciary

8   duty, breaches of contract, and other wrongdoing, Defendant Koren has prevented Plaintiffs from

9   earning any license fees, royalty fees, or profits whatsoever as the result of its troubled United

10  States venture, whereas Defendant Koren has managed to ensure that he is paid handsomely.

11      11.     Unsatisfied with simply using Nominal Defendant PCJV as a vehicle to enrich

12  himself at the expense of his international, and trusting, partners, Defendant Koren has now frozen

13  Nominal Defendant PCJV's governance and management, by taking the outrageous position that

14  (1) he can never be removed as Chief Executive Officer unless his handpicked PCJV Managers

15  agree, and, (2) he is entitled to majority ownership of PCJV, based upon a knowingly frivolous

16  claim arising from a "right of first refusal." Absent this Court's intervention, Nominal Defendant

17  PCJV's governance and control is effectively frozen.

18      12.     Plaintiffs are only beginning to learn the extent of Defendant Koren's breaches of

19  fiduciary, legal, and contractual duties, given that, Defendant Koren has also failed to provide

20  comprehensive books and records on a monthly basis including reconciled bank statements and

21  other documents detailing PCJV's financial condition. This failure, in addition to constituting a

22  breach of the contracts he entered into with Plaintiffs, has facilitated, and concealed, his

23  wrongdoing until only very recently.

24      13.     Given the above, and the allegations stated herein, Plaintiffs Cinco and PCI

25  (collectively, "Plaintiffs"), have been forced to initiate this action to, among other things, obtain

26  and recover (1) control over the United States Potato Corner operations; (2) judicial confirmation

27  of Plaintiff PCI's (obvious) majority ownership of PCJV and majority control over PCJV

28  Management; (3) an accounting as to PCJV's operations given the near decade of concealment by

16544.2:9330787.1                              5

1  Defendant Koren; (4) damages resulting from the astonishing breaches of loyalty, care, good faith,
2  deceit, and breaches of contract, all of which have damaged Plaintiffs, as well as Nominal
3  Defendant PCJV; and (5) establish a constructive trust over the Potato Corner stores that (i) should
4  have been presented by Defendant Koren to Nominal Defendant PCJV as corporate opportunities
5  to consider, as well as (ii) those stores owned by Defendant Koren and his affiliates that he
6  enriched using unreimbursed and unapproved resources, capital, and attention from Nominal
7  Defendant PCJV

8                                      **THE PARTIES**

9       14.    Nominal Defendant PCJV is a Delaware limited liability company, Nominal
10  Defendant PCJV's principal place of business is in Los Angeles, California. 60% of the
11  Membership Interests of Nominal Defendant PCJV are owned by Plaintiff PCI, whereas the
12  remaining Membership Interests are shared by Defendant Koren, and Jacoby, each in their
13  individual capacity.

14      15.    Plaintiff Cinco is a corporation headquartered in the Republic of the Philippines,
15  which owns, operates, and franchises its brand name Potato Corner french fries in outlets located
16  in Asia, the Americas, and the Middle East, and, as alleged herein, through its subsidiary (Plaintiff
17  PCI) here in the United States. Plaintiff Cinco negotiated the terms of the Nominal Defendant
18  PCJV structure and governance prior to the formation of Nominal Defendant PCJV.

19      16.    Plaintiff PCI is a Delaware corporation with its principal place of business in Los
20  Angeles County, California. Plaintiff PCI is a wholly owned subsidiary of Plaintiff Cinco and is a
21  founding member of Nominal Defendant PCJV. From Nominal Defendant PCJV's inception, to
22  the present, Plaintiff PCI has been the sole owner of 60% of the Membership Interests of Nominal
23  Defendant PCI. Plaintiff PCI has never transferred, sold, assigned, or in any way ceased to be an
24  owner of the 60% equity represented by the Membership Interests received in or around July of
25  2010 when Nominal Defendant PCJV was formed.

26      17.    Defendant Koren is an individual and resident of the County of Los Angeles, in the
27  State of California. In 2012, Defendant Koren became the President of Nominal Defendant PCJV.
28  ///

ERVIN COHEN & JESSUP LLP

16544.2:9330787.1

6

VERIFIED SECOND AMENDED COMPLAINT

ERVIN COHEN & JESSUP LLP

1     18.    Defendant Potato Corner LA Group, LLC Group is a California limited liability

2 company entered into by Defendant Koren and Jacoby, as well as Nemanim, who is no longer a

3 member of Potato Corner LA Group, LLC.

4     19.    The following Defendants are collectively referred to herein as the "Koren Affiliate

5 Defendants."

6          a.    Defendant NKM Capital Group, LLC, is a California limited liability

7              company that Plaintiffs are informed and believe, and thereon allege, to be

8              owned, operated, and/or controlled by Defendant Koren.

9          b.    Defendant J&K Americana, LLC, is a California limited liability company

10             that Plaintiffs are informed and believe, and thereon allege, to be owned,

11             operated, and/or controlled by Defendant Koren.

12          c.    Defendant J&K Culver, LLC, is a California limited liability company that

13             Plaintiffs are informed and believe, and thereon allege, to be owned,

14             operated, and/or controlled by Defendant Koren.

15          d.    Defendant J&K Lakewood, LLC, is a California limited liability company

16             that Plaintiffs are informed and believe, and thereon allege, to be owned,

17             operated, and/or controlled by Defendant Koren.

18          e.    Defendant J&K Oakridge, LLC, is a California limited liability company

19             that Plaintiffs are informed and believe, and thereon allege, to be owned,

20             operated, and/or controlled by Defendant Koren.

21          f.    Defendant J&K Valley Fair, LLC, is a California limited liability company

22             that Plaintiffs are informed and believe, and thereon allege, to be owned,

23             operated, and/or controlled by Defendant Koren

24          g.    Defendant J&K Capital 2, LLC, is a California limited liability company

25             that Plaintiffs are informed and believe, and thereon allege, to be owned,

26             operated, and/or controlled by Defendant Koren.

27          h.    Defendant J&K Ontario, LLC, is a California limited liability company that

28             Plaintiffs are informed and believe, and thereon allege, to be owned,

1    operated, and/or controlled by Defendant Koren.

2        i.   Defendant J&K PC Trucks, LLC, is a California limited liability company

3            that Plaintiffs are informed and believe, and thereon allege, to be owned,

4            operated, and/or controlled by Defendant Koren.

5        j.   Defendant J&K Consultants Group, LLC, is a California limited liability

6            company that Plaintiffs are informed and believe, and thereon allege, to be

7            owned, operated, and/or controlled by Defendant Koren.

8        k.   Defendant GK Capital Group, LLC, is a California limited liability

9            company that Plaintiffs are informed and believe, and thereon allege, to be

10           owned, operated, and/or controlled by Defendant Koren.

11   20.   Defendant Alon Koren is and at all relevant times was, an individual residing in the

12   County of Los Angeles, State of California.

13   21.   Defendant Thomas Hodgson is and at all relevant times was, an individual residing

14   in the County of Los Angeles, State of California.

15   22.   Defendant Emily Garcia is and at all relevant times was, an individual residing in

16   the County of Los Angeles, State of California.

17   23.   Plaintiffs do not know the true names and capacities of Defendants DOES 1

18   through 25, inclusive, and therefore sues these "Doe Defendants" by such fictitious names

19   pursuant to Section 474 of the California Code of Civil Procedure. Plaintiffs will seek leave of

20   Court to amend this Amended Complaint when the true names and capacities of the Doe

21   Defendants have been ascertained. Plaintiffs are informed and believe, and based thereon allege,

22   that each of the Defendants designated as a Doe herein was the agent and/or alter ego of each of

23   the remaining Defendants or is in some manner responsible for the events and occurrences herein

24   described, and legally and proximately caused injury and damages to Plaintiffs as herein alleged.

25   (Hereinafter, Defendant Koren, the Koren Affiliate Defendants, and Doe Defendants, inclusive,

26   will be referred to collectively as "Defendants.")

27   24.   Plaintiffs are informed and believe and based thereon allege that all of the

28   Defendants named herein are in some manner responsible for the acts herein alleged, and that each

16544.2:9330787.1        8

ERVIN COHEN & JESSUP LLP

1    was the agent, servant, representative, alter-ego, principal, employer or master of each other

2    Defendant herein and, further, was acting within the scope of such agency, servitude, employment,

3    representation or capacity and/or for the benefit of each other in doing the acts herein alleged.

4                                    **JURISDICTION AND VENUE**

5        25.    This Court has jurisdiction over this lawsuit because the amount in controversy

6    exceeds this Court's jurisdictional amount, exclusive of attorneys' fees, interest and costs.

7        26.    Venue is proper in the County of Los Angeles pursuant to Cal. Code Civ. P. § 395,

8    as Defendant Koren, as well as most, if not all, of the other Defendants reside in the County of Los

9    Angeles.

10                            **FACTS COMMON TO ALL CAUSES OF ACTION**

11       27.    Plaintiff Cinco's first exploration into expanding the Potato Corner Brand in the

12   United States began in or around 2009, when it agreed that Defendant Koren, through Defendant

13   NKM, could open a Potato Corner store in Santa Anita (the "Santa Anita Potato Corner Store").

14       28.    Desiring to build on that first Santa Anita Potato Corner Store, and expand further

15   in America, Plaintiff Cinco decided to entrust Defendant Koren with that expansion through a

16   business structure that had great potential for both Defendant Koren and Plaintiff Cinco. That

17   structure was embodied in two limited liability companies described herein: Nominal Defendant

18   PCJV as well as PCI Trading, LLC ("PCIT"), which was to be the supplier for Potato Corner

19   stores owned or franchised by Nominal Defendant PCJV.

20       29.    Plaintiff Cinco's Chief Executive Officer, Mr. Jose Magsaysay ("Mr. Magsaysay")

21   believed Defendant Koren's sales pitch, in which Defendant Koren represented that he was a

22   trustworthy and hardworking partner who would dedicate himself to expand and build the Potato

23   Corner Brand in America. Mr. Magsaysay, with his heart for entrepreneurship and his trust in

24   growing business opportunities of others (evidenced by his franchisees in Asia and elsewhere),

25   agreed to go into business with Defendant Koren through Nominal Defendant PCJV.

26       30.    Because of the distance between Potato Corner's headquarters in Manila and the

27   United States, the only way this venture could succeed was if Defendant Koren adhered to,

28   respected, and comported himself with the great trust and confidence placed by Plaintiffs in

16544 2:9330787 1                                    9

ERVIN COHEN & JESSUP LLP

1  Defendant Koren that he would act loyally, in good faith, and with great care towards Plaintiff
2  PCI, the subsidiary established by Plaintiff Cinco as its American headquarters.

3      31.    As alleged herein, Defendant Koren knowingly repudiated and breached these
4  duties, in a manner that benefited himself, and his affiliates, at the expense of Plaintiffs Cinco and
5  PCI, as well as the franchisees and the Potato Corner Brand.

6      32.    Nominal Defendant PCJV – the entity that Plaintiff Cinco and Defendant Koren
7  had previously agreed would serve as the locus from which Potato Corner would expand
8  nationwide – was established on or around July 16, 2010. Prior to its inception, Plaintiff Cinco and
9  Defendant Koren memorialized the structure of the soon to be created limited liability company
10 through a Joint Venture Agreement ("JVA"), the governing document for Nominal Defendant
11 PCJV. A true and correct copy of the JVA is attached hereto as Exhibit A and incorporated by
12 reference herein.

13     33.    Because Nominal Defendant PCJV had not yet been created (nor had Plaintiff
14 Cinco's subsidiary, Plaintiff PCI, which would serve as the majority owner), Plaintiff Cinco
15 executed the JVA as holder of the putative 60% equity of the soon-to-be-established limited
16 liability company. Defendant Koren, Jacoby and Nemanim, also executed the JVA in their
17 individual capacity.

18     34.    In section 3(g) of the JVA, Plaintiff Cinco agreed to license the "Potato Corner"
19 Intellectual Property to Nominal Defendant PCJV, in exchange for a license fee of "thirty percent
20 of all initial/franchise fees and ongoing royalty fees paid to/collected by [Nominal Defendant
21 PCJV]" from its franchisees (the "Approved License Fee").

22     35.    Nearly a decade later, Plaintiff Cinco has never received any Approved License
23 Fee, as the result of the deceit, and breaches of fiduciary duty alleged herein.

24               *Allocation of Membership Interests of Nominal Defendant*
25               *PCJV, as Set Forth in Its Governing Document, the JVA*

26     36.    The JVA memorialized that 60% of the still unformed Nominal Defendant PCJV
27 Membership Interests would be owned by Plaintiff Cinco, with the express stipulation that
28 Plaintiff Cinco would have the right to assign all of its interests in Nominal Defendant PCJV to a

ERVIN COHEN & JESSUP LLP

1  wholly owned subsidiary (the "Permitted Cinco Equity Assignment"). Plaintiff Cinco took
2  advantage of the Permitted Cinco Assignment, by assigning any and all interests in the transaction
3  to its wholly owned subsidiary – and separate legal entity – Plaintiff PCI.

4       37.     The JVA memorialized that the remaining 40% of the Nominal Defendant PCJV
5  Membership Interests would be owned by Defendant Koren, Jacoby, and Nemanim, personally
6  and individually.

7       38.     Under the JVA, the owners of Membership Interests in Nominal Defendant PCJV –
8  Plaintiff PCI, Defendant Koren, Jacoby, and Nemanim were prohibited from transferring their
9  Membership Interests in Nominal Defendant PCJV, absent compliance with a right of first refusal.
10 (Exh. A, JVA, § 2(d).)

11      39.     In 2010, Nemanim, who, pursuant to the JVA, was appointed President (the
12 primary executive officer) of Nominal Defendant PCJV, issued Certificates for Limited Liability
13 Company Interests with this ownership structure, allocating Membership Interests in PCJV as
14 follows: Plaintiff PCI (60%), Nemanim (15.20%), Defendant Koren (15.20%), and Jacoby (9.6%).
15 True and correct copies of the executed Certificates for Limited Liability Company Interests are
16 attached hereto as Exhibit B and incorporated by reference herein.

17      *Governance in Nominal Defendant PCJV is Vested in a Seven Member Management*
18         *Committee, Whereas Day to Day Operations Are Vested in PCJV Officers*

19      40.     Under Section 3 of the JVA (Exh. A), the "business and affairs," and all policy, of
20 Nominal Defendant PCJV are vested in and to be directed by seven Managers (referred to in the
21 agreement as "Management"), four of whom were to be appointed by Plaintiff Cinco (or its
22 assignee, who as alleged herein, is its wholly owned subsidiary, and separate legal entity, Plaintiff
23 PCI). The other three individuals comprising PCJV Management were to be appointed by the three
24 other holders of Membership Interests: Defendant Koren, Amir Jacoby, and Non-Party Nemanim.

25      41.     The initial composition of PCJV Management was set forth in the JVA, and was as
26 follows:

27         a.     Plaintiff PCI's initial four individuals appointed to PCJV Management
28              were: Mr. Magsaysay, Jose Miguel Ma. Montinola ("Mr. Montinola"), Ma.

16544.2:9330787.1                    11

ERVIN COHEN & JESSUP LLP

1          Vitoria O. Bermejo ("Ms. Bermejo"), and Ricardo Montelibano ("Mr.

2          Montelibano").

3              b.    Defendant Koren, Amir Jacoby, and Non-Party Nemanim named

4                   themselves as the other three Managers.

5     42.    As set forth in the JVA (Section 3) among the powers vested in Management

6  ("Management Powers") are as follows:

7              a.    Management of the business and affairs of Nominal Defendant PCJV;

8              b.    Establishing policies and directives of Nominal Defendant PCJV;

9              c.    Approval of all compensation to "managers, executive offices, and key

10                  personnel" of Nominal Defendant PCJV;

11              d.    "Approval of the Accounting System/Procedures/Software/Method" to be

12                  used by Nominal Defendant PCJV;

13              e.    Approval of Nominal Defendant PCJV's budget "and any changes to it;"

14              f.    Approval of all franchising agreements, and lease agreements of Nominal

15                  Defendant PCJV; and

16              g.    "Approval of all purchases and disbursements in excess of $10,000," and

17                  any modifications to such payments.

18     43.    As alleged herein, pursuant to Section 3(j) of the JVA, one of the most significant

19  Management Powers, is the right of all seven individuals comprising the Management to be

20  presented with new Potato Corner store opportunities outside of Los Angeles and San Francisco

21  Counties ("New Store Corporate Opportunities"), and to decide if such stores would be owned and

22  operated by Nominal Defendant PCJV. If PCJV Management voted to pass on any particular New

23  Store Corporate Opportunities, only then could Defendant Koren, Jacoby, and Nemanim open a

24  store at that location, but only on the condition that it be operated as a franchise, subject to the

25  same terms and conditions as any other franchise of Nominal Defendant PCJV.

26     44.    Under Section 3(b) and 3(f) of the JVA, certain individuals named by the

27  Management would be appointed as "executive officers," who are entrusted with managing "the

28  business and property of the Company, and to market the business, in accordance with and

ERVIN COHEN & JESSUP LLP

1  pursuant to the directives of and policies set by the Management" of Nominal Defendant PCJV.

2  The JVA also identified the initial appointments to those officer positions:

3            a.    Chairman of the Board: Mr. Magsaysay, a Manager, and the Chief

4                  Executive Officer of Plaintiff Cinco.

5            b.    President: Nemanim. The JVA also stated that "[a]t any given time, the

6                  President shall be any one of the following members: Amit Nemanim, Guy

7                  Koren or Amir Jacoby."

8            c.    Corporate Secretary: Non-Party Erlinda Bartolome.

9            d.    Treasurer: Mr. Montinola, a Manager.

10    45.    The JVA expressly authorizes PCJV Management to "recall and/or withdraw the

11  appointment of any executive officer, as it deems necessary." (Exh. A, JVA, § 3(f).)

12    46.    The JVA further delineates the duties of the President (Exh. A, § 3(i)), all of which

13  are covered by the umbrella requirement of "compl[iance] with the rules, policies and procedures

14  approved by the Management of the Company." These responsibilities include the following:

15            a.    "[M]anagement, operational, marketing, establishment, maintenance,

16                  licensing and sublicensing with respect to the 'Potato Corner' outlets/stores

17                  in the Territory," which was defined as being the United States and Israel,

18                  outside of Los Angeles and San Francisco Counties.

19            b.    Using "best efforts at all times . . . to operate and maintain the 'Potato

20                  Corner' outlets/stores in the Territory according to the highest standards

21                  achievable consistent with the overall plan of the Management of the

22                  Company."

23            c    Maintenance of a "comprehensive system of records, books, and accounts,

24                  with respect to the licensing and sublicensing activities, operation,

25                  establishment, management, maintenance and other activities of the 'Potato

26                  Corner' outlets in the Territory with the assistance of the Corporate

27                  Secretary."

28            d.    Production of monthly "statements of receipts and disbursements, a

ERVIN COHEN & JESSUP LLP

16544.2:9330787.1                              13
                              VERIFIED SECOND AMENDED COMPLAINT

1    schedule of accounts receivable and payable, and a schedule of fees

2    collected and distributed together with a reconciled bank statement as of the

3    last day of the month" (the "Mandatory Monthly Financial Disclosure").

4    e.    Issuance of annual audited financial statements.

5    f.    Taking "such actions as may be necessary to comply promptly with any and

6    all laws, ordinances, orders or other requirements of any federal, state,

7    county, or municipal authority having jurisdiction of the Company and

8    affecting the Company" ("Legal Compliance").

9

10    *The Master Services Agreement Between Nominal*

11    *Defendant PCJV and the "LA Group."*

12    47.    In Section 3(i) of the JVA, it was agreed by all parties that Defendant Koren, Amir

13    Jacoby, and Nemanim (or a "corporation" designated by these three individuals) would be

14    compensated for their duties and obligations arising under that governing agreement, pursuant to a

15    "Master Services Agreement" ("MSA"), which was to be negotiated subsequent to the JVA.

16    48.    Attached hereto, and incorporated herein by reference, as Exhibit C, is a true and

17    correct copy of the MSA later executed on or around June 8, 2012, by all of the named individuals

18    comprising the Management of Nominal Defendant PCJV, in which, Defendant Koren, Jacoby,

19    and Nemanim reaffirmed their specific obligations set forth in the JVA – the duties conferred on

20    the President (which was to be one of the three of them) in Section 3(i) of the JVA, as well as the

21    New Store Corporate Opportunities obligation set forth in Section 3(j).

22    49.    Specifically, in the MSA (Exh. C), Defendant Koren, Jacoby, and Nemanim

23    expressly restated their obligations to satisfy the following responsibilities:

24    a.    "Conduct management, operations, marketing, establishment, maintenance,

25    licensing and sublicensing activities with respect to the 'Potato Corner'

26    outlets/stores in the Territory."

27    b.    "Use best efforts at all times to operate and maintain 'Potato Corner'

28    outlets/stores in the Territory according to the highest standards achievable

16544 2:9330787.1    14

VERIFIED SECOND AMENDED COMPLAINT

*(left margin)* ERVIN COHEN & JESSUP LLP

1    consistent with the overall plan of PCJV Management."

2         c.   "Advertise, market, and promote the Potato Corner outlets/stores with the

3            goal of causing public knowledge, awareness and patronage of the Potato

4            Corner outlets/stores."

5         d.   "Maintain a comprehensive system of records, books, and accounts, with

6            respect to the licensing and sublicensing activities, operation, establishment,

7            management, maintenance and other activities of the Potato Corner outlets

8            in the Territory with the assistance of the Corporate Secretary."

9         e.   Provide the Mandatory Monthly Financial Disclosure to PCJV

10           Management.

11        f.   Issuance of annual audited financial statements.

12        g.   Consistent with their fiduciary duties of care and loyalty, presentation to

13           Management of New Store Corporate Opportunities, so that the

14           Management can vote as to whether that New Store Corporate Opportunity

15           would be a Company Store, and, if not, and only then, could Defendants

16           Koren, Jacoby, and Nemanim have the right to build a store at that location,

17           "provided that [they] shall enter into a franchising agreement with PCJV,

18           and shall pay franchise fees and ongoing royalty fees as set forth in PCJV's

19           standard franchising agreement."

20        h.   Maintenance and protection of Confidential Information of PCJV, as

21           defined in the JVA and again in the MSA.

22        i.   Taking "such actions as may be necessary to comply promptly with any and

23           all laws, ordinances, orders or other requirements of any federal, state,

24           county, or municipal authority having jurisdiction of the Company and

25           affecting the Company" ("Legal Compliance").

26      50.   In the JVA, and again in the MSA, Plaintiff PCI, through its representatives, agreed

27   that, in satisfaction of Defendant Koren, Jacoby and Nemanim's duties under the MSA, Defendant

28   Koren, Jacoby and Nemanim would receive "consideration" through a "services fee equal to thirty

ERVIN COHEN & JESSUP LLP

1 | (30%) percent of all initial/franchise fees and continuing royalty fees paid to/collected by the

2 | Company" (the "Approved Management Fee").

<div align="center">

*Allocation of Fees Collected by and Profits*

*Earned by Nominal Defendant PCJV*

</div>

5 | 51. As set forth herein, the purpose of Nominal Defendant PCJV was established to

6 | spread the Potato Corner Brand by franchising stores to third parties, or by operating stores owned

7 | by Nominal Defendant PCJV ("Company Owned Stores").

8 | 52. Income from franchise stores would be in the form of franchise fees and royalties

9 | ("Franchise Fees and Royalties") whereas income from Company Owned Stores would be pure

10 | profit to Nominal Defendant PCJV.

11 | 53. The JVA set forth a formula by which the income of Nominal Defendant PCJV is

12 | allocated. Specifically, Franchise Fees and Royalties are to be distributed as follows: 30% payable

13 | to Plaintiff Cinco pursuant to the Approved License Fee, 30% payable to Defendants Koren,

14 | Jacoby, and Nemanim pursuant to the Approved Management Fee, and the remainder distributed

15 | as profit: 60% to Plaintiff PCI, and the remainder of the 40% distributed to Defendants Koren,

16 | Jacoby, and Nemanim.

17 | 54. All other profit of Nominal Defendant PCJV was to be distributed as follows: 60%

18 | to Plaintiff PCI, and the remainder of the 40% distributed to Defendants Koren, Jacoby and

19 | Nemanim.

20 | 55. As of the date of this Amended Complaint, neither of the Plaintiffs have ever

21 | received a single cent of Approved License Fees or profit, whereas Defendant Koren, and the

22 | Koren Affiliate Defendants, have received substantial income. The only way Defendants have

23 | been able to earn income has been through the abuse of, and brazen disregard for, Defendant

24 | Koren's fiduciary duties required under law, and those that are expressly stated throughout the

25 | JVA and MSA.

26 | 56. Relief from Defendant Koren's knowing repudiation of his fiduciary, legal, and

27 | contractual duties, are at issue and sought herein.

28 | ///

ERVIN COHEN & JESSUP LLP

*Koren Becomes President in 2012, Which Sets in Motion his Plan to Wrest Control*
*Of, and Abuse his Duties to Plaintiffs and Nominal Defendant PCJV*

57.    In or around October of 2012, PCJV Management approved the replacement of Nemanim as President by Defendant Koren. At the same time, Nemanim withdrew from Nominal Party PCJV Management as an owner of Membership Interests.

58.    As the result of these changes, the owners of Membership Interests in Nominal Party PCJV became, and remain to this day, as follows: Plaintiff PCI owns 60% of the Membership Interests, whereas the remaining 40% equity of Nominal Party PCJV is owned by Defendant Koren and Amir Jacoby.

59.    From 2012 onwards, and continuing through the present, Defendant Koren has abused his authority, and fiduciary duties, as President.

60.    As explained herein, and as will be proven at trial, Defendant Koren's plan was to divert Nominal Defendant opportunities and resources for his own benefit, and the benefit of the Koren Affiliate Defendants, in the form of opening Potato Corner Store Opportunities without fully disclosing to and seeking approval from Nominal Defendant PCJV Management for either (1) opening the store in the first place (instead of a Company Owned Store), and/or (2) the terms of the relationship between the Koren Affiliate Defendant owned stores and PCJV.

61.    After opening these stores (some of which were opened without approval from Management as alleged above), Defendant Koren treated his own stores preferentially, to the detriment of the other third party franchisees, by using Nominal Defendant PCJV resources, capital, and attention to benefit and favor those Koren Affiliate Defendant-owned stores – effectively treating them as Company Owned Stores (except that Nominal Defendant PCJV did not receive the financial benefits and profits of those stores). Indeed, Plaintiffs are informed, and believe, and thereon allege, that Defendant Koren even referred to these stores owned by the Koren Affiliate Defendants as "Company-Owned Stores."

62.    Defendant Koren's self-dealing with respect to the stores owned by the Koren Affiliate Defendants went even further.

///

16544.2:9330787.1                                    17
VERIFIED SECOND AMENDED COMPLAINT

1    63.    For example, each of the PCJV franchisees are obligated to pay 2% of their income
2    into a "marketing fund," which, pooled together is to be used to market all of the PCJV
3    franchisees. Without seeking approval from, or disclosing to, PCJV Management, Defendant
4    Koren waived, on behalf of PCJV, marketing fund fees owed by the Koren Affiliate Defendants,
5    while requiring the other franchisees to continue paying into that fund. Even worse, Defendant
6    Koren caused the Nominal Defendant PCJV's marketing fund to be used to promote and market
7    the Koren Affiliate Defendant stores preferentially and disproportionately, even though they were
8    not paying into that account. This preferential and self-interested use of the PCJV marketing fund
9    was also never disclosed to or approved by PCJV Management. Put simply, Defendant Koren was
10    forcing third party franchisees to pay for the marketing of his own stores.

11    64.    Defendant Koren's self-dealing extended into other transactions. For example, as
12    alleged herein, the separate company PCIT, also managed by Defendant Koren, was responsible
13    for selling supplies to the American Potato Corner stores. Defendant Koren caused PCIT to sell
14    supplies at cost (with a heavy discount) to the Koren Affiliate Stores, while charging the third-
15    party franchisees to pay market prices – or sometimes even above market prices.

16    65.    Defendant Koren also caused Nominal Defendant PCJV to agree to waive franchise
17    fees and royalties owed by the Koren Affiliate Stores. The only such waivers that were presented
18    to, and approved by, PCJV Management, arose from the first two Koren Affiliate Defendant
19    stores, and those waivers were not to be in perpetuity.

20    66.    The other third-party franchisees of Nominal Defendant PCJV did not receive this
21    same preferential treatment granted to those owned by the Koren Affiliate Defendants. Plaintiffs
22    are informed and believe and thereon allege that these third-party franchise stores suffered as the
23    result of the preferential treatment given to the Koren Affiliate Defendants. Plaintiffs are further
24    informed and believe, and thereon allege that, as the result of this preferential treatment, Nominal
25    Defendant PCJV was forced to waive franchise and royalty fees from these other third-party
26    franchisees, so as to allow them to survive under these austere conditions.

27    67.    As a result of this preferential treatment, fees and profits earned by Nominal
28    Defendant PCJV have been depressed, preventing payment of Approved License Fees and profits

ERVIN COHEN & JESSUP LLP

1  to Plaintiffs, whereas Koren-Affiliate Defendant owned stores have received unreimbursed

2  resources and benefits from Nominal Defendant PCJV, as well as waived fees and royalties,

3  earning profits to those stores that Defendant Koren and his affiliates took for themselves. Again,

4  this kind of preferential treatment, to the detriment of other third-party franchisees, provided by

5  Defendant Koren to the Koren Affiliate Defendants was not approved by PCJV Management, let

6  alone a disinterested majority of the Managers.

*The JVA Is Amended, However, there is No Meeting of*

*the Minds as to the Intent of the Amended Terms*

9    68.    In or around October of 2012, the JVA was Amended, pursuant to an Amended

10  Joint Venture Agreement ("AJVA"), which is attached hereto as Exhibit D.

11    69.    The AJVA recognizes and acknowledges that Plaintiff PCI is the holder of the 60%

12  equity of Nominal Defendant PCJV. The AJVA also recognizes the removal of Non-Party

13  Nemanim from Nominal Defendant PCJV. These terms are not in dispute.

14    70.    Most of the provisions of the AJVA remain unchanged from the JVA.

15    71.    The principal term to have materially changed from the JVA to the AJVA, was

16  Section 3(c), identifying the specific individuals to serve as executive officers. In addition to

17  naming Defendant Koren as the President, the AJVA, Section 3(c) also inserted the following

18  vague language: "Any change in these mentioned executive officers will require a vote of 75% of

19  members' interests."

20    72.    The purpose of this new language was to protect executive officers from unilateral

21  action of Plaintiff PCI, given that, section 3(f) allowed Management to hire and fire executive

22  officers. Because Plaintiff PCI has the unilateral right to name four of the seven individuals

23  comprising Management, Defendant Koren expressed his concern that Plaintiff PCI could

24  effectively dictate who serves as Executive Officers. As a concession to Defendant Koren,

25  Plaintiff PCI agreed that a supermajority of equity owners holding Membership Interests

26  (i.e. Plaintiff PCI plus one of the other owners of Membership Interests, Jacoby or Defendant

27  Koren) would be required to decide whether an Executive Officer should be hired or fired.

28  ///

ERVIN COHEN & JESSUP LLP

16544 2·9330787 1                                19

VERIFIED SECOND AMENDED COMPLAINT

1    73.    Plaintiff PCI and Amir Jacoby, on the one hand, and Defendant Koren, on the

2  other, possessed a different intent as to what this new Section 3(c) means.

3    74.    While Plaintiff PCI and Jacoby intended, upon execution of the AJVA, that, among

4  other things, replacement of Executive Officers required a 75% vote of the holders of Membership

5  Interests in Nominal Defendant PCJV, Defendant Koren apparently believed and intended that

6  replacement of Executive Officers required a 75% vote of the Management (6 out of 7 Managers),

7  and, further, that he possessed the sole authority to name three of the seven individuals comprising

8  the Management, thus, effectively insulating himself from ever being terminated or replaced as

9  President.

10    75.    Plaintiff PCI would never have agreed to give Defendant Koren the right to serve

11  as President in perpetuity, nor did they ever intend for that interpretation of this vague term.

12    76.    These interpretations of the new Section 3(c) are so irreconcilable that they

13  evidence the failure of any meeting of the minds between the signatories to the AJVA, such that

14  this term cannot be enforced.

15    77.    Despite the absence of any meeting of the minds as to Section 3(c) of the AJVA,

16  Defendant Koren has nevertheless taken the position that this unenforceable term has protected

17  him from termination as President, unless six out of seven of the individuals comprising the

18  Management of Nominal Defendant PCJV agree. Given Defendant Koren's claim that he also

19  possesses the unilateral right to name three out of the seven individuals comprising the

20  Management of Nominal Defendant PCJV, this interpretation of the AJVA would insulate him

21  from termination unless he, or his handpicked Managers agree.

22    78.    Despite the absence of any meeting of the minds as to the AJVA, Defendant Koren

23  has nevertheless imposed his unilateral and disputed interpretation of this unenforceable term from

24  the AJVA upon Plaintiff PCI, thus blocking his termination as President of Nominal Defendant

25  PCJV, even in the face of the egregious and brazen self-dealing and wrongful conduct at issue

26  herein.

27  ///

28  ///

16544 2 9330787 1                                      20
VERIFIED SECOND AMENDED COMPLAINT

ERVIN COHEN & JESSUP LLP

*Defendant Koren Conceals his Wrongdoing by Failing to Satisfy*

*his Obligations of Financial Disclosure and Transparency*

79.     From his installation as President, to the present, and continuing as of the filing of this Amended Complaint, Defendant Koren has concealed from Nominal Defendant PCJV, and Plaintiffs, his self-dealing, and breaches of fiduciary duties of good faith and care, as well as his other legal and contractual duties.

80.     Defendant Koren accomplished the concealment of his wrongdoing by, among other things:

a.     Failing to disclose, and seek approval from a disinterested majority of Management, for each of the self-dealing transactions alleged herein.

b.     Failing to provide the detailed Mandatory Monthly Financial Disclosures to Nominal Defendant Management, as required by Section 3(i)(iv) of the JVA.

c.     Failing to provide annual audited financial statements as required by Section 3(i)(v) of the JVA.

d.     Causing knowingly false statements to be included in the consolidated financial statement covering 2015-2017. Plaintiffs only recently realized the falsity of the representations contained in that audited financial statement.

e.     Failing to comply with and ignoring recent directives of PCJV Management demanding a five-year plan.

81.     Plaintiff PCI only began to learn of the wrongful acts being committed by Defendant Koren in the Spring of 2018, when, for a temporary period, Plaintiff PCI operated the day to day business of PCJV.

*Defendant Koren Takes New Store Opportunities*

*for Himself and Koren Affiliate Defendants*

82.     From the opening of the Santa Anita Potato Corner Store through the present only 46 Potato Corner Stores have been opened in the United States, twelve of which have since closed.

///

ERVIN COHEN & JESSUP LLP

1  This is woefully below what Plaintiffs ever expected when entering into the Nominal Defendant

2  PCJV transaction with Defendant Koren.

3       83.    Not one of the 46 Potato Corner Stores have been opened as Company Stores,

4  owned and operated by Nominal Defendant PCJV, with profits and earnings owned by Nominal

5  Defendant PCJV. Instead, 37 of those stores were opened by third-party franchisees, whereas nine

6  were opened by Koren Affiliate Defendants. Out of the nine stores opened by the Koren Affiliate

7  Defendants, five have been purchased from existing Nominal Defendant PCJV's Franchisees, the

8  purchase of which was never disclosed to or approved by PCJV Management.

9       84.    Nine of the United States Potato Corner Stores have been opened by Defendant

10  Koren, through his Defendant Affiliates (as collectively referred to herein). Those Defendant

11  Affiliates, and their corresponding stores, are as follows.

12             a.    On February 7, 2010, Defendant NKM Capital Group, LLC, an affiliate of

13                   Defendant Koren in which neither Plaintiff possesses any Membership

14                   Interest or governance rights whatsoever, opened the first Santa Anita

15                   Potato Corner Store.

16             b.    On December 15, 2010, Defendant J&K Americana, LLC, an affiliate of

17                   Defendant Koren in which neither Plaintiff possesses any Membership

18                   Interest or governance rights whatsoever, opened the Potato Corner Store at

19                   the Americana Mall in Glendale, California.

20             c.    On January 26, 2013, Defendant J&K Culver, LLC, an affiliate of

21                   Defendant Koren in which neither Plaintiff possesses any Membership

22                   Interest or governance rights whatsoever, opened the Potato Corner Store in

23                   Culver City, California.

24             d.    On October 20, 2013, Defendant J&K Lakewood, LLC, an affiliate of

25                   Defendant Koren in which neither Plaintiff possesses any Membership

26                   Interest or governance rights whatsoever, opened the Potato Corner Store in

27                   Lakewood, California.

28             e.    On May 13, 2014, Defendant J&K Oakridge, LLC, an affiliate of Defendant

ERVIN COHEN & JESSUP LLP

16544.2:9330787.1                         22
VERIFIED SECOND AMENDED COMPLAINT

1    Koren in which neither Plaintiff possesses any Membership Interest or

2    governance rights whatsoever, opened the Potato Corner Store in San Jose,

3    California.

4    f.    Also, on May 13, 2014, Defendant J&K Valley Fair, LLC, an affiliate of

5    Defendant Koren in which neither Plaintiff possesses any Membership

6    Interest or governance rights whatsoever, opened the Potato Corner Store in

7    Santa Clara, California.

8    g.    On July 24, 2014, Defendant J&K 2, LLC, an affiliate of Defendant Koren

9    in which neither Plaintiff possesses any Membership Interest or governance

10    rights whatsoever, opened the Potato Corner Store in Sherman Oaks,

11    California. This Potato Corner Store closed on January 8, 2017.

12    h.    On July 23, 2016, Defendant NKM Capital Group, LLC opened a second

13    store in Arcadia ("Santa Anita #2").

14    i.    On July 25, 2017, Defendant Koren caused the creation of J&K PC Trucks,

15    LLC in or around July 25, 2017, for the purpose of establishing a Potato

16    Corner food truck, without having presented this opportunity to Nominal

17    Defendant PCJV.

18    j.    On February 25, 2018, just months before this dispute erupted, Defendant

19    J&K Ontario, LLC, an affiliate of Defendant Koren in which neither

20    Plaintiff possesses any Membership Interest or governance rights

21    whatspever, opened the Potato Corner Store in Ontario, California.

22    85.    Plaintiffs are informed, and believe, and thereon allege that not one of the Potato

23    Corner Stores outside of Los Angeles County or San Francisco County were presented for

24    approval, consideration, and a vote, by the Management of Nominal Defendant PCJV (let alone a

25    disinterested majority of Management), as required by the JVA, MSA, and AJVA.

26    86.    With respect to each of the nine stores owned by Defendant Koren and his

27    Defendant Affiliates, Defendant Koren failed to disclose to, or seek approval from a disinterested

28    majority of the Management of Nominal Defendant PCJV, as to some or all of the following self-

16544.2:9330787.1                              23
VERIFIED SECOND AMENDED COMPLAINT

ERVIN COHEN & JESSUP LLP



1  interested transactions:

2          a.     Defendant Koren's waiver of franchise fees, marketing fund contributions,

3                 and royalties due and owing to Nominal Defendant PCJV from the

4                 Defendant Koren Affiliates arising from their ownership of Potato Corner

5                 franchises.

6          b.     Defendant Koren's preferential diversion of unreimbursed Nominal

7                 Defendant PCJV human, financial and other resources for the benefit of

8                 these nine stores owned by the Defendant Koren Affiliates, to the exclusion,

9                 and detriment of the other 37 PCJV franchisees owned by third-parties.

10         c.     Defendant Koren's sale of supplies "at cost" from PCIT to Potato Corner

11                Stores owned by Defendant Koren Affiliates, whereas the other PCJV

12                franchisees were required to pay market or above market prices.

13     87.    Accordingly, Defendant Koren wrongfully diverted New Store Opportunities, and,

14  upon opening these and the other Koren Affiliate Defendant stores, Defendant Koren treated the

15  Koren Affiliate Defendant Stores as PCJV Company Owned Stores – giving these stores all the

16  benefits and resources of Nominal Defendant PCJV – without treating them as PCJV Company

17  Owned Stores for the purpose of profits. In essence, Defendant Koren and the Koren Affiliate

18  Defendants reaped all of the rewards and profits of the New Store Opportunities and other

19  franchises, without reimbursing Nominal Defendant PCJV for the resources contributed to, or at

20  least the profits earned from these Koren Affiliate Defendant-owned stores, let alone the franchise

21  and royalties owed by these outlets.

22     88.    Put simply, Nominal Defendant PCJV has not received one penny in the form of

23  fees, royalties, reimbursement, or profit, from any of the stores owned by Defendant Koren's

24  Affiliates, nor did Nominal Defendant PCJV's Management approve the opening of all of these

25  New Store Opportunities by all of Koren Affiliate Defendants or approve of Defendant Koren's

26  self-dealing transactions with the Koren Affiliate Defendants.

27     89.    The net result of Koren's diversion of corporate opportunities, self-dealing, and

28  preferential treatment of his stores to the detriment of other PCJV franchisees, has caused the

16544.2:9330787.1                              24

VERIFIED SECOND AMENDED COMPLAINT

ERVIN COHEN & JESSUP LLP



1  Koren Affiliate Defendant stores to be some of the strongest among PCJV's franchisees, whereas
2  the third-party franchisees have struggled under this disparate treatment.

3        ***Defendant Koren's Brazen, Self-Dealing, and Void "Services Agreement," Which***
4        ***Diverted Nominal Defendant PCJV Profits to Himself, While Plaintiffs Waived Their Fees***

5        90.    On July 13, 2013, at a meeting of the PCJV Management, Defendant Koren, as
6  President, Manager, and Member of Nominal Defendant PCJV reported to Plaintiff PCI, and the
7  Management, that Nominal Defendant PCJV's income from fees and royalties was insufficiently
8  high to support payment of the Approved License Fee. Specifically, Defendant Koren reported
9  that due to financial constraints, Nominal Defendant PCJV may slow down operations.

10        91.    As the result of Defendant Koren's disclosure regarding the financial health of
11  Nominal Defendant PCJV, Plaintiffs agreed to waive the Approved License Fee, a waiver that was
12  subsequently repeated by Plaintiffs annually. Plaintiffs agreed to waive this income based on
13  Defendant Koren's representation that he and Amir Jacoby would correspondingly also waive
14  Approved Management Fees agreed to in the JVA and MSA.

15        92.    Despite owing fiduciary, legal, and contractual duties to Plaintiffs and Nominal
16  Defendant PCJV, at no point did Defendant Koren disclose facts material to Plaintiffs' agreement
17  to waive these Approved License Fees. An example of material facts not disclosed to Management
18  of PCJV, as well as Plaintiffs, included the fact that Defendant Koren was using Nominal
19  Defendant PCJV resources for the benefit of Koren Affiliate Defendants, while simultaneously
20  causing Koren Affiliate Defendants to be relieved of their duties to pay franchise and royalty fees,
21  as well as market prices for supplies. Had Defendant Koren disclosed these material facts,
22  Plaintiffs would never have agreed to waive Approved License Fees.

23        93.    When seeking these waivers and representing that Defendant Koren would cause
24  the Approved Management Fee to also be waived, Defendant Koren failed to disclose that he
25  would secretly cause Nominal Defendant PCJV to divert other PCJV funds for his benefit without
26  approval by Nominal Defendant PCJV Management. Had Defendant Koren disclosed this intent to
27  divert funds of Nominal Defendant PCJV for his benefit, Plaintiffs would never have agreed to
28  waive Approved License Fees.

ERVIN COHEN & JESSUP LLP

1    94.    The most brazen step in Defendant Koren's scheme to divert funds from Nominal
2  Defendant PCJV was taken on January 1, 2017, when Defendant Koren executed a "Services
3  Agreement," a copy of which is attached hereto as Exhibit E.

4    95.    In this voidable "Services Agreement," dated January 1, 2017, Defendant Koren
5  and Jacoby agreed to provide the services that they had already agreed to provide in the MSA, in
6  exchange for an annual "management fee" of $240,000 payable by Nominal Defendant PCJV to
7  Defendant Koren and Jacoby. Put simply, the "Services Agreement" increased the fee payable to
8  the LA Group, without offering any consideration other than that to which the LA Group was
9  already supposed to deliver.

10    96.    Defendant Koren signed this voidable "Services Agreement" transferring funds
11  from Nominal Defendant PCJV to himself, however, shockingly, Defendant Koren signed this
12  document on behalf of Nominal Defendant PCJV, even though he failed to ever disclose the
13  "Services Agreement" to, or obtain approval for that transaction from, the Management of
14  Nominal Defendant PCJV.

15    97.    Accordingly, Defendant Koren did not possess the authority to enter into that
16  "Services Agreement," and executed that document based upon deceit, and a wholesale violation
17  of his fiduciary, legal, and contractual duties. Moreover, because the "Services Agreement"
18  contained a promise by Defendant Koren and Jacoby to deliver the same services they had already
19  contracted to provide, there was no consideration provided to Nominal Defendant PCJV, such that
20  the Services Agreement fails for lack of consideration.

21    98.    At no point, from January 1, 2017 through the present, did Defendant Koren
22  disclose his self-dealing "Services Agreement" to Nominal Defendant PCJV Management, or
23  Plaintiffs. During the pendency of this "Services Agreement," in which Defendant Koren was
24  diverting Nominal Defendant PCJV funds to himself, Plaintiffs continued to agree to waive rights
25  to Approved License Fees. Had Plaintiffs known about the "Services Agreement," they would
26  never have agreed to waive payment of any fees, royalties, or profits of Nominal Defendant PCJV.
27    99.    This "Services Agreement" was only discovered by a Plaintiff Cinco internal audit
28  group in the Spring of 2018 (conducted during a temporary period in which Defendant Koren was

16544 2 9330787.1                                26

VERIFIED SECOND AMENDED COMPLAINT

ERVIN COHEN & JESSUP LLP

1  not serving as President of Nominal Defendant PCJV).

2  　　100.  Plaintiffs are informed and believe, and thereon allege, that Defendant Koren has
3  entered into other secret agreements, including "Services Agreement" such as the one reflected in
4  Exhibit E for the years 2015 and 2016. Plaintiffs are informed and believe and thereon allege that
5  these additional void Services Agreement were signed by Defendant Koren on behalf of Nominal
6  Defendant PCJV, without having disclosed those transactions to, or obtained approval from PCJV
7  Management.

8  　　101.  Plaintiffs are informed and believe, and thereon allege that, Defendant Koren was
9  diverting substantial sums from Nominal Defendant to himself, in the form of unapproved
10  "management fees" in 2015 and 2016, as well as the 2017 and 2018 fees alleged herein pursuant to
11  the "Services Agreement."

12  　　102.  At the same time these illegal, and unapproved, self-dealing transactions took
13  place, whereby Defendant Koren was diverting funds to himself, Plaintiffs were waiving their
14  rights to fees and profits, based upon Defendant Koren's representations regarding the financial
15  condition of Nominal Defendant PCJV.

16  　　　　　*Other Breaches of Fiduciary, Contractual, and Legal Duties Owed*
17  　　　　　*by Defendant Koren to Plaintiffs and Nominal Defendant PCJV*

18  　　103.  Unsatisfied with diverting Nominal Defendant PCJV funds and resources to
19  himself, and the Koren Affiliate Defendants, for his own benefit, under false and fraudulent
20  pretenses, in violation of his fiduciary, contractual and legal duties, Defendant Koren has engaged
21  in numerous other breaches of contractual, fiduciary, and legal duties. A non-exclusive list of
22  these breaches and wrongful acts are as follows:

23  　　　　　　a.　On March 26, 2018, Defendant Koren withdrew more $1,000.000 from a
24  　　　　　　　　bank account of Nominal Defendant PCJV, without obtaining approval
25  　　　　　　　　from the Management, as required under the JVA. These funds were then
26  　　　　　　　　transferred to a new bank account which he unilaterally opened without
27  　　　　　　　　approval from the Management.

28  　　　　　　b.　Defendant Koren has authorized bonuses and compensation packages to

ERVIN COHEN & JESSUP LLP

16544 2 9330787 1

27

VERIFIED SECOND AMENDED COMPLAINT

1    Nominal Defendant PCJV staff and contractors, without seeking approval

2    from the Management, as required under the JVA. For example, within the

3    last year, Non-Party Thomas Hodgson – who serves an operations role at

4    Nominal Defendant PCJV – was paid an unapproved bonus of $60,000.

5    c.   Defendant Koren has caused flagrant violations of basic franchise rules and

6    regulations in California, which has subjected Nominal Defendant to

7    needless expense, scrutiny, investigation, and other injuries.

8    d.   Defendant Koren has caused Nominal Defendant PCJV to ignore and fail to

9    sufficiently support third party franchisees, in a manner that has caused

10    injury to the goodwill, reputation, and income of Nominal Defendant PCJV.

11    e.   Defendant Koren has entered into other contracts, including a lease

12    agreement, without seeking approval from PCJV Management.

13    f.   Defendant Koren has failed to use his "best efforts at all times . . . to operate

14    and maintain the 'Potato Corner' outlets/stores in the Territory according to

15    the highest standards achievable consistent with the overall plan of the

16    Management of the Company." This failure has caused PCJV franchises

17    and the Potato Corner Brand to suffer.

18    g.   Defendant Koren has failed to "[a]dvertise, market, and promote the Potato

19    Corner outlets/stores with the goal of causing public knowledge, awareness

20    and patronage of the Potato Corner outlets/stores." Indeed, Defendant

21    Koren's failures have depressed the expansion of Potato Corner to levels

22    that fall well below what he promised and what Plaintiffs expected when

23    beginning this venture.

24    h.   Defendant Koren has failed to protect the confidential information of

25    Plaintiffs, as required by the governing agreements.

26    i.   Defendant Koren has refused access to Nominal Defendant PCJV books

27    and records, as well as Nominal Defendant PCJV offices.

28    j.   Defendant Koren harassed and threatened representatives of Plaintiff Cinco

ERVIN COHEN & JESSUP ᴸᴸᴾ

1        and Plaintiff PCI at Nominal Defendant PCJV's Office in April 2018.

2        k.    Defendant Koren's personnel broke into, and wrongfully removed

3              documents and records from Nominal Defendant PCJV's office on April 30,

4              2018, during a period in which he was not President.

5        l.    In Summer of 2018, Defendant Koren caused Nominal Defendant PCJV to

6              break contracts with contractors hired by Plaintiffs during the short period

7              in which Defendant Koren was removed as President, in a manner that has

8              injured Nominal Defendant PCJV goodwill. Defendant Koren did so as a

9              form of revenge to those contractors who elected to work with Plaintiffs

10             during the short period in which they were operating PCJV.

11       104.   The above list of fiduciary and contract breaches, waste, and mismanagement by

12  Defendant Koren is necessarily incomplete, given Defendant Koren's concealment of his

13  wrongdoing from Nominal Defendant PCJV Management, as well as the majority owner, Plaintiff

14  PCI.

15       *Defendant Koren Takes the Outrageous and Unsupportable Position that He and*

16       *Jacoby Are Entitled to Majority Equity Ownership of Nominal Defendant PCJV*

17       105.   The governing agreements of Nominal Defendant PCJV grant to the holders of

18  equity in Nominal Defendant PCJV the right of first refusal should that owner of Membership

19  Interests wish to sell or transfer its ownership.

20       106.   As alleged herein, Plaintiff PCI is the undisputed owner of 60% of the Membership

21  Interests in Nominal Defendant PCJV. At no point has Plaintiff PCI ever transferred its

22  Membership Interests in Nominal Defendant PCJV to any person whatsoever.

23       107.   Plaintiff PCI is owned by the separate and distinct entity, Plaintiff Cinco. Plaintiff

24  Cinco does not possess any Membership Interests in Nominal Defendant PCJV as the equity is

25  held solely by Plaintiff PCI. Plaintiff Cinco possesses no other interests, rights, equity, or other

26  transferrable interests in Nominal Defendant PCJV, the JVA, or any other aspect of Nominal

27  Defendant PCJV.

28  ///

ERVIN COHEN & JESSUP LLP

1    108.    Despite this simple corporate structure, Defendant Koren has taken the outrageous

2 position that the acquisition of shares by a new shareholder of Plaintiff Cinco – the corporate

3 parent of Plaintiff PCI – somehow triggered the right of first refusal to which Plaintiff Cinco's

4 subsidiary is obligated. It appears, then, that Defendant Koren believes that any acquisition of

5 stock in Plaintiff Cinco effects a transfer of Plaintiff PCI's equity or interests in PCJV, even

6 though Plaintiffs Cinco and PCI are entirely different and separate entities. This claim makes no

7 sense and is contrary to basic corporate law.

8    109.    The reason for Defendant Koren's nonsensical position was confirmed in

9 correspondence from Defendant Koren's counsel in August of 2018, indicating that Defendant

10 Koren's is relying upon this unsupportable and outrageous claim to argue that Plaintiff PCI is now

11 a minority owner of Nominal Defendant PCJV, and, moreover, that Plaintiff PCI is no longer

12 entitled to name four members of the Management of Nominal Defendant PCJV. Defendant Koren

13 has bootstrapped this frivolous accusation into a baseless, malicious, and self-dealing claim for

14 majority ownership and control over Nominal Defendant PCJV.

15    110.    Defendant Koren's frivolous claim to a majority stake in Nominal Defendant PCJV

16 equity and governance has frozen Nominal Defendant PCJV's governance, as Defendant Koren is

17 now refusing to recognize Plaintiff PCI as the majority owner, and is frivolously objecting to

18 Plaintiff PCI's right to name a majority of the individuals comprising the Management of Nominal

19 Defendant PCJV.

20    ***The Futility of Presentation of Claims Held by Nominal***

21    ***Defendant PCJV to the Management for Prosecution***

22    111.    As of the filing of this Amended Complaint, the Management of Nominal

23 Defendant PCJV is comprised of seven individuals: four of which were named by Plaintiff PCI.

24    112.    Despite Plaintiff PCI's obvious control over a majority of the Management of

25 Nominal Defendant PCJV, Defendant Koren has repudiated, rejected, and is unwilling to

26 recognize Plaintiff PCI's right to control a majority of the Management of Nominal Defendant

27 PCJV.

28    ///

16544.2:9330787.1                                    30
VERIFIED SECOND AMENDED COMPLAINT

ERVIN COHEN & JESSUP LLP



1    113.    Defendant Koren refuses to recognize Plaintiff PCI's right to name a majority of

2    the Management of Nominal Defendant PCJV based on his frivolous and unsupportable position

3    that Plaintiff PCI somehow transferred its equity in Nominal Defendant PCJV when Plaintiff

4    PCI's corporate parent sold stock to a third party.

5    114.    Based on the foregoing, any attempt by Plaintiff PCI to make a demand on the

6    Management of Nominal Defendant PCJV to pursue its valid claims against Defendant Koren

7    would be futile, as any vote of the Management would be disputed, rejected, and repudiated by

8    Defendant Koren.

9    **FIRST CAUSE OF ACTION FOR DECLARATORY RELIEF**

10    **(By Plaintiffs Against Defendants Koren and PCJV-LA Group)**

11    115.    Plaintiffs re-allege and incorporate by reference the allegations of the preceding

12    paragraphs of this Amended Complaint as if fully set forth herein.

13    116.    An actual dispute and controversy has arisen and now exists between Plaintiffs and

14    Defendants Koren as to:

15        a.    Whether Plaintiff Cinco possesses any Membership Interests in, equity of,

16            or transferrable rights to, Nominal Defendant PCJV.

17        b.    Whether a third party's recent acquisition of stock from Plaintiff Cinco

18            triggered any right of first refusal by Defendants Koren and/or PCJV-LA

19            Group or Jacoby.

20        c.    Whether Defendants Koren and PCJV-LA Group or Jacoby have any right,

21            claim, or legitimate basis to demand ownership of or rights to any of

22            Plaintiff PCI's 60% Membership Interests in Nominal Defendant PCJV.

23        d.    Whether Plaintiff PCI remains the rightful owner of 60% of the

24            Membership Interests in Nominal Defendant PCJV.

25    117.    A judicial declaration is necessary and appropriate at this time under these

26    circumstances.

27    118.    Accordingly, Plaintiffs seek judicial declarations that:

28        a.    Plaintiff Cinco possesses no Membership Interests in, equity of, or

ERVIN COHEN & JESSUP LLP

16544.2:9330787.1                                    31

VERIFIED SECOND AMENDED COMPLAINT

1    transferrable rights to, Nominal Defendant PCJV, other than its right to

2    receive royalties from PCJV.

3        b.    A third party's recent acquisition of stock from Plaintiff Cinco did not

4            trigger any right of first refusal by Defendants Koren and PCJV-LA Group

5            or Jacoby.

6        c.    Neither Defendant Koren, Defendant PCJV-LA Group, nor Jacoby have any

7            right, claim, or legitimate basis for demand to own any of Plaintiff PCI's

8            60% Membership Interests in Nominal Defendant PCJV.

9        d.    Plaintiff PCI remains the rightful and sole owner of 60% of the Membership

10            Interests in Nominal Defendant PCJV.

11        **SECOND CAUSE OF ACTION FOR DECLARATORY RELIEF**

12    **(By Plaintiff PCI Against Defendants Koren and Potato Corner LA Group, LLC Group)**

13        119.    Plaintiff PCI re-alleges and incorporates by reference the allegations of the

14    preceding paragraphs of this Amended Complaint as if fully set forth herein.

15        120.    An actual dispute and controversy has arisen and now exists as to:

16        a.    Whether Plaintiff PCI possesses the right to name four of the seven

17            individuals constituting the Management of Nominal Defendant PCI.

18        b.    Whether Defendant Koren has the right to appoint any of the four seats of

19            Nominal Defendant's PCJV Management, which are allocated to Plaintiff

20            PCI under the JVA and/or AJVA.

21        c.    Whether Plaintiff PCI controls a majority of Management of Nominal

22            Defendant PCJV.

23        121.    A judicial declaration is necessary and appropriate at this time under these

24    circumstances.

25        122.    Accordingly, Plaintiff PCI seeks judicial declarations that:

26        a.    Plaintiff PCI possesses the right to name four of the seven individuals

27            constituting the Management of Nominal Defendant PCI.

28        b.    Defendant Koren has no right to appoint any of the four seats of Nominal

VERIFIED SECOND AMENDED COMPLAINT

ERVIN COHEN & JESSUP LLP

1  Defendant's PCJV Management, which are allocated to Plaintiff PCI under

2  the JVA and/or AJVA.

3  **THIRD CAUSE OF ACTION FOR DECLARATORY RELIEF**

4  **(By Plaintiff PCI Against Defendant Koren)**

5  123.  Plaintiff PCI re-alleges and incorporates by reference the allegations of the

6  preceding paragraphs of this Amended Complaint as if fully set forth herein.

7  124.  An actual dispute and controversy has arisen and now exists as to:

8  a.  Whether Section 3(c) of the AJVA (Exhibit D), stating that "[a]ny change in

9  these mentioned executive officers will require a vote of 75% of members'

10  interests," refers to (i) 75% of the Membership Interests held by the owners

11  of equity of Nominal Defendant PCJV; (ii) 75% of the votes of the

12  individuals comprising Management, or (iii) is unenforceable.

13  b.  Whether a majority of the individuals comprising PCJV Management may

14  terminate Defendant Koren as President of Nominal Defendant PCJV.

15  125.  A judicial declaration is necessary and appropriate at this time under these

16  circumstances.

17  126.  Accordingly, Plaintiffs seek judicial declarations that:

18  a.  Section 3(c) of the AJVA (Exhibit D), stating that "[a]ny change in these

19  mentioned executive officers will require a vote of 75% of members'

20  interests," either refers to 75% of the Membership Interests held by the

21  owners of equity of Nominal Defendant PCJV, or is unenforceable.

22  b.  A majority of the individuals comprising PCJV Management may terminate

23  Defendant Koren as President of Nominal Defendant PCJV.

24  **FOURTH CAUSE OF ACTION FOR DECLARATORY RELIEF**

25  **(By Plaintiff PCI Against Defendants Koren and Potato Corner LA Group, LLC)**

26  127.  Plaintiff PCI re-alleges and incorporates by reference the allegations of the

27  preceding paragraphs of this Amended Complaint as if fully set forth herein.

28  ///

16544 2 9330787.1                    33
VERIFIED SECOND AMENDED COMPLAINT

1    128.    Plaintiff is informed and believes and thereon alleges that Defendant Koren has

2 transferred his membership interest in PCJV to Potato Corner LA Group, LLC in violation of the

3 right of first refusal. Plaintiff is also informed and believes and thereon alleges that Defendant

4 Koren has now taken the position that the right to name three seats of PCJV Management

5 allocated to the "LA Group" in the governing documents, has been transferred to Potato Corner

6 LA Group, LLC, in violation of the governing agreements.

7    129.    An actual dispute and controversy has arisen and now exists as to:

8        a.    Whether Koren's transfer of membership interests in PCJV to Potato Corner

9            LA Group, LLC has breached the right of first refusal, entitling Plaintiff

10           PCI to the right to acquire those interests.

11       b.    Whether Potato Corner LA Group LLC possesses any membership interest

12           or equity of PCJV.

13       c.    Whether Potato Corner LA Group LLC possesses any right to name any or

14           all of the three seats of PCJV Management allocated to the "LA Group" in

15           the JVA and AJVA.

16   130.    A judicial declaration is necessary and appropriate at this time under these

17 circumstances.

18   131.    Accordingly, Plaintiff PCI seeks judicial declarations that:

19       a.    Koren's transfer of membership interests in PCJV to Potato Corner LA

20           Group, LLC breached the right of first refusal, entitling Plaintiff PCI to the

21           right to acquire those interests.

22       b.    Potato Corner LA Group LLC possesses no membership interest or equity

23           of PCJV.

24       c.    Potato Corner LA Group LLC possesses no right to name any seats of PCJV

25           Management.

26 ///

27 ///

28 ///

16544 2:9330787 1                                34
                                  VERIFIED SECOND AMENDED COMPLAINT

ERVIN COHEN & JESSUP LLP



1    **FIFTH CAUSE OF ACTION FOR BREACH OF FIDUCIARY DUTY**

2    **(By Plaintiff PCI, Derivatively, on behalf of Nominal Defendant PCJV, Against Defendants**

3    **Koren, Hodgson, Alon Koren, and Garcia, and DOES 1-25)**

4    132.    Plaintiff PCI, pleading derivatively, on behalf of Nominal Defendant PCJV, re-

5    alleges and incorporates by reference the allegations of the preceding paragraphs of this Amended

6    Complaint as if fully set forth herein.

7    133.    At all times relevant to this Amended Complaint, Defendant Koren has owed

8    Nominal Defendant PCJV fiduciary duties of loyalty, good faith, and care, which are codified by

9    California law, as well as the agreements governing Nominal Defendant PCJV.

10    134.    Defendant Koren has brazenly and repeatedly breached these fiduciary duties owed

11    to Nominal Defendant PCJV, by, among other things:

12        a.    Diverting New Store Corporate Opportunities to certain Koren Affiliate

13            Defendants without disclosing to, or seeking approval from, PCJV

14            Management, or a disinterested majority of PCJV Management.

15        b.    Diverting PCJV resources, capital, and attention to benefit stores owned by

16            Koren Affiliate Defendants, without reimbursement or compensation to

17            PCJV, and without disclosing to, or seeking approval from, PCJV

18            Management, or a disinterested majority of PCJV Management, for these

19            self-interested transactions, benefits, and opportunities.

20        c.    Entering into self-interested transactions, such as the void Services

21            Agreement (Exhibit E hereto), from which Defendant Koren (and the Koren

22            Affiliate Defendants) benefit, without disclosing to, or seeking approval

23            from, PCJV Management, or a disinterested majority of PCJV

24            Management, of these self-interested transactions.

25        d.    Failure to treat all franchises of Nominal Defendant PCJV fairly, and

26            without preference, such that, the differential treatment of third-party

27            franchises as compared to his own franchises (owned by the Koren Affiliate

28            Defendants), Defendant Koren breached his duties of good faith, care, and

16544.2:9330787.1    35

ERVIN COHEN & JESSUP LLP

1    loyalty to Nominal Defendant PCJV in the operation and maintenance of

2    those franchise relationships and operations.

3        e.    Failure to comply with "all laws, ordinances, orders or other requirements

4            of any federal, state, county, or municipal authority having jurisdiction of

5            the Company and affecting the Company," as he expressly agreed to do in

6            the JVA and MSA.

7        f.    Other acts of mismanagement and waste of Nominal Defendant PCJV.

8    135.    Defendant Koren has concealed from Nominal Defendant PCJV, and its

9    Management, some or all of his breaches of fiduciary duty, by, among other things:

10        a.    Failing to disclose to, and seek approval from, a disinterested majority of

11            PCJV Management, for each of the wrongful acts at issue herein.

12        b.    Failing to provide the detailed Mandatory Monthly Financial Disclosures to

13            PCJV Management, as required by Section 3(i)(iv) of the JVA.

14        c.    Failing to provide annual audited financial statements as required by

15            Section 3(i)(v) of the JVA.

16        d.    Causing knowingly false statements to be included in the consolidated

17            financial statement covering 2015-2017. Plaintiffs only recently realized the

18            falsity of the representations contained in that audited financial statement.

19    136.    During a portion of the period at issue herein, Defendants Alon Koren and Thomas

20    Hodgson purported to serve as Managers of PCJV, thus, took on fiduciary duties of loyalty, good

21    faith, and care to PCJV. Moreover, Defendants Alon Koren, Thomas Hodgson, and Defendant

22    Emily Garcia have, during a portion of the period at issue, also owed duties of loyalty pursuant to

23    Cal. Labor Code § 2863.

24    137.    Defendants Alon Koren, Thomas Hodgson, and Emily Garcia have breached these

25    fiduciary duties owed to Nominal Defendant PCJV, by, among other things:

26        a.    Diverting PCJV resources, capital, or attention to benefit stores owned by

27            Koren Affiliate Defendants.

28        b.    Failure to treat all franchises of Nominal Defendant PCJV fairly, and

ERVIN COHEN & JESSUP LLP

16544.2:9330787.1
36
VERIFIED SECOND AMENDED COMPLAINT

1    without preference.

2    c.    Other acts of mismanagement and waste of Nominal Defendant PCJV.

3    138.    The breaches of fiduciary duty of Defendants Koren, Alon Koren, Thomas

4    Hodgson, and Emily Garcia have caused, and continue to cause, proximately, directly, and

5    indirectly, actual economic and non-economic damage to the Nominal Defendant PCJV, in an

6    amount to be established at trial, but that exceeds the jurisdictional minimum of this Court.

7    Defendant Koren's breaches of fiduciary duty were a substantial factor in all harm to Nominal

8    Defendant PCJV for which relief is sought in this action.

9    139.    In performing the acts described herein, Defendants Koren, Alon Koren, Thomas

10   Hodgson, and Emily Garcia acted with sufficient malice, wantonness, willfulness, recklessness,

11   oppression, and/or fraud, so as to entitle Nominal Defendant PCJV to an award of exemplary and

12   punitive damages according to proof.

13   ## SIXTH CAUSE OF ACTION FOR BREACH OF FIDUCIARY DUTY

14   **(By Plaintiff PCI Against Defendants Koren, Alon Koren, and Thomas Hodgson, and DOES**

15   **1-25)**

16   140.    Plaintiff PCI re-alleges and incorporates by reference the allegations of the

17   preceding paragraphs of this Amended Complaint as if fully set forth herein.

18   141.    At all times relevant to this Amended Complaint, Defendant Koren has owed

19   Plaintiff PCI fiduciary duties of loyalty, good faith, and care, which are codified by California law,

20   as well as the agreements governing Nominal Defendant PCJV.

21   142.    Defendant Koren has brazenly and repeatedly breached these fiduciary duties owed

22   to Plaintiff PCI, by, among other things:

23   a.    Failing to disclose to Plaintiff PCI that he is diverting New Store Corporate

24   Opportunities to certain Koren Affiliate Defendants.

25   b.    Failing to disclose to Plaintiff PCI that he is diverting PCJV resources,

26   capital, and attention to benefit stores owned by Koren Affiliate

27   Defendants, without reimbursement or compensation to PCJV, and in a

28   manner that preferred the Koren Affiliate Defendant Stores over the other

16544 2 9330787.1                              37
VERIFIED SECOND AMENDED COMPLAINT

ERVIN COHEN & JESSUP LLP

1    third-party franchisees.

2        c.    Failing to disclose to Plaintiff PCI that he was entering into self-interested

3            transactions, such as the void Services Agreement (Exhibit E hereto), in

4            which Defendant Koren (or the Koren Affiliate Defendants) benefitted

5            personally.

6        d.    Misrepresenting that he was waiving Approved Management Fees, without

7            disclosing other secret self-interested transactions in which Defendant

8            Koren benefited personally.

9        e.    Failing to disclose the true facts surrounding Nominal Defendant PCJV's

10            lack of funds sufficient to pay the Approved License Fee.

11        f.    Attempting to squeeze Plaintiff PCI out of its majority position on PCJV

12            Management, and out of its majority equity ownership.

13    143.    Defendant Koren has concealed from Plaintiff PCI some or all of his breaches of

14    fiduciary duty, by, among other things:

15        a.    Failing to disclose to, and seek approval from a disinterested majority of

16            Management, for each of the wrongful acts at issue herein.

17        b.    Failing to provide the detailed Mandatory Monthly Financial Disclosures to

18            Nominal Defendant Management, as required by Section 3(i)(iv) of the

19            JVA.

20        c.    Failing to provide annual audited financial statements as required by

21            Section 3(i)(v) of the JVA.

22        d.    Causing knowingly false statements to be included in the consolidated

23            financial statement covering 2015-2017. Plaintiffs only recently realized the

24            falsity of the representations contained in that audited financial statement.

25    144.    During a portion of the period at issue herein, Defendants Alon Koren and Thomas

26    Hodgson purported to serve as Managers of PCJV, thus, took on fiduciary duties of loyalty, good

27    faith, and care to Plaintiff PCI.

28    ///

ERVIN COHEN & JESSUP LLP

16544.2:9330787.1

38

VERIFIED SECOND AMENDED COMPLAINT

1    145.    Defendants Alon Koren and Thomas Hodgson have breached these fiduciary duties
2  owed to Nominal Defendant PCJV, by, among other things, failing to disclose to Plaintiff PCI
3  that PCJV resources, capital, and attention are being diverted to benefit stores owned by Koren
4  Affiliate Defendants, without reimbursement or compensation to PCJV, and in a manner that
5  preferred the Koren Affiliate Defendant Stores over the other third party franchisees.

6    146.    The breaches of fiduciary duty of Defendants Koren, Alon Koren and Thomas
7  Hodgson have caused, and continue to cause, proximately, directly, and indirectly, actual
8  economic and non-economic damage to Plaintiff PCI, in an amount to be established at trial, but
9  that exceeds the jurisdictional minimum of this Court. Defendant Koren's breaches of fiduciary
10  duty were a substantial factor in all harm to Plaintiff PCI for which relief is sought in this action.

11    147.    In performing the acts described herein, Defendants Koren, Alon Koren and
12  Thomas Hodgson have acted with sufficient malice, wantonness, willfulness, recklessness,
13  oppression, and/or fraud, so as to entitle Plaintiff PCI to an award of exemplary and punitive
14  damages according to proof.

15    **SEVENTH CAUSE OF ACTION FOR DECEIT**

16    **(By Plaintiffs Against Defendant Koren and DOES 1-25)**

17    148.    Plaintiffs re-allege and incorporate by reference the allegations of the preceding
18  paragraphs of this Amended Complaint as if fully set forth herein.

19    149.    As alleged herein, Defendant Koren intentionally failed to disclose the following
20  facts to Plaintiffs:

21        a.    That he is diverting New Store Corporate Opportunities to certain Koren
22              Affiliate Defendants.

23        b.    That he is diverting PCJV resources, capital, and attention to benefit stores
24              owned by Koren Affiliate Defendants, without reimbursement or
25              compensation to PCJV, and in a manner that is preferring his stores (those
26              owned by the Koren Affiliate Defendants) over other third-party
27              franchisees.

28        c.    That he is entering into self-interested transactions, such as the void

ERVIN COHEN & JESSUP LLP

1       Services Agreement (Exhibit E hereto), in which Defendant Koren (or the

2       Koren Affiliate Defendants) benefitted personally.

3     d. Misrepresenting that he was waiving Approved Management Fees, without

4      disclosing other self-interested transactions in which Defendant Koren

5      benefited personally.

6     e. The true facts surrounding Nominal Defendant PCJV's lack of funds

7      sufficient to pay the Approved License Fee.

8   150. Defendant Koren possessed a duty to disclose each of the above facts.

9   151. Each of these facts that Defendant Koren failed to disclose were material to

10 Plaintiffs, such that, had Plaintiffs these facts, they would have acted differently. For example,

11 Plaintiffs would not have authorized the waiver of Approved License Fees due and owing under

12 the JVA had they known these concealed facts.

13   152. Defendant Koren's deceit has caused, and continue to cause, proximately, directly,

14 and indirectly, actual economic and non-economic damage to Plaintiffs, in an amount to be

15 established at trial, but that exceeds the jurisdictional minimum of this Court. Defendant Koren's

16 deceit was a substantial factor in all harm to Plaintiffs for which relief is sought in this action.

17   153. In performing the acts described herein, Defendant Koren acted with sufficient

18 malice, wantonness, willfulness, recklessness, oppression, and/or fraud, so as to entitle Plaintiffs

19 to an award of exemplary and punitive damages according to proof.

20      **EIGHTH CAUSE OF ACTION FOR BREACH OF CONTRACT**

21      **(By Plaintiffs Against Defendant Koren and DOES 1-25)**

22   154. Plaintiffs re-allege and incorporate herein the allegations of the preceding

23 paragraphs of this Amended Complaint as if fully set forth herein.

24   155. Plaintiffs are parties to various contracts with Defendant Koren, including the JVA

25 and the MSA.

26   156. Parties have performed their obligations under the JVA and the MSA.

27   157. Defendant Koren has breached the JVA and/or the MSA, by, among other things:

28     a. Failing to submit, for approval, New Store Corporate Opportunities before

ERVIN COHEN & JESSUP LLP

1                            diverting those opportunities to Koren Affiliate Defendants;

2         b.   Failing to submit for approval to the PCJV Management compensation of

3              "managers, executive offices, and key personnel;"

4         c.   Failing to submit for approval to the PCJV Management all franchising

5              agreements and lease agreements;

6         d.   Failing to submit for approval to the PCJV Management all "purchases and

7              disbursements in excess of $10,000;"

8         e.   Failing to submit for approval to the PCJV Management a budget;

9         f.   Failure to adequately manage PCJV and its franchisees, including,

10             "management, operational, marketing, establishment, maintenance,

11             licensing and sublicensing with respect to the 'Potato Corner'

12             outlets/stores;"

13         g.   Failing to use "best efforts at all times . . . to operate and maintain the

14             'Potato Corner' outlets/stores in the Territory according to the highest

15             standards achievable consistent with the overall plan of the Management of

16             the Company;"

17         h.   Failure to produce the Mandatory Monthly Financial Disclosures;

18         i.   Failure to cause the issuance of annual audited financial statements;

19         j.   Failure to take "such actions as may be necessary to comply promptly with

20             any and all laws, ordinances, orders or other requirements of any federal,

21             state, county, or municipal authority having jurisdiction of the Company

22             and affecting the Company;"

23         k.   Failure to sufficiently "[a]dvertise, market, and promote the Potato Corner

24             outlets/stores with the goal of causing public knowledge, awareness and

25             patronage of the Potato Corner outlets/stores."

26         l.   Failure to protect PCJV's Confidential Information;

27         m.   Repudiating and misrepresenting the express terms of the right of first

28             refusal; and

ERVIN COHEN & JESSUP LLP

1          n.    Repudiating and misrepresenting the express terms of the AJVA.

2     158.    Each, some, or all of the above breaches of the JVA and/or MSA by Defendant

3 Koren were a substantial factor in causing injury to Plaintiffs, and none of these breaches were

4 excused.

5     159.    As such Defendant Koren's breaches of contract have caused, and continue to

6 cause, proximately, directly, and indirectly, damage to Plaintiff PCI, in an amount to be

7 established at trial, but that exceeds the jurisdictional minimum of this Court.

## NINTH CAUSE OF ACTION FOR SPECIFIC PERFORMANCE AND INJUNCTIVE RELIEF

**(By Plaintiffs Against Defendant Koren, Potato Corner LA Group, LLC, and DOES 1-25)**

10     160.    Plaintiffs re-allege and incorporate herein the allegations of the preceding

12 paragraphs of this Amended Complaint as if fully set forth herein.

13     161.    Plaintiffs are parties to various contracts with Defendant Koren, including the JVA,

14 AJVA, and the Operating Agreement. Those contracts are reasonable and supported by

15 consideration, particularly those aspects in which Defendant Koren agreed to a right of first refusal

16 as to his membership interests in PCJV and agreed not to transfer any other rights conferred upon

17 him in PCJV.

18     162.    Despite having agreed to these terms, Defendant Koren, in breach of the JVA and

19 AJVA has purported to transfer his membership interest and right to name Managers of PCJV to

20 Potato Corner LA Group, LLC.

21     163.    These breaches have caused injury to Plaintiff PC for which they are without an

22 adequate remedy at law. Specifically, damages would not adequately compensate Plaintiff PCI for

23 the breaches.

24     164.    Accordingly, Plaintiff PCI seeks (1) specific performance of the right of first

25 refusal, (2) specific performance of the agreement not to transfer other rights in the JVA and

26 AJVA, and (3) to enjoin Potato Corner LA Group LLC from claiming possession of membership

27 in PCJV and from claiming any right to name Managers of PCJV.

28     165.    Plaintiff PCI has performed, and is prepared to perform, all obligations under the

ERVIN COHEN & JESSUP LLP

1 | JVA and AJVA. Thus, there is a mutuality of remedies.

2 |     166.   The terms of the right of first refusal and agreement not to transfer rights in PCJV

3 | are sufficiently definite to enable the court to know what it is to enforce.

4 |     167.   There is a substantial similarity of the requested performance of the JVA and

5 | AJVA to that promised in the contract.

6 | <div align="center">**TENTH CAUSE OF ACTION FOR RESCISSION**</div>

7 | <div align="center">**(By Plaintiff PCI, Derivatively, and on behalf of Nominal Defendant PCJV, Against**</div>

8 | <div align="center">**Defendant Koren and DOES 1-25)**</div>

9 |     168.   Plaintiff PCI, derivatively, and on behalf of Nominal Defendant PCJV, re-alleges

10 | and incorporates by reference the allegations of the preceding paragraphs of this Amended

11 | Complaint as if fully set forth herein.

12 |     169.   On January 1, 2017, Defendant Koren executed a "Services Agreement," a copy of

13 | which is attached hereto as Exhibit E.

14 |     170.   Defendant Koren signed this "Services Agreement" transferring funds from

15 | Nominal Defendant PCJV to himself, however, shockingly, Defendant Koren signed this

16 | document on behalf of Nominal Defendant PCJV, even though he failed to ever disclose the

17 | "Services Agreement" to, or obtain approval for that self-interested transaction from, the

18 | Management of Nominal Defendant PCJV.

19 |     171.   In this "Services Agreement," dated January 1, 2017, Defendant Koren,

20 | purportedly (but without authority) agreed to accept services that had already been agreed to in the

21 | MSA, albeit this time in exchange for a new "management fee" of $240,000 payable by Nominal

22 | Defendant PCJV to Defendant Koren and Jacoby. Put simply, the "Services Agreement" increased

23 | the fee payable to the LA Group, without offering any consideration other than that to which the

24 | LA Group was already supposed to deliver.

25 |     172.   Accordingly, Defendant Koren did not possess the authority to enter into that

26 | "Services Agreement," and executed that document based upon deceit, and a wholesale violation

27 | of his fiduciary, legal, and contractual duties. Moreover, because the "Services Agreement"

28 | contained a promise by Defendant Koren and Jacoby to deliver the same services they had already

16544.2:9330787.1         43

ERVIN COHEN & JESSUP LLP

<div align="center">VERIFIED SECOND AMENDED COMPLAINT</div>

1  contracted to provide, there was no consideration provided to Nominal Defendant PCJV, such that
2  the Services Agreement fails for lack of consideration.

3      173.    Based upon the foregoing, Plaintiff PCI, on behalf of Nominal Defendant PCJV,
4  hereby provides notice of, and rescinds, the Services Agreement, pursuant to Cal. Civ. Code §§
5  1688 et. seq. Specifically, rescission is proper pursuant to Cal. Civ. Code § 1689(b)(1)-(b)(6).

6      174.    Because Nominal Defendant PCJV provided nothing in exchange for this Services
7  Agreement, there is nothing of value for Plaintiff PCI, on behalf of Nominal Defendant PCJV, to
8  restore.

9      175.    Plaintiff PCI, on behalf of Nominal Defendant PCJV is informed and believes, and
10 thereon alleges that Defendant Koren has entered into other secret and self-interested agreements,
11 signed by Defendant Koren on behalf of Nominal Defendant PCJV, without having disclosed
12 those transactions to, or obtained approval from PCJV Management. Accordingly, Plaintiff PCI,
13 on behalf of Nominal Defendant PCJV shall seek rescission of those additional contracts once
14 they are fully disclosed by Defendant Koren.

15     176.    Pursuant to Cal. Civ. Code § 1692, Plaintiff PCI, on behalf of Nominal Defendant
16 PCJV, seeks disgorgement and restitution from Defendant Koren from all funds, benefits received
17 as the result of this rescinded Services Agreement, as well as any and all consequential damages
18 caused by this void contract.

19     177.    In performing the acts described herein, Defendant Koren acted with sufficient
20 malice, wantonness, willfulness, recklessness, oppression, and/or fraud, so as to entitle Plaintiff
21 PCI to an award of exemplary and punitive damages according to proof.

22 ///
23 ///
24 ///
25 ///
26 ///
27 ///
28 ///

16544.2:9330787.1                    44
VERIFIED SECOND AMENDED COMPLAINT

ERVIN COHEN & JESSUP LLP



# ELEVENTH CAUSE OF ACTION FOR AIDING AND ABETTING A BREACH OF
## FIDUCIARY DUTY

**(By Plaintiff PCI, Derivatively, on behalf of Nominal Defendant PCJV, Against Defendant NKM Capital Group, LLC; Defendant J&K Americana, LLC; Defendant J&K Culver, LLC; Defendant J&K Lakewood, LLC; Defendant J&K Oakridge, LLC; Defendant J&K Valley Fair, LLC; Defendant J&K 2, LLC; Defendant J&K Ontario, LLC; Defendant J&K PC Trucks, LLC; Defendant J&K Consultants Group, LLC; Defendant GK Capital, LLC; Alon Koren; Thomas Hodgson; Emily Garcia; and DOES 1-25)**

178.    Plaintiff PCI, pleading derivatively, on behalf of Nominal Defendant PCJV, re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Amended Complaint as if fully set forth herein.

179.    At all times relevant to this Amended Complaint, Defendant Koren has owed Nominal Defendant PCJV fiduciary duties of loyalty, good faith, and care, which are codified by California law, as well as the agreements governing Nominal Defendant PCJV.

180.    At all times relevant to this action, the Koren Affiliate Defendants, as well as Alon Koren, Thomas Hodgson and Emily Garcia, knew of the fiduciary duties of loyalty, good faith, and care owed by Defendant Koren to Nominal Defendant PCJV.

181.    Defendant Koren has brazenly and repeatedly breached these fiduciary duties owed to Nominal Defendant PCJV, by, among other things:

      a.    Diverting New Store Corporate Opportunities to certain Koren Affiliate Defendants without disclosing to, or seeking approval from, PCJV Management, or a disinterested majority of PCJV Management.

      b.    Diverting PCJV resources, capital, and attention to benefit stores owned by Koren Affiliate Defendants, without reimbursement or compensation to PCJV, and without disclosing to, or seeking approval from, PCJV Management, or a disinterested majority of PCJV Management, for these self-interested transactions, benefits, and opportunities.

      c.    Entering into self-interested transactions, such as the void Services

ERVIN COHEN & JESSUP LLP

1    Agreement (Exhibit E hereto), from which Defendant Koren (and the Koren

2    Affiliate Defendants) benefit, without disclosing to, or seeking approval

3    from, PCJV Management, or a disinterested majority of PCJV

4    Management, of these self-interested transactions.

5    d.    Failing to treat all franchises of Nominal Defendant PCJV fairly, and

6    without preference, such that, the differential treatment of third-party

7    franchises as compared to his own franchises (owned by the Koren Affiliate

8    Defendants), Defendant Koren breached his duties of good faith, care, and

9    loyalty to Nominal Defendant PCJV in the operation and maintenance of

10    those franchise relationships and operations.

11    e.    Other acts of mismanagement and waste of Nominal Defendant PCJV.

12    182.    Defendant Koren has concealed from Nominal Defendant PCJV, and its

13    Management, some or all of his breaches of fiduciary duty, by, among other things:

14    a.    Failing to disclose to, and seek approval from a disinterested majority of

15    Management, for each of the wrongful acts at issue herein.

16    b.    Failing to provide the detailed Mandatory Monthly Financial Disclosures to

17    Nominal Defendant Management, as required by Section 3(i)(iv) of the

18    JVA.

19    c.    Failing to provide annual audited financial statements as required by

20    Section 3(i)(v) of the JVA.

21    d.    Causing knowingly false statements to be included in the consolidated

22    financial statement covering 2015-2017. Plaintiffs only recently realized the

23    falsity of the representations contained in that audited financial statement.

24    183.    The Koren Affiliate Defendants – as well as Alon Koren, Thomas Hodgson and

25    Emily Garcia – knew of each of these breaches of fiduciary duty of Defendant Koren, and gave

26    substantial assistance or encouragement to Defendant Koren in his breaches of fiduciary duty. For

27    example, the Koren Affiliate Defendants knowingly accepted all of the benefits received from

28    Nominal Defendant PCJV (in the form of New Store Opportunities, as well as unreimbursed or

16544.2:9330787.1                                46

VERIFIED SECOND AMENDED COMPLAINT

ERVIN COHEN & JESSUP LLP

1  uncompensated resources, capital, and attention, to the exclusion of other PCJV franchisees).

2       184.    The aiding and abetting by the Koren Affiliate Defendants as well as Alon Koren,
3  Thomas Hodgson and Emily Garcia of Defendant Koren's breaches of fiduciary duty have caused,
4  and continue to cause, proximately, directly, and indirectly, actual economic and non-economic
5  injury to the Nominal Defendant PCJV. Defendant Koren's breaches of fiduciary duty were a
6  substantial factor in all harm to Nominal Defendant PCJV.

7       185.    As a remedy for the aiding and abetting by the Koren Affiliate Defendants, Plaintiff
8  PCI, on behalf of Nominal Defendant PCJV, seeks disgorgement and restitution from the Koren
9  Affiliate Defendants, as well as imposition of a constructive trust on all (i) money and fund of the
10  Koren Affiliate Defendants, and (ii) all Potato Corner stores, outlets and franchises owned by the
11  Koren Affiliate Defendants.

12       186.    As a remedy for the aiding and abetting by Alon Koren, Thomas Hodgson, and
13  Emily Garcia, Plaintiff PCI, on behalf of Nominal Defendant PCJV, seeks damages according to
14  proof.

15       187.    In performing the acts described herein, the Koren Affiliate Defendants, Alon
16  Koren, Thomas Hodgson, and Emily Garcia, acted with sufficient malice, wantonness, willfulness,
17  recklessness, oppression, and/or fraud, so as to entitle Nominal Defendant PCJV to an award of
18  exemplary and punitive damages according to proof.

19  **TWELFTH CAUSE OF ACTION FOR UNFAIR BUSINESS PRACTICES PURSUANT TO**
20  **CAL. BUS. & PROF. CODE § 17200 ET. SEQ.**

21  **(By Plaintiffs against all Defendants and DOES 1-25)**

22       188.    Plaintiffs re-allege and incorporate by reference the allegations of the preceding
23  paragraphs of this Amended Complaint as if fully set forth herein.

24       189.    Defendants, and each of them, are prohibited under California law from engaging
25  in any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

26       190.    Defendants, and each of them, have brazenly violated this rule, by engaging in the
27  numerous and extensive unfair business practices alleged herein. Those unfair business practices
28  have injured Plaintiffs, Nominal Defendant PCJV, as well as each of the third-party franchisees

ERVIN COHEN & JESSUP LLP

16544.2·9330787.1                                      47
VERIFIED SECOND AMENDED COMPLAINT

1  owning stores other than those owned by the Koren Affiliate Defendants.

2      191.    As a remedy for the numerous violations of Cal. Bus. & Prof. Code § 17200

3  alleged herein, Plaintiffs seek disgorgement from all Defendants, restitution from all Defendants,

4  as well as imposition of a constructive trust on all (i) money and fund of the Koren Affiliate

5  Defendants, and (ii) all Potato Corner stores, outlets and franchises owned by the Koren Affiliate

6  Defendants.

7      192.    Plaintiffs also seek other relief in the form of attorneys' fees and other costs

8  allowable by statute.

9              ## THIRTEENTH CAUSE OF ACTION FOR ACCOUNTING

10     **(By Plaintiff PCI, Derivatively, and on behalf of Nominal Defendant PCJV, Against**

11                      **all Defendants and DOES 1-25)**

12     193.    Plaintiff PCI, pleading derivatively, on behalf of Nominal Defendant PCJV, re-

13  alleges and incorporates by reference the allegations of the preceding paragraphs of this Amended

14  Complaint as if fully set forth herein.

15     194.    Defendant Koren is a fiduciary of Nominal Defendant PCJV.

16     195.    Each of the Koren Affiliate Defendants possess contractual and/or fiduciary duties

17  to Nominal Defendant PCJV.

18     196.    As the result of the wrongful acts and other transactions between Nominal

19  Defendant PCJV, on the one hand, and some or all of the Defendants, on the other, a balance is

20  most certainly due to Nominal Defendant PCJV from Defendants.

21     197.    The amount due from Defendants to Nominal Defendant PCJV is not readily

22  ascertainable. Indeed, the accounts and amounts due are so complicated, that they can only be

23  ascertained through an accounting.

24                          **PRAYER FOR RELIEF**

25     WHEREFORE, Plaintiffs pray for judgment against the Defendants, and each of them, as

26  follows:

27     1    For judicial declarations as set forth in paragraphs 112, 116, and 120 herein;

28     2.   For damages, according to proof, whether economic, non-economic, general,

16544.2:9330787.1                          48
                        VERIFIED SECOND AMENDED COMPLAINT

ERVIN COHEN & JESSUP LLP

1  special, actual, compensatory, or otherwise;

2      3.      Restitution and disgorgement;

3      4.      Rescission of the Services Agreement (Exhibit E), and any and all other self-

4  interested transactions between Defendant Koren and Nominal Defendant PCJV;

5      5.      Imposition of a constructive trust on all (i) money and fund of the Koren Affiliate

6  Defendants, and (ii) all Potato Corner stores, outlets and franchises owned by the Koren Affiliate

7  Defendants;

8      6.      Injunctive Relief and Specific Performance;

9      7.      Punitive and exemplary damages;

10     8.      For injunctive and other equitable relief;

11     9.      For an award of costs and attorneys' fees where allowable by statute (such as the

12  Unfair Competition Law), or otherwise;

13     10.     For pre-judgment and post-judgment interest; and

14     11.     For such other and further relief as the Court deems just and proper.

15  DATED:  December 18, 2018              ERVIN COHEN & JESSUP LLP

16

17                                    By:

18                                        Michael D. Murphy
                                          Attorneys for Plaintiffs and Cross-Defendants
19                                        CINCO CORPORATION and POTATO
                                          CORNER INTERNATIONAL, INC.
20

21

22

23

24

25

26

27

28

16544.2:9330787.1                           49

*(left margin, vertical)* ERVIN COHEN & JESSUP LLP

## VERIFICATION

I have read the foregoing **VERIFIED SECOND AMENDED COMPLAINT** and know its contents.

I am [title] of Potato Corner International, Inc., a Plaintiff and Cross-Defendant in this action. The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

Executed on this 18th day of December 2018, at Manila, Philippines.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

POTATO CORNER INTERNATIONAL, INC.

JOSE P. MAGSAYSAY, JR.

Its: CEO

50
VERIFIED SECOND AMENDED COMPLAINT

1
<u>**VERIFICATION**</u>

2

3        I have read the foregoing **VERIFIED SECOND AMENDED COMPLAINT** and know

4    its contents.

5        I am [title] of Cinco Corporation, a Plaintiff and Cross-Defendant in this action. The

6    matters stated in the foregoing document are true of my own knowledge except as to those matters

7    which are stated on information and belief, and as to those matters I believe them to be true.

8        Executed on this 18th day of December 2018, at Manila, Philippines.

9        I declare under penalty of perjury under the laws of the State of California that the

10   foregoing is true and correct.

11                                          CINCO CORPORATION

12

13                                          JOSE P. MAGSAYSAY, JR.

14                                          Its: President and CEO

15

16

17

18

19

20

21

22

23

24

25

26

27

28

16544.2.9330787.1

ERVIN COHEN & JESSUP LLP