CONTINUATION OF EXHIBIT D

# EXHIBIT A

**Exhibit A**

## POTATO CORNER USA
## JOINT VENTURE AGREEMENT

This Joint Venture Agreement (the "Agreement") dated _____ is made and entered into on _____, by and between:

> Cinco Corporation, a corporation duly existing and registered by virtue of and under the laws of the Republic of the Philippines with office address at 869 Katarungan Street, Plainview Mandaluyong City, Philippines 1550, represented herein by its duly authorized representative, Jose P. Magsaysay (hereinafter "Cinco"), and its directors, Jose P. Magsaysay, Jr., Jose Miguel Ma. G. Montinola, Ma. Victoria O. Bermejo, Ricardo K. Montelibano, all of whom are Philippine citizens and resident, and collectively referred to as the "Cinco Group";

-and-

> AMIT NEMANIM, GUY KOREN, AMIR JACOBY, all of whom are U.S. citizens and residents and collectively referred to as the "LA Group:

### RECITALS

WHEREAS, the Parties hereto have agreed to form a limited liability company (hereinafter referred to as the "Company") under the laws of the State of Delaware, with the primary purpose of engaging in the business of establishing, operating, managing, licensing and franchising "Potato Corner" stores/outlets in the United States of America and Israel, except in the County of Los Angeles, USA and the County of San Francisco, USA and Tanforan Mall (hereinafter, "Territory").

WHEREAS, the Parties herein have agreed to enter into this Agreement which sets forth the terms and conditions with respect to the organization, incorporation, operation and management of the Company and defines their respective rights, duties and obligations of the parties to this Agreement.

WHEREAS, the Parties agree that the LLC operating agreement to be entered by them shall reflect the terms and conditions as set forth in this Agreement.

WHEREAS, Cinco may assign and or all of its rights to the joint venture company formed under this Agreement to a wholly-owned subsidiary as it deems fit.

NOW, THEREFORE, for and in consideration of the foregoing premises, the Parties hereby agree as follows:

1) ORGANIZATION AND FORMATION OF THE COMPANY

   a) Within ten (10) days from the Effective Date of this Agreement, the Parties herein agree to organize and form, a limited liability company to be called "PCJV USA" ( hereinafter referred to as the Company) for the primary purpose of engaging in the business of establishing, operating, managing, licensing and franchising "Potato Corner" stores/outlets in the Territory.

b) The initial members of the Company shall be the following:

   i) Cinco Group
      (1) Cinco
      (2) Jose P. Magsaysay, Jr.
      (3) Jose Miguel Ma. G. Montinola
      (4) Ma. Victoria O. Bermejo
      (5) Ricardo K. Montelibano

   ii) LA Group
      (1) Amit Nemanim
      (2) Guy Koren
      (3) Amir Jacoby

c) The principal office of the Company shall be at   1729 Santee St., Los Angeles, California 90015.

d) The annual general meeting of the members of the Company shall be held every year at the principal office of the Company.   The members may, at their discretion, invite non-members to join the annual general meeting, but only as non-voting observers.  Further, to the extent allowed by the financial condition of the Company, and as agreed upon by a majority of all member interests, the Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses incurred by the following members in attendance of the annual members' meeting: Jose P. Magsaysay, Jr., Jose Miguel Ma. Montinola, Ma. Victoria O. Bermejo and Ricardo K. Montelibano.

e) The fiscal year of the Company shall begin on January 1 and end on December 31 of each year.

f) The Company shall immediately upon formation obtain a "Liability Insurance" for the Company the amount and scope of coverage to be determined by the managers.

g) All costs, fees and expenses incurred in connection with the organization and formation of the Company shall be for the account of the Company.

h) The operating agreement of the Company shall reflect the terms and conditions set forth in this Agreement between the Parties.

2) CAPITALIZATION/OWNERSHIP OF THE COMPANY

a) At the time of formation, the Company shall have a total capital account of Fifty Thousand Dollars (US$50,000) which shall be fully subscribed and paid.

b) Unless other agreed to in writing, at the commencement of this Agreement, the Parties hereby agree that the Cinco Group shall contribute Thirty Thousand Dollars (US$30,000) and own sixty (60%) percent of the Company's capital accounts, while the LA Group shall contribute Twenty Thousand Dollars (US$20,000) and own the remaining forty (40%) percent.



2

c) The Parties hereby agree any increase in the capital account shall require an affirmative vote of 75% of all of the members' percentage interests in the Company. In the event an increase in the Company's capital accounts is approved by the members, both Parties shall have rights of pre-emption so that their pro rata ownership share in the Company shall be maintained; provided that, either Party shall have thirty (30) days within which to confirm in writing that it is willing and able to subscribe and fully pay its pro rata share of the increase in capital.

d) Neither Party shall assign any of its rights or obligations under this Agreement, nor his/its member interests in the Company without the prior written consent of the other Party. In the event either Party desire to transfer or sell his/its pro rata members interest in the Company to a person other those specifically named in Section 1(a) of this Agreement, such Party shall be obligated to sell the same first to the other Party, which has have thirty (30) days within which to exercise its rights of first refusal from the date of receipt of a written notice to sell. For this purpose, the Parties hereby agree that the right of first refusal may be exercised in accordance with the following formula:. The average of the Company's earnings before interest, depreciation, taxes and amortization (EBITDA) for the last two (2) years multiplied by 5 times, and further multiplied by the percentage of member interest subject to such right of first refusal over total outstanding member interests.

3) **MANAGEMENT OF THE COMPANY**

a) As will be provided in the Operating Agreement, the business and affairs of the Company shall be managed and all of the Company powers shall be exercised by or under the direction of the managers (collectively referred to as "Management"). Unless otherwise agreed to by the parties, the Management shall be composed of seven (7) members, four (4) of whom shall be designated by the Cinco Group, and three (3) designated by the LA Group. Upon the formation of the Company, the following shall be named managers: Jose P. Magsaysay, Jr., Jose Miguel Ma. Montinola, Ma. Victoria O. Bermejo, Ricardo K. Montelibano, Amit Nemanim, Guy Koren, and Amir Jacoby.



b) The Management shall regularly meet on a monthly basis. The regular monthly board meeting may be done via teleconference or through the internet. The members may, at their discretion, invite non-members to join member meetings, but only as non-voting observers. Further, to the extent allowed by the financial condition of the Company, and as agreed upon by a majority of all member interests, the Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses incurred by the members named in Section 1(d) in attendance of said meetings.

c) Upon the formation of the Company, it shall have the following executive officers: President, Corporate Secretary and Treasurer, and the following shall be elected by the members to serve these positions:

i) Chairman of the Board of Members – Jose P. Magsaysay

3

    ii) President – At any given time, the President shall be any one of the following members: Amit Nenamin, Guy Koren or Amir Jacoby, and the first president will be Amit Nemanim

    iii) Corporate Secretary – Erlinda Bartolome.

    iv) Treasurer – Jose Miguel Ma. Montinola

      (1) The Treasurer shall have oversight functions over the Accounting and Finance Departments that shall be exercised independent of the President.

d) Additional executive officers may be appointed by Management as it may deem necessary.

e) It is hereby agreed that the rights and responsibilities of the Management shall include the following:

    i) Approval of the compensation package for the managers, executive offices and key personnel.

    ii) Approval of the Accounting System/Procedures/Software/Method to be used by the Company.

    iii) Approval of the operating budget of the Company, and any changes to it.

    iv) Approval of all franchising agreements, and lease agreements.

    v) Approval of all purchases and disbursements in excess of $10,000, provided that such amount may be changed or modified by Management as it deems necessary.

f) The executive officers shall manage the business and property of the Company, and to market the business, in accordance with and pursuant to the directives of and policies set by the Management of the Company. The Management of the Company can recall and/or withdraw the appointment of any executive officer, as it deems necessary.

g) The Company shall enter into a Master License Agreement with Cinco (or an affiliated company to be designated by Cinco) which shall include the following terms and conditions:

    i) The Company agrees to license the "POTATO CORNER" intellectual property rights from Cinco or an affiliated company to be designated by Cinco) consisting of (i) the trademark, service mark and trade name "POTATO CORNER"; and (ii) various trademarks, service marks, trade names, slogans, designs, insignias, emblems, symbols, color schemes, package features, logo and other propriety identifying characteristics used in relation and in connection with the "Potato Corner" Products and the System; and (iii) as well as other intellectual property rights in connection with the "POTATO CORNER" intellectual property rights, for use in the Territory.

    ii) The Company agrees to pay, as an arm's length license fee, the following amounts:

      (1) With respect to the licensing / sub-licensing or franchising the "POTATO CORNER" intellectual property rights in connection with the "POTATO CORNER" outlets/stores, an amount equal to thirty percent (30%) of all

4



Initial/franchise fees and ongoing royalty fees paid to/ collected by the Company. Payments shall be made to Cinco (or an affiliated company to be designated by Cinco) by wire transfer using a bank or other financial institution specified by it within thirty (30) days from receipt of the fees by the Company.

(2) All withholding and other applicable taxes levied by any authority on the payments by the Company shall be borne solely by the Company.

h) The Company agrees to engage the LA Group to provide management and strategic experience and expertise during the duration of this Agreement. The Company shall enter into a Master Services Agreement with the LA Group (or a corporation to be designated by the LA Group) which shall include the following terms and conditions:

   i) In consideration for the provision of its services under the Master Services Agreement, the LA Group shall be entitled to a services fee equal to thirty (30%) percent of all initial/franchise fee and continuing royalty fees paid to/ collected by the Company .

   ii) All withholding and other applicable taxes levied by any authority on the payments by the Company to the LA Group under this Agreement shall be borne solely by the Company.

   iii) The LA Group shall faithfully, diligently and efficiently exercise its obligations and responsibilities under the Master Services Agreement.

   iv) The LA Group shall maintain and protect the Confidential Information belonging to Cinco or the Company, and such undertaking shall apply to all of its partners, officers, employees, or agents.

i) The President of the Company shall render the following services and shall perform the following duties for the Company in a faithful, diligent and efficient manner:

   i) The President shall be responsible for all management, operational, marketing, establishment, maintenance, licensing and sub-licensing activities with respect to the "Potato Corner" outlets/stores in the Territory. He shall use his best efforts at all times during the term of this Agreement to operate and maintain the "Potato Corner" outlets/stores in the Territory according to the highest standards achievable consistent with the overall plan of the Management of the Company. The President shall comply with the rules, policies and procedures approved by the Management of the Company from time to time.

   ii) The President shall advertise market and promote the "Potato Corner" outlets/stores with the goal of causing public knowledge, awareness and patronage of the "Potato Corner" outlets/sites.

   iii) The President shall maintain a comprehensive system of records, books and accounts, with respect to the licensing and sub-licensing activities, operation,



5

establishment, management, maintenance and other activities of the "Potato Corner" outlets /stores in the Territory with the assistance of the Corporate Secretary.

iv) No later than the twentieth (20th) day of each month, with respect to the preceding month, the President shall render a statement of receipts and disbursements, a schedule of accounts receivable and payable, and a schedule of fees collected and distributed, together with a reconciled bank statement as of the last day of the month with the assistance of the Corporate Secretary.

v) No later than three (3) months after the end of a fiscal year, the President shall, with the assistance of the Corporate Secretary and external accountant hired by Management, cause the Company to issue audited financial statements, and shall provide a copy of the same to all the members of Management.

vi) To the extent the President is lawfully able to do so, the President shall take such action as may be necessary to comply promptly with any and all laws, ordinances, orders or other requirements of any federal, state, county or municipal authority having jurisdiction of the Company and affecting the Company.

j) Consistent with its fiduciary duty to the Company, the members and managers shall exercise the duty of care and shall, at all times, ensure that all corporate opportunities consistent with the objectives of this Agreement shall be pursued on behalf of, and for the benefit of the Company. As such, with respect to the establishment of Company-owned stores, whenever potential locations are identified by any member or manager, it shall be promptly brought to the attention of the Management. At all times, and within thirty (30) days from receipt of this information, the Management shall decide to either build a Company-owned store at the identified location. In the event the Company chooses to build a Company-owned store at the identified location, it shall have the right to do so, to the exclusion of any of the members or managers. However, in the even the Company decides not to build a Company-owned store at the identified location, it shall notify the members and managers of its decision in writing. In such case, the LA Group shall have the right to build a store at the identified location, provided that it shall enter into a franchising agreement with the Company, and shall pay the franchise fees and ongoing royalty fees as set forth in the Company's standard franchising agreement.

4) DURATION OF AGREEMENT

a) This Agreement shall become effective from the date of execution hereof and shall continue indefinitely unless otherwise terminated by (i) an affirmative vote of 75 percent (75%) of all member interests, or (ii) upon mutual agreement by the Parties in writing.

b) Upon termination of this Agreement, the effects of termination shall be as follows:

6

i) All rights granted under the Master License Agreement shall terminate and the Company shall cease the use of the Potato Corner Intellectual Property Rights, and Confidential Information, provided however, that the Company shall be permitted to use any of the foregoing as is reasonably required in order to comply with its obligations under its sub-licensing or franchising agreements, but only to the extent of the duration of sub-licensing or franchising agreements in existence at the time of the termination of this Agreement.

ii) The LA Group shall be subject to a non-compete arrangement and hereby agrees that, within two (2) years from the date of termination of this Agreement, it shall not engage in the business of establishing, operating, managing, licensing and franchising identical or similar products sold by the Company, using the intellectual property rights identical or similar to those used by the Company, at the time of the termination of this Agreement.

5) GENERAL PROVISIONS

a) This Agreement may not be altered, changed, supplemented or modified except by a written instrument duly signed by the Parties.

b) The Parties shall use their best efforts to cooperate for the success of the business of the Company. The Parties further agree to perform all acts and execute and deliver all documents or instruments required or necessary to fully implement or consummate the transactions contemplated in and the intent underlying this Agreement.

c) The Parties shall, to the extent feasible, cause the operating agreement of the Company to reflect the mutual covenants and provisions contained in this Agreement.

d) All notices and other communications required or permitted to be given hereunder shall be given in writing (and for this purpose shall include emails or fax transmissions) and shall be addressed to the appropriate Party at the address of such Party as heretofore designated, or at such address as such Party may designate subsequently in writing.

e) The failure of any Party at any time to require performance by the others of any provision of this Agreement shall not affect, in any way, the right of such Party to require performance of that or any other provision, and any waiver by any Party of any breach of this Agreement shall not be construed as a waiver of any continuing or succeeding breach of such provision, or a waiver of any other right under this Agreement.



f) This Agreement shall constitute the entire agreement between the Parties and shall supersede any previous agreements, written or otherwise, with respect to the same subject matter which may have been made by the Parties prior hereto.

g) The invalidity of any portion of this Agreement will not and shall not render the entire Agreement void, nor effect the validity of the rest of the provisions of this Agreement.

7



h) This Agreement shall be governed by the laws of the State of California.

i) Parties acknowledge that, from time to time, one Party (the "Discloser") may disclose to the other Party (the "Recipient") information: (a) relating to the Potato Corner outlets and sites; (b) relating to the Potato Corner Intangible Property Rights; (c) Potato Corner product specifications and related information; (d) which is marked with "confidential" or a similar legend; (e) which is described orally and designated as confidential; or (f) which would, under the circumstances, be understood by a reasonable person to be confidential ("Confidential Information"). Upon subsequent disclosure of previously disclosed Confidential Information to the Recipient by the Discloser, the information will remain Confidential Information even if not identified as Confidential Information at the subsequent disclosure. Recipient shall retain such Confidential Information in confidence, and shall not disclose it to any Third Party or use it for other than the purposes of this Agreement without the Discloser's prior written consent. Each Party shall use at least the same procedures and degree of care with respect to such Confidential Information which it uses to protect its own confidential information of like importance, and in no event less than reasonable care. The Recipient will immediately give written notice to the Discloser of any unauthorized use or disclosure of the Discloser's Confidential Information, and the Recipient will assist the Discloser in remedying such unauthorized use or disclosure.

[The Remainder of This Page is Left Intentionally Blank]



8

WEST\222455823.2

IN WITNESS WHEREOF, the parties have executed this Agreement on the date and in place first mentioned.

**Cinco Group:**

Cinco Corporation (Philippines)

Name: Jose P. Magsaysay

Title:   CEO

Jose P. Magsaysay, Jr.,

Jose Miguel Ma. G. Montinola

Ms. Victoria O. Bermejo

Ricardo K. Montelibano,

**L.A. Group:**

Amit Nemanim

Guy Kored

Amir Jacoby

SIGNED IN THE PRESENCE OF:

05/09/2018

9

# EXHIBIT B



### CERTIFICATE FOR LIMITED LIABILITY COMPANY INTERESTS IN
### PCJV USA, LLC

**THIS CERTIFICATE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933 OR UNDER THE SECURITIES OR BLUE SKY LAWS OF ANY STATE. THE HOLDER OF THIS CERTIFICATE, BY ITS ACCEPTANCE HEREOF, REPRESENTS THAT IT IS ACQUIRING THIS SECURITY FOR INVESTMENT AND NOT WITH A VIEW TO ANY SALE OR DISTRIBUTION HEREOF. ANY TRANSFER OF THIS CERTIFICATE OR ANY LIMITED LIABILITY COMPANY INTERESTS REPRESENTED HEREBY IS SUBJECT TO THE TERMS AND CONDITIONS OF THE LIMITED LIABILITY COMPANY AGREEMENT (AS DEFINED BELOW).**

Certificate No. 01                                    60.00% Percentage Interest

PCJV USA, LLC, a Delaware limited liability company (the "Company"), hereby certifies that Potato Corner International, Inc. (together with any assignee of this Certificate, the "Holder") is the registered owner of Sixty Percent (60.00%) of the limited liability company interests in the Company. The rights, powers, preferences, restrictions and limitations of the interests in the Company are set forth in, and this Certificate and the limited liability company interests in the Company represented hereby are issued and shall in all respects be subject to the terms and provisions of, the Operating Agreement of the Company dated as of _____, 2010, as the same may be further amended or restated from time to time (the "Operating Agreement"). By acceptance of this Certificate, and as a condition to being entitled to any rights and/or benefits with respect to the limited liability company interests evidenced hereby, the Holder is deemed to have agreed to comply with and be bound by all the terms and conditions of the Operating Agreement. The Company will furnish a copy of the Operating Agreement to the Holder without charge upon written request to the Company at its principal place of business. Transfer of any or all of the limited liability company interests in the Company evidenced by this Certificate is subject to certain restrictions in the Operating Agreement and can be effected only after compliance with all of those restrictions and the presentation to the Company of the Certificate, accompanied by an assignment in the form appearing on the reverse side of this Certificate, duly completed and executed by and on behalf of the transferor in such Transfer, and an application for transfer in the form appearing on the reverse side of this Certificate, duly completed and executed by and on behalf of the transferee in such Transfer.

Each limited liability company interest in the Company shall constitute a "security" within the meaning of (i) Section 8-102(a)(15) of the Uniform Commercial Code as in effect from time to time in the States of Delaware and California and (ii) the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995 (and each limited liability company interest in the Company shall be treated as such a "security" for all purposes, including, without limitation perfection of the security interest therein under Article 8 of each applicable Uniform Commercial Code).

This Certificate and the limited liability company interests evidenced hereby shall be governed by and construed in accordance with the laws of the State of Delaware without regard to principles of conflicts of laws.

IN WITNESS WHEREOF, the Company has caused this Certificate to be executed as of the date set forth below.

Dated: November ___, 2010

PCJV USA, LLC
a Delaware limited liability company

By: _____
    Name:  Amit Nemanin
    Title:  President.

WEST\23117101 1
373527-000001

10/10/2011  11:44    13104789013                                                         PAGE  02/04

## CERTIFICATE FOR LIMITED LIABILITY COMPANY INTERESTS IN
## PCJV USA, LLC

THIS CERTIFICATE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933 OR UNDER THE SECURITIES OR BLUE SKY LAWS OF ANY STATE. THE HOLDER OF THIS CERTIFICATE, BY ITS ACCEPTANCE HEREOF, REPRESENTS THAT IT IS ACQUIRING THIS SECURITY FOR INVESTMENT AND NOT WITH A VIEW TO ANY SALE OR DISTRIBUTION HEREOF. ANY TRANSFER OF THIS CERTIFICATE OR ANY LIMITED LIABILITY COMPANY INTERESTS REPRESENTED HEREBY IS SUBJECT TO THE TERMS AND CONDITIONS OF THE LIMITED LIABILITY COMPANY AGREEMENT (AS DEFINED BELOW).

**Certificate No. 02**                                               **15.20% Percentage Interest**

PCJV USA, LLC, a Delaware limited liability company (the "Company"), hereby certifies that Amit Nemanim (together with any assignee of this Certificate, the "Holder") is the registered owner of Fifteen and Two Tenths Percent (15.20%) of the limited liability company interests in the Company. The rights, powers, preferences, restrictions and limitations of the interests in the Company are set forth in, and this Certificate and the limited liability company interests in the Company represented hereby are issued and shall in all respects be subject to the terms and provisions of, the Operating Agreement of the Company dated as of _____, 2010, as the same may be further amended or restated from time to time (the "Operating Agreement"). By acceptance of this Certificate, and as a condition to being entitled to any rights and/or benefits with respect to the limited liability company interests evidenced hereby, the Holder is deemed to have agreed to comply with and be bound by all the terms and conditions of the Operating Agreement. The Company will furnish a copy of the Operating Agreement to the Holder without charge upon written request to the Company at its principal place of business. Transfer of any or all of the limited liability company interests in the Company evidenced by this Certificate is subject to certain restrictions in the Operating Agreement and can be effected only after compliance with all of those restrictions and the presentation to the Company of the Certificate, accompanied by an assignment in the form appearing on the reverse side of this Certificate, duly completed and executed by and on behalf of the transferor in such Transfer, and an application for transfer in the form appearing on the reverse side of this Certificate, duly completed and executed by and on behalf of the transferee in such Transfer.

Each limited liability company interest in the Company shall constitute a "security" within the meaning of (i) Section 8-102(a)(15) of the Uniform Commercial Code as in effect from time to time in the States of Delaware and California and (ii) the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995 (and each limited liability company interest in the Company shall be treated as such a "security" for all purposes, including, without limitation perfection of the security interest therein under Article 8 of each applicable Uniform Commercial Code).

This Certificate and the limited liability company interests evidenced hereby shall be governed by and construed in accordance with the laws of the State of Delaware without regard to principles of conflicts of laws.

IN WITNESS WHEREOF, the Company has caused this Certificate to be executed as of the date set forth below.

Dated: _____, 2010

PCJV USA, LLC
a Delaware limited liability company

By: _____
     Name:   Amit Nemanim.
     Title:   President.

WEST\223117102.1

## CERTIFICATE FOR LIMITED LIABILITY COMPANY INTERESTS IN
## PCJV USA, LLC

THIS CERTIFICATE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933 OR UNDER THE SECURITIES OR BLUE SKY LAWS OF ANY STATE. THE HOLDER OF THIS CERTIFICATE, BY ITS ACCEPTANCE HEREOF, REPRESENTS THAT IT IS ACQUIRING THIS SECURITY FOR INVESTMENT AND NOT WITH A VIEW TO ANY SALE OR DISTRIBUTION HEREOF. ANY TRANSFER OF THIS CERTIFICATE OR ANY LIMITED LIABILITY COMPANY INTERESTS REPRESENTED HEREBY IS SUBJECT TO THE TERMS AND CONDITIONS OF THE LIMITED LIABILITY COMPANY AGREEMENT (AS DEFINED BELOW).

Certificate No. 03                                                    15.20% Percentage Interest

    PCJV USA, LLC, a Delaware limited liability company (the "Company"), hereby certifies that Guy Koren (together with any assignee of this Certificate, the "Holder") is the registered owner of Fifteen and Two Tenths Percent (15.20%) of the limited liability company interests in the Company. The rights, powers, preferences, restrictions and limitations of the interests in the Company are set forth in, and this Certificate and the limited liability company interests in the Company represented hereby are issued and shall in all respects be subject to the terms and provisions of, the Operating Agreement of the Company dated as of _____, 2010, as the same may be further amended or restated from time to time (the "Operating Agreement"). By acceptance of this Certificate, and as a condition to being entitled to any rights and/or benefits with respect to the limited liability company interests evidenced hereby, the Holder is deemed to have agreed to comply with and be bound by all the terms and conditions of the Operating Agreement. The Company will furnish a copy of the Operating Agreement to the Holder without charge upon written request to the Company at its principal place of business. Transfer of any or all of the limited liability company interests in the Company evidenced by this Certificate is subject to certain restrictions in the Operating Agreement and can be effected only after compliance with all of those restrictions and the presentation to the Company of the Certificate, accompanied by an assignment in the form appearing on the reverse side of this Certificate, duly completed and executed by and on behalf of the transferor in such Transfer, and an application for transfer in the form appearing on the reverse side of this Certificate, duly completed and executed by and on behalf of the transferee in such Transfer.

    Each limited liability company interest in the Company shall constitute a "security" within the meaning of (i) Section 8-102(a)(15) of the Uniform Commercial Code as in effect from time to time in the States of Delaware and California and (ii) the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995 (and each limited liability company interest in the Company shall be treated as such a "security" for all purposes, including, without limitation, perfection of the security interest therein under Article 8 of each applicable Uniform Commercial Code).

    This Certificate and the limited liability company interests evidenced hereby shall be governed by and construed in accordance with the laws of the State of Delaware without regard to principles of conflicts of laws.

    IN WITNESS WHEREOF, the Company has caused this Certificate to be executed as of the date set forth below.

Dated: _____, 2010          PCJV USA, LLC
                                    a Delaware limited liability company

                                    By: _____

                                        Name:  Amit Nemanik.
                                        Title:  President

WEST\223\17103.1

10/18/2011  11:44    13104789013

PAGE  04/04

## CERTIFICATE FOR LIMITED LIABILITY COMPANY INTERESTS IN
## PCJV USA, LLC

THIS CERTIFICATE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933 OR UNDER THE SECURITIES OR BLUE SKY LAWS OF ANY STATE.   THE HOLDER OF THIS CERTIFICATE, BY ITS ACCEPTANCE HEREOF, REPRESENTS THAT IT IS ACQUIRING THIS SECURITY FOR INVESTMENT AND NOT WITH A VIEW TO ANY SALE OR DISTRIBUTION HEREOF.  ANY TRANSFER OF THIS CERTIFICATE OR ANY LIMITED LIABILITY COMPANY INTERESTS REPRESENTED HEREBY IS SUBJECT TO THE TERMS AND CONDITIONS OF THE LIMITED LIABILITY COMPANY AGREEMENT (AS DEFINED BELOW).

Certificate No. 04

9.60% Percentage Interest

PCJV USA, LLC, a Delaware limited liability company (the "Company"), hereby certifies that Amir Jacoby (together with any assignee of this Certificate, the "Holder") is the registered owner of Nine and Six Tenths Percent (9.60%) of the limited liability company interests in the Company. The rights, powers, preferences, restrictions and limitations of the interests in the Company are set forth in, and this Certificate and the limited liability company interests in the Company represented hereby are issued and shall in all respects be subject to the terms and provisions of, the Operating Agreement of the Company dated as of _____, 2010, as the same may be further amended or restated from time to time (the "Operating Agreement"). By acceptance of this Certificate, and as a condition to being entitled to any rights and/or benefits with respect to the limited liability company interests evidenced hereby, the Holder is deemed to have agreed to comply with and be bound by all the terms and conditions of the Operating Agreement. The Company will furnish a copy of the Operating Agreement to the Holder without charge upon written request to the Company at its principal place of business. Transfer of any or all of the limited liability company interests in the Company evidenced by this Certificate is subject to certain restrictions in the Operating Agreement and can be effected only after compliance with all of those restrictions and the presentation to the Company of the Certificate, accompanied by an assignment in the form appearing on the reverse side of this Certificate, duly completed and executed by and on behalf of the transferor in such Transfer, and an application for transfer in the form appearing on the reverse side of this Certificate, duly completed and executed by and on behalf of the transferee in such Transfer.

Each limited liability company interest in the Company shall constitute a "security" within the meaning of (I) Section 8-102(a)(15) of the Uniform Commercial Code as in effect from time to time in the States of Delaware and California and (II) the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995 (and each limited liability company interest in the Company shall be treated as such a "security" for all purposes, including, without limitation perfection of the security interest therein under Article 8 of each applicable Uniform Commercial Code).

This Certificate and the limited liability company interests evidenced hereby shall be governed by and construed in accordance with the laws of the State of Delaware without regard to principles of conflicts of laws.

IN WITNESS WHEREOF, the Company has caused this Certificate to be executed as of the date set forth below.

Dated: _____, 2010

PCJV USA, LLC
a Delaware limited liability company

By: _____
Name:   Amit Nemanim
Title:   President.

WEST\23117104.1

# EXHIBIT C

**Exhibit C**

## PCVJ USA, LLC AND LA GROUP MASTER SERVICES AGREEMENT

This Master Services Agreement ("Agreement") dated ___6/18/12___ is entered into by and between PCVJ USA, LLCa Delaware Limited Liability Company (hereinafter "PCVJ") and Amit Nemanim, Guy Koren and Amir Jacoby (whom are collectively referred to as the "LA Group").

### RECITALS

WHEREAS, PCJVwishes to contract with the LA Group to provide management and strategic experience and expertise.

WHEREAS, the LA Group agrees to provide Services to PCJV as delineated within this Agreement.

NOW, THEREFORE, the Parties hereby agree as follows:

<u>Services</u>:

1. The LA Group shall faithfully, diligently and efficiently exercise the following obligations and responsibilities:
    a. Conduct management, operations, marketing, establishment, maintenance, licensing and sub-licensing activities with respect to the Potato Corner outlets/stores in the Territory.
    b. Use best efforts at all times to operate and maintain the Potato Corner outlets/stores in the Territory according to the highest standards achievable, consistent with the overall plan of PCJV Management.
    c. Comply with the rules, policies and procedures approved by PCJV Management.
    d. Advertise, market, and promote the Potato Corner outlets/stores with the goal of causing public knowledge, awareness and patronage of the Potato Corner outlets/stores.
    e. Maintain a comprehensive system of records, books and accounts, with respect to the licensing and sub-licensing activities, operation, establishment, management, maintenance and other activities of the Potato Corner outlets/stores in the Territory with the assistance of the PCJV Corporate Secretary.
    f. No later than the twentieth (20th) day of each month, with respect to the preceding month, LA Group shall render a statement of receipts and disbursements, a schedule of accounts receivable and payable, and a schedule of fees collected and distributed, together with a reconciled bank statement as of the last day of the month with the assistance of the PCJV Corporate Secretary.
    g. No later than three (3) months after the end of a fiscal year, the LA Group, with the assistance of the PCJV Corporate Secretary and an external accountant

    hired by PCJV Management, cause PCJV to issue audited financial statements and shall provide a copy of the same to all members of PCJV Management.

h. To the extent that the LA Group is able to do so, the LA Group shall take such action as may be necessary to comply promptly with any and all laws, ordinances, orders or other requirements of any federal, state, county or municipal authority having jurisdiction of PCJV and affecting PCJV.

i. The LA Group shall have a fiduciary duty to exercise the duty of care and shall, at all times, ensure that all corporate opportunities consistent with the objectives of PCJV shall be pursued. As such, with respect to the establishment of PCVJ-owned stores, whenever potential locations are identified by any member of the LA Group, it shall be promptly brought to the attention of PCJV Management. At all times, and within thirty (30) days from receipt of this information, PCJV Management shall decide whether or not to build a PCJV-owned store at the identified location. In the event PCJV chooses to build a PCJV-owned store at the identified location, it shall have the right to do so, to the exclusion of the LA Group. However, in the event that PCJV decides not to build a PCJV-owned store at the identified location, it shall notify the LA Group of its decision in writing. In such case, the LA Group shall have the right to build a store at the identified location, provided that it shall enter into a franchising agreement with PCJV, and shall pay franchise fees and ongoing royalty fees as set forth in PCJV's standard franchising agreement.

2. Territory for the purposes of this Agreement is defined as the United States of America and Israel, except in the County of Los Angeles, USA and the County of San Francisco, USA and Tanforan Mall.

3. The LA Group shall maintain and protect the Confidential Information belonging to PCJV, and such undertaking shall apply to all of its partners, officers, employees, or agents.

4. In consideration for the provision of its Services the LA Group shall be entitled to a service fee equal to thirty (30%) percent of all initial/franchise fees and continuing royalty fees paid to/collected by PCJV

5. All withholding and other applicable taxes levied by any authority on the payments by PCJV to the LA Group under this Agreement shall be borne solely by PCJV.

Confidential Information:



1. The Parties acknowledge that from time to time, one Party (the "Discloser") may disclose to the other Party (the "Recipient") information : a) relating to the Potato Corner outlets and stores; b) relating to the Potato Corner Intangible Property Rights; c) Potato Corner product specifications and related information; d) which is marked with "confidential" or a similar legend; e) which is described orally and designated as confidential; or f) which would, under the circumstances, be understood by a reasonable person to be confidential ("Confidential Information").

2. Upon subsequent disclosure of previously disclosed Confidential Information to the Recipient by the Discloser, the information will remain Confidential Information even if not identified as Confidential Information at the subsequent disclosure.

3. Recipient shall retain such Confidential Information in confidence, and shall not disclose it to any Third Party or use it for other than the purposes of this Agreement without the Discloser's prior written consent.

4. Each Party shall use at least the same procedures and degree of care with respect to such Confidential Information which it uses to protect its on confidential information of like importance, and in no event less than reasonable care. The Recipient will immediately give written notice to the Discloser of any unauthorized use or disclosure of the Discloser's Confidential Information, and the Recipient will assist the Discloser in remedying such unauthorized use or disclosure.

#### Duration of Agreement:

1. This Agreement shall become effective from the date of execution hereof and shall continue indefinitely unless terminated by a) mutual written agreement by the Parties or b) breach of any provision of this Agreement by either Party which will result in termination of this Agreement unless cured by the breaching Party within twenty (20) days from the date of the breach.

#### General Provisions:

1. This Agreement may not be altered, changed, supplemented or modified except by a written instrument duly signed by the Parties.

2. The invalidity of any portion of this Agreement will not render the entire Agreement void, nor affect the validity of the rest of the provisions of this Agreement.

3. This Agreement shall be governed by the laws of the State of California.

4. Neither Party shall assign any of its rights or obligations under this Agreement without the prior written consent of the other Party.

5. The failure of any Party at any time to require performance by the others of any provision of this Agreement shall not affect, in any way, the right of such Party to require performance of that or any provision, and any waiver by any Party of any breach of this Agreement shall not be construed as a waiver of any continuing or succeeding breach of such provision, or a waiver of any other right under this Agreement.



IN WITNESS WHEREOF,

PCJV USA, LLC

_____

Name: Jose P. Magsaysay

Title:    CEO

6/18/12
Date

LA Group

_____
Amit Nemanim

06/18/12
Date

_____
Guy Koren

6/18/12
Date

_____
Amir Jacoby

6/18/12
Date

PCJV USA, LLC and LA Group Master Services Agreement
Page 4 of 4

# EXHIBIT D

**Exhibit D**

## PCJV USA LLC
## JOINT VENTURE AGREEMENT
### (FIRST AMENDMENT TO THE JV AGREEMENT)

This Joint Venture Agreement (the "Agreement") is made and entered into on OCTOBER 17, 2012 at its Principal Office , Suite #1100, 6380 Wilshire Blvd Los Angeles, CA 90048 by and between:

POTATO CORNER INTERNATIONAL, a corporation duly existing and registered by virtue of and under the laws of the State of Delaware, US with office address at 92 Corporate Park Suite C-332, Irvine, California, USA 92606, represented herein by its duly authorized representative, Jose P. Magsaysay (hereinafter "PCI"), and its directors, Jose P. Magsaysay, Jr., Jose Miguel Ma. G. Montinola, Ma. Victoria O. Bermejo, Ricardo K. Montelibano, all of whom are Philippine citizens and resident, and collectively referred to as the "PCI Group";

-and-

GUY KOREN, AMIR JACOBY AND INBAL JACOBY all of whom are U.S. citizens and residents and collectively referred to as the "LA Group.

### RECITALS

WHEREAS, the Parties hereto have agreed to form a limited liability company (hereinafter referred to as the "Company") under the laws of the State of Delaware, with the primary purpose of engaging in the business of establishing, operating, managing, licensing and franchising "Potato Corner" stores/outlets in the United States of America and Israel, except in the County of Los Angeles, USA and the County of San Francisco, USA and Tanforan Mall (hereinafter, "Territory").

WHEREAS, the Parties herein have agreed to enter into this Agreement which sets forth the terms and conditions with respect to the organization, incorporation, operation and management of the Company and defines their respective rights, duties and obligations of the parties to this Agreement.

WHEREAS, the Parties agree that the LLC operating agreement to be entered by them shall reflect the terms and conditions as set forth in this Agreement.

WHEREAS, Cinco may assign and or all of its rights to the joint venture company formed under this Agreement to a wholly-owned subsidiary as it deems fit.

NOW, THEREFORE, for and in consideration of the foregoing premises, the Parties hereby agree as follows:

1) ORGANIZATION AND FORMATION OF THE COMPANY

a) Within ten (10) days from the Effective Date of this Agreement, the Parties herein agree to organize and form, a limited liability company to be called "PCJV USA" ( hereinafter referred to as the Company) for the primary purpose of engaging in

WEST\222455823.2

the business of establishing, operating, managing, licensing and franchising "Potato Corner" stores/outlets in the Territory.

b) The initial members of the Company shall be the following:

   i)  Potato Corner International (PCI)
      (1) Jose P. Magsaysay, Jr.
      (2) Jose Miguel Ma. G. Montinola
      (3) Ma. Victoria O. Bermejo
      (4) Ricardo K. Montelibano

   ii) LA Group
      (1) Guy Koren
      (2) Amir Jacoby
      (3) Inbal Jacoby

c) The principal office of the Company shall be at  Suite 1100, 6380 Wilshire Blvd. Los Angeles, CA 90048 USA.

d) The annual general meeting of the members of the Company shall be held every year at the principal office of the Company.  The members may, at their discretion, invite non-members to join the annual general meeting, but only as non-voting observers. Further, to the extent allowed by the financial condition of the Company, and as agreed upon by a majority of all member interests, the Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses incurred by the following members in attendance of the annual members' meeting: Jose P. Magsaysay, Jr., Jose Miguel Ma. Montinola, Ma. Victoria O. Bermejo and Ricardo K. Montelibano.

e) The fiscal year of the Company shall begin on January 1 and end on December 31 of each year.

f) The Company shall immediately upon formation obtain a "Liability Insurance" for the Company the amount and scope of coverage to be determined by the managers.

g) All costs, fees and expenses incurred in connection with the organization and formation of the Company shall be for the account of the Company.

h) The operating agreement of the Company shall reflect the terms and conditions set forth in this Agreement between the Parties.

2) CAPITALIZATION/OWNERSHIP OF THE COMPANY

a) At the time of formation, the Company shall have a total capital account of Fifty Thousand Dollars (US$50,000) which shall be fully subscribed and paid.

b) Unless other agreed to in writing, at the commencement of this Agreement, the Parties hereby agree that the Cinco Group shall contribute Thirty Thousand Dollars (US$30,000) and own sixty (60%) percent of the Company's capital

G.k

accounts, while the LA Group shall contribute Twenty Thousand Dollars (US$20,000) and own the remaining forty (40%) percent.

c) The Parties hereby agree any increase in the capital account shall require an affirmative vote of 75% of all of the members' percentage interests in the Company. In the event an increase in the Company's capital accounts is approved by the members, both Parties shall have rights of pre-emption so that their pro rata ownership share in the Company shall be maintained, provided that, either Party shall have thirty (30) days within which to confirm in writing that it is willing and able to subscribe and fully pay its pro rata share of the increase in capital.

d) Neither Party shall assign any of its rights or obligations under this Agreement, nor his/its member interests in the Company without the prior written consent of the other Party. In the event either Party desire to transfer or sell his/its pro rata members interest in the Company to a person other those specifically named in Section 1(a) of this Agreement, such Party shall be obligated to sell the same first to the other Party, which has have thirty (30) days within which to exercise its rights of first refusal from the date of receipt of a written notice to sell. For this purpose, the Parties hereby agree that the right of first refusal may be exercised in accordance with the following formula: The average of the Company's earnings before interest, depreciation, taxes and amortization (EBITDA) for the last two (2) years multiplied by 5 times, and further multiplied by the percentage of member interest subject to such right of first refusal over total outstanding member interests.

3) MANAGEMENT OF THE COMPANY

a) As will be provided in the Operating Agreement, the business and affairs of the Company shall be managed and all of the Company powers shall be exercised by or under the direction of the managers (collectively referred to as "Management"). Unless otherwise agreed to by the parties, the Management shall be composed of seven (7) members, four (4) of whom shall be designated by the Cinco Group, and three (3) designated by the LA Group. Upon the formation of the Company, the following shall be named managers: Jose P. Magsaysay, Jr., Jose Miguel Ma. Montinola, Ma. Victoria O. Bermejo, Ricardo K. Montelibano, Guy Koren, Amir Jacoby and Inbal Jacoby.

b) The Management shall regularly meet on a monthly basis. The regular monthly board meeting may be done via teleconference or through the internet. The members may, at their discretion, invite non-members to join member meetings, but only as non-voting observers. Further, to the extent allowed by the financial condition of the Company, and as agreed upon by a majority of all member interests, the Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses incurred by the members named in Section 1(d) in attendance of said meetings.

c) Upon the formation of the Company, it shall have the following executive officers; President, Corporate Secretary and Treasurer, and the following shall be elected by the managers/members to serve these positions. Any change in these mentioned executive officers will require a vote of 75% of members' interest.

3

G.K  AT

    i)  Chairman of the Board of Members – Jose P. Magsaysay

    ii)  President – At any given time, the President shall be any one of the following members: Guy Koren or Amir Jacoby or Inbal Jacoby and the first president will be Amit Nemanim now replaced by Guy Koren

    iii)  Corporate Secretary – Erlinda S. Bartolome.

    iv)  Treasurer – Maria Victoria O. Bermejo

      ·(1)  The Treasurer shall have oversight functions over the Accounting and Finance Departments that shall be exercised independent of the President.

d)  Additional executive officers may be appointed by Management as it may deem necessary. Replacement and removal will require Managers simple majority vote.

e)  It is hereby agreed that the rights and responsibilities of the Management shall include the following:

    i)  Approval of the compensation package for the managers, executive offices and key personnel.

    ii)  Approval of the Accounting System/Procedures/Software/Method to be used by the Company.

    iii)  Approval of the operating budget of the Company, and any changes to it.

    iv)  Approval of all franchising agreements, and lease agreements.

    v)  Approval of all purchases and disbursements in excess of $10,000, provided that such amount may be changed or modified by Management as it deems necessary.

f)  The executive officers shall manage the business and property of the Company, and to market the business, in accordance with and pursuant to the directives of and policies set by the Management of the Company. The Management of the Company can recall and/or withdraw the appointment of any executive officer, as it deems necessary.

g)  The Company shall enter into a Master License Agreement with Cinco (or an affiliated company to be designated by Cinco) which shall include the following terms and conditions:

    i)  The Company agrees to license the "POTATO CORNER" intellectual property rights from Cinco or an affiliated company to be designated by Cinco) consisting of (i) the trademark, service mark and trade name "POTATO CORNER"; and (ii) various trademarks, service marks, trade names, slogans, designs, insignias, emblems, symbols, color schemes, package features, logo and other propriety identifying characteristics used in relation and in connection with the 'Potato Corner" Products and the System; and (iii) as well as other intellectual property rights in connection with the "POTATO CORNER" intellectual property rights, for use in the Territory.

    ii)  The Company agrees to pay, as an arm's length license fee, the following amounts:

4

(1) With respect to the licensing / sub-licensing or franchising the "POTATO CORNER" intellectual property rights in connection with the "POTATO CORNER" outlets/stores, an amount equal to thirty percent (30%) of all initial/franchise fees and ongoing royalty fees paid to/ collected by the Company. Payments shall be made to Cinco (or an affiliated company to be designated by Cinco) by wire transfer using a bank or other financial institution specified by it within thirty (30) days from receipt of the fees by the Company.

(2) All withholding and other applicable taxes levied by any authority on the payments by the Company shall be borne solely by the Company.

h) The Company agrees to engage the LA Group to provide management and strategic experience and expertise during the duration of this Agreement. The Company shall enter into a Master Services Agreement with the LA Group (or a corporation to be designated by the LA Group) which shall include the following terms and conditions:

   i) In consideration for the provision of its services under the Master Services Agreement, the LA Group shall be entitled to a services fee equal to thirty (30%) percent of all Initial/franchise fee and continuing royalty fees paid to/ collected by the Company .

   ii) All withholding and other applicable taxes levied by any authority on the payments by the Company to the LA Group under this Agreement shall be borne solely by the Company.

   iii) The LA Group shall faithfully, diligently and efficiently exercise its obligations and responsibilities under the Master Services Agreement.

   iv) The LA Group shall maintain and protect the Confidential Information belonging to Cinco or the Company, and such undertaking shall apply to all of its partners, officers, employees, or agents.

i) The President of the Company shall render the following services and shall perform the following duties for the Company in a faithful, diligent and efficient manner:

   i) The President shall be responsible for all management, operational, marketing, establishment, maintenance, licensing and sub-licensing activities with respect to the "Potato Corner" outlets/stores in the Territory. He shall use his best efforts at all times during the term of this Agreement to operate and maintain the "Potato Corner" outlets/stores in the Territory according to the highest standards achievable consistent with the overall plan of the Management of the Company. The President shall comply with the rules, policies and procedures approved by the Management of the Company from time to time.

   ii) The President shall advertise market and promote the "Potato Corner" outlets/stores with the goal of causing public knowledge, awareness and patronage of the "Potato Corner" outlets/sites.

5

iii) The President shall maintain a comprehensive system of records, books and accounts, with respect to the licensing and sub-licensing activities, operation, establishment, management, maintenance and other activities of the "Potato Corner" outlets /stores in the Territory with the assistance of the Corporate Secretary.

iv) No later than the twentieth (20th) day of each month, with respect to the preceding month, the President shall render a statement of receipts and disbursements, a schedule of accounts receivable and payable, and a schedule of fees collected and distributed, together with a reconciled bank statement as of the last day of the month with the assistance of the Corporate Secretary.

v) No later than three (3) months after the end of a fiscal year, the President shall, with the assistance of the Corporate Secretary and external accountant hired by Management, cause the Company to issue audited financial statements, and shall provide a copy of the same to all the members of Management.

vi) To the extent the President is lawfully able to do so, the President shall take such action as may be necessary to comply promptly with any and all laws, ordinances, orders or other requirements of any federal, state, county or municipal authority having jurisdiction of the Company and affecting the Company.

j) Consistent with its fiduciary duty to the Company, the members and managers shall exercise the duty of care and shall, at all times, ensure that all corporate opportunities consistent with the objectives of this Agreement shall be pursued on behalf of, and for the benefit of the Company. As such, with respect to the establishment of Company-owned stores, whenever potential locations are identified by any member or manager, it shall be promptly brought to the attention of the Management. At all times, and within thirty (30) days from receipt of this information, the Management shall decide to either build a Company-owned store at the identified location. In the event the Company chooses to build a Company-owned store at the identified location, it shall have the right to do so, to the exclusion of any of the members or managers. However, in the even the Company decides not to build a Company-owned store at the identified location, it shall notify the members and managers of its decision in writing. In such case, the LA Group shall, have the right to build a store at the identified location, provided that it shall enter into a franchising agreement with the Company, and shall pay the franchise fees and ongoing royalty fees as set forth in the Company's standard franchising agreement.

4) DURATION OF AGREEMENT

a) This Agreement shall become effective from the date of execution hereof and shall continue indefinitely unless otherwise terminated by (i) an affirmative vote of 75 percent (75%) of all member interests, or (ii) upon mutual agreement by the Parties in writing.



6

b) Upon termination of this Agreement, the effects of termination shall be as follows:

    i) All rights granted under the Master License Agreement shall terminate and the Company shall cease the use of the Potato Corner Intellectual Property Rights, and Confidential Information, provided however, that the Company shall be permitted to use any of the foregoing as is reasonably required in order to comply with its obligations under its sub-licensing or franchising agreements, but only to the extent of the duration of sub-licensing or franchising agreements in existence at the time of the termination of this Agreement.

    ii) The LA Group shall be subject to a non-compete arrangement and hereby agrees that, within two (2) years from the date of termination of this Agreement, it shall not engage in the business of establishing, operating, managing, licensing and franchising identical or similar products sold by the Company, using the intellectual property rights identical or similar to those used by the Company, at the time of the termination of this Agreement.

5) GENERAL PROVISIONS

a) This Agreement may not be altered, changed, supplemented or modified except by a written instrument duly signed by the Parties.

b) The Parties shall use their best efforts to cooperate for the success of the business of the Company. The Parties further agree to perform all acts and execute and deliver all documents or instruments required or necessary to fully implement or consummate the transactions contemplated in and the intent underlying this Agreement.

c) The Parties shall, to the extent feasible, cause the operating agreement of the Company to reflect the mutual covenants and provisions contained in this Agreement.

d) All notices and other communications required or permitted to be given hereunder shall be given in writing (and for this purpose shall include emails or fax transmissions) and shall be addressed to the appropriate Party at the address of such Party as heretofore designated, or at such address as such Party may designate subsequently in writing.

e) The failure of any Party at any time to require performance by the others of any provision of this Agreement shall not affect, in any way, the right of such Party to require performance of that or any other provision, and any waiver by any Party of any breach of this Agreement shall not be construed as a waiver of any continuing or succeeding breach of such provision, or a waiver of any other right under this Agreement.

f) This Agreement shall constitute the entire agreement between the Parties and shall supersede any previous agreements, written or otherwise, with respect to the same subject matter which may have been made by the Parties prior hereto.

7

g) The invalidity of any portion of this Agreement will not and shall not render the entire Agreement void, nor affect the validity of the rest of the provisions of this Agreement.

h) This Agreement shall be governed by the laws of the State of California.

I) Parties acknowledge that, from time to time, one Party (the "Discloser") may disclose to the other Party (the "Recipient") information: (a) relating to the Potato Corner outlets and sites; (b) relating to the Potato Corner Intangible Property Rights; (c) Potato Corner product specifications and related information; (d) which is marked with "confidential" or a similar legend; (e) which is described orally and designated as confidential; or (f) which would, under the circumstances, be understood by a reasonable person to be confidential ("Confidential Information"). Upon subsequent disclosure of previously disclosed Confidential Information to the Recipient by the Discloser, the information will remain Confidential Information even if not identified as Confidential Information at the subsequent disclosure.    Recipient shall retain such Confidential Information in confidence, and shall not disclose it to any Third Party or use it for other than the purposes of this Agreement without the Discloser's prior written consent.  Each Party shall use at least the same procedures and degree of care with respect to such Confidential Information which it uses to protect its own confidential information of like importance, and in no event less than reasonable care.  The Recipient will immediately give written notice to the Discloser of any unauthorized use or disclosure of the Discloser's Confidential Information, and the Recipient will assist the Discloser in remedying such unauthorized use or disclosure.

[The Remainder of This Page is Left Intentionally Blank]



8



IN WITNESS WHEREOF, the parties have executed this Agreement on the date and in place first mentioned.

**POTATO CORNER INTERNATIONAL GROUP:**

Jose P. Magsaysay, Jr.,

Jose Miguel Ma. G Montinola

Ma. Victoria O. Bermejo

Ricardo K. Montelibano,

**L.A. Group:**

Inbal Jacoby

Guy Koren

Amir Jacoby

SIGNED IN THE PRESENCE OF:

ACKNOWLEDGMENT

9

WEST\222455823.2

# EXHIBIT E



**Exhibit E**



SERVICES AGREEMENT

By and between Potato Corner Joint Venture, also known as PCJV USA LLC referred to as "Company", and Guy Koran AND Amir Jacoby known as "LA Group" and referred herein as "Management Partner"

The Company, located at 6380 Wilshire Blvd. Suite 1100 Los Angeles, CA 90048, engages LA Group of 8950 W Olympic Blvd. #563, Beverly Hills, CA 90211 on the following terms and conditions:

1. Start Date: Engagement shall commence on January 1, 2011 time being of the essence

2. DUTIES: Management Partner agree to perform the duties set out herein:

A. Management Duties

LA Group as Management Partner shall perform its duties as follows:

Guy Koren shall act as President and Managing Partner; and Amir Jacoby as Managing Partner, and shall develop and direct the business known as Potato Corner in the United States and other available territories as assigned. This will include overall day-to-day management of company efforts to develop the venture into a growing fast-food franchise, day-to-day management of company assets, day-to-day management of company efforts to develop independent franchisee relationships, day-to-day management of Management Partner, and provide direction of the company to increase its revenue and member value as directed by and at the discretion of the company board of directors.

Managing Partner shall perform such further duties as are customarily performed by holding such positions in other businesses of the same or similar nature as that engaged in by Company.

3. COMPENSATION: In consideration of the foregoing, Company shall pay Management Partner a services fee of $240,000 per year, for services, payable on a monthly basis.

ADDITIONAL COMPENSATION: Management Partner shall be entitled to a waiver of any and all royalties and franchise fees due to PCJV USA LLC for any Potato Corner branded stores, units, or other means of sale owned and operated by Management Partner during the entire term of the relationship between Management Partner and PCJV USA LLC.

4. DURATION OF EMPLOYMENT: Management Partner's agreement shall remain in effect until it is terminated by either party, commencing at the date of signature on this agreement.

5. TERMINATION: This agreement may be terminated at will by the company board of directors or earlier upon (1) death of Management Partner or illness or incapacity that prevents Management Partner from performing his/her duties for a period of more than 16 weeks in any calendar year and (2) breach of the agreement by Management Partner. Such option shall be exercised by Employer giving a notice to Management Partner by certified mail, addressed to him at the above named address. With such notice, this agreement shall cease and come to an end five (5) days after in which the notice is mailed.

6. MISCELLANEOUS: (1) Management Partner agrees not to disclose any of Company's trade practices, proprietary information, formulations, or other items classified as trade secrets during or after the employment for a period of up to 48 months. (2) In the event of any dispute over this agreement, it shall be resolved through binding arbitration under the rules of the American Arbitration Association.

In witness whereof, both parties have executed this agreement at 6380 Wilshire Blvd. Suite 1100 Los Angeles, CA 90048, on (date).

PCJV USA, LLC:

Management Partner

Date: Jan 1st, 2017.

LA Group, LLC:

Management Partner

Date: 1/1/17

1    **PROOF OF SERVICE**

2    STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

3        At the time of service, I was over 18 years of age and **not a party to this action.** I am
     employed in the County of Los Angeles, State of California. My business address is 9401
4    Wilshire Boulevard, Ninth Floor, Beverly Hills, CA 90212-2974.

5        On December _18, 2018, I served true copies of the following document(s) described as
     **VERIFIED SECOND AMENDED COMPLAINT** on the interested parties in this action as
6    follows:

7                              **SEE ATTACHED SERVICE LIST**

8        **BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the
     persons at the addresses listed in the Service List and placed the envelope for collection and
9    mailing, following our ordinary business practices. I am readily familiar with Ervin Cohen &
     Jessup LLP's practice for collecting and processing correspondence for mailing. On the same day
10   that the correspondence is placed for collection and mailing, it is deposited in the ordinary course
     of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

11
         I declare under penalty of perjury under the laws of the State of California that the
12   foregoing is true and correct.

13       Executed on December 18, 2018, at Beverly Hills, California.

14

15   _____
                          Joe Dirkx
16

17

18

19

20

21

22

23

24

25

26

27

28

16544.2:9330787.1                                    1

ERVIN COHEN & JESSUP LLP



1

2

**SERVICE LIST**
**Cinco Corporation, et al. v. Guy Koren, et al.**
**Case No. BC701075**

3  Todd M. Lander, Esq.
   Arash Beral, Esq.
4  Carol Chow, Esq.
   FREEMAN, FREEMAN & SMILEY, LLP
5  1888 Century Park East, Suite 1900
   Los Angeles, CA 90067

Attorneys for Defendant and Cross-Complainant
Guy Koren, and Cross-Complainants Alon
Koren, Thomas Hodgson, Emily Garcia, and
Ashley Grundnowski

6

   Robert A. Levinson, Esq.
7  David Krol, Esq.
   Jason J. Jarvis, Esq.
8  LEVINSON ARSHONSKY & KURTZ, LLP
   15303 Ventura Blvd., Suite 1650
9  Sherman Oaks, CA 91403

Attorneys for Cross-Defendants AMIR
JACOBY and INBAL JACOBY

10  Frances M. O'Meara, Esq.
    Stephen M. Caine, Esq.
11  Holly M. Teel, Esq.
    Thompson Coe
12  12100 Wilshire Blvd
    Suite 1200
13  Los Angeles, California 90025

Attorneys for Cross-Complainant PCI Trading,
LLC and Nominal Defendant and Cross-
Complainant PCJV USA, LLC

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ERVIN COHEN & JESSUP LLP

# EXHIBIT 79

1 | Michael D. Murphy (SBN 224678)
   mmurphy@ecjlaw.com
2 | Siobhan C. Amin (SBN 308416)
   samin@ecjlaw.com
3 | Banu S. Naraghi (SBN 312754)
   bnaraghi@ecjlaw.com
4 | **ERVIN COHEN & JESSUP LLP**
   9401 Wilshire Boulevard, Ninth Floor
5 | Beverly Hills, California 90212-2974
   Telephone (310) 273-6333
6 | Facsimile (310) 859-2325

7 | Attorneys for Plaintiffs and Cross-Defendants CINCO CORPORATION and POTATO CORNER INTERNATIONAL, INC.

8 | **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9 | **COUNTY OF LOS ANGELES, CENTRAL DISTRICT**

| | |
|---|---|
| CINCO CORPORATION a Philippines corporation; POTATO CORNER INTERNATIONAL, INC., a Delaware corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>GUY KOREN, an individual; NKM CAPITAL GROUP, LLC, a California limited liability company; J & K AMERICANA, LLC, a California limited liability company; J & K CULVER, LLC, a California limited liability company; J&K LAKEWOOD, LLC, a California limited liability company; J&K OAKRIDGE, LLC, a California limited liability company; J&K VALLEY FAIR, LLC, a California limited liability company; J & K CAPITAL 2, LLC, a California limited liability company; J & K ONTARIO, LLC, a California limited liability company; J&K PC TRUCKS, LLC, a California limited liability company; J&K CONSULTANTS GROUP, LLC, a California limited liability company; GK CAPITAL GROUP, LLC, a California limited liability company; POTATO CORNER LA GROUP, LLC, a California limited liability company; ALON KOREN, an individual; THOMAS HODGSON, an individual; EMILY GARCIA, an individual; and DOES 1 through 25, inclusive,<br><br>Defendants,<br><br>– and –<br><br>PCJV USA, LLC, a Delaware limited liability company,<br><br>Nominal Defendant. | Case No.: BC701075<br>Related Case No.: BC706000<br><br>Assigned to Hon. Rafael Ongkeko, Dept. 73<br><br>**VERIFIED THIRD AMENDED COMPLAINT** |

16544.2;9619218.1

ERVIN COHEN ∴ JESSUP

1  PCJV USA, LLC, a Delaware limited liability company; PCI TRADING LLC, a Delaware
2  limited liability company; POTATO CORNER LA GROUP, LLC, a California
3  limited liability company; NKM CAPITAL GROUP, LLC, a California limited liability
4  company; J & K AMERICANA, LLC, a California limited liability company; J & K
5  CULVER, LLC, a California limited liability company; J&K LAKEWOOD, LLC, a
6  California limited liability company; J&K OAKRIDGE, LLC, a California limited
7  liability company; J&K VALLEY FAIR, LLC, a California limited liability company; J
8  & K CAPITAL 2, LLC, a California limited liability company; J & K ONTARIO, LLC, a
9  California limited liability company; J&K PC TRUCKS, LLC, a California limited liability
10 company; J&K CONSULTANTS GROUP, LLC, a California limited liability company;
11 GK CAPITAL GROUP, LLC, a California limited liability company; GUY KOREN, an
12 individual; ALON KOREN, an individual; THOMAS HODGSON, an individual;
13 EMILY GARCIA, an individual; ASHLEY GRUDNOWSKI, an individual,

14            Cross-Complainants,

15      vs.

16
   CINCO CORPORATION, a Philippines
17 corporation; POTATO CORNER INTERNATIONAL, INC., a Delaware
18 corporation; HIGHFIVE CORPORATION, a Philippines corporation; JOSE P.
19 MAGSAYSAY, JR., an individual; JOSE MIGUEL MA. MONTINOLA, an individual;
20 RICARDO ENRIQUE K. MONTELIBANO, an individual; MA. VICTORIA O.
21 BERMEJO, an individual; BEN OLIVAS, an individual; JOHN EDWARD HERNANDEZ,
22 an individual; CHAD DOMINIC HERNANDEZ, an individual; MIGUEL
23 RAYMUNDO HERNANDEZ, an individual; MYROSE VICTOR, an individual;
24 MARIVIC DEL PILAR, an individual; JOSE MARCO DEL PILAR, an individual; DIA
25 LACABA, an individual; NICARDO FALCIS, an individual; AMIR JACOBY, an
26 individual; INBAL JACOBY, an individual; and ROES 1 through 500 inclusive,
27            Cross-Defendants.
28

Complaint Filed:   April 10, 2018
Trial Date:        None Set

16544.2:9619218.1                      2

**INTRODUCTION**

1.     Plaintiff Cinco Corporation ("Cinco"), a corporation based in the Philippines, is the owner of the "Potato Corner" brand, an international fast food chain that proudly promotes itself as the "World's Best Flavored Fries." There are now more than 1,100 Potato Corner locations worldwide selling these flavored fries and other menu items, using the Potato Corner trademarks, trade name, service marks and other intellectual property ("Potato Corner Intellectual Property").

2.     After having gained a foothold in Asia, in or around 2009, Plaintiff Cinco sought to expand its unique brand into the United States. Plaintiff Cinco was willing to share its Potato Corner Intellectual Property, product, and services ("Potato Corner Brand") with a trusted local United States partner, and was willing to share in the proceeds of its expansion into the United States. Unfortunately, the partner selected by Plaintiff Cinco – Defendant Guy Koren ("Defendant Koren") – abused the great trust and confidence conferred upon him by his Filipino partners.

3.     The vehicle through which Plaintiff Cinco and Defendant Koren agreed to expand the Potato Corner Brand in the United States is Nominal Defendant PCJV USA, LLC ("Nominal Defendant PCJV"). During their negotiations both Plaintiff Cinco and Defendant Koren expressed their shared vision that, through Nominal Defendant PCJV, Potato Corner could expand into hundreds of franchised and PCJV-owned stores nationwide. Instead, under Defendant Koren's direction, less than fifty stores have ever been opened (25% of which have since closed), and, other than the stores owned by Defendant Koren and his affiliates (some of which represent company opportunities wrongfully diverted by Defendant Koren), the other franchised Potato Corner outlets have not yielded the financial success that was intended and promised. Plaintiff Cinco and Plaintiff Potato Corner International, Inc. ("Plaintiff PCI") have now learned that this difference in success between Defendant Koren's stores and the other third-party franchisees has been caused by Defendant Koren's disloyal treatment of his own stores preferentially, at the expense of Nominal Defendant PCJV and the third-party franchisees.

4.     After the structure of Nominal Defendant PCJV was agreed to, Plaintiff Cinco established Plaintiff PCI, an American subsidiary of Plaintiff Cinco – and separate legal entity –

/ / /

16544.2:9619218.1                            3
VERIFIED SECOND AMENDED COMPLAINT

1 which became a founding member of Nominal Defendant PCJV, owning 60% of its equity

2 ("Membership Interests").

3      5.      The remaining 40% of Nominal Defendant PCJV, LLC Membership Interests were

4 split between Defendant Koren, as well as two other associates of Defendant Koren – Amir Jacoby

5 ("Jacoby," named by Koren as a Cross-Defendant in this proceeding) and Amit Nemanim

6 ("Nemanim"). It was expressly stated by Defendant Koren and Jacoby, as well as others involved

7 in the inception of PCJV, that Defendant Koren, Jacoby, and Nemanim were each, in their

8 individual capacity owning Membership interests reflecting a fraction of the remaining 40%

9 equity. Nemanim ceased to be a Member of Nominal Defendant PCJV in 2012, thus leaving

10 Defendant Koren, and Jacoby, as the remaining holders of the 40% Membership Interests (the "LA

11 Group").

12      6.      In 2012, Koren became the President – the principal Executive Officer – of

13 Nominal Defendant PCJV, reporting to a managing board of seven (the "PCJV Management" or

14 "Management"), four of which are appointed by Plaintiff PCI, and the remaining three from the

15 LA Group.

16      7.      From that day forward, and continuing to the present, Defendant Koren has

17 brazenly abused his fiduciary duties to Plaintiff PCI and Nominal Defendant PCJV, as well as his

18 contractual and other legal obligations to Plaintiffs and Nominal Defendant PCJV.

19      8.      As alleged herein, Defendant Koren's scheme has been to (1) prevent Plaintiffs

20 from yielding any financial or other benefit from their hoped for expansion into the United States

21 through his deceit, concealment, and breaches of fiduciary duty; (2) divert Nominal Defendant

22 PCJV's funds, resources, and corporate opportunities to himself for his own personal gain;

23 (3) repudiate PCJV Management's authority; and (4) damage Plaintiffs' goodwill, business,

24 reputation, and relationships, through his mismanagement and waste.

25      9.      For example, as alleged herein, Defendant Koren has prevented Nominal Defendant

26 PCJV from opening certain Potato Corner Stores as company owned, and, instead, diverted those

27 opportunities to separate entities owned by Defendant Koren. Even worse, Defendant Koren has

28 caused Nominal Defendant PCJV to fund and support these and the other stores owned by his

16544.2:9619218.1

4

ERVIN COHEN & JESSUP

1  affiliates, without reimbursement, and through provision of free resources and capital, waivers of
2  fees and royalties, and preferential attention and favor, as if those stores were company owned
3  operations. Put simply, Defendant Koren has caused Nominal Defendant PCJV to bear the burdens
4  of Defendant Koren's own Potato Corner franchises, while taking the benefits for himself. This is
5  just one of the examples of the disloyal and self-interested transactions Defendant Koren has
6  caused Nominal Defendant PCJV to enter into benefiting Defendant Koren and his affiliates, to
7  the detriment of Plaintiffs, as well as Nominal Defendant PCJV.

8         10.    As the result of these and many other acts of self-dealing, breaches of fiduciary
9  duty, breaches of contract, and other wrongdoing, Defendant Koren has prevented Plaintiffs from
10 earning any license fees, royalty fees, or profits whatsoever as the result of its troubled United
11 States venture, whereas Defendant Koren has managed to ensure that he is paid handsomely.

12        11.    Unsatisfied with simply using Nominal Defendant PCJV as a vehicle to enrich
13 himself at the expense of his international, and trusting, partners, Defendant Koren has now frozen
14 Nominal Defendant PCJV's governance and management, by taking the outrageous position that
15 (1) he can never be removed as Chief Executive Officer unless his handpicked PCJV Managers
16 agree, and, (2) he is entitled to majority ownership of PCJV, based upon a knowingly frivolous
17 claim arising from a "right of first refusal." Absent this Court's intervention, Nominal Defendant
18 PCJV's governance and control is effectively frozen.

19        12.    Plaintiffs are only beginning to learn the extent of Defendant Koren's breaches of
20 fiduciary, legal, and contractual duties, given that, Defendant Koren has also failed to provide
21 comprehensive books and records on a monthly basis including reconciled bank statements and
22 other documents detailing PCJV's financial condition. This failure, in addition to constituting a
23 breach of the contracts he entered into with Plaintiffs, has facilitated, and concealed, his
24 wrongdoing until only very recently.

25        13.    Given the above, and the allegations stated herein, Plaintiffs Cinco and PCI
26 (collectively, "Plaintiffs"), have been forced to initiate this action to, among other things, obtain
27 and recover (1) control over the United States Potato Corner operations; (2) judicial confirmation
28 of Plaintiff PCI's (obvious) majority ownership of PCJV and majority control over PCJV

16544.2:9619218.1                              5

ERVIN COHEN & JESSUP

1  Management; (3) an accounting as to PCJV's operations given the near decade of concealment by
2  Defendant Koren; (4) damages resulting from the astonishing breaches of loyalty, care, good faith,
3  deceit, and breaches of contract, all of which have damaged Plaintiffs, as well as Nominal
4  Defendant PCJV; and (5) establish a constructive trust over the Potato Corner stores that (i) should
5  have been presented by Defendant Koren to Nominal Defendant PCJV as corporate opportunities
6  to consider, as well as (ii) those stores owned by Defendant Koren and his affiliates that he
7  enriched using unreimbursed and unapproved resources, capital, and attention from Nominal
8  Defendant PCJV.

9  ## THE PARTIES

10  14.  Nominal Defendant PCJV is a Delaware limited liability company. Nominal
11  Defendant PCJV's principal place of business is in Los Angeles, California. 60% of the
12  Membership Interests of Nominal Defendant PCJV are owned by Plaintiff PCI, whereas the
13  remaining Membership Interests are shared by Defendant Koren, and Jacoby, each in their
14  individual capacity.

15  15.  Plaintiff Cinco is a corporation headquartered in the Republic of the Philippines,
16  which owns, operates, and franchises its brand name Potato Corner french fries in outlets located
17  in Asia, the Americas, and the Middle East, and, as alleged herein, through its subsidiary (Plaintiff
18  PCI) here in the United States. Plaintiff Cinco negotiated the terms of the Nominal Defendant
19  PCJV structure and governance prior to the formation of Nominal Defendant PCJV.

20  16.  Plaintiff PCI is a Delaware corporation with its principal place of business in Los
21  Angeles County, California. Plaintiff PCI is a wholly owned subsidiary of Plaintiff Cinco and is a
22  founding member of Nominal Defendant PCJV. From Nominal Defendant PCJV's inception, to
23  the present, Plaintiff PCI has been the sole owner of 60% of the Membership Interests of Nominal
24  Defendant PCJV. Plaintiff PCI has never transferred, sold, assigned, or in any way ceased to be an
25  owner of the 60% equity represented by the Membership Interests received in or around July of
26  2010 when Nominal Defendant PCJV was formed.

27  17.  Defendant Koren is an individual and resident of the County of Los Angeles, in the
28  State of California. In 2012, Defendant Koren became the President of Nominal Defendant PCJV.

ERVIN COHEN & JESSUP

1    18.    Defendant Potato Corner LA Group, LLC Group is a California limited liability

2 company entered into by Defendant Koren and Jacoby.

3    19.    The following Defendants are collectively referred to herein as the "Koren Affiliate

4 Defendants."

5         a.    Defendant NKM Capital Group, LLC, is a California limited liability

6              company that Plaintiffs are informed and believe, and thereon allege, to be

7              owned, operated, and/or controlled by Defendant Koren.

8         b.    Defendant J&K Americana, LLC, is a California limited liability company

9              that Plaintiffs are informed and believe, and thereon allege, to be owned,

10             operated, and/or controlled by Defendant Koren.

11        c.    Defendant J&K Culver, LLC, is a California limited liability company that

12             Plaintiffs are informed and believe, and thereon allege, to be owned,

13             operated, and/or controlled by Defendant Koren.

14        d.    Defendant J&K Lakewood, LLC, is a California limited liability company

15             that Plaintiffs are informed and believe, and thereon allege, to be owned,

16             operated, and/or controlled by Defendant Koren.

17        e.    Defendant J&K Oakridge, LLC, is a California limited liability company

18             that Plaintiffs are informed and believe, and thereon allege, to be owned,

19             operated, and/or controlled by Defendant Koren.

20        f.    Defendant J&K Valley Fair, LLC, is a California limited liability company

21             that Plaintiffs are informed and believe, and thereon allege, to be owned,

22             operated, and/or controlled by Defendant Koren.

23        g.    Defendant J&K Capital 2, LLC, is a California limited liability company

24             that Plaintiffs are informed and believe, and thereon allege, to be owned,

25             operated, and/or controlled by Defendant Koren.

26        h.    Defendant J&K Ontario, LLC, is a California limited liability company that

27             Plaintiffs are informed and believe, and thereon allege, to be owned,

28             operated, and/or controlled by Defendant Koren.

ERVIN COHEN ᴜ JESSUP ᴸᴸᴾ

16544.2:9619218.1                                           7

1               i.     Defendant J&K PC Trucks, LLC, is a California limited liability company

2                    that Plaintiffs are informed and believe, and thereon allege, to be owned,

3                    operated, and/or controlled by Defendant Koren.

4               j.     Defendant J&K Consultants Group, LLC, is a California limited liability

5                    company that Plaintiffs are informed and believe, and thereon allege, to be

6                    owned, operated, and/or controlled by Defendant Koren.

7               k.     Defendant GK Capital Group, LLC, is a California limited liability

8                    company that Plaintiffs are informed and believe, and thereon allege, to be

9                    owned, operated, and/or controlled by Defendant Koren.

10      20.     Defendant Alon Koren is and at all relevant times was, an individual residing in the

11 County of Los Angeles, State of California.

12      21.     Defendant Thomas Hodgson is and at all relevant times was, an individual residing

13 in the County of Los Angeles, State of California.

14      22.     Defendant Emily Garcia is and at all relevant times was, an individual residing in

15 the County of Los Angeles, State of California.

16      23.     Plaintiffs do not know the true names and capacities of Defendants DOES 1

17 through 25, inclusive, and therefore sues these "Doe Defendants" by such fictitious names

18 pursuant to Section 474 of the California Code of Civil Procedure. Plaintiffs will seek leave of

19 Court to amend this Amended Complaint when the true names and capacities of the Doe

20 Defendants have been ascertained. Plaintiffs are informed and believe, and based thereon allege,

21 that each of the Defendants designated as a Doe herein was the agent and/or alter ego of each of

22 the remaining Defendants or is in some manner responsible for the events and occurrences herein

23 described, and legally and proximately caused injury and damages to Plaintiffs as herein alleged.

24 (Hereinafter, Defendant Koren, the Koren Affiliate Defendants, and Doe Defendants, inclusive,

25 will be referred to collectively as "Defendants.")

26      24.     Plaintiffs are informed and believe and based thereon allege that all of the

27 Defendants named herein are in some manner responsible for the acts herein alleged, and that each

28 was the agent, servant, representative, alter-ego, principal, employer or master of each other

ERVIN COHEN & JESSUP

1  Defendant herein and, further, was acting within the scope of such agency, servitude, employment,

2  representation or capacity and/or for the benefit of each other in doing the acts herein alleged.

3                              **JURISDICTION AND VENUE**

4          25.     This Court has jurisdiction over this lawsuit because the amount in controversy

5  exceeds this Court's jurisdictional amount, exclusive of attorneys' fees, interest and costs.

6          26.     Venue is proper in the County of Los Angeles pursuant to Cal. Civ. Proc. Code §

7  395, as Defendant Koren, as well as most, if not all, of the other Defendants reside in the County

8  of Los Angeles.

9                        **FACTS COMMON TO ALL CAUSES OF ACTION**

10         27.     Plaintiff Cinco's first exploration into expanding the Potato Corner Brand in the

11  United States began in or around 2009, when it agreed that Defendant Koren, through Defendant

12  NKM, could open a Potato Corner store in Santa Anita (the "Santa Anita Potato Corner Store").

13         28.     Desiring to build on that first Santa Anita Potato Corner Store, and expand further

14  in America, Plaintiff Cinco decided to entrust Defendant Koren with that expansion through a

15  business structure that had great potential for both Defendant Koren and Plaintiff Cinco. That

16  structure was embodied in two limited liability companies described herein: Nominal Defendant

17  PCJV as well as PCI Trading, LLC ("PCIT"), which was to be the supplier for Potato Corner

18  stores owned or franchised by Nominal Defendant PCJV.

19         29.     Plaintiff Cinco's Chief Executive Officer, Mr. Jose Magsaysay ("Mr. Magsaysay")

20  believed Defendant Koren's sales pitch, in which Defendant Koren represented that he was a

21  trustworthy and hardworking partner who would dedicate himself to expand and build the Potato

22  Corner Brand in America.  Mr. Magsaysay, with his heart for entrepreneurship and his trust in

23  growing business opportunities of others (evidenced by his franchisees in Asia and elsewhere),

24  agreed to go into business with Defendant Koren through Nominal Defendant PCJV.

25         30.     Because of the distance between Potato Corner's headquarters in Manila and the

26  United States, the only way this venture could succeed was if Defendant Koren adhered to,

27  respected, and comported himself with the great trust and confidence placed by Plaintiffs in

28  ///

ERVIN COHEN & JESSUP

1  Defendant Koren that he would act loyally, in good faith, and with great care towards Plaintiff
2  PCI, the subsidiary established by Plaintiff Cinco as its American headquarters.

3      31.    As alleged herein, Defendant Koren knowingly repudiated and breached these
4  duties, in a manner that benefited himself, and his affiliates, at the expense of Plaintiffs Cinco and
5  PCI, as well as the franchisees and the Potato Corner Brand.

6      32.    Nominal Defendant PCJV – the entity that Plaintiff Cinco and Defendant Koren
7  had previously agreed would serve as the locus from which Potato Corner would expand
8  nationwide – was established on or around July 16, 2010. Prior to its inception, Plaintiff Cinco and
9  Defendant Koren memorialized the structure of the soon to be created limited liability company
10  through a Joint Venture Agreement ("JVA"), the governing document for Nominal Defendant
11  PCJV. A true and correct copy of the JVA is attached hereto as Exhibit A and incorporated by
12  reference herein.

13      33.    Because Nominal Defendant PCJV had not yet been created (nor had Plaintiff
14  Cinco's subsidiary, Plaintiff PCI, which would serve as the majority owner), Plaintiff Cinco
15  executed the JVA as holder of the putative 60% equity of the soon-to-be established limited
16  liability company. Defendant Koren, Jacoby and Nemanim, also executed the JVA in their
17  individual capacity.

18      34.    In section 3(g) of the JVA, Plaintiff Cinco agreed to license the "Potato Corner"
19  Intellectual Property to Nominal Defendant PCJV, in exchange for a license fee of "thirty percent
20  of all initial/franchise fees and ongoing royalty fees paid to/collected by [Nominal Defendant
21  PCJV]" from its franchisees (the "Approved License Fee").

22      35.    Nearly a decade later, Plaintiff Cinco has never received any Approved License
23  Fee, as the result of the deceit, and breaches of fiduciary duty alleged herein.

24          ***Allocation of Membership Interests of Nominal Defendant***
25          ***PCJV, as Set Forth in Its Governing Document, the JVA***

26      36.    The JVA memorialized that 60% of the still unformed Nominal Defendant PCJV
27  Membership Interests would be owned by Plaintiff Cinco, with the express stipulation that
28  Plaintiff Cinco would have the right to assign all of its interests in Nominal Defendant PCJV to a

ERVIN COHEN & JESSUP

1   wholly owned subsidiary (the "Permitted Cinco Equity Assignment"). Plaintiff Cinco took

2   advantage of the Permitted Cinco Assignment, by assigning any and all interests in the transaction

3   to its wholly owned subsidiary – and separate legal entity – Plaintiff PCI.

4       37.     The JVA memorialized that the remaining 40% of the Nominal Defendant PCJV

5   Membership Interests would be owned by Defendant Koren, Jacoby, and Nemanim, personally

6   and individually.

7       38.     Under the JVA, the owners of Membership Interests in Nominal Defendant PCJV –

8   Plaintiff PCI, Defendant Koren, Jacoby, and Nemanim were prohibited from transferring their

9   Membership Interests in Nominal Defendant PCJV, absent compliance with a right of first refusal.

10  (Exh. A, JVA, § 2(d).)

11      39.     In 2010, Nemanim, who, pursuant to the JVA, was appointed President (the

12  primary executive officer) of Nominal Defendant PCJV, issued Certificates for Limited Liability

13  Company Interests with this ownership structure, allocating Membership Interests in PCJV as

14  follows: Plaintiff PCI (60%), Nemanim (15.20%), Defendant Koren (15.20%), and Jacoby (9.6%).

15  True and correct copies of the executed Certificates for Limited Liability Company Interests are

16  attached hereto as Exhibit B and incorporated by reference herein.

17      ***Governance in Nominal Defendant PCJV is Vested in a Seven Member Management***

18      ***Committee, Whereas Day to Day Operations Are Vested in PCJV Officers***

19      40.     Under Section 3 of the JVA (Exh. A), the "business and affairs," and all policy, of

20  Nominal Defendant PCJV are vested in and to be directed by seven Managers (referred to in the

21  agreement as "Management"), four of whom were to be appointed by Plaintiff Cinco (or its

22  assignee, who as alleged herein, is its wholly owned subsidiary, and separate legal entity, Plaintiff

23  PCI). The other three individuals comprising PCJV Management were to be appointed by the three

24  other holders of Membership Interests: Defendant Koren, Amir Jacoby, and Non-Party Nemanim.

25      41.     The initial composition of PCJV Management was set forth in the JVA, and was as

26  follows:

27          a.   Plaintiff PCI's initial four individuals appointed to PCJV Management

28              were: Mr. Magsaysay, Jose Miguel Ma. Montinola ("Mr. Montinola"), Ma.

ERVIN COHEN & JESSUP

1    Vitoria O. Bermejo ("Ms. Bermejo"), and Ricardo Montelibano ("Mr.

2    Montelibano").

3         b.    Defendant Koren, Amir Jacoby, and Non-Party Nemanim named

4               themselves as the other three Managers.

5    42.    As set forth in the JVA (Section 3) among the powers vested in Management

6    ("Management Powers") are as follows:

7         a.    Management of the business and affairs of Nominal Defendant PCJV;

8         b.    Establishing policies and directives of Nominal Defendant PCJV;

9         c.    Approval of all compensation to "managers, executive offices, and key

10              personnel" of Nominal Defendant PCJV;

11        d.    "Approval of the Accounting System/Procedures/Software/Method" to be

12              used by Nominal Defendant PCJV;

13        e.    Approval of Nominal Defendant PCJV's budget "and any changes to it;"

14        f.    Approval of all franchising agreements, and lease agreements of Nominal

15              Defendant PCJV; and

16        g.    "Approval of all purchases and disbursements in excess of $10,000," and

17              any modifications to such payments.

18   43.    As alleged herein, pursuant to Section 3(j) of the JVA, one of the most significant

19   Management Powers, is the right of all seven individuals comprising the Management to be

20   presented with new Potato Corner store opportunities outside of Los Angeles and San Francisco

21   Counties ("New Store Corporate Opportunities"), and to decide if such stores would be owned and

22   operated by Nominal Defendant PCJV. If PCJV Management voted to pass on any particular New

23   Store Corporate Opportunities, only then could Defendant Koren, Jacoby, and Nemanim open a

24   store at that location, but only on the condition that it be operated as a franchise, subject to the

25   same terms and conditions as any other franchise of Nominal Defendant PCJV.

26   44.    Under Section 3(b) and 3(f) of the JVA, certain individuals named by the

27   Management would be appointed as "executive officers," who are entrusted with managing "the

28   business and property of the Company, and to market the business, in accordance with and

16544.2:9619218.1                    12

ERVIN COHEN ∷ JESSUP ⁘

1  pursuant to the directives of and policies set by the Management" of Nominal Defendant PCJV.

2  The JVA also identified the initial appointments to those officer positions:

3          a.    Chairman of the Board: Mr. Magsaysay, a Manager, and the Chief

4                Executive Officer of Plaintiff Cinco.

5          b.    President: Nemanim. The JVA also stated that "[a]t any given time, the

6                President shall be any one of the following members: Amit Nemanim, Guy

7                Koren or Amir Jacoby."

8          c.    Corporate Secretary: Non-Party Erlinda Bartolome.

9          d.    Treasurer: Mr. Montinola, a Manager.

10    45.    The JVA expressly authorizes PCJV Management to "recall and/or withdraw the

11  appointment of any executive officer, as it deems necessary." (Exh. A, JVA, § 3(f).)

12    46.    The JVA further delineates the duties of the President (Exh. A, § 3(i)), all of which

13  are covered by the umbrella requirement of "compl[iance] with the rules, policies and procedures

14  approved by the Management of the Company." These responsibilities include the following:

15         a.    "[M]anagement, operational, marketing, establishment, maintenance,

16                licensing and sublicensing with respect to the 'Potato Corner' outlets/stores

17                in the Territory," which was defined as being the United States and Israel,

18                outside of Los Angeles and San Francisco Counties.

19         b.    Using "best efforts at all times . . . to operate and maintain the 'Potato

20                Corner' outlets/stores in the Territory according to the highest standards

21                achievable consistent with the overall plan of the Management of the

22                Company."

23         c.    Maintenance of a "comprehensive system of records, books, and accounts,

24                with respect to the licensing and sublicensing activities, operation,

25                establishment, management, maintenance and other activities of the 'Potato

26                Corner' outlets in the Territory with the assistance of the Corporate

27                Secretary."

28  ///

16544.2:9619218.1                          13
VERIFIED THIRD AMENDED COMPLAINT

ERVIN COHEN & JESSUP

1       d.    Production of monthly "statements of receipts and disbursements, a

2             schedule of accounts receivable and payable, and a schedule of fees

3             collected and distributed together with a reconciled bank statement as of the

4             last day of the month" (the "Mandatory Monthly Financial Disclosure").

5       e.    Issuance of annual audited financial statements.

6       f.    Taking "such actions as may be necessary to comply promptly with any and

7             all laws, ordinances, orders or other requirements of any federal, state,

8             county, or municipal authority having jurisdiction of the Company and

9             affecting the Company" ("Legal Compliance").

10                      *The Master Services Agreement Between Nominal*

11                      *Defendant PCJV and the "LA Group."*

12      47.    In Section 3(i) of the JVA, it was agreed by all parties that Defendant Koren, Amir

13  Jacoby, and Nemanim (or a "corporation" designated by these three individuals) would be

14  compensated for their duties and obligations arising under that governing agreement, pursuant to a

15  "Master Services Agreement" ("MSA"), which was to be negotiated subsequent to the JVA.

16      48.    Attached hereto, and incorporated herein by reference, as Exhibit C, is a true and

17  correct copy of the MSA later executed on or around June 8, 2012, by all of the named individuals

18  comprising the Management of Nominal Defendant PCJV, in which, Defendant Koren, Jacoby,

19  and Nemanim reaffirmed their specific obligations set forth in the JVA – the duties conferred on

20  the President (which was to be one of the three of them) in Section 3(i) of the JVA, as well as the

21  New Store Corporate Opportunities obligation set forth in Section 3(j).

22      49.    Specifically, in the MSA (Exh. C), Defendant Koren, Jacoby, and Nemanim

23  expressly restated their obligations to satisfy the following responsibilities:

24      a.    "Conduct management, operations, marketing, establishment, maintenance,

25             licensing and sublicensing activities with respect to the 'Potato Corner'

26             outlets/stores in the Territory."

27      b.    "Use best efforts at all times to operate and maintain 'Potato Corner'

28             outlets/stores in the Territory according to the highest standards achievable

16544.2:9619218.1                        14

ERVIN COHEN ⊃ JESSUP ⁚

1    consistent with the overall plan of PCJV Management."

2        c.    "Advertise, market, and promote the Potato Corner outlets/stores with the

3    goal of causing public knowledge, awareness and patronage of the Potato

4    Corner outlets/stores."

5        d.    "Maintain a comprehensive system of records, books, and accounts, with

6    respect to the licensing and sublicensing activities, operation, establishment,

7    management, maintenance and other activities of the Potato Corner outlets

8    in the Territory with the assistance of the Corporate Secretary."

9        e.    Provide the Mandatory Monthly Financial Disclosure to PCJV

10    Management.

11        f.    Issuance of annual audited financial statements.

12        g.    Consistent with their fiduciary duties of care and loyalty, presentation to

13    Management of New Store Corporate Opportunities, so that the

14    Management can vote as to whether that New Store Corporate Opportunity

15    would be a Company Store, and, if not, and only then, could Defendants

16    Koren, Jacoby, and Nemanim have the right to build a store at that location,

17    "provided that [they] shall enter into a franchising agreement with PCJV,

18    and shall pay franchise fees and ongoing royalty fees as set forth in PCJV's

19    standard franchising agreement."

20        h.    Maintenance and protection of Confidential Information of PCJV, as

21    defined in the JVA and again in the MSA.

22        i.    Taking "such actions as may be necessary to comply promptly with any and

23    all laws, ordinances, orders or other requirements of any federal, state,

24    county, or municipal authority having jurisdiction of the Company and

25    affecting the Company" ("Legal Compliance").

26        50.    In the JVA, and again in the MSA, Plaintiff PCI, through its representatives, agreed

27    that, in satisfaction of Defendant Koren, Jacoby and Nemanim's duties under the MSA, Defendant

28    Koren, Jacoby and Nemanim would receive "consideration" through a "services fee equal to thirty

16544.2:9619218.1                                    15

ERVIN COHEN ⸱ JESSUP

1    (30%) percent of all initial/franchise fees and continuing royalty fees paid to/collected by the

2    Company" (the "Approved Management Fee").

3                    *Allocation of Fees Collected by and Profits*

4                       *Earned by Nominal Defendant PCJV*

5        51.    As set forth herein, the purpose of Nominal Defendant PCJV was established to

6    spread the Potato Corner Brand by franchising stores to third parties, or by operating stores owned

7    by Nominal Defendant PCJV ("Company Owned Stores").

8        52.    Income from franchise stores would be in the form of franchise fees and royalties

9    ("Franchise Fees and Royalties") whereas income from Company Owned Stores would be pure

10    profit to Nominal Defendant PCJV.

11        53.    The JVA set forth a formula by which the income of Nominal Defendant PCJV is

12    allocated. Specifically, Franchise Fees and Royalties are to be distributed as follows: 30% payable

13    to Plaintiff Cinco pursuant to the Approved License Fee, 30% payable to Defendants Koren,

14    Jacoby, and Nemanim pursuant to the Approved Management Fee, and the remainder distributed

15    as profit: 60% to Plaintiff PCI, and the remainder of the 40% distributed to Defendants Koren,

16    Jacoby, and Nemanim.

17        54.    All other profit of Nominal Defendant PCJV was to be distributed as follows: 60%

18    to Plaintiff PCI, and the remainder of the 40% distributed to Defendants Koren, Jacoby and

19    Nemanim.

20        55.    As of the date of this Amended Complaint, neither of the Plaintiffs have ever

21    received a single cent of Approved License Fees or profit, whereas Defendant Koren, and the

22    Koren Affiliate Defendants, have received substantial income. The only way Defendants have

23    been able to earn income has been through the abuse of, and brazen disregard for, Defendant

24    Koren's fiduciary duties required under law, and those that are expressly stated throughout the

25    JVA and MSA.

26        56.    Relief from Defendant Koren's knowing repudiation of his fiduciary, legal, and

27    contractual duties, are at issue and sought herein.

28    / / /

ERVIN COHEN & JESSUP

*Koren Becomes President in 2012, Which Sets in Motion his Plan to Wrest Control Of, and Abuse his Duties to Plaintiffs and Nominal Defendant PCJV*

57.    In or around October of 2012, PCJV Management approved the replacement of Nemanim as President by Defendant Koren. At the same time, Nemanim withdrew from Nominal Party PCJV Management as an owner of Membership Interests.

58.    As the result of these changes, the owners of Membership Interests in Nominal Party PCJV became, and remain to this day, as follows: Plaintiff PCI owns 60% of the Membership Interests, whereas the remaining 40% equity of Nominal Party PCJV is owned by Defendant Koren and Amir Jacoby.

59.    From 2012 onwards, and continuing through the present, Defendant Koren has abused his authority, and fiduciary duties, as President.

60.    As explained herein, and as will be proven at trial, Defendant Koren's plan was to divert Nominal Defendant opportunities and resources for his own benefit, and the benefit of the Koren Affiliate Defendants, in the form of opening Potato Corner Store Opportunities without fully disclosing to and seeking approval from Nominal Defendant PCJV Management for either (1) opening the store in the first place (instead of a Company Owned Store), and/or (2) the terms of the relationship between the Koren Affiliate Defendant owned stores and PCJV.

61.    After opening these stores (some of which were opened without approval from Management as alleged above), Defendant Koren treated his own stores preferentially, to the detriment of the other third party franchisees, by using Nominal Defendant PCJV resources, capital, and attention to benefit and favor those Koren Affiliate Defendant-owned stores – effectively treating them as Company Owned Stores (except that Nominal Defendant PCJV did not receive the financial benefits and profits of those stores). Indeed, Plaintiffs are informed, and believe, and thereon allege, that Defendant Koren even referred to these stores owned by the Koren Affiliate Defendants as "Company-Owned Stores."

62.    Defendant Koren's self-dealing with respect to the stores owned by the Koren Affiliate Defendants went even further.

///

ERVIN COHEN & JESSUP

1    63.    For example, each of the PCJV franchisees are obligated to pay 2% of their income
2  into a "marketing fund," which, pooled together is to be used to market all of the PCJV
3  franchisees. Without seeking approval from, or disclosing to, PCJV Management, Defendant
4  Koren waived, on behalf of PCJV, marketing fund fees owed by the Koren Affiliate Defendants,
5  while requiring the other franchisees to continue paying into that fund. Even worse, Defendant
6  Koren caused the Nominal Defendant PCJV's marketing fund to be used to promote and market
7  the Koren Affiliate Defendant stores preferentially and disproportionately, even though they were
8  not paying into that account. This preferential and self-interested use of the PCJV marketing fund
9  was also never disclosed to or approved by PCJV Management. Put simply, Defendant Koren was
10  forcing third party franchisees to pay for the marketing of his own stores.

11    64.    Defendant Koren's self-dealing extended into other transactions. For example, as
12  alleged herein, the separate company PCIT, also managed by Defendant Koren, was responsible
13  for selling supplies to the American Potato Corner stores. Defendant Koren caused PCIT to sell
14  supplies at cost (with a heavy discount) to the Koren Affiliate Stores, while charging the third-
15  party franchisees to pay market prices – or sometimes even above market prices.

16    65.    Defendant Koren also caused Nominal Defendant PCJV to agree to waive franchise
17  fees and royalties owed by the Koren Affiliate Stores. The only such waivers that were presented
18  to, and approved by, PCJV Management, arose from the first two Koren Affiliate Defendant
19  stores, and those waivers were not to be in perpetuity.

20    66.    The other third-party franchisees of Nominal Defendant PCJV did not receive this
21  same preferential treatment granted to those owned by the Koren Affiliate Defendants. Plaintiffs
22  are informed and believe and thereon allege that these third-party franchise stores suffered as the
23  result of the preferential treatment given to the Koren Affiliate Defendants. Plaintiffs are further
24  informed and believe, and thereon allege that, as the result of this preferential treatment, Nominal
25  Defendant PCJV was forced to waive franchise and royalty fees from these other third-party
26  franchisees, so as to allow them to survive under these austere conditions.

27    67.    As a result of this preferential treatment, fees and profits earned by Nominal
28  Defendant PCJV have been depressed, preventing payment of Approved License Fees and profits

16544.2:9619218.1                18

ERVIN COHEN & JESSUP

1  to Plaintiffs, whereas Koren-Affiliate Defendant owned stores have received unreimbursed

2  resources and benefits from Nominal Defendant PCJV, as well as waived fees and royalties,

3  earning profits to those stores that Defendant Koren and his affiliates took for themselves. Again,

4  this kind of preferential treatment, to the detriment of other third-party franchisees, provided by

5  Defendant Koren to the Koren Affiliate Defendants was not approved by PCJV Management, let

6  alone a disinterested majority of the Managers.

*The JVA is Amended, However, there is No Meeting of*

*the Minds as to the Intent of the Amended Terms*

9       68.     In or around October of 2012, the JVA was Amended, pursuant to an Amended

10  Joint Venture Agreement ("AJVA"), which is attached hereto as Exhibit D.

11       69.     The AJVA recognizes and acknowledges that Plaintiff PCI is the holder of the 60%

12  equity of Nominal Defendant PCJV. The AJVA also recognizes the removal of Non-Party

13  Nemanim from Nominal Defendant PCJV. These terms are not in dispute.

14       70.     Most of the provisions of the AJVA remain unchanged from the JVA.

15       71.     The principal term to have materially changed from the JVA to the AJVA, was

16  Section 3(c), identifying the specific individuals to serve as executive officers. In addition to

17  naming Defendant Koren as the President, the AJVA, Section 3(c) also inserted the following

18  vague language: "Any change in these mentioned executive officers will require a vote of 75% of

19  members' interests."

20       72.     The purpose of this new language was to protect executive officers from unilateral

21  action of Plaintiff PCI, given that, section 3(f) allowed Management to hire and fire executive

22  officers. Because Plaintiff PCI has the unilateral right to name four of the seven individuals

23  comprising Management, Defendant Koren expressed his concern that Plaintiff PCI could

24  effectively dictate who serves as Executive Officers. As a concession to Defendant Koren,

25  Plaintiff PCI agreed that a supermajority of equity owners holding Membership Interests

26  (i.e. Plaintiff PCI plus one of the other owners of Membership Interests, Jacoby or Defendant

27  Koren) would be required to decide whether an Executive Officer should be hired or fired.

28  ///

16544.2:9619218.1                    19

VERIFIED THIRD AMENDED COMPLAINT

ERVIN COHEN ⸱ JESSUP

1    73.    Plaintiff PCI and Amir Jacoby, on the one hand, and Defendant Koren, on the
2  other, possessed a different intent as to what this new Section 3(c) means.

3    74.    While Plaintiff PCI and Jacoby intended, upon execution of the AJVA, that, among
4  other things, replacement of Executive Officers required a 75% vote of the holders of Membership
5  Interests in Nominal Defendant PCJV, Defendant Koren apparently believed and intended that
6  replacement of Executive Officers required a 75% vote of the Management (6 out of 7 Managers),
7  and, further, that he possessed the sole authority to name three of the seven individuals comprising
8  the Management, thus, effectively insulating himself from ever being terminated or replaced as
9  President.

10    75.    Plaintiff PCI would never have agreed to give Defendant Koren the right to serve
11  as President in perpetuity, nor did they ever intend for that interpretation of this vague term.

12    76.    These interpretations of the new Section 3(c) are so irreconcilable that they
13  evidence the failure of any meeting of the minds between the signatories to the AJVA, such that
14  this term cannot be enforced.

15    77.    Despite the absence of any meeting of the minds as to Section 3(c) of the AJVA,
16  Defendant Koren has nevertheless taken the position that this unenforceable term has protected
17  him from termination as President, unless six out of seven of the individuals comprising the
18  Management of Nominal Defendant PCJV agree. Given Defendant Koren's claim that he also
19  possesses the unilateral right to name three out of the seven individuals comprising the
20  Management of Nominal Defendant PCJV, this interpretation of the AJVA would insulate him
21  from termination unless he, or his handpicked Managers agree.

22    78.    Despite the absence of any meeting of the minds as to the AJVA, Defendant Koren
23  has nevertheless imposed his unilateral and disputed interpretation of this unenforceable term from
24  the AJVA upon Plaintiff PCI, thus blocking his termination as President of Nominal Defendant
25  PCJV, even in the face of the egregious and brazen self-dealing and wrongful conduct at issue
26  herein.

27  / / /
28  / / /

ERVIN COHEN & JESSUP

20

1 | ***Defendant Koren Conceals his Wrongdoing by Failing to Satisfy***

2 | ***his Obligations of Financial Disclosure and Transparency***

3 | 79.    From his installation as President, to the present, and continuing as of the filing of

4 | this Amended Complaint, Defendant Koren has concealed from Nominal Defendant PCJV, and

5 | Plaintiffs, his self-dealing, and breaches of fiduciary duties of good faith and care, as well as his

6 | other legal and contractual duties.

7 | 80.    Defendant Koren accomplished the concealment of his wrongdoing by, among

8 | other things:

9 |     a.    Failing to disclose, and seek approval from a disinterested majority of

10 |     Management, for each of the self-dealing transactions alleged herein.

11 |     b.    Failing to provide the detailed Mandatory Monthly Financial Disclosures to

12 |     Nominal Defendant Management, as required by Section 3(i)(iv) of the

13 |     JVA.

14 |     c.    Failing to provide annual audited financial statements as required by

15 |     Section 3(i)(v) of the JVA.

16 |     d.    Causing knowingly false statements to be included in the consolidated

17 |     financial statement covering 2015-2017. Plaintiffs only recently realized the

18 |     falsity of the representations contained in that audited financial statement.

19 |     e.    Failing to comply with and ignoring recent directives of PCJV Management

20 |     demanding a five-year plan.

21 | 81.    Plaintiff PCI only began to learn of the wrongful acts being committed by

22 | Defendant Koren in the Spring of 2018, when, for a temporary period, Plaintiff PCI operated the

23 | day to day business of PCJV.

24 | ***Defendant Koren Takes New Store Opportunities***

25 | ***for Himself and Koren Affiliate Defendants***

26 | 82.    From the opening of the Santa Anita Potato Corner Store through the present only

27 | 46 Potato Corner Stores have been opened in the United States, twelve of which have since closed.

28 | / / /

ERVIN COHEN · JESSUP

1 This is woefully below what Plaintiffs ever expected when entering into the Nominal Defendant
2 PCJV transaction with Defendant Koren.

3     83.     Not one of the 46 Potato Corner Stores have been opened as Company Stores,
4 owned and operated by Nominal Defendant PCJV, with profits and earnings owned by Nominal
5 Defendant PCJV. Instead, 37 of those stores were opened by third-party franchisees, whereas nine
6 were opened by Koren Affiliate Defendants. Out of the nine stores opened by the Koren Affiliate
7 Defendants, five have been purchased from existing Nominal Defendant PCJV's Franchisees, the
8 purchase of which was never disclosed to or approved by PCJV Management.

9     84.     Nine of the United States Potato Corner Stores have been opened by Defendant
10 Koren, through his Defendant Affiliates (as collectively referred to herein). Those Defendant
11 Affiliates, and their corresponding stores, are as follows.

12         a.     On February 7, 2010, Defendant NKM Capital Group, LLC, an affiliate of
13             Defendant Koren in which neither Plaintiff possesses any Membership
14             Interest or governance rights whatsoever, opened the first Santa Anita
15             Potato Corner Store.

16         b.     On December 15, 2010, Defendant J&K Americana, LLC, an affiliate of
17             Defendant Koren in which neither Plaintiff possesses any Membership
18             Interest or governance rights whatsoever, opened the Potato Corner Store at
19             the Americana Mall in Glendale, California.

20         c.     On January 26, 2013, Defendant J&K Culver, LLC, an affiliate of
21             Defendant Koren in which neither Plaintiff possesses any Membership
22             Interest or governance rights whatsoever, opened the Potato Corner Store in
23             Culver City, California.

24         d.     On October 20, 2013, Defendant J&K Lakewood, LLC, an affiliate of
25             Defendant Koren in which neither Plaintiff possesses any Membership
26             Interest or governance rights whatsoever, opened the Potato Corner Store in
27             Lakewood, California.

28   / / /

ERVIN COHEN & JESSUP

VERIFIED THIRD AMENDED COMPLAINT

e. On May 13, 2014, Defendant J&K Oakridge, LLC, an affiliate of Defendant Koren in which neither Plaintiff possesses any Membership Interest or governance rights whatsoever, opened the Potato Corner Store in San Jose, California.

f. Also, on May 13, 2014, Defendant J&K Valley Fair, LLC, an affiliate of Defendant Koren in which neither Plaintiff possesses any Membership Interest or governance rights whatsoever, opened the Potato Corner Store in Santa Clara, California.

g. On July 24, 2014, Defendant J&K 2, LLC, an affiliate of Defendant Koren in which neither Plaintiff possesses any Membership Interest or governance rights whatsoever, opened the Potato Corner Store in Sherman Oaks, California. This Potato Corner Store closed on January 8, 2017.

h. On July 23, 2016, Defendant NKM Capital Group, LLC opened a second store in Arcadia ("Santa Anita #2").

i. On July 25, 2017, Defendant Koren caused the creation of J&K PC Trucks, LLC in or around July 25, 2017, for the purpose of establishing a Potato Corner food truck, without having presented this opportunity to Nominal Defendant PCJV.

j. On February 25, 2018, just months before this dispute erupted, Defendant J&K Ontario, LLC, an affiliate of Defendant Koren in which neither Plaintiff possesses any Membership Interest or governance rights whatsoever, opened the Potato Corner Store in Ontario, California.

85.     Plaintiffs are informed, and believe, and thereon allege that not one of the Potato Corner Stores outside of Los Angeles County or San Francisco County were presented for approval, consideration, and a vote, by the Management of Nominal Defendant PCJV (let alone a disinterested majority of Management), as required by the JVA, MSA, and AJVA.

86.     With respect to each of the nine stores owned by Defendant Koren and his Defendant Affiliates, Defendant Koren failed to disclose to, or seek approval from a disinterested

ERVIN COHEN & JESSUP

1  majority of the Management of Nominal Defendant PCJV, as to some or all of the following self-
2  interested transactions:

3        a.    Defendant Koren's waiver of franchise fees, marketing fund contributions,
4            and royalties due and owing to Nominal Defendant PCJV from the
5            Defendant Koren Affiliates arising from their ownership of Potato Corner
6            franchises.

7        b.    Defendant Koren's preferential diversion of unreimbursed Nominal
8            Defendant PCJV human, financial and other resources for the benefit of
9            these nine stores owned by the Defendant Koren Affiliates, to the exclusion,
10           and detriment of the other 37 PCJV franchisees owned by third-parties.

11        c.    Defendant Koren's sale of supplies "at cost" from PCIT to Potato Corner
12           Stores owned by Defendant Koren Affiliates, whereas the other PCJV
13           franchisees were required to pay market or above market prices.

14    87.    Accordingly, Defendant Koren wrongfully diverted New Store Opportunities, and,
15  upon opening these and the other Koren Affiliate Defendant stores, Defendant Koren treated the
16  Koren Affiliate Defendant Stores as PCJV Company Owned Stores – giving these stores all the
17  benefits and resources of Nominal Defendant PCJV – without treating them as PCJV Company
18  Owned Stores for the purpose of profits. In essence, Defendant Koren and the Koren Affiliate
19  Defendants reaped all of the rewards and profits of the New Store Opportunities and other
20  franchises, without reimbursing Nominal Defendant PCJV for the resources contributed to, or at
21  least the profits earned from these Koren Affiliate Defendant-owned stores, let alone the franchise
22  and royalties owed by these outlets.

23    88.    Put simply, Nominal Defendant PCJV has not received one penny in the form of
24  fees, royalties, reimbursement, or profit, from any of the stores owned by Defendant Koren's
25  Affiliates, nor did Nominal Defendant PCJV's Management approve the opening of all of these
26  New Store Opportunities by all of Koren Affiliate Defendants or approve of Defendant Koren's
27  self-dealing transactions with the Koren Affiliate Defendants.

28  ///

ERVIN COHEN & JESSUP

1    89.    The net result of Koren's diversion of corporate opportunities, self-dealing, and
2    preferential treatment of his stores to the detriment of other PCJV franchisees, has caused the
3    Koren Affiliate Defendant stores to be some of the strongest among PCJV's franchisees, whereas
4    the third-party franchisees have struggled under this disparate treatment.

5    ***Defendant Koren's Brazen, Self-Dealing, and Void "Services Agreement," Which***
6    ***Diverted Nominal Defendant PCJV Profits to Himself, While Plaintiffs Waived Their Fees***

7    90.    On July 13, 2013, at a meeting of the PCJV Management, Defendant Koren, as
8    President, Manager, and Member of Nominal Defendant PCJV reported to Plaintiff PCI, and the
9    Management, that Nominal Defendant PCJV's income from fees and royalties was insufficiently
10   high to support payment of the Approved License Fee. Specifically, Defendant Koren reported
11   that due to financial constraints, Nominal Defendant PCJV may slow down operations.

12   91.    As the result of Defendant Koren's disclosure regarding the financial health of
13   Nominal Defendant PCJV, Plaintiffs agreed to waive the Approved License Fee, a waiver that was
14   subsequently repeated by Plaintiffs annually. Plaintiffs agreed to waive this income based on
15   Defendant Koren's representation that he and Amir Jacoby would correspondingly also waive
16   Approved Management Fees agreed to in the JVA and MSA.

17   92.    Despite owing fiduciary, legal, and contractual duties to Plaintiffs and Nominal
18   Defendant PCJV, at no point did Defendant Koren disclose facts material to Plaintiffs' agreement
19   to waive these Approved License Fees. An example of material facts not disclosed to Management
20   of PCJV, as well as Plaintiffs, included the fact that Defendant Koren was using Nominal
21   Defendant PCJV resources for the benefit of Koren Affiliate Defendants, while simultaneously
22   causing Koren Affiliate Defendants to be relieved of their duties to pay franchise and royalty fees,
23   as well as market prices for supplies. Had Defendant Koren disclosed these material facts,
24   Plaintiffs would never have agreed to waive Approved License Fees.

25   93.    When seeking these waivers and representing that Defendant Koren would cause
26   the Approved Management Fee to also be waived, Defendant Koren failed to disclose that he
27   would secretly cause Nominal Defendant PCJV to divert other PCJV funds for his benefit without
28   approval by Nominal Defendant PCJV Management. Had Defendant Koren disclosed this intent to

16544.2:9619218.1                              25

ERVIN COHEN & JESSUP

1  divert funds of Nominal Defendant PCJV for his benefit, Plaintiffs would never have agreed to
2  waive Approved License Fees.

3      94.      The most brazen step in Defendant Koren's scheme to divert funds from Nominal
4  Defendant PCJV was taken on January 1, 2017, when Defendant Koren executed a "Services
5  Agreement," a copy of which is attached hereto as Exhibit E.

6      95.      In this voidable "Services Agreement," dated January 1, 2017, Defendant Koren
7  and Jacoby agreed to provide the services that they had already agreed to provide in the MSA, in
8  exchange for an annual "management fee" of $240,000 payable by Nominal Defendant PCJV to
9  Defendant Koren and Jacoby. Put simply, the "Services Agreement" increased the fee payable to
10 the LA Group, without offering any consideration other than that to which the LA Group was
11 already supposed to deliver.

12     96.      Defendant Koren signed this voidable "Services Agreement" transferring funds
13 from Nominal Defendant PCJV to himself, however, shockingly, Defendant Koren signed this
14 document on behalf of Nominal Defendant PCJV, even though he failed to ever disclose the
15 "Services Agreement" to, or obtain approval for that transaction from, the Management of
16 Nominal Defendant PCJV.

17     97.      Accordingly, Defendant Koren did not possess the authority to enter into that
18 "Services Agreement," and executed that document based upon deceit, and a wholesale violation
19 of his fiduciary, legal, and contractual duties. Moreover, because the "Services Agreement"
20 contained a promise by Defendant Koren and Jacoby to deliver the same services they had already
21 contracted to provide, there was no consideration provided to Nominal Defendant PCJV, such that
22 the Services Agreement fails for lack of consideration.

23     98.      At no point, from January 1, 2017 through the present, did Defendant Koren
24 disclose his self-dealing "Services Agreement" to Nominal Defendant PCJV Management, or
25 Plaintiffs. During the pendency of this "Services Agreement," in which Defendant Koren was
26 diverting Nominal Defendant PCJV funds to himself, Plaintiffs continued to agree to waive rights
27 to Approved License Fees. Had Plaintiffs known about the "Services Agreement," they would
28 never have agreed to waive payment of any fees, royalties, or profits of Nominal Defendant PCJV.

16544.2:9619218.1                                    26

ERVIN COHEN & JESSUP

1    99.    This "Services Agreement" was only discovered by a Plaintiff Cinco internal audit
2  group in the Spring of 2018 (conducted during a temporary period in which Defendant Koren was
3  not serving as President of Nominal Defendant PCJV).

4    100.    Plaintiffs are informed and believe, and thereon allege, that Defendant Koren has
5  entered into other secret agreements, including "Services Agreement" such as the one reflected in
6  Exhibit E for the years 2015 and 2016. Plaintiffs are informed and believe and thereon allege that
7  these additional void Services Agreement were signed by Defendant Koren on behalf of Nominal
8  Defendant PCJV, without having disclosed those transactions to, or obtained approval from PCJV
9  Management.

10    101.    Plaintiffs are informed and believe, and thereon allege that, Defendant Koren was
11  diverting substantial sums from Nominal Defendant to himself, in the form of unapproved
12  "management fees" in 2015 and 2016, as well as the 2017 and 2018 fees alleged herein pursuant to
13  the "Services Agreement."

14    102.    At the same time these illegal, and unapproved, self-dealing transactions took
15  place, whereby Defendant Koren was diverting funds to himself, Plaintiffs were waiving their
16  rights to fees and profits, based upon Defendant Koren's representations regarding the financial
17  condition of Nominal Defendant PCJV.

18              ***Other Breaches of Fiduciary, Contractual, and Legal Duties Owed***
19              ***by Defendant Koren to Plaintiffs and Nominal Defendant PCJV***

20    103.    Unsatisfied with diverting Nominal Defendant PCJV funds and resources to
21  himself, and the Koren Affiliate Defendants, for his own benefit, under false and fraudulent
22  pretenses, in violation of his fiduciary, contractual and legal duties, Defendant Koren has engaged
23  in numerous other breaches of contractual, fiduciary, and legal duties. A non-exclusive list of
24  these breaches and wrongful acts are as follows:

25              a.    On March 26, 2018, Defendant Koren withdrew more $1,000,000 from a
26                    bank account of Nominal Defendant PCJV, without obtaining approval
27                    from the Management, as required under the JVA. These funds were then
28  ///

ERVIN COHEN ⁞ JESSUP

1   transferred to a new bank account which he unilaterally opened without

2   approval from the Management.

3   b.   Defendant Koren has authorized bonuses and compensation packages to

4        Nominal Defendant PCJV staff and contractors, without seeking approval

5        from the Management, as required under the JVA. For example, within the

6        last year, Non-Party Thomas Hodgson – who serves an operations role at

7        Nominal Defendant PCJV – was paid an unapproved bonus of $60,000.

8   c.   Defendant Koren has caused flagrant violations of basic franchise rules and

9        regulations in California, which has subjected Nominal Defendant to

10       needless expense, scrutiny, investigation, and other injuries.

11   d.   Defendant Koren has caused Nominal Defendant PCJV to ignore and fail to

12       sufficiently support third party franchisees, in a manner that has caused

13       injury to the goodwill, reputation, and income of Nominal Defendant PCJV.

14   e.   Defendant Koren has entered into other contracts, including a lease

15       agreement, without seeking approval from PCJV Management.

16   f.   Defendant Koren has failed to use his "best efforts at all times . . . to operate

17       and maintain the 'Potato Corner' outlets/stores in the Territory according to

18       the highest standards achievable consistent with the overall plan of the

19       Management of the Company." This failure has caused PCJV franchises

20       and the Potato Corner Brand to suffer.

21   g.   Defendant Koren has failed to "[a]dvertise, market, and promote the Potato

22       Corner outlets/stores with the goal of causing public knowledge, awareness

23       and patronage of the Potato Corner outlets/stores." Indeed, Defendant

24       Koren's failures have depressed the expansion of Potato Corner to levels

25       that fall well below what he promised and what Plaintiffs expected when

26       beginning this venture.

27   h.   Defendant Koren has failed to protect the confidential information of

28       Plaintiffs, as required by the governing agreements.

16544.2:9619218.1

28

VERIFIED THIRD AMENDED COMPLAINT

ERVIN COHEN ᴚ JESSUP ᴚ

1          i.    Defendant Koren has refused access to Nominal Defendant PCJV books

2          and records, as well as Nominal Defendant PCJV offices.

3          j.    Defendant Koren harassed and threatened representatives of Plaintiff Cinco

4          and Plaintiff PCI at Nominal Defendant PCJV's Office in April 2018.

5          k.    Defendant Koren's personnel broke into, and wrongfully removed

6          documents and records from Nominal Defendant PCJV's office on April 30,

7          2018, during a period in which he was not President.

8          l.    In Summer of 2018, Defendant Koren caused Nominal Defendant PCJV to

9          break contracts with contractors hired by Plaintiffs during the short period

10          in which Defendant Koren was removed as President, in a manner that has

11          injured Nominal Defendant PCJV goodwill. Defendant Koren did so as a

12          form of revenge to those contractors who elected to work with Plaintiffs

13          during the short period in which they were operating PCJV.

14     104.    The above list of fiduciary and contract breaches, waste, and mismanagement by

15  Defendant Koren is necessarily incomplete, given Defendant Koren's concealment of his

16  wrongdoing from Nominal Defendant PCJV Management, as well as the majority owner, Plaintiff

17  PCI.

18         ***Defendant Koren Takes the Outrageous and Unsupportable Position that He and***

19         ***Jacoby Are Entitled to Majority Equity Ownership of Nominal Defendant PCJV***

20     105.    The governing agreements of Nominal Defendant PCJV grant to the holders of

21  equity in Nominal Defendant PCJV the right of first refusal should that owner of Membership

22  Interests wish to sell or transfer its ownership.

23     106.    As alleged herein, Plaintiff PCI is the undisputed owner of 60% of the Membership

24  Interests in Nominal Defendant PCJV. At no point has Plaintiff PCI ever transferred its

25  Membership Interests in Nominal Defendant PCJV to any person whatsoever.

26     107.    Plaintiff PCI is owned by the separate and distinct entity, Plaintiff Cinco. Plaintiff

27  Cinco does not possess any Membership Interests in Nominal Defendant PCJV as the equity is

28  held solely by Plaintiff PCI. Plaintiff Cinco possesses no other interests, rights, equity, or other

ERVIN COHEN & JESSUP

1  transferrable interests in Nominal Defendant PCJV, the JVA, or any other aspect of Nominal
2  Defendant PCJV.

3      108.    Despite this simple corporate structure, Defendant Koren has taken the outrageous
4  position that the acquisition of shares by a new shareholder of Plaintiff Cinco – the corporate
5  parent of Plaintiff PCI – somehow triggered the right of first refusal to which Plaintiff Cinco's
6  subsidiary is obligated. It appears, then, that Defendant Koren believes that any acquisition of
7  stock in Plaintiff Cinco effects a transfer of Plaintiff PCI's equity or interests in PCJV, even
8  though Plaintiffs Cinco and PCI are entirely different and separate entities. This claim makes no
9  sense and is contrary to basic corporate law.

10     109.    The reason for Defendant Koren's nonsensical position was confirmed in
11  correspondence from Defendant Koren's counsel in August of 2018, indicating that Defendant
12  Koren's is relying upon this unsupportable and outrageous claim to argue that Plaintiff PCI is now
13  a minority owner of Nominal Defendant PCJV, and, moreover, that Plaintiff PCI is no longer
14  entitled to name four members of the Management of Nominal Defendant PCJV. Defendant Koren
15  has bootstrapped this frivolous accusation into a baseless, malicious, and self-dealing claim for
16  majority ownership and control over Nominal Defendant PCJV.

17     110.    Defendant Koren's frivolous claim to a majority stake in Nominal Defendant PCJV
18  equity and governance has frozen Nominal Defendant PCJV's governance, as Defendant Koren is
19  now refusing to recognize Plaintiff PCI as the majority owner, and is frivolously objecting to
20  Plaintiff PCI's right to name a majority of the individuals comprising the Management of Nominal
21  Defendant PCJV.

22          *The Futility of Presentation of Claims Held by Nominal*
23          *Defendant PCJV to the Management for Prosecution*

24     111.    As of the filing of this Amended Complaint, the Management of Nominal
25  Defendant PCJV is comprised of seven individuals: four of which were named by Plaintiff PCI.

26     112.    Despite Plaintiff PCI's obvious control over a majority of the Management of
27  Nominal Defendant PCJV, Defendant Koren has repudiated, rejected, and is unwilling to
28  ///

ERVIN COHEN ∴ JESSUP

1  recognize Plaintiff PCI's right to control a majority of the Management of Nominal Defendant
2  PCJV.

3      113.    Defendant Koren refuses to recognize Plaintiff PCI's right to name a majority of
4  the Management of Nominal Defendant PCJV based on his frivolous and unsupportable position
5  that Plaintiff PCI somehow transferred its equity in Nominal Defendant PCJV when Plaintiff
6  PCI's corporate parent sold stock to a third party.

7      114.    Based on the foregoing, any attempt by Plaintiff PCI to make a demand on the
8  Management of Nominal Defendant PCJV to pursue its valid claims against Defendant Koren
9  would be futile, as any vote of the Management would be disputed, rejected, and repudiated by
10  Defendant Koren.

11  **FIRST CAUSE OF ACTION FOR DECLARATORY RELIEF**

12  **(By Plaintiffs Against Defendants Koren and Potato Corner LA Group, LLC)**

13      115.    Plaintiffs re-allege and incorporate by reference the allegations of the preceding
14  paragraphs of this Amended Complaint as if fully set forth herein.

15      116.    An actual dispute and controversy has arisen and now exists between Plaintiffs and
16  Defendants Koren as to:

17          a.    Whether Plaintiff Cinco possesses any Membership Interests in, equity of,
18              or transferrable rights to, Nominal Defendant PCJV.

19          b.    Whether a third party's recent acquisition of stock from Plaintiff Cinco
20              triggered any right of first refusal by Defendants Koren and/or Potato
21              Corner LA Group, LLC or Jacoby.

22          c.    Whether Defendants Koren and Potato Corner LA Group, LLC or Jacoby
23              have any right, claim, or legitimate basis to demand ownership of or rights
24              to any of Plaintiff PCI's 60% Membership Interests in Nominal Defendant
25              PCJV.

26          d.    Whether Plaintiff PCI remains the rightful owner of 60% of the
27              Membership Interests in Nominal Defendant PCJV.

28  / / /

16544.2:9619218.1                    31

ERVIN COHEN ᾽ JESSUP

1    117.    A judicial declaration is necessary and appropriate at this time under these

2    circumstances.

3    118.    Accordingly, Plaintiffs seek judicial declarations that:

4        a.    Plaintiff Cinco possesses no Membership Interests in, equity of, or

5              transferrable rights to, Nominal Defendant PCJV, other than its right to

6              receive royalties from PCJV.

7        b.    A third party's recent acquisition of stock from Plaintiff Cinco did not

8              trigger any right of first refusal by Defendants Koren and Potato Corner LA

9              Group, LLC or Jacoby.

10        c.    Neither Defendant Koren, Defendant Potato Corner LA Group, LLC, nor

11              Jacoby have any right, claim, or legitimate basis for demand to own any of

12              Plaintiff PCI's 60% Membership Interests in Nominal Defendant PCJV.

13        d.    Plaintiff PCI remains the rightful and sole owner of 60% of the Membership

14              Interests in Nominal Defendant PCJV.

15        **SECOND CAUSE OF ACTION FOR DECLARATORY RELIEF**

16    **(By Plaintiff PCI Against Defendants Koren and Potato Corner LA Group, LLC)**

17    119.    Plaintiff PCI re-alleges and incorporates by reference the allegations of the

18    preceding paragraphs of this Amended Complaint as if fully set forth herein.

19    120.    An actual dispute and controversy has arisen and now exists as to:

20        a.    Whether Plaintiff PCI possesses the right to name four of the seven

21              individuals constituting the Management of Nominal Defendant PCI.

22        b.    Whether Defendant Koren has the right to appoint any of the four seats of

23              Nominal Defendant's PCJV Management, which are allocated to Plaintiff

24              PCI under the JVA and/or AJVA.

25        c.    Whether Plaintiff PCI controls a majority of Management of Nominal

26              Defendant PCJV.

27    121.    A judicial declaration is necessary and appropriate at this time under these

28    circumstances.

ERVIN COHEN ∴ JESSUP

1    122.    Accordingly, Plaintiff PCI seeks judicial declarations that:

2         a.    Plaintiff PCI possesses the right to name four of the seven individuals

3              constituting the Management of Nominal Defendant PCI.

4         b.    Defendant Koren has no right to appoint any of the four seats of Nominal

5              Defendant's PCJV Management, which are allocated to Plaintiff PCI under

6              the JVA and/or AJVA.

7              **THIRD CAUSE OF ACTION FOR DECLARATORY RELIEF**

8                   **(By Plaintiff PCI Against Defendant Koren)**

9    123.    Plaintiff PCI re-alleges and incorporates by reference the allegations of the

10    preceding paragraphs of this Amended Complaint as if fully set forth herein.

11    124.    An actual dispute and controversy has arisen and now exists as to:

12         a.    Whether Section 3(c) of the AJVA (Exhibit D), stating that "[a]ny change in

13              these mentioned executive officers will require a vote of 75% of members'

14              interests," refers to (i) 75% of the Membership Interests held by the owners

15              of equity of Nominal Defendant PCJV; (ii) 75% of the votes of the

16              individuals comprising Management, or (iii) is unenforceable.

17         b.    Whether a majority of the individuals comprising PCJV Management may

18              terminate Defendant Koren as President of Nominal Defendant PCJV.

19    125.    A judicial declaration is necessary and appropriate at this time under these

20    circumstances.

21    126.    Accordingly, Plaintiffs seek judicial declarations that:

22         a.    Section 3(c) of the AJVA (Exhibit D), stating that "[a]ny change in these

23              mentioned executive officers will require a vote of 75% of members'

24              interests," either refers to 75% of the Membership Interests held by the

25              owners of equity of Nominal Defendant PCJV, or is unenforceable.

26         b.    A majority of the individuals comprising PCJV Management may terminate

27              Defendant Koren as President of Nominal Defendant PCJV.

28    / / /

ERVIN COHEN & JESSUP

1

**FOURTH CAUSE OF ACTION FOR DECLARATORY RELIEF**

2

**(By Plaintiff PCI Against Defendants Koren and Potato Corner LA Group, LLC)**

3    127.    Plaintiff PCI re-alleges and incorporates by reference the allegations of the

4    preceding paragraphs of this Amended Complaint as if fully set forth herein.

5    128.    Plaintiff is informed and believes and thereon alleges that Defendant Koren has

6    transferred his membership interest in PCJV to Potato Corner LA Group, LLC in violation of the

7    right of first refusal. Plaintiff is also informed and believes and thereon alleges that Defendant

8    Koren has now taken the position that the right to name three seats of PCJV Management

9    allocated to the "LA Group" in the governing documents, has been transferred to Potato Corner

10    LA Group, LLC, in violation of the governing agreements.

11    129.    An actual dispute and controversy has arisen and now exists as to:

12            a.    Whether Koren's transfer of membership interests in PCJV to Potato Corner

13                  LA Group, LLC has breached the right of first refusal, entitling Plaintiff

14                  PCI to the right to acquire those interests.

15            b.    Whether Potato Corner LA Group LLC possesses any membership interest

16                  or equity of PCJV.

17            c.    Whether Potato Corner LA Group LLC possesses any right to name any or

18                  all of the three seats of PCJV Management allocated to the "LA Group" in

19                  the JVA and AJVA.

20    130.    A judicial declaration is necessary and appropriate at this time under these

21    circumstances.

22    131.    Accordingly, Plaintiff PCI seeks judicial declarations that:

23            a.    Koren's transfer of membership interests in PCJV to Potato Corner LA

24                  Group, LLC breached the right of first refusal, entitling Plaintiff PCI to the

25                  right to acquire those interests.

26            b.    Potato Corner LA Group LLC possesses no membership interest or equity

27                  of PCJV.

28    / / /

34

VERIFIED THIRD AMENDED COMPLAINT

ERVIN COHEN & JESSUP

1        c.    Potato Corner LA Group LLC possesses no right to name any seats of PCJV

2        Management.

3    **FIFTH CAUSE OF ACTION FOR BREACH OF FIDUCIARY DUTY**

4    **(By Plaintiff PCI, Derivatively, on behalf of Nominal Defendant PCJV, Against Defendants**

5    **Koren, Hodgson, Alon Koren, and Garcia, and DOES 1-25)**

6    132.    Plaintiff PCI, pleading derivatively, on behalf of Nominal Defendant PCJV, re-

7 alleges and incorporates by reference the allegations of the preceding paragraphs of this Amended

8 Complaint as if fully set forth herein.

9    133.    At all times relevant to this Amended Complaint, Defendant Koren has owed

10 Nominal Defendant PCJV fiduciary duties of loyalty, good faith, and care, which are codified by

11 California law, as well as the agreements governing Nominal Defendant PCJV.

12    134.    Defendant Koren has brazenly and repeatedly breached these fiduciary duties owed

13 to Nominal Defendant PCJV, by, among other things:

14        a.    Diverting New Store Corporate Opportunities to certain Koren Affiliate

15        Defendants without disclosing to, or seeking approval from, PCJV

16        Management, or a disinterested majority of PCJV Management.

17        b.    Diverting PCJV resources, capital, and attention to benefit stores owned by

18        Koren Affiliate Defendants, without reimbursement or compensation to

19        PCJV, and without disclosing to, or seeking approval from, PCJV

20        Management, or a disinterested majority of PCJV Management, for these

21        self-interested transactions, benefits, and opportunities.

22        c.    Entering into self-interested transactions, such as the void Services

23        Agreement (Exhibit E hereto), from which Defendant Koren (and the Koren

24        Affiliate Defendants) benefit, without disclosing to, or seeking approval

25        from, PCJV Management, or a disinterested majority of PCJV

26        Management, of these self-interested transactions.

27        d.    Failure to treat all franchises of Nominal Defendant PCJV fairly, and

28        without preference, such that, the differential treatment of third-party

ERVIN COHEN & JESSUP

1  franchises as compared to his own franchises (owned by the Koren Affiliate

2  Defendants), Defendant Koren breached his duties of good faith, care, and

3  loyalty to Nominal Defendant PCJV in the operation and maintenance of

4  those franchise relationships and operations.

5      e.    Failure to comply with "all laws, ordinances, orders or other requirements

6  of any federal, state, county, or municipal authority having jurisdiction of

7  the Company and affecting the Company," as he expressly agreed to do in

8  the JVA and MSA.

9      f.    Other acts of mismanagement and waste of Nominal Defendant PCJV.

10  135.    Defendant Koren has concealed from Nominal Defendant PCJV, and its

11  Management, some or all of his breaches of fiduciary duty, by, among other things:

12      a.    Failing to disclose to, and seek approval from, a disinterested majority of

13  PCJV Management, for each of the wrongful acts at issue herein.

14      b.    Failing to provide the detailed Mandatory Monthly Financial Disclosures to

15  PCJV Management, as required by Section 3(i)(iv) of the JVA.

16      c.    Failing to provide annual audited financial statements as required by

17  Section 3(i)(v) of the JVA.

18      d.    Causing knowingly false statements to be included in the consolidated

19  financial statement covering 2015-2017. Plaintiffs only recently realized the

20  falsity of the representations contained in that audited financial statement.

21  136.    During a portion of the period at issue herein, Defendants Alon Koren and Thomas

22  Hodgson purported to serve as Managers of PCJV, thus, took on fiduciary duties of loyalty, good

23  faith, and care to PCJV. Moreover, Defendants Alon Koren, Thomas Hodgson, and Defendant

24  Emily Garcia have, during a portion of the period at issue, also owed duties of loyalty pursuant to

25  Cal. Labor Code § 2863.

26  137.    Defendants Alon Koren, Thomas Hodgson, and Emily Garcia have breached these

27  fiduciary duties owed to Nominal Defendant PCJV, by, among other things:

28  / / /

ERVIN COHEN &amp; JESSUP

16544.2:9619218.1

36

VERIFIED THIRD AMENDED COMPLAINT

1           a.    Diverting PCJV resources, capital, or attention to benefit stores owned by

2                Koren Affiliate Defendants.

3           b.    Failure to treat all franchises of Nominal Defendant PCJV fairly, and

4                without preference.

5           c.    Other acts of mismanagement and waste of Nominal Defendant PCJV.

6    138.    The breaches of fiduciary duty of Defendants Koren, Alon Koren, Thomas

7 Hodgson, and Emily Garcia have caused, and continue to cause, proximately, directly, and

8 indirectly, actual economic and non-economic damage to the Nominal Defendant PCJV, in an

9 amount to be established at trial, but that exceeds the jurisdictional minimum of this Court.

10 Defendant Koren's breaches of fiduciary duty were a substantial factor in all harm to Nominal

11 Defendant PCJV for which relief is sought in this action.

12    139.    In performing the acts described herein, Defendants Koren, Alon Koren, Thomas

13 Hodgson, and Emily Garcia acted with sufficient malice, wantonness, willfulness, recklessness,

14 oppression, and/or fraud, so as to entitle Nominal Defendant PCJV to an award of exemplary and

15 punitive damages according to proof.

16                  **SIXTH CAUSE OF ACTION FOR BREACH OF FIDUCIARY DUTY**

17  **(By Plaintiff PCI Against Defendants Koren, Alon Koren, and Thomas Hodgson, and DOES**

18                                      **1-25)**

19    140.    Plaintiff PCI re-alleges and incorporates by reference the allegations of the

20 preceding paragraphs of this Amended Complaint as if fully set forth herein.

21    141.    At all times relevant to this Amended Complaint, Defendant Koren has owed

22 Plaintiff PCI fiduciary duties of loyalty, good faith, and care, which are codified by California law,

23 as well as the agreements governing Nominal Defendant PCJV.

24    142.    Defendant Koren has brazenly and repeatedly breached these fiduciary duties owed

25 to Plaintiff PCI, by, among other things:

26           a.    Failing to disclose to Plaintiff PCI that he is diverting New Store Corporate

27                Opportunities to certain Koren Affiliate Defendants.

28 / / /

ERVIN COHEN _ JESSUP

1           b.   Failing to disclose to Plaintiff PCI that he is diverting PCJV resources,

2              capital, and attention to benefit stores owned by Koren Affiliate

3              Defendants, without reimbursement or compensation to PCJV, and in a

4              manner that preferred the Koren Affiliate Defendant Stores over the other

5              third-party franchisees.

6           c.   Failing to disclose to Plaintiff PCI that he was entering into self-interested

7              transactions, such as the void Services Agreement (Exhibit E hereto), in

8              which Defendant Koren (or the Koren Affiliate Defendants) benefitted

9              personally.

10          d.   Misrepresenting that he was waiving Approved Management Fees, without

11             disclosing other secret self-interested transactions in which Defendant

12             Koren benefited personally.

13          e.   Failing to disclose the true facts surrounding Nominal Defendant PCJV's

14             lack of funds sufficient to pay the Approved License Fee.

15          f.   Attempting to squeeze Plaintiff PCI out of its majority position on PCJV

16             Management, and out of its majority equity ownership.

17    143.   Defendant Koren has concealed from Plaintiff PCI some or all of his breaches of

18  fiduciary duty, by, among other things:

19          a.   Failing to disclose to, and seek approval from a disinterested majority of

20             Management, for each of the wrongful acts at issue herein.

21          b.   Failing to provide the detailed Mandatory Monthly Financial Disclosures to

22             Nominal Defendant Management, as required by Section 3(i)(iv) of the

23             JVA.

24          c.   Failing to provide annual audited financial statements as required by

25             Section 3(i)(v) of the JVA.

26          d.   Causing knowingly false statements to be included in the consolidated

27             financial statement covering 2015-2017. Plaintiffs only recently realized the

28             falsity of the representations contained in that audited financial statement.

ERVIN COHEN & JESSUP

1    144.    During a portion of the period at issue herein, Defendants Alon Koren and Thomas

2    Hodgson purported to serve as Managers of PCJV, thus, took on fiduciary duties of loyalty, good

3    faith, and care to Plaintiff PCI.

4    145.    Defendants Alon Koren and Thomas Hodgson have breached these fiduciary duties

5    owed to Nominal Defendant PCJV, by, among other things, failing to disclose to Plaintiff PCI

6    that PCJV resources, capital, and attention are being diverted to benefit stores owned by Koren

7    Affiliate Defendants, without reimbursement or compensation to PCJV, and in a manner that

8    preferred the Koren Affiliate Defendant Stores over the other third party franchisees.

9    146.    The breaches of fiduciary duty of Defendants Koren, Alon Koren and Thomas

10   Hodgson have caused, and continue to cause, proximately, directly, and indirectly, actual

11   economic and non-economic damage to Plaintiff PCI, in an amount to be established at trial, but

12   that exceeds the jurisdictional minimum of this Court.  Defendant Koren's breaches of fiduciary

13   duty were a substantial factor in all harm to Plaintiff PCI for which relief is sought in this action.

14   147.    In performing the acts described herein, Defendants Koren, Alon Koren and

15   Thomas Hodgson have acted with sufficient malice, wantonness, willfulness, recklessness,

16   oppression, and/or fraud, so as to entitle Plaintiff PCI to an award of exemplary and punitive

17   damages according to proof.

18                    **SEVENTH CAUSE OF ACTION FOR DECEIT**

19              **(By Plaintiffs Against Defendant Koren and DOES 1-25)**

20   148.    Plaintiffs re-allege and incorporate by reference the allegations of the preceding

21   paragraphs of this Amended Complaint as if fully set forth herein.

22   149.    As alleged herein, Defendant Koren intentionally failed to disclose the following

23   facts to Plaintiffs:

24              a.    That he is diverting New Store Corporate Opportunities to certain Koren

25                    Affiliate Defendants.

26              b.    That he is diverting PCJV resources, capital, and attention to benefit stores

27                    owned by Koren Affiliate Defendants, without reimbursement or

28                    compensation to PCJV, and in a manner that is preferring his stores (those

16544.2:9619218.1                          39
VERIFIED THIRD AMENDED COMPLAINT

1  owned by the Koren Affiliate Defendants) over other third-party

2  franchisees.

3     c. That he is entering into self-interested transactions, such as the void

4      Services Agreement (Exhibit E hereto), in which Defendant Koren (or the

5      Koren Affiliate Defendants) benefitted personally.

6     d. Misrepresenting that he was waiving Approved Management Fees, without

7      disclosing other self-interested transactions in which Defendant Koren

8      benefited personally.

9     e. The true facts surrounding Nominal Defendant PCJV's lack of funds

10      sufficient to pay the Approved License Fee.

11    150. Defendant Koren possessed a duty to disclose each of the above facts.

12    151. Each of these facts that Defendant Koren failed to disclose were material to

13  Plaintiffs, such that, had Plaintiffs these facts, they would have acted differently. For example,

14  Plaintiffs would not have authorized the waiver of Approved License Fees due and owing under

15  the JVA had they known these concealed facts.

16    152. Defendant Koren's deceit has caused, and continue to cause, proximately, directly,

17  and indirectly, actual economic and non-economic damage to Plaintiffs, in an amount to be

18  established at trial, but that exceeds the jurisdictional minimum of this Court.  Defendant Koren's

19  deceit was a substantial factor in all harm to Plaintiffs for which relief is sought in this action.

20    153. In performing the acts described herein, Defendant Koren acted with sufficient

21  malice, wantonness, willfulness, recklessness, oppression, and/or fraud, so as to entitle Plaintiffs

22  to an award of exemplary and punitive damages according to proof.

23        **EIGHTH CAUSE OF ACTION FOR BREACH OF CONTRACT**

24        **(By Plaintiffs Against Defendant Koren and DOES 1-25)**

25    154. Plaintiffs re-allege and incorporate herein the allegations of the preceding

26  paragraphs of this Amended Complaint as if fully set forth herein.

27    155. Plaintiffs are parties to various contracts with Defendant Koren, including the JVA

28  and the MSA.

ERVIN COHEN & JESSUP

ERVIN COHEN & JESSUP

156. Parties have performed their obligations under the JVA and the MSA.

157. Defendant Koren has breached the JVA and/or the MSA, by, among other things:

a. Failing to submit, for approval, New Store Corporate Opportunities before diverting those opportunities to Koren Affiliate Defendants;

b. Failing to submit for approval to the PCJV Management compensation of "managers, executive offices, and key personnel;"

c. Failing to submit for approval to the PCJV Management all franchising agreements and lease agreements;

d. Failing to submit for approval to the PCJV Management all "purchases and disbursements in excess of $10,000;"

e. Failing to submit for approval to the PCJV Management a budget;

f. Failure to adequately manage PCJV and its franchisees, including, "management, operational, marketing, establishment, maintenance, licensing and sublicensing with respect to the 'Potato Corner' outlets/stores;"

g. Failing to use "best efforts at all times . . . to operate and maintain the 'Potato Corner' outlets/stores in the Territory according to the highest standards achievable consistent with the overall plan of the Management of the Company;"

h. Failure to produce the Mandatory Monthly Financial Disclosures;

i. Failure to cause the issuance of annual audited financial statements;

j. Failure to take "such actions as may be necessary to comply promptly with any and all laws, ordinances, orders or other requirements of any federal, state, county, or municipal authority having jurisdiction of the Company and affecting the Company;"

k. Failure to sufficiently "[a]dvertise, market, and promote the Potato Corner outlets/stores with the goal of causing public knowledge, awareness and patronage of the Potato Corner outlets/stores."

16544.2:9619218.1                    41

1            l.     Failure to protect PCJV's Confidential Information;

2            m.    Repudiating and misrepresenting the express terms of the right of first

3                refusal; and

4            n.     Repudiating and misrepresenting the express terms of the AJVA.

5      158.    Each, some, or all of the above breaches of the JVA and/or MSA by Defendant

6 Koren were a substantial factor in causing injury to Plaintiffs, and none of these breaches were

7 excused.

8      159.    As such Defendant Koren's breaches of contract have caused, and continue to

9 cause, proximately, directly, and indirectly, damage to Plaintiffs, in an amount to be established at

10 trial, but that exceeds the jurisdictional minimum of this Court.

11      <u>**NINTH CAUSE OF ACTION FOR RESTITUTION AND RECOVERY PURSUANT TO**</u>

12                                <u>**CAL. CIV. CODE § 1692**</u>

13     **(By Plaintiff PCI, Derivatively, and on behalf of Nominal Defendant PCJV, Against**

14                     **Defendant Koren and DOES 1-25)**

15      160.    Plaintiff PCI, derivatively, and on behalf of Nominal Defendant PCJV, re-alleges

16 and incorporates by reference the allegations of the preceding paragraphs of this Amended

17 Complaint as if fully set forth herein.

18      161.    On January 1, 2017, Defendant Koren executed a "Services Agreement," a copy of

19 which is attached hereto as Exhibit E.

20      162.    Defendant Koren signed this "Services Agreement" transferring funds from

21 Nominal Defendant PCJV to himself, however, shockingly, Defendant Koren signed this

22 document on behalf of Nominal Defendant PCJV, even though he failed to ever disclose the

23 "Services Agreement" to, or obtain approval for that self-interested transaction from, the

24 Management of Nominal Defendant PCJV.

25      163.    In this "Services Agreement," dated January 1, 2017, Defendant Koren,

26 purportedly (but without authority) agreed to accept services that had already been agreed to in the

27 MSA, albeit this time in exchange for a new "management fee" of $240,000 payable by Nominal

28 Defendant PCJV to Defendant Koren and Jacoby. Put simply, the "Services Agreement" increased

ERVIN COHEN & JESSUP

1  the fee payable to the LA Group, without offering any consideration other than that to which the
2  LA Group was already supposed to deliver.

3      164.    Accordingly, Defendant Koren did not possess the authority to enter into that
4  "Services Agreement," and executed that document based upon deceit, and a wholesale violation
5  of his fiduciary, legal, and contractual duties. Moreover, because the "Services Agreement"
6  contained a promise by Defendant Koren and Jacoby to deliver the same services they had already
7  contracted to provide, there was no consideration provided to Nominal Defendant PCJV, such that
8  the Services Agreement fails for lack of consideration.

9      165.    Based upon the foregoing, Plaintiff PCI, on behalf of Nominal Defendant PCJV,
10  hereby provides notice of, and rescinds, the Services Agreement, pursuant to Cal. Civ. Code §§
11  1688 et. seq. Specifically, rescission is proper pursuant to Cal. Civ. Code § 1689(b)(1)-(b)(6).

12      166.    Because Nominal Defendant PCJV provided nothing in exchange for this Services
13  Agreement, there is nothing of value for Plaintiff PCI, on behalf of Nominal Defendant PCJV, to
14  restore.

15      167.    Plaintiff PCI, on behalf of Nominal Defendant PCJV is informed and believes, and
16  thereon alleges that Defendant Koren has entered into other secret and self-interested agreements,
17  signed by Defendant Koren on behalf of Nominal Defendant PCJV, without having disclosed
18  those transactions to, or obtained approval from PCJV Management. Accordingly, Plaintiff PCI,
19  on behalf of Nominal Defendant PCJV shall seek rescission of those additional contracts once
20  they are fully disclosed by Defendant Koren.

21      168.    Pursuant to Cal. Civ. Code § 1692, Plaintiff PCI, on behalf of Nominal Defendant
22  PCJV, seeks disgorgement, restitution, and recovery from Defendant Koren from all funds,
23  benefits received as the result of this rescinded Services Agreement, as well as any and all
24  consequential damages caused by this void contract.

25      169.    In performing the acts described herein, Defendant Koren acted with sufficient
26  malice, wantonness, willfulness, recklessness, oppression, and/or fraud, so as to entitle Plaintiff
27  PCI to an award of exemplary and punitive damages according to proof.

28  ///

ERVIN COHEN & JESSUP

**TENTH CAUSE OF ACTION FOR AIDING AND ABETTING A BREACH OF**

**FIDUCIARY DUTY**

**(By Plaintiff PCI, Derivatively, on behalf of Nominal Defendant PCJV, Against Defendant NKM Capital Group, LLC; Defendant J&K Americana, LLC; Defendant J&K Culver, LLC; Defendant J&K Lakewood, LLC; Defendant J&K Oakridge, LLC; Defendant J&K Valley Fair, LLC; Defendant J&K 2, LLC; Defendant J&K Ontario, LLC; Defendant J&K PC Trucks, LLC; Defendant J&K Consultants Group, LLC; Defendant GK Capital, LLC; Alon Koren; Thomas Hodgson; Emily Garcia; and DOES 1-25)**

170.    Plaintiff PCI, pleading derivatively, on behalf of Nominal Defendant PCJV, re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Amended Complaint as if fully set forth herein.

171.    At all times relevant to this Amended Complaint, Defendant Koren has owed Nominal Defendant PCJV fiduciary duties of loyalty, good faith, and care, which are codified by California law, as well as the agreements governing Nominal Defendant PCJV.

172.    At all times relevant to this action, the Koren Affiliate Defendants, as well as Alon Koren, Thomas Hodgson and Emily Garcia, knew of the fiduciary duties of loyalty, good faith, and care owed by Defendant Koren to Nominal Defendant PCJV.

173.    Defendant Koren has brazenly and repeatedly breached these fiduciary duties owed to Nominal Defendant PCJV, by, among other things:

      a.    Diverting New Store Corporate Opportunities to certain Koren Affiliate Defendants without disclosing to, or seeking approval from, PCJV Management, or a disinterested majority of PCJV Management.

      b.    Diverting PCJV resources, capital, and attention to benefit stores owned by Koren Affiliate Defendants, without reimbursement or compensation to PCJV, and without disclosing to, or seeking approval from, PCJV Management, or a disinterested majority of PCJV Management, for these self-interested transactions, benefits, and opportunities.

/ / /

44

ERVIN COHEN ∴ JESSUP

1          c.   Entering into self-interested transactions, such as the void Services

2               Agreement (Exhibit E hereto), from which Defendant Koren (and the Koren

3               Affiliate Defendants) benefit, without disclosing to, or seeking approval

4               from, PCJV Management, or a disinterested majority of PCJV

5               Management, of these self-interested transactions.

6          d.   Failing to treat all franchises of Nominal Defendant PCJV fairly, and

7               without preference, such that, the differential treatment of third-party

8               franchises as compared to his own franchises (owned by the Koren Affiliate

9               Defendants), Defendant Koren breached his duties of good faith, care, and

10             loyalty to Nominal Defendant PCJV in the operation and maintenance of

11             those franchise relationships and operations.

12          e.   Other acts of mismanagement and waste of Nominal Defendant PCJV.

13    174.   Defendant Koren has concealed from Nominal Defendant PCJV, and its

14 Management, some or all of his breaches of fiduciary duty, by, among other things:

15          a.   Failing to disclose to, and seek approval from a disinterested majority of

16             Management, for each of the wrongful acts at issue herein.

17          b.   Failing to provide the detailed Mandatory Monthly Financial Disclosures to

18             Nominal Defendant Management, as required by Section 3(i)(iv) of the

19             JVA.

20          c.   Failing to provide annual audited financial statements as required by

21             Section 3(i)(v) of the JVA.

22          d.   Causing knowingly false statements to be included in the consolidated

23             financial statement covering 2015-2017. Plaintiffs only recently realized the

24             falsity of the representations contained in that audited financial statement.

25    175.   The Koren Affiliate Defendants – as well as Alon Koren, Thomas Hodgson and

26 Emily Garcia – knew of each of these breaches of fiduciary duty of Defendant Koren, and gave

27 substantial assistance or encouragement to Defendant Koren in his breaches of fiduciary duty. For

28 example, the Koren Affiliate Defendants knowingly accepted all of the benefits received from

1  Nominal Defendant PCJV (in the form of New Store Opportunities, as well as unreimbursed or
2  uncompensated resources, capital, and attention, to the exclusion of other PCJV franchisees).

3      176.    The aiding and abetting by the Koren Affiliate Defendants as well as Alon Koren,
4  Thomas Hodgson and Emily Garcia of Defendant Koren's breaches of fiduciary duty have caused,
5  and continue to cause, proximately, directly, and indirectly, actual economic and non-economic
6  injury to the Nominal Defendant PCJV. Defendant Koren's breaches of fiduciary duty were a
7  substantial factor in all harm to Nominal Defendant PCJV.

8      177.    As a remedy for the aiding and abetting by the Koren Affiliate Defendants, Plaintiff
9  PCI, on behalf of Nominal Defendant PCJV, seeks disgorgement and restitution from the Koren
10 Affiliate Defendants, as well as imposition of a constructive trust on all (i) money and fund of the
11 Koren Affiliate Defendants, and (ii) all Potato Corner stores, outlets and franchises owned by the
12 Koren Affiliate Defendants.

13     178.    As a remedy for the aiding and abetting by Alon Koren, Thomas Hodgson, and
14 Emily Garcia, Plaintiff PCI, on behalf of Nominal Defendant PCJV, seeks damages according to
15 proof.

16     179.    In performing the acts described herein, the Koren Affiliate Defendants, Alon
17 Koren, Thomas Hodgson, and Emily Garcia, acted with sufficient malice, wantonness, willfulness,
18 recklessness, oppression, and/or fraud, so as to entitle Nominal Defendant PCJV to an award of
19 exemplary and punitive damages according to proof.

20 **ELEVENTH CAUSE OF ACTION FOR UNFAIR BUSINESS PRACTICES PURSUANT**
21 **TO CAL. BUS. & PROF. CODE § 17200 ET. SEQ.**
22 **(By Plaintiffs against all Defendants and DOES 1-25)**

23     180.    Plaintiffs re-allege and incorporate by reference the allegations of the preceding
24 paragraphs of this Amended Complaint as if fully set forth herein.

25     181.    Defendants, and each of them, are prohibited under California law from engaging
26 in any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

27     182.    Defendants, and each of them, have brazenly violated this rule, by engaging in the
28 numerous and extensive unfair business practices alleged herein. Those unfair business practices

16544.2:9619218.1                                46

ERVIN COHEN ֹ JESSUP ֹ

1 | have injured Plaintiffs, Nominal Defendant PCJV, as well as each of the third-party franchisees
2 | owning stores other than those owned by the Koren Affiliate Defendants.

3 |     183.    As a remedy for the numerous violations of Cal. Bus. & Prof. Code § 17200
4 | alleged herein, Plaintiffs seek disgorgement from all Defendants, restitution from all Defendants,
5 | as well as imposition of a constructive trust on all (i) money and fund of the Koren Affiliate
6 | Defendants, and (ii) all Potato Corner stores, outlets and franchises owned by the Koren Affiliate
7 | Defendants.

8 |     184.    Plaintiffs also seek other relief in the form of attorneys' fees and other costs
9 | allowable by statute.

10 | ## TWELFTH CAUSE OF ACTION FOR ACCOUNTING

11 | **(By Plaintiff PCI, Derivatively, and on behalf of Nominal Defendant PCJV, Against**
12 | **all Defendants and DOES 1-25)**

13 |     185.    Plaintiff PCI, pleading derivatively, on behalf of Nominal Defendant PCJV, re-
14 | alleges and incorporates by reference the allegations of the preceding paragraphs of this Amended
15 | Complaint as if fully set forth herein.

16 |     186.    Defendant Koren is a fiduciary of Nominal Defendant PCJV.

17 |     187.    Each of the Koren Affiliate Defendants possess contractual and/or fiduciary duties
18 | to Nominal Defendant PCJV.

19 |     188.    As the result of the wrongful acts and other transactions between Nominal
20 | Defendant PCJV, on the one hand, and some or all of the Defendants, on the other, a balance is
21 | most certainly due to Nominal Defendant PCJV from Defendants.

22 |     189.    The amount due from Defendants to Nominal Defendant PCJV is not readily
23 | ascertainable. Indeed, the accounts and amounts due are so complicated, that they can only be
24 | ascertained through an accounting.

25 | ## PRAYER FOR RELIEF

26 |     WHEREFORE, Plaintiffs pray for judgment against the Defendants, and each of them, as
27 | follows:

28 | ///

ERVIN COHEN & JESSUP

16544.2:9619218.1

47

VERIFIED THIRD AMENDED COMPLAINT

1.    For judicial declarations as set forth in paragraphs 112, 116, and 120 herein;

2.    For damages, according to proof, whether economic, non-economic, general, special, actual, compensatory, or otherwise;

3.    Restitution and disgorgement;

4.    Restitution and damages pursuant to Cal. Civ. Code § 1692 as a result of rescission of the Services Agreement (Exhibit E), and any and all other self-interested transactions between Defendant Koren and Nominal Defendant PCJV;

5.    Imposition of a constructive trust on all (i) money and fund of the Koren Affiliate Defendants, and (ii) all Potato Corner stores, outlets and franchises owned by the Koren Affiliate Defendants;

6.    Injunctive Relief and Specific Performance;

7.    Punitive and exemplary damages;

8.    For injunctive and other equitable relief;

9.    For an award of costs and attorneys' fees where allowable by statute (such as the Unfair Competition Law), or otherwise;

10.    For pre-judgment and post-judgment interest; and

11.    For such other and further relief as the Court deems just and proper.

DATED: June 28, 2019                    ERVIN COHEN & JESSUP LLP

By: _____
     Michael D. Murphy
     Attorneys for Plaintiffs and Cross-Defendants
     CINCO CORPORATION and POTATO
     CORNER INTERNATIONAL, INC.

16544.2:9619218.1                          48
VERIFIED THIRD AMENDED COMPLAINT



## POTATO CORNER USA
## JOINT VENTURE AGREEMENT

This Joint Venture Agreement (the "Agreement") dated _____ is made and entered into on _____, by and between:

Cinco Corporation, a corporation duly existing and registered by virtue of and under the laws of the Republic of the Philippines with office address at 869 Katarungan Street, Plainview Mandaluyong City, Philippines 1550, represented herein by its duly authorized representative, Jose P. Magsaysay (hereinafter "Cinco"), and its directors, Jose P. Magsaysay, Jr., Jose Miguel Ma. G. Montinola, Ma. Victoria O. Bermejo, Ricardo K. Montelibano, all of whom are Philippine citizens and resident, and collectively referred to as the "Cinco Group";

-and-

AMIT NEMANIM, GUY KOREN, AMIR JACOBY, all of whom are U.S. citizens and residents and collectively referred to as the "LA Group:

### RECITALS

WHEREAS, the Parties hereto have agreed to form a limited liability company (hereinafter referred to as the "Company") under the laws of the State of Delaware, with the primary purpose of engaging in the business of establishing, operating, managing, licensing and franchising "Potato Corner" stores/outlets in the United States of America and Israel, except in the County of Los Angeles, USA and the County of San Francisco, USA and Tanforan Mall (hereinafter, "Territory").

WHEREAS, the Parties herein have agreed to enter into this Agreement which sets forth the terms and conditions with respect to the organization, incorporation, operation and management of the Company and defines their respective rights, duties and obligations of the parties to this Agreement.

WHEREAS, the Parties agree that the LLC operating agreement to be entered by them shall reflect the terms and conditions as set forth in this Agreement.

WHEREAS, Cinco may assign and or all of its rights to the joint venture company formed under this Agreement to a wholly-owned subsidiary as it deems fit.

NOW, THEREFORE, for and in consideration of the foregoing premises, the Parties hereby agree as follows:

1) ORGANIZATION AND FORMATION OF THE COMPANY

a) Within ten (10) days from the Effective Date of this Agreement, the Parties herein agree to organize and form, a limited liability company to be called "PCJV USA" ( hereinafter referred to as the Company) for the primary purpose of engaging in the business of establishing, operating, managing, licensing and franchising "Potato Corner" stores/outlets in the Territory.

b) The initial members of the Company shall be the following:

    i)   Cinco Group
       (1) Cinco
       (2) Jose P. Magsaysay, Jr.
       (3) Jose Miguel Ma. G. Montinola
       (4) Ma. Victoria O. Bermejo
       (5) Ricardo K. Montelibano

    ii)   LA Group
       (1) Amit Nemanim
       (2) Guy Koren
       (3) Amir Jacoby

c) The principal office of the Company shall be at  1729 Santee St., Los Angeles, California 90015.

d) The annual general meeting of the members of the Company shall be held every year at the principal office of the Company. The members may, at their discretion, invite non-members to join the annual general meeting, but only as non-voting observers. Further, to the extent allowed by the financial condition of the Company, and as agreed upon by a majority of all member interests, the Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses incurred by the following members in attendance of the annual members' meeting: Jose P. Magsaysay, Jr., Jose Miguel Ma. Montinola, Ma. Victoria O. Bermejo and Ricardo K. Montelibano.

e) The fiscal year of the Company shall begin on January 1 and end on December 31 of each year.

f) The Company shall immediately upon formation obtain a "Liability Insurance" for the Company the amount and scope of coverage to be determined by the managers.

g) All costs, fees and expenses incurred in connection with the organization and formation of the Company shall be for the account of the Company.

h) The operating agreement of the Company shall reflect the terms and conditions set forth in this Agreement between the Parties.

2) CAPITALIZATION/OWNERSHIP OF THE COMPANY



a) At the time of formation, the Company shall have a total capital account of Fifty Thousand Dollars (US$50,000) which shall be fully subscribed and paid.

b) Unless other agreed to in writing, at the commencement of this Agreement, the Parties hereby agree that the Cinco Group shall contribute Thirty Thousand Dollars (US$30,000) and own sixty (60%) percent of the Company's capital accounts, while the LA Group shall contribute Twenty Thousand Dollars (US$20,000) and own the remaining forty (40%) percent.

2

c) The Parties hereby agree any increase in the capital account shall require an affirmative vote of 75% of all of the members' percentage interests in the Company. In the event an increase in the Company's capital accounts is approved by the members, both Parties shall have rights of pre-emption so that their pro rata ownership share in the Company shall be maintained, provided that, either Party shall have thirty (30) days within which to confirm in writing that it is willing and able to subscribe and fully pay its pro rata share of the increase in capital.

d) Neither Party shall assign any of its rights or obligations under this Agreement, nor his/its member interests in the Company without the prior written consent of the other Party. In the event either Party desire to transfer or sell his/its pro rata members interest in the Company to a person other those specifically named in Section 1(a) of this Agreement, such Party shall be obligated to sell the same first to the other Party, which has have thirty (30) days within which to exercise its rights of first refusal from the date of receipt of a written notice to sell. For this purpose, the Parties hereby agree that the right of first refusal may be exercised in accordance with the following formula: The average of the Company's earnings before interest, depreciation, taxes and amortization (EBITDA) for the last two (2) years multiplied by 5 times, and further multiplied by the percentage of member interest subject to such right of first refusal over total outstanding member interests.

3) MANAGEMENT OF THE COMPANY

a) As will be provided in the Operating Agreement, the business and affairs of the Company shall be managed and all of the Company powers shall be exercised by or under the direction of the managers (collectively referred to as "Management"). Unless otherwise agreed to by the parties, the Management shall be composed of seven (7) members, four (4) of whom shall be designated by the Cinco Group, and three (3) designated by the LA Group. Upon the formation of the Company, the following shall be named managers: Jose P. Magsaysay, Jr., Jose Miguel Ma. Montinola, Ma. Victoria O. Bermejo, Ricardo K. Montelibano, Amit Nemanim, Guy Koren, and Amir Jacoby.



b) The Management shall regularly meet on a monthly basis. The regular monthly board meeting may be done via teleconference or through the internet. The members may, at their discretion, invite non-members to join member meetings, but only as non-voting observers. Further, to the extent allowed by the financial condition of the Company, and as agreed upon by a majority of all member interests, the Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses incurred by the members named in Section 1(d) in attendance of said meetings.

c) Upon the formation of the Company, it shall have the following executive officers: President, Corporate Secretary and Treasurer, and the following shall be elected by the members to serve these positions:

   i)   Chairman of the Board of Members – Jose P. Magsaysay

3

    ii) President – At any given time, the President shall be any one of the following members: Amit Nenamin, Guy Koren or Amir Jacoby, and the first president will be Amit Nemanim

    iii) Corporate Secretary – Erlinda Bartolome.

    iv) Treasurer – Jose Miguel Ma. Montinola

        (1) The Treasurer shall have oversight functions over the Accounting and Finance Departments that shall be exercised independent of the President.

d) Additional executive officers may be appointed by Management as it may deem necessary.

e) It is hereby agreed that the rights and responsibilities of the Management shall include the following:

    i) Approval of the compensation package for the managers, executive offices and key personnel.

    ii) Approval of the Accounting System/Procedures/Software/Method to be used by the Company.

    iii) Approval of the operating budget of the Company, and any changes to it.

    iv) Approval of all franchising agreements, and lease agreements.

    v) Approval of all purchases and disbursements in excess of $10,000, provided that such amount may be changed or modified by Management as it deems necessary.

f) The executive officers shall manage the business and property of the Company, and to market the business, in accordance with and pursuant to the directives of and policies set by the Management of the Company. The Management of the Company can recall and/or withdraw the appointment of any executive officer, as it deems necessary.

g) The Company shall enter into a Master License Agreement with Cinco (or an affiliated company to be designated by Cinco) which shall include the following terms and conditions:



    i) The Company agrees to license the "POTATO CORNER" intellectual property rights from Cinco or an affiliated company to be designated by Cinco) consisting of (i) the trademark, service mark and trade name "POTATO CORNER"; and (ii) various trademarks, service marks, trade names, slogans, designs, insignias, emblems, symbols, color schemes, package features, logo and other propriety identifying characteristics used in relation and in connection with the "Potato Corner" Products and the System; and (iii) as well as other intellectual property rights in connection with the "POTATO CORNER" Intellectual property rights, for use in the Territory.

    ii) The Company agrees to pay, as an arm's length license fee, the following amounts:

        (1) With respect to the licensing / sub-licensing or franchising the "POTATO CORNER" intellectual property rights in connection with the "POTATO CORNER" outlets/stores, an amount equal to thirty percent (30%) of all

4

initial/franchise fees and ongoing royalty fees paid to/ collected by the Company. Payments shall be made to Cinco (or an affiliated company to be designated by Cinco) by wire transfer using a bank or other financial institution specified by it within thirty (30) days from receipt of the fees by the Company.

(2) All withholding and other applicable taxes levied by any authority on the payments by the Company shall be borne solely by the Company.

h) The Company agrees to engage the LA Group to provide management and strategic experience and expertise during the duration of this Agreement. The Company shall enter into a Master Services Agreement with the LA Group (or a corporation to be designated by the LA Group) which shall include the following terms and conditions:

i) In consideration for the provision of its services under the Master Services Agreement, the LA Group shall be entitled to a services fee equal to thirty (30%) percent of all initial/franchise fee and continuing royalty fees paid to/ collected by the Company .

ii) All withholding and other applicable taxes levied by any authority on the payments by the Company to the LA Group under this Agreement shall be borne solely by the Company.

iii) The LA Group shall faithfully, diligently and efficiently exercise its obligations and responsibilities under the Master Services Agreement.

iv) The LA Group shall maintain and protect the Confidential Information belonging to Cinco or the Company, and such undertaking shall apply to all of its partners, officers, employees, or agents.

I) The President of the Company shall render the following services and shall perform the following duties for the Company in a faithful, diligent and efficient manner:

i) The President shall be responsible for all management, operational, marketing, establishment, maintenance, licensing and sub-licensing activities with respect to the "Potato Corner" outlets/stores in the Territory. He shall use his best efforts at all times during the term of this Agreement to operate and maintain the "Potato Corner" outlets/stores in the Territory according to the highest standards achievable consistent with the overall plan of the Management of the Company. The President shall comply with the rules, policies and procedures approved by the Management of the Company from time to time.

ii) The President shall advertise market and promote the "Potato Corner" outlets/stores with the goal of causing public knowledge, awareness and patronage of the "Potato Corner" outlets/sites.

iii) The President shall maintain a comprehensive system of records, books and accounts, with respect to the licensing and sub-licensing activities, operation,



5

establishment, management, maintenance and other activities of the "Potato Corner" outlets /stores in the Territory with the assistance of the Corporate Secretary.

iv) No later than the twentieth (20th) day of each month, with respect to the preceding month, the President shall render a statement of receipts and disbursements, a schedule of accounts receivable and payable, and a schedule of fees collected and distributed, together with a reconciled bank statement as of the last day of the month with the assistance of the Corporate Secretary.

v) No later than three (3) months after the end of a fiscal year, the President shall, with the assistance of the Corporate Secretary and external accountant hired by Management, cause the Company to issue audited financial statements, and shall provide a copy of the same to all the members of Management.

vi) To the extent the President is lawfully able to do so, the President shall take such action as may be necessary to comply promptly with any and all laws, ordinances, orders or other requirements of any federal, state, county or municipal authority having jurisdiction of the Company and affecting the Company.

j) Consistent with its fiduciary duty to the Company, the members and managers shall exercise the duty of care and shall, at all times, ensure that all corporate opportunities consistent with the objectives of this Agreement shall be pursued on behalf of, and for the benefit of the Company. As such, with respect to the establishment of Company-owned stores, whenever potential locations are identified by any member or manager, it shall be promptly brought to the attention of the Management. At all times, and within thirty (30) days from receipt of this information, the Management shall decide to either build a Company-owned store at the identified location. In the event the Company chooses to build a Company-owned store at the identified location, it shall have the right to do so, to the exclusion of any of the members or managers. However, in the even the Company decides not to build a Company-owned store at the identified location, it shall notify the members and managers of its decision in writing. In such case, the LA Group shall have the right to build a store at the identified location, provided that it shall enter into a franchising agreement with the Company, and shall pay the franchise fees and ongoing royalty fees as set forth in the Company's standard franchising agreement.

4) DURATION OF AGREEMENT

a) This Agreement shall become effective from the date of execution hereof and shall continue indefinitely unless otherwise terminated by (i) an affirmative vote of 75 percent (75%) of all member interests, or (ii) upon mutual agreement by the Parties in writing.

b) Upon termination of this Agreement, the effects of termination shall be as follows:

6

i) All rights granted under the Master License Agreement shall terminate and the Company shall cease the use of the Potato Corner Intellectual Property Rights, and Confidential Information, provided however, that the Company shall be permitted to use any of the foregoing as is reasonably required in order to comply with its obligations under its sub-licensing or franchising agreements, but only to the extent of the duration of sub-licensing or franchising agreements in existence at the time of the termination of this Agreement.

ii) The LA Group shall be subject to a non-compete arrangement and hereby agrees that, within two (2) years from the date of termination of this Agreement, it shall not engage in the business of establishing, operating, managing, licensing and franchising identical or similar products sold by the Company, using the intellectual property rights identical or similar to those used by the Company, at the time of the termination of this Agreement.

5) GENERAL PROVISIONS

a) This Agreement may not be altered, changed, supplemented or modified except by a written instrument duly signed by the Parties.

b) The Parties shall use their best efforts to cooperate for the success of the business of the Company. The Parties further agree to perform all acts and execute and deliver all documents or instruments required or necessary to fully implement or consummate the transactions contemplated in and the intent underlying this Agreement.

c) The Parties shall, to the extent feasible, cause the operating agreement of the Company to reflect the mutual covenants and provisions contained in this Agreement.

d) All notices and other communications required or permitted to be given hereunder shall be given in writing (and for this purpose shall include emails or fax transmissions) and shall be addressed to the appropriate Party at the address of such Party as heretofore designated, or at such address as such Party may designate subsequently in writing.

e) The failure of any Party at any time to require performance by the others of any provision of this Agreement shall not affect, in any way, the right of such Party to require performance of that or any other provision, and any waiver by any Party of any breach of this Agreement shall not be construed as a waiver of any continuing or succeeding breach of such provision, or a waiver of any other right under this Agreement.



f) This Agreement shall constitute the entire agreement between the Parties and shall supersede any previous agreements, written or otherwise, with respect to the same subject matter which may have been made by the Parties prior hereto.

g) The invalidity of any portion of this Agreement will not and shall not render the entire Agreement void, nor affect the validity of the rest of the provisions of this Agreement.

7

WEST\222455823.2

h) This Agreement shall be governed by the laws of the State of California.

i) Parties acknowledge that, from time to time, one Party (the "Discloser") may disclose to the other Party (the "Recipient") information: (a) relating to the Potato Corner outlets and sites; (b) relating to the Potato Corner Intangible Property Rights; (c) Potato Corner product specifications and related information; (d) which is marked with "confidential" or a similar legend; (e) which is described orally and designated as confidential; or (f) which would, under the circumstances, be understood by a reasonable person to be confidential ("Confidential Information"). Upon subsequent disclosure of previously disclosed Confidential Information to the Recipient by the Discloser, the information will remain Confidential Information even if not identified as Confidential Information at the subsequent disclosure.   Recipient shall retain such Confidential Information in confidence, and shall not disclose it to any Third Party or use it for other than the purposes of this Agreement without the Discloser's prior written consent. Each Party shall use at least the same procedures and degree of care with respect to such Confidential Information which it uses to protect its own confidential information of like importance, and in no event less than reasonable care. The Recipient will immediately give written notice to the Discloser of any unauthorized use or disclosure of the Discloser's Confidential Information, and the Recipient will assist the Discloser in remedying such unauthorized use or disclosure.

[The Remainder of This Page is Left Intentionally Blank]



8

WEST\222455823.2

IN WITNESS WHEREOF, the parties have executed this Agreement on the date and in place first mentioned.

**Cinco Group:**

Cinco Corporation (Philippines)

Name: Jose P. Magsaysay

Title: CEO

Jose P. Magsaysay, Jr.,

Jose Miguel Ma. G. Montinola

Ma. Victoria O. Bermejo

Ricardo K. Montelibano,

**L.A. Group:**

Amit Nemanim

Guy Koren

Amir Jacoby,

SIGNED IN THE PRESENCE OF:

9

WEST\222455823.2

# EXHIBIT B



Exhibit B

10/10/2011  11:44    13104789013

PAGE  01/04

## CERTIFICATE FOR LIMITED LIABILITY COMPANY INTERESTS IN PCJV USA, LLC

THIS CERTIFICATE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933 OR UNDER THE SECURITIES OR BLUE SKY LAWS OF ANY STATE. THE HOLDER OF THIS CERTIFICATE, BY ITS ACCEPTANCE HEREOF, REPRESENTS THAT IT IS ACQUIRING THIS SECURITY FOR INVESTMENT AND NOT WITH A VIEW TO ANY SALE OR DISTRIBUTION HEREOF. ANY TRANSFER OF THIS CERTIFICATE OR ANY LIMITED LIABILITY COMPANY INTERESTS REPRESENTED HEREBY IS SUBJECT TO THE TERMS AND CONDITIONS OF THE LIMITED LIABILITY COMPANY AGREEMENT (AS DEFINED BELOW).

Certificate No. 01

60.00% Percentage Interest

PCJV USA, LLC, a Delaware limited liability company (the "Company"), hereby certifies that Potato Corner International, Inc. (together with any assignee of this Certificate, the "Holder") is the registered owner of Sixty Percent (60.00%) of the limited liability company interests in the Company. The rights, powers, preferences, restrictions and limitations of the interests in the Company are set forth in, and this Certificate and the limited liability company interests in the Company represented hereby are issued and shall in all respects be subject to the terms and provisions of, the Operating Agreement of the Company dated as of _____, 2010, as the same may be further amended or restated from time to time (the "Operating Agreement"). By acceptance of this Certificate, and as a condition to being entitled to any rights and/or benefits with respect to the limited liability company interests evidenced hereby, the Holder is deemed to have agreed to comply with and be bound by all the terms and conditions of the Operating Agreement. The Company will furnish a copy of the Operating Agreement to the Holder without charge upon written request to the Company at its principal place of business. Transfer of any or all of the limited liability company interests in the Company evidenced by this Certificate is subject to certain restrictions in the Operating Agreement and can be effected only after compliance with all of those restrictions and the presentation to the Company of the Certificate, accompanied by an assignment in the form appearing on the reverse side of this Certificate, duly completed and executed by and on behalf of the transferor in such Transfer, and an application for transfer in the form appearing on the reverse side of this Certificate, duly completed and executed by and on behalf of the transferee in such Transfer.

Each limited liability company interest in the Company shall constitute a "security" within the meaning of (i) Section 8-102(a)(15) of the Uniform Commercial Code as in effect from time to time in the States of Delaware and California and (ii) the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995 (and each limited liability company interest in the Company shall be treated as such a "security" for all purposes, including, without limitation perfection of the security interest therein under Article 8 of each applicable Uniform Commercial Code).

This Certificate and the limited liability company interests evidenced hereby shall be governed by and construed in accordance with the laws of the State of Delaware without regard to principles of conflicts of laws.

IN WITNESS WHEREOF, the Company has caused this Certificate to be executed as of the date set forth below.

Dated: November ___, 2010

PCJV USA, LLC
a Delaware limited liability company

By: _____

Name:  Amit Nemanin
Title:  President.

WEST\223117101.1
373527-000001

## CERTIFICATE FOR LIMITED LIABILITY COMPANY INTERESTS IN
## PCJV USA, LLC

THIS CERTIFICATE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE
SECURITIES ACT OF 1933 OR UNDER THE SECURITIES OR BLUE SKY LAWS OF ANY
STATE.   THE HOLDER OF THIS CERTIFICATE, BY ITS ACCEPTANCE HEREOF,
REPRESENTS THAT IT IS ACQUIRING THIS SECURITY FOR INVESTMENT AND NOT
WITH A VIEW TO ANY SALE OR DISTRIBUTION HEREOF.   ANY TRANSFER OF THIS
CERTIFICATE OR ANY LIMITED LIABILITY COMPANY INTERESTS REPRESENTED
HEREBY IS SUBJECT TO THE TERMS AND CONDITIONS OF THE LIMITED LIABILITY
COMPANY AGREEMENT (AS DEFINED BELOW).

Certificate No. 02                                    15.20% Percentage Interest

PCJV USA, LLC, a Delaware limited liability company (the "Company"), hereby
certifies that Amit Nemanim (together with any assignee of this Certificate, the "Holder") is the registered
owner of Fifteen and Two Tenths Percent (15.20%) of the limited liability company interests in the
Company. The rights, powers, preferences, restrictions and limitations of the interests in the Company are
set forth in, and this Certificate and the limited liability company interests in the Company represented
hereby are issued and shall in all respects be subject to the terms and provisions of, the Operating
Agreement of the Company dated as of _____, 2010, as the same may be further amended or
restated from time to time (the "Operating Agreement"). By acceptance of this Certificate, and as a
condition to being entitled to any rights and/or benefits with respect to the limited liability company interests
evidenced hereby, the Holder is deemed to have agreed to comply with and be bound by all the terms and
conditions of the Operating Agreement. The Company will furnish a copy of the Operating Agreement to
the Holder without charge upon written request to the Company at its principal place of business. Transfer
of any or all of the limited liability company interests in the Company evidenced by this Certificate is
subject to certain restrictions in the Operating Agreement and can be effected only after compliance with all
of those restrictions and the presentation to the Company of the Certificate, accompanied by an assignment
in the form appearing on the reverse side of this Certificate, duly completed and executed by and on behalf
of the transferor in such Transfer, and an application for transfer in the form appearing on the reverse side of
this Certificate, duly completed and executed by and on behalf of the transferee in such Transfer.

Each limited liability company interest in the Company shall constitute a "security" within
the meaning of (i) Section 8-102(a)(15) of the Uniform Commercial Code as in effect from time to time in
the States of Delaware and California and (ii) the Uniform Commercial Code of any other applicable
jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by
the American Law Institute and the National Conference of Commissioners on Uniform State Laws and
approved by the American Bar Association on February 14, 1995 (and each limited liability company
interest in the Company shall be treated as such a "security" for all purposes, including, without limitation
perfection of the security interest therein under Article 8 of each applicable Uniform Commercial Code).

This Certificate and the limited liability company interests evidenced hereby shall be
governed by and construed in accordance with the laws of the State of Delaware without regard to principles
of conflicts of laws.

IN WITNESS WHEREOF, the Company has caused this Certificate to be executed as of
the date set forth below.

Dated: _____, 2010

PCJV USA, LLC
a Delaware limited liability company

By: _____
        Name:    Amit Nemanim.
        Title:    President.

WEST\223117102.1

10/10/2011  11:44    13104789013                                                    PAGE  03/04

## CERTIFICATE FOR LIMITED LIABILITY COMPANY INTERESTS IN PCJV USA, LLC

**THIS CERTIFICATE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933 OR UNDER THE SECURITIES OR BLUE SKY LAWS OF ANY STATE.   THE HOLDER OF THIS CERTIFICATE, BY ITS ACCEPTANCE HEREOF, REPRESENTS THAT IT IS ACQUIRING THIS SECURITY FOR INVESTMENT AND NOT WITH A VIEW TO ANY SALE OR DISTRIBUTION HEREOF.  ANY TRANSFER OF THIS CERTIFICATE OR ANY LIMITED LIABILITY COMPANY INTERESTS REPRESENTED HEREBY IS SUBJECT TO THE TERMS AND CONDITIONS OF THE LIMITED LIABILITY COMPANY AGREEMENT (AS DEFINED BELOW).**

Certificate No. 03                                                    15.20% Percentage Interest

PCJV USA, LLC, a Delaware limited liability company (the "Company"), hereby certifies that Guy Koren (together with any assignee of this Certificate, the "Holder") is the registered owner of Fifteen and Two Tenths Percent (15.20%) of the limited liability company interests in the Company. The rights, powers, preferences, restrictions and limitations of the interests in the Company are set forth in, and this Certificate and the limited liability company interests in the Company represented hereby are issued and shall in all respects be subject to the terms and provisions of, the Operating Agreement of the Company dated as of _____, 2010, as the same may be further amended or restated from time to time (the "Operating Agreement").  By acceptance of this Certificate, and as a condition to being entitled to any rights and/or benefits with respect to the limited liability company interests evidenced hereby, the Holder is deemed to have agreed to comply with and be bound by all the terms and conditions of the Operating Agreement.  The Company will furnish a copy of the Operating Agreement to the Holder without charge upon written request to the Company at its principal place of business.  Transfer of any or all of the limited liability company interests in the Company evidenced by this Certificate is subject to certain restrictions in the Operating Agreement and can be effected only after compliance with all of those restrictions and the presentation to the Company of the Certificate, accompanied by an assignment in the form appearing on the reverse side of this Certificate, duly completed and executed by and on behalf of the transferor in such Transfer, and an application for transfer in the form appearing on the reverse side of this Certificate, duly completed and executed by and on behalf of the transferee in such Transfer.

Each limited liability company interest in the Company shall constitute a "security" within the meaning of (i) Section 8-102(a)(15) of the Uniform Commercial Code as in effect from time to time in the States of Delaware and California and (ii) the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995 (and each limited liability company interest in the Company shall be treated as such a "security" for all purposes, including, without limitation perfection of the security interest therein under Article 8 of each applicable Uniform Commercial Code).

This Certificate and the limited liability company interests evidenced hereby shall be governed by and construed in accordance with the laws of the State of Delaware without regard to principles of conflicts of laws.

IN WITNESS WHEREOF, the Company has caused this Certificate to be executed as of the date set forth below.

Dated: _____, 2010

PCJV USA, LLC
a Delaware limited liability company

By: _____

Name:  Amit Nemanik.
Title:  President

WEST\223117103.1

10/10/2011  11:44    13104709013

PAGE 04/04

## CERTIFICATE FOR LIMITED LIABILITY COMPANY INTERESTS IN
## PCJV USA, LLC

THIS CERTIFICATE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933 OR UNDER THE SECURITIES OR BLUE SKY LAWS OF ANY STATE.   THE HOLDER OF THIS CERTIFICATE, BY ITS ACCEPTANCE HEREOF, REPRESENTS THAT IT IS ACQUIRING THIS SECURITY FOR INVESTMENT AND NOT WITH A VIEW TO ANY SALE OR DISTRIBUTION HEREOF. ANY TRANSFER OF THIS CERTIFICATE OR ANY LIMITED LIABILITY COMPANY INTERESTS REPRESENTED HEREBY IS SUBJECT TO THE TERMS AND CONDITIONS OF THE LIMITED LIABILITY COMPANY AGREEMENT (AS DEFINED BELOW).

Certificate No. 04                                                9.60% Percentage Interest

PCJV USA, LLC, a Delaware limited liability company (the "Company"), hereby certifies that Amir Jacoby (together with any assignee of this Certificate, the "Holder") is the registered owner of Nine and Six Tenths Percent (9.60%) of the limited liability company interests in the Company. The rights, powers, preferences, restrictions and limitations of the interests in the Company are set forth in, and this Certificate and the limited liability company interests in the Company represented hereby are issued and shall in all respects be subject to the terms and provisions of, the Operating Agreement of the Company dated as of _____, 2010, as the same may be further amended or restated from time to time (the "Operating Agreement"). By acceptance of this Certificate, and as a condition to being entitled to any rights and/or benefits with respect to the limited liability company interests evidenced hereby, the Holder is deemed to have agreed to comply with and be bound by all the terms and conditions of the Operating Agreement. The Company will furnish a copy of the Operating Agreement to the Holder without charge upon written request to the Company at its principal place of business. Transfer of any or all of the limited liability company interests in the Company evidenced by this Certificate is subject to certain restrictions in the Operating Agreement and can be effected only after compliance with all of those restrictions and the presentation to the Company of the Certificate, accompanied by an assignment in the form appearing on the reverse side of this Certificate, duly completed and executed by and on behalf of the transferor in such Transfer, and an application for transfer in the form appearing on the reverse side of this Certificate, duly completed and executed by and on behalf of the transferee in such Transfer.

Each limited liability company interest in the Company shall constitute a "security" within the meaning of (i) Section 8-102(a)(15) of the Uniform Commercial Code as in effect from time to time in the States of Delaware and California and (ii) the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995 (and each limited liability company interest in the Company shall be treated as such a "security" for all purposes, including, without limitation perfection of the security interest therein under Article 8 of each applicable Uniform Commercial Code).

This Certificate and the limited liability company interests evidenced hereby shall be governed by and construed in accordance with the laws of the State of Delaware without regard to principles of conflicts of laws.

IN WITNESS WHEREOF, the Company has caused this Certificate to be executed as of the date set forth below.

Dated: _____, 2010

PCJV USA, LLC
a Delaware limited liability company

By: _____
    Name:  Amit Nemanim
    Title:  President.

WEST\23117104.1

# EXHIBIT C



Exhibit C

## PCVJ USA, LLC AND LA GROUP MASTER SERVICES AGREEMENT

This Master Services Agreement ("Agreement") dated _____6/18/13_____ is entered into by and between PCVJ USA, LLCa Delaware Limited Liability Company (hereinafter "PCVJ") and Amit Nemanim, Guy Koren and Amir Jacoby (whom are collectively referred to as the "LA Group").

### RECITALS

WHEREAS, PCJVwishes to contract with the LA Group to provide management and strategic experience and expertise.

WHEREAS, the LA Group agrees to provide Services to PCJV as delineated within this Agreement.

NOW, THEREFORE, the Parties hereby agree as follows:

<u>Services</u>:

1. The LA Group shall faithfully, diligently and efficiently exercise the following obligations and responsibilities:
    a. Conduct management, operations, marketing, establishment, maintenance, licensing and sub-licensing activities with respect to the Potato Corner outlets/stores in the Territory.
    b. Use best efforts at all times to operate and maintain the Potato Corner outlets/stores in the Territory according to the highest standards achievable, consistent with the overall plan of PCJV Management.
    c. Comply with the rules, policies and procedures approved by PCJV Management.
    d. Advertise, market, and promote the Potato Corner outlets/stores with the goal of causing public knowledge, awareness and patronage of the Potato Corner outlets/stores.
    e. Maintain a comprehensive system of records, books and accounts, with respect to the licensing and sub-licensing activities, operation, establishment, management, maintenance and other activities of the Potato Corner outlets/stores in the Territory with the assistance of the PCJV Corporate Secretary.
    f. No later than the twentieth (20th) day of each month, with respect to the preceding month, LA Group shall render a statement of receipts and disbursements, a schedule of accounts receivable and payable, and a schedule of fees collected and distributed, together with a reconciled bank statement as of the last day of the month with the assistance of the PCJV Corporate Secretary.
    g. No later than three (3) months after the end of a fiscal year, tha LA Group, with the assistance of the PCJV Corporate Secretary and an external accountant

hired by PCJV Management, cause PCJV to issue audited financial statements, and shall provide a copy of the same to all members of PCJV Management.

h. To the extent that the LA Group is able to do so, the LA Group shall take such action as may be necessary to comply promptly with any and all laws, ordinances, orders or other requirements of any federal, state, county or municipal authority having jurisdiction of PCJV and affecting PCJV.

i. The LA Group shall have a fiduciary duty to exercise the duty of care and shall, at all times, ensure that all corporate opportunities consistent with the objectives of PCJV shall be pursued. As such, with respect to the establishment of PCVJ-owned stores, whenever potential locations are identified by any member of the LA Group, it shall be promptly brought to the attention of PCJV Management. At all times, and within thirty (30) days from receipt of this information, PCJV Management shall decide whether or not to build a PCJV-owned store at the identified location. In the event PCJV chooses to build a PCJV-owned store at the identified location, it shall have the right to do so, to the exclusion of the LA Group. However, in the event that PCJV decides not to build a PCJV-owned store at the identified location, it shall notify the LA Group of its decision in writing. In such case, the LA Group shall have the right to build a store at the identified location, provided that it shall enter into a franchising agreement with PCJV, and shall pay franchise fees and ongoing royalty fees as set forth in PCJV's standard franchising agreement.

2. Territory for the purposes of this Agreement is defined as the United States of America and Israel, except in the County of Los Angeles, USA and the County of San Francisco, USA and Tanforan Mall.

3. The LA Group shall maintain and protect the Confidential Information belonging to PCJV, and such undertaking shall apply to all of its partners, officers, employees, or agents.

4. In consideration for the provision of its Services the LA Group shall be entitled to a service fee equal to thirty (30%) percent of all initial/franchise fees and continuing royalty fees paid to/collected by PCJV.

5. All withholding and other applicable taxes levied by any authority on the payments by PCJV to the LA Group under this Agreement shall be borne solely by PCJV.

Confidential Information:

1. The Parties acknowledge that from time to time, one Party (the "Discloser") may disclose to the other Party (the "Recipient") information : a) relating to the Potato Corner outlets and stores; b) relating to the Potato Corner Intangible Property Rights; c) Potato Corner product specifications and related information; d) which is marked with "confidential" or a similar legend; e) which is described orally and designated as confidential; or f) which would, under the circumstances, be understood by a reasonable person to be confidential ("Confidential Information").

2. Upon subsequent disclosure of previously disclosed Confidential Information to the Recipient by the Discloser, the information will remain Confidential Information even if not identified as Confidential Information at the subsequent disclosure.

3. Recipient shall retain such Confidential Information in confidence, and shall not disclose it to any Third Party or use it for other than the purposes of this Agreement without the Discloser's prior written consent.

4. Each Party shall use at least the same procedures and degree of care with respect to such Confidential Information which it uses to protect its on confidential information of like importance, and in no event less than reasonable care. The Recipient will immediately give written notice to the Discloser of any unauthorized use or disclosure of the Discloser's Confidential Information, and the Recipient will assist the Discloser in remedying such unauthorized use of disclosure.

## Duration of Agreement:

1. This Agreement shall become effective from the date of execution hereof and shall continue indefinitely unless terminated by a) mutual written agreement by the Parties or b) breach of any provision of this Agreement by either Party which will result in termination of this Agreement unless cured by the breaching Party within twenty (20) days from the date of the breach.

## General Provisions:

1. This Agreement may not be altered, changed, supplemented or modified except by a written instrument duly signed by the Parties.

2. The invalidity of any portion of this Agreement will not render the entire Agreement void, nor affect the validity of the rest of the provisions of this Agreement.

3. This Agreement shall be governed by the laws of the State of California.

4. Neither Party shall assign any of its rights or obligations under this Agreement without the prior written consent of the other Party.

5. The failure of any Party at any time to require performance by the others of any provision of this Agreement shall not affect, in any way, the right of such Party to require performance of that or any provision, and any waiver by any Party of any breach of this Agreement shall not be construed as a waiver of any continuing or succeeding breach of such provision, or a waiver of any other right under this Agreement.



IN WITNESS WHEREOF,

PCJV USA, LLC

Date

Name: Jose P. Magsaysay

Title:    CEO

LA Group

Amit Nemanim

Date

Guy Koren

Date

Amir Jacoby

Date

PCJV USA, LLC and LA Group Master Services Agreement
Page 4 of 4

# EXHIBIT D



## PCJV USA LLC
## JOINT VENTURE AGREEMENT
### (FIRST AMENDMENT TO THE JV AGREEMENT)

This Joint Venture Agreement (the "Agreement") is made and entered into on OCTOBER 17, 2012 at its Principal Office , Suite #1100, 6380 Wilshire Blvd Los Angeles, CA 90048 by and between:

POTATO CORNER INTERNATIONAL, a corporation duly existing and registered by virtue of and under the laws of the State of Delaware, US with office address at 92 Corporate Park Suite C-332, Irvine, California, USA 92606, represented herein by its duly authorized representative, Jose P. Magsaysay (hereinafter "PCI"), and its directors, Jose P. Magsaysay, Jr., Jose Miguel Ma. G. Montinola, Ma. Victoria O. Bermejo, Ricardo K. Montelibano, all of whom are Philippine citizens and resident, and collectively referred to as the "PCI Group";

-and-

GUY KOREN, AMIR JACOBY AND INBAL JACOBY all of whom are U.S. citizens and residents and collectively referred to as the "LA Group:

### RECITALS

WHEREAS, the Parties hereto have agreed to form a limited liability company (hereinafter referred to as the "Company") under the laws of the State of Delaware, with the primary purpose of engaging in the business of establishing, operating, managing, licensing and franchising "Potato Corner" stores/outlets in the United States of America and Israel, except in the County of Los Angeles, USA and the County of San Francisco, USA and Tanforan Mall (hereinafter, "Territory").

WHEREAS, the Parties herein have agreed to enter into this Agreement which sets forth the terms and conditions with respect to the organization, incorporation, operation and management of the Company and defines their respective rights, duties and obligations of the parties to this Agreement.

WHEREAS, the Parties agree that the LLC operating agreement to be entered by them shall reflect the terms and conditions as set forth in this Agreement.

WHEREAS, Cinco may assign and or all of its rights to the joint venture company formed under this Agreement to a wholly-owned subsidiary as it deems fit.

NOW, THEREFORE, for and in consideration of the foregoing premises, the Parties hereby agree as follows:

1) ORGANIZATION AND FORMATION OF THE COMPANY

a) Within ten (10) days from the Effective Date of this Agreement, the Parties herein agree to organize and form, a limited liability company to be called "PCJV USA" ( hereinafter referred to as the Company) for the primary purpose of engaging in

WEST\22455823.2

the business of establishing, operating, managing, licensing and franchising "Potato Corner" stores/outlets in the Territory.

b) The initial members of the Company shall be the following:

  i) Potato Corner International (PCI)
     (1) Jose P. Magsaysay, Jr.
     (2) Jose Miguel Ma. G. Montinola
     (3) Ma. Victoria O. Bermejo
     (4) Ricardo K. Montelibano

  ii) LA Group
     (1) Guy Koren
     (2) Amir Jacoby
     (3) Inbal Jacoby

c) The principal office of the Company shall be at   Suite 1100, 6380 Wilshire Blvd. Los Angeles, CA 90048 USA.

d) The annual general meeting of the members of the Company shall be held every year at the principal office of the Company. The members may, at their discretion, invite non-members to join the annual general meeting, but only as non-voting observers. Further, to the extent allowed by the financial condition of the Company, and as agreed upon by a majority of all member interests, the Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses incurred by the following members in attendance of the annual members' meeting: Jose P. Magsaysay, Jr., Jose Miguel Ma. Montinola, Ma. Victoria O. Bermejo and Ricardo K. Montelibano.

e) The fiscal year of the Company shall begin on January 1 and end on December 31 of each year.

f) The Company shall immediately upon formation obtain a "Liability Insurance" for the Company the amount and scope of coverage to be determined by the managers.

g) All costs, fees and expenses incurred in connection with the organization and formation of the Company shall be for the account of the Company.

h) The operating agreement of the Company shall reflect the terms and conditions set forth in this Agreement between the Parties.

2) CAPITALIZATION/OWNERSHIP OF THE COMPANY

a) At the time of formation, the Company shall have a total capital account of Fifty Thousand Dollars (US$50,000) which shall be fully subscribed and paid.

b) Unless other agreed to in writing, at the commencement of this Agreement, the Parties hereby agree that the Cindo Group shall contribute Thirty Thousand Dollars (US$30,000) and own sixty (60%) percent of the Company's capital

G. k

WEST\222455823.2

accounts, while the LA Group shall contribute Twenty Thousand Dollars (US$20,000) and own the remaining forty (40%) percent.

c) The Parties hereby agree any increase in the capital account shall require an affirmative vote of 75% of all of the members' percentage interests in the Company. In the event an increase in the Company's capital accounts is approved by the members, both Parties shall have rights of pre-emption so that their pro rata ownership share in the Company shall be maintained, provided that, either Party shall have thirty (30) days within which to confirm in writing that it is willing and able to subscribe and fully pay its pro rata share of the increase in capital.

d) Neither Party shall assign any of its rights or obligations under this Agreement, nor his/its member interests in the Company without the prior written consent of the other Party. In the event either Party desire to transfer or sell his/its pro rata members interest in the Company to a person other those specifically named in Section 1(a) of this Agreement, such Party shall be obligated to sell the same first to the other Party, which has have thirty (30) days within which to exercise its rights of first refusal from the date of receipt of a written notice to sell. For this purpose, the Parties hereby agree that the right of first refusal may be exercised in accordance with the following formula: The average of the Company's earnings before interest, depreciation, taxes and amortization (EBITDA) for the last two (2) years multiplied by 5 times, and further multiplied by the percentage of member interest subject to such right of first refusal over total outstanding member interests.

3) MANAGEMENT OF THE COMPANY

a) As will be provided in the Operating Agreement, the business and affairs of the Company shall be managed and all of the Company powers shall be exercised by or under the direction of the managers (collectively referred to as "Management"). Unless otherwise agreed to by the parties, the Management shall be composed of seven (7) members, four (4) of whom shall be designated by the Cinco Group, and three (3) designated by the LA Group. Upon the formation of the Company, the following shall be named managers: Jose P. Magsaysay, Jr., Jose Miguel Ma. Montinola, Ma. Victoria O. Bermejo, Ricardo K. Montelibano, Guy Koren, Amir Jacoby and Inbal Jacoby.

b) The Management shall regularly meet on a monthly basis. The regular monthly board meeting may be done via teleconference or through the internet. The members may, at their discretion, invite non-members to join member meetings, but only as non-voting observers. Further, to the extent allowed by the financial condition of the Company, and as agreed upon by a majority of all member interests, the Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses incurred by the members named in Section 1(d) in attendance of said meetings.

c) Upon the formation of the Company, it shall have the following executive officers; President, Corporate Secretary and Treasurer, and the following shall be elected by the managers/members to serve these positions. Any change in these mentioned executive officers will require a vote of 75% of members' interest.

3     G.к   AJ

i)   Chairman of the Board of Members – Jose P. Magsaysay
ii)  President – At any given time, the President shall be any one of the following
     members: Guy Koren or Amir Jacoby or Inbal Jacoby and the first president
     will be Amit Nemanim now replaced by Guy Koren
iii) Corporate Secretary – Erlinda S. Bartolome.
iv)  Treasurer – Maria Victoria O. Bermejo
     (1) The Treasurer shall have oversight functions over the Accounting and
         Finance Departments that shall be exercised independent of the
         President.

d) Additional executive officers may be appointed by Management as it may deem
   necessary. Replacement and removal will require Managers simple majority vote.

e) It is hereby agreed that the rights and responsibilities of the Management shall
   include the following:

   i)   Approval of the compensation package for the managers, executive offices
        and key personnel.
   ii)  Approval of the Accounting System/Procedures/Software/Method to be used
        by the Company.
   iii) Approval of the operating budget of the Company, and any changes to it.
   iv)  Approval of all franchising agreements, and lease agreements.
   v)   Approval of all purchases and disbursements in excess of $10,000, provided
        that such amount may be changed or modified by Management as it deems
        necessary.

f) The executive officers shall manage the business and property of the Company,
   and to market the business, in accordance with and pursuant to the directives of
   and policies set by the Management of the Company. The Management of the
   Company can recall and/or withdraw the appointment of any executive officer, as
   it deems necessary.

g) The Company shall enter into a Master License Agreement with Cinco (or an
   affiliated company to be designated by Cinco) which shall include the following
   terms and conditions:

   i)   The Company agrees to license the "POTATO CORNER" intellectual
        property rights from Cinco or an affiliated company to be designated by
        Cinco) consisting of (i) the trademark, service mark and trade name
        "POTATO CORNER"; and (ii) various trademarks, service marks, trade
        names, slogans, designs, insignias, emblems, symbols, color schemes,
        package features, logo and other propriety identifying characteristics used in
        relation and in connection with the 'Potato Corner' Products and the System;
        and (iii) as well as other intellectual property rights in connection with the
        "POTATO CORNER" intellectual property rights, for use in the Territory.

   ii)  The Company agrees to pay, as an arm's length license fee, the following
        amounts:

4



G. K

(1) With respect to the licensing / sub-licensing or franchising the "POTATO CORNER" intellectual property rights in connection with the "POTATO CORNER" outlets/stores, an amount equal to thirty percent (30%) of all initial/franchise fees and ongoing royalty fees paid to/ collected by the Company. Payments shall be made to Cinco (or an affiliated company to be designated by Cinco) by wire transfer using a bank or other financial institution specified by it within thirty (30) days from receipt of the fees by the Company.

(2) All withholding and other applicable taxes levied by any authority on the payments by the Company shall be borne solely by the Company.

h) The Company agrees to engage the LA Group to provide management and strategic experience and expertise during the duration of this Agreement. The Company shall enter into a Master Services Agreement with the LA Group (or a corporation to be designated by the LA Group) which shall include the following terms and conditions:

   i) In consideration for the provision of its services under the Master Services Agreement, the LA Group shall be entitled to a services fee equal to thirty (30%) percent of all initial/franchise fee and continuing royalty fees paid to/ collected by the Company .

   ii) All withholding and other applicable taxes levied by any authority on the payments by the Company to the LA Group under this Agreement shall be borne solely by the Company.

   iii) The LA Group shall faithfully, diligently and efficiently exercise its obligations and responsibilities under the Master Services Agreement.

   iv) The LA Group shall maintain and protect the Confidential Information belonging to Cinco or the Company, and such undertaking shall apply to all of its partners, officers, employees, or agents.

I) The President of the Company shall render the following services and shall perform the following duties for the Company in a faithful, diligent and efficient manner:

   i) The President shall be responsible for all management, operational, marketing, establishment, maintenance, licensing and sub-licensing activities with respect to the "Potato Corner" outlets/stores in the Territory. He shall use his best efforts at all times during the term of this Agreement to operate and maintain the "Potato Corner" outlets/stores in the Territory according to the highest standards achievable consistent with the overall plan of the Management of the Company. The President shall comply with the rules, policies and procedures approved by the Management of the Company from time to time.

   ii) The President shall advertise market and promote the "Potato Corner" outlets/stores with the goal of causing public knowledge, awareness and patronage of the "Potato Corner" outlets/sites.



5

G.k   AT

iii) The President shall maintain a comprehensive system of records, books and accounts, with respect to the licensing and sub-licensing activities, operation, establishment, management, maintenance and other activities of the "Potato Corner" outlets /stores in the Territory with the assistance of the Corporate Secretary.

iv) No later than the twentieth (20th) day of each month, with respect to the preceding month, the President shall render a statement of receipts and disbursements, a schedule of accounts receivable and payable, and a schedule of fees collected and distributed, together with a reconciled bank statement as of the last day of the month with the assistance of the Corporate Secretary.

v) No later than three (3) months after the end of a fiscal year, the President shall, with the assistance of the Corporate Secretary and external accountant hired by Management, cause the Company to issue audited financial statements, and shall provide a copy of the same to all the members of Management.

vi) To the extent the President is lawfully able to do so, the President shall take such action as may be necessary to comply promptly with any and all laws, ordinances, orders or other requirements of any federal, state, county or municipal authority having jurisdiction of the Company and affecting the Company.

j) Consistent with its fiduciary duty to the Company, the members and managers shall exercise the duty of care and shall, at all times, ensure that all corporate opportunities consistent with the objectives of this Agreement shall be pursued on behalf of, and for the benefit of the Company. As such, with respect to the establishment of Company-owned stores, whenever potential locations are identified by any member or manager, it shall be promptly brought to the attention of the Management. At all times, and within thirty (30) days from receipt of this information, the Management shall decide to either build a Company-owned store at the identified location. In the event the Company chooses to build a Company-owned store at the identified location, it shall have the right to do so, to the exclusion of any of the members or managers. However, in the even the Company decides not to build a Company-owned store at the identified location, it shall notify the members and managers of its decision in writing. In such case, the LA Group shall have the right to build a store at the identified location, provided that it shall enter into a franchising agreement with the Company, and shall pay the franchise fees and ongoing royalty fees as set forth in the Company's standard franchising agreement.

4) DURATION OF AGREEMENT

a) This Agreement shall become effective from the date of execution hereof and, shall continue indefinitely unless otherwise terminated by (i) an affirmative vote of 75 percent (75%) of all member interests, or (ii) upon mutual agreement by the Parties in writing.



6

$G, k$

b) Upon termination of this Agreement, the effects of termination shall be as follows:

    i) All rights granted under the Master License Agreement shall terminate and the Company shall cease the use of the Potato Corner Intellectual Property Rights, and Confidential Information, provided however, that the Company shall be permitted to use any of the foregoing as is reasonably required in order to comply with its obligations under its sub-licensing or franchising agreements, but only to the extent of the duration of sub-licensing or franchising agreements in existence at the time of the termination of this Agreement.

    ii) The LA Group shall be subject to a non-compete arrangement and hereby agrees that, within two (2) years from the date of termination of this Agreement, it shall not engage in the business of establishing, operating, managing, licensing and franchising identical or similar products sold by the Company, using the intellectual property rights identical or similar to those used by the Company, at the time of the termination of this Agreement.

5) GENERAL PROVISIONS

a) This Agreement may not be altered, changed, supplemented or modified except by a written instrument duly signed by the Parties.

b) The Parties shall use their best efforts to cooperate for the success of the business of the Company. The Parties further agree to perform all acts and execute and deliver all documents or instruments required or necessary to fully implement or consummate the transactions contemplated in and the intent underlying this Agreement.

c) The Parties shall, to the extent feasible, cause the operating agreement of the Company to reflect the mutual covenants and provisions contained in this Agreement.

d) All notices and other communications required or permitted to be given hereunder shall be given in writing (and for this purpose shall include emails or fax transmissions) and shall be addressed to the appropriate Party at the address of such Party as heretofore designated, or at such address as such Party may designate subsequently in writing.

e) The failure of any Party at any time to require performance by the others of any provision of this Agreement shall not affect, in any way, the right of such Party to require performance of that or any other provision, and any waiver by any Party of any breach of this Agreement shall not be construed as a waiver of any continuing or succeeding breach of such provision, or a waiver of any other right under this Agreement.

f) This Agreement shall constitute the entire agreement between the Parties and shall supersede any previous agreements, written or otherwise, with respect to the same subject matter which may have been made by the Parties prior hereto.

7

g) The invalidity of any portion of this Agreement will not and shall not render the entire Agreement void, nor affect the validity of the rest of the provisions of this Agreement.

h) This Agreement shall be governed by the laws of the State of California.

I) Parties acknowledge that, from time to time, one Party (the "Discloser") may disclose to the other Party (the "Recipient") information: (a) relating to the Potato Corner outlets and sites; (b) relating to the Potato Corner Intangible Property Rights; (c) Potato Corner product specifications and related Information; (d) which is marked with "confidential" or a similar legend; (e) which is described orally and designated as confidential; or (f) which would, under the circumstances, be understood by a reasonable person to be confidential ("Confidential Information"). Upon subsequent disclosure of previously disclosed Confidential Information to the Recipient by the Discloser, the information will remain Confidential Information even if not identified as Confidential Information at the subsequent disclosure.    Recipient shall retain such Confidential Information in confidence, and shall not disclose it to any Third Party or use it for other than the purposes of this Agreement without the Discloser's prior written consent. Each Party shall use at least the same procedures and degree of care with respect to such Confidential Information which it uses to protect its own confidential information of like importance, and in no event less than reasonable care.  The Recipient will immediately give written notice to the Discloser of any unauthorized use or disclosure of the Discloser's Confidential Information, and the Recipient will assist the Discloser in remedying such unauthorized use or disclosure.

[The Remainder of This Page is Left Intentionally Blank]



8

IN WITNESS WHEREOF, the parties have executed this Agreement on the date and in place first mentioned.

**POTATO CORNER INTERNATIONAL GROUP:**

Jose P. Magsaysay, Jr.,

Jose Miguel Ma. G. Montinola

Ma. Victoria O. Bermejo

Ricardo K. Montelibano,

**L.A. Group:**

Inbal Jacoby

Guy Koren

Amir Jacoby

SIGNED IN THE PRESENCE OF:

ACKNOWLEDGMENT

9

WEST\222455823.2

# EXHIBIT E



**SERVICES AGREEMENT**

By and between Potato Corner Joint Venture, also known as PCJV USA LLC referred to as "Company", and Guy Koran AND Amir Jacoby known as "LA Group" and referred herein as "Management Partner"

The Company, located at 6380 Wilshire Blvd. Suite 1100 Los Angeles, CA 90048, engages LA Group of 8950 W. Olympic Blvd. #563, Beverly Hills, CA 90211 on the following terms and conditions:

1. Start Date: Engagement shall commence on January 1, 2011 time being of the essence.

2. DUTIES: Management Partner agree to perform the duties set out herein:

A. Management Duties

LA Group as Management Partner shall perform its duties as follows:

Guy Koren shall act as President and Managing Partner; and Amir Jacoby as Managing Partner, and shall develop and direct the business known as Potato Corner in the United States and other available territories as assigned. This will include overall day-to-day management of company efforts to develop the venture into a growing fast-food franchise, day-to-day management of company assets, day-to-day management of company efforts to develop independent franchisee relationships, day-to-day management of Management Partner, and provide direction of the company to increase its revenue and member value as directed by and at the discretion of the company board of directors.

Managing Partner shall perform such further duties as are customarily performed by holding such positions in other businesses of the same or similar nature as that engaged in by Company.

3. COMPENSATION: In consideration of the foregoing, Company shall pay Management Partner a services fee of $240,000 per year, for services, payable on a monthly basis.

ADDITIONAL COMPENSATION: Management Partner shall be entitled to a waiver of any and all royalties and franchise fees due to PCJV USA LLC for any Potato Corner branded stores, units, or other means of sale owned and operated by Management Partner during the entire term of the relationship between Management Partner and PCJV USA LLC.

4. DURATION OF EMPLOYMENT: Management Partner's agreement shall remain in effect until it is terminated by either party, commencing at the date of signature on this agreement.

5. TERMINATION: This agreement may be terminated at will by the company board of directors or earlier upon (1) death of Management Partner or illness or incapacity that prevents Management Partner from performing his/her duties for a period of more than 16 weeks in any calendar year and (2) breach of the agreement by Management Partner. Such option shall be exercised by Employer giving a notice to Management Partner by certified mail, addressed to him at the above named address. With such notice, this agreement shall cease and come to an end five (5) days after in which the notice is mailed.

6. MISCELLANEOUS: (1) Management Partner agrees not to disclose any of Company's trade practices, proprietary information, formulations, or other items classified as trade secrets during or after the employment for a period of up to 48 months. (2) In the event of any dispute over this agreement, it shall be resolved through binding arbitration under the rules of the American Arbitration Association.

In witness whereof, both parties have executed this agreement at 6380 Wilshire Blvd. Suite 1100 Los Angeles, CA 90048, on (date).

PCJV USA, LLC:

Management Partner

Date: Jan 1st, 2017

LA Group, LLC:

Management Partner

Date: 1/1/17

1    **VERIFICATION**

2

3       I have read the foregoing **VERIFIED THIRD AMENDED COMPLAINT** and know its

4    contents.

5       I am CEO of Potato Corner International, Inc., a Plaintiff and Cross-Defendant in this

6    action. The matters stated in the foregoing document are true of my own knowledge except as to

7    those matters which are stated on information and belief, and as to those matters I believe them to

8    be true.

9       Executed on this 28th day of June 2019, at Manila, Philippines.

10      I declare under penalty of perjury under the laws of the State of California that the

11   foregoing is true and correct.

12                                    POTATO CORNER INTERNATIONAL, INC.

13

14                                    JOSE P. MAGSAYSAY, JR.
                                      Its:CEO
15

16

17

18

19

20

21

22

23

24

25

26

27

28

16544.2:9615770.1                          50
                       VERIFIED THIRD AMENDED COMPLAINT

1

## **PROOF OF SERVICE**

2

**Cinco Corporation, et al. v. Guy Koren, et al.**
**Case No. BC701075**

3

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

4

5   At the time of service, I was over 18 years of age and **not a party to this action**. I am employed in the County of Los Angeles, State of California. My business address is 9401 Wilshire Boulevard, Ninth Floor, Beverly Hills, CA 90212-2974.

6

7   On June 28, 2019, I served true copies of the following document(s) described as **VERIFIED THIRD AMENDED COMPLAINT** on the interested parties in this action as follows:

8

### **SEE ATTACHED SERVICE LIST**

9

10   **BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to J&K Consultants Group, LLC at the addresses listed in the Service List and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with Ervin Cohen & Jessup LLP's practice for collecting and processing correspondence for mailing. On the same day that the correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

11

12

13

14   **BY E-MAIL OR ELECTRONIC TRANSMISSION:** I caused a copy of the document(s) to be sent from e-mail address kparr@ecjlaw.com to the persons at the e-mail addresses listed in the Service List (except for J&K Consultants Group, LLC, which is served by mail). I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

15

16

17   I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

18   Executed on June 28, 2019, at Beverly Hills, California.

19

20



21   Kevin Parr

22

23

24

25

26

27

28

ERVIN COHEN & JESSUP LLP

1

**SERVICE LIST**
**Cinco Corporation, et al. v. Guy Koren, et al.**
**Case No. BC701075**

2

| | |
|---|---|
| 3   Todd M. Lander, Esq. | Attorneys for Defendants and Cross- |
|      todd.lander@ffslaw.com | Complainants Guy Koren, GK Captial Group, |
| 4   Arash Beral, Esq. | LLC, Alon Koren, Thomas Hodgson, Emily |
|      arash.beral@ffslaw.com | Garcia, and Cross-Complainant Ashley |
| 5   Ms. Maria Villagran | Grundnowski |
|      maria.villagran@ffslaw.com | |
| 6   FREEMAN, FREEMAN & SMILEY, LLP | |
|      1888 Century Park East, Suite 1900 | |
| 7   Los Angeles, CA 90067 | |

| | |
|---|---|
| 8   James Cooper, Esq. | Attorneys for Cross-Defendants Amir Jacoby |
|      jcooper@laklawyers.com | and Inbal Jacoby |
| 9   Ms. Lauri Lord | |
|      llord@laklawyers.com | |
| 10  LEVINSON ARSHONSKY & KURTZ, LLP | |
|      15303 Ventura Blvd., Suite 1650 | |
| 11  Sherman Oaks, CA 91403 | |

| | |
|---|---|
| 12  Frances M. O'Meara, Esq. | Attorneys for Cross-Complainant PCI Trading, |
|      FOMeara@thompsoncoe.com | LLC and Nominal Defendant and Cross- |
| 13  Stephen M. Caine, Esq. | Complainant PCJV USA, LLC |
|      SCaine@thompsoncoe.com | |
| 14  Holly M. Teel, Esq. | |
|      THOMPSON COE | |
| 15  12100 Wilshire Blvd | |
|      Suite 1200 | |
| 16  Los Angeles, California 90025 | |

| | |
|---|---|
| 17  Daniel Sable, Esq. | Attorneys for Defendants and Cross- |
|      dsable@seyfarth.com | Complainants NKM Capital Group, LLC, |
| 18  Eric McDonough, Esq. | J & K Americana, LLC, J & K CULVER, |
|      emcdonough@seyfarth.com | LLC, J&K Lakewood, LLC, J&K Oakridge, |
| 19  Mr. Jeffrey Gimble | LLC, J&K Valley Fair, LLC, J & K Capital |
|      jgimble@seyfarth.com | 2, LLC, J & K Ontario, LLC, J&K PC |
| 20  SEYFARTH SHAW LLP | Trucks, LLC, and Potato Corner LA Group, |
|      2029 Century Park East | LLC |
| 21  Suite 3500 | |
|      Los Angeles, CA 90067-3021 | |

| | |
|---|---|
| 22 | |
|      J&K Consultants Group, LLC | Agent for Service of Process |
| 23  c/o Elinor Cody | |
|      1017 L. Street, #439 | |
| 24  Sacramento, CA 95814 | |

25

26

27

28

2

# EXHIBIT 80

1  TODD M. LANDER (BAR NO. 173031)
   todd.lander@ffslaw.com
2  ARASH BERAL (BAR NO. 245219)
   arash.beral@ffslaw.com
3  FREEMAN, FREEMAN & SMILEY, LLP
   1888 Century Park East, Suite 1900
4  Los Angeles, California 90067
   Telephone: (310) 255-6100
5  Facsimile: (310) 255-6200

6  Attorneys for Defendant and Cross-Complainant
   GUY KOREN

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9              COUNTY OF LOS ANGELES, CENTRAL DISTRICT

10

11  CINCO CORPORATION,                    Case No. BC701075

12           Plaintiff,                   CROSS-COMPLAINANT GUY KOREN'S
                                          VERIFIED CROSS-COMPLAINT FOR:
13       vs.
                                          1. BREACH OF FIDUCIARY DUTY;
14  GUY KOREN, an individual; and DOES 1  2. INTENTIONAL INTERFERENCE
    through 25, inclusive,                   WITH CONTRACTUAL RELATIONS;
15                                         3. INTENTIONAL INTERFERENCE
             Defendants.                     WITH PROSPECTIVE ECONOMIC
16                                           RELATIONS;
                                          4. NEGLIGENT INTERFERENCE
17  GUY KOREN,                               WITH PROSPECTIVE ECONOMIC
                                             RELATIONS;
18           Cross-Complainant,           5. INDUCEMENT TO BREACH
                                             CONTRACTUAL DOCUMENTS;
19       vs.                              6. UNFAIR COMPETITION IN
                                             VIOLATION OF CAL. BUS. & PROF.
20  CINCO CORPORATION, a Philippines         CODE §§ 17200, ET SEQ.;
    corporation; POTATO CORNER           7. BREACH OF WRITTEN CONTRACT;
21  INTERNATIONAL, INC., a Delaware       8. FRAUDULENT INDUCEMENT;
    Corporation; MYROSE VICTOR, an        9. BREACH OF ORAL CONTRACT;
22  individual; JOHN EDWARD HERNANDEZ,    10. BREACH OF IMPLIED-IN-FACT
    an individual; JOSE P. MAGSAYSAY, JR.,    CONTRACT;
23  an individual; MARIVIC DEL PILAR, an  11. BREACH OF THE COVENANT OF
    individual; RICARDO ENRIQUE K.            GOOD FAITH AND FAIR DEALING;
24  MONTELIBANO, an individual; BEN       12. ACCOUNTING; AND
    OLIVAS, an individual; AMIR JACOBY, an 13. DECLARATORY RELIEF
25  individual; INBAL JACOBY, an individual;
    and ROES 1 through 100, inclusive,    Assigned for All Purposes to the
26                                        Hon. Rafael Ongkeko, Dept. 73
             Cross-Defendants.
27                                        Action Filed:      April 10, 2018

28

3782229 1 24069-200

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

MAY -- 8 2018

Sherri R. Carter, Executive Officer/Clerk
By Nancy Alvarez, Deputy

1  Cross-Complainant Guy Koren ("Cross-Complainant" or "Mr. Koren"), complains of
2  Cross-Defendants CINCO CORPORATION ("Cinco"), POTATO CORNER INTERNATIONAL,
3  INC., ("PCI"), MYROSE VICTOR ("Ms. Victor"), JOHN EDWARD HERNANDEZ ("Mr.
4  Hernandez"), JOSE MAGSAYSAY, JR. ("Mr. Magsaysay"), MARIVIC DEL PILAR ("Ms. Del
5  Pilar"), RICARDO ENRIQUE K. MONTELIBANO ("Mr. Montelibano"), BEN OLIVAS ("Mr.
6  Olivas"), AMIR JACOBY ("Mr. Jacoby"), INBAL JACOBY ("Mrs. Jacoby"), and ROES 1
7  through 100, inclusive (collectively, "Cross-Defendants" and each a "Cross-Defendant"), and
8  alleges as follows:

## BACKGROUND

10  1.  "There is a sufficiency in the world for man's need," Ghandi said, "but not for man's
11  greed." That observation, uttered decades ago, aptly describes the rapacious corporate maneuvering
12  and malfeasance at the crux of this dispute. The Cross-Defendants, in a campaign of manipulation
13  and fraud that would have made Machiavelli whistle in grudging admiration, induced Mr. Koren to
14  devote years of his labor and expertise in developing and building the American franchises of a
15  popular foreign food chain – all on the promise of financial reward once the business began
16  generating more durable revenue – only to discard him the moment the franchises, due to his hard
17  work, reached breakthrough success and Mr. Koren requested a consequent increase in his personal
18  compensation. In short, rather than spreading the benefits of that success to those responsible for it,
19  the Cross-Defendants instead seized the financial spoils for themselves and cut out the architect of
20  the underlying business plan and the man who nurtured the business from infancy to corporate
21  adulthood, all while being vastly underpaid – Mr. Koren. No good deed goes unpunished.

22  2.  The specific facts of this sordid tale, alleged in detail below, are stark. Mr. Koren,
23  who long dreamed of bringing his entrepreneurial talents to the United States, conjured the idea of
24  franchising the popular Potato Corner French Fries chain – which he'd come to appreciate as a child
25  of an Israeli diplomat in the Philippines years before – in this country. He then proposed a
26  blueprint for doing so to Cinco (the owner of the Potato Corner brand headquartered in the
27  Philippines), which agreed to have Mr. Koren lead the efforts in expanding and franchising the
28  business in the United States. And in came Mr. Jacoby, with whom Mr. Koren agreed to a

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3782229.1 24069-200
2

1 straightforward and common structure – Mr. Koren would provide the time, labor and expertise

2 essential to building the franchises, and Mr. Jacoby would provide the seed capital. The two

3 proceeded to enter into a joint venture agreement with the Cinco Group to expand Potato Corner

4 into the United States (with Mr. Koren at the helm) in addition to opening 8 franchises of their own

5 over the ensuing 8 years, all in accordance with this paradigm. Mr. Koren, for his part, worked

6 tirelessly as these start-up businesses experienced the growing pains natural to any new enterprise.

7 By late 2017, however, and because of Mr. Koren's efforts, the businesses gained traction and

8 established themselves. Mr. Koren had, through determination and sweat equity, constructed a

9 successful franchise business.

10       3.      Mr. Koren had never been paid appropriately, however, nor had he insisted on

11 compensation that approximated the packages similarly situated executives were receiving. As of

12 early 2018, in fact, Mr. Koren was receiving compensation amounting to a fraction of what the

13 market would bear for the services he was providing. Accordingly, in January 2018, he increased

14 his salary to an amount that, while certainly higher than what he had been previously earning, was

15 nonetheless still below market value. But that single and innocuous act – namely, taking a modest

16 financial benefit – was too much for the Cross-Defendants, who swiftly moved to crush Mr. Koren

17 and purge him from the business he had built. And their speed with which they executed their coup

18 was withering. Mr. Jacoby initiated the assault by unlawfully and illegally withdrawing over

19 $50,000 in funds from the business' bank accounts without any claim or legitimate right to them.

20 Then, when Mr. Koren (as the person charged with management of the business) lawfully and

21 justifiably changed the business' banking relationship in order to safeguard the company funds

22 from Mr. Jacoby's continuing raid, Mr. Jacoby colluded with the other Cross-Defendants to push

23 Mr. Koren out of the business altogether. The final act was a concocted "meeting" of the

24 management of the joint venture that served as the partnership governing the operation of the

25 various Potato Corner franchises, where, in Darwinian malice, the Cross-Defendants purported to

26 eject Mr. Koren as an owner and manager of the entire enterprise.

27       4.      That, then, was Mr. Koren's reward for contributing years of his life to this

28 enterprise – an attempt to forcibly remove him from the business, simply because he took the

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 80067
(310) 255-6100

3782229.1 24069-200                              3

1 audacious step of increasing his officer compensation from massively below market to simply
2 below market. No good deed indeed. As alleged below, the Cross-Defendants' conduct, for all its
3 sound and fury, was both improper and illegal, and did not effectuate his removal from the
4 business. But this misconduct, both past and present, is creating an unsettled state of affairs, which
5 has caused Mr. Koren (and the subject businesses) to suffer both irreparable harm and a substantial
6 amount of damages, well exceeding the minimum jurisdictional amount of this Court. For these
7 reasons, Mr. Koren brings this Cross-Complaint.

## THE PARTIES

9      5.     Mr. Koren is, and at all relevant times was, an individual residing in the County of
10 Los Angeles, State of California.

11     6.     Cross-Complainant is informed and believes and thereon alleges that Cross-
12 Defendant Cinco is, and at all relevant times was, a corporation organized and existing under the
13 Republic of the Philippines, and that it conducts business in the United States, including in the
14 County of Los Angeles, State of California. A search of "Cinco" and "Cinco Corporation" on the
15 California Secretary of State's website does not at present yield any positive results leading Cross-
16 Complainant to believe that Cinco is not registered with the California Secretary of State.

17     7.     Cross-Complainant is informed and believes and thereon alleges that Cross-
18 Defendant PCI is, and at all relevant times was, a corporation organized and existing under the State
19 of Delaware, and that it conducts business in the United States, including in the County of Los
20 Angeles, State of California. At present, the California Secretary of State's website indicates that
21 PCI is "FTB FORFEITED" but that it was registered on October 28, 2010 by Mr. Olivas as its
22 "Assistant Secretary" as well as its agent for service of process. Cross-Complainant is informed
23 and believes and thereon alleges that PCI is owned by Cinco and by Mr. Olivas.

24     8.     Cross-Complainant is informed and believes and thereon alleges that Cross-
25 Defendant Ms. Victor is, and at all relevant times was, an individual residing in the Republic of the
26 Philippines who routinely maintains contacts with the United States including with the County of
27 Los Angeles, State of California.

28 ///

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1    9.    Cross-Complainant is informed and believes and thereon alleges that Cross-
2 Defendant Mr. Hernandez is, and at all relevant times was, an individual residing in the Republic of
3 the Philippines who routinely maintains contacts with the United States including with the County
4 of Los Angeles, State of California.

5    10.    Cross-Complainant is informed and believes and thereon alleges that Cross-
6 Defendant Mr. Magsaysay is, and at all relevant times was, an individual residing in the Republic of
7 the Philippines who routinely maintains contacts with the United States including with the County
8 of Los Angeles, State of California.

9    11.    Cross-Complainant is informed and believes and thereon alleges that Cross-
10 Defendant Ms. Del Pilar is, and at all relevant times was, an individual residing in the Republic of
11 the Philippines who routinely maintains contacts with the United States including with the County
12 of Los Angeles, State of California.

13    12.    Cross-Complainant is informed and believes and thereon alleges that Cross-
14 Defendant Mr. Montelibano is, and at all relevant times was, an individual residing in the Republic
15 of the Philippines who routinely maintains contacts with the United States including with the
16 County of Los Angeles, State of California.

17    13.    Cross-Complainant is informed and believes and thereon alleges that Cross-
18 Defendant Mr. Olivas is, and at all relevant times was, an individual residing in Belmont,
19 California.

20    14.    Cross-Complainant is informed and believes and thereon alleges that Cross-
21 Defendant Mr. Jacoby is, and at all relevant times was, an individual residing in Los Angeles,
22 California.

23    15.    Cross-Complainant is informed and believes and thereon alleges that Cross-
24 Defendant Mrs. Jacoby is, and at all relevant times was, an individual residing in Los Angeles,
25 California, and is Mr. Jacoby's wife.

26    16.    Cross-Complainant is ignorant of the true names and capacities of the cross-
27 defendants sued herein as ROES 1 through 100, inclusive, and therefore sues said cross-defendants
28 by said fictitious names. Cross-Complainant will amend this Cross-Complaint to allege their true

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1    names and capacities when ascertained.

2        17.    Cross-Complainant is informed and believes and thereon alleges that each of the
3    fictitiously named cross-defendants is responsible in some manner for the occurrences herein
4    alleged and that Cross-Complainant's damages were proximately caused thereby. Cross-
5    Complainant is informed and believes and thereupon alleges that at all times relevant herein, each
6    of the ROE cross-defendants and the named Cross-Defendants were the agents and/or employees of
7    one or more of the other cross-defendants, were acting within the course and scope of said agency
8    and/or employment, and that each cross-defendant has aided and assisted one or more of the other
9    cross-defendants in committing the wrongful acts herein alleged.

10       18.    Cross-Complainant is informed and believes and thereon alleges that Cross-
11   Defendants, and each of them, conspired and agreed among themselves to do the acts complained of
12   herein and were, in doing the acts complained of herein, acting pursuant to said conspiracy, and that
13   each Cross-Defendant sued herein is jointly and severally responsible and liable to Cross-
14   Complainant for the damages alleges herein.

15                        **GENERAL ALLEGATIONS**

16             **Mr. Koren Brings "Potato Corner" to the United States**

17       19.    As a young teenage resident of the Philippines in the early 1990s, Mr. Koren – who
18   was then living in the Far East by virtue of his father's work for the Israeli Embassy in Manila –
19   imagined the day he could live in the United States and pursue the American dream.  And, while in
20   the Philippines, he fell in love with that most American of food – the french fry.  More particularly,
21   he became enamored of a seasoned french fries business known as "Potato Corner" and, as the
22   years passed, became determined to bring Potato Corner to this country.

23       20.    By 2009, Mr. Koren had realized his ambition of living and working in the United
24   States, and was a successful entrepreneur in Los Angeles.  At around that time, he met with Mr.
25   Magsaysay, the CEO of Cinco (the company that owned the Potato Corner brand) and the two
26   ultimately agreed that Mr. Koren would expand Potato Corner into the United States.  Based on that
27   agreement, Mr. Koren – through an entity named NKM Capital Group, LLC ("NKM Capital") –
28   came to open his first Potato Corner store in Santa Anita, California in or about February 2010.

3782229 1 24069-200
                                    6

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**Mr. Jacoby Becomes a Non-Managing Investor in the Franchisees Controlled by Mr. Koren Based on an Agreement to Fund 100% of Mr. Koren's Capital Contributions**

21.    NKM Capital was formed to manage and control the first Santa Anita location of Potato Corner. Mr. Koren and his brother Alon Koren together own a majority 51% stake in NKM Capital and Mr. Koren has always been and continues to be its managing member. Mr. Jacoby owns approximately 25.75% of the membership in NKM Capital, though he acquired that minority interest only after inducing Mr. Koren to transfer to him that stake on a promise that he – Mr. Jacoby – would fund 100% of Mr. Koren's required capital contributions in NKM Capital and likewise fund Mr. Koren's participation in any future Potato Corner franchises. The specific terms of the agreement provided that Messrs. Koren and Jacoby would solicit future Potato Corner franchises and, where successful, each would acquire an equal share in the franchises so long as Mr. Jacoby funds all of Mr. Koren's required capital contributions (the "Jacoby-Koren Agreement"). Mr. Koren would, in return, devote his time and expertise to managing the franchises and maximizing their profitability. Mr. Jacoby would provide the initial financial support, in other words, and Mr. Koren would furnish the sweat equity and know-how necessary to generate profit.

22.    With some exceptions (discussed below) and for nearly a decade, Mr. Koren and Mr. Jacoby complied and conducted themselves in accordance with the Jacoby-Koren Agreement, opening six other Potato Corner franchisee businesses (J & K Americana, LLC, J & K Lakewood, LLC, J & K Culver, LLC, J & K Oakridge, LLC, J & K Valley-Fair, LLC, and J & K Ontario, LLC), a food truck business (J & K PC Trucks, LLC), and a consulting business (J & K Consultants, LLC) (collectively, the "J & K Entities") in the process. And with the exception of J & K PC Trucks, LLC and J & K Consultants, LLC (in which Mr. Jacoby and Mr. Koren each hold a 50% stake) and J & K PC Trucks, LLC (in which Mr. Jacoby and Mr. Koren each hold a 40% stake with the other 20% held by another investor), Mr. Jacoby and Mr. Koren each maintain a 35% stake in the remaining J & K Entities (with the other 30% held by another investor). As effectively the "sweat equity" partner, Mr. Koren has always managed, controlled, and operated all of the J & K Entities (in addition to NKM Capital).

///

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**Cinco Enters into a Joint Venture Agreement for Mr. Koren's Group to Exclusively Manage and Facilitate – as Franchisors – the Opening of other Potato Corner Stores/Franchisees in the United States and Israel**

23.     Before the J & K Entities came into existence, however, and in building on the momentum generated from the opening of Potato Corner's first American franchise, Mr. Koren and a group composed of Cinco and its directors known as the "Cinco Group" decided to joint venture concerning the budding Potato Corner business. Specifically, Mr. Koren and Mr. Koren's group (Koren, Jacoby, et al.) known as the "LA Group", on the one hand, and the Cinco Group, on the other hand, entered into a joint venture agreement in or around 2009 or 2010 that later came to be memorialized in writing as the "Potato Corner USA Joint Venture Agreement" (the "JV Agreement"). A true and correct copy of the JV Agreement is attached hereto as **Exhibit "A"** and incorporated by reference herein.

24.     Under the JV Agreement, the Cinco Group and the LA Group agreed to form a limited liability company (which came to be known as PCJV USA, LLC ["PCJV USA"]) with membership divided between the Cinco Group, at 60%, and the LA Group, holding a 40% membership interest. The governance of this newly formed LLC was subject to certain terms and conditions, including (among other things): (a) a prohibition on the transfer or assignment of rights, obligations, or equity interests without consent of the other member; (b) the granting of rights of first refusal with respect to the sale or transfer of any membership interests; (c) the vesting of governing decisions in a board of 7 "managers" or "members" or "member interests" (those terms are used interchangeably in the parties' governing contractual documents) to be composed of 4 managers/members selected by the Cinco Group and 3 managers/members selected by the LA Group; and (d) the designation that the LA Group would always hold a presidency position in the company and would manage the company through a Master Services Agreement. These terms were eventually included in the LLC's operating agreement (discussed below).

25.     In accordance with those terms, the LA Group initially designated Amit Nemanim ("Mr. Nemanim"), Mr. Koren, and Mr. Jacoby as its 3 managers/members charged with voting on particular matters in PCJV USA. At some point thereafter, however, and as discussed below, Mr.

1  Nemanim left the business to pursue other opportunities, leaving an opening in the PCJV USA

2  presidency position (Mr. Nemanim was its original President) and in the LA Group's 3 designated

3  voting representatives. On or about October 16, 2012, PCJV USA held a board meeting addressing

4  Mr. Nemanim's departure and it was agreed then that Mr. Koren would replace Mr. Nemanim as

5  PCJV USA's President and that a 75% vote of the 7 managers/members would thereafter be

6  required to replace the CEO, President, Treasurer, and Corporate Secretary of PCJV USA. The

7  parties settled on this 75% requirement to protect both sides, and to be sure that 6 of 7

8  manager/member votes would be needed to replace specifically designated high-level officers. A

9  true and correct copy of PCJV USA's Board Meeting Minutes of October 16, 2012[1] (the "October

10  2012 Minutes") is attached hereto as **Exhibit "B"** and incorporated by reference herein.

11         26.     The next day, October 17, 2012, the JV Agreement was amended and, while a

12  substantial majority of its terms and conditions remained intact, the amendment made certain

13  material changes to the pre-existing agreement: (a) Cross-Defendant PCI would replace Cinco as a

14  joint venturer and the Cinco Group would become known as the "PCI Group"[2]; (b) any change in

15  the company's executive officers (President, Corporate Secretary, and Treasurer) to require a

16  supermajority 75% vote of the 7 managers/members; and (c) Mr. Koren would be the President of

17  the company (PCJV USA). A true and correct copy of the First Amendment to the JV Agreement

18  is attached hereto as **Exhibit "C"** and incorporated by reference herein.

19         27.     Mr. Koren is informed and believes and based thereon alleges that the law firm of

20  DLA Piper (and Mr. Olivas in particular) handled all of the transactional paperwork for PCJV USA.

21  In addition to preparing the JV Agreement and the First Amendment to the JV Agreement, DLA

22  Piper incorporated PCJV USA in Delaware on or about July 16, 2010 and registered it in California

23  on or about November 2, 2010 and at some point thereafter DLA Piper (through Mr. Olivas)

24  _____

25  [1] There appears to be a typographical error in the October 2012 Minutes showing "October 16,
    2013" as the date of the meeting. Cross-Complainant is informed and believes and thereon alleges

26  that the actual meeting occurred in 2012.

27  [2] However, on information and belief, the parties continued to refer to the "PCI Group" as the
    "Cinco Group".

28

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  prepared PCJV USA's Limited Liability Company Agreement (the "LLC Agreement"), a true and
2  correct copy of which is attached hereto as **Exhibit "D"**[3] and incorporated by reference herein.
3  For purposes of this Cross-Complaint, the JV Agreement (Exhibit "A"), the October 2012 Minutes
4  (Exhibit "B"), the First Amendment to the JV Agreement (Exhibit "C"), and the LLC Agreement
5  (Exhibit "D") will be collectively referred to as the "PCJV Governing Documents".

6                                    **The LA Group is Formed**

7          28.     For purposes of holding a membership interest in PCJV USA and carrying out the
8  LA Group's obligations, Mr. Koren, Mr. Jacoby, and Mr. Nemanim formed a partnership named
9  "PCJV-LA Group" which was later converted to Potato Corner LA Group, LLC (the "LA Group").
10 Initially, Mr. Koren and Mr. Nemanim held equal 38% shares in the LA Group with Mr. Jacoby
11 holding 24%. But Mr. Koren and Mr. Jacoby eventually acquired Mr. Nemanim's interest in the
12 LA Group, resulting in Mr. Koren holding a 61.3% membership interest and Mr. Jacoby retaining
13 the remaining 38.7%.[4]  As with all the other J & K Entities and NKM Capital, Mr. Koren
14 exclusively managed, controlled, and operated the LA Group. The LA Group governed itself in
15 accordance with a "Partnership Agreement", a true and correct copy of which is attached hereto as
16 **Exhibit "E"** and incorporated by reference herein.

17         29.     With Mr. Nemanim leaving the LA Group to pursue other ventures, Mr. Jacoby
18 approached Mr. Koren and insisted that Mrs. Jacoby (Mr. Jacoby's wife) replace Mr. Nemanim as a
19 voting representative of the LA Group on the PCJV USA board of 7 managers/members. Mr.
20 Koren, desiring to maintain harmony within the group, reluctantly obliged, though he was and
21 remained concerned about the effort to force Mrs. Jacoby -- who'd had no previous high-level
22 involvement in the business between Messrs. Koren and Jacoby – into a voting role. But given that

23

24  [3] Although the signature page of the LLC Agreement bears a note indicating a November 30, 2010
25  date, Mr. Koren does not at present recall when the LLC Agreement was executed. The same goes
    for the JV Agreement which is undated.

26  [4] Mr. Jacoby has recently contended that the equity interests in the LA Group was modified to
    50/50, but this contention is not borne out by the evidence. While the two had certain negotiations
27  to modify the equity interests, no agreement ever came from it.

28

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1 Mr. Koren, as the managing member of the LA Group, could always replace the LA Group's voting
2 representatives in PCJV USA if the need ever arose, he felt secure in accommodating the request.

### PCJV USA Enters into a Master Services Agreement with the LA Group

4    30.    On or about June 18, 2012, in accordance with the PCJV Governing Documents,
5 PCJV USA entered into a Master Services Agreement with the LA Group. The Master Services
6 Agreement obligates the LA Group to, among other things, "[c]onduct management, operations,
7 marketing, establishment, maintenance, licensing and sub-licensing activities with respect to the
8 Potato Corner outlets/stores in the Territory". A true and correct copy of the Master Services
9 Agreement is attached hereto as **Exhibit "F"** and incorporated by reference herein.

### Mr. Jacoby Reneges on the Jacoby-Koren Agreement; Mr. Koren Appeases Him

11    31.    As is frequently the case in any start-up business, the initial Potato Corner franchises
12 took time to reach profitability. That said, there was nothing unusual about that inevitable reality
13 and, despite facing the typical growing pains of a new business, these franchises each demonstrated
14 the likelihood of long term success. But Mr. Jacoby was impatient and, over time, grew irrationally
15 concerned about his investment. Unable to accept the natural vicissitudes of the start-up economy –
16 to which he'd knowingly volunteered to subject himself when he entered the Jacoby-Koren
17 Agreement – he suddenly, unilaterally and without discussion or consent decided to convert the
18 capital contributions he was making on Mr. Koren's behalf into specific loans to be repaid by Mr.
19 Koren. That he had no right to convert equity into debt, under the Jacoby-Koren Agreement, or
20 otherwise, is axiomatic. But it was also profoundly unfair to Mr. Koren, since Mr. Jacoby initially
21 induced Mr. Koren to give him (Jacoby) an equity stake in NKM Capital and on future businesses
22 on the material condition that Mr. Jacoby would fund Mr. Koren's capital contributions (without
23 expectation of repayment). Even under these inequitable circumstances, however, Mr. Koren
24 continued trying to accommodate Mr. Jacoby. Thus, in an effort to avoid conflict and allay Mr.
25 Jacoby's concerns, Mr. Koren began advancing some payments to Mr. Jacoby in or about 2015 with
26 the understanding that the two would later sit down to discuss their specific business arrangement –
27 that included whether a modification to the Jacoby-Koren Agreement could be reached. Mr. Jacoby
28 accepted these payments on the express understanding that they were a mere accommodation by

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3782229.1 24069-200                        11

1   Mr. Koren, and that any long-term revisions to their relationship would need to be negotiated.

2   Although negotiations and several discussions ensued over the course of the next couple of years,

3   no modification to the Jacoby-Koren Agreement was ever reached.

**Cinco Group Transfers Majority Ownership to the Hernandez Group in Derivation of the**

**PCJV Governing Documents**

6       32.    The perfidious unraveling of the parties' agreements, and the systematic campaign to

7   deprive Mr. Koren of his contractual and legal rights, began accelerating in late 2017. Cross-

8   Complainant is informed and believes and based thereon alleges that in or about October 2017, the

9   Cinco Group transferred 55% of its holdings and rights in PCJV USA to a group led by Mr.

10   Hernandez (the "Hernandez Group"). That transfer violated the the PCJV Governing Documents,

11   in that it was undertaken without the consent of the LA Group and without first offering the LA

12   Group a right of first refusal. And though the PCJV Governing Documents prohibit exactly this

13   type of transfer in order to ensure that the parties are dealing with business partners who they know

14   and trust, the Cinco Group disregarded that prohibition – and its corollary obligation to honor the

15   Governing Documents – in effectuating this transfer of interest and power.

16       33.    Cross-Complainant is further informed and believes and based thereon alleges that at

17   some point after or contemporaneous with the Cinco Group transferring a majority ownership stake

18   to the Hernandez Group, the Cinco Group replaced one of its PCJV USA voting representatives on

19   the PCJV USA board of 7 members/managers with Mr. Hernandez. Ms. Victor and Ms. Del Pilar

20   (who are also part of the Hernandez Group) eventually were purportedly given officerial,

21   directorial, and/or managerial positions in PCJV USA.

22           **Mr. Jacoby Withdraws Money From the J & K Entities Without Authorization**

23       34.    By 2015, and largely because of the efforts of Mr. Koren, the Potato Corner business

24   was accelerating at a rapid pace in the United States. By early 2018, PCJV USA had contractual

25   relationships with at least 60 stores in the United States (which relationships Mr. Koren was

26   actively managing on behalf of PCJV USA and its affiliate business, PCI Trading, LLC ["PCI

27   Trading"]) with many more in the pipeline. In addition, at the same time, Mr. Koren was actively

28

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 256-6100

1 managing and operating not only the LA Group, but also the J & K Entities, which comprised of 8
2 franchisee businesses and a consulting business.

3       35.    While business and profitability was increasing (along with the attendant work for
4 those responsible for the various business' management, particularly Mr. Koren), Mr. Koren's
5 salary – well below market – largely remained the same. This state of affairs was unfair and
6 improper, particularly given that Mr. Koren had devoted inordinate time and energy to the Potato
7 Corner franchises and he, more than any other party, was responsible for their gathering success.
8 Having declined market compensation for years, he rightly believed the circumstances now
9 demanded an increase in pay that would at least approximate what the market would bear for the
10 services he was providing. After studying comparable salaries of similarly situated high-level
11 executives and given the business conditions existing at that time as well as Mr. Koren's past
12 efforts, Mr. Koren informed Mr. Jacoby that he would be increasing his salary and distributions
13 totaling approximately $225,000 per year ($120,000 in salary and approximately $105,000 in
14 distributions) to a $300,000 salary per year effective calendar year 2018 (with a corresponding
15 reduction in distributions to zero for a short while until the business further grew). Based on that
16 management decision (which decision Mr. Koren was charged with making), Mr. Koren began
17 drawing an additional $15,000 per month salary. Even that increase nonetheless left Mr. Koren
18 below the similarly situated executives whose compensation he had studied, merely underscoring
19 the extent to which he had been underpaid to that point.

20       36.    Mr. Jacoby saw an opportunity in Mr. Koren's desire to adjust his compensation to
21 something approaching market. He (Jacoby) unilaterally decided (without legitimate justification
22 or authority) that he, too, would begin to draw an additional $15,000 per month. This, despite the
23 fact that he was already drawing a salary as well as receiving monthly distributions from the
24 business notwithstanding that he did not participate in management, and that Mrs. Jacoby was also
25 drawing a salary from the business of $60,000 per year as a part-time employee. Cross-
26 Complainant is informed and believes and based thereon alleges that Mr. Jacoby unilaterally and
27 unlawfully withdrew $37,500 (in two $15,000 and $22,500 withdrawals) on or about February 22,
28 2018 from the LA Group's bank account, $3,600 (in equal $1,800 withdrawals) on or about March

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  2, 2018 from J & K Consultants, LLC's bank account, $4,000 on or about March 9, 2018 from J &

2  K Consultants, LLC's bank account, and $10,000 on or about March 9, 2018 from the LA Group's

3  bank account (the "Unauthorized Jacoby Withdrawals").

4    **Mr. Koren Changes the PCJV USA Banking Relationship from Wells Fargo to Chase in**

5      **Order to Safeguard PCJV USA's Funds, But Returns the Money to Wells Fargo After**

6                    **Receiving Sufficient Assurances from the Cinco Group**

7        37.    On or about March 26, 2018, in an effort to safeguard PCJV USA's funds from Mr.

8  Jacoby's continuing raid, Mr. Koren transferred PCJV USA's bank accounts from Wells Fargo to

9  J.P. Morgan Chase Bank. Mr. Koren contemporaneously called Mr. Magsaysay of the Cinco Group

10 to inform him of the reasons for the transfer and to reassure him that the new accounts would be

11 established on the same entity names and that the Cinco Group will obtain full access to the new

12 accounts.

13       38.    On or about April 3, 2018, Mr. Koren sent Mr. Magsaysay a letter memorializing the

14 discussion they had regarding the account transfers and the reasons why Mr. Koren had to take said

15 action. Mr. Koren offered to return the funds to Wells Fargo should Cinco Group insist that it be

16 done with the full understanding and assumption of risk underlying Mr. Jacoby's unauthorized

17 transfers. A true and correct copy of the April 3, 2018 letter is attached hereto as **Exhibit "G"** and

18 incorporated by reference herein.

19       39.    That transparency did not induce the Cinco Group into conducting itself with

20 integrity, or in compliance with the parties' agreements. Instead, the Cinco Group insisted –

21 following the April 3, 2018 letter – that the money be transferred back to Wells Fargo. Mr. Koren,

22 again accommodating a predatory partner, agreed to return the money to Wells Fargo provided that

23 the Cinco Group would watch out for any unauthorized transfers by Mr. Jacoby and consent to

24 action taken against Mr. Jacoby if necessary. Cinco Group agreed to this condition and Mr. Koren

25 immediately returned the money to Wells Fargo.[5]

26

27 [5] Cross-Complainant is informed and believes and based thereon alleges that given the unsettled
    state of affairs, Wells Fargo has frozen all accounts and intends to interplead the frozen funds.

28

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**Cross-Defendants Attempt to Vote Mr. Koren Out as the LA Group's Voting Representative
and as President of PCJV USA**

40.     On or about March 27, 2018, Mr. Magsaysay called a member's meeting to occur on April 9, 2018 to address a variety of matters including the election of the directors and officers for PCJV USA. A true and correct copy of Mr. Magsaysay's meeting request is attached hereto as **Exhibit "H"** and incorporated by reference herein.

41.     Unbeknownst to Mr. Koren that Cross-Defendants were colluding together to vote Mr. Koren out of the business, Mr. Koren appeared at the April 9, 2018 meeting to discuss the various agenda items in Mr. Magsaysay's March 27 email (Exhibit "H"). But Mr. Koren was in for an ambush when Cross-Defendants Mr. Magsaysay, Ms. Del Pilar and Mr. Hernandez (who were never authorized by the LA Group to be a voting member in PCJV USA), Mr. Montelibano, Mr. Jacoby, and Mrs. Jacoby (who stopped working for the company in March 2018) purportedly voted to remove Mr. Koren as a manager and officer in PCJV USA. All of this was done over Mr. Koren's objection and Cross-Defendants' refusal to allow Mr. Koren to appoint new voting representatives for the LA Group.

**Cross-Defendants Ambush Mr. Koren and PCJV USA Employees**

42.     The following day, April 10, 2018, Ms. Victor, Mr. Jacoby, Mrs. Jacoby, and two attorneys completed the ambush, arriving at PCJV USA's offices and demanding that PCJV USA staff accede to a transition of power claiming that Mr. Koren no longer had any power or control over any business matters whatsoever. Mr. Koren arrived later and objected to said Cross-Defendants' unannounced visit and blatant efforts to interfere with Mr. Koren's management and operations of the business.

43.     Cross-Complainant is informed and believes and based thereon alleges that on that same day (on April 10, 2018), Cinco (through DLA Piper) initiated this litigation while contemporaneously seeking *ex parte* relief for a TRO/OSC along with other requests for relief which were all denied. No representative of Cinco (including DLA Piper) ever gave Mr. Koren advance notice of the lawsuit or the *ex parte* application. And the timing of the lawsuit and extensive briefing that was prepared and ready to be filed the very morning after the April 9, 2018

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  meeting suggests that Cross-Defendants had previously conspired to oust Mr. Koren and ambush
2  him on April 10, 2018 in an extreme show of force.

3      44.    On that same day, April 10, 2018, DLA Piper also sent a cease and desist letter to
4  Mr. Koren contending that "a meeting of the Managers was held on April 9, 2018, during which the
5  LA Group and Guy Koren were removed from management by a majority vote (85%) of the
6  Managers and Membership interests." The reference to 85% could only refer to Cinco's purported
7  position that 6 out of 7 voting representatives in PCJV USA voted to oust Mr. Koren. A true and
8  correct copy of DLA Piper's April 10, 2018 letter is attached hereto as **Exhibit "I"** and
9  incorporated by reference herein.

10     45.    Mr. Koren responded to the April 10, 2018 letter asserting his position as to why the
11 April 9, 2018 vote was improper insofar as it was improperly noticed and that Mr. Koren's request
12 to appoint new LA Group voting representatives was ignored. Mr. Koren also asserted his position
13 as to why the grounds for the purported termination were baseless and appeared to be a pretext.
14 (Additionally, the propriety and effectiveness of the Hernandez Group's vote – by Ms. Del Pilar
15 and Mr. Hernandez – was in question.)

16 **Mired by the Ineffective and Improper First Vote, Cross-Defendants Attempt to Vote Mr.**
17                    **Koren out a Second Time**

18     46.    Cross-Defendants eventually conceded that they had no proper ground to remove
19 Mr. Koren out as a voting representative of the LA Group or to dictate who the LA Group
20 designates as its 3 voting managers/members in PCJV USA. Therefore, Cross-Defendants assented
21 to Mr. Koren's replacing Mr. Jacoby and Mrs. Jacoby as voting representatives of the LA Group
22 with Alon Koren (Mr. Koren's brother) and Tom Hodgson (the V.P. of Operations of PCJV USA).

23     47.    On or about Friday, April 20, 2018, DLA Piper informed Mr. Koren's attorney that
24 PCJV USA had called a special meeting to take place on Monday, April 23, 2018. Again, over Mr.
25 Koren's objections, the April 23, 2018 meeting proceeded with Cross-Defendants and the new LA
26 Group voting representatives appearing. The new LA Group voting representatives voted against
27 the initiative to remove Mr. Koren as an officer of PCJV USA. Despite that, and despite the fact
28 that a 75% vote (at least 6 of 7) was necessary to remove Mr. Koren as an officer of PCJV USA, the

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  purported Chairman (Mr. Hernandez) and Mr. Robert W. Brownlie as Acting Secretary – Mr.

2  Brownlie is lead litigation counsel for Cinco in this litigation – incorrectly and improperly

3  concluded that enough votes were cast to remove Mr. Koren from his officerial role in the

4  company. A true and correct copy of the April 23, 2018 Meeting Minutes is attached hereto as

5  **Exhibit "J"** and incorporated by reference herein.

6                              **Cross-Defendants Terminate the Master Services Agreement**

7        48.    In conjunction with the April 23, 2018 meeting, Cross-Defendants apparently also

8  voted to terminate the Master Services Agreement. The April 23, 2018 Meeting Minutes (Exhibit

9  "J") cite some unknown "Services Agreement" dated January 1, 2017, however, and some unknown

10  "Section 5" to the "Services Agreement". Cross-Complainant is informed and believes and thereon

11  alleges that the LA Group never entered into a "Services Agreement" with PCJV USA on January

12  1, 2017 and that the Master Services Agreement dated June 18, 2012 was the only written "services

13  agreement" in place governing the parties' respective relationship.

14        49.    The Master Services Agreement itself dictates when it could be terminated only: (a)

15  upon mutual written agreement; or (b) upon breach unless cured within 20 days from the date of the

16  breach. Here, there was never a mutual written agreement to terminate the Master Services

17  Agreement and there was never a breach of it. Even if it can be said that there was a breach, any

18  such alleged breach was cured. Therefore, Cross-Defendants had no justification for terminating

19  the Master Services Agreement.

20      **Cross-Defendants Audaciously Agree to Change PCJV USA's Banking Relationships From**

21                                    **Wells Fargo to Citibank**

22        50.    In the wake of Cross-Defendants' vigorous objections to Mr. Koren changing PCJV

23  USA's banking relationship to safeguard those funds from Mr. Jacoby and using that episode as a

24  pretext for purportedly removing Mr. Koren, Cross-Defendants purportedly voted – at the same

25  April 23, 2018 meeting – to change PCJV USA's banking relationship from Wells Fargo to

26  Citibank and authorized one another (including Mr. Olivas from DLA Piper) to be the signatories

27  on the new accounts (at the exclusion of Mr. Koren and the LA Group).

28  / / /

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1 **Cross-Defendants Publicly Inform Franchisees and Staff about the Purported Removal of Mr.**
2 **Koren in an Overt Attempt at Interference and Disparagement**

3        51.        Following the April 9, 2018 meeting and continuing after the April 23, 2018
4 meeting, Cross-Defendants set out on a crusade to publicly disparage Mr. Koren and cast doubt on
5 his authority and role in PCJV USA. In one example, Cross-Defendants sent a letter to Ms. Emily
6 Garcia (who works for PCJV USA) to inform her that Mr. Koren was removed as a manager and
7 President "due to his breach of his fiduciary and contractual duties to PCJV and its Members." The
8 letter states that the authorized representatives for PCJV USA are now Mrs. Jacoby, Ms. Victor, and
9 Mr. Olivas. Cross-Complainant is informed and believes and thereon alleges that Cross-Defendants
10 sent similar letters to other staff members and third parties. A true and correct copy of the letter to
11 Ms. Garcia is attached hereto as **Exhibit "K"** and incorporated by reference herein.

12        52.        In yet another example of Cross-Defendants' tortious behavior, on or about April 26,
13 2018, Cross-Defendants sent a letter to a franchisee in Seattle claiming that Mr. Koren had been
14 removed as President of PCJV USA on April 23, 2018 and that "[t]hese actions were undertaken
15 with the support of PCJV's majority owner, Cinco Corporation, through its wholly-owned
16 subsidiary, Potato Corner International". Cross-Complainant is informed and believes and thereon
17 alleges that Cross-Defendants sent similar letters to other franchisees and third parties. A true and
18 correct copy of the April 26, 2018 letter is attached hereto as **Exhibit "L"** and incorporated by
19 reference herein.

20        53.        To make matters even worse, Cross-Complainant is informed and believes and based
21 thereon alleges that Cross-Defendants conspired with one another to remove Mr. Koren from PCJV
22 USA's office and warehouse, and to discontinue Mr. Koren's official Potato Corner USA email
23 access (along with the email access of third parties whom Cross-Defendants presumably view as
24 being loyal to Mr. Koren), thus further disrupting Mr. Koren's and the LA Group's ability to
25 manage PCJV USA and comply with its duties.

26 / / /

27 / / /

28 / / /

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1

2

3

## FIRST CAUSE OF ACTION

## (BREACH OF FIDUCIARY DUTY)

### Against All Cross-Defendants

4       54.     Cross-Complainant re-alleges and incorporates herein by this reference all previous

5   allegations as though set forth herein in full.

6       55.     Mr. Koren alleges that by virtue of the parties' close business ties and relationships,

7   including the various contractual agreements entered into by the parties, i.e., the PCJV Governing

8   Documents, the Jacoby-Koren Agreement, the Partnership Agreement, and the Master Services

9   Agreement, Cross-Defendants, and each of them, owed Mr. Koren a duty to act with the utmost

10   good faith, care, and loyalty.

11       56.     In engaging in the actions set forth above, including but not limited to, Cross-

12   Defendants' attempts to remove Mr. Koren from PCJV USA, interfere with Mr. Koren's

13   management and operations of the LA Group and PCJV USA entities, cast doubt upon Mr.

14   Koren's authority and role in the LA Group and PCJV USA to members of the public, deprive Mr.

15   Koren access to PCJV USA bank accounts, offices, and email addresses, and in Mr. Jacoby's

16   taking and converting funds from the J & K Entities and Mr. Jacoby's and Mrs. Jacoby's colluding

17   with the Cinco Group to remove Mr. Koren from management, all to the detriment of Mr. Koren

18   and the LA Group, Cross-Defendants, and each of them, breached their respective fiduciary duties

19   to Mr. Koren, unlawfully putting their own interests ahead of Mr. Koren's.

20       57.     As a direct and proximate result of Cross-Defendants' conduct, Mr. Koren has

21   sustained and will continue to sustain substantial non-economic and economic injury in an amount

22   to be proven at trial.

23       58.     Mr. Koren further alleges that in doing the things described above, Cross-

24   Defendants, and each of them acted with the intent to deprive Mr. Koren of his legal rights and to

25   injury him such that Cross-Defendants' actions constitute fraud, oppression, or malice within the

26   meaning of Civil Code § 3294. Cross-Defendants' conduct was and continues to be despicable,

27   oppressive, and outrageous, justifying the imposition of punitive and exemplary damages against

28   Cross-Defendants to make an example of Cross-Defendants and to deter such conduct in the future

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3782229.1 24069-200

19

1  in an amount that proof at trial may indicate is appropriate.

2  **SECOND CAUSE OF ACTION**

3  **(INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS)**

4  **Against All Cross-Defendants**

5  59.    Cross-Complainant re-alleges and incorporates herein by this reference all previous

6  allegations as though set forth herein in full.

7  60.    As alleged above, the parties enjoyed the benefits of particular contractual relations

8  which were governed primarily by the PCJV Governing Documents, the Jacoby-Koren

9  Agreement, the Partnership Agreement, and the Master Services Agreement, but which expanded

10 to other agreements with third party franchisees each bearing an expectation of payment to Mr.

11 Koren for Mr. Koren's services.

12 61.    Mr. Koren alleges that Cross-Defendants, and each of them, had knowledge of all

13 of these contractual relations.  Despite that knowledge, Mr. Koren alleges that Cross-Defendants,

14 and each of them, had the intent to interfere with those contractual relations.  Indeed, by engaging

15 in the conduct described above, Cross-Defendants, and each of them, took specific action to

16 interfere with those contractual relations, in order to further each of their own special interests.

17 62.    As a direct and proximate result of Cross-Defendants' conduct, Mr. Koren has

18 sustained and will continue to sustain substantial non-economic and economic injury in an amount

19 to be proven at trial.

20 63.    Mr. Koren further alleges that in doing the things described above, Cross-

21 Defendants, and each of them acted with the intent to deprive Mr. Koren of his legal rights and to

22 injury him such that Cross-Defendants' actions constitute fraud, oppression, or malice within the

23 meaning of Civil Code § 3294.  Cross-Defendants' conduct was and continues to be despicable,

24 oppressive, and outrageous, justifying the imposition of punitive and exemplary damages against

25 Cross-Defendants to make an example of Cross-Defendants and to deter such conduct in the future

26 in an amount that proof at trial may indicate is appropriate.

27 ///

28 ///

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

## THIRD CAUSE OF ACTION

### (INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS)

#### Against All Cross-Defendants

64.     Cross-Complainant re-alleges and incorporates herein by this reference all previous allegations as though set forth herein in full.

65.     As alleged above, the parties enjoyed the benefits of particular contractual relationships which were governed primarily by the PCJV Governing Documents, the Jacoby-Koren Agreement, the Partnership Agreement, and the Master Services Agreement, but which expanded to other agreements with third party franchisees each bearing an expectation of payment to Mr. Koren for Mr. Koren's services.  In addition, by virtue of these contractual relationships, Mr. Koren had certain expectations of prospective economic benefits.

66.     Mr. Koren alleges that Cross-Defendants, and each of them, had knowledge of all of these actual contractual relations and prospective economic relations.  Despite that knowledge, Mr. Koren alleges that Cross-Defendants, and each of them, had the intent to interfere with those contractual relations and prospective economic relations.  Indeed, by engaging in the conduct described above, Cross-Defendants, and each of them, took specific action to interfere with those contractual relations and prospective economic relations, in order to further each of their own special interests.

67.     As a direct and proximate result of Cross-Defendants' conduct, Mr. Koren has sustained and will continue to sustain substantial non-economic and economic injury in an amount to be proven at trial.

68.     Mr. Koren further alleges that in doing the things described above, Cross-Defendants, and each of them acted with the intent to deprive Mr. Koren of his legal rights and to injury him such that Cross-Defendants' actions constitute fraud, oppression, or malice within the meaning of Civil Code § 3294. Cross-Defendants' conduct was and continues to be despicable, oppressive, and outrageous, justifying the imposition of punitive and exemplary damages against Cross-Defendants to make an example of Cross-Defendants and to deter such conduct in the future in an amount that proof at trial may indicate is appropriate.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1

**FOURTH CAUSE OF ACTION**

2

**(NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS)**

3

**Against All Cross-Defendants**

4      69.      Cross-Complainant re-alleges and incorporates herein by this reference all previous

5   allegations as though set forth herein in full.

6      70.      As alleged above, the parties enjoyed the benefits of particular contractual

7   relationships which were governed primarily by the PCJV Governing Documents, the Jacoby-

8   Koren Agreement, the Partnership Agreement, and the Master Services Agreement, but which

9   expanded to other agreements with third party franchisees each bearing an expectation of payment

10   to Mr. Koren for Mr. Koren's services. In addition, by virtue of these contractual relationships,

11   Mr. Koren had certain expectations of prospective economic benefits.

12      71.      Mr. Koren alleges that Cross-Defendants, and each of them, had knowledge of all

13   of these actual contractual relations and prospective economic relations. Despite that knowledge,

14   Mr. Koren alleges that Cross-Defendants, and each of them, had the intent to interfere, and to the

15   extent they did not have specific intent, they negligent interfered with those contractual relations

16   and prospective economic relations. Indeed, by engaging in the conduct described above, Cross-

17   Defendants, and each of them, took specific action to negligently interfere with those contractual

18   relations and prospective economic relations, in order to further each of their own special interests.

19      72.      As a direct and proximate result of Cross-Defendants' conduct, Mr. Koren has

20   sustained and will continue to sustain substantial non-economic and economic injury in an amount

21   to be proven at trial.

22      73.      Mr. Koren further alleges that in doing the things described above, Cross-

23   Defendants, and each of them acted with the intent to deprive Mr. Koren of his legal rights and to

24   injury him such that Cross-Defendants' actions constitute fraud, oppression, or malice within the

25   meaning of Civil Code § 3294. Cross-Defendants' conduct was and continues to be despicable,

26   oppressive, and outrageous, justifying the imposition of punitive and exemplary damages against

27   Cross-Defendants to make an example of Cross-Defendants and to deter such conduct in the future

28   in an amount that proof at trial may indicate is appropriate.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3782229.1 24069-200

22

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**FIFTH CAUSE OF ACTION**

**(INDUCEMENT TO BREACH CONTRACTUAL DOCUMENTS)**

**Against All Cross-Defendants**

74. Cross-Complainant re-alleges and incorporates herein by this reference all previous allegations as though set forth herein in full.

75. As alleged above, the parties enjoyed the benefits of particular contractual relationships which were governed primarily by the PCJV Governing Documents, the Jacoby-Koren Agreement, the Partnership Agreement, and the Master Services Agreement, but which expanded to other agreements with third party franchisees each bearing an expectation of payment to Mr. Koren for Mr. Koren's services.

76. Mr. Koren alleges that Cross-Defendants, and each of them, had knowledge of all of these contracts and intended to cause the parties to those contracts to breach the contracts. Based on the allegations asserted above, Cross-Defendants, and each of them took specific action to induce the breach of these contracts, in order to further each of their own special interests.

77. As a direct and proximate result of Cross-Defendants' conduct, Mr. Koren has sustained and will continue to sustain substantial non-economic and economic injury in an amount to be proven at trial.

78. Mr. Koren further alleges that in doing the things described above, Cross-Defendants, and each of them acted with the intent to deprive Mr. Koren of his legal rights and to injury him such that Cross-Defendants' actions constitute fraud, oppression, or malice within the meaning of Civil Code § 3294. Cross-Defendants' conduct was and continues to be despicable, oppressive, and outrageous, justifying the imposition of punitive and exemplary damages against Cross-Defendants to make an example of Cross-Defendants and to deter such conduct in the future in an amount that proof at trial may indicate is appropriate.

/ / /

/ / /

/ / /

/ / /

3782229.1 24069-200

23

**SIXTH CAUSE OF ACTION**

**(UNFAIR COMPETITION IN VIOLATION OF CALIFORNIA BUSINESS &**

**PROFESSIONS CODE §§ 17200, *ET SEQ.*)**

**Against All Cross-Defendants**

79.     Cross-Complainant re-alleges and incorporates herein by this reference all previous allegations as though set forth herein in full.

80.     California Business and Professions Code § 17200 provides:

> As used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code.

78.     Cross-Defendants have engaged in unfair business acts and practices within the meaning of California Business and Professions Code § 17200.  As alleged above, these unfair business practices and acts include Cross-Defendants' interference activities, breaches of fiduciary duties, collusion, and inducements to breach contract.

79.     As a direct, proximate, and foreseeable result of the wrongful conduct of Cross-Defendants, and each of them, Mr. Koren has been damaged and entitled to relief, including full restitution and/or disgorgement of any funds and benefits that may have been and will be obtained by Cross-Defendants as result of such unfair business acts and practices.

80.     California Business and Professions Code § 17203 provides, in relevant part:

> Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction.  The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition.

81.     Pursuant to California Business and Professions Code § 17203, Mr. Koren seeks an order of this Court for a temporary restraining order, preliminary injunction and/or permanent injunction.

///

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1

2

3

## SEVENTH CAUSE OF ACTION

### (BREACH OF WRITTEN CONTRACT)

#### Against Cinco and PCI

4    81.    Cross-Complainant re-alleges and incorporates herein by this reference all previous

5  allegations as though set forth herein in full.

6    82.    As alleged above, the parties entered into the PCJV Governing Documents.  Mr.

7  Koren was an intended third party beneficiary to the PCJV Governing Documents.

8    83.    In or about October 2017, Cross-Defendants Cinco and PCI breached the PCJV

9  Governing Documents in transferring an equity stake in Cinco Group to the Hernandez Group

10  without consent and without complying with their obligations in connection with certain rights of

11  first refusal.

12    84.    On or about April 9, 2018, Cross-Defendants Cinco and PCI breached the PCJV

13  Governing Documents when they purportedly vote to remove Mr. Koren as a manager and officer

14  without the required votes.

15    85.    On or about April 23, 2018, Cross-Defendants Cinco and PCI breached the PCJV

16  Governing Documents by again purportedly voting to remove Mr. Koren as an officer without the

17  required votes.

18    86.    To the extent possible, Mr. Koren (as a third party intended beneficiary to the

19  PCJV Governing Documents) performed all of his obligations, except as waived, prevented, or

20  excused by the acts and omissions of Cinco and/or PCI.

21    87.    As a direct and proximate result of the foregoing breaches of contract, Mr. Koren

22  has sustained and will continue to sustain substantial non-economic and economic injury in an

23  amount to be proven at trial.

24

25

26

## EIGHTH CAUSE OF ACTION

### (FRAUDULENT INDUCEMENT)

#### Against Jacoby

27    88.    Cross-Complainant re-alleges and incorporates herein by this reference all previous

28  allegations as though set forth herein in full.

89.     Cross-Complainant alleges that Mr. Jacoby induced Mr. Koren to enter into the Jacoby-Koren Agreement based on the representation that Mr. Jacoby would fund 100% of Mr. Koren's required capital contributions in NKM Capital and on any future franchisees that they may together open, in which future franchisee businesses Mr. Koren and Mr. Jacoby would each acquire an equal share so long as Mr. Jacoby funds all of Mr. Koren's required capital contributions.

90.     In reliance on the foregoing representation, Mr. Koren provided Mr. Jacoby an equity stake in NKM Capital and in every other subsequent business entity in which each of them was involved, including the J & K Entities and the LA Group.

91.     Cross-Complainant is informed and believes and thereon alleges that Mr. Jacoby's representation was false and that it was made with the intent to induce Mr. Koren to relinquish certain interests in NKM Capital, the J & K Entities, and the LA Group to Mr. Jacoby. In fact, the truth was that Mr. Jacoby did not intend to fund Mr. Koren's capital contributions or that he intended to do so only under the right conditions, which were concealed from Mr. Koren.

92.     Indeed, Mr. Koren was unaware of the falsity of Mr. Jacoby's representation and reasonably relied on it to his detriment. Had Mr. Koren known the truth, he would not have transferred any equity stake in any of the business to Mr. Jacoby.

93.     As a direct and proximate result of the Mr. Jacoby's conduct, Mr. Koren has sustained and will continue to sustain substantial non-economic and economic injury in an amount to be proven at trial. Mr. Koren is also entitled to rescission of all documents and instruments that provide for the transfer of any equity interest to Mr. Jacoby in any business which Mr. Koren is involved as well as the retroactive restoration of Mr. Koren's respective equity stakes in said businesses.

94.     Mr. Koren further alleges that in doing the things described above, Jacoby acted with the intent to deprive Mr. Koren of his legal rights and to injury him such that Jacoby's actions constitute fraud, oppression, or malice within the meaning of Civil Code § 3294. Jacoby's conduct was and continues to be despicable, oppressive, and outrageous, justifying the imposition of punitive and exemplary damages against Jacoby to make an example of him and to deter such

1  conduct in the future in an amount that proof at trial may indicate is appropriate.

2  ## NINTH CAUSE OF ACTION

3  ## (BREACH OF ORAL CONTRACT)

4  ### Against Jacoby

5  95.    Cross-Complainant re-alleges and incorporates herein by this reference all previous

6  allegations as though set forth herein in full.

7  96.    As alleged above, in or about 2009-2010, Mr. Koren and Mr. Jacoby verbally

8  entered into the Jacoby-Koren Agreement.

9  97.    Within the last two years, Mr. Jacoby breached the Jacoby-Koren Agreement in

10  refusing to acknowledge his capital contribution obligations and instead insisting that Mr. Koren

11  treat such payments as a loan.

12  98.    Mr. Koren performed all of his obligations under the Jacoby-Koren Agreement,

13  except as waived, prevented, or excused by the acts and omissions of Jacoby.

14  99.    As a direct and proximate result of the foregoing breaches of contract, Mr. Koren

15  has sustained and will continue to sustain substantial non-economic and economic injury in an

16  amount to be proven at trial.

17  ## TENTH CAUSE OF ACTION

18  ## (BREACH OF IMPLIED-IN-FACT CONTRACT)

19  ### Against Jacoby

20  100.    Cross-Complainant re-alleges and incorporates herein by this reference all previous

21  allegations as though set forth herein in full.

22  101.    The respective conduct and relationship of Mr. Koren and Mr. Jacoby implies by

23  law an implied-in-fact contract. The conduct of these parties, as alleged above, establishes that

24  they comported themselves under the terms of the Jacoby-Koren Agreement.

25  102.    Within the last two years, Mr. Jacoby breached the Jacoby-Koren Agreement

26  (whether it be oral or implied-in-fact) in refusing to acknowledge his capital contribution

27  obligations and instead insisting that Mr. Koren treat such payments as a loan.

28  ///

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

103.    Mr. Koren performed all of his obligations under the implied-in-fact Jacoby-Koren Agreement, except as waived, prevented, or excused by the acts and omissions of Jacoby.

104.    As a direct and proximate result of the foregoing breaches of contract, Mr. Koren has sustained and will continue to sustain substantial non-economic and economic injury in an amount to be proven at trial.

## ELEVENTH CAUSE OF ACTION

### (BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING)

### Against Cinco, PCI, and Jacoby

105.    Cross-Complainant re-alleges and incorporates herein by this reference all previous allegations as though set forth herein in full.

106.    As alleged above, Mr. Koren was a third party beneficiary to the PCJV Governing Documents and a direct beneficiary to the Jacoby-Koren Agreement, under all of which there is an implied covenant of good faith and fair dealing.

107.    However, as alleged above, Cross-Defendants Cinco's, PCI's, and Jacoby's conduct is and continues to be in derogation of that covenant of good faith and fair dealing.

108.    As a direct and proximate result of the foregoing breaches of the covenant of good faith and fair dealing, Mr. Koren has sustained and will continue to sustain substantial non-economic and economic injury in an amount to be proven at trial.

## TWELFTH CAUSE OF ACTION

### (ACCOUNTING)

### Against All Cross-Defendants

109.    Cross-Complainant re-alleges and incorporates herein by this reference all previous allegations as though set forth herein in full.

110.    As alleged above, on or about April 23, 2018, Cross-Defendants purportedly changed PCJV USA's banking relationships to Citibank. Cross-Complainant is informed and believes and thereon alleges that Cross-Defendants wrongfully began to and continue to divert PCJV USA's funds into accounts they opened at Citibank.

/ / /

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1    111.    The amount of money diverted to Citibank is unknown and cannot be ascertained

2  without an accounting thereof.

3                        **THIRTEENTH CAUSE OF ACTION**

4                          **(DECLARATORY RELIEF)**

5                        **Against All Cross-Defendants**

6    112.    Cross-Complainant re-alleges and incorporates herein by this reference all previous

7  allegations as though set forth herein in full.

8    113.    Based on the foregoing, a number of disputes has arisen between Mr. Koren, on the

9  one hand, and Cross-Defendants, and each of them, on the other hand regarding their respective

10  rights and obligations, among other things, under the PCJV Governing Documents, the Jacoby-

11  Koren Agreement, the Partnership Agreement, and the Master Services Agreement. Further

12  disputes surround: (a) the validity of the votes and resolutions to remove Mr. Koren from PCJV

13  USA's management; (b) the Hernandez Group's ability to participate in the management of PCJV

14  USA; (c) the impropriety of Mr. Jacoby's inducing Mr. Koren to transfer certain equity stakes in

15  certain businesses to Mr. Jacoby; (d) Mr. Jacoby's unauthorized withdrawals of money from

16  certain business accounts; (e) control and management of PCJV USA and the LA Group.

17    114.    A judicial declaration is necessary and appropriate at this time under these

18  circumstances to resolve the claims of Mr. Koren, on the one hand, and Cross-Defendants, and

19  each of them, on the other hand.

20    115.    As such, Mr. Koren seeks judicial declarations that:

21         a.  Mr. Koren's changing PCJV USA's banking relationship to safeguard those funds

22             from Mr. Jacoby was justified.

23         b.  The votes and resolutions to remove Mr. Koren as a voting representative,

24             manager, and/or officer of PCJV USA are invalid or null and void.

25         c.  In transferring a majority interest to the Hernandez Group, Cinco Group breached

26             the PCJV Governing Documents.

27         d.  In transferring a majority interest to the Hernandez Group without first providing

28             the LA Group a right of first refusal, Cinco Group breached the PCJV Governing

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1    Documents.

2    e.  The transfer of equity interests by the Cinco Group to the Hernandez Group is

3    invalid or null and void.

4    f.  Any vote by any member of the Hernandez Group, including Mr. Hernandez, is

5    invalid or null and void.

6    g.  Mr. Jacoby fraudulently induced Mr. Koren to transfer shares in NKM Capital, the

7    J & K Entities, and the LA Group such that said transfers shall be rescinded and

8    ownership of the subject shares be restored to Mr. Koren.

9    h.  Mr. Jacoby was not authorized to withdraw over \$50,000 from the J & K Entities

10    bank accounts and shall return said money immediately forthwith.

11    i.  Mr. Koren's management of PCJV USA and LA Group shall continue without

12    interference by any of the Cross-Defendants and any person acting in concert with

13    or participating with them.

14    j.  The purported termination of the Master Services Agreement is invalid or null and

15    void.

16    k.  Mr. Koren's percentage interest in the LA Group has always been 61.3% and was

17    not modified.

18    **PRAYER FOR RELIEF**

19    WHEREFORE, Cross-Complainant prays for judgment against Cross-Defendants, and

20    each of them, jointly and severally, as follows:

21    1.    For general, special, actual, compensatory and/or nominal damages in an amount to

22    be proved at trial;

23    2.    For rescission;

24    3.    For restitution;

25    4.    For punitive and exemplary damages;

26    5.    For a temporary restraining order, preliminary injunction, and permanent

27    injunction;

28    6.    For declaratory relief;

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  7. For a constructive trust;

2  8. For an award of attorneys' fees, costs and expenses;

3  9. For prejudgment and post-judgment interest as allowed by law;

4  10. For costs of suit incurred herein; and

5  11. For such other and further relief that the Court deems just and proper.

6

7 DATED: May 8, 2018    FREEMAN, FREEMAN & SMILEY, LLP

8

9      By: _____

         TODD M. LANDER

10       ARASH BERAL

         Attorneys for Defendant and Cross-Complainant

11       GUY KOREN

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1

**VERIFICATION**

2  **STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

3      I have read the foregoing CROSS-COMPLAINANT GUY KOREN'S VERIFIED CROSS-COMPLAINT FOR: 1. BREACH OF FIDUCIARY DUTY; 2. INTENTIONAL INTERFERENCE
4  WITH CONTRACTUAL RELATIONS; 3. INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS; 4. NEGLIGENT INTERFERENCE WITH
5  PROSPECTIVE ECONOMIC RELATIONS; 5. INDUCEMENT TO BREACH CONTRACTUAL DOCUMENTS; 6. UNFAIR COMPETITION IN VIOLATION OF CAL. BUS. & PROF. CODE
6  §§ 17200, *ET SEQ.*; 7. BREACH OF WRITTEN CONTRACT; 8. FRAUDULENT INDUCEMENT; 9. BREACH OF ORAL CONTRACT; 10. BREACH OF IMPLIED-IN-FACT
7  CONTRACT; 11. BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING; 12. ACCOUNTING; AND 13. DECLARATORY RELIEF and know its contents.

8

9      I am a party to this action.  The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

10

11      Executed on May 8, 2018, at Los Angeles, California.

12      I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

13

14

15  <u> GUY KOREN </u>                    Signature
    Print Name of Signatory

16

17

18

19

20

21

22

23

24

25

26

27

28

3782229.1 24069-200

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

# EXHIBIT A

## POTATO CORNER USA
## JOINT VENTURE AGREEMENT

This Joint Venture Agreement (the "Agreement") dated _____ is made and entered into on _____, by and between:

> Cinco Corporation, a corporation duly existing and registered by virtue of and under the laws of the Republic of the Philippines with office address at 869 Katarungan Street, Plainview Mandaluyong City, Philippines 1550, represented herein by its duly authorized representative, Jose P. Magsaysay (hereinafter "Cinco"), and its directors, Jose P. Magsaysay, Jr., Jose Miguel Ma. G. Montinola, Ma. Victoria O. Bermejo, Ricardo K. Montelibano, all of whom are Philippine citizens and resident, and collectively referred to as the "Cinco Group";

-and-

> AMIT NEMANIM, GUY KOREN, AMIR JACOBY, all of whom are U.S. citizens and residents and collectively referred to as the "LA Group:

### RECITALS

WHEREAS, the Parties hereto have agreed to form a limited liability company (hereinafter referred to as the "Company") under the laws of the State of Delaware, with the primary purpose of engaging in the business of establishing, operating, managing, licensing and franchising "Potato Corner" stores/outlets in the United States of America and Israel, except in the County of Los Angeles, USA and the County of San Francisco, USA and Tanforan Mall (hereinafter, "Territory").

WHEREAS, the Parties herein have agreed to enter into this Agreement which sets forth the terms and conditions with respect to the organization, incorporation, operation and management of the Company and defines their respective rights, duties and obligations of the parties to this Agreement.

WHEREAS, the Parties agree that the LLC operating agreement to be entered by them shall reflect the terms and conditions as set forth in this Agreement.

WHEREAS, Cinco may assign and or all of its rights to the joint venture company formed under this Agreement to a wholly-owned subsidiary as it deems fit.

NOW, THEREFORE, for and in consideration of the foregoing premises, the Parties hereby agree as follows:

1) ORGANIZATION AND FORMATION OF THE COMPANY

   a) Within ten (10) days from the Effective Date of this Agreement, the Parties herein agree to organize and form, a limited liability company to be called "PCJV USA" ( hereinafter referred to as the Company) for the primary purpose of engaging in the business of establishing, operating, managing, licensing and franchising "Potato Corner" stores/outlets in the Territory.

b) The initial members of the Company shall be the following:

 i) Cinco Group
  (1) Cinco
  (2) Jose P. Magsaysay, Jr.
  (3) Jose Miguel Ma. G. Montinola
  (4) Ma. Victoria O. Bermejo
  (5) Ricardo K. Montelibano

 ii) LA Group
  (1) Amit Nemanim
  (2) Guy Koren
  (3) Amir Jacoby

c) The principal office of the Company shall be at   1729 Santee St., Los Angeles, California 90015.

d) The annual general meeting of the members of the Company shall be held every year at the principal office of the Company.   The members may, at their discretion, invite non-members to join the annual general meeting, but only as non-voting observers.  Further, to the extent allowed by the financial condition of the Company, and as agreed upon by a majority of all member interests, the Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses incurred by the following members in attendance of the annual members' meeting: Jose P. Magsaysay, Jr., Jose Miguel Ma. Montinola, Ma. Victoria O. Bermejo and Ricardo K. Montelibano.

e) The fiscal year of the Company shall begin on January 1 and end on December 31 of each year.

f) The Company shall immediately upon formation obtain a "Liability Insurance" for the Company the amount and scope of coverage to be determined by the managers.

g) All costs, fees and expenses incurred in connection with the organization and formation of the Company shall be for the account of the Company.

h) The operating agreement of the Company shall reflect the terms and conditions set forth in this Agreement between the Parties.



2) CAPITALIZATION/OWNERSHIP OF THE COMPANY

a) At the time of formation, the Company shall have a total capital account of Fifty Thousand Dollars (US$50,000) which shall be fully subscribed and paid.

b) Unless other agreed to in writing, at the commencement of this Agreement, the Parties hereby agree that the Cinco Group shall contribute Thirty Thousand Dollars (US$30,000) and own sixty (60%) percent of the Company's capital accounts, while the LA Group shall contribute Twenty Thousand Dollars (US$20,000) and own the remaining forty (40%) percent.

2

c) The Parties hereby agree any increase in the capital account shall require an affirmative vote of 75% of all of the members' percentage interests in the Company.   In the event an increase in the Company's capital accounts is approved by the members, both Parties shall have rights of pre-emption so that their pro rata ownership share in the Company shall be maintained, provided that, either Party shall have thirty (30) days within which to confirm in writing that it is willing and able to subscribe and fully pay its pro rata share of the increase in capital.

d) Neither Party shall assign any of its rights or obligations under this Agreement, nor his/its member interests in the Company without the prior written consent of the other Party. In the event either Party desire to transfer or sell his/its pro rata members interest in the Company to a person other those specifically named in Section 1(a) of this Agreement, such Party shall be obligated to sell the same first to the other Party, which has have thirty (30) days within which to exercise its rights of first refusal from the date of receipt of a written notice to sell.  For this purpose, the Parties hereby agree that the right of first refusal may be exercised in accordance with the following formula:   The average of the Company's earnings before interest, depreciation, taxes and amortization (EBITDA) for the last two (2) years multiplied by 5 times, and further multiplied by the percentage of member interest subject to such right of first refusal over total outstanding member interests.

3) MANAGEMENT OF THE COMPANY

a) As will be provided in the Operating Agreement, the business and affairs of the Company shall be managed and all of the Company powers shall be exercised by or under the direction of the managers (collectively referred to as "Management"). Unless otherwise agreed to by the parties, the Management shall be composed of seven (7) members, four (4) of whom shall be designated by the Cinco Group, and three (3) designated by the LA Group.  Upon the formation of the Company, the following shall be named managers: Jose P. Magsaysay, Jr., Jose Miguel Ma. Montinola, Ma. Victoria O. Bermejo, Ricardo K. Montelibano, Amit Nemanim, Guy Koren, and Amir Jacoby.



b) The Management shall regularly meet on a monthly basis. The regular monthly board meeting may be done via teleconference or through the internet.  The members may, at their discretion, invite non-members to join member meetings, but only as non-voting observers. Further, to the extent allowed by the financial condition of the Company, and as agreed upon by a majority of all member interests, the Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses incurred by the members named in Section 1(d) in attendance of said meetings.

c) Upon the formation of the Company, it shall have the following executive officers: President, Corporate Secretary and Treasurer, and the following shall be elected by the members to serve these positions:

    i)   Chairman of the Board of Members – Jose P. Magsaysay

3

ii) President – At any given time, the President shall be any one of the following members: Amit Nenamin, Guy Koren or Amir Jacoby, and the first president will be Amit Nemanim

iii) Corporate Secretary – Erlinda Bartolome.

iv) Treasurer – Jose Miguel Ma. Montinola

  (1) The Treasurer shall have oversight functions over the Accounting and Finance Departments that shall be exercised independent of the President.

d) Additional executive officers may be appointed by Management as it may deem necessary.

e) It is hereby agreed that the rights and responsibilities of the Management shall include the following:

  i) Approval of the compensation package for the managers, executive offices and key personnel.

  ii) Approval of the Accounting System/Procedures/Software/Method to be used by the Company.

  iii) Approval of the operating budget of the Company, and any changes to it.

  iv) Approval of all franchising agreements, and lease agreements.

  v) Approval of all purchases and disbursements in excess of $10,000, provided that such amount may be changed or modified by Management as it deems necessary.

f) The executive officers shall manage the business and property of the Company, and to market the business, in accordance with and pursuant to the directives of and policies set by the Management of the Company. The Management of the Company can recall and/or withdraw the appointment of any executive officer, as it deems necessary.

g) The Company shall enter into a Master License Agreement with Cinco (or an affiliated company to be designated by Cinco) which shall include the following terms and conditions:

  i) The Company agrees to license the "POTATO CORNER" intellectual property rights from Cinco or an affiliated company to be designated by Cinco) consisting of (i) the trademark, service mark and trade name "POTATO CORNER"; and (ii) various trademarks, service marks, trade names, slogans, designs, insignias, emblems, symbols, color schemes, package features, logo and other propriety identifying characteristics used in relation and in connection with the "Potato Corner" Products and the System; and (iii) as well as other intellectual property rights in connection with the "POTATO CORNER" intellectual property rights, for use in the Territory.

  ii) The Company agrees to pay, as an arm's length license fee, the following amounts:

    (1) With respect to the licensing / sub-licensing or franchising the "POTATO CORNER" intellectual property rights in connection with the "POTATO CORNER" outlets/stores, an amount equal to thirty percent (30%) of all

4

initial/franchise fees and ongoing royalty fees paid to/ collected by the Company. Payments shall be made to Cinco (or an affiliated company to be designated by Cinco) by wire transfer using a bank or other financial institution specified by it within thirty (30) days from receipt of the fees by the Company.

(2) All withholding and other applicable taxes levied by any authority on the payments by the Company shall be borne solely by the Company.

h) The Company agrees to engage the LA Group to provide management and strategic experience and expertise during the duration of this Agreement. The Company shall enter into a Master Services Agreement with the LA Group (or a corporation to be designated by the LA Group) which shall include the following terms and conditions:

   i) In consideration for the provision of its services under the Master Services Agreement, the LA Group shall be entitled to a services fee equal to thirty (30%) percent of all initial/franchise fee and continuing royalty fees paid to/ collected by the Company .

   ii) All withholding and other applicable taxes levied by any authority on the payments by the Company to the LA Group under this Agreement shall be borne solely by the Company.

   iii) The LA Group shall faithfully, diligently and efficiently exercise its obligations and responsibilities under the Master Services Agreement.

   iv) The LA Group shall maintain and protect the Confidential Information belonging to Cinco or the Company, and such undertaking shall apply to all of its partners, officers, employees, or agents.

i) The President of the Company shall render the following services and shall perform the following duties for the Company in a faithful, diligent and efficient manner:

   i) The President shall be responsible for all management, operational, marketing, establishment, maintenance, licensing and sub-licensing activities with respect to the "Potato Corner" outlets/stores in the Territory. He shall use his best efforts at all times during the term of this Agreement to operate and maintain the "Potato Corner" outlets/stores in the Territory according to the highest standards achievable consistent with the overall plan of the Management of the Company. The President shall comply with the rules, policies and procedures approved by the Management of the Company from time to time.

   ii) The President shall advertise market and promote the "Potato Corner" outlets/stores with the goal of causing public knowledge, awareness and patronage of the "Potato Corner" outlets/sites.

   iii) The President shall maintain a comprehensive system of records, books and accounts, with respect to the licensing and sub-licensing activities, operation,



5

establishment, management, maintenance and other activities of the "Potato Corner" outlets /stores in the Territory with the assistance of the Corporate Secretary.

iv) No later than the twentieth (20th) day of each month, with respect to the preceding month, the President shall render a statement of receipts and disbursements, a schedule of accounts receivable and payable, and a schedule of fees collected and distributed, together with a reconciled bank statement as of the last day of the month with the assistance of the Corporate Secretary.

v) No later than three (3) months after the end of a fiscal year, the President shall, with the assistance of the Corporate Secretary and external accountant hired by Management, cause the Company to issue audited financial statements, and shall provide a copy of the same to all the members of Management.

vi) To the extent the President is lawfully able to do so, the President shall take such action as may be necessary to comply promptly with any and all laws, ordinances, orders or other requirements of any federal, state, county or municipal authority having jurisdiction of the Company and affecting the Company.

j) Consistent with its fiduciary duty to the Company, the members and managers shall exercise the duty of care and shall, at all times, ensure that all corporate opportunities consistent with the objectives of this Agreement shall be pursued on behalf of, and for the benefit of the Company. As such, with respect to the establishment of Company-owned stores, whenever potential locations are identified by any member or manager, it shall be promptly brought to the attention of the Management. At all times, and within thirty (30) days from receipt of this information, the Management shall decide to either build a Company-owned store at the identified location. In the event the Company chooses to build a Company-owned store at the identified location, it shall have the right to do so, to the exclusion of any of the members or managers. However, in the even the Company decides not to build a Company-owned store at the identified location, it shall notify the members and managers of its decision in writing. In such case, the LA Group shall have the right to build a store at the identified location, provided that it shall enter into a franchising agreement with the Company, and shall pay the franchise fees and ongoing royalty fees as set forth in the Company's standard franchising agreement.



4) DURATION OF AGREEMENT

a) This Agreement shall become effective from the date of execution hereof and shall continue indefinitely unless otherwise terminated by (i) an affirmative vote of 75 percent (75%) of all member interests, or (ii) upon mutual agreement by the Parties in writing.

b) Upon termination of this Agreement, the effects of termination shall be as follows:

6

i) All rights granted under the Master License Agreement shall terminate and the Company shall cease the use of the Potato Corner Intellectual Property Rights, and Confidential Information, provided however, that the Company shall be permitted to use any of the foregoing as is reasonably required in order to comply with its obligations under its sub-licensing or franchising agreements, but only to the extent of the duration of sub-licensing or franchising agreements in existence at the time of the termination of this Agreement.

ii) The LA Group shall be subject to a non-compete arrangement and hereby agrees that, within two (2) years from the date of termination of this Agreement, it shall not engage in the business of establishing, operating, managing, licensing and franchising identical or similar products sold by the Company, using the intellectual property rights identical or similar to those used by the Company, at the time of the termination of this Agreement.

5) GENERAL PROVISIONS

a) This Agreement may not be altered, changed, supplemented or modified except by a written instrument duly signed by the Parties.

b) The Parties shall use their best efforts to cooperate for the success of the business of the Company. The Parties further agree to perform all acts and execute and deliver all documents or instruments required or necessary to fully implement or consummate the transactions contemplated in and the intent underlying this Agreement.

c) The Parties shall, to the extent feasible, cause the operating agreement of the Company to reflect the mutual covenants and provisions contained in this Agreement.

d) All notices and other communications required or permitted to be given hereunder shall be given in writing (and for this purpose shall include emails or fax transmissions) and shall be addressed to the appropriate Party at the address of such Party as heretofore designated, or at such address as such Party may designate subsequently in writing.

e) The failure of any Party at any time to require performance by the others of any provision of this Agreement shall not affect, in any way, the right of such Party to require performance of that or any other provision, and any waiver by any Party of any breach of this Agreement shall not be construed as a waiver of any continuing or succeeding breach of such provision, or a waiver of any other right under this Agreement.

f) This Agreement shall constitute the entire agreement between the Parties and shall supersede any previous agreements, written or otherwise, with respect to the same subject matter which may have been made by the Parties prior hereto.

g) The invalidity of any portion of this Agreement will not and shall not render the entire Agreement void, nor affect the validity of the rest of the provisions of this Agreement.



7

h) This Agreement shall be governed by the laws of the State of California.

i) Parties acknowledge that, from time to time, one Party (the "Discloser") may disclose to the other Party (the "Recipient") information: (a) relating to the Potato Corner outlets and sites; (b) relating to the Potato Corner Intangible Property Rights; (c) Potato Corner product specifications and related information; (d) which is marked with "confidential" or a similar legend; (e) which is described orally and designated as confidential; or (f) which would, under the circumstances, be understood by a reasonable person to be confidential ("Confidential Information"). Upon subsequent disclosure of previously disclosed Confidential Information to the Recipient by the Discloser, the information will remain Confidential Information even if not identified as Confidential Information at the subsequent disclosure.   Recipient shall retain such Confidential Information in confidence, and shall not disclose it to any Third Party or use it for other than the purposes of this Agreement without the Discloser's prior written consent. Each Party shall use at least the same procedures and degree of care with respect to such Confidential Information which it uses to protect its own confidential information of like importance, and in no event less than reasonable care. The Recipient will immediately give written notice to the Discloser of any unauthorized use or disclosure of the Discloser's Confidential Information, and the Recipient will assist the Discloser in remedying such unauthorized use or disclosure.

[The Remainder of This Page is Left Intentionally Blank]



WEST\222455823.2

IN WITNESS WHEREOF, the parties have executed this Agreement on the date and in place first mentioned.

**Cinco Group:**

Cinco Corporation (Philippines)

Name: Jose P. Magsaysay

Title:   CEO

Jose P, Magsaysay, Jr.,

Jose Miguel Ma. G. Montinola

Ma. Victoria O. Bermejo

Ricardo K. Montelibano,

**L.A. Group:**

Amit Nemanim

Guy Koren

Amir Jacoby

SIGNED IN THE PRESENCE OF:

9

# EXHIBIT B



PCJV BOARD MEETING
October 16, 2013, PCJV Office Wilshire, Los Angeles
11:00 am to 3:00 pm

In Attendance

Directors:

Jose P. Magsaysay
Jose Miguel Ma. Montinola
Ricardo Enrique Montelibano
Maria Victoria Bermejo
Guy Koren
Amir Jacoby
Inbal Jacoby

Erlinda S. Bartolome – Corporate Secretary

1. Minutes of the last Board Meeting was not read and
approved.

2. Board approved Statement of Account from Ginco, as of
April 4, 2011 total was US 23,000.00
   a. Breakdown included: Advances to DLA Piper US
   8,000.00, Advances for Salaries of Guy and Amit US
   4,000.00 and Consultancy Fee advances to
   E.S.Bartolome US 11,000.00 (Nov 2010 to Feb
   2011).

Pag 1 of 4

(JPEG Image, 2550 × 3270 pixels) - Scaled (22%)    https://mail-attachment.googleusercontent.com/attachment/u/0/?ui=2...

b. On ESBartolome's consultancy Board approved the consultancy through the Board's signature on a written document. To enable PCJV to pay the amount, Consultancy fee will temporarily be increased to US 2,300.00 until the US 11,000.00 from previous months will have been paid. The difference will be paid to Cinco. Consultancy Fee will go back to US 1,300.00 until amount is paid. Inbal given copy of this signed document.

c. The Board approved that the amount of US 23,000.00 be taken up as long - term liability of PCJV.

d. The Board discussed the billings of DLA Piper and Guy and Amir will negotiate with Kim on possible discount on billings.

3. Operating Agreements and Structure

a. There are two Operating Agreements:
   i. Internal Operating Joint Venture signed by all Directors.
   ii. Limited Liability Operating Agreement of PCJV USA LLC filed with the government.
   iii. Sections of the Internal Joint Venture are reflected in the LLC Operating Agreement.

b. NKM and J & K
   i. License Agreement with NKM will be terminated and shall be migrated to an ADA in favor of J & K.
   ii. Prior to migration to ADA for J & K (Guy and Amir), there is a need for all shareholders of

NKM to sign Quit Claim and Memorandum of
Understanding.

    iii. J & K shall be the new company in place of NKM
and will sign an ADA with PCJV. Franchise Fee
will remain the same US 1,500.00

    iv. Guy will take care of negotiation with Amit.

c. On the 30/30 share of Franchise Fees and Royalties
per Joint Venture Agreement:

    i. Board has approved that this will not be an
expense in the P & L of PCJV but shall be given
as part of its distributive income.

    ii. Since Amit is no longer a Managing Partner in
PCJV, the 30% share of the LA Group shall be
divided between Guy and Amir.

d. Board reviewed and discussed the Joint Venture
Agreement. The following revisions were approved:

    i. Section 1 c - Principal Office address will
change to reflect present address.

    ii. Section 1 f - LA Group as managing partners
shall be responsible in securing the Liability
Insurance of PCJV.

    iii. Section 3 a:

        1. Clarification on the present role of Amit in
the Management of the Company as a
member.

        2. When documents of Amit are done, Inbal
Jacoby shall replace Amit in the
management of the company or as Board



iv. Section 3 c:
   1. Guy Koren to replace Amit Neimamin as President of PCJV.
   2. Maria Victoria Bermejo will replace Jose Miguel Ma. Montinola as Treasurer
   3. Additionally, the Board approved to include the following provision: That a 75% vote will be needed to replace the CEO, President, Treasurer, Corporate Secretary. Other Senior Officers of PCJV will need simple majority approval.

4. Dividend or distributive income is projected to be released by mid 2013. Salary adjustments of the Managing Partners (LA Group) shall be done after the first dividends are released.

5. PCI Trading.
   a. Operating Agreement should be drawn up and Ben Olivas will be requested to do this.
   b. The Board agreed on the following:
      i. Ownership shall mirror PCJV: 60% Potato Corner International and 40% LA Group.
      ii. Since the LA Group shall be the managing partner, profit sharing shall be 50/50.

ERLINDA S. BARTOLOME

# EXHIBIT C

## PCJV USA LLC
## JOINT VENTURE AGREEMENT
(FIRST AMENDMENT TO THE JV AGREEMENT)

This Joint Venture Agreement (the "Agreement") is made and entered into on OCTOBER 17, 2012 at its Principal Office , Suite #1100, 6380 Wilshire Blvd Los Angeles, CA 90048 by and between:

POTATO CORNER INTERNATIONAL, a corporation duly existing and registered by virtue of and under the laws of the State of Delaware, US with office address at 92 Corporate Park Suite C-332, Irvine, California, USA 92606, represented herein by its duly authorized representative, Jose P. Magsaysay (hereinafter "PCI"), and its directors, Jose P. Magsaysay, Jr., Jose Miguel Ma. G. Montinola, Ma. Victoria O. Bermejo, Ricardo K. Montelibano, all of whom are Philippine citizens and resident, and collectively referred to as the "PCI Group";

-and-

GUY KOREN, AMIR JACOBY AND INBAL JACOBY all of whom are U.S. citizens and residents and collectively referred to as the "LA Group:

### RECITALS

WHEREAS, the Parties hereto have agreed to form a limited liability company (hereinafter referred to as the "Company") under the laws of the State of Delaware, with the primary purpose of engaging in the business of establishing, operating, managing, licensing and franchising "Potato Corner" stores/outlets in the United States of America and Israel, except in the County of Los Angeles, USA and the County of San Francisco, USA and Tanforan Mall (hereinafter, "Territory").

WHEREAS, the Parties herein have agreed to enter into this Agreement which sets forth the terms and conditions with respect to the organization, incorporation, operation and management of the Company and defines their respective rights, duties and obligations of the parties to this Agreement.

WHEREAS, the Parties agree that the LLC operating agreement to be entered by them shall reflect the terms and conditions as set forth in this Agreement.

WHEREAS, Cinco may assign and or all of its rights to the joint venture company formed under this Agreement to a wholly-owned subsidiary as it deems fit.

NOW, THEREFORE, for and in consideration of the foregoing premises, the Parties hereby agree as follows:

1) ORGANIZATION AND FORMATION OF THE COMPANY

   a) Within ten (10) days from the Effective Date of this Agreement, the Parties herein agree to organize and form, a limited liability company to be called "PCJV USA" ( hereinafter referred to as the Company) for the primary purpose of engaging in

the business of establishing, operating, managing, licensing and franchising "Potato Corner" stores/outlets in the Territory.

b) The initial members of the Company shall be the following:

  i)  Potato Corner International (PCI)
      (1) Jose P. Magsaysay, Jr.
      (2) Jose Miguel Ma. G. Montinola
      (3) Ma. Victoria O. Bermejo
      (4) Ricardo K. Montelibano

  ii) LA Group
      (1) Guy Koren
      (2) Amir Jacoby
      (3) Inbal Jacoby

c) The principal office of the Company shall be at Suite 1100, 6380 Wilshire Blvd. Los Angeles, CA 90048 USA.

d) The annual general meeting of the members of the Company shall be held every year at the principal office of the Company. The members may, at their discretion, invite non-members to join the annual general meeting, but only as non-voting observers. Further, to the extent allowed by the financial condition of the Company, and as agreed upon by a majority of all member interests, the Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses incurred by the following members in attendance of the annual members' meeting: Jose P. Magsaysay, Jr., Jose Miguel Ma. Montinola, Ma. Victoria O. Bermejo and Ricardo K. Montelibano.

e) The fiscal year of the Company shall begin on January 1 and end on December 31 of each year.

f) The Company shall immediately upon formation obtain a "Liability Insurance" for the Company the amount and scope of coverage to be determined by the managers.

g) All costs, fees and expenses incurred in connection with the organization and formation of the Company shall be for the account of the Company.

h) The operating agreement of the Company shall reflect the terms and conditions set forth in this Agreement between the Parties.

2) CAPITALIZATION/OWNERSHIP OF THE COMPANY

a) At the time of formation, the Company shall have a total capital account of Fifty Thousand Dollars (US$50,000) which shall be fully subscribed and paid.

b) Unless other agreed to in writing, at the commencement of this Agreement, the Parties hereby agree that the Cinco Group shall contribute Thirty Thousand Dollars (US$30,000) and own sixty (60%) percent of the Company's capital

2

G. k

accounts, while the LA Group shall contribute Twenty Thousand Dollars (US$20,000) and own the remaining forty (40%) percent.

c) The Parties hereby agree any increase in the capital account shall require an affirmative vote of 75% of all of the members' percentage interests in the Company. In the event an increase in the Company's capital accounts is approved by the members, both Parties shall have rights of pre-emption so that their pro rata ownership share in the Company shall be maintained, provided that, either Party shall have thirty (30) days within which to confirm in writing that it is willing and able to subscribe and fully pay its pro rata share of the increase in capital.

d) Neither Party shall assign any of its rights or obligations under this Agreement, nor his/its member interests in the Company without the prior written consent of the other Party. In the event either Party desire to transfer or sell his/its pro rata members interest in the Company to a person other those specifically named in Section 1(a) of this Agreement, such Party shall be obligated to sell the same first to the other Party, which has have thirty (30) days within which to exercise its rights of first refusal from the date of receipt of a written notice to sell. For this purpose, the Parties hereby agree that the right of first refusal may be exercised in accordance with the following formula: The average of the Company's earnings before interest, depreciation, taxes and amortization (EBITDA) for the last two (2) years multiplied by 5 times, and further multiplied by the percentage of member interest subject to such right of first refusal over total outstanding member interests.

3) MANAGEMENT OF THE COMPANY

a) As will be provided in the Operating Agreement, the business and affairs of the Company shall be managed and all of the Company powers shall be exercised by or under the direction of the managers (collectively referred to as "Management"). Unless otherwise agreed to by the parties, the Management shall be composed of seven (7) members, four (4) of whom shall be designated by the Cinco Group, and three (3) designated by the LA Group. Upon the formation of the Company, the following shall be named managers: Jose P. Magsaysay, Jr., Jose Miguel Ma. Montinola, Ma. Victoria O. Bermejo, Ricardo K. Montelibano, Guy Koren, Amir Jacoby and Inbal Jacoby.

b) The Management shall regularly meet on a monthly basis. The regular monthly board meeting may be done via teleconference or through the internet. The members may, at their discretion, invite non-members to join member meetings, but only as non-voting observers. Further, to the extent allowed by the financial condition of the Company, and as agreed upon by a majority of all member interests, the Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses incurred by the members named in Section 1(d) in attendance of said meetings.

c) Upon the formation of the Company, it shall have the following executive officers; President, Corporate Secretary and Treasurer, and the following shall be elected by the managers/members to serve these positions. Any change in these mentioned executive officers will require a vote of 75% of members' interest.

3

G. k   AJ

i) Chairman of the Board of Members – Jose P. Magsaysay
ii) President – At any given time, the President shall be any one of the following members: Guy Koren or Amir Jacoby or Inbal Jacoby and the first president will be Amit Nemanim now replaced by Guy Koren
iii) Corporate Secretary – Erlinda S. Bartolome.
iv) Treasurer – Maria Victoria O. Bermejo
   (1) The Treasurer shall have oversight functions over the Accounting and Finance Departments that shall be exercised independent of the President.

d) Additional executive officers may be appointed by Management as it may deem necessary. Replacement and removal will require Managers simple majority vote.

e) It is hereby agreed that the rights and responsibilities of the Management shall include the following:

   i) Approval of the compensation package for the managers, executive offices and key personnel.
   ii) Approval of the Accounting System/Procedures/Software/Method to be used by the Company.
   iii) Approval of the operating budget of the Company, and any changes to it.
   iv) Approval of all franchising agreements, and lease agreements.
   v) Approval of all purchases and disbursements in excess of $10,000, provided that such amount may be changed or modified by Management as it deems necessary.

f) The executive officers shall manage the business and property of the Company, and to market the business, in accordance with and pursuant to the directives of and policies set by the Management of the Company. The Management of the Company can recall and/or withdraw the appointment of any executive officer, as it deems necessary.

g) The Company shall enter into a Master License Agreement with Cinco (or an affiliated company to be designated by Cinco) which shall include the following terms and conditions:

   i) The Company agrees to license the "POTATO CORNER" intellectual property rights from Cinco or an affiliated company to be designated by Cinco) consisting of (i) the trademark, service mark and trade name "POTATO CORNER"; and (ii) various trademarks, service marks, trade names, slogans, designs, insignias, emblems, symbols, color schemes, package features, logo and other propriety identifying characteristics used in relation and in connection with the "Potato Corner" Products and the System; and (iii) as well as other intellectual property rights in connection with the "POTATO CORNER" intellectual property rights, for use in the Territory.

   ii) The Company agrees to pay, as an arm's length license fee, the following amounts:

4

(1) With respect to the licensing / sub-licensing or franchising the "POTATO CORNER" intellectual property rights in connection with the "POTATO CORNER" outlets/stores, an amount equal to thirty percent (30%) of all initial/franchise fees and ongoing royalty fees paid to/ collected by the Company.  Payments shall be made to Cinco (or an affiliated company to be designated by Cinco) by wire transfer using a bank or other financial institution specified by it within thirty (30) days from receipt of the fees by the Company.

(2) All withholding and other applicable taxes levied by any authority on the payments by the Company shall be borne solely by the Company.

h) The Company agrees to engage the LA Group to provide management and strategic experience and expertise during the duration of this Agreement.  The Company shall enter into a  Master Services Agreement with the LA Group (or a corporation to be designated by the LA Group) which shall include the following terms and conditions:

i) In consideration for the provision of its services under the Master Services Agreement, the LA Group shall be entitled to a services fee equal to thirty (30%) percent of all initial/franchise fee and continuing royalty fees paid to/ collected by the Company .

ii) All withholding and other applicable taxes levied by any authority on the payments by the Company to the LA Group under this Agreement shall be borne solely by the Company.

iii) The LA Group shall faithfully, diligently and efficiently exercise its obligations and responsibilities under the Master Services Agreement.

iv) The LA Group shall maintain and protect the Confidential Information belonging to Cinco or the Company, and such undertaking shall apply to all of its partners, officers, employees, or agents.

i) The President of the Company shall render the following services and shall perform the following duties for the Company in a faithful, diligent and efficient manner:

i) The President shall be responsible for all management, operational, marketing, establishment, maintenance, licensing and sub-licensing activities with respect to the "Potato Corner" outlets/stores in the Territory. He shall use his best efforts at all times during the term of this Agreement to operate and maintain the "Potato Corner" outlets/stores in the Territory according to the highest standards achievable  consistent with the overall plan of the Management of the Company. The President shall comply with the rules, policies and procedures approved by the Management of the Company from time to time.

ii) The President shall advertise market and promote the "Potato Corner" outlets/stores with the goal of causing public knowledge, awareness and patronage of the "Potato Corner" outlets/sites.

5

iii) The President shall maintain a comprehensive system of records, books and accounts, with respect to the licensing and sub-licensing activities, operation, establishment, management, maintenance and other activities of the "Potato Corner" outlets /stores in the Territory with the assistance of the Corporate Secretary.

iv) No later than the twentieth (20th) day of each month, with respect to the preceding month, the President shall render a statement of receipts and disbursements, a schedule of accounts receivable and payable, and a schedule of fees collected and distributed, together with a reconciled bank statement as of the last day of the month with the assistance of the Corporate Secretary.

v) No later than three (3) months after the end of a fiscal year, the President shall, with the assistance of the Corporate Secretary and external accountant hired by Management, cause the Company to issue audited financial statements, and shall provide a copy of the same to all the members of Management.

vi) To the extent the President is lawfully able to do so, the President shall take such action as may be necessary to comply promptly with any and all laws, ordinances, orders or other requirements of any federal, state, county or municipal authority having jurisdiction of the Company and affecting the Company.

j) Consistent with its fiduciary duty to the Company, the members and managers shall exercise the duty of care and shall, at all times, ensure that all corporate opportunities consistent with the objectives of this Agreement shall be pursued on behalf of, and for the benefit of the Company. As such, with respect to the establishment of Company-owned stores, whenever potential locations are identified by any member or manager, it shall be promptly brought to the attention of the Management. At all times, and within thirty (30) days from receipt of this information, the Management shall decide to either build a Company-owned store at the identified location. In the event the Company chooses to build a Company-owned store at the identified location, it shall have the right to do so, to the exclusion of any of the members or managers. However, in the even the Company decides not to build a Company-owned store at the identified location, it shall notify the members and managers of its decision in writing. In such case, the LA Group shall have the right to build a store at the identified location, provided that it shall enter into a franchising agreement with the Company, and shall pay the franchise fees and ongoing royalty fees as set forth in the Company's standard franchising agreement.

4) DURATION OF AGREEMENT

a) This Agreement shall become effective from the date of execution hereof and shall continue indefinitely unless otherwise terminated by (i) an affirmative vote of 75 percent (75%) of all member interests, or (ii) upon mutual agreement by the Parties in writing.

6

$G, K$

b) Upon termination of this Agreement, the effects of termination shall be as follows:

   i)  All rights granted under the Master License Agreement shall terminate and the Company shall cease the use of the Potato Corner Intellectual Property Rights, and Confidential Information, provided however, that the Company shall be permitted to use any of the foregoing as is reasonably required in order to comply with its obligations under its sub-licensing or franchising agreements, but only to the extent of the duration of sub-licensing or franchising agreements in existence at the time of the termination of this Agreement.

   ii) The LA Group shall be subject to a non-compete arrangement and hereby agrees that, within two (2) years from the date of termination of this Agreement, it shall not engage in the business of establishing, operating, managing, licensing and franchising identical or similar products sold by the Company, using the intellectual property rights identical or similar to those used by the Company, at the time of the termination of this Agreement.

5) GENERAL PROVISIONS

   a) This Agreement may not be altered, changed, supplemented or modified except by a written instrument duly signed by the Parties.

   b) The Parties shall use their best efforts to cooperate for the success of the business of the Company. The Parties further agree to perform all acts and execute and deliver all documents or instruments required or necessary to fully implement or consummate the transactions contemplated in and the intent underlying this Agreement.

   c) The Parties shall, to the extent feasible, cause the operating agreement of the Company to reflect the mutual covenants and provisions contained in this Agreement.

   d) All notices and other communications required or permitted to be given hereunder shall be given in writing (and for this purpose shall include emails or fax transmissions) and shall be addressed to the appropriate Party at the address of such Party as heretofore designated, or at such address as such Party may designate subsequently in writing.

   e) The failure of any Party at any time to require performance by the others of any provision of this Agreement shall not affect, in any way, the right of such Party to require performance of that or any other provision, and any waiver by any Party of any breach of this Agreement shall not be construed as a waiver of any continuing or succeeding breach of such provision, or a waiver of any other right under this Agreement.

   f)  This Agreement shall constitute the entire agreement between the Parties and shall supersede any previous agreements, written or otherwise, with respect to the same subject matter which may have been made by the Parties prior hereto.

7

g) The invalidity of any portion of this Agreement will not and shall not render the entire Agreement void, nor affect the validity of the rest of the provisions of this Agreement.

h) This Agreement shall be governed by the laws of the State of California.

i) Parties acknowledge that, from time to time, one Party (the "Discloser") may disclose to the other Party (the "Recipient") information: (a) relating to the Potato Corner outlets and sites; (b) relating to the Potato Corner Intangible Property Rights; (c) Potato Corner product specifications and related information; (d) which is marked with "confidential" or a similar legend; (e) which is described orally and designated as confidential; or (f) which would, under the circumstances, be understood by a reasonable person to be confidential ("Confidential Information"). Upon subsequent disclosure of previously disclosed Confidential Information to the Recipient by the Discloser, the information will remain Confidential Information even if not identified as Confidential Information at the subsequent disclosure. Recipient shall retain such Confidential Information in confidence, and shall not disclose it to any Third Party or use it for other than the purposes of this Agreement without the Discloser's prior written consent. Each Party shall use at least the same procedures and degree of care with respect to such Confidential Information which it uses to protect its own confidential information of like importance, and in no event less than reasonable care. The Recipient will immediately give written notice to the Discloser of any unauthorized use or disclosure of the Discloser's Confidential Information, and the Recipient will assist the Discloser in remedying such unauthorized use or disclosure.

[The Remainder of This Page is Left Intentionally Blank]



8

IN WITNESS WHEREOF, the parties have executed this Agreement on the date and in place first mentioned.

**POTATO CORNER INTERNATIONAL GROUP:**

Jose P. Magsaysay, Jr.,

Jose Miguel Ma. G. Montinola

Ma. Victoria O. Bermejo

Ricardo K. Montelibano,

**L.A. Group:**

Inbal Jacoby

Guy Koren

Amir Jacoby

SIGNED IN THE PRESENCE OF:

ACKNOWLEDGMENT

9

# EXHIBIT D

**LIMITED LIABILITY COMPANY AGREEMENT**
**of**
**PCJV USA, LLC**
**A Delaware Limited Liability Company**

THE INTERESTS CREATED BY THIS OPERATING AGREEMENT HAVE NOT BEEN
REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE
SECURITIES ACT OF 1933, AS AMENDED, OR WITH THE SECURITIES AUTHORITIES
OF ANY STATE UNDER ANY STATE SECURITIES LAWS, AND MAY NOT BE SOLD
OR OTHERWISE TRANSFERRED UNLESS REGISTERED UNDER SUCH LAWS OR
UNLESS AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF SUCH
LAWS IS AVAILABLE. THE SALE OR TRANSFER OF SUCH INTERESTS IS SUBJECT
TO CERTAIN ADDITIONAL RESTRICTIONS DESCRIBED IN THIS OPERATING
AGREEMENT.

## TABLE OF CONTENTS

Page

ARTICLE I     DEFINITIONS ...........................................................................................1

ARTICLE II    FORMATION .........................................................................................4

2.1   Purpose .........................................................................................4
2.2   Powers ..........................................................................................4
2.3   Formation and Name ....................................................................4
2.4   Principal Place of Business ...........................................................4
2.5   Registered Office and Registered Agent......................................4
2.6   Records to be Maintained..............................................................5
2.7   Term ..............................................................................................5

ARTICLE III   MEMBERS............................................................................................5

3.1   Classification of Members.............................................................5
3.2   Admission of Additional Members ...............................................5
3.3   Right of First Refusal ...................................................................6
3.4   Amendment of Member Listing ....................................................6
3.5   Payment of Costs..........................................................................6
3.6   Limited Liability of Members ......................................................6
3.7   Voting Rights................................................................................6
3.8   Meetings of Members....................................................................7
3.9   Right of Inspection; Provision of Records to Members ...............10
3.10  Representations and Warranties ....................................................12

ARTICLE IV   MANAGEMENT ..................................................................................12

4.1   Management ..................................................................................12
4.2   Number and Qualifications of Managers ......................................14
4.3   Election of Managers....................................................................14
4.4   Removal of Managers....................................................................14
4.5   Resignation of Managers...............................................................14
4.6   Term of Office as Manager ...........................................................14
4.7   Authority of Multiple Managers...................................................14
4.8   Fiduciary Duties Owed by Managers ...........................................15
4.9   Conduct of Meetings of Managers ...............................................15
4.10  Regular Monthly Meetings............................................................15
4.11  Officers .........................................................................................15
4.12  Indemnification and Liability Insurance.......................................17
4.13  Actions of the Managers...............................................................18
4.14  Meetings of Managers ..................................................................18
4.15  Compensation of Manager ...........................................................19
4.16  Authority of Members to Bind the Company................................19
4.17  Specific Arrangements with the Cinco Group...............................20
4.18  Specific Arrangements with the LA Group...................................20

WEST\224283219.2

## TABLE OF CONTENTS
(continued)

Page

| ARTICLE V | CAPITAL | 21 |
|---|---|---|
| 5.1 | Initial Capital Contributions | 21 |
| 5.2 | Capital Accounts | 21 |
| 5.3 | Adjustment for Distributions in Kind | 21 |
| 5.4 | Interest | 21 |
| 5.5 | Deficit Capital Account | 22 |
| 5.6 | Return of Capital | 22 |
| 5.7 | Optional Adjustments to Capital Accounts | 22 |

| ARTICLE VI | INCOME AND LOSSES | 22 |
|---|---|---|
| 6.1 | Allocations | 22 |
| 6.2 | Qualified Income Offset | 22 |
| 6.3 | Minimum Gain Chargeback | 22 |
| 6.4 | Contributed Property and Revaluations | 22 |
| 6.5 | Timing | 23 |

| ARTICLE VII | DISTRIBUTIONS | 23 |
|---|---|---|
| 7.1 | Operating Distributions | 23 |
| 7.2 | Generally Pro Rata | 23 |
| 7.3 | Liquidating Distributions | 23 |

| ARTICLE VIII | ASSIGNMENT OF INTERESTS | 23 |
|---|---|---|
| 8.1 | Assignment of Interests | 23 |
| 8.2 | No Dissolution upon Assignment | 24 |
| 8.3 | Information Regarding Assignee | 24 |
| 8.4 | No Release of Liability of Assignor | 24 |
| 8.5 | Pledge of Membership Interest | 24 |
| 8.6 | Exercise of Rights upon Death or Incompetency | 24 |
| 8.7 | Exercise of Rights upon Dissolution or Termination | 24 |

| ARTICLE IX | DISSOLUTION AND WINDING UP | 24 |
|---|---|---|
| 9.1 | Dissolution | 24 |
| 9.2 | Effect of Dissolution | 25 |

| ARTICLE X | TAX AND ACCOUNTING MATTERS | 25 |
|---|---|---|
| 10.1 | Characterization as a Partnership | 25 |
| 10.2 | No Partnership Intended for Nontax Purposes | 25 |
| 10.3 | Fiscal Year | 26 |
| 10.4 | Accounting Method | 26 |
| 10.5 | Tax Information | 26 |
| 10.6 | Basis Adjustment | 26 |
| 10.7 | Other Elections | 26 |
| 10.8 | Taxes of Taxing Jurisdictions | 26 |
| 10.9 | Tax Matters Partner | 26 |

WEST\224283219.2

## TABLE OF CONTENTS
(continued)

| | | |
|---|---|---|
| ARTICLE XI | DISSOCIATION OF A MEMBER | 27 |
| 11.1 | Dissociation | 27 |
| 11.2 | Rights of Dissociating Member | 27 |
| ARTICLE XII | MISCELLANEOUS PROVISIONS | 28 |
| 12.1 | Amendment of Operating Agreement | 28 |
| 12.2 | Entire Agreement | 28 |
| 12.3 | Interpretation | 28 |
| 12.4 | Rights of Creditors and Third Parties under Operating Agreement | 28 |
| 12.5 | Valuation of Non-Cash Consideration | 28 |
| 12.6 | Counterpart Execution | 28 |
| 12.7 | Remedies | 28 |
| 12.8 | Successors and Assigns | 29 |
| 12.9 | Severability | 29 |
| 12.10 | Governing Law | 29 |

WEST\242832192

## LIMITED LIABILITY COMPANY AGREEMENT
### of
## PCJV USA, LLC

The Limited Liability Company Agreement is made and entered into as of the Effective Date by the Members listed below for the purpose of forming a Delaware limited liability company in accordance with the provisions hereinafter set forth.

### ARTICLE I

### DEFINITIONS

The following terms, as used herein, shall have the following respective meanings:

1.1     **Act** – The Delaware Limited Liability Company Act, 6 Del.C. §18-101, et seq., as amended from time to time.

1.2     **Additional Member** – A member other than an Initial Member or a Substitute Member who has acquired a Membership Interest from the Company.

1.3     **Assignee** – A transferee of a Membership Interest who has not been admitted as a Substitute Member.

1.4     **Assignor** – A transferor of a Membership Interest.

1.5     **Business Day** – Any day other than Saturday, Sunday or any legal holiday observed in the State of Delaware.

1.6     **Capital Account** – The account maintained for a Member or Assignee determined in accordance with Article V.

1.7     **Capital Contribution** – Any contribution actually made to the capital of the Company pursuant to Section 5.1 by or on behalf of a Member or Assignee. The initial Capital Contribution of the Members shall be US$50,000 which shall be fully subscribed and paid.

1.8     **Certificate** – The Certificate of Formation of the Company.

1.9     **Company** – The company named in the introductory paragraph of this Operating Agreement, and any successor thereof.

1.10    **Company Liability** – Any enforceable debt or obligation for which the Company is liable or which is secured by any Company Property.

1.11    **Company Minimum Gain** – The extent to which a nonrecourse liability exceeds the adjusted tax basis of the Company Property it encumbers. The amount of Company Minimum Gain shall be determined in accordance with Regulations Section 1.704-2(d) by substituting the terms "*Company*" and "*Holder*" for the terms "*partnership*" and "*partner*," respectively, in each place they appear therein.

1.12 **Company Property** – Any Property owned by the Company.

1.13 **Contribution** – A contribution as defined by the Act.

1.14 **Disposition (Dispose)** – Any sale, assignment, transfer, exchange, mortgage, pledge, grant, hypothecation, or other transfer, absolute or as security or encumbrance (including dispositions by operation of law).

1.15 **Dissociation** – Any action which causes a Person to cease to be Member as described in Article XI hereof.

1.16 **Dissolution Event** – An event, the occurrence of which will result in the dissolution of the Company under ARTICLE IX unless the Members agree to the contrary.

1.17 **Distribution** – A distribution of Money or Property made pursuant to this Operating Agreement.

1.18 **Economic Interest** – A Person's right to share in the income, gains, losses, deductions, credits or similar items of, and to receive Distributions from, the Company, exclusive of any other rights of a Member including, without limitation, the right to vote or to participate in management, or any right to information concerning the business and affairs of the Company.

1.19 **Effective Date** – The date the Certificate is filed with the Delaware Secretary of State.

1.20 **Holder** – A Person holding an Economic Interest, whether as a Member or as an Assignee.

1.21 **Income and Losses** – With respect to a taxable year of the Company (or other period for which Income or Losses must be computed), the Company's taxable income or loss for federal income tax purposes, as determined by the tax advisors employed by the Company for this purpose, except that: (1) any tax-exempt income of the Company as described in IRC Section 705(a)(1)(B) shall be treated as gross income of the Company, (2) any nondeductible noncapital expenditures as described in IRC Section 705(a)(2)(B) shall be treated as a deduction of the Company, and (3) if any Company property is reflected on the books of the Company at a value (**"Book Value"**) different from the adjusted tax basis of such property, any item of Income or Loss with respect to such property shall be computed by reference to such Book Value.

1.22 **Initial Capital Contribution** – The Capital Contribution agreed to be made by the Initial Members as described in Section 5.1.

1.23 **Initial Members** – Those persons identified on Exhibit A attached hereto and made a part hereof by this reference who have executed the Operating Agreement.

1.24 **IRC** – The Internal Revenue Code of 1986, as amended.

2

1.25    **Majority** – The affirmative vote or consent of Members having Percentage Interests in excess of one-half of the Percentage Interests of all the Members entitled to vote on a particular matter. Assignees and, in the case of approvals to withdrawal where consent of the remaining Members is required, Dissociating Members shall not be considered Members entitled to vote for the purpose of determining a Majority. In the case of a Member who has Disposed of that Member's entire Membership Interest to an Assignee, but has not been removed as provided below, the Percentage Interest of such Assignee shall be considered in determining a Majority and such Member's vote or consent shall be determined by such Percentage Interest.

1.26    **Management Right** – The right of a Member to participate in the management of the Company, including the rights to information and to consent or approve actions of the Company.

1.27    **Manager** – A manager selected to manage the affairs of the Company as provided under Article IV hereof.

1.28    **Member** – A member as defined by the Act, including all Initial Members, Substitute Members and Additional Members (but not including any Assignee or any Member who has Dissociated).

1.29    **Membership Interest** – A membership interest as defined by the Act.

1.30    **Money** – Cash or other legal tender of the United States, or any obligation that is immediately reducible to legal tender without delay or discount. Money shall be considered to have a fair market value equal to its face amount.

1.31    **Notice** – Except as otherwise expressly provided herein, all Notices shall be in writing. Notice to the Company shall be considered given when mailed by first class mail postage prepaid addressed to any Manager in care of the Company at the address of the principal place of business of the Company. Notice to a Member shall be considered given when mailed by first class mail postage prepaid addressed to the Member at the address reflected in the Operating Agreement unless the Member has given the Company a Notice of a different address.

1.32    **Operating Agreement** – This Limited Liability Company Agreement and all amendments thereto adopted in accordance with this Limited Liability Company Agreement and the Act.

1.33    **Organization** – A Person other than a natural person. Organization includes, without limitation, corporations (both non-profit and other corporations), partnerships (both limited and general), trusts, joint ventures, limited liability companies, and unincorporated associations, but the term does not include joint tenancies and tenancies by the entirety.

1.34    **Percentage Interest** – With respect to a Member, the percentage set forth opposite such Member's name on Exhibit A hereto, as such Exhibit is amended from time to time in accordance with Section 3.3 hereof, and with respect to a Holder not a Member, the Percentage Interest or part thereof corresponding to the portion of a Member's Economic Interest such Holder has acquired.

1.35    **Person** – A person as defined by the Act.

1.36    **Proceeding** – Any judicial or administrative trial, hearing or other activity, civil, criminal or investigative, the result of which may be that a court, arbitrator, or governmental agency may enter a judgment, order, decree, or other determination which, if not appealed and reversed, would be binding upon the Company, a Member or other person subject to the jurisdiction of such court, arbitrator, or governmental agency.

1.37    **Property** – Any property real or personal, tangible or intangible, including money and any legal or equitable interest in such property, but excluding services and promises to perform services in the future.

1.38    **Regulations** – Except where the context indicates otherwise, the permanent, temporary or proposed regulations of the Department of the Treasury promulgated under the IRC as such regulations may be amended from time to time.

1.39    **Taxing Jurisdiction** – Any state, local, or foreign government that collects tax, interest or penalties, however designated, on any Member's share of the income or gain attributable to the Company.

1.40    **Term** – As specified in Section 2.7.

### ARTICLE II

### FORMATION

2.1    Purpose.  The purpose of the Company is to engage in any lawful act or activity for which a limited liability company may be organized under the Act or the laws of any other jurisdiction in which the Company may do business.

2.2    Powers.  The Company shall have all powers necessary to accomplish its purposes without the necessity of their specific enumeration herein including, without limitation, all powers described in Section 18-106 of the Act.

2.3    Formation and Name.  The Members have caused to be formed a limited liability company under the name of PCJV USA, LLC (the "*Company*"), by the filing of the Certificate pursuant to the provisions of Section 18-201 of the Act.  The Members desire to govern the affairs of the Company by entering into this Operating Agreement.

2.4    Principal Place of Business.  The principal place of business of the Company shall be located at Suite 1110, 6380 Wilshire Blvd, CA 90048 USA, unless changed by the Managers.

2.5    Registered Office and Registered Agent.  The Company's registered office is at 615 South DuPont Highway, City of Dover, County of Kent 19901 and the name of its initial registered agent at such address is National Corporate Research, Ltd.  The Company may change the registered office and/or the registered agent at such times and from time to time as the Managers may deem advisable.

2.6     Records to be Maintained. The Company shall maintain the following records at its principal place of business:

2.6.1    A current list of the full name and last known business or residence address of each Member and Assignee set forth in alphabetical order, together with a schedule showing the Capital Contribution and Percentage Interest of each Member and Assignee;

2.6.2    A current list of the full name and business or residence address of each Manager, if any;

2.6.3    A copy of the Certificate and all amendments thereto, together with any powers of attorney pursuant to which the Certificate or any amendments thereto were executed;

2.6.4    Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six most recent taxable years;

2.6.5    A copy of this Operating Agreement and any amendments hereto, together with any powers of attorney pursuant to which this Operating Agreement or any amendments hereto were executed;

2.6.6    Copies of the financial statements of the Company, if any, for the six most recent fiscal years;

2.6.7    The books and records of the Company as they relate to the internal affairs of the Company for at least the current and past four fiscal years; and

2.6.8    Any other records to be maintained pursuant to the Act.

2.7     Term. The Term of this Operating Agreement shall commence upon the date the Certificate is filed and shall continue indefinitely unless otherwise terminated by (i) an affirmative vote of 75 percent (75%) of all member interests, or (ii) upon mutual agreement by the Parties in writing.

## ARTICLE III

## MEMBERS

3.1     Classification of Members. Pursuant to the Joint Venture Agreement entered into by the Members on ___8.12___, the Members shall be classified and designated as either part of the Cinco Corporation (Philippines) group (the "Cinco Group") or the LA group (the "LA Group"). Both the Cinco Group and the LA Group agreed to the specific rights and obligations granted to each group, and undertake to fully observe the rights vested to each group under the Operating Agreement.

3.2     Admission of Additional Members. Additional Members may be admitted to the Company upon the consent of the Members required pursuant to Section 3.7, which such consent

may be granted in their sole discretion. The Capital Contribution of any Additional Member shall be determined by the Members consenting to the admission. Each Additional Member shall execute a counterpart of this Operating Agreement, agreeing thereby to be bound by all of the terms and provisions hereof.

3.3    Right of First Refusal. A Member of the Cinco Group or the the LA Group shall not assign any of its rights or obligations nor his/its Member Interests in the Company outside of the Cinco Group and the LA Group, without the prior written consent of the non-assigning group. In the event a Member of either the Cinco Group or the LA Group desire to transfer or sell his/its pro rata members interest in the Company to a person other those in either the Cinco Group or the LA Group, such Member shall be obligated to sell the same first to the existing Members, which has have thirty (30) days within which to exercise its rights of first refusal from the date of receipt of a written notice to sell. For this purpose, the Parties hereby agree that the right of first refusal may be exercised in accordance with the following formula: The average of the Company's earnings before interest, depreciation, taxes and amortization (EBITDA) for the last two (2) years multiplied by 5 times, and further multiplied by the percentage of member interest subject to such right of first refusal over total outstanding Member Interests.

3.4    Amendment of Member Listing. Upon admission of an Additional Member, the Member listing required by Section 2.6 and Exhibit A hereto shall be amended accordingly.

3.5    Payment of Costs. All reasonable expenses, including attorneys' fees, incurred by the Company in connection with the admission of an Additional Member shall be borne by such Additional Member.

3.6    Limited Liability of Members. Members shall not be personally liable for the liabilities of the Company.

3.7    Voting Rights. All Members shall be entitled to vote on any matter submitted to a vote of the Members. Unless otherwise specified herein, actions to be taken by Members require the consent of a Majority of the Percentage Interests represented at a duly held meeting of the Members or, if such action is taken by written consent, by a Majority of all of the Percentage Interests. Notwithstanding the foregoing, the following actions require the consent described below:

| Action | Consent Required |
|---|---|
| Decision to dissolve the Company. | 75% of all Membership Interests |
| Decision to continue the business of the Company after a Dissolution Event. | 75% of all Membership Interests |
| Approval of the transfer of a Membership Interest and admission of an Assignee as a Substitute Member of the Company. | Prior written consent of the other Member |

| **Action** | **Consent Required** |
|---|---|
| Approval of the withdrawal and Dissociation of a Member of the Company. | Prior written consent of the other Member |
| Any amendment of the Certificate or this Operating Agreement. | 75% of all Membership Interests |
| Agreement of merger as defined in Section 17551 of the Act. | 75% of all Membership Interests |
| Disposition by the Company of all or substantially all of the Company's assets. | 75% of all Membership Interests |
| Confession of a judgment against the Company in excess of Ten Thousand Dollars. | 75% of all Membership Interests |

3.8     Meetings of Members.

3.8.1     Place of Meetings. Meetings of Members may be held at any place, selected by the Person or Persons calling the meeting. If no other place is stated or fixed, all meetings shall be held at the principal place of business of the Company.

3.8.2     Calling of Meetings. A meeting of the Members may be called at any time by any Manager or by one or more Members with an aggregate Percentage Interest of more than ten percent (10%) for the purpose of addressing any matter on which the Members may vote.

3.8.3     Notice of Meetings. Whenever Members are required or permitted to take any action at a meeting, a Notice of the meeting shall be given not less than ten (10) calendar days nor more than sixty (60) calendar days before the date of the meeting to each Member entitled to vote at the meeting. The Notice shall state the place, date, and hour of the meeting and the general nature of the business to be transacted. No other business may be transacted at such a meeting.

3.8.4     Means of Providing Notice of Meetings. Any Notice of a meeting of the Members shall be given either personally or by mail or other means of written communication, charges prepaid, addressed to the Member at the address of the Member appearing on the books of the Company or given by the Member to the Company for the purpose of Notice, or, if no address appears or is given, at the place where the principal place of business of the Company is located or by publication at least once in a newspaper of general circulation in the county in which the principal place of business is located. The Notice shall be deemed to have been given at the time when delivered personally or deposited in the mail or sent by other means of written communication. An affidavit of mailing of any Notice in accordance with the provisions of this section, executed by a Manager or Member, shall be prima facie evidence of the giving of the Notice.

Upon written request to a Manager by any Person entitled to call a meeting of Members, the Manager shall immediately cause Notice to be given to the Members entitled to vote that a meeting will be held at a time requested by the Person calling the meeting, not less than ten (10) calendar days nor more than sixty (60) calendar days after the receipt of the request. If the Notice is not given within twenty (20) calendar days after receipt of the request, the Person entitled to call the meeting may give the Notice or, upon the application of that Person, the superior court of the county in which the principal place of business of the Company is located, or if the principal place of business is not in this state, the county in which the Company's address in this state is located, shall summarily order the giving of the Notice, after Notice to the Company affording it an opportunity to be heard.

The Members may, at their discretion, invite non-Members to join, but only as non-voting observers. Further, to the extent allowed by the financial condition of the Company, and as agreed upon by a majority of all member interests, the Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses incurred by the Members in attendance.

3.8.5   Adjourned Meetings. When a Members' meeting is adjourned to another time or place, unless the Certificate or this Operating Agreement otherwise requires, and, except as provided in the Act, Notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken. At the adjourned meeting, the Company may transact any business that may have been transacted at the original meeting. If the adjournment is for forty-five (45) calendar days or more, or if after the adjournment a new record date is fixed for the adjourned meeting, a Notice of the adjourned meeting shall be given to each Member entitled to vote at the meeting.

3.8.6   Validation of Meeting Held Without Proper Call or Notice. The actions taken at any meeting of Members, however called and noticed, and wherever held, have the same validity as if taken at a meeting duly held after regular call and notice, if a quorum is present either in person or by proxy, and if, either before or after the meeting, each of the Members entitled to vote, not present in person or by proxy, signs a written waiver of Notice or consents to the holding of the meeting or approves the minutes of the meeting. All waivers, consents, and approvals shall be filed with the Company records or made a part of the minutes of the meeting. Attendance of a Member at a meeting shall constitute a waiver of Notice of the meeting, except when the Member objects, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Attendance at a meeting is not a waiver of any right to object to the consideration of matters required by this title to be included in the Notice but not so included, if the objection is expressly made at the meeting. Neither the business to be transacted nor the purpose of any meeting of Members need be specified in any written waiver of Notice, unless otherwise provided in the Certificate or this Operating Agreement, except as provided in subsection 3.8.8.

3.8.7   Participation Through Telecommunications Equipment. Members may participate in a meeting of the Company through the use of conference telephones or similar communications equipment, as long as all Members participating in the meeting

8

can hear one another. Participation in a meeting pursuant to this provision constitutes presence in person at that meeting.

    3.8.8   Notice of General Nature of Meeting. Any action approved at a meeting, other than by unanimous approval of those entitled to vote, shall be valid only if the general nature of the proposal so approved was stated in the Notice of meeting or in any written waiver of Notice.

    3.8.9   Quorum.

        3.8.9.1   Members holding in excess of one-half of the Percentage Interests represented in person or by proxy shall constitute a quorum at a meeting of Members.

        3.8.9.2   The Members present at a duly called or held meeting at which a quorum is present may continue to transact business until adjournment, notwithstanding the loss of a quorum, if any action taken after loss of a quorum, other than adjournment, is approved by the requisite Percentage Interests of Members specified in the Certificate, this Operating Agreement, or the Act.

        3.8.9.3   In the absence of a quorum, any meeting of Members may be adjourned from time to time by the vote of a majority of the Membership Interests represented either in person or by proxy at such meeting, but no other business may be transacted, except as provided in subparagraph 3.8.9.2 above.

    3.8.10  Action Without a Meeting.

        3.8.10.1   Any action that may be taken at any meeting of the Members may be taken without a meeting if a consent in writing, setting forth the action so taken, is signed and delivered to the Company within sixty (60) calendar days of the record date for that action by Members having not less than the minimum number of votes that would be necessary to authorize or take that action at a meeting at which all Members entitled to vote thereon were present and voted.

        3.8.10.2   Unless the consents of all Members entitled to vote have been solicited in writing, (A) Notice of any Member approval of an amendment to the Certificate or this Operating Agreement, a dissolution of the Company, or a merger of the Company, without a meeting by less than unanimous written consent shall be given at least ten (10) calendar days before the consummation of the action authorized by such approval, and (B) prompt Notice shall be given of the taking of any other action approved by Members without a meeting by less than unanimous written consent, to those Members entitled to vote who have not consented in writing.

        3.8.10.3   Any Member giving a written consent, or the Member's proxyholder, may revoke the consent by a writing received by the Company prior to the time that written consents of Members having the minimum number of votes that would be required to authorize the proposed action have been received

by the Company, but may not do so thereafter. This revocation is effective upon its receipt at the principal place of business of the Company.

3.8.11 Proxies. Every Member entitled to vote shall have the right to do so in person or by one (1) or more agents authorized by a written proxy executed by such Member or his duly authorized agent and filed with the Company. Any proxy executed is not revoked and continues in full force and effect until (i) a writing stating that the proxy is revoked or a duly executed proxy bearing a later date is filed with the Company prior to the vote pursuant thereto, (ii) the Member executing the proxy attends the meeting and votes in person, or (iii) written Notice of the death or incapacity of the maker of such proxy is received by the Company before the vote pursuant thereto is counted; provided that no proxy shall be valid after the expiration of eleven months from the date of its execution, unless the person executing it specifies therein the length of time for which such proxy is to continue in force.

3.8.12 Record Date. In order that the Company may determine the Members of record entitled to Notices of any meeting or to vote, or entitled to receive any Distribution or to exercise any rights in respect of any other lawful action, a Manager, or Members representing more than ten percent (10%) of the Percentage Interests, may fix, in advance, a record date, that is not more than sixty (60) calendar days nor less than ten (10) calendar days prior to the date of the meeting and not more than sixty (60) calendar days prior to any other action. If no record date is fixed:

3.8.12.1   The record date for determining Members entitled to Notice of or to vote at a meeting of Members shall be at the close of business on the business day next preceding the day on which Notice is given or, if Notice is waived, at the close of business on the business day next preceding the day on which the meeting is held.

3.8.12.2   The record date for determining Members entitled to give consent to Company action in writing without a meeting shall be the day on which the first written consent is given.

3.8.12.3   The record date for determining Members for any other purpose shall be at the close of business on the day on which the Managers adopt the resolution relating thereto, or the sixtieth day prior to the date of the other action, whichever is later.

3.8.12.4   The determination of Members entitled to Notice of or to vote at a meeting of Members shall apply to any adjournment of the meeting unless a Manager or the Members who called the meeting fix a new record date for the adjourned meeting, but the Manager or the Members who called the meeting shall fix a new record date if the meeting is adjourned for more than forty five (45) calendar days from the date set for the original meeting.

3.9   Right of Inspection; Provision of Records to Members.

3.9.1   Right of Inspection. Each Member, Manager and Assignee has the right, upon reasonable request, for purposes reasonably related to the interest of that Person as a Member, Manager, or Assignee, to each of the following at the expense of the Company:

    3.9.1.1   To inspect and copy during normal business hours any of the records required to be maintained by Sections 2.6.1, 2.6.2, 2.6.3 and 2.6.4 above; and

    3.9.1.2   To obtain from a Manager, promptly after becoming available, a copy of the Company's federal, state, and local income tax or information returns for each year.

3.9.2   Additional Rights. So long as the Company has more than 35 Members:

    3.9.2.1   A Manager shall cause an annual report to be sent to each of the Members not later than one hundred twenty (120) calendar days after the close of each fiscal year. That report shall contain a balance sheet as of the end of the fiscal year and an income statement and statement of changes in financial position for the fiscal year.

    3.9.2.2   Members with an aggregate Percentage Interest of at least five percent (5%), or any three or more Members, may make a written request to a Manager for an income statement of the Company for the initial three-month, six-month, or nine-month period of the current fiscal ended more than thirty (30) calendar days prior to the date of request, and a balance sheet of the Company as of the end of that period. The statement shall be delivered or mailed to the Members within thirty (30) calendar days thereafter.

    3.9.2.3   The financial statements referred to in this section shall be accompanied by the report thereon, if any, of the independent accounts engaged by the Company or, if there is no report, the certificate of the Treasurer of the Company that the financial statements were prepared without audit from the books and records of the Company.

3.9.3   Copy of Amendment of Certificate and Operating Agreement. A Manager shall promptly furnish to a Member a copy of any amendment to the Certificate or this Operating Agreement executed by that Manager pursuant to a power of attorney from the Member.

3.9.4   Tax Information. The Company shall send or cause to be sent to each Holder within ninety (90) calendar days after the end of each taxable year such information as is necessary to complete their respective federal and state income tax or information returns, and, if the Company has thirty-five (35) or fewer Holders, a copy of the Company's federal, state, and local income tax or information returns for the year.

3.9.5   Relationship with Act. Nothing in this Section 3.9 shall be construed as in any way limiting a Member's right of inspection as set forth in Section 18-305 of the Act.

3.10    Representations and Warranties. Each Member hereby represents and warrants to the Company and each other Member that:

3.10.1  If that Member is a organization, that it is duly organized, validly existing, and in good standing under the law of its state of organization and that it has full organizational power to execute and agree to the Operating Agreement to perform its obligations hereunder;

3.10.2  Such Member is acquiring its interest in the Company for its own account for investment purposes only and not with a view to the resale or distribution of all or any part of such interest and such Member has no present intention, agreement or arrangement to divide its participation with others or to sell, assign, transfer or otherwise dispose of all or any part of such interest. Such Member is aware that the interests have not been registered under the Securities Act of 1933, or any state securities laws, and that such interests may not be resold or otherwise disposed of unless they are registered thereunder or an exemption from registration is available. Accordingly, each Member is aware that it must bear the economic risk of investment in the Company for an indefinite period of time. Each Member is capable of bearing that risk.

## ARTICLE IV

## MANAGEMENT

4.1    Management. Subject to the limitations of the Certificate, the Act, and this Operating Agreement as to actions to be authorized or approved by the Members, the business and affairs of the Company shall be managed and all the Company powers shall be exercised by or under the direction of the Managers. The Managers may delegate the management of the day-to-day operation of the business of the Company to the officers of the Company or other persons provided that the business and affairs of the Company shall be managed and all powers shall be exercised under the ultimate direction of the Managers. Without prejudice to such general powers, but subject to the same limitations, the Managers shall have the following powers:

4.1.1   To approve compensation packages for the managers, executive offices and key personnel.

4.1.2   To approve the Accounting System/Procedures/Software/Method to be used by the Company.

4.1.3   To approve the operating budget of the Company, and any changes to it.

4.1.4   To approve all franchising agreements, and lease agreements.

4.1.5   To approve all purchases and disbursements in excess of Ten Thousand Dollars ($10,000), provided that such amount may be changed or modified by Management as it deems necessary.

4.1.6   To institute, prosecute, and defend any Proceeding in the Company's name;

4.1.7    To purchase, receive, lease or otherwise acquire and deal with the Property, wherever located;

4.1.8    To sell, convey, mortgage, pledge, lease, exchange, or otherwise Dispose of Property;

4.1.9    To lend money, invest and reinvest the Company's funds, and receive and hold Property as security for repayment, including, without limitation, the loaning of money to Members, officers, employees, and agents;

4.1.10    To borrow money and incur indebtedness for the purposes of the Company, and to cause to be executed and delivered therefor in the Company name promissory notes, bonds, debentures, deeds of trust, mortgages, pledges, hypothecations or other evidences of debt and securities therefor;

4.1.11    To change the principal place of business of the Company from one location to another as provided in Section 2.3 hereof, and to fix and locate from time to time one or more subsidiary offices of the Corporation;

4.1.12    To prescribe the forms of Membership Certificates, and to alter the form of such Membership Certificates from time to time as in their judgment they deem best, provided such Membership Certificates shall at all times comply with provisions of law;

4.1.13    To select and remove all of the officers, agents and employees of the Company, to prescribe such powers and duties for them as may not be inconsistent with law, with the Certificate or this Operating Agreement, to fix their compensation, and to require from them security for faithful service;

4.1.14    To pay pensions and establish pension plans, pension trusts, profit sharing plans, and benefit and incentive plans for all or any of the current or former Members, employees, and agents of the Company;

4.1.15    To make donations to the public welfare or for religious, charitable, scientific, literary or educational purposes;

4.1.16    To purchase insurance on the life of any of the Members or Company employees for the benefit of the Company;

4.1.17    To participate in partnership agreements, joint ventures, or other associations of any kind with any person or persons; and

4.1.18    To authorize the issuance of Additional Membership Interests from time to time upon such terms as may be lawful in consideration of money paid, labor done, services actually rendered to the Company or for its benefit or in its formation or reorganization, debts or securities cancelled, and tangible or intangible property actually received either by the Company or any one of its wholly-owned subsidiaries, if any, or future services.

4.2     Number and Qualifications of Managers.  Until changed by amendment of the Certificate or an amendment to this section:

    4.2.1    The agreed-upon and authorized number of Managers shall be seven (7), four (4) of whom shall be designated by the Cinco Group, and three (3) designated by the LA Group.

    4.2.2    Upon the formation of the Company, the following shall be named and designated as managers:

        4.2.2.1     For the Cinco Group:  Jose P. Magsaysay, Jr., Jose Miguel Ma. Montinola, Ma. Victoria O. Bermejo, and Ricardo K. Montelibano.

        4.2.2.2     For the LA Group:  Amit Nemanim, Guy Koren, and Amir Jacoby.

4.3     Election of Managers.

    4.3.1    Election at Meeting of Members.  In any election of Managers at a meeting of Members duly called and noticed, the Cinco Group shall be entitled to elect four (4) Managers, while the LA Group shall be entitled to elect three (3) Managers. Interests entitled to be voted for them up to the number of Managers to be elected by such Members shall be elected.  Elections for Managers need not be by ballot unless a Member demands election by ballot at the meeting and before the voting begins.

    4.3.2    Election by Written Consent.  Managers may alternatively be elected by a written consent action of Members made pursuant to Section 3.8.10 executed by a Majority of the Members.

4.4     Removal of Managers.  Any Managers may be removed, with or without cause, by the vote of a Majority of the Members by written consent or at a meeting of Members called expressly for that purpose.  Any removal shall be without prejudice to the rights, if any, of the Manager under any contract of employment.

4.5     Resignation of Managers.  Any Manager may resign as a Manager at any time upon written Notice to the Company, without prejudice to the rights, if any, of the Company under any contract to which the Manager is a party.

4.6     Term of Office as Manager.  Each Manager shall serve until the earliest to occur of (i) the resignation of the Manager, (ii) the removal of the Manager, or (iii) the election of a successor.

4.7     Authority of Multiple Managers.  If, pursuant to Section 4.2 above, more than one manager is authorized, then any one or more Managers may take any action permitted to be taken by any one or more other Managers, unless this Operating Agreement or the Act requires the consent of more than one Manager.

4.8     Fiduciary Duties Owed by Managers. Managers shall owe fiduciary duties to the Company and the Members in the manner prescribed in the Act and under applicable case law.

4.9     Conduct of Meetings of Managers. The Managers may adopt such rules and regulations for the conduct of its meetings and the management of the Company not inconsistent with this Operating Agreement or applicable law.

4.10    Regular Monthly Meetings. The Managers shall meet at least on a monthly basis, and may be done in person, via teleconference or through the internet. The Managers may, at their discretion, invite non-Members to join, but only as non-voting observers.

4.11    Officers.

4.11.1 Officers. The officers of the Company, if any, shall include the following: Chairman of the Board of Members, President, Corporate Secretary, and Treasurer. The Company may also have, at the discretion of the Managers, one or more vice-presidents, one or more assistant secretaries, one or more assistant financial officers, and such other officers as may be appointed in accordance with the provisions of this Operating Agreement. Any number of offices may be held by the same person. Officers need not be Members.

4.11.2 Election. The officers of the Company, except such officers as may be appointed in accordance with the provisions of Section 10.3, shall be chosen by the Managers, and each shall hold his office until he or she shall resign or shall be removed by the Managers or otherwise disqualified to serve, or his successor shall be elected and qualified.

4.11.3 Subordinate Officers. The Managers may appoint, and may empower the President to appoint, such other officers as the business of the Company may require, each of whom shall hold office for such period, have such authority and perform such duties as the appointing authority may designate, subject to any limitations imposed by resolution of the Managers.

4.11.4 Removal. Any officer may be removed, either with or without cause, by the Managers, at any regular or special meeting thereof or, except in case of an officer chosen by the Managers, by any officer upon whom such power of removal may be conferred by the Managers (subject, in each case, to the rights, if any, of an officer under any contract of employment).

4.11.5 Resignation. Any officer may resign at any time by giving Notice to the Managers or to the President or to the Secretary of the Company, but without prejudice to the rights, if any, of the Company under any contract to which such officer is a party. Any such resignation shall take effect at the date of the receipt of such Notice or any later time specified therein; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

4.11.6 Vacancies. A vacancy in any office because of death, resignation, removal, disqualification or any other cause shall be filled in the manner prescribed in this Operating Agreement for regular appointments to such office.

4.11.7 President. The President shall be the chief executive officer of the Company and shall, subject to the control of the Managers, have general supervision, direction and control of the business and officers of the Company. The President shall preside at all meetings of the Members and the Managers. He or she shall have the general powers and duties of management usually vested in the office of the President of a corporation, and shall have such other powers and duties as may be prescribed by the Managers or this Operating Agreement. As agreed upon by the Members, at any given time, the President shall be any of the following: Amit Nemanim, Guy Korean, and Amir Jacoby. The initial President of the Company shall be Amit Nemanim. The President of the Company shall render the following services and shall perform the following duties for the Company in a faithful, diligent and efficient manner:

4.11.7.1 The President shall be responsible for all management, operational, marketing, establishment, maintenance, licensing and sub-licensing activities with respect to the "Potato Corner" outlets/stores in the Territory. He shall use his best efforts at all times during the term of this Agreement to operate and maintain the "Potato Corner" outlets/stores in the Territory according to the highest standards achievable consistent with the overall plan of the Management of the Company. The President shall comply with the rules, policies and procedures approved by the Management of the Company from time to time.

4.11.7.2 The President shall advertise market and promote the "Potato Corner" outlets/stores with the goal of causing public knowledge, awareness and patronage of the "Potato Corner" outlets/sites.

4.11.7.3 The President shall maintain a comprehensive system of records, books and accounts, with respect to the licensing and sub-licensing activities, operation, establishment, management, maintenance and other activities of the "Potato Corner" outlets /stores in the Territory with the assistance of the Corporate Secretary.

4.11.7.4 No later than the twentieth (20th) day of each month, with respect to the preceding month, the President shall render a statement of receipts and disbursements, a schedule of accounts receivable and payable, and a schedule of fees collected and distributed, together with a reconciled bank statement as of the last day of the month with the assistance of the Corporate Secretary.

4.11.7.5 No later than three (3) months after the end of a fiscal year, the President shall, with the assistance of the Corporate Secretary and external accountant hired by Management, cause the Company to issue audited financial statements, and shall provide a copy of the same to all the members of Management.

16

4.11.7.6    To the extent the President is lawfully able to do so, the President shall take such action as may be necessary to comply promptly with any and all laws, ordinances, orders or other requirements of any federal, state, county or municipal authority having jurisdiction of the Company and affecting the Company.

4.11.8  Secretary.  The Secretary shall record or cause to be recorded, and shall keep or cause to be kept, at the principal place of business of the Company and such other place or places as the Managers may order, a book of minutes of actions taken at all meetings of Managers, committees and Members, with the time and place of holding, whether regular or special, and, if special, how authorized, the Notice thereof given, the names of those present at Managers' and committee meetings, the Percentage Interest present or represented at Members' meetings, and the proceedings thereof.

The Secretary shall keep, or cause to be kept, at the principal place of business those records referenced in Section 2.6 above and, if the Company has issued Membership Certificates, a register showing the number and date of each Membership Certificate, and the number and date of each Membership Certificate surrendered for cancellation.

The Secretary shall give, or cause to be given, Notice of all the meetings of the Members and the Managers required by this Operating Agreement or by the Act to be given, and shall have such other powers and perform such other duties as may be prescribed by the Managers or by this Operating Agreement.

4.11.9  Treasurer.  The Treasurer shall keep and maintain, or cause to be kept and maintained, adequate and correct accounts of the properties and business transactions of the Company, including accounts of its assets, liabilities, receipts, disbursements, income, losses, changes in financial position, Capital Accounts, and retained earnings.

The Treasurer shall deposit all moneys and other valuables in the name and to the credit of the Company with such depositories as may be designated by the Managers. He or she shall disburse the funds of the Company as may be ordered by the Managers, shall render to the President and the Managers whenever they request it, an account of all of his transactions as Treasurer and of the financial condition of the Company, and shall have such other powers and perform such other duties as may be prescribed by the Managers or this Operating Agreement.

4.12    Indemnification and Liability Insurance.

4.12.1  The Company may provide indemnification to its Managers, officers and agents to the fullest extent permitted by Delaware law.

4.12.2  The Company shall have the power to purchase and maintain insurance on behalf of any Manager or officer against any liability asserted against or incurred by a Manager or officer in that capacity or arising out of that person's status as a Manager or officer of the Company.

4.13    Actions of the Managers. Each Manager has the power to bind the Company as provided in this ARTICLE IV. If there is more than one Manager, decisions of the Managers shall be made by majority vote of the Managers if at a meeting, or by unanimous written consent. No act of a Member in contravention of such a determination shall bind the Company to Persons having knowledge of such determination.

4.14    Meetings of Managers.

4.14.1    Place of Meetings. Meetings of Managers may be held at any place, selected by the person or persons calling the meeting. If no other place is stated or fixed, all meetings shall be held at the principal place of business of the Company.

4.14.2    Calling of Meetings. A meeting of the Managers may be called at any time by the President or any two Managers.

4.14.3    Notice of Meetings. Notice of the time and place of meetings of Managers shall be personally delivered to each Manager or communicated to each Manager by telephone or mail, charges prepaid, addressed to the Manager's address as is shown upon the records of the Company, or if it is not so shown on such records or is not readily ascertainable, at the place at which the meetings of Managers are regularly held. In the case Notice is mailed, it shall be deposited in the United States mail at least ninety-six (96) hours prior to the time of the holding of the meeting. In the event Notice is delivered personally or communicated by telephone, it shall be so delivered or communicated at least forty-eight (48) hours prior to the time of the holding of a meeting.

Except as otherwise provided by the Act or this Operating Agreement, a Notice need not specify the purpose of the meeting of the Managers. Whenever any Manager has been absent from any meeting of the Manager for which Notice has not been dispensed with, an entry in the minutes to the effect that Notice has been duly given shall be conclusive and incontrovertible evidence that due Notice of such meeting was given to such Manager.

4.14.4    Participation Through Telecommunications Equipment. Managers may participate in a meeting of the Company through the use of conference telephones or similar communications equipment, as long as all Managers participating in the meeting can hear one another. Participation in a meeting pursuant to this provision constitutes presence in person at that meeting.

4.14.5    Adjourned Meetings. When a Managers' meeting is adjourned to another time or place, unless the Certificate or this Operating Agreement otherwise requires, and, except as provided in the Act, Notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken. At the adjourned meeting, the Managers may transact any business that may have been transacted at the original meeting. If the adjournment is for forty-eight hours or more, a Notice of the adjourned meeting shall be given to each Member entitled to vote at the meeting.

4.14.6 <u>Validation of Meeting Held Without Proper Call or Notice</u>. The actions taken at any meeting of Managers, however called and noticed, and wherever held, have the same validity as if taken at a meeting duly held after regular call and notice, if a quorum is present either in person or by proxy, and if, either before or after the meeting, each of the Managers signs a written waiver of Notice or consents to the holding of the meeting or approves the minutes of the meeting. All waivers, consents, and approvals shall be filed with the Company records or made a part of the minutes of the meeting. Attendance of a Manager at a meeting shall constitute a waiver of Notice of the meeting, except when the Manager objects, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.

4.14.7 <u>Participation Through Telecommunications Equipment</u>. Managers may participate in a meeting of the Managers through the use of conference telephones or similar communications equipment, as long as all Managers participating in the meeting can hear one another. Participation in a meeting pursuant to this provision constitutes presence in person at that meeting.

4.14.8 <u>Quorum</u>.

4.14.8.1   A majority of the Managers in attendance or represented by proxy shall constitute a quorum at a meeting of Managers.

4.14.8.2   The Managers present at a duly called or held meeting at which a quorum is present may continue to transact business until adjournment, notwithstanding the loss of a quorum, if any action taken after loss of a quorum, other than adjournment, is approved by the requisite number of Managers specified in the Certificate, this Operating Agreement, or the Act.

4.14.8.3   In the absence of a quorum, any meeting of Managers may be adjourned from time to time by the vote of a majority of the Managers in attendance, but no other business may be transacted, except as provided in subparagraph 4.14.8.24.14.8.2 above.

4.14.9 <u>Action Without a Meeting</u>. Any action required or permitted to be taken by the Managers may be taken without a meeting if all the Managers shall individually or collectively consent in writing to such action. Such consent or consents shall be filed with the minutes of the proceedings of the Managers and shall have the same force and effect as a unanimous vote of the Managers.

4.15   <u>Compensation of Manager</u>. Each Manager shall be reimbursed all reasonable expenses incurred in managing the Company and shall be entitled to compensation in an amount, if any, to be determined from time to time by the affirmative vote of a Majority of the Members.

4.16   <u>Authority of Members to Bind the Company</u>. The Members hereby agree that only the Managers and authorized agents of the Company shall have the authority to bind the Company. No Member other than a Manager shall take any action as a Member to bind the Company, and each Member shall indemnify the Company for any costs or damages incurred by the Company as a result of the unauthorized action of such Member.

4.17    Specific Arrangements with the Cinco Group. As agreed upon in the Joint Venture Agreement, the Company shall enter into a Master License Agreement with Cinco Corporation (Philippines), Inc. (or an affiliated company designated) which shall include the following terms and conditions:

    4.17.1 The Company agrees to license the "POTATO CORNER" intellectual property rights from Cinco Corporation (Philippines), Inc. (or an affiliated company designated) consisting of (i) the trademark, service mark and trade name "POTATO CORNER"; and (ii) various trademarks, service marks, trade names, slogans, designs, insignias, emblems, symbols, color schemes, package features, logo and other propriety identifying characteristics used in relation and in connection with the "Potato Corner" Products and the System; and (iii) as well as other intellectual property rights in connection with the "POTATO CORNER" intellectual property rights, for use in the Territory.

    4.17.2 The Company agrees to pay, as an arm's length license fee, the following amounts: (i) With respect to the licensing / sub-licensing or franchising the "POTATO CORNER" intellectual property rights in connection with the "POTATO CORNER" outlets/stores, an amount equal to thirty percent (30%) of all initial/franchise fees and ongoing royalty fees paid to/ collected by the Company. Payments shall be made to Cinco (or an affiliated company to be designated by Cinco) by wire transfer using a bank or other financial institution specified by it within thirty (30) days from receipt of the fees by the Company; and (ii) All withholding and other applicable taxes levied by any authority on the payments by the Company shall be borne solely by the Company.

4.18    Specific Arrangements with the LA Group. As agreed upon in the Joint Venture Agreement, the Company agrees to engage the LA Group to provide management and strategic experience and expertise during the duration of this Agreement. The Company shall enter into a Master Services Agreement with the LA Group (or a corporation to be designated by the LA Group) which shall include the following terms and conditions:

    4.18.1 In consideration for the provision of its services under the Master Services Agreement, the LA Group shall be entitled to a services fee equal to thirty (30%) percent of all initial/franchise fee and continuing royalty fees paid to/ collected by the Company.

    4.18.2 All withholding and other applicable taxes levied by any authority on the payments by the Company to the LA Group under this Agreement shall be borne solely by the Company.

    4.18.3 The LA Group shall faithfully, diligently and efficiently exercise its obligations and responsibilities under the Master Services Agreement.

    4.18.4 The LA Group shall maintain and protect confidential information belonging to Cinco or the Company, and such undertaking shall apply to all of its partners, officers, employees, or agents.

## ARTICLE V

## CAPITAL

5.1     Initial Capital Contributions.  Upon execution of this Agreement, each Member shall assign, convey and transfer their respective Initial Capital Contribution to the Company. Each Member represents and warrants to the Company that (i) the Member's Shares are free of any mortgage, pledge, lien, security, interest or other encumbrance of any kind or nature, (ii) such Member is the lawful beneficial and record owner of, and has good and marketable title to, the Member's Shares, and (iii) to the best of such Member's knowledge, the Member's Shares are duly authorized, validly issued, fully paid and nonassessable.  Additional Members shall make Capital Contributions in the amount, at the time and on the terms determined by the Members consenting to the admission pursuant to Section 3.1 hereof.

5.2     Capital Accounts.  The Company shall establish and maintain a Capital Account for each Holder in accordance with Regulations Section 1.704-1(b)(2)(iv). Accordingly, a Holder's Capital Account shall be increased by (1) the amount of money the Holder contributes to the Company, (2) the fair market value of property the Holder contributes to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under IRC Section 752, and (3) allocations to the Holder of Income (or items thereof), including income and gain exempt from tax and gain as computed for book purposes in accordance with Regulations Section 1.704-1(b)(2)(iv)(g) but excluding any gain separately computed for tax purposes as described in Regulations Section 1.704-1(b)(4)(i).  A Holder's Capital Account shall be decreased by (1) the amount of money the Company distributes to the Holder, (2) the fair market value of property the Company distributes to the Holder (net of any liabilities secured by such distributed property that the Holder is considered to assume or take subject to under IRC Section 752), (3) allocations to the Holder of the Company's nondeductible, noncapital expenditures, and (4) allocations to the Holder of Losses (or item thereof), including loss and deduction as computed for book purposes in accordance with Regulations Section 1.704-1(b)(2)(iv)(g) but excluding nondeductible, noncapital expenditures and loss and deduction separately computed for tax purposes as described in Regulations Section 1.704-1(b)(4)(i).  A Holder's Capital Account in all events shall be adjusted in accordance with the additional rules set forth in Regulations Section 1.704-1(b)(2)(iv).  In the event a Holder transfers all or any portion of his interest in the Company, the transferee shall succeed to the individual Capital Account balance of the transferor to the extent such individual Capital Account balance relates to the transferred interest.

5.3     Adjustment for Distributions in Kind.  Any asset of the Company distributed to the Holders in kind shall be valued according to its fair market value.  An item of Income or Loss shall be computed as if such asset had been sold at its fair market value, such hypothetical item shall be allocated as provided in Section 6.1, and each Holder's Capital Account shall be credited or charged, as the case may be, with the Holder's share of such hypothetical item prior to any such distribution of assets.

5.4     Interest.  No Capital Contribution or Capital Account balance shall bear interest.

5.5     Deficit Capital Account. No Holder shall be obligated to restore a Capital Account having a balance of less than zero.

5.6     Return of Capital. Except as otherwise provided in this Operating Agreement, no Holder shall have any right to withdraw or make a demand for Distribution or withdrawal or return of any Capital Contribution or Capital Account balance.

5.7     Optional Adjustments to Capital Accounts. Upon (i) a contribution of cash or property (which shall be valued at its fair market value) to the Company by a new or existing Holder for a Membership or Economic Interest, or (ii) a distribution by the Company to a retiring or continuing Holder for a Membership or Economic Interest, the Company may, in the discretion of the Members, increase or decrease the Capital Accounts of the Holders to reflect a revaluation of Company Property on the books of the Company, in accordance with the provisions of Regulations Section 1.704-1(b)(2)(iv)(f).

## ARTICLE VI

## INCOME AND LOSSES

6.1     Allocations. Except as otherwise provided in this Article VI, Income and Losses, and each item thereof, of the Company shall be allocated to the Holders in proportion to their Percentage Interests.

6.2     Qualified Income Offset. A Holder whose Capital Account is unexpectedly reduced on account of an adjustment described in Section 1.704-1(b)(2)(ii)(d)(4) of the Regulations, an allocation described in Section 1.704-1(b)(2)(ii)(d)(5) of the Regulations, or a distribution described in Section 1.704-1(b)(2)(ii)(d)(6) of the Regulations, shall be allocated that Holder's pro rata portion of each item of Company income, including gross income, and gain in an amount and manner sufficient to eliminate such deficit balance as quickly as possible.

6.3     Minimum Gain Chargeback. Notwithstanding any other provision herein, if there is a net decrease in Company Minimum Gain during any taxable year, items of Company income and gain shall be allocated in accordance with the provisions of Regulations Section 1.704-2(f). This provision is intended to comply with Regulations Section 1.704-2(e)(3).

6.4     Contributed Property and Revaluations. In accordance with IRC Section 704(c), income, gain, loss and deduction with respect to property contributed to the Company by a Holder shall be allocated solely for tax purposes among the Holders so as to take account of any variation between the adjusted basis of the property to the Company and its fair market value on the date of the Contribution. Further, if the book value of any Company asset is adjusted as described in Regulations Section 1.704-1(b)(2)(iv)(f), subsequent allocations for tax purposes of income, gain, loss and deduction with respect to such asset shall take into account any variation between its adjusted tax basis and its adjusted book value. In either case, the Managers shall determine such allocations using a method that qualifies as reasonable within the meaning of Regulations Section 1.704-3. No Holder's Capital Account shall be adjusted for allocations made under this Section.

6.5    Timing. All allocations of Income or Losses shall be made to the Persons shown on the records of the Company to have been Holders as of the end of business on the last day of the Company's taxable year for which the allocation is made. Notwithstanding the foregoing, upon the transfer of an Economic Interest or the admission of an Additional Member during a taxable year of the Company, the Income or Losses shall be allocated between the former Holder and the successor, or to the Additional Member, as the case may be, according to the number of days during such year each was a Holder.

## ARTICLE VII

## DISTRIBUTIONS

7.1    Operating Distributions. The Managers from time to time may determine, in their reasonable judgment, that: (i) there is an excess of cash on hand beyond the Company's current and anticipated requirements, including, without limitation, cash flow and reserve requirements, and (ii) a distribution of such excess cash on hand, if any, is permissible under Section 18-607 of the Act. In that event, the Managers may, in their sole and absolute discretion, make a distribution of all or a part of such excess (an "*Operating Distribution*") to the Holders, provided that no such Distribution shall he declared and paid unless, after such Distribution, the assets of the Company will exceed all liabilities of the Company. Such Distributions may be made in cash or Property or partly in both, as determined in the sole and absolute discretion of the Managers.

7.2    Generally Pro Rata. Except as provided in Section 7.3 below, Distributions shall be allocated to Holders in proportion to their Percentage Interests.

7.3    Liquidating Distributions. Upon the dissolution of the Company, liquidating distributions in all cases shall be made in accordance with the positive Capital Account balances of the Holders, as determined after taking into account all Capital Account adjustments for the Company's taxable year during which such dissolution occurs (other than those made pursuant to this section), by the end of such taxable year or, if later, within ninety (90) days after the date of such dissolution.

## ARTICLE VIII

## ASSIGNMENT OF INTERESTS

8.1    Assignment of Interests. An Economic Interest is assignable in whole or in part, provided, however, that no Membership Interest may be assigned to any Person (including any assignments for security purposes or other form of pledge) without the consent of Members required pursuant to Section 3.7. Upon admission, the Assignee shall become a Substitute Member, and shall have the rights and benefits, and is subject to the restrictions and liabilities, of a Member under the Certificate, this Operating Agreement, and the Act. A Substitute Member is also liable for the obligations of the Assignor to make Capital Contributions, and to return any unlawful distributions made to the Assignor under Chapter VI (commencing with Section 18 601) of the Act. However, the Substitute Member is not obligated for liabilities unknown to the Substitute Member at the time the Substitute Member became a Member and that could not be ascertained from the Certificate or this Operating Agreement.

8.2    No Dissolution upon Assignment. An assignment of an Economic Interest does not of itself dissolve the Company or, except as otherwise set forth herein, entitle the Assignee to vote or participate in the management and affairs of the Company or to become or exercise any rights of a Member. An assignment of an Economic Interest merely entitles the Assignee to receive, to the extent assigned, the Income, Losses, Distributions and similar items to which the Assignor would be entitled.

8.3    Information Regarding Assignee. Upon the assignment of all or part of an Economic Interest, the Assignor shall provide the Manager or Member of the Company responsible for maintaining the books and records with the name and address of the Assignee, together with details of the interest assigned. Upon receipt of that Notice, the Company shall amend the list required by Section 2.6 accordingly. Until the Assignee becomes a Substitute Member, the Assignor continues to be a Member and to have the power to exercise any rights and powers of a Member, including the right to vote which, in the case of a Member who has assigned his or her or its entire Economic Interest in the Company, shall include the right to vote in proportion to the Percentage Interest that the assigning Member would have, had the assignment not been made.

8.4    No Release of Liability of Assignor. The Assignor is not released from liability as a Member solely as a result of the Assignment. Whether or not an Assignee becomes a Substitute Member, the Assignor is not released from the Assignor's liability to the Company under Subchapter V (commencing with Section 18 501) and Subchapter VI (commencing with Section 18-601) of the Act.

8.5    Pledge of Membership Interest. The pledge of, or granting of, a security interest, lien, or other encumbrance in or against any or all of the Membership Interest of a Member shall not cause the Member to cease to be a Member or to grant to anyone else the power to exercise any rights or powers of a Member.

8.6    Exercise of Rights upon Death or Incompetency. If a Member who is a natural person dies or is adjudged by a court of competent jurisdiction to be incompetent to manage the Member's person or property, the Member's executor, administrator, guardian, conservator, or other legal representative may exercise all of the Member's rights for the purpose of settling the Member's estate or administering the Member's property, including any power the Member had under the Certificate or this Operating Agreement to assign its Membership Interest.

8.7    Exercise of Rights upon Dissolution or Termination. If a Member which is an Organization is dissolved or terminated, the powers of that Member may be exercised by its legal representative or successor.

## ARTICLE IX

## DISSOLUTION AND WINDING UP

9.1    Dissolution. The Company shall and may only be dissolved, and its affairs wound up, upon the first to occur of the following events (which, unless the Members agree to continue the business, shall constitute Dissolution Events):

9.1.1 the expiration of the Term, unless the business of the Company is continued with the consent of those Members required pursuant to Section 3.7;

9.1.2 the vote of such number of Members as is required pursuant to Section 3.7;

9.1.3 the Dissociation of a Member under Article XI, unless the business of the Company is continued with the consent of those Members required pursuant to Section 3.7 within ninety (90) calendar days after such Dissociation; or

9.1.4 the entry of a decree of judicial dissolution pursuant to the Act.

9.2     Effect of Dissolution. Upon dissolution, the Company shall be dissolved and wound up in accordance with the Act, and the Company Property shall be distributed in accordance with Section 7.3. In addition, upon dissolution, the following shall immediate apply:

9.2.1 All rights granted under the Master License Agreement shall terminate and the Company shall cease the use of the Potato Corner intellectual property rights, and confidential information, provided however, that the Company shall be permitted to use any of the foregoing as is reasonably required in order to comply with its obligations under its sub-licensing or franchising agreements, but only to the extent of the duration of sub-licensing or franchising agreements in existence at the time of the termination of this Operating Agreement.

9.2.2 The LA Group shall be subject to a non-compete arrangement and hereby agrees that, within two (2) years from the date of termination of this Operating Agreement, it shall not engage in the business of establishing, operating, managing, licensing and franchising identical or similar products sold by the Company, using the intellectual property rights identical or similar to those used by the Company, at the time of the termination of this Operating Agreement.

## ARTICLE X

## TAX AND ACCOUNTING MATTERS

10.1   Characterization as a Partnership. The Members intend that the Company be classified as a partnership for federal and state income tax purposes. Accordingly, this Operating Agreement is written and shall be construed in a manner consistent with such intent.

10.2   No Partnership Intended for Nontax Purposes. The Members have formed the Company under the Act, and expressly do not intend hereby to form a partnership under either the Delaware Uniform Parmership Law or the Delaware Revised Uniform Limited Partnership Act. The Members do not intend to be partners one to another, or partners as to any third party. To the extent any Member, by word or action, represents to another person that any other Member is a partner or that the Company is a partnership, the Member making such wrongful representation shall be liable to any other Member who incurs personal liability by reason of such wrongful representation.

10.3   Fiscal Year. The fiscal year of the Company shall end on the last day of December of each year. The Managers may at any time change the fiscal and taxable year of the Company, subject to any applicable limitation of law or regulation.

10.4   Accounting Method. The Managers shall select the method of accounting by which the Company books of account shall be maintained and its income, gains, losses, deductions and credits shall be reported, for both financial and tax accounting purposes. The Managers may at any time change the financial and tax accounting method of the Company, subject to any applicable limitation of law or regulation.

10.5   Tax Information. As soon as reasonably practicable after the end of the Company fiscal year, the Managers shall cause each Holder to be furnished with a Schedule K-1 for such year and any other schedule or statement required by federal income tax law.

10.6   Basis Adjustment. In the case of a Distribution of Company Property or a transfer of a Membership Interest, the Managers may cause the Company to file an election under IRC Section 754 to adjust the basis of the Company Property. As a result of this election, the Managers shall have the right to require, as a condition to the granting of consent to any transfer, the reimbursement of expenditures made by the Company for any legal and accounting fees incurred to make any such basis adjustment. The Managers shall have the right, in their sole and absolute discretion, to decline to make such an election; and further, the failure to make any election under the IRC in connection with any particular transfer of an interest in the Company shall not affect the right of the Managers to make, or refuse to make, such an election with respect to any subsequent transfer of an interest in the Company.

10.7   Other Elections. The Company shall have the right, in the sole and absolute discretion of the Managers, to make any other elections or determinations required or permitted for federal or state income tax or other tax purposes. The Managers may rely upon the advice of the Company's accountants or tax attorneys with respect to the making of any such election.

10.8   Taxes of Taxing Jurisdictions. To the extent that the laws of any Taxing Jurisdiction requires, each Holder requested to do so by the Managers will submit an agreement indicating that the Holder will make timely income tax payments to the Taxing Jurisdiction and that the Holder accepts personal jurisdiction of the Taxing Jurisdiction with regard to the collection of income taxes attributable to the Holder's income, and interest, and penalties assessed on such income. If the Holder fails to provide such agreement, the Company may withhold and pay over to such Taxing Jurisdiction the amount of tax, penalty and interest determined under the laws of the Taxing Jurisdiction with respect to such income. Any such payments with respect to the income of a Holder shall be treated as a distribution to such Holder for purposes of ARTICLE VII. The Company may, where permitted by the rules of any Taxing Jurisdiction, file a composite, combined or aggregate tax return reflecting the income of the Company and pay the tax, interest and penalties of some or all of the Holders on such income to the Taxing Jurisdiction, in which case the Company shall inform the Holders of the amount of such tax, interest and penalties so paid.

10.9   Tax Matters Partner. The Managers shall designate one of their number or, if there are no Managers eligible to act as tax matters partner any other Member, as the tax matters

partner of the Company pursuant to IRC Section 6231(a)(7). Any Member designated as tax matters partner shall take such action as may be necessary to cause each other Member to become a notice partner within the meaning of IRC Section 6223. Any Member who is designated tax matter partner may not take any action contemplated by IRC Sections 6222 through 6232 without the consent of the Managers.

## ARTICLE XI

## DISSOCIATION OF A MEMBER

11.1    Dissociation. A Person shall cease to be a Member upon the happening of any of the following events:

11.1.1  the withdrawal of a Member with the consent of such number of Members as is required pursuant to Section 3.7;

11.1.2  the bankruptcy (as defined by the Act) of a Member;

11.1.3  in the case of a Member who is a natural Person, the death of the Member or the entry of an order by a court of competent jurisdiction adjudicating the Member incompetent to manage the Member's personal estate;

11.1.4  in the case of a Member who is acting as a Member by virtue of being a trustee of a trust, the termination of the trust (but not merely the substitution of a new trustee);

11.1.5  in the case of a Member that is a separate Organization other than a corporation, the dissolution and commencement of winding up of the separate Organization;

11.1.6  in the case of a Member that is a corporation, the filing of a certificate of dissolution, or its equivalent, for the corporation or the revocation of its charter; or

11.1.7  in the case of an estate, the distribution by the fiduciary of the estate's entire interest in the Company.

11.2    Rights of Dissociating Member. In the event any Member dissociates prior to the expiration of the Term:

11.2.1  if the Dissociation causes a dissolution and winding up of the Company, the Member shall be entitled to participate in the winding up of the Company to the same extent as any other Member except that any Distributions to which the Member would have been entitled shall be reduced by the damages sustained by the Company as a result of the Dissolution and winding up;

11.2.2  if the Dissociation does not cause a dissolution and winding up of the Company, the Member shall not be entitled to receive any amount in consideration of the Member's Membership Interest on account of such Dissociation, unless such Member no

longer holds the corresponding Economic Interest. Otherwise, the Dissociated Member shall continue as Holder of an Economic Interest only.

## ARTICLE XII

### MISCELLANEOUS PROVISIONS

12.1    Amendment of Operating Agreement. This Operating Agreement may be modified upon the vote of Members required pursuant to Section 3.7. No Member or Manager shall have any vested rights in the Operating Agreement which may not be modified through an amendment to the Operating Agreement.

12.2    Entire Agreement. The Operating Agreement represents the entire agreement among all the Members and between the Members and the Company.

12.3    Interpretation. To the extent any provision of this Operating Agreement is prohibited or ineffective under the Act, the Operating Agreement shall be considered amended to the smallest degree possible in order to make the agreement effective under the Act. In the event the Act is subsequently amended or interpreted in such a way to make any provision of the Operating Agreement that was formerly invalid valid, such provision shall be considered to be valid from the effective date of such interpretation or amendment.

12.4    Rights of Creditors and Third Parties under Operating Agreement. This Operating Agreement is entered into among the Company and the Members for the exclusive benefit of the Company, its Members, and their successors and assignees. This Operating Agreement is expressly not intended for the benefit of any creditor of the Company or any other Person. Except and only to the extent provided by applicable statute, no such creditor or third party shall have any rights under this Operating Agreement or any agreement between the Company and any Member with respect to any Capital Contribution or otherwise.

12.5    Valuation of Non-Cash Consideration. For purposes of this Operating Agreement, the procedure for valuing any non-cash consideration shall be as follows: If the parties cannot otherwise agree, each party shall select a qualified appraiser and the appraisers so selected shall jointly select an appraiser, and the valuation of the appraiser so selected shall be binding on all parties. Such valuation shall be based on an arm's length cash sale of the assets. If the non-cash consideration being valued is real property, the selected appraiser shall be an MAI appraiser.

12.6    Counterpart Execution. This Operating Agreement may be executed in any number of identical counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same instrument when each party has signed one (1) such counterpart.

12.7    Remedies. The parties hereto recognize and agree that the breach of any term, provision, or condition of this Operating Agreement may cause irreparable damage, the amount of which is difficult to ascertain and that the award of damages may not be adequate relief to the party aggrieved; the parties therefore agree that, in addition to all other remedies available in the event of a breach of any of the terms or conditions of this Operating Agreement, the party

28

aggrieved shall have the right, in addition to all other remedies available in the event of a breach of this Operating Agreement, to injunctive or other equitable relief (from any court or other body having appropriate jurisdiction).

12.8     Successors and Assigns. Except as herein otherwise specifically provided, this Operating Agreement shall be binding upon and inure to the benefit of the parties and their legal representatives, heirs, administrators, executors, successors and assigns.

12.9     Severability. If any provision of this Operating Agreement, or the application of such provision to any Person or circumstance, shall be held invalid, the remainder of this Operating Agreement, or the application of such provision to Persons or circumstances other than those to which it is held invalid, shall not be affected thereby.

12.10   Governing Law. This Operating Agreement shall be governed by and construed and enforced in accordance with the laws of the State of California without regard to the principles governing conflicts of laws.

IN WITNESS WHEREOF, this Operating Agreement is entered into as of the Effective Date.

INSERT SIGNATURE BLOCKS

IN WITNESS WHEREOF, the parties have executed this Agreement on the date and in place first mentioned.

**Cinco Group:**

Cinco Corporation (Philippines)

Name: Jose P. Magsaysay

Title:   CEO

Jose P. Magsaysay, Jr.

Ma. Victoria O. Bermejo

Ricardo K. Montelibano

**L.A. Group:**

Amit Nemanim

Guy Koren:

Amir Jacoby

SIGNED IN THE PRESENCE OF:

November 30, 2010

# EXHIBIT E

# PCJV-LA GROUP

## PARTNERSHIP AGREEMENT

### Preamble

This Partnership Agreement ("Agreement") is made March 1, 2013, to memorialize the partnership activities and relationship of the partners executing this Partnership Agreement, who shall be referred to in this Agreement individually as a "Partner" and collectively as "Partners."

### RECITALS

A. The Guy Koren ("Koren"), Amit Nemanim ("Nemanim"), and Amir Jacoby ("Jacoby") collectively initiated negotiations to work together as a group with the individuals constituting the Cinco Group to establish, operate, manage, license and franchise "Potato Corner" stores/outlets in the United States and Israel (other than Los Angeles and San Francisco Counties and Tanforan Mall), pursuant to the terms of the Potato Corner USA Joint Venture Agreement executed on or about 11/2009 ("JV Agreement"), which JV Agreement was subsequently replaced by the PCJV USA, LLC Limited Liability Company Agreement made effective 10/2010 ("PCJV Agreement").

B. Pursuant to the PCJV Agreement, Koren, Nemanim, and Jacoby were invited to participate in PCJV USA, LLC as the "LA Group", by making a Capital Contribution (as defined in the PCJV Agreement) of $20,000 to PCJV USA, LLC and executing and performing services for PCJV USA, LLC pursuant to a Master Services Agreement ("Master Services Agreement").

C. This Agreement is intended to memorialize in writing the election by Koren, Nemanim and Jacoby to continue the partnership relationship they initially established in connection with the negotiation of the JV Agreement, to accept the offer made to the LA Group to purchase and hold of a 40% membership interest in PCJV USA, LLC and to accept the offer made by PCJV USA, LLC to the LA Group to provide the services described in the Master Services Agreement.

### Type of Business

1. The Partners have associated to form a General Partnership for the purpose of holding a membership interest in PCJV USA, LLC and providing services on behalf of PCJV USA, LLC pursuant to the Master Services Agreement, and to engage in such other activities as may be permitted by law and approved by a majority of the Partners.

### Partnership Name

2. The Partnership name shall be "PCJV-LA Group".

### Partnership Term

3. The Partnership shall be deemed to have commenced as of the execution of this Agreement by the Partners, and shall continue until dissolved by agreement of the Partners or terminated under the provisions of this Agreement.

## Place of Business

4.      The Partnership's principal place of business shall be: 8950 West Olympic Boulevard, Suite 563, Beverly Hills, CA 90211, California 90035. The Partnership shall maintain any other place or places of business agreed upon by the Partners.

## Initial Capital

5.      The Partners shall each be required to contribute to the Partnership their proportional share of the $20,000 Capital Contribution made by the Partnership to PCJV USA, LLC in and for their interest in the Partnership. The Partnership has offered Partnership interests in the Partnership to the following individuals in proportion to their respective capital contributions to the Partnership., as set forth in Exhibit A to this Agreement. Only those persons contributing a proportion share of this Capital Contribution shall be deemed a continuing Partners of the Partnership, in proportion to their actual contribution.

| | | |
|---|---|---|
| 5.1 | Guy Koren | $7.600 |
| 5.2 | Amit Nemanim | $7,600 |
| 5.3 | Amir Jacoby | $4,800 |

The failure of any Partner to pay their required contribution to this Partnership shall be deemed in default. If the default is not cured following 30 days prior written notice, the other Partners may advance the capital contribution as (i) a loan to the defaulting Partner to bear interest at the rate of 10% per annum until paid in full and secured by the Partner's interest in the Partnership and/or distributions made to such Partner with respect to such interest or (ii) a purchase from the Partnership of the defaulting Partner's allocated interest (or any part thereof) and a corresponding cancellation of such Partner's opportunity to continue as a Partner.

        The Partners will prepare an Exhibit A to this Agreement to reflect the actual contributions made and the proportional Partnership interest thereby obtained.

## Service Commitment

6.      Subject to the allocation of responsibility among the Partners for the performance of the services required of the Partnership under the terms of the Master Services Agreement, each of the Partners shall be responsible for providing a proportional share of the services required (as determined by the Partners). Alternatively, the Partners may agree to compensate individual Partners for the service obligations required under the Master Services Agreement that have been assigned to and assumed and performed by them on behalf of the Partnership.

## Capital Withdrawals

7.      No Partner shall withdraw any portion of the Partnership capital without the other Partners' express written consent.

## Profits and Losses

8.      Net profits and net losses will be allocated to the Partners, and net cash available for distribution by the Partnership will be distributed in proportion to the respective percentage interests of the Partners in the Partnership as described on Exhibit A to this Agreement. The term "net profits," as used in this Agreement, shall mean for tax purposes the Partnership net profits as determined by the accounting method generally and consistently applied by the Partnership, and for purposes of determining the cash available for distribution by the Partnership to the Partners the term "net profits" shall mean the net cash available to the Partnership after establishing such cash reserves as the Partners may determine to be prudent for working capital and any contingent liabilities.

## Books of Account

9.      Partnership books of account shall be accurately kept and shall include records of all Partnership income, expenses, assets, and liabilities. The Partnership books of account shall be maintained on a cash basis. Each Partner shall have the right to inspect the Partnership books during normal business hours at the principal office of the Partnership.

## Fiscal Year

10.     The Partnership's fiscal year shall end on December 31 each year.

## Accountings

11.     Complete accountings of the Partnership affairs at the close of business on the last days of March, June, September, and December of each year shall be rendered to each Partner within thirty (30) days after the close of each such month or as soon thereafter as may be practical with regard to the availability of such information from PCJV USA, LLC. At the time of each accounting, the net profits of the Partnership, if any, shall be distributed to the Partners as provided in this Agreement. Except as to errors brought to the Partners' attention within 15 days after it is rendered, each accounting shall be final and conclusive.

## Time Devoted to Partnership

12.     The Partners shall be required to devote such time and attention to the Partnership business as may be necessary for the Partnership to fulfill its obligations under the Master Services Agreement. Except as the service responsibilities may otherwise be allocated or delegated by the Partners, each of the Partners is required to provide a proportional amount of the service time required by the Master Services Agreement relative to their respective percentage interest in the Partnership. Failure to provide the time required to perform or to perform their respective share of the services required of the Partnership or otherwise allocated or delegated to a Partner shall constitute a breach of the Partnership Agreement. A Partner shall not be deemed in breach of their obligation to provide services on behalf of the Partnership unless and until the Partnership has provided such Partner with at least 30 days prior written notice of the alleged default or breach, and the default or breach as gone uncured during that notice period.

In addition to the services to be provided by the Partners in fulfillment of the Partnership's responsibilities under the Master Services Agreement, the Partners may be individually designated by the Partnership to serve as a Manager of PCJV USA, LLC. If so designated, a Partner shall fulfill their Manager responsibilities on behalf of the Partnership, and if unable or unwilling to do so a Partner shall so advise the Partnership so that they may designate someone else to serve in that capacity. The Partnership shall appoint its Manager designees to PCJV USA, LLC by Majority Approval (as defined below).

## Management and Authority

13.     Partnership decisions and the actions of the Partners shall be determined and approved by the vote or written consent of Partners holding a majority in percentage interest of the Partnership ("Majority Approval"). Individual Partners may not bind the Partnership without obtaining the Majority Approval of the Partners. Any obligation incurred in violation of this provision may be charged to and collected from the Partner who incurred the obligation. Subject to the above authorization requirement, any individual Partner may execute a document on behalf of the Partnership.

Guy Koren has been initially granted the title of "Managing Partner" on behalf of the Partnership in expectation that he will execute documents on behalf of the Partnership.

## Statement of Partnership

14.     The Partners will cause to be filed with the California Secretary of State a Statement of Partnership Authority pursuant to California Corporations Code Section 16303 on form GP-1 in effect at the time of the filing. The Partnership shall cause a Statement of Partnership Authority to be recorded in every county in which the Partnership owns, or contemplates owning, real property.

## Partners' Salaries

15.     Although no salaries are contemplated with respect to a Partner's services as a Manager of PCJV USA, LLC, the Partners providing services on behalf of the Partnership in fulfillment of the Partnership's obligations under the Master Services Agreement shall be entitled to such compensation as may be approved by the Partners by Majority Approval. If the Partnership is unable to pay for the services performed by a Partner, by Majority Approval the Partners the compensation otherwise payable may be accrued and thereafter paid from the first funds made available to the Partnership from PCJV USA, LLC. Compensation payable to a Partner for services provided may be paid as a guaranteed payment as provided under IRC Section 707(c), as payment made to a Partner irrespective of the Partner's percentage interest in Net Profits, the payment of which shall reduce the Net Profits allocable to the Partners in accordance with the Partners' percentage interests. In addition to compensation for their time, Partners shall be entitled to reimbursement for their reasonable business expenses incurred in furtherance of the Partnership business, so long as approved by the Partners by Majority Approval. Any compensation paid to a Partner and any business expenses reimbursed shall be deducted ordinary business expenses prior to computing net profits.

## Withdrawal of Partner

16.     Upon thirty (30) days written notice of intent to the other Partners, a Partner may dissociate from the Partnership by withdrawing as a Partner.

## Option to Purchase Dissociated Interest

17.     On dissociation of a Partner by death, withdrawal, or other act, the remaining Partners may continue the Partnership business by purchasing the outgoing Partner's interest in the Partnership assets and goodwill. The remaining Partners shall have the option to purchase the dissociated Partner's interest by paying to the outgoing Partner or the appropriate personal representative the value of the dissociated Partner's interest as determined under Paragraph 18 of this Agreement. If the remaining Partners do not exercise this option, the Partnership shall be dissolved as provided under Paragraph 21 of this Agreement, unless the remaining Partners have elected to convert the Partnership into an other business entity form and the withdrawing Partner's interest in such other entity is in proportion and comparable to the interest held by the withdrawing Partner immediately prior to withdrawal as provided in Paragraph 21A.

## Purchase Price of Partnership Interest

18.     On exercise of the option described in Paragraph 17 of this Agreement, the remaining Partners shall pay to the dissociated Partner or appropriate personal representative the value of the dissociated Partner's Partnership interest as determined by the last regular accounting preceding the effective date of the withdrawal plus the full unwithdrawn portion of the dissociated Partner's share in net profits earned between the date of that accounting and the date of dissociation. The Partnership shall have the right to offset against the purchase price otherwise payable for a withdrawing Partner's interest the Partner's share of any existing liabilities and accounts receivable incurred prior to the effective date of the withdrawal.

## Liability of Deceased Partner's Estate

19.     If on the death of one Partner, the surviving Partners exercise their option to purchase the deceased Partner's interest under Paragraphs 17 and 18, the liability of the deceased Partner's estate for Partnership obligations incurred during the period of continuation shall be limited to the amount that the deceased Partner had invested or the net value of the Partner's interest in the Partnership at the time of death (and including the unwithdrawn portion of net profits earned since the last accounting), whichever is greater.

## Duties of Purchasing Partners

20.     On any purchase and sale made pursuant to Paragraphs 17, 18, or 19 of this Agreement, the remaining Partners shall assume all Partnership obligations (subject to the right to offset a proportional amount against the purchase price). The remaining Partners shall hold and defend the withdrawing Partner or the deceased Partner's estate and personal representative, as well as any property belonging to either a withdrawing or deceased Partner, free and harmless from all liability for Partnership obligations beyond those reflected in the calculation of the purchase price payable. Immediately upon purchase of a withdrawing or deceased Partner's interest, the remaining Partners shall prepare, file, serve, and publish all notices required by law to protect the withdrawing Partner or the deceased Partner's estate and personal representative from liability for future Partnership obligations. All costs incident to the requirements of this Paragraph shall he borne by the remaining Partners.

## Dissolution

**21.** When: (1) the Partnership is dissolved by agreement of the Partners; or (2) a remaining Partner or Partners decline(s) to exercise the option to purchase a dissociated Partner's interest under Paragraph 17; or (3) it is otherwise required by law, the Partnership affairs shall be wound up, the Partnership assets liquidated, its obligations to creditors, including, to the extent permitted by law, Partners who are creditors, shall be paid, and the surplus divided among the Partners according to their rights of distribution of their Partnership accounts.

## Conversion

21A. Upon the occurrence of an event resulting in a dissociation of a Partner, within 90 days of such event the remaining Partners may elect to convert the Partnership into an other business entity form for which the dissociated Partner's interest will be afforded limited liability from any liability arising after such conversion. Conversion to an other entity form shall be in lieu of the exercise of the option to purchase the dissociated Partner's interest in the Partnership and in lieu of the Partnership dissolution. The dissociated Partner shall receive an interest in the other entity form adopted by the remaining Partners that is proportional and comparable to the held by the dissociated Partner's interest in the Partnership prior to the dissociation event; provided, however, that the dissociated Partner's interest in the other entity need only he in a form that is comparable economically and need not include any voting rights or authority to act on behalf of the other entity in a manner comparable to that held as a Partner (e.g. comparable to an "economic interest" in a limited liability company, as defined in Cal Corp Code Section 17001(o)).

## Notices

**22.** All notices between the Partners shall be in writing and shall be deemed served when personally delivered to a Partner, or when deposited in the United States mail, certified, first-class postage prepaid or by overnight courier, addressed to a Partner at the Partner's address set forth on the signature page to this Agreement or to such other place as may be specified in a notice given pursuant to this Paragraph as the address for service of notice on that Partner. Notices may also be deemed duly provided if delivered by e-mail to an e-mail address specified by the receiving Partner and the party giving notice concurrently places a copy thereof in the United States mail (as described above) or delivers a copy by overnight courier, in which event notice shall be deemed given on the date of the delivery of the e-mail.

## Consents and Agreements

**23.** All consents and agreements provided for or permitted by this Agreement shall be in writing. Signed copies of all consents and agreements pertaining to the Partnership shall be kept with the Partnership books.

## Governing Law

**24.** This Agreement shall be governed by the California Uniform Partnership Act of 1994, as amended, and shall in all respects be a contract under California law.

## Attorney Fees

**25.**    As between the parties to this Agreement, the prevailing party in any dispute arising from or relating to this Agreement shall be awarded costs and attorney fees whether or not the matter is resolved by trial or appeal.

## Sole Agreement

**26.**     This instrument contains the Partners' sole agreement relating to their Partnership. It correctly sets out the Partners' rights and obligations. Any prior agreements, promises, negotiations, or representations not expressly set forth in this instrument have no force or effect.

Executed by the undersigned with effect as of the Effective Date defined above, at Orange County, California.

[See Counterpart Signature Pages of the Partners attached hereto]

EXHIBIT A

PARTNER CAPITAL CONTRIBUTIONS AND PERCENTAGE INTERESTS
(Proposed)

| PARTNER NAME AND ADDRESS | CAPITAL CONTRIBUTION | PERCENTAGE INTEREST |
|---|---|---|
| GUY KOREN <br> 1478 S. crest Dr <br> LA, CA 90035 | $7,600 | 38% |
| AMIT NEMANIM | $7,600 | 38% |
| AMIR JACOBY <br> 14320 Ventura Bl #115 <br> Sherman Oas, CA 91423 | $4,800 | 24% |

915753.1/81153.08003

## EXHIBIT A

### PARTNERS, CAPITAL CONTRIBUTIONS AND PARTNERSHIP INTERESTS

#### (Amended and Updated March 22, 2013)

| NAME OF PARTNER AND ADDRESS | CAPITAL CONTRIBUTION | PARTNERSHIP PERCENTAGE INTEREST |
|---|---|---|
| GUY KOREN | 12,258.04 | 61.3 |
| AMIR JACOBY | 7,741.96 | 38.7 |

915753.1/81153.08003

## PCJV-LA GROUP,
### a California general partnership

## MEMBER COUNTERPART SIGNATURE PAGE

The undersigned, desiring to enter into the Partnership Agreement made effective March 1, 2013 (the "Agreement") for PCJV-LA GROUP, a California general partnership (the "Company"), hereby agrees to all of the terms and provisions thereof. The undersigned hereby joins and executes the Agreement as a Partner of the Partnership, and hereby authorizes this Signature Page to be attached thereto in evidence of this joinder.

WITNESS, the execution hereof by the undersigned, as a Partner of PCJV-LA GROUP:

Signature of Partner

Address: 14320 Ventura BL #115
Sherman Oaks, CA 91423

### Spousal Consent

The undersigned is the spouse of the above general partner. I have read and understood the terms and conditions of the Partnership Agreement of PCJV-LA Group and agree to be bound by its terms. I agree that my spouse shall have the sole and exclusive power to manage the partnership interest created by the foregoing Agreement, regardless of whether that interest was acquired with community property, quasi-community property, or separate property assets, however so titled or characterized. I further acknowledge and agree that my spouse may, from time to time, or at any time, amend, restate, sell, transfer, assign or hypothecate his Partnership interest in any manner whatsoever, with or without my further consent.

Executed at __L A__ County, California.

Date: __3/1/2013__

912600.1/01927.99001

## PCJV-LA GROUP,
### a California general partnership

## MEMBER COUNTERPART SIGNATURE PAGE

The undersigned, desiring to enter into the Partnership Agreement made effective
March 1, 2013 (the "Agreement") for PCJV-LA GROUP, a California general
partnership (the "Company"), hereby agrees to all of the terms and provisions thereof.
The undersigned hereby joins and executes the Agreement as a Partner of the Partnership,
and hereby authorizes this Signature Page to be attached thereto in evidence of this
joinder.

WITNESS, the execution hereof by the undersigned, as a Partner of PCJV-LA
GROUP:

Signature of Partner

Address: 1478 S. Crest Dr
LA, CA 90035

912600.1/01927.99001

# EXHIBIT F

## PCVJ USA, LLC AND LA GROUP MASTER SERVICES AGREEMENT

This Master Services Agreement ("Agreement") dated _____6/18/13_____ is entered into by and between PCVJ USA, LLCa Delaware Limited Liability Company (hereinafter "PCVJ") and Amit Nemanim, Guy Koren and Amir Jacoby (whom are collectively referred to as the "LA Group").

### RECITALS

WHEREAS, PCJVwishes to contract with the LA Group to provide management and strategic experience and expertise.

WHEREAS, the LA Group agrees to provide Services to PCJV as delineated within this Agreement.

NOW, THEREFORE, the Parties hereby agree as follows:

Services:

1. The LA Group shall faithfully, diligently and efficiently exercise the following obligations and responsibilities:
    a. Conduct management, operations, marketing, establishment, maintenance, licensing and sub-licensing, activities with respect to the Potato Corner outlets/stores in the Territory.
    b. Use best efforts at all times to operate and maintain the Potato Corner outlets/stores in the Territory according to the highest standards achievable, consistent with the overall plan of PCJV Management.
    c. Comply with the rules, policies and procedures approved by PCJV Management.
    d. Advertise, market, and promote the Potato Corner outlets/stores with the goal of causing public knowledge, awareness and patronage of the Potato Corner outlets/stores.
    e. Maintain a comprehensive system of records, books and accounts, with respect to the licensing and sub-licensing activities, operation, establishment, management, maintenance and other activities of the Potato Corner outlets/stores in the Territory with the assistance of the PCJV Corporate Secretary.
    f. No later than the twentieth (20th) day of each month, with respect to the preceding month, LA Group shall render a statement of receipts and disbursements, a schedule of accounts receivable and payable, and a schedule of fees collected and distributed, together with a reconciled bank statement as of the last day of the month with the assistance of the PCJV Corporate Secretary.
    g. No later than three (3) months after the end of a fiscal year, the LA Group, with the assistance of the PCJV Corporate Secretary and an external accountant



> hired by PCJV Management, cause PCJV to issue audited financial statements, and shall provide a copy of the same to all members of PCJV Management.
>
> h. To the extent that the LA Group is able to do so, the LA Group shall take such action as may be necessary to comply promptly with any and all laws, ordinances, orders or other requirements of any federal, state, county or municipal authority having jurisdiction of PCJV and affecting PCJV.
>
> i. The LA Group shall have a fiduciary duty to exercise the duty of care and shall, at all times, ensure that all corporate opportunities consistent with the objectives of PCJV shall be pursued. As such, with respect to the establishment of PCVJ-owned stores, whenever potential locations are identified by any member of the LA Group, it shall be promptly brought to the attention of PCJV Management. At all times, and within thirty (30) days from receipt of this information, PCJV Management shall decide whether or not to build a PCJV-owned store at the identified location. In the event PCJV chooses to build a PCJV-owned store at the identified location, it shall have the right to do so, to the exclusion of the LA Group. However, in the event that PCJV decides not to build a PCJV-owned store at the identified location, it shall notify the LA Group of its decision in writing. In such case, the LA Group shall have the right to build a store at the identified location, provided that it shall enter into a franchising agreement with PCJV, and shall pay franchise fees and ongoing royalty fees as set forth in PCJV's standard franchising agreement.

2. Territory for the purposes of this Agreement is defined as the United States of America and Israel, except in the County of Los Angeles, USA and the County of San Francisco, USA and Tanforan Mall.

3. The LA Group shall maintain and protect the Confidential Information belonging to PCJV, and such undertaking shall apply to all of its partners, officers, employees, or agents.

4. In consideration for the provision of its Services the LA Group shall be entitled to a service fee equal to thirty (30%) percent of all initial/franchise fees and continuing royalty fees paid to/collected by PCJV.

5. All withholding and other applicable taxes levied by any authority on the payments by PCJV to the LA Group under this Agreement shall be borne solely by PCJV.

Confidential Information:



1. The Parties acknowledge that from time to time, one Party (the "Discloser") may disclose to the other Party (the "Recipient") information : a) relating to the Potato Corner outlets and stores; b) relating to the Potato Corner Intangible Property Rights; c) Potato Corner product specifications and related information; d) which is marked with "confidential" or a similar legend; e) which is described orally and designated as confidential; or f) which would, under the circumstances, be understood by a reasonable person to be confidential ("Confidential Information").

2. Upon subsequent disclosure of previously disclosed Confidential Information to the Recipient by the Discloser, the information will remain Confidential Information even if not identified as Confidential Information at the subsequent disclosure.

3. Recipient shall retain such Confidential Information in confidence, and shall not disclose it to any Third Party or use it for other than the purposes of this Agreement without the Discloser's prior written consent.

4. Each Party shall use at least the same procedures and degree of care with respect to such Confidential Information which it uses to protect its on confidential Information of like importance, and in no event less than reasonable care. The Recipient will immediately give written notice to the Discloser of any unauthorized use or disclosure of the Discloser's Confidential Information, and the Recipient will assist the Discloser in remedying such unauthorized use or disclosure.

## Duration of Agreement:

1. This Agreement shall become effective from the date of execution hereof and shall continue indefinitely unless terminated by a) mutual written agreement by the Parties or b) breach of any provision of this Agreement by either Party which will result in termination of this Agreement unless cured by the breaching Party within twenty (20) days from the date of the breach.

## General Provisions:

1. This Agreement may not be altered, changed, supplemented or modified except by a written instrument duly signed by the Parties.

2. The invalidity of any portion of this Agreement will not render the entire Agreement void, nor affect the validity of the rest of the provisions of this Agreement.

3. This Agreement shall be governed by the laws of the State of California.

4. Neither Party shall assign any of its rights or obligations under this Agreement without the prior written consent of the other Party.



5. The failure of any Party at any time to require performance by the others of any provision of this Agreement shall not affect, in any way, the right of such Party to require performance of that or any provision, and any waiver by any Party of any breach of this Agreement shall not be construed as a waiver of any continuing or succeeding breach of such provision, or a waiver of any other right under this Agreement.

IN WITNESS WHEREOF,

PCJV USA, LLC

_____        6/18/12
                                        Date

Name: Jose P. Magsaysay

Title:   CEO

LA Group

_____        06/18/12
Amit Nemanim                            Date

_____        6/18/12
Guy Koren                               Date

_____        6/18/12
Amir Jacoby                             Date

# EXHIBIT G



April 3, 2018

Jo Mag
Board of Directors
PCJV, LLC

Re: PCJV & PCIT Transfer of Bank Accounts

Dear Jo Mag,

Per our telephone conversation last week, I am writing now to confirm that I have transferred the PCJV and PCIT bank accounts from Wells Fargo to Chase Bank. I just want to reiterate that these accounts have been established at Chase under the same entity names and were transferred to protect them from unauthorized access.

I will provide you and any other requested Cinco members with full access to these accounts as necessary or requested. I have additionally transferred all the Company stores to Chase as a matter of operational efficiencies since Chase has offered us management solutions and certain beneficial services better suited for our needs.

I apologize for not giving you formal written notice until now but I was under the impression that the information discussed in our telephone conversation would be shared with the other members. I want you to know that I made the decision to transfer these funds, primarily for security reasons, based on my position as majority member and sole managing member of the PCJV Los Angeles group. As you know, I have always acted in the best interest of PCJV and the brand. I believed it was necessary to make these changes only as a security precaution to prevent the unauthorized withdrawal of funds which Amir has caused to happen on prior occasion from our PCJV Los Angeles group accounts.

Contrary to the letter by Amir's attorney, I have made sure that all funds have been accounted for and that there have been no NSF checks or any payments otherwise rejected. I have always made every effort to keep all of our accounts in good standing and have no reason to think they are any less secure now than before the transfer. In fact, the banking circumstances are an improvement, especially from an operational point of view, than those previously maintained at Wells Fargo. Again, I will be providing to you, under separate cover, direct user and password access to the PCJV accounts. I welcome you to confirm that these accounts are in good standing and are being used as authorized and for the best interest of our group and its members.

Although your attorney has requested that the Wells Fargo accounts be reestablished, I strongly suggest the accounts be maintained at Chase where they are secure from any unauthorized access. As you are well aware, Amir is not involved operationally with PCJV and has not been actively involved in the daily business affairs of the company for quite some time now. All of the activities associated with these

accounts have been done in a totally transparent manner to the extent that I invite you to review them to your satisfaction. However, if you insist that the Wells Fargo accounts be reestablished please advise me accordingly.   My point of view is that there is a substantial risk of compromising these accounts, as well as our operational stability if access to our financial accounts is not absolutely secure.

The Board has elected me to be the Managing Member.  I have always and will continue to act in good faith for the best interest of the company and our members.  I am confident that my actions regarding our accounts was necessary and likewise in the best interest of the company and our members.  I am just as confident that upon review of the totality of circumstances that you will conclude the same.

Best regards,

Guy Koren
President & Managing Member
PCJV, LLC
dba Potato Corner USA

# EXHIBIT H

On Mar 27, 2018, at 3:09 AM, Jose Magsaysay, Jr. <jomag28@gmail.com> wrote:

To our LA Partners,

We would like to request for a Member's meeting on Monday, April 9, 2018, 5:30pm (LA Time) via teleconference primarily to discuss the Letter of Intent that was sent to the LA Group last week.

AGENDA

1. Call to Order.

2. Determination of Quorum/ Attendance.

3. Welcome.

4. Guy Koren: To report 2017;
a) Business Development highlights (new territories, store growth, topline growth, franchise)
b) Store Operations highlights
c) Logistics and Supply Chain operational highlights
d) Marketing and Brand highlights
e) Administration updates
f) Other Matters

5. Inbal Jacoby: To Report on 2017 (and 2016) financial performance

6. Guy Koren and/or Amir Jacoby: To Present 5-year plan for PCJV.

7. Letter of Intent.

8. Matters for Approval.

9. Election of the Board of Directors and Officers of the Board.

10. Other Matters.

11. Adjourment.

Thank you.

Joe

# EXHIBIT I



**DLA Piper LLP (US)**
401 B Street, Suite 1700
San Diego, California 92101-4297
www.dlapiper.com

Kellin M. Chatfield
kellin.chatfield@dlapiper.com
T 619.699.2637
F 619.764.6637

April 10, 2018
Via E-Mail (mhare.mouradian@rmkb.com)

Mhare O. Mouradian
RMKB Lawyers
445 S. Figueroa St., Suite 300
Los Angeles, CA 90071-1619

**Re:** **Cease and Desist and Demand that Guy Koren Cease Any and All Actions on Behalf of PCJV USA, LLC**

Dear Mr. Mouradian:

As you know, my firm and I represent the Cinco Corporation and Potato Corner International (collectively, "Cinco Group") and have been retained to represent Cinco Group with regards to Mr. Koren's unauthorized withdrawal of approximately $1 million from the Wells Fargo bank accounts (the "Withdrawn Funds") for PCJV USA, LLC ("PCJV") on March 26, 2018 and his subsequent refusal to step down as President, notwithstanding a vote by the majority of PCJV's voting members (over 75%) relieving Mr. Koren of his title, duties, and obligations as officer and President of PCJV.

Specifically, a meeting of the Managers was held on April 9, 2018, during which the LA Group and Guy Koren were removed from management by a majority vote (85%) of the Managers and Membership interests. Mr. Koren was therefore relieved of his duties as an officer and President of PCJV. Although both the Joint Venture and Operating Agreements allow for removal of an officer without cause, Mr. Koren's removal was based upon his recent breaches of his contractual and fiduciary duties to PCJV and to Cinco Group, by, among other things: (1) emptying PCJV accounts without approval on March 26, 2018; (2) entering a lease on behalf of PCJV without approval of the majority of the Members; and (3) failing to provide a five-year strategic plan, or otherwise account for his actions on behalf of PCJV, in violation of his duties under the Joint Venture Agreement. Mr. Koren's conduct shows a blatant disregard for his fiduciary duties to Cinco Group and the other Members. His conduct poses immediate and substantial risks to Cinco Group's goodwill in the Potato Corner brand and franchise.

Notwithstanding his removal by majority vote, we understand Mr. Koren has refused to step down as President of PCJV and that he removed representatives of PCJV's newly appointed officers from the PCJV offices the afternoon of April 10, 2018. Mr. Koren has no authority to take such action.

Accordingly, we write to demand that Mr. Koren immediately step down and vacate the PCJV offices. We further demand that Mr. Koren immediately cease and desist any action dissipating PCJV assets and cease and desist all action on behalf of PCJV and Cinco Group. We further demand that Mr. Koren cease and desist any conduct that would interfere in Cinco Group's management of PCJV. We also demand that Mr. Koren immediately surrender all PCJV books, accounts, records, and inventory



Mhare O. Mouradian
April 10, 2018
Page Two

If we do not receive confirmation that Mr. Koren will cease all dissipation of PCJV funds; cease all action on behalf of PCJV and Cinco Group; surrender the offices, inventory, and records of PCJV; and cooperate in the transition of management by **noon on April 11**, then we will take immediate steps to protect Cinco Group's interests.

We will be serving Mr. Koren with a copy of our complaint based upon the above-identified breaches of fiduciary duty and will send you a courtesy copy once service is complete.

If you have any questions, you may contact me by telephone or email.

Very truly yours,

**DLA Piper LLP (US)**

Kellin M. Chatfield
Associate

Admitted In California Bar

KMC:lw

WEST\281134512.1

# EXHIBIT J

## MINUTES OF SPECAL MEETING
## OF MANAGERS OF
## PCJV USA, LLC,
A Delaware Limited Liability Company

## APRIL 23, 2018

On April 23, 2018, at 5:11 PM PDST, the Board of Managers of PCJV USA, LLC ("PCJV" or
the "Company") held, via telephone conference, a special meeting of Managers of PCJV
pursuant to Section 4.14.3 of the Limited Liability Company Agreement of PCJV USA, LLC
(the "Agreement") and Notice of Special Meeting, which was mailed on April 18, 2018.

The participants in the meeting were: Guy Koren; Alon Koren; Tom Hodgson; Jose Magsaysay,
Jr.; Marivic del Pilar; Marco del Pilar; Ricardo Enrique K. Montelibano; John Edward
Hernandez; Amir Jacoby; and Inbal Jacoby. Robert Brownlie of DLA Piper LLP (US) and
Myrose Victor observed the meeting. Mr. Brownlie acted as secretary of the meeting.

John Edward Hernandez acted as the Chair of the meeting. At the outset of the call,
Mr. Hernandez confirmed that the participants in the call could hear each other. Mr. Hernandez
held proxy for any Managers of the Company appointed by Cinco Group and/or Potato Corner
International, Inc.

### Explanatory Note

Before April 9, 2018, the Managers of PCJV consisted of the following individuals: Jose P.
Magsaysay; Marivic del Pilar; John Edward Hernandez; Ricardo Enrique K. Montelibano; Guy
Koren; Amir Jacoby; and Inbal Jacoby. These individuals are referred to as the "Prior Board."

On April 9, 2018, the Members of PCJV held a meeting to, among other things, elect new
Managers. The individuals elected to represent Potato Corner International, Inc. / Cinco Group
as Managers of PCJV USA, LLC were: Jose P. Magsaysay; Marivic del Pilar; John Edward
Hernandez; and Marco del Pilar. The individuals elected to represent the LA Group as Managers
of PCJV USA, LLC were: Amir Jacoby and Inbal Jacoby. For the purposes of these minutes,
the "April 9 Board" refers to Jose P. Magsaysay; Marivic del Pilar; John Edward Hernandez;
Marco del Pilar; Amir Jacoby and Inbal Jacoby.

By a letter, dated April 11, 2018, counsel for Guy Koren objected to the election of Amir Jacoby
and Inbal Jacoby as Managers to represent the LA Group. Through his counsel, Mr. Koren
asserted that the individuals who represent the interests of the LA Group as Managers of PCJV
USA, LLC were: Guy Koren; Alon Koren; and Tom Hodgson. For the purposes of these
minutes, the "April 11 Board" refers to Jose P. Magsaysay; Marivic del Pilar; John Edward
Hernandez; Marco del Pilar; Guy Koren; Alon Koren; and Tom Hodgson.

## REMOVAL OF CURRENT OFFICERS AND SUBORDINATE OFFICERS

The Chairman announced that the first item of business was to consider the removal of all of the Company's officers, including its Chairman of the Board of Members, President, Corporate Secretary, and Treasurer, and subordinate officers pursuant to Section 4.11.4 of the Agreement. A motion was duly made to remove of all of the Company's officers, including its Chairman of the Board of Members, President, Corporate Secretary, and Treasurer, and subordinate officers. The motion was seconded, and a discussion ensued. After the discussion, by a roll call vote, the motion was passed unanimously by the April 9 Board, by a majority of the Prior Board with Guy Koren dissenting, and a by a majority of the April 11 Board with Guy Koren, Alon Koren, and Tom Hodgson dissenting. Therefore, regardless of whether the Managers consisted of the Prior Board, April 9 Board, or April 11 Board, the motion passed.

## ELECTION OF NEW OFFICERS

The Chairman announced that the next item of business was to consider the election of new officers of the Company, including its Chairman of the Board of Members, President, Corporate Secretary, and Treasurer. A motion was duly made to elect the following individuals to serve as officers of the Company:

| | |
|---|---|
| Chairman of the Board: | John Edward P. Hernandez |
| President: | Amir Jacoby |
| Treasurer: | Marivic del Pilar |
| Corporate Secretary: | Ben Olivas |

The motion was seconded, and a discussion ensued. After the discussion, by a roll call vote, the motion was passed unanimously by the April 9 Board, by a majority of the Prior Board with Guy Koren dissenting, and a by a majority of the April 11 Board with Guy Koren, Alon Koren, and Tom Hodgson dissenting. Therefore, regardless of whether the Managers consisted of the Prior Board, April 9 Board, or April 11 Board, the motion passed.

## ELECTION OF NEW SUBBORDINATE OFFICER

The Chairman announced that the next item of business was to consider the election of a subordinate officer of the Company. A motion was duly made to elect Jose Magsaysay as the Chief Operating Officer of the Company. The motion was seconded, and a discussion ensued. After the discussion, by a roll call vote, the motion was passed unanimously by the April 9 Board, by a majority of the Prior Board with Guy Koren dissenting, and a by a majority of the April 11 Board with Guy Koren, Alon Koren, and Tom Hodgson dissenting. Therefore, regardless of whether the Managers consisted of the Prior Board, April 9 Board, or April 11 Board, the motion passed.

## TERMINATION OF THE SERVICES AGREEMENT

The Chairman announced that the next item of business was to consider the Services Agreement by and between Potato Corner Joint Venture also known as PCJV USA, LLC, on the one hand,

WEST\281304421.1

and Guy Koren and Amir Jacoby, known as the LA Group, on the other hand, dated January 1, 2017 (the "Services Agreement"), pursuant to Section 5 of the Services Agreement. A motion was duly made to terminate the Service Agreement. The motion was seconded, and a discussion ensued. After the discussion, by a roll call vote, the motion was passed unanimously by the April 9 Board, by a majority of the Prior Board with Guy Koren dissenting, and a by a majority of the April 11 Board with Guy Koren, Alon Koren, and Tom Hodgson dissenting. Therefore, regardless of whether the Managers consisted of the Prior Board, April 9 Board, or April 11 Board, the motion passed.

## THE COMPANY'S BANKING RELATIONSHIPS

The Chairman announced that the notice of meeting allowed the consideration of other items of business. One such matter has arisen as result of the removal and replacement of the Company's officers, which relates to the Company's banking relationships because among the individuals who were removed as officers were those who were the authorized signatories on the Company's bank accounts. A motion was duly made to:

1) Close the Company's current banking relationships;

2) Authorize the Company's officers to open new accounts at Citibank and ratify all actions that have been taken in that regard;

3) Require two signatures for the Company's checks and withdrawals; and

4) Authorize the following signatories for the Company's bank accounts: Jose Marco de Pilar; Jose P. Magsaysay, Jr.; Ricardo Enrique K. Montelibano; Marivic H. del Pilar; John Edward Hernandez; Chad Dominic Hernandez; Myrose April Victor; Inbal P. Jacoby; and Ben Olivas.

The motion was seconded, and a discussion ensued. After the discussion, by a roll call vote, the motion was passed unanimously by the April 9 Board, by a majority of the Prior Board with Guy Koren dissenting, and a by a majority of the April 11 Board with Guy Koren, Alon Koren, and Tom Hodgson dissenting. Therefore, regardless of whether the Managers consisted of the Prior Board, April 9 Board, or April 11 Board, the motion passed.

## ADJOURNMENT

After a motion duly made, seconded and approved, the meeting was adjourned on 5:34 PM.

JOHN EDWARD HERNANDEZ

CHAIRMAN OF PCJV USA, LLC

ROBERT W. BROWNLIE

ACTING SECRETARY

# EXHIBIT K



Emily Garcia
PCJV USA, LLC
6380 Wilshire Blvd., Suite 1100
Los Angeles, CA 90048

Dear Emily,

This is to inform you that PCJV USA, LLC ("PCJV") held a Members' meeting on April 9, 2018 and, by a majority vote of 75% of the Membership Interests, voted to remove Mr. Guy Koren as a Manager, and also relieve him of his duties as President of PCJV, effective immediately. Mr. Koren's removal was due to his breach of his fiduciary and contractual duties to PCJV and its Members.

Going forward, the following are designated duly-authorized representatives of PCJV, effective immediately:

- Ms. Inbal Jacoby (Member and Manager of PCJV);

- Ms. Myrose Victor (Chief Financial Officer of Cinco Philippines, Inc.); and

- Ben R. Olivas (Corporate Secretary of PCJV).

PCJV, through these authorized representatives, will reach out to you and address any concerns and questions you may have during this time. Your continued role in day-to-day management affairs of PCJV is essential to the continued success of our venture. As such, PCJV and Cinco Philippines, Inc. are committed to supporting you, and ensuring that there are no disruptions to your role during the transition to a new management team.

We will reach out to you in the next few days, to schedule a meeting to address your questions or discuss any concerns you may have. We thank you for your kind understanding.

Very truly yours,

Amir Jacoby, Manager

Inbal Jacoby, Manager

Ben R. Olivas, Corporate Secretary

# EXHIBIT L

---------- Forwarded message ----------
From: Hillard, Sarah <Sarah.Hillard@dlapiper.com>
Date: Thu, May 3, 2018, 3:12 PM
Subject: Letter to PCJV Franchisees
To: Seattle@potatocornerusa.com <Seattle@potatocornerusa.com>, radavlai@gmail.com
<radavlai@gmail.com>
Cc: Myrose Victor <myrose.victor@potatocorner.com>, Amir Jacoby <ajacoby88@gmail.com>, Olivas, Ben
<Ben.Olivas@dlapiper.com>


Kindly see the attached letter regarding the change of management of PCJV USA, LLC; this was also sent to
you via certified mail. If you have any questions or wish to discuss further, please feel free to contact Mr. Amir
Jacoby, President of PCJV (mobile: 877-323-9788).


Best regards,


**Sarah Hillard**
Legal Practice Specialist


T +1 650.833.1578
F +1 650.833.2001
E sarah.hillard@dlapiper.com





DLA Piper LLP (US)
2000 University Avenue
East Palo Alto, California 94303-2215
United States
www.dlapiper.com


Please consider the environment before printing this email.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended
recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure,
dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this
communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to
postmaster@dlapiper.com. Thank you.



April 26, 2018
Via Certified Mail

Vannrada Lai
Beyond Business, Inc.
2800 Southcenter Mall
Seattle, WA 98188

Dear Vannrada,

This is to inform you that PCJV USA, LLC ("PCJV") held a Managers' meeting on April 23,
2018. At the meeting, the Board of Managers voted to remove Mr. Guy Koren as President of
PCJV, effective immediately.

In the same meeting, the following were elected as officers of PCJV:

- John Edward Hernandez          Chairman of the Board

- Amir Jacoby                    President

- Jose Magsaysay, Jr.            Chief Executive Officer

- Marivic del Pilar              Treasurer

- Ben Olivas                     Corporate Secretary

Also, PCJV appointed the following as duly-authorized representatives of PCJV, effective
immediately:

- Ms. Inbal Jacoby (Member of PCJV);

- Ms. Myrose Victor (Chief Financial Officer of Cinco Corporation); and

- Ben Olivas (Corporate Secretary of PCJV).

PCJV, has appointed the following individual as your contact person on this matter. He will
reach out to you and address any concerns and questions you may have during this time:

- Mr. Amir Jacoby (President of PCJV; mobile: 877-323-9788).

PCJV and Cinco Corporation are committed to providing continued support to your operations,
and will work to provide that there are no disruptions to your business during the transition to a
new management team. These actions were undertaken with the support of PCJV's majority
owner, Cinco Corporation, through its wholly-owned U.S. subsidiary, Potato Corner
International, Inc. ("PC-International"). Cinco Corporation, as the registered owner of the

**PCJV USA, LLC**
16060 Ventura Blvd., Suite # 526, Encino, CA 91436
www.potatocornerusa.com | Office: 323-951-1155 | Fax: 888-810-1174

"Potato Corner" trademark and tradename, is committed to ensure your continued growth and success.

We will reach out to you in the next few days, to schedule a meeting to address your questions or discuss any concerns you may have. If you would like to contact the new management team, please call Amir Jacoby at the number provided above. We thank you for your kind understanding.

Very truly yours,

John Edward Hernandez, Chairman of the Board

Amir Jacoby, President

Ben Olivas, Corporate Secretary

1    **PROOF OF SERVICE**

2    **STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

3    At the time of service, I was over 18 years of age and **not a party to this action**. I am
employed in the County of Los Angeles, State of California. My business address is 1888 Century
4    Park East, Suite 1900, Los Angeles, California 90067.

5    On May 8, 2018, I served true copies of the following document(s) described as **CROSS-
COMPLAINANT GUY KOREN'S VERIFIED CROSS-COMPLAINT FOR: 1. BREACH
6    OF FIDUCIARY DUTY; 2. INTENTIONAL INTERFERENCE WITH CONTRACTUAL
RELATIONS; 3. INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC
7    RELATIONS; 4. NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC
RELATIONS; 5. INDUCEMENT TO BREACH CONTRACTUAL DOCUMENTS;
8    6. UNFAIR COMPETITION IN VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200,
*ET SEQ.*; 7. BREACH OF WRITTEN CONTRACT; 8. FRAUDULENT INDUCEMENT;
9    9. BREACH OF ORAL CONTRACT; 10. BREACH OF IMPLIED-IN-FACT CONTRACT;
11. BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING;
10   12. ACCOUNTING; AND 13. DECLARATORY RELIEF** on the interested parties in this
action as follows:

11

12                                    **SERVICE LIST**

13   Robert W. Brownlie, Esq.                    *Attorneys for Plaintiff*
     Kellin M. Chatfield, Esq.                   *CINCO CORPORATION*
14   DLA PIPER LLP (US)
     401 B Street, Suite 1700
15   San Diego, California 92101-4297
     Telephone: (619) 699-2700
16   Facsimile: (213) 699-2701

17   **BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the
18   persons at the addresses listed in the Service List and placed the envelope for collection and
     mailing, following our ordinary business practices. I am readily familiar with Freeman, Freeman &
19   Smiley, LLP's practice for collecting and processing correspondence for mailing. On the same day
     that the correspondence is placed for collection and mailing, it is deposited in the ordinary course of
20   business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

21   I declare under penalty of perjury under the laws of the State of California that the
     foregoing is true and correct.
22
23   Executed on May 8, 2018, at Los Angeles, California.

24

25   Maria Villagran

26

27

28

3782229.1 24069-200

FREEMAN. FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

# EXHIBIT 81

1 │ TODD M. LANDER (BAR NO. 173031)
   │ todd.lander@ffslaw.com
2 │ ARASH BERAL (BAR NO. 245219)
   │ arash.beral@ffslaw.com
3 │ JEFFREY S. GOODFRIED (BAR NO. 253804)
   │ jeffrey.goodfried@ffslaw.com
4 │ KELSEY L. HOTCHKISS (BAR NO. 282486)
   │ kelsey.hotchkiss@ffslaw.com
5 │ FREEMAN, FREEMAN & SMILEY, LLP
   │ 1888 Century Park East, Suite 1900
6 │ Los Angeles, California 90067
   │ Telephone: (310) 255-6100
7 │ Facsimile: (310) 255-6200

8 │ Attorneys for Defendants and Cross-
   │ Complainants PCJV USA, LLC, GUY KOREN,
9 │ NKM CAPITAL GROUP, LLC, J & K
   │ AMERICANA, LLC, J & K CULVER, LLC,
10 │ J&K LAKEWOOD, LLC, J&K OAKRIDGE,
   │ LLC, J&K VALLEY FAIR, LLC, J & K
11 │ CAPITAL 2, LLC, J & K ONTARIO, LLC, J&K
   │ PC TRUCKS, LLC, J&K CONSULTANTS
12 │ GROUP, LLC, GK CAPITAL GROUP, LLC, and
   │ POTATO CORNER LA GROUP, LLC, and
13 │ Cross-Complainants PCI TRADING, LLC,
   │ ALON KOREN, THOMAS HODGSON, EMILY
14 │ GARCIA, and ASHLEY GRUDNOWSKI

CONFORMED COPY
ORIGINAL FILED
Superior Court Of California
County Of Los Angeles

OCT 1 0 2018

Sherri R. Carter, Executive Officer/Clerk
By: Claudette Jasper, Deputy

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

15

16 │ **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

17 │ **COUNTY OF LOS ANGELES, CENTRAL DISTRICT**

18

19 │ CINCO CORPORATION, a Philippines
   │ corporation; POTATO CORNER
20 │ INTERNATIONAL, INC., a Delaware
   │ corporation,
21 │
   │        Plaintiffs,
22 │
   │     vs.
23 │
24 │ GUY KOREN, an individual; NKM
   │ CAPITAL GROUP, LLC, a California limited
25 │ liability company; J & K AMERICANA,
   │ LLC, a California limited liability company;
26 │ J & K CULVER, LLC, a California limited
   │ liability company; J&K LAKEWOOD, LLC,
27 │ a California limited liability company; J&K
   │ OAKRIDGE, LLC, a California limited
28 │ liability company; J&K VALLEY FAIR, LLC,

Case No. BC701075
[Related with Case No. BC706000]

**VERIFIED FIRST AMENDED CROSS-COMPLAINT OF CROSS-COMPLAINANTS PCJV USA, LLC, PCI TRADING LLC, POTATO CORNER LA GROUP, LLC, NKM CAPITAL GROUP, LLC, J & K AMERICANA, LLC, J&K LAKEWOOD, LLC, J & K CULVER, LLC, J&K OAKRIDGE, LLC, J&K VALLEY FAIR, LLC, J & K CAPITAL 2, LLC, J & K ONTARIO, LLC, J&K PC TRUCKS, LLC, J&K CONSULTANTS GROUP, LLC, GK CAPITAL GROUP, LLC, GUY KOREN, ALON KOREN, THOMAS HODGSON, EMILY GARCIA, AND ASHLEY GRUDNOWSKI FOR:**

3818668.1

1 | a California limited liability company; J & K
CAPITAL 2, LLC, a California limited
2 | liability company; J & K ONTARIO, LLC, a
California limited liability company; J&K PC
3 | TRUCKS, LLC, a California limited liability
company; J&K CONSULTANTS GROUP,
4 | LLC, a California limited liability company;
GK CAPITAL GROUP, LLC, a California
5 | limited liability company; POTATO CORNER
LA GROUP, LLC, a California limited
6 | liability company; and DOES 1 through 25,
inclusive,

7 |                   Defendants,

8 |

9 |                   – and –

10 | PCJV USA, LLC, a Delaware limited liability
company,

11 |
                   Nominal Defendant.
12 |

13 | PCJV USA, LLC, a Delaware limited liability
company; PCI TRADING LLC, a Delaware
14 | limited liability company; POTATO CORNER
LA GROUP, LLC, a California limited
15 | liability company; NKM CAPITAL GROUP,
LLC, a California limited liability company; J
16 | & K AMERICANA, LLC, a California limited
liability company; J&K LAKEWOOD, LLC, a
17 | California limited liability company; J & K
CULVER, LLC, a California limited liability
18 | company; J&K OAKRIDGE, LLC, a
California limited liability company; J&K
19 | VALLEY FAIR, LLC, a California limited
liability company; J & K CAPITAL 2, LLC, a
20 | California limited liability company; J & K
ONTARIO, LLC, a California limited liability
21 | company; J&K PC TRUCKS, LLC, a
California limited liability company; J&K
22 | CONSULTANTS GROUP, LLC, a California
limited liability company; GK CAPITAL
23 | GROUP, LLC, a California limited liability
company; GUY KOREN, an individual;
24 | ALON KOREN, an individual; THOMAS
HODGSON, an individual; EMILY GARCIA,
25 | an individual; ASHLEY GRUDNOWSKI, an
individual,

26 |
                   Cross-Complainants,
27 |
               vs.
28 |

1. **CONSPIRATORIAL FRAUD;**
2. **BREACH OF WRITTEN CONTRACT;**
3. **ANTICIPATORY REPUDIATION;**
4. **FRAUDULENT INDUCEMENT;**
5. **BREACH OF ORAL CONTRACT;**
6. **BREACH OF IMPLIED-IN-FACT CONTRACT;**
7. **BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;**
8. **BREACH OF FIDUCIARY DUTY;**
9. **INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS;**
10. **INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS;**
11. **NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS;**
12. **INDUCING BREACHES OF CONTRACT;**
13. **NEGLIGENCE;**
14. **CONVERSION;**
15. **MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF CAL. CIVIL CODE §§ 3426, *ET SEQ.*;**
16. **UNFAIR COMPETITION IN VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ.*;**
17. **ACCOUNTING;**
18. **RESTITUTION TO AVOID UNJUST ENRICHMENT;**
19. **DECLARATORY RELIEF;**
20. **REFORMATION;**
21. **IMPLIED/EQUITABLE INDEMNITY; AND**
22. **COMPARATIVE INDEMNITY AND APPORTIONMENT OF FAULT**

**Assigned for All Purposes to the Hon. Rafael Ongkeko, Dept. 73**

Action Filed:        April 10, 2018

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3818668.1

2

VERIFIED FIRST AMENDED CROSS-COMPLAINT

1 | CINCO CORPORATION, a Philippines
corporation; POTATO CORNER
2 | INTERNATIONAL, INC., a Delaware
Corporation; HIGHFIVE CORPORATION, a
3 | Philippines corporation; JOSE P.
MAGSAYSAY, JR., an individual; JOSE
4 | MIGUEL MA. MONTINOLA, an individual;
RICARDO ENRIQUE K. MONTELIBANO,
5 | an individual; MA. VICTORIA O.
BERMEJO, an individual; BEN OLIVAS, an
6 | individual; JOHN EDWARD HERNANDEZ,
an individual; CHAD DOMINIC
7 | HERNANDEZ, an individual; MIGUEL
RAYMUNDO HERNANDEZ, an individual;
8 | MYROSE VICTOR, an individual; MARIVIC
DEL PILAR, an individual; JOSE MARCO
9 | DEL PILAR, an individual; DIA LACABA,
an individual; NICARDO FALCIS, an
10 | individual; AMIR JACOBY, an individual;
INBAL JACOBY, an individual; and ROES 1
11 | through 500, inclusive,

12 |         Cross-Defendants.

13

14      Cross-Complainants PCJV USA, LLC, PCI TRADING LLC, POTATO CORNER LA

15 | GROUP, LLC, NKM CAPITAL GROUP, LLC, J & K AMERICANA, LLC, J&K LAKEWOOD,

16 | LLC, J & K CULVER, LLC, J&K OAKRIDGE, LLC, J&K VALLEY FAIR, LLC, J & K

17 | CAPITAL 2, LLC, J & K ONTARIO, LLC, J&K PC TRUCKS, LLC, J&K CONSULTANTS

18 | GROUP, LLC, GK CAPITAL GROUP, LLC, GUY KOREN, ALON KOREN, THOMAS

19 | HODGSON, EMILY GARCIA, and ASHLEY GRUDNOWSKI (collectively, "Cross-

20 | Complainants") complain of Cross-Defendants CINCO CORPORATION, POTATO CORNER

21 | INTERNATIONAL, INC., HIGHFIVE CORPORATION, JOSE P. MAGSAYSAY, JR., JOSE

22 | MIGUEL MA. MONTINOLA, RICARDO ENRIQUE K. MONTELIBANO, MA. VICTORIA O.

23 | BERMEJO, BEN OLIVAS, JOHN EDWARD HERNANDEZ, CHAD DOMINIC

24 | HERNANDEZ, MIGUEL RAYMUNDO HERNANDEZ, MYROSE VICTOR, MARIVIC DEL

25 | PILAR, JOSE MARCO DEL PILAR, DIA LACABA, NICARDO FALCIS, AMIR JACOBY,

26 | INBAL JACOBY (collectively, "Cross-Defendants", and each a "Cross-Defendant"), and ROES 1

27 | through 500, inclusive, and allege as follows:

28

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1

## BACKGROUND

2    1.    This action pits the interests of parties (the Cross-Complainants), on whose
3    respective backs the United States' arm of Potato Corner – a quick service restaurant chain – was
4    built, against foreign and domestic collaborators whose sole mission it is to invade forcibly and
5    conquer all Potato Corner United States operations in strict derogation of Cross-Complainants'
6    contractual, legal, and equitable rights. It took nearly two months for the Los Angeles Superior
7    Court to foil Cross-Defendants' plot and issue preliminary injunctive relief in favor of Guy Koren
8    ("Koren") and against Cinco Corporation ("Cinco") in June 2018, and in doing so exposing the true
9    reality behind Cross-Defendants' intentions. The Court's own words underscore the perfidious
10    roots of the Cross-Defendants' motives: ***"there is evidence Cinco's efforts to oust Koren were***
11    ***precipitated by a dispute unrelated to his performance as President,"*** specifically alluding to the
12    ***"alleged breaches of the right of first refusal"*** as the linchpin of Cross-Defendants' subterfuge.
13    *See* Preliminary Injunction entered June 18, 2018 (at p. 19), a true and correct copy of which is
14    attached hereto as **Exhibit "A"** and incorporated by reference herein.

15    2.    Indeed, the last few months have stripped the thin veneer of authenticity from Cross-
16    Defendants' conduct and confirmed what Cross-Complainants knew instinctively from the outset of
17    this ill-conceived litigation: Cross-Defendants' ambush of Cross-Complainants has nothing
18    whatever to do with Koren's management of PCJV USA, LLC ("PCJV"), but instead is rooted in
19    Cross-Defendants' effort to salvage the sale of 55% of Cinco's shares to an outside group (the
20    Hernandez Group, defined below) that had no interest in taking control of PCJV – Potato Corner's
21    U.S. arm – unless it could manage the company and its profits. Cross-Defendants knew, under
22    PCJV's governing documents, that Cinco was required to obtain – through his individual and
23    corporate capacity – Koren's consent and extend him a right of first refusal in connection with any
24    sale of Cinco's interests. But Koren was the architect of PCJV, the very reason Potato Corner
25    found its way to American shores, and Cross-Defendants knew that Koren would exercise that right
26    of first refusal as he was contractually permitted to do (and which the parties had contemplated
27    from the outset). Hungry to put its hands on the millions of dollars the Hernandez Group was
28    willing to pay coupled with the Hernandez Group's zealous and unyielding effort to gain majority

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3818668.1                                                4

1   control of Cinco, Cinco and its shareholders instead ignored their contractual obligations and
2   proceeded with the sale. And then, in service to their new master's insistence on absolute control,
3   and to circumvent Koren, Cinco (in collusion with the Hernandez Group) secretly plotted with
4   Amir and Inbal Jacoby (the "Jacobys") who worked with Koren – likely with promises of financial
5   and/or other incentives – to oust Koren from the business that Koren conceived and built. Cinco
6   and its shareholders now lay claim to the millions of dollars they so clearly wanted, and have
7   illegally allowed the Hernandez Group to occupy Cinco's interests, unlawfully obtain access to
8   Potato Corner's confidential information, improperly exert control over this litigation, and
9   fraudulently attempt to lay claim over Potato Corner's United States operations.

10      3.      The above only begins to scratch the surface of Cross-Defendants' transgressions –
11  both past and present. In fact, *as soon as a tentative ruling was issued by the Court in favor of*
12  *Koren on the Preliminary Injunction*, Cross-Defendants scurried to misappropriate information and
13  engage in transparently hostile acts against Cross-Complainants. *And after the Preliminary*
14  *Injunction was entered*, Cross-Defendants mounted an illegal campaign of sabotage and
15  interference aimed at Cross-Complainants, in one instance unilaterally and without explanation
16  *tripling* the price the United States operations would have to pay for ingredients and products
17  ultimately sold to United States franchisees. In other instances, Cross-Defendants continue to run
18  promotions and marketing schemes accessible in the United States without Cross-Complainants'
19  knowledge or consent, leading to confusion in the marketplace and various other harm to the
20  American operations and their franchisees. To this day, several Cross-Defendants lay claim to
21  funds held in at least one bank account belonging to PCI Trading, LLC ("PCI Trading") – PCJV's
22  sister company – and refuse to return those funds. They also maintain an office in the United States
23  – which they leased on behalf of PCJV – that can only be viewed as an unfair and improper effort to
24  compete with Cross-Complainants.

25      4.      In normal circumstances, these actions would surprise even the hardened cynic but
26  Cross-Complainants are informed and believe that these actions are typical of the Hernandez Group
27  and those associated with them. Since the institution of this lawsuit, Cross-Complainants have
28  learned that the Hernandez Group is engaged in active efforts to control all of Cinco's ***global***

38186681                                    5

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  operations in derogation of rights of parties who stand in the same shoes as Cross-Complainants in
2  at least one other country. This "stop-at-nothing" approach to usurping power comes in the wake of
3  serious allegations by famous Filipino actress and daughter of Corazon Aquino (the 11th President
4  of the Philippines) and sister of Benigno S. Aquino III (the 15th President of the Philippines), Kris
5  Aquino, that she suffered serious betrayal and financial abuse at the hands of parties associated with
6  Potato Corner in the Philippines causing her to fall physically ill as a result. While she did not
7  specifically name the alleged perpetrators, her allegations appear to be directed at members of the
8  Hernandez Group with which she has a business relationship. The Hernandez Group's *modus*
9  *operandi* is clear: slash-and-burn, scorched earth, no holds barred, take no prisoners, and the
10 consequences and victims be damned.

11 <center>**SUMMARY OF THE DISPUTE**</center>

12     5.    The specific facts of this sordid tale, alleged in detail below, are stark. Koren, who
13 long dreamed of bringing his entrepreneurial talents to the United States, conjured the idea of
14 bringing the popular Potato Corner French Fries chain – which he'd come to appreciate as a child of
15 an Israeli diplomat in the Philippines years before – to this country. Acquiring Cinco's agreement,
16 and, specifically, that of its CEO, Jose P. Magsaysay, Jr. ("Magsaysay"), to enable him to initially
17 open up to 15 Potato Corner outlets of his own (with exclusivity in heavily populated areas in
18 California) and with the expectation that he could later expand to other territories, Koren (along
19 with several investors) opened his first American Potato Corner store (the first in this country) in
20 Santa Anita, California in February 2010. Later that same year, Cinco and its four 25% equal
21 shareholders (Cinco along with its shareholders collectively known as the "Cinco Group") promised
22 – and Koren agreed based on certain guarantees made to Koren – to lead the efforts in expanding
23 and franchising Potato Corner to third party franchisees in the United States and Israel, while also
24 maintaining his exclusive rights to have an ownership stake in 15 of his own Potato Corner outlets.
25 Those would come to serve – at Koren's and his investors' expense – as the principal research and
26
27
28

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3818668.1

<center>6</center>

1  development test stores in the United States.[1]  Magsaysay, who was like a father to Koren,

2  repeatedly promised Koren that Koren would one day come to own Cinco and its global interests,

3  i.e., Potato Corner in its entirety, which induced Koren to dedicate his life to this business

4  enterprise.[2]

5       6.     At the time Koren and Cinco initially agreed to Potato Corner's American

6  expansion, Koren was not in a position to fund the new operations.  In came Amir Jacoby, with

7  whom Koren agreed to a straightforward and common structure – Koren would provide the time,

8  labor and expertise essential to building the franchises, and Amir Jacoby would provide the capital.

9  Koren thus expanded Potato Corner into the United States opening a handful of stores (some that

10  failed and some that succeeded) over the ensuing years of his own and franchising over four times

11  as many to third party franchisees, all in accordance with this paradigm.  Koren, for his part,

12  worked tirelessly as these start-up businesses experienced various growing pains.  While a few of

13  those growing pains were natural to any new enterprise, they were largely caused by the Cinco

14  Group's utter neglect and reckless attitude towards its new U.S. business partner.[3]  Indeed, as

15  alleged below, while the Cinco Group made certain promises to induce Koren to devote years of his

16  life to this business enterprise, the Cinco Group in actuality never had an intent to fulfill those

17  promises.  The Cinco Group effectively and instead left Koren on an island, providing little to no

18

19  [1] By virtue of the fact that Koren was the principal reason behind Potato Corner's expansion to the
20  United States along with the fact that the outlets in which Koren maintains an interest were used
   for testing, market research, development, training, establishing proof of concept, enticing
21  potential franchisees, and other efforts ultimately benefitting PCJV and its franchisees, it was
   agreed at the outset that Koren's outlets would always be exempt from any payment of franchise
22  fees, royalties, or other charges owing to PCJV.

23  [2] Indeed, these representations drove Koren to continue his efforts at Potato Corner and put his
   personal life on hold despite the fact that the business enterprise was not profitable for several
24  years and Koren hardly received any compensation for his work.  In fact, at some point in or about
   2012 or 2013, the Cinco Group felt so terrible about Koren's financial predicament that they
25  issued a $20,000 loan to PCJV for Koren's benefit to help pay for Koren's living expenses.

26  [3] The Cinco Group, focused on their own self-interests, even went so far as to appoint their
   franchising consultant, Erlinda Bartolome ("Bartolome"), to communicate with Cross-
27  Complainants, so that the Cinco Group did not have to and could limit the time they would have to
   devote to PCJV.  Bartolome later came to be appointed as PCJV's Corporate Secretary and in fact
28  became a critically important member of PCJV's operations.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  support and routinely resorting to both negligent and hostile conduct that significantly damaged the
2  U.S. business interests and greatly undermined their growth.

3       7.      By 2017, however, and because of Koren's efforts, the businesses gained traction
4  and established themselves. Koren had, through determination and sweat equity, constructed a
5  successful franchise business. In or about the same time period, however, an internal dispute
6  rocked Cinco and its shareholders which involved, upon information and belief, Magsaysay, Cinco
7  shareholder Ricardo Enrique K. Montelibano ("Montelibano"), and Cinco shareholder Ma. Victoria
8  O. Bermejo ("Bermejo"). As a result of this internal dispute, rumors floated that Cinco and its
9  shareholders were interested in selling off their shares.

10      8.      Consequently, on March 1, 2017, Koren sent a letter to the Cinco Group in which he
11 addressed the rumors, and reminded the Cinco Group of their transfer restrictions and the right of
12 first refusal provisions under the parties' agreements (which provisions Magsaysay had first insisted
13 upon so that neither group – nor the members of that group – could sell any equity interests to
14 outsiders without consent and without extending a right of first refusal). That letter made clear that
15 Koren was exercising the right to purchase the shares, if offered, based upon the agreed-to formula
16 in the parties' governing agreements.

17      9.      Cross-Complainants have since learned that just a few weeks after receipt of Koren's
18 letter, the Cinco Group secretly sold their shares to an outside group controlled by John Edward
19 Hernandez ("Hernandez") (Hernandez, collectively with persons associated with him are commonly
20 known and referred to herein as the "Hernandez Group"). Hernandez, for his part, submitted a
21 declaration under oath in this case attesting to the fact that he "became Chairman of the Board of
22 Cinco in June 2017, after [his] family, together with its business interests, purchased a 55% interest
23 in Cinco from its then existing shareholders," and that he – Hernandez – "was personally involved
24 in this transaction and the negotiations leading to it." But, Cross-Complainants are informed and
25 believe, and thereupon allege, that the Hernandez Group were fully aware of the transfer restrictions
26 and rights of first refusal provisions of PCJV's governing documents before acquiring the 55%
27 stake in Cinco. Cross-Complainants are further informed and believe, and thereupon allege, that
28 the Hernandez Group exploited the internal Cinco dispute such that they first sought to acquire a

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1   10% interest from each of Magsaysay, Montelibano, and Cinco shareholder Jose Miguel Ma. G.
2   Montinola ("Montinola"), and then induced Bermejo to sell her entire 25% share in Cinco in order
3   to acquire the majority 55% interest in Cinco.

4       10.    Hernandez's plan worked, and the two groups (Cinco and Hernandez) effectively
5   conspired together to transact equity interests in conscious derogation of Koren's and his group's
6   rights, and with the specific intent to permit Hernandez and his group to exercise unfettered control
7   over voting and management rights in PCJV. During the apparently months-long due diligence
8   period, however, the transacting parties continued to conceal that transaction from Koren and his
9   group, and they never once informed Koren that the Hernandez Group was intent on acquiring or
10  had actually acquired a 55% interest in Cinco.

11      11.    In fact, Koren and his team were introduced to members of the Hernandez Group
12  much later in 2017, long after the Cinco-Hernandez transaction was apparently completed. Koren
13  and his group, of course, objected to the Hernandez Group's acquisition of Cinco's shares and
14  refused to accept them as their new business partners. But in order to appease Koren and avoid a
15  potential rescission of the Cinco-Hernandez transaction and exercise of the right of first refusal
16  provision (effectively, to salvage their deal), members of the Cinco Group (purportedly comprising
17  then also the Hernandez Group) specifically agreed in or about November 2017 that PCJV shall be
18  owned 100% by Koren's group and that the PCJV-Cinco relationship shall solely be governed by a
19  Master License Agreement.

20      12.    In accordance with that November 2017 agreement in principle, on February 13,
21  2018, Koren forwarded a proposed term sheet for the Master License Agreement for review. But
22  for reasons then unknown, Cinco reneged on that agreement and refused to proceed with it. Koren
23  is informed and believes, and thereupon alleges, that the primary reason for Cinco's change of heart
24  was due to efforts led principally by Amir Jacoby (Koren's business partner) to interfere and induce
25  Cinco not to proceed with it. To that end, a mere 9 days following the transmission of the February
26  13, 2018 term sheet, Amir Jacoby began to unilaterally and unlawfully withdraw money (defined
27  below as the "Unauthorized Jacoby Withdrawals") from various bank accounts tied to Potato
28  Corner's United States operations. Then, when Koren (as the person charged with management of

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3818668.1              9

VERIFIED FIRST AMENDED CROSS-COMPLAINT

1  all of the business operations) lawfully and justifiably changed the business' banking relationship in
2  order to safeguard the company funds from Amir Jacoby's continuing raid, Amir Jacoby colluded
3  with the Cross-Defendants to push Koren out of the business altogether.

4       13.    The final acts were concocted and purported "meetings" of the management of PCJV
5  in April 2018, where, with Darwinian calculation, the Cross-Defendants purported to eject Koren as
6  an owner and manager of the entire enterprise, and initiate litigation against him through an uber-
7  aggressive (albeit, conflicted) 4,200-lawyer law firm DLA Piper, LLP, one of which partners – Ben
8  Olivas ("Olivas") – maintains an ownership interest in Potato Corner International, Inc. ("PCI"),
9  Cinco's alter ego in the United States. Cinco, through their lawyers, managed to not only file this
10 litigation against Koren (the very day following the first "meeting" purporting to eject him from
11 PCJV), but it also filed separate litigation *on behalf of PCJV in a verified pleading made under oath*
12 against several individuals (who are joined as Cross-Complainants here) alleging, among other
13 things, that they all converted and misappropriated funds belonging to PCJV. (These parties are
14 now forced to seek declaratory relief in this action so as to clear their names of any alleged
15 wrongdoing.)

16      14.    For all its sound and fury, however, Cinco's April 2018 attempts to remove Koren
17 were improper, ultimately leading the Court to issue preliminary injunctive relief in favor of Koren
18 and against Cinco. The one upshot of the preliminary injunction proceedings was that it revealed,
19 to some extent, the nature and timing of the Cinco-Hernandez transaction and the Hernandez
20 Group's obvious efforts to control PCJV. The Hernandez Group in fact has no legal right to control
21 or manage PCJV in any respect, as this action seeks to establish. Among other things, the
22 Hernandez-Cinco transaction must be rescinded and equitable or legal relief provided such that, for
23 example, the 55% shares of Cinco are transferred to Koren in his individual or corporate capacity in
24 order to right the wrongs of Cross-Defendants. Cross-Complainants also seek damages
25 (compensatory, special, and punitive), restitution, imposition of constructive trusts, injunctive and
26 declaratory relief, attorneys' fees and costs, interest, and all other relief the Court deems
27 appropriate.

28 / / /

3818668.1           10

1

**THE PARTIES**

2   15.   Cross-Complainant PCJV is, and at all relevant times was, a limited liability

3  company organized and existing under the State of Delaware, maintaining its principal place of

4  business within the County of Los Angeles, State of California.

5   16.   Cross-Complainant PCI Trading is, and at all relevant times was, a limited liability

6  company organized and existing under the State of Delaware, maintaining its principal place of

7  business within the County of Los Angeles, State of California.

8   17.   Cross-Complainant Potato Corner LA Group, LLC ("PC LA Group") is, and at all

9  relevant times was, a limited liability company organized and existing under the State of California,

10  maintaining its principal place of business within the County of Los Angeles, State of California.

11   18.   Cross-Complainant NKM Capital Group, LLC ("NKM") is, and at all relevant times

12  was, a limited liability company organized and existing under the State of California, maintaining

13  its principal place of business within the County of Los Angeles, State of California.

14   19.   Cross-Complainant J & K Americana, LLC ("JK Americana") is, and at all relevant

15  times was, a limited liability company organized and existing under the State of California,

16  maintaining its principal place of business within the County of Los Angeles, State of California.

17   20.   Cross-Complainant J&K Lakewood, LLC ("JK Lakewood") is, and at all relevant

18  times was, a limited liability company organized and existing under the State of California,

19  maintaining its principal place of business within the County of Los Angeles, State of California.

20   21.   Cross-Complainant J & K Culver, LLC ("JK Culver") is, and at all relevant times

21  was, a limited liability company organized and existing under the State of California, maintaining

22  its principal place of business within the County of Los Angeles, State of California.

23   22.   Cross-Complainant J&K Oakridge, LLC ("JK Oakridge") is, and at all relevant

24  times was, a limited liability company organized and existing under the State of California,

25  maintaining its principal place of business within the County of Los Angeles, State of California.

26   23.   Cross-Complainant J&K Valley Fair, LLC ("JK Valley Fair") is, and at all relevant

27  times was, a limited liability company organized and existing under the State of California,

28  maintaining its principal place of business within the County of Los Angeles, State of California.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3818668.1                                    11

24.     Cross-Complainant J & K Capital 2, LLC ("JK Capital 2") is, and at all relevant times was, a limited liability company organized and existing under the State of California, maintaining its principal place of business within the County of Los Angeles, State of California.

25.     Cross-Complainant J & K Ontario, LLC ("JK Ontario") is, and at all relevant times was, a limited liability company organized and existing under the State of California, maintaining its principal place of business within the County of Los Angeles, State of California.

26.     Cross-Complainant J&K PC Trucks, LLC ("JK PC Trucks") is, and at all relevant times was, a limited liability company organized and existing under the State of California, maintaining its principal place of business within the County of Los Angeles, State of California.

27.     Cross-Complainant J&K Consultants Group, LLC ("JK Consultants") is, and at all relevant times was, a limited liability company organized and existing under the State of California, maintaining its principal place of business within the County of Los Angeles, State of California.

28.     Cross-Complainant GK Capital Group, LLC ("GK Capital") is, and at all relevant times was, a limited liability company organized and existing under the State of California, maintaining its principal place of business within the County of Los Angeles, State of California.

29.     Cross-Complainant Koren is, and at all relevant times was, an individual residing in the County of Los Angeles, State of California.

30.     Cross-Complainant Alon Koren is, and at all relevant times was, an individual residing in the County of Los Angeles, State of California.

31.     Cross-Complainant Thomas Hodgson ("Hodgson") is, and at all relevant times was, an individual residing in the County of Orange, State of California.

32.     Cross-Complainant Emily Garcia ("Garcia") is, and at all relevant times was, an individual residing in the County of Los Angeles, State of California.

33.     Cross-Complainant Ashley Grudnowski ("Grudnowski") is, and at all relevant times was, an individual residing in the County of Los Angeles, State of California.

34.     Cross-Complainants are informed and believe, and thereupon allege, that Cross-Defendant Cinco is, and at all relevant times was, a corporation organized and existing under the

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3818668.1                          12

1  Republic of the Philippines, and that it conducts business in the United States, including in the
2  County of Los Angeles, State of California.

3      35.    Cross-Complainants are informed and believe, and thereupon allege, that Cross-
4  Defendant PCI is, and at all relevant times was, a corporation organized and existing under the State
5  of Delaware, and that it conducts business in the United States, including in the County of Los
6  Angeles, State of California.

7      36.    Cross-Complainants are informed and believe, and thereupon allege, that Cross-
8  Defendant Highfive Corporation ("Highfive") is, and at all relevant times was, a corporation
9  organized and existing under the Republic of the Philippines, and that it routinely maintains
10  contacts with the United States including with the County of Los Angeles, State of California.

11     37.    Cross-Complainants are informed and believe, and thereupon allege, that Cross-
12  Defendant Magsaysay is, and at all relevant times was, an individual residing in the Republic of the
13  Philippines who routinely maintains contacts with the United States including with the County of
14  Los Angeles, State of California.

15     38.    Cross-Complainants are informed and believe, and thereupon allege, that Cross-
16  Defendant Montinola is, and at all relevant times was, an individual residing in the Republic of the
17  Philippines who routinely maintains contacts with the United States including with the County of
18  Los Angeles, State of California.

19     39.    Cross-Complainants are informed and believe, and thereupon allege, that Cross-
20  Defendant Montelibano is, and at all relevant times was, an individual residing in the Republic of
21  the Philippines who routinely maintains contacts with the United States including with the County
22  of Los Angeles, State of California.

23     40.    Cross-Complainants are informed and believe, and thereupon allege, that Cross-
24  Defendant Bermejo is, and at all relevant times was, an individual residing in the Republic of the
25  Philippines who routinely maintains contacts with the United States including with the County of
26  Los Angeles, State of California.

27     41.    Cross-Complainants are informed and believe, and thereupon allege, that Cross-
28  Defendant Olivas is, and at all relevant times was, an individual residing in Belmont, California.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1    42.    Cross-Complainants are informed and believe, and thereupon allege, that Cross-
2  Defendant Hernandez is, and at all relevant times was, an individual residing in the Republic of the
3  Philippines who routinely maintains contacts with the United States including with the County of
4  Los Angeles, State of California.

5    43.    Cross-Complainants are informed and believe, and thereupon allege, that Cross-
6  Defendant Chad Dominic Hernandez is, and at all relevant times was, an individual residing in the
7  Republic of the Philippines who routinely maintains contacts with the United States including with
8  the County of Los Angeles, State of California.

9    44.    Cross-Complainants are informed and believe, and thereupon allege, that Cross-
10  Defendant Miguel Raymundo Hernandez is, and at all relevant times was, an individual residing in
11  the Republic of the Philippines who routinely maintains contacts with the United States including
12  with the County of Los Angeles, State of California.

13    45.    Cross-Complainants are informed and believe, and thereupon allege, that Cross-
14  Defendant Myrose Victor is, and at all relevant times was, an individual residing in the Republic of
15  the Philippines who routinely maintains contacts with the United States including with the County
16  of Los Angeles, State of California.

17    46.    Cross-Complainants are informed and believe, and thereupon allege, that Cross-
18  Defendant Marivic del Pilar is, and at all relevant times was, an individual residing in the Republic
19  of the Philippines who routinely maintains contacts with the United States including with the
20  County of Los Angeles, State of California.

21    47.    Cross-Complainants are informed and believe, and thereupon allege, that Cross-
22  Defendant Marco del Pilar is, and at all relevant times was, an individual residing in the Republic of
23  the Philippines who routinely maintains contacts with the United States including with the County
24  of Los Angeles, State of California.

25    48.    Cross-Complainants are informed and believe, and thereupon allege, that Cross-
26  Defendant Dia Lacaba is, and at all relevant times was, an individual residing in the Republic of the
27  Philippines who routinely maintains contacts with the United States including with the County of
28  Los Angeles, State of California.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1        49.    Cross-Complainants are informed and believe, and thereupon allege, that Cross-
2   Defendant Nicardo Falcis is, and at all relevant times was, an individual residing in the Republic of
3   the Philippines who routinely maintains contacts with the United States including with the County
4   of Los Angeles, State of California.

5        50.    Cross-Complainants are informed and believe, and thereupon allege, that Cross-
6   Defendant Amir Jacoby is, and at all relevant times was, an individual residing in Los Angeles,
7   California.

8        51.    Cross-Complainants are informed and believe, and thereupon allege, that Cross-
9   Defendant Inbal Jacoby is, and at all relevant times was, an individual residing in Los Angeles,
10  California.

11       52.    Cross-Complainants are ignorant of the true names and capacities of the cross-
12  defendants sued herein as ROES 1 through 500, inclusive, and therefore sue said cross-defendants
13  by said fictitious names. Cross-Complainants will amend this First Amended Cross-Complaint to
14  allege their true names and capacities when ascertained.

15       53.    Cross-Complainants are informed and believe, and thereupon allege, that each of the
16  fictitiously named cross-defendants is responsible in some manner for the occurrences herein
17  alleged and that Cross-Complainants' damages were proximately caused thereby. Cross-
18  Complainants are informed and believe, and thereupon allege, that at all relevant times herein, each
19  of the ROE cross-defendants and the named Cross-Defendants were the agents and/or employees of
20  one or more of the other cross-defendants, were acting within the course and scope of said agency
21  and/or employment, and that each cross-defendant has aided and assisted one or more of the other
22  cross-defendants in committing the wrongful acts herein alleged.

23       54.    Cross-Complainants are informed and believe, and thereupon allege, that cross-
24  defendants, and each of them, conspired and agreed among themselves to do the acts complained of
25  herein and were, in doing the acts complained of herein, acting pursuant to said conspiracy, and that
26  each cross-defendant sued herein is jointly and severally responsible and liable to each cross-
27  complainant for the damages alleged herein.

28  ///

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

## CORPORATE OWNERSHIP

55.    Subject to the claims asserted below and any relief the Court may award that may equitably or legally adjust the ownership structure of the entity participants named herein, Cross-Complainants set forth below the equity ownership structure of each entity party (as per Cross-Complainants' current knowledge and belief) for the Court's ease of review, use, and reference:

a)  PCJV:             60% Cinco Group (defined below); 40% PC LA Group.

b)  PCI Trading:      50% Cinco Group (defined below); 50% PC LA Group.

c)  PC LA Group:      61.3% Koren; 38.7% Amir Jacoby.

d)  NKM:              50.875% Koren; 39.625% Amir Jacoby; 3% Danny Shalom; 3% Ron Jacoby; 2% Alon Koren; 1.5% Mark Tung.

e)  JK Americana:     35% Koren; 35% Amir Jacoby; 30% Di Xie.

f)  JK Lakewood:      35% Koren; 35% Amir Jacoby; 30% Di Xie.

g)  JK Culver:        35% Koren; 35% Amir Jacoby; 30% Hodgson.

h)  JK Oakridge:      35% Koren; 35% Amir Jacoby; 30% Hodgson.

i)  JK Valley Fair:   35% Koren; 35% Amir Jacoby; 30% Hodgson.

j)  JK Capital 2:     35% Koren; 35% Amir Jacoby; 30% Mark Tung.

k)  JK Ontario:       35% Koren; 35% Amir Jacoby; 30% Hodgson.

l)  JK PC Trucks:     35% Koren; 35% Amir Jacoby; 30% Vannrada Lai.

m)  JK Consultants:   50% Koren; 50% Amir Jacoby.

n)  GK Capital:       100% Koren.

o)  Cinco:            (Previously) 25% Magsaysay; 25% Montinola; 25% Montelibano; 25% Bermejo.

                      (Currently) 55% Hernandez Group; 15% Magsaysay; 15% Montinola; 15% Montelibano

p)  PCI:              99.5% Cinco; 0.1% Magsaysay; 0.1% Montinola; 0.1% Montelibano; 0.1% Bermejo; 0.1% Olivas

q)  Highfive:         Unknown, but believed to be wholly owned by Cinco and/or Cinco's shareholders.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**FRANCHISOR AND FRANCHISEE AFFILIATIONS**

56.     Subject to the claims asserted below and any relief the Court may award that may equitably or legally adjust the affiliations of the Potato Corner United States franchisor and franchisee entity participants named herein, Cross-Complainants set forth below the general affiliations of the entity parties (as per Cross-Complainants' current knowledge and belief) for the Court's ease of review, use, and reference:

Franchisor Affiliations

a)  PCJV is the master franchisor of Potato Corner outlets in the United States. The equity interests in PCJV are held by Cinco Group (defined below) and PC LA Group. PC LA Group, through Koren, manages PCJV.

b)  PCI Trading is PCJV's sister company also owned by Cinco Group and PC LA Group; it distributes products/ingredients to U.S. franchisees. PCI Trading purchases certain products/ingredients from Highfive, believed to be Cinco's wholly owned subsidiary (and alter ego) in the Philippines. PC LA Group, through Koren, manages PCI Trading.

c)  PC LA Group (formerly a partnership later converted to a limited liability company) is a company that Koren and Amir Jacoby formed to hold their collective interests in PCJV and PCI Trading. The management fees owed to Koren for services performed by PC LA Group are paid to GK Capital, a company wholly owned by Koren.

d)  PCI is a U.S. company that Cinco formed as its purported "wholly owned subsidiary" solely for the purpose of holding the Cinco Group's interests in PCJV and PCI Trading. A dispute has arisen among the parties whether PCI or the "PCI Group" ever formally replaced the Cinco Group as an owner in the U.S. operations and that, if it did, whether those transactions were proper, i.e., devoid of fraud given Cinco's position in this lawsuit that the sale of its shares to the Hernandez Group did not trigger the right of first refusal as the Hernandez did not directly buy into PCI.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

17

1    Franchisee Affiliations

2          e)    The interests of the Potato Corner outlets in which Koren maintains a direct

3                ownership stake are generally held by different entities, as set forth above. Aside

4                from NKM, Koren holds no more than a 35% equity interest in each Potato

5                Corner U.S. outlet (see various "JK" entities).

6          f)    Of the named "JK" parties, JK Capital 2 is no longer active as the store it was

7                operating was closed in or about January 2017.

8          g)    JK Consultants was formed by Koren and Amir Jacoby to provide management

9                and consulting services to the various Potato Corner stores they co-own.

10                          **ABBREVIATED REFERENCES**

11    57.    For ease of reference, the following abbreviated references will be used herein:

12          a)    Cinco, Magsaysay, Montinola, Montelibano, and Bermejo will be collectively

13                referred to herein as the "Cinco Group".

14          b)    PCI, Magsaysay, Montinola, Montelibano, Bermejo, and Olivas will be

15                collectively referred to herein as the "PCI Group".

16          c)    The Cinco Group and the PCI Group will be collectively referred to herein as the

17                "Cinco/PCI Group".

18          d)    Hernandez, Chad Dominic Hernandez, Miguel Raymundo Hernandez, Myrose

19                Victor, Marivic del Pilar, Jose Marco del Pilar, Dia Lacaba, Nicardo Falcis, and

20                ROES 1 through 100, inclusive, will be collectively referred to herein as the

21                "Hernandez Group".

22          e)    NKM, JK Americana, JK Lakewood, JK Culver, JK Oakridge, JK Valley Fair,

23                JK Capital 2, JK Ontario, JK PC Trucks, and JK Consultants will be collectively

24                referred to herein as the "NKM/JK Entities".

25                          **ALTER-EGO ALLEGATIONS**

26    58.    Cross-Complainants are informed and believe, and thereupon allege, that there is a

27    unity of interest and ownership between and among the following parties, such that any

28

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1    individuality and separateness between them never existed or has ceased, and that said parties are

2    alter egos of one another:

3        Cinco and Highfive

4            a) Cinco and Highfive were conceived, intended, and/or used by the Cinco/PCI

5               Group and Hernandez Group as a device for the purpose of defrauding others,

6               including Cross-Complainants;

7            b) The Cinco/PCI Group and Hernandez Group exercised dominion and control

8               over the finances of Cinco and Highfive and treated Cinco's and Highfive's

9               finances as their own;

10           c) The Cinco/PCI Group and Hernandez Group used the corporate forms of Cinco

11              and Highfive for their own purposes as though they were their own, and did not

12              follow proper corporate formalities; and

13           d) Adherence to the fiction of the separate existence of Cinco and Highfive as

14              entities distinct from the Cinco/PCI Group and Hernandez Group would permit

15              an abuse of the corporate privilege and would sanction fraud.

16       PCI

17           e) PCI was conceived, intended, and/or used by the Cinco/PCI Group and

18              Hernandez Group as a device for the purpose of defrauding others, including

19              Cross-Complainants;

20           f) The Cinco/PCI Group and Hernandez Group exercised dominion and control

21              over the finances of PCI and treated PCI's finances as their own;

22           g) The Cinco/PCI Group and Hernandez Group used the corporate form of PCI for

23              their own purposes as though it was their own, and did not follow proper

24              corporate formalities; and

25           h) Adherence to the fiction of the separate existence of PCI as an entity distinct

26              from the Cinco/PCI Group and Hernandez Group would permit an abuse of the

27              corporate privilege and would sanction fraud.

28    ///

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1    ROES 1 through 100, Inclusive

2        i)    ROES 1 through 100, inclusive, were conceived, intended, and/or used by the

3            Hernandez Group as a device for the purpose of defrauding others, including

4            Cross-Complainants;

5        j)    The Hernandez Group exercised dominion and control over the finances of

6            ROES 1 through 100, inclusive, and treated the finances of ROES 1 through 100,

7            inclusive, as their own;

8        k)    The Hernandez Group used the corporate form of ROES 1 through 100,

9            inclusive, for their own purposes as though they were their own, and did not

10           follow proper corporate formalities; and

11       l)    Adherence to the fiction of the separate existence of ROES 1 through 100,

12           inclusive, as entities distinct from the Hernandez Group would permit an abuse

13           of the corporate privilege and would sanction fraud.

14                              **GENERAL ALLEGATIONS**

15                    **Koren Brings "Potato Corner" to the United States**

16       59.    As a young teenage resident of the Philippines in the early 1990s, Koren – who was

17    then living in the Far East by virtue of his father's work for the Israeli Embassy in Manila –

18    imagined the day he could live in the United States and pursue the American dream.  And, while in

19    the Philippines, he fell in love with an icon of American culture – the french fry.  More particularly,

20    he became enamored of a seasoned french fries business known as "Potato Corner" and, as the

21    years passed, became determined to bring Potato Corner to this country.

22       60.    By 2009, Koren had realized his ambition of living and working in the United States,

23    and was a successful entrepreneur in Los Angeles.  At around that time, he met with Magsaysay,

24    the CEO of Cinco (the company that owned the Potato Corner brand) and the two ultimately agreed

25    that Koren would expand Potato Corner into the United States.  Based on that agreement, Koren –

26    through NKM – came to open his first Potato Corner store in Santa Anita, California in or about

27    February 2010.

28

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**Amir Jacoby Becomes a Non-Managing Investor in the Franchisees Controlled by Koren**
**Based on an Agreement to Fund 100% of Koren's Capital Contributions**

61.     NKM was formed to manage and control the first Santa Anita location of Potato Corner. Koren owns a majority stake in NKM and he has always been and continues to be its managing member. Amir Jacoby now owns approximately 40% of the membership in NKM (which was originally 25.75%), though he acquired that minority interest only after inducing Koren to transfer to him that stake on a promise that he – Amir Jacoby – would fund 100% of Koren's required capital contributions in NKM and likewise fund Koren's participation in any future Potato Corner franchises. The specific terms of the agreement provided that Messrs. Koren and Jacoby would solicit future Potato Corner franchises and, where successful, each would acquire an equal share in the franchises so long as Amir Jacoby funded all of Koren's required capital contributions (the "Jacoby-Koren Agreement"). Koren would, in return, devote his time and expertise to managing the franchises and maximizing their profitability. Amir Jacoby would provide the initial financial support, in other words, and Koren would furnish the sweat equity and know-how necessary to generate profit.

62.     With some exceptions (discussed below) and for nearly a decade, Koren and Amir Jacoby complied and conducted themselves in accordance with the Jacoby-Koren Agreement. As effectively the "sweat equity" partner, Koren always managed, controlled, and operated all of the NKM/JK Entities.

**Cinco Enters into a Joint Venture Agreement for Koren's Group to Exclusively Manage and**
**Facilitate – as Franchisors – the Opening of other Potato Corner Stores/Franchisees in the**
**United States and Israel**

63.     In building on the momentum generated from the opening of Potato Corner's first American franchise, Koren and a group composed of Cinco and its shareholders known as the "Cinco Group" decided to joint venture concerning the budding Potato Corner business. Specifically, Koren and Koren's group (Koren, Jacoby, et al.) known as the "LA Group", on the one hand, and the Cinco Group, on the other hand, entered into a joint venture agreement in or around 2009 or 2010 that later came to be memorialized in writing as the "Potato Corner USA Joint

1 Venture Agreement" (the "JV Agreement"). A true and correct copy of the JV Agreement is
2 attached hereto as **Exhibit "B"** and incorporated by reference herein.

3       64.     In negotiations leading up to PCJV formation, it was first agreed that the LA Group
4 was going to hold the 60% equity stake in PCJV and that it – the LA Group – would hold 4 of the 7
5 seats on the PCJV board (roughly equal to its 60% stake). Ultimately, Magsaysay and the Cinco
6 Group made certain promises and representations, including that Koren would ultimately become
7 the CEO and owner of Cinco and he or his group would eventually come to control 100% of Cinco
8 (which Magsaysay repeated from time to time over the course of several years). Each of those
9 promises and representations proed later to be false and fraudulent and were made in large part to
10 induce the LA Group to part with 20% of the 60% of its promised equity allocation, such that the
11 final agreed-to equity allocation turned out to be Cinco Group (60%) and LA Group (40%). Thus,
12 under the JV Agreement, the Cinco Group and the LA Group agreed to form a limited liability
13 company (PCJV) with membership divided between the Cinco Group, at 60%, and the LA Group,
14 at 40%.

15       65.     The governance of PCJV was subject to certain terms and conditions, including
16 (among other things): (a) a prohibition on the transfer or assignment of rights, obligations, or equity
17 interests without consent; (h) the granting of rights of first refusal with respect to the sale or transfer
18 of any membership interests; (c) the vesting of governing decisions in a board of 7 "managers" or
19 "members" or "member interests" (those terms are used interchangeably in the parties' governing
20 contractual documents) to be composed of 4 managers/members selected by the Cinco Group and 3
21 managers/members selected by the LA Group; and (d) the designation that the LA Group would
22 always hold a presidency position in the company and would manage the company through a
23 Master Services Agreement. Magsaysay and the Cinco Group specifically insisted on the inclusion
24 of the prohibition on transfer and the right of first refusal provisions so that they would be assured
25 that they would be solely dealing with the LA Group and, by corollary, the LA Group would solely
26 be dealing with the Cinco Group.

27       66.     In accordance with those terms, the LA Group initially designated Amit Nemanim
28 ("Nemanim"), Koren, and Amir Jacoby as its 3 managers/members charged with voting on

3818668.1
22

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  particular matters in PCJV. At some point thereafter, however, and as discussed below, Nemanim
2  left the business to pursue other opportunities, leaving an opening in the PCJV presidency position
3  (Nemanim was its original President in name) and in the LA Group's 3 designated voting
4  representatives. On or about October 16, 2012, PCJV held a board meeting addressing Nemanim's
5  departure and it was agreed then that Koren would formally replace Nemanim as PCJV's President
6  and that a 75% vote of the 7 managers/members would thereafter be required to replace the CEO,
7  President, Treasurer, and Corporate Secretary. The parties settled on this 75% requirement to
8  protect both sides, and to be sure that 6 of 7 supermajority manager/member votes would be needed
9  to replace specifically designated high-level officers. A true and correct copy of PCJV's Board
10 Meeting Minutes of October 16, 2012[4] (the "October 2012 Minutes") is attached hereto as **Exhibit**
11 **"C"** and incorporated by reference herein.

12     67.     The next day, October 17, 2012, the JV Agreement was amended and, while a
13 substantial majority of its terms and conditions remained intact, the amendment made certain
14 material changes to the pre-existing agreement, including that: (a) Cross-Defendant PCI would
15 replace Cinco as a joint venturer and the Cinco Group would become known as the "PCI Group"[5];
16 (b) any change in the company's executive officers (President, Corporate Secretary, and Treasurer)
17 would require the 75% supermajority vote of the 7 managers/members noted above; and (c) Koren
18 would be the President of the company. A true and correct copy of the First Amendment to the JV
19 Agreement is attached hereto as **Exhibit "D"** and incorporated by reference herein.

20     68.     Cross-Complainants are informed and believe, and thereupon allege, that tDLA
21 Piper (and Olivas in particular) handled the transactional paperwork for PCJV. In addition to
22 preparing the JV Agreement and, upon information and belief, the First Amendment to the JV
23 Agreement, DLA Piper incorporated PCJV in Delaware on or about July 16, 2010 and registered it

24

---

25  [4] There appears to be a typographical error in the October 2012 Minutes showing "October 16,
26  2013" as the date of the meeting. Cross-Complainants are informed and believe, and thereupon
    allege that the actual meeting occurred in October 2012.

27  [5] However, the parties continued to refer to the "PCI Group" as the "Cinco Group" and treated the
28  Cinco Group as the effective owners of the 60% stake in PCJV.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  in California on or about November 2, 2010. The firm also prepared at some point thereafter – but

2  before the First Amendment to the JV Agreement – PCJV's Limited Liability Company Agreement

3  (the "LLC Agreement"), a true and correct copy of which is attached hereto as **Exhibit "E"**[6] and

4  incorporated by reference herein. For purposes of this Cross-Complaint, the JV Agreement

5  (Exhibit "B"), the October 2012 Minutes (Exhibit "C"), the First Amendment to the JV Agreement

6  (Exhibit "D"), and the LLC Agreement (Exhibit "E") will be collectively referred to as the "PCJV

7  Governing Documents". As the Court has found, however, the First Amendment to the JV

8  Agreement (Exhibit "D") modified all prior agreements and constitutes the operative agreement

9  governing PCJV's affairs.

10                                   **The LA Group is Formed**

11         69.     For purposes of holding a membership interest in PCJV and carrying out the LA

12  Group's obligations, Koren, Amir Jacoby, and Nemanim formed a partnership named "PCJV-LA

13  Group", which was later converted to PC LA Group. Initially, Koren and Nemanim held equal

14  38% shares in the LA Group with Amir Jacoby holding 24%. But Koren and Amir Jacoby

15  eventually acquired Nemanim's interest in the LA Group, resulting in Koren holding a 61.3%

16  membership interest and Amir Jacoby retaining the remaining 38.7%.[7] Those percentage interests

17  aside, Koren exclusively manages, controls, and operates PC LA Group. PC LA Group governs

18  itself in accordance with a "Partnership Agreement", a true and correct copy of which is attached

19  hereto as **Exhibit "F"** and incorporated by reference herein.

20         70.     With Nemanim leaving the LA Group to pursue other ventures, Amir Jacoby

21  approached Koren and insisted that Inbal Jacoby (Amir Jacoby's wife) replace Nemanim as a

22  voting representative of PC LA Group on the PCJV board of 7 managers/members. Koren, desiring

23  to maintain harmony within the group, reluctantly obliged, though he was and remained concerned

24  ────────────────

25  [6] Although the signature page of the LLC Agreement bears a note indicating a November 30, 2010
   date, Cross-Complainants do not at present recall when the LLC Agreement was executed. The
26  same goes for the JV Agreement which is undated.

27  [7] Amir Jacoby has recently contended that the equity interests in PC LA Group were modified to
   50/50, but this contention is not borne out by the evidence. While the two had certain negotiations
28  to modify the equity interests, no agreement ever came from it.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1   about the effort to force Inbal Jacoby – who'd had no previous high-level involvement in the
2   business between Messrs. Koren and Jacoby – into a voting role. But given that Koren, as the
3   managing member of PC LA Group, could always replace PC LA Group's voting representatives in
4   PCJV if the need ever arose, he ultimately decided to accommodate the request.

5               **PCJV Enters into a Master Services Agreement with the LA Group**

6          71.     On or about June 18, 2012, in accordance with the PCJV Governing Documents,
7   PCJV entered into a Master Services Agreement with the LA Group. The Master Services
8   Agreement obligates the LA Group to, among other things, "[c]onduct management, operations,
9   marketing, establishment, maintenance, licensing and sub-licensing activities with respect to the
10  Potato Corner outlets/stores in the Territory". A true and correct copy of the Master Services
11  Agreement is attached hereto as **Exhibit "G"** and incorporated by reference herein.

12            **Amir Jacoby Reneges on the Jacoby-Koren Agreement; Koren Appeases Him**

13         72.     As is frequently the case in any start-up business, the initial Potato Corner franchises
14  took time to reach profitability, and a few even failed. That said, there was nothing unusual about
15  that inevitable reality and, despite facing the typical challenges of a new business, these franchises
16  each demonstrated a likelihood of long term success. But Amir Jacoby was impatient and, over
17  time, grew irrationally concerned about his investment. Unable to accept the natural vicissitudes of
18  the start-up economy – to which he'd knowingly volunteered to subject himself when he entered the
19  Jacoby-Koren Agreement – he suddenly, unilaterally and without discussion or consent decided to
20  convert the capital contributions he was making on Koren's behalf into specific loans to be repaid
21  by Koren. That he had no right to convert equity into debt, under the Jacoby-Koren Agreement, or
22  otherwise, is axiomatic. But it was also profoundly unfair to Koren, since Amir Jacoby initially
23  induced Koren to give him (Jacoby) an equity stake in NKM and on future businesses on the
24  material condition that Amir Jacoby would fund Koren's capital contributions (without expectation
25  of repayment).

26         73.     Even under these inequitable circumstances, however, Koren continued trying to
27  accommodate Amir Jacoby. Thus, in an effort to avoid conflict and allay Amir Jacoby's concerns,
28  Koren began advancing some payments to Amir Jacoby in or about 2015 with the understanding

3818668.1                                    25
                    VERIFIED FIRST AMENDED CROSS-COMPLAINT

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  that the two would later sit down to discuss their specific business arrangement – that included

2  whether a modification to the Jacoby-Koren Agreement could be reached. Amir Jacoby accepted

3  these payments on the express understanding that they were a mere accommodation by Koren, and

4  that any long-term revisions to their relationship would need to be negotiated. And while

5  negotiations and several discussions in fact ensued over the course of the next couple of years, no

6  modification to the Jacoby-Koren Agreement was ever reached.

7  **Cinco Group Transfers Majority Ownership to the Hernandez Group in Derogation of the**

8  **PCJV Governing Documents**

9  74.  The perfidious unraveling of the parties' agreements, and the systematic campaign to

10  deprive Koren of his contractual and legal rights, began accelerating in late 2017. Cross-

11  Complainants are informed and believe, and thereupon allege, that in 2017, the Cinco Group

12  transferred 55% of its holdings and rights in Cinco to the Hernandez Group. That transfer violated

13  the PCJV Governing Documents, in that it was undertaken without the consent of the LA Group

14  and without first offering Koren or the LA Group a right of first refusal. And though the PCJV

15  Governing Documents prohibit precisely this form of transfer as a means of ensuring that the

16  parties are dealing with business partners who they know and trust, the Cinco Group disregarded

17  that prohibition, and its corollary obligation to honor the Governing Documents, in effectuating this

18  transfer of interest and power.

19  75.  Cross-Complainants are further informed and believe, and thereupon allege, that at

20  some point after or contemporaneous with the Cinco Group transferring a majority ownership stake

21  to the Hernandez Group, the Cinco Group replaced three of its PCJV voting representatives on the

22  PCJV board of 7 members/managers with members of the Hernandez Group, who eventually were

23  purportedly given officerial, directorial, and/or managerial positions in PCJV.

24  **Amir Jacoby Withdraws Money From the JK Entities Without Authorization**

25  76.  By 2015, and largely because of Koren's efforts, the Potato Corner business was

26  accelerating at a rapid pace in the United States. By early 2018, PCJV had contractual relationships

27  with at least 60 stores in the United States (which relationships Koren was actively managing on

28  behalf of PCJV and its affiliate business, PCI Trading) with many more in the pipeline. In addition,

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3818668.1                                        26

1  at the same time, Koren was actively managing and operating not only the LA Group, but also the
2  NKM/JK Entities, which comprise 8 franchisee businesses and a consulting business.

3      77.     While business and profitability was increasing (along with the attendant work for
4  those responsible for the various business' management, particularly Koren), Koren's compensation
5  – well below market – largely remained the same. This state of affairs was unfair and improper,
6  particularly given that Koren had devoted inordinate time and energy to the Potato Corner
7  franchises and he, more than any other party, was responsible for their gathering success. Having
8  declined market compensation for years, he rightly believed the circumstances now demanded an
9  increase in pay that would at least approximate what the market would bear for the services he was
10 providing. After studying comparable salaries of similarly situated high-level executives and given
11 the business conditions existing at that time as well as Koren's past efforts, Koren informed Amir
12 Jacoby that he would be increasing his total compensation of roughly $225,000 per year ($120,000
13 in salary and approximately $105,000 in distributions) to $300,000. Based on that management
14 decision (which decision Koren was charged with making), Koren began drawing an additional
15 salary. Even that increase nonetheless left Koren below the similarly situated executives whose
16 compensation he had studied, merely underscoring the extent to which he had been underpaid to
17 that point.

18     78.     Amir Jacoby saw a personal opportunity in Koren's desire to adjust his
19 compensation to something approaching market, regardless of its obvious market justification and
20 its inherent reasonableness. He (Jacoby) unilaterally decided (without legitimate justification or
21 authority) that he would begin to draw an additional $15,000 per month. This, despite the fact that
22 he was already drawing a salary as well as receiving monthly distributions from the businesses
23 notwithstanding that he did not participate in management, and that Inbal Jacoby was also drawing
24 a salary from the business of $60,000 per year as a part-time employee. Cross-Complainants are
25 informed and believe, and thereupon allege, that Amir Jacoby unilaterally and unlawfully withdrew
26 $37,500 (in two $15,000 and $22,500 withdrawal transactions) on or about February 22, 2018 from
27 PC LA Group's bank account, $3,600 (in equal $1,800 withdrawal transactions) on or about March
28 2, 2018 from JK Consultants' bank account, $4,000 on or about March 9, 2018 from JK

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1   Consultants' bank account, and $10,000 on or about March 9, 2018 from PC LA Group's bank
2   account (the "Unauthorized Jacoby Withdrawals").

3   **Koren Changes the PCJV Banking Relationship from Wells Fargo to Chase in Order to**
4   **Safeguard PCJV's Funds, But Returns the Money to Wells Fargo After Receiving Sufficient**
5   **Assurances from the Cinco Group**

6   79.    On or about March 26, 2018, in an effort to safeguard PCJV's funds from Amir
7   Jacoby's continuing raid, Koren transferred PCJV's bank accounts from Wells Fargo to J.P.
8   Morgan Chase Bank. Koren contemporaneously called Magsaysay of the Cinco Group to inform
9   him of the reasons for the transfer and to reassure him that the new accounts would be established
10  in the same entity names and that the Cinco Group will obtain full access to the new accounts.

11  80.    On or about April 3, 2018, Koren sent Magsaysay a letter memorializing the
12  discussion they had regarding the account transfers and the reasons why Koren had to take the
13  action he did. Koren offered to return the funds to Wells Fargo should Cinco Group insist that it be
14  done with the full understanding and assumption of risk underlying Amir Jacoby's unauthorized
15  transfers. A true and correct copy of the April 3, 2018 letter is attached hereto as **Exhibit "H"** and
16  incorporated by reference herein.

17  81.    That transparency unfortunately did not induce the Cinco Group into conducting
18  itself with integrity, or in compliance with the parties' agreements. Instead, the Cinco Group
19  insisted – following the April 3, 2018 letter – that the money be transferred back to Wells Fargo.
20  Koren, again accommodating a predatory partner, agreed to return the money to Wells Fargo
21  provided that the Cinco Group would monitor the accounts to protect against any unauthorized
22  transfers by Amir Jacoby and take action against Amir Jacoby if that became necessary. Cinco
23  Group agreed to this condition and Koren then immediately returned the money to Wells Fargo.

24  **Cross-Defendants Attempt to Vote Koren Out as the LA Group's Voting Representative and**
25  **as President of PCJV**

26  82.    On or about March 27, 2018, Magsaysay called a member's meeting to occur on
27  April 9, 2018 purportedly to address a variety of matters including the election of the directors and
28

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  officers for PCJV. A true and correct copy of Magsaysay's meeting request is attached hereto as
2  **Exhibit "I"** and is incorporated by reference herein.

3      83.  Unbeknownst to Koren, Cross-Defendants were actively conspiring together to vote
4  Koren out of the business, Koren consequently appeared at the April 9, 2018 meeting intending to
5  discuss the various agenda items in Magsaysay's March 27 email (Exhibit "I"). But Koren soon
6  discovered that he was in for an ambush that became clear when members of the Cinco Group and
7  members of the Hernandez Group (who were never authorized by the LA Group to be a voting
8  member in PCJV), and the Jacobys, including Inbal Jacoby (who stopped working for the company
9  in March 2018), purportedly voted to remove Koren as a manager and officer in PCJV. All of this
10  was done over Koren's objection and Cross-Defendants' refusal to allow Koren to appoint new
11  voting representatives for the LA Group.

12                      **Cross-Defendants Ambush Koren and PCJV Employees**

13      84.  The following day, April 10, 2018, Victor, the Jacobys, and at least one attorney
14  consolidated the ambush, arriving at PCJV's offices and demanding that PCJV staff accede to a
15  transition of power and claiming that Koren no longer had any power or control over any business
16  matters whatsoever. Koren arrived later and objected to those Cross-Defendants' unannounced
17  visit and blatant efforts to interfere with Koren's management and operations of the business.

18      85.  Cross-Complainants are informed and believe, and thereupon allege, that on that
19  same day (on April 10, 2018), Cross-Defendants (through DLA Piper) initiated this litigation while
20  contemporaneously seeking *ex parte* relief for a TRO/OSC along with other requests for relief
21  which were all denied. No party ever gave Koren advance notice of the lawsuit or the *ex parte*
22  application. And the timing of the lawsuit and extensive briefing that was prepared and ready to be
23  filed the very morning after the April 9, 2018 meeting merely serves to confirm that Cross-
24  Defendants had conspired in a premeditated scheme to oust Koren and ambush him on April 10,
25  2018 in an extreme show of force.

26      86.  That same day, April 10, 2018, DLA Piper also sent a cease and desist letter to
27  Koren contending that "a meeting of the Managers was held on April 9, 2018, during which the LA
28  Group and Guy Koren were removed from management by a majority vote (85%) of the Managers

3818668.1

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  and Membership interests." The reference to 85% could only refer to Cinco's purported position
2  that 6 out of 7 voting representatives in PCJV voted to oust Koren. A true and correct copy of DLA
3  Piper's April 10, 2018 letter is attached hereto as **Exhibit "J"** and incorporated by reference herein.

4       87.    Koren responded to the April 10, 2018 letter asserting his position as to why the
5  April 9, 2018 vote was improper insofar as it was improperly noticed and that Koren's request to
6  appoint new LA Group voting representatives was ignored. Koren also asserted his position as to
7  why the grounds for the purported termination were baseless and appeared to be a pretext.
8  (Additionally, the propriety and effectiveness of votes by members of the Hernandez Group was
9  and still is in question.)

10  **Mired by the Ineffective and Improper First Vote, Cross-Defendants Attempt to Vote Koren**
11  **out a Second Time**

12       88.    Cross-Defendants eventually conceded that they had no proper grounds to remove
13  Koren as a voting representative of the LA Group or to dictate who the LA Group designates as its
14  3 voting managers/members in PCJV. Therefore, Cross-Defendants assented to Koren's replacing
15  Amir Jacoby and Inbal Jacoby as voting representatives of the LA Group with Alon Koren and
16  Hodgson.

17       89.    On or about Friday, April 20, 2018, DLA Piper informed Koren's attorney that
18  PCJV had called another special meeting, this one to take place on Monday, April 23, 2018. Again,
19  over Koren's objections, the April 23, 2018 meeting proceeded with Cross-Defendants and the new
20  LA Group voting representatives appearing. The new LA Group voting representatives voted
21  against the initiative to remove Koren as an officer of PCJV. Despite that, and despite the fact that
22  a 75% vote (at least 6 of 7) was necessary to remove Koren as an officer of PCJV, the purported
23  Chairman (Hernandez) and DLA Piper partner, Mr. Robert W. Brownlie, as Acting Secretary –
24  Mr. Brownlie was formerly lead litigation counsel for Cinco in this litigation – erroneously and
25  improperly concluded that enough votes were cast to remove Koren from his officerial role in the
26  company. A true and correct copy of the April 23, 2018 Meeting Minutes is attached hereto as
27  **Exhibit "K"** and incorporated by reference herein.

28  / / /

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**Cross-Defendants Terminate the Master Services Agreement**

90.    In conjunction with the April 23, 2018 meeting, Cross-Defendants apparently also voted to terminate the Master Services Agreement and/or a "Services Agreement" dated January 1, 2017. The Master Services Agreement itself dictates when it could be terminated only: (a) upon mutual written agreement; or (b) upon breach unless cured within 20 days from the date of the breach. But, there was never a mutual written agreement to terminate the Master Services Agreement here, nor was there a breach of it. Even if it can be said that there was a breach, any such alleged breach was cured. Therefore, Cross-Defendants had no justification for terminating the Master Services Agreement or any Services Agreement.

**Cross-Defendants Audaciously Agree to Change PCJV's Banking Relationships From Wells Fargo to Citibank**

91.    In the wake of Cross-Defendants' vigorous objections to Koren changing PCJV's banking relationship to safeguard those funds from Amir Jacoby and using that episode as a pretext for purportedly removing Koren, Cross-Defendants purportedly voted – at the same April 23, 2018 meeting – to change PCJV's banking relationship from Wells Fargo to Citibank and authorized one another (including Olivas) to be the signatories on the new accounts (at the exclusion of Koren and the LA Group).

**Cross-Defendants Publicly Inform Franchisees and Staff about the Purported Removal of Koren in an Overt Attempt at Interference and Disparagement**

92.    Following the April 9, 2018 meeting and continuing after the April 23, 2018 meeting, Cross-Defendants set out on a crusade to publicly disparage Koren and cast doubt on his authority and role in PCJV. In one example, Cross-Defendants sent a letter to Garcia (who works for PCJV) to inform her that Koren was removed as a manager and President "due to his breach of his fiduciary and contractual duties to PCJV and its Members." The letter states that the authorized representatives for PCJV are now Inbal Jacoby, Victor, and Olivas. Cross-Complainant is informed and believes and thereon alleges that Cross-Defendants sent similar letters to other staff members and third parties. A true and correct copy of the letter to Ms. Garcia is attached hereto as **Exhibit "L"** and incorporated by reference herein.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1      93.    In yet another example of Cross-Defendants' tortious behavior, on or about April 26,

2  2018, Cross-Defendants sent a letter to a franchisee in Seattle claiming that Koren had been

3  removed as President of PCJV on April 23, 2018 and that "[t]hese actions were undertaken with the

4  support of PCJV's majority owner, Cinco Corporation, through its wholly-owned subsidiary, Potato

5  Corner International". Cross-Complainants are informed and believe, and thereupon allege, that

6  Cross-Defendants sent similar letters to other franchisees and third parties. A true and correct copy

7  of the April 26, 2018 letter is attached hereto as **Exhibit "M"** and incorporated by reference herein.

8      94.    To make matters even worse, Cross-Defendants conspired with one another to

9  remove Koren from PCJV's office and warehouse, and to discontinue Koren's official Potato

10  Corner USA email access (along with the email access of third parties whom Cross-Defendants

11  presumably view as being loyal to Koren), thus further disrupting Koren's and the LA Group's

12  ability to manage PCJV and comply with its duties.

13  **Cross-Defendants File Suit on Behalf of PCJV Against Koren, Alon Koren, Hodgson, Garcia,**

14                       **and Grudnowski**

15      95.    On May 8, 2018, before any Court Order determining the efficacy of Cross-

16  Defendants' removal of Koren from PCJV or assessing whether Cross-Defendants were somehow

17  permitted to act or file suit on behalf of PCJV, Cross-Defendants separately filed a lawsuit on

18  behalf of PCJV against Koren, Alon Koren, Hodgson, Garcia, and Grudnowski (Case No.

19  BC705580) (hereinafter, the "Cinco-PCJV Action"). In that action, Cross-Defendants contended,

20  among other things, that the defendants converted PCJV's bank accounts for their own use.

21  **The Court Ultimately Unravels Cross-Defendants' Nefarious Plan; in the Meantime, Cross-**

22  **Defendants Unlawfully and Improperly Access Cross-Complainants' Confidential Documents**

23      96.    On the morning of May 10, 2018, shortly before 5 a.m. (so as to ensure that the

24  parties located in the Philippines obtain timely notice), Koren gave notice of his intent to seek *ex*

25  *parte* temporary restraining order/injunctive relief addressing Cinco's (and those participating with

26  Cinco's) improper and unlawful conduct. Not to be outdone, 5 hours later, Cinco (through DLA

27  Piper) provided competing notice of their intent to seek injunctive relief in both the Cinco-PCJV

28

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3818668.1                32

1  Action and this action. Because of certain procedural improprieties underlying their application in

2  the Cinco-PCJV Action, the Court did not address the application brought in that case.

3      97.    At the outset, the Court – facing a heavy volume of pleadings and other submissions

4  – issued temporary restraining order relief to both sides so as to, in the Court's belief, preserve the

5  status quo. Then, following weeks of additionally extensive briefing and argument, the Court

6  issued a tentative ruling, on June 6, 2018, in Koren's favor and against Cinco. In the face of

7  pleading from Cinco's counsel, the Court allowed further evidentiary submissions and took the

8  matter under submission.

9      98.    Cross-Complainants are informed and believe, and thereupon allege, that

10  immediately after they received a copy of the tentative ruling, Cross-Defendants engaged in a

11  campaign to copy confidential and non-confidential records maintained at PCJV's office (including

12  confidential records of PC LA Group and the NKM/JK Entities, among others) and, upon

13  information and belief, deleted and disposed of relevant evidentiary documents, all the while having

14  access to and accessing various email accounts of Cross-Complainants.

15     99.    On or about June 18, 2018, the Court entered its final Preliminary Injunction in favor

16  of Koren. *See* Exhibit "A". It took several days for Cross-Defendants to comply with the

17  Preliminary Injunction, however, i.e., by restoring email access to Koren and his group. Cross-

18  Complainants are informed and believe, and thereupon allege, that even after the Court entered the

19  Preliminary Injunction, Cross-Defendants continued to access Cross-Complainants' confidential

20  information and engaged in various suspicious activities relating to Cross-Complainants' email

21  accounts, among other things.

22  **Cross-Defendants Embark on a Campaign of Retaliation, Sabotage, and Interference**

23     100.   Having lost the Preliminary Injunction, Cross-Defendants -- while conscious of the

24  injunction against them – set their sights on ways to retaliate, sabotage, and undermine Cross-

25  Complainants' efforts in the United States so as to manufacture arguments in this litigation that

26  Cross-Complainants' conduct and/or performance was and is somehow subpar. In one instance, on

27  or about August 31, 2018, Cross-Defendants, through Highfive, sent notice to PCI Trading that

28

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3818668 1                              33

1    effective September 1, 2018, there will be a "new price for all Potato Corner Products that we

2    supply to you." The price sheet attached to the notice reflects a *300% increase* in prices.

3          101.    This unilateral, unauthorized and transparently retaliatory price increase on goods

4    that PCJV and PCI Trading had been purchasing from the Cinco Group for years departs from a

5    longstanding agreement that the goods will be sold to PCJV and PCI Trading at cost. Having failed

6    to remove Koren through a Court order, Cross-Defendants are now plainly attempting to facilitate

7    the same result through economic warfare and ambush, actions that violate the Preliminary

8    Injunction.

9          102.    In further attempts of sabotage, Cross-Defendants continue to run promotions and

10   marketing schemes in the United States without Cross-Complainants' knowledge or consent,

11   leading to confusion in the marketplace and various other harm to the United States' operations and

12   its franchisees. Furthermore, Cross-Defendants lay claim to funds held in bank accounts belonging

13   to PCI Trading and refuse to return those funds. They also maintain an office in the United States –

14   which they leased on behalf of PCJV – that can only be viewed as an unfair and improper effort to

15   compete with Cross-Complainants.

16                              **FIRST CAUSE OF ACTION**

17                              **(CONSPIRATORIAL FRAUD)**

18   **By All Cross-Complainants Against All Cross-Defendants and ROES 1 through 250,**

19                              **Inclusive**

20         103.    Cross-Complainants re-allege and incorporate herein by this reference all previous

21   allegations as though set forth herein in full.

22         104.    While Cross-Complainants are still ignorant of the specific details of the

23   conspiratorial conduct by Cross-Defendants and ROES 1 through 250, inclusive, directed at Cross-

24   Complainants, Cross-Complainants allege that the following acts of fraud are actionable:

25                a)  The Cinco/PCI Group's agreement with the Hernandez Group to sidestep the

26                    rights afforded to Koren and his group concerning the restriction on transfer and

27                    right of first refusal provisions contained in the PCJV Governing Documents

28                    (hereinafter, "Conspiracy No. 1").

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3818668.1
VERIFIED FIRST AMENDED CROSS-COMPLAINT

1  b) The Cinco Group's formation of PCI and the PCI Group's claimed ownership of

2    PCJV as an artifice to avoid the restriction on transfer and right of first refusal

3    provisions contained in the PCJV Governing Documents (hereinafter,

4    "Conspiracy No. 2").

5  c) The Cinco/PCI Group's, Hernandez Group's, and the Jacobys' collective

6    agreement to default from the agreement to provide PC LA Group 100%

7    ownership of PCJV and entry into a Master License Agreement (hereinafter,

8    "Conspiracy No. 3").

9  d) The Cinco/PCI Group's, Hernandez Group's, and the Jacobys' collective

10    agreement to remove Koren as President of PCJV and as a manager, to interfere

11    with his business activities, as well as the activities of the other Cross-

12    Complainants (hereinafter, "Conspiracy No. 4").

13  e) The Cinco/PCI Group's, Hernandez Group's, and Highfive's collective

14    agreement to retaliate against Koren and undermine Cross-Complainants'

15    business efforts in the United States in tripling the prices of Potato Corner

16    products to the United States (hereinafter, "Conspiracy No. 5"). (Conspiracy No.

17    1 through Conspiracy No. 5 are hereinafter referred to collectively as the

18    "Conspiracies" and each a "Conspiracy".)

19  105. Cross-Complainants allege that each of the above Conspiracies was entered into

20 with the full knowledge, intent, and cooperation of the Cross-Defendants involved in each

21 Conspiracy, as alleged above, with the intent to cause Cross-Complainants damage.

22  106. Cross-Complainants allege that as a result of the Conspiracies, Cross-Complainants

23 have been damaged in an amount according to proof and further allege that equitable remedies,

24 including the remedy of rescission, are appropriate under the circumstances. Indeed, among other

25 things, Cross-Complainants specifically request that the Cinco-Hernandez Transaction be rescinded

26 and that the 55% of shares of Cinco purchased by the Hernandez Group be equitably transferred in

27 a manner benefitting Koren and/or PC LA Group as the parties whose right of first refusal

28 contractual rights were violated as a result of the Conspiracies.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3818668.1    35

1    107.    Cross-Complainants further allege that in doing the things described above, Cross-

2    Defendants, and ROES 1 through 250, inclusive, and each of them acted with the intent to deprive

3    Cross-Complainants of their legal rights and to injure them such that Cross-Defendants' actions

4    constitute fraud, oppression, or malice within the meaning of Civil Code § 3294. Cross-

5    Defendants' conduct was and continues to be despicable, oppressive, and outrageous, justifying the

6    imposition of punitive and exemplary damages against Cross-Defendants, and ROES 1 through

7    250, inclusive, to make an example of Cross-Defendants and to deter such conduct in the future in

8    an amount that proof at trial may indicate is appropriate.

9                                    **SECOND CAUSE OF ACTION**

10                                    **(BREACH OF WRITTEN CONTRACT)**

11    **By PCJV, PCI Trading, PC LA Group, and Koren Against Cinco/PCI Group and ROES 251**

12                                    **through 300, Inclusive**

13    108.    Cross-Complainants re-allege and incorporate herein by this reference all previous

14    allegations as though set forth herein in full.

15    109.    As alleged above, the PCJV Governing Documents contain, among other things,

16    restriction on transfer and right of first refusal provisions. Cross-Complainants allege that the

17    Cinco/PCI Group breached those provisions in 2017 when they caused 55% of Cinco's shares to be

18    transferred to the Hernandez Group.

19    110.    On or about April 9, 2018, the Cinco/PCI Group further breached the PCJV

20    Governing Documents when they purportedly vote to remove Koren as a manager and officer

21    without the required votes.

22    111.    On or about April 23, 2018, the Cinco/PCI Group further breached the PCJV

23    Governing Documents by again purportedly voting to remove Koren as an officer without the

24    required votes.

25    112.    Further, Cross-Complainants allege that although the parties to the PCJV Governing

26    Documents always intended for ingredients and products be sold at cost and without profit by the

27    Cinco/PCI Group to PCJV and PCI Trading, on or about December 19, 2017, the provisions of the

28    PCJV Governing Documents were modified for the benefit of PCJV and PCI Trading such that it

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  was made clear that ingredients and products would be sold at cost and that PCJV and PCI Trading

2  may purchase those ingredients and products directly from the supplier.

3      113.    However, on or about August 31, 2018, the Cinco/PCI Group breached the PCJV

4  Governing Documents by tripling the price of ingredients and products to be sold to PCJV and PCI

5  Trading by their own alter-ego company, Highfive.

6      114.    Cross-Complainants allege that the breaches of the PCJV Governing Documents

7  caused Cross-Complainants harm.

8      115.    Cross-Complainants allege that they have performed all of the conditions of the

9  PCJV Governing Documents that are required to be performed by Cross-Complainants and that

10  Cross-Complainants remain ready and willing perform all of the terms of the PCJV Governing

11  Documents in order for the Court to order the specific performance of the right of first refusal

12  provisions contained in the PCJV Governing Documents, such that the 55% of shares of Cinco

13  purchased by the Hernandez Group be equitably transferred in a manner benefitting Koren and/or

14  PC LA Group as the parties whose right of first refusal contractual rights were violated. Specific

15  performance in this respect is required as money damages are inadequate for the breach of the

16  restriction on transfer and right of first refusal provisions.

17      116.    As a result of the above breaches, Cross-Complainants are entitled to damages at an

18  amount in accordance to proof and other equitable or legal remedies, including specific

19  performance.

20                          **THIRD CAUSE OF ACTION**

21                          **(ANTICIPATORY REPUDIATION)**

22  **By PC LA Group and NKM/JK Entities Against Cinco/PCI Group and ROES 251 through**

23                          **300, Inclusive**

24      117.    Cross-Complainants re-allege and incorporate herein by this reference all previous

25  allegations as though set forth herein in full.

26      118.    As alleged above, PC LA Group is a party to the Master Services Agreement that

27  enables PC LA Group and the Cinco Group to split profits, if any, amongst themselves. Cross-

28  Complainants allege the parties waived respective percentage compensation under the Master

3818668 1                                    37

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  Services Agreement for operational reasons. However, the salaries of the managing officers (paid

2  through PC LA Group, but formerly paid directly by PCJV) were in place and never waived.[8]  In

3  2018, the salaries of the managing officers totaled $30,000 per month.  In 2017, the salaries of the

4  managing officers totaled $20,000 per month.[9]  Additionally, as alleged above, there is a

5  longstanding agreement among the parties that the NKM/JK Entities and any future store in which

6  Koren maintains an equity interest would be exempt from payment of any fees or royalties to PCJV.

7      119.   By their conduct, the Cinco/PCI Group have expressed an intention to anticipatorily

8  breach these agreements, and thus repudiate these agreements.

9      120.   Cross-Complainants performed all of their obligations, except as waived,

10  prevented, or excused by the acts and omissions of the Cinco/PCI Group.

11      121.   As a direct and proximate result of the foregoing anticipatory breaches of contract,

12  Cross-Complainants have sustained and will continue to sustain substantial non-economic and

13  economic injury in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION

## (FRAUDULENT INDUCEMENT)

**By PCJV, PC LA Group, Koren, and NKM/JK Entities Against Magsaysay, Cinco Group, Amir Jacoby, and ROES 301-350, Inclusive**

18      122.   Cross-Complainants re-allege and incorporate herein by this reference all previous

19  allegations as though set forth herein in full.

20      123.   As alleged above, in inducing Koren to take actions concerning the expansion of

21  Potato Corner in the United States and to reduce PC LA Group's equity interest in PCJV,

22  Magsaysay and the Cinco Group made certain promises and representations to Koren that:

23

24  [8] The salaries were in addition to PC LA Group's 30% profits interest under the Master Services
25  Agreement, which profits interests were waived by PC LA Group, and 30% licensing fees were
    waived by the Cinco Group.

26  [9] Cross-Defendants allege in their First Amended Complaint that a "Services Agreement"
27  executed by Koren and Jacoby in 2017 is fraudulent. That is far from the truth. That "Services
    Agreement" simply memorialized the payment of salaries as required by the company's auditors at
28  that time.

3818668 1                                                38

a) Koren would ultimately become the CEO and owner of Cinco and he or his group would eventually come to control 100% of Cinco (which Magsaysay repeated from time to time over the course of several years).

b) Any franchisee in which Koren maintains an interest is exempt from any fees owing to PCJV.

c) PC LA Group would be paid a management fee for its efforts in managing PCJV.

d) The Cinco Group would provide assistance to PCJV, PC LA Group, and Koren in connection with marketing, accounting, advertising, sourcing of goods, business development, strategic growth activities, franchising, legal services, training, operations, brand management, guidelines, and the like.

e) The Cinco Group would not sell, transfer, or assign any interest to any third party without consent and without offering Koren and PC LA Group a right of first refusal based on an agreed-to formula.

124.    In reliance on the foregoing representations, Koren agreed to dedicate his career and all of his efforts to Potato Corner's expansion in the United States and to reduce his group's equity percentage stake in PCJV from majority 60% to a minority 40% stake.

125.    Cross-Complainants are informed and believe, and thereupon allege, that the representations of Magsaysay and the Cinco Group in general were false and that they were made with the intent to induce and entice Koren, PCJV, PC LA Group, and the NKM/JK Entities to expand Potato Corner in the United States and for PC LA Group to reduce its equity percentage stake in PCJV. In fact, the truth was that neither Magsaysay nor the Cinco Group in general intended to follow through with their promises.

126.    Indeed, Koren, PCJV, PC LA Group, and the NKM/JK Entities were unaware of the falsity of these representations and reasonably relied on them to their detriment. Had they known the truth, they would not have agreed to dedicate their substantial time, effort, and expense to expand Potato Corner in the United States nor enter into the PCJV Governing Documents.

///

3818668 1                                         39
VERIFIED FIRST AMENDED CROSS-COMPLAINT

1    127.   As a direct and proximate result of Magsaysay's and the Cinco Group's conduct,
2    Koren, PCJV, PC LA Group, and the NKM/JK Entities have sustained and will continue to sustain
3    substantial non-economic and economic injury in an amount to be proven at trial. Koren, PCJV,
4    PC LA Group, and the NKM/JK Entities are also entitled to equitable relief addressing Cross-
5    Defendants' wrongs, including the retroactive restoration of PC LA Group's 60% equity stake in
6    PCJV.

7    128.   Koren, PC LA Group, and the NKM/JK Entities further allege that in doing the
8    things described above, Jacoby acted with the intent to deprive Koren, PC LA Group, and the
9    NKM/JK Entities of their legal rights and to injure them such that Jacoby's actions constitute
10   fraud, oppression, or malice within the meaning of Civil Code § 3294. Jacoby's conduct was and
11   continues to be despicable, oppressive, and outrageous, justifying the imposition of punitive and
12   exemplary damages against Jacoby to make an example of him and to deter such conduct in the
13   future in an amount that proof at trial may indicate is appropriate.

14   129.   In addition, Amir Jacoby induced Koren to enter into the Jacoby-Koren Agreement
15   based on the representation that Amir Jacoby would fund 100% of Koren's required capital
16   contributions in NKM and on any future franchisees that they may together open, in which future
17   franchisee businesses Koren and Amir Jacoby would each acquire an equal share so long as Amir
18   Jacoby funds all of Koren's required capital contributions.

19   130.   In reliance on the foregoing representation, Koren provided Amir Jacoby an equity
20   stake in NKM and in every other subsequent business entity in which each of them was involved,
21   including the JK Entities and PC LA Group.

22   131.   Cross-Complainants are informed and believe, and thereupon allege, that Amir
23   Jacoby's representation was false and that it was made with the intent to induce Koren to
24   relinquish certain interests in the NKM/JK Entities and PC LA Group to Amir Jacoby. In fact, the
25   truth was that Amir Jacoby did not intend to fund Koren's capital contributions or that he intended
26   to do so only under the right conditions, which were concealed from Koren.

27   132.   Indeed, Koren was unaware of the falsity of Amir Jacoby's representation and
28   reasonably relied on it to his detriment. Had Koren known the truth, he would not have

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  transferred any equity stake in any of the business to Amir Jacoby.

2  133.   As a direct and proximate result of Amir Jacoby's conduct, Koren, PC LA Group,
3  and the NKM/JK Entities have sustained and will continue to sustain substantial non-economic
4  and economic injury in an amount to be proven at trial. Koren, PC LA Group, and the NKM/JK
5  Entities are also entitled to rescission of all documents and instruments that provide for the
6  transfer of any equity interest to Amir Jacoby in any business which Koren is involved as well as
7  the retroactive restoration of Koren's respective equity stakes in said businesses.

8  134.   Koren, PC LA Group, and the NKM/JK Entities further allege that in doing the
9  things described above, Jacoby acted with the intent to deprive Koren, PC LA Group, and the
10 NKM/JK Entities of their legal rights and to injure them such that Jacoby's actions constitute
11 fraud, oppression, or malice within the meaning of Civil Code § 3294. Jacoby's conduct was and
12 continues to be despicable, oppressive, and outrageous, justifying the imposition of punitive and
13 exemplary damages against Jacoby to make an example of him and to deter such conduct in the
14 future in an amount that proof at trial may indicate is appropriate.

## FIFTH CAUSE OF ACTION

### (BREACH OF ORAL CONTRACT)

**By Koren, Hodgson, PC LA Group, and the NKM/JK Entities Against Jacoby**

18 135.   Cross-Complainants re-allege and incorporate herein by this reference all previous
19 allegations as though set forth herein in full.

20 136.   As alleged above, Koren and Amir Jacoby verbally entered into the Jacoby-Koren
21 Agreement. Amir Jacoby also entered into a similar verbal agreement with Hodgson concerning
22 the funding of Hodgson's capital contributions in the various entities in which Hodgson maintains
23 an interest as an inducement for Hodgson to become involved in this business enterprise
24 (hereinafter, the "Jacoby-Hodgson Agreement").

25 137.   Within the last two years, Amir Jacoby breached the Jacoby-Koren Agreement in
26 refusing to acknowledge his capital contribution obligations and instead insisting that Koren treat
27 such payments as loans and in other respects refusing to fund those agreed-to capital contributions
28 in the first place. Additionally, within the last two years, Amir Jacoby breached the Jacoby-

3818668 1                          41

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  Hodgson Agreement by refusing to perform his end of the bargain in breach of the Jacoby-

2  Hodgson Agreement.

3      138.    Cross-Complainants allege that PC LA Group and the NKM/JK Entities were the

4  intended third party beneficiaries to the Jacoby-Koren Agreement and the Jacoby-Hodgson

5  Agreement.

6      139.    Koren and Hodgson performed all of their obligations under the Jacoby-Koren

7  Agreement and Jacoby-Hodgson Agreement, except as waived, prevented, or excused by the acts

8  and omissions of Jacoby.

9      140.    As a direct and proximate result of the foregoing breaches of contract, Koren,

10  Hodgson, PC LA Group, and the NKM/JK Entities have sustained and will continue to sustain

11  substantial non-economic and economic injury in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION

### (BREACH OF IMPLIED-IN-FACT CONTRACT)

**By Koren, Hodgson, PC LA Group, and the NKM/JK Entities Against Jacoby**

15      141.    Cross-Complainant re-alleges and incorporates herein by this reference all previous

16  allegations as though set forth herein in full.

17      142.    The respective conduct and relationships of Koren, Hodgson, and Amir Jacoby

18  implies by law implied-in-fact contracts. The conduct of these parties, as alleged above,

19  establishes that they comported themselves under the terms of the Jacoby-Koren Agreement and

20  Jacoby-Hodgson Agreement.

21      143.    Within the last two years, Amir Jacoby breached the Jacoby-Koren Agreement in

22  refusing to acknowledge his capital contribution obligations and instead insisting that Koren treat

23  such payments as loans and in other respects refusing to fund those agreed-to capital contributions

24  in the first place. Additionally, within the last two years, Amir Jacoby breached the Jacoby-

25  Hodgson Agreement by refusing to perform his end of the bargain in breach of the Jacoby-

26  Hodgson Agreement.

27      144.    Cross-Complainants allege that PC LA Group and the NKM/JK Entities were the

28  intended third party beneficiaries to the Jacoby-Koren Agreement and the Jacoby-Hodgson

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  Agreement.

2     145.    Koren and Hodgson performed all of their obligations under the Jacoby-Koren

3  Agreement and Jacoby-Hodgson Agreement, except as waived, prevented, or excused by the acts

4  and omissions of Jacoby.

5     146.    As a direct and proximate result of the foregoing breaches of contract, Koren,

6  Hodgson, PC LA Group, and the NKM/JK Entities have sustained and will continue to sustain

7  substantial non-economic and economic injury in an amount to be proven at trial.

8                        **SEVENTH CAUSE OF ACTION**

9      **(BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)**

10   **By PCJV, PCI Trading, Koren, Hodgson, PC LA Group, and the NKM/JK Entities Against**

11          **Cinco/PCI Group, Jacoby, and ROES 251 through 300, Inclusive**

12     147.    Cross-Complainants re-allege and incorporate herein by this reference all previous

13  allegations as though set forth herein in full.

14     148.    As alleged above in the Second Cause of Action, Third Cause of Action, Fifth

15  Cause of Action, and Sixth Cause of Action, PCJV, PCI Trading, Koren, Hodgson, PC LA Group,

16  and the NKM/JK Entities were parties to or third beneficiaries of certain agreements by the

17  parties, under all of which there is an implied covenant of good faith and fair dealing.

18     149.    However, as alleged above, Cross-Defendants Cinco/PCI Group's and Amir

19  Jacoby's conduct is and continues to be in derogation of that implied covenant of good faith and

20  fair dealing.

21     150.    As a direct and proximate result of the foregoing breaches of the implied covenant

22  of good faith and fair dealing, PCJV, PCI Trading, Koren, Hodgson, PC LA Group, and the

23  NKM/JK Entities have sustained and will continue to sustain substantial non-economic and

24  economic injury in an amount to be proven at trial. As alleged above, in addition to monetary

25  damages, these parties are also entitled to other legal and equitable remedies, including rescission

26  and specific performance.

27  / / /

28  / / /

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

## EIGHTH CAUSE OF ACTION

### (BREACH OF FIDUCIARY DUTY)

**By All Cross-Complainants Against All Cross-Defendants and ROES 1 through 250 and 351 through 400, Inclusive**

151.    Cross-Complainants re-allege and incorporate herein by this reference all previous allegations as though set forth herein in full.

152.    Cross-Complainants allege that by virtue of the parties' close business ties and relationships, including the various contractual agreements entered into by the parties, i.e., the PCJV Governing Documents, the Jacoby-Koren Agreement, the Jacoby-Hodgson Agreement, the Partnership Agreement, and the Master Services Agreement, Cross-Defendants, and each of them, owed Cross-Complainants a duty to act with the utmost good faith, care, and loyalty.

153.    In engaging in the actions set forth above, including but not limited to, Cross-Defendants' attempts to remove Koren from PCJV, interfere with Koren's management and operations of PC LA Group, PCJV, and other entities, cast doubt upon Koren's authority and role in PCJV to members of the public, deprive Koren access to PCJV bank accounts, offices, and email addresses, and in Amir Jacoby's taking and converting funds from the NKM/JK Entities, the Conspiracies alleged above, and the ambush of PCJV employees, among other things, Cross-Defendants, and each of them, breached their respective fiduciary duties to Cross-Complainants, unlawfully putting their own interests ahead of Cross-Complainants' interests.

154.    As a direct and proximate result of Cross-Defendants' conduct, Cross-Complainants' have sustained and will continue to sustain substantial non-economic and economic injury in an amount to be proven at trial.

155.    Cross-Complainants further allege that in doing the things described above, Cross-Defendants, and each of them acted with the intent to deprive Cross-Complainants of their legal rights and to injure them such that Cross-Defendants' actions constitute fraud, oppression, or malice within the meaning of Civil Code § 3294. Cross-Defendants' conduct was and continues to be despicable, oppressive, and outrageous, justifying the imposition of punitive and exemplary damages against Cross-Defendants to make an example of Cross-Defendants and to deter such

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-8100

3818668 1

44

1 conduct in the future in an amount that proof at trial may indicate is appropriate.

2 ## NINTH CAUSE OF ACTION

3 ## (INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS)

4 **By PCJV, PCI Trading, Koren, Hodgson, PC LA Group, and the NKM/JK Entities Against**

5 **All Cross-Defendants, and ROES 1 through 400, Inclusive**

6 156. Cross-Complainants re-allege and incorporate herein by this reference all previous
7 allegations as though set forth herein in full.

8 157. As alleged above, the parties enjoyed the benefits of particular contractual relations
9 which were governed primarily by the PCJV Governing Documents, the Jacoby-Koren
10 Agreement, the Jacoby-Hodgson Agreement, the Partnership Agreement, and the Master Services
11 Agreement, but which expanded to other agreements with third party franchisees each bearing an
12 expectation of payment or other benefits to PCJV, PCI Trading, Koren, Hodgson, PC LA Group,
13 and the NKM/JK Entities.

14 158. PCJV, PCI Trading, Koren, Hodgson, PC LA Group, and the NKM/JK Entities
15 allege that Cross-Defendants, and ROES 1 through 400, inclusive, and each of them, had
16 knowledge of all of these contractual relations. Despite that knowledge, Cross-Complainants
17 allege that Cross-Defendants, and each of them, had the intent to interfere with those contractual
18 relations. Indeed, by engaging in the conduct described above, Cross-Defendants, and each of
19 them, took specific action to interfere with those contractual relations, in order to further each of
20 their own special interests.

21 159. As a direct and proximate result of Cross-Defendants' conduct, Cross-
22 Complainants have sustained and will continue to sustain substantial non-economic and economic
23 injury in an amount to be proven at trial.

24 160. Cross-Complainants further allege that in doing the things described above, Cross-
25 Defendants, and each of them, acted with the intent to deprive Cross-Complainants of their legal
26 rights and to injure them such that Cross-Defendants' actions constitute fraud, oppression, or
27 malice within the meaning of Civil Code § 3294. Cross-Defendants' conduct was and continues
28 to be despicable, oppressive, and outrageous, justifying the imposition of punitive and exemplary

1  damages against Cross-Defendants to make an example of Cross-Defendants and to deter such

2  conduct in the future in an amount that proof at trial may indicate is appropriate.

3  ## TENTH CAUSE OF ACTION

4  ## (INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS)

5  ## By PCJV, PCI Trading, Koren, Hodgson, PC LA Group, and the NKM/JK Entities Against

6  ## All Cross-Defendants, and ROES 1 through 400, Inclusive

7  161.    Cross-Complainants re-allege and incorporate herein by this reference all previous

8  allegations as though set forth herein in full.

9  162.    As alleged above, the parties enjoyed the benefits of particular contractual relations

10  which were governed primarily by the PCJV Governing Documents, the Jacoby-Koren

11  Agreement, the Jacoby-Hodgson Agreement, the Partnership Agreement, and the Master Services

12  Agreement, but which expanded to other agreements with third party franchisees each bearing an

13  expectation of prospective economic benefits to PCJV, PCI Trading, Koren, Hodgson, PC LA

14  Group, and the NKM/JK Entities.

15  163.    PCJV, PCI Trading, Koren, Hodgson, PC LA Group, and the NKM/JK Entities

16  allege that Cross-Defendants, and ROES 1 through 400, inclusive, and each of them, had

17  knowledge of all of these contractual and prospective economic relations.  Despite that

18  knowledge, Cross-Complainants allege that Cross-Defendants, and each of them, had the intent to

19  interfere with those contractual and prospective economic relations.  Indeed, by engaging in the

20  conduct described above, Cross-Defendants, and each of them, took specific action to interfere

21  with those contractual and prospective economic relations, in order to further each of their own

22  special interests.

23  164.    As a direct and proximate result of Cross-Defendants' conduct, Cross-

24  Complainants have sustained and will continue to sustain substantial non-economic and economic

25  injury in an amount to be proven at trial.

26  165.    Cross-Complainants further allege that in doing the things described above, Cross-

27  Defendants, and each of them, acted with the intent to deprive Cross-Complainants of their legal

28  rights and to injure them such that Cross-Defendants' actions constitute fraud, oppression, or

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3818668 1

46

1   malice within the meaning of Civil Code § 3294. Cross-Defendants' conduct was and continues

2   to be despicable, oppressive, and outrageous, justifying the imposition of punitive and exemplary

3   damages against Cross-Defendants to make an example of Cross-Defendants and to deter such

4   conduct in the future in an amount that proof at trial may indicate is appropriate.

5                                    **ELEVENTH CAUSE OF ACTION**

6   **(NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS)**

7   **By PCJV, PCI Trading, Koren, Hodgson, PC LA Group, and the NKM/JK Entities Against**

8                    **All Cross-Defendants, and ROES 1 through 400, Inclusive**

9       166.    Cross-Complainants re-allege and incorporate herein by this reference all previous

10  allegations as though set forth herein in full.

11      167.    As alleged above, the parties enjoyed the benefits of particular contractual relations

12  which were governed primarily by the PCJV Governing Documents, the Jacoby-Koren

13  Agreement, the Jacoby-Hodgson Agreement, the Partnership Agreement, and the Master Services

14  Agreement, but which expanded to other agreements with third party franchisees each bearing an

15  expectation of prospective economic benefits to PCJV, PCI Trading, Koren, Hodgson, PC LA

16  Group, and the NKM/JK Entities.

17      168.    PCJV, PCI Trading, Koren, Hodgson, PC LA Group, and the NKM/JK Entities

18  allege that Cross-Defendants, and ROES 1 through 400, inclusive, and each of them, had

19  knowledge of all of these contractual and prospective economic relations. Despite that

20  knowledge, Cross-Complainants allege that Cross-Defendants, and each of them, had the intent to

21  interfere, and to the extent they did not have specific intent, they negligently interfered with those

22  contractual and prospective economic relations. Indeed, by engaging in the conduct described

23  above, Cross-Defendants, and each of them, took specific action to negligently interfere with those

24  contractual and prospective economic relations, in order to further each of their own special

25  interests.

26      169.    As a direct and proximate result of Cross-Defendants' conduct, Cross-

27  Complainants have sustained and will continue to sustain substantial non-economic and economic

28  injury in an amount to be proven at trial.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3818668.1                                    47

170.    Cross-Complainants further allege that in doing the things described above, Cross-Defendants, and each of them, acted with the intent to deprive Cross-Complainants of their legal rights and to injure them such that Cross-Defendants' actions constitute fraud, oppression, or malice within the meaning of Civil Code § 3294. Cross-Defendants' conduct was and continues to be despicable, oppressive, and outrageous, justifying the imposition of punitive and exemplary damages against Cross-Defendants to make an example of Cross-Defendants and to deter such conduct in the future in an amount that proof at trial may indicate is appropriate.

## TWELFTH CAUSE OF ACTION

## (INDUCING BREACHES OF CONTRACT)

**By PCJV, PCI Trading, Koren, Hodgson, PC LA Group, and the NKM/JK Entities Against All Cross-Defendants, and ROES 1 through 400, Inclusive**

171.    Cross-Complainants re-allege and incorporate herein by this reference all previous allegations as though set forth herein in full.

172.    As alleged above, the parties enjoyed the benefits of particular contractual relations which were governed primarily by the PCJV Governing Documents, the Jacoby-Koren Agreement, the Jacoby-Hodgson Agreement, the Partnership Agreement, and the Master Services Agreement, but which expanded to other agreements with third party franchisees each bearing an expectation of prospective economic benefits to PCJV, PCI Trading, Koren, Hodgson, PC LA Group, and the NKM/JK Entities.

173.    PCJV, PCI Trading, Koren, Hodgson, PC LA Group, and the NKM/JK Entities allege that Cross-Defendants, and ROES 1 through 400, inclusive, and each of them, had knowledge of all of these contracts and intended to cause the parties to those contracts to breach the contracts. Despite that knowledge, Cross-Complainants allege that Cross-Defendants, and each of them, took specific action to induce the breaches of these contracts, in order to further each of their own special interests.

174.    As a direct and proximate result of Cross-Defendants' conduct, Cross-Complainants have sustained and will continue to sustain substantial non-economic and economic injury in an amount to be proven at trial.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1    175.    Cross-Complainants further allege that in doing the things described above, Cross-

2  Defendants, and each of them, acted with the intent to deprive Cross-Complainants of their legal

3  rights and to injure them such that Cross-Defendants' actions constitute fraud, oppression, or

4  malice within the meaning of Civil Code § 3294. Cross-Defendants' conduct was and continues

5  to be despicable, oppressive, and outrageous, justifying the imposition of punitive and exemplary

6  damages against Cross-Defendants to make an example of Cross-Defendants and to deter such

7  conduct in the future in an amount that proof at trial may indicate is appropriate.

8                          **THIRTEENTH CAUSE OF ACTION**

9                                    **(NEGLIGENCE)**

10  **By PCJV, PCI Trading, Koren, PC LA Group, and the NKM/JK Entities Against Cinco/PCI**

11                         **Group, and ROES 301-350, Inclusive**

12    176.    Cross-Complainants re-allege and incorporate herein by this reference all previous

13  allegations as though set forth herein in full.

14    177.    Cross-Complainants allege that, at all times relevant herein, the Cinco/PCI Group

15  owed common law duties to PCJV, PCI Trading, Koren, PC LA Group, and the NKM/JK Entities

16  to act in accordance with the requisite standard of care.

17    178.    The Cinco/PCI Group's conduct as alleged herein above is and continued to be in

18  derogation of those duties.

19    179.    As a direct and proximate result of Cross-Defendants' conduct, Cross-

20  Complainants have sustained and will continue to sustain substantial non-economic and economic

21  injury in an amount to be proven at trial.

22                          **FOURTEENTH CAUSE OF ACTION**

23                                    **(CONVERSION)**

24  **By PC LA Group and JK Consultants Against Amir Jacoby and ROES 401-450, Inclusive**

25    180.    Cross-Complainants re-allege and incorporate herein by this reference all previous

26  allegations as though set forth herein in full.

27    181.    As alleged above, Cross-Complainants are informed and believe, and thereupon

28  allege, that Amir Jacoby engaged in the Unauthorized Jacoby Withdrawals, and converted those

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1 | funds for his own use

2 |     182.    While Cross-Complainants have repeatedly demanded the return of the subject
3 | funds, Amir Jacoby has failed and refused, and continues to fail and refuse, to return the funds.
4 | Upon information and belief, Amir Jacoby has utilized the subject funds for his own purposes
5 | such that an imposition of a constructive trust on the interests of Amir Jacoby and ROES 401-450,
6 | inclusive, including any business interests, profits, investments, real estate, and other assets, which
7 | is necessary and appropriate under the circumstances.

8 |     183.    In addition, Cross-Complainants have incurred time and money in pursuit of the
9 | converted funds, which further damages Cross-Complainants are entitled to recover against Amir
10 | Jacoby and ROES 401-450, inclusive.

11 |     184.    Cross-Complainants further allege that in doing the things described above, Amir
12 | Jacoby and ROES 401-450, inclusive, and each of them, acted with the intent to deprive Cross-
13 | Complainants of their legal rights and to injure them such that Cross-Defendants' actions
14 | constitute fraud, oppression, or malice within the meaning of Civil Code § 3294. Cross-
15 | Defendants' conduct was and continues to be despicable, oppressive, and outrageous, justifying
16 | the imposition of punitive and exemplary damages against Cross-Defendants to make an example
17 | of Cross-Defendants and to deter such conduct in the future in an amount that proof at trial may
18 | indicate is appropriate.

19 | **FIFTEENTH CAUSE OF ACTION**

20 | **(MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF CAL. CIVIL CODE**
21 | **§§ 3426, *ET. SEQ.*)**

22 | **By PCJV, PC1 Trading, PC LA Group, and the NKM/JK Entities Against the Cinco/PCI**
23 | **Group, the Jacobys, the Hernandez Group, and ROES 1 through 250, Inclusive**

24 |     185.    Cross-Complainants re-allege and incorporate herein by this reference all previous
25 | allegations as though set forth herein in full.

26 |     186.    Over the years, PCJV, PCI Trading, PC LA Group, and the NKM/JK Entities have
27 | created and accumulated confidential and proprietary information on a variety of subjects
28 | including, without limitation, data, pricing, preferred vendor information, marketing strategies,

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  market research, marketing activities, advertising, customer preferences, information concerning

2  the strategic positioning of stores and kiosks, targeting, customer offerings, promotions,

3  production, business management, social networking, publicity, public relations, training, training

4  schedules, training materials, and the like (hereinafter, the "Confidential Information").

5      187.    PCJV, PCI Trading, PC LA Group, and the NKM/JK Entities, largely through

6  Koren's efforts, developed the Confidential Information through a significant investment of time,

7  labor, and capital.

8      188.    The Confidential Information represents a valuable resource to Cross-

9  Complainants, and therefore has independent economic value, in that the information comprising

10 the Confidential Information is not known to the general public or even to other people engaged in

11 the same business or occupation. Such information has been, and is, the subject of reasonable

12 efforts on the part of Cross-Complainants to maintain its secrecy.

13     189.    Access to the Confidential Information would give a competitor an unfair

14 competitive advantage because any competitor with access to the Confidential Information could

15 use it as a shortcut to develop new business without having made the investment of time, labor,

16 and capital that Cross-Complainants made to create and accumulate the Confidential Information.

17     190.    Cross-Complainants engage in reasonable and cautionary measures to preserve the

18 confidentiality of the Confidential Information. For example, Cross-Complainants do not disclose

19 the Confidential Information to competitors or to any unaffiliated third party. For another, Cross-

20 Complainants have established, and enforce, a series of protective measures to ensure that the

21 Confidential Information is not disclosed to others.

22     191.    Despite this, Cross-Complainants are informed and believe, and thereupon allege,

23 that prior to the Cinco-Hernandez transaction, the Hernandez Group was a franchisee of Cinco's in

24 the Philippines, opening their first Potato Corner store in or about 2015. As such, the Hernandez

25 Group is a competing franchisee to the NKM/JK Entities, and the Hernandez Group's interests are

26 adverse to the interests of PCJV, PCI Trading, PC LA Group, and the NKM/JK Entities.

27 However, as alleged above, in a coordinated effort by the Cinco/PCI Group and the Jacobys, the

28 Hernandez Group was permitted to access and misappropriate the Confidential Information and

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  has used and continues to use that Confidential Information to cause damage to PCJV, PCI

2  Trading, PC LA Group, and the NKM/JK Entities.

3      192.   The conduct of Cross-Defendants Cinco/PCI Group, the Jacobys, the Hernandez

4  Group, and ROES 1 through 250, inclusive, as alleged above, constitutes actual and threatened

5  misappropriation of trade secrets in violation of the California Uniform Trade Secrets Act

6  ("CUTSA"), Cal. Civ. Code §§ 3426, *et seq.*

7      193.   As a direct and proximate result of Cross-Defendants' conduct, Cross-

8  Complainants have sustained and will continue to sustain substantial non-economic and economic

9  injury in an amount to be proven at trial.

10     194.   Cross-Complainants further allege that in doing the things described above, the

11 Cinco/PCI Group, the Jacobys, the Hernandez Group, and ROES 1 through 250, inclusive, and

12 each of them, acted with the intent to deprive Cross-Complainants of their legal rights and to

13 injure them such that Cross-Defendants' actions constitute fraud, oppression, or malice within the

14 meaning of Civil Code § 3294. Cross-Defendants' conduct was and continues to be despicable,

15 oppressive, and outrageous, justifying the imposition of punitive and exemplary damages against

16 Cross-Defendants to make an example of Cross-Defendants and to deter such conduct in the future

17 in an amount that proof at trial may indicate is appropriate.

18     195.   Moreover, Cross-Complainants allege that the Cinco/PCI Group, the Jacobys, the

19 Hernandez Group, and ROES 1 through 250, inclusive threaten to continue to act in derogation of

20 Cross-Complainants' rights unless they are restrained and enjoined from doing so. As such,

21 Cross-Complainants are entitled to further injunctive relief enjoining, at a minimum, all

22 responsible parties from using or retaining the Confidential Information.

23 / / /

24 / / /

25 / / /

26 / / /

27 / / /

28 / / /

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3818668.1

# SIXTEENTH CAUSE OF ACTION

## (UNFAIR COMPETITION IN VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ.*)

### By All Cross-Complainants Against All Cross-Defendants, and ROES 1 through 500, Inclusive

196.    Cross-Complainants re-allege and incorporate herein by this reference all previous allegations as though set forth herein in full.

197.    California Business and Professions Code § 17200 provides:

> As used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code.

78.    As alleged above, Cross-Defendants have engaged in unfair business acts and practices within the meaning of California Business and Professions Code § 17200.

79.    As a direct, proximate, and foreseeable result of the wrongful conduct of Cross-Defendants, and each of them, Cross-Complainants have been damaged and entitled to relief, including full restitution and/or disgorgement of any funds and benefits that may have been and will be obtained by Cross-Defendants as a result of such unfair business acts and practices, including any other legal or equitable relief the Court deems proper.

80.    California Business and Professions Code § 17203 provides, in relevant part:

> Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition.

198.    Pursuant to California Business and Professions Code § 17203, Cross-Complainants seek injunctive relief as the Court deems appropriate and, to the extent allowable, the recovery of Cross-Complainants' attorneys' fees and costs.

///

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3818668.1

53

## SEVENTEENTH CAUSE OF ACTION

### (ACCOUNTING)

**By PCJV, PCI Trading, and the NKM/JK Entities Against the Cinco/PCI Group, Highfive, the Hernandez Group, and ROES 451 through 500, Inclusive**

199.    Cross-Complainants re-allege and incorporate herein by this reference all previous allegations as though set forth herein in full.

200.    As alleged above, despite the fact that the parties agreed that ingredients and products would be sold to PCJV and/or PCI Trading at cost, Cross-Defendants Cinco/PCI Group, Highfive, the Hernandez Group have made an effort to unlawfully profit off of PCJV and/or PCI Trading by tripling the prices of those products and ingredients, thus causing damage to all United States franchisees including the NKM/JK Entities.

201.    Cross-Complainants are informed and believe, and thereupon allege, that despite assurances to the contrary, the Cinco/PCI Group and Highfive have unlawfully profited from the sale of said products and ingredients since 2010 and failed and refused to sell those products at cost as promised.

202.    The amount of profits generated by this scheme by the Cinco/PCI Group and Highfive, and now with the continued facilitation by the Hernandez Group, is unknown and could only be ascertained through an accounting.

203.    Additionally, Cross-Complainants are informed and believe, and thereupon allege, that the Cinco/PCI Group and the Hernandez Group maintain a bank account belonging to PCI Trading which they have thus far refused to turn over to PCI Trading as required. PCI Trading thus demands an accounting of all funds belonging to it held or controlled by any Cross-Defendant.

/ / /

/ / /

/ / /

/ / /

/ / /

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3818668.1

VERIFIED FIRST AMENDED CROSS-COMPLAINT

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

## EIGHTEENTH CAUSE OF ACTION

## (RESTITUTION TO AVOID UNJUST ENRICHMENT)

**By PCJV, PCI Trading, and the NKM/JK Entities Against the Cinco/PCI Group, Highfive, the Hernandez Group, and ROES 451 through 500, Inclusive**

204.    Cross-Complainants re-allege and incorporate herein by this reference all previous allegations as though set forth herein in full.

205.    As alleged above, the Cinco/PCI Group, Highfive, and the Hernandez Group, and ROES 451 through 500, inclusive, have profited by reason of their acts of unfair competition, and other unlawful, tortious acts as alleged herein.

206.    Under the circumstances, it would be inequitable for these Cross-Defendants to retain the benefits of their ill-gotten gains. Once a full accounting is completed, Cross-Complainants are entitled to full restitution and/or disgorgement by Cross-Defendants of all revenues, earnings, profits, or other economic benefits earned at Cross-Complainants' detriment and expense. Otherwise, Cross-Defendants will be unjustly enriched.

## NINETEENTH CAUSE OF ACTION

## (DECLARATORY RELIEF)

**By All Cross-Complainants Against All Cross-Defendants, and ROES 1 through 500, Inclusive**

207.    Cross-Complainants re-allege and incorporate herein by this reference all previous allegations as though set forth herein in full.

208.    Based on the foregoing, a number of disputes have arisen between Cross-Complainants, on the one hand, and Cross-Defendants, and ROES 1 through 500, inclusive, and each of them, on the other hand regarding their respective rights and obligations, among other things, under the PCJV Governing Documents, the Jacoby-Koren Agreement, the Jacoby-Hodgson Agreement, the Partnership Agreement, and the Master Services Agreement. Further disputes surround: (a) the validity of the votes and resolutions to remove Koren from PCJV's management; (b) the propriety of the Cinco-Hernandez transaction and the Hernandez Group's ability to participate in the management of PCJV; (c) the equity breakdown and interests of the parties in the

3818668.1

VERIFIED FIRST AMENDED CROSS-COMPLAINT

1  entities involved in this litigation; (d) the propriety of Amir Jacoby's unauthorized withdrawals;

2  (e) the control and management of PCJV and PCI Trading; (f) certain Cross-Defendants'

3  maintenance of a bank account in the name of PCI Trading; (g) certain Cross-Defendants'

4  maintenance of a lease agreement once entered on behalf of PCJV, which space in Encino,

5  California that they, upon information and belief, continue to lease and occupy; (h) the rights of

6  Cross-Complainants regarding the ability to purchase ingredients and products at cost and/or

7  ability to source those ingredients elsewhere; (i) the continued rights of the parties involving the

8  waiver of royalties and fees; (j) Koren and/or PC LA Group's rights to 55% of Cinco's shares; and

9  (k) whether certain Cross-Complainants sued in the Cinco-PCJV Action committed any

10  wrongdoing, among other things. A judicial declaration is necessary and appropriate at this time

11  under these circumstances to resolve the claims of Cross-Complainants, on the one hand, and

12  Cross-Defendants, and each of them, on the other hand.

13        209.   As such, Cross-Complainants seek judicial declarations that:

14           a.  Koren's changing PCJV's banking relationship to safeguard those funds from

15              Amir Jacoby was justified.

16           b.  The votes and resolutions to remove Koren as a voting representative, manager,

17              and/or officer of PCJV are invalid or null and void.

18           c.  In transferring a majority interest to the Hernandez Group, the Cinco/PCI

19              Group breached the PCJV Governing Documents.

20           d.  In transferring a majority interest to the Hernandez Group without first

21              providing Koren or PC LA Group a right of first refusal, the Cinco/PCI Group

22              breached the PCJV Governing Documents.

23           e.  The transfer of equity interests by the Cinco Group to the Hernandez Group is

24              subject to rescission.

25           f.  Any vote by any member of the Hernandez Group, including Hernandez, is

26              invalid or null and void, in PCJV.

27           g.  Amir Jacoby was not authorized to withdraw over $50,000 from the PC LA

28              Group and JK Consulting bank accounts.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

h. Koren's management of PCJV and PC LA Group shall continue without interference by any of the Cross-Defendants and any person acting in concert with or participating with them.

i. The purported termination of the Master Services Agreement is invalid or null and void.

j. Any franchisee in which Koren maintains an interest is exempt from payment of fees or royalties to PCJV.

k. The equity interests of the various entities involved in this litigation shall be established in accordance to Cross-Complainants' contentions and/or equitably modified/adjusted as the Court deems appropriate;

l. Cross-Defendants shall not charge PCJV or PCI Trading for products and ingredients in excess of their actual costs plus shipping;

m. Cross-Defendants are not entitled to maintain any bank account in the name of PCI Trading (or PCJV) and shall return such funds held in any such account immediately forthwith;

n. Cross-Defendants are not entitled to maintain an office or competing enterprise in the United States;

o. Cross-Defendants are not entitled to engage in marketing or advertising activities that are accessible in the United States without the consent of Cross-Complainants; and

p. Cross-Complainants Koren, Alon Koren, Hodgson, Garcia, and Grudnowski are not liable in any manner for the claims and assertions made in the Cinco-PCJV Action.

/ / /
/ / /
/ / /
/ / /
/ / /

3818668.1

57

VERIFIED FIRST AMENDED CROSS-COMPLAINT

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

## TWENTIETH CAUSE OF ACTION

## (REFORMATION)

**By PCJV, PCI Trading, PC LA Group, and Koren Against Cinco/PCI Group and ROES 251 through 300, Inclusive**

210.    Cross-Complainants re-allege and incorporate herein by this reference all previous allegations as though set forth herein in full.

211.    As alleged above, the parties enjoyed the benefits of particular contractual relations which were governed primarily by the PCJV Governing Documents, the Partnership Agreement, and the Master Services Agreement, but which expanded to other agreements each bearing an expectation of prospective economic benefits to PCJV, PCI Trading, PC LA Group, and Koren. At times, and given certain nature and circumstances beyond Cross-Complainants' doing or control, the written agreements may not accurately reflect the true intention of the parties.

212.    As a result of the foregoing, PCJV, PCI Trading, PC LA Group, and Koren allege that the written agreements shall be reformed, to the extent necessary, to reflect the true intention of the parties.

## TWENTY-FIRST CAUSE OF ACTION

## (IMPLIED/EQUITABLE INDEMNITY)

**By All Cross-Complainants Against the Jacobys and ROES 401-450, Inclusive**

213.    Cross-Complainants re-allege and incorporate herein by this reference all previous allegations as though set forth herein in full.

214.    In this action and the Cinco-PCJV Action (which was dismissed without prejudice), Cinco and PCI have directly or indirectly asserted various claims against Cross-Complainants, but have neglected to name Amir Jacoby or Inbal Jacoby, whose interests in many ways aligns with Cross-Complainants, as party defendants.

215.    Cross-Complainants allege that in light of the foregoing, the Jacobys must indemnify Cross-Complainants for all attorneys' fees, expenses, expert fees, and costs incurred by them. Cross-Complainants further allege that the Jacobys are responsible and liable for all losses that Cross-Complainants have incurred and will incur in the future in connection with this matter.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1    216.   Cross-Complainants further allege that, should Cinco or PCI prevail in this

2  litigation, any injuries or damages to Cinco or PCI were caused solely through the negligence and

3  carelessness and/or fault and/or tortious conduct of the Jacobys, and their agents, and not due to

4  any action on the part of any Cross-Complainant or their agents.  Therefore, if any Cross-

5  Complainant is held liable to Cinco or PCI, or any party affiliated and/or associated with Cinco or

6  PCI, said liability will be solely of a vicarious and ultimately secondary nature predicated upon the

7  facts set forth herein, and that by reason of the foregoing facts, Cross-Complainants are entitled to

8  full and complete indemnification from the Jacobys.

9                        **TWENTY-SECOND CAUSE OF ACTION**

10            **(COMPARATIVE INDEMNITY AND APPORTIONMENT OF FAULT)**

11        **By All Cross-Complainants Against the Jacobys and ROES 401-450, Inclusive**

12    217.   Cross-Complainants re-allege and incorporate herein by this reference all previous

13  allegations as though set forth herein in full.

14    218.   In this action and the Cinco-PCJV Action (which was dismissed without prejudice),

15  Cinco and PCI have directly or indirectly asserted various claims against Cross-Complainants, but

16  have neglected to name Amir Jacoby or Inbal Jacoby, whose interests in many ways aligns with

17  Cross-Complainants, as party defendants.

18    219.   If any Cross-Complainant is adjudged to be liable to Cinco or PCI, or any party

19  affiliated and/or associated with Cinco or PCI, the Jacobys, and each of them, should be required

20  to pay a share of such liability which is in proportion to the comparative negligence of that party

21  in causing any such damage or injury.

22    220.   Cross-Complainants allege that in light of the foregoing, the Jacobys must also

23  indemnify Cross-Complainants for all attorneys' fees, expenses, expert fees, and costs incurred by

24  them.  Cross-Complainants further allege that the Jacobys are responsible and liable for all losses

25  that Cross-Complainants have incurred and will incur in the future in connection with this matter.

26  / / /

27  / / /

28  / / /

3818668 1

59

VERIFIED FIRST AMENDED CROSS-COMPLAINT

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1    **PRAYER FOR RELIEF**

2    WHEREFORE, Cross-Complainants pray for judgment against Cross-Defendants, and

3    each of them, jointly and severally, as follows:

4         1.    For general, special, actual, compensatory and/or nominal damages in an amount to

5    be proved at trial;

6         2.    For rescission;

7         3.    For specific performance;

8         4.    For restitution;

9         5.    For punitive and exemplary damages;

10        6.    For a temporary restraining order, preliminary injunction, and permanent

11              injunction;

12        7.    For declaratory relief;

13        8.    For constructive trusts;

14        9.    For an award of attorneys' fees, costs and expenses;

15        10.   For prejudgment and post-judgment interest as allowed by law; and

16        11.   For such other and further relief that the Court deems just and proper.

17    / / /

18    / / /

19    / / /

20    / / /

21    / / /

22    / / /

23    / / /

24    / / /

25    / / /

26    / / /

27    / / /

28    / / /

3818668.1                                    60
                      VERIFIED FIRST AMENDED CROSS-COMPLAINT

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1    DATED: October 10, 2018                FREEMAN, FREEMAN & SMILEY, LLP

2

3                                           By: _____

4                                               TODD M. LANDER
                                                ARASH BERAL
5                                               JEFFREY S. GOODFRIED
                                                KELSEY L. HOTCHKISS
6                                               Attorneys for Defendants and Cross-Complainants
                                                PCJV USA, LLC, GUY KOREN, NKM
7                                               CAPITAL GROUP, LLC, J & K AMERICANA,
                                                LLC, J & K CULVER, LLC, J&K LAKEWOOD,
8                                               LLC, J&K OAKRIDGE, LLC, J&K VALLEY
9                                               FAIR, LLC, J & K CAPITAL 2, LLC, J & K
                                                ONTARIO, LLC, J&K PC TRUCKS, LLC, J&K
10                                              CONSULTANTS GROUP, LLC, GK CAPITAL
                                                GROUP, LLC, and POTATO CORNER LA
11                                              GROUP, LLC, and Cross-Complainants PCI
                                                TRADING, LLC, ALON KOREN, THOMAS
12                                              HODGSON, EMILY GARCIA, and ASHLEY
13                                              GRUDNOWSKI

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3818668.1                                    61
                            VERIFIED FIRST AMENDED CROSS-COMPLAINT

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**VERIFICATION**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I have read the foregoing **VERIFIED FIRST AMENDED CROSS-COMPLAINT** and know its contents.

I am a party to this action. The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

I am an authorized representative of PCJV USA, LLC, a Delaware limited liability company; PCI TRADING LLC, a Delaware limited liability company; POTATO CORNER LA GROUP, LLC, a California limited liability company; NKM CAPITAL GROUP, LLC, a California limited liability company; J & K AMERICANA, LLC, a California limited liability company; J&K LAKEWOOD, LLC, a California limited liability company; J & K CULVER, LLC, a California limited liability company; J&K OAKRIDGE, LLC, a California limited liability company; J&K VALLEY FAIR, LLC, a California limited liability company; J & K CAPITAL 2, LLC, a California limited liability company; J & K ONTARIO, LLC, a California limited liability company; J&K PC TRUCKS, LLC, a California limited liability company; J&K CONSULTANTS GROUP, LLC, a California limited liability company; GK CAPITAL GROUP, LLC, a California limited liability company, all parties to this action, and am authorized to make this verification for and on their behalf, and I make this verification for that reason. I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.

Executed on October 10, 2018, at Los Angeles, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

| | |
|---|---|
| Guy Koren individually and on behalf of PCJV USA, LLC, a Delaware limited liability company; PCI TRADING LLC, a Delaware limited liability company; POTATO CORNER LA GROUP, LLC, a California limited liability company; NKM CAPITAL GROUP, LLC, a California limited liability company; J & K AMERICANA, LLC, a California limited liability company; J&K LAKEWOOD, LLC, a California limited liability company; J & K CULVER, LLC, a California limited liability company; J&K OAKRIDGE, LLC, a California limited liability company; J&K VALLEY FAIR, LLC, a California limited liability company; J & K CAPITAL 2, LLC, a California limited liability company; J & K ONTARIO, LLC, a California limited liability company; J&K PC TRUCKS, LLC, a California limited liability company; J&K CONSULTANTS GROUP, LLC, a California limited liability company; GK CAPITAL GROUP, LLC, a California limited liability company | |
| Print Name of Signatory | Signature |

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3933897.1 26859-000

**VERIFICATION**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I have read the foregoing **VERIFIED FIRST AMENDED CROSS-COMPLAINT** and know its contents.

I am a party to this action. The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

Executed on October 10, 2018, at Los Angeles, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

ALON KOREN
Print Name of Signatory                                    Signature

3933897.1 26859-800

**VERIFICATION**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I have read the foregoing **VERIFIED FIRST AMENDED CROSS-COMPLAINT** and know its contents.

I am a party to this action. The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

Executed on October 10, 2018, at Los Angeles, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

THOMAS HODGSON
Print Name of Signatory                    Signature

3933897 1 26859-800

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**VERIFICATION**

1

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

2

3      I have read the foregoing **VERIFIED FIRST AMENDED CROSS-COMPLAINT** and know its contents.

4      I am a party to this action. The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to

5      those matters I believe them to be true.

6      Executed on October 10, 2018, at Los Angeles, California.

7      I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

8

9

10     EMILY GARCIA                                    Signature
       Print Name of Signatory

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3933897.1 26859-800

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**VERIFICATION**

1

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

2

3    I have read the foregoing **VERIFIED FIRST AMENDED CROSS-COMPLAINT** and know its contents.

4    I am a party to this action. The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to
5    those matters I believe them to be true.

6    Executed on October 10, 2018, at Los Angeles, California.

7    I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

8

9

10   ASHLEY GRUDNOWSKI
     Print Name of Signatory                    Signature

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3933897 1 26859-800

# EXHIBIT A

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

JUN 18 2018

Sherri R. Carter, Executive Officer/Clerk
By Fernando Becerra, Jr., Deputy

SUPERIOR COURT FOR THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

| | |
|---|---|
| CINCO CORPORATION, | ) Case No.: BC701075 |
| | ) |
| Plaintiff | ) Order Denying Cinco's Request for |
| | ) Injunctive Relief and Granting Koren's |
| vs. | ) Request for Injunctive Relief |
| | ) |
| GUY KOREN, et al., | ) Hearing: |
| | ) June 6, 2018 |
| Defendants | ) 9:30 a.m. |
| | ) Dept. 86 |
| | ) |

Plaintiff Cinco Corporation (Cinco) is a Philippine Company that alleges it is a member of a Delaware limited liability company (LLC) known as PCJV USA LLC (Company). Defendant Guy Koren alleges he is also a member of the LLC and that he has served as President of the Company since 2012. Cinco contends that in April 2018 meetings, it validly removed Koren as President of the Company. Cinco also accuses Koren of wrongdoing in connection with his management of the company, alleging causes of action against Koren for conversion of Company funds allegedly taken from its bank accounts, breach of fiduciary duty, breach of contract, anticipatory breach of contract, and unfair business practices in violation of Business &

1

1   Professions Code § 17200. Cinco seeks to impose a constructive trust and seeks preliminary and
2   permanent injunctive relief.

3     Koren's May 8, 2018 verified cross-complaint names as defendants Cinco, its subsidiary
4   Potato Corner International, Inc. (PCI) and the following individuals: Myrose Victor, John
5   Edward Hernandez, Jose P. Magsaysay Jr., Marivic del Pilar, Ricardo Enrique K. Montelibano,
6   Ben Olivas, Amir Jacoby and Inbal Jacoby. The Cross-complaint asserts causes of action for
7   breach of fiduciary duty, intentional interference with contractual relations, intentional and
8   negligent interference with prospective economic relations, unfair competition, breach of
9   contract, fraudulent inducement, and various breaches of written, oral, and implied in fact
10  contracts.

11    On May 11, 2018, this Court granted, in part, Cinco's ex parte application for a
12  temporary restraining order (TRO) and ordered Koren to show cause why the Court should not
13  issue a preliminary injunction. The Court also granted, in part, Koren's application for a TRO
14  and ordered Cinco to show cause why it should not be preliminarily enjoined. The Court heard
15  argument on June 6, 2018 and gave leave for both sides to submit additional evidence. Having
16  reviewed the extensive evidence and briefing from both sides, the Court now DENIES Cinco's
17  request for injunctive relief and GRANTS, IN PART, Koren's request for relief.[1]

18
19  # I. Factual Background

20    There are three successive written agreements pertinent to the issues before this Court: a
21  Potato Corner USA Joint Venture Agreement (JVA) (apparently executed in 2010), a Limited
22  Liability Company Agreement of PCJV USA LLC (Operating Agreement or OA), and a 2012
23  PCJV USA LLC First Amendment to Joint Venture Agreement (AJVA). All three agreements
24

25
---
[1] The court has separately ruled on all evidentiary objections submitted by the parties.

2

address the parties' collaboration in a multi-outlet restaurant franchise business operating under the name "Potato Corner." As explained more fully below, an important issue is whether Cinco will probably succeed in proving the Company properly voted to remove Koren as President. That question turns, in part, on which of the agreements presently governs the parties' conduct, and whether that gives Cinco the right to remove the President of the Company. Although the Court concludes that the most recent agreement is most likely the operative agreement, the Court summarizes, below, the content of all three contracts.

### A.    The 2010 Joint Venture Agreement (JVA)

The undated Joint Venture Agreement (JVA) (apparently signed in 2010) and the First Amendment to the Joint Venture Agreement (AJVA) are nearly identical. The basic purpose of the JVA was to memorialize the parties' intentions to form a Delaware limited liability company (LLC) ("Company") by setting forth "terms and conditions" "with respect to the organization, incorporation, operation and management" and the Parties' "respective rights, duties and obligations . . . ." (JVA p. 1; see also AJVA p. 1.) Under Delaware law, a "member" of an LLC is a percentage owner of the enterprise. (Del. Code Ann. tit. 6, § 18-101.) However, reviewing the language in the JVA, the Court cannot reasonably ascertain who was intended to be a Party to the JVA or a member and/or manager of the Company or the respective rights, duties and obligations of the Parties, members and managers.

By its terms, the JVA is "made and entered into" by Cinco Corporation ("represented . . . by its duly authorized representatives" identified as "Jose P. Magsaysay and its directors: Jose P. Magsaysay Jr., Jose Miguel Ma. G. Montinola, Ma. Victoria O. Bermejo, Ricardo K. Montelibano . . . collectively referred to as the 'Cinco Group' ") and "AMIT NEMANIM, GUY KOREN and AMIR JACOBY . . . collectively referred to as the 'LA Group.' " (JVA p. 1.) This language suggests there are four "Parties" to the JVA: Cinco and the three individuals referred to

3

as LA Group. However, language in Paragraph 2) suggests there are two parties to the JVA. Addressing "CAPITALIZATION/OWNERSHIP OF THE COMPANY," Paragraph 2) refers to "both Parties" and calls for capital contributions from Cinco Group (\$30,000) and LA Group (20,000). (*Id.*, ¶ 2) c); see also AJVA ¶ 2) c).)

Ordinarily, the parties to an agreement sign the agreement. The signature page should therefore shed light on the identity of the parties to the agreement. However, the JVA's signature page only adds uncertainty because, instead of two signatures or four signatures, it has eight signatures. Five signatures appear under the heading "Cinco Group:" Jose Magsaysay as CEO of Cinco Corporation followed by signatures for Jose P. Magsaysay Jr., Jose Miguel Ma G. Montinola, Victoria O. Bermejo and Ricardo K. Montelibano. (JVA p. 9; see also AJVA p. 9.) Three signatures appear under the heading "L.A. Group:" Amit Nemanim, Guy Koren and Amir Jacoby. (*Id.*) The JVA is therefore uncertain with respect to the identity of the Parties to the agreement.

The JVA is also uncertain with respect to the identity of the proposed "members" and "managers" of the Company and their respective rights and powers. Under Delaware Law, the percentage owners of an LLC are its "members." Because, by its terms, the JVA requires capital contributions from "both Parties" (i.e., Cinco Group and LA Group), one would expect the JVA to identify Cinco Group and LA Group as the two "members" of the intended LLC. Instead, the JVA identifies the "initial members" as "Cinco" and seven individuals (four of whom are associated with Cinco and three of whom are associated with LA Group):

    i) Cinco Group
        (1) Cinco
        (2) Jose Magsaysay Jr.
        (3) Jose Miguel Ma G. Montinola
        (4) Ma. Victoria O. Bermejo
        (5) Ricardo k. Montelibano
    ii) LA Group
        (1)Amit Nemanim

4

(2) Guy Koren
(3) Amir Jacoby

(JVA ¶ 1) b).)

After identifying these seven individuals as the initial "members" (along with "Cinco"), the JVA appoints the same seven individuals as the Company's "managers" or "Management." (JVA ¶ 3) a); see also AJVA ¶ 3) a).) There is language in the JVA conferring broad discretion to the managers (rather than the members) to exercise "all of the Company powers." (*Id.*) However, various provisions in the JVA appear to use the terms "member" and "manager" interchangeably, e.g., "[Management] shall be composed of seven (7) *members*, four (4) of whom shall be designated by the Cinco Group, and three (3) designated by the LA Group." (*Id.*) (Emphasis added.) Addressing monthly Management meetings, Paragraph 3) b) says "Management shall regularly meet on a monthly basis" in a "board meeting" that may be telephonic but goes on to describe the participants as "members," stating that the "*members* may . . . invite non-members to join *member* meetings." (JVA ¶ 3) b); see also AJVA ¶ 3) b).) The language in JVA Paragraph 3) j), addressing fiduciary duties, similarly refers to "members and managers" as if the terms are interchangeable. (JVA ¶ 3) j).)

The confusing references to "members" and "managers" makes it difficult to ascertain the parties' intentions with respect to the decision-making authority of the members versus the managers. In Paragraph 3) a), the JVA broadly empowers the managers to manage "the business and affairs of the Company" and directs that "all of the Company powers shall be exercised by or under the direction of the managers." (JVA ¶ 3) a).) Consistent with that discretion, other provisions give the managers authority to appoint "additional executive officers," set executive officers' salaries, and "recall and/or withdraw the appointment of any executive officer." (JVA

5

¶¶ 3 a), c) e) and f).) On the other hand, an adjacent provision indicates that the *members* (rather than the managers) elected the initial executive officers: "[u]pon formation [the Company] shall have the following executive officers: President, Corporate Secretary and Treasurer, and the following [persons] shall be elected by the *members* to serve these positions . . . .") (JVA ¶ 3) c).) Without specifying who is empowered to select or elect the President, Paragraph 3) c) ii) meanwhile states that "[a]t any given time, the President shall be one of the following *members*" (identifying Nemanim, Koren and Jacoby). (JVA ¶ 3) c) ii.)

The JVA is also confusing in its descriptions of the votes necessary to take action on various matters. In the paragraphs addressing capitalization and ownership of the Company (provisions which necessarily refer to the Company's owners), the JVA uses the phrases "pro rata" and "percentage" to describe the members' interests, referring to "members' percentage interests," the "pro rata members' interest in the Company," and "pro rata ownership share." (JVA ¶¶ 2) c) and d); see also AJVA ¶¶ 2) c) and d).) This terminology ("percentage" and "pro rata") is reasonably interpreted as identifying the Company's owners (the proposed members of the LLC under Delaware law). It therefore follows that references to "members' interests" without adjectives such as "percentage" and "pro rata" reasonably refer to interests other than ownership interests in the Company.

Thus, the reference in Paragraph 2 to "members' interests" as distinct from "members' percentage interests" suggests the parties intended to distinguish between them. For any increase in capital accounts, Paragraph 2) of the JVA requires "an affirmative vote of 75% of all of the *members' percentage interests* in the Company." (JVA ¶ 2) c); see also AJVA ¶ 2) c).) (Emphasis added.) Similarly, the JVA imposes a right of first refusal on any "Party" that desires to sell "his/its *pro rata members interest* in the Company" to a third party. (JVA ¶ 2) d); see also

6

AJVA ¶ 2) d).) (Emphasis added.) On the other hand, for an assignment of "his/its *member interests* in the Company," the JVA only requires the "prior written consent of the other Party." (*Id.*) (Emphasis added.) These distinctions between a "member interest" and a member's "pro rata" or "percentage" interests suggest that the parties intended the term "member interests" to mean something less than an ownership interest in the Company.

The JVA purports to be an integrated agreement. Under Paragraph 5), the JVA specifies that it "shall constitute the entire agreement . . . and shall supersede any previous agreements, written or otherwise" and that it "may not be altered, changed, supplemented or modified except by a written instrument duly signed by the Parties." (JVA ¶¶ 5) a) and f); see also AJVA 5) a) and f).)

## B.    The Operating Agreement

The Limited Liability of Company Agreement of PCJV USA, LLC (Operating Agreement or OA) was apparently executed after the JVA and before the AJVA. (Koren Decl. 5/30/18 ¶¶ 3 – 7.) Like the JVA and the AJVA, the Operating Agreement is uncertain and confusing with respect to the identity of the members of the LLC, i.e., the owners of the Company. It states on the first page that it is entered into by certain "Members listed below" but defines the term "Member" in a confusing manner. The "Members listed below" apparently refers to a list of members that should have been attached as Exhibit A because the Operating Agreement defines a Member's "Percentage Interest" as "the percentage set forth opposite such Member's name on Exbibit A hereto . . . ." (OA ¶ 1.34.) However, the copies of the Operating Agreement submitted by the parties to this action do not contain an Exhibit A.[2]  As a result, the

---

[2] An undated PCJV USA LLC Membership Unit Ledger and four undated Certificates submitted by Cinco's attorney, Robert Brownlie, identify Potato Corner International, Inc. as the owner of certificate No. 01 (owning 60%), Nemanim as the owner of Certificate 02 (15.20 %), Koren as owner of Certificate 03 (15.20%) and Anit Jacoby as owner of Certificate 04 (9.6%)). (Brownlie Decl., ¶ 4, Exhs. A and B.) Brownlie declares, on information

Operating Agreement fails to identify the members of the LLC or their percentage ownership interests. In Paragraph 1.28, the Operating Agreement defines Member as "[a] member as defined by the Act[3] including all Initial Members . . . ." (OA ¶1.28.) This is confusing because the Act defines members as owners and there is language in the Operating Agreement apparently using the "members" to refer to non-owners.

Based on the seven signatures to the Operating Agreement, it is reasonable to infer there were seven members of the Company. Four persons signed under the heading <u>Cinco Group</u> (Magsaysay as CEO of Cinco Corporation, along with Magsaysay, Jr., Bermejo, and Montelibano) and three signed under the heading <u>L.A. Group</u> (Nemanim, Koren and Amir Jacoby.) On the other hand, the fact that the JVA contemplates a capital contribution from Cinco Corporation suggests that Cinco Corporation was to be the only member of the Company representing the Cinco Group. The notion that Cinco is the only member from the Cinco group is inconsistent with other language in the Operating Agreement which suggests there was more than one Cinco Group "Member." For example, the reference in Paragraph 3.3 to "[a] Member of the Cinco Group" suggests that the Cinco Group had more than one Member. The language in Paragraph 3.1 specifying that "the Members shall be classified and designated as either part of the [Cinco Group or the LA Group] also implies there was more than one Cinco Group Member. (OA ¶ 3.1.)

Language in the section of the Operating Agreement addressing restrictions on a Member's ability to assign or transfer an interest in the Company adds to the confusion. Paragraph 3.3 uses initial capital letter to refer to "Member Interests" as if it is a defined term. In

---

and belief, that the Ledger was prepared in 2010. Koren objects to Brownlie's testimony as lacking foundation. The Court sustains Koren's objections.

[3] The Delaware Act defines an LLC interest as "a member's share of the profits and losses of a limited liability company and a member's right to receive distributions of the limited liability company's assets." (Del. Code Ann. tit. 6, § 18-101.) It also defines the term "Percentage Interest" stating that, "[w]ith respect to a Member, [it is] the percentage set forth opposite such Member's name on Exhibit A hereto . . . ." (OA ¶ 1.34.)

8

fact, the defined term is "Membership Interest" meaning "[a] membership interest as defined by the Act." (OA ¶ 1.29.) Paragraph 3.3 refers to "Member Interests" and to "pro rata members interest." (*Id.*) Although "Member Interests" is not a defined term in the Operating Agreement, Paragraph 3.3 provides that a "Member of the Cinco Group or the LA Group" who wishes to assign any of its rights, obligations or "*Member Interests*" in the Company must "obtain the prior written consent of the non-assigning group." (OA ¶ 3.3.) (Emphasis added.) On the other hand, any "Member of either the Cinco Group or the LA Group" who desires to "transfer or sell his/its *pro rata members interest*" to a person outside the Cinco or LA Group must first offer to sell to an existing Member (provide a right of first refusal.) (*Id.*) (Emphasis added.) Using the more specific language ("pro rata membership interest") alongside the more general reference (the undefined term "Member Interests") suggests that the latter means something other than a percentage ownership interest.

The Operating Agreement is also ambiguous with respect to the powers and responsibilities of "Managers" versus "Members." Delaware law allows LLCs to designate managers and defines a "manager" as "a person who is named as a manager of a limited liability company in, or designated as a manager of a limited liability company pursuant to, a limited liability company agreement or similar instrument under which the limited liability company is formed." (6 Del. Code Ann. § 18-101(10).)

Under the Operating Agreement, Managers have "the authority to bind the Company" and "[n]o Member other than a Manager shall take any action as a Member to bind the Company." (*Id.*, ¶ 4.16.) It provides that "[e]ach Manager has the power to bind the Company [and if] there is more than one Manager, decisions of the Managers shall be made by majority vote of the Managers if at a meeting, or by unanimous written consent." (*Id.*, ¶ 4.13.) The Operating Agreement also specifically authorizes the Managers (and not the Members) to

9

remove Officers. (*Id.*, ¶ 4.11.2) It provides that "[a]ny officer may be removed, wither with or without cause, *by the Managers* at any regular or special meeting thereof . . . ." (*Id.*, ¶ 4.11.4.)

The managers' powers are also confusing. Although Paragraph 4.4 of the Operating Agreement allows a majority of the Members to remove a Manager, with or without cause, that right appears to conflict with other language giving each "Group" the unfettered right to designate who its Managers will be. Paragraph 4.2.1 states four Managers "shall be designated by the Cinco Group" and three "shall be designated by the LA Group." (*Id.*, ¶ 4.2.1.) Similarly, under the heading "Election of Managers," it provides that the "LA Group shall be entitled to elect (3) Managers" and that Cinco Group is entitled to elect four Managers. (*Id.*, ¶¶ 4.4, 4.3.1.)

The language in the Operating Agreement placing LA Group in charge of managing the Company and ensuring that an LA Group representative serves as President is relatively clear. The Operating Agreement requires that, "[a]s agreed upon by the Members, at any given time, the President shall be any of the following" identifying the three LA Group Managers/Members, either Nemanim, Koren or Amir Jacoby. (*Id.*, ¶ 4.11.7.) It further requires the Company to "engage the LA Group to provide management and strategic experience and expertise during the duration of this Agreement" and enter into a Master Services Agreement with LA Group allowing LA Group to earn 30 % of all franchise fees. (*Id.*, ¶ 4.18.)

## C. The October 16, 2012[4] Board Meeting

Although, according to the JVA and the Operating Agreement, the Company is an LLC run by Managers, the minutes of the Company's October 16, 2012 meeting characterize it as a "Board Meeting" among seven "directors" (Magsaysay, Montinola, Montelibano, Bermejo, Koren, Amir Jacoby and Inbal Jacoby). (Cross-Complt., Exh. B.) The Minutes recount that

---

[4] Koren's declarant that the meeting occurred in 2012 rather than 2013 is not controverted. (Koren Decl. 5/30/18 ¶ 7.) The Court therefore refers to the meeting as an October 16, 2012 meeting even though the minutes say October 16, 2013.

10

1  "[t]he Board reviewed and discussed the Joint Venture Agreement" and that "[w]hen documents

2  of Amit [Nemanim] are done, Inbal Jacoby shall replace Amit in the management of the

3  company or as Board." (*Id.*, p. 4.)

4       The Minutes also state, under a heading, "Operating Agreements and Structure," "[t]here

5  are two Operating Agreements," identifying the JVA and the Operating Agreement. Addressing

6  Paragraph 3) c) of the JVA, the Minutes state as follows:

7            1. Guy Koren to replace Amit Nemanim as President of PCJV.

8            2. Maria Victoria Bermejo will replace Jose Manuel M Montinola as Treasurer.

9            3. Additionally, the Board approved to include the following provision: That a 75% vote

10           will be needed to replace the CEO, President, Treasurer, Corporate Secretary. Other

11           Senior Officers of PCJV will need simple majority vote.

12  (*Id.*) The Minutes also note that an Operating Agreement for PCI Trading should be drawn up

13  and that the ownership of that entity "shall mirror [the Company]: 60% Potato Corner

14  International and 40% LA Group" (implying that the Company has two members with a 60/40

15  split of ownership.) (*Id.*, p. 4.)

16       These Minutes say nothing about a vote to remove Nemanim as President. However, as

17  described in more detail below, Cinco has produced a document entitled "MANAGEMENT

18  MEETING- OCTOBER 16, 2012" that describes that vote in terms of percentage interests.

19  (Magsaysay Jr. Decl., Exh. E.)

## C.    The First Amendment to Joint Venture Agreement (AJVA)

The AJVA was executed the day after the October 16, 2012 Board Meeting. Although,

by and large, the terms of the AJVA are identical to the terms of the JVA, there are several

differences. Like the JVA, the AJVA is uncertain with respect to the identity of the Parties,

members and whether the Company has two members (PCI and LA Group) or four members

11

1    (PCI and Koren, Jacoby and Jacoby) or seven members (four from Cinco and three from LA
2    Group).  (AJVA ¶ 1) b).)  The AJVA also perpetuates the confusing language in the JVA with
3    respect to the term "member interest," sometimes referring to "member interests" and sometimes
4    referring to "members' percentage interests" and "pro rata members interest."  (E.g., AJVA ¶ 1)
5    d) and 3) j) versus 2) c) and 2) d).)

6         The AJVA identifies Cinco's subsidiary, PCI rather than Cinco as a party to the
7    agreement but treats Cinco as the party elsewhere in the agreement.  (AJVA p. 1; ¶ 2) b).)
8    Whereas the JVA was "by and between" Cinco Corporation and Nemanim, Koren and Amir
9    Jacoby "referred to as the 'LA Group,' " the AJVA is "by and between" POTATO CORNER
10   INTERNATIONAL ("PCI"), a Delaware Corporation, "represented . . . by its duly authorized
11   representative Jose P. Magsaysay . . . and its directors [Magsaysay, Jr., Montinola, Bermejo, and
12   Montelibano] . . . collectively referred to as the 'PCI Group' " and "GUY KOREN, AMIR
13   JACOBY AND INBAL JACOBY . . . collectively referred to as the "LA Group." (AJVA p. 1.).

14        According to the AJVA, the Company "upon formation" designated, as managers, the
15   same persons designated as members in the AJVA: Magsaysay Jr., Montinola, Bermejo,
16   Montelibano, Koren, Amir Jacoby and Inbal Jacoby." (*Id.*)  The AJVA provides that "at any
17   given time, the President shall be any one of the following [LA Group] members: Guy Koren or
18   Amir Jacoby or Inbal Jacoby" noting that "the first president will be Amit Nemanim, now
19   replaced by Guy Koren." (AJVA ¶ 3) c).)  Whereas the JVA states that upon formation, the
20   Company's President, Corporate Secretary and Treasurer "shall be elected *by the members*,"
21   AJVA has "member/managers" selecting these officers, i.e., that the officers "shall be elected *by*
22   *the managers/members* to serve in these positions." (AJVA ¶ 3) c).) (Emphasis added.)  There
23   is a new sentence in 3) c) of the AJVA apparently implementing the Board's October 16, 2012
24   decision to require a "75% vote . . . to replace" the President and other officers: "Any change in
25   these mentioned executive officers will require a vote of 75% of members' interest." (*Id.*)  The

AJVA does not define the term "members' interest." (As noted above, "Members' interest" was also not a defined term in the Operating Agreement or the JVA.)

The AJVA is an integrated agreements that, by its terms, was intended to "supersede any previous agreements, written or otherwise, with respect to the same subject matter . . . ." (AJVA ¶ 5) c). It is therefore reasonable to interpret the AJVA as the operative agreement among the parties, superseding the Operating Agreement and the JVA.

### D.   *2018 Proceedings to Remove Koren as Manager and President*

Cinco contends that under the Operating Agreement and/or the AJVA, votes taken in two April 2018 manager or member meetings validly removed Koren as President of the Company. Relying on the AJVA's required vote of "75% of members interest" to change executive officers, Cinco alternatively asserts it validly removed Koren as President in an April 23, 2018 vote of 75% of the Company's ownership interests. (AJVA, ¶ 3) c).) Alternatively, Cinco relies on language in the Operating Agreement ("[a]ny officer may be removed, with or without cause, by the Managers at any regular or special meeting thereof . . . .") (OA, ¶ 4.11.4.) The evidence regarding the April 2018 meetings is as follows.

On March 27, 2018, Magsaysay Jr. sent an email to "our LA Partners" requesting a Member's meeting on April 9, 2018 with a proposed Agenda that included an election of the Board of Directors and Officers of the Board. The Minutes of the April 9, 2018 (apparently recorded by attorney Ben Olivas "acting corporate secretary for the meeting) identify, as the "Members" in attendance, Edward Hernandez (for Potato Corner International) and Koren, Amir Jacoby and Inbal Jacoby (for the LA Group.) (Complaint, BC705580, Exh. B.) Although the notice specified a "Members' " meeting, the Minutes also identify eight Company Managers as present: five individuals for Potato Corner International (Hernandez, Magsaysay Jr., Montinola

13

(by proxy), Montelibano (by proxy) and del Pilar) and three for the LA Group (Koren, Amir Jacoby and Inbal Jacoby.) (*Id.*)

The minutes are confusing with respect to the votes that were taken. According to the minutes, Hernandez confronted Koren, asking him to "explain why he withdrew all of PCJV's cash from the Wells Fargo accounts," and "why he signed the lease contract [for PCJV] by himself without informing Cinco Group as required by the LLC Operating Agreement." (*Id.* p. 3.) Hernandez then presided over an "Election of Managers and Officers" in which, according to the Minutes, the *Members* (identified as PC International, Amir Jacoby and Inbal Jacoby) voted in favor of removing "all LA Group members as *Managers*" by a vote of "75% vote of all Membership Interests." (*Id.*, p. 4.) Although that vote was to remove "*Managers*," the minutes recount that "[t]he remaining *Members*, by 75% of all Membership Interests voted to remove Mr. Koren as President" and to "[amend] Section 4.11.7 of the Operating Agreement to carry out this resolution." (*Id.*, p. 4.) (Emphasis added.) To effectuate these votes, an April 9, 2018 "Resolution of the Members of PCJV USA LLC" purports to eliminate the reference to Koren as President in Paragraph 4.11.7 of the Operating Agreement, identifying Magsaysay Jr. as the Company's (new) Chief Executive Officer and Hernandez as its Chairman of the Board. (*Id.*, Exh. F.)

After Koren's Counsel sent a an April 11, 2018 letter objecting to the April 9, 2018 election of Amir Jacoby and Inbal Jacoby as LA Group's Managers, Cinco convened a second meeting. According to the Minutes of the April 23, 2018 Special Meeting of Managers, Koren's attorney insisted the LA Group Managers were Koren, Alon Koren and Tom Hodgson. (Cross-Complt. Exh. J.) The April 23, 2018 Manager Meeting Minutes accordingly identify three different groups of managers in an effort to establish the validity of the votes to remove Koren as President: (1) the "April 11, 2018 Board" comprised of the three LA Group managers (Koren,

14

1   Alon Koren, Tom Hodgson) and the four managers representing the Cinco/PCI; (2) the "April 9

    Board" comprised of the managers who voted to remove Koren at the April 9, 2018 meeting; and

    (3) the "Prior Board" comprised of the managers in place before the April 9, 2018 meeting.

4   (*Id.*) The April 23 Minutes state there was a motion to remove "all of the Company's officers . .

5   . pursuant to Section 4.11.4 of the [Operating] Agreement" and a motion to elect new officers

6   (including Amir Jacoby as President) both passed "by a roll call vote." The minutes say that

7   these measures passed with the April 9 Board voting unanimously in favor; the Prior Board

8   voting with a majority vote in favor (Koren dissenting) and the April 11 Board voting with a

9   majority in favor (Koren, Alon Koren and Hodgson dissenting.) (Id, p. 2.) Referring to each of

    these votes, the April 23, 2018 Minutes assert that, "Therefore, regardless of whether the

11  Managers consisted of the Prior Board, April 9 Board or April 11 Board, the motion(s) passed"

12  by at least a majority vote of Managers. (*Id.*)

## II.    The May 11, 2018 TROs and OSCs

On May 11, 2018, the Court heard and granted, in part, cross applications for Temporary

Restraining Orders (TROs) and Orders to Show Cause why a Preliminary Injunction Should Not

Issue (OSCs) from Cinco and Koren. Pending the June 6, 2018 hearing on opposing OSCs, the

Court signed orders that essentially gave Cinco exclusive temporary operational control over the

Company while restraining Cinco from commenting on Koren's role as President or his authority

to manage and operate the Company.

### A.    Cinco's TRO and OSC

In favor of Cinco, the Court's May 11, 2018 TRO restrained Koren and his agents from

continuing to act as President of the Company with respect to the Company's property (bank

accounts, inventory, computers, business records and intellectual property, employees, and third

party suppliers, landlords, brokers, etc. The Court also ordered Koren to show cause, on June 6,

15

2018, why he should not be preliminarily enjoined from engaging in these activities and related conduct in connection with PCJV's business.

### B. Koren's TRO and OSC

In favor of Koren, the Court issued a May 11, 2018 Order directing Cross-Defendants to show cause why they should not be restrained from interfering with his management and operation of the Company, casting doubt on his title and authority to manage the company, relying on the April 9 or April 23, 2018 votes ostensibly removing him from office, using Company bank accounts, offices, records etc. Pending the June 6, 2018 hearing, the Order temporarily restrained cross-defendants from commenting on Koren's role as President or his authority to manage and operate the Company.

## III. Analysis of Cinco's Application

The central issue presented in Cinco's application is whether Cinco has established a probability of success on the merits of its claims for conversion, breach of fiduciary duty or breach of contract. If Cinco can demonstrate a probability of succeeding on any of these claims and that it will suffer great or irreparable harm if Koren remains as President of the Company, it is entitled to injunctive relief.

### A. Cinco Has Failed to Establish a Likelihood of Success in Demonstrating that Koren's Banking Activities Constituted a Breach

16

1   *of the Operating Agreement, a Conversion of Company Assets, or a*

2   *Breach of Fiduciary Duties*

###   1.   Cinco Has Failed to Establish Likely Success in Proving a

4

###   Wrongful Taking of Company Funds or Property

5

6       Amir Jacoby declares that on March 28, 2018, he learned that Koren "withdrew all of the

7   funds from [the Company's] Wells Fargo bank accounts, withdrawing more than \$1.2 million on

8   March 26, 2018. (Jacoby Decl. ¶¶ 8, 9.) Koren transferred the funds to a new account at JP

9   Morgan Chase Bank and designated himself as the only signor on the account. (*Id.*, ¶ 10.)

10   Jacoby asserts the withdrawals were not authorized by any other Manager or Member of the

11   Company. (*Id.*, ¶ 12.) Koren has refused to allow PCJV "full access to PCJV's bank accounts."

12   (*Id.*, ¶14.)   Jacoby accuses Koren of "dereliction of duties" in failing to provide a five-year

13   business plan. (*Id.*)   Jacoby asserts Koren was properly removed as President of the Company

14   on April 8, 2018 but has resisted relinquishing control of the Company since then. (*Id.*, ¶¶ 16 –

15   23.)   Jacoby accuses Koren of improperly controlling the Company's payroll system after that

16   removal. (*Id.*, ¶ 31.) He also accuses Koren of issuing Company checks after the checks were

17   "stolen" from Company premises by Koren's associate, Tom Hodgson. (*Id.*, ¶ 32 -33.)

18       Cinco contends that Koren's transfer of funds in the Company's bank account violated

19   paragraph 4.1.5 of the Operating Agreement which gives Managers the power "[t]o approve all

20   purchases and disbursements in excess of Ten Thousand Dollars (\$10,000) . . . ." (OA ¶4.1.5.)

21   This argument is not persuasive because, as noted above, the AJVA superseded the Operating

22   Agreement.

23       Even if 4.1 of the Operating Agreement was controlling, that agreement also gives the

24   Managers discretion to delegate such power to the officers. (OA, ¶ 4.1.) Cinco has failed to

25   provide evidence that, historically, the Managers have executed this discretion rather than

17

1    delegate it to the officers. The Court is therefore not persuaded that the Managers retained this

2    discretion. The Court is also not persuaded that Koren's transfer of Company funds to a

3    different bank account in the Company's name was a "purchase" or "disbursement" of Company

4    funds subject to 4.1 of the Operating Agreement. Under the Operating Agreement, Koren had

5    the power, as a Manager, to act on behalf of the Company and as the President, he had broad

6    authority to manage the affairs of the Company. (OA ¶¶ 4.16, 4.11.7.) These powers are

7    reasonably interpreted to include discretion to select and change the Company's financial

8    institution. Therefore even if the Operating Agreement was the operative agreement in the case,

9    Cinco would fail to establish likelihood of success in demonstrating Koren's banking activities

10    constituted a breach.

11       Cinco has also failed to provide evidence Koren's transfer of funds to the Chase account

12    involved any nefarious conduct such as the conversion of any funds to his personal use. Amir

13    Jacoby's testimony that Koren "returned" the transferred funds to the Company without

14    providing a "full accounting" is not evidence Koren absconded with any funds. (A. Jacoby

15    Decl., ¶ 15.) That Jacoby "thinks" there are funds missing is likewise not evidence Koren acted

16    improperly. (*Id.*)

17       Koren has meanwhile provided contrary evidence. He declares he has served as

18    President of the Company since October 16, 2012. (Koren Decl. 5/11/18 ¶ 2.) He specifically

19    denies misappropriating money from the Company, declaring he "simply moved accounts to a

20    different bank under the same entity names (not in my name) in order to safeguard the company

21    funds from further looting by Mr. Jacoby" and "promptly notified Cinco of this protective

22    measure that [he] was taking." (*Id.*, ¶ 3.)

23       Viewing the evidence as a whole, Cinco has failed to persuade the Court it will

24    successfully prove that Koren exceeded his authority or acted improperly in connection with the

25    change of banking relationship.

1

2

## 2.    Cinco Has Failed to Establish Koren's Performance as President Breached of Fiduciary Duties or Contracts

3       There is no dispute Koren has served as the Company's President and primary manager

4   since 2012. Cinco accuses Koren of breaching fiduciary duties by improperly negotiating a new

5   lease for the Company and failing to provide financials or a five year plan.

6       With respect to allegations he engaged in improper lease negotiations, Koren explains he

7   was properly negotiating a new lease because the current office lease, located from the

8   warehouse, was ending.  (*Id.*, ¶ 4.)  Koren asserts he has historically had authority to make such

9   decisions without "approval" from Cinco or other PCJV members or managers including the

10  Company's first five year lease.  (*Id.* ¶ 4.)  Koren also denies any improper conduct in his alleged

11  failure to prepare a five year strategic plan, pointing out Cinco Group gave him only a week to

12  prepare it during a time when he was busy with other tasks.  (*Id.*, ¶ 5.)

13      Moreover, there is evidence Cinco's efforts to oust Koren were precipitated by a dispute

14  unrelated to his performance as President.  As Hernandez acknowledges, LA Group's

15  contentions regarding alleged breaches of the right of first refusal were the source of the initial

16  friction between Cinco and LA Group.  (Hernandez Decl. ¶ 8.)  That disagreement led to

17  negotiations between the two entities about a possible buy-out, but the negotiations did not yield

18  a resolution.  (*Id.*, ¶ 9.)  Hernandez nevertheless attributes his "frustration with the L.A. Group

19  and Mr. Koren" to "LA Group's inability to produce financial or management reports that Cinco

20  repeatedly asked Mr. Koren to provide" and Koren's alleged failure to produce a business plan.

21      These claims are too vague and conclusory to persuade the Court that Koren's conduct

22  with respect to financials and a five year plan amounted to breaches of fiduciary duties.  While

23  the Court can appreciate that friction between the two entities led to Hernandez's frustration and

24  his opinion "that a change in PCJV's management was needed," the Court is not persuaded

25

19

Hernandez and his colleagues had the right to summarily remove Koren from his position.
(Hernandez Decl. ¶ 13.)

## B.  Cinco Has Failed to Establish Probable Success in Proving It Had the Contractual Right to Remove Koren by the Votes Taken in the April 2018 Meetings

Cinco contends that regardless whether the Operating Agreement or the AJVA is the operative agreement, it had the contractual right to remove Koren and properly exercised that right. As noted above, the Court regards the AJVA as the operative agreement but has serious concerns whether its terms (and, alternatively, the terms of the Operating Agreement) are sufficiently certain to be enforceable.

For purposes of interpreting the various agreements, the Court is guided by ordinary rules for contractual interpretation which include the following principles:

"The existence of mutual consent is determined by objective rather than subjective criteria, the test being what the outward manifestations of consent would lead a reasonable person to believe." (*Meyer v. Benko, supra,* 55 Cal.App.3d 937, 943, 127 Cal.Rptr. 846.) Outward manifestations thus govern the finding of mutual consent required by Civil Code sections 1550, 1565 and 1580 for contract formation. (See also 1 Witkin, Summary of Cal. Law (9th ed., 1987) Contracts, § 119, p. 144 ["... the outward manifestation or expression of assent is controlling. Mutual assent is gathered from the reasonable meaning of the words and acts of the parties, and not from their unexpressed intentions or understanding."] ) The parties' outward manifestations must show that the parties all agreed "upon the same thing in the same sense." (Civ.Code § 1580.) If there is no evidence establishing a manifestation of assent to the "same thing" by both parties,

20

then there is no mutual consent to contract and no contract formation. (Civ.Code §§ 1550, 1565 and 1580.)

In order for acceptance of a proposal to result in the formation of a contract, the proposal "must be sufficiently definite, or must call for such definite terms in the acceptance, that the performance promised is reasonably certain." (1 Witkin, Summary of Cal. Law (9th ed., 1987) Contracts, § 145, p. 169.) A proposal "cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain. [¶] The terms of a contract are reasonably certain if they provide a basis for determining...the existence of a breach and for giving an appropriate remedy." (*Ibid.,* quoting from Rest.2d Contracts, § 33.) If, by contrast, a supposed "contract" does not provide a basis for determining what obligations the parties have agreed to, and hence does not make possible a determination of whether those agreed obligations have been breached, there is no contract. (See, e.g., 1 Williston on Contracts (4th ed. 1990, Lord) § 4:18, p. 414 ["It is a necessary requirement that an agreement, in order to be binding, must be sufficiently definite to enable the courts to give it an exact meaning."]; see also Civ.Code § 3390, subd. 5 [a contract is not specifically enforceable unless the terms are *812 "sufficiently certain to make the precise act which is to be done clearly ascertainable."] )

Weddington Productions, Inc. v. Flick (1998) 60 Cal.App.4th 793, 811–812 [71 Cal.Rptr.2d 265, 277]

## 1. The Language of the AJVA Is Confusing and Uncertain

Although the Court regards the AJVA as the operative agreement, key provisions in the AJVA are inconsistent and uncertain. Cinco's primary contention under the AJVA – that it has the right to remove Koren as President based on a 75% vote of "member interests" -- rests on the contention the parties intended "member interests" to mean ownership interests.  The language

21

1   of the AJVA is equivocal with respect to that contention. As noted above, the JVA and the

2   AJVA use more specific terminology to refer to ownership interests such as "pro rata members'

3   interest in the Company" and "pro rata ownership share." (JVA ¶¶ 2) c) and d); AJVA ¶¶ 2) c)

4   and d).) The AJVA's reference to "member percentage interests" (rather than "member

    interests") in 2) c) particularly evidences the parties' intentions to use "percentage interests" to

6   denote ownership interests because that provision addresses contributions to capital accounts.

7   The decision to pay money into capital accounts is arguably the only decision that necessarily

8   must be made the members/owners of an LLC. By using the phrase "member percentage

9   interests" for capital accounts, the AJVA makes a distinction between ownership interests and

10  "member interests." That distinction suggests the parties intended "member interests" to mean

11  something other than or something less than ownership interests.

12          Moreover, the wording in Paragraph 3) c) just before the reference to "75% of members

13  interest" appears to use the terms "managers" and "members" interchangeably, referring to the

14  election of executive officers "by the *managers/members*." (AJVA ¶3) c).) (Emphasis added.)

15  Other language in Paragraph 3) a), also suggests the parties intended to use members and

16  managers as interchangeable terms. Although Cinco contends the first page of the AJVA

17  identifies four "members" of the Company (Potato Corner International, Koren, Amir Jacoby and

18  Inbal Jacoby), other language in Paragraph 3) a) suggests there are seven members, stating "the

19  Management shall be composed of seven (7) *members*," identifying the seven members as the

20  "named managers" (Magsaysay Jr., Montinola, Bennejo, Montelibano, Koren, Amir Jacoby and

21  Inbal Jacoby.) In Paragraph 3) b), the AJVA mandates a monthly "board meeting" for

22  Management but describes the participants as "members" noting, "[t]he members may, at their

23  discretion, invite non-members to join member meetings . . . ." The ensuing sentence, which

24  addresses Company Management, also conflates members with managers by allowing "a

25

22

majority of all member interests" to agree to cover travel expenses "incurred by the members named in Section 1) d) in attendance of said meetings."

The AJVA is also confusing with respect to the identity of the members. Paragraph 1) d) identifies Magsaysay Jr., Montinola, Bermejo and Montelibano as the "members" whose expenses can be reimbursed. This reference to Cinco's representatives as "members" (plural) is inconsistent with Cinco's contention Potato Corner International was the one and only Cinco Group "member." Identifying Magsaysay Jr., Montinola, Bermejo and Montelibano as "members" is arguably more consistent with an interpretation of "member interest" as the voting interest held by the seven "member/managers." Therefore, based on all of the language in the AJVA and reading it as a whole, the Court cannot conclude Cinco is likely to succeed in proving the parties intended "member interests" to mean ownership interests as opposed to the voting interests of the seven members and/or managers.

## 2.    The Extrinsic Evidence Is Conflicting and Inconclusive

The Court may consider extrinsic evidence to aid in the interpretation of a contract so long as the evidence is consistent with an interpretation that is reasonable. In this case, the extrinsic evidence offered by the parties is inconclusive with respect to the identity of the members of the LLC. Attorney Ben Olivas submitted a declaration as Corporate Secretary of the Company. Without averring that he is the custodian of records or explaining how or where he located corporate records, Olivas states that he has searched "available" corporate records and found a Membership Unit Ledger attached and certificates of LLC ownership identifying PCI International as the 60% owner of the Company with Nemanim, Koren and Amir Jacoby owning 15.2%, 15.2% and 9.6% respectively. (*Id.*, ¶¶3-5, Exhs. A & B.) Olivas does not lay any foundation to overcome hearsay objections to these documents. The Court therefore disregards them as inadmissible hearsay.

23

Following the June 6, 2018 hearing, Cinco presented additional extrinsic evidence
regarding the identity of the intended owners (LLC members) of the Company. Jose Magsaysay
Jr.'s June 13, 2018 Declaration asserts personal knowledge of events based on his status as a
founder and current President and CEO of Cinco and current CEO of the Company.

Regarding Potato Corner International, Inc. (PCI), the entity identified as a party to the
AJVA, Magsaysay Jr. avers PCI is a Delaware subsidiary of Cinco, offering a July 16, 2010
Certificate of Incorporation for PCI and certificates indicating PCI is 99.5% owned by Cinco.
(*Id.*, ¶3, Exhs. A, B.) The Court accepts this testimony as evidence Cinco will likely prove that
PCI is a duly formed subsidiary of Cinco.

Magsaysay avers that when the Company was formed, Cinco "took a 60% member
interest" and the "remaining 40% member interest" in the Company "has been held by
individuals . . . referred to as the LA Group." (*Id.* ¶¶ 4, 5.) Like attorney Olivas, Magsaysay Jr.
attaches extrinsic evidence comprised of "true and correct copies" of a July 16, 2010 Certificate
of Formation for the Company and four Certificates (all apparently signed by former LA Group
representative, Nemanim, as President) identifying the following persons as owners of
percentage LLC interests: PCI (60%); Nemanim (15.20%); Koren (15.20%) and Amir Jacoby
(9.60%). (*Id.*, ¶ 4, 5; Exhs. C, D.) Although Magsaysay Jr. fails to provide any concrete basis
for personal knowledge of the certificates and lays no foundation to overcome hearsay
objections, the certificates appear to be bona fide and the Court accepts them as extrinsic
evidence suggesting that Cinco and Nemanim intended the four parties to have the specified
percentages of ownership in the Company at or around the time when it was formed.

Koren provides contrary extrinsic evidence suggesting the parties agreed to have two
members of the LLC. The Company's 2015 and 2016 state and federal tax returns and K-1
forms authenticated by the declaration of the Company's accountant, Christopher Passmore,
identify two members of the LLC (owners of the Company): PCI (as 60% owner) and LA Group

(as 40% owner.)  (Passmore Decl., ¶ 4.)  Passmore obtained the returns via an email from Inbal Jacoby (with copies to Amir Jacoby and Koren.)  This evidence suggests the parties more recently intended to have two members/owners of the Company: PCI and LA Group.

In his June 13, 2018 Declaration, Koren provides additional evidence the parties intended the Company to have two members.  According to Koren, Cinco's attorney, Ben Olivas, made a powerpoint presentation in October 2010 to Koren, Magsaysay and others describing the Company has having two "shareholders" identified as PCI (with 60%) and LA Group (with 40%).  (Koren Decl. 6/14/18 ¶¶ 4, 5.)  The presentation refers to Cinco/PCI and LA Group each contributing capital their respective 60% and 40% "equity interest;" and explains that income will be divided between the shareholders "based on their pro rata ownership shares" described as "PC International = 60%; LA Group = 40%.)

Koren argues that presentation is evidence the parties intended to have two members owning the Company with a 60/40 split and that makes Cinco's argument the AJVA required a vote of 75% of ownership interests nonsensical because it would require a unanimous vote.  (Koren Decl. ¶5/30/18 ¶6.)  Korén also offers extrinsic evidence to support his argument the Company was always managed by the seven representatives voting equally.  According to Koren,  the Company "always conducted affairs by a vote of the 7 voting representatives."  (Koren 5/17/18 Decl. ¶ 7, 8.)  According to Koren, the Company "has always been governed by the 7-person board" and that "not once did we ever vote by equity percentage interests."  (Koren 5/30/17 Decl. ¶ 5.)[5]

Erlinda Bartolome offers testimony corroborating Koren's account.  As a franchise consultant and Corporate Secretary, she has attended numerous meetings among the Company's principals since its inception.  (Bartolome Decl. ¶¶ 8, 9.)    She points out that the seven

─────────────────

[5]  (Koren's other testimony about the identity of the intended members of the Company amounts to inadmissible evidence of unexpressed intentions (subjective evidence) rather than conversations or conduct (objective evidence.)  (E.g., Koren 5/30/18 Decl. ¶¶ 3, 5, 6, 7; Koren 5/17/18 Decl. ¶ 5.) )

25

"designated Managers/Members" (four from Cinco or PCI and three from LA Group) signed the JVA and AJVA and attended all meetings since 2010. (*Id.*, ¶¶ 14, 15.) Bartolome "does not recall the Board deciding/voting according to 60/40 equity percentage interests but it was always the 7 managers signing/deciding as 7 equal votes." (*Id.*, ¶ 16.)

Magsaysay Jr. and Amir Jacoby offer contrary evidence, asserting that the October 16, 2012 vote to remove the Company's first President (Nemanim) was a vote of "member interests." (*Id.*, ¶ 6.) In support of that statement, Magsaysay identifies a document entitled, "PCJV USA LLC MANAGERS MEETING – OCTOBER 16, 2012" as a "ballot" from the meeting. (*Id.*, Exh. E.) That document (which appears to contain the signatures of Magsaysay Jr., Koren and Amir Jacoby) describes the vote at that meeting in terms of percentages that, from Cinco's point of view, match the ownership percentages of the four members of the Company:

**"POTATO CORNER INTERNATIONAL** – 60% Represented by:

1. Jose P. Magsaysay

2. Jose Montinola

3. Maria Victoria Bermejo

4. Ricardo Montelibano

**LA GROUP**

1. Guy Koren – 15.20 %

2. Amir Jacoby 9.60 %

TOTAL VOTES FOR REMOVAL, 84.8%

APPROVED OCTOBER 16, 2012."

According to Magsaysay Jr., this was a vote of ownership interests and the reference to a "75% vote of Management" was just a mistake by the document's preparer, Erlinda Bartolome. (*Id.*, ¶

26

9.) He agrees with Bartolome that every other vote was unanimous. [6] (*Id.*, ¶ 16.) In his June 13, 2018 Declaration, Amir Jacoby corroborates Magsaysay Jr.'s testimony, averring that the October 16, 2012 vote to remove Nemanim was made by 84.8% of the ownership interests.[7]

Koren disputes that the vote at that meeting was by equity percentage interests. (Koren 6/13/18 Decl. ¶ 10). He points out it was a managers' meeting and that the managers "have no equity percentage in [the Company.]" (*Id.*) Koren contends that, as stated in the document, the vote was a "75% vote of Management," pointing out that the April 2018 votes to remove him as President were not votes of 75% of the managers. (*Id.*, ¶ 11.)

Koren is correct that there is language in the document that is inconsistent with Magsaysay Jr.'s contention it was a vote of ownership interests. The document describes the meeting as a "*managers* meeting" in the title and recounts that, in that meeting, "the *Managers* have approved that replacement of the . . . President . . . shall require a 75% vote of *Management;*" and that "PURSUANT TO THE ABOVE," the "*Managers* in the said meeting approved to remove AMIT NEMANIM as President of PCJV USA LLC and [have] designated GUY KOREN as his replacement." (Magsaysay Jr. Decl., Exh. E.)

From the Court's point of view, the documentation of the Company's meetings is in conflict and fails to memorialize a reasonably certain meeting of the minds as to the procedures and votes necessary to remove the President. Like the conflicting language in the parties' various agreements, the conflicting extrinsic evidence fails persuade the Court that Cinco is

---

[6] Magsaysay Jr.'s additional testimony about the parties' intentions require a 75% ownership vote to remove officers is not admissible because it describes the parties' unexpressed intentions. (*Id.*, ¶¶ 10 – 13.) He asserts that Koren has engaged in self-dealing about refers to documents that purport to show that the LA Group has "unilaterally increased their management fees annually" without Cinco's knowledge. (*Id.*, ¶¶ 20, 21.) The Court disregards this testimony because these issues were not raised in the moving papers and because it is primarily comprised of inadmissible opinions, hearsay and/or conclusions rather than admissible evidence.

[7] Like Magsaysay Jr., Jacoby also offers testimony about unexpressed intentions as to the meaning of "member interests," evidence the Court disregards as inadmissible.

27

likely to successfully prove the parties intended "75% vote of member interest" in the AJVA to mean ownership interests as opposed to the voting interests of the managers.

### 3. Cinco Has Failed to Demonstrate Likely Success Based on the Language of the Operating Agreement.

Cinco's contention it had the right to remove Koren under the terms of the Operating Agreement is also problematical. As noted above, the Operating Agreement, Paragraph 4.11.4, plainly vests the power to remove officers in the Managers rather than the LLC's members. (OA ¶ 4.11.4.) If the Operating Agreement (rather than the AJVA) is the operative agreement, Koren can be removed as President by a vote of four out of seven Managers.

Even if the Court were to accept Cinco's contention that Operating Agreement (rather than the AJVA) should govern, the Court is not persuaded Cinco would likely prevail. As with the terms of the agreements themselves, the evidence of the business transacted in the April 2018 meetings is confusing and inconsistent. Although the notice for the April 9, 2018 specifies a "Members Meeting," the April 9, 2018 Minutes describe a "Members' and Managers' Meeting" (seeming to use the terms "Manager" and "Member" are interchangeable). (Complt. BC 705580, Exh. B, C.) Whereas the Operating Agreement specifies the appointment of seven managers (four for Cinco and three for LA Group), the April 9, 2018 Minutes identify eight managers who are present: five for Potato Corner International and three for LA Group. (*Id.*) Although the Operating Agreement requires a vote of managers to remove an officer, the April 9, 2018 Minutes do not describe a *Managers'* vote to remove Koren. Instead, they recount that the *Members* voted "by 75% vote of all Membership Interests" to remove Koren as president. Based on this evidence, the Court cannot conclude Cinco is likely to succeed in proving that, consistent with the Operating Agreement, there was a majority vote of Managers to remove Koren on April 9, 2018.

1    The re-vote by the "Prior Board" at the April 23, 2018 arguably corrects this problem.

2    Under the Operating Agreement, the "Cinco Group" was entitled to name four Managers and the

3    LA Group was entitled to name three Managers including Amir Jacoby. With votes from four

4    or more Managers voting against Koren, Cinco arguably had the majority of Manager votes

5    necessary to remove him from office on April 23, 2018 under the Operating Agreement's

6    Paragraph 4.11.4.

7    However, as noted above, the Operating Agreement does not appear to be the operative

8    contract. There is evidence the Company modified the Operating Agreement to require a

9    supermajority of Managers to remove Koren and then executed the AJVA which, by its terms,

10   supersedes the Operating Agreement. Therefore, to the extent Cinco relies on the Operating

11   Agreement as the source of a contractual right to remove Koren based on the April 2018 votes,

the Court is not persuaded it is likely to prevail.[8]

## 4. Cinco Has Failed to Establish It Will Suffer Great or Irreparable Harm

Where the potential harm is very great or irreparable, a Court may issue a preliminary

injunction even where a party fails to demonstrate a probability of success on the merits but does

present evidence supporting each element of its claim. (*Jessen v. Keystone Savings & Loan

Assn.* (1983) 142 Cal.App.3d 454, 459.) In this sense, the standard for issuing a preliminary

injunction is elastic or a "sliding scale." (*Butts v. State* (1992) 4 Cal.4th 668, 678.) The Court

_____

[a] Koren also argues the Court should deny Cinco's request for injunction because Hernandez acquired his interest in Cinco and PCI without Koren's consent and in violation of Koren's right of first refusal. (AJVA 2) d.) Under the AJVA: "[n]either Party shall assign any of its rights . . . under this Agreement nor his/its member interests in the Company without the prior written consent of the other Party. In the event either Party desire (sie) to transfer or sell his/its pro rata members interest in the Company to a person other than those specifically named in Section 1(a) of this Agreement, such Party shall be obligated to sell the same first to the other Party, which has have [sic] thirty (30) days within which to exercise its rights of first refusal . . . ." (*Id.*) There is insufficient evidence for the Court to determine whether or not Koren is likely to succeed on this argument.

29

therefore examines whether Cinco's showing of harm is so compelling that the Court should provide injunctive relief notwithstanding Cinco's failure to demonstrate probable success on the merits.

Because Cinco owns 60% of the Company, one could argue that any harm to the Company falls more heavily on Cinco than on other lesser owners, such as Koren. However, as noted above, the Court is not persuaded Koren has or is harming the Company by breaching fiduciary duties or otherwise. To the contrary, based on Koren's testimony and his corroborating evidence, Koren has and is conferring benefit on the company by diligently and ably performing his duties as President. (See, e.g., Declarations of Hodgson, Bartolome, Zhang, Shaikh, Grudnowski, and Lai.)

The primary harm to the Company established by the evidence on both sides is the uncertainty among persons doing business with the Company as to who is in charge of operations. Because the uncertainty arguably resulted from Cinco's conduct (the votes in the April 9 and April 23, 2018 meetings to oust Koren and correspondence to third parties regarding the outcomes of the votes), it would not be equitable for the Court to weigh the harm caused by uncertainty in favor of Cinco.

## IV.   Analysis of Koren's Application for TRO and OSC

As summarized above, Koren has presented evidence he bargained for the right to maintain his status as President of the Company unless and until 75% of the Company's seven appointed managers (three of whom are controlled by LA Group which is, in turn, controlled by Koren) vote to remove him. In addition, Koren has strong evidence he and the Company will suffer harm if cannot perform as President. He declares that his replacement, Jacoby, has "rarely participated in the day-to-day operations of PCJV and has little knowledge or experience with the internal workings of the Company." (Koren Decl. 5/30/18, ¶ 6.) Koren asserts that Jacoby

30

"runs a full time construction business" and has little interest in running the Company. (*Id.*, ¶ 8.) He also points out that the other Cinco representatives are based in the Philippines and not well positioned to run the Company. (*Id.*) Koren has also presented evidence he stands to lose substantial salary and status if he is removed from his position as President. (*Id.*, ¶ 10.) Koren has therefore made the stronger showing with respect to the element of great or irreparable harm.

Under Code of Civil Procedure Section 526, subdivision (a), the Court may issue a preliminary injunction:

(1) When it appears by the complaint that the plaintiff is entitled to the relief demanded, and the relief, or any part thereof, consists in restraining the commission or continuance of the act complained of, either for a limited period or perpetually.

(2) When it appears by the complaint or affidavits that the commission or continuance of some act during the litigation would produce waste, or great or irreparable injury, to a party to the action.

(3) When it appears, during the litigation, that a party to the action is doing, or threatens, or is about to do, or is procuring or suffering to be done, some act in violation of the rights of another party to the action respecting the subject of the action, and tending to render the judgment ineffectual.

Koren has presented substantial evidence of likely success on the merits of his claim coupled with strong evidence he will suffer great or irreparable harm if Cinco is not restrained from interfering with his performance of his duties as President of the Company. It also appears that Cinco's continued conduct in preventing Koren from resuming his duties will tend to render any judgment for Declaratory Relief in favor of Koren ineffectual.  Therefore, under Section 526, subdivision (a), subsections (1), (2) and (3), Koren is entitled to a preliminary injunction.

31

The Court ordered Cinco to show cause why it should not be restrained from various
2   activities including a) interfering with his management of the Company; b) casting doubt on his
3   title as President and authority to manage the Company; c) relying on the April 2018 votes to
4   deny him management rights or as a basis to terminate the Master Service Agreement; d) using
5   Company bank accounts or relationship without Koren's authorization; e) interfering with
6   Koren's efforts to enter into stipulations for Wells Fargo's release of frozen funds to the
7   Company; f) interfering with Koren's engagement of attorneys to represent the Company, LA
8   Group and other entities in lawsuits and other legal matters; g) refusing to give Koren access to
9   Company offices, documents, books, records, computer, computer systems, accounts, emails,
10  and email addresses; h) refusing to cooperate with Koren in any way that is detrimental to the
11  Company's success.  The Court is satisfied Koren is entitled to injunctive relief as to (a) through
12  (e) and (g) but declines relief as requested in f) above because the Court has no evidence of
13  interference with Koren's engagement of attorneys to represent the Company. The Court also
14  declines to issue an order as to h) above because the proposed order is too vague to be
15  enforceable.

16      The court also denies Koren's request for orders compelling Cinco to return to Koren all
17  keys to the Company's physical locations; restore Company email access; return Company funds
18  and bank accounts to Koren's control and dismiss any lawsuits filed on behalf of the company
19  including PCJV USA LLC v. Guy Koren (BC705580.) The latter four requests for are denied
20  because they are duplicative of other relief or because they are framed as mandatory injunctions
21  rather than restraining orders. Mandatory injunctions are immediately appealable and require a
22  stronger showing of proof than Koren has provided in this case.

23      The Court also denies Koren's request the Court appoint a receiver as moot.

24

25

32

## V.  Conclusion

The Court DENIES Cinco's request for injunctive relief.

The Court GRANTS Koren's request for injunctive relief and enters a preliminary injunction ordering Cinco to refrain from:

1) interfering with Koren's management of the Company as its President;

2) communicating with Company customers, venders, contractors and other third parties to this action in a manner that casts doubt on Koren's title as President and/or his authority to manage the Company;

3) relying on the April 2018 votes to deny him management rights or as a basis to terminate the Master Service Agreement;

4) using Company bank accounts or relationships without Koren's authorization;

5) interfering with Koren's efforts to enter into stipulations for Wells Fargo's release of frozen funds to the Company;

6) refusing to give Koren access to Company offices, documents, books, records, computer, computer systems, accounts, emails, and email addresses.

The Court ORDERS Koren to post a bond in the amount of $25,000.

Dated: June 19, 2018

AMY D. HOGUE, JUDGE

Judge of the Superior Court

33

# EXHIBIT B

## POTATO CORNER USA
## JOINT VENTURE AGREEMENT

This Joint Venture Agreement (the "Agreement") dated _____ is made and
entered into on _____, by and between:

Cinco Corporation, a corporation duly existing and registered by virtue of and
under the laws of the Republic of the Philippines with office address at 869
Katarungan Street, Plainview Mandaluyong City, Philippines 1550, represented
herein by its duly authorized representative, Jose P. Magsaysay (hereinafter
"Cinco"), and its directors, Jose P. Magsaysay, Jr., Jose Miguel Ma. G. Montinola,
Ma. Victoria O. Bermejo, Ricardo K. Montelibano, all of whom are Philippine
citizens and resident, and collectively referred to as the "Cinco Group";

-and-

AMIT NEMANIM, GUY KOREN, AMIR JACOBY, all of whom are U.S.
citizens and residents and collectively referred to as the "LA Group:

### RECITALS

WHEREAS, the Parties hereto have agreed to form a limited liability company (hereinafter
referred to as the "Company") under the laws of the State of Delaware, with the primary
purpose of engaging in the business of establishing, operating, managing, licensing and
franchising "Potato Corner" stores/outlets in the United States of America and Israel, except
in the County of Los Angeles, USA and the County of San Francisco, USA and Tanforan
Mall (hereinafter, "Territory").

WHEREAS, the Parties herein have agreed to enter into this Agreement which sets forth
the terms and conditions with respect to the organization, incorporation, operation and
management of the Company and defines their respective rights, duties and obligations of
the parties to this Agreement.



WHEREAS, the Parties agree that the LLC operating agreement to be entered by them
shall reflect the terms and conditions as set forth in this Agreement.

WHEREAS, Cinco may assign and or all of its rights to the joint venture company formed
under this Agreement to a wholly-owned subsidiary as it deems fit.

NOW, THEREFORE, for and in consideration of the foregoing premises, the Parties hereby
agree as follows:

## 1) ORGANIZATION AND FORMATION OF THE COMPANY

a) Within ten (10) days from the Effective Date of this Agreement, the Parties herein
agree to organize and form, a limited liability company to be called "PCJV USA" (
hereinafter referred to as the Company) for the primary purpose of engaging in
the business of establishing, operating, managing, licensing and franchising
"Potato Corner" stores/outlets in the Territory.

b) The initial members of the Company shall be the following:

   i) Cinco Group
      (1) Cinco
      (2) Jose P. Magsaysay, Jr.
      (3) Jose Miguel Ma. G. Montinola
      (4) Ma. Victoria O. Bermejo
      (5) Ricardo K. Montelibano

   ii) LA Group
      (1) Amit Nemanim
      (2) Guy Koren
      (3) Amir Jacoby

c) The principal office of the Company shall be at   1729 Santee St., Los Angeles, California 90015.

d) The annual general meeting of the members of the Company shall be held every year at the principal office of the Company.   The members may, at their discretion, invite non-members to join the annual general meeting, but only as non-voting observers.  Further, to the extent allowed by the financial condition of the Company, and as agreed upon by a majority of all member interests, the Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses incurred by the following members in attendance of the annual members' meeting: Jose P. Magsaysay, Jr., Jose Miguel Ma. Montinola, Ma. Victoria O. Bermejo and Ricardo K. Montelibano.

e) The fiscal year of the Company shall begin on January 1 and end on December 31 of each year.

f) The Company shall immediately upon formation obtain a "Liability Insurance" for the Company the amount and scope of coverage to be determined by the managers.

g) All costs, fees and expenses incurred in connection with the organization and formation of the Company shall be for the account of the Company.

h) The operating agreement of the Company shall reflect the terms and conditions set forth in this Agreement between the Parties.



2) CAPITALIZATION/OWNERSHIP OF THE COMPANY

   a) At the time of formation, the Company shall have a total capital account of Fifty Thousand Dollars (US$50,000) which shall be fully subscribed and paid.

   b) Unless other agreed to in writing, at the commencement of this Agreement, the Parties hereby agree that the Cinco Group shall contribute Thirty Thousand Dollars (US$30,000) and own sixty (60%) percent of the Company's capital accounts, while the LA Group shall contribute Twenty Thousand Dollars (US$20,000) and own the remaining forty (40%) percent.

2

c) The Parties hereby agree any increase in the capital account shall require an affirmative vote of 75% of all of the members' percentage interests in the Company. In the event an increase in the Company's capital accounts is approved by the members, both Parties shall have rights of pre-emption so that their pro rata ownership share in the Company shall be maintained, provided that, either Party shall have thirty (30) days within which to confirm in writing that it is willing and able to subscribe and fully pay its pro rata share of the increase in capital.

d) Neither Party shall assign any of its rights or obligations under this Agreement, nor his/its member interests in the Company without the prior written consent of the other Party. In the event either Party desire to transfer or sell his/its pro rata members interest in the Company to a person other those specifically named in Section 1(a) of this Agreement, such Party shall be obligated to sell the same first to the other Party, which has have thirty (30) days within which to exercise its rights of first refusal from the date of receipt of a written notice to sell. For this purpose, the Parties hereby agree that the right of first refusal may be exercised in accordance with the following formula:   The average of the Company's earnings before interest, depreciation, taxes and amortization (EBITDA) for the last two (2) years multiplied by 5 times, and further multiplied by the percentage of member interest subject to such right of first refusal over total outstanding member interests.

3) MANAGEMENT OF THE COMPANY

a) As will be provided in the Operating Agreement, the business and affairs of the Company shall be managed and all of the Company powers shall be exercised by or under the direction of the managers (collectively referred to as "Management"). Unless otherwise agreed to by the parties, the Management shall be composed of seven (7) members, four (4) of whom shall be designated by the Cinco Group, and three (3) designated by the LA Group. Upon the formation of the Company, the following shall be named managers: Jose P. Magsaysay, Jr., Jose Miguel Ma. Montinola, Ma. Victoria O. Bermejo, Ricardo K. Montelibano, Amit Nemanim, Guy Koren, and Amir Jacoby.



b) The Management shall regularly meet on a monthly basis. The regular monthly board meeting may be done via teleconference or through the internet. The members may, at their discretion, invite non-members to join member meetings, but only as non-voting observers. Further, to the extent allowed by the financial condition of the Company, and as agreed upon by a majority of all member interests, the Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses incurred by the members named in Section 1(d) in attendance of said meetings.

c) Upon the formation of the Company, it shall have the following executive officers: President, Corporate Secretary and Treasurer, and the following shall be elected by the members to serve these positions:

   i)   Chairman of the Board of Members – Jose P. Magsaysay

3

ii) President – At any given time, the President shall be any one of the following members: Amit Nenamin, Guy Koren or Amir Jacoby, and the first president will be Amit Nemanim

iii) Corporate Secretary – Erlinda Bartolome.

iv) Treasurer – Jose Miguel Ma. Montinola

(1) The Treasurer shall have oversight functions over the Accounting and Finance Departments that shall be exercised independent of the President.

d) Additional executive officers may be appointed by Management as it may deem necessary.

e) It is hereby agreed that the rights and responsibilities of the Management shall include the following:

i) Approval of the compensation package for the managers, executive offices and key personnel.

ii) Approval of the Accounting System/Procedures/Software/Method to be used by the Company.

iii) Approval of the operating budget of the Company, and any changes to it.

iv) Approval of all franchising agreements, and lease agreements.

v) Approval of all purchases and disbursements in excess of $10,000, provided that such amount may be changed or modified by Management as it deems necessary.

f) The executive officers shall manage the business and property of the Company, and to market the business, in accordance with and pursuant to the directives of and policies set by the Management of the Company. The Management of the Company can recall and/or withdraw the appointment of any executive officer, as it deems necessary.

g) The Company shall enter into a Master License Agreement with Cinco (or an affiliated company to be designated by Cinco) which shall include the following terms and conditions:

i) The Company agrees to license the "POTATO CORNER" intellectual property rights from Cinco or an affiliated company to be designated by Cinco) consisting of (i) the trademark, service mark and trade name "POTATO CORNER"; and (ii) various trademarks, service marks, trade names, slogans, designs, insignias, emblems, symbols, color schemes, package features, logo and other propriety identifying characteristics used in relation and in connection with the "Potato Corner" Products and the System; and (iii) as well as other intellectual property rights in connection with the "POTATO CORNER" intellectual property rights, for use in the Territory.

ii) The Company agrees to pay, as an arm's length license fee, the following amounts:

(1) With respect to the licensing / sub-licensing or franchising the "POTATO CORNER" intellectual property rights in connection with the "POTATO CORNER" outlets/stores, an amount equal to thirty percent (30%) of all



4

initial/franchise fees and ongoing royalty fees paid to/ collected by the Company. Payments shall be made to Cinco (or an affiliated company to be designated by Cinco) by wire transfer using a bank or other financial institution specified by it within thirty (30) days from receipt of the fees by the Company.

(2) All withholding and other applicable taxes levied by any authority on the payments by the Company shall be borne solely by the Company.

h) The Company agrees to engage the LA Group to provide management and strategic experience and expertise during the duration of this Agreement. The Company shall enter into a Master Services Agreement with the LA Group (or a corporation to be designated by the LA Group) which shall include the following terms and conditions:

i) In consideration for the provision of its services under the Master Services Agreement, the LA Group shall be entitled to a services fee equal to thirty (30%) percent of all initial/franchise fee and continuing royalty fees paid to/ collected by the Company .

ii) All withholding and other applicable taxes levied by any authority on the payments by the Company to the LA Group under this Agreement shall be borne solely by the Company.

iii) The LA Group shall faithfully, diligently and efficiently exercise its obligations and responsibilities under the Master Services Agreement.

iv) The LA Group shall maintain and protect the Confidential Information belonging to Cinco or the Company, and such undertaking shall apply to all of its partners, officers, employees, or agents.

i) The President of the Company shall render the following services and shall perform the following duties for the Company in a faithful, diligent and efficient manner:

i) The President shall be responsible for all management, operational, marketing, establishment, maintenance, licensing and sub-licensing activities with respect to the "Potato Corner" outlets/stores in the Territory. He shall use his best efforts at all times during the term of this Agreement to operate and maintain the "Potato Corner" outlets/stores in the Territory according to the highest standards achievable consistent with the overall plan of the Management of the Company. The President shall comply with the rules, policies and procedures approved by the Management of the Company from time to time.

ii) The President shall advertise market and promote the "Potato Corner" outlets/stores with the goal of causing public knowledge, awareness and patronage of the "Potato Corner" outlets/sites.

iii) The President shall maintain a comprehensive system of records, books and accounts, with respect to the licensing and sub-licensing activities, operation,



5

establishment, management, maintenance and other activities of the "Potato Corner" outlets /stores in the Territory with the assistance of the Corporate Secretary.

iv) No later than the twentieth (20th) day of each month, with respect to the preceding month, the President shall render a statement of receipts and disbursements, a schedule of accounts receivable and payable, and a schedule of fees collected and distributed, together with a reconciled bank statement as of the last day of the month with the assistance of the Corporate Secretary.

v) No later than three (3) months after the end of a fiscal year, the President shall, with the assistance of the Corporate Secretary and external accountant hired by Management, cause the Company to issue audited financial statements, and shall provide a copy of the same to all the members of Management.

vi) To the extent the President is lawfully able to do so, the President shall take such action as may be necessary to comply promptly with any and all laws, ordinances, orders or other requirements of any federal, state, county or municipal authority having jurisdiction of the Company and affecting the Company.

j) Consistent with its fiduciary duty to the Company, the members and managers shall exercise the duty of care and shall, at all times, ensure that all corporate opportunities consistent with the objectives of this Agreement shall be pursued on behalf of, and for the benefit of the Company. As such, with respect to the establishment of Company-owned stores, whenever potential locations are identified by any member or manager, it shall be promptly brought to the attention of the Management. At all times, and within thirty (30) days from receipt of this information, the Management shall decide to either build a Company-owned store at the identified location. In the event the Company chooses to build a Company-owned store at the identified location, it shall have the right to do so, to the exclusion of any of the members or managers. However, in the even the Company decides not to build a Company-owned store at the identified location, it shall notify the members and managers of its decision in writing. In such case, the LA Group shall have the right to build a store at the identified location, provided that it shall enter into a franchising agreement with the Company, and shall pay the franchise fees and ongoing royalty fees as set forth in the Company's standard franchising agreement.



4) DURATION OF AGREEMENT

a) This Agreement shall become effective from the date of execution hereof and shall continue indefinitely unless otherwise terminated by (i) an affirmative vote of 75 percent (75%) of all member interests, or (ii) upon mutual agreement by the Parties in writing.

b) Upon termination of this Agreement, the effects of termination shall be as follows:

6

    i) All rights granted under the Master License Agreement shall terminate and the Company shall cease the use of the Potato Corner Intellectual Property Rights, and Confidential Information, provided however, that the Company shall be permitted to use any of the foregoing as is reasonably required in order to comply with its obligations under its sub-licensing or franchising agreements, but only to the extent of the duration of sub-licensing or franchising agreements in existence at the time of the termination of this Agreement.

    ii) The LA Group shall be subject to a non-compete arrangement and hereby agrees that, within two (2) years from the date of termination of this Agreement, it shall not engage in the business of establishing, operating, managing, licensing and franchising identical or similar products sold by the Company, using the intellectual property rights identical or similar to those used by the Company, at the time of the termination of this Agreement.

5) GENERAL PROVISIONS

    a) This Agreement may not be altered, changed, supplemented or modified except by a written instrument duly signed by the Parties.

    b) The Parties shall use their best efforts to cooperate for the success of the business of the Company. The Parties further agree to perform all acts and execute and deliver all documents or instruments required or necessary to fully implement or consummate the transactions contemplated in and the intent underlying this Agreement.

    c) The Parties shall, to the extent feasible, cause the operating agreement of the Company to reflect the mutual covenants and provisions contained in this Agreement.

    d) All notices and other communications required or permitted to be given hereunder shall be given in writing (and for this purpose shall include emails or fax transmissions) and shall be addressed to the appropriate Party at the address of such Party as heretofore designated, or at such address as such Party may designate subsequently in writing.

    e) The failure of any Party at any time to require performance by the others of any provision of this Agreement shall not affect, in any way, the right of such Party to require performance of that or any other provision, and any waiver by any Party of any breach of this Agreement shall not be construed as a waiver of any continuing or succeeding breach of such provision, or a waiver of any other right under this Agreement.

    f) This Agreement shall constitute the entire agreement between the Parties and shall supersede any previous agreements, written or otherwise, with respect to the same subject matter which may have been made by the Parties prior hereto.

    g) The invalidity of any portion of this Agreement will not and shall not render the entire Agreement void, nor affect the validity of the rest of the provisions of this Agreement.



7

h) This Agreement shall be governed by the laws of the State of California.

i) Parties acknowledge that, from time to time, one Party (the "Discloser") may disclose to the other Party (the "Recipient") information: (a) relating to the Potato Corner outlets and sites; (b) relating to the Potato Corner Intangible Property Rights; (c) Potato Corner product specifications and related information; (d) which is marked with "confidential" or a similar legend; (e) which is described orally and designated as confidential; or (f) which would, under the circumstances, be understood by a reasonable person to be confidential ("Confidential Information"). Upon subsequent disclosure of previously disclosed Confidential Information to the Recipient by the Discloser, the information will remain Confidential Information even if not identified as Confidential Information at the subsequent disclosure.     Recipient shall retain such Confidential Information in confidence, and shall not disclose it to any Third Party or use it for other than the purposes of this Agreement without the Discloser's prior written consent. Each Party shall use at least the same procedures and degree of care with respect to such Confidential Information which it uses to protect its own confidential information of like importance, and in no event less than reasonable care. The Recipient will immediately give written notice to the Discloser of any unauthorized use or disclosure of the Discloser's Confidential Information, and the Recipient will assist the Discloser in remedying such unauthorized use or disclosure.

[The Remainder of This Page is Left Intentionally Blank]



WEST\222455823.2

IN WITNESS WHEREOF, the parties have executed this Agreement on the date and in place first mentioned.
**Cinco Group:**

Cinco Corporation (Philippines)

Name: Jose P. Magsaysay

Title:   CEO

Jose P. Magsaysay, Jr.,

Jose Miguel Ma. G. Montinola

Ma. Victoria O. Bermejo

Ricardo K. Montelibano,

**L.A. Group:**

Amit Nemanim

Guy Koren

Amir Jacoby

SIGNED IN THE PRESENCE OF:

9

# EXHIBIT C

(JPEG Image, 2550 × 3270 pixels) - Scaled (22%)

PBP BOARD MEETING
October 10, 2013 PBW Office Wilshire, Los Angeles,
11:00 am to 1:00 pm

Attendance

Directors

Attorney - Corporate Secretary

b. On EşBartolome's consultancy Board approved the
consultancy through the Board's signature on a
written document. To enable PCJV to pay the
amount. Consultancy fee will temporarily be
increased to US 2,300.00 until the US 11,000.00
from previous months will have been paid. The
difference will be paid to Cinco. Consultancy fee will
go back to US 1,300.00 until amount is paid. Inbal
given copy of this signed document.

The Board approved that the amount of US
__000.00 be taken up as long - term liability of
PCJV.

d. The Board discussed the billings of DLA Piper and
GW and Amir will negotiate with Kim on possible
discount on billings.

Operating Agreements and Structure

a. There are two Operating Agreements:
   i. Internal operating Joint Venture, signed by all
      Directors.
   ii. Limited Liability Operating Agreement of PCJV
       USA LLC filed with the government.
   iii. Sections of the Internal Joint Venture are
        created in the LLC Operating Agreement

b. Mandi & K
   i. License Agreement with NKM will then
      be altered and shall be migrated to an ADA from.
   ii. Yonoti & E
   iii. Prior to migration to ADA for JMK, GW and
        Amir, there is a need for all Shareholders

NKM to sign Out Claim and Memorandum of
Understanding.
i. FXK shall be the new company in place of NKM
and will sign an NDA with PCIY Franchise fee
will remain the same US 1,500.00
ii. Guy will take care of negotiation with Amir.

On the 30/30 share of Franchise Fees and Royalties
per Joint Venture Agreement:
i. Board has approved that this will not be an
expense in the P & L of PCIY but shall be given
as part of its distributive income.
ii. Since Amir is no longer a Managing Partner in
PCIY, the 30% share of the LA Group shall be
divided between Guy and Amir.

Board reviewed and discussed the Joint Venture
agreement. The following revisions were approved:
i. Section 14.2 - 'Transfer of ...' - the ... will
change to 'sell ... '
ii. ... USA Group ... change its position ...
... shall ... the ... of PCIY.

... clarification in the provisions of Article ...
the Management of the company as ...
member ...
when a member of the ... directors in the
... by a ... shall be replaced ... will ... in the
management of the company ...

(JPEG Image, 2550 × 3270 pixels) - Scaled (22%)

https://mail-attachment.googleusercontent.com/attachment/u/0/?ui=2.

# EXHIBIT D

## PCJV USA LLC
## JOINT VENTURE AGREEMENT
### (FIRST AMENDMENT TO THE JV AGREEMENT)

This Joint Venture Agreement (the "Agreement") is made and entered into on OCTOBER 17, 2012 at its Principal Office , Suite #1100, 6380 Wilshire Blvd Los Angeles, CA 90048 by and between:

POTATO CORNER INTERNATIONAL, a corporation duly existing and registered by virtue of and under the laws of the State of Delaware, US with office address at 92 Corporate Park Suite C-332, Irvine, California, USA 92606, represented herein by its duly authorized representative, Jose P. Magsaysay (hereinafter "PCI"), and its directors, Jose P. Magsaysay, Jr., Jose Miguel Ma. G. Montinola, Ma. Victoria O. Bermejo, Ricardo K. Montelibano, all of whom are Philippine citizens and resident, and collectively referred to as the "PCI Group";

-and-

GUY KOREN, AMIR JACOBY AND INBAL JACOBY all of whom are U.S. citizens and residents and collectively referred to as the "LA Group:

## RECITALS

WHEREAS, the Parties hereto have agreed to form a limited liability company (hereinafter referred to as the "Company") under the laws of the State of Delaware, with the primary purpose of engaging in the business of establishing, operating, managing, licensing and franchising "Potato Corner" stores/outlets in the United States of America and Israel, except in the County of Los Angeles, USA and the County of San Francisco, USA and Tanforan Mall (hereinafter, "Territory").

WHEREAS, the Parties herein have agreed to enter into this Agreement which sets forth the terms and conditions with respect to the organization, incorporation, operation and management of the Company and defines their respective rights, duties and obligations of the parties to this Agreement.

WHEREAS, the Parties agree that the LLC operating agreement to be entered by them shall reflect the terms and conditions as set forth in this Agreement.

WHEREAS, Cinco may assign and or all of its rights to the joint venture company formed under this Agreement to a wholly-owned subsidiary as it deems fit.

NOW, THEREFORE, for and in consideration of the foregoing premises, the Parties hereby agree as follows:

1) ORGANIZATION AND FORMATION OF THE COMPANY

   a) Within ten (10) days from the Effective Date of this Agreement, the Parties herein agree to organize and form, a limited liability company to be called "PCJV USA" ( hereinafter referred to as the Company) for the primary purpose of engaging in

the business of establishing, operating, managing, licensing and franchising "Potato Corner" stores/outlets in the Territory

b) The initial members of the Company shall be the following:

   i) Potato Corner International (PCI)
      (1) Jose P. Magsaysay, Jr.
      (2) Jose Miguel Ma. G. Montinola
      (3) Ma. Victoria O. Bermejo
      (4) Ricardo K. Montelibano

   ii) LA Group
      (1) Guy Koren
      (2) Amir Jacoby
      (3) Inbal Jacoby

c) The principal office of the Company shall be at   Suite 1100, 6380 Wilshire Blvd Los Angeles, CA 90048 USA.

d) The annual general meeting of the members of the Company shall be held every year at the principal office of the Company.  The members may, at their discretion, invite non-members to join the annual general meeting, but only as non-voting observers.  Further, to the extent allowed by the financial condition of the Company, and as agreed upon by a majority of all member interests, the Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses incurred by the following members in attendance of the annual members' meeting: Jose P. Magsaysay, Jr., Jose Miguel Ma. Montinola, Ma. Victoria O. Bermejo and Ricardo K. Montelibano.

e) The fiscal year of the Company shall begin on January 1 and end on December 31 of each year.

f) The Company shall immediately upon formation obtain a "Liability Insurance" for the Company the amount and scope of coverage to be determined by the managers.

g) All costs, fees and expenses incurred in connection with the organization and formation of the Company shall be for the account of the Company.

h) The operating agreement of the Company shall reflect the terms and conditions set forth in this Agreement between the Parties.

2) CAPITALIZATION/OWNERSHIP OF THE COMPANY

a) At the time of formation, the Company shall have a total capital account of Fifty Thousand Dollars (US$50,000) which shall be fully subscribed and paid.

b) Unless other agreed to in writing, at the commencement of this Agreement, the Parties hereby agree that the Cinco Group shall contribute Thirty Thousand Dollars (US$30,000) and own sixty (60%) percent of the Company's capital

WEST\222455623.2

accounts, while the LA Group shall contribute Twenty Thousand Dollars (US$20,000) and own the remaining forty (40%) percent.

c) The Parties hereby agree any increase in the capital account shall require an affirmative vote of 75% of all of the members' percentage interests in the Company. In the event an increase in the Company's capital accounts is approved by the members, both Parties shall have rights of pre-emption so that their pro rata ownership share in the Company shall be maintained, provided that, either Party shall have thirty (30) days within which to confirm in writing that it is willing and able to subscribe and fully pay its pro rata share of the increase in capital.

d) Neither Party shall assign any of its rights or obligations under this Agreement, nor his/its member interests in the Company without the prior written consent of the other Party In the event either Party desire to transfer or sell his/its pro rata members interest in the Company to a person other those specifically named in Section 1(a) of this Agreement, such Party shall be obligated to sell the same first to the other Party, which has have thirty (30) days within which to exercise its rights of first refusal from the date of receipt of a written notice to sell. For this purpose, the Parties hereby agree that the right of first refusal may be exercised in accordance with the following formula: The average of the Company's earnings before interest, depreciation, taxes and amortization (EBITDA) for the last two (2) years multiplied by 5 times, and further multiplied by the percentage of member interest subject to such right of first refusal over total outstanding member interests.

3) MANAGEMENT OF THE COMPANY

a) As will be provided in the Operating Agreement, the business and affairs of the Company shall be managed and all of the Company powers shall be exercised by or under the direction of the managers (collectively referred to as "Management"). Unless otherwise agreed to by the parties, the Management shall be composed of seven (7) members, four (4) of whom shall be designated by the Cinco Group, and three (3) designated by the LA Group. Upon the formation of the Company, the following shall be named managers: Jose P. Magsaysay, Jr., Jose Miguel Ma. Montinola, Ma. Victoria O. Bermejo, Ricardo K. Montelibano, Guy Koren, Amir Jacoby and Inbal Jacoby.

b) The Management shall regularly meet on a monthly basis. The regular monthly board meeting may be done via teleconference or through the internet. The members may, at their discretion, invite non-members to join member meetings, but only as non-voting observers. Further, to the extent allowed by the financial condition of the Company, and as agreed upon by a majority of all member interests, the Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses incurred by the members named in Section 1(d) in attendance of said meetings.

c) Upon the formation of the Company, it shall have the following executive officers: President, Corporate Secretary and Treasurer, and the following shall be elected by the managers/members to serve these positions. Any change in these mentioned executive officers will require a vote of 75% of members' interest.

G. K   AJ

3

    i) Chairman of the Board of Members – Jose P. Magsaysay
    ii) President – At any given time, the President shall be any one of the following members: Guy Koren or Amir Jacoby or Inbal Jacoby and the first president will be Amit Nemanim now replaced by Guy Koren
    iii) Corporate Secretary – Erlinda S. Bartolome.
    iv) Treasurer -- Maria Victoria O. Bermejo
       (1) The Treasurer shall have oversight functions over the Accounting and Finance Departments that shall be exercised independent of the President.

d) Additional executive officers may be appointed by Management as it may deem necessary. Replacement and removal will require Managers simple majority vote.

e) It is hereby agreed that the rights and responsibilities of the Management shall include the following:

    i) Approval of the compensation package for the managers, executive offices and key personnel.
    ii) Approval of the Accounting System/Procedures/Software/Method to be used by the Company.
    iii) Approval of the operating budget of the Company, and any changes to it.
    iv) Approval of all franchising agreements, and lease agreements.
    v) Approval of all purchases and disbursements in excess of $10,000, provided that such amount may be changed or modified by Management as it deems necessary.

f) The executive officers shall manage the business and property of the Company, and to market the business, in accordance with and pursuant to the directives of and policies set by the Management of the Company. The Management of the Company can recall and/or withdraw the appointment of any executive officer, as it deems necessary.

g) The Company shall enter into a Master License Agreement with Cinco (or an affiliated company to be designated by Cinco) which shall include the following terms and conditions:

    i) The Company agrees to license the "POTATO CORNER" intellectual property rights from Cinco or an affiliated company to be designated by Cinco) consisting of (i) the trademark, service mark and trade name "POTATO CORNER"; and (ii) various trademarks, service marks, trade names, slogans, designs, insignias, emblems, symbols, color schemes, package features, logo and other propriety identifying characteristics used in relation and in connection with the "Potato Corner" Products and the System; and (iii) as well as other intellectual property rights in connection with the "POTATO CORNER" intellectual property rights, for use in the Territory.

    ii) The Company agrees to pay, as an arm's length license fee, the following amounts:

4

(1) With respect to the licensing / sub-licensing or franchising the "POTATO CORNER" intellectual property rights in connection with the "POTATO CORNER" outlets/stores, an amount equal to thirty percent (30%) of all initial/franchise fees and ongoing royalty fees paid to/ collected by the Company. Payments shall be made to Cinco (or an affiliated company to be designated by Cinco) by wire transfer using a bank or other financial institution specified by it within thirty (30) days from receipt of the fees by the Company.

(2) All withholding and other applicable taxes levied by any authority on the payments by the Company shall be borne solely by the Company.

h) The Company agrees to engage the LA Group to provide management and strategic experience and expertise during the duration of this Agreement. The Company shall enter into a Master Services Agreement with the LA Group (or a corporation to be designated by the LA Group) which shall include the following terms and conditions:

i) In consideration for the provision of its services under the Master Services Agreement, the LA Group shall be entitled to a services fee equal to thirty (30%) percent of all initial/franchise fee and continuing royalty fees paid to/ collected by the Company .

ii) All withholding and other applicable taxes levied by any authority on the payments by the Company to the LA Group under this Agreement shall be borne solely by the Company.

iii) The LA Group shall faithfully, diligently and efficiently exercise its obligations and responsibilities under the Master Services Agreement.

iv) The LA Group shall maintain and protect the Confidential Information belonging to Cinco or the Company, and such undertaking shall apply to all of its partners, officers, employees, or agents.

i) The President of the Company shall render the following services and shall perform the following duties for the Company in a faithful, diligent and efficient manner:

i) The President shall be responsible for all management, operational, marketing, establishment, maintenance, licensing and sub-licensing activities with respect to the "Potato Corner" outlets/stores in the Territory. He shall use his best efforts at all times during the term of this Agreement to operate and maintain the "Potato Corner" outlets/stores in the Territory according to the highest standards achievable consistent with the overall plan of the Management of the Company. The President shall comply with the rules, policies and procedures approved by the Management of the Company from time to time.

ii) The President shall advertise market and promote the "Potato Corner" outlets/stores with the goal of causing public knowledge, awareness and patronage of the "Potato Corner" outlets/sites.

5

iii) The President shall maintain a comprehensive system of records, books and accounts, with respect to the licensing and sub-licensing activities, operation, establishment, management, maintenance and other activities of the "Potato Corner" outlets /stores in the Territory with the assistance of the Corporate Secretary.

iv) No later than the twentieth (20th) day of each month, with respect to the preceding month, the President shall render a statement of receipts and disbursements, a schedule of accounts receivable and payable, and a schedule of fees collected and distributed, together with a reconciled bank statement as of the last day of the month with the assistance of the Corporate Secretary.

v) No later than three (3) months after the end of a fiscal year, the President shall, with the assistance of the Corporate Secretary and external accountant hired by Management, cause the Company to issue audited financial statements, and shall provide a copy of the same to all the members of Management.

vi) To the extent the President is lawfully able to do so, the President shall take such action as may be necessary to comply promptly with any and all laws, ordinances, orders or other requirements of any federal, state, county or municipal authority having jurisdiction of the Company and affecting the Company.

j) Consistent with its fiduciary duty to the Company, the members and managers shall exercise the duty of care and shall, at all times, ensure that all corporate opportunities consistent with the objectives of this Agreement shall be pursued on behalf of, and for the benefit of the Company. As such, with respect to the establishment of Company-owned stores, whenever potential locations are identified by any member or manager, it shall be promptly brought to the attention of the Management. At all times, and within thirty (30) days from receipt of this information, the Management shall decide to either build a Company-owned store at the identified location. In the event the Company chooses to build a Company-owned store at the identified location, it shall have the right to do so, to the exclusion of any of the members or managers. However, in the even the Company decides not to build a Company-owned store at the identified location, it shall notify the members and managers of its decision in writing. In such case, the LA Group shall have the right to build a store at the identified location, provided that it shall enter into a franchising agreement with the Company, and shall pay the franchise fees and ongoing royalty fees as set forth in the Company's standard franchising agreement.

4) DURATION OF AGREEMENT

a) This Agreement shall become effective from the date of execution hereof and shall continue indefinitely unless otherwise terminated by (i) an affirmative vote of 75 percent (75%) of all member interests, or (ii) upon mutual agreement by the Parties in writing.

6

b) Upon termination of this Agreement, the effects of termination shall be as follows:

i) All rights granted under the Master License Agreement shall terminate and the Company shall cease the use of the Potato Corner Intellectual Property Rights, and Confidential Information, provided however, that the Company shall be permitted to use any of the foregoing as is reasonably required in order to comply with its obligations under its sub-licensing or franchising agreements, but only to the extent of the duration of sub-licensing or franchising agreements in existence at the time of the termination of this Agreement.

ii) The LA Group shall be subject to a non-compete arrangement and hereby agrees that, within two (2) years from the date of termination of this Agreement, it shall not engage in the business of establishing, operating, managing, licensing and franchising identical or similar products sold by the Company, using the intellectual property rights identical or similar to those used by the Company, at the time of the termination of this Agreement.

5) GENERAL PROVISIONS

a) This Agreement may not be altered, changed, supplemented or modified except by a written instrument duly signed by the Parties.

b) The Parties shall use their best efforts to cooperate for the success of the business of the Company. The Parties further agree to perform all acts and execute and deliver all documents or instruments required or necessary to fully implement or consummate the transactions contemplated in and the intent underlying this Agreement.

c) The Parties shall, to the extent feasible, cause the operating agreement of the Company to reflect the mutual covenants and provisions contained in this Agreement.

d) All notices and other communications required or permitted to be given hereunder shall be given in writing (and for this purpose shall include emails or fax transmissions) and shall be addressed to the appropriate Party at the address of such Party as heretofore designated, or at such address as such Party may designate subsequently in writing.

e) The failure of any Party at any time to require performance by the others of any provision of this Agreement shall not affect, in any way, the right of such Party to require performance of that or any other provision, and any waiver by any Party of any breach of this Agreement shall not be construed as a waiver of any continuing or succeeding breach of such provision, or a waiver of any other right under this Agreement.

f) This Agreement shall constitute the entire agreement between the Parties and shall supersede any previous agreements, written or otherwise, with respect to the same subject matter which may have been made by the Parties prior hereto.

7

g) The invalidity of any portion of this Agreement will not and shall not render the entire Agreement void, nor affect the validity of the rest of the provisions of this Agreement.

h) This Agreement shall be governed by the laws of the State of California.

i) Parties acknowledge that, from time to time, one Party (the "Discloser") may disclose to the other Party (the "Recipient") information: (a) relating to the Potato Corner outlets and sites; (b) relating to the Potato Corner Intangible Property Rights; (c) Potato Corner product specifications and related information; (d) which is marked with "confidential" or a similar legend; (e) which is described orally and designated as confidential; or (f) which would, under the circumstances, be understood by a reasonable person to be confidential ("Confidential Information"). Upon subsequent disclosure of previously disclosed Confidential Information to the Recipient by the Discloser, the information will remain Confidential Information even if not identified as Confidential Information at the subsequent disclosure. Recipient shall retain such Confidential Information in confidence, and shall not disclose it to any Third Party or use it for other than the purposes of this Agreement without the Discloser's prior written consent. Each Party shall use at least the same procedures and degree of care with respect to such Confidential Information which it uses to protect its own confidential information of like importance, and in no event less than reasonable care. The Recipient will immediately give written notice to the Discloser of any unauthorized use or disclosure of the Discloser's Confidential Information, and the Recipient will assist the Discloser in remedying such unauthorized use or disclosure.

[The Remainder of This Page is Left Intentionally Blank]



8

IN WITNESS WHEREOF, the parties have executed this Agreement on the date and in place first mentioned.

POTATO CORNER INTERNATIONAL GROUP:

Jose P. Magsaysay, Jr.,

Jose Miguel Ma. G. Montinola

Ma. Victoria O. Bermejo

Ricardo K. Montelibano,

**L.A. Group:**

Inbal Jacoby

Guy Koren

Amir Jacoby

SIGNED IN THE PRESENCE OF:

ACKNOWLEDGMENT

9

WEST\222455823.2

# EXHIBIT E

## LIMITED LIABILITY COMPANY AGREEMENT
of
## PCJV USA, LLC
### A Delaware Limited Liability Company

THE INTERESTS CREATED BY THIS OPERATING AGREEMENT HAVE NOT BEEN
REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE
SECURITIES ACT OF 1933, AS AMENDED, OR WITH THE SECURITIES AUTHORITIES
OF ANY STATE UNDER ANY STATE SECURITIES LAWS, AND MAY NOT BE SOLD
OR OTHERWISE TRANSFERRED UNLESS REGISTERED UNDER SUCH LAWS OR
UNLESS AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF SUCH
LAWS IS AVAILABLE. THE SALE OR TRANSFER OF SUCH INTERESTS IS SUBJECT
TO CERTAIN ADDITIONAL RESTRICTIONS DESCRIBED IN THIS OPERATING
AGREEMENT.

# TABLE OF CONTENTS

Page

ARTICLE I       DEFINITIONS ................................................................................................1

ARTICLE II      FORMATION ................................................................................................4

2.1     Purpose ..................................................................................................4
2.2     Powers ..................................................................................................4
2.3     Formation and Name .............................................................................4
2.4     Principal Place of Business ...................................................................4
2.5     Registered Office and Registered Agent ...............................................4
2.6     Records to be Maintained ......................................................................5
2.7     Term ......................................................................................................5

ARTICLE III     MEMBERS ....................................................................................................5

3.1     Classification of Members .....................................................................5
3.2     Admission of Additional Members ........................................................5
3.3     Right of First Refusal ............................................................................6
3.4     Amendment of Member Listing .............................................................6
3.5     Payment of Costs ..................................................................................6
3.6     Limited Liability of Members ................................................................6
3.7     Voting Rights .........................................................................................6
3.8     Meetings of Members ............................................................................7
3.9     Right of Inspection; Provision of Records to Members ......................10
3.10    Representations and Warranties ...........................................................12

ARTICLE IV      MANAGEMENT ..........................................................................................12

4.1     Management .........................................................................................12
4.2     Number and Qualifications of Managers .............................................14
4.3     Election of Managers ...........................................................................14
4.4     Removal of Managers ..........................................................................14
4.5     Resignation of Managers .....................................................................14
4.6     Term of Office as Manager ..................................................................14
4.7     Authority of Multiple Managers ..........................................................14
4.8     Fiduciary Duties Owed by Managers ...................................................15
4.9     Conduct of Meetings of Managers ......................................................15
4.10    Regular Monthly Meetings ..................................................................15
4.11    Officers ................................................................................................15
4.12    Indemnification and Liability Insurance ..............................................17
4.13    Actions of the Managers ......................................................................18
4.14    Meetings of Managers ..........................................................................18
4.15    Compensation of Manager ...................................................................19
4.16    Authority of Members to Bind the Company .......................................19
4.17    Specific Arrangements with the Cinco Group ......................................20
4.18    Specific Arrangements with the LA Group ..........................................20

## TABLE OF CONTENTS
### (continued)

Page

ARTICLE V      CAPITAL ........................................................................................................21

  5.1     Initial Capital Contributions ...........................................................................21
  5.2     Capital Accounts ...........................................................................................21
  5.3     Adjustment for Distributions in Kind ..............................................................21
  5.4     Interest ..........................................................................................................21
  5.5     Deficit Capital Account ..................................................................................22
  5.6     Return of Capital ...........................................................................................22
  5.7     Optional Adjustments to Capital Accounts ....................................................22

ARTICLE VI     INCOME AND LOSSES ......................................................................22

  6.1     Allocations .....................................................................................................22
  6.2     Qualified Income Offset .................................................................................22
  6.3     Minimum Gain Chargeback ...........................................................................22
  6.4     Contributed Property and Revaluations .........................................................22
  6.5     Timing ............................................................................................................23

ARTICLE VII    DISTRIBUTIONS ...............................................................................23

  7.1     Operating Distributions ..................................................................................23
  7.2     Generally Pro Rata ........................................................................................23
  7.3     Liquidating Distributions ................................................................................23

ARTICLE VIII   ASSIGNMENT OF INTERESTS .........................................................23

  8.1     Assignment of Interests .................................................................................23
  8.2     No Dissolution upon Assignment ...................................................................24
  8.3     Information Regarding Assignee .....................................................................24
  8.4     No Release of Liability of Assignor ................................................................24
  8.5     Pledge of Membership Interest ......................................................................24
  8.6     Exercise of Rights upon Death or Incompetency ...........................................24
  8.7     Exercise of Rights upon Dissolution or Termination ......................................24

ARTICLE IX     DISSOLUTION AND WINDING UP ....................................................24

  9.1     Dissolution .....................................................................................................24
  9.2     Effect of Dissolution ......................................................................................25

ARTICLE X      TAX AND ACCOUNTING MATTERS ..................................................25

  10.1    Characterization as a Partnership ..................................................................25
  10.2    No Partnership Intended for Nontax Purposes ...............................................25
  10.3    Fiscal Year .....................................................................................................26
  10.4    Accounting Method ........................................................................................26
  10.5    Tax Information ..............................................................................................26
  10.6    Basis Adjustment ...........................................................................................26
  10.7    Other Elections ..............................................................................................26
  10.8    Taxes of Taxing Jurisdictions ........................................................................26
  10.9    Tax Matters Partner .......................................................................................26

WEST\224283219.2

## TABLE OF CONTENTS
(continued)

Page

| ARTICLE XI | DISSOCIATION OF A MEMBER | 27 |
|---|---|---|
| 11.1 | Dissociation | 27 |
| 11.2 | Rights of Dissociating Member | 27 |
| ARTICLE XII | MISCELLANEOUS PROVISIONS | 28 |
| 12.1 | Amendment of Operating Agreement | 28 |
| 12.2 | Entire Agreement | 28 |
| 12.3 | Interpretation | 28 |
| 12.4 | Rights of Creditors and Third Parties under Operating Agreement | 28 |
| 12.5 | Valuation of Non-Cash Consideration | 28 |
| 12.6 | Counterpart Execution | 28 |
| 12.7 | Remedies | 28 |
| 12.8 | Successors and Assigns | 29 |
| 12.9 | Severability | 29 |
| 12.10 | Governing Law | 29 |

WEST\242832192

LIMITED LIABILITY COMPANY AGREEMENT
of
PCJV USA, LLC

The Limited Liability Company Agreement is made and entered into as of the Effective Date by the Members listed below for the purpose of forming a Delaware limited liability company in accordance with the provisions hereinafter set forth.

## ARTICLE I

## DEFINITIONS

The following terms, as used herein, shall have the following respective meanings:

1.1    **Act** – The Delaware Limited Liability Company Act, 6 Del.C. §18-101, et seq., as amended from time to time.

1.2    **Additional Member** – A member other than an Initial Member or a Substitute Member who has acquired a Membership Interest from the Company.

1.3    **Assignee** – A transferee of a Membership Interest who has not been admitted as a Substitute Member.

1.4    **Assignor** – A transferor of a Membership Interest.

1.5    **Business Day** – Any day other than Saturday, Sunday or any legal holiday observed in the State of Delaware.

1.6    **Capital Account** – The account maintained for a Member or Assignee determined in accordance with Article V.

1.7    **Capital Contribution** – Any contribution actually made to the capital of the Company pursuant to Section 5.1 by or on behalf of a Member or Assignee. The initial Capital Contribution of the Members shall be US$50,000 which shall be fully subscribed and paid.

1.8    **Certificate** – The Certificate of Formation of the Company.

1.9    **Company** – The company named in the introductory paragraph of this Operating Agreement, and any successor thereof.

1.10    **Company Liability** – Any enforceable debt or obligation for which the Company is liable or which is secured by any Company Property.

1.11    **Company Minimum Gain** – The extent to which a nonrecourse liability exceeds the adjusted tax basis of the Company Property it encumbers. The amount of Company Minimum Gain shall be determined in accordance with Regulations Section 1.704-2(d) by substituting the terms *"Company"* and *"Holder"* for the terms *"partnership"* and *"partner,"* respectively, in each place they appear therein.

WEST\224283219.2

1.12    **Company Property** – Any Property owned by the Company.

1.13    **Contribution** – A contribution as defined by the Act.

1.14    **Disposition (Dispose)** – Any sale, assignment, transfer, exchange, mortgage, pledge, grant, hypothecation, or other transfer, absolute or as security or encumbrance (including dispositions by operation of law)..

1.15    **Dissociation** – Any action which causes a Person to cease to be Member as described in Article XI hereof.

1.16    **Dissolution Event** – An event, the occurrence of which will result in the dissolution of the Company under ARTICLE IX unless the Members agree to the contrary.

1.17    **Distribution** – A distribution of Money or Property made pursuant to this Operating Agreement.

1.18    **Economic Interest** – A Person's right to share in the income, gains, losses, deductions, credits or similar items of, and to receive Distributions from, the Company, exclusive of any other rights of a Member including, without limitation, the right to vote or to participate in management, or any right to information concerning the business and affairs of the Company.

1.19    **Effective Date** – The date the Certificate is filed with the Delaware Secretary of State.

1.20    **Holder** – A Person holding an Economic Interest, whether as a Member or as an Assignee.

1.21    **Income and Losses** – With respect to a taxable year of the Company (or other period for which Income or Losses must be computed), the Company's taxable income or loss for federal income tax purposes, as determined by the tax advisors employed by the Company for this purpose, except that: (1) any tax-exempt income of the Company as described in IRC Section 705(a)(1)(B) shall be treated as gross income of the Company, (2) any nondeductible noncapital expenditures as described in IRC Section 705(a)(2)(B) shall be treated as a deduction of the Company, and (3) if any Company property is reflected on the books of the Company at a value ("**Book Value**") different from the adjusted tax basis of such property, any item of Income or Loss with respect to such property shall be computed by reference to such Book Value.

1.22    **Initial Capital Contribution** – The Capital Contribution agreed to be made by the Initial Members as described in Section 5.1.

1.23    **Initial Members** – Those persons identified on Exhibit A attached hereto and made a part hereof by this reference who have executed the Operating Agreement.

1.24    **IRC** – The Internal Revenue Code of 1986, as amended.

1.25    **Majority** -- The affirmative vote or consent of Members having Percentage Interests in excess of one-half of the Percentage Interests of all the Members entitled to vote on a particular matter. Assignees and, in the case of approvals to withdrawal where consent of the remaining Members is required, Dissociating Members shall not be considered Members entitled to vote for the purpose of determining a Majority. In the case of a Member who has Disposed of that Member's entire Membership Interest to an Assignee, but has not been removed as provided below, the Percentage Interest of such Assignee shall be considered in determining a Majority and such Member's vote or consent shall be determined by such Percentage Interest.

1.26    **Management Right** -- The right of a Member to participate in the management of the Company, including the rights to information and to consent or approve actions of the Company.

1.27    **Manager** -- A manager selected to manage the affairs of the Company as provided under Article IV hereof.

1.28    **Member** -- A member as defined by the Act, including all Initial Members, Substitute Members and Additional Members (but not including any Assignee or any Member who has Dissociated).

1.29    **Membership Interest** -- A membership interest as defined by the Act.

1.30    **Money** -- Cash or other legal tender of the United States, or any obligation that is immediately reducible to legal tender without delay or discount. Money shall be considered to have a fair market value equal to its face amount.

1.31    **Notice** -- Except as otherwise expressly provided herein, all Notices shall be in writing. Notice to the Company shall be considered given when mailed by first class mail postage prepaid addressed to any Manager in care of the Company at the address of the principal place of business of the Company. Notice to a Member shall be considered given when mailed by first class mail postage prepaid addressed to the Member at the address reflected in the Operating Agreement unless the Member has given the Company a Notice of a different address.

1.32    **Operating Agreement** -- This Limited Liability Company Agreement and all amendments thereto adopted in accordance with this Limited Liability Company Agreement and the Act.

1.33    **Organization** -- A Person other than a natural person. Organization includes, without limitation, corporations (both non-profit and other corporations), partnerships (both limited and general), trusts, joint ventures, limited liability companies, and unincorporated associations, but the term does not include joint tenancies and tenancies by the entirety.

1.34    **Percentage Interest** -- With respect to a Member, the percentage set forth opposite such Member's name on Exhibit A hereto, as such Exhibit is amended from time to time in accordance with Section 3.3 hereof, and with respect to a Holder not a Member, the Percentage Interest or part thereof corresponding to the portion of a Member's Economic Interest such Holder has acquired.

1.35    **Person** – A person as defined by the Act.

1.36    **Proceeding** – Any judicial or administrative trial, hearing or other activity, civil, criminal or investigative, the result of which may be that a court, arbitrator, or governmental agency may enter a judgment, order, decree, or other determination which, if not appealed and reversed, would be binding upon the Company, a Member or other person subject to the jurisdiction of such court, arbitrator, or governmental agency.

1.37    **Property** – Any property real or personal, tangible or intangible, including money and any legal or equitable interest in such property, but excluding services and promises to perform services in the future.

1.38    **Regulations** – Except where the context indicates otherwise, the permanent, temporary or proposed regulations of the Department of the Treasury promulgated under the IRC as such regulations may be amended from time to time.

1.39    **Taxing Jurisdiction** – Any state, local, or foreign government that collects tax, interest or penalties, however designated, on any Member's share of the income or gain attributable to the Company.

1.40    **Term** – As specified in Section 2.7.

## ARTICLE II

## FORMATION

2.1    **Purpose.** The purpose of the Company is to engage in any lawful act or activity for which a limited liability company may be organized under the Act or the laws of any other jurisdiction in which the Company may do business.

2.2    **Powers.** The Company shall have all powers necessary to accomplish its purposes without the necessity of their specific enumeration herein including, without limitation, all powers described in Section 18-106 of the Act.

2.3    **Formation and Name.** The Members have caused to be formed a limited liability company under the name of PCJV USA, LLC (the "*Company*"), by the filing of the Certificate pursuant to the provisions of Section 18-201 of the Act. The Members desire to govern the affairs of the Company by entering into this Operating Agreement.

2.4    **Principal Place of Business.** The principal place of business of the Company shall be located at Suite 1110, 6380 Wilshire Blvd, CA 90048 USA, unless changed by the Managers.

2.5    **Registered Office and Registered Agent.** The Company's registered office is at 615 South DuPont Highway, City of Dover, County of Kent 19901 and the name of its initial registered agent at such address is National Corporate Research, Ltd. The Company may change the registered office and/or the registered agent at such times and from time to time as the Managers may deem advisable.

2.6     Records to be Maintained. The Company shall maintain the following records at its principal place of business:

2.6.1     A current list of the full name and last known business or residence address of each Member and Assignee set forth in alphabetical order, together with a schedule showing the Capital Contribution and Percentage Interest of each Member and Assignee;

2.6.2     A current list of the full name and business or residence address of each Manager, if any;

2.6.3     A copy of the Certificate and all amendments thereto, together with any powers of attorney pursuant to which the Certificate or any amendments thereto were executed;

2.6.4     Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six most recent taxable years;

2.6.5     A copy of this Operating Agreement and any amendments hereto, together with any powers of attorney pursuant to which this Operating Agreement or any amendments hereto were executed;

2.6.6     Copies of the financial statements of the Company, if any, for the six most recent fiscal years;

2.6.7     The books and records of the Company as they relate to the internal affairs of the Company for at least the current and past four fiscal years; and

2.6.8     Any other records to be maintained pursuant to the Act.

2.7     Term. The Term of this Operating Agreement shall commence upon the date the Certificate is filed and shall continue indefinitely unless otherwise terminated by (i) an affirmative vote of 75 percent (75%) of all member interests, or (ii) upon mutual agreement by the Parties in writing.

## ARTICLE III

## MEMBERS

3.1     Classification of Members. Pursuant to the Joint Venture Agreement entered into by the Members on ___ 8.12 ___, the Members shall be classified and designated as either part of the Cinco Corporation (Philippines) group (the "Cinco Group") or the LA group (the "LA Group"). Both the Cinco Group and the LA Group agreed to the specific rights and obligations granted to each group, and undertake to fully observe the rights vested to each group under the Operating Agreement.

3.2     Admission of Additional Members. Additional Members may be admitted to the Company upon the consent of the Members required pursuant to Section 3.7, which such consent

may be granted in their sole discretion. The Capital Contribution of any Additional Member shall be determined by the Members consenting to the admission. Each Additional Member shall execute a counterpart of this Operating Agreement, agreeing thereby to be bound by all of the terms and provisions hereof.

     3.3    Right of First Refusal. A Member of the Cinco Group or the the LA Group shall not assign any of its rights or obligations nor his/its Member Interests in the Company outside of the Cinco Group and the LA Group, without the prior written consent of the non-assigning group. In the event a Member of either the Cinco Group or the LA Group desire to transfer or sell his/its pro rata members interest in the Company to a person other those in either the Cinco Group or the LA Group, such Member shall be obligated to sell the same first to the existing Members, which has have thirty (30) days within which to exercise its rights of first refusal from the date of receipt of a written notice to sell. For this purpose, the Parties hereby agree that the right of first refusal may be exercised in accordance with the following formula: The average of the Company's earnings before interest, depreciation, taxes and amortization (EBITDA) for the last two (2) years multiplied by 5 times, and further multiplied by the percentage of member interest subject to such right of first refusal over total outstanding Member Interests.

     3.4    Amendment of Member Listing. Upon admission of an Additional Member, the Member listing required by Section 2.6 and Exhibit A hereto shall be amended accordingly.

     3.5    Payment of Costs. All reasonable expenses, including attorneys' fees, incurred by the Company in connection with the admission of an Additional Member shall be borne by such Additional Member.

     3.6    Limited Liability of Members. Members shall not be personally liable for the liabilities of the Company.

     3.7    Voting Rights. All Members shall be entitled to vote on any matter submitted to a vote of the Members. Unless otherwise specified herein, actions to be taken by Members require the consent of a Majority of the Percentage Interests represented at a duly held meeting of the Members or, if such action is taken by written consent, by a Majority of all of the Percentage Interests. Notwithstanding the foregoing, the following actions require the consent described below:

| Action | Consent Required |
|---|---|
| Decision to dissolve the Company. | 75% of all Membership Interests |
| Decision to continue the business of the Company after a Dissolution Event. | 75% of all Membership Interests |
| Approval of the transfer of a Membership Interest and admission of an Assignee as a Substitute Member of the Company. | Prior written consent of the other Member |

| Action | Consent Required |
|---|---|
| Approval of the withdrawal and Dissociation of a Member of the Company. | Prior written consent of the other Member |
| Any amendment of the Certificate or this Operating Agreement. | 75% of all Membership Interests |
| Agreement of merger as defined in Section 17551 of the Act. | 75% of all Membership Interests |
| Disposition by the Company of all or substantially all of the Company's assets. | 75% of all Membership Interests |
| Confession of a judgment against the Company in excess of Ten Thousand Dollars. | 75% of all Membership Interests |

3.8     Meetings of Members.

3.8.1    Place of Meetings. Meetings of Members may be held at any place, selected by the Person or Persons calling the meeting. If no other place is stated or fixed, all meetings shall be held at the principal place of business of the Company.

3.8.2    Calling of Meetings. A meeting of the Members may be called at any time by any Manager or by one or more Members with an aggregate Percentage Interest of more than ten percent (10%) for the purpose of addressing any matter on which the Members may vote.

3.8.3    Notice of Meetings. Whenever Members are required or permitted to take any action at a meeting, a Notice of the meeting shall be given not less than ten (10) calendar days nor more than sixty (60) calendar days before the date of the meeting to each Member entitled to vote at the meeting. The Notice shall state the place, date, and hour of the meeting and the general nature of the business to be transacted. No other business may be transacted at such a meeting.

3.8.4    Means of Providing Notice of Meetings. Any Notice of a meeting of the Members shall be given either personally or by mail or other means of written communication, charges prepaid, addressed to the Member at the address of the Member appearing on the books of the Company or given by the Member to the Company for the purpose of Notice, or, if no address appears or is given, at the place where the principal place of business of the Company is located or by publication at least once in a newspaper of general circulation in the county in which the principal place of business is located. The Notice shall be deemed to have been given at the time when delivered personally or deposited in the mail or sent by other means of written communication. An affidavit of mailing of any Notice in accordance with the provisions of this section, executed by a Manager or Member, shall be prima facie evidence of the giving of the Notice.

Upon written request to a Manager by any Person entitled to call a meeting of Members, the Manager shall immediately cause Notice to be given to the Members entitled to vote that a meeting will be held at a time requested by the Person calling the meeting, not less than ten (10) calendar days nor more than sixty (60) calendar days after the receipt of the request. If the Notice is not given within twenty (20) calendar days after receipt of the request, the Person entitled to call the meeting may give the Notice or, upon the application of that Person, the superior court of the county in which the principal place of business of the Company is located, or if the principal place of business is not in this state, the county in which the Company's address in this state is located, shall summarily order the giving of the Notice, after Notice to the Company affording it an opportunity to be heard.

The Members may, at their discretion, invite non-Members to join, but only as non-voting observers. Further, to the extent allowed by the financial condition of the Company, and as agreed upon by a majority of all member interests, the Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses incurred by the Members in attendance.

3.8.5   Adjourned Meetings. When a Members' meeting is adjourned to another time or place, unless the Certificate or this Operating Agreement otherwise requires, and, except as provided in the Act, Notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken. At the adjourned meeting, the Company may transact any business that may have been transacted at the original meeting. If the adjournment is for forty-five (45) calendar days or more, or if after the adjournment a new record date is fixed for the adjourned meeting, a Notice of the adjourned meeting shall be given to each Member entitled to vote at the meeting.

3.8.6   Validation of Meeting Held Without Proper Call or Notice. The actions taken at any meeting of Members, however called and noticed, and wherever held, have the same validity as if taken at a meeting duly held after regular call and notice, if a quorum is present either in person or by proxy, and if, either before or after the meeting, each of the Members entitled to vote, not present in person or by proxy, signs a written waiver of Notice or consents to the holding of the meeting or approves the minutes of the meeting. All waivers, consents, and approvals shall be filed with the Company records or made a part of the minutes of the meeting. Attendance of a Member at a meeting shall constitute a waiver of Notice of the meeting, except when the Member objects, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Attendance at a meeting is not a waiver of any right to object to the consideration of matters required by this title to be included in the Notice but not so included, if the objection is expressly made at the meeting. Neither the business to be transacted nor the purpose of any meeting of Members need be specified in any written waiver of Notice, unless otherwise provided in the Certificate or this Operating Agreement, except as provided in subsection 3.8.8.

3.8.7   Participation Through Telecommunications Equipment. Members may participate in a meeting of the Company through the use of conference telephones or similar communications equipment, as long as all Members participating in the meeting

can hear one another. Participation in a meeting pursuant to this provision constitutes presence in person at that meeting.

3.8.8    Notice of General Nature of Meeting. Any action approved at a meeting, other than by unanimous approval of those entitled to vote, shall be valid only if the general nature of the proposal so approved was stated in the Notice of meeting or in any written waiver of Notice.

3.8.9    Quorum.

3.8.9.1    Members holding in excess of one-half of the Percentage Interests represented in person or by proxy shall constitute a quorum at a meeting of Members.

3.8.9.2    The Members present at a duly called or held meeting at which a quorum is present may continue to transact business until adjournment, notwithstanding the loss of a quorum, if any action taken after loss of a quorum, other than adjournment, is approved by the requisite Percentage Interests of Members specified in the Certificate, this Operating Agreement, or the Act.

3.8.9.3    In the absence of a quorum, any meeting of Members may be adjourned from time to time by the vote of a majority of the Membership Interests represented either in person or by proxy at such meeting, but no other business may be transacted, except as provided in subparagraph 3.8.9.2 above.

3.8.10.  Action Without a Meeting.

3.8.10.1    Any action that may be taken at any meeting of the Members may be taken without a meeting if a consent in writing, setting forth the action so taken, is signed and delivered to the Company within sixty (60) calendar days of the record date for that action by Members having not less than the minimum number of votes that would be necessary to authorize or take that action at a meeting at which all Members entitled to vote thereon were present and voted.

3.8.10.2    Unless the consents of all Members entitled to vote have been solicited in writing, (A) Notice of any Member approval of an amendment to the Certificate or this Operating Agreement, a dissolution of the Company, or a merger of the Company, without a meeting by less than unanimous written consent shall be given at least ten (10) calendar days before the consummation of the action authorized by such approval, and (B) prompt Notice shall be given of the taking of any other action approved by Members without a meeting by less than unanimous written consent, to those Members entitled to vote who have not consented in writing.

3.8.10.3    Any Member giving a written consent, or the Member's proxyholder, may revoke the consent by a writing received by the Company prior to the time that written consents of Members having the minimum number of votes that would be required to authorize the proposed action have been received

by the Company, but may not do so thereafter. This revocation is effective upon its receipt at the principal place of business of the Company.

3.8.11 Proxies. Every Member entitled to vote shall have the right to do so in person or by one (1) or more agents authorized by a written proxy executed by such Member or his duly authorized agent and filed with the Company. Any proxy executed is not revoked and continues in full force and effect until (i) a writing stating that the proxy is revoked or a duly executed proxy bearing a later date is filed with the Company prior to the vote pursuant thereto, (ii) the Member executing the proxy attends the meeting and votes in person, or (iii) written Notice of the death or incapacity of the maker of such proxy is received by the Company before the vote pursuant thereto is counted; provided that no proxy shall be valid after the expiration of eleven months from the date of its execution, unless the person executing it specifies therein the length of time for which such proxy is to continue in force.

3.8.12 Record Date. In order that the Company may determine the Members of record entitled to Notices of any meeting or to vote, or entitled to receive any Distribution or to exercise any rights in respect of any other lawful action, a Manager, or Members representing more than ten percent (10%) of the Percentage Interests, may fix, in advance, a record date, that is not more than sixty (60) calendar days nor less than ten (10) calendar days prior to the date of the meeting and not more than sixty (60) calendar days prior to any other action. If no record date is fixed:

3.8.12.1   The record date for determining Members entitled to Notice of or to vote at a meeting of Members shall be at the close of business on the business day next preceding the day on which Notice is given or, if Notice is waived, at the close of business on the business day next preceding the day on which the meeting is held.

3.8.12.2   The record date for determining Members entitled to give consent to Company action in writing without a meeting shall be the day on which the first written consent is given.

3.8.12.3   The record date for determining Members for any other purpose shall be at the close of business on the day on which the Managers adopt the resolution relating thereto, or the sixtieth day prior to the date of the other action, whichever is later.

3.8.12.4   The determination of Members entitled to Notice of or to vote at a meeting of Members shall apply to any adjournment of the meeting unless a Manager or the Members who called the meeting fix a new record date for the adjourned meeting, but the Manager or the Members who called the meeting shall fix a new record date if the meeting is adjourned for more than forty five (45) calendar days from the date set for the original meeting.

3.9    Right of Inspection; Provision of Records to Members.

3.9.1   Right of Inspection. Each Member, Manager and Assignee has the right, upon reasonable request, for purposes reasonably related to the interest of that Person as a Member, Manager, or Assignee, to each of the following at the expense of the Company:

3.9.1.1   To inspect and copy during normal business hours any of the records required to be maintained by Sections 2.6.1, 2.6.2, 2.6.3 and 2.6.4 above; and

3.9.1.2   To obtain from a Manager, promptly after becoming available, a copy of the Company's federal, state, and local income tax or information returns for each year.

3.9.2   Additional Rights. So long as the Company has more than 35 Members:

3.9.2.1   A Manager shall cause an annual report to be sent to each of the Members not later than one hundred twenty (120) calendar days after the close of each fiscal year. That report shall contain a balance sheet as of the end of the fiscal year and an income statement and statement of changes in financial position for the fiscal year.

3.9.2.2   Members with an aggregate Percentage Interest of at least five percent (5%), or any three or more Members, may make a written request to a Manager for an income statement of the Company for the initial three-month, six-month, or nine-month period of the current fiscal ended more than thirty (30) calendar days prior to the date of request, and a balance sheet of the Company as of the end of that period. The statement shall be delivered or mailed to the Members within thirty (30) calendar days thereafter.

3.9.2.3   The financial statements referred to in this section shall be accompanied by the report thereon, if any, of the independent accounts engaged by the Company or, if there is no report, the certificate of the Treasurer of the Company that the financial statements were prepared without audit from the books and records of the Company.

3.9.3   Copy of Amendment of Certificate and Operating Agreement. A Manager shall promptly furnish to a Member a copy of any amendment to the Certificate or this Operating Agreement executed by that Manager pursuant to a power of attorney from the Member.

3.9.4   Tax Information. The Company shall send or cause to be sent to each Holder within ninety (90) calendar days after the end of each taxable year such information as is necessary to complete their respective federal and state income tax or information returns, and, if the Company has thirty-five (35) or fewer Holders, a copy of the Company's federal, state, and local income tax or information returns for the year.

3.9.5   Relationship with Act. Nothing in this Section 3.9 shall be construed as in any way limiting a Member's right of inspection as set forth in Section 18-305 of the Act.

3.10   Representations and Warranties. Each Member hereby represents and warrants to the Company and each other Member that:

3.10.1   If that Member is a organization, that it is duly organized, validly existing, and in good standing under the law of its state of organization and that it has full organizational power to execute and agree to the Operating Agreement to perform its obligations hereunder;

3.10.2   Such Member is acquiring its interest in the Company for its own account for investment purposes only and not with a view to the resale or distribution of all or any part of such interest and such Member has no present intention, agreement or arrangement to divide its participation with others or to sell, assign, transfer or otherwise dispose of all or any part of such interest. Such Member is aware that the interests have not been registered under the Securities Act of 1933, or any state securities laws, and that such interests may not be resold or otherwise disposed of unless they are registered thereunder or an exemption from registration is available. Accordingly, each Member is aware that it must bear the economic risk of investment in the Company for an indefinite period of time. Each Member is capable of bearing that risk.

### ARTICLE IV

### MANAGEMENT

4.1   Management. Subject to the limitations of the Certificate, the Act, and this Operating Agreement as to actions to be authorized or approved by the Members, the business and affairs of the Company shall be managed and all the Company powers shall be exercised by or under the direction of the Managers. The Managers may delegate the management of the day-to-day operation of the business of the Company to the officers of the Company or other persons provided that the business and affairs of the Company shall be managed and all powers shall be exercised under the ultimate direction of the Managers. Without prejudice to such general powers, but subject to the same limitations, the Managers shall have the following powers:

4.1.1   To approve compensation packages for the managers, executive offices and key personnel.

4.1.2   To approve the Accounting System/Procedures/Software/Method to be used by the Company.

4.1.3   To approve the operating budget of the Company, and any changes to it.

4.1.4   To approve all franchising agreements, and lease agreements.

4.1.5   To approve all purchases and disbursements in excess of Ten Thousand Dollars ($10,000), provided that such amount may be changed or modified by Management as it deems necessary.

4.1.6   To institute, prosecute, and defend any Proceeding in the Company's name;

WEST\224283219:2                                    12

4.1.7   To purchase, receive, lease or otherwise acquire and deal with the Property, wherever located;

4.1.8   To sell, convey, mortgage, pledge, lease, exchange, or otherwise Dispose of Property;

4.1.9   To lend money, invest and reinvest the Company's funds, and receive and hold Property as security for repayment, including, without limitation, the loaning of money to Members, officers, employees, and agents;

4.1.10  To borrow money and incur indebtedness for the purposes of the Company, and to cause to be executed and delivered therefor in the Company name promissory notes, bonds, debentures, deeds of trust, mortgages, pledges, hypothecations or other evidences of debt and securities therefor;

4.1.11  To change the principal place of business of the Company from one location to another as provided in Section 2.3 hereof, and to fix and locate from time to time one or more subsidiary offices of the Corporation;

4.1.12  To prescribe the forms of Membership Certificates, and to alter the form of such Membership Certificates from time to time as in their judgment they deem best, provided such Membership Certificates shall at all times comply with provisions of law;

4.1.13  To select and remove all of the officers, agents and employees of the Company, to prescribe such powers and duties for them as may not be inconsistent with law, with the Certificate or this Operating Agreement, to fix their compensation, and to require from them security for faithful service;

4.1.14  To pay pensions and establish pension plans, pension trusts, profit sharing plans, and benefit and incentive plans for all or any of the current or former Members, employees, and agents of the Company;

4.1.15  To make donations to the public welfare or for religious, charitable, scientific, literary or educational purposes;

4.1.16  To purchase insurance on the life of any of the Members or Company employees for the benefit of the Company;

4.1.17  To participate in partnership agreements, joint ventures, or other associations of any kind with any person or persons; and

4.1.18  To authorize the issuance of Additional Membership Interests from time to time upon such terms as may be lawful in consideration of money paid, labor done, services actually rendered to the Company or for its benefit or in its formation or reorganization, debts or securities cancelled, and tangible or intangible property actually received either by the Company or any one of its wholly-owned subsidiaries, if any, or future services.

4.2     Number and Qualifications of Managers. Until changed by amendment of the Certificate or an amendment to this section:

4.2.1   The agreed-upon and authorized number of Managers shall be seven (7), four (4) of whom shall be designated by the Cinco Group, and three (3) designated by the LA Group.

4.2.2   Upon the formation of the Company, the following shall be named and designated as managers:

4.2.2.1   For the Cinco Group: Jose P. Magsaysay, Jr., Jose Miguel Ma. Montinola, Ma. Victoria O. Bermejo, and Ricardo K. Montelibano.

4.2.2.2   For the LA Group: Amit Nemanim, Guy Koren, and Amir Jacoby.

4.3     Election of Managers.

4.3.1   Election at Meeting of Members. In any election of Managers at a meeting of Members duly called and noticed, the Cinco Group shall be entitled to elect four (4) Managers, while the LA Group shall be entitled to elect three (3) Managers. Interests entitled to be voted for them up to the number of Managers to be elected by such Members shall be elected. Elections for Managers need not be by ballot unless a Member demands election by ballot at the meeting and before the voting begins.

4.3.2   Election by Written Consent. Managers may alternatively be elected by a written consent action of Members made pursuant to Section 3.8.10 executed by a Majority of the Members.

4.4     Removal of Managers. Any Managers may be removed, with or without cause, by the vote of a Majority of the Members by written consent or at a meeting of Members called expressly for that purpose. Any removal shall be without prejudice to the rights, if any, of the Manager under any contract of employment.

4.5     Resignation of Managers. Any Manager may resign as a Manager at any time upon written Notice to the Company, without prejudice to the rights, if any, of the Company under any contract to which the Manager is a party.

4.6     Term of Office as Manager. Each Manager shall serve until the earliest to occur of (i) the resignation of the Manager, (ii) the removal of the Manager, or (iii) the election of a successor.

4.7     Authority of Multiple Managers. If, pursuant to Section 4.2 above, more than one manager is authorized, then any one or more Managers may take any action permitted to be taken by any one or more other Managers, unless this Operating Agreement or the Act requires the consent of more than one Manager.

4.8     Fiduciary Duties Owed by Managers. Managers shall owe fiduciary duties to the Company and the Members in the manner prescribed in the Act and under applicable case law.

4.9     Conduct of Meetings of Managers. The Managers may adopt such rules and regulations for the conduct of its meetings and the management of the Company not inconsistent with this Operating Agreement or applicable law.

4.10    Regular Monthly Meetings. The Managers shall meet at least on a monthly basis, and may be done in person, via teleconference or through the internet. The Managers may, at their discretion, invite non-Members to join, but only as non-voting observers.

4.11    Officers.

4.11.1  Officers. The officers of the Company, if any, shall include the following: Chairman of the Board of Members, President, Corporate Secretary, and Treasurer. The Company may also have, at the discretion of the Managers, one or more vice-presidents, one or more assistant secretaries, one or more assistant financial officers, and such other officers as may be appointed in accordance with the provisions of this Operating Agreement. Any number of offices may be held by the same person. Officers need not be Members.

4.11.2  Election. The officers of the Company, except such officers as may be appointed in accordance with the provisions of Section 10.3, shall be chosen by the Managers, and each shall hold his office until he or she shall resign or shall be removed by the Managers or otherwise disqualified to serve, or his successor shall be elected and qualified.

4.11.3  Subordinate Officers. The Managers may appoint, and may empower the President to appoint, such other officers as the business of the Company may require, each of whom shall hold office for such period, have such authority and perform such duties as the appointing authority may designate, subject to any limitations imposed by resolution of the Managers.

4.11.4  Removal. Any officer may be removed, either with or without cause, by the Managers, at any regular or special meeting thereof or, except in case of an officer chosen by the Managers, by any officer upon whom such power of removal may be conferred by the Managers (subject, in each case, to the rights, if any, of an officer under any contract of employment).

4.11.5  Resignation. Any officer may resign at any time by giving Notice to the Managers or to the President or to the Secretary of the Company, but without prejudice to the rights, if any, of the Company under any contract to which such officer is a party. Any such resignation shall take effect at the date of the receipt of such Notice or any later time specified therein; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

4.11.6 <u>Vacancies</u>. A vacancy in any office because of death, resignation, removal, disqualification or any other cause shall be filled in the manner prescribed in this Operating Agreement for regular appointments to such office.

4.11.7 <u>President</u>. The President shall be the chief executive officer of the Company and shall, subject to the control of the Managers, have general supervision, direction and control of the business and officers of the Company. The President shall preside at all meetings of the Members and the Managers. He or she shall have the general powers and duties of management usually vested in the office of the President of a corporation, and shall have such other powers and duties as may be prescribed by the Managers or this Operating Agreement. As agreed upon by the Members, at any given time, the President shall be any of the following: Amit Nemanim, Guy Korean, and Amir Jacoby. The initial President of the Company shall be Amit Nemanim. The President of the Company shall render the following services and shall perform the following duties for the Company in a faithful, diligent and efficient manner:

4.11.7.1    The President shall be responsible for all management, operational, marketing, establishment, maintenance, licensing and sub-licensing activities with respect to the "Potato Corner" outlets/stores in the Territory. He shall use his best efforts at all times during the term of this Agreement to operate and maintain the "Potato Corner" outlets/stores in the Territory according to the highest standards achievable consistent with the overall plan of the Management of the Company. The President shall comply with the rules, policies and procedures approved by the Management of the Company from time to time.

4.11.7.2    The President shall advertise market and promote the "Potato Corner" outlets/stores with the goal of causing public knowledge, awareness and patronage of the "Potato Corner" outlets/sites.

4.11.7.3    The President shall maintain a comprehensive system of records, books and accounts, with respect to the licensing and sub-licensing activities, operation, establishment, management, maintenance and other activities of the "Potato Corner" outlets /stores in the Territory with the assistance of the Corporate Secretary.

4.11.7.4    No later than the twentieth (20th) day of each month, with respect to the preceding month, the President shall render a statement of receipts and disbursements, a schedule of accounts receivable and payable, and a schedule of fees collected and distributed, together with a reconciled bank statement as of the last day of the month with the assistance of the Corporate Secretary.

4.11.7.5    No later than three (3) months after the end of a fiscal year, the President shall, with the assistance of the Corporate Secretary and external accountant hired by Management, cause the Company to issue audited financial statements, and shall provide a copy of the same to all the members of Management.

4.11.7.6    To the extent the President is lawfully able to do so, the President shall take such action as may be necessary to comply promptly with any and all laws, ordinances, orders or other requirements of any federal, state, county or municipal authority having jurisdiction of the Company and affecting the Company.

4.11.8  Secretary. The Secretary shall record or cause to be recorded, and shall keep or cause to be kept, at the principal place of business of the Company and such other place or places as the Managers may order, a book of minutes of actions taken at all meetings of Managers, committees and Members, with the time and place of holding, whether regular or special, and, if special, how authorized, the Notice thereof given, the names of those present at Managers' and committee meetings, the Percentage Interest present or represented at Members' meetings, and the proceedings thereof.

The Secretary shall keep, or cause to be kept, at the principal place of business those records referenced in Section 2.6 above and, if the Company has issued Membership Certificates, a register showing the number and date of each Membership Certificate, and the number and date of each Membership Certificate surrendered for cancellation.

The Secretary shall give, or cause to be given, Notice of all the meetings of the Members and the Managers required by this Operating Agreement or by the Act to be given, and shall have such other powers and perform such other duties as may be prescribed by the Managers or by this Operating Agreement.

4.11.9  Treasurer. The Treasurer shall keep and maintain, or cause to be kept and maintained, adequate and correct accounts of the properties and business transactions of the Company, including accounts of its assets, liabilities, receipts, disbursements, income, losses, changes in financial position, Capital Accounts, and retained earnings.

The Treasurer shall deposit all moneys and other valuables in the name and to the credit of the Company with such depositories as may be designated by the Managers. He or she shall disburse the funds of the Company as may be ordered by the Managers, shall render to the President and the Managers whenever they request it, an account of all of his transactions as Treasurer and of the financial condition of the Company, and shall have such other powers and perform such other duties as may be prescribed by the Managers or this Operating Agreement.

4.12    Indemnification and Liability Insurance.

4.12.1  The Company may provide indemnification to its Managers, officers and agents to the fullest extent permitted by Delaware law.

4.12.2  The Company shall have the power to purchase and maintain insurance on behalf of any Manager or officer against any liability asserted against or incurred by a Manager or officer in that capacity or arising out of that person's status as a Manager or officer of the Company.

4.13   Actions of the Managers. Each Manager has the power to bind the Company as provided in this ARTICLE IV. If there is more than one Manager, decisions of the Managers shall be made by majority vote of the Managers if at a meeting, or by unanimous written consent. No act of a Member in contravention of such a determination shall bind the Company to Persons having knowledge of such determination.

4.14   Meetings of Managers.

4.14.1 Place of Meetings. Meetings of Managers may be held at any place, selected by the person or persons calling the meeting. If no other place is stated or fixed, all meetings shall be held at the principal place of business of the Company.

4.14.2 Calling of Meetings. A meeting of the Managers may be called at any time by the President or any two Managers.

4.14.3 Notice of Meetings. Notice of the time and place of meetings of Managers shall be personally delivered to each Manager or communicated to each Manager by telephone or mail, charges prepaid, addressed to the Manager's address as is shown upon the records of the Company, or if it is not so shown on such records or is not readily ascertainable, at the place at which the meetings of Managers are regularly held. In the case Notice is mailed, it shall be deposited in the United States mail at least ninety-six (96) hours prior to the time of the holding of the meeting. In the event Notice is delivered personally or communicated by telephone, it shall be so delivered or communicated at least forty-eight (48) hours prior to the time of the holding of a meeting.

Except as otherwise provided by the Act or this Operating Agreement, a Notice need not specify the purpose of the meeting of the Managers. Whenever any Manager has been absent from any meeting of the Manager for which Notice has not been dispensed with, an entry in the minutes to the effect that Notice has been duly given shall be conclusive and incontrovertible evidence that due Notice of such meeting was given to such Manager.

4.14.4 Participation Through Telecommunications Equipment. Managers may participate in a meeting of the Company through the use of conference telephones or similar communications equipment, as long as all Managers participating in the meeting can hear one another. Participation in a meeting pursuant to this provision constitutes presence in person at that meeting.

4.14.5 Adjourned Meetings. When a Managers' meeting is adjourned to another time or place, unless the Certificate or this Operating Agreement otherwise requires, and, except as provided in the Act, Notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken. At the adjourned meeting, the Managers may transact any business that may have been transacted at the original meeting. If the adjournment is for forty-eight hours or more, a Notice of the adjourned meeting shall be given to each Member entitled to vote at the meeting.

4.14.6  Validation of Meeting Held Without Proper Call or Notice.  The actions taken at any meeting of Managers, however called and noticed, and wherever held, have the same validity as if taken at a meeting duly held after regular call and notice, if a quorum is present either in person or by proxy, and if, either before or after the meeting, each of the Managers signs a written waiver of Notice or consents to the holding of the meeting or approves the minutes of the meeting. All waivers, consents, and approvals shall be filed with the Company records or made a part of the minutes of the meeting. Attendance of a Manager at a meeting shall constitute a waiver of Notice of the meeting, except when the Manager objects, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.

4.14.7  Participation Through Telecommunications Equipment.  Managers may participate in a meeting of the Managers through the use of conference telephones or similar communications equipment, as long as all Managers participating in the meeting can hear one another. Participation in a meeting pursuant to this provision constitutes presence in person at that meeting.

4.14.8  Quorum.

4.14.8.1  A majority of the Managers in attendance or represented by proxy shall constitute a quorum at a meeting of Managers.

4.14.8.2  The Managers present at a duly called or held meeting at which a quorum is present may continue to transact business until adjournment, notwithstanding the loss of a quorum, if any action taken after loss of a quorum, other than adjournment, is approved by the requisite number of Managers specified in the Certificate, this Operating Agreement, or the Act.

4.14.8.3  In the absence of a quorum, any meeting of Managers may be adjourned from time to time by the vote of a majority of the Managers in attendance, but no other business may be transacted, except as provided in subparagraph 4.14.8.2.4.14.8.2 above.

4.14.9  Action Without a Meeting.  Any action required or permitted to be taken by the Managers may be taken without a meeting if all the Managers shall individually or collectively consent in writing to such action. Such consent or consents shall be filed with the minutes of the proceedings of the Managers and shall have the same force and effect as a unanimous vote of the Managers.

4.15  Compensation of Manager.  Each Manager shall be reimbursed all reasonable expenses incurred in managing the Company and shall be entitled to compensation in an amount, if any, to be determined from time to time by the affirmative vote of a Majority of the Members.

4.16  Authority of Members to Bind the Company.  The Members hereby agree that only the Managers and authorized agents of the Company shall have the authority to bind the Company. No Member other than a Manager shall take any action as a Member to bind the Company, and each Member shall indemnify the Company for any costs or damages incurred by the Company as a result of the unauthorized action of such Member.

4.17    Specific Arrangements with the Cinco Group. As agreed upon in the Joint
Venture Agreement, the Company shall enter into a Master License Agreement with Cinco
Corporation (Philippines), Inc. (or an affiliated company designated) which shall include the
following terms and conditions:

4.17.1 The Company agrees to license the "POTATO CORNER" intellectual
property rights from Cinco Corporation (Philippines), Inc. (or an affiliated company
designated) consisting of (i) the trademark, service mark and trade name "POTATO
CORNER"; and (ii) various trademarks, service marks, trade names, slogans, designs,
insignias, emblems, symbols, color schemes, package features, logo and other propriety
identifying characteristics used in relation and in connection with the "Potato Corner"
Products and the System; and (iii) as well as other intellectual property rights in
connection with the "POTATO CORNER" intellectual property rights, for use in the
Territory.

4.17.2 The Company agrees to pay, as an arm's length license fee, the following
amounts: (i) With respect to the licensing / sub-licensing or franchising the "POTATO
CORNER" intellectual property rights in connection with the "POTATO CORNER"
outlets/stores, an amount equal to thirty percent (30%) of all initial/franchise fees and
ongoing royalty fees paid to/ collected by the Company. Payments shall be made to
Cinco (or an affiliated company to be designated by Cinco) by wire transfer using a bank
or other financial institution specified by it within thirty (30) days from receipt of the fees
by the Company; and (ii) All withholding and other applicable taxes levied by any
authority on the payments by the Company shall be borne solely by the Company.

4.18    Specific Arrangements with the LA Group. As agreed upon in the Joint Venture
Agreement, the Company agrees to engage the LA Group to provide management and strategic
experience and expertise during the duration of this Agreement. The Company shall enter into a
Master Services Agreement with the LA Group (or a corporation to be designated by the LA
Group) which shall include the following terms and conditions:

4.18.1 In consideration for the provision of its services under the Master Services
Agreement, the LA Group shall be entitled to a services fee equal to thirty (30%) percent
of all initial/franchise fee and continuing royalty fees paid to/ collected by the Company.

4.18.2 All withholding and other applicable taxes levied by any authority on the
payments by the Company to the LA Group under this Agreement shall be borne solely
by the Company.

4.18.3 The LA Group shall faithfully, diligently and efficiently exercise its
obligations and responsibilities under the Master Services Agreement.

4.18.4 The LA Group shall maintain and protect confidential information
belonging to Cinco or the Company, and such undertaking shall apply to all of its
partners, officers, employees, or agents.

## ARTICLE V

### CAPITAL

5.1    Initial Capital Contributions. Upon execution of this Agreement, each Member shall assign, convey and transfer their respective Initial Capital Contribution to the Company. Each Member represents and warrants to the Company that (i) the Member's Shares are free of any mortgage, pledge, lien, security, interest or other encumbrance of any kind or nature, (ii) such Member is the lawful beneficial and record owner of, and has good and marketable title to, the Member's Shares, and (iii) to the best of such Member's knowledge, the Member's Shares are duly authorized, validly issued, fully paid and nonassessable. Additional Members shall make Capital Contributions in the amount, at the time and on the terms determined by the Members consenting to the admission pursuant to Section 3.1 hereof.

5.2    Capital Accounts. The Company shall establish and maintain a Capital Account for each Holder in accordance with Regulations Section 1.704-1(b)(2)(iv). Accordingly, a Holder's Capital Account shall be increased by (1) the amount of money the Holder contributes to the Company, (2) the fair market value of property the Holder contributes to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under IRC Section 752, and (3) allocations to the Holder of Income (or items thereof), including income and gain exempt from tax and gain as computed for book purposes in accordance with Regulations Section 1.704-1(b)(2)(iv)(g) but excluding any gain separately computed for tax purposes as described in Regulations Section 1.704-1(b)(4)(i). A Holder's Capital Account shall be decreased by (1) the amount of money the Company distributes to the Holder, (2) the fair market value of property the Company distributes to the Holder (net of any liabilities secured by such distributed property that the Holder is considered to assume or take subject to under IRC Section 752), (3) allocations to the Holder of the Company's nondeductible, noncapital expenditures, and (4) allocations to the Holder of Losses (or item thereof), including loss and deduction as computed for book purposes in accordance with Regulations Section 1.704-1(b)(2)(iv)(g) but excluding nondeductible, noncapital expenditures and loss and deduction separately computed for tax purposes as described in Regulations Section 1.704-1(b)(4)(i). A Holder's Capital Account in all events shall be adjusted in accordance with the additional rules set forth in Regulations Section 1.704-1(b)(2)(iv). In the event a Holder transfers all or any portion of his interest in the Company, the transferee shall succeed to the individual Capital Account balance of the transferor to the extent such individual Capital Account balance relates to the transferred interest.

5.3    Adjustment for Distributions in Kind. Any asset of the Company distributed to the Holders in kind shall be valued according to its fair market value. An item of Income or Loss shall be computed as if such asset had been sold at its fair market value, such hypothetical item shall be allocated as provided in Section 6.1, and each Holder's Capital Account shall be credited or charged, as the case may be, with the Holder's share of such hypothetical item prior to any such distribution of assets.

5.4    Interest. No Capital Contribution or Capital Account balance shall bear interest.

5.5     Deficit Capital Account. No Holder shall be obligated to restore a Capital Account having a balance of less than zero.

5.6     Return of Capital. Except as otherwise provided in this Operating Agreement, no Holder shall have any right to withdraw or make a demand for Distribution or withdrawal or return of any Capital Contribution or Capital Account balance.

5.7     Optional Adjustments to Capital Accounts. Upon (i) a contribution of cash or property (which shall be valued at its fair market value) to the Company by a new or existing Holder for a Membership or Economic Interest, or (ii) a distribution by the Company to a retiring or continuing Holder for a Membership or Economic Interest, the Company may, in the discretion of the Members, increase or decrease the Capital Accounts of the Holders to reflect a revaluation of Company Property on the books of the Company, in accordance with the provisions of Regulations Section 1.704-1(b)(2)(iv)(f).

## ARTICLE VI

### INCOME AND LOSSES

6.1     Allocations. Except as otherwise provided in this Article VI, Income and Losses, and each item thereof, of the Company shall be allocated to the Holders in proportion to their Percentage Interests.

6.2     Qualified Income Offset. A Holder whose Capital Account is unexpectedly reduced on account of an adjustment described in Section 1.704-1(b)(2)(ii)(d)(4) of the Regulations, an allocation described in Section 1.704-1(b)(2)(ii)(d)(5) of the Regulations, or a distribution described in Section 1.704-1(b)(2)(ii)(d)(6) of the Regulations, shall be allocated that Holder's pro rata portion of each item of Company income, including gross income, and gain in an amount and manner sufficient to eliminate such deficit balance as quickly as possible.

6.3     Minimum Gain Chargeback. Notwithstanding any other provision herein, if there is a net decrease in Company Minimum Gain during any taxable year, items of Company income and gain shall be allocated in accordance with the provisions of Regulations Section 1.704-2(f). This provision is intended to comply with Regulations Section 1.704-2(e)(3).

6.4     Contributed Property and Revaluations. In accordance with IRC Section 704(c), income, gain, loss and deduction with respect to property contributed to the Company by a Holder shall be allocated solely for tax purposes among the Holders so as to take account of any variation between the adjusted basis of the property to the Company and its fair market value on the date of the Contribution. Further, if the book value of any Company asset is adjusted as described in Regulations Section 1.704-1(b)(2)(iv)(f), subsequent allocations for tax purposes of income, gain, loss and deduction with respect to such asset shall take into account any variation between its adjusted tax basis and its adjusted book value. In either case, the Managers shall determine such allocations using a method that qualifies as reasonable within the meaning of Regulations Section 1.704-3. No Holder's Capital Account shall be adjusted for allocations made under this Section.

6.5     Timing.  All allocations of Income or Losses shall be made to the Persons shown on the records of the Company to have been Holders as of the end of business on the last day of the Company's taxable year for which the allocation is made.  Notwithstanding the foregoing, upon the transfer of an Economic Interest or the admission of an Additional Member during a taxable year of the Company, the Income or Losses shall be allocated between the former Holder and the successor, or to the Additional Member, as the case may be, according to the number of days during such year each was a Holder.

## ARTICLE VII

## DISTRIBUTIONS

7.1     Operating Distributions.  The Managers from time to time may determine, in their reasonable judgment, that: (i) there is an excess of cash on hand beyond the Company's current and anticipated requirements, including, without limitation, cash flow and reserve requirements, and (ii) a distribution of such excess cash on hand, if any, is permissible under Section 18-607 of the Act.  In that event, the Managers may, in their sole and absolute discretion, make a distribution of all or a part of such excess (an *"Operating Distribution"*) to the Holders, provided that no such Distribution shall be declared and paid unless, after such Distribution, the assets of the Company will exceed all liabilities of the Company.  Such Distributions may be made in cash or Property or partly in both, as determined in the sole and absolute discretion of the Managers.

7.2     Generally Pro Rata.  Except as provided in Section 7.3 below, Distributions shall be allocated to Holders in proportion to their Percentage Interests.

7.3     Liquidating Distributions.  Upon the dissolution of the Company, liquidating distributions in all cases shall be made in accordance with the positive Capital Account balances of the Holders, as determined after taking into account all Capital Account adjustments for the Company's taxable year during which such dissolution occurs (other than those made pursuant to this section), by the end of such taxable year or, if later, within ninety (90) days after the date of such dissolution.

## ARTICLE VIII

## ASSIGNMENT OF INTERESTS

8.1     Assignment of Interests.  An Economic Interest is assignable in whole or in part, provided, however, that no Membership Interest may be assigned to any Person (including any assignments for security purposes or other form of pledge) without the consent of Members required pursuant to Section 3.7.  Upon admission, the Assignee shall become a Substitute Member, and shall have the rights and benefits, and is subject to the restrictions and liabilities, of a Member under the Certificate, this Operating Agreement, and the Act.  A Substitute Member is also liable for the obligations of the Assignor to make Capital Contributions, and to return any unlawful distributions made to the Assignor under Chapter VI (commencing with Section 18-601) of the Act.  However, the Substitute Member is not obligated for liabilities unknown to the Substitute Member at the time the Substitute Member became a Member and that could not be ascertained from the Certificate or this Operating Agreement.

8.2     No Dissolution upon Assignment.  An assignment of an Economic Interest does not of itself dissolve the Company or, except as otherwise set forth herein, entitle the Assignee to vote or participate in the management and affairs of the Company or to become or exercise any rights of a Member.  An assignment of an Economic Interest merely entitles the Assignee to receive, to the extent assigned, the Income, Losses, Distributions and similar items to which the Assignor would be entitled.

8.3     Information Regarding Assignee.  Upon the assignment of all or part of an Economic Interest, the Assignor shall provide the Manager or Member of the Company responsible for maintaining the books and records with the name and address of the Assignee, together with details of the interest assigned.  Upon receipt of that Notice, the Company shall amend the list required by Section 2.6 accordingly.  Until the Assignee becomes a Substitute Member, the Assignor continues to be a Member and to have the power to exercise any rights and powers of a Member, including the right to vote which, in the case of a Member who has assigned his or her or its entire Economic Interest in the Company, shall include the right to vote in proportion to the Percentage Interest that the assigning Member would have, had the assignment not been made.

8.4     No Release of Liability of Assignor.  The Assignor is not released from liability as a Member solely as a result of the Assignment.  Whether or not an Assignee becomes a Substitute Member, the Assignor is not released from the Assignor's liability to the Company under Subchapter V (commencing with Section 18 501) and Subchapter VI (commencing with Section 18-601) of the Act.

8.5     Pledge of Membership Interest.  The pledge of, or granting of, a security interest, lien, or other encumbrance in or against any or all of the Membership Interest of a Member shall not cause the Member to cease to be a Member or to grant to anyone else the power to exercise any rights or powers of a Member.

8.6     Exercise of Rights upon Death or Incompetency.  If a Member who is a natural person dies or is adjudged by a court of competent jurisdiction to be incompetent to manage the Member's person or property, the Member's executor, administrator, guardian, conservator, or other legal representative may exercise all of the Member's rights for the purpose of settling the Member's estate or administering the Member's property, including any power the Member had under the Certificate or this Operating Agreement to assign its Membership Interest.

8.7     Exercise of Rights upon Dissolution or Termination.  If a Member which is an Organization is dissolved or terminated, the powers of that Member may be exercised by its legal representative or successor.

## ARTICLE IX

## DISSOLUTION AND WINDING UP

9.1     Dissolution.  The Company shall and may only be dissolved, and its affairs wound up, upon the first to occur of the following events (which, unless the Members agree to continue the business, shall constitute Dissolution Events):

9.1.1   the expiration of the Term, unless the business of the Company is continued with the consent of those Members required pursuant to Section 3.7;

9.1.2   the vote of such number of Members as is required pursuant to Section 3.7;

9.1.3   the Dissociation of a Member under Article XI, unless the business of the Company is continued with the consent of those Members required pursuant to Section 3.7 within ninety (90) calendar days after such Dissociation; or

9.1.4   the entry of a decree of judicial dissolution pursuant to the Act.

9.2   Effect of Dissolution. Upon dissolution, the Company shall be dissolved and wound up in accordance with the Act, and the Company Property shall be distributed in accordance with Section 7.3. In addition, upon dissolution, the following shall immediate apply:

9.2.1   All rights granted under the Master License Agreement shall terminate and the Company shall cease the use of the Potato Corner intellectual property rights, and confidential information, provided however, that the Company shall be permitted to use any of the foregoing as is reasonably required in order to comply with its obligations under its sub-licensing or franchising agreements, but only to the extent of the duration of sub-licensing or franchising agreements in existence at the time of the termination of this Operating Agreement.

9.2.2   The LA Group shall be subject to a non-compete arrangement and hereby agrees that, within two (2) years from the date of termination of this Operating Agreement, it shall not engage in the business of establishing, operating, managing, licensing and franchising identical or similar products sold by the Company, using the intellectual property rights identical or similar to those used by the Company, at the time of the termination of this Operating Agreement.

## ARTICLE X

## TAX AND ACCOUNTING MATTERS

10.1   Characterization as a Partnership. The Members intend that the Company be classified as a partnership for federal and state income tax purposes. Accordingly, this Operating Agreement is written and shall be construed in a manner consistent with such intent.

10.2   No Partnership Intended for Nontax Purposes. The Members have formed the Company under the Act, and expressly do not intend hereby to form a partnership under either the Delaware Uniform Partnership Law or the Delaware Revised Uniform Limited Partnership Act. The Members do not intend to be partners one to another, or partners as to any third party. To the extent any Member, by word or action, represents to another person that any other Member is a partner or that the Company is a partnership, the Member making such wrongful representation shall be liable to any other Member who incurs personal liability by reason of such wrongful representation.

10.3    Fiscal Year. The fiscal year of the Company shall end on the last day of December of each year. The Managers may at any time change the fiscal and taxable year of the Company, subject to any applicable limitation of law or regulation.

10.4    Accounting Method. The Managers shall select the method of accounting by which the Company books of account shall be maintained and its income, gains, losses, deductions and credits shall be reported, for both financial and tax accounting purposes. The Managers may at any time change the financial and tax accounting method of the Company, subject to any applicable limitation of law or regulation.

10.5    Tax Information. As soon as reasonably practicable after the end of the Company fiscal year, the Managers shall cause each Holder to be furnished with a Schedule K-1 for such year and any other schedule or statement required by federal income tax law.

10.6    Basis Adjustment. In the case of a Distribution of Company Property or a transfer of a Membership Interest, the Managers may cause the Company to file an election under IRC Section 754 to adjust the basis of the Company Property. As a result of this election, the Managers shall have the right to require, as a condition to the granting of consent to any transfer, the reimbursement of expenditures made by the Company for any legal and accounting fees incurred to make any such basis adjustment. The Managers shall have the right, in their sole and absolute discretion, to decline to make such an election; and further, the failure to make any election under the IRC in connection with any particular transfer of an interest in the Company shall not affect the right of the Managers to make, or refuse to make, such an election with respect to any subsequent transfer of an interest in the Company.

10.7    Other Elections. The Company shall have the right, in the sole and absolute discretion of the Managers, to make any other elections or determinations required or permitted for federal or state income tax or other tax purposes. The Managers may rely upon the advice of the Company's accountants or tax attorneys with respect to the making of any such election.

10.8    Taxes of Taxing Jurisdictions. To the extent that the laws of any Taxing Jurisdiction requires, each Holder requested to do so by the Managers will submit an agreement indicating that the Holder will make timely income tax payments to the Taxing Jurisdiction and that the Holder accepts personal jurisdiction of the Taxing Jurisdiction with regard to the collection of income taxes attributable to the Holder's income, and interest, and penalties assessed on such income. If the Holder fails to provide such agreement, the Company may withhold and pay over to such Taxing Jurisdiction the amount of tax, penalty and interest determined under the laws of the Taxing Jurisdiction with respect to such income. Any such payments with respect to the income of a Holder shall be treated as a distribution to such Holder for purposes of ARTICLE VII. The Company may, where permitted by the rules of any Taxing Jurisdiction, file a composite, combined or aggregate tax return reflecting the income of the Company and pay the tax, interest and penalties of some or all of the Holders on such income to the Taxing Jurisdiction, in which case the Company shall inform the Holders of the amount of such tax, interest and penalties so paid.

10.9    Tax Matters Partner. The Managers shall designate one of their number or, if there are no Managers eligible to act as tax matters partner any other Member, as the tax matters

partner of the Company pursuant to IRC Section 6231(a)(7). Any Member designated as tax matters partner shall take such action as may be necessary to cause each other Member to become a notice partner within the meaning of IRC Section 6223. Any Member who is designated tax matter partner may not take any action contemplated by IRC Sections 6222 through 6232 without the consent of the Managers.

## ARTICLE XI

## DISSOCIATION OF A MEMBER

11.1    Dissociation. A Person shall cease to be a Member upon the happening of any of the following events:

11.1.1  the withdrawal of a Member with the consent of such number of Members as is required pursuant to Section 3.7;

11.1.2  the bankruptcy (as defined by the Act) of a Member;

11.1.3  in the case of a Member who is a natural Person, the death of the Member or the entry of an order by a court of competent jurisdiction adjudicating the Member incompetent to manage the Member's personal estate;

11.1.4  in the case of a Member who is acting as a Member by virtue of being a trustee of a trust, the termination of the trust (but not merely the substitution of a new trustee);

11.1.5  in the case of a Member that is a separate Organization other than a corporation, the dissolution and commencement of winding up of the separate Organization;

11.1.6  in the case of a Member that is a corporation, the filing of a certificate of dissolution, or its equivalent, for the corporation or the revocation of its charter; or

11.1.7  in the case of an estate, the distribution by the fiduciary of the estate's entire interest in the Company.

11.2    Rights of Dissociating Member. In the event any Member dissociates prior to the expiration of the Term:

11.2.1  if the Dissociation causes a dissolution and winding up of the Company, the Member shall be entitled to participate in the winding up of the Company to the same extent as any other Member except that any Distributions to which the Member would have been entitled shall be reduced by the damages sustained by the Company as a result of the Dissolution and winding up;

11.2.2  if the Dissociation does not cause a dissolution and winding up of the Company, the Member shall not be entitled to receive any amount in consideration of the Member's Membership Interest on account of such Dissociation, unless such Member no

longer holds the corresponding Economic Interest. Otherwise, the Dissociated Member shall continue as Holder of an Economic Interest only.

## ARTICLE XII

### MISCELLANEOUS PROVISIONS

12.1    Amendment of Operating Agreement. This Operating Agreement may be modified upon the vote of Members required pursuant to Section 3.7. No Member or Manager shall have any vested rights in the Operating Agreement which may not be modified through an amendment to the Operating Agreement.

12.2    Entire Agreement. The Operating Agreement represents the entire agreement among all the Members and between the Members and the Company.

12.3    Interpretation. To the extent any provision of this Operating Agreement is prohibited or ineffective under the Act, the Operating Agreement shall be considered amended to the smallest degree possible in order to make the agreement effective under the Act. In the event the Act is subsequently amended or interpreted in such a way to make any provision of the Operating Agreement that was formerly invalid valid, such provision shall be considered to be valid from the effective date of such interpretation or amendment.

12.4.    Rights of Creditors and Third Parties under Operating Agreement. This Operating Agreement is entered into among the Company and the Members for the exclusive benefit of the Company, its Members, and their successors and assignees. This Operating Agreement is expressly not intended for the benefit of any creditor of the Company or any other Person. Except and only to the extent provided by applicable statute, no such creditor or third party shall have any rights under this Operating Agreement or any agreement between the Company and any Member with respect to any Capital Contribution or otherwise.

12.5.    Valuation of Non-Cash Consideration. For purposes of this Operating Agreement, the procedure for valuing any non-cash consideration shall be as follows: If the parties cannot otherwise agree, each party shall select a qualified appraiser and the appraisers so selected shall jointly select an appraiser, and the valuation of the appraiser so selected shall be binding on all parties. Such valuation shall be based on an arm's length cash sale of the assets. If the non-cash consideration being valued is real property, the selected appraiser shall be an MAI appraiser.

12.6    Counterpart Execution. This Operating Agreement may be executed in any number of identical counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same instrument when each party has signed one (1) such counterpart.

12.7    Remedies. The parties hereto recognize and agree that the breach of any term, provision, or condition of this Operating Agreement may cause irreparable damage, the amount of which is difficult to ascertain and that the award of damages may not be adequate relief to the party aggrieved; the parties therefore agree that, in addition to all other remedies available in the event of a breach of any of the terms or conditions of this Operating Agreement, the party

aggrieved shall have the right, in addition to all other remedies available in the event of a breach of this Operating Agreement, to injunctive or other equitable relief (from any court or other body having appropriate jurisdiction).

12.8     Successors and Assigns. Except as herein otherwise specifically provided, this Operating Agreement shall be binding upon and inure to the benefit of the parties and their legal representatives, heirs, administrators, executors, successors and assigns.

12.9     Severability. If any provision of this Operating Agreement, or the application of such provision to any Person or circumstance, shall be held invalid, the remainder of this Operating Agreement, or the application of such provision to Persons or circumstances other than those to which it is held invalid, shall not be affected thereby.

12.10    Governing Law. This Operating Agreement shall be governed by and construed and enforced in accordance with the laws of the State of California without regard to the principles governing conflicts of laws.

IN WITNESS WHEREOF, this Operating Agreement is entered into as of the Effective Date.

INSERT SIGNATURE BLOCKS

IN WITNESS WHEREOF, the parties have executed this Agreement on the date and in place first mentioned.

Cinco Group:

Cinco Corporation (Philippines)

Name: Jose P. Magsaysay

Title: CEO

Jose P. Magsaysay, Jr.

Ma. Victoria O. Bermejo

Ricardo K. Montelibano

L.A. Group:

Amit Nemanim

Guy Koren:

Amir Jacoby

SIGNED IN THE PRESENCE OF:

November 30, 2010

# EXHIBIT F

# PCJV-LA GROUP

## PARTNERSHIP AGREEMENT

### Preamble

This Partnership Agreement ("Agreement") is made March 1, 2013, to memorialize the partnership activities and relationship of the partners executing this Partnership Agreement, who shall be referred to in this Agreement individually as a "Partner" and collectively as "Partners."

## RECITALS

A.      The Guy Koren ("Koren"), Amit Nemanim ("Nemanim"), and Amir Jacoby ("Jacoby") collectively initiated negotiations to work together as a group with the individuals constituting the Cinco Group to establish, operate, manage, license and franchise "Potato Corner" stores/outlets in the United States and Israel (other than Los Angeles and San Francisco Counties and Tanforan Mall), pursuant to the terms of the Potato Corner USA Joint Venture Agreement executed on or about 11/2009 ("JV Agreement"), which JV Agreement was subsequently replaced by the PCJV USA, LLC Limited Liability Company Agreement made effective 10/2010 ("PCJV Agreement").

B.      Pursuant to the PCJV Agreement, Koren, Nemanim, and Jacoby were invited to participate in PCJV USA, LLC as the "LA Group", by making a Capital Contribution (as defined in the PCJV Agreement) of $20,000 to PCJV USA, LLC and executing and performing services for PCJV USA, LLC pursuant to a Master Services Agreement ("Master Services Agreement").

C.      This Agreement is intended to memorialize in writing the election by Koren, Nemanim and Jacoby to continue the partnership relationship they initially established in connection with the negotiation of the JV Agreement, to accept the offer made to the LA Group to purchase and hold of a 40% membership interest in PCJV USA, LLC and to accept the offer made by PCJV USA, LLC to the LA Group to provide the services described in the Master Services Agreement.

### Type of Business

1.      The Partners have associated to form a General Partnership for the purpose of holding a membership interest in PCJV USA, LLC and providing services on behalf of PCJV USA, LLC pursuant to the Master Services Agreement, and to engage in such other activities as may be permitted by law and approved by a majority of the Partners.

### Partnership Name

2.      The Partnership name shall be "PCJV-LA Group".

### Partnership Term

3.   .   The Partnership shall be deemed to have commenced as of the execution of this Agreement by the Partners, and shall continue until dissolved by agreement of the Partners or terminated under the provisions of this Agreement.

### Place of Business

4.      The Partnership's principal place of business shall be: 8950 West Olympic Boulevard, Suite 563, Beverly Hills, CA 90211, California 90035. The Partnership shall maintain any other place or places of business agreed upon by the Partners.

### Initial Capital

5.      The Partners shall each be required to contribute to the Partnership their proportional share of the $20,000 Capital Contribution made by the Partnership to PCJV USA, LLC in and for their interest in the Partnership. The Partnership has offered Partnership interests in the Partnership to the following individuals in proportion to their respective capital contributions to the Partnership., as set forth in Exhibit A to this Agreement. Only those persons contributing a proportion share of this Capital Contribution shall be deemed a continuing Partners of the Partnership, in proportion to their actual contribution.

|     |              |         |
|-----|--------------|---------|
| 5.1 | Guy Koren    | $7,600  |
| 5.2 | Amit Nemanim | $7,600  |
| 5.3 | Amir Jacoby  | $4,800  |

The failure of any Partner to pay their required contribution to this Partnership shall be deemed in default. If the default is not cured following 30 days prior written notice, the other Partners may advance the capital contribution as (i) a loan to the defaulting Partner to bear interest at the rate of 10% per annum until paid in full and secured by the Partner's interest in the Partnership and/or distributions made to such Partner with respect to such interest or (ii) a purchase from the Partnership of the defaulting Partner's allocated interest (or any part thereof) and a corresponding cancellation of such Partner's opportunity to continue as a Partner.

The Partners will prepare an Exhibit A to this Agreement to reflect the actual contributions made and the proportional Partnership interest thereby obtained.

### Service Commitment

6.      Subject to the allocation of responsibility among the Partners for the performance of the services required of the Partnership under the terms of the Master Services Agreement, each of the Partners shall be responsible for providing a proportional share of the services required (as determined by the Partners). Alternatively, the Partners may agree to compensate individual Partners for the service obligations required under the Master Services Agreement that have been assigned to and assumed and performed by them on behalf of the Partnership.

### Capital Withdrawals

7.      No Partner shall withdraw any portion of the Partnership capital without the other Partners' express written consent.

### Profits and Losses

8.      Net profits and net losses will be allocated to the Partners, and net cash available for distribution by the Partnership will be distributed in proportion to the respective percentage interests of the Partners in the Partnership as described on Exhibit A to this Agreement. The term "net profits," as used in this Agreement, shall mean for tax purposes the Partnership net profits as determined by the accounting method generally and consistently applied by the Partnership, and for purposes of determining the cash available for distribution by the Partnership to the Partners the term "net profits" shall mean the net cash available to the Partnership after establishing such cash reserves as the Partners may determine to be prudent for working capital and any contingent liabilities

### Books of Account

9.      Partnership books of account shall be accurately kept and shall include records of all Partnership income, expenses, assets, and liabilities. The Partnership books of account shall be maintained on a cash basis. Each Partner shall have the right to inspect the Partnership books during normal business hours at the principal office of the Partnership.

### Fiscal Year

10.     The Partnership's fiscal year shall end on December 31 each year.

### Accountings

11.     Complete accountings of the Partnership affairs at the close of business on the last days of March, June, September, and December of each year shall be rendered to each Partner within thirty (30) days after the close of each such month or as soon thereafter as may be practical with regard to the availability of such information from PQJV USA, LLC  At the time of each accounting, the net profits of the Partnership, if any, shall be distributed to the Partners as provided in this Agreement. Except as to errors brought to the Partners' attention within 15 days after it is rendered, each accounting shall be final and conclusive.

### Time Devoted to Partnership

12.     The Partners shall be required to devote such time and attention to the Partnership business as may be necessary for the Partnership to fulfill its obligations under the Master Services Agreement. Except as the service responsibilities may otherwise be allocated or delegated by the Partners, each of the Partners is required to provide a proportional amount of the service time required by the Master Services Agreement relative to their respective percentage interest in the Partnership. Failure to provide the time required to perform or to perform their respective share of the services required of the Partnership or otherwise allocated or delegated to a Partner shall constitute a breach of the Partnership Agreement.  A Partner shall not be deemed in breach of their obligation to provide services on behalf of the Partnership unless and until the Partnership has provided such Partner with at least 30 days prior written notice of the alleged default or breach, and the default or breach as gone uncured during that notice period.

In addition to the services to be provided by the Partners in fulfillment of the Partnership's responsibilities under the Master Services Agreement, the Partners may be individually designated by the Partnership to serve as a Manager of PCJV USA, LLC. If so designated, a Partner shall fulfill their Manager responsibilities on behalf of the Partnership, and if unable or unwilling to do so a Partner shall so advise the Partnership so that they may designate someone else to serve in that capacity. The Partnership shall appoint its Manager designees to PCJV USA, LLC by Majority Approval (as defined below).

## Management and Authority

13.    Partnership decisions and the actions of the Partners shall be determined and approved by the vote or written consent of Partners holding a majority in percentage interest of the Partnership ("Majority Approval"). Individual Partners may not bind the Partnership without obtaining the Majority Approval of the Partners. Any obligation incurred in violation of this provision may be charged to and collected from the Partner who incurred the obligation. Subject to the above authorization requirement, any individual Partner may execute a document on behalf of the Partnership.

Guy Koren has been initially granted the title of "Managing Partner" on behalf of the Partnership in expectation that he will execute documents on behalf of the Partnership.

## Statement of Partnership

14.    The Partners will cause to be filed with the California Secretary of State a Statement of Partnership Authority pursuant to California Corporations Code Section 16303 on form GP-1 in effect at the time of the filing. The Partnership shall cause a Statement of Partnership Authority to be recorded in every county in which the Partnership owns, or contemplates owning, real property.

## Partners' Salaries

15.    Although no salaries are contemplated with respect to a Partner's services as a Manager of PCJV USA, LLC, the Partners providing services on behalf of the Partnership in fulfillment of the Partnership's obligations under the Master Services Agreement shall be entitled to such compensation as may be approved by the Partners by Majority Approval. If the Partnership is unable to pay for the services performed by a Partner, by Majority Approval the Partners the compensation otherwise payable may be accrued and thereafter paid from the first funds made available to the Partnership from PCJV USA, LLC. Compensation payable to a Partner for services provided may be paid as a guaranteed payment as provided under IRC Section 707(c), as payment made to a Partner irrespective of the Partner's percentage interest in Net Profits, the payment of which shall reduce the Net Profits allocable to the Partners in accordance with the Partners' percentage interests. In addition to compensation for their time, Partners shall be entitled to reimbursement for their reasonable business expenses incurred in furtherance of the Partnership business, so long as approved by the Partners by Majority Approval. Any compensation paid to a Partner and any business expenses reimbursed shall be deducted ordinary business expenses prior to computing net profits.

## Withdrawal of Partner

915753.1/81153.08003

16.     Upon thirty (30) days written notice of intent to the other Partners, a Partner may dissociate from the Partnership by withdrawing as a Partner.

### Option to Purchase Dissociated Interest

17.     On dissociation of a Partner by death, withdrawal, or other act, the remaining Partners may continue the Partnership business by purchasing the outgoing Partner's interest in the Partnership assets and goodwill. The remaining Partners shall have the option to purchase the dissociated Partner's interest by paying to the outgoing Partner or the appropriate personal representative the value of the dissociated Partner's interest as determined under Paragraph 18 of this Agreement. If the remaining Partners do not exercise this option, the Partnership shall be dissolved as provided under Paragraph 21 of this Agreement, unless the remaining Partners have elected to convert the Partnership into an other business entity form and the withdrawing Partner's interest in such other entity is in proportion and comparable to the interest held by the withdrawing Partner immediately prior to withdrawal as provided in Paragraph 21A.

### Purchase Price of Partnership Interest

18.     On exercise of the option described in Paragraph 17 of this Agreement, the remaining Partners shall pay to the dissociated Partner or appropriate personal representative the value of the dissociated Partner's Partnership interest as determined by the last regular accounting preceding the effective date of the withdrawal plus the full unwithdrawn portion of the dissociated Partner's share in net profits earned between the date of that accounting and the date of dissociation. The Partnership shall have the right to offset against the purchase price otherwise payable for a withdrawing Partner's interest the Partner's share of any existing liabilities and accounts receivable incurred prior to the effective date of the withdrawal.

### Liability of Deceased Partner's Estate

19.     If on the death of one Partner, the surviving Partners exercise their option to purchase the deceased Partner's interest under Paragraphs 17 and 18, the liability of the deceased Partner's estate for Partnership obligations incurred during the period of continuation shall be limited to the amount that the deceased Partner had invested or the net value of the Partner's interest in the Partnership at the time of death (and including the unwithdrawn portion of net profits earned since the last accounting), whichever is greater.

### Duties of Purchasing Partners

20.     On any purchase and sale made pursuant to Paragraphs 17, 18, or 19 of this Agreement, the remaining Partners shall assume all Partnership obligations (subject to the right to offset a proportional amount against the purchase price). The remaining Partners shall hold and defend the withdrawing Partner or the deceased Partner's estate and personal representative, as well as any property belonging to either a withdrawing or deceased Partner, free and harmless from all liability for Partnership obligations beyond those reflected in the calculation of the purchase price payable. Immediately upon purchase of a withdrawing or deceased Partner's interest, the remaining Partners shall prepare, file, serve, and publish all notices required by law to protect the withdrawing Partner or the deceased Partner's estate and personal representative from liability for future Partnership obligations. All costs incident to the requirements of this Paragraph shall be borne by the remaining Partners.

915753.1/81153.08003

## Dissolution

21. When: (1) the Partnership is dissolved by agreement of the Partners; or (2) a remaining Partner or Partners decline(s) to exercise the option to purchase a dissociated Partner's interest under Paragraph 17; or (3) it is otherwise required by law, the Partnership affairs shall be wound up, the Partnership assets liquidated, its obligations to creditors, including, to the extent permitted by law, Partners who are creditors, shall be paid, and the surplus divided among the Partners according to their rights of distribution of their Partnership accounts.

## Conversion

21A. Upon the occurrence of an event resulting in a dissociation of a Partner, within 90 days of such event the remaining Partners may elect to convert the Partnership into an other business entity form for which the dissociated Partner's interest will be afforded limited liability from any liability arising after such conversion. Conversion to an other entity form shall be in lieu of the exercise of the option to purchase the dissociated Partner's interest in the Partnership and in lieu of the Partnership dissolution. The dissociated Partner shall receive an interest in the other entity form adopted by the remaining Partners that is proportional and comparable to the held by the dissociated Partner's interest in the Partnership prior to the dissociation event; provided, however, that the dissociated Partner's interest in the other entity need only be in a form that is comparable economically and need not include any voting rights or authority to act on behalf of the other entity in a manner comparable to that held as a Partner (e.g. comparable to an "economic interest" in a limited liability company, as defined in Cal Corp Code Section 17001(o)).

## Notices

22. All notices between the Partners shall be in writing and shall be deemed served when personally delivered to a Partner, or when deposited in the United States mail, certified, first-class postage prepaid or by overnight courier, addressed to a Partner at the Partner's address set forth on the signature page to this Agreement or to such other place as may be specified in a notice given pursuant to this Paragraph as the address for service of notice on that Partner. Notices may also be deemed duly provided if delivered by e-mail to an e-mail address specified by the receiving Partner and the party giving notice concurrently places a copy thereof in the United States mail (as described above) or delivers a copy by overnight courier, in which event notice shall be deemed given on the date of the delivery of the e-mail.

## Consents and Agreements

23. All consents and agreements provided for or permitted by this Agreement shall be in writing. Signed copies of all consents and agreements pertaining to the Partnership shall be kept with the Partnership books.

## Governing Law

24. This Agreement shall be governed by the California Uniform Partnership Act of 1994, as amended, and shall in all respects be a contract under California law.

## Attorney Fees

915753.1/81153.08003

25.    As between the parties to this Agreement, the prevailing party in any dispute arising from or relating to this Agreement shall be awarded costs and attorney fees whether or not the matter is resolved by trial or appeal.

## Sole Agreement

26.    This instrument contains the Partners' sole agreement relating to their Partnership. It correctly sets out the Partners' rights and obligations. Any prior agreements, promises, negotiations, or representations not expressly set forth in this instrument have no force or effect.

Executed by the undersigned with effect as of the Effective Date defined above, at Orange County, California.

[See Counterpart Signature Pages of the Partners attached hereto]

915753.1/81153.08003

EXHIBIT A

PARTNER CAPITAL CONTRIBUTIONS AND PERCENTAGE INTERESTS
(Proposed)

| PARTNER NAME AND ADDRESS | CAPITAL CONTRIBUTION | PERCENTAGE INTEREST |
|---|---|---|
| GUY KOREN<br>1478 S. crest Dr<br>LA. CA 90035 | $7,600 | 38% |
| AMIT NEMANIM | $7,600 | 38% |
| AMIR JACOBY<br>14320 Ventura Bl #115<br>Sherman Oas, CA 91423 | $4,800 | 24% |

EXHIBIT A

PARTNERS, CAPITAL CONTRIBUTIONS AND PARTNERSHIP INTERESTS

(Amended and Updated March 22, 2013)

| NAME OF PARTNER AND ADDRESS | CAPITAL CONTRIBUTION | PARTNERSHIP PERCENTAGE INTEREST |
|---|---|---|
| GUY KOREN | 12,258.04 | 61.3 |
| AMIR JACOBY | 7,741.96 | 38.7 |

915753.1/81153.08003

PCJV-LA GROUP,
a California general partnership

## MEMBER COUNTERPART SIGNATURE PAGE

The undersigned, desiring to enter into the Partnership Agreement made effective
March 1, 2013 (the "Agreement") for PCJV-LA GROUP, a California general
partnership (the "Company"), hereby agrees to all of the terms and provisions thereof.
The undersigned hereby joins and executes the Agreement as a Partner of the Partnership,
and hereby authorizes this Signature Page to be attached thereto in evidence of this
joinder.

WITNESS, the execution hereof by the undersigned, as a Partner of PCJV-LA
GROUP:

Signature of Partner

Address: 14320 Ventura Bl #H15
Sherman Oaks, CA 91423

### Spousal Consent

The undersigned is the spouse of the above general partner. I have read and understood
the terms and conditions of the Partnership Agreement of PCJV-LA Group and agree to
be bound by its terms. I agree that my spouse shall have the sole and exclusive power to
manage the partnership interest created by the foregoing Agreement, regardless of
whether that interest was acquired with community property, quasi-community property,
or separate property assets, however so titled or characterized. I further acknowledge and
agree that my spouse may, from time to time, or at any time, amend, restate, sell, transfer,
assign or hypothecate his Partnership interest in any manner whatsoever, with or without
my further consent.

Executed at _L.A_ County, California.

Date: 3/1/2013

912600.1/01927.99001

**PCJV-LA GROUP,**
a California general partnership

## MEMBER COUNTERPART SIGNATURE PAGE

The undersigned, desiring to enter into the Partnership Agreement made effective March 1, 2013 (the "Agreement") for PCJV-LA GROUP, a California general partnership (the "Company"), hereby agrees to all of the terms and provisions thereof. The undersigned hereby joins and executes the Agreement as a Partner of the Partnership, and hereby authorizes this Signature Page to be attached thereto in evidence of this joinder.

WITNESS, the execution hereof by the undersigned, as a Partner of PCJV-LA GROUP:

_____
Signature of Partner

Address: 1478 S. Crest Dr
LA, CA 90035

# EXHIBIT G

## PCVJ USA, LLC AND LA GROUP MASTER SERVICES AGREEMENT

This Master Services Agreement ("Agreement") dated _6/18/12_, is entered into by and between PCVJ USA, LLCa Delaware Limited Liability Company (hereinafter "PCVJ") and Amit Nemanim, Guy Koren and Amir Jacoby (whom are collectively referred to as the "LA Group").

### RECITALS

WHEREAS, PCJVwishes to contract with the LA Group to provide management and strategic experience and expertise.

WHEREAS, the LA Group agrees to provide Services to PCJV as delineated within this Agreement.

NOW, THEREFORE, the Parties hereby agree as follows:

Services:

1. The LA Group shall faithfully, diligently and efficiently exercise the following obligations and responsibilities:
    a. Conduct management, operations, marketing, establishment, maintenance, licensing and sub-licensing activities with respect to the Potato Corner outlets/stores in the Territory.
    b. Use best efforts at all times to operate and maintain the Potato Corner outlets/stores in the Territory according to the highest standards achievable, consistent with the overall plan of PCJV Management.
    c. Comply with the rules, policies and procedures approved by PCJV Management.
    d. Advertise, market, and promote the Potato Corner outlets/stores with the goal of causing public knowledge, awareness and patronage of the Potato Corner outlets/stores.
    e. Maintain a comprehensive system of records, books and accounts, with respect to the licensing and sub-licensing activities, operation, establishment, management, maintenance and other activities of the Potato Corner outlets/stores in the Territory with the assistance of the PCJV Corporate Secretary.
    f. No later than the twentieth (20th) day of each month, with respect to the preceding month, LA Group shall render a statement of receipts and disbursements, a schedule of accounts receivable and payable, and a schedule of fees collected and distributed, together with a reconciled bank statement as of the last day of the month with the assistance of the PCJV Corporate Secretary.
    g. No later than three (3) months after the end of a fiscal year, the LA Group, with the assistance of the PCJV Corporate Secretary and an external accountant



hired by PCJV Management, cause PCJV to issue audited financial statements, and shall provide a copy of the same to all members of PCJV Management.

h. To the extent that the LA Group is able to do so, the LA Group shall take such action as may be necessary to comply promptly with any and all laws, ordinances, orders or other requirements of any federal, state, county or municipal authority having jurisdiction of PCJV and affecting PCJV.

i. The LA Group shall have a fiduciary duty to exercise the duty of care and shall, at all times, ensure that all corporate opportunities consistent with the objectives of PCJV shall be pursued. As such, with respect to the establishment of PCVJ-owned stores, whenever potential locations are identified by any member of the LA Group, it shall be promptly brought to the attention of PCJV Management. At all times, and within thirty (30) days from receipt of this information, PCJV Management shall decide whether or not to build a PCJV-owned store at the identified location. In the event PCJV chooses to build a PCJV-owned store at the identified location, it shall have the right to do so, to the exclusion of the LA Group. However, in the event that PCJV decides not to build a PCJV-owned store at the identified location, it shall notify the LA Group of its decision in writing. In such case, the LA Group shall have the right to build a store at the identified location, provided that it shall enter into a franchising agreement with PCJV, and shall pay franchise fees and ongoing royalty fees as set forth in PCJV's standard franchising agreement.

2. Territory for the purposes of this Agreement is defined as the United States of America and Israel, except in the County of Los Angeles, USA and the County of San Francisco, USA and Tanforan Mall.

3. The LA Group shall maintain and protect the Confidential Information belonging to PCJV, and such undertaking shall apply to all of its partners, officers, employees, or agents.

4. In consideration for the provision of its Services the LA Group shall be entitled to a service fee equal to thirty (30%) percent of all initial/franchise fees and continuing royalty fees paid to/collected by PCJV.

5. All withholding and other applicable taxes levied by any authority on the payments by PCJV to the LA Group under this Agreement shall be borne solely by PCJV.

Confidential Information:



1. The Parties acknowledge that from time to time, one Party (the "Discloser") may disclose to the other Party (the "Recipient") information : a) relating to the Potato Corner outlets and stores; b) relating to the Potato Corner Intangible Property Rights; c) Potato Corner product specifications and related information; d) which is marked with "confidential" or a similar legend; e) which is described orally and designated as confidential; or f) which would, under the circumstances, be understood by a reasonable person to be confidential ("Confidential Information").

2. Upon subsequent disclosure of previously disclosed Confidential Information to the Recipient by the Discloser, the information will remain Confidential Information even if not identified as Confidential Information at the subsequent disclosure.

3. Recipient shall retain such Confidential Information in confidence, and shall not disclose it to any Third Party or use it for other than the purposes of this Agreement without the Discloser's prior written consent.

4. Each Party shall use at least the same procedures and degree of care with respect to such Confidential Information which it uses to protect its on confidential Information of like importance, and in no event less than reasonable care. The Recipient will immediately give written notice to the Discloser of any unauthorized use or disclosure of the Discloser's Confidential Information, and the Recipient will assist the Discloser in remedying such unauthorized use or disclosure.

## Duration of Agreement:

1. This Agreement shall become effective from the date of execution hereof and shall continue indefinitely unless terminated by a) mutual written agreement by the Parties or b) breach of any provision of this Agreement by either Party which will result in termination of this Agreement unless cured by the breaching Party within twenty (20) days from the date of the breach.

## General Provisions:

1. This Agreement may not be altered, changed, supplemented or modified except by a written instrument duly signed by the Parties.

2. The invalidity of any portion of this Agreement will not render the entire Agreement void, nor affect the validity of the rest of the provisions of this Agreement.

3. This Agreement shall be governed by the laws of the State of California

4. Neither Party shall assign any of its rights or obligations under this Agreement without the prior written consent of the other Party.



5. The failure of any Party at any time to require performance by the others of any provision of this Agreement shall not affect, in any way, the right of such Party to require performance of that or any provision, and any waiver by any Party of any breach of this Agreement shall not be construed as a waiver of any continuing or succeeding breach of such provision, or a waiver of any other right under this Agreement.

IN WITNESS WHEREOF,

PCJV USA, LLC

_____          _____
                                 Date

Name: José P. Magsaysay

Title:   CEO

LA Group

_____          06/18/12
Amit Nemanim                     Date

_____          6/18/12
Guy Koren                        Date

_____          6/18/12
Amir Jacoby                      Date

# EXHIBIT H



April 3, 2018

Jo Mag
Board of Directors
PCJV, LLC

Re: PCJV & PCIT Transfer of Bank Accounts

Dear Jo Mag,

Per our telephone conversation last week, I am writing now to confirm that I have transferred the PCJV and PCIT bank accounts from Wells Fargo to Chase Bank. I just want to reiterate that these accounts have been established at Chase under the same entity names and were transferred to protect them from unauthorized access.

I will provide you and any other requested Cinco members with full access to these accounts as necessary or requested. I have additionally transferred all the Company stores to Chase as a matter of operational efficiencies since Chase has offered us management solutions and certain beneficial services better suited for our needs.

I apologize for not giving you formal written notice until now but I was under the impression that the information discussed in our telephone conversation would be shared with the other members. I want you to know that I made the decision to transfer these funds, primarily for security reasons, based on my position as majority member and sole managing member of the PCJV Los Angeles group. As you know, I have always acted in the best interest of PCJV and the brand. I believed it was necessary to make these changes only as a security precaution to prevent the unauthorized withdrawal of funds which Amir has caused to happen on prior occasion from our PCJV Los Angeles group accounts.

Contrary to the letter by Amir's attorney, I have made sure that all funds have been accounted for and that there have been no NSF checks or any payments otherwise rejected. I have always made every effort to keep all of our accounts in good standing and have no reason to think they are any less secure now than before the transfer. In fact, the banking circumstances are an improvement, especially from an operational point of view, than those previously maintained at Wells Fargo. Again, I will be providing to you, under separate cover, direct user and password access to the PCJV accounts. I welcome you to confirm that these accounts are in good standing and are being used as authorized and for the best interest of our group and its members.

Although your attorney has requested that the Wells Fargo accounts be reestablished, I strongly suggest the accounts be maintained at Chase where they are secure from any unauthorized access. As you are well aware, Amir is not involved operationally with PCJV and has not been actively involved in the daily business affairs of the company for quite some time now. All of the activities associated with these

accounts have been done in a totally transparent manner to the extent that I invite you to review them to your satisfaction. However, if you insist that the Wells Fargo accounts be reestablished please advise me accordingly. My point of view is that there is a substantial risk of compromising these accounts, as well as our operational stability if access to our financial accounts is not absolutely secure.

The Board has elected me to be the Managing Member. I have always and will continue to act in good faith for the best interest of the company and our members. I am confident that my actions regarding our accounts was necessary and likewise in the best interest of the company and our members. I am just as confident that upon review of the totality of circumstances that you will conclude the same.

Best regards,

Guy Koren
President & Managing Member
PCJV, LLC
dba Potato Corner USA

# EXHIBIT I

On Mar 27, 2018, at 3:09 AM, Jose Magsaysay, Jr. <jomag28@gmail.com> wrote:

To our LA Partners,

We would like to request for a Member's meeting on Monday, April 9, 2018, 5:30pm (LA Time) via teleconference primarily to discuss the Letter of Intent that was sent to the LA Group last week.

AGENDA

1. Call to Order.

2. Determination of Quorum/ Attendance.

3. Welcome.

4. Guy Koren: To report 2017;
a) Business Development highlights (new territories, store growth, topline growth, franchise)
b) Store Operations highlights
c) Logistics and Supply Chain operational highlights
d) Marketing and Brand highlights
e) Administration updates
f) Other Matters

5. Inbal Jacoby: To Report on 2017 (and 2016) financial performance

6. Guy Koren and/or Amir Jacoby: To Present 5-year plan for PCJV.

7. Letter of Intent.

8. Matters for Approval.

9. Election of the Board of Directors and Officers of the Board.

10. Other Matters.

11. Adjourment.

4

Thank you,

Joe

# EXHIBIT J



DLA Piper LLP (US)
401 B Street, Suite 1700
San Diego, California 92101-4297
www.dlapiper.com

Kellin M. Chatfield
kellin.chatfield@dlapiper.com
T   619.699.2637
F   619.764.6637

April 10, 2018
Via E-Mail (mhare.mouradian@rmkb.com)

Mhare O. Mouradian
RMKB Lawyers
445 S. Figueroa St., Suite 300
Los Angeles, CA 90071-1619

Re:    Cease and Desist and Demand that Guy Koren Cease Any and All Actions on Behalf of
       PCJV USA, LLC

Dear Mr. Mouradian:

As you know, my firm and I represent the Cinco Corporation and Potato Corner International (collectively,
"Cinco Group") and have been retained to represent Cinco Group with regards to Mr. Koren's
unauthorized withdrawal of approximately $1 million from the Wells Fargo bank accounts (the "Withdrawn
Funds") for PCJV USA, LLC ("PCJV") on March 26, 2018 and his subsequent refusal to step down as
President, notwithstanding a vote by the majority of PCJV's voting members (over 75%) relieving Mr.
Koren of his title, duties, and obligations as officer and President of PCJV.

Specifically, a meeting of the Managers was held on April 9, 2018, during which the LA Group and Guy
Koren were removed from management by a majority vote (85%) of the Managers and Membership
interests. Mr. Koren was therefore relieved of his duties as an officer and President of PCJV. Although
both the Joint Venture and Operating Agreements allow for removal of an officer without cause, Mr.
Koren's removal was based upon his recent breaches of his contractual and fiduciary duties to PCJV and
to Cinco Group, by, among other things: (1) emptying PCJV accounts without approval on March 26,
2018; (2) entering a lease on behalf of PCJV without approval of the majority of the Members; and (3)
failing to provide a five-year strategic plan, or otherwise account for his actions on behalf of PCJV, in
violation of his duties under the Joint Venture Agreement. Mr. Koren's conduct shows a blatant disregard
for his fiduciary duties to Cinco Group and the other Members. His conduct poses immediate and
substantial risks to Cinco Group's goodwill in the Potato Corner brand and franchise.

Notwithstanding his removal by majority vote, we understand Mr. Koren has refused to step down as
President of PCJV and that he removed representatives of PCJV's newly appointed officers from the
PCJV offices the afternoon of April 10, 2018. Mr. Koren has no authority to take such action.

Accordingly, we write to demand that Mr. Koren immediately step down and vacate the PCJV offices. We
further demand that Mr. Koren immediately cease and desist any action dissipating PCJV assets and
cease and desist all action on behalf of PCJV and Cinco Group. We further demand that Mr. Koren
cease and desist any conduct that would interfere in Cinco Group's management of PCJV. We also
demand that Mr. Koren immediately surrender all PCJV books, accounts, records, and inventory.



Mhare O. Mouradian
April 10, 2018
Page Two

If we do not receive confirmation that Mr. Koren will cease all dissipation of PCJV funds; cease all action
on behalf of PCJV and Cinco Group; surrender the offices, inventory, and records of PCJV; and
cooperate in the transition of management by **noon on April 11**, then we will take immediate steps to
protect Cinco Group's interests.

We will be serving Mr. Koren with a copy of our complaint based upon the above-identified breaches of
fiduciary duty and will send you a courtesy copy once service is complete.

If you have any questions, you may contact me by telephone or email.

Very truly yours,

DLA Piper LLP (US)

Kellin M. Chatfield
Associate

Admitted In California Bar

KMC:lw

WEST\281134512.1

# EXHIBIT K

MINUTES OF SPECAL MEETING
OF MANAGERS OF
PCJV USA, LLC,
A Delaware Limited Liability Company

### APRIL 23, 2018

On April 23, 2018, at 5:11 PM PDST, the Board of Managers of PCJV USA, LLC ("PCJV" or
the "Company") held, via telephone conference, a special meeting of Managers of PCJV
pursuant to Section 4.14.3 of the Limited Liability Company Agreement of PCJV USA, LLC
(the "Agreement") and Notice of Special Meeting, which was mailed on April 18, 2018.

The participants in the meeting were: Guy Koren; Alon Koren; Tom Hodgson; Jose Magsaysay,
Jr.; Marivic del Pilar; Marco del Pilar; Ricardo Enrique K. Montelibano; John Edward
Hernandez; Amir Jacoby; and Inbal Jacoby. Robert Brownlie of DLA Piper LLP (US) and
Myrose Victor observed the meeting. Mr. Brownlie acted as secretary of the meeting.

John Edward Hernandez acted as the Chair of the meeting. At the outset of the call,
Mr. Hernandez confirmed that the participants in the call could hear each other. Mr. Hernandez
held proxy for any Managers of the Company appointed by Cinco Group and/or Potato Corner
International, Inc.

### Explanatory Note

Before April 9, 2018, the Managers of PCJV consisted of the following individuals: Jose P.
Magsaysay; Marivic del Pilar; John Edward Hernandez; Ricardo Enrique K. Montelibano; Guy
Koren; Amir Jacoby; and Inbal Jacoby. These individuals are referred to as the "Prior Board."

On April 9, 2018, the Members of PCJV held a meeting to, among other things, elect new
Managers. The individuals elected to represent Potato Corner International, Inc. / Cinco Group
as Managers of PCJV USA, LLC were: Jose P. Magsaysay; Marivic del Pilar; John Edward
Hernandez; and Marco del Pilar. The individuals elected to represent the LA Group as Managers
of PCJV USA, LLC were: Amir Jacoby and Inbal Jacoby. For the purposes of these minutes,
the "April 9 Board" refers to Jose P. Magsaysay; Marivic del Pilar; John Edward Hernandez;
Marco del Pilar; Amir Jacoby and Inbal Jacoby.

By a letter, dated April 11, 2018, counsel for Guy Koren objected to the election of Amir Jacoby
and Inbal Jacoby as Managers to represent the LA Group. Through his counsel, Mr. Koren
asserted that the individuals who represent the interests of the LA Group as Managers of PCJV
USA, LLC were: Guy Koren; Alon Koren; and Tom Hodgson. For the purposes of these
minutes, the "April 11 Board" refers to Jose P. Magsaysay; Marivic del Pilar; John Edward
Hernandez; Marco del Pilar; Guy Koren; Alon Koren; and Tom Hodgson.

### REMOVAL OF CURRENT OFFICERS AND SUBORDINATE OFFICERS

The Chairman announced that the first item of business was to consider the removal of all of the Company's officers, including its Chairman of the Board of Members, President, Corporate Secretary, and Treasurer, and subordinate officers pursuant to Section 4.11.4 of the Agreement. A motion was duly made to remove of all of the Company's officers, including its Chairman of the Board of Members, President, Corporate Secretary, and Treasurer, and subordinate officers. The motion was seconded, and a discussion ensued. After the discussion, by a roll call vote, the motion was passed unanimously by the April 9 Board, by a majority of the Prior Board with Guy Koren dissenting, and a by a majority of the April 11 Board with Guy Koren, Alon Koren, and Tom Hodgson dissenting. Therefore, regardless of whether the Managers consisted of the Prior Board, April 9 Board, or April 11 Board, the motion passed.

### ELECTION OF NEW OFFICERS

The Chairman announced that the next item of business was to consider the election of new officers of the Company, including its Chairman of the Board of Members, President, Corporate Secretary, and Treasurer. A motion was duly made to elect the following individuals to serve as officers of the Company:

| | |
|---|---|
| Chairman of the Board: | John Edward P. Hernandez |
| President: | Amir Jacoby |
| Treasurer: | Marivic del Pilar |
| Corporate Secretary: | Ben Olivas |

The motion was seconded, and a discussion ensued. After the discussion, by a roll call vote, the motion was passed unanimously by the April 9 Board, by a majority of the Prior Board with Guy Koren dissenting, and a by a majority of the April 11 Board with Guy Koren, Alon Koren, and Tom Hodgson dissenting. Therefore, regardless of whether the Managers consisted of the Prior Board, April 9 Board, or April 11 Board, the motion passed.

### ELECTION OF NEW SUBORDINATE OFFICER

The Chairman announced that the next item of business was to consider the election of a subordinate officer of the Company. A motion was duly made to elect Jose Magsaysay as the Chief Operating Officer of the Company. The motion was seconded, and a discussion ensued. After the discussion, by a roll call vote, the motion was passed unanimously by the April 9 Board, by a majority of the Prior Board with Guy Koren dissenting, and a by a majority of the April 11 Board with Guy Koren, Alon Koren, and Tom Hodgson dissenting. Therefore, regardless of whether the Managers consisted of the Prior Board, April 9 Board, or April 11 Board, the motion passed.

### TERMINATION OF THE SERVICES AGREEMENT

The Chairman announced that the next item of business was to consider the Services Agreement by and between Potato Corner Joint Venture also known as PCJV USA, LLC, on the one hand,

and Guy Koren and Amir Jacoby, known as the LA Group, on the other hand, dated January 1, 2017 (the "Services Agreement"), pursuant to Section 5 of the Services Agreement. A motion was duly made to terminate the Service Agreement. The motion was seconded, and a discussion ensued. After the discussion, by a roll call vote, the motion was passed unanimously by the April 9 Board, by a majority of the Prior Board with Guy Koren dissenting, and a by a majority of the April 11 Board with Guy Koren, Alon Koren, and Tom Hodgson dissenting. Therefore, regardless of whether the Managers consisted of the Prior Board, April 9 Board, or April 11 Board, the motion passed.

## THE COMPANY'S BANKING RELATIONSHIPS

The Chairman announced that the notice of meeting allowed the consideration of other items of business. One such matter has arisen as result of the removal and replacement of the Company's officers, which relates to the Company's banking relationships because among the individuals who were removed as officers were those who were the authorized signatories on the Company's bank accounts. A motion was duly made to:

1) Close the Company's current banking relationships;

2) Authorize the Company's officers to open new accounts at Citibank and ratify all actions that have been taken in that regard;

3) Require two signatures for the Company's checks and withdrawals; and

4) Authorize the following signatories for the Company's bank accounts: Jose Marco de Pilar; Jose P. Magsaysay, Jr.; Ricardo Enrique K. Montelibano; Marivic H. del Pilar; John Edward Hernandez; Chad Dominic Hernandez; Myrose April Victor; Inbal P. Jacoby; and Ben Olivas.

The motion was seconded, and a discussion ensued. After the discussion, by a roll call vote, the motion was passed unanimously by the April 9 Board, by a majority of the Prior Board with Guy Koren dissenting, and a by a majority of the April 11 Board with Guy Koren, Alon Koren, and Tom Hodgson dissenting. Therefore, regardless of whether the Managers consisted of the Prior Board, April 9 Board, or April 11 Board, the motion passed.

## ADJOURNMENT

After a motion duly made, seconded and approved, the meeting was adjourned on 5:34 PM.

JOHN EDWARD HERNANDEZ

CHAIRMAN OF PCJV USA, LLC

ROBERT W. BROWNLIE

ACTING SECRETARY

# EXHIBIT L



Emily Garcia
PCJV USA, LLC
6380 Wilshire Blvd., Suite 1100
Los Angeles, CA 90048

Dear Emily,

This is to inform you that PCJV USA, LLC ("PCJV") held a Members' meeting on April 9, 2018 and, by a majority vote of 75% of the Membership Interests, voted to remove Mr. Guy Koren as a Manager, and also relieve him of his duties as President of PCJV, effective immediately. Mr. Koren's removal was due to his breach of his fiduciary and contractual duties to PCJV and its Members.

Going forward, the following are designated duly-authorized representatives of PCJV, effective immediately:

- Ms. Inbal Jacoby (Member and Manager of PCJV);

- Ms. Myrose Victor (Chief Financial Officer of Cinco Philippines, Inc.); and

- Ben R. Olivas (Corporate Secretary of PCJV).

PCJV, through these authorized representatives, will reach out to you and address any concerns and questions you may have during this time. Your continued role in day-to-day management affairs of PCJV is essential to the continued success of our venture. As such, PCJV and Cinco Philippines, Inc. are committed to supporting you, and ensuring that there are no disruptions to your role during the transition to a new management team.

We will reach out to you in the next few days, to schedule a meeting to address your questions or discuss any concerns you may have. We thank you for your kind understanding.

Very truly yours,

Amir Jacoby, Manager

Inbal Jacoby, Manager

Ben R. Olivas, Corporate Secretary

# EXHIBIT M

---------- Forwarded message ---------
From: Hillard, Sarah <Sarah.Hillard@dlapiper.com>
Date: Thu, May 3, 2018, 3:12 PM
Subject: Letter to PCJV Franchisees
To: Seattle@potatocornerusa.com <Seattle@potatocornerusa.com>, radavlai@gmail.com
<radavlai@gmail.com>
Cc: Myrose Victor <myrose.victor@potatocorner.com>, Amir Jacoby <ajacoby88@gmail.com>, Olivas, Ben
<Ben.Olivas@dlapiper.com>


Kindly see the attached letter regarding the change of management of PCJV USA, LLC; this was also sent to
you via certified mail. If you have any questions or wish to discuss further, please feel free to contact Mr. Amir
Jacoby, President of PCJV (mobile: 877-323-9788).


Best regards,


**Sarah Hillard**
Legal Practice Specialist


T +1 650.833.1578
F +1 650.833.2001
E sarah.hillard@dlapiper.com





DLA Piper LLP (US)
2000 University Avenue
East Palo Alto, California 94303-2215
United States
www.dlapiper.com


Please consider the environment before printing this email.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended
recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure,
dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this
communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to
postmaster@dlapiper.com. Thank you.



April 26, 2018
Via Certified Mail

Vannrada Lai
Beyond Business, Inc.
2800 Southcenter Mall
Seattle, WA 98188

Dear Vannrada,

This is to inform you that PCJV USA, LLC ("PCJV") held a Managers' meeting on April 23, 2018. At the meeting, the Board of Managers voted to remove Mr. Guy Koren as President of PCJV, effective immediately.

In the same meeting, the following were elected as officers of PCJV:

- John Edward Hernandez     Chairman of the Board

- Amir Jacoby                        President

- Jose Magsaysay, Jr.            Chief Executive Officer

- Marivic del Pilar                 Treasurer

- Ben Olivas                          Corporate Secretary

Also, PCJV appointed the following as duly-authorized representatives of PCJV, effective immediately:

- Ms. Inbal Jacoby (Member of PCJV);

- Ms. Myrose Victor (Chief Financial Officer of Cinco Corporation); and

- Ben Olivas (Corporate Secretary of PCJV).

PCJV, has appointed the following individual as your contact person on this matter. He will reach out to you and address any concerns and questions you may have during this time:

- Mr. Amir Jacoby (President of PCJV; mobile: 877-323-9788).

PCJV and Cinco Corporation are committed to providing continued support to your operations, and will work to provide that there are no disruptions to your business during the transition to a new management team. These actions were undertaken with the support of PCJV's majority owner, Cinco Corporation, through its wholly-owned U.S. subsidiary, Potato Corner International, Inc. ("PC-International"). Cinco Corporation, as the registered owner of the

2

"Potato Corner" trademark and tradename, is committed to ensure your continued growth and success.

We will reach out to you in the next few days, to schedule a meeting to address your questions or discuss any concerns you may have. If you would like to contact the new management team, please call Amir Jacoby at the number provided above. We thank you for your kind understanding.

Very truly yours,

John Edward Hernandez, Chairman of the Board

Amir Jacoby, President

Ben Olivas, Corporate Secretary

1    **PROOF OF SERVICE**

2    **STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

3    At the time of service, I was over 18 years of age and **not a party to this action**. I am
employed in the County of Los Angeles, State of California. My business address is 1888 Century
4    Park East, Suite 1900, Los Angeles, California 90067.

5    On October 10, 2018, I served true copies of the following document(s) described as
**VERIFIED FIRST AMENDED CROSS-COMPLAINT** on the interested parties in this action
6    as follows:

7    **SERVICE LIST**

8    Michael D. Murphy, Esq.                          *Attorneys for Plaintiff and Cross-Defendant*
      Ervin Cohen & Jessup LLP                        *CINCO CORPORATION and Defendant*
9    9401 Wilshire Boulevard, 9th Floor               *POTATO CORNER INTERNATIONAL, INC.*
      Beverly Hills, CA 90212-2974
10   Tel: (310) 281-6336
      Fax: (310) 887-6838
11   *mmurphy@ecjlaw.com*

12   Robert A. Levinson, Esq.                         *Attorneys for Cross-Defendants*
      David Krol, Esq.                                *AMIR JACOBY and INBAL JACOBY*
13   LEVINSON ARSHONSKY & KURTZ, LLP
      15303 Ventura Blvd., Suite 1650
14   Sherman Oaks, California 91403
      Telephone: (818) 382-3434
15   Facsimile: (818) 382-3433
      *rlevinson@laklawyers.com*
16   *dkrol@laklawyers.com*

17

18   **BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the
persons at the addresses listed in the Service List and placed the envelope for collection and
19   mailing, following our ordinary business practices. I am readily familiar with Freeman, Freeman &
Smiley, LLP's practice for collecting and processing correspondence for mailing. On the same day
20   that the correspondence is placed for collection and mailing, it is deposited in the ordinary course of
business with the United States Postal Service, in a sealed envelope with postage fully prepaid.
21

22   I declare under penalty of perjury under the laws of the State of California that the
foregoing is true and correct.

23   Executed on October 10, 2018, at Los Angeles, California.

24

25   _____

26   Maria Villagran

27

28

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

# EXHIBIT 82

Electronically FILED by Superior Court of California, County of Los Angeles on 07/22/2019 04:28 PM Sherri R. Carter, Executive Officer/Clerk of Court, by D. Ramos,Deputy Clerk

Case 2:24-cv-04546-SB-AGR   Document 274-5   Filed 08/18/25   Page 462 of 762
Page ID #:13117

1 | TODD M. LANDER (BAR NO. 173031)
todd.lander@ffslaw.com
2 | ARASH BERAL (BAR NO. 245219)
arash.beral@ffslaw.com
3 | FREEMAN, FREEMAN & SMILEY, LLP
1888 Century Park East, Suite 1900
4 | Los Angeles, California 90067
Telephone:  (310) 255-6100
5 | Facsimile:  (310) 255-6200

6 | Attorneys for Defendants and Cross-
Complainants GUY KOREN, GK CAPITAL
7 | GROUP, LLC, ALON KOREN, THOMAS
HODGSON, and EMILY GARCIA, and Cross-
8 | Complainant ASHLEY GRUDNOWSKI

9

10 **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

11 **COUNTY OF LOS ANGELES, CENTRAL DISTRICT**

12

13 | CINCO CORPORATION, a Philippines
corporation; POTATO CORNER
14 | INTERNATIONAL, INC., a Delaware
corporation,

15 |          Plaintiffs,

16

     vs.

17

18 | GUY KOREN, an individual; NKM
CAPITAL GROUP, LLC, a California limited
19 | liability company; J & K AMERICANA,
LLC, a California limited liability company;
20 | J & K CULVER, LLC, a California limited
liability company; J&K LAKEWOOD, LLC,
21 | a California limited liability company; J&K
OAKRIDGE, LLC, a California limited
22 | liability company; J&K VALLEY FAIR, LLC,
a California limited liability company; J & K
23 | CAPITAL 2, LLC, a California limited
liability company; J & K ONTARIO, LLC, a
24 | California limited liability company; J&K PC
TRUCKS, LLC, a California limited liability
25 | company; J&K CONSULTANTS GROUP,
LLC, a California limited liability company;
26 | GK CAPITAL GROUP, LLC, a California
limited liability company; POTATO CORNER
27 | LA GROUP, LLC, a California limited
liability company; and DOES 1 through 25,
28 | inclusive,

Case No. BC701075
[Related with Case No. BC706000]

**CROSS-COMPLAINANT GUY KOREN'S
VERIFIED SECOND AMENDED CROSS-
COMPLAINT**

**Assigned for All Purposes to the
Hon. Rafael Ongkeko, Dept. 73**

Action Filed:    April 10, 2018
Trial Date:     April 27, 2020

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

4232336.1

GUY KOREN'S VERIFIED SECOND AMENDED CROSS-COMPLAINT

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1               Defendants,

2

3           – and –

4   PCJV USA, LLC, a Delaware limited liability company,

5            Nominal Defendant.

6

7   PCJV USA, LLC, a Delaware limited liability
    company; PCI TRADING LLC, a Delaware
8   limited liability company; POTATO CORNER
    LA GROUP, LLC, a California limited
9   liability company; NKM CAPITAL GROUP,
    LLC, a California limited liability company; J
10  & K AMERICANA, LLC, a California limited
    liability company; J&K LAKEWOOD, LLC, a
11  California limited liability company; J & K
    CULVER, LLC, a California limited liability
12  company; J&K OAKRIDGE, LLC, a
    California limited liability company; J&K
13  VALLEY FAIR, LLC, a California limited
    liability company; J & K CAPITAL 2, LLC, a
14  California limited liability company; J & K
    ONTARIO, LLC, a California limited liability
15  company; J&K PC TRUCKS, LLC, a
    California limited liability company; J&K
16  CONSULTANTS GROUP, LLC, a California
    limited liability company; GK CAPITAL
17  GROUP, LLC, a California limited liability
    company; GUY KOREN, an individual;
18  ALON KOREN, an individual; THOMAS
    HODGSON, an individual; EMILY GARCIA,
19  an individual; ASHLEY GRUDNOWSKI, an
    individual,

20
             Cross-Complainants,
21
         vs.
22
    CINCO CORPORATION, a Philippines
23  corporation; POTATO CORNER
    INTERNATIONAL, INC., a Delaware
24  Corporation; HIGHFIVE CORPORATION, a
    Philippines corporation; JOSE P.
25  MAGSAYSAY, JR., an individual; JOSE
    MIGUEL MA. MONTINOLA, an individual;
26  RICARDO ENRIQUE K. MONTELIBANO,
    an individual; MA. VICTORIA O.
27  BERMEJO, an individual; BEN OLIVAS, an
    individual; JOHN EDWARD HERNANDEZ,
28  an individual; CHAD DOMINIC

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  HERNANDEZ, an individual; MIGUEL
RAYMUNDO HERNANDEZ, an individual;
2  MYROSE VICTOR, an individual; MARIVIC
DEL PILAR, an individual; JOSE MARCO
3  DEL PILAR, an individual; DIA LACABA,
an individual; NICARDO FALCIS, an
4  individual; AMIR JACOBY, an individual;
INBAL JACOBY, an individual; and ROES 1
5  through 500, inclusive,

6                    Cross-Defendants.

7

8          Cross-Complainant Guy Koren ("Koren" or "Cross-Complainant")[1] complains of the

9  following Cross-Defendants (collectively, "Cross-Defendants", and each a "Cross-Defendant"):

10         i.     Amir Jacoby ("Jacoby") and Inbal Jacoby (collectively, the "Jacobys");

11         ii.    Cinco Corporation ("Cinco"), Jose P. Magsaysay, Jr. ("Magsaysay"), Jose Miguel

12                Ma. Montinola ("Montinola"), Ricardo Enrique K. Montelibano ("Montelibano"),

13                Ma. Victoria O. Bermejo ("Bermejo") (collectively, the "Cinco Group");

14         iii.   Ben Olivas ("Olivas");

15         iv.    Potato Corner International, Inc. ("PC International");

16         v.     John Edward Hernandez, Chad Dominic Hernandez, Miguel Raymundo

17                Hernandez, Myrose Victor, Marivic Del Pilar, Jose Marco Del Pilar, Dia Lacaba,

18                Nicardo Falcis, and ROES 1 through 200, inclusive (collectively, the "Hernandez

19                Group"); and

20         vi.    ROES 201 through 500, inclusive, and allege as follows:

21  / / /

22  / / /

23  _____

24  [1] This Second Amended Cross-Complaint is filed pursuant to a stipulation between counsel for
Plaintiffs/Cross-Defendants and counsel for Defendants/Cross-Complainants that was placed on
25  the record in December 2018 and adopted by the Court.  This Second Amended Cross-Complaint
supersedes only Koren's prior operative complaint and is not meant to supersede any allegation or
26  claim by any other cross-complaining party to the First Amended Cross-Complaint.  Koren is
informed and believes that the remaining cross-complainants to this action will file their amended
27  cross-complaint in due course.

28

4232336.1                                  3

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

## **SUMMARY OF THE CASE**

1.     Inasmuch as Cross-Defendants have and are continuing to manufacture false and misleading narratives in order to divert the Court's attention away from their own conduct and on to Koren's, the true reality is that we would not be here – and this case and all of its past associated and related cases would not have been initiated – if it were not for each of the above Cross-Defendant factions' separate and collective acts of misconduct.

2.     We would not be here, for instance, if it were not for the Jacobys' direct interference with a November 2017 settled agreement for Koren and his group to take 100% ownership of all of PCJV USA, LLC's ("PCJV") interests in exchange for ongoing royalty payments to Cinco off of all USA revenues, an agreement which, by the way, was negotiated and agreed to by both the Cinco Group *and* the disputed stakeholders, the Hernandez Group.  The Jacobys – individuals who were once loyal to Koren but were motivated by naked ambition and greed to betray him – induced the Cinco Group and Hernandez Group to breach this settled agreement by manipulating the narrative against Koren, conscripting Olivas into their perfidious scheme, and enticing the Cinco Group and Hernandez Group to take action to remove Koren from PCJV.  All this was intended to deal Koren a crushing blow so that they – the Cinco Group and Hernandez Group – would not have to honor the November 2017 settled agreement and could instead maintain control over PCJV by installing Jacoby as PCJV's new President.  The Jacobys have since entrenched themselves on the Cinco Group and Hernandez Group sidelines hoping that the Cinco Group and Hernandez Group will come to their rescue.

3.     We would not be here if it were not for the Cinco Group and, particularly, Magsaysay, who, in 2010, one year into Koren's tenure as an exclusive Los Angeles County Potato Corner licensee with rights to sublicense anywhere in the U.S. and a first right to expand his own exclusive territory to all of California, induced Koren to transform that existing business relationship into a franchisor relationship in order to help absolve the Cinco Group from U.S. franchise law violations.  The Cinco Group then encouraged Koren to divert his focus as a Potato Corner licensee (after Koren had already purchased direct licensing rights to open 10 Potato Corner outlets for himself) to running Potato Corner's U.S. operations as franchisor with inducements that

4232336.1

GUY KOREN'S VERIFIED SECOND AMENDED CROSS-COMPLAINT

1   Koren would have ultimate future protections in place, including a right of first refusal, and

2   promises by Magsaysay that Koren would one day succeed Magsaysay as Cinco's CEO and come

3   to control all of Potato Corner's global operations.  Koren, induced by those incentives, agreed,

4   only to come to discover years later that the Cinco Group had no intent to honor these promises.

5   Indeed, Koren recently learned that in or about mid-2017, the Cinco Group rejected Koren's

6   exercise of the right of first refusal at the specified formula set forth in each of PCJV's governing

7   documents and surreptitiously sold 55% of their interests in Cinco in a series of transactions to a

8   contingent of people comprising and/or affiliated with the Hernandez Group, whom Koren had

9   never met before or done business with.  After this series of transactions (the documentation for

10  which the Cinco Group and the Hernandez Group have refused to turn over) was consummated,

11  generating a new majority faction of Potato Corner's interests around the world and particularly in

12  PCJV where the Hernandez Group claimed and still claim voting and management rights, the Cinco

13  Group would come to reject any claim of wrongdoing, including a first refusal breach.

14          4.      We would not be here if it were not for Olivas, Magsaysay's childhood friend and a

15  partner at DLA Piper LLP, who, with the weight of substantial fiduciary duties owed to nearly all of

16  the major parties in this case, muscled his way into an ownership and operational role within Potato

17  Corner USA's operations and constructed the very organizational and corporate structures,

18  documents, and artifices that have assisted the other Cross-Defendants to use Olivas's poorly

19  drafted documents to take antithetical and absurd positions.  Without any regard to his fiduciary

20  duties, Olivas has facilitated Cross-Defendants' mission to harm Koren and his interests.  That

21  Koren has been forced to employ counsel to protect his interests in this case due to Olivas' tortious

22  conduct is but one of a multitude of circumstances pervading this case.

23          5.      We would likewise not be here if it were not for the creation of PC International, a

24  shell corporate instrumentality devised by Olivas to enable the Cinco Group to limit their potential

25  tax exposure in connection with PCJV.  This entity – the Cinco Group's (and now also the

26  Hernandez Group's) alter ego to be sure – has been used as an artifice to defraud Koren in an effort

27  to avoid the trigger of the right of first refusal.  That is, according to Cinco (and PC International),

28  there could be no breach of the right of first refusal because the disputed transactions occurred at

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  the parent level and not at the subsidiary level thereby *ipso facto* absolving the Cinco Group from

2  any right of first refusal violation.  As bizarre as this position sounds – contradicting all notions of

3  common sense – the reality is that the pertinent contract documents contractually restricted Cinco's

4  *and its shareholders'* ability to transact with third parties (and the evidence in this case exposes the

5  perfidious nature of this argument).  Even if the contract documents are unclear in any way

6  regarding Cinco's *and its shareholders'* direct duties and obligations, the covenant of good faith

7  and fair dealing clearly supports enforcement of Koren's right of first refusal rights under the

8  circumstances presented in this case.  *See, e.g., Oregon RSA No. 6, Inc. v. Castle Rock Cellular of*

9  *Oregon*, 840 F. Supp. 770 (D. Or. 1993) *aff'd* 76 F.3d 1003 (9th Cir. 1996) (finding that the

10  conveyance of interests of the parent of a company that is bound by a right of first refusal provision

11  "is a blatant subterfuge intended to circumvent the right-of-first-refusal" and "an artifice intended to

12  thwart plaintiff's legitimate contractual expectation"); *see also Mieuli v. DeBartolo*, 2001 WL

13  777447 at *7 (N.D. Cal. 2001) (adopting the Oregon RSA opinion in applying California law).

14          6.       And finally, of course, we would not be here if it were not for the Hernandez Group,

15  parties who were fully aware of PCJV's governing documents, the right of first refusal provisions,

16  and the PCJV agreements' provisions excluding third parties who, nonetheless, decided to

17  consummate the purchase of Cinco's shares thus triggering various breaches of the PCJV governing

18  documents.  Worse, these parties have from the outset claimed a voting and management right in

19  PCJV and intend to take whatever action necessary including, but not limited to, surreptitiously

20  installing spy software on PCJV's servers, accessing Koren's and others' documents, spoliating

21  evidence, and other indecent and malicious conduct, with the end goal of harming Koren and taking

22  over Potato Corner USA's operations.

23          7.       It would be quite amusing if it were not so disheartening that the above-described

24  factions who have all turned on Koren for their own separate but duplicitous reasons total five in

25  number, a reminiscent reference to the English definition of the word "cinco".  Such is the case of

26  Cinco versus Koren.

27  / / /

28  / / /

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**THE PARTIES**

8.     Cross-Complainant Koren is, and at all relevant times was, an individual residing in the County of Los Angeles, State of California.

9.     Cross-Complainant is informed and believes, and thereupon alleges, that Cross-Defendant Amir Jacoby is, and at all relevant times was, an individual residing in Los Angeles, California.

10.     Cross-Complainant is informed and believes, and thereupon alleges, that Cross-Defendant Inbal Jacoby is, and at all relevant times was, an individual residing in Los Angeles, California.

11.     Cross-Complainant is informed and believes, and thereupon alleges, that Cross-Defendant Cinco is, and at all relevant times was, a corporation organized and existing under the Republic of the Philippines, and that it conducts business in the United States, including in the County of Los Angeles, State of California.

12.     Cross-Complainant is informed and believes, and thereupon alleges, that Cross-Defendant Magsaysay is, and at all relevant times was, an individual residing in the Republic of the Philippines who routinely maintains contacts with the United States including with the County of Los Angeles, State of California.

13.     Cross-Complainant is informed and believes, and thereupon alleges, that Cross-Defendant Montinola is, and at all relevant times was, an individual residing in the Republic of the Philippines who routinely maintains contacts with the United States including with the County of Los Angeles, State of California.

14.     Cross-Complainant is informed and believes, and thereupon alleges, that Cross-Defendant Montelibano is, and at all relevant times was, an individual residing in the Republic of the Philippines who routinely maintains contacts with the United States including with the County of Los Angeles, State of California.

15.     Cross-Complainant is informed and believes, and thereupon alleges, that Cross-Defendant Bermejo is, and at all relevant times was, an individual residing in the Republic of the Philippines who routinely maintains contacts with the United States including with the County of

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  Los Angeles, State of California.

2      16.    Cross-Complainant is informed and believes, and thereupon alleges, that Cross-

3  Defendant Olivas is, and at all relevant times was, an individual residing in Belmont, California.

4      17.    Cross-Complainant is informed and believes, and thereupon alleges, that Cross-

5  Defendant PC International is, and at all relevant times was, a corporation organized and existing

6  under the State of Delaware, and that it conducts business in the United States, including in the

7  County of Los Angeles, State of California.

8      18.    Cross-Complainant is informed and believes, and thereupon alleges, that Cross-

9  Defendant John Edward Hernandez is, and at all relevant times was, an individual residing in the

10  Republic of the Philippines who routinely maintains contacts with the United States including with

11  the County of Los Angeles, State of California.

12      19.    Cross-Complainant is informed and believes, and thereupon alleges, that Cross-

13  Defendant Chad Dominic Hernandez is, and at all relevant times was, an individual residing in the

14  Republic of the Philippines who routinely maintains contacts with the United States including with

15  the County of Los Angeles, State of California.

16      20.    Cross-Complainant is informed and believes, and thereupon alleges, that Cross-

17  Defendant Miguel Raymundo Hernandez is, and at all relevant times was, an individual residing in

18  the Republic of the Philippines who routinely maintains contacts with the United States including

19  with the County of Los Angeles, State of California.

20      21.    Cross-Complainant is informed and believes, and thereupon alleges, that Cross-

21  Defendant Myrose Victor is, and at all relevant times was, an individual residing in the Republic of

22  the Philippines who routinely maintains contacts with the United States including with the County

23  of Los Angeles, State of California.

24      22.    Cross-Complainant is informed and believes, and thereupon alleges, that Cross-

25  Defendant Marivic del Pilar is, and at all relevant times was, an individual residing in the Republic

26  of the Philippines who routinely maintains contacts with the United States including with the

27  County of Los Angeles, State of California.

28  / / /

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

23.     Cross-Complainant is informed and believes, and thereupon alleges, that Cross-Defendant Marco del Pilar is, and at all relevant times was, an individual residing in the Republic of the Philippines who routinely maintains contacts with the United States including with the County of Los Angeles, State of California.

24.     Cross-Complainant is informed and believes, and thereupon alleges, that Cross-Defendant Dia Lacaba is, and at all relevant times was, an individual residing in the Republic of the Philippines who routinely maintains contacts with the United States including with the County of Los Angeles, State of California.

25.     Cross-Complainant is informed and believes, and thereupon alleges, that Cross-Defendant Nicardo Falcis is, and at all relevant times was, an individual residing in the Republic of the Philippines who routinely maintains contacts with the United States including with the County of Los Angeles, State of California.

26.     Cross-Complainant is ignorant of the true names and capacities of the cross-defendants sued herein as ROES 1 through 500, inclusive, and therefore sue said cross-defendants by said fictitious names.  Cross-Complainant will amend this Second Amended Cross-Complaint to allege their true names and capacities when ascertained.

27.     Cross-Complainant is informed and believes, and thereupon alleges, that each of the fictitiously named cross-defendants is responsible in some manner for the occurrences herein alleged and that Cross-Complainant's damages were proximately caused thereby.  Cross-Complainant is informed and believes, and thereupon alleges, that at all relevant times herein, each of the ROE cross-defendants and the named Cross-Defendants were the agents and/or employees of one or more of the other cross-defendants, were acting within the course and scope of said agency and/or employment, and that each cross-defendant has aided and assisted one or more of the other cross-defendants in committing the wrongful acts herein alleged.

28.     Cross-Complainant is informed and believes, and thereupon alleges, that cross-defendants, and each of them, conspired and agreed among themselves to do the acts complained of herein and were, in doing the acts complained of herein, acting pursuant to said conspiracy, and that each cross-defendant sued herein is jointly and severally responsible and liable to each cross-

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1 | complainant for the damages alleged herein.

2 | **ALTER-EGO ALLEGATIONS**

3 | 29. Cross-Complainant is informed and believes, and thereupon alleges, that there is a

4 | unity of interest and ownership between and among the following parties, such that any

5 | individuality and separateness between them never existed or has ceased, and that said parties are

6 | alter egos of one another:

7 | Cinco and PC International

8 | a) PC International was conceived, intended, and/or used by the Cinco Group and

9 | Hernandez Group as a device for the purpose of defrauding others, including

10 | Cross-Complainant;

11 | b) The Cinco Group and Hernandez Group exercised dominion and control over the

12 | finances of PC International and treated PC International's finances as their own;

13 | c) The Cinco Group and Hernandez Group used the corporate form of PC

14 | International for their own purposes as though it was their own, and did not

15 | follow proper corporate formalities; and

16 | d) Adherence to the fiction of the separate existence of PC International as an entity

17 | distinct from the Cinco Group and Hernandez Group would permit an abuse of

18 | the corporate privilege and would sanction fraud.

19 | The Cinco Group

20 | e) Cinco was conceived, intended, and/or used by Magsaysay, Montinola,

21 | Montelibano, and Bermejo as a device for the purpose of defrauding others,

22 | including Cross-Complainant;

23 | f) The Cinco Group exercised dominion and control over the finances of Cinco and

24 | treated Cinco's finances as their own;

25 | g) Magsaysay, Montinola, Montelibano, and Bermejo used the corporate form of

26 | Cinco for their own purposes as though it was their own, and did not follow

27 | proper corporate formalities; and

28 | / / /

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

4232336.1

10

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

h)   Adherence to the fiction of the separate existence of Cinco as an entity distinct

from Magsaysay, Montinola, Montelibano, and Bermejo would permit an abuse

of the corporate privilege and would sanction fraud.

ROES 101 through 200, Inclusive

i)   ROES 101 through 200, inclusive, were conceived, intended, and/or used by the

Hernandez Group as a device for the purpose of defrauding others, including

Cross-Complainant;

j)   The Hernandez Group exercised dominion and control over the finances of

ROES 101 through 200, inclusive, and treated the finances of ROES 101 through

200, inclusive, as their own;

k)   The Hernandez Group used the corporate form of ROES 101 through 200,

inclusive, for their own purposes as though they were their own, and did not

follow proper corporate formalities; and

l)   Adherence to the fiction of the separate existence of ROES 101 through 200,

inclusive, as entities distinct from the Hernandez Group would permit an abuse

of the corporate privilege and would sanction fraud.

## **KOREN'S RELEVANT POSITIONS, TITLES, CAPACITIES**

30.   Koren is on the Board of Managers of PCJV, the entity formed in 2010 to act as the

master franchisor of Potato Corner's operations in the United States and Israel, and has served in

that capacity since PCJV's inception in or about 2010.  Koren is also the President of PCJV and has

served in that capacity since at least on or about October 16, 2012; although Koren regularly

performed the duties of President prior to October 16, 2012, Koren was not formally named PCJV's

President until that date.  In addition to PCJV, Koren also serves as President of PCI Trading LLC

("PCI Trading") and has held this title since PCI Trading's inception.

31.   Koren is presently also the majority member (holding 61.3% of its equity ownership

interest) and manager of Potato Corner LA Group, LLC (the "LA Group LLC"), which was

formerly a partnership known as PCJV-LA Group (the "LA Group Partnership") from on or about

March 1, 2013 through on or about July 22, 2015 for which Koren was the sole managing partner,

1   and prior to that an association of three individuals: Koren, Amit Nemanim ("Nemanim"), and

2   Jacoby (the "LA Group Association").  The LA Group LLC, the LA Group Partnership, and the LA

3   Group Association are collectively referred to herein as the "LA Group".  The LA Group currently

4   holds a 40% equity ownership interest in PCJV and is and has always been charged with PCJV's

5   (and PCI Trading's) management.

6        32.    Koren is also a member and manager of various other entities, including NKM

7   Capital Group, LLC ("NKM") and other entities involved in this litigation and which names begin

8   with the prefix "J & K" or "J&K" (collectively, the "NKM/JK Entities").

9                              **FACTUAL ALLEGATIONS**

10                   **Koren Brings "Potato Corner" to the United States**

11        33.    As a young teenage resident of the Philippines in the early 1990s, Koren – who was

12   then living in the Far East by virtue of his father's work for the Israeli Embassy in Manila –

13   imagined the day he could live in the United States and pursue the American dream.  And, while in

14   the Philippines, he fell in love with an icon of American culture – the french fry.  More particularly,

15   he became enamored of a seasoned french fries business known as "Potato Corner" and, as the

16   years passed, became determined to bring Potato Corner to this country.

17        34.    By late 2008, Koren had realized his ambition of living and working in the United

18   States, and was a successful entrepreneur in Los Angeles.  At around that time, he sat down with

19   Magsaysay, the CEO of Cinco (the company that owned the Potato Corner brand), for an in-person

20   meeting in Los Angeles.  During that meeting, the two bonded, discussing their respective

21   backgrounds, mutual friends and relationships (particularly those in the Philippines), and

22   Magsaysay's history with Potato Corner.  At the time of this meeting, Koren was 28 years old.

23   Magsaysay, approximately 20 years older than Koren, told Koren that he – Magsaysay – was

24   excited about Koren's relative youth – as Magsaysay was looking to retire at some point in the

25   future and in search of a successor.

26        35.    As the talks progressed, Magsaysay inquired of Koren whether Koren was ready to

27   devote his life to Potato Corner, and Koren certainly was.  Magsaysay informed Koren that he had

28   received many inquiries from the United States, but he had decided that none of those prior

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  inquiries were worth pursuing.  Magsaysay also mentioned that Potato Corner had dabbled in the

2  United States before and maintained some presence in San Francisco at the Tanforan Mall through

3  another licensee, but for various reasons, that other licensee was not a good candidate to be given a

4  larger role.  Ultimately, Magsaysay decided that Koren was the right candidate and told Koren in no

5  uncertain terms: "it makes me feel safe to award you the rights to the U.S." ("Magsaysay Statement

6  No. 1").

7  <div align="center">**NKM Receives a Master License Agreement in April 2009**</div>

8  36.    As the Koren-Magsaysay talks progressed, both sides became enamored with the

9  prospect of Koren expanding Potato Corner's footprint.  One particular condition Magsaysay raised

10  that was of critical importance to him was that he – Magsaysay – wanted the relationship to be more

11  than that of mere business partners; he wanted to kindle a family-type connection.  Magsaysay was

12  thus adamant that any business arrangement would carry with it a restriction on transfers or

13  assignments of interests in order, at first, to protect him from having to do business with some third

14  party.  He didn't want, as he described, to do business with a "Joe Schmo" ("Magsaysay Statement

15  No. 2").  And, in order to further entice Koren to agree to this condition, Magsaysay began to lay

16  the groundwork for his future promises that Koren would ultimately take over Magsaysay's

17  position as chief executive of Potato Corner's global interests; indeed, Magsaysay told Koren at this

18  early juncture that he – Magsaysay – may look to Koren to take over his CEO position one day

19  ("Magsaysay Statement No. 3").  Excited about potentially taking over all of Potato Corner's global

20  operations, Koren agreed to Magsaysay's condition restricting transfers of interest.

21  37.    Another particular condition of Magsaysay's involved Koren's team having to cover

22  all store costs because Magsaysay said that he had no desire to pay for any costs for the opening of

23  any U.S. outlet, nor did he have a desire to take ownership interests in any U.S. outlet ("Magsaysay

24  Statement No. 4").  Koren accepted this condition.

25  38.    In or about March 2009, Magsaysay forwarded a draft Master License Agreement

26  (the "NKM License Agreement") for Koren's and Nemanim's signatures.  The NKM License

27

28

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

4232336.1

<div align="center">13</div>

1   Agreement identifies Magsaysay as the President of Potato Corner Global Company Limited, Hong

2   Kong,[2] and Koren as the CEO and President of NKM.

3        39.    Upon review of the NKM License Agreement, on or about April 2 or 3, 2009, Koren

4   sent an email to Magsaysay addressing its various terms, including the restriction of transfer clause.

5   Confirming Magsaysay Statement No. 2, Koren's email to Magsaysay stated: "In regard with rights

6   to assign shareholding within our company, you know we are here for the long term, at the same

7   time with assigning shares of our company, we need complete control. We aviously [sic]

8   understand your concern of one day dealing with 'joe shmo' so we can base this one [sic] the

9   premise that Guy and Amit will always maitain [sic] <[sic]51% of the Inc. at all times unless agreed

10   by all parties."

11        40.    On April 16, 2009, Magsaysay forwarded a revised version of the NKM License

12   Agreement, which was subsequently executed.  The NKM License Agreement is fairly

13   straightforward: it provides that Koren (through NKM) would initially get the exclusive rights to

14   open up to ten Potato Corner stores in Los Angeles County with the option to expand his exclusive

15   geographical territory to all of California upon certain terms, provided that Koren pay to Magsaysay

16   50% of the total agreed-to license fees for all ten outlets in advance.  Koren could also open more

17   than ten outlets anywhere (including both within and outside the exclusive geographical territory)

18   provided that Koren pays a $3,000 license fee in advance for each additional outlet.  The NKM

19   License Agreement further provides Koren (through NKM) could sublicense rights and split all

20   royalties paid by any sub-licensee of Koren's choosing 50/50 with Magsaysay.  At some point after

21   executing the NKM License Agreement, Koren remitted 50% of the total agreed-to license fees to

22   enable him to open 10 (ten) Potato Corner outlets pursuant to the terms of the parties' agreement.

23   A true and correct copy of the NKM License Agreement is attached as **Exhibit "A"** to this Second

24   Amended Cross-Complaint, and incorporated by reference hereto.

25   / / /

26

27   [2] In later agreements, "Cinco Corporation" is identified as the party-in-interest.

28

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

4232336.1

14

**Koren Identifies the Westfield Santa Anita Mall for his First Flagship Store**

41.     Having the NKM License Agreement in place, Koren next turned his attention to opening his first Potato Corner store. After conducting a heavy amount of due diligence and with an eye towards launching the first store in an attention-grabbing environment (that would not only help ensure Koren's success but would also help Magsaysay market Potato Corner's groundbreaking U.S. expansion, which was a huge deal in the Philippines), Koren identified the Westfield Santa Anita mall as a prime location to launch NKM's flagship store due to the mall's special characteristics.

42.     While Koren led the efforts in opening a store at Westfield Santa Anita, working 12-16 hour days while negotiating favorable terms and dealing with all aspects of the store's opening, Magsaysay kept a watchful eye. Unfortunately, there was little Magsaysay could do to assist Koren in opening his first store as Magsaysay was not used to that level of "red tape". Indeed, Magsaysay was unfamiliar with the legal and regulatory hurdles in launching a food store in America.

**While Koren was Occupied with Launching the Santa Anita Store, Magsaysay Insists on Transforming the Relationship into a "Franchise-Model" Business Arrangement**

43.     While Koren and his team were heavily invested and engaged in opening their first store in Santa Anita, in or about late 2009 or early 2010 (and before the Santa Anita store opened), Magsaysay approached Koren to inform him that he had conferred with his high school classmate and long-time friend, Olivas, and that Olivas or his law firm had advised Magsaysay that according to American law, there was a requirement to establish a U.S.-based *franchise* business ("Magsaysay Statement No. 5").

44.     While Koren had no legal background whatsoever, he also had no reason to doubt Magsaysay; Koren placed all of his faith and confidence in him. Besides, the idea of franchising was appealing to Koren (and, in fact, in some ways already contemplated by the "sublicense" provisions that existed in the NKM License Agreement), so Koren was eager to learn about it so long as it didn't frustrate all of the time and work Koren had put in to date and did not suddenly deny him the exclusivity he had negotiated for before.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

4232336.1

15

GUY KOREN'S VERIFIED SECOND AMENDED CROSS-COMPLAINT

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

45.    To start, Magsaysay told Koren that he was very pleased with Koren's hard work and thrilled to have connected with him. Magsaysay said that his feeling about Koren had come true and wanted nothing but to continue their "partnership". Magsaysay said that with this new proposed franchise relationship, Koren would get even *more* rights and geographical reach insofar as *all* of the United States would be included as part of the deal ("Magsaysay Statement No. 6"). In other words, not only would Koren gain the rights to become a franchisor of Potato Corner but to also have the *exclusive rights to franchise Potato Corner to the entire United States*. Magsaysay told Koren that he had entered into partnership relationships like these in other countries, such as Indonesia, whereby the Indonesian partner received a 70% stake in the business and had total control of all operations in the country. Magsaysay said that he wanted to simulate the same structure with Koren.

46.    Koren asked Magsaysay several questions, including, what exactly would this new business structure look like, what would happen with the ten+ stores that Koren had already purchased rights for, who would manage this new business, how it would be operated, and the like. Magsaysay responded that he wanted the parties to jointly create a new business to act as the master Potato Corner franchisor of the U.S., in which business Koren and his group would control a majority equity interest and which Koren (or somebody Koren designates) would exclusively operate. Koren sought to confirm that his group would get a 70% equity stake like Magsaysay's Indonesian partner but Magsaysay said that because the U.S. market has large potential, he'd only be comfortable with giving Koren's group 60%. At the same time, Magsaysay also proposed putting in place a board structure whereby overarching decisions would be voted on by members of the board and that Koren's side, by virtue of its 60% stake, would have majority control of the board.

47.    With respect to the rights NKM had already purchased as a Potato Corner licensee, Magsaysay said that Koren could keep those rights and, because Koren's group was going to be the franchisor in the U.S., Koren could provide his group and his entities whatever geographical exclusivity he wanted. It would be completely up to Koren, Magsaysay said, and that as the "future

1  Potato Corner CEO" [Magsaysay's words], running the entire U.S. operations would help get Koren

2  the experience Koren needed to run the global operations one day.  ("Magsaysay Statement No. 7.")

3      48.    Koren and Magsaysay had several further discussions concerning this new proposed

4  arrangement.  Koren asked Magsaysay whether Magsaysay would include Israel in the deal, and

5  Magsaysay said he would.  Koren asked Magsaysay what kind of assistance the Manila team would

6  provide, and Magsaysay replied that the Manila team would do anything and everything it takes,

7  specifically, that he and his team would provide Koren all legal and regulatory assistance, training,

8  operational support, marketing, accounting, advertising, sourcing of goods, business development,

9  strategic growth activities, franchising, brand management, guidelines, etc. ("Magsaysay Statement

10  No. 8").  Despite the fact that Koren had already negotiated and put in place the NKM License

11  Agreement that effectively gave Koren exclusive rights to "sub-license" Potato Corner across

12  California and own 100% of those rights (with additional non-exclusive rights across the United

13  States), having full control as franchisor, expanding that exclusive geographical reach to the United

14  States and Israel, and in one day taking over the entire Potato Corner global operations, appealed to

15  him.

16      49.    At the same time that Magsaysay and Koren were discussing this potential franchise

17  business in the U.S., many friends and acquaintances of Koren's had approached Koren to invest.

18  Indeed, because Magsaysay led Koren to believe that Koren's side would have four votes on the

19  would-be seven-person board that would come to oversee this new business venture, Koren was on

20  the lookout for potential investors and board members.  One particular contact of Koren's, Mark

21  Tung ("Tung"), was exceedingly interested in Potato Corner and offered to invest $600,000.  Others

22  also showed interest in investing.

23  **Jacoby Induces Koren to Allow Jacoby's Investment; Koren and Jacoby Make an Agreement**

24      50.    At or about the same time, Koren crossed paths with Jacoby (who was a business

25  contact of his) in connection with a construction matter (Jacoby is a general contractor) and Jacoby

26  asked Koren to assist him with a project.  Koren told Jacoby, in response, that Koren did not have

27  the time.  Jacoby inquired as to why Koren's time was limited, but Koren was hesitant about telling

28  Jacoby about Potato Corner.  Besides, Koren was already talking to his close friends regarding

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

4232336.1

17

1  investment and did not need Jacoby or his money.  But, Jacoby insisted that Koren tell him what he

2  was doing and Koren finally relented.

3       51.    Upon discovering that Koren had gained the rights to Potato Corner, Jacoby told

4  Koren that Jacoby had some limited involvement in food service in the past and always had the

5  passion to invest in such a business.  Jacoby insisted that Koren allow him to invest.  Koren did not

6  agree at first, however.  Over time, Jacoby aggressively pursued Koren and his consent to allow

7  Jacoby to invest and, eventually, Koren gave in under one specific condition: Koren would allow

8  Jacoby to invest so long as Jacoby agreed to cover 100% of Koren's capital contributions in NKM

9  and all future Potato Corner related entities in exchange for a minority equity stake in each such

10  business, to which Jacoby agreed (the "Jacoby-Koren Agreement").

11       **Koren Proceeds to Open the Potato Corner Santa Anita Location in February 2010**

12       52.    Despite various challenges, NKM finally succeeded in opening its first American

13  Potato Corner store in February 2010.  Magsaysay and his team heavily advertised the fact of

14  Potato Corner's American expansion here and abroad and this became a major topic of discussion

15  in the Filipino news cycle.  Some of that advertising is still accessible through www.youtube.com

16  by searching "Potato Corner Grand Opening in LA" which YouTube links the Manila team used to

17  entice additional licensees/franchisees and begin to establish Potato Corner's global reputation.

18  There was a renewed fervor over Potato Corner in the Philippines because any Filipino company's

19  expansion into the U.S. is viewed with great honor and exuberance in that country.  Indeed, very

20  few Filipino companies have ever successfully broken into the American market.

21       53.    Many Filipino news articles tout that Potato Corner's U.S. expansion was due to

22  Koren's efforts and unique connection to the Philippines.  For example, a December 2016 article in

23  the Philippine Star (for which Magsaysay was the principal contributor) recounts:

24       In 2010, they brought the brand to the United States.  It was also another student
         whose father used to head the security of the Israeli Embassy here who was
25       instrumental in bringing Potato Corner to the land of French fries. The student
         who studied at the International School and lived in a condo along Ayala Avenue
26       used to walk every day to Glorietta to buy from Potato Corner and wanted to
         bring it to the US.  Joe and his group studied the market there and talked with a
27       marketing guru in the US who actually advised him against it, likening the
         prospect to selling ice cream to an ice cream house. Their group, however, had

28

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

4232336.1                                    18

1   more faith in his gut feel and went ahead with Potato Corner's invasion of the
2   land of French fries.

3       54.     To cite another example, a July 11, 2018 article in the Filipino press includes a direct

4   quote from *Dom Hernandez* (who is part of the Hernandez Group that allegedly came to acquire

5   Cinco's interests in 2017 and had no involvement in Potato Corner whatsoever in 2010)

6   misleadingly attempting to take credit for Koren's endeavor in expanding Potato Corner to the U.S.:

7   "COO Dom Hernandez narrates, 'Our US franchise, for instance. We were approached by the son

8   of an expat who lived in Pacific Plaza (along Ayala Avenue, Makati). He told us how he

9   skateboarded to Glorietta every day to get his Potato Corner fries.'"  Remarkably, this article was

10  published *after* Dom Hernandez and his family (who allege to have acquired Cinco Corporation's

11  interests in 2017) effectuated Koren's removal from PCJV and instituted this lawsuit against him.

12      55.     As Potato Corner was a new concept to the American public, Koren and his team

13  were constantly researching, developing, testing, advertising, pricing, and marketing ideas.  Koren

14  worked 70-80 hour workweeks without any compensation just to get Potato Corner off the ground.

15  Koren was broke and at some point, couldn't even afford to pay his rent.  While the Santa Anita

16  store had yet to reach profitability (and was well below the break-even point), Koren's efforts did

17  lead to growing revenues and repeat customers (and additional press among the Filipino community

18  in the United States and abroad).  At the same time, Magsaysay witnessed how difficult it was to

19  break into the U.S. market and open stores here.  In spite of the fact that NKM was losing money

20  each month, Koren stayed committed to pleasing Magsaysay.

**The LA Group and Cinco Group Have Meetings and Discussions in April-May 2010 to**
**Discuss the Proposed Franchise-Model Business Arrangement**

23      56.     In the latter part of April 2010, Magsaysay, Montelibano, Montinola, and Bermejo –

24  each a 25% shareholder of Cinco – flew to California with Erlinda S. Bartolome ("Bartolome" or

25  "Lyndah") of GMB Franchise Developers (the Cinco Group's global franchise consultant) to meet

26  with Koren, Nemanim, and Jacoby.  At around the same time, the Cinco Group was dealing with a

27  series of potential violations with the California Department of Business Oversight ("DBO").

28  Koren was informed that the Cinco Group had possibly run afoul of regulatory rules when they

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1    licensed rights to the Tanforan Mall and, potentially, to NKM without first having franchise

2    disclosure documents in place.  As such, discussions centered on ways for the Cinco Group to avoid

3    DBO liability, such as treating those stores as "company stores" so that no disclosure documents

4    would be necessary or exempting them from the franchisor's reach altogether by carve-out.[3]

5        57.    Beyond the DBO issues, the parties also discussed the new franchise business.  At

6    the outset of these meetings, Koren did not lose sight of the fact that their side outnumbered his in

7    person and he found it suspicious that all of a sudden all of Cinco's four shareholders (a couple of

8    whom, i.e., Montelibano and Montinola, Koren was told had little motivation to do anything

9    relating to Potato Corner) along with their long-time franchise consultant made the trip to California

10   to meet face-to-face.

11       58.    At an early point in these meetings, Magsaysay turned to Koren and said that he

12   would require that Koren along with Nemanim and Jacoby sign a joint venture agreement in their

13   individual capacities so that it is crystal clear that neither one of them could assign or transfer their

14   interests in this new company – regardless of whether those interests were held in their individual

15   capacity or in an LLC – without Magsaysay approval.  The minutes of the parties' April 19, 2010

16   meetings reflect this very communication: "Incorporators for the JV Company shall be Amit, Guy

17   and Amir in their individual capacity since Potato Corner would like to establish a lasting

18   relationship with these individuals.  They could invite other investors in their own LLC company

19   but the JV will always be with them individually."

20       59.    Koren found it a bit concerning that Magsaysay made this statement, not so much for

21   its substance – Koren was in it for the long haul anyway and he had already agreed to the same

22

23   [3] The Cinco Group and DLA Piper ultimately chose to pursue a combination of both options
     (treating Koren's stores as company stores because there was common ownership between the
24   would-be-franchisees [Koren's entities] and would-be-franchisor [what came to be PCJV], *and*
     exempting the County of Los Angeles [where NKM had opened] and San Francisco
25   County/Tanforan Mall [where Potato Corner already had a presence] from PCJV's reach),
     although the parties in the end decided to issue notices of violations to all concerned anyway in
26   cooperation with the DBO.  Fortunately, and due to Koren's efforts and the relationships he came
     to build with franchisees, no party ever raised liability contentions against the Cinco Group or
27   PCJV or sought to rescind any franchise agreement.  On May 2, 2017, a person associated with
     Cinco sent an email proposing that the Cinco Group "send a letter of appreciation to Guy".

28

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1    provision in the NKM License Agreement – but because Magsaysay identified only the three of

2    them as the individuals with whom he'd like to establish a "lasting relationship".  Koren was, of

3    course, still under the impression at that time that he would have a majority 60% equity stake in the

4    business and entitled to designate four members on the would-be seven-person board, as Magsaysay

5    had promised him months before.  Koren began to suspect, however, that Magsaysay may be

6    angling towards reneging on that promise and trying to influence Koren through a show of force,

7    i.e., strength in numbers, to agree to a shift in the equity and voting interests in this new business

8    favoring Magsaysay and his group.  To try and preempt him, Koren made sure to remind

9    Magsaysay and all those present that Tung had already formed PCE Management LLC and PCE

10   Trading LLC and was ready to join Koren's group as their fourth member and invest $600,000.

11   Indeed, there's a reference to that specific announcement in the April 20, 2010 minutes: "Mark will

12   come in with 600K and shall own 15% of PCE."

13        60.    Magsaysay, however, later went on to demand that the two groups flip the

14   percentages the other way: 60% to Magsaysay's group and 40% to Koren's group.  This request

15   was a major problem from Koren's perspective because the negotiations had from the outset been

16   based on the assumption that Koren would exercise majority control.  This proposal, however,

17   would result in Koren being in the minority.  As a result, Koren seriously considered rejecting this

18   new proposed franchise-model business, relying only on the rights he had negotiated before in

19   connection with the NKM License Agreement moving forward.

20        61.    Magsaysay, however, in the face of potential franchise law violations, aggressively

21   attempted to convince Koren to move forward with the franchise-model business.  While Koren

22   was visibly upset about this sudden change in position regarding equity percentage, over the course

23   of the next several hours and days, Magsaysay attempted to soothe his concerns, telling Koren not

24   to worry, and that Koren and his group would have all management and operational control, that

25   sooner or later Koren would replace Magsaysay as the "Potato Corner CEO", and that Koren would

26   come to control all of Potato Corner's global operations one day ("Magsaysay Statement No. 9").

27   "This is *your* company, Guy," ("Magsaysay Statement No. 10"), Mr. Magsaysay repeatedly told

28   Koren.  "You have all control and control over your own stores," ("Magsaysay Statement No. 11"),

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  he said in sum and substance, "you are free to exempt your stores from any fee and royalty

2  requirements should you wish … you could provide yourself whatever territorial exclusivity you

3  want" ("Magsaysay Statement No. 12").  And, in a showing of good faith, Magsaysay later, over

4  the course of those two weeks said that he would agree to waive all royalties and further license

5  fees ("Magsaysay Statement No. 13").  The following statement in the April 19, 2010 minutes

6  partly confirms the above agreement: "While the LA Team likewise is the Master Licensee for

7  California, the 50% retention was removed in view of the JV for the entire US."

8      62.    In the ensuing years, Magsaysay groomed Koren to take over all of Potato Corner's

9  global operations.  For example, Magsaysay directed Koren to work with an area developer in

10  Panama who wanted exclusive rights to franchise Potato Corner in Panama.  Koren did a majority

11  of the legwork with this developer and assisted with arranging Potato Corner's expansion in

12  Panama.  Potato Corner's presence in Panama still exists to this day.  In the next few years, Koren

13  met an even larger developer, one whose team had major food industry holdings in all of the Middle

14  East and was connected to a wealthy sheikh.  Koren met with this gentleman multiple times in Los

15  Angeles (at Magsaysay's direction) and worked out the terms of a term sheet.  This developer

16  wanted to initially develop 100 Potato Corner locations in eight or so countries in the Middle East.

17  With the term sheet in place (that Koren negotiated on behalf of Potato Corner) and a $100,000

18  deposit from the area developer, Koren led the efforts in helping this developer open their first

19  location in Dubai. While the Middle East developer ultimately decided to move on from Potato

20  Corner because he felt that he could not trust Magsaysay, Koren was a pivotal member in helping

21  lead this expansion.  These examples demonstrate that not only did Magsaysay lead Koren to

22  believe that he would succeed him through his words, he also did so through his actions.

23      63.    While Koren appreciated Magsaysay's promises, Koren needed reassurances that the

24  basic structure Magsaysay and Koren had agreed upon would remain.  Specifically, the "just us"

25  nature of the business relationship became of paramount importance to Koren, because if Koren

26  were now going to be a minority interest-holder it was critical that Koren have certainty that

27  Magsaysay and the Cinco Group (as then constituted) would remain his business partners.  Simply

28  put, Koren trusted Magsaysay and was prepared to move forward only so long as he – Magsaysay –

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  remained the controlling interest-holder in the Cinco Group.  At that point, Koren became the one

2  insisting that no other "Jo Schmo" would become to acquire any interest (equity, voting,

3  management, or otherwise) in this partnership, which covenant Koren ultimately received.

4      64.    During the course of those two weeks in April-May 2010, Koren met with potential

5  franchisees and, relying on Magsaysay's promises, Koren even agreed to allow these third parties to

6  open Potato Corner stores within the exclusive geographical territory that Koren had previously

7  negotiated for himself.  Because of the impending reformulation of the business relationship, and

8  believing that there were long-term protections in place that would benefit him, Koren's goals had

9  effectively shifted from opening his own stores to franchising Potato Corner to third parties.  In

10  other words, based on Magsaysay's promises, Koren was willing to have others enjoy the benefits

11  of the bargains that he had previously obtained for himself.

12  **The Parties Continue to Discuss and Negotiate a "Joint Venture Agreement"; the Terms of**

13  **the Joint Venture Agreement were Modified Through Subsequent Words and Conduct**

14      65.    On or about April 20, 2010, Bartolome forwarded a "working draft" of a "Joint

15  Venture Agreement" to Koren and Nemanim.  That first draft included within it a provision (at

16  Paragraph 2.3) as follows: "The Parties hereby agree that Cinco, Jose P. Magsaysay, Jr., Jose Maria

17  Montinola, Ma. Victoria O. Bermejo and Ricardo K. Montelibano shall collectively own sixty

18  (60%) of the Company while Amit Nenamin [sic], Guy Koren and Amir Jacoby shall collectively

19  own the remaining forty (40%) percent."  Tung was excluded from this draft.  Moreover, the

20  document conspicuously omitted who would serve on the Board and which side will have the right

21  to name the majority – four members – to the Board.  This first draft also allowed for the Cinco

22  Group to gain its proposed 60% ownership interest without any capital contribution from them and

23  restricted the company's right to issue a capital call for ten years.  The agreement also excluded

24  "the County of Los Angeles, USA and the County of San Francisco, USA and Tanforan Mall" for

25  the potential franchise law liability concerns addressed above.  The agreement also contained a

26  similar restriction on transfer clause (at Paragraph 2.5.2) as the NKM License Agreement:

27      The _____(LA group) shall not assign any of its/their rights or obligations under
        this Agreement without the prior written consent of Cinco. Any change in the

28

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

4232336.1                                    23

1
2

shareholding or partnership or sole proprietorship or control or management of the ____(LA group)____ shall be considered an assignment.
There was no right of first refusal provision included in this first draft.

3    66.    As a side-note, Olivas and DLA Piper were ultimately charged with establishing this

4 new business entity and seeing to it that all of the necessary legal work and documentation was

5 correctly put in place.  In an email dated May 11, 2010 concerning issues raised with the first draft

6 of the Joint Venture Agreement, Magsaysay wrote: "We will let our USA lawyers, DLA Piper do

7 all our contracts so that they will marry seamlessly with our franchise direction, specially [sic]

8 because DLA Piper are the ones setting up our Franchise system laws/requirements."  On May 15,

9 2010, Magsaysay sent a further email stating: "Using DLA Piper with it's [sic] prestige and

10 credibility will be good for us, short and long term.  Whatever DLA Piper will do for us they will

11 defend it in a US court of Law with all their might …" ("Magsaysay Statement No. 14").

12    67.    On May 18, 2010, Magsaysay sent an email informing Koren that the Joint Venture

13 Agreement was being done by the "SF attorneys" (DLA Piper's San Francisco office, from which

14 office Olivas worked out of) and that, according to Mr. Magsaysay, "… we are so happy to with

15 such sharp people and hard working partners like you" ("Magsaysay Statement No. 15").

16    68.    On or about May 30, 2010, the parties conducted a "board meeting" of sorts at the

17 Santa Anita mall.  At that meeting, each of the individuals was asked to provide their individual

18 thoughts "on the partnership forged between the two groups".  Koren shared that he was thankful

19 for the opportunity and of Magsaysay.  Magsaysay stated: "we were forewarned by people about

20 partnership with Jews.  But the decision to partner with you was an out-of-the-box decision.  We

21 have managed to grow Potato Corner since we always seek new ways of looking at things.  At

22 Potato Corner, we reinvent, we do not survive in looking for what other companies have done but

23 we grow by taking the untrodden path to decisions and partnerships.  We found the right partners."

24 ("Magsaysay Statement No. 16").

25    69.    On June 1, 2010, Magsaysay forwarded a revised version of the Joint Venture

26 Agreement that was sent to him by Olivas the day before.  This June 1, 2010 version of the Joint

27 Venture Agreement reflected that it the new company would solely be between Cinco (the entity),

28 on the one hand, and Nemanim, Jacoby, and Koren, on the other hand, with the ownership interest

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

4232336.1                            24

1    in the new franchisor company to be held 60% by Cinco and 40% by LA Group.  The draft

2    agreement also modified the restriction on transfer clause (Paragraph 2.d.) including now, a right of

3    first refusal provision providing Cinco the right to purchase any transfer-prohibited shares upon

4    trigger of the right of first refusal at an agreed-to formula.  It also deleted the following provision

5    that was included in earlier agreements, presumably, replacing it with the right of first refusal

6    provision: "Any change in the shareholding or partnership or sole proprietorship or control or

7    management of the ____(LA group)____ shall be considered an assignment."

8        70.    Koren addressed the right of first refusal provision (and a variety of other issues)

9    with Magsaysay.  Koren told Magsaysay that just like he – Magsaysay – did not want to do

10   business with some "Jo Schmo", neither did Koren.  Therefore, Koren said, if Koren were going to

11   agree to give Magsaysay the majority equity interest in addition to the voting interest in this new

12   company, then Koren must have similar protections in place such that neither Cinco nor its

13   individual shareholders could sell their interests without first offering Koren and his group a right

14   of first refusal.  Magsaysay, for his part, was sympathetic to Koren's position and responded in

15   substance: "Guy, rest assured that we're only going to do business with you … it will be just us"

16   ("Magsaysay Statement No. 17").

17       71.    In the ensuing days, there was discussion regarding the tax consequences for the

18   Cinco Group concerning this proposed venture.  Cinco preferred to have a corporation for the "joint

19   venture" to limit its potential tax exposure.  In a June 10, 2010 email, Olivas advised Bartolome

20   (and Magsaysay) to have the joint venture form a limited liability company and for Cinco to form

21   "a US corporation to hold its 60% interest in the LLC".  Olivas explained that this structure would

22   allow Cinco to save on U.S. taxes "[s]ince it will not be owning the LLC interest directly" and if

23   any distributions are made by the LLC to Cinco's separate U.S. corporation, that U.S. corporation

24   "could choose not to make a dividend distribution and keep/invest the income here in the US."

25   Magsaysay said that he liked that idea and said that he was "inclined to use" it.

26       72.    On June 11, 2010, Bartolome circulated a further revised version of the Joint

27   Venture Agreement that she intended to send to Olivas to make the additional proposed changes.

28

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

One proposed change included adding Tung as an "Independent/non-voting Director".  Another change included making Paragraph 2.d. (which included the right of first refusal clause) mutual.

73.     On June 14, 2010, Magsaysay rejected adding Tung as an "Independent/non-voting Director" because he – Magsaysay – contended that he could not place his trust in Tung the same way he placed his trust in Koren and his group.  In Magsaysay's own words:

> I am now leaning towards changing my mind about [Tung] being part of the board of the JV company when to this point he has not proven, to my satisfaction, that he thinks like us and the LA Group (Amit, Guy and Amir).  We begun [sic] on mutual trust and this will be a key value the the [sic] JV company shall have.  Any person bringing distrust to start a relationship with the JV company should be looked at with concern.  The time we proffesionalize [sic] and have proffesional [sic] managers running things for us is the time we should let contracts and agreements with lawyers concern be ahead of trust.  That's why to those who join our journey at this point when all we have is trust, I value them and their partnership and we should reep [sic] the benefits if trusting as blindly.  ("Magsaysay Statement No. 18")

Koren respected Magsaysay's decision and responded to his email agreeing that the partnership was built on trust and that when Magsaysay told Koren that it would be "just us" (because of his various concerns of letting outsiders in), Koren understood him completely.

74.     By June 28, 2010, Olivas had made further changes to the Joint Venture Agreement per the Cinco Group's directions, and it was forwarded for review.  Olivas confirmed in an email dated June 28, 2010 the substantive changes he had made including that he "added the 4 individuals as signatories to the Agreement," specifically referring to Cinco's four shareholders.  Indeed, that June 28, 2010 draft reflected an agreement between the Cinco Group (Cinco *and its four shareholders*), on the one hand, and the LA Group, on the other.  It also made Paragraph 2.d. of the Agreement (the prohibited transfer/right of first refusal provision) mutual such that the Cinco Group, or any of them, could not assign or sell any interests to any party outside of the Cinco Group, and the LA Group, or any of them, could not assign or sell any interests to any party outside of the LA Group without consent and without offering a right of first refusal.

75.     On July 2, 2010, Bartolome circulated the Cinco Group's comments to this latest draft including comments such as imposing supermajority voting requirements (75%) on certain actions "so that at least there will be two (2) from their side", specifically referencing the amount of

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  manager votes needed from the LA Group in order to pass a resolution requiring a 75% vote.  In

2  other words, to pass a resolution that requires a 75% vote, the Cinco Group would have to get at

3  least two of the LA Group board votes to join the four Cinco Group board votes in passing such a

4  resolution (6 of 7 board votes needed).[4]

5      76.      In or about August or September 2010, Bartolome drafted an informational report

6  concerning PCJV's corporate structure and ownership for use in PCJV's franchise disclosure

7  statement.  In that report, Bartolome declared that the equity ownership breakdown of PCJV was as

8  follows: Cinco Corporation – 56%, Jose P. Magsaysay – 1%, Jose Miguel Ma. G. Montinola – 1%,

9  Ricardo Enrique Kilayko Montelibano – 1%, Maria Victoria O. Bermejo – 1%, Amit Nemanim –

10  16.4%, Guy Koren – 16.4%, Amir Jacoby – 7.2%.  Indeed, even *after* PC International's formation,

11  this document shows that the "Cinco Group" – Cinco and its four owners (Magsaysay, Montinola,

12  Montelibano, and Bermejo) – were to collectively hold 60% of PCJV's equity interest.  Many

13  iterations of this document were exchanged among the parties and DLA Piper over the course of the

14  next several months, all of which included the same ownership breakdown as per above.

15      77.      Later, prompted by an email from Bartolome sent on September 7, 2010 asking for

16  Olivas' review of the Cinco Group's comments to the draft agreement, Olivas, on September 14,

17  2010, sent a further draft of the Joint Venture Agreement, which Bartolome circulated on

18  September 16, 2010.  This document, prepared two months after PC International's formation,

19  again evidences an intent for the *Cinco Group* to hold ownership and voting interests in PCJV.

20  Magsaysay responded to Bartolome's email the same day confirming: "I am ok with this".

21      78.      The parties had several further discussions concerning the Joint Venture Agreement

22  over the ensuing two years and, upon information and belief, the Joint Venture Agreement was not

23  ────────────────────

24  [4] Cinco's attempt to remove Koren as PCJV's President was a source of immense friction early in
this litigation, with each side arguing over whether a 75% vote referred to a vote of equity

25  percentages or board votes. Although the Court ultimately got the result right, it could have made
quick work of Cinco's and DLA Piper's false and misleading interpretation of the joint venture

26  agreement if it had this email at its disposal in May 2018 (which it did not).  This email clearly
stated: "Amit is suggesting 75% so that at least there will be two (2) from their side."  This is clear

27  and unequivocal evidence demonstrating that the reference to a percentage vote always
contemplated board votes, i.e., 6 of 7 votes to carry a 75% resolution.

28

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  executed until 2012, likely on or about August 8, 2012.  Although the Joint Venture Agreement was

2  unsigned for some time, the parties conducted and comported themselves in accordance with its

3  principal terms (with some exceptions).  For instance, while the Joint Venture Agreement contained

4  a stock provision concerning a reference to potential "Company-owned stores", the Cinco Group

5  repeatedly informed Koren and the LA Group that they had no intent to fund or open any stores

6  under PCJV.  An October 1, 2010 email from Kim Lambert of DLA Piper to Koren and others

7  confirms this very fact: "Also please confirm that the audit will be of the franchisor entity which

8  will not hold any assets of any stores."  As another example, Magsaysay sent an email on August

9  18, 2011 stating: "Let me clarify one thing.  In franchising or why we do franchising.  1). *Because*

10 *we lack financial resources to put up our own stores* and we need other people's money …"

11 (Emphasis added) ("Magsaysay Statement No. 19").

12      79.    Beyond informing the LA Group that they had no expectation to open any stores or

13 that there was any expectation on the LA Group to provide the Cinco Group any first right to open

14 any stores on behalf of the franchisor entity (because they did not want to open or fund any such

15 stores), as discussed above, Koren had rights through NKM to open up to ten stores under the NKM

16 License Agreement and, when Magsaysay approached Koren to create PCJV, Magsaysay told

17 Koren that Koren could open as many stores as he wanted and give himself as much exclusivity as

18 he wanted, including fee and royalty waivers (which are common in the industry when there is

19 commonality of ownership or management between franchisor and franchisee).  In discussions

20 concerning the Joint Venture Agreement which called for capital contributions from the Cinco

21 Group of $30,000 and the LA Group of $20,000, Koren told Magsaysay and the Cinco Group that

22 $50,000 is much too low to capitalize this business and that the business would need much more

23 capital.  In response, Magsaysay told Koren that he did not want to put in any more money and that

24 Koren should just "figure it out" ("Magsaysay Statement No. 20").  The Cinco Group simply had

25 no desire to invest any substantial sum of money in the U.S.

26      80.    As yet another example of how this joint venture arrangement came to be developed,

27 at some point the LA Group announced its desire to hold all of the LA Group's membership

28 interests (including its rights to voting and management) in an entity, rather than in individual

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1   capacities.  There was no objection to this request; in fact, Olivas believed that the request was

2   appropriate and so advised the Cinco Group.  In a January 4, 2011 email, for instance, Olivas

3   emailed Bartolome and Magsaysay and wrote: "… the LA Group intends to invest in PCJV through

4   NKM … From PCJV's perspective, it does not make a difference if the LA Group's investment is

5   made through NKM.  Furthermore, from the LA Group's perspective, their U.S. tax treatment

6   remains the same, as if they invested in PCJV as individuals.  This is because NKM is an LLC and

7   its pro rata share of income (or losses) from PCJV will go directly to its investors.  Amit and I

8   spoke about this, and we both agree that this should affect the JV arrangements."  In later

9   discussions that Koren had with Magsaysay, Magsaysay also agreed on behalf of the Cinco Group

10  to allow the LA Group to hold its interests in an entity.  Magsaysay was initially concerned

11  regarding whether the LA Group individuals would still be bound by the right of first refusal and

12  transfer restrictions should they elect to hold the LA Group's interests in an entity.  As soon as

13  Magsaysay discovered that those first-refusal, transfer restriction terms, etc. would not be affected

14  if the LA Group individuals were to hold the LA Group's interests in an entity, Magsaysay

15  consented to that request.  As such, and as alleged above, a partnership was later formed in 2013

16  and then, in 2015, that partnership was converted to an LLC, all of which was disclosed to the

17  Cinco Group and no objection was ever lodged by any member of the Cinco Group to that

18  ministerial change.

19     **DLA Piper Marshals PCJV Through its Initial Franchise Disclosure Document and Audits**

20       **Necessitating Executed Documents Between the Cinco Group and LA Group including a**

21     **Trademark License Agreement, Master Services Agreement, Joint Venture Agreement, and**

22                **LLC Agreement; PCJV incurs DBO Violations**

23          81.    Being a franchise operation, PCJV goes through a stringent yearly audit and other

24  regulatory review processes.  In January 2011, PCJV's auditors Singer Lewak (whom Olivas the

25  LA Group to engage on behalf of PCJV) were working with DLA Piper in connection with PCJV's

26  first audit and financial statements.  During that process, Bartolome forwarded to Koren a copy of

27  PCJV's first financial statement which described PCJV's members as the Cinco Group and LA

28  Group.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

4232336.1                                    29

82.    DLA Piper also prepared PCJV's first Franchise Disclosure Document ("FDD"), which was issued on or about February 7, 2011. That first FDD makes no reference whatsoever to PC International. Rather, Cinco is mentioned numerous times. For example, page 9 of the FDD states: "We relied on Cinco's approximately 18 years of operating stores in the Philippines to compile these estimates plus conducted preliminary due diligence in the United States." Page 11 states: "We will issue and modify standards and specifications based on our, Cinco's, and our franchise owners' experience in operating Potato Corner Stores."

83.    In or about 2011, PCJV was cited for various DBO violations, and DLA Piper was charged with interfacing with the DBO to assist the parties with these violations. A major problem was that the company was so undercapitalized, and there was nothing Koren could do about it at the time because the Cinco Group had no desire to inject any more capital into the company. Ultimately, the responsibility fell on Koren's shoulders to get the company out of trouble (something he never bargained for) and, therefore, Koren led the efforts in notifying franchisees of the violations and assisting the company in dodging *all* contingent liabilities – in the millions of dollars – by 2017.

84.    While DLA Piper was working on PCJV's first FDD, financial statements, etc., there became a need to document an intellectual property license agreement, which DLA Piper directed to be titled a "Trademark, Copyright, and Know-How License Agreement" (the "Trademark License Agreement"). The Trademark License Agreement was entered between PCJV and Cinco and made effective on October 1, 2010. Koren signed the document on behalf of PCJV.

85.    While this process was ongoing and there were multiple exchanges of emails with DLA Piper, on February 27, 2011, Bartolome emailed Lambert of DLA Piper and confirmed that "no royalty payments have been made from the start" concerning the Santa Anita store and "no monthly royalty payments" would be made in connection with a Topanga store. The email also confirmed that the Cinco Group had not collected any monthly royalties in connection with a separate, pre-existing franchise in San Francisco. That same email communication also includes comments from Bartolome stating, "Can we request non issuance of the Notice of Violation on the grounds that the Directors/Shareholders of NKM are also Directors/Shareholders of PCJV.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1    Indirectly, the store is owned by the Franchisor considering the shareholders involved.  Santa Anita

2    was used as the prototype to precisely develop the Franchise Business Model of Potato Corner in

3    the US.  It will be the training store also of PCJV."

4    86.    On April 10, 2011, Bartolome emailed Med Quiambao – a CPA and friend of

5    Magsaysay's who was assisting the parties with accounting for a short period of time – to describe

6    the ownership of PCJV.  Bartolome specifically wrote:

7    PCJV USA LLC :  60% breakdown: 56% Cinco Corporation, all other directors like Potato

8    Corner International - 1- share each.  40% breakdown: 16.4% Amit Nemanin, 16.4% Guy

9    Koren and 7.2% Amir Jacoby.

10    87.    DLA Piper and Olivas in particular were critical participants throughout the LA

11    Group's business relationship with the Cinco Group.  Not only did they perform legal services for

12    the Cinco Group, they also came to perform legal services for PCJV, PCI Trading, NKM, the LA

13    Group (and its individuals), and many of the other parties involved in this case.

14    88.    Olivas and DLA Piper were also instrumental in utilizing PCJV to assist Magsaysay

15    in his pursuit of obtaining an L1A Visa.  In September and October 2011, various exchanges of

16    emails among Olivas, Magsaysay, Bartolome, Pia Dyquiangco (an immigration attorney,

17    "Dyquiangco"), and others reveal that Olivas created certain PCJV membership certificates solely

18    for the purpose of facilitating Magsaysay's L1A Visa application.  On October 5, 2011, after

19    Dyquiangco's September 27, 2011 request for stock certificates showing "that stocks held in the

20    LLC so 60% to Cinco and 40% to LA Group" and other PCJV documents, Olivas sent an email to

21    his colleague at DLA Piper, Susan Reynholds, asking Ms. Reynholds to "confirm if we already

22    have issued stock certificates (or the equivalent for an LLC) to both Cinco Corporation (60%) and

23    the LA Group (40%)".  This email exchange ultimately led to Olivas forwarding stock certificates

24    to Nemanim for signature so as to help facilitate Magsaysay's L1A Visa application.

25    89.    On February 28, 2012, Koren discussed with Olivas certain disputes of the LA

26    Group with Nemanim and proposed restructuring the LA Group.  Olivas sent Koren an email that

27    day confirming that telephone discussion that Cinco and the Cinco Group were entitled to the 60%

28    profits in PCJV.  Olivas specifically wrote: "With respect to the 40% profits in PCJV (determined

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1    after paying the 30% management fee to the LA Group, and the 30% license fee to Cinco), as stated

2    in the JV agreement, this will be shared 60% for the Cinco group, and 40% for the LA Group, but

3    only after the operating expenses are deducted."  With respect to any future stores Koren was to

4    open (up to 9 additional), Olivas confirmed that "[n]o additional payments will be due to Cinco

5    …": "I understand that the existing license agreement included an initial payment by NKM LLC to

6    Cinco of $15k for the right to open up to 10 stores in the LA territory.  Thus far, only one (Santa

7    Anita) has been opened by NKM.  The existing license agreement will further be amended so that

8    the rights to open 9 new stores in the LA territory will be transferred by NKM LLC to J&K LLC.

9    No additional payments will be due to Cinco for these rights, apart from those already stated in the

10   existing license agreement."

11            90.     On or about June 18, 2012, a Master Services Agreement between the LA Group ad

12   PCJV was documented.

13            91.     On June 29, 2012, Kim Lambert of DLA Piper emailed Olivas and copied Koren to

14   request a signed operating agreement for PCJV "that shows the equity of each partner" for the

15   auditors.

16            92.     On July 23, 2012, Bartolome emailed Koren to request certain papers "for the Cinco

17   Board" and confirmed that "Ben is sending me the signature blocks for the Operating Agreement

18   and will send to you as soon I as I receive it."

19            93.      On August 7, 2012, Singer Lewak emailed Koren and others a draft audit report for

20   the year ended 2011 and demanded a "signed LLC Agreement" before it would be able to issue the

21   audit report.  Page 12 of the audit report states that the Cinco Group and the LA Group are the

22   members of PCJV and further provides that "[t]he Cinco Group contributed $30,000 and owns sixty

23   (60%) percent of PCJV's capital accounts."

24            94.     As Singer Lewak was consistently pressuring the LA Group and Cinco Group to

25   send them a "signed LLC Agreement" so that it could issue an audit report, Olivas and DLA Piper

26   scurried to put one together based on the Joint Venture Agreement (which Koren is informed and

27   believes was still unsigned at the time).  As the Court became well aware during the injunction

28   proceedings last year, the end result – PCJV's Limited Liability Company Agreement (the "LLC

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

Agreement") – is not exactly a model of clarity but it does, however, capture many of the Joint

Venture Agreement's salient points including that, according to Paragraph 3.1, "Pursuant to the

Joint Venture Agreement entered into by the Members on 8.8.12, the Members shall be classified

and designated as either part of the Cinco Corporation (Philippines) group (the "Cinco Group") or

the LA group (the "LA Group"). Both the Cinco Group and the LA Group agreed to the specific

rights and obligations granted to each group, and undertake to fully observe the rights vested to

each group under the Operating Agreement." The reference to "8.8.12" leads Koren to believe that

the Joint Venture Agreement (and very likely also the LLC Agreement) were executed on August 8,

2012 (a day after Singer Lewak's August 7, 2012 email) in accordance with the need to provide

executed documents to the auditors at that time. A true and correct copy of the executed Joint

Venture Agreement is attached as **Exhibit "B"** to this Second Amended Cross-Complaint, and

incorporated by reference hereto. A true and correct copy of the executed LLC Agreement is

attached as **Exhibit "C"** to this Second Amended Cross-Complaint, and incorporated by reference

hereto.

95.     Of note, the Joint Venture Agreement at Paragraph 2.d. states:

Neither Party shall assign any of its rights or obligations under this Agreement nor his/its member interests in the Company without the prior written consent of the other Party. In the event either Party desire to transfer or sell his/its pro rata members interest in the Company to a person other those specifically named in Section 1(a) of this Agreement, such Party shall be obligated to sell the same first to the other Party, which has have thirty (30) days within which to exercise its rights of first refusal from the date of receipt of a written notice to sell. For this purpose, the Parties hereby agree that the right of first refusal may be exercised in accordance with the following formula: The average of the Company's earnings before interest, depreciation, taxes and amortization (EBITDA) for the last two (2) years multiplied by 5 times, and further multiplied by the percentage of member interest subject to such right of first refusal over total outstanding member interests.

The above provision formed the bedrock principle on which their relationship would rely,

i.e., that they would only do business with each other. Again, all of the individuals to the Joint

Venture Agreement agreed to this provision – in their individual capacity – so that it was clear that

neither Cinco nor any of its shareholders or any one of the LA Group members could transfer any

interests without consent or without offering the other side a right of first refusal.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

96.     For its part, the LLC Agreement also captured the right of first refusal (Paragraph 3.3), transfer restrictions (Paragraph 3.7), and assignment of interests (Paragraph 8.1).  The right of first refusal (at Paragraph 3.3) states:

> A Member of the Cinco Group or the LA Group shall not assign any of its rights or obligations nor his/its Member Interests in the Company outside of the Cinco Group and the LA Group, without the prior written consent of the non-assigning group.  In the event a Member of either the Cinco Group or the LA Group desire to transfer or sell his/its pro rata members interest in the Company to a person other those in either the Cinco Group or the LA Group, such Member shall be obligated to sell the same first to the existing Members, which has have thirty (30) days within which to exercise its rights of first refusal from the date of receipt of a written notice to sell.  For this purpose, the Parties hereby agree that the right of first refusal may be exercised in accordance with the following formula: The average of the Company's earnings before interest, depreciation, taxes and amortization (EBITDA) for the last two (2) years multiplied by 5 times, and further multiplied by the percentage of member interest subject to such right of first refusal over total outstanding Member Interests.

97.     Paragraph 8.1 of the LLC Agreement explicitly provides: "An Economic Interest is assignable in whole or in part, provided, however, that no Membership Interest may be assigned to any Person … without the consent of Members required pursuant to Section 3.7."  In other words, even if the right of first refusal did not exist, Paragraph 8.1 served as a backstop to ensure that only an "Economic Interest" (defined in Paragraph 1.18 to mean "A Person's right to share in the income, gains, losses, deductions, credits or similar items of, and to receive Distributions from, the Company, exclusive of any other rights of a Member including, without limitation, the right to vote or to participate in management, or any right to information concerning the business and affairs of the Company") may potentially be assignable but not any other rights of a Member, such as the right to vote, participate in management, or right to information.

### Koren Opens Two Additional Stores in 2012, Both of Which Fail

98.     While Koren and his team were still struggling with the Santa Anita location and his focus had suddenly turned to assisting the Cinco Group with the creation of this U.S.-based franchise business to help them avoid liability, and in keeping his promise to Magsaysay to help grow the brand, Koren utilized his contacts and connections within Westfield (connections he made through his lengthy discussions and negotiations with Westfield concerning the Santa Anita store)

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1   and proceeded to negotiate and open, in 2012, two additional Potato Corner outlets in the Westfield

2   Valencia Town Center in Santa Clarita, California and Westfield Fashion Square Mall in Sherman

3   Oaks, California.  In keeping his end of the bargain under the Jacoby-Koren Agreement, Jacoby

4   funded Koren's capital contributions for both of these new outlets, and a third investor, Tung, was

5   invited to and did participate in these two new stores. Given NKM's continuing monthly losses,

6   Nemanim did not wish to participate in opening any new Potato Corner store.

7          99.     The Potato Corner Valencia and Potato Corner Fashion Square stores were not

8   profitable, however.  Indeed, Koren, Jacoby, and Tung suffered losses of approximately $1 million,

9   if not well more than that, due to these stores and were forced to cut their losses and move on.  The

10  Valencia store was closed on December 31, 2013 and the Fashion Square store was closed on

11  January 8, 2017.  The Fashion Square location in Sherman Oaks was near and dear to Jacoby's

12  heart.  That location was closest to his home and he was the principal driver in influencing the

13  group to open a Potato Corner outlet in that mall.  Unfortunately, due in large part to the losses they

14  incurred at Valencia and Fashion Square, Koren's relationship with Jacoby was never quite the

15  same after that.  In light of the failed investment in these stores, Jacoby unilaterally decided to

16  modify the Jacoby-Koren Agreement such that any future funding of Koren' capital contributions in

17  any new store would be treated as a "loan"; he reneged and defaulted on the agreement.  Koren

18  never agreed to this alternative arrangement, however, he did attempt to work things out with Mr.

19  Jacoby.  To avoid conflict, Koren began advancing some payments to Jacoby in or about 2015 with

20  the understanding that the two would sit down to discuss a potential formal modification to the

21  Jacoby-Koren Agreement.  Jacoby accepted these payments on the understanding that they were a

22  mere accommodation, and that any long-term revisions to the relationship would need to be

23  negotiated.  While negotiations ensued, Jacoby and Koren never reached an agreement to modify

24  the Jacoby-Koren Agreement.

25      **The Relationship with Nemanim Soured, Leading to his Exit From the LA Group and,**

26          **Eventually, the Execution of an Amended Joint Venture Agreement**

27          100.    Beyond the losses incurred with the stores, the various DBO violations that exposed

28  the LA Group – and Koren personally (because they had yet to shield the LA Group through an

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

4232336.1
35

1  entity) – to millions of dollars of contingent liability, and the fact that Koren was not making any

2  money in this venture, Koren's and Jacoby's relationship with Nemanim also began to deteriorate.

3  Koren and Jacoby ultimately resolved their disputes with Nemanim through a settlement agreement

4  and Nemanim exited the venture.

5       101.   The Cinco Group and LA Group held a PCJV board meeting on October 16, 2012, at

6  which time it was decided by a unanimous vote to require, among other things, that Koren formally

7  be named as PCJV's President and that a 75% vote of the 7 voting representatives would be

8  required to replace the President (Koren), the Corporate Secretary (Bartolome), and the Treasurer

9  (Bermejo) from then forward.

10       102.   On or about the next day, October 17, 2012, the parties entered into the First

11  Amendment to the Joint Venture Agreement (the "Amended JV Agreement"). The Amended JV

12  Agreement included the modified provisions discussed above and, in some places, made reference

13  to Cinco's shell corporation, PC International and the "PCI Group" (defined collectively as PC

14  International and the four Cinco shareholders). In other places, the Amended JV Agreement made

15  reference to "Cinco" and the "Cinco Group", i.e., in the fourth "whereas" clause ("WHEREAS,

16  Cinco may assign …"), Paragraph 2.b. ("… the Cinco Group shall contribute …"), Paragraph 3.a.

17  ("… the Management shall be composed of seven (7) members, four (4) of whom shall be

18  designated by the Cinco Group …"), Paragraph 3.g. ("… Master License Agreement with Cinco

19  …"), Paragraph 3.g.ii.1. ("Payments shall be made to Cinco …"). For all intents and purposes, the

20  Cinco Group continued to exercise voting and management rights in PCJV and, aside from having

21  PC International formally recognized as the Cinco Group's arm to shield them from potential tax

22  exposure, there was no change to the relationship between the Cinco Group and the LA Group. To

23  be clear, neither Koren nor the LA Group agreed then nor did it even occur to them that by inserting

24  PC International into this agreement, the Cinco Group would one day contend that they could get

25  around the right of first refusal by transacting shares outside of PC International. Had they

26  disclosed this fact to Koren, Koren would not have agreed to allow them to effectively render the

27  right of first refusal a nullity. As far as Koren was concerned, he was still dealing with the same

28  people, the Cinco Group, and he had received prior assurances that it would always be "just us." A

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

36

1  true and correct copy of the Amended JV Agreement is attached as **Exhibit "D"** to this Second

2  Amended Cross-Complaint, and incorporated by reference hereto.

3    103.    In light of Nemanim's exit, Jacoby approached Koren and requested that Koren

4  allow Jacoby's wife, Inbal Jacoby, to replace Nemanim as a voting representative on the PCJV

5  board.  Koren, desiring to maintain harmony within his group, obliged though he was and remained

6  concerned about the effort to have Mrs. Jacoby – who'd had no previous high-level involvement in

7  the business – into a voting role.  But given that Koren, as the controlling interest-holder of the LA

8  Group, could always replace LA Group's voting representatives in PCJV if the need ever arose, he

9  accommodated Jacoby's request.

10  **The LA Group Memorializes a Partnership Agreement and Later Converts the Partnership**

11  **into an LLC**

12    104.    Initially, Koren and Nemanim collectively held 76% of the equity ownership

13  interests in the LA Group, with Jacoby holding the remaining 24%.  Upon Nemanim's exit, the

14  ownership interests in the LA Group changed, such that Koren came to hold a 61.3% equity interest

15  and Jacoby came to hold a 38.7% interest.  On or about March 1, 2013, Jacoby and Koren executed

16  the PCJV-LA Group Partnership Agreement (the "Partnership Agreement") memorializing the LA

17  Group relationship.  Paragraph 13 of the Partnership Agreement states in no uncertain terms that

18  Koren, as the LA Group's Managing Partner and majority percentage interest holder, would have

19  the sole management and authority to act on behalf of the partnership, including making

20  compensation decisions for the partners (Paragraph 15).  A true and correct copy of the Partnership

21  Agreement is attached as **Exhibit "E"** to this Second Amended Cross-Complaint, and incorporated

22  by reference hereto.

23    105.    In light of concerns over potential liability, especially given the ongoing issues with

24  the DBO, Koren and Magsaysay discussed the need for the LA Group to convert the Partnership

25  into a shielded entity.  Magsaysay and Koren talked about this repeatedly and Magsaysay's only

26  objection to the conversion to an entity involved the question of whether Koren and Jacoby would

27  still be bound by the right of first refusal.  Once Koren assured Magsaysay that it made no

28  difference whether the LA Group held PCJV interests in a partnership or an LLC, and that Koren

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1    and Jacoby would be bound by the right of first refusal either way, Magsaysay consented to the

2    conversion into an LLC.  Thus, on or about July 22, 2015, the LA Group Partnership was converted

3    to the LA Group, LLC (Potato Corner LA Group, LLC), and rather than creating a new set of

4    operating agreements, Koren and Jacoby agreed to remain bound by the Partnership Agreement that

5    they had executed in March 2013 in connection with the LLC and they governed themselves by the

6    Partnership Agreement's terms.

7    **In 2015, the Cinco Group and LA Group Engage in Buyout Talks and Agree on a Contingent**

8    **Agreement for the LA Group to Acquire all of PCJV's Interests; the Cinco Group Infuses its**

9    **60% Portion of Capital into PCJV**

10    106.    In early 2015, differences between the Cinco Group and the LA Group had

11    materialized concerning undercapitalization and multiple inquires by the DBO, among many other

12    things.  PCJV was suffering due to the mounting fees needed to defend the DBO inquiries which

13    were amplified by the Cinco Group's general apathy towards PCJV, refusal to assist with PCJV's

14    governance, refusal to support the LA Group's efforts in growing PCJV, and their refusal to

15    properly capitalize PCJV.

16    107.    Throughout this time, it became apparent that the Cinco Group intended to rid

17    themselves of any and all responsibilities and duties involving PCJV.  Therefore, the LA Group

18    made a good faith offer to purchase the Cinco Group's PCJV shares.  In response, on or about May

19    25, 2015, the Cinco Group (through Olivas) made a counter-offer proposing to sell "Cinco's 60%

20    equity interest in PCJV for $750,000."

21    108.    What transpired next was a meeting between Koren and Olivas to discuss the terms

22    of Cinco's counter-offer and several further discussions with the Cinco Group.  Out of those

23    discussions arose an agreement in principle to transfer the Cinco Group's 60% interest in PCJV to

24    the LA Group in exchange for a licensing agreement provided that PCJV was cleared of its then-

25    existing DBO violations and potential contingent liabilities.  Koren agreed to this condition.

26    109.    On or about August 8, 2015, Montelibano of the Cinco Group sent a letter to Jacoby

27    and Koren stating that he was writing "[o]n behalf of the Cinco Board of Directors" concerning

28    franchise law violations.  Montelibano alleged: "We note that when these potential violations

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

4232336.1

38

1  occurred, the Cinco directors who represented Cinco's interests in PCJV had no knowledge of the

2  potential franchise violations."  The suggestion that the Cinco directors did not know about the

3  potential franchise violations was false, of course, but what is noteworthy about this letter is that

4  Montelibano concedes that Cinco maintains the interests in PCJV.

5      110.  On or about November 4, 2015, Jacoby and Koren sent a detailed letter to the Cinco

6  Group (through Bartolome) setting forth, among other things, the LA Group's issues with the Cinco

7  Group and its lack of support, both financial and otherwise, to the company along with the various

8  DBO and undercapitalization issues of the company, and the negligent legal advice provided from

9  the start through lawyers that the Cinco Group insisted they use.  As part of that letter, Koren and

10  Jacoby specifically made clear that:

> It has now been clearly documented that the Company was and up until now has
> been clearly undercapitalized.  No reasonable person would consider $50,000
> sufficient initial capital to conduct a formal franchising operation.
> Undercapitalization is one of the key determining factors to permit a claimant to
> "pierce the veil" of limited liability that might otherwise exist with a limited
> liability company.  As a result, failure to provide adequate additional capital will
> likely result in direct personal liability to the members of the Company.  Public
> policy mandates that the Company's members provide additional capital or
> personally absorb any liability claims.  The LA Group has provided its share of
> what has been reasonably projects as a "minimum" additional capital
> contribution, which means that if Cinco Group does not provide its proportional
> capital contribution or permit the Company to raise that capital from other
> sources, that the Cinco Group and its members will be exposed to personal
> liability for any unmet obligations of the Company.

20      111.  On or about November 12, 2015, PCJV held a "members meeting" to address the

21  DBO issues and PCJV's contingent liabilities.  The meeting was somewhat contentious, and of the

22  Cinco Group, only Bermejo attended without a proxy.  Magsaysay, Montinola, and Montelibano

23  attended through proxies, two of whom delegated their votes to Olivas.  Bartolome, Koren, and

24  Jacoby were also present.  With respect to a $500,000 capital call (to help get PCJV out of trouble

25  with the DBO), the Cinco Group ultimately decided to meet its capital call requirements.

26  Accordingly, in 2015, the Cinco Group contributed $300,000 in capital (circuited through PC

27  International) and the LA Group contributed $200,000.  Among other things, the meeting minutes

28  of that November 2015 meeting show that Koren and Jacoby expected PCJV to need $2 million in

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  operating capital per 45 stores, that the breakeven point for PCJV would be 125 stores in 7 to 10

2  years, and that once PCJV had 250 stores under contract, PCJV could then give substantial

3  dividends to its members.

**Internal Turmoil Rocks the Cinco Group in 2016 and Koren was Given "Priority" to**

**Purchase Cinco's Shares and Become Cinco's CEO as was Promised to Him Years Earlier**

6  112.    In or around mid-2016, it was discovered that Magsaysay was having an affair with

7  Bermejo.  (One of Cinco's original founders was Bermejo's husband, who passed away thus

8  leaving his Cinco shares to Bermejo.  Bermejo is also the sister of Montelibano, another Cinco

9  shareholder.)  This affair caused some internal turmoil within Cinco, mostly for Bermejo as

10  Montelibano (Bermejo's brother) and others came to cast the blame on Bermejo for the affair.  The

11  affair further heightened the issues the LA Group was already having with the Cinco Group.

12  113.    In the ensuing chaos, Koren learned that Magsaysay was interested in selling Cinco

13  altogether.  Koren spoke with Magsaysay about the proposed transaction on September 26, 2016,

14  and Magsaysay agreed with Koren that Koren must have priority in purchasing Cinco; indeed,

15  Magsaysay always intended for Koren to succeed him.  Koren noted that the proposed sale would

16  necessarily include the transfer of an equity interest in PCJV, given the Cinco Group's 60%

17  ownership interest of that entity, as well as all other global interests.

18  114.    Accordingly, Magsaysay introduced Koren to Lito Sibayan, Mabuhay Capital's

19  President.  Between September 28, 2016 and December 10, 2016, Koren exchanged multiple emails

20  with Magsaysay and representatives of Mabuhay concerning the potential transaction.  On October

21  28, 2016, Koren participated in a telephone conference with Lito Sibayan and two of his colleagues,

22  Barbie Torres and Miki Chua.  During that call, the parties discussed the proposed transaction and

23  Koren requested Cinco's financials before he and a third party investor could submit a fair offer.

24  Rather than provide the financials as requested, Mabuhay emailed Koren a draft Letter of Intent

25  ("LOI") demanding that Koren sign it before engaging in any due diligence effort.  The asking price

26  was well over market value.

27  115.    Koren continued to communicate with Mabuhay during the course of the following

28  few weeks.  On December 10, 2016, Koren expressed his concern that Mabuhay was improperly

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  demanding that he execute the LOI before signing a non-disclosure agreement ("NDA") and

2  reviewing Cinco's financials.  Koren had expected to sign the NDA, receive the financials, perform

3  due diligence, thereafter submit an LOI and initial term sheet, conduct further diligence and finally,

4  draft and sign a final agreement.  Accordingly, Koren suggested the parties either follow the

5  process he outlined or that Koren would sign the LOI if the section concerning the price was

6  stricken, to allow for a review of Cinco's financials before agreeing to a price calculation.

7          116.    On December 10, 2016, Lito Sibayan followed up on Koren's proposal, specifically

8  stating that "[w]e fully agree with you on the process you outlined. We would likely have pursued a

9  similar process if Joe had not wanted us to give you priority, on the basis that his desired

10 EV/EBITDA multiple of 10x for 75% is acceptable."  Lito Sibayan went on to state his apparent

11 basis for the calculation, concluding that he would keep me "posted on process when we get new

12 directions from Joe in the next few weeks."  Koren patiently waited but did not hear from

13 Magsaysay, Mabuhay, or anyone after this communication.

14          117.    After not hearing back from Magsaysay, Mabuhay, or anyone, in or about February-

15 March 2017, Koren grew concerned that they may be shopping Cinco's shares on the open market.

16 Thus, Koren wrote the Cinco Group to remind them of their obligations under the PCJV governing

17 documents.  Koren also exercised the contractual right to purchase any shares that the Cinco Group

18 may desire to sell at the agreed-to formula under the PCJV governing documents.

19          118.    A few weeks later, Koren received a response to his letter (strangely from

20 Montelibano) denying that there was any intent to transact any shares.  Montelibano specifically

21 stated, "there has been no attempt to sell any of its membership interest in PCJV" ("Montelibano

22 Statement No. 1").  The representations in Mr. Montelibano's March 2017 letter turned out to be

23 false.  According to declarations and pleadings filed in this action, sometime in mid-2017, the

24 Cinco Group sold 55% of their shares to the Hernandez Group, without any advance notice to

25 Koren, without his consent, and without providing Koren the right of first refusal.

26 / / /

27 / / /

28 / / /

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**The Cinco Group Surreptitiously Engage in Transactions with the Hernandez Group in 2017;**

**The Cinco Group, LA Group, and Hernandez Group Enter into a Settled Agreement, but**

**Jacoby Steals Money and he and his Wife Interfere with that Agreement; The**

**Cinco/Hernandez/Jacoby Groups Along with Olivas then Conspire to Remove Koren**

119.    The Cinco Group worked hand in hand with the Hernandez Group to conceal their transactions.  Even as of the filing of this Second Amended Cross-Complaint (in July 2019), neither Koren nor PCJV, PCI Trading, or the LA Group has received any documents reflecting the purported transactions whereby 55% of Cinco's shares came to be acquired by members of the Hernandez Group sometime in 2017.  Nevertheless, although Koren objected to Hernandez Group's involvement, Koren agreed to have discussions with them under a reservation of rights.  The respective parties eventually came to discuss how they could possibly work together to resolve the ownership and right of first refusal issues, among other things.  In those discussions, members of the Hernandez Group agreed with Koren that the LA Group should come to own 100% of PCJV.  Thus, in light of the Hernandez Group's willingness to provide complete ownership of PCJV to the LA Group, Koren agreed to work with them to resolve these issues.  For their part, the Hernandez Group sought additional information about PCJV's operation, which Koren provided to them per the Cinco Group's direction and consent.

120.    Out of these discussions arose lengthy discussions with the Hernandez Group concerning how PCJV conducted its affairs.  In particular, the Hernandez Group requested access to PCJV's Quickbooks, Financial Statements, Tax Returns, and FDDs, all of which Koren granted to them solely in connection with the negotiations to resolve the aforementioned issues.  On September 14, 2017, Koren sent an email copying Chad Dominic Hernandez, Marco Del Pilar, and Myrose Victor (all of the Hernandez Group) specifically explaining (in an email below that) how Koren and Jacoby as members of the LA Group collectively held over 50% interests in stores which were "used for franchisee training, product R&D and any & all operational testing & development for PCJV.  The company stores do not pay royalties …"

121.    On October 21, 2017, Chad Dominic Hernandez sent Koren an email copying Magsaysay, Myrose Victor, Nicko Falcis, and Marco Del Pilar (in response to an email Koren sent

1    him on October 11, 2017).  In Koren's October 11, 2017 email, Koren reiterated that PCJV's

2    members were the Cinco Group and LA Group and that no formal or official notice had been given

3    to PCJV to address the modification of any of PCJV's board members.  Koren's email also referred

4    to the "conversion of the relationship" between the Cinco Group and LA Group directly referencing

5    Koren's first meeting with Hernandez when "we had agreed that the first order of business is to

6    restructure PCJV USA through one of two possible options: The First Option, the LA Group would

7    acquire majority control over PCJV USA (Approx 80%-90%) and redo the operating agreement; or

8    Second Option, change the shared operation of PCJV USA to a Master License Agreement between

9    Cinco Group and PCJV USA, with the LA Group as the 100% owner of PCJV USA.  We Agreed to

10   complete this restructure in December before the end of the year."  In response to that email,

11   Hernandez confirmed that "Cinco" had agreed in 2015 to invest another $300,000 in PCJV "to

12   preserve its 60% equity ownership": "… the reason why Cinco agreed to invest another $300k in

13   2015 was to preserve its 60% equity ownership upon a capital call by the LA Group, and

14   notwithstanding the requests for Cinco to turn over its equity ownership".

15          122.    Following the Hernandez Group's "due diligence" and substantial back-and-forth

16   (during which time Koren was completely transparent with them and they came to learn the

17   complete ins and outs of PCJV and its operations), an agreement was entered in principle in

18   November 2017 calling for all interests in PCJV to be transferred to the LA Group.  In exchange,

19   Cinco (then allegedly controlled by the Hernandez Group) would receive certain fees.  Koren

20   agreed to the proposal, and agreed to memorialize it in a further long-form agreement.  The

21   agreement in principle is captured in PCJV's November 28, 2017 "meeting minutes":

22          IV. Discussion of Wayforward for PC USA

23          **All attendees have agreed that option "C"  (100% Ownership of PCJV by the**
       **LA Group + Master License Agreement between Cinco Corporation (PH**
24          **Company) and PC USA) will be the best option to proceed with.**

25          Next steps:

26          • LA group will draft a Master License Agreement for the Cinco group to
            review and prepare comments.

27          • After Agreement is reached both groups will meet at the LA office for
            signatures.

28

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

- Simultaneously, all aspects of changing ownership of PCJV and PCIT will be addressed by both parties attorneys
- The time line both parties are committing for the completion of the finalization of the Master License Agreement is no later then February 2018

A. Status Quo (60% Cinco Group, 40% LA Group)

1) Drafting of Master License Agreement between Cinco Corporation and PCJV

2) Drafting of revised JV Agreement (including appointment of Officers)

3) Drafting of PCJV Operating Agreement and PCIT Sourcing Agreement

B. Change in Ownership (60% LA Group, 40% Cinco Group)

1) Drafting of Master License Agreement between Cinco Corporation and PCJV

2) Drafting of revised JV Agreement (including appointment of Officers)

3) Drafting of PCJV Operating Agreement and PCIT Sourcing Agreement

**C. 100% Ownership of PCJV by the LA Group + Master License Agreement between Cinco Corporation (PH Company) and PC USA**

**Drafting of Master License Agreement between Cinco Corporation and PC USA entity**

(Emphasis added on Option "C") (the "November 2017 Settled-in-Principle Agreement").  Notably, while the parties were discussing the LA Group acquiring 100% ownership of PCJV and went on to agree and memorialize that agreement in writing in these informal "meeting minutes", there is not a single mention or reference to PC International in these minutes.  Rather, the references are all to "Cinco Corporation" and "Cinco Group".  Indeed, the parties all believed that the Cinco Group and Cinco were the true parties in interest in connection with the relationship vis-à-vis PCJV, especially when it came to transferring PCJV's interests.

123.    On January 31, 2018, Myrose Victor (a member of the Hernandez Group) followed up with Koren concerning the formal memorialization of the November 2017 Settled-in-Principle Agreement.  Certainly by that point, the Hernandez Group appeared eager to consummate the transaction. On February 13, 2018, Koren delivered a draft term sheet with the general terms of the proposed agreement. The February 2018 term sheet reflected the agreement the parties had agreed

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1    to in principle, i.e., the LA Group would own 100% of PCJV and certain fees off gross revenues

2    would be paid to Cinco going forward.

3        124.    Around the same time, a dispute arose between Koren and Jacoby concerning

4    salaries that the two were drawing from the LA Group.  Up until then, Koren was distributing, i.e.,

5    gifting, a large portion of his salary (that the LA Group was receiving from PCJV and PCI Trading)

6    to Jacoby, while Jacoby was not working for any of those businesses, but was rather focused on his

7    own full-time construction business.  Having devoted his life to the Potato Corner businesses,

8    Koren was rightly concerned that Jacoby was receiving monies as compensation for work

9    performed for PCJV and PCI Trading whereas Jacoby was not actually performing that work.

10       125.    Accordingly, rather than draw additional salary from PCJV or PCI Trading, Koren

11   told Jacoby that he – Koren – intended to reduce the funds he was sharing with Jacoby because

12   Koren felt that Jacoby was not entitled to that compensation, however that Jacoby would be entitled

13   to any distributions any of the companies were to make by virtue of his ownership interests.

14   Wrongfully distressed, Jacoby went on to unilaterally and unlawfully withdraw money from the LA

15   Group's and J&K Consultants Group LLC's bank accounts.  To be specific, Jacoby unilaterally and

16   unlawfully withdrew $37,500 (in two $15,000 and $22,500 withdrawal transactions) on or about

17   February 22, 2018 from the LA Group's bank account, $3,600 (in equal $1,800 withdrawal

18   transactions) on or about March 2, 2018 from J&K Consultants Group's bank account, $4,000 on or

19   about March 9, 2018 from J&K Consultants Group's bank account, and $10,000 on or about March

20   9, 2018 from the LA Group's bank account.  In all, Jacoby withdrew $55,100 from the accounts

21   over the period of 15 days (from February 22, 2018 through March 9, 2018) (collectively, the

22   "Unauthorized Jacoby Withdrawals").  He has yet to return those funds.

23       126.    As Koren has now come to discover through documents produced by Jacoby in this

24   litigation, on March 8, 2018, Jacoby wrote an email to the Cinco Group and Hernandez Group

25   (without Koren's knowledge) seeking to "address troubling developments in PCJV USA, LLC",

26   lodging false accusations against Koren and clearly seeking to effectuate Koren's removal from

27   PCJV.  Jacoby wrote: "It is possible that the requirements for the management of PCJV USA, LLC

28   at this stage of its development may require engaging more experienced upper management in

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1   addition to or in place of current staff in PCJV USA, LLC or LA Group … I am unable to force

2   Guy to become more accountable … Guy has now requested and unilaterally elected to increase his

3   salary …  Please let me know whether Cinco Group, under its current management, is willing to

4   take a more affirmative role … and to hold the current management accountable …"

5       127.    What exactly ensued before and after this March 8, 2018 email is a source of

6   mystery as none of the parties in this litigation have yet to produce a complete copy of all of the

7   email correspondence.  Jacoby, for his part, took it upon himself to redact complete portions of

8   contemporaneously- exchanged emails.  Documents produced by Jacoby in this litigation, bates-

9   stamped AJ 00081-00085 demonstrate this concerted effort to hide evidence.  Those documents

10  also show that the Jacobys together engaged in a surreptitious campaign to provide confidential

11  information to members of the Hernandez Group without Koren's knowledge or authority.  In one

12  email, bates-stamped AJ 00085, Jacoby admits that he had "voiced [his] concern" to Olivas,

13  suggesting that Olivas or his law firm may have been behind this whole scheme.  Jacoby also

14  produced a privilege log in this litigation asserting privilege over a variety of emails including

15  emails with Olivas.

16      128.    Of significant note, sometime later in 2018 (after the Court issued injunctive relief in

17  Koren's favor), Koren and his team discovered a March 2018 email from Magsaysay to Mrs.

18  Jacoby's old Potato Corner email account stating: "noted in this Inbal … lets talk soon. **will share**

19  **with you and Amir our plans before the April 9 Members meeting**.  joe"  (Emphasis added.)

20  This email was sent before Koren was even told about any purported April 9 meeting and clearly

21  demonstrated that there were "plans" in place among these various conspirators seeking to do

22  Koren harm.

23      129.    According to documents produced by Mrs. Jacoby in this litigation, a week

24  following Mr. Jacoby's March 8, 2018 email, Mrs. Jacoby sent an email of her own to the

25  Cinco/Hernandez Groups.  Mrs. Jacoby's March 16, 2018 email which, upon information and belief

26  was not written by her, follows the same theme of Mr. Jacoby's March 8 email.  Following the slew

27  of false narrative against Koren directly (calling Koren out by name in several places), Mrs. Jacoby

28  states: "… I thought you should be aware that the level of reporting and accountability that may

1   have historically been enjoyed by PCJV USA and PCIT USA may soon be changing should you

2   feel it is incumbent upon Cinco Group and/or the Managers to take action to preserve the status quo

3   or at least create a standstill until Cinco Group and its Managers have an opportunity to evaluate

4   what may be best for PCJV USA."

5   130.   Interestingly, as the document bates-stamped AJ 00040 from Mrs. Jacoby's

6   production shows, on the morning of March 19, 2018, Magsaysay responded to Mrs. Jacoby's email

7   stating: "Our legal counsel has been in touch with Amir last week at LA."  Following that email

8   there's a big black box, reflecting a redaction that the Jacobys made before producing this

9   document.  The Jacobys have refused to produce whatever it is that was redacted from this

10  document.  In any event, Magsaysay's email reference to their legal counsel being "in touch with

11  Amir last week" further leads Koren to believe that Olivas – as the Cinco Group's counsel –

12  assisted and participated with Jacoby to help effectuate this scheme against Koren.

13  131.   Later on March 20, 2018, and in a clear attempt at repudiating the November 2017

14  Settled-in-Principle Agreement, Dom Hernandez circulated a draft non-binding Letter of Intent for

15  Koren's review.  Much to Koren's surprise, the Hernandez/Cinco Groups had suddenly injected a

16  demand that (beyond the licensing fee that was agreed to before), the LA Group pay for the Cinco

17  Group's PCJV interests in the exorbitant amount of **$7,000,000**, a term which the parties never

18  contemplated or agreed upon during the November 28, 2017 meeting.  The Letter of Intent

19  contained other onerous demands that the Cinco and Hernandez Groups knew Koren could not and

20  would not accept, and demanded a response by no later than March 27, 2018.

21  132.   While the Jacobys and the Cinco/Hernandez Groups were secretly concocting some

22  elaborate scheme to remove Koren from PCJV and otherwise harm Koren, Koren was still mostly

23  concerned about potential harm to the companies by Jacoby's raiding the bank accounts.  At that

24  time, tensions had escalated and Koren did not know (or want to find out) to what ends Jacoby

25  would go to cause the companies (and Koren's livelihood) to falter.  Therefore, on March 26, 2018,

26  and solely in an effort to safeguard PCJV's and PCI Trading's funds from Jacoby's continuing raid,

27  Koren transferred the bank accounts that were held at Wells Fargo to J.P. Morgan Chase Bank.

28  Koren contemporaneously called Magsaysay to inform him of the reasons for the transfer and to

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

GUY KOREN'S VERIFIED SECOND AMENDED CROSS-COMPLAINT

1  reassure him that the new accounts would be established in the same entity names and that the

2  Cinco Group will obtain full access to the new accounts.  On April 3, 2018, Koren sent Magsaysay

3  a letter memorializing the discussion they had regarding the account transfers and the reasons why

4  Koren had to take the action that he did.  As Koren knows now (but did not know back then),

5  Magsaysay had already forged an alliance with Jacoby and thus insisted that Koren return the funds

6  to Wells Fargo.  Koren agreed to do so provided that the Cinco Group would take action against

7  Jacoby should he – Jacoby – withdraw any money from PCJV's accounts.  Magsaysay agreed

8  ("Magsaysay Statement No. 21") and Koren returned the accounts to Wells Fargo.

9        133.   On or about March 27, 2018, Magsaysay called a PCJV member's meeting to take

10  place on April 9, 2018.  The proposed topics of discussion seemed innocuous; mainly, the notice

11  signified the intent to elect officers and directors.  In truth, however, the April 9, 2018 meeting was

12  a setup.  The Cinco Group, Hernandez Group, and Jacobys all conspired to remove Koren from

13  PCJV altogether (both as an officer and voting manager).  Indeed, the Hernandez Group

14  affirmatively voted to remove Koren as President and from PCJV's board, despite the fact that they

15  have no voting right whatsoever in PCJV.  Koren thus objected and took action to protect himself,

16  including to remove the Jacobys as LA Group managers and replace them with Thomas Hodgson

17  and Alon Koren.

18        134.   The very next morning, Cinco – and Cinco alone – initiated this action (through

19  DLA Piper) and sought TRO relief against Koren (which Koren did not know about at the time

20  because they refused to give him notice, but came to discover nearly a month later).  According to

21  the Court's register of actions, that initial TRO/injunctive relief request was denied.  Also on that

22  day, on April 10, 2018, Myrose Victor, the Jacobys, and at least one attorney ambushed PCJV's

23  offices, demanding that PCJV staff accede to a transition of power and claiming that Koren no

24  longer had any power or control over any business matters whatsoever.  Koren arrived later and

25  objected to the unannounced visit and blatant efforts to interfere with his management and

26  operations of the business.

27        135.   That same day, April 10, 2018, DLA Piper also sent a cease and desist letter to

28  Koren contending that "a meeting of the Managers was held on April 9, 2018, during which the LA

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1    Group and Guy Koren were removed from management by a majority vote (85%) of the Managers

2    and Membership interests." The reference to 85% could only refer to 6 out of 7 voting

3    representatives in PCJV purportedly voting to oust Koren. Koren responded to the April 10, 2018

4    letter asserting his position as to why the April 9, 2018 vote was improper insofar as it was

5    improperly noticed and that Koren's request to appoint new LA Group voting representatives was

6    ignored. Koren also asserted his position as to why the grounds for the purported termination were

7    baseless and appeared to be a pretext. (Additionally, the votes by members of the Hernandez Group

8    was ineffectual.)

9         136.    The Cinco Group eventually conceded that they had no proper grounds to remove

10   Koren as a voting representative of the LA Group or to dictate who the LA Group designates as its

11   3 voting representatives in PCJV. Therefore, the Cinco Group assented to Koren's replacing the

12   Jacobys as voting representatives of the LA Group with Alon Koren and Thomas Hodgson. Then,

13   knowing that the April 9 meeting was completely artificial and objectionable, the Cinco Group

14   decided to hold another meeting to try and oust Koren again.

15        137.    On Friday, April 20, 2018, DLA Piper informed Koren's then-attorney that PCJV

16   had purportedly called a special meeting, this one to take place the very next business day, on

17   Monday, April 23, 2018. Again, over Koren's objections, the April 23, 2018 meeting proceeded

18   and the Cinco/Hernandez/Jacoby Groups attempted to remove Koren as an officer of PCJV. The

19   new LA Group voting representatives voted against the initiative to remove Koren as an officer of

20   PCJV. Despite that, and despite the fact that a 75% vote (at least 6 of 7) was necessary to remove

21   Koren as an officer of PCJV, the purported Chairman (Hernandez) and DLA Piper partner, Mr.

22   Robert W. Brownlie, as Acting Secretary, erroneously and improperly concluded that enough votes

23   were cast to remove Koren from his officerial role in the company. At that same meeting, the

24   Cinco-aligned parties audaciously decided to change PCJV's banking relationship from Wells

25   Fargo to Citibank and authorized one another (including Olivas, Brownlie's law partner) to be the

26   signatories on the new accounts.

27        138.    Following the April 9, 2018 meeting and continuing after the April 23, 2018

28   meeting, the Cinco parties set out on a crusade to publicly disparage Koren and cast doubt on his

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1    authority and role within PCJV.  In one example, the Cinco parties sent a letter to Emily Garcia

2    (PCJV employee) to inform her that Koren was removed as a manager and President "due to his

3    breach of his fiduciary and contractual duties to PCJV and its Members."  The letter states that the

4    authorized representatives for PCJV were changed to Inbal Jacoby, Myrose Victor, and Olivas.

5        139.    Moreover, these same parties also set out to remove Koren from PCJV's office and

6    warehouse, and to discontinue Koren's Potato Corner USA email access (along with the email

7    access of third parties, including franchisees, who were viewed to be loyal to Koren), thus further

8    disrupting Koren's and the LA Group's ability to manage PCJV and comply with their duties and

9    obligations.  Despite that, Koren was, at the time, continuing to manage PCJV's day-to-day

10   operations from his apartment, and was constantly on the phone with franchisees and others to

11   assist them with their ongoing needs.

12   **The Cinco/Hernandez/Jacoby Groups Prepared PCJV's 2018 FDD Clearly Establishing that**

13   **Cinco/PC International's Claims Against Koren in this Litigation are a Ruse**

14       140.    While there were management items Koren could perform from his apartment, the

15   Cinco/Hernandez/Jacoby groups prevented Koren from complying with other of his duties as

16   President.  One such duty involved working with PCJV's attorneys and accountants to prepare

17   PCJV's 2018 Franchise Disclosure Document.  Interestingly, on or about May 3, 2018 (while

18   Koren was still prevented from performing the majority of his duties), PCJV finalized its Franchise

19   Disclosure Document (the "2018 FDD").  Myrose Victor of the Hernandez Group is named in the

20   2018 FDD as a general PCJV contact.  Olivas is designated as the person to contact at PCJV's Los

21   Angeles office to "discuss the availability of disclosures in different formats."

22       141.    Of significance and in establishing that Cinco and PC International's claims against

23   Koren are nothing more than a pretext to gain some sort of false leverage in this litigation, the 2018

24   FDD (prepared and finalized by persons who are accusing Koren in this lawsuit of wrongdoing,

25   alleging that Koren improperly caused fee waivers for franchisee entities in which Koren has a

26   minority interest in or that Koren improperly caused PCJV to pay himself a salary, and the like)

27   clearly discloses at "Note 7 – Related Party Transactions" to the "Notes to Financial Statements"

28   the following:

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

4232336.1

50

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

- Certain members of the Company who own approximately 40% of the Company's member interests also own and operate 6 franchise locations as of December 31, 2017. No initial franchise fee was paid and monthly royalties have been waived as the stores provide services to the franchisor, including training for new franchise employees and testing new menu items.

- The Company's management has determined these franchisee entities are not variable interest entities required to be consolidated in the Company's financial statements. The Company believes the ongoing value of the services obtained from the use of these franchise locations approximates the value of the initial franchise fee and waived royalties.

- The Company has a contractual obligation to remit 30% of all initial franchise fees and continuing royalty fees collected to certain members who own approximately 40% of the Company and provide management services on behalf of the Company. Additionally, the Company has a contractual obligation to remit 30%, as licensing fees, of all initial franchise fees and continuing royalty fees collected to certain members who own approximately 60% of the Company. Both obligations have been waived by the respective parties for the years ended December 31, 2017, 2016 and 2015.

- The Company is required to pay an annual service fee with certain members who own approximately 40% of the Company. Under the terms of the related agreement, annual service fees for 2017, 2016 and 2015 were $240,000, $181,200 and $181,200, respectively. During the years ended December 31, 2017 and 2016, the Company has paid $240,000 and $181,200, respectively, to these members for the services performed. During the year ended December 31, 2015, the Company has paid $108,300 to these members for the services performed and the remaining $72,900 was waived by the members.

142.    To further expand on the last bullet point above, within approximately two years following PCJV's formation, Nemanim and Koren began drawing minimal salaries from PCJV (approximately $1,500/month).  Over the years, as PCJV's and PCI Trading's cash flow position improved and after Nemanim's exit, Koren began to share his salary with Jacoby, this despite the fact that Jacoby was not working very much for PCJV and had a side full-time construction business.  Beginning in or about 2015, rather than being paid to Koren and Jacoby directly, the salaries began to be distributed to the LA Group, from which they drew their salaries.  While the 2018 FDD describes these payments as "annual service fees", they were really, in essence, Koren's salary, a large portion of which Koren shared with Jacoby.  These payments were no secret to

1    anyone and were approved by the Cinco Group.  Among other things, the Cinco Group had access

2    to Quickbooks software, received annual financial statements, audits, and FDDs, which disclosed

3    these payments.  Despite the contentions made in this lawsuit, these were far from "self-interested

4    transactions".  This was simply compensation for work.

5    **Jacoby Gets an "Executive Employment Agreement" from the Hernandez Group**

6         143.    Koren has come to discover through documents produced in this litigation by Jacoby

7    that, on or about May 9, 2018, Myrose Victor of the Hernandez Group sent Jacoby a document

8    titled "PCJV – Executive Employment Agreement – Amir Jacoby_05092018.pdf".  The Jacobys

9    have refused to produce this agreement; and neither has Cinco or PC International.  Even without

10   the attachment, the May 9, 2018 email in itself shows that a transaction took place or, at the very

11   least, was contemplated between Jacoby, on the one hand, and the Hernandez Group, on the other,

12   and that Myrose Victor sent the agreement "for [Mr. Jacoby's] signature".

13   **The Cinco/Hernandez Groups Embark on a Campaign of Retaliation, Sabotage, and**

14   **Interference**

15        144.    Having lost the Preliminary Injunction in June 2018, the Cinco/Hernandez Groups

16   set their sights on ways to retaliate, sabotage, and undermine Koren.  In one instance, on or about

17   August 31, 2018, the Cinco/Hernandez Groups caused a notice to be sent to PCI Trading noting that

18   effective September 1, 2018, there will be a "new price for all Potato Corner Products that we

19   supply to you."  The price sheet attached to the notice reflected a *300% increase* in prices.  This

20   unilateral, unauthorized and transparently retaliatory price increase on goods that PCJV and PCI

21   Trading had been purchasing from the Cinco Group for years departs from a longstanding

22   agreement that the goods would be sold to PCJV and PCI Trading at cost.  Having failed to remove

23   Koren through a Court order, the Cinco/Hernandez Groups plainly attempted to facilitate the same

24   result through economic warfare and ambush.

25        145.    In further attempts of sabotage, and among various other things, the

26   Cinco/Hernandez Groups began to run promotions and marketing schemes without Koren's

27   knowledge or consent, lay claim to funds held in accounts belonging to PCI Trading, mysteriously

28   maintain an office in Los Angeles, and maintain spy software on PCJV's servers.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

4232336.1

52

**FIRST CAUSE OF ACTION**

**(DECLARATORY RELIEF)**

**By Koren Against Cinco**

146.     Koren re-alleges and incorporates herein by this reference all previous allegations as though set forth herein in full.

147.     Cinco has taken the legal position in this case that the alleged transaction in 2017 whereby a number of persons associated with the Hernandez Group acquired 55% of Cinco's stock from members of the Cinco Group did not trigger any violation of the right of first refusal and consent provisions contained in the Joint Venture Agreement, LLC Agreement, or Amended JV Agreement (collectively, the "PCJV Governing Documents").  According to Cinco, because no shares of PC International (its claimed subsidiary) were sold, assigned, or transferred, those right of first refusal and consent provisions in the PCJV Governing Documents were not and could not have been triggered as a matter of law.

148.     While Koren disagrees with the factual assumption underlying Cinco's legal position, i.e., that PC International is legally considered to be the 60% member of PCJV with all attendant rights to vote, participate in management, etc. at the exclusion of the Cinco Group, *even if* Cinco's factual predicate were true, which it is not, a dispute has arisen between Koren, on the one hand, and Cinco, on the other hand, regarding whether under the covenant of good faith and fair dealing implied in every contract, Cinco had a duty to seek Koren's written consent and offer Koren a right of first refusal before engaging in the transaction involving members of the Hernandez Group in 2017.

149.     Koren respectfully submits that, without having to ever reach the question of contract breach, Cinco had a legal duty to Koren under the covenant of good faith and fair dealing alone regardless of the parties' conflicting positions and interpretational differences concerning the contract documents.  That is to say that even under Cinco's legal theory described above, the covenant of good faith and fair dealing commands a legal duty owed to Koren to seek his written consent and offer him a right of first refusal.  *See, e.g., Oregon RSA No. 6, Inc. v. Castle Rock Cellular of Oregon*, 840 F. Supp. 770 (D. Or. 1993) *aff'd* 76 F.3d 1003 (9th Cir. 1996) (finding that

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1    the conveyance of interests of the parent of a company that is bound by a right of first refusal

2    provision "is a blatant subterfuge intended to circumvent the right-of-first refusal" and "an artifice

3    intended to thwart plaintiff's legitimate contractual expectation"); *see also Mieuli v. DeBartolo*,

4    2001 WL 777447 at *7 (N.D. Cal. 2001) (adopting the *Oregon RSA* opinion in applying California

5    law).

6        150.    As such, Koren seeks a judicial declaration that Cinco owed him a legal duty to seek

7    his written consent and offer Koren a right of first refusal before engaging in the alleged transaction

8    involving members of the Hernandez Group in 2017.

9        151.    In light of the dispute over the issue of a legal duty owed under the covenant of good

10   faith and fair dealing under the facts and circumstances of this case, Koren has suffered and

11   continues to suffer as a result of the unsettled state of affairs.  A judicial declaration is thus

12   necessary and appropriate at this time in order for Koren to ascertain the duties owed him under the

13   covenant of good faith and fair dealing.

14               **SECOND CAUSE OF ACTION**

15                  **(DECLARATORY RELIEF)**

16              **By Koren Against PC International**

17       152.    Koren re-alleges and incorporates herein by this reference all previous allegations as

18   though set forth herein in full.

19       153.    PC International has taken the legal position in this case that the alleged transaction

20   in 2017 whereby a number of persons associated with the Hernandez Group acquired 55% of

21   Cinco's stock from members of the Cinco Group did not trigger any violation of the right of first

22   refusal and consent provisions contained in the Joint Venture Agreement, LLC Agreement, or

23   Amended JV Agreement (collectively, the "PCJV Governing Documents").  According to PC

24   International (a claimed subsidiary of Cinco's), because none of its shares were sold, assigned, or

25   transferred, those right of first refusal and consent provisions in the PCJV Governing Documents

26   were not and could not have been triggered as a matter of law.

27       154.    While Koren disagrees with the factual assumption underlying PC International's

28   legal position, i.e., that PC International is legally considered to be the 60% member of PCJV with

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1   all attendant rights to vote, participate in management, etc. at the exclusion of the Cinco Group,

2   *even if* PC International's factual predicate were true, which it is not, a dispute has arisen between

3   Koren, on the one hand, and PC International, on the other hand, regarding whether under the

4   covenant of good faith and fair dealing implied in every contract, PC International had a duty to

5   seek Koren's written consent and offer Koren a right of first refusal before its owners, the Cinco

6   Group, engaged in the transaction involving members of the Hernandez Group in 2017.

7        155.    Koren respectfully submits that, without having to ever reach the question of

8   contract breach, PC International had a legal duty to Koren under the covenant of good faith and

9   fair dealing alone regardless of the parties' conflicting positions and interpretational differences

10  concerning the contract documents.  That is to say that even under PC International's legal theory

11  described above, the covenant of good faith and fair dealing commands a legal duty owed to Koren

12  to seek his written consent and offer him a right of first refusal.  *See, e.g., Oregon RSA No. 6, Inc. v.*

13  *Castle Rock Cellular of Oregon*, 840 F. Supp. 770 (D. Or. 1993) *aff'd* 76 F.3d 1003 (9th Cir. 1996)

14  (finding that the conveyance of interests of the parent of a company that is bound by a right of first

15  refusal provision "is a blatant subterfuge intended to circumvent the right-of-first-refusal" and "an

16  artifice intended to thwart plaintiff's legitimate contractual expectation"); *see also Mieuli v.*

17  *DeBartolo*, 2001 WL 777447 at *7 (N.D. Cal. 2001) (adopting the *Oregon RSA* opinion in applying

18  California law).

19       156.    As such, Koren seeks a judicial declaration that PC International owed him a legal

20  duty to seek his written consent and offer Koren a right of first refusal before its owners engaged in

21  the alleged transaction involving members of the Hernandez Group in 2017.

22       157.    In light of the dispute over the issue of a legal duty owed under the covenant of good

23  faith and fair dealing under the facts and circumstances of this case, Koren has suffered and

24  continues to suffer as a result of the unsettled state of affairs.  A judicial declaration is thus

25  necessary and appropriate at this time in order for Koren to ascertain the duties owed him under the

26  covenant of good faith and fair dealing.

27  / / /

28  / / /

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**THIRD CAUSE OF ACTION**

**(DECLARATORY RELIEF AND/OR REFORMATION)**

**By Koren Against All Cross-Defendants**

158.    Koren re-alleges and incorporates herein by this reference all previous allegations as though set forth herein in full.

159.    In addition to the dispute between Koren, on the one hand, and Cinco/PC International, on the other hand, alleged above over the issue of a legal duty owed to Koren under the covenant of good faith and fair dealing involving the Cinco Group-Hernandez Group transactions in 2017, there are a number of additional disputes between Koren, on the one hand, and Cross-Defendants, on the other hand, over the parties' respective legal rights, duties, and obligations.  Those disputes concern:

a) the propriety of the Cinco Group-Hernandez Group transactions in 2017 whereby members of the Hernandez Group allegedly came to acquire 55% of Cinco's interests without Koren's consent or offering Koren a first-refusal right;

b) whether the Cinco Group-Hernandez Group transactions are subject to rescission;

c) the appropriate remedy or remedies to rectify the violations of Koren's consent and first-refusal rights in light of the true intention of the parties to only do business with one another;

d) whether Jacoby waived and relinquished all rights, if any he had, to exercise any consent or right of first refusal right contained in the PCJV Governing Documents and, as such, he should not be entitled to participate in any right or remedy in connection therewith;

e) the validity of the votes and resolutions to remove Koren from PCJV in April 2018;

f) the composition of the legal members of PCJV and PCI Trading and their equity, management, and voting interests;

g) the composition of the board of managers of PCJV and PCI Trading;

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

h)   when referring to a "75% vote", whether the PCJV Governing Documents refer to a vote of the seven managers on the board of managers or a vote of equity ownership interests;

i)   whether the stock certificates purportedly signed by Nemanim in 2011 have any validity or bearing on the issues presented in this case;

j)   the Hernandez Group's ability to participate in the management of PCJV in light of the provisions of Paragraph 8.1 of the LLC Agreement;

k)   the Hernandez Group's ability to vote in matters relating to PCJV in light of the provisions of Paragraph 8.1 of the LLC Agreement;

l)   the Hernandez Group's right to information relating to PCJV in light of the provisions of Paragraph 8.1 of the LLC Agreement;

m)   the interpretation and meaning of the PCJV Governing Documents, including (i) which of the PCJV Governing Documents' provisions were superseded by written amendment, (ii) whether the PCJV Governing Documents wholly reflect the true intent of the contracting parties and/or are subject to reformation, (iii) whether any provisions of the PCJV Governing Documents were modified through the contracting parties' words or conduct, (iv) whether any provisions of the PCJV Governing Documents were waived by the parties' words or conduct, and (v) whether any provisions of the PCJV Governing Documents are subject to reformation due to mutual mistake, unilateral mistake, or fraud;

n)   whether Cinco and PC International are alter egos of the Cinco Group and/or Hernandez Group;

o)   whether the November 2017 Settled-in-Principle Agreement is a valid, binding contract and subject to enforcement;

p)   the ability of any Cross-Defendant to interfere or induce the breach of any agreement involving royalty and fee waivers owed to PCJV's franchisees;

q)   Koren's rights under the NKM License Agreement and/or any future agreement covering the same subject matter;

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

r)  the ability of any Cross-Defendant to interfere with Koren's authority to waive fees for any Potato Corner franchisee or define reasonable salaries for himself and other PCJV and PCI Trading officers and employees or otherwise carry out and fulfill his duties as President of PCJV and PCI Trading;

s)  whether Koren is entitled to defense, indemnity, and reimbursement of legal fees incurred in this action and other related and/or associated actions for himself and other parties employed by PCJV or PCI Trading by virtue of Labor Code Section 2802 and other pertinent legal authorities;

t)  whether Koren is entitled to recover legal fees by virtue of the "tort of another" doctrine;

u)  the propriety of the Unauthorized Jacoby Withdrawals, and whether a constructive trust shall be imposed in connection therewith;

v)  whether the Partnership Agreement governs the LA Group;

w)  the propriety of the Cinco Group and/or Hernandez Group and/or PC International's maintenance of a bank account in the name of PCI Trading;

x)  the propriety of the Cinco Group and/or Hernandez Group and/or PC International's maintenance of a lease agreement once entered on behalf of PCJV, which space in Encino, California that they, upon information and belief, continue to lease and occupy;

y)  Koren's ability to purchase ingredients and products for PCJV and/or PCI Trading at cost and/or ability to source ingredients elsewhere;

z)  whether Koren or any other party named in the Cinco-PCJV Action committed any wrongdoing;

aa) whether any of the Cross-Defendants should be held in contempt for violations of the June 2018 Preliminary Injunction;

bb) whether any of the Cross-Defendants destroyed evidence in this case; and

cc) in gathering documents, computers, and other things from Koren's and other employees/officers' offices, and in installing spy software on PCJV's servers,

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1    whether Cross-Defendants, or any of them, violated state or federal law, invaded

2    privacy rights, should be sanctioned (with monetary, evidentiary, and/or terminating

3    sanctions) or subject to any other appropriate order of the Court.

4    160.    In light of the disputes among the parties over the above subject matters, Koren

5    seeks appropriate judicial declarations from the Court.  Koren has suffered and continues to suffer

6    as a result of the unsettled state of affairs.  Judicial declarations are thus necessary and appropriate

7    at this time in order for Koren to ascertain his rights, duties, and obligations with respect to the

8    above subject matters.

9    161.    In addition to declaratory relief, Koren respectfully requests that the Court reform,

10    where appropriate, the parties' various agreements to accurately reflect the true intention of the

11    parties or otherwise exercise its powers in equity to issue appropriate order(s) governing the parties'

12    rights, interests, duties, and obligations, including but not limited to necessary injunctive relief.

13    **FOURTH CAUSE OF ACTION**

14    **(INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS)**

15    **By Koren Against the Jacobys and the Hernandez Group**

16    162.    Koren re-alleges and incorporates herein by this reference all previous allegations as

17    though set forth herein in full.

18    As to the Jacobys

19    163.    As alleged above, in or about November 2017, the parties entered into the November

20    2017 Settled-in-Principle Agreement in which Koren had the expectation to obtain future financial

21    benefits.

22    164.    The Jacobys, and each of them, had knowledge of the 2017 Settled-in-Principle

23    Agreement.  Despite that knowledge, the Jacobys, and each of them, had the intent to and did

24    interfere with the 2017 Settled-in-Principle Agreement.

25    165.    By engaging in the conduct described above, including but not limited to the

26    transmission of their March 8, 2018 and March 16, 2018 emails, the Jacobys, and each of them,

27    took specific action to interfere with the 2017 Settled-in-Principle Agreement, in order to further

28    each of their own special interests.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

4232336.1

59

GUY KOREN'S VERIFIED SECOND AMENDED CROSS-COMPLAINT

1   166.    As a direct and proximate result of the Jacobys' conduct, Koren has sustained and

2   will continue to sustain substantial non-economic and economic injury in an amount to be proven

3   at trial.

4   167.    Koren further alleges that in doing the things described above, the Jacobys, and

5   each of them, acted with the intent to deprive Koren of his legal rights and to injure him such that

6   the Jacobys' actions constitute fraud, oppression, or malice within the meaning of Civil Code §

7   3294.  The Jacobys' conduct was and continues to be despicable, oppressive, and outrageous,

8   justifying the imposition of punitive and exemplary damages against the Jacobys, and each of

9   them, to make an example of the Jacobys and to deter such conduct in the future in an amount that

10  proof at trial may indicate is appropriate.

11  <u>As to the Hernandez Group</u>

12  168.    As alleged above, in or about 2012, the parties entered into the PCJV Governing

13  Documents in which Koren had the expectation to obtain future financial benefits.

14  169.    The Hernandez Group, and each of them, had knowledge of the PCJV Governing

15  Documents including, specifically, its consent and right of first refusal provisions.  Despite that

16  knowledge, the Hernandez Group, and each of them, had the intent to and did interfere with the

17  PCJV Governing Documents.

18  170.    By engaging in the conduct described above, including but not limited to the

19  purported transaction in 2017 whereby members of the Hernandez Group came to acquire 55% of

20  Cinco's interests, the Hernandez Group, and each of them, took specific action to interfere with the

21  PCJV Governing Documents, in order to further each of their own special interests.

22  171.    As a direct and proximate result of the Hernandez Group's conduct, Koren has

23  sustained and will continue to sustain substantial non-economic and economic injury in an amount

24  to be proven at trial.

25  172.    Koren further alleges that in doing the things described above, the Hernandez

26  Group, and each of them, acted with the intent to deprive Koren of his legal rights and to injure

27  him such that the Hernandez Group's actions constitute fraud, oppression, or malice within the

28  meaning of Civil Code § 3294.  The Hernandez Group's conduct was and continues to be

1 despicable, oppressive, and outrageous, justifying the imposition of punitive and exemplary

2 damages against the Hernandez Group, and each of them, to make an example of the Hernandez

3 Group and to deter such conduct in the future in an amount that proof at trial may indicate is

4 appropriate.

5 **FIFTH CAUSE OF ACTION**

6 **(INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS)**

7 **By Koren Against the Jacobys and the Hernandez Group**

8 173. Koren re-alleges and incorporates herein by this reference all previous allegations as

9 though set forth herein in full.

10 As to the Jacobys

11 174. As alleged above, in or about November 2017, the parties entered into the November

12 2017 Settled-in-Principle Agreement in which Koren had the expectation to obtain future financial

13 benefits.

14 175. The Jacobys, and each of them, had knowledge of the 2017 Settled-in-Principle

15 Agreement and Koren's prospective economic advantage. Despite that knowledge, the Jacobys,

16 and each of them, had the intent to and did interfere with the 2017 Settled-in-Principle Agreement

17 and Koren's prospective economic advantage.

18 176. By engaging in the conduct described above, including but not limited to the

19 transmission of their March 8, 2018 and March 16, 2018 emails, the Jacobys, and each of them,

20 took specific action to interfere with the 2017 Settled-in-Principle Agreement and Koren's

21 prospective economic advantage, in order to further each of their own special interests.

22 177. As a direct and proximate result of the Jacobys' conduct, Koren has sustained and

23 will continue to sustain substantial non-economic and economic injury in an amount to be proven

24 at trial.

25 178. Koren further alleges that in doing the things described above, the Jacobys, and

26 each of them, acted with the intent to deprive Koren of his legal rights and to injure him such that

27 the Jacobys' actions constitute fraud, oppression, or malice within the meaning of Civil Code §

28 3294. The Jacobys' conduct was and continues to be despicable, oppressive, and outrageous,

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1 justifying the imposition of punitive and exemplary damages against the Jacobys, and each of

2 them, to make an example of the Jacobys and to deter such conduct in the future in an amount that

3 proof at trial may indicate is appropriate.

4      As to the Hernandez Group

5      179.    As alleged above, in or about 2012, the parties entered into the PCJV Governing

6 Documents in which Koren had the expectation to obtain future financial benefits.

7      180.    The Hernandez Group, and each of them, had knowledge of the PCJV Governing

8 Documents (and Koren's prospective economic advantage) including, specifically, its consent and

9 right of first refusal provisions.  Despite that knowledge, the Hernandez Group, and each of them,

10 had the intent to and did interfere with the PCJV Governing Documents and Koren's prospective

11 economic advantage.

12      181.    By engaging in the conduct described above, including but not limited to the

13 purported transaction in 2017 whereby members of the Hernandez Group came to acquire 55% of

14 Cinco's interests, the Hernandez Group, and each of them, took specific action to interfere with the

15 PCJV Governing Documents and Koren's prospective economic advantage, in order to further each

16 of their own special interests.

17      182.    As a direct and proximate result of the Hernandez Group's conduct, Koren has

18 sustained and will continue to sustain substantial non-economic and economic injury in an amount

19 to be proven at trial.

20      183.    Koren further alleges that in doing the things described above, the Hernandez

21 Group, and each of them, acted with the intent to deprive Koren of his legal rights and to injure

22 him such that the Hernandez Group's actions constitute fraud, oppression, or malice within the

23 meaning of Civil Code § 3294.  The Hernandez Group's conduct was and continues to be

24 despicable, oppressive, and outrageous, justifying the imposition of punitive and exemplary

25 damages against the Hernandez Group, and each of them, to make an example of the Hernandez

26 Group and to deter such conduct in the future in an amount that proof at trial may indicate is

27 appropriate.

28 / / /

**SIXTH CAUSE OF ACTION**

**(NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS)**

**By Koren Against the Jacobys and the Hernandez Group**

184.    Koren re-alleges and incorporates herein by this reference all previous allegations as though set forth herein in full.

As to the Jacobys

185.    As alleged above, in or about November 2017, the parties entered into the November 2017 Settled-in-Principle Agreement in which Koren had the expectation to obtain future financial benefits.

186.    The Jacobys, and each of them, had knowledge of the 2017 Settled-in-Principle Agreement and Koren's prospective economic advantage.  Despite that knowledge, the Jacobys, and each of them, had the intent to interfere, and to the extent they did not have specific intent, they negligently interfered with the 2017 Settled-in-Principle Agreement and Koren's prospective economic advantage.

187.    By engaging in the conduct described above, including but not limited to the transmission of their March 8, 2018 and March 16, 2018 emails, the Jacobys, and each of them, took specific action to negligently interfere with the 2017 Settled-in-Principle Agreement and Koren's prospective economic advantage, in order to further each of their own special interests.

188.    As a direct and proximate result of the Jacobys' conduct, Koren has sustained and will continue to sustain substantial non-economic and economic injury in an amount to be proven at trial.

189.    Koren further alleges that in doing the things described above, the Jacobys, and each of them, acted with the intent to deprive Koren of his legal rights and to injure him such that the Jacobys' actions constitute fraud, oppression, or malice within the meaning of Civil Code § 3294.  The Jacobys' conduct was and continues to be despicable, oppressive, and outrageous, justifying the imposition of punitive and exemplary damages against the Jacobys, and each of them, to make an example of the Jacobys and to deter such conduct in the future in an amount that proof at trial may indicate is appropriate.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1      As to the Hernandez Group

2      190.  As alleged above, in or about 2012, the parties entered into the PCJV Governing

3 Documents in which Koren had the expectation to obtain future financial benefits.

4      191.  The Hernandez Group, and each of them, had knowledge of the PCJV Governing

5 Documents (and Koren's prospective economic advantage) including, specifically, its consent and

6 right of first refusal provisions.  Despite that knowledge, the Hernandez Group, and each of them,

7 had the intent to interfere, and to the extent they did not have specific intent, they negligently

8 interfered with the PCJV Governing Documents and Koren's prospective economic advantage.

9      192.  By engaging in the conduct described above, including but not limited to the

10 purported transaction in 2017 whereby members of the Hernandez Group came to acquire 55% of

11 Cinco's interests, the Hernandez Group, and each of them, took specific action to negligently

12 interfere with the PCJV Governing Documents and Koren's prospective economic advantage, in

13 order to further each of their own special interests.

14      193.  As a direct and proximate result of the Hernandez Group's conduct, Koren has

15 sustained and will continue to sustain substantial non-economic and economic injury in an amount

16 to be proven at trial.

17      194.  Koren further alleges that in doing the things described above, the Hernandez

18 Group, and each of them, acted with the intent to deprive Koren of his legal rights and to injure

19 him such that the Hernandez Group's actions constitute fraud, oppression, or malice within the

20 meaning of Civil Code § 3294.  The Hernandez Group's conduct was and continues to be

21 despicable, oppressive, and outrageous, justifying the imposition of punitive and exemplary

22 damages against the Hernandez Group, and each of them, to make an example of the Hernandez

23 Group and to deter such conduct in the future in an amount that proof at trial may indicate is

24 appropriate.

25 / / /

26 / / /

27 / / /

28 / / /

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**SEVENTH CAUSE OF ACTION**

**(BREACH OF THE PARTNERSHIP AGREEMENT)**

**By Koren Against Jacoby**

195.    Koren re-alleges and incorporates herein by this reference all previous allegations as though set forth herein in full.

196.    As alleged above, Koren and Jacoby are parties to the written Partnership Agreement (Exhibit "E"), which agreement governs the LA Group.  According to the Partnership Agreement:

    a)  "The Partnership shall appoint its Manager designees to PCJV USA, LLC by Majority Approval (as defined below)."  Partnership Agreement, ¶ 12.

    b)  "Partnership decisions and the actions of the Partners shall be determined and approved by the vote or written consent of Partners holding a majority in percentage interest of the Partnership ("Majority Approval").  Individual Partners may not bind the Partnership without obtaining the Majority Approval of the Partners.  Any obligation incurred in violation of this provision may be charged to and collected from the Partner who incurred the obligation."  Partnership Agreement, ¶ 13.

    c)  "Guy Koren has been initially granted the title of "Managing Partner" on behalf of the Partnership …"  Partnership Agreement, ¶ 13.

    d)  "Although no salaries are contemplated with respect to a Partner's services as a Manager of PCJV USA, LLC, the Partners providing services on behalf of the Partnership in fulfillment of the Partnership's obligations under the Master Services Agreement shall be entitled to such compensation as may be approved by the Partners by Majority Approval."  Partnership Agreement, ¶ 15.

    e)  Koren holds a 61.3 partnership percentage interest and Jacoby holds a 38.7 partnership percentage interest.  Partnership Agreement at Exhibit A, Amended and Updated March 22, 2013.

197.    As of on or about February-March 2018 through the present, Jacoby has breached the above provisions of the Partnership Agreement.  Specifically, Jacoby has refused and continues to refuse to acknowledge Koren's authority under the Partnership Agreement's terms to do exactly

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  the things he's contractually entitled and justified to do, such as to name managers to the board of

2  managers of PCJV and to make compensation decisions.  Jacoby has also refused to acknowledge

3  Koren's and Jacoby's relative ownership percentage interests in the LA Group.  Additionally, in a

4  clear effort at undermining Koren's authority in breach of the Partnership Agreement, Jacoby

5  engaged in the Unauthorized Jacoby Withdrawals.

6      198.    Koren has performed all conditions, covenants, and promises required by him on his

7  part to be performed in accordance with the terms and conditions of the Partnership Agreement

8  except those obligations that Koren was prevented or excused from performing.

9      199.    Koren has suffered monetary and non-monetary damages legally caused by Jacoby's

10  breaches of the Partnership Agreement in the nature and amount to be proven at trial, but that well

11  exceeds the jurisdictional minimum of this Court.  Additionally, Koren has had to expend a

12  substantial amount of legal fees as a result of the unsettled state of affairs created by Jacoby due to

13  his breaches.

14      200.    In addition to damages, Koren respectfully requests that the Court exercise its

15  powers in equity to issue appropriate order(s) governing the parties' rights, interests, duties, and

16  obligations, including but not limited to necessary injunctive relief.

17      201.    Paragraph 25 of the Partnership Agreement provides: "As between the parties to this

18  Agreement, the prevailing party in any dispute arising from or relating to this Agreement shall be

19  awarded costs and attorney fees whether or not the matter is resolved by trial or appeal."  Pursuant

20  to this contractual provision, Koren is also entitled to the recovery of his costs and attorney fees

21  incurred in this action.

22                          **EIGHTH CAUSE OF ACTION**

23                  **(BREACH OF THE JACOBY-KOREN AGREEMENT)**

24                          **By Koren Against Jacoby**

25      202.    Koren re-alleges and incorporates herein by this reference all previous allegations as

26  though set forth herein in full.

27      203.    As alleged above, Koren and Jacoby entered into the Jacoby-Koren Agreement,

28  which was partly oral, partly written, and partly implied-in-fact.

4232336.1

66

1    204.    Jacoby breached the Jacoby-Koren Agreement in refusing to acknowledge his

2    capital contribution obligations and instead insisting that Koren treat such payments as loans and

3    in other respects refusing to fund those agreed-to capital contributions in the first place.

4    205.    Koren has performed all conditions, covenants, and promises required by him on his

5    part to be performed in accordance with the terms and conditions of the Jacoby-Koren Agreement

6    except those obligations that Koren was prevented or excused from performing.

7    206.    Koren has suffered monetary and non-monetary damages legally caused by

8    Jacoby's breaches of the Jacoby-Koren Agreement in the nature and amount to be proven at trial,

9    but that well exceeds the jurisdictional minimum of this Court.

10    **NINTH CAUSE OF ACTION**

11    **(CONVERSION)**

12    **By Koren Against Jacoby**

13    207.    Koren re-alleges and incorporates herein by this reference all previous allegations as

14    though set forth herein in full.

15    208.    As alleged above, Jacoby engaged in the Unauthorized Jacoby Withdrawals, and

16    converted exactly $55,100.00 for his own use.

17    209.    Although Koren did not have legal title to the funds Jacoby converted, the law

18    allows a person without legal title to property to recover from the converter if that person is

19    responsible to the true owner.  As managing member and officer of the LA Group and J&K

20    Consultants Group LLC, Koren is responsible to the true owners of the funds (the entities) to

21    recover those funds.

22    210.    While Koren has repeatedly demanded the return of the subject funds, Jacoby has

23    failed and refused, and continues to fail and refuse, to return the funds.  Upon information and

24    belief, Jacoby has utilized the funds for his own purposes such that an imposition of a constructive

25    trust on the interests of Jacoby and ROES 401-450, inclusive, including any business interests,

26    profits, investments, real estate, and other assets, is necessary and appropriate.

27    211.    In addition, Koren has incurred time and money in pursuit of the converted funds,

28    which further damages Koren is entitled to recover against Jacoby and ROES 401-450, inclusive.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

4232336.1

67

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

212.    Koren further alleges that in doing the things described above, Jacoby acted with the intent to deprive Koren of his legal rights and to injure him such that Jacoby's actions constitute fraud, oppression, or malice within the meaning of Civil Code § 3294.  Jacoby's conduct was and continues to be despicable, oppressive, and outrageous, justifying the imposition of punitive and exemplary damages against Jacoby to make an example of Jacoby and to deter such conduct in the future in an amount that proof at trial may indicate is appropriate.

## TENTH CAUSE OF ACTION

### (BREACH OF FIDUCIARY DUTY)

### By Koren Against the Jacobys, Cinco Group, and Olivas

213.    Koren re-alleges and incorporates herein by this reference all previous allegations as though set forth herein in full.

214.    The allegations above establish that many of the parties are fiduciaries to one another by virtue of their close business ties and relationships as alleged above.  Koren specifically alleges that each of the Jacobys, the Cinco Group, and Olivas (collectively, the "Fiduciaries") owed him fiduciary duties, including the duty of undivided loyalty and the duty to act with the utmost good faith in Koren's best interests.

215.    In engaging in the actions set forth above, including but not limited to, the Fiduciaries' conduct in: (i) removing Koren from PCJV, (ii) interfering with Koren's management and operations of PCJV, PCI Trading, the LA Group, and other entities, (iii) casting doubt upon Koren's authority and role in PCJV, (iv) depriving Koren access to PCJV's bank accounts, offices, and email addresses, (v) taking and converting funds by Jacoby, (vi) taking strategic advantage of ambiguities in the PCJV Governing Documents to deprive Koren of his rights under those documents, (vii) manufacturing false artifices to avoid the trigger of the right of first refusal, (viii) engaging in and/or refusing to object to the Cinco Group-Hernandez Group transactions in 2017, (ix) assisting the Hernandez Group with their takeover of PCJV, (x) providing the Hernandez Group confidential information and rights to manage and vote regarding PCJV's affairs, among many other things, the Fiduciaries, and each of them, breached their respective fiduciary duties to Koren, unlawfully putting their own interests ahead of Koren's interests.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1   216.   Koren has suffered monetary and non-monetary damages legally caused by the

2   Fiduciaries' breaches of their fiduciary duties in the nature and amount to be proven at trial, but

3   that well exceeds the jurisdictional minimum of this Court.  Additionally, Koren has had to expend

4   a substantial amount of legal fees as a result of the unsettled state of affairs created by the

5   Fiduciaries due to their breaches.

6   217.   In addition to damages, Koren respectfully requests that the Court exercise its

7   powers in equity to issue appropriate order(s) governing the parties' rights, interests, duties, and

8   obligations, including but not limited to necessary injunctive relief.

9   218.   Koren further alleges that in doing the things described above, the Fiduciaries, and

10  each of them acted with the intent to deprive Koren of his legal rights and to injure him such that

11  the Fiduciaries' actions constitute fraud, oppression, or malice within the meaning of Civil Code §

12  3294.  The Fiduciaries' conduct was and continues to be despicable, oppressive, and outrageous,

13  justifying the imposition of punitive and exemplary damages against the Fiduciaries to make an

14  example of the Fiduciaries and to deter such conduct in the future in an amount that proof at trial

15  may indicate is appropriate.

16  ## ELEVENTH CAUSE OF ACTION

17  ### (BREACH OF THE PCJV GOVERNING DOCUMENTS)

18  **By Koren Against the Cinco Group, Hernandez Group, and PC International**

19  219.   Koren re-alleges and incorporates herein by this reference all previous allegations as

20  though set forth herein in full.

21  220.   As alleged above, the parties entered into the PCJV Governing Documents (Exhibits

22  "B", "C", and "D"), all of which are governed under California law.  Koren alleges that the PCJV

23  Governing Documents were executed by individuals in their individual capacity in addition to,

24  where needed, in their corporate capacity.  Koren further alleges that with the exception of

25  obtaining an economic interest in PCJV for tax avoidance and planning purposes, PC International

26  did not obtain any other rights in PCJV, including the right to vote or participate in PCJV's

27  management and that, regardless, PC International is the Cinco Group's alter ego and its corporate

28  veil must be pierced.

1     221.    Koren alleges that in engaging in the purported transactions in 2017 to acquire a

2   55% ownership interest in Cinco and/or in purporting to take control of and manage PCJV's affairs,

3   the Hernandez Group voluntarily accepted benefits arising under the PCJV Governing Documents

4   and, by law, must also bear its burdens according to Civil Code §§ 1589, 3521 and related

5   decisional authorities.

6     222.    As alleged above, the PCJV Governing Documents contain, among other things,

7   restriction on transfer, consent provisions, and right of first refusal provisions.  Koren alleges that

8   the Cinco Group, Hernandez Group, and PC International breached those provisions in 2017 when

9   they caused 55% of Cinco's shares to be transferred to members of the Hernandez Group without

10   Koren's consent and without offering him a right of first refusal.

11     223.    On or about April 9, 2018, the Cinco Group, Hernandez Group, and PC

12   International further breached the PCJV Governing Documents when they purportedly vote to

13   remove Koren as a manager and officer without the required votes.

14     224.    On or about April 23, 2018, the Cinco Group, Hernandez Group, and PC

15   International further breached the PCJV Governing Documents by again purportedly voting to

16   remove Koren as an officer without the required votes.

17     225.    Further, as of on or about 2017 and continuing to the present, Koren alleges that in

18   taking action to provide the Hernandez Group confidential information concerning PCJV along

19   with assigning members of the Hernandez Group to PCJV's board of managers and otherwise

20   allowing and/or honoring votes by the Hernandez Group involving PCJV's affairs, the Cinco

21   Group, Hernandez Group, and PC International breached Paragraph 8.1 of the LLC Agreement.

22     226.    Koren has performed all conditions, covenants, and promises required by him on his

23   part to be performed in accordance with the terms and conditions of the PCJV Governing

24   Documents except those obligations that Koren was prevented or excused from performing.

25     227.    Koren requests rescission of the Cinco Group-Hernandez Group transactions and/or

26   for the Court to order the specific performance of the right of first refusal provisions contained in

27   the PCJV Governing Documents, such that the 55% of shares of Cinco purchased by the Hernandez

28   Group be equitably transferred to Koren.  In the alternative, Koren respectfully requests that the

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1   Court exercise its powers in equity to issue appropriate order(s) governing the parties' rights,

2   interests, duties, and obligations, including but not limited to necessary injunctive relief in

3   connection with any order involving the specific performance of any act required under the PCJV

4   Governing Documents to make Koren whole.  Specific performance in this respect is required as

5   money damages are inadequate for the breach of the restriction on transfer and right of first refusal

6   provisions.

7          228.    Additionally, Koren has suffered monetary and other non-monetary damages legally

8   caused by the Cinco Group, Hernandez Group, and PC International's breaches of the PCJV

9   Governing Documents in the nature and amount to be proven at trial, but that well exceeds the

10  jurisdictional minimum of this Court.

## TWELFTH CAUSE OF ACTION

## (BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

## UNDERLYING THE PCJV GOVERNING DOCUMENTS)

### By Koren Against the Cinco Group, Hernandez Group, and PC International

15         229.    Koren re-alleges and incorporates herein by this reference all previous allegations as

16  though set forth herein in full.

17         230.    As alleged above, the parties entered into the PCJV Governing Documents (Exhibits

18  "B", "C", and "D"), all of which are governed under California law.  Koren alleges that the PCJV

19  Governing Documents were executed by individuals in their individual capacity in addition to,

20  where needed, in their corporate capacity.  Koren further alleges that with the exception of

21  obtaining an economic interest in PCJV for tax avoidance and planning purposes, PC International

22  did not obtain any other rights in PCJV, including the right to vote or participate in PCJV's

23  management and that, regardless, PC International is the Cinco Group's alter ego and its corporate

24  veil must be pierced.

25         231.    Koren alleges that in engaging in the purported transactions in 2017 to acquire a

26  55% ownership interest in Cinco and/or in purporting to take control of and manage PCJV's affairs,

27  the Hernandez Group voluntarily accepted benefits arising under the PCJV Governing Documents

28

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  and, by law, must also bear its burdens according to Civil Code §§ 1589, 3521 and related

2  decisional authorities.

3       232.    Koren alleges that there is and has always been an implied covenant of good faith

4  and fair dealing underlying the PCJV Governing Documents.

5       233.    As alleged above, the PCJV Governing Documents contain, among other things,

6  restriction on transfer, consent provisions, and right of first refusal provisions.  Koren alleges that

7  the Cinco Group, Hernandez Group, and PC International breached the implied covenant of good

8  faith and fair dealing underlying those provisions in 2017 when they caused 55% of Cinco's shares

9  to be transferred to members of the Hernandez Group without Koren's consent and without offering

10  him a right of first refusal.

11       234.    On or about April 9, 2018, the Cinco Group, Hernandez Group, and PC

12  International further breached the implied covenant of good faith and fair dealing underlying the

13  PCJV Governing Documents when they purportedly vote to remove Koren as a manager and

14  officer without the required votes.

15       235.    On or about April 23, 2018, the Cinco Group, Hernandez Group, and PC

16  International further breached the implied covenant of good faith and fair dealing underlying the

17  PCJV Governing Documents by again purportedly voting to remove Koren as an officer without

18  the required votes.

19       236.    Further, as of on or about 2017 and continuing to the present, Koren alleges that in

20  taking action to provide the Hernandez Group confidential information concerning PCJV along

21  with assigning members of the Hernandez Group to PCJV's board of managers and otherwise

22  allowing and/or honoring votes by the Hernandez Group involving PCJV's affairs, the Cinco

23  Group, Hernandez Group, and PC International breached the implied covenant of good faith and

24  fair dealing underlying the PCJV Governing Documents including, specifically, Paragraph 8.1 of

25  the LLC Agreement.

26       237.    Koren has performed all conditions, covenants, and promises required by him on his

27  part to be performed in accordance with the terms and conditions of the PCJV Governing

28  Documents except those obligations that Koren was prevented or excused from performing.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

4232336.1

72

238.    Koren requests rescission of the Cinco Group-Hernandez Group transactions and/or for the Court to order the specific performance of the right of first refusal provisions contained in the PCJV Governing Documents, such that the 55% of shares of Cinco purchased by the Hernandez Group be equitably transferred to Koren.  In the alternative, Koren respectfully requests that the Court exercise its powers in equity to issue appropriate order(s) governing the parties' rights, interests, duties, and obligations, including but not limited to necessary injunctive relief in connection with any order involving the specific performance of any act required under the PCJV Governing Documents to make Koren whole.  Specific performance in this respect is required as money damages are inadequate for the breach of the restriction on transfer and right of first refusal provisions.

239.    Additionally, Koren has suffered monetary and other non-monetary damages legally caused by the Cinco Group, Hernandez Group, and PC International's breaches of the implied covenant of good faith and fair dealing underlying the PCJV Governing Documents in the nature and amount to be proven at trial, but that well exceeds the jurisdictional minimum of this Court.

## THIRTEENTH CAUSE OF ACTION

### (INDUCING BREACH OF CONTRACT)

### By Koren Against the Hernandez Group

240.    Koren re-alleges and incorporates herein by this reference all previous allegations as though set forth herein in full.

241.    As alleged above, Koren enjoyed the benefits of particular contractual relations which were governed primarily by the PCJV Governing Documents.

242.    Koren alleges that the Hernandez Group had knowledge of the PCJV Governing Documents and intended to induce the parties to those contracts (in particular, the Cinco Group and PC International) to breach the contracts.  Despite that knowledge, Koren alleges that the Hernandez Group took specific action to induce the breaches of these contracts, in order to further each of their own special interests.

243.    Koren has suffered monetary and other non-monetary damages legally caused by the Hernandez Group's inducing breaches of the PCJV Governing Documents in the nature and

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  amount to be proven at trial, but that well exceeds the jurisdictional minimum of this Court.

2  244.    Koren further alleges that in doing the things described above, the Hernandez

3  Group, and each of them, acted with the intent to deprive Koren of his legal rights and to injure

4  him such that the Hernandez Group's actions constitute fraud, oppression, or malice within the

5  meaning of Civil Code § 3294.  The Hernandez Group's conduct was and continues to be

6  despicable, oppressive, and outrageous, justifying the imposition of punitive and exemplary

7  damages against the Hernandez Group to make an example of the Hernandez Group and to deter

8  such conduct in the future in an amount that proof at trial may indicate is appropriate.

9  ## FOURTEENTH CAUSE OF ACTION

10  ## (INTENTIONAL MISREPRESENTATION)

11  ### By Koren Against the Cinco Group and Jacoby

12  245.    Koren re-alleges and incorporates herein by this reference all previous allegations as

13  though set forth herein in full.

14  As to the Cinco Group

15  246.    As alleged above, certain representations were made to Koren over time that induced

16  Koren to make various decisions.  Those representations include Magsaysay Statement Nos. 1-21

17  and Montelibano Statement No. 1 (collectively, the "False Representations").  Koren alleges that

18  the False Representations were made on behalf of and with the authority of the Cinco Group.

19  247.    The following False Representations induced Koren to believe that:

20      a.    He would come to succeed Magsaysay one day as Cinco's CEO (Magsaysay

21          Statement Nos. 1, 3, 7, 9, 10, 11, 12, 15, 16).

22      b.    The parties to the business relationship would remain as is (Magsaysay Statement

23          Nos. 2, 9, 14, 15, 16, 17, 18, and Montelibano Statement No. 1).

24      c.    The Cinco Group did not have any expectation of funding or opening Potato Corner

25          stores in the U.S. (Magsaysay Statement No. 4, 11, 12, 13, 19, 20).

26

27      d.    Koren's agreement to establish and help run PCJV would render a benefit to the

28          Cinco Group in return for which he would have full control, full support, and long-

4232336.1

74

GUY KOREN'S VERIFIED SECOND AMENDED CROSS-COMPLAINT

term protections in place (Magsaysay Statement Nos. 5, 6, 7, 8, 10, 11, 12, 13, 15, 16, 17, 18).

e. The Cinco Group would take action against Jacoby in connection with any unauthorized withdrawals of funds (Magsaysay Statement No. 21).

248. The above categories of representations made to Koren were false and the Cinco Group knew that the representations were false when they authorized Magsaysay and Montelibano to make them. If not made intentionally, the above representations were made recklessly and without regard for their truth. The actual truth was:

a. The Cinco Group had no intent to allow Koren to take over Cinco's global operations upon reasonable terms.

b. The Cinco Group had no intent to honor the "just us" nature of the agreement and had no qualms about allowing outsiders in.

c. The Cinco Group (according to allegations in this lawsuit) had an expectation for PCJV to open company stores.

d. The Cinco Group did not intend for Koren to have full control, full support, and long-term protections in place.

e. The Cinco Group had aligned themselves with Jacoby and had no intent to take any action against him.

249. In making the False Representations, the Cinco Group intended for Koren to rely on them. Indeed, Koren reasonably and justifiably relied on the False Representations. In reliance thereon, Koren changed his position including, but not limited to, dedicating his career to Potato Corner, providing third parties rights to open stores in exclusive territories that he had previously negotiated for himself, devoting his time and attention to a multitude of issues and concerns raised by the prospect of creating and running a franchisor company at the exclusion of exercising his rights under the NKM License Agreement, allowing the Cinco Group to take the majority equity

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  interest in PCJV and board control, returning PCJV's and PCI Trading's funds back to Wells Fargo,

2  etc.

3       250.    Koren was unaware of the falsity of these representations.  Had he known the truth,

4  he would not have agreed to, among other things, dedicate his substantial time, effort, and expense

5  to expand Potato Corner in the United States nor enter into the PCJV Governing Documents.

6       251.    As a direct and proximate result of the Cinco Group's conduct, Koren has suffered

7  monetary and other non-monetary damages legally caused by the Cinco Group's False

8  Representations in the nature and amount to be proven at trial, but that well exceeds the

9  jurisdictional minimum of this Court.  Koren is also entitled to equitable relief addressing the

10  Cinco Group's fraud, including the retroactive restoration of Koren's majority equity stake in

11  PCJV and majority control of the board.  Koren also requests that the Court exercise its powers in

12  equity to issue appropriate order(s) governing the parties' rights, interests, duties, and obligations,

13  including but not limited to necessary injunctive relief.

14       252.    Koren further alleges that in doing the things described above, the Cinco Group

15  acted with the intent to deprive Koren of his legal rights and to injure him such that the Cinco

16  Group's actions constitute fraud, oppression, or malice within the meaning of Civil Code § 3294.

17  The Cinco Group's conduct was and continues to be despicable, oppressive, and outrageous,

18  justifying the imposition of punitive and exemplary damages against the Cinco Group to make an

19  example of them and to deter such conduct in the future in an amount that proof at trial may

20  indicate is appropriate.

21       As to Jacoby

22       253.    As alleged above, Jacoby induced Koren to enter into the Jacoby-Koren Agreement

23  based on the representation that Jacoby would fund 100% of Koren's required capital

24  contributions in NKM and on any future Potato Corner related entities that they may together

25  open, in which future franchisee businesses Koren and Jacoby would each acquire an equal share

26  so long as Jacoby funds all of Koren's required capital contributions.

27       254.    In reliance on the foregoing representation, Koren provided Jacoby an equity stake

28  in NKM and the LA Group, and in every other subsequent business entity in which each of them

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

4232336.1

76

1  was involved, i.e., the J&K Entities.

2  255.    Koren alleges that Jacoby's representation was false and that it was made with the

3  intent to induce Koren to relinquish certain interests in his entities to Jacoby.  In fact, the truth was

4  that Jacoby did not intend to fund Koren's capital contributions or that he intended to do so only

5  under the right conditions, which were concealed from Koren.

6  256.    Indeed, Koren was unaware of the falsity of Jacoby's representation and reasonably

7  relied on it to his detriment.  Had Koren known the truth, he would not have transferred any equity

8  stake in any of the business to Jacoby.

9  257.    As a direct and proximate result of Jacoby's conduct, Koren has suffered monetary

10  and other non-monetary damages legally caused by Jacoby's false representation in the nature and

11  amount to be proven at trial, but that well exceeds the jurisdictional minimum of this Court.

12  Koren is also entitled to rescission of all documents and instruments that provide for the transfer

13  of any equity interest to Jacoby in any business which Koren is involved as well as the retroactive

14  restoration of Koren's respective equity stakes in said businesses.

15  258.    Koren further alleges that in doing the things described above, Jacoby acted with the

16  intent to deprive Koren of his legal rights and to injure him such that Jacoby's actions constitute

17  fraud, oppression, or malice within the meaning of Civil Code § 3294.  Jacoby's conduct was and

18  continues to be despicable, oppressive, and outrageous, justifying the imposition of punitive and

19  exemplary damages against Jacoby to make an example of him and to deter such conduct in the

20  future in an amount that proof at trial may indicate is appropriate.

21  ### FIFTEENTH CAUSE OF ACTION

22  ### (NEGLIGENT MISREPRESENTATION)

23  ### By Koren Against the Cinco Group and Jacoby

24  259.    Koren re-alleges and incorporates herein by this reference all previous allegations as

25  though set forth herein in full.

26  As to the Cinco Group

27  260.    As alleged above, certain representations were made to Koren over time that induced

28  Koren to make various decisions.  Those representations include Magsaysay Statement Nos. 1-21

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

4232336.1

77

and Montelibano Statement No. 1 (collectively, the "False Representations").  Koren alleges that the False Representations were made on behalf of and with the authority of the Cinco Group.

261.    The following False Representations induced Koren to believe that:

a.   He would come to succeed Magsaysay one day as Cinco's CEO (Magsaysay Statement Nos. 1, 3, 7, 9, 10, 11, 12, 15, 16).

b.   The parties to the business relationship would remain as is (Magsaysay Statement Nos. 2, 9, 14, 15, 16, 17, 18, and Montelibano Statement No. 1).

c.   The Cinco Group did not have any expectation of funding or opening Potato Corner stores in the U.S. (Magsaysay Statement No. 4, 11, 12, 13, 19, 20).

d.   Koren's agreement to establish and help run PCJV would render a benefit to the Cinco Group in return for which he would have full control, full support, and long-term protections in place (Magsaysay Statement Nos. 5, 6, 7, 8, 10, 11, 12, 13, 15, 16, 17, 18).

e.   The Cinco Group would take action against Jacoby in connection with any unauthorized withdrawals of funds (Magsaysay Statement No. 21).

262.    The above categories of representations made to Koren were false and the Cinco Group knew that the representations were false when they authorized Magsaysay and Montelibano to make them.  If not made intentionally, the above representations were made recklessly and without regard for their truth.  Alternatively, while the Cinco Group may have honestly believed that the False Representations were true, they had no reasonable grounds for believing that the False Representations were true when they made them.  The actual truth was:

a.   The Cinco Group had no intent to allow Koren to take over Cinco's global operations upon reasonable terms.

b.   The Cinco Group had no intent to honor the "just us" nature of the agreement and had no qualms about allowing outsiders in.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

c.  The Cinco Group (according to allegations in this lawsuit) had an expectation for PCJV to open company stores.

d.  The Cinco Group did not intend for Koren to have full control, full support, and long-term protections in place.

e.  The Cinco Group had aligned themselves with Jacoby and had no intent to take any action against him.

263.  In making the False Representations, the Cinco Group intended for Koren to rely on them.  Indeed, Koren reasonably and justifiably relied on the False Representations.  In reliance thereon, Koren changed his position including, but not limited to, dedicating his career to Potato Corner, providing third parties rights to open stores in exclusive territories that he had previously negotiated for himself, devoting his time and attention to a multitude of issues and concerns raised by the prospect of creating and running a franchisor company at the exclusion of exercising his rights under the NKM License Agreement, allowing the Cinco Group to take the majority equity interest in PCJV and board control, returning PCJV's and PCI Trading's funds back to Wells Fargo, etc.

264.  Koren was unaware of the falsity of these representations.  Had he known the truth, he would not have agreed to, among other things, dedicate his substantial time, effort, and expense to expand Potato Corner in the United States nor enter into the PCJV Governing Documents.

265.  As a direct and proximate result of the Cinco Group's conduct, Koren has suffered monetary and other non-monetary damages legally caused by the Cinco Group's False Representations in the nature and amount to be proven at trial, but that well exceeds the jurisdictional minimum of this Court.  Koren is also entitled to equitable relief addressing the Cinco Group's fraud, including the retroactive restoration of Koren's majority equity stake in PCJV and majority control of the board.  Koren also requests that the Court exercise its powers in equity to issue appropriate order(s) governing the parties' rights, interests, duties, and obligations, including but not limited to necessary injunctive relief.

/ / /

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1    266.    Koren further alleges that in doing the things described above, the Cinco Group

2    acted with the intent to deprive Koren of his legal rights and to injure him such that the Cinco

3    Group's actions constitute fraud, oppression, or malice within the meaning of Civil Code § 3294.

4    The Cinco Group's conduct was and continues to be despicable, oppressive, and outrageous,

5    justifying the imposition of punitive and exemplary damages against the Cinco Group to make an

6    example of them and to deter such conduct in the future in an amount that proof at trial may

7    indicate is appropriate.

8    As to Jacoby

9    267.    As alleged above, Jacoby induced Koren to enter into the Jacoby-Koren Agreement

10    based on the representation that Jacoby would fund 100% of Koren's required capital

11    contributions in NKM and on any future Potato Corner related entities that they may together

12    open, in which future franchisee businesses Koren and Jacoby would each acquire an equal share

13    so long as Jacoby funds all of Koren's required capital contributions.

14    268.    In reliance on the foregoing representation, Koren provided Jacoby an equity stake

15    in NKM and the LA Group, and in every other subsequent business entity in which each of them

16    was involved, i.e., the J&K Entities.

17    269.    Koren alleges that Jacoby's representation was false and that it was made with the

18    intent to induce Koren to relinquish certain interests in his entities to Jacoby.  In fact, the truth was

19    that Jacoby did not intend to fund Koren's capital contributions or that he intended to do so only

20    under the right conditions, which were concealed from Koren.  Alternatively, while Jacoby may

21    have honestly believed that his representation was true, he had no reasonable grounds for

22    believing that his representation was true when he made it.

23    270.    Indeed, Koren was unaware of the falsity of Jacoby's representation and reasonably

24    relied on it to his detriment.  Had Koren known the truth, he would not have transferred any equity

25    stake in any of the business to Jacoby.

26    271.    As a direct and proximate result of Jacoby's conduct, Koren has suffered monetary

27    and other non-monetary damages legally caused by Jacoby's false representation in the nature and

28    amount to be proven at trial, but that well exceeds the jurisdictional minimum of this Court.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

4232336.1

80

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1 Koren is also entitled to rescission of all documents and instruments that provide for the transfer

2 of any equity interest to Jacoby in any business which Koren is involved as well as the retroactive

3 restoration of Koren's respective equity stakes in said businesses.

4      272.    Koren further alleges that in doing the things described above, Jacoby acted with the

5 intent to deprive Koren of his legal rights and to injure him such that Jacoby's actions constitute

6 fraud, oppression, or malice within the meaning of Civil Code § 3294. Jacoby's conduct was and

7 continues to be despicable, oppressive, and outrageous, justifying the imposition of punitive and

8 exemplary damages against Jacoby to make an example of him and to deter such conduct in the

9 future in an amount that proof at trial may indicate is appropriate.

10 <div align="center">**SIXTEENTH CAUSE OF ACTION**</div>

11 <div align="center">**(FALSE PROMISE)**</div>

12 <div align="center">**By Koren Against the Cinco Group**</div>

13      273.    Koren re-alleges and incorporates herein by this reference all previous allegations as

14 though set forth herein in full.

15     <u>As to the Cinco Group</u>

16      274.    As alleged above, certain promises were made to Koren over time that induced

17 Koren to make various decisions. Those promises include Magsaysay Statement Nos. 1-21 and

18 Montelibano Statement No. 1 (collectively, the "False Promises"). Koren alleges that the False

19 Promises were made on behalf of and with the authority of the Cinco Group.

20      275.    The following False Promises induced Koren to believe that:

21        a.    He would come to succeed Magsaysay one day as Cinco's CEO (Magsaysay

22           Statement Nos. 1, 3, 7, 9, 10, 11, 12, 15, 16).

23        b.    The parties to the business relationship would remain as is (Magsaysay Statement

24           Nos. 2, 9, 14, 15, 16, 17, 18, and Montelibano Statement No. 1).

25        c.    The Cinco Group did not have any expectation of funding or opening Potato Corner

26           stores in the U.S. (Magsaysay Statement No. 4, 11, 12, 13, 19, 20).

27

28

1         d.  Koren's agreement to establish and help run PCJV would render a benefit to the

2             Cinco Group in return for which he would have full control, full support, and long-

3             term protections in place (Magsaysay Statement Nos. 5, 6, 7, 8, 10, 11, 12, 13, 15,

4             16, 17, 18).

5         e.  The Cinco Group would take action against Jacoby in connection with any

6             unauthorized withdrawals of funds (Magsaysay Statement No. 21).

7

8      276.   The Cinco Group did not intend to perform any of the False Promises.  The actual truth was:

9

10         a.  The Cinco Group had no intent to allow Koren to take over Cinco's global

11             operations upon reasonable terms.

12         b.  The Cinco Group had no intent to honor the "just us" nature of the agreement and

13             had no qualms about allowing outsiders in.

14         c.  The Cinco Group (according to allegations in this lawsuit) had an expectation for

15             PCJV to open company stores.

16         d.  The Cinco Group did not intend for Koren to have full control, full support, and

17             long-term protections in place.

18         e.  The Cinco Group had aligned themselves with Jacoby and had no intent to take any

19             action against him.

20

21      277.   In making the False Promises, the Cinco Group intended for Koren to rely on them.

22  Indeed, Koren reasonably and justifiably relied on the False Promises.  In reliance thereon, Koren

23  changed his position including, but not limited to, dedicating his career to Potato Corner, providing

24  third parties rights to open stores in exclusive territories that he had previously negotiated for

25  himself, devoting his time and attention to a multitude of issues and concerns raised by the prospect

26  of creating and running a franchisor company at the exclusion of exercising his rights under the

27  NKM License Agreement, allowing the Cinco Group to take the majority equity interest in PCJV

28  and board control, returning PCJV's and PCI Trading's funds back to Wells Fargo, etc.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1    278.    Koren was unaware of the falsity of these promises.  Had he known the truth, he

2  would not have agreed to, among other things, dedicate his substantial time, effort, and expense to

3  expand Potato Corner in the United States nor enter into the PCJV Governing Documents.

4    279.    As a direct and proximate result of the Cinco Group's conduct, Koren has suffered

5  monetary and other non-monetary damages legally caused by the Cinco Group's False Promises in

6  the nature and amount to be proven at trial, but that well exceeds the jurisdictional minimum of

7  this Court.  Koren is also entitled to equitable relief addressing the Cinco Group's fraud, including

8  the retroactive restoration of Koren's majority equity stake in PCJV and majority control of the

9  board.  Koren also requests that the Court exercise its powers in equity to issue appropriate

10  order(s) governing the parties' rights, interests, duties, and obligations, including but not limited to

11  necessary injunctive relief.

12    280.    Koren further alleges that in doing the things described above, the Cinco Group

13  acted with the intent to deprive Koren of his legal rights and to injure him such that the Cinco

14  Group's actions constitute fraud, oppression, or malice within the meaning of Civil Code § 3294.

15  The Cinco Group's conduct was and continues to be despicable, oppressive, and outrageous,

16  justifying the imposition of punitive and exemplary damages against the Cinco Group to make an

17  example of them and to deter such conduct in the future in an amount that proof at trial may

18  indicate is appropriate.

19    As to Jacoby

20    281.    As alleged above, Jacoby induced Koren to enter into the Jacoby-Koren Agreement

21  based on the promise that Jacoby would fund 100% of Koren's required capital contributions in

22  NKM and on any future Potato Corner related entities that they may together open, in which future

23  franchisee businesses Koren and Jacoby would each acquire an equal share so long as Jacoby

24  funds all of Koren's required capital contributions.

25    282.    In reliance on the foregoing promise, Koren provided Jacoby an equity stake in

26  NKM and the LA Group, and in every other subsequent business entity in which each of them was

27  involved, i.e., the J&K Entities.

28  / / /

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

283.    Koren alleges that Jacoby did not intend to perform his promise.  In fact, the truth was that Jacoby did not intend to fund Koren's capital contributions or that he intended to do so only under the right conditions, which were concealed from Koren.

284.    Indeed, Koren was unaware of the falsity of Jacoby's promise and reasonably relied on it to his detriment.  Had Koren known the truth, he would not have transferred any equity stake in any of the business to Jacoby.

285.    As a direct and proximate result of Jacoby's conduct, Koren has suffered monetary and other non-monetary damages legally caused by Jacoby's false representation in the nature and amount to be proven at trial, but that well exceeds the jurisdictional minimum of this Court. Koren is also entitled to rescission of all documents and instruments that provide for the transfer of any equity interest to Jacoby in any business which Koren is involved as well as the retroactive restoration of Koren's respective equity stakes in said businesses.

286.    Koren further alleges that in doing the things described above, Jacoby acted with the intent to deprive Koren of his legal rights and to injure him such that Jacoby's actions constitute fraud, oppression, or malice within the meaning of Civil Code § 3294.  Jacoby's conduct was and continues to be despicable, oppressive, and outrageous, justifying the imposition of punitive and exemplary damages against Jacoby to make an example of him and to deter such conduct in the future in an amount that proof at trial may indicate is appropriate.

## SEVENTEENTH CAUSE OF ACTION

### (CONCEALMENT)

### By Koren Against the Jacobys, Cinco Group, and Olivas

287.    Koren re-alleges and incorporates herein by this reference all previous allegations as though set forth herein in full.

288.    Koren specifically alleged above and reiterates here that each of the Jacobys, the Cinco Group, and Olivas (the "Fiduciaries") owed him fiduciary duties, including the duty of undivided loyalty and the duty to act with the utmost good faith in Koren's best interests.

289.    Koren alleges that the Fiduciaries secretly worked together with the Hernandez Group to harm Koren while concealing their efforts from Koren.  For example:

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

a) the Cinco Group secretly entered into a series of purported agreements with the Hernandez Group to assign or transfer 55% of Cinco's interests to the Hernandez Group in breach of the rights afforded to Koren under the PCJV Governing Documents.

b) the Fiduciaries have secretly entered into an agreement to repudiate the terms of the PCJV Governing Documents in a manner to avoid the restriction on transfer and right of first refusal provisions contained in the PCJV Governing Documents. For instance, the Fiduciaries have agreed to exalt PC International's shell existence over substance at the exclusion of the Cinco Group in order to avoid the bar of transfer restriction articles contained in the PCJV Governing Documents.

c) the Fiduciaries secretly plotted to remove Koren from PCJV in March-April 2018 and to interfere with Koren's conduct as President.

290. Koren alleges that the Fiduciaries intentionally failed to disclose the above facts to Koren, which facts Koren could not have discovered on his own. Indeed, in engaging in this secret conduct, the Fiduciaries prevented Koren from discovering these facts.

291. Koren further alleges that had the omitted information been disclosed, Koren reasonably would have behaved differently.

292. As a direct and proximate result of the Fiduciaries' conduct, Koren has suffered monetary and other non-monetary damages legally caused by the Fiduciaries' fraud in the nature and amount to be proven at trial, but that well exceeds the jurisdictional minimum of this Court. Koren is also entitled to equitable relief addressing the Fiduciaries' fraud, including rescission of the Cinco Group-Hernandez Group transactions and/or for the Court to order the specific performance of the right of first refusal provisions contained in the PCJV Governing Documents, such that the 55% of shares of Cinco purchased by the Hernandez Group be equitably transferred to Koren. In the alternative, Koren respectfully requests that the Court exercise its powers in equity to issue appropriate order(s) governing the parties' rights, interests, duties, and obligations, including but not limited to necessary injunctive relief in connection with any order involving the specific performance of any act required under the PCJV Governing Documents to make Koren whole.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1    293.    Koren further alleges that in doing the things described above, the Fiduciaries acted

2    with the intent to deprive Koren of his legal rights and to injure him such that the Fiduciaries'

3    actions constitute fraud, oppression, or malice within the meaning of Civil Code § 3294.  The

4    Fiduciaries' conduct was and continues to be despicable, oppressive, and outrageous, justifying the

5    imposition of punitive and exemplary damages against the Fiduciaries to make an example of them

6    and to deter such conduct in the future in an amount that proof at trial may indicate is appropriate.

## EIGHTEENTH CAUSE OF ACTION

### (ACCOUNTING)

### By Koren Against the Cinco

10    294.    Koren re-alleges and incorporates herein by this reference all previous allegations as

11    though set forth herein in full.

12    295.    Koren alleges that Cinco has profited a million dollars or more since 2010 by

13    causing the sale of products and ingredients to PCJV and PCI Trading at prices well above their

14    cost.  This is in spite of the fact that the parties had a long-standing agreement to sell products and

15    ingredients at cost plus shipping.

16    296.    The amount of profits generated by this scheme by the Cinco is unknown and could

17    only be ascertained through an accounting.

18    297.    Additionally, Koren alleges that Cinco or one of its agents maintains a bank

19    account belonging to PCI Trading which Cinco has thus far refused to turn over to PCI Trading as

20    required.  Koren thus demands an accounting of all funds belonging to PCI Trading.

## NINETEENTH CAUSE OF ACTION

### (INDEMNITY)

### By Koren Against Olivas, the Jacobys, and the Hernandez Group

24    298.    Koren re-alleges and incorporates herein by this reference all previous allegations as

25    though set forth herein in full.

26    299.    Koren alleges that the disputes at the center of the controversy of this litigation arose

27    out of tortious conduct by Olivas, the Jacobys, and the Hernandez Group.  Regarding Olivas, a

28    majority of the disputes among the parties concern the drafting and ambiguities underlying the

4232336.1

86

1  PCJV Governing Documents, which Olivas was in charge of drafting and completing.  In light of

2  those ambiguities and questions concerning the drafting of these documents, Koren has now found

3  himself in litigation over the meaning and interpretation of these contract documents.

4      300.    Koren further alleges that the controversies in this litigation additional arose in

5  light of the Jacobys' and the Hernandez Group's tortious conduct, all of which is alleged above.

6  Moreover, Cinco and PC International have directly or indirectly asserted various claims against

7  Koren, but have neglected to name the Jacobys in their lawsuit.

8      301.    Koren alleges that in light of the foregoing, Olivas, the Jacobys, and the Hernandez

9  Group must indemnify Koren for all attorneys' fees, expenses, expert fees, and costs incurred by

10  him.  Koren further alleges that Olivas, the Jacobys, and the Hernandez Group are responsible and

11  liable for all losses that Koren has incurred and will incur in the future in connection with this

12  matter.

13      302.    Koren further alleges that, should Cinco or PC International prevail in this litigation,

14  any injuries or damages to Cinco or PC International were caused solely through the negligence and

15  carelessness and/or fault and/or tortious conduct of Olivas, the Jacobys, the Hernandez Group, and

16  each of their agents, and not due to any action on the part of Koren or his agents.  Therefore, if

17  Koren is held liable to Cinco or PC International, or any party affiliated and/or associated with

18  Cinco or PC International, said liability will be solely of a vicarious and ultimately secondary

19  nature predicated upon the facts set forth herein, and that by reason of the foregoing facts, Koren is

20  entitled to full and complete indemnification from Olivas, the Jacobys, and/or the Hernandez

21  Group.

22      **PRAYER FOR RELIEF**

23      WHEREFORE, Koren prays for judgment against Cross-Defendants, and each of them,

24  jointly and severally, as follows:

25      1.    For general, special, actual, compensatory, consequential, and/or nominal damages

26  in an amount to be proved at trial;

27      2.    For rescission;

28      3.    For specific performance;

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

4232336.1

4. For restitution;

5. For punitive and exemplary damages;

6. For a temporary restraining order, preliminary injunction, and permanent injunction;

7. For declaratory relief;

8. For constructive trusts;

9. For an award of attorneys' fees, costs and expenses;

10. For prejudgment and post-judgment interest as allowed by law; and

11. For such other and further relief that the Court deems just and proper.

DATED: July 22, 2019                    FREEMAN, FREEMAN & SMILEY, LLP

By: _____
TODD M. LANDER
ARASH BERAL
Attorneys for Defendants and Cross-Complainants
GUY KOREN, GK CAPITAL GROUP, LLC,
ALON KOREN, THOMAS HODGSON, and
EMILY GARCIA, and Cross-Complainant
ASHLEY GRUDNOWSKI

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

GUY KOREN'S VERIFIED SECOND AMENDED CROSS-COMPLAINT

1

**VERIFICATION**

2

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

3

I have read the foregoing **CROSS-COMPLAINANT GUY KOREN'S VERIFIED SECOND AMENDED CROSS-COMPLAINT** and know its contents.

4

5

I am a party to this action. The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

6

7

Executed on July 22, 2019, at Los Angeles, California.

8

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

9

10

11

__GUY KOREN__                                    Signature
Print Name of Signatory

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

4231607.1 26859-800

# EXHIBIT "A"

## Potato Corner
## Master License Agreement

Agreement made and executed at _Beverly Hills Los Angeles County_, this _28th_ day of _April_____, 2009, by and between: _California_

Potato Corner Global Company Limited, Hong Kong, a corporation duly organized and existing under and by virtue of Hong Kong laws, with principal office situated at unit 8 19/F Cheuk Nang 21st Century Plaza, 250 Hennessy Rd., Wanchai, Hong Kong, represented herein by its President, Jose P. Magsaysay, Jr., and hereinafter referred to as the "Licensor;"

- and –

_NKM Capital group LLC_, a corporation duly organized and existing under and by virtue of the laws of _California US____ with principal office at _1478 S.crest Dr, LA, CA 90035_, represented herein by its _CEO_____, _Guy Koren_____, and hereinafter referred to as the "Licensee".

Whereas:

WHEREAS, Licensor is the owner of trademark "Potato Corner and Device" and owns proprietary know-how relating to and has created, designed, and developed a chain of Potato Corner outlets specializing in the marketing, preparation, and sale of French Fries, potato varieties and other food products.

WHEREAS, the Licensor has developed and has exclusive rights and authority to use the trademark "Potato Corner and Device" and to the other service marks, trademarks, logos, and trade secrets (hereinafter referred to as "Trademarks") used in conjunction therewith.

WHEREAS, the Licensee desires to acquire from Licensor, and Licensor is willing to grant Licensee a master license to operate "Potato Corner" outlets (hereinafter called as "Outlets") and to use the Trademarks, upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, for and in consideration of the foregoing premises and the covenants and stipulations hereinafter stated, the Licensor hereby grants unto the Licensee, the license to establish and operate Outlets, sell "Potato Corner" food lines, use the Trademarks, under the following terms and conditions, to wit:

1   NOTARIAL CERTIFICATE ATTACHED 03/24/09

1. **Territory.** The license herein granted shall be exercised or availed of within the County of Los Angeles, USA (the "Territory"), subject to the terms and conditions of this Agreement.

2. **Term of License.** This Agreement shall commence only upon the execution of the following: a) signing of this Agreement by both parties and b) payment to the Licensor of US$ 15,000.00 by the Licensee US$ 5,000.00 upon the signing of this Agreement and US$ 10,000.00 thirty (30) days before the scheduled opening of the first outlet. Should Licensee fail to make the foregoing payments this Agreement shall commence on the fifth month from the date of the signing of this Agreement. This Agreement   shall expire upon the expiration of the term of the License granted herein the term of the License granted herein shall be for ten (10) years. For purposes of computing the ten (10) year period, it shall commence upon the date of the formal opening of the first outlet or 5 months from the date this Agreement was signed by the Licensee whichever comes first.  Licensor shall have the option to renew this Agreement for another term of ten (10) years, subject to such terms and conditions as prescribed in this and the new Agreement.

3. **Grant of Sub-Licensee.**  Licensee may be entitled to appoint Sub-Licensees to operate other Outlets under the Trademarks.  This right shall be granted to Licensee after the opening of the 5th  Outlet and based on its performance as Licensee for the first 6 months of this Agreement. However, upon mutual agreement by the parties herein contained in a subsequent written document, the Licensee may appoint Sub-Licensee even before the opening of the 5th Outlet based on its performance

    Licensee acknowledges and agrees that its appointment of a Sub-Licensee is entirely at Licensee's own risk and that Licensor will not be responsible in any way for the conduct or performance of any Sub-Licensee.

    The appointment of any Sub-Licensee shall not diminish or affect any of the Licensee's obligations owed to Licensor.

    All Sub-License fees that are non-hard asset in nature such as service fees and management fees,  and fees for use of property right and trademarks and the like paid by any Sub-Licensee shall be split 80/20. 80% going to the Licensee and 20% going to the Licensor. However, the monthly fee per Outlet of  the Sub-Licensees of US $200.00  or 5% (whichever is higher) of the Outlet sales, whichever is higher, shall be split 50/50 between the Licensor and Licensee.

    The Licensee shall, within ten (10) business days from execution of any Sub-License

NOTARIAL CERTIFICATE ATTACHED

Agreement, furnish the Licensor with a duly executed copy of said agreement, together with the fees mentioned in the next preceding paragraph.

In the event that a Sub-License Agreement with any Sub-Licensee is terminated for any reason, resulting in Licensee not being in compliance with its continuous operation, Licensee will use its best efforts to find a new Sub-Licensee as expeditiously as possible, without prejudice to the right of Licensor to terminate this Contract. The Sub-License Agreement shall contain the terms and conditions of this Agreement and shall not exceed the term hereof. Licensee shall see to it that its Sub-Licensees comply with the terms and conditions of the Sub-License Agreement.

4. **Location.** Licensee shall build and operate Outlets, including those of the Sub-Licensees, only in locations approved by the Licensor that will maintain an image and reputation of high quality and uniformity consistent with the image and reputation of the Trademarks as approved by the Licensor.

5. **Obligations of Licensor.** During this Agreement, Licensor shall:

Use reasonable and diligent efforts to register the Trademarks in the Territory. However, Licensee understands and acknowledges that there is no assurance that the Licensor will succeed in obtaining such registration.

Grant Licensee the license to use the Trademarks and sell products bearing the Trademarks in the Territory, subject to the terms and conditions of this Agreement.

Provide consultation and advice to Licensee in connection with the usage of the Trademarks and sale of products bearing the Trademarks in the Outlets.

Visit the Licensee's Outlets once a year for the purpose of audit and confirming royalty payments, at Licensor's expense

6. **Obligations of Licensee.** During this Agreement, the Licensee will:

Sell products with due regard for the suggested retail price for such products in the region.

Purchase all proprietary and non proprietary blends, flavorings, sauces, raw materials, paper, and packaging products only from Licensor or its accredited supplier, subject of an accreditation agreement, to ensure product quality

Purchase other consumable raw, uncooked, cooked semi-cooked, semi-finished

NOTARIAL CERTIFICATE ATTACHED          03/24/09

or finished materials from local suppliers that has been accredited  by the Licensor, subject of an accreditation agreement .

Buy equipment needed for the proper operation of the Outlets, with guidance from Licensor and in accordance with all applicable laws and regulations.

Procure all necessary insurance for the Outlets as provided for in this Agreement.

Secure all required licenses and permits necessary for the operation of the Outlets.

Keep appropriate records of all sales transactions as provided for in this Agreement and required by pertinent law and regulations.

Provide right wages and benefits to employees of the Outlets as mandated by pertinent laws and regulations.

Oversee the day to day operations of the Outlets and ensure clean, sanitary, attractive, and efficiently operated Outlets offering high quality food products and courteous and helpful service.

Develop marketing and branding plans for the Trademarks and Outlets in accordance with Licensor's guidelines for advertising its Trademarks.

Set up a minimum of six (6) Outlets in the Territory within the first two (2) years of the term of this Agreement.

Use the Tredemarks exclusively for the operation of the licensed Outlets.

Immediately notify the Licensor of any infringement of the Trademarks.

Refrain from utilizing the Trademarks or any part thereof or any similar names or marks as part of its own name (including domain name) or style.

Send monthly sales, individual and corporate (Licensor's company) financial reports, financial statements, income statements, product movements/mix reports not more than 30 days after the end of the month, submit a yearly marketing and business plan two months before the start of the years plans. Submit sub-licensee's reports similar to the ones the Licensee submits to the Licensor.

Refrain from representing itself as being Licensor or an agent or partner of

Licensor.

At the Licensee's expense send a representative from the Licensor, at least once a year, to do operational, marketing, training and financial check-ups and conduct business reviews with the Licensor. One visit every year starting July 2010 until the validity of this agreement.

7. **Annual Review and Audit.**

**Annual Review** – Once each calendar year, at a time designated by Licensor, Licensee's representative shall be obligated at Licensee's expense to meet with representatives of Licensor at Licensor's principal office, for the purpose of discussing and reviewing Licensee's use of the Trademarks. Licensee shall likewise conduct an annual review with respect to its Sub-Licensees. This may be done via teleconference.

**Licensor's Right to Audit** – Licensor shall have the right once a year, during business hours, to inspect and audit, or cause to be inspected and audited, the business records, bookkeeping and accounting records, sales and income tax records and returns, and other records of the Outlets for the purpose of confirming royalty payments. Licensee and its Sub-Licensees shall fully cooperate with representatives of Licensor and independent accountants hired by Licensor to conduct such inspection or audit.

8. **Records.** The Licensee and its Sub-Licensees shall make its records available to scrutiny and inspection by the Licensor's representatives during the latter's annual visit for the purpose of confirming royalty payments.

9. **Trademarks**

**Ownership and Goodwill** – Licensee and its Sub-Licensees acknowledge that their right to use the Trademarks and to sell products via the Outlets is derived solely from this Agreement and is limited to the conduct of business by Licensee and its Sub-Licensees pursuant to and in compliance with this Agreement and all applicable standards and specifications prescribed by Licensor from time to time during the term of this Agreement.

**Limitations on Use of the Trademarks** – Licensee and its Sub-Licensees agree to use the Trademarks as the sole identification of the Outlets, provided that they shall identify themselves as the independent owner thereof in the manner prescribed by Licensor. Licensee and its Sub-Licensees shall not use the

NOTARIAL CERTIFICATE ATTACHED

Trademarks as part of any corporate or trade name or with any prefix, suffix, or other modifying words, terms, designs, or symbols (other than logos licensed to Licensee hereunder), or in any modified form, nor may Licensee and its Sub-Licensees use any Trademarks in any manner not expressly authorized in writing by Licensor.  Licensee and its Sub-Licensees agree to prominently display products and other supplies and packaging materials. All Trademarks shall be displayed in the manner prescribed by Licensor.

**Modification/Discontinuance of Use of Trademarks** – Licensor shall not be obligated to compensate Licensee and its Sub-Licensees for any costs incurred in connection with such modification should it become advisable at any time, in Licensor's sole discretion, for Licensor to modify the use of any Trademark, and/or use one or more additional or substitute trade or service directions to modify the use of such Trademark within reasonable time after notice thereof by Licensor. The foregoing also applies to the discontinuance of the use of the Trademark in extraordinary cases in consultation with the Licensee.

**Preservation of Trademarks** – In order to preserve and protect the image and the goodwill associated with the Trademarks, Licensee and its Sub-Licensees shall refrain from any act or omission that impairs or threatens to impair the image, goodwill, or stature or reputation of the Trademarks or Licensor's business.

10. **Right of First Refusal.** Licensor shall give Licensee the first option to obtain exclusive licenses of the entire state of California; provided Licensee complies with the following:

Licensee has opened six (6) Outlets within the Territory during the first 2 years of the term of this Agreement and  Licensee pays the license fees for the 6th up to the 10th  Outlets during the first 2 years of the term of this Agreement . Licensee has established a good working relationship with Licensor.

Licensee has achieved an average daily sale per Outlet of at least US$ 350.00 over a period of one year for all opened Outlets.

The grant of an exclusive license for the entire state of California in favor of the Licensee shall be covered by a separate Agreement under terms and conditions to be mutually agreed by the parties herein.

11. **Fees.**  In consideration of the license and other rights granted hereunder, the Licensee shall pay to the Licensor a license fee of US$ 30,000 for ten (10) outlets to be opened within the first 2 years of this Agreement, which is US$ 3,000 per Outlet. Upon signing of

NOTARIAL CERTIFICATE ATTACHED

this Agreement, Licensee shall pay Licensor US$ 15,000 representing 50% of the license fee for ten (10) outlets.

**For the 6th up to the 10th Outlets to be opened within the first 2 years of this Agreement, Licensee shall pay the corresponding license fee thereto prior to the opening of said Outlets.**

Licensee shall pay Licensor a license fee of US$3,000 prior to the opening of each Outlet beyond the initial ten (10) outlets provided for in this Agreement.

Licensee shall also pay Licensor an on-going monthly fee per Outlet of US$200 or 5% of Outlet sales, whichever is higher. For Outlets of Sub-Licensees, the said fee shall be split 50-50. The foregoing fee shall be paid to the Licensor every 20th day of the succeeding month.

All withholding and other taxes levied by any authority on the payments by the Licensee to the Licensor under this Agreement shall be borne solely by the Licensee.

All payments made under this agreement shall be made by wire transfer using a bank or other financial institution specified by Licensor, except as expressly provided in this agreement, any and all fees and monies paid by Licensee to the Licensor shall not be withheld, set off, or deducted, and shall not be refunded to the Licensee under any circumstances whatsoever.

12. **Indemnity.** In the event that either party to this Agreement is required to employ legal counsel or to incur other expense to enforce any obligation of any party hereunder, or to defend against any claim, demand, action, or proceeding by reason of any of the parties' failure to perform any obligation imposed by this Agreement, and provided that legal action is filed and such action establishes a party's default hereunder; then the aggrieved party shall be entitled to recover in said action from the defaulting party the amount of all reasonable attorneys' fees of such counsel and all other expenses incurred in enforcing such obligation, or in defending against such claim, demand, action, or proceeding, whether incurred prior to, or in preparation for, or in contemplation of the filing of such action or thereafter.

13. **Right to Assign.** Licensee shall not assign any of its rights or obligations under this Agreement without the prior written consent of the Licensor. Any change in the shareholding or partnership or sole proprietorship or control of management of the Licensee shall be considered an assignment.

NOTARIAL CERTIFICATE ATTACHED

**14. Termination.** This agreement shall be terminated upon its expiry date and may be terminated at any time, with notice of at least thirty (30) days to the other party:

> By either party, if the other party hereto breaches any of the terms and conditions hereunder or fails to perform any of its obligations or covenants contained in this agreement and that breach or failure to perform is not remedied within thirty (30) days after written notice of such breach or failure to perform has been given to it; or

> By the Licensor, if the Licensee is dissolved, shall become bankrupt, insolvent, or go into liquidation, whether compulsorily or voluntarily, or enter into any arrangement or composition with its creditors, or has a receiver or similar officer appointed over any part of its assets or undertaking.

**15. Effects of Termination.** Upon termination of this Agreement for any reason whatsoever:

> The Licensee and Sub-Licensees shall immediately thereafter cease to use the Trademarks.

> Licensee and Sub-Licensees must return all items with proprietary trademarks to Licensor.

> The Licensor and/or Licensee shall accordingly notify in writing the Sub-Licensees of the termination of this Agreement, the terms and conditions of which form part of the Sub-Licensees' agreement with the Licensee.

**16. Restrictions.** On termination of this agreement, the Licensee shall not:

> At any time after the termination of this agreement reveal or use, for its own benefit or for the benefit of any third party, any trade secret or confidential information of Licensor or any other trade secret or confidential information acquired from the Licensor in connection with this agreement;

> For a period of one (1) year thereafter solicit, interfere with, or endeavor to entice away, employ, or contract for the provision of services of any employee or consultant of the Licensor or any employee of or person who has entered into a contract with the Licensor.

NOTARIAL CERTIFICATE ATTACHED

During the period of this agreement, the Licensee shall not be involved, directly or indirectly in any way, in any business which competes with, or is similar to, or in any way can be mistaken for or thought to be related to Licensor, the Trademarks, or Outlets.

Except for the rights expressly granted herein during the term of this agreement, the Licensee undertakes that it will not, as well as ensure that none of its officers, employees, or agents will, at any time, either during the term of this agreement or after termination of this agreement or the concerned employee's employment with the Licensee (as the case may be), use or register any of the Trademarks or the trade name or any trademark, tradename, logo, symbol, device, or other item whatsoever which is in any way similar to, competitive, or in conflict with any of the Trademarks or the trade names, or otherwise in any way resemble or attempt to pass off as any of the Trademarks or trade names for any purpose whatsoever.

17. **Option to Renew.**  Upon the expiry of the term of this Agreement, the Licensor may, upon written request of the Licensee made not less than six (6) months before the expiry date of this agreement, renew the agreement, covered by a new agreement under terms and conditions stated therein, for another ten (10) years, taking into consideration  the following :

> There is no breach of any of the terms of this agreement by the Licensee, either during the term of this Agreement or at its expiration;

> The Licensee has performed satisfactorily during the term of this Agreement; and

> Licensee has established at least fifty (50) Outlets within the term of this Agreement.

However, upon mutual agreement by the Licensor and Licensee, they may renegotiate the terms and conditions of this Agreement at the end of the 5th year of the term of this Agreement.

18. **Joint and Several Liability.** Should Licensee consist of more than one person, the liability of such persons to Licensor shall be joint and several.

19. **Illegality.**  If, for any reason, any provision herein is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation, such shall not impair the operation of or affect the remaining provisions of this Agreement, and the latter will continue to be given full force and effect and bind the parties hereto; and said invalid

NOTARIAL CERTIFICATE ATTACHED

provisions shall be deemed not part of this Agreement; Provided, however, that if Licensor determines that said finding of illegality adversely affects the basic consideration of this Agreement, Licensor may, at its option, terminate this Agreement.

20. **Force Majeure.** Whenever a period of time is provided in this Agreement for either party to do or perform any act or thing, except the payment of monies, neither party shall be liable or responsible for any delays due to strikes, lockouts, casualties, acts of God, war, governmental regulation or control, or other causes beyond the reasonable control of the parties, and in any event, said time period for the performance of an obligation hereunder shall be extended for the amount of time of the delay. This clause shall not apply or not result in an extension of the term of this Agreement.

**Waiver.** No failure of Licensor / Licensee to exercise any power reserved hereunder, or to insist upon strict compliance with any obligation or condition hereunder, and no custom or practice of the parties in variance with the terms hereof, shall constitute a waiver of their right to demand exact compliance with the terms of this Agreement.

21. **Confidentiality.** At all times and notwithstanding the termination of this agreement, all information relating to the Outlets and Trademarks, whether written or oral, supplied or made known directly or indirectly by the Licensor to the Licensee, shall be retained in strict confidence and shall not, except with the prior written approval of the Licensor and for purposes in accordance with this agreement, be used or divulged to any other person, firm, or company. Licensee will keep, and will ensure that its officers, employees, and agents keep, such information, techniques, and know-how strictly confidential at all times.

All product specifications and trademark usage issued by the Licensor shall throughout the period of this Agreement and thereafter remain the property of Licensor and may not be reproduced in any way by the Licensee or any of its officers, employees, or agents.

22. **Rules and Regulations.** The Licensee shall comply with the existing and subsequent rules and regulations of the Licensor in connection with its trademarks and products and such rules and regulations shall bind the Licensee upon and from the date on which notice in writing thereof is given to the Licensee by the Licensor, unless otherwise stated by the Licensor. Any breach by the Licensee of any of the said rules and regulations shall be deemed to be a breach of the terms and conditions of this agreement.

NOTARIAL CERTIFICATE ATTACHED

23. **No Partnership.** This Agreement is an agreement between two distinct and different entities or personalities and does not create a fiduciary relationship between the parties, nor does it constitute Licensee as an agent, legal representative, joint venturer, partner, employee, or servant of Licensor for any purpose whatsoever. It is understood between the parties hereto that Licensee shall be an independent contractor and is in no way authorized to make any contract, agreement, warranty, or representation on behalf of Licensor, nor to incur any debt, or to create any obligation, express or implied, on behalf of Licensor.   Likewise, the Licensor shall not be responsible for the conduct of the employees and/or personnel of the Licensee.

24. **Notice.** Any notice required to be given hereunder shall be in writing and shall be either mailed by certified mail, return receipt requested, or delivered by a recognized courier service, receipt acknowledged.

Alternatively, any report, notice, request, demand, or other communication required or permitted under this Agreement shall be deemed to be have been properly given by the sender and received by the addressee (1) if personally delivered; (2) if a confirmation receipt is faxed back containing the signature of an authorized person, when sent by fax; or (3) if an email reply is sent back by the receiver confirming receipt, when emailed.   Notices and correspondence through facsimile or email requiring the transmission of original documents must be followed by such transmission of original copies via courier mail.

Any notice to comply with the provisions shall be deemed to be given five (5) business days after mailing, or on the date of receipt, whichever is earlier.  Each party shall have the right to designate any other address or addressee for such notices by giving notice thereof in the foregoing manner, and in such event all notices to be mailed after receipt of such notice shall be sent to such other address or addressee.

All email notices as provided for in this Agreement shall be sent to the following email addresses:

> Licensor: josemagsaysay@yahoo.com
> Licensee: _guyk23@hotmail.com_
> _damitneman@yahoo.com_

25. **Entire Agreement.** This Agreement, along with any exhibit attached hereto, and the documents referred to herein, shall be construed together and constitute the entire, full, and complete agreement between Licensor and Licensee concerning the subject matter hereof; and supersedes all prior agreements.  No amendment, change, or variance from this Agreement shall be binding on either party, unless executed in writing by both

NOTARIAL CERTIFICATE ATTACHED

parties.

26. **Governing Law and Jurisdiction.**  This agreement shall be interpreted and construed under the laws of the Hong Kong Special Administrative Region, People's Republic of China.

Any action sought to be brought by either party shall be brought before the Hong Kong courts, which shall have exclusive jurisdiction, and the parties do hereby waive all questions of personal jurisdiction or venue for the purposes of carrying out this provision.

27. **Arbitration.**  If any matter, dispute or claim cannot be settled amicably between the parties within thirty (30) days after the same has been discussed by their authorized representatives, then the matter, dispute, or claim will be submitted for arbitration to the Hong Kong International Arbitration Centre, in accordance with the rules of the United Nations Commission on International Trade Law (UNCITRAL). Nothing contained herein shall, however, be construed to limit or to preclude Licensor from bringing any action in any court of competent jurisdiction for injunctive or provisional relief as Licensor deems to be necessary or appropriate to compel Licensee to comply with its obligations hereunder or to protect Licensor's rights. In addition, nothing contained herein shall be construed to limit or to preclude Licensor from joining with any action for injunctive or provisional relief all monetary claims that Licensor may have against Licensee which arise out of the acts or omissions giving rise to the action for injunctive or provisional relief. The arbitration provision shall be deemed self-executing, and in the event that Licensee fails to appear at any properly noticed arbitration proceeding, award may be entered against Licensee notwithstanding Licensee's failure to appear.

Nothing herein contained shall bar the right of the parties to seek and obtain temporary injunctive relief from a court of competent jurisdiction in accordance with applicable laws against threatened conduct that will cause loss or damage, pending completion of the arbitration.

The arbitration proceedings shall be held in Hong Kong Special Administrative Region, People's Republic of China at such venue within as may be specified by the arbitrator.

The arbitration proceedings shall be conducted in the English language.

The decision and award of the arbitrator shall be final and binding on the Parties.

NOTARIAL CERTIFICATE ATTACHED          03/24/09

**28. Insurance.** Licensee shall, at Licensee's expense and no later than upon commencement of the business contemplated by this Agreement, procure and maintain in full force and effect throughout the term of this Agreement all types of insurance as may be required by Licensor under this or subsequent agreements, or as mandated by government agencies, which shall be for a minimum period of one (1) calendar year and in such amounts as Licensor or a government agency may require from time to time, and shall designate Licensor as an additional name insured. The types of insurance may include, but is not limited to, Fire, Theft and Broadwater Damage Insurance, and Comprehensive General Liability Insurance;

Licensee shall make timely delivery of certificates of all required insurance to Licensor, each of which shall contain a statement by the insurer that the policy will not be cancelled or materially altered without at least thirty (30) days prior written notice to Licensor.

Should Licensee, at any time, fail or refuse to maintain in effect any insurance coverage required by Licensor or a government agency pursuant to this Agreement, or to furnish satisfactory evidence thereof, Licensor may, but is not obligated to, obtain such insurance coverage on Licensee's behalf. Licensee must then promptly pay upon Licensor's demand any costs and premiums Licensor has incurred in this respect. The payment of these costs is non-refundable.

**29. Acknowledgements.** Licensee hereby acknowledges the exclusive rights of Licensor to the products and Trademarks.

Licensee further acknowledges that Licensor does not give any guarantee or warranty in connection with profitability or any other aspect of the proposed business.

Licensee acknowledges that it has been advised by the Licensor to seek other appropriate independent advice and that the decision to enter into this agreement has been taken solely on the basis of the personal judgment and experience of the Licensee and its having taken such independent advice. Accordingly, the Licensee acknowledges that no representation, warranty, inducement or promise, express or implied, has been made by Licensor to induce Licensee to enter into this agreement, save for those written, annexed to, and incorporated in this agreement.

It is hereby expressly agreed between the parties that each of the restrictions contained in this agreement is reasonably necessary for the protection of the Licensor and its other licensees, the trade names and the Trademarks, and does not unreasonably interfere with the freedom of action of the Licensee who enters into this agreement with benefit of legal advice in full knowledge of all the provisions hereof; and the Licensee acknowledges that all such provisions are fair and reasonable.

Licensee further acknowledges that to the best of the Licensor's information, knowledge and belief, none of the Trademarks infringe upon any rights of any third party and that the Licensor has given no warranty as to the validity of any rights in any of the Trademarks in the Territory.

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound here-by, have duly executed, sealed and delivered this Agreement in triplicate the day and year first above written.

**Potato Corner Global Company**                    *NKM Capital Group LLC*
**Limited**

BY:

Jose P. Magsaysay, Jr.                                        *Guy Koren*
President                                                                President

Signed in the Presence of:

Guy Koren                                        Amit Nemanim

ACKNOWLEDGEMENT

BEFORE ME, a Notary Public for the City of *Beverly Hills*, personally appeared the following persons:

| Name | Identification Card No. | Date and Place of Issue |
|------|------------------------|------------------------|
| Guy Koren | DL# 84924397 | California 03-27-09 |
| Amit Nemanim | DL# A9480000 | CA 05/27/11 |

known to me and to me known to be the same persons who executed the foregoing License Agreement consisting of __14__ (___) pages, including the page where this Acknowledgement is written, and they acknowledged that the same is their true and voluntary act and deed and that of the corporation which they represent.

WITNESS MY HAND SEAL, this __29th__ day of __2009__ at __April__.

Potato Corner License Agreement                          14                                    03/24/09

**NOTARIAL CERTIFICATE ATTACHED**

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of Los Angeles

On April 29th 2009 before me, Todd E. Peters "Notary Public"
_____
Date                                    Here Insert Name and Title of the Officer

personally appeared Amit Nemanim and Guy Koren
_____
Name(s) of Signer(s)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

**TODD E. PETERS**
Commission # 1690486
Notary Public - California
Los Angeles County
My Comm. Expires Aug 29, 2010

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Place Notary Seal Above

Signature _____
                Signature of Notary Public

----- OPTIONAL -----

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

### Description of Attached Document

Title or Type of Document: Potato Corner Master License Agreement

Document Date: April 29th 2009          Number of Pages: 14 pgs And Certificates Attached

Signer(s) Other Than Named Above: _____

### Capacity(ies) Claimed by Signer(s)

Signer's Name: Amit Nemanim
☐ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☒ Other: Managing Member

RIGHT THUMBPRINT
OF SIGNER
Top of thumb here

Signer Is Representing: _____

Signer's Name: Guy Koren
☐ Individual
☒ Corporate Officer — Title(s): President
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

RIGHT THUMBPRINT
OF SIGNER
Top of thumb here

Signer Is Representing: _____

© 2007 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org   Item #5907   Reorder: Call Toll-Free 1-800-876-6827

## ACKNOWLEDGMENT

REPUBLIC OF THE PHILIPPINES )
MAKATI CITY              )      S.S.

BEFORE ME, a Notary Public, in and for the City of Makati, on this day personally appeared Jose P. Magsaysay Jr., with his Philippine Passport No. PP 0753283 issued on January 26, 2005 at Manila and valid until January 26, 2010 known to me and to me known to be the same person who executed the foregoing Master License Agreement consisting of 16 pages, including the page where this Acknowledgement is written, and acknowledged to me that the same is his own free will and voluntary act and deed and that of the corporation he represents.

WITNESS MY HAND AND SEAL this 20ᵗʰ day of May 2009 at Makati City.

Doc. No.:     8
Page No.:     3
Book No.:     I
Series of :   2009

NOTARY PUBLIC

Felicit C. Cordero
Notary Public for Makati City
Appt. No. M-193 until December 31, 2010
2ⁿᵈ Floor SEDCCO Bldg. Rada cor. Legaspi Sts.
Attorney's Roll no. 56041
PTR No. 1572293 - 01/07/09 - Makati City
IBP No. 769758 - 01/07/09 - Makati City
TIN No. 187-221-693

# EXHIBIT "B"

## POTATO CORNER USA
## JOINT VENTURE AGREEMENT

This Joint Venture Agreement (the "Agreement") dated _effective 10/1/09_ is made and entered into on ___immediately___ , by and between:

Cinco Corporation, a corporation duly existing and registered by virtue of and under the laws of the Republic of the Philippines with office address at 869 Katarungan Street, Plainview Mandaluyong City, Philippines 1550, represented herein by its duly authorized representative, Jose P. Magsaysay (hereinafter "Cinco"), and its directors, Jose P. Magsaysay, Jr., Jose Miguel Ma. G. Montinola, Ma. Victoria O. Bermejo, Ricardo K. Montelibano, all of whom are Philippine citizens and resident, and collectively referred to as the "Cinco Group";

-and-

AMIT NEMANIM, GUY KOREN, AMIR JACOBY, all of whom are U.S. citizens and residents and collectively referred to as the "LA Group:

### RECITALS

WHEREAS, the Parties hereto have agreed to form a limited liability company (hereinafter referred to as the "Company") under the laws of the State of Delaware, with the primary purpose of engaging in the business of establishing, operating, managing, licensing and franchising "Potato Corner" stores/outlets in the United States of America and Israel, except in the County of Los Angeles, USA and the County of San Francisco, USA and Tanforan Mall (hereinafter, "Territory").

WHEREAS, the Parties herein have agreed to enter into this Agreement which sets forth the terms and conditions with respect to the organization, incorporation, operation and management of the Company and defines their respective rights, duties and obligations of the parties to this Agreement.

WHEREAS, the Parties agree that the LLC operating agreement to be entered by them shall reflect the terms and conditions as set forth in this Agreement.

WHEREAS, Cinco may assign and or all of its rights to the joint venture company formed under this Agreement to a wholly-owned subsidiary as it deems fit.

NOW, THEREFORE, for and in consideration of the foregoing premises, the Parties hereby agree as follows:

1) ORGANIZATION AND FORMATION OF THE COMPANY

   a) Within ten (10) days from the Effective Date of this Agreement, the Parties herein agree to organize and form, a limited liability company to be called "PCJV USA" ( hereinafter referred to as the Company) for the primary purpose of engaging in the business of establishing, operating, managing, licensing and franchising "Potato Corner" stores/outlets in the Territory.

b) The initial members of the Company shall be the following:

   i) Cinco Group
     (1) Cinco
     (2) Jose P. Magsaysay, Jr.
     (3) Jose Miguel Ma. G. Montinola
     (4) Ma. Victoria O. Bermejo
     (5) Ricardo K. Montelibano

   ii) LA Group
     (1) Amit Nemanim
     (2) Guy Koren
     (3) Amir Jacoby

c) The principal office of the Company shall be at   1729 Santee St., Los Angeles, California 90015.

d) The annual general meeting of the members of the Company shall be held every year at the principal office of the Company.   The members may, at their discretion, invite non-members to join the annual general meeting, but only as non-voting observers.  Further, to the extent allowed by the financial condition of the Company, and as agreed upon by a majority of all member interests, the Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses incurred by the following members in attendance of the annual members' meeting: Jose P. Magsaysay, Jr., Jose Miguel Ma. Montinola, Ma. Victoria O. Bermejo and Ricardo K. Montelibano.

e) The fiscal year of the Company shall begin on January 1 and end on December 31 of each year.

f) The Company shall immediately upon formation obtain a "Liability Insurance" for the Company the amount and scope of coverage to be determined by the managers.

g) All costs, fees and expenses incurred in connection with the organization and formation of the Company shall be for the account of the Company.

h) The operating agreement of the Company shall reflect the terms and conditions set forth in this Agreement between the Parties.

2) CAPITALIZATION/OWNERSHIP OF THE COMPANY

a) At the time of formation, the Company shall have a total capital account of Fifty Thousand Dollars (US$50,000) which shall be fully subscribed and paid.

b) Unless other agreed to in writing, at the commencement of this Agreement, the Parties hereby agree that the Cinco Group shall contribute Thirty Thousand Dollars (US$30,000) and own sixty (60%) percent of the Company's capital accounts, while the LA Group shall contribute Twenty Thousand Dollars (US$20,000) and own the remaining forty (40%) percent.



2

c) The Parties hereby agree any increase in the capital account shall require an affirmative vote of 75% of all of the members' percentage interests in the Company. In the event an increase in the Company's capital accounts is approved by the members, both Parties shall have rights of pre-emption so that their pro rata ownership share in the Company shall be maintained, provided that, either Party shall have thirty (30) days within which to confirm in writing that it is willing and able to subscribe and fully pay its pro rata share of the increase in capital.

d) Neither Party shall assign any of its rights or obligations under this Agreement, nor his/its member interests in the Company without the prior written consent of the other Party. In the event either Party desire to transfer or sell his/its pro rata members interest in the Company to a person other those specifically named in Section 1(a) of this Agreement, such Party shall be obligated to sell the same first to the other Party, which has have thirty (30) days within which to exercise its rights of first refusal from the date of receipt of a written notice to sell. For this purpose, the Parties hereby agree that the right of first refusal may be exercised in accordance with the following formula:   The average of the Company's earnings before interest, depreciation, taxes and amortization (EBITDA) for the last two (2) years multiplied by 5 times, and further multiplied by the percentage of member interest subject to such right of first refusal over total outstanding member interests.

3) MANAGEMENT OF THE COMPANY

a) As will be provided in the Operating Agreement, the business and affairs of the Company shall be managed and all of the Company powers shall be exercised by or under the direction of the managers (collectively referred to as "Management"). Unless otherwise agreed to by the parties, the Management shall be composed of seven (7) members, four (4) of whom shall be designated by the Cinco Group, and three (3) designated by the LA Group.  Upon the formation of the Company, the following shall be named managers: Jose P. Magsaysay, Jr., Jose Miguel Ma. Montinola, Ma. Victoria O. Bermejo, Ricardo K. Montelibano, Amit Nemanim, Guy Koren, and Amir Jacoby.



b) The Management shall regularly meet on a monthly basis. The regular monthly board meeting may be done via teleconference or through the internet.  The members may, at their discretion, invite non-members to join member meetings, but only as non-voting observers.  Further, to the extent allowed by the financial condition of the Company, and as agreed upon by a majority of all member interests, the Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses incurred by the members named in Section 1(d) in attendance of said meetings.

c) Upon the formation of the Company, it shall have the following executive officers:  President, Corporate Secretary and Treasurer, and the following shall be elected by the members to serve these positions:

i)   Chairman of the Board of Members – Jose P. Magsaysay

3

    ii)   President – At any given time, the President shall be any one of the following members: Amit Nenamin, Guy Koren or Amir Jacoby, and the first president will be Amit Nemanim

    iii)  Corporate Secretary – Erlinda Bartolome.

    iv)  Treasurer – Jose Miguel Ma. Montinola

       (1)  The Treasurer shall have oversight functions over the Accounting and Finance Departments that shall be exercised independent of the President.

d)  Additional executive officers may be appointed by Management as it may deem necessary.

e)  It is hereby agreed that the rights and responsibilities of the Management shall include the following:

    i)   Approval of the compensation package for the managers, executive offices and key personnel.

    ii)  Approval of the Accounting System/Procedures/Software/Method to be used by the Company.

    iii) Approval of the operating budget of the Company, and any changes to it.

    iv) Approval of all franchising agreements, and lease agreements.

    v)  Approval of all purchases and disbursements in excess of $10,000, provided that such amount may be changed or modified by Management as it deems necessary.

f)  The executive officers shall manage the business and property of the Company, and to market the business, in accordance with and pursuant to the directives of and policies set by the Management of the Company. The Management of the Company can recall and/or withdraw the appointment of any executive officer, as it deems necessary.

g)  The Company shall enter into a Master License Agreement with Cinco (or an affiliated company to be designated by Cinco) which shall include the following terms and conditions:

    i)   The Company agrees to license the "POTATO CORNER" intellectual property rights from Cinco or an affiliated company to be designated by Cinco) consisting of (i) the trademark, service mark and trade name "POTATO CORNER"; and (ii) various trademarks, service marks, trade names, slogans, designs, insignias, emblems, symbols, color schemes, package features, logo and other propriety identifying characteristics used in relation and in connection with the "Potato Corner" Products and the System; and (iii) as well as other intellectual property rights in connection with the "POTATO CORNER" intellectual property rights, for use in the Territory.

    ii)  The Company agrees to pay, as an arm's length license fee, the following amounts:

       (1) With respect to the licensing / sub-licensing or franchising the "POTATO CORNER" intellectual property rights in connection with the "POTATO CORNER" outlets/stores, an amount equal to thirty percent (30%) of all



4

initial/franchise fees and ongoing royalty fees paid to/ collected by the Company. Payments shall be made to Cinco (or an affiliated company to be designated by Cinco) by wire transfer using a bank or other financial institution specified by it within thirty (30) days from receipt of the fees by the Company.

(2) All withholding and other applicable taxes levied by any authority on the payments by the Company shall be borne solely by the Company.

h) The Company agrees to engage the LA Group to provide management and strategic experience and expertise during the duration of this Agreement. The Company shall enter into a Master Services Agreement with the LA Group (or a corporation to be designated by the LA Group) which shall include the following terms and conditions:

   i) In consideration for the provision of its services under the Master Services Agreement, the LA Group shall be entitled to a services fee equal to thirty (30%) percent of all initial/franchise fee and continuing royalty fees paid to/ collected by the Company .

   ii) All withholding and other applicable taxes levied by any authority on the payments by the Company to the LA Group under this Agreement shall be borne solely by the Company.

   iii) The LA Group shall faithfully, diligently and efficiently exercise its obligations and responsibilities under the Master Services Agreement.

   iv) The LA Group shall maintain and protect the Confidential Information belonging to Cinco or the Company, and such undertaking shall apply to all of its partners, officers, employees, or agents.

i) The President of the Company shall render the following services and shall perform the following duties for the Company in a faithful, diligent and efficient manner:

   i) The President shall be responsible for all management, operational, marketing, establishment, maintenance, licensing and sub-licensing activities with respect to the "Potato Corner" outlets/stores in the Territory. He shall use his best efforts at all times during the term of this Agreement to operate and maintain the "Potato Corner" outlets/stores in the Territory according to the highest standards achievable consistent with the overall plan of the Management of the Company. The President shall comply with the rules, policies and procedures approved by the Management of the Company from time to time.

   ii) The President shall advertise market and promote the "Potato Corner" outlets/stores with the goal of causing public knowledge, awareness and patronage of the "Potato Corner" outlets/sites.

   iii) The President shall maintain a comprehensive system of records, books and accounts, with respect to the licensing and sub-licensing activities, operation,



5

establishment, management, maintenance and other activities of the "Potato Corner" outlets /stores in the Territory with the assistance of the Corporate Secretary.

iv) No later than the twentieth (20th) day of each month, with respect to the preceding month, the President shall render a statement of receipts and disbursements, a schedule of accounts receivable and payable, and a schedule of fees collected and distributed, together with a reconciled bank statement as of the last day of the month with the assistance of the Corporate Secretary.

v) No later than three (3) months after the end of a fiscal year, the President shall, with the assistance of the Corporate Secretary and external accountant hired by Management, cause the Company to issue audited financial statements, and shall provide a copy of the same to all the members of Management.

vi) To the extent the President is lawfully able to do so, the President shall take such action as may be necessary to comply promptly with any and all laws, ordinances, orders or other requirements of any federal, state, county or municipal authority having jurisdiction of the Company and affecting the Company.

j) Consistent with its fiduciary duty to the Company, the members and managers shall exercise the duty of care and shall, at all times, ensure that all corporate opportunities consistent with the objectives of this Agreement shall be pursued on behalf of, and for the benefit of the Company. As such, with respect to the establishment of Company-owned stores, whenever potential locations are identified by any member or manager, it shall be promptly brought to the attention of the Management. At all times, and within thirty (30) days from receipt of this information, the Management shall decide to either build a Company-owned store at the identified location. In the event the Company chooses to build a Company-owned store at the identified location, it shall have the right to do so, to the exclusion of any of the members or managers. However, in the even the Company decides not to build a Company-owned store at the identified location, it shall notify the members and managers of its decision in writing. In such case, the LA Group shall have the right to build a store at the identified location, provided that it shall enter into a franchising agreement with the Company, and shall pay the franchise fees and ongoing royalty fees as set forth in the Company's standard franchising agreement.

## 4) DURATION OF AGREEMENT

a) This Agreement shall become effective from the date of execution hereof and shall continue indefinitely unless otherwise terminated by (i) an affirmative vote of 75 percent (75%) of all member interests, or (ii) upon mutual agreement by the Parties in writing.

b) Upon termination of this Agreement, the effects of termination shall be as follows:

6

i) All rights granted under the Master License Agreement shall terminate and the Company shall cease the use of the Potato Corner Intellectual Property Rights, and Confidential Information, provided however, that the Company shall be permitted to use any of the foregoing as is reasonably required in order to comply with its obligations under its sub-licensing or franchising agreements, but only to the extent of the duration of sub-licensing or franchising agreements in existence at the time of the termination of this Agreement.

ii) The LA Group shall be subject to a non-compete arrangement and hereby agrees that, within two (2) years from the date of termination of this Agreement, it shall not engage in the business of establishing, operating, managing, licensing and franchising identical or similar products sold by the Company, using the intellectual property rights identical or similar to those used by the Company, at the time of the termination of this Agreement.

5) GENERAL PROVISIONS

a) This Agreement may not be altered, changed, supplemented or modified except by a written instrument duly signed by the Parties.

b) The Parties shall use their best efforts to cooperate for the success of the business of the Company. The Parties further agree to perform all acts and execute and deliver all documents or instruments required or necessary to fully implement or consummate the transactions contemplated in and the intent underlying this Agreement.

c) The Parties shall, to the extent feasible, cause the operating agreement of the Company to reflect the mutual covenants and provisions contained in this Agreement

d) All notices and other communications required or permitted to be given hereunder shall be given in writing (and for this purpose shall include emails or fax transmissions) and shall be addressed to the appropriate Party at the address of such Party as heretofore designated, or at such address as such Party may designate subsequently in writing

e) The failure of any Party at any time to require performance by the others of any provision of this Agreement shall not affect, in any way, the right of such Party to require performance of that or any other provision, and any waiver by any Party of any breach of this Agreement shall not be construed as a waiver of any continuing or succeeding breach of such provision, or a waiver of any other right under this Agreement.

f) This Agreement shall constitute the entire agreement between the Parties and shall supersede any previous agreements, written or otherwise, with respect to the same subject matter which may have been made by the Parties prior hereto.

g) The invalidity of any portion of this Agreement will not and shall not render the entire Agreement void, nor affect the validity of the rest of the provisions of this Agreement.



7

WEST\222455823.2

8

WEST\222455823.2

IN WITNESS WHEREOF, the parties have executed this Agreement on the date and in place first mentioned.
**Cinco Group:**

Cinco Corporation (Philippines)

Name: Jose P. Magsaysay

Title:    CEO

Jose P. Magsaysay, Jr.,

Jose Miguel Ma. G. Montinola

Ma. Victoria O. Bermejo

Ricardo K. Montelibano,

**L.A. Group:**

Amit Nemanim

Guy Koren,

Amir Jacoby

SIGNED IN THE PRESENCE OF:

ADAM MANDEL

9

## ACKNOWLEDGMENT

10

WEST\222455923.2

# EXHIBIT "C"

LIMITED LIABILITY COMPANY AGREEMENT
of
PCJV USA, LLC
A Delaware Limited Liability Company

THE INTERESTS CREATED BY THIS OPERATING AGREEMENT HAVE NOT BEEN
REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE
SECURITIES ACT OF 1933, AS AMENDED, OR WITH THE SECURITIES AUTHORITIES
OF ANY STATE UNDER ANY STATE SECURITIES LAWS, AND MAY NOT BE SOLD
OR OTHERWISE TRANSFERRED UNLESS REGISTERED UNDER SUCH LAWS OR
UNLESS AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF SUCH
LAWS IS AVAILABLE. THE SALE OR TRANSFER OF SUCH INTERESTS IS SUBJECT
TO CERTAIN ADDITIONAL RESTRICTIONS DESCRIBED IN THIS OPERATING
AGREEMENT.

## TABLE OF CONTENTS

Page

ARTICLE I     DEFINITIONS ........................................................................1

ARTICLE II    FORMATION .........................................................................4

2.1    Purpose ...................................................................................4
2.2    Powers ....................................................................................4
2.3    Formation and Name ..............................................................4
2.4    Principal Place of Business .....................................................4
2.5    Registered Office and Registered Agent .................................4
2.6    Records to be Maintained .......................................................5
2.7    Term .......................................................................................5

ARTICLE III   MEMBERS .............................................................................5

3.1    Classification of Members ......................................................5
3.2    Admission of Additional Members .........................................5
3.3    Right of First Refusal .............................................................6
3.4    Amendment of Member Listing ..............................................6
3.5    Payment of Costs ....................................................................6
3.6    Limited Liability of Members .................................................6
3.7    Voting Rights ..........................................................................6
3.8    Meetings of Members .............................................................7
3.9    Right of Inspection; Provision of Records to Members .........10
3.10   Representations and Warranties ............................................12

ARTICLE IV    MANAGEMENT ...................................................................12

4.1    Management ..........................................................................12
4.2    Number and Qualifications of Managers ...............................14
4.3    Election of Managers ............................................................14
4.4    Removal of Managers ............................................................14
4.5    Resignation of Managers .......................................................14
4.6    Term of Office as Manager ...................................................14
4.7    Authority of Multiple Managers ...........................................14
4.8    Fiduciary Duties Owed by Managers .....................................15
4.9    Conduct of Meetings of Managers .........................................15
4.10   Regular Monthly Meetings ....................................................15
4.11   Officers .................................................................................15
4.12   Indemnification and Liability Insurance ................................17
4.13   Actions of the Managers ........................................................18
4.14   Meetings of Managers ...........................................................18
4.15   Compensation of Manager .....................................................19
4.16   Authority of Members to Bind the Company ........................19
4.17   Specific Arrangements with the Cinco Group .......................20
4.18   Specific Arrangements with the LA Group ............................20

WEST\274283219.1

TABLE OF CONTENTS
(continued)

Page

ARTICLE V      CAPITAL ....................................................................................21

5.1      Initial Capital Contributions .................................................................21
5.2      Capital Accounts .....................................................................................21
5.3      Adjustment for Distributions in Kind .....................................................21
5.4      Interest ....................................................................................................21
5.5      Deficit Capital Account ..........................................................................22
5.6      Return of Capital ....................................................................................22
5.7      Optional Adjustments to Capital Accounts .............................................22

ARTICLE VI     INCOME AND LOSSES ...............................................................22

6.1      Allocations ..............................................................................................22
6.2      Qualified Income Offset ..........................................................................22
6.3      Minimum Gain Chargeback .....................................................................22
6.4      Contributed Property and Revaluations ...................................................22
6.5      Timing .....................................................................................................23

ARTICLE VII    DISTRIBUTIONS ..........................................................................23

7.1      Operating Distributions ..........................................................................23
7.2      Generally Pro Rata ..................................................................................23
7.3      Liquidating Distributions ........................................................................23

ARTICLE VIII   ASSIGNMENT OF INTERESTS ....................................................23

8.1      Assignment of Interests ...........................................................................23
8.2      No Dissolution upon Assignment .............................................................24
8.3      Information Regarding Assignee ..............................................................24
8.4      No Release of Liability of Assignor .........................................................24
8.5      Pledge of Membership Interest ................................................................24
8.6      Exercise of Rights upon Death or Incompetency .....................................24
8.7      Exercise of Rights upon Dissolution or Termination ...............................24

ARTICLE IX     DISSOLUTION AND WINDING UP .............................................24

9.1      Dissolution ..............................................................................................24
9.2      Effect of Dissolution ...............................................................................25

ARTICLE X      TAX AND ACCOUNTING MATTERS .........................................25

10.1     Characterization as a Partnership ............................................................25
10.2     No Partnership Intended for Nontax Purposes .........................................25
10.3     Fiscal Year ..............................................................................................26
10.4     Accounting Method .................................................................................26
10.5     Tax Information .......................................................................................26
10.6     Basis Adjustment ....................................................................................26
10.7     Other Elections .......................................................................................26
10.8     Taxes of Taxing Jurisdictions .................................................................26
10.9     Tax Matters Partner .................................................................................26

WEST\234283219.2

TABLE OF CONTENTS
(continued)

Page

ARTICLE XI      DISSOCIATION OF A MEMBER...................................................................27

11.1    Dissociation ...................................................................................................27
11.2    Rights of Dissociating Member.....................................................................27

ARTICLE XII     MISCELLANEOUS PROVISIONS ...............................................................28

12.1    Amendment of Operating Agreement ...........................................................28
12.2    Entire Agreement...........................................................................................28
12.3    Interpretation .................................................................................................28
12.4    Rights of Creditors and Third Parties under Operating Agreement.............28
12.5    Valuation of Non-Cash Consideration ..........................................................28
12.6    Counterpart Execution...................................................................................28
12.7    Remedies ........................................................................................................28
12.8    Successors and Assigns ..................................................................................29
12.9    Severability.....................................................................................................29
12.10   Governing Law ..............................................................................................29

WEST\243832192

## LIMITED LIABILITY COMPANY AGREEMENT
### of
## PCJV USA, LLC

The Limited Liability Company Agreement is made and entered into as of the Effective Date by the Members listed below for the purpose of forming a Delaware limited liability company in accordance with the provisions hereinafter set forth.

### ARTICLE I

### DEFINITIONS

The following terms, as used herein, shall have the following respective meanings:

1.1     Act – The Delaware Limited Liability Company Act, 6 Del.C. §18-101, et seq., as amended from time to time.

1.2     Additional Member - A member other than an Initial Member or a Substitute Member who has acquired a Membership Interest from the Company.

1.3     Assignee – A transferee of a Membership Interest who has not been admitted as a Substitute Member.

1.4     Assignor – A transferor of a Membership Interest.

1.5     Business Day – Any day other than Saturday, Sunday or any legal holiday observed in the State of Delaware.

1.6     Capital Account – The account maintained for a Member or Assignee determined in accordance with Article V.

1.7     Capital Contribution – Any contribution actually made to the capital of the Company pursuant to Section 5.1 by or on behalf of a Member or Assignee. The initial Capital Contribution of the Members shall be US$50,000 which shall be fully subscribed and paid.

1.8     Certificate – The Certificate of Formation of the Company.

1.9     Company – The company named in the introductory paragraph of this Operating Agreement, and any successor thereof.

1.10    Company Liability – Any enforceable debt or obligation for which the Company is liable or which is secured by any Company Property.

1.11    Company Minimum Gain – The extent to which a nonrecourse liability exceeds the adjusted tax basis of the Company Property it encumbers. The amount of Company Minimum Gain shall be determined in accordance with Regulations Section 1.704-2(d) by substituting the terms "*Company*" and "*Holder*" for the terms "*partnership*" and "*partner*," respectively, in each place they appear therein.

WEST\24383219.1

1.12   **Company Property** – Any Property owned by the Company.

1.13   **Contribution** – A contribution as defined by the Act.

1.14   **Disposition (Dispose)** – Any sale, assignment, transfer, exchange, mortgage, pledge, grant, hypothecation, or other transfer, absolute or as security or encumbrance (including dispositions by operation of law)..

1.15   **Dissociation** – Any action which causes a Person to cease to be Member as described in Article XI hereof.

1.16   **Dissolution Event** – An event, the occurrence of which will result in the dissolution of the Company under ARTICLE IX unless the Members agree to the contrary.

1.17   **Distribution** – A distribution of Money or Property made pursuant to this Operating Agreement.

1.18   **Economic Interest** – A Person's right to share in the income, gains, losses, deductions, credits or similar items of, and to receive Distributions from, the Company, exclusive of any other rights of a Member including, without limitation, the right to vote or to participate in management, or any right to information concerning the business and affairs of the Company.

1.19   **Effective Date** – The date the Certificate is filed with the Delaware Secretary of State.

1.20   **Holder** – A Person holding an Economic Interest, whether as a Member or as an Assignee.

1.21   **Income and Losses** – With respect to a taxable year of the Company (or other period for which Income or Losses must be computed), the Company's taxable income or loss for federal income tax purposes, as determined by the tax advisors employed by the Company for this purpose, except that: (1) any tax-exempt income of the Company as described in IRC Section 705(a)(1)(B) shall be treated as gross income of the Company, (2) any nondeductible noncapital expenditures as described in IRC Section 705(a)(2)(B) shall be treated as a deduction of the Company, and (3) if any Company property is reflected on the books of the Company at a value ("*Book Value*") different from the adjusted tax basis of such property, any item of Income or Loss with respect to such property shall be computed by reference to such Book Value.

1.22   **Initial Capital Contribution** – The Capital Contribution agreed to be made by the Initial Members as described in Section 5.1.

1.23   **Initial Members** – Those persons identified on Exhibit A attached hereto and made a part hereof by this reference who have executed the Operating Agreement.

1.24   **IRC** – The Internal Revenue Code of 1986, as amended.

2

1.25    Majority – The affirmative vote or consent of Members having Percentage Interests in excess of one-half of the Percentage Interests of all the Members entitled to vote on a particular matter. Assignees and, in the case of approvals to withdrawal where consent of the remaining Members is required, Dissociating Members shall not be considered Members entitled to vote for the purpose of determining a Majority. In the case of a Member who has Disposed of that Member's entire Membership Interest to an Assignee, but has not been removed as provided below, the Percentage Interest of such Assignee shall be considered in determining a Majority and such Member's vote or consent shall be determined by such Percentage Interest.

1.26    Management Right – The right of a Member to participate in the management of the Company, including the rights to information and to consent or approve actions of the Company.

1.27    Manager – A manager selected to manage the affairs of the Company as provided under Article IV hereof.

1.28    Member – A member as defined by the Act, including all Initial Members, Substitute Members and Additional Members (but not including any Assignee or any Member who has Dissociated).

1.29    Membership Interest – A membership interest as defined by the Act.

1.30    Money – Cash or other legal tender of the United States, or any obligation that is immediately reducible to legal tender without delay or discount. Money shall be considered to have a fair market value equal to its face amount.

1.31    Notice – Except as otherwise expressly provided herein, all Notices shall be in writing. Notice to the Company shall be considered given when mailed by first class mail postage prepaid addressed to any Manager in care of the Company at the address of the principal place of business of the Company. Notice to a Member shall be considered given when mailed by first class mail postage prepaid addressed to the Member at the address reflected in the Operating Agreement unless the Member has given the Company a Notice of a different address.

1.32    Operating Agreement – This Limited Liability Company Agreement and all amendments thereto adopted in accordance with this Limited Liability Company Agreement and the Act.

1.33    Organization – A Person other than a natural person. Organization includes, without limitation, corporations (both non-profit and other corporations), partnerships (both limited and general), trusts, joint ventures, limited liability companies, and unincorporated associations, but the term does not include joint tenancies and tenancies by the entirety.

1.34    Percentage Interest – With respect to a Member, the percentage set forth opposite such Member's name on Exhibit A hereto, as such Exhibit is amended from time to time in accordance with Section 3.3 hereof, and with respect to a Holder not a Member, the Percentage Interest or part thereof corresponding to the portion of a Member's Economic Interest such Holder has acquired.

1.35    Person – A person as defined by the Act.

1.36    Proceeding – Any judicial or administrative trial, hearing or other activity, civil, criminal or investigative, the result of which may be that a court, arbitrator, or governmental agency may enter a judgment, order, decree, or other determination which, if not appealed and reversed, would be binding upon the Company, a Member or other person subject to the jurisdiction of such court, arbitrator, or governmental agency.

1.37    Property – Any property real or personal, tangible or intangible, including money and any legal or equitable interest in such property, but excluding services and promises to perform services in the future.

1.38    Regulations – Except where the context indicates otherwise, the permanent, temporary or proposed regulations of the Department of the Treasury promulgated under the IRC as such regulations may be amended from time to time.

1.39    Taxing Jurisdiction – Any state, local, or foreign government that collects tax, interest or penalties, however designated, on any Member's share of the income or gain attributable to the Company.

1.40    Term – As specified in Section 2.7.

## ARTICLE II

## FORMATION

2.1    Purpose.. The purpose of the Company is to engage in any lawful act or activity for which a limited liability company may be organized under the Act or the laws of any other jurisdiction in which the Company may do business.

2.2    Powers. The Company shall have all powers necessary to accomplish its purposes without the necessity of their specific enumeration herein including, without limitation, all powers described in Section 18-106 of the Act.

2.3    Formation and Name. The Members have caused to be formed a limited liability company under the name of PCJV USA, LLC (the "Company"), by the filing of the Certificate pursuant to the provisions of Section 18-201 of the Act. The Members desire to govern the affairs of the Company by entering into this Operating Agreement.

2.4    Principal Place of Business. The principal place of business of the Company shall be located at Suite 1110, 6380 Wilshire Blvd, CA 90048 USA, unless changed by the Managers.

2.5    Registered Office and Registered Agent. The Company's registered office is at 615 South DuPont Highway, City of Dover, County of Kent 19901 and the name of its initial registered agent at such address is National Corporate Research, Ltd. The Company may change the registered office and/or the registered agent at such times and from time to time as the Managers may deem advisable.

2.6    Records to be Maintained. The Company shall maintain the following records at its principal place of business:

2.6.1    A current list of the full name and last known business or residence address of each Member and Assignee set forth in alphabetical order, together with a schedule showing the Capital Contribution and Percentage Interest of each Member and Assignee;

2.6.2    A current list of the full name and business or residence address of each Manager, if any;

2.6.3    A copy of the Certificate and all amendments thereto, together with any powers of attorney pursuant to which the Certificate or any amendments thereto were executed;

2.6.4    Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six most recent taxable years;

2.6.5    A copy of this Operating Agreement and any amendments hereto, together with any powers of attorney pursuant to which this Operating Agreement or any amendments hereto were executed;

2.6.6    Copies of the financial statements of the Company, if any, for the six most recent fiscal years;

2.6.7    The books and records of the Company as they relate to the internal affairs of the Company for at least the current and past four fiscal years; and

2.6.8    Any other records to be maintained pursuant to the Act.

2.7    Term. The Term of this Operating Agreement shall commence upon the date the Certificate is filed and shall continue indefinitely unless otherwise terminated by (i) an affirmative vote of 75 percent (75%) of all member interests; or (ii) upon mutual agreement by the Parties in writing.

## ARTICLE III

## MEMBERS

3.1    Classification of Members. Pursuant to the Joint Venture Agreement entered into by the Members on _____, the Members shall be classified and designated as either part of the Cinco Corporation (Philippines) group (the "Cinco Group") or the LA group (the "LA Group"). Both the Cinco Group and the LA Group agreed to the specific rights and obligations granted to each group, and undertake to fully observe the rights vested to each group under the Operating Agreement.

3.2    Admission of Additional Members. Additional Members may be admitted to the Company upon the consent of the Members required pursuant to Section 3.7, which such consent

5

may be granted in their sole discretion. The Capital Contribution of any Additional Member shall be determined by the Members consenting to the admission. Each Additional Member shall execute a counterpart of this Operating Agreement, agreeing thereby to be bound by all of the terms and provisions hereof.

3.3    Right of First Refusal. A Member of the Cinco Group or the the LA Group shall not assign any of its rights or obligations nor his/its Member Interests in the Company outside of the Cinco Group and the LA Group, without the prior written consent of the non-assigning group. In the event a Member of either the Cinco Group or the LA Group desire to transfer or sell his/its pro rata members interest in the Company to a person other those in either the Cinco Group or the LA Group, such Member shall be obligated to sell the same first to the existing Members, which has have thirty (30) days within which to exercise its rights of first refusal from the date of receipt of a written notice to sell. For this purpose, the Parties hereby agree that the right of first refusal may be exercised in accordance with the following formula: The average of the Company's earnings before interest, depreciation, taxes and amortization (EBITDA) for the last two (2) years multiplied by 5 times, and further multiplied by the percentage of member interest subject to such right of first refusal over total outstanding Member Interests.

3.4    Amendment of Member Listing. Upon admission of an Additional Member, the Member listing required by Section 2.6 and Exhibit A hereto shall be amended accordingly.

3.5    Payment of Costs. All reasonable expenses, including attorneys' fees, incurred by the Company in connection with the admission of an Additional Member shall be borne by such Additional Member.

3.6    Limited Liability of Members. Members shall not be personally liable for the liabilities of the Company.

3.7    Voting Rights. All Members shall be entitled to vote on any matter submitted to a vote of the Members. Unless otherwise specified herein, actions to be taken by Members require the consent of a Majority of the Percentage Interests represented at a duly held meeting of the Members or, if such action is taken by written consent, by a Majority of all of the Percentage Interests. Notwithstanding the foregoing, the following actions require the consent described below:

| Action | Consent Required |
|---|---|
| Decision to dissolve the Company. | 75% of all Membership Interests |
| Decision to continue the business of the Company after a Dissolution Event. | 75% of all Membership Interests |
| Approval of the transfer of a Membership Interest and admission of an Assignee as a Substitute Member of the Company. | Prior written consent of the other Member |

| Action | Consent Required |
|---|---|
| Approval of the withdrawal and Dissociation of a Member of the Company. | Prior written consent of the other Member |
| Any amendment of the Certificate or this Operating Agreement. | 75% of all Membership Interests |
| Agreement of merger as defined in Section 17551 of the Act. | 75% of all Membership Interests |
| Disposition by the Company of all or substantially all of the Company's assets. | 75% of all Membership Interests |
| Confession of a judgment against the Company in excess of Ten Thousand Dollars. | 75% of all Membership Interests |

3.8    Meetings of Members.

3.8.1    Place of Meetings. Meetings of Members may be held at any place, selected by the Person or Persons calling the meeting. If no other place is stated or fixed, all meetings shall be held at the principal place of business of the Company.

3.8.2    Calling of Meetings. A meeting of the Members may be called at any time by any Manager or by one or more Members with an aggregate Percentage Interest of more than ten percent (10%) for the purpose of addressing any matter on which the Members may vote.

3.8.3    Notice of Meetings. Whenever Members are required or permitted to take any action at a meeting, a Notice of the meeting shall be given not less than ten (10) calendar days nor more than sixty (60) calendar days before the date of the meeting to each Member entitled to vote at the meeting. The Notice shall state the place, date, and hour of the meeting and the general nature of the business to be transacted. No other business may be transacted at such a meeting.

3.8.4    Means of Providing Notice of Meetings. Any Notice of a meeting of the Members shall be given either personally or by mail or other means of written communication, charges prepaid, addressed to the Member at the address of the Member appearing on the books of the Company or given by the Member to the Company for the purpose of Notice, or, if no address appears or is given, at the place where the principal place of business of the Company is located or by publication at least once in a newspaper of general circulation in the county in which the principal place of business is located. The Notice shall be deemed to have been given at the time when delivered personally or deposited in the mail or sent by other means of written communication. An affidavit of mailing of any Notice in accordance with the provisions of this section, executed by a Manager or Member, shall be prima facie evidence of the giving of the Notice.

Upon written request to a Manager by any Person entitled to call a meeting of Members, the Manager shall immediately cause Notice to be given to the Members entitled to vote that a meeting will be held at a time requested by the Person calling the meeting, not less than ten (10) calendar days nor more than sixty (60) calendar days after the receipt of the request. If the Notice is not given within twenty (20) calendar days after receipt of the request, the Person entitled to call the meeting may give the Notice or, upon the application of that Person, the superior court of the county in which the principal place of business of the Company is located, or if the principal place of business is not in this state, the county in which the Company's address in this state is located, shall summarily order the giving of the Notice, after Notice to the Company affording it an opportunity to be heard.

The Members may, at their discretion, invite non-Members to join, but only as non-voting observers. Further, to the extent allowed by the financial condition of the Company, and as agreed upon by a majority of all member interests, the Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses incurred by the Members in attendance.

3.8.5   Adjourned Meetings. When a Members' meeting is adjourned to another time or place, unless the Certificate or this Operating Agreement otherwise requires, and, except as provided in the Act, Notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken. At the adjourned meeting, the Company may transact any business that may have been transacted at the original meeting. If the adjournment is for forty-five (45) calendar days or more, or if after the adjournment a new record date is fixed for the adjourned meeting, a Notice of the adjourned meeting shall be given to each Member entitled to vote at the meeting.

3.8.6   Validation of Meeting Held Without Proper Call or Notice. The actions taken at any meeting of Members, however called and noticed, and wherever held, have the same validity as if taken at a meeting duly held after regular call and notice, if a quorum is present either in person or by proxy, and if, either before or after the meeting, each of the Members entitled to vote, not present in person or by proxy, signs a written waiver of Notice or consents to the holding of the meeting or approves the minutes of the meeting. All waivers, consents, and approvals shall be filed with the Company records or made a part of the minutes of the meeting. Attendance of a Member at a meeting shall constitute a waiver of Notice of the meeting, except when the Member objects, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Attendance at a meeting is not a waiver of any right to object to the consideration of matters required by this title to be included in the Notice but not so included, if the objection is expressly made at the meeting. Neither the business to be transacted nor the purpose of any meeting of Members need be specified in any written waiver of Notice, unless otherwise provided in the Certificate or this Operating Agreement, except as provided in subsection 3.8.8.

3.8.7   Participation Through Telecommunications Equipment. Members may participate in a meeting of the Company through the use of conference telephones or similar communications equipment, so long as all Members participating in the meeting

8

can hear one another. Participation in a meeting pursuant to this provision constitutes presence in person at that meeting.

3.8.8   Notice of General Nature of Meeting. Any action approved at a meeting, other than by unanimous approval of those entitled to vote, shall be valid only if the general nature of the proposal so approved was stated in the Notice of meeting or in any written waiver of Notice.

3.8.9   Quorum.

3.8.9.1   Members holding in excess of one-half of the Percentage Interests represented in person or by proxy shall constitute a quorum at a meeting of Members.

3.8.9.2   The Members present at a duly called or held meeting at which a quorum is present may continue to transact business until adjournment, notwithstanding the loss of a quorum, if any action taken after loss of a quorum, other than adjournment, is approved by the requisite Percentage Interests of Members specified in the Certificate, this Operating Agreement, or the Act.

3.8.9.3   In the absence of a quorum, any meeting of Members may be adjourned from time to time by the vote of a majority of the Membership Interests represented either in person or by proxy at such meeting, but no other business may be transacted, except as provided in subparagraph 3.8.9.2 above.

3.8.10.  Action Without a Meeting.

3.8.10.1   Any action that may be taken at any meeting of the Members may be taken without a meeting if a consent in writing, setting forth the action so taken, is signed and delivered to the Company within sixty (60) calendar days of the record date for that action by Members having not less than the minimum number of votes that would be necessary to authorize or take that action at a meeting at which all Members entitled to vote thereon were present and voted.

3.8.10.2   Unless the consents of all Members entitled to vote have been solicited in writing, (A) Notice of any Member approval of an amendment to the Certificate or this Operating Agreement, a dissolution of the Company, or a merger of the Company, without a meeting by less than unanimous written consent shall be given at least ten (10) calendar days before the consummation of the action authorized by such approval, and (B) prompt Notice shall be given of the taking of any other action approved by Members without a meeting by less than unanimous written consent, to those Members entitled to vote who have not consented in writing.

3.8.10.3   Any Member giving a written consent, or the Member's proxyholder, may revoke the consent by a writing received by the Company prior to the time that written consents of Members having the minimum number of votes that would be required to authorize the proposed action have been received

by the Company, but may not do so thereafter. This revocation is effective upon its receipt at the principal place of business of the Company.

3.8.11 Proxies. Every Member entitled to vote shall have the right to do so in person or by one (1) or more agents authorized by a written proxy executed by such Member or his duly authorized agent and filed with the Company. Any proxy executed is not revoked and continues in full force and effect until (i) a writing stating that the proxy is revoked or a duly executed proxy bearing a later date is filed with the Company prior to the vote pursuant thereto, (ii) the Member executing the proxy attends the meeting and votes in person, or (iii) written Notice of the death or incapacity of the maker of such proxy is received by the Company before the vote pursuant thereto is counted; provided that no proxy shall be valid after the expiration of eleven months from the date of its execution, unless the person executing it specifies therein the length of time for which such proxy is to continue in force.

3.8.12 Record Date. In order that the Company may determine the Members of record entitled to Notices of any meeting or to vote, or entitled to receive any Distribution or to exercise any rights in respect of any other lawful action, a Manager, or Members representing more than ten percent (10%) of the Percentage Interests, may fix, in advance, a record date, that is not more than sixty (60) calendar days nor less than ten (10) calendar days prior to the date of the meeting and not more than sixty (60) calendar days prior to any other action. If no record date is fixed:

3.8.12.1 The record date for determining Members entitled to Notice of or to vote at a meeting of Members shall be at the close of business on the business day next preceding the day on which Notice is given or, if Notice is waived, at the close of business on the business day next preceding the day on which the meeting is held.

3.8.12.2 The record date for determining Members entitled to give consent to Company action in writing without a meeting shall be the day on which the first written consent is given.

3.8.12.3 The record date for determining Members for any other purpose shall be at the close of business on the day on which the Managers adopt the resolution relating thereto, or the sixtieth day prior to the date of the other action, whichever is later.

3.8.12.4 The determination of Members entitled to Notice of or to vote at a meeting of Members shall apply to any adjournment of the meeting unless a Manager or the Members who called the meeting fix a new record date for the adjourned meeting, but the Manager or the Members who called the meeting shall fix a new record date if the meeting is adjourned for more than forty five (45) calendar days from the date set for the original meeting.

3.9   Right of Inspection, Provision of Records to Members.

3.9.1    Right of Inspection. Each Member, Manager and Assignee has the right, upon reasonable request, for purposes reasonably related to the interest of that Person as a Member, Manager, or Assignee, to each of the following at the expense of the Company:

     3.9.1.1    To inspect and copy during normal business hours any of the records required to be maintained by Sections 2.6.1, 2.6.2, 2.6.3 and 2.6.4 above; and

     3.9.1.2    To obtain from a Manager, promptly after becoming available, a copy of the Company's federal, state, and local income tax or information returns for each year.

3.9.2    Additional Rights. So long as the Company has more than 35 Members:

     3.9.2.1    A Manager shall cause an annual report to be sent to each of the Members not later than one hundred twenty (120) calendar days after the close of each fiscal year. That report shall contain a balance sheet as of the end of the fiscal year and an income statement and statement of changes in financial position for the fiscal year.

     3.9.2.2    Members with an aggregate Percentage Interest of at least five percent (5%), or any three or more Members, may make a written request to a Manager for an income statement of the Company for the initial three-month, six-month, or nine-month period of the current fiscal ended more than thirty (30) calendar days prior to the date of request, and a balance sheet of the Company as of the end of that period. The statement shall be delivered or mailed to the Members within thirty (30) calendar days thereafter.

     3.9.2.3    The financial statements referred to in this section shall be accompanied by the report thereon, if any, of the independent accounts engaged by the Company or, if there is no report, the certificate of the Treasurer of the Company that the financial statements were prepared without audit from the books and records of the Company.

3.9.3    Copy of Amendment of Certificate and Operating Agreement. A Manager shall promptly furnish to a Member a copy of any amendment to the Certificate or this Operating Agreement executed by that Manager pursuant to a power of attorney from the Member.

3.9.4    Tax Information. The Company shall send or cause to be sent to each Holder within ninety (90) calendar days after the end of each taxable year such information as is necessary to complete their respective federal and state income tax or information returns, and, if the Company has thirty-five (35) or fewer Holders, a copy of the Company's federal, state, and local income tax or information returns for the year.

3.9.5    Relationship with Act. Nothing in this Section 3.9 shall be construed as in any way limiting a Member's right of inspection as set forth in Section 18-305 of the Act.

3.10   Representations and Warranties. Each Member hereby represents and warrants to the Company and each other Member that:

3.10.1  If that Member is a organization, that it is duly organized, validly existing, and in good standing under the law of its state of organization and that it has full organizational power to execute and agree to the Operating Agreement to perform its obligations hereunder;

3.10.2  Such Member is acquiring its interest in the Company for its own account for investment purposes only and not with a view to the resale or distribution of all or any part of such interest and such Member has no present intention, agreement or arrangement to divide its participation with others or to sell, assign, transfer or otherwise dispose of all or any part of such interest. Such Member is aware that the interests have not been registered under the Securities Act of 1933, or any state securities laws, and that such interests may not be resold or otherwise disposed of unless they are registered thereunder or an exemption from registration is available. Accordingly, each Member is aware that it must bear the economic risk of investment in the Company for an indefinite period of time. Each Member is capable of bearing that risk.

## ARTICLE IV

## MANAGEMENT

4.1   Management. Subject to the limitations of the Certificate, the Act, and this Operating Agreement as to actions to be authorized or approved by the Members, the business and affairs of the Company shall be managed and all the Company powers shall be exercised by or under the direction of the Managers. The Managers may delegate the management of the day-to-day operation of the business of the Company to the officers of the Company or other persons provided that the business and affairs of the Company shall be managed and all powers shall be exercised under the ultimate direction of the Managers. Without prejudice to such general powers, but subject to the same limitations, the Managers shall have the following powers:

4.1.1  To approve compensation packages for the managers, executive offices and key personnel.

4.1.2  To approve the Accounting System/Procedures/Software/Method to be used by the Company.

4.1.3  To approve the operating budget of the Company, and any changes to it.

4.1.4  To approve all franchising agreements, and lease agreements.

4.1.5  To approve all purchases and disbursements in excess of Ten Thousand Dollars ($10,000), provided that such amount may be changed or modified by Management as it deems necessary.

4.1.6  To institute, prosecute, and defend any Proceeding in the Company's name;

4.1.7    To purchase, receive, lease or otherwise acquire and deal with the Property, wherever located;

4.1.8    To sell, convey, mortgage, pledge, lease, exchange, or otherwise Dispose of Property;

4.1.9    To lend money, invest and reinvest the Company's funds, and receive and hold Property as security for repayment, including, without limitation, the loaning of money to Members, officers, employees, and agents;

4.1.10   To borrow money and incur indebtedness for the purposes of the Company, and to cause to be executed and delivered therefor in the Company name promissory notes, bonds, debentures, deeds of trust, mortgages, pledges, hypothecations or other evidences of debt and securities therefor;

4.1.11   To change the principal place of business of the Company from one location to another as provided in Section 2.3 hereof, and to fix and locate from time to time one or more subsidiary offices of the Corporation;

4.1.12   To prescribe the forms of Membership Certificates, and to alter the form of such Membership Certificates from time to time as in their judgment they deem best, provided such Membership Certificates shall at all times comply with provisions of law;

4.1.13   To select and remove all of the officers, agents and employees of the Company, to prescribe such powers and duties for them as may not be inconsistent with law, with the Certificate or this Operating Agreement, to fix their compensation, and to require from them security for faithful service;

4.1.14   To pay pensions and establish pension plans, pension trusts, profit sharing plans, and benefit and incentive plans for all or any of the current or former Members, employees, and agents of the Company;

4.1.15   To make donations to the public welfare or for religious, charitable, scientific, literary or educational purposes;

4.1.16   To purchase insurance on the life of any of the Members or Company employees for the benefit of the Company;

4.1.17   To participate in partnership agreements, joint ventures, or other associations of any kind with any person or persons; and

4.1.18   To authorize the issuance of Additional Membership Interests from time to time upon such terms as may be lawful in consideration of money paid, labor done, services actually rendered to the Company or for its benefit or in its formation or reorganization, debts or securities cancelled, and tangible or intangible property actually received either by the Company or any one of its wholly owned subsidiaries, if any, or future services.

WEST\224283319.2                    13

4.2    Number and Qualifications of Managers. Until changed by amendment of the Certificate or an amendment to this section:

4.2.1    The agreed-upon and authorized number of Managers shall be seven (7), four (4) of whom shall be designated by the Cinco Group, and three (3) designated by the LA Group.

4.2.2    Upon the formation of the Company, the following shall be named and designated as managers:

4.2.2.1    For the Cinco Group: Jose P. Magsaysay, Jr., Jose Miguel Ma. Montinola, Ma. Victoria O. Bermejo, and Ricardo K. Montelibano.

4.2.2.2    For the LA Group: Amit Nemanim, Guy Koren, and Amir Jacoby.

4.3    Election of Managers.

4.3.1    Election at Meeting of Members. In any election of Managers at a meeting of Members duly called and noticed, the Cinco Group shall be entitled to elect four (4) Managers, while the LA Group shall be entitled to elect three (3) Managers. Interests entitled to be voted for them up to the number of Managers to be elected by such Members shall be elected. Elections for Managers need not be by ballot unless a Member demands election by ballot at the meeting and before the voting begins.

4.3.2    Election by Written Consent. Managers may alternatively be elected by a written consent action of Members made pursuant to Section 3.8.10 executed by a Majority of the Members.

4.4    Removal of Managers. Any Managers may be removed, with or without cause, by the vote of a Majority of the Members by written consent or at a meeting of Members called expressly for that purpose. Any removal shall be without prejudice to the rights, if any, of the Manager under any contract of employment.

4.5    Resignation of Managers. Any Manager may resign as a Manager at any time upon written Notice to the Company, without prejudice to the rights, if any, of the Company under any contract to which the Manager is a party.

4.6    Term of Office as Manager. Each Manager shall serve until the earliest to occur of (i) the resignation of the Manager; (ii) the removal of the Manager; or (iii) the election of a successor.

4.7    Authority of Multiple Managers. If, pursuant to Section 4.2 above, more than one manager is authorized, then any one or more Managers may take any action permitted to be taken by any one or more other Managers, unless this Operating Agreement or the Act requires the consent of more than one Manager.

4.8    Fiduciary Duties Owed by Managers.  Managers shall owe fiduciary duties to the Company and the Members in the manner prescribed in the Act and under applicable case law.

4.9    Conduct of Meetings of Managers.  The Managers may adopt such rules and regulations for the conduct of its meetings and the management of the Company not inconsistent with this Operating Agreement or applicable law

4.10    Regular Monthly Meetings.  The Managers shall meet at least on a monthly basis, and may be done in person, via teleconference or through the internet. The Managers may, at their discretion, invite non-Members to join, but only as non-voting observers.

4.11    Officers.

4.11.1    Officers.  The officers of the Company, if any, shall include the following: Chairman of the Board of Members, President, Corporate Secretary, and Treasurer. The Company may also have, at the discretion of the Managers, one or more vice-presidents, one or more assistant secretaries, one or more assistant financial officers, and such other officers as may be appointed in accordance with the provisions of this Operating Agreement. Any number of offices may be held by the same person. Officers need not be Members.

4.11.2    Election.  The officers of the Company, except such officers as may be appointed in accordance with the provisions of Section 10.3, shall be chosen by the Managers, and each shall hold his office until he or she shall resign or shall be removed by the Managers or otherwise disqualified to serve, or his successor shall be elected and qualified.

4.11.3    Subordinate Officers.  The Managers may appoint, and may empower the President to appoint, such other officers as the business of the Company may require, each of whom shall hold office for such period, have such authority and perform such duties as the appointing authority may designate, subject to any limitations imposed by resolution of the Managers.

4.11.4    Removal.  Any officer may be removed, either with or without cause, by the Managers, at any regular or special meeting thereof or, except in case of an officer chosen by the Managers, by any officer upon whom such power of removal may be conferred by the Managers (subject, in each case, to the rights, if any, of an officer under any contract of employment).

4.11.5    Resignation.  Any officer may resign at any time by giving Notice to the Managers or to the President or to the Secretary of the Company, but without prejudice to the rights, if any, of the Company under any contract to which such officer is a party. Any such resignation shall take effect at the date of the receipt of such Notice or any later time specified therein; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective

4.11.6 Vacancies. A vacancy in any office because of death, resignation, removal, disqualification or any other cause shall be filled in the manner prescribed in this Operating Agreement for regular appointments to such office.

4.11.7 President. The President shall be the chief executive officer of the Company and shall, subject to the control of the Managers, have general supervision, direction and control of the business and officers of the Company. The President shall preside at all meetings of the Members and the Managers. He or she shall have the general powers and duties of management usually vested in the office of the President of a corporation, and shall have such other powers and duties as may be prescribed by the Managers or this Operating Agreement. As agreed upon by the Members, at any given time, the President shall be any of the following: Amit Nenanim, Guy Korean, and Amir Jacoby. The initial President of the Company shall be Amit Nenanim. The President of the Company shall render the following services and shall perform the following duties for the Company in a faithful, diligent and efficient manner:

4.11.7.1    The President shall be responsible for all management, operational, marketing, establishment, maintenance, licensing and sub-licensing activities with respect to the "Potato Corner" outlets/stores in the Territory. He shall use his best efforts at all times during the term of this Agreement to operate and maintain the "Potato Corner" outlets/stores in the Territory according to the highest standards achievable consistent with the overall plan of the Management of the Company. The President shall comply with the rules, policies and procedures approved by the Management of the Company from time to time.

4.11.7.2    The President shall advertise market and promote the "Potato Corner" outlets/stores with the goal of causing public knowledge, awareness and patronage of the "Potato Corner" outlets/sites.

4.11.7.3    The President shall maintain a comprehensive system of records, books and accounts, with respect to the licensing and sub-licensing activities, operation, establishment, management, maintenance and other activities of the "Potato Corner" outlets /stores in the Territory with the assistance of the Corporate Secretary.

4.11.7.4    No later than the twentieth (20th) day of each month, with respect to the preceding month, the President shall render a statement of receipts and disbursements, a schedule of accounts receivable and payable, and a schedule of fees collected and distributed, together with a reconciled bank statement as of the last day of the month with the assistance of the Corporate Secretary.

4.11.7.5    No later than three (3) months after the end of a fiscal year, the President shall, with the assistance of the Corporate Secretary and external accountant hired by Management, cause the Company to issue audited financial statements, and shall provide a copy of the same to all the members of Management.

4.11.7.6    To the extent the President is lawfully able to do so, the President shall take such action as may be necessary to comply promptly with any and all laws, ordinances, orders or other requirements of any federal, state, county or municipal authority having jurisdiction of the Company and affecting the Company.

4.11.8  Secretary.  The Secretary shall record or cause to be recorded, and shall keep or cause to be kept, at the principal place of business of the Company and such other place or places as the Managers may order, a book of minutes of actions taken at all meetings of Managers, committees and Members, with the time and place of holding, whether regular or special, and, if special, how authorized, the Notice thereof given, the names of those present at Managers' and committee meetings, the Percentage Interest present or represented at Members' meetings, and the proceedings thereof.

The Secretary shall keep, or cause to be kept, at the principal place of business those records referenced in Section 2.6 above and, if the Company has issued Membership Certificates, a register showing the number and date of each Membership Certificate, and the number and date of each Membership Certificate surrendered for cancellation.

The Secretary shall give, or cause to be given, Notice of all the meetings of the Members and the Managers required by this Operating Agreement or by the Act to be given, and shall have such other powers and perform such other duties as may be prescribed by the Managers or by this Operating Agreement.

4.11.9  Treasurer.  The Treasurer shall keep and maintain, or cause to be kept and maintained, adequate and correct accounts of the properties and business transactions of the Company, including accounts of its assets, liabilities, receipts, disbursements, income, losses, changes in financial position, Capital Accounts, and retained earnings.

The Treasurer shall deposit all moneys and other valuables in the name and to the credit of the Company with such depositories as may be designated by the Managers. He or she shall disburse the funds of the Company as may be ordered by the Managers, shall render to the President and the Managers whenever they request it, an account of all of his transactions as Treasurer and of the financial condition of the Company, and shall have such other powers and perform such other duties as may be prescribed by the Managers or this Operating Agreement.

4.12    Indemnification and Liability Insurance.

4.12.1  The Company may provide indemnification to its Managers, officers and agents to the fullest extent permitted by Delaware law.

4.12.2  The Company shall have the power to purchase and maintain insurance on behalf of any Manager or officer against any liability asserted against or incurred by a Manager or officer in that capacity or arising out of that person's status as a Manager or officer of the Company.

17

4.13   Actions of the Managers. Each Manager has the power to bind the Company as provided in this ARTICLE IV. If there is more than one Manager, decisions of the Managers shall be made by majority vote of the Managers if at a meeting, or by unanimous written consent. No act of a Member in contravention of such a determination shall bind the Company to Persons having knowledge of such determination.

4.14   Meetings of Managers.

4.14.1   Place of Meetings. Meetings of Managers may be held at any place, selected by the person or persons calling the meeting. If no other place is stated or fixed, all meetings shall be held at the principal place of business of the Company.

4.14.2   Calling of Meetings. A meeting of the Managers may be called at any time by the President or any two Managers.

4.14.3   Notice of Meetings. Notice of the time and place of meetings of Managers shall be personally delivered to each Manager or communicated to each Manager by telephone or mail, charges prepaid, addressed to the Manager's address as is shown upon the records of the Company, or if it is not so shown on such records or is not readily ascertainable, at the place at which the meetings of Managers are regularly held. In the case Notice is mailed, it shall be deposited in the United States mail at least ninety-six (96) hours prior to the time of the holding of the meeting. In the event Notice is delivered personally or communicated by telephone, it shall be so delivered or communicated at least forty-eight (48) hours prior to the time of the holding of a meeting.

Except as otherwise provided by the Act or this Operating Agreement, a Notice need not specify the purpose of the meeting of the Managers. Whenever any Manager has been absent from any meeting of the Manager for which Notice has not been dispensed with, an entry in the minutes to the effect that Notice has been duly given shall be conclusive and incontrovertible evidence that due Notice of such meeting was given to such Manager.

4.14.4   Participation Through Telecommunications Equipment. Managers may participate in a meeting of the Company through the use of conference telephones or similar communications equipment, as long as all Managers participating in the meeting can hear one another. Participation in a meeting pursuant to this provision constitutes presence in person at that meeting.

4.14.5   Adjourned Meetings. When a Managers' meeting is adjourned to another time or place, unless the Certificate or this Operating Agreement otherwise requires, and, except as provided in the Act, Notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken. At the adjourned meeting, the Managers may transact any business that may have been transacted at the original meeting. If the adjournment is for forty-eight hours or more, a Notice of the adjourned meeting shall be given to each Member entitled to vote at the meeting.

4 14.6  Validation of Meeting Held Without Proper Call or Notice.  The actions taken at any meeting of Managers, however called and noticed, and wherever held, have the same validity as if taken at a meeting duly held after regular call and notice, if a quorum is present either in person or by proxy, and if, either before or after the meeting, each of the Managers signs a written waiver of Notice or consents to the holding of the meeting or approves the minutes of the meeting. All waivers, consents, and approvals shall be filed with the Company records or made a part of the minutes of the meeting. Attendance of a Manager at a meeting shall constitute a waiver of Notice of the meeting, except when the Manager objects, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.

4.14.7  Participation Through Telecommunications Equipment.  Managers may participate in a meeting of the Managers through the use of conference telephones or similar communications equipment, as long as all Managers participating in the meeting can hear one another.  Participation in a meeting pursuant to this provision constitutes presence in person at that meeting.

4.14.8  Quorum.

4.14.8.1   A majority of the Managers in attendance or represented by proxy shall constitute a quorum at a meeting of Managers.

4.14.8.2   The Managers present at a duly called or held meeting at which a quorum is present may continue to transact business until adjournment, - notwithstanding the loss of a quorum, if any action taken after loss of a quorum, other than adjournment, is approved by the requisite number of Managers specified in the Certificate, this Operating Agreement, or the Act.

4.14.8.3   In the absence of a quorum, any meeting of Managers may be adjourned from time to time by the vote of a majority of the Managers in attendance, but no other business may be transacted, except as provided in subparagraph 4.14.8.24.14.8.2 above.

4.14.9  Action Without a Meeting.  Any action required or permitted to be taken by the Managers may be taken without a meeting if all the Managers shall individually or collectively consent in writing to such action.  Such consent or consents shall be filed with the minutes of the proceedings of the Managers and shall have the same force and effect as a unanimous vote of the Managers.

4.15   Compensation of Manager.  Each Manager shall be reimbursed all reasonable expenses incurred in managing the Company and shall be entitled to compensation in an amount, if any, to be determined from time to time by the affirmative vote of a Majority of the Members.

4.16   Authority of Members to Bind the Company.  The Members hereby agree that only the Managers and authorized agents of the Company shall have the authority to bind the Company.  No Member other than a Manager shall take any action as a Member to bind the Company, and each Member shall indemnify the Company for any costs or damages incurred by the Company as a result of the unauthorized action of such Member.

4.17   Specific Arrangements with the Cinco Group. As agreed upon in the Joint Venture Agreement, the Company shall enter into a Master License Agreement with Cinco Corporation (Philippines), Inc. (or an affiliated company designated) which shall include the following terms and conditions:

4.17.1   The Company agrees to license the "POTATO CORNER" intellectual property rights from Cinco Corporation (Philippines), Inc. (or an affiliated company designated) consisting of (i) the trademark, service mark and trade name "POTATO CORNER"; and (ii) various trademarks, service marks, trade names, slogans, designs, insignias, emblems, symbols, color schemes, package features, logo and other propriety identifying characteristics used in relation and in connection with the "Potato Corner" Products and the System; and (iii) as well as other intellectual property rights in connection with the "POTATO CORNER" intellectual property rights, for use in the Territory.

4.17.2   The Company agrees to pay, as an arm's length license fee, the following amounts: (i) With respect to the licensing / sub-licensing or franchising the "POTATO CORNER" intellectual property rights in connection with the "POTATO CORNER" outlets/stores, an amount equal to thirty percent (30%) of all initial/franchise fees and ongoing royalty fees paid to/ collected by the Company. Payments shall be made to Cinco (or an affiliated company to be designated by Cinco) by wire transfer using a bank or other financial institution specified by it within thirty (30) days from receipt of the fees by the Company; and (ii) All withholding and other applicable taxes levied by any authority on the payments by the Company shall be borne solely by the Company.

4.18   Specific Arrangements with the LA Group. As agreed upon in the Joint Venture Agreement, the Company agrees to engage the LA Group to provide management and strategic experience and expertise during the duration of this Agreement. The Company shall enter into a Master Services Agreement with the LA Group (or a corporation to be designated by the LA Group) which shall include the following terms and conditions:

4.18.1   In consideration for the provision of its services under the Master Services Agreement, the LA Group shall be entitled to a services fee equal to thirty (30%) percent of all initial/franchise fee and continuing royalty fees paid to/ collected by the Company.

4.18.2   All withholding and other applicable taxes levied by any authority on the payments by the Company to the LA Group under this Agreement shall be borne solely by the Company.

4.18.3   The LA Group shall faithfully, diligently and efficiently exercise its obligations and responsibilities under the Master Services Agreement.

4.18.4   The LA Group shall maintain and protect confidential information belonging to Cinco or the Company, and such undertaking shall apply to all of its partners, officers, employees, or agents.

## ARTICLE V

## CAPITAL

5.1     Initial Capital Contributions. Upon execution of this Agreement, each Member shall assign, convey and transfer their respective Initial Capital Contribution to the Company. Each Member represents and warrants to the Company that (i) the Member's Shares are free of any mortgage, pledge, lien, security, interest or other encumbrance of any kind or nature, (ii) such Member is the lawful beneficial and record owner of, and has good and marketable title to, the Member's Shares, and (iii) to the best of such Member's knowledge, the Member's Shares are duly authorized validly issued, fully paid and nonassessable. Additional Members shall make Capital Contributions in the amount, at the time and on the terms determined by the Members consenting to the admission pursuant to Section 3.1 hereof.

5.2     Capital Accounts. The Company shall establish and maintain a Capital Account for each Holder in accordance with Regulations Section 1.704-1(b)(2)(iv). Accordingly, a Holder's Capital Account shall be increased by (1) the amount of money the Holder contributes to the Company, (2) the fair market value of property the Holder contributes to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under IRC Section 752, and (3) allocations to the Holder of Income (or items thereof), including income and gain exempt from tax and gain as computed for book purposes in accordance with Regulations Section 1.704-1(b)(2)(iv)(g) but excluding any gain separately computed for tax purposes as described in Regulations Section 1.704-1(b)(4)(i). A Holder's Capital Account shall be decreased by (1) the amount of money the Company distributes to the Holder, (2) the fair market value of property the Company distributes to the Holder (net of any liabilities secured by such distributed property that the Holder is considered to assume or take subject to under IRC Section 752), (3) allocations to the Holder of the Company's nondeductible, noncapital expenditures, and (4) allocations to the Holder of Losses (or item thereof), including loss and deduction as computed for book purposes in accordance with Regulations Section 1.704-1(b)(2)(iv)(g) but excluding nondeductible, noncapital expenditures and loss and deduction separately computed for tax purposes as described in Regulations Section 1.704-1(b)(4)(i). A Holder's Capital Account in all events shall be adjusted in accordance with the additional rules set forth in Regulations Section 1.704-1(b)(2)(iv). In the event a Holder transfers all or any portion of his interest in the Company, the transferee shall succeed to the individual Capital Account balance of the transferor to the extent such individual Capital Account balance relates to the transferred interest.

5.3     Adjustment for Distributions in Kind. Any asset of the Company distributed to the Holders in kind shall be valued according to its fair market value. An item of Income or Loss shall be computed as if such asset had been sold at its fair market value, such hypothetical item shall be allocated as provided in Section 6.1, and each Holder's Capital Account shall be credited or charged, as the case may be, with the Holder's share of such hypothetical item prior to any such distribution of assets.

5.4     Interest. No Capital Contribution or Capital Account balance shall bear interest.

5.5     Deficit Capital Account. No Holder shall be obligated to restore a Capital Account having a balance of less than zero.

5.6     Return of Capital. Except as otherwise provided in this Operating Agreement, no Holder shall have any right to withdraw or make a demand for Distribution or withdrawal or return of any Capital Contribution or Capital Account balance.

5.7     Optional Adjustments to Capital Accounts. Upon (i) a contribution of cash or property (which shall be valued at its fair market value) to the Company by a new or existing Holder for a Membership or Economic Interest, or (ii) a distribution by the Company to a retiring or continuing Holder for a Membership or Economic Interest, the Company may, in the discretion of the Members, increase or decrease the Capital Accounts of the Holders to reflect a revaluation of Company Property on the books of the Company, in accordance with the provisions of Regulations Section 1.704-1(b)(2)(iv)(f).

## ARTICLE VI

## INCOME AND LOSSES

6.1     Allocations. Except as otherwise provided in this Article VI, Income and Losses, and each item thereof, of the Company shall be allocated to the Holders in proportion to their Percentage Interests.

6.2     Qualified Income Offset. A Holder whose Capital Account is unexpectedly reduced on account of an adjustment described in Section 1.704-1(b)(2)(ii)(d)(4) of the Regulations, an allocation described in Section 1.704-1(b)(2)(ii)(d)(5) of the Regulations, or a distribution described in Section 1.704-1(b)(2)(ii)(d)(6) of the Regulations, shall be allocated that Holder's pro rata portion of each item of Company income, including gross income, and gain in an amount and manner sufficient to eliminate such deficit balance as quickly as possible.

6.3     Minimum Gain Chargeback. Notwithstanding any other provision herein, if there is a net decrease in Company Minimum Gain during any taxable year, items of Company income and gain shall be allocated in accordance with the provisions of Regulations Section 1.704-2(f). This provision is intended to comply with Regulations Section 1.704-2(e)(3).

6.4     Contributed Property and Revaluations. In accordance with IRC Section 704(c), income, gain, loss and deduction with respect to property contributed to the Company by a Holder shall be allocated solely for tax purposes among the Holders so as to take account of any variation between the adjusted basis of the property to the Company and its fair market value on the date of the Contribution. Further, if the book value of any Company asset is adjusted as described in Regulations Section 1.704-1(b)(2)(iv)(f), subsequent allocations for tax purposes of income, gain, loss and deduction with respect to such asset shall take into account any variation between its adjusted tax basis and its adjusted book value. In either case, the Managers shall determine such allocations using a method that qualifies as reasonable within the meaning of Regulations Section 1.704-3. No Holder's Capital Account shall be adjusted for allocations made under this Section.

6.5    Timing. All allocations of Income or Losses shall be made to the Persons shown on the records of the Company to have been Holders as of the end of business on the last day of the Company's taxable year for which the allocation is made. Notwithstanding the foregoing, upon the transfer of an Economic Interest or the admission of an Additional Member during a taxable year of the Company, the Income or Losses shall be allocated between the former Holder and the successor, or to the Additional Member, as the case may be, according to the number of days during such year each was a Holder.

## ARTICLE VII

## DISTRIBUTIONS

7.1    Operating Distributions. The Managers from time to time may determine, in their reasonable judgment, that: (i) there is an excess of cash on hand beyond the Company's current and anticipated requirements, including, without limitation, cash flow and reserve requirements, and (ii) a distribution of such excess cash on hand, if any, is permissible under Section 18-607 of the Act. In that event, the Managers may, in their sole and absolute discretion, make a distribution of all or a part of such excess (an "*Operating Distribution*") to the Holders, provided that no such Distribution shall be declared and paid unless, after such Distribution, the assets of the Company will exceed all liabilities of the Company. Such Distributions may be made in cash or Property or partly in both, as determined in the sole and absolute discretion of the Managers.

7.2    Generally Pro Rata. Except as provided in Section 7.3 below, Distributions shall be allocated to Holders in proportion to their Percentage Interests.

7.3    Liquidating Distributions. Upon the dissolution of the Company, liquidating distributions in all cases shall be made in accordance with the positive Capital Account balances of the Holders, as determined after taking into account all Capital Account adjustments for the Company's taxable year during which such dissolution occurs (other than those made pursuant to this section), by the end of such taxable year or, if later, within ninety (90) days after the date of such dissolution.

## ARTICLE VIII

## ASSIGNMENT OF INTERESTS

8.1    Assignment of Interests. An Economic Interest is assignable in whole or in part, provided, however, that no Membership Interest may be assigned to any Person (including any assignments for security purposes or other form of pledge) without the consent of Members required pursuant to Section 3.7. Upon admission, the Assignee shall become a Substitute Member, and shall have the rights and benefits, and is subject to the restrictions and liabilities, of a Member under the Certificate, this Operating Agreement, and the Act. A Substitute Member is also liable for the obligations of the Assignor to make Capital Contributions, and to return any unlawful distributions made to the Assignor under Chapter VI (commencing with Section 18-601) of the Act. However, the Substitute Member is not obligated for liabilities unknown to the Substitute Member at the time the Substitute Member became a Member and that could not be ascertained from the Certificate or this Operating Agreement.

8.2     No Dissolution upon Assignment.  An assignment of an Economic Interest does not of itself dissolve the Company or, except as otherwise set forth herein, entitle the Assignee to vote or participate in the management and affairs of the Company or to become or exercise any rights of a Member.  An assignment of an Economic Interest merely entitles the Assignee to receive, to the extent assigned, the Income, Losses, Distributions and similar items to which the Assignor would be entitled.

8.3     Information Regarding Assignee.  Upon the assignment of all or part of an Economic Interest, the Assignor shall provide the Manager or Member of the Company responsible for maintaining the books and records with the name and address of the Assignee, together with details of the interest assigned.  Upon receipt of that Notice, the Company shall amend the list required by Section 2.6 accordingly.  Until the Assignee becomes a Substitute Member, the Assignor continues to be a Member and to have the power to exercise any rights and powers of a Member, including the right to vote which, in the case of a Member who has assigned his or her or its entire Economic Interest in the Company, shall include the right to vote in proportion to the Percentage Interest that the assigning Member would have, had the assignment not been made.

8.4     No Release of Liability of Assignor.  The Assignor is not released from liability as a Member solely as a result of the Assignment.  Whether or not an Assignee becomes a Substitute Member, the Assignor is not released from the Assignor's liability to the Company under Subchapter V (commencing with Section 18 501) and Subchapter VI (commencing with Section 18-601) of the Act.

8.5     Pledge of Membership Interest.  The pledge of, or granting of, a security interest, lien, or other encumbrance in or against any or all of the Membership Interest of a Member shall not cause the Member to cease to be a Member or to grant to anyone else the power to exercise any rights or powers of a Member.

8.6     Exercise of Rights upon Death or Incompetency.  If a Member who is a natural person dies or is adjudged by a court of competent jurisdiction to be incompetent to manage the Member's person or property, the Member's executor, administrator, guardian, conservator, or other legal representative may exercise all of the Member's rights for the purpose of settling the Member's estate or administering the Member's property, including any power the Member had under the Certificate or this Operating Agreement to assign its Membership Interest.

8.7     Exercise of Rights upon Dissolution or Termination.  If a Member which is an Organization is dissolved or terminated, the powers of that Member may be exercised by its legal representative or successor.

## ARTICLE IX

## DISSOLUTION AND WINDING UP

9.1     Dissolution  The Company shall and may only be dissolved, and its affairs wound up, upon the first to occur of the following events (which, unless the Members agree to continue the business, shall constitute Dissolution Events):

9.1.1 the expiration of the Term, unless the business of the Company is continued with the consent of those Members required pursuant to Section 3.7;

9.1.2 the vote of such number of Members as is required pursuant to Section 3.7;

9.1.3 the Dissociation of a Member under Article XI, unless the business of the Company is continued with the consent of those Members required pursuant to Section 3.7 within ninety (90) calendar days after such Dissociation; or

9.1.4 the entry of a decree of judicial dissolution pursuant to the Act.

9.2    Effect of Dissolution. Upon dissolution, the Company shall be dissolved and wound up in accordance with the Act, and the Company Property shall be distributed in accordance with Section 7.3. In addition, upon dissolution, the following shall immediate apply:

9.2.1 All rights granted under the Master License Agreement shall terminate and the Company shall cease the use of the Potato Corner intellectual property rights, and confidential information, provided however, that the Company shall be permitted to use any of the foregoing as is reasonably required in order to comply with its obligations under its sub-licensing or franchising agreements, but only to the extent of the duration of sub-licensing or franchising agreements in existence at the time of the termination of this Operating Agreement.

9.2.2 The LA Group shall be subject to a non-compete arrangement and hereby agrees that, within two (2) years from the date of termination of this Operating Agreement, it shall not engage in the business of establishing, operating, managing, licensing and franchising identical or similar products sold by the Company, using the intellectual property rights identical or similar to those used by the Company, at the time of the termination of this Operating Agreement.

## ARTICLE X

## TAX AND ACCOUNTING MATTERS

10.1    Characterization as a Partnership. The Members intend that the Company be classified as a partnership for federal and state income tax purposes. Accordingly, this Operating Agreement is written and shall be construed in a manner consistent with such intent.

10.2    No Partnership Intended for Nontax Purposes. The Members have formed the Company under the Act, and expressly do not intend hereby to form a partnership under either the Delaware Uniform Partnership Law or the Delaware Revised Uniform Limited Partnership Act. The Members do not intend to be partners one to another, or partners as to any third party. To the extent any Member, by word or action, represents to another person that any other Member is a partner or that the Company is a partnership, the Member making such wrongful representation shall be liable to any other Member who incurs personal liability by reason of such wrongful representation.

10.3    Fiscal Year. The fiscal year of the Company shall end on the last day of December of each year. The Managers may at any time change the fiscal and taxable year of the Company, subject to any applicable limitation of law or regulation.

10.4    Accounting Method. The Managers shall select the method of accounting by which the Company books of account shall be maintained and its income, gains, losses, deductions and credits shall be reported, for both financial and tax accounting purposes. The Managers may at any time change the financial and tax accounting method of the Company, subject to any applicable limitation of law or regulation.

10.5    Tax Information. As soon as reasonably practicable after the end of the Company fiscal year, the Managers shall cause each Holder to be furnished with a Schedule K-1 for such year and any other schedule or statement required by federal income tax law.

10.6    Basis Adjustment. In the case of a Distribution of Company Property or a transfer of a Membership Interest, the Managers may cause the Company to file an election under IRC Section 754 to adjust the basis of the Company Property. As a result of this election, the Managers shall have the right to require, as a condition to the granting of consent to any transfer, the reimbursement of expenditures made by the Company for any legal and accounting fees incurred to make any such basis adjustment. The Managers shall have the right, in their sole and absolute discretion, to decline to make such an election; and further, the failure to make any election under the IRC in connection with any particular transfer of an interest in the Company shall not affect the right of the Managers to make, or refuse to make, such an election with respect to any subsequent transfer of an interest in the Company.

10.7    Other Elections. The Company shall have the right, in the sole and absolute discretion of the Managers, to make any other elections or determinations required or permitted for federal or state income tax or other tax purposes. The Managers may rely upon the advice of the Company's accountants or tax attorneys with respect to the making of any such election.

10.8    Taxes of Taxing Jurisdictions. To the extent that the laws of any Taxing Jurisdiction requires, each Holder requested to do so by the Managers will submit an agreement indicating that the Holder will make timely income tax payments to the Taxing Jurisdiction and that the Holder accepts personal jurisdiction of the Taxing Jurisdiction with regard to the collection of income taxes attributable to the Holder's income, and interest, and penalties assessed on such income. If the Holder fails to provide such agreement, the Company may withhold and pay over to such Taxing Jurisdiction the amount of tax, penalty and interest determined under the laws of the Taxing Jurisdiction with respect to such income. Any such payments with respect to the income of a Holder shall be treated as a distribution to such Holder for purposes of ARTICLE VII. The Company may, where permitted by the rules of any Taxing Jurisdiction, file a composite, combined or aggregate tax return reflecting the income of the Company and pay the tax, interest and penalties of some or all of the Holders on such income to the Taxing Jurisdiction, in which case the Company shall inform the Holders of the amount of such tax, interest and penalties so paid.

10.9    Tax Matters Partner. The Managers shall designate one of their number or, if there are no Managers eligible to act as tax matters partner any other Member, as the tax matters

partner of the Company pursuant to IRC Section 6231(a)(7). Any Member designated as tax matters partner shall take such action as may be necessary to cause each other Member to become a notice partner within the meaning of IRC Section 6723. Any Member who is designated tax matter partner may not take any action contemplated by IRC Sections 6222 through 6232 without the consent of the Managers.

## ARTICLE XI

## DISSOCIATION OF A MEMBER

11.1    Dissociation.  A Person shall cease to be a Member upon the happening of any of the following events:

11.1.1  the withdrawal of a Member with the consent of such number of Members as is required pursuant to Section 3.7;

11.1.2  the bankruptcy (as defined by the Act) of a Member;

11.1.3  in the case of a Member who is a natural Person, the death of the Member or the entry of an order by a court of competent jurisdiction adjudicating the Member incompetent to manage the Member's personal estate;

11.1.4  in the case of a Member who is acting as a Member by virtue of being a trustee of a trust, the termination of the trust (but not merely the substitution of a new trustee);

11.1.5  in the case of a Member that is a separate Organization other than a corporation, the dissolution and commencement of winding up of the separate Organization;

11.1.6  in the case of a Member that is a corporation, the filing of a certificate of dissolution, or its equivalent, for the corporation or the revocation of its charter; or

11.1.7  in the case of an estate, the distribution by the fiduciary of the estate's entire interest in the Company.

11.2    Rights of Dissociating Member.  In the event any Member dissociates prior to the expiration of the Term:

11.2.1  if the Dissociation causes a dissolution and winding up of the Company, the Member shall be entitled to participate in the winding up of the Company to the same extent as any other Member except that any Distributions to which the Member would have been entitled shall be reduced by the damages sustained by the Company as a result of the Dissolution and winding up;

11.2.2  if the Dissociation does not cause a dissolution and winding up of the Company, the Member shall not be entitled to receive any amount in consideration of the Member's Membership Interest on account of such Dissociation, unless such Member no

longer holds the corresponding Economic Interest. Otherwise, the Dissociated Member shall continue as Holder of an Economic Interest only.

## ARTICLE XII

## MISCELLANEOUS PROVISIONS

12.1    Amendment of Operating Agreement. This Operating Agreement may be modified upon the vote of Members required pursuant to Section 3.7. No Member or Manager shall have any vested rights in the Operating Agreement which may not be modified through an amendment to the Operating Agreement.

12.2    Entire Agreement. The Operating Agreement represents the entire agreement among all the Members and between the Members and the Company

12.3    Interpretation. To the extent any provision of this Operating Agreement is prohibited or ineffective under the Act, the Operating Agreement shall be considered amended to the smallest degree possible in order to make the agreement effective under the Act. In the event the Act is subsequently amended or interpreted in such a way to make any provision of the Operating Agreement that was formerly invalid valid, such provision shall be considered to be valid from the effective date of such interpretation or amendment.

12.4.   Rights of Creditors and Third Parties under Operating Agreement. This Operating Agreement is entered into among the Company and the Members for the exclusive benefit of the Company, its Members, and their successors and assignees. This Operating Agreement is expressly not intended for the benefit of any creditor of the Company or any other Person. Except and only to the extent provided by applicable statute, no such creditor or third party shall have any rights under this Operating Agreement or any agreement between the Company and any Member with respect to any Capital Contribution or otherwise.

12.5 .  Valuation of Non-Cash Consideration. For purposes of this Operating Agreement, the procedure for valuing any non-cash consideration shall be as follows: If the parties cannot otherwise agree, each party shall select a qualified appraiser and the appraisers so selected shall jointly select an appraiser, and the valuation of the appraiser so selected shall be binding on all parties. Such valuation shall be based on an arm's length cash sale of the assets. If the non-cash consideration being valued is real property, the selected appraiser shall be an MAI appraiser.

12.6    Counterpart Execution. This Operating Agreement may be executed in any number of identical counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same instrument when each party has signed one (1) such counterpart.

12.7    Remedies. The parties hereto recognize and agree that the breach of any term, provision, or condition of this Operating Agreement may cause irreparable damage, the amount of which is difficult to ascertain and that the award of damages may not be adequate relief to the party aggrieved; the parties therefore agree that, in addition to all other remedies available in the event of a breach of any of the terms or conditions of this Operating Agreement, the party

28

aggrieved shall have the right, in addition to all other remedies available in the event of a breach of this Operating Agreement, to injunctive or other equitable relief (from any court or other body having appropriate jurisdiction).

    12.8   Successors and Assigns. Except as herein otherwise specifically provided, this Operating Agreement shall be binding upon and inure to the benefit of the parties and their legal representatives, heirs, administrators, executors, successors and assigns.

    12.9   Severability. If any provision of this Operating Agreement, or the application of such provision to any Person or circumstance, shall be held invalid, the remainder of this Operating Agreement, or the application of such provision to Persons or circumstances other than those to which it is held invalid, shall not be affected thereby.

    12.10  Governing Law. This Operating Agreement shall be governed by and construed and enforced in accordance with the laws of the State of California without regard to the principles governing conflicts of laws.

    IN WITNESS WHEREOF, this Operating Agreement is entered into as of the Effective Date.

                                    INSERT SIGNATURE BLOCKS

IN WITNESS WHEREOF, the parties have executed this Agreement on the date and in place first mentioned.

Cinco Group:

Cinco Corporation (Philippines)

Name: Jose P. Magsaysay

Title: CEO

Jose P. Magsaysay, Jr.

Ma. Victoria O. Bermejo

Ricardo R. Montelibano

L.A. Group:

Amit Nemanim

Guy Koreni

Amir Jacoby

SIGNED IN THE PRESENCE OF:

November 30, 2010

# EXHIBIT "D"

## PCJV USA LLC
## JOINT VENTURE AGREEMENT
(FIRST AMENDMENT TO THE JV AGREEMENT)

This Joint Venture Agreement (the "Agreement") is made and entered into on OCTOBER 17, 2012 at its Principal Office , Suite #1100, 6380 Wilshire Blvd Los Angeles, CA 90048 by and between:

POTATO CORNER INTERNATIONAL a corporation duly existing and registered by virtue of and under the laws of the State of Delaware, US with office address at 92 Corporate Park Suite C-332, Irvine, California, USA 92606, represented herein by its duly authorized representative, Jose P. Magsaysay (hereinafter "PCI"), and its directors, Jose P. Magsaysay, Jr., Jose Miguel Ma. G. Montinola, Ma. Victoria O. Bermejo, Ricardo K. Montelibano, all of whom are Philippine citizens and resident, and collectively referred to as the "PCI Group";

-and-

GUY KOREN, AMIR JACOBY AND INBAL JACOBY all of whom are U.S citizens and residents and collectively referred to as the "LA Group

### RECITALS

WHEREAS, the Parties hereto have agreed to form a limited liability company (hereinafter referred to as the "Company") under the laws of the State of Delaware, with the primary purpose of engaging in the business of establishing, operating, managing, licensing and franchising "Potato Corner" stores/outlets in the United States of America and Israel, except in the County of Los Angeles, USA and the County of San Francisco, USA and Tanforan Mall (hereinafter, "Territory").

WHEREAS, the Parties herein have agreed to enter into this Agreement which sets forth the terms and conditions with respect to the organization, incorporation, operation and management of the Company and defines their respective rights, duties and obligations of the parties to this Agreement

WHEREAS, the Parties agree that the LLC operating agreement to be entered by them shall reflect the terms and conditions as set forth in this Agreement.

WHEREAS, Cinco may assign and or all of its rights to the joint venture company formed under this Agreement to a wholly-owned subsidiary as it deems fit.

NOW, THEREFORE, for and in consideration of the foregoing premises, the Parties hereby agree as follows:

1) ORGANIZATION AND FORMATION OF THE COMPANY

    a) Within ten (10) days from the Effective Date of this Agreement, the Parties herein agree to organize and form, a limited liability company to be called "PCJV USA" ( hereinafter referred to as the Company) for the primary purpose of engaging in



WEST\222455823.2

the business of establishing, operating, managing, licensing and franchising "Potato Corner" stores/outlets in the Territory.

b) The initial members of the Company shall be the following:

    i)  Potato Corner International (PCI)
        (1) Jose P. Magsaysay, Jr.
        (2) Jose Miguel Ma. G. Montinola
        (3) Ma. Victoria O. Bermejo
        (4) Ricardo K. Montelibano

    ii)  LA Group
        (1) Guy Koren
        (2) Amir Jacoby
        (3) Inbal Jacoby

c) The principal office of the Company shall be at Suite 1100, 6380 Wilshire Blvd. Los Angeles, CA 90048 USA.

d) The annual general meeting of the members of the Company shall be held every year at the principal office of the Company. The members may, at their discretion, invite non-members to join the annual general meeting, but only as non-voting observers. Further, to the extent allowed by the financial condition of the Company, and as agreed upon by a majority of all member interests, the Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses incurred by the following members in attendance of the annual members' meeting: Jose P. Magsaysay, Jr., Jose Miguel Ma. Montinola, Ma. Victoria O. Bermejo and Ricardo K. Montelibano.

e) The fiscal year of the Company shall begin on January 1 and end on December 31 of each year.

f) The Company shall immediately upon formation obtain a "Liability Insurance" for the Company the amount and scope of coverage to be determined by the managers.

g) All costs, fees and expenses incurred in connection with the organization and formation of the Company shall be for the account of the Company.

h) The operating agreement of the Company shall reflect the terms and conditions set forth in this Agreement between the Parties.

2) CAPITALIZATION/OWNERSHIP OF THE COMPANY

a) At the time of formation, the Company shall have a total capital account of Fifty Thousand Dollars (US$50,000) which shall be fully subscribed and paid.

b) Unless other agreed to in writing, at the commencement of this Agreement, the Parties hereby agree that the Cinco Group shall contribute Thirty Thousand Dollars (US$30,000) and own sixty (60%) percent of the Company's capital

2     G. k

accounts, while the LA Group shall contribute Twenty Thousand Dollars (US$20,000) and own the remaining forty (40%) percent.

c) The Parties hereby agree any increase in the capital account shall require an affirmative vote of 75% of all of the members' percentage interests in the Company. In the event an increase in the Company's capital accounts is approved by the members, both Parties shall have rights of pre-emption so that their pro rata ownership share in the Company shall be maintained, provided that, either Party shall have thirty (30) days within which to confirm in writing that it is willing and able to subscribe and fully pay its pro rata share of the increase in capital.

d) Neither Party shall assign any of its rights or obligations under this Agreement, nor his/its member interests in the Company without the prior written consent of the other Party. In the event either Party desire to transfer or sell his/its pro rata members interest in the Company to a person other those specifically named in Section 1(a) of this Agreement, such Party shall be obligated to sell the same first to the other Party, which has have thirty (30) days within which to exercise its rights of first refusal from the date of receipt of a written notice to sell. For this purpose, the Parties hereby agree that the right of first refusal may be exercised in accordance with the following formula: The average of the Company's earnings before interest, depreciation, taxes and amortization (EBITDA) for the last two (2) years multiplied by 5 times, and further multiplied by the percentage of member interest subject to such right of first refusal over total outstanding member interests.

3) MANAGEMENT OF THE COMPANY

a) As will be provided in the Operating Agreement, the business and affairs of the Company shall be managed and all of the Company powers shall be exercised by or under the direction of the managers (collectively referred to as "Management"). Unless otherwise agreed to by the parties, the Management shall be composed of seven (7) members, four (4) of whom shall be designated by the Cinco Group, and three (3) designated by the LA Group. Upon the formation of the Company, the following shall be named managers: Jose P. Magsaysay, Jr., Jose Miguel Ma. Montinola, Ma. Victoria O. Bermejo, Ricardo K. Montelibano, Guy Koren, Amir Jacoby and Inbal Jacoby.

b) The Management shall regularly meet on a monthly basis. The regular monthly board meeting may be done via teleconference or through the internet. The members may, at their discretion, invite non-members to join member meetings, but only as non-voting observers. Further, to the extent allowed by the financial condition of the Company, and as agreed upon by a majority of all member interests, the Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses incurred by the members named in Section 1(d) in attendance of said meetings.

c) Upon the formation of the Company, it shall have the following executive officers: President, Corporate Secretary and Treasurer, and the following shall be elected by the managers/members to serve these positions. Any change in these mentioned executive officers will require a vote of 75% of members' interest.

3



G.K

i) Chairman of the Board of Members – Jose P. Magsaysay

ii) President – At any given time, the President shall be any one of the following members: Guy Koren or Amir Jacoby or Inbal Jacoby and the first president will be Amit Nemanim now replaced by Guy Koren.

iii) Corporate Secretary – Erlinda S. Bartolome.

iv) Treasurer – Maria Victoria O. Bermejo

   (1) The Treasurer shall have oversight functions over the Accounting and Finance Departments that shall be exercised independent of the President.

d) Additional executive officers may be appointed by Management as it may deem necessary. Replacement and removal will require Managers simple majority vote.

e) It is hereby agreed that the rights and responsibilities of the Management shall include the following:

   i) Approval of the compensation package for the managers, executive offices and key personnel.

   ii) Approval of the Accounting System/Procedures/Software/Method to be used by the Company.

   iii) Approval of the operating budget of the Company, and any changes to it

   iv) Approval of all franchising agreements, and lease agreements.

   v) Approval of all purchases and disbursements in excess of $10,000, provided that such amount may be changed or modified by Management as it deems necessary.

f) The executive officers shall manage the business and property of the Company, and to market the business, in accordance with and pursuant to the directives of and policies set by the Management of the Company. The Management of the Company can recall and/or withdraw the appointment of any executive officer, as it deems necessary.

g) The Company shall enter into a Master License Agreement with Cinco (or an affiliated company to be designated by Cinco) which shall include the following terms and conditions:

   i) The Company agrees to license the "POTATO CORNER" intellectual property rights from Cinco or an affiliated company to be designated by Cinco) consisting of (i) the trademark, service mark and trade name "POTATO CORNER"; and (ii) various trademarks, service marks, trade names, slogans, designs, insignias, emblems, symbols, color schemes, package features, logo and other propriety identifying characteristics used in relation and in connection with the "Potato Corner" Products and the System; and (iii) as well as other intellectual property rights in connection with the "POTATO CORNER" intellectual property rights, for use in the Territory.

   ii) The Company agrees to pay, as an arm's length license fee, the following amounts:

4

(1) With respect to the licensing / sub-licensing or franchising the "POTATO CORNER" intellectual property rights in connection with the "POTATO CORNER" outlets/stores, an amount equal to thirty percent (30%) of all initial/franchise fees and ongoing royalty fees paid to/ collected by the Company. Payments shall be made to Cinco (or an affiliated company to be designated by Cinco) by wire transfer using a bank or other financial institution specified by it within thirty (30) days from receipt of the fees by the Company.

(2) All withholding and other applicable taxes levied by any authority on the payments by the Company shall be borne solely by the Company.

h) The Company agrees to engage the LA Group to provide management and strategic experience and expertise during the duration of this Agreement. The Company shall enter into a Master Services Agreement with the LA Group (or a corporation to be designated by the LA Group) which shall include the following terms and conditions:

i) In consideration for the provision of its services under the Master Services Agreement, the LA Group shall be entitled to a services fee equal to thirty (30%) percent of all initial/franchise fee and continuing royalty fees paid to/ collected by the Company

ii) All withholding and other applicable taxes levied by any authority on the payments by the Company to the LA Group under this Agreement shall be borne solely by the Company.

iii) The LA Group shall faithfully, diligently and efficiently exercise its obligations and responsibilities under the Master Services Agreement.

iv) The LA Group shall maintain and protect the Confidential Information belonging to Cinco or the Company, and such undertaking shall apply to all of its partners, officers, employees, or agents.

i) The President of the Company shall render the following services and shall perform the following duties for the Company in a faithful, diligent and efficient manner:

i) The President shall be responsible for all management, operational, marketing, establishment, maintenance, licensing and sub-licensing activities with respect to the "Potato Corner" outlets/stores in the Territory. He shall use his best efforts at all times during the term of this Agreement to operate and maintain the "Potato Corner" outlets/stores in the Territory according to the highest standards achievable consistent with the overall plan of the Management of the Company. The President shall comply with the rules, policies and procedures approved by the Management of the Company from time to time.

ii) The President shall advertise market and promote the "Potato Corner" outlets/stores with the goal of causing public knowledge, awareness and patronage of the "Potato Corner" outlets/sites

5

iii) The President shall maintain a comprehensive system of records, books and accounts, with respect to the licensing and sub-licensing activities, operation, establishment, management, maintenance and other activities of the "Potato Corner" outlets /stores in the Territory with the assistance of the Corporate Secretary.

iv) No later than the twentieth (20th) day of each month, with respect to the preceding month, the President shall render a statement of receipts and disbursements, a schedule of accounts receivable and payable, and a schedule of fees collected and distributed, together with a reconciled bank statement as of the last day of the month with the assistance of the Corporate Secretary.

v) No later than three (3) months after the end of a fiscal year, the President shall, with the assistance of the Corporate Secretary and external accountant hired by Management, cause the Company to issue audited financial statements, and shall provide a copy of the same to all the members of Management.

vi) To the extent the President is lawfully able to do so, the President shall take such action as may be necessary to comply promptly with any and all laws, ordinances, orders or other requirements of any federal, state, county or municipal authority having jurisdiction of the Company and affecting the Company.

j) Consistent with its fiduciary duty to the Company, the members and managers shall exercise the duty of care and shall, at all times, ensure that all corporate opportunities consistent with the objectives of this Agreement shall be pursued on behalf of, and for the benefit of the Company. As such, with respect to the establishment of Company-owned stores, whenever potential locations are identified by any member or manager, it shall be promptly brought to the attention of the Management. At all times, and within thirty (30) days from receipt of this information, the Management shall decide to either build a Company-owned store at the identified location. In the event the Company chooses to build a Company-owned store at the identified location, it shall have the right to do so, to the exclusion of any of the members or managers. However, in the even the Company decides not to build a Company-owned store at the identified location, it shall notify the members and managers of its decision in writing. In such case, the LA Group shall have the right to build a store at the identified location, provided that it shall enter into a franchising agreement with the Company, and shall pay the franchise fees and ongoing royalty fees as set forth in the Company's standard franchising agreement.

4) DURATION OF AGREEMENT

a) This Agreement shall become effective from the date of execution hereof and shall continue indefinitely unless otherwise terminated by (i) an affirmative vote of 75 percent (75%) of all member interests, or (ii) upon mutual agreement by the Parties in writing.

8

b) Upon termination of this Agreement, the effects of termination shall be as follows:

   i) All rights granted under the Master License Agreement shall terminate and the Company shall cease the use of the Potato Corner Intellectual Property Rights, and Confidential Information, provided however, that the Company shall be permitted to use any of the foregoing as is reasonably required in order to comply with its obligations under its sub-licensing or franchising agreements, but only to the extent of the duration of sub-licensing or franchising agreements in existence at the time of the termination of this Agreement

   ii) The LA Group shall be subject to a non-compete arrangement and hereby agrees that, within two (2) years from the date of termination of this Agreement, it shall not engage in the business of establishing, operating, managing, licensing and franchising identical or similar products sold by the Company, using the intellectual property rights identical or similar to those used by the Company, at the time of the termination of this Agreement.

5) GENERAL PROVISIONS

   a) This Agreement may not be altered, changed, supplemented or modified except by a written instrument duly signed by the Parties.

   b) The Parties shall use their best efforts to cooperate for the success of the business of the Company. The Parties further agree to perform all acts and execute and deliver all documents or instruments required or necessary to fully implement or consummate the transactions contemplated in and the intent underlying this Agreement.

   c) The Parties shall, to the extent feasible, cause the operating agreement of the Company to reflect the mutual covenants and provisions contained in this Agreement.

   d) All notices and other communications required or permitted to be given hereunder shall be given in writing (and for this purpose shall include emails or fax transmissions) and shall be addressed to the appropriate Party at the address of such Party as heretofore designated, or at such address as such Party may designate subsequently in writing.

   e) The failure of any Party at any time to require performance by the others of any provision of this Agreement shall not affect, in any way, the right of such Party to require performance of that or any other provision, and any waiver by any Party of any breach of this Agreement shall not be construed as a waiver of any continuing or succeeding breach of such provision, or a waiver of any other right under this Agreement.

   f) This Agreement shall constitute the entire agreement between the Parties and shall supersede any previous agreements, written or otherwise, with respect to the same subject matter which may have been made by the Parties prior hereto.

7

g)  The invalidity of any portion of this Agreement will not and shall not render the entire Agreement void, nor affect the validity of the rest of the provisions of this Agreement.

h)  This Agreement shall be governed by the laws of the State of California.

i)  Parties acknowledge that, from time to time, one Party (the "Discloser") may disclose to the other Party (the "Recipient") information: (a) relating to the Potato Corner outlets and sites; (b) relating to the Potato Corner Intangible Property Rights; (c) Potato Corner product specifications and related information; (d) which is marked with "confidential" or a similar legend; (e) which is described orally and designated as confidential; or (f) which would, under the circumstances, be understood by a reasonable person to be confidential ("Confidential Information"). Upon subsequent disclosure of previously disclosed Confidential Information to the Recipient by the Discloser, the information will remain Confidential Information even if not identified as Confidential Information at the subsequent disclosure.    Recipient shall retain such Confidential Information in confidence, and shall not disclose it to any Third Party or use it for other than the purposes of this Agreement without the Discloser's prior written consent.  Each Party shall use at least the same procedures and degree of care with respect to such Confidential Information which it uses to protect its own confidential information of like importance, and in no event less than reasonable care.  The Recipient will immediately give written notice to the Discloser of any unauthorized use or disclosure of the Discloser's Confidential Information, and the Recipient will assist the Discloser in remedying such unauthorized use or disclosure.

[The Remainder of This Page is Left Intentionally Blank]



IN WITNESS WHEREOF, the parties have executed this Agreement on the date and in place first mentioned.

**POTATO CORNER INTERNATIONAL GROUP:**

_____
Jose P. Magsaysay, Jr.

_____
Jose Miguel Ma. G. Monlinola

_____
Ma. Victoria O. Bermejo

_____
Ricardo K. Montelibano,

**L.A. Group:**

_____
Inbal Jacoby

_____
Guy Koren

_____
Amir Jacoby

SIGNED IN THE PRESENCE OF

_____          _____

**ACKNOWLEDGMENT**

9

# EXHIBIT "E"

# PCJV-LA GROUP

## PARTNERSHIP AGREEMENT

### Preamble

This Partnership Agreement ("Agreement") is made March 1, 2013, to memorialize the partnership activities and relationship of the partners executing this Partnership Agreement, who shall be referred to in this Agreement individually as a "Partner" and collectively as "Partners."

### RECITALS

A.    The Guy Koren ("Koren"), Amit Nemanim ("Nemanim"), and Amir Jacoby ("Jacoby") collectively initiated negotiations to work together as a group with the individuals constituting the Cinco Group to establish, operate, manage, license and franchise "Potato Corner" stores/outlets in the United States and Israel (other than Los Angeles and San Francisco Counties and Tanforan Mall), pursuant to the terms of the Potato Corner USA Joint Venture Agreement executed on or about 11/2009 ("JV Agreement"), which JV Agreement was subsequently replaced by the PCJV USA, LLC Limited Liability Company Agreement made effective 10/2010 ("PCJV Agreement").

B.    Pursuant to the PCJV Agreement, Koren, Nemanim, and Jacoby were invited to participate in PCJV USA, LLC as the "LA Group", by making a Capital Contribution (as defined in the PCJV Agreement) of $20,000 to PCJV USA, LLC and executing and performing services for PCJV USA, LLC pursuant to a Master Services Agreement ("Master Services Agreement").

C.    This Agreement is intended to memorialize in writing the election by Koren, Nemanim and Jacoby to continue the partnership relationship they initially established in connection with the negotiation of the JV Agreement, to accept the offer made to the LA Group to purchase and hold of a 40% membership interest in PCJV USA, LLC and to accept the offer made by PCJV USA, LLC to the LA Group to provide the services described in the Master Services Agreement.

### Type of Business

1.    The Partners have associated to form a General Partnership for the purpose of holding a membership interest in PCJV USA, LLC and providing services on behalf of PCJV USA, LLC pursuant to the Master Services Agreement, and to engage in such other activities as may be permitted by law and approved by a majority of the Partners.

### Partnership Name

2.    The Partnership name shall be "PCJV-LA Group".

### Partnership Term

3.    .    The Partnership shall be deemed to have commenced as of the execution of this Agreement by the Partners, and shall continue until dissolved by agreement of the Partners or terminated under the provisions of this Agreement.

## Place of Business

4.     The Partnership's principal place of business shall be: 8950 West Olympic Boulevard, Suite 563, Beverly Hills, CA 90211, California 90035. The Partnership shall maintain any other place or places of business agreed upon by the Partners.

## Initial Capital

5.     The Partners shall each be required to contribute to the Partnership their proportional share of the $20,000 Capital Contribution made by the Partnership to PCJV USA, LLC in and for their interest in the Partnership. The Partnership has offered Partnership interests in the Partnership to the following individuals in proportion to their respective capital contributions to the Partnership, as set forth in Exhibit A to this Agreement. Only those persons contributing a proportion share of this Capital Contribution shall be deemed a continuing Partners of the Partnership, in proportion to their actual contribution.

| | | |
|---|---|---|
| 5.1 | Guy Koren | $7,600 |
| 5.2 | Amit Nemanim | $7,600 |
| 5.3 | Amir Jacoby | $4,800 |

The failure of any Partner to pay their required contribution to this Partnership shall be deemed in default. If the default is not cured following 30 days prior written notice, the other Partners may advance the capital contribution as (i) a loan to the defaulting Partner to bear interest at the rate of 10% per annum until paid in full and secured by the Partner's interest in the Partnership and/or distributions made to such Partner with respect to such interest or (ii) a purchase from the Partnership of the defaulting Partner's allocated interest (or any part thereof) and a corresponding cancellation of such Partner's opportunity to continue as a Partner.

The Partners will prepare an Exhibit A to this Agreement to reflect the actual contributions made and the proportional Partnership interest thereby obtained.

## Service Commitment

6.     Subject to the allocation of responsibility among the Partners for the performance of the services required of the Partnership under the terms of the Master Services Agreement, each of the Partners shall be responsible for providing a proportional share of the services required (as determined by the Partners). Alternatively, the Partners may agree to compensate individual Partners for the service obligations required under the Master Services Agreement that have been assigned to and assumed and performed by them on behalf of the Partnership.

## Capital Withdrawals

7.     No Partner shall withdraw any portion of the Partnership capital without the other Partners' express written consent.

915753.1/81133.08003

## Profits and Losses

8.      Net profits and net losses will be allocated to the Partners, and net cash available for distribution by the Partnership will be distributed in proportion to the respective percentage interests of the Partners in the Partnership as described on Exhibit A to this Agreement. The term "net profits," as used in this Agreement, shall mean for tax purposes the Partnership net profits as determined by the accounting method generally and consistently applied by the Partnership, and for purposes of determining the cash available for distribution by the Partnership to the Partners the term "net profits" shall mean the net cash available to the Partnership after establishing such cash reserves as the Partners may determine to be prudent for working capital and any contingent liabilities.

## Books of Account

9.      Partnership books of account shall be accurately kept and shall include records of all Partnership income, expenses, assets, and liabilities. The Partnership books of account shall be maintained on a cash basis. Each Partner shall have the right to inspect the Partnership books during normal business hours at the principal office of the Partnership.

## Fiscal Year

10.     The Partnership's fiscal year shall end on December 31 each year.

## Accountings

11.     Complete accountings of the Partnership affairs at the close of business on the last days of March, June, September, and December of each year shall be rendered to each Partner within thirty (30) days after the close of each such month or as soon thereafter as may be practical with regard to the availability of such information from PCJV USA, LLC. At the time of each accounting, the net profits of the Partnership, if any, shall be distributed to the Partners as provided in this Agreement. Except as to errors brought to the Partners' attention within 15 days after it is rendered, each accounting shall be final and conclusive.

## Time Devoted to Partnership

12.     The Partners shall be required to devote such time and attention to the Partnership business as may be necessary for the Partnership to fulfill its obligations under the Master Services Agreement. Except as the service responsibilities may otherwise be allocated or delegated by the Partners, each of the Partners is required to provide a proportional amount of the service time required by the Master Services Agreement relative to their respective percentage interest in the Partnership. Failure to provide the time required to perform or to perform their respective share of the services required of the Partnership or otherwise allocated or delegated to a Partner shall constitute a breach of the Partnership Agreement. A Partner shall not be deemed in breach of their obligation to provide services on behalf of the Partnership unless and until the Partnership has provided such Partner with at least 30 days prior written notice of the alleged default or breach, and the default or breach as gone uncured during that notice period.

In addition to the services to be provided by the Partners in fulfillment of the Partnership's responsibilities under the Master Services Agreement, the Partners may be individually designated by the Partnership to serve as a Manager of PCJV USA, LLC. If so designated, a Partner shall fulfill their Manager responsibilities on behalf of the Partnership, and if unable or unwilling to do so a Partner shall so advise the Partnership so that they may designate someone else to serve in that capacity. The Partnership shall appoint its Manager designees to PCJV USA, LLC by Majority Approval (as defined below).

## Management and Authority

13.     Partnership decisions and the actions of the Partners shall be determined and approved by the vote or written consent of Partners holding a majority in percentage interest of the Partnership ("Majority Approval"). Individual Partners may not bind the Partnership without obtaining the Majority Approval of the Partners. Any obligation incurred in violation of this provision may be charged to and collected from the Partner who incurred the obligation. Subject to the above authorization requirement, any individual Partner may execute a document on behalf of the Partnership.

Guy Koren has been initially granted the title of "Managing Partner" on behalf of the Partnership in expectation that he will execute documents on behalf of the Partnership.

## Statement of Partnership

14.     The Partners will cause to be filed with the California Secretary of State a Statement of Partnership Authority pursuant to California Corporations Code Section 16303 on form GP-1 in effect at the time of the filing. The Partnership shall cause a Statement of Partnership Authority to be recorded in every county in which the Partnership owns, or contemplates owning, real property.

## Partners' Salaries

15.     Although no salaries are contemplated with respect to a Partner's services as a Manager of PCJV USA, LLC, the Partners providing services on behalf of the Partnership in fulfillment of the Partnership's obligations under the Master Services Agreement shall be entitled to such compensation as may be approved by the Partners by Majority Approval. If the Partnership is unable to pay for the services performed by a Partner, by Majority Approval the Partners the compensation otherwise payable may be accrued and thereafter paid from the first funds made available to the Partnership from PCJV USA, LLC. Compensation payable to a Partner for services provided may be paid as a guaranteed payment as provided under IRC Section 707(c), as payment made to a Partner irrespective of the Partner's percentage interest in Net Profits, the payment of which shall reduce the Net Profits allocable to the Partners in accordance with the Partners' percentage interests. In addition to compensation for their time, Partners shall be entitled to reimbursement for their reasonable business expenses incurred in furtherance of the Partnership business, so long as approved by the Partners by Majority Approval. Any compensation paid to a Partner and any business expenses reimbursed shall be deducted ordinary business expenses prior to computing net profits.

## Withdrawal of Partner

16.     Upon thirty (30) days written notice of intent to the other Partners, a Partner may dissociate from the Partnership by withdrawing as a Partner.

## Option to Purchase Dissociated Interest

17.     On dissociation of a Partner by death, withdrawal, or other act, the remaining Partners may continue the Partnership business by purchasing the outgoing Partner's interest in the Partnership assets and goodwill. The remaining Partners shall have the option to purchase the dissociated Partner's interest by paying to the outgoing Partner or the appropriate personal representative the value of the dissociated Partner's interest as determined under Paragraph 18 of this Agreement. If the remaining Partners do not exercise this option, the Partnership shall be dissolved as provided under Paragraph 21 of this Agreement, unless the remaining Partners have elected to convert the Partnership into an other business entity form and the withdrawing Partner's interest in such other entity is in proportion and comparable to the interest held by the withdrawing Partner immediately prior to withdrawal as provided in Paragraph 21A.

## Purchase Price of Partnership Interest

18.     On exercise of the option described in Paragraph 17 of this Agreement, the remaining Partners shall pay to the dissociated Partner or appropriate personal representative the value of the dissociated Partner's Partnership interest as determined by the last regular accounting preceding the effective date of the withdrawal plus the full unwithdrawn portion of the dissociated Partner's share in net profits earned between the date of that accounting and the date of dissociation. The Partnership shall have the right to offset against the purchase price otherwise payable for a withdrawing Partner's interest the Partner's share of any existing liabilities and accounts receivable incurred prior to the effective date of the withdrawal.

## Liability of Deceased Partner's Estate

19.     If on the death of one Partner, the surviving Partners exercise their option to purchase the deceased Partner's interest under Paragraphs 17 and 18, the liability of the deceased Partner's estate for Partnership obligations incurred during the period of continuation shall be limited to the amount that the deceased Partner had invested or the net value of the Partner's interest in the Partnership at the time of death (and including the unwithdrawn portion of net profits earned since the last accounting), whichever is greater.

## Duties of Purchasing Partners

20.     On any purchase and sale made pursuant to Paragraphs 17, 18, or 19 of this Agreement, the remaining Partners shall assume all Partnership obligations (subject to the right to offset a proportional amount against the purchase price). The remaining Partners shall hold and defend the withdrawing Partner or the deceased Partner's estate and personal representative, as well as any property belonging to either a withdrawing or deceased Partner, free and harmless from all liability for Partnership obligations beyond those reflected in the calculation of the purchase price payable. Immediately upon purchase of a withdrawing or deceased Partner's interest, the remaining Partners shall prepare, file, serve, and publish all notices required by law to protect the withdrawing Partner or the deceased Partner's estate and personal representative from liability for future Partnership obligations. All costs incident to the requirements of this Paragraph shall be borne by the remaining Partners.

## Dissolution

21.   When:  (1) the Partnership is dissolved by agreement of the Partners; or (2) a remaining Partner or Partners decline(s) to exercise the option to purchase a dissociated Partner's interest under Paragraph 17; or (3) it is otherwise required by law, the Partnership affairs shall be wound up, the Partnership assets liquidated, its obligations to creditors, including, to the extent permitted by law, Partners who are creditors, shall be paid, and the surplus divided among the Partners according to their rights of distribution of their Partnership accounts.

## Conversion

21A.   Upon the occurrence of an event resulting in a dissociation of a Partner, within 90 days of such event the remaining Partners may elect to convert the Partnership into an other business entity form for which the dissociated Partner's interest will be afforded limited liability from any liability arising after such conversion.  Conversion to an other entity form shall be in lieu of the exercise of the option to purchase the dissociated Partner's interest in the Partnership and in lieu of the Partnership dissolution.  The dissociated Partner shall receive an interest in the other entity form adopted by the remaining Partners that is proportional and comparable to the held by the dissociated Partner's interest in the Partnership prior to the dissociation event; provided, however, that the dissociated Partner's interest in the other entity need only be in a form that is comparable economically and need not include any voting rights or authority to act on behalf of the other entity in a manner comparable to that held as a Partner (e.g. comparable to an "economic interest" in a limited liability company, as defined in Cal Corp Code Section 17001(o)).

## Notices

22.   All notices between the Partners shall be in writing and shall be deemed served when personally delivered to a Partner, or when deposited in the United States mail, certified, first-class postage prepaid or by overnight courier, addressed to a Partner at the Partner's address set forth on the signature page to this Agreement or to such other place as may be specified in a notice given pursuant to this Paragraph as the address for service of notice on that Partner.  Notices may also be deemed duly provided if delivered by e-mail to an e-mail address specified by the receiving Partner and the party giving notice concurrently places a copy thereof in the United States mail (as described above) or delivers a copy by overnight courier, in which event notice shall be deemed given on the date of the delivery of the e-mail.

## Consents and Agreements

23.   All consents and agreements provided for or permitted by this Agreement shall be in writing. Signed copies of all consents and agreements pertaining to the Partnership shall be kept with the Partnership books.

## Governing Law

24.   This Agreement shall be governed by the California Uniform Partnership Act of 1994, as amended, and shall in all respects be a contract under California law.

## Attorney Fees

25.     As between the parties to this Agreement, the prevailing party in any dispute arising from or relating to this Agreement shall be awarded costs and attorney fees whether or not the matter is resolved by trial or appeal.

## Sole Agreement

26.     This instrument contains the Partners' sole agreement relating to their Partnership. It correctly sets out the Partners' rights and obligations. Any prior agreements, promises, negotiations, or representations not expressly set forth in this instrument have no force or effect.

Executed by the undersigned with effect as of the Effective Date defined above, at Orange County, California.

[See Counterpart Signature Pages of the Partners attached hereto]

## EXHIBIT A

### PARTNER CAPITAL CONTRIBUTIONS AND PERCENTAGE INTERESTS
(Proposed)

| PARTNER NAME AND ADDRESS | CAPITAL CONTRIBUTION | PERCENTAGE INTEREST |
|---|---|---|
| GUY KOREN<br>1478 S Crest Dr<br>LA, CA 90035 | $7,600 | 38% |
| AMIT NEMANIM | $7,600 | 38% |
| AMIR JACOBY<br>14320 Ventura Bl #115<br>Sherman Oaks, CA 91423 | $4,800 | 24% |

# EXHIBIT A

## PARTNERS, CAPITAL CONTRIBUTIONS AND PARTNERSHIP INTERESTS

### (Amended and Updated March 22, 2013)

| NAME OF PARTNER AND ADDRESS | CAPITAL CONTRIBUTION | PARTNERSHIP PERCENTAGE INTEREST |
|---|---|---|
| GUY KOREN | 12,258.04 | 61.3 |
| AMIR JACOBY | 7,741.96 | 38.7 |

## PCJV-LA GROUP,
### a California general partnership

## MEMBER COUNTERPART SIGNATURE PAGE

The undersigned, desiring to enter into the Partnership Agreement made effective March 1, 2013 ((the "Agreement") for PCJV-LA GROUP, a California general partnership (the "Company"), hereby agrees to all of the terms and provisions thereof. The undersigned hereby joins and executes the Agreement as a Partner of the Partnership, and hereby authorizes this Signature Page to be attached thereto in evidence of this joinder.

WITNESS, the execution hereof by the undersigned, as a Partner of PCJV-LA GROUP:

Signature of Partner

Address: 14320 Ventura BL #115
Sherman Oaks, CA 91423

### Spousal Consent

The undersigned is the spouse of the above general partner. I have read and understood the terms and conditions of the Partnership Agreement of PCJV-LA Group and agree to be bound by its terms. I agree that my spouse shall have the sole and exclusive power to manage the partnership interest created by the foregoing Agreement, regardless of whether that interest was acquired with community property, quasi-community property, or separate property assets, however so titled or characterized. I further acknowledge and agree that my spouse may, from time to time, or at any time, amend, restate, sell, transfer, assign or hypothecate his Partnership interest in any manner whatsoever, with or without my further consent.

Executed at  LA            County, California.

Date: 3/1/2013

## PCJV-LA GROUP,
### a California general partnership

## MEMBER COUNTERPART SIGNATURE PAGE

The undersigned, desiring to enter into the Partnership Agreement made effective March 1, 2013 (the "Agreement") for PCJV-LA GROUP, a California general partnership (the "Company"), hereby agrees to all of the terms and provisions thereof. The undersigned hereby joins and executes the Agreement as a Partner of the Partnership, and hereby authorizes this Signature Page to be attached thereto in evidence of this joinder.

WITNESS, the execution hereof by the undersigned, as a Partner of PCJV-LA GROUP:

Signature of Partner

Address: 1478 S, crest Dr
LA, CA 90035

1                                     **PROOF OF SERVICE**

2   **STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

3        At the time of service, I was over 18 years of age and **not a party to this action**. I am

4   employed in the County of Los Angeles, State of California. My business address is 1888 Century Park East, Suite 1900, Los Angeles, California 90067.

5        On July 22, 2019, I served true copies of the following document(s) described as **CROSS-COMPLAINANT GUY KOREN'S VERIFIED SECOND AMENDED CROSS-**

6   **COMPLAINT** on the interested parties in this action as follows:

7                        **SEE ATTACHED SERVICE LIST**

8

9        **BY E-MAIL OR ELECTRONIC TRANSMISSION:** I caused a copy of the document(s) to be sent from e-mail address colleen.reid-rose@ffslaw.com to the persons at the e-mail addresses listed in the Service List.

10        I declare under penalty of perjury under the laws of the State of California that the

11   foregoing is true and correct.

12        Executed on July 22, 2019, at Los Angeles, California.

13

14                                Colleen Reid-Rose

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

4232336.1

1

## SERVICE LIST

2

Michael D. Murphy, Esq.
Banu S. Naraghi, Esq.
Siobhan Amin, Esq.
Ervin Cohen & Jessup LLP
9401 Wilshire Boulevard, 9th Floor
Beverly Hills, CA 90212-2974
Tel:  (310) 281-6336
Fax: (310) 887-6838
*mmurphy@ecjlaw.com*
*bnaraghi@ecjlaw.com*
*samin@ecjlaw.com*
*kparr@ecjlaw.com*

*Attorneys for Plaintiffs and Cross-Defendants
CINCO CORPORATION and POTATO
CORNER INTERNATIONAL, INC.*

3

4

5

6

7

8

9

James S. Cooper, Esq.
LEVINSON ARSHONSKY & KURTZ, LLP
15303 Ventura Blvd., Suite 1650
Sherman Oaks, California 91403
Telephone: (818) 382-3434
Facsimile:  (818) 382-3433
*jcooper@laklawyers.com*
*llord@laklawyers.com*

*Attorneys for Cross-Defendants
AMIR JACOBY and INBAL JACOBY*

10

11

12

13

Frances M. O'Meara, Esq.
Stephen M. Caine, Esq.
Holly M. Teel, Esq.
THOMPSON, COE & O'MEARA, LLP
12100 Wilshire Boulevard, Suite 1200
Los Angeles, CA 90025
Tel:  (310) 954-2400
Fax: (310) 954-2345
*fomeara@thompsoncoe.com*
*scaine@thompsoncoe.com*
*hteel@thompsoncoe.com*

*Attorneys for Defendant and Cross-
Complainant PCJV USA, LLC and Cross-
Complainant PCI Trading, LLC*

14

15

16

17

18

19

Eric McDonough, Esq.
Daniel R. Sable, Esq.
Seyfarth Shaw LLP
2029 Century Park East, Suite 3500
Los Angeles, California 90067-3021
Tel: (310) 277-7200
Fax: (310) 201-5219
*emcdonough@seyfarth.com*
*dsable@seyfarth.com*
*igimble@seyfarth.com*

*Attorneys for Potato Corner LA Group, LLC,
NKM Capital Group, LLC, J & K Americana,
LLC, J&K Lakewood, LLC, J & K Culver, LLC,
J&K Oakridge, LLC, J&K Valley Fair, LLC, J
& K Capital 2, LLC, J & K Ontario, LLC, and
J&K PC Trucks, LLC*

20

21

22

23

24

25

26

27

28

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

4232336.1

# EXHIBIT 83

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

MAY 30 2018

Sherri R. Carter, Executive Officer/Clerk

By Barbara Hall, Deputy

1 | TODD M. LANDER (BAR NO. 173031)
todd.lander@ffslaw.com
2 | ARASH BERAL (BAR NO. 245219)
arash.beral@ffslaw.com
3 | FREEMAN, FREEMAN & SMILEY, LLP
1888 Century Park East, Suite 1900
4 | Los Angeles, California 90067
Telephone: (310) 255-6100
5 | Facsimile: (310) 255-6200

6 | Attorneys for Defendant and Cross-Complainant
GUY KOREN
7

8 | **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9 | **COUNTY OF LOS ANGELES, CENTRAL DISTRICT**

10

11 | CINCO CORPORATION,

12 |         Plaintiff,

13 | vs.

14 | GUY KOREN, an individual; and DOES 1
through 25, inclusive,

15

16 |         Defendants.

17 | AND RELATED CROSS-ACTION.

18

19

20

21

22

23

24

25

26

27

28

Case No. BC701075

**GUY KOREN'S OPPOSITION BRIEF TO CINCO CORPORATION'S *EX PARTE* APPLICATION FOR ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION**

[All documents filed herewith:

1. Opposition Brief
2. Declarations of Guy Koren, Tom Hodgson, Erlinda S. Bartolome, Faisal Shaikh, Mark Zhang, Proposed Receiver Theodore Lanes, and Proposed Receiver David J. Pasternak
3. Evidentiary Objections to the Declarations and Corrected Declarations of Robert Brownlie, Ben Olivas, and John Edward P. Hernandez
4. [Proposed] Order re: Appointment of Receiver

Proof of Service]

Date:    June 6, 2018
Time:    9:30 a.m.
Dept:    86

**Assigned for All Purposes to the Hon. Rafael Ongkeko, Dept. 73**

Action Filed:    April 10, 2018

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3792010.2
GUY KOREN'S OPPOSITION BRIEF TO CINCO CORPORATION'S EX PARTE APPLICATION FOR ORDER
TO SHOW CAUSE RE: PRELIMINARY INJUNCTION

1

## TABLE OF CONTENTS

2

Page

3   I.   INTRODUCTION .................................................................................................... 1

4   II.  ANALYSIS ........................................................................................................... 4

5        A.   Koren, not Cinco, has a Probability of Prevailing on the Merits. ............................ 4

6             1.   As a Matter of Law, the JV Agreement is an Operating Agreement. ........... 4

7             2.   The Parties Delegated ALL Company Powers to a 7-Person Board............. 6

8             3.   Principles of Contract Interpretation Militate Towards Endorsing
                   Koren's Interpretation of the Contract Documents. ...................................... 7

9
10            4.   Even if Cinco's Interpretation Prevails, Cinco did not have the
                   Necessary Equity Percentage Interest Vote to Remove Koren. ................... 12

11       B.   The Relative Harm to Koren Far Exceeds the Alleged Interim Harm to
                   Cinco. ............................................................................................................. 13

12
13       C.   Cinco is Not Irreparably Injured. ......................................................................... 14

         D.   Cinco Should Post a Significant Bond to Secure any Preliminary Injunction. ....... 14
14
15       E.   If the Court is Inclined to Issue a Preliminary Injunction to Cinco, it Should
                   Appoint a Receiver Instead. ................................................................................ 15

16   III.  CONCLUSION ..................................................................................................... 15

17

18

19

20

21

22

23

24

25

26

27

28

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

## <u>TABLE OF AUTHORITIES</u>

**Page**

<u>Cases</u>

*Alderman v. Hamilton*, 205 Cal.App.3d 1033 (1988) ........................................................................ 10

*Blix Street Records, Inc. v. Cassidy*, 191 Cal.App.4th 39 (2010) ...................................................... 6

*Butt v. State of California*, 4 Cal.4th 668 (1992) .............................................................................. 4

*Crestview Cemetery Assn. v. Dieden*, 54 Cal.2d 744 (1960) ............................................................. 11

*Haley v. Talcott*, 864 A.2d 86 (Del. Ch. 2004) ................................................................................ 6

*Kuroda v. SPJS Hldgs., LLC*, 971 A.2d 872 (Del. Ch. 2009) ............................................................ 6

*Lawrence v. Walzer & Gabrielson*, 207 Cal.App.3d 1501 (1989)..................................................... 10

*Lent v. H.C. Morris Co.*, 25 Cal.App.2d 305 (1930)........................................................................ 15

*Mayhew v. Benninghoff*, 53 Cal.App.4th 1365 (1997) ...................................................................... 10

*Misita v. Distillers Corp. Ltd.*, 54 Cal.App 2d 244 ......................................................................... 15

*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.*, 107 Cal.App.4th 516 (2003)..................... 7, 8

*Pleasant Hill Bayshore Disposal, Inc. v. Chip-It Recycling, Inc.*, 91 Cal.App.4th 678 (2001)......... 4

*Prouty v. Gores Technology Group*, 121 Cal.App.4th 1225 (2004) ................................................... 9

*Robbins v. Superior Court*, 38 Cal.3d 199 (1985) ...................................................................... 4, 13

*Smissaert v. Chiodo*, 163 Cal.App.2d 827 (1958).......................................................................... 6

*WDT-Winchester v. Nilsson*, 27 Cal.App.4th 516 (1994) ................................................................. 8

*White v. Davis*, 30 Cal.4th 528 (2003) ...................................................................................... 4, 13

<u>Statutes</u>

6 Del. C. § 18-101(7) ...................................................................................................................... 5

6 Del. C. § 18-110(b) ...................................................................................................................... 6

Cal. Civ. Code § 1638 ...................................................................................................................... 8

Cal. Civ. Code § 1859 ...................................................................................................................... 9

Cal. Civ. Proc. Code § 526(a) ........................................................................................................ 4

Cal. Civ. Proc. Code § 529............................................................................................................ 14

Cal. Civ. Proc. Code § 564(b)(9) .................................................................................................. 15

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

Cal. Corp. Code § 17701.02(s) ............................................................................................................... 5

Cal. Corp. Code § 17704.07(c) ............................................................................................................... 6

Cal. Corp. Code § 17701.10 ................................................................................................................... 5

Other Authorities

Robert L. Symonds, Jr. & Matthew J. O'Toole, Delaware Limited Liability Companies § 9.01[B], at 9–9 (2015) ............................................................................................................................... 6

Rules

Cal. Rules of Court, Rule 3.1150(f) ...................................................................................................... 14

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

GUY KOREN'S OPPOSITION BRIEF TO CINCO CORPORATION'S EX PARTE APPLICATION FOR ORDER
TO SHOW CAUSE RE: PRELIMINARY INJUNCTION

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2 **I.    INTRODUCTION**

3      The last few weeks have stripped the thin veneer of authenticity from Cinco Corporation's
4  ("Cinco") conduct and confirmed what Guy Koren ("Koren") knew instinctively from the outset
5  of this ill-conceived litigation: Cinco's ambush of Koren had nothing whatever to do with Koren's
6  management of PCJV USA, LLC ("PCJV"), but instead was rooted in Cinco's effort to salvage
7  the sale of 55% of its shares to an outside group (the Hernandez Group) that had no interest in
8  taking control of PCJV – Cinco's U.S. arm – unless it could manage the company and its profits.
9  Cinco knew, under PCJV's governing documents – which it, and its lawyers, DLA Piper, drafted –
10 that PCJV must be excluded from the sale or, alternatively, the it must obtain the LA Group's
11 consent or extend it a right of first refusal. But Koren was the architect of PCJV, the very reason
12 Potato Corner found its way to American shores, and Cinco knew he would exercise that right of
13 first refusal as he was contractually permitted to do. Hungry to put its hands on the $10 million
14 the Hernandez Group was willing to pay, Cinco instead ignored its contractual obligations and
15 proceeded with the sale. And then, in service to its new master's insistence on absolute control,
16 and to circumvent Koren, Cinco (in collusion with the Hernandez Group) secretly plotted with the
17 Jacobys (likely with promises of financial incentives) to excise Koren from the business he
18 conceived and built. Having executed its scheme, Cinco now lays claim to the $10 million it so
19 clearly wanted, and it has handed the Hernandez Group unfettered dominion over PCJV. Koren
20 has, in contrast, been cast aside for no reason other than pure economic greed.

21      *Oh what a tangled web we weave, when first we practice to deceive.*

22      Now Cinco has conscripted this Court in its tangled web, and placed it in the unenviable
23 position to decide the parties' fate when the governing documents are not exactly a model of
24 contractual clarity. Fortunately, the law provides clear guidance on that issue. First, the Court
25 must ascertain the parties' objective intent using common sense standards of construction.
26 Second, if there is uncertainty, the Court must construe ambiguous contract terms against the
27 drafter, in this case Cinco. And third, if the foregoing construction doesn't end the inquiry, the
28 Court must look to the parties' course of conduct. Under any analysis, Koren must prevail.

3792010.2                                                                    1

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1    Most dispositive are the written agreements themselves – all of which constitute operating

2    agreements as a matter of law – establishing the parties' collective intent for the *JV Agreement* to

3    govern their relationship[1] and that: (1) ***ALL COMPANY POWERS*** must be made by a 7-person

4    board; (2) the LA Group shall designate 3 representatives to that board; and (3) a 75% vote (6 of 7

5    members) is required to remove Koren as President. The JV Agreement is clear on its face:

6    "[T]he business and affairs of the Company shall be managed ***and all of the***
***Company powers shall be exercised*** by or under the direction of the managers
7    (collectively referred to as "Management"). Unless otherwise agreed to by the
parties, the Management shall be composed of seven (7) members, four (4) of
8    whom shall be designated by the Cinco Group, and three (3) designated by the LA
9    Group." Koren's Verified Cross-Complaint ("VCC"), Exhs. "A" and "C", ¶ 3.a.

10    That the parties intended to and did delegate ***ALL COMPANY POWERS*** to the 7-person

11    board is additionally evidenced by the parties' course of conduct showing that they never departed

12    from this voting structure. Indeed, Cinco has not only admitted this in filings to the Court, it has

13    yet to provide the Court with a single piece of paper establishing that the parties *ever intended*

14    *voting by any means other than the 7-person board, i.e., by direct or indirect percentage interests.*

15    Cinco would have this Court ignore the objective intent of the parties, their history and

16    course of conduct and instead indulge in an alternative reality, where its unilateral and self-serving

17    whims control the determination of the dispute. But even assuming *arguendo* that the April 9

18    meeting were a "Member" meeting as Cinco says, and that it was called properly and did not

19    otherwise violate the terms of the contract documents, the meeting consisted of only two

20    _____

21    [1] The pertinent provisions of the JV Agreement state:

22    "WHEREAS, the Parties herein have agreed to enter into this Agreement which sets forth the
terms and conditions with respect to the organization, incorporation, operation and management of
23    the Company and defines their respective rights, duties and obligations of the parties to this
Agreement."

24    "WHEREAS, the Parties agree that the LLC operating agreement to be entered by them shall
25    reflect the terms and conditions a set forth in this Agreement."

26    "The operating agreement of the Company shall reflect the terms and conditions set forth in this
Agreement between the Parties."

27    "The Parties shall, to the extent feasible, cause the operating agreement of the Company to reflect
28    the mutual covenants and provisions contained in this Agreement."

3792010 2                                    2

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  Members, Cinco Group and LA Group. If those Members, and they were indisputably the only
2  members of PCJV, voted their alleged equity percentage interests, the resulting tally would be
3  60%-40%.[2]  And that was simply insufficient to remove Koren as President. End of story.

4       Knowing that to be the case, Cinco encourages the Court to slide deeper into the veritable
5  rabbit hole, asserting in the face of the evidence that the two Members' percentage interests could
6  somehow be divided and swapped among each of the members of the Members, enabling a
7  member of the LA Group to cross the floor and vote as part of Cinco. That defies the record and,
8  indeed, Cinco ultimately agreed that Koren could name the three voters for the LA Group during
9  the fateful, though ineffectual, April 23 meeting. That alone lays waste to Cinco's *ex post facto*
10 rationale for its removal of Koren. But engaging in this sub-alternative reality, if Jacoby's interest
11 in the LA Group could act as a separate voting bloc in PCJV, then the Court would have to excise
12 the Hernandez Group's interest in Cinco (55% of the 60%) and remove those votes from the
13 equation given the nonconsensual nature in which they obtained that interest and the LLC
14 Agreement's clear language prohibiting any assignee of any "economic interest" from carrying
15 voting rights. The result is clear – Cinco's 27% and Jacoby's 15.48% voted in favor of Koren's
16 removal (total of 42.48%), and the entirety of the LA Group (40%) – or, Koren's sub-layered
17 24.52% interest alone – voted against. The resolution thus failed, because Cinco fell far short of
18 the 75% vote it needed to remove Koren even under that multi-layered hypothetical.

19      The true reality – and what is important for our purposes today – is that for the Court to
20 grant Cinco's injunction, it must be persuaded that *Cinco* has a likelihood of ultimately prevailing
21 on the merits. Cinco hasn't proven that it can. Neither the contracts nor the evidence support
22 Cinco's position and the conduct of the parties bespeak the reality which we know to be true:
23 PCJV's affairs were always governed by 7 voting representatives, 3 of whom were designated by
24 the LA Group and 4 by Cinco. And without 6 of 7 votes, Cinco could not remove Koren as

25

26

27 [2] This assumes, without concession, that the equity percentage vote of the Hernandez Group
28 counted, which it did not.

3792010.2                                        3

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  President and it never had the right to remove him as Manager.[3]

2  **II.    ANALYSIS**

3       Both sides have briefed, and the Court is well aware, of the standards governing

4  preliminary injunction requests. Therefore, there's no need for an extensive recitation of the law.

5  In sum, the Court must weigh two "interrelated" factors: the likelihood of prevailing on the merits

6  and the relative interim harm to the parties. Cal. Civ. Proc. Code § 526(a); *Butt v. State of*

7  *California*, 4 Cal.4th 668, 677-678 (1992); *Robbins v. Superior Court*, 38 Cal.3d 199, 206 (1985);

8  *White v. Davis*, 30 Cal.4th 528, 554 (2003); *Pleasant Hill Bayshore Disposal, Inc. v. Chip-It*

9  *Recycling, Inc.*, 91 Cal.App.4th 678, 696 (2001). The weight of these factors tip in Koren's favor.

10       **A.    Koren, not Cinco, has a Probability of Prevailing on the Merits.**

11       The question of which side will ultimately prevail entails an analysis of the contract

12  language and tenets of contract construction. Koren now has on file his Verified Cross-

13  Complaint, his *Ex Parte* Application, and a Supplemental Brief, all of which address and discuss

14  his position on the contract documents. This brief further addresses the contracts and the

15  governing principles of construction which all lead to one result: Koren prevailing on the merits.

16       **1.    As a Matter of Law, the JV Agreement is an Operating Agreement.**

17       As an initial matter, one cannot dispute that the parties intended for the *Joint Venture*

18  *Agreement* and its amendment (collectively, the "JV Agreement") to control PCJV's affairs,

19  including its operation and management. That's clear because the JV Agreement *specifically says*

20  *so*, stating that any LLC agreement to be entered by the parties "shall" reflect the terms and

21  conditions of the JV Agreement. Indeed, the pertinent provisions of the JV Agreement state:

22       "WHEREAS, *the Parties herein have agreed to enter into this Agreement which*
         *sets forth the terms and conditions with respect to the organization,*
23       *incorporation, operation and management of the Company and defines their*
         *respective rights, duties and obligations of the parties to this Agreement.*"
24

25  _____

26  [3] We discuss all this below, as well as any potential bond requirement to be imposed on Cross-
    Defendants to secure any injunction that may be issued in their favor. But in the end, if the Court
27  is ever inclined to grant Cinco relief, Koren requests that the Court appoint a receiver instead. To
    that end, we address, in the alternative to denying Cinco's request outright and granting Koren's
28  injunction request, the imposition of a potential receiver.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1

2

"WHEREAS, *the Parties agree that the LLC operating agreement to be entered by them shall reflect the terms and conditions a set forth in this Agreement*."

3

4

"*The operating agreement of the Company shall reflect the terms and conditions set forth in this Agreement between the Parties*."

5

6

"*The Parties shall, to the extent feasible, cause the operating agreement of the Company to reflect the mutual covenants and provisions contained in this Agreement*."

7   VCC, Exhs. "A" and "C" at p. 1, "Recitals", at p. 2, ¶ 1.h., and at p. 7, ¶ 5.c. (emphasis added).

8   The import of this language is equally clear: *the JV Agreement was to govern the operation and*

9   *management of PCJV and any LLC agreement would simply mirror the JV Agreement's specific*

10  *terms.* Declaration of Erlinda S. Bartolome ("Bartolome Decl."), ¶¶ 10-11; Declaration of Guy

11  Koren ("Koren Decl."), ¶¶ 2-3. This fact becomes all the more pertinent because we know that the

12  parties decided to amend the *JV Agreement*, not PCJV's Limited Liability Company Agreement

13  ("LLC Agreement"), when they needed to make a change to its terms in October 2012. Koren

14  Decl., ¶ 7. And the JV Agreement's final iteration (the last signed writing by the parties) clearly

15  and unequivocally contains an integration clause:

16

17

18

This Agreement shall constitute the entire agreement between the Parties and *shall supersede any previous agreements*, written or otherwise, with respect to the same subject matter which may have been made by the Parties prior hereto. VCC, Exh. "C", ¶ 5.f (emphasis added).

19

20  While the agreements are all governed by *California Law* (JV Agreement at ¶ 5.h., LLC

21  Agreement at ¶ 12.10), regardless of whether the laws of California or Delaware apply, the

22  governing laws all provide that where parties agree to be bound by an agreement – any agreement

23  – governing the affairs of the company, that agreement will function as the "operating agreement".

24  Cal. Corp. Code § 17701.02(s) ("Operating agreement" means the agreement, *whether or not*

25  *referred to as an operating agreement* and whether oral, in a record, implied, or in any

26  combination thereof, of all the members of a limited liability company, including a sole member,

27  concerning the matters described in subdivision (a) of Section 17701.10) (emphasis added); Del.

28  Code Ann. tit. 6, § 18-101(7) ("Limited liability company agreement'" means *any agreement*

1  *(whether referred to as a limited liability company agreement, operating agreement or otherwise),*
2  written, oral or implied, of the member or members as to the affairs of a limited liability company
3  and the conduct of its business) (emphasis added). Therefore, *as a matter of California and*
4  *Delaware law* (and contract), the JV Agreement constitutes the operating agreement of PCJV.[4]

5       **2.      The Parties Delegated ALL Company Powers to a 7-Person Board.**

6       The most important and dispositive contractual provision here is the JV Agreement's
7  clause calling for *all* company powers to be exercised by a 7-person board: "the business and
8  affairs of the Company shall be managed *and all of the Company powers shall be exercised* by or
9  under the direction of the managers (collectively referred to as "Management"). Unless otherwise
10 agreed to by the parties, the Management shall be composed of seven (7) members, four (4) of
11 whom shall be designated by the Cinco Group, and three (3) designated by the LA Group." VCC,
12 Exhs. "A" and "C", ¶ 3.a. (emphasis added).

13      This contractual direction is specific and it is purposeful. The parties plainly intended for
14 PCJV's powers be delegated to a 7-person board with each side controlling a certain number of
15 seats on that board. Koren Decl., ¶ 5. This is not uncommon and both California and Delaware
16 law contemplate such a structure; those States also acknowledge parties' freedom to contract and
17 define the character of the company and the rights and obligations of its members. Cal. Corp.
18 Code § 17704.07(c); 6 Del. C. § 18-110(b); *Kuroda v. SPJS Hldgs., LLC*, 971 A.2d 872, 880 (Del.
19 Ch. 2009). One "attraction of the LLC form of entity is the statutory freedom granted to members
20 to shape, by contract, their own approach to common business 'relationship' problems." *Haley v.*
21 *Talcott*, 864 A.2d 86, 88 (Del. Ch. 2004). "Virtually any management structure may be
22 implemented through the company's governing instrument." Robert L. Symonds, Jr. & Matthew
23 J. O'Toole, Delaware Limited Liability Companies § 9.01[B], at 9–9 (2015).

24

25 [4] Cinco appears to argue that the JV Agreement was only an "agreement to agree". But the text of
26 that agreement contains specific and definite terms and is supported by consideration. Cinco's
   argument is belied by the text of the JV Agreement itself and the law, which provides that "[w]hen
27 parties intend that an agreement be binding, the fact that a more formal agreement must be
   prepared and executed does not alter the validity of the agreement." *Blix Street Records, Inc. v.*
28 *Cassidy*, 191 Cal.App.4th 39, 48 (2010); *Smissaert v. Chiodo*, 163 Cal.App.2d 827, 831 (1958).

3792010.2                                    6

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 256-6100

1   Under this structure, the LA Group was guaranteed to have 3 seats on PCJV's 7-person

2   board which it, and only it, could fill, remove, or replace. And this 7-person board was to exercise

3   *ALL COMPANY POWERS*, which includes the removal of any officers of the company. Thus,

4   when the parties required a 75% vote to remove the President, Corporate Secretary, and Treasurer,

5   6 of 7 votes were necessary to effectuate such a change. VCC, Exh. "C", ¶ 3.c.; Koren Decl., ¶ 6.

6   Accordingly, because the LA Group collectively voted against Koren's removal, Cinco did not

7   obtain the necessary 6 of 7 votes to remove him.[5] Nor did they have the necessary votes to

8   remove the Corporate Secretary (Erlinda S. Bartolome), which also required a 75% vote.[6]

9              **3.    Principles of Contract Interpretation Militate Towards Endorsing**

10             **Koren's Interpretation of the Contract Documents.**

11                  *a.    A Reasonable and Common Sense Interpretation of the Contract*

12                  *Documents Consistent with the Parties' Apparent Intent Prevails.*

13   As the Court of Appeal in *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.*, 107

14   Cal.App.4th 516, 524-525 (2003) succinctly summarized:

15   When a dispute arises over the meaning of contract language, the first question to
     be decided is whether the language is "reasonably susceptible" to the
16   interpretation urged by the party. If it is not, the case is over. If the court decides
     the language is reasonably susceptible to the interpretation urged, the court moves
17   to the second question: what did the parties intend the language to mean? In
     interpreting an unambiguous contractual provision we are bound to give effect to
18   the plain and ordinary meaning of the language used by the parties. Thus, where
     "contract language is clear and explicit and does not lead to absurd results, we
19   ascertain intent from the written terms and go no further." If the contract is
     capable of more than one reasonable interpretation, it is ambiguous, and it is the
20   court's task to determine the ultimate construction to be placed on the ambiguous
     language by applying the standard rules of interpretation in order to give effect to
21   the mutual intention of the parties. However, the "mere fact that a word or phrase
     in a [contract] may have multiple meanings does not create an ambiguity." "The
22   goal of contractual interpretation is to determine and give effect to the mutual
     intention of the parties." (Internal Citations Omitted.)
23

24

25   _____

26   [5] And there's a serious question as to whether 3 of 4 of Cinco's votes counted at all seeing that it
     was the Hernandez Group – which had no voting rights – casting those votes.

27   [6] Cinco simply conducted the April meetings without Ms. Bartolome present and at the April 23
     meeting, Ben Olivas of DLA Piper was purportedly elected as the new Corporate Secretary.
28

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1    "In sum," the *Lockyer* Court observed, "courts must give a reasonable and commonsense
2  interpretation of a contract consistent with the parties' apparent intent." *Id.* at 526. The parties'
3  objective and apparent intent here was to govern PCJV's affairs under the JV Agreement and that
4  the LLC Agreement would simply mirror the JV Agreement's terms. VCC, Exhs. "A" and "C" at
5  p. 1, "Recitals", at p. 2, ¶ 1.h., and at p. 7, ¶ 5.c. Under the JV Agreement, *ALL COMPANY*
6  *POWERS* was to be – and actually was – exercised by a 7-person board. VCC, Exhs. "A" and
7  "C", ¶ 3.a. As a result, members carrying equity percentage interests alone had no voting rights
8  other than those rights delegated to them under the 7-person board structure. This manifestation
9  of intent is clear and is what the parties actually practiced for years, even in the approximate two
10 years before they even memorialized the structure in writing. Indeed, when they got around to
11 preparing the LLC Agreement, nobody even bothered to create "Exhibit A" to that Agreement
12 listing the equity percentage interest of each Member in the LLC. That the LLC Agreement does
13 not contain "Exhibit A" demonstrates that the parties did not contemplate voting by equity
14 percentage interests, which is quite telling in and of itself. Koren Decl., ¶ 4. Indeed, the only
15 "reasonable and commonsense" interpretation of the governing documents is exactly what Koren
16 advances, and which is consistent with the parties' course of conduct.

17    Cinco instead urges the Court to focus on the generic language of the LLC Agreement,
18 rather than on the parties' clear manifestation of intent under the JV Agreement. But the reality is
19 that the boilerplate machinations of the LLC Agreement – if they're given any weight – create
20 absurd results. *See* Cal. Civ. Code § 1638; *WDT-Winchester v. Nilsson*, 27 Cal.App.4th 516, 528-
21 529 (1994) (clear language of a contract provision governs unless it leads to an absurdity). This
22 absurdity is self-evident here where Cinco claims that it could bypass the 7-person board
23 altogether and conduct a "Members meeting" at which time the equity percentage interests of each
24 member of a Member in PCJV could control the outcome of a manager's and designated officer's
25 removal by a majority equity percentage interest vote. If that were truly the case, however, the
26 entire structure of the 7-person board would collapse. That would mean, for example, that Cinco,
27 at its whim, could remove any manager and replace that manager with whomever it chooses,
28 effectively giving itself a wholly-controlled board. That's not what the JV Agreement calls for.

3792010.2                                        8

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  The JV Agreement specifically states that 3 seats on the 7-person board shall be designated by the
2  LA Group. VCC, Exhs. "A" and "C", ¶ 3.a. And the LA Group could not remove Cinco's
3  managers, nor could Cinco remove LA Group's managers. The agreements must be read to give
4  effect to this express intention.

5      Conflating the above absurdity with the LLC Agreement's boilerplate provisions regarding
6  removal of officers, Cinco contends that the "Members" voted their equity percentage stake to
7  remove Koren as President. But their reliance on that position not only requires the Court to jump
8  through several hoops to sustain their argument, but also runs directly afoul of the JV Agreement's
9  language vesting all company powers to the 7-person board. Cinco's position effectively
10  undermines the foundation and structure of the 7-person board, thus creating a further absurdity.
11  If Cinco's position were to prevail, it would effectively create a whole new management structure
12  – one never contemplated or actually practiced – where "Members" effectively usurp the role of
13  the 7-person board. That is not what the parties intended, nor is there any textual support for this
14  contention in any of the written agreements.

15              *b.      Specific Contractual Provisions Take Precedence over General,*
16                      *Potentially Inconsistent Provisions.*

17      There is obviously a dichotomy between Koren's position (percentage interest vote of 7-
18  person board) and Cinco's position (direct plus indirect *equity* percentage interest vote of
19  Members) concerning the standards governing Cinco's attempt to remove Koren from PCJV. The
20  Court should note that there is not a single contractual provision that permits direct and indirect
21  equity percentage interest holders to vote to replace a manager or officer. Rather, the *specific*
22  provision addressing this issue calls for *all company powers* to be exercised by a 7-person board.

23      California law establishes that a more specific contract provision takes precedence over a
24  more general, inconsistent contract provision. *See* Cal. Civ. Code § 1859; *see also Prouty v.*
25  *Gores Technology Group*, 121 Cal.App.4[th] 1225, 1235 (2004) ("In this circumstance, under well
26  established principles of contract interpretation, when a general and a particular provision are
27  inconsistent, the particular and specific provision is paramount to the general provision"). The
28  provision calling for a 7-person board is specific and definite. VCC, Exhs. "A" and "C", ¶ 3.a.

3792010.2                                    9

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  But the provisions Cinco relies on in the LLC Agreement are general, boilerplate. Therefore, to

2  the extent there is an ambiguity in the contract language, the specific contract provision contained

3  in the JV Agreement takes precedence as a matter of law.

4              c.      *In the Event of Uncertainty, the Contract Documents Must be*

5                      *Interpreted Most Strongly Against the Party Who Caused the*

6                      *Uncertainty to Exist.*

7         Another rule of construction provides that where ambiguities exist in a contract, those

8  ambiguities must be construed against the drafter of the instrument. Cal. Civ. Code § 1654.

9  "Moreover, the doctrine of *contra proferentum* (construing ambiguous agreements against the

10  drafter) applies with even greater force when the person who prepared the writing is a lawyer."

11  *Mayhew v. Benninghoff*, 53 Cal.App.4[th] 1365, 1370 (1997); *Lawrence v. Walzer & Gabrielson*,

12  207 Cal.App.3d 1501, 1507 (1989); *Alderman v. Hamilton*, 205 Cal.App.3d 1033, 1037 (1988).

13  Here, Cross-Defendant Olivas of DLA Piper, an attorney, and his colleagues at DLA Piper drafted

14  the subject instruments at issue. Bartolome Decl., ¶¶ 7, 11; Koren Decl., ¶¶ 2-4, 7. Aside from

15  being an attorney representing Cinco's interests, Mr. Olivas also maintains an equity stake in

16  Potato Corner International ("PCI") – which is the real party in interest and Cinco's claimed U.S.

17  subsidiary[7] – and plays several roles within Cinco and PCJV, including officer (Corporate

18  Secretary) and proxy voter. Koren Decl., ¶ 2. Mr. Olivas' involvement within the Cinco

19  organization and his drafting of these agreements weighs against – as a matter of law –

20  constructing the agreements in Cinco's favor.

21              d.      *The Parties' Course of Conduct Establishes Koren's Position.*

22         "Actions speak louder than words," our Supreme Court echoed when describing the rule of

23  construction given a contract by the acts and conduct of the parties to a contract:

24         This rule of practical construction is predicated on the common sense concept that
           "actions speak louder than words." Words are frequently but an imperfect
25         medium to convey thought and intention. When the parties to a contract perform
           under it and demonstrate by their conduct that they knew what they were talking
26

27  _____
    [7] It should be noted that Cinco may not have standing to assert the claims it has asserted. Rather,
28  the real party in interest is PCI.

    3792010.2                                          10

1    about the courts should enforce that intent. *Crestview Cemetery Assn. v. Dieden,*
2    54 Cal.2d 744, 754 (1960).

3    As Koren has said before and will reiterate here, the parties never swayed from the 7-
4    person voting structure they established and never voted by *equity* percentage interests. Ever.
5    Koren Decl., ¶ 5. Koren may be partial on this question, but one need not look far to demonstrate
6    that he is right. The Court need only refer to: (a) *PCJV's long time Corporate Secretary* – an
7    independent third party – who kindly agreed to provide a Declaration in Koren's favor attesting to
8    this point, Bartolome Decl., ¶ 16, and (b) Cinco's and its lawyers' own documents showing that
9    they, too, believed and conducted themselves under the 7-person board voting structure. Indeed,
10   in a letter dated April 10, 2018, Cinco's lawyers explain that Koren was purportedly removed by
11   an "85% vote". VCC, Exh. "I". 6 divided by 7 is 85%. Under no alternative scenario could
12   anyone derive that 85% calculation other than dividing 6 by 7. *Cinco and Mr. Jacoby also admit*
13   *this in filings they've made to the Court already:*

14        • "85% of PCJV's Member interests voted to remove Koren as President" (referring
15          to the April 9 meeting). Cinco's *Ex Parte* Application filed May 11, 2018, at p. 3,
16          line 14, citing Cinco's Verified Complaint.

17        • "At the Members meeting, 85% of the Membership interests voted to remove
18          Koren as an officer and Manager." Declaration of Amir Jacoby filed May 11,
19          2018, ¶ 17.

20   Mr. Jacoby's testimony (and Cinco's argument) specify that "Members" and "Membership
21   interests" voted with an 85% interest. Thus, *their own words undermine their lawyers' argument*
22   *that the so-called "Members" meeting yielded an equity percentage vote of 75.48% to remove*
23   *Koren.* These are fatal admissions.

24   If the above alone were not convincing enough, the minutes of the April 23 meeting
25   (which Cinco and its lawyers prepared) also state that the votes of the 7 voting representatives
26   were tallied to remove Koren. VCC, Exh. "J". If it were anything but, why have Mrs. Jacoby
27   (who carries no equity percentage interest) vote? Indeed, Cinco's own words and actions conform
28   to the only true and common sense interpretation of the governing contract documents: Koren's.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3792010.2                                11

1

### 4.   Even if Cinco's Interpretation Prevails, Cinco did not have the
### Necessary Equity Percentage Interest Vote to Remove Koren.

2

3        As Koren has shown, the contracts are clear on their face calling for **ALL COMPANY**
4  **POWERS** to be exercised by a 7-person board and, to the extent there is any ambiguity, **ALL** of
5  the rules of contract construction work in Koren's favor, not Cinco's. But, even assuming
6  *arguendo* that Cinco were right, Cinco's argument would still fail as it did not obtain the necessary
7  *equity* percentage interest vote to remove Koren.

8        For it to prevail, and assuming its interpretation of the contract documents is correct
9  (which it is not), Cinco first has to establish that a member of a Member could separate his equity
10 percentage interest and vote it as a separate and distinct bloc. But there is no contract provision
11 anywhere in any agreement permitting that. Rather, the agreements provide that there are two
12 members in PCJV: (1) Cinco Group/PCI and (2) LA Group. VCC, Exhs. "A" and "C" (*see, e.g.*,
13 first page above recitals, and ¶¶ 1.b., 2.b.), and VCC, Exh. "D" (*see, e.g.*, ¶¶ 3.1, 3.7 ["Prior
14 written consent of the *other* Member" required to take certain actions]); *see also generally* the
15 duality language included therein, i.e., "by and between", "neither party", and the like. And only
16 those two Members provided capital in forming PCJV and each obtained a specific equity
17 percentage in PCJV as a result (60%-40%). *Id.* Thus, when there is a so-called "Member's
18 meeting" of PCJV, the resulting tally of any vote of both Members could only be 60%-40% or
19 100%. There is no in-between. And because Koren is the managing partner of the LA Group, he
20 and only he could cast the LA Group's 40% equity vote (assuming, again, that equity percentage
21 interest vote prevails as Cinco advances). In other words, Cinco did not obtain a 75% vote under
22 this hypothetical (assuming equity percentage interest controls) to remove Koren.[8]

23        Assuming further that a member of a Member could separate his or its equity percentage
24 and vote it as a separate and distinct bloc, Cinco next has to establish that the vote of the
25 Hernandez Group counts. Putting aside for the moment the improper transfer of ownership

26

----

27 [8] Because it is not dispositive to this hypothetical, we do not address here the viability of the Cinco
28 vote given the improper transfer to the Hernandez Group. We discuss this in the next hypothetical.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  interests to the Hernandez Group and the breaches of contract caused thereby, Paragraph 8.1 of the

2  LLC Agreement provides:

> An Economic Interest is assignable in whole or in part, provided, however, that no
> Membership Interest may be assigned to any Person (including any assignments
> for security purposes or other form of pledge) without the consent of Members
> required pursuant to Section 3.7. VCC, Exh. "D".

6  The term "Economic Interest" is defined in Paragraph 1.18 as *excluding* "the right to vote

7  or to participate in management, or any right to information concerning the business and affairs of

8  the Company." *Id.* Therefore, based on the LLC Agreement itself that Cinco so heavily relies

9  upon, the Hernandez Group's equity percentage interest cannot and does not count. Thus, its 55%

10  equity percentage in Cinco must be extracted from Cinco's total 60% direct or indirect interest in

11  PCJV. As a consequence, Cinco could only vote 27% (45% of 60%) towards any alleged

12  "Member" resolution. And because, by any standard, Cinco's 27% plus Jacoby's indirect interest

13  is insufficient to reach the 75% threshold, the vote to remove Koren fails yet again.[9]

14  **B.    The Relative Harm to Koren Far Exceeds the Alleged Interim Harm to Cinco.**

15  The injunction analysis also requires a balancing of the interim harm. *White*, *supra*, 30

16  Cal.4th at 554 (The court must balance "the interim harm that the plaintiff is likely to sustain if the

17  injunction were denied compared to the harm that the defendant is likely to suffer ... The ultimate

18  goal of any test to be used ... is to minimize the harm which an erroneous interim decision may

19  cause"); *Robbins*, *supra*, 38 Cal.3d at 205 ("If the denial of an injunction would result in great

20  harm to the plaintiff, and the defendants would suffer little harm if it were granted, then it is an

21  abuse of discretion to fail to grant the preliminary injunction").

22  For Koren, this case impacts his entire life; it impacts his livelihood and ability to make a

23  living. The harm of being pushed out of a business that *he* promoted, organized, created, and

24  controlled, and in which business he maintains so many contacts and relationships and for which

25  he has sacrificed so much, is so vast that it is immeasurable. And continuing to lock him out of

---

[9] In truth, if equity percentage interest prevails, the actual vote tally to remove Koren was 40% in
favor of Koren staying on as President (because Koren controls the LA Group and could vote its
equity interest) and 27% against. Thus, the measure passed markedly *in Koren's favor.*

GUY KOREN'S OPPOSITION BRIEF TO CINCO CORPORATION'S EX PARTE APPLICATION FOR ORDER
TO SHOW CAUSE RE: PRELIMINARY INJUNCTION

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

that business is punitive and cruel. On the other hand, Cinco never managed PCJV nor did

Jacoby. Cinco and Jacoby have no interest in operating PCJV other than to secretly plot together

to breach long-lasting agreements in a further effort to crush Koren. In fact, Jacoby (who heads a

large construction company and is only a passive investor in the LA Group) has indicated to third

parties that he is only the "interim" President of PCJV, suggesting that Cinco has plans to remove

him once this Court battle is over. The relative interim harm to Koren if an injunction were issued

against him far and away and *substantially* exceeds the relative interim harm to Cinco if an

injunction were issued against Cinco. All Koren's injunction will do is restore the status quo and

place Koren back in charge of PCJV. The opposite result would be devastating. Koren Decl., ¶ 8.

Indeed, many people associated with Potato Corner, including franchisees, rely upon and trust

Koren to run the business; the alternative makes no sense. Bartolome Decl., ¶ 19; Declaration of

Tom Hodgson, ¶¶ 2-5; Declaration of Mark Zhang, ¶¶ 2-5; Declaration of Faisal Shaikh, ¶¶ 2-4.

13    **C.    Cinco is Not Irreparably Injured.**

While Koren would suffer greatly if an injunction were issued against him, if an injunction

were issued against Cinco, Cinco would have adequate remedies at law in the event it believes it's

been injured in any way. To that end, Cinco cannot establish it has suffered or will suffer

*irreparable* injury from any charging allegation it makes in this lawsuit. All of Cinco's alleged

grievances can be alleviated through monetary damages; Koren's grievances cannot. Therefore,

this factor also weighs against any injunction imposed in Cinco's favor.

20    **D.    Cinco Should Post a Significant Bond to Secure any Preliminary Injunction.**

In the event the Court disagrees with Koren and issues a preliminary injunction in Cinco's

favor, it "must" condition that preliminary injunction on the posting of a bond or undertaking.

Cal. Civ. Proc. Code § 529; Cal. Rules of Court, Rule 3.1150(f). For Cinco to secure a

preliminary injunction, the bond amount must be significant because unlike the trivial harm to

Cinco if an injunction were issued in Koren's favor, the harm to Koren if an injunction were

issued against him is *far* greater. Indeed, if an injunction were issued against Koren, the practical

effect would be, among other things, that: (1) he will lose past, present, and future income; (2) his

earning capacity would significantly diminish; (3) be would suffer substantial, additional harm to

37920l0.2                                         14

GUY KOREN'S OPPOSITION BRIEF TO CINCO CORPORATION'S EX PARTE APPLICATION FOR ORDER
TO SHOW CAUSE RE: PRELIMINARY INJUNCTION

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  his reputation; (4) the value of his interests in PCJV and the LA Group would be substantially
2  impaired; and (5) the income and value of his franchisee businesses will decline. As the Koren
3  Decl. filed concurrently herewith establishes, any bond or undertaking securing a preliminary
4  injunction for Cinco must be, at minimum, $5 million. Koren Decl., ¶¶ 9-10.

5         **E.    If the Court is Inclined to Issue a Preliminary Injunction to Cinco, it Should**
6                 **Appoint a Receiver Instead.**

7         At the first *ex parte* hearing on May 11, the Court remarked that this case might be ripe for
8  the appointment of a receiver to take over PCJV while the parties litigate their disputes. To that
9  end, we do not believe a receiver is necessary given that the result here should be and must be that
10 Koren's interpretation of the contract documents is correct, that all of the rules governing
11 contractual interpretation and the balancing tests underlying injunction requests favor Koren, and,
12 therefore, Koren's application for preliminary injunction should be granted. But, to the extent the
13 Court is in anyway inclined to grant Cinco relief, we urge the Court to impose a receiver instead.

14        Among other purposes, the Court is authorized to appoint a receiver in cases "necessary to
15 preserve the property or rights of any party." Cal. Civ. Proc. Code § 564(b)(9). And such
16 appointment could be made on an *ex parte* basis. *Misita v. Distillers Corp. Ltd.*, 54 Cal.App 2d
17 244, 250 (1942); *Lent v. H.C. Morris Co.*, 25 Cal.App.2d 305, 308 (1930). To the extent further
18 briefing on the issue of a receiver's appointment is necessary, Koren is happy to oblige, but for the
19 time being, Koren proposes and nominates two receivers (Theodore Lanes and David Pasternak),
20 both of which are ready to take on and any one of which could capably handle the receivership
21 role. To that end, concurrently filed herewith are Declarations of each of the foregoing proposed
22 receivers along with a proposed order/injunction governing their receivership appointment.

23 **III.    CONCLUSION**

24        Based on the foregoing analyses, Koren should prevail and Cinco's Application should be
25 denied. To the extent, however, the Court disagrees, the Court should appoint a receiver to take
26 control of PCJV while the parties litigate their disputes.

27

28
3792010.2                                    15

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1 | DATED: May 30, 2018

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FREEMAN, FREEMAN & SMILEY, LLP

By: _____
TODD M. LANDER
ARASH BERAL
Attorneys for Defendant and Cross-Complainant
GUY KOREN

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3792010.2

16

# EXHIBIT 84

1                             **DECLARATION OF JOSE P. MAGSAYSAY, JR.**

2        I, Jose P. Magsaysay, Jr., declare as follows:

3        1.     I am the President (the Chief Executive Officer) of Plaintiff Potato Corner

4 International, Inc. ("Plaintiff PCI"). I make this Declaration in support of the Motion for

5 Preliminary Injunction filed by Plaintiff PCI. I have personal knowledge of the matters stated

6 herein, and if called as a witness I could testify competently to these facts.

7

8                               ***Potato Corner History and Cinco***

9                                  ***Corporation Formation***

10       2.     On October 16, 1992, I, and three business partners (and their spouses) opened the

11 first Potato Corner branded outlet – a food cart – which was located in the "SM Megamall" in

12 Mandaluyong, Philippines.

13       3.     In 1993, along with these same business partners, I founded Quattro Food and

14 Resources, Inc. ("Quattro"), a corporation incorporated in the Philippines, for the purpose of

15 owning the Potato Corner trademarks, service marks, recipes, trade secrets, and brand, as well as

16 to operate the Potato Corner outlets that had grown in number from that first food cart.

17       4.     From its incorporation in 1993 through 1997, I served as President of Quattro.

18 From 1997 through 2000, I also served as Chairman of the Board of Quattro.

19       5.     In 2000, as Chairman of the Board of Quattro, I negotiated, approved, and

20 participated in the consummation of the incorporation of Plaintiff Cinco, which was originally

21 named Cinco Holdings Corporation, as part of a transaction whereby all Quattro assets and

22 intellectual property (including the Potato Corner trademarks, service marks, recipes, trade secrets,

23 and brand, and all rights and interests in the Potato Corner stores that were operating at the time)

24 were transferred to Plaintiff Cinco. Filed concurrently herewith as Exhibit 1, are the Articles of

25 Incorporation for Cinco Holdings Corporation, which I reviewed, approved, and signed prior to

26 their filing with the Filipino government in 2001. The signature above my name on the last page

27 of Exhibit 1 is mine, which I affixed prior to that document's filing with the Filipino government.

28 As reflected in Exhibit 1, Cinco Holdings Corporation issued 250,000 shares of stock to five

16544.2:9354751.1              3

ERVIN COHEN & JESSUP LLP

1  shareholders, of which I was one. I have owned these 50,000 shares of Plaintiff Cinco from its
2  inception until the present.

3       6.       In 2006, Plaintiff Cinco changed its name from Cinco Holdings Corporation to
4  Cinco Corporation. Filed concurrently herewith as Exhibit 2 are the Amended Articles of
5  Incorporation for Plaintiff Cinco, reflecting its name change, which I reviewed, approved, and
6  signed prior to their filing with the Filipino government in 2006. The signature above my name on
7  the last page of Exhibit 2 is mine, which I affixed prior to that document's filing with the Filipino
8  government. As reflected in Exhibit 2, as of 2006, again, Plaintiff Cinco had 250,000 shares of
9  stock outstanding, the same 50,000 of which I owned as of 2006. Between 2006 and 2017, I
10 acquired an additional 12,500 shares, for a total of 62,500.

11      7.       From 2000 through 2001, I served as Chairman of the Board of Plaintiff Cinco.
12 From 2001 through August 31, 2018, I was the President of Plaintiff Cinco, in addition to my role
13 (described below) as President of Plaintiff PCI. On August 31, 2018, I took a leave of absence,
14 however, I remain President of PCI.

15      8.       As President of Plaintiff Cinco, I was responsible for supervising, and being
16 familiar with, among other things, the issuance of Cinco shares, the ownership of Cinco shares, the
17 establishment, operations, and activities of Plaintiff Cinco's subsidiaries, growth of the Potato
18 Corner brand owned by Cinco, as well as the expansion of Potato Corner, though, among other
19 things, franchising of the Potato Corner concept. From its inception until the present, the Potato
20 Corner brand has grown throughout Asia and on other continents, as it opened more than 1,100
21 new stores worldwide, and received various awards.

22

23              *Plaintiff Cinco and Defendant Koren, Among Others, Negotiate the Terms*
24              *of a Joint Venture Agreement, Codifying the Governance of PCJV*

25      9.       As of 2010, Plaintiff Cinco had one Potato Corner store in the United States: a
26 Potato Corner outlet in the Tanforan Mall in San Francisco.

27      10.      In or around 2010, I began negotiating with Defendant and Cross-Complainant Guy
28 Koren ("Defendant Koren") to create a structure and transaction whereby the Potato Corner brand

ERVIN COHEN & JESSUP LLP

16544.2·9354751 1                                4
DECLARATION OF JOSE P. MAGSAYSAY, JR

1  could be franchised in the United States. I participated directly in these negotiations, on behalf of
2  Plaintiff Cinco (in my capacity as President of Cinco), and communicated directly with, among
3  others, Defendant Koren, as well as Cross-Defendant Amir Jacoby ("Jacoby") and non-party Amit
4  Nemanim ("Nemanim"), which we referred to collectively as the "LA Group."

5        11.    During the negotiations to create a structure and transaction whereby the Potato
6  Corner brand could be expanded in the United States, in addition to myself, Plaintiff Cinco was
7  represented by Jose Miguel Ma G. Montinola ("Mr. Montinola"), Ma. Victoria O. Bermejo ("Ms.
8  Bermejo"), and Ricardo Montelibano ("Mr. Montelibano").

9        12.    As a result of my negotiations, along with Plaintiff Cinco's representatives (acting
10  on behalf of Plaintiff Cinco), on the one hand, and Defendant Koren, Jacoby, and Nemanim, on
11  the other, in 2010, we agreed to establish a Delaware limited liability company called "PCJV
12  USA, LLC," which stands for "Potato Corner Joint Venture USA." PCJV USA, LLC ("PCJV"),
13  which was to be the vehicle through which the Potato Corner brand, intellectual property, and
14  stores would expand in the United States.

15        13.    In our agreement, on behalf of Plaintiff Cinco, on the one hand, and Defendant
16  Koren, Jacoby, and Nemanim, on the other, we agreed that 60% of the percentage membership
17  interests of PCJV USA, LLC ("PCJV") would be owned entirely by a corporate designee of
18  Plaintiff Cinco, which was to be a Cinco subsidiary. During these negotiations, I insisted that
19  Plaintiff Cinco be allowed to designate a subsidiary as the sole and exclusive owner of the 60%
20  membership interest of PCJV, so that Plaintiff Cinco had a separate American corporate entity
21  with a footprint in the United States, and fully governed by American corporate law.

22        14.    During these negotiations, I expressly indicated my intent and requirement, on
23  behalf of Plaintiff Cinco, that the so-called LA Group – Defendant Koren, Jacoby, and Nemanim –
24  hold their proportionate share of the remaining 40% membership interest of PCJV personally and
25  individually, and that they not transfer those interests to any entity or third party. No member of
26  the LA Group – including Defendant Koren – ever disagreed with or rejected this demand during
27  or prior to execution of the governing documents.

28

ERVIN COHEN & JESSUP LLP

16544.2·9354751.1

5

DECLARATION OF JOSE P. MAGSAYSAY, JR

1      15.    During these negotiations, we agreed that all assignments of equity in PCJV, other

2 than the permitted assignment by Cinco to a subsidiary of Cinco, would be governed by a right of

3 first refusal, in which other equity owners of PCJV would have the right to acquire a selling

4 owner's equity prior to any sale to a third party.

5      16.    The structure of the soon to be created PCJV to which I, on behalf of Plaintiff

6 Cinco, agreed with the LA Group in 2010 was as follows: PCJV would be governed by a board of

7 seven Managers ("Management"), who would select executive officers, including the PCJV

8 President, a person responsible for day to day operations of PCJV under the direction of the seven

9 Managers. Plaintiff Cinco's designee – to which all membership interests and rights would be

10 assigned – would be allowed to name four of the seven managers, whereas the "LA Group" could

11 name three.

12      17.    I understand from reading Guy Koren's most recent Amended Cross-Complaint

13 that he makes various false allegations, including the preposterous claim that, during these

14 negotiations, I promised him that he would someday own all of Plaintiff Cinco. I never made such

15 a promise, nor could I, as I do not possess ownership of all of Plaintiff Cinco's stock, nor do I (or

16 did I) have the authority to pledge the other Cinco shareholders' stock to Koren. This is not the

17 only false allegation contained in that pleading, which I reject outright.

18      18.    The terms of our agreement to expand Potato Corner in the United States with the

19 LA Group were memorialized in a Joint Venture Agreement ("JVA"), a true and correct copy of

20 which is filed concurrently herewith as Exhibit 3. The first signature at the top of page 9 of

21 Exhibit 3 is my own. I understood the JVA to govern and address PCJV's ownership structure,

22 limited liability company governance, intellectual property, management, as well as the allocation

23 of profits, royalties, and fees, among other things. I also understood the JVA to memorialize the

24 terms of the negotiations that preceded the JVA's execution, which are described in paragraphs

25 11-16 herein.

26      19.    As reflected in the Recitals to the JVA (Exh. 3, p. 1), I signed the JVA in my

27 capacity as a representative of Plaintiff Cinco, and not in my individual capacity.

28

ERVIN COHEN & JESSUP LLP

16544.2:9354751.1

6

DECLARATION OF JOSE P. MAGSAYSAY, JR.

1    20.    I understood that the Recitals and Section 2(b) of the JVA (Exhibit 3) codified the
2 allocation of ownership of PCJV equity to be 60% owned by Cinco Corporation (or a designated
3 subsidiary of Cinco), and the remaining 40% was to be split by the "LA Group," which the JVA
4 defined to be Guy Koren, Amir Jacoby, and Amit Nemanim.

5    21.    I have never been advised, heard, or had any awareness of any demand by Mr.
6 Montinola, Ms. Bermejo, and/or Mr. Montelibano – the representatives of Plaintiff Cinco set forth
7 in the Recitals – that the JVA be, or was, executed (on page 9) in their individual capacity.

8    22.    I have never claimed any personal or individual ownership interest (membership
9 interest) in PCJV, nor have I ever claimed any personal or individual rights arising out of the JVA.
10 I have never been advised, heard, or had any awareness that that Mr. Montinola, Ms. Bermejo, or
11 Mr. Montelibano ever claimed any personal or individual interest in the JVA or ownership
12 (membership) interest in PCJV.

13    23.    The structure memorialized in the JVA corresponded with the structure to which I
14 agreed in our negotiations with the LA Group. For example, the recitals (Exh. 3, p. 1) state that
15 "Cinco may assign any or all of its rights to the joint venture company [PCJV] formed under this
16 Agreement to a wholly-owned subsidiary as it deems fit." The JVA codified my understanding of
17 the results of our prior negotiation, wherein all *other* transfers of equity in PCJV by any owner of
18 PCJV equity was to be governed by Section 2(d), which contained a right of first refusal.

19    24.    Section 3 (beginning on page 3) also codified my understanding of our agreement
20 regarding PCJV's Management by seven individuals, four of whom were to be named by Plaintiff
21 Cinco (or its designee subsidiary), and three of whom were to be named by Defendant Koren,
22 Jacoby and Nemanim.

23    25.    Sections 3(c)-3(d) of the JVA, which I executed on behalf of Plaintiff Cinco, also
24 codified another term that I recall negotiating and approving prior to execution of the JVA: the
25 appointment of executive officers, subject to a majority vote of Management. The JVA named me
26 as Chairman of the Board of Members of PCJV, and named Nemanim as the President.

27    26.    During the negotiations prior to execution of the JVA, I, on behalf of Plaintiff
28 Cinco, used and/or understood the terms "members' interest," "members' percentage interest,"

16544.2:9354751.1                                        7

DECLARATION OF JOSE P. MAGSAYSAY, JR.

1 "pro rata members interest," or "pro rata ownership share," to mean the same concept: an owner of
2 a limited liability company's equity in PCJV, measured by their percentage membership interest:
3 Plaintiff Cinco's designee (60%), Defendant Koren (15.2%), Nemanim (15.2%), and
4 Jacoby (9.6%).

5     27.    When I reviewed Sections 1(d), 2(c), and 2(d) of the JVA prior to my execution of
6 that document on behalf of Plaintiff Cinco, my understanding was confirmed that "members'
7 interest," "members' percentage interest," "pro rata members interest," or "pro rata ownership
8 share," all referred to the same concept: an owner's equity in PCJV, measured by their percentage
9 membership interest. These sections all use those terms when referring to the effects of or
10 responsibilities inherent in equity ownership of PCJV.

11

12           *Plaintiff Cinco Incorporates the Subsidiary Plaintiff PCI as a Delaware*
13           *Corporation to Serve as Majority Member of PCJV USA, LLC*

14     28.    In my capacity as President of Plaintiff Cinco, as well as an executive officer of the
15 soon to be created PCJV (appointed in Section 3(c) of the JVA), I supervised the creation of
16 PCJV. On July 16, 2010, PCJV was formed, as memorialized in a document I reviewed on or
17 around that date. Filed concurrently herewith as Exhibit 6 is a copy of the Articles of Organization
18 of PCJV that I reviewed prior to their filing with the Delaware Secretary of State on July 16, 2010.

19     29.    Filed concurrently herewith as Exhibit 8 is a copy of a document I reviewed on or
20 around November 2, 2010, entitled "Application for Limited Liability Company Registration,"
21 which was to be filed with the California Secretary of State so as to register PCJV with the State
22 of California.

23     30.    As President of Plaintiff Cinco, on July 16, 2010, I authorized the incorporation of
24 Plaintiff Potato Corner International, Inc. in the State of Delaware. On behalf of Plaintiff Cinco, I
25 named myself as President of Plaintiff PCI. Filed concurrently herewith as Exhibit 9 is a true and
26 correct copy of the July 16, 2010 Certificate of Incorporation that I reviewed and approved, and,
27 after I approved, I authorized Susan Reynolds of DLA Piper, to file with the State of Delaware.

28

16544.2:9354751.1

                                 8

ERVIN COHEN & JESSUP LLP

1    31.    Filed concurrently herewith as Exhibit 11 is a copy of a document I reviewed and
2 approved on or around November 2, 2010, entitled "Statement and Designation by Foreign
3 Corporation," and, after I approved, I authorized this document to be filed with the California
4 Secretary of State so as to register PCI with the State of California.

5    32.    I have served as President of Plaintiff PCI from the date it was incorporated
6 (July 16, 2010) through the present. As President of Plaintiff PCI, I am responsible for
7 supervising, and being familiar with, among other things, the issuance and ownership of Plaintiff
8 PCI shares, supervising PCI's compliance with corporate formalities (such as shareholder
9 meetings, minutes, and corporate filings), satisfaction of all of Plaintiff PCI's duties and
10 obligations arising out of its ownership of PCJV as well as the JVA (as Plaintiff Cinco's
11 designee), monitoring the operations, activities, and growth of the Potato Corner brand in the
12 United States.

13    33.    Attached hereto as Exhibit 12 are five Potato Corner International stock certificates
14 that I signed, as President of Plaintiff PCI, on July 16, 2010, reflecting the issuance of 1000 shares
15 of stock in Plaintiff PCI. The purpose of my issuance of these stock certificates on July 16, 2010
16 on behalf of Plaintiff PCI was to memorialize the following.

17         a.    That, as of July 16, 2010, Plaintiff Cinco owned 995/1000 shares of
18              Plaintiff PCI stock (99.5%, as reflected in Certificate No. 1; Exhibit 12, p.
19              1).
20         b.    That, as of July 16, 2010, I, in my individual capacity, owned 1/1000 share
21              of Plaintiff PCI stock (0.1%, as reflected in Certificate No. 2; Exhibit 12, p.
22              2).
23         c.    That, as of July 16, 2010, Mr. Montinola, in his individual capacity, owned
24              1/1000 share of Plaintiff PCI stock (0.1%, as reflected in Certificate No. 3;
25              Exhibit 12, p. 3).
26         d.    That, as of July 16, 2010, Ms. Bermejo, in her individual capacity, owned
27              1/1000 share of Plaintiff PCI stock (0.1%, as reflected in Certificate No. 4;
28              Exhibit 12, p. 4).

ERVIN COHEN & JESSUP LLP

ERVIN COHEN & JESSUP LLP

1           e.    That, as of July 16, 2010, Mr. Montelibano, in his individual capacity,

2              owned 1/1000 share of Plaintiff PCI stock (0.1%, as reflected in Certificate

3              No. 5; Exhibit 12, p. 5).

4           f.    Finally, that, as of July 16, 2010, Ben Olivas ("Mr. Olivas"), in his

5              individual capacity, owned 1/1000 share of Plaintiff PCI stock (0.1%, as

6              reflected in Certificate No. 6; Exhibit 12, p. 6).

7      34.    From July 16, 2010 through the present, the shareholders of Plaintiff PCI have not

8 changed, with one exception: on October 11, 2017, Ms. Bermejo assigned her one share of

9 Plaintiff PCI to Plaintiff Cinco. Filed concurrently herewith as Exhibit 13 is the seventh, and most

10 recent stock certificate of Plaintiff PCI, which was signed by me on October 11, 2017,

11 memorializing that Ms. Bermejo's one share of Plaintiff PCI had been assigned to Plaintiff Cinco.

12 Accordingly, as of October 11, 2017, Plaintiff Cinco owned 99.6% of Plaintiff PCI. Plaintiff

13 Cinco has owned these 996 shares from October 11, 2017 through the present.

14      35.    At all times from July 16, 2010, through the present, Plaintiffs Cinco and PCI have

15 remained separate corporate entities, each observing the unique corporate formalities of the

16 Philippines and the State of Delaware, and each maintaining separate bank accounts. Each has

17 separate governance boards. Their sole relationship is that Plaintiff PCI is a subsidiary of Plaintiff

18 Cinco.

19      36.    My purpose in creating Plaintiff PCI, was that I, on behalf of Plaintiff Cinco,

20 intended that Plaintiff PCI serve as the separate corporate domestic American entity that Plaintiff

21 Cinco would designate as the 60% member of PCJV. To that end, on July 16, 2010, on behalf of

22 Plaintiff Cinco, and as its President, I caused all of Plaintiff Cinco's rights arising from the JVA,

23 and all membership interests in PCJV (which was created on that same date) to be assigned and

24 transferred to Plaintiff PCI.

25      37.    As a result of my causing Plaintiff Cinco to assign to Plaintiff PCI all of Plaintiff

26 Cinco's rights in and to PCJV, Plaintiff Cinco ceased to have any rights whatsoever in the

27 management, governance, operations, of PCJV. Plaintiff Cinco's sole relationship with PCJV was

28 as a licensor of intellectual property, as codified in Section 3(g) of the JVA.

1    38.    At all times from July 16, 2010 through the present, as the result of my having
2    caused Plaintiff Cinco to assign all rights in and to PCJV to Plaintiff PCI, Plaintiff Cinco has
3    possessed no interest whatsoever in the equity or rights to the management of PCJV, including the
4    right to name managers of PCJV. Those rights have been held by Plaintiff PCI from July 16, 2010
5    through the present. Plaintiff Cinco's sole right in and to PCJV arises from its right to receive
6    royalties for PCJV's use of Plaintiff Cinco's intellectual property.

7    39.    At no point from PCJV's inception on July 16, 2010 to the present has Plaintiff
8    Cinco possessed any rights whatsoever to govern, own, manage, or operate PCJV, nor has Plaintiff
9    Cinco possessed any right to name Managers of PCJV or claim rights to distributions of PCJV.
10    Those rights have been held by Plaintiff PCI from July 16, 2010 through the present. From July
11    16, 2010, Plaintiff Cinco has never possessed any contractual rights arising from the JVA, with the
12    sole exception of Plaintiff Cinco's sole right to receive royalties for the use of Potato Corner
13    intellectual property by PCJV and any stores opened by PCJV or PCJV franchisees

14    40.    Filed concurrently herewith as Exhibit 46 are true and correct copies of certificates
15    for PCJV limited liability company interests that I received in 2011 in my capacity as President of
16    Plaintiff PCI. I relied upon these documents as confirmation that PCJV, through its then President,
17    recognizes Plaintiff PCI as the owner of 60% of the membership interests in PCJV (Certificate 01
18    of Exhibit 24), and that Amit Nemanim, Guy Koren, and Amir Jacoby owned 15.2%, 15.2%, and
19    9.6% respectively, as of 2011.

20

21                      *The 2012 Amended JVA, and the*
22                         *Purpose of the Amendment*

23    41.    As Chairman of the Board of PCJV – a role that I served from July 16, 2010 until
24    October 11, 2017 – I conducted and led each of the meetings of the Management, as well as the
25    Members. My role as Chairman of the Board included, but was not limited to, conducting
26    meetings and votes, supervising the tallying of votes, and reporting the results of the vote to the
27    Managers.

28

ERVIN COHEN & JESSUP LLP

16544 2 9354751 1                              11
DECLARATION OF JOSE P. MAGSAYSAY, JR.

1      42.     In 2012, I learned from Defendant Koren that there was dissension among the three

2 individuals holding the 40% percentage membership interests of PCJV (the so-called "LA

3 Group").

4      43.     As Board Chair for PCJV, I attended a meeting for PCJV on October 16, 2012. I

5 attended that meeting, conducted that meeting in person, and I set the agenda for that October 16,

6 2012 meeting, the primary agenda item pertaining to the removal of Nemanim as President of

7 PCJV, and his withdrawal as a member of PCJV.

8      44.     During that October 16, 2012 meeting, a vote was called to remove Nemanim as

9 President. As Chairman of the Board, I conducted that vote, and supervised the tallying of the

10 votes. I specifically recall that the votes were counted based upon the percentage membership

11 interest (equity) present at the meeting, and observed the voting as follows:

12          a.    Plaintiff PCI voted its 60% membership interest in PCJV to remove

13              Nemanim as President of PCJV.

14          b    Defendant Koren voted his 15.2% membership interest in PCJV to remove

15              Nemanim as President of PCJV.

16          c.    Jacoby voted his 9.6% membership interest in PCJV to remove Nemanim as

17              President of PCJV.

18      45.     Because 84.8% of the holders of membership interests in PCJV present at the

19 meeting and holding a membership interest (equity) in PCJV voted in support of removing

20 Nemanim, I reported to the participants of the meeting that Nemanim had been removed as

21 President. Defendant Koren did not object during the October 16, 2012 meeting that the balloting

22 as to the motion to remove Nemanim as President was being counted by reference to the

23 percentage membership interest being held by the PCJV members that were present.

24      46.     This vote to remove Nemanim on October 16, 2012 is the only instance from 2010

25 through April 9, 2018 (last year), in which there was anything other than a unanimous consent for

26 any policy, decision, or vote among the PCJV members or Management during a meeting of

27 Managers or Members.

28

16544.2:9354751.1            12

DECLARATION OF JOSE P. MAGSAYSAY, JR.

ERVIN COHEN & JESSUP ᴸᴸᴾ

47. As part of the discussion during the October 16, 2012 meeting, it was agreed that Defendant Koren would become President. Defendant Koren requested assurance that he would not be subject to termination as President by a simple majority of the Managers. As the result of the discussion that ensued, I specifically recall, and supported, a proposal by the Managers to amend the JVA such that a vote representing 75% of the membership interests held by the remaining members – Plaintiff PCI (60%), Defendant Koren and Jacoby (who, in their individual capacity would be splitting the remaining 40% equity) – would be required to remove the President, or an executive officer named in the Amended JVA. This proposal would have required the support of Plaintiff PCI and one of the two other members of PCJV – Defendant Koren or Jacoby – to terminate an executive officer named in the Amended JVA.

48. At no point during the October 16, 2012 meeting did I agree, nor did anyone else state, that the JVA would be amended so that *75% of the Management* (6 out of 7 Managers) would be required to terminated Defendant Koren as President. I would never have agreed to this, as President of Plaintiff PCI, as this would have required a vote of 6 out of 7 individuals serving on Management to authorize his termination. This would have given too much power to Defendant Koren, Jacoby, and the third person that they selected to replace Nemanim on Management: Inbal Jacoby. This would have required two out of the three of the LA Group selected Managers to support termination of Defendant Koren.

49. In 2012, and continuing through this year, Erlinda Bartolome ("Ms. Bartolome") was the Secretary of PCJV, whom I tasked, with, among other things, documenting the meetings of Managers and Members of PCJV in meeting minutes. As part of the October 16, 2012 meeting I conducted, I asked Mr. Bartolome to prepare a ballot and minutes reflecting our vote to remove Nemanim, as well as our agreement to amend the JVA so as to protect Defendant Koren from being terminated as President absent 75% approval among the members of PCJV holding percentage membership interest (equity) in PCJV.

50. Filed concurrently herewith as Exhibit 14 is a true and correct copy of the Minutes and ballot that I received from Ms. Bartolome documenting the October 16, 2012 meeting. I recall seeing this document at the meeting, and affixing my signature next to my name in the balloting

16544 2:9354751.1                                    13

1  portion documenting the termination of Nemanim. This ballot reflects, and corresponds to my
2  recollection that, the vote to remove Nemanim as President, which I conducted, was counted by
3  reference to the percentage of member interests – equity – held by the members (owners) of PCJV
4  voting on that motion. When I reviewed this document in 2012, it confirmed that the motion to
5  remove Nemanim as President was passed as the result of the approving votes of 84.8% of the
6  PCJV owners holding a percentage membership interest in PCJV.

7      51.    When I saw this document reflecting the ballot from the October 16, 2012 meeting,
8  I was focused on the ballot relating to the termination of Nemanim. I did not notice at the time that
9  above the balloting portion relating to Nemanim's termination, the document states that the
10 Managers "approved a requirement that the CEO, President, Treasurer, and Corporate Secretary of
11 PCJV" could be removed by a "75% vote of Management." As explained above, this is not what I
12 agreed to at the October 16, 2012 meeting, nor would I have ever agreed, on behalf of Plaintiff
13 PCI to that unfair provision, which I understand would have insulated Defendant Koren from ever
14 being terminated.

15     . 52.    When it was brought to my attention that there is an inconsistency in the
16 October 16, 2012 ballot and minutes between the actual vote and ballot removing Nemanim as
17 President on October 16, 2012 – which was counted by reference to the equity ownership
18 percentage interest of those voting on the ballot – with the prior reference to a requirement of a
19 "75% vote of Management," I concluded that the inconsistency was cured by the actual
20 Amendment to the JVA, which was executed after the October 16, 2012 meeting.

21     53.    Filed concurrently herewith as Exhibit 15 is a true and correct copy of the
22 Amendment to the JVA ("AJVA") – the document governing PCJV. I executed this agreement in
23 or around 2012 in my capacity as President of Plaintiff PCI. My initials are found on each page,
24 and my signature is the first on the last page (page 9). This agreement was intended to amend the
25 original JVA (Exhibit 3).

26     54.    I recall there being only a few differences between the AJVA and the JVA, which
27 are as follows:

28

16544.2:9354751 1                                 14
                         DECLARATION OF JOSE P. MAGSAYSAY, JR

ERVIN COHEN & JESSUP LLP

ERVIN COHEN & JESSUP LLP

a.  Before the Recitals, and in Section 1(b), I understood that the AJVA
confirmed that Plaintiff Cinco had assigned all of its membership interests
in PCJV and rights arising out of the JVA (including the right to name four
of the seven Managers) to Plaintiff PCI which was being represented by
myself, Mr. Montinola, Ms. Bermejo, and Mr. Montelibano (the "PCI
Group"). It appears that all other references to the "Cinco Group" were not
replaced with the "PCI Group" in this amendment to the JVA, however,
given that the original JVA expressly allowed Plaintiff Cinco to assign all
of its rights arising from the JVA, as well as all membership interests in
PCJV to a designee – Plaintiff PCI – I always understood that any reference
to Cinco (or the Cinco Group) in the AJVA – with the exception of section
3(g) – was always to be construed as meaning Plaintiff PCI. Section 3(g) is
excepted from this understanding as that provision relates to Plaintiff
Cinco's license of intellectual property of which Plaintiff PCI possesses no
interest whatsoever.

b.  Before the Recitals, and in Section 1(b), I understood that the AJVA
documented that Nemanim was no longer a member of PCJV, and no longer
a party to the JVA, and that the sole members of PCJV (referred to
collectively as the "LA Group") are now Defendant Koren, Amir Jacoby
and Inbal Jacoby.

c.  I understood that Section 1(c) of the AJVA reflected a change in the
physical office of PCJV.

d.  Section 3(a) of the AJVA reflected my understanding that Nemanim was no
longer one of the seven individuals comprising Management, and had been
replaced by Inbal Jacoby.

e.  Section 3(c) reflected my understanding of the appointment of new
Executive Officers, including the appointment of Defendant Koren as
President. That section also included new language, consistent with my

16544.2.9354751.1                                    15
DECLARATION OF JOSE P. MAGSAYSAY, JR.

1    recollection as to what we agreed to at the October 16, 2012 meeting,

2    specifically, that "[a]ny change in these mentioned executive officers will

3    require a vote of 75% members' interest." Because I always used the term

4    "members' interest" to refer to the ownership equity held by PCJV

5    members – percentage membership interest in PCJV – this comported with

6    my understanding that a change in the executive officers would require

7    approval of a 75% of the percentage membership interests (equity) owned

8    by the PCJV members: Plaintiff PCI (60%) and either Defendant Koren or

9    Jacoby, who, after Nemanim's withdrawal, I understood were to split the

10    remaining 40% equity of PCJV individually. When I signed the AJVA on

11    behalf of Plaintiff PCI, I was not agreeing that "members interest" would be

12    construed differently now to refer to "Management member's voting

13    rights."

14    f.    I understood that Section 3(d) was amended to add language after the

15    sentence "[a]dditional executive officers may be appointed by Management

16    as it deems necessary," that read "[r]eplacement and removal will require

17    Managers' simple majority vote." I recall noting that this new language did

18    not refer to "members' interest" but instead to a "Managers' vote." This was

19    consistent with my understanding that a reference to a vote by "members'

20    interest" was referring to percentage equity ownership of PCJV (equity),

21    whereas any requirement that a vote of the Management was required

22    would refer to a "Managers' vote."

23    55.    I have never been advised, heard, or had any awareness of any demand by Mr.

24    Montinola, Ms. Bermejo, and/or Mr. Montelibano (referred to as the "Cinco Group") – the

25    representatives of Plaintiff Cinco set forth in the Recitals – that the AJVA be executed (page 9) in

26    their individual capacity.

27

28

16544.2:9354751.1                                    16
DECLARATION OF JOSE P. MAGSAYSAY, JR.

ERVIN COHEN & JESSUP LLP

1    56.    I have never claimed any personal or individual interest in the AJVA or PCJV. I
2  have never been advised, heard, or had any awareness that that Mr. Montinola, Ms. Bermejo, or
3  Mr. Montelibano ever claimed any personal or individual interest in the AJVA or PCJV.

4    57.    I understand that Defendant Koren is now taking the position that the AJVA
5  Section 3(c)'s reference to "75% members' interest" means a member of Management, and that
6  this means that 75% of the Managers must vote to remove an executive officer. Defendant Koren's
7  position is contrary to my understanding of what this amendment to the AJVA means. Moreover, I
8  have never seen or been presented with any document, contract, or authority that confers any
9  "interest" in PCJV to a Manager has in PCJV.

10    58.    At no point did I, on behalf of Plaintiff PCI, ever agree or contemplate that a 75%
11  vote of the seven Managers would be required to terminate any of the executive officers, including
12  Defendant Koren. If that was the case, six out of seven Managers would be required. This would
13  have given too much power to Defendant Koren.

14    59.    When I reviewed the AJVA prior to my execution of that document, my
15  understanding was confirmed that the reference to "members' interest," in the new section 3(c)
16  referred to an owner's equity in PCJV, measured by their percentage membership interest. Among
17  the bases for my having confirmed this understanding, was by reviewing Sections 1(d), 2(c), and
18  2(d) of the AJVA, which remained unchanged, which also used the terms "members' interest,"
19  "members' percentage interest," "pro rata members interest," or "pro rata ownership share," to
20  refer to the same concept: an owner's equity in PCJV, measured by their percentage membership
21  interest.

22    60.    Filed concurrently herewith as Exhibit 16 is a true and correct copy of an
23  "Operating Agreement" governing PCJV that was executed by me and that also governs PCJV.

24

25                    ***Hernandez's Acquisition of a Majority***
26                          ***of Plaintiff Cinco Shares***

27    61.    As of 2017, Plaintiff Cinco still had 250,000 outstanding shares.

28

16544.2.9354751.1                                17
                            DECLARATION OF JOSE P. MAGSAYSAY, JR.

62. In 2017, in my capacity as President of Plaintiff Cinco, I was directly involved in the negotiations for the sale of stock between existing shareholders of Plaintiff Cinco, including me, and Mr. Edward Hernandez ("Mr. Hernandez"), who I understood to be negotiating on behalf of himself, his family members, and certain business entities owned by Mr. Hernandez and his family members (the "Hernandez Group").

63. As the result of those negotiations, the Hernandez Group consummated an acquisition of 55% of the outstanding shares of Plaintiff Cinco, which were transferred to Mr. Hernandez, his family members, and certain business entities owned by Mr. Hernandez and his family members (the "Hernandez Cinco Stock Acquisition"). The Cinco shareholders that sold stock included myself, who sold a portion of my shares, as did Ricardo Montelibano, and Jose Miguel Ma Montinola. Ms. Bermejo sold all of her Cinco stock.

64. The Hernandez Cinco Stock Acquisition was solely and exclusively limited to shares of Plaintiff Cinco as well as Ms. Bermejo's stock in Cinco related companies and subsidiaries. Because Plaintiff Cinco does not own any membership interests in PCJV, or have any governance or management rights in PCJV arising from the JVA and AJVA, shareholders of Plaintiff Cinco could not have sold any membership interests in or rights to PCJV.

65. As President of Plaintiffs PCI and Cinco at the time of the Hernandez Cinco Stock Acquisition, I can confirm that the Hernandez Cinco Stock Acquisition did not include any transfer to Mr. Hernandez (or his family or family's business interests) of any of Cinco's 995 shares of Plaintiff PCI. Although I did have the understanding that Ms. Bermejo's one share of Plaintiff PCI was purchased by Ms. del Pilar, as nominee of the Hernandez Group, I later learned that Ms. Bermejo's one share would be assigned back to Plaintiff Cinco, as reflected in Exhibit 12 filed concurrently herewith. To date, the sole shareholders of Plaintiff PCI are Plaintiff Cinco (99.6%), myself (.1%), Mr. Montelibano (.1%), Mr. Montinola (.1%), and Mr. Olivas (.1%).

66. As President of Plaintiffs PCI and Cinco at the time of the Hernandez Cinco Stock Acquisition, I can also confirm that the Hernandez Cinco Stock Acquisition did not include any transfer to Mr. Hernandez (or his family or family's business interests) of any of Plaintiff PCI's 60% membership interest in PCJV, or any of Plaintiff PCI's interests in or rights to PCJV,

16544.2:9354751 1                               18

DECLARATION OF JOSE P. MAGSAYSAY, JR.

1 including the right to name managers. To date, the sole members of PCJV remain: Plaintiff PCI

2 (60%), Defendant Koren, and Jacoby (the latter of whom share the remaining 40%).

3

4 ***Defendant Koren's Assertions Regarding***

5 ***the Right of First Refusal***

6     67.    Filed concurrently herewith as Exhibit 22 is a true and correct copy of an email and

7 letter I received from Defendant Koren on February 28, 2017. I understood that letter to be a

8 demand by Defendant Koren that the LA Group has the right to exercise its right of first refusal set

9 forth in Section 3.3 of the Operating Agreement (which mirrors 2(d) of the JVA and AJVA),

10 based upon Defendant Koren's apparent belief that membership interests (equity) in PCJV were in

11 the process of being sold to a third party.

12     68.    I understood Defendant Koren's demand to be referring to the Hernandez Cinco

13 Stock Acquisition. I rejected Defendant Koren's demand to exercise the right of first refusal

14 because Plaintiff PCI was not selling any of its membership interest in PCJV to Mr. Hernandez

15 nor any other person or entity.

16     69.    I understand that Defendant Koren is now claiming that he has a right to a portion

17 of Plaintiff PCI's membership interest in PCJV, based on the Hernandez Stock Acquisition.

18     70.    As President of Plaintiff PCI, I can confirm, as I have stated to Defendant Koren,

19 Plaintiff PCI, the sole owner of the 60% membership interests in PCJV has not transferred or sold

20 its 60% equity in PCJV to any person, nor has it transferred its rights arising from the JVA and

21 AJVA (including the right to name four of the seven Managers), and Plaintiff PCI remains the sole

22 holder of the membership interest that it received at the founding of PCJV in 2010.

23     71.    As President of Plaintiff PCI, I can confirm, as I have repeatedly stated to

24 Defendant Koren, Plaintiff PCI, the sole owner of the 60% membership interests in PCJV, has not

25 assigned any of its rights or obligations conferred upon Plaintiff PCI in the JVA or AJVA, as

26 executed by its representatives (referred to as the PCI Group). As of the filing of this Declaration,

27 PCI remains the owner of the 60% membership interests in PCJV, and has never assigned,

28 transferred, or sold any of its membership interests or transferrable rights in and to PCJV. At no

ERVIN COHEN & JESSUP LLP

1 point has Plaintiff PCI ever transferred any of its rights to participate in the management or
2 governance of PCJV, nor Plaintiff PCI's right to its 60% equity in PCJV.

3     72.    I know of no contract to which Cinco or PCI are parties that confers upon any
4 Defendant in this action, including Guy Koren and the Potato Corner LA Group, LLC any claim
5 or right to any of PCI's membership interest in PCJV as the result of a sale of Plaintiff Cinco's
6 stock.

7     73.    Defendant Koren has expressed to me, and is now taking the position that because
8 of his claim that the Hernandez Cinco Stock Acquisition triggered his right to acquire a portion of
9 Plaintiff PCI's membership interest in PCJV, he and Potato Corner LA Group, LLC also have a
10 corresponding right to name more than the three of the seven PCJV Management seats; *ie.* that the
11 Hernandez Stock Acquisition caused Plaintiff PCI to lose its right to name four of the seven
12 Managers. As President of Plaintiff PCI, I have rejected this demand of Defendant Koren for two
13 reasons. First, the Hernandez Cinco Stock Acquisition did not constitute a transfer of any rights or
14 obligations in and to PCJV. Second, my intent in entering into the JVA and AJVA (which I
15 understand to be confirmed by the contractual language itself) even if Plaintiff PCI had sold some
16 of its membership interests in PCJV, Plaintiff PCI's right to name four of the seven seats on PCJV
17 Management is not tied to its percentage ownership of PCJV, and would remain unchanged.

18     74.    I know of no contract entered into by Plaintiff PCI, Plaintiff Cinco, or anyone
19 authorized to act on behalf of Plaintiff PCI and Plaintiff Cinco, whereby the allocation of the
20 Management seats contained in the JVA, AJVA, and Operating Agreement (four to be named by
21 Plaintiff Cinco or its designee, PCI and three by the LA Group) is to be altered if any of the
22 percentage equity ownership held by the members of PCJV was to be increased or reduced. Put
23 differently, even if Plaintiff PCI had transferred a portion of its membership interests in PCJV, I
24 know of no contract that would require a corresponding reduction in the number of Managers that
25 Plaintiff Cinco (or its designee, PCI) is authorized to appoint (four of the seven). Put simply, I
26 know of no contractual term whatsoever that has been executed by Plaintiff PCI, or that governs
27 PCJV, that reduces Plaintiff PCI's right to name four of the seven seats on PCJV management, if
28 Plaintiff PCI's percentage membership interest in PCJV is reduced.

             20

ERVIN COHEN & JESSUP LLP

1    75.    On November 28, 2017, at a board meeting of Plaintiff PCI, which I attended, I was
2    instructed by the Board of Plaintiff PCI to, among other things, appoint Mr. Hernandez as a
3    Manager of PCJV, pursuant to its unilateral right to name four of the seven Managers of PCJV
4    under Sections 3(a) of the JVA and AJVA. This did not constitute a transfer of any rights or
5    membership interests in and to PCJV by Plaintiff PCJV to Mr. Hernandez.

6    76.    I know of no contractual term whatsoever that has been executed by Plaintiff PCI,
7    or that governs PCJV, that restricts Plaintiff PCI's right under Section 3(a) of the JVA and AJVA
8    to name any of the four seats on PCJV Management to which Plaintiff PCI is entitled.

9    77.    During an April 9, 2018 meeting of Management of PCJV, Defendant Koren
10   expressly stated his belief that he and Potato Corner LA Group, LLC, unilaterally, possesses the
11   right to name three of the seven seats on PCJV Management, and that any of those appointees
12   need not to have membership interests in PCJV. I understand that Defendant believes that his
13   naming of third parties, not parties to the JVA, as Managers of PCJV does not trigger the right of
14   first refusal contained in 2(d) of the JVA and AJVA.

15

16                    ***Financial Statements Received by PCJV in October of 2018***

17   78.    Guy Koren remains President of PCJV (despite my wishes that he be terminated),
18   and (unfortunately) authorized to serve, act, and speak on behalf of PCJV as its agent, even though
19   I believe he has injured PCJV through what I believe to be his self-dealing and fraud.

20   79.    I understand that, pursuant to Section 3(i)(iii)-(v) of the JVA and AJVA (Exhibits 3
21   and 14) as well as Sections 2.6 and 3.9.1 of the Operating Agreement (Exhibit 15), Guy Koren, as
22   principal of PCJV, is obligated to deliver, among other things, financial statements of PCJV upon
23   the request of Plaintiff PCI, the member of PCJV.

24   80.    Filed concurrently herewith as Exhibit 21 is a true and correct copy of a "Balance
25   Sheet" that I received from Guy Koren on or around October 2, 2018. I understood that document
26   to constitute a "financial statement" of PCJV, produced by Koren, acting on behalf of PCJV,
27   pursuant to his and PCJV's obligations pursuant to Section 3(i)(iii)-(v) of the JVA and AJVA as
28   well as Sections 2.6 and 3.9.1 of the Operating Agreement.

16544.2:9354751.1                              21
DECLARATION OF JOSE P. MAGSAYSAY, JR.

81.     Upon review of Exhibit 21, which was dated October 2, 2018, I concluded that PCJV agrees, and does not dispute, that Plaintiff PCI continues to own 60% of the equity of PCJV.

## *Management of PCJV Has Been Frozen by Guy Koren, Allowing him Free Reign to Disregard Fiduciary Duties and Trample on the Rights of the Owners of PCJV*

82.     As explained herein, Potato Corner is my idea, and the growth of Potato Corner is the result of the hard work of me and Cinco Corporation for decades. When we planned the growth of Potato Corner in the United States, I never imagined that our local partner, Guy Koren, would attempt to kick out, exclude, and keep in the dark the very Filipino partners whose concept and brand with which Guy Koren was entrusted.

83.     It was always intended – and indeed an express part of our agreement governing PCJV – that the officers of PCJV serve at the direction of the policies and procedures set by the Management Board of seven. This is contemplated not only by Sections 3(a), 3(b), 3(e), and 3(i) of the AJVA (Exhibit 15) but in the Article IV of the Operating Agreement as well (Exhibit 16.).

84.     On January 20, 2019, I received a Notice for a Manager meeting from John Edward Hernandez who, again, is one of the appointees of PCI to sit on PCJV Management. That Notice is filed concurrently herewith as Exhibit 24.

85.     As of January 20, 2019, the four Management Board seats appointed by PCI remained myself, Mr. Hernandez, Ms. Marivic del Pilar, and Mr. Marco del Pilar.

86.     I agreed with this demand for a Management Meeting, as the Management has been deprived of updates as to PCJV's performance, operations, franchising, and other issues.

87.     Among the issues I wished to be presented at the Manager Meeting is Guy Koren's having caused PCJV to engage in insider transactions with the seven franchisees owned by Guy Koren, including Santa Anita (owned by NKM Capital Group), Americana (owned by J&K Americana), Culver City (owned by J&K Culver), Valley Fair in Santa Clara (owned by J&K Valley Fair), San Jose (owned by J&K Oakridge), Sherman Oaks owned by J&K Capital 2), Ontario (owned by J&K Ontario).

16544.2.9354751 1

22

DECLARATION OF JOSE P. MAGSAYSAY, JR.

ERVIN COHEN & JESSUP LLP

1    88.    As a person who has served as a part of the Management Board since the inception
2  of PCJV, I can confirm that the only store that was granted any such waiver by the Management
3  was the Santa Anita store, and that was not an unlimited waiver. The Management Board has
4  never been asked to approve a wholesale waiver of franchise fees and royalties owned by all of the
5  stores owned and operated by Guy Koren's entities.

6    89.    Even if prior waivers had been granted (as they had with the Santa Anita store
7  previously), that does not prevent the Management Board from revisiting those waivers and
8  modifying them going forward. I intended to vote against some, or all, of these waivers.

9    90.    I also wished to have presented at the Management Meeting consideration of any
10  and all claims PCJV was alleging in the First Amended Cross Complaint.

11    91.    I further wished to have presented at the Management Meeting consideration of
12  whether PCJV is allowed to pay any of the legal fees incurred by Guy Koren, Thomas Hogdson,
13  Emily Garcia, or Ashley Grudnowski in their pursuit of claims against PCI, Cinco, or any of PCI
14  or Cinco's officers or employees.

15    92.    On January 25, 2019, Guy Koren forwarded me a letter from his counsel, filed
16  concurrently herewith as Exhibit 25. I understood this to be a rejection of any Manager Meeting
17  demand and a refusal for any Manager Meeting to proceed.

18    93.    I also noted in the January 25, 2019 letter (Exhibit 25) that Guy Koren, through his
19  counsel, was taking the position that the Potato Corner LA Group, LLC was now claiming the
20  right to name the three Management seats previously allocated to Guy Koren, Amir Jacoby and
21  Inbal Jacoby. I also understand that the Potato Corner LA Group, LLC is claiming to now hold the
22  entire 40% equity to which we agreed would be held by the "LA Group," which, in the Amended
23  JVA (Exhibit 15) is Guy Koren, Amir Jacoby and Inbal Jacoby.

24

25

26

27

28

16544.2.9354751.1                                    23
                          DECLARATION OF JOSE P. MAGSAYSAY, JR.

94.     As a person who has served as a part of the Management Board since the inception of PCJV, and who has been President of PCI since the inception of PCJV, I can confirm that PCI never approved the assignment or transfer to the Potato Corner LA Group LLC of any rights arising out of or related to the AJVA, including the right to name Managers, nor did PCI ever approve the assignment to the Potato Corner LA Group LLC of any equity held by Guy Koren or Amir Jacoby in PCJV.

95.     If anyone has violated the Right of First Refusal, it is Guy Koren, as his attorneys admit in the January 25, 2019 letter.

96.     No Management meetings are being held by PCJV, and PCJV is being blocked from correcting conduct that Guy Koren is engaging in that I believe to be injuring PCJV, including, but not limited to, waiving fees owed to PCJV by entities he owns, paying PCJV employees to sue PCJV's owners. I and my fellow Managers are also being prevented from seeing any financial or operational documents, books and records of PCJV to which we are entitled.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on this 15th day of May, 2019, at San Francisco, California.

Jose P. Magsaysay, Jr.

16544.2:9354751.1                          24
DECLARATION OF JOSE P. MAGSAYSAY, JR.

ERVIN COHEN & JESSUP LLP

# EXHIBIT 85

**DECLARATION OF JOHN EDWARD HERNANDEZ**

I, John Edward Hernandez, declare as follows:

1.      I have personal knowledge of the facts set forth herein, except as to those stated on information and belief and, as to those, I am informed and believe them to be true. I make this declaration in support of the Motion for Preliminary Injunction filed by Plaintiff Potato Corner International ("Plaintiff PCI").

2.      I am currently both a shareholder in and Chairman of the Board of Plaintiff Cinco. As Plaintiff Cinco's Board Chair, I am charged with, in relevant part, possessing full knowledge of the ownership and assets of Cinco, supervising Cinco management's ownership of and participation in Cinco subsidiaries, supervising Cinco's management, finances, operations, and activities. This is not an exclusive list of my functions as Chairman of Plaintiff Cinco's Board.

*My Negotiation for the Acquisition of Cinco Corporation*
*Stock, on Behalf of the Hernandez Group*

3.      In 2017, acting on behalf of myself (in addition to members of my family, and certain entities owned by myself and my family, all of whom I was authorized to act on behalf), I entered into negotiations to acquire shares of Plaintiff Cinco from then current shareholders.

4.      I was the principal negotiator for this acquisition by me, my family, and certain entities owned by me and my family members (the "Hernandez Group"), which included my direct participation in the due diligence that preceded the conclusion of this negotiation.

5.      The negotiations and due diligence for the potential acquisition of Plaintiff Cinco shares by the Hernandez Group began prior to 2017.

6.      During that negotiation, I agreed that the total combined shares in Plaintiff Cinco that would be acquired by the Hernandez Group would represent 55% of the 250,000 outstanding shares of Plaintiff Cinco – a total of 137,500 shares. The Plaintiff Cinco shares that I agreed would be purchased by the Hernandez Group would he acquired from then existing shareholders of Plaintiff Cinco, rather than purchasing newly issued shares of Plaintiff Cinco.

16544.2:9354994.1

3

DECLARATION OF JOHN EDWARD HERNANDEZ

ERVIN COHEN & JESSUP LLP

1    7.    After the total number of Plaintiff Cinco shares that I agreed would be purchased

2 by the Hernandez Group from existing Cinco shareholders was decided, as well as the purchase

3 price, I learned, for the first time, during due diligence, that Plaintiff Cinco was the owner of an

4 American subsidiary called Potato Corner International ("Plaintiff PCI"). It was during my

5 negotiation and due diligence on behalf of the Hernandez Group that I also learned Plaintiff PCI

6 owned 60% of the percentage membership interests (equity) in a Delaware limited liability

7 company called PCJV USA, LLC ("PCJV"). During my negotiation and due diligence I also

8 learned that the remaining 40% of PCJV was owned by Defendant and Cross-Complainant Guy

9 Koren ("Defendant Koren") and Amir Jacoby ("Jacoby"), who, collectively, I understand are

10 referred to as the "LA Group."

11    8.    My discovery of Plaintiff Cinco's ownership of a subsidiary, Plaintiff PCI, did not

12 alter the deal structure that I was negotiating for the acquisition of Plaintiff Cinco shares.

13

14                    ***The Hernandez Group's Acquisition of Cinco Corporation***

15                 ***Stock and Other Interests Not Involving PCJV***

16    9.    In 2017, the transaction by which the Hernandez Group acquired a majority stake

17 in Cinco closed (the "Hernandez Cinco Stock Acquisition"). The Hernandez Cinco Stock

18 Acquisition took the form of two separate agreements. In the First Cinco Stock Acquisition, I, and

19 the Hernandez Group, nominated and appointed Marivic del Pilar to execute the agreement on our

20 behalf, whereby we acquired 75,000 out of 250,000 outstanding shares of Cinco by acquiring a

21 portion of Cinco shares held by Mr. Magsaysay, Mr. Montelibano, and Mr. Montinola. In the

22 Second Cinco Stock Acquisition, which I, and other members of the Hernandez Group executed in

23 or around May of 2017, involved the acquisition of 62,500 of Maria Victoria Bermejo's Cinco

24 stock – representing her entire Cinco ownership, as well as her ownership interests in other Cinco

25 subsidiaries and Cinco related companies.

26    10.    In the Hernandez Cinco Stock Acquisition, initially, I agreed that Ms. del Pilar

27 would take ownership of Ms. Bermejo's one share of Plaintiff PCI's stock. After the Hernandez

28 Cinco Stock Acquisition closed, we waived that transfer of 1/1000 of PCI stock, and agreed that

16544 2-9354994.1        4

ERVIN COHEN & JESSUP LLP

1   Ms. Bermejo's one share in Plaintiff PCI be assigned by Ms. Bermejo back to Plaintiff Cinco.

2   Neither I, nor any member of the Hernandez Group currently claim any ownership interest, equity,

3   or any other rights in or to Plaintiff PCI.

4       11.    In the Hernandez Cinco Stock Acquisition, neither I nor any member of the

5   Hernandez Group (on behalf of which I was the principal negotiator) purchased any percentage

6   membership interest (equity) of or any other interest in PCJV. Neither I, nor any member of the

7   Hernandez Group (on behalf of which I was the principal negotiator) acquired or claim any

8   ownership interest, equity, or any other rights in or to PCJV. Neither I, nor any member of the

9   Hernandez Group (on behalf of which I was the principal negotiator) acquired or claim any right

10   arising out of the Joint Venture Agreement or Amended Joint Venture Agreement, including the

11   right to name managers of PCJV.

12       12.    I have never claimed any ownership of any of the equity in PCJV, nor have I ever

13   claimed any individual rights in and to PCJV arising out of any of its governing agreements or

14   otherwise. I have never been made aware of any claim by any other member of the Hernandez

15   Group to any ownership of PCJV equity, or any individual rights in and to PCJV arising out of any

16   of its governing agreements or otherwise.

17

18              ***Defendant Koren Demands a Right to Plaintiff PCI's Equity in***

19              ***PCJV Based on the Hernandez Cinco Stock Acquisition***

20       13.    On or around November 28, 2017, I attended a Board meeting of Plaintiff PCI.

21   During that Board meeting, I was appointed by Plaintiff PCI, as one of the seven Managers of

22   PCJV.

23       14.    In or around November of 2017, I was told by Defendant Koren that he believed

24   that the Hernandez Cinco Stock Acquisition by the Hernandez Group was a breach of a right of

25   first refusal contained in an agreement governing PCJV entitled the Joint Venture Agreement. I

26   was told by Mr. Koren that as the result of the Hernandez Group's Acquisition of Plaintiff Cinco

27   shares, either he, or the other individuals comprising the "LA Group," is entitled to an increase in

28   their total 40% membership interests (equity) of PCJV.

ERVIN COHEN & JESSUP LLP

1    15.    Subsequent to learning of Mr. Koren's demand regarding the "right of first

2    refusal," I read the JVA, a copy of which is filed concurrently herewith as Exhibit 3. I reviewed

3    Section 2(d) of that agreement. After my review of the JVA, I concluded that nothing in Section

4    2(d) applies to me, or the Hernandez Group. I have never seen, or been presented with, any

5    contract whatsoever that conferred upon any person the right to acquire equity in PCJV as the

6    result of the Hernandez Cinco Stock Acquisition.

7    16.    As part of the Hernandez Cinco Stock Acquisition, I personally became an owner

8    of Cinco shares.

9    17.    I have never acquired any rights or obligations under the JVA, the AJVA, or any

10    other agreement to which Defendant Koren or Jacoby are parties, nor has anyone ever transferred

11    or assigned to me any rights or obligations under the JVA, AJVA, or any other agreement to

12    which Defendant Koren or Jacoby are parties.

13    18.    I have never acquired any percentage membership interests in PCJV from Plaintiff

14    PCI, or any other person, nor has anyone ever transferred or assigned to me any membership

15    interests in PCJV. I claim no rights to distributions of PCJV whatsoever. As part of the Hernandez

16    Cinco Stock Acquisition, none of the Hernandez Group members were assigned or transferred any

17    membership interests (equity) in or rights to PCJV.

18    19.    My sole function with respect to PCJV arises from having been appointed by

19    Plaintiff PCI to serve as a Manager (and executive officer) pursuant to Section 3(a) of the JVA

20    (and a subsequent amendment).

21    20.    I have never been assigned any of Plaintiff PCI's right to name Managers of PCJV,

22    as conferred upon Plaintiff PCI pursuant to Section 3(a) of the JVA (or a subsequent amendment).

23    21.    As part of the Hernandez Cinco Stock Acquisition, none of the Hernandez Group

24    members were assigned or transferred any rights or obligations under the JVA, or AJVA, or any

25    other agreement to which Defendant Koren or Jacoby are parties.

26    22.    As part of the Hernandez Cinco Stock Acquisition, none of the Hernandez Group

27    members were assigned or transferred any membership interests (equity) in or rights to PCJV.

28

ERVIN COHEN & JESSUP LLP

16544.2:9354994.1                                        6

DECLARATION OF JOHN EDWARD HERNANDEZ

1

*My Rejected Demand for a Management*

2

*Meeting of PCJV*

3    23.    On January 20, 2019, I sent a Notice for a Manager meeting to the other PCI-

4  appointed Managers – Jose P. Magsaysay, Jr., Marivic del Pilar, and Marco del Pilar – as well as

5  Guy Koren, Thomas Hogdson, Alon Koren, Amir Jacoby, and Inbal Jacoby. That Notice is filed

6  concurrently herewith as Exhibit 24.

7    24.    As of January 20, 2019, the four Management Board seats appointed by PCI

8  remained myself, Mr. Magsaysay, Ms. Marivic del Pilar, and Mr. Marco del Pilar.

9    25.    I demanded this Management Meeting, because we, as Managers, are entitled to

10  information, updates, financial statements, performance updates, budgets, and other information as

11  to PCJV's performance over 2018, and going forward.

12    26.    Among the issues I intended to present at the Manager Meeting is Guy Koren's

13  having caused PCJV to engage in insider transactions with the seven franchisees owned by Guy

14  Koren, including Santa Anita (owned by NKM Capital Group), Americana (owned by J&K

15  Americana), Culver City (owned by J&K Culver), Valley Fair in Santa Clara (owned by J&K

16  Valley Fair), San Jose (owned by J&K Oakridge), Sherman Oaks owned by J&K Capital 2),

17  Ontario (owned by J&K Ontario).

18    27.    Although I understand Guy Koren's position that these waivers to his own

19  companies have been previously approved by Management – a position that we at PCI disagree –

20  that does not prevent the Management Board from revisiting those waivers and modifying them

21  going forward. I intended to vote against some, or all, of these waivers.

22    28.    At the Management Board Meeting I intended to demand a justification for these

23  across the board waivers to Guy Koren's own entities, and to set for a vote by Management,

24  approval, as to each entity of Guy Koren's whether that entity could have a waiver of franchise

25  fees and/or royalties, or receive any other special treatment not afforded other franchisees.

26    29.    At the Management Board Meeting, I also intended to call for a vote whether PCJV

27  can file any of the claims alleged in Guy Koren's First Amended Cross-Complaint, to which PCJV

28

16544.2:9354994.1                                    7
DECLARATION OF JOHN EDWARD HERNANDEZ

ERVIN COHEN & JESSUP LLP

1 joined. Based upon my review of Section 4.1.6 of the Operating Agreement (Exhibit 16), this is a
2 prerequisite to the institution of any claims by PCJV.

3        30.    At the Management Board Meeting, I also intended to call for a vote as to whether
4 PCJV is allowed to pay any of the legal fees incurred by Guy Koren, Thomas Hogdson, Emily
5 Garcia, or Ashley Grudnowski in their pursuit of claims against PCI, Cinco, or any of PCI or
6 Cinco's officers or employees. I do not believe PCJV should be paying its employees legal fees
7 for suing PCJV's owner, PCI. Given that their claims are designed to kick PCI out of ownership or
8 Management, that would effectively mean that PCJV's funds are being used by PCJV officers and
9 employees to attack a majority owner of PCJV.

10       31.    No Management meeting was held, thus, I was prevented from demanding a vote as
11 to (1) whether Guy Koren's continue causing PCJV to waive fees owed by Guy Koren's
12 franchisees, (2) whether PCJV may pursue the claims Guy Koren forced PCJV to file against PCI
13 and PCI's owners and officers, and (3) whether PCJV may pay legal fees incurred by PCJV
14 officers or employees in pursuit of lawsuits against PCJV owners, PCI officers and directors, or
15 Cinco and its employees.

16       32.    The reason no Management meeting was held is because Guy Koren refused to
17 allow a Management meeting to proceed with me as a PCJV Manager, as well as Marivic del Pilar
18 and Marco del Pilar.

19       33.    Filed concurrently herewith as Exhibit 25 is a true and correct copy of a letter Guy
20 Koren forwarded from his counsel to Mr. Magsaysay, who forwarded the letter to me. I was
21 confused by this letter, as, on page 2, he claims that my "equity ownership in PCJV (as well as
22 Cinco and PCI) must be forfeited." First, I own no equity interest in PCJV. Second, his claim that
23 my purchase of Cinco stock triggered a right of first refusal to which Cinco's subsidiary is
24 obligated makes no sense. Even if Cinco was still a member of PCJV itself, my purchase of Cinco
25 stock did not include a purchase of Cinco's property (*i.e.* securities in other entities owned by
26 Cinco).

27       34.    Attached hereto as Exhibit 26 is a true and correct copy of an email I sent to the
28 other PCI-appointed Managers – Jose P. Magsaysay, Jr., Marivic del Pilar, and Marco del Pilar –

ERVIN COHEN & JESSUP LLP

16544.2:9354994.1                                8
DECLARATION OF JOHN EDWARD HERNANDEZ

1 | as well as Guy Koren, Thomas Hogdson, Alon Koren, Amir Jacoby, and Inbal Jacoby in response
2 | to that letter.

3 |     35.    Despite my requests, and demand, no Management Meeting has since been held.

4 |     36.    I understand that the following requests have been communicated to Guy Koren,
5 | and rejected: that he cease (1) causing PCJV to waive fees owed by Guy Koren's franchisees, (2)
6 | causing PCJV to pursue claims against PCI and PCI's owners and officers, and (3) causing PCJV
7 | to pay legal fees incurred by PCJV officers or employees in pursuit of lawsuits against PCJV
8 | owners, PCI officers and directors, or Cinco and its employees.

9 |     37.    As a Director of PCI, and PCI-appointed Manager of PCJV, I require, among other
10 | things, various financial statements, PCJV books and records regarding its franchising operations,
11 | K1 tax forms, budgets, as well as *monthly* "statement of receipts and disbursements, a schedule of
12 | accounts receivable and payable, and a schedule of fees collected and distributed, together with a
13 | reconciled bank statement." These requests have been made, on my behalf, and rejected.

14 |     38.    By refusing to hold Management meetings, repudiating my right to serve on the
15 | PCJV Board (as a PCI appointed Manager), rejecting our requests that Guy Koren agree to certain
16 | policies regarding waiver of fees to his own companies, and refusing to even update PCI as to the
17 | status, finances, and operations of PCJV, PCI and its Managers, have been shut out, squeezed out,
18 | and otherwise effectively ousted from PCJV.

19 |     39.    Guy Koren has given himself free reign, and total control over PCJV, despite our
20 | polite efforts that he comply with his contractual and legal duties to the Filipino partners that
21 | invited him into the Potato Comer family.

22 |     I declare under penalty of perjury under the laws of the State of California that the
23 | foregoing is true and correct.

24 |     Executed on this 15th day of May, 2019, at Manila, Philippines.

25 |
26 |                                          John Edward Hernandez
27 |
28 |

16544.2:9354994 1                                9
DECLARATION OF JOHN EDWARD HERNANDEZ

ERVIN COHEN & JESSUP LLP

# EXHIBIT 86



## **DECLARATION OF JOSE P. MAGSAYSAY, JR.**

I, Jose P. Magsaysay, Jr., declare as follows:

1.     I am the President (the Chief Executive Officer) of Plaintiff Potato Corner International, Inc. ("Plaintiff PCI"). I make this Declaration in support of the Motion for Summary Adjudication filed by Plaintiff PCI. I have personal knowledge of the matters stated herein, and if called as a witness I could testify competently to these facts.

### *Potato Corner History and Cinco*
### *Corporation Formation*

2.     On October 16, 1992, I, and three business partners (and their spouses) opened the first Potato Corner branded outlet – a food cart – which was located in the "SM Megamall" in Mandaluyong, Philippines.

3.     In 1993, along with these same business partners, I founded Quattro Food and Resources, Inc. ("Quattro"), a corporation incorporated in the Philippines, for the purpose of owning the Potato Corner trademarks, service marks, recipes, trade secrets, and brand, as well as to operate the Potato Corner outlets that had grown in number from that first food cart.

4.     From its incorporation in 1993 through 1997, I served as President of Quattro. From 1997 through 2000, I also served as Chairman of the Board of Quattro.

5.     In 2000, as Chairman of the Board of Quattro, I negotiated, approved, and participated in the consummation of the incorporation of Plaintiff Cinco, which was originally named Cinco Holdings Corporation, as part of a transaction whereby all Quattro assets and intellectual property (including the Potato Corner trademarks, service marks, recipes, trade secrets, and brand, and all rights and interests in the Potato Corner stores that were operating at the time) were transferred to Plaintiff Cinco. Filed concurrently herewith as Exhibit 1, are the Articles of Incorporation for Cinco Holdings Corporation, which I reviewed, approved, and signed prior to their filing with the Filipino government in 2001. The signature above my name on the last page of Exhibit 1 is mine, which I affixed prior to that document's filing with the Filipino government. As reflected in Exhibit 1, Cinco Holdings Corporation issued 250,000 shares of stock to five

16544 2 9354751.1                           3

ERVIN COHEN & JESSUP LLP

1  shareholders, of which I was one. I have owned these 50,000 shares of Plaintiff Cinco from its
2  inception until the present.

3      6.    In 2006, Plaintiff Cinco changed its name from Cinco Holdings Corporation to
4  Cinco Corporation. Filed concurrently herewith as Exhibit 2 are the Amended Articles of
5  Incorporation for Plaintiff Cinco, reflecting its name change, which I reviewed, approved, and
6  signed prior to their filing with the Filipino government in 2006. The signature above my name on
7  the last page of Exhibit 2 is mine, which I affixed prior to that document's filing with the Filipino
8  government. As reflected in Exhibit 2, as of 2006, again, Plaintiff Cinco had 250,000 shares of
9  stock outstanding, the same 50,000 of which I owned as of 2006. Between 2006 and 2017, I
10  acquired an additional 12,500 shares, for a total of 62,500.

11      7.    From 2000 through 2001, I served as Chairman of the Board of Plaintiff Cinco.
12  From 2001 through August 31, 2018, I was the President of Plaintiff Cinco, in addition to my role
13  (described below) as President of Plaintiff PCI. On August 31, 2018, I took a leave of absence,
14  however, I remain President of Cinco.

15      8.    As President of Plaintiff Cinco, I was responsible for supervising, and being
16  familiar with, among other things, the issuance of Cinco shares, the ownership of Cinco shares, the
17  establishment, operations, and activities of Plaintiff Cinco's subsidiaries, growth of the Potato
18  Corner brand owned by Cinco, as well as the expansion of Potato Corner, though, among other
19  things, franchising of the Potato Corner concept. From its inception until the present, the Potato
20  Corner brand has grown throughout Asia and on other continents, as it opened more than 1,100
21  new stores worldwide, and received various awards.

22

23          ***Plaintiff Cinco and Defendant Koren, Among Others, Negotiate the Terms***
24          ***of a Joint Venture Agreement, Codifying the Governance of PCJV***

25      9.    As of 2010, Plaintiff Cinco had one Potato Corner store in the United States: a
26  Potato Corner outlet in the Tanforan Mall in San Francisco.

27      10.    In or around 2010, I began negotiating with Defendant and Cross-Complainant Guy
28  Koren ("Defendant Koren") to create a structure and transaction whereby the Potato Corner brand

16544.2:9354751.1              4

DECLARATION OF JOSE P. MAGSAYSAY, JR.

ERVIN COHEN & JESSUP LLP

1 could be franchised in the United States. I participated directly in these negotiations, on behalf of

2 Plaintiff Cinco (in my capacity as President of Cinco), and communicated directly with, among

3 others, Defendant Koren, as well as Cross-Defendant Amir Jacoby ("Jacoby") and non-party Amit

4 Nemanim ("Nemanim"), which we referred to collectively as the "LA Group."

5    11.    During the negotiations to create a structure and transaction whereby the Potato

6 Corner brand could be expanded in the United States, in addition to myself, Plaintiff Cinco was

7 represented by Jose Miguel Ma G. Montinola ("Mr. Montinola"), Ma. Victoria O. Bermejo ("Ms.

8 Bermejo"), and Ricardo Montelibano ("Mr. Montelibano").

9    12.    As a result of my negotiations, along with Plaintiff Cinco's representatives (acting

10 on behalf of Plaintiff Cinco), on the one hand, and Defendant Koren, Jacoby, and Nemanim, on

11 the other, in 2010, we agreed to establish a Delaware limited liability company called "PCJV

12 USA, LLC," which stands for "Potato Corner Joint Venture USA." PCJV USA, LLC ("PCJV"),

13 which was to be the vehicle through which the Potato Corner brand, intellectual property, and

14 stores would expand in the United States.

15    13.    In our agreement, on behalf of Plaintiff Cinco, on the one hand, and Defendant

16 Koren, Jacoby, and Nemanim, on the other, we agreed that 60% of the percentage membership

17 interests of PCJV USA, LLC ("PCJV") would be owned entirely by a corporate designee of

18 Plaintiff Cinco, which was to be a Cinco subsidiary. During these negotiations, I insisted that

19 Plaintiff Cinco be allowed to designate a subsidiary as the sole and exclusive owner of the 60%

20 membership interest of PCJV, so that Plaintiff Cinco had a separate American corporate entity

21 with a footprint in the United States, and fully governed by American corporate law.

22    14.    During these negotiations, I expressly indicated my intent and requirement, on

23 behalf of Plaintiff Cinco, that the so-called LA Group – Defendant Koren, Jacoby, and Nemanim –

24 hold their proportionate share of the remaining 40% membership interest of PCJV personally and

25 individually, and that they not transfer those interests to any entity or third party. No member of

26 the LA Group – including Defendant Koren – ever disagreed with or rejected this demand during

27 or prior to execution of the governing documents.

28 ///

ERVIN COHEN & JESSUP LLP

15.    During these negotiations, we agreed that all assignments of equity in PCJV, other than the permitted assignment by Cinco to a subsidiary of Cinco, would be governed by a right of first refusal, in which other equity owners of PCJV would have the right to acquire a selling owner's equity prior to any sale to a third party.

16.    The structure of the soon to be created PCJV to which I, on behalf of Plaintiff Cinco, agreed with the LA Group in 2010 was as follows: PCJV would be governed by a board of seven Managers ("Management"), who would select executive officers, including the PCJV President, a person responsible for day to day operations of PCJV under the direction of the seven Managers. Plaintiff Cinco's designee – to which all membership interests and rights would be assigned – would be allowed to name four of the seven managers, whereas the "LA Group" could name three.

17.    I understand from reading Guy Koren's most recent Amended Cross-Complaint that he makes various false allegations, including the preposterous claim that, during these negotiations, I promised him that he would someday own all of Plaintiff Cinco. I never made such a promise, nor could I, as I do not possess ownership of all of Plaintiff Cinco's stock, nor do I (or did I) have the authority to pledge the other Cinco shareholders' stock to Koren. This is not the only false allegation contained in that pleading, which I reject outright.

18.    The terms of our agreement to expand Potato Corner in the United States with the LA Group were memorialized in a Joint Venture Agreement ("JVA"), a true and correct copy of which is filed concurrently herewith as Exhibit 3. The first signature at the top of page 9 of Exhibit 3 is my own. I understood the JVA to govern and address PCJV's ownership structure, limited liability company governance, intellectual property, management, as well as the allocation of profits, royalties, and fees, among other things. I also understood the JVA to memorialize the terms of the negotiations that preceded the JVA's execution, which are described in paragraphs 11-16 herein.

19.    As reflected in the Recitals to the JVA (Exh. 3, p. 1), I signed the JVA in my capacity as a representative of Plaintiff Cinco, and not in my individual capacity.

///

1    20.    I understood that the Recitals and Section 2(b) of the JVA (Exhibit 3) codified the
2  allocation of ownership of PCJV equity to be 60% owned by Cinco Corporation (or a designated
3  subsidiary of Cinco), and the remaining 40% was to be split by the "LA Group," which the JVA
4  defined to be Guy Koren, Amir Jacoby, and Amit Nemanim.

5    21.    I have never been advised, heard, or had any awareness of any demand by Mr.
6  Montinola, Ms. Bermejo, and/or Mr. Montelibano – the representatives of Plaintiff Cinco set forth
7  in the Recitals – that the JVA be, or was, executed (on page 9) in their individual capacity.

8    22.    I have never claimed any personal or individual ownership interest (membership
9  interest) in PCJV, nor have I ever claimed any personal or individual rights arising out of the JVA.
10  I have never been advised, heard, or had any awareness that that Mr. Montinola, Ms. Bermejo, or
11  Mr. Montelibano ever claimed any personal or individual interest in the JVA or ownership
12  (membership) interest in PCJV.

13    23.    The structure memorialized in the JVA corresponded with the structure to which I
14  agreed in our negotiations with the LA Group. For example, the recitals (Exh. 3, p. 1) state that
15  "Cinco may assign any or all of its rights to the joint venture company [PCJV] formed under this
16  Agreement to a wholly-owned subsidiary as it deems fit." The JVA codified my understanding of
17  the results of our prior negotiation, wherein all *other* transfers of equity in PCJV by any owner of
18  PCJV equity was to be governed by Section 2(d), which contained a right of first refusal.

19    24.    Section 3 (beginning on page 3) also codified my understanding of our agreement
20  regarding PCJV's Management by seven individuals, four of whom were to be named by Plaintiff
21  Cinco (or its designee subsidiary), and three of whom were to be named by Defendant Koren,
22  Jacoby and Nemanim.

23    25.    Sections 3(c)-3(d) of the JVA, which I executed on behalf of Plaintiff Cinco, also
24  codified another term that I recall negotiating and approving prior to execution of the JVA: the
25  appointment of executive officers, subject to a majority vote of Management. The JVA named me
26  as Chairman of the Board of Members of PCJV, and named Nemanim as the President.

27    26.    During the negotiations prior to execution of the JVA, I, on behalf of Plaintiff
28  Cinco, used and/or understood the terms "members' interest," "members' percentage interest,"

16544.2:9354751.1                                    7
DECLARATION OF JOSE P. MAGSAYSAY, JR.

1 "pro rata members interest," or "pro rata ownership share," to mean the same concept: an owner of
2 a limited liability company's equity in PCJV, measured by their percentage membership interest;
3 Plaintiff Cinco's designee (60%), Defendant Koren (15.2%), Nemanim (15.2%), and
4 Jacoby (9.6%).

5     27.    When I reviewed Sections 1(d), 2(c), and 2(d) of the JVA prior to my execution of
6 that document on behalf of Plaintiff Cinco, my understanding was confirmed that "members'
7 interest," "members' percentage interest," "pro rata members interest," or "pro rata ownership
8 share," all referred to the same concept: an owner's equity in PCJV, measured by their percentage
9 membership interest. These sections all use those terms when referring to the effects of or
10 responsibilities inherent in equity ownership of PCJV.

11

12         *Plaintiff Cinco Incorporates the Subsidiary Plaintiff PCI as a Delaware*
13         *Corporation to Serve as Majority Member of PCJV USA, LLC*

14     28.    In my capacity as President of Plaintiff Cinco, as well as an executive officer of the
15 soon to be created PCJV (appointed in Section 3(c) of the JVA), I supervised the creation of
16 PCJV. On July 16, 2010, PCJV was formed, as memorialized in a document I reviewed on or
17 around that date. Filed concurrently herewith as Exhibit 6 is a copy of the Articles of Organization
18 of PCJV that I reviewed prior to their filing with the Delaware Secretary of State on July 16, 2010.

19     29.    Filed concurrently herewith as Exhibit 8 is a copy of a document I reviewed on or
20 around November 2, 2010, entitled "Application for Limited Liability Company Registration,"
21 which was to be filed with the California Secretary of State so as to register PCJV with the State
22 of California.

23     30.    As President of Plaintiff Cinco, on July 16, 2010, I authorized the incorporation of
24 Plaintiff Potato Corner International, Inc. in the State of Delaware. On behalf of Plaintiff Cinco, I
25 named myself as President of Plaintiff PCI. Filed concurrently herewith as Exhibit 9 is a true and
26 correct copy of the July 16, 2010 Certificate of Incorporation that I reviewed and approved, and, and,
27 after I approved, I authorized Susan Reynolds of DLA Piper, to file with the State of Delaware.
28 ///

16544.2.9354751.1         8

DECLARATION OF JOSE P. MAGSAYSAY, JR

ERVIN COHEN & JESSUP LLP

31.     Filed concurrently herewith as Exhibit 11 is a copy of a document I reviewed and approved on or around November 2, 2010, entitled "Statement and Designation by Foreign Corporation," and, after I approved, I authorized this document to be filed with the California Secretary of State so as to register PCI with the State of California.

32.     I have served as President of Plaintiff PCI from the date it was incorporated (July 16, 2010) through the present. As President of Plaintiff PCI, I am responsible for supervising, and being familiar with, among other things, the issuance and ownership of Plaintiff PCI shares, supervising PCI's compliance with corporate formalities (such as shareholder meetings, minutes, and corporate filings), satisfaction of all of Plaintiff PCI's duties and obligations arising out of its ownership of PCJV as well as the JVA (as Plaintiff Cinco's designee), monitoring the operations, activities, and growth of the Potato Corner brand in the United States.

33.     Attached hereto as Exhibit 12 are five Potato Corner International stock certificates that I signed, as President of Plaintiff PCI, on July 16, 2010, reflecting the issuance of 1000 shares of stock in Plaintiff PCI. The purpose of my issuance of these stock certificates on July 16, 2010 on behalf of Plaintiff PCI was to memorialize the following:

> a.     That, as of July 16, 2010, Plaintiff Cinco owned 995/1000 shares of Plaintiff PCI stock (99.5%, as reflected in Certificate No. 1; Exhibit 12, p. 1).
>
> b.     That, as of July 16, 2010, I, in my individual capacity, owned 1/1000 share of Plaintiff PCI stock (0.1%, as reflected in Certificate No. 2; Exhibit 12, p. 2).
>
> c.     That, as of July 16, 2010, Mr. Montinola, in his individual capacity, owned 1/1000 share of Plaintiff PCI stock (0.1%, as reflected in Certificate No. 3; Exhibit 12, p. 3).
>
> d.     That, as of July 16, 2010, Ms. Bermejo, in her individual capacity, owned 1/1000 share of Plaintiff PCI stock (0.1%, as reflected in Certificate No. 4; Exhibit 12, p. 4).

1          e.      That, as of July 16, 2010, Mr. Montelibano, in his individual capacity,

2                  owned 1/1000 share of Plaintiff PCI stock (0.1%, as reflected in Certificate

3                  No. 5; Exhibit 12, p. 5).

4          f.      Finally, that, as of July 16, 2010, Ben Olivas ("Mr. Olivas"), in his

5                  individual capacity, owned 1/1000 share of Plaintiff PCI stock (0.1%, as

6                  reflected in Certificate No. 6; Exhibit 12, p. 6).

7      34.     From July 16, 2010 through the present, the shareholders of Plaintiff PCI have not

8  changed, with one exception: on October 11, 2017, Ms. Bermejo assigned her one share of

9  Plaintiff PCI to Plaintiff Cinco. Filed concurrently herewith as Exhibit 13 is the seventh, and most

10  recent stock certificate of Plaintiff PCI, which was signed by me on October 11, 2017,

11  memorializing that Ms. Bermejo's one share of Plaintiff PCI had been assigned to Plaintiff Cinco.

12  Accordingly, as of October 11, 2017, Plaintiff Cinco owned 99.6% of Plaintiff PCI. Plaintiff  .

13  Cinco has owned these 996 shares from October 11, 2017 through the present.

14      35.     At all times from July 16, 2010, through the present, Plaintiffs Cinco and PCI have

15  remained separate corporate entities, each observing the unique corporate formalities of the

16  Philippines and the State of Delaware, and each maintaining separate bank accounts. Each has

17  separate governance boards. Their sole relationship is that Plaintiff PCI is a subsidiary of Plaintiff

18  Cinco.

19      36.     My purpose in creating Plaintiff PCI, was that I, on behalf of Plaintiff Cinco,

20  intended that Plaintiff PCI serve as the separate corporate domestic American entity that Plaintiff

21  Cinco would designate as the 60% member of PCJV. To that end, on July 16, 2010, on behalf of

22  Plaintiff Cinco, and as its President, I caused all of Plaintiff Cinco's rights arising from the JVA,

23  and all membership interests in PCJV (which was created on that same date) to be assigned and

24  transferred to Plaintiff PCI.

25      37.     As a result of my causing Plaintiff Cinco to assign to Plaintiff PCI all of Plaintiff

26  Cinco's rights in and to PCJV, Plaintiff Cinco ceased to have any rights whatsoever in the

27  management, governance, operations, of PCJV. Plaintiff Cinco's sole relationship with PCJV was

28  as a licensor of intellectual property, as codified in Section 3(g) of the JVA.

16544.2·9354751.1                                10

DECLARATION OF JOSE P. MAGSAYSAY, JR

38. At all times from July 16, 2010 through the present, as the result of my having caused Plaintiff Cinco to assign all rights in and to PCJV to Plaintiff PCI, Plaintiff Cinco has possessed no interest whatsoever in the equity or rights to the management of PCJV, including the right to name managers of PCJV. Those rights have been held by Plaintiff PCI from July 16, 2010 through the present. Plaintiff Cinco's sole right in and to PCJV arises from its right to receive royalties for PCJV's use of Plaintiff Cinco's intellectual property.

39. At no point from PCJV's inception on July 16, 2010 to the present has Plaintiff Cinco possessed any rights whatsoever to govern, own, manage, or operate PCJV, nor has Plaintiff Cinco possessed any right to name Managers of PCJV or claim rights to distributions of PCJV. Those rights have been held by Plaintiff PCI from July 16, 2010 through the present. From July 16, 2010, Plaintiff Cinco has never possessed any contractual rights arising from the JVA, with the sole exception of Plaintiff Cinco's sole right to receive royalties for the use of Potato Corner intellectual property by PCJV and any stores opened by PCJV or PCJV franchisees

40. Filed concurrently herewith as Exhibit 27 are true and correct copies of certificates for limited liability company interests that I received in 2011 in my capacity as President of Plaintiff PCI. I relied upon these documents as confirmation that PCJV, through its then President, recognize Plaintiff PCI as the owner of 60% of the membership interests in PCJV (Certificate 01 of Exhibit 24), and that Amit Nemanim, Guy Koren, and Amir Jacoby owned 15.2%, 15.2%, and 9.6% respectively, as of 2011.

***The 2012 Amended JVA, and the***

***Purpose of the Amendment***

41. As Chairman of the Board of PCJV – a role that I served from July 16, 2010 until October 11, 2017 – I conducted and led each of the meetings of the Management, as well as the Members. My role as Chairman of the Board included, but was not limited to, conducting meetings and votes, supervising the tallying of votes, and reporting the results of the vote to the Managers.

///

ERVIN COHEN & JESSUP LLP

1   42. In 2012, I learned from Defendant Koren that there was dissension among the three

2 individuals holding the 40% percentage membership interests of PCJV (the so-called "LA

3 Group").

4   43. As Board Chair for PCJV, I attended a meeting for PCJV on October 16, 2012. I

5 attended that meeting, conducted that meeting in person, and I set the agenda for that October 16,

6 2012 meeting, the primary agenda item pertaining to the removal of Nemanim as President of

7 PCJV, and his withdrawal as a member of PCJV.

8   44. During that October 16, 2012 meeting, a vote was called to remove Nemanim as

9 President. As Chairman of the Board, I conducted that vote, and supervised the tallying of the

10 votes. I specifically recall that the votes were counted based upon the percentage membership

11 interest (equity) present at the meeting, and observed the voting as follows:

12     a. Plaintiff PCI voted its 60% membership interest in PCJV to remove

13      Nemanim as President of PCJV.

14     b. Defendant Koren voted his 15.2% membership interest in PCJV to remove

15      Nemanim as President of PCJV.

16     c. Jacoby voted his 9.6% membership interest in PCJV to remove Nemanim as

17      President of PCJV.

18   45. Because 84.8% of the holders of membership interests in PCJV present at the

19 meeting and holding a membership interest (equity) in PCJV voted in support of removing

20 Nemanim, I reported to the participants of the meeting that Nemanim had been removed as

21 President. Defendant Koren did not object during the October 16, 2012 meeting that the balloting

22 as to the motion to remove Nemanim as President was being counted by reference to the

23 percentage membership interest being held by the PCJV members that were present.

24   46. This vote to remove Nemanim on October 16, 2012 is the only instance from 2010

25 through April 9, 2018 (this year), in which there was anything other than a unanimous consent for

26 any policy, decision, or vote among the PCJV members or Management during a meeting of

27 Managers or Members.

28 / / /

16544.2:9354751.1     12

DECLARATION OF JOSE P. MAGSAYSAY, JR.

ERVIN COHEN & JESSUP LLP

1    47.    As part of the discussion during the October 16, 2012 meeting, it was agreed that
2 Defendant Koren would become President. Defendant Koren requested assurance that he would
3 not be subject to termination as President by a simple majority of the Managers. As the result of
4 the discussion that ensued, I specifically recall, and supported, a proposal by the Managers to
5 amend the JVA such that a vote representing 75% of the membership interests held by the
6 remaining members – Plaintiff PCI (60%), Defendant Koren and Jacoby (who, in their individual
7 capacity would be splitting the remaining 40% equity) – would be required to remove the
8 President, or an executive officer named in the Amended JVA. This proposal would have required
9 the support of Plaintiff PCI and one of the two other members of PCJV – Defendant Koren or
10 Jacoby – to terminate an executive officer named in the Amended JVA.

11    48.    At no point during the October 16, 2012 meeting did I agree, nor did anyone else
12 state, that the JVA would be amended so that *75% of the Management* (6 out of 7 Managers)
13 would be required to terminated Defendant Koren as President. I would never have agreed to this,
14 as President of Plaintiff PCI, as this would have required a vote of 6 out of 7 individuals serving
15 on Management to authorize his termination. This would have given too much power to Defendant
16 Koren, Jacoby, and the third person that they selected to replace Nemanim on Management: Inbal
17 Jacoby. This would have required two out of the three of the LA Group selected Managers to
18 support termination of Defendant Koren.

19    49.    In 2012, and continuing through this year, Erlinda Bartolome ("Ms. Bartolome")
20 was the Secretary of PCJV, whom I tasked, with, among other things, documenting the meetings
21 of Managers and Members of PCJV in meeting minutes. As part of the October 16, 2012 meeting I
22 conducted, I asked Mr. Bartolome to prepare a ballot and minutes reflecting our vote to remove
23 Nemanim, as well as our agreement to amend the JVA so as to protect Defendant Koren from
24 being terminated as President absent 75% approval among the members of PCJV holding
25 percentage membership interest (equity) in PCJV.

26    50.    Filed concurrently herewith as Exhibit 14 is a true and correct copy of the Minutes
27 and ballot that I received from Ms. Bartolome documenting the October 16, 2012 meeting. I recall
28 seeing this document at the meeting, and affixing my signature next to my name in the balloting

16544.2:9354751.1                                    13

ERVIN COHEN & JESSUP LLP

1  portion documenting the termination of Nemanim. This ballot reflects, and corresponds to my
2  recollection that, the vote to remove Nemanim as President, which I conducted, was counted by
3  reference to the percentage of member interests – equity – held by the members (owners) of PCJV
4  voting on that motion. When I reviewed this document in 2012, it confirmed that the motion to
5  remove Nemanim as President was passed as the result of the approving votes of 84.8% of the
6  PCJV owners holding a percentage membership interest in PCJV.

7       51.    When I saw this document reflecting the ballot from the October 16, 2012 meeting,
8  I was focused on the ballot relating to the termination of Nemanim. I did not notice at the time that
9  above the balloting portion relating to Nemanim's termination, the document states that the
10 Managers "approved a requirement that the CEO, President, Treasurer, and Corporate Secretary of
11 PCJV" could be removed by a "75% vote of Management." As explained above, this is not what I
12 agreed to at the October 16, 2012 meeting, nor would I have ever agreed, on behalf of Plaintiff
13 PCI to that unfair provision, which I understand would have insulated Defendant Koren from ever
14 being terminated.

15      52.    When it was brought to my attention that there is an inconsistency in the
16 October 16, 2012 ballot and minutes between the actual vote and ballot removing Nemanim as
17 President on October 16, 2012 – which was counted by reference to the equity ownership
18 percentage interest of those voting on the ballot – with the prior reference to a requirement of a
19 "75% vote of Management," I concluded that the inconsistency was cured by the actual
20 Amendment to the JVA, which was executed after the October 16, 2012 meeting.

21      53.    Filed concurrently herewith as Exhibit 15 is a true and correct copy of the
22 Amendment to the JVA ("AJVA") – the document governing PCJV. I executed this agreement in
23 or around 2012 in my capacity as President of Plaintiff PCI. My initials are found on each page,
24 and my signature is the first on the last page (page 9). This agreement was intended to amend the
25 original JVA (Exhibit 3).

26      54.    I recall there being only a few differences between the AJVA and the JVA, which
27 are as follows:

28 ///

16544.2.9354751.1                                14
                        DECLARATION OF JOSE P. MAGSAYSAY, JR

a.    Before the Recitals, and in Section 1(b), I understood that the AJVA
confirmed that Plaintiff Cinco had assigned all of its membership interests
in PCJV and rights arising out of the JVA (including the right to name four
of the seven Managers) to Plaintiff PCI which was being represented by
myself, Mr. Montinola, Ms. Bermejo, and Mr. Montelibano (the "PCI
Group"). It appears that all other references to the "Cinco Group" were not
replaced with the "PCI Group" in this amendment to the JVA, however,
given that the original JVA expressly allowed Plaintiff Cinco to assign all
of its rights arising from the JVA, as well as all membership interests in
PCJV to a designee – Plaintiff PCI – I always understood that any reference
to Cinco (or the Cinco Group) in the AJVA – with the exception of section
3(g) – was always to be construed as meaning Plaintiff PCI. Section 3(g) is
excepted from this understanding as that provision relates to Plaintiff
Cinco's license of intellectual property of which Plaintiff PCI possesses no
interest whatsoever.

b.    Before the Recitals, and in Section 1(b), I understood that the AJVA
documented that Nemanim was no longer a member of PCJV, and no longer
a party to the JVA, and that the sole members of PCJV (referred to
collectively as the "LA Group") are now Defendant Koren, Amir Jacoby
and Inbal Jacoby.

c.    I understood that Section 1(c) of the AJVA reflected a change in the
physical office of PCJV.

d.    Section 3(a) of the AJVA reflected my understanding that Nemanim was no
longer one of the seven individuals comprising Management, and had been
replaced by Inbal Jacoby.

e.    Section 3(c) reflected my understanding of the appointment of new
Executive Officers, including the appointment of Defendant Koren as
President. That section also included new language, consistent with my

16544.2:9354751 1

15

DECLARATION OF JOSE P. MAGSAYSAY, JR.

ERVIN COHEN & JESSUP LLP

1       recollection as to what we agreed to at the October 16, 2012 meeting,

2       specifically, that "[a]ny change in these mentioned executive officers will

3       require a vote of 75% members' interest." Because I always used the term

4       "members' interest" to refer to the ownership equity held by PCJV

5       members – percentage membership interest in PCJV – this comported with

6       my understanding that a change in the executive officers would require

7       approval of a 75% of the percentage membership interests (equity) owned

8       by the PCJV members: Plaintiff PCI (60%) and either Defendant Koren or

9       Jacoby, who, after Nemanim's withdrawal, I understood were to split the

10      remaining 40% equity of PCJV individually. When I signed the AJVA on

11      behalf of Plaintiff PCI, I was not agreeing that "members interest" would be

12      construed differently now to refer to "Management member's voting

13      rights."

14      f.      I understood that Section 3(d) was amended to add language after the

15      sentence "[a]dditional executive officers may be appointed by Management

16      as it deems necessary," that read "[r]eplacement and removal will require

17      Managers' simple majority vote." I recall noting that this new language did

18      not refer to "members' interest" but instead to a "Managers' vote." This was

19      consistent with my understanding that a reference to a vote by "members'

20      interest" was referring to percentage equity ownership of PCJV (equity),

21      whereas any requirement that a vote of the Management was required

22      would refer to a "Managers' vote."

23      55.     I have never been advised, heard, or had any awareness of any demand by Mr.

24  Montinola, Ms. Bermejo, and/or Mr. Montelibano (referred to as the "Cinco Group") – the

25  representatives of Plaintiff Cinco set forth in the Recitals – that the AJVA be executed (page 9) in

26  their individual capacity.

27  ///

28  ///

16544 2:9354751.1                              16
DECLARATION OF JOSE P. MAGSAYSAY, JR.

ERVIN COHEN & JESSUP LLP



1    56.    I have never claimed any personal or individual interest in the AJVA or PCJV. I

2   have never been advised, heard, or had any awareness that that Mr. Montinola, Ms Bermejo, or

3   Mr. Montelibano ever claimed any personal or individual interest in the AJVA or PCJV.

4    57.    I understand that Defendant Koren is now taking the position that the AJVA

5   Section 3(c)'s reference to "75% members' interest" means a member of Management, and that

6   this means that 75% of the Managers must vote to remove an executive officer. Defendant Koren's

7   position is contrary to my understanding of what this amendment to the AJVA means. Moreover, I

8   have never seen or been presented with any document, contract, or authority that confers any

9   "interest" in PCJV to a Manager has in PCJV.

10   58.    At no point did I, on behalf of Plaintiff PCI, ever agree or contemplate that a 75%

11  vote of the seven Managers would be required to terminate any of the executive officers, including

12  Defendant Koren. If that was the case, six out of seven Managers would be required. This would

13  have given too much power to Defendant Koren.

14   59.    When I reviewed the AJVA prior to my execution of that document, my

15  understanding was confirmed that the reference to "members' interest," in the new section 3(c)

16  referred to an owner's equity in PCJV, measured by their percentage membership interest. Among

17  the bases for my having confirmed this understanding, was by reviewing Sections 1(d), 2(c), and

18  2(d) of the AJVA, which remained unchanged, which also used the terms "members' interest,"

19  "members' percentage interest," "pro rata members interest," or "pro rata ownership share," to

20  refer to the same concept: an owner's equity in PCJV, measured by their percentage membership

21  interest.

22   60.    Filed concurrently herewith as Exhibit 16 is a true and correct copy of an

23  "Operating Agreement" governing PCJV that was executed by me and that also governs PCJV.

24

25                    ***Hernandez's Acquisition of a Majority***

26                         ***of Plaintiff Cinco Shares***

27   61.    As of 2017, Plaintiff Cinco still had 250,000 outstanding shares.

28  ///

DECLARATION OF JOSE P. MAGSAYSAY, JR.

ERVIN COHEN & JESSUP LLP

1    62.    In 2017, in my capacity as President of Plaintiff Cinco, I was directly involved in
2   the negotiations for the sale of stock between existing shareholders of Plaintiff Cinco, including
3   me, and Mr. Edward Hernandez ("Mr. Hernandez"), who I understood to be negotiating on behalf
4   of himself, his family members, and certain business entities owned by Mr. Hernandez and his
5   family members (the "Hernandez Group").

6    63.    As the result of those negotiations, the Hernandez Group consummated an
7   acquisition of 55% of the outstanding shares of Plaintiff Cinco, which were transferred to Mr.
8   Hernandez, his family members, and certain business entities owned by Mr. Hernandez and his
9   family members (the "Hernandez Cinco Stock Acquisition"). The Cinco shareholders that sold
10   stock included myself, who sold a portion of my shares, as did Ricardo Montelibano, and Jose
11   Miguel Ma Montinola. Ms. Bermejo sold all of her Cinco stock.

12    64.    The Hernandez Cinco Stock Acquisition was solely and exclusively limited to
13   shares of Plaintiff Cinco as well as Ms. Bermejo's stock in Cinco related companies and
14   subsidiaries. Because Plaintiff Cinco does not own any membership interests in PCJV, or have any
15   governance or management rights in PCJV arising from the JVA and AJVA, shareholders of
16   Plaintiff Cinco could not have sold any membership interests in or rights to PCJV.

17    65.    As President of Plaintiffs PCI and Cinco at the time of the Hernandez Cinco Stock
18   Acquisition, I can confirm that the Hernandez Cinco Stock Acquisition did not include any
19   transfer to Mr. Hernandez (or his family or family's business interests) of any of Cinco's 995
20   shares of Plaintiff PCI. Although I did have the understanding that Ms. Bermejo's one share of
21   Plaintiff PCI was purchased by Ms. del Pilar, as nominee of the Hernandez Group, I later learned
22   that Ms. Bermejo's one share would be assigned back to Plaintiff Cinco, as reflected in Exhibit 12
23   filed concurrently herewith. To date, the sole shareholders of Plaintiff PCI are Plaintiff Cinco
24   (99.6%), myself (.1%), Mr. Montelibano (.1%), Mr. Montinola (.1%), and Mr. Olivas (.1%).

25    66.    As President of Plaintiffs PCI and Cinco at the time of the Hernandez Cinco Stock
26   Acquisition, I can also confirm that the Hernandez Cinco Stock Acquisition did not include any
27   transfer to Mr. Hernandez (or his family or family's business interests) of any of Plaintiff PCI's
28   60% membership interest in PCJV, or any of Plaintiff PCI's interests in or rights to PCJV,

16544 2:9354751.1                                    18

1  including the right to name managers. To date, the sole members of PCJV remain: Plaintiff PCI

2  (60%), Defendant Koren, and Jacoby (the latter of whom share the remaining 40%).

3

4  ### *Defendant Koren's Assertions Regarding*

5  ### *the Right of First Refusal*

6  67.     Filed concurrently herewith as Exhibit 22 is a true and correct copy of an email and

7  letter I received from Defendant Koren on February 28, 2017. I understood that letter to be a

8  demand by Defendant Koren that the LA Group has the right to exercise its right of first refusal set

9  forth in Section 3.3 of the Operating Agreement (which mirrors 2(d) of the JVA and AJVA),

10  based upon Defendant Koren's apparent belief that membership interests (equity) in PCJV were in

11  the process of being sold to a third party.

12  68.     I understood Defendant Koren's demand to be referring to the Hernandez Cinco

13  Stock Acquisition. I rejected Defendant Koren's demand to exercise the right of first refusal

14  because Plaintiff PCI was not selling any of its membership interest in PCJV to Mr. Hernandez

15  nor any other person or entity.

16  69.     I understand that Defendant Koren is now claiming that he has a right to a portion

17  of Plaintiff PCI's membership interest in PCJV, based on the Hernandez Stock Acquisition.

18  70.     As President of Plaintiff PCI, I can confirm, as I have stated to Defendant Koren,

19  Plaintiff PCI, the sole owner of the 60% membership interests in PCJV has not transferred or sold

20  its 60% equity in PCJV to any person, nor has it transferred its rights arising from the JVA and

21  AJVA (including the right to name four of the seven Managers), and Plaintiff PCI remains the sole

22  holder of the membership interest that it received at the founding of PCJV in 2010.

23  71.     As President of Plaintiff PCI, I can confirm, as I have repeatedly stated to

24  Defendant Koren, Plaintiff PCI, the sole owner of the 60% membership interests in PCJV, has not

25  assigned any of its rights or obligations conferred upon Plaintiff PCI in the JVA or AJVA, as

26  executed by its representatives (referred to as the PCI Group). As of the filing of this Declaration,

27  PCI remains the owner of the 60% membership interests in PCJV, and has never assigned,

28  transferred, or sold any of its membership interests or transferrable rights in and to PCJV. At no

ERVIN COHEN & JESSUP LLP

1  point has Plaintiff PCI ever transferred any of its rights to participate in the management or

2  governance of PCJV, nor Plaintiff PCI's right to its 60% equity in PCJV.

3      72.    I know of no contract to which Cinco or PCI are parties that confers upon any

4  Defendant in this action, including Guy Koren and the Potato Corner LA Group, LLC any claim

5  or right to any of PCI's membership interest in PCJV as the result of the Hernandez Stock

6  Acquisition, or any other sale of Plaintiff Cinco's stock.

7      73.    Defendant Koren has expressed to me, and is now taking the position that because

8  of his claim that the Hernandez Cinco Stock Acquisition triggered his right to acquire a portion of

9  Plaintiff PCI's membership interest in PCJV, he and Potato Corner LA Group, LLC also have a

10  corresponding right to name more than the three of the seven PCJV Management seats; ie. that the

11  Hernandez Stock Acquisition caused Plaintiff PCI to lose its right to name four of the seven

12  Managers. As President of Plaintiff PCI, I have rejected this demand of Defendant Koren for two

13  reasons. First, the Hernandez Cinco Stock Acquisition did not constitute a transfer of any rights or

14  obligations in and to PCJV. Second, my intent in entering into the JVA and AJVA (which I

15  understand to be confirmed by the contractual language itself) even if Plaintiff PCI had sold some

16  of its membership interests in PCJV, Plaintiff PCI's right to name four of the seven seats on PCJV

17  Management is not tied to its percentage ownership of PCJV, and would remain unchanged.

18      74.    I know of no contract entered into by Plaintiff PCI, Plaintiff Cinco, or anyone

19  authorized to act on behalf of Plaintiff PCI and Plaintiff Cinco, whereby the allocation of the

20  Management seats contained in the JVA, AJVA, and Operating Agreement (four to be named by

21  Plaintiff Cinco or its designee, PCI and three by the LA Group) is to be altered if any of the

22  percentage equity ownership held by the members of PCJV was to be increased or reduced. Put

23  differently, even if Plaintiff PCI had transferred a portion of its membership interests in PCJV, I

24  know of no contract that would require a corresponding reduction in the number of Managers that

25  Plaintiff Cinco (or its designee, PCI) is authorized to appoint (four of the seven). Put simply, I

26  know of no contractual term whatsoever that has been executed by Plaintiff PCI, or that governs

27  PCJV, that reduces Plaintiff PCI's right to name four of the seven seats on PCJV management, if

28  Plaintiff PCI's percentage membership interest in PCJV is reduced.

ERVIN COHEN & JESSUP LLP



1    75.    On November 28, 2017, at a board meeting of Plaintiff PCI, which I attended, I was
2    instructed by the Board of Plaintiff PCI to, among other things, appoint Mr. Hernandez as a
3    Manager of PCJV, pursuant to its unilateral right to name four of the seven Managers of PCJV
4    under Sections 3(a) of the JVA and AJVA. This did not constitute a transfer of any rights or
5    membership interests in and to PCJV by Plaintiff PCJV to Mr. Hernandez.

6    76.    I know of no contractual term whatsoever that has been executed by Plaintiff PCI,
7    or that governs PCJV, that restricts Plaintiff PCI's right under Section 3(a) of the JVA and AJVA
8    to name any of the four seats on PCJV Management to which Plaintiff PCI is entitled.

9    77.    During an April 9, 2018 meeting of Management of PCJV, Defendant Koren
10   expressly stated his belief that he and Potato Corner LA Group, LLC, unilaterally, possesses the
11   right to name three of the seven seats on PCJV Management, and that any of those appointees
12   need not to have membership interests in PCJV. I understand that Defendant believes that his
13   naming of third parties, not parties to the JVA, as Managers of PCJV does not trigger the right of
14   first refusal contained in 2(d) of the JVA and AJVA.

15
16                    ***Financial Statements Received by PCJV in October of 2018***

17   78.    Guy Koren remains President of PCJV (despite my wishes that he be terminated),
18   and (unfortunately) authorized to serve, act, and speak on behalf of PCJV as its agent, even though
19   I believe he has injured PCJV through what I believe to be his self-dealing and fraud.

20   79.    I understand that, pursuant to Section 3(i)(iii)-(v) of the JVA and AJVA (Exhibits 3
21   and 14) as well as Sections 2.6 and 3.9.1 of the Operating Agreement (Exhibit 15), Guy Koren, as
22   principal of PCJV, is obligated to deliver, among other things, financial statements of PCJV upon
23   the request of Plaintiff PCI, the member of PCJV.

24   80.    Filed concurrently herewith as Exhibit 21 is a true and correct copy of a "Balance
25   Sheet" that I received from Guy Koren on or around October 2, 2018. I understood that document
26   to constitute a "financial statement" of PCJV, produced by Koren, acting on behalf of PCJV,
27   pursuant to his and PCJV's obligations pursuant to Section 3(i)(iii)-(v) of the JVA and AJVA as
28   well as Sections 2.6 and 3.9.1 of the Operating Agreement.

ERVIN COHEN & JESSUP LLP

81.     Upon review of Exhibit 21, which was dated October 2, 2018, I concluded that PCJV agrees, and does not dispute, that Plaintiff PCI continues to own 60% of the equity of PCJV.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on this 19th day of December, 2018, at _____.

Jose P. Mangsaysay, Jr.

# EXHIBIT 87

1

2

**DECLARATION OF EDWARD HERNANDEZ**

3    I, Edward Hernandez, declare as follows:

4    1.    I have personal knowledge of the facts set forth herein, except as to those stated on

5    information and belief and, as to those, I am informed and believe them to be true. I make this

6    declaration in support of the Motion for Summary Adjudication filed by Plaintiff Potato Corner

7    International ("Plaintiff PCI").

8    2.    I am currently both a shareholder in and Chairman of the Board of Plaintiff Cinco.

9    As Plaintiff Cinco's Board Chair, I am charged with, in relevant part, possessing full knowledge

10    of the ownership and assets of Cinco, supervising Cinco management's ownership of and

11    participation in Cinco subsidiaries, supervising Cinco's management, finances, operations, and

12    activities. This is not an exclusive list of my functions as Chairman of Plaintiff Cinco's Board.

13

14    *My Negotiation for the Acquisition of Cinco Corporation*

15    *Stock, on Behalf of the Hernandez Group*

16    3.    In 2017, acting on behalf of myself (in addition to members of my family, and

17    certain entities owned by myself and my family, all of whom I was authorized to act on behalf), I

18    entered into negotiations to acquire shares of Plaintiff Cinco from then current shareholders.

19    4.    I was the principal negotiator for this acquisition by me, my family, and certain

20    entities owned by me and my family members (the "Hernandez Group"), which included my

21    direct participation in the due diligence that preceded the conclusion of this negotiation.

22    5.    The negotiations and due diligence for the potential acquisition of Plaintiff Cinco

23    shares by the Hernandez Group began prior to 2017.

24    6.    During that negotiation, I agreed that the total combined shares in Plaintiff Cinco

25    that would be acquired by the Hernandez Group would represent 55% of the 250,000 outstanding

26    shares of Plaintiff Cinco – a total of 137,500 shares. The Plaintiff Cinco shares that I agreed would

27    be purchased by the Hernandez Group would be acquired from then existing shareholders of

28    Plaintiff Cinco, rather than purchasing newly issued shares of Plaintiff Cinco.

16544.2:9354994.1
3

ERVIN COHEN & JESSUP LLP

7.      After the total number of Plaintiff Cinco shares that I agreed would be purchased by the Hernandez Group from existing Cinco shareholders was decided, as well as the purchase price, I learned, for the first time, during due diligence, that Plaintiff Cinco was the owner of an American subsidiary called Potato Corner International ("Plaintiff PCI"). It was during my negotiation and due diligence on behalf of the Hernandez Group that I also learned Plaintiff PCI owned 60% of the percentage membership interests (equity) in a Delaware limited liability company called PCJV USA, LLC ("PCJV"). During my negotiation and due diligence I also learned that the remaining 40% of PCJV was owned by Defendant and Cross-Complainant Guy Koren ("Defendant Koren") and Amir Jacoby ("Jacoby"), who, collectively, I understand are referred to as the "LA Group."

8.      My discovery of Plaintiff Cinco's ownership of a subsidiary, Plaintiff PCI, did not alter the deal structure that I was negotiating for the acquisition of Plaintiff Cinco shares.

## *The Hernandez Group's Acquisition of Cinco Corporation*
## *Stock and Other Interests Not Involving PCJV*

9.      In 2017, the transaction by which the Hernandez Group acquired a majority stake in Cinco closed (the "Hernandez Cinco Stock Acquisition"). The Hernandez Cinco Stock Acquisition took the form of two separate agreements. In the First Cinco Stock Acquisition, I, and the Hernandez Group, nominated and appointed Marivic del Pilar to execute the agreement on our behalf, whereby we acquired 75,000 out of 250,000 outstanding shares of Cinco by acquiring a portion of Cinco shares held by Mr. Magsaysay, Mr. Montelibano, and Mr. Montinola. In the Second Cinco Stock Acquisition, which I, and other members of the Hernandez Group executed in or around May of 2017, involved the acquisition of 62,500 of Maria Victoria Bermejo's Cinco stock – representing her entire Cinco ownership, as well as her ownership interests in other Cinco subsidiaries and Cinco related companies. True and correct copies of those two agreements – the First and Second Cinco Stock Acquisitions – are filed under seal concurrently herewith as Exhibits 17 and 18.

/ / /

16544.2·9354994.1

4

DECLARATION OF EDWARD HERNANDEZ

1        10.    In the Hernandez Cinco Stock Acquisition, initially, I agreed that Ms. del Pilar
2   would take ownership of Ms. Bermejo's one share of Plaintiff PCI's stock. After the Hernandez
3   Cinco Stock Acquisition closed, we deferred that right, and agreed that Ms. Bermejo's one share
4   in Plaintiff PCI be assigned by Ms. Bermejo back to Plaintiff Cinco. Neither I, nor any member of
5   the Hernandez Group currently claim any ownership interest, equity, or any other rights in or to
6   Plaintiff PCI.

7        11.    In the Hernandez Cinco Stock Acquisition, neither I nor any member of the
8   Hernandez Group (on behalf of which I was the principal negotiator) purchased any percentage
9   membership interest (equity) of or any other interest in PCJV. Neither I, nor any member of the
10  Hernandez Group (on behalf of which I was the principal negotiator) acquired or claim any
11  ownership interest, equity, or any other rights in or to PCJV. Neither I, nor any member of the
12  Hernandez Group (on behalf of which I was the principal negotiator) acquired or claim any right
13  arising out of the Joint Venture Agreement or Amended Joint Venture Agreement, including the
14  right to name managers of PCJV.

15       12.    I have never claimed any ownership of any of the equity in PCJV, nor have I ever
16  claimed any individual rights in and to PCJV arising out of any of its governing agreements or
17  otherwise. I have never been made aware of any claim by any other member of the Hernandez
18  Group to any ownership of PCJV equity, or any individual rights in and to PCJV arising out of any
19  of its governing agreements or otherwise.

20

21                *Defendant Koren Demands a Right to Plaintiff PCI's Equity in*
22                *PCJV Based on the Hernandez Cinco Stock Acquisition*

23       13.    On or around November 28, 2017, I attended a Board meeting of Plaintiff PCI.
24  During that Board meeting, I was appointed by Plaintiff PCI, as one of the seven Managers of
25  PCJV.

26       14.    In or around November of 2017, I was told by Defendant Koren that he believed
27  that the Hernandez Cinco Stock Acquisition by the Hernandez Group was a breach of a right of
28  first refusal contained in an agreement governing PCJV entitled the Joint Venture Agreement. I

16544 2:9354994.1                                      5

DECLARATION OF EDWARD HERNANDEZ

ERVIN COHEN & JESSUP LLP

1   was told by Mr. Koren that as the result of the Hernandez Group's Acquisition of Plaintiff Cinco

2   shares, either he, or the other individuals comprising the "LA Group," is entitled to an increase in

3   their total 40% membership interests (equity) of PCJV.

4       15.    Subsequent to learning of Mr. Koren's demand regarding the "right of first

5   refusal," I read the JVA, a copy of which is filed concurrently herewith as Exhibit 3. I reviewed

6   Section 2(d) of that agreement. After my review of the JVA, I concluded that nothing in Section

7   2(d) applies to me, or the Hernandez Group. I have never seen, or been presented with, any

8   contract whatsoever that conferred upon any person the right to acquire equity in PCJV as the

9   result of the Hernandez Cinco Stock Acquisition.

10      16.    As part of the Hernandez Cinco Stock Acquisition, I personally became an owner

11  of Cinco shares.

12      17.    I have never acquired any rights or obligations under the JVA, the AJVA, or any

13  other agreement to which Defendant Koren or Jacoby are parties, nor has anyone ever transferred

14  or assigned to me any rights or obligations under the JVA, AJVA, or any other agreement to

15  which Defendant Koren or Jacoby are parties.

16      18.    I have never acquired any percentage membership interests in PCJV from Plaintiff

17  PCI, or any other person, nor has anyone ever transferred or assigned to me any membership

18  interests in PCJV. I claim no rights to distributions of PCJV whatsoever. As part of the Hernandez

19  Cinco Stock Acquisition, none of the Hernandez Group members were assigned or transferred any

20  membership interests (equity) in or rights to PCJV.

21      19.    My sole function with respect to PCJV arises from having been appointed by

22  Plaintiff PCI to serve as a Manager (and executive officer) pursuant to Section 3(a) of the JVA

23  (and a subsequent amendment).

24      20.    I have never been assigned any of Plaintiff PCI's right to name Managers of PCJV,

25  as conferred upon Plaintiff PCI pursuant to Section 3(a) of the JVA (or a subsequent amendment).

26      21.    As part of the Hernandez Cinco Stock Acquisition, none of the Hernandez Group

27  members were assigned or transferred any rights or obligations under the JVA, or AJVA, or any

28  other agreement to which Defendant Koren or Jacoby are parties.

16544.2:9354994.1                                6

ERVIN COHEN & JESSUP LLP

22.    As part of the Hernandez Cinco Stock Acquisition, none of the Hernandez Group members were assigned or transferred any membership interests (equity) in or rights to PCJV.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on this 18th day of December, 2018, at _____.

_____

Edward Hernandez

16544 2 9354994 1

7

DECLARATION OF EDWARD HERNANDEZ

# EXHIBIT 88

1  Michael D. Murphy (SBN 224678)
   mmurphy@ecjlaw.com
2  Banu S. Naraghi (State Bar No. 312754)
   bnaraghi@ecjlaw.com
3  **ERVIN COHEN & JESSUP LLP**
   9401 Wilshire Boulevard, Ninth Floor
4  Beverly Hills, California 90212-2974
   Telephone (310) 273-6333
5  Facsimile (310) 859-2325

6  Attorneys for Plaintiffs and Cross-Defendants CINCO CORPORATION and POTATO CORNER
   INTERNATIONAL, INC.
7

8              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9              **COUNTY OF LOS ANGELES, CENTRAL DISTRICT**

10 CINCO CORPORATION a Philippines          Case No.: BC701075
   corporation; POTATO CORNER              Related Case No.: BC706000
11 INTERNATIONAL, INC., a Delaware
   corporation,                            Assigned to Hon. Rafael Ongkeko, Dept. 73
12
                    Plaintiffs,            **NOTICE OF MOTION AND MOTION**
13                                         **TO FILE UNDER SEAL CERTAIN**
            vs.                            **EXHIBITS IN SUPPORT OF MOTION**
14 GUY KOREN, an individual; NKM           **FOR SUMMARY ADJUDICATION; AND**
   CAPITAL GROUP, LLC, a California limited
15 liability company; J & K AMERICANA,
   LLC, a California limited liability company;
16 J & K CULVER, LLC, a California limited  **DECLARATION OF MICHAEL D.**
   liability company; J&K LAKEWOOD, LLC,   **MURPHY**
17 a California limited liability company; J&K
   OAKRIDGE, LLC, a California limited
18 liability company; J&K VALLEY FAIR,     **RES ID.:      277262848726**
   LLC, a California limited liability company;
19 J & K CAPITAL 2, LLC, a California limited  DATE: March 1, 2019
   liability company; J & K ONTARIO, LLC, a   TIME:  8:30 A.M.
20 California limited liability company; J&K PC  DEPT.: 73
   TRUCKS, LLC, a California limited liability
21 company; J&K CONSULTANTS GROUP,
   LLC, a California limited liability company;  Complaint Filed: April 1, 2018
22 GK CAPITAL GROUP, LLC, a California     Trial Date:      None Set
   limited liability company; POTATO
23 CORNER LA GROUP, LLC, a California
   limited liability company; and DOES 1
24 through 25, inclusive,

25                  Defendants,

26          – and –

27 PCJV USA, LLC, a Delaware limited liability
   company,

28                  Nominal Defendant.
   ─────────────────────────────────
   16544.2:9455452.1
   ─────────────────────────────────
   NOTICE OF MOTION AND MOTION TO FILE UNDER SEAL CERTAIN EXHIBITS IN SUPPORT OF
   MOTION FOR SUMMARY ADJUDICATION

1 | PCJV USA, LLC, a Delaware limited liability
company; PCI TRADING LLC, a Delaware
2 | limited liability company; POTATO
CORNER LA GROUP, LLC, a California
3 | limited liability company; NKM CAPITAL
GROUP, LLC, a California limited liability
4 | company; J & K AMERICANA, LLC, a
California limited liability company; J & K
5 | CULVER, LLC, a California limited liability
company; J&K LAKEWOOD, LLC, a
6 | California limited liability company; J&K
OAKRIDGE, LLC, a California limited
7 | liability company; J&K VALLEY FAIR,
LLC, a California limited liability company; J
8 | & K CAPITAL 2, LLC, a California limited
liability company; J & K ONTARIO, LLC, a
9 | California limited liability.company; J&K PC
TRUCKS, LLC, a California limited liability
10 | company; J&K CONSULTANTS GROUP,
LLC, a California limited liability company;
11 | GK CAPITAL GROUP, LLC, a California
limited liability company; GUY KOREN, an
12 | individual; ALON KOREN, an individual;
THOMAS HODGSON, an individual;
13 | EMILY GARCIA, an individual; ASHLEY
GRUDNOWSKI, an individual,
14
           Cross-Complainants,
15
              vs.
16
CINCO CORPORATION, a Philippines
17 | corporation; POTATO CORNER
INTERNATIONAL, INC., a Delaware
18 | corporation; HIGHFIVE CORPORATION, a
Philippines corporation; JOSE P.
19 | MAGSAYSAY, JR., an individual; JOSE
MIGUEL MA. MONTINOLA, an individual;
20 | RICARDO ENRIQUE K. MONTELIBANO,
an individual; MA. VICTORIA O.
21 | BERMEJO, an individual; BEN OLIVAS, an
individual; JOHN EDWARD HERNANDEZ,
22 | an individual; CHAD DOMINIC
HERNANDEZ, an individual; MIGUEL
23 | RAYMUNDO HERNANDEZ, an individual;
MYROSE VICTOR, an individual;
24 | MARIVIC DEL PILAR, an individual; JOSE
MARCO DEL PILAR, an individual; DIA
25 | LACABA, an individual; NICARDO
FALCIS, an individual; AMIR JACOBY, an
26 | individual; INBAL JACOBY, an individual;
and ROES 1 through 500 inclusive,
27
           Cross-Defendants.
28

16544.2:9455452.1                    2

ERVIN COHEN & JESSUP LLP

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on March 1, 2019 at 8:30 a.m. or as soon thereafter as the matter may be heard in Department 73 of the above-referenced court located at 111 North Hill Street, Los Angeles, California 90012, Plaintiffs and Cross-Defendants Cinco Corporation and Potato Corner International, Inc. will and hereby do move this Court for an Order to file two exhibits to their Motion for Summary Adjudication under seal (Exhibits 17 and 18, currently filed in redacted form, and lodged with this Court conditionally under seal).

This motion is based upon this Notice of Motion; the attached Memorandum of Points and Authorities, the concurrently filed Declaration of Michael D. Murphy, exhibits thereto, and any other pleadings, documents, records, file and other evidence as may be presented at or before the hearing on this matter.

DATED: December / 2018            ERVIN COHEN & JESSUP LLP

By:

Michael D. Murphy
Attorneys for Plaintiffs and Cross-Defendants
CINCO CORPORATION and POTATO
CORNER INTERNATIONAL, INC.

ERVIN COHEN & JESSUP LLP

1  **MEMORANDUM OF POINTS AND AUTHORITIES**

2  **I.    INTRODUCTION AND FACTUAL BACKGROUND.**

3      Pursuant to California Rules of Court, Rules 2.550 and 2.551, Plaintiffs apply to the Court

4  for entry of an order sealing documents which are submitted in support of Plaintiffs' Motion for

5  Summary Adjudication, set for hearing on March 4, 2018.

6      Plaintiffs request that the following documents be filed under seal

7      First, Exhibit 17: a 2017 Memorandum of Agreement between Jose P. Magsaysay, Jr.,

8  Ricardo Montelibano, Jose Miguel Ma Montinola, on the one hand, and Marivic Del Pilar, on the

9  other, reflecting the sale of stock in Plaintiff Cinco Corporation. (Declaration of Michael Murphy

10  in Support of Motion to File Exhibits Under Seal, ("Murphy Sealing Decl."); ¶ 2.) This

11  transaction, if made public, would reveal not only the identify of private persons engaged in

12  private financial dealings, but, would also reveal an interlocking corporate structure among parents

13  and subsidiaries, all of which are closely held, and none of which have anything to do with this

14  action. Again, the only relevance of this agreement to this action is that the agreement exists, and

15  that the agreement did not involve the sale of PCJV interests sufficient to trigger Plaintiff PCI's

16  right of first refusal. This litigation does not in any way require disclosure of the inner corporate

17  ownership structure of Plaintiff Cinco, its various subsidiaries, nor the identities of its new owners.

18  (Murphy Sealing Decl., ¶ 2.)

19      Second, Exhibit 18: a Share Purchase Agreement dated May 12, 2017 between various

20  non-parties, on the one hand, and Victoria Bermejo, on the other. (Murphy Sealing Decl.; ¶ 3.) As

21  with Exhibit 17, the details of this transaction have no bearing on the facts at issue in this action,

22  which pertains to the United States operations of the Potato Corner. This document contains even

23  more sensitive information than Exhibit 17, in that this document would reveal the confidential

24  terms of the acquisition of Cinco stock by Marivic del Pilar, as a nominee for various other

25  shareholders. The only relevance of this agreement to this action is that the agreement exists, and

26  that the agreement did not involve the sale of PCJV interests sufficient to trigger Plaintiff PCI's

27  right of first refusal. This litigation does not in any way require disclosure of the inner corporate

28  ownership structure of Plaintiff Cinco – a wholly private transaction. None of the private ·

16544.2:9455452.1                                                4

ERVIN COHEN & JESSUP ᴸᴸᴾ

1 individuals identified as engaging in these private financial transactions in this exhibit have

2 consented to their disclosure in the public record. (Murphy Seal Decl., ¶ 3.)

3        These documents memorialize a transaction whereby various related buyers acquired

4 various equity stakes in a related set of entities involving Plaintiff Cinco Corporation. Other than

5 the discrete issue presented in the Motion for Summary Adjudication the details of these

6 agreements are irrelevant to the issues in this action. Moreover, even if relevant these documents

7 are of a sensitive business nature, as they identify various private individuals and companies,

8 engaged in a complicated transaction which, would, among other things disclose the sensitive and

9 confidential inner structure of a large, but closely held set of corporate entities, and, moreover,

10 would reveal the identity of its various owners – who are not parties to this action – as well as

11 their investment stake.

12        Up to, and through, early December 2018, counsel for Plaintiff PCI has attempted to

13 negotiate with counsel for Defendant Guy Koren, the terms of a Protective Order, whereby

14 documents could be identified as "confidential." (Murphy Seal Decl., ¶ 4.) The form proposed is

15 that found on the website of the Los Angeles Superior Court, which defines confidentiality in a

16 manner that would cover Exhibits 17 and 18. (Murphy Seal Decl., ¶ 4; Exh. A.)

17        Given the likelihood that this Protective Order will be agreed upon, the day before this

18 Motion was filed – December 18, 2018 – counsel for Plaintiff PCI proposed an agreement with all

19 counsel, in which, in exchange for an agreement to maintain confidentiality, counsel for Plaintiff

20 PCI would serve the sealed versions of the documents on all parties. The purpose was to ensure

21 that Defendant Koren and all parties have access to all papers supporting the Motion for Summary

22 Adjudication as it is filed. (Murphy Seal Decl., ¶ 5; Exh. B.). None of the attorneys responded to

23 this email, thus, effectively rejecting the opportunity to be served with the unsealed Exhibits 17

24 and 18 at the same time as the Motion for Summary Adjudication. Given that they were provided

25 with notice and elected not to take advantage of the agreement proposed by Plaintiff PCI, they will

26 not be prejudiced by the sealing order proposed herein. (Murphy Seal Decl., ¶ 6.) As soon as – or

27 if – counsel responds to and agrees to the confidentiality proposed in the December 19, 2018 to

28 my email, and agree to confidentiality, Plaintiff PCI will serve all counsel with the sealed copies

16544 2:9455452.1                                5

ERVIN COHEN & JESSUP LLP

1    of Exhibits 17 and 18.

2

3    **II.    ARGUMENT**

4        California Rules of Court Rule 2.550(c) provides that unless confidentiality is required by

5    law, court records are presumed to be open. However, the Court may order that a record be placed

6    under seal if it finds the following:

7        1.  There exists an overriding interest that overcomes the right of public access to the

8    record;

9        2.  The overriding interest supports sealing the record;

10        3.  A substantial probability exists that the overriding interest will be prejudiced if the

11    record is not sealed;

12        4.  The proposed sealing is narrowly tailored; and

13        5.  No less restrictive means exist to achieve the overriding interest.

14        The foregoing "rules do not attempt to define what may constitute an 'overriding interest,'

15    but leave this to case law." Advisory Committee Comment to Cal. Rules of Court, Rule 2.550.

16    Further, "[c]ourts have found that, under appropriate circumstances, various statutory privileges,

17    trade secrets, and privacy interests, when properly asserted and not waived, may constitute

18    'overriding interests.'" Id. The Supreme Court of the United States has long recognized an

19    overriding interest in protecting the privacy of individuals. See Nixon v. Warner Communications,

20    Inc. (1978) 435 U.S. 589, 598 ("It is uncontested, however, that the right to inspect and copy

21    judicial records in not absolute. Every court has supervisory power over its own records and files,

22    and access has been denied where court files might have become a vehicle for improper

23    purposes").

24        In this instance, sealing of the documents in appropriate as they contain privileged and

25    personal information regarding non-parties to the instant lawsuit. The sensitive nature of the

26    underlying transaction also makes sealing appropriate.

27    **III.    CONCLUSION**

28        For each and all of the foregoing reasons, Plaintiffs respectfully request that the Court

16544.2:9455452.1                                          6

ERVIN COHEN & JESSUP LLP

1    enter a limited sealing order allowing Plaintiffs to file under seal the designated exhibits to the

2    Motion for Summary Adjudication.

3

4

5    DATED: December /2018             ERVIN COHEN & JESSUP LLP

6

7                                 By:

8                                   Michael D. Murphy
                                  Attorneys for Plaintiffs and Cross-Defendants

9                                   CINCO CORPORATION and POTATO

10                                  CORNER INTERNATIONAL, INC.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

16544.2:9455452.1                       7

NOTICE OF MOTION AND MOTION TO FILE UNDER SEAL CERTAIN EXHIBITS IN SUPPORT OF
MOTION FOR SUMMARY ADJUDICATION

ERVIN COHEN & JESSUP LLP

1

## DECLARATION OF MICHAEL D. MURPHY

2      I, Michael D. Murphy, declare as follows:

3      1.      I am a Partner of Ervin Cohen & Jessup, LLP, attorneys of record for Plaintiffs and
4  Cross-Defendants Cinco Corporation and Potato Corner International, Inc. I have personal
5  knowledge of the facts set forth herein, except as to those stated on information and belief and, as
6  to those, I am informed and believe them to be true. I make this declaration in support of Plaintiff
7  Potato Corner International's Motion to File Two Exhibits Under Seal in Connection with Plaintiff
8  PCI's Motion for Summary Adjudication.

9      2.      The First Exhibit that we request to be filed under seal is Exhibit 17, which is a
10  Memorandum of Agreement between Jose P. Magsaysay, Jr., Ricardo Montelibano, Jose Miguel
11  Ma Montinola, on the one hand, and Marivic Del Pilar, on the other, reflecting the sale of stock in
12  Plaintiff Cinco Corporation. The details of this transaction have no bearing on the facts at issue in
13  this action, which pertains to the United States operations of the Potato Corner. This document
14  would reveal the confidential terms of the acquisition of Cinco stock by Marivic del Pilar, as a
15  nominee for various other shareholders. The only relevance of this agreement to this action is that
16  the agreement exists, and that the agreement did not involve the sale of PCJV interests sufficient
17  to trigger Plaintiff PCI's right of first refusal. This litigation does not in any way require
18  disclosure of the inner corporate ownership structure of Plaintiff Cinco – a wholly private
19  transaction.

20      3.      The second Exhibit that we request to be filed under seal is Exhibit 18, which is a
21  Memorandum of Agreement between numerous private individuals and companies located in the
22  Philippines, most of which are not parties to this action. As with Exhibit 17, the details of this
23  transaction have no bearing on the facts at issue in this action, which pertains to the United States
24  operations of the Potato Corner. This transaction, if made public, would reveal not only the
25  identify of private persons engaged in private financial dealings, but, would also reveal an
26  interlocking corporate structure among parents and subsidiaries, all of which are closely held, and
27  none of which have anything to do with this action. Again, the only relevance of this agreement to
28  this action is that the agreement exists, and that the agreement did not involve the sale of PCJV

16544.2:9455452.1                                    8

1  interests sufficient to trigger Plaintiff PCI's right of first refusal. This litigation does not in any
2  way require disclosure of the inner corporate ownership structure of Plaintiff Cinco, its various
3  subsidiaries, nor the identities of its new owners. None of the private individuals identified as
4  engaging in these private financial transactions in this exhibit have consented to their disclosure in
5  the public record.

6      4.    Up to, and through, early December 2018, I have attempted to negotiate with
7  counsel for Guy Koren, the terms of a Protective Order, whereby documents could be identified as
8  "confidential." The form we are using is the form proposed by the Los Angeles Superior Court,
9  which defines confidentiality in a manner that would cover Exhibits 17 and 18. A true and correct
10  copy of the current redline of the Protective Order we are negotiating is attached hereto as Exhibit
11  A. I anticipate that a Protective Order will eventually be agreed upon and proposed to this Court,
12  and, as evidenced by Exhibit A attached hereto.

13      5.    Attached hereto as Exhibit B is a true and correct copy of an email I sent to all
14  counsel on December 18, 2018, whereby I proposed an agreement with counsel for Defendant
15  Koren, in which they would agree to keep the two exhibits (17 and 18) at issue herein confidential,
16  so that I could serve the documents, in an unsealed fashion to Defendant Koren, and the others,
17  concurrent with the Motion for Summary Adjudication.

18      6.    Defendant Koren's counsel – indeed none of the other attorneys – responded to my
19  email, despite having been placed on notice one day before the Motion for Summary Judgment
20  was filed, as to our intent to file documents conditionally under seal. As soon as they respond to
21  my email, and agree to confidentiality, I will serve them with the sealed versions. They will not be
22  prejudiced by this delay, as they were on notice before the Motion for Summary Adjudication was
23  even filed.

24  / / /
25  / / /
26  / / /
27  / / /
28  / / /

16544.2:9455452 1                                     9
DECLARATION OF MICHAEL D. MURPHY

ERVIN COHEN & JESSUP ᴸᴸᴾ

1      I declare under penalty of perjury under the laws of the State of California that the

2 foregoing is true and correct.

3      Executed on this / day of December, 2018, at Los Angeles, CA.

4

5

6                            Michael D. Murphy

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

10

DECLARATION OF MICHAEL D. MURPHY

ERVIN COHEN & JESSUP LLP

**EXHIBIT A**

# EXHIBIT A

1 │ Michael D. Murphy (SBN 224678)
   │   mmurphy@ecjlaw.com
2 │ Banu S. Naraghi (State Bar No. 312754)
   │   bnaraghi@ecjlaw.com
3 │ **ERVIN COHEN & JESSUP LLP**
   │ 9401 Wilshire Boulevard, Ninth Floor
4 │ Beverly Hills, California 90212-2974
   │ Telephone (310) 273-6333
5 │ Facsimile (310) 859-2325

6 │ Attorneys for Plaintiffs and Cross-Defendants CINCO CORPORATION and POTATO CORNER
   │ INTERNATIONAL, INC.
7 │

8 │ **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9 │ **COUNTY OF LOS ANGELES, CENTRAL DISTRICT**

| | |
|---|---|
| 10 │ CINCO CORPORATION a Philippines corporation; POTATO CORNER | Case No.: BC701075<br>Related Case No.: BC706000 |
| 11 │ INTERNATIONAL, INC., a Delaware corporation, | |
| 12 │ Plaintiffs, | Assigned to Hon. Rafael Ongkeko, Dept. 73 |
| 13 │ vs. | [PROPOSED] STIPULATION AND PROTECTIVE ORDER |
| 14 │ GUY KOREN, an individual; NKM CAPITAL GROUP, LLC, a California limited | |
| 15 │ liability company; J & K AMERICANA, LLC, a California limited liability company; | |
| 16 │ J & K CULVER, LLC, a California limited liability company; J&K LAKEWOOD, LLC, | |
| 17 │ a California limited liability company; J&K OAKRIDGE, LLC, a California limited | |
| 18 │ liability company; J&K VALLEY FAIR, LLC, a California limited liability company; J | |
| 19 │ & K CAPITAL 2, LLC, a California limited liability company; J & K ONTARIO, LLC, a | |
| 20 │ California limited liability company; J&K PC TRUCKS, LLC, a California limited liability | |
| 21 │ company; J&K CONSULTANTS GROUP, LLC, a California limited liability company; | |
| 22 │ GK CAPITAL GROUP, LLC, a California limited liability company; POTATO | |
| 23 │ CORNER LA GROUP, LLC, a California limited liability company; and DOES 1 | |
| 24 │ through 25, inclusive, | |
| 25 │ Defendants, | |
| 26 │ – and – | |
| 27 │ PCJV USA, LLC, a Delaware limited liability company, | |
| 28 │ Nominal Defendant. | |

3961779.1

OPPOSITION TO DEFENDANTS' DEMURRER TO PLAINTIFFS' FIRST AMENDED VERIFIED COMPLAINT

ERVIN COHEN & JESSUP LLP



1 | GUY KOREN, an individual,

2 | Cross-Complainant,

3 | vs.

4 | CINCO CORPORATION, a Philippines corporation; POTATO CORNER
5 | INTERNATIONAL, INC., a Delaware corporation; MYROSE VICTOR, an
6 | individual; JOHN EDWARD HERNANDEZ, an individual; JOSE P. MAGSAYSAY, JR.,
7 | an individual; MARIVIC DEL PILAR, an individual; RICARDO ENRIQUE K.
8 | MONTELIBANO, an individual; BEN OLIVAS, an individual; AMIR JACOBY, and
9 | individual; INBAL JACOBY, an individual; and ROES 1 through 100 inclusive,

10

11 | Cross-Defendants.

Complaint Filed:    April 10, 2018
Trial Date:       None Set

12

13 | / / /

14 | / / /

15 | / / /

16 | / / /

17 | / / /

18 | / / /

19 | / / /

20 | / / /

21 | / / /

22 | / / /

23 | / / /

24 | / / /

25 | / / /

26 | / / /

27 | / / /

28 | / / /

ERVIN COHEN & JESSUP LLP

3961779.1                   2

OPPOSITION TO DEFENDANTS' DEMURRER TO PLAINTIFFS' FIRST AMENDED VERIFIED COMPLAINT

IT IS HEREBY STIPULATED by and ~~between~~ among the Parties to ~~Plaintiffs v.~~
~~Defendants~~Cinco Corporation, et al. v. Guy Koren, et al., Case Number BC701075. ~~(list names of~~
~~Plaintiffs and Defendants)~~, by and through their respective counsel of record, that in order to
facilitate the exchange of information and documents which may be subject to confidentiality
limitations on disclosure due to federal laws, state laws, and privacy rights, the Parties stipulate as
follows:

    1.    In this Stipulation and Protective Order, the words set forth below shall
have the following meanings:

    a.    "Proceeding" means the proceeding with the Los Angeles Case
Number BC701075.

    b.    "Court" means the Hon. Rafael Ongkeko, or any other judge to
which this Proceeding may be assigned, including Court staff
participating in such proceedings.

    c.    "Confidential" means any information which is in the possession of
a Designating Party who believes in good faith that such information
is entitled to confidential treatment under applicable law.

    d.    "Confidential Materials" means any Documents, Testimony or
Information as defined below designated as "Confidential" pursuant
to the provisions of this Stipulation and Protective Order.

    e.    "Designating Party" means the Party that designates Materials as
"Confidential."

    f.    "Disclose" or "Disclosed" or "Disclosure" means to reveal, divulge,
give, or make available Materials, or any part thereof, or any
information contained therein.

    g.    "Documents" means

    i.    any "Writing," "Original," and "Duplicate" as those terms
are defined by California Evidence Code Sections 250, 255,
and 260, which have been produced in discovery in this

1
DECLARATION OF MICHAEL D. MURPHY

ERVIN COHEN ᴄ JESSUP

1              Proceeding by any person, and

2                   ii.    any copies, reproductions, or summaries of all or any part of

3                          the foregoing.

4          h.    "Information" means the content of Documents or Testimony.

5          i.    "Testimony" means all depositions, declarations or other testimony

6                 taken or used in this Proceeding.

7       **2.**    The Designating Party shall have the right to designate as "Confidential"

8  any Documents, Testimony or Information that the Designating Party in good faith believes to

9  contain non-public information that is entitled to confidential treatment under applicable law.

10      **3.**    The entry of this Stipulation and Protective Order does not alter, waive,

11 modify, or abridge any right, privilege or protection otherwise available to any Party with respect

12 to the discovery of matters, including but not limited to any Party's right to assert the attorney-

13 client privilege, the attorney work product doctrine, or other privileges, or any Party's right to

14 contest any such assertion.

15      **4.**    Any Documents, Testimony or Information to be designated as

16 "Confidential" must be clearly so designated before the Document, Testimony or Information is

17 Disclosed or produced. ~~The Confidential designation shall include the case name and number, on~~

18 ~~each page, as follows: "Cinco Corporation, et. al. v. Guy Koren, et. al., LASC Case No.~~

19 ~~BC701075."~~ The "Confidential" designation should not obscure or interfere with the legibility of

20 the designated Information.

21          a.    For Documents (apart from transcripts of depositions or other

22                pretrial or trial proceedings), the Designating Party must affix the

23                legend "Confidential" on each page of any Document containing

24                such designated Confidential Material.

25          b.    For Testimony given in depositions the Designating Party may

26                either:

27                   i.    identify on the record, before the close of the deposition, all

28                         "Confidential" Testimony, by specifying all portions of the

---

ERVIN COHEN   JESSUP:

1    Testimony that qualify as "Confidential," a requirement that

2    shall apply to electronic documents or hard copy documents;

3    or

4    ii.    designate the entirety of the Testimony at the deposition as

5    "Confidential" (before the deposition is concluded) with the

6    right to identify more specific portions of the Testimony as

7    to which protection is sought within 30 days following

8    receipt of the deposition transcript.

9    In circumstances where portions of the deposition Testimony are

10   designated for protection, the transcript pages containing

11   "Confidential" Information may be separately bound by the court

12   reporter, who must affix to the top of each page the legend

13   "Confidential," as instructed by the Designating Party.

14   c.    For Information produced in some form other than Documents, and

15   for any other tangible items, including, without limitation, compact

16   discs or DVDs, the Designating Party must affix in a prominent

17   place on the exterior of the container or containers in which the

18   Information or item is stored the legend "Confidential," except that,

19   if a compact disc or DVD contains records that may be individually

20   labeled as Confidential, 4(a) shall be followed as to each individual

21   page of each electronic record. If only portions of the Information or

22   item warrant protection, the Designating Party, to the extent

23   practicable, shall identify the "Confidential" portions.

24   5.    The inadvertent production by any of the undersigned Parties or non-Parties

25   to the Proceedings of any Document, Testimony or Information during discovery in this

26   Proceeding without a "Confidential" designation, shall be without prejudice to any claim that such

27   item is "Confidential" and such Party shall not be held to have waived any rights by such

28   inadvertent production. In the event that any Document, Testimony or Information that is subject

3961779.1                                    3
OPPOSITION TO DEFENDANTS' DEMURRER TO PLAINTIFFS' FIRST AMENDED VERIFIED COMPLAINT

ERVIN COHEN   JESSUP

ERVIN COHEN | JESSUP

1 to a "Confidential" designation is inadvertently produced without such designation, the Party that
2 inadvertently produced the document shall give written notice of such inadvertent production
3 within twenty (20) days of discovery of the inadvertent production, together with a further copy of
4 the subject Document, Testimony or Information designated as "Confidential" (the "Inadvertent
5 Production Notice"). Upon receipt of such Inadvertent Production Notice, the Party that received
6 the inadvertently produced Document, Testimony or Information shall promptly destroy the
7 inadvertently produced Document, Testimony or Information and all copies thereof, or, at the
8 expense of the producing Party, return such together with all copies of such Document, Testimony
9 or Information to counsel for the producing Party and shall retain only the "Confidential"
10 designated Materials. Should the receiving Party choose to destroy such inadvertently produced
11 Document, Testimony or Information, the receiving Party shall notify the producing Party in
12 writing of such destruction within ten (10) days of receipt of written notice of the inadvertent
13 production. This provision is not intended to apply to any inadvertent production of any
14 Information protected by attorney-client or work product privileges. In the event that this
15 provision conflicts with any applicable law regarding waiver of confidentiality through the
16 inadvertent production of Documents, Testimony or Information, such law shall govern.

17          6.     In the event that counsel for a Party receiving Documents, Testimony or
18 Information in discovery designated as "Confidential" objects to such designation with respect to
19 any or all of such items, said counsel shall advise counsel for the Designating Party, in writing, of
20 such objections, the specific Documents, Testimony or Information to which each objection
21 pertains, and the specific reasons and support for such objections (the "Designation Objections").
22 Counsel for the Designating Party shall have fourteen (14) days from receipt of the written
23 Designation Objections to ~~either (a)~~ agree in writing to de-designate Documents, Testimony or
24 Information pursuant to any or all of the Designation Objections, Otherwise, counsel for the
25 objecting Party ~~and/or (b)~~ may file a motion with the Court seeking to ~~uphold~~ challenge any or all
26 designations on Documents, Testimony or Information addressed by the Designation Objections
27 (the "Designation Motion"). Pending a resolution of the Designation Motion by the Court, any and
28 all existing designations on the Documents, Testimony or Information at issue in such Motion

3961779.1                                    4

1 | shall remain in place. The Designating Party shall have the burden on any Designation Motion of

2 | establishing the applicability of its "Confidential" designation. ~~In the event that the Designation~~

3 | ~~Objections are neither timely agreed to nor timely addressed in the Designation Motion, then such~~

4 | ~~Documents, Testimony or Information shall be de-designated in accordance with the Designation~~

5 | ~~Objection applicable to such material.~~

6 |       **7.**    Access to and/or Disclosure of Confidential Materials designated as

7 | "Confidential" shall be permitted only to the following persons:

8 |       a.    The Court and court-appointed discovery referees and/or mediators;

9 |       b.    ~~(1)~~ Attorneys of record in the Proceedings and their affiliated

10 | attorneys, paralegals, clerical and secretarial staff employed by such

11 | attorneys who are actively involved in the Proceedings and are not

12 | employees of any Party. ~~(2) In-house counsel to the undersigned~~

13 | ~~Parties and the paralegal, clerical and secretarial staff employed by~~

14 | ~~such counsel.~~ Provided, however, that each non-lawyer given access

15 | to Confidential Materials shall be advised that such Materials are

16 | being Disclosed pursuant to, and are subject to, the terms of this

17 | Stipulation and Protective Order and that they may not be Disclosed

18 | other than pursuant to its terms;

19 |       c.    Guy Koren, or any of his respective agents, representatives, or

20 | appointees, on behalf of Defendants and Cross-Complainants PCJV

21 | USA, LLC, GUY KOREN, NKM CAPITAL GROUP, LLC, J & K

22 | AMERICANA, LLC, J & K CULVER, LLC, J&K LAKEWOOD,

23 | LLC, J&K OAKRIDGE, LLC, J&K VALLEY FAIR, LLC, J & K

24 | CAPITAL 2, LLC, J & K ONTARIO, LLC, J&K PC TRUCKS,

25 | LLC, J&K CONSULTANTS GROUP, LLC, GK CAPITAL

26 | GROUP, LLC, and POTATO CORNER LA GROUP, LLC, and

27 | Cross-Complainants PCI TRADING, LLC, ALON KOREN,

28 | THOMAS HODGSON, EMILY GARCIA, and ASHLEY

ERVIN COHEN & JESSUP

GRUDNOWSKI; ~~Those officers, directors, partners, members,~~
~~employees and agents of all non-designating Parties that counsel for~~
~~such Parties deems necessary to aid counsel in the prosecution and~~
~~defense of this Proceeding;~~ provided, however, that prior to the
Disclosure of Confidential Materials to ~~any such officer, director,~~
~~partner, member, employee or agent~~Mr. Koren, counsel for the Party
making the Disclosure shall deliver a copy of this Stipulation and
Protective Order to ~~such person~~Mr. Koren, shall explain that ~~such~~
~~person~~he is bound to follow the terms of such Order, and shall
secure ~~the~~ his signature ~~of such person~~ on a statement in the form
attached hereto as Exhibit A;

~~c.~~d.    Jose Magsaysay, Jr. on behalf of CINCO CORPORATION and
POTATO CORNER INTERNATIONAL, INC., and their affiliated
entities, shareholders, members, officers, and/or directors; provided,
however, that prior to the Disclosure of Confidential Materials to
Mr. Magsaysay, Jr., counsel for the Party making the Disclosure
shall deliver a copy of this Stipulation and Protective Order to him,
shall explain that he is bound to follow the terms of such Order, and
shall secure his signature on a statement in the form attached hereto
as Exhibit A;

~~d.~~e.    court reporters in this Proceeding (whether at depositions, hearings,
or any other proceeding);

~~e.~~    Any deposition, trial or hearing witness in the Proceeding who
previously has had access to the Confidential Materials and is
otherwise entitled to review the Confidential Materials, ~~or who is~~
~~currently or was previously an officer, director, partner, member,~~
~~employee or agent of an entity that has had access to the~~
~~Confidential Materials;~~

3961779.1                                        6
OPPOSITION TO DEFENDANTS' DEMURRER TO PLAINTIFFS' FIRST AMENDED VERIFIED COMPLAINT

ERVIN COHEN & JESSUP

f.  ~~Any deposition or non-trial hearing witness in the Proceeding who~~
~~previously did not have access to the Confidential Materials;~~
~~provided, however, that each such witness given access to~~
~~Confidential Materials shall be advised that such Materials are being~~
~~Disclosed pursuant to, and are subject to, the terms of this~~
~~Stipulation and Protective Order and that they may not be Disclosed~~
~~other than pursuant to its terms;~~

~~g.~~ Mock jury participants, provided, however, that prior to the
Disclosure of Confidential Materials to any such mock jury
participant, counsel for the Party making the Disclosure shall deliver
a copy of this Stipulation and Protective Order to such person, shall
explain that such person is bound to follow the terms of such Order,
and shall secure the signature of such person on a statement in the
form attached hereto as Exhibit A.

~~g.~~

~~h.~~ Outside experts or expert consultants consulted by the undersigned
Parties or their counsel in connection with the Proceeding, whether
or not retained to testify at any oral hearing; provided, however, that
prior to the Disclosure of Confidential Materials to any such expert
or expert consultant, counsel for the Party making the Disclosure
shall deliver a copy of this Stipulation and Protective Order to such
person, shall explain its terms to such person, and shall secure the
signature of such person on a statement in the form attached hereto
as Exhibit A.

h.  Any Disclosure of Confidential Materials to any authorized Party or
non-Party must be made outside the presence of any Party or non-
Party to whom Disclosure is not specifically provided for by this
Stipulation and Protective Order so as to avoid unauthorized

3961779.1

7

OPPOSITION TO DEFENDANTS' DEMURRER TO PLAINTIFFS' FIRST AMENDED VERIFIED COMPLAINT

ERVIN COHEN & JESSUP

Disclosure;

    i.   It shall be the obligation of counsel, upon learning of any breach or threatened breach of this Stipulation and Protective Order by any such expert or expert consultant, to promptly notify counsel for the Designating Party of such breach or threatened breach; and i. any other person that the Designating Party agrees to in writing.

8.   It is expressly understood and agreed that the following parties and any ROE cross-defendant party associated with the "Hernandez Group" shall not have or gain access to the Confidential Materials in any way: JOHN EDWARD HERNANDEZ, CHAD DOMINIC HERNANDEZ, MIGUEL RAYMUNDO HERNANDEZ, MYROSE VICTOR, MARIVIC DEL PILAR, JOSE MARCO DEL PILAR, DIA LACABA, NICARDO FALCIS, and unnamed ROE cross-defendants associated with them.

8.9.   Confidential Materials shall be used by the persons receiving them only for the purposes of preparing for, conducting, participating in the conduct of, and/or prosecuting and/or defending the Proceeding, and not for any business or other purpose whatsoever.

9.10.   Any Party to the Proceeding (or other person subject to the terms of this Stipulation and Protective Order) may ask the Court, after appropriate notice to the other Parties to the Proceeding, to modify or grant relief from any provision of this Stipulation and Protective Order.

10.11.   Entering into, agreeing to, and/or complying with the terms of this Stipulation and Protective Order shall not:

    a.   a. operate as an admission by any person that any particular Document, Testimony or Information marked "Confidential" contains or reflects trade secrets, proprietary, confidential or competitively sensitive business, commercial, financial or personal information; or

ERVIN COHEN & JESSUP

Formatted: Indent: Left: 1.5", Hanging: 0.5", Outline numbered + Level: 4 + Numbering Style: a, b, c, ... + Start at: 1 + Alignment: Left + Aligned at: 1.5" + Tab after: 2" + Indent at: 0"

1    b.    prejudice in any way the right of any Party (or any other person

2          subject to the terms of this Stipulation and Protective Order):

3          i.    to seek a determination by the Court of whether any

4                particular Confidential Material should be subject to

5                protection as "Confidential" under the terms of this

6                Stipulation and Protective Order; or

7          ii.   to seek relief from the Court on appropriate notice to all

8                other Parties to the Proceeding from any provision(s) of this

9                Stipulation and Protective Order, either generally or as to

10               any particular Document, Material or Information.

11   ~~11.~~12.  Any Party to the Proceeding who has not executed this Stipulation and

12   Protective Order as of the time it is presented to the Court for signature may

13   thereafter become a Party to this Stipulation and Protective Order by its

14   counsel's signing and dating a copy thereof and filing the same with the

15   Court, and serving copies of such signed and dated copy upon the other

16   Parties to this Stipulation and Protective Order.

17   ~~12.~~13.  Any Information that may be produced by a non-Party witness in discovery

18   in the Proceeding pursuant to subpoena or otherwise may be designated by

19   such non-Party as "Confidential" under the terms of this Stipulation and

20   Protective Order, and any such designation by a non-Party shall have the

21   same force and effect, and create the same duties and obligations, as if made

22   by one of the undersigned Parties hereto. Any such designation shall also

23   function as a consent by such producing Party to the authority of the Court

24   in the Proceeding to resolve and conclusively determine any motion or other

25   application made by any person or Party with respect to such designation, or

26   any other matter otherwise arising under this Stipulation and Protective

27   Order.

28   ~~13.~~14.  If any person subject to this Stipulation and Protective Order who has

3961779.1                                  9

OPPOSITION TO DEFENDANTS' DEMURRER TO PLAINTIFFS' FIRST AMENDED VERIFIED COMPLAINT

ERVIN COHEN & JESSUP

ERVIN COHEN & JESSUP

1    custody of any Confidential Materials receives a subpoena or other process

2    ("Subpoena") from any government or other person or entity demanding

3    production of Confidential Materials, the recipient of the Subpoena shall

4    promptly give notice of the same by electronic mail transmission, followed

5    by either express mail or overnight delivery to counsel of record for the

6    Designating Party, and shall furnish such counsel with a copy of the

7    Subpoena. Upon receipt of this notice, the Designating Party may, in its sole

8    discretion and at its own cost, move to quash or limit the Subpoena,

9    otherwise oppose production of the Confidential Materials, and/or seek to

10   obtain confidential treatment of such Confidential Materials from the

11   subpoenaing person or entity to the fullest extent available under law. The

12   recipient of the Subpoena may not produce any Documents, Testimony or

13   Information pursuant to the Subpoena prior to the date specified for

14   production on the Subpoena.

15       14.15. Nothing in this Stipulation and Protective Order shall be construed to

16       preclude either Party from asserting in good faith that certain Confidential

17       Materials require additional protection. The Parties shall meet and confer to

18       agree upon the terms of such additional protection.

19       15.16. If, after execution of this Stipulation and Protective Order, any Confidential

20       Materials submitted by a Designating Party under the terms of this

21       Stipulation and Protective Order is Disclosed by a non-Designating Party to

22       any person other than in the manner authorized by this Stipulation and

23       Protective Order, the non-Designating Party responsible for the Disclosure

24       shall bring all pertinent facts relating to the Disclosure of such Confidential

25       Materials to the immediate attention of the Designating Party.

26       16.17. This Stipulation and Protective Order is entered into without prejudice to

27       the right of any Party to knowingly waive the applicability of this

28       Stipulation and Protective Order to any Confidential Materials designated

3961779.1                                    10
OPPOSITION TO DEFENDANTS' DEMURRER TO PLAINTIFFS' FIRST AMENDED VERIFIED COMPLAINT

ERVIN COHEN & JESSUP

1    by that Party. If the Designating Party uses Confidential Materials in a non-

2    Confidential manner, then the Designating Party shall advise that the

3    designation no longer applies.

4    ~~17.~~18. Where any Confidential Materials, or Information derived from

5    Confidential Materials, is included in any motion or other proceeding

6    governed by California Rules of Court, Rules 2.550 and 2.551, the party

7    shall follow those rules. With respect to discovery motions or other

8    proceedings not governed by California Rules of Court, Rules 2.550 and

9    2.551, the following shall apply: If Confidential Materials or Information

10    derived from Confidential Materials are submitted to or otherwise disclosed

11    to the Court in connection with discovery motions and proceedings, the

12    same shall be separately filed under seal with the clerk of the Court in an

13    envelope marked: "CONFIDENTIAL – FILED UNDER SEAL

14    PURSUANT TO PROTECTIVE ORDER AND WITHOUT ANY

15    FURTHER SEALING ORDER REQUIRED."

16    ~~18.~~19. The Parties shall meet and confer regarding the procedures for use of

17    Confidential Materials at trial and shall move the Court for entry of an

18    appropriate order.

19    ~~19.~~20. Nothing in this Stipulation and Protective Order shall affect the

20    admissibility into evidence of Confidential Materials, or abridge the rights

21    of any person to seek judicial review or to pursue other appropriate judicial

22    action with respect to any ruling made by the Court concerning the issue of

23    the status of Protected Material.

24    ~~20.~~21. This Stipulation and Protective Order shall continue to be binding after the

25    conclusion of this Proceeding and all subsequent proceedings arising from

26    this Proceeding, except that a Party may seek the written permission of the

27    Designating Party or may move the Court for relief from the provisions of

28    this Stipulation and Protective Order. To the extent permitted by law, the

3961779.1      11

ERVIN COHEN & JESSUP

1   Court shall retain jurisdiction to enforce, modify, or reconsider this

2   Stipulation and Protective Order, even after the Proceeding is terminated.

3   ~~21.~~22. Upon written request made within thirty (30) days after the settlement or

4   other termination of the Proceeding, the undersigned Parties shall have

5   thirty (30) days to either (a) promptly return to counsel for each Designating

6   Party all Confidential Materials and all copies thereof (except that counsel

7   for each Party may maintain in its files, in continuing compliance with the

8   terms of this Stipulation and Protective Order, all work product, and one

9   copy of each pleading filed with the Court, and one copy of each deposition

10  together with the exhibits marked at the deposition, (b) agree with counsel

11  for the Designating Party upon appropriate methods and certification of

12  destruction or other disposition of such Confidential Materials, or (c) as to

13  any Documents, Testimony or other Information not addressed by sub-

14  paragraphs (a) and (b), file a motion seeking a Court order regarding proper

15  preservation of such Materials. To the extent permitted by law the Court

16  shall retain continuing jurisdiction to review and rule upon the motion

17  referred to in sub-paragraph (c) herein. Termination of the Proceeding shall

18  be deemed to be the later of (1) dismissal of all claims and defenses in this

19  action, with or without prejudice; and (2) final judgment after the

20  completion and exhaustion of all appeals, rehearings, remands, trials, or

21  reviews of this action, including the time limits for filing any motions or

22  applications for extension of time pursuant to applicable law.

23  ~~22.~~23. After this Stipulation and Protective Order has been signed by counsel for

24  all Parties, it shall be presented to the Court for entry. Counsel agree to be

25  bound by the terms set forth herein with regard to any Confidential

26  Materials that have been produced before the Court signs this Stipulation

27  and Protective Order.

28  ~~23.~~24. The Parties and all signatories to the Certification attached hereto as Exhibit

3961779.1                                    12
OPPOSITION TO DEFENDANTS' DEMURRER TO PLAINTIFFS' FIRST AMENDED VERIFIED COMPLAINT

A agree to be bound by this Stipulation and Protective Order pending its
approval and entry by the Court. In the event that the Court modifies this
Stipulation and Protective Order, or in the event that the Court enters a
different Protective Order, the Parties agree to be bound by this Stipulation
and Protective Order until such time as the Court may enter such a different
Order. It is the Parties' intent to be bound by the terms of this Stipulation
and Protective Order pending its entry so as to allow for immediate
production of Confidential Materials under the terms herein. This
Stipulation and Protective Order may be executed in counterparts.

25. Execution of this Stipulation and Protective Order shall not be construed as
a waiver or consent by any Party to any objection to the representation of
another Party by the counsel signing on that Party's behalf.

24. The Parties further agree that to the extent any Party inadvertently produces a
privileged document (a document subject to the attorney-client privilege and/or the attorney work
product doctrine), the production shall not constitute a waiver of said privilege and/or doctrine,
and the receiving party will agree to return the document to the producing party upon the
producing party's request. The Parties further agree that while an inadvertent production will not
constitute a waiver of any privilege or protection, the Parties reserve the right to challenge any
claim of the attorney-client privilege and/or the attorney work production with regard to any
document (with the exception of the argument that the production results in a waiver).

DATED: DecemberDecemberNovember ERVIN COHEN & JESSUP LLP
. , 2018

By: _____
         Michael D. Murphy
         Attorneys for Plaintiffs and Cross-Defendants
         CINCO CORPORATION and POTATO
         CORNER INTERNATIONAL, INC.

ERVIN COHEN & JESSUP LLP

1  DATED: December~~December~~~~November~~ FREEMAN, FREEMAN & SMILEY LLP
2  ___, 2018

3

4                                            By: _____
                                                 Arash Beral
5                                                Attorneys for Defendants and Cross-Complainants
6                                                PCJV USA, LLC, GUY KOREN, NKM
                                                 CAPITAL GROUP, LLC, J & K AMERICANA,
7                                                LLC, J & K CULVER, LLC, J&K LAKEWOOD,
                                                 LLC, J&K OAKRIDGE, LLC, J&K VALLEY
8                                                FAIR, LLC, J & K CAPITAL 2, LLC, J & K
                                                 ONTARIO, LLC, J&K PC TRUCKS, LLC, J&K
9                                                CONSULTANTS GROUP, LLC, GK CAPITAL
                                                 GROUP, LLC, and POTATO CORNER LA
10                                               GROUP, LLC, and Cross-Complainants PCI
                                                 TRADING, LLC, ALON KOREN, THOMAS
11                                               HODGSON, EMILY GARCIA, and ASHLEY
12                                               GRUDNOWSKI
                                                 ~~INSERT~~
13

14 DATED: December~~December~~~~November~~ LEVINSON ARSHONSKY & KURTZ, LLP
   ___, 2018
15

16

17                                           By: _____
                                                 David Krol
18                                               Attorneys for Cross-Defendants Amir Jacoby and
                                                 Inbal Jacoby
19

20

21

22

23

24

25

26

27

28

3961779.1                          14
OPPOSITION TO DEFENDANTS' DEMURRER TO PLAINTIFFS' FIRST AMENDED VERIFIED COMPLAINT

ERVIN COHEN & JESSUP

1    **ORDER**

2    **GOOD CAUSE APPEARING**, the Court hereby approves this Stipulation and Protective

3    Order.

4

5    **IT IS SO ORDERED.**

6

7    DATED:_____          BY: _____

8                                        Hon. Rafael Ongkeko

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3961779.1                              15
OPPOSITION TO DEFENDANTS' DEMURRER TO PLAINTIFFS' FIRST AMENDED VERIFIED COMPLAINT

ERVIN COHEN & JESSUP LLP

ERVIN COHEN & JESSUP LLP

1  **EXHIBIT A**

2  **CERTIFICATION RE CONFIDENTIAL DISCOVERY MATERIALS**

3  I hereby acknowledge that I, _____ [NAME],

4  _____ [POSITION AND EMPLOYER], am

5  about to receive Confidential Materials supplied in connection with the Proceeding, *Cinco*

6  *Corporation, et. al. v. Guy Koren, et. al.*, LASC Case No. BC701075. I certify that I understand

7  that the Confidential Materials are provided to me subject to the terms and restrictions of the

8  Stipulation and Protective Order filed in this Proceeding. I have been given a copy of the

9  Stipulation and Protective Order; I have read it, and I agree to be bound by its terms. I understand

10  that Confidential Materials, as defined in the Stipulation and Protective Order, including any notes

11  or other records that may be made regarding any such materials, shall not be Disclosed to anyone

12  except as expressly permitted by the Stipulation and Protective Order. I will not copy or use,

13  except solely for the purposes of this Proceeding, any Confidential Materials obtained pursuant to

14  this Protective Order, except as provided therein or otherwise ordered by the Court in the

15  Proceeding. I further understand that I am to retain all copies of all Confidential Materials

16  provided to me in the Proceeding in a secure manner, and that all copies of such Materials are to

17  remain in my personal custody until termination of my participation in this Proceeding,

18  whereupon the copies of such Materials will be returned to counsel who provided me with such

19  Materials.

20      I declare under penalty of perjury, under the laws of the State of California, that the

21  foregoing is true and correct. Executed this _____ day of _____, 20__, at _____.

22      DATED:_____      BY: _____

23                                          Signature

24                                          _____
                                            Title

25                                          _____
                                            Address

26                                          _____
27                                          City, State, Zip

28                                          _____
                                            Telephone Number

3961779.1                          16
OPPOSITION TO DEFENDANTS' DEMURRER TO PLAINTIFFS' FIRST AMENDED VERIFIED COMPLAINT

**EXHIBIT B**

# EXHIBIT B

## Teresa Castelli

| From: | Michael Murphy |
|---|---|
| Sent: | Wednesday, December 19, 2018 11:32 AM |
| To: | Teresa Castelli |
| Subject: | FW: Confidential Documents |

**From:** Michael Murphy
**Sent:** Tuesday, December 18, 2018 2:55 PM
**To:** 'Arash Beral' <Arash.Beral@ffslaw.com>; 'O'Meara, Frances' <FOMeara@thompsoncoe.com>;
dkrol@laklawyers.com
**Cc:** Banu Naraghi <bnaraghi@ecjlaw.com>; Kevin Parr <kparr@ecjlaw.com>; Teresa Castelli <tcastelli@ecjlaw.com>
**Subject:** Confidential Documents

Counsel:

As you all know, we have proposed a Protective Order to which Mr. Beral has responded with terms that are
objectionable to us. During the Informal Discovery Conference on December 10, 2018, Judge Ongkeko instructed us to
agree upon a discovery referee for, among other reasons, the purpose of finalizing that agreement. My hope is that we
can agree upon that discovery referee soon. I am open to suggestions.

Given that no protective order is yet in place, we nevertheless wish to attach to our Motion for Summary Adjudication,
confidentially (and conditionally under seal), the documents comprising the Hernandez Stock Acquisition. These
documents would be covered by and produced by us pursuant to the Protective Order, if one is in place.

Rather than hold up this process, I wish to propose the following:

I would like to circulate a short agreement, whereby the parties agree that any documents exchanged or produced
labeled as "Confidential" be treated as if it is governed by the undisputed terms of the current draft of the Protective
Order, including Section 7 which limits any disclosure of Confidential documents and Section 23, which states that
Counsel and clients in receipt of documents produced as Confidential prior to entry of the Protective Order will treat the
documents as if the Protective Order is in place such that disclosure of marked documents will be subject to the same  ·
sanction as violation of that Order once the Order is eventually entered.

Please confirm your agreement to the above, in principle, and I will circulate a draft.

**Michael D. Murphy**

ERVIN COHEN & JESSUP LLP

9401 Wilshire Boulevard, 9th Floor   Beverly Hills, CA 90212-2974
(310) 281-6367 (t)   (310) 859-2325 (f)
www.ecjlaw.com ∣ mmurphy@ecjlaw.com ∣ LinkedIn

The information contained herein is confidential and privileged attorney-client information or work product intended
only for the individual or entity to whom it is addressed. Any unauthorized use, distribution or copying of this
communication is strictly prohibited. If you have received this communication in error, please notify me immediately.

1

1

## PROOF OF SERVICE

2

**Cinco Corporation, et al. v. Guy Koren, et al.**
**Case No. BC701075**

3

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

4

5    At the time of service, I was over 18 years of age and **not a party to this action.** I am
employed in the County of Los Angeles, State of California. My business address is 9401
Wilshire Boulevard, Ninth Floor, Beverly Hills, CA 90212-2974.

6

7    ON DECEMBER 19, 2018, I SERVED TRUE COPIES OF THE FOLLOWING DOCUMENT(S)
DESCRIBED AS **NOTICE OF MOTION AND MOTION TO FILE UNDER SEAL**
8    **CERTAIN EXHIBITS IN SUPPORT OF MOTION FOR SUMMARY ADJUDICATION**
ON THE INTERESTED PARTIES IN THIS ACTION AS FOLLOWS:
9                         **SEE ATTACHED SERVICE LIST** .

10    **BY PERSONAL SERVICE:** I personally delivered the document(s) to the person at the
addresses listed in the Service List. (1) For a party represented by an attorney, delivery was made
11    to the attorney or at the attorney's office by leaving the documents in an envelope or package
clearly labeled to identify the attorney being served with a receptionist or an individual in charge
12    of the office. (2) For a party, delivery was made to the party or by leaving the documents at the
party's residence with some person not less than 18 years of age between the hours of eight in the
13    morning and six in the evening.

14    I declare under penalty of perjury under the laws of the State of California that the
foregoing is true and correct.

15
    Executed on December 19, 2018, at Beverly Hills, California.

16

17

18                                        Kevin Parr

19

20

21

22

23

24

25

26

27

28

ERVIN COHEN & JESSUP LLP

| | | |
|---|---|---|
| 1 | | **SERVICE LIST** |
| 2 | | **Cinco Corporation, et al. v. Guy Koren, et al.**<br>**Case No. BC701075** |
| 3 | Todd M. Lander, Esq. | Attorneys for Defendant and Cross- |
| 4 | Arash Beral, Esq.<br>Carol Chow, Esq. | Complainant Guy Koren, and Cross-<br>Complainants Alon Koren, Thomas Hodgson, |
| 5 | FREEMAN, FREEMAN & SMILEY, LLP<br>1888 Century Park East, Suite 1900 | Emily Garcia, and Ashley Grundnowski |
| 6 | Los Angeles, CA 90067 | |
| 7 | Robert A. Levinson, Esq.<br>David Krol, Esq. | Attorneys for Cross-Defendants AMIR<br>JACOBY and INBAL JACOBY |
| 8 | Jason J. Jarvis, Esq.<br>LEVINSON ARSHONSKY & KURTZ, LLP | |
| 9 | 15303 Ventura Blvd., Suite 1650<br>Sherman Oaks, CA 91403 | |
| 10 | Frances M. O'Meara, Esq. | Attorneys for Cross-Complainant PCI Trading, |
| 11 | Stephen M. Caine, Esq.<br>Holly M. Teel, Esq. | LLC and Nominal Defendant and Cross-<br>Complainant PCJV USA, LLC |
| 12 | Thompson Coe<br>12100 Wilshire Blvd | |
| 13 | Suite 1200<br>Los Angeles, California 90025 | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

2

 Journal Technologies Court Portal

# Make a Reservation

## CINCO CORPORATION VS GUY KOREN

Case Number: BC701075   Case Type: Civil Unlimited   Category: Other Contract Dispute (not breach/insurance/fraud/negligence)   Date Filed: 2018-04-10
Location: Stanley Mosk Courthouse · Department 73

### Reservation

| | |
|---|---|
| Case Name:<br>CINCO CORPORATION VS GUY KOREN | Case Number:<br>BC701075 |
| Type:<br>Motion re: (Seal) | Status:<br>RESERVED |
| Party:<br>Potato Corner International, Inc. (Cross-Defendant) | Location:<br>Stanley Mosk Courthouse - Department 73 |
| Date/Time:<br>03/01/2019 8:30 AM | Number of Motions:<br>1 |
| Reservation ID:<br>277262848726 | Confirmation Code:<br>CR-LRUIXBVFX7KSQEB7Z |

### Fees

| Description | Fee | Qty | Amount |
|---|---|---|---|
| Motion re: (name extension) | 60.00 | 1 | 60.00 |
| Credit Card Percentage Fee (2.75%) | 1.65 | 1 | 1.65 |
| TOTAL | | | **$61.65** |

### Payment

| | |
|---|---|
| Amount:<br>$61.65 | Type:<br>Visa |
| Account Number:<br>XXXX3018 | Authorization:<br>088242 |

🖶 Print Receipt    ✚ <u>Reserve Another Hearing</u>

Copyright © Journal Technologies, USA. All rights reserved.

# EXHIBIT 89

Robert A. Levinson, Esq. [SBN 82300]
David Krol, Esq. [SBN 213740]
**LEVINSON ARSHONSKY & KURTZ, LLP**
15303 Ventura Blvd., Suite 1650
Sherman Oaks, CA 91403
Telephone: (818) 382-3434
Facsimile: (818) 382-3433
E-Mail: rlevinson@laklawyers.com
dkrol@laklawyers.com

Attorneys for Cross-Defendants
AMIR JACOBY and INBAL JACOBY

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES

| | |
|---|---|
| CINCO CORPORATION,<br><br>Plaintiff,<br><br>vs.<br><br>GUY KOREN, an individual; and DOES 1 through 25, inclusive,<br><br>Defendants.<br><br>AND CROSS COMPLAINT. | CASE NO. BC 701075<br>[Assigned To Hon. Rafael Ongkeko, Dept. 73]<br><br>**VERIFIED RESPONSE OF CROSS-DEFENDANT AMIR JACOBY TO DEMURRER OF DEFENDANTS PCJV USA, LLC, GUY KOREN, NKM CAPITAL GROUP, LLC, J & K AMERICANA, LLC, J& K CULVER, LLC, J&K LAKEWOOD, LLC, J&K OAKRIDGE, LLC, J&K VALLEY FAIR, LLC, J & K CAPITAL 2, LLC, J & K ONTARIO, LLC, J&K PCJV TRUCKS, LLC, J&K CONSULTANTS GROUP, LLC, GK CAPITAL GROUP, LLC, AND POTATO CORNER LA GROUP, LLC TO FIRST AMENDED COMPLAINT OF PLAINTIFFS CINCO CORPORATION AND POTATO CORNER INTERNATIONAL, INC.**<br><br>Hearing Date: November 8, 2018<br>Time: 8:30 a.m.<br>Dept: 73<br><br>Action Filed: April 10, 2018<br>Trial Date: None set |

///

///

///

///

**COPY**

2796-001/761563.docx

1

1       Cross-Defendant AMIR JACOBY, an individual ("Mr. Jacoby") responds to the Demurrer of

2  Cross-Defendants PCJV USA, LLC, GUY KOREN, NKM CAPITAL GROUP, LLC, J & K

3  AMERICANA, LLC, J&K CULVER, LLC, J&K LAKEWOOD, LLC, J&K OAKRIDGE, LLC,

4  J&K VALLEY FAIR, LLC, J & K CAPITAL 2, LLC, J & K ONTARIO, LLC, J&K PCJV

5  TRUCKS, LLC, J&K CONSULTANTS GROUP, LLC, GK CAPITAL GROUP, LLC, AND

6  POTATO CORNER LA GROUP, LLC to the First Amended Complaint of Plaintiffs CINCO

7  CORPORATION AND POTATO CORNER INTERNATIONAL, INC. as follows:

8     1.    Mr. Jacoby objects to Freeman, Freeman & Smiley LLP's representation of

9  Defendants and Cross-Complainants NKM Capital Group, LLC; J&K Americana, LLC; J&K

10  Culver, LLC; J&K Lakewood, LLC; J&K Oakridge, LLC; J&K Valley Fair, LLC; J&K Capital 2,

11  LLC; J&K Ontario, LLC; J&K PC Trucks, LLC; and J&K Consultants Group, LLC (collectively the

12  "J&K Entities"), of Potato Corner LA Group, LLC (the "LA Group"), and of Nominal Defendant

13  PCJV USA, LLC ("PCJV").

14     2.    The J&K Entities and the LA Group are managed by all of their members, including

15  Mr. Jacoby, or by more than one manager, including Mr. Jacoby. The LA Group is a member of

16  PCJV, and Mr. Jacoby is also a member of the LA Group. In a member-managed limited liability

17  company, each member has equal rights in the management and conduct of the limited liability

18  company's activities. (Corp. Code, §§ 17704.07(b)(1), (b)(2).) In a manager-managed limited

19  liability company, each manager has equal rights in the management and conduct of the limited

20  liability company's activities. (Corp. Code, §§ 17704.07(c)(1), (c)(2).) Neither Freeman, Freeman,

21  & Smiley nor Defendant Guy Koren ("Koren") ever asked Mr. Jacoby to consent to Freeman,

22  Freeman & Smiley's representation of the J&K Entities, the LA Group, and PCJV, and Mr. Jacoby

23  does not consent to that representation.

24     3.    Mr. Jacoby also does not waive the conflict of interest arising from Freeman &

25  Smiley, LLP's concurrent representation of the J&K Entities, the LA Group, and PCJV on the one

26  hand and Koren on the other hand, and the conflict of interest is unwaivable in any event. (Cal.

27  Rules Prof. Conduct, rules 3-310, 3-600(A), 3-600(D), 3-600(E).)

28

2796-001/761563.docx                     2

1    4.    Mr. Jacoby does not contend that any person's acquisition of stock in Plaintiff Cinco

2    Corporation, a Philippines corporation ("Cinco") has triggered any right of first refusal by Mr.

3    Jacoby, Defendant Guy Koren, or both of them.

4    5.    Mr. Jacoby does not contend that he, Koren, or both of them have any right, claim, or

5    legitimate basis to demand ownership of or rights to any of Plaintiff Potato Corner International,

6    Inc.'s 60% membership interests in PCJV.

7    6.    Mr. Jacoby does not dispute any of the declaratory relief sought by Cinco in its First

8    Amended Complaint, including any of the judicial declarations sought in Paragraph 115 of its First

9    Amended Complaint.

10

11    Dated: October 26, 2018                LEVINSON ARSHONSKY & KURTZ, LLP

12

13                                By: _____
                                         DAVID KROL
14                                    Attorneys for Cross-Defendants AMIR JACOBY
                                      and INBAL JACOBY

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2796-001/761563.docx                                3

## VERIFICATION

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

    I have read the foregoing **VERIFIED RESPONSE OF CROSS-DEFENDANT AMIR JACOBY TO DEMURRER OF DEFENDANTS PCJV USA, LLC, GUY KOREN, NKM CAPITAL GROUP, LLC, J & K AMERICANA, LLC, J& K CULVER, LLC, J&K LAKEWOOD, LLC, J&K OAKRIDGE, LLC, J&K VALLEY FAIR, LLC, J & K CAPITAL 2, LLC, J & K ONTARIO, LLC, J&K PCJV TRUCKS, LLC, J&K CONSULTANTS GROUP, LLC, GK CAPITAL GROUP, LLC, AND POTATO CORNER LA GROUP, LLC TO FIRST AMENDED COMPLAINT OF PLAINTIFFS CINCO CORPORATION AND POTATO CORNER INTERNATIONAL, INC.** and know its contents.

    _X_  I am a party to this action. The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

    ____ I am _____ an officer ____ a partner _____ a _____ of _____ _____, and am authorized to make this verification for and on its behalf, and I make this verification for that reason. ____ I am informed and believe and on that ground allege that the matters stated in the foregoing document are true. ____ The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters, I believe them to be true.

    ____ I am one of the attorneys for _____, a party to this action. Such party is absent from the county of aforesaid where such attorneys have their offices, and I make this verification for and on behalf of that party for that reason. I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.

    Executed on October 23, 2018 at Sherman oaks , CA .

    I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

| AMIR JACOBY | |
| --- | --- |
| Type or Print Name | Signature |

LEVINSON ARSHONSKY & KURTZ, LLP

1

## PROOF OF SERVICE
1013a(3) CCP

2

3    STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

4        I am employed in the County of Los Angeles, State of California. I am over the age of eighteen years and not a party to the within action; my business address is 15303 Ventura

5    Boulevard, Suite 1650, Sherman Oaks, California 91403.

6        On the date below, I served the foregoing document(s), described as **VERIFIED RESPONSE OF CROSS-DEFENDANT AMIR JACOBY TO DEMURRER OF**

7    **DEFENDANTS PCJV USA, LLC, GUY KOREN, NKM CAPITAL GROUP, LLC, J & K AMERICANA, LLC, J& K CULVER, LLC, J&K LAKEWOOD, LLC, J&K OAKRIDGE,**

8    **LLC, J&K VALLEY FAIR, LLC, J & K CAPITAL 2, LLC, J & K ONTARIO, LLC, J&K PCJV TRUCKS, LLC, J&K CONSULTANTS GROUP, LLC, GK CAPITAL GROUP, LLC,**

9    **AND POTATO CORNER LA GROUP, LLC TO FIRST AMENDED COMPLAINT OF PLAINTIFFS CINCO CORPORATION AND POTATO CORNER INTERNATIONAL, INC.**

10   on each of the interested parties in this action by placing ☐ the original ☒ a true copy thereof enclosed in sealed envelopes addressed as follows (or as addressed on the attached mailing list):

11   Michael D. Murphy, Esq.         **Attorneys for Plaintiff**
     Ervin Cohen & Jessup LLP      **CINCO CORPORATION**
12   9401 Wilshire Blvd., 9ᵗʰ Fl.     Tel: (310) 281-6336
     Beverly Hills, CA  90212-2974   Fax: (310) 887-6838
13                           Email: mmurphy@ecjlaw.com

14   Todd M. Lander, Esq.           **Attorneys for Defendant and**
     Arash Beral, Esq.               **Cross-Complainant GUY KOREN**
15   FREEMAN, FREEMAN & SMILEY, LLP  Tel: (310) 255-6100
     1888 Century Park East, Suite 1900   Fax: (310) 255-6200
16   Los Angeles, CA 90067         Emails: Todd.Lander@ffslaw.com
                             Arash.Beral@ffslaw.com
17

18   ☐  **(BY MAIL)** By placing the envelope for collection and mailing following our ordinary business practices. I am readily familiar with firm's practice of collection and processing
19       correspondence for mailing. Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid.

20   ☒  **(BY OVERNIGHT MAIL)** I enclosed the document in an envelope or package provided by an overnight delivery carrier and addressed to the person(s) set forth above (or on the attached
21       service list). I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery courier.
22

23   ☐  **BY EMAIL:** I caused the documents to be sent to the persons at the electronic notification addresses listed above. I did not receive, within a reasonable time after the transmission, any
24       electronic message or other indication that the transmission was unsuccessful.

25       I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

26       Executed on October 26, 2018, at Sherman Oaks, California.

27

28   STACIA MCFADDEN                           
                                       *Signature*

LEVINSON ARSHONSKY & KURTZ, LLP

2796-001/762340.docx

1    <u>**PROOF OF SERVICE**</u>

2    **STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

3    At the time of service, I was over 18 years of age and **not a party to this action**. I am
employed in the County of Los Angeles, State of California. My business address is 1888 Century
4    Park East, Suite 1500, Los Angeles, California 90067.

5    On August 17, 2020, I served true copies of the following document(s) described as
**COMPENDIUM OF EVIDENCE IN SUPPORT OF DEFENDANTS AND CROSS-
6    COMPLAINANTS GUY KOREN AND POTATO CORNER LA GROUP, LLC'S JOINT
MOTION FOR SUMMARY ADJUDICATION** on the interested parties in this action as
7    follows:

8    **SEE ATTACHED SERVICE LIST**

9

10    **BY ELECTRONIC TRANSMISSION:** Pursuant to the Court's Order Authorizing
Electronic Service, signed June 18, 2020, I caused a true and correct copy to be electronically
served by transmission to CASE ANYWHERE.

11

12    I declare under penalty of perjury under the laws of the State of California that the
foregoing is true and correct.

13    Executed on August 17, 2020, at Los Angeles, California.

14

15    _Maria Villagran_
_____
16    Maria Villagran

17

18

19

20

21

22

23

24

25

26

27

28

4632901.1

*Left margin:* FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

# Electronic Service List

Case:                              **Cinco Corporation, et al. v. Guy Koren, et al.**

Case Info:                         BC701075, Los Angeles Superior Court

**DLA Piper LLP**                                          *Representing:* Ben Olivas
Charles Deem, Esq. (charles.deem@us.dlapiper.com)
401 B Street, Suite 1700
San Diego, CA 92101
Phone: (619) 699-2700
Fax: (619) 699-2701

**Ervin Cohen & Jessup, LLP**                             *Representing:* Cinco Corporation
Siobahn Amin, Esq. (samin@ecjlaw.com)                                    Potato Corner International, Inc.
Michael Murphy, Esq. (mmurphy@ecjlaw.com)
Banu Naraghi, Esq. (bnaraghi@ecjlaw.com)
9401 Wilshire Boulevard, 9th Floor
Beverly Hills, CA 90212
Phone: (310) 273-6333
Fax: (310) 859-2325

**Freeman Freeman & Smiley, LLP**                         *Representing:* Ashley Grundnowski
Arash Beral, Esq. (arash.beral@ffslaw.com)                              GK Capital Group, LLC
John Stanley, Esq. (john.stanley@ffslaw.com)                            Guy Koren
1888 Century Park East, Suite 1500                                      Thomas Hodgson
Los Angeles, CA 90067
Phone: (310) 255-6100
Fax: (310) 255-6200

**Klinedinst PC**                                         *Representing:* Ben Olivas
Heather Rosing, Esq. (hrosing@klinedinstlaw.com)
Robert Shaughnessy, Esq. (rshaughnessy@klinedinstlaw.com)
Amara Turzak, Esq. (aturzak@klinedinstlaw.com)
501 West Broadway, Suite 600
San Diego, CA 92101
Phone: (619) 239-8131
Fax: (619) 238-8707

**Levinson, Arshonsky, Kurtz, LLP**                       *Representing:* Amir Jacoby
James Cooper, Esq. (jcooper@laklawyers.com)                             Inbal Jacoby
15303 Ventura Boulevard, Suite 1650
Sherman Oaks, CA 91403
Phone: (818) 382-3434
Fax: (818) 382-3433

**Thompson Coe & O'Meara, L.L.P.**                        *Representing:* PCI Trading, LLC
Stephen Caine, Esq. (scaine@thompsoncoe.com)                            PCJV USA, LLC
Frances O'Meara, Esq. (fomeara@thompsoncoe.com)
David Ramirez, Esq. (dramirez@thompsoncoe.com)
12100 Wilshire Boulevard, Suite 1200
Los Angeles, CA 90025
Phone: (310) 954-2400
Fax: (310) 954-2345

**Valle Makoff, LLP**                                     *Representing:* Alon Koren
John Moscarino, Esq. (jmoscarino@vallemakoff.com)                       Emily Garcia
11777 San Vicente Boulevard, Suite 890
Los Angeles, CA 90049
Phone: (310) 476-0300
Fax: (310) 476-0333

**Vedder Price (CA), LLP**                                *Representing:* J & K Americana LLC
Deborah Hedley, Esq. (dhedley@vedderprice.com)                          J & K Capital 2 LLC
Eric McDonough, Esq. (emcdonough@vedderprice.com)                       J & K Culver LLC
1925 Century Park East, Suite 1900                                      J & K Ontario LLC
Los Angeles, CA 90067                                                   J&K Consultants Group LLC
Phone: (424) 204-7700                                                   J&K Lakewood LLC
Fax: (424) 204-7702                                                     J&K Oakridge LLC

J&K PC Trucks LLC
J&K Valley Fair LLC
NKM Capital Group LLC
Potato Corner LA Group LLC