1  MICHAEL D. MURPHY (SBN 224678)
   mdmurphy@foxrothschild.com
2  MATTHEW FOLLETT (SBN 325481)
   mfollett@foxrothschild.com
3  MEEGHAN TIRTASAPUTRA (SBN 325572 )
   mtirtasaputra@foxrothschild.com
4  JESSICA NWASIKR (SBN 343087)
   jnwasike@foxrothschild.com
5  FOX ROTHSCHILD LLP
   Constellation Place
6  10250 Constellation Boulevard, Suite 900
   Los Angeles, California 90067
7  Telephone:  310.598.4150
   Facsimile:   310.556.9828
8
   Attorneys for Plaintiff and Counterclaim
9  Defendant SHAKEY'S PIZZA ASIA
   VENTURES, INC. and Third Party Defendants
10 CINCO CORPORATION, PC
   INTERNATIONAL PTE LTD., and SPAVI
11 INTERNATIONAL USA, INC.

12              **UNITED STATES DISTRICT COURT**

13              **CENTRAL DISTRICT OF CALIFORNIA**

14

15 SHAKEY'S PIZZA ASIA VENTURES,       Case No. 2:24-CV-04546-SB(AGRx)
   INC, a Philippines corporation,
16                                       *The Hon. Stanley Blumenfeld, Jr.*
                 Plaintiff,
17                                       **JOINT STATEMENT
          v.                             REGARDING FURTHER
18                                       CLARIFICATION OF CLAIMS IN
   PCJV USA, LLC, a Delaware limited    RESPONSE TO DKT. NO. 294**
19 liability company; PCI TRADING,
   LLC, a Delaware limited liability
20 company; GUY KOREN, an individual;   Complaint Filed:   May 31, 2024
   POTATO CORNER LA GROUP, LLC,         Trial Date:        September 12, 2025
21 a California limited liability company;
   NKM CAPITAL GROUP, LLC, a
22 California limited liability company;
   J & K AMERICANA, LLC, a California
23 limited liability company; J&K
   LAKEWOOD, LLC, a California
24 limited liability company; J&K
   VALLEY FAIR, LLC, a California
25 limited liability company; J & K
   ONTARIO, LLC, a California limited
26 liability company; HLK MILPITAS,
   LLC, a California, limited liability
27 company; GK CERRITOS, LLC, a
   California, limited liability company;
28 J&K PC TRUCKS, LLC, a California

                              1

1    limited liability company; and, GK
CAPITAL GROUP, LLC, a California
2    limited liability company and DOES 1
through 100, inclusive,

3

                Defendants.

4

5    PCJV USA, LLC, a Delaware limited
liability company; PCI TRADING LLC,
6    a Delaware limited liability company;
POTATO CORNER LA GROUP LLC,
7    a California limited liability company;
GK CAPITAL GROUP, LLC, a
8    California limited liability company;
NKM CAPITAL GROUP LLC, a
9    California limited liability company; and
GUY KOREN, an individual,

10

                Counter-Claimants,

11

     v.

12

SHAKEY'S PIZZA ASIA VENTURES,
13    INC, a Philippines corporation,

14

                Counter Defendant.

15

16    PCJV USA, LLC, a Delaware limited
liability company; PCI TRADING LLC,
17    a Delaware liability company;
POTATO CORNER LA GROUP LLC,
18    a California limited liability company;
GK CAPITAL GROUP, LLC, a
19    California limited liability company;
NKM CAPITAL GROUP LLC, a
20    California limited liability company; and
GUY KOREN, an individual,

21

                Third Party Plaintiffs,

22

     v.

23

PC INTERNATIONAL PTE LTD., a
24    Singapore business entity; SPAVI
INTERNATIONAL USA, INC., a
25    California corporation; CINCO
CORPORATION, a Philippines
26    corporation; and DOES 1 through 10,
inclusive,

27

                Third Party Defendants.

28

JOINT STATEMENT REGARDING FURTHER CLARIFICATION OF CLAIMS IN RESPONSE TO DKT. NO. 294

The Parties, after having met-and-conferred, jointly file this *Statement Regarding Further Clarification of Claims In Response to Dkt. No. 294* pursuant to the Court's order on September 5, 2025. Dkt. No. 294.

## I.    PLAINTIFFS' FURTHER CLARIFICATION OF THEIR CLAIMS.

Pursuant to the Court's Order at Dkt. No. 294, Plaintiff respectfully submits the following statement in response to the Court's order on September 5, 2025. Dkt. No. 294.

In the first two bullet points of this Court's Order from September 5,2025 (Dkt. 294, pp.2-3), various questions are asked about the overlapping nature of certain of Plaintiffs' claims, whether certain claims are duplicative, and specifics as to which claim is being alleged by Plaintiff against whom. Plaintiff hopes that the following not only answers those questions, but also to confirm that this Court's request for narrowing of the disputes has not fallen on deaf ears.

At the outset, this case was and remains about a holdover licensee (PCJV USA, LLC) that refused to accept that its license had been terminated on May 31, 2024. Instead, PCJV (operated and owned by named Defendants Guy Koren, GK Capital, LLC; Potato Corner LA Group, LLC) and its "company owned" stores comprising the remaining Defendants), continued to sell the French fries prepared with the distinctive and proprietary Potato Corner seasonings, all of which was emblazoned with, and sold under the banner of the three primary marks in the Potato Corner portfolio: the logo mark, the word mark, and the slogan mark primary marks  "house mark."

As such, the use by PCJV (at the direction of its managers and officers) of the house marks, continuously, from termination on May 31, 2024 to the present, was the primary window within which Plaintiffs intended to, and will continue to seek a monetary recovery (disgorgement) as well as, upon a finding of willfulness, trebling of damages, and attorneys' fees. 15 U.S.C 1117(a)-(b). It is this core injury

1    that will also serve as the basis for the permanent injunction to be sought

2    subsequent to trial.

3        What Plaintriff did not expect were two events, each of which has shaped its

4    case ever since.

5        First, Plaintriff did not anticipate that Defendants would jettison their decade

6    long contractual assertions and public pronouncement that the seasonings are

7    indeed a trade secret, so as to give PCJV "cover" to compete against Potato Corner

8    using stolen information regarding the makeup of the seasonings. The fact that

9    Koren transferred the packages containing the proprietary trade secret seasonings to

10    a third party, when his license had terminated, is itself the wrongful act of

11    misappropriation. He should have relinquished access to the flavorings, and, most

12    certainly should not have used those flavorings to facilitate the development of his

13    new brand. The fruits of that misappropriation are the new flavorings used by

14    Undercover Fries (which advertises itself with the slogan "same flavor, new look."

15    **This Court asks how each of the other Defendants (besides Koren**

16    **himself) are liable for misappropriation**.  The answer is found in the California

17    Uniform Trade Secrets Act itself at Cal. Civ. Code § 3426.1(b), which defines

18    "misappropriation" to mean, acquisition, "disclosure or use" of a trade secret by

19    anyone who had reason to know of its improper acquisition. This implicates each of

20    the Defendants in different ways.

21      • Defendants Koren and PCJV, as well as the entities that operate PCJV

22        from a corporate governance standpoint (Potato Corner LA Group LLC

23        and GK Capital – the members of PCJV) are the acquirers. It was Koren,

24        on behalf of PCJV that obtained the packages, retained them without a

25        license, and gave them to a third party for reverse engineering.

26      • PCI Trading, LLC, is a discloser, as it is the supply chain arm that feeds

27        supplies to each of the stores. It is PCI Trading that receives the new

28        seasonings created as a result of reverse engineering. As Koren owns

4

1    PCIT, and operates it, that knowledge is imputed to the corporate entity.

2    • Each of the other Defendants own stores that have used the seasonings

3      sold by PCI Trading, and developed through use of misappropriation. In

4      doing so, each is a "user," also liable under the CUTSA.

5    When Plaintiff included the trade secret misappropriation claim in its

6    Amended Complaint, the full effect of the reverse engineering had not yet been

7    revealed. By filing suit, immediately, Plaintiff's diligence was coupled with an

8    awareness that things may change with respect to this claim, as the seasonings had

9    not yet penetrated the market.

10    The second event that Plaintriff did not expect was the decision by

11    Defendants to disregard this Court's lengthy analysis of the factual and legal

12    defects in their defenses and claims. Plaintiff reasonably assumed that the analysis

13    and rulings would be taken to heart, and realized that the liability as to trademark

14    infringement will remain likely, unless they can uncover a new theory or new fact

15    that answers this Court's analysis. It is this reason that Plaintiff – having already

16    provided the proof it needs for its claim, focused less on discovery (as this was now

17    just a damages case) and wait for Defendants' initial disclosures which were going

18    to include the financial statements needed for damages. Instead, Plaintiff focused on

19    enforcement of the injunction, which proved to be an extensive, and consuming

20    endeavor. The injunction is particularly important to Plaintiff given that it is in the

21    process of developing the groundwork and foundation for its own proliferation and

22    marketing of the Potato Corner brand, and the insistence by Koren of offering

23    PCJV as the same brand, is toxic for Plaintiff's efforts.

24    Nevertheless, Defendants, in addition to refusing to listen to this Court's

25    analysis and adapt their case to it, simply ignored it. Their Counterclaims against

26    Plaintiff (and Third Party Claims against Cinco) depend upon and assume, this

27    Court (and the Ninth Circuit) were wrong on the law and facts. The claims are

28    nonsensical, and absurd, and exist only in a fact free world. Defendants take

positions contrary to the Lanham Act, and repeatedly ignored Plaintiff pointing out the absence of probable cause behind each of them. Of course, this was filed less than 30 days before the close of discovery. Nevertheless, given that the Court is inclined to limit, severely, the scope of the trial before the jury, each of the Plaintiff and Third Party Defendants are confident they have what they need to prosecute their claims and defenses.[1]

It is only now as the dust has settled from the having developed the competitor "Undercover Fries" while operating as a Potato Corner, and using Potato Corner's proprietary and trade secret information to build that brand, Plaintiff is now electing to proceed in the following way:

**First, Plaintiff has elected to forgo, and dismiss, without prejudice, its claim for trade secret misappropriation arising from the packages of seasonings that were reverse engineered**. Although the act of repudiation of trade secrecy and theft of the trade secrets, will play a prominent role (as discussed below), the damages unique to the trade secret theft, and not attributable otherwise to the trademark infringement is not large enough to warrant the downsides this Court has pointed out.

Second, Plaintiff instead will pursue the trademark infringement, and separately, the false designation of origin claims. The former must focus solely on the registered trademark (the primary marks in the Potato Corner portfolio), whereas the latter, false designation, can include any registered or unregistered mark (even one that is not protectable), and can include items that are not

---

[1] Plaintiff understands this Court's critique, however, with finite resources and money, the focus on trying to force compliance while making sure that the body of evidence already in Plaintiff's hand was sufficient to prosecute its claim and defenses (it was and is), was the proper way to spend its money on legal fees. Just because Defendants continued to defend a case that they are doomed to lose (a damages case), does not mean Plaintiff must move heaven and earth to further prove their already proven claim. Moreover, given the avalanche of absurd ex partes and motions and applications to the Supreme Court, and fatally flawed discovery motions, was also costing Plaintiff substantial amounts in fees. In a world of unlimited resources, it would also have engaged in a full throated discovery to buttress the evidence it already has.

protectible under the Lanham Act such as procedures, processes, or, even proprietary information and trade secrets. There is precedence for this claim, and this distinction, as false designation of origin -distinct from trade dress and trademark infringement – "is clearly actionable under § 1125(a)." *Int'l Ord. of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912, 916, n. 5 (9th Cir. 1980); *see also JUUL Labs, Inc. v. Chou*, 557 F. Supp. 3d 1041, 1053–54 (C.D. Cal. 2021) (setting forth a clean distinction between infringement and trademark infringement).

This Court's implied request to dismiss the false designation theory is well taken, but Plaintiff cannot agree for one specific reason: the Defendants' affirmative defenses and counterclaims. Specifically, Defendants have alleged outlandish affirmative defenses that the registrations are invalid, and the trademarks abandoned. Although Plaintriff is confident it will prevail over Defendants' nearly impossible task of proving by clear and convincing evidence that naked licensing occurred, or an assignment in gross,, however, in the off chance that the jury goes sideways on those issues, false designation can still remain a theory of liability if a claim that requires registered trademarks goes down.[2]  Such a false designation theory will place, prominently, the act of reverse engineering, the lack of authority, the secrecy and clandestine nature of the adventure, and the use of those flavors to claim to be Potato Corner. This is the most appropriate place to present the jury with that aspect of the fact pattern – although  it was indeed the theft of a trade secret,

**Finally, this Court has asked Plaintiff to specify which of the Defendants is also to be held liable for contributory or inducement of trade infringement**. To answer this Court's questions, it recites each question verbatim.

**Court: "Plaintiff shall clarify whether it wishes to pursue its inducement**

---

[2] Plaintiff is curious about the abandonment theories proffered by Defendants, given that, if abandonment is found no one can claim ownership of the marks; no one can use them without fear of infringers. Perhaps the thought is if Koren and PCJV cannot have Potato Corner, no one should.

1   **and contributory infringement theories at trial.**"

2      **Plaintiff's Answer**: yes as to both.

3      **Court: "If so, Plaintiff shall identify (1) for purposes of its "inducing**

4   **infringement" instruction, which defendant is alleged to be the direct infringer**

5   **and which defendant(s) is alleged to have to have induced the direct infringer**

6   **to commit infringement**."

7      **Plaintiff's Answer**:

8        1.   <u>Direct Infringers (the stores)</u>: NKM Capital Group, LLC (owns

9           Santa Anita stores); J&K Americana, LLC (owns Americana

10           store); J&K Lakewood, LLC (owns a store in Lakewood); J&K

11           Valley Fair, LLC; J & K Ontario, LLC (owns a store in

12           Ontario); HLK Milpitas, LLC (owns a store in Milpitas); GK

13           Cerritos, LLC (owns a store in Cerritos); and J&K PC Trucks,

14           LLC, (owns the mobile food truck operation).

15        2.   <u>Inducers</u>: PCJV and its owners, managers, and operators which

16           are PCJV, Potato Corner LA Group LLC and GK Capital, LLC

17        3.   <u>Note</u>:  As shown above, PCJV is both an inducer and an

18           infringer as it has stores of its own, and also induced its

19           sublicensees (the other Defendants) to engage in direct

20           infringement.

21        4.   <u>Note</u>: Guy Koren is an inducer, but also the theories applicable

22           to managers and CEOs of infringers will also apply.

23      **Court: "If so, Plaintiff shall identify (2) for purposes of its "contributory**

24   **infringement" instruction, which defendant is alleged to be the direct infringer**

25   **and which defendant(s) is alleged to have sold goods or services to the direct**

26   **infringer**."

27        1.   Direct Infringers (the stores): NKM Capital Group, LLC (owns

28           Santa Anita stores); J&K Americana, LLC (owns Americana

8

store); J&K Lakewood, LLC (owns a store in Lakewood); J&K
Valley Fair, LLC; J & K Ontario, LLC (owns a store in
Ontario); HLK Milpitas, LLC (owns a store in Milpitas); GK
Cerritos, LLC (owns a store in Cerritos); and J&K PC Trucks,
LLC, (owns the mobile food truck operation).

2.    <u>Contributors</u>: PCI Trading, LLC (the supply chain affiliate
selling supplies to the infringers) and PCJV (selling franchise
services in exchange for royalties and fees)

## II.    DEFENDANTS' FURTHER CLARIFICATION OF THEIR CLAIMS.

Pursuant to the Court's Order at Dkt. No. 294, Defendants respectfully
submit the following report identifying their narrowed and focused claims.
Defendants also look forward to conferring with the Court regarding an efficient
path to bringing this matter to trial.

## <u>COUNTERCLAIM 8 – BREACH OF CONTRACT AGAINST CINCO/SPAVI</u>

Defendants respectfully submit that the parties' written agreements provide
the logical starting point for Defendants' portion of this report. Accordingly, the
breaches of contract are addressed first and are set forth in two logically coherent
sections.

## <u>Section 1: Breach of Vested, Property Right to Exclusively Possess, Use, Control, and Restrict the Transfer of the IP in the United States and Israel Under the LLC/JV Agreements</u>

Initially, Defendants believe that it is essential that the Court—and, if/when
so instructed, the Jury—understand that the IP was the foundational asset on which
the joint venture partnership was formed. The foundational written agreements—
the Joint Venture Agreement (governing the overarching joint venture) and the LLC
Agreement (governing the LLC)—document, in part, a pre-existing joint venture

partnership that was "forged" between the two partnership groups following an

unlawful licensor-licensee relationship that never formed.

The foundational written agreements, the LLC Agreement at 4.17 and the

JVA at 3)g), included binding directives to the "Company" to "agree" to the terms

already negotiated by the joint venture partners. Those provisions focus on and the

burden of action (to "agree") rested solely on the "Company"—not Cinco—and

was not conditioned on any further action by Cinco whatsoever. The use of "shall"

and "agrees" evidences a present and binding obligation on the Company's part.

The Company's mere agreement (a legal fiction it must carry—and did carry) is the

operative trigger. There is no language indicating that Cinco's agreement is pending

or subject to further negotiation, or that execution by any party is required. The

documents do not say, for example, "subject to Cinco's approval" or "upon mutual

agreement" or "conditioned on execution." Instead, Cinco's agreement is pre-

existing, presumed, and among the negotiated rights and obligations of the parties.

When measured against the evidence of the timeline of events and the

parties' negotiations to restructure their relationship into a joint venture partnership,

including the actual drafts exchanged, and the parties' performance before any joint

venture or LLC document was ever signed, it is readily apparent that Cinco already

had discharged its duty to contribute its IP to the joint venture partnership (which it

labeled a "master license"), in exchange for which it was to receive (and did

receive) a majority 60% interest in the "Company" once formed, among other

things. Plaintiff's theory that these provisions are merely "agreements to agree" is

refuted by the plain language of the provisions themselves, the four corners of the

agreements, all the evidence surrounding the contracts, the parties' actual

performance, and the parties' under oath statements. There is not a single item in

the record corroborating Plaintiff's theory; every piece of evidence supports Defendants' interpretation (the truth).[3]

The starting point for this claim is the LLC Agreement at 4.17-4.18 and the JVA at 3)g)-3)h) which collectively evidence the parties' agreement to share *equally* at all times in the economic benefits flowing from the IP (each group to receive an equal share of "initial/franchise fees" and "continuing royalty fees" paid to the "Company"). *See* Trial Exh. 1010 at 1.1.2-1.1.3; Trial Exhs. 62, 1050. That co-equal IP economic-sharing agreement is a direct biproduct of a "grant" of a "master license to use" the IP in the United States and Israel in exchange for which Cinco Group received the majority 60% interest in the Company to be formed (and 4 of 7 manager votes). *See, e.g.,* Trial Exh. 1010 at 2.4; *see also* LLC Agreement at 4.3.1, JVA at 3)a). These provisions must be construed together alongside the other companion written provisions and authorizations which, among other things:

    A. authorize and require the Company to establish, operate, manage, license and franchise "Potato Corner" stores/outlets (JVA at 1)a));

    B. acknowledge rights and obligations "granted" and "vested" to each group (LLC Agreement at 3.1);

    C. bestow on the Company's President and the LA Group the right and responsibility to control the IP (LLC Agreement at 4.11.7; JVA at 3)i); MSA at 1 of "Services");

    D. restrict assignments of any right or obligation without prior written consent (LLC Agreement at 3.3 ["prior written consent" required to assign rights or obligations in the LLC]; JVA at 2)d) [same as to the

---

[3] Contract interpretation is a judicial function using rules of construction (including discerning the mutual intent of the parties, considering the whole contracts, the parties' actual performance, interpreting ambiguities against the drafter, and applying a lawful, operative, definite, and reasonable interpretation of the contracts rather than an interpretation that results in forfeiture). Defendants respectfully submit that the Court's interpretation of the contracts may go a long way towards eliminating issues at trial.

joint venture], MSA at 4 of "General Provisions"), coupled with *mutual* rights of first refusal [*id.*];

E.  make the granted and vested rights and obligations of indefinite duration—binding the parties to each other (as partners and fiduciaries) absent mutual agreement or 75% vote to dissolve the LLC and 75% vote to terminate the joint venture (LLC Agreement at 2.7, 3.7, 9.1; JVA at 4)a); MSA at 1 of "Duration of Agreement" [requiring mutual agreement to terminate or uncured breach]),[4] which further mutual agreement or 75% vote to terminate the joint venture partnership and 75% vote to dissolve the LLC would expressly trigger the "trailing IP rights" provisions, further evidencing the Company's vested and non-terminable right to use and the President's and LA Group's right and responsibility to control the IP (LLC Agreement at 9.2.1; JVA at 4)b)i));

F.  require the parties to use best efforts to cooperate in the success of the Company and to perform any further acts as necessary to implement the intent of the parties (JVA at 5)b));

G.  authorize PCJV to enter long-term, minimum 10-year franchise agreements with franchisees, under which agreements (originally drafted by Cinco) each franchisee is required to "acknowledge and agree that [the franchisee's] use of the Marks and any goodwill established by that use are exclusively for our [PCJV's] benefit …" *See, e.g.,* Trial Exh. 1034 (2010 approved model Franchise Agreement, beginning at PDF p. 51 of 123, at Section 5 "Marks"); *see also, e.g.,*

---

[4] It is noteworthy that when the parties left something up for "mutual agreement," they explicitly said so. Nowhere in the "licensing provisions" in the LLC Agreement at 4.17 or the JVA at 3)g) did they require "mutual agreement." Nor was further agreement required, as the parties already had agreed upon all material terms, including provisions regarding payment, term, and vesting the rights and responsibility to control the IP in the Company's President and the LA Group.

JOINT STATEMENT REGARDING FURTHER CLARIFICATION OF CLAIMS IN RESPONSE TO DKT. NO. 294

executed Franchise Agreement by MAF Capital Group TX, LLC at 17.7 (Trial Exh. 1233) ("Franchisee acknowledges and agrees that the rights to the Potato Corner Marks and the use of the Potato Corner Marks shall be and remain the property of Franchisor"); and

H. Authorize the President and LA Group to reverse engineer seasonings ("We also agreed that PCJV USA will start working with Newly Weds spice company for the sourcing of the seasonings from their US plants and the LA Group with negotiate on PCJVs behalf") – Trial Exh. 1064.

Taken together, these provisions and authorizations (of which there are many more) objectively establish that PCJV possessed all the hallmarks of a non-terminable, non-transferable property right in the IP (e.g., possession, use, control).

By purportedly assigning or transferring (without authority or prior written consent or a 75% vote) all or any portion of PCJV's vested, property right to exclusively possess, use, control, and restrict the transfer of the IP in the United States and Israel, and in failing to honor those rights, the purported assignment or transfer (whether or not invalid) constitutes a breach by Cinco (and SPAVI as its successor[5]) of the LLC Agreement at 2.7, 3.1, 3.3, 3.7, 4.11.7, 4.17, 9.1, and 9.2.1 and the JVA (including its First Amendment) at 1)a), 2)d), 3)g), 3)i), 4)a), 4)b)i), and 5)b), collectively.[6]

PCJV USA, LLC, PCI Trading LLC, Potato Corner LA Group LLC, GK Capital Group, LLC, NKM Capital Group LLC, and Guy Koren (collectively, the "PCJV Plaintiffs") are suing Cinco and SPAVI for breach of the LLC agreement

---

[5] LLC Agreement at 12.8 binds successors and assigns.

[6] Each subject matter encompassed by the foregoing provisions also constitutes a distinct and independent breach of contract under the specific clauses identified above. Moreover, separate and apart from those breaches, the 50-year License Agreement prepared, memorialized in the FDDs, and attested under penalty of perjury by Cinco has likewise been breached.

and JVA (including its First Amendment) as set forth above. The PCJV Plaintiffs have standing to bring the claim either as signatories, successors, owners, or beneficiaries of the agreements. Should the Court, in consultation with SPAVI/Cinco, determine that it is both prudent and efficient to do so, Defendants consent to consolidating the claims under a single party, PCJV, provided that the Jury is instructed that all claims have been assigned to, and will be prosecuted by, PCJV solely as a procedural efficiency measure.[7]

## Section 2: Breach of SRA/MIPA

Both the SRA and MIPA—Trial Exh. 1172—are binding on successors and assigns. SRA at 12, MIPA at 8.06. Therefore, like the claims above, and whether by virtue of contractual or legal successorship,[8] these claims are asserted against Cinco and SPAVI. Likewise, the same proposal made above regarding consolidating and bringing the claims under a single party, PCJV, apply here as well, and to each claim that follows.

As follows below, there are two distinct subject matter breaches of the SRA/MIPA. First, by virtue of Cinco's and SPAVI's failure to honor releases and waivers, they breached the SRA at 4.1 and 5 (read in context with Recital E). Second, by virtue of Cinco's and SPAVI's failure to honor PCJV/PCI Trading's 100% ownership rights, interests, and control of the IP, they breached the MIPA at 1.01, 3.02, 3.03 (which must be read in context with SRA Recitals G and H).

Breach of SRA at 4.1, 5 (Read in Conjunction with SRA Recital E)

---

[7] On a meet and confer video conference call on September 9, 2025, Defendants' counsel offered this proposal as to all claims asserted by Defendants. Plaintiff's counsel is considering the proposal.

[8] The issue of whether SPAVI is a successor-in-interest to Cinco either by virtue of law or contract coinciding with SPAVI's disavowal of stepping into Cinco's shoes and inheriting contractual and fiduciary duties (estoppel), also appears to present a complex set of legal issues, which may be ripe for the Court's consideration following further briefing.

Recital E of the SRA identified "licensing" and "control" among the disputes involved in the "Main Action." At 4.1, each of the 21 "Cinco Parties" (inclusive of their assigns and successors, as well as named parties owned, employed, or affiliated with SPAVI, also including their assigns and successors) released all the "Koren Releasees" of all claims, known or unknown, "related to or arising from matters that were raised or that could have been raised in the Main Action" (which undisputedly, per the SRA, involved "licensing") and at 5, they waived the provisions of California Civil Code Section 1542. By refusing to honor those broad releases and waivers, Cinco (by assisting SPAVI) and SPAVI (by purportedly "terminating") breached those provisions.[9]

<u>Breach of MIPA at 1.01, 3.02, 3.03 (Read in Conjunction with SRA Recitals G-H)</u>

At SRA Recital G, Cinco represented that SPAVI did not acquire any "ownership rights" in "PC International, Cinco, nor PCJV or PCI Trading." At SRA Recital H, the parties acknowledged that the MIPA constitutes a "complete withdrawal by the Cinco Parties from any ownership or other interest in PCJV, PCI Trading, or any other Koren Party." Attendant to those representations, and among other things, the MIPA:

1. At 1.01, memorializes a sale of all "Interests" and "rights attached to the Interests" free and clear of any "Encumbrance" including any equitable interest, restriction of any kind, restriction on use, or exercise of any other "ownership attribute."

2. At 3.02, solemnly confirms that the transaction will not require the consent or license of a third party or violate or conflict with, or create in any party the right to terminate a license, joint venture, or any other arrangement, whether written or oral, or result in an "Encumbrance" (as defined in 1.01).

---

[9] The only carve-out for Cinco from the broad general release and waiver was a narrow and limited declaratory relief claim by Cinco.

3.  At 3.03, further represents and warrants that the Interests are free and clear of all Encumbrances and are not subject to any agreement, understandings, or other collaborative arrangements or understanding with any other party.

By refusing to honor these provisions confirming that PCJV owns 100% of all rights, interests, and control of the IP without an "Encumbrance," Cinco (by assisting SPAVI) and SPAVI (by purportedly "terminating" rights in the IP) breached those provisions.

## COUNTERCLAIM 9 – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST CINCO/SPAVI

The next claim to address in logical sequence following the breach of contract claim is the breach of the implied covenant of good faith and fair dealing. This claim is simple: to the extent the Court does not interpret the express provisions of the written agreements the way the PCJV Plaintiffs interpret them, then the implied covenant of good faith and fair dealing serves as a backstop by preventing parties from undermining the core purposes underlying those contracts and protecting the PCJV Plaintiffs' right to receive the "fruits of the bargain" they made.

The implied covenant: (a) prohibits Cinco and SPAVI from taking unfair advantage of any potential oversights or acting in a manner that was contrary to the original intent of the deal; (b) ensures that when a contract gives one party broad discretionary power (such as, if required, to execute a license agreement), that power must be exercised reasonably and in good faith, not arbitrarily or capriciously; (c) when a contract is silent on a particular issue, provides a legal basis for courts to fill in the gaps to ensure that the parties' reasonable expectations

are met; (d) prevents any party from exploiting ambiguities for unfair gain; and (e) prevents any party from effectuating a forfeiture of rights or consideration.[10]

## COUNTERCLAIMS 2, 3, 4 AND 5 – INDUCING BREACH/INTERFERENCE CLAIMS AGAINST SPAVI

In Defendants' view, the next logical claims in sequence are the inducing breach and interference claims. All of these claims stem from SPAVI's alleged acquisition of superior IP rights. First, SPAVI induced Cinco's or PCJV's breach of and intentionally interfered with each of the contracts and their associated provisions identified in the breach of contract section above: LLC Agreement at 2.7, 3.1, 3.3, 3.7, 4.11.7, 4.17, 4.18, 9.1, and 9.2.1; JVA (including its First Amendment) at 1)a), 2)d), 3)g), 3)h), 3)i), 4)a), 4)b)i), and 5)b); MSA at 1 of "Services," at 4 of "General Provisions," and at 1 of "Duration of Agreement;" SRA at 4.1, 5; MIPA at 1.01, 3.02, 3.03; and the 50-year "License Agreement" as memorialized in PCJV's FDDs. (Counterclaims 2 and 3.)

Second, SPAVI induced breaches of and intentionally interfered with PCJV's franchise agreements with PCJV's third party franchisees (approximately 19 of them who now claim to be doing business with SPAVI). Those breached/interfered with PCJV franchise agreements include provisions granting a long-term license to use the Potato Corner Marks under specified terms and conditions (at Sections 2, 3, and 9), fees and payments to be made to PCJV alongside other franchisee obligations (at Sections 4, 7, 8, 10, 15, and 17), each of which were breached or

---

[10] The parties plainly agreed that there were no at-will termination rights. Even without indefinite or 50-year IP rights, Cinco could not cause PCJV to breach franchisee agreements and to lose contracts or rights to royalties. Because Cinco did not have at-will termination rights, whether due to expressed terms in their written agreements or the implied covenant of good faith and faith dealing, or otherwise, Cinco could not transfer at-will termination rights to SPAVI, especially in light of Cinco's judicial admissions in the existing litigation between PCJV's joint venture partners, which resulted in (i) PCJV's President, Koren, winning control over and the continued responsibility to use of the IP and (ii) Cinco being enjoined from interfering with PCJV's President's operations of Potato Corner USA, including the exercise of his "perpetual" right and responsibility to control PCJV alongside PCJV's use of the IP.

interfered with by virtue of SPAVI's conduct. These franchise agreements also included an expectation of future economic benefits (e.g., renewals of license terms, rebranding rights); therefore, they also are candidates for the prospective economic relations claims. (Counterclaims 2, 3, 4 and 5.)

Third, SPAVI interfered with PCJV's supply chain agreements with its vendors, including Bunzl, Shanghai Orientals, Lamb Weston, Ferna, and Newly Weds, making performance more difficult, expensive, restrictive, or prohibitive all together. The parties also expected future economic benefits for each of these relationships, making them also candidates for the prospective economic relations claims. (Counterclaims 3, 4, and 5.)

Fourth, SPAVI intentionally interfered with Defendants' lease agreements with various commercial landlords making performance more expensive or difficult by virtue of a compelled name change. But for SPAVI's tortious alleged acquisition of IP rights, this harm does not occur. (Counterclaim 3.)

Fifth, SPAVI interfered with at least two active developments by Defendants to open two new store locations in Northern California (and many more planned across the country, inclusive of many with actual or prospective third party franchisees), which were delayed or abandoned. (Counterclaim 3, 4, and 5.)

## COUNTERCLAIMS 7 AND 6 – BREACH OF FIDUCIARY DUTY AGAINST CINCO/SPAVI, AND AIDING AND ABETTING AGAINST SPAVI

Well beyond any contractual duties (or duties arising from the implied covenant of good faith and fair dealing), Cinco, as a joint venture partner, owed fiduciary duties of loyalty, care, and good faith to the other joint venture partners, to PCJV, and to PCJV's members. SPAVI, as Cinco's successor, is alleged to have assumed these fiduciary obligations (which SPAVI denies acquiring). The breaches against Cinco and SPAVI include: (a) acting in their own self-interest to the detriment of PCJV and PCI Trading; (b) facilitating unauthorized transfers of

rights, interests, or control of the IP; (c) undermining PCJV and PCI Trading's business and goodwill; (d) causing disruptions in PCJV's and PCI Trading's relationships; and (e) attempting to do indirectly what they were prohibited from doing directly (terminate PCJV's rights and interfere with Koren's rights and responsibilities). (Counterclaim 7.)

SPAVI aided and abetted each of the foregoing breaches of fiduciary duty. Additionally, SPAVI aided and abetted: (a) the conversion of PCJV's IP rights; and (b) the "Cinco Parties'" fraud (intentional misrepresentations and concealments of fact) in the SRA/MIPA as set forth above (if those representations were false, misleading, or concealed). (Counterclaim 6.)

## COUNTERCLAIM 11 – QUANTUM MERUIT AGAINST ALL COUNTERCLAIM DEFENDANTS

This claim is pled in the alternative and is premised on the extent to which Cinco or SPAVI (and their affiliated counterclaim defendant parties) requested, accepted, and benefitted from services, efforts, or investments by Defendants (e.g., in establishing, developing, and growing the Potato Corner USA brand and goodwill, along with a domestic franchise system, targeted franchisee selections and locations, lucrative negotiated agreements, know-how, trade secret, proprietary and/or confidential information, supply chain network, relationships, marketing, advertising, etc.). Cinco and SPAVI have failed and refused to compensate Defendants for the benefits requested and conferred after denying contractual rights, fiduciary obligations—disavowing the joint venture partnership and claiming that Defendants were mere at-will licensees. The PCJV Plaintiffs are entitled to recover the reasonable value of the requested services to create a U.S. brand and goodwill allegedly on behalf of Cinco and its successors. This alternative claim is triggered if the Court finds that those services were not for PCJV's own benefit, so as to avoid unjust enrichment.

1    The counterclaim defendants include Cinco and PC International PTE Ltd.,

2  both of which registered trademarks used, developed, and/or created by PCJV,

3  including their associated goodwill, and SPAVI and SPAVI International USA,

4  Inc., both of which co-opted (and, thus, accepted) the benefits of the franchise

5  system built by the PCJV Plaintiffs.[11]

6

7  Dated: September 10, 2025                    **FOX ROTHSCHILD LLP**

8

9                                               /s/ Michael D. Murphy

10                                              Michael D. Murphy
                                                Attorneys for Plaintiff and Counterclaim
11                                              Defendant SHAKEY'S PIZZA ASIA
                                                VENTURES, INC. and Third Party
12                                              Defendants CINCO CORPORATION,
                                                PC INTERNATIONAL PTE LTD., and
13                                              SPAVI INTERNATIONAL USA, INC.

14  DATED: September 10, 2025    **BLANK ROME LLP**

15

16                              By: /s/ Arash Beral
                                    Todd M. Malynn
17                                  Arash Beral
                                    Jamison T. Gilmore
18                                  Attorneys for Defendants, Counterclaimants,
                                    and Third Party Plaintiffs PCJV USA, LLC,
19                                  PCI TRADING LLC, POTATO CORNER,
                                    LA GROUP, LLC, GK CAPITAL GROUP,
20                                  LLC, NKM CAPITAL GROUP, LLC and
                                    GUY KOREN, and Defendants J & K
21                                  AMERICANA, LLC, J&K LAKEWOOD,
                                    LLC, J&K OAKRIDGE, LLC, J&K
22                                  VALLEY FAIR, LLC, J & K ONTARIO,
                                    LLC, J&K PC TRUCKS, LLC, HLK
23                                  MILPITAS, LLC, and GK CERRITOS, LLC

24

25

26

    _____
    [11] Defendants submit that following the introduction of evidence and testimony of
27  Plaintiff's witnesses, including cross-examination, Defendants' claims may need to
    be conformed to proof—whether expanded or reduced. For purposes of this report,
28  Defendants have cogently asserted their alleged claims as they view and know them
    based on the evidence presently available, in as logical manner as possible.

# <u>ATTESTATION</u>

Pursuant to Local Rule 5-4.3.4, the filer attests that all signatories listed, and on whose behalf the filing is submitted, concurs in the filing's content and have authorized the filing.


<u>*/s/ Michael Murphy*</u>
Michael Murphy

# **CERTIFICATE OF SERVICE**

The undersigned certifies that, on August 29, 2025, the foregoing document was electronically filed with the Clerk of the Court for the United States District Court, Central District of California, using the Court's ECF filing system. I further certify that all counsel for all parties to this action are registered CM/ECF user and that service will be accomplished by the CM/ECF system.

I certify under penalty of perjury that the foregoing is true and correct.

Dated:  September 10, 2025

**FOX ROTHSCHILD LLP**

*/s/ Michael D. Murphy*

Michael D. Murphy
Attorneys for Plaintiff and Counterclaim
Defendant SHAKEY'S PIZZA ASIA
VENTURES, INC. and Third-Party
Defendants CINCO CORPORATION,
PC INTERNATIONAL PTE LTD., and
SPAVI INTERNATIONAL USA, INC.