**BLANK ROME LLP**
Todd M. Malynn (SBN 181595)
todd.malynn@blankrome.com
Arash Beral (SBN 245219)
arash.beral@blankrome.com
Todd M. Malynn (SBN 181595)
jamison.gilmore@blankrome.com
2029 Century Park East | 6th Floor
Los Angeles, CA 90067
Telephone:   424.239.3400
Facsimile:    424.239.3434

Attorneys for Defendants, Counterclaimants, and Third Party Plaintiffs PCJV USA, LLC, PCI TRADING LLC, POTATO CORNER LA GROUP, LLC, GK CAPITAL GROUP, LLC, NKM CAPITAL GROUP, LLC and GUY KOREN, and Defendants J & K AMERICANA, LLC, J&K LAKEWOOD, LLC, J&K OAKRIDGE, LLC, J&K VALLEY FAIR, LLC, J & K ONTARIO, LLC, J&K PC TRUCKS, LLC, HLK MILPITAS, LLC, and GK CERRITOS, LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHAKEY'S PIZZA ASIA VENTURES, INC, a Philippines corporation,<br><br>Plaintiff,<br><br>vs.<br><br>PCJV USA, LLC, a Delaware limited liability company; PCI TRADING, LLC, a Delaware limited liability company; GUY KOREN, an individual; POTATO CORNER LA GROUP, LLC, a California limited liability company; NKM CAPITAL GROUP, LLC, a California limited liability company; J & K AMERICANA, LLC, a California limited liability company; J&K LAKEWOOD, LLC, a California limited liability company; J&K VALLEY FAIR, LLC, a California limited liability company; J & K ONTARIO, LLC, a California limited liability company; HLK MILPITAS, LLC, a California, limited liability company; GK CERRITOS, LLC, a California, limited liability company;  J&K PC TRUCKS, LLC, a California limited liability company; and, GK CAPITAL GROUP, LLC, a California | Case No. 2:24-CV-04546-SB(AGRx)<br><br>*Hon. Stanley Blumenfeld, Jr.*<br><br>**DECLARATION OF ERLINDA "LYNDAH" S. BARTOLOME**<br><br>Complaint Filed:   May 31, 2024<br>Trial Date:             September 26, 2025 |

160850.00001/154448422v.1

**DECLARATION OF ERLINDA "LYNDAH" S. BARTOLOME**

| | |
|---|---|
| 1 | limited liability company and DOES 1 through 100, inclusive, |
| 2 | Defendants. |
| 3 | _____ |
| 4 | PCJV USA, LLC, a Delaware limited liability company; PCI TRADING LLC, a Delaware limited liability company; POTATO CORNER LA GROUP LLC, a California limited liability company; GK CAPITAL GROUP, LLC, a California limited liability company; NKM CAPITAL GROUP LLC, a California limited liability company; and GUY KOREN, an individual, |
| 9 | Counter-Claimants, |
| 10 | v. |
| 11 | SHAKEY'S PIZZA ASIA VENTURES, INC, a Philippines corporation, |
| 12 | Counter Defendant. |
| 13 | _____ |
| 14 | PCJV USA, LLC, a Delaware limited liability company; PCI TRADING LLC, a Delaware limited liability company; POTATO CORNER LA GROUP LLC, a California limited liability company; GK CAPITAL GROUP, LLC, a California limited liability company; NKM CAPITAL GROUP LLC, a California limited liability company; and GUY KOREN, an individual, |
| 19 | Third Party Plaintiffs, |
| 21 | v. |
| 22 | PC INTERNATIONAL PTE LTD., a Singapore business entity; SPAVI INTERNATIONAL USA, INC., a California corporation; CINCO CORPORATION, a Philippines corporation; and ROES 1 through 10, inclusive, |
| 25 | Third Party Defendants. |

160850.00001/154448422v.1            1
**DECLARATION OF ERLINDA "LYNDAH" S. BARTOLOME**

# DECLARATION OF ERLINDA "LYNDAH" S. BARTOLOME

I, Erlinda "Lyndah" S. Bartolome, declare as follows:

1. I am over 18 years old. I have personal knowledge of the facts set forth in this declaration, and if called upon to testify under oath, I could and would testify competently thereto.

<u>My Background and Role</u>

2. Cinco Corporation ("Cinco") engaged me in 1997 to help develop Potato Corner's franchise program in the Philippines. Beginning around 2008, Cinco asked me to assist with international franchising, including the United States effort led by Guy Koren.

3. From 2008 for approximately a decade, I worked closely with Cinco's CEO, Jose P. Magsaysay, Jr. ("Mr. Magsaysay" a/k/a "JoMag"), and with the Los Angeles group led by Mr. Koren on establishing the U.S. Potato Corner business, which came to be known as "Potato Corner USA."

4. From inception of the U.S. joint venture partnership through the formation of PCJV USA, LLC ("PCJV") and thereafter, I served as Corporate Secretary, kept minutes, and coordinated documents among the parties, DLA Piper LLP, and SingerLewak (the auditors that DLA Piper chose to engage).

<u>Formation; Governing Structure; Indefinite Duration</u>

5. In April–May 2010, Cinco principals (Messrs. Magsaysay, Montelibano, Montinola, and Ms. Bermejo) met repeatedly in Los Angeles with Mr. Koren and his partners to structure a U.S. joint venture to develop and franchise Potato Corner. I attended and recorded minutes. Some meetings occurred at the Santa Anita location operated by NKM Capital Group, LLC, which had opened a few months earlier and was the first U.S. Potato Corner location.

6. By that time, Mr. Koren (through NKM) had negotiated and operated under exclusive territorial rights. On advice from DLA Piper, Cinco understood that a compliant U.S. franchise system was required because NKM's existing license did

not satisfy U.S. franchise law. Cinco asked the LA Group to build that system while the parties negotiated their respective rights.

7. By that point, Mr. Koren had developed a U.S.-oriented quick-service restaurant model significantly distinct from then-existing international formats. In connection with transitioning the LA Group from licensee to franchisor, the parties discussed and agreed in principle that the U.S. (and Israel) would be allocated to the venture.

8. By May 30, 2010, the parties had agreed on essential partnership terms, with the Potato Corner trademarks as the central asset. The first circulating draft of the Joint Venture Agreement (which I circulated on April 20, 2010) preceded the May 30, 2010 partnership meeting. A true and correct copy is attached to the Appendix at Trial Ex. 1010.

9. Sections 1.1.1–1.1.3 of the April 20, 2010 JVA draft contemplated assigning trademarks to a Hong Kong entity (for tax purposes) and granting a "master license" from that entity to the Company, with income from that IP equally shared by Cinco (via the Hong Kong entity) and the LA Group. In exchange, Cinco and its principals would receive 60% Company ownership (Section 2.4). The parties later removed the Hong Kong entity to create a direct relationship and ensure both sides were directly bound by the consent and transfer-restriction provisions.

10. Cinco's contribution to the joint venture partnership and the Company that would act as the U.S. Potato Corner master franchisor was its intellectual property, from which each side would benefit equally. The May 30, 2010 board minutes I drafted (a true and correct copy of which is attached to the Appendix at Trial Ex. 1019) reflect the formation of the partnership on that understanding.

11. Subsequent JVA drafts maintained equal economic sharing provisions from the grant of the intellectual property. On June 11, 2010, I added the term "initial/franchise fees and on going royalty" to the economic-sharing provisions to clarify equal participation from the economic benefits of the IP for each side. That

language remained in final agreements. I must emphasize that from the outset, Cinco's contribution to the joint venture and the Company was its IP, which was never intended to be revocable at-will. A true and correct copy of the June 11, 2010 JVA draft with my redline is attached to the Appendix at Trial Ex. 1023. All of the JVA drafts in sequential order are attached to the Appendix at Trial Ex. 1010 (April 20, 2010 draft), 1020 (June 1, 2010 draft), 1023 (June 11, 2010 draft), 1025 (June 28, 2010 draft), 1096 (July 2, 2010 draft), 1028 (September 16, 2010 draft).

12. From 2010–2012, the parties negotiated and implemented the governing agreements: the Joint Venture Agreement ("JVA"), its First Amendment (October 2012), and the Limited Liability Company Agreement (2012) (collectively, the "Governing Agreements"). True and correct copies of these Governing Agreements are attached to the Appendix at Trial Ex. 1050, 1053, and 62, respectively.

13. I circulated drafts, comments, and board actions. As reflected in Trial Ex. 1023 and later governance documents, the venture's use of the IP had no fixed term and required supermajority or mutual consent for termination. Indeed, the parties negotiated against a 10-year term proposed by DLA Piper and Mr. Magsaysay himself directed that the joint venture and Company have long-term, indefinite rights to use the trademarks. By that point, Mr. Koren had established "proof of concept" in the United States through NKM's prototype Santa Anita location. Cinco and its principals were 100% comfortable vesting control and proliferation of the trademarks in the United States with Mr. Koren and his group.

14. The Governing Agreements authorized PCJV to establish, operate, manage, license, and franchise U.S. Potato Corner outlets. Day-to-day operational and licensing responsibilities were vested in PCJV's President and the LA Group under the JVA, LLC Agreement, and the June 18, 2012 Master Services Agreement (a true and correct copy of which is attached to the Appendix at Trial Ex. 1045) signed by Mr. Magsaysay and LA Group members. During my tenure, PCJV continued to operate and perform the functions of the U.S. franchisor.

15. I understand Plaintiff contends the JVA required a separate, executed "Master License Agreement" before PCJV could use the IP long-term. This is the wrong interpretation of the Governing Agreements. The partners had already agreed to the license economics (equal sharing of specified fees, with indefinite duration), and the JVA directed the Company to accept and implement those pre-agreed terms.

16. After the parties already had agreed to these terms, DLA Piper and SingerLewak recommended documenting a stand-alone license agreement to facilitate audits and franchise regulatory approvals. DLA Piper, thus, drafted a "Trademark, Copyright, and Know-How License Agreement," which Mr. Koren signed at my request for compliance purposes. My note—'Do we still charge?'—reflected our discussions with DLA Piper's franchise attorney, Kim Lambert, that removing significant revenue from PCJV could signal insufficient financial support for franchisees and jeopardize regulatory approval. The parties therefore and thereafter agreed to waive the 30%/30% fees to prioritize growth and maintain financial support within PCJV. Through annual audits, both sides approved and reflected this waiver, and Cinco agreed to receive distributions consistent with its 60% ownership interest instead (and through sale of supplies to PCJV and PCI Trading through Highfive Corporation, Cinco's supply chain entity). News of Potato Corner's expansion into the United States also delivered immediate economic benefits to Cinco in the Philippines, rising sales by 30%, and used as a marketing tool to grow and expand internationally.

17. During FDD preparation and audits, DLA Piper decided to insert a 50-year license term (20 years plus three automatic 10-year renewals) in FDDs for regulators and prospective franchisees because they felt that hinging termination on a 75% termination vote may be unclear for regulators and prospective franchisees, and would raise questions. The parties always understood that the joint venture's and PCJV's IP rights to be long-term and continuing, and any stated term, i.e., a 50-

year term, would be extended in the ordinary course. The 50-year term was used for disclosure clarity, not to shorten the parties' agreed duration.

18. Plaintiff asserts the First Amendment to the JVA removed Cinco. The October 16, 2012 board minutes (which I drafted, a true and correct copy of which is attached to the Appendix at Trial Ex. 1052) show the purpose was to add protections for certain PCJV officers. Where I inserted "Potato Corner International, Inc." or "PCI," I did so believing PCI held an economic interest for tax savings and immigration purposes that Cinco wanted to implement. It was not intended to remove Cinco from ownership, and the LLC Agreement was not amended to do so.

19. True and correct copies of DLA Piper billing statements for structuring the joint venture and PCJV, all of which I received in the ordinary course of business, are attached to the Appendix at Trial Exs. 1038–1041. They and other contemporaneous communications reflect the following timeline regarding the drafting and implementation of a separate license agreement:

    a. <u>October 28, 2010</u>: Kim Lambert billed for "draft of Trademark, Copyright and Know-how License Agreement" (Trial Ex. 1041).

    b. <u>January 4, 2011</u>: Ben Olivas[1] emailed me to ask if I have a draft Master License Agreement. A true and correct copy of that communication is attached to the Appendix at Trial Ex. 1032.

    c. <u>January 18, 2011</u>: Kim Lambert wrote us: "1. The current FDD states in Item 13 that the Trademark, Copyright and Know-How License Agreement was signed on October 1, 2010. If that is not the case, we will need to amend the FDD to reflect the date that this License Agreement is actually signed. 2. Please ask the accountants to change the name of this License Agreement from

---

[1] Mr. Olivas was a partner at DLA Piper and a childhood friend of Mr. Magsaysay. Mr. Magsaysay insisted to engage him and his colleagues at DLA Piper to perform the work involved in setting up the franchise system. Mr. Olivas also became a part owner of Potato Corner International, Inc. ("PCI").

"Master Licensing Agreement" to "Trademark, Copyright and Know-How License Agreement" as the reference to Master License Agreement may confuse the examiner." A true and correct copy of this email is attached to the Appendix at Trial Ex. 75.

    d. <u>January 18, 2011</u>: Kim Lambert billed for "review of date of execution of Trademark License Agreement" (Trial Ex. 1039).

    e. <u>February 7, 2011</u>: Ben Olivas billed for "Meet with Mr. J. Magsaysay to discuss, finalize and sign FDD application" (Trial Ex. 1038).

    f. <u>February 7, 2011</u>: the first set of FDDs (a true and correct copy of which are attached to the Appendix at Trial Ex. 1034) are issued. Those FDDs refer to the license agreement as the "Trademark License Agreement," the same way Ms. Lambert described it in her January 18, 2011 billing entry (no longer using the term "Trademark, Copyright and Know-How License Agreement").

20. Based on these records, by the time Mr. Magsaysay signed the February 7, 2011 FDDs, it is clear that the license agreement title and execution-date issues identified on January 18, 2011 had been addressed for FDD purposes, and the first FDDs were issued and approved, authorizing PCJV to sell franchises, and granting those franchises long-term Potato Corner IP rights.[2]

<u>PCJV as U.S. Master Franchisor; Franchise Agreements and Goodwill</u>

21. PCJV's franchise form granted ten-year initial terms with renewal rights and provided that goodwill arising from franchisees' use of the marks inured to PCJV as franchisor.

/ / /

---

[2] Ultimately, the pre-existing stores (including NKM's store at Santa Anita) was adopted into PCJV's franchise system.

22. From 2011 onward, franchise sales and regulatory compliance were conducted through PCJV as franchisor.

23. U.S. franchisees obtained rights to use the Potato Corner marks via PCJV-issued franchise agreements throughout my service.

Ownership and Economics; Course of Dealing

24. The parties implemented a 60/40 ownership (Cinco Group/LA Group) and managed PCJV through seven managers (four Cinco-side, three LA Group). Consistent with the Governing Agreements and alongside the Master Services Agreement, PCJV exercised franchisor rights; the LA Group handled operations and licensing; and Cinco and the LA Group were to share equally in initial franchise fees and ongoing royalties received by PCJV from U.S. franchisees.

25. In 2015, to meet regulatory capital needs, PCJV conducted a members' meeting and capital call. Cinco contributed $300,000 (through its U.S. vehicle) and the LA Group contributed $200,000. These steps supported PCJV's franchisor status and compliance.

26. At various points in time in meetings I attended and while I was party to various communications, there were discussions regarding "naked licensing." Cinco and its principals were warned against that potential outcome.

Records Provided; the State Court Actions

27. In 2016, at the request of Cinco's then-new principals, I assembled PCJV's records (Governing Agreements, minutes, FDDs, financials, and tax filings) for their due diligence on the U.S. business. Those records reflected PCJV as U.S. franchisor governed by the JVA, LLC Agreement, and Master Services Agreement, with long-term franchise agreements in place.

28. I assisted the parties regarding the 2018 state court disputes and regularly communicated with Mr. Magsaysay and Mr. Koren. Based on my involvement, I understood those actions were aimed at changing control of PCJV, including on claims I found to lack merit and common sense, and also contradict the

parties' intensions, i.e., on claims that Mr. Koren improperly moved banking relationships or was not paying royalties (even though Cinco had waived those royalties). In my opinion, those claims were designed by Cinco's new majority ownership group (including by Myrose Victor who I understand is now part of Plaintiff SPAVI) as a strategic maneuver to take control of PCJV. In my further opinion, this federal court action by Plaintiff SPAVI is more of the same, just designed differently.

29. In the state court action, I assisted Mr. Koren in preparing declarations in his capacity as PCJV President as well as to prepare my own declarations. I must inform the Court that during that litigation, Mr. Magsaysay continued to be friendly with Mr. Koren, communicating with him (and me) privately. At one point, Mr. Magsaysay asked Mr. Koren to employ him at PCJV so that the two could continue to proliferate and expand Potato Corner USA together.

30. It is my firm belief that Mr. Magsaysay was always and continues to be fond of Mr. Koren and considers Mr. Koren as the "JoMag of the United States." It always has surprised me that Mr. Magsaysay has been executing declarations supporting claims against Mr. Koren. It does not surprise me, however, that no other member of the Cinco Group (Bermejo, Montelibano, Montinola) has supported these claims.

31. I reviewed Cinco's verified pleadings and declarations in the state actions (true and correct copies of which are attached to the Appendix at Trial Exs. 1076-79, 1084, 1086, 1413). In those filings, Cinco affirmed that: (a) PCJV's business, reputation, and goodwill were at stake in the U.S.; (b) the JVA and LLC structure governed use and licensing of the Potato Corner marks in the U.S.; and (c) Cinco's U.S. economic rights were its agreed share of initial fees and royalties paid to PCJV by franchisees. These statements match the course of dealing I observed since 2010.

/ / /

Key Facts

32. Based on my role and the records I handled:

   a. Since 2010, PCJV served—and was held out—as the sole U.S. master franchisor.

   b. Each U.S. franchise agreement granting rights to use the marks was issued by PCJV, with ten-year initial terms, renewal rights, and goodwill inuring to PCJV.

   c. The Governing Agreements had no fixed term, required supermajority or mutual consent for termination, and vested day-to-day licensing/operations in PCJV's President and the LA Group.

   d. The parties' performance, regulatory filings, and franchise agreements consistently reflect PCJV's authority to use and license the marks in the U.S. and to grant long-term franchise rights.

   e. Cinco treated its U.S. role as an economic right to share in initial/franchise fees and ongoing royalties paid to or collected by PCJV, while PCJV's business, reputation, and goodwill were tied to U.S. operations.

33. The above was true when I prepared minutes (2010–2012), assisted with audits and FDDs (starting 2011), observed supermajority officer rights adopted in October 2012, assisted with regulatory/capital issues through 2015, assembled records in 2016, and reviewed the 2018 FDD identifying PCJV as U.S. franchisor (a true and correct copy of which is attached to the Appendix at Trial Ex. 1184).

34. At no time during my involvement did Cinco attempt to dissolve PCJV, revoke PCJV's franchisor status, or attempt to terminate PCJV's authority to grant or maintain long-term franchise rights already granted to U.S. franchisees. Franchisees continued operating under PCJV-issued long-term agreements.

35.  These statements are consistent with the contemporaneous records I handled: board minutes, the JVA and First Amendment, the LLC Agreement, the Master Services Agreement, the 2011 and subsequent FDDs, and executed franchise agreements.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed September 24, 2025, in Manila, Philippines.

_____
Erlinda "Lynda" S. Bartolome