| | |
|---|---|
| 1 | **BLANK ROME LLP**<br>Todd M. Malynn (SBN 181595) |
| 2 | todd.malynn@blankrome.com<br>Arash Beral (SBN 245219) |
| 3 | arash.beral@blankrome.com<br>Todd M. Malynn (SBN 181595) |
| 4 | jamison.gilmore@blankrome.com<br>2029 Century Park East | 6th Floor |
| 5 | Los Angeles, CA 90067<br>Telephone:  424.239.3400 |
| 6 | Facsimile:   424.239.3434 |
| 7 | Attorneys for Defendants, Counterclaimants, and Third Party Plaintiffs PCJV USA, LLC, PCI |
| 8 | TRADING LLC, POTATO CORNER LA GROUP, LLC, GK CAPITAL GROUP, LLC, |
| 9 | NKM CAPITAL GROUP, LLC and GUY KOREN, and Defendants J & K AMERICANA, |
| 10 | LLC, J&K LAKEWOOD, LLC, J&K OAKRIDGE, LLC, J&K VALLEY FAIR, LLC, J |
| 11 | & K ONTARIO, LLC, J&K PC TRUCKS, LLC, HLK MILPITAS, LLC, and GK CERRITOS, LLC |
| 12 | |

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| 15 | | |
| 16 | SHAKEY'S PIZZA ASIA VENTURES, INC, a Philippines corporation, | Case No. 2:24-CV-04546-SB(AGRx) |
| 17 | Plaintiff, | *Hon. Stanley Blumenfeld, Jr.* |
| 18 | vs. | **DECLARATION OF ADAM MANDEL** |
| 19 | PCJV USA, LLC, a Delaware limited liability company; PCI TRADING , LLC, a | Complaint Filed:  May 31, 2024<br>Trial Date:         September 26, 2025 |
| 20 | Delaware limited liability company; GUY KOREN, an individual; POTATO CORNER | |
| 21 | LA GROUP, LLC, a California limited liability company; NKM CAPITAL GROUP, | |
| 22 | LLC, a California limited liability company; J & K AMERICANA, LLC, a California | |
| 23 | limited liability company; J&K LAKEWOOD, LLC, a California limited | |
| 24 | liability company; J&K VALLEY FAIR, LLC, a California limited liability company; | |
| 25 | J & K ONTARIO, LLC, a California limited liability company; HLK MILPITAS, LLC, a | |
| 26 | California, limited liability company; GK CERRITOS, LLC, a California, limited | |
| 27 | liability company;  J&K PC TRUCKS, LLC, a California limited liability company; and, | |
| 28 | GK CAPITAL GROUP, LLC, a California | |

160850.00001/154448422v.1

**DECLARATION OF ADAM MANDEL**

| | |
|---|---|
| 1 | limited liability company and DOES 1 through 100, inclusive, |
| 2 | Defendants. |
| 3 | _____ |
| 4 | PCJV USA, LLC, a Delaware limited liability company; PCI TRADING LLC, a Delaware limited liability company; POTATO CORNER LA GROUP LLC, a California limited liability company; GK CAPITAL GROUP, LLC, a California limited liability company; NKM CAPITAL GROUP LLC, a California limited liability company; and GUY KOREN, an individual, |
| 9 | Counter-Claimants, |
| 10 | v. |
| 11 | SHAKEY'S PIZZA ASIA VENTURES, INC, a Philippines corporation, |
| 12 | Counter Defendant. |
| 13 | _____ |
| 14 | PCJV USA, LLC, a Delaware limited liability company; PCI TRADING LLC, a Delaware limited liability company; POTATO CORNER LA GROUP LLC, a California limited liability company; GK CAPITAL GROUP, LLC, a California limited liability company; NKM CAPITAL GROUP LLC, a California limited liability company; and GUY KOREN, an individual, |
| 19 | Third Party Plaintiffs, |
| 20 | v. |
| 21 | PC INTERNATIONAL PTE LTD., a Singapore business entity; SPAVI INTERNATIONAL USA, INC., a California corporation; CINCO CORPORATION, a Philippines corporation; and ROES 1 through 10, inclusive, |
| 25 | Third Party Defendants. |

160850.00001/154448422v.1

1

**DECLARATION OF ADAM MANDEL**

# DECLARATION OF ADAM MANDEL

I, Adam Mandel, declare as follows:

1. I am over 18 years old. The facts stated here are based on my personal knowledge, my work for PCJV USA, LLC ("PCJV"), and my review of files and business records maintained in the ordinary course of PCJV's business. If called, I could and would testify competently thereto.

<u>Personal Background and Role, Including as Witness to Execution of JVA/LLC Agreements</u>

2. I am the acting Chief Operating Officer for PCJV, a company I also worked with from 2010-2016, re-commencing in 2024.

3. I have years of experience creating brands, repositioning brands, and creating and launching marketing plans for quick-service restaurant businesses, including for some of the most prominent brands in the restaurant industry with franchised outlets (such as El Pollo Loco and Pizza Hut) and non-franchised outlets (such as In-N-Out Burger). I am familiar with both business structures and how they relate to building and repositioning a nationwide restaurant brand.

4. I witnessed and signed as a witness the Potato Corner USA Joint Venture Agreement ("JVA") executed by Cinco Corporation ("Cinco"), Jose P. Magsaysay ("Magsaysay"), Jose Miguel Ma. G. Montinola ("Montinola"), Ma. Victoria O. Bermejo ("Bermejo"), and Ricardo K. Montelibano ("Montelibano") (collectively, the "Cinco Group"), and by Amit Nemanim ("Nemanim"), Guy Koren ("Koren"), and Amir Jacoby ("Jacoby") (collectively, the "LA Group"). A true and correct copy of the JVA is attached to the Appendix at Trial Ex. 1050.

5. Beginning in 2010, I worked with and spoke to Magsaysay, Montinola, Nemanim, Koren and Jacoby regarding a joint venture partnership (the "Partnership"), including and specifically as it related to creating and developing a Potato Corner brand of quick-service restaurants in the United States, before I subsequently witnessed, signed, and spoke with them about the JVA years later.

6. I also witnessed and signed as a witness the Limited Liability Company Agreement of PCJV (the "LLC Agreement"), which was executed by Cinco, Magsaysay, Montinola, Bermejo, and Montelibano as the Cinco Group, and by Nemanim, Koren, and Jacoby as the LA Group. A true and correct copy of the LLC Agreement is attached to the Appendix at Trial Ex. 62. I spoke with each of them about the LLC Agreement before I witnessed and signed it.

<u>The Partnership</u>

7. The Partnership comprised two groups of relatively unsophisticated individuals from different countries, each with limited means and offering something the other did not have or was not in a position to provide—coming together to achieve a common objective on a "handshake" deal. The partnership, which both Magsaysay and Koren expressed to me and confirmed numerous times, was simple: Cinco was contributing intellectual property—a foreign brand the parties wanted to expand to the United States—and the LA Group was investing its time, effort, and money to build, manage, and grow a U.S. Potato Corner brand, business model, and marketing plan for a quick-service restaurant that the Partnership could franchise across the United States and that would appeal to consumers in different geographic markets and transcend any niche market for flavored french fries.

8. I was sought out and retained by Messrs. Nemanim, Koren and Jacoby because of my prior experience doing this kind of work. At El Pollo Loco, for example, I led the marketing team to reposition the brand to mainstream from its Mexican roots. We successfully transformed the brand into a premier health-conscious quick-service chicken restaurant across the United States.

9. At the time the Partnership was agreed upon, and later when franchise disclosure documents were prepared, I, alongside other involved parties, such as the LA Group, believed that Cinco owned the recipes for certain of the seasonings used

to flavor french fries. We later discovered that Cinco did not own any recipes but simply purchased and resold those seasonings from Ferna Corporation.

10. Neither the Cinco Group nor the LA Group had prior U.S. experience or relevant materials to create, design, or develop a marketing plan or to form the operations of a U.S. quick-service franchise restaurant business. Prior to 2010, Potato Corner in other countries comprised wood huts and food carts, using lower-grade food supplies (such as Grade B potatoes) and equipment that was not suitable for restaurants in the United States. Koren and his Los Angeles investors initially set out to design and open the first prototype Potato Corner quick-service restaurant in the United States.

11. Initially, I met with Koren and Jacoby, who were working from Jacoby's garage, which had been converted into an office. "Potato Corner USA" was a name the LA Group coined and that everyone began to use to refer to the Partnership.

12. After several meetings with Koren and Jacoby, we agreed on two main objectives: (1) create a U.S. branded quick-service restaurant, which could be franchised across the country; and (2) create a nationwide restaurant brand that would transcend any niche market and have widespread appeal to U.S. customers.

13. There were many challenges the LA Group and I had to overcome to create Potato Corner USA, including two principal obstacles: (a) unsophisticated partners with little or no relevant U.S. knowledge or experience, providing little support; and (b) no brand awareness in the United States—essentially creating a snack-food restaurant from scratch.

14. Below are the steps I advised the LA Group to undertake or helped the LA Group undertake to build a successful U.S. quick-service restaurant franchise and brand:

    a. Designed restaurants from the ground up;

    b. Identified and secured shopping mall locations;

c. Conceived and developed a business model and trademark/trade dress for U.S. operations, including a completely different physical look and feel at the retail level. Potato Corner USA moved away from a flat, dated design centered on Potato Corner's "Spudster" character, dated typefaces, and flat surfaces and colors. What emerged was the use of woods, granite surfaces, unique lighting, and varied surfaces. U.S. operations also designed and implemented modern typefaces to appeal to a broader demographic;

d. Established—without any input from the Cinco Group—what the Potato Corner brand meant in, and how it could be duplicated across, the United States. Potato Corner USA needed and developed:

    i. *Operational procedures.* To be approved to offer franchises, an operations manual and training materials were required. The LA Group and I wrote a comprehensive operations manual, training materials, and training videos to help create consistent operations from store to store.

    ii. *Cooking process.* To comply with enclosed-mall lease requirements, ensure product consistency, and increase safety around hot oil, U.S. operations sourced, tested, installed, and successfully implemented the use of AutoFry fryers. This equipment directly contributed to the ability to quickly output high-quality fried foods.

    iii. *Menu items.*

        1. *Chicken products.* We added chicken wings and chicken "poppers," allowing quick "full meal" options for consumers and increasing average check.

This U.S.-created idea had not been done in Potato Corner outlets in other countries. For the U.S. market, it was vital that the brand extend beyond pure snack foods into full meal options.

2. *Baked potatoes.* To offer non-fried options for health-conscious U.S. consumers and additional full-meal options, U.S. operations created, developed, tested, and executed baked potatoes.

3. *Chili Cheese Fries.* To meet diverse U.S. tastes and prevent revenue loss to other food choices, U.S. operations created, sourced, developed, tested, and executed Chili Cheese Fries among other alternative menu options.

4. *Drink options.* The U.S. tested and installed ICEE, a flavored ice-based drink, to offer more choice beyond traditional soft drinks. ICEE, along with Blueberry Blast (another drink option), was installed to boost revenue and prevent loss of customer counts to other mall quick-service options.

5. *Combos.* U.S. operations developed and installed proprietary combo boxes to boost average check and offer convenient transportability of multiple food elements for quick full meals.

6. *Alternate flavors.* U.S. operations developed, tested, and installed flavors better matched to U.S. consumption and demographic demands, including Garlic and Cinnamon Sugar (as a sweet alternative). These flavors helped retain consumer loyalty and

          encouraged repeat purchases. We developed and sourced these flavors ourselves through a U.S.-based manufacturer (not Ferna Corporation).

    e.    Established quality control and training, including standardized procedures for franchising and personally trained franchisees, which is critical to creating a U.S. brand.

    f.    Developed and implemented all marketing through our own website, potatocornerusa.com, and social media channels like Facebook and Instagram (through our own dedicated accounts).

15. Both groups relied upon each other and requested that I witness their execution of the JVA and LLC Agreement because I had worked with each group for their mutual benefit.

16. Both agreements confirmed the purpose of the Partnership. They included numerous provisions confirming PCJV's intellectual property rights and documenting that PCJV was established and would be operated for the mutual benefit of the joint venture partners, including expressly having an indefinite duration as well as vested rights to use Potato Corner intellectual property, including after termination, to support U.S. franchise and franchisee agreements. They included provisions specifying each group's rights, obligations, and responsibilities as PCJV's President, executive officers, and voting members of management pertaining to the use, control, licensing, and franchising of the Potato Corner brand, where control of the Potato Corner intellectual property rights was vested domestically in PCJV and was expressly made non-transferable.

17. My understanding of the purpose of PCJV and its operating agreements was formed in real time when I interacted and spoke with members from each partnership group, including specifically Magsaysay. Interestingly, it was not until third parties and lawyers got involved that any "disputes" arose.

| | |
|---|---|
| 1 | I declare under penalty of perjury that the foregoing is true and correct. |
| 2 | Executed September 24, 2025, within the United States, its territories, possessions, |
| 3 | or commonwealths. |

Signed by:

Adam Mandel

160850.00001/154448422v.1

8

**DECLARATION OF ADAM MANDEL**