EXHIBIT B

EXHIBIT 1248

**PCJV USA, LLC**

**FRANCHISE AGREEMENT**

BDBR Properties, Inc
_____
**FRANCHISEE**

September 12, 2024
_____
**DATE OF AGREEMENT**

**RESTAURANT ADDRESS**

Westfield Culver City Mall
_____

6000 Sepulveda Blvd
_____

Culver City, CA 90230
_____

\\Prolaw1\shares\Documents\MJS\26053-22\3235581.docx
2024 PCJV USA, LLC  FDD
FRANCHISE AGREEMENT

**EXHIBIT 1248 - 0001**

**PCJV USA, LLC**
**FRANCHISE AGREEMENT**

### TABLE OF CONTENTS

| | | |
|---|---|---|
| 1. | DEFINITIONS | 1 |
| 2. | GRANT | 8 |
| 3. | INITIAL AND RENEWAL TERMS. | 9 |
| 4. | FEES AND PAYMENTS | 10 |
| 5. | FRANCHISED LOCATION, CONSTRUCTION AND OPENING FOR BUSINESS | 12 |
| 6. | OBLIGATIONS OF FRANCHISOR | 15 |
| 7. | OBLIGATIONS OF FRANCHISEE | 17 |
| 8. | SUPPLIERS AND PRODUCTS | 26 |
| 9. | POTATO CORNER MARKS | 27 |
| 10. | MARKETING | 29 |
| 11. | CONFIDENTIAL INFORMATION | 33 |
| 12. | ACCOUNTING AND RECORDS | 34 |
| 13. | INSURANCE | 36 |
| 14. | TRANSFER OF INTEREST | 37 |
| 15. | COVENANTS | 42 |
| 16. | DEFAULT AND TERMINATION | 44 |
| 17. | OBLIGATIONS FOLLOWING TERMINATION OR EXPIRATION | 48 |
| 18. | INDEPENDENT CONTRACTOR AND INDEMNIFICATION | 50 |
| 19. | DISPUTE RESOLUTION | 52 |
| 20. | NOTICES | 56 |
| 21. | ACKNOWLEDGMENTS | 57 |

### EXHIBITS

| | |
|---|---|
| EXHIBIT A | FRANCHISE INFORMATION |
| EXHIBIT B | ENTITY INFORMATION DISCLOSURE |
| EXHIBIT C | GUARANTEE OF FRANCHISE AGREEMENT |
| EXHIBIT D | DEBIT AUTHORIZATION FORM |

**EXHIBIT 1248 - 0002**

## PCJV USA, LLC
## FRANCHISE AGREEMENT

**THIS FRANCHISE AGREEMENT** (the **"Agreement"**) is made and entered into as of the **"Effective Date"** set forth on <u>Exhibit A</u> by and between **PCJV USA, LLC**, a Delaware limited liability company (**"Franchisor"**), on the one hand, and the individuals or Entity identified as **"Franchisee"** on <u>Exhibit A</u>, on the other hand, who are individually referred to in this Agreement as a **"Party"**, and collectively referred to in this Agreement as **"Parties"**, with reference to the following facts:

A.      Franchisor and its affiliates have developed the **"Potato Corner System"** for the establishment and operation of restaurants (**"Potato Corner Restaurants"**) that offer flavored french fries, baked potatoes, hash browns, loopy fries, chicken tenders and related food and beverage products (collectively, the **"Potato Corner Menu Items"**) under the trade name and service mark **"Potato Corner"** and other related trademarks, service marks, logos and commercial symbols (collectively, the **"Potato Corner Marks"**). The Potato Corner Menu Items are prepared according to specified recipes and procedures and use high quality ingredients, including specially formulated and specially produced proprietary lines of flavoring and seasoning and other food products (collectively, the **"Trade Secret Food Ingredients"**).

B.      Franchisee desires to obtain a license and franchise to develop, own and operate one Potato Corner Restaurant (the **"Franchised Restaurant"**) under the Potato Corner Marks in strict accordance with the Potato Corner System and the standards established by Franchisor from time to time, and Franchisor is willing to grant Franchisee a license and franchise under the terms and conditions set forth in this Agreement.

**NOW, THEREFORE, THE PARTIES AGREE:**

1.      **DEFINITIONS**

The capitalized terms in this Agreement that are not defined elsewhere in the text of this Agreement are assigned these definitions:

 **"Abandon"** means (i) Franchisee's failure, at any time during the Term, to keep the Franchised Restaurant open and operating for business for a period of five (5) consecutive days; (ii) Franchisee's failure to keep the Franchised Restaurant open and operating for any period after which it is not unreasonable under the facts and circumstances for Franchisor to conclude that Franchisee does not intend to continue to operate the Franchised Restaurant, unless the failure to operate is due to Force Majeure (subject to Franchisee's continuing compliance with this Agreement); (iii) the withdrawal of permission from the Landlord that results in Franchisee's inability to continue operation of the Franchised Restaurant at the Franchised Location; or (iv) a closure of the Franchised Restaurant required by Applicable Law.

**"Affiliate"** or **"Affiliates"** mean any Person or Entity that controls, is controlled by, or is under common control with, a Party to this Agreement. Control of a Person or Entity means the power, direct or indirect, to direct or cause the direction of the management and policies of such Person or Entity whether by contract or otherwise.

**"Applicable Law"** means and includes applicable common law and all statutes, laws, rules, regulations, ordinances, policies and procedures established by any Governmental Authority with jurisdiction over the operation of the Franchised Restaurant that are in effect on or after the Effective Date, as they may be amended from time to time.

**EXHIBIT 1248 - 0003**

"**Business Judgment**" means that Franchisor is allowed to exercise its judgment however Franchisor believes is appropriate in a given circumstance without limitation, subject to the use of that discretion in any reasonable way as more fully described in <u>Section 21.14</u>.

"**Co-Branding**" means the operation of an independent business, product line or operating system owned or licensed by another Entity (not Franchisor) that is featured or incorporated within the Franchised Restaurant or is adjacent to the Franchised Restaurant and operated in a manner likely to cause the public to perceive it is related to the Franchised Restaurant. An example would be an independent ice cream store or counter installed within the Franchised Restaurant.

"**Competitive Business**" means any restaurant business that prepares, offers and sells flavored french fries, baked potatoes, hash browns, loopy fries and chicken tenders as its primary menu items and any business that looks like, copies, imitates, or operates with similar trade dress or décor to a Potato Corner Restaurant.

"**Constituents**" means past, present and future Affiliates, parents, subsidiaries, divisions, partners, members, trustees, receivers, executors, representatives, administrators, owners, shareholders, distributors, parents, predecessors, officers, directors, agents, managers, principals, employees, insurers, successors, assigns, representatives and attorneys and the past, present and future officers, directors, agents, managers, principals, members, employees, insurers, successors, assigns, representatives and attorneys of each of the foregoing.

"**Crisis Management Event**" means any event that occurs at or about the Franchised Restaurant that has or may cause harm or injury to customers or employees, including, without limitation, food contamination, food spoilage/poisoning, food tampering/sabotage, contagious diseases, natural disasters, terrorist acts, shootings, epidemics, pandemics or any other circumstance which may damage the Potato Corner System, the Potato Corner Marks, or the image or reputation of Franchisor and its Affiliates.

"**Default**" means any breach of, or failure to comply with, any of the terms or conditions of an agreement.

"**Electronic Signature**" means any electronic symbol and/or process attached to or logically associated with a document and executed by a Party with the intent to sign such document, including facsimile, email, or other electronic signatures.

"**Entity**" means any limited liability company, partnership, trust, association, corporation or other entity, which is not an individual.

"**Equity**" means capital stock, membership interests, partnership rights or other equity ownership interests of an Entity.

"**Expiration Date**" means the tenth anniversary of the Opening Date as set forth on **Exhibit A**.

"**Food Delivery Services**" means on-line third-party food-ordering platforms that deliver Potato Corner Authorized Products.

"**Force Majeure**" means any event (i) that was reasonably unforeseeable as of the Effective Date, (ii) that is beyond the reasonable control, directly or indirectly, of a Party, (iii) that could not reasonably have been prevented or avoided by that Party with the exercise of reasonable efforts and due diligence, (iv) that does not result from the fault or negligence of that Party or its agents, employees or contractors, and (v) that causes performance by that Party to be delayed, in whole or in part, or unable to partially or wholly perform its

**EXHIBIT 1248 - 0004**

obligations under this Agreement. Subject to the satisfaction of the foregoing criteria, "**Force Majeure**" includes (a) acts of God (such as tornadoes, earthquakes, hurricanes, floods, fire or other natural catastrophe), (b) strikes, lockouts or other industrial disturbances, (c) war, terrorist acts, riot, or other civil disturbance, (d) unilateral governmental action impacting restaurants generally, and (e) contagious disease, epidemics, pandemics, transportation shortages, inadequate supply of labor, material or energy, or a Party foregoing the right to acquire or use any of the foregoing in order to accommodate or comply with the orders, requests, regulations, recommendations or instructions of any federal, state or municipal government or any department or agency. Neither an act or failure to act by a Governmental Authority, nor the performance, non-performance or exercise of rights under any agreement with Franchisee by any lender, Landlord, contractor, or other Person, or Franchisee's financial inability to perform or Franchisee's insolvency, shall be an event of Force Majeure hereunder, except to the extent that such act, failure to act, performance, non-performance or exercise of rights results from an act which is otherwise an event of Force Majeure. An event of Force Majeure will not affect or change Franchisee's obligation to pay Royalty Fees, Marketing Fund Fees, Software License Fees or any other fees owed to Franchisor when due.

"**Franchised Location**" means the site of the Franchised Restaurant as set forth on **Exhibit A**.

"**General Manager**" means an individual who is responsible for overseeing the operation of the Franchised Restaurant in the absence of the Principal Owner as set forth on **Exhibit B**.

"**General Release**" means the form of general release prescribed by Franchisor of any and all known and unknown obligations, liabilities, demands, costs, expenses, damages, claims, actions and causes of action, of whatever nature, character or description, against Franchisor and its Constituents. A General Release will cover future consequences of acts, omissions events and circumstances predating the date of the General Release, but will not release, in advance, future acts, omissions or events which have not occurred at the time the General Release is executed.

"**Grand Opening Marketing Expenditure**" means the up to $5,000 that Franchisee must spend for a promotional campaign for the grand opening of the Franchised Restaurant thirty (30) days before, and sixty (60) days after, the Opening Date.

"**Good Standing**" means Franchisee is in substantial compliance with the material requirements of this Agreement, the Manuals and all other agreements then in effect between Franchisor, or its Affiliates, and Franchisee, and has substantially cured each curable Default for which Franchisor has issued a Notice of Default to Franchisee within the time periods set forth in Article 16.

"**Governmental Authority**" means all Federal, state, county, municipal and local governmental and quasi-governmental agencies, commissions and authorities.

"**Gross Sales**" means the total of all revenues derived from sales of any nature or kind whatsoever from the Franchised Restaurant during the Term, as well as the proceeds from any business interruption insurance related to the non-operation of the Franchised Restaurant, and whether evidenced by cash, services, property, barter, or other means of exchange, including orders taken in or from the Franchised Restaurant although filled elsewhere and delivery and catering charges that are not included in the price of the Potato Corner Authorized Products. "**Gross Sales**" shall include the full value of drinks and snacks Franchisee provides to its employees as incident to their employment (less the value of any discounts against Gross Sales given during the month in which the drinks and snacks were provided) and all proceeds from the sale of coupons, gift

**EXHIBIT 1248 - 0005**

certificates or vouchers. "**Gross Sales**" shall exclude the amount of bona fide refunds paid to customers and the amount of any sales or use taxes actually paid to any Governmental Authority and the retail price of any coupons, gift certificates and vouchers when they are redeemed.

"**Initial Franchise Fee**" means the $30,000 initial fee that Franchisee must pay Franchisor for the right to operate the Franchised Restaurant under this Agreement.

"**Initial Term**" means the ten (10) year period commencing on the Opening Date and ending on the Expiration Date.

"**Initial Training Program**" means Franchisor's training program that Franchisor shall provide for up to two (2) persons selected by Franchisee who must include the Principal Owner and General Manager, at no charge to Franchisee before Franchisee begins servicing customers and that Franchisor may provide at other times during the Term, upon Franchisee's request, and by mutual arrangement of the Parties for the fees described in this Agreement. Franchisor may modify the Initial Training Program at any time without notice.

"**Landlord**" means the owner of the Franchised Location who enters into a Lease with Franchisee for the Franchised Location.

"**Lease**" means any agreement, however denominated, that allows Franchisee to occupy a Franchised Location owned by a Landlord, including any lease, sublease, concession agreement, license and similar arrangement between Franchisee and a Landlord.

"**Local Store Marketing Expenditures**" means the monthly expenditures that Franchisee shall spend each calendar month during the Term for local promotion and marketing of the Franchised Restaurant equal to one percent (1%) of the Gross Sales of the Franchised Restaurant. Franchisor shall have the right to adjust the amount of the Local Store Marketing Expenditure at any time and from time to time during the Term upon ninety (90) days' prior written notice from Franchisor to Franchisee, to an amount not to exceed two percent (2%) of Gross Sales.

"**Manuals**" means Franchisor's Operations Manual, which may consist of one (1) or more manuals, and any other written directives related to the Potato Corner System, as they may be amended, issued and revised from time to time.

"**Marketing Fund**" means the fund that Franchisor has established to promote the Potato Corner Marks and Potato Corner Restaurants.

"**Marketing Fund Fees**" means the fees that Franchisor may require Franchisee to pay the Marketing Fund as a percentage of the Gross Sales of the Franchised Restaurant if and when Franchisor requires, at any time on 90 days' prior written notice to Franchisee, and which shall not exceed one percent (1%) of the Gross Sales of the Franchised Restaurant.

"**NACHA**" means the National Automated Clearing House Association, an organization that establishes the standards and rules followed by financial institutions for transferring payments.

"**Non-Proprietary Products**" means the food and beverage products, condiments, drink ingredients, raw materials, fixtures, furnishings, equipment, uniforms, supplies, paper goods, services, menus, packaging, forms, POS Systems, computer hardware, software, modems and peripheral equipment and other products,

EXHIBIT 1248 - 0006

supplies, services and equipment, other than Potato Corner Branded Products and Potato Corner Proprietary Products, that Franchisee may or must use, offer and sell at the Franchised Restaurant.

"**Non-Traditional Venues**" means a broad variety of atypical sites, including, without limitation, a site or location within a captive market site, another primary business or in conjunction with other businesses or at institutional settings such as office buildings, business complexes, arenas, stadiums and entertainment venues, recreational facilities, beaches, parks, airports, train and bus stations, travel plazas, toll road facilities and other transportation terminals, food service fulfillment centers, educational, medical, governmental and other types of institutional facilities, sites in retail locations (for example, a kiosk within a grocery store), cafeterias and casinos, and any site for which the lessor, owner or operator limits the operation of its beverages and/or food service facilities to a master concessionaire or contract food service provider.

"**Notice of Default**" means a written notice from one Party to another Party demanding the cure of a Default and demanding that the defaulting Party provide evidence of the cure to the other Party.

"**On-Site Opening Assistance Fee**" means the up to $5,000 fee that Franchisee must pay Franchisor to provide on-site opening assistance if the Franchised Restaurant is more than 100 miles from Franchisor's corporate office in Culver City, California.

"**Open**," "**Open for Business,**" and "**Opened**" means that Franchisee has actually begun to offer Potato Corner Authorized Products for sale to the public from the Franchised Restaurant.

"**Opening Date**" means the day that (i) Franchisee receives written authorization from Franchisor and all applicable Governmental Authorities to commence business operations at the Franchised Restaurant, and (ii) Franchisee actually begins to offer Potato Corner Authorized Products for sale to the public from the Franchised Restaurant, whichever occurs last, which shall be no later than the first anniversary of the Effective Date as set forth on **Exhibit A**.

"**Owner**" means each of the individuals listed on **Exhibit B** and each future direct or indirect shareholder, member, general or limited partner, trustee or other Equity owner of Franchisee who owns ten percent (10%) or more of the Equity of Franchisee. If Franchisee is an Entity, each Owner and each Owner's spouse shall jointly and severally guarantee Franchisee's payment and performance of its obligations under this Agreement under a Guarantee in the form of **Exhibit C**.

"**Payment Network**" means Visa, MasterCard and any credit or debit card network issuing credit or debit cards and/or their duly authorized entities, agents or affiliates.

"**Payment Processors**" means all credit card, debit card and/or ACH processors whose services Franchisor may require Franchisee to utilize, as well as payment gateway service providers.

"**Payment Rules**" means the operating rules and regulations of Payment Processors and any applicable Payment Network, as in effect from time to time.

"*Person*" means any natural person or Entity.

"**Post-Opening Initial Training Fee**" means the $2,500 fee Franchisee shall pay Franchisor for each trainee if Franchisee requests Franchisor to provide its Initial Training Program for new or replacement supervisorial or managerial personnel of Franchisee following the Opening Date of the Franchised Restaurant.

"**Post-Opening Additional Training Program Daily Fee**" means the $250 daily fee Franchisee shall pay Franchisor for Post-Opening Additional Training Programs provided by Franchisor for each of Franchisor's representatives who provides Post-Opening Additional Training Programs for Franchisee.

"**Potato Corner Authorized Products**" means all Potato Corner Branded Products, Potato Corner Proprietary Products and Non-Proprietary Products offered for sale or used at Potato Corner Restaurants, as specified by Franchisor from time to time.

"**Potato Corner Approved Suppliers**" means suppliers of Potato Corner Branded Products, Potato Corner Proprietary Products and Non-Proprietary Products, and ancillary services, Food Delivery Services, food products, beverages, packaging, supplies, furniture, fixtures and equipment for Potato Corner Restaurants that have been accepted and approved by Franchisor because they have demonstrated to Franchisor their ability to supply products and services for Potato Corner Restaurants meeting Franchisor's specifications as to brand names, models, contents, manner of preparation, ingredients, quality, freshness, compliance with governmental standards and regulations, reliability with respect to delivery and consistency in the quality of their products or services. Franchisor and its Affiliates may be Potato Corner Approved Suppliers.

"**Potato Corner Branded Products**" means any product now existing or developed in the future that bears any of the Potato Corner Marks, including products that are prepared, sold and/or manufactured in strict accordance with Franchisor's recipes, methods, standards and specifications, including, without limitation, pre-packaged food and beverage products, packaging, clothing, souvenirs and novelty items.

"**Potato Corner Franchise Agreements**" means Franchise Agreements between Franchisor and Potato Corner Franchisees for Potato Corner Restaurants, including all exhibits, riders, guarantees or other related instruments, all as amended from time to time.

"**Potato Corner Franchisees**" means the parties who enter into Potato Corner Franchise Agreements with Franchisor to develop, own and operate Potato Corner Restaurants.

"**Potato Corner Proprietary Products**" means Potato Corner food products, beverages, packaging and other items that are produced or manufactured strictly in accordance with the Potato Corner Trade Secrets or that Franchisor or its Affiliates otherwise designate as proprietary and include, without limitation, certain equipment, oil, french fries, small wares, sodas, other paper products, CCTV camera, accounting software, sour cream, cheese, sauces, dips, jalapeño, baked potatoes, chicken, seasonings, and  Trade Secret Food Ingredients.

"**Potato Corner System**" means the system developed by Franchisor and its Affiliates that includes operating methods and business practices related to Potato Corner Restaurants, the relationship between Franchisor and Potato Corner Franchisees, interior and exterior restaurant design, other items of trade dress, specifications for equipment, fixtures and uniforms, defined product offerings, recipes and unique cooking techniques and methods, specified pricing and promotions, restrictions on ownership, standard operating and administrative procedures, management and technical training programs, marketing and public relations programs, and Franchisor's Website, all as Franchisor may modify the same from time to time.

"**Potato Corner Trade Secrets**" means proprietary and confidential information of Franchisor and its Affiliates, including, the Trade Secret Food Ingredients, recipes, ingredients, specifications, procedures, policies, concepts, systems, know-how, plans, software, strategies and methods and techniques of operating Potato Corner Restaurants and producing Potato Corner Authorized Products, excluding information that is or

**EXHIBIT 1248 - 0008**

becomes a part of the public domain through publication or communication by third parties not bound by any confidentiality obligation or that Franchisee can show was already lawfully in Franchisee's possession before receipt from Franchisor

"**Pre-Opening Additional Initial Training Fee**" means the $2,500 fee Franchisee shall pay Franchisor for each additional trainee if Franchisee requests Franchisor to provide its Initial Training Program to more than two (2) supervisorial or managerial personnel selected by Franchisee prior to the Opening Date of the Franchised Restaurant.

"**Principal Owner**" means the individual designated by Franchisee on **Exhibit B** and accepted by Franchisor to serve as the primary operator of the Franchised Restaurant, to serve as the authorized representative of Franchisee, who shall have at least a seventy percent (70%) interest in the Equity of Franchisee, who shall act as Franchisee's representative in all matters with Franchisor as Franchisee's liaison with Franchisor and the Owners, and who shall have the authority to act on behalf of Franchisee during the Term without the active participation of any other Owner.

"**Protected Area**" means the geographic area designated on **Exhibit A**.

"**Recommended Suppliers**" means suppliers of Non-Proprietary Products who are recommended by Franchisee to become Potato Corner Approved Suppliers.

"**Relocation Fee**" means the $5,000 fee that Franchisee must pay Franchisor if Franchisee requests Franchisor to consent to a relocation of the Franchised Restaurant, plus Franchisor's out-of-pocket expenses, including transportation, food and lodging for reviewing a new location.

"**Renewal Fee**" means 80% of the then-current Initial Franchise Fee for new franchisees that Franchisee must pay Franchisor to extend the Initial Term and each Renewal Term.

"**Renewal Right**" means the right held by Franchisee to renew this Agreement for successive Renewal Terms upon the expiration of the Initial Term and prior Renewal Terms.

"**Renewal Term**" means successive periods, each for ten (10) years.

"**Renewal Term Expiration Date**" means the tenth anniversary of the commencement date of each Renewal Term.

"**Restricted Person**" means Franchisee, and each of its Owners and Affiliates, and the respective officers, directors, managers and Affiliates of each of them, and the spouse of each of the foregoing who are individuals.

"**Royalty Fees**" means the monthly royalty fees that Franchisee shall pay Franchisor equal to the percentage of the Gross Sales of the Franchised Restaurant set forth on **Exhibit A**.

"**Software License Fees**" means the $400 fee that Franchisee shall pay Franchisor to install the POS System and inventory control software designated by Franchisor and the up to $600 continuing monthly fee that Franchisee shall pay Franchisor for the continuing right to use the POS System and inventory control software designated by Franchisor. Franchisor may, at any time during the Initial Term, upon ninety (90) days' prior notice to Franchisee, increase the amount of the Software License Fees.

"**Term**" means the Initial Term unless this Agreement is extended for one or more Renewal Terms, in which case "**Term**" shall mean both the Initial Term and the Renewal Terms.

"**Then-Current**" means the form of agreement then-currently provided by Franchisor to similarly situated prospective Potato Corner Franchisees which may contain terms and conditions that are materially different from this Agreement, or if not then being so provided, then a form of agreement selected by Franchisor in its discretion which previously has been delivered to and executed by a Potato Corner Franchisee of Franchisor, or, as the context of this Agreement indicates, the fees then-currently charged by Franchisor or its Affiliates, or Franchisor's specifications, standards or the like.

"**Transfer Fee**" means 80% of the then-current Initial Franchise Fee for new franchisees that Franchisee must pay Franchisor as a condition precedent to an Assignment of this Agreement.

"**Website**" means an interactive electronic document contained in a network of computers linked by communication software that refers to the Franchised Restaurant, the Potato Corner Marks, Franchisor or the Potato Corner System, and includes Internet and World Wide Web home pages.

2.    **GRANT**

  2.1    **Grant**. Franchisor hereby awards Franchisee, and Franchisee hereby accepts, the right, license and obligation, during the Initial Term, to use and display the Potato Corner Marks and use the Potato Corner System to continually operate one (1) Potato Corner Restaurant at, and only at, the Franchised Location, upon the terms and subject to the provisions of this Agreement and all ancillary documents binding the Parties. Franchisee shall utilize the Franchised Location only for the operation of the Franchised Restaurant. Franchisee shall not sublicense, sublease, subcontract or enter any management agreement providing for the right to operate the Franchised Restaurant or to use the Potato Corner System granted pursuant to this Agreement.

  2.2    **Protected Area**. During the Initial Term, and provided that Franchisee is not in Default under this Agreement or any other agreement between Franchisor or its Affiliates and Franchisee, Franchisor shall not own, operate, sell or issue a franchise for any other Potato Corner Restaurant within the Protected Area. Notwithstanding the foregoing, however, if the Franchised Location is located at a Non-Traditional Venue, the Protected Area shall be limited to the Non-Traditional Venue. Except as provided in this Section 2.2, Franchisee shall have no territorial or protective rights with respect to the Potato Corner Restaurant, and Franchisor shall have the right to place other Potato Corner Restaurants anywhere it desires outside the Protected Area. Franchisee shall not receive an exclusive territory. Unless Franchisor agrees otherwise in writing, Franchisee may only accept and fulfill orders received from Food Delivery Services in the Protected Area. Franchisee must advise all Food Delivery Services of these delivery restrictions imposed on Franchisee. The license granted to Franchisee under this Agreement is nonexclusive, and.

  2.3    **Rights Reserved by Franchisor**. Franchisor and its Affiliates expressly reserve all other rights with respect to the Potato Corner System, the Potato Corner Marks and Potato Corner Restaurants, including the exclusive right, in their discretion, directly or indirectly, without paying Franchisee any compensation or granting Franchisee any rights in the same, to (i) develop, own and operate, and to grant licenses and franchises to third parties to develop, own and operate, Potato Corner Restaurants at any location outside of the Protected Area regardless of its proximity to the Franchised Restaurant; (ii) develop, own and operate, and to grant licenses and franchises to third parties to develop, own and operate, any other business other than a Competitive Business, under marks and systems different from the Potato Corner Marks and the Potato Corner System at any location regardless of its proximity to the Franchised Restaurant; (iii) sell or distribute, at retail

EXHIBIT 1248 - 0010

or wholesale, directly or indirectly, and license others to sell or distribute, Potato Corner Branded Products from any location within or outside of the Protected Area regardless of proximity to the Franchised Restaurant, through the Internet, mail order catalogs, direct mail advertising and through other distribution methods; (iv) market on the Internet and use the Potato Corner Marks on the Internet, including all use of Websites, domain names, URLs, directory addresses, email addresses, metatags, linking, advertising, co-branding and other arrangements, and in all other forms of electronic media; (v) deliver and/or license to other Potato Corner Restaurants or third parties to deliver at any location within or outside of the Protected Area without compensation to Franchisee, and to establish a delivery policy in the future which may restrict the delivery jurisdiction of Franchisor or of any Potato Corner Franchisees; (vi) develop, own or operate and to grant franchises or licenses to third parties to develop, own or operate Potato Corner Restaurants at Non-Traditional Venues within and outside of the Protected Area regardless of their proximity to the Franchised Restaurant; (vii) acquire the assets or ownership interests of one or more businesses providing products and services similar to those provided at Potato Corner Restaurants and to franchise, license or create similar arrangements with respect to these businesses once acquired, wherever these businesses (or the franchisees or licensees of these businesses) are located or operating; (viii) be acquired (whether through acquisition of assets, ownership interests or otherwise, regardless of the form of transaction), by any business providing products and services similar to those provided at Potato Corner Restaurants, or by another business, even if such business operates, franchises and/or licenses Competitive Businesses; and (ix) engage in all other activities that this Agreement does not expressly prohibit.

3.  **INITIAL AND RENEWAL TERMS.**

3.1  **Initial Term**. The Initial Term shall commence on the Opening Date and shall expire on the Expiration Date. If Franchisee does not elect to renew the Initial Term under Section 3.2, this Agreement shall expire on the Expiration Date.

3.2  **Renewal Right**. Upon the expiration of the Initial Term, Franchisee shall have the right (the "**Renewal Right**") to enter into a new franchise agreement in the Then-Current form then generally being offered to prospective Potato Corner Franchisees (a "**Renewal Franchise Agreement**") for successive Renewal Terms. If Franchisee desires to exercise the Renewal Right for a Renewal Term, Franchisee shall, no later than twelve (12) months prior to the Expiration Date or Renewal Term Expiration Date, as the case may be, notify Franchisor in writing (the "**Renewal Notice**") that Franchisee desires to extend the Initial Term or Renewal Term for the duration of the Renewal Term or the next successive Renewal Term, as the case may be. If Franchisee exercises a Renewal Right, this Agreement shall terminate on the next Renewal Term Expiration Date. This Agreement is not otherwise renewable.

3.3  **Conditions to Renewal**. Franchisee may exercise its Renewal Rights only if all of the following conditions precedent are satisfied prior to the Expiration Date or Renewal Term Expiration Date, as the case may be: (i) Franchisee shall fully perform all of its obligations under this Agreement, any Multi-Unit Development Agreement and all other agreements binding the Parties and shall be in Good Standing on the date of the Renewal Notice, on the date of Franchisor's execution of the Renewal Franchise Agreement and on the Expiration Date or the Renewal Term Expiration Date, as the case may be; (ii) Franchisee shall, prior to the commencement date of the Renewal Term, undertake and complete at its expense, the remodeling, renovation, modernization, and refurbishing of the Franchised Location and the Franchised Restaurant to comply with Franchisor's Then-Current specifications and standards for new Potato Corner Restaurants; (iii) Franchisee shall not commit three (3) or more material Defaults during any eighteen (18) month period during the then-expiring Initial Term or Renewal Term, as the case may be, which are subject to notices of Default issued by Franchisor, whether or not the Defaults were cured; (iv) Franchisee shall continue to comply with the terms

EXHIBIT 1248 - 0011

and conditions of this Agreement; (v) Franchisee shall satisfy Franchisor's Then-Current qualifications and training requirements; (vi) Franchisee shall execute and deliver to Franchisor a General Release; (vii) each Owner and each Owner's spouse of Franchisee shall execute and deliver to Franchisor a personal guarantee, in a form then satisfactory to Franchisor, jointly and severally guaranteeing Franchisee's performance of its obligations under the Renewal Franchise Agreement; (viii) Franchisee shall pay Franchisor a Renewal Fee when Franchisee issues the Renewal Notice to Franchisor; and (ix) Franchisee shall execute the Renewal Franchise Agreement and deliver it to Franchisor.

3.4    **Renewal Procedures**. Following the expiration of any waiting periods required by Applicable Law and no more than thirty (30) days after Franchisee receives a franchise disclosure document, if applicable, and the execution copies of the Renewal Franchise Agreement, Franchisee shall execute the copies of the Renewal Franchise Agreement and return them to Franchisor. If Franchisee has exercised a Renewal Right in accordance with Section 3.2 and satisfied all of the conditions in Section 3.3 and in this Section 3.4, Franchisor shall execute the Renewal Franchise Agreement. If Franchisee fails to perform any of the acts, or deliver any of the notices required under this Article 3 in a timely fashion, the failure to do so shall be deemed an election by Franchisee to not exercise the applicable Renewal Right and shall automatically cause the applicable Renewal Right to lapse and expire.

3.5    **Notice Required by Law**. If Applicable Law requires Franchisor to give notice to Franchisee prior to the expiration of the Initial Term or a Renewal Term, as the case may be, this Agreement shall remain in effect on a week-to-week basis until Franchisor has given the notice required by Applicable Law. If Franchisor is not offering new franchises, is in the process of revising, amending or renewing its form of franchise agreement or franchise disclosure document, or is not lawfully able to offer Franchisee its Then-Current form of franchise agreement, at the time Franchisee delivers a Renewal Notice, Franchisor may, in its discretion, either: (i) offer to renew this Agreement upon the same terms set forth in this Agreement for a renewal term determined in accordance with Section 3.2; or (ii) offer to extend the Term on a week-to-week basis following the expiration of the Term for as long as it deems necessary or appropriate so that it may lawfully offer its Then-Current form of franchise agreement.

3.6    **Month-to-Month Agreement**. If Franchisee does not sign Franchisor's Then-Current Franchise Agreement prior to the Expiration Date and Franchisee continues to accept the benefits of this Agreement after it expires, then at Franchisor's option, this Agreement may be treated either as (i) expired as of the Expiration Date with Franchisee then operating without a license to do so and in violation of Franchisor's rights; or (ii) continued on a month-to-month basis ("**Month-to-Month Agreement**") until one party provides the other with written notice of such party's intent to terminate the Month-to-Month Agreement, in which case the Month-to-Month Agreement will terminate thirty (30) days after receipt of the notice to terminate the Month-to-Month Agreement, or such longer notice period as is required by Applicable Law. In the latter case, all of Franchisee's obligations shall remain in full force and effect during the Month-to-Month Agreement as if this Agreement had not expired, and all obligations and restrictions imposed on Franchisee upon expiration of this Agreement shall be deemed to take effect upon termination of the Month-to-Month Agreement.

4.    **FEES AND PAYMENTS**

4.1    **Initial Franchise Fee**. On the Effective Date, Franchisee shall pay Franchisor the Initial Franchise Fee in the manner provided in Section 4.7. The Initial Franchise Fee shall be non-refundable, in whole or in part, once paid.

EXHIBIT 1248 - 0012

4.2    **Royalty Fees**. Franchisee shall pay Franchisor a monthly Royalty Fee in the manner provided in Section 4.7 without deduction, abatement or offset. The Royalty Fee shall be paid on the tenth day of each calendar month, or upon reasonable notice to Franchisee, before the tenth day, of each calendar month on the Gross Sales of the Franchised Restaurant during the preceding calendar month. Each payment shall be accompanied by a statement of Gross Sales for the preceding calendar month, certified as complete and accurate by the Principal Owner.

4.3    **Marketing Fund Fees**. On ninety (90) days' prior written notice to Franchisee, Franchisee shall pay a monthly Marketing Fund Fee to the Marketing Fund in the manner provided in Section 4.7 without deduction, abatement or offset. If required by Franchisor, I Marketing Fund Fee shall be paid on the tenth day of each calendar month on the Gross Sales of the Franchised Restaurant during the preceding calendar month. In addition, Franchisor may, from time to time, offer Franchisee the opportunity to purchase point of sale advertising material, posters, flyers, product displays, templates and other promotional materials for the Franchised Restaurant at Franchisor's direct costs for the same.

4.4    **Software License Fees.** Franchisee shall pay Franchisor Software License Fees in the manner provided in Section 4.7 without deduction, abatement or offset. The Software License Fees shall be paid on the tenth day of each month.

4.5    **Other Payments**. Franchisee shall promptly pay Franchisor and its Affiliates, as applicable, when due without deduction, abatement or offset: (i) all amounts advanced by Franchisor or which Franchisor has paid, or for which Franchisor has become obligated to pay on behalf of Franchisee for any reason whatsoever; and (ii) all amounts due to Franchisor or its Affiliates for Potato Corner Branded Products and Potato Corner Proprietary Products sold to Franchisee.

4.6    **Interest and Charges for Late Payments**. If Franchisee fails to pay any amount due to Franchisor under this Agreement by the date payment is due, or if any electronic payment is unpaid because of insufficient funds or otherwise, Franchisee shall additionally be obligated to pay, as a late charge, the sum of $50. Additionally, Franchisee shall pay interest on the amount outstanding at the rate of five percent (5%) per month (but not to exceed the maximum legal rate of interest) imposed from the date payment was due until the entire sum and late charge are paid in full. This Section 4.6 does not constitute an agreement by Franchisor to accept any payment after the date payment is due or a commitment by Franchisor to extend credit to, or otherwise finance, Franchisee, and Franchisee's failure to pay all amounts when due shall constitute grounds for termination of this Agreement notwithstanding this Section 4.6.

4.7    **Manner of Payment**. Franchisee shall make all payments due to Franchisor or its Affiliates from Franchisee's bank account by electronic funds transfer ("**EFT**") or other automatic payment mechanism that Franchisor may designate. Promptly upon Franchisor's request, Franchisee shall execute and deliver to Franchisor the EFT payment form attached to this Agreement as **Exhibit D** and all pre-authorized check forms and other instruments or drafts required by Franchisor's bank, payable against Franchisee's bank account, to enable Franchisor to draw the Royalty Fees and other sums payable under the terms of this Agreement. Franchisee shall maintain a single bank account for all EFT payments and shall maintain such minimum balance in this account in the amount that Franchisor may reasonably specify from time to time in order to ensure that all payments due to Franchisor and its Affiliates can be paid in full when drawn from the account. Franchisee shall not alter or close this account except with Franchisor's prior written approval. Any failure by Franchisee to implement an EFT system in strict accordance with Franchisor's instructions shall constitute a material Default of this Agreement. All payments by Franchisee shall be made in US Dollars free and clear of any tax, deduction, offset or withholding of any kind. Franchisee shall register for and collect and report sales

EXHIBIT 1248 - 0013

tax in compliance with all Applicable Laws. All taxes and penalties presently or in the future levied on the payments due to Franchisor under this Agreement shall be fully borne by Franchisee.

       4.8    **Application of Funds**. If Franchisee shall be delinquent in the payment of any obligation to Franchisor under this Agreement, or under any other agreement with Franchisor, Franchisor shall have the absolute right to apply any payments received from Franchisee to any obligation owed, whether under this Agreement or otherwise, notwithstanding any contrary designation by Franchisee as to application.

       4.9    **Security Interest**.  Franchisee hereby grants Franchisor and its Affiliates a security interest in and to all leasehold improvements, fixtures, furnishings and equipment, inventory, supplies and vehicles located at or used in connection with the Franchised Restaurant, now or hereafter acquired by Franchisee, together will all accounts, payment intangibles, attachments, accessories, additions, substitutions and replacements, all cash and non-cash proceeds derived from insurance or the disposition of the assets, all rights of Franchisee to use the Potato Corner Marks, trade names, trade styles, patents, copyrights and their registrations, trade secret information and other proprietary rights, and all rights granted, owned or licensed to Franchisee under this Agreement for the use of the Potato Corner Marks, trade names, trade styles, patents, copyrights, trade secret information and other proprietary rights, to secure payment and performance of all debts, liabilities and obligations of any kind, whenever and however incurred, from Franchisee to Franchisor. Franchisee hereby authorizes Franchisor and its Affiliates to prepare and file all Uniform Commercial Code (and comparable) financing statements and other documents necessary or desirable to evidence, perfect and continue the priority of this security interest under the Uniform Commercial Code wherever applicable. If Franchisee is in Good Standing under this Agreement and all other agreements between Franchisee and Franchisor or its Affiliates, then Franchisor and its Affiliates shall, upon request of Franchisee, execute a written subordination of its security interest to lenders providing equipment or other financing for the Franchised Restaurant. If Franchisee is in Default of any of the terms and conditions of this Agreement, Franchisor and its Affiliates may, in their discretion, exercise their rights with respect to their security interests. In that event, Franchisee shall remain liable for any deficiency remaining due to Franchisor and its Affiliates and shall be entitled to recover any surplus which results after the application of the proceeds derived from the enforcement of the security interest.

5.      **FRANCHISED LOCATION, CONSTRUCTION AND OPENING FOR BUSINESS**

       5.1    **Franchised Location**. The Franchised Restaurant shall be located at the Franchised Location. If the address of the Franchised Location has not been inserted in the blank space on **Exhibit A** on the Effective Date, Franchisee shall, within ninety (90) days after the Effective Date, locate one or more proposed sites that meet Franchisor's Then-Current standards and specifications. Franchisor shall provide Franchisee with Franchisor's site criteria following the parties' execution of this Agreement. Franchisee shall submit to Franchisor all demographic and other information regarding a proposed site and its neighboring areas that Franchisor shall require. Franchisor shall accept or reject a proposed site for the Franchised Restaurant within thirty (30) days after Franchisee provides Franchisor all supplemental information that Franchisor requires to evaluate the site. Following Franchisor's approval of a site, Franchisee shall promptly negotiate a Lease for the site and shall submit a copy of the proposed Lease to Franchisor to allow Franchisor at least fifteen (15) days to confirm that the provisions set forth in Section 5.2 have been included in the proposed Lease and that the Landlord and Franchisee have executed an Option to Obtain Lease Assignment in the form specified by Franchisor. Franchisee shall not enter into any Lease for a site unless and until Franchisor has approved the site and the Lease in writing. Following Franchisee's execution of the Lease for the Franchised Location, the Parties shall complete and execute an addendum to **Exhibit A** to identify the Franchised Location. Franchisee shall obtain a fully executed Lease for the site no later than ninety (90) days after the Effective Date. Franchisor

EXHIBIT 1248 - 0014

may voluntarily, and without obligation, assist Franchisee in selecting an acceptable site for the Franchised Location. Franchisee acknowledges its sole responsibility for finding the Franchised Location.

5.2    **Lease for Franchised Location**. Franchisee shall not create any obligations on Franchisor's behalf or grant the Landlord any rights against Franchisor, or agree to any term, condition or covenant in the Lease which are inconsistent with any provision of this Agreement. Franchisee shall deliver a fully executed copy of the Lease to Franchisor promptly following its execution, in the form and on the terms previously accepted by Franchisor, without further request by Franchisor. The Lease shall provide, unless Franchisor otherwise consents in writing prior to the execution of the Lease, that: (i) the Lease may not be amended, assigned or sublet without Franchisor's prior written consent; (ii) Franchisor shall have the right (but not the obligation) to succeed to Franchisee's rights under the Lease if Franchisee fails to exercise any option to renew, and or extend the term of the Lease; (iii) upon Franchisee's Default under the Lease, the Landlord shall notify Franchisor in writing at least fifteen (15) days prior to the termination or non-renewal of the Lease; (iv) Franchisor shall have an option to assume the Lease upon the termination or expiration of the Lease for any reason by giving written notice of the election to Franchisee and the Landlord; (v) Franchisee shall have the unrestricted right, without the Landlord's consent, to assign or sublet the Franchised Location to Franchisor, or any Potato Corner Franchisee or licensee approved by Franchisor; (vi) Franchisor shall have the right to enter the Franchised Location to remove all of the Potato Corner Marks from the Franchised Location and modify the décor of the Franchised Location so that it no longer resembles, in whole or in part, a Franchised Restaurant if Franchisee fails to do so; and (vii) upon any renewal of the Lease, Franchisor and Landlord will cooperate with each other and use reasonable best efforts to adjust the expiration dates of both the renewal Lease and this Agreement or Renewal Franchise Agreement, if applicable, so that the term of the renewal Lease will expire contemporaneously with the expiration of the Term of this Agreement or Renewal Franchise Agreement, if applicable. In addition to including these provisions in the Lease, Franchisor, Franchisee and the Landlord shall execute an Option to Obtain Lease Assignment in the form specified by Franchisor at the time the Lease is executed by Franchisee and the Landlord. If Franchisor elects to succeed to Franchisee's rights under the Lease, Franchisee shall assign to Franchisor all of its right, title and interest in and to the Lease and take all further action that Franchisor, in its sole and absolute discretion, may deem necessary or advisable to effect the assignment within ten (10) days after written demand by Franchisor to do so. Franchisor may voluntarily (without obligation) assist Franchisee in locating an acceptable site for the Franchised Restaurant. Franchisor's acceptance of any proposed Lease is based solely on Franchisor's own interests. Franchisee acknowledges and agrees that although Franchisor may consult with Franchisee regarding the terms of a Lease and the negotiations with a Landlord, it is Franchisee's sole responsibility to negotiate, review and approve the Lease or purchase agreement for the Franchised Restaurant.

5.3    **Construction**. Franchisor shall make available, at no charge to Franchisee, Franchisor's specifications for the décor and layout of a prototype Franchised Restaurant and the required fixtures, equipment, furnishings, décor, trade dress and signs. Franchisee shall be responsible for the costs of preparing architectural, engineering and construction drawings and site and space layout and exterior signage plans for the Franchised Restaurant. Franchisee shall, at its own expense, adapt the specifications for the prototype Franchised Restaurant to conform to the characteristics of the Franchised Location and shall submit the final plans to Franchisor within forty-five (45) days after Franchisee obtains possession of the Franchised Location. Franchisor shall review and accept or reject the plans within fifteen (15) days after receiving them from Franchisee. Before commencing any renovation or construction, Franchisee shall employ a licensed architect and engineer approved by Franchisor to prepare preliminary and final architectural and engineering drawings and specifications for the Franchised Restaurant in accordance with Franchisor's standard architectural plans and specifications for a prototype Franchised Restaurant. Franchisee shall, at its own expense, obtain all zoning classifications, licenses, permits, and clearances for construction. Franchisee's failure to locate an acceptable

EXHIBIT 1248 - 0015

site, enter a Lease and Open the Franchised Restaurant within the applicable time periods provided for in this <u>Article 5</u> shall be deemed to be material Default under this Agreement. Franchisee shall notify Franchisor of the anticipated construction completion date and, within a reasonable time after construction is completed, Franchisor shall have the right, but not the obligation, to conduct a final inspection of the Franchised Restaurant.

      5.4      **Open for Business**. The Franchised Restaurant shall Open for Business no later than the 270 days after the Effective Date, (i) unless Franchisor extends the date for the required Opening Date of the Franchised Restaurant in writing, or (ii) the Opening Date is otherwise set forth pursuant to an applicable Development Agreement with Franchisor. Franchisor shall not unreasonably withhold its consent to Franchisee's request for additional time to Open the Franchised Restaurant without cause. To protect the Potato Corner System, the Potato Corner Marks, the Potato Corner Trade Secrets and the goodwill associated with the same, Franchisee shall not Open the Franchised Restaurant or offer Potato Corner Authorized Products to the public without the express written authorization of Franchisor, which authorization may be conditioned upon Franchisee's strict compliance with the specifications of the approved final plans and Potato Corner System standards, the completion of the Initial Training Program by the Principal Owner and the General Manager and Franchisee's compliance with staffing and other requirements. Franchisee shall Open the Franchised Restaurant for business following receipt of a temporary or permanent certificate of occupancy and no more than ten (10) days after receipt of Franchisor's written authorization to Open. Following the Opening Date, the Parties shall complete and execute an addendum to **Exhibit A** to designate the Opening Date.

      5.5      <u>**Relocation of Franchised Restaurant**</u>. To protect the Potato Corner System, the Potato Corner Marks, the Potato Corner Trade Secrets and the goodwill associated with the same, Franchisee may not relocate the Franchised Restaurant without Franchisor's prior written consent. Franchisee shall pay Franchisor a Relocation Fee when Franchisee requests Franchisor's consent to a relocation of the Franchised Restaurant. If Franchisor consents to a relocation, Franchisee shall de-identify the former Franchised Location in the manner described in <u>Section 17.1</u> and shall reimburse and indemnify and hold Franchisor harmless from any direct and indirect losses, costs and expenses, including attorney's fees, arising out of Franchisee's failure to do so. If Franchisor consents to a relocation of the Franchised Restaurant during the Term, Franchisee shall have twelve (12) months from the date of Franchisor's approval of the new Franchised Location to secure the new Franchised Location and to Open and operate the Franchised Restaurant at the new Franchised Location. Once Franchisee has identified the new Franchised Location, Franchisor has approved it, and the Lease has been submitted to Franchisor to allow Franchisor at least fifteen (15) days to confirm that the provisions set forth in <u>Section 5.2</u> have been included in the proposed Lease and/or that the Landlord and Franchisee have executed an Option to Obtain Lease Assignment in the form specified by Franchisor, Franchisor will prepare an addendum to **Exhibit A** to designate the Franchised Location and will provide the addendum to Franchisee. If Franchisee fails to secure the new Franchised Location within twelve (12) months of the date of Franchisor's approval of the new Franchised Location, Franchisor, in its discretion, may extend the time for Franchisee to do so; however, Franchisor shall then have the right to estimate and bill Franchisee for Royalty Fees for the time period following the expiration of the twelve (12) month period (a "**Relocation Assessment**") based upon the Royalty Fees received for the Franchised Restaurant during the identical periods of the last preceding calendar year plus an additional ten percent (10%) of such amount or, if the Franchised Restaurant was not in operation during the identical period of the last preceding year, a Relocation Assessment based upon the average Royalty Fees paid during the number of months the original Franchised Restaurant was in operation plus an additional ten percent (10%) of that amount**.**

EXHIBIT 1248 - 0016

6.    **OBLIGATIONS OF FRANCHISOR**

6.1    **Pre-Opening Initial Training Program**. Prior to the Opening Date of the Franchised Restaurant, Franchisor shall provide an Initial Training Program in the Potato Corner System and methods of operation at company-owned Potato Corner Restaurants currently located in Southern California Franchisor selects and/or Franchisor's corporate office, for up to four (4) supervisorial or managerial personnel of Franchisee selected by Franchisee who must include the Principal Owner and General Manager, at no charge to Franchisee. Franchisee shall pay Franchisor its Then-Current Pre-Opening Additional Initial Training Fee for each additional trainee. The Initial Training Program will consist of approximately two (2) weeks of training prior to the Opening Date of the Franchised Restaurant and must be completed before the Franchised Restaurant Opens for business. The Initial Training Program shall not be provided by Franchisor if: (i) Franchisee or any Affiliate of Franchisee owns or operates a Potato Corner Restaurant as of the Effective Date; or (ii) this Agreement is executed as a Renewal Franchise Agreement. Franchisor shall determine the contents and manner of conducting the Initial Training Program in its discretion, however, the Initial Training Program will be structured to provide practical training in the implementation and operation of a Potato Corner Restaurant and may include such topics as food and beverage preparation, portion control, cooking procedures, packaging procedures, Potato Corner System standards, marketing and customer service techniques, reports and equipment maintenance. Following the Opening Date of the Franchised Restaurant, Franchisor may, at Franchisee's request and at Franchisor's discretion, provide additional Initial Training Programs ("**Post-Opening Initial Training Programs**") for new or replacement supervisorial or managerial personnel of Franchisee.

6.2    **Post-Opening Additional Training Programs**. Following the Opening Date of the Franchised Restaurant, Franchisor may, at Franchisor's discretion, from time to time during the Term: (i) require the Principal Owner and each General Manager and/or other supervisorial or managerial personnel of Franchisee to attend; or (ii) make available to the Principal Owner and each General Manager and/or other supervisorial or managerial personnel of Franchisee, additional and remedial training programs ("**Post-Opening Additional Training Programs**").

6.3    **On-Site Opening Assistance**.  For Franchisee's first Franchised Restaurant, Franchisor will provide on-site training and assistance for up to three (3) days after Franchisee's Franchised Restaurant Opens to the public. On-site opening assistance shall not be provided by Franchisor if: (i) Franchisee or any Affiliate of Franchisee owns or operates a Potato Corner Restaurant as of the Effective Date; or (ii) this Agreement is executed as a Renewal Franchise Agreement. Franchisor shall select the representatives who will provide the on-site training and the length of time that on-site training will be provided.

6.4    **Manuals**. Franchisor will provide Franchisee with access, by hard copy or via the Internet, to one copy of its current Manuals during the Term which may include audio, video, compact disks, computer software, other electronic media and/or written materials. At Franchisor's option, Franchisor may post some or all of the Manuals on a restricted Website, intranet, or extranet to which Franchisee will have access. The Manuals may change from time to time during the Term. The Manuals are, and at all times shall remain Franchisor's sole property and shall promptly be returned to Franchisor upon expiration, termination or an Assignment of this Agreement. The Manuals contain both mandatory and recommended specifications, standards, procedures, rules and other information pertinent to the Potato Corner System and Franchisee's obligations under this Agreement. The Manuals, as modified by Franchisor from time to time, are an integral part of this Agreement and all provisions now or hereafter contained in the Manuals or otherwise communicated to Franchisee in writing are expressly incorporated into this Agreement by this reference and made a part of this Agreement. Franchisor reserves the right to modify the Manuals from time to time to reflect

EXHIBIT 1248 - 0017

changes that it may implement in the mandatory and recommended specifications, standards and operating procedures of the Potato Corner System.

6.5    **Post-Opening Consultation**. Following the Opening Date of the Franchised Restaurant, Franchisor may provide regular consultation and advice to Franchisee in response to Franchisee's inquiries about specific administrative and operating issues that Franchisee brings to Franchisor's attention including, without limitation, mandatory and recommended specifications, standards and operating procedures of the Potato Corner System. Franchisor's consultation and advice may be provided by telephone, in writing, electronically, in person, or by other means. Franchisee acknowledges and agrees that the results of Franchisee's efforts to operate a Potato Corner Restaurant rest solely with Franchisee. Franchisor may make recommendations that it deems appropriate to assist Franchisee's efforts. However, Franchisee alone shall establish all requirements, consistent with the policies of Franchisor, regarding:  (i)  employment policies, hiring, firing, training, wage and hour requirements, record keeping, supervision, and discipline of employees; (ii) the individuals to whom Franchisee will offer and sell its products and services; and (iii) the suppliers from whom Franchisee obtains any products or services used in or at the Restaurant for which Franchisor has not established Potato Corner Approved Suppliers.

6.6    **Post-Opening Inspections**. To protect the Potato Corner System, the Potato Corner Marks, the Potato Corner Trade Secrets and the goodwill associated with the same, following the Opening Date of the Franchised Restaurant, Franchisor's authorized representatives shall have the right, but not the obligation, from time to time, to enter the Franchised Restaurant during business hours, to examine the Franchised Restaurant, to confer with Franchisee's supervisory and managerial personnel, inspect and check operations, food, beverages, furnishings, interior and exterior décor, supplies, fixtures and equipment, and determine whether the Franchised Restaurant is being operated in accordance with this Agreement, the Potato Corner System and the Manuals. Franchisor shall use reasonable efforts to avoid materially disrupting the operation of the Franchised Restaurant during an inspection.

6.7    **Virtual Training, Assistance and Inspections**. Franchisor may provide any or all portions of the Initial Training Program, Post-Opening Initial Training Programs, Post-Opening Additional Training Programs, pre and post-opening on-site opening assistance, post-opening consultations and/or post-opening inspections remotely over a virtual communication platform designated by Franchisor.

6.8    **Assignment**. Upon the occurrence of an Assignment, the Proposed Buyer must be trained by Franchisor as a condition to the granting of Franchisor's consent to the Assignment. All costs for this training shall be included in the Transfer Fee payable by Franchisee in accordance with Section 14.4.7.

6.9    **Delegation of Performance**. Franchisor, may, in Franchisor's sole discretion, delegate its responsibilities under this Agreement to any designee, employee or agent of Franchisor, as Franchisor may direct.

6.10    **Toll Free Telephone Number**.  Franchisor has the right, but not the obligation, to establish and maintain a toll free telephone number for the purpose of accepting and confirming customer orders nationwide, customer service, and customer follow-up and satisfaction surveys.  If Franchisor establishes a toll free number, Franchisee shall comply with Franchisor's procedures for implementing the nationwide service as Franchisor specifies in the Manuals or otherwise in writing.

EXHIBIT 1248 - 0018

6.11  **Delegation of Duties**. Franchisee acknowledges and agrees that any designee, employee, or agent of Franchisor may perform any duty or obligation imposed on Franchisor by the Agreement, as Franchisor may direct.

7.  **OBLIGATIONS OF FRANCHISEE**

To protect the Potato Corner System, the Potato Corner Marks, the Potato Corner Trade Secrets and the goodwill associated with the same:

7.1  **Potato Corner System**. Franchisee shall operate the Franchised Restaurant in compliance with the terms of this Agreement and the Manuals. Franchisee acknowledges and agrees that Franchisee alone shall exercise day-to-day control over all operations, activities and elements of the Franchised Restaurant, including over Franchisee's employees, and that under no circumstance shall Franchisor do so or be deemed to do so. Franchisee further acknowledges and agrees that the various requirements, restrictions, prohibitions, specifications and procedures of the Potato Corner System with which Franchisee must comply under this Agreement, the Manuals or otherwise, do not directly or indirectly constitute, suggest, infer or imply that Franchisor controls any aspect or element of the day-to-day operations of the Franchised Restaurant, which Franchisee alone controls, but only constitute standards to which Franchisee must adhere when exercising Franchisee's control over the day-to-day operations of the Franchised Restaurant consistent with the policies of Franchisor. Franchisee shall comply with Franchisor's standards and shall operate the Franchised Restaurant in conformity with the methods, standards, and specifications that Franchisor may from time to time prescribe in the Manuals or otherwise. Franchisee shall comply, at Franchisee's expense, with all modifications prescribed by Franchisor and shall implement changes to the Potato Corner System within the time periods specified by Franchisor following Franchisee's receipt of notice from Franchisor to do so. Franchisee shall refrain from deviating from the methods, standards, and specifications without Franchisor's prior written consent and from otherwise operating in any manner which reflects adversely on the Potato Corner Marks or the Potato Corner System. Since every detail of the Potato Corner System is essential in order to develop and maintain quality operating standards, to increase the demand for the products and services sold by Potato Corner Restaurants under the Potato Corner System and to protect the Potato Corner Marks and Franchisor's reputation and goodwill, Franchisor shall have the right to disapprove, as it believes necessary, any modification of, or addition to, the Potato Corner System suggested by Franchisee that is reasonably likely to have an adverse material effect on the Potato Corner System, the Potato Corner Marks or Franchisor's reputation or goodwill.

7.2  **Pre-Opening Initial Training Program**. Franchisee's supervisorial and managerial personnel shall attend and complete to Franchisor's satisfaction the Initial Training Program. Franchisee shall not commence operation of the Franchised Restaurant until the Initial Training Program has been completed. Franchisee shall pay all travel, living, compensation, and other expenses, if any, incurred by Franchisor and by Franchisee for the Principal Owner, General Manager and other supervisorial or managerial personnel, to attend the Initial Training Program. In addition, if the Franchised Restaurant is more than 100 miles from Franchisor's corporate office in Culver City, California, Franchisee shall pay Franchisor an On-Site Opening Assistance Fee of up to $5,000. Franchisee acknowledges that because of Franchisor's superior skill and knowledge with respect to the training and skill required to manage a Potato Corner Restaurant, Franchisor, in its sole discretion, shall determine if Franchisee, the Principal Owner, the General Manager and/or other supervisorial or managerial personnel have satisfactorily completed the Initial Training Program. If the Principal Owner: (i) fails to complete the Initial Training Program within five (5) months after the Effective Date; (ii) does not complete the Initial Training Program to Franchisor's satisfaction; (iii) does not, during the Initial Training Program, appear to possess the skills necessary to properly fulfill and discharge the demands

EXHIBIT 1248 - 0019

and responsibilities required by the Potato Corner System or this Agreement; or (iv) is not acceptable to become a franchisee of Franchisor for any reason whatsoever, then, in Franchisor's sole and absolute discretion, Franchisor may terminate this Agreement upon five (5) days' written notice to Franchisee and this Agreement shall thereafter be of no further force or effect.  Franchisor shall have the right to retain the Initial Franchise Fee. The Parties acknowledge and agree that the actual damages to be suffered by Franchisor in this circumstance are difficult, if not impossible, to determine, and that, under all the facts and circumstances, this calculation of Franchisor's potential damages and retention of the Initial Franchise Fee by Franchisor, are a reasonable, good-faith estimate of those damages.

7.3    **Post-Opening Initial Training Program**. If, following the Opening Date of the Franchised Restaurant, Franchisee requests Franchisor to provide Post-Opening Initial Training Programs for new or replacement supervisorial or managerial personnel and Franchisor agrees to do so, Franchisee shall pay Franchisor its Then-Current Post-Opening Initial Training Fee for each trainee that receives the Post-Opening Initial Training Programs to defray Franchisor's direct costs to provide the additional Post-Opening Initial Training Programs. Franchisee shall pay all transportation costs, food, lodging and similar costs incurred in connection with attendance at the Post-Opening Initial Training Programs.

7.4    **Post-Opening Additional Training Programs**. Following the Opening Date of the Franchised Restaurant, Franchisee, the Principal Owner and each General Manager shall attend Post-Opening Additional Training Programs as required by Franchisor. Franchisee shall pay Franchisor its Then-Current Post-Opening Additional Training Program Daily Fee for each of Franchisor's representatives who provides Post-Opening Additional Training Programs to defray Franchisor's direct costs to provide the Post-Opening Additional Training Programs. In addition, Franchisee shall pay all transportation costs, food, lodging and similar costs incurred in connection with attendance at the Post-Opening Additional Training Programs.

7.5    **Manuals**. Franchisee shall treat all information contained in the Manuals as Potato Corner Confidential Information and shall use all reasonable efforts to keep the information confidential. Franchisee shall not, without Franchisor's prior written consent, copy, duplicate, record or otherwise reproduce the Manuals, in whole or in part, or otherwise make them available to any Person not required to have access to their contents in order to carry out their employment functions. If Franchisee misplaces the Manuals or fails to return the manuals to Franchisor upon demand, Franchisee shall pay Franchisor the sum of $200 as a manual replacement fee. Franchisee shall comply with all mandatory requirements now or hereafter included in the Manuals, and acknowledges and agrees that a Default under any mandatory requirement of the Manuals shall constitute a Default under this Agreement and grounds for termination. Franchisee shall immediately conform its operations to all revisions in mandatory specifications, standards, operating procedures and rules prescribed by Franchisor.

7.6    **Post-Opening Inspections**. Following the Opening Date of the Franchised Restaurant, if any inspection of the Franchised Restaurant by Franchisor indicates any deficiency or unsatisfactory condition at the Franchised Restaurant, Franchisor will notify Franchisee in writing of the deficiencies and Franchisee shall promptly correct, remedy or repair such deficiency or unsatisfactory condition. In addition, if any inspection indicates any deficiency or unsatisfactory condition which requires a re-inspection of the Franchised Restaurant within a period of thirty (30) days, Franchisee shall pay Franchisor, upon demand, the sum of $500 for each re-inspection of the Franchised Restaurant and shall, in addition, reimburse Franchisor for its out of pocket expenses for the re-inspection, including for transportation costs, food, lodging and similar costs.

EXHIBIT 1248 - 0020

7.7    **Virtual Training, Assistance and Inspections**. Franchisee acknowledges and agrees that Franchisor may provide any or all portions of the Initial Training Program, Pre-Opening Additional Initial Training Program, Post-Opening Initial Training Programs, Post-Opening Additional Training Programs, post-opening on-site opening assistance, post-opening consultations and/or post-opening inspections remotely over a virtual communication platform designated by Franchisor.

7.8    **POS System; Computer Hardware and Software**. Franchisee shall purchase, use and maintain a computerized point of sale cash collection system and inventory control system (the "**POS System**"), a back office computer and printer, including all related hardware and software, cameras and a DVR, each as specified in the Manuals or otherwise by Franchisor in writing for the Franchised Restaurant. The POS System shall at all times be capable of accessing the Internet for the purpose of implementing software, transmitting and receiving data, and accessing the Internet for ordering and maintaining the POS System. The POS System shall be electronically linked to Franchisor, and Franchisee shall allow Franchisor to poll the POS System on a daily or other basis at the times and in the manner established by Franchisor, with or without notice, and to retrieve transaction information including sales, menu mix, usage, and other operations data that Franchisor deems appropriate. Franchisor may require Franchisee to update, upgrade or replace the POS System, including hardware and/or software, from time to time, upon written notice, provided that Franchisee shall not be required to replace the POS System any more frequently than once every three (3) years. The POS System must include the required technology to permit Franchisee to accept online orders of Potato Corner Products and services at the Franchised Restaurant and to accept and process Potato Corner gift cards sold in other Potato Corner Restaurants. In addition, Franchisee shall purchase, lease or license all computer hardware and software designated by Franchisor for the Franchised Restaurant at Franchisee's expense. During the Term, Franchisee shall maintain and update all computer hardware and software as required by Franchisor.

7.9    **Product Line and Service**. Franchisee shall advertise, sell and serve all and only Potato Corner Authorized Products at or from the Franchised Restaurant. All Potato Corner Authorized Products shall be sold and distributed under the names designated by Franchisor and shall be prepared and served strictly in accordance with Franchisor's methods, standards, and specifications. Franchisee shall not remove any Potato Corner Authorized Product from Franchisee's menu without Franchisor's written consent. Franchisee shall not sell any Potato Corner Authorized Products outside of the Franchised Restaurant or to any customer for the purpose of resale by the customer, and all sales by Franchisee shall be for retail consumption only.

7.10    **Prices**. Subject to Applicable Law, following the Opening Date of the Franchised Restaurant, Franchisor shall have the right to establish pricing guidelines for Potato Corner Authorized Products and, subject to Applicable Law, Franchisee shall comply with, and be bound by, prices which may be recommended, suggested or advertised by Franchisor. Subject to Applicable Law, Franchisee shall honor the terms of all promotional or discount programs that Franchisor may offer to the public for Potato Corner Restaurants and shall comply with all pricing policies that Franchisor may specify, including minimum and maximum price policies, minimum advertised price policies and unilateral price policies. Franchisee shall also provide products and services designated by Franchisor on terms Franchisor specifies, including free-of-charge.

7.11    **Oversight and Management**. The Principal Owner shall be responsible for oversight of the day-to-day operations of the Franchised Restaurant and shall devote his full time and best efforts solely to the operation of the Franchised Restaurant only in a management capacity and not as a staff member behind the service counter and to no other business activities. Following the Opening Date of the Franchised Restaurant, Franchisee shall provide comprehensive initial training programs, additional training programs and remedial

EXHIBIT 1248 - 0021

training programs for its supervisorial and managerial personnel and other employees and shall ensure that the Franchised Restaurant is at all times under the direct control of a General Manager fully trained by Franchisee and solely dedicated to operation of the Franchised Restaurant and other employees who have been fully trained by Franchisee and solely dedicated to operation of the Franchised Restaurant. The Franchised Restaurant shall be under the direct control of a General Manager in the absence of the Principal Owner. Each General Manager shall have a skill level, training and experience commensurate with the demands of the position and conform in all respects with Franchisor's high standards for quality products, courteous service, and cleanliness of operations. Prior to the Opening Date, Franchisee, its Principal Owner and each General Manager shall successfully complete the ServSafe® Food Safety Certification Program, or show evidence of prior ServSafe® certification. Franchisor may, in its sole discretion, replace the ServSafe® Food Safety Certification Program with another food safety certification program, if deemed appropriate. Franchisee shall be responsible for all fees and material costs associated with any certification program. In addition, Franchisor may, in its sole discretion, contract with a third party to conduct sanitation and food safety audits of the Franchised Restaurant periodically throughout the Term, but no less than once per calendar year.

7.12    **Menus**. The approved and authorized menu and menu formats may include, in Franchisor's discretion, requirements on organization, graphics, product descriptions, illustrations and any other matters related to the menu, whether or not similar to those listed. In Franchisor's discretion, the menu and/or menu formats may vary depending upon region, market size and other factors which affect the Franchised Restaurant.  Franchisor may change the menu and/or menu formats from time to time and authorize tests from region to region or within regions. Franchisee shall, upon receipt of notice from Franchisor, add, delete or update any Potato Corner Authorized Products to its menu according to the instructions contained in the notice. Franchisee shall have a minimum of thirty (30) days and not more than sixty (60) days after receipt of written notice in which to fully implement any menu change. Franchisee shall cease selling previously approved Potato Corner Authorized Products within thirty (30) days after receipt of notice that the product is no longer approved. All menus, containers, napkins, bags, cups and other packaging and like articles used at the Franchised Restaurant shall conform to Franchisor's specifications, shall be imprinted with the Potato Corner Marks, if and as specified by Franchisor, and shall be purchased by Franchisee from a Potato Corner Approved Supplier.

7.13    **Compliance with Applicable Law**. Franchisee shall operate the Franchised Restaurant as a clean, orderly, legal and respectable place of business in accordance with Franchisor's business standards and merchandising policies and shall comply with all Applicable Laws. Franchisee shall not cause or allow any part of the Franchised Restaurant or the Franchised Location to be used for any immoral or illegal purpose. Franchisee shall in all dealings with its customers, suppliers, and public officials adhere to high standards of honesty, integrity, fair dealing and ethical conduct and refrain from engaging in any action which will cause Franchisor to be in violation of any Applicable Law. If Franchisee shall receive any notice, report, fine, test results or the like from any applicable department of health (or other similar Governmental Authority), Franchisee shall promptly send a copy of the same to Franchisor.

7.14    **Hours**. Subject to Applicable Law, the Franchised Restaurant shall be open and operational at least twelve (12) hours per day, seven (7) days per week or as otherwise prescribed by Franchisor. Franchisee shall continually operate the Franchised Restaurant throughout the Term. Franchisee shall diligently and efficiently exercise its best efforts to achieve the maximum Gross Sales possible from its Franchised Location, and shall remain open for longer hours if additional opening hours are reasonably required to maximize operations and sales.

EXHIBIT 1248 - 0022

7.15   **Signs**. Franchisee shall maintain approved signs and/or awnings at, on, or near the front of the Franchised Restaurant, identifying the Franchised Location as a Franchised Restaurant, which shall conform in all respects to Franchisor's specifications and requirements and the layout and design plan approved for the Franchised Location, subject only to restrictions imposed by Applicable Law.

7.16   **Franchisee Employee Policies**. Franchisee shall maintain a competent, conscientious, and trained staff and shall take all steps necessary to ensure that its employees preserve good customer relations, render competent, prompt, courteous, and knowledgeable service, and meet the minimum standards that Franchisor may establish from time to time in the Manuals or otherwise. All employees hired by or working for Franchisee shall be the employees of Franchisee, and Franchisee alone, and shall not, for any purpose, be deemed to be the employees of Franchisor or subject to Franchisor's direct or indirect control, most particularly with respect to any mandated or other insurance coverage, tax or contributions, or requirements pertaining to withholdings, levied or fixed by any Governmental Authority. Franchisee and Franchisor will each file their own tax, regulatory and payroll reports, and be responsible for all employee benefits and workers compensation insurance payments with respect to their respective employees and operations. Franchisee acknowledges and agrees that Franchisor will not have the power to hire or fire Franchisee's employees. Franchisee expressly agrees, and will never contend otherwise, that Franchisor's authority under this Agreement to certify Franchisee's supervisorial or managerial personnel for qualification to perform certain functions at the Franchised Restaurant does not directly or indirectly vest in Franchisor the power to hire, fire or control any of Franchisee's personnel. Franchisee alone shall be solely responsible for all hiring and employment decisions and functions relating to the Franchised Restaurant, including, without limitation, those related to hiring, firing, training, establishing remuneration, compliance with wage and hour requirements, personnel policies, benefits, recordkeeping, supervision and discipline of employees, regardless of whether Franchisee has received advice from Franchisor on these subjects or not. Franchisee acknowledges and agrees that any guidance Franchisee receives from Franchisor regarding employment policies should be considered as examples, that Franchisee alone is responsible for establishing and implementing its own employment policies, and that Franchisee understands that Franchisee should do so in consultation with local legal counsel experienced in employment law. Franchisee shall immediately defend, reimburse and hold Franchisor harmless from any direct or indirect losses, costs and expenses, including attorney's fees, arising out of any claim made by or for the benefit of any employee of Franchisee against Franchisor regarding employment decisions and employee functions at the Franchised Restaurant, including, without limitation, those related to hiring, firing, training, wage and hour requirements, record keeping, supervision, and discipline of employees. Franchisee shall take all action necessary to ensure that Franchisee's employees understand and acknowledge that they are not employees of Franchisor, including, without limitation, requiring Franchisee's employees to sign a written acknowledgement that Franchisee is an independently owned and operated franchisee and their sole employer in a form specified by Franchisor in the Manuals or otherwise in writing from time to time. Franchisee shall cause all employees, while working in the Franchised Restaurant, to wear uniforms of the color, design and other specifications that Franchisor may designate from time to time and to present a neat and clean appearance. If Franchisor removes a type of uniform utilized by Franchisee from the list of approved uniforms, Franchisee shall have thirty (30) days from receipt of written notice of removal to discontinue use of its existing inventory of uniforms and obtain and use the approved type of uniform.

7.17   **Vending or Other Machines**. Except with Franchisor's written approval, Franchisee shall not cause or permit vending, gaming machines, pay telephones, automatic teller machines, Internet kiosks or any other mechanical or electrical device to be installed or maintained at the Franchised Restaurant.

EXHIBIT 1248 - 0023

7.18    **Co-Branding**. Franchisee may not engage in any co-branding in or in connection with the Franchised Restaurant except with Franchisor's prior written consent. Franchisor may approve any co-branding chain or arrangement in its discretion, and only if Franchisor has recognized that co-branding chain as an approved co-brand for operation within Potato Corner Restaurants.

7.19    **Customer Complaints and Cooperation**. Franchisee shall respond promptly to each customer inquiry or complaint and resolve all reasonable complaints to the customer's satisfaction. At Franchisor's request, Franchisee shall use and display in the Franchised Restaurant during all operating hours customer comment cards in the manner specified in the Manuals. Franchisee shall, from time to time, purchase from Franchisor or a Potato Corner Approved Supplier, and maintain in the Franchised Restaurant, a supply of postage prepaid customer comment cards reasonably adequate to meet Franchisee's needs. Franchisee shall at all times cooperate with Franchisor and other Potato Corner Franchisees and shall actively participate in any and all sales, public relations, marketing, cooperative marketing and purchasing programs or promotional programs which may be developed and implemented by Franchisor which call for the cooperation of Franchisee and other Potato Corner Franchisees. Franchisee shall further cooperate in any additional programs which may be established and designated by Franchisor from time to time including participating in coupon programs, the system-wide use of gift cards, and other similar programs for the benefit of the Potato Corner System, and shall comply with Franchisor's rules and regulations established from time to time in connection therewith. Franchisee shall cooperate with Franchisor in connection with the test marketing of products and services at the Franchised Restaurant and shall comply with Franchisor's rules and regulations established from time to time in connection therewith.

7.20    **Adequate Reserves and Working Capital**. Franchisee shall, at all times, maintain adequate reserves and working capital sufficient for Franchisee to fulfill all of Franchisee's obligations under this Agreement and to cover the risks and contingencies of the Franchised Restaurant for at least three (3) months.

7.21    **Re-Imaging of Franchised Restaurant**. Franchisee shall at its own expense, make the alterations, additions, or modifications to the Franchised Restaurant that Franchisor may reasonably require to accommodate changes made by Franchisor to the Potato Corner System, including, without limitation, changes to menu items or market positioning.  Franchisee shall have ninety (90) days from receipt of notice from Franchisor regarding re-imaging requirements in which to make the required alterations, additions, or modifications to the Franchised Restaurant.

7.22    **Intranet**. If Franchisor establishes a Potato Corner Franchisee Intranet, Franchisee shall have the mere privilege to use the Intranet, subject to Franchisee's strict compliance with the standards and specifications, protocols and restrictions that Franchisor may establish from time to time in the Manuals and otherwise. Franchisee acknowledges that, as administrator of the Intranet, Franchisor may access and view any communication posted on the Intranet. Franchisee further acknowledges that the Intranet facility and all communications that are posted to it will become Franchisor's property, free of any claims of privacy or privilege that Franchisee or any other Person may assert. Upon receipt of notice from Franchisor that Franchisor has established an Intranet, Franchisee shall establish and continually maintain an electronic connection with the Intranet as specified in the Manuals that allows Franchisor to send messages to and receive messages from Franchisee. If Franchisee shall Default under this Agreement or any other agreement with Franchisor, Franchisor may, in addition to, and without limiting any other rights and remedies available to Franchisor, disable or terminate Franchisee's access to the Intranet without Franchisor having any liability to Franchisee.

EXHIBIT 1248 - 0024

7.23    **Improvements**. If Franchisee develops any new concept, process or improvement in the Potato Corner System (an "**Improvement**"), Franchisee shall promptly notify Franchisor and provide Franchisor with all necessary related information, without compensation. Any Improvement shall become the sole property of Franchisor and Franchisor shall be the sole owner of all related intellectual property rights. Franchisee hereby assigns to Franchisor any rights Franchisee may have or acquire in the Improvements, including the right to modify the Improvement, and Franchisee waives and/or releases all rights of restraint and moral rights therein and thereto. Franchisee shall assist Franchisor in obtaining and enforcing the intellectual property rights to any Improvement in any and all countries and further agrees to execute and provide Franchisor with all necessary documentation for obtaining and enforcing those rights. Franchisee hereby irrevocably designates and appoints Franchisor as Franchisee's agent and attorney-in-fact to execute and file any the documentation and to do all other lawful acts to further the prosecution and issuance of intellectual property rights related to any Improvement. If the foregoing provisions of this <u>Section 7.23</u> are found to be invalid or otherwise unenforceable, Franchisee hereby grants Franchisor a worldwide, perpetual, non-exclusive, fully-paid license to use and sublicense to use of the Improvement to the extent the use or sublicense would, absent this Agreement, directly or indirectly infringe Franchisee's rights therein.

7.24    **Refurbishment of Franchised Restaurant**. At Franchisor's request, but not more often than once every five (5) years unless sooner required by the Lease, Franchisee shall refurbish the Franchised Restaurant, at its own expense, to conform to the building design, trade dress, color schemes, and presentation of the Potato Corner Marks in a manner consistent with the Then-Current public image for new or remodeled Potato Corner Restaurants, including, without limitation, replacement or renovation of equipment, remodeling, redecoration, and modifications to existing improvements and reasonable structural changes that Franchisor may reasonably require or that may be required by Applicable Law. Franchisee's costs for the required refurbishment shall not exceed $100,000 for the interior of the Franchised Restaurant or $50,000 for the exterior of the Franchised Restaurant.

7.25    **Notifications and Crisis Management Events**. Franchisee shall notify Franchisor in writing within (i) twenty-four (24) hours, and confirm in writing within two (2) days thereafter, of any investigation or violation, actual or alleged, of any health, liquor or narcotics laws or regulation related to the Franchised Restaurant, and (ii) five (5) days of the commencement of any investigation, action, suit, or proceeding or of the issuance of any order, writ, injunction, award, or decree of any court, agency, or other Governmental Authority which may adversely affect the operation or financial condition of the Franchised Restaurant. Franchisee shall immediately inform Franchisor's Chief Executive Officer (or as otherwise instructed in the Manuals) by telephone of the occurrence of a Crisis Management Event. Franchisee shall cooperate fully with Franchisor with respect to Franchisor's response to a Crisis Management Event.

7.26    **Authorization to Release Information and Use Images**. Franchisee hereby authorizes (and agrees to execute any other documents deemed necessary to effect the authorization) (i) all banks, financial institutions, businesses, suppliers, manufacturers, contractors, vendors and other persons or entities with whom Franchisee does business to disclose to Franchisor any financial information in their possession relating to Franchisee or the Franchised Restaurant which Franchisor may request; (ii) Franchisor to disclose to prospective Potato Corner Franchisees or other third parties data from Franchisee's reports if Franchisor determines, in Franchisor's sole discretion, that the disclosure is necessary or advisable; (iii) Franchisor to photograph and film Franchisee, its employees, the public and all areas of the Franchised Restaurant, without further authorization from, or compensation to, Franchisee and to use their images for marketing and promotion of the Franchised Restaurant, other Franchised Restaurants and franchises for Potato Corner restaurants; and (iv) Franchisor to disclose to third parties, including but not limited to Franchisee's Landlord or bank, information about Franchisee relating to Franchisee's obligations or performance under this

Agreement if Franchisor determines, in Franchisor's sole discretion, that the disclosure is necessary or advisable.

7.27    **Annual Franchise Conference**. Franchisor may hold an Annual Franchise Conference for all Potato Corner Franchisees each year. The Principal Owner and each General Manager shall attend the Annual Franchise Conference. Franchisee shall pay Franchisor a "**Franchisee Conference Fee**" to reimburse Franchisor for a portion of the direct costs to provide the Annual Franchise Conference. Franchisee shall pay the Franchisee Conference Fee upon demand at least thirty (30) days before the date of the Annual Franchise Conference, whether or not Franchisee attends the Annual Franchise Conference.

7.28    **Credit Cards**. Franchisee shall honor all credit, charge, courtesy and cash cards approved by Franchisor in writing. To the extent Franchisee shall store, process, transmit or otherwise access or possess cardholder data in connection with the sale of Potato Corner Authorized Products, Franchisee shall maintain the security of cardholder data and adhere to the Then-Current Payment Card Industry Data Security Standards ("**PCI DSS**"), currently found at www.pcisecuritystandards.org, for the protection of cardholder data throughout the Term. Franchisee shall be and remain responsible for the security of cardholder data in the possession or control of any subcontractors Franchisee engages to process credit cards. All subcontractors must be identified to and approved by Franchisor in writing prior to sharing cardholder data with the subcontractor. Franchisee shall, if requested to do so by Franchisor, provide appropriate documentation to Franchisor to demonstrate compliance with applicable PCI DSS requirements by Franchisee and all identified subcontractors.

7.29    **Gift Cards, Loyalty, CRM, Social Media Software, Online and Mobile Ordering Programs**. Franchisee shall not create or issue any gift certificates or gift cards and shall only sell gift certificates or gift cards that have been issued by Franchisor that are accepted at all Potato Corner Restaurants. Franchisee shall participate in all gift certificate and/or gift card administration programs as may be designated by Franchisor from time to time. Franchisee shall honor all coupons, gift certificates, gift cards and other programs or promotions as directed by Franchisor. Franchisee shall fully participate in all guest loyalty or frequent customer programs now or in the future adopted or approved by Franchisor. Franchisee shall not issue coupons or discounts of any type for use at the Franchised Restaurant except as approved by Franchisor in writing, which may be withheld in Franchisor's sole and absolute discretion. In addition, Franchisee shall purchase, enroll in or subscribe to, as applicable, all CRM, social media analytics, and online and mobile ordering software or programs as specified by Franchisor in its Manual or otherwise in writing. Franchisor reserves the right to change the designated suppliers of these or similar services in Franchisor's sole discretion. Franchisee shall change, purchase or subscribe to the additional programs or software, as applicable, immediately upon notice from Franchisor to do so.

7.30    **Data Security Safeguards**. Franchisee shall exert Franchisee's best efforts to protect its customers against a cyber-event, including, without limitation, a data breach or other identity theft or theft of personal information (collectively, a "**Cyber Event**"). If a Cyber Event occurs, regardless of whether the Cyber Event affects only the Potato Corner Restaurant, Franchisor reserves the right, but shall not have any obligation, to perform and/or control and/or cause its third-party consultants to perform and/or control all aspects of the response to the Cyber Event including, without limitation, the investigation, containment and resolution of the Cyber Event and all communications within the Potato Corner franchise system and with vendors and suppliers, Governmental Authorities and the general public. Franchisor's control of the response to a Cyber Event may potentially affect or interrupt operations of the Potato Corner Restaurant, but shall not create any liability for Franchisor or additional rights for Franchisee, entitle Franchisee to damages or relieve Franchisee of Franchisee's indemnification obligations under <u>Section 18.4</u>. Franchisee shall reimburse

EXHIBIT 1248 - 0026

Franchisor for all of Franchisor's out-of-pocket costs and expenses incurred in responding to and remedying any Cyber Event caused solely by Franchisee or the Potato Corner Restaurant. Franchisee shall at all times be compliant with (i) the NACHA ACH Security Framework; (ii) the Payment Rules; (iii) Applicable Law regarding data privacy, data security and security breaches; and (iv) Franchisor's security policies and guidelines, all as may be adopted and/or amended from time to time (collectively, "**Data Security Safeguards**"). Franchisee shall obtain advice from Franchisee's own legal and security consultants to ensure that Franchisee operates the Potato Corner Restaurant at all times in full compliance with the Data Security Safeguards. Notwithstanding Franchisor's right to perform and/or control all aspects of a response to a Cyber Event, Franchisor shall make commercially reasonable efforts to coordinate its response with Franchisee and Franchisee's insurance carrier(s) and to cooperate with Franchisee's insurance carrier(s) regarding insurance coverage of the Cyber Event to the extent reasonably practicable under the circumstances.

7.31    **Payment of Debts and Taxes**.  Franchisee shall be solely responsible for selecting, retaining and paying Franchisee's employees; the payment of all invoices for the purchase of goods and services used in connection with operating the Potato Corner Restaurant and determining whether, and on what terms, to obtain any financing or credit which Franchisee deems advisable or necessary for the opening and operation of the Potato Corner Restaurant. Franchisee shall pay all obligations and liabilities to suppliers, lessors and creditors on a timely basis.  Franchisee shall indemnify Franchisor if Franchisor is held responsible for any debts owed by Franchisee if Franchisor elects to pay any of Franchisee's obligations in order to preserve the relationship between suppliers and Potato Corner Franchisees.  Franchisee shall make prompt payment of all federal, state and local taxes, including individual and corporate taxes, sales and use taxes, franchise taxes, gross receipts taxes, employee withholding taxes, FICA taxes, and personal property and real estate taxes arising from Franchisee's operation of the Potato Corner Restaurant.  Franchisee shall indemnify Franchisor if Franchisor is held responsible for any of these taxes.

7.32    **Food Delivery Services**. Franchisee shall follow Franchisor's delivery policies and procedures in the Manuals, which may require Franchisee to provide delivery services and/or utilize third party Food Delivery Services and restrict the areas in which Franchisee may offer delivery services as set forth in Section 2.2, and which Franchisor may change from time to time during the Term. Franchisee acknowledges that Franchisor's delivery policies and procedures may allow other Potato Corner Restaurants to provide delivery services in Franchisee's Protected Area and may allow Franchisee to provide delivery services outside of Franchisee's Protected Area. Franchisor may require Franchisee to discontinue delivery services. Franchisee shall  use the Food Delivery Service(s) with which we may have a national contract, and , in that case, Franchisee  may not contract with any other delivery platform without our written approval.

7.33    **Privacy**.  Franchisee shall comply with all Applicable Laws pertaining to the privacy of customer, employee and transactional information ("**Privacy Laws**").  Franchisee shall also comply with Franchisor's standards and policies pertaining to Privacy Laws. If there is a conflict between Franchisor's standards and policies pertaining to Privacy Laws and actual Applicable Law, Franchisee shall (i) comply with the requirements of Applicable Law; (ii) immediately give Franchisor written notice of the conflict; and (iii) promptly and fully cooperate with Franchisor and Franchisor's counsel in determining the most effective way, if any, to meet Franchisor's standards and policies pertaining to Privacy Laws within the bounds of Applicable Law. Franchisee shall not publish, disseminate, implement, revise, or rescind a data privacy policy without Franchisor's prior written consent to such policy.

EXHIBIT 1248 - 0027

8. **SUPPLIERS AND PRODUCTS**

To protect the Potato Corner System, the Potato Corner Marks, the Potato Corner Trade Secrets and the goodwill associated with the same:

    8.1    **Potato Corner Approved Suppliers**. Franchisor shall designate its Potato Corner Approved Suppliers for Franchisee following the Effective Date. All Potato Corner Branded Products, Potato Corner Proprietary Products and Non-Proprietary Products designated by Franchisor for use and sale at the Franchised Restaurant must be purchased from Potato Corner Approved Suppliers. Franchisor and its Affiliates may be, but are not obligated to become, Potato Corner Approved Suppliers of certain Potato Corner Branded Products, Potato Corner Proprietary Products and Non-Proprietary Products and may act as the sole Potato Corner Approved Suppliers of certain Potato Corner Branded Products, Potato Corner Proprietary Products and Non-Proprietary Products. Franchisor may operate an online portal that Franchisee can use to buy Potato Corner Branded Products, Potato Corner Proprietary Products, marketing materials, handbooks and menus directly from Potato Corner Approved Suppliers.

    8.2    **Recommended Suppliers**. If Franchisee desires to purchase authorized Non-Proprietary Products from a Recommended Supplier rather than from Franchisor, its Affiliates or a Potato Corner Approved Supplier, Franchisee shall deliver written notice to Franchisor identifying the Recommended Supplier and shall provide Franchisor with reasonable financial, operational and other information regarding the Recommended Supplier necessary for Franchisor to assess the Recommended Supplier. Franchisor shall notify Franchisee of Franchisor's decision within sixty (60) days after Franchisor's receipt of the necessary information from Franchisee. If Franchisor does not approve or disapprove a Recommended Supplier within sixty (60) days, the Recommended Supplier shall be deemed disapproved. As a condition of its approval, Franchisor may require a Recommended Supplier to agree in writing to (i) provide, from time to time, upon Franchisor's request, free samples of the Non-Proprietary Product the Recommended Supplier intends to supply to Franchisee; (ii) faithfully comply with Franchisor's specifications for the Non-Proprietary Products to be sold by the Recommended Supplier; (iii) sell any Non-Proprietary Products bearing the Potato Corner Marks only to Potato Corner Franchisees and only under a trademark license agreement with Franchisor; (iv) provide Franchisor, upon request, with duplicate purchase invoices issued to Franchisee for Franchisor's records and inspection purposes; and (v) otherwise comply with Franchisor's reasonable requests. Further, Franchisor may require Franchisee or the Recommended Supplier to reimburse Franchisor for all of Franchisor's actual costs in reviewing the application of the Recommended Supplier and all current and future reasonable costs and expenses, including transportation costs, food, lodging and similar costs incurred, related to inspecting, re-inspecting and auditing the Recommended Suppliers' facilities, equipment, and food products, and all product testing costs paid by Franchisor to third parties and to pay Franchisor, in advance, a deposit of up to $1,000, before Franchisor inspects the Recommended Supplier's facilities. Franchisor may revoke its approval of a previously approved Recommended Supplier if the Recommended Supplier does not continue to satisfy Franchisor's criteria.

    8.3    **Purchases from Franchisor or its Affiliates**. All Potato Corner Branded Products, Potato Corner Proprietary Products and Non-Proprietary Products purchased from Franchisor or its Affiliates shall be purchased in accordance with the purchase order format issued from time to time by Franchisor or its Affiliates and at the prices and on delivery terms and other terms offered to similarly situated Potato Corner Franchisees. Franchisor, or its Affiliates, in its sole and absolute discretion, may establish the credit terms, if any, upon which it will accept Franchisee's orders, and may require Franchisee to pay for orders on a cash-in-advance or cash-on-delivery basis. On the termination or expiration of this Agreement, or in the event of any Default by Franchisee under this Agreement, Franchisor or its Affiliates shall not be obliged to fill or ship any

orders then pending or, in the case of termination or non-renewal, made any time thereafter by Franchisee and may, among other things, only deliver the quantities reasonably necessary to supply Franchisee's needs prior to the termination or expiration of this Agreement. Franchisor or its Affiliates shall not be liable to Franchisee for any delay or delivery failure caused by Force Majeure. Franchisor or its Affiliate shall not be liable to Franchisee for unavailability of, or delay in shipment or receipt of, merchandise because of temporary product shortages, order backlogs, production difficulties, delays, unavailability of transportation, fire, strikes, work stoppages, or other causes beyond the reasonable control of Franchisor or its Affiliate. If any goods or products sold by Franchisor or its Affiliate are not in sufficient supply to fully fulfill all orders, Franchisor or its Affiliate may allocate the available supply among itself, its Affiliates and others, including Franchisee and other franchisees, in any way Franchisor or its Affiliate deems appropriate, which may result in Franchisee not receiving any allocation of certain goods or products as a result of a shortage.

8.4    **Rebates**. Franchisor or its Affiliates may receive rebates or allowances from certain Potato Corner Approved Suppliers on purchases of Potato Corner Branded Products, Potato Corner Proprietary Products and Non-Proprietary Products made by Franchisee and other Potato Corner Franchisees. Rebates and allowances will generally be a percentage of the revenue derived by the Potato Corner Approved Supplier from sales to Potato Corner Restaurants, will be included in Franchisor's general revenue, and may be used by Franchisor for a variety of purposes including ongoing programs, education, marketing, advertising, seminars and conferences, the handling of inquiries and complaints from Potato Corner Franchisees' customers and for general and administrative expenses. Franchisor may use these rebate and allowance funds received for any purpose in its sole and absolute discretion.

## 9.    POTATO CORNER MARKS

Franchisor and its Affiliates continue to develop, use and control the use of the Potato Corner Marks in order to identify for the public the source of services and products marketed under the Potato Corner Marks and the Potato Corner System, and to represent the Potato Corner System's high standards of quality, appearance and service. To protect the Potato Corner System, the Potato Corner Marks, the Potato Corner Trade Secrets and the goodwill associated with the same;

9.1    **Ownership and Goodwill of Potato Corner Marks**. Franchisee acknowledges that its right to use the Potato Corner Marks is derived solely from this Agreement and is limited to use in operating as Franchisee pursuant to and in compliance with this Agreement. Any unauthorized use of the Potato Corner Marks by Franchisee shall constitute a Default under this Agreement and an infringement of Franchisor's and Franchisor's Affiliate's rights in and to the Potato Corner Marks. Franchisee acknowledges and agrees that as between Franchisor and Franchisee (i) Franchisor owns the Potato Corner Marks and the Potato Corner System; (ii) Franchisee owns no goodwill or rights in the Potato Corner Marks or the Potato Corner System except for the license granted by this Agreement; and (iii) Franchisee's use of the Potato Corner Marks and any goodwill established by that use shall inure to the exclusive benefit of Franchisor. Franchisee agrees not to contest, or assist any other Person to contest, the validity of Franchisor's rights and interest in the Potato Corner Marks or the Potato Corner System either during the Term or after this Agreement terminates or expires.

9.2    **Limitations on Use**. If Franchisee is an Entity, Franchisee shall not use the Potato Corner Marks, or Franchisor's trade name, or any words or symbols which are confusingly phonetically or visually similar to the Potato Corner Marks, as all or part of Franchisee's name. In addition, Franchisee shall not use any Potato Corner Marks (i) with any prefix, suffix, or other modifying words, terms, designs, or symbols (other than logos licensed to Franchisee under this Agreement); (ii) in connection with unauthorized services

EXHIBIT 1248 - 0029

or products; (iii) as part of any domain name or electronic address maintained on the Internet, the World Wide Web, or any other similar proprietary or common carrier electronic delivery system; or (iv) in any other manner not expressly authorized in writing by Franchisor. Franchisee shall give all notices of trademark and service mark registration that Franchisor specifies and shall use and obtain all fictitious or assumed name registrations required by Franchisor or under Applicable Law. Franchisee further agrees that no service mark other than "**Potato Corner**", other Potato Corner Marks specified by Franchisor shall be used in marketing, promoting, or operating the Franchised Restaurant.

9.3    **Modifications**. Franchisor reserves the right to (i) modify or discontinue licensing any of the Potato Corner Marks; (ii) add new names, marks, designs, logos or commercial symbols to the Potato Corner Marks and require that Franchisee use them; and (iii) require that Franchisee introduce or observe new practices as part of the Potato Corner System in operating the Franchised Restaurant. Franchisee acknowledges and agrees that the term "**Potato Corner Marks**" means the specific names, marks, designs, logos or commercial symbols licensed by Franchisor at any given point in time, subject to Franchisor's right to impose changes. Franchisee shall comply, at Franchisee's sole expense, with Franchisor's directions regarding changes in the Potato Corner Marks and Potato Corner System within a reasonable time after written notice from Franchisor. Franchisor shall have no liability to Franchisee for any cost, expense, loss or damage that Franchisee incurs in complying with Franchisor's directions and conforming to required changes.

9.4    **Defense of Potato Corner Marks and Potato Corner System**. Franchisor shall have the sole right, either alone or with its Affiliates, to handle disputes with Franchisees and third parties concerning Franchisor's or Franchisor's Affiliates' ownership of, rights in, or Franchisee's use of, the Potato Corner Marks or the Potato Corner System. Franchisee shall immediately notify Franchisor in writing if Franchisee receives notice, or is informed, of any (i) improper use of any of the Potato Corner Marks or elements of the Potato Corner System, including misuse by Franchisees; (ii) use by any third party of any mark, design, logo or commercial symbol which, in Franchisee's judgment, may be confusingly similar to any of the Potato Corner Marks; (iii) use by any third party of any business practice which, in Franchisee's judgment, unfairly simulates the Potato Corner System in a manner likely to confuse or deceive the public; or (iv) claim, challenge, suit or demand asserted against Franchisee based upon Franchisee's use of the Potato Corner Marks or the Potato Corner System. Franchisor and/or Franchisor's Affiliates shall have sole discretion to take all action as it deems appropriate, including, without limitation, to take no action, and the sole right to control any legal proceeding or negotiation arising out of any infringement, challenge or claim or otherwise relating to the Potato Corner Marks or the Potato Corner System. Franchisee shall not settle or compromise any claim, suit or demand asserted against it and agrees to be bound by Franchisor's decisions in handling disputes regarding the Potato Corner Marks and the Potato Corner System. Franchisee shall cooperate fully with Franchisor and execute all documents and perform all actions as may, in Franchisor's judgment, be necessary, appropriate or advisable in the defense of all claims, suits or demands and to protect and maintain Franchisor's rights in the Potato Corner Marks and the Potato Corner System. Unless it is established that a third party claim asserted against Franchisee is based directly upon Franchisee's misuse of the Potato Corner Marks or the Potato Corner System, Franchisor agrees to defend Franchisee against the third party claim and indemnify Franchisee for any losses resulting therefore, provided Franchisee has notified Franchisor as soon as practical after learning of the claim and fully cooperates in the defense of the action. Because Franchisor will defend the third party claim, Franchisee is not entitled to be reimbursed for legal or other professional fees or costs paid to independent legal counsel or others in connection with the matter.

EXHIBIT 1248 - 0030

10.  <u>**MARKETING**</u>

To protect the Potato Corner System, the Potato Corner Marks, the Potato Corner Trade Secrets and the goodwill associated with the same:

10.1  <u>**Marketing Fund**</u>. Franchisor has established the Marketing Fund to promote the Potato Corner Marks and all Potato Corner Restaurants. On ninety (90) days' prior written notice to Franchisee, Franchisee shall pay the Marketing Fund Fees to the Marketing Fund each month during the Term. The Marketing Fund shall be administered by Franchisor and shall be used to meet the costs of conducting marketing and promotional activities. Franchisor retains sole discretion over all marketing and public relations programs and activities financed by the Marketing Fund, including the creative concepts, materials and endorsements used and the geographic market, media placement and allocation. Company-owned and Affiliate owned Potato Corner Restaurants may, but are not required to, contribute to the Marketing Fund. If they do, they may not be required to contribute in the same percentage as Franchisee and may stop contributing at any time without notice to Franchisee.

10.1.1  The Marketing Fund may be used to pay the costs of preparing and producing associated materials and programs as Franchisor determines, including video, audio and written marketing materials employing marketing agencies, sponsorship of sporting, charitable or similar events, administering regional and multi-regional marketing programs including purchasing direct mail and other media marketing, and employing marketing agencies to assist with marketing efforts, supporting public relations, market research and other marketing and promotional activities, campaigns, test marketing, marketing surveys, public relations activities, Website design and development/operation for portal, Internet, Intranet and URL services, social media, technology programs, electronic application design and development, and for 800 or similar numbers. All expenditures are at the sole discretion of Franchisor. Franchisor may spend in any year more or less than the total contributions to the Marketing Fund in that year. Franchisor may borrow from Franchisor or other lenders on behalf of the Marketing Fund to cover deficits of the Marketing Fund or cause the Marketing Fund to invest any surplus for future use by the Marketing Fund. Upon request, Franchisor will prepare an annual accounting of the Marketing Fund and will distribute it to Franchisees, once a year, that will state the total amount of money collected and spent by the Marketing Fund during the previous year and list, by general category, the manner in which Franchisor spent the money. The report will not be separately audited but will be examined as part of the overall annual audit of Franchisor's books.'

10.1.2  Franchisee acknowledges that the Marketing Fund is intended to maximize general public recognition of and the acceptance of the Potato Corner brand for the benefit of the Potato Corner System as a whole. Franchisor undertakes no obligation, in administering the Marketing Fund, to make expenditures for Franchisee that are equivalent or proportionate to its contribution, or to ensure that any particular Franchisee benefits directly or pro rata from marketing or promotion conducted with the Marketing Fund.

10.1.3  Franchisor will maintain the Marketing Fund in an account separate from Franchisor's other monies, and will not use it to defray any of Franchisor's expenses, except for reasonable administrative and marketing wages and costs and overhead which Franchisor may incur in activities related to administering the Marketing Fund and marketing programs for Potato Corner Franchisees. Franchisor's printed materials and Website may also contain references stating that "Franchises Are Available" and/or that "Each Potato Corner Franchise Is Independently Owned and Operated" to promote the sale of franchises for Potato Corner Restaurants. With this exception, no portion of the Marketing Fund will be used to solicit or to sell Potato Corner franchises to prospective Potato Corner Franchisees. The Marketing Fund is not and will not be an asset of Franchisor. Any Marketing Fund Fees collected in a year, but not spent in that year, will be

EXHIBIT 1248 - 0031

carried over to the next year. Franchisor shall have the right, in its sole discretion, to terminate the collection and disbursement of Marketing Fund Fees upon ninety (90) days' prior written notice to Franchisee. Upon termination, Franchisor shall disburse the remaining Marketing Fund Fees on hand only for the purposes authorized by this Article 10.

      10.2   **Local Store Marketing Expenditures**. Franchisee shall spend the Local Store Marketing Expenditure each month on local marketing and promotion of the Franchised Restaurant as required by Franchisor. Franchisor shall have the right to adjust the amount of the Local Store Marketing Expenditure at any time and from time to time during the Term upon ninety (90) days' prior written notice from Franchisor to Franchisee, to an amount not to exceed two percent (2%) of Gross Sales. Franchisee shall conduct all local marketing and promotion in accordance with the policies and provisions with respect to format, content, media, geographic coverage and other criteria as are from time to time contained in the Manuals, or as otherwise directed by Franchisor, and shall not use or publish any marketing material or in any way use or display any of the Potato Corner Marks except in accordance with said policies and provisions and with Franchisor's prior written approval. Franchisee shall submit samples of all marketing and promotional plans and materials to Franchisor for Franchisor's approval and may only commence use of the materials after they have been approved, in writing, by Franchisor. Franchisor shall have the right at any time after Franchisee commences use of any materials to prohibit further use, effective upon written notice to Franchisee. On the tenth (10th) day of each calendar month during the Term, Franchisee shall provide Franchisor with copies of all invoices, statements, canceled checks or other forms of payment that have been issued by Franchisee during the preceding calendar month which evidence the expenditure and payment by Franchisee of the required Local Store Marketing Expenditure. If Franchisee fails to do so, or fails to spend the required Local Store Marketing Expenditure during any calendar month, Franchisee shall immediately pay the Marketing Fund the difference between the amount that Franchisee actually spent on local marketing and the required Local Store Marketing Expenditure.

      10.3   **Cooperative Marketing Programs**. Franchisor may from time to time establish programs for co-operative marketing ("**Cooperative Marketing Programs**") to coordinate marketing efforts and programs, to serve as a conduit for the collection and expenditure of the contributed funds and to maximize the efficient use of local and/or regional advertising media. If and when Franchisor creates a Cooperative Marketing Program for the  marketing coverage area (a "**Marketing Coverage Area**") in which the Franchised Restaurant is located, Franchisee (and, if Franchisor or an Affiliate of Franchisor owns a Franchised Restaurant in the Marketing Coverage Area, then Franchisor or such Affiliate of Franchisor), shall become a subscriber and member of the Cooperative Marketing Program and shall participate in the Cooperative Marketing Program in the manner prescribed by Franchisor. The size and content of a Marketing Coverage Area, if and when established by Franchisor, shall be binding upon Franchisee, and all other similarly situated Potato Corner Franchisees and Franchisor or an Affiliate of Franchisor, if it operates Potato Corner Restaurants in the Marketing Coverage Area. Each participating Potato Corner Franchisee, as well as Franchisor (or its Affiliate), if applicable, shall be entitled to one vote for each Franchised Restaurant located within the Marketing Coverage Area as may reasonably be determined by Franchisor, but in no event shall any Potato Corner Franchisee and/or its Affiliates have more than twenty-five percent (25%) of the vote, regardless of the number of Potato Corner Restaurants owned.

      10.3.1   Franchisee and all other members of the Marketing Coverage Area whose Franchise Agreements require their participation in the Cooperative Marketing Program, shall contribute to the Cooperative Marketing Program the amounts that are determined by Franchisor and fifty percent (50%) or more of the participating Potato Corner Restaurants in the Cooperative Marketing Program (not to exceed two percent (2%) of the Gross Sales of each participating Franchised Restaurant located in the Marketing Coverage

EXHIBIT 1248 - 0032

Area. Franchisee's contribution to the Cooperative Marketing Program shall be credited towards the satisfaction of the Local Store Marketing Expenditure required by <u>Section 10.2</u>.

        10.3.2    Franchisor shall administer the Cooperative Marketing Program and shall determine the policies of the Cooperative Marketing Program and the usage of the available funds for media time, production of media materials, radio, television, newspapers or Franchised Restaurant level materials such as flyers, or posters, or for any other type of advertising or marketing use. Franchisor reserves the right to establish general standards concerning the operation of the Cooperative Marketing Program, advertising agencies retained by the Cooperative Marketing Program, and marketing conducted by the Cooperative Marketing Program. Any disputes (other than pricing) arising among or between Franchisee, other Potato Corner Franchisees, and/or the Cooperative Marketing Program shall be resolved by Franchisor, whose decision shall be final and binding on all parties.

        10.4    **Grand Opening Marketing Expenditure; Grand Opening Events**. At least sixty (60) days before the Opening Date of the Franchised Restaurant, Franchisor and Franchisee shall develop a promotional campaign plan for the grand opening of the Franchised Restaurant. Franchisee shall provide Franchisor with copies of all invoices, statements, canceled checks or other forms of payment which have been issued by Franchisee which evidence the Grand Opening Marketing Expenditure and payment by Franchisee of the amounts required by this <u>Section 10.4</u> for the grand opening marketing campaign for the Franchised Restaurant. If Franchisee fails to provide Franchisor with such evidence of payment, or if Franchisee fails to spend the amount required by this <u>Section 10.4</u>, Franchisee shall immediately pay the Marketing Fund the difference between the amount that Franchisee actually spent on the grand opening marketing campaign and the required Grand Opening Marketing Expenditure. In addition to the Grand Opening Marketing Expenditure, Franchisee shall conduct grand opening events and promotions as required and directed by Franchisor.

        10.5    **Promotional Campaigns**. From time to time during the Term, Franchisor shall have the right to establish and conduct promotional campaigns on a national or regional basis, which may by way of illustration and not limitation promote particular products or marketing themes. Franchisee shall participate in the promotional campaigns upon the terms and conditions that Franchisor may establish. Franchisee acknowledges and agrees that participation may require Franchisee to purchase point of sale advertising material, posters, flyers, product displays and other promotional materials.

        10.6    **Advisory Council**. Franchisor may from time to time establish an Advisory Council for Potato Corner Franchisees to work with Franchisor and to consult with Franchisor on potential improvements to the Potato Corner System, the products offered by Potato Corner Restaurants, advertising conducted by the Marketing Fund and any other matters that Franchisor deems appropriate. If an Advisory Council is formed, it will act solely in an advisory capacity, and will not have decision making authority, will be comprised of Franchisor's representatives and Potato Corner Franchisees who may be chosen by Franchisor or elected by other Potato Corner Franchisees. All Potato Corner Franchisees who serve on an Advisory Council shall pay all transportation costs, food, lodging and similar costs incurred in connection with their attendance at Advisory Council meetings. Franchisor shall have the right to form, change, merge or dissolve any Advisory Council at any time, in its sole discretion.

        10.7    **Internet**. Franchisee shall not develop, create, generate, own, license, lease or use in any manner any computer medium or electronic medium (including, without limitation, any Internet home page, e-mail address, Website, domain name, bulletin board, newsgroup or other Internet-related medium or activity) which in any way uses or displays, in whole or part, the Potato Corner Marks, or any of them, or any words, symbols or terms confusingly similar thereto without Franchisor's prior written consent, and then only

EXHIBIT 1248 - 0033

in the manner and in accordance with the procedures, policies, standards and specifications that Franchisor may establish from time to time. Franchisee shall not separately register any domain name or any portion of any domain name containing the Potato Corner Marks or participate or market on any Website or other form of electronic media (including, without limitation, through the use of social technology, social media, social networking platforms, video Websites, email marketing sites or other forms of electronic media not yet developed) using the Potato Corner Marks without Franchisor's prior written consent. Franchisee's general conduct on the Internet and in the use of other forms of electronic media is subject to the terms and conditions of this Agreement and all other rules, requirements or policies that Franchisor may identify from time to time. Franchisor may, at any time after Franchisee commences use of any approved electronic media, prohibit further use, effective upon receipt of written notice by Franchisee.

10.8    **Websites**. Franchisor shall establish and maintain from time to time, one or more Internet Websites that shall be used to provide information about Potato Corner Restaurants to the public. Franchisor has sole discretion and control over the establishment, design and content of the Website. Franchisor may, in its discretion, configure the site to accommodate one or more interior pages which Franchisor shall dedicate, in whole or in part, to the Franchised Restaurant, all at Franchisee's expense. Franchisor shall have the right, at its sole option, from time to time, to (i) change, revise, or eliminate the design, content and functionality of the Website; (ii) make operational changes to the Website; (iii) change or modify the URL and/or domain name of the Website; (iv) substitute, modify, or rearrange the Website, at Franchisor's sole option, including in any manner that Franchisor considers necessary or desirable to comply with Applicable Laws, or respond to changes in market conditions or technology and respond to any other circumstances; (v) limit or restrict end-user access (in whole or in part) to the Website, and (vi) disable or terminate the Website without any liability to Franchisee.

10.9    **Social Media**. Franchisee shall not participate or market through the use of social technology, social media such as Facebook, Instagram, Pinterest, Twitter, Snapchat, Tumblr, social networking platforms or other forms of electronic media not yet developed ("**Social Media Platforms**") using the Potato Corner Marks or in connection with the Franchised Restaurant, without Franchisor's prior written consent. If Franchisee separately registers any Social Media Platform account (a "**Social Media Account**") containing the Potato Corner Marks or otherwise related to the Franchised Restaurant, whether with Franchisor's prior consent or otherwise (i) Franchisee shall promptly notify Franchisor and provide Franchisor with all necessary information related to the Social Media Account that Franchisor requires or demands, without compensation to Franchisee; and (ii) the Social Media account shall, without further notice, become and be deemed to be Franchisor's sole property without compensation to Franchisee, and Franchisee hereby assigns all of Franchisee's right, title and interest in all such Social Media Accounts to Franchisor. Franchisor shall be the sole owner of all related intellectual property rights in the Social Media Account and all content posted thereon. In addition, Franchisee hereby assigns to Franchisor the right to control and administer all Social Media Accounts, including the right to modify the Social Media Accounts, and Franchisee waives and releases all rights of restraint and moral rights therein and thereto. If the foregoing provisions of this Section 10.9 are found to be invalid or otherwise unenforceable, Franchisee hereby grants Franchisor a worldwide, perpetual, non-exclusive, fully-paid license to use and administer the Social Media Account to the extent the use or sublicense would, absent this Agreement, directly or indirectly infringe Franchisee's rights. For elimination of doubt, Franchisor's right to control and administer the Social Media Accounts includes, without limitation, the right to post or remove content, language and media, the right to require Franchisee to post and remove content, language and media, and to disable and/or close a Social Media Account.

11.    **CONFIDENTIAL INFORMATION**

11. 1    **Potato Corner Confidential Information**. Franchisee acknowledges and agrees that the Potato Corner System is comprised of confidential information that has been developed by Franchisor and its Affiliates by the investment of time, skill, effort and money and is widely recognized by the public, is of substantial value, and is proprietary, confidential and constitutes trade secrets of Franchisor and its Affiliates and includes, without limitation, tangible and intangible information (whether or not in electronic form) relating to Franchisor's business operations, products and services, recipes, specially formulated and specially produced proprietary lines of flavoring and seasoning and the Trade Secret Food Ingredients, cooking techniques and methods, sources of materials and equipment, customer management and other software, data, other content, formulations, patterns, compilations, programs, devices and processes, business relationships, contact information for industry professionals, designs, developmental or experimental work and services, improvements, discoveries, plans for research, potential new or supplemental products and services, Websites, advertisements or ancillary products and services, marketing and selling methods and/or plans, business plans, budgets and unpublished financial statements, licenses, prices and costs, vendors, collaborators, current customer and prospective customer names and addresses, information regarding credit extensions to customers, customer service purchasing histories and prices charged to customers, customer lists and other customer data, information regarding the skills and compensation of employees of Franchisor and contractors of Franchisor, designs, drawings, specifications, source code, object code, documentation, diagrams, flowcharts, research, development, marketing techniques and materials, trademarks, trade secrets, sales/license techniques, inventions, copyrightable material, trademarkable material, databases, relationships between Franchisor and other companies, persons or entities, knowledge or know-how concerning the methods of operation of the Franchised Restaurant which may be communicated to Franchisee, or of which Franchisee may be apprised, by virtue of Franchisee's operation of the Franchised Restaurant under the terms of this Agreement, and any other information or material considered proprietary by Franchisor whether or not designated as confidential information by Franchisor, that is not generally known by the public, or which derives independent economic value (actual or potential) from not being generally known to the public or persons unaffiliated with Franchisor or its Affiliates and which is the subject of efforts by Franchisor that are reasonable under the circumstances to maintain its secrecy, and any other information in oral, written, graphic or electronic form which, given the circumstances surrounding its disclosure, would be considered confidential (collectively, the "**Potato Corner Confidential Information**"). Potato Corner Confidential Information does not include any information that was in the lawful and unrestricted possession of Franchisee prior to its disclosure by Franchisor; is or becomes generally available to the public by acts other than those of Franchisee after receiving it; has been received lawfully and in good faith by Franchisee from a third party who did not derive it from Franchisor or Franchisee; or is shown by acceptable evidence to have been independently developed by Franchisee.

11.2    **Value**. Franchisee acknowledges and agrees the Potato Corner Confidential Information is not generally known by the public or Persons other than Franchisor, its Affiliates, Potato Corner Franchisees and Franchisee; derives independent economic value (actual or potential) from not being generally known to the public or persons unaffiliated with Franchisor or Franchisee; and is the subject of efforts by Franchisor that are reasonable under the circumstances to maintain the secrecy of the Potato Corner Confidential Information, including, without limitation (i) not revealing the Potato Corner Confidential Information to unauthorized parties; (ii) requiring Potato Corner Franchisees to acknowledge and agree in writing that the Potato Corner Confidential Information is confidential; (iii) requiring Potato Corner Franchisees to agree in writing to maintain the confidentiality of the Potato Corner Confidential Information; (iv) monitoring electronic access to the Potato Corner Confidential Information by the use of passwords and other restrictions so that electronic access to the Potato Corner Confidential Information is limited to authorized parties; and (v) requiring Potato

EXHIBIT 1248 - 0035

Corner Franchisees to return all Potato Corner Confidential Information to Franchisor upon the termination or expiration of their Potato Corner Franchise Agreements.

11. 3    **Maintain Confidentiality**.  To protect the Potato Corner System, the Potato Corner Marks, the Potato Corner Trade Secrets and the goodwill associated with the same, Franchisee shall not, during the term of this Agreement or thereafter, communicate, divulge, or use for the benefit of anyone else, any information that Franchisor considers its Potato Corner Trade Secrets and/or Potato Corner Confidential Information. Franchisee shall divulge Potato Corner Confidential Information only to its supervisorial or managerial personnel who must have access to it in order to perform their employment responsibilities.

11.4    **Irreparable Injury from Disclosure of Potato Corner Confidential Information**. Franchisee acknowledges that failure to comply with the requirements of this Section 11 will result in irreparable injury to Franchisor for which no adequate remedy at law may be available, and Franchisee consents to the issuance of, and agrees to pay all court costs and reasonable attorneys' fees incurred by Franchisor in obtaining, without the posting of any bond, an ex parte or other order for injunctive or other legal or equitable relief with respect to the requirements of this Section 11.

11.5    **Confidentiality Covenants from Individuals Associated with Franchisee**.  Franchisee shall require any supervisorial or managerial personnel who may have access to any Potato Corner Confidential Information of Franchisor to execute covenants that they will maintain the confidentiality of the Potato Corner Confidential Information they receive in connection with their association with Franchisee. Such covenants shall be in a form satisfactory to Franchisor, including, without limitation, specific identification of Franchisor as a third-party beneficiary of such covenants with the independent right to enforce them.

11.6    **No Restriction**. Nothing in this Article 11 is intended to prohibit or restrict any activity which prohibition or restriction violates Franchisee's employees' rights to engage in protected concerted activity under the National Labor Relations Act.

12.    **ACCOUNTING AND RECORDS**

12.1    **General Reporting**. Franchisee shall submit weekly and monthly statistical control forms and other financial, operational and statistical information that Franchisor may require (i) to assist Franchisee in the operation of the Franchised Restaurant; (ii) to allow Franchisor to monitor Gross Sales, purchases, costs and expenses; (iii) to enable Franchisor to develop chain wide statistics; (iv) to assist Franchisor in the development of new Potato Corner Authorized Products or the removal of existing unsuccessful Potato Corner Authorized Products; (v) to enable Franchisor to refine existing Potato Corner Authorized Products; and (vi) to generally improve chain-wide understanding of the Potato Corner System (collectively, the "**Reporting Information**"). Franchisor reserves the right to require the further information concerning the Franchised Restaurant that Franchisor may, from time to time, reasonably request.

12.2    **Specific Reporting**. Unless otherwise agreed by Franchisor in writing, Franchisee shall submit condensed reports of daily Gross Sales to Franchisor on a weekly basis in accordance with the guidelines established by Franchisor. Franchisee will electronically link the Franchised Restaurant to Franchisor and will allow Franchisor to poll the POS System on a daily basis at a time selected by Franchisor to retrieve Reporting Information including sales, sales mix, usage and operations data. Further:

12.2.1    Within five (5) days following the end of each calendar month during the Term, or at any other interval that Franchisor may establish, Franchisee shall submit a Gross Sales report signed by

EXHIBIT 1248 - 0036

Franchisee, in the form and manner prescribed by Franchisor, reporting all Gross Sales for the preceding month, together with the additional financial information that Franchisor may, from time to time, request.

12.2.2   Within fifteen (15) days following the end of each calendar quarter during the Term, Franchisee shall submit to Franchisor financial statements for the preceding quarter, including a balance sheet and profit and loss statement, prepared in the form and manner prescribed by Franchisor and in accordance with generally accepted accounting principles, which shall be certified by Franchisee to be accurate and complete.

12.2.3   Within forty-five (45) days following the end of each calendar year during the Term, Franchisee shall submit to Franchisor an unaudited annual financial statement prepared in accordance with generally accepted accounting principles, and in the form and manner prescribed by Franchisor, which shall be certified by Franchisee to be accurate and complete.

12.2.4   Within forty-five (45) days following Franchisor's request, Franchisee shall provide Franchisor with copies of signed original sales and use tax forms.

12.3     **Audits**. Franchisee shall prepare, and keep for not less than three (3) years following the end of each of its fiscal years, adequate books and records showing daily receipts in, at and from the Potato Corner Restaurants, applicable sales tax returns, if any, all pertinent original serially numbered sales slips and cash register records, and the other sales records as may be reasonably required by Franchisor, from time to time, to verify the Gross Sales reported by Franchisee to Franchisor, in a form suitable for an audit of Franchisee's records by an authorized auditor or agent of Franchisor. Such information shall be broken down by categories of goods, foods and beverages sold, when possible. Franchisor, its agents or representatives may, at any reasonable time during normal working hours, audit or review Franchisee's books and records in accordance with generally accepted standards established by certified public accountants. If any audit or other investigation reveals an under-reporting or under-recording error of two percent (2%) or more, then in addition to any other sums due, the expenses of the audit/inspection shall be borne and paid by Franchisee upon billing by Franchisor, which shall include, without limitation, Franchisor's travel, lodging and wage expenses and reasonable accounting and legal expenses, plus interest at the rate of five percent (5%) per month (but not to exceed the maximum legal rate of interest).

12.4     **Accounting System**. Franchisee shall maintain an accounting and record keeping system, which shall provide for basic accounting information necessary to prepare financial statements, a general ledger and reports required by this Agreement and the Manuals. Franchisee shall maintain accurate, adequate and verifiable books and supporting documentation relating to the accounting information.

12.5     **Use of Financial Statements In Disclosure Document**. Franchisee hereby irrevocably consents to Franchisor's use of information contained in its financial statements, at Franchisor's election, in its franchise disclosure document for the offer and sale of franchises.

12.6     **Data for Franchised Restaurant**. All data pertaining to the Franchised Restaurant and all data created or collected by Franchisee in connection with Franchisee's operation of the Franchised Restaurant (including, without limitation, data pertaining to the Franchised Restaurant's customers) or otherwise provided by Franchisee (including, without limitation, data uploaded to, or downloaded from Franchisee's POS System and/or computer system) is the sole property of Franchisor and Franchisor shall have the right to use such data in any manner that Franchisor deems appropriate without any compensation to Franchisee. Franchisee shall provide Franchisor with copies and/or originals of such data upon request by Franchisor.

EXHIBIT 1248 - 0037

Franchisor hereby licenses use of such data to Franchisee during the Term, at no cost, solely for Franchisee's use in connection with the operation of the Franchised Restaurant.

13.  **INSURANCE**

13.1    **Franchisee's Insurance Obligations**. Franchisee shall obtain and maintain throughout the Term the types and amounts of insurance required by Franchisor and shall provide Franchisor with proof of coverage and Certificates of Insurance upon demand. This insurance shall protect Franchisee and Franchisor against any demand or claim with respect to personal and bodily injury, death, or property damage, or any loss, liability, or expense whatsoever arising or occurring upon or in connection with the operation of the Franchised Restaurant. Franchisee shall obtain and maintain (i) workers compensation insurance in compliance with local laws and regulations; (ii) employer's liability insurance with $1,000,000 combined single limit coverage; (iii) comprehensive general liability insurance and product liability insurance with limits of $1,000,000 combined single limit coverage including broad form contractual liability and personal injury coverage (employee and contractual inclusion deleted), provided that the required amounts may be modified periodically by us to reflect inflation or future experience with claims; (iv) automobile liability insurance on company vehicles, including owned, hired and non-owned vehicle coverage, with a combined single limit of at least $1,000,000; (v) loss of income insurance (in an amount sufficient to cover the all fees due to Franchisor under this Agreement for a period of at least twelve (12) months); (vi) rental value insurance in an amount sufficient to cover the rents and other fees due the Landlord under the Lease during any period of business interruption or inability to operate the Franchised Restaurant or any greater amounts of insurance as required by the Lease for the Franchised Location; (vii) employment practices liability insurance with a co-defendant endorsement in favor of Franchisor; (viii) employee non-owned automobile insurance with limits of $1,000,000; (ix) cyber-liability insurance with limits of $50,000; and (x) additional insurance and types of coverage as required by any Lease for the Franchised Location, including an umbrella policy with limits of $2,000,000 to $4,000,000. Franchisor reserves the right to change the insurance requirements during the term of this Agreement, including the types of coverage and the amounts of coverage. Franchisee must comply with any changes to these requirements.

13.2    **Required Endorsements and Certificates**. Each policy shall: (i) be written by insurers licensed and admitted to write coverage in the jurisdiction in which the Franchised Restaurant is located and with a rating of "A" or better as set forth in the most recent edition of Best's Key Rating Guide; (ii) name Franchisor as an additional insured; and (iii) comply with the requirements prescribed by Franchisor at the time the policies are obtained. Franchisee and Franchisee's insurers shall agree to waive their rights of subrogation against Franchisor, and Franchisee shall provide evidence of the waiver in accordance with Section 13.1. Franchisee's obligation to obtain and maintain insurance shall not be limited in any way by reason of any insurance which may be maintained by Franchisor, nor shall Franchisee's performance of that obligation relieve it of liability under the indemnity provisions set forth in Section 18.4. All public liability and property damage policies shall contain a provision that Franchisor and its Affiliates, although named as an additional insured, shall nevertheless be entitled to recover under the policies on any loss occasioned to Franchisor, or its Affiliates, partners, shareholders, directors, agents, or employees by reason of the negligence of Franchisee or its partners, shareholders, directors, agents, or employees. At least ten (10) days prior to the time any insurance is first required to be carried by Franchisee, and thereafter at least thirty (30) days prior to the expiration of any policy, Franchisee shall deliver to Franchisor Certificates of Insurance evidencing the proper types and minimum amounts of required coverage. All Certificates shall expressly provide that no less than thirty (30) days' prior written notice shall be given Franchisor in the event of material alteration to or cancellation or non-renewal of the coverages evidenced by the Certificates. Certificates evidencing the insurance required by this Section 13 shall name Franchisor, and each of its Affiliates, partners, shareholders, directors, agents, and

EXHIBIT 1248 - 0038

employees as additional insureds on the additional-insured Grantor of Franchise Form CG-2029 or an insurer's comparable form, and shall expressly provide that any interest of each shall not be affected by any Default by Franchisee of any policy provisions for which the Certificates evidence coverage.

13.3    **Franchisor's Right to Secure Insurance on Behalf of Franchisee**. Should Franchisee, for any reason, fail to procure or maintain the insurance required by this Agreement, as the requirements may be revised from time to time by Franchisor in the Manuals or otherwise in writing, Franchisor shall have the right and authority (but not the obligation) to immediately procure the insurance and to charge the same to Franchisee, which charges, together with Franchisor's expenses in so acting, shall be payable by Franchisee immediately upon notice. The foregoing remedies shall be in addition to any other remedies Franchisor may have.

14.    **TRANSFER OF INTEREST**

14.1    **Transfer by Franchisor**. Franchisor shall have the right to transfer or assign all or any part of its rights or obligations under this Agreement to any Person or Entity without the consent or approval of Franchisee. With respect to any assignment which results in the subsequent performance by the assignee of all of Franchisor's obligations under this Agreement, the assignee shall expressly assume and agree to perform the obligations, and shall become solely responsible for all obligations, of Franchisor under this Agreement from the date of assignment. Franchisor and or its Affiliates may sell their assets, the Potato Corner Marks, or the Potato Corner System, may sell securities in a public offering or in a private placement, may merge, acquire other corporations, or be acquired by another corporation, and may undertake a refinancing, recapitalization, leveraged buy-out, or other economic or financial restructuring all without the consent or approval of Franchisee. In connection with any of the foregoing, at Franchisor's request, Franchisee shall deliver to Franchisor a statement in writing certifying (a) that this Agreement is unmodified and in full force and effect (or if there have been modifications that the Agreement as modified is in full force and effect and identifying the modifications); (b) that Franchisee is not in default under any provision of this Agreement, or if in default, describing the nature thereof in detail; and (c) as to such other matters as Franchisor may reasonably request; and Franchisee agrees that any such statements may be relied upon by Franchisor and any prospective purchaser, assignee or lender of Franchisor.

14.2    **Assignment by Franchisee**. Franchisee acknowledges and agrees that the rights granted to Franchisee under this Agreement are personal and are granted in reliance upon, among other considerations, the individual or collective character, skill, aptitude, attitude, experience, business ability and financial condition and capacity of Franchisee and, if Franchisee is an Entity, that of the Owners. Accordingly, to protect the Potato Corner System, the Potato Corner Marks, the Potato Corner Trade Secrets and the goodwill associated with the same, Franchisee shall not offer, sell, or negotiate the sale of its rights under this Agreement to any third party, either in Franchisee's own name or in the name and/or on behalf of Franchisor, except as otherwise provided in this Agreement. Franchisee acknowledges and agrees that Franchisee has no right, by operation of law or otherwise, to sell, assign, transfer, pledge, donate, encumber or otherwise deal with, directly or indirectly (i) any interest in this Agreement; or (ii) the right to use the Potato Corner System or the Potato Corner Marks (an "**Assignment**") without Franchisor's prior written consent. Franchisor shall not unreasonably withhold its consent to an Assignment if, in Franchisor's judgment, Franchisee satisfies the conditions to the Assignment identified in this Agreement.

14.2.1    Unless the Parties otherwise agree in writing, Franchisee shall not make any Assignment of this Agreement except in conjunction with a concurrent Assignment to the same approved assignee of all Potato Corner Restaurants then owned and operated by Franchisee. As a condition to

EXHIBIT 1248 - 0039

Franchisor's consent to an Assignment, the assignee must execute Franchisor's Then-Current form of Potato Corner Franchise Agreement for each Franchised Restaurant sold to the assignee. Further, without Franchisor's prior written consent, which may be withheld by Franchisor in its discretion (i) Franchisee shall not offer for sale or transfer at public or private auction any of the rights of Franchisee under this Agreement; and (ii) Franchisee shall not, directly or indirectly, pledge, encumber, hypothecate or otherwise grant any third party a security interest in this Agreement in any manner whatsoever. To the extent that the foregoing prohibition may be ineffective under Applicable Law, Franchisee shall provide not less than ten (10) days' prior written notice (which notice shall contain the name and address of the secured party and the terms of the pledge, encumbrance, hypothecation or security interest) of any pledge, encumbrance, hypothecation or security interest in this Agreement.

14.2.2    For purposes of this Agreement, each of the following events is an Assignment subject to the conditions to Assignment identified in this Agreement: (i) the death or incapacity of any Owner; (ii) the offer or sale of securities of Franchisee pursuant to a transaction subject to registration under applicable securities laws or by private placement pursuant to a written offering memorandum; (iii) the sale, assignment, transfer, conveyance, gift, pledge, mortgage, or other encumbrance of more than twenty percent (20%) in the aggregate, whether in one or more transactions, of the Equity or voting power of Franchisee, by operation of law or otherwise or any other events or transactions which, directly or indirectly, effectively changes control of Franchisee; (iv) the issuance of any securities by Franchisee which itself or in combination with any other transactions results in the Owners, as constituted on the Effective Date, owning less than seventy percent (70%) of the outstanding Equity or voting power of Franchisee; and (v) any merger, stock redemption, consolidation, reorganization, recapitalization or other transfer of control of the Franchisee, however effected. Franchisee shall promptly provide Franchisor with written notice (stating the information that Franchisor may from time to time require) of each and every transfer, assignment and encumbrance by any Owner of any direct or indirect Equity or voting rights in Franchisee, notwithstanding that the same may not constitute an Assignment under this <u>Article 14</u>.

14.2.3    Neither Franchisor's right of first refusal nor the other conditions of Assignment shall apply to a transfer by Franchisee of all of Franchisee's rights under this Agreement to a newly-formed corporation, limited liability company or other business Entity provided all of the Equity or voting interests of the new business Entity are owned by the same Owners (a "**Qualified Assignment**"). Any attempted or purported Assignment which fails to comply with the requirements of this <u>Article 14</u> shall be null and void and shall constitute a Default under this Agreement.

14.3    <u>**Right of First Refusal**</u>. Except with respect to a Qualified Assignment, if Franchisee or an Owner receive a bona fide written offer ("**Third Party Offer**") from a third party (the "**Proposed Buyer**") to purchase or otherwise acquire any interest in Franchisee which will result in an Assignment within the meaning of this Agreement, Franchisee or the Proposed Buyer shall, within five (5) days after receiving the Third Party Offer and before accepting it, apply to Franchisor in writing for Franchisor's consent to the proposed Assignment. To constitute a bona fide written offer, the Third Party Offer must also apply to purchase or otherwise acquire all Potato Corner Restaurants then owned and operated by Franchisee, or its Affiliates.

14.3.1    Franchisee, or the Proposed Buyer, shall attach to its application for consent to complete the Assignment a copy of the Third Party Offer together with (i) information relating to the proposed transferee's experience and qualifications; (ii) a copy of the proposed transferee's current financial statement; and (iii) any other information material to the Third Party Offer, proposed transferee and proposed Assignment or that Franchisor requests.

EXHIBIT 1248 - 0040

14.3.2    Franchisor or its nominee shall have the right, exercisable by written notice ("**Purchase Notice**") given to Franchisee or the Proposed Buyer, within thirty (30) days following receipt of the Third Party Offer, all supporting information, and the application for consent, to notify Franchisee or the Proposed Buyer that it will purchase or acquire the rights, assets, Equity or interests proposed to be assigned on the same terms and conditions set forth in the Third Party Offer, except that Franchisor may (i) substitute cash for any form of payment proposed in the offer discounted to present value based upon the rate of interest stated in the Third Party Offer; and (ii) deduct from the purchase price the amount of all amounts then due and owing from Franchisee to Franchisor under this Agreement or otherwise. If Franchisor believes the Third Party Offer does not reflect the fair market value of the Franchise, Franchisor may exercise its rights under this Section 14.3 to purchase or acquire the rights, assets, Equity or interests proposed to be assigned on the same terms and conditions set forth in the Third Party Offer, except the purchase price shall be at the cost or fair market value of the rights, assets, Equity or interests proposed to be assigned, whichever is less. If the Parties cannot agree on the cost and/or fair market value within thirty (30) days after Franchisee's receipt of the Purchase Notice, an independent appraiser acceptable to Franchisee shall be designated by Franchisor. The appraiser's determination shall be binding on the Parties. The Parties will share the cost of the appraiser equally.

14.3.3    If Franchisor or its nominee elects to purchase or acquire the rights, assets, Equity or interests proposed to be assigned to the Proposed Buyer, the closing shall take no later than sixty (60) days following the date that the Purchase Notice was issued by Franchisor.

14.3.4    If Franchisor does not elect to purchase or acquire the rights, assets, Equity or interests proposed to be assigned to the Proposed Buyer, the closing of the sale to the Proposed Buyer shall take no later than ninety (90) days following the date that the Third Party Offer was received by Franchisee. If there is any material change in the terms of the Third Party Offer before the closing of the sale, Franchisor shall have a right of first refusal to accept the new terms subject to the conditions stated in this Section 14.3.

14.4    **Conditions of Assignment to Third Party**. As a condition to obtaining Franchisor's consent to an Assignment, all of the following conditions must be satisfied:

14.4.1    The Proposed Buyer must submit a completed franchise application to Franchisor and meet Franchisor's Then-Current qualifications for new Potato Corner Franchisees, including qualifications pertaining to financial condition, credit rating, experience, moral character and reputation.

14.4.2    Franchisee must be in Good Standing on the date consent is requested and until the date of closing of the Assignment.

14.4.3    The sales price of the interest to be conveyed must not be so high, or the terms of the sale so onerous, that, in the judgment of Franchisor, the Proposed Buyer will be unlikely to meet the Proposed Buyer's financial and other obligations to Franchisor, third party suppliers and creditors following the closing. Franchisor shall have no liability to either Franchisee or the Proposed Buyer if Franchisor approves the Assignment and the Proposed Buyer thereafter experiences financial difficulties.

14.4.4    The Proposed Buyer must sign Franchisor's Then-Current form of Franchise Agreement, the terms of which may differ materially from any and all of the terms contained in this Agreement, and which shall supersede this Agreement in all respects, except that the term of replacement Franchise Agreement shall be the remaining term of this Agreement. In exchange for signing the Then-Current Franchise Agreement, the Proposed Buyer shall receive the rights provided for in this Agreement. If the

EXHIBIT 1248 - 0041

Proposed Buyer is an Entity, each Person, and their spouse, who at the time of the Assignment, or later, owns or acquires, either legally or beneficially, ten percent (10%) or more of the Equity or voting interests of the Proposed Buyer shall jointly and severally guarantee the Proposed Buyer's performance of its obligations in the Then-Current Franchise Agreement under a Guarantee in the form of **Exhibit C**. If Franchisor is not offering new Potato Corner franchises, is in the process of revising, amending or renewing Franchisor's form of Franchise Agreement or franchise disclosure document or is not lawfully able to offer Franchisor's Then-Current form of Franchise Agreement at the time of an Assignment, Franchisor may offer to amend this Agreement, upon terms and conditions that will be established by Franchisor and the Proposed Buyer at that time, or may offer to amend the Term on substantially the terms and conditions set forth in this Agreement on a month-to-month basis for as long as Franchisor deems necessary or appropriate so that Franchisor may subsequently offer and utilize a Then-Current form of Franchise Agreement.

14.4.5    Franchisee will remain subject to all obligations stated in this Agreement that expressly, or by implication due to their nature, survive the Assignment, termination or expiration of this Agreement, including, without limitation, the provisions prohibiting competition, non-interference and non-disclosure of Potato Corner Confidential Information.

14.4.6    Franchisee and the Proposed Buyer shall execute a General Release of all known and unknown liabilities, demands, costs, expenses, damages, claims, actions and causes of action, of whatever nature, character or description, that they have, may have or believe to have against Franchisor and its Affiliates and their officers, directors, agents, shareholders and employees as of the date of the General Release, in a form acceptable to Franchisor.

14.4.7    Franchisee shall pay Franchisor the Transfer Fee to apply against Franchisor's administrative and other costs to process the Assignment.

14.4.8    Franchisee must simultaneously transfer its rights in all contracts for which continuation is necessary for operation of the Franchised Restaurant to the Proposed Buyer and satisfy any separate conditions to obtain any third party consents required for the Assignment of Franchisee's rights to the Proposed Buyer. The Proposed Buyer must execute all other documents and agreements required by Franchisor to consummate the Assignment. All required third party consents to the Assignment must be obtained, including but not limited to, an assignment of the Lease.

14.4.9    Franchisee's right to receive the sales proceeds from the Proposed Buyer in consideration of the Assignment shall be subordinate to the obligations of the Proposed Buyer owed to Franchisor and its Affiliates under, or pursuant to, this Agreement or any other agreement. All contracts by and between Franchisee and the Proposed Buyer shall expressly include a subordination provision permitting payment of the sales proceeds to Franchisee only after any outstanding obligations owed to Franchisor and its Affiliates are fully satisfied.

14.4.10    Except when the transferee is an existing Potato Corner Franchisee, the Proposed Buyer and  a supervisorial or managerial employee of the Proposed Buyer who will have general management and supervisory responsibilities for the Franchised Restaurant who is acceptable to Franchisor, must complete to Franchisor's sole satisfaction Franchisor's Initial Training Program prior to the effective date of the Assignment.

14.4.11    The Proposed Buyer must conform the Franchised Restaurant with Franchisor's Then-Current appearance and design standards and equipment specifications applicable to new Potato Corner Restaurants.

EXHIBIT 1248 - 0042

14.4.12    Franchisee must sign a guarantee personally guaranteeing the Proposed Buyer's obligations under the new Franchise Agreement in favor of Franchisor.

14.5    **Restriction on Publicly Traded and Private Securities.** Securities, partnership or other ownership interests in Franchisee may not be offered to the public under the Securities Act of 1933, as amended, nor may they be registered under the Securities Exchange Act of 1934, as amended, or any comparable federal, state or foreign law, rule or regulation, nor may such interests be offered by private offering or otherwise, without the prior written consent of Franchisor, which consent shall not be unreasonably withheld. All materials required for any private offering by federal or state law shall be submitted to Franchisor for a limited review as discussed below prior to being filed with any governmental agency; and any materials to be used in any exempt offering shall be submitted to Franchisor for review prior to use. No offering by Franchisee shall imply that Franchisor is participating in an underwriting, issuance or offering of securities of Franchisee or Franchisor, and Franchisor's review of any offering materials shall be limited solely to the subject of the relationship between Franchisee and Franchisor, and its Affiliates. Franchisor may, at its option, require Franchisee's offering materials to contain a written statement prescribed by Franchisor concerning the limitations described in the preceding sentence. Franchisee, its Owners and other participants in the offering must fully agree in writing to defend and indemnify Franchisor, its Affiliates, their respective partners and the officers, directors, manager(s) (if a limited liability company), shareholders, members, partners, agents, representatives, independent contractors, servants and employees of each of them, from and against any and all losses, costs and liability in connection with the offering and shall execute any documentation required by Franchisor to further evidence this indemnity. For each proposed offering, Franchisee shall pay to Franchisor a non-refundable fee of $10,000, which shall be in addition to any Transfer Fee under any Franchise Agreement and/or Development Agreement or such greater amount as is necessary to reimburse Franchisor for its reasonable costs and expenses associated with reviewing the proposed offering, including without limitation, legal and accounting fees. Franchisee shall give Franchisor written notice at least thirty (30) days prior to the date of commencement of any offering or other transaction covered by this Article 14.

14.6    **Death or Incapacity.** In the event of the death or incapacity of an Owner, the spouse, heirs or personal representative of the deceased or incapacitated Owner, or the remaining Owners (the "**Successor**") shall have one hundred eighty (180) days from the date of death or incapacity in which to (i) purchase the interest of the deceased or incapacitated Owner; or (ii) complete an Assignment of the interest of the deceased or incapacitated Owner to a qualified, approved third party, subject to the provisions of this Article 14. If a Successor has not purchased the interest of the deceased or incapacitated Owner or completed an Assignment of the interest of the deceased or incapacitated Owner to a qualified, approved third party within one hundred eighty (180) days from the date of death or incapacity, Franchisor may terminate this Agreement.

14.7    **Transfer by Franchisee in Bankruptcy.** If, for any reason, this Agreement is not terminated pursuant to Section 16.1 and this Agreement is assumed, or Assignment of the same to any Person or Entity who has made a bona fide offer to accept an Assignment of this Agreement is contemplated pursuant to the United States Bankruptcy Code, then notice of the proposed Assignment or assumption, setting forth (i) the name and address of the proposed assignee; and (ii) all of the terms and conditions of the proposed Assignment and assumption, shall be given to Franchisor within twenty (20) days after receipt of the proposed assignee's offer to accept Assignment of this Agreement, and, in any event, within ten (10) days prior to the date application is made to a court of competent jurisdiction for authority and approval to enter into the Assignment and assumption, and Franchisor shall thereupon have the prior right and option, to be exercised by notice given at any time prior to the effective date of the proposed Assignment and assumption, to accept an Assignment of this Agreement to Franchisor itself upon the same terms and conditions and for the same

EXHIBIT 1248 - 0043

consideration, if any, as in the bona fide offer made by the proposed assignee, less any brokerage commissions which may be payable by Franchisee out of the consideration to be paid by the assignee for the Assignment of this Agreement.

15.    **COVENANTS**

15.1    **No Prior Experience, Information or Knowledge**. Franchisee specifically acknowledges and agrees that prior to becoming a franchisee of Franchisor, Franchisee had no experience, information or knowledge whatsoever about restaurants that offer flavored french fries, baked potatoes, hash browns, loopy fries, chicken tenders and related food and beverage products or a Potato Corner Restaurant and that Franchisee's knowledge of the Potato Corner Confidential Information was obtained solely from Franchisor, following Franchisee's training by Franchisor and Franchisee's subsequent operation of the Franchised Restaurant under this Agreement. In addition, Franchisee specifically acknowledges that, pursuant to this Agreement, Franchisee will receive valuable specialized training and confidential information, including, without limitation, Potato Corner Confidential Information regarding the operational, sales, promotional, and marketing methods and techniques of Franchisor and the Potato Corner System, which are unique and proprietary to Franchisor, derive independent economic value from not being generally known to the public and are the subject of Franchisor's efforts and that are reasonable under the circumstances to maintain their secrecy.

15.2    **Non-Competition During Term of Agreement**. Franchisee and each Restricted Person covenants that during the Term, except as otherwise approved in writing by Franchisor, Franchisee and each Restricted Person shall not, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any Person, or Entity (i) divert or attempt to divert any present or prospective Potato Corner customer to any Competitive Business, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Potato Corner Marks and the Potato Corner System; or (ii)own (either beneficially or of record), engage in or render services to, whether as an investor, partner, lender, director, officer, manager, employee, consultant, representative or agent, any Competitive Business, provided, however, the restrictions stated in this Section 15.2 shall not apply to any Restricted Person after two (2) years from the date the Restricted Person ceases to be an officer, director, shareholder, member, manager, trustee, owner, general partner, employee or otherwise associated in any capacity with Franchisee.

15.3    **Non-Competition After Expiration or Termination of Agreement**. Except as Franchisor otherwise approves in writing, commencing upon the date of (i) an Assignment permitted under Article 14; (ii) the Expiration Date of this Agreement; (iii) the termination of this Agreement (regardless of the cause for termination); or (iv) a final court order (after all appeals have been taken) with respect to any of the foregoing events or with respect to enforcement of this Section 15.3, and continuing for an uninterrupted period of two (2) years thereafter, Franchisee and each Restricted Person shall not, own (either beneficially or of record), engage in or render services to, whether as an investor, partner, lender, director, officer, manager, employee, consultant, representative or agent, any Competitive Business located at the Franchised Location or within two (2) miles of the Franchised Location or any other Potato Corner Restaurant; provided, however, the restrictions stated in this Section 15.3 shall not apply to any Restricted Person after two (2) years from the date the Restricted Person ceases to be an officer, director, shareholder, member, manager, trustee, owner, general partner, employee or otherwise associated in any capacity with Franchisee.

EXHIBIT 1248 - 0044

15.4 **Violation of Covenants**. If Franchisee or any Restricted Person shall commit any violation of Section 15.3 during the two (2) year period following (i) the termination or expiration of this Agreement; (ii) the occurrence of any Assignment during the Term; (iii) the cession of the Restricted Person's relationship with Franchisee; or (iv) a final court order (after all appeals have been taken) with respect to any of the foregoing events or with respect to enforcement of Section 15.3, in addition to all other remedies available to Franchisor, Franchisee or the Restricted Person shall pay Franchisor, throughout two (2) year period, seven percent (7%) of the revenue derived by Franchisee from the sale of all products and services and all other income of every kind and nature ("**Post Termination Gross Sales**") of the Competitive Business. Franchisee shall account for and pay the seven percent (7%) of the Post Termination Gross Sales to Franchisor on the fifteenth day of each calendar month on the Post Termination Gross Sales of the Competitive Business during the preceding calendar month. Franchisor shall have the right to audit the books and records of the competing business in accordance with Section 12.3 to confirm Franchisee's compliance with this Section 15.4, upon prior notice to Franchisee.

15.5 **Exceptions to Covenants**. Section 15.2 and Section 15.3 shall not apply to ownership by Franchisee or a Restricted Person of a less than five percent (5%) beneficial interest in the outstanding equity securities of any Competitive Business registered under the Securities Act of 1933, or the Securities Exchange Act of 1934.

15.6 **Reducing Scope of Covenants**. Franchisee understands and acknowledges that Franchisor shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in Section 15.3, or any portion thereof, without Franchisee's consent, effective immediately upon receipt by Franchisee of written notice thereof; and Franchisee agrees that it shall comply forthwith with any covenant as so modified, which shall be fully enforceable.

15.7 **Reasonable Good Faith Estimate**. The Parties acknowledge and agree that it would be impossible and impracticable to determine the precise amount of damages and expenses Franchisor will incur if Franchisee or any Restricted Person shall commit any violation of Section 15.3 during the two (2) year period following (i) the termination or expiration of this Agreement; (ii) the occurrence of any Assignment during the Term; (iii) the cession of the Restricted Person's relationship with Franchisee; or (iv) a final court order (after all appeals have been taken) with respect to any of the foregoing events or with respect to enforcement of Section 15.3 due to the complications inherent in determining the amount of revenue lost by Franchisor because of the uncertainty regarding the number of months left to complete the Term then in effect, the uncertainty regarding the Gross Sales of the Franchised Restaurant during the remainder of that Term, the amount of Royalty Fees Franchisee would have paid Franchisor based upon the Gross Sales of the Franchised Restaurant and the like as well as the amount of the fees that Franchisor will collect from Franchisee upon the occurrence of the circumstances described in Section 15.3. The Parties further acknowledge and agree that the seven percent (7%) fee of Post Termination Gross Sales is a reasonable, good faith estimate of those damages.

15.8 **Covenants from Individuals**. Upon demand by Franchisor, Franchisee shall obtain and furnish to Franchisor executed covenants similar in substance to those set forth in this Article 15 (including covenants applicable upon the termination of a Person's relationship with Franchisee) from all Owners. Every covenant required by this Section 15.8 shall be in a form acceptable to Franchisor, and shall include, without limitation, a designation of Franchisor as a third party beneficiary of the covenants with the independent right to enforce them.

15.9    **Effect of Applicable Law**. In the event any portion of the covenants in this Article 15 violates laws affecting Franchisee, or is held invalid or unenforceable in a final judgment to which Franchisor and Franchisee are parties, then the maximum legally allowable restriction permitted by Applicable Law shall control and bind Franchisee. Franchisor may at any time unilaterally reduce the scope of any part of the above covenants, and Franchisee shall comply with any reduced covenant upon receipt of written notice.  The provisions of this Article 15 shall be in addition to and not in lieu of any other confidentiality obligation of Franchisee, or any other Person, whether pursuant to another agreement or pursuant to Applicable Law.

15.10    **Business Practices**. Franchisee shall comply with and/or assist Franchisor to the fullest extent possible in Franchisor's efforts to comply with Executive Order 13224 issued by the President of the United States, the USA Patriot Act, and all other present and future federal, state and local laws, ordinances, regulations, policies, lists and any other requirements of any Governmental Authority addressing or in any way relating to terrorist acts and acts of war (the "**Anti-Terrorism Laws**"). In connection with its compliance, Franchisee certifies, represents and warrants that none of Franchisee's property or interests are subject to being "blocked" under any of the Anti-Terrorism Laws and that Franchisee is not otherwise in violation of any of the Anti-Terrorism Laws.  Any violation of the Anti-Terrorism Laws by Franchisee or Franchisee's employees or any "blocking" of Franchisee's assets under the Anti-Terrorism Laws constitute grounds for immediate termination of this Agreement and any other agreements Franchisee has entered into with Franchisor or any of its Affiliates, in accordance with the provisions of Section 16.2.

15.11    **Survival**. The provisions of this Article 15 shall survive the expiration and termination of this Agreement and shall not limit, restrain or otherwise affect any right or cause of action which may accrue to Franchisor for any infringement of, violation of, or interference with, this Agreement, or the Potato Corner Marks, the Potato Corner System, the Potato Corner Confidential Information, the Potato Corner Trade Secrets, or any other proprietary aspects of Franchisor's business.

16.    **DEFAULT AND TERMINATION**

16.1    **Termination In the Event of Franchisee's Bankruptcy or Insolvency**. Franchisee shall be deemed to be in Default under this Agreement, and all rights granted to Franchisee of this Agreement shall automatically terminate without notice to Franchisee (i) if Franchisee or its Principal Owner becomes insolvent or make a general assignment for the benefit of creditors; (ii) if a petition in bankruptcy is filed under any foreign, state or United States Bankruptcy Act by Franchisee or its Principal Owner or if a petition is filed against and not opposed by Franchisee or its Principal Owner; (iii) if Franchisee or its Principal Owner is adjudicated as bankrupt or insolvent; (iv) if a bill in equity or other proceeding for the appointment of a receiver of Franchisee or its Principal Owner or other custodian for the Franchised Restaurant is filed and consented to by Franchisee or its Principal Owner; (v) if a receiver or other custodian (permanent or temporary) of Franchisee's or its Principal Owner's assets or property, or any part thereof, is appointed by any court of competent jurisdiction; (vi) if proceedings for a composition with creditors under any Applicable Law is instituted by or against Franchisee or its Principal Owner; (vii) if a final judgment in excess of $100,000 against the Franchised Restaurant remains unsatisfied or of record for thirty (30) days or longer (unless a supersedeas bond is filed); (viii) if Franchisee or its Principal Owner admits Franchisee or its Principal Owner is unable to generally pay Franchisee's or its Principal Owner's debts as they become due; (ix) if execution is levied against the Franchised Restaurant or property; (x) if suit to foreclose any lien or mortgage against the Franchised Restaurant, the Franchised Location or the equipment of the Franchised Restaurant is instituted against Franchisee or its Principal Owner and not dismissed within thirty (30) days; or (xi) if the Franchised Restaurant or the Franchised Location shall be sold after levy thereupon by any sheriff, marshal, or constable.

EXHIBIT 1248 - 0046

16.2    **Option to Terminate Without Opportunity to Cure**.  Franchisee shall be deemed to be in Default and Franchisor may, at its option, terminate this Agreement and all rights granted under this Agreement, without affording Franchisee any opportunity to cure the Default, effective immediately upon receipt of notice by Franchisor upon the occurrence of any of the following events:

16.2.1    If Franchisee shall Abandon the Franchised Restaurant.

16.2.2    If Franchisee shall purport to make any Assignment without the prior written consent of Franchisor.

16.2.3    If Franchisee shall Default in any obligation as to which Franchisee has previously received three (3) or more written notices of Default from Franchisor setting forth the Default complained of within the preceding twelve (12) months.

16.2.4    If Franchisee makes any material misrepresentations in connection with the execution of this Agreement or the operations of the Franchised Restaurant.

16.2.5    If Franchisee fails, for a period of ten (10) days after having received notification of noncompliance from Franchisor or any Governmental Authority, to comply with any Federal, state or local law or regulation applicable to the operation of the Franchised Restaurant.

16.2.6    If Franchisee's operation of the Franchised Restaurant constitutes an imminent danger to the public health or if Franchisee sells unauthorized products to the public after Notice of Default and thereafter sells the products, whether or not Franchisee has cured the Default after one or more notices.

16.2.7    If an audit or investigation conducted by Franchisor discloses that Franchisee has knowingly maintained false books or records, or submitted false reports to Franchisor, or knowingly understated its Gross Sales or withheld the reporting of the same as provided in this Agreement.

16.2.8    If Franchisee or any of its Owners, are convicted of or plead guilty or *nolo contendere* to a felony or any other crime or offense that is reasonably likely, in the sole opinion of Franchisor, to adversely affect Franchisor's reputation, the Potato Corner System, the Potato Corner Marks or the goodwill associated with the same; however, if the crime or offense is committed by an Owner other than the Principal Owner, Franchisor may only terminate this Agreement under this Section 16.2.8 if the convicted Owner fails to sell its interest in Franchisee to Franchisee's other Owners within thirty (30) days after the conviction or guilty plea.

16.2.9    If Franchisee materially misuses or makes any unauthorized use of the Potato Corner Marks or otherwise materially impairs the goodwill associated therewith or Franchisor's rights therein, or takes any action which reflects materially and unfavorably upon the operation and reputation of the Franchised Restaurant or the Potato Corner chain generally.

16.2.10    If Franchisee makes any unauthorized use, disclosure, or duplication of the Potato Corner Trade Secrets or Potato Corner Confidential Information.

16.2.11    If Franchisee fails to purchase and maintain in inventory the types and quantities of Potato Corner Branded Products, Potato Corner Proprietary Products or Non-Proprietary Products necessary to meet reasonably anticipated consumer demand.

16.2.12  If Franchisee shall or purports to purchase Potato Corner Branded Products or Potato Corner Proprietary Products or Non-Proprietary Products from other than a Potato Corner Approved Supplier and fails to cease use of the non-complying product within three (3) days after having received notification from Franchisor to do so.

16.2.13  If Franchisee shall or attempts to sell any food products other than Potato Corner Authorized Products at the Franchised Restaurant and fails to cease to do so within three (3) days after having received notification from Franchisor to do so.

16.2.14  If Franchisee shall Default in any obligation under this Agreement that by its nature is not capable of being cured by Franchisee.

16.2.15  If, within ten (10) days after receipt of written notice from Franchisor that any required payment is overdue, Franchisee fails to make the payment to Franchisor, Franchisor's Affiliates, or, to Franchisee's Landlord, suppliers, creditors or employees unless, with respect to Franchisee's suppliers, creditors or employees, Franchisee notifies Franchisor of the existence on a bona fide dispute and takes immediate action to resolve it.

16.2.16  If Franchisee fails to meet the site selection requirements, enter a Lease or Open the Franchised Restaurant within the applicable time periods provided for in this Agreement.

16.2.17  If Franchisee or the Owners use abusive language when communicating with Franchisor, Franchisor's staff or with customers, or denigrate the Potato Corner System or portray it in an unflattering light on the Internet or otherwise.

16.2.18  If Franchisee fails to make timely payments upon any obligation of Franchisee upon which Franchisor has advanced any funds for or on behalf of Franchisee, or upon which Franchisor is acting as a guarantor of Franchisee, or Default upon or breach of any provision of any promissory note or other evidence of indebtedness or any agreement relating to this Agreement concerning any obligation of Franchisee which arises from the Franchised Restaurant.

16.2.19  If Franchisee Defaults in the repayment or performance of any obligation or financing transaction with third parties under which this franchise, the Franchised Location or any assets of the Franchised Restaurant are pledged as security for Franchisee's performance.

16.2.20  If funding promised or otherwise represented to be made available to Franchisee or its Owners on the condition that Franchisee sign this Agreement is not made available to Franchisee or its Owners within ten (10) business days after Franchisee signs this Agreement.

16.2.21  If, in Franchisor's Business Judgment, Franchisor has grounds to believe that Franchisee or any of its Owners, officers, directors, or key employees has engaged or attempted to engage, through one or more affirmative acts or a failure to act, in any fraudulent, dishonest, unethical, immoral, or similar conduct in connection with the Franchised Restaurant's operation, whether such conduct is directed at or reasonably expected to impact the Franchised Restaurant, the Potato Corner System, the Franchisor or its Affiliates, suppliers, other franchisees, or another third party.

EXHIBIT 1248 - 0048

16.2.22 If, in Franchisor's Business Judgment, Franchisor has grounds to believe that Franchisee or any of its Owners, officers, or directors has engaged in any lewd or immoral conduct, whether or not in connection with the Franchised Restaurant's operation.

16.3 **Termination With Notice and Opportunity To Cure**. Except for any Default by Franchisee under Section 16.1 or Section 16.2, and as expressly provided elsewhere in this Agreement, Franchisee shall have five (5) days, in the case of any monetary Default and ten (10) days in the case of any other type of Default, following the receipt of a Notice of Default (a "**Notice of Default**") demanding the cure of the Default and to provide evidence of the cure to Franchisor. If any Default is not cured within that time period, or any longer time period that Applicable Law may require or that Franchisor may specify in the Notice of Default, this Agreement and all rights granted in this Agreement shall automatically terminate without further notice or opportunity to cure.

16.4 **Reimbursement of Franchisor's Costs**. Upon a Default by Franchisee, all of Franchisor's costs and expenses arising from the Default, including reasonable attorneys' fees, shall be paid to Franchisor within five (5) days after cure or upon demand by Franchisor whether or not the Default is cured.

16.5 **Cross-Default**. Any Default by Franchisor under the terms and conditions of this Agreement, any Multi-Unit Development Agreement 'or any other agreement between Franchisor, or its Affiliates, and Franchisee, or its Owners or Affiliates, shall be deemed to be a Default of each and every other agreement. In the event of termination, for any cause, of this Agreement or any other agreement between the Parties, Franchisor may, at its option, terminate any or all of the agreements.

16.6 **Notice Required By Law**. Notwithstanding anything to the contrary contained in this Article 16, if any valid Applicable Law of a competent Governmental Authority having jurisdiction over this Agreement and the Parties shall limit Franchisor's rights of termination under this Agreement or shall require longer notice periods than those set forth above, this Agreement shall be deemed amended to conform to the minimum notice periods or restrictions upon termination required by that Applicable Law. Franchisor shall not, however, be precluded from contesting the validity, enforceability or application of Applicable Laws in any action, hearing or dispute relating to this Agreement or the termination of this Agreement.

16.7 **Interim Management**. To protect the Potato Corner System, the Potato Corner Marks, the Potato Corner Trade Secrets and the goodwill associated with the same, after Franchisor has given Franchisee written notice that Franchisee is in Default, Franchisor may (but is not obligated to) assume interim management of the Franchised Restaurant during the pendency of any cure period or in lieu of immediately terminating this Agreement. If Franchisor elects to assume interim management of the Franchised Restaurant (i) Franchisor's election will not relieve Franchisee of Franchisee's obligations under this Agreement; (ii) Franchisor will not be liable for any debts, losses, costs or expenses incurred in the operation of the Franchised Restaurant during any interim management period; (iii) Franchisor will have the right to charge a reasonable fee for the management services; and (iv) Franchisee agrees to, and hereby does, indemnify and hold Franchisor harmless against any and all claims, demands, judgments, fines, losses, liabilities, costs, amounts paid in settlement and reasonable expenses (including, but not limited to attorneys' fees) incurred in connection with the interim management of the Franchised Restaurant, other than those arising solely from the gross negligence or willful misconduct of Franchisor. Franchisor may delegate its responsibilities under this Section 16.7 to any designee, employee or agent of Franchisor, as Franchisor may direct.

EXHIBIT 1248 - 0049

16.8    **Delay by Force Majeure**. Franchisee shall provide Franchisor, within five (5) days after the occurrence of an event that Franchisee believes is an event of Force Majeure, with notice of the specific nature and extent of the Force Majeure and an explanation as to how the event has delayed Franchisee's performance under this Agreement. The determination of whether an event of Force Majeure has occurred shall be made by Franchisor upon Franchisor's assessment of the event causing the delay. If Franchisor determines that the Default is the result of an event of Force Majeure, the required date for performance by Franchisee shall be extended by the number of days equal to the number of days that the Force Majeure exists. Franchisee shall provide Franchisor with continuing updates and all information requested by Franchisor regarding Franchisee's progress and diligence in responding to and overcoming the event of Force Majeure. An event of Force Majeure will not affect or change Franchisee's obligation to pay Royalty, Marketing Fund Fees, Software License Fees or any other fees or payments owed to Franchisor or Franchisor's Affiliates when due.

## 17.    OBLIGATIONS FOLLOWING TERMINATION OR EXPIRATION

17.1    **General**. To protect the Potato Corner System, the Potato Corner Marks, the Potato Corner Trade Secrets and the goodwill associated with the same, upon the termination or expiration of Franchisee's rights granted under this Agreement, Franchisee shall immediately cease to use all Potato Corner Trade Secrets, Potato Corner Confidential Information, the Potato Corner Marks, and any confusingly similar trademark, service mark, trade name, logotype, or other commercial symbol or insignia. Franchisee shall at its own cost immediately return the Manuals and all written materials incorporating Potato Corner Trade Secrets and all copies of any of the same to Franchisor. Franchisee shall at its own cost make cosmetic changes to the Franchised Restaurant and the Franchised Location so that they no longer contain or resemble Franchisor's proprietary designs and shall remove all Potato Corner identifying materials and distinctive Potato Corner cosmetic features and finishes, soffits, interior wall coverings and colors, exterior finishes and colors and signage from the Franchised Location that Franchisor may reasonably direct. In addition, Franchisee shall allow Franchisor permanent and unfettered access to the POS System of the Franchised Restaurant.

17.2    **Prior Payments**. Franchisor may retain all fees paid to Franchisor pursuant to this Agreement, and Franchisee shall immediately pay any and all amounts remaining due to Franchisor and its Affiliates. If this Agreement terminates due to a Default by Franchisee, the amounts to be paid by Franchisee shall include all damages, and costs, and expenses, including reasonable attorneys' fees, incurred by Franchisor as a result of the Default, which obligation shall remain, until paid in full, a lien in favor of Franchisor against assets of the Franchised Restaurant.

17.3    **Termination of Obligations and Rights**. Upon the termination or expiration of this Agreement, any and all obligations of Franchisor to Franchisee under this Agreement shall immediately cease and terminate. Likewise, any and all rights of Franchisee under this Agreement shall immediately cease and terminate and Franchisee shall immediately cease and thereafter refrain from representing itself as a then or former Franchisee or other Affiliate of Franchisor.

17.4    **Electronic Communications and Media**. The goodwill associated with all telephone and fax numbers, email addresses, domain names. Websites or web pages, social media and other Internet addresses used in operation of the Franchised Restaurant ("**Electronic Communications and Media**") is an asset that belongs to Franchisor. Franchisor shall have the option, exercisable by written notice within thirty (30) days after the cancellation, termination or expiration of this Agreement, to take an assignment of all Electronic Communications and Media for the Franchised Restaurant. If Franchisor exercises this option, Franchisee will be deemed to have assigned to Franchisor or Franchisor's designee, all right, title and interest in and to these and/or services associated with the same. Franchisee shall notify the telephone company, domain name

EXHIBIT 1248 - 0050

registrars and all listing agencies of the cancellation, termination or expiration of its right to use the Electronic Communications and Media associated with the Franchised Restaurant, and shall authorize their transfer to Franchisor. Franchisee hereby appoints Franchisor as its true and lawful agent and attorney-in-fact with full power and authority, for the sole purpose of taking such action as may be necessary to effect an assignment of all Electronic Communications and Media for the Franchised Restaurant. This power of attorney is coupled with an interest and shall survive the cancellation, termination or expiration of this Agreement. Franchisee, by executing this Agreement, authorizes Franchisor and hereby appoints Franchisor and all of Franchisor's officers as Franchisee's attorney-in-fact to direct the telephone company, domain name registrars and all listing agencies to transfer the same to Franchisor, should Franchisee fail or refuse to do so. The telephone company, domain name registrars and all listing agencies may accept this Agreement as conclusive evidence of Franchisor's exclusive rights to the Electronic Communications and Media and Franchisor's authority to direct their transfer. Franchisee must sign the instruments Franchisor requests to confirm the assignment and transfers to Franchisor. Franchisee shall not be entitled to any compensation from Franchisor if Franchisor exercises this option.

17.5    **Purchase Restaurant Assets**. Upon the expiration of this Agreement or the termination of this Agreement for any Default of Franchisee, Franchisor shall have the option, to be exercised by written notice to Franchisee within thirty (30) days after the Expiration Date or termination date, to purchase some or all of the assets of the Franchised Restaurant, regardless of whether the Franchised Restaurant is under construction or is Open and operating, and some or all of the assets of Franchisee related to the Franchised Restaurant that Franchisor elects to purchase (collectively, the "**Restaurant Assets**"). The purchase price for the Restaurant Assets (the "**Purchase Price**") shall be the "**Fair Market Value**" of the Restaurant Assets as determined under this Section 17.5. "**Fair Market Value**" means the price that a willing buyer would pay to a willing seller when neither is acting under compulsion and when both have reasonable knowledge of the relevant facts on the date the option is first exercisable (the "**Exercise Date**"). The Parties shall use their best efforts to mutually agree upon the Fair Market Value. If they are unable to so agree within thirty (30) days after the Exercise Date, Franchisor shall appoint, within forty (40) days of the Exercise Date, one (1) appraiser, and Franchisee shall appoint within forty (40) days of the Exercise Date, one (1) appraiser. The two (2) appraisers shall within a period of five (5) additional days, agree upon and appoint an additional appraiser. The three (3) appraisers shall, within sixty (60) days after the appointment of the third appraiser, determine the Purchase Price in writing and submit their report to the Parties. The Purchase Price shall be determined by disregarding the appraiser's valuation that diverges the greatest from each of the other two (2) appraisers' valuations, and the arithmetic mean of the remaining two (2) appraisers' valuations shall be the Purchase Price. The Parties shall each pay for the services of the appraiser they select, plus fifty percent (50%) of the fee charged by the third appraiser, and fifty percent (50%) of all other costs relating to the determination of the Purchase Price. The Purchase Price as so determined shall be payable as the Parties mutually agree. If they are unable to so agree within ten (10) days after final determination of the Purchase Price, fifty percent (50%) of the Purchase Price shall be payable in cash and the remaining fifty percent (50%) of the Purchase Price shall be paid in eighty-four (84) equal monthly payments and shall bear interest at a rate equal to the greater of the prime rate of interest, as published by the Western Edition of the Wall Street Journal, plus three percent (3%), or ten percent (10%) per annum, but in no event in excess of the maximum rate permitted by Applicable Law. Payment of the portion of the Purchase Price not paid in cash shall be secured by a security interest in the Restaurant Assets. Any purchase of the Restaurant Assets shall include the assumption by Franchisor and the assignment by Franchisee, of the Lease for the Franchised Restaurant.

EXHIBIT 1248 - 0051

17.6     **Survival of Obligations**. Termination or expiration of this Agreement shall be without prejudice to any other rights or remedies that Franchisor or Franchisee, as the case may be, shall have in law or in equity, including, without limitation, the right to recover benefit of the bargain damages. In no event shall a termination or expiration of this Agreement affect Franchisee's obligations to take or abstain from taking any action in accordance with this Agreement. The provisions of this Agreement which by their nature or expressly constitute post-termination or post-expiration covenants and agreements, including the obligation of the Parties to attempt to resolve all disputes by mediation, shall survive the termination or expiration of this Agreement.

17.7     **No Ownership of Potato Corner Marks**. Franchisee acknowledges and agrees that the rights to the Potato Corner Marks and the use of the Potato Corner Marks shall be and remain the property of Franchisor. Franchisee acknowledges and agrees that any use of the Potato Corner Marks after the termination or expiration of this Agreement shall constitute an unauthorized use of an identical mark and shall entitle Franchisor to damages due to, but not limited to, trademark infringement and counterfeiting.

17.8     **Government Filings**. If Franchisee has registered any of the Potato Corner Marks or the name Potato Corner or Potato Corner as part of an assumed, fictitious or corporate name, Franchisee shall promptly amend those registrations to delete the Potato Corner Marks and any confusingly similar marks or names.

17.9     **Security Interest**. Franchisee acknowledges and agrees that in addition to any other rights and remedies to which Franchisor and its Affiliates may be entitled, Franchisor and its Affiliates may enforce any rights and remedies of a secured party under the UCC as enacted in the state where the Franchised Location is located, pursuant to the security interest granted in Section 4.9, including, without limitation, the right to enter the Franchised Location to remove and repossess any products or goods in which Franchisor or its Affiliates have been granted a security interest, without notice to Franchisee. Franchisee hereby waives and releases Franchisor and its Affiliates from any and all claims in connection therewith and arising therefrom. At the request of Franchisor or its Affiliates following the event of a Default, Franchisee shall assemble and make available to Franchisor and its Affiliates all products and goods in which Franchisor or its Affiliates have been granted a security interest at a place to be designated by Franchisor or its Affiliates which is reasonably convenient to both Parties.

18.     **INDEPENDENT CONTRACTOR AND INDEMNIFICATION**

18.1     **No Fiduciary Relationship**. This Agreement does not create a fiduciary relationship between the Parties. Franchisee shall be an independent contractor, and nothing in this Agreement is intended to constitute or appoint either Party an agent, legal representative, subsidiary, joint venturer, partner, employee, or servant of the other for any purpose whatsoever.

18.2     **Public Notice of Independent Status**. Franchisee shall conspicuously identify itself in all dealings with its customers, contractors, suppliers, public officials, and others, as an independent Franchisee of Franchisor, and shall place the notice of independent ownership on all forms. Franchisor shall have the right to specify the language of any notice. In addition, Franchisee must be identified as the owner of the Franchised Restaurant by placing Franchisee's individual, Entity or other legal name on all checks, invoices, receipts, contracts, stationary and other documents by Franchisee that bear the Potato Corner Marks from diminishing or destroying the legal protection to which the Potato Corner Marks are entitled.

EXHIBIT 1248 - 0052

18.3    **Independent Contractor**. Franchisee acknowledges and agrees that it is not authorized to make any contract, agreement, warranty, or representation on Franchisor's behalf, or to incur any debt or other obligations in Franchisor's name, and that Franchisor shall in no event assume liability for, or be deemed liable under this Agreement as a result of, any action, nor shall Franchisor be liable by reason of any act or omission of Franchisee in its conduct of the Franchised Restaurant or for any claim or judgment arising therefrom against Franchisee or Franchisor.

18.4    **Indemnification**. Franchisee and its Owners and Affiliates (collectively, the "**Indemnitors**") shall indemnify, defend and hold harmless to the fullest extent permitted by Applicable Law, Franchisor and its Constituents (collectively, the "**Indemnitees**"), from any and all "**Losses and Expenses**" incurred in connection with any litigation or other form of adjudicatory procedure, claim, demand, investigation, or formal or informal inquiry (regardless of whether same is reduced to judgment) or any settlement thereof, and regardless of whether the same is between Indemnitors and Indemnities (collectively, an "**Indemnifiable Claim**") which arises directly or indirectly from, as a result of, or in connection with Franchisee's operation of the Franchised Restaurant and regardless of whether the Indemnifiable Claim or the Losses and Expenses resulted from any strict or vicarious liability imposed by law on Franchisee; provided, however, that this indemnity shall not apply to any liability arising from the gross negligence of Franchisor (except to the extent that joint liability is involved, in which event the indemnification provided for in this <u>Section 18.4</u> shall extend to any finding of comparative negligence or contributory negligence attributable to Franchisee). For the purpose of this <u>Section 18.4</u>, the term "**Losses and Expenses**" means and include compensatory, exemplary, or punitive damages, fines and penalties, attorneys' fees, experts' fees, court costs, costs associated with investigating and defending against claims, settlement amounts, judgments, compensation for damages to a Party's reputation and goodwill, and all other costs associated with any of the foregoing Losses and Expenses.

18.4.1    The Indemnitees shall give the Indemnitors prompt notice of any Indemnifiable Claim of which the Indemnitees are aware for which indemnification is required under this <u>Section 18.4</u> The notice shall specify whether the Indemnifiable Claim arises as a result of an Indemnifiable Claim by a third party against the Indemnitees (a "**Third Party Claim**") or whether the Indemnifiable Claim does not result from an Indemnifiable Claim by a third party against the Indemnitees (a "**Direct Claim**"), and shall also specify with reasonable particularity (to the extent that the information is available) the factual basis for the Indemnifiable Claim and the amount of the Indemnifiable Claim, if known. If, through the fault of the Indemnitees, the Indemnitors do not receive notice of any Indemnifiable Claim in time to effectively contest the determination of any Losses and Expenses susceptible of being contested, the Indemnitors shall be entitled to set off against the amount claimed by the Indemnitees the amount of any Losses and Expenses incurred by the Indemnitors resulting from the Indemnitees' failure to give such notice on a timely basis.

18.4.2    With respect to Third Party Claims, the Indemnitors shall have the right, at their expense and at their election, to assume control of the negotiation, settlement and defense of Third Party Claims through counsel of their choice. The election of the Indemnitors to assume such control shall be made within thirty (30) days after the Indemnitors' receipt of notice of a Third Party Claim. If the Indemnitors elect to assume control, the Indemnitors shall do so at the Indemnitors' sole expense. The Indemnitees shall have the right to be informed and consulted with respect to the negotiation, settlement or defenses of the Third Party Claim and to retain counsel to act on the Indemnitees' behalf, at the Indemnitees' sole expense, unless the Indemnitors consent to the retention of the Indemnitees' counsel at the Indemnitors' expense or unless the Indemnitors and the Indemnitees are both named in any action or proceeding and the representation of both the Indemnitors and the Indemnitees by the same counsel would be appropriate because of the absence of any actual or potential differing interests between them (such as the availability of different defenses).

18.4.3   If the Indemnitors elect to assume control, but thereafter fail to defend the Third Party Claim within a reasonable time, the Indemnitees shall be entitled to assume control and the Indemnitors shall be bound by the results obtained by the Indemnitees with respect to the Third Party Claim.  If any Third Party Claim is of a nature that the Indemnitees are required by Applicable Law to make a payment to any claimant with respect to the Third Party Claim before the completion of settlement negotiations or related legal proceedings, the Indemnitees may make such payment and the Indemnitors shall, within thirty (30) days after demand by the Indemnitees, reimburse the Indemnitees for the amount of the payment. If the Indemnitees' liability under the Third Party Claim, as finally determined, is less than the amount paid by the Indemnitors to the Indemnitees, the Indemnitees shall, within thirty (30) days after receipt of the difference from the claimant, pay the difference to the Indemnitors.

18.4.4   If the Indemnitors fail to assume control of the defense of any Third Party Claim, the Indemnitees shall have the exclusive right to consent, settle or pay the amount claimed. Whether or not the Indemnitors assume control of the negotiation, settlement or defenses of any Third Party Claim, the Indemnitors shall not settle any Third Party Claim without the written consent of the Indemnitees, which consent shall not be unreasonably withheld or delayed. The Indemnitees and the Indemnitors shall cooperate fully with each other with respect to Third Party Claims, and shall keep each other fully advised with respect to Third Party Claims (including supplying copies of all relevant documentation promptly as they become available).

18.4.5   With respect to Direct Claims, following receipt of notice from the Indemnitees of the Direct Claim, the Indemnitors shall have thirty (30) days to make such investigation of the Direct Claim as is considered necessary or desirable. For the purpose of the investigation, the Indemnitees shall make available to the Indemnitors the information relied upon by the Indemnitees to substantiate the Direct Claim, together with all other information that the Indemnitors may reasonably request. If the Indemnitors and the Indemnitees agree at or prior to the expiration of the thirty (30) day period (or any mutually agreed upon extension thereof) to the validity and amount of a Direct Claim, the Indemnitors shall immediately pay the Indemnitees the full agreed upon amount of the Direct Claim. If the Indemnitors fails to pay the same, the matter shall be resolved in the manner described in <u>Article 15</u>.

18.4.6   The Indemnitees shall exert commercially reasonable efforts to mitigate the Losses and Expenses upon and after becoming aware of any Indemnifiable Claim which could reasonably be expected to give rise to the payment of Losses and Expenses.

19.      **DISPUTE RESOLUTION**

19.1     **Mediation**. The Parties pledge to attempt first to resolve any dispute pursuant to mediation conducted in accordance with the Commercial Mediation Rules of the American Arbitration Association ("**AAA**") unless the Parties agree on alternative rules and a mediator within fifteen (15) days after either Party first gives notice of mediation. Mediation shall be conducted in Los Angeles County, California, and shall be conducted and completed within forty-five (45) days following the date either Party first gives notice of mediation unless otherwise agreed to in writing by the Parties. The fees and expenses of the mediator shall be shared equally by the Parties.  The mediator shall be disqualified as a witness, expert or counsel for any Party with respect to the Dispute and any related matter. Mediation is a compromise negotiation and shall constitute privileged communications under California and other Applicable Laws. The entire mediation process shall be confidential and the conduct, statements, promises, offers, views and opinions of the mediator and the Parties shall not be discoverable or admissible in any legal proceeding for any purpose; provided, however, that evidence which is otherwise discoverable or admissible shall not be excluded from discovery or admission as a result of its use in the mediation. The mediation provision in this <u>Section 19.1</u> shall not apply to any action

EXHIBIT 1248 - 0054

for injunctive or other provisional relief, including, without limitation, enforcement of liens, security agreements, or attachment, as Franchisor deems to be necessary or appropriate to compel Franchisee to comply with Franchisee's obligations to Franchisor and/or to protect the Potato Corner Marks. Any claim or dispute involving or contesting the validity of any of the Potato Corner Marks shall not be subject to mediation.

19.2    **Arbitration**. The Parties agree that, subject to Section 19.1 and Section 19.8 of this Agreement, all disputes arising out of or relating to this Agreement or any other agreement between Franchisor and Franchisee, Franchisor's relationship with Franchisee, the scope and validity of this Agreement or any other agreement between Franchisor and Franchisee or any provision of those agreements (including the validity and scope of the arbitration obligations under this Section 19.2, which the Parties acknowledge is to be determined by an arbitrator and not by a court), or the Potato Corner System, shall be submitted for binding arbitration, on demand of either Party, to the AAA.

19.2.1    The arbitration proceedings shall be conducted by one arbitrator and, except as otherwise provided in this Section 19.2, according to the then-current commercial arbitration rules of the AAA. All proceedings shall be conducted at a suitable location chosen by the arbitrator in the Los Angeles, California metropolitan area. All matters relating to arbitration will be governed by the Federal Arbitration Act (9 USC. §§ 1 et seq.). Judgment upon the arbitrator's award may be entered in any court of competent jurisdiction. The arbitrator shall have the right to award or include in the arbitrator's award any relief which the arbitrator deems proper, including, without limitation, money damages (with interest on any unpaid amounts from the date due), specific performance, injunctive relief (except as provided in Section 19.7), and attorneys' fees and costs, provided that the arbitrator may not declare any Potato Corner Mark generic or otherwise invalid or award any punitive or exemplary damages against either Party. The Parties shall be bound by the provisions of any limitation on the period of time in which claims must be brought under Applicable Law or this Agreement, whichever expires earlier. The Parties further agree that, in any arbitration proceeding, each Party must submit or file any claim which would constitute a compulsory counterclaim (as defined by Rule 13 of the Federal Rules of Civil Procedure) within the same proceeding as the claim to which it relates. Any claim which is not submitted or filed as required shall be forever barred. The arbitrator may not consider any settlement discussions or offers that might have been made by either Party.

19.2.2    Franchisor reserves the right, but not the obligation, to advance Franchise's share of the costs of any arbitration proceeding in order for the arbitration proceeding to take place and, by doing so, shall not be deemed to have waived or relinquished Franchisor's right to seek the recovery of amounts advanced in accordance with Section 19.6. The Parties agree that arbitration shall be conducted on an individual, not a class-wide, basis and that any arbitration proceeding between the Parties, or their Affiliates, and/or their respective officers, directors, shareholders, members, managers, agents, and/or employees, may not be consolidated with any other arbitration proceeding between the Parties and any other Person. Notwithstanding the foregoing or anything to the contrary in this Section 19.2, if any court or arbitrator determines that all or any part of the preceding sentence is unenforceable with respect to a dispute that otherwise would be subject to arbitration under this Section 19.2, the Parties agree that this arbitration clause shall not apply to that dispute and that such dispute shall be resolved in a judicial proceeding in the Superior Court of California, County or Los Angeles or the United States District Court for the Central District of California in Los Angeles, California in accordance with this Article 19 (excluding this Section 19.2).

19.3    **Governing Law**. Except as otherwise provided in Section 19.2.1, this Agreement shall be interpreted and construed under the laws of the State of California. In the event of any conflict of law, the law of California shall prevail, without regard to the application of California conflict of law rules. If, however, any provision of this Agreement would not be enforceable under the laws of California, and if the Franchised

EXHIBIT 1248 - 0055

Restaurant is located outside of California and such provision would be enforceable under the laws of the state in which the Franchised Restaurant is located, then such provision shall be interpreted and construed under the laws of that state. Nothing in this <u>Section 19.3</u> is intended by the Parties to subject this Agreement to any franchise or similar law, rules, or regulation of any state to which it would not otherwise be subject.

19.4    **Waivers**. The Parties agree, to the extent permitted by Applicable Law, that any legal action or proceeding of any kind by either Party must be commenced by no later than the last to occur of the following: (i) one hundred eighty (180) days after obtaining knowledge of the facts which constituted or gave rise to the alleged violation or liability; or (ii) one (1) year after the act, event, occurrence or transaction which constituted or gave rise to the alleged violation or liability. Franchisor and Franchise, for themselves, and Franchise, for and on behalf of the Owners, hereby waive to the fullest extent permitted by Applicable Law, any right to, or claim for, punitive or exemplary damages against the other and agree that, in the event of a dispute between them, the Parties shall each be limited to recovering only the actual damages proven to have been sustained by that Party, except as provided in <u>Section 19.7</u>.

19.5    **Specific Performance**. The Parties acknowledge that each Party would be irreparably damaged if the provisions of this Agreement were not capable of being specifically enforced, and for this reason, the Parties agree that the provisions of this Agreement shall be specifically enforceable. The Parties further agree that any act or failure to act which does not strictly comply with the provisions and conditions of this Agreement may be specifically restrained, and that the equitable relief provided for in this Agreement shall not in any way limit or deny any other remedy at law or in equity that either Franchisor or Franchisee might otherwise have.

19.6    **Injunctive Relief**. Franchisee acknowledges and agrees that irreparable harm could be caused to Franchisor by Franchisee's violation of certain provisions of this Agreement and, as such, in addition to any other relief available at law or equity, Franchisor shall be entitled to obtain in any court of competent jurisdiction, without bond, restraining orders or temporary or permanent injunctions in order to enforce, among other items, the provisions of this Agreement relating to: (i) Franchisee's use of the Potato Corner Marks and Confidential Information (including any proprietary software used in connection with the Franchised Business); (ii) the in-term covenant not to compete, as well as any other violations of the restrictive covenants set forth in this Agreement; (iii) Franchisee's obligations on termination or expiration of this Agreement; (iv) disputes and controversies based on or arising under the Lanham Act, or otherwise involving the Potato Corner Marks, as now or hereafter amended; (v) disputes and controversies involving enforcement of the Franchisor's rights with respect to confidentiality under this Agreement; and (vi) prohibit any act or omission by Franchisee or its employees that constitutes a violation of Applicable Law, threatens Franchisor's franchise system or threatens other franchisees of Franchisor. Franchisee's only remedy if such an injunction is entered will be the dissolution of the injunction, if appropriate, and Franchisee waives all damage claims if the injunction is wrongfully issued.

19.7    **Exclusive Remedy**. In no event shall either Party make or have any claim for money damages based on any claim or assertion that the other Party has unreasonably withheld, conditioned or delayed any consent, approval or authorization required under this Agreement. Each Party waives any claim for damages. Neither Party may claim any damages by way of setoff, counterclaim or defense. Each Party's sole remedy for such a claim shall be an action or proceeding to enforce the provisions of this Agreement, for specific performance or for declaratory judgment.

EXHIBIT 1248 - 0056

19.8    **Attorneys' Fees and Costs**. In any legal action or proceeding brought to enforce any provision of this Agreement or arising out of, or in connection with, this Agreement, the prevailing Party shall be entitled to recover from the other Party its reasonable attorneys' fees and costs in addition to any other relief that may be awarded by a court of competent jurisdiction.

19.9    **Exceptions to Mediation and Arbitration**. Section 19.1 and Section 19.2 shall not apply to any action involving or contesting the validity of any of the Potato Corner Marks or any action for injunctive or other provisional relief, including, without limitation, enforcement of liens, security agreements, or attachment, as Franchisor deems to be necessary or appropriate to compel Franchisee to comply with Franchisee's obligations to Franchisor and/or to protect the Potato Corner Marks.

19.10    **No Withholding of Payments**. Franchisee shall not withhold all or any part of any payment to Franchisor or any of its Affiliates on the grounds of Franchisor's alleged nonperformance or as an offset against any amount Franchisor or any of Franchisor's Affiliates allegedly may owe Franchisee under this Agreement or any related agreements.

19.11    **WAIVER OF JURY TRIAL**. THE PARTIES HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER AT LAW OR EQUITY, REGARDLESS OF WHICH PARTY BRINGS SUIT. THIS WAIVER SHALL APPLY TO ANY MATTER WHATSOEVER BETWEEN THE PARTIES WHICH ARISES OUT OF OR IS RELATED IN ANY WAY TO THIS AGREEMENT, THE PERFORMANCE OF EITHER PARTY, AND/OR FRANCHISEE'S PURCHASE FROM FRANCHISOR OF THE FRANCHISE AND/OR ANY GOODS OR SERVICES.

19.12    **WAIVER OF CLASS ACTIONS OR OTHER COLLECTIVE ACTIONS**. THE PARTIES AGREE THAT ALL PROCEEDINGS ARISING OUT OF OR RELATED TO THIS AGREEMENT, OR THE SALE OF THE FRANCHISED BUSINESS, WILL BE CONDUCTED ON AN INDIVIDUAL, NOT A CLASS-WIDE BASIS, AND THAT ANY PROCEEDING BETWEEN FRANCHISEE, FRANCHISEE'S GUARANTORS AND FRANCHISOR OR ITS AFFILIATES/OFFICERS/EMPLOYEES MAY NOT BE CONSOLIDATED WITH ANY OTHER PROCEEDING BETWEEN FRANCHISOR AND ANY OTHER THIRD PARTY.

19.13    **Waiver of Punitive Damages**. Franchisee hereby waives to the fullest extent permitted by law, any right to or claim for any punitive, exemplary, incidental, indirect, special or consequential damages (including, without limitation, lost profits) against Franchisor arising out of any cause whatsoever (whether such cause be based in contract, negligence, strict liability, other tort or otherwise) and agrees that in the event of a dispute, that Franchisee's recovery is limited to actual damages. Except for any damages or losses incurred by Franchisor as a result of or arising out of any of Franchisee's (i) breach of its non-compete or confidentiality obligations under the Franchise Agreement, (ii) misuse or breach of its obligations under the Franchise Agreement as it relates to or arises out of the Potato Corner Marks or the System, (iii) fraud or willful misconduct, or (iv) any other illegal conduct or bad faith actions, Franchisor hereby waives to the fullest extent permitted by law, any right to or claim for any punitive damages (and only punitive damages) against Franchisee arising out of any cause whatsoever (whether such cause be based in contract, negligence, strict liability, other tort or otherwise).

19.14    **Consequential Damages**. If any other term of this Agreement is found or determined to be unconscionable or unenforceable for any reason, the foregoing provisions shall continue in full force and effect, including, without limitation, Franchisee's waiver of any right to claim any consequential damages. Nothing in this Section 19.14 or any other provision of this Agreement shall be construed to prevent Franchisor from claiming and obtaining expectation or consequential damages, including lost future royalties for the balance

EXHIBIT 1248 - 0057

of the Term if it is terminated due to Franchisee's default, which the Parties agree and acknowledge Franchisor may claim under this Agreement.

19.15   **Survival**. The provisions of this <u>Article 19</u> shall survive the expiration, termination or non-renewal of this Agreement.

20.   **NOTICES**

All notices or demands to be given under this Agreement shall be in writing and shall be served in person, by air courier delivery with a guaranteed tracking facility, by certified mail, by facsimile transmission or by electronic transmission (email). Service shall be deemed conclusively made (i) at the time of service, if personally served; (ii) three (3) business days after delivery by the Party giving the notice, statement or demand if by air courier with a guaranteed tracking facility; (iii) three (3) business days after placement in the United States mail by Certified Mail, Return Receipt Requested, with postage prepaid; (iv) on the day of facsimile transmission to the facsimile number given below if confirmation of receipt is obtained by the sender promptly after completion of facsimile transmission; and (v) on the day of electronic transmission to the email address given below if confirmation of receipt is obtained by the sender promptly after completion of electronic transmission. Notices and demands shall be given to the respective Parties at the following addresses, unless and until a different address has been designated by written notice to the other Party.

**Notices to Franchisor**:

> PCJV USA, LLC
> 8657 Hayden Place
> Culver City, California 90232
> Attention: President

**With a copy to (which shall not constitute notice):**

> Barry Kurtz, Esq.
> Lewitt, Hackman, Shapiro, Marshall and Harlan
> 16633 Ventura Boulevard, 11th Floor
> Encino, California 91436
> Fax: (818) 981-4764

**Notices to Franchisee**:                 See **Exhibit A**

Either Party may change its address for the purpose of receiving notices, demands and other communications provided by a written notice given in the manner aforesaid to the other Party.

21.   **ACKNOWLEDGMENTS**

21.1   **Waiver and Delay**. No waiver by Franchisor of any Default, or series of Defaults in performance by Franchisee, and no failure, refusal or neglect of Franchisor to exercise any right, power or option given to it under this Agreement or under any agreement between the Parties, whether entered into before, after or contemporaneously with the execution of this Agreement, or to insist upon strict compliance with or performance of Franchisee's obligations under this Agreement or any Franchise Agreement or other agreement between the Parties, whether entered into before, after or contemporaneously with the execution of this Agreement, shall constitute a waiver of the provisions of this Agreement with respect to any continuing

or subsequent Default or a waiver by Franchisor of its right at any time thereafter to require exact and strict compliance with the provisions thereof.

21.2    **Survival of Covenants**. The covenants contained in this Agreement which, by their nature or terms, require performance by the Parties after the termination or expiration of this Agreement shall be enforceable notwithstanding said expiration or other termination of this Agreement for any reason whatsoever.

21.3    **Successors and Assigns**. This Agreement shall be binding upon and inure to the benefit of the successors and assigns of Franchisor and shall be binding upon and inure to the benefit of Franchisee and his or their respective, heirs, executors, administrators, and its successors and assigns, subject to the prohibitions and restrictions against Assignment contained in this Agreement.

21.4    **Joint and Several Liability**. If Franchisee consists of more than one Owner, the obligations and liabilities of each Person or Entity to Franchisor are joint and several.

21.5    **Entire Agreement**. This Agreement and the Exhibits contain all of the terms and conditions agreed upon by the Parties concerning the subject matter of this Agreement. No other agreements concerning the subject matter of this Agreement, written or oral, shall be deemed to exist or to bind either of the Parties and all prior agreements, understandings and representations are merged into this Agreement and superseded by this Agreement. No officer or employee or agent of Franchisor has any authority to make any representation or promise not included in this Agreement. This Agreement cannot be modified or changed except by written instrument signed by both of the Parties. Nothing in this Agreement or any related agreement, however, is intended to disclaim the representations made in the Potato Corner Franchise Disclosure Document previously furnished to Franchisee.

21.6    **Titles and Recitals**. Article and Section titles used in this Agreement are for convenience only and shall not be deemed to affect the meaning or construction of any of the terms, provisions, covenants, or conditions of this Agreement. The Recitals set forth in Recitals A and B are true and correct and are hereby incorporated by reference into the body of this Agreement.

21.7    **Gender and Construction**. The terms of all Exhibits attached to this Agreement are hereby incorporated into and made a part of this Agreement as if the same had been set forth in full in this Agreement. All terms used in any one number or gender shall extend to mean and include any other number and gender as the facts, context, or sense of this Agreement or any Article or Section in this Agreement may require. As used in this Agreement, the words "include," "includes" or "including" are used in a non-exclusive sense. Unless otherwise expressly provided in this Agreement to the contrary, any consent, approval, acceptance or authorization of Franchisor or Franchisee that may be required under this Agreement shall be in writing and shall not be unreasonably withheld, conditioned or delayed by the Party whose consent, approval, acceptance or authorization has been requested. To protect the Potato Corner System, the Potato Corner Marks, the Potato Corner Trade Secrets and the goodwill associated with the same, on any occasion where Franchisor is required or permitted to make any judgment, determination or use its discretion, including any decision as to whether any condition or circumstance meets Franchisor's standards or satisfaction, Franchisor may do so in its sole subjective judgment and discretion. Neither this Agreement nor any uncertainty or ambiguity in this Agreement shall be construed or resolved against the drafter of this Agreement, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by the Parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of both Parties. The Parties intend that if any provision of this Agreement is

EXHIBIT 1248 - 0059

susceptible to two or more constructions, one of which would render the provision enforceable and the other or others of which would render the provision unenforceable, then the provision shall be given the meaning that renders it enforceable.

21.8    **Severability; Modification**. Nothing contained in this Agreement shall be construed as requiring the commission of any act contrary to Applicable Law. Whenever there is any conflict between any provisions of this Agreement and any present or future statute, law, ordinance or regulation contrary to which the Parties have no legal right to contract, the latter shall prevail, but in that event, the provisions of this Agreement thus affected shall be curtailed and limited only to the extent necessary to bring it within the requirements of the law.  In the event that any part, article, paragraph, sentence or clause of this Agreement shall be held to be indefinite, invalid or otherwise unenforceable, the indefinite, invalid or unenforceable provision shall be deemed deleted, and the remaining part of this Agreement shall continue in full force and effect.

21.9    **Multi-Unit Development Agreement**. This Section 21.9 is only applicable if Franchisee or its Affiliates have entered into a Multi-Unit Development Agreement (a "**Development Agreement**") with Franchisor. Franchisor and Franchisee acknowledge and agree that the Development Agreement contains certain negotiated provisions which are intended to apply to, and modify, future franchise agreements entered into by the Parties. Therefore, notwithstanding anything to the contrary set forth in this Agreement, to the extent any provision in the Development Agreement contradicts any provision in this Agreement, or is in addition to any provision of this Agreement, the Development Agreement shall control to the extent of such inconsistency or addition. Franchisor and Franchisee further acknowledge and agree that this Section 21.9 has been added at the request and for the convenience and benefit of both Parties and with advice of counsel. Accordingly, both Franchisor and Franchisee shall work in good faith to resolve any disputes regarding the application or intent of the Development Agreement and future franchise agreements entered into by the Parties. Should a dispute arise as to the application or intent of the Development Agreement as it pertains to this Agreement, the Parties shall resolve the dispute in accordance with Article 19 of this Agreement.

21.10    **Counterparts and Electronic Transmission**. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.  Copies of this Agreement with signatures that have been transmitted by email or by facsimile shall constitute and be deemed original copies of this Agreement for all purposes, provided that the copies are fully executed, dated and identical in form to the original hard copy version of this Agreement.

21.11    **Electronic Execution and Copies**. This Agreement and all Exhibits to this Agreement may be signed electronically by the Parties and Electronic Signatures appearing on this Agreement and the Exhibits shall be deemed to be the same as handwritten signatures for the purposes of the validity, enforceability and admissibility of this Agreement and the Exhibits. An executed copy of this Agreement (or any portion of this Agreement) may be delivered by either of the Parties by facsimile, electrical, digital, magnetic, optical, electromagnetic, or similar capability regardless of the medium of transmission (collectively, "**electronic**"), and delivery will be effective and binding upon the Parties, and will not in any way diminish or affect the legal effectiveness, validity or enforceability of this Agreement. Franchisee acknowledges and agrees that Franchisor may create an electronic record of any or all agreements, correspondence or other communications between the Parties or involving third parties and may thereafter dispose of or destroy the original of any of the agreements, correspondence or other communications. Any such electronic record will be inscribed on a tangible medium or stored in an electronic or other medium and be retrievable in perceivable form, and will be maintained in and readable by hardware and software generally available. Notwithstanding any Applicable Law to the contrary,

EXHIBIT 1248 - 0060

any electronic version of this Agreement or any other agreements, correspondence or other communications between the Parties will have the same legal effect, validity and enforceability as an original of any document, even if the original of the document has been disposed of or intentionally destroyed.

21.12   **Copy of Agreement**. Franchisee acknowledges that it received a copy of this Agreement, the Exhibits attached to this Agreement and all other agreements relating hereto, if any, with all of the blank lines filled in, at least seven (7) days prior to the Effective Date.

21.13   **Franchise Disclosure Document**. Franchisee acknowledges that it has received a copy of the complete Potato Corner Franchise Disclosure Document which contains a copy of this Agreement, at least fourteen (14) calendar days prior to the date on which this Agreement was executed.

21.14   **Atypical Terms**. Franchisee acknowledges and agrees that Franchisor may modify the offer of its franchises to other Potato Corner Franchisees in any manner and at any time, which offers have or may have terms, conditions, and obligations that may differ from the terms, conditions, and obligations in this Agreement. Franchisee further acknowledges and agrees that Franchisor has made no warranty or representation that all Potato Corner Franchise Agreements previously issued or issued after this Agreement by Franchisor do or will contain terms substantially similar to those contained in this Agreement. Franchisor may, in its reasonable Business Judgment and its sole and absolute discretion, due to local business conditions or otherwise, waive or modify comparable provisions of other Potato Corner Franchise Agreements previously executed or executed after the Effective Date with other Potato Corner Franchisees in a non-uniform manner.

21.15   **Business Judgment**. Notwithstanding any provision in this Agreement to the contrary, Franchisee and the Owners acknowledge and agree that:

21.15.1 This Agreement (and the relationship of the Parties which arises from this Agreement) grants Franchisor the discretion to make decisions, take actions or refrain from taking actions not inconsistent with the explicit rights and obligations of Franchisee and the Owners hereunder that may affect Franchisee and the Owners' interests favorably or adversely. Franchisor shall use its Business Judgment in exercising such discretion based on its assessment of its own interests and balancing those interests against the interests, promotion, and benefit of the Potato Corner System and other Potato Corner Franchisees, Potato Corner Restaurants generally, and specifically without considering the individual interests of Franchisee or the Owners or the individual interests of any other Potato Corner Franchisee. Franchisee and the Owners acknowledge and agree that Franchisor shall have no liability to Franchisee or the Owners for the exercise of its discretion in this manner; and even if Franchisor has numerous motives for a particular action or decision, so long as at least one motive is a reasonable business justification, no trier of fact in any legal action shall substitute his or her judgment for Franchisor's judgment so exercised and no such action or decision shall be subject to challenge for abuse of discretion. If Franchisor takes any action or Franchisor chooses not to take any action in its discretion with regard to any matter related to this Agreement and its actions or inaction are challenged for any reason, the Parties expressly direct the trier of fact to find that Franchisor's reliance on a business reason in the exercise of its discretion is to be viewed as a reasonable and proper exercise of its discretion, without regard to whether other reasons for its decision may exist and without regard to whether the trier of fact would independently accord the same weight to the business reason.

21.15.2 In granting its approval of the Franchised Location, designating suppliers, setting standards and the like, Franchisor shall exercise its Business Judgment. However, in the exercise of its Business Judgment, Franchisor shall not be liable to Franchisee or the Owners or anyone else, if Franchisor's exercise of its Business Judgment results in a business loss or if the products or services provided fail to meet the

EXHIBIT 1248 - 0061

expectations of Franchisor, Franchisee, the Owners or other parties. Franchisor disclaims all warranties and liability for the acts or omissions of any contractors, vendors, suppliers, products or employees which Franchisee uses, purchases, retains or hires pursuant to Franchisor's exercise of its Business Judgment.

21.15.3  If Applicable Law implies a covenant of good faith and fair dealing in this Agreement, the Parties agree that the covenant shall not imply any rights or obligations that are inconsistent with a fair construction of the terms of this Agreement. Additionally, if Applicable Law shall imply the covenant, Franchisee agrees that: (i) this Agreement (and the relationship of the Parties that is inherent in this Agreement) grants Franchisor the discretion to make decisions, take actions and/or refrain from taking actions not inconsistent with Franchisor's explicit rights and obligations under this Agreement that may affect favorably or adversely Franchisee's interests; (ii) Franchisor will use its judgment in exercising the discretion based on Franchisor's assessment of its own interests and balancing those interests against the interests of the Potato Corner Franchisees generally (including Franchisor and its Affiliates if applicable), and specifically without considering Franchisee's individual interests or the individual interests of any other particular Potato Corner Franchisee; (iii) Franchisor will have no liability to Franchisee for the exercise of Franchisor's discretion in this manner, so long as the discretion is not exercised in bad faith; and (iv) in the absence of bad faith, no trier of fact in any arbitration or litigation shall substitute its judgment for Franchisor's judgment so exercised.

21.16    **No Third Party Beneficiaries**. Except as expressly provided to the contrary in this Agreement, nothing in this Agreement is intended, nor shall be deemed, to confer on any Person or Entity other than Franchisee, Franchisor, Franchisor's officers, directors and personnel and such of Franchisee's and Franchisor's respective successors and assigns that may have any rights or remedies under or as a result of this Agreement.

21.17    **Time of the Essence**. Time is of the essence of this Agreement with respect to each and every provision of this Agreement in which time is a factor.

21.18    **Acceptance**. The submission of this Agreement does not constitute an offer and this Agreement shall become effective only upon its execution by both Franchisor and Franchisee. This Agreement shall not be binding on Franchisor unless and until accepted and signed on its behalf by an authorized officer of Franchisor.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement on the Effective Date.

EXHIBIT 1248 - 0062

**FRANCHISOR**:

PCJV USA, LLC,
A Delaware limited liability company

By: _Guy Koren_

Name: Guy Koren

Title: President/Managing Partner

**FRANCHISEE:**

**(IF FRANCHISEE IS A CORPORATION, LIMITED LIABILITY COMPANY, OR PARTNERSHIP):**

BDBR Properties, Inc

[Print Name of Franchisee Entity]

_Amber Robello_

By: Amber Robello (Sep 13, 2024 14:58 PDT)

Name: Amber Robello

Title: CEO

**OR**

**(IF FRANCHISEE IS AN INDIVIDUAL AND NOT AS A LEGAL ENTITY):**

_____

Print Name

_____

Signature

_____

Print Name

_____

Signature

EXHIBIT 1248 - 0063

**PCJV USA, LLC**
**FRANCHISE AGREEMENT**

**EXHIBIT A**
**FRANCHISE INFORMATION**

**EXHIBIT 1248 - 0064**

PCJV USA, LLC
FRANCHISE AGREEMENT

EXHIBIT A
FRANCHISE INFORMATION

**EFFECTIVE DATE:** September 12, 2024 .

**NAME OF FRANCHISEE:** BDBR Properties, Inc .

**EXPIRATION DATE:** September 11, 2034*          (*See Trial Period Addendum) .

**ADDRESS OF FRANCHISED LOCATION:** 6000 Sepulveda Blvd, Culver City, CA 90230 .

**OPENING DATE:** September 2024 .

**PROTECTED AREA:** N/A .

**ROYALTY FEES:** 7*  % OF GROSS SALES.

**NOTICE ADDRESS FOR FRANCHISEE:** 808 Wall St, Ste 7E, Los Angeles, CA 90014

**EMAIL:** bdbpinc@gmail.com .

IN WITNESS WHEREOF, the Parties have executed this **Exhibit A** on the Effective Date.

FRANCHISOR:

PCJV USA, LLC
A Delaware limited liability company

By: _Guy Koren_
Name: Guy Koren
Title: President/Managing Partner

FRANCHISEE:

**(IF FRANCHISEE IS A CORPORATION, LIMITED LIABILITY COMPANY, OR PARTNERSHIP):**
BDBR Properties, Inc
[Print Name of Franchisee Entity]

By: _Amber Robello_
Amber Robello (Sep 13, 2024 14:58 PDT)
Name: Amber Robello
Title: CEO

**OR**

**(IF FRANCHISEE IS AN INDIVIDUAL):**

_____
Print Name

_____
Signature

_____
Print Name

_____
Signature

**PCJV USA, LLC**
**FRANCHISE AGREEMENT**


**EXHIBIT B**
**ENTITY INFORMATION DISCLOSURE**

**EXHIBIT 1248 - 0066**

**PCJV USA, LLC**
**FRANCHISE AGREEMENT**

**EXHIBIT B**
**ENTITY INFORMATION DISCLOSURE**

Franchisee represents and warrants that the following information is accurate and complete in all material respects:

(1)     Franchisee is a (check as applicable):

[✓] corporation
[ ] limited liability company
[ ] general partnership
[ ] limited partnership
[ ] Other (specify): _____

State of incorporation/organization: __CA_____

Name of Franchisee entity: __BDBR Properties, Inc_____

(2)     Franchisee shall provide to Franchisor concurrently with the execution of this Agreement true and accurate copies of its charter documents including Articles of Incorporation/Organization, Bylaws, Operating Agreement, Partnership Agreement, resolutions authorizing the execution of this Agreement and any amendments to the foregoing (the "**Entity Documents**").

(3)     Franchisee promptly shall provide all additional information that Franchisor may from time to time request concerning all persons who may have any, direct or indirect, financial interest in Franchisee.

(4)     The name and address of each Owner is:

| NAME | ADDRESS | NUMBER OF SHARES OR PERCENTAGE INTEREST |
|------|---------|------------------------------------------|
| Amber Robello | 5801 Pico Blvd, Unit 201, Los Angeles, CA 90019 | 100% |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

(5)     The names, addresses and titles of Franchisee Owners who will be devoting their full time to the Franchised Restaurant are:

| NAME | ADDRESS | TITLE |
|------|---------|-------|
| Amber Robello | 5801 Pico Blvd, Unit 201, Los Angeles, CA 90019 | CEO |
| | | |

**EXHIBIT 1248 - 0067**

(6)      The address where Franchisee's financial records and Entity Documents are maintained is: 808 Wall St, Ste 7E, Los Angeles, CA 90014 .

(7)      The Principal Owner is Amber Robello _____ .

(8)      The General Manager is _____ .

(9)      Franchisee represents and warrants to Franchisor, as an inducement to Franchisor's execution of the Franchise Agreement, that the information set forth in this Entity Information Disclosure is true, accurate and complete in all material respects on the Effective Date and that Franchisee shall provide Franchisor with all additional information Franchisor may request with respect to the partners, shareholders and members of Franchisee and the ownership of Franchisee upon demand by Franchisor. In addition, Franchisee shall notify Franchisor within ten (10) days of any change in the information set forth in this Entity Information Disclosure and shall provide Franchisor with a revised Entity Information Disclosure certified by Franchisee to be true, correct and complete in all material respects. Franchisor grants Franchisee the rights in the Franchise Agreement in reliance upon each and all of the terms of this Entity Information Disclosure.

IN WITNESS WHEREOF, the Parties have executed this **Exhibit B** on the Effective Date.

**FRANCHISOR**:

PCJV USA, LLC
A Delaware limited liability company

By: _Guy Koren_____
Name: Guy Koren_____
Title: President/Managing Partner___

**FRANCHISEE:**

**(IF FRANCHISEE IS A CORPORATION, LIMITED LIABILITY COMPANY, OR PARTNERSHIP):**
BDBR Properties, Inc_____
[Print Name of Franchisee Entity]

By: _Amber Robello_____
    Amber Robello (Sep 13, 2024 14:58 PDT)
Name: Amber Robello_____
Title: CEO_____

**OR**

**(IF FRANCHISEE IS AN INDIVIDUAL AND NOT LEGAL ENTITY):**

_____
Print Name

_____
Signature

_____
Print Name

_____
Signature

**EXHIBIT 1248 - 0068**

**PCJV USA, LLC**
**FRANCHISE AGREEMENT**


**EXHIBIT C**
**GUARANTEE OF FRANCHISE AGREEMENT**

**EXHIBIT 1248 - 0069**

**PCJV USA, LLC**
**FRANCHISE AGREEMENT**

**EXHIBIT C**
**GUARANTEE OF FRANCHISE AGREEMENT**

The undersigned ("**Guarantors**") have requested **PCJV USA, LLC**, a Delaware limited liability company ("**Franchisor**"), to enter into that certain Franchise Agreement dated ___September 12, 2024___ (the "**Franchise Agreement**") with the "**Franchisee**" named in the Franchise Agreement. In consideration for, and as an inducement to, Franchisor's execution of the Franchise Agreement, Guarantors hereby agree as follows:

1.      "**Obligations**" means and includes any and all obligations of Franchisee arising under or pursuant to the Franchise Agreement and all other obligations, whether now existing or hereafter arising, of Franchisee to Franchisor of whatever nature.

2.      Guarantors irrevocably and unconditionally, fully guarantees to Franchisor the prompt, full and complete payment of any and all Obligations of Franchisee to Franchisor and the performance of any and all obligations of Franchisee including, without limitation, obligations under the Franchise Agreement or any other agreement, instrument or document relating to, evidencing or securing any Obligations.

3.      If Franchisee fails to pay any of the Obligations, Guarantors shall, within five (5) days after a written demand therefore has been given to Guarantors by Franchisor, pay all of the Obligations in like manner as if the Obligations constituted the direct and primary obligation of Guarantors.  Guarantors agree that if any obligation, covenant or agreement contained in the Franchise Agreement is not observed, performed or discharged as required by the Franchise Agreement (taking into consideration any applicable cure periods), Guarantors shall, within five (5) days after a written demand therefore has been given to Guarantors by Franchisor, to observe, perform or discharge the obligation, covenant or agreement in like manner as if the same constituted the direct and primary obligation of Guarantors.

4.      No exercise or non-exercise by Franchisor of any right under this Guarantee, no dealing by Franchisor with Franchisee or any other Person and no change, impairment or suspension of any right or remedy of Franchisor shall in any way affect any Obligations of Guarantors under this Guarantee or give Guarantors any recourse against Franchisor. Without limiting the generality of the foregoing, Guarantors agree that, regardless of whether Franchisor gives notice thereof or obtains the consent of Guarantors thereto, Guarantors' liability under this Guarantee shall not be released, extinguished or otherwise reduced in any way by reason of (i) any amendment, modification, renewal, extension, substitution or replacement of the Franchise Agreement or of any of the Obligations, in whole or in part; (ii) any acceptance, enforcement or release by Franchisor of any security for the Franchise Agreement or of any of the Obligations, any addition, substitution or release of any of the Guarantors, or any enforcement, waiver, surrender, impairment, release, compromise or settlement of any matter with respect to the Franchise Agreement or the Obligations or any security therefore; (iii) any assignment of this Guarantee, in whole or in part by Franchisor, or any Assignment or transfer of the Franchise Agreement (or any of them) by Franchisor or Franchisee; (iv) the invalidity or unenforceability of any provision of the Franchise Agreement or any of the Obligations; or (v) any failure, omission or delay of Franchisor in enforcing the Franchise Agreement, the Obligations or this Guarantee.

**EXHIBIT 1248 - 0070**

5.      Guarantors waive and agree not to assert or take advantage of (i) any right to require Franchisor to proceed against Franchisee or any other Person, firm or corporation or to proceed against or exhaust any security held by Franchisor at any time or to pursue any other remedy in Franchisor's power; (ii) any statute of limitations in any action under this Guarantee to collect any Obligations guaranteed hereby; (iii) any defense that may arise by reason of Franchisee's incapacity, lack of authority, insolvency or bankruptcy or Franchisor's failure to file or enforce a claim against the estate (either in bankruptcy or other proceeding) of Franchisee, any other or others; (iv) any defense arising out of any alteration of the Franchise Agreement or the Obligations; (v) notice of Franchisee's Default in the payment or performance of any of the Obligations; (vi) demand, protest and notice of any kind including, without limitation, notice of acceptance, notice of the existence, creation or incurring of new or additional Obligations or obligations or of any action or non-action on the part of Franchisee, Franchisor, any endorser, creditor of Franchisee or Guarantors under this or any other instrument, or any other Person, in connection with any obligation or evidence of Obligations held by Franchisor or in connection with any Obligations hereby guaranteed; (vii) all rights and defenses arising out of an election of remedies by Franchisor, even though that election of remedies, such as non-judicial foreclosure with respect to security for a guaranteed obligation, has destroyed Guarantors' rights of subrogation and reimbursement against Franchisee by operation of Applicable Law or otherwise; (viii) any duty of Franchisor to disclose to Guarantors any facts that Franchisor may now or hereafter know about Franchisee, regardless of whether Franchisor has reason to believe that those facts materially increase the risk beyond that which Guarantors intends to assumes or has reason to believe that the facts are unknown to Guarantors or has a reasonable opportunity to communicate the facts to Guarantors, it being understood and agreed that Guarantors is responsible to be and to keep informed of Franchisee's financial condition and of all circumstances bearing on the risk of nonpayment of any Obligations hereby guaranteed; and (ix) any right to the benefit of or to direct the application of any security held by Franchisor.

6.      Until all Obligations to Franchisor are paid in full and fully performed, Guarantors shall have no right of subrogation and waive any right to enforce any remedy that Franchisor now has or may hereafter have against Franchisee. All existing or future indebtedness of Franchisee to Guarantors and any right to withdraw capital invested in Franchisee by Guarantors are hereby subordinated to all Obligations.

7.      Guarantors' liabilities and all rights, powers and remedies of Franchisor under this Guarantee and under any other agreement now or at any time hereafter in force between Franchisor and Guarantors shall be cumulative and not alternative and the rights, powers and remedies shall be additional to all rights, powers and remedies given to Franchisor by Applicable Law. Without limiting the generality of anything contained in this Guarantee, Guarantors waive and agree not to assert or take advantage of: (i) all rights described in California Civil Code Sections 2856(a)(1) through 2856(a)(3), inclusive, including, without limitation, any rights or defenses which are or may become available to Guarantors by reason of California Civil Code Sections 2787 through 2855, inclusive; and (ii) California Civil Code Section 2899.

8.      The liability of Guarantors under this Guarantee shall be an absolute, direct, immediate and unconditional continuing guarantee of payment and performance and not of collection. Guarantors' obligations under this Guarantee are independent of Franchisee's obligations. This is a continuing Guarantee. It shall be irrevocable during the initial term and each renewal term and through any extensions, renewals, amendments, modifications, substitutions or replacements of the Franchise Agreement and until all Obligations has been fully paid and the Obligations have been fully performed. In the event of any Default under this Guarantee, a separate action and/or successive actions may be brought and prosecuted against Guarantors regardless of whether action is brought against Franchisee or whether Franchisee is joined in any action or actions. Franchisor may maintain successive actions for other Defaults.

Franchisor's rights under this Guarantee shall not be exhausted by Franchisor's exercise of any rights or remedies or by any action or by any number of successive actions until and unless all Obligations have fully been paid and performed. The obligations of Guarantors shall be primary and are independent of the obligations of Franchisee and Franchisor may directly enforce its rights under this Guarantee without proceeding against or joining Franchisee or any other Person or Entity, or applying or enforcing any security of the Franchise Agreement.  Guarantors acknowledge and agree that Guarantors shall, and hereby are, bound by each and all of the confidentiality and non-competition provisions of the Franchise Agreement.

9.    Neither any provision of this Guarantee nor right of Franchisor under this Guarantee can be waived, nor can Guarantors be released from Guarantors' obligations under this Guarantee except by a written agreement executed by Franchisor. If any provision or portion of any provision of this Guarantee is found by a court of competent jurisdiction to be illegal or unenforceable, all other provisions shall, nevertheless, remain enforceable and effective. This Guarantee constitutes the entire agreement of Guarantors and Franchisor with respect to the subject matter hereof and no representation, understanding, promise or condition concerning the subject matter hereof shall bind Franchisor unless expressed in this Guarantee.

10.    All written notices permitted or required under this Guarantee shall be deemed given and delivered in accordance with Article 20 of the Franchise Agreement. Notices to Guarantors shall be sent to the address set forth below each Guarantor's signature below.

11.    This Guarantee may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument. Copies of this Guarantee with signatures that have been transmitted by email or by facsimile shall constitute and be deemed original copies of this Guarantee for all purposes, provided that the copies are fully executed, dated and identical in form to the original hard copy version of this Guarantee. In addition, this Guarantee may be signed electronically by the Guarantors and electronic signatures appearing on this Guarantee shall be deemed to be the same as handwritten signatures for the purposes of the validity, enforceability and admissibility of this Guarantee.

12.    This Guarantee shall be interpreted and construed under the laws of California. In the event of any conflict of law, the law of California shall prevail, without regard to the application of California conflict of law rules. If, however, any provision of this Guarantee would not be enforceable under the laws of California, and if the Franchised Restaurant is located outside of California and such provision would be enforceable under the laws of the state in which the Franchised Restaurant is located, then such provision shall be interpreted and construed under the laws of that state. Nothing in this Section 12 is intended by the Parties to subject this Agreement to any franchise or similar law, rules, or regulation of the state of California to which it would not otherwise be subject. Venue for purposes of any legal proceedings brought in connection with or arising out of this Guarantee shall be conclusively presumed to be in the State of California, County of Los Angeles. Guarantors hereby submit to the jurisdiction of the United States District Court for the Central District of California.

Executed by or on behalf of Guarantors on the date set forth below.

By: _Amber Robello_____    Date: 13/09/2024_____
Amber Robello (Sep 13, 2024 14:58 PDT)

By: _____    Date: _____

\\Prolaw1\shares\Documents\MJS\26053-22\3235581.docx
2024 PCJV USA, LLC FDD
FRANCHISE AGREEMENT

3

EXHIBIT 1248 - 0072

# Culver City Franchise Agreement

**Final Audit Report**                                         2024-09-13

| | |
|---|---|
| Created: | 2024-09-12 |
| By: | Ashley Grudnowski (ashley@gkcapitalllc.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAANKphyhd_m34wwCyMCRaj7Qz1OdH2MOLe |

## "Culver City Franchise Agreement" History

📄 Document created by Ashley Grudnowski (ashley@gkcapitalllc.com)
2024-09-12 - 7:28:38 PM GMT

✉ Document emailed to Amber Robello (bdbpinc@gmail.com) for signature
2024-09-12 - 7:28:58 PM GMT

📄 Email viewed by Amber Robello (bdbpinc@gmail.com)
2024-09-13 - 9:56:21 PM GMT

✔ Document e-signed by Amber Robello (bdbpinc@gmail.com)
Signature Date: 2024-09-13 - 9:58:18 PM GMT - Time Source: server

✓ Agreement completed.
2024-09-13 - 9:58:18 PM GMT

**Adobe Acrobat Sign**

EXHIBIT 1248 - 0073