**BLANK ROME LLP**
Todd M. Malynn (SBN 181595)
todd.malynn@blankrome.com
Arash Beral (SBN 245219)
arash.beral@blankrome.com
Todd M. Malynn (SBN 181595)
jamison.gilmore@blankrome.com
2029 Century Park East | 6th Floor
Los Angeles, CA 90067
Telephone: 424.239.3400
Facsimile: 424.239.3434

Attorneys for Defendants, Counterclaimants, and Third Party Plaintiffs PCJV USA, LLC, PCI TRADING LLC, POTATO CORNER LA GROUP, LLC, GK CAPITAL GROUP, LLC, NKM CAPITAL GROUP, LLC and GUY KOREN, and Defendants J & K AMERICANA, LLC, J&K LAKEWOOD, LLC, J&K OAKRIDGE, LLC, J&K VALLEY FAIR, LLC, J & K ONTARIO, LLC, J&K PC TRUCKS, LLC, HLK MILPITAS, LLC, and GK CERRITOS, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHAKEY'S PIZZA ASIA VENTURES, INC, a Philippines corporation,<br><br>Plaintiff,<br><br>vs.<br><br>PCJV USA, LLC, a Delaware limited liability company; PCI TRADING, LLC, a Delaware limited liability company; GUY KOREN, an individual; POTATO CORNER LA GROUP, LLC, a California limited liability company; NKM CAPITAL GROUP, LLC, a California limited liability company; J & K AMERICANA, LLC, a California limited liability company; J&K LAKEWOOD, LLC, a California limited liability company; J&K VALLEY FAIR, LLC, a California limited liability company; J & K ONTARIO, LLC, a California limited liability company; HLK MILPITAS, LLC, a California, limited liability company; GK CERRITOS, LLC, a California, limited liability company; J&K PC TRUCKS, LLC, a California limited liability company; and, GK CAPITAL GROUP, LLC, a California | Case No. 2:24-CV-04546-SB(AGRx)<br><br>*Hon. Stanley Blumenfeld, Jr.*<br><br>**SUPPLEMENTAL DECLARATION OF ERLINDA "LYNDAH" S. BARTOLOME**<br><br>Complaint Filed: May 31, 2024<br>Trial Date: TBD |

| | |
|---|---|
| limited liability company and DOES 1 through 100, inclusive,<br><br>    Defendants. | |

PCJV USA, LLC, a Delaware limited liability company; PCI TRADING LLC, a Delaware limited liability company; POTATO CORNER LA GROUP LLC, a California limited liability company; GK CAPITAL GROUP, LLC, a California limited liability company; NKM CAPITAL GROUP LLC, a California limited liability company; and GUY KOREN, an individual,

    Counter-Claimants,

    v.

SHAKEY'S PIZZA ASIA VENTURES, INC, a Philippines corporation,

    Counter Defendant.

PCJV USA, LLC, a Delaware limited liability company; PCI TRADING LLC, a Delaware limited liability company; POTATO CORNER LA GROUP LLC, a California limited liability company; GK CAPITAL GROUP, LLC, a California limited liability company; NKM CAPITAL GROUP LLC, a California limited liability company; and GUY KOREN, an individual,

    Third Party Plaintiffs,

    v.

PC INTERNATIONAL PTE LTD., a Singapore business entity; SPAVI INTERNATIONAL USA, INC., a California corporation; CINCO CORPORATION, a Philippines corporation; and ROES 1 through 10, inclusive,

    Third Party Defendants.

160850.00001/154448422v.1

1

**SUPPLEMENTAL DECLARATION OF ERLINDA "LYNDAH" S. BARTOLOME**

# SUPPLEMENTAL DECLARATION OF ERLINDA "LYNDAH" S. BARTOLOME

I, Erlinda "Lyndah" S. Bartolome, declare as follows:

1. I am over 18 years old. I have personal knowledge of the facts set forth in this declaration, and if called upon to testify under oath, I could and would testify competently thereto.

2. I adopt all the facts I attested to in my declaration of last week (filed at Dkt. No. 309-2) and supplement that declaration with the following additional facts.

### Supplemental Context Regarding Mr. Magsaysay and the Parties' Intent

3. I read Plaintiff's summary judgment motion papers and the declarations from last year on which they rely, particularly Mr. Magsaysay's October 9, 2024 declaration. I was surprised by several of his statements about the parties' intent and the agreements, as they do not match my notes, the drafts I circulated, the signed final versions, the parties' course of dealing and conduct, or my recollection of the events. Because of these discrepancies, I question whether Mr. Magsaysay fully read and understood what he was signing, especially regarding PCJV's rights.

4. Moreover, and I mention this solely to provide context for the discrepancies I observed and not to criticize or disparage Mr. Magsaysay, but he has had multiple brain operations, which at times have affected his memory and recollection of events. For example, attached to the Supplemental Appendix as Trial Exs. 81 and 82 are true and correct copies of emails from September 2013 and April 2014 in which Mr. Koren had to remind Mr. Magsaysay of prior agreements regarding the training ground for a potential Potato Corner Middle-East development. The agreement was for training to take place in the United States, not the Philippines, because the Middle-East developer wanted to model the U.S. restaurant format rather than the Philippines cart operations: "We agreed on this on your visit to LA … whether you remember or not." Also, attached as Trial Ex. 1017 is a May 18, 2010 email from Mr. Magsaysay referencing his vertigo.

5. Based on my direct, personal involvement in the formation, negotiation, and implementation of the joint venture and of PCJV and related agreements, I can state unequivocally that at all times, it was the mutual intent and understanding of the parties that Cinco's contribution to the joint venture was intellectual property, including Potato Corner marks, and those intellectual property rights were to be held by PCJV for the long term, not subject to arbitrary revocation or reassignment.

6. The governing agreements—including the JVA, its First Amendment, and the LLC Agreement—were drafted, negotiated, and executed with the express purpose of vesting PCJV and the LA Group with the exclusive right to use and license the Potato Corner marks in the United States. This was reflected in everything I observed from the outset. Plaintiff's assertion that it or Cinco retained the right to unilaterally terminate or reassign the U.S. rights is contrary to the agreements and the parties' conduct and course of performance I observed.

<u>My Role and Impartiality</u>

7. At all times, I was paid by Cinco for my role in assisting with international franchising, including the United States effort led by Mr. Koren. Even while serving as PCJV's Corporate Secretary until I resigned from Cinco's board in Manila, I continued to be compensated by Cinco for my work in that capacity. I was the Cinco Group's "eyes and ears" on the ground at PCJV. At the same time, I attended Cinco's own internal board meetings and private discussions regarding PCJV and reported material matters regarding PCJV to the Cinco board back in Manila. As to PCJV, I always viewed my role as that of Cinco's agent. After I resigned from Cinco in 2017, PCJV paid me minor consulting fees.

8. I am not being paid for my testimony, nor do I have any reason to be biased. I spent over a month in Southern California prepared to provide my testimony to the jury in this case. As I became more familiar with Plaintiff's positions and arguments, I grew increasingly concerned. My desire is to help the

Court reach an accurate outcome, as Plaintiff's position is, in my view, contrary to the reality I observed.

### The First Amendment is an "Add" Document, not a "Replace" Document

9. Much like the United States Constitution, it is important for the Court to understand that the parties always treated the Potato Corner USA Joint Venture Agreement as the foundational document governing their joint venture relationship. That is how we all viewed and relied on that agreement. The title of the subsequent document—"First Amendment to the JV Agreement"—which I personally added, reflects that understanding. Like the First Amendment to the U.S. Constitution, the First Amendment to the JV Agreement was never meant to replace the JVA, but to add to it. It was never intended to remove Cinco as a party. Any suggestion otherwise is a fundamental misreading of the First Amendment.

10. The intent behind the First Amendment was to document what the parties had agreed to in the board meeting from the prior day, as reflected in the board meeting minutes of October 16, 2012 that I prepared (Trial Ex. 1052). As reflected in those minutes at 3.d. beginning with "Board reviewed and discussed the Joint Venture Agreement. The following revisions were approved:" there were four specific items approved by the PCJV Board that the First Amendment was to memorialize. That was the only effect of the First Amendment.

11. Upon closer examination, the First Amendment is not even fully executed as Ms. Bermejo's signature is missing. Regardless, all the parties understood that the First Amendment was not intended to remove Cinco. That interpretation makes no sense. How could you remove Cinco from a joint venture and limited liability company when the very mutual benefits the parties negotiated—including the IP economic sharing—derive from Cinco's trademark registrations? How can you have a mutual obligation prohibiting the assignment of any rights and obligations absent prior written consent of the joint venture partners if Cinco is not a party? You cannot. Removing Cinco would have undermined the

foundation of the partnership and defeated the mutual benefits both sides negotiated, intended and agreed to achieve. If it were the intent of the parties to remove Cinco, then we would have expressly stated that intent in this document and Cinco would have executed the document stating that it is exiting the joint venture and the LLC.

12. Removing Cinco also would have rendered the Master Services Agreement component of the deal illusory. Because the LA Group was vested with the obligation and responsibility to license Potato Corner outlets/stores pursuant to the Master Services Agreement, it was essential that Cinco remain a party to the joint venture. Without Cinco's continued involvement, the rights granted to the LA Group would have been illusory, and the entire structure of the partnership would have collapsed.

<u>Additional Context Regarding the Joint Venture Structure, the LLC Agreement, and the Parties' Conduct</u>

13. As I stated before, the sole intent of PCI was to help the Cinco Group achieve favorable U.S. tax treatment and to facilitate Mr. Magsaysay's L1A visa application. There are documents on this in the event the Court would like to review them, but I do not believe this is a disputed issue. Regardless, I was never furnished with any assignment of rights from Cinco to PCI for any PCJV purpose, nor was Cinco allowed to assign its duties or obligations to PCI (the recital only contemplates "rights" to be assigned to a wholly-owned subsidiary, not duties or obligations). The Court should also note that PCI was not "wholly-owned" by Cinco. It included an additional owner (Ben Olivas of DLA Piper) and the Cinco Group members each also owned a share of PCI in their individual capacities.

14. I must note that the argument that Cinco was "excused" from PCJV, had it been presented to me when I was working for Cinco and acting as PCJV's Corporate Secretary (no such argument was ever presented to me), I would have pointed out that it would not have made any difference regarding the parties' intent. The agreement also bound all the individuals involved, in line with the parties'

specific objectives—to ensure that everyone was mutually bound and that no one could take advantage of the others. This change is reflected in the June 28, 2010 draft of the JVA (Trial Ex. 1025), where the "Cinco Group" concept was adopted, adding the individuals as part of the "Cinco Group" and revising section 1)d) to state: "… the Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses incurred by the following *members* in attendance of the *annual members' meeting*: Jose P. Magsaysay, Jr., Jose Maria Montinola, Ma. Victoria O. Bermejo, and Ricardo K. Montelibano." (Emphasis added.) That version also made the consent, restriction on transfer, and right of first refusal provisions mutual, binding the parties to each other in their individual capacities indefinitely. In the final agreement, all of the individuals signed the document in their individual capacities to reinforce this arrangement (Trial Ex. 1050). It was always the parties' expressed intent that the individuals who controlled Cinco remained obligated to provide PCJV with the intellectual property rights that were the basis of the parties' bargain, if not already pre-existing.

15. The October 16, 2012 minutes also reflect the parties' understanding that "[t]here are two Operating Agreements"—the JVA and the LLC Agreement. While the parties agreed to modify the JVA (as reflected in section 3.d. of the minutes), they did not modify the LLC Agreement in 2012. It was the intent of the parties that Cinco remained bound by the LLC Agreement as well, which is why the parties did not amend or execute a new LLC Agreement removing Cinco.

16. Furthermore, my review of the records shows that the LLC Agreement was the last document in time to be revised, not the JVA. On April 9, 2018, after the vote to remove Mr. Koren as President of PCJV (which was later restrained by a court injunction), the members of PCJV adopted a resolution to amend Section 4.11.7 of the LLC Agreement. *See* Trial Ex. 1413 at PDF pp. 130-131 ("FURTHER RESOLVED, that Section 4.11.7 of the PCJV USA, LLC Operating Agreement shall be amended as follows: … FURTHER RESOLVED, that Section 4.11.1 of the

PCJV USA, LLC Operating Agreement shall be amended as follows: …"). At a managers' meeting on April 23, 2018, *id.* at PDF pp. 138-140, PCJV's managers also held a special meeting "pursuant to Section 4.14.3 of the Limited Liability Company Agreement" and, "pursuant to Section 4.11.4 of the Agreement," removed all officers and elected new ones, including appointing Ben Olivas as my successor as Corporate Secretary of PCJV.[1]

17. For Plaintiff's position to make sense, it would require believing that the Cinco Group was deceiving the LA Group, the public, regulators, the California DBO, auditors, attorneys, franchisees, vendors, and others. That simply makes no sense. As a practical matter, if Cinco truly believed that PCJV had no long-term rights in place, there would have been discussions about it, which would be reflected in my meeting minutes. Moreover, Cinco would not have remained silent for over a decade—making annual visits to U.S. restaurants and encouraging further growth with the LA Group—without ever raising the need to document a separate agreement to secure long-term rights or asserting that they could terminate those rights at will. Cinco also would not have approved FDDs (without a single mention of PCI in them). Cinco, of course, would not have filed two lawsuits (one from Cinco itself and another directly on behalf of PCJV) in an unsuccessful effort to obtain control over Potato Corner USA. It simply would have terminated PCJV's right to use (if it believed that right existed, which it did not) the Potato Corner intellectual property rights. Plaintiff's position defies common sense and the parties' actual conduct.

/ / /

/ / /

/ / /

---

[1] I did not challenge the vote because I had previously indicated that I wanted to resign from my position anyway. Mr. Koren, however, and those others operating PCJV from Los Angeles always felt that I was improperly removed without the necessary 75% vote of managers required per the First Amendment.

<u>Corrections and Clarifications to Misstatements in Plaintiff's Summary Judgment Motion</u>

18. Below, I address several specific statements in Plaintiff's summary judgment motion that are inaccurate or misleading:

    a. <u>Incorrect Statement No. 1</u>: *"Mr. Magsaysay agreed to let Koren lead this effort, even though another store was already in progress of development by a different licensee, who was actually first to use Potato Corner in commerce, domestically."* Dkt. 312 at 13:6-9. That is incorrect. Mr. Koren's group was the first to use Potato Corner in commerce in the United States. Not only with the opening of the Santa Anita location (which was the first Potato Corner outlet in the United States), well before that or any commercial activity in the United States, Mr. Koren's group conducted market testing and research in the United States. Mr. Koren's group attended three events, where they brought mobile cart-style turbo broilers and sold french fries under the Potato Corner name: a fair in Los Angeles (where they made only $500 in sales over two days), an event in Santa Barbara with a different target customer base, and an Israeli event (I believe it was Israeli Independence Day). I knew of all these events in real time and witnessed their occurrence; I actually also attended the Israeli Independence Day event. Through this market research, Mr. Koren's group was able to create and develop the United States Potato Corner menus and the quick-service restaurant model at Santa Anita, which became the prototype for the Tanforan mall location. In fact, Mr. Koren assisted with developing the design of the Tanforan mall location and that location at Tanforan opened in November 2010 (9 months after NKM opened at Santa Anita).

Without a doubt, Mr. Koren's group was the first to use Potato Corner in commerce in the United States. Furthermore, the reason the Joint Venture Agreement is made "effective 10/1/09" (Trial Ex. 1050) is to memorialize the parties' understanding that all uses of the Potato Corner brand in the United States prior to the opening of the Santa Anita location in February 2010 would relate back to, and be included as part of, the Joint Venture.

b. <u>Incorrect Statement No. 2</u>: *"The joint venture would be owned by a subsidiary of Cinco, Potato Corner International, Inc. ... The Amended Joint Venture Agreement is Agreed to on October 17, 2012, Excusing Cinco from PCJV ... which amended and superseded the JVA ..."* Dkt. 312 at 13:19-21, 13:27-28, 15:4. First, these appear to be inconsistent statements (if the joint venture was to be owned by PCI from the outset, why would there be a need for Cinco to be "excused" later). Second, for the reasons discussed above, it is incorrect. Cinco always remained an owner from the outset. There never was any intent to remove Cinco.

c. <u>Incorrect Statement No. 3</u>: *"PCJV (which stands for Potato Corner Joint Venture) was organized as a Delaware limited liability company on July 16, 2010 by Cinco and the LA Group, under which they operated their joint venture."* Dkt. 312 at 13:21-24. That is not entirely accurate. The joint venture itself existed independently and oversaw the limited liability company, with an obligation to create a "Company" to implement the intent of the joint venture partners. In other words, the joint venture technically operated separately from PCJV. This distinction was material because, as PCJV faced millions of dollars in contingent

liabilities and the risk of bankruptcy due to Cinco unlawfully selling franchises before franchise disclosure documents were in place, the "joint venture" served as a backstop. For example, it required the joint venture partners to create a new "Company," if necessary, to implement the terms of their agreement—for instance, in the event of PCJV's bankruptcy due to those contingent liabilities potentially becoming permanent liabilities.

d. <u>Incorrect Statement No. 4</u>: *"In that Section 3 of the October 16, 2012 Meeting Minutes, it is noted that there were two parallel structures being built: one in which the brand would be spread through sublicenses and the other through franchisees."* Dkt. 312 at 14:18-21. This is incorrect. Nowhere in my meeting minutes does it reflect that two parallel structures were being built. This statement appears to stem from Plaintiff's misunderstanding of how area development agreements work, as explained in PCJV's FDDs. An area development agreement is a type of direct agreement that PCJV would enter into with a franchisee, granting that franchisee the right to open multiple locations (typically 2–10) within a specific territory. "Sublicenses" are entirely different and PCJV never granted "sublicenses" to anyone, even though it had the authority in the governing agreements to do so. In practice, it made no sense to allow franchisees to sublicense (i.e., sub-franchise) their rights to third parties. PCJV always maintained direct control over all of its franchisees.

e. <u>Incorrect Statement No. 5</u>: *"… that none of his stores would ever have to pay license fees. Curiously, there is no written record of these promises that contradict Koren's own evidence he wishes to show the jury."* Dkt. 312 at 15:27-28. This is another wrong

statement. The initial JVA drafts and the parties' discussions distinguished between third-party stores and affiliate Company stores, and originally required the Company to collect royalties from both. However, the provision requiring affiliate Company stores to pay royalties was later removed because the parties agreed that the Company would not have to collect royalties from Company stores. *See* Trial Ex. 1023 at 3(h)(ii)(2) (my comment: "Remove completely no.2"). Later, both Cinco and the auditors agreed that Mr. Koren's stores could be and would be treated as "Affiliate-Owned" Company stores. *See* Trial Ex. 1184-0055 (Item 20) and 1184-0240 (third bullet). As a result, PCJV was never required to collect royalties from those stores and, in fact, did not collect royalties from those stores.

f. <u>Incorrect Statement No. 6</u>: *"The AJVA was silent on the length of the term for this future Master License Agreement."* Dkt 312 at 16:26 – 17:1. None of the documents were silent on duration of the term. The duration was indefinite only subject to termination by a 75% vote and dissolution of PCJV or by mutual agreement. The termination provision also grants PCJV ongoing rights after termination, consistent with the terms applicable to franchisees.

g. <u>Incorrect Statement No. 7</u>: *"And, while a Master Services Agreement was quickly executed, a Master License Agreement was never signed."* Dkt. 312 at 17:1-2. A Master License Agreement was never required to be signed—only "entered"—and was not a condition for PCJV to obtain rights. All that was required was for PCJV to "agree," which it did. In fact, by entering into the Master Services Agreement—executed by PCJV with Mr. Magsaysay's signature—the LA Group was granted the

rights to license the brand. That, by itself, is a signed document by Mr. Magsasysay expressing PCJV's agreement. Moreover, even if another separate agreement were necessary, that would only have been for Cinco's benefit, as the Cinco Group and LA Group already had agreed to the terms of a master license in the U.S. and Israel and, further, the record shows that DLA Piper prepared a "Trademark License Agreement," billed for "review of date of execution of Trademark License Agreement," and met with Mr. Magsaysay to "discuss, finalize and sign FDD application." PCJV's FDDs were then issued, noting the existence of that agreement. See Trial Exs. 1034, 1038, 1039. The Court should note that even though not technically required, it was important for the LA Group to obtain a *signed* Master Services Agreement because, as minority partners, they needed the additional protection of a signature. My notes reflect this as well (Trial Ex. 1023 ["Master Service Agreement will be *signed* …"]). Nowhere in my notes does it reflect an intention for a Master License Agreement to be signed. The Cinco Group, as majority owners, did not need that additional protection.

h. <u>Incorrect Statement No. 8</u>: *"… quote from very ambiguous language that, at best, suggests, a temporary moratorium on royalty payments."* Dkt. 312 at 17:13-17. The language in my meeting minutes of October 16, 2012 was not ambiguous to the parties who attended. The waiver of royalties was clearly approved by all present, with the express purpose of prioritizing growth and ensuring that PCJV could maintain financial support for its franchisees. Additionally, this was a benefit to Cinco in that it could obtain distributions on a 60/40 basis rather than

royalties on a 30/30 basis.

    i. <u>Incorrect Statement No. 9</u>: *"… that all parties recognized the absence of, and need for, a Master License Agreement, and discussed this prior to this dispute over the source of PCJV's rights."* Dkt. 312 at 18:18 – 19:2. This statement is incorrect and misleading. It cites negotiations over a proposed *new* agreement in connection with the LA Group acquiring Cinco's interests in PCJV—not any recognition of a pre-existing deficiency. It is false to suggest that the parties believed a master license agreement was missing or required; in reality, the parties were simply negotiating new terms as part of a contemplated restructuring. The cited exhibits (Trial Exs. 1055, 1065, 1072) confirm that PCJV already had the rights in question and further demonstrate that Cinco remained a party throughout:

        i. Trial Ex. 1055 confirms that the parties' discussions regarding a Master License Agreement were part of a contemplated restructuring, not an effort to address any deficiency in PCJV's rights. This exhibit contains Cinco's "counter-offer" to the LA Group concerning the potential acquisition of "Cinco's 60% equity interest in PCJV for $750,000," and sets forth proposed terms for future license fees and the treatment of both franchise and corporate stores. The language is forward-looking and contingent on the LA Group acquiring Cinco's equity interest; it indeed presumes that PCJV already possessed the rights to use and license the Potato Corner marks. Notably, Cinco's counter-offer specifies that, under the new agreement, a license fee equal to 2% of net sales would apply to all stores—

including corporate stores—which, upon the effective date of the new license agreement, would no longer be exempt from royalty obligations. This is significant because it confirms that, under the existing structure, Mr. Koren's "corporate stores" were not required to pay royalties, and only the new, proposed agreement would have changed that arrangement. Nowhere in Trial Ex. 1055 do the parties express concern that PCJV's rights were in question or that a Master License Agreement was overdue or required to legitimize PCJV's operations. Instead, the exhibit reflects that Cinco remained an active party to the negotiations, and that any new agreement would be a product of mutual consent in light of a new ownership structure—not a remedy for a prior defect. The exhibit undermines Plaintiff's narrative and reinforces that PCJV's authority was never in doubt.

ii. Trial Ex. 1065 documents another negotiation regarding a potential restructuring of the joint venture, specifically the LA Group's possible acquisition of Cinco's interests in PCJV. The exhibit outlines the steps and terms for a new business arrangement, including the drafting of a new Master License Agreement. The context of these discussions is forward-looking and contingent on a change in ownership structure. There is no language in Trial Ex. 1065 suggesting that PCJV's existing rights to use and license the Potato Corner marks were deficient or in question. Instead, the parties are negotiating what the new agreement would look like if the LA Group were to acquire

1    majority or full ownership. The exhibit presumes that PCJV
2    already possesses the necessary rights, and the focus is on
3    the terms that would govern the relationship after the
4    contemplated transaction.

5    iii. Trial Ex. 1072 further demonstrates that the parties'
6    discussions about a Master License Agreement were part of
7    a contemplated restructuring, not an effort to cure a pre-
8    existing deficiency. In fact, Trial Ex. 1072 shows Cinco's
9    continued involvement as a party in PCJV and its active
10   role in shaping the terms of the new agreement. There is no
11   indication in the exhibit that PCJV's prior or ongoing
12   operations were unauthorized or that a Master License
13   Agreement was overdue or required to legitimize PCJV's
14   rights. Instead, the exhibit reflects the parties' mutual
15   understanding that the existing agreements (JVA, First
16   Amendment, LLC Agreement, and Master Services
17   Agreement) governed their relationship up to that point,
18   and that any new agreement would be a product of mutual
19   consent in light of a new ownership structure. For example,
20   it states: "… the current ownership arrangements of PCJV
21   LLC shall continue, and the terms set forth in the LLC
22   Operating Agreement for PCJV LLC shall continue to
23   govern the arrangements between the Parties." Cinco's
24   proposed term sheet also values "Cinco's 60% equity
25   interest in PCJV LLC" at $7,000,000. It is clear that
26   Cinco's valuation of its 60% interest in PCJV necessarily
27   included the value of PCJV's pre-existing intellectual
28   property rights, as there would be no other reasonable basis

160850.00001/154448422v.1                  15
SUPPLEMENTAL DECLARATION OF ERLINDA "LYNDAH" S. BARTOLOME

for such a high valuation at that time absent the inclusion of those intellectual property assets.

19. I have reviewed Mr. Koren's Supplemental Declaration and I agree with everything stated there, as I observed them through the point of the state court litigation, as I was not directly involved with the litigation (other than submitting declarations as needed). Mr. Koren's testimony that the duration term of the parties' agreements was always tied to the intellectual property rights is correct. The "ten-year" term was included in the original NKM license agreement to use the IP, then discussed in negotiations over the JVA but made indefinite. The "indefinite" term was always tied to the use of the IP.

20. I hope the above is helpful to the Court in its objective to reach the correct outcome in this case. I am willing to provide further testimony or clarification as needed.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed September 30, 2025, in Manila, Philippines.

_____
Erlinda "Lynda" S. Bartolome