| | |
|---|---|
| 1 | **BLANK ROME LLP**<br>Todd M. Malynn (SBN 181595) |
| 2 | todd.malynn@blankrome.com<br>Arash Beral (SBN 245219) |
| 3 | arash.beral@blankrome.com<br>Todd M. Malynn (SBN 181595) |
| 4 | jamison.gilmore@blankrome.com<br>2029 Century Park East \| 6th Floor |
| 5 | Los Angeles, CA 90067<br>Telephone:  424.239.3400 |
| 6 | Facsimile:   424.239.3434 |
| 7 | Attorneys for Defendants, Counterclaimants, and Third Party Plaintiffs PCJV USA, LLC, PCI |
| 8 | TRADING LLC, POTATO CORNER LA GROUP, LLC, GK CAPITAL GROUP, LLC, |
| 9 | NKM CAPITAL GROUP, LLC and GUY KOREN, and Defendants J & K AMERICANA, |
| 10 | LLC, J&K LAKEWOOD, LLC, J&K OAKRIDGE, LLC, J&K VALLEY FAIR, LLC, J |
| 11 | & K ONTARIO, LLC, J&K PC TRUCKS, LLC, HLK MILPITAS, LLC, and GK CERRITOS, LLC |
| 12 | |
| 13 | <center>UNITED STATES DISTRICT COURT</center> |
| 14 | <center>CENTRAL DISTRICT OF CALIFORNIA</center> |

| | | |
|---|---|---|
| 15 | | |
| 16 | SHAKEY'S PIZZA ASIA VENTURES, INC, a Philippines corporation, | Case No. 2:24-CV-04546-SB(AGRx) |
| 17 | Plaintiff, | *Hon. Stanley Blumenfeld, Jr.* |
| 18 | vs. | **SUPPLEMENTAL DECLARATION OF GUY KOREN** |
| 19 | PCJV USA, LLC, a Delaware limited liability company; PCI TRADING , LLC, a | Complaint Filed:  May 31, 2024<br>Trial Date:         TBD |
| 20 | Delaware limited liability company; GUY KOREN, an individual; POTATO CORNER | |
| 21 | LA GROUP, LLC, a California limited liability company; NKM CAPITAL GROUP, | |
| 22 | LLC, a California limited liability company; J & K AMERICANA, LLC, a California | |
| 23 | limited liability company; J&K LAKEWOOD, LLC, a California limited | |
| 24 | liability company; J&K VALLEY FAIR, LLC, a California limited liability company; | |
| 25 | J & K ONTARIO, LLC, a California limited liability company; HLK MILPITAS, LLC, a | |
| 26 | California, limited liability company; GK CERRITOS, LLC, a California, limited | |
| 27 | liability company;  J&K PC TRUCKS, LLC, a California limited liability company; and, | |
| 28 | GK CAPITAL GROUP, LLC, a California | |

160850.00001/154448422v.1

**SUPPLEMENTAL DECLARATION OF GUY KOREN**

| | |
|---|---|
| limited liability company and DOES 1 through 100, inclusive, | |
| Defendants. | |
| _____ | |
| PCJV USA, LLC, a Delaware limited liability company; PCI TRADING LLC, a Delaware limited liability company; POTATO CORNER LA GROUP LLC, a California limited liability company; GK CAPITAL GROUP, LLC, a California limited liability company; NKM CAPITAL GROUP LLC, a California limited liability company; and GUY KOREN, an individual, | |
| Counter-Claimants, | |
| v. | |
| SHAKEY'S PIZZA ASIA VENTURES, INC, a Philippines corporation, | |
| Counter Defendant. | |
| _____ | |
| PCJV USA, LLC, a Delaware limited liability company; PCI TRADING LLC, a Delaware limited liability company; POTATO CORNER LA GROUP LLC, a California limited liability company; GK CAPITAL GROUP, LLC, a California limited liability company; NKM CAPITAL GROUP LLC, a California limited liability company; and GUY KOREN, an individual, | |
| Third Party Plaintiffs, | |
| v. | |
| PC INTERNATIONAL PTE LTD., a Singapore business entity; SPAVI INTERNATIONAL USA, INC., a California corporation; CINCO CORPORATION, a Philippines corporation; and ROES 1 through 10, inclusive, | |
| Third Party Defendants. | |

160850.00001/154448422v.1

1

**SUPPLEMENTAL DECLARATION OF GUY KOREN**

# SUPPLEMENTAL DECLARATION OF GUY KOREN

I, Guy Koren, declare as follows:

1. I am over 18 years old. The facts stated here are based on my personal knowledge, my work for PCJV USA, LLC ("PCJV") and PCI Trading LLC ("PCI Trading") and all other defendants named in this action (all of which I operate and manage), and my review of files and business records maintained in the ordinary course of our business. If called, I could and would testify competently thereto.

2. I adopt all the facts I attested to in my declaration of last week (filed at Dkt. No. 309-4) and supplement that declaration with the following additional facts.

3. I have reviewed the Supplemental Declaration of Erlinda "Lyndah" S. Bartolome being filed concurrently with our opposition papers. I agree with everything stated and could testify to the facts asserted in them myself if needed. In keeping with a judicious approach, I do not see the need to repeat all of the statements she made. To supplement the context she provided based on my own independent perspective, I add the following facts.

### How the Parties' Intent and Course of Dealing Shaped the Agreements; The Origin of the Ten-Year Term; Duration Was Always Tied to IP Rights

4. Attached to the concurrently-filed Supplemental Appendix at Trial Exhibit No. ("TE") 1001 is a true and correct copy of an April 2009 email chain between Mr. Magsaysay and me, reflecting our negotiations over the April 2009 "license agreement" with NKM (TE 7), which was in reality an unlawful franchise agreement as we later discovered. From the outset of negotiations, I rejected any at-will or unilateral termination rights by the projected licensor (Cinco had yet to register any trademarks) and insisted that our investment be protected. I expressly objected to language allowing unilateral, discretionary action. Specifically, addressing Paragraph 9 (trademarks), I wrote: "Discontinuance of use of Trademarks should be based upon the agreement. The line: 'should it become advisable at anytime, in licensor's sole discretion, for licensor to modify or

discontinue use of Trademarks' is risky for us as the company that is investing this type of cash on branding and marketting. What is to assure us years from now that we will not loose the license simply due to a better offer by a third party. This clause should be more 2 sided and assure the definite approval of the continuance (given there is no breach) for the whole CA territory." These statements reflect my rejection of any at-will right to discontinue or terminate rights "in licensor's sole discretion," and my insistence on mutuality and continuation absent breach. This was not a matter of legal technicality, but a matter of protecting our investment and ensuring fairness in the relationship.

5. Addressing termination (Paragraphs 14 and 15), I required cause or mutual agreement and protection through the end of location leases: "In regard to termination, we are going to have leases that will be minimum 3 years at a time. Termination of trade rights in the middle of a lease contract will create problems for us as the leaseholders. If termination of license is neccessary, the licensee should be able to proceed with business untill the end of the location's lease. Immediate termination should occur only if agreement is breached or is agreed by both parties (because there are costs and penalties to terminating long term leases early, It is risky for us). Reasonable steps have to be taken to reach amicable solution before proceeding with an immediate termination." By this language, I rejected immediate or at-will termination and required termination only for breach or mutual consent, with continued operation through lease terms.

6. I also deleted any clause authorizing unilateral takeover by the licensor, writing: "We erased the paragraph that gives rights for the Licensor to take over licensee's operations at any point. In case of the termination the licensor shall take over operations as long as an amicable agreement has been reached by all parties. (our investment has to be protected)." This reflects my rejection of unilateral, discretionary termination or control.

///

7. I further emphasized that the agreement must be "more 2 sided" and that our rights could not be unilaterally altered after we invested substantial resources: "We discussed that this contracts serves as guidelines rather then exact compliance… Somehow we have to make sure that at no point can 'the rug be pulled from under our feet'. For example few years from now after we have spent thousands of hours and dollars building a brand in CA, a new CEO should be not able to renegotiate other terms. Strict compliance will create countless loopholes with could cause problems for us in the future. Basically making the contract more 2 sided." This demonstrates my rejection of any provision enabling unilateral or at-will changes affecting our rights.

8. I obtained some but not all of these concessions, as reflected in TE 7. What is materially important is that the "Term of License" in that document was "for ten (10) years." In other words, the ten-year term was tied to the use of intellectual property. When it came time to create a lawful franchise system and to negotiate the Joint Venture Agreement (and related agreements thereafter), the parties rejected the ten-year term and made it indefinite—always tying the duration to the intellectual property rights we had negotiated.

<u>Trust and Mutuality, Not Legal Formalities, Defined the Partnership</u>

9. Attached to the concurrently-filed Supplemental Appendix at TE 1024 is a true and correct copy of a June 2010 email chain with Mr. Magsaysay. In a June 14, 2010 email, Mr. Magsaysay made clear that the very foundation of the joint venture partnership was trust—not legal formalities or paperwork. He wrote: "We begun on mutual trust and this will be a key value the JV company shall have. Any person bringing distrust to start a relationship with the JV company should be looked at with concern."

10. Mr. Magsaysay further emphasized that trust was not just a value, but the operative principle guiding the parties' relationship, even above contracts and legal documentation. He stated: "The time we professionalize and have professional

managers running things for us is the time we should let contracts and agreements with lawyers concern be ahead of trust. That's why to those who join our journey at this point when all we have is trust, I value them and their partnership and we should reap the benefits of trusting as blindly." [sic] This underscores that, at the outset, we deliberately prioritized personal trust and mutual confidence over legal formalities and written agreements. The parties' conduct and communications consistently reflected this approach.

11. In the same email, Mr. Magsaysay tied participation in the joint venture directly to this principle of trust. Regarding Mark Tung's involvement, he wrote: "At this point Mark is not an officer, owner, shareholder or agent of the JV company. We will not put in the JV agreement about Mark being a non-voting independent director since I am now leaning towards changing my mind about him being part of the board of the JV company when to this point he has not proven, to my satisfaction, that he thinks like us and the LA group (Amit, Guy and Amir)." Our partnership's foundation was grounded in mutual trust.

The Evolution of the JV Agreements and the Centrality of IP Rights

12. In 2015–2016, the Cinco Group sought to avoid further capital contributions, DBO exposure, and the governance obligations they had repeatedly resisted. Although we discussed a framework under which the LA Group would receive 100% of PCJV at no cost (with royalty fees based on nationwide revenues), Cinco ultimately did not finalize that deal.

13. Our governing documents contained consent and right of first refusal ("ROFR") protections designed to ensure that only the original parties remained in business together and to prevent outsiders from joining without our consent. Despite these protections, internal turmoil within the Cinco Group—including a private dispute between Mr. Magsaysay and Ms. Bermejo—led to separate transactions with a third-party group. Ms. Bermejo sold all her interests in Cinco and PCI, while

the other three members sold portions of their interests, resulting in the Hernandez Group acquiring 55% of Cinco and immediately seeking to control PCJV.

14. I objected to the fact that our prior consent was not obtained and the LA Group attempted to exercise its ROFR rights. Rather than honor the ROFR, Cinco's new principals (including Myrose Victor) traveled to Los Angeles and ultimately entered negotiations with us regarding a new agreement to restructure PCJV (*see* TE 1065 and 1072). These negotiations were always premised on the LA Group waiving its consent and ROFR protections.

15. Attached to the Supplemental Appendix at TE 1066 is a true and correct copy of a February 13, 2018 email and term sheet I sent to the new Cinco principals. The email specifically references negotiations about "how best to *restructure* our relationship in the form of a *new* license agreement partnership," and the term sheet proposes "[a] *new* Master Territorial License …" to "*replace the existing relationship*." Emphasis added.

16. The next day, on February 14, 2018, Mr. Jacoby and I (both part of the LA Group) had a dispute over the future of PCJV under our 100% ownership. This led to a series of well-documented events in which the new Cinco principals surreptitiously attempted to remove me from PCJV under pretext. The pretext was that I had improperly moved PCJV's money from one bank did to another, which I did to safeguard the funds from Mr. Jacoby. I was completely transparent and even sent Mr. Magsaysay a letter on April 3, 2018 explaining what I did. Attached to the Supplemental Appendix at TE 1073 is a true and correct copy of that letter. (Of interest, the letter also notes that I transferred the accounts of "all the Company stores to Chase," which further evidences the agreement of the parties to treat my stores as "Company stores" from which PCJV was not obligated to collect IP royalties.)

/ / /

/ / /

17. During those proceedings, I relied on the October 16, 2012 meeting minutes and the First Amendment to vindicate my rights—specifically, that I could not be removed without a 75% vote of managers.

18. After I objected and attempted to enforce my and the LA Group's consent and ROFR protections, Cinco and its counsel argued that a sale of stock "upstream" in Cinco itself would not trigger any ROFR or consent rights because no membership interest certificates in PCJV (allegedly held through PCI) changed hands. When it became clear that this argument was contradicted by the evidence—since Bermejo had transferred her direct shares in PCI as well as Cinco—they reversed the PCI transaction, having Bermejo's share go to Cinco instead of Hernandez. This maneuver was also a ruse.

19. The Hernandez Group's motivations were economic and strategic: to extract value immediately from the U.S. venture while preventing me from purchasing only the U.S. piece via our ROFR, using a formula we had already negotiated with the original Cinco Group members. The result was exactly what our ROFR and consent clauses were designed to prevent: outsiders—Hernandez and his associates—asserting dominion over PCJV without our consent and without first offering us the opportunity to purchase the interest being conveyed. Thankfully, the state court enjoined that misconduct.

20. At no point during the state court litigation did I or my attorneys ever take the position that Cinco exited our joint venture partnership or from PCJV, or was no longer part of PCJV by virtue of the First Amendment. On the contrary, we always maintained that Cinco was a party. For example, attached to the Supplemental Appendix as Exh. "AA" is a true and correct copy of the transcript of an October 8, 2020 hearing in state court regarding a motion for summary adjudication that we filed. I was present in the courtroom for that hearing, which was the last in state court involving any contested issue over the ROFR and Cinco's status as a party. During that hearing, my attorney (Mr. Beral) argued that, even

assuming PCI and Cinco had furnished an assignment to us (which they never did), PCI only held an economic interest in PCJV at best by virtue of the transfer restrictions placed in the LLC Agreement, while the Cinco Group members retained their rights to vote and manage (which constitute ownership rights). He further noted that the parties' intent was for the individuals to remain bound by the ROFR and management rights, and that the use of "Cinco" rather than "PCI" in documents, as well as the lack of evidence of an actual assignment, reinforced that PCI was not treated as the true member in practice.

21. I was present at the October 16, 2012 meeting and personally observed the discussions over the agreements we made that day, as reflected in the board meeting minutes (TE 1052). Specifically, when we removed Amit Nemanim from the LA Group and made me PCJV's President, the managers gave me the additional protection that a 75% vote of managers would be required to remove me in the future. The First Amendment reflects this reality and was the operative agreement giving me those additional protections.

22. In 2018, after the then-new principals of Cinco voted to remove me, Cinco passed a resolution to modify the LLC Agreement. During the state court proceedings, Cinco took the position that the Joint Venture Agreement and/or the LLC Agreement served as the operative license agreement entitling Cinco to 30% of collected royalties, while at the same time arguing that the First Amendment lacked a "meeting of the minds." There were ongoing disputes over which documents—or even whether verbal or implied-in-fact agreements—actually governed PCJV. Ultimately, these disputes were resolved through our settlement agreement (TE 1172). In that settlement, all parties expressly agreed that all of the prior agreements govern PCJV, "including" (but not limited to) the JVA, its First Amendment, and the LLC Agreement. *See* TE 1172 at Recital B. Recital B is a definitive, mutually agreed statement, whereas Recital G contains only Cinco's representations (which

we did not adopt or concede as factually accurate). *See* TE 1172 at Paragraph 8; *see also* Recital G ("Cinco represents that … Cinco further represents that").

23. In addition to agreeing in Recital B that "PCJV is governed by a set of agreements, including …," the parties specifically carved out "Excluded Claims" from the release, preserving our damages claims and the right to seek declaratory relief against Cinco (including any alter ego claims) "arising out of the sale of Potato Corner IP to SPAVI." If PCI is determined to be Cinco's alter ego, then Cinco remains subject to those claims and was not released from liability.

<u>The Declaration of Yiow Leong Tan Confirms that Cinco Was a Party</u>

24. As I explain further below, I completely disagree with Plaintiff's narrative that I was negotiating with Plaintiff to obtain rights that I believed we did not already possess. That is simply not true. We already had those rights; my only goal was to negotiate a peaceful resolution based on us relinquishing rights we already held and to reach a peaceful coexistence with new Potato Corner international operators. The contemporaneous documents and course of dealing confirm this intent.

25. Even setting aside my disagreement, the Declaration of Yiow Leong Tan itself demonstrates that Plaintiff considered Cinco to be a party to the relevant arrangements. For example, in Paragraph 30, Mr. Tan states that he had two objectives, one of which was for SPAVI to serve "as a franchisor to PCJV (*which is how Cinco structured its relationship with PCJV*)." Emphasis added. Further, in Paragraph 37.c., Mr. Tan explains that he wanted Plaintiff to offer resources, including "stepping into the shoes of PCJV and becoming the domestic franchisor … or entering into a new agreement *structured similar to that which PCJV had with Cinco*, wherein SPAVI would be directly involved in the management and operations of PCJV, but Koren would also be serving as an executive." (Emphasis added.) These statements confirm that, even from Plaintiff's perspective, Cinco was a party to the operative relationship with PCJV.

### Settlement Negotiations Focused on Future Arrangements, Not Alleged Past Defects

26. Plaintiff has sought to mischaracterize our mediation and settlement protected negotiations with Cinco and SPAVI during the state court lawsuit. Even disregarding settlement and mediation protections, those negotiations were never about remedying a supposed defect in prior agreements. Instead, we were always focused on negotiating a new agreement and a new partnership structure for the future. Attached to the Supplemental Appendix as TE 26, for example, is a true and correct copy of my February 16, 2024 email to Plaintiff where I discuss scheduling a meeting "to discuss the terms of a new license agreement" and to "get on the same page and agree on the terms of a new license agreement that's mutually acceptable that will serve as the foundation of a new healthy partnership that can and will grow and strengthen for years to come!"

27. Attached to the Supplemental Appendix as TE 21 is a true and correct copy of a prior email I sent to Plaintiff with a "Proposed Term Sheet" clearly stating that it is being sent "[i]n connection with our settlement discussions …" That Term Sheet is also premised on us acquiring Cinco Group's and SPAVI's interests in PCJV and PCI Trading. We specifically defined "Philippines-based parties" as including all those parties. *See* Term Sheet at Fn. 1. We always were in the dark on who owned the interests, and Cinco and SPAVI always refused to share information or documents with us.

28. Indeed, our goal always was to achieve a global resolution. For over two years, we diligently negotiated through Mr. Murphy who represented all parties. We never abandoned any discussions, "caused the negotiations to fail," nor did we "vanish for months." *See* Dkt. 312 at 22:11-13. The record shows we consistently and diligently engaged in good faith to reach a global resolution. *See* Dkt. 48-2, Paragraphs 14-34. That filing also explained the multiple times we made it known that we maintain perpetual rights. To claim that we "never objected to the

1  transaction" (Dkt. 312 at 21:19) is flat wrong. The negotiation process began with
2  us objecting to the transaction. TE 1354.
3       29.    Attached to the Supplemental Appendix at TE 1421 and 1355 are true
4  and correct copies of my Verified Third Amended Cross-Complaint in state court,
5  and Cinco's Verified Answer to that pleading, respectively. Mr. Magsaysay signed a
6  verification on behalf of Cinco on June 9, 2020 in connection with Cinco's Verified
7  Answer. Of note:
8       a. At Paragraph 85, Cinco stated under oath that the Master Services
9          Agreement was properly entered.
10      b. At Paragraph 143, Cinco admitted the truth of all of the
11         statements made in the 2018 FDD.
12      c. At Paragraph 144, Cinco admitted the truth of the statements
13         made in the 2018 FDD concerning royalty waivers and related
14         statements in the audit portion of the 2018 FDD.
15      I declare under penalty of perjury that the foregoing is true and correct.
16  Executed September 29, 2025, within the United States, its territories, possessions,
17  or commonwealths.



Guy Koren

160850.00001/154448422v.1

11

**SUPPLEMENTAL DECLARATION OF GUY KOREN**