EXHIBIT AA

CINCO CORPORATION vs GUY KOREN, BC701075
October 8, 2020
Copy

1          SUPERIOR COURT OF THE STATE OF CALIFORNIA

2               FOR THE COUNTY OF LOS ANGELES

3    DEPARTMENT SSC 10      HON. WILLIAM F. HIGHBERGER, JUDGE

4
     CINCO CORPORATION, et al., )
5                              )
                   Plaintiff(s),  ) CASE NO. BC701075
6                              )
            vs.                )
7                              )
     GUY KOREN, et al.,        )
8                              )
                   Defendant(s).  )
9    _____)
                               )
10   AND RELATED CROSS-ACTIONS. )
     _____)
11

12           REPORTER'S TRANSCRIPT OF PROCEEDINGS

13               THURSDAY, OCTOBER 8, 2020

14
     APPEARANCES:
15
     FOR PLAINTIFFS/
16   CROSS-DEFENDANT:  CINCO CORPORATION AND POTATO CORNER
                        INTERNATIONAL, INC.
17
                       ERVIN COHEN & JESSUP, LLP
18                     BY:  MICHAEL D. MURPHY, ESQ.
                            BANU NARAGHI, ESQ.
19                     9401 Wilshire Boulevard, 9th Floor
                       Beverly Hills, CA  90212
20                     310.281.6342
                       mmurphy@ecjlaw.com
21                     bnaraghi@ecjlaw.com

22

23                     (APPEARANCES CONTINUED ON NEXT PAGE.)
24

25

26

27   Christine Kwon-Chang, CSR No. 12143, CRR
     Official Pro Tempore Court Reporter
28   Job No. 160576

CINCO CORPORATION VS. GUY KOREN, BC701073
October 8, 2020
<span style="color:red">Copy</span>

```
 1   APPEARANCES:  (CONTINUED)

 2   FOR DEFENDANTS/
     CROSS-COMPLAINANTS:  GUY KOREN, GK CAPITAL GROUP, LLC,
 3                        ALON KOREN, THOMAS HODGSON,
                          EMILY GARCIA
 4
     FOR CROSS-COMPLAINANT: ASHLEY GRUNDNOWSKI
 5
                     FREEMAN FREEMAN & SMILEY
 6                   BY:  ARASH BERAL, ESQ.
                         JOHN D. STANLEY, ESQ.
 7                       (APPEARING VIA LACOURTCONNECT)
                     1888 Century Park East, Suite 1500
 8                   Los Angeles, CA  90067
                     310.255.6100
 9                   arash.beral@ffslaw.com
                     john.stanley@ffslaw.com
10
11   FOR DEFENDANTS/
     CROSS-COMPLAINANTS:  NKM CAPITAL GROUP, LLC,
12                        J & K AMERICANA, LLC, J & K CULVER,
                          LLC, J&K LAKEWOOD, LLC,
13                        J&K OAKRIDGE, LLC, J&K VALLEY FAIR,
                          LLC, J & K CAPITAL 2, LLC, J & K
14                        ONTARIO, LLC, J&K PC TRUCKS, LLC,
                          J&K CONSULTANTS GROUP, LLC, AND
15                        POTATO CORNER LA GROUP, LLC

16                   VEDDER PRICE, LLP
                     BY:  DEBORAH A. HEDLEY, ESQ.
17                       (APPEARING VIA LACOURTCONNECT)
                     1925 Century Park East, Suite 1900
18                   Los Angeles, CA  90067
                     424.204.7700
19                   dhedley@vedderprice.com

20
     FOR DEFENDANTS/
21   CROSS-COMPLAINANTS:  ALON KOREN AND EMILY GARCIA

22                   VALLE MAKOFF
                     BY:  JOHN M. MOSCARINO, ESQ.
23                       (APPEARING VIA LACOURTCONNECT)
                     11911 San Vicente Boulevard, Suite 324
24                   Los Angeles, CA  90049
                     310.476.0300
25                   jmoscarino@vallemakoff.com

26

27                   (APPEARANCES CONTINUED ON NEXT PAGE.)

28
```

CINCO CORPORATION vs SHAI KOREN, BC701075
October 8, 2020
**Copy**

```
 1   APPEARANCES:  (CONTINUED)

 2   FOR CROSS-COMPLAINANT:  PCI Trading, LLC

 3   FOR NOMINAL DEFENDANT/
     CROSS-COMPLAINANT:      PCJV USA, LLC
 4
                        FREEMAN MATHIS & GARY, LLP
 5                      BY:  STEPHEN M. CAINE, ESQ.
                             (APPEARING VIA LACOURTCONNECT)
 6                      550 South Hope Street, Suite 220
                        Los Angeles, CA  90071
 7                      scaine@fmglaw.com

 8
     FOR CROSS-DEFENDANTS: AMIR JACOBY AND INBAL JACOBY
 9
                        LEVINSON ARSHONSKY & KURTZ, LLP
10                      BY: JAMES COOPER, ESQ.
                        (APPEARING VIA LACOURTCONNECT)
11                      15303 Ventura Boulevard, Suite 1650
                        Sherman Oaks, CA  91403
12                      jcooper@laklawyers.com

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
```

CINCO CORPORATION VS. GUY KOREN, BC701075
October 8, 2020
Copy

```
 1                (THURSDAY, OCTOBER 8, 2020)
 2                 M A S T E R   I N D E X
 3

 4        CHRONOLOGICAL/ALPHABETICAL ORDER OF WITNESSES
 5                        (NONE)
 6

 7                   INDEX OF EXHIBITS
 8                    (NONE OFFERED)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
```

CINCO CORPORATION VS. GUY KOREN, BC701075
October 8, 2020

Copy

1

```
 1   CASE NUMBER:              BC701075
 2   CASE NAME:                CINCO CORPORATION VS. GUY KOREN
 3   LOS ANGELES, CALIFORNIA, THURSDAY, OCTOBER 8, 2020
 4   DEPARTMENT SSC 10         HON. WILLIAM F. HIGHBERGER
 5   REPORTER:                 CHRISTINE KWON-CHANG
                               CSR NO. 12143
 6
     TIME:                     A.M. SESSION
 7
     APPEARANCES:              (AS HERETOFORE NOTED.)
 8
 9              (The following proceedings
10               were held in open court with
11               some counsel appearing
12               remotely via
13               LACourtConnect:)
14
15      THE COURT:  On the record on the BC701075, Cinco
16   v. Koren.
17          I've got plaintiffs' counsel in the
18   courtroom and counsel for Mr. Koren in the courtroom and
19   various lawyers for the parties on the phone.
20          Lawyers in the courtroom, the reporter
21   knows who you are?
22          If you're talking on a phone or via video,
23   it would probably be good if you state your name as you
24   begin.
25          So a week ago we had begun argument on
26   some of the issues.  We resolved the small question
27   about an amended pleading.
28          We got into the question of summary
```

1    adjudication.  I want to spend more time on the summary
2    adjudication.
3              I've got a further tentative earlier this
4    week with the same outcome but more elaborate reasoning.
5    It wasn't terribly more elaborate about the real
6    decisional point, which is that under Paramount
7    Petroleum Court v. Superior Court, the question
8    presented to the Court at this time is actually not
9    amenable to summary adjudication.  My view hasn't
10   changed in that regard.
11             What I did speak to at greater length, in
12   the hopes that some advanced analysis might help
13   structure the anticipated trial, was to talk about the
14   merits of the arguments in a rather preliminary way,
15   assuming that the process of impediment was gone.
16             And, obviously, if we go to trial, the
17   process of impediment under CCP Section 437c does go
18   away to the very reason of conducting a trial.
19             You've been kind enough to respond to my
20   inquiry about whether it's possible to use the record
21   presently before the Court as a gathering of the
22   extrinsic evidence most germane to the interpretation of
23   Section 2D of the first amendment to the joint venture
24   agreement and/or Section 2D of the original joint
25   venture agreement, and I'm properly educated.
26             On this point, both sides are fairly
27   consistent that this record wasn't intended to gather
28   the extrinsic evidence for that purpose because the

CINCO CORPORATION vs. GUY KOREN, BC701075
October 8, 2020
Copy

3

 1   basic hypothesis of the motion was that this Court
 2   should bow down and honor word for word a noncontrolling
 3   district court decision from the federal court in Oregon
 4   and conclude that the covenant of good faith and fair
 5   dealing necessarily requires that Mr. Koren has been
 6   afforded a right of first refusal when the disputed sale
 7   of partial ownership of a second-level grandparent, to
 8   wit, Cinco Corp., occurred in 2017.
 9            I don't at the moment know what the
10   correct interpretation would be, but I do know that I'm
11   not persuaded that the cited Oregon district court
12   decision, Oregon RSA No. 6 v. Castle Rock Cellular,
13   Limited Partnership, 840 F.Supp 779, is factually on
14   point with what's current here.
15            That was a very dissimilar circumstance
16   factually; and, therefore, Mr. Beral, it would waste
17   your effort and would only tend to diminish the
18   credibility of your argument.
19            So I urge you to structure your argument
20   as you go forward on something other than saying I need
21   to follow what the district court -- what the magistrate
22   judge -- anyway, what the decision was in the Oregon
23   case to determine whether or not there was a breach in
24   fact.
25            So I'll invite further argument, but in
26   the interim what I'd like to do is have argument whether
27   summary adjudication should be granted, not talk about
28   what may happen in a separate trial, because from a

CINCO CORPORATION vs GUY KOREN, BC701075
October 8, 2020
Copy

4

```
 1   calendar point of view, we have a motion for summary
 2   adjudication on calendar.
 3              And although I've talked to issues that
 4   may be germane to a future trial, I want to be done with
 5   the ruling on the summary adjudication before we start
 6   talking about organizing a trial.
 7              So, Mr. Murphy, I assume you'd submit?
 8        MR. MURPHY:  I would submit, yes.
 9        THE COURT:  Mr. Beral, specific to the motion for
10   summary adjudication, before we turn to the other
11   continued matters?
12        MR. BERAL:  I would like to be heard on the
13   motion for summary adjudication briefly.
14              I had organized my thoughts to speak to
15   the issue of the MSA and a bifurcated trial at the same
16   time.
17        THE COURT:  I'll hear you.  Feel free to go into
18   those points.
19        MR. BERAL:  I appreciate Your Honor's tentative.
20              I am still confident -- at least
21   optimistic that we can change your mind on this.
22              And I appreciate the distinction that the
23   Court drew between the facts of this case and the facts
24   in the Oregon RSA case.
25              I would submit to Your Honor that that's a
26   distinction without a difference.  The distinction the
27   Court drew was that the parent in that case was a shell,
28   didn't own anything else, but that the parent or the
```

CINCO CORPORATION vs GUY KOREN, BC701075

October 8, 2020

Copy

5

 1    grandparent, whatever way you want to handle it, is not

 2    a shell and owns other stuff.

 3            THE COURT:  In the world of Cinco.

 4            MR. BERAL:  In the world of Cinco, correct.

 5                Now, there are reasons why we disagree

 6    with that.  If we go to trial, there's going to be

 7    disputed issues regarding that issue.  But for purposes

 8    of the MSA, I just want to point out that the court in

 9    Oregon did not find that factor to be a dispositive

10    factor.

11                In fact, the court says in that section

12    where it's discussing that issue, the court says

13    specifically, and I quote, (as read:)

14                No one factor is

15            determinative that the subsidiary

16            is a wholly-owned subsidiary of

17            the parent or shares interlocking

18            directorates is not of itself

19            conclusive.

20                What happened in that case is it was a

21    relevant factor that there was a parent company that was

22    formed that owned nothing about this interest, and they

23    sold off that parent interest.

24                But the Court in that case was not focused

25    on that issue.  The focus was on the effect that the

26    transaction had on the other partner.

27                So the focus was:  Does this transaction

28    affect the rights of this other partner?

CINCO CORPORATION vs. GUY KOREN, BC701075
October 8, 2020
Copy

6

```
 1              And in that case --
 2         THE COURT:  They weren't able to improve their
 3    percentage interest in the business.  Is one of the
 4    then-existing partners prepared to set itself from
 5    ownership?
 6              And under that first right of refusal, if
 7    the then-partner wanted out, that was an occasion for
 8    the remaining partners to plus up pro rata their
 9    ownership in the business.  But because the selling
10    partner chose to sell a hundred percent of its interest
11    only to one of the partners and ignore the third
12    partner, the partner who was obliged with the
13    opportunity to buy a hundred percent was increasing its
14    pro rata interest in the business rather than letting
15    the remaining partners stay in equipoise with each other
16    when one person chose to extend itself from the
17    investment.
18              So there was a material change, and that I
19    suppose would have happened here if Potato Corner
20    International chose to sell some percentage but not all
21    of its ownership interest in the joint venture with a
22    long-winded acronym named PCJV, space, USA, space, LLC.
23              And when I refer to the word "joint
24    venture" for the rest of the morning, that's the entity
25    I intend to refer to.
26              But Cinco through PCI did not sell any
27    percentage interest in the joint venture, and therefore
28    the 60/40 split of ownership that existed going in as
```

Copy

1    between Cinco and directly in the LA Group remained at a

2    60/40 split of ownership coming out of the deal, which

3    is very different than what happened in Oregon RSA.

4              Tell me how that didn't remain the status

5    after the sale of a portion of Cinco to the Hernandez

6    folk.

7         MR. BERAL:  Cinco is basically a holding entity

8    that owns a lot of interest around the world.  They had

9    the option of excluding PCJV from the sale.  They could

10   have done that in one of many ways.

11             They could have sold all their

12   subsidiaries in all the other countries and excluded

13   PCJV.  They could have sold the equivalent of PCI in the

14   other countries that they owned and excluded PCJV.  They

15   could have specifically excluded PCJV from the sale of

16   stock to the other people.

17             They did not do that.  Had they done that,

18   we would have no problem with it.

19             "You sold your other companies' interests

20   in other parts of the world.  No issues.  We're still in

21   business with you.  The four managers who are the

22   managers of the Cinco Group who own Cinco are still

23   managers with us.  We're fine with that."

24             But that was not the object of the

25   transaction.  The object of the transaction was to sell

26   the United States.  The United States --

27        THE COURT:  United States plus more.

28        MR. BERAL:  Plus more, but the United States was

CINCO CORPORATION vs. GUY KOREN, BC701075
October 8, 2020

Copy

8

1   the biggest market for that.

2             That's why Mr. Hernandez and his family

3   paid so much money for this interest, and that's why

4   we're fighting -- we're spending millions of dollars on

5   this litigation for the rights of the United States.

6             So factually when you look at the sales

7   agreements that they -- that they filed under seal, PCI

8   and PCJV are both mentioned in those sales agreements,

9   but the direct objective that they had as part of these

10  transactions was to sell PCJV.

11            And let's look at what happened after they

12  sold.  After they sold, they had members of the

13  Hernandez group trying to vote on PCJV's board.  They

14  appointed people from the Hernandez group as voting

15  members of the PCJV board.

16        THE COURT:  So in theory they had the right to

17  name four of the seven members, and that's what happened

18  when Ms. Bermejo disappears.

19        MR. BERAL:  I disagree, Your Honor, and I'm -- I

20  would ask for permission to use your board -- your

21  whiteboard if I can, Your Honor, to illustrate that.

22        THE COURT:  Yeah, pull it to the middle of the

23  well if it helps.

24            You can go in the well.

25        THE COURTROOM ASSISTANT:  I'll bring it.

26        THE COURT:  Do you need to erase or mark over

27  mine or just use the blank side on the back?

28        MR. BERAL:  If there's a blank side, I'll use the

CINCO CORPORATION vs. GUY KOREN; BC701075
October 8, 2020

Copy

9

```
1   blank side.
2          THE COURT:  You can erase what's there.
3          MR. BERAL:  I think this would be a helpful
4   exercise not only for the MSA but also positioning --
5          MR. MURPHY:  Could you do this (indicating) so
6   that counsel can see?
7          MR. BERAL:  Sure.
8          MR. MURPHY:  Thank you.
9          MR. BERAL:  Is that okay (indicating)?
10         MR. MURPHY:  And I would request that whatever is
11  drawn, that we take a picture and make that an exhibit
12  to the record so that we have a complete record.
13         THE COURT:  I'll certainly let you make a picture
14  and attach it to the notice of ruling.
15              And, Mr. Murphy, when we're done here
16  today, you'll be kind enough to give notice?
17         MR. MURPHY:  I will do that.  Thank you, Your
18  Honor.
19         THE COURT:  Take your time, Mr. Beral.
20         MR. BERAL:  Thank you, Your Honor.
21              I'm going to speak as I write.  I'll try
22  to go this way (indicating).
23         MR. MURPHY:  I appreciate that.  Thank you.
24         MR. BERAL:  As we talked about last week, the
25  genesis of this relationship began with Mr. Koren and
26  Mr. Magsaysay from Filipino group, and they discussed
27  expanding Potato Corner to the United States.
28              They ultimately agreed that Mr. Koren's
```

Copy

10

```
 1   entity which was called NKM -- I think it's NKM Capital
 2   Group, but we'll shorthand it as NKM -- would be --
 3   would receive a license to open ten Potato Corner stores
 4   with exclusive territory in Los Angeles with the option
 5   to expand that exclusivity to all of California.
 6              They also received rights to sublicense
 7   their rights -- NKM's rights to anywhere in the United
 8   States, and so if they sublicensed and in effect have
 9   other franchisees open up other places in the United
10   States, they would share fees 50/50 between what
11   eventually turned out to be Cinco and Mr. Koren's group.
12              So this contract was not with Cinco.  It
13   was with an entity called Potato Corner Hong Kong
14   Company Limited, something like that.
15              So I'll shorthand it PC- --
16        THE COURT:  Off the record.
17
18           (A discussion was held off
19            the record.)
20
21        THE COURT:  Okay.  We're back on the record.
22              Continue, Mr. Beral.
23        MR. BERAL:  This is the license agreement that
24   they first agreed to, NKM and Potato Corner Hong Kong.
25              Through this license agreement, NKM,
26   Mr. Koren, starts opening up stores.  They start
27   developing stores.  They start opening up a store in
28   Santa Anita, which was their first flagship store.
```

CINCO CORPORATION vs. GUY KOREN, BC701075
October 8, 2020
Copy

11

```
 1              At some point while that's going on, the
 2   Cinco Group and Mr. Magsaysay comes forward and says,
 3   "Well, we need to create a franchise business.  Our
 4   people at DLA Piper are telling us this is not kosher.
 5   We can't do a license agreement.  We need to have
 6   franchise disclosure documents in place.  These rights
 7   that we gave you, which effectively were that you get
 8   the franchise, you get to have exclusivity, we didn't do
 9   it the correct way."
10              So what ended up happening is -- and by
11   the way, the negotiations at first started with the
12   suggestion that Mr. Koren's group would own the majority
13   interest in what turned out to be PCJV.
14              That was flipped in the last minute.
15              So what happened is, they transformed this
16   relationship into PCJV -- PCJV USA, and they constructed
17   it in a way that there would be two groups.
18              Here would be Mr. Koren (indicating) --
19   let me just draw out this side to be consistent.
20              Koren, Nemanim, Jacoby called themselves
21   the LA Group.
22              Here what they did was -- it's not only
23   Cinco Corporation that was part of that group.  They had
24   Cinco plus their four shareholders.  Each shareholder
25   owned 25 percent of Cinco.
26              So you've got Cinco, plus Magsaysay, plus
27   Montinola, plus Montelibano, plus Bermejo.
28          THE COURT:  Were their interest 20 percent or
```

CINCO CORPORATION VS. GUY KOREN, BC701075
October 8, 2020
Copy

```
 1    25 percent?

 2          MR. BERAL:  Twenty-five, 25, 25, 25.

 3                These four people owned Cinco.

 4          THE COURT:  The first line is one name?  It's

 5    just two words?

 6          MR. BERAL:  Cinco, plus Magsaysay, plus,

 7    Montinola --

 8          THE COURT:  Got you.

 9                Cinco.  Magsaysay is the first human.

10          MR. BERAL:  Right.

11                They called themselves the Cinco Group.

12                What you have here is an initial JV

13    agreement, the joint venture agreement, between the two

14    groups.  That's clear.

15                They intended for these individuals to be

16    part of this agreement.  They intended the individuals

17    on that side to be part of the agreement.  And as the

18    testimony shows, that was important for the Cinco Group

19    because what they wanted is to have -- make sure the

20    individuals are individually bound by this agreement

21    such that the individuals can't sell their interest to

22    any outsider without providing a right of first refusal.

23                At some point in time --

24          THE COURT:  Well, will I get extrinsic evidence

25    to manifest that by way of negotiation or otherwise?

26          MR. BERAL:  That's in the agreement.

27          THE COURT:  That's your view of 2D?

28          MR. BERAL:  If you look at the first page of the
```

October 8, 2020

Copy

13

```
 1    agreement, it tells you who the parties are.
 2              It says Cinco Group is defined as these
 3    five (indicating).  LA Group is defined as these three
 4    (indicating).  That's clear.
 5              At some point, Cinco Group is in the midst
 6    of getting more tax advice.  There is a -- there's a
 7    desire by Mr. Magsaysay to obtain an immigration visa to
 8    travel to the United States.
 9              They get advice from DLA Piper.  We have
10    documents from DLA Piper where DLA Piper is giving them
11    advice to create a wholly-owned subsidiary in the United
12    States because it would help them with tax issues.  It
13    would also help facilitate Mr. Magsaysay's visa request.
14              They approach the LA Group.  They say, "We
15    want to create Potato Corner International.  We're going
16    to substitute Potato Corner International into our
17    agreement."
18              And Mr. Koren had no objection to that.
19    Okay?
20              So what ends up happening with the amended
21    joint venture agreement is -- oh, by the way,
22    Mr. Nemanim had some problems with Mr. Koren and
23    Mr. Jacoby.
24              He ultimately exited.  There was a
25    settlement agreement, and so Nemanim at that point is
26    out.
27              So what they do with the amended JV
28    agreement is they replaced Mr. Nemanim with Mrs. Jacoby
```

CINCO CORPORATION vs. GUY KOREN, BC701075
October 8, 2020

Copy

14

```
 1    as a manager, but for all intents and purposes, the
 2    LA Group remains the same.
 3           THE COURT:  Who gets which piece or pieces of
 4    Nemanim's interest?
 5           MR. BERAL:  Sure.  This is what happened.
 6                  The LA Group owned 38 percent, Mr. Koren;
 7    38 percent, Mr. Nemanim; 24 percent, Mr. Jacoby.
 8    Nemanim sells off his interest.
 9                  What ends up happening is Koren then has
10    61.3 percent, and Jacoby has 38.7 percent.
11           THE COURT:  So Jacoby steps up.  He goes from a
12    smaller piece to 38 percent?
13           MR. BERAL:  That's correct.
14           THE COURT:  But Koren becomes indisputably the
15    controlling portion of the LA Group.
16           MR. BERAL:  Correct.  They both get a step up.
17                  And because they needed three members to
18    be managers on the PCJV board, Mr. Jacoby approaches
19    Mr. Koren and says, "Why don't we get my wife, Inbal
20    Jacoby, be a manager?"
21                  They agree, and Inbal becomes a manager of
22    the PCJV board.
23                  On this side of the equation, what happens
24    is they want to create a situation whereby
25    PC International obtains the equity interest in this
26    group such that it would help them in the foreseeable
27    future where there would be a distribution made to them
28    such that they could help save on taxes.
```

Copy

15

```
 1            MR. MURPHY:  Can you restate that?  I missed
 2    that.  I'm sorry.
 3            MR. BERAL:  So they want to create a situation
 4    here where Potato Corner International receives any
 5    distributions that go to -- go from PCJV to its members.
 6                  So what they do is, they say, "We want to
 7    replace Cinco with Potato Corner International so that
 8    Potato Corner International obtains the equity interest
 9    in PCJV."
10                  Okay.  So they create this amended joint
11    venture agreement to give them the right to do that,
12    only to transfer the equity interest from this group
13    (indicating) to Potato Corner International.
14            THE COURT:  What do you define to be the "other
15    than equity interest" that is somehow detached in the
16    process?
17            MR. BERAL:  There's the rights to vote, be a
18    manager, and rights to information.
19                  So to be a member under the law, Delaware
20    law and California law is consistent, you need an equity
21    interest, which is basically a right to distribution.
22    If money comes down, you get it; you need a right to
23    vote; you need a right to information.
24                  Those are the three things.  Those are the
25    holy trinity to be a full-fledged member.
26            THE COURT:  Does Delaware let you separate those
27    and detach the bundle of sticks?
28            MR. BERAL:  Absolutely.
```

CINCO CORPORATION vs. GUY KOREN, BC701075
October 8, 2020

Copy

16

1              In fact, if you look at the amended joint

2    venture agreement, paragraph 3A specifically says that

3    the Cinco Group retains the right to name managers to

4    the PCJV board, not PCI, not the PCI Group.

5              They specifically retained the right to

6    name managers.  They did not transfer the right to vote

7    to Potato Corner International.

8              And so that's clear on the face of the

9    amended JV agreement.

10        THE COURT:  And this obviously is an LLC, not a

11   more traditional for-profit corporation, but to my

12   limited understanding of corporate law, rusty as it is

13   at this point, you can certainly have restricted stocks.

14             So some of our high-tech startups have

15   different classes of shares.  Some get to vote.  Some

16   have supermajority voting.

17        MR. BERAL:  That's correct.

18        THE COURT:  So you can in theory detach your

19   ownership of an equity interest from the extent to which

20   you have voting rights.

21        MR. BERAL:  Correct.

22        THE COURT:  Presumably, if you're on the board,

23   you have a clear right of information.  As a regular

24   shareholder, your rights of information are limited.

25             If you happen to have the power to put

26   somebody on the board de facto, you'll have your right

27   of information, but only if you have access to a board

28   member.

CINCO CORPORATION VS. GUY KOREN, BC701075

October 8, 2020

Copy

17

```
1          MR. BERAL:  Correct.
2          THE COURT:  And the LLC has a slightly different
3     body of law.
4          MR. BERAL:  They created this hybrid LLC
5     structure that kind of looks like a corporation, but
6     it's really an LLC.
7               They did that for various reasons, but the
8     fact of the matter is --
9          THE COURT:  But the jurisprudence of an LLC is
10    much larger than whatever Mr. Koren or Cinco wish to do.
11    It is the body of law of governance of LLCs generally --
12    at least Delaware LLCs under Delaware law.
13         MR. BERAL:  Right.  You can contract to do
14    basically whatever you want to do.
15              Also, there's a restriction on transfers
16    in the LLC agreement that says even if you transfer
17    economic interest to somebody else, you cannot transfer
18    management rights or voting rights.  So that's there as
19    well that serves as a backstop.
20              So even if there's no right of first
21    refusal in the agreement, you still can't transfer
22    management rights, and there's a purpose for that.
23              And so I'm looking at the amended JV
24    agreement --
25         THE COURT:  I have it in front of me.
26         MR. BERAL:  Paragraph 3A.
27         THE COURT:  I have it in front of me.
28         MR. BERAL:  It says, (as read:)
```

CINCO CORPORATION vs. GUY KOREN, BC701075
October 8, 2020
Copy

```
1              Unless otherwise agreed to
2          by the parties, the management
3          shall be composed of seven
4          members, four of whom shall be
5          designated by the Cinco Group.
6              Cinco Group are these guys (indicating).
7              And if you look at page 1 of the amended
8   joint venture agreement, the parties to that agreement
9   are identified as Potato Corner International, plus
10  Magsaysay, Montinola, Bermejo, Montelibano, all of whom
11  are Philippine citizens and residents and collectively
12  referred to as the PCI Group.
13             So now what you have is -- what they
14  constructed effectively, in fact, is you've got PCI plus
15  four as one membership group.
16             You've got LA Group as another membership
17  group.  The individuals are still part of this deal.
18  The individuals, in fact, retained their rights to name
19  managers to the PCJV.
20             The individuals were bound by the right of
21  first refusal.  That was the intent of having the
22  individuals as part of this agreement.
23             In fact, when we submitted our compendium
24  of evidence, we showed Your Honor that when they went
25  through in exchanging drafts of the initial joint
26  venture agreement, there was one initial draft where the
27  individuals were taken out.  It was just Cinco
28  Corporation.
```

CINCO CORPORATION vs. GUY KOREN, BC701075
October 8, 2020
Copy

19

```
1              And then after that they decided, "Wait a
2   minute.  No.  We need the individuals there so that the
3   individuals are bound by the right of first refusal."
4          THE COURT:  Which exhibit is that, sir?
5          MR. BERAL:  That is Exhibit 23 to Mr. Koren's
6   compendium.
7          THE COURT:  Thank you.
8              What purports to be a final draft from
9   Ms. Bartolome circulated in June of 2010.
10         MR. BERAL:  There are actually some earlier
11  drafts that are 21 and 22 as well that I just -- if I
12  may, just give me 30 seconds so I can make sure that's
13  the exhibit.
14         THE COURT:  Sure.
15             Do I infer that Ms. Bartolome was the
16  scrivener of these troublesome documents?
17         MR. BERAL:  She was a representative of the Cinco
18  Group.  She was the franchise consultant -- global
19  franchise consultant for Cinco Group, and she ended up
20  being a secretary for PCJV USA.
21             And so she prepared the minutes, and she
22  had, obviously, firsthand knowledge of the joint venture
23  agreement --
24         THE COURT:  Did she prepare these drafts though,
25  or did DLA Piper prepare the drafts, or did
26  Mr. Magsaysay prepare the drafts, or did Mr. Koren
27  prepare the drafts?
28         MR. BERAL:  I believe it was Mr. Olivas at the
```

CINCO CORPORATION vs. GUY KOREN, BC701075
October 8, 2020
Copy

20

1   DLA Piper with, obviously, input from the Cinco Group,

2   but I do not know for a fact.  I believe it was

3   DLA Piper.

4           THE COURT:  They're not a model of clarity.

5           MR. BERAL:  They're not.

6                And that's -- that is -- it has been an

7   issue in the case, as Your Honor saw Judge Hogue's

8   ruling back in 2018.

9                We've been burdened by these issues, but

10  once you peel back the layers of the onion, I think it's

11  pretty clear in our minds.

12               Exhibit 10 is actually the genesis of the

13  joint venture agreement, the first draft.  And the first

14  draft there has Cinco Corporation and Cinco Corporation

15  alone as the party in interest.

16               As they --

17          THE COURT:  The theoretical corporation on the

18  other side that didn't quite come to be that way.

19          MR. BERAL:  You mean on the LA Group side?

20          THE COURT:  Yeah.

21          MR. BERAL:  The LA Group side were a conglomerate

22  of the three individuals at the time.

23          THE COURT:  As I understand it, they essentially

24  presented themselves as a partnership of some type in

25  regard to their ownership of the PCJV USA LLC joint

26  venture.

27          MR. BERAL:  Right.

28               In 2010 they were not a partnership.  They

CINCO CORPORATION vs. GUY KOREN, BC701075
October 8, 2020
Copy

21

```
 1    were literally just three individuals.  In 2013 they
 2    became a formal partnership.  They drafted a partnership
 3    agreement.
 4                  So this --
 5          THE COURT:  They had their own independent
 6    severable interest in 2010.
 7          MR. BERAL:  Correct.
 8          THE COURT:  Not a collective partnership interest
 9    in the totality.
10          MR. BERAL:  Correct.
11          THE COURT:  Fine.  Proceed.
12          MR. BERAL:  So what you have now is -- and it's
13    clear in the documents, and this is a source of
14    disagreement between us, Your Honor, and the tentative,
15    is that Potato Corner International is not solely the
16    contracting party here.
17                  You've got the group who's the contracting
18    party.  You've got a fractured membership interest
19    within this side (indicating).  You've got Potato Corner
20    International that allegedly has the right to equity
21    interest.
22                  By the way, they've never produced any
23    assignment.  The amended joint venture agreement gives
24    them the right to assign equity interest to Potato
25    Corner International.
26                  We've never seen an actual assignment that
27    they actually did that.
28          THE COURT:  From Cinco down to PCI?
```

CINCO CORPORATION vs. GUY KOREN, BC701075
October 8, 2020

Copy

```
 1              MR. BERAL:  Correct.
 2                   But we don't dispute it because we did
 3    have Potato Corner International as the 60-percent
 4    owner per their wishes --
 5              THE COURT:  They probably get listed on the tax
 6    returns in 2015 and 2016.
 7              MR. BERAL:  That's what they wanted, and
 8    DLA Piper, whose idea this was, was also representing
 9    PCJV.
10                   So at some level you've got Mr. Koren
11    trusting the word of DLA Piper and this side over here
12    (indicating) and conforming to whatever their wishes
13    were with respect to Potato Corner International.
14              THE COURT:  Is there a tolling agreement such
15    that they're not involved in this litigation?
16              MR. BERAL:  Yes, there is, and it expires in
17    February.
18              THE COURT:  This is complicated enough without
19    adding parties, but one wonders sometimes.
20              MR. BERAL:  It gets even more complicated, Your
21    Honor.
22                   When they formed Potato Corner
23    International, they told Mr. Koren that Potato Corner
24    International is going to be a wholly-owned subsidiary
25    of Cinco.
26              THE COURT:  Almost was but not quite.
27              MR. BERAL:  Almost was but not quite.
28                   The reason they told Mr. Koren that is
```

CINCO CORPORATION vs. GUY KOREN, BC701075
October 8, 2020
Copy

23

```
1  because they assured Mr. Koren that regardless of
2  whether they do this or not, that all these folks are
3  still going to be bound by the right of first refusal.
4           Mr. Koren had never contemplated in his
5  mind --
6       THE COURT:  Help me out where that's manifest in
7  a writing or sworn testimony to a verbal statement.
8       MR. BERAL:  The amended joint venture agreement
9  itself says we have the right to transfer our interest
10 to Potato Corner International which is our wholly-owned
11 subsidiary.
12      THE COURT:  I don't quarrel with you making your
13 inference from the writings, but if you believe you have
14 negotiating history that adds this as a written or oral
15 statement that you're willing to try to prove up,
16 frankly I don't think you're going to get to use it
17 today because I really think you're trying to get an
18 adjudication on breach.
19          And for that alone, you can't win today.
20      MR. BERAL:  I will get to that.
21      THE COURT:  Later there's a chance you can still
22 win, and it's important in my mind's eye that then you
23 give me the best collection of extrinsic evidence that
24 you have that supports your view of how to interpret
25 what I think everybody must accept to be an ambiguous
26 agreement.
27      MR. BERAL:  I'll get to that, Your Honor.
28          And I submit to Your Honor that the words
```

CINCO CORPORATION vs. GUY KOREN, BC701075
October 8, 2020

Copy

24

1   and the verbiage and Mr. Koren's understanding is all in
2   his declaration, the very long declaration that --
3       THE COURT:  His understanding is different than
4   what's the exchange he negotiated.
5           Personal thoughts that -- you know, "I
6   thought this was going to be great for me," doesn't
7   count for diddly.
8       MR. BERAL:  There is testimony in Mr. Koren's
9   declaration regarding what Mr. Magsaysay had represented
10  to him.
11          Mr. Magsaysay represented to him --
12      THE COURT:  Is there a particular paragraph I can
13  look at?
14      MR. BERAL:  There are the statements where
15  Mr. Magsaysay said, "Look, it's going to be just us" --
16      THE COURT:  One moment.  Let me find the
17  declaration of such.
18          I have it.  Do you have a paragraph number
19  or numbers?
20      MR. BERAL:  We'll find it.
21      THE COURT:  Thank you, sir.
22
23          (Pause in proceedings.)
24
25      MR. BERAL:  Starts at paragraph 60, Your Honor.
26      THE COURT:  Six, zero?
27      MR. BERAL:  Yes.
28      THE COURT:  Thank you.

CINCO CORPORATION vs. GUY KOREN, BC701075
October 8, 2020
Copy

25

```
 1            For counsel's edification, I need to
 2   recess at 12:15.  We can resume at 1:30 if we have to go
 3   into the afternoon.
 4            MR. MURPHY:  I've got -- I can't this afternoon,
 5   unfortunately, because I kind of booked my day thinking
 6   we were here at 9:00.
 7            THE COURT:  Understood.
 8                 So then we'll probably need to continue
 9   things, but --
10            MR. MURPHY:  But I -- I would -- we've gone on
11   for 25 minutes on facts.
12                 I'm sorry to interject, but we're talking
13   about -- we're hearing a factual recitation.  Most of
14   this that we've heard a presentation of is not even in
15   the record.
16                 Most of it is about intent of the
17   agreement.  None of it is in a separate statement.
18                 If we're going to be doing -- you know,
19   and I have a particular objection because our clients
20   disagree with the entire story that's being told to the
21   trier of fact if we have a bench trial.
22            THE COURT:  Well, I'll give Mr. Beral another
23   seven minutes, and then I'll let you have into the lunch
24   hour to 12:15, Mr. Murphy.
25            MR. MURPHY:  Thank you, Your Honor.
26            THE COURT:  So try to use your next seven minutes
27   prudently.
28            MR. BERAL:  I will.
```

Copy

26

```
1              All the documents are there, and Your
2    Honor is asking me questions about the evidence, and I'm
3    giving you specific cites to the evidence, so it's in
4    the record.
5              You've got PCI Group.  PCI Group --
6    arguably PCI owns 60 percent equity interest, and the
7    other individuals maintained their rights to vote and
8    management.
9              So fractured interest here.
10             They have various discussions over the
11   course of the following years regarding sales,
12   regarding -- you know, in 2015 there was a negotiation
13   to sell the Cinco Group's interest to the LA Group, and
14   in all of those negotiations, they used the term "Cinco"
15   or "Cinco Group."  Not ever did they use "Potato Corner
16   International."
17             That was just an afterthought for the
18   shell corporation created to give them some sort of a
19   tax advantage.
20             In 2016, Mr. Koren gets wind of the fact
21   that Mr. Magsaysay is trying to sell his interest or
22   Cinco Group is going to sell their interest.
23             There's some internal affair going on
24   between the two of the members in the Cinco Group
25   between Ms. Bermejo and Mr. Magsaysay.
26             It upends everything, and at some point,
27   Mr. Magsaysay even says in a written -- in a writing
28   that Mr. Koren should get priority to purchase Cinco,
```

CINCO CORPORATION vs. GUY KOREN, BC701075
October 8, 2020
Copy

1    the global corporation.

2              They engage in a discussion about that.

3    They engage in a written dialogue with Mr. Magsaysay's

4    investment bankers, and ultimately investment bankers go

5    dark on Mr. Koren.

6              Mr. Koren and Mr. Jacoby then powwow and

7    say, "What's going on?"

8              They then send a letter to these folks

9    (indicating) and say, "Wait a minute.  We have a right

10   of first refusal under our joint venture agreement.  You

11   have to sell us your interest in PCJV at the agreed-to

12   rate."

13             They come back.  They send a letter, and

14   this is exactly when they concocted this fiction that,

15   "So long as we don't sell Potato Corner International,

16   we're okay.  We can sell up here (indicating).  We don't

17   need to give you any rights down here (indicating)."

18             And they send a letter back and say, "No,

19   we're not selling anything."

20             After that Mr. Koren has Mr. Hernandez

21   calling him and saying, "I now own PCJV.  You're going

22   to take direction from me.  You're going to take

23   direction from my group."

24             Mr. Koren is like, "What's going on?"

25             They go back and forth.  They get into a

26   negotiation themselves.  They ultimately negotiate a

27   deal whereby Mr. Hernandez agrees that the LA Group

28   should own a hundred percent of the PCJV and kickback a

CINCO CORPORATION vs. GUY KOREN, BC701075
October 8, 2020

Copy

28

```
1    royalty back to Cinco.  They put that in writing in an
2    e-mail.
3              Mr. Koren was then tasked with the duty of
4    getting the agreement formalized.  While he was doing
5    that, Mr. Koren and Mr. Jacoby have a dispute.
6              Mr. Jacoby, in our opinion, approaches
7    Mr. Hernandez and says, "Wait a minute.  We don't need
8    Mr. Koren.  Let's get rid of Mr. Koren," and then this
9    litigation ensues.
10             So that's the foundation of what we're
11   talking about here, and I think it's important because
12   if we're going to bifurcate this for trial, it should be
13   with the understanding of what the facts are.
14             And Mr. Murphy may argue the facts, but
15   the facts are clear on the face of the documents.  The
16   face of the documents say Potato Corner International
17   plus these four (indicating) are the membership group in
18   PCJV.  And when any of these four transfer their
19   interest, that's a violation of the right of first
20   refusal.
21             As I mentioned, they could have excluded
22   PCJV from the sale.  They did not do that.  The object
23   was to sell PCJV as part of their interest.
24             And Ms. Bermejo, by the way, is completely
25   out.  She's completely out.  She had it with this whole
26   issue of the affair.  She was shunned by her community
27   as a result.  She wanted out of this.
28             So what happens in the Potato Corner
```

CINCO CORPORATION vs. GUY KOREN, BC701075
October 8, 2020

Copy

29

```
1    International level is you've got PCI that has 995
2    shares.  Each one of these four (indicating) had one
3    share each.  I'll call them the group.  And then
4    Mr. Olivas has one share.
5              The lawyer representing Cinco and PCJV
6    gets an ownership stake in Potato Corner International.
7         THE COURT:  I wonder if he told DLA Piper.
8         MR. BERAL:  I've had some discussions with their
9    general counsel about that.
10             Mr. Hernandez approaches the Cinco Group
11   at first believing that he could buy percentages of each
12   one of these four.  He basically bifurcates the
13   discussions.  He buys 10 percent here (indicating),
14   10 percent here (indicating), 10 percent here
15   (indicating).
16             And the original intent of the Cinco Group
17   was not to give Hernandez the majority interest of
18   Cinco.  They only want to sell a portion of their
19   interest, but unbeknownst to them, Ms. Bermejo is out
20   here also having discussions with Mr. Hernandez, and she
21   decides, "Well, I want out of here altogether," because
22   of what happened to her.  She sells her entire
23   25 percent of her stake.
24             So Mr. Hernandez, by buying 25 percent
25   here (indicating), 10 (indicating), 10 (indicating), 10
26   (indicating), ultimately gets 55 percent of interest of
27   Cinco --
28        THE COURT:  Two-minute warning.
```

Copy

30

```
1        MR. BERAL:  -- gets control of the entire
2   enterprises, approaches Mr. Koren and says, "I now get
3   the right to declare four people on this board.  I
4   now -- I'm your boss, effectively."
5             Mr. Koren says to himself, "Wait a minute.
6   I thought we had this right of first refusal.  I thought
7   Mr. Magsaysay's word to me was that it would only be
8   just us."
9             But what ended up happening in fact was
10  that this person was crossed out (indicating), crossed
11  out (indicating), crossed out (indicating) and replaced
12  with three members of the Hernandez group.  And that's
13  the issue that we're dealing with, Your Honor.
14             I mean, I can get into this a little bit
15  further --
16        THE COURT:  Time's up.  Thirty seconds.
17        MR. BERAL:  I do want to get into the duty versus
18  breach issue, the Paramount case.
19             I don't believe it speaks to that.  In the
20  Paramount case, the party didn't bring a motion for
21  summary judgment on the issue of duty.  It had brought a
22  summary judgment motion on the issue of breach.
23             I don't see this as a breach case.
24             If you extract the real issue that we're
25  having with this right of first refusal --
26        THE COURT:  But I have to decide, to grant your
27  motion, that something about this fact pattern gave rise
28  to an enforceable duty.
```

Case 2:24-cv-04546-SB-AGR   Document 314-4   Filed 09/30/25   Page 36 of 76   Page ID #:17334

CINCO CORPORATION vs. GUY KOREN, BC701075
October 8, 2020
Copy

31

1      MR. BERAL:  Correct.
2      THE COURT:  Because they have to work backwards
3  from a fact pattern that I see is breached.  Thank you.
4          Mr. Murphy?
5      MR. MURPHY:  Thank you, Your Honor.
6          And I'm not going to take 35 minutes,
7  so --
8      THE COURT:  I'd like to try to get all three
9  motions --
10     MR. MURPHY:  So my goal is for us to get that
11 done, and because of that, I have to make sure that the
12 record is clear that we object vigorously to the fairy
13 tale without any evidence that was just told to the
14 Court.
15         For example, this -- that last little bit
16 that Hernandez went and did this, and then Hernandez and
17 Bermejo was secretly doing this, that's not in the
18 record.
19         In the stacks of paper you have, Your
20 Honor, that's not there.  So all of this fantasy about
21 this secret plot is not in the record.  It has nothing
22 to do with the summary adjudication.
23         So I could tell you what I think happened,
24 but it would be a waste of this Court's time, and so I
25 hope we're very clear that all of that should be
26 disregarded.
27         We're going to a trial, and it's the job
28 of Mr. Koren and the LA Group LLC to put in the record

CINCO CORPORATION vs. GUY KOREN, BC701075
October 8, 2020
Copy

```
 1   admissible evidence that this fantasy/fiction happened.
 2              But I would like to make a couple points.
 3              First, the big gotcha I heard from this
 4   tall tale was that the idea of PCI was a fiction, right,
 5   and that it was never used.
 6              Now, I will concede that people have been
 7   careless with their words sometimes.  Right?  People
 8   could sometimes use "Cinco."
 9              What hasn't been pointed out are all the
10   times "PCI" is used to describe the controlling,
11   managing entity of that 60-percent interest.
12              And I'm going to guide you to one exhibit
13   that just blows up the entire argument that was just
14   made that PCI was never, never operated as the effective
15   manager.
16              You go to Exhibit 14 of our -- in our
17   exhibits.
18         THE COURT:  One moment.
19              You falsely economized and didn't provide
20   exhibit tabs.
21         MR. MURPHY:  I apology.  We even instructed our
22   service to do this.  It's been a challenge.
23         THE COURT:  Then don't pay them.
24         MR. MURPHY:  What's that?
25         THE COURT:  Then don't pay them.
26              Minutes of meeting?
27         MR. MURPHY:  Yes, Your Honor.
28              So these are minutes --
```

CINCO CORPORATION vs. GUY KOREN, BC701075
October 8, 2020

Copy

```
 1          THE COURT:  I haven't found them.  I just see --
 2          MR. MURPHY:  Oh, sorry.
 3               And, again, I apology, Your Honor.
 4          MR. BERAL:  Do you have a page number in the
 5     compendium?
 6          MS. NARAGHI:  109.
 7          MR. BERAL:  Thank you.
 8          THE COURT:  The hard copy provided to me is not
 9     paginated.  You may be able to read it on a PDF, but --
10          MR. MURPHY:  I am so sorry.
11          THE COURT:  Twelve?
12          MR. MURPHY:  Fourteen, Your Honor.
13          THE COURT:  Fourteen is what I'm looking for?
14               Getting close.
15          MR. MURPHY:  I know.
16          THE COURT:  Okay.  We've got it.  Hang on.
17          MR. MURPHY:  Okay.
18          THE COURT:  I found it.
19          MR. MURPHY:  Thank you, Your Honor.  I appreciate
20     your patience.
21          THE COURT:  You might want to send somebody in to
22     fix this.
23          MR. MURPHY:  We're going to have this redone and
24     brought in as a courtesy --
25          THE COURT:  But I have it.
26          MR. MURPHY:  So this document -- these are
27     minutes of a managers' meeting of PCJV, October 16th,
28     2012.
```

CINCO CORPORATION vs. GUY KOREN, BC701075
October 8, 2020

Copy

34

```
 1              If you go to the second -- to the bottom
 2    of the page, what does it say?
 3              It shows Potato Corner International as
 4    the 6-percent owner acting as the manager of the entity
 5    with the signatures of each of the four individuals who
 6    are representing PCI.
 7              So this completely contradicts the story
 8    just told to the Court that PCI never acted as the
 9    manager, PCI never appointed managers, PCI never
10    operated as the controlling party of the manager --
11    management rights, the -- you know, all three of the
12    holy trinity as my esteemed opposing counsel referenced
13    to this Court.
14              So what really happened, Your Honor, is --
15    and I didn't write the agreements.  I came in and
16    substituted in for DLA Piper.
17              I'm not going to say anything bad about
18    anybody, but I think we can all agree the agreements are
19    not a model of clarity.
20              And what really happened, and I'm going to
21    put in my own gloss because this isn't in the record
22    either, but we'll establish this, is that all the places
23    where it says "Cinco" just weren't replaced with "PCI."
24    Right?
25              So it just was careless drafting.
26              We have undisputed fact after undisputed
27    fact that they did not dispute for the purpose of
28    this -- of this motion, but they haven't disputed
```

CINCO CORPORATION vs. GUY KOREN, BC701075
October 8, 2020

Copy

35

```
 1    otherwise, which is that PCI was acting as the party
 2    with the right to name four managers, as evidenced by
 3    our Exhibit 14 as an example.
 4              Our last four statements of undisputed
 5    fact -- additional undisputed fact identified that PCI
 6    holds the right to the managers, undisputed for purposes
 7    of this motion according to my opponents.
 8              Mr. Hernandez was appointed as a manager
 9    by PCI as the party with the right to name four
10    managers, undisputed for the purpose of this motion.
11              So if you read our additional undisputed
12    facts that are undisputed for this motion, it defeats
13    the entire argument that was just made.
14              So --
15         THE COURT:  But you don't have a cross-motion for
16    me to grant, and I have the same problem --
17         MR. MURPHY:  That's right.
18         THE COURT:  -- about breach being part of the
19    package.
20         MR. MURPHY:  So with that preface that I object
21    to the entire fairy tale that was told, I just want to
22    make a couple points.
23              First, at the foundational level what is
24    being asked of this Court is to rule as a matter of law
25    that Section 2D, irrespective of the intent of the
26    parties, constituted a restraint on alienation of equity
27    of any entity up the corporate chain.
28              That's what is being asked of this Court.
```

CINCO CORPORATION vs. GUY KOREN, BC701075
October 8, 2020

Copy

36

1    There's no law to establish that.

2              As this Court points out, if you look at

3    2D itself, 2D refers to membership interest.  The

4    reasonable interpretation, notwithstanding prior

5    rulings -- the prior preliminary injunction ruling, the

6    reasonable interpretation is that means equity.

7              So what is being asked of this Court

8    essentially is to rule, as a matter of law, that there's

9    a duty within the duty of good faith and fair dealing

10   that is beyond what the face of the Section 2D says,

11   which is you can't sell membership interest.

12             And -- and Mr. Koren and the LA Group LLC

13   want that determination made, as a matter of law, that

14   there's a duty within the duty of good faith that is

15   broader than what is contained on the face of

16   Section 2D.

17             They want you to make that determination

18   without reference to any intent of the parties entering

19   that that agreement.

20             There's no law that establishes that.

21             And I will note that in the factual

22   recitation that was delivered to this Court and is set

23   forth on the whiteboard (indicating), I lost count of

24   the number of times that opposing counsel used the word

25   "intent."  Right?

26             We need to have a trial on the intent.  We

27   will -- we can fight it out with opening statements and

28   presentation of parties and documents, but -- but what

Copy

37

```
1    is in front of this Court is Section 2D and whether or
2    not there's a duty in the contract to do something that
3    is actually asking this Court to determine the breach.
4              And I want to get to that point because
5    that is actually, at the end of the day, the reason why
6    this motion should be denied, and all you have to do is
7    look at the Oregon RSA case that they rely upon so much.
8              What does the Oregon RSA case say?
9              That the duty of good faith and fair
10   dealing is the duty, and it was breached by this
11   transaction which is an artifice.
12             None of the cases cited by -- by Koren and
13   the LA Group LLC identify the -- this Oregon type duty
14   as being anything other than the duty of good faith and
15   fair dealing.
16             And so I do believe the Paramount case is
17   the applicable case.  Their reference to Linden[n is not
18   helpful to them.
19             And, again, as I said last week, the cases
20   that are -- that -- you know, there's -- I think there
21   was the Anderson case or maybe it's the Paramount case
22   where there's the implied duty in the contract, and then
23   the question is:  Was an act a breach?
24             That's all we're asking of this Court.  We
25   agree with that ruling.
26             What is at issue in this motion is not
27   permitted under summary adjudication under 437c, and so
28   I think we can end the discussion there.
```

Copy

38

```
1              I would like to make just a couple more
2    points because there have been a lot of statements made.
3              This question that was presented in this
4    court, "Well, why didn't" -- I think opposing counsel
5    said they could have carved out PCJV.
6              Well, that is a -- a very -- that's a
7    glossy question that doesn't pay attention to what the
8    transaction was.
9              Cinco wasn't selling anything.  It was
10   shareholders of Cinco selling anything.
11             So how could, for example --
12        THE COURT:  They'd have to restructure Cinco,
13   simply put, for tax consequences.
14        MR. MURPHY:  Sergio Magsaysay, Mr. Magsaysay, he
15   was selling some of his shares in Cinco.
16             It's basic corporate law.  When you have
17   stock in a corporation, you have no interest in the
18   property of that corporation, let alone its subsidiary,
19   let alone its subsidiary's subsidiary.  That's just
20   basic corporate law.
21             So this question:  Why didn't Joe Mag,
22   Mr. Magsaysay, why didn't he carve out PCJV from the
23   transaction?
24             Because there was nothing to sell.  He
25   didn't have any stake in PCJV.
26             And there are, again, more additional
27   statements of fact that we've presented that neither
28   Mr. Joe Mag, Mr. Montelibano, Mr. Montinola,
```

CINCO CORPORATION vs GUY KOREN, BC701075
October 8, 2020

Copy

1   Ms. Bermejo, none of them ever claimed an equity

2   interest in PCJV, ever, and we've got statements of fact

3   undisputed for the purpose of this motion.

4           They might dispute that later, but nothing

5   in the record, Your Honor --

6       THE COURT:  Do we know why DLA Piper or somebody

7   thought it was brilliant to put 995 of a thousand shares

8   in Cinco but to then issue 5 separate shares?

9           Is it just so that Mr. Olivas had an

10  excuse to take a share?

11      MR. MURPHY:  I'm glad you asked that, Your Honor.

12          First of all, let's be clear about what

13  wholly-owned subsidiary means.

14          And I pointed this out to opposing counsel

15  in an earlier iteration of discovery requests when the

16  big "ah-ha" was, it's not a wholly-owned subsidiary.

17          Actually, under the SEC regulations,

18  Securities and Exchange regulations, a parent company's

19  ownership of 50.1 percent or more constitutes a

20  wholly-owned subsidiary.

21          So there's no -- there's no like secret

22  nondisclosure here, "ah-ha."  No.

23          In fact, in documents -- I think we have a

24  PowerPoint presentation that Ben Olivas made prior to

25  the creation of PCJV -- he actually discloses to

26  everybody.  Right?

27          This was disclosed that Cinco would own

28  995 shares and that the four representatives of Cinco

CINCO CORPORATION vs. GUY KOREN, BC701075
October 8, 2020
Copy

40

```
1    would each own 1 share of PCI to Mr. Olivas --
2          THE COURT:  Is that for immigration or tax or
3    image, or was there a business or legal logic of why?
4          MR. MURPHY:  Your Honor, again, I'm not -- I'm
5    going to do something I objected to last week, which
6    is -- you know, last week there was testimony that
7    transactions like this never happened.  That's expert
8    testimony.
9            When Your Honor asked why isn't there more
10   case law on this, and the statement was made
11   transactions like this never happen, that's expert
12   testimony.  That should be disregarded.
13           I'm going to disregard my own objection
14   and say to you that that's actually very common in
15   transactions like this where directors and officers and
16   shareholders of a parent corporation would get some sort
17   of a sweetener 1 percent here.
18           This is .1 percent.  It's not an unusual
19   thing.
20           The Ben Olivas share?  Look, I'm a lawyer.
21   I know the rules.  Right?  It's not something I would
22   do, and so we can talk to Ben about why he did that.  I
23   don't know.
24           But it certainly doesn't establish or have
25   any bearing whatsoever as to whether or not Cinco, its
26   shareholders, could sell their shares.
27         THE COURT:  Thank you.
28           Can you try to limit the rest of your
```

CINCO CORPORATION vs. GUY KOREN, BC701075
October 8, 2020

Copy

1   argument to three minutes specific to the summary
2   adjudication?
3        MR. MURPHY:  Yes.
4             Actually, the SEC point was really my last
5   point.
6        THE COURT:  Thank you.
7             I'll give you two minutes, Mr. Beral.  And
8   I know you wanted to say something.
9        MR. BERAL:  I've got a say I'll keep it short to
10  two minutes.
11            I want to get to the most important factor
12  which is the Oregon RSA case in my view and the
13  distinction the Court drew there.
14            If California law is going to be that if
15  you own more -- in the case of Cinco, if you own more
16  stuff up here (indicating), then you can sell your
17  interest without regard to your partner down here
18  (indicating), then the message is going to be that the
19  LA Group entity, all they have to do is start owning
20  more stuff other than PCJV.
21            They can get into real estate and other
22  things, and if they owned more stuff, they can transact
23  in the same way to avoid the right of first refusal on
24  their end.
25       THE COURT:  They would sell the interest in
26  LA Group, not the 40 percent in the JV.
27       MR. BERAL:  Right.
28            If they sell their shares --

CINCO CORPORATION vs. GUY KOREN, BC701075
October 8, 2020

Copy

1          THE COURT:  No.  Whatever is a transferable

2    interest in LA Group, not a transferable interest in the

3    40 percent of PCJV, space, USA, space LLC.

4          MR. BERAL:  Correct.

5               It would be an artifice to defraud, and

6    that's the exact point of the Oregon RSA case.

7               The point is --

8          THE COURT:  Thanks.

9               For purposes of today, you're not going to

10   win, and you're better off going soft on Oregon RSA and

11   come back in two weeks or two months when I may have

12   more patience to listen to why it still controls here.

13               I don't think it controls factually.

14               I think you are making a tactical mistake

15   trying to leverage your clients' success or failure on a

16   single district court case that is not controlling when

17   frankly I have questions in my own mind's eye as to

18   whether or not this should be a matter considered as

19   Delaware law.

20               I put it in the footnote that the briefing

21   about choice of law that I've gotten up to now is

22   mediocre on both sides, but when we come back for real

23   trial, if there's going to be a difference between

24   Delaware versus California -- there's no reason to think

25   that Oregon law would apply to these transactions.

26   Maybe California, maybe Delaware.

27               So did you have any comment on the

28   question of why these five stray shares were parsed out

Copy

```
 1   to PCI and Mr. Law?
 2         MR. BERAL:  My understanding is that they wanted
 3   to imitate the relationship that they had in PCJV with
 4   the corporation and the individuals owning interest.
 5   That's how they did it.
 6              Ben Olivas came into the fray because they
 7   needed a United States citizen to be able to open a bank
 8   account for them, and they cannot open a bank account
 9   unless there's a shareholder -- okay.  It's not in the
10   record.
11         MR. MURPHY:  Thank you.
12              But this is the trier of fact.  I object.
13         THE COURT:  Okay.  I've heard enough.
14              I'm ruling on the motion for summary
15   adjudication.  It's denied because it asked me to
16   determine both duty and breach, and it's denied for the
17   reasons recited in the October 8th tentative.
18              I'm not adopting any of the portion of the
19   tentative that starts with the words, "On the ultimate
20   merits of the parties' competing arguments."
21         MR. MURPHY:  Is that because of oral argument
22   today, Your Honor?
23         THE COURT:  No.  It's because I want to have as
24   much running room as possible when I adjudicate the case
25   at the time of a court trial.
26         MR. MURPHY:  Okay.  So I just want to make sure
27   you haven't changed your mind --
28         THE COURT:  I am totally unpersuaded by
```

CINCO CORPORATION vs. GUY KOREN, BC701075
October 8, 2020
Copy

44

```
 1    Oregon RSA, and the more Mr. Beral argues it, the less
 2    I'm persuaded.
 3                 So if that gives you comfort, you have
 4    that.
 5                 It's a larger question though.  It is
 6    murky as to whether the parties are only Cinco and
 7    LA Group, and therefore it's the alienation of those
 8    interests which is the trigger, or is it down to the
 9    four human beings on the Cinco Group side.
10                 And the shared interest in PCI, arguably
11    there's something about their individual status.
12                 The paperwork -- it's malpractice as best
13    as I can tell, but I don't have a malpractice case in
14    front of me, so I guess that's for another day.
15                 Let's talk about the motion involving
16    Mr. McDonough and his office.
17                 Do we have anybody from -- I guess that's
18    Ms. Hedley, I think.
19        MS. HEDLEY:  Yes.  Good morning.  This is
20    Deborah.
21        THE COURT:  So this would be your request to
22    bifurcate.
23                 We almost had it resolved a week ago but
24    no finality to it.
25                 Do you want to be heard further on my
26    current determination to deny without prejudice?
27        MS. HEDLEY:  No, Your Honor.  We'll submit on the
28    tentative.
```

CINCO CORPORATION vs. GUY KOREN, BC701075
October 8, 2020

Copy

45

```
1          THE COURT:  Anybody else feel a need to argue
2    about the motion to bifurcate?
3               Hearing nothing further, the tentative of
4    October 1 for the motion to bifurcate is adopted.
5               Mr. Murphy, you're giving notice of all
6    the stuff we're doing today.
7          MR. MURPHY:  Thank you, Your Honor.  We will do
8    so.
9          THE COURT:  Okay.  Motion for separate trial,
10   that's your motion, Mr. Murphy.
11         MR. MURPHY:  Yes, Your Honor.
12         THE COURT:  You want to be -- and presumably you
13   like my ruling?
14         MR. MURPHY:  I did like your ruling.
15              We would submit and reserve the right to
16   respond to any argument that is made in opposition.
17         THE COURT:  Okay.  Mr. Beral, I know you wanted
18   to win your summary adjudication, but if you can't win
19   your summary adjudication, it's not obvious to me why
20   you wouldn't want this separate trial to try to, as
21   quickly and cheaply as possible in a case that's
22   probably already cost the parties millions if I heard
23   you right earlier, get to that point when you
24   demonstrate that your client is winning and you have all
25   the leverage you need.
26         MR. BERAL:  I absolutely do want a trial, and
27   that was clear in the opposition to the motion.
28              I disagree with the approach, and I
```

46

```
 1   disagree that California law would allow that approach.
 2        THE COURT:  Bear with me.
 3             My theory is I bifurcate the question of
 4   contract interpretation of Section 2D, the first
 5   amendment to the joint venture agreement, and/or any
 6   arguable reliance in the alternative on Section 2D of
 7   the original joint venture agreement and/or language in
 8   the operating agreement for the joint venture.
 9             Though I think the first amendment is the
10   controlling document, I agree with Judge Hogue in that
11   regard, but it's a question of contract interpretation,
12   and I have the discretionary right to bifurcate that and
13   to try that.
14             And if in the process of trying that
15   question, it turns out we need a jury to answer special
16   interrogatories in a special verdict form, there will be
17   a role of the jury, but I can't tell that now.
18             But I think I have discretion to do it, so
19   why is it contrary to California law to do that?
20        MR. BERAL:  I have no objection to what Your
21   Honor just said about the scope of the bifurcated trial.
22   What I have an objection to is extracting declaratory
23   relief claims that deal with past conduct which would be
24   an end-run around establishing elements of a substantive
25   claim, such as breach of contract, breach of the implied
26   covenant of good faith and fair dealing, and so on.
27             And with the end-run around potentially
28   statute of limitations issues and things like that,
```

CINCO CORPORATION vs. GUY KOREN, BC701075
October 8, 2020

Copy

47

```
1    that's --
2              THE COURT:  So bear with me.
3                    I didn't intend to include an important
4    question, but one that I think severable, and that is
5    whether or not the purported vote to remove Mr. Koren
6    was or was not a proper vote.
7                    As I recollect, five of seven tried to
8    remove him, not six of seven, and that wasn't 75 percent
9    of the humans.  It was 71 percent of the humans.
10                   So they pointed to the equity ownership
11   and said, "Hey, we have enough equity, so we should win
12   anyway."
13             MR. BERAL:  Correct.
14             THE COURT:  But I don't propose to put that in
15   the first trial.
16             MR. MURPHY:  And, Your Honor, that wasn't part of
17   our motion.
18             THE COURT:  The statute of limitations
19   affirmative defense -- well, maybe that ought to be put
20   into the first trial if that's such a lay-down winner.
21                   I confess that I haven't thought about the
22   statute of limitations affirmative defense in this case
23   much, if at all.
24                   Why would I want to throw in the statute
25   of limitations as part of the bifurcated trial?
26             MR. BERAL:  The statute of limitations gets to
27   their fourth cause of action which is the declaratory
28   relief that wants the Court to determine that the
```

CINCO CORPORATION vs. GUY KOREN, BC701075
October 8, 2020

Copy

48

```
 1   transfer or assignment from the individuals in LA Group
 2   to a partnership was a breach of the right of first
 3   refusal.
 4              That occurred in 2013.  There was adequate
 5   notice.  Besides the statute of limitations issue,
 6   there's a waiver.  There's all sorts of other defense --
 7       THE COURT:  That probably comes to me as an
 8   evidentiary question because basically they use it as a
 9   hypocrisy defense in terms of contract interpretation,
10   but you can rise above it.
11              I think you're within your rights.
12   Politicians can be hypocrites, and lawyers in the
13   courtroom can be hypocrites.
14       MR. BERAL:  I hope not to be a hypocrite because
15   transfer didn't involve outsiders.  I think the goal was
16   you don't bring in uninvited outsiders.
17       THE COURT:  I think you get to that as an in
18   limine problem way back when LA Group did some
19   rearranging of the furniture or should be considered to
20   be irrelevant.
21       MR. BERAL:  Yes.  And that's the first point.
22              The second point I would add, Your Honor,
23   is that -- just lost my train of thought.
24       THE COURT:  Take your time.
25       MR. BERAL:  Oh, that's right.
26              So the -- Your Honor's purpose in
27   interpreting the contract gets us into an issue that's
28   in the contract world.  Those are also issues in the
```

Copy

49

```
 1    tort world.
 2                So if I can explain, Your Honor, real
 3    brief, I'll take two minutes.
 4                The way I view this is -- forget the MSA.
 5    Put that aside.  The way I view this is, is there a
 6    legal duty from one side to the other?
 7                And that duty can manifest itself either
 8    by contract or by law.
 9                I don't want to be in the world of solely
10    arguing to you, Your Honor, that they have a contractual
11    duty.  I want to be able to argue to you they also have
12    a legal duty.
13        THE COURT:  The covenant of good faith and fair
14    dealing springs form the contract terms and is
15    considered to be a mode of ensuring the proper
16    interpretation application, but it necessarily springs
17    from the contract.
18                If you have a totally one-sided contract
19    that allows you to screw the other business partner, the
20    covenant of good faith and fair dealing won't change
21    that.
22        MR. BERAL:  I agree --
23        THE COURT:  But is there something about
24    franchise law of Delaware, the U.S., or California that
25    gives your clients some right of first refusal that
26    springs from statutory law?
27        MR. BERAL:  No.
28                But --
```

Copy

50

```
 1            THE COURT:  So what source of law are you
 2    pointing to if it's not the covenant of good faith and
 3    fair dealing?  Is it theories of negligence?
 4            MR. BERAL:  It's not negligence.
 5                   So it would be fiduciary duties.  There
 6    would be duties of not to conceal information, to be
 7    honest and forthright with your partners.
 8                   That gets us into the fraud,
 9    misrepresentation, concealment world.
10                   So --
11            THE COURT:  Bear with me.
12            MR. BERAL:  Yes.
13            THE COURT:  I do understand that fiduciary duty
14    can create rights that don't depend on contract.
15                   They do depend on status and
16    relationships, but they don't depend on contract per se.
17                   And negligent misrepresentation,
18    intentional misrepresentation, again, is independent of
19    the contract.
20                   If I were to interpret the contract as
21    giving Mr. Koren no right of first refusal but he had
22    been the victim of a breach of fiduciary duty or
23    fraudulent conduct, wouldn't those torts survive and
24    still be available to be tried?
25            MR. BERAL:  Absolutely true.
26                   My point is --
27            THE COURT:  So what's the harm of a separate
28    trial on a contract claim if his rights to maximize the
```

Copy

```
 1   value of the tort claims have to wait in abeyance?
 2         MR. BERAL:  My purpose would be to join
 3   everything all at the same time.
 4         THE COURT:  Well, the first threshold question
 5   which is really important to get to, and I do bring 20
 6   years experience as a judge now, including 19 years
 7   experience in civil matters, is contract interpretation
 8   uniquely benefits from being looked at in isolation for
 9   the very reason that I have to give both sides the right
10   to put forward everything you hope to offer as extrinsic
11   evidence, be patient and not say, "That's ridiculous.
12   You can't possibly use that."
13              And instead demonstrate to the appellate
14   court that I picked up, touched, felt, fondled, maybe
15   even heard a witness before I rule on admissibility
16   because admissibility rulings to the effect of, "No, you
17   can't possibly derogate what I think the contract means
18   with this evidence," is the surest way to get reversed.
19              But if you demonstrate to the appellate
20   court that you've really touched and tasted and felt the
21   proffered evidence and then say it's not amenable to
22   lead to the contract result, then you should be affirmed
23   because you've satisfied the process.
24              And that is separate from trying torts of
25   negligence -- excuse me -- of misrepresentation of
26   fiduciary duty.
27              So I definitely for the purpose of getting
28   into what most matters to get started is to just look at
```

CINCO CORPORATION vs. GUY KOREN, BC701075
October 8, 2020

Copy

52

```
1    the contract question, just look at the extrinsic
2    evidence, figure out what's going to be admissible.
3              That is a judge function.  I don't need a
4    jury to do that.  And then only if it turns out there's
5    a bona fide dispute of extrinsic evidence that can lead
6    to inconsistent factual conclusions, then we know we
7    need a jury trial.
8              And due to the pandemic, you can't have it
9    for a year, practically speaking, maybe nine months.
10             But if we can get there without it, and I
11   don't mean to skew the admissibility ruling just to
12   avoid a jury trial, but at least we can try to make some
13   progress.
14             And I thought your client wanted to try to
15   bring this case to a resolution anticipating victory.
16        MR. BERAL:  He does, absolutely.
17        THE COURT:  I'm trying to help you get the case
18   to resolution, not because I'm trying to make you the
19   victor any more than Mr. Murphy, but I would love to get
20   this case to resolution.
21        MR. BERAL:  We'd love a trial.
22             Now with your explanation, Your Honor, I
23   understand where you're going with it.  That's fine.
24             I would raise just a derivative point,
25   which is whether we're trying the issue of Cinco and
26   Potato Corner International's alter ego as that may have
27   an effect on Your Honor's interpretation of the
28   contract.
```

Case 2:24-cv-04546-SB-AGR   Document 314-4   Filed 09/30/25   Page 58 of 76   Page
ID #:17356
CINCO CORPORATION v. GUY KOREN, BC701075
October 8, 2020

Copy

53

1         THE COURT:  Bear with me.

2              I don't see how alleged alter ego would

3    inform the question of admissible extrinsic evidence.

4              If you think there's something in that

5    category that you want to offer on the first instance as

6    an advocate, you probably should put it there.

7              Mr. Murphy, I understand, may object on

8    relevance.  I may object on relevance.

9              I'm not stopping you from giving a try if

10   you can offer some intellectual argument why it's

11   germane as extrinsic evidence.

12             I would not otherwise see it as suitable

13   to try alter ego as a standalone question while I'm

14   trying to figure out how to interpret an ambiguous

15   contract with the benefit of whatever extrinsic evidence

16   may or may not exist.

17             I had the joy of one case recently that

18   involved tens of millions of dollars of a contract that

19   was formed back in the mid-'70s, and there was no living

20   witness left who knew anything germane.

21             The one witness who was called just

22   remembered, "We went to Hawaii because Castle & Cooke

23   was one of the parties to the transaction.  They had a

24   conference overlooking the Pacific, but I can't remember

25   a word about the negotiation."

26             So with no extrinsic evidence offered, I

27   was able to just interpret the written agreement within

28   its four corners, which from a judge's point of view is

Copy

54

1    a joy.

2              Normally, lawyers are throwing all these

3    collateral stuff at you because they think it helps, but

4    you end up being bogged down having to go through the

5    collateral stuff.

6              But in that case, even though it was tens

7    of millions of dollars, there was nothing collateral.

8    It was just a textual analysis within the four corners

9    of the document, and I got affirmed.

10             But, anyway, that's what I propose to do.

11             How many weeks do you think you need to

12   figure out what your offer of extrinsic evidence is

13   going to be?  Two weeks?  Four weeks?

14        MR. BERAL:  I just want to be clear.

15             I'm not foreclosed from bringing that

16   issue at trial?  I'm not foreclosed from doing discovery

17   on it --

18        THE COURT:  If you think you have alter ego, the

19   matters for interpreting Section 2D included, it doesn't

20   start out as really obvious why it's relevant, but I

21   definitely want you to at least put it on your list.

22             And, yes, discovery in the meantime,

23   insofar as discovery is needed, I would -- well, I would

24   like you to let us get to trial doing only discovery

25   germane to extrinsic evidence, if you feel you need

26   discovery not yet taken before we can try the question

27   of extrinsic evidence, Mr. Beral.

28        MR. BERAL:  Absolutely.

Copy

```
1          THE COURT:  Who do you have to depose, or what
2    documents do you have to demand?
3          MR. BERAL:  We've demanded documents several
4    times.
5               At this point in time, we've not received
6    a single document from Cinco -- internal document I
7    should say from Cinco that gets to any of the issues.
8               They have all the documents from our side.
9    They swept through the office.  They have everything.
10   They just reproduced everything back to us, but we don't
11   have any documents from them.
12              I need to be able to depose these
13   individuals (indicating) who are part of this
14   transaction.  I need to be able to depose Mr. Olivas.
15              Part of the issue is going to be --
16         THE COURT:  Are we blessed now with the ability
17   to take deposition of a Filipino electronically and skip
18   the travel?
19         MR. BERAL:  That was my next point.
20              I had contemplated an in-person deposition
21   of all these individuals.  I don't know whether I can
22   travel to the Philippines at this point.
23              I'm not sure if Cinco would produce them
24   here in Los Angeles.  I don't know that yet, but there's
25   a lot of work that needs to be done to get this case
26   ready for trial.
27              There are discovery issues between us and
28   Mr. Murphy's office.  There's discovery issues between
```

CINCO CORPORATION vs. GUY KOREN, BC701075
October 8, 2020

Copy

56

 1    the LA Group and Mr. Murphy's office.
 2             I mean, I would contemplate -- we're
 3    looking at months before those discovery issues are
 4    even --
 5         THE COURT:  Even if you try to narrow it to the
 6    question of what's the germane extrinsic evidence?
 7         MR. BERAL:  Yes, unfortunately.
 8             Unfortunately, we're entitled to
 9    documents -- their internal documents, their internal
10    ruminations --
11         THE COURT:  I don't know all the back-story of
12    the case.
13             I'm not trying to act skeptical about your
14    suggestion that discovery is needed.  I'm just trying to
15    figure out the plan forward.  Bear with me.
16             Mr. Murphy?
17         MR. MURPHY:  Yes.
18             First of all, just, again, so the record
19    is clear, this Court issued an order several months ago
20    that Guy Koren has 20 days to produce documents pursuant
21    to rulings of Judge Rosenberg pursuant to document
22    requests that he was ordered to supplement and respond
23    to, document requests that we propounded two years ago.
24             Guy Koren has not produced one page in
25    response, and I've been polite about it, but I keep
26    being accused of not having produced documents which is
27    absolutely false.  Right?
28             We are to meet and confer on recent

CINCO CORPORATION vs GUY KOREN, BC701075
October 8, 2020
Copy

57

```
 1    documents that Guy Koren produced.
 2              But let's be clear.  If I wanted to come
 3    in here on a failure to comply with a court order, I
 4    could, and I won't.  But I want to make sure, again, the
 5    presentation that was just made to Your Honor, I
 6    disagree with.
 7              However, here's what I do agree with.  I
 8    do agree it will take a couple months to get to a point
 9    where we could have a trial on 2D.  I actually agree
10    with counsel on that.
11        THE COURT:  Even if the near term discovery is
12    just properly identifying, authenticating extrinsic
13    evidence and testing it to your adversary's extrinsic
14    evidence.
15        MR. MURPHY:  I think we can -- and Mr. Beral and
16    I have -- despite the presentation in the court, we get
17    along very well, and we've already had discussions about
18    how we approach this.
19              And I think Mr. Beral and I, along with
20    other counsel, can talk about how we can create a narrow
21    discovery plan that focuses on these issues.
22        THE COURT:  You should go on a long run socially
23    distanced.
24        MR. MURPHY:  I love that idea.
25        THE COURT:  And try to talk it through, and you
26    can talk about something other than this case.
27        MR. MURPHY:  I love that idea.  Maybe we'll do
28    that.
```

CINCO CORPORATION vs. GUY KOREN, BC701075
October 8, 2020
Copy

58

```
 1              So my request is that we set a hearing to
 2     check in maybe next week.  After we could have kind of a
 3     discussion about -- a good faith discussion which I
 4     commit to -- and, again, Mr. Beral and I have a general
 5     agreement that it will take a couple months because I do
 6     think there are some depositions that need to be taken.
 7          THE COURT:  Our notes show we have a status
 8     conference scheduled for November 9th at 3:00 p.m.
 9              Does that comport with anyone else's
10     understanding?
11          MR. MURPHY:  Yes.
12              Isn't that the Akpovi -- the Martini?
13     That's our Martini lunch, Your Honor.
14          THE COURT:  Catch up on how that's going.
15          MR. MURPHY:  That's correct.
16          THE COURT:  We can make that more.  I'm happy to
17     see you soon or --
18          MR. MURPHY:  I would request we do it sooner.
19              I probably won't come in in person.  I
20     think this is something we can probably do by
21     LACourtConnect just to give Mr. Beral and I just a week
22     or so.
23          THE COURT:  What about Wednesday, the 21st, or
24     Monday, the 19th?
25          MR. MURPHY:  Your Honor, if I might just look at
26     my calendar?
27          THE COURT:  Of course.
28          MR. BERAL:  I could do the 21st, Your Honor, but
```

CINCO CORPORATION VS. GUY KOREN, BC701075
October 8, 2020

Copy

```
 1   not the 19th.
 2           MR. MURPHY:  What date did you say you could do?
 3           MR. BERAL:  The 21st would be fine.
 4           MR. MURPHY:  I -- hold on.
 5           THE COURT:  I can do the morning or afternoon on
 6   the 21st.
 7           MR. BERAL:  I would prefer afternoon if we could.
 8           MR. MURPHY:  I can rearrange my calendar for that
 9   afternoon, Your Honor.
10           THE COURT:  Okay.  I'll put you down for
11   2:00 p.m. on Wednesday the 21st for a further status
12   conference, and I'll call it a trial setting conference.
13   But I do understand, because discovery is needed, that
14   we can't expect to get the trial set too soon.
15               I would ask for a joint report on Monday,
16   the 19th, served by the end of the day, and you can file
17   it on the 20th.
18               But that will give you all of next week to
19   negotiate --
20           MR. MURPHY:  I agree.
21           THE COURT:   -- before you have to give me your
22   report.
23           MR. MURPHY:  May I ask -- Mr. Beral and I were
24   discussing before Your Honor took the bench just kind of
25   generally what your understanding is as to the resources
26   available and when.
27               There's a question about -- so you can --
28           THE COURT:  I can conduct a court trial starting
```

Copy

60

1    November 16th, and I would be prepared, if you didn't
2    have your discovery problems, to try to get this case
3    calendared in November to see what the competing
4    extrinsic evidence is and start making admissibility
5    rulings, possibly even hearing from live witnesses, if
6    need be, if I need that before I can make a proper
7    admissibility ruling.
8            MR. MURPHY:  Okay.
9            THE COURT:  That threshold is to determine if
10   there's a jury question.
11               The sooner you get the answer to that
12   question, the sooner you'll know realistically when you
13   can move this case forward in terms of the key question.
14               Mr. Beral is quite correct.  This is the
15   key question in the case.
16           MR. MURPHY:  Your Honor, are you anticipating
17   that we file a joint submission of exhibits as to
18   authenticity of which we do not dispute, and then Your
19   Honor --
20           THE COURT:  Joint is perfect, but I could take as
21   separate either because you haven't yet had your
22   adversary concede authenticity or admissibility.
23               But at least you can proffer, and then a
24   week later I want to know what your adversary says,
25   which boxes can be checked for authentic, not
26   admissibility, and which can be authentic and
27   admissible.
28           MR. MURPHY:  These are just documents -- as you

CINCO CORPORATION vs. GUY KOREN, BC701079

October 8, 2020

Copy

1    might expect, that declaration --

2          THE COURT:  Extrinsic evidence can be oral.

3               Oftentimes in negotiating, it may be

4    manifest in writing, but theoretically, you could have

5    competent, credible extrinsic evidence that is to the

6    effect of, "Guy Koren says on such and such a day,

7    Mr. Magsaysay said this to me when we were having a Mai

8    Tai at Trader Vic's in Beverly Hills at 6:00 in the

9    evening, and I remember exactly what was said," and that

10   could be competent extrinsic evidence.

11              So I certainly can't exclude that and say

12   you must present it to me in writing.  The main point is

13   I want something that really though is extrinsic

14   evidence about the bargaining history that precedes the

15   formation of the contract.

16              I will tell you that if you start offering

17   me things that postdate the contract, it's most unlikely

18   to be seen by me as having any possible relevance

19   because post formation course of dealing is not what

20   informs the intent when the contract is made.

21              Of course, the course of dealing that

22   precedes the formation of the first amendment to could

23   help inform the meaning of the first amendment, but

24   there's in my mind a great time break with the date of

25   contract that should be interpreted that says things

26   that precede it can be relevant, things that follow it

27   most likely not.

28         MR. MURPHY:  Thank you, Your Honor.

Copy

1          So I'm just trying to get an idea.

2          THE COURT:  Don't put it up with things that

3     prove breach of fiduciary duty or fraudulent

4     misrepresentation only.

5               Keep it to things that are bona fide

6     advocate's offer of plausible extrinsic evidence that is

7     actually informative of what the contract means

8     specifically as to Section 2D, as in "dog."

9          MR. MURPHY:  So we do our own submissions of

10    extrinsic evidence, and then Your Honor would review it

11    and consider it, and then we would have --

12         THE COURT:  And I'd ask each of you to say, "Do

13    you concede the admissibility of any of this?"

14              I'd be pleasantly surprised if you

15    conceded even 10 percent of it.

16              Anyways, tell me what you were going to

17    tell me, and then start marching through it.

18              And, you know, is there some reason for

19    live testimony?

20              I hope not, but I wouldn't automatically

21    say it's prohibited.

22         MR. MURPHY:  Okay.

23         THE COURT:  And then start determining which I

24    would view to be as admissible and which aren't.

25              That's different than who wins on the

26    contract.  This is just an admissibility question.

27         MR. MURPHY:  Got it.

28         THE COURT:  That may be dramatic foreshadowing on

Copy

63

```
 1    the ruling on contract interpretation, but admissibility
 2    is a separate and necessarily preliminary question
 3    before we finally see what is admissible and then where
 4    that takes the Court as the interpreter of the written
 5    document.
 6         MR. MURPHY:  So then we would have that -- we'd
 7    submit our proposed evidence, our proffer.  We then
 8    determine what is in dispute --
 9         THE COURT:  Argue with each other about the
10    little bit of it that you concede is admissible even
11    though you're still going to win.
12         MR. MURPHY:  And then we have a bench trial
13    potentially after that, or Your Honor might determine
14    there are specific questions that I need the jury to
15    answer.
16         THE COURT:  We would start actually with the
17    portion of a bench trial that is the bench trial to
18    determine admissibility.
19         MR. MURPHY:  Got it.
20         THE COURT:  On the calendar it's a trial, but it
21    is the preliminary phase of the trial to determine
22    admissibility with no jury in the hall, thank God for
23    lots of reasons, because it's just determining
24    admissibility.
25              But once admissibility is determined, then
26    Chapter 2 is, "Okay.  This is now our universe of
27    admissible extrinsic evidence.  Advocates, make your
28    arguments."
```

CINCO CORPORATION VS. GUY KOREN, BC701075
October 8, 2020

Copy

64

```
 1            MR. MURPHY:  Great.
 2            THE COURT:  I doubt there's a need at that point
 3     for witnesses in connection with that trial.
 4                 But that's the time when your arguments
 5     about what conclusions are reasonably drawn from this
 6     universe of extrinsic evidence against this ambiguous
 7     contract term, let's you as advocates from the podium,
 8     not the witness stand, try to persuade me to rule for
 9     your clients.
10            MR. MURPHY:  I just want to say --
11            THE COURT:  But if there is, this will be
12     determined after admissibility has been determined but
13     before we join the main event of how to interpret the
14     admissible evidence applied against the ambiguous
15     contract if there is a dispute internal to the universe
16     of extrinsic evidence that is factual in nature between
17     one side's evidence and the other's such that a jury
18     needs to determine which of these is considered credible
19     and which is not credible, then we finally identify the
20     purpose for which we would have to have a jury.
21            MR. MURPHY:  Your Honor, this is so helpful.
22                 And I just want to say that the Court has
23     my word, and I give my opposing counsel my word, that I
24     think we can actually narrowly tailor disclosure and --
25            THE COURT:  You can get a ruling --
26            MR. MURPHY:  Thank you, Your Honor.
27            THE COURT:  That's the best I can give you.
28            MR. MURPHY:  We have our hearing on October 21st.
```

CINCO CORPORATION VS. GUY KOREN, BC701075
October 8, 2020

Copy

65

```
 1   We will give notice.
 2        THE COURT:  Anything else that you want to
 3   present before the Court, Mr. Beral?
 4        MR. BERAL:  I have to correct the record because
 5   we have a court reporter here on the discovery issue.
 6             We've complied with discovery.  It's the
 7   LA Group that's producing the documents on behalf of
 8   Mr. Koren.  They're producing documents for everybody on
 9   our side.
10             We've produced 160,000 pages of documents.
11   We've not flouted or not complied with any discovery
12   rules.
13             But with respect to the contractual
14   interpretation issue, I suppose I need to do a little
15   bit of research.
16             I was always of the view that post conduct
17   could inform on the parties' intent.
18        THE COURT:  Since I'm skeptical, write a good
19   brief.  I'm skeptical, so you'd better marshal the
20   authorities and tell them I must do it more than
21   anything that says I may do it because I intellectually
22   find it -- it's like subsequent legislative officials.
23             The third congress acts, if people passed
24   a law, go out on the floor and say, "Three sessions ago,
25   I'm sure that my predecessor said such and such."
26             That to me is bull.
27        MR. BERAL:  That's fine.  If we're focused on
28   preconduct, that's fine.
```

CINCO CORPORATION vs. GUY KOREN, BC701075
October 8, 2020

Copy

66

```
 1                    In my mind, I believed you can look at
 2     post conduct, but I'll do the research on that and
 3     figure this out, and I'll meet and confer with
 4     Mr. Murphy --
 5          THE COURT:  Be aware that you've got a skeptical
 6     audience.
 7          MR. BERAL:  Will do.
 8          THE COURT:  Anything else, Mr. Beral.
 9          MR. BERAL:  That's it, Your Honor.  Thank you.
10          THE COURT:  Ms. Hedley?
11          MS. HEDLEY:  Yes, Your Honor.
12                    I would like to ask the Court to set an
13     informal discovery conference following the exact time
14     frame with a hearing on the 21st and a joint report due
15     the 19th.
16                    We have several issues.  I'll just
17     briefly -- we haven't been able to get verifications to
18     the discovery responses from plaintiff that were due in
19     July.
20                    So we really need the Court's help to move
21     discovery along.
22          THE COURT:  Who are you poking at?
23                    Cinco and that team, Ms. Hedley?
24          MS. HEDLEY:  Yes, Your Honor.
25          MR. MURPHY:  Just so -- I made a mistake in the
26     verification form, and so I had to get them reverified.
27                    I think I should have them later today or
28     tomorrow, but I think an informal discovery conference
```

CINCO CORPORATION vs. GUY KOREN, BC701075
October 8, 2020

Copy

67

```
1   makes sense, and maybe we can also loop in this issue
2   regarding the discovery of Guy Koren into that because I
3   have some questions --
4           THE COURT:  I don't want to add it to the 21st.
5               And you weren't available on the 19th,
6   Mr. Murphy?
7           MR. MURPHY:  I am.  I don't know if Mr. Beral is.
8           MR. BERAL:  I was not.
9           THE COURT:  Ms. Hedley, can I put an informal
10  discovery between you and Mr. Murphy on Monday, the
11  19th, in the afternoon?
12          MS. HEDLEY:  Your Honor, I'm sorry.  I'm in a
13  deposition that day.
14          THE COURT:  Then I would slide it to the 28th in
15  the afternoon.
16          MS. HEDLEY:  That's fine, Your Honor.
17          THE COURT:  3:00 p.m.
18          MR. MURPHY:  Your Honor, could we do it slightly
19  later?
20              I have -- well, actually, I can -- I've
21  got a mediation call with the Court of Appeal.  It's a
22  mandatory thing.
23          THE COURT:  What hour?
24          MR. MURPHY:  On the 2:00 p.m. hour.
25          THE COURT:  I'll set you down for 3:30.
26          MR. MURPHY:  Great.  Thank you, Your Honor.
27          THE COURT:  3:30 on the 28th with a joint report
28  due by the 21st.
```

October 8, 2020

Copy

68

1              That's specifically on the controversy

2    between the J&K entities and the Cinco parties; correct,

3    Ms. Hedley?

4         MS. HEDLEY:  Yes, Your Honor.

5              And I believe that -- I believe -- (audio

6    distortion).

7         THE COURT REPORTER:  I'm sorry, Your Honor.  I

8    couldn't understand that.

9         MS. HEDLEY:  I don't know if John -- (audio

10   distortion).

11        THE COURT:  At the moment I want to limit the

12   issue to just between J&K and Cinco.

13             I'll set a different informal discovery

14   conference involving Mr. Koren and the LA Group.

15        MR. BERAL:  It's essentially the same issues

16   that -- we have and the LA Group have essentially the

17   same issues as to Cinco, and I think it would make sense

18   to put them all together.

19        THE COURT:  Can you join us on the 28th at 3:30?

20        MR. BERAL:  Yes, Your Honor.

21        THE COURT:  We'll add it to the fight.

22             This apparently also then includes a fight

23   between Cinco and LA Group.

24        MR. MURPHY:  Can I also then include the document

25   production because obviously we have a dispute there?

26        THE COURT:  That's from Cinco back against Koren

27   and --

28        MR. MURPHY:  Yeah.  They say they've produced

Copy

69

 1  documents.  I've not received one document from Guy

 2  Koren, ever.

 3          THE COURT:  Go ahead and put it in the hopper.

 4          MR. MURPHY:  Thank you, your Honor.

 5          THE COURT:  Put it in the notice.

 6              Ms. Hedley, anything else?

 7          MS. HEDLEY:  No, Your Honor.  Thank you.

 8          THE COURT:  Mr. Cooper, anything?

 9          MR. COOPER:  No, Your Honor.

10          THE COURT:  Mr. Caine?

11          MR. CAINE:  Nothing, your Honor.

12          THE COURT:  Mr. Moscarino?

13          MR. MOSCARINO:  The only thing, Your Honor, is

14  that at some point along the line, I think we'll need to

15  start thinking about whether it makes sense to -- (audio

16  distortion) -- what's going on in court.

17              For example, I have a responsive pleading

18  due to Mr. Cooper's cross-complaint, and I think we're

19  going to have to think about whether you really want all

20  that going on at the same time or we could defer and

21  come back.

22          THE COURT:  Do you have any insurance adjustor

23  interested in making a separate piece to stop paying you

24  legal fees?

25          MR. MOSCARINO:  No.

26          THE COURT:  Do you have any other way to make a

27  separate piece?

28          MR. MOSCARINO:  I'm sure we do.

CINCO CORPORATION vs. GUY KOREN, BC701079
October 8, 2020
<span style="color:red">Copy</span>

70

```
 1          THE COURT:  I'm not making any order to that
 2   effect, but if you want to ask me to make an order, get
 3   something on for a status conference or make a motion.
 4               So the last person I think we need to talk
 5   to you is you, Mr. Murphy.
 6               Anything else you want to take up with the
 7   Court?
 8          MR. MURPHY:  I don't, Your Honor.  Thank you very
 9   much.
10          THE COURT:  You're giving notice?
11          MR. MURPHY:  Yes, Your Honor.
12          THE COURT:  Court's in recess.  You're free to
13   go.
14          MR. BERAL:  Thank you, Your Honor.
15          MR. MURPHY:  Thank you, Your Honor.
16          MS. HEDLEY:  Thank you, Your Honor.
17
18               (The proceedings were concluded.)
19                      - OOO -
20
21
22
23
24
25
26
27
28
```

CINCO CORPORATION vs. GUY KOREN, BC701075
October 8, 2020

<span style="color:red">Copy</span>

71

```
 1            SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2                 FOR THE COUNTY OF LOS ANGELES

 3   DEPARTMENT SSC 10      HON. WILLIAM F. HIGHBERGER, JUDGE

 4
     CINCO CORPORATION, et al., )
 5                              )
               Plaintiff(s),   ) CASE NO. BC701075
 6                             )
           vs.                 ) REPORTER'S
 7                             ) CERTIFICATE
     GUY KOREN, et al.,        )
 8                             )
               Defendant(s).   )
 9   _____)
                               )
10   AND RELATED CROSS-ACTIONS. )
     _____)
11

12            I, Christine Kwon-Chang, official pro

13   tempore court reporter of the Superior Court of the

14   State of California, for the County of Los Angeles, do

15   hereby certify that due to COVID-19 and some counsel

16   appearing remotely via LACourtConnect, I did correctly

17   report the proceedings contained herein to the best of

18   my ability to hear and report this matter, and that the

19   foregoing pages comprise a full, true, and correct

20   transcript of the proceedings taken in the matter of the

21   above-entitled cause on October 8, 2020.

22

23            Dated this 12th day of October, 2020.

24

25

         _____
26       Christine Kwon-Chang, CSR No. 12143, CRR
         Official Pro Tempore Reporter
27

28
```