EXHIBIT TE 21

# EXHIBIT 21

| | |
|---|---|
| **From:** | Guy Koren <guy@potatocornerusa.com> |
| **Sent:** | Wednesday, June 28, 2023 10:45 PM |
| **To:** | vlgregorio@shakeys.biz; yltan@shakeysinternational.com |
| **Subject:** | [EXT] License agreement - Proposed term sheet. June 28th, 2023. |
| **Attachments:** | Proposed Term Sheet(132046757.3).pdf |

Hi Vicente & Yiow,
I hope this email finds you well. It was great meeting you, I appreciate you guys making the stop in LA so we can meet each other and put a face to the name, before your trip to the NRA show in Chicago.  I feel much better now that we have met because after our discussion I felt that we share a lot of similarities in our philosophy and in our vision of what Potato Corner can be, it's growth potential and it's place in the market. That helped a lot in my thinking of how to construct the proposal and finding a mutual ground we can meet and work together and grow together for our mutual benefit!

With that said, please find attached proposal for your review, I would really appreciate it if we could jump on a conference call, so we could review the proposal together and I could go over it point by point in detail and answer any questions you may have so there is no misunderstanding and we can hopefully move the ball forward some.  Let me know if & when you're available, today if possible or tomorrow if preferred.  I'll also try to call you and hopefully we can connect and discuss it together.

Looking forward to hearing from you!


Salamatpo,

# PROPOSED TERM SHEET

## ACQUISITION AND LICENSE RE: POTATO CORNER

In connection with our settlement discussions, we submit the following proposed term sheet to the Philippines-based parties,[1] whom we understand own and control the membership and ownership rights as well as all intellectual property rights relating to Potato Corner.

**Proposed Terms:**

<u>Purchase of Philippines-based parties' interests in PCJV and PCI Trading by Buyer from Seller</u>.  Guy Koren or his wholly owned entity ("Buyer") will acquire all ownership interests of PCJV and PCI Trading from the Philippines-based parties ("Seller") for the amount of $450,000, payable ratably, without interest, over a ten-year period, as previously agreed.

<u>License Structure</u>.  While the proposed Licensee (PCJV) cannot provide legal advice to the proposed Licensor (represented to us to be SPAVI) – and encourages Licensor to seek expert franchise counsel – we believe, based on prior comments, that Licensor does not want to be the seller of a master franchise in the US where it will be regulated under a number of franchise laws.  If that were indeed the case, Licensor will have to go through the regulatory process with applicable states, and prepare the statutory disclosure requirements and maintain its registrations.  That process is likely to prolong the closing for many months, possibly a year, and trigger extensive expense.  We understand, however, that Licensor prefers not to act as the master franchisor but to limit this proposed arrangement to that of a license agreement only.  In doing so, Licensor cannot prescribe a program of operations or a system; nor can it provide substantial assistance.  Licensee must be given operational independence (including extended menu), a term previously discussed (and, we believe, agreed upon).  Licensor can, however, protect the use of its intellectual property so that its IP is protected and preserved.

<u>License Terms.</u>

1. <u>Duration.</u>  As previously discussed and agreed, the term of the License will be for twenty years with continuous automatic renewals on the same terms and conditions for periods of fifteen years each, such renewals subject *only* to Licensee being in material compliance with the terms of the License, with rights to cure if applicable.

2. <u>Territory.</u>  As previously discussed and agreed, the Territory will be the United States of America and all of its territories and possessions, as well as the Country of Israel. The Territory cannot be reduced based on any particular internal default under the License.  As long as the License remains intact, the Territory is inviolate.

3. <u>Continuing Royalties</u>.  Licensee will pay Licensor an annual royalty fee of 0.60% of all gross sales from its franchisee stores.  For affiliate franchisee stores that are currently royalty free, they will commence paying an annual royalty fee of 0.50% of

---

[1] The Philippines-based parties include the "Cinco Group" and "PCI Group" as defined in the PCJV USA governing documents (inclusive of all individuals) as well as the parties named in the *Cinco v. Koren* litigation, in addition to SPAVI.

all gross sales directly to Licensor, provided that as soon as Licensor reaches a total of 100 operating franchisee stores, the affiliate franchisee stores will no longer be obligated to pay annual royalty fees. In general, Licensee has the right to adopt its fee and royalty schedule and to modify it at any time and from time to time, but agrees that its affiliate stores will pay royalties directly to Licensor as described above.

4. <u>Initial Franchise and Development Fees</u>. Licensee will pay Licensor a royalty tied to receipt of initial franchise and development fees based on the following formula: Licensee anticipates costs (comprising, for example, expenses relating to site selection assistance, construction assistance, provisioning assistance, training and opening assistance, etc.) to be approximately three fourths (75%) of the receipts (the "Base Line Cost Percentage"). The difference between the Base Line Cost Percentage and the receipt for Initial and Development Fees is the Initial Fee Royalty Base. Following receipt of Initial and Development Franchise Fees, Licensee will pay Licensor 50% of the Initial Fee Royalty Base.

5. <u>Transfer and Renewal Fees</u>. Licensee will pay Licensor a royalty tied to receipt of transfer and renewal fees (which are typically 60% of initial fees) that is based on the Base Line Cost Percentage related to those fees. As is done with initial fees, transfer and renewal fees are assessed, in part, to "reimburse" to the Licensee certain costs incurred in connection with transfers and renewals, including, for renewals, evaluation of the condition of the store and requiring remodeling, supervision of same, issuing and monitoring/negotiating revised updated franchise agreements and schedules, related regulatory deliverables and filings and legal expenses, and, for transfers, evaluation and vetting of a transferee, as well as all of the elements involved in a renewal. The difference between the Base Line Cost Percentage and the receipt for Transfer and Renewal Fees is the Transfer and Renewal Fee Royalty Base. Following receipt of Transfer and Renewal Fees, Licensee will pay Licensor 50% of the Transfer and Renewal Fee Royalty Base.

6. <u>Fee Exclusions</u>. Any other income experienced by Licensee will be royalty-free, including, but not limited to, marketing fees collected from franchisees. For example, SPAVI previously requested 50% of marketing fees. These fees are collected and held in trust for the benefit of the franchisees and the Licensee pledges to use such funds for local, regional, and national advertising. They cannot be shared with the Licensor or any other party.

7. <u>Marketing Plan</u>. The Marketing Plan calling for ten, twenty and thirty new net units in each of the first three years and 40 per year thereafter is only agreed to by Licensee as a goal, but not as a trip wire on which it will be in default under the License. It is in Licensee's best interests to grow inside the Territory and, in that regard, the goals of Licensor and Licensee are aligned. But it is far too easy to lose everything if the numbers are not exactly reached. The goal may be to exceed 1,000 units within ten years, but timing, capital, economic conditions, pandemics, wars, supply chain issues, health fads, and the like make predictions too risky and Licensee is not willing to risk all of its efforts on projections when the environment for growth is not controllable. Licensee is prepared to state that, as a condition to the 20-year renewal, 150 units

have to be opened, but it cannot be stuck with mandatory growth of a precise number of units on an annual basis. Licensee is prepared to state that, if it does not meet the Marketing Plan, it will pay a penalty per missed unit, but there will not be any other intrusion of the scope of the License based on this standard.

8. <u>Intellectual Property</u>. License to include all intellectual property of Seller, including, but not limited to, trademarks, trade dress, patents, copyrights, formulas, flavors, and recipes if known. Buyer/PCJV has the right to source the flavors locally in the US and if Seller does not have recipes, Buyer/PCJV has the right to source the recipes without objection from Licensor. To the extent any of the intellectual property is not registered in the US, Licensor will have the obligation to arrange for such registration. If it does not do so promptly after execution, Licensee has the right to do so in its own name. Licensee agrees not to deviate from registered intellectual property licensed to Licensee, including trademarks, unless modifications are consented to in advance in writing by Licensor, which consent will not be unreasonably withheld.

9. <u>Indemnification</u>. Standard indemnification provisions for intellectual property licenses; provided, however, Buyer/Licensee will indemnify and defend Seller/Licensor from any claims brought by Amir or Inbal Jacoby against Seller/Licensor (provided such claims are based on Buyer/Licensee's conduct and not Seller/Licensor's conduct), with Buyer/Licensee controlling the defense and the litigation expenses. As partial consideration for said indemnification, Seller agrees to assign all claims Seller has against Amir Jacoby, Inbal Jacoby, DLA Piper, Ben Olivas and others relating to the US operations of the franchise system.

10. <u>Assignment</u>. No transfer of License by Licensee without consent by Licensor, which will not be unreasonably withheld; provided that Licensee may transfer to a controlled affiliate without consent and Licensee may sell all or substantially all of the Licensed Business provided that transferee is credit-worthy and has operational experience, subject to reasonable consent of Licensor. Licensor will not have a right of first refusal.

11. <u>Balance of Terms</u>. The License will contain all other terms that are customary and conventional for commercial licenses, including, but not limited to, dispute resolution, attorneys' fees, representations and warranties as to ownership of intellectual property rights, authority, qualification to do business, quiet title from past owners, compliance with laws, covenants regarding protection of intellectual property, full indemnification, limitation on damages, internal statutes of limitations, non-disparagement, non-intervention, no affiliated or competing enterprises, confidentiality, venue and dispute resolution in California, audit rights, obligation for provision by Licensee of audited statements and mutual cooperation.