1  TODD M. LANDER (BAR NO. 173031)
   todd.lander@ffslaw.com
2  ARASH BERAL (BAR NO. 245219)
   arash.beral@ffslaw.com
3  FREEMAN, FREEMAN & SMILEY, LLP
   1888 Century Park East, Suite 1900
4  Los Angeles, California 90067
   Telephone: (310) 255-6100
5  Facsimile: (310) 255-6200

6  Attorneys for Defendant and Cross-Complainant
   GUY KOREN
7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9              COUNTY OF LOS ANGELES, CENTRAL DISTRICT

10

11  CINCO CORPORATION,                    Case No. BC701075

12              Plaintiff,                 **DECLARATION OF GUY KOREN WITH
                                            ADDITIONAL EVIDENCE IN SUPPORT
13      vs.                                OF THE COURT'S TENTATIVE RULING
                                            RE: PRELIMINARY INJUNCTION**
14  GUY KOREN, an individual; and DOES 1
    through 25, inclusive,                 Date:   June 6, 2018
15                                         Time:   9:30 a.m.
                Defendants.                Dept:   86
16
17  AND RELATED CROSS-ACTION.              **Assigned for All Purposes to the
                                            Hon. Rafael Ongkeko, Dept. 73**
18                                         Action Filed:    April 10, 2018
19
20
21
22
23
24
25
26
27
28

3794826.1
DECLARATION OF GUY KOREN WITH ADDITIONAL EVIDENCE IN SUPPORT OF THE COURT'S
TENTATIVE RULING RE: PRELIMINARY INJUNCTION

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**Exhibit 10 - page 1**

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1    **DECLARATION OF GUY KOREN**

2    I, Guy Koren, declare that:

3    1.    I am an individual over the age of eighteen.  All of the facts set forth in this

4    Declaration are known to me personally to be true, unless stated on information and belief (in

5    which case I believe them to be true), and if called upon to do so I could and would competently

6    testify to them under oath.  I submit this Declaration in support of the Court's June 6, 2018

7    Tentative Ruling re: Preliminary Injunction for the purpose of providing the Court additional

8    evidence supporting my position in connection with the Preliminary Injunction.

9    2.    I'd like to first remind the Court that because my Potato Corner email access has

10   been discontinued and Cross-Defendants have refused to restore my email access (probably

11   intentionally in order to undermine my ability to provide such evidence to the Court), it is

12   extremely difficult for me to submit evidence to the Court at this time when I know that a majority

13   of that evidence is stored in my email inbox and email folders.  For example, I believe my emails

14   will establish the intention of and purposes behind the various agreements governing PCJV's

15   affairs, the ownership structure of PCJV with equity percentages held by only two parties (Cinco

16   Group at 60% and LA Group at 40%), that the parties vested all company powers in a 7-person

17   board and always voted as a 7-person board regarding <u>all</u> decisions, and that the parties never once

18   voted via equity percentage interest.  That all having been said, I've done my best in the limited

19   amount of time I've had to gather material to submit to the Court.  I've also had to resort to

20   obtaining information from third parties.  For example, Christopher Passmore, a CPA whom we

21   engaged to prepare and file PCJV's 2017 tax return was kind enough to sign a declaration in

22   support of my position, which declaration is filed concurrently with this Declaration.[1]

23

24   [1] Mr. Passmore's Declaration attaches a true and correct copy of a February 7, 2018 email on

25   which I was copied and which contains a copy of PCJV's 2016 tax return.  As Mr. Passmore confirms, and I can independently confirm and authenticate, PCJV's 2016 tax return (which I

26   reviewed and authorized to be filed) shows clearly that PCJV has two owners (Potato Corner International and Potato Corner LA Group) and the equity percentage interest breakdown is 60%-

27   40%.  We never once reported to the IRS or FTB that there were more than two parties carrying equity percentage interests in PCJV.

28

3794826.1

2

DECLARATION OF GUY KOREN WITH ADDITIONAL EVIDENCE IN SUPPORT OF THE COURT'S
TENTATIVE RULING RE: PRELIMINARY INJUNCTION

**Exhibit 10 - page 2**

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3.      One piece of evidence I was able to gather is a PowerPoint presentation prepared by Ben Olivas of DLA Piper and ultimately provided to me and the other people that would come to be associated with PCJV USA, LLC ("PCJV"). The PowerPoint presentation is dated October 2010 and authored by Mr. Olivas, whom I understood to be representing Cinco Corporation ("Cinco"). That understanding arose because Mr. Magsaysay of Cinco introduced Mr. Olivas to me in or about 2010 as Cinco's attorney and told me that Mr. Olivas and Mr. Magsaysay were childhood friends. As discussed further below, Mr. Olivas continued to perform a significant amount of legal work for Cinco and its affiliates. A true and correct copy of the DLA Piper PowerPoint presentation dated October 2010 is attached hereto as **Exhibit "A"**.

4.      As the second page of the PowerPoint presentation makes clear (titled "Structuring Steps"), the parties intended for Cinco (or its subsidiary – "PC International" a/k/a "Potato Corner International") to contribute $30,000 as capital in PCJV in exchange "for its 60% equity interest" and for LA Group to contribute $20,000 in PCJV in exchange "for its 40% equity interest" in PCJV. The following page (page 3) titled "Operating Steps" makes clear that the "[r]emaining income in PCJV is divided *between* its shareholders based on their pro rata ownership shares (PC International = 60%; LA Group = 40%)." At no point was there ever a discussion nor did we intend to have an ownership structure beyond two members.[2]

5.      As Exhibit "A" itself demonstrates, this two-member structure was *Cinco's* idea. In fact, it was a key component of my early negotiations with Mr. Magsaysay (of Cinco) because Mr. Magsaysay was concerned about the LA Group individuals selling their individual interests to outsiders, i.e., third parties. I, as well, was concerned about the Cinco Group individuals selling their interests to outsiders and Mr. Magsaysay and I specifically discussed this issue. We ultimately agreed that while the individuals associated with PCJV could sell their interests to

---

[2] Page 4 of the PowerPoint presentation reflects a checklist for Potato Corner International (the entity Cinco claims is its wholly owned subsidiary, hereinafter, "PCI"). That page indicates that Cinco owns 995 shares of PCI, and certain individuals, including Mr. Olivas, own 1 share each. For the Court's information, the term "Cinco Philippines" is a reference to Cinco as Cinco is based out of the Philippines.

DECLARATION OF GUY KOREN WITH ADDITIONAL EVIDENCE IN SUPPORT OF THE COURT'S TENTATIVE RULING RE: PRELIMINARY INJUNCTION

**Exhibit 10 - page 3**

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1   others within their respective groups, i.e., Mr. Nemanim could sell his interests to me and/or to

2   Mr. Jacoby (which actually occurred), or one of the Cinco Group individuals could sell their

3   interests to another individual within the Cinco Group (which did not occur[3]), those individuals

4   could not sell their interests to outsiders without consent.  Mr. Magsaysay therefore proposed that

5   there be two entities owning PCJV and that the parties become bound by the prohibited transfer

6   and right of first refusal clauses in the governing agreements so that each individual within the

7   "Cinco Group" umbrella be permitted to sell its interests to the individuals within that umbrella

8   and any individual within the "LA Group" umbrella could sell its interests to individuals within

9   the "LA Group" umbrella.  That is why the individuals/entities within each umbrella are named in

10   the governing agreements, i.e., to make clear which parties are bound by the prohibited

11   transfer/right of first refusal clauses.  The individuals/entities within each umbrella are not

12   identified for purposes of showing that they are "members" in PCJV.  Rather, it was clear and

13   understood that PCJV has only two members holding direct equity percentage interests.

14       6.     As mentioned above, Mr. Olivas represented Cinco (and PCI) and he and his firm

15   performed all of the transactional paperwork.[4]  While I don't recall whether he ever had an

16   engagement agreement with PCJV or with me or with any other entity I was controlling, such as

17   the LA Group entity (Potato Corner LA Group, LLC), the lines were blurred as to which entities

18   he was actually representing after PCJV began its operations.  Nor do I recall at any time Mr.

19   Olivas or anybody at DLA Piper disclosing to me any actual or potential conflict or requesting a

20   waiver of any potential or actual conflict.  At some point, I do recall that Mr. Olivas and DLA

21   Piper began to bill PCJV directly for their services.  And as the October 2012 Meeting Minutes

22   show (attached as Exhibit "B" to my Verified Cross-Complaint, a cleaner, more correct copy of

23   which is attached as Exhibit "A" to my Supplemental Declaration filed on May 17, 2018), at

---

25   [3] When Cinco and the Cinco Group individuals sold their interests to the Hernandez Group (an

26   outside third party), they breached these terms.

27   [4] This is also confirmed through Paragraphs 7 and 11 of Ms. Bartolome's Declaration filed on May 30, 2018.

28

3794826.1

4

DECLARATION OF GUY KOREN WITH ADDITIONAL EVIDENCE IN SUPPORT OF THE COURT'S
TENTATIVE RULING RE: PRELIMINARY INJUNCTION

**Exhibit 10 - page 4**

1  Paragraph 2.d., I was one of the people charged with negotiating discounts on DLA Piper's

2  billings.  It is nonetheless clear (especially given the incidents leading up to this lawsuit) that Mr.

3  Olivas has taken the position that he was acting on behalf of Cinco at all times and drafted the

4  various agreements governing PCJV on behalf of Cinco.

5         7.      I was present in Court on June 6 when Cinco's attorney, Robert Brownlie, argued

6  that the "75% requirement" does not make sense in the context of a 7-member voting board

7  because 75% of 7 is 5.25.  I disagree with Mr. Brownlie and I wish to explain why the 75%

8  criteria was established.  The purpose of that heightened requirement as to PCJV was to protect

9  me following Mr. Nemanim's departure against exactly the kind of conduct that is the subject

10  matter of this case.  At the time, we were contemplating bringing on a strategic investor at some

11  point in the future in PCJV.  Thus, in anticipating that perhaps one day we would add an 8th

12  member to the voting board, the 75% requirement was reached to ensure that in the event we had 7

13  or 8 members on the board, a vote of 6 members would be required to replace me as President or

14  to replace others as Treasurer or Corporate Secretary.  In that instant, the "75% requirement" was

15  put in place because 6 divided by 8 is 75%.  The number "6" was important in this scenario so that

16  if any potential strategic investor voted with the 4 Cinco representatives to remove me, they would

17  only have 5 votes, which would be insufficient.  In other words, we specifically discussed and

18  negotiated the 75% requirement so that 6 votes would be necessary to remove me whether there

19  were 7 or 8 total members on the board.

20         8.      Mr. Brownlie also argued on June 6 that the notion of me being reinstalled as

21  PCJV's President makes no sense insofar as I could select three members to the voting board

22  which would effectively keep me in place as PCJV's President against the alleged wishes of the

23  alleged majority equity percentage owner.  Mr. Brownlie is also wrong on this point as this was

24  precisely the subject of our negotiations with Cinco (assuming Cinco still maintains a majority

25  equity percentage interest, which I dispute since it violated the prohibited transfer and right of first

26

27

28

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3794826.1

5

DECLARATION OF GUY KOREN WITH ADDITIONAL EVIDENCE IN SUPPORT OF THE COURT'S
TENTATIVE RULING RE: PRELIMINARY INJUNCTION

Exhibit 10 - page 5

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  refusal clauses in the governing agreements[5]).  Mr. Magsaysay (of Cinco) and I specifically

2  discussed this provision and I and all of the individuals associated with PCJV negotiated the 75%

3  requirement so that I would maintain PCJV's Presidency position unless we agreed to a succession

4  plan or resignation.  It was always Cinco's desire that I would maintain the Presidency position

5  and that the LA Group (the entity I control) would manage PCJV.  If Cinco wants nothing to do

6  with me now, the simple fact is that they should negotiate a new agreement with me, rather than

7  try and oust me in contravention of our agreements and the clear understandings of the parties.

8  But Cinco has made no effort to negotiate, or work with me in any respect.  It has instead launched

9  a contentious, costly, and unnecessary litigation.

10       9.      Lastly, attached to this Declaration as **Exhibit "B"** is a true and correct copy of the

11  Trademark, Copyright, and Know-How License Agreement ("License Agreement") which

12  licenses Cinco's "Marks" to PCJV.  The term of the License Agreement is 20 years followed by

13  successive three 10-year terms, effectively 50 years.  Under Paragraph 9, the License Agreement

14  can only be terminated by Cinco upon PCJV's breach and failure to cure within 30 days after

15  receiving written notice of the breach.  The License Agreement is governed by California law.

16  I'm not aware of any breach of the License Agreement or failure to cure.  If Cinco is intent on

17  canceling the License Agreement or finding ways to get out from underneath it, Cinco would be in

18  further breach of its commitments not only to PCJV but also to all of the franchisees with whom

19  we have sublicenses, and Cinco may also be in violation of any Court Order this Court may issue.

20       10.     I received and reviewed a Supplemental Declaration today from Mr. Jacoby (the

21  only one I received from Cross-Defendants thus far today) attaching as Exhibit "A" what appears

22  to be minutes of a managers' meeting on October 16, 2012.  While I don't recall signing this

23  document, this document mistakenly implies that the managers at that meeting voted by equity

24  percentage interests to remove Mr. Nemanim.  That is not what happened.  The managers have no

25

26  [5] The LA Group intends to file an action seeking rescission of the Hernandez Group transaction
    and specific performance of the LA Group's right of first refusal.  If successful, and there is no
27  reason to doubt that we will not be successful, the LA Group will effectively become the majority
    equity percentage interest holder of PCJV.

28

3794826.1

DECLARATION OF GUY KOREN WITH ADDITIONAL EVIDENCE IN SUPPORT OF THE COURT'S
TENTATIVE RULING RE: PRELIMINARY INJUNCTION

**Exhibit 10 - page 6**

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  equity percentage interests in PCJV.  The actual vote was unanimous to remove Mr. Nemanim.

2  Page 2 of this document wrongly reflects what appears to be a calculation of direct and indirect

3  equity percentage interests.  I have no idea why that calculation was included on page 2, but it is

4  immaterial to the discussions and decisions made at the meeting I attended.  That meeting was a

5  management meeting attended by the majority of the 7 managers of PCJV.

6      11.    Despite the inclusion of a calculation that appears to be based on direct and indirect

7  equity percentage interests, the results and implications of that meeting are clear.  The document

8  demonstrates on page 1 that **"a 75% vote of Management"** was necessary to remove me as

9  President.  Thus, when Cinco and its associates attempted to remove me in April 2018, they did

10  not obtain a 75% vote of management to remove me.  This document is clearly consistent with the

11  position I have taken in this litigation.

12      I declare under penalty of perjury under the laws of the State of California that the

13  foregoing is true and correct.

14      Executed on this 13th day of June 2018, at Los Angeles, California.

15

16

17  Guy Koren

18

19

20

21

22

23

24

25

26

27

28

3794826.1

7

**Exhibit 10 - page 7**

# EXHIBIT A

Exhibit 10 - page 8



Exhibit 10 - page 9

# Potato Corner JV – Structuring Steps





Food Supply

Franchising business

- Step 1 – Cinco and LA Group enter into JV Agreement.

- Step 2a – Cinco Philippines contributes $30,000 in cash as capital in Potato Corner International, Inc. (Delaware) (hereinafter, "PC International").

- Step 2b– PC International contributes the $30,000 cash as capital in PCJV USA, for its 60% equity interest.

- Step 2c – LA Group contributes $20,000 for its 40% equity interest in PCJV USA.

- Step 3 – Cinco enters into a Master License Agreement to license the Potato Corner intellectual property to PCJV – license fees subject to a 15% U.S. withholding tax on payment.

- Step 4 – LA Group enters into a Master Services Agreement with PCJV.

- Step 5 – The parties form PC-Trading LLC, which will send food supplies to the franchisees.

2

**Exhibit 10 - page 10**

# Potato Corner JV – Operating Steps





- PCJV enters into franchising agreements with third parties and collects franchising fee

- PCJV pays operating expenses plus:
  - 30% license fee to Cinco
  - 30% management services fee to LA Group

- Remaining income in PCJV is divided between its shareholders based on their pro rata ownership shares (PC International = 60%; LA Group = 40%)

Exhibit 10 - page 11

# Potato Corner International Checklist of Documents



- Certificate of Formation - done
- Articles of Incorporation – done
- Investor Representation Statement
    - Jose Magsaysay – signed; filed
    - Jose Miguel Ma. G. Montinola – signed; filed
    - Ma. Victoria O. Bermejo – signed; filed
    - Ricardo K. Montelibano – signed; filed
    - Ben R. Olivas – signed; filed
- Initial By-Laws – signed by Ms. Lyndah Bartolome (corporate secretary); filed
- Organization minutes – signed by directors; filed
- Wells Fargo bank account
    - Opening of bank account – Done
    - Need to add Jo Magsaysay as signatory; will be done when is in the SF Bay Area
    - Cinco to transfer of funds to Wells Fargo account
- Issuance of share certificates to shareholders
    - Cinco Philippines – 995 shares @ par ($0.001)
        - Capital stock = $0.995
        - Additional paid-in capital = $29,999
    - Jose Magsaysay – 1 share @ par ($0.001)
    - Jose Miguel Ma. G. Montinola – 1 share @ par ($0.001)
    - Ma. Victoria O. Bermejo – 1 share @ par ($0.001)
    - Ricardo K. Montelibano – 1 share @ par ($0.001)
    - Ben R. Olivas – 1 share @ par ($0.001)
- Fictitious Business Name (FBN) Application – filed; waiting for approved copy
- US Federal Tax ID Number – done; (27-3667978)
- California Secretary of State qualification document – filed; waiting for approved copy
- Acquire the shares in PCJV USA LLC – open

Exhibit 10 - page 12

# PCJV USA
# Checklist of Documents



- Joint Venture Agreement between Cinco and the LA Group – final draft available
- Certificate of Formation – done; formed July 16, 2010
- LLC Operating Agreement – open
- Wells Fargo bank account
  - Opening of bank account – Done by Amit Nemanim
  - Contribution by PC-Int'l of funds – open
  - Contribution by L.A. Group of funds – open
- US Federal Tax ID Number – open
- Agreements
  - Master License Agreement between Cinco Philippines and PCJV USA - open
  - Master Services Agreement between the L.A. Group and PCJV USA - open
- Audited financial statements
  - Appointment of auditor - open
  - Issuance of unaudited financial statements with footnote disclosure - open

**Exhibit 10 - page 13**

# PC-Trading USA
# Checklist of Documents



- Name check/reservation – open

- Certificate of Formation – open

- LLC Operating Agreement – open

- Wells Fargo bank account

  - Opening of bank account – open

  - Contribution by PC-Int'l of funds – open

  - Contribution by L.A. Group of funds – open

- US Federal Tax ID Number – open

- Agreements

  - Master Supply Agreement between Cinco Philippines and PC Trading USA - open

  - Master Services Agreement between the L.A. Group and PC Trading USA - open

Exhibit 10 - page 14

# EXHIBIT B

Exhibit 10 - page 15

## TRADEMARK, COPYRIGHT, AND KNOW-HOW LICENSE AGREEMENT

**THIS TRADEMARK, COPYRIGHT, AND KNOW-HOW LICENSE AGREEMENT** (the "**Agreement**") is made and entered into as of October 1, 2010 (the "**Effective Date**") (regardless of the dates of the parties' signatures below) by and between PCJV, LLC, a California limited liability company ("**Licensor**"), and CINCO CORPORATION, a Philippine corporation ("**Licensee**").

### RECITALS

Licensor currently owns and uses certain trademarks, service marks, and commercial symbols, including, but not limited to, the mark POTATO CORNER (**collectively, the "Marks"**), in connection with the operation of Potato Corner Stores;

Licensor also owns and uses certain copyrights for various tangible items used in connection with the development and operation of Potato Corner Stores (**the "Copyrights"**);

Licensor also owns and uses certain knowhow and other proprietary information in connection with the development and operation of Potato Corner Stores (**the "KnowHow"**);

Licensee, an affiliate of Licensor, desires to engage in the business of franchising Potato Corner Stores in the United States and Israel using the Marks, Copyrights, and KnowHow that Licensor has developed; and

Upon the terms and conditions contained in this Agreement, Licensor desires to grant to Licensee, and Licensee desires to receive from Licensor, a license of the right to use and authorize franchisees to use the Marks, Copyrights, and KnowHow in connection with the promotion, franchising, development, and operation of Potato Corner Stores.

**NOW, THEREFORE,** in consideration of the mutual covenants, agreements, and obligations set forth in this Agreement, the parties agree as follows:

1. **Grant of License.** Licensor hereby grants to Licensee, upon the terms set forth in this Agreement, the non-exclusive right to (a) use the Marks, Copyrights, and KnowHow in franchising Potato Corner Stores in the United States and (b) authorize franchisees to use the Marks, Copyrights, and KnowHow in developing and operating Potato Corner Stores.

2. **Term.** The term of this Agreement and the license it grants is twenty (20) years from the Effective Date. Licensee may renew this Agreement for three (3) successive ten (10) year terms by written notice ninety (90) days prior to the expiration of the then-current term subject to current licensing terms of Cinco. When this Agreement expires, or if Licensor or Licensee terminates this Agreement, Licensee agrees immediately to cease using and sublicensing the Marks, Copyrights, and KnowHow in any manner, although any Potato Corner Store franchisee who has been authorized as of that time, pursuant to a signed and effective franchise agreement, to use the Marks, Copyrights, and KnowHow in connection with its Potato Corner Store franchise may continue using the Marks, Copyrights, and KnowHow until that franchisee's then current franchise agreement, and any permitted successor franchise agreement, expire or are terminated, but only on the condition that the franchisee continues to comply for Licensor's

**Exhibit 10 - page 16**

benefit with all of its obligations in its then current franchise agreement and in any permitted successor franchise agreement during their remaining terms.

3. **Fees**. Licensee shall pay to Licensor the amount of _____ ($_____) and other good and valuable consideration, the sufficiency of which is agreed to. Do we still charge? I think we have to charge a minimum fee of 1% of all fees collected for this to really look like a License Agreement. May I get your feedback on this.

4. **Ownership of Marks, Copyrights, and KnowHow**. Licensee acknowledges that Licensor is the owner of the Marks, Copyrights, and KnowHow, that Licensee's right to use the Marks, Copyrights, and KnowHow is derived solely from this Agreement, and that Licensee's and its franchisees' use of the Marks, Copyrights, and KnowHow, and any goodwill established by that use, will inure exclusively to Licensor's benefit.

5. **Quality Control**. Licensee acknowledges the importance to Licensor of both its reputation and goodwill and maintaining high, uniform standards of quality in the products that Licensee's franchisees offer and sell in their Potato Corner Stores under the Marks and using the Copyrights and KnowHow. Licensee therefore agrees to maintain, and to require its franchisees to maintain, the quality standards that Licensor prescribes from time to time regarding the type, nature, and quality of the products that Licensee's franchisees may offer and sell in their Potato Corner Stores under the Marks and using the Copyrights and KnowHow. To determine whether Licensee and its franchisees are complying with this Agreement and Licensor's quality standards, Licensor has the right at any time during business hours to inspect and observe Licensee's premises and operation, and the premises and operations of all Potato Corner Store franchisees, and to request specimens of their use of the Marks, Copyrights, and KnowHow. Licensee agrees to permit these inspections and observations and to cooperate fully with Licensor's representatives during them. Licensee agrees to require its franchisees to submit to similar inspections and observations.

6. **Form of Use**. Licensee agrees to use, and to cause its franchisees to use, the Marks and Copyrights only as directed by Licensor, in a manner consistent with good trademark and copyright practice, and with all appropriate legends and notices. Licensee further agrees not to use, nor to allow its franchisees to use, any other name or mark in combination with the Marks without Licensor's prior written approval.

7. **Notification of Infringements and Claims**. Licensee agrees to notify Licensor immediately of any apparent infringement, or challenge to Licensee's or any franchisee's use, of the Marks, Copyrights, and KnowHow or any claim by any person of any rights in the Marks, Copyrights, and KnowHow. Licensor has the right both to take any action it deems appropriate (including no action) and to control exclusively any litigation, Patent and Trademark Office proceeding, Copyright Office proceeding, or other proceeding arising out of any infringement, challenge, or claim. Licensee agrees to execute, and to require its franchisees to execute, any and all documents and to take, and to require its franchisees to take, any other action that, in the opinion of Licensor's counsel, are reasonably necessary or advisable to protect and maintain Licensor's interests in any litigation, Patent and Trademark Office proceeding, Copyright Office proceeding, or other proceeding.

8. **Indemnity**. Licensee agrees to reimburse and indemnify Licensor and its other affiliates, and their respective owners, directors, officers, employees, agents, and assignees

WEST:222679291.1
373527-000001

2

**Exhibit 10 - page 17**

(collectively, the **"Licensor Parties"**), for, and to hold harmless the Licensor Parties from, any losses, liabilities, taxes, or damages (actual, consequential, or otherwise), and all reasonable costs and expenses of defending either any claim brought against any of them or any action in which any of them is named as a party (including, without limitation, reasonable accountants', arbitrators', and attorneys' fees, court costs, other litigation expenses, and travel and living expenses), which any of the Licensor Parties suffers, sustains, or incurs by reason of, arising from, or in connection with Licensee's franchising of Potato Corner Stores or the operation of franchised Potato Corner Stores.

9. **Termination**. Licensee may terminate this Agreement at any time and for any or no reason upon sixty (60) days' prior written notice to Licensor. Licensor may terminate this Agreement immediately, upon delivery of written notice to Licensee, if Licensee breaches this Agreement and fails to cure the breach within thirty (30) days after receiving written notice of the breach from Licensor.

10. **Assignment**. Licensor may assign this Agreement without restriction. Licensee may not assign this Agreement or any of its rights under this Agreement without Licensor's prior written consent.

11. **Waiver**. Either party's waiver of any breach by the other of any provision of this Agreement will not operate or be construed as a waiver of any subsequent breach by the original breaching party.

12. **Binding Effect**. This Agreement is binding upon the parties and inures to the benefit of their respective executors, administrators, heirs, and successors in interest.

13. **Severability**. The invalidity, illegality, or unenforceability of any provision of this Agreement will not in way affect, impair, invalidate, or render unenforceable this Agreement as a whole or any of its other provisions.

14. **Construction**. The paragraph headings are for information only. The recitals to this Agreement, and any quality, trademark, or copyright standards or specifications that Licensor issues, are a part of this Agreement, which constitutes the entire agreement of the parties, and there are no other oral or written understandings, representations, or agreements between Licensor (or any of its other affiliates) and Licensee relating to the subject matter of this Agreement.

15. **Governing Law**. Except to the extent governed by United States trademark and copyright law or other federal law, the validity, construction, and enforceability of this Agreement, and all aspects of the relationship between Licensor and Licensee, will be governed by the laws of the State of California.

[Signature Page Follows]

**Exhibit 10 - page 18**

IN WITNESS WHEREOF, the parties have signed this Agreement on the dates specified below but to be effective as of the Effective Date.

LICENSOR:                                    LICENSEE:

CINCO CORPORATION, a Philippine              PCJV, LLC, a California limited liability
company                                      company

By:                                          By: _____
    Title:                                       Title: _Managing partner_
    Date: _____, 2010                       Date: _Nov - 30_, 2010

Exhibit 10 - page 19

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1

## PROOF OF SERVICE

2 **STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

3        At the time of service, I was over 18 years of age and **not a party to this action**. I am employed in the County of Los Angeles, State of California. My business address is 1888 Century
4 Park East, Suite 1900, Los Angeles, California 90067.

5        On June 13, 2018, I served true copies of the following document(s) described as
**DECLARATION OF GUY KOREN WITH ADDITIONAL EVIDENCE IN SUPPORT OF**
6 **THE COURT'S TENTATIVE RULING RE: PRELIMINARY INJUNCTION** on the
interested parties in this action as follows:

7

8                        ## SERVICE LIST

9  Robert W. Brownlie, Esq.                *Attorneys for Plaintiff and Cross-Defendant*
   robert.brownlie@dlapiper.com            *CINCO CORPORATION*
   Kellin M. Chatfield, Esq.
10 kellin.chatfield@dlapiper.com
   DLA PIPER LLP (US)
11 401 B Street, Suite 1700
   San Diego, California 92101-4297
12 Telephone: (619) 699-2700
   Facsimile: (619) 699-2701
13
   Robert A. Levinson, Esq.                *Attorneys for Cross-Defendants*
14 rlevinson@laklawyers.com                *AMIR JACOBY and INBAL JACOBY*
   David Krol, Esq.
15 dkrol@laklawyers.com
   LEVINSON ARSHONSKY & KURTZ, LLP
16 15303 Ventura Blvd., Suite 1650
   Sherman Oaks, California 91403
17 Telephone: (818) 382-3434
   Facsimile: (818) 382-3433
18

19

20        **BY E-MAIL OR ELECTRONIC TRANSMISSION:** Based on a court order or an
agreement of the parties to accept service by e-mail or electronic transmission, I caused the
document(s) to be sent from e-mail address maria.villagran@ffslaw.com to the persons at the e-mail
21 addresses listed in the Service List. I did not receive, within a reasonable time after the
transmission, any electronic message or other indication that the transmission was unsuccessful.
22
        I declare under penalty of perjury under the laws of the State of California that the
23 foregoing is true and correct.

24        Executed on June 13, 2018, at Los Angeles, California.

25

26                                                Maria Villagran
                                                  _____
27                                                Maria Villagran

28

3794826.1
_____
DECLARATION OF GUY KOREN WITH ADDITIONAL EVIDENCE IN SUPPORT OF THE COURT'S
TENTATIVE RULING RE: PRELIMINARY INJUNCTION

**Exhibit 10 - page 20**