Michael D. Murphy (SBN 224678)
  mmurphy@ecjlaw.com
Kenneth P. Hsu (SBN 306326)
  khsu@ecjlaw.com
**ERVIN COHEN & JESSUP LLP**
9401 Wilshire Boulevard, Twelfth Floor
Beverly Hills, California 90212-2974
Telephone: (310) 273-6333
Facsimile: (310) 859-2325

Attorneys for Plaintiff SHAKEY'S
PIZZA ASIA VENTURES, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

SHAKEY'S PIZZA ASIA
VENTURES, INC, a Philippines
corporation,

          Plaintiff,

    v.

PCJV USA, LLC, a Delaware limited
liability company; PCI TRADING,
LLC, a Delaware limited liability
company; GUY KOREN, an individual;
Potato Corner LA Group, LLC, a
California limited liability company;
NKM CAPITAL GROUP, LLC, a
California limited liability company; J
& K AMERICANA, LLC, a California
limited liability company; J & K
CULVER, LLC, a California limited
liability company; J&K LAKEWOOD,
LLC, a California limited liability
company; J&K OAKRIDGE, LLC, a
California limited liability company;
J&K VALLEY FAIR, LLC, a
California limited liability company;
J & K CAPITAL 2, LLC, a California
limited liability company; J & K
ONTARIO, LLC, a California limited
liability company; J&K PC TRUCKS,
LLC, a California limited liability
company; J&K CONSULTANTS
GROUP, LLC, a California limited
liability company; GK CAPITAL
GROUP, LLC, a California limited
liability company; and DOES 1 through
100, inclusive,

          Defendants.

Case No. 2:24-cv-04546-PVC

**DECLARATION OF VICENTE
GREGORIO IN SUPPORT OF
PLAINTIFF SHAKEY PIZZA ASIA
VENTURES, INC.'S MOTION FOR
PRELIMINARY INJUNCTION**

**EXHIBIT 1439 - 0001**

ERVIN COHEN & JESSUP LLP

ERVIN COHEN & JESSUP LLP

## DECLARATION OF VICENTE GREGORIO

I, Vicente Gregorio, declare as follows:

1.      I am a resident and citizen of the Republic of the Philippines, where I live in the City of Parañaque in Metro Manila. I am not a party to this action. However, I am the Chief Executive Officer ("CEO") and President of Plaintiff Shakey's Pizza Asia Ventures Inc. ("SPAVI"), a publicly traded corporation. I make this Declaration in support of SPAVI's Motion for a Preliminary Injunction (the "Motion") against Defendants PCJV USA, LLC ("PCJV"), its affiliate, Defendant PCI Trading, LLC ("PCIT"), their principal Guy Koren ("Mr. Koren"), and all of the affiliated franchisees and operations that continue to use SPAVI's protected intellectual property without proper authorization.

## Background to My Proud Service as SPAVI's President
## and CEO and Appurtenant Responsibilities

2.      Although I graduated with a Bachelor of Science in Electrical Engineering from Central Colleges of the Philippines in 1987, after receiving this degree, I decided to pursue a career in the food services industry because it allowed me to work with people in a way that being an engineer would not. To date, I have accumulated a total of 40 years of experience in the business.

3.      My first jobs in the food service industry were entry-level positions at the franchise level in the Philippines. I worked my way up the ladder from those entry level positions to eventually being hired in management positions, including, for example, when I served as Operations Manager for Chowking Food Corporation (the number one Southeast Asian fast-food chain in the Philippines) and Director of Operations for Roasters Philippines, Inc. (operator of the Kenny Rogers Roasters and Seattle's Best Coffee brands in the Philippines).

EXHIBIT 1439 - 0002

ERVIN COHEN & JESSUP LLP

4.      In 2003, I was appointed by SPAVI to serve as its General Manager, a position in which I was effectively responsible for all operations of SPAVI. In 2013, I was elected as the CEO and President of SPAVI – positions that I hold to this day.

5.      As Executive Vice President and Chief Operations Officer from 2003 through 2013, and as the CEO and President of SPAVI since 2013, I have been at all times and remain familiar with, and indeed responsible for, all of SPAVI's operations, finances, brands, intellectual property (including intellectual property of its brands), capitalization, governmental reporting and compliance, strategic planning, and major transactions (including those that would be reported to regulatory agencies such as the U.S. Securities and Exchange Commission after SPAVI's initial public offering in December 2016), as well as SPAVI's history and the history of its brands, strategic planning, and all other aspects of its business and operations.

**SPAVI's Business, Operations, and Growth**

6.      SPAVI is a Philippines corporation with its principal place of business in Manila, Philippines.

7.      SPAVI is listed in the Philippines Stock Exchange, trading under the stock symbol "PIZZA," in honor of SPAVI's cornerstone and foundational brand: Shakey's Pizza Parlor ("Shakey's"), the international pizza chain.

8.      SPAVI also owns various other brands including Peri-Peri Chicken Charcoal Chicken and Sauce Bar, Project Pie, Bakemaster, Inc., as well as the newly acquired Potato Corner brand, which is at issue in this action. SPAVI also serves as the master franchisor in the Philippines for R&B Tea, a tea and coffee shop. When these brands are considered together, collectively, SPAVI – either directly or through subsidiaries, licensees, or sub-franchisors – operates approximately 2,300 restaurants and outlets around the world. I should note, because I anticipate the question will arise, SPAVI does not operate Shakey's in the United States, as the

EXHIBIT 1439 - 0003

ERVIN COHEN & JESSUP LLP

1  Americas, together with territories such as Japan and Malaysia, are operated by

2  separate entities. As such, those Shakey's outlets that might be familiar to this Court

3  are not owned by SPAVI, although the branding and trademarks remain largely

4  uniform. Other than those Shakey's outlets located in the territories mentioned

5  above, the remainder of the Shakey's restaurants around the world are operated by

6  SPAVI.

7    9.    From 2003 up through the beginning of the COVID-19 pandemic in

8  2020, SPAVI enjoyed 16 years of uninterrupted growth in revenue, operations, and

9  brand expansion, and a global reach in accomplishing this success. Although,

10  obviously, food services brands such as ours took an economic hit during the

11  pandemic (such that during fiscal year 2020 and 2021 our revenue resembled 2015

12  numbers), SPAVI's rebound has been astonishing. Indeed, 2022 was not only a

13  record year, but the growth in our revenue increased at a level never seen before in

14  our company, and that was exceeded the following year 2023. SPAVI is not only

15  back on track after the pandemic but appears to be rebounding with growth levels

16  never seen before in our company's history.

17

18    **SPAVI's Acquisition of the Potato Corner**

19    **Brand Effective March 5, 2022**

20    10.    Effective March 5, 2022, SPAVI acquired all assets and intellectual

21  property (including all trademarks, all copyrights, all trade secrets, etc.) relating to

22  the "Potato Corner" brand from Cinco Corporation ("Cinco") and its affiliated

23  companies. I personally participated in the negotiation and consummation of this

24  transaction, and I am among those who executed final deal documents on behalf of

25  SPAVI.

26    11.    Prior to the negotiations preceding the March 5, 2022 acquisition of the

27  Potato Corner brand (commencing sometime in 2021), neither SPAVI, nor any of its

28  affiliates, had any ownership stake in, business relationship with, or participation in

18393.1:11319523.5                    4

DECLARATION OF VICENTE GREGORIO IN SUPPORT OF PLAINTIFF SHAKEY PIZZA ASIA VENTURES,
INC.'S MOTION FOR PRELIMINARY INJUNCTION

EXHIBIT 1439 - 0004

1 Potato Corner, Cinco, or any of Cinco's affiliates or subsidiaries. SPAVI and its
2 subsidiaries and affiliates, on the one hand, and Cinco, and its subsidiaries and
3 affiliates, were unrelated – effectively strangers other than both operating out of
4 Manila – with no contractual or other duties, rights, or obligations, in one another,
5 except to the extent shareholders or officers of Cinco or its affiliates may have
6 owned shares of the publicly traded SPAVI.

7       12.    As a result of this transaction, as of March 5, 2022, and through the
8 present, SPAVI owns the entirety of the Potato Corner brand from Cinco, including
9 the trade name "Potato Corner" and all other related trademarks, service marks,
10 commercial symbols, copyrights, know-how, processes, trade secrets, confidential
11 recipes and other proprietary information. The value of the transaction was
12 estimated by SPAVI to be approximately 2.6 billion in Philippine pesos, or
13 approximately 44.6 million US dollars. Effective March 5, 2022, Cinco, and each of
14 its affiliates, ceased to have rights in and to any of the Potato Corner intellectual
15 property. This transaction did not, in any way, directly or indirectly, result in the
16 transfer of any rights to SPAVI (or SPAVI affiliate) in PCJV or PCI Trading.

17       13.    I was thrilled to take the lead on behalf of SPAVI in acquiring the
18 Potato Corner assets and intellectual property from Cinco, as I had (and have) great
19 admiration for the brand that its co-founders, including Jose Magsaysay, had
20 developed and the opportunity to grow that valuable brand worldwide.

21

22 **The Importance and Significant Value of SPAVI's Intellectual Property and**
23 **Trademarks, Including, Specifically, the Potato Corner Brand**

24       14.    SPAVI's value as reflected in its market capitalization in the
25 Philippines stock exchange (again, trading under the symbol "PIZZA") as of the
26 close of the market on October 9, 2024 is currently valued at approximately
27 **Murphy to insert in morning** billion in Philippine pesos, or approximately
28 **Murphy to insert in morning** million US dollars.

DECLARATION OF VICENTE GREGORIO IN SUPPORT OF PLAINTIFF SHAKEY PIZZA ASIA VENTURES, INC.'S MOTION FOR PRELIMINARY INJUNCTION

EXHIBIT 1439 - 0005

ERVIN COHEN & JESSUP LLP

15.    I credit much of SPAVI's success as an international food brand with what all of us at SPAVI have embraced as our "WOW" mission statement, which was adopted during my tenure as CEO and President. Each of us, in whatever role we play – from the individual stores selling pizza in the Philippines, to the Boardroom and "C" suite offices in Manila – have committed to "WOW Everyone, Everywhere, Everyday." I believe this is more than just corporate jargon. I have witnessed how this simple message can be adopted into each of our roles and has led to what I believe to be our extraordinary results. It is the people that operate SPAVI around the world that have made us a growing success.

16.    A foundational aspect of SPAVI's WOW mission is relevant to this dispute because we are committed to the belief that our company will only grow and succeed if we invest in three things: our brands, our stores, and our people. As such, SPAVI's brands – as well as our investment in, expansion of, and vigorous protection of SPAVI's brands – is core to the company's mission, value, and growth. Investment in our stores and people is equally important, as it is the stores that generate revenue, and the more stores we have, the more revenue is available, and the happier our employees and customers are, the more they will make each store a success.

17.    As a publicly traded company, SPAVI is required to prepare publicly disclosed – and filed with the Philippines Securities and Exchange Commission – audited financial statements for our shareholders reflecting the financial performance of SPAVI. Attached hereto as **Exhibit 32** is a true and correct copy of portions of SPAVI's fully audited Consolidated Financial Statement for the fiscal year 2023 and the Notes thereto, which were executed by me (as well as SPAVI's Board Chairman and SPAVI's Chief Financial Officer) on or around April 15, 2024 and which were attached as "Annex C" to SPAVI's SEC Form 17-A, filed, as amended, on April 16, 2024 with the Philippines Securities and Exchange Commission. This Consolidated Financial Statement of SPAVI for the year 2023

DECLARATION OF VICENTE GREGORIO IN SUPPORT OF PLAINTIFF SHAKEY PIZZA ASIA VENTURES, INC.'S MOTION FOR PRELIMINARY INJUNCTION

**EXHIBIT 1439 - 0006**

was prepared at SPAVI's supervision, by SPAVI's auditor SyCip Gorres Velayo & Co. ("SGV & Co."), which is a member practice of Ernst & Young International. SGV & Co. has performed SPAVI's annual financial audit (resulting in an audited financial statement) every year since 2016, and even going back to the 1990s before Shakey's Philippines (then called International Family Food Services, Inc., or IFFSI) became a publicly listed company in 2016. SPAVI's fully audited Consolidated Financial Statement for the fiscal year 2023 and Notes thereto (Exhibit 32) was prepared in the ordinary course of business of SPAVI, as an audited corporation and as part of its required annual financial audit, and this report was made at or near the time of the accounting and audit review by SGV & Co., which has knowledge of SPAVI's books and records. This document is the paradigmatic financial statement audit, prepared in compliance with the prevailing accounting standards, and the rules governing SPAVI's listing with the Philippines stock exchange.

18.    As reflected in Notes 6 and 14 of SPAVI's fully audited Consolidated Financial Statement for the fiscal year 2023 and Notes thereto (Exhibit 32 at pp. 17-18 and 25-26), SPAVI's entire trademark portfolio and goodwill in total was, as of December 31, 2023, valued at 8.77 billion in Philippine pesos, or approximately 150.31 million US dollars, and 1.32 billion Philippine pesos, or approximately 22.71 million US dollars, respectively.

19.    Also as reflected in those Notes (6 and 14 at pp. 17-18 and 25-26) of SPAVI's fully audited Consolidated Financial Statement for the fiscal year 2023 and Notes thereto (Exhibit 32), more than a third of that value in SPAVI's trademark and goodwill portfolio represents just the Potato Corner brand. Specifically, SPAVI's Potato Corner trademarks and goodwill are valued at 3.21 billion in Philippine pesos, or approximately 55.02 million US dollars, and 60.7 million Philippine pesos, or approximately 1.04 million US dollars, respectively.

18393.1:11319523.5

7

DECLARATION OF VICENTE GREGORIO IN SUPPORT OF PLAINTIFF SHAKEY PIZZA ASIA VENTURES, INC.'S MOTION FOR PRELIMINARY INJUNCTION

EXHIBIT 1439 - 0007

20.    Put simply, the value of the Potato Corner trademarks to SPAVI alone – not including the other Potato Corner assets acquired – are of substantial value to SPAVI. These approximately 55 million US dollars in assets of SPAVI – the Potato Corner trademarks and goodwill – represent what I believe to be the floor, given that there are so many markets in which the Potato Corner brand has not begun to achieve full penetration. We at SPAVI are putting our resources to work, and maximizing those markets in which Potato Corner has not achieved its potential. Over the last two years, we have added more Potato Corner outlets in China and the Philippines than we thought possible. Indeed, the more the Potato Corner brand grows, the more value will accrue to those trademarks and goodwill. The strength of this Potato Corner brand, however, must be protected by SPAVI from unauthorized and unsanctioned use.

21.    The US is another market that SPAVI believes has so much unmet potential. PCJV's failure to open more than 40 stores in a decade is not acceptable to us, when we are able to open as many stores in a year in other jurisdictions. We were willing to work with PCJV and show it how, with SPAVI's help, it can expand beyond its current snail pace. Unfortunately, as explained herein, despite SPAVI's good-faith and exhaustive attempts to negotiate a license agreement with PCJV and Mr. Koren (and the related Defendants named in this case), Mr. Koren and the Defendants took commercially unreasonable positions making it impossible for SPAVI to agree. As such, SPAVI must protect the immense value of the Potato Corner brand, and demand that the unauthorized use of SPAVI's protected intellectual property by the Defendants, and each of them, must cease. I also explain below the great harm our new brand is suffering every day Koren, PCJV, and the other Defendants' unlicensed operation of Potato Corner stores is permitted.

**My Directions within SPAVI Regarding our Good-Faith Negotiation of a License for the United States Potato Corner Operations**

DECLARATION OF VICENTE GREGORIO IN SUPPORT OF PLAINTIFF SHAKEY PIZZA ASIA VENTURES, INC.'S MOTION FOR PRELIMINARY INJUNCTION

EXHIBIT 1439 - 0008

ERVIN COHEN & JESSUP LLP

22.     I participated in, and evaluated information learned from, the due diligence performed by SPAVI prior to closing on the acquisition of the Potato Corner IP Portfolio beginning sometime in 2021.

23.     As part of this due diligence, we evaluated the status of Potato Corner IP rights in the various jurisdictions in which Potato Corner was operating around the world.

24.     As part of the negotiation of and due diligence regarding, the acquisition of the Potato Corner assets, I learned from those negotiating on behalf of Cinco the following, all of which was confirmed by Mr. Koren, to me, directly, in a lunch meeting that I attended with Mr. Koren, on May 18, 2023: at the time of SPAVI's acquisition, the Potato Corner operations in the United States were operated by a master franchisor, PCJV, an entity that was owned 60% by a subsidiary of Cinco, and the remaining 40% by a group referred to as the "LA Group," directed by Mr. Koren.

25.     I also learned from Cinco during these negotiations that PCJV and Cinco, among others, were in litigation regarding the ownership and governance of PCJV. Mr. Koren confirmed on May 18, 2023 the pendency of this litigation, which had been pending since 2018. That case was known as *Cinco Corporation et. al. v. Guy Koren et. al*, Los Angeles Superior Court Case No. BC701075 (the "Prior PCJV Governance Action").

26.     During our due diligence, SPAVI conducted a review of the public docket of this case and concluded that the litigation did not challenge or place in dispute – or even address from what we could tell – the ownership of any of the Potato Corner Intellectual Property SPAVI would be buying. We also did not see anything in the docket showing any dispute about, or challenge to, PCJV's license, or treatment of the Potato Corner IP. The battles appeared to be about who manages and governs PCJV and who decides which corporate opportunities to exploit. I was

EXHIBIT 1439 - 0009

I        6

1  confident that this corporate governance lawsuit had no bearing on or potential to

2  diminish the value or security of the rights we were buying.

3       27.    Because SPAVI was purchasing – and did purchase – the intellectual

4  property of Potato Corner and was not acquiring any interest in PCJV or any US

5  entity, SPAVI had no stake in nor would it be affected by any determinations in the

6  Prior PCJV Governance Action.

7       28.    My understanding from Cinco that I learned during the negotiations for

8  and due diligence regarding the acquisition of Potato Corner assets was that this

9  acrimonious litigation had been stayed – during and after execution of our deal with

10  Cinco – to allow for a potential settlement between Cinco and related parties, on the

11  one hand, and Mr. Koren and his affiliated entities, on the other. Mr. Koren

12  confirmed for me on May 18, 2023 the existence of this stay, as well as the fact that

13  among the primary deal points being negotiated during that stay was a written

14  license agreement governing PCJV's use of the Potato Corner brand, which would

15  state a length of the license term, describe renewal rights, as well as a royalty to be

16  paid to SPAVI.

17       29.    Although SPAVI had no stake in that litigation, it was important to me,

18  on behalf of SPAVI, that this litigation be brought to an end for two reasons. First,

19  no one could find a written agreement governing PCJV's use of the intellectual

20  property of Potato Corner had been executed, and getting this in place was crucial

21  for SPAVI to ensure was accomplished. Second, because SPAVI was going to be

22  the new licensor to PCJV, it was also important that PCJV exit from litigation and

23  focus on growing the Potato Corner brand in the United States.

24       30.    As a result of these understandings, I instructed those SPAVI officers

25  and principals involved in the negotiation on behalf of SPAVI to approach and work

26  with Mr. Koren, applying our WOW philosophy, to develop an independent,

27  trusting, positive, and constructive relationship with Mr. Koren. It was my goal –

28  and thus SPAVI's goal – to invite Mr. Koren to use SPAVI's acquisition of the

DECLARATION OF VICENTE GREGORIO IN SUPPORT OF PLAINTIFF SHAKEY PIZZA ASIA VENTURES,
INC.'S MOTION FOR PRELIMINARY INJUNCTION

EXHIBIT 1439 - 0010

ERVIN COHEN & JESSUP LLP

Potato Corner brand as a new chapter for the US Potato Corner operations. I believed that SPAVI had substantial resources and know-how to invest in Mr. Koren and PCJV that we were willing to commit, so as to allow PCJV to flourish and grow. I wanted SPAVI and Mr. Koren to develop an independent and mutually trusting relationship because that way, I believed, SPAVI and the United States operations could both flourish.

## Our Initial and Unsuccessful Efforts to Negotiate
## a License with PCJV During 2022

31.    With those directions in mind, in February 2022 – before our deal with Cinco for the acquisition of Potato Corner Intellectual Property closed – I asked SPAVI's Chief Operating Officer and Business Unit Head of Potato Corner, Jose Arnold T. Alvero, to take the lead on advocating for building this relationship between SPAVI and the US operations, and to monitor the progress of negotiations to resolve the Prior PCJV Governance Action so that SPAVI's interests were protected.

32.    In February 2022, I understood that a deal had been proposed by Cinco to settle the Prior PCJV Governance Action, with the guidance of a mediator, which would also include written license terms. Although I had some concerns about very low value for the license in that deal, SPAVI did not want to disrupt the negotiations by rejecting the terms of the license.

33.    I am informed and believe that, while Mr. Koren was considering the proposal offered by Cinco, which included license terms that would be binding on SPAVI, Mr. Alvero and Mr. Koren engaged in an online Zoom meeting on May 16, 2022, in which Mr. Alvero introduced SPAVI to Mr. Koren, after which they discussed the potential for the relationship between SPAVI and PCJV. During my lunch with Mr. Koren a year later, we discussed this initial "zoom" between he and

EXHIBIT 1439 - 0011

1    Mr. Alvero, and Mr. Koren expressed kind words to me about how he believed that

2    introduction started out this new relationship on a positive new footing.

3        34.    On or around May 27, 2022, I received a copy of and reviewed a

4    counter-proposal offered by Mr. Koren in response to Cinco's settlement proposal.

5    As it relates to the license for PCJV's use of the "Potato Corner Intellectual

6    Property" (a term defined more fully in the concurrently filed Declaration of Maria

7    Rosario L. Ybanez), Mr. Koren's proposal contained two deal points that were not

8    acceptable to SPAVI. First, Mr. Koren was proposing that the royalties to SPAVI be

9    paid from PCJV's receipt of royalties from its franchisees, rather than from those

10   stores' gross sales. This was highly unorthodox and is not a mechanism that SPAVI

11   would agree to. Second, Mr. Koren was demanding that his franchisees be exempted

12   from any obligation to pay for their use of the Potato Corner Intellectual Property.

13   This, too, would be unacceptable.

14       35.    I authorized a response to that counterproposal on or around August 2,

15   2022 to be communicated to the mediator, in which SPAVI expressed its concern

16   and objection to these two terms. We communicated this through the mediator that

17   the parties had hired to resolve the Prior PCJV Governance Action so as to not

18   disrupt the global concept they had conceived to resolve that litigation, which would

19   include finally executing a written license agreement. We did not, however, believe

20   that SPAVI was in active adversity or disputes with the defendants in the Prior

21   PCJV Governance Action. Put simply, I was not communicating this to settle a

22   dispute, but, rather, to facilitate a business transaction.

23       36.    I learned that after I communicated SPAVI's disapproval of Mr.

24   Koren's license deal terms, a proposal was made and being discussed that resolution

25   of this impasse be negotiated, and discussed, in the context of a mediation that

26   would include SPAVI. I also understand that, for the next six months, no such

27   follow-up mediation was scheduled, in part because of the unavailability of the

28   mediator, among other things.

18393.1:11319523.5                          12

DECLARATION OF VICENTE GREGORIO IN SUPPORT OF PLAINTIFF SHAKEY PIZZA ASIA VENTURES, INC.'S MOTION FOR PRELIMINARY INJUNCTION

EXHIBIT 1439 - 0012

ERVIN COHEN & JESSUP LLP

I    9

## SPAVI's Expansion of the Team and the Negotiation of License Terms with Mr. Koren and PCJV

37.     As of the beginning of 2023, I had become frustrated that our negotiations were being confined within the context of Cinco's settlement discussions with Mr. Koren, even though SPAVI was not a party to the Prior PCJV Governance Action. I was also frustrated by the lack of movement from Mr. Koren regarding what we believed to be his unreasonable demands. Accordingly, I elected to engage our negotiations directly – outside the context of the Prior PCJV Governance Action – along with Mr. Alvero and Yiow Leong Tan, whom SPAVI had hired in February of 2023 to serve as Group Director for International markets in SPAVI.

38.     Mr. Tan, Mr. Alvero, and I developed our new approach in early 2023 with the goal of meeting Mr. Koren personally to learn more about what was motivating him and about what he and the United States operations required to move past this stalemate. It was my goal to develop alternative solutions for Mr. Koren to consider, perhaps with arrangements other than a licensor-licensee relationship. It was my hope that we could help Mr. Koren understand that SPAVI's relationship with him would be different than what he had experienced in the past, and that there were substantial opportunities for him and the United States operations if we could figure out a path forward.

39.     My assumptions going into this new, more direct, approach included the following: (1) Potato Corner was not expanding in the United States as quickly as it could, thus depressing the potential value of what this brand could achieve with better penetration in this market, and (2) the current manner in which PCJV was operating the United States operations – as licensees without a formal written license agreement authorizing their use of the Potato Corner Intellectual Property – was untenable and unstable, requiring either a written license for a specified term in

DECLARATION OF VICENTE GREGORIO IN SUPPORT OF PLAINTIFF SHAKEY PIZZA ASIA VENTURES, INC.'S MOTION FOR PRELIMINARY INJUNCTION

EXHIBIT 1439 - 0013

I          0

1  which SPAVI was compensated, or some other mechanism or structure in the

2  relationship whereby SPAVI receives actual value for PCJV's use of the Potato

3  Corner brand.

4      40.    Together, in early 2023, Mr. Tan, Mr. Alvero, and I agreed to

5  accelerate our negotiations with Mr. Koren, to achieve these two goals of

6  maximizing the expansion of the brand in the United States in a manner that brings

7  value and is financially reasonable for SPAVI and its shareholders – goals that,

8  again, were not being satisfied.

9      41.    I, on behalf of SPAVI, and directing the negotiation, was open to

10  various alternatives, each of which would allow SPAVI to invest in and empower

11  Mr. Koren and PCJV to grow and achieve success, while bringing value to SPAVI

12  as well. Those options we would consider would be either the traditional licensor-

13  licensee route we had been discussing (so long as financially reasonable for

14  SPAVI), returning to a franchisor- franchisee relationship between SPAVI and

15  PCJV, or even acquiring PCJV so that SPAVI would operate the domestic

16  franchising entity and allow Mr. Koren to continue as a franchisee.

17  **My Meeting in Los Angeles with Mr. Koren**

18  **and Mr. Tan on May 18, 2023**

19      42.    I believe that relationships are best developed when potential partners

20  have some interaction in person. Given the importance of this negotiation, and the

21  need to resolve the unsettled status of PCJV operating without a written license to

22  use Potato Corner Intellectual Property, I recommended an in-person meeting in Los

23  Angeles with Mr. Koren, Mr. Tan, and myself.

24      43.    Mr. Koren agreed to this meeting, which was scheduled to occur on

25  May 18, 2023, in Los Angeles.

26      44.    Prior to that meeting, I reviewed, and approved, a letter to be sent on

27  SPAVI's behalf on May 4, 2023, proposing two ways in which SPAVI and Mr.

28  Koren (and PCJV) could establish their relationship: (1) a written license agreement

DECLARATION OF VICENTE GREGORIO IN SUPPORT OF PLAINTIFF SHAKEY PIZZA ASIA VENTURES,
INC.'S MOTION FOR PRELIMINARY INJUNCTION

ERVIN COHEN & JESSUP LLP

EXHIBIT 1439 - 0014

I        1

1  between PCJV and SPAVI, allowing PCJV to use the Potato Corner Intellectual

2  Property for a 20-year term (along with other details we outlined); or (2) SPAVI

3  acquires all of PCJV and allows Mr. Koren's affiliates to operate the Potato Corner

4  stores currently in operation in the United States.

5         45.    I personally attended, in Culver City, a lunch with Mr. Koren and Mr.

6  Tan, which was nearly two hours long. I have reviewed Mr. Tan's summary of the

7  meeting described in Paragraph 37 of his Declaration filed concurrently herewith,

8  and that conforms entirely with my recollection of what took place and was

9  discussed.

10         46.    During that lunch on May 18, 2023, I specifically recall explaining to

11 Mr. Koren that it was my goal, on behalf of SPAVI, to ensure Mr. Koren's success

12 and the success of PCJV and Potato Corner in the United States. I explained to Mr.

13 Koren the resources and expertise of SPAVI that we can make available to Mr.

14 Koren. Mr. Koren reacted in a manner that I understood to be relieved, appreciative,

15 and excited, about the opportunities we were offering him.

16         47.    As part of this discussion on May 18, 2023, I was clear that whatever

17 deal we negotiated with Mr. Koren and PCJV must make business sense and be

18 commercially reasonable to SPAVI. I reminded Mr. Koren that I owe duties to

19 SPAVI shareholders to make sure their assets, like the Potato Corner brand, yield

20 value, and that the current situation in which SPAVI is receiving no value for

21 PCJV's use of the Potato Corner Intellectual Property was untenable and needed to

22 be resolved.

23         48.    At no point during this lunch on May 18, 2023 did Mr. Koren object to

24 SPAVI's ownership of the Potato Corner Intellectual Property, or assert Cinco did

25 not have the right to sell us this brand without his consent. At no point did he state

26 that a license was already in place permitting the use of Potato Corner Intellectual

27 Property, nor did Mr. Koren advise that he believed that he and PCJV (and his

28 franchisees) possess a perpetual and irrevocable license to use the Potato Corner

DECLARATION OF VICENTE GREGORIO IN SUPPORT OF PLAINTIFF SHAKEY PIZZA ASIA VENTURES,
INC.'S MOTION FOR PRELIMINARY INJUNCTION

EXHIBIT 1439 - 0015

1    2

Intellectual Property, or that he possessed the right to use this intellectual property for free, any one of which would have obviated the need for a written license agreement for a specified term. To the contrary, Mr. Koren agreed, expressly, to my face, on May 18, 2023, that a written agreement memorializing PCJV's use of the intellectual property for a specified term must be negotiated. It was the nature of that relationship between SPAVI and PCJV (licensee/licensor; franchisee/franchisor; etc.) that had to be decided.

49.    I agree with Mr. Tan's assessment that our lunch with Mr. Koren was constructive, positive, and upbeat, and that each of us, including Mr. Koren, expressed excitement about the future of the United States Potato Corner operations with us at SPAVI as his partner. Mr. Koren expressed excitement during this lunch and expressed hope for the future.

50.    We left the lunch with Mr. Koren agreeing to take the next step: provide a proposal for the terms of PCJV and PCIT's use of Potato Corner Intellectual Property, whether with PCJV as a licensee, a franchisee, or with SPAVI taking over PCJV entirely.

**Mr. Koren Makes Unacceptable Proposals**
**and then Abandons the Negotiation**

51.    At the end of our lunch meeting on May 18, 2023, Mr. Koren left me with the impression that he would be placing this negotiation – and his presentation of a proposal – as a top priority. In a May 29, 2023 email exchange to which I was a recipient, a true and correct copy of which is attached hereto as **Exhibit 20**. I understood Mr. Koren to be communicating that he was focused on providing a "mutually acceptable" proposal and that we would receive it promptly.

52.    Mr. Koren waited until the end of June 2023 to finally provide that proposal, which, upon review, was unacceptable to SPAVI. Specifically, on June 28,

ERVIN COHEN & JESSUP LLP

DECLARATION OF VICENTE GREGORIO IN SUPPORT OF PLAINTIFF SHAKEY PIZZA ASIA VENTURES, INC.'S MOTION FOR PRELIMINARY INJUNCTION

EXHIBIT 1439 - 0016

I        3

2023, we received a proposed Term Sheet, a true and correct copy of which is attached hereto as **Exhibit 21**, containing what Mr. Koren was proposing.

53.    Based on my review of this June 28, 2023 Term Sheet (Exhibit 21), it was my understanding that Mr. Koren was rejecting any alternative relationship other than that as a licensee and licensor, and that he was proposing that the license fee to be paid by PCJV to SPAVI was an astonishingly low 0.6% of gross sales with his franchises (1/3 of the stores) exempted. I was disappointed with this proposal, given that this low royalty rate was too low, and the exemption for Mr. Koren's franchisees made no sense, as it is inconceivable why SPAVI should allow his franchisees to use this intellectual property for free, and, moreover, this would create an incentive for Mr. Koren to focus on opening only stores owned by him so as to avoid royalties.

54.    Separately, my understanding of Mr. Koren's Term Sheet was that it was proposing that any requirements for growth of the brand and addition of new stores domestically would have no enforcement mechanism, rendering those growth requirements as suggestions and not requirements. Put differently, if Mr. Koren and PCJV failed to add new stores at the rate agreed upon by the parties, this would not constitute a breach of contract, nor could that be a basis for non-renewal of the license. This demand effectively signaled to me that Mr. Koren did not intend to grow the brand as SPAVI expected from PCJV. If SPAVI were to agree to that term, SPAVI would be consenting to unacceptably slow growth of the brand in the United States going forward, without any mechanism to accelerate that growth.

55.    I, on behalf of SPAVI, was disappointed with this proposal in June of 2023, which was now more than one year after SPAVI had taken ownership of the Potato Corner brand. SPAVI could never agree to these terms, as they fail to achieve either of our requirements (commercial reasonableness to SPAVI and growth of the bran). Moreover, I was disappointed because this proposal indicated that Mr. Koren was rejecting and repudiating all that was discussed during our May 18, 2023 lunch

EXHIBIT 1439 - 0017

meeting. Rather than make a proposal for a license that would provide value to SPAVI and take advantage of the resources we were offering him, Mr. Koren intended to disregard SPAVI's needs and expectations.

56.    I attended a Zoom meeting with Mr. Koren and Mr. Tan on July 6, 2023, in which I explained to Mr. Koren that I, on behalf of SPAVI, could never agree to those deal terms. I explained to Mr. Koren, yet again, that SPAVI is publicly traded, and that we have financial obligations to our investors, and that I could not recommend SPAVI agree to these terms or to any license agreement that is financially unviable for SPAVI. I explained, for example, that the royalty rate is too low, far below market, and would not make financial sense to SPAVI as SPAVI would not be receiving value for its license.

57.    We explained to Mr. Koren that the low royalty rates are even worse, given that Mr. Koren was demanding that any benchmarks for growth of the brand in the United States be suggestive and not tied to any accountability or consequences. Put simply, Mr. Koren's proposal, as I explained, would provide no guarantee that SPAVI would ever receive any commercially reasonable compensation for the use of its intellectual property, and that the proposal provided no confidence that Potato Corner could grow at a rate we believed was possible, and necessary, for this relationship to make financial sense.

58.    I recall during that video conference that Mr. Koren expressed that his proposal was based on the financial condition of the United States Potato Corner operations and the financial condition of his franchisees. Based on these assertions, we requested, and Mr. Koren agreed on that July 6, 2023 video conference, to provide financials for PCJV and his stores so that we could better understand his position. I recall that we agreed to research other similar brands and the royalty rates that are paid, so as to confirm that the 0.6% proposed by Mr. Koren was substantially below market rates.

DECLARATION OF VICENTE GREGORIO IN SUPPORT OF PLAINTIFF SHAKEY PIZZA ASIA VENTURES, INC.'S MOTION FOR PRELIMINARY INJUNCTION

EXHIBIT 1439 - 0018

I        5

59.    Following that call, Mr. Tan sent an email on July 12, 2023 – which I reviewed and approved prior to transmission and that I also received – summarizing our call, our expectations, and providing some comparable market rates that Mr. Tan learned during his research. Mr. Tan reminded Mr. Koren to provide the financial information that he agreed to deliver to substantiate the low royalty rates he was insisting upon. A true and correct copy of this email is attached hereto as **Exhibit 23.**

60.    Mr. Koren then went silent for the remainder of 2023. He did not respond, did not provide the financial information he promised, and, as far as I was concerned, walked away from the negotiations. What made this effective abandonment of the negotiations most frustrating was that he, PCJV, and his franchisees were continuing to use Potato Corner Intellectual Property and was not offering any compensation during this negotiation period.

## My Final Attempt to Negotiate with Mr. Koren
## Before He Again Abandons Negotiations

61.    Although I believe SPAVI could have deemed the negotiations terminated, I am a hopeful person and believed we should provide one more opportunity to salvage the negotiation with the hope that we could actually enter into a mutually beneficial relationship with Mr. Koren.

62.    On January 23, 2024, I sent an email to Mr. Koren, a true and correct copy of which is attached hereto as **Exhibit 24**, in which I stated as follows:

> Dear Guy,
>
> First of all, I wish you a Happy New Year and I hope this note finds you well since we last spoke in July last year.
>
> Referring to the previous email sent by Yiow on July 12th, on our part we had shared with you the fees structure for several comparable kiosk-based snack brands in the US under a franchise agreement; our proposed fees in the letter sent to you in April are significantly lower. We also shared with you SPAVI's minimum year-by-year

DECLARATION OF VICENTE GREGORIO IN SUPPORT OF PLAINTIFF SHAKEY PIZZA ASIA VENTURES, INC.'S MOTION FOR PRELIMINARY INJUNCTION

**EXHIBIT 1439 - 0019**

ERVIN COHEN & JESSUP LLP

I     6

projected revenues / income stream we expect from the US business.

During our last call, we had made clear that the proposal you sent us on June 29th is far away from what is acceptable to us, it does not meet our business objectives nor our minimum financial requirements. We were hoping to see the actual financial statements for Potato Corner LA Group LLC and for your company-owned stores so that we can assess the impact of any proposed fees structure on your P&L profitability. To date we still have not received the information from you. With the financial statements, we will be in a better position to continue our discussion to reach a win-win arrangement.

With the above in mind, I suggest we have another meeting with you to continue our discussion and hopefully work towards an arrangement which is mutually agreeable and meets the objectives of both SPAVI and yourself.

Kindly advise on your availability this week or next week for the meeting.

Look forward to hearing back from you. Best regards, Vic

63.     Mr. Koren did not respond to my email in the days after I sent it. However, I learned from Mr. Tan that Mr. Koren confirmed receipt of the email on January 24, 2024, and had promised Mr. Tan that, over the next few weeks, I would receive the information he had promised the previous July and that I described in that email.

64.     It was not until three weeks later – February 16, 2024 – when I received information from Mr. Koren that I understood he intended to be responsive to my email of January 23, 2024. That email and attached information is attached hereto as **Exhibit 26**.

65.     The financial information received from Mr. Koren on February 16, 2024 did not, by my assessment, fully explain the financial picture of the United States Potato Corner operations sufficient to justify Mr. Koren's demand that he and PCJV could only pay below market royalty rates and that his stores be exempt from paying for the use of the brand. Moreover, the financial information he provided invited more questions than they answered. For example, Mr. Koren failed to

DECLARATION OF VICENTE GREGORIO IN SUPPORT OF PLAINTIFF SHAKEY PIZZA ASIA VENTURES, INC.'S MOTION FOR PRELIMINARY INJUNCTION

EXHIBIT 1439 - 0020

I        7

provide financials for PCIT or any specific store or franchisee, including his own, and revealed that Mr. Koren is being paid a handsome percentage (30%) of license fees from all the stores, undermining his claim of financial duress.

66.    On February 27, 2024, I sent an email to Mr. Koren, explaining why the financial information he had provided was insufficient, and specifying additional information we require, and explaining why. A true and correct copy of that email is attached hereto as **Exhibit 27**.

67.    Mr. Koren did not respond to my February 27, 2024 email (Exhibit 27).

68.    Mr. Tan followed up with Mr. Koren on March 5, 2024, a true and correct copy of which is attached hereto as **Exhibit 28**, asking whether Mr. Koren had received my February 27, 2024 email, and, again, explaining that we at SPAVI need a complete financial picture of Potato Corner operations in the United States so that it can properly assess its health and profitability in its entirety.

69.    Mr. Koren has **never** responded to my February 27, 2024 email, let alone even acknowledge receipt. To date, Mr. Koren has not responded to those emails or provided the information that I have requested.

70.    As of May 31, 2024, I concluded that Mr. Koren and PCJV had abandoned the negotiation, and that Mr. Koren's last proposal (June 28, 2023) was his "best and final," and, given that SPAVI had rejected those terms, the negotiation had failed.

### SPAVI Terminates Defendants' License to Use
### the Potato Corner Intellectual Property

71.    Given Mr. Koren's abandonment of the negotiations, and the failure to agree upon terms for use of the Potato Corner Intellectual Property by PCJV and PCIT (and the other Defendants), SPAVI had only one option given that PCJV, PCIT, and Mr. Koren's franchisees continued to use the Potato Corner Intellectual Property without paying any license fees to SPAVI: terminate the at-will license.

18393.1:11319523.5                                    21

DECLARATION OF VICENTE GREGORIO IN SUPPORT OF PLAINTIFF SHAKEY PIZZA ASIA VENTURES,
INC.'S MOTION FOR PRELIMINARY INJUNCTION

EXHIBIT 1439 - 0021

ERVIN COHEN & JESSUP LLP

I          8

72.    As such, I approved a notice of termination of the license of the Potato Corner Intellectual Property (the "Termination Letter"), which I understand was sent to Mr. Koren on May 31, 2024, at 7 a.m. That Termination Letter included a demand that each of the Defendants cease and desist from using Potato Corner Intellectual Property. A true and correct copy of the Termination Letter is attached hereto as **Exhibit 29**.

73.    I was surprised that, upon receipt of the Termination Letter, Mr. Koren made no attempt to communicate with me about his continued use of our intellectual property, or about his options with respect to the flavorings and other resources he must certainly have suspected would vanish, or what options are available for SPAVI's relationship with the Defendants going forward. Instead, Mr. Koren has pretended that it is "business as usual," and has brazenly continued to use our intellectual property, as if he has the rights to do so. Most significantly, Mr. Koren has not reached out to us to protect his franchisees from the consequences of this termination.

74.    Given how things have transpired – particularly Mr. Koren's brazen use of our intellectual property after the Termination Letter without so much as a communication with me about this violation of SPAVI's rights – we are no longer comfortable with him serving as the steward of the Potato Corner expansion in the United States. As such, the only option that SPAVI will now accept through negotiation is the acquisition of the leases and non-Potato Corner property in the Defendants' stores so that they can be considered for inclusion into SPAVI's domestic master franchisor that it intends to begin offering franchises in the US as soon as all regulatory requirements are satisfied.  SPAVI insists that it now be in charge of spreading the Potato Corner brand domestically, not Mr. Koren.

**The Potato Corner Brand Flavors, and My Efforts to Prevent Unauthorized Access to those Flavors from Unauthorized Parties**

DECLARATION OF VICENTE GREGORIO IN SUPPORT OF PLAINTIFF SHAKEY PIZZA ASIA VENTURES, INC.'S MOTION FOR PRELIMINARY INJUNCTION

EXHIBIT 1439 - 0022

ERVIN COHEN & JESSUP LLP

I          9

75.     At the core of what makes Potato Corner so special and unique – and why I worked so hard for SPAVI to acquire this brand in 2022 – is its unique food preparation, using the flavors the recipes for which are so closely guarded, all signified by its extensive family of trademarks, as well as its rich history. There are other aspects of this brand that also add value – other know how, information, processes etc. – but this is the center of what makes the Potato Corner so special, and valuable.

76.     As evidenced by SPAVI's actions in this case, we will protect this brand by taking action against all infringement, and otherwise protect all other confidential, proprietary, and trade secret information on which this brand is built. This includes the flavors, the recipe for which (method of preparation, ingredients, and relative quantities of ingredients) are only found in only a few places on earth (the supplier, a locked location at SPAVI, and one other location I cannot disclose). SPAVI and the supplier maintain the secrecy of this recipe. Each Potato Corner outlet has access only to the  list of flavor ingredients as they are included on the flavor package (without any information as to treatment, or preparation, respective quantities at each stage of preparation). Again, only licensed stores that have agreed to protect confidentiality have access. The disclosure of the flavoring packages to anyone who is not in Potato Corner is a violation of confidentiality.

77.     The distinctive flavors of Potato Corner are purchased by us, from one single supplier, who also owns some of the rights to that recipe along with SPAVI. We require all Potato Corner outlets around the world to acquire those flavors from us. We also do not permit any unlicensed Potato Corner to acquire those flavorings. There are a few other suppliers who have similar flavorings with whom SPAVI also has a relationship, and to whom SPAVI has communicated the great value of this "closed system" within which the distinctive Potato Corner flavors may circulate.

78.     With this closed system, we keep those distinctive unique flavors only within the approved Potato Corner network, and no other restaurant can offer it,

DECLARATION OF VICENTE GREGORIO IN SUPPORT OF PLAINTIFF SHAKEY PIZZA ASIA VENTURES,
INC.'S MOTION FOR PRELIMINARY INJUNCTION

ERVIN COHEN & JESSUP LLP

EXHIBIT 1439 - 0023

1    which adds to the value. We also maintain control over the information on those

2    flavor packages, which identify (not by quantities or preparation techniques) the

3    ingredients, which we want to prevent from reverse engineering.

4        79.    The Potato Corner brand would be damaged, if, for example, a

5    restaurant pretending to be Potato Corner, or using our marks without our approval,

6    obtained access to the flavors, and then prepared food that did not meet our

7    standards, and made people sick. Alternatively, the value of the distinctive flavor

8    would be diluted if anyone could buy these flavors and use them in their stores.

9        80.    I have communicated to suppliers to SPAVI of flavors that only Potato

10    Corner affiliates that have been approved and/or licensed by us, should be

11    purchasing flavors from our suppliers, so as to maintain the integrity of the closed

12    Potato Corner system. I have instructed them that, any attempts to obtain these

13    flavors by persons that are not licensed by SPAVI or approved by SPAVI, should

14    not be permitted.

15

16    **Our Filing of this Motion After Exhaustive Attempts to Allow the Third-Party**

17    **Franchisees an Opportunity to Protect Themselves**

18        81.    In the May 31, 2024 Termination Letter I signed – Exh. 29 at p. 6

19    (beginning with "Second") – I expressly instructed the now terminated licensee,

20    PCJV, that it must advise third party franchisees that SPAVI is offering a grace

21    period after termination of the license, so that they can continue operating Potato

22    Corner stores, while we figure out terms. This would allow these third parties to

23    continue their Potato Corner business with as minimal disruption as possible if an

24    injunction is in place.

25        82.    This was important to me, and SPAVI, because each of these third

26    parties are not at fault for Mr. Koren's having failed to negotiate the terms of a

27    license, but there will be consequences to their business, nonetheless. I have

28    compassion for these business owners, and, indeed, view them as potential partners

EXHIBIT 1439 - 0024

ERVIN COHEN & JESSUP LLP

for SPAVI's growth of the Potato Corner brand domestically now that Mr. Koren and PCJV (and PCIT) have been terminated.

83.    From filing of the Complaint, to the present, Mr. Tan, Mr. Alvero, and I agreed that we must locate those United States franchisees not controlled by Mr. Koren who will be impacted by the relief we seek – orders prohibiting the use of Potato Corner intellectual property – and offer them opportunities to negotiate a license with SPAVI directly. True and correct copies of letter correspondence sent to these third parties communicating offers to negotiate short-term licenses with SPAVI are attached hereto as **Exhibit 30** and **Exhibit 31**.

84.    I am confident that we have exhausted all efforts to apprise these third parties that, as a result of the Termination Letter, their rights to operate a Potato Corner have terminated (which arise from a sublicense granted by PCJV, which is now void as well), and that a potential injunction may immediately cease their right to operate.

85.    As of today, we are in the process of negotiating terms with respect to more than a few of the currently franchised stores, wherein they will receive licenses permitting their ongoing use of Potato Corner IP, and that would excuse them from any consequences of this injunction. As explained below,  if this Court grants the injunction SPAVI seeks, I will instruct SPAVI to be receptive to negotiate short term licenses with any additional third parties that change their minds in the face of a looming injunction.

**PCJV Has Refused to Inventory all Information and Property in its Possession, Preventing us From Knowing What Potato Corner IP it Possesses**

86.    In the May 31, 2024 Termination Letter I signed – Exh. 29 at p. 7 (beginning with "Fourth") – I expressly instructed Mr. Koren to inventory all of its Potato Corner IP so that we can evaluate how to ensure these unlicensed individuals cease to have access.

DECLARATION OF VICENTE GREGORIO IN SUPPORT OF PLAINTIFF SHAKEY PIZZA ASIA VENTURES, INC.'S MOTION FOR PRELIMINARY INJUNCTION

ERVIN COHEN & JESSUP LLP

EXHIBIT 1439 - 0025

87.    PCJV and Mr. Koren ignored this demand. As such, SPAVI has no ability to know what information PCJV has collected over the years that constitutes proprietary, confidential, or trade secret information.

88.    I understand PCJV's counsel has communicated that Defendants do not believe that any information they have received requires protection as confidential – which is counter to their representations over the years with respect to, for example, flavorings.

89.    SPAVI now has no way to know what information PCJV and its franchisees possess that could be confidential, proprietary, or trade secret, and now that PCJV has disclaimed any such protections, and is willing to disclose confidential information, we fear that he may disclose, or use, or steal any information that we do not know he even possesses.

90.    Given that we know Koren is developing a competitor (explained below), while in possession of unknown confidential, proprietary, or trade secret he refuses to identify and disclaims any obligation to protect from disclosure, the risk that the decades of hard work developing this brand could be stolen by someone once entrusted to spread Potato Corner in the US.

**Franchisee Concerns About Immediate**

**Supply of Flavors Can Be Resolved**

91.    I understand from those current franchisees I have spoken to, one of whom I met in person, that Mr. Koren did not tell the PCJV franchisees – as we instructed in our Termination Lette of May 31, 2024 (Exh. 29)—that they have options, and that SPAVI was offering an alternative to staying with PCJV, through a direct license that would give them certainty of the security of their rights. It seems as if Mr. Koren trapped his franchisees by not telling them about the termination of the Potato Corner Intellectual Property license and our offer to provide them with a license directly, forcing them to stay with PCJV.

DECLARATION OF VICENTE GREGORIO IN SUPPORT OF PLAINTIFF SHAKEY PIZZA ASIA VENTURES, INC.'S MOTION FOR PRELIMINARY INJUNCTION

ERVIN COHEN & JESSUP LLP

EXHIBIT 1439 - 0026

I        3

92.    Although I cannot guarantee that these franchisees, like Rada Kong (a declarant in PCJV's Emergency Application) will see this declaration, I can hope that now, Mr. Koren and PCJV will tell these franchisees, like Rada Kong that they have an alternative, which is this: SPAVI's offer remains open to those franchisees with whom we have not yet negotiated, a direct, short term license with us, that will give her and any other franchisee unaffiliated with Mr. Koren, freedom to use the Potato Corner Intellectual Property legally, and with access to flavorings, immediately even if an injunction is in place. They need only communicate to our counsel in this case, and we can make this reality within a few days.

## **Irreparable Harm that SPAVI Will Suffer**
## **if this Injunction Is Not Granted**

93.    The irreparable harm SPAVI will suffer if PCJV and the Defendants are allowed to proceed is substantial, numerous, and each compounds the other.

94.    First, if the Motion is not granted, SPAVI will have lost control of its intellectual property in the United States, causing irreparable damage to the value of one of SPAVI's most valuable assets – the Potato Corner Intellectual Property. Specifically, Defendants' continued, unauthorized use of the Potato Corner Intellectual Property interferes with SPAVI's basic right to control its own intellectual property, including its registered trademarks, and preserve the quality of that intellectual property. Put simply, SPAVI is powerless to force Defendants, including Mr. Koren, use and maintain the Potato Corner Intellectual Property consistently with SPAVI's goals, interests, and objectives. To the contrary, for reasons set forth above, it has become apparent that Mr. Koren is intent on using the Potato Corner Intellectual Property to further his own goals, interests, and objectives.

95.    Mr. Koren has admitted, now, that PCJV is doing just this. For example, in paragraph 56 of his September 22, 2024 declaration in support of its Ex

DECLARATION OF VICENTE GREGORIO IN SUPPORT OF PLAINTIFF SHAKEY PIZZA ASIA VENTURES, INC.'S MOTION FOR PRELIMINARY INJUNCTION

ERVIN COHEN & JESSUP LLP

EXHIBIT 1439 - 0027

I       4

Parte Application for a TRO [Dkt. 37-8], Mr. Koren admits that he is "always . . . creating new IP for" the Potato Corner stores, including, among other things "new logos." This was a surprise, given that PCJV has never, in four years, asked for SPAVI's approval for new logos and marks. As recently as June 28, 2023 (Exh. 21), Mr. Koren represented in one of his offers in the failed negotiation, that he would seek approval for all modifications of trademarks, which of course would include "new logos." By admitting to rolling out new logos, without seeking our approval, Mr. Koren has admitted that PCJV's offers and promises mean nothing and that Defendants have no hesitation deviating from our trademarks without our consent. We will have lost complete control, and Mr. Koren admits that control will be abused.

96.     Second, and related our inability to impose food quality and safety requirements is a serious concern. We not only want our food to be tasty, but we also want it to be safe. SPAVI has no ability to control the quality and safety of PCJV's stores and are learning that PCJV's stores are not following these rules and offering substandard, potentially unhealthy food. This will affect how consumers view our brand, and SPAVI will be stuck with a reputation that it had no power to stop.

97.     Third, contrary to PCJV's representations and promises that it "acknowledges that Licensor is the owner of the Marks," (Exh. 11 (October 10, 2010 document PCJV signed and claimed was the license agreement), **in this very case Mr. Koren is now claiming and Defendants are arguing that PCJV owns our marks** – the very same Potato Corner trademarks PCJV was entrusted to promote, on our behalf. [Dkt 37-1.] This truly brazen, and stunning position – in which our licensee now claims it is the owner of the intellectual property it was licensed – threatens the very foundation of the rights we are trying to protect. This means PCJV can assert that ownership over property it accepted as a licensee, whether through modifications, new marks, new logos (which PCJV already

EXHIBIT 1439 - 0028

ERVIN COHEN & JESSUP LLP

I    5

1  admitted it was rolling out), or, even worse, deviating to new products, or markets,

2  which are not approved.

3      98.    Fourth, contrary to PCJV's representations and promises that it

4  concedes that the Potato Corner IP includes trade secrets, and confidential

5  information, by repudiating those assertions and denying any intellectual property

6  other than trademarks, all of SPAVI's intellectual property in PCJV's possession –

7  which has never been inventoried for SPAVI – is now at risk of theft. If, for

8  example, as PCJV now claims, the flavor recipes are not trade secrets of SPAVI and

9  the supplier, neither PCJV, PCIT, nor Koren will hesitate to find ways to steal,

10  duplicate, disclose, or take for themselves, or the competitor that Koren is now

11  developing right under our nose. Indeed, in ¶ 51 of Guy Koren's September 22,

12  2024 declaration in support of PCJV's Ex Parte Application for a TRO [Dkt. 37-8],

13  he admits that he has previously attempted to reverse engineer the flavor recipes.

14  **Simply giving Mr. Koren access to these flavors gives him the ability to conduct**

15  **that reverse engineering again.** To Defendants, those flavors are theirs to use, not

16  protectible in any way, and their promises to protect trade secrets and confidential

17  information notwithstanding, they can, and have shown they will, steal.

18      99.    Fifth, and relatedly, we now know Defendants, while using Potato

19  Corner Intellectual Property are, at the same time, developing a competitor for the

20  Potato Corner brand. This kind of disloyalty to the brand is most certainly a harm

21  that we cannot wait until trial to cure. If, while Defendants are presenting

22  themselves as Potato Corner and benefiting from the Potato Corner trademark, they

23  are simultaneously preparing a competitor, Defendants can, without any

24  consequence or oversight, pick through the Potato Corner Intellectual Property,

25  including, for them to incorporate, adopt, and add value to their new competitor,

26  stealing what it took Potato Corner decades to develop.

27      100.   Sixth, the conduct of PCJV in the marketplace threatens to hurt our

28  Potato Corner brand and goodwill. The simple act of making false statements in its

DECLARATION OF VICENTE GREGORIO IN SUPPORT OF PLAINTIFF SHAKEY PIZZA ASIA VENTURES,
INC.'S MOTION FOR PRELIMINARY INJUNCTION

EXHIBIT 1439 - 0029

1  FDDs regarding the security and nature of its license (claiming falsely that PCJV

2  has an executed 20-year license with PCJV) threatens the core of how Potato Corner

3  will grow. If it becomes known that the those who lied to franchisees to induce them

4  into joining Potato Corner remains at the helm of the brand, Potato Corner will

5  never add more stores – the single most significant source of revenue growth. Who

6  would want to join a franchise family led by those who deceive to trap new

7  entrepreneurs? PCJV's conduct in this case alone – concealing the fact that each

8  franchisee has the option to negotiate a direct license with SPAVI causing them to

9  stay with him and potentially face serious disruption – reveals an abuse of

10 franchisees that will, again, hurt us where it hurts the most: in our ability to open

11 new stores.

12         101.    Of course, finally, Defendants' continued, unauthorized use of the

13 Potato Corner Intellectual Property is being done without ever paying a cent in

14 license fees to SPAVI. Indeed, PCJV and Mr. Koren actively repudiate any

15 obligation to pay for use of these rights, while claiming that they have some

16 perpetual irrevocable right, or that they have somehow obtained ownership over this

17 intellectual property. As such, not only are Defendants interfering with SPAVI's

18 basic rights to control and preserve its intellectual property but are doing so without

19 any benefit to SPAVI that it would be otherwise entitled to receive as the right

20 owner and licensor of the Potato Corner Intellectual Property. The absence of any

21 benefit to SPAVI that it would otherwise receive but for Defendants continued,

22 unauthorized use the Potato Corner Intellectual Property will again continue to

23 irreparably harm SPAVI if the Motion is not granted.

24         102.    If Mr. Koren and the other Defendants successfully launched a

25 competitor under our nose, stole confidential or proprietary information they now

26 / / /

27 / / /

28 / / /

DECLARATION OF VICENTE GREGORIO IN SUPPORT OF PLAINTIFF SHAKEY PIZZA ASIA VENTURES,
INC.'S MOTION FOR PRELIMINARY INJUNCTION

EXHIBIT 1439 - 0030

ERVIN COHEN & JESSUP LLP

102.    If Mr. Koren and the other Defendants successfully launched a competitor under our nose, stole confidential or proprietary information they now repudiate, reverse engineer flavors, after having abused and diluted our marks by modifying them, associating them with products or services inimical to the Potato Corner brand, or, fail to cure the mistreatment, and, quite frankly, intentionally misleading treatment of our valued Potato Corner store owners, the consequences could ruin the Potato Corner brand, irretrievably, including the value of the Potato Corner IP portfolio, which was valued by our auditors within the last two years to $55 million, USD, as explained in ¶ 19 above, and as supported by our audited financials as authenticated in ¶ 17. To be sure, this is certainly an undervaluation today, as our Potato Corner team continues to open new stores around the world..

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 9th day of October, 2024, at Parañaque in Metro Manila, Republic of the Philippines.

_____
Vicente Gregorio

DECLARATION OF VICENTE GREGORIO IN SUPPORT OF PLAINTIFF SHAKEY PIZZA ASIA VENTURES, INC.'S MOTION FOR PRELIMINARY INJUNCTION

EXHIBIT 1439 - 0031

# EXHIBIT 20

EXHIBIT 1439 - 0032

**From:** Yiow Leong Tan <yltan@shakeysinternational.com>
**Sent:** Monday, May 29, 2023 21:41
**To:** guy@potatocornerusa.com <guy@potatocornerusa.com>
**Cc:** Vic Gregorio <vlgregorio@shakeys.biz>
**Subject:** Re: Thank you for the meeting on May 18th

Hi Guy,

Thank you for your reply.

I am glad to know you feel as positively as Vic and I do about our meeting in LA, and towards the prospect of our working together to grow Potato Corner in the US under a license agreement.

We look forward to receiving your response to our previous letter, with your comments to the proposed terms contained within. Once received, we can arrange for a meeting via Zoom to discuss.

Meanwhile, if you have any comments or if there are any matters you would like to discuss with me, please feel free to contact me via email, whatsapp or a call.

Best regards, Yiow
Mobile: +65 - 9625 5583

1

EXHIBIT 1439 - 0033

**From:** Guy Koren <guy@potatocornerusa.com>
**Sent:** Monday, May 29, 2023 20:46
**To:** Yiow Leong Tan <yltan@shakeysinternational.com>
**Cc:** Vic Gregorio <vlgregorio@shakeys.biz>
**Subject:** Re: Thank you for the meeting on May 18th

Yiow
I hope this message finds you well!  It was with great pleasure meeting both Victor & you! now more than ever before, I feel positive about us being able to work together, starting with a new slate, and finding a mutually acceptable & beneficial common ground on which we can build on and expand Potato Corner which is our mutual goal ultimately.  I'm confident that with our common goal, we can reach a mutually agreeable license agreement working directly with each other rather then through litigation which is not conducive to what we are cc'd trying to achieve, we tried and it doesn't work.
As we discussed in the meeting, I am working
  a response to your proposed terms letter, per your request  I will email you once our response is ready to schedule a zoom meeting so we can review together.  Please let me if works for you or if you have any questions or concerns? Otherwise if works for you then great, I look forward to connecting soon!

Warm regards


Guy koren




On Fri, May 26, 2023 at 19:22 Yiow Leong Tan <yltan@shakeysinternational.com> wrote:

Dear Guy,

I trust this note finds you well since we met last week.

Thank you for meeting with Vic and myself. I think we had a good and open discussion, and we believe we are aligned on the long term potential of Potato Corner in the States.

As agreed during the meeting, you will respond to our previous letter to you with your comments on the proposed terms of the master license agreement. To date we have not yet heard back from you.

We look forward to receiving your comments in writing soon. Vic and I sincerely believe we can grow the Brand together in this market under the right partnership structure and with a Win-Win-Win mentality.

With kind regards,

EXHIBIT 1439 - 0034

4

Yiow
Mobile: +65 - 9625 5583
--

Regards,


Guy Koren
Potato Corner USA
President/Managing Partner
(310) 593-1581

EXHIBIT 1439 - 0035

# EXHIBIT 2

EXHIBIT 1439 - 0036

| From: | Yiow Leong Tan <yltan@shakeysinternational.com> |
|---|---|
| Sent: | Wednesday, July 12, 2023 7:17 AM |
| To: | Guy Koren |
| Cc: | Vic Gregorio |
| Subject: | Re: [EXT] License agreement - Proposed term sheet. June 28th, 2023. |
| Attachments: | PC USA - June 2023.xlsx |

Hi Guy,

Thank you for meeting with Vic and me last Thursday July 6th, 2023. I think it was a constructive discussion and I believe we now better understand each other's perspectives.

Our lawyer has highlighted to us that we have until this Friday July 14th to reach an agreement on the way forward for Potato Corner USA, before the judge demands that the case be brought to court. We therefore need to act quickly to come to an agreement, otherwise

Below are the action items which we had mutually agreed upon during our last meeting.

1. **Yiow and Guy to separately source for data on royalty / license fees for kiosk-based snacking / food brands in the US:**
   I have done research on the typical range of royalty rates and other fees charged by a Franchisor under a franchise agreement, please see below:

| Brand | Agreement | Royalty Rate | Initial Fees | Advertising Contribution |
|---|---|---|---|---|
| Auntie Anne's | Franchise | 7.0% of net sales | $10,500 to $35,500 depending on asset type | 1.0% of net Sales |
| Cinnabon | Franchise | 6.0% of net sales | $7,500 to $30,000 depending on asset type | 1.5% of net Sales |
| Subway | Franchise | 8.0% of gross sales | $7,500 to $15,000 | 4.5% of gross sales |

As you can see, compared to a typical kiosk-based snack / food brand in the US under a franchise agreement, SPAVI's proposed royalty rates in the License Agreement detailed in our letter are significantly lower. Had it been under a franchise arrangement our proposed fees will be higher. For example, the royalty rates will be in the 5% to 7% range at least.

2. **SPAVI to share with Guy our expected annual revenues / income based on the terms of the License Agreement in our letter to Guy dated April 2023**
   As Vic had mentioned, we are public listed company and have financial obligations to our investors and we cannot agree on an agreement which is financially unviable for us.
   Below is year-by-year projected revenues / income stream (in PHP millions) to SPAVI. The cumulative income over 15 years is USD 112 million including royalties and NSO/development fee. This is the minimum acceptable level to us.

   We have used the attached worksheet to calculate our projected revenues / income, this can be found in the first tab "SPAVI". You may use the same template to input your revised proposal including the royalty rates, development fee, new store opening plan etc. (see point 3 below)

1

**EXHIBIT 1439 - 0037**

4

| TOPLINE FORECAST* | Year 0 | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 |
|---|---|---|---|---|---|---|---|---|---|
| **Store revenues** | - | - | - | - | - | - | - | - | - |
| **Other income** | | 50 | 78 | 119 | 183 | 234 | 286 | 341 | 397 |
| *Royalties* | | 44 | 66 | 101 | 156 | 207 | 259 | 314 | 370 |
| *NSO/development fee* | | 6 | 12 | 18 | 27 | 27 | 27 | 27 | 27 |
| *Others* | | - | - | - | - | - | - | - | - |
| **Total Revenues and Income** | | 50 | 78 | 119 | 183 | 234 | 286 | 341 | 397 |

*Revenues /income here are in Philippine Pesos except for the last column which is shown in USD million.*

3. **SPAVI provide template to Guy to fill in his revised growth plan containing his proposed royalty / fees and annual Development schedule; Guy to share completed template with SPAVI by Thursday 13th July 2023**
Please use the tab "For Mr Koren Inputs" for your revised proposal / plan. You only need to fill in the green cells, the results / outputs are automatically calculated. We can then compare the projected revenues / income to SPAVI between the two scenarios.

4. **Guy to share Potato Corner LA Group LLC's audited financial statements with SPAVI, as well as unaudited financial statements for his company-owned Potato Corner stores and his franchised stores**
Please share with us the above financial statements soonest, as they will be helpful to us in our understanding the impact of our proposed royalty rates on your P&L profitability.

5. **SPAVI and Guy to have a follow up meeting to further our discussion**
This was tentatively set for Monday 17th July 2023 Philippines time (Sunday 16th July California time). However, in view of the timeline set by the judge, we will likely need to bring forward our next meeting. Please let us know your availability over the next few days.

Here, I reiterate that we are willing to work with you to grow Potato Corner together, provided the commercial terms are fair and makes sense to us financially.

Please let us know if you have any comments or questions on the above. Look forward to hearing back from you soon.

Regards, Yiow

---

**From:** Yiow Leong Tan <yltan@shakeysinternational.com>
**Date:** Tuesday, 4 July 2023 at 11:58
**To:** Guy Koren <guy@potatocornerusa.com>
**Cc:** Vic Gregorio <vlgregorio@shakeys.biz>
**Subject:** Re: [EXT] License agreement - Proposed term sheet. June 28th, 2023.

Hi Guy,

Happy 4th of July to you in advance!

I had sent you several text messages via whatsapp and iMessage. Vic and I would like to have a call or online meeting with you to discuss the way forward for Potato Corner in the US. Are you available tomorrow Wednesday or Thursday to speak with us?

It is urgent that we speak soon and that time is of essence. Look forward to hearing back from you.

Best, Yiow

**Yiow-Leong TAN**
Group Director of International
Shakey's Pizza Asia Ventures, Inc.

2

**EXHIBIT 1439 - 0038**

**M** +65 9625 5583   **E** yltan@shakeysinternational.com

---

**From:** Guy Koren <guy@potatocornerusa.com>
**Date:** Friday, 30 June 2023 at 10:58
**To:** Yiow Leong Tan <yltan@shakeysinternational.com>
**Cc:** Vic Gregorio <vlgregorio@shakeys.biz>
**Subject:** Re: [EXT] License agreement - Proposed term sheet. June 28th, 2023.

Hi Yiow,
Thank you for your email confirmation.  My mobile is (310) 593 - 1581.  I look forward to hearing from you and setting up either a call or an online meeting to go over the term sheet.  Please feel free to call me and/or text me anytime, early day or late night, it doesn't matter to me, I'll make myself available.

Sincerely,


Guy Koren



On Thu, Jun 29, 2023 at 17:24 Yiow Leong Tan <yltan@shakeysinternational.com> wrote:

Hi Guy,

We have received your proposal, thank you.

Please give us a few days to review it, we will contact you to arrange a call or online meeting. Can you share with us your mobile number, please?

Kind regards, Yiow

---

**From:** Guy Koren <guy@potatocornerusa.com>
**Sent:** Thursday, June 29, 2023 13:45
**To:** Vic Gregorio <vlgregorio@shakeys.biz>; Yiow Leong Tan <yltan@shakeysinternational.com>
**Subject:** [EXT] License agreement - Proposed term sheet. June 28th, 2023.

Hi Vicente & Yiow,
I hope this email finds you well. It was great meeting you, I appreciate you guys making the stop in LA so we can meet each other and put a face to the name, before your trip to the NRA show in Chicago.  I feel much better now that we have met because after our discussion I felt that we share a lot of similarities in our philosophy and in our vision of what Potato Corner can be, it's growth potential and it's place in the market. That helped a lot in my thinking of how to construct the proposal and finding a mutual ground we can meet and work together and grow together for our mutual benefit!

With that said, please find attached proposal for your review, I would really appreciate it if we could jump on a conference call, so we could review the proposal together and I could go over it point by point in detail and answer any questions you may have so there is no misunderstanding and we can hopefully move the ball forward some.  Let me know if & when you're available, today if possible or tomorrow if preferred.  I'll also try to call you and hopefully we can connect and discuss it together.

Looking forward to hearing from you!

**EXHIBIT 1439 - 0039**

Salamatpo,

--

Regards,


Guy Koren
Potato Corner USA
President/Managing Partner
(310) 593-1581

EXHIBIT 1439 - 0040

**SPAVI REVENUE FORECAST - POTATO CORNER USA**

Input Cell    --> Please input only in these cells. DO NOT change worksheet's formula

| TOPLINE FORECAST* | Year 0 | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 | Year 13 | Year 14 | Year 15 | 15-Year Total, in USD Mn |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Systemwide Store Count | 39 | 49 | 69 | 99 | 139 | 179 | 219 | 259 | 299 | 339 | 379 | 419 | 459 | 499 | 539 | 579 | |
| Company-Owned | 10 | 12 | 16 | 22 | 30 | 38 | 46 | 54 | 62 | 70 | 78 | 86 | 94 | 102 | 110 | 118 | |
| Franchised | 29 | 37 | 53 | 77 | 109 | 141 | 173 | 205 | 237 | 269 | 301 | 333 | 365 | 397 | 429 | 461 | |
| Systemwide Sales (SWS) | | 1,631 | 2,303 | 3,352 | 4,797 | 6,347 | 7,958 | 9,630 | 11,365 | 13,167 | 15,036 | 16,974 | 18,997 | 21,098 | 23,277 | 25,537 | 3,241 |
| Company-Owned | | 486 | 631 | 874 | 1,219 | 1,626 | 2,049 | 2,488 | 2,944 | 3,417 | 3,908 | 4,417 | 4,959 | 5,523 | 6,110 | 6,721 | 846 |
| Franchised | | 1,145 | 1,672 | 2,478 | 3,578 | 4,721 | 5,908 | 7,141 | 8,421 | 9,750 | 11,127 | 12,557 | 14,039 | 15,575 | 17,167 | 18,816 | 2,395 |
| Store revenues | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other income | | 50 | 78 | 119 | 183 | 234 | 286 | 341 | 397 | 456 | 517 | 580 | 646 | 715 | 786 | 860 | 112 |
| Royalties | | 44 | 66 | 101 | 156 | 207 | 259 | 314 | 370 | 429 | 490 | 553 | 620 | 688 | 759 | 833 | 105 |
| NSO/development fee | | 6 | 12 | 18 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 6 |
| Others | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Revenues and Income | | 50 | 78 | 119 | 183 | 234 | 286 | 341 | 397 | 456 | 517 | 580 | 646 | 715 | 786 | 860 | 112 |

*Financial amounts in Millions of Philippine Pesos*

| ASSUMPTIONS | Input | Remarks |
|---|---|---|
| Year 0 Company-Owned ADS, in USD | 2,192 | As confirmed with Ms Lyndah Bartolome |
| Year 0 Company-Owned ADS, in PHP | 122,752 | Converted using Forex rate in cell B31 |
| NSO Year 2 ADS as a % of Year 1 ADS | 100.00% | |
| Franchise ADS as a % of COO ADS | 70.00% | As confirmed with Ms Lyndah Bartolome |
| ADS Growth Rate, Year on Year | 2.00% | Conservative assumption based on US Federal Reserve target annual inflation rate. Note that 15-year food and beverage inflation rate in the US is 4.04% |
| Company-Owned Store Mix -- NSO Count | 20.00% | |
| Forex (PHP to USD 1.00) | 56.00 | Based on runrate -30 June 2023 |

| COMPANY-OWNED | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 | Year 13 | Year 14 | Year 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Store Count | 10 | 12 | 16 | 22 | 30 | 38 | 46 | 54 | 62 | 70 | 78 | 86 | 94 | 102 | 110 | 118 |
| NSOs | | 2 | 4 | 6 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 |
| | | | | | | | | | | | | | | | | |
| SWS - Existing (Php Mn) | | 442 | 451 | 552 | 750 | 1052 | 1464 | 1891 | 2335 | 2796 | 3274 | 3771 | 4298 | 4847 | 5418 | 6014 |
| Stores | | 10 | 10 | 12 | 16 | 22 | 30 | 38 | 46 | 54 | 62 | 70 | 78 | 86 | 94 | 102 |
| ADS | 122,752 | 122,752 | 125,207 | 127,711 | 130,265 | 132,871 | 135,528 | 138,239 | 141,003 | 143,824 | 146,700 | 149,634 | 152,627 | 155,679 | 158,793 | 161,969 |
| Days | | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 361 | 362 | 363 | 364 |
| | | | | | | | | | | | | | | | | |
| SWS - Year 2 of NSOs (Php Mn) | | 0 | 90 | 184 | 281 | 383 | 390 | 398 | 406 | 414 | 422 | 431 | 441 | 451 | 461 | 472 |
| Stores | | 0 | 2 | 4 | 6 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 |
| ADS | | 122,752 | 125,207 | 127,711 | 130,265 | 132,871 | 135,528 | 138,239 | 141,003 | 143,824 | 146,700 | 149,634 | 152,627 | 155,679 | 158,793 | 161,969 |
| Days | | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 361 | 362 | 363 | 364 |
| | | | | | | | | | | | | | | | | |
| SWS - NSOs (Php Mn) | | 44 | 90 | 138 | 188 | 191 | 195 | 199 | 203 | 207 | 211 | 215 | 220 | 225 | 231 | 236 |
| Stores (mid-year opening) | | 2 | 4 | 6 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 |
| ADS | | 122,752 | 125,207 | 127,711 | 130,265 | 132,871 | 135,528 | 138,239 | 141,003 | 143,824 | 146,700 | 149,634 | 152,627 | 155,679 | 158,793 | 161,969 |
| Days | | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180.5 | 181 | 181.5 | 182 |
| | | | | | | | | | | | | | | | | |
| Total SWS - Company-Owned (Php Mn) | | 486 | 631 | 874 | 1,219 | 1,626 | 2,049 | 2,488 | 2,944 | 3,417 | 3,908 | 4,417 | 4,959 | 5,523 | 6,110 | 6,721 |
| ROYALTY RATE | | 2.00% | 2.50% | 3.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% |
| Royalty income of SPAVI, in Php Mn | | 10 | 16 | 26 | 49 | 65 | 82 | 100 | 118 | 137 | 156 | 177 | 198 | 221 | 244 | 269 |

**EXHIBIT 1439 - 0041**

| | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 | Year 13 | Year 14 | Year 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *NSO RATE PER STORE, in PHP* | | 560,000 | 672,000 | 840,000 | 1,120,000 | 1,120,000 | 1,120,000 | 1,120,000 | 1,120,000 | 1,120,000 | 1,120,000 | 1,120,000 | 1,120,000 | 1,120,000 | 1,120,000 | |
| New Store Fee income of SPAVI, in Php Mn | | 1 | 3 | 5 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | |
| **TOTAL INCOME OF SPAVI FROM COMPANY-OWNED, in Php Mn** | | **11** | **18** | **31** | **58** | **74** | **91** | **108** | **127** | **146** | **165** | **186** | **207** | **230** | **253** | **278** |
| **FRANCHISED** | | **Year 1** | **Year 2** | **Year 3** | **Year 4** | **Year 5** | **Year 6** | **Year 7** | **Year 8** | **Year 9** | **Year 10** | **Year 11** | **Year 12** | **Year 13** | **Year 14** | **Year 15** |
| Store Count | 29 | 37 | 53 | 77 | 109 | 141 | 173 | 205 | 237 | 269 | 301 | 333 | 365 | 397 | 429 | 461 |
| NSOs | | 8 | 16 | 24 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 |
| **SWS - Existing (Php Mn)** | | **897** | **915** | **1191** | **1740** | **2578** | **3723** | **4912** | **6147** | **7430** | **8762** | **10143** | **11577** | **13064** | **14606** | **16204** |
| Stores | | 29 | 29 | 37 | 53 | 77 | 109 | 141 | 173 | 205 | 237 | 269 | 301 | 333 | 365 | 397 |
| ADS | | 85,926 | 87,645 | 89,398 | 91,186 | 93,009 | 94,870 | 96,767 | 98,702 | 100,676 | 102,690 | 104,744 | 106,839 | 108,975 | 111,155 | 113,378 |
| Days | | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 |
| **SWS - Year 2 of NSOs (Php Mn)** | | **0** | **252** | **515** | **788** | **1071** | **1093** | **1115** | **1137** | **1160** | **1183** | **1207** | **1231** | **1255** | **1281** | **1306** |
| Stores | | 0 | 8 | 16 | 24 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 |
| ADS | | 85,926 | 87,645 | 89,398 | 91,186 | 93,009 | 94,870 | 96,767 | 98,702 | 100,676 | 102,690 | 104,744 | 106,839 | 108,975 | 111,155 | 113,378 |
| Days | | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 |
| **SWS - NSOs (Php Mn)** | | **247** | **505** | **772** | **1050** | **1071** | **1093** | **1115** | **1137** | **1160** | **1183** | **1207** | **1231** | **1255** | **1281** | **1306** |
| Stores (mid-year opening) | | 8 | 16 | 24 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 |
| ADS | | 85,926 | 87,645 | 89,398 | 91,186 | 93,009 | 94,870 | 96,767 | 98,702 | 100,676 | 102,690 | 104,744 | 106,839 | 108,975 | 111,155 | 113,378 |
| Days | | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 |
| **Total SWS - Franchised (Php Mn)** | | **1,145** | **1,672** | **2,478** | **3,578** | **4,721** | **5,908** | **7,141** | **8,421** | **9,750** | **11,127** | **12,557** | **14,039** | **15,575** | **17,167** | **18,816** |
| *ROYALTY RATE* | | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% |
| Royalty income of SPAVI, in Php Mn | | 34 | 50 | 74 | 107 | 142 | 177 | 214 | 253 | 292 | 334 | 377 | 421 | 467 | 515 | 564 |
| *NSO RATE PER STORE, in PHP* | | 560,000 | 560,000 | 560,000 | 560,000 | 560,000 | 560,000 | 560,000 | 560,000 | 560,000 | 560,000 | 560,000 | 560,000 | 560,000 | 560,000 | 560,000 |
| New Store Fee income of SPAVI, in Php Mn | | 4 | 9 | 13 | 18 | 18 | 18 | 18 | 18 | 18 | 18 | 18 | 18 | 18 | 18 | 18 |
| **TOTAL INCOME OF SPAVI FROM FRANCHISED, in Php Mn** | | **39** | **59** | **88** | **125** | **160** | **195** | **232** | **271** | **310** | **352** | **395** | **439** | **485** | **533** | **582** |

| | Year 0 | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 | Year 13 | Year 14 | Year 15 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Company-Owned Stores - Mix in Store Count | | 24.5% | 23.2% | 22.2% | 21.6% | 21.2% | 21.0% | 20.8% | 20.7% | 20.6% | 20.6% | 20.5% | 20.5% | 20.4% | 20.4% | 20.4% | |
| Company-Owned Stores - Mix in SWS | | 29.8% | 27.4% | 26.1% | 25.4% | 25.6% | 25.8% | 25.8% | 25.9% | 26.0% | 26.0% | 26.0% | 26.1% | 26.2% | 26.2% | 26.3% | |
| Total NSO target | | 10 | 20 | 30 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 540 |

EXHIBIT 1439 - 0042

**MR KOREN REVENUE FORECAST - POTATO CORNER USA**

| Input Cell | --> Please input only in these cells. DO NOT change worksheet's formula |
|---|---|

| TOPLINE FORECAST* | Year 0 | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 | Year 13 | Year 14 | Year 15 | 15-Year Total, in USD Mn |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Systemwide Store Count | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Company-Owned | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Franchised | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Systemwide Sales (SWS) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Company-Owned | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Franchised | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Store revenues | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other income | | | | | | | | | | | | | | | | | |
| Royalties | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| NSO/development fee | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Others | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Revenues and Income | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |

*Financial amounts in Millions of Philippine Pesos

| ASSUMPTIONS | Input | Remarks |
|---|---|---|
| Year 0 Company-Owned ADS, in USD | | |
| Year 0 Company-Owned ADS, in PHP | 0 | Converted using Forex rate in cell B31 |
| NSO Year 2 ADS as a % of Year 1 ADS | | |
| Franchise ADS as a % of COO ADS | | |
| ADS Growth Rate, Year on Year | | Conservative assumption based on US Federal Reserve target annual inflation rate. Note that 15-year food and beverage inflation rate in the US is 4.04% |
| Company-Owned Store Mix -- NSO Count | | |
| Forex (PHP to USD 1.00) | 56.00 | Based on runrate -30 June 2023 |

| COMPANY-OWNED | Input | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 | Year 13 | Year 14 | Year 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Store Count | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| NSOs | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| SWS - Existing (Php Mn) | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Stores | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| ADS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Days | | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 361 | 362 | 363 | 364 |
| SWS - Year 2 of NSOs (Php Mn) | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Stores | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| ADS | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Days | | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 361 | 362 | 363 | 364 |
| SWS - NSOs (Php Mn) | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Stores (mid-year opening) | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| ADS | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Days | | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180.5 | 181 | 181.5 | 182 |
| Total SWS - Company-Owned (Php Mn) | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| ROYALTY RATE | | | | | | | | | | | | | | | | |
| Royalty income of SPAVI, in Php Mn | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |

**EXHIBIT 1439 - 0043**

-0    D    9 of 9   Page ID
#:2636

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 | Year 13 | Year 14 | Year 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *NSO RATE PER STORE, in PHP* | | | | | | | | | | | | | | | |
| **New Store Fee income of SPAVI, in Php Mn** | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **TOTAL INCOME OF SPAVI FROM COMPANY-OWNED, in Php Mn** | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **FRANCHISED** | | | | | | | | | | | | | | | |
| Store Count | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| NSOs | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **SWS - Existing (Php Mn)** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** |
| Stores | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| ADS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Days | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 |
| **SWS - Year 2 of NSOs (Php Mn)** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** |
| Stores | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| ADS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Days | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 |
| **SWS - NSOs (Php Mn)** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** |
| Stores (mid-year opening) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| ADS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Days | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 |
| **Total SWS - Franchised (Php Mn)** | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| *ROYALTY RATE* | | | | | | | | | | | | | | | |
| **Royalty income of SPAVI, in Php Mn** | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| *NSO RATE PER STORE, in PHP* | | | | | | | | | | | | | | | |
| **New Store Fee income of SPAVI, in Php Mn** | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **TOTAL INCOME OF SPAVI FROM FRANCHISED, in Php Mn** | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |

| | Year 0 | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 | Year 13 | Year 14 | Year 15 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Company-Owned Stores - Mix in Store Count | | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | |
| Company-Owned Stores - Mix in SWS | | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | |
| Total NSO target | | | | | | | | | | | | | | | | | 0 |

**EXHIBIT 1439 - 0044**

# EXHIBIT 2

EXHIBIT 1439 - 0045

| | |
|---|---|
| **From:** | Vic Gregorio <vlgregorio@shakeys.biz> |
| **Sent:** | Tuesday, January 23, 2024 2:19 AM |
| **To:** | guy@potatocornerusa.com |
| **Cc:** | Yiow Leong Tan |
| **Subject:** | PC USA |

Dear Guy,

First of all, I wish you a Happy New Year and I hope this note finds you well since we last spoke in July last year.

Referring to the previous email sent by Yiow on July 12th, on our part we had shared with you the fees structure for several comparable kiosk-based snack brands in the US under a franchise agreement; our proposed fees in the letter sent to you in April are significantly lower. We also shared with you SPAVI's minimum year-by-year projected revenues / income stream we expect from the US business.

During our last call, we had made clear that the proposal you sent us on June 29th is far away from what is acceptable to us, it does not meet our business objectives nor our minimum financial requirements. We were hoping to see the actual financial statements for Potato Corner LA Group LLC and for your company-owned stores so that we can assess the impact of any proposed fees structure on your P&L profitability. To date we still have not received the information from you. With the financial statements, we will be in a better position to continue our discussion to reach a win-win arrangement.

With the above in mind, I suggest we have another meeting with you to continue our discussion and hopefully work towards an arrangement which is mutually agreeable and meets the objectives of both SPAVI and yourself.

Kindly advise on your availability this week or next week for the meeting.

Look forward to hearing back from you. Best regards, Vic

Get Outlook for Android

EXHIBIT 1439 - 0046

# EXHIBIT 2

EXHIBIT 1439 - 0047

| From: | Guy Koren <g@gkcapitalllc.com> |
|---|---|
| Sent: | Friday, February 16, 2024 8:07 PM |
| To: | vlgregorio@shakeys.biz |
| Cc: | yltan@shakeysinternational.com |
| Subject: | [EXT] PCJV audited financial statements for 2020/2021/2022 |
| Attachments: | PCJV – Audited Financial Statements 202020212022.pdf |

Hi Vic,

I hope this email finds you well!  I apologize for the delay in sending you this, I wanted to include some financials of stores and was waiting on the CPA to finalize 2023 but they need a bit more time so I'll just send them to you later whenever they are ready since PCJV's financials are more important for you to review and those I have ready for you.  Attached you will find PCJV USA audited financials for the years 2020, 2021, and 2022.  We are about to begin the 2023 audit in a week or so and will gladly share it with you whenever it is completed.  Please don't hesitate to let me know if you have any question regarding the audited financial statements and whenever you're done with your review we can schedule a zoom meeting to discuss the terms of a new license agreement and hopefully we can get on the same page and agree on the terms of a new license agreement that's mutually acceptable that will serve as the foundation of a new healthy partnership that can and will grow and strengthen for years to come!

Looking forward to hearing from you once you have completed your review.


Regards,



Guy Koren
Potato Corner USA
President/ Managing Partner
(310) 593-1581

**EXHIBIT 1439 - 0048**

**PCJV USA, LLC DBA**
**POTATO CORNER**

**Financial Statements and**
**Independent Auditors' Report**

**December 31, 2022, 2021 and 2020**



**EXHIBIT 1439 - 0049**

5     4
I     9

**PCJV USA, LLC DBA POTATO CORNER**
**Financial Statements**
**December 31, 2022, 2021 and 2020**

**Table of Contents**

|  | Page |
|---|---|
| **Independent Auditors' Report** | 1 - 2 |
| **Financial Statements** | |
| Balance Sheets | 3 |
| Statements of Operations and Members' Equity | 4 |
| Statements of Cash Flows | 5 |
| **Notes to Financial Statements** | 6 - 14 |

**EXHIBIT 1439 - 0050**

5          4
I          0



## INDEPENDENT AUDITORS' REPORT

To the Members of
PCJV USA, LLC:

### Opinion

We have audited the accompanying financial statements of PCJV USA, LLC DBA Potato Corner (the "Company"), which comprise the balance sheets as of December 31, 2022 and 2021, the related statements of operations and members' equity and cash flows for the years then ended, and the related notes to the financial statements.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2022 and 2021, and the results of its operations and its cash flows for the year then ended in accordance with accounting principles generally accepted in the United States of America.

### Basis for Opinion

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Our responsibilities under those standards are further described in the Auditor's Responsibilities for the Audit of the Financial Statements section of our report. We are required to be independent of PCJV USA, LLC and to meet our other ethical responsibilities in accordance with the relevant ethical requirements relating to our audits. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

### Other Matters

*2020 Financial Statements*

The financial statements of PCJV USA, LLC as of and for the year ended December 31, 2020 was audited by Martini Akpovi Partners, LLC, who joined with WithumSmith+Brown, PC on February 1, 2022 and expressed an unmodified opinion on those statements dated April 20, 2021.

*Emphasis of a Matter*

As described in Note 1, the Company adopted Accounting Standards Codification Topic 842 as of January 1, 2022. The Company's 2021 and 2020 financial statements were not adjusted upon adoption and still follows Topic 840 as the Company utilized the practical expedient available under the guidance. Our conclusion is not modified with respect to this matter.

### Responsibilities of Management for the Financial Statements

Management is responsible for the preparation and fair presentation of the financial statements in accordance with accounting principles generally accepted in the United States of America, and for the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

In preparing the financial statements, management is required to evaluate whether there are conditions or events, considered in the aggregate, that raise substantial doubt about the Company's ability to continue as a going concern within one year after the date that the financial statements are available to be issued.

WithumSmith+Brown, PC    16830 Ventura Boulevard, Suite 501, Encino, California 91436-1717    T (818) 789 1179    F (818) 789 1162    withum.com

AN INDEPENDENT MEMBER OF HLB - THE GLOBAL ADVISORY AND ACCOUNTING NETWORK

EXHIBIT 1439 - 0051

5   4
1



**A ditors Responsibilities for the A dit of the Financial Statements**

Our objectives are to obtain reasonable assurance about whether the financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditor's report that includes our opinion. Reasonable assurance is a high level of assurance but is not absolute assurance and therefore is not a guarantee that an audit conducted in accordance with generally accepted auditing standards will always detect a material misstatement when it exists. The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control. Misstatements, including omissions, are considered material if there is a substantial likelihood that, individually or in the aggregate, they would influence the judgment made by a reasonable user based on the financial statements.

In performing an audit in accordance with generally accepted auditing standards, we:

Exercise professional judgment and maintain professional skepticism throughout the audit.

Identify and assess the risks of material misstatement of the financial statements, whether due to fraud or error, and design and perform audit procedures responsive to those risks. Such procedures include examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements.

Obtain an understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control. Accordingly, no such opinion is expressed.

Evaluate the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluate the overall presentation of the financial statements.

Conclude whether, in our judgment, there are conditions or events, considered in the aggregate, that raise substantial doubt about the Company's ability to continue as a going concern for a reasonable period of time.

We are required to communicate with those charged with governance regarding, among other matters, the planned scope and timing of the audit, significant audit findings, and certain internal control related matters that we identified during the audit.

*Withum Smith + Brown, PC*

May 18, 2023

**EXHIBIT 1439 - 0052**

**PCJV USA, LLC DBA POTATO CORNER**
**Balance Sheets**
**December 31, 2022, 2021, and 2020**

|  | 2022 | 2021 | 2020 |
|---|---|---|---|
| **Assets** | | | |
| **Current Assets** | | | |
| Cash and cash equivalents | $ 176,326 | $ 85,687 | $ 198,753 |
| Restricted cash | 580,790 | 519,816 | 436,634 |
| Accounts receivable, net | 206,742 | 232,694 | 206,621 |
| Inventory of food and beverages | 19,137 | 14,192 | 9,471 |
| Due from related parties | 75,250 | 107,487 | 39,987 |
| Note receivable | 40,960 | 40,959 | - |
| Prepaid expenses and other current assets | 11,825 | 41,800 | 33,498 |
| **Total Current Assets** | 1,111,030 | 1,042,635 | 924,964 |
| | | | |
| Equipment and leasehold improvements, net | 77,749 | 113,174 | 147,942 |
| Note receivable, net of current portion | 37,546 | 64,853 | - |
| Other assets | 26,360 | 26,360 | 27,231 |
| Right of use asset, operating | 158,647 | - | - |
| **Total Assets** | $ 1,411,332 | $ 1,247,022 | $ 1,100,137 |
| | | | |
| **Liabilities and Members' Equity** | | | |
| **Current Liabilities** | | | |
| Accounts payable and accrued expenses | $ 69,763 | $ 226,775 | $ 217,625 |
| Accounts payable - marketing | 618,137 | 533,638 | 478,140 |
| Due to member | 9,000 | 9,000 | 9,000 |
| Deferred revenue | 79,601 | 83,082 | 78,076 |
| Loan from member | 20,000 | 20,000 | 20,000 |
| Current portion of operating lease liability | 161,038 | - | - |
| **Total Current Liabilities** | 957,539 | 872,495 | 802,841 |
| | | | |
| Paycheck Protection Program loan | - | - | 102,738 |
| Deferred revenue, net of current portion | 489,044 | 526,128 | 437,142 |
| Operating lease liability, net of current portion | 6,878 | - | - |
| **Total Liabilities** | 1,453,461 | 1,398,623 | 1,342,721 |
| **Commitments and Contingencies** | | | |
| **Members' Equity (Deficit)** | (42,129) | (151,601) | (242,584) |
| **Total Liabilities and Members' Equity** | $ 1,411,332 | $ 1,247,022 | $ 1,100,137 |

The Accompanying Notes are an Integral Part of These Financial Statements

3

**EXHIBIT 1439 - 0053**

**PCJV USA, LLC DBA POTATO CORNER**
**Statements of Operations and Members' Equity**
**For the Years Ended December 31, 2022, 2021 and 2020**

|  | 2022 | 2021 | 2020 |
|---|---|---|---|
| **Revenues** | | | |
| Sale of food and beverages | $ 500,094 | $ 457,039 | $ 180,780 |
| Franchise fees | 68,941 | 103,311 | 64,615 |
| Area development fees | 31,624 | 15,500 | 14,875 |
| Royalty fees | 687,247 | 647,582 | 332,460 |
| Rebates | 326,396 | 284,575 | 154,355 |
| Marketing fund revenue | 138,108 | 152,625 | 64,951 |
| **Total Revenues** | 1,752,410 | 1,660,632 | 812,036 |
| **Cost of Sales - Food and Beverages** | 521,147 | 468,641 | 138,422 |
| **Selling, General and Administrative Expenses** | 1,118,491 | 1,271,315 | 1,174,178 |
| **Income (Loss) from Operations** | 112,772 | (79,324) | (500,564) |
| **Other Income** | | | |
| Gain from sale of franchised store | - | 60,358 | - |
| Other income (Note 7) | - | 130,538 | 10,000 |
| **Total Other Income** | - | 190,896 | 10,000 |
| **Income (Loss) Before Limited Liability Company Fees** | 112,772 | 111,572 | (490,564) |
| **Limited Liability Company Fees** | 3,300 | 3,300 | 3,300 |
| **Net Income (Loss)** | 109,472 | 108,272 | (493,864) |
| **Members' Equity (Deficit), Beginning of Year** | (151,601) | (242,584) | 251,280 |
| **Distribution to Members** | - | (17,289) | - |
| **Members' Equity (Deficit), End of Year** | $ (42,129) | $ (151,601) | $ (242,584) |

The Accompanying Notes are an Integral Part of These Financial Statements

4

**EXHIBIT 1439 - 0054**

# PCJV USA, LLC DBA POTATO CORNER
## Statements of Cash Flows
## For the Years Ended December 31, 2022, 2021, and 2020

| | 2022 | 2021 | 2020 |
|---|---|---|---|
| **Cash Flows from Operating Activities** | | | |
| Net income (loss) | $ 109,472 | $ 108,272 | $ (493,864) |
| Adjustments to reconcile net income (loss) to net cash provided (used) by operating activities: | | | |
| Allowance for doubtful accounts | - | 1,286 | 1,416 |
| Depreciation and amortization | 42,914 | 46,968 | 44,661 |
| Amortization of right-of-use asset - operating | 158,178 | - | - |
| Gain from forgiveness of PPP Loan | - | (102,738) | - |
| Changes in assets and liabilities: | | | |
| Accounts receivable | 25,952 | (27,359) | 36,320 |
| Inventory of food and beverages | (4,945) | (4,721) | 947 |
| Prepaid expenses and other current assets | 29,975 | (8,302) | (5,431) |
| Other assets | - | 871 | (15,000) |
| Accounts payable and accrued expenses | (157,012) | 9,150 | 153,001 |
| Accounts payable - marketing | 84,499 | 55,498 | 30,359 |
| Due from related parties | 32,237 | (67,500) | (36,033) |
| Due to member | - | - | 9,000 |
| Deferred revenue | (40,565) | 93,992 | (63,998) |
| Operating lease liability | (148,909) | - | - |
| **Net Cash Provided (Used) by Operating Activities** | 131,796 | 105,417 | (338,622) |
| **Cash From Investing Activities** | | | |
| Purchase of equipment and leasehold improvements | (7,489) | (12,200) | - |
| Issuance of note receivable | - | (122,879) | - |
| Repayments on note receivable | 27,306 | 17,067 | - |
| **Net Cash Provided (Used) by Investing Activities** | 19,817 | (118,012) | - |
| **Cash From Financing Activities** | | | |
| Proceeds from Paycheck Protection Program loan | - | - | 102,738 |
| Distribution to members | - | (17,289) | - |
| **Total Cash Provided (Used) by Financing Activities** | - | (17,289) | 102,738 |
| **Net Increase (Decrease) in Cash, Cash Equivalents and Restricted Cash** | 151,613 | (29,884) | (235,884) |
| **Cash, Cash Equivalents and Restricted Cash Beginning of Year** | 605,503 | 635,387 | 871,271 |
| **Cash, Cash Equivalents and Restricted Cash End of Year** | $ 757,116 | $ 605,503 | $ 635,387 |
| **Supplemental Cash Flow Information** | | | |
| Cash Paid During the Year for: | | | |
| Limited Liability Company Fees | $ - | $ - | $ - |
| Interest | $ - | $ - | $ - |
| The following table provides a reconciliation of cash, cash equivalents and restricted cash to amounts reported in the balance sheets: | | | |
| Cash and cash equivalents | $ 176,326 | $ 85,687 | $ 198,753 |
| Restricted cash | 580,790 | 519,816 | 436,634 |
| Cash, cash equivalents and restricted cash | $ 757,116 | $ 605,503 | $ 635,387 |

The Accompanying Notes are an Integral Part of These Financial Statements

5

EXHIBIT 1439 - 0055

**PCJV USA, LLC DBA POTATO CORNER**
**Notes to Financial Statements**
**For the Years Ended December 31, 2022, 2021, and 2020**

**Note 1 – Summary of Significant Accounting Policies**

<u>Description of Businesses</u>

PCJV USA, LLC (the "Company" or "PCJV") was organized to engage in the business of franchising the Potato Corner® food business, as well as to establish and operate franchise and company-owned stores within the United States. PCJV is a limited liability company formed under Delaware law on July 16, 2010. PCJV has sold franchise licenses to franchisees in California, Florida, Nevada, New Jersey, New Mexico, New York, Texas, Washington, Minnesota, Arizona, Georgia and Pennsylvania

The Company grants franchisees the rights to operate a Potato Corner® store and to use the Company's business formats, methods, procedures, signs, designs, layouts, standards, specifications, trademarks, service marks and commercial symbols in its operations, under franchise agreements for a 10 year term. Upon signing a franchise agreement, the Company generally receives a franchise fee of $10,000 - $30,000 for a single location. Franchise fees are subject to discounts at the Company's discretion.

The Company may also enter into an area development agreement which grants a franchisee an exclusive territory in which to operate Potato Corner® stores.

The Company owns and operates a single Potato Corner store located in Downey, California ("Potato Corner Stonewood").

The Company is managed pursuant to written documents vesting day-to-day management to Potato Corner LA Group, LLC ("LA Group"). The Company's written governing document required an initial contribution of $50,000 from the members and that any subsequent increase of capital shall only be made upon affirmative vote of 75% of the board managers. The liability of the members of the Company is limited to the members' total capital contributions. The Company will only terminate upon an affirmative agreement by the members.

<u>Transfer of Potato Corner Roseville to PCJV and Subsequent Sale</u>

In April 2021, the Company terminated a franchise agreement with another franchisee who was operating one of the Potato Corner stores located in Roseville, California ("Potato Corner Roseville") due to the franchisee's failure to cure defaults which included ongoing violations of the Company's system standards. At the time of the transfer, Potato Corner Roseville owned certain fully depreciated equipment and no inventories. Also at the time of the transfer, the Company assumed $49,482 of unpaid rents incurred by Potato Corner Roseville.

In September 2021, the Company sold the operations of Potato Corner Roseville to an unrelated third-party in accordance with an asset purchase agreement for $122,879 payable over 36 monthly installment payments with 0% interest. Potato Corner Roseville did not have any assets at the time of sale. As a result of this transaction, the Company recognized a gain of $60,358, net of assumed rent liability of $49,482 and selling cost of $13,039 in its 2021 statement of operations. As of December 31, 2022, and 2021, note receivable resulting from the asset purchase agreement was $78,506 and $105,812, respectively.

**EXHIBIT 1439 - 0056**

**PCJV USA, LLC DBA POTATO CORNER**
**Notes to Financial Statements**
**For the Years Ended December 31, 2022, 2021, and 2020**

---

**Note 1 – Summary of Significant Accounting Policies (continued)**

Transfer of Potato Corner Roseville to PCJV and Subsequent Sale (continued)

The note receivable matures as follows for the years ending December 31:

| | |
|---|---|
| 2023 | $ 40,960 |
| 2024 | 37,546 |
| | $ 78,506 |

Basis of Presentation

The accompanying financial statements are prepared in conformity with accounting principles generally accepted in the United States of America.

Reclassification

Certain prior year amounts have been reclassified for consistency with the current year presentation. These reclassifications had no effect on the reported results of operations.

Use of Estimates

The preparation of the financial statements in accordance with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the amounts reported in the financial statements and accompanying notes. Significant estimates and assumptions made by management are used for, but not limited to, the allowance for doubtful accounts and the estimated useful lives and impairment of long-lived assets. Actual results could differ from those estimates.

Revenue Recognition

The Company follows the provisions of Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") Topic 606, *"Revenue from Contracts with Customers"* in recognizing its revenues. Under this guidance, revenue is recognized as goods or services are delivered to customers in an amount that reflects the consideration the Company expects to be entitled in exchange for those goods or services.

*Sale of Food and Beverages*
Sales by Potato Corner Stonewood are recognized when payment is tendered at the point of sale. Sales are presented net of sales tax and other sales related taxes.

*Franchise Fees*
The Company recognizes initial franchise fees as a distinct series of performance obligations which the Company accomplishes over the term of the contract, which is typically 10 years. Accordingly, payments received from the sale of franchises are deferred and recognized as revenues over 10 years starting from the contract execution or store opening date using the straight-line method.

EXHIBIT 1439 - 0057

**PCJV USA, LLC DBA POTATO CORNER**
**Notes to Financial Statements**
**For the Years Ended December 31, 2022, 2021, and 2020**

---

**Note 1 – Summary of Significant Accounting Policies (continued)**

Revenue Recognition (continued)

*Area Development Fees*
Area development fees are deferred until a new store is opened pursuant to the area development agreement. At which time, revenue is recognized on a straight-line basis over the term of the franchise agreement. Cash payments for area development agreements are typically due when an area development agreement has been executed.

Franchise fees and area development fees allocated to remaining performance obligations for the year ending December 31 are as follows:

|  |  |
|---|---|
| 2023 | $ 79,601 |
| 2024 | 68,210 |
| 2025 | 69,338 |
| 2026 | 67,977 |
| 2027 | 62,852 |
| Thereafter | 220,667 |
|  | $ 568,645 |

*Royalty Fees*
In addition to the initial franchise fee, each of the franchise locations is required to remit to the Company a monthly royalty fee of up to 6% of the store's gross sales (as defined in the franchise agreement). If the store fails to report its current month's gross sales, the royalty due will be 120% of the last monthly royalty paid to the Company. Royalty fees are recognized as revenue on a monthly basis when earned.

*Rebates*
The Company receives rebates from various suppliers of franchised stores, typically on a quarterly or monthly basis, which are based on the volume of goods shipped to the franchisees. Rebates received are recognized as income in the appropriate period when the transaction that results in such rebates has been fulfilled and the rebate amount has been determined. Rebates that have not been received are accrued when the amounts are reasonably estimable and collection is reasonably assured.

Cash and Cash Equivalents

The Company considers all highly liquid investments purchased with maturities of 3 months or less at the time of purchase to be cash equivalents. The Company also maintains cash in bank deposit accounts which, at times, may exceed federally insured limits. Any loss incurred or lack of access to such funds could have a significant adverse impact on the Company's financial condition, results of operations and cash flows.

Restricted Cash

Restricted cash consists of contributions received from franchisees for the sole purpose of advertising and development and are not available for general operating purposes (see Note 4).

**EXHIBIT 1439 - 0058**

**PCJV USA, LLC DBA POTATO CORNER**
**Notes to Financial Statements**
**For the Years Ended December 31, 2022, 2021, and 2020**

---

**Note 1 – Summary of Significant Accounting Policies (continued)**

Accounts Receivable

Accounts receivable are carried at original invoice amount less an estimate made for doubtful accounts and consist primarily of royalties, marketing funds and franchise fees due from franchisees. The allowance for doubtful accounts is determined by evaluating individual account balances, considering a franchisee's financial condition and credit history and current economic conditions. At December 31, 2022, 2021, and 2020 management recorded an allowance for doubtful accounts of $2,702, $2,702, and $1,416 respectively. Accounts receivable are written off when deemed uncollectible. Recoveries of accounts receivable previously written off are recorded as income when received. Management determines the past due status of accounts receivable based on contractual terms with each franchisee. Interest is not charged on past due accounts. Accounts receivable at January 1, 2020 was $244,357.

Inventory

Inventory, consisting of food and beverages, is value at the lower of cost or net realizable value. Cost is determined by the first-in, first-out method.

Equipment and leasehold improvements

Equipment and leasehold improvements are recorded at cost. Depreciation is calculated using the straight-line method over the estimated useful lives of the assets, which range from 3 to 7 years. Leasehold improvements are amortized over the shorter of their estimated useful lives or respective lease term. Upon the disposition of an asset, its accumulated depreciation is deducted from the original cost, and any gain or loss is reflected in current earnings. Repairs and maintenance that do not enhance the use or extend the life of equipment and leasehold improvements are expensed as incurred.

Impairment

The Company reviews its long-lived assets whenever events or circumstances indicate that the carrying amounts of such assets may not be recoverable. Impairment is evaluated by comparing the carrying value of the assets with the estimated future net undiscounted cash flows expected to result from the use of the assets, including cash flows from disposition. Should the sum of the expected future net cash flows be less than the carrying value, the Company would recognize an impairment loss at that date for the amount by which the carrying amount of the asset exceeds its fair value. Management has determined that no impairment existed as of December 31, 2022, 2021 and 2020.

Advertising

Advertising costs are charged to operations as incurred. There was no significant advertising expense incurred for the years ended December 31, 2022, 2021 and 2020, other than amounts related to marketing funds collected from franchisees (see Note 4).

**EXHIBIT 1439 - 0059**

**PCJV USA, LLC DBA POTATO CORNER**
**Notes to Financial Statements**
**For the Years Ended December 31, 2022, 2021, and 2020**

---

**Note 1 – Summary of Significant Accounting Policies (continued)**

Income Taxes

The Company is a limited liability company and, as such, is taxed as a partnership. Accordingly, each member separately accounts for their pro-rata share of the Company's items of income, deductions, losses and credits on their respective individual income tax returns. As a result of this election, income taxes representing the fees for doing business in California as a limited liability corporation as well as filing fees to the State of Delaware have been recognized in the accompanying financial statements.

Accounting principles generally accepted in the United States of America require management to evaluate tax positions taken by the Company and recognize a tax liability (or asset) if the Company has taken an uncertain tax position that more likely than not would not be sustained upon examination by the Internal Revenue Service. Management has analyzed the tax positions taken by the Company, and has concluded that as of December 31, 2022, 2021 and 2020, there were no uncertain tax positions taken or expected to be taken that would require recognition of a liability (or asset) or disclosure in the financial statements. The Company is subject to routine audits by taxing and other jurisdictions. However, there are currently no audits in progress for any prior tax periods.

Leases

The Company categorizes leases with contractual terms longer than 12 months as either operating or financing. Finance leases are generally those that allow the Company to substantially utilize or pay for the entire asset over its estimated life. All other leases are categorized as operating leases. Leases with contractual terms of 12 months or less are not recorded on the balance sheet. The Company has no finance leases during 2022.

Certain lease contracts include obligations to pay for other services, such as operations, property taxes, and maintenance. The services are accounted for separately and the Company allocates payments to the leases and other service components based on estimated stand-alone prices.

Lease liabilities are recognized at the present value of the fixed lease payments, reduced by landlord incentives, using a discount rate based on the risk-free rate. Right-of-use ("ROU") assets are recognized based on the initial present value of the fixed lease payments, reduced by landlord incentives, plus any direct costs from executing the leases. Lease assets are tested for impairment in the same manner as long-lived assets used in operations.

Options to extend lease terms, terminate leases before the contractual expiration date, or purchase the leased assets, are evaluated for their likelihood of exercise. If it is reasonably certain that the option will be exercised, the option is considered in determining the classification and measurement of the lease.

Costs associated with operating lease assets are recognized on a straight-line basis within operating expenses over the term of the lease.

EXHIBIT 1439 - 0060

**PCJV USA, LLC DBA POTATO CORNER**
**Notes to Financial Statements**
**For the Years Ended December 31, 2022, 2021, and 2020**

---

**Note 1 – Summary of Significant Accounting Policies (continued)**

Recent Accounting Pronouncement

In February 2016, the FASB issued an Accounting Standards Update ("ASU") amending the accounting for leases. The Company adopted the new standard effective January 1, 2022, using the modified retrospective approach. Comparative prior periods were not adjusted upon adoption, as the Company utilized the practical expedient available under the guidance. Further, the Company elected to implement the package of practical expedients, whereby the Company did not reassess existing contracts for embedded leases, financing or operating classification, or consideration of initial direct costs. The implementation of this standard did not have a material impact to the statement of operations or cash flows.

Upon adoption, the Company recognized $158,647 in ROU assets, net of deferred rent liability of approximately $10,000 which was reclassified from current liabilities, related to its operating leases. Corresponding lease liability of $167,916 were also recognized. There was no cumulative effect of applying the new standard, and accordingly, there was no adjusted to retained earnings upon adoption.

Fair Value of Financial Instruments

Unless otherwise specified, management believes the carrying value of financial instruments approximates their fair value.

Subsequent Events

The Company has considered subsequent events through May 18, 2023, the date the financial statements were available to be issued, in preparing the financial statements.

**Note 2 – Equipment and Leasehold Improvements**

Equipment and leasehold improvements consisted of the following:

|  | 2022 | 2021 | 2020 |
|---|---|---|---|
| Computer equipment | $ 47,252 | $ 38,082 | $ 23,037 |
| Furniture and fixtures | 34,114 | 34,114 | 36,958 |
| Leasehold improvements | 180,000 | 180,000 | 180,000 |
|  | 261,366 | 252,196 | 239,995 |
| Less: accumulated depreciation | (183,617) | (139,022) | (92,053) |
| Equipment, net | $ 77,749 | $ 113,174 | $ 147,942 |

Depreciation expense was $42,914, $46,968 and $44,661 for the years ended December 31, 2022, 2021 and 2020, respectively.

**EXHIBIT 1439 - 0061**

**PCJV USA, LLC DBA POTATO CORNER**
**Notes to Financial Statements**
**For the Years Ended December 31, 2022, 2021, and 2020**

---

**Note 3 – Franchised Locations**

The following table summarizes the changes in the number of franchised Potato Corner® locations since January 1, 2020:

| | |
|---|---:|
| Open at January 1, 2020 | 27 |
| Opened during the year | 2 |
| Transferred as a corporate store during the year | (2) |
| Terminated or closed during the year | - |
| Transferred from corporate to 3rd party | - |
| Open at December 31, 2020 | 27 |
| Opened during the year | - |
| Transferred as a corporate store during the year | (1) |
| Open at December 31, 2021 | 26 |
| Opened during the year | 2 |
| Terminated or closed during the year | (2) |
| Open at December 31, 2022 | 26 |

**Note 4 – Accounts Payable – Marketing**

Each franchisee is required to contribute an amount equal to 1% of the store's monthly gross sales to an advertising and development fund (the "Fund"). The required contribution can increase up to 2% of the Store's monthly gross sales. The Fund is to be used for advertising, marketing and public relations programs and materials the Company deems appropriate. The Company is required to account for the Fund separately from other cash on hand and cannot use the Fund for general operating purposes. Under ASC Topic 606, the Company has determined that it acts as the principal under this arrangement as it is primarily responsible for the fulfillment and control of the marketing services. Accordingly, the Company records marketing fees in revenues and the related marketing fund expenditures in expense in the statements of operations. At December 31, 2022, 2021 and 2020, the balance in accounts payable for the marketing fund, which represented unexpended marketing fund contributions, was $618,137, $533,638 and $478,140, respectively. Also as of December 31, 2022, 2021 and 2020, marketing fund due from franchisees and other sources was $37,347, $13,822, and $41,506, respectively.

**Note 5 – Commitments and Contingencies**

<u>Leases</u>

The Company has a noncancellable lease agreement with a third-party for its headquarters located in Culver City expiring in January 2024. Rent expense charged to operations under this operating lease for the years ended December 31, 2022, 2021 and 2020 was approximately $160,000, $118,000 and $107,000, respectively.

EXHIBIT 1439 - 0062

**PCJV USA, LLC DBA POTATO CORNER**
**Notes to Financial Statements**
**For the Years Ended December 31, 2022, 2021, and 2020**

---

**Note 5 – Commitments and Contingencies (continued)**

The following is a maturity analysis of the annual undiscounted cash flows of the operating lease liabilities for the years ending December 31:

| | | |
|---|---|---:|
| 2023 | $ | 164,690 |
| 2024 | | 6,878 |
| | | 171,568 |
| Less: Imputed interest | | (3,652) |
| Lease liability at December 31, 2022 | $ | 167,916 |

The following is an analysis of the Company's outstanding lease at December 31, 2022:

| | | |
|---|---|---:|
| Cash paid for amounts included in the measurement of operating lease liability: | $ | 159,540 |
| Weighted -average remaining life: | | 13 months |
| Weighted-average discount rate: | | 4.50% |

The Company has month-to-month lease agreement with another third-party for its Potato Corner Stonewood store located in Downey. Total short-term lease charged to operations, for the years ended December 31, 2022, 2021, and 2020 was approximately $72,000, $59,000 and $27,000, respectively.

<u>Litigation</u>

From time to time, the Company may become a party to certain legal matters arising in the normal course of business. While the Company believes the impact of the matters will not have an adverse effect to its financial position, results of operations or cash flows, any such outcome is not guaranteed.

**Note 6 – Related Party Transactions**

The Company had the following related party transactions:

The Company has an outstanding $20,000 loan due to one of its members at December 31, 2022, 2021 and 2020. The loan does not bear interest and is not secured by any collateral. The loan is due on demand. However, the member has no intention of demanding payment of this loan in 2023.

As of December 31, 2022, 2021 and 2020, the Company is due $75,250, $107,487, and $39,987, respectively, from related parties for various short-term cash advances and reimbursement of expenses paid on their behalf.

Certain members of the Company who own approximately 40% of the Company's member interests also own and operate sight franchise locations as of December 31, 2022. These stores provide services to the Company by establishing proof of concept of its operations, promoting the franchise brand and engaging in marketing activities which help attract customers for future franchisees. These stores also provide training for new and existing franchisees and testing new menu items. The Company believes that the ongoing value of these services approximates the initial franchise fee and royalty fees and accordingly, management has waived such fees from stores owned by the 40% member since inception. Additionally, the Company's management has determined these franchisee entities are not variable interest entities required to be consolidated in the Company's financial statements.

**EXHIBIT 1439 - 0063**

**PCJV USA, LLC DBA POTATO CORNER**
**Notes to Financial Statements**
**For the Years Ended December 31, 2022, 2021, and 2020**

**Note 6 – Related Party Transactions (continued)**

The Company has a contractual obligation to remit 30% of all initial franchise fees and continuing royalty fees collected to certain members who own approximately 40% of the Company and provide management services on behalf of the Company. Additionally, the Company has a contractual obligation to remit 30%, as licensing fees, of all initial franchise fees and continuing royalty fees collected to certain members who own approximately 60% of the Company. Both obligations have been permanently waived by the respective parties through December 31, 2022.

The Company is required to pay an annual service fee to certain members who own approximately 40% of the Company. Under the terms of the related agreement, annual service fees for the years ended December 31, 2022, 2021 and 2020 was $240,000, $285,000 and $240,000, respectively. During the years ended December 31, 2022, 2021 and 2020, the Company has paid $240,000, $285,000 and $231,000, respectively to these members for the services performed. As of December 31, 2022, 2021 and 2020, unpaid service fee due to members was $9,000.

**Note 7 – Government Assistance Programs**

During the year-ended December 31, 2021, the Company filed for the Employee Retention Credit ("ERC"), which is a refundable tax credit akin to a government grant for eligible entities. As US GAAP does not contain guidance on the accounting for government grants to for-profit entities, the Company is following the guidance in ASC 958-605, Not for Profit Entities - Revenue Recognition, by analogy. Thus, the ERC is recognized over time as qualifying expenses that give rise to the credit are incurred. The full amount of the ERC of $25,254 was recognized in other income in the accompanying 2021 statement of operations. The ERC credit was received in June 2022.

In April 2020, the Company entered into a Paycheck Protection Program Loan agreement ("PPP Loan") under the CARES Act. Under the PPP Loan, the Company received $102,738 which was fully forgiven by Small Business Administration ("SBA") in October 2021. Accordingly, a gain from forgiveness of PPP Loan has been included as other income in the 2021 statement of operations.

In April 2020, the Company applied for and was granted a $10,000 Economic Injury Disaster Loan (EIDL) Advance. EIDL Advances provide additional funds to businesses who can demonstrate more than 30% reduction in revenue during an eight-week period beginning on March 2, 2020 or later. The Company did not need to repay the EIDL Loan Advance and accordingly, the amount was reported as other income in the Company's 2020 statement of operations.

EXHIBIT 1439 - 0064

# EXHIBIT 2

EXHIBIT 1439 - 0065

| | |
|---|---|
| **From:** | Vic Gregorio <vlgregorio@shakeys.biz> |
| **Sent:** | Tuesday, February 27, 2024 1:16 AM |
| **To:** | Guy Koren |
| **Cc:** | Yiow Leong Tan |
| **Subject:** | Re: [EXT] PCJV audited financial statements for 2020/2021/2022 |

Hi Guy,

We have received the financials for PCJV you sent via email last February 17, 2024 and we thank for doing so. Our team took the week to review it in detail. However, upon reviewing the reports you sent, we see that the report does not provide sufficient information for us to have a comprehensive view of the overall PC USA business. Please let me explain.

In our previous communications, you had said that PCJV/PCI Trading can only afford to pay to SPAVI a license fee of 0.5% of gross sales from all franchisees excluding your own (which is 1/3 of the total PC USA store network). This counteroffer you initially made is significantly lower than our proposal sent to you on May 2023, which we know is already below the industry standard royalty / license fee of 5%-6% of sales. Not only is your counteroffer way below current market and industry rates it is also far below what makes us financially viable deal for SPAVI. We also note that in your original that in your original license agreement in 2009 with the Cinco group (the NKM License Agreement that we believe was superseded by the JVA/AJA), you agreed to a license fee of 5% of gross sales. This is why it is unclear for us the basis you used to offer a license fee of 0.5% which is about 90% lower than what was agreed in the original agreement.

To better understand your position, we now ask for a full financial picture of the Potato Corner operation in the US. Without this full picture, we can only fall back on (1.) The market rate, and (2.) the economics of SPAVI US operations. Our request for the full information is to help you help us understand the position you have taken and as to what you can afford and what you cannot. The financials you sent provided us an incomplete picture.

In particular, we noted that the financials in the report do not include the sales and profits of your company-owned PC stores which we understand are franchised from PCJV (which is conformed by Note 6 of the audited financial, third bullet point). We understand your position that those stores should be exempt from paying the license fees, however, for the purpose of this disclosure we need not resolve those differing positions. At a minimum, we should be able to at least see how those stores are doing, as we evaluate our differing positions. Also, we would like to see the financials related to the other 27 franchisees that are not owned by you, so as to evaluate their numbers as well (allowing us to dig a bit under the hood of these audited financials). There are also references to other agreements in the last two bullet points of Note 6 ( on page 14 of the audited financials) that we will appreciate being able to review (including obligations to pay the LA Group 30% of all royalties received from the stores, as well as the annual service fee you receive). Again, this is just to understand the financial picture of PCJV and be able to properly evaluate and further proposals you make in the context of your concern that PCJV cannot afford any more than 0.5%.

1

**EXHIBIT 1439 - 0066**

We are also aware that there is a separate company that conducts trading business (PCI Trading) and this was excluded in the financials you sent. We would appreciate seeing the financial reports of this company as well. Further, we need more detailed information on the breakdown of the revenue components of PCJV such as franchise fees, area development fees, royalties etc. as well as the nature of the operating expenses. Finally, although we appreciate that these would be rough and unaudited, we still would like to see the numbers for each stores (including yours) for 2023 as well. We would be agreeable to quickbook reports that have not been reviewed by Withum.

Guy, please understand that without the additional detailed information on the PC USA business shown above, we will not be able to properly assess the health and profitability of the entire US Potato Corner Operations and nor will we be fully educated on the basis of the position you have taken in our negotiation.

I assume and hope that these request for more detailed information will not be controversial, and that you receive them in the spirit of our attempt to understand your position in this negotiation. We do wish to resolve this as soon as possible and so may I request that you provide us the requested information within a week? Perhaps your accountant for PCJV can locate this with greater speed given the recency of their work on the audited financials you sent. Thanks in advance.

Best,

Vic

---

**From:** Guy Koren <g@gkcapitalllc.com>
**Date:** Saturday, 17 February 2024 at 12:07 PM
**To:** Vic Gregorio <vlgregorio@shakeys.biz>
**Cc:** Yiow Leong Tan <yltan@shakeysinternational.com>
**Subject:** [EXT] PCJV audited financial statements for 2020/2021/2022

Hi Vic,
I hope this email finds you well! I apologize for the delay in sending you this, I wanted to include some financials of stores and was waiting on the CPA to finalize 2023 but they need a bit more time so I'll just send them to you later whenever they are ready since PCJV's financials are more important for you to review and those I have ready for you. Attached you will find PCJV USA audited financials for the years 2020, 2021, and 2022. We are about to begin the 2023 audit in a week or so and will gladly share it with you whenever it is completed. Please don't hesitate to let me know if you have any question regarding the audited financial statements and whenever you're done with your review we can schedule a zoom meeting to discuss the terms of a new license agreement and hopefully we can get on the same page and agree on the terms of a new license agreement that's mutually acceptable that will serve as the foundation of a new healthy partnership that can and will grow and strengthen for years to come!

Looking forward to hearing from you once you have completed your review.

Regards,

**EXHIBIT 1439 - 0067**

Guy Koren
Potato Corner USA
President/ Managing Partner
(310) 593-1581

EXHIBIT 1439 - 0068

# EXHIBIT 2

EXHIBIT 1439 - 0069

   

## SHAKEY'S PIZZA ASIA VENTURES INC.

May 31, 2024 (Pacific Standard Time)
June 1, 2024 (Philippine Standard Time)

**VIA EMAIL**

Mr. Guy Koren
President / Managing Partner
PCJV USA, LLC and PCI Trading, LLC
8657 Hayden Place
Culver City, CA 90232
Email: guy@potatocornerusa.com

Re:      Notice of Termination of License – EFFECTIVE IMMEDIATELY

Dear Mr. Koren:

 Reference is made to all intellectual property, proprietary information, and other assets arising from the Potato Corner, including: all registered and unregistered trademarks (including, but not limited to marks registered with the United States Patent and Trademark Office, Reg. Nos. 5900257 and 3760041), service marks, trade names, copyrights, recipes, trade secrets, know-how, procedures, and processes, among other things, which are referred to herein, collectively, as the "Potato Corner Intellectual Property and Proprietary Information."

 As explained herein, with this letter ("Termination Letter" or "Termination"), **Shakey's Pizza Ventures, Inc. ("SPAVI") hereby officially terminates any license held by PCJV USA, LLC ("PCJV") and PCI Trading, LLC ("PCIT") to use any Potato Corner Intellectual Property and Proprietary Information, effective immediately**. This termination is based on your refusal to negotiate reasonable terms for that license, and your having effectively ignored the negotiation for a year. It has always been our goal to develop a partnership with you and empower you to help Potato Corner expand and thrive in the US, but you have refused to negotiate reasonable terms and have ignored the negotiation for nearly a year. **Please note that we are very aware of the fact that there are third party franchisees whose rights derive from PCJV's rights, and who will thus be affected, through no fault of their own, by the Termination of their own license rights that you have now caused. As set forth in this letter, we have implemented a process by which we will endeavor to minimize, if not eliminate, disruption to the operations of these franchisees who are not at fault for this Termination; a process that will include a grace period during which we will negotiate terms for a temporary direct license with each of them, using (below market) terms, which we are confident will be mutually beneficial for them and for SPAVI.**

16901.1:10187507.1

**EXHIBIT 1439 - 0070**

As we have explained and communicated to you before, in 2022, SPAVI acquired from Cinco Corporation and its affiliates all Potato Corner Intellectual Property and Proprietary Information used throughout the world. As a part of the global network of Potato Corner outlets, then, all of the Potato Corner Intellectual Property and Proprietary Information used by PCJV and/or PCIT – as well as any other entity or person with whom PCJV and/or PCIT has licensed that same Potato Corner Intellectual Property and Proprietary Information, including franchisees (collectively, the "US Potato Corner Licensees") – is now owned by SPAVI. This is an extremely important asset for which our shareholders expect and are entitled to receive immense value.

Upon acquisition of the Potato Corner Intellectual Property and Proprietary Information, SPAVI investigated the state of the license upon which the US Potato Corner Licensees were and are using Potato Corner Intellectual Property and Proprietary Information. The only "agreement" ever identified by you as constituting the license agreement for PCJV and PCIT's use of these assets is an unsigned, illusory, and incomplete draft purportedly dated October 1, 2010. Indeed, that document fails to provide for any consideration to be paid to SPAVI (or its predecessor) for the license and contains a note in the consideration section of that document confirming that it is a draft. Putting aside the troubling fact that PCJV announces, annually, in Franchise Disclosure Document ("FDD") filings, that its legal right to use Potato Corner Intellectual Property and Proprietary Information arises from that unsigned, draft, and illusory "agreement," for the purposes of this Termination Letter, all that needs to be said is that this is not a license agreement.

Without that document, all we have been able to find are "agreements to agree" on a license contained in a "Joint Venture Agreement" ("JVA"), which was subsequently amended without revising the agreement to agree on a license agreement. These terms contained in the agreement to agree do not constitute a license agreement. Even if they did, the agreements to agree, create, at best, an at-will license for use of the Potato Corner Intellectual Property and Proprietary Information. It is our further understanding that, since 2018, Cinco was prevented from forcing PCJV to negotiate a formal written license pursuant to these agreements to agree, given various orders of a Court in now-dismissed litigation between PCJV and Cinco.

Given the above, then, and again, at best, PCJV and PCIT possess a revocable-at-will license to use Potato Corner Intellectual Property and Proprietary Information. **As explained herein, the license to use Potato Corner Intellectual Property and Proprietary Information is hereby terminated _immediately_ upon receipt of this letter**.

Below, we explain the basis for this termination, and, at the conclusion, discuss the next steps that will be required for (1) immediate cessation of all Potato Corner Intellectual Property and Proprietary Information by PCJV, PCIT, as well as all Potato Corner outlets operated by any entity you own or control; (2) you to satisfy our expectation that you voluntarily and properly inform and advise all US Potato Corner franchisees and operators of this development and for

**EXHIBIT 1439 - 0071**

those not controlled by you, advise them of the short term direct license opportunity we are offering to continue doing business with SPAVI and be a part of a thriving SPAVI Potato Corner family; and (3) the commencement of the process by which PCJV, PCIT and all Potato Corner outlets owned or operated by any entity you own or control to release to SPAVI all proprietary, confidential, trade secret information, as well as the transfer of the potatocornerus.com and other related domains and social media accounts.

The basis for this Termination Letter is as follows.

Beginning in 2022, the Chief Operating Officer of Potato Corner (Joey Alvero), the SPAVI Group Director for International (Yiow Leong Tan), and I (as President and Chief Executive Officer of SPAVI) have attempted in good faith to negotiate with you the license for use of all Potato Corner Intellectual Property and Proprietary Information between SPAVI and all US Potato Corner Licensees. At all times our negotiating stance has been focused on helping you, PCJV, and PCIT succeed and grow. We have offered you our resources and experience and listened to, and considered, your needs and expectations, and frustrations, and have discussed with you our desire to remove all roadblocks from a truly exciting future for Potato Corner. And we have done so while agreeing to below market terms to back up our desire to assist the United States Potato Corner operations. We have also always been very clear about our requirements, including the obvious one: any deal we strike has to be commercially reasonable and provide value for our shareholders.

Despite these efforts from the highest echelon of SPAVI – including our concessions, immediate and personal attention (including meeting you personally in the United States to negotiate), and patience – we have been met by you (acting on behalf of PCJV and PCIT) with unreasonable demands and a refusal to engage the negotiation. After our July 12, 2023 requests for information from you (requested by us to understand the basis for your commercially unreasonable license demands) were ignored by you for _half a year_, we had to push you to get this information, which we only partially received on February 17, 2024. I followed up with a polite email on February 27, 2024 asking for further information – an email that you ignored entirely. Three months have elapsed since my February 27, 2024 email, and we have heard nothing from you whatsoever. You have ignored us completely. And yet, every day, each of the US Potato Corner Licensees continue to use Potato Corner Intellectual Property and Proprietary Information without paying a single penny to SPAVI. At a minimum, we would have expected, as a show of good faith, that PCJV would at least pay the license fee at the rate you were demanding, even though SPAVI rejected that rate as too low. As such, SPAVI is now two years into owning this asset that has been used throughout the United States and has not been paid a cent. This is unacceptable.

Even if you had not abandoned the negotiation – a conclusion that would be reasonable given your utter silence for three months – this negotiating tactic employed by you to issue

**EXHIBIT 1439 - 0072**

unreasonable and commercially unviable demands that cannot be explained or justified as well as to ignore or unreasonably delay responding to our requests to continue negotiating, all while PCJV, PCIT, and all other US Potato Corner Licensees reap daily benefits from this asset – has led us to conclude that we have exhausted all efforts to negotiate a license and that you, PCIV, and PCIT do not intend to negotiate in good faith.

Although you have effectively abandoned the negotiations, we now confirm that the negotiations have terminated and have failed to achieve a consummated license for the US Potato Corner Licenses to legally use any and all Potato Corner Intellectual Property and Proprietary Information, **effective immediately**.

As a result of this Termination, we expect, and demand the following.

**First, and foremost, we demand that PCJV and PCIT – and all other entities owned or controlled or managed by you, Guy Koren – cease and desist, *immediately*, all use, whether direct or indirect, of any Potato Corner Intellectual Property and Proprietary Information in all aspects of their operations**. This group includes all "Affiliate Companies," "Affiliate Owned Restaurants," NKM, and the Downey Store, as described in PCJV's FDDs. This immediate cessation of all use of any Potato Corner Intellectual Property and Proprietary Information includes everything from the obvious – all Potato Corner outlets within this group must cease operations immediately – as well as to uses of this intellectual property online, on websites, social media accounts, letterhead, emails, and any other medium or manner in which such Potato Corner Intellectual Property and Proprietary Information is used. We can negotiate transfers of social media accounts as well as the potatocornerusa.com URL (a transfer that you would be well advised to negotiate to avoid claims of cybersquatting), however, for now, all such uses of Potato Corner Intellectual Property and Proprietary Information must cease immediately. **As part of this cease-and-desist demand, we further demand that, no later than 12:00 p.m. Pacific Standard Time today, May 31, 2024, you confirm (1) receipt of this Termination Letter and (2) that you and each of the persons, entities, and outlets described in this paragraph will comply immediately, effective today, May 31, 2024**. This confirmation must be delivered, by email, to Michael Murphy and Kenneth Hsu at Ervin, Cohen & Jessup (mmurphy@ecjlaw.com and khsu@ecjlaw.com), with a copy to Yiow Leong Tan. Please do not ignore this demand to confirm by 12:00 p.m. May 31, 2024 receipt of the Termination and confirmation of compliance, as the failure to respond by that time will be viewed as a repudiation of this cease-and-desist demand.

Please note, the confirmation we are demanding above may not be provided in the form of a request to negotiate a license between SPAVI and PCJV/PCIT further. That negotiation is closed, and we will no longer entertain discussions regarding license terms with PCJV and PCIT. The only negotiation SPAVI is willing to entertain is either (1) the sale of PCJV and PCIT to SPAVI; or (2) license terms for your affiliate companies operating Potato Corner outlets, so long as such terms include payment of gross receipts increasing from 2% in the first year to 4% at year four,

**EXHIBIT 1439 - 0073**

4

for the remainder of the period which will be 15 years. Those royalty rates are not negotiable. Should you wish to pursue those licenses for your affiliates, in addition to confirming receipt and compliance with this Termination, advise us by 12:00 p.m. today, May 31, 2024 (PST) that you agree to those royalty rates and a term of 15 years, and we can commence negotiating the other standard and basic terms so as to complete those written license agreements. Should you wish to discuss the sale of PCJV and PCIT outright, please so advise by the deadline set forth in the preceding paragraph, with the inclusion of a proposed selling price for us to consider.

**Second**, although we must, and will, protect all Potato Corner Intellectual Property and Proprietary Information to the maximum extent possible, we intend to do so in a manner that protects, minimizes, and, if possible, eliminates disruption to all other persons, franchisees, or entities that are not owned, controlled or managed by you (*i.e.* not "Affiliate Companies," "Affiliate Owned Restaurants," NKM, nor the Downey Store, as described in PCJV's FDDs) and that have entered into any agreement with PCJV and PCIT for the use of Potato Corner Intellectual Property and Proprietary Information, whether as franchisees or otherwise. **Accordingly, you must advise each of these entities or persons by the close of business today, May 31, 2024 (PST) as to the Termination of PCJV and PCIT's license, and advise them as to a grace period that we will extend to those stores only – allowing them to continue using Potato Corner Intellectual Property and Proprietary Information for two weeks (until June 12, 2024) – a period that will be used to negotiate written terms of a temporary direct license with SPAVI, so as to minimize disruption to their business**. Please advise those operators, that, to take advantage of this grace period, they must (1) contact Yiow Leong Tan (whose email you have) by email, by the close of business on May 31, 2024 to confirm they wish to take advantage of this grace period, and (2) comply with all aspects of their franchise agreement with PCJV during that grace period.

**Third, we demand that you provide us, by 12:00 p.m. Pacific Standard Time today, May 31, 2024, with a list of all entities and persons using any Potato Corner Intellectual Property and Proprietary Information by way of any agreement with PCJV or PCIT or any other US Potato Corner Licensee  – a list that shall include up to date contact information of any persons responsible for each such operation using Potato Corner Intellectual Property and Proprietary Information**. The purpose of this is to, among other things, understand the universe of US Potato Corner Licensees, know how to contact them immediately, and for those referenced in the preceding paragraph, determine how best to embrace them in the SPAVI Potato Corner family, and assist them during this interim period to minimize disruption. Please note, our intent to offer a grace period (as described in the preceding paragraph) and negotiate temporary licenses to these Potato Corner outlets not operated by entities you own or control is not punitive, but, instead, is based on the fact that you have effectively repudiated the terms we will be offering these other outlets, as a result of your commercially unreasonable terms and bad faith negotiating tactics described above.

**EXHIBIT 1439 - 0074**

4

**Fourth, by 1:00 pm. Saturday, June 1, 2024, we demand delivery to Yiow Leong Tan – or between our counsel – of all lists of all Potato Corner Intellectual Property and Proprietary Information used by PCJV, PCIT, and or any other entity or person that uses such Potato Corner Intellectual Property and Proprietary Information by way of the license terminated herein**. This delivery must include any and all lists documenting what Potato Corner Intellectual Property and Proprietary Information has been used by PCJV and/or PCIT or licensed by PCJV or PCIT to any entity or person (whether stores you operated or otherwise) as well as any information provided to PCJV or PCIT by any person documenting actual use of any Potato Corner Intellectual Property and Proprietary Information by any such entity or person.

**Fifth**, and finally, we demand that you, PCJV, PCIT, and all of the entities you own, or control preserve all emails, letters, documents, accounting records, text messages – any and all documents or records whatsoever – related in any way to Potato Corner. This will allow us to ensure that if we have questions about the uses of Potato Corner Intellectual Property and Proprietary Information, all data relating to this information can be accessed.

Please note, the demands made herein are not the entirety of the demands that we will be making, or efforts we expect you, PCJV, and PCIT (as well as your own stores) to be exerting, as we proceed through this regrettable, disappointing, and unfortunate unwinding. After our meeting a year ago in Los Angeles, I was truly hopeful that you saw the benefits of proceeding with Potato Corner under SPAVI, and that you understood our requirements to achieve an arrangement between our groups that will be mutually viable. I even approved concessions that were way below what SPAVI was expecting to receive just to allow this to be a continuing partnership.

Now that a year has passed since we met (and nearly a year since your proposed terms that we rejected), no progress has been made, and you either abandoned the negotiation or ignored us entirely. We find this totally unacceptable, and, as such, we now deem the prior negotiation closed and must move forward with the initial steps in the new direction we require, as set forth in this Termination Letter.

**Vic Gregorio**
CEO
***Shakey's Pizza Asia Ventures, Inc.***

**EXHIBIT 1439 - 0075**

# EXHIBIT   0

EXHIBIT 1439 - 0076

   

## SHAKEY'S PIZZA ASIA VENTURES INC.

**<u>VIA EMAIL</u>**

June 5, 2024

To: Potato Corner Franchisees

**Re:     Offer of Short Term Temporary License During PCJV's Licensing Dispute with the Owners of Potato Corner**

Dear Sir/Madam:

Please allow me to introduce myself. I am **Yiow-Leong Tan**, the Group Director of International for Shakey's Pizza Asia Ventures Inc. ("SPAVI"), which is the owner of the Potato Corner brand and all related intellectual property, trademarks, processes, flavors, etc. I am in charge of all our brands including Potato Corner in the international markets outside of the Philippines. My responsibility is to grow our brands in a sustainable and profitable manner through operating company owned as well as franchised stores in both existing countries and entering into new markets. I have more than 15 years of experience in restaurant and real estate business development, brand management and operations in international markets.

By now, Guy Koren, the President and Managing Partner of PCJV USA LLC ("PCJV"), should have advised you that, as of May 31, 2024, we have given notice to PCJV to cease and desist all use of the Potato Corner trademarks and intellectual property by PCJV USA LLC and its affiliate PCI Trading LLC, effective immediately. I understand that this affects your operation, as your use of the Potato Corner brand and intellectual property derives from PCJV's. **<u>The purpose of my letter is to reach out to you and assure you that it is not our goal to stop your Potato Corner operation, and that we want to work with you to develop a short-term license directly with you so that disruptions to your operation are minimized. After the issues with PCJV are sorted out, our goal is for you to remain in the Potato Corner family, as a franchisee, after the dust settles. Put simply, our goal is to keep your business running, and help you succeed now and into the future, notwithstanding these disputes with PCJV.</u>**

To provide background, in 2022 SPAVI acquired all the trademarks and intellectual property of Potato Corner from the previous owners, Cinco Corporation. SPAVI now owns all of Potato Corner's trademarks and intellectual property, which are used throughout the world including the United States. Upon acquisition, we have been made aware that the previous owner Cinco Corporation had been negotiating with Guy Koren for some time because the current "franchisor" of Potato Corner in the United States, namely PCJV, does not have a valid license to

**EXHIBIT 1439 - 0077**

use the brand and its trademarks. This unstable licensing situation between PCJV and the licensor (SPAVI) is bad for everyone, including your store.

Over the past 2 years, we have reached out to Guy Koren in good faith to negotiate and put in place a proper license agreement that would protect PCJV, as well as your store (and all other franchisees), even offering him very favorable terms which are better than what is normal industry practice. However, this negotiation was unsuccessful despite our best efforts. Therefore, we have been forced to terminate any license held by PCJV and its affiliate PCI Trading LLC for use of the Potato Corner brand. This is not a decision we have taken lightly, especially in view of the inevitable disruption to the operations of the Potato Corner stores who were not responsible for Mr. Koren and PCJV's failure to negotiate with SPAVI, including yours.

As Mr. Koren should have advised when he gave you notice of the termination of PCJV's license, in our cease and desist notice to PCJV, we have granted to those franchisees who not affiliates of PCJV or PCIT, such as yourself, the option of a grace period of 2 weeks (**until June 24, 2024**) to continue using the Potato Corner brand, so that we can work out the terms of a temporary license with you during this interim period immediately following the termination of PCJV's license with us. To take advantage of this 2-week grace period, **you must contact me via the email address from which this is being sent (yltan@shakeysinternational.com) by June 10, 2024 to confirm your intention**. We will assume that, if you do not contact me and indicate your intent to negotiate a short term license with SPAVI directly, we will assume that you and your store do not wish to take advantage of this opportunity.

During the 2-week grace period, I hope to meet you online to discuss and, at a minimum, reach an agreement with you on a temporary license, which will allow you to continue to operate your Potato Corner store. This temporary license will be for 6 months, but can be extended, depending on the status of the situation with PCJV. To help you through this period of uncertainty, we are willing to offer you a **favorable license fee at a rate lower than the current royalty fee you are paying to PCJV**. As the undisputed owner of the Potato Corner brand, we have the legal rights to offer you this license.

In addition, we will also extend to you our support, should you wish to take advantage of it, in terms of:

- *Supply Chain*, particularly for the ordering and supply of proprietary flavours and packaging;
- *Marketing*: providing you the latest brand assets and marketing collateral; and
- *Other support* to help you improve your store performance.

Again, we are committed to doing all the above in order to minimize disruption to your business.

EXHIBIT 1439 - 0078

Here, I wish to highlight that SPAVI is a public listed company in the Philippines with vast experience in restaurant operations across the casual dining, beverage and snacking segments. We currently operate more than 2,200 company owned and franchised restaurants across the 6 brands in our portfolio. Since acquiring Potato Corner, we have invested in and grown the brand from 1,000 stores in 2022 to more than 1,800 stores currently with presence in 16 countries. Therefore, we have the capability and know-how to help you to grow and improve your business.

We have plans to open a support center in the United States in the future, which will be staffed with a professional team to assist you and other operators of Potato Corner outlets, both in the temporary capacity as licensee, and, eventually upon your return to a franchisee of an operation that has proper licensing in place.

It is our sincerest desire that you will continue to operate Potato Corner as part of the SPAVI family. To that end, rest assured we will do our part as the Brand owner and as your partner.

I hope to hear from you, and I look forward to working with you to grow Potato Corner together!


Yours sincerely,

**Yiow-Leong Tan**
Group Director of International
Shakey's Pizza Asia Ventures, Inc.
**Email:** yltan@shakeysinternational.com

**EXHIBIT 1439 - 0079**

# EXHIBIT

EXHIBIT 1439 - 0080

    

## SHAKEY'S PIZZA ASIA VENTURES INC.

**<u>VIA FEDEX AND PERSONAL DELIVERY</u>**

June 13, 2024

To: Potato Corner Franchisee

**Re:    Offer of Short Term Temporary License During PCJV's Licensing Dispute with the Owners of Potato Corner**

Dear Sir/Madam:

Please allow me to introduce myself. I am **Yiow-Leong Tan**, the Group Director of International for Shakey's Pizza Asia Ventures, Inc. ("SPAVI"), which is the owner of the Potato Corner brand and all related intellectual property, trademarks, processes, flavors, etc. I am in charge of all our brands, including Potato Corner, in the international markets outside of the Philippines. My responsibility is to grow our brands in a sustainable and profitable manner through operating company-owned, as well as franchised, stores in both existing countries and entering into new markets. I have more than 15 years of experience in restaurant and real estate business development, brand management, and operations in international markets.

This is our second attempt to contact you. We had previously sent a letter, dated June 5, 2024, to all of the franchisees of Potato Corner in the United States, a copy of which I attach here for your reference. To date, we have not heard back from you.

To provide background, on May 31, 2024, we sent a cease and desist notice to Guy Koren. In that letter, we had demanded that he notify all the franchisees about the immediate termination of PCJV and PCIT's license to use any Potato Corner intellectual property, including trademarks. In additon, we also demanded that he provide us the list of all the companies, franchisees, and their contact details. This is to facilitate our contacting you to discuss putting in place a temporary short-term license by a certain date, so as to avoid interruption to your business, given that, as of now, your rights to use the intellectual property derive from the now canceled license with PCJV. That letter was followed up by the commencement of litigation between SPAVI, on the one hand, and PCJV, PCIT, Mr. Koren, and his affiliates, on the other, seeking relief from PCJV's continued use of our intellectual property. *See Shakey's Pizza Asia Ventures, Inc. v. PCJV USA, LLC et al.* (C.D. Cal.) Case No. 2:24-cv-04546.

**EXHIBIT 1439 - 0081**

However, it is apparent that Mr. Koren did not inform you of our cease and desist notice. Nor has he provided us your contact details or the contact details of any of the other franchisees. We take a serious view of these lapses, which we see as an interference to our right to protect our intellectual property, and, perhaps more significantly, Mr. Koren's failure to disclose any of this to you threatens to disrupt your business as well.

Therefore, we are now trying again to reach out to you. As in my first letter, **the purpose of this letter is to reach out to you and assure you that it is not our goal to stop your Potato Corner operation and that we want to work with you to develop a short-term license directly with you so that disruptions to your operation are minimized. Our goal is to keep your business running and help you succeed now and into the future, notwithstanding these disputes with PCJV.**

In the absence of Mr. Koren providing us with contact information for decisionmakers in your operation, we have been forced to engage in investigatory efforts to try to locate you. As a result, we are making further attempts at new addresses we have discovered in the hopes that this letter will reach you.

After you review this letter and the attached letter, please advise whether you wish to take advantage of the grace period for termination of the license so as to negotiate a short-term license with us (as described in the attached letter). We are now **extending the deadline to Tuesday, June 18, 2024** for you to contact me via email (my email address is: **yltan@shakeysinternational.com**) to indicate your intention to negotiate a short-term license with SPAVI directly. We will extend the grace period for you to continue using the Potato Corner trademarks and brand until we have finalized the temporary short-term license agreement, which will be for 6 months but can be extended depending on the status of the situation with PCJV.

We fully understand that the decision to sign a license agreement with SPAVI will impact all aspects of the operations of your stores, so our commitment is that we will do our best to ensure your store operations will continue smoothly. Further, to help you through this period of uncertainty, we are willing to offer you **a favorable license fee at a rate lower than the current royalty fee you are paying to PCJV.** As the undisputed owner of the Potato Corner brand, we have the legal rights to offer you this license.

Here, I wish to reiterate that it is our sincerest desire that you will continue to operate Potato Corner as part of the SPAVI family. To that end, rest assured we will do our part as the Brand owner and as your partner.

**EXHIBIT 1439 - 0082**

I hope to hear from you soon.

Yours sincerely,

**Yiow-Leong Tan**
Group Director of International
Shakey's Pizza Asia Ventures, Inc.
**Email: <ins>yltan@shakeysinternational.com</ins>**

Encl.

**EXHIBIT 1439 - 0083**

# EXHIBIT 32

EXHIBIT 1439 - 0084



**STATEMENT OF MANAGEMENT'S RESPONSIBILITY
FOR CONSOLIDATED FINANCIAL STATEMENTS**

The management of Shakey's Pizza Asia Ventures, Inc. and Subsidiaries (the Group) is responsible for the preparation and fair presentation of the consolidated financial statements including the schedules attached therein as at December 31, 2023 and 2022, and each of the three years in the period ended December 31, 2023, in accordance with the Philippine Financial Reporting Standards, and for such internal control as management determines is necessary to enable the preparation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

In preparing the consolidated financial statements, management is responsible for assessing the Company's ability to continue as a going concern, disclosing as applicable matters related to going concern and using the going concern basis of accounting unless management either intends to liquidate the Company or to cease operations, or has no realistic alternative but to do so.

The Board of Directors is responsible for overseeing the Company's financial reporting process.

The Board of Directors reviews and approves the consolidated financial statements including the schedules attached therein and submits the same to the stockholders or members.

Sycip Gorres Velayo & Co., the independent auditor appointed by the stockholders, has audited the consolidated financial statements of the Group in accordance with Philippine Standards of Auditing and its report to the stockholders or members, has expressed its opinion on the fairness of presentation upon completion of such audit.


**Christopher T. Po**
Chairman of the Board


**Vicente L. Gregorio**
President & Chief Executive Officer

**Manuel T. Del Barrio**
Vice-President & Chief Finance Officer


Signed this 15 day of April, 2024.


SHAKEY'S PIZZA ASIA VENTURES INC.
Km. 15 East Service Road corner Marian Road 2, San Martin De Porres,
Parañaque City

**EXHIBIT 1439 - 0085**



Page 2 of Statement of Management's
Responsibility for Consolidated Financial Statements

REPUBLIC OF THE PHILIPPINES          )
                                     ) s.s.
TAGUIG CITY

SUBSCRIBE AND SWORN to before me this    APR 1 5 2024    affiant(s) exhibiting to me the
Passport Numbers, as follows:

| Name | Passport No. | Date Issue | Place of Issue |
|---|---|---|---|
| Christopher T. Po | P8631182A | Sept. 6, 2018 | DFA Manila |
| Vicente L. Gregorio | P4438672B | Jan. 18, 2020 | DFA NCR South |
| Manuel T. Del Barrio | P5309094B | Jul. 10, 2020 | DFA Manila |

Notary Public

ATTY. IRISH S. PRECION
Notary Public for Taguig City
Appointment No. 23 (2023-2024)
Roll No. 59286-00...17 / 28 No. 26747912,29,23
PTR No. A-5...-03.24/Taguig City
MCLE Compliance No. 70-...0615 valid until 04-14-25
Ground Floor FTI Old Admin. Bldg. FTI Complex, Taguig City
precionirishs@gmail.com / 09988534549

Doc. No. 409
Page No. 82
Book No. XXXVIII
Series of 2024.

SHAKEY'S PIZZA ASIA VENTURES INC.
Km. 15 East Service Road corner Marian Road 2, San Martin De Porres,
Parañaque City

EXHIBIT 1439 - 0086

ID

# C O V E R   S H E E T
### for
### AUDITED FINANCIAL STATEMENTS

SEC Registration Number

| | | | | | | 5 | 4 | 6 | 6 | 6 |
|---|---|---|---|---|---|---|---|---|---|---|

**C O M P A N Y   N A M E**

| S | H | A | K | E | Y | ' | S | | P | I | Z | Z | A | | A | S | I | A | | V | E | N | T | U | R | E | S | | I |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| N | C | . | | A | N | D | | S | U | B | S | I | D | I | A | R | I | E | S | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

**PRINCIPAL OFFICE** *( No. / Street / Barangay / City / Town / Province )*

| 1 | 5 | K | m | | E | a | s | t | | S | e | r | v | i | c | e | | R | o | a | d | | c | o | r | n | e | r |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M | a | r | i | a | n | | R | o | a | D | | 2 | , | | B | a | r | a | n | g | a | y | | S | a | n | | M | a |
| r | t | i | n | | d | e | | P | o | R | r | e | s | , | | P | a | r | a | ñ | a | q | u | e | | C | i | t | y |
| | 1 | 7 | 0 | 0 | | | | | | | | | | | | | | | | | | | | | | | | |

| Form Type | Department requiring the report | Secondary License Type, If Applicable |
|---|---|---|
| A  C  F  S | C  R  M  D | N  A |

## C O M P A N Y   I N F O R M A T I O N

| Company's Email Address | Company's Telephone Number | Mobile Number |
|---|---|---|
| **shakeyspizza.ph** | **(02)8839-0011** | **NA** |

| No. of Stockholders | Annual Meeting (Month / Day) | Fiscal Year (Month / Day) |
|---|---|---|
| **41** | **May 3** | **December 31** |

## CONTACT PERSON INFORMATION

The designated contact person ***MUST*** be an Officer of the Corporation

| Name of Contact Person | Email Address | Telephone Number/s | Mobile Number |
|---|---|---|---|
| **Manuel Del Barrio** | **mtdelbarrio@shakeys.biz** | **(02)8839-0011** | **NA** |

## CONTACT PERSON's ADDRESS

**15Km  East Service Road corner Marian Road 2, Barangay San Martin de Porres, Parañaque City 1700**

***NOTE  1 :***  *In case of death, resignation or cessation of office of the officer designated as contact person, such incident shall be reported to the Commission within thirty (30) calendar days from the occurrence thereof with information and complete contact details of the new contact person designated.*

*2 :  All Boxes must be properly and completely filled-up.  Failure to do so shall cause the delay in updating the corporation's records with the Commission and/or non-receipt of Notice of Deficiencies.  Further, non-receipt of Notice of Deficiencies shall not excuse the corporation from liability for its deficiencies*

**EXHIBIT 1439 - 0087**



ID

SyCip Gorres Velayo & Co.     Tel: (632) 8891 0307
6760 Ayala Avenue            Fax: (632) 8819 0872
1226 Makati City             ey.com/ph
Philippines

**INDEPENDENT AUDITOR'S REPORT**

The Stockholders and the Board of Directors
Shakey's Pizza Asia Ventures Inc.
15Km East Service Road corner Marian Road 2
Barangay San Martin de Porres, Parañaque City 1700

**Opinion**

We have audited the consolidated financial statements of Shakey's Pizza Asia Ventures Inc. and its subsidiaries (the Group), which comprise the consolidated statements of financial position as at December 31, 2023 and 2022, and the consolidated statements of comprehensive income, consolidated statements of changes in equity and consolidated statements of cash flows for each of the three years in the period ended December 31, 2023, and notes to the consolidated financial statements, including material accounting policy information.

In our opinion, the accompanying consolidated financial statements present fairly, in all material respects, the consolidated financial position of the Group as at December 31, 2023 and 2022, and its consolidated financial performance and its consolidated cash flows for each of the three years in the period ended December 31, 2023 in accordance with Philippine Financial Reporting Standards (PFRSs).

**Basis for Opinion**

We conducted our audits in accordance with Philippine Standards on Auditing (PSAs). Our responsibilities under those standards are further described in the *Auditor's Responsibilities for the Audit of the Consolidated Financial Statements* section of our report. We are independent of the Group in accordance with the Code of Ethics for Professional Accountants in the Philippines (Code of Ethics) together with the ethical requirements that are relevant to our audit of the consolidated financial statements in the Philippines, and we have fulfilled our other ethical responsibilities in accordance with these requirements and the Code of Ethics. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our opinion.

**Key Audit Matters**

Key audit matters are those matters that, in our professional judgment, were of most significance in our audit of the consolidated financial statements of the current period. These matters were addressed in the context of our audit of the consolidated financial statements as a whole, and in forming our opinion thereon, and we do not provide a separate opinion on these matters. For the matter below, our description of how our audit addressed the matter is provided in that context.

We have fulfilled the responsibilities described in the *Auditor's Responsibilities for the Audit of the Consolidated Financial Statements* section of our report, including in relation to these matters. Accordingly, our audit included the performance of procedures designed to respond to our assessment of the risks of material misstatement of the consolidated financial statements. The results of our audit procedures, including the procedures performed to address the matter below, provide the basis for our audit opinion on the accompanying consolidated financial statements.

A member firm of Ernst & Young Global Limited



**EXHIBIT 1439 - 0088**



- 2 -

### *Impairment Assessment of Goodwill and Trademarks With Indefinite Useful Life*

Under PFRS, the Group is required to annually test the amount of goodwill and trademarks with indefinite useful life for impairment. As of December 31, 2023, the Group's goodwill, which are attributable to the Potato Corner, Bakemasters and Peri-Peri businesses, amounting to ₱1,324.85 million, and trademarks with indefinite useful life attributable to Shakey's, Potato Corner and Peri-Peri, amounting to ₱8,769.09 million, are significant to the consolidated financial statements. In addition, management's assessment process requires significant judgment and is based on assumptions which are subject to higher level of estimation uncertainty, specifically revenue growth rate, gross margin, operating margin, capital expenditures, discount rate and long-term revenue growth rate.

The Group's disclosures about goodwill and trademarks with indefinite useful life are included in Notes 5 and 14 to the consolidated financial statements.

### *Audit response*

We obtained an understanding of the management's assessment process for evaluating the impairment of goodwill and trademarks with indefinite useful life. We involved our internal specialist in evaluating the methodologies and the assumptions used. We compared the key assumptions used, such as revenue growth rate against the historical performance of the cash generating units and other relevant external data. We tested the parameters used in the determination of the discount rate against market data. We also reviewed the Group's disclosures about those assumptions to which the outcome of the impairment test is most sensitive, specifically those that have the most significant effect on the determination of the recoverable amount of goodwill and trademarks with indefinite useful life.

### **Other Information**

Management is responsible for the other information. The other information comprises the information included in the SEC Form 17-A for the year ended December 31, 2023, but does not include the consolidated financial statements and our auditor's report thereon, which we obtained prior to the date of this auditor's report, and the SEC Form 20-IS (Definitive Information Statement) and Annual Report for the year ended December 31, 2023, which are expected to be made available to us after that date.

Our opinion on the consolidated financial statements does not cover the other information and we will not express any form of assurance conclusion thereon.

In connection with our audits of the consolidated financial statements, our responsibility is to read the other information identified above when it becomes available and, in doing so, consider whether the other information is materially inconsistent with the consolidated financial statements or our knowledge obtained in the audits, or otherwise appears to be materially misstated.

If, based on the work we have performed on the other information that we obtained prior to the date of this auditor's report, we conclude that there is a material misstatement of this other information, we are required to report that fact. We have nothing to report in this regard.



**EXHIBIT 1439 - 0089**



ID

- 3 -

**Responsibilities of Management and Those Charged with Governance for the Consolidated Financial Statements**

Management is responsible for the preparation and fair presentation of the consolidated financial statements in accordance with PFRSs, and for such internal control as management determines is necessary to enable the preparation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

In preparing the consolidated financial statements, management is responsible for assessing the Group's ability to continue as a going concern, disclosing, as applicable, matters related to going concern and using the going concern basis of accounting unless management either intends to liquidate the Group or to cease operations, or has no realistic alternative but to do so.

Those charged with governance are responsible for overseeing the Group's financial reporting process.

**Auditor's Responsibilities for the Audit of the Consolidated Financial Statements**

Our objectives are to obtain reasonable assurance about whether the consolidated financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditor's report that includes our opinion.  Reasonable assurance is a high level of assurance, but is not a guarantee that an audit conducted in accordance with PSAs will always detect a material misstatement when it exists. Misstatements can arise from fraud or error and are considered material if, individually or in the aggregate, they could reasonably be expected to influence the economic decisions of users taken on the basis of these consolidated financial statements.

As part of an audit in accordance with PSAs, we exercise professional judgment and maintain professional skepticism throughout the audit.  We also:

- Identify and assess the risks of material misstatement of the consolidated financial statements, whether due to fraud or error, design and perform audit procedures responsive to those risks, and obtain audit evidence that is sufficient and appropriate to provide a basis for our opinion.  The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control.

- Obtain an understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Group's internal control.

- Evaluate the appropriateness of accounting policies used and the reasonableness of accounting estimates and related disclosures made by management.



**EXHIBIT 1439 - 0090**

ID



- 4 -

- Conclude on the appropriateness of management's use of the going concern basis of accounting and, based on the audit evidence obtained, whether a material uncertainty exists related to events or conditions that may cast significant doubt on the Group's ability to continue as a going concern. If we conclude that a material uncertainty exists, we are required to draw attention in our auditor's report to the related disclosures in the consolidated financial statements or, if such disclosures are inadequate, to modify our opinion. Our conclusions are based on the audit evidence obtained up to the date of our auditor's report. However, future events or conditions may cause the Group to cease to continue as a going concern.

As part of an audit in accordance with PSAs, we exercise professional judgment and maintain professional skepticism throughout the audit. We also:

- Identify and assess the risks of material misstatement of the consolidated financial statements, whether due to fraud or error, design and perform audit procedures responsive to those risks, and obtain audit evidence that is sufficient and appropriate to provide a basis for our opinion. The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control.

- Obtain an understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Group's internal control.

- Evaluate the appropriateness of accounting policies used and the reasonableness of accounting estimates and related disclosures made by management.

- Conclude on the appropriateness of management's use of the going concern basis of accounting and, based on the audit evidence obtained, whether a material uncertainty exists related to events or conditions that may cast significant doubt on the Group's ability to continue as a going concern. If we conclude that a material uncertainty exists, we are required to draw attention in our auditor's report to the related disclosures in the consolidated financial statements or, if such disclosures are inadequate, to modify our opinion. Our conclusions are based on the audit evidence obtained up to the date of our auditor's report. However, future events or conditions may cause the Group to cease to continue as a going concern.

- Evaluate the overall presentation, structure and content of the consolidated financial statements, including the disclosures, and whether the consolidated financial statements represent the underlying transactions and events in a manner that achieves fair presentation.

- Obtain sufficient appropriate audit evidence regarding the financial information of the entities or business activities within the Group to express an opinion on the consolidated financial statements. We are responsible for the direction, supervision and performance of the audit. We remain solely responsible for our audit opinion.

We communicate with those charged with governance regarding, among other matters, the planned scope and timing of the audit and significant audit findings, including any significant deficiencies in internal control that we identify during our audit.



**EXHIBIT 1439 - 0091**

ID



SGV
Building a better
working world

- 5 -

We also provide those charged with governance with a statement that we have complied with relevant ethical requirements regarding independence, and to communicate with them all relationships and other matters that may reasonably be thought to bear on our independence, and where applicable, related safeguards.

From the matters communicated with those charged with governance, we determine those matters that were of most significance in the audit of the consolidated financial statements of the current period and are therefore the key audit matters. We describe these matters in our auditor's report unless law or regulation precludes public disclosure about the matter or when, in extremely rare circumstances, we determine that a matter should not be communicated in our report because the adverse consequences of doing so would reasonably be expected to outweigh the public interest benefits of such communication.

The engagement partner on the audit resulting in this independent auditor's report is Christine G. Vallejo.

SYCIP GORRES VELAYO & CO.

*Christine G. Vallejo*

Christine G. Vallejo
Partner
CPA Certificate No. 99857
Tax Identification No. 206-384-906
BOA/PRC Reg. No. 0001, August 25, 2021, valid until April 15, 2024
BIR Accreditation No. 08-001998-105-2022, November 7, 2022, valid until November 6, 2025
PTR No. 10082028, January 6, 2024, Makati City

April 15, 2024

A member firm of Ernst & Young Global Limited



EXHIBIT 1439 - 0092

## SHAKEY'S PIZZA ASIA VENTURES INC. AND SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF FINANCIAL POSITION

|  | December 31 | |
|---|---|---|
|  | **2023** | 2022 |
| **ASSETS** | | |
| **Current Assets** | | |
| Cash (Notes 6, 8 and 31) | **₱901,147,527** | ₱989,578,790 |
| Trade and other receivables (Notes 6, 9, 19 and 31) | **1,224,789,572** | 1,133,066,392 |
| Inventories (Notes 6 and 10) | **1,712,217,989** | 1,001,114,060 |
| Prepaid expenses and other current assets (Notes 6 and 11) | **635,187,293** | 730,884,353 |
| Total Current Assets | **4,473,342,381** | 3,854,643,595 |
| **Noncurrent Assets** | | |
| Property and equipment (Notes 6 and 13) | **1,833,780,583** | 1,764,723,405 |
| Intangible assets (Notes 6 and 14) | **10,366,799,313** | 10,339,886,416 |
| Right-of-use assets (Note 15) | **1,540,630,889** | 1,443,780,579 |
| Deferred input value-added tax | **3,886,410** | 9,653,323 |
| Deferred tax assets - net (Note 30) | **100,394,721** | 25,566,418 |
| Rental deposits (Notes 6, 16, 31 and 32) | **309,113,712** | 270,164,541 |
| Total Noncurrent Assets | **14,154,605,628** | 13,853,774,682 |
| **TOTAL ASSETS** | **₱18,627,948,009** | ₱17,708,418,277 |
| **LIABILITIES AND EQUITY** | | |
| **Current Liabilities** | | |
| Short-term loans payable (Notes 17) | **₱700,000,000** | ₱500,000,000 |
| Current portion of: | | |
| Long-term loans payable (Notes 20 and 31) | **47,876,004** | 47,932,514 |
| Lease liabilities (Note 15) | **275,584,146** | 58,902,122 |
| Contract liabilities (Note 22) | **30,059,596** | 13,445,337 |
| Income tax payable | **142,150,319** | 52,155,804 |
| Accounts payable and other current liabilities (Notes 6, 18, 19 and 31) | **1,753,136,296** | 2,132,213,295 |
| Total Current Liabilities | **2,948,806,361** | 2,804,649,072 |
| **Noncurrent Liabilities** | | |
| Long-term loans payable (Notes 20 and 31) | **5,194,694,987** | 5,242,625,440 |
| Noncurrent current portion of: | | |
| Lease liabilities (Note 15) | **1,555,254,353** | 1,641,116,052 |
| Contract liabilities (Note 22) | **117,882,366** | 61,226,844 |
| Accrued pension costs (Note 27) | **117,600,878** | 86,599,794 |
| Deferred tax liabilities - net (Notes 6 and 30) | **627,872,928** | 679,788,566 |
| Dealers' deposits and other noncurrent liabilities (Note 32) | **106,626,720** | 146,635,403 |
| Total Noncurrent Liabilities | **7,719,932,232** | 7,857,992,099 |
| Total Liabilities | **10,668,738,593** | 10,662,641,171 |
| **Equity** | | |
| Capital stock (Note 21) | **1,683,760,178** | 1,683,760,178 |
| Additional paid-in capital (Note 21) | **2,451,116,470** | 2,451,116,470 |
| Retained earnings (Note 21) | **3,788,433,048** | 2,877,362,495 |
| Other components of equity | **35,899,720** | 33,537,963 |
| Total Equity | **7,959,209,416** | 7,045,777,106 |
| **TOTAL LIABILITIES AND EQUITY** | **₱18,627,948,009** | ₱17,708,418,277 |

*See accompanying Notes to Consolidated Financial Statements.*



**EXHIBIT 1439 - 0093**

**SHAKEY'S PIZZA ASIA VENTURES INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME**

| | Years Ended December 31 | | |
|---|---|---|---|
| | **2023** | 2022 | 2021 |
| **REVENUE FROM CONTRACTS WITH CUSTOMERS** (Notes 22) | **₱12,823,923,008** | ₱10,142,024,578 | ₱5,480,427,588 |
| **COST OF SALES** (Notes 23) | **(9,673,051,933)** | (7,546,508,401) | (4,206,711,163) |
| **GROSS INCOME** | **3,150,871,075** | 2,595,516,177 | 1,273,716,425 |
| **GENERAL AND ADMINISTRATIVE EXPENSES** (Note 24) | **(1,570,509,929)** | (1,222,810,270) | (837,345,396) |
| **INTEREST EXPENSE** (Note 28) | **(361,489,106)** | (323,971,110) | (292,179,579) |
| **INTEREST INCOME** (Note 7) | **464,950** | 504,742 | 1,276,273 |
| **OTHER INCOME - Net** (Note 29) | **25,073,732** | 49,175,399 | 85,211,847 |
| **INCOME BEFORE INCOME TAX** | **1,244,410,722** | 1,098,414,938 | 230,679,570 |
| **PROVISION FOR (BENEFIT FROM) INCOME TAX** (Note 30) | | | |
| Current | **291,971,466** | 140,130,584 | 24,222,135 |
| Deferred | **(127,007,314)** | 83,882,273 | 83,477,277 |
| | **164,964,152** | 224,012,857 | 107,699,412 |
| **NET INCOME** | **1,079,446,570** | 874,402,081 | 122,980,158 |
| **OTHER COMPREHENSIVE INCOME** | | | |
| Other comprehensive income not to be reclassified to profit or loss in subsequent periods: | | | |
| Actuarial gain on defined benefit obligation (Note 26) | **3,233,804** | 54,741,546 | 75,856,746 |
| Tax effect (Note 27) | **(872,047)** | (13,641,238) | (18,738,959) |
| | **2,361,757** | 41,100,308 | 57,117,787 |
| **TOTAL COMPREHENSIVE INCOME** | **₱1,081,808,327** | ₱915,502,389 | ₱180,097,945 |
| **Basic/Diluted Earnings Per Share** (Note 35) | **₱0.64** | ₱0.52 | ₱0.08 |

*See accompanying Notes to Consolidated Financial Statements.*

EXHIBIT 1439 - 0094

**SHAKEY'S PIZZA ASIA VENTURES INC. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF CHANGES IN EQUITY**
**FOR THE YEARS ENDED DECEMBER 31, 2023 AND 2022**

| | Capital Stock (Note 21) | Additional Paid-in Capital (Note 21) | Retained Earnings (Note 21) | Other Components of Equity (Note 27) | Total |
|---|---|---|---|---|---|
| Balances at January 1, 2023 | ₱1,683,760,178 | ₱2,451,116,470 | ₱2,877,362,495 | ₱33,537,963 | ₱7,045,777,106 |
| Total comprehensive income | – | – | 1,079,446,570 | 2,361,757 | 1,081,808,327 |
| Cash dividends (Note 21) | – | – | (168,376,017) | – | (168,376,017) |
| Balances at December 31, 2023 | ₱1,683,760,178 | ₱2,451,116,470 | ₱3,788,433,048 | ₱35,899,720 | ₱7,959,209,416 |
| | | | | | |
| Balances at January 1, 2022 | ₱1,683,760,178 | ₱2,451,116,470 | ₱2,053,473,219 | (₱7,562,345) | ₱6,180,787,522 |
| Total comprehensive income | – | – | 874,402,081 | 41,100,308 | 915,502,389 |
| Cash dividends (Note 21) | – | – | (50,512,805) | – | (50,512,805) |
| Balances at December 31, 2022 | ₱1,683,760,178 | ₱2,451,116,470 | ₱2,877,362,495 | ₱33,537,963 | ₱7,045,777,106 |
| | | | | | |
| Balances at January 1, 2021 | ₱1,531,321,053 | ₱1,353,554,797 | ₱1,964,168,269 | (₱64,680,132) | ₱4,784,363,987 |
| Issuance of new shares (Note 21) | 152,439,125 | 1,097,561,673 | | | 1,250,000,798 |
| Total comprehensive loss | – | – | 122,980,158 | 57,117,787 | 180,097,945 |
| Cash dividends (Note 21) | – | – | (33,675,208) | – | (33,675,208) |
| Balances at December 31, 2021 | ₱1,683,760,178 | ₱2,451,116,470 | ₱2,053,473,219 | (₱7,562,345) | ₱6,180,787,522 |

*See accompanying Notes to Consolidated Financial Statements.*

**EXHIBIT 1439 - 0095**

# SHAKEY'S PIZZA ASIA VENTURES INC. AND SUBSIDIARIES
# CONSOLIDATED STATEMENTS OF CASH FLOWS

| | Years Ended December 31 | | |
|---|---|---|---|
| | **2023** | 2022 | 2021 |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | |
| Income before income tax | **₱1,244,410,722** | ₱1,098,414,938 | ₱230,679,570 |
| Adjustments for: | | | |
| Depreciation and amortization (Note 7 and 26) | **757,777,196** | 636,955,383 | 499,875,646 |
| Interest expense (Note 7 and 28) | **361,489,106** | 323,971,110 | 292,179,579 |
| Movement in pension costs | **34,234,887** | 45,080,393 | 40,879,361 |
| Loss (gain) on: | | | |
| Disposal of property and equipment (Note 29) | **(1,228,757)** | (67,336) | 121,143 |
| Pre-terminations of leases (Note 29) | **1,226,148** | (18,323,273) | (10,529,566) |
| Interest income from accretion (Notes 19 and 37) | **(1,692,305)** | (2,000,871) | (3,023,323) |
| Interest income from cash in bank (Notes 7) | **(464,950)** | (504,742) | (1,276,273) |
| Net unrealized foreign exchange loss (gain) | **261,300** | (2,212,953) | (247,925) |
| Provision for (reversal of) legal and other contingencies – net (Notes 29 and 34) | **–** | 11,394,323 | (1,353,452) |
| Fair value gain on financial assets at fair value through profit or loss (FVPL) (Note 29) | **–** | (404,374) | (1,949,288) |
| Gain on reversal of liabilities (Note 29) | **–** | – | (24,682,991) |
| Income before working capital changes | **2,396,013,347** | 2,092,302,598 | 1,020,672,481 |
| Decrease (increase) in: | | | |
| Trade and other receivables | **(91,723,180)** | (409,083,025) | (173,290,549) |
| Inventories | **(711,103,929)** | (568,237,834) | 12,065,346 |
| Prepaid expenses and other current assets | **95,697,060** | (559,930,385) | (11,085,299) |
| Deferred input value-added tax | **5,766,913** | 18,581,229 | 20,189,422 |
| Increase (decrease) in | | | |
| Contract liabilities (Note 36) | **67,084,402** | (10,737,004) | (11,172,587) |
| Accounts payable and other current liabilities | **(379,076,999)** | 1,128,018,038 | 191,067,983 |
| Cash generated from operations | **1,382,657,614** | 1,690,913,617 | 1,048,446,797 |
| Income taxes paid (including creditable withholding taxes) | **(201,976,951)** | (72,929,249) | (63,556,930) |
| Interest received | **464,950** | 504,742 | 1,276,273 |
| Net cash provided by operating activities | **1,181,145,613** | 1,618,489,110 | 986,166,140 |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | |
| Acquisition of: | | | |
| Property and equipment (Note 13) | **(448,155,633)** | (710,050,093) | (280,137,822) |
| Software (Note 14) | **(52,909,939)** | (56,556,757) | |
| Trademark (Note 14) | **–** | (405,000,000) | (1,243,186) |
| Franchise right (Note 14) | **–** | (2,884,236) | |
| Subsidiaries (Note 6) | **–** | (2,063,923,182) | |
| Financial assets at FVPL (Note 12) | **–** | | (300,000,000) |
| Proceeds from: | | | |
| Disposal of property and equipment | **27,577,982** | 181,013 | 123,547 |
| Redemption of financial assets at FVPL (Note 32) | **–** | 300,404,374 | 121,949,288 |
| Collection (payment) of rental deposits (Note 36) | **(37,256,866)** | 321,123,851 | (409,172,651) |
| Increase (decrease) in dealers' deposits and other noncurrent liabilities | **(40,008,683)** | 62,655,500 | 42,739,353 |
| Cash acquired from business combination (Note 6) | **–** | 20,503,549 | – |
| Net cash used in investing activities | **(550,753,139)** | (2,533,545,981) | (825,741,471) |

*(Forward)*

EXHIBIT 1439 - 0096

- 2 -

| | | Years Ended December 31 | |
| | 2023 | 2022 | 2021 |
|---|---|---|---|
| **CASH FLOWS FROM FINANCING ACTIVITIES** (Note 35) | | | |
| Proceeds from availment of: | | | |
| Short-term loans (Note 17) | **₱700,000,000** | ₱500,000,000 | ₱— |
| Long-term loans (Note 20) | **—** | 1,600,000,000 | — |
| Issuance of capital stock (Note 21) | **—** | — | 1,250,000,798 |
| Payments of: | | | |
| Short-term loans (Note 17) | **(500,000,000)** | — | (1,050,000,000) |
| Lease liabilities (Note 15) | **(461,980,269)** | (360,864,550) | (204,302,941) |
| Interest | **(238,206,151)** | (221,614,458) | (194,954,854) |
| Dividends (Note 21) | **(168,376,017)** | (50,512,805) | (33,675,208) |
| Long-term loans (Note 20) | **(50,000,000)** | (50,000,000) | (50,000,000) |
| Net cash provided by (used in) financing activities | **(718,562,437)** | 1,417,008,187 | (282,932,205) |
| | | | |
| **NET INCREASE (DECREASE) IN CASH** | **(88,169,963)** | 501,951,316 | (122,507,536) |
| | | | |
| **EFFECT OF EXCHANGE RATE CHANGES ON CASH** | **(261,300)** | 2,212,953 | 247,925 |
| | | | |
| **CASH AT BEGINNING OF YEAR** (Note 8) | **989,578,790** | 485,414,521 | 607,674,132 |
| | | | |
| **CASH AT END OF YEAR** (Note 8) | **₱901,147,527** | ₱989,578,790 | ₱485,414,521 |

*See accompanying Notes to Consolidated Financial Statements.*

EXHIBIT 1439 - 0097

## SHAKEY'S PIZZA ASIA VENTURES INC. AND SUBSIDIARIES
## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

1. **General Information**

   <u>Corporate Information</u>
   Shakey's Pizza Asia Ventures Inc., doing business under the name and style of Shakey's (SPAVI or the Parent Company), was incorporated and registered with the Philippine Securities and Exchange Commission (SEC) on February 14, 1974. The Parent Company and its subsidiaries (collectively referred to as "the Group") are involved primarily in the development, operations and franchising of fast casual restaurants under the trade names "Shakey's", "Peri-Peri" and "Potato Corner".

   On December 15, 2016, the common shares of the Parent Company were listed and traded in the Philippine Stock Exchange (PSE) under the trading name "PIZZA".

   The registered office address of the Parent Company is 15Km East Service Road corner Marian Road 2, Barangay San Martin de Porres, Parañaque City 1700.

   <u>Approval and Authorization for the Issuance of the Consolidated Financial Statements</u>
   The consolidated financial statements were approved and authorized for issuance by the Board of Directors (BOD) on April 15, 2024.

2. **Basis of Preparation and Consolidation, and Statement of Compliance**

   <u>Basis of Preparation</u>
   The consolidated financial statements have been prepared on a historical cost basis, except for financial assets at fair value through profit or loss (FVPL) which are carried at fair value. The consolidated financial statements are presented in Philippine peso, which is the Group's functional currency.

   <u>Statement of Compliance</u>
   The consolidated financial statements have been prepared in accordance with Philippine Financial Reporting Standards (PFRSs).

   <u>Basis of Consolidation</u>
   The consolidated financial statements comprise the financial statements of the Parent Company and its wholly owned subsidiaries as at December 31. The financial statements of the subsidiaries are prepared for the same reporting period as the Parent Company, using uniform accounting policies for like transactions and other events with similar circumstances.

   The consolidated financial statements include the accounts of the Parent Company and the following subsidiaries:

| | Principal Activities | Place of Incorporation | Percentage of Ownership (%) |
|---|---|---|---|
| Bakemasters, Inc. (BMI) | Manufacturer of pizza dough and pastries | Philippines | 100% |
| PC International Limited (PCIL) g | Restaurant business | Singapore | 100% |
| Queensview International Limited (QIL) g | Trademark | British Virgin Islands | 100% |
| Shakey's International Limited (SIL) | Trademark | Hong Kong | 100% |
| Shakey's Seacrest Incorporated (SSI) | Trademark | Philippines | 100% |
| Shakey's Pizza Regional Foods Limited (SPRFL) | Trademark | Hong Kong | 100% |
| Shakey's Pizza Commerce Inc. (SPCI) | Trading of goods | Philippines | 100% |
| Wow Brand Holdings, Inc. (WBHI) | Restaurant business | Philippines | 100% |
| Shanghai Miaomiao Shu Catering Co. LTD (SMSCCL) | Restaurant business | China | 100% |



EXHIBIT 1439 - 0098

- 2 -

### 3. Changes in Accounting Policies and Disclosures

The Group's accounting policies are consistent with those of the previous financial year, except for the adoption of new standards effective in 2023. The Group has not early adopted any standard, interpretation or amendment that has been issued but is not yet effective.

- Amendments to PAS 1 and PFRS Practice Statement 2, *Disclosure of Accounting Policies*

  The amendments provide guidance and examples to help entities apply materiality judgements to accounting policy disclosures. The amendments aim to help entities provide accounting policy disclosures that are more useful by:

  - Replacing the requirement for entities to disclose their 'significant' accounting policies with a requirement to disclose their 'material' accounting policies, and
  - Adding guidance on how entities apply the concept of materiality in making decisions about accounting policy disclosures.

  The amendments have had an impact on the Group's disclosures of accounting policies, but not on the measurement, recognition or presentation of any items in the consolidated financial statements. The amendments have been considered under "Material Accounting and Financial Reporting Policies" in Note 4.

- Amendments to PAS 12, *Deferred Tax related to Assets and Liabilities arising from a Single Transaction*

  The amendments narrow the scope of the initial recognition exception under PAS 12, so that it no longer applies to transactions that give rise to equal taxable and deductible temporary differences.

  The amendments also clarify that where payments that settle a liability are deductible for tax purposes, it is a matter of judgement (having considered the applicable tax law) whether such deductions are attributable for tax purposes to the liability recognized in the financial statements (and interest expense) or to the related asset component (and interest expense).

- Amendments to PAS 12 *International Tax Reform – Pillar Two Model Rules*

  The amendments introduce a mandatory exception in PAS 12 from recognizing and disclosing deferred tax assets and liabilities related to Pillar Two income taxes.

  The amendments also clarify that PAS 12 applies to income taxes arising from tax law enacted or substantively enacted to implement the Pillar Two Model Rules published by the Organization for Economic Cooperation and Development (OECD), including tax law that implements qualified domestic minimum top-up taxes. Such tax legislation, and the income taxes arising from it, are referred to as 'Pillar Two legislation' and 'Pillar Two income taxes', respectively.

  The temporary exception from recognition and disclosure of information about deferred taxes and the requirement to disclose the application of the exception, apply immediately and retrospectively upon adoption of the amendments in June 2023.

EXHIBIT 1439 - 0099

- 3 -

Meanwhile, the disclosure of the current tax expense related to Pillar Two income taxes and the disclosures in relation to periods before the legislation is effective are required for annual reporting periods beginning on or after 1 January 2023.

The Group adopted and applied the exceptions introduced by PAS 12. The current income tax expense related to Pillar Two income taxes amounted to nil in 2023.

As at April 15, 2024, the Group is in the process of gathering information and assessing the potential exposure arising from the Pillar Two legislation.

Standards Issued but Not Yet Effective
Pronouncements issued but not yet effective are listed below. Unless otherwise indicated, the Group does not expect that the future adoption of the said pronouncements will have a significant impact on its parent company financial statements. The Group intends to adopt the following pronouncements when they become effective.

*Effective beginning on or after January 1, 2024*
- Amendments to PAS 1, *Classification of Liabilities as Current or Non-current*
- Amendments to PFRS 16, *Lease Liability in a Sale and Leaseback*
- Amendments to PAS 7 and PFRS 7, *Disclosures: Supplier Finance Arrangements*

*Effective beginning on or after January 1, 2025*
- PFRS 17, *Insurance Contracts*
- Amendments to PAS 21, *Lack of exchangeability*

*Deferred effectivity*
- Amendments to PFRS 10, *Consolidated Financial Statements*, and PAS 28, *Sale or Contribution of Assets between an Investor and its Associate or Joint Venture*

---

4. **Material Accounting and Financial Reporting Policies**

Business Combinations and Goodwill
Business combinations are accounted for using the acquisition method. The cost of an acquisition is measured as the aggregate of the consideration transferred, measured at acquisition date fair value, and the amount of any non-controlling interest in the acquiree. For each business combination, the Group elects whether to measure the noncontrolling interest in the acquiree either at fair value or at the proportionate share of the acquiree's identifiable net assets. Acquisition-related costs are expensed as incurred.

When the Group acquires a business, it assesses the financial assets and liabilities assumed for appropriate classification and designation in accordance with the contractual terms, economic circumstances and pertinent conditions as at the acquisition date. This includes the separation of embedded derivatives in host contracts by the acquiree.

If the business combination is achieved in stages, the acquisition date fair value of the acquirer's previously held equity interest in the acquiree is remeasured to fair value at the acquisition date through profit or loss included under "Remeasurement gain (loss) arising from business combination."

EXHIBIT 1439 - 0100

- 4 -

Goodwill is initially measured at cost where cost is the excess of the aggregate of the consideration transferred and the amount recognized for non-controlling interest over the net identifiable assets acquired and liabilities assumed.  If the fair value of the net assets acquired is in excess of the aggregate consideration transferred, the Group re-assesses whether it has correctly identified all of the assets acquired and all of the liabilities assumed and reviews the procedures used to measure the amounts to be recognized at the acquisition date.  If the reassessment still results in an excess of the fair value of net assets acquired over the aggregate consideration transferred, then the gain is recognized in profit or loss and included under "other income (expenses)."

Following initial recognition, goodwill is measured at cost less any accumulated impairment loss.  Goodwill is reviewed for impairment, annually or more frequently if events or changes in circumstances indicate that the carrying value may be impaired.  For purposes of impairment testing, goodwill acquired in a business combination is, from the acquisition date, allocated to each of the Group's cash-generating units (CGUs), or groups of CGUs, that are expected to benefit from the synergies of the combination, irrespective of whether other assets or liabilities of the Group are assigned to those units or groups of units.  Each unit or group of units to which the goodwill is allocated should:

- represent the lowest level within the Group at which the goodwill is monitored for internal management purposes; and
- not be larger than an operating segment determined in accordance with PFRS 8, *Operating Segments*.

Occasionally, an acquirer will make a bargain purchase, which is a business combination in which the net amount resulting from the acquisition-date amounts of the identifiable assets acquired and the liabilities assumed measured exceeds the aggregate of the consideration transferred.

Before recognizing a gain on a bargain purchase, the acquirer shall reassess whether it has correctly identified all of the assets acquired and all of the liabilities assumed and shall recognize any additional assets or liabilities that are identified in that review.  The acquirer shall then review the procedures used to measure the amounts to be recognized at the acquisition date for all of the following:

a.   the identifiable assets acquired and liabilities assumed;
b.   the noncontrolling interest in the acquiree, if any;
c.   for a business combination achieved in stages, the acquirer's previously held equity interest in the acquiree; and
d.   the consideration transferred.

If that excess remains after applying the requirements above, the acquirer shall recognize the resulting gain in profit or loss on the acquisition date.  The gain shall be attributed to the acquirer.

Where goodwill forms part of a CGU (or group of CGUs) and part of the operation within that unit is disposed of, the goodwill associated with the operation disposed of is included in the carrying amount of the operation when determining the gain or loss on disposal of the operation.  Goodwill disposed of in these circumstances is measured based on the relative values of the operation disposed of and the portion of the CGU retained.

EXHIBIT 1439 - 0101

- 5 -

Financial Instruments

*Financial Assets*
The Group's financial assets are classified as financial assets at amortized cost. The Group's cash, trade and other receivables and rental and other deposits included in "Rental deposits" in the consolidated statement of financial position (see Notes 8, 9 and 16) are included in this category. For trade receivables, the Group applies a simplified approach in calculating ECLs. Therefore, the Group does not track changes in credit risk, but instead recognizes a loss allowance based on lifetime ECLs at each reporting date. The Group has established a provision matrix that is based on its historical credit loss experience, adjusted for forward-looking factors specific to the debtors and the economic environment. The Group considers a financial asset in default when contractual payments are 360 days past due. However, in certain cases, the Group may also consider a financial asset to be in default when internal or external information indicates that the Group is unlikely to receive the outstanding contractual amounts in full before taking into account any credit enhancements held by the Group. A financial asset is written off when there is no reasonable expectation of recovering contractual cash flows.

*Financial liabilities*
The Group's financial liabilities are classified as loans and borrowing and payables. This category includes short-term and long-term loans payable, accounts payable and other current liabilities (excluding statutory liabilities), lease liabilities (see Notes 15, 17, 19 and 20), and dealers' deposits and other noncurrent liabilities. These are recognized initially at fair value, net of directly attributable transaction costs, and subsequently measured at amortized cost. A financial liability is derecognized when the obligation under the liability is discharged or canceled or has expired. When an existing financial liability is replaced by another from the same lender on substantially different terms, or the terms of an existing liability are substantially modified, such an exchange or modification is treated as a derecognition of the original liability and the recognition of a new liability, and the difference in the respective carrying amounts is recognized in the Group's profit or loss.

Prepayment Option
If the Group revises its estimates of payments or receipts, the Group shall adjust the carrying amount of the financial asset or financial liability (or group of financial instruments) to reflect actual and revised estimated cash flows. The entity recalculates the carrying amount by computing the present value of estimated future cash flows at the financial instrument's original effective interest rate or, when applicable, the revised effective interest rate calculated. The adjustment is recognized in the consolidated statement of comprehensive income as income or expense.

Inventories
Inventories are valued at the lower of cost and net realizable value (NRV). Costs incurred in bringing each product to its present location and condition are accounted for as follows:

| | | |
|---|---|---|
| Finished goods | - | determined using the moving average method, cost includes direct materials and labor and a proportion of manufacturing overhead costs based on normal operating capacity but excluding borrowing costs. |
| Raw materials and merchandise | - | determined using the moving average method. |

NRV of finished goods is the estimated selling price in the ordinary course of business less estimated costs necessary to make the sale. NRV of raw materials is the current replacement cost.

EXHIBIT 1439 - 0102

- 6 -

Property and Equipment
Property and equipment are stated at cost, excluding the costs of day-to-day servicing, less accumulated depreciation, amortization and any impairment in value.

Depreciation and amortization commence once the assets are available for use. Depreciation and amortization are computed using the straight-line basis over the following estimated useful lives of the property and equipment:

| Category | Number of year(s) |
|---|---|
| Building | 15-20 |
| Leasehold improvements | 2-10 |
| Furniture, fixtures and equipment | 2-10 |
| Machinery and equipment | 2-3 |
| Transportation equipment | 2-7 |
| Shop and maintenance tools | 3-10 |
| Glassware and utensils | 2 |

The useful lives and depreciation and amortization method are reviewed at each reporting date, and adjusted prospectively, if appropriate.

Construction in progress is stated at cost. This includes cost of construction and other direct costs related to the asset being constructed. Construction in progress is transferred to the related property and equipment when the construction or installation and related activities necessary to prepare the property and equipment for their intended use have been completed, and the property and equipment are ready for use. Construction in progress is not depreciated until such time as the relevant assets are completed and put into operational use.

Intangible Assets
The cost of intangible assets acquired in a business combination such as trademarks is the fair value as at the date of acquisition. The useful lives of intangible assets are assessed to be either finite or indefinite. Following initial recognition, intangible assets are carried at cost less any accumulated amortization in the case of intangible assets with finite lives, and any accumulated impairment losses.

Intangible assets with finite lives such as software and franchise right are amortized over the useful economic life and assessed for impairment whenever there is an indication that the intangible asset may be impaired. The amortization period and the amortization method for an intangible asset with a finite useful life are reviewed at least at the end of each reporting period. The amortization expense on intangible assets with finite lives is recognized in the statement of comprehensive income in the expense category that is consistent with the function of the intangible assets.

Amortization commences once the assets are available for use. Amortization is computed using the straight-line basis over the following estimated useful lives of the intangible assets with finite life:

| Category | Number of year(s) |
|---|---|
| Software | 10-15 |
| Franchise | 7 |

Intangible assets with indefinite useful lives, such as goodwill and trademarks, are tested for impairment annually or more frequently if an indication of impairment exists either individually or at the CGU level. Such intangibles are not amortized. Intangible asset with an indefinite life is reviewed annually to determine whether indefinite life assessment continues to be supportable. If not, the change in the useful life assessment from indefinite to finite is made on a prospective basis.

EXHIBIT 1439 - 0103

- 7 -

An intangible asset is derecognized upon disposal (i.e., at the date the recipient obtains control) or when no future economic benefits are expected from its use or disposal. Any gain or loss arising upon derecognition of the asset (calculated as the difference between the net disposal proceeds and the carrying amount of the asset) is included in the consolidated statement of comprehensive income.

Impairment of Nonfinancial Assets
The Group's property and equipment, right-of-use assets, intangible assets with definite useful lives and other non-financial assets are tested for impairment whenever events or changes in circumstances indicate that the carrying amount may not be recoverable.

Goodwill and trademarks with indefinite useful lives are tested for impairment annually at the CGU level, as appropriate, and when circumstances indicate that the carrying value may be impaired.

Dealers' Deposits
Dealers' deposits are initially recognized at fair value. The discount is recognized as deferred credits and amortized over the estimated remaining term of the deposits using the effective interest method.

Revenue from Contracts with Customers
Revenue from contracts with customers is recognized when control of the goods or services are transferred to the customer at an amount that reflects the consideration to which the Group expects to be entitled in exchange for those goods or services. The Group assesses its revenue arrangements against specific criteria to determine if it is acting as a principal or as an agent. The Group has concluded that it is acting as principal in majority of its revenue arrangements. The following specific recognition criteria must also be met before revenue is recognized:

*Restaurant Sales.* Revenue from restaurant sales is recognized at a point in time which is when the related orders are served.

*Sale of goods.* Revenue from sales of goods consists of revenue from sale of materials and equipment. Transaction price of merchandise sales, which excludes discounts, returns, rebates and sales taxes, is normally received and recorded at a point in time.

*Franchise Revenue.* Initial franchise fee is recognized on a straight-line basis over the term of the franchise agreement, which ranges from 5 to 10 years. The transaction price for franchise agreement is discounted, using the rate that would be reflected in a separate financing transaction between the Group and its customers at contract inception, to take into consideration the significant financing component. In instances where a significant financing component has been identified from its contracts with customers, this is recognized as interest expense in the consolidated statement of comprehensive income.

Other franchise revenues consisting of royalty fees and various reimbursements from franchisees are recognized when earned.

*Interest Income.* Revenue is recognized at a point in time which is as the interest accrues, using the EIR that exactly discounts estimated future cash receipts through the expected life of the financial instrument to the net carrying amount of the financial asset.

Contract Balances

*Trade Receivables.* A receivable represents the Group's right to an amount of consideration that is unconditional (i.e., only the passage of time is required before payment of the consideration is due).

EXHIBIT 1439 - 0104

- 8 -

*Contract Liabilities.*  A contract liability is the obligation to transfer goods or services to a customer for which the Group has received consideration (or an amount of consideration) from the customer. If a customer pays consideration before the Group transfers goods or services to the customer, a contract liability is recognized when the payment is made or the payment is due (whichever is earlier).  Contract liabilities are recognized as revenue when the Group performs under the contract.

Further, the Group has a loyalty points program which allows customers to accumulate points that can be applied to customer purchases depending on the actual usage within the next financial year. The liability is recognized when the customer avails of the Group's services using the loyalty card. Loyalty points are recognized as revenue upon actual usage or expiration whichever comes first.

Cost and Expenses Recognition
Cost and expenses are decreases in economic benefits during the accounting period in the form of outflows or decrease of assets or incurrence of liabilities that result in decrease in equity, other than those relating to distributions to equity participants.  Costs of sales and general and administrative expenses are recognized in net income in the consolidated statement of comprehensive income in the period these are incurred.

Leases
The Group assesses at contract inception whether a contract is, or contains, a lease. That is if the contract conveys the right to control the use of an identified asset for a period of time in exchange for consideration.

*Right-of-use assets.*  The Group recognizes right-of-use assets at the commencement date of the lease (i.e., the date the underlying asset is available for use). Right-of-use assets are measured at cost, less any accumulated depreciation and impairment losses, and adjusted for any remeasurement of lease liabilities. The cost of right-of-use assets includes the amount of lease liabilities recognized, initial direct costs incurred, and lease payments made at or before the commencement date less any lease incentives received and estimate of costs to be incurred by the lessee in dismantling and removing the underlying asset, restoring the site on which it is located or restoring the underlying asset to the condition required by the terms and conditions of the lease, unless those costs are incurred to produce inventories. Unless the Group is reasonably certain to obtain ownership of the leased asset at the end of the lease term, the recognized right-of-use assets are depreciated on a straight-line basis over the shorter of its estimated useful life and the lease term, which is between 2 to 25 years.

Right-of-use assets are subject to impairment. Refer to the accounting policies section on impairment of non-financial assets.

*Lease liabilities.*  At the commencement date of the lease, the Group recognizes lease liabilities measured at the present value of lease payments to be made over the lease term. The lease payments include fixed payments (including in-substance fixed payments) less any lease incentives receivable, variable lease payments that depend on an index or a rate, and amounts expected to be paid under residual value guarantees. The lease payments also include the exercise price of a purchase option reasonably certain to be exercised by the Group and payments of penalties for terminating a lease, if the lease term reflects the Group exercising the option to terminate. The variable lease payments that do not depend on an index or a rate are recognized as expense in the period on which the event or condition that triggers the payment occurs.

In calculating the present value of lease payments, the Group uses the incremental borrowing rate at the lease commencement date if the interest rate implicit in the lease is not readily determinable. After the commencement date, the amount of lease liabilities is increased to reflect the accretion of interest and reduced for the lease payments made. In addition, the carrying amount of lease liabilities

EXHIBIT 1439 - 0105

- 9 -

is remeasured if there is a modification, a change in the lease term, a change in the in-substance fixed lease payments or a change in the assessment to purchase the underlying asset.

*Short-term leases and leases of low-value assets.*  The Group applies the short-term lease recognition exemption to its short-term leases of machinery and equipment (i.e., those leases that have a lease term of 12 months or less from the commencement date and do not contain a purchase option). It also applies the leases of low-value assets recognition exemption to leases of office equipment that are considered of low value. Lease payments on short-term leases and leases of low-value assets are recognized as expense on a straight-line basis over the lease term.

*Lease Modification.*  Lease modification is defined as a change in the scope of a lease, or the consideration for a lease, that was not part of the original terms and conditions of the lease (for example, adding or terminating the right to use one or more underlying assets, or extending or shortening the contractual lease term).

A lessee shall account for a lease modification as a separate lease if both:

- The modification increases the scope of the lease by adding the right to use one or more underlying assets; and
- The consideration for the lease increases by an amount commensurate with the stand-alone price for the increase in scope and any appropriate adjustments to that stand-alone price to reflect the circumstances of the particular contract.

For a lease modification that is not accounted for as a separate lease, at the effective date of the lease modification a lessee shall:

- Allocate the consideration in the modified contract;
- Determine the lease term of the modified lease; and
- Remeasure the lease liability by discounting the revised lease payments using a revised discount rate. The revised discount rate is determined as the interest rate implicit in the lease for the remainder of the lease term, if that rate can be readily determined, of the lessee's incremental borrowing rate at the effective date of the modification, if the interest rate implicit in the lease cannot be readily determined. The lessee shall account for the remeasurement of the lease liability by:

  - Decreasing the carrying amount of the right-of-use asset to reflect the partial or full termination of the lease for lease modifications that decrease the scope of the lease. The lessee shall recognize in profit or loss any gain or loss relating to partial or full termination of the lease.
  - Making corresponding adjustment to the right-of-use asset for all other lease modifications.

As a practical expedient, a lessee may elect not to assess whether a rent concession occurring as a direct consequence of COVID-19 pandemic is a lease modification and only if all of the following conditions are met:

- The change in lease payments results in revised consideration for the lease that is substantially the same as, or less than, the consideration for the lease immediately preceding the change;
- Any reduction in lease payments affects only payments originally due on or before June 30, 2022; and,
- There is no substantive change to other terms and conditions of the lease.

EXHIBIT 1439 - 0106

- 10 -

Rent concession received from lessors are accounted for as negative variable lease payments in profit or loss.

Pension
The Group has a funded, noncontributory defined benefit retirement plan covering substantially all of its qualified employees.  The plan requires contributions to be made to a separately administered fund.  The cost of providing benefits under the defined benefit plan is determined using the projected unit credit method.

*Defined benefit plan.*  The Group classifies its retirement benefit as defined benefit plans.  Under the defined benefit plans, the cost of providing benefits is determined using the projected unit credit method, with actuarial valuations being carried out at the end of each annual reporting period.

Retirement benefit costs are categorized as follows:

- Service cost (including current service cost, past service cost, as well as gains and losses on curtailments and settlements);
- Net interest expense or income; and
- Remeasurement.

Service costs which include current service costs, past service costs, and gains or losses on non-routine settlements are recognized as expense in profit or loss.  Past service costs are recognized when plan amendment or curtailment occurs.  These amounts are calculated periodically by independent qualified actuaries.

Net interest on the net defined benefit liability or asset is the change during the period in the net defined benefit liability or asset that arises from the passage of time which is determined by applying the discount rate based on government bonds to the net defined benefit liability or asset.

Net interest on the net defined benefit liability or asset is recognized as expense or income in profit or loss.

Remeasurements comprising actuarial gains and losses, return on plan assets and any change in the effect of the asset ceiling (excluding net interest on defined benefit obligation) are recognized immediately in other comprehensive income in the period in which they arise.  Remeasurements are not reclassified to profit or loss in subsequent periods.

Plan assets are assets that are held by a long-term employee benefit fund.  Fair value of plan assets is based on market price information.  When no market price is available, the fair value of plan assets is estimated by discounting expected future cash flows using a discount rate that reflects both the risk associated with the plan assets and the maturity or expected disposal date of those assets (or, if they have no maturity, the expected period until the settlement of the related obligations).

Actuarial valuations are made with sufficient regularity that the amounts recognized in the consolidated financial statements do not differ materially from the amounts that would be determined at reporting date.

Foreign Currency-denominated Transactions
Foreign currency-denominated transactions are recorded in Philippine peso using the exchange rate at the date of the transaction.  Monetary assets and liabilities denominated in foreign currencies are restated using the closing exchange rate at reporting date.  Exchange rate differences arising on the settlement and restatement of monetary items at rates different from those at which they were initially

EXHIBIT 1439 - 0107

- 11 -

recorded are recognized in net income in the consolidated statement of comprehensive income in the year such differences arise. Nonmonetary items denominated in foreign currencies are measured on a historical cost basis and translated using the exchange rate at the date of transaction.

<u>Income Tax</u>
*Current Tax.* Current tax assets and liabilities for the current and prior years are measured at the amount expected to be recovered from or paid to the tax authority. The tax rates and tax laws used to compute the amount are those that are enacted or substantively enacted at the reporting date. The Group's current tax expense is calculated using 25% regular corporate income tax (RCIT) rate in 2023 and 2022 or 2% and 1%minimum corporate income tax (MCIT) rate in 2023 and 2022, respectively, whichever is higher. BMI, SSI and SPCI use Optional Standard Deduction (OSD), while the Parent Company and the remaining subsidiaries incorporated in the Philippines use itemized deductions in the computation of their respective taxable income.

*Deferred income tax*
Deferred tax is provided using the liability method on temporary differences between the tax bases of assets and liabilities and their carrying amounts for financial reporting purposes at the financial reporting date.

Deferred tax liabilities are recognized for all taxable temporary differences except: (1) when the deferred tax liability arises from the initial recognition of goodwill or of an asset or liability in a transaction that is not a business combination and, at the time of the transaction, affects neither the accounting profit nor taxable profit or loss; or (2) in respect of taxable temporary differences associated with investment in subsidiaries, associates and interests in joint ventures, where the timing of the reversal of the temporary differences can be controlled and it is probable that the reversal will not occur in the foreseeable future.

Deferred tax assets are recognized for all deductible temporary differences and carryforward benefits of unused excess of minimum corporate income tax ("MCIT") over regular corporate income tax ("RCIT") and unused net operating loss carry-over ("NOLCO") to the extent that it is probable that taxable income will be available against which the deductible temporary differences and the carryforward benefits of unused tax credits and unused tax losses can be utilized except: (1) when the deferred income tax asset relating to deductible temporary difference arises from the initial recognition of an asset or liability in a transaction that is not a business combination and, at the time of the transaction, affects neither the accounting profit nor taxable profit or loss; or (2) in respect of deductible temporary differences associated with investments in subsidiaries, associates and interests in joint ventures, deferred tax assets are recognized only to the extent that it is probable that the temporary differences will reverse in the foreseeable future and taxable profit will be available against which the temporary differences can be utilized.

The carrying amount of deferred tax assets is reviewed at each financial reporting date and reduced to the extent that it is no longer probable that sufficient taxable income will be available to allow all or part of the deferred income tax asset to be utilized. Unrecognized deferred tax assets are reassessed at each financial reporting date and are recognized to the extent that it has become probable that future taxable profit will allow the deferred tax asset to be recovered.

Deferred tax assets and liabilities are measured at the tax rates that are expected to apply to the year when the asset is realized or the liability is settled, based on tax rates (and tax laws) that have been enacted or substantively enacted as at financial reporting date.

EXHIBIT 1439 - 0108

- 12 -

Deferred tax relating to items recognized outside profit or loss is recognized in correlation to the underlying transaction either in other comprehensive income (OCI) or directly in equity.

Deferred tax assets and liabilities are offset, if a legally enforceable right exists to set off current tax assets against current tax liabilities and the deferred taxes relate to the same taxable entity and the same taxation authority.

Value-added Tax (VAT)
Revenues, expenses and assets are recognized net of the amount of sales tax except:

▪ where the tax incurred on a purchase of assets or services is not recoverable from the tax authority, in which case the tax is recognized as part of the cost of acquisition of the asset or as part of the expense item as applicable; and
▪ receivables and payables that are stated with the amount of tax included.

The net amount of tax recoverable from, or payable to, the tax authority is included as part of receivables or payables in the consolidated statement of financial position.

Deferred Input VAT
Deferred input VAT pertains to input VAT on accumulated purchases of property, plant and equipment for each month amounting to ₱1.00 million or more. This is amortized over five (5) years or the life of the property and equipment, whichever is shorter, in accordance with the Bureau of Internal Revenue (BIR) regulation.

Segment Reporting
The Group's operating businesses are organized and managed separately according to the nature of the products and services provided, with representing a strategic business unit that offers different products. Financial information on business segments is presented in Note 7 to the consolidated financial statements.

Provisions
Provisions arising from present obligation are recognized in profit or loss when the timing and amount of settlement can be reliably measured.

5. **Significant Accounting Judgments, Estimates and Assumptions**

The preparation of the consolidated financial statements requires management to make judgments, estimates and assumptions that affect the reported amounts of revenue, expenses, assets and liabilities and the disclosure of contingent liabilities. Uncertainty about these assumptions and estimates could result in outcomes that require a material adjustment to the carrying amount of the asset or liability affected in future periods.

Judgments
In the process of applying the Group's accounting policies, management has made judgments which have significant effect on the amounts recognized in the consolidated financial statements and accompanying notes. The judgments are based upon management's evaluation of relevant facts and circumstances as at the date of the consolidated financial statements.

EXHIBIT 1439 - 0109

- 13 -

*Right to Access - Performance Obligation Satisfied Over Time.* The Group determines whether it provides a dealer/franchisee with either:

- a right to access the Group's intellectual property through a "Trademark Licensing and Franchise Agreement" throughout the term of the franchise agreement for which revenue is recognized over the term of the franchise agreement, or
- a right to use the Group's intellectual property a "Trademark Licensing and Franchise Agreement" as it exists at the point in time the franchise license is granted for which revenue is recognized at the point in time the franchisee can first use and benefit from the franchise license.

In assessing whether the nature of the Group's promise in granting a "Trademark Licensing and Franchise Agreement" is to provide a right to access the Group's intellectual property (i.e., franchise license), the Group considers whether all of the following criteria are met:

- the franchise agreement requires, or the franchisee reasonably expects that the Group will undertake activities that will significantly affect the franchise license to which the franchisee has rights (e.g., advertisements, promotions, campaigns, etc.);
- the rights granted by the franchise license directly expose the franchisee to any positive or negative effects of the Group's activities;
- those activities do not result in the transfer of a good or service to the franchisee as those activities occur.

The Group determined that it has met all of the criteria mentioned above and concluded that it provides its franchisees with a right to access the Group's franchise license throughout the term of the franchise agreement. Accordingly, revenue from granting franchise license is recognized over the term of the franchise agreement.

*Determination of lease term of contracts with renewal and termination options - Group as a Lessee.* The Group has several lease contracts that include extension and termination options. The Group applies judgement in evaluating whether it is reasonably certain whether or not to exercise the option to renew or terminate the lease. That is, it considers all relevant factors that create an economic incentive for it to exercise either the renewal or termination. After the commencement date, the Group reassesses the lease term if there is a significant event or change in circumstances that is within its control and affects its ability to exercise or not to exercise the option to renew or to terminate (e.g., construction of significant leasehold improvements or significant customization to the leased asset).

As at December 31, 2023 and 2022, the Group's right-of-use assets amounted to ₱1,540.6 million and ₱1,443.8 million, respectively, and the Group's lease liabilities as at those dates amounted to ₱1,830.8 million and ₱1,700.0 million, respectively. In 2023, 2022 and 2021, the Group recognized amortization of right-of use assets amounting to ₱339.9 million, ₱155.8 million and ₱155.8 million, respectively. Interest expense on lease liabilities recognized amounted to ₱111,567 million, ₱80.9 million, ₱89.1 million, respectively (see Notes 15 and 28).

*Acquisition of Potato Corner (PC) Business.* On March 5, 2022, the Group entered into various purchase agreements (the "Agreements") with Cinco Group for the assets and intellectual property related to the PC business both domestically and internationally. The agreements also include purchase of 100% shares in PCIL and QIL (collectively "the PC offshore entities"). The agreements were considered as comprising linked transactions and accounted as one business combination at the Group's consolidated financial statements.

EXHIBIT 1439 - 0110

- 14 -

Estimates and Assumptions
The key estimates and assumptions concerning the future and other key sources of estimation uncertainty at reporting period that have a significant risk of causing a material adjustment to the carrying amounts of assets and liabilities within the next financial year are discussed below.  The Group based its assumptions and estimates on parameters available when the consolidated financial statements were prepared.  Existing circumstances and assumptions about future developments, however, may change due to market changes or circumstances arising beyond the control of the Group.  Such changes are reflected in the assumptions when they occur.

*Leases - Estimating the incremental borrowing rate.* The Group cannot readily determine the interest rate implicit in the lease, therefore, it uses its incremental borrowing rate (IBR) to measure lease liability. The IBR is the rate of interest that the Group would have to pay to borrow over a similar term, and with a similar security, the funds necessary to obtain an asset of a similar value to the right-of-use asset in a similar economic environment. The IBR therefore reflects what the Group 'would have to pay', which requires estimation when no observable rates are available or when they need to be adjusted to reflect the terms and conditions of the lease. The Group estimates the IBR using observable inputs (such as market interest rates) when available and is required to make certain entity-specific estimates.

As at December 31, 2023 and 2022, the Group's lease liabilities amounted to ₱1,830.8 million and ₱1,700.0 million, respectively (see Note 15).

*Determination of Fair Value of Financial Instruments.*  Where the fair value of financial assets and liabilities recorded in the consolidated statement of financial position cannot be derived from active markets, they are determined using valuation techniques including the discounted cash flows model.  The inputs to these models are taken from observable markets where possible, but where this is not feasible, a degree of judgment is required in establishing fair values.  The judgments include considerations of inputs such as liquidity risk, credit risk and volatility.  Changes in assumptions about these factors could affect the reported fair value of financial instruments.

The fair values of financial assets and financial liabilities are disclosed in Note 32.

*Impairment of Trade and Other Receivables and Rental and Other Deposits.*  The Group uses a provision matrix to calculate ECLs for its trade and other receivables and rental and other deposits.  The provision rates are based on days past due for groupings of various customer segments that have similar loss patterns (i.e., customer type and rating).

The provision matrix is initially based on the Group's historical observed default rates. The Group calibrates the matrix to adjust the historical credit loss experience with forward-looking information. At every reporting date, the historical observed default rates are updated and changes in the forward-looking estimates are analyzed.

The assessment of the correlation between historical observed default rates, forward-looking information, and ECLs is a significant estimate.  The amount of ECL is sensitive to changes in circumstances and of forecast economic conditions.  The Group's historical credit loss experience and forecast of economic conditions may also not be representative of the customer's actual default in the future.  The information about the ECLs on the Group's receivables is disclosed in Note 8.

There have been no significant changes in estimation techniques or significant assumptions made during the reporting period.

EXHIBIT 1439 - 0111

- 15 -

The carrying value of trade and other receivables amounted to ₱1,224.8 million and ₱1,133.1 million as at December 31, 2023 and 2022, respectively (see Note 9).  Allowance for ECL amounted to ₱9.8 million as of December 31, 2023 and ₱9.3 million as of December 31, 2022.  Provision for ECL was recognized amounting to ₱5.6 million in 2023, ₱3.1 million in 2022, and nil in 2021. Reversal of allowance for ECL amounted to ₱5.0 million in 2023 and none in 2022 and 2021 (see Notes 8).

The carrying value of rental and other deposits amounted to ₱309.1 million and ₱270.2 million as at December 31, 2023 and 2022, respectively (see Note 16).  Allowance for unrecoverable rental and other deposits amounted to ₱3.3 million as at December 31, 2023 and 2022.  No provision for unrecoverable deposits was recognized in 2023, 2022 and 2021 (see Note 16).

*Evaluation of Net Realizable Value of Inventories.*  The Group writes down the cost of inventories whenever net realizable value of inventories becomes lower than cost due to damage, physical deterioration, obsolescence.  The lower of cost and net realizable value of inventories is reviewed at each reporting date.  Inventory items identified to be obsolete and unusable are also written off and charged as expense in net income in the consolidated statement of comprehensive income.

The provision for (reversal of) inventory obsolescence in 2023 amounted to ₱0.51 million while nil in the years, 2022 and 2021.  The carrying values of inventories amounted to ₱1,712.2 million as of December 31, 2023 and ₱1,001.1 million as of December 31, 2022, net of allowance for inventory obsolescence of ₱4.84 million and ₱4.33 million as at December 31, 2023 and 2022, respectively (see Note 10).

*Determination of Impairment of Nonfinancial Assets.*  Impairment review is performed when certain impairment indicators are present.

Determining the value in use of property and equipment, which requires the determination of future cash flows expected to be generated from the continued use and ultimate disposition of such assets, requires the Group to make estimates and assumptions that can materially affect the consolidated financial statements.

Based on the assessment of management, the Group's nonfinancial assets do not have any indication of impairment as at December 31, 2023 and 2022.  No impairment loss was recognized in 2023 and 2022.  The carrying values of the Group's nonfinancial assets follow:

|  | 2023 | 2022 |
|---|---|---|
| Property and equipment (see Note 13) | ₱1,833,780,583 | ₱1,764,723,405 |
| Software (see Note 14) | 267,554,247 | 249,428,715 |
| Franchise (see Note 14) | 5,303,692 | 6,253,328 |
| Right-of-use assets (see Note 15) | 1,540,630,889 | 1,443,780,579 |
|  | ₱3,647,269,411 | ₱3,464,186,027 |

*Recoverability of Goodwill and Trademarks with Indefinite Useful Life.*  The Group performs recoverability testing annually or more frequently when there are indications of impairment for goodwill and trademarks with indefinite useful life.  Goodwill acquired through business combination has been allocated to one CGU which is also the operating entity acquired through business combination and to which the goodwill relates.  Recoverability testing requires an estimation of the value-in-use or fair value less cost of disposal of the CGU to which goodwill and trademarks with indefinite useful life are allocated.  Estimating the recoverable amount of the CGU involves significant assumptions about the future results of the business such as revenue growth rate, gross margin, operating margin, capital expenditures, discount rate and long-term revenue growth rate.

EXHIBIT 1439 - 0112

- 16 -

which were applied to cash flow forecasts. The cash flow forecasts were based on financial budgets approved by senior management covering a five-year period.

The impairment of goodwill and trademark is determined by comparing: (a) the carrying amount of the cash-generating unit; and (b) the present value of the annual projected cash flows for five years and the present value of the terminal value computed under the discounted cash flow method.

The key assumptions used in the impairment test of goodwill and trademarks with indefinite useful life are as follows:

a.  Gross Revenue

    On the average, gross revenue of the CGU over the next five years were projected to grow in line with the economy or with nominal Gross Domestic Product. This assumes that the market share of the subsidiaries in their respective industries will be flat on the assumption that the industries also grow at par with the economy. Historically, the business growth had a direct correlation with economic growth. A 5.8% perpetuity growth rate was assumed at the end of the five-year forecast period for Shakey's, Bakemasters, and Peri-Peri while a 2% perpetuity growth rate was used for Potato Corner.

b.  Operating Expenses

    On the average, operating expenses were projected to increase in relation to revenue growth.

c.  Gross Margins

    Increased efficiencies over the next five years are expected to result in margin improvements.

d.  Discount Rate

    The discount rate used to arrive at the present value of future cash flows was the Group's Weighted Average Cost of Capital (WACC). WACC was based on the appropriate weights of debt and equity, which were multiplied with the assumed costs of debt and equity. The pre-tax discount rates applied to the cash flow projections range from 11.0% to 15.4% in 2023 and 10.9% to 14.3% 2022.

The carrying amount of goodwill and trademarks with indefinite useful life as at December 31, 2023 and 2022 are as follows:

|  | 2023 | 2022 |
|---|---|---|
| Goodwill (see Note 14) | ₱1,324,852,131 | ₱1,324,852,131 |
| Trademarks (see Note 14) | 8,769,089,243 | 8,759,352,242 |
|  | ₱10,093,941,374 | ₱10,084,204,373 |

The recoverable amounts of the CGUs to which the goodwill and trademarks with indefinite useful lives are allocated are greater than their carrying amounts. No impairment loss was recognized on goodwill and trademarks with indefinite useful life for the years ended December 31, 2023, 2022 and 2021.

*Determination of Pension Costs.* The cost of defined benefit pension plans and present value of the pension obligation are determined using actuarial valuations. The actuarial valuation involves making various assumptions. These include the determination of the discount rates, future salary increases, mortality rates and future pension increases. Due to the complexity of the valuation, the underlying assumptions and its long-term nature, defined benefit obligations are highly sensitive to

EXHIBIT 1439 - 0113

- 17 -

changes in these assumptions.  All assumptions are reviewed at each reporting date.  Accrued pension cost amounted to ₱117.6 million and  ₱86.6 million as at December 31, 2023 and 2022, respectively, (see Note 27).

The discount rate is derived by discounting all expected benefit payments using interest rates of government bonds that correspond to the timing of benefit payments, after which, a single discount rate is computed considering the aggregate amount of all discounted values.

The mortality rate is based on publicly available mortality tables in the Philippines and is modified accordingly with estimates of mortality improvements.  Future salary and pension increases are based on expected future inflation rates in the Philippines.

Further details about the assumptions used are provided in Note 27.

*Recoverability of Deferred Tax Assets.*  The Group performs an annual evaluation of the realizability of deferred tax assets in determining the portion of deferred tax assets which should be recognized. The Group's assessment on the recognition of deferred tax assets on deductible temporary differences is based on the forecasted taxable income of the following period.  This forecast is based on the Group's past results and future expectations on revenue and expenses. The effect of COVID-19 pandemic on the macroeconomic factors are also used in developing the assumptions. The Group computes for deferred tax using the 25% corporate tax rate except for its subsidiaries BMI, SPCI and SSI which compute for deferred tax using the OSD effective tax rate of 15%.

Deferred tax assets recognized amounted to ₱645.68 million and ₱153.5 million as at December 31, 2023 and 2022, respectively (see Note 30).

*Evaluation of Claims Under Legal and Other Contingencies.*  The Group is involved in certain legal actions and claims.  The Group's estimate of the probable costs for the resolution of possible legal actions and claims has been developed in consultation with outside legal counsel handling the Group's defense in these matters and is based upon thorough analysis of potential results. Management believes that the ultimate liability or loss recorded in the consolidated financial statements with respect to such obligations, claims and disputes is adequate (see Notes 29 and 34).

*Estimating fair values for the purchase price allocation related to Acquisition of PC business.*  The Group acquired PC business on March 5, 2022.  The fair value of the net assets of the investee company was determined using a combination of discounted cash flows, which assumed expected future earnings stream attributable to the identified income-generating asset discounted using weighted average cost of capital and fair value less cost to sell valuation method.  The Group estimated the cash flows based on average life of the identified assets.

6. **Business Combination**

*Acquisition of Potato Corner (PC) Business*
On March 5, 2022, the Group entered into various purchase agreements (the "Agreements") with Cinco Group for the assets and intellectual property related to the PC business.  The acquisition also involved owning and operating all company-owned stores, as well as serving as brand-owner and franchisor of stores being operated by franchisees both domestically and internationally.  The agreements also include purchase of 100% shares in the PC offshore entities.  The agreements were considered as a comprising linked transactions and accounted as one business combination at the Group's consolidated financial statements.

Potato Corner is a food franchise known for its flavored French fries.



EXHIBIT 1439 - 0114

- 18 -

In December 2022, the Group and the seller made amendments in the agreements dated March 5, 2022.  As a result of the amendments, the value in exchange for the fair value of the net assets acquired related to the transaction amounted to ₱2,603.9 million.  The purchase price consideration has been allocated based on relative fair values at date of acquisition.  The fair value of the identifiable net assets acquired amounted to ₱2,540.0 million at date of acquisition.  The current assets acquired composed of cash, receivables, prepayments, and inventories with fair values amounting to ₱20.5 million, ₱14.5 million, ₱0.9 million and ₱39.0 million, respectively at date of acquisition.  The noncurrent assets acquired composed of property and equipment, security deposits, and trademarks with fair values amounting to ₱78.0 million, ₱42.0 million and ₱3,208.8 million, respectively at date of acquisition.  The liabilities assumed composed of accounts payable and other current liabilities amounting to ₱61.5 million at date of acquisition.  The carrying values of the assets and liabilities assumed is the same with its fair value at date of acquisition except for the trademarks with carrying amount of ₱2,467.4 million at date of acquisition.  The purchase price allocation resulted to goodwill, trademarks and deferred tax liability amounting to ₱60.7 million, ₱3,208.8 million and ₱802.2 million, respectively.

The fair value of property and equipment was measured using the replacement cost method while the fair value of the trademark was measured using the income approach.  The revenue growth and discount rates used to measure the fair value of trademark are 2% and 11%, respectively.

As of December 31, 2022, the fair values of the assets acquired assumed have been finalized; no changes from the initial recognition were recognized by the Group.

The goodwill of ₱60.9 million reflects the expected growth in the Group's business and Group management attributes the goodwill to achieving synergies and economies of scale arising from its common processes in its existing operations and contracts with suppliers and other partners to improve cost and efficiency.  The goodwill is not deductible for tax purposes.

Had acquisition taken place on January 1, 2022, the consolidated statement of comprehensive income of the Group would have included revenues from contracts with franchisees and customers of ₱10,349.9 million and net profit of ₱921.0 million for the year ended December 31, 2022.

The revenue from contracts with customer and net income included in the consolidated statement of comprehensive income for the year ended December 31, 2022, contributed by the acquisition of PC amounted to ₱1,919.4 million and ₱303.3 million, respectively.

7.  **Segment Information**

Segment information is prepared on the following bases:

Business Segments
For management purposes, the Group is organized into three business activities - Restaurant sales, franchise and royalty fees and commissary sales.  This segmentation is the basis upon which the Group reports its primary segment information.

- Restaurant sales comprise revenues from restaurant activities and sale of merchandise and equipment to franchisees.
- Franchise and royalty fees represents payment of sub-dealers for use of the Shakey's brand.
- Commissary sales comprise third party sales other than aforementioned activities.

EXHIBIT 1439 - 0115

- 19 -

Inter-segment Transactions
Segment revenue, segment expenses and operating results include transfers among business segments. The transfers are accounted for at competitive market prices charged to unrelated customers for similar services. Such transfers are eliminated upon consolidation.

The Group's chief operating decision maker, monitors operating results of its business segments separately for the purpose of making decisions about resource allocation and performance assessment. Segment performance is evaluated based on operating profit or loss and is measured consistently with operating profit and loss in the consolidated financial statements.

On a consolidated basis, the Group's performance is evaluated based on consolidated net income for the year, EBITDA and EBITDA margin. EBITDA margin pertains to EBITDA divided by gross revenues.

EBITDA and EBITDA margin are non-PFRSs measures.

The following table shows the reconciliation of the consolidated EBITDA to consolidated net income:

| | Years Ended December 31 | | |
|---|---|---|---|
| | **2023** | 2022 | 2021 |
| Consolidated EBITDA | **₱2,363,212,074** | ₱2,058,836,689 | ₱1,021,458,522 |
| Depreciation and amortization (Note 26) | **(757,777,196)** | (636,955,383) | (499,875,646) |
| Benefit from (provision for) income tax (Note 30) | **(164,964,152)** | (224,012,857) | (107,699,412) |
| Interest expense (Note 28) | **(361,489,106)** | (323,971,110) | (292,179,579) |
| Interest income (Note 8) | **464,950** | 504,742 | 1,276,273 |
| Consolidated net income | **₱1,079,446,570** | ₱874,402,081 | ₱122,980,158 |

EXHIBIT 1439 - 0116

- 20 -

## Business Segment Data

The following tables present revenue and income information and certain assets and liabilities information regarding business segments for each of the three years in the period ended December 31:

| | Restaurant | | | Franchise and Royalty Fees | | | Commissary and Others | | | Eliminations | | | Consolidated | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2023 | 2022 | 2021 | 2023 | 2022 | 2021 | 2023 | 202 | 2021 | 2023 | 2022 | 2021 | 2023 | 2022 | 2021 |
| **Revenue from contracts with customers** | ₱18,560,242,446 | ₱12,009,059,163 | ₱5,388,587,125 | ₱773,256,366 | ₱723,803,089 | ₱305,720,125 | ₱646,991,634 | ₱517,245,262 | ₱405,281,225 | (₱7,156,567,438) | (₱3,108,082,936) | (₱619,160,887) | ₱12,823,923,008 | ₱10,142,024,578 | ₱5,480,427,588 |
| | | | | | | | | | | | | | | | |
| Net income (loss) | ₱1,942,165,701 | ₱752,854,428 | (₱143,550,674) | ₱570,351,859 | ₱579,770,208 | ₱218,664,056 | ₱74,658,791 | ₱54,355,160 | ₱50,397,202 | (₱1,507,729,781) | (₱512,577,715) | (₱2,530,426) | ₱1,079,446,570 | ₱874,402,081 | ₱122,980,158 |
| Interest expense | 352,747,060 | 312,287,074 | 281,955,664 | 540,161 | 3,642,826 | 3,132,434 | 8,201,885 | 8,041,210 | 7,111,481 | – | – | – | 361,489,106 | 323,971,110 | 292,179,579 |
| Interest income | (339,693) | (271,268) | (1,231,358) | (66,378) | (5,781) | (6,668) | (58,879) | (227,693) | (38,247) | – | – | (464,950) | (464,950) | (504,742) | (1,276,273) |
| Income tax | (28,073,756) | 64,817,471 | 24,570,587 | 176,293,599 | 145,017,283 | 74,533,570 | 16,744,309 | 14,178,103 | 10,186,506 | – | – | (1,591,251) | 164,964,152 | 224,012,857 | 107,699,412 |
| Depreciation and amortization | 725,335,718 | 603,231,555 | 462,050,114 | – | – | – | 32,441,478 | 32,569,233 | 36,670,937 | – | 1,154,595 | 1,154,595 | 757,777,196 | 636,955,383 | 499,875,646 |
| **EBITDA** | **₱2,991,835,030** | **₱1,732,919,260** | **₱623,774,333** | **₱747,119,241** | **₱728,424,536** | **₱296,323,392** | **₱131,987,584** | **₱108,916,013** | **₱104,327,879** | **(₱1,507,729,781)** | **(₱511,423,120)** | **(₱2,967,082)** | **₱2,363,212,074** | **₱2,058,836,689** | **₱1,021,458,522** |
| | | | | | | | | | | | | | | | |
| **EBITDA Margin** | | | | | | | | | | | | | 16.7% | 20.3% | 18.6% |
| **Assets and Liabilities** | | | | | | | | | | | | | | | |
| Operating assets | **₱23,106,258,726** | **₱20,178,457,308** | ₱12,859,819,534 | **₱3,380,311,963** | ₱3,566,668,451 | ₱1,386,435,005 | ₱668,343,836 | ₱703,041,886 | ₱626,455,376 | (₱8,627,361,237) | (₱6,765,315,786) | (₱2,485,953,280) | 18,527,553,288 | ₱17,682,851,859 | ₱12,386,756,635 |
| Deferred tax assets - net | **100,111,915** | 25,566,418 | 248,857,614 | **-** | – | – | 3,647,797 | – | 454,384 | (3,364,991) | – | (1,355,706) | 100,394,721 | 25,566,418, | 247,956,293 |
| Total assets | **₱23,206,370,641** | **₱20,204,023,726** | ₱13,108,677,148 | **₱3,380,311,963** | ₱3,566,668,451 | ₱1,386,435,005 | ₱671,991,633 | ₱703,041,886 | ₱626,909,760 | (₱8,630,726,228) | (₱6,765,315,786) | (₱2,487,308,986) | ₱18,627,948,009 | ₱17,708,418,277 | ₱12,634,712,928 |
| | | | | | | | | | | | | | | | |
| Operating liabilities | **₱9,431,706,869** | ₱9,266,733,516 | ₱3,145,415,483 | **₱2,106,628,434** | ₱463,038,268 | ₱199,492,313 | ₱266,902,774 | ₱231,468,528 | ₱207,294,615 | (₱7,706,943,403) | (₱5,768,945,661) | (₱838,834,959) | ₱4,098,294,674 | ₱4,192,294,651 | ₱2,713,367,452 |
| Interest-bearing loans and borrowings | **5,942,570,991** | 5,790,557,954 | 3,740,557,954 | - | – | – | - | – | – | - | – | – | 5,942,570,991 | 5,790,557,954 | 3,740,557,954 |
| Deferred tax liabilities-net | – | – | – | – | – | – | – | – | – | 627,872,928 | 679,788,566 | – | 627,872,928 | 679,788,566 | – |
| Total liabilities | **₱15,374,277,860** | ₱15,057,291,470 | ₱6,885,973,437 | **₱2,106,628,434** | ₱463,038,268 | ₱199,492,313 | ₱266,902,774 | ₱231,468,528 | ₱207,294,615 | (₱7,079,070,475) | (₱5,089,157,095) | (₱838,834,959) | ₱10,668,738,593 | ₱10,662,641,171 | ₱6,453,925,406 |

EXHIBIT 1439 - 0117

- 21 -

Restaurant sales are attributable to revenues from the general public, which are generated through the Group's store outlets while franchise and royalty fees and commissary and others are derived from various franchisees of the Group's trade names. Consequently, the Group has no concentrations of revenues from a single customer or franchisee in 2023 and 2022.

As of December 31, 2023 and 2022, the Group's international operations are considered to be not material in relation to the consolidated financial statements.

The following are the percentage of total assets and revenues in 2023, 2022 and 2021, of the consolidated assets and revenues, respectively, of the Group:

| | Years Ended December 31 | | Years Ended December 31 | | |
| | Total Assets | | Revenue | | |
| | 2023 | 2022 | 2023 | 2022 | 2021 |
|---|---|---|---|---|---|
| Shakey's International Limited (SIL) | 0.01% | 0.01% | 0.00% | 0.03% | 0.07% |
| Shakey's Pizza Regional Foods Limited (SPRFL) | 0.00% | 0.00% | 0.31% | 0.08% | 0.07% |
| PC International Limited (PCIL) | 0.70% | 0.64% | 0.00% | 1.29% | – |
| Queensview International Limited (QIL) | 9.17% | 10% | 0.00% | 0.00% | – |
| Shanghai Miaomiao Shu Catering Co. LTD (SMSCCL) | 0.32% | – | 0.00% | – | – |

8. **Cash**

| | 2023 | 2022 |
|---|---|---|
| Cash on hand | ₱79,685,940 | ₱103,207,719 |
| Cash in banks | 821,461,587 | 886,371,071 |
| | ₱901,147,527 | ₱989,578,790 |

Cash in banks earn interest at the respective bank deposit rates. Interest income on cash amounted to ₱0.5 million, ₱0.5 million and ₱1.3 million for the years ended December 31, 2023, 2022 and 2021 respectively.

9. **Trade and Other Receivables**

| | 2023 | 2022 |
|---|---|---|
| Trade: | | |
|     Franchisees | ₱416,906,032 | ₱379,564,504 |
|     Third parties | 402,961,088 | 334,644,122 |
|     Royalty receivable | 176,925,408 | 170,138,255 |
|     Related parties (see Note 18) | 18,458,583 | 24,913,919 |
| Nontrade receivable from: | | |
|     Franchisees | 61,680,414 | 63,775,172 |
|     National Advertising Fund (NAF) | 51,829,287 | 50,225,215 |
|     Employees | 23,383,344 | 31,425,291 |
| Others | | |
|     Dividend receivable | 69,640,768 | 71,869,359 |
|     Stores | 12,844,086 | 15,776,201 |
| | 1,234,629,010 | 1,142,332,038 |
| Less allowance for ECL | (9,839,438) | (9,265,646) |
| | ₱1,224,789,572 | ₱1,133,066,392 |

EXHIBIT 1439 - 0118

- 22 -

Below are the terms and conditions of the financial assets:

- Trade receivables are non-interest bearing and are normally collectible within 10 days.
- Receivable from franchisees pertains to receivables for transactions other than sale of goods such as management fees, freight and gas expenses and are non-interest bearing and generally have 30 to 45 days' term.
- Royalty receivable is being collected from dealers on the 20th day of the following month.
- Receivables from employees, which represent mainly salary loan, are interest-free and are being collected through salary deduction for a period ranging from 6 months to 1 year.
- Other receivables consist mainly of receivables from cooperatives and freight charges which are non-interest bearing and generally have 30 to 45 days' term.
- For terms and conditions of related party receivables, refer to Note 18.

The movements of allowance for ECL are as follows:

| | 2023 | | | 2022 | | |
| | Trade and Others | Receivables from Employees | Total | Trade and Others | Receivables from Employees | Total |
|---|---|---|---|---|---|---|
| Balance at beginning of year | ₱8,020,079 | ₱1,245,567 | ₱9,265,646 | ₱4,873,440 | ₱1,245,567 | ₱6,119,007 |
| Provision (see Note 24) | 3,575,124 | 2,041,548 | 5,616,672 | 3,146,639 | – | 3,146,639 |
| Reversals | (3,770,043) | (1,272,837) | (5,042,880) | – | – | – |
| Balance at year-end | ₱7,825,160 | ₱2,014,278 | ₱9,839,438 | ₱8,020,079 | ₱1,245,567 | ₱9,265,646 |

For the years ended December 31, 2023, 2022 and 2021, the Group used the simplified provision matrix approach in estimating the ECL on trade and other receivables.

## 10. Inventories

| | 2023 | 2022 |
|---|---|---|
| At cost: | | |
| Finished goods | ₱11,450,454 | ₱10,117,799 |
| Raw materials - food | 63,168,734 | 43,882,543 |
| Raw materials - packaging | 5,806,245 | 7,973,034 |
| At NRV- | | |
| Merchandise | 1,631,792,556 | 939,140,684 |
| | ₱1,712,217,989 | ₱1,001,114,060 |

The cost of the merchandise inventories carried at NRV amounted to ₱1,636.6 million and ₱943.4 million as at December 31, 2023 and 2022, respectively.

The cost of merchandise and materials charged to cost of sales in the consolidated statements of comprehensive income amounted to ₱6,950.1 million in 2023 and ₱4,469.3 million in 2022 (see Note 23).

Allowance for inventory obsolescence amounted to ₱4.8 million as at December 31, 2023 and ₱4.3 million as at December 31, 2022.

Provision for (reversal of) inventory obsolescence amounted ₱0.5 million in 2023 and nil in 2022.

EXHIBIT 1439 - 0119

- 23 -

### 11. **Prepaid Expenses and Other Current Assets**

|  | **2023** | 2022 |
|---|---|---|
| Advances to suppliers | **₱473,193,172** | ₱623,699,846 |
| Prepaid taxes | **90,883,087** | 48,360,623 |
| Prepaid expenses | **71,111,034** | 58,823,884 |
|  | **₱635,187,293** | ₱730,884,353 |

Advances to suppliers represent payments for items purchased or goods yet to be delivered or services to be rendered.

Prepaid expenses pertain to advance payments for insurance, dues, rent and subscription and are amortized monthly over a period of one year.

### 12. **Financial Assets at FVPL**

The Group's investments in financial assets at FVPL consisted of UITF, which have no holding period and were callable any time by the Issuer.  The remaining balance amounting to ₱300.0 million was fully redeemed in 2022. Fair value gain on financial assets at FVPL included in "Other income" in the 2022 consolidated financial statements amounted to ₱0.4 million (see Note 29).

EXHIBIT 1439 - 0120

- 24 -

## 13. Property and Equipment

| | Building | Leasehold Improvements | Furniture, Fixtures and Equipment | Machinery and Equipment | Transportation Equipment | Cost of Shops and Maintenance Tools | Glassware and Utensils | Construction in-progress | Total |
|---|---|---|---|---|---|---|---|---|---|
| **Cost** | | | | | | | | | |
| Balance at December 31, 2021 | ₱264,941,019 | ₱1,298,311,501 | ₱1,223,238,197 | ₱220,810,643 | ₱26,434,990 | ₱26,038,151 | ₱21,515,578 | ₱130,482,753 | ₱3,211,771,832 |
| Additions | 201,486 | 349,848,646 | 207,740,821 | 15,607,393 | 13,293,444 | 12,640,449 | 15,815,870 | 94,901,984 | 710,050,093 |
| Disposals | (165,153) | (866,707) | (2,094,402) | – | (1,832,767) | – | – | – | (4,959,029) |
| Balance at December 31, 2022 | 264,977,352 | 1,647,293,440 | 1,428,884,616 | 236,418,036 | 37,895,667 | 38,678,600 | 37,330,448 | 225,384,737 | 3,916,862,896 |
| Additions | – | 225,937,419 | 162,101,104 | 30,638,451 | 8,221,037 | 12,290,228 | 8,967,393 | – | 448,155,632 |
| Disposals | (15,680,772) | (34,900,814) | (5,458,238) | (6,564,234) | (1,691,269) | (436,539) | (1,359,871) | – | (66,091,737) |
| Reclassification | – | 87,529,089 | 89,824,836 | – | – | 5,619,558 | – | (182,973,483) | – |
| **Balance at December 31, 2023** | **249,296,580** | **1,925,859,134** | **1,675,352,318** | **260,492,253** | **44,425,435** | **56,151,847** | **44,937,970** | **42,411,254** | **4,298,926,791** |
| **Accumulated Depreciation** | | | | | | | | | |
| Balance at December 31, 2021 | 66,322,525 | 794,302,835 | 794,710,109 | 125,676,218 | 16,387,203 | 21,420,443 | 19,389,187 | – | 1,838,208,520 |
| Depreciation (see Notes 23, 24 and 26) | 17,039,423 | 116,176,728 | 144,751,454 | 18,519,486 | 4,575,404 | 9,802,475 | 5,528,346 | – | 316,393,316 |
| Disposals | – | (83,333) | (789,726) | – | (1,589,286) | – | – | – | (2,462,245) |
| **Balance at December 31, 2022** | **83,361,948** | **910,396,230** | **938,671,837** | **144,195,704** | **19,373,321** | **31,222,918** | **24,917,533** | **–** | **2,152,139,491** |
| Depreciation (see Notes 23, 24 and 26) | 15,031,953 | 135,975,178 | 150,331872 | 17,574,144 | 4,212,795 | 13,050,768 | 16,572,520 | – | 352,749,230 |
| Disposals | (7,840,386) | (19,116,067) | (5,094,158) | (6,334,947) | – | (157,091) | (1,199,864) | – | (39,742,513) |
| **Balance at December 31, 2023** | **90,553,515** | **1,027,255,341** | **1,083,909,551** | **155,434,901** | **23,586,116** | **44,116,595** | **40,290,189** | **–** | **2,465,146,208** |
| **Net Book Value** | | | | | | | | | |
| Balance at December 31, 2022 | ₱181,615,404 | ₱736,897,210 | ₱490,212,779 | ₱92,222,332 | ₱18,522,346 | ₱7,455,682 | ₱12,412,915 | ₱225,384,737 | ₱1,764,723,405 |
| **Balance at December 31, 2023** | **₱158,743,065** | **₱898,603,793** | **₱591,442,767** | **₱105,057,352** | **₱20,839,319** | **₱12,035,252** | **₱4,647,781** | **₱42,411,254** | **₱1,833,780,583** |

There are no idle assets as at December 31, 2023 and 2022.  The Group has no property and equipment that are used as collateral for existing loans payable.

Net book value of property and equipment transferred to franchisees as part of the franchising agreement amounted to ₱20.9 million in 2023 and ₱4.6 million in 2022.

EXHIBIT 1439 - 0121

- 25 -

14. **Intangible Assets**

The Group's intangible assets consist of:

|  | 2023 | 2022 |
|---|---|---|
| Goodwill (see Note 6) | ₱1,324,852,131 | ₱1,324,852,131 |
| Trademarks (see Note 6) | 8,769,089,243 | 8,759,352,242 |
| Software | 267,554,247 | 249,428,715 |
| Franchise | 5,303,692 | 6,253,328 |
|  | ₱10,366,799,313 | ₱10,339,886,416 |

In 2016, goodwill amounting to ₱1,078.6 million was recognized in connection with the acquisition of BMI while trademarks amounting to ₱4,987.1 million related to the pizza business was recognized and treated as acquisition of assets based on relevant accounting standards since such transaction did not qualify as an acquisition of a business.

In 2019, the Group acquired the Peri-Peri business from I-Foods, Inc. including the properties, assets and rights which are related to or are used in the said business. Such transaction was accounted for as an acquisition of a business and additional goodwill and trademarks amounting to ₱185.5 million and ₱562.2 million, respectively, were recorded as at the date of acquisition.

On August 24, 2020, the Group entered into a master franchise agreement for a consideration of ₱5.0 million ($0.1 million) with Supertea (Int) Pte. Ltd. (Supertea), whereby Supertea granted the Group the following:

- the exclusive right and license to develop and operate the Business, provide the services and sell the products, from the R&B Tea Outlets;
- the exclusive right and license, subject to the fulfillment of certain conditions, to grant franchisees for R&B Tea Outlet to third parties (Sub-Franchisees) by entering into sub-franchise agreements in the form approved and/or provided by Supertea in writing; and
- the non-exclusive right and license to use the Intellectual Property strictly in connection with the aforesaid.

The license does not include the right to sell, provide or distribute any products or services through channels other than the R&B Outlets, or selected outlets as set out in the master franchise agreement.

The master franchise agreement is effective from August 20, 2020 and continue for the initial term of seven (7) years, unless otherwise terminated or renewed.

On November 17, 2021, the Group executed a deed of assignment with DBE Project, Inc. acquiring the Project Pie Design Build Eat trademark for a consideration of ₱1.2 million.

On April 2, 2019, SPAVI and I-Foods, Inc. (IFI) entered into a purchase agreement (the "Agreement") for the rights, title and interest to the Peri-Peri (P2) Business, including the properties, assets, and rights which are related to or are used in the P2 Business.

P2 Business is a casual and full-service restaurant brand in the Philippines. The restaurant offers variety of food and sauces such as peri-peri chicken, pizza and pasta.

On June 1, 2019 (the acquisition date), SPAVI and WBHI, a newly incorporated subsidiary, executed a deed of assignment, wherein SPAVI, assigned, transferred and conveyed all its rights under the Agreement, except with respect to SPAVI's rights under the Agreement pertaining to Trademarks,

EXHIBIT 1439 - 0122

- 26 -

Know-How and Confidential Information, and Intellectual Properties (collectively, the "Intangible Assets") of the P2 Business, to WBHI. Subsequently, WBHI and IFI executed a deed of absolute sale of assets wherein I-Foods sold, transferred and conveyed to WBHI the title, rights, material and physical possession of, and interest in, the assets related to the P2 Business for ₱212.3 million. On the same date, as part of the acquisition of the P2 business, SPAVI acquired 100% ownership of AWIL, which is the owner of the intangible assets relevant to the P2 Business for ₱562.2 million.

Total consideration for the acquisition of the P2 business amounted to ₱774.5 million, such transaction was accounted for as an acquisition of a business and additional goodwill and trademarks amounting to ₱185.5 million and ₱562.2 million, respectively, were recorded as at the date of acquisition. The fair value of the identifiable assets acquired, excluding trademark, amounted to ₱26.8 million.

On March 5, 2022, the Group acquired the PC business.  The business acquisition resulted to additional goodwill, trademarks and deferred tax liability amounting to ₱60.7 million, ₱3,208.8 million and ₱802.2 million, respectively (see Note 5).

The details of the Group's intangible assets with finite life are as follows:

|  | Software | Franchise |
|---|---|---|
| **Cost** | | |
| Balance at December 31, 2021 | ₱263,318,449 | ₱4,964,977 |
| Additions | 56,556,757 | 2,884,236 |
| Balance at December 31, 2022 | 319,875,206 | 7,849,213 |
| Additions | 52,909,939 | – |
| **Balance at December 31, 2023** | **372,785,145** | **7,849,213** |
| **Accumulated Amortization** | | |
| Balance at December 31, 2021 | 47,705,903 | 886,603 |
| Amortization (see Note 25) | 22,740,588 | 709,282 |
| Balance at December 31, 2022 | 70,446,491 | 1,595,885 |
| Amortization (see Note 25) | **34,784,407** | **949,636** |
| Balance at December 31, 2023 | 105,230,898 | 2,545,521 |
| **Net Book Value** | | |
| **Balance at December 31, 2023** | **₱267,554,247** | **₱5,303,692** |
| Balance at December 31, 2022 | ₱249,428,715 | ₱6,253,328 |

The average remaining useful lives of software and franchise is 8 years and 5 years, respectively, as of December 31, 2023.

15. **Right-of-Use Assets and Lease Liabilities**

*Group as a lessee*
The Group has lease contracts for land and building for the use of its office spaces and stores. Lease contracts of office spaces usually have terms of 20 to 25 years while leases of stores usually have terms of 3 to 15 years.

The Group also has certain leases of stores with lease terms of 12 months or less and leases of office equipment with low value. The Group applies the 'short-term lease' and 'lease of low-value assets' recognition exemptions for these leases.

EXHIBIT 1439 - 0123

- 27 -

The rollforward analysis of right-of-use assets follows:

|  | 2023 | 2022 |
|---|---|---|
| **Cost** | | |
| Balance at beginning of year | ₱2,376,814,694 | ₱1,967,648,594 |
| Additions | 482,493,291 | 611,244,521 |
| Pre-terminations | (91,799,743) | (202,078,421) |
| Balance at end of year | 2,767,508,242 | 2,376,814,694 |
| **Accumulated Amortization** | | |
| Balance at beginning of year | 933,034,115 | 736,132,455 |
| Amortization (see Notes 23, 24 and 26) | 379,801,415 | 287,944,102 |
| Pre-terminations | (85,958,177) | (91,042,442) |
| Balance at end of year | 1,226,877,353 | 933,034,115 |
| **Net Book Value** | **₱1,540,630,889** | ₱1,443,780,579 |

The rollforward analysis of lease liabilities follows:

|  | 2023 | 2022 |
|---|---|---|
| Balance at beginning of year | ₱1,700,018,174 | ₱1,480,736,519 |
| Additions | 485,848,399 | 610,225,027 |
| Interest expense (see Note 28) | 111,567,612 | 102,828,224 |
| Payments | (461,980,269) | (360,864,550) |
| Pre-terminations | (4,615,417) | (130,225,864) |
| Lease concessions | – | (2,681,182) |
| Balance at end of year | 1,830,838,499 | 1,700,018,174 |
| Current portion of lease liabilities | 275,584,146 | 58,902,122 |
| **Lease liabilities – non-current portion** | **₱1,555,254,353** | ₱1,641,116,052 |

The Group has lease contracts for stores that contains variable payments based on the gross sales. The following provides information on the Group's variable lease payments, including the magnitude in relation to fixed payments:

|  | As at December 31, 2023 | | |
|---|---|---|---|
|  | Fixed Payments | Variable Payments | Total |
| Fixed | ₱241,826,865 | ₱– | ₱241,826,865 |
| Variable rent with minimum payment | 229,468,978 | 134,498,233 | 363,967,211 |
| Variable rent only | – | 9,310,431 | 9,310,431 |
|  | ₱471,295,843 | ₱143,808,664 | ₱615,104,507 |

|  | As at December 31, 2022 | | |
|---|---|---|---|
|  | Fixed Payments | Variable Payments | Total |
| Fixed | ₱215,689,786 | ₱– | ₱215,689,786 |
| Variable rent with minimum payment | 203,099,643 | 143,992,434 | 347,092,077 |
| Variable rent only | – | 2,733,421 | 2,733,421 |
|  | ₱418,789,429 | ₱146,725,855 | ₱565,515,284 |

EXHIBIT 1439 - 0124

- 28 -

Shown below is the maturity analysis of the undiscounted lease payments:

|  | **2023** | 2022 |
|---|---|---|
| 1 year | **₱366,104,436** | ₱352,714,066 |
| more than 1 years to 2 years | **361,181,506** | 305,708,932 |
| more than 2 years to 3 years | **308,655,778** | 269,378,506 |
| more than 3 years to 4 years | **280,346,722** | 246,411,328 |
| more than 5 years | **994,208,082** | 1,331,472,556 |

Rent expense on short-term leases and leases of low-value assets amounted to ₱379.56 million, ₱246.5 million and ₱88.0 million for the years ended December 31, 2023, 2022 and 2021, respectively (see Notes 23 and 24).

16. **Rental Deposits**

The carrying value of rental deposits, net of allowance for unrecoverable deposits (₱3.30 million in 2023 and 2022), amounted to ₱309.11 million and ₱270.16 million as at December 31, 2023 and 2022, respectively.

The Group's rental deposits are refundable at the end of the lease term which range from 3 years to 15 years. Accordingly, rental deposits are discounted based on comparable rates for similar financial instruments with rates ranging from 1.12% to 10.39% for the years ended December 31, 2023, 2022 and 2021. The excess of the principal amount of the deposit over its fair value is accounted for as right-of-use asset and amortized over the lease term on a straight-line basis while interest on the deposit is accounted for using the effective interest rate method.

The Group uses a provision matrix to calculate ECLs for rental and other deposits. No provision was recognized in 2023, 2022 and 2021.

The accretion income from rental deposits amounted to ₱1.7 million, ₱2.0 million and ₱3.0 million in 2023, 2022 and 2021, respectively (see Note 29).

17. **Short-term Loans Payable**

|  | **2023** | 2022 |
|---|---|---|
| Balance at beginning of year | **₱500,000,000** | ₱– |
| Additions | **700,000,000** | 500,000,000 |
| Payments | **(500,000,000)** | – |
| Balance at end of year | **₱700,0000,000** | ₱500,000,000 |

The Parent Company availed of several short-term loans amounting to ₱1,500 million with interest ranging from 3.50% to 5.50% per annum in 2020.

In 2022, the Parent Company availed of a short-term loan from the Bank of the Philippine Islands amounting to ₱500.0 million with a 2.30% effective interest rate per annum.

In 2023, The Parent Company utilized multiple short-term loans from Bank of the Philippines Islands, totaling to ₱700 million, with annual interest rates ranging from 5.58% to 6.25%.

**EXHIBIT 1439 - 0125**

- 29 -

Interest expense pertaining to short-term loans amounting to ₱25.5 million, ₱9.5 million and ₱30.9 million were recognized for the years ended December 31, 2023, 2022 and 2021, respectively (see Note 28).

18. **Accounts Payable and Other Current Liabilities**

|  | 2023 | 2022 |
|---|---|---|
| Trade: | | |
| Suppliers | **₱881,714,386** | ₱1,442,515,377 |
| Related parties (see Note 19) | **151,700,266** | 127,047,981 |
| Nontrade- | | |
| Suppliers | **191,766,451** | 87,883,647 |
| Accrued expenses: | | |
| Suppliers | **129,998,023** | 169,771,074 |
| Customers loyalty | **36,030,849** | 15,635,843 |
| Utilities | **31,533,587** | 48,513,378 |
| Salaries and wages | **17,479,254** | 23,907,449 |
| Others | **1,838,479** | 1,536,472 |
| Others | **311,075,001** | 215,402,074 |
|  | **₱1,753,136,296** | ₱2,132,213,295 |

Below are the terms and conditions of the financial liabilities:

- Trade payables are non-interest bearing and are normally settled in 30 to 90 days' term.
- Nontrade payables consist mainly of reimbursable expenses to officers and employees, payable to contractors and employment agencies which are normally settled in 30 to 90 days' term.
- Accrued expenses, which consist mainly of accrual of rent expense of stores, utilities, employee benefits and incentives, freight, commissions and storage costs are normally settled in 30 to 90 days' term.
- Customers loyalty pertain to accumulated points which are generally applied to customer purchases within the next financial year. Revenue is recognized upon actual usage or expiration whichever comes first.
- Other payables are normally settled in 15 to 45 days' term.
- For terms and conditions of related party payables, refer to Note 19.

Other payables consist of the following:

|  | 2023 | 2022 |
|---|---|---|
| Customers' deposits | **₱51,781,697** | ₱79,152,364 |
| Output VAT | **140,029,064** | 18,251,158 |
| Withholding tax payable | **47,839,290** | 36,709,532 |
| Retention payable | **19,004,028** | 12,712,780 |
| Advertising fund payable | **13,428,658** | – |
| Fun certificates payable | **12,885,728** | 11,877,495 |
| SSS, Philhealth and Pag-ibig payables | **501,067** | – |
| Provision (see Note 34) | **–** | 47,073,871 |
| Others | **25,605,469** | 9,624,874 |
|  | **₱311,075,001** | ₱215,402,074 |

EXHIBIT 1439 - 0126

- 30 -

19. **Related Party Transactions**

Parties are considered to be related if one party has the ability to control the other party or exercise significant influence over the other party in making financial and operating decisions.  This includes: (a) individuals owning, directly or indirectly through one or more intermediaries, control, or are controlled by, or under common control with, the Group; (b) associates; and (c) individuals owning, directly or indirectly, an interest in the voting power of the Group that gives them significant influence over the Group and close members of the family of any such individual.

*Approval requirements and limits on the amount and extent of related party transactions*

Material related party transactions (MRPT) refers to any related party transactions, either individually, or in aggregate over a twelve (12)-month period with the same related party, amounting to ten percent (10%) or higher of the Group's total consolidated assets based on its latest audited consolidated financial statements.

All individual MRPT shall be approved by at least two-thirds (2/3) vote of the BOD, with at least a majority of the Independent Directors voting to approve the MRPT. In case that a majority of the Independent Directors' vote is not secured, the MRPT may be ratified by the vote of the stockholders representing at least two thirds (2/3) of the outstanding capital stock.

Aggregate RPT transactions within a 12-month period that meets or breaches the materiality threshold shall require the same BOD approval mentioned above.

Outstanding balances at year-end are unsecured and settlement occurs in cash throughout the financial year.  There have been no guarantees provided or received for any related party receivables or payables.  For the years ended December 31, 2023 and 2022, the Group has not recorded any impairment of receivables on amounts owed by the related parties.  The assessment is undertaken each financial year through examining the financial position of the related party and the market in which the related party operates.

**EXHIBIT 1439 - 0127**

- 31 -

In the normal course of business, the Group has significant transactions with the following companies which have common members of BOD and stockholders as the Group:

| Category | Nature | Year | Amount/ Volume of transaction | Outstanding Balance Receivable (see Note 9) | Payable (see Note 18) | Terms | Conditions |
|---|---|---|---|---|---|---|---|
| **Century Pacific Group Inc. (CPGI, Ultimate Parent Company)** | | | | | | | |
| Sales | Sale of goods at prices (normally on | **2023** | **₱7,766,842** | **₱3,082,080** | **₱–** | 30-day; non-interest | Unsecured; not |
| | cost-plus basis) mutually agreed | 2022 | 8,489,353 | 3,082,080 | – | bearing | impaired |
| | upon by both parties | 2021 | 7,685,937 | 2,389,537 | – | | |
| ***Companies with common members of BOD and stockholders as the Group*** | | | | | | | |
| **The Pacific Meat Company Inc. (PMCI)** | | | | | | | |
| Sales | Sale of goods at prices (normally on | **2023** | **8,587,176** | **5,400,644** | – | 30-day; non-interest | Unsecured; not |
| | cost-plus basis) mutually agreed | 2022 | 17,898,896 | 9,693,410 | – | bearing | impaired |
| | upon by both parties | 2021 | 17,510,534 | 14,349,478 | – | | |
| Purchases | Purchase of raw materials and goods | **2023** | **241,786,131** | – | **142,402,642** | 30-day; non-interest | Unsecured |
| | at agreed prices usually on a cost- | 2022 | 248,948,140 | – | 121,785.346 | bearing | |
| | plus basis | 2021 | 130,969,714 | – | 51,919,361 | | |
| **DBE Project Inc. (DBE)** | | | | | | | |
| Trade sales and service income | Sale of goods at prices (normally on | **2023** | – | – | – | 30-day; non-interest | Unsecured; not |
| | cost-plus basis) mutually agreed | 2022 | – | 2,778,786 | – | bearing | impaired |
| | upon by both parties | 2021 | 99,814 | 2,778,786 | – | | |
| Purchases | Purchase of raw materials and goods | **2023** | – | – | – | 30-day; non-interest | Unsecured |
| | at agreed prices usually on a cost- | 2022 | – | – | 293,488 | bearing | |
| | plus basis | 2021 | 1.392.369 | – | 293,488 | | |

*(Forward)*

EXHIBIT 1439 - 0128

- 32 -

| Category | Nature | Year | Amount/ Volume of transaction | Outstanding Balance | | Terms | Conditions |
|---|---|---|---|---|---|---|---|
| | | | | Receivable (see Note 9) | Payable (see Note 18) | | |
| **Century Pacific Food, Inc. (CPFI)** | | | | | | | |
| Sales | Sale of goods at prices (normally on cost-plus basis) mutually agreed upon by both parties | **2023** | **₱26,857,813** | **₱9,975,859** | **₱–** | 30-day; non-interest bearing | Unsecured; not impaired |
| | | 2022 | 20,536,620 | 9,359,643 | – | | |
| | | 2021 | 22,184,403 | 6,410,531 | – | | |
| Purchases | Purchase of raw materials and goods at agreed prices usually on a cost-plus basis | **2023** | **15,232,070** | **–** | **9,297,624** | 30-day; non-interest bearing | Unsecured |
| | | 2022 | 29,380,586 | – | 4,969,147 | | |
| | | 2021 | 19,680,597 | – | 9,051,507 | | |
| | | **2023** | | **₱18,458,583** | **₱151,700,266** | | |
| | | 2022 | | 24,913,919 | 127,047,981 | | |

EXHIBIT 1439 - 0129

- 33 -

Compensation of Key Management Personnel
The salaries and pension costs of key management personnel in 2023, 2022 and 2021 are as follows:

|  | **2023** | 2022 | 2021 |
|---|---|---|---|
| Salaries | **₱136,624,017** | ₱131,728,491 | ₱120,388,442 |
| Pension costs | **55,643,464** | 40,163,660 | 50,828,697 |
|  | **₱192,267,481** | ₱171,892,151 | ₱168,507,998 |

There are no other short-term and long-term benefits given to the key management personnel.

### 20. **Long-term Loans Payable**

Long-term facility loans:

BDO Unibank, Inc. (BDO) Loan
On June 8, 2016, the Group entered into an Omnibus Loan and Security Agreement (OLSA) with BDO (the Lender) and SAFHI. The lender provided a term loan facility in the principal amount of ₱5,000.0 million. The loan is payable within 10 years to commence on the 12th month following the availment date. Payments shall be made in 18 consecutive semi-annual installments of ₱25.0 million and a final payment of ₱4,550.0 million.

The loan's interest is to be fixed at the higher of 5-year PDST-R2 plus a spread of 0.75% or 4.5% floor rate for the first 5 years, to be repriced at the last 5 years. Management has assessed that the interest rate floor on the loan is an embedded derivative which is not for bifurcation since the market rate approximates the floor rate at the transaction date.

The loan facility also contains a prepayment provision which allows the Group to make optional prepayment in the amount calculated by the lender comprising (i) the outstanding principal amount of the Loan to be prepaid, and (ii) any accrued interest on the principal amount of the Loan being prepaid computed as of the date of prepayment. The prepayment option was assessed as closely related to the loan and thus, was not bifurcated.

On December 22, 2016, the Group notified BDO of its intention to prepay the loan amounting to ₱1,000.0 million. The exercise of the prepayment option resulted in the revision of estimated future payments and change in the carrying amount of the financial liability. On January 3, 2017, the Group prepaid portion of the loan amounting to ₱1,000.0 million and the corresponding break funding fee and prepayment penalty amounting to ₱21.4 million.

As long as any portion of the loan is outstanding and until payment in full of all amounts payable by the Group under the loan documents are made, the Group is required to comply with certain affirmative covenants, unless the Lender shall otherwise give its consent in writing:

a. Ensure that at all times its obligations will constitute its secured, direct, unconditional and unsubordinated obligations, and any of its residual obligation not satisfied out of the proceeds of the Collateral shall rank and will rank at all times at least in priority of payment and in all other respects with all its unsecured obligations, save for such obligations in respect of which a statutory preference is established solely by operation of law.

**EXHIBIT 1439 - 0130**

- 34 -

b. The net proceeds from the loan shall be used for the purpose of refinancing the bridge loan.

c. Financial covenant during the term of the Term Loan:
   i. its Debt Service Coverage Ratio is at least 1.2x. Debt Service Coverage Ratio is as of the date of determination, the ratio of EBITDA less regular dividends and advances to shareholders over Debt Service. For purposes hereof, "EBITDA" means operating profit before interest, taxes, depreciation and amortization, each item determined in accordance with PFRSs, and the term "Debt Service" means the aggregate amount of the succeeding year's principal amortization for the Loan, interest, fees and other financial charges made or due in respect thereof payable by the Borrower, provided that one (1) year prior to the maturity of the Loan, "Debt Service Coverage Ratio" shall mean the ratio of sum of the beginning cash balance and EBITDA less regular dividends and advances to shareholders over Debt Service;
   ii. its Debt to Equity Ratio does not exceed 5.0x within the first two years from the Borrowing under the Term Loan and 4.0x thereafter.

   The foregoing financial covenant shall be tested every six months based on annual audited or unaudited semi-annual consolidated financial statements. On January 27, 2017, the OLSA was amended to include June 30, 2017 as the commencement date for the testing of the financial covenant ratios.

d. Within the period required, open and establish the Debt Service Reserve Account (DSRA); and ensure that the funds deposited in the DSRA is at all times maintained in accordance with the agreement. As at December 31, 2023 and 2022, the balances of DSRA have been applied to the loan balance.

e. Prior to the assignment or transfer of any trade names, copyrights, trademarks, patents and other intellectual property rights or licenses currently held by the Group or any wholly owned subsidiary of the Group, the Group shall pledge in favor of the Lender, under the terms and conditions of the Pledge under the Omnibus loan and security Agreement, all the outstanding shares of the Group in such wholly-owned subsidiary.

As at December 31, 2023 and 2022, the Group is in compliance with the aforementioned affirmative covenants.

<u>Bank of the Philippines Islands (BPI) Loan</u>
On February 24, 2022, the Group entered into a loan agreement with Bank of the Philippines Islands (the Lender). The Lender provided a principal amount of ₱1,600.0 million, payable in ten (10) years from March 2, 2022 (the value date). The loan has an effective interest rate of 4.3% payable monthly until paid in full.

The loan agreement also contains a prepayment provision which allows the Group to make optional prepayments in the amount of ₱320.0 million on March 2, 2025, ₱8.0 million on March 2, 2026, and a final payment of ₱1,232.0 million on maturity date.

The Group is not subject to any loan covenants from BPI loan.

EXHIBIT 1439 - 0131

- 35 -

The breakdown of the loans follows:

|  | 2023 | 2022 |
|---|---|---|
| BDO loan - principal | ₱3,647,932,514 | ₱3,697,986,963 |
| Less unamortized debt issue costs | 5,361,523 | 7,429,009 |
| BDO loan - net of unamortized debt issue costs | 3,642,570,991 | 3,690,557,954 |
| BPI loan | 1,600,000,000 | 1,600,000,000 |
|  | 5,242,570,991 | 5,290,557,954 |
| Less current portion of loan payable | 47,876,004 | 47,932,514 |
| Noncurrent portion | ₱5,194,694,987 | ₱5,242,625,440 |

Interest expense amounting to ₱212.9 million, ₱205.9 million and ₱166.4 million were recognized for the years ended December 31, 2023, 2022 and 2021, respectively (see Note 28).

21. **Equity**

Capital Stock

*Authorized capital stock*
The authorized capital stock of the Parent Company is 2,000,000,000 shares at ₱1 par value in 2023 and 2022.

*Issued and outstanding*

|  | 2023 | | 2022 | |
|---|---|---|---|---|
|  | No. of shares | Amount | No. of shares | Amount |
| Balance at beginning and end of year | 1,683,760,178 | ₱1,683,760,178 | 1,683,760,178 | ₱1,683,760,178 |

Below is the Parent Company's track record of the registration of securities:

| Date of SEC Order Rendered Effective or Permit to Sell | Event | Authorized Capital Stock | Issued Shares | Issue Price |
|---|---|---|---|---|
|  | Registered and Listed Shares (Original Shares) | 2,000,000,000 | 1,179,321,053 | ₱1.00 |
| December 1, 2016 | Initial Public Offering (IPO) |  |  |  |
|  | Primary | 2,000,000,000 | 104,000,000 | 11.26 |
|  | Secondary | 2,000,000,000 | 202,000,000 | 11.26 |
|  | Over-allotment Option | 2,000,000,000 | 46,000,000 | 11.26 |
| August 6, 2021 | Issuance | 2,000,000,000 | 152,439,025 | 7.93 |
| August 9, 2021 | Issuance | 2,000,000,000 | 100 | 8.20 |

The issued and outstanding shares are held by 41 equity holders as at December 31, 2023 and 2022

EXHIBIT 1439 - 0132

- 36 -

Retained Earnings
Details of cash dividends declared in 2023 and 2022 are as follows:

| | Dividend | | |
| Date of Declaration | Rate (per share) | Amount | Record Date |
|---|---|---|---|
| July 15, 2021 | ₱0.02 | ₱33,675,208 | August 17, 2021 |
| June 20, 2022 | 0.03 | 50,512,805 | July 4, 2022 |
| June 20, 2023 | 0.10 | 168,376,017 | July 31, 2023 |

There are no outstanding dividends payable as at December 31, 2023 and 2022. Cash dividend declared and paid amounted to ₱168.4 million in 2023 and ₱50.5 million in 2022.

Undistributed earnings of the subsidiaries included in the Group's retained earnings amounting to ₱200.4 million and ₱282.4 million as at December 31, 2023 and 2022, respectively, are not available for dividend declaration by the Parent Company until these are declared by the investee companies.

APIC
Amount received in excess of the par values of the shares issued amounting to ₱2,451.1 million were recognized as "APIC" as at December 31, 2023 and 2022, respectively.

22. **Revenue from Contracts with Customers**

Set out below is the disaggregation of the Group's revenue from contracts with customers for the years ended December 31, 2023, 2022 and 2021:

| | 2023 | 2022 | 2021 |
|---|---|---|---|
| Revenue source: | | | |
| Restaurant sales | ₱8,362,853,329 | ₱7,206,297,269 | ₱3,856,896,913 |
| Sale of goods | 3,973,643,491 | 2,535,590,654 | 1,356,366,336 |
| Royalty and franchise fees (see Note 33) | 487,426,188 | 400,136,655 | 267,164,339 |
| | ₱12,823,923,008 | ₱10,142,024,578 | ₱5,480,427,588 |
| Timing of recognition: | | | |
| Goods transferred at a point in time | ₱12,787,539,880 | ₱10,123,187,575 | ₱5,457,508,873 |
| Services rendered over time | 36,383,128 | 18,837,003 | 22,918,715 |
| | ₱12,823,923,008 | ₱10,142,024,578 | ₱5,480,427,588 |

*Contract liabilities*
Below are the details of contract liabilities as at December 31, 2023 and 2022:

| | 2023 | 2022 |
|---|---|---|
| Initial franchise fee | ₱147,941,962 | ₱74,672,181 |
| Less current portion | 30,059,596 | 13,445,337 |
| Noncurrent portion | ₱117,882,366 | ₱61,226,844 |

EXHIBIT 1439 - 0133

- 37 -

Movements of contract liabilities arising from initial franchise fees as at and for the years ended December 31, 2023 and 2022 are as follows:

|  | 2023 | 2022 |
|---|---|---|
| Balance as at January 1 | ₱74,672,181 | ₱82,197,813 |
| Amortization of initial franchise fees | (36,383,128) | (18,837,004) |
| Initial franchise fees received | 103,467,530 | 8,100,000 |
| Accretion of interest expense (see Note 28) | 6,185,379 | 3,211,372 |
| Balance as at December 31 | ₱147,941,962 | ₱74,672,181 |

As at December 31, 2023, the amounts of initial franchise fees allocated to remaining performance obligations, its accretion of interest expense in the succeeding years, and contract liabilities arising from initial franchise fees are as follows:

|  | Unamortized initial franchise fees | Accretion of interest expense | Contract liabilities from initial franchise fees |
|---|---|---|---|
| Within one year | ₱30,059,596 | ₱6,501,216 | ₱36,560,812 |
| More than one year | 117,882,366 | 10,692,684 | 128,575,051 |
|  | ₱147,941,962 | ₱17,193,900 | ₱165,135,863 |

## 23. Cost of Sales

|  | 2023 | 2022 | 2021 |
|---|---|---|---|
| Inventory costs (see Note 10) | ₱5,647,952,421 | ₱4,469,334,367 | ₱2,231,590,400 |
| Salaries, wages and benefits | 1,091,063,729 | 854,700,420 | 564,090,965 |
| Depreciation and amortization (see Note 26) | 704,774,502 | 590,989,960 | 464,894,144 |
| Utilities | 551,091,000 | 436,806,339 | 285,447,117 |
| Rent (see Note 15) | 377,231,414 | 246,132,289 | 87,675,542 |
| Outside services | 341,734,564 | 239,770,198 | 113,920,696 |
| Supplies | 232,788,578 | 157,112,346 | 86,613,779 |
| Delivery call fees | 165,473,535 | 176,298,984 | 145,684,145 |
| Gas expenses | 157,882,862 | 133,789,783 | 75,972,071 |
| Repairs and maintenance | 99,458,417 | 57,686,408 | 60,903,968 |
| Card charges | 34,800,157 | 30,957,572 | 15,829,245 |
| Pension costs (see Note 27) | 16,310,101 | 21,322,594 | 20,500,279 |
| Dues and subscription | 10,341,176 | 4,005,890 | 22,343,628 |
| Commissary costs | 7,752,977 | 4,822,778 | 1,733,483 |
| Seminar and training | – | 12,095,750 | 942,877 |
| Others | 234,396,500 | 110,682,723 | 28,568,824 |
|  | ₱9,673,051,933 | ₱7,546,508,401 | ₱4,206,711,163 |

**EXHIBIT 1439 - 0134**

- 38 -

24. **General and Administrative Expenses**

| | **2023** | 2022 | 2021 |
|---|---|---|---|
| Salaries, wages and benefits | **₱488,318,840** | ₱361,312,638 | ₱241,493,636 |
| Advertising and promotions | **369,757,505** | 283,890,781 | 176,819,913 |
| Outside services | **172,071,403** | 164,348,824 | 95,298,364 |
| Taxes and licenses | **135,846,838** | 98,087,732 | 105,122,992 |
| Transportation and travel | **68,176,409** | 47,674,426 | 34,930,982 |
| Depreciation and amortization (see Note 26) | **53,002,695** | 45,965,423 | 34,981,502 |
| Supplies | **38,575,244** | 34,735,283 | 31,301,760 |
| Promotions | **28,842,189** | 14,183,378 | – |
| Professional fees | **22,495,862** | 3,929,849 | 1,036,054 |
| Pension costs (see Note 27) | **21,041,870** | 26,510,801 | 32,379,082 |
| Utilities | **20,835,170** | 19,878,150 | 13,619,760 |
| Senior citizen discount | **15,536,713** | 10,717,139 | – |
| Gas expenses | **12,651,603** | 15,207,420 | 7,669,083 |
| Dues and subscriptions | **11,935,932** | 809,884 | 515,344 |
| Start-up costs | **11,218,446** | 18,961,866 | 2,064,058 |
| Card charges | **10,016,590** | 6,438,226 | 2,034,205 |
| Royalty | **7,829,969** | 4,358,479 | 29,648,015 |
| Insurance | **7,351,833** | 6,228,656 | 4,852,364 |
| Repairs and maintenance | **3,472,138** | 3,472,341 | 4,238,478 |
| Rent (see Note 15) | **2,324,887** | 368,136 | 367,260 |
| Directors' fees | **1,652,632** | 1,378,947 | 1,249,123 |
| Provision for ECL – net (see Note 9) | **701,998** | 3,146,639 | – |
| Others | **66,853,163** | 51,205,252 | 14,928,978 |
| | **₱1,570,509,929** | ₱1,222,810,270 | ₱837,550,953 |

25. **Personnel Expenses**

| | **2023** | 2022 | 2021 |
|---|---|---|---|
| Salaries, wages, bonuses, and allowances: | | | |
| Cost of sales (see Note 23) | **₱1,058,983,492** | ₱834,621,934 | ₱526,987,995 |
| General and administrative expenses (see Note 24) | **449,192,968** | 329,261,032 | 227,555,296 |
| SSS, Pag-ibig, Medicare and other contributions: | | | |
| Cost of sales (see Note 23) | **32,080,237** | 20,078,486 | 37,102,970 |
| General and administrative expenses (see Note 24) | **39,125,872** | 28,915,874 | 13,938,340 |
| Pension costs: | | | |
| Cost of sales (see Notes 23 and 26) | **16,310,101** | 21,322,593 | 20,500,279 |
| General and administrative expenses (see Notes 24 and 26) | **21,041,870** | 28,609,595 | 32,379,082 |
| | **₱1,616,734,540** | ₱1,262,809,514 | ₱858,463,962 |

EXHIBIT 1439 - 0135

- 39 -

26. **Depreciation and Amortization**

|  | **2023** | 2022 | 2021 |
|---|---|---|---|
| Property and equipment: |  |  |  |
| Cost of sales (see Note 23) | **₱323,010,907** | ₱372,179,083 | ₱309,207,492 |
| General and administrative |  |  |  |
| expenses (see Note 24) | **29,738,323** | 23,745,266 | 16,409,002 |
| Right-of-use assets: |  |  |  |
| Cost of sales (see Note 23) | **369,293,924** | 218,810,877 | 155,686,652 |
| General and administrative |  |  |  |
| expenses (see Note 24) | **–** | – | 144,521 |
| Software - |  |  |  |
| Cost of sales (see Note 23) | **12,469,671** | **–** | – |
| General and administrative |  |  |  |
| expenses (see Note 24) | **22,314,736** | 21,510,874 | 17,718,697 |
| Franchise - |  |  |  |
| General and administrative |  |  |  |
| expenses (see Note 24) | **949,635** | 709,283 | 709,282 |
|  | **₱757,777,196** | ₱636,955,383 | ₱499,875,646 |

27. **Pension Costs**

The Group has a funded, noncontributory defined benefit pension plan covering substantially all of its qualified employees. The benefits are based on years of service and percentage of compensation during the last year of employment. Based on the Group's retirement plan, employees who completed at least five (5) years of service qualify in the early retirement plan of the Group. Current service cost and interest cost were computed using the financial assumptions at the beginning of the year reflecting the benefits offered under the plan amendment. Any changes in that effect, excluding amount in net interest, are recognized in OCI.

The following tables summarize the components of net pension costs in the consolidated statements of comprehensive income in 2023 and 2022 and accrued pension costs in the consolidated statements of financial position as at December 31, 2023 and 2022. The latest actuarial valuation is as at December 31, 2023.

|  | **2023** | 2022 | 2021 |
|---|---|---|---|
| Pension costs: |  |  |  |
| Current service cost | **₱31,186,128** | ₱40,276,683 | ₱47,905,273 |
| Net interest cost | **17,229,422** | 12,133,009 | 5,704,427 |
| Expected return on plan assets | **(11,063,579)** | – | – |
|  | **₱37,351,971** | ₱52,409,692 | ₱53,609,700 |

|  | **2023** | 2022 |
|---|---|---|
| Accrued pension costs: |  |  |
| Present value of benefit obligation (PVBO) | **₱276,109,298** | ₱242,014,435 |
| Fair value of plan assets (FVPA) | **(158,508,420)** | (155,414,641) |
|  | **₱117,600,878** | ₱86,599,794 |

EXHIBIT 1439 - 0136

- 40 -

Movements in the PVBO are as follows:

|  | 2023 | 2022 |
|---|---|---|
| Balance at beginning of year | ₱242,014,435 | ₱262,655,508 |
| Current service cost | 31,186,128 | 40,276,683 |
| Interest cost | 17,229,422 | 13,098,993 |
| Net actuarial gain | (7,189,103) | (61,589,972) |
| Benefits paid from plan assets | (7,131,584) | (12,426,777) |
| Balance at end of year | ₱276,109,298 | ₱242,014,435 |

Movements in the FVPA are as follows:

|  | 2023 | 2022 |
|---|---|---|
| Balance at beginning of year | ₱155,414,641 | ₱166,394,561 |
| Interest income | 11,063,579 | 8,295,283 |
| Contributions | 3,117,083 | – |
| Net actuarial loss | (3,532,920) | – |
| Remeasurement - plan asset | (422,380) | (6,848,426) |
| Benefits paid from plan assets | (7,131,583) | (12,426,777) |
| Balance at end of year | ₱158,508,420 | ₱155,414,641 |

Movements in the accrued pension costs are as follows:

|  | 2023 | 2022 |
|---|---|---|
| Balance at beginning of year | ₱86,599,794 | ₱96,260,947 |
| Pension costs | 37,351,971 | 45,080,393 |
| Contributions | (3,117,083) | – |
| Actuarial loss gain | (3,233,804) | (54,741,546) |
| Balance at end of year | ₱117,600,878 | ₱86,599,794 |

Amounts recognized in OCI are as follows:

|  | 2023 | 2022 | 2021 |
|---|---|---|---|
| Actuarial gain (loss) - PVBO | ₱7,189,103 | ₱61,589,972 | ₱82,084,789 |
| Actuarial gain (loss) - FVPA | (3,955,299) | (6,848,426) | (6,228,043) |
| Deferred income tax | (872,047) | (13,641,238) | (18,738,959) |
|  | ₱2,361,757 | ₱41,100,308 | ₱57,117,787 |

The details of the market value of the Group's plan assets are shown below:

|  | 2023 | 2022 |
|---|---|---|
| Investments: |  |  |
| Government securities | ₱83,173,235 | ₱100,425,675 |
| Stocks | 33,038,811 | 6,451,827 |
| Deposit in banks | 2,710,421 | 4,875 |
| Money market investment in trust funds | 23,115,975 | 29,257,033 |
| Other securities | 15,484,979 | 18,483,181 |
| Total investments | 157,523,421 | 154,622,591 |

*(Forward)*



EXHIBIT 1439 - 0137

- 41 -

|                      | 2023 | 2022 |
|----------------------|------|------|
| Other assets:        |      |      |
| Interest receivable  | ₱1,065,785 | ₱683,671 |
| Receivable           | – | 228,479 |
| Total other assets   | 1,065,785 | 912,150 |
| Total assets         | 158,589,206 | 155,534,741 |
| Fees payable         | (80,787) | (120,100) |
| Net asset value      | ₱158,508,419 | ₱155,414,641 |

The plan assets were invested in fixed income securities and equity investments. All equity and debt instruments held have quoted prices in active market. Investment activities entered by the plan asset/liability matching strategy during the year consist of, but is not limited to, buying and selling of securities. All investments are considered as high grade based on its performance in the market.

The management performs an Asset-Liability Matching Study (ALM) annually. The overall investment policy and strategy of the Group's defined benefit plans is guided by the objective of achieving an investment return which, together with contributions, ensures that there will be sufficient assets to pay pension benefits as they fall due while also mitigating the various risk of the plans.

The principal assumptions used in determining retirement benefit costs as at January 1, 2023, 2022 and 2021 were as follows:

|                                | 2023 | 2022 | 2021 |
|--------------------------------|------|------|------|
| Discount rates at beginning of year | 7.12% | 4.99% | 3.79% |
| Rate of compensation increase  | 5.00% | 5.00% | 5.00% |

The discount rates and salary increase rates used in determining the retirement benefit obligation as of December 31, 2023 are 6.09% and 4.00%, respectively.

The sensitivity analysis below has been determined based on reasonably possible changes of each significant assumption on the defined benefit obligation assuming all other assumptions were held constant:

|                    | 2023 | | 2022 | |
|--------------------|------|------|------|------|
|                    | Increase (decrease) | Amount | Increase (decrease) | Amount |
| Discount rates     | 0.50% | (₱7,061,739) | 0.50% | (₱6,243,145) |
|                    | (0.50%) | 8,592,252 | (0.50%) | 8,221,974 |
| Salary increase rate | 1.00% | 19,190,433 | 1.00% | 17,086,849 |
|                    | (1.00%) | (13,040,420) | (1.00%) | (11,418,866) |

Shown below is the maturity profile of the undiscounted benefit payments as of December 31, 2023 and 2022:

|                                | 2023 | 2022 |
|--------------------------------|------|------|
| 1 year and less                | ₱23,965,824 | ₱21,268,123 |
| more than 1 years to 5 years   | 16,936,881 | 5,858,556 |
| more than 5 years to 10 years  | 89,731,104 | 92,368,558 |
| more than 10 years to 15 years | 183,899,013 | 136,461,424 |
| more than 15 years to 20 years | 344,346,520 | 415,338,387 |
| more than 20 years             | 6,691,846,058 | 7,542,694,338 |

EXHIBIT 1439 - 0138

- 42 -

The Group expects to contribute ₱50.47 million to the Fund in 2024.

The plan contributions are based on the actuarial present value of accumulated plan benefits and fair value of plan assets are determined using an independent actuarial valuation.  The net defined benefit cost and the contributions to the plan are specifically identifiable, such that, the Group's PVBO pertains only to the benefit of the Group's employees and the FVPA, pertains only to the contributions made by the Group.  The Group shall contribute to the Fund such amounts as shall be required, under actuarial principles, to provide the benefits and the expenses incident to the operation and administration of the Fund.

## 28. Interest Expense

|  | 2023 | 2022 | 2021 |
|---|---|---|---|
| Long-term loans payables (see Note 20) | ₱212,864,549 | ₱205,879,581 | ₱166,437,238 |
| Lease liabilities (see Note 15) | 111,567,612 | 102,828,224 | 89,082,753 |
| Short-term loans payable (see Note 19) | 25,510,044 | 9,548,194 | 30,896,730 |
| Contract liabilities (see Note 22) | 6,185,379 | 3,642,826 | 3,749,821 |
| Debt issue cost | 5,361,522 | 2,067,486 | 2,013,037 |
| Others | – | 4,799 | – |
|  | ₱361,489,106 | ₱323,971,110 | ₱292,179,579 |

## 29. Other Income (Charges)

|  | 2023 | 2022 | 2021 |
|---|---|---|---|
| Service fee and expired loyalty fund points | ₱23,871,145 | ₱19,689,335 | ₱6,045,697 |
| Gain (loss) on: |  |  |  |
| Disposal of inventories | (8,471,354) | (2,630,006) | (12,250,140) |
| Disposal of property and equipment | 1,228,757 | 67,336 | (121,143) |
| Pre-termination of leases (see Note 15) | (1,226,148) | 18,323,273 | 10,529,566 |
| Reversal of long-outstanding liabilities | – | – | 24,682,991 |
| Recovery of receivables | – | – | 23,210,194 |
| Other income from franchisees | 5,410,483 | 7,040,034 | 23,310,805 |
| Unrealized foreign exchange gain (loss) | (2,887,382) | 10,146,394 | 247,925 |
| Accretion income from rental' deposits (see Note 16) | 1,692,305 | 2,000,871 | 3,023,323 |
| Net reversal (provisions for) legal and other contingencies (see Note 34) | – | (11,394,323) | 1,353,452 |
| Fair value gain on financial assets at FVPL (see Note 12) | – | 404,374 | 1,949,288 |
| Others - net | 5,455,926 | 5,528,111 | 3,229,889 |
|  | ₱25,073,732 | ₱49,175,399 | ₱85,211,847 |

EXHIBIT 1439 - 0139

- 43 -

Other income from franchisees pertains mostly to cash overages, fees charged by the Group to its franchisees for the new module of the point-of-sale machines, rental income and incentives given by a supplier for high volume purchases.

### 30. Income Taxes

The details of the Group's net deferred tax assets are as follows:

|  | 2023 | 2022 |
|---|---|---|
| Deferred tax assets: | | |
| Lease liabilities | ₱149,148,044 | ₱129,791,810 |
| NOLCO | 88,107,648 | 21,072,622 |
| Accrued pension costs | 2,502,491 | 654,022 |
| Loyalty points | 1,254,062 | 406,176 |
| Unamortized past service cost | 506,576 | 818,647 |
| Accrued bonus and other expense | 149,523 | 2,011,581 |
| Allowance for expected credit losses | 652,646 | – |
|  | 242,320,990 | 154,754,858 |
| Deferred tax liabilities: | | |
| Right-of-use-asset | 141,926,269 | 129,173,453 |
| Pension asset | – | 14,987 |
|  | 141,926,269 | 129,188,440 |
|  | ₱100,394,721 | ₱25,566,418 |

The details of the Group's net deferred tax liabilities as of December 31, 2023 are as follows:

|  | 2023 | 2022 |
|---|---|---|
| Deferred tax assets: | | |
| Lease liabilities | ₱284,297,017 | ₱59,025,906 |
| Accrued pension costs | 28,405,025 | 20,841,349 |
| Contract liabilities | 28,053,584 | 6,543,943 |
| MCIT | 22,142,778 | – |
| Difference in depreciation due to adoption of lease standard | 18,379,806 | 31,551,183 |
| NOLCO | 11,346,647 | – |
| Accrued bonus and other expenses | 3,452,272 | 4,543,819 |
| Loyalty points | 2,542,031 | 407,102 |
| Unamortized past service cost | 1,215,518 | 1,855,309 |
| Allowance for: | | |
| Inventory obsolescence | 1,190,628 | 1,064,150 |
| Expected credit losses | 1,372,116 | 1,228,669 |
| Unrecoverable deposits | 824,323 | 824,323 |
| Unrealized foreign exchange loss | 135,006 | – |
|  | 403,356,751 | 127,885,753 |
| Deferred tax liabilities: | | |
| Excess of fair value over cost of net identifiable assets acquired in business combination (see Note 6) | 805,565,467 | 805,565,467 |

*(Forward)*



EXHIBIT 1439 - 0140

- 44 -

|  | 2023 | 2022 |
|---|---|---|
| Right-of-use assets | ₱224,323,832 | ₱— |
| Debt issuance cost | 1,340,380 | 1,857,252 |
| Unrealized foreign exchange gain | – | 251,600 |
|  | 1,031,229,679 | 807,674,319 |
|  | (₱627,872,928) | (₱679,788,566) |

The deferred tax assets were measured using the appropriate corporate income tax rate on the year these are expected to be reversed. The Group computes for deferred tax using the 25% tax rate except for its subsidiaries, namely BMI, SPCI and SSI, which compute for deferred tax using the OSD effective tax rate of 15%.

On September 30, 2020, the BIR issued Revenue Regulations No. 25-2020 implementing Section 4(b) of "Bayanihan to Recover As One Act" which states that the NOLCO incurred for taxable years 2020 and 2021 can be carried over and claimed as a deduction from gross income for the next five (5) consecutive taxable years immediately following the year of such loss.

The Group has incurred NOLCO in taxable year 2020 which can be claimed as deduction from the regular taxable income for the next five (5) consecutive taxable years pursuant to the Bayanihan to Recover As One Act, as follows:

| Year Incurred | Availment Period | Amount | Applied in Previous Year/s | Expired | Applied in Current Year | Unapplied |
|---|---|---|---|---|---|---|
| 2020 | 2021-2025 | ₱569,472,013 | ₱203,932,152 | ₱– | ₱303,544,146 | ₱61,995,715 |
| 2022 | 2023-2025 | 21,072,622 | – | – | – | 21,072,622 |
| 2023 | 2024-2026 | 314,748,843 | – | – | – | 314,748,843 |
|  |  | ₱905,293,478 | ₱203,932,152 | ₱– | ₱303,544,146 | ₱397,817,180 |

The MCIT that can be applied against future RCIT is as follows:

| | | | MCIT | | | |
|---|---|---|---|---|---|---|
| Year Incurred | Availment Period | Amount | Applied in Previous Year/s | Expired | Applied in Current Year | Unapplied |
| 2020 | 2021-2023 | ₱12,149,016 | ₱– | ₱– | ₱12,149,016 | ₱– |
| 2021 | 2022-2024 | 8,396,745 | – | – | 8,396,745 | – |
| 2023 | 2024-2026 | 22,142,778 | – | – | – | 22,142,778 |
|  |  | ₱42,688,539 | ₱– | ₱– | ₱20,545,761 | ₱22,142,778 |

The provision for current income tax represents RCIT, MCIT and final withholding taxes on royalty and franchise fees which are as follows:

|  | 2023 | 2022 | 2021 |
|---|---|---|---|
| RCIT | ₱266,526,100 | ₱139,882,917 | ₱16,918,486 |
| MCIT | 22,142,778 | – | 11,252,265 |
| Final withholding taxes | 3,302,588 | 247,667 | 298,948 |
|  | ₱291,971,466 | ₱140,130,584 | ₱28,469,699 |

EXHIBIT 1439 - 0141

C                        C
                         ID

- 45 -

The reconciliation between the provision for income tax computed at statutory income tax rate and the provision for (benefit from) income tax as shown in the consolidated statements of comprehensive income is as follows:

|  | **2023** | 2022 | 2021 |
|---|---|---|---|
| Provision for (benefit from) income tax computed at statutory income tax rate of 25% in 2023 and 2022, and 30% in 2020 | **₱311,102,681** | ₱274,603,734 | ₱57,669,893 |
| Tax effects of: |  |  |  |
| Nondeductible expenses | **50,482,452** | 156,655,363 | 17,963,800 |
| Reversal of provision for claims and contingencies | **–** | **–** | (9,258,250) |
| Application of OSD | **(178,348,879)** | (70,519,749) | (8,131,888) |
| Nontaxable: |  |  |  |
| Other income | **(15,716,527)** | – | – |
| Interest accretion | **(34,148)** | (93,627) | (626,458) |
| Dividend income | **–** | (127,547,786) | – |
| Amortization of franchise fees | **–** | (3,495,276) | (3,302,588) |
| Income subject to final tax: |  |  |  |
| Interest income | **(2,274,513)** | (373,587) | (405,026) |
| Fair value gain on financial assets at FVPL | **–** | (101,094) | (461,346) |
| Other income subject to 25% | **(246,914)** | (5,115,121) | – |
| Change in tax rate | **–** | – | 54,251,275 |
| Provision for (benefit from) income tax | **₱164,964,152** | ₱224,012,857 | ₱107,699,412 |

31. **Financial Risks Management Objectives and Policies**

The Group's principal financial instruments comprise cash, trade and other receivables and short-term and long-term loans payable. The main purpose of these financial instruments is to finance the Group's operations. The Group has various other financial assets and liabilities such as rental deposit, accounts payable and other current liabilities, and dealers' deposits arising directly from operations.

The main risks arising from the Group's financial instruments are credit risk and liquidity risk. The BOD reviews and approves policies for managing each of these risks and they are summarized below:

Credit Risk. Credit risk is the risk that the Group will incur a loss because its customers or counterparties failed to discharge their contractual obligations. The Group manages and controls credit risk by trading only with recognized, creditworthy third parties. It is the Group's policy that all customers who wish to trade on credit terms are subject to credit verification procedures. In addition, receivable balances are monitored on an ongoing basis with the result that the Group's exposure to bad debts is not significant.

The table below shows the maximum exposure to credit risk for the Group's financial assets, without taking account of any collateral and other credit enhancements:

|  | **2023** | 2022 |
|---|---|---|
| Cash* | **₱821,461,587** | ₱886,371,071 |
| Trade and other receivables: | **1,234,629,010** | 1,142,332,038 |
| Rental and other deposits | **312,411,004** | 254,504,587 |
| Total credit risk exposure | **₱2,368,501,601** | ₱2,283,207,696 |

*Excluding cash on hand.*


EXHIBIT 1439 - 0142

- 46 -

An aging analysis of financial assets per class are as follows:

| | Neither Past Due nor Impaired | Past Due but not Impaired | | | Expected Credit Loss | Total |
|---|---|---|---|---|---|---|
| | | 1–180 Days | Over 360 days | Subtotal | | |
| | | | **2023** | | | |
| Cash* | ₱821,461,587 | ₱– | ₱– | ₱– | ₱– | ₱821,461,587 |
| Trade and other receivables | 1,087,463,927 | 131,650,542 | 5,675,103 | 137,325,645 | 9,839,438 | 1,234,629,010 |
| Rental and other deposits | 245,867,461 | – | 63,246,2501 | 63,246,25 | 3,297,293 | 312,411,004 |
| | ₱2,154,792,975 | ₱131,650,542 | ₱68,921,354 | ₱200,571,896 | ₱13,136,731 | ₱2,368,501,601 |

*Excluding cash on hand.*

| | Neither Past Due nor Impaired | Past Due but not Impaired | | | Expected Credit Loss | Total |
|---|---|---|---|---|---|---|
| | | 1–180 Days | Over 360 days | Subtotal | | |
| | | | **2022** | | | |
| Cash* | ₱886,371,071 | ₱– | ₱– | ₱– | ₱– | ₱886,371,071 |
| Trade and other receivables | 809,236,091 | 323,830,301 | – | 323,830,301 | 9,265,646 | 1,142,332,038 |
| Rental and other deposits | 189,287,521 | – | 65,217,066 | 65,217,066 | – | 254,504,587 |
| | ₱1,884,894,683 | ₱323,830,301 | ₱65,217,066 | ₱389,047,367 | ₱9,265,646 | ₱2,283,207,696 |

*Excluding cash on hand.*

A financial asset is considered past due when a counterparty has failed to make a payment when contractually due. "Past due but not impaired" financial assets are items with history of frequent default. Nevertheless, the amounts due are still collectible. Lastly, "Impaired" items are those that are long outstanding and have been specifically identified as impaired.

The table below shows the credit quality of the Group's neither past due nor impaired financial assets based on their historical experience with the corresponding debtors:

| | Stage 1 | Stage 2 | Stage 3 | Total |
|---|---|---|---|---|
| | | **2023** | | |
| Cash* | ₱821,461,587 | ₱– | ₱– | ₱821,461,587 |
| Trade and other receivables: | | | | |
| Trade receivables | 361,316,833 | 379,066,378 | – | 740,383,211 |
| Royalty receivable | 176,925,409 | – | – | 176,925,409 |
| Receivable from NAF | – | – | 51,829,287 | 51,829,287 |
| Receivable from franchisee | – | – | 61,680,414 | 61,680,414 |
| Receivable from employees | – | – | 23,383,344 | 23,383,344 |
| Other receivables | 33,262,262 | – | – | 33,262,262 |
| Rental and other deposits | – | – | 245,867,461 | 245,867,461 |
| | ₱1,392,966,091 | ₱379,066,378 | ₱382,760,506 | ₱2,154,792,975 |

*Excluding cash on hand.*

| | Stage 1 | Stage 2 | Stage 3 | Total |
|---|---|---|---|---|
| | | **2022** | | |
| Cash* | ₱886,371,071 | ₱– | ₱– | ₱886,371,071 |
| Trade and other receivables: | | | | |
| Trade receivables | 257,928,959 | 374,028,503 | – | 631,957,462 |
| Royalty receivable | 170,138,255 | – | – | 170,138,255 |
| Receivable from NAF | – | – | 50,225,215 | 50,225,215 |
| Receivable from franchisee | – | – | 63,775,172 | 63,775,172 |
| Receivable from employees | – | – | 17,710,252 | 17,710,252 |
| Other receivables | 87,645,560 | – | – | 87,645,560 |
| Rental and other deposits | – | – | 189,287,521 | 189,287,521 |
| | ₱1,459,248,928 | ₱424,028,503 | ₱320,998,160 | ₱2,204,275,591 |

*Excluding cash on hand.*

Financial assets classified as "stage 1" are those cash transacted with reputable local banks and financial assets with no history of default on the agreed contract terms while "stage 2" includes those financial assets being collected on due dates with an effort of collection. Financial instruments classified as "stage 3" are those financial assets with little history of default on the agreed terms of the contract.

EXHIBIT 1439 - 0143

- 47 -

*Liquidity Risk.*  Liquidity risk arises from the possibility that the Group may encounter difficulties in raising funds to meet or settle its obligations at a reasonable price.

The Group's objective is to maintain a balance between continuity of funding and flexibility through the use of advances to related parties.  The Group maintains sufficient cash to finance its operations.

The Group manages its liquidity risk by maintaining strength and quality on financial position where debt-to-equity ratio is at a manageable level.  The Group also maintains a financial strategy that the scheduled debts are within the Group's ability to generate cash from its business operations.

The table below summarizes the maturity profile of the Group's financial liabilities based on contractual undiscounted payments.  The table also analyses the maturity profile of the Group's financial assets in order to provide a complete view of the Group's contractual commitments and liquidity.

| | 2023 | | | | | |
|---|---|---|---|---|---|---|
| | Due and Demandable | < 90 Days | 91–180 Days | 181–365 Days | Over 365 Days | Total |
| Cash | ₱901,147,527 | ₱– | ₱– | ₱– | ₱– | ₱901,147,527 |
| Trade and other receivables | | | | | | |
| Trade | 750,241,303 | 72,053,021 | 10,500,334 | – | 5,531,045 | 838,325,703 |
| Royalty receivables | 43,257,615 | 10,659,071 | – | 6,879,438 | 884,290 | 61,680,414 |
| Receivable from NAF | 30,039,722 | 21,789,565 | – | – | – | 51,829,287 |
| Receivable from franchisees | 176,925,408 | – | – | – | – | 176,925,408 |
| Receivables from employees | 4,821,452 | 16,648,551 | – | – | 1,913,341 | 23,383,344 |
| Other receivables | 82,178,426 | – | – | – | 306,428 | 82,484,854 |
| Rental and other deposits | 245,867,461 | – | – | – | 66,543,544 | 312,411,005 |
| | 2,234,478,914 | 121,150,208 | 10,500,334 | 6,879,438 | 75,178,648 | 2,448,187,542 |
| Accounts payable and other current liabilities: | | | | | | |
| Trade payables | – | 1,033,414,652 | – | – | – | 1,033,414,652 |
| Nontrade payables | – | 191,766,451 | – | – | – | 191,766,451 |
| Accrued expenses | – | 216,880,192 | – | – | – | 216,880,192 |
| Other payables* | – | 310,573,934 | – | – | – | 310,573,934 |
| Dealers' deposit and other noncurrent payables | – | – | – | – | 106,626,720 | 106,626,720 |
| Long-term loans payable** | 47,876,004 | – | – | – | 5,194,694,987 | 5,242,570,991 |
| Lease liabilities | 366,104,436 | – | – | – | 1,944,392,088 | 2,310,496,524 |
| | 413,980,440 | 1,752,635,229 | – | – | 7,245,713,795 | 9,412,329,464 |
| Liquidity gap | ₱1,820,498,474 | (₱1,631,485,021) | ₱10,500,334 | ₱6,879,438 | (₱7,170,535,147) | (₱6,964,141,922) |

*Excluding statutory payables.*
**Including future interest payments.*

| | 2022 | | | | | |
|---|---|---|---|---|---|---|
| | Due and Demandable | < 90 Days | 91–180 Days | 181–365 Days | Over 365 Days | Total |
| Cash | ₱989,578,790 | ₱– | ₱– | ₱– | ₱– | ₱989,578,790 |
| Trade and other receivables | | | | | | |
| Trade | 424,028,503 | 74,099,759 | 231,728,638 | – | 7,640,101 | 737,497,001 |
| Royalty receivables | 170,138,255 | – | – | – | – | 170,138,255 |
| Receivable from NAF | 50,225,215 | – | – | – | – | 50,225,215 |
| Receivable from franchisees | 63,775,172 | – | – | – | – | 63,775,172 |
| Receivables from employees | 13,423,386 | 18,001,905 | – | – | 1,144,630 | 32,569,921 |
| Other receivables | 87,645,560 | – | – | – | 480,914 | 88,126,474 |
| Rental and other deposits | 189,287,521 | – | – | – | 65,217,066 | 254,504,587 |
| | 1,988,102,402 | 92,101,664 | 231,728,638 | – | 74,482,711 | 2,386,415,415 |
| Accounts payable and other current liabilities: | | | | | | |
| Trade payables | – | 1,569,563,358 | – | – | – | 1,569,563,358 |
| Nontrade payables | – | 101,857,257 | – | – | – | 101,857,257 |
| Accrued expenses | – | 306,438,087 | – | – | – | 306,438,087 |
| Other payables* | – | 247,493,838 | – | – | – | 247,493,838 |
| Dealers' deposit and other noncurrent payables | – | – | – | – | 146,389,568 | 146,389,568 |
| Long-term loans payable** | 47,932,514 | – | – | – | 5,242,625,440 | 5,290,557,954 |
| Lease liabilities | 352,714,066 | – | – | – | 2,152,971,322 | 2,505,685,388 |
| | 400,646,580 | 2,225,352,540 | – | – | 7,541,986,330 | 10,167,985,450 |
| Liquidity gap | ₱1,587,455,822 | (₱2,133,250,876) | ₱231,728,638 | ₱– | (₱7,467,503,619) | (₱7,781,570,035) |

*Excluding statutory payables.*
**Including future interest payments.*

EXHIBIT 1439 - 0144

- 48 -

Capital Management
The primary objective of the Group's capital management is to safeguard the Group's ability to continue as a going concern, so that it can to provide returns to stockholders and benefits to other stakeholders and to maintain an optimal capital structure to reduce the cost of capital.

The Group manages its capital structure and makes adjustments to it, in light of changes in economic conditions.  To maintain or adjust the capital structure, the Group adjusts the dividend payment to stockholders, return capital to stockholders or issue new shares.

The Group's debt-to-equity ratio is as follows:

|  | **2023** | 2022 |
|---|---|---|
| Total liabilities | **₱10,668,738,593** | ₱10,662,641,171 |
| Total equity | **7,959,209,416** | 7,045,777,106 |
|  | **1.34:1** | 1.51:1 |

## 32. Fair Value Information

Fair value is defined as the amount at which the financial instruments could be exchanged in a current transaction between knowledgeable willing parties in an arm's length transaction, other than in forced or liquidation sale.

*Financial Instruments Whose Carrying Amounts Approximate Fair Value.*  Management has determined that the carrying amounts of cash, financial assets at FVPL, trade and other receivables and accounts payable and other current liabilities, based on their notional amounts, reasonably approximates their fair values because these are mostly short-term in nature or are repriced frequently.

*Other Financial Instruments.*  Set out below is a comparison by category of carrying amounts and estimated fair values of the Group's financial instruments other than those described above:

| | | | As at December 31, 2023 | |
| | | | | **Fair Value** | |
| | **Date of Valuation** | **Carrying Value** | **Level 1 Quoted** | **Level 2 Significant Observable Input** |
|---|---|---|---|---|
| **Assets for which fair values are disclosed -** | | | | |
| **Rental deposits** | **December 31, 2023** | **₱309,113,712** | **₱—** | **₱300,110,399** |
| | | **₱309,113,712** | **₱—** | **₱300,110,399** |
| **Liabilities for which fair values are disclosed:** | | | | |
| **Long-term loans payable** | **December 31, 2023** | **5,242,570,991** | **₱—** | **₱5,457,516,402** |
| **Dealers' deposits** | **December 31, 2023** | **106,626,720** | **—** | **104,355,571** |
| | | **₱5,349,197,711** | **₱** | **₱5,561,871,973** |

EXHIBIT 1439 - 0145

- 49 -

|  | Date of Valuation | Carrying Value | Level 1 Quoted | Level 2 Significant Observable Input |
|---|---|---|---|---|
| *As at December 31, 2022 — Fair Value* | | | | |
| Assets for which fair values are disclosed - | | | | |
| Rental deposits | December 31, 2022 | ₱254,504,587 | ₱– | ₱218,589,354 |
|  | | ₱254,504,587 | ₱– | ₱ 218,589,354 |
| Liabilities for which fair values are disclosed: | | | | |
| Long-term loans payable | December 31, 2022 | ₱5,290,557,954 | ₱– | ₱6,334,150,117 |
| Dealers' deposits | December 31, 2022 | 160,080,740 | – | 130,017,749 |
|  | | ₱ 5,450,638,694 | ₱– | ₱6,464,167,866 |

The following methods and assumptions are used to estimate the fair value of each class of financial instruments:

*Rental Deposits*. The fair values were obtained by discounting the instruments' expected cash flows using interest rates of 1.65% to 8.56% as at December 31, 2023 and of 3.62% to 6.14% as at December 31, 2022.

*Long-term loans Payable*. The fair value of loan payable which was discounted using prevailing market rate of 4.18% and 4.29% as at December 31, 2023 and 2022, respectively, approximates the carrying value since these bear interest at current market rates. Fair value category is Level 2, significant observable inputs.

*Dealers' Deposits*. The fair values were obtained by discounting the instruments' expected cash flows using interest rates of 4.92% and 4.69% as at December 31, 2023 and 2022, respectively.

As at December 31, 2023 and 2022, there were no transfers between Level 1 and 2 fair value measurements.

## 33. Commitments

Trademark Licensing and Franchise Agreements
The Group has existing Trademark Licensing and Franchise Agreements with independent franchisees to operate restaurant outlets under the "Shakey's", "Peri-Peri" and "Potato Corner" brand name, method, concept and trade name. In consideration thereof, the franchisees agree to pay continuing franchise fees equivalent to a certain percentage of the franchisees' net sales.

The franchisees also pay management fees for various services, including maintenance services, rendered by the Group.

The Group recognized royalty and franchise fees amounting to ₱487.4 million in 2023, ₱400.1 million in 2022 and ₱267.2 million in 2021 (see Note 22). Royalty receivables as at December 31, 2023 and 2022 amounted ₱176.9 million and ₱170.1 million, respectively (see Note 9).

EXHIBIT 1439 - 0146

- 50 -

---

34. **Provisions**

|  | **2023** | 2022 |
|---|---|---|
| Balance at beginning of year | **₱47,073,871** | ₱35,679,548 |
| Addition (see Note 29) | **–** | 12,653,061 |
| Reversal (see Note 29) | **–** | (1,258,738) |
| Balance at end of year | **₱47,073,871** | ₱47,073,871 |

The Group's outstanding provisions consist mainly of provisions for legal actions and claims and other contingencies which are normal to the Group's business. These include estimates settlement amounts and other costs of claims made against the Group. As allowed by PAS 37, the Group does not provide further information on these provisions and contingencies in order not to impair the outcome of the litigations, claims and disputes.

---

35. **Earnings (Loss) per Share (EPS)**

Basic earnings (loss) per share (EPS) is computed based on the weighted average number of issued and outstanding common shares during each year. Diluted EPS is computed as if the potential common share or instrument that may entitle the holder to common share were exercised as of the beginning of the year. When there are no potential common shares or other instruments that may entitle the holder to common shares, diluted EPS, is the same as the basic EPS.

There are no dilutive financial instruments as of December 31, 2023 and 2022, hence, diluted EPS is the same as the basic EPS.

The Group's EPS were computed as follows:

|  | **2023** | 2022 | 2021 |
|---|---|---|---|
| (a) Net income (loss) | **₱1,079,446,570** | ₱874,402,081 | ₱122,980,158 |
| (b) Weighted average number of shares outstanding | **1,683,760,178** | 1,683,760,178 | 1,594,837,355 |
| Basic/diluted EPS (a/b) | **₱0.64** | ₱0.52 | ₱0.08 |

---

36. **Notes to Consolidated Statements of Cash Flows**

The following are the noncash activities for the years ended December 31, 2023 and 2022:

|  | **2023** | | | |
|---|---|---|---|---|
|  | **January 1** | **Net cash flows** | **Noncash changes** | **December 31** |
| Rental deposits (a) | **₱270,164,541** | **₱37,256,866** | **₱1,692,305** | **₱309,113,712** |
| Long-term loans payable (b) | **5,790,557,954** | **150,000,000** | **2,013,037** | **5,942,570,991** |
| Contract liabilities (c) | **74,672,181** | **67,084,402** | **6,185,379** | **147,941,962** |

**EXHIBIT 1439 - 0147**

- 51 -

| | 2022 | | | |
|---|---|---|---|---|
| | January 1 | Net cash flows | Noncash changes | December 31 |
| Rental deposits (a) | ₱589,287,521 | (₱321,123,851) | ₱2,000,871 | ₱270,164,541 |
| Long-term loans payable (b) | 3,740,557,954 | 2,050,000,000 | – | 5,790,557,954 |
| Contract liabilities (c) | 82,197,813 | (10,737,004) | 3,211,372 | 74,672,181 |

Details of the noncash changes are as follows:

(a) Pertains to accretion of interest expense and interest income on long-term rental deposits included in "Rental and other noncurrent assets" and long-term dealer's deposits included in "Dealer's deposits and other noncurrent liabilities", respectively.
(b) Pertains to amortization of debt issuance cost during the year amounting to ₱5.4 million and ₱2.1 million in 2023 and 2022, respectively.
(c) Pertains to the accretion of the significant financing component of contract liabilities during the year amounting to ₱6.2 million and ₱3.2 million in 2023 and 2022, respectively.

The changes in the Group's liabilities arising from financing activities are as follows:

| | 2023 | | | | | | |
|---|---|---|---|---|---|---|---|
| | January 1 | Additions | Proceeds | Payments | Interest expense | Other movements | December 31 |
| Lease liabilities* | ₱1,700,018,174 | ₱482,385,920 | ₱– | (₱461,980,269) | ₱115,030,091 | (₱4,615,417) | ₱1,830,838,499 |
| Loans payable | 5,790,557,954 | – | 700,000,000 | (550,000,000) | – | 2,013,037 | 5,942,570,991 |
| Dividends | – | 168,376,017 | – | (168,376,017) | – | – | – |
| Accrued interest** | – | – | – | (238,206,151) | 361,489,106 | (123,282,955) | – |
| Total liabilities from financing activities | ₱7,490,576,128 | ₱650,761,937 | ₱700,000,000 | (₱1,418,562,437) | ₱476,519,197 | (₱125,885,335) | ₱7,773,409,490 |

*Other movements pertain to the gain on lease concession and derecognition of lease liability
**Other movements pertain to interest accretion for PFRS 15

| | 2022 | | | | | | |
|---|---|---|---|---|---|---|---|
| | January 1 | Additions | Proceeds | Payments | Interest expense | Other movements | December 31 |
| Lease liabilities* | ₱1,480,736,520 | ₱610,225,027 | ₱– | (₱360,864,550) | ₱102,828,224 | (₱132,907,047) | ₱1,700,018,174 |
| Loans payable | 3,740,557,954 | – | 2,100,000,000 | (50,000,000) | – | – | 5,790,557,954 |
| Dividends | – | 50,512,805 | – | (50,512,805) | – | – | – |
| Accrued interest** | 7,656,566 | – | – | (221,614,458) | 323,971,110 | (110,013,218) | – |
| Total liabilities from financing activities | ₱5,228,951,040 | ₱660,737,832 | ₱2,100,000,000 | (₱682,991,813) | ₱426,799,334 | (₱242,920,265) | ₱7,490,576,128 |

*Other movements pertain to the gain on lease concession and derecognition of lease liability
**Other movements pertain to interest accretion for PFRS 15

EXHIBIT 1439 - 0148



SGV
Building a better
working world

SyCip Gorres Velayo & Co.    Tel: (632) 8891 0307
6760 Ayala Avenue              Fax: (632) 8819 0872
1226 Makati City               ey.com/ph
Philippines

**INDEPENDENT AUDITOR'S REPORT
ON SUPPLEMENTARY SCHEDULES**

The Stockholders and the Board of Directors
Shakey's Pizza Asia Ventures Inc.
15Km East Service Road corner Marian Road 2
Barangay San Martin de Porres, Parañaque City 1700

We have audited, in accordance with Philippine Standards on Auditing, the consolidated financial statements of Shakey's Pizza Asia Ventures Inc. and its subsidiaries (the Group) as at December 31, 2023 and 2022 and for each of the three years in the period ended December 31, 2023, included in this Form 17-A, and have issued our report thereon dated April 15, 2024. Our audits were made for the purpose of forming an opinion on the basic consolidated financial statements taken as a whole. The schedules listed in the Index to the Consolidated Financial Statements and Supplementary Schedules are the responsibility of the Group's management. These schedules are presented for purposes of complying with the Revised Securities Regulation Code Rule 68, and are not part of the basic consolidated financial statements. These schedules have been subjected to the auditing procedures applied in the audit of the basic consolidated financial statements and, in our opinion, fairly state in all material respects, the information required to be set forth therein in relation to the basic consolidated financial statements taken as a whole.

SYCIP GORRES VELAYO & CO.

*Christine J. Vallejo*
Christine G. Vallejo
Partner
CPA Certificate No. 99857
Tax Identification No. 206-384-906
BOA/PRC Reg. No. 0001, August 25, 2021, valid until April 15, 2024
BIR Accreditation No. 08-001998-105-2022, November 7, 2022, valid until November 6, 2025
PTR No. 10082028, January 6, 2024, Makati City

April 15, 2024



**EXHIBIT 1439 - 0149**



SyCip Gorres Velayo & Co.
6760 Ayala Avenue
1226 Makati City
Philippines

Tel: (632) 8891 0307
Fax: (632) 8819 0872
ey.com/ph

**INDEPENDENT AUDITOR'S REPORT ON**
**SUPPLEMENTARY SCHEDULE ON**
**COMPONENTS OF FINANCIAL SOUNDNESS INDICATORS**

The Stockholders and the Board of Directors
Shakey's Pizza Asia Ventures Inc.
15Km East Service Road corner Marian Road 2
Barangay San Martin de Porres, Parañaque City 1700

We have audited in accordance with Philippine Standards on Auditing, the consolidated financial statements of Shakey's Pizza Asia Ventures Inc. and its subsidiaries (the Group) as at December 31, 2023 and 2022 and for each of the three years in the period ended December 31, 2023, and have issued our report thereon dated April 15, 2024. Our audits were made for the purpose of forming an opinion on the basic consolidated financial statements taken as a whole. The Supplementary Schedule on Financial Soundness Indicators, including their definitions, formulas, calculation, and their appropriateness or usefulness to the intended users, are the responsibility of the Group's management. These financial soundness indicators are not measures of operating performance defined by Philippine Financial Reporting Standards (PFRSs) and may not be comparable to similarly titled measures presented by other companies. This schedule is presented for the purpose of complying with the Revised Securities Regulation Code Rule 68 issued by the Securities and Exchange Commission, and is not a required part of the basic consolidated financial statements prepared in accordance with PFRS. The components of these financial soundness indicators have been traced to the Group's consolidated financial statements as at December 31, 2023 and 2022 and for each of the three years in the period ended December 31, 2023 and no material exceptions were noted.

SYCIP GORRES VELAYO & CO.

Christine G. Vallejo
Partner
CPA Certificate No. 99857
Tax Identification No. 206-384-906
BOA/PRC Reg. No. 0001, August 25, 2021, valid until April 15, 2024
BIR Accreditation No. 08-001998-105-2022, November 7, 2022, valid until November 6, 2025
PTR No. 10082028, January 6, 2024, Makati City

April 15, 2024



**EXHIBIT 1439 - 0150**

**SHAKEY'S PIZZA ASIA VENTURES, INC.**
**Additional Requirements for Issuers of Securities to the Public**
**Required by the Securities and Exchange Commission**
**As at December 31, 2023**

### TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
|  | Table of Contents |  |
| A. | Financial Assets | 1 |
| B. | Amounts Receivable from Directors, Officers, Employees, Related Parties, and Principal Stockholders (Other than Related Parties) | 2 |
| C. | Amounts Receivable from Related Parties which are Eliminated during the Consolidation of Financial Statements | 3 |
| D. | Intangible Assets - Other Assets | 4 |
| E. | Long-Term Debt | 5 |
| F. | Indebtedness to Related Parties | 6 |
| G. | Guarantees of Securities of Other Issuers | 7 |
| H. | Capital Stock | 8 |

**EXHIBIT 1439 - 0151**

**SHAKEY'S PIZZA ASIA VENTURES, INC.**
**Schedule A - Financial Assets**
**As of December 31, 2023**

| HTM Investments | Name of Issuing Entity | Face Value | Amount Shown in Balance Sheet | Income Received and Accrued |
|---|---|---|---|---|
| Not applicable: The Company has no FVOCI or FPVL as at December 31, 2023. | | | | |
| **Total** | | | **-** | **-** |

**EXHIBIT 1439 - 0152**

**SHAKEY'S PIZZA ASIA VENTURES, INC.**
**Schedule B - Amounts Receivable from Employees**
**As of December 31, 2023**

| Name and Designation of Debtor | Balance at Beginning of Period | Additions | Amounts Collected | Amounts Written-off | Current | Non-Current | Balance at end of Period |
|---|---|---|---|---|---|---|---|
| DBE Project Inc. | 2,778,786 | - | 2,778,786 | - | - | - | - |
| Century Pacific Group Inc. | 3,082,080 | 7,766,842 | 7,766,842 | - | 3,082,080 | - | 3,082,080 |
| Century Pacific Foods Inc. | 9,359,643 | 26,857,813 | 26,241,597 | - | 9,975,859 | - | 9,975,859 |
| The Pacific Meat Company Inc. | 9,694,410 | 8,587,176 | 12,879,942 | - | 5,400,644 | - | 5,400,644 |
| Receivables from employees | 31,425,291 | 19,292,951 | 27,206,691 | 128,207 | 23,383,344 | - | 23,383,344 |
| | **P 56,339,210** | **P 62,504,782** | **P 76,873,858** | **P    128,207** | **P 41,841,927** | | **P   41,841,927** |

*This consists of various small amount of receivable per employee.*

**EXHIBIT 1439 - 0153**

24-          R          44-                    Page 71 of 83   Page
                        ID #:2757

**SHAKEY'S PIZZA ASIA VENTURES, INC.**

**Schedule C – Amounts Receivable from Related Parties which are Eliminated during the Consolidation of Financial Statements**

**As of December 31, 2023**

| Name and Designation of Debtor | Balance at Beginning of Period | Additions | Amounts Collected | Amounts Written-off | Current | Non Current | Balance at end of Period |
|---|---|---|---|---|---|---|---|
| Shakey's Seacrest Inc. | 211,901,003 | 112,631,047 | 265,240,919 | - | 59,291,131 | - | 59,291,131 |
| Shakey's International Ltd. | 58,297,652 | 1,546,958 | | - | 59,844,611 | - | 59,844,611 |
| Shakey's Pizza Commerce Inc. | 1,269,757,346 | 3,725,594,241 | 2,037,373,222 | - | 2,957,978,365 | - | 2,957,978,365 |
| Bakemasters Inc. | 34,037,954 | 1,663,269 | 33,862,236 | - | 1,838,987 | - | 1,838,987 |
| Wow Brand Holdings Inc. | 209,938,126 | 59,950,085 | 57,818,933 | - | 177,619,260 | - | 177,619,260 |
| | P 1,783,932,082 | P 3,901,385,600 | P2,428,745,329 | P  - | P 3,256,572,353 | P  - | P 3,256,572,353 |

EXHIBIT 1439 - 0154

**SHAKEY'S PIZZA ASIA VENTURES, INC.**
**Schedule D – Intangible Assets**
**As of December 31, 2023**

| Description | Beginning Balance | Additions at Cost | Charged to Cost and Expenses | Charged to Other Accounts | Other Changes | Ending Balance |
|---|---|---|---|---|---|---|
| Goodwill | 1,324,852,131 | - | - | - | - | 1,324,852,131 |
| Trademarks | 8,759,352,242 | 9,737,001 | - | - | - | 8,769,089,243 |
| Softwares – net | 249,428,715 | 52,909,939 | 34,784,407 | - | - | 267,554,247 |
| Franchise Rights – net | 6,253,328 | - | 949,634 | - | - | 5,303,694 |
| Total | 10,339,886,416 | 62,646,940 | 35,734,041 | - | - | 10,366,799,313 |

**EXHIBIT 1439 - 0155**

24-            R           44-                    Page 73 of 83   Page
ID #:2759

**SHAKEY'S PIZZA ASIA VENTURES, INC.**
**Schedule E – Long Term Debt**
**As of December 31, 2023**

| Bank | Beginning Balance | Availment | Payment | Ending Balance | Current | Non Current |
|------|------------------:|----------:|--------:|---------------:|--------:|------------:|
| Omnibus Loan and Security Agreement-BDO Unibank,Inc. | P3,700,000,000 | | P50,000,000 | P3,650,000,000 | P50,000,000 | P3,600,000,000 |
| Amortized debt issue costs | (2,013,037) | | (2,067,486) | (2,067,486) | | |
| Unamortized debt issue costs | (7,429,009) | | | (5,361,523) | (2,123,996) | (3,237,527) |
| BPI Loan | 1,600,000,000 | | | 1,600,000,000 | | 1,600,000,000 |
| | **P5,290,557,954** | | **P47,932,514** | **5,242,570,991** | **P47,876,004** | **5,194,694,987** |

EXHIBIT 1439 - 0156

C                              C
                                    ID

- 6 -

**SHAKEY'S PIZZA ASIA VENTURES, INC.**
Schedule  F.                    Indebtedness to Related Parties (Long-Term Loans from Related Companies)
                                December 31, 2023

| Name of Related Party | Balance at Beginning of Period | Balance at End of Period |
|---|---|---|
| Not applicable: The Company has no indebtedness to related parties as at December 31, 2023. | | |
| | ₱ - | ₱ - |

**EXHIBIT 1439 - 0157**

C                                    C
                         ID

- 7 -

**SHAKEY'S PIZZA ASIA VENTURES, INC.**
**Schedule    G.   Guarantees of Securities of Other Issuers**
              **December 31, 2023**

| Name of Issuing Entity of Securities Guaranteed by the Company for which Statement is Filed | Title of Issue of Each Class of Securities Guaranteed | Total Amount Guaranteed and Outstanding | Amount Owned by the Company for which Statement is Filed | Nature of Guarantee |
|---|---|---|---|---|
| Not applicable: The Company has no guarantees of securities of other issuers as at December 31, 2023. | | | | |
| | | ₽          - | ₽          - | |

**EXHIBIT 1439 - 0158**

24-                    R              44-                Page 76 of 83   Page
                                     ID #:2762

| | | | | Number of Shares Held By | | |
| Title of Issue | Number of Shares Authorized | Number of Shares Issued and Outstanding | Number of Shares reserved for options, warrants, conversion and other rights | Related Parties | Directors, Officers and Employees | Others |
|---|---|---|---|---|---|---|
| **SHAKEY'S PIZZA ASIA VENTURES, INC.** Schedule H – Capital Stock As of December 31, 2023 | | | | | | |
| **Common Shares** | 2,000,000,000 | 1,683,760,178 | | 1,294,529,898 | 4,209,400 | 385,020,880 |

EXHIBIT 1439 - 0159

C                              C        ID

Annex A

**Reconciliation of Retained Earnings**
**Available for Declaration**

As at December 31, 2023

SHAKEY'S PIZZA ASIA VENTURES, INC.
WOW SHAKEY'S CENTER, KM 15 EAST
SERVICE ROAD COR. MARRIAN ROAD,
SAN MARTIN DE PORRES,
PARANAQUE CITY

| Items | Amount |
|---|---|
| Unappropriated Retained Earnings, beginning | 2,594,937,323 |
| Adjustments: | |
|     Deferred tax assets (excluding the cumulative tax effect on actuarial gain on defined benefit obligation) | (342,924,572) |
| Unappropriated Retained Earnings, as adjusted, beginning | 2,252,012,751 |
| | |
| Net Income based on the face of AFS | 1,398,623,408 |
| Less: Non-actual losses | - |
|     Change in deferred tax assets (excluding tax effect on actuarial gain during the year) | (51,320,180) |
|     Realized foreign exchange gain, except those attributable to Cash and cash equivalents | (2,271,906) |
| | |
| Net Income Actual/Realized | 1,345,031,322 |
| | |
| Adjustments: | |
|     Dividend declarations during the year | (168,376,017) |
|     Reversal of appropriations | - |
|     Appropriation for the year | - |
| | |
| **Unappropriated Retained Earnings, as adjusted, ending** | **3,428,668,056** |

**EXHIBIT 1439 - 0160**

**SHAKEY'S PIZZA ASIA VENTURES INC.**
**CONSOLIDATED COMPANY STATEMENTS OF FINANCIAL POSITION**

| | 2023 | 2022 |
|---|---|---|
| **ASSETS** | | |
| **Current Assets** | | |
| Cash and Cash Equivalents | 901,147,527 | 989,578,790 |
| Trade and other receivables | 1,224,789,572 | 1,133,066,392 |
| Inventories | 1,712,217,989 | 1,001,114,060 |
| Prepaid and other current assets | 635,187,293 | 730,884,353 |
| Total Current Assets | 4,473,342,381 | 3,854,643,595 |
| **Noncurrent Assets** | | |
| Property and equipment - net | 1,833,780,584 | 1,764,723,406 |
| Intangible Assets | 10,366,799,313 | 10,339,886,416 |
| Right-of-use Assets | 1,540,630,889 | 1,443,780,579 |
| Rental and otheer deposits | 309,113,711 | 270,164,540 |
| Deferred input value-added tax | 3,886,410 | 9,653,323 |
| Deferred tax assets | 100,394,721 | 25,566,418 |
| Total Noncurrent Assets | 14,154,605,628 | 13,853,774,682 |
| **TOTAL ASSETS** | 18,627,948,009 | 17,708,418,277 |
| | | |
| **LIABILITIES AND EQUITY** | | |
| **Current Liabilities** | | |
| Accounts payable and other current liabilities | 1,753,136,296 | 2,132,213,295 |
| Short-term loans payable | 700,000,000 | 500,000,000 |
| Current portion of: | | |
|    Long-term loans payable | 47,876,004 | 47,932,514 |
|    Lease liabilities | 275,584,146 | 58,902,122 |
|    Contract liabilities | 30,059,596 | 13,445,337 |
| Income tax payable | 142,150,319 | 52,155,804 |
| Total Current Liabilities | 2,948,806,361 | 2,804,649,072 |
| **Noncurrent Liabilities** | | |
| Loan payable - net of current portion | 5,194,694,987 | 5,242,625,440 |
| Contract liabilities - net of current portion | 117,882,366 | 61,226,844 |
| Accrued pension costs | 117,600,878 | 86,599,794 |
| Lease liability | 1,555,254,353 | 1,641,116,052 |
| Dealer's deposits and other noncurrent liabilities | 106,626,720 | 146,635,403 |
| Deferred tax liabilities | 627,872,928 | 679,788,566 |
| Total Noncurrent Liabilities | 7,719,932,232 | 7,857,992,099 |
| Total Liabilities | 10,668,738,593 | 10,662,641,171 |
| **Equity** | | |
| Capital stock | 1,683,760,178 | 1,683,760,178 |
| Additional Paid In Capital | 2,451,116,470 | 2,451,116,470 |
| Retained Earnings | 3,788,433,048 | 2,877,362,495 |
| Other components of equity | 35,899,720 | 33,537,963 |
| Total Equity | 7,959,209,416 | 7,045,777,106 |
| | 18,627,948,009 | 17,708,418,277 |

**EXHIBIT 1439 - 0161**

1    4
I    5

**SHAKEY'S PIZZA ASIA VENTURES INC.**
**CONSOLIDATED COMPANY STATEMENTS OF COMPREHENSIVE INCOME**

| | 2023 | 2022 |
|---|---|---|
| **REVENUES FROM CONTRACTS WITH CUSTOMER** | **12,823,923,008** | 10,142,024,578 |
| **COSTS OF SALES** | **9,673,051,933** | (7,546,508,401) |
| **GROSS INCOME** | **3,150,871,075** | 2,595,516,177 |
| **GENERAL AND ADMINISTRATIVE EXPENSES** | **(1,570,509,929)** | (1,222,810,270) |
| **INTEREST EXPENSES** | **(361,489,106)** | (323,971,110) |
| **OTHER INCOME - Net** | **25,538,682** | 49,680,141 |
| **INCOME BEFORE INCOME TAX** | **1,244,410,722** | 1,098,414,938 |
| **PROVISION FOR (BENEFIT FROM) INCOME TAX** | | |
| Current | **(291,971,466)** | (140,130,584) |
| Deferred | **127,007,314** | (83,882,273) |
| | **(164,964,152)** | (224,012,857) |
| **NET INCOME** | **1,079,446,570** | 874,402,081 |
| **OTHER COMPREHENSIVE INCOME (LOSS)** | | |
| Other comprehensive income (loss) not to be reclassified to profit or loss in subsequent periods (net of tax) - | | |
| Actuarial loss on defined benefit obligation | **3,233,804** | 54,741,546 |
| Tax effect | **(872,047)** | (13,641,238) |
| **TOTAL OTHER COMPREHENSIVE INCOME** | **2,361,757** | 41,100,308 |
| **TOTAL COMPREHENSIVE INCOME** | **1,081,808,327** | 915,502,389 |
| **Basic/Diluted Earnings Per Share** | **0.64** | 0.52 |

**EXHIBIT 1439 - 0162**

C                                    D
                          ID

**SHAKEY'S PIZZA ASIA VENTURES INC.**
**FINANCIAL SOUNDNESS INDICATORS-FINANCIAL INDICATOR**
As of December 31, 2023

| Ratio | Formula | | Current Year | Prior Year |
|---|---|---|---|---|
| Current ratio | | | 1.52x | 1.37x |
| | Total Current Assets | 4,473,342,381 | | |
| | Divide by: Total Current Liabilities | 2,948,806,361 | | |
| | Current Ratio | 1.52 | | |
| Quick/Acid test ratio | | | 0.72x | 0.76x |
| | Total Current Assets | 4,473,342,381 | | |
| | Less: Inventories | (1,712,217,989) | | |
| | Prepayments and | | | |
| | other Current Assets | (635,187,293) | | |
| | Quick assets | 2,125,937,099 | | |
| | Divide by: Total Current Liabilities | 2,948,806,361 | | |
| | Quick/Acid test ratio | 0.72 | | |
| Debt-to-equity ratio | | | 1.34x | 1.51x |
| | Total Liabilties | 10,668,738,593 | | |
| | Divide by: Total Equity | 7,959,209,416 | | |
| | Debt-to-equity ratio | 1.34 | | |
| Gearing ratio | | | 0.75x | 0.82x |
| | Interest bearing liabilities | 5,942,570,991 | | |
| | Divide by: Total Equity | 7,959,209,416 | | |
| | Gearing ratio | 0.75 | | |
| Net Gearing ratio | | | 0.63x | 0.68x |
| | Interest bearing liabilities | 5,942,570,991 | | |
| | Minus: Cash | 901,147,527 | | |
| | Net | 5,041,423,464 | | |
| | Divide by: Total Equity | 7,959,209,416 | | |
| | Net Gearing ratio | 0.63 | | |
| Asset-to-equity ratio | | | 2.34x | 2.51x |
| | Total Assets | 18,627,948,009 | | |
| | Divide by: Total Equity | 7,959,209,416 | | |
| | Asset-to-equity ratio | 2.34 | | |
| Interest rate coverage ratio | | | 3.44x | 3.39x |
| | EBIT | 1,244,410,722 | | |
| | Divide by: Interest Expenses | 361,489,106 | | |
| | Interest rate coverage ratio | 3.44 | | |
| Working capital turnover | | | 8.41x | 9.66x |
| | Net Sales | 12,823,923,008 | | |
| | Divide by: Working capital | | | |
| | Current Assets | 4,473,342,381 | | |
| | Less: Current Liabilities | (2,948,806,361) | | |
| | Working Capital | 1,524,536,020 | | |
| | Working Capital Turnover | 8.41 | | |
| Return on equity | | | 13.56% | 12.41% |
| | Net Income | 1,079,446,570 | | |
| | Divide by: Total Equity | 7,959,209,416 | | |
| | Return on equity | 13.56% | | |
| Return on assets | | | 5.79% | 4.94% |
| | Net Income | 1,079,446,570 | | |
| | Divide by: Total Assets | 18,627,948,009 | | |
| | Return on assets | 5.79% | | |
| Earnings per share | | | 0.64 | 0.52 |
| | Net Income | 1,079,446,570 | | |
| | Average No. of shares | 1,683,760,178 | | |
| | Earnings per share | 0.64 | | |

**EXHIBIT 1439 - 0163**

**SHAKEY'S PIZZA ASIA VENTURES INC.**
**CONGLOMERATE MAP**
**AS OF DECEMBER 31, 2023**



EXHIBIT 1439 - 0164

C                              C
                                    ID

## [EXT] Your BIR AFS eSubmission uploads were received

eafs@bir.gov.ph <eafs@bir.gov.ph>

Sun 4/21/2024 9:55 PM

To:Tax Section <taxsection@shakeys.biz>
Cc:MPPINON@SHAKEY.BIZ <MPPINON@SHAKEY.BIZ>

Hi SHAKEY'S PIZZA ASIA VENTURES INC,

**Valid file**

- EAFS000163396AFSTY122023.pdf

**Invalid file**

- \<None\>

Transaction Code: **AFS-0-B6LCDGD7099DH9G69MQ2XYPTY04ZYQ2TP3**
Submission Date/Time: **Apr 21, 2024 09:55 PM**
Company TIN: **000-163-396**

Please be reminded that you accepted the terms and conditions for the use of this portal and expressly agree, warrant and certify that:

- The submitted forms, documents and attachments are complete, truthful and correct based on the personal knowledge and the same are from authentic records;
- The submission is without prejudice to the right of the BIR to require additional document, if any, for completion and verification purposes;
- The hard copies of the documents submitted through this facility shall be submitted when required by the BIR in the event of audit/investigation and/or for any other legal purpose.

This is a system-generated e-mail. Please do not reply.

**EXHIBIT 1439 - 0165**

4/21/24, 9





# File Upload



**All files successfully uploaded**

**Transaction Code:**
**AFS-0-B6LCDGD7099DH9G69MQ2XYPTY04ZYQ2TP3**

**Submission Date/Time:**
**Apr 21, 2024 09:55 PM**

⬆ Back To Upload

Copyright © **2020 EZY Infotech Inc.** All Rights Reserved.                Version 1.0.2.0

**EXHIBIT 1439 - 0166**