1  TODD M. LANDER (BAR NO. 173031)
   todd.lander@ffslaw.com
2  ARASH BERAL (BAR NO. 245219)
   arash.beral@ffslaw.com
3  JEFFREY S. GOODFRIED (BAR NO. 253804)
   jeffrey.goodfried@ffslaw.com
4  KELSEY L. HOTCHKISS (BAR NO. 282486)
   kelsey.hotchkiss@ffslaw.com
5  FREEMAN, FREEMAN & SMILEY, LLP
   1888 Century Park East, Suite 1900
6  Los Angeles, California 90067
   Telephone: (310) 255-6100
7  Facsimile: (310) 255-6200

8  Attorneys for Defendants and Cross-
   Complainants PCJV USA, LLC, GUY KOREN,
9  NKM CAPITAL GROUP, LLC, J & K
   AMERICANA, LLC, J & K CULVER, LLC,
10 J&K LAKEWOOD, LLC, J&K OAKRIDGE,
   LLC, J&K VALLEY FAIR, LLC, J & K
11 CAPITAL 2, LLC, J & K ONTARIO, LLC, J&K
   PC TRUCKS, LLC, J&K CONSULTANTS
12 GROUP, LLC, GK CAPITAL GROUP, LLC, and
   POTATO CORNER LA GROUP, LLC, and
13 Cross-Complainants PCI TRADING, LLC,
   ALON KOREN, THOMAS HODGSON, EMILY
14 GARCIA, and ASHLEY GRUDNOWSKI

15

16            **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

17            **COUNTY OF LOS ANGELES, CENTRAL DISTRICT**

18

19 CINCO CORPORATION, a Philippines              Case No. BC701075
   corporation; POTATO CORNER                     [Related with Case No. BC706000]
20 INTERNATIONAL, INC., a Delaware
   corporation,                                   **VERIFIED FIRST AMENDED CROSS-**
21                                                 **COMPLAINT OF CROSS-**
              Plaintiffs,                          **COMPLAINANTS PCJV USA, LLC, PCI**
22                                                 **TRADING LLC, POTATO CORNER LA**
              vs.                                  **GROUP, LLC, NKM CAPITAL GROUP,**
23                                                 **LLC, J & K AMERICANA, LLC, J&K**
                                                   **LAKEWOOD, LLC, J & K CULVER,**
24 GUY KOREN, an individual; NKM                  **LLC, J&K OAKRIDGE, LLC, J&K**
   CAPITAL GROUP, LLC, a California limited        **VALLEY FAIR, LLC, J & K CAPITAL 2,**
25 liability company; J & K AMERICANA,            **LLC, J & K ONTARIO, LLC, J&K PC**
   LLC, a California limited liability company;    **TRUCKS, LLC, J&K CONSULTANTS**
26 J & K CULVER, LLC, a California limited         **GROUP, LLC, GK CAPITAL GROUP,**
   liability company; J&K LAKEWOOD, LLC,           **LLC, GUY KOREN, ALON KOREN,**
27 a California limited liability company; J&K     **THOMAS HODGSON, EMILY GARCIA,**
   OAKRIDGE, LLC, a California limited             **AND ASHLEY GRUDNOWSKI FOR:**
28 liability company; J&K VALLEY FAIR, LLC,

3818668.1

VERIFIED FIRST AMENDED CROSS-COMPLAINT

CONFORMED COPY
ORIGINAL FILED
Superior Court Of California
County Of Los Angeles

OCT 10 2018

Sherri R. Carter, Executive Officer/Clerk
By: Claudette Jasper, Deputy

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

Exhibit 73 - page 1

| | |
|---|---|
| 1 | a California limited liability company; J & K CAPITAL 2, LLC, a California limited |
| 2 | liability company; J & K ONTARIO, LLC, a California limited liability company; J&K PC |
| 3 | TRUCKS, LLC, a California limited liability company; J&K CONSULTANTS GROUP, |
| 4 | LLC, a California limited liability company; GK CAPITAL GROUP, LLC, a California |
| 5 | limited liability company; POTATO CORNER LA GROUP, LLC, a California limited |
| 6 | liability company; and DOES 1 through 25, inclusive, |
| 7 | |
| | Defendants, |
| 8 | |
| 9 | – and – |
| 10 | PCJV USA, LLC, a Delaware limited liability company, |
| 11 | |
| | Nominal Defendant. |
| 12 | |

| | |
|---|---|
| 1. | **CONSPIRATORIAL FRAUD;** |
| 2. | **BREACH OF WRITTEN CONTRACT;** |
| 3. | **ANTICIPATORY REPUDIATION;** |
| 4. | **FRAUDULENT INDUCEMENT;** |
| 5. | **BREACH OF ORAL CONTRACT;** |
| 6. | **BREACH OF IMPLIED-IN-FACT CONTRACT;** |
| 7. | **BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;** |
| 8. | **BREACH OF FIDUCIARY DUTY;** |
| 9. | **INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS;** |
| 10. | **INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS;** |
| 11. | **NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS;** |
| 12. | **INDUCING BREACHES OF CONTRACT;** |
| 13. | **NEGLIGENCE;** |
| 14. | **CONVERSION;** |
| 15. | **MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF CAL. CIVIL CODE §§ 3426, *ET SEQ.*;** |
| 16. | **UNFAIR COMPETITION IN VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ.*;** |
| 17. | **ACCOUNTING;** |
| 18. | **RESTITUTION TO AVOID UNJUST ENRICHMENT;** |
| 19. | **DECLARATORY RELIEF;** |
| 20. | **REFORMATION;** |
| 21. | **IMPLIED/EQUITABLE INDEMNITY; AND** |
| 22. | **COMPARATIVE INDEMNITY AND APPORTIONMENT OF FAULT** |

13 | PCJV USA, LLC, a Delaware limited liability company; PCI TRADING LLC, a Delaware

14 | limited liability company; POTATO CORNER LA GROUP, LLC, a California limited

15 | liability company; NKM CAPITAL GROUP, LLC, a California limited liability company; J

16 | & K AMERICANA, LLC, a California limited liability company; J&K LAKEWOOD, LLC, a

17 | California limited liability company; J & K CULVER, LLC, a California limited liability

18 | company; J&K OAKRIDGE, LLC, a California limited liability company; J&K

19 | VALLEY FAIR, LLC, a California limited liability company; J & K CAPITAL 2, LLC, a

20 | California limited liability company; J & K ONTARIO, LLC, a California limited liability

21 | company; J&K PC TRUCKS, LLC, a California limited liability company; J&K

22 | CONSULTANTS GROUP, LLC, a California limited liability company; GK CAPITAL

23 | GROUP, LLC, a California limited liability company; GUY KOREN, an individual;

24 | ALON KOREN, an individual; THOMAS HODGSON, an individual; EMILY GARCIA,

25 | an individual; ASHLEY GRUDNOWSKI, an individual,

26 |

Cross-Complainants,

27 |

vs.

28 |

**Assigned for All Purposes to the Hon. Rafael Ongkeko, Dept. 73**

Action Filed:     April 10, 2018

3818668.1

2

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**Exhibit 73 - page 2**

1 │ CINCO CORPORATION, a Philippines
corporation; POTATO CORNER
2 │ INTERNATIONAL, INC., a Delaware
Corporation; HIGHFIVE CORPORATION, a
3 │ Philippines corporation; JOSE P.
MAGSAYSAY, JR., an individual; JOSE
4 │ MIGUEL MA. MONTINOLA, an individual;
RICARDO ENRIQUE K. MONTELIBANO,
5 │ an individual; MA. VICTORIA O.
BERMEJO, an individual; BEN OLIVAS, an
6 │ individual; JOHN EDWARD HERNANDEZ,
an individual; CHAD DOMINIC
7 │ HERNANDEZ, an individual; MIGUEL
RAYMUNDO HERNANDEZ, an individual;
8 │ MYROSE VICTOR, an individual; MARIVIC
DEL PILAR, an individual; JOSE MARCO
9 │ DEL PILAR, an individual; DIA LACABA,
an individual; NICARDO FALCIS, an
10 │ individual; AMIR JACOBY, an individual;
INBAL JACOBY, an individual; and ROES 1
11 │ through 500, inclusive,

12 │      Cross-Defendants.

13

14 Cross-Complainants PCJV USA, LLC, PCI TRADING LLC, POTATO CORNER LA

15 GROUP, LLC, NKM CAPITAL GROUP, LLC, J & K AMERICANA, LLC, J&K LAKEWOOD,

16 LLC, J & K CULVER, LLC, J&K OAKRIDGE, LLC, J&K VALLEY FAIR, LLC, J & K

17 CAPITAL 2, LLC, J & K ONTARIO, LLC, J&K PC TRUCKS, LLC, J&K CONSULTANTS

18 GROUP, LLC, GK CAPITAL GROUP, LLC, GUY KOREN, ALON KOREN, THOMAS

19 HODGSON, EMILY GARCIA, and ASHLEY GRUDNOWSKI (collectively, "Cross-

20 Complainants") complain of Cross-Defendants CINCO CORPORATION, POTATO CORNER

21 INTERNATIONAL, INC., HIGHFIVE CORPORATION, JOSE P. MAGSAYSAY, JR., JOSE

22 MIGUEL MA. MONTINOLA, RICARDO ENRIQUE K. MONTELIBANO, MA. VICTORIA O.

23 BERMEJO, BEN OLIVAS, JOHN EDWARD HERNANDEZ, CHAD DOMINIC

24 HERNANDEZ, MIGUEL RAYMUNDO HERNANDEZ, MYROSE VICTOR, MARIVIC DEL

25 PILAR, JOSE MARCO DEL PILAR, DIA LACABA, NICARDO FALCIS, AMIR JACOBY,

26 INBAL JACOBY (collectively, "Cross-Defendants", and each a "Cross-Defendant"), and ROES 1

27 through 500, inclusive, and allege as follows:

28

3818668 1
3
VERIFIED FIRST AMENDED CROSS-COMPLAINT

**Exhibit 73 - page 3**

1

# BACKGROUND

2    1.    This action pits the interests of parties (the Cross-Complainants), on whose
3  respective backs the United States' arm of Potato Corner – a quick service restaurant chain – was
4  built, against foreign and domestic collaborators whose sole mission it is to invade forcibly and
5  conquer all Potato Corner United States operations in strict derogation of Cross-Complainants'
6  contractual, legal, and equitable rights. It took nearly two months for the Los Angeles Superior
7  Court to foil Cross-Defendants' plot and issue preliminary injunctive relief in favor of Guy Koren
8  ("Koren") and against Cinco Corporation ("Cinco") in June 2018, and in doing so exposing the true
9  reality behind Cross-Defendants' intentions. The Court's own words underscore the perfidious
10  roots of the Cross-Defendants' motives: *"there is evidence Cinco's efforts to oust Koren were*
11  *precipitated by a dispute unrelated to his performance as President,"* specifically alluding to the
12  *"alleged breaches of the right of first refusal"* as the linchpin of Cross-Defendants' subterfuge.
13  *See* Preliminary Injunction entered June 18, 2018 (at p. 19), a true and correct copy of which is
14  attached hereto as **Exhibit "A"** and incorporated by reference herein.

15    2.    Indeed, the last few months have stripped the thin veneer of authenticity from Cross-
16  Defendants' conduct and confirmed what Cross-Complainants knew instinctively from the outset of
17  this ill-conceived litigation: Cross-Defendants' ambush of Cross-Complainants has nothing
18  whatever to do with Koren's management of PCJV USA, LLC ("PCJV"), but instead is rooted in
19  Cross-Defendants' effort to salvage the sale of 55% of Cinco's shares to an outside group (the
20  Hernandez Group, defined below) that had no interest in taking control of PCJV – Potato Corner's
21  U.S. arm – unless it could manage the company and its profits. Cross-Defendants knew, under
22  PCJV's governing documents, that Cinco was required to obtain – through his individual and
23  corporate capacity – Koren's consent and extend him a right of first refusal in connection with any
24  sale of Cinco's interests. But Koren was the architect of PCJV, the very reason Potato Corner
25  found its way to American shores, and Cross-Defendants knew that Koren would exercise that right
26  of first refusal as he was contractually permitted to do (and which the parties had contemplated
27  from the outset). Hungry to put its hands on the millions of dollars the Hernandez Group was
28  willing to pay coupled with the Hernandez Group's zealous and unyielding effort to gain majority

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3818668.1                                      4

**Exhibit 73 - page 4**

1 control of Cinco, Cinco and its shareholders instead ignored their contractual obligations and
2 proceeded with the sale. And then, in service to their new master's insistence on absolute control,
3 and to circumvent Koren, Cinco (in collusion with the Hernandez Group) secretly plotted with
4 Amir and Inbal Jacoby (the "Jacobys") who worked with Koren – likely with promises of financial
5 and/or other incentives – to oust Koren from the business that Koren conceived and built. Cinco
6 and its shareholders now lay claim to the millions of dollars they so clearly wanted, and have
7 illegally allowed the Hernandez Group to occupy Cinco's interests, unlawfully obtain access to
8 Potato Corner's confidential information, improperly exert control over this litigation, and
9 fraudulently attempt to lay claim over Potato Corner's United States operations.

10    3.    The above only begins to scratch the surface of Cross-Defendants' transgressions –
11 both past and present. In fact, *as soon as a tentative ruling was issued by the Court in favor of*
12 *Koren on the Preliminary Injunction*, Cross-Defendants scurried to misappropriate information and
13 engage in transparently hostile acts against Cross-Complainants. *And after the Preliminary*
14 *Injunction was entered*, Cross-Defendants mounted an illegal campaign of sabotage and
15 interference aimed at Cross-Complainants, in one instance unilaterally and without explanation
16 *tripling* the price the United States operations would have to pay for ingredients and products
17 ultimately sold to United States franchisees. In other instances, Cross-Defendants continue to run
18 promotions and marketing schemes accessible in the United States without Cross-Complainants'
19 knowledge or consent, leading to confusion in the marketplace and various other harm to the
20 American operations and their franchisees. To this day, several Cross-Defendants lay claim to
21 funds held in at least one bank account belonging to PCI Trading, LLC ("PCI Trading") – PCJV's
22 sister company – and refuse to return those funds. They also maintain an office in the United States
23 – which they leased on behalf of PCJV – that can only be viewed as an unfair and improper effort to
24 compete with Cross-Complainants.

25    4.    In normal circumstances, these actions would surprise even the hardened cynic but
26 Cross-Complainants are informed and believe that these actions are typical of the Hernandez Group
27 and those associated with them. Since the institution of this lawsuit, Cross-Complainants have
28 learned that the Hernandez Group is engaged in active efforts to control all of Cinco's ***global***

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3818668 1
5
VERIFIED FIRST AMENDED CROSS-COMPLAINT

**Exhibit 73 - page 5**

1  operations in derogation of rights of parties who stand in the same shoes as Cross-Complainants in

2  at least one other country. This "stop-at-nothing" approach to usurping power comes in the wake of

3  serious allegations by famous Filipino actress and daughter of Corazon Aquino (the 11th President

4  of the Philippines) and sister of Benigno S. Aquino III (the 15th President of the Philippines), Kris

5  Aquino, that she suffered serious betrayal and financial abuse at the hands of parties associated with

6  Potato Corner in the Philippines causing her to fall physically ill as a result. While she did not

7  specifically name the alleged perpetrators, her allegations appear to be directed at members of the

8  Hernandez Group with which she has a business relationship. The Hernandez Group's *modus*

9  *operandi* is clear: slash-and-burn, scorched earth, no holds barred, take no prisoners, and the

10  consequences and victims be damned.

11  <center>**SUMMARY OF THE DISPUTE**</center>

12  5.      The specific facts of this sordid tale, alleged in detail below, are stark. Koren, who

13  long dreamed of bringing his entrepreneurial talents to the United States, conjured the idea of

14  bringing the popular Potato Corner French Fries chain – which he'd come to appreciate as a child of

15  an Israeli diplomat in the Philippines years before – to this country. Acquiring Cinco's agreement,

16  and, specifically, that of its CEO, Jose P. Magsaysay, Jr. ("Magsaysay"), to enable him to initially

17  open up to 15 Potato Corner outlets of his own (with exclusivity in heavily populated areas in

18  California) and with the expectation that he could later expand to other territories, Koren (along

19  with several investors) opened his first American Potato Corner store (the first in this country) in

20  Santa Anita, California in February 2010. Later that same year, Cinco and its four 25% equal

21  shareholders (Cinco along with its shareholders collectively known as the "Cinco Group") promised

22  – and Koren agreed based on certain guarantees made to Koren – to lead the efforts in expanding

23  and franchising Potato Corner to third party franchisees in the United States and Israel, while also

24  maintaining his exclusive rights to have an ownership stake in 15 of his own Potato Corner outlets.

25  Those would come to serve – at Koren's and his investors' expense – as the principal research and

26

27

28

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**Exhibit 73 - page 6**

1  development test stores in the United States.[1]  Magsaysay, who was like a father to Koren,

2  repeatedly promised Koren that Koren would one day come to own Cinco and its global interests,

3  i.e., Potato Corner in its entirety, which induced Koren to dedicate his life to this business

4  enterprise.[2]

5       6.     At the time Koren and Cinco initially agreed to Potato Corner's American

6  expansion, Koren was not in a position to fund the new operations.  In came Amir Jacoby, with

7  whom Koren agreed to a straightforward and common structure – Koren would provide the time,

8  labor and expertise essential to building the franchises, and Amir Jacoby would provide the capital.

9  Koren thus expanded Potato Corner into the United States opening a handful of stores (some that

10  failed and some that succeeded) over the ensuing years of his own and franchising over four times

11  as many to third party franchisees, all in accordance with this paradigm.  Koren, for his part,

12  worked tirelessly as these start-up businesses experienced various growing pains.  While a few of

13  those growing pains were natural to any new enterprise, they were largely caused by the Cinco

14  Group's utter neglect and reckless attitude towards its new U.S. business partner.[3]  Indeed, as

15  alleged below, while the Cinco Group made certain promises to induce Koren to devote years of his

16  life to this business enterprise, the Cinco Group in actuality never had an intent to fulfill those

17  promises.  The Cinco Group effectively and instead left Koren on an island, providing little to no

18

---

19  [1] By virtue of the fact that Koren was the principal reason behind Potato Corner's expansion to the

20  United States along with the fact that the outlets in which Koren maintains an interest were used
for testing, market research, development, training, establishing proof of concept, enticing

21  potential franchisees, and other efforts ultimately benefitting PCJV and its franchisees, it was
agreed at the outset that Koren's outlets would always be exempt from any payment of franchise

22  fees, royalties, or other charges owing to PCJV.

23  [2] Indeed, these representations drove Koren to continue his efforts at Potato Corner and put his
personal life on hold despite the fact that the business enterprise was not profitable for several

24  years and Koren hardly received any compensation for his work.  In fact, at some point in or about
2012 or 2013, the Cinco Group felt so terrible about Koren's financial predicament that they

25  issued a $20,000 loan to PCJV for Koren's benefit to help pay for Koren's living expenses.

26  [3] The Cinco Group, focused on their own self-interests, even went so far as to appoint their
franchising consultant, Erlinda Bartolome ("Bartolome"), to communicate with Cross-

27  Complainants, so that the Cinco Group did not have to and could limit the time they would have to
devote to PCJV.  Bartolome later came to be appointed as PCJV's Corporate Secretary and in fact

28  became a critically important member of PCJV's operations.

---

7

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1800
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**Exhibit 73 - page 7**

1 | support and routinely resorting to both negligent and hostile conduct that significantly damaged the
2 | U.S. business interests and greatly undermined their growth.

3      7.      By 2017, however, and because of Koren's efforts, the businesses gained traction
4 | and established themselves. Koren had, through determination and sweat equity, constructed a
5 | successful franchise business. In or about the same time period, however, an internal dispute
6 | rocked Cinco and its shareholders which involved, upon information and belief, Magsaysay, Cinco
7 | shareholder Ricardo Enrique K. Montelibano ("Montelibano"), and Cinco shareholder Ma. Victoria
8 | O. Bermejo ("Bermejo"). As a result of this internal dispute, rumors floated that Cinco and its
9 | shareholders were interested in selling off their shares.

10      8.      Consequently, on March 1, 2017, Koren sent a letter to the Cinco Group in which he
11 | addressed the rumors, and reminded the Cinco Group of their transfer restrictions and the right of
12 | first refusal provisions under the parties' agreements (which provisions Magsaysay had first insisted
13 | upon so that neither group – nor the members of that group – could sell any equity interests to
14 | outsiders without consent and without extending a right of first refusal). That letter made clear that
15 | Koren was exercising the right to purchase the shares, if offered, based upon the agreed-to formula
16 | in the parties' governing agreements.

17      9.      Cross-Complainants have since learned that just a few weeks after receipt of Koren's
18 | letter, the Cinco Group secretly sold their shares to an outside group controlled by John Edward
19 | Hernandez ("Hernandez") (Hernandez, collectively with persons associated with him are commonly
20 | known and referred to herein as the "Hernandez Group"). Hernandez, for his part, submitted a
21 | declaration under oath in this case attesting to the fact that he "became Chairman of the Board of
22 | Cinco in June 2017, after [his] family, together with its business interests, purchased a 55% interest
23 | in Cinco from its then existing shareholders," and that he – Hernandez – "was personally involved
24 | in this transaction and the negotiations leading to it." But, Cross-Complainants are informed and
25 | believe, and thereupon allege, that the Hernandez Group were fully aware of the transfer restrictions
26 | and rights of first refusal provisions of PCJV's governing documents before acquiring the 55%
27 | stake in Cinco. Cross-Complainants are further informed and believe, and thereupon allege, that
28 | the Hernandez Group exploited the internal Cinco dispute such that they first sought to acquire a

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3818668 1

8

VERIFIED FIRST AMENDED CROSS-COMPLAINT

**Exhibit 73 - page 8**

1 10% interest from each of Magsaysay, Montelibano, and Cinco shareholder Jose Miguel Ma. G.

2 Montinola ("Montinola"), and then induced Bermejo to sell her entire 25% share in Cinco in order

3 to acquire the majority 55% interest in Cinco.

4       10.     Hernandez's plan worked, and the two groups (Cinco and Hernandez) effectively

5 conspired together to transact equity interests in conscious derogation of Koren's and his group's

6 rights, and with the specific intent to permit Hernandez and his group to exercise unfettered control

7 over voting and management rights in PCJV. During the apparently months-long due diligence

8 period, however, the transacting parties continued to conceal that transaction from Koren and his

9 group, and they never once informed Koren that the Hernandez Group was intent on acquiring or

10 had actually acquired a 55% interest in Cinco.

11       11.     In fact, Koren and his team were introduced to members of the Hernandez Group

12 much later in 2017, long after the Cinco-Hernandez transaction was apparently completed. Koren

13 and his group, of course, objected to the Hernandez Group's acquisition of Cinco's shares and

14 refused to accept them as their new business partners. But in order to appease Koren and avoid a

15 potential rescission of the Cinco-Hernandez transaction and exercise of the right of first refusal

16 provision (effectively, to salvage their deal), members of the Cinco Group (purportedly comprising

17 then also the Hernandez Group) specifically agreed in or about November 2017 that PCJV shall be

18 owned 100% by Koren's group and that the PCJV-Cinco relationship shall solely be governed by a

19 Master License Agreement.

20       12.     In accordance with that November 2017 agreement in principle, on February 13,

21 2018, Koren forwarded a proposed term sheet for the Master License Agreement for review. But

22 for reasons then unknown, Cinco reneged on that agreement and refused to proceed with it. Koren

23 is informed and believes, and thereupon alleges, that the primary reason for Cinco's change of heart

24 was due to efforts led principally by Amir Jacoby (Koren's business partner) to interfere and induce

25 Cinco not to proceed with it. To that end, a mere 9 days following the transmission of the February

26 13, 2018 term sheet, Amir Jacoby began to unilaterally and unlawfully withdraw money (defined

27 below as the "Unauthorized Jacoby Withdrawals") from various bank accounts tied to Potato

28 Corner's United States operations. Then, when Koren (as the person charged with management of

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3818668.1

9

**Exhibit 73 - page 9**

1  all of the business operations) lawfully and justifiably changed the business' banking relationship in
2  order to safeguard the company funds from Amir Jacoby's continuing raid, Amir Jacoby colluded
3  with the Cross-Defendants to push Koren out of the business altogether.

4      13.    The final acts were concocted and purported "meetings" of the management of PCJV
5  in April 2018, where, with Darwinian calculation, the Cross-Defendants purported to eject Koren as
6  an owner and manager of the entire enterprise, and initiate litigation against him through an uber-
7  aggressive (albeit, conflicted) 4,200-lawyer law firm DLA Piper, LLP, one of which partners – Ben
8  Olivas ("Olivas") – maintains an ownership interest in Potato Corner International, Inc. ("PCI"),
9  Cinco's alter ego in the United States. Cinco, through their lawyers, managed to not only file this
10 litigation against Koren (the very day following the first "meeting" purporting to eject him from
11 PCJV), but it also filed separate litigation *on behalf of PCJV in a verified pleading made under oath*
12 against several individuals (who are joined as Cross-Complainants here) alleging, among other
13 things, that they all converted and misappropriated funds belonging to PCJV. (These parties are
14 now forced to seek declaratory relief in this action so as to clear their names of any alleged
15 wrongdoing.)

16     14.    For all its sound and fury, however, Cinco's April 2018 attempts to remove Koren
17 were improper, ultimately leading the Court to issue preliminary injunctive relief in favor of Koren
18 and against Cinco. The one upshot of the preliminary injunction proceedings was that it revealed,
19 to some extent, the nature and timing of the Cinco-Hernandez transaction and the Hernandez
20 Group's obvious efforts to control PCJV. The Hernandez Group in fact has no legal right to control
21 or manage PCJV in any respect, as this action seeks to establish. Among other things, the
22 Hernandez-Cinco transaction must be rescinded and equitable or legal relief provided such that, for
23 example, the 55% shares of Cinco are transferred to Koren in his individual or corporate capacity in
24 order to right the wrongs of Cross-Defendants. Cross-Complainants also seek damages
25 (compensatory, special, and punitive), restitution, imposition of constructive trusts, injunctive and
26 declaratory relief, attorneys' fees and costs, interest, and all other relief the Court deems
27 appropriate.
28 ///

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**Exhibit 73 - page 10**

## THE PARTIES

15.     Cross-Complainant PCJV is, and at all relevant times was, a limited liability company organized and existing under the State of Delaware, maintaining its principal place of business within the County of Los Angeles, State of California.

16.     Cross-Complainant PCI Trading is, and at all relevant times was, a limited liability company organized and existing under the State of Delaware, maintaining its principal place of business within the County of Los Angeles, State of California.

17.     Cross-Complainant Potato Corner LA Group, LLC ("PC LA Group") is, and at all relevant times was, a limited liability company organized and existing under the State of California, maintaining its principal place of business within the County of Los Angeles, State of California.

18.     Cross-Complainant NKM Capital Group, LLC ("NKM") is, and at all relevant times was, a limited liability company organized and existing under the State of California, maintaining its principal place of business within the County of Los Angeles, State of California.

19.     Cross-Complainant J & K Americana, LLC ("JK Americana") is, and at all relevant times was, a limited liability company organized and existing under the State of California, maintaining its principal place of business within the County of Los Angeles, State of California.

20.     Cross-Complainant J&K Lakewood, LLC ("JK Lakewood") is, and at all relevant times was, a limited liability company organized and existing under the State of California, maintaining its principal place of business within the County of Los Angeles, State of California.

21.     Cross-Complainant J & K Culver, LLC ("JK Culver") is, and at all relevant times was, a limited liability company organized and existing under the State of California, maintaining its principal place of business within the County of Los Angeles, State of California.

22.     Cross-Complainant J&K Oakridge, LLC ("JK Oakridge") is, and at all relevant times was, a limited liability company organized and existing under the State of California, maintaining its principal place of business within the County of Los Angeles, State of California.

23.     Cross-Complainant J&K Valley Fair, LLC ("JK Valley Fair") is, and at all relevant times was, a limited liability company organized and existing under the State of California, maintaining its principal place of business within the County of Los Angeles, State of California.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3818668.1

11

**Exhibit 73 - page 11**

24. Cross-Complainant J & K Capital 2, LLC ("JK Capital 2") is, and at all relevant times was, a limited liability company organized and existing under the State of California, maintaining its principal place of business within the County of Los Angeles, State of California.

25. Cross-Complainant J & K Ontario, LLC ("JK Ontario") is, and at all relevant times was, a limited liability company organized and existing under the State of California, maintaining its principal place of business within the County of Los Angeles, State of California.

26. Cross-Complainant J&K PC Trucks, LLC ("JK PC Trucks") is, and at all relevant times was, a limited liability company organized and existing under the State of California, maintaining its principal place of business within the County of Los Angeles, State of California.

27. Cross-Complainant J&K Consultants Group, LLC ("JK Consultants") is, and at all relevant times was, a limited liability company organized and existing under the State of California, maintaining its principal place of business within the County of Los Angeles, State of California.

28. Cross-Complainant GK Capital Group, LLC ("GK Capital") is, and at all relevant times was, a limited liability company organized and existing under the State of California, maintaining its principal place of business within the County of Los Angeles, State of California.

29. Cross-Complainant Koren is, and at all relevant times was, an individual residing in the County of Los Angeles, State of California.

30. Cross-Complainant Alon Koren is, and at all relevant times was, an individual residing in the County of Los Angeles, State of California.

31. Cross-Complainant Thomas Hodgson ("Hodgson") is, and at all relevant times was, an individual residing in the County of Orange, State of California.

32. Cross-Complainant Emily Garcia ("Garcia") is, and at all relevant times was, an individual residing in the County of Los Angeles, State of California.

33. Cross-Complainant Ashley Grudnowski ("Grudnowski") is, and at all relevant times was, an individual residing in the County of Los Angeles, State of California.

34. Cross-Complainants are informed and believe, and thereupon allege, that Cross-Defendant Cinco is, and at all relevant times was, a corporation organized and existing under the

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

Exhibit 73 - page 12

Republic of the Philippines, and that it conducts business in the United States, including in the County of Los Angeles, State of California.

35.  Cross-Complainants are informed and believe, and thereupon allege, that Cross-Defendant PCI is, and at all relevant times was, a corporation organized and existing under the State of Delaware, and that it conducts business in the United States, including in the County of Los Angeles, State of California.

36.  Cross-Complainants are informed and believe, and thereupon allege, that Cross-Defendant Highfive Corporation ("Highfive") is, and at all relevant times was, a corporation organized and existing under the Republic of the Philippines, and that it routinely maintains contacts with the United States including with the County of Los Angeles, State of California.

37.  Cross-Complainants are informed and believe, and thereupon allege, that Cross-Defendant Magsaysay is, and at all relevant times was, an individual residing in the Republic of the Philippines who routinely maintains contacts with the United States including with the County of Los Angeles, State of California.

38.  Cross-Complainants are informed and believe, and thereupon allege, that Cross-Defendant Montinola is, and at all relevant times was, an individual residing in the Republic of the Philippines who routinely maintains contacts with the United States including with the County of Los Angeles, State of California.

39.  Cross-Complainants are informed and believe, and thereupon allege, that Cross-Defendant Montelibano is, and at all relevant times was, an individual residing in the Republic of the Philippines who routinely maintains contacts with the United States including with the County of Los Angeles, State of California.

40.  Cross-Complainants are informed and believe, and thereupon allege, that Cross-Defendant Bermejo is, and at all relevant times was, an individual residing in the Republic of the Philippines who routinely maintains contacts with the United States including with the County of Los Angeles, State of California.

41.  Cross-Complainants are informed and believe, and thereupon allege, that Cross-Defendant Olivas is, and at all relevant times was, an individual residing in Belmont, California.

3818668.1

13

VERIFIED FIRST AMENDED CROSS-COMPLAINT

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

Exhibit 73 - page 13

42. Cross-Complainants are informed and believe, and thereupon allege, that Cross-Defendant Hernandez is, and at all relevant times was, an individual residing in the Republic of the Philippines who routinely maintains contacts with the United States including with the County of Los Angeles, State of California.

43. Cross-Complainants are informed and believe, and thereupon allege, that Cross-Defendant Chad Dominic Hernandez is, and at all relevant times was, an individual residing in the Republic of the Philippines who routinely maintains contacts with the United States including with the County of Los Angeles, State of California.

44. Cross-Complainants are informed and believe, and thereupon allege, that Cross-Defendant Miguel Raymundo Hernandez is, and at all relevant times was, an individual residing in the Republic of the Philippines who routinely maintains contacts with the United States including with the County of Los Angeles, State of California.

45. Cross-Complainants are informed and believe, and thereupon allege, that Cross-Defendant Myrose Victor is, and at all relevant times was, an individual residing in the Republic of the Philippines who routinely maintains contacts with the United States including with the County of Los Angeles, State of California.

46. Cross-Complainants are informed and believe, and thereupon allege, that Cross-Defendant Marivic del Pilar is, and at all relevant times was, an individual residing in the Republic of the Philippines who routinely maintains contacts with the United States including with the County of Los Angeles, State of California.

47. Cross-Complainants are informed and believe, and thereupon allege, that Cross-Defendant Marco del Pilar is, and at all relevant times was, an individual residing in the Republic of the Philippines who routinely maintains contacts with the United States including with the County of Los Angeles, State of California.

48. Cross-Complainants are informed and believe, and thereupon allege, that Cross-Defendant Dia Lacaba is, and at all relevant times was, an individual residing in the Republic of the Philippines who routinely maintains contacts with the United States including with the County of Los Angeles, State of California.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3818668.1

14

VERIFIED FIRST AMENDED CROSS-COMPLAINT

**Exhibit 73 - page 14**

49. Cross-Complainants are informed and believe, and thereupon allege, that Cross-Defendant Nicardo Falcis is, and at all relevant times was, an individual residing in the Republic of the Philippines who routinely maintains contacts with the United States including with the County of Los Angeles, State of California.

50. Cross-Complainants are informed and believe, and thereupon allege, that Cross-Defendant Amir Jacoby is, and at all relevant times was, an individual residing in Los Angeles, California.

51. Cross-Complainants are informed and believe, and thereupon allege, that Cross-Defendant Inbal Jacoby is, and at all relevant times was, an individual residing in Los Angeles, California.

52. Cross-Complainants are ignorant of the true names and capacities of the cross-defendants sued herein as ROES 1 through 500, inclusive, and therefore sue said cross-defendants by said fictitious names. Cross-Complainants will amend this First Amended Cross-Complaint to allege their true names and capacities when ascertained.

53. Cross-Complainants are informed and believe, and thereupon allege, that each of the fictitiously named cross-defendants is responsible in some manner for the occurrences herein alleged and that Cross-Complainants' damages were proximately caused thereby. Cross-Complainants are informed and believe, and thereupon allege, that at all relevant times herein, each of the ROE cross-defendants and the named Cross-Defendants were the agents and/or employees of one or more of the other cross-defendants, were acting within the course and scope of said agency and/or employment, and that each cross-defendant has aided and assisted one or more of the other cross-defendants in committing the wrongful acts herein alleged.

54. Cross-Complainants are informed and believe, and thereupon allege, that cross-defendants, and each of them, conspired and agreed among themselves to do the acts complained of herein and were, in doing the acts complained of herein, acting pursuant to said conspiracy, and that each cross-defendant sued herein is jointly and severally responsible and liable to each cross-complainant for the damages alleged herein.

/ / /

3818668.1

15

VERIFIED FIRST AMENDED CROSS-COMPLAINT

Exhibit 73 - page 15

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

# CORPORATE OWNERSHIP

55.     Subject to the claims asserted below and any relief the Court may award that may equitably or legally adjust the ownership structure of the entity participants named herein, Cross-Complainants set forth below the equity ownership structure of each entity party (as per Cross-Complainants' current knowledge and belief) for the Court's ease of review, use, and reference:

| | | |
|---|---|---|
| a) | PCJV: | 60% Cinco Group (defined below); 40% PC LA Group. |
| b) | PCI Trading: | 50% Cinco Group (defined below); 50% PC LA Group. |
| c) | PC LA Group: | 61.3% Koren; 38.7% Amir Jacoby. |
| d) | NKM: | 50.875% Koren; 39.625% Amir Jacoby; 3% Danny Shalom; 3% Ron Jacoby; 2% Alon Koren; 1.5% Mark Tung. |
| e) | JK Americana: | 35% Koren; 35% Amir Jacoby; 30% Di Xie. |
| f) | JK Lakewood: | 35% Koren; 35% Amir Jacoby; 30% Di Xie. |
| g) | JK Culver: | 35% Koren; 35% Amir Jacoby; 30% Hodgson. |
| h) | JK Oakridge: | 35% Koren; 35% Amir Jacoby; 30% Hodgson. |
| i) | JK Valley Fair: | 35% Koren; 35% Amir Jacoby; 30% Hodgson. |
| j) | JK Capital 2: | 35% Koren; 35% Amir Jacoby; 30% Mark Tung. |
| k) | JK Ontario: | 35% Koren; 35% Amir Jacoby; 30% Hodgson. |
| l) | JK PC Trucks: | 35% Koren; 35% Amir Jacoby; 30% Vannrada Lai. |
| m) | JK Consultants: | 50% Koren; 50% Amir Jacoby. |
| n) | GK Capital: | 100% Koren. |
| o) | Cinco: | (Previously) 25% Magsaysay; 25% Montinola; 25% Montelibano; 25% Bermejo. |
| | | (Currently) 55% Hernandez Group; 15% Magsaysay; 15% Montinola; 15% Montelibano |
| p) | PCI: | 99.5% Cinco; 0.1% Magsaysay; 0.1% Montinola; 0.1% Montelibano; 0.1% Bermejo; 0.1% Olivas |
| q) | Highfive: | Unknown, but believed to be wholly owned by Cinco and/or Cinco's shareholders. |

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

16

VERIFIED FIRST AMENDED CROSS-COMPLAINT

Exhibit 73 - page 16

## FRANCHISOR AND FRANCHISEE AFFILIATIONS

56.     Subject to the claims asserted below and any relief the Court may award that may equitably or legally adjust the affiliations of the Potato Corner United States franchisor and franchisee entity participants named herein, Cross-Complainants set forth below the general affiliations of the entity parties (as per Cross-Complainants' current knowledge and belief) for the Court's ease of review, use, and reference:

Franchisor Affiliations

a) PCJV is the master franchisor of Potato Corner outlets in the United States. The equity interests in PCJV are held by Cinco Group (defined below) and PC LA Group. PC LA Group, through Koren, manages PCJV.

b) PCI Trading is PCJV's sister company also owned by Cinco Group and PC LA Group; it distributes products/ingredients to U.S. franchisees. PCI Trading purchases certain products/ingredients from Highfive, believed to be Cinco's wholly owned subsidiary (and alter ego) in the Philippines. PC LA Group, through Koren, manages PCI Trading.

c) PC LA Group (formerly a partnership later converted to a limited liability company) is a company that Koren and Amir Jacoby formed to hold their collective interests in PCJV and PCI Trading. The management fees owed to Koren for services performed by PC LA Group are paid to GK Capital, a company wholly owned by Koren.

d) PCI is a U.S. company that Cinco formed as its purported "wholly owned subsidiary" solely for the purpose of holding the Cinco Group's interests in PCJV and PCI Trading. A dispute has arisen among the parties whether PCI or the "PCI Group" ever formally replaced the Cinco Group as an owner in the U.S. operations and that, if it did, whether those transactions were proper, i.e., devoid of fraud given Cinco's position in this lawsuit that the sale of its shares to the Hernandez Group did not trigger the right of first refusal as the Hernandez did not directly buy into PCI.

3818668.1

17

VERIFIED FIRST AMENDED CROSS-COMPLAINT

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**Exhibit 73 - page 17**

Franchisee Affiliations

  e) The interests of the Potato Corner outlets in which Koren maintains a direct ownership stake are generally held by different entities, as set forth above. Aside from NKM, Koren holds no more than a 35% equity interest in each Potato Corner U.S. outlet (see various "JK" entities).

  f) Of the named "JK" parties, JK Capital 2 is no longer active as the store it was operating was closed in or about January 2017.

  g) JK Consultants was formed by Koren and Amir Jacoby to provide management and consulting services to the various Potato Corner stores they co-own.

## ABBREVIATED REFERENCES

57. For ease of reference, the following abbreviated references will be used herein:

  a) Cinco, Magsaysay, Montinola, Montelibano, and Bermejo will be collectively referred to herein as the "Cinco Group".

  b) PCI, Magsaysay, Montinola, Montelibano, Bermejo, and Olivas will be collectively referred to herein as the "PCI Group".

  c) The Cinco Group and the PCI Group will be collectively referred to herein as the "Cinco/PCI Group".

  d) Hernandez, Chad Dominic Hernandez, Miguel Raymundo Hernandez, Myrose Victor, Marivic del Pilar, Jose Marco del Pilar, Dia Lacaba, Nicardo Falcis, and ROES 1 through 100, inclusive, will be collectively referred to herein as the "Hernandez Group".

  e) NKM, JK Americana, JK Lakewood, JK Culver, JK Oakridge, JK Valley Fair, JK Capital 2, JK Ontario, JK PC Trucks, and JK Consultants will be collectively referred to herein as the "NKM/JK Entities".

## ALTER-EGO ALLEGATIONS

58. Cross-Complainants are informed and believe, and thereupon allege, that there is a unity of interest and ownership between and among the following parties, such that any

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

Exhibit 73 - page 18

1  individuality and separateness between them never existed or has ceased, and that said parties are

2  alter egos of one another:

3      Cinco and Highfive

4          a) Cinco and Highfive were conceived, intended, and/or used by the Cinco/PCI

5             Group and Hernandez Group as a device for the purpose of defrauding others,

6             including Cross-Complainants;

7          b) The Cinco/PCI Group and Hernandez Group exercised dominion and control

8             over the finances of Cinco and Highfive and treated Cinco's and Highfive's

9             finances as their own;

10         c) The Cinco/PCI Group and Hernandez Group used the corporate forms of Cinco

11            and Highfive for their own purposes as though they were their own, and did not

12            follow proper corporate formalities; and

13         d) Adherence to the fiction of the separate existence of Cinco and Highfive as

14            entities distinct from the Cinco/PCI Group and Hernandez Group would permit

15            an abuse of the corporate privilege and would sanction fraud.

16     PCI

17         e) PCI was conceived, intended, and/or used by the Cinco/PCI Group and

18            Hernandez Group as a device for the purpose of defrauding others, including

19            Cross-Complainants;

20         f) The Cinco/PCI Group and Hernandez Group exercised dominion and control

21            over the finances of PCI and treated PCI's finances as their own;

22         g) The Cinco/PCI Group and Hernandez Group used the corporate form of PCI for

23            their own purposes as though it was their own, and did not follow proper

24            corporate formalities; and

25         h) Adherence to the fiction of the separate existence of PCI as an entity distinct

26            from the Cinco/PCI Group and Hernandez Group would permit an abuse of the

27            corporate privilege and would sanction fraud.

28  ///

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3818668.1                                    19
                        VERIFIED FIRST AMENDED CROSS-COMPLAINT

Exhibit 73 - page 19

ROES 1 through 100, Inclusive

    i) ROES 1 through 100, inclusive, were conceived, intended, and/or used by the Hernandez Group as a device for the purpose of defrauding others, including Cross-Complainants;

    j) The Hernandez Group exercised dominion and control over the finances of ROES 1 through 100, inclusive, and treated the finances of ROES 1 through 100, inclusive, as their own;

    k) The Hernandez Group used the corporate form of ROES 1 through 100, inclusive, for their own purposes as though they were their own, and did not follow proper corporate formalities; and

    l) Adherence to the fiction of the separate existence of ROES 1 through 100, inclusive, as entities distinct from the Hernandez Group would permit an abuse of the corporate privilege and would sanction fraud.

## GENERAL ALLEGATIONS

### Koren Brings "Potato Corner" to the United States

59.    As a young teenage resident of the Philippines in the early 1990s, Koren – who was then living in the Far East by virtue of his father's work for the Israeli Embassy in Manila – imagined the day he could live in the United States and pursue the American dream. And, while in the Philippines, he fell in love with an icon of American culture – the french fry. More particularly, he became enamored of a seasoned french fries business known as "Potato Corner" and, as the years passed, became determined to bring Potato Corner to this country.

60.    By 2009, Koren had realized his ambition of living and working in the United States, and was a successful entrepreneur in Los Angeles. At around that time, he met with Magsaysay, the CEO of Cinco (the company that owned the Potato Corner brand) and the two ultimately agreed that Koren would expand Potato Corner into the United States. Based on that agreement, Koren – through NKM – came to open his first Potato Corner store in Santa Anita, California in or about February 2010.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**Exhibit 73 - page 20**

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**Amir Jacoby Becomes a Non-Managing Investor in the Franchisees Controlled by Koren Based on an Agreement to Fund 100% of Koren's Capital Contributions**

61.    NKM was formed to manage and control the first Santa Anita location of Potato Corner. Koren owns a majority stake in NKM and he has always been and continues to be its managing member. Amir Jacoby now owns approximately 40% of the membership in NKM (which was originally 25.75%), though he acquired that minority interest only after inducing Koren to transfer to him that stake on a promise that he – Amir Jacoby – would fund 100% of Koren's required capital contributions in NKM and likewise fund Koren's participation in any future Potato Corner franchises. The specific terms of the agreement provided that Messrs. Koren and Jacoby would solicit future Potato Corner franchises and, where successful, each would acquire an equal share in the franchises so long as Amir Jacoby funded all of Koren's required capital contributions (the "Jacoby-Koren Agreement"). Koren would, in return, devote his time and expertise to managing the franchises and maximizing their profitability. Amir Jacoby would provide the initial financial support, in other words, and Koren would furnish the sweat equity and know-how necessary to generate profit.

62.    With some exceptions (discussed below) and for nearly a decade, Koren and Amir Jacoby complied and conducted themselves in accordance with the Jacoby-Koren Agreement. As effectively the "sweat equity" partner, Koren always managed, controlled, and operated all of the NKM/JK Entities.

**Cinco Enters into a Joint Venture Agreement for Koren's Group to Exclusively Manage and Facilitate – as Franchisors – the Opening of other Potato Corner Stores/Franchisees in the United States and Israel**

63.    In building on the momentum generated from the opening of Potato Corner's first American franchise, Koren and a group composed of Cinco and its shareholders known as the "Cinco Group" decided to joint venture concerning the budding Potato Corner business. Specifically, Koren and Koren's group (Koren, Jacoby, et al.) known as the "LA Group", on the one hand, and the Cinco Group, on the other hand, entered into a joint venture agreement in or around 2009 or 2010 that later came to be memorialized in writing as the "Potato Corner USA Joint

3818668 1                                                    21

**Exhibit 73 - page 21**

1  Venture Agreement" (the "JV Agreement").  A true and correct copy of the JV Agreement is

2  attached hereto as **Exhibit "B"** and incorporated by reference herein.

3      64.  In negotiations leading up to PCJV formation, it was first agreed that the LA Group

4  was going to hold the 60% equity stake in PCJV and that it – the LA Group – would hold 4 of the 7

5  seats on the PCJV board (roughly equal to its 60% stake).  Ultimately, Magsaysay and the Cinco

6  Group made certain promises and representations, including that Koren would ultimately become

7  the CEO and owner of Cinco and he or his group would eventually come to control 100% of Cinco

8  (which Magsaysay repeated from time to time over the course of several years).  Each of those

9  promises and representations proed later to be false and fraudulent and were made in large part to

10  induce the LA Group to part with 20% of the 60% of its promised equity allocation, such that the

11  final agreed-to equity allocation turned out to be Cinco Group (60%) and LA Group (40%).  Thus,

12  under the JV Agreement, the Cinco Group and the LA Group agreed to form a limited liability

13  company (PCJV) with membership divided between the Cinco Group, at 60%, and the LA Group,

14  at 40%.

15      65.  The governance of PCJV was subject to certain terms and conditions, including

16  (among other things): (a) a prohibition on the transfer or assignment of rights, obligations, or equity

17  interests without consent; (h) the granting of rights of first refusal with respect to the sale or transfer

18  of any membership interests; (c) the vesting of governing decisions in a board of 7 "managers" or

19  "members" or "member interests" (those terms are used interchangeably in the parties' governing

20  contractual documents) to be composed of 4 managers/members selected by the Cinco Group and 3

21  managers/members selected by the LA Group; and (d) the designation that the LA Group would

22  always hold a presidency position in the company and would manage the company through a

23  Master Services Agreement.  Magsaysay and the Cinco Group specifically insisted on the inclusion

24  of the prohibition on transfer and the right of first refusal provisions so that they would be assured

25  that they would be solely dealing with the LA Group and, by corollary, the LA Group would solely

26  be dealing with the Cinco Group.

27      66.  In accordance with those terms, the LA Group initially designated Amit Nemanim

28  ("Nemanim"), Koren, and Amir Jacoby as its 3 managers/members charged with voting on

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3818668.1

22

**Exhibit 73 - page 22**

1 particular matters in PCJV. At some point thereafter, however, and as discussed below, Nemanim
2 left the business to pursue other opportunities, leaving an opening in the PCJV presidency position
3 (Nemanim was its original President in name) and in the LA Group's 3 designated voting
4 representatives. On or about October 16, 2012, PCJV held a board meeting addressing Nemanim's
5 departure and it was agreed then that Koren would formally replace Nemanim as PCJV's President
6 and that a 75% vote of the 7 managers/members would thereafter be required to replace the CEO,
7 President, Treasurer, and Corporate Secretary. The parties settled on this 75% requirement to
8 protect both sides, and to be sure that 6 of 7 supermajority manager/member votes would be needed
9 to replace specifically designated high-level officers. A true and correct copy of PCJV's Board
10 Meeting Minutes of October 16, 2012[4] (the "October 2012 Minutes") is attached hereto as **Exhibit**
11 **"C"** and incorporated by reference herein.

12     67.     The next day, October 17, 2012, the JV Agreement was amended and, while a
13 substantial majority of its terms and conditions remained intact, the amendment made certain
14 material changes to the pre-existing agreement, including that: (a) Cross-Defendant PCI would
15 replace Cinco as a joint venturer and the Cinco Group would become known as the "PCI Group"[5];
16 (b) any change in the company's executive officers (President, Corporate Secretary, and Treasurer)
17 would require the 75% supermajority vote of the 7 managers/members noted above; and (c) Koren
18 would be the President of the company. A true and correct copy of the First Amendment to the JV
19 Agreement is attached hereto as **Exhibit "D"** and incorporated by reference herein.

20     68.     Cross-Complainants are informed and believe, and thereupon allege, that tDLA
21 Piper (and Olivas in particular) handled the transactional paperwork for PCJV. In addition to
22 preparing the JV Agreement and, upon information and belief, the First Amendment to the JV
23 Agreement, DLA Piper incorporated PCJV in Delaware on or about July 16, 2010 and registered it

24

---

25 [4] There appears to be a typographical error in the October 2012 Minutes showing "October 16,
26 2013" as the date of the meeting. Cross-Complainants are informed and believe, and thereupon allege that the actual meeting occurred in October 2012.

27 [5] However, the parties continued to refer to the "PCI Group" as the "Cinco Group" and treated the
28 Cinco Group as the effective owners of the 60% stake in PCJV.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**Exhibit 73 - page 23**

1 in California on or about November 2, 2010. The firm also prepared at some point thereafter – but
2 before the First Amendment to the JV Agreement – PCJV's Limited Liability Company Agreement
3 (the "LLC Agreement"), a true and correct copy of which is attached hereto as **Exhibit "E"**[6] and
4 incorporated by reference herein. For purposes of this Cross-Complaint, the JV Agreement
5 (Exhibit "B"), the October 2012 Minutes (Exhibit "C"), the First Amendment to the JV Agreement
6 (Exhibit "D"), and the LLC Agreement (Exhibit "E") will be collectively referred to as the "PCJV
7 Governing Documents". As the Court has found, however, the First Amendment to the JV
8 Agreement (Exhibit "D") modified all prior agreements and constitutes the operative agreement
9 governing PCJV's affairs.

<div align="center">

**The LA Group is Formed**

</div>

11    69.    For purposes of holding a membership interest in PCJV and carrying out the LA
12 Group's obligations, Koren, Amir Jacoby, and Nemanim formed a partnership named "PCJV-LA
13 Group", which was later converted to PC LA Group. Initially, Koren and Nemanim held equal
14 38% shares in the LA Group with Amir Jacoby holding 24%. But Koren and Amir Jacoby
15 eventually acquired Nemanim's interest in the LA Group, resulting in Koren holding a 61.3%
16 membership interest and Amir Jacoby retaining the remaining 38.7%.[7] Those percentage interests
17 aside, Koren exclusively manages, controls, and operates PC LA Group. PC LA Group governs
18 itself in accordance with a "Partnership Agreement", a true and correct copy of which is attached
19 hereto as **Exhibit "F"** and incorporated by reference herein.

20    70.    With Nemanim leaving the LA Group to pursue other ventures, Amir Jacoby
21 approached Koren and insisted that Inbal Jacoby (Amir Jacoby's wife) replace Nemanim as a
22 voting representative of PC LA Group on the PCJV board of 7 managers/members. Koren, desiring
23 to maintain harmony within the group, reluctantly obliged, though he was and remained concerned

24 _____

25 [6] Although the signature page of the LLC Agreement bears a note indicating a November 30, 2010
date, Cross-Complainants do not at present recall when the LLC Agreement was executed. The
26 same goes for the JV Agreement which is undated.

27 [7] Amir Jacoby has recently contended that the equity interests in PC LA Group were modified to
50/50, but this contention is not borne out by the evidence. While the two had certain negotiations
28 to modify the equity interests, no agreement ever came from it.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3818668.1                                    24
<div align="center">

VERIFIED FIRST AMENDED CROSS-COMPLAINT

</div>

Exhibit 73 - page 24

1  about the effort to force Inbal Jacoby – who'd had no previous high-level involvement in the

2  business between Messrs. Koren and Jacoby – into a voting role. But given that Koren, as the

3  managing member of PC LA Group, could always replace PC LA Group's voting representatives in

4  PCJV if the need ever arose, he ultimately decided to accommodate the request.

5               **PCJV Enters into a Master Services Agreement with the LA Group**

6       71.    On or about June 18, 2012, in accordance with the PCJV Governing Documents,

7  PCJV entered into a Master Services Agreement with the LA Group. The Master Services

8  Agreement obligates the LA Group to, among other things, "[c]onduct management, operations,

9  marketing, establishment, maintenance, licensing and sub-licensing activities with respect to the

10  Potato Corner outlets/stores in the Territory". A true and correct copy of the Master Services

11  Agreement is attached hereto as **Exhibit "G"** and incorporated by reference herein.

12               **Amir Jacoby Reneges on the Jacoby-Koren Agreement; Koren Appeases Him**

13       72.    As is frequently the case in any start-up business, the initial Potato Corner franchises

14  took time to reach profitability, and a few even failed. That said, there was nothing unusual about

15  that inevitable reality and, despite facing the typical challenges of a new business, these franchises

16  each demonstrated a likelihood of long term success. But Amir Jacoby was impatient and, over

17  time, grew irrationally concerned about his investment. Unable to accept the natural vicissitudes of

18  the start-up economy – to which he'd knowingly volunteered to subject himself when he entered the

19  Jacoby-Koren Agreement – he suddenly, unilaterally and without discussion or consent decided to

20  convert the capital contributions he was making on Koren's behalf into specific loans to be repaid

21  by Koren. That he had no right to convert equity into debt, under the Jacoby-Koren Agreement, or

22  otherwise, is axiomatic. But it was also profoundly unfair to Koren, since Amir Jacoby initially

23  induced Koren to give him (Jacoby) an equity stake in NKM and on future businesses on the

24  material condition that Amir Jacoby would fund Koren's capital contributions (without expectation

25  of repayment).

26       73.    Even under these inequitable circumstances, however, Koren continued trying to

27  accommodate Amir Jacoby. Thus, in an effort to avoid conflict and allay Amir Jacoby's concerns,

28  Koren began advancing some payments to Amir Jacoby in or about 2015 with the understanding

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  that the two would later sit down to discuss their specific business arrangement – that included

2  whether a modification to the Jacoby-Koren Agreement could be reached. Amir Jacoby accepted

3  these payments on the express understanding that they were a mere accommodation by Koren, and

4  that any long-term revisions to their relationship would need to be negotiated. And while

5  negotiations and several discussions in fact ensued over the course of the next couple of years, no

6  modification to the Jacoby-Koren Agreement was ever reached.

7  **Cinco Group Transfers Majority Ownership to the Hernandez Group in Derogation of the**

8  **PCJV Governing Documents**

9      74.    The perfidious unraveling of the parties' agreements, and the systematic campaign to

10  deprive Koren of his contractual and legal rights, began accelerating in late 2017. Cross-

11  Complainants are informed and believe, and thereupon allege, that in 2017, the Cinco Group

12  transferred 55% of its holdings and rights in Cinco to the Hernandez Group. That transfer violated

13  the PCJV Governing Documents, in that it was undertaken without the consent of the LA Group

14  and without first offering Koren or the LA Group a right of first refusal. And though the PCJV

15  Governing Documents prohibit precisely this form of transfer as a means of ensuring that the

16  parties are dealing with business partners who they know and trust, the Cinco Group disregarded

17  that prohibition, and its corollary obligation to honor the Governing Documents, in effectuating this

18  transfer of interest and power.

19      75.    Cross-Complainants are further informed and believe, and thereupon allege, that at

20  some point after or contemporaneous with the Cinco Group transferring a majority ownership stake

21  to the Hernandez Group, the Cinco Group replaced three of its PCJV voting representatives on the

22  PCJV board of 7 members/managers with members of the Hernandez Group, who eventually were

23  purportedly given officerial, directorial, and/or managerial positions in PCJV.

24      **Amir Jacoby Withdraws Money From the JK Entities Without Authorization**

25      76.    By 2015, and largely because of Koren's efforts, the Potato Corner business was

26  accelerating at a rapid pace in the United States. By early 2018, PCJV had contractual relationships

27  with at least 60 stores in the United States (which relationships Koren was actively managing on

28  behalf of PCJV and its affiliate business, PCI Trading) with many more in the pipeline. In addition,

VERIFIED FIRST AMENDED CROSS-COMPLAINT

**Exhibit 73 - page 26**

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1   at the same time, Koren was actively managing and operating not only the LA Group, but also the

2   NKM/JK Entities, which comprise 8 franchisee businesses and a consulting business.

3          77.    While business and profitability was increasing (along with the attendant work for

4   those responsible for the various business' management, particularly Koren), Koren's compensation

5   – well below market – largely remained the same. This state of affairs was unfair and improper,

6   particularly given that Koren had devoted inordinate time and energy to the Potato Corner

7   franchises and he, more than any other party, was responsible for their gathering success. Having

8   declined market compensation for years, he rightly believed the circumstances now demanded an

9   increase in pay that would at least approximate what the market would bear for the services he was

10   providing. After studying comparable salaries of similarly situated high-level executives and given

11   the business conditions existing at that time as well as Koren's past efforts, Koren informed Amir

12   Jacoby that he would be increasing his total compensation of roughly $225,000 per year ($120,000

13   in salary and approximately $105,000 in distributions) to $300,000. Based on that management

14   decision (which decision Koren was charged with making), Koren began drawing an additional

15   salary. Even that increase nonetheless left Koren below the similarly situated executives whose

16   compensation he had studied, merely underscoring the extent to which he had been underpaid to

17   that point.

18          78.    Amir Jacoby saw a personal opportunity in Koren's desire to adjust his

19   compensation to something approaching market, regardless of its obvious market justification and

20   its inherent reasonableness. He (Jacoby) unilaterally decided (without legitimate justification or

21   authority) that he would begin to draw an additional $15,000 per month. This, despite the fact that

22   he was already drawing a salary as well as receiving monthly distributions from the businesses

23   notwithstanding that he did not participate in management, and that Inbal Jacoby was also drawing

24   a salary from the business of $60,000 per year as a part-time employee. Cross-Complainants are

25   informed and believe, and thereupon allege, that Amir Jacoby unilaterally and unlawfully withdrew

26   $37,500 (in two $15,000 and $22,500 withdrawal transactions) on or about February 22, 2018 from

27   PC LA Group's bank account, $3,600 (in equal $1,800 withdrawal transactions) on or about March

28   2, 2018 from JK Consultants' bank account, $4,000 on or about March 9, 2018 from JK

**Exhibit 73 - page 27**

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  Consultants' bank account, and $10,000 on or about March 9, 2018 from PC LA Group's bank

2  account (the "Unauthorized Jacoby Withdrawals").

3  **Koren Changes the PCJV Banking Relationship from Wells Fargo to Chase in Order to**

4  **Safeguard PCJV's Funds, But Returns the Money to Wells Fargo After Receiving Sufficient**

5  **Assurances from the Cinco Group**

6  79.    On or about March 26, 2018, in an effort to safeguard PCJV's funds from Amir

7  Jacoby's continuing raid, Koren transferred PCJV's bank accounts from Wells Fargo to J.P.

8  Morgan Chase Bank. Koren contemporaneously called Magsaysay of the Cinco Group to inform

9  him of the reasons for the transfer and to reassure him that the new accounts would be established

10  in the same entity names and that the Cinco Group will obtain full access to the new accounts.

11  80.    On or about April 3, 2018, Koren sent Magsaysay a letter memorializing the

12  discussion they had regarding the account transfers and the reasons why Koren had to take the

13  action he did. Koren offered to return the funds to Wells Fargo should Cinco Group insist that it be

14  done with the full understanding and assumption of risk underlying Amir Jacoby's unauthorized

15  transfers. A true and correct copy of the April 3, 2018 letter is attached hereto as **Exhibit "H"** and

16  incorporated by reference herein.

17  81.    That transparency unfortunately did not induce the Cinco Group into conducting

18  itself with integrity, or in compliance with the parties' agreements. Instead, the Cinco Group

19  insisted – following the April 3, 2018 letter – that the money be transferred back to Wells Fargo.

20  Koren, again accommodating a predatory partner, agreed to return the money to Wells Fargo

21  provided that the Cinco Group would monitor the accounts to protect against any unauthorized

22  transfers by Amir Jacoby and take action against Amir Jacoby if that became necessary. Cinco

23  Group agreed to this condition and Koren then immediately returned the money to Wells Fargo.

24  **Cross-Defendants Attempt to Vote Koren Out as the LA Group's Voting Representative and**

25  **as President of PCJV**

26  82.    On or about March 27, 2018, Magsaysay called a member's meeting to occur on

27  April 9, 2018 purportedly to address a variety of matters including the election of the directors and

28

3818668 1

28

VERIFIED FIRST AMENDED CROSS-COMPLAINT

**Exhibit 73 - page 28**

1 | officers for PCJV. A true and correct copy of Magsaysay's meeting request is attached hereto as
2 | **Exhibit "I"** and is incorporated by reference herein.

3      83.    Unbeknownst to Koren, Cross-Defendants were actively conspiring together to vote
4 | Koren out of the business, Koren consequently appeared at the April 9, 2018 meeting intending to
5 | discuss the various agenda items in Magsaysay's March 27 email (Exhibit "I"). But Koren soon
6 | discovered that he was in for an ambush that became clear when members of the Cinco Group and
7 | members of the Hernandez Group (who were never authorized by the LA Group to be a voting
8 | member in PCJV), and the Jacobys, including Inbal Jacoby (who stopped working for the company
9 | in March 2018), purportedly voted to remove Koren as a manager and officer in PCJV. All of this
10 | was done over Koren's objection and Cross-Defendants' refusal to allow Koren to appoint new
11 | voting representatives for the LA Group.

12 | <center>**Cross-Defendants Ambush Koren and PCJV Employees**</center>

13      84.    The following day, April 10, 2018, Victor, the Jacobys, and at least one attorney
14 | consolidated the ambush, arriving at PCJV's offices and demanding that PCJV staff accede to a
15 | transition of power and claiming that Koren no longer had any power or control over any business
16 | matters whatsoever. Koren arrived later and objected to those Cross-Defendants' unannounced
17 | visit and blatant efforts to interfere with Koren's management and operations of the business.

18      85.    Cross-Complainants are informed and believe, and thereupon allege, that on that
19 | same day (on April 10, 2018), Cross-Defendants (through DLA Piper) initiated this litigation while
20 | contemporaneously seeking *ex parte* relief for a TRO/OSC along with other requests for relief
21 | which were all denied. No party ever gave Koren advance notice of the lawsuit or the *ex parte*
22 | application. And the timing of the lawsuit and extensive briefing that was prepared and ready to be
23 | filed the very morning after the April 9, 2018 meeting merely serves to confirm that Cross-
24 | Defendants had conspired in a premeditated scheme to oust Koren and ambush him on April 10,
25 | 2018 in an extreme show of force.

26      86.    That same day, April 10, 2018, DLA Piper also sent a cease and desist letter to
27 | Koren contending that "a meeting of the Managers was held on April 9, 2018, during which the LA
28 | Group and Guy Koren were removed from management by a majority vote (85%) of the Managers

3818668.1                  29
<center>VERIFIED FIRST AMENDED CROSS-COMPLAINT</center>

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**Exhibit 73 - page 29**

1 and Membership interests." The reference to 85% could only refer to Cinco's purported position
2 that 6 out of 7 voting representatives in PCJV voted to oust Koren. A true and correct copy of DLA
3 Piper's April 10, 2018 letter is attached hereto as **Exhibit "J"** and incorporated by reference herein.

4       87.    Koren responded to the April 10, 2018 letter asserting his position as to why the
5 April 9, 2018 vote was improper insofar as it was improperly noticed and that Koren's request to
6 appoint new LA Group voting representatives was ignored. Koren also asserted his position as to
7 why the grounds for the purported termination were baseless and appeared to be a pretext.
8 (Additionally, the propriety and effectiveness of votes by members of the Hernandez Group was
9 and still is in question.)

10 **Mired by the Ineffective and Improper First Vote, Cross-Defendants Attempt to Vote Koren**
11 **out a Second Time**

12       88.    Cross-Defendants eventually conceded that they had no proper grounds to remove
13 Koren as a voting representative of the LA Group or to dictate who the LA Group designates as its
14 3 voting managers/members in PCJV. Therefore, Cross-Defendants assented to Koren's replacing
15 Amir Jacoby and Inbal Jacoby as voting representatives of the LA Group with Alon Koren and
16 Hodgson.

17       89.    On or about Friday, April 20, 2018, DLA Piper informed Koren's attorney that
18 PCJV had called another special meeting, this one to take place on Monday, April 23, 2018. Again,
19 over Koren's objections, the April 23, 2018 meeting proceeded with Cross-Defendants and the new
20 LA Group voting representatives appearing. The new LA Group voting representatives voted
21 against the initiative to remove Koren as an officer of PCJV. Despite that, and despite the fact that
22 a 75% vote (at least 6 of 7) was necessary to remove Koren as an officer of PCJV, the purported
23 Chairman (Hernandez) and DLA Piper partner, Mr. Robert W. Brownlie, as Acting Secretary –
24 Mr. Brownlie was formerly lead litigation counsel for Cinco in this litigation – erroneously and
25 improperly concluded that enough votes were cast to remove Koren from his officerial role in the
26 company. A true and correct copy of the April 23, 2018 Meeting Minutes is attached hereto as
27 **Exhibit "K"** and incorporated by reference herein.

28 / / /

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3818668.1

30

**Exhibit 73 - page 30**

**Cross-Defendants Terminate the Master Services Agreement**

90.     In conjunction with the April 23, 2018 meeting, Cross-Defendants apparently also voted to terminate the Master Services Agreement and/or a "Services Agreement" dated January 1, 2017. The Master Services Agreement itself dictates when it could be terminated only: (a) upon mutual written agreement; or (b) upon breach unless cured within 20 days from the date of the breach. But, there was never a mutual written agreement to terminate the Master Services Agreement here, nor was there a breach of it. Even if it can be said that there was a breach, any such alleged breach was cured. Therefore, Cross-Defendants had no justification for terminating the Master Services Agreement or any Services Agreement.

**Cross-Defendants Audaciously Agree to Change PCJV's Banking Relationships From Wells Fargo to Citibank**

91.     In the wake of Cross-Defendants' vigorous objections to Koren changing PCJV's banking relationship to safeguard those funds from Amir Jacoby and using that episode as a pretext for purportedly removing Koren, Cross-Defendants purportedly voted – at the same April 23, 2018 meeting – to change PCJV's banking relationship from Wells Fargo to Citibank and authorized one another (including Olivas) to be the signatories on the new accounts (at the exclusion of Koren and the LA Group).

**Cross-Defendants Publicly Inform Franchisees and Staff about the Purported Removal of Koren in an Overt Attempt at Interference and Disparagement**

92.     Following the April 9, 2018 meeting and continuing after the April 23, 2018 meeting, Cross-Defendants set out on a crusade to publicly disparage Koren and cast doubt on his authority and role in PCJV. In one example, Cross-Defendants sent a letter to Garcia (who works for PCJV) to inform her that Koren was removed as a manager and President "due to his breach of his fiduciary and contractual duties to PCJV and its Members." The letter states that the authorized representatives for PCJV are now Inbal Jacoby, Victor, and Olivas. Cross-Complainant is informed and believes and thereon alleges that Cross-Defendants sent similar letters to other staff members and third parties. A true and correct copy of the letter to Ms. Garcia is attached hereto as **Exhibit "L"** and incorporated by reference herein.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3818668.1

31

**Exhibit 73 - page 31**

93. In yet another example of Cross-Defendants' tortious behavior, on or about April 26, 2018, Cross-Defendants sent a letter to a franchisee in Seattle claiming that Koren had been removed as President of PCJV on April 23, 2018 and that "[t]hese actions were undertaken with the support of PCJV's majority owner, Cinco Corporation, through its wholly-owned subsidiary, Potato Corner International". Cross-Complainants are informed and believe, and thereupon allege, that Cross-Defendants sent similar letters to other franchisees and third parties. A true and correct copy of the April 26, 2018 letter is attached hereto as **Exhibit "M"** and incorporated by reference herein.

94. To make matters even worse, Cross-Defendants conspired with one another to remove Koren from PCJV's office and warehouse, and to discontinue Koren's official Potato Corner USA email access (along with the email access of third parties whom Cross-Defendants presumably view as being loyal to Koren), thus further disrupting Koren's and the LA Group's ability to manage PCJV and comply with its duties.

**Cross-Defendants File Suit on Behalf of PCJV Against Koren, Alon Koren, Hodgson, Garcia, and Grudnowski**

95. On May 8, 2018, before any Court Order determining the efficacy of Cross-Defendants' removal of Koren from PCJV or assessing whether Cross-Defendants were somehow permitted to act or file suit on behalf of PCJV, Cross-Defendants separately filed a lawsuit on behalf of PCJV against Koren, Alon Koren, Hodgson, Garcia, and Grudnowski (Case No. BC705580) (hereinafter, the "Cinco-PCJV Action"). In that action, Cross-Defendants contended, among other things, that the defendants converted PCJV's bank accounts for their own use.

**The Court Ultimately Unravels Cross-Defendants' Nefarious Plan; in the Meantime, Cross-Defendants Unlawfully and Improperly Access Cross-Complainants' Confidential Documents**

96. On the morning of May 10, 2018, shortly before 5 a.m. (so as to ensure that the parties located in the Philippines obtain timely notice), Koren gave notice of his intent to seek *ex parte* temporary restraining order/injunctive relief addressing Cinco's (and those participating with Cinco's) improper and unlawful conduct. Not to be outdone, 5 hours later, Cinco (through DLA Piper) provided competing notice of their intent to seek injunctive relief in both the Cinco-PCJV

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3818668.1

32

**Exhibit 73 - page 32**

1  Action and this action. Because of certain procedural improprieties underlying their application in

2  the Cinco-PCJV Action, the Court did not address the application brought in that case.

3       97.    At the outset, the Court – facing a heavy volume of pleadings and other submissions

4  – issued temporary restraining order relief to both sides so as to, in the Court's belief, preserve the

5  status quo. Then, following weeks of additionally extensive briefing and argument, the Court

6  issued a tentative ruling, on June 6, 2018, in Koren's favor and against Cinco. In the face of

7  pleading from Cinco's counsel, the Court allowed further evidentiary submissions and took the

8  matter under submission.

9       98.    Cross-Complainants are informed and believe, and thereupon allege, that

10  immediately after they received a copy of the tentative ruling, Cross-Defendants engaged in a

11  campaign to copy confidential and non-confidential records maintained at PCJV's office (including

12  confidential records of PC LA Group and the NKM/JK Entities, among others) and, upon

13  information and belief, deleted and disposed of relevant evidentiary documents, all the while having

14  access to and accessing various email accounts of Cross-Complainants.

15       99.    On or about June 18, 2018, the Court entered its final Preliminary Injunction in favor

16  of Koren. *See* Exhibit "A". It took several days for Cross-Defendants to comply with the

17  Preliminary Injunction, however, i.e., by restoring email access to Koren and his group. Cross-

18  Complainants are informed and believe, and thereupon allege, that even after the Court entered the

19  Preliminary Injunction, Cross-Defendants continued to access Cross-Complainants' confidential

20  information and engaged in various suspicious activities relating to Cross-Complainants' email

21  accounts, among other things.

22     **Cross-Defendants Embark on a Campaign of Retaliation, Sabotage, and Interference**

23       100.    Having lost the Preliminary Injunction, Cross-Defendants -- while conscious of the

24  injunction against them – set their sights on ways to retaliate, sabotage, and undermine Cross-

25  Complainants' efforts in the United States so as to manufacture arguments in this litigation that

26  Cross-Complainants' conduct and/or performance was and is somehow subpar. In one instance, on

27  or about August 31, 2018, Cross-Defendants, through Highfive, sent notice to PCI Trading that

28

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3818668 1               33
             VERIFIED FIRST AMENDED CROSS-COMPLAINT

Exhibit 73 - page 33

1   effective September 1, 2018, there will be a "new price for all Potato Corner Products that we

2   supply to you." The price sheet attached to the notice reflects a *300% increase* in prices.

3       101.    This unilateral, unauthorized and transparently retaliatory price increase on goods

4   that PCJV and PCI Trading had been purchasing from the Cinco Group for years departs from a

5   longstanding agreement that the goods will be sold to PCJV and PCI Trading at cost. Having failed

6   to remove Koren through a Court order, Cross-Defendants are now plainly attempting to facilitate

7   the same result through economic warfare and ambush, actions that violate the Preliminary

8   Injunction.

9       102.    In further attempts of sabotage, Cross-Defendants continue to run promotions and

10  marketing schemes in the United States without Cross-Complainants' knowledge or consent,

11  leading to confusion in the marketplace and various other harm to the United States' operations and

12  its franchisees. Furthermore, Cross-Defendants lay claim to funds held in bank accounts belonging

13  to PCI Trading and refuse to return those funds. They also maintain an office in the United States –

14  which they leased on behalf of PCJV – that can only be viewed as an unfair and improper effort to

15  compete with Cross-Complainants.

## FIRST CAUSE OF ACTION

## (CONSPIRATORIAL FRAUD)

**By All Cross-Complainants Against All Cross-Defendants and ROES 1 through 250,**

**Inclusive**

20      103.    Cross-Complainants re-allege and incorporate herein by this reference all previous

21  allegations as though set forth herein in full.

22      104.    While Cross-Complainants are still ignorant of the specific details of the

23  conspiratorial conduct by Cross-Defendants and ROES 1 through 250, inclusive, directed at Cross-

24  Complainants, Cross-Complainants allege that the following acts of fraud are actionable:

25          a)  The Cinco/PCI Group's agreement with the Hernandez Group to sidestep the

26              rights afforded to Koren and his group concerning the restriction on transfer and

27              right of first refusal provisions contained in the PCJV Governing Documents

28              (hereinafter, "Conspiracy No. 1").

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3818668.1

34

**Exhibit 73 - page 34**

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

b) The Cinco Group's formation of PCI and the PCI Group's claimed ownership of PCJV as an artifice to avoid the restriction on transfer and right of first refusal provisions contained in the PCJV Governing Documents (hereinafter, "Conspiracy No. 2").

c) The Cinco/PCI Group's, Hernandez Group's, and the Jacobys' collective agreement to default from the agreement to provide PC LA Group 100% ownership of PCJV and entry into a Master License Agreement (hereinafter, "Conspiracy No. 3").

d) The Cinco/PCI Group's, Hernandez Group's, and the Jacobys' collective agreement to remove Koren as President of PCJV and as a manager, to interfere with his business activities, as well as the activities of the other Cross-Complainants (hereinafter, "Conspiracy No. 4").

e) The Cinco/PCI Group's, Hernandez Group's, and Highfive's collective agreement to retaliate against Koren and undermine Cross-Complainants' business efforts in the United States in tripling the prices of Potato Corner products to the United States (hereinafter, "Conspiracy No. 5"). (Conspiracy No. 1 through Conspiracy No. 5 are hereinafter referred to collectively as the "Conspiracies" and each a "Conspiracy".)

105. Cross-Complainants allege that each of the above Conspiracies was entered into with the full knowledge, intent, and cooperation of the Cross-Defendants involved in each Conspiracy, as alleged above, with the intent to cause Cross-Complainants damage.

106. Cross-Complainants allege that as a result of the Conspiracies, Cross-Complainants have been damaged in an amount according to proof and further allege that equitable remedies, including the remedy of rescission, are appropriate under the circumstances. Indeed, among other things, Cross-Complainants specifically request that the Cinco-Hernandez Transaction be rescinded and that the 55% of shares of Cinco purchased by the Hernandez Group be equitably transferred in a manner benefitting Koren and/or PC LA Group as the parties whose right of first refusal contractual rights were violated as a result of the Conspiracies.

Exhibit 73 - page 35

1    107.    Cross-Complainants further allege that in doing the things described above, Cross-

2    Defendants, and ROES 1 through 250, inclusive, and each of them acted with the intent to deprive

3    Cross-Complainants of their legal rights and to injure them such that Cross-Defendants' actions

4    constitute fraud, oppression, or malice within the meaning of Civil Code § 3294.  Cross-

5    Defendants' conduct was and continues to be despicable, oppressive, and outrageous, justifying the

6    imposition of punitive and exemplary damages against Cross-Defendants, and ROES 1 through

7    250, inclusive, to make an example of Cross-Defendants and to deter such conduct in the future in

8    an amount that proof at trial may indicate is appropriate.

9                                 **SECOND CAUSE OF ACTION**

10                              **(BREACH OF WRITTEN CONTRACT)**

11   **By PCJV, PCI Trading, PC LA Group, and Koren Against Cinco/PCI Group and ROES 251**

12                                  **through 300, Inclusive**

13   108.    Cross-Complainants re-allege and incorporate herein by this reference all previous

14   allegations as though set forth herein in full.

15   109.    As alleged above, the PCJV Governing Documents contain, among other things,

16   restriction on transfer and right of first refusal provisions.  Cross-Complainants allege that the

17   Cinco/PCI Group breached those provisions in 2017 when they caused 55% of Cinco's shares to be

18   transferred to the Hernandez Group.

19   110.    On or about April 9, 2018, the Cinco/PCI Group further breached the PCJV

20   Governing Documents when they purportedly vote to remove Koren as a manager and officer

21   without the required votes.

22   111.    On or about April 23, 2018, the Cinco/PCI Group further breached the PCJV

23   Governing Documents by again purportedly voting to remove Koren as an officer without the

24   required votes.

25   112.    Further, Cross-Complainants allege that although the parties to the PCJV Governing

26   Documents always intended for ingredients and products be sold at cost and without profit by the

27   Cinco/PCI Group to PCJV and PCI Trading, on or about December 19, 2017, the provisions of the

28   PCJV Governing Documents were modified for the benefit of PCJV and PCI Trading such that it

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3818668 1                                     36
                         VERIFIED FIRST AMENDED CROSS-COMPLAINT

**Exhibit 73 - page 36**

1  was made clear that ingredients and products would be sold at cost and that PCJV and PCI Trading
2  may purchase those ingredients and products directly from the supplier.

3  113.  However, on or about August 31, 2018, the Cinco/PCI Group breached the PCJV
4  Governing Documents by tripling the price of ingredients and products to be sold to PCJV and PCI
5  Trading by their own alter-ego company, Highfive.

6  114.  Cross-Complainants allege that the breaches of the PCJV Governing Documents
7  caused Cross-Complainants harm.

8  115.  Cross-Complainants allege that they have performed all of the conditions of the
9  PCJV Governing Documents that are required to be performed by Cross-Complainants and that
10 Cross-Complainants remain ready and willing perform all of the terms of the PCJV Governing
11 Documents in order for the Court to order the specific performance of the right of first refusal
12 provisions contained in the PCJV Governing Documents, such that the 55% of shares of Cinco
13 purchased by the Hernandez Group be equitably transferred in a manner benefitting Koren and/or
14 PC LA Group as the parties whose right of first refusal contractual rights were violated. Specific
15 performance in this respect is required as money damages are inadequate for the breach of the
16 restriction on transfer and right of first refusal provisions.

17 116.  As a result of the above breaches, Cross-Complainants are entitled to damages at an
18 amount in accordance to proof and other equitable or legal remedies, including specific
19 performance.

20 **THIRD CAUSE OF ACTION**

21 **(ANTICIPATORY REPUDIATION)**

22 **By PC LA Group and NKM/JK Entities Against Cinco/PCI Group and ROES 251 through**

23 **300, Inclusive**

24 117.  Cross-Complainants re-allege and incorporate herein by this reference all previous
25 allegations as though set forth herein in full.

26 118.  As alleged above, PC LA Group is a party to the Master Services Agreement that
27 enables PC LA Group and the Cinco Group to split profits, if any, amongst themselves. Cross-
28 Complainants allege the parties waived respective percentage compensation under the Master

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3818668 1

37

VERIFIED FIRST AMENDED CROSS-COMPLAINT

Exhibit 73 - page 37

1  Services Agreement for operational reasons. However, the salaries of the managing officers (paid

2  through PC LA Group, but formerly paid directly by PCJV) were in place and never waived.[8]  In

3  2018, the salaries of the managing officers totaled $30,000 per month.  In 2017, the salaries of the

4  managing officers totaled $20,000 per month.[9]  Additionally, as alleged above, there is a

5  longstanding agreement among the parties that the NKM/JK Entities and any future store in which

6  Koren maintains an equity interest would be exempt from payment of any fees or royalties to PCJV.

7       119.  By their conduct, the Cinco/PCI Group have expressed an intention to anticipatorily

8  breach these agreements, and thus repudiate these agreements.

9       120.  Cross-Complainants performed all of their obligations, except as waived,

10  prevented, or excused by the acts and omissions of the Cinco/PCI Group.

11       121.  As a direct and proximate result of the foregoing anticipatory breaches of contract,

12  Cross-Complainants have sustained and will continue to sustain substantial non-economic and

13  economic injury in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION

## (FRAUDULENT INDUCEMENT)

**By PCJV, PC LA Group, Koren, and NKM/JK Entities Against Magsaysay, Cinco Group, Amir Jacoby, and ROES 301-350, Inclusive**

18       122.  Cross-Complainants re-allege and incorporate herein by this reference all previous

19  allegations as though set forth herein in full.

20       123.  As alleged above, in inducing Koren to take actions concerning the expansion of

21  Potato Corner in the United States and to reduce PC LA Group's equity interest in PCJV,

22  Magsaysay and the Cinco Group made certain promises and representations to Koren that:

---

[8] The salaries were in addition to PC LA Group's 30% profits interest under the Master Services Agreement, which profits interests were waived by PC LA Group, and 30% licensing fees were waived by the Cinco Group.

[9] Cross-Defendants allege in their First Amended Complaint that a "Services Agreement" executed by Koren and Jacoby in 2017 is fraudulent. That is far from the truth. That "Services Agreement" simply memorialized the payment of salaries as required by the company's auditors at that time.

3818668 1

38

VERIFIED FIRST AMENDED CROSS-COMPLAINT

Exhibit 73 - page 38

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

a) Koren would ultimately become the CEO and owner of Cinco and he or his group would eventually come to control 100% of Cinco (which Magsaysay repeated from time to time over the course of several years).

b) Any franchisee in which Koren maintains an interest is exempt from any fees owing to PCJV.

c) PC LA Group would be paid a management fee for its efforts in managing PCJV.

d) The Cinco Group would provide assistance to PCJV, PC LA Group, and Koren in connection with marketing, accounting, advertising, sourcing of goods, business development, strategic growth activities, franchising, legal services, training, operations, brand management, guidelines, and the like.

e) The Cinco Group would not sell, transfer, or assign any interest to any third party without consent and without offering Koren and PC LA Group a right of first refusal based on an agreed-to formula.

124. In reliance on the foregoing representations, Koren agreed to dedicate his career and all of his efforts to Potato Corner's expansion in the United States and to reduce his group's equity percentage stake in PCJV from majority 60% to a minority 40% stake.

125. Cross-Complainants are informed and believe, and thereupon allege, that the representations of Magsaysay and the Cinco Group in general were false and that they were made with the intent to induce and entice Koren, PCJV, PC LA Group, and the NKM/JK Entities to expand Potato Corner in the United States and for PC LA Group to reduce its equity percentage stake in PCJV. In fact, the truth was that neither Magsaysay nor the Cinco Group in general intended to follow through with their promises.

126. Indeed, Koren, PCJV, PC LA Group, and the NKM/JK Entities were unaware of the falsity of these representations and reasonably relied on them to their detriment. Had they known the truth, they would not have agreed to dedicate their substantial time, effort, and expense to expand Potato Corner in the United States nor enter into the PCJV Governing Documents.

///

39

VERIFIED FIRST AMENDED CROSS-COMPLAINT

**Exhibit 73 - page 39**

127. As a direct and proximate result of Magsaysay's and the Cinco Group's conduct, Koren, PCJV, PC LA Group, and the NKM/JK Entities have sustained and will continue to sustain substantial non-economic and economic injury in an amount to be proven at trial. Koren, PCJV, PC LA Group, and the NKM/JK Entities are also entitled to equitable relief addressing Cross-Defendants' wrongs, including the retroactive restoration of PC LA Group's 60% equity stake in PCJV.

128. Koren, PC LA Group, and the NKM/JK Entities further allege that in doing the things described above, Jacoby acted with the intent to deprive Koren, PC LA Group, and the NKM/JK Entities of their legal rights and to injure them such that Jacoby's actions constitute fraud, oppression, or malice within the meaning of Civil Code § 3294. Jacoby's conduct was and continues to be despicable, oppressive, and outrageous, justifying the imposition of punitive and exemplary damages against Jacoby to make an example of him and to deter such conduct in the future in an amount that proof at trial may indicate is appropriate.

129. In addition, Amir Jacoby induced Koren to enter into the Jacoby-Koren Agreement based on the representation that Amir Jacoby would fund 100% of Koren's required capital contributions in NKM and on any future franchisees that they may together open, in which future franchisee businesses Koren and Amir Jacoby would each acquire an equal share so long as Amir Jacoby funds all of Koren's required capital contributions.

130. In reliance on the foregoing representation, Koren provided Amir Jacoby an equity stake in NKM and in every other subsequent business entity in which each of them was involved, including the JK Entities and PC LA Group.

131. Cross-Complainants are informed and believe, and thereupon allege, that Amir Jacoby's representation was false and that it was made with the intent to induce Koren to relinquish certain interests in the NKM/JK Entities and PC LA Group to Amir Jacoby. In fact, the truth was that Amir Jacoby did not intend to fund Koren's capital contributions or that he intended to do so only under the right conditions, which were concealed from Koren.

132. Indeed, Koren was unaware of the falsity of Amir Jacoby's representation and reasonably relied on it to his detriment. Had Koren known the truth, he would not have

3818668 1                                              40
VERIFIED FIRST AMENDED CROSS-COMPLAINT

**Exhibit 73 - page 40**

1 | transferred any equity stake in any of the business to Amir Jacoby.

2 | 133. As a direct and proximate result of Amir Jacoby's conduct, Koren, PC LA Group,
3 | and the NKM/JK Entities have sustained and will continue to sustain substantial non-economic
4 | and economic injury in an amount to be proven at trial. Koren, PC LA Group, and the NKM/JK
5 | Entities are also entitled to rescission of all documents and instruments that provide for the
6 | transfer of any equity interest to Amir Jacoby in any business which Koren is involved as well as
7 | the retroactive restoration of Koren's respective equity stakes in said businesses.

8 | 134. Koren, PC LA Group, and the NKM/JK Entities further allege that in doing the
9 | things described above, Jacoby acted with the intent to deprive Koren, PC LA Group, and the
10 | NKM/JK Entities of their legal rights and to injure them such that Jacoby's actions constitute
11 | fraud, oppression, or malice within the meaning of Civil Code § 3294. Jacoby's conduct was and
12 | continues to be despicable, oppressive, and outrageous, justifying the imposition of punitive and
13 | exemplary damages against Jacoby to make an example of him and to deter such conduct in the
14 | future in an amount that proof at trial may indicate is appropriate.

15 | ## FIFTH CAUSE OF ACTION

16 | ### (BREACH OF ORAL CONTRACT)

17 | **By Koren, Hodgson, PC LA Group, and the NKM/JK Entities Against Jacoby**

18 | 135. Cross-Complainants re-allege and incorporate herein by this reference all previous
19 | allegations as though set forth herein in full.

20 | 136. As alleged above, Koren and Amir Jacoby verbally entered into the Jacoby-Koren
21 | Agreement. Amir Jacoby also entered into a similar verbal agreement with Hodgson concerning
22 | the funding of Hodgson's capital contributions in the various entities in which Hodgson maintains
23 | an interest as an inducement for Hodgson to become involved in this business enterprise
24 | (hereinafter, the "Jacoby-Hodgson Agreement").

25 | 137. Within the last two years, Amir Jacoby breached the Jacoby-Koren Agreement in
26 | refusing to acknowledge his capital contribution obligations and instead insisting that Koren treat
27 | such payments as loans and in other respects refusing to fund those agreed-to capital contributions
28 | in the first place. Additionally, within the last two years, Amir Jacoby breached the Jacoby-

3818668 1

41

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**Exhibit 73 - page 41**

1 Hodgson Agreement by refusing to perform his end of the bargain in breach of the Jacoby-

2 Hodgson Agreement.

3     138.    Cross-Complainants allege that PC LA Group and the NKM/JK Entities were the

4 intended third party beneficiaries to the Jacoby-Koren Agreement and the Jacoby-Hodgson

5 Agreement.

6     139.    Koren and Hodgson performed all of their obligations under the Jacoby-Koren

7 Agreement and Jacoby-Hodgson Agreement, except as waived, prevented, or excused by the acts

8 and omissions of Jacoby.

9     140.    As a direct and proximate result of the foregoing breaches of contract, Koren,

10 Hodgson, PC LA Group, and the NKM/JK Entities have sustained and will continue to sustain

11 substantial non-economic and economic injury in an amount to be proven at trial.

<div align="center">

### SIXTH CAUSE OF ACTION

### (BREACH OF IMPLIED-IN-FACT CONTRACT)

</div>

**By Koren, Hodgson, PC LA Group, and the NKM/JK Entities Against Jacoby**

15     141.    Cross-Complainant re-alleges and incorporates herein by this reference all previous

16 allegations as though set forth herein in full.

17     142.    The respective conduct and relationships of Koren, Hodgson, and Amir Jacoby

18 implies by law implied-in-fact contracts. The conduct of these parties, as alleged above,

19 establishes that they comported themselves under the terms of the Jacoby-Koren Agreement and

20 Jacoby-Hodgson Agreement.

21     143.    Within the last two years, Amir Jacoby breached the Jacoby-Koren Agreement in

22 refusing to acknowledge his capital contribution obligations and instead insisting that Koren treat

23 such payments as loans and in other respects refusing to fund those agreed-to capital contributions

24 in the first place. Additionally, within the last two years, Amir Jacoby breached the Jacoby-

25 Hodgson Agreement by refusing to perform his end of the bargain in breach of the Jacoby-

26 Hodgson Agreement.

27     144.    Cross-Complainants allege that PC LA Group and the NKM/JK Entities were the

28 intended third party beneficiaries to the Jacoby-Koren Agreement and the Jacoby-Hodgson

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**Exhibit 73 - page 42**

1  Agreement.

2  145. Koren and Hodgson performed all of their obligations under the Jacoby-Koren
3  Agreement and Jacoby-Hodgson Agreement, except as waived, prevented, or excused by the acts
4  and omissions of Jacoby.

5  146. As a direct and proximate result of the foregoing breaches of contract, Koren,
6  Hodgson, PC LA Group, and the NKM/JK Entities have sustained and will continue to sustain
7  substantial non-economic and economic injury in an amount to be proven at trial.

8  ## SEVENTH CAUSE OF ACTION

9  **(BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)**
10 **By PCJV, PCI Trading, Koren, Hodgson, PC LA Group, and the NKM/JK Entities Against**
11 **Cinco/PCI Group, Jacoby, and ROES 251 through 300, Inclusive**

12 147. Cross-Complainants re-allege and incorporate herein by this reference all previous
13 allegations as though set forth herein in full.

14 148. As alleged above in the Second Cause of Action, Third Cause of Action, Fifth
15 Cause of Action, and Sixth Cause of Action, PCJV, PCI Trading, Koren, Hodgson, PC LA Group,
16 and the NKM/JK Entities were parties to or third beneficiaries of certain agreements by the
17 parties, under all of which there is an implied covenant of good faith and fair dealing.

18 149. However, as alleged above, Cross-Defendants Cinco/PCI Group's and Amir
19 Jacoby's conduct is and continues to be in derogation of that implied covenant of good faith and
20 fair dealing.

21 150. As a direct and proximate result of the foregoing breaches of the implied covenant
22 of good faith and fair dealing, PCJV, PCI Trading, Koren, Hodgson, PC LA Group, and the
23 NKM/JK Entities have sustained and will continue to sustain substantial non-economic and
24 economic injury in an amount to be proven at trial. As alleged above, in addition to monetary
25 damages, these parties are also entitled to other legal and equitable remedies, including rescission
26 and specific performance.

27 / / /

28 / / /

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3818668 1

43

**Exhibit 73 - page 43**

# EIGHTH CAUSE OF ACTION

## (BREACH OF FIDUCIARY DUTY)

**By All Cross-Complainants Against All Cross-Defendants and ROES 1 through 250 and 351 through 400, Inclusive**

151. Cross-Complainants re-allege and incorporate herein by this reference all previous allegations as though set forth herein in full.

152. Cross-Complainants allege that by virtue of the parties' close business ties and relationships, including the various contractual agreements entered into by the parties, i.e., the PCJV Governing Documents, the Jacoby-Koren Agreement, the Jacoby-Hodgson Agreement, the Partnership Agreement, and the Master Services Agreement, Cross-Defendants, and each of them, owed Cross-Complainants a duty to act with the utmost good faith, care, and loyalty.

153. In engaging in the actions set forth above, including but not limited to, Cross-Defendants' attempts to remove Koren from PCJV, interfere with Koren's management and operations of PC LA Group, PCJV, and other entities, cast doubt upon Koren's authority and role in PCJV to members of the public, deprive Koren access to PCJV bank accounts, offices, and email addresses, and in Amir Jacoby's taking and converting funds from the NKM/JK Entities, the Conspiracies alleged above, and the ambush of PCJV employees, among other things, Cross-Defendants, and each of them, breached their respective fiduciary duties to Cross-Complainants, unlawfully putting their own interests ahead of Cross-Complainants' interests.

154. As a direct and proximate result of Cross-Defendants' conduct, Cross-Complainants' have sustained and will continue to sustain substantial non-economic and economic injury in an amount to be proven at trial.

155. Cross-Complainants further allege that in doing the things described above, Cross-Defendants, and each of them acted with the intent to deprive Cross-Complainants of their legal rights and to injure them such that Cross-Defendants' actions constitute fraud, oppression, or malice within the meaning of Civil Code § 3294. Cross-Defendants' conduct was and continues to be despicable, oppressive, and outrageous, justifying the imposition of punitive and exemplary damages against Cross-Defendants to make an example of Cross-Defendants and to deter such

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-8100

3818668.1

44

**Exhibit 73 - page 44**

1  conduct in the future in an amount that proof at trial may indicate is appropriate.

## NINTH CAUSE OF ACTION

### (INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS)

**By PCJV, PCI Trading, Koren, Hodgson, PC LA Group, and the NKM/JK Entities Against All Cross-Defendants, and ROES 1 through 400, Inclusive**

156.  Cross-Complainants re-allege and incorporate herein by this reference all previous allegations as though set forth herein in full.

157.  As alleged above, the parties enjoyed the benefits of particular contractual relations which were governed primarily by the PCJV Governing Documents, the Jacoby-Koren Agreement, the Jacoby-Hodgson Agreement, the Partnership Agreement, and the Master Services Agreement, but which expanded to other agreements with third party franchisees each bearing an expectation of payment or other benefits to PCJV, PCI Trading, Koren, Hodgson, PC LA Group, and the NKM/JK Entities.

158.  PCJV, PCI Trading, Koren, Hodgson, PC LA Group, and the NKM/JK Entities allege that Cross-Defendants, and ROES 1 through 400, inclusive, and each of them, had knowledge of all of these contractual relations. Despite that knowledge, Cross-Complainants allege that Cross-Defendants, and each of them, had the intent to interfere with those contractual relations. Indeed, by engaging in the conduct described above, Cross-Defendants, and each of them, took specific action to interfere with those contractual relations, in order to further each of their own special interests.

159.  As a direct and proximate result of Cross-Defendants' conduct, Cross-Complainants have sustained and will continue to sustain substantial non-economic and economic injury in an amount to be proven at trial.

160.  Cross-Complainants further allege that in doing the things described above, Cross-Defendants, and each of them, acted with the intent to deprive Cross-Complainants of their legal rights and to injure them such that Cross-Defendants' actions constitute fraud, oppression, or malice within the meaning of Civil Code § 3294. Cross-Defendants' conduct was and continues to be despicable, oppressive, and outrageous, justifying the imposition of punitive and exemplary

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3818668 1

45

VERIFIED FIRST AMENDED CROSS-COMPLAINT

**Exhibit 73 - page 45**

1  damages against Cross-Defendants to make an example of Cross-Defendants and to deter such

2  conduct in the future in an amount that proof at trial may indicate is appropriate.

3  ## TENTH CAUSE OF ACTION

4  ### (INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS)

5  ### By PCJV, PCI Trading, Koren, Hodgson, PC LA Group, and the NKM/JK Entities Against

6  ### All Cross-Defendants, and ROES 1 through 400, Inclusive

7  161.  Cross-Complainants re-allege and incorporate herein by this reference all previous

8  allegations as though set forth herein in full.

9  162.  As alleged above, the parties enjoyed the benefits of particular contractual relations

10 which were governed primarily by the PCJV Governing Documents, the Jacoby-Koren

11 Agreement, the Jacoby-Hodgson Agreement, the Partnership Agreement, and the Master Services

12 Agreement, but which expanded to other agreements with third party franchisees each bearing an

13 expectation of prospective economic benefits to PCJV, PCI Trading, Koren, Hodgson, PC LA

14 Group, and the NKM/JK Entities.

15 163.  PCJV, PCI Trading, Koren, Hodgson, PC LA Group, and the NKM/JK Entities

16 allege that Cross-Defendants, and ROES 1 through 400, inclusive, and each of them, had

17 knowledge of all of these contractual and prospective economic relations. Despite that

18 knowledge, Cross-Complainants allege that Cross-Defendants, and each of them, had the intent to

19 interfere with those contractual and prospective economic relations. Indeed, by engaging in the

20 conduct described above, Cross-Defendants, and each of them, took specific action to interfere

21 with those contractual and prospective economic relations, in order to further each of their own

22 special interests.

23 164.  As a direct and proximate result of Cross-Defendants' conduct, Cross-

24 Complainants have sustained and will continue to sustain substantial non-economic and economic

25 injury in an amount to be proven at trial.

26 165.  Cross-Complainants further allege that in doing the things described above, Cross-

27 Defendants, and each of them, acted with the intent to deprive Cross-Complainants of their legal

28 rights and to injure them such that Cross-Defendants' actions constitute fraud, oppression, or

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3818668 1

46

**Exhibit 73 - page 46**

1  malice within the meaning of Civil Code § 3294. Cross-Defendants' conduct was and continues

2  to be despicable, oppressive, and outrageous, justifying the imposition of punitive and exemplary

3  damages against Cross-Defendants to make an example of Cross-Defendants and to deter such

4  conduct in the future in an amount that proof at trial may indicate is appropriate.

<div align="center">

**ELEVENTH CAUSE OF ACTION**

**(NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS)**

**By PCJV, PCI Trading, Koren, Hodgson, PC LA Group, and the NKM/JK Entities Against**

**All Cross-Defendants, and ROES 1 through 400, Inclusive**

</div>

9      166.    Cross-Complainants re-allege and incorporate herein by this reference all previous

10  allegations as though set forth herein in full.

11      167.    As alleged above, the parties enjoyed the benefits of particular contractual relations

12  which were governed primarily by the PCJV Governing Documents, the Jacoby-Koren

13  Agreement, the Jacoby-Hodgson Agreement, the Partnership Agreement, and the Master Services

14  Agreement, but which expanded to other agreements with third party franchisees each bearing an

15  expectation of prospective economic benefits to PCJV, PCI Trading, Koren, Hodgson, PC LA

16  Group, and the NKM/JK Entities.

17      168.    PCJV, PCI Trading, Koren, Hodgson, PC LA Group, and the NKM/JK Entities

18  allege that Cross-Defendants, and ROES 1 through 400, inclusive, and each of them, had

19  knowledge of all of these contractual and prospective economic relations. Despite that

20  knowledge, Cross-Complainants allege that Cross-Defendants, and each of them, had the intent to

21  interfere, and to the extent they did not have specific intent, they negligently interfered with those

22  contractual and prospective economic relations. Indeed, by engaging in the conduct described

23  above, Cross-Defendants, and each of them, took specific action to negligently interfere with those

24  contractual and prospective economic relations, in order to further each of their own special

25  interests.

26      169.    As a direct and proximate result of Cross-Defendants' conduct, Cross-

27  Complainants have sustained and will continue to sustain substantial non-economic and economic

28  injury in an amount to be proven at trial.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1    170.   Cross-Complainants further allege that in doing the things described above, Cross-

2 Defendants, and each of them, acted with the intent to deprive Cross-Complainants of their legal

3 rights and to injure them such that Cross-Defendants' actions constitute fraud, oppression, or

4 malice within the meaning of Civil Code § 3294. Cross-Defendants' conduct was and continues

5 to be despicable, oppressive, and outrageous, justifying the imposition of punitive and exemplary

6 damages against Cross-Defendants to make an example of Cross-Defendants and to deter such

7 conduct in the future in an amount that proof at trial may indicate is appropriate.

## TWELFTH CAUSE OF ACTION

## (INDUCING BREACHES OF CONTRACT)

**By PCJV, PCI Trading, Koren, Hodgson, PC LA Group, and the NKM/JK Entities Against**
**All Cross-Defendants, and ROES 1 through 400, Inclusive**

12    171.   Cross-Complainants re-allege and incorporate herein by this reference all previous

13 allegations as though set forth herein in full.

14    172.   As alleged above, the parties enjoyed the benefits of particular contractual relations

15 which were governed primarily by the PCJV Governing Documents, the Jacoby-Koren

16 Agreement, the Jacoby-Hodgson Agreement, the Partnership Agreement, and the Master Services

17 Agreement, but which expanded to other agreements with third party franchisees each bearing an

18 expectation of prospective economic benefits to PCJV, PCI Trading, Koren, Hodgson, PC LA

19 Group, and the NKM/JK Entities.

20    173.   PCJV, PCI Trading, Koren, Hodgson, PC LA Group, and the NKM/JK Entities

21 allege that Cross-Defendants, and ROES 1 through 400, inclusive, and each of them, had

22 knowledge of all of these contracts and intended to cause the parties to those contracts to breach

23 the contracts. Despite that knowledge, Cross-Complainants allege that Cross-Defendants, and

24 each of them, took specific action to induce the breaches of these contracts, in order to further

25 each of their own special interests.

26    174.   As a direct and proximate result of Cross-Defendants' conduct, Cross-

27 Complainants have sustained and will continue to sustain substantial non-economic and economic

28 injury in an amount to be proven at trial.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**Exhibit 73 - page 48**

175. Cross-Complainants further allege that in doing the things described above, Cross-Defendants, and each of them, acted with the intent to deprive Cross-Complainants of their legal rights and to injure them such that Cross-Defendants' actions constitute fraud, oppression, or malice within the meaning of Civil Code § 3294. Cross-Defendants' conduct was and continues to be despicable, oppressive, and outrageous, justifying the imposition of punitive and exemplary damages against Cross-Defendants to make an example of Cross-Defendants and to deter such conduct in the future in an amount that proof at trial may indicate is appropriate.

## THIRTEENTH CAUSE OF ACTION

### (NEGLIGENCE)

**By PCJV, PCI Trading, Koren, PC LA Group, and the NKM/JK Entities Against Cinco/PCI Group, and ROES 301-350, Inclusive**

176. Cross-Complainants re-allege and incorporate herein by this reference all previous allegations as though set forth herein in full.

177. Cross-Complainants allege that, at all times relevant herein, the Cinco/PCI Group owed common law duties to PCJV, PCI Trading, Koren, PC LA Group, and the NKM/JK Entities to act in accordance with the requisite standard of care.

178. The Cinco/PCI Group's conduct as alleged herein above is and continued to be in derogation of those duties.

179. As a direct and proximate result of Cross-Defendants' conduct, Cross-Complainants have sustained and will continue to sustain substantial non-economic and economic injury in an amount to be proven at trial.

## FOURTEENTH CAUSE OF ACTION

### (CONVERSION)

**By PC LA Group and JK Consultants Against Amir Jacoby and ROES 401-450, Inclusive**

180. Cross-Complainants re-allege and incorporate herein by this reference all previous allegations as though set forth herein in full.

181. As alleged above, Cross-Complainants are informed and believe, and thereupon allege, that Amir Jacoby engaged in the Unauthorized Jacoby Withdrawals, and converted those

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**Exhibit 73 - page 49**

1 funds for his own use

2     182.   While Cross-Complainants have repeatedly demanded the return of the subject
3 funds, Amir Jacoby has failed and refused, and continues to fail and refuse, to return the funds.
4 Upon information and belief, Amir Jacoby has utilized the subject funds for his own purposes
5 such that an imposition of a constructive trust on the interests of Amir Jacoby and ROES 401-450,
6 inclusive, including any business interests, profits, investments, real estate, and other assets, which
7 is necessary and appropriate under the circumstances.

8     183.   In addition, Cross-Complainants have incurred time and money in pursuit of the
9 converted funds, which further damages Cross-Complainants are entitled to recover against Amir
10 Jacoby and ROES 401-450, inclusive.

11     184.   Cross-Complainants further allege that in doing the things described above, Amir
12 Jacoby and ROES 401-450, inclusive, and each of them, acted with the intent to deprive Cross-
13 Complainants of their legal rights and to injure them such that Cross-Defendants' actions
14 constitute fraud, oppression, or malice within the meaning of Civil Code § 3294. Cross-
15 Defendants' conduct was and continues to be despicable, oppressive, and outrageous, justifying
16 the imposition of punitive and exemplary damages against Cross-Defendants to make an example
17 of Cross-Defendants and to deter such conduct in the future in an amount that proof at trial may
18 indicate is appropriate.

19 <div align="center">**FIFTEENTH CAUSE OF ACTION**</div>

20 <div align="center">**(MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF CAL. CIVIL CODE**</div>
21 <div align="center">**§§ 3426, *ET. SEQ.*)**</div>

22 <div align="center">**By PCJV, PC1 Trading, PC LA Group, and the NKM/JK Entities Against the Cinco/PCI**</div>
23 <div align="center">**Group, the Jacobys, the Hernandez Group, and ROES 1 through 250, Inclusive**</div>

24     185.   Cross-Complainants re-allege and incorporate herein by this reference all previous
25 allegations as though set forth herein in full.

26     186.   Over the years, PCJV, PCI Trading, PC LA Group, and the NKM/JK Entities have
27 created and accumulated confidential and proprietary information on a variety of subjects
28 including, without limitation, data, pricing, preferred vendor information, marketing strategies,

FREEMAN, FREEMAN & SMITH, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**Exhibit 73 - page 50**

1    market research, marketing activities, advertising, customer preferences, information concerning

2    the strategic positioning of stores and kiosks, targeting, customer offerings, promotions,

3    production, business management, social networking, publicity, public relations, training, training

4    schedules, training materials, and the like (hereinafter, the "Confidential Information").

5         187.     PCJV, PCI Trading, PC LA Group, and the NKM/JK Entities, largely through

6    Koren's efforts, developed the Confidential Information through a significant investment of time,

7    labor, and capital.

8         188.     The Confidential Information represents a valuable resource to Cross-

9    Complainants, and therefore has independent economic value, in that the information comprising

10    the Confidential Information is not known to the general public or even to other people engaged in

11    the same business or occupation. Such information has been, and is, the subject of reasonable

12    efforts on the part of Cross-Complainants to maintain its secrecy.

13         189.     Access to the Confidential Information would give a competitor an unfair

14    competitive advantage because any competitor with access to the Confidential Information could

15    use it as a shortcut to develop new business without having made the investment of time, labor,

16    and capital that Cross-Complainants made to create and accumulate the Confidential Information.

17         190.     Cross-Complainants engage in reasonable and cautionary measures to preserve the

18    confidentiality of the Confidential Information. For example, Cross-Complainants do not disclose

19    the Confidential Information to competitors or to any unaffiliated third party. For another, Cross-

20    Complainants have established, and enforce, a series of protective measures to ensure that the

21    Confidential Information is not disclosed to others.

22         191.     Despite this, Cross-Complainants are informed and believe, and thereupon allege,

23    that prior to the Cinco-Hernandez transaction, the Hernandez Group was a franchisee of Cinco's in

24    the Philippines, opening their first Potato Corner store in or about 2015. As such, the Hernandez

25    Group is a competing franchisee to the NKM/JK Entities, and the Hernandez Group's interests are

26    adverse to the interests of PCJV, PCI Trading, PC LA Group, and the NKM/JK Entities.

27    However, as alleged above, in a coordinated effort by the Cinco/PCI Group and the Jacobys, the

28    Hernandez Group was permitted to access and misappropriate the Confidential Information and

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3818668.1             51

Exhibit 73 - page 51

1 has used and continues to use that Confidential Information to cause damage to PCJV, PCI
2 Trading, PC LA Group, and the NKM/JK Entities.

3     192.   The conduct of Cross-Defendants Cinco/PCI Group, the Jacobys, the Hernandez
4 Group, and ROES 1 through 250, inclusive, as alleged above, constitutes actual and threatened
5 misappropriation of trade secrets in violation of the California Uniform Trade Secrets Act
6 ("CUTSA"), Cal. Civ. Code §§ 3426, *et seq.*

7     193.   As a direct and proximate result of Cross-Defendants' conduct, Cross-
8 Complainants have sustained and will continue to sustain substantial non-economic and economic
9 injury in an amount to be proven at trial.

10     194.   Cross-Complainants further allege that in doing the things described above, the
11 Cinco/PCI Group, the Jacobys, the Hernandez Group, and ROES 1 through 250, inclusive, and
12 each of them, acted with the intent to deprive Cross-Complainants of their legal rights and to
13 injure them such that Cross-Defendants' actions constitute fraud, oppression, or malice within the
14 meaning of Civil Code § 3294. Cross-Defendants' conduct was and continues to be despicable,
15 oppressive, and outrageous, justifying the imposition of punitive and exemplary damages against
16 Cross-Defendants to make an example of Cross-Defendants and to deter such conduct in the future
17 in an amount that proof at trial may indicate is appropriate.

18     195.   Moreover, Cross-Complainants allege that the Cinco/PCI Group, the Jacobys, the
19 Hernandez Group, and ROES 1 through 250, inclusive threaten to continue to act in derogation of
20 Cross-Complainants' rights unless they are restrained and enjoined from doing so. As such,
21 Cross-Complainants are entitled to further injunctive relief enjoining, at a minimum, all
22 responsible parties from using or retaining the Confidential Information.

23 ///
24 ///
25 ///
26 ///
27 ///
28 ///

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3818668.1

Exhibit 73 - page 52

## SIXTEENTH CAUSE OF ACTION

### (UNFAIR COMPETITION IN VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ.*)

**By All Cross-Complainants Against All Cross-Defendants, and ROES 1 through 500, Inclusive**

196. Cross-Complainants re-allege and incorporate herein by this reference all previous allegations as though set forth herein in full.

197. California Business and Professions Code § 17200 provides:

> As used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code.

78. As alleged above, Cross-Defendants have engaged in unfair business acts and practices within the meaning of California Business and Professions Code § 17200.

79. As a direct, proximate, and foreseeable result of the wrongful conduct of Cross-Defendants, and each of them, Cross-Complainants have been damaged and entitled to relief, including full restitution and/or disgorgement of any funds and benefits that may have been and will be obtained by Cross-Defendants as a result of such unfair business acts and practices, including any other legal or equitable relief the Court deems proper.

80. California Business and Professions Code § 17203 provides, in relevant part:

> Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition.

198. Pursuant to California Business and Professions Code § 17203, Cross-Complainants seek injunctive relief as the Court deems appropriate and, to the extent allowable, the recovery of Cross-Complainants' attorneys' fees and costs.

///

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**Exhibit 73 - page 53**

# SEVENTEENTH CAUSE OF ACTION

## (ACCOUNTING)

**By PCJV, PCI Trading, and the NKM/JK Entities Against the Cinco/PCI Group, Highfive, the Hernandez Group, and ROES 451 through 500, Inclusive**

199.   Cross-Complainants re-allege and incorporate herein by this reference all previous allegations as though set forth herein in full.

200.   As alleged above, despite the fact that the parties agreed that ingredients and products would be sold to PCJV and/or PCI Trading at cost, Cross-Defendants Cinco/PCI Group, Highfive, the Hernandez Group have made an effort to unlawfully profit off of PCJV and/or PCI Trading by tripling the prices of those products and ingredients, thus causing damage to all United States franchisees including the NKM/JK Entities.

201.   Cross-Complainants are informed and believe, and thereupon allege, that despite assurances to the contrary, the Cinco/PCI Group and Highfive have unlawfully profited from the sale of said products and ingredients since 2010 and failed and refused to sell those products at cost as promised.

202.   The amount of profits generated by this scheme by the Cinco/PCI Group and Highfive, and now with the continued facilitation by the Hernandez Group, is unknown and could only be ascertained through an accounting.

203.   Additionally, Cross-Complainants are informed and believe, and thereupon allege, that the Cinco/PCI Group and the Hernandez Group maintain a bank account belonging to PCI Trading which they have thus far refused to turn over to PCI Trading as required.  PCI Trading thus demands an accounting of all funds belonging to it held or controlled by any Cross-Defendant.

/ / /

/ / /

/ / /

/ / /

/ / /

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3818668.1

54

**EIGHTEENTH CAUSE OF ACTION**

**(RESTITUTION TO AVOID UNJUST ENRICHMENT)**

**By PCJV, PCI Trading, and the NKM/JK Entities Against the Cinco/PCI Group, Highfive,**

**the Hernandez Group, and ROES 451 through 500, Inclusive**

204.     Cross-Complainants re-allege and incorporate herein by this reference all previous allegations as though set forth herein in full.

205.     As alleged above, the Cinco/PCI Group, Highfive, and the Hernandez Group, and ROES 451 through 500, inclusive, have profited by reason of their acts of unfair competition, and other unlawful, tortious acts as alleged herein.

206.     Under the circumstances, it would be inequitable for these Cross-Defendants to retain the benefits of their ill-gotten gains. Once a full accounting is completed, Cross-Complainants are entitled to full restitution and/or disgorgement by Cross-Defendants of all revenues, earnings, profits, or other economic benefits earned at Cross-Complainants' detriment and expense. Otherwise, Cross-Defendants will be unjustly enriched.

**NINETEENTH CAUSE OF ACTION**

**(DECLARATORY RELIEF)**

**By All Cross-Complainants Against All Cross-Defendants, and ROES 1 through 500,**

**Inclusive**

207.     Cross-Complainants re-allege and incorporate herein by this reference all previous allegations as though set forth herein in full.

208.     Based on the foregoing, a number of disputes have arisen between Cross-Complainants, on the one hand, and Cross-Defendants, and ROES 1 through 500, inclusive, and each of them, on the other hand regarding their respective rights and obligations, among other things, under the PCJV Governing Documents, the Jacoby-Koren Agreement, the Jacoby-Hodgson Agreement, the Partnership Agreement, and the Master Services Agreement. Further disputes surround: (a) the validity of the votes and resolutions to remove Koren from PCJV's management; (b) the propriety of the Cinco-Hernandez transaction and the Hernandez Group's ability to participate in the management of PCJV; (c) the equity breakdown and interests of the parties in the

3818668.1                                                55
VERIFIED FIRST AMENDED CROSS-COMPLAINT

**Exhibit 73 - page 55**

1 entities involved in this litigation; (d) the propriety of Amir Jacoby's unauthorized withdrawals;

2 (e) the control and management of PCJV and PCI Trading; (f) certain Cross-Defendants'

3 maintenance of a bank account in the name of PCI Trading; (g) certain Cross-Defendants'

4 maintenance of a lease agreement once entered on behalf of PCJV, which space in Encino,

5 California that they, upon information and belief, continue to lease and occupy; (h) the rights of

6 Cross-Complainants regarding the ability to purchase ingredients and products at cost and/or

7 ability to source those ingredients elsewhere; (i) the continued rights of the parties involving the

8 waiver of royalties and fees; (j) Koren and/or PC LA Group's rights to 55% of Cinco's shares; and

9 (k) whether certain Cross-Complainants sued in the Cinco-PCJV Action committed any

10 wrongdoing, among other things. A judicial declaration is necessary and appropriate at this time

11 under these circumstances to resolve the claims of Cross-Complainants, on the one hand, and

12 Cross-Defendants, and each of them, on the other hand.

13     209.   As such, Cross-Complainants seek judicial declarations that:

14       a.  Koren's changing PCJV's banking relationship to safeguard those funds from

15         Amir Jacoby was justified.

16       b.  The votes and resolutions to remove Koren as a voting representative, manager,

17         and/or officer of PCJV are invalid or null and void.

18       c.  In transferring a majority interest to the Hernandez Group, the Cinco/PCI

19         Group breached the PCJV Governing Documents.

20       d.  In transferring a majority interest to the Hernandez Group without first

21         providing Koren or PC LA Group a right of first refusal, the Cinco/PCI Group

22         breached the PCJV Governing Documents.

23       e.  The transfer of equity interests by the Cinco Group to the Hernandez Group is

24         subject to rescission.

25       f.  Any vote by any member of the Hernandez Group, including Hernandez, is

26         invalid or null and void, in PCJV.

27       g.  Amir Jacoby was not authorized to withdraw over $50,000 from the PC LA

28         Group and JK Consulting bank accounts.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**Exhibit 73 - page 56**

h. Koren's management of PCJV and PC LA Group shall continue without interference by any of the Cross-Defendants and any person acting in concert with or participating with them.

i. The purported termination of the Master Services Agreement is invalid or null and void.

j. Any franchisee in which Koren maintains an interest is exempt from payment of fees or royalties to PCJV.

k. The equity interests of the various entities involved in this litigation shall be established in accordance to Cross-Complainants' contentions and/or equitably modified/adjusted as the Court deems appropriate;

l. Cross-Defendants shall not charge PCJV or PCI Trading for products and ingredients in excess of their actual costs plus shipping;

m. Cross-Defendants are not entitled to maintain any bank account in the name of PCI Trading (or PCJV) and shall return such funds held in any such account immediately forthwith;

n. Cross-Defendants are not entitled to maintain an office or competing enterprise in the United States;

o. Cross-Defendants are not entitled to engage in marketing or advertising activities that are accessible in the United States without the consent of Cross-Complainants; and

p. Cross-Complainants Koren, Alon Koren, Hodgson, Garcia, and Grudnowski are not liable in any manner for the claims and assertions made in the Cinco-PCJV Action.

/ / /
/ / /
/ / /
/ / /
/ / /

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**Exhibit 73 - page 57**

# TWENTIETH CAUSE OF ACTION

## (REFORMATION)

**By PCJV, PCI Trading, PC LA Group, and Koren Against Cinco/PCI Group and ROES 251 through 300, Inclusive**

210. Cross-Complainants re-allege and incorporate herein by this reference all previous allegations as though set forth herein in full.

211. As alleged above, the parties enjoyed the benefits of particular contractual relations which were governed primarily by the PCJV Governing Documents, the Partnership Agreement, and the Master Services Agreement, but which expanded to other agreements each bearing an expectation of prospective economic benefits to PCJV, PCI Trading, PC LA Group, and Koren. At times, and given certain nature and circumstances beyond Cross-Complainants' doing or control, the written agreements may not accurately reflect the true intention of the parties.

212. As a result of the foregoing, PCJV, PCI Trading, PC LA Group, and Koren allege that the written agreements shall be reformed, to the extent necessary, to reflect the true intention of the parties.

# TWENTY-FIRST CAUSE OF ACTION

## (IMPLIED/EQUITABLE INDEMNITY)

**By All Cross-Complainants Against the Jacobys and ROES 401-450, Inclusive**

213. Cross-Complainants re-allege and incorporate herein by this reference all previous allegations as though set forth herein in full.

214. In this action and the Cinco-PCJV Action (which was dismissed without prejudice), Cinco and PCI have directly or indirectly asserted various claims against Cross-Complainants, but have neglected to name Amir Jacoby or Inbal Jacoby, whose interests in many ways aligns with Cross-Complainants, as party defendants.

215. Cross-Complainants allege that in light of the foregoing, the Jacobys must indemnify Cross-Complainants for all attorneys' fees, expenses, expert fees, and costs incurred by them. Cross-Complainants further allege that the Jacobys are responsible and liable for all losses that Cross-Complainants have incurred and will incur in the future in connection with this matter.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**Exhibit 73 - page 58**

216.     Cross-Complainants further allege that, should Cinco or PCI prevail in this litigation, any injuries or damages to Cinco or PCI were caused solely through the negligence and carelessness and/or fault and/or tortious conduct of the Jacobys, and their agents, and not due to any action on the part of any Cross-Complainant or their agents.  Therefore, if any Cross-Complainant is held liable to Cinco or PCI, or any party affiliated and/or associated with Cinco or PCI, said liability will be solely of a vicarious and ultimately secondary nature predicated upon the facts set forth herein, and that by reason of the foregoing facts, Cross-Complainants are entitled to full and complete indemnification from the Jacobys.

## TWENTY-SECOND CAUSE OF ACTION

## (COMPARATIVE INDEMNITY AND APPORTIONMENT OF FAULT)

### By All Cross-Complainants Against the Jacobys and ROES 401-450, Inclusive

217.     Cross-Complainants re-allege and incorporate herein by this reference all previous allegations as though set forth herein in full.

218.     In this action and the Cinco-PCJV Action (which was dismissed without prejudice), Cinco and PCI have directly or indirectly asserted various claims against Cross-Complainants, but have neglected to name Amir Jacoby or Inbal Jacoby, whose interests in many ways aligns with Cross-Complainants, as party defendants.

219.     If any Cross-Complainant is adjudged to be liable to Cinco or PCI, or any party affiliated and/or associated with Cinco or PCI, the Jacobys, and each of them, should be required to pay a share of such liability which is in proportion to the comparative negligence of that party in causing any such damage or injury.

220.     Cross-Complainants allege that in light of the foregoing, the Jacobys must also indemnify Cross-Complainants for all attorneys' fees, expenses, expert fees, and costs incurred by them.  Cross-Complainants further allege that the Jacobys are responsible and liable for all losses that Cross-Complainants have incurred and will incur in the future in connection with this matter.

/ / /

/ / /

/ / /

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3818668 1

VERIFIED FIRST AMENDED CROSS-COMPLAINT

**Exhibit 73 - page 59**

1                             **PRAYER FOR RELIEF**

2        WHEREFORE, Cross-Complainants pray for judgment against Cross-Defendants, and

3 each of them, jointly and severally, as follows:

4       1.   For general, special, actual, compensatory and/or nominal damages in an amount to

5 be proved at trial;

6       2.   For rescission;

7       3.   For specific performance;

8       4.   For restitution;

9       5.   For punitive and exemplary damages;

10       6.   For a temporary restraining order, preliminary injunction, and permanent

11            injunction;

12       7.   For declaratory relief;

13       8.   For constructive trusts;

14       9.   For an award of attorneys' fees, costs and expenses;

15      10.   For prejudgment and post-judgment interest as allowed by law; and

16      11.   For such other and further relief that the Court deems just and proper.

17 / / /

18 / / /

19 / / /

20 / / /

21 / / /

22 / / /

23 / / /

24 / / /

25 / / /

26 / / /

27 / / /

28 / / /

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3818668.1                          60

Exhibit 73 - page 60

DATED: October 10, 2018

FREEMAN, FREEMAN & SMILEY, LLP

By: _____

TODD M. LANDER
ARASH BERAL
JEFFREY S. GOODFRIED
KELSEY L. HOTCHKISS
Attorneys for Defendants and Cross-Complainants
PCJV USA, LLC, GUY KOREN, NKM
CAPITAL GROUP, LLC, J & K AMERICANA,
LLC, J & K CULVER, LLC, J&K LAKEWOOD,
LLC, J&K OAKRIDGE, LLC, J&K VALLEY
FAIR, LLC, J & K CAPITAL 2, LLC, J & K
ONTARIO, LLC, J&K PC TRUCKS, LLC, J&K
CONSULTANTS GROUP, LLC, GK CAPITAL
GROUP, LLC, and POTATO CORNER LA
GROUP, LLC, and Cross-Complainants PCI
TRADING, LLC, ALON KOREN, THOMAS
HODGSON, EMILY GARCIA, and ASHLEY
GRUDNOWSKI

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3818668.1

61

VERIFIED FIRST AMENDED CROSS-COMPLAINT

Exhibit 73 - page 61

## VERIFICATION

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I have read the foregoing **VERIFIED FIRST AMENDED CROSS-COMPLAINT** and know its contents.

I am a party to this action. The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

I am an authorized representative of PCJV USA, LLC, a Delaware limited liability company; PCI TRADING LLC, a Delaware limited liability company; POTATO CORNER LA GROUP, LLC, a California limited liability company; NKM CAPITAL GROUP, LLC, a California limited liability company; J & K AMERICANA, LLC, a California limited liability company; J&K LAKEWOOD, LLC, a California limited liability company; J & K CULVER, LLC, a California limited liability company; J&K OAKRIDGE, LLC, a California limited liability company; J&K VALLEY FAIR, LLC, a California limited liability company; J & K CAPITAL 2, LLC, a California limited liability company; J & K ONTARIO, LLC, a California limited liability company; J&K PC TRUCKS, LLC, a California limited liability company; J&K CONSULTANTS GROUP, LLC, a California limited liability company; GK CAPITAL GROUP, LLC, a California limited liability company, all parties to this action, and am authorized to make this verification for and on their behalf, and I make this verification for that reason. I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.

Executed on October 10, 2018, at Los Angeles, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Guy Koren individually and on behalf of PCJV USA, LLC, a Delaware limited liability company; PCI TRADING LLC, a Delaware limited liability company; POTATO CORNER LA GROUP, LLC, a California limited liability company; NKM CAPITAL GROUP, LLC, a California limited liability company; J & K AMERICANA, LLC, a California limited liability company; J&K LAKEWOOD, LLC, a California limited liability company; J & K CULVER, LLC, a California limited liability company; J&K OAKRIDGE, LLC, a California limited liability company; J&K VALLEY FAIR, LLC, a California limited liability company; J & K CAPITAL 2, LLC, a California limited liability company; J & K ONTARIO, LLC, a California limited liability company; J&K PC TRUCKS, LLC, a California limited liability company; J&K CONSULTANTS GROUP, LLC, a California limited liability company; GK CAPITAL GROUP, LLC, a California limited liability company

Print Name of Signatory                              Signature

3933897.1 26859-000

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

Exhibit 73 - page 62

## VERIFICATION

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I have read the foregoing **VERIFIED FIRST AMENDED CROSS-COMPLAINT** and know its contents.

I am a party to this action. The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

Executed on October 10, 2018, at Los Angeles, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

ALON KOREN
Print Name of Signatory

Signature

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3933897.1 26859-800

**Exhibit 73 - page 63**

**VERIFICATION**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I have read the foregoing **VERIFIED FIRST AMENDED CROSS-COMPLAINT** and know its contents.

I am a party to this action. The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

Executed on October 10, 2018, at Los Angeles, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

THOMAS HODGSON
Print Name of Signatory                                    Signature

3933897 1 26859-800

**Exhibit 73 - page 64**

# VERIFICATION

## STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I have read the foregoing **VERIFIED FIRST AMENDED CROSS-COMPLAINT** and know its contents.

I am a party to this action. The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

Executed on October 10, 2018, at Los Angeles, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

EMILY GARCIA
Print Name of Signatory

Signature

3933897.1 26859-800

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

Exhibit 73 - page 65

**VERIFICATION**

1

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

2

3   I have read the foregoing **VERIFIED FIRST AMENDED CROSS-COMPLAINT** and know its contents.

4   I am a party to this action. The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to
5   those matters I believe them to be true.

6   Executed on October 10, 2018, at Los Angeles, California.

7   I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

8

9

10   ASHLEY GRUDNOWSKI
     Print Name of Signatory                         Signature

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3933897 1 26859-800

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**Exhibit 73 - page 66**

# EXHIBIT A

Exhibit 73 - page 67

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

JUN 1 8 2018

Sherri R. Carter, Executive Officer/Clerk
By Fernando Becerra, Jr., Deputy

SUPERIOR COURT FOR THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

| | |
|---|---|
| CINCO CORPORATION, | ) Case No.: BC701075 |
| | ) |
| Plaintiff | ) Order Denying Cinco's Request for |
| | ) Injunctive Relief and Granting Koren's |
| vs. | ) Request for Injunctive Relief |
| | ) |
| GUY KOREN, et al., | ) Hearing: |
| | ) June 6, 2018 |
| Defendants | ) 9:30 a.m. |
| | ) Dept. 86 |
| | ) |

Plaintiff Cinco Corporation (Cinco) is a Philippine Company that alleges it is a member of a Delaware limited liability company (LLC) known as PCJV USA LLC (Company). Defendant Guy Koren alleges he is also a member of the LLC and that he has served as President of the Company since 2012. Cinco contends that in April 2018 meetings, it validly removed Koren as President of the Company. Cinco also accuses Koren of wrongdoing in connection with his management of the company, alleging causes of action against Koren for conversion of Company funds allegedly taken from its bank accounts, breach of fiduciary duty, breach of contract, anticipatory breach of contract, and unfair business practices in violation of Business &

1

Exhibit 73 - page 68

1  Professions Code § 17200.  Cinco seeks to impose a constructive trust and seeks preliminary and

2  permanent injunctive relief.

3  Koren's May 8, 2018 verified cross-complaint names as defendants Cinco, its subsidiary

4  Potato Corner International, Inc. (PCI) and the following individuals: Myrose Victor, John

5  Edward Hernandez, Jose P. Magsaysay Jr., Marivic del Pilar, Ricardo Enrique K. Montelibano,

6  Ben Olivas, Amir Jacoby and Inbal Jacoby.  The Cross-complaint asserts causes of action for

7  breach of fiduciary duty, intentional interference with contractual relations, intentional and

8  negligent interference with prospective economic relations, unfair competition, breach of

9  contract, fraudulent inducement, and various breaches of written, oral, and implied in fact

10  contracts.

11  On May 11, 2018, this Court granted, in part, Cinco's ex parte application for a

12  temporary restraining order (TRO) and ordered Koren to show cause why the Court should not

13  issue a preliminary injunction.  The Court also granted, in part, Koren's application for a TRO

14  and ordered Cinco to show cause why it should not be preliminarily enjoined.  The Court heard

15  argument on June 6, 2018 and gave leave for both sides to submit additional evidence.  Having

16  reviewed the extensive evidence and briefing from both sides, the Court now DENIES Cinco's

17  request for injunctive relief and GRANTS, IN PART, Koren's request for relief.[1]

18

## I.  Factual Background

19

20  There are three successive written agreements pertinent to the issues before this Court: a

21  Potato Corner USA Joint Venture Agreement (JVA) (apparently executed in 2010), a Limited

22  Liability Company Agreement of PCJV USA LLC (Operating Agreement or OA), and a 2012

23  PCJV USA LLC First Amendment to Joint Venture Agreement (AJVA).  All three agreements

24

25
_____

[1] The court has separately ruled on all evidentiary objections submitted by the parties.

2

**Exhibit 73 - page 69**

address the parties' collaboration in a multi-outlet restaurant franchise business operating under

the name "Potato Corner." As explained more fully below, an important issue is whether Cinco

will probably succeed in proving the Company properly voted to remove Koren as President.

That question turns, in part, on which of the agreements presently governs the parties' conduct,

and whether that gives Cinco the right to remove the President of the Company.

Although the Court concludes that the most recent agreement is most likely the operative

agreement, the Court summarizes, below, the content of all three contracts.

### A. The 2010 Joint Venture Agreement (JVA)

The undated Joint Venture Agreement (JVA) (apparently signed in 2010) and the First

Amendment to the Joint Venture Agreement (AJVA) are nearly identical. The basic purpose of

the JVA was to memorialize the parties' intentions to form a Delaware limited liability company

(LLC) ("Company") by setting forth "terms and conditions" "with respect to the organization,

incorporation, operation and management" and the Parties' "respective rights, duties and

obligations . . . ." (JVA p. 1; see also AJVA p. 1.) Under Delaware law, a "member" of an

LLC is a percentage owner of the enterprise. (Del. Code Ann. tit. 6, § 18-101.) However,

reviewing the language in the JVA, the Court cannot reasonably ascertain who was intended to

be a Party to the JVA or a member and/or manager of the Company or the respective rights,

duties and obligations of the Parties, members and managers.

By its terms, the JVA is "made and entered into" by Cinco Corporation ("represented . . .

by its duly authorized representatives" identified as "Jose P. Magsaysay and its directors: Jose P.

Magsaysay Jr., Jose Miguel Ma. G. Montinola, Ma. Victoria O. Bermejo, Ricardo K.

Montelibano . . . collectively referred to as the 'Cinco Group' ") and "AMIT NEMANIM, GUY

KOREN and AMIR JACOBY . . . collectively referred to as the 'LA Group.' " (JVA p. 1.) This

language suggests there are four "Parties" to the JVA: Cinco and the three individuals referred to

3

Exhibit 73 - page 70

as LA Group. However, language in Paragraph 2) suggests there are two parties to the JVA. Addressing "CAPITALIZATION/OWNERSHIP OF THE COMPANY," Paragraph 2) refers to "both Parties" and calls for capital contributions from Cinco Group ($30,000) and LA Group (20,000). (*Id.*, ¶ 2) c); see also AJVA ¶ 2) c).)

Ordinarily, the parties to an agreement sign the agreement. The signature page should therefore shed light on the identity of the parties to the agreement. However, the JVA's signature page only adds uncertainty because, instead of two signatures or four signatures, it has eight signatures. Five signatures appear under the heading "Cinco Group:" Jose Magsaysay as CEO of Cinco Corporation followed by signatures for Jose P. Magsaysay Jr., Jose Miguel Ma G. Montinola, Victoria O. Bermejo and Ricardo K. Montelibano. (JVA p. 9; see also AJVA p. 9.) Three signatures appear under the heading "L.A. Group:" Amit Nemanim, Guy Koren and Amir Jacoby. (*Id.*) The JVA is therefore uncertain with respect to the identity of the Parties to the agreement.

The JVA is also uncertain with respect to the identity of the proposed "members" and "managers" of the Company and their respective rights and powers. Under Delaware Law, the percentage owners of an LLC are its "members." Because, by its terms, the JVA requires capital contributions from "both Parties" (i.e., Cinco Group and LA Group), one would expect the JVA to identify Cinco Group and LA Group as the two "members" of the intended LLC. Instead, the JVA identifies the "initial members" as "Cinco" and seven individuals (four of whom are associated with Cinco and three of whom are associated with LA Group):

> i) Cinco Group
>     (1) Cinco
>     (2) Jose Magsaysay Jr.
>     (3) Jose Miguel Ma G. Montinola
>     (4) Ma. Victoria O. Bermejo
>     (5) Ricardo k. Montelibano
> ii) LA Group
>     (1)Amit Nemanim

4

Exhibit 73 - page 71

(2) Guy Koren
(3) Amir Jacoby

(JVA ¶ 1) b).)

    After identifying these seven individuals as the initial "members" (along with "Cinco"), the JVA appoints the same seven individuals as the Company's "managers" or "Management." (JVA ¶ 3) a); see also AJVA ¶ 3) a).) There is language in the JVA conferring broad discretion to the managers (rather than the members) to exercise "all of the Company powers." (*Id.*) However, various provisions in the JVA appear to use the terms "member" and "manager" interchangeably, e.g., "[Management] shall be composed of seven (7) *members*, four (4) of whom shall be designated by the Cinco Group, and three (3) designated by the LA Group." (*Id.*) (Emphasis added.) Addressing monthly Management meetings, Paragraph 3) b) says "Management shall regularly meet on a monthly basis" in a "board meeting" that may be telephonic but goes on to describe the participants as "members," stating that the "*members* may . . . invite non-members to join *member* meetings." (JVA ¶ 3) b); see also AJVA ¶ 3) b).) The language in JVA Paragraph 3) j), addressing fiduciary duties, similarly refers to "members and managers" as if the terms are interchangeable. (JVA ¶ 3) j).)

    The confusing references to "members" and "managers" makes it difficult to ascertain the parties' intentions with respect to the decision-making authority of the members versus the managers. In Paragraph 3) a), the JVA broadly empowers the managers to manage "the business and affairs of the Company" and directs that "all of the Company powers shall be exercised by or under the direction of the managers." (JVA ¶ 3) a).) Consistent with that discretion, other provisions give the managers authority to appoint "additional executive officers," set executive officers' salaries, and "recall and/or withdraw the appointment of any executive officer." (JVA

5

Exhibit 73 - page 72

(¶¶ 3 a), c) e) and f).) On the other hand, an adjacent provision indicates that the *members* (rather than the managers) elected the initial executive officers: "[u]pon formation [the Company] shall have the following executive officers: President, Corporate Secretary and Treasurer, and the following [persons] shall be elected by the *members* to serve these positions . . . .") (JVA ¶ 3) c).) Without specifying who is empowered to select or elect the President, Paragraph 3) c) ii) meanwhile states that "[a]t any given time, the President shall be one of the following *members*" (identifying Nemanim, Koren and Jacoby). (JVA ¶ 3) c) ii.)

The JVA is also confusing in its descriptions of the votes necessary to take action on various matters. In the paragraphs addressing capitalization and ownership of the Company (provisions which necessarily refer to the Company's owners), the JVA uses the phrases "pro rata" and "percentage" to describe the members' interests, referring to "members' percentage interests," the "pro rata members' interest in the Company," and "pro rata ownership share." (JVA ¶¶ 2) c) and d); see also AJVA ¶¶ 2) c) and d).) This terminology ("percentage" and "pro rata") is reasonably interpreted as identifying the Company's owners (the proposed members of the LLC under Delaware law). It therefore follows that references to "members' interests" without adjectives such as "percentage" and "pro rata" reasonably refer to interests other than ownership interests in the Company.

Thus, the reference in Paragraph 2 to "members' interests" as distinct from "members' percentage interests" suggests the parties intended to distinguish between them. For any increase in capital accounts, Paragraph 2) of the JVA requires "an affirmative vote of 75% of all of the *members' percentage interests* in the Company." (JVA ¶ 2) c); see also AJVA ¶ 2) c).) (Emphasis added.) Similarly, the JVA imposes a right of first refusal on any "Party" that desires to sell "his/its *pro rata members interest* in the Company" to a third party. (JVA ¶ 2) d); see also

6

Exhibit 73 - page 73

AJVA ¶ 2) d).) (Emphasis added.) On the other hand, for an assignment of "his/its *member interests* in the Company," the JVA only requires the "prior written consent of the other Party." (*Id.*) (Emphasis added.) These distinctions between a "member interest" and a member's "pro rata" or "percentage" interests suggest that the parties intended the term "member interests" to mean something less than an ownership interest in the Company.

The JVA purports to be an integrated agreement. Under Paragraph 5), the JVA specifies that it "shall constitute the entire agreement . . . and shall supersede any previous agreements, written or otherwise" and that it "may not be altered, changed, supplemented or modified except by a written instrument duly signed by the Parties." (JVA ¶¶ 5) a) and f); see also AJVA 5) a) and f).)

## B.  The Operating Agreement

The Limited Liability of Company Agreement of PCJV USA, LLC (Operating Agreement or OA) was apparently executed after the JVA and before the AJVA. (Koren Decl. 5/30/18 ¶¶ 3 – 7.)  Like the JVA and the AJVA, the Operating Agreement is uncertain and confusing with respect to the identity of the members of the LLC, i.e., the owners of the Company. It states on the first page that it is entered into by certain "Members listed below" but defines the term "Member" in a confusing manner. The "Members listed below" apparently refers to a list of members that should have been attached as Exhibit A because the Operating Agreement defines a Member's "Percentage Interest" as "the percentage set forth opposite such Member's name on Exhibit A hereto . . . ."  (OA ¶ 1.34.)  However, the copies of the Operating Agreement submitted by the parties to this action do not contain an Exhibit A.[2]  As a result, the

---

[2] An undated PCJV USA LLC Membership Unit Ledger and four undated Certificates submitted by Cinco's attorney, Robert Brownlie, identify Potato Corner International, Inc. as the owner of certificate No. 01 (owning 60%), Nemanim as the owner of Certificate 02 (15.20 %), Koren as owner of Certificate 03 (15.20%) and Amit Jacoby as owner of Certificate 04 (9.6%)). (Brownlie Decl., ¶ 4, Exhs. A and B.) Brownlie declares, on information

7

Exhibit 73 - page 74

Operating Agreement fails to identify the members of the LLC or their percentage ownership interests. In Paragraph 1.28, the Operating Agreement defines Member as "[a] member as defined by the Act[3] including all Initial Members . . . ." (OA ¶1.28.) This is confusing because the Act defines members as owners and there is language in the Operating Agreement apparently using the "members" to refer to non-owners.

Based on the seven signatures to the Operating Agreement, it is reasonable to infer there were seven members of the Company. Four persons signed under the heading Cinco Group (Magsaysay as CEO of Cinco Corporation, along with Magsaysay, Jr., Bermejo, and Montelibano) and three signed under the heading L.A. Group (Nemanim, Koren and Amir Jacoby.) On the other hand, the fact that the JVA contemplates a capital contribution from Cinco Corporation suggests that Cinco Corporation was to be the only member of the Company representing the Cinco Group. The notion that Cinco is the only member from the Cinco group is inconsistent with other language in the Operating Agreement which suggests there was more than one Cinco Group "Member." For example, the reference in Paragraph 3.3 to "[a] Member of the Cinco Group" suggests that the Cinco Group had more than one Member. The language in Paragraph 3.1 specifying that "the Members shall be classified and designated as either part of the [Cinco Group or the LA Group] also implies there was more than one Cinco Group Member. (OA ¶ 3.1.)

Language in the section of the Operating Agreement addressing restrictions on a Member's ability to assign or transfer an interest in the Company adds to the confusion. Paragraph 3.3 uses initial capital letter to refer to "Member Interests" as if it is a defined term. In

---

and belief, that the Ledger was prepared in 2010. Koren objects to Brownlie's testimony as lacking foundation. The Court sustains Koren's objections.

[3] The Delaware Act defines an LLC interest as "a member's share of the profits and losses of a limited liability company and a member's right to receive distributions of the limited liability company's assets." (Del. Code Ann. tit. 6, § 18-101.) It also defines the term "Percentage Interest" stating that, "[w]ith respect to a Member, [it is] the percentage set forth opposite such Member's name on Exhibit A hereto . . . ." (OA ¶ 1.34.)

8

Exhibit 73 - page 75

fact, the defined term is "Membership Interest" meaning "[a] membership interest as defined by the Act." (OA ¶ 1.29.) Paragraph 3.3 refers to "Member Interests" and to "pro rata members interest." (*Id.*) Although "Member Interests" is not a defined term in the Operating Agreement,

4  Paragraph 3.3 provides that a "Member of the Cinco Group or the LA Group" who wishes to assign any of its rights, obligations or "*Member Interests*" in the Company must "obtain the prior

6  written consent of the non-assigning group." (OA ¶ 3.3.) (Emphasis added.) On the other hand,

7  any "Member of either the Cinco Group or the LA Group" who desires to "transfer or sell his/its

8  *pro rata members interest*" to a person outside the Cinco or LA Group must first offer to sell to

9  an existing Member (provide a right of first refusal.) (*Id.*) (Emphasis added.) Using the more

10  specific language ("pro rata membership interest") alongside the more general reference (the

11  undefined term "Member Interests") suggests that the latter means something other than a

12  percentage ownership interest.

13  The Operating Agreement is also ambiguous with respect to the powers and

14  responsibilities of "Managers" versus "Members." Delaware law allows LLCs to designate

15  managers and defines a "manager" as "a person who is named as a manager of a limited liability

16  company in, or designated as a manager of a limited liability company pursuant to, a limited

17  liability company agreement or similar instrument under which the limited liability company is

18  formed." (6 Del. Code Ann. § 18-101(10).)

19  Under the Operating Agreement, Managers have "the authority to bind the Company"

20  and "[n]o Member other than a Manager shall take any action as a Member to bind the

21  Company." (*Id.*, ¶ 4.16.) It provides that "[e]ach Manager has the power to bind the Company

22  [and if] there is more than one Manager, decisions of the Managers shall be made by majority

23  vote of the Managers if at a meeting, or by unanimous written consent." (*Id.*, ¶ 4.13.) The

24  Operating Agreement also specifically authorizes the Managers (and not the Members) to

25

9

Exhibit 73 - page 76

1   remove Officers. (*Id.*, ¶ 4.11.2) It provides that "[a]ny officer may be removed, wither with or

2   without cause, *by the Managers* at any regular or special meeting thereof . . . ." (*Id.*, ¶ 4.11.4.)

3         The managers' powers are also confusing. Although Paragraph 4.4 of the Operating

4   Agreement allows a majority of the Members to remove a Manager, with or without cause, that

5   right appears to conflict with other language giving each "Group" the unfettered right to

6   designate who its Managers will be. Paragraph 4.2.1 states four Managers "shall be designated

7   by the Cinco Group" and three "shall be designated by the LA Group." (*Id.*, ¶ 4.2.1.) Similarly,

8   under the heading "Election of Managers," it provides that the "LA Group shall be entitled to

9   elect (3) Managers" and that Cinco Group is entitled to elect four Managers. (*Id.*, ¶¶ 4.4, 4.3.1.)

10        The language in the Operating Agreement placing LA Group in charge of managing the

11  Company and ensuring that an LA Group representative serves as President is relatively clear.

12  The Operating Agreement requires that, "[a]s agreed upon by the Members, at any given time,

13  the President shall be any of the following" identifying the three LA Group Managers/Members,

14  either Nemanim, Koren or Amir Jacoby. (*Id.*, ¶ 4.11.7.) It further requires the Company to

15  "engage the LA Group to provide management and strategic experience and expertise during the

16  duration of this Agreement" and enter into a Master Services Agreement with LA Group

17  allowing LA Group to earn 30 % of all franchise fees. (*Id.*, ¶ 4.18.)

## C. The October 16, 2012[4] Board Meeting

Although, according to the JVA and the Operating Agreement, the Company is an LLC run by Managers, the minutes of the Company's October 16, 2012 meeting characterize it as a "Board Meeting" among seven "directors" (Magsaysay, Montinola, Montelibano, Bermejo, Koren, Amir Jacoby and Inbal Jacoby). (Cross-Complt., Exh. B.) The Minutes recount that

---

[4] Koren's declarant that the meeting occurred in 2012 rather than 2013 is not controverted. (Koren Decl. 5/30/18 ¶ 7.) The Court therefore refers to the meeting as an October 16, 2012 meeting even though the minutes say October 16, 2013.

10

Exhibit 73 - page 77

"[t]he Board reviewed and discussed the Joint Venture Agreement" and that "[w]hen documents of Amit [Nemanim] are done, Inbal Jacoby shall replace Amit in the management of the company or as Board." (*Id.*, p. 4.)

The Minutes also state, under a heading, "Operating Agreements and Structure," "[t]here are two Operating Agreements," identifying the JVA and the Operating Agreement. Addressing Paragraph 3) c) of the JVA, the Minutes state as follows:

1. Guy Koren to replace Amit Nemanim as President of PCJV.

2. Maria Victoria Bermejo will replace Jose Manuel M Montinola as Treasurer.

3. Additionally, the Board approved to include the following provision: That a 75% vote will be needed to replace the CEO, President, Treasurer, Corporate Secretary. Other Senior Officers of PCJV will need simple majority vote.

(*Id.*) The Minutes also note that an Operating Agreement for PCI Trading should be drawn up and that the ownership of that entity "shall mirror [the Company]: 60% Potato Corner International and 40% LA Group" (implying that the Company has two members with a 60/40 split of ownership.) (*Id.*, p. 4.)

These Minutes say nothing about a vote to remove Nemanim as President. However, as described in more detail below, Cinco has produced a document entitled "MANAGEMENT MEETING- OCTOBER 16, 2012" that describes that vote in terms of percentage interests. (Magsaysay Jr. Decl., Exh. E.)

## C. The First Amendment to Joint Venture Agreement (AJVA)

The AJVA was executed the day after the October 16, 2012 Board Meeting. Although, by and large, the terms of the AJVA are identical to the terms of the JVA, there are several differences. Like the JVA, the AJVA is uncertain with respect to the identity of the Parties, members and whether the Company has two members (PCI and LA Group) or four members

11

Exhibit 73 - page 78

(PCI and Koren, Jacoby and Jacoby) or seven members (four from Cinco and three from LA Group). (AJVA ¶ 1) b).) The AJVA also perpetuates the confusing language in the JVA with respect to the term "member interest," sometimes referring to "member interests" and sometimes referring to "members' percentage interests" and "pro rata members interest." (E.g., AJVA ¶ 1) d) and 3) j) versus 2) c) and 2) d).)

The AJVA identifies Cinco's subsidiary, PCI rather than Cinco as a party to the agreement but treats Cinco as the party elsewhere in the agreement. (AJVA p. 1; ¶ 2) b).) Whereas the JVA was "by and between" Cinco Corporation and Nemanim, Koren and Amir Jacoby "referred to as the 'LA Group,' " the AJVA is "by and between" POTATO CORNER INTERNATIONAL ("PCI"), a Delaware Corporation, "represented . . . by its duly authorized representative Jose P. Magsaysay . . . and its directors [Magsaysay, Jr., Montinola, Bermejo, and Montelibano] . . . collectively referred to as the 'PCI Group' " and "GUY KOREN, AMIR JACOBY AND INBAL JACOBY . . . collectively referred to as the "LA Group." (AJVA p. 1.).

According to the AJVA, the Company "upon formation" designated, as managers, the same persons designated as members in the AJVA: Magsaysay Jr., Montinola, Bermejo, Montelibano, Koren, Amir Jacoby and Inbal Jacoby." (*Id.*) The AJVA provides that "at any given time, the President shall be any one of the following [LA Group] members: Guy Koren or Amir Jacoby or Inbal Jacoby" noting that "the first president will be Amit Nemanim, now replaced by Guy Koren." (AJVA ¶ 3) c).) Whereas the JVA states that upon formation, the Company's President, Corporate Secretary and Treasurer "shall be elected *by the members*," AJVA has "member/managers" selecting these officers, i.e., that the officers "shall be elected *by the managers/members* to serve in these positions." (AJVA ¶ 3) c).) (Emphasis added.) There is a new sentence in 3) c) of the AJVA apparently implementing the Board's October 16, 2012 decision to require a "75% vote . . . to replace" the President and other officers: "Any change in these mentioned executive officers will require a vote of 75% of members' interest." (*Id.*) The

**Exhibit 73 - page 79**

AJVA does not define the term "members' interest." (As noted above, "Members' interest" was also not a defined term in the Operating Agreement or the JVA.)

The AJVA is an integrated agreements that, by its terms, was intended to "supersede any previous agreements, written or otherwise, with respect to the same subject matter . . . ." (AJVA ¶ 5) c). It is therefore reasonable to interpret the AJVA as the operative agreement among the parties, superseding the Operating Agreement and the JVA.

## D.    2018 Proceedings to Remove Koren as Manager and President

Cinco contends that under the Operating Agreement and/or the AJVA, votes taken in two April 2018 manager or member meetings validly removed Koren as President of the Company. Relying on the AJVA's required vote of "75% of members interest" to change executive officers, Cinco alternatively asserts it validly removed Koren as President in an April 23, 2018 vote of 75% of the Company's ownership interests. (AJVA, ¶ 3) c).) Alternatively, Cinco relies on language in the Operating Agreement ("[a]ny officer may be removed, with or without cause, by the Managers at any regular or special meeting thereof . . . .") (OA, ¶ 4.11.4.) The evidence regarding the April 2018 meetings is as follows.

On March 27, 2018, Magsaysay Jr. sent an email to "our LA Partners" requesting a Member's meeting on April 9, 2018 with a proposed Agenda that included an election of the Board of Directors and Officers of the Board. The Minutes of the April 9, 2018 (apparently recorded by attorney Ben Olivas "acting corporate secretary for the meeting) identify, as the "Members" in attendance, Edward Hernandez (for Potato Corner International) and Koren, Amir Jacoby and Inbal Jacoby (for the LA Group.) (Complaint, BC705580, Exh. B.) Although the notice specified a "Members' " meeting, the Minutes also identify eight Company Managers as present: five individuals for Potato Corner International (Hernandez, Magsaysay Jr., Montinola

13

Exhibit 73 - page 80

(by proxy), Montelibano (by proxy) and del Pilar) and three for the LA Group (Koren, Amir Jacoby and Inbal Jacoby.) (*Id.*)

The minutes are confusing with respect to the votes that were taken. According to the minutes, Hernandez confronted Koren, asking him to "explain why he withdrew all of PCJV's cash from the Wells Fargo accounts," and "why he signed the lease contract [for PCJV] by himself without informing Cinco Group as required by the LLC Operating Agreement." (*Id.* p. 3.) Hernandez then presided over an "Election of Managers and Officers" in which, according to the Minutes, the *Members* (identified as PC International, Amir Jacoby and Inbal Jacoby) voted in favor of removing "all LA Group members as *Managers*" by a vote of "75% vote of all Membership Interests." (*Id.*, p. 4.) Although that vote was to remove "*Managers*," the minutes recount that "[t]he remaining *Members*, by 75% of all Membership Interests voted to remove Mr. Koren as President" and to "[amend] Section 4.11.7 of the Operating Agreement to carry out this resolution." (*Id.*, p. 4.) (Emphasis added.) To effectuate these votes, an April 9, 2018 "Resolution of the Members of PCJV USA LLC" purports to eliminate the reference to Koren as President in Paragraph 4.11.7 of the Operating Agreement, identifying Magsaysay Jr. as the Company's (new) Chief Executive Officer and Hernandez as its Chairman of the Board. (*Id.*, Exh. F.)

After Koren's Counsel sent a an April 11, 2018 letter objecting to the April 9, 2018 election of Amir Jacoby and Inbal Jacoby as LA Group's Managers, Cinco convened a second meeting. According to the Minutes of the April 23, 2018 Special Meeting of Managers, Koren's attorney insisted the LA Group Managers were Koren, Alon Koren and Tom Hodgson. (Cross-Complt. Exh. J.) The April 23, 2018 Manager Meeting Minutes accordingly identify three different groups of managers in an effort to establish the validity of the votes to remove Koren as President: (1) the "April 11, 2018 Board" comprised of the three LA Group managers (Koren,

14

Exhibit 73 - page 81

Alon Koren, Tom Hodgson) and the four managers representing the Cinco/PCI; (2) the "April 9 Board" comprised of the managers who voted to remove Koren at the April 9, 2018 meeting; and (3) the "Prior Board" comprised of the managers in place before the April 9, 2018 meeting. (*Id.*) The April 23 Minutes state there was a motion to remove "all of the Company's officers . . . pursuant to Section 4.11.4 of the [Operating] Agreement" and a motion to elect new officers (including Amir Jacoby as President) both passed "by a roll call vote." The minutes say that these measures passed with the April 9 Board voting unanimously in favor; the Prior Board voting with a majority vote in favor (Koren dissenting) and the April 11 Board voting with a majority in favor (Koren, Alon Koren and Hodgson dissenting.) (Id, p. 2.) Referring to each of these votes, the April 23, 2018 Minutes assert that, "Therefore, regardless of whether the Managers consisted of the Prior Board, April 9 Board or April 11 Board, the motion(s) passed" by at least a majority vote of Managers. (*Id.*)

## II.   The May 11, 2018 TROs and OSCs

On May 11, 2018, the Court heard and granted, in part, cross applications for Temporary Restraining Orders (TROs) and Orders to Show Cause why a Preliminary Injunction Should Not Issue (OSCs) from Cinco and Koren. Pending the June 6, 2018 hearing on opposing OSCs, the Court signed orders that essentially gave Cinco exclusive temporary operational control over the Company while restraining Cinco from commenting on Koren's role as President or his authority to manage and operate the Company.

### *A.   Cinco's TRO and OSC*

In favor of Cinco, the Court's May 11, 2018 TRO restrained Koren and his agents from continuing to act as President of the Company with respect to the Company's property (bank accounts, inventory, computers, business records and intellectual property, employees, and third party suppliers, landlords, brokers, etc. The Court also ordered Koren to show cause, on June 6,

15

**Exhibit 73 - page 82**

2018, why he should not be preliminarily enjoined from engaging in these activities and related conduct in connection with PCJV's business.

### B. Koren's TRO and OSC

In favor of Koren, the Court issued a May 11, 2018 Order directing Cross-Defendants to show cause why they should not be restrained from interfering with his management and operation of the Company, casting doubt on his title and authority to manage the company, relying on the April 9 or April 23, 2018 votes ostensibly removing him from office, using Company bank accounts, offices, records etc. Pending the June 6, 2018 hearing, the Order temporarily restrained cross-defendants from commenting on Koren's role as President or his authority to manage and operate the Company.

## III. Analysis of Cinco's Application

The central issue presented in Cinco's application is whether Cinco has established a probability of success on the merits of its claims for conversion, breach of fiduciary duty or breach of contract. If Cinco can demonstrate a probability of succeeding on any of these claims and that it will suffer great or irreparable harm if Koren remains as President of the Company, it is entitled to injunctive relief.

### A. Cinco Has Failed to Establish a Likelihood of Success in Demonstrating that Koren's Banking Activities Constituted a Breach

16

Exhibit 73 - page 83

*of the Operating Agreement, a Conversion of Company Assets, or a Breach of Fiduciary Duties*

### 1. Cinco Has Failed to Establish Likely Success in Proving a Wrongful Taking of Company Funds or Property

Amir Jacoby declares that on March 28, 2018, he learned that Koren "withdrew all of the funds from [the Company's] Wells Fargo bank accounts, withdrawing more than $1.2 million on March 26, 2018. (Jacoby Decl. ¶¶ 8, 9.) Koren transferred the funds to a new account at JP Morgan Chase Bank and designated himself as the only signor on the account. (*Id.*, ¶ 10.) Jacoby asserts the withdrawals were not authorized by any other Manager or Member of the Company. (*Id.*, ¶ 12.) Koren has refused to allow PCJV "full access to PCJV's bank accounts." (*Id.*, ¶14.) Jacoby accuses Koren of "dereliction of duties" in failing to provide a five-year business plan. (*Id.*) Jacoby asserts Koren was properly removed as President of the Company on April 8, 2018 but has resisted relinquishing control of the Company since then. (*Id.*, ¶¶ 16 – 23.) Jacoby accuses Koren of improperly controlling the Company's payroll system after that removal. (*Id.*, ¶ 31.) He also accuses Koren of issuing Company checks after the checks were "stolen" from Company premises by Koren's associate, Tom Hodgson. (*Id.*, ¶ 32 -33.)

Cinco contends that Koren's transfer of funds in the Company's bank account violated paragraph 4.1.5 of the Operating Agreement which gives Managers the power "[t]o approve all purchases and disbursements in excess of Ten Thousand Dollars ($10,000) . . . ." (OA ¶4.1.5.) This argument is not persuasive because, as noted above, the AJVA superseded the Operating Agreement.

Even if 4.1 of the Operating Agreement was controlling, that agreement also gives the Managers discretion to delegate such power to the officers. (OA, ¶ 4.1.) Cinco has failed to provide evidence that, historically, the Managers have executed this discretion rather than

17

Exhibit 73 - page 84

1   delegate it to the officers. The Court is therefore not persuaded that the Managers retained this

2   discretion. The Court is also not persuaded that Koren's transfer of Company funds to a

3   different bank account in the Company's name was a "purchase" or "disbursement" of Company

4   funds subject to 4.1 of the Operating Agreement. Under the Operating Agreement, Koren had

5   the power, as a Manager, to act on behalf of the Company and as the President, he had broad

6   authority to manage the affairs of the Company. (OA ¶¶ 4.16, 4.11.7.) These powers are

7   reasonably interpreted to include discretion to select and change the Company's financial

8   institution. Therefore even if the Operating Agreement was the operative agreement in the case,

9   Cinco would fail to establish likelihood of success in demonstrating Koren's banking activities

10   constituted a breach.

11        Cinco has also failed to provide evidence Koren's transfer of funds to the Chase account

12   involved any nefarious conduct such as the conversion of any funds to his personal use. Amir

13   Jacoby's testimony that Koren "returned" the transferred funds to the Company without

14   providing a "full accounting" is not evidence Koren absconded with any funds. (A. Jacoby

15   Decl., ¶ 15.) That Jacoby "thinks" there are funds missing is likewise not evidence Koren acted

16   improperly. (*Id.*)

17        Koren has meanwhile provided contrary evidence. He declares he has served as

18   President of the Company since October 16, 2012. (Koren Decl. 5/11/18 ¶ 2.) He specifically

19   denies misappropriating money from the Company, declaring he "simply moved accounts to a

20   different bank under the same entity names (not in my name) in order to safeguard the company

21   funds from further looting by Mr. Jacoby" and "promptly notified Cinco of this protective

22   measure that [he] was taking." (*Id.*, ¶ 3.)

23        Viewing the evidence as a whole, Cinco has failed to persuade the Court it will

24   successfully prove that Koren exceeded his authority or acted improperly in connection with the

25   change of banking relationship.

**Exhibit 73 - page 85**

## 2. Cinco Has Failed to Establish Koren's Performance as President Breached of Fiduciary Duties or Contracts

There is no dispute Koren has served as the Company's President and primary manager since 2012. Cinco accuses Koren of breaching fiduciary duties by improperly negotiating a new lease for the Company and failing to provide financials or a five year plan.

With respect to allegations he engaged in improper lease negotiations, Koren explains he was properly negotiating a new lease because the current office lease, located from the warehouse, was ending. (*Id.*, ¶ 4.) Koren asserts he has historically had authority to make such decisions without "approval" from Cinco or other PCJV members or managers including the Company's first five year lease. (*Id.* ¶ 4.) Koren also denies any improper conduct in his alleged failure to prepare a five year strategic plan, pointing out Cinco Group gave him only a week to prepare it during a time when he was busy with other tasks. (*Id.*, ¶ 5.)

Moreover, there is evidence Cinco's efforts to oust Koren were precipitated by a dispute unrelated to his performance as President. As Hernandez acknowledges, LA Group's contentions regarding alleged breaches of the right of first refusal were the source of the initial friction between Cinco and LA Group. (Hernandez Decl. ¶ 8.) That disagreement led to negotiations between the two entities about a possible buy-out, but the negotiations did not yield a resolution. (*Id.*, ¶ 9.) Hernandez nevertheless attributes his "frustration with the L.A. Group and Mr. Koren" to "LA Group's inability to produce financial or management reports that Cinco repeatedly asked Mr. Koren to provide" and Koren's alleged failure to produce a business plan.

These claims are too vague and conclusory to persuade the Court that Koren's conduct with respect to financials and a five year plan amounted to breaches of fiduciary duties. While the Court can appreciate that friction between the two entities led to Hernandez's frustration and his opinion "that a change in PCJV's management was needed," the Court is not persuaded

19

**Exhibit 73 - page 86**

Hernandez and his colleagues had the right to summarily remove Koren from his position. (Hernandez Decl. ¶ 13.)

## B. Cinco Has Failed to Establish Probable Success in Proving It Had the Contractual Right to Remove Koren by the Votes Taken in the April 2018 Meetings

Cinco contends that regardless whether the Operating Agreement or the AJVA is the operative agreement, it had the contractual right to remove Koren and properly exercised that right. As noted above, the Court regards the AJVA as the operative agreement but has serious concerns whether its terms (and, alternatively, the terms of the Operating Agreement) are sufficiently certain to be enforceable.

For purposes of interpreting the various agreements, the Court is guided by ordinary rules for contractual interpretation which include the following principles:

"The existence of mutual consent is determined by objective rather than subjective criteria, the test being what the outward manifestations of consent would lead a reasonable person to believe." (*Meyer v. Benko, supra,* 55 Cal.App.3d 937, 943, 127 Cal.Rptr. 846.) Outward manifestations thus govern the finding of mutual consent required by Civil Code sections 1550, 1565 and 1580 for contract formation. (See also 1 Witkin, Summary of Cal. Law (9th ed., 1987) Contracts, § 119, p. 144 ["... the outward manifestation or expression of assent is controlling. Mutual assent is gathered from the reasonable meaning of the words and acts of the parties, and not from their unexpressed intentions or understanding."] ) The parties' outward manifestations must show that the parties all agreed "upon the same thing in the same sense." (Civ.Code § 1580.) If there is no evidence establishing a manifestation of assent to the "same thing" by both parties,

20

Exhibit 73 - page 87

then there is no mutual consent to contract and no contract formation. (Civ.Code §§ 1550, 1565 and 1580.)

In order for acceptance of a proposal to result in the formation of a contract, the proposal "must be sufficiently definite, or must call for such definite terms in the acceptance, that the performance promised is reasonably certain." (1 Witkin, Summary of Cal. Law (9th ed., 1987) Contracts, § 145, p. 169.) A proposal "cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain. [¶] The terms of a contract are reasonably certain if they provide a basis for determining...the existence of a breach and for giving an appropriate remedy." (*Ibid.,* quoting from Rest.2d Contracts, § 33.) If, by contrast, a supposed "contract" does not provide a basis for determining what obligations the parties have agreed to, and hence does not make possible a determination of whether those agreed obligations have been breached, there is no contract. (See, e.g., 1 Williston on Contracts (4th ed. 1990, Lord) § 4:18, p. 414 ["It is a necessary requirement that an agreement, in order to be binding, must be sufficiently definite to enable the courts to give it an exact meaning."]; see also Civ.Code § 3390, subd. 5 [a contract is not specifically enforceable unless the terms are *812 "sufficiently certain to make the precise act which is to be done clearly ascertainable."] )

Weddington Productions, Inc. v. Flick (1998) 60 Cal.App.4th 793, 811–812 [71 Cal.Rptr.2d 265, 277]

### 1. The Language of the AJVA Is Confusing and Uncertain

Although the Court regards the AJVA as the operative agreement, key provisions in the AJVA are inconsistent and uncertain. Cinco's primary contention under the AJVA – that it has the right to remove Koren as President based on a 75% vote of "member interests" -- rests on the contention the parties intended "member interests" to mean ownership interests. The language

21

Exhibit 73 - page 88

1   of the AJVA is equivocal with respect to that contention. As noted above, the JVA and the

2   AJVA use more specific terminology to refer to ownership interests such as "pro rata members'

3   interest in the Company" and "pro rata ownership share." (JVA ¶¶ 2) c) and d); AJVA ¶¶ 2) c)

4   and d).) The AJVA's reference to "member percentage interests" (rather than "member

    interests") in 2) c) particularly evidences the parties' intentions to use "percentage interests" to

6   denote ownership interests because that provision addresses contributions to capital accounts.

7   The decision to pay money into capital accounts is arguably the only decision that necessarily

8   must be made the members/owners of an LLC. By using the phrase "member percentage

9   interests" for capital accounts, the AJVA makes a distinction between ownership interests and

10   "member interests." That distinction suggests the parties intended "member interests" to mean

11   something other than or something less than ownership interests.

12           Moreover, the wording in Paragraph 3) c) just before the reference to "75% of members

13   interest" appears to use the terms "managers" and "members" interchangeably, referring to the

14   election of executive officers "by the *managers/members*." (AJVA ¶3) c).) (Emphasis added.)

15   Other language in Paragraph 3) a), also suggests the parties intended to use members and

16   managers as interchangeable terms. Although Cinco contends the first page of the AJVA

17   identifies four "members" of the Company (Potato Corner International, Koren, Amir Jacoby and

18   Inbal Jacoby), other language in Paragraph 3) a) suggests there are seven members, stating "the

19   Management shall be composed of seven (7) *members*," identifying the seven members as the

20   "named managers" (Magsaysay Jr., Montinola, Bermejo, Montelibano, Koren, Amir Jacoby and

21   Inbal Jacoby.) In Paragraph 3) b), the AJVA mandates a monthly "board meeting" for

22   Management but describes the participants as "members" noting, "[t]he members may, at their

23   discretion, invite non-members to join member meetings . . . ." The ensuing sentence, which

24   addresses Company Management, also conflates members with managers by allowing "a

25

Exhibit 73 - page 89

majority of all member interests" to agree to cover travel expenses "incurred by the members named in Section 1) d) in attendance of said meetings."

  The AJVA is also confusing with respect to the identity of the members. Paragraph 1) d) identifies Magsaysay Jr., Montinola, Bermejo and Montelibano as the "members" whose expenses can be reimbursed. This reference to Cinco's representatives as "members" (plural) is inconsistent with Cinco's contention Potato Corner International was the one and only Cinco Group "member." Identifying Magsaysay Jr., Montinola, Bermejo and Montelibano as "members" is arguably more consistent with an interpretation of "member interest" as the voting interest held by the seven "member/managers." Therefore, based on all of the language in the AJVA and reading it as a whole, the Court cannot conclude Cinco is likely to succeed in proving the parties intended "member interests" to mean ownership interests as opposed to the voting interests of the seven members and/or managers.

## 2. The Extrinsic Evidence Is Conflicting and Inconclusive

  The Court may consider extrinsic evidence to aid in the interpretation of a contract so long as the evidence is consistent with an interpretation that is reasonable. In this case, the extrinsic evidence offered by the parties is inconclusive with respect to the identity of the members of the LLC. Attorney Ben Olivas submitted a declaration as Corporate Secretary of the Company. Without averring that he is the custodian of records or explaining how or where he located corporate records, Olivas states that he has searched "available" corporate records and found a Membership Unit Ledger attached and certificates of LLC ownership identifying PCI International as the 60% owner of the Company with Nemanim, Koren and Amir Jacoby owning 15.2%, 15.2% and 9.6% respectively. (*Id.*, ¶¶3-5, Exhs. A & B.) Olivas does not lay any foundation to overcome hearsay objections to these documents. The Court therefore disregards them as inadmissible hearsay.

23

Exhibit 73 - page 90

Following the June 6, 2018 hearing, Cinco presented additional extrinsic evidence regarding the identity of the intended owners (LLC members) of the Company. Jose Magsaysay Jr.'s June 13, 2018 Declaration asserts personal knowledge of events based on his status as a founder and current President and CEO of Cinco and current CEO of the Company.

Regarding Potato Corner International, Inc. (PCI), the entity identified as a party to the AJVA, Magsaysay Jr. avers PCI is a Delaware subsidiary of Cinco, offering a July 16, 2010 Certificate of Incorporation for PCI and certificates indicating PCI is 99.5% owned by Cinco. (*Id.*, ¶3, Exhs. A, B.) The Court accepts this testimony as evidence Cinco will likely prove that PCI is a duly formed subsidiary of Cinco.

Magsaysay avers that when the Company was formed, Cinco "took a 60% member interest" and the "remaining 40% member interest" in the Company "has been held by individuals . . . referred to as the LA Group." (*Id.* ¶¶ 4, 5.) Like attorney Olivas, Magsaysay Jr. attaches extrinsic evidence comprised of "true and correct copies" of a July 16, 2010 Certificate of Formation for the Company and four Certificates (all apparently signed by former LA Group representative, Nemanim, as President) identifying the following persons as owners of percentage LLC interests: PCI (60%); Nemanim (15.20%); Koren (15.20%) and Amir Jacoby (9.60%). (*Id.*, ¶ 4, 5; Exhs. C, D.) Although Magsaysay Jr. fails to provide any concrete basis for personal knowledge of the certificates and lays no foundation to overcome hearsay objections, the certificates appear to be bona fide and the Court accepts them as extrinsic evidence suggesting that Cinco and Nemanim intended the four parties to have the specified percentages of ownership in the Company at or around the time when it was formed.

Koren provides contrary extrinsic evidence suggesting the parties agreed to have two members of the LLC. The Company's 2015 and 2016 state and federal tax returns and K-1 forms authenticated by the declaration of the Company's accountant, Christopher Passmore, identify two members of the LLC (owners of the Company): PCI (as 60% owner) and LA Group

24

Exhibit 73 - page 91

1 (as 40% owner.) (Passmore Decl., ¶ 4.) Passmore obtained the returns via an email from Inbal

2 Jacoby (with copies to Amir Jacoby and Koren.) This evidence suggests the parties more

3 recently intended to have two members/owners of the Company: PCI and LA Group.

4     In his June 13, 2018 Declaration, Koren provides additional evidence the parties intended

5 the Company to have two members. According to Koren, Cinco's attorney, Ben Olivas, made a

6 powerpoint presentation in October 2010 to Koren, Magsaysay and others describing the

7 Company has having two "shareholders" identified as PCI (with 60%) and LA Group (with

8 40%). (Koren Decl. 6/14/18 ¶¶ 4, 5.) The presentation refers to Cinco/PCI and LA Group each

9 contributing capital their respective 60% and 40% "equity interest;" and explains that income

10 will be divided between the shareholders "based on their pro rata ownership shares" described as

11 "PC International = 60%; LA Group = 40%.)

12     Koren argues that presentation is evidence the parties intended to have two members

13 owning the Company with a 60/40 split and that makes Cinco's argument the AJVA required a

14 vote of 75% of ownership interests nonsensical because it would require a unanimous vote.

15 (Koren Decl. ¶5/30/18 ¶6.) Korén also offers extrinsic evidence to support his argument the

16 Company was always managed by the seven representatives voting equally. According to

17 Koren, the Company "always conducted affairs by a vote of the 7 voting representatives."

18 (Koren 5/17/18 Decl. ¶ 7, 8.) According to Koren, the Company "has always been governed by

19 the 7-person board" and that "not once did we ever vote by equity percentage interests." (Koren

20 5/30/17 Decl. ¶ 5.)[5]

21     Erlinda Bartolome offers testimony corroborating Koren's account. As a franchise

22 consultant and Corporate Secretary, she has attended numerous meetings among the Company's

23 principals since its inception. (Bartolome Decl. ¶¶ 8, 9.) She points out that the seven

24

25 [5] (Koren's other testimony about the identity of the intended members of the Company amounts to inadmissible evidence of unexpressed intentions (subjective evidence) rather than conversations or conduct (objective evidence.) (E.g., Koren 5/30/18 Decl. ¶¶ 3, 5, 6, 7; Koren 5/17/18 Decl. ¶ 5.) )

25

Exhibit 73 - page 92

1  "designated Managers/Members" (four from Cinco or PCI and three from LA Group) signed the

2  JVA and AJVA and attended all meetings since 2010. (*Id.*, ¶¶ 14, 15.) Bartolome "does not

3  recall the Board deciding/voting according to 60/40 equity percentage interests but it was always

4  the 7 managers signing/deciding as 7 equal votes." (*Id.*, ¶ 16.)

5        Magsaysay Jr. and Amir Jacoby offer contrary evidence, asserting that the October 16,

6  2012 vote to remove the Company's first President (Nemanim) was a vote of "member

7  interests." (*Id.*, ¶ 6.) In support of that statement, Magsaysay identifies a document entitled,

8  "PCJV USA LLC MANAGERS MEETING – OCTOBER 16, 2012" as a "ballot" from the

9  meeting. (*Id.*, Exh. E.) That document (which appears to contain the signatures of Magsaysay

10  Jr., Koren and Amir Jacoby) describes the vote at that meeting in terms of percentages that, from

11  Cinco's point of view, match the ownership percentages of the four members of the Company:

12       **"POTATO CORNER INTERNATIONAL** – 60% Represented by:

13       1. Jose P. Magsaysay

14       2. Jose Montinola

15       3. Maria Victoria Bermejo

16       4. Ricardo Montelibano

17       **LA GROUP**

18       1. Guy Koren – 15.20 %

19       2. Amir Jacoby 9.60 %

20       TOTAL VOTES FOR REMOVAL, 84.8%

21       APPROVED OCTOBER 16, 2012."

22  According to Magsaysay Jr., this was a vote of ownership interests and the reference to a "75%

23  vote of Management" was just a mistake by the document's preparer, Erlinda Bartolome. (*Id.*, ¶

24

25

26

Exhibit 73 - page 93

1    9.) He agrees with Bartolome that every other vote was unanimous. [6] (*Id.*, ¶ 16.) In his June 13,
     2018 Declaration, Amir Jacoby corroborates Magsaysay Jr.'s testimony, averring that the
     October 16, 2012 vote to remove Nemanim was made by 84.8% of the ownership interests.[7]

4          Koren disputes that the vote at that meeting was by equity percentage interests. (Koren
5    6/13/18 Decl. ¶ 10). He points out it was a managers' meeting and that the managers "have no
6    equity percentage in [the Company.]" (*Id.*) Koren contends that, as stated in the document, the
7    vote was a "75% vote of Management," pointing out that the April 2018 votes to remove him as
8    President were not votes of 75% of the managers. (*Id.*, ¶ 11.)

9          Koren is correct that there is language in the document that is inconsistent with
10   Magsaysay Jr.'s contention it was a vote of ownership interests. The document describes the
11   meeting as a "*managers* meeting" in the title and recounts that, in that meeting, "the *Managers*
12   have approved that replacement of the . . . President . . . shall require a 75% vote of
13   *Management;*" and that "PURSUANT TO THE ABOVE," the "*Managers* in the said meeting
14   approved to remove AMIT NEMANIM as President of PCJV USA LLC and [have] designated
15   GUY KOREN as his replacement." (Magsaysay Jr. Decl., Exh. E.)

16         From the Court's point of view, the documentation of the Company's meetings is in
17   conflict and fails to memorialize a reasonably certain meeting of the minds as to the procedures
18   and votes necessary to remove the President. Like the conflicting language in the parties'
19   various agreements, the conflicting extrinsic evidence fails persuade the Court that Cinco is

20

21

22

---

[6] Magsaysay Jr.'s additional testimony about the parties' intentions require a 75% ownership vote to remove
23   officers is not admissible because it describes the parties' unexpressed intentions. (*Id.*, ¶¶ 10 – 13.) He asserts that
     Koren has engaged in self-dealing about refers to documents that purport to show that the LA Group has
24   "unilaterally increased their management fees annually" without Cinco's knowledge. (*Id.*, ¶¶ 20, 21.) The Court
     disregards this testimony because these issues were not raised in the moving papers and because it is primarily
     comprised of inadmissible opinions, hearsay and/or conclusions rather than admissible evidence.
25   [7] Like Magsaysay Jr., Jacoby also offers testimony about unexpressed intentions as to the meaning of "member
     interests," evidence the Court disregards as inadmissible.

27

Exhibit 73 - page 94

likely to successfully prove the parties intended "75% vote of member interest" in the AJVA to mean ownership interests as opposed to the voting interests of the managers.

### 3.    Cinco Has Failed to Demonstrate Likely Success Based on the Language of the Operating Agreement.

Cinco's contention it had the right to remove Koren under the terms of the Operating Agreement is also problematical. As noted above, the Operating Agreement, Paragraph 4.11.4, plainly vests the power to remove officers in the Managers rather than the LLC's members. (OA ¶ 4.11.4.) If the Operating Agreement (rather than the AJVA) is the operative agreement, Koren can be removed as President by a vote of four out of seven Managers.

Even if the Court were to accept Cinco's contention that Operating Agreement (rather than the AJVA) should govern, the Court is not persuaded Cinco would likely prevail. As with the terms of the agreements themselves, the evidence of the business transacted in the April 2018 meetings is confusing and inconsistent. Although the notice for the April 9, 2018 specifies a "Members Meeting," the April 9, 2018 Minutes describe a "Members' and Managers' Meeting" (seeming to use the terms "Manager" and "Member" are interchangeable). (Complt. BC 705580, Exh. B, C.) Whereas the Operating Agreement specifies the appointment of seven managers (four for Cinco and three for LA Group), the April 9, 2018 Minutes identify eight managers who are present: five for Potato Corner International and three for LA Group. (*Id.*) Although the Operating Agreement requires a vote of managers to remove an officer, the April 9, 2018 Minutes do not describe a *Managers*' vote to remove Koren. Instead, they recount that the *Members* voted "by 75% vote of all Membership Interests" to remove Koren as president. Based on this evidence, the Court cannot conclude Cinco is likely to succeed in proving that, consistent with the Operating Agreement, there was a majority vote of Managers to remove Koren on April 9, 2018.

28

**Exhibit 73 - page 95**

1    The re-vote by the "Prior Board" at the April 23, 2018 arguably corrects this problem.

2  Under the Operating Agreement, the "Cinco Group" was entitled to name four Managers and the

3  LA Group was entitled to name three Managers including Amir Jacoby.  With votes from four

4  or more Managers voting against Koren, Cinco arguably had the majority of Manager votes

5  necessary to remove him from office on April 23, 2018 under the Operating Agreement's

6  Paragraph 4.11.4.

7    However, as noted above, the Operating Agreement does not appear to be the operative

8  contract.  There is evidence the Company modified the Operating Agreement to require a

9  supermajority of Managers to remove Koren and then executed the AJVA which, by its terms,

10  supersedes the Operating Agreement.  Therefore, to the extent Cinco relies on the Operating

11  Agreement as the source of a contractual right to remove Koren based on the April 2018 votes,

the Court is not persuaded it is likely to prevail.[8]

13

## 4.    Cinco Has Failed to Establish It Will Suffer Great or

14

## Irreparable Harm

15

16    Where the potential harm is very great or irreparable, a Court may issue a preliminary

17  injunction even where a party fails to demonstrate a probability of success on the merits but does

present evidence supporting each element of its claim.  (*Jessen v. Keystone Savings & Loan*

18

19  *Assn.* (1983) 142 Cal.App.3d 454, 459.)  In this sense, the standard for issuing a preliminary

injunction is elastic or a "sliding scale."  (*Butts v. State* (1992) 4 Cal.4th 668, 678.)  The Court

20

21

22    [8] Koren also argues the Court should deny Cinco's request for injunction because Hernandez acquired his interest in Cinco and PCI without Koren's consent and in violation of Koren's right of first refusal.  (AJVA 2) d.)
Under the AJVA: "[n]either Party shall assign any of its rights . . . under this Agreement nor his/its member interests
23  in the Company without the prior written consent of the other Party.  In the event either Party desire (sic) to transfer
or sell his/its pro rata members interest in the Company to a person other than those specifically named in Section
24  1(a) of this Agreement, such Party shall be obligated to sell the same first to the other Party, which has have [sic]
thirty (30) days within which to exercise its rights of first refusal . . . ."  (*Id.*)  There is insufficient evidence for the
Court to determine whether or not Koren is likely to succeed on this argument.

25

29

**Exhibit 73 - page 96**

therefore examines whether Cinco's showing of harm is so compelling that the Court should provide injunctive relief notwithstanding Cinco's failure to demonstrate probable success on the merits.

Because Cinco owns 60% of the Company, one could argue that any harm to the Company falls more heavily on Cinco than on other lesser owners, such as Koren. However, as noted above, the Court is not persuaded Koren has or is harming the Company by breaching fiduciary duties or otherwise. To the contrary, based on Koren's testimony and his corroborating evidence, Koren has and is conferring benefit on the company by diligently and ably performing his duties as President. (See, e.g., Declarations of Hodgson, Bartolome, Zhang, Shaikh, Grudnowski, and Lai.)

The primary harm to the Company established by the evidence on both sides is the uncertainty among persons doing business with the Company as to who is in charge of operations. Because the uncertainty arguably resulted from Cinco's conduct (the votes in the April 9 and April 23, 2018 meetings to oust Koren and correspondence to third parties regarding the outcomes of the votes), it would not be equitable for the Court to weigh the harm caused by uncertainty in favor of Cinco.

## IV. Analysis of Koren's Application for TRO and OSC

As summarized above, Koren has presented evidence he bargained for the right to maintain his status as President of the Company unless and until 75% of the Company's seven appointed managers (three of whom are controlled by LA Group which is, in turn, controlled by Koren) vote to remove him. In addition, Koren has strong evidence he and the Company will suffer harm if cannot perform as President. He declares that his replacement, Jacoby, has "rarely participated in the day-to-day operations of PCJV and has little knowledge or experience with the internal workings of the Company." (Koren Decl. 5/30/18, ¶ 6.) Koren asserts that Jacoby

30

Exhibit 73 - page 97

"runs a full time construction business" and has little interest in running the Company. (*Id.*, ¶ 8.) He also points out that the other Cinco representatives are based in the Philippines and not well positioned to run the Company. (*Id.*) Koren has also presented evidence he stands to lose substantial salary and status if he is removed from his position as President. (*Id.*, ¶ 10.) Koren has therefore made the stronger showing with respect to the element of great or irreparable harm.

Under Code of Civil Procedure Section 526, subdivision (a), the Court may issue a preliminary injunction:

> (1) When it appears by the complaint that the plaintiff is entitled to the relief demanded, and the relief, or any part thereof, consists in restraining the commission or continuance of the act complained of, either for a limited period or perpetually.

> (2) When it appears by the complaint or affidavits that the commission or continuance of some act during the litigation would produce waste, or great or irreparable injury, to a party to the action.

> (3) When it appears, during the litigation, that a party to the action is doing, or threatens, or is about to do, or is procuring or suffering to be done, some act in violation of the rights of another party to the action respecting the subject of the action, and tending to render the judgment ineffectual.

Koren has presented substantial evidence of likely success on the merits of his claim coupled with strong evidence he will suffer great or irreparable harm if Cinco is not restrained from interfering with his performance of his duties as President of the Company. It also appears that Cinco's continued conduct in preventing Koren from resuming his duties will tend to render any judgment for Declaratory Relief in favor of Koren ineffectual. Therefore, under Section 526, subdivision (a), subsections (1), (2) and (3), Koren is entitled to a preliminary injunction.

31

Exhibit 73 - page 98

The Court ordered Cinco to show cause why it should not be restrained from various
activities including a) interfering with his management of the Company; b) casting doubt on his
title as President and authority to manage the Company; c) relying on the April 2018 votes to
deny him management rights or as a basis to terminate the Master Service Agreement; d) using
Company bank accounts or relationship without Koren's authorization; e) interfering with
Koren's efforts to enter into stipulations for Wells Fargo's release of frozen funds to the
Company; f) interfering with Koren's engagement of attorneys to represent the Company, LA
Group and other entities in lawsuits and other legal matters; g) refusing to give Koren access to
Company offices, documents, books, records, computer, computer systems, accounts, emails,
and email addresses; h) refusing to cooperate with Koren in any way that is detrimental to the
Company's success. The Court is satisfied Koren is entitled to injunctive relief as to (a) through
(e) and (g) but declines relief as requested in f) above because the Court has no evidence of
interference with Koren's engagement of attorneys to represent the Company. The Court also
declines to issue an order as to h) above because the proposed order is too vague to be
enforceable.

The court also denies Koren's request for orders compelling Cinco to return to Koren all
keys to the Company's physical locations; restore Company email access; return Company funds
and bank accounts to Koren's control and dismiss any lawsuits filed on behalf of the company
including PCJV USA LLC v. Guy Koren (BC705580.) The latter four requests for are denied
because they are duplicative of other relief or because they are framed as mandatory injunctions
rather than restraining orders. Mandatory injunctions are immediately appealable and require a
stronger showing of proof than Koren has provided in this case.

The Court also denies Koren's request the Court appoint a receiver as moot.

32

Exhibit 73 - page 99

## V.   Conclusion

The Court DENIES Cinco's request for injunctive relief.

The Court GRANTS Koren's request for injunctive relief and enters a preliminary injunction ordering Cinco to refrain from:

1) interfering with Koren's management of the Company as its President;

2) communicating with Company customers, venders, contractors and other third parties to this action in a manner that casts doubt on Koren's title as President and/or his authority to manage the Company;

3) relying on the April 2018 votes to deny him management rights or as a basis to terminate the Master Service Agreement;

4) using Company bank accounts or relationships without Koren's authorization;

5) interfering with Koren's efforts to enter into stipulations for Wells Fargo's release of frozen funds to the Company;

6) refusing to give Koren access to Company offices, documents, books, records, computer, computer systems, accounts, emails, and email addresses.

The Court ORDERS Koren to post a bond in the amount of $25,000.

Dated: June 19, 2018

AMY D. HOGUE, JUDGE

Judge of the Superior Court

33

Exhibit 73 - page 100

# EXHIBIT B

**Exhibit 73 - page 101**

Case 2:24-cv-04546-SB-AGR   Document 33-17   Filed 09/30/25   Page 102 of 198   Page ID #:1806

## POTATO CORNER USA
## JOINT VENTURE AGREEMENT

This Joint Venture Agreement (the "Agreement") dated _____ is made and entered into on _____, by and between:

Cinco Corporation, a corporation duly existing and registered by virtue of and under the laws of the Republic of the Philippines with office address at 869 Katarungan Street, Plainview Mandaluyong City, Philippines 1550, represented herein by its duly authorized representative, Jose P. Magsaysay (hereinafter "Cinco"), and its directors, Jose P. Magsaysay, Jr., Jose Miguel Ma. G. Montinola, Ma. Victoria O. Bermejo, Ricardo K. Montelibano, all of whom are Philippine citizens and resident, and collectively referred to as the "Cinco Group";

-and-

AMIT NEMANIM, GUY KOREN, AMIR JACOBY, all of whom are U.S. citizens and residents and collectively referred to as the "LA Group:

### RECITALS

WHEREAS, the Parties hereto have agreed to form a limited liability company (hereinafter referred to as the "Company") under the laws of the State of Delaware, with the primary purpose of engaging in the business of establishing, operating, managing, licensing and franchising "Potato Corner" stores/outlets in the United States of America and Israel, except in the County of Los Angeles, USA and the County of San Francisco, USA and Tanforan Mall (hereinafter, "Territory").

WHEREAS, the Parties herein have agreed to enter into this Agreement which sets forth the terms and conditions with respect to the organization, incorporation, operation and management of the Company and defines their respective rights, duties and obligations of the parties to this Agreement.



WHEREAS, the Parties agree that the LLC operating agreement to be entered by them shall reflect the terms and conditions as set forth in this Agreement.

WHEREAS, Cinco may assign and or all of its rights to the joint venture company formed under this Agreement to a wholly-owned subsidiary as it deems fit.

NOW, THEREFORE, for and in consideration of the foregoing premises, the Parties hereby agree as follows:

1) ORGANIZATION AND FORMATION OF THE COMPANY

a) Within ten (10) days from the Effective Date of this Agreement, the Parties herein agree to organize and form, a limited liability company to be called "PCJV USA" ( hereinafter referred to as the Company) for the primary purpose of engaging in the business of establishing, operating, managing, licensing and franchising "Potato Corner" stores/outlets in the Territory.

WEST\222455823.2

Exhibit 73 - page 102

b) The initial members of the Company shall be the following:

   i) Cinco Group
     (1) Cinco
     (2) Jose P. Magsaysay, Jr.
     (3) Jose Miguel Ma. G. Montinola
     (4) Ma. Victoria O. Bermejo
     (5) Ricardo K. Montelibano

   ii) LA Group
     (1) Amit Nemanim
     (2) Guy Koren
     (3) Amir Jacoby

c) The principal office of the Company shall be at 1729 Santee St., Los Angeles, California 90015.

d) The annual general meeting of the members of the Company shall be held every year at the principal office of the Company. The members may, at their discretion, invite non-members to join the annual general meeting, but only as non-voting observers. Further, to the extent allowed by the financial condition of the Company, and as agreed upon by a majority of all member interests, the Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses incurred by the following members in attendance of the annual members' meeting: Jose P. Magsaysay, Jr., Jose Miguel Ma. Montinola, Ma. Victoria O. Bermejo and Ricardo K. Montelibano.

e) The fiscal year of the Company shall begin on January 1 and end on December 31 of each year.

f) The Company shall immadiately upon formation obtain a "Liability Insurance" for the Company the amount and scope of coverage to be determined by the managers.

g) All costs, fees and expenses incurred in connection with the organization and formation of the Company shall be for the account of the Company.

h) The operating agreement of the Company shall raflect the terms and conditions set forth in this Agreement between the Parties.



2) CAPITALIZATION/OWNERSHIP OF THE COMPANY

a) At the time of formation, the Company shall have a total capital account of Fifty Thousand Dollars (US$50,000) which shall be fully subscribed and paid.

b) Unless other agreed to in writing, at the commencement of this Agreement, the Parties hereby agree that the Cinco Group shall contribute Thirty Thousand Dollars (US$30,000) and own sixty (60%) percent of the Company's capital accounts, while the LA Group shall contribute Twenty Thousand Dollars (US$20,000) and own the remaining forty (40%) percent.

2

Exhibit 73 - page 103

c) The Parties hereby agree any increase in the capital account shall require an affirmative vote of 75% of all of the members' percentage interests in the Company. In the event an increase in the Company's capital accounts is approved by the members, both Parties shall have rights of pre-emption so that their pro rata ownership share in the Company shall be maintained, provided that, either Party shall have thirty (30) days within which to confirm in writing that it is willing and able to subscribe and fully pay its pro rata share of the increase in capital.

d) Neither Party shall assign any of its rights or obligations under this Agreement, nor his/its member interests in the Company without the prior written consent of the other Party. In the event either Party desire to transfer or sell his/its pro rata members interest in the Company to a person other those specifically named in Section 1(a) of this Agreement, such Party shall be obligated to sell the same first to the other Party, which has have thirty (30) days within which to exercise its rights of first refusal from the date of receipt of a written notice to sell. For this purpose, the Parties hereby agree that the right of first refusal may be exercised in accordance with the following formula:   The average of the Company's earnings before interest, depreciation, taxes and amortization (EBITDA) for the last two (2) years multiplied by 5 times, and further multiplied by the percentage of member interest subject to such right of first refusal over total outstanding member interests.

## 3) MANAGEMENT OF THE COMPANY

a) As will be provided in the Operating Agreement, the business and affairs of the Company shall be managed and all of the Company powers shall be exercised by or under the direction of the managers (collectively referred to as "Management"). Unless otherwise agreed to by the parties, the Management shall be composed of seven (7) members, four (4) of whom shall be designated by the Cinco Group, and three (3) designated by the LA Group.  Upon the formation of the Company, the following shall be named managers: Jose P. Magsaysay, Jr., Jose Miguel Ma. Montinola, Ma. Victoria O. Bermejo, Ricardo K. Montelibano, Amit Nemanim, Guy Koren, and Amir Jacoby.



b) The Management shall regularly meet on a monthly basis. The regular monthly board meeting may be done via teleconference or through the internet.  The members may, at their discretion, invite non-members to join member meetings, but only as non-voting observers.  Further, to the extent allowed by the financial condition of the Company, and as agreed upon by a majority of all member interests, the Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses incurred by the members named in Section 1(d) in attendance of said meetings.

c) Upon the formation of the Company, it shall have the following executive officers: President, Corporate Secretary and Treasurer, and the following shall be elected by the members to serve these positions:

    i)   Chairman of the Board of Members – Jose P. Magsaysay

3

Exhibit 73 - page 104

  ii) President – At any given time, the President shall be any one of the following members: Amit Nenamin, Guy Koren or Amir Jacoby, and the first president will be Amit Nemanim

  iii) Corporate Secretary – Erlinda Bartolome.

  iv) Treasurer – Jose Miguel Ma. Montinola

   (1) The Treasurer shall have oversight functions over the Accounting and Finance Departments that shall be exercised independent of the President.

 d) Additional executive officers may be appointed by Management as it may deem necessary.

 e) It is hereby agreed that the rights and responsibilities of the Management shall include the following:

  i) Approval of the compensation package for the managers, executive offices and key personnel.

  ii) Approval of the Accounting System/Procedures/Software/Method to be used by the Company.

  iii) Approval of the operating budget of the Company, and any changes to it.

  iv) Approval of all franchising agreements, and lease agreements.

  v) Approval of all purchases and disbursements in excess of $10,000, provided that such amount may be changed or modified by Management as it deems necessary.

 f) The executive officers shall manage the business and property of the Company, and to market the business, in accordance with and pursuant to the directives of and policies set by the Management of the Company. The Management of the Company can recall and/or withdraw the appointment of any executive officer, as it deems necessary.

 g) The Company shall enter into a Master License Agreement with Cinco (or an affiliated company to be designated by Cinco) which shall include the following terms and conditions:

  i) The Company agrees to license the "POTATO CORNER" intellectual property rights from Cinco or an affiliated company to be designated by Cinco) consisting of (i) the trademark, service mark and trade name "POTATO CORNER"; and (ii) various trademarks, service marks, trade names, slogans, designs, insignias, emblems, symbols, color schemes, package features, logo and other propriety identifying characteristics used in relation and in connection with the "Potato Corner" Products and the System; and (iii) as well as other intellectual property rights in connection with the "POTATO CORNER" intellectual property rights, for use in the Territory.

  ii) The Company agrees to pay, as an arm's length license fee, the following amounts:

   (1) With respect to the licensing / sub-licensing or franchising the "POTATO CORNER" intellectual property rights in connection with the "POTATO CORNER" outlets/stores, an amount equal to thirty percent (30%) of all



4

WEST\222455823.2

Exhibit 73 - page 105

initial/franchise fees and ongoing royalty fees paid to/ collected by the Company. Payments shall be made to Cinco (or an affiliated company to be designated by Cinco) by wire transfer using a bank or other financial institution specified by it within thirty (30) days from receipt of the fees by the Company.

(2) All withholding and other applicable taxes levied by any authority on the payments by the Company shall be borne solely by the Company.

h) The Company agrees to engage the LA Group to provide management and strategic experience and expertise during the duration of this Agreement. The Company shall enter into a Master Services Agreement with the LA Group (or a corporation to be designated by the LA Group) which shall include the following terms and conditions:

   i) In consideration for the provision of its services under the Master Services Agreement, the LA Group shall be entitled to a services fee equal to thirty (30%) percent of all initial/franchise fee and continuing royalty fees paid to/ collected by the Company .

   ii) All withholding and other applicable taxes levied by any authority on the payments by the Company to the LA Group under this Agreement shall be borne solely by the Company.

   iii) The LA Group shall faithfully, diligently and efficiently exercise its obligations and responsibilities under the Master Services Agreement.

   iv) The LA Group shall maintain and protect the Confidential Information belonging to Cinco or the Company, and such undertaking shall apply to all of its partners, officers, employees, or agents.

I) The President of the Company shall render the following services and shall perform the following duties for the Company in a faithful, diligent and efficient manner:

   i) The President shall be responsible for all management, operational, marketing, establishment, maintenance, licensing and sub-licensing activities with respect to the "Potato Corner" outlets/stores in the Territory. He shall use his best efforts at all times during the term of this Agreement to operate and maintain the "Potato Corner" outlets/stores in the Territory according to the highest standards achievable consistent with the overall plan of the Management of the Company. The President shall comply with the rules, policies and procedures approved by the Management of the Company from time to time.

   ii) The President shall advertise market and promote the "Potato Corner" outlets/stores with the goal of causing public knowledge, awareness and patronage of the "Potato Corner" outlets/sites.

   iii) The President shall maintain a comprehensive system of records, books and accounts, with respect to the licensing and sub-licensing activities, operation,



5

Exhibit 73 - page 106

establishment, management, maintenance and other activities of the "Potato Corner" outlets /stores in the Territory with the assistance of the Corporate Secretary.

iv) No later than the twentieth (20th) day of each month, with respect to the preceding month, the President shall render a statement of receipts and disbursements, a schedule of accounts receivable and payable, and a schedule of fees collected and distributed, together with a reconciled bank statement as of the last day of the month with the assistance of the Corporate Secretary.

v) No later than three (3) months after the end of a fiscal year, the President shall, with the assistance of the Corporate Secretary and external accountant hired by Management, cause the Company to issue audited financial statements, and shall provide a copy of the same to all the members of Management.

vi) To the extent the President is lawfully able to do so, the President shall take such action as may be necessary to comply promptly with any and all laws, ordinances, orders or other requirements of any federal, state, county or municipal authority having jurisdiction of the Company and affecting the Company.

j) Consistent with its fiduciary duty to the Company, the members and managers shall exercise the duty of care and shall, at all times, ensure that all corporate opportunities consistent with the objectives of this Agreement shall be pursued on behalf of, and for the benefit of the Company. As such, with respect to the establishment of Company-owned stores, whenever potential locations are identified by any member or manager, it shall be promptly brought to the attention of the Management. At all times, and within thirty (30) days from receipt of this information, the Management shall decide to either build a Company-owned store at the identified location. In the event the Company chooses to build a Company-owned store at the identified location, it shall have the right to do so, to the exclusion of any of the members or managers. However, in the even the Company decides not to build a Company-owned store at the identified location, it shall notify the members and managers of its decision in writing. In such case, the LA Group shall have the right to build a store at the identified location, provided that it shall enter into a franchising agreement with the Company, and shall pay the franchise fees and ongoing royalty fees as set forth in the Company's standard franchising agreement.



## 4) DURATION OF AGREEMENT

a) This Agreement shall become effective from the date of execution hereof and shall continue indefinitely unless otherwise terminated by (i) an affirmative vote of 75 percent (75%) of all member interests, or (ii) upon mutual agreement by the Parties in writing.

b) Upon termination of this Agreement, the effects of termination shall be as follows:

6

Exhibit 73 - page 107

    i) All rights granted under the Master License Agreement shall terminate and the Company shall cease the use of the Potato Corner Intellectual Property Rights, and Confidential Information, provided however, that the Company shall be permitted to use any of the foregoing as is reasonably required in order to comply with its obligations under its sub-licensing or franchising agreements, but only to the extent of the duration of sub-licensing or franchising agreements in existence at the time of the termination of this Agreement.

    ii) The LA Group shall be subject to a non-compete arrangement and hereby agrees that, within two (2) years from the date of termination of this Agreement, it shall not engage in the business of establishing, operating, managing, licensing and franchising identical or similar products sold by the Company, using the intellectual property rights identical or similar to those used by the Company, at the time of the termination of this Agreement.

5) GENERAL PROVISIONS

a) This Agreement may not be altered, changed, supplemented or modified except by a written instrument duly signed by the Parties.

b) The Parties shall use their best efforts to cooperate for the success of the business of the Company. The Parties further agree to perform all acts and execute and deliver all documents or instruments required or necessary to fully implement or consummate the transactions contemplated in and the intent underlying this Agreement.

c) The Parties shall, to the extent feasible, cause the operating agreement of the Company to reflect the mutual covenants and provisions contained in this Agreement.

d) All notices and other communications required or permitted to be given hereunder shall be given in writing (and for this purpose shall include emails or fax transmissions) and shall be addressed to the appropriate Party at the address of such Party as heretofore designated, or at such address as such Party may designate subsequently in writing.

e) The failure of any Party at any time to require performance by the others of any provision of this Agreement shall not affect, in any way, the right of such Party to require performance of that or any other provision, and any waiver by any Party of any breach of this Agreement shall not be construed as a waiver of any continuing or succeeding breach of such provision, or a waiver of any other right under this Agreement.

f) This Agreement shall constitute the entire agreement between the Parties and shall supersede any previous agreements, written or otherwise, with respect to the same subject matter which may have been made by the Parties prior hereto.

g) The invalidity of any portion of this Agreement will not and shall not render the entire Agreement void, nor affect the validity of the rest of the provisions of this Agreement.



7

WEST\222455823.2

Exhibit 73 - page 108

h) This Agreement shall be governed by the laws of the State of California.

i) Parties acknowledge that, from time to time, one Party (the "Discloser") may disclose to the other Party (the "Recipient") information: (a) relating to the Potato Corner outlets and sites; (b) relating to the Potato Corner Intangible Property Rights; (c) Potato Corner product specifications and related information; (d) which is marked with "confidential" or a similar legend; (e) which is described orally and designated as confidential; or (f) which would, under the circumstances, be understood by a reasonable person to be confidential ("Confidential Information"). Upon subsequent disclosure of previously disclosed Confidential Information to the Recipient by the Discloser, the information will remain Confidential Information even if not identified as Confidential Information at the subsequent disclosure.    Recipient shall retain such Confidential Information in confidence, and shall not disclose it to any Third Party or use it for other than the purposes of this Agreement without the Discloser's prior written consent. Each Party shall use at least the same procedures and degree of care with respect to such Confidential Information which it uses to protect its own confidential information of like importance, and in no event less than reasonable care. The Recipient will immediately give written notice to the Discloser of any unauthorized use or disclosure of the Discloser's Confidential Information, and the Recipient will assist the Discloser in remedying such unauthorized use or disclosure.

[The Remainder of This Page is Left Intentionally Blank]



WEST\222455823.2

8

Exhibit 73 - page 109

IN WITNESS WHEREOF, the parties have executed this Agreement on the date and in place first mentioned.
**Cinco Group:**

Cinco Corporation (Philippines)

Name: Jose P. Magsaysay

Title:   CEO

Jose P. Magsaysay, Jr.,

Jose Miguel Ma. G. Montinola

Ma. Victoria O. Bermejo

Ricardo K. Montelibano,

**L.A. Group:**

Amit Nemanim

Guy Koren

Amir Jacoby

SIGNED IN THE PRESENCE OF:

9

WEST\222455823.2

**Exhibit 73 - page 110**

# EXHIBIT C

**Exhibit 73 - page 111**

(JPEG Image, 2550 × 3270 pixels) - Scaled (22%)    https://mail-attachment.googleusercontent.com/attachment/u/0/?ui=2...

PCIV BOARD MEETING
October 16, 2013. PCIV Office Wilshire, Los Angeles,
11:00 am to 1:00 pm

Attendance

Directors

N. P. Marcos - VC
MJLEMV Montinola
Ricardo Jaime Montelibano
Ma. Victoria Bermejo
Choy Torres R.
Amy Jacoby
Jay Macasiny

Brill de Bartolome - Corporate Secretary

Minutes of the last Board Meeting was not read and
approved.

Finance Report. Statement of Account from office in
August 1, 2013 totaling US$ 83,000.00 ...........................
Breakdown included: Advances to PCIV Piñas US
$20,000.00; Advances for Salaries of staff and audit US
$33,000.00; and Consultancy/Legal/advances fees
Barcelona US 15,000.00 (Nov. 2010) ...................
2013.

Exhibit 73 - page 112

b. On ESBartolome's consultancy, Board approved the
consultancy through the Board's signature on a
written document. To enable PCJV to pay the
amount, Consultancy fee will temporarily be
increased to US 2,300.00 until the US 11,000.00
from previous months will have been paid. The
difference will be paid to Cinco. Consultancy fee will
go back to US 1,300.00 until amount is paid. Inbal
given copy of this signed document.

The Board approved that the amount of US
___,000.00 be taken up as long - term liability of
PCJV.

d. The Board discussed the billings of DLA Piper and
GJV and Amir will negotiate with Kim on possible
discount on billings.

Operating Agreements and Structure

There are two Operating Agreements:
i. Internal operating Joint Venture, signed by all
Directors.
ii. Limited Liability Operating Agreement of PCJV
USA, LLC filed with the government.
iii. Sections of the internal Joint Venture are
repeated in the LLC Operating Agreement.

N. M and H & K
License Agreement with NKM will then
be authored and shall be migrated to an ADA with
Venogi & K
i. Prior to migration to ADA for J & K, GJV and
Amir, there is a need for all shareholders

**Exhibit 73 - page 113**

(JPEG image, 2550 × 3270 pixels) - Scaled (22%)

https://mail-attachment.googleusercontent.com/attachment/u/0/?ui=2...

Exhibit 73 - page 114

(JPEG Image, 2550 × 3270 pixels) - Scaled (22%)

https://mail-attachment.googleusercontent.com/attachment/u/0/?ui=2.

3/18/2013 3:16 PM

**Exhibit 73 - page 115**

# EXHIBIT D

**Exhibit 73 - page 116**

## PCJV USA LLC
## JOINT VENTURE AGREEMENT
### (FIRST AMENDMENT TO THE JV AGREEMENT)

This Joint Venture Agreement (the "Agreement") is made and entered into on OCTOBER 17, 2012 at its Principal Office , Suite #1100, 6380 Wilshire Blvd Los Angeles, CA 90048 by and between:

POTATO CORNER INTERNATIONAL, a corporation duly existing and registered by virtue of and under the laws of the State of Delaware, US with office address at 92 Corporate Park Suite C-332, Irvine. California, USA 92606, represented herein by its duly authorized representative, Jose P. Magsaysay (hereinafter "PCI"), and its directors, Jose P. Magsaysay, Jr., Jose Miguel Ma. G. Montinola, Ma. Victoria O. Bermejo, Ricardo K. Montelibano, all of whom are Philippine citizens and resident, and collectively referred to as the "PCI Group";

-and-

GUY KOREN, AMIR JACOBY AND INBAL JACOBY all of whom are U.S. citizens and residents and collectively referred to as the "LA Group:

### RECITALS

WHEREAS, the Parties hereto have agreed to form a limited liability company (hereinafter referred to as the "Company") under the laws of the State of Delaware, with the primary purpose of engaging in the business of establishing, operating, managing, licensing and franchising "Potato Corner" stores/outlets in the United States of America and Israel, except in the County of Los Angeles, USA and the County of San Francisco, USA and Tanforan Mall (hereinafter, "Territory").

WHEREAS, the Parties herein have agreed to enter into this Agreement which sets forth the terms and conditions with respect to the organization, incorporation, operation and management of the Company and defines their respective rights, duties and obligations of the parties to this Agreement.

WHEREAS, the Parties agree that the LLC operating agreement to be entered by them shall reflect the terms and conditions as set forth in this Agreement.

WHEREAS, Cinco may assign and or all of its rights to the joint venture company formed under this Agreement to a wholly-owned subsidiary as it deems fit.

NOW, THEREFORE, for and in consideration of the foregoing premises, the Parties hereby agree as follows:

1) ORGANIZATION AND FORMATION OF THE COMPANY

a) Within ten (10) days from the Effective Date of this Agreement, the Parties herein agree to organize and form, a limited liability company to be called "PCJV USA" ( hereinafter referred to as the Company) for the primary purpose of engaging in

WEST\222455823.2

**Exhibit 73 - page 117**

the business of establishing, operating, managing, licensing and franchising "Potato Corner" stores/outlets in the Territory

b) The initial members of the Company shall be the following:

   i) Potato Corner International (PCI)
      (1) Jose P. Magsaysay, Jr.
      (2) Jose Miguel Ma. G. Montinola
      (3) Ma. Victoria O. Bermejo
      (4) Ricardo K. Montelibano

   ii) LA Group
      (1) Guy Koren
      (2) Amir Jacoby
      (3) Inbal Jacoby

c) The principal office of the Company shall be at   Suite 1100, 6380 Wilshire Blvd Los Angeles, CA 90048 USA.

d) The annual general meeting of the members of the Company shall be held every year at the principal office of the Company.  The members may, at their discretion, invite non-members to join the annual general meeting, but only as non-voting observers.  Further, to the extent allowed by the financial condition of the Company, and as agreed upon by a majority of all member interests, the Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses incurred by the following members in attendance of the annual members' meeting: Jose P. Magsaysay, Jr., Jose Miguel Ma. Montinola, Ma. Victoria O. Bermejo and Ricardo K. Montelibano.

e) The fiscal year of the Company shall begin on January 1 and end on December 31 of each year.

f) The Company shall immediately upon formation obtain a "Liability Insurance" for the Company the amount and scope of coverage to be determined by the managers.

g) All costs, fees and expenses incurred in connection with the organization and formation of the Company shall be for the account of the Company.

h) The operating agreement of the Company shall reflect the terms and conditions set forth in this Agreement between the Parties.

2) CAPITALIZATION/OWNERSHIP OF THE COMPANY

a) At the time of formation, the Company shall have a total capital account of Fifty Thousand Dollars (US$50,000) which shall be fully subscribed and paid.

b) Unless other agreed to in writing, at the commencement of this Agreement, the Parties hereby agree that the Cindo Group shall contribute Thirty Thousand Dollars (US$30,000) and own sixty (60%) percent of the Company's capital

WEST\222455623.2

**Exhibit 73 - page 118**

accounts, while the LA Group shall contribute Twenty Thousand Dollars (US$20,000) and own the remaining forty (40%) percent.

c) The Parties hereby agree any increase in the capital account shall require an affirmative vote of 75% of all of the members' percentage interests in the Company. In the event an increase in the Company's capital accounts is approved by the members, both Parties shall have rights of pre-emption so that their pro rata ownership share in the Company shall be maintained, provided that, either Party shall have thirty (30) days within which to confirm in writing that it is willing and able to subscribe and fully pay its pro rata share of the increase in capital.

d) Neither Party shall assign any of its rights or obligations under this Agreement, nor his/its member interests in the Company without the prior written consent of the other Party In the event either Party desire to transfer or sell his/its pro rata members interest in the Company to a person other those specifically named in Section 1(a) of this Agreement, such Party shall be obligated to sell the same first to the other Party, which has have thirty (30) days within which to exercise its rights of first refusal from the date of receipt of a written notice to sell. For this purpose, the Parties hereby agree that the right of first refusal may be exercised in accordance with the following formula: The average of the Company's earnings before interest, depreciation, taxes and amortization (EBITDA) for the last two (2) years multiplied by 5 times, and further multiplied by the percentage of member interest subject to such right of first refusal over total outstanding member interests.

3) MANAGEMENT OF THE COMPANY

a) As will be provided in the Operating Agreement, the business and affairs of the Company shall be managed and all of the Company powers shall be exercised by or under the direction of the managers (collectively referred to as "Management"). Unless otherwise agreed to by the parties, the Management shall be composed of seven (7) members, four (4) of whom shall be designated by the Cinco Group, and three (3) designated by the LA Group. Upon the formation of the Company, the following shall be named managers: Jose P. Magsaysay, Jr., Jose Miguel Ma. Montinola, Ma. Victoria O. Bermejo, Ricardo K. Montelibano, Guy Koren, Amir Jacoby and Inbal Jacoby.

b) The Management shall regularly meet on a monthly basis. The regular monthly board meeting may be done via teleconference or through the internet. The members may, at their discretion, invite non-members to join member meetings, but only as non-voting observers. Further, to the extent allowed by the financial condition of the Company, and as agreed upon by a majority of all member interests, the Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses incurred by the members named in Section 1(d) in attendance of said meetings.

c) Upon the formation of the Company, it shall have the following executive officers; President, Corporate Secretary and Treasurer, and the following shall be elected by the managers/members to serve these positions. Any change in these mentioned executive officers will require a vote of 75% of members' interest.

3

Exhibit 73 - page 119

i) Chairman of the Board of Members – Jose P. Magsaysay

ii) President – At any given time, the President shall be any one of the following members: Guy Koren or Amir Jacoby or Inbal Jacoby and the first president will be Amit Nemanim now replaced by Guy Koren

iii) Corporate Secretary – Erlinda S. Bartolome.

iv) Treasurer -- Maria Victoria O. Bermejo

    (1) The Treasurer shall have oversight functions over the Accounting and Finance Departments that shall be exercised independent of the President.

d) Additional executive officers may be appointed by Management as it may deem necessary. Replacement and removal will require Managers simple majority vote.

e) It is hereby agreed that the rights and responsibilities of the Management shall include the following:

i) Approval of the compensation package for the managers, executive offices and key personnel.

ii) Approval of the Accounting System/Procedures/Software/Method to be used by the Company.

iii) Approval of the operating budget of the Company, and any changes to it.

iv) Approval of all franchising agreements, and lease agreements.

v) Approval of all purchases and disbursements in excess of $10,000, provided that such amount may be changed or modified by Management as it deems necessary.

f) The executive officers shall manage the business and property of the Company, and to market the business, in accordance with and pursuant to the directives of and policies set by the Management of the Company. The Management of the Company can recall and/or withdraw the appointment of any executive officer, as it deems necessary.

g) The Company shall enter into a Master License Agreement with Cinco (or an affiliated company to be designated by Cinco) which shall include the following terms and conditions:

i) The Company agrees to license the "POTATO CORNER" intellectual property rights from Cinco or an affiliated company to be designated by Cinco) consisting of (i) the trademark, service mark and trade name "POTATO CORNER"; and (ii) various trademarks, service marks, trade names, slogans, designs, insignias, emblems, symbols, color schemes, package features, logo and other propriety identifying characteristics used in relation and in connection with the "Potato Corner" Products and the System; and (iii) as well as other intellectual property rights in connection with the "POTATO CORNER" intellectual property rights, for use in the Territory.

ii) The Company agrees to pay, as an arm's length license fee, the following amounts:

4

WEST\222455823.2`

**Exhibit 73 - page 120**

(1) With respect to the licensing / sub-licensing or franchising the "POTATO CORNER" intellectual property rights in connection with the "POTATO CORNER" outlets/stores, an amount equal to thirty percent (30%) of all initial/franchise fees and ongoing royalty fees paid to/ collected by the Company. Payments shall be made to Cinco (or an affiliated company to be designated by Cinco) by wire transfer using a bank or other financial institution specified by it within thirty (30) days from receipt of the fees by the Company.

(2) All withholding and other applicable taxes levied by any authority on the payments by the Company shall be borne solely by the Company.

h) The Company agrees to engage the LA Group to provide management and strategic experience and expertise during the duration of this Agreement. The Company shall enter into a Master Services Agreement with the LA Group (or a corporation to be designated by the LA Group) which shall include the following terms and conditions:

i) In consideration for the provision of its services under the Master Services Agreement, the LA Group shall be entitled to a services fee equal to thirty (30%) percent of all initial/franchise fee and continuing royalty fees paid to/ collected by the Company .

ii) All withholding and other applicable taxes levied by any authority on the payments by the Company to the LA Group under this Agreement shall be borne solely by the Company.

iii) The LA Group shall faithfully, diligently and efficiently exercise its obligations and responsibilities under the Master Services Agreement.

iv) The LA Group shall maintain and protect the Confidential Information belonging to Cinco or the Company, and such undertaking shall apply to all of its partners, officers, employees, or agents.

i) The President of the Company shall render the following services and shall perform the following duties for the Company in a faithful, diligent and efficient manner:

i) The President shall be responsible for all management, operational, marketing, establishment, maintenance, licensing and sub-licensing activities with respect to the "Potato Corner" outlets/stores in the Territory. He shall use his best efforts at all times during the term of this Agreement to operate and maintain the "Potato Corner" outlets/stores in the Territory according to the highest standards achievable consistent with the overall plan of the Management of the Company. The President shall comply with the rules, policies and procedures approved by the Management of the Company from time to time.

ii) The President shall advertise market and promote the "Potato Corner" outlets/stores with the goal of causing public knowledge, awareness and patronage of the "Potato Corner" outlets/sites.

5

WEST\222455823.2

Exhibit 73 - page 121

iii) The President shall maintain a comprehensive system of records, books and accounts, with respect to the licensing and sub-licensing activities, operation, establishment, management, maintenance and other activities of the "Potato Corner" outlets /stores in the Territory with the assistance of the Corporate Secretary.

iv) No later than the twentieth (20th) day of each month, with respect to the preceding month, the President shall render a statement of receipts and disbursements, a schedule of accounts receivable and payable, and a schedule of fees collected and distributed, together with a reconciled bank statement as of the last day of the month with the assistance of the Corporate Secretary.

v) No later than three (3) months after the end of a fiscal year, the President shall, with the assistance of the Corporate Secretary and external accountant hired by Management, cause the Company to issue audited financial statements, and shall provide a copy of the same to all the members of Management.

vi) To the extent the President is lawfully able to do so, the President shall take such action as may be necessary to comply promptly with any and all laws, ordinances, orders or other requirements of any federal, state, county or municipal authority having jurisdiction of the Company and affecting the Company.

j) Consistent with its fiduciary duty to the Company, the members and managers shall exercise the duty of care and shall, at all times, ensure that all corporate opportunities consistent with the objectives of this Agreement shall be pursued on behalf of, and for the benefit of the Company. As such, with respect to the establishment of Company-owned stores, whenever potential locations are identified by any member or manager, it shall be promptly brought to the attention of the Management. At all times, and within thirty (30) days from receipt of this information, the Management shall decide to either build a Company-owned store at the identified location. In the event the Company chooses to build a Company-owned store at the identified location, it shall have the right to do so, to the exclusion of any of the members or managers. However, in the even the Company decides not to build a Company-owned store at the identified location, it shall notify the members and managers of its decision in writing. In such case, the LA Group shall have the right to build a store at the identified location, provided that it shall enter into a franchising agreement with the Company, and shall pay the franchise fees and ongoing royalty fees as set forth in the Company's standard franchising agreement.

4) DURATION OF AGREEMENT

a) This Agreement shall become effective from the date of execution hereof and shall continue indefinitely unless otherwise terminated by (i) an affirmative vote of 75 percent (75%) of all member interests, or (ii) upon mutual agreement by the Parties in writing.

6

G, K   AJ

WEST\222455823.2

Exhibit 73 - page 122

b) Upon termination of this Agreement, the effects of termination shall be as follows:

   i) All rights granted under the Master License Agreement shall terminate and the Company shall cease the use of the Potato Corner Intellectual Property Rights, and Confidential Information, provided however, that the Company shall be permitted to use any of the foregoing as is reasonably required in order to comply with its obligations under its sub-licensing or franchising agreements, but only to the extent of the duration of sub-licensing or franchising agreements in existence at the time of the termination of this Agreement.

   ii) The LA Group shall be subject to a non-compete arrangement and hereby agrees that, within two (2) years from the date of termination of this Agreement, it shall not engage in the business of establishing, operating, managing, licensing and franchising identical or similar products sold by the Company, using the intellectual property rights identical or similar to those used by the Company, at the time of the termination of this Agreement.

5) GENERAL PROVISIONS

  a) This Agreement may not be altered, changed, supplemented or modified except by a written instrument duly signed by the Parties.

  b) The Parties shall use their best efforts to cooperate for the success of the business of the Company. The Parties further agree to perform all acts and execute and deliver all documents or instruments required or necessary to fully implement or consummate the transactions contemplated in and the intent underlying this Agreement.

  c) The Parties shall, to the extent feasible, cause the operating agreement of the Company to reflect the mutual covenants and provisions contained in this Agreement.

  d) All notices and other communications required or permitted to be given hereunder shall be given in writing (and for this purpose shall include emails or fax transmissions) and shall be addressed to the appropriate Party at the address of such Party as heretofore designated, or at such address as such Party may designate subsequently in writing.

  e) The failure of any Party at any time to require performance by the others of any provision of this Agreement shall not affect, in any way, the right of such Party to require performance of that or any other provision, and any waiver by any Party of any breach of this Agreement shall not be construed as a waiver of any continuing or succeeding breach of such provision, or a waiver of any other right under this Agreement.

  f) This Agreement shall constitute the entire agreement between the Parties and shall supersede any previous agreements, written or otherwise, with respect to the same subject matter which may have been made by the Parties prior hereto.

7

WEST\222455823.2

Exhibit 73 - page 123

g) The invalidity of any portion of this Agreement will not and shall not render the entire Agreement void, nor affect the validity of the rest of the provisions of this Agreement.

h) This Agreement shall be governed by the laws of the State of California.

i) Parties acknowledge that, from time to time, one Party (the "Discloser") may disclose to the other Party (the "Recipient") information: (a) relating to the Potato Corner outlets and sites; (b) relating to the Potato Corner Intangible Property Rights; (c) Potato Corner product specifications and related information; (d) which is marked with "confidential" or a similar legend; (e) which is described orally and designated as confidential; or (f) which would, under the circumstances, be understood by a reasonable person to be confidential ("Confidential Information"). Upon subsequent disclosure of previously disclosed Confidential Information to the Recipient by the Discloser, the information will remain Confidential Information even if not identified as Confidential Information at the subsequent disclosure. Recipient shall retain such Confidential Information in confidence, and shall not disclose it to any Third Party or use it for other than the purposes of this Agreement without the Discloser's prior written consent. Each Party shall use at least the same procedures and degree of care with respect to such Confidential Information which it uses to protect its own confidential information of like importance, and in no event less than reasonable care. The Recipient will immediately give written notice to the Discloser of any unauthorized use or disclosure of the Discloser's Confidential Information, and the Recipient will assist the Discloser in remedying such unauthorized use or disclosure.

[The Remainder of This Page is Left Intentionally Blank]



8

WEST\222455823.2

**Exhibit 73 - page 124**

IN WITNESS WHEREOF, the parties have executed this Agreement on the date and in place first mentioned.

POTATO CORNER INTERNATIONAL GROUP:

Jose P. Magsaysay, Jr.,

Jose Miguel Ma. G. Montinola

Ma. Victoria O. Bermejo

Ricardo K. Montelibano,

**L.A. Group:**

Inbal Jacoby

Guy Koren

Amir Jacoby

SIGNED IN THE PRESENCE OF:

ACKNOWLEDGMENT

9

WEST\222455823.2

**Exhibit 73 - page 125**

# EXHIBIT E

**Exhibit 73 - page 126**

# LIMITED LIABILITY COMPANY AGREEMENT
of
## PCJV USA, LLC
### A Delaware Limited Liability Company

THE INTERESTS CREATED BY THIS OPERATING AGREEMENT HAVE NOT BEEN
REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE
SECURITIES ACT OF 1933, AS AMENDED, OR WITH THE SECURITIES AUTHORITIES
OF ANY STATE UNDER ANY STATE SECURITIES LAWS, AND MAY NOT BE SOLD
OR OTHERWISE TRANSFERRED UNLESS REGISTERED UNDER SUCH LAWS OR
UNLESS AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF SUCH
LAWS IS AVAILABLE. THE SALE OR TRANSFER OF SUCH INTERESTS IS SUBJECT
TO CERTAIN ADDITIONAL RESTRICTIONS DESCRIBED IN THIS OPERATING
AGREEMENT.

WEST\24283219.2

**Exhibit 73 - page 127**

## TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| ARTICLE I | DEFINITIONS | 1 |
| ARTICLE II | FORMATION | 4 |

| | | |
|---|---|---|
| 2.1 | Purpose | 4 |
| 2.2 | Powers | 4 |
| 2.3 | Formation and Name | 4 |
| 2.4 | Principal Place of Business | 4 |
| 2.5 | Registered Office and Registered Agent | 4 |
| 2.6 | Records to be Maintained | 5 |
| 2.7 | Term | 5 |

| | | |
|---|---|---|
| ARTICLE III | MEMBERS | 5 |

| | | |
|---|---|---|
| 3.1 | Classification of Members | 5 |
| 3.2 | Admission of Additional Members | 5 |
| 3.3 | Right of First Refusal | 6 |
| 3.4 | Amendment of Member Listing | 6 |
| 3.5 | Payment of Costs | 6 |
| 3.6 | Limited Liability of Members | 6 |
| 3.7 | Voting Rights | 6 |
| 3.8 | Meetings of Members | 7 |
| 3.9 | Right of Inspection; Provision of Records to Members | 10 |
| 3.10 | Representations and Warranties | 12 |

| | | |
|---|---|---|
| ARTICLE IV | MANAGEMENT | 12 |

| | | |
|---|---|---|
| 4.1 | Management | 12 |
| 4.2 | Number and Qualifications of Managers | 14 |
| 4.3 | Election of Managers | 14 |
| 4.4 | Removal of Managers | 14 |
| 4.5 | Resignation of Managers | 14 |
| 4.6 | Term of Office as Manager | 14 |
| 4.7 | Authority of Multiple Managers | 14 |
| 4.8 | Fiduciary Duties Owed by Managers | 15 |
| 4.9 | Conduct of Meetings of Managers | 15 |
| 4.10 | Regular Monthly Meetings | 15 |
| 4.11 | Officers | 15 |
| 4.12 | Indemnification and Liability Insurance | 17 |
| 4.13 | Actions of the Managers | 18 |
| 4.14 | Meetings of Managers | 18 |
| 4.15 | Compensation of Manager | 19 |
| 4.16 | Authority of Members to Bind the Company | 19 |
| 4.17 | Specific Arrangements with the Cinco Group | 20 |
| 4.18 | Specific Arrangements with the LA Group | 20 |

WEST\24283219.2

Exhibit 73 - page 128

## TABLE OF CONTENTS
(continued)

Page

| ARTICLE V | CAPITAL | 21 |
|---|---|---|
| 5.1 | Initial Capital Contributions | 21 |
| 5.2 | Capital Accounts | 21 |
| 5.3 | Adjustment for Distributions in Kind | 21 |
| 5.4 | Interest | 21 |
| 5.5 | Deficit Capital Account | 22 |
| 5.6 | Return of Capital | 22 |
| 5.7 | Optional Adjustments to Capital Accounts | 22 |

| ARTICLE VI | INCOME AND LOSSES | 22 |
|---|---|---|
| 6.1 | Allocations | 22 |
| 6.2 | Qualified Income Offset | 22 |
| 6.3 | Minimum Gain Chargeback | 22 |
| 6.4 | Contributed Property and Revaluations | 22 |
| 6.5 | Timing | 23 |

| ARTICLE VII | DISTRIBUTIONS | 23 |
|---|---|---|
| 7.1 | Operating Distributions | 23 |
| 7.2 | Generally Pro Rata | 23 |
| 7.3 | Liquidating Distributions | 23 |

| ARTICLE VIII | ASSIGNMENT OF INTERESTS | 23 |
|---|---|---|
| 8.1 | Assignment of Interests | 23 |
| 8.2 | No Dissolution upon Assignment | 24 |
| 8.3 | Information Regarding Assignee | 24 |
| 8.4 | No Release of Liability of Assignor | 24 |
| 8.5 | Pledge of Membership Interest | 24 |
| 8.6 | Exercise of Rights upon Death or Incompetency | 24 |
| 8.7 | Exercise of Rights upon Dissolution or Termination | 24 |

| ARTICLE IX | DISSOLUTION AND WINDING UP | 24 |
|---|---|---|
| 9.1 | Dissolution | 24 |
| 9.2 | Effect of Dissolution | 25 |

| ARTICLE X | TAX AND ACCOUNTING MATTERS | 25 |
|---|---|---|
| 10.1 | Characterization as a Partnership | 25 |
| 10.2 | No Partnership Intended for Nontax Purposes | 25 |
| 10.3 | Fiscal Year | 26 |
| 10.4 | Accounting Method | 26 |
| 10.5 | Tax Information | 26 |
| 10.6 | Basis Adjustment | 26 |
| 10.7 | Other Elections | 26 |
| 10.8 | Taxes of Taxing Jurisdictions | 26 |
| 10.9 | Tax Matters Partner | 26 |

WEST\224283219.2

**Exhibit 73 - page 129**

## TABLE OF CONTENTS
(continued)

Page

| ARTICLE XI | DISSOCIATION OF A MEMBER | 27 |
|---|---|---|
| 11.1 | Dissociation | 27 |
| 11.2 | Rights of Dissociating Member | 27 |
| ARTICLE XII | MISCELLANEOUS PROVISIONS | 28 |
| 12.1 | Amendment of Operating Agreement | 28 |
| 12.2 | Entire Agreement | 28 |
| 12.3 | Interpretation | 28 |
| 12.4 | Rights of Creditors and Third Parties under Operating Agreement | 28 |
| 12.5 | Valuation of Non-Cash Consideration | 28 |
| 12.6 | Counterpart Execution | 28 |
| 12.7 | Remedies | 28 |
| 12.8 | Successors and Assigns | 29 |
| 12.9 | Severability | 29 |
| 12.10 | Governing Law | 29 |

WEST\242832192

Exhibit 73 - page 130

## LIMITED LIABILITY COMPANY AGREEMENT
### of
### PCJV USA, LLC

The Limited Liability Company Agreement is made and entered into as of the Effective Date by the Members listed below for the purpose of forming a Delaware limited liability company in accordance with the provisions hereinafter set forth.

### ARTICLE I

### DEFINITIONS

The following terms, as used herein, shall have the following respective meanings:

1.1    **Act** – The Delaware Limited Liability Company Act, 6 Del.C. §18-101, et seq., as amended from time to time.

1.2    **Additional Member** – A member other than an Initial Member or a Substitute Member who has acquired a Membership Interest from the Company.

1.3    **Assignee** – A transferee of a Membership Interest who has not been admitted as a Substitute Member.

1.4    **Assignor** – A transferor of a Membership Interest.

1.5    **Business Day** – Any day other than Saturday, Sunday or any legal holiday observed in the State of Delaware.

1.6    **Capital Account** – The account maintained for a Member or Assignee determined in accordance with Article V.

1.7    **Capital Contribution** – Any contribution actually made to the capital of the Company pursuant to Section 5.1 by or on behalf of a Member or Assignee. The initial Capital Contribution of the Members shall be US$50,000 which shall be fully subscribed and paid.

1.8    **Certificate** – The Certificate of Formation of the Company.

1.9    **Company** – The company named in the introductory paragraph of this Operating Agreement, and any successor thereof.

1.10    **Company Liability** – Any enforceable debt or obligation for which the Company is liable or which is secured by any Company Property.

1.11    **Company Minimum Gain** – The extent to which a nonrecourse liability exceeds the adjusted tax basis of the Company Property it encumbers. The amount of Company Minimum Gain shall be determined in accordance with Regulations Section 1.704-2(d) by substituting the terms *"Company"* and *"Holder"* for the terms *"partnership"* and *"partner,"* respectively, in each place they appear therein.

WEST\224283219.2

**Exhibit 73 - page 131**

1.12    **Company Property** – Any Property owned by the Company.

1.13    **Contribution** – A contribution as defined by the Act.

1.14    **Disposition (Dispose)** – Any sale, assignment, transfer, exchange, mortgage, pledge, grant, hypothecation, or other transfer, absolute or as security or encumbrance (including dispositions by operation of law)..

1.15    **Dissociation** – Any action which causes a Person to cease to be Member as described in Article XI hereof.

1.16    **Dissolution Event** – An event, the occurrence of which will result in the dissolution of the Company under ARTICLE IX unless the Members agree to the contrary.

1.17    **Distribution** – A distribution of Money or Property made pursuant to this Operating Agreement.

1.18    **Economic Interest** – A Person's right to share in the income, gains, losses, deductions, credits or similar items of, and to receive Distributions from, the Company, exclusive of any other rights of a Member including, without limitation, the right to vote or to participate in management, or any right to information concerning the business and affairs of the Company.

1.19    **Effective Date** – The date the Certificate is filed with the Delaware Secretary of State.

1.20    **Holder** – A Person holding an Economic Interest, whether as a Member or as an Assignee.

1.21    **Income and Losses** – With respect to a taxable year of the Company (or other period for which Income or Losses must be computed), the Company's taxable income or loss for federal income tax purposes, as determined by the tax advisors employed by the Company for this purpose, except that: (1) any tax-exempt income of the Company as described in IRC Section 705(a)(1)(B) shall be treated as gross income of the Company, (2) any nondeductible noncapital expenditures as described in IRC Section 705(a)(2)(B) shall be treated as a deduction of the Company, and (3) if any Company property is reflected on the books of the Company at a value ("***Book Value***") different from the adjusted tax basis of such property, any item of Income or Loss with respect to such property shall be computed by reference to such Book Value.

1.22    **Initial Capital Contribution** – The Capital Contribution agreed to be made by the Initial Members as described in Section 5.1.

1.23    **Initial Members** – Those persons identified on Exhibit A attached hereto and made a part hereof by this reference who have executed the Operating Agreement.

1.24    **IRC** – The Internal Revenue Code of 1986, as amended.

2

Exhibit 73 - page 132

1.25    **Majority** – The affirmative vote or consent of Members having Percentage Interests in excess of one-half of the Percentage Interests of all the Members entitled to vote on a particular matter. Assignees and, in the case of approvals to withdrawal where consent of the remaining Members is required, Dissociating Members shall not be considered Members entitled to vote for the purpose of determining a Majority. In the case of a Member who has Disposed of that Member's entire Membership Interest to an Assignee, but has not been removed as provided below, the Percentage Interest of such Assignee shall be considered in determining a Majority and such Member's vote or consent shall be determined by such Percentage Interest.

1.26    **Management Right** – The right of a Member to participate in the management of the Company, including the rights to information and to consent or approve actions of the Company.

1.27    **Manager** – A manager selected to manage the affairs of the Company as provided under Article IV hereof.

1.28    **Member** – A member as defined by the Act, including all Initial Members, Substitute Members and Additional Members (but not including any Assignee or any Member who has Dissociated).

1.29    **Membership Interest** – A membership interest as defined by the Act.

1.30    **Money** – Cash or other legal tender of the United States, or any obligation that is immediately reducible to legal tender without delay or discount. Money shall be considered to have a fair market value equal to its face amount.

1.31    **Notice** – Except as otherwise expressly provided herein, all Notices shall be in writing. Notice to the Company shall be considered given when mailed by first class mail postage prepaid addressed to any Manager in care of the Company at the address of the principal place of business of the Company. Notice to a Member shall be considered given when mailed by first class mail postage prepaid addressed to the Member at the address reflected in the Operating Agreement unless the Member has given the Company a Notice of a different address.

1.32    **Operating Agreement** – This Limited Liability Company Agreement and all amendments thereto adopted in accordance with this Limited Liability Company Agreement and the Act.

1.33    **Organization** – A Person other than a natural person. Organization includes, without limitation, corporations (both non-profit and other corporations), partnerships (both limited and general), trusts, joint ventures, limited liability companies, and unincorporated associations, but the term does not include joint tenancies and tenancies by the entirety.

1.34    **Percentage Interest** – With respect to a Member, the percentage set forth opposite such Member's name on Exhibit A hereto, as such Exhibit is amended from time to time in accordance with Section 3.3 hereof, and with respect to a Holder not a Member, the Percentage Interest or part thereof corresponding to the portion of a Member's Economic Interest such Holder has acquired.

3

**Exhibit 73 - page 133**

1.35 **Person** – A person as defined by the Act.

1.36 **Proceeding** – Any judicial or administrative trial, hearing or other activity, civil, criminal or investigative, the result of which may be that a court, arbitrator, or governmental agency may enter a judgment, order, decree, or other determination which, if not appealed and reversed, would be binding upon the Company, a Member or other person subject to the jurisdiction of such court, arbitrator, or governmental agency.

1.37 **Property** – Any property real or personal, tangible or intangible, including money and any legal or equitable interest in such property, but excluding services and promises to perform services in the future.

1.38 **Regulations** – Except where the context indicates otherwise, the permanent, temporary or proposed regulations of the Department of the Treasury promulgated under the IRC as such regulations may be amended from time to time.

1.39 **Taxing Jurisdiction** – Any state, local, or foreign government that collects tax, interest or penalties, however designated, on any Member's share of the income or gain attributable to the Company.

1.40 **Term** – As specified in Section 2.7.

## ARTICLE II

## FORMATION

2.1 **Purpose.** The purpose of the Company is to engage in any lawful act or activity for which a limited liability company may be organized under the Act or the laws of any other jurisdiction in which the Company may do business.

2.2 **Powers.** The Company shall have all powers necessary to accomplish its purposes without the necessity of their specific enumeration herein including, without limitation, all powers described in Section 18-106 of the Act.

2.3 **Formation and Name.** The Members have caused to be formed a limited liability company under the name of PCJV USA, LLC (the "*Company*"), by the filing of the Certificate pursuant to the provisions of Section 18-201 of the Act. The Members desire to govern the affairs of the Company by entering into this Operating Agreement.

2.4 **Principal Place of Business.** The principal place of business of the Company shall be located at Suite 1110, 6380 Wilshire Blvd, CA 90048 USA, unless changed by the Managers.

2.5 **Registered Office and Registered Agent.** The Company's registered office is at 615 South DuPont Highway, City of Dover, County of Kent 19901 and the name of its initial registered agent at such address is National Corporate Research, Ltd. The Company may change the registered office and/or the registered agent at such times and from time to time as the Managers may deem advisable.

Exhibit 73 - page 134

2.6    Records to be Maintained. The Company shall maintain the following records at its principal place of business:

    2.6.1   A current list of the full name and last known business or residence address of each Member and Assignee set forth in alphabetical order, together with a schedule showing the Capital Contribution and Percentage Interest of each Member and Assignee;

    2.6.2   A current list of the full name and business or residence address of each Manager, if any;

    2.6.3   A copy of the Certificate and all amendments thereto, together with any powers of attorney pursuant to which the Certificate or any amendments thereto were executed;

    2.6.4   Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six most recent taxable years;

    2.6.5   A copy of this Operating Agreement and any amendments hereto, together with any powers of attorney pursuant to which this Operating Agreement or any amendments hereto were executed;

    2.6.6   Copies of the financial statements of the Company, if any, for the six most recent fiscal years;

    2.6.7   The books and records of the Company as they relate to the internal affairs of the Company for at least the current and past four fiscal years; and

    2.6.8   Any other records to be maintained pursuant to the Act.

2.7 .    Term. The Term of this Operating Agreement shall commence upon the date the Certificate is filed and shall continue indefinitely unless otherwise terminated by (i) an affirmative vote of 75 percent (75%) of all member interests, or (ii) upon mutual agreement by the Parties in writing.

<div align="center">

## ARTICLE III

### MEMBERS

</div>

3.1    Classification of Members. Pursuant to the Joint Venture Agreement entered into by the Members on _§ 8.12_ , the Members shall be classified and designated as either part of the Cinco Corporation (Philippines) group (the "Cinco Group") or the LA group (the "LA Group"). Both the Cinco Group and the LA Group agreed to the specific rights and obligations granted to each group, and undertake to fully observe the rights vested to each group under the Operating Agreement.

3.2    Admission of Additional Members. Additional Members may be admitted to the Company upon the consent of the Members required pursuant to Section 3.7, which such consent

Exhibit 73 - page 135

may be granted in their sole discretion. The Capital Contribution of any Additional Member shall be determined by the Members consenting to the admission. Each Additional Member shall execute a counterpart of this Operating Agreement, agreeing thereby to be bound by all of the terms and provisions hereof.

3.3    Right of First Refusal. A Member of the Cinco Group or the the LA Group shall not assign any of its rights or obligations nor his/its Member Interests in the Company outside of the Cinco Group and the LA Group, without the prior written consent of the non-assigning group. In the event a Member of either the Cinco Group or the LA Group desire to transfer or sell his/its pro rata members interest in the Company to a person other those in either the Cinco Group or the LA Group, such Member shall be obligated to sell the same first to the existing Members, which has have thirty (30) days within which to exercise its rights of first refusal from the date of receipt of a written notice to sell. For this purpose, the Parties hereby agree that the right of first refusal may be exercised in accordance with the following formula: The average of the Company's earnings before interest, depreciation, taxes and amortization (EBITDA) for the last two (2) years multiplied by 5 times, and further multiplied by the percentage of member interest subject to such right of first refusal over total outstanding Member Interests.

3.4    Amendment of Member Listing. Upon admission of an Additional Member, the Member listing required by Section 2.6 and Exhibit A hereto shall be amended accordingly.

3.5    Payment of Costs. All reasonable expenses, including attorneys' fees, incurred by the Company in connection with the admission of an Additional Member shall be borne by such Additional Member.

3.6    Limited Liability of Members. Members shall not be personally liable for the liabilities of the Company.

3.7    Voting Rights. All Members shall be entitled to vote on any matter submitted to a vote of the Members. Unless otherwise specified herein, actions to be taken by Members require the consent of a Majority of the Percentage Interests represented at a duly held meeting of the Members or, if such action is taken by written consent, by a Majority of all of the Percentage Interests. Notwithstanding the foregoing, the following actions require the consent described below:

| Action | Consent Required |
|---|---|
| Decision to dissolve the Company. | 75% of all Membership Interests |
| Decision to continue the business of the Company after a Dissolution Event. | 75% of all Membership Interests |
| Approval of the transfer of a Membership Interest and admission of an Assignee as a Substitute Member of the Company. | Prior written consent of the other Member |

WEST\24283219:2

6

Exhibit 73 - page 136

| Action | Consent Required |
|---|---|
| Approval of the withdrawal and Dissociation of a Member of the Company. | Prior written consent of the other Member |
| Any amendment of the Certificate or this Operating Agreement. | 75% of all Membership Interests |
| Agreement of merger as defined in Section 17551 of the Act. | 75% of all Membership Interests |
| Disposition by the Company of all or substantially all of the Company's assets. | 75% of all Membership Interests |
| Confession of a judgment against the Company in excess of Ten Thousand Dollars. | 75% of all Membership Interests |

3.8   Meetings of Members.

3.8.1   Place of Meetings. Meetings of Members may be held at any place, selected by the Person or Persons calling the meeting. If no other place is stated or fixed, all meetings shall be held at the principal place of business of the Company.

3.8.2   Calling of Meetings. A meeting of the Members may be called at any time by any Manager or by one or more Members with an aggregate Percentage Interest of more than ten percent (10%) for the purpose of addressing any matter on which the Members may vote.

3.8.3   Notice of Meetings. Whenever Members are required or permitted to take any action at a meeting, a Notice of the meeting shall be given not less than ten (10) calendar days nor more than sixty (60) calendar days before the date of the meeting to each Member entitled to vote at the meeting. The Notice shall state the place, date, and hour of the meeting and the general nature of the business to be transacted. No other business may be transacted at such a meeting.

3.8.4   Means of Providing Notice of Meetings. Any Notice of a meeting of the Members shall be given either personally or by mail or other means of written communication, charges prepaid, addressed to the Member at the address of the Member appearing on the books of the Company or given by the Member to the Company for the purpose of Notice, or, if no address appears or is given, at the place where the principal place of business of the Company is located or by publication at least once in a newspaper of general circulation in the county in which the principal place of business is located. The Notice shall be deemed to have been given at the time when delivered personally or deposited in the mail or sent by other means of written communication. An affidavit of mailing of any Notice in accordance with the provisions of this section, executed by a Manager or Member, shall be prima facie evidence of the giving of the Notice.

WEST\24283219.2

7

Exhibit 73 - page 137

Upon written request to a Manager by any Person entitled to call a meeting of Members, the Manager shall immediately cause Notice to be given to the Members entitled to vote that a meeting will be held at a time requested by the Person calling the meeting, not less than ten (10) calendar days nor more than sixty (60) calendar days after the receipt of the request. If the Notice is not given within twenty (20) calendar days after receipt of the request, the Person entitled to call the meeting may give the Notice or, upon the application of that Person, the superior court of the county in which the principal place of business of the Company is located, or if the principal place of business is not in this state, the county in which the Company's address in this state is located, shall summarily order the giving of the Notice, after Notice to the Company affording it an opportunity to be heard.

The Members may, at their discretion, invite non-Members to join, but only as non-voting observers. Further, to the extent allowed by the financial condition of the Company, and as agreed upon by a majority of all member interests, the Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses incurred by the Members in attendance.

3.8.5 Adjourned Meetings. When a Members' meeting is adjourned to another time or place, unless the Certificate or this Operating Agreement otherwise requires, and, except as provided in the Act, Notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken. At the adjourned meeting, the Company may transact any business that may have been transacted at the original meeting. If the adjournment is for forty-five (45) calendar days or more, or if after the adjournment a new record date is fixed for the adjourned meeting, a Notice of the adjourned meeting shall be given to each Member entitled to vote at the meeting.

3.8.6 Validation of Meeting Held Without Proper Call or Notice. The actions taken at any meeting of Members, however called and noticed, and wherever held, have the same validity as if taken at a meeting duly held after regular call and notice, if a quorum is present either in person or by proxy, and if, either before or after the meeting, each of the Members entitled to vote, not present in person or by proxy, signs a written waiver of Notice or consents to the holding of the meeting or approves the minutes of the meeting. All waivers, consents, and approvals shall be filed with the Company records or made a part of the minutes of the meeting. Attendance of a Member at a meeting shall constitute a waiver of Notice of the meeting, except when the Member objects, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Attendance at a meeting is not a waiver of any right to object to the consideration of matters required by this title to be included in the Notice but not so included, if the objection is expressly made at the meeting. Neither the business to be transacted nor the purpose of any meeting of Members need be specified in any written waiver of Notice, unless otherwise provided in the Certificate or this Operating Agreement, except as provided in subsection 3.8.8.

3.8.7 Participation Through Telecommunications Equipment. Members may participate in a meeting of the Company through the use of conference telephones or similar communications equipment, as long as all Members participating in the meeting

WBST\224283219.2                                     8

can hear one another. Participation in a meeting pursuant to this provision constitutes presence in person at that meeting.

3.8.8    Notice of General Nature of Meeting. Any action approved at a meeting, other than by unanimous approval of those entitled to vote, shall be valid only if the general nature of the proposal so approved was stated in the Notice of meeting or in any written waiver of Notice.

3.8.9    Quorum.

    3.8.9.1    Members holding in excess of one-half of the Percentage Interests represented in person or by proxy shall constitute a quorum at a meeting of Members.

    3.8.9.2    The Members present at a duly called or held meeting at which a quorum is present may continue to transact business until adjournment, notwithstanding the loss of a quorum, if any action taken after loss of a quorum, other than adjournment, is approved by the requisite Percentage Interests of Members specified in the Certificate, this Operating Agreement, or the Act.

    3.8.9.3    In the absence of a quorum, any meeting of Members may be adjourned from time to time; by the vote of a majority of the Membership Interests represented either in person or by proxy at such meeting, but no other business may be transacted, except as provided in subparagraph 3.8.9.2 above.

3.8.10    Action Without a Meeting.

    3.8.10.1    Any action that may be taken at any meeting of the Members may be taken without a meeting if a consent in writing, setting forth the action so taken, is signed and delivered to the Company within sixty (60) calendar days of the record date for that action by Members having not less than the minimum number of votes that would be necessary to authorize or take that action at a meeting at which all Members entitled to vote thereon were present and voted.

    3.8.10.2    Unless the consents of all Members entitled to vote have been solicited in writing, (A) Notice of any Member approval of an amendment to the Certificate or this Operating Agreement, a dissolution of the Company, or a merger of the Company, without a meeting by less than unanimous written consent shall be given at least ten (10) calendar days before the consummation of the action authorized by such approval, and (B) prompt Notice shall be given of the taking of any other action approved by Members without a meeting by less than unanimous written consent, to those Members entitled to vote who have not consented in writing.

    3.8.10.3    Any Member giving a written consent, or the Member's proxyholder, may revoke the consent by a writing received by the Company prior to the time that written consents of Members having the minimum number of votes that would be required to authorize the proposed action have been received

WEST\234283219.2

9

Exhibit 73 - page 139

by the Company, but may not do so thereafter. This revocation is effective upon its receipt at the principal place of business of the Company.

3.8.11 <u>Proxies</u>. Every Member entitled to vote shall have the right to do so in person or by one (1) or more agents authorized by a written proxy executed by such Member or his duly authorized agent and filed with the Company. Any proxy executed is not revoked and continues in full force and effect until (i) a writing stating that the proxy is revoked or a duly executed proxy bearing a later date is filed with the Company prior to the vote pursuant thereto, (ii) the Member executing the proxy attends the meeting and votes in person, or (iii) written Notice of the death or incapacity of the maker of such proxy is received by the Company before the vote pursuant thereto is counted; provided that no proxy shall be valid after the expiration of eleven months from the date of its execution, unless the person executing it specifies therein the length of time for which such proxy is to continue in force.

3.8.12 <u>Record Date</u>. In order that the Company may determine the Members of record entitled to Notices of any meeting or to vote, or entitled to receive any Distribution or to exercise any rights in respect of any other lawful action, a Manager, or Members representing more than ten percent (10%) of the Percentage Interests, may fix, in advance, a record date, that is not more than sixty (60) calendar days nor less than ten (10) calendar days prior to the date of the meeting and not more than sixty (60) calendar days prior to any other action. If no record date is fixed:

3.8.12.1   The record date for determining Members entitled to Notice of or to vote at a meeting of Members shall be at the close of business on the business day next preceding the day on which Notice is given or, if Notice is waived, at the close of business on the business day next preceding the day on which the meeting is held.

3.8.12.2   The record date for determining Members entitled to give consent to Company action in writing without a meeting shall be the day on which the first written consent is given.

3.8.12.3   The record date for determining Members for any other purpose shall be at the close of business on the day on which the Managers adopt the resolution relating thereto, or the sixtieth day prior to the date of the other action, whichever is later.

3.8.12.4   The determination of Members entitled to Notice of or to vote at a meeting of Members shall apply to any adjournment of the meeting unless a Manager or the Members who called the meeting fix a new record date for the adjourned meeting, but the Manager or the Members who called the meeting shall fix a new record date if the meeting is adjourned for more than forty five (45) calendar days from the date set for the original meeting.

3.9   <u>Right of Inspection; Provision of Records to Members.</u>

Exhibit 73 - page 140

3.9.1   Right of Inspection. Each Member, Manager and Assignee has the right, upon reasonable request, for purposes reasonably related to the interest of that Person as a Member, Manager, or Assignee, to each of the following at the expense of the Company:

3.9.1.1   To inspect and copy during normal business hours any of the records required to be maintained by Sections 2.6.1, 2.6.2, 2.6.3 and 2.6.4 above; and

3.9.1.2   To obtain from a Manager, promptly after becoming available, a copy of the Company's federal, state, and local income tax or information returns for each year.

3.9.2   Additional Rights. So long as the Company has more than 35 Members:

3.9.2.1   A Manager shall cause an annual report to be sent to each of the Members not later than one hundred twenty (120) calendar days after the close of each fiscal year. That report shall contain a balance sheet as of the end of the fiscal year and an income statement and statement of changes in financial position for the fiscal year.

3.9.2.2   Members with an aggregate Percentage Interest of at least five percent (5%), or any three or more Members; may make a written request to a Manager for an income statement of the Company for the initial three-month, six-month, or nine-month period of the current fiscal ended more than thirty (30) calendar days prior to the date of request, and a balance sheet of the Company as of the end of that period. The statement shall be delivered or mailed to the Members within thirty (30) calendar days thereafter.

3.9.2.3   The financial statements referred to in this section shall be accompanied by the report thereon, if any, of the independent accounts engaged by the Company or, if there is no report, the certificate of the Treasurer of the Company that the financial statements were prepared without audit from the books and records of the Company.

3.9.3   Copy of Amendment of Certificate and Operating Agreement. A Manager shall promptly furnish to a Member a copy of any amendment to the Certificate or this Operating Agreement executed by that Manager pursuant to a power of attorney from the Member.

3.9.4   Tax Information. The Company shall send or cause to be sent to each Holder within ninety (90) calendar days after the end of each taxable year such information as is necessary to complete their respective federal and state income tax or information returns, and, if the Company has thirty-five (35) or fewer Holders, a copy of the Company's federal, state, and local income tax or information returns for the year.

3.9.5   Relationship with Act. Nothing in this Section 3.9 shall be construed as in any way limiting a Member's right of inspection as set forth in Section 18-305 of the Act.

11

Exhibit 73 - page 141

3.10    Representations and Warranties. Each Member hereby represents and warrants to the Company and each other Member that:

3.10.1  If that Member is a organization, that it is duly organized, validly existing, and in good standing under the law of its state of organization and that it has full organizational power to execute and agree to the Operating Agreement to perform its obligations hereunder;

3.10.2  Such Member is acquiring its interest in the Company for its own account for investment purposes only and not with a view to the resale or distribution of all or any part of such interest and such Member has no present intention, agreement or arrangement to divide its participation with others or to sell, assign, transfer or otherwise dispose of all or any part of such interest. Such Member is aware that the interests have not been registered under the Securities Act of 1933, or any state securities laws, and that such interests may not be resold or otherwise disposed of unless they are registered thereunder or an exemption from registration is available. Accordingly, each Member is aware that it must bear the economic risk of investment in the Company for an indefinite period of time. Each Member is capable of bearing that risk.

## ARTICLE IV

## MANAGEMENT

4.1    Management. Subject to the limitations of the Certificate, the Act, and this Operating Agreement as to actions to be authorized or approved by the Members, the business and affairs of the Company shall be managed and all the Company powers shall be exercised by or under the direction of the Managers. The Managers may delegate the management of the day-to-day operation of the business of the Company to the officers of the Company or other persons provided that the business and affairs of the Company shall be managed and all powers shall be exercised under the ultimate direction of the Managers. Without prejudice to such general powers, but subject to the same limitations, the Managers shall have the following powers:

4.1.1   To approve compensation packages for the managers, executive offices and key personnel.

4.1.2   To approve the Accounting System/Procedures/Software/Method to be used by the Company.

4.1.3   To approve the operating budget of the Company, and any changes to it.

4.1.4   To approve all franchising agreements, and lease agreements.

4.1.5   To approve all purchases and disbursements in excess of Ten Thousand Dollars ($10,000), provided that such amount may be changed or modified by Management as it deems necessary.

4.1.6   To institute, prosecute, and defend any Proceeding in the Company's name;

WEST\242283219.2

12

Exhibit 73 - page 142

4.1.7   To purchase, receive, lease or otherwise acquire and deal with the Property, wherever located;

4.1.8   To sell, convey, mortgage, pledge, lease, exchange, or otherwise Dispose of Property;

4.1.9   To lend money, invest and reinvest the Company's funds, and receive and hold Property as security for repayment, including, without limitation, the loaning of money to Members, officers, employees, and agents;

4.1.10   To borrow money and incur indebtedness for the purposes of the Company, and to cause to be executed and delivered therefor in the Company name promissory notes, bonds, debentures, deeds of trust, mortgages, pledges, hypothecations or other evidences of debt and securities therefor;

4.1.11   To change the principal place of business of the Company from one location to another as provided in Section 2.3 hereof, and to fix and locate from time to time one or more subsidiary offices of the Corporation;

4.1.12   To prescribe the forms of Membership Certificates, and to alter the form of such Membership Certificates from time to time as in their judgment they deem best, provided such Membership Certificates shall at all times comply with provisions of law;

4.1.13   To select and remove all of the officers, agents and employees of the Company, to prescribe such powers and duties for them as may not be inconsistent with law, with the Certificate or this Operating Agreement, to fix their compensation, and to require from them security for faithful service;

4.1.14   To pay pensions and establish pension plans, pension trusts, profit sharing plans, and benefit and incentive plans for all or any of the current or former Members, employees, and agents of the Company;

4.1.15   To make donations to the public welfare or for religious, charitable, scientific, literary or educational purposes;

4.1.16   To purchase insurance on the life of any of the Members or Company employees for the benefit of the Company;

4.1.17   To participate in partnership agreements, joint ventures, or other associations of any kind with any person or persons; and

4.1.18   To authorize the issuance of Additional Membership Interests from time to time upon such terms as may be lawful in consideration of money paid, labor done, services actually rendered to the Company or for its benefit or in its formation or reorganization, debts or securities cancelled, and tangible or intangible property actually received either by the Company or any one of its wholly-owned subsidiaries, if any, or future services.

WEST\224283219.2                                    13

4.2    Number and Qualifications of Managers. Until changed by amendment of the Certificate or an amendment to this section:

4.2.1    The agreed-upon and authorized number of Managers shall be seven (7), four (4) of whom shall be designated by the Cinco Group, and three (3) designated by the LA Group.

4.2.2    Upon the formation of the Company, the following shall be named and designated as managers:

4.2.2.1    For the Cinco Group: Jose P. Magsaysay, Jr., Jose Miguel Ma. Montinola, Ma. Victoria O. Bermejo, and Ricardo K. Montelibano.

4.2.2.2    For the LA Group: Amit Nemanim, Guy Koren, and Amir Jacoby.

4.3    Election of Managers.

4.3.1    Election at Meeting of Members. In any election of Managers at a meeting of Members duly called and noticed, the Cinco Group shall be entitled to elect four (4) Managers, while the LA Group shall be entitled to elect three (3) Managers. Interests entitled to be voted for them up to the number of Managers to be elected by such Members shall be elected. Elections for Managers need not be by ballot unless a Member demands election by ballot at the meeting and before the voting begins.

4.3.2    Election by Written Consent. Managers may alternatively be elected by a written consent action of Members made pursuant to Section 3.8.10 executed by a Majority of the Members.

4.4    Removal of Managers. Any Managers may be removed, with or without cause, by the vote of a Majority of the Members by written consent or at a meeting of Members called expressly for that purpose. Any removal shall be without prejudice to the rights, if any, of the Manager under any contract of employment.

4.5    Resignation of Managers. Any Manager may resign as a Manager at any time upon written Notice to the Company, without prejudice to the rights, if any, of the Company under any contract to which the Manager is a party.

4.6    Term of Office as Manager. Each Manager shall serve until the earliest to occur of (i) the resignation of the Manager, (ii) the removal of the Manager, or (iii) the election of a successor.

4.7    Authority of Multiple Managers. If, pursuant to Section 4.2 above, more than one manager is authorized, then any one or more Managers may take any action permitted to be taken by any one or more other Managers, unless this Operating Agreement or the Act requires the consent of more than one Manager.

WEST\254283219.2                                    14

4.8     Fiduciary Duties Owed by Managers. Managers shall owe fiduciary duties to the Company and the Members in the manner prescribed in the Act and under applicable case law.

4.9     Conduct of Meetings of Managers. The Managers may adopt such rules and regulations for the conduct of its meetings and the management of the Company not inconsistent with this Operating Agreement or applicable law.

4.10    Regular Monthly Meetings. The Managers shall meet at least on a monthly basis, and may be done in person, via teleconference or through the internet. The Managers may, at their discretion, invite non-Members to join, but only as non-voting observers.

4.11    Officers.

4.11.1  Officers. The officers of the Company, if any, shall include the following: Chairman of the Board of Members, President, Corporate Secretary, and Treasurer. The Company may also have, at the discretion of the Managers, one or more vice-presidents, one or more assistant secretaries, one or more assistant financial officers, and such other officers as may be appointed in accordance with the provisions of this Operating Agreement. Any number of offices may be held by the same person. Officers need not be Members.

4.11.2  Election. The officers of the Company, except such officers as may be appointed in accordance with the provisions of Section 10.3, shall be chosen by the Managers, and each shall hold his office until he or she shall resign or shall be removed by the Managers or otherwise disqualified to serve, or his successor shall be elected and qualified.

4.11.3  Subordinate Officers. The Managers may appoint, and may empower the President to appoint, such other officers as the business of the Company may require, each of whom shall hold office for such period, have such authority and perform such duties as the appointing authority may designate, subject to any limitations imposed by resolution of the Managers.

4.11.4  Removal. Any officer may be removed, either with or without cause, by the Managers, at any regular or special meeting thereof or, except in case of an officer chosen by the Managers, by any officer upon whom such power of removal may be conferred by the Managers (subject, in each case, to the rights, if any, of an officer under any contract of employment).

4.11.5  Resignation. Any officer may resign at any time by giving Notice to the Managers or to the President or to the Secretary of the Company, but without prejudice to the rights, if any, of the Company under any contract to which such officer is a party. Any such resignation shall take effect at the date of the receipt of such Notice or any later time specified therein; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

WEST\224283219.2

15

Exhibit 73 - page 145

4.11.6 Vacancies. A vacancy in any office because of death, resignation, removal, disqualification or any other cause shall be filled in the manner prescribed in this Operating Agreement for regular appointments to such office.

4.11.7 President. The President shall be the chief executive officer of the Company and shall, subject to the control of the Managers, have general supervision, direction and control of the business and officers of the Company. The President shall preside at all meetings of the Members and the Managers. He or she shall have the general powers and duties of management usually vested in the office of the President of a corporation, and shall have such other powers and duties as may be prescribed by the Managers or this Operating Agreement. As agreed upon by the Members, at any given time, the President shall be any of the following: Amit Nemanim, Guy Korean, and Amir Jacoby. The initial President of the Company shall be Amit Nemanim. The President of the Company shall render the following services and shall perform the following duties for the Company in a faithful, diligent and efficient manner:

4.11.7.1 The President shall be responsible for all management, operational, marketing, establishment, maintenance, licensing and sub-licensing activities with respect to the "Potato Corner" outlets/stores in the Territory. He shall use his best efforts at all times during the term of this Agreement to operate and maintain the "Potato Corner" outlets/stores in the Territory according to the highest standards achievable consistent with the overall plan of the Management of the Company. The President shall comply with the rules, policies and procedures approved by the Management of the Company from time to time.

4.11.7.2 The President shall advertise market and promote the "Potato Corner" outlets/stores with the goal of causing public knowledge, awareness and patronage of the "Potato Corner" outlets/sites.

4.11.7.3 The President shall maintain a comprehensive system of records, books and accounts, with respect to the licensing and sub-licensing activities, operation, establishment, management, maintenance and other activities of the "Potato Corner" outlets /stores in the Territory with the assistance of the Corporate Secretary.

4.11.7.4 No later than the twentieth (20th) day of each month, with respect to the preceding month, the President shall render a statement of receipts and disbursements, a schedule of accounts receivable and payable, and a schedule of fees collected and distributed, together with a reconciled bank statement as of the last day of the month with the assistance of the Corporate Secretary.

4.11.7.5 No later than three (3) months after the end of a fiscal year, the President shall, with the assistance of the Corporate Secretary and external accountant hired by Management, cause the Company to issue audited financial statements, and shall provide a copy of the same to all the members of Management.

Exhibit 73 - page 146

4.11.7.6    To the extent the President is lawfully able to do so, the President shall take such action as may be necessary to comply promptly with any and all laws, ordinances, orders or other requirements of any federal, state, county or municipal authority having jurisdiction of the Company and affecting the Company.

4.11.8  Secretary.  The Secretary shall record or cause to be recorded, and shall keep or cause to be kept, at the principal place of business of the Company and such other place or places as the Managers may order, a book of minutes of actions taken at all meetings of Managers, committees and Members, with the time and place of holding, whether regular or special, and, if special, how authorized, the Notice thereof given, the names of those present at Managers' and committee meetings, the Percentage Interest present or represented at Members' meetings, and the proceedings thereof.

The Secretary shall keep, or cause to be kept, at the principal place of business those records referenced in Section 2.6 above and, if the Company has issued Membership Certificates, a register showing the number and date of each Membership Certificate, and the number and date of each Membership Certificate surrendered for cancellation.

The Secretary shall give, or cause to be given, Notice of all the meetings of the Members and the Managers required by this Operating Agreement or by the Act to be given, and shall have such other powers and perform such other duties as may be prescribed by the Managers or by this Operating Agreement.

4.11.9  Treasurer.  The Treasurer shall keep and maintain, or cause to be kept and maintained, adequate and correct accounts of the properties and business transactions of the Company, including accounts of its assets, liabilities, receipts, disbursements, income, losses, changes in financial position, Capital Accounts, and retained earnings.

The Treasurer shall deposit all moneys and other valuables in the name and to the credit of the Company with such depositories as may be designated by the Managers.  He or she shall disburse the funds of the Company as may be ordered by the Managers, shall render to the President and the Managers whenever they request it, an account of all of his transactions as Treasurer and of the financial condition of the Company, and shall have such other powers and perform such other duties as may be prescribed by the Managers or this Operating Agreement.

4.12    Indemnification and Liability Insurance.

4.12.1  The Company may provide indemnification to its Managers, officers and agents to the fullest extent permitted by Delaware law.

4.12.2  The Company shall have the power to purchase and maintain insurance on behalf of any Manager or officer against any liability asserted against or incurred by a Manager or officer in that capacity or arising out of that person's status as a Manager or officer of the Company.

17

Exhibit 73 - page 147

4.13    Actions of the Managers. Each Manager has the power to bind the Company as provided in this ARTICLE IV. If there is more than one Manager, decisions of the Managers shall be made by majority vote of the Managers if at a meeting, or by unanimous written consent. No act of a Member in contravention of such a determination shall bind the Company to Persons having knowledge of such determination.

4.14    Meetings of Managers.

4.14.1 Place of Meetings. Meetings of Managers may be held at any place, selected by the person or persons calling the meeting. If no other place is stated or fixed, all meetings shall be held at the principal place of business of the Company.

4.14.2 Calling of Meetings. A meeting of the Managers may be called at any time by the President or any two Managers.

4.14.3 Notice of Meetings. Notice of the time and place of meetings of Managers shall be personally delivered to each Manager or communicated to each Manager by telephone or mail, charges prepaid, addressed to the Manager's address as is shown upon the records of the Company, or if it is not so shown on such records or is not readily ascertainable, at the place at which the meetings of Managers are regularly held. In the case Notice is mailed, it shall be deposited in the United States mail at least ninety-six (96) hours prior to the time of the holding of the meeting. In the event Notice is delivered personally or communicated by telephone, it shall be so delivered or communicated at least forty-eight (48) hours prior to the time of the holding of a meeting.

Except as otherwise provided by the Act or this Operating Agreement, a Notice need not specify the purpose of the meeting of the Managers. Whenever any Manager has been absent from any meeting of the Manager for which Notice has not been dispensed with, an entry in the minutes to the effect that Notice has been duly given shall be conclusive and incontrovertible evidence that due Notice of such meeting was given to such Manager.

4.14.4 Participation Through Telecommunications Equipment. Managers may participate in a meeting of the Company through the use of conference telephones or similar communications equipment, as long as all Managers participating in the meeting can hear one another. Participation in a meeting pursuant to this provision constitutes presence in person at that meeting.

4.14.5 Adjourned Meetings. When a Managers' meeting is adjourned to another time or place, unless the Certificate or this Operating Agreement otherwise requires, and, except as provided in the Act, Notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken. At the adjourned meeting, the Managers may transact any business that may have been transacted at the original meeting. If the adjournment is for forty-eight hours or more, a Notice of the adjourned meeting shall be given to each Member entitled to vote at the meeting.

WEST\224283219.2                                    18

Exhibit 73 - page 148

4.14.6 <u>Validation of Meeting Held Without Proper Call or Notice</u>. The actions taken at any meeting of Managers, however called and noticed, and wherever held, have the same validity as if taken at a meeting duly held after regular call and notice, if a quorum is present either in person or by proxy, and if, either before or after the meeting, each of the Managers signs a written waiver of Notice or consents to the holding of the meeting or approves the minutes of the meeting. All waivers, consents, and approvals shall be filed with the Company records or made a part of the minutes of the meeting. Attendance of a Manager at a meeting shall constitute a waiver of Notice of the meeting, except when the Manager objects, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.

4.14.7 <u>Participation Through Telecommunications Equipment</u>. Managers may participate in a meeting of the Managers through the use of conference telephones or similar communications equipment, as long as all Managers participating in the meeting can hear one another. Participation in a meeting pursuant to this provision constitutes presence in person at that meeting.

4.14.8 <u>Quorum</u>.

4.14.8.1    A majority of the Managers in attendance or represented by proxy shall constitute a quorum at a meeting of Managers.

4.14.8.2    The Managers present at a duly called or held meeting at which a quorum is present may continue to transact business until adjournment, notwithstanding the loss of a quorum, if any action taken after loss of a quorum, other than adjournment, is approved by the requisite number of Managers specified in the Certificate, this Operating Agreement, or the Act.

4.14.8.3    In the absence of a quorum, any meeting of Managers may be adjourned from time to time by the vote of a majority of the Managers in attendance, but no other business may be transacted, except as provided in subparagraph 4.14.8.24.14.8.2 above.

4.14.9    <u>Action Without a Meeting</u>. Any action required or permitted to be taken by the Managers may be taken without a meeting if all the Managers shall individually or collectively consent in writing to such action. Such consent or consents shall be filed with the minutes of the proceedings of the Managers and shall have the same force and effect as a unanimous vote of the Managers.

4.15    <u>Compensation of Manager</u>. Each Manager shall be reimbursed all reasonable expenses incurred in managing the Company and shall be entitled to compensation in an amount, if any, to be determined from time to time by the affirmative vote of a Majority of the Members.

4.16    <u>Authority of Members to Bind the Company</u>. The Members hereby agree that only the Managers and authorized agents of the Company shall have the authority to bind the Company. No Member other than a Manager shall take any action as a Member to bind the Company, and each Member shall indemnify the Company for any costs or damages incurred by the Company as a result of the unauthorized action of such Member.

Exhibit 73 - page 149

4.17    Specific Arrangements with the Cinco Group. As agreed upon in the Joint Venture Agreement, the Company shall enter into a Master License Agreement with Cinco Corporation (Philippines), Inc. (or an affiliated company designated) which shall include the following terms and conditions:

4.17.1 The Company agrees to license the "POTATO CORNER" intellectual property rights from Cinco Corporation (Philippines), Inc. (or an affiliated company designated) consisting of (i) the trademark, service mark and trade name "POTATO CORNER"; and (ii) various trademarks, service marks, trade names, slogans, designs, insignias, emblems, symbols, color schemes, package features, logo and other propriety identifying characteristics used in relation and in connection with the "Potato Corner" Products and the System; and (iii) as well as other intellectual property rights in connection with the "POTATO CORNER" intellectual property rights, for use in the Territory.

4.17.2 The Company agrees to pay, as an arm's length license fee, the following amounts: (i) With respect to the licensing / sub-licensing or franchising the "POTATO CORNER" intellectual property rights in connection with the "POTATO CORNER" outlets/stores, an amount equal to thirty percent (30%) of all initial/franchise fees and ongoing royalty fees paid to/ collected by the Company. Payments shall be made to Cinco (or an affiliated company to be designated by Cinco) by wire transfer using a bank or other financial institution specified by it within thirty (30) days from receipt of the fees by the Company; and (ii) All withholding and other applicable taxes levied by any authority on the payments by the Company shall be borne solely by the Company.

4.18    Specific Arrangements with the LA Group. As agreed upon in the Joint Venture Agreement, the Company agrees to engage the LA Group to provide management and strategic experience and expertise during the duration of this Agreement. The Company shall enter into a Master Services Agreement with the LA Group (or a corporation to be designated by the LA Group) which shall include the following terms and conditions:

4.18.1 In consideration for the provision of its services under the Master Services Agreement, the LA Group shall be entitled to a services fee equal to thirty (30%) percent of all initial/franchise fee and continuing royalty fees paid to/ collected by the Company.

4.18.2 All withholding and other applicable taxes levied by any authority on the payments by the Company to the LA Group under this Agreement shall be borne solely by the Company.

4.18.3 The LA Group shall faithfully, diligently and efficiently exercise its obligations and responsibilities under the Master Services Agreement.

4.18.4 The LA Group shall maintain and protect confidential information belonging to Cinco or the Company, and such undertaking shall apply to all of its partners, officers, employees, or agents.

Exhibit 73 - page 150

## ARTICLE V

### CAPITAL

5.1    Initial Capital Contributions. Upon execution of this Agreement, each Member shall assign, convey and transfer their respective Initial Capital Contribution to the Company. Each Member represents and warrants to the Company that (i) the Member's Shares are free of any mortgage, pledge, lien, security, interest or other encumbrance of any kind or nature, (ii) such Member is the lawful beneficial and record owner of, and has good and marketable title to, the Member's Shares, and (iii) to the best of such Member's knowledge, the Member's Shares are duly authorized, validly issued, fully paid and nonassessable. Additional Members shall make Capital Contributions in the amount, at the time and on the terms determined by the Members consenting to the admission pursuant to Section 3.1 hereof.

5.2    Capital Accounts. The Company shall establish and maintain a Capital Account for each Holder in accordance with Regulations Section 1.704-1(b)(2)(iv). Accordingly, a Holder's Capital Account shall be increased by (1) the amount of money the Holder contributes to the Company, (2) the fair market value of property the Holder contributes to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under IRC Section 752, and (3) allocations to the Holder of Income (or items thereof), including income and gain exempt from tax and gain as computed for book purposes in accordance with Regulations Section 1.704-1(b)(2)(iv)(g) but excluding any gain separately computed for tax purposes as described in Regulations Section 1.704-1(b)(4)(i). A Holder's Capital Account shall be decreased by (1) the amount of money the Company distributes to the Holder, (2) the fair market value of property the Company distributes to the Holder (net of any liabilities secured by such distributed property that the Holder is considered to assume or take subject to under IRC Section 752), (3) allocations to the Holder of the Company's nondeductible, noncapital expenditures, and (4) allocations to the Holder of Losses (or item thereof), including loss and deduction as computed for book purposes in accordance with Regulations Section 1.704-1(b)(2)(iv)(g) but excluding nondeductible, noncapital expenditures and loss and deduction separately computed for tax purposes as described in Regulations Section 1.704-1(b)(4)(i). A Holder's Capital Account in all events shall be adjusted in accordance with the additional rules set forth in Regulations Section 1.704-1(b)(2)(iv). In the event a Holder transfers all or any portion of his interest in the Company, the transferee shall succeed to the individual Capital Account balance of the transferor to the extent such individual Capital Account balance relates to the transferred interest.

5.3    Adjustment for Distributions in Kind. Any asset of the Company distributed to the Holders in kind shall be valued according to its fair market value. An item of Income or Loss shall be computed as if such asset had been sold at its fair market value, such hypothetical item shall be allocated as provided in Section 6.1, and each Holder's Capital Account shall be credited or charged, as the case may be, with the Holder's share of such hypothetical item prior to any such distribution of assets.

5.4    Interest. No Capital Contribution or Capital Account balance shall bear interest.

**Exhibit 73 - page 151**

5.5     Deficit Capital Account. No Holder shall be obligated to restore a Capital Account having a balance of less than zero.

5.6     Return of Capital. Except as otherwise provided in this Operating Agreement, no Holder shall have any right to withdraw or make a demand for Distribution or withdrawal or return of any Capital Contribution or Capital Account balance.

5.7     Optional Adjustments to Capital Accounts. Upon (i) a contribution of cash or property (which shall be valued at its fair market value) to the Company by a new or existing Holder for a Membership or Economic Interest, or (ii) a distribution by the Company to a retiring or continuing Holder for a Membership or Economic Interest, the Company may, in the discretion of the Members, increase or decrease the Capital Accounts of the Holders to reflect a revaluation of Company Property on the books of the Company, in accordance with the provisions of Regulations Section 1.704-1(b)(2)(iv)(f).

## ARTICLE VI

## INCOME AND LOSSES

6.1     Allocations. Except as otherwise provided in this Article VI, Income and Losses, and each item thereof, of the Company shall be allocated to the Holders in proportion to their Percentage Interests.

6.2     Qualified Income Offset. A Holder whose Capital Account is unexpectedly reduced on account of an adjustment described in Section 1.704-1(b)(2)(ii)(d)(4) of the Regulations, an allocation described in Section 1.704-1(b)(2)(ii)(d)(5) of the Regulations, or a distribution described in Section 1.704-1(b)(2)(ii)(d)(6) of the Regulations, shall be allocated that Holder's pro rata portion of each item of Company income, including gross income, and gain in an amount and manner sufficient to eliminate such deficit balance as quickly as possible.

6.3     Minimum Gain Chargeback. Notwithstanding any other provision herein, if there is a net decrease in Company Minimum Gain during any taxable year, items of Company income and gain shall be allocated in accordance with the provisions of Regulations Section 1.704-2(f). This provision is intended to comply with Regulations Section 1.704-2(e)(3).

6.4     Contributed Property and Revaluations. In accordance with IRC Section 704(c), income, gain, loss and deduction with respect to property contributed to the Company by a Holder shall be allocated solely for tax purposes among the Holders so as to take account of any variation between the adjusted basis of the property to the Company and its fair market value on the date of the Contribution. Further, if the book value of any Company asset is adjusted as described in Regulations Section 1.704-1(b)(2)(iv)(f), subsequent allocations for tax purposes of income, gain, loss and deduction with respect to such asset shall take into account any variation between its adjusted tax basis and its adjusted book value. In either case, the Managers shall determine such allocations using a method that qualifies as reasonable within the meaning of Regulations Section 1.704-3. No Holder's Capital Account shall be adjusted for allocations made under this Section.

Exhibit 73 - page 152

6.5    Timing. All allocations of Income or Losses shall be made to the Persons shown on the records of the Company to have been Holders as of the end of business on the last day of the Company's taxable year for which the allocation is made. Notwithstanding the foregoing, upon the transfer of an Economic Interest or the admission of an Additional Member during a taxable year of the Company, the Income or Losses shall be allocated between the former Holder and the successor, or to the Additional Member, as the case may be, according to the number of days during such year each was a Holder.

## ARTICLE VII

## DISTRIBUTIONS

7.1    Operating Distributions. The Managers from time to time may determine, in their reasonable judgment, that: (i) there is an excess of cash on hand beyond the Company's current and anticipated requirements, including, without limitation, cash flow and reserve requirements, and (ii) a distribution of such excess cash on hand, if any, is permissible under Section 18-607 of the Act. In that event, the Managers may, in their sole and absolute discretion, make a distribution of all or a part of such excess (an "*Operating Distribution*") to the Holders, provided that no such Distribution shall be declared and paid unless, after such Distribution, the assets of the Company will exceed all liabilities of the Company. Such Distributions may be made in cash or Property or partly in both, as determined in the sole and absolute discretion of the Managers.

7.2    Generally Pro Rata. Except as provided in Section 7.3 below, Distributions shall be allocated to Holders in proportion to their Percentage Interests.

7.3    Liquidating Distributions. Upon the dissolution of the Company, liquidating distributions in all cases shall be made in accordance with the positive Capital Account balances of the Holders, as determined after taking into account all Capital Account adjustments for the Company's taxable year during which such dissolution occurs (other than those made pursuant to this section), by the end of such taxable year or, if later, within ninety (90) days after the date of such dissolution.

## ARTICLE VIII

## ASSIGNMENT OF INTERESTS

8.1    Assignment of Interests. An Economic Interest is assignable in whole or in part, provided, however, that no Membership Interest may be assigned to any Person (including any assignments for security purposes or other form of pledge) without the consent of Members required pursuant to Section 3.7. Upon admission, the Assignee shall become a Substitute Member, and shall have the rights and benefits, and is subject to the restrictions and liabilities, of a Member under the Certificate, this Operating Agreement, and the Act. A Substitute Member is also liable for the obligations of the Assignor to make Capital Contributions, and to return any unlawful distributions made to the Assignor under Chapter VI (commencing with Section 18-601) of the Act. However, the Substitute Member is not obligated for liabilities unknown to the Substitute Member at the time the Substitute Member became a Member and that could not be ascertained from the Certificate or this Operating Agreement.

Exhibit 73 - page 153

8.2    No Dissolution upon Assignment. An assignment of an Economic Interest does not of itself dissolve the Company or, except as otherwise set forth herein, entitle the Assignee to vote or participate in the management and affairs of the Company or to become or exercise any rights of a Member. An assignment of an Economic Interest merely entitles the Assignee to receive, to the extent assigned, the Income, Losses, Distributions and similar items to which the Assignor would be entitled.

8.3    Information Regarding Assignee. Upon the assignment of all or part of an Economic Interest, the Assignor shall provide the Manager or Member of the Company responsible for maintaining the books and records with the name and address of the Assignee, together with details of the interest assigned. Upon receipt of that Notice, the Company shall amend the list required by Section 2.6 accordingly. Until the Assignee becomes a Substitute Member, the Assignor continues to be a Member and to have the power to exercise any rights and powers of a Member, including the right to vote which, in the case of a Member who has assigned his or her or its entire Economic Interest in the Company, shall include the right to vote in proportion to the Percentage Interest that the assigning Member would have, had the assignment not been made.

8.4    No Release of Liability of Assignor. The Assignor is not released from liability as a Member solely as a result of the Assignment. Whether or not an Assignee becomes a Substitute Member, the Assignor is not released from the Assignor's liability to the Company under Subchapter V (commencing with Section 18 501) and Subchapter VI (commencing with Section 18-601) of the Act.

8.5    Pledge of Membership Interest. The pledge of, or granting of, a security interest, lien, or other encumbrance in or against any or all of the Membership Interest of a Member shall not cause the Member to cease to be a Member or to grant to anyone else the power to exercise any rights or powers of a Member.

8.6    Exercise of Rights upon Death or Incompetency. If a Member who is a natural person dies or is adjudged by a court of competent jurisdiction to be incompetent to manage the Member's person or property, the Member's executor, administrator, guardian, conservator, or other legal representative may exercise all of the Member's rights for the purpose of settling the Member's estate or administering the Member's property, including any power the Member had under the Certificate or this Operating Agreement to assign its Membership Interest.

8.7    Exercise of Rights upon Dissolution or Termination. If a Member which is an Organization is dissolved or terminated, the powers of that Member may be exercised by its legal representative or successor.

## ARTICLE IX

## DISSOLUTION AND WINDING UP

9.1    Dissolution. The Company shall and may only be dissolved, and its affairs wound up, upon the first to occur of the following events (which, unless the Members agree to continue the business, shall constitute Dissolution Events):

Exhibit 73 - page 154

9.1.1    the expiration of the Term, unless the business of the Company is continued with the consent of those Members required pursuant to Section 3.7;

9.1.2    the vote of such number of Members as is required pursuant to Section 3.7;

9.1.3    the Dissociation of a Member under Article XI, unless the business of the Company is continued with the consent of those Members required pursuant to Section 3.7 within ninety (90) calendar days after such Dissociation; or

9.1.4    the entry of a decree of judicial dissolution pursuant to the Act.

9.2    Effect of Dissolution. Upon dissolution, the Company shall be dissolved and wound up in accordance with the Act, and the Company Property shall be distributed in accordance with Section 7.3. In addition, upon dissolution, the following shall immediate apply:

9.2.1    All rights granted under the Master License Agreement shall terminate and the Company shall cease the use of the Potato Corner intellectual property rights, and confidential information, provided however, that the Company shall be permitted to use any of the foregoing as is reasonably required in order to comply with its obligations under its sub-licensing or franchising agreements, but only to the extent of the duration of sub-licensing or franchising agreements in existence at the time of the termination of this Operating Agreement.

9.2.2    The LA Group shall be subject to a non-compete arrangement and hereby agrees that, within two (2) years from the date of termination of this Operating Agreement, it shall not engage in the business of establishing, operating, managing, licensing and franchising identical or similar products sold by the Company, using the intellectual property rights identical or similar to those used by the Company, at the time of the termination of this Operating Agreement.

## ARTICLE X

## TAX AND ACCOUNTING MATTERS

10.1    Characterization as a Partnership. The Members intend that the Company be classified as a partnership for federal and state income tax purposes. Accordingly, this Operating Agreement is written and shall be construed in a manner consistent with such intent.

10.2    No Partnership Intended for Nontax Purposes. The Members have formed the Company under the Act, and expressly do not intend hereby to form a partnership under either the Delaware Uniform Partnership Law or the Delaware Revised Uniform Limited Partnership Act. The Members do not intend to be partners one to another, or partners as to any third party. To the extent any Member, by word or action, represents to another person that any other Member is a partner or that the Company is a partnership, the Member making such wrongful representation shall be liable to any other Member who incurs personal liability by reason of such wrongful representation.

Exhibit 73 - page 155

10.3    Fiscal Year. The fiscal year of the Company shall end on the last day of December of each year. The Managers may at any time change the fiscal and taxable year of the Company, subject to any applicable limitation of law or regulation.

10.4    Accounting Method. The Managers shall select the method of accounting by which the Company books of account shall be maintained and its income, gains, losses, deductions and credits shall be reported, for both financial and tax accounting purposes. The Managers may at any time change the financial and tax accounting method of the Company, subject to any applicable limitation of law or regulation.

10.5    Tax Information. As soon as reasonably practicable after the end of the Company fiscal year, the Managers shall cause each Holder to be furnished with a Schedule K-1 for such year and any other schedule or statement required by federal income tax law.

10.6    Basis Adjustment. In the case of a Distribution of Company Property or a transfer of a Membership Interest, the Managers may cause the Company to file an election under IRC Section 754 to adjust the basis of the Company Property. As a result of this election, the Managers shall have the right to require, as a condition to the granting of consent to any transfer, the reimbursement of expenditures made by the Company for any legal and accounting fees incurred to make any such basis adjustment. The Managers shall have the right, in their sole and absolute discretion, to decline to make such an election; and further, the failure to make any election under the IRC in connection with any particular transfer of an interest in the Company shall not affect the right of the Managers to make, or refuse to make, such an election with respect to any subsequent transfer of an interest in the Company.

10.7    Other Elections: The Company shall have the right, in the sole and absolute discretion of the Managers, to make any other elections or determinations required or permitted for federal or state income tax or other tax purposes. The Managers may rely upon the advice of the Company's accountants or tax attorneys with respect to the making of any such election.

10.8    Taxes of Taxing Jurisdictions. To the extent that the laws of any Taxing Jurisdiction requires, each Holder requested to do so by the Managers will submit an agreement indicating that the Holder will make timely income tax payments to the Taxing Jurisdiction and that the Holder accepts personal jurisdiction of the Taxing Jurisdiction with regard to the collection of income taxes attributable to the Holder's income, and interest, and penalties assessed on such income. If the Holder fails to provide such agreement, the Company may withhold and pay over to such Taxing Jurisdiction the amount of tax, penalty and interest determined under the laws of the Taxing Jurisdiction with respect to such income. Any such payments with respect to the income of a Holder shall be treated as a distribution to such Holder for purposes of ARTICLE VII. The Company may, where permitted by the rules of any Taxing Jurisdiction, file a composite, combined or aggregate tax return reflecting the income of the Company and pay the tax, interest and penalties of some or all of the Holders on such income to the Taxing Jurisdiction, in which case the Company shall inform the Holders of the amount of such tax, interest and penalties so paid.

10.9    Tax Matters Partner. The Managers shall designate one of their number or, if there are no Managers eligible to act as tax matters partner any other Member, as the tax matters

Exhibit 73 - page 156

partner of the Company pursuant to IRC Section 6231(a)(7). Any Member designated as tax matters partner shall take such action as may be necessary to cause each other Member to become a notice partner within the meaning of IRC Section 6223. Any Member who is designated tax matter partner may not take any action contemplated by IRC Sections 6222 through 6232 without the consent of the Managers.

## ARTICLE XI

### DISSOCIATION OF A MEMBER

11.1    Dissociation. A Person shall cease to be a Member upon the happening of any of the following events:

11.1.1    the withdrawal of a Member with the consent of such number of Members as is required pursuant to Section 3.7;

11.1.2    the bankruptcy (as defined by the Act) of a Member;

11.1.3    in the case of a Member who is a natural Person, the death of the Member or the entry of an order by a court of competent jurisdiction adjudicating the Member incompetent to manage the Member's personal estate;

11.1.4    in the case of a Member who is acting as a Member by virtue of being a trustee of a trust, the termination of the trust (but not merely the substitution of a new trustee);

11.1.5    in the case of a Member that is a separate Organization other than a corporation, the dissolution and commencement of winding up of the separate Organization;

11.1.6    in the case of a Member that is a corporation, the filing of a certificate of dissolution, or its equivalent, for the corporation or the revocation of its charter; or

11.1.7    in the case of an estate, the distribution by the fiduciary of the estate's entire interest in the Company.

11.2    Rights of Dissociating Member. In the event any Member dissociates prior to the expiration of the Term:

11.2.1    if the Dissociation causes a dissolution and winding up of the Company, the Member shall be entitled to participate in the winding up of the Company to the same extent as any other Member except that any Distributions to which the Member would have been entitled shall be reduced by the damages sustained by the Company as a result of the Dissolution and winding up;

11.2.2    if the Dissociation does not cause a dissolution and winding up of the Company, the Member shall not be entitled to receive any amount in consideration of the Member's Membership Interest on account of such Dissociation, unless such Member no

WEST\224283219.2                                                27

longer holds the corresponding Economic Interest. Otherwise, the Dissociated Member shall continue as Holder of an Economic Interest only.

## ARTICLE XII

### MISCELLANEOUS PROVISIONS

12.1    Amendment of Operating Agreement. This Operating Agreement may be modified upon the vote of Members required pursuant to Section 3.7. No Member or Manager shall have any vested rights in the Operating Agreement which may not be modified through an amendment to the Operating Agreement.

12.2    Entire Agreement. The Operating Agreement represents the entire agreement among all the Members and between the Members and the Company.

12.3    Interpretation. To the extent any provision of this Operating Agreement is prohibited or ineffective under the Act, the Operating Agreement shall be considered amended to the smallest degree possible in order to make the agreement effective under the Act. In the event the Act is subsequently amended or interpreted in such a way to make any provision of the Operating Agreement that was formerly invalid valid, such provision shall be considered to be valid from the effective date of such interpretation or amendment.

12.4.    Rights of Creditors and Third Parties under Operating Agreement. This Operating Agreement is entered into among the Company and the Members for the exclusive benefit of the Company, its Members, and their successors and assignees. This Operating Agreement is expressly not intended for the benefit of any creditor of the Company or any other Person. Except and only to the extent determined by applicable statute, no such creditor or third party shall have any rights under this Operating Agreement or any agreement between the Company and any Member with respect to any Capital Contribution or otherwise.

12.5.    Valuation of Non-Cash Consideration. For purposes of this Operating Agreement, the procedure for valuing any non-cash consideration shall be as follows: If the parties cannot otherwise agree, each party shall select a qualified appraiser and the appraisers so selected shall jointly select an appraiser, and the valuation of the appraiser so selected shall be binding on all parties. Such valuation shall be based on an arm's length cash sale of the assets. If the non-cash consideration being valued is real property, the selected appraiser shall be an MAI appraiser.

12.6    Counterpart Execution. This Operating Agreement may be executed in any number of identical counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same instrument when each party has signed one (1) such counterpart.

12.7    Remedies. The parties hereto recognize and agree that the breach of any term, provision, or condition of this Operating Agreement may cause irreparable damage, the amount of which is difficult to ascertain and that the award of damages may not be adequate relief to the party aggrieved; the parties therefore agree that, in addition to all other remedies available in the event of a breach of any of the terms or conditions of this Operating Agreement, the party

WEST\242832192                                              28

**Exhibit 73 - page 158**

aggrieved shall have the right, in addition to all other remedies available in the event of a breach of this Operating Agreement, to injunctive or other equitable relief (from any court or other body having appropriate jurisdiction).

12.8    Successors and Assigns. Except as herein otherwise specifically provided, this Operating Agreement shall be binding upon and inure to the benefit of the parties and their legal representatives, heirs, administrators, executors, successors and assigns.

12.9    Severability. If any provision of this Operating Agreement, or the application of such provision to any Person or circumstance, shall be held invalid, the remainder of this Operating Agreement, or the application of such provision to Persons or circumstances other than those to which it is held invalid, shall not be affected thereby.

12.10    Governing Law. This Operating Agreement shall be governed by and construed and enforced in accordance with the laws of the State of California without regard to the principles governing conflicts of laws.

IN WITNESS WHEREOF, this Operating Agreement is entered into as of the Effective Date.

INSERT SIGNATURE BLOCKS

Exhibit 73 - page 159

IN WITNESS WHEREOF, the parties have executed this Agreement on the date and in place first mentioned.

Cinco Group:

Cinco Corporation (Philippines)

Name: Jose P. Magsaysay

Title: CEO

Jose P. Magsaysay, Jr.

Ma. Victoria O. Bermejo

Ricardo K. Montelibano

L.A. Group:

Amit Nemanim

Guy Koren:

Amir Jacoby

SIGNED IN THE PRESENCE OF:

November 30, 2010

**Exhibit 73 - page 160**

# EXHIBIT F

**Exhibit 73 - page 161**

# PCJV-LA GROUP

## PARTNERSHIP AGREEMENT

### Preamble

This Partnership Agreement ("Agreement") is made March 1, 2013, to memorialize the partnership activities and relationship of the partners executing this Partnership Agreement, who shall be referred to in this Agreement individually as a "Partner" and collectively as "Partners."

### RECITALS

A.    The Guy Koren ("Koren"), Amit Nemanim ("Nemanim"), and Amir Jacoby ("Jacoby") collectively initiated negotiations to work together as a group with the individuals constituting the Cinco Group to establish, operate, manage, license and franchise "Potato Corner" stores/outlets in the United States and Israel (other than Los Angeles and San Francisco Counties and Tanforan Mall), pursuant to the terms of the Potato Corner USA Joint Venture Agreement executed on or about 11/2009 ("JV Agreement"), which JV Agreement was subsequently replaced by the PCJV USA, LLC Limited Liability Company Agreement made effective 10/2010 ("PCJV Agreement").

B.    Pursuant to the PCJV Agreement, Koren, Nemanim, and Jacoby were invited to participate in PCJV USA, LLC as the "LA Group", by making a Capital Contribution (as defined in the PCJV Agreement) of $20,000 to PCJV USA, LLC and executing and performing services for PCJV USA, LLC pursuant to a Master Services Agreement ("Master Services Agreement").

C.    This Agreement is intended to memorialize in writing the election by Koren, Nemanim and Jacoby to continue the partnership relationship they initially established in connection with the negotiation of the JV Agreement, to accept the offer made to the LA Group to purchase and hold of a 40% membership interest in PCJV USA, LLC and to accept the offer made by PCJV USA, LLC to the LA Group to provide the services described in the Master Services Agreement.

### Type of Business

1.    The Partners have associated to form a General Partnership for the purpose of holding a membership interest in PCJV USA, LLC and providing services on behalf of PCJV USA, LLC pursuant to the Master Services Agreement, and to engage in such other activities as may be permitted by law and approved by a majority of the Partners.

### Partnership Name

2.    The Partnership name shall be "PCJV-LA Group".

### Partnership Term

3.    .    The Partnership shall be deemed to have commenced as of the execution of this Agreement by the Partners, and shall continue until dissolved by agreement of the Partners or terminated under the provisions of this Agreement.

915753.1/8115.3.08003

**Exhibit 73 - page 162**

### Place of Business

4.       The Partnership's principal place of business shall be: 8950 West Olympic Boulevard, Suite 563, Beverly Hills, CA 90211, California 90035. The Partnership shall maintain any other place or places of business agreed upon by the Partners.

### Initial Capital

5.       The Partners shall each be required to contribute to the Partnership their proportional share of the $20,000 Capital Contribution made by the Partnership to PCJV USA, LLC in and for their interest in the Partnership. The Partnership has offered Partnership interests in the Partnership to the following individuals in proportion to their respective capital contributions to the Partnership., as set forth in Exhibit A to this Agreement. Only those persons contributing a proportion share of this Capital Contribution shall be deemed a continuing Partners of the Partnership, in proportion to their actual contribution.

|      |               |         |
|------|---------------|---------|
| 5.1  | Guy Koren     | $7,600  |
| 5.2  | Amit Nemanim  | $7,600  |
| 5.3  | Amir Jacoby   | $4,800  |

The failure of any Partner to pay their required contribution to this Partnership shall be deemed in default. If the default is not cured following 30 days prior written notice, the other Partners may advance the capital contribution as (i) a loan to the defaulting Partner to bear interest at the rate of 10% per annum until paid in full and secured by the Partner's interest in the Partnership and/or distributions made to such Partner with respect to such interest or (ii) a purchase from the Partnership of the defaulting Partner's allocated interest (or any part thereof) and a corresponding cancellation of such Partner's opportunity to continue as a Partner.

The Partners will prepare an Exhibit A to this Agreement to reflect the actual contributions made and the proportional Partnership interest thereby obtained.

### Service Commitment

6.       Subject to the allocation of responsibility among the Partners for the performance of the services required of the Partnership under the terms of the Master Services Agreement, each of the Partners shall be responsible for providing a proportional share of the services required (as determined by the Partners). Alternatively, the Partners may agree to compensate individual Partners for the service obligations required under the Master Services Agreement that have been assigned to and assumed and performed by them on behalf of the Partnership.

### Capital Withdrawals

7.       No Partner shall withdraw any portion of the Partnership capital without the other Partners' express written consent.

915753.1/81153.08003

**Exhibit 73 - page 163**

## Profits and Losses

8.      Net profits and net losses will be allocated to the Partners, and net cash available for distribution by the Partnership will be distributed in proportion to the respective percentage interests of the Partners in the Partnership as described on Exhibit A to this Agreement. The term "net profits," as used in this Agreement, shall mean for tax purposes the Partnership net profits as determined by the accounting method generally and consistently applied by the Partnership, and for purposes of determining the cash available for distribution by the Partnership to the Partners the term "net profits" shall mean the net cash available to the Partnership after establishing such cash reserves as the Partners may determine to be prudent for working capital and any contingent liabilities

## Books of Account

9.      Partnership books of account shall be accurately kept and shall include records of all Partnership income, expenses, assets, and liabilities. The Partnership books of account shall be maintained on a cash basis. Each Partner shall have the right to inspect the Partnership books during normal business hours at the principal office of the Partnership.

## Fiscal Year

10.      The Partnership's fiscal year shall end on December 31 each year.

## Accountings

11.      Complete accountings of the Partnership affairs at the close of business on the last days of March, June, September, and December of each year shall be rendered to each Partner within thirty (30) days after the close of each such month or as soon thereafter as may be practical with regard to the availability of such information from PQJV USA, LLC   At the time of each accounting, the net profits of the Partnership, if any, shall be distributed to the Partners as provided in this Agreement. Except as to errors brought to the Partners' attention within 15 days after it is rendered, each accounting shall be final and conclusive.

## Time Devoted to Partnership

12.      The Partners shall be required to devote such time and attention to the Partnership business as may be necessary for the Partnership to fulfill its obligations under the Master Services Agreement. Except as the service responsibilities may otherwise be allocated or delegated by the Partners, each of the Partners is required to provide a proportional amount of the service time required by the Master Services Agreement relative to their respective percentage interest in the Partnership. Failure to provide the time required to perform or to perform their respective share of the services required of the Partnership or otherwise allocated or delegated to a Partner shall constitute a breach of the Partnership Agreement.  A Partner shall not be deemed in breach of their obligation to provide services on behalf of the Partnership unless and until the Partnership has provided such Partner with at least 30 days prior written notice of the alleged default or breach, and the default or breach as gone uncured during that notice period.

915753.1/81153.08003

Exhibit 73 - page 164

In addition to the services to be provided by the Partners in fulfillment of the Partnership's responsibilities under the Master Services Agreement, the Partners may be individually designated by the Partnership to serve as a Manager of PCJV USA, LLC. If so designated, a Partner shall fulfill their Manager responsibilities on behalf of the Partnership, and if unable or unwilling to do so a Partner shall so advise the Partnership so that they may designate someone else to serve in that capacity. The Partnership shall appoint its Manager designees to PCJV USA, LLC by Majority Approval (as defined below).

## Management and Authority

13. Partnership decisions and the actions of the Partners shall be determined and approved by the vote or written consent of Partners holding a majority in percentage interest of the Partnership ("Majority Approval"). Individual Partners may not bind the Partnership without obtaining the Majority Approval of the Partners. Any obligation incurred in violation of this provision may be charged to and collected from the Partner who incurred the obligation. Subject to the above authorization requirement, any individual Partner may execute a document on behalf of the Partnership.

Guy Koren has been initially granted the title of "Managing Partner" on behalf of the Partnership in expectation that he will execute documents on behalf of the Partnership.

## Statement of Partnership

14. The Partners will cause to be filed with the California Secretary of State a Statement of Partnership Authority pursuant to California Corporations Code Section 16303 on form GP-1 in effect at the time of the filing. The Partnership shall cause a Statement of Partnership Authority to be recorded in every county in which the Partnership owns, or contemplates owning, real property.

## Partners' Salaries

15. Although no salaries are contemplated with respect to a Partner's services as a Manager of PCJV USA, LLC, the Partners providing services on behalf of the Partnership in fulfillment of the Partnership's obligations under the Master Services Agreement shall be entitled to such compensation as may be approved by the Partners by Majority Approval. If the Partnership is unable to pay for the services performed by a Partner, by Majority Approval the Partners the compensation otherwise payable may be accrued and thereafter paid from the first funds made available to the Partnership from PCJV USA, LLC. Compensation payable to a Partner for services provided may be paid as a guaranteed payment as provided under IRC Section 707(c), as payment made to a Partner irrespective of the Partner's percentage interest in Net Profits, the payment of which shall reduce the Net Profits allocable to the Partners in accordance with the Partners' percentage interests. In addition to compensation for their time, Partners shall be entitled to reimbursement for their reasonable business expenses incurred in furtherance of the Partnership business, so long as approved by the Partners by Majority Approval. Any compensation paid to a Partner and any business expenses reimbursed shall be deducted ordinary business expenses prior to computing net profits.

## Withdrawal of Partner

915753.1/81153.08003

**Exhibit 73 - page 165**

16.     Upon thirty (30) days written notice of intent to the other Partners, a Partner may dissociate from the Partnership by withdrawing as a Partner.

## Option to Purchase Dissociated Interest

17.     On dissociation of a Partner by death, withdrawal, or other act, the remaining Partners may continue the Partnership business by purchasing the outgoing Partner's interest in the Partnership assets and goodwill. The remaining Partners shall have the option to purchase the dissociated Partner's interest by paying to the outgoing Partner or the appropriate personal representative the value of the dissociated Partner's interest as determined under Paragraph 18 of this Agreement. If the remaining Partners do not exercise this option, the Partnership shall be dissolved as provided under Paragraph 21 of this Agreement, unless the remaining Partners have elected to convert the Partnership into an other business entity form and the withdrawing Partner's interest in such other entity is in proportion and comparable to the interest held by the withdrawing Partner immediately prior to withdrawal as provided in Paragraph 21A.

## Purchase Price of Partnership Interest

18.     On exercise of the option described in Paragraph 17 of this Agreement, the remaining Partners shall pay to the dissociated Partner or appropriate personal representative the value of the dissociated Partner's Partnership interest as determined by the last regular accounting preceding the effective date of the withdrawal plus the full unwithdrawn portion of the dissociated Partner's share in net profits earned between the date of that accounting and the date of dissociation. The Partnership shall have the right to offset against the purchase price otherwise payable for a withdrawing Partner's interest the Partner's share of any existing liabilities and accounts receivable incurred prior to the effective date of the withdrawal.

## Liability of Deceased Partner's Estate

19.     If on the death of one Partner, the surviving Partners exercise their option to purchase the deceased Partner's interest under Paragraphs 17 and 18, the liability of the deceased Partner's estate for Partnership obligations incurred during the period of continuation shall be limited to the amount that the deceased Partner had invested or the net value of the Partner's interest in the Partnership at the time of death (and including the unwithdrawn portion of net profits earned since the last accounting), whichever is greater.

## Duties of Purchasing Partners

20.     On any purchase and sale made pursuant to Paragraphs 17, 18, or 19 of this Agreement, the remaining Partners shall assume all Partnership obligations (subject to the right to offset a proportional amount against the purchase price). The remaining Partners shall hold and defend the withdrawing Partner or the deceased Partner's estate and personal representative, as well as any property belonging to either a withdrawing or deceased Partner, free and harmless from all liability for Partnership obligations beyond those reflected in the calculation of the purchase price payable. Immediately upon purchase of a withdrawing or deceased Partner's interest, the remaining Partners shall prepare, file, serve, and publish all notices required by law to protect the withdrawing Partner or the deceased Partner's estate and personal representative from liability for future Partnership obligations. All costs incident to the requirements of this Paragraph shall be borne by the remaining Partners.

915753.1/81153.08003

Exhibit 73 - page 166

## Dissolution

**21.** When: (1) the Partnership is dissolved by agreement of the Partners; or (2) a remaining Partner or Partners decline(s) to exercise the option to purchase a dissociated Partner's interest under Paragraph 17; or (3) it is otherwise required by law, the Partnership affairs shall be wound up, the Partnership assets liquidated, its obligations to creditors, including, to the extent permitted by law, Partners who are creditors, shall be paid, and the surplus divided among the Partners according to their rights of distribution of their Partnership accounts.

## Conversion

21A. Upon the occurrence of an event resulting in a dissociation of a Partner, within 90 days of such event the remaining Partners may elect to convert the Partnership into an other business entity form for which the dissociated Partner's interest will be afforded limited liability from any liability arising after such conversion. Conversion to an other entity form shall be in lieu of the exercise of the option to purchase the dissociated Partner's interest in the Partnership and in lieu of the Partnership dissolution. The dissociated Partner shall receive an interest in the other entity form adopted by the remaining Partners that is proportional and comparable to the held by the dissociated Partner's interest in the Partnership prior to the dissociation event; provided, however, that the dissociated Partner's interest in the other entity need only be in a form that is comparable economically and need not include any voting rights or authority to act on behalf of the other entity in a manner comparable to that held as a Partner (e.g. comparable to an "economic interest" in a limited liability company, as defined in Cal Corp Code Section 17001(o)).

## Notices

**22.** All notices between the Partners shall be in writing and shall be deemed served when personally delivered to a Partner, or when deposited in the United States mail, certified, first-class postage prepaid or by overnight courier, addressed to a Partner at the Partner's address set forth on the signature page to this Agreement or to such other place as may be specified in a notice given pursuant to this Paragraph as the address for service of notice on that Partner. Notices may also be deemed duly provided if delivered by e-mail to an e-mail address specified by the receiving Partner and the party giving notice concurrently places a copy thereof in the United States mail (as described above) or delivers a copy by overnight courier, in which event notice shall be deemed given on the date of the delivery of the e-mail.

## Consents and Agreements

**23.** All consents and agreements provided for or permitted by this Agreement shall be in writing. Signed copies of all consents and agreements pertaining to the Partnership shall be kept with the Partnership books.

## Governing Law

**24.** This Agreement shall be governed by the California Uniform Partnership Act of 1994, as amended, and shall in all respects be a contract under California law.

## Attorney Fees

915753.1/81153.08003

**Exhibit 73 - page 167**

25.     As between the parties to this Agreement, the prevailing party in any dispute arising from or relating to this Agreement shall be awarded costs and attorney fees whether or not the matter is resolved by trial or appeal.

Exhibit 73 - page 168

## Sole Agreement

26.    This instrument contains the Partners' sole agreement relating to their Partnership. It correctly sets out the Partners' rights and obligations. Any prior agreements, promises, negotiations, or representations not expressly set forth in this instrument have no force or effect.

Executed by the undersigned with effect as of the Effective Date defined above, at Orange County, California.

[See Counterpart Signature Pages of the Partners attached hereto]

915753.1/81153.08003

**Exhibit 73 - page 169**

EXHIBIT A

PARTNER CAPITAL CONTRIBUTIONS AND PERCENTAGE INTERESTS
(Proposed)

| PARTNER NAME AND ADDRESS | CAPITAL CONTRIBUTION | PERCENTAGE INTEREST |
|---|---|---|
| GUY KOREN<br>_1478 S. crest Dr_<br>_LA, CA 90035_ | $7,600 | 38% |
| AMIT NEMANIM | $7,600 | 38% |
| AMIR JACOBY<br>_14320 Ventura B #115_<br>_Sherman Oaks, CA 91423_ | $4,800 | 24% |

915753.1/81153.08003

EXHIBIT A

PARTNERS, CAPITAL CONTRIBUTIONS AND PARTNERSHIP INTERESTS

(Amended and Updated March 22, 2013)

| NAME OF PARTNER AND ADDRESS | CAPITAL CONTRIBUTION | PARTNERSHIP PERCENTAGE INTEREST |
|---|---|---|
| GUY KOREN | 12,258.04 | 61.3 |
| AMIR JACOBY | 7,741.96 | 38.7 |

915753.1/81153.08003

Exhibit 73 - page 171

PCJV-LA GROUP,
a California general partnership

## MEMBER COUNTERPART SIGNATURE PAGE

The undersigned, desiring to enter into the Partnership Agreement made effective March 1, 2013 (the "Agreement") for PCJV-LA GROUP, a California general partnership (the "Company"), hereby agrees to all of the terms and provisions thereof. The undersigned hereby joins and executes the Agreement as a Partner of the Partnership, and hereby authorizes this Signature Page to be attached thereto in evidence of this joinder.

WITNESS, the execution hereof by the undersigned, as a Partner of PCJV-LA GROUP:

Signature of Partner

Address: 14320 Ventura Bl #115
Sherman Oaks, CA 91423

### Spousal Consent

The undersigned is the spouse of the above general partner. I have read and understood the terms and conditions of the Partnership Agreement of PCJV-LA Group and agree to be bound by its terms. I agree that my spouse shall have the sole and exclusive power to manage the partnership interest created by the foregoing Agreement, regardless of whether that interest was acquired with community property, quasi-community property, or separate property assets, however so titled or characterized. I further acknowledge and agree that my spouse may, from time to time, or at any time, amend, restate, sell, transfer, assign or hypothecate his Partnership interest in any manner whatsoever, with or without my further consent.

Executed at  L.A  County, California.

Date: 3/1/2013

912600.1/01927.99001

**Exhibit 73 - page 172**

## PCJV-LA GROUP,
### a California general partnership

## MEMBER COUNTERPART SIGNATURE PAGE

The undersigned, desiring to enter into the Partnership Agreement made effective
March 1, 2013 (the "Agreement") for PCJV-LA GROUP, a California general
partnership (the "Company"), hereby agrees to all of the terms and provisions thereof.
The undersigned hereby joins and executes the Agreement as a Partner of the Partnership,
and hereby authorizes this Signature Page to be attached thereto in evidence of this
joinder.

WITNESS, the execution hereof by the undersigned, as a Partner of PCJV-LA
GROUP:

Signature of Partner

Address: 1478 S. Crest Dr
LA, CA 90035

912600.1/01927.99001

**Exhibit 73 - page 173**

# EXHIBIT G

**Exhibit 73 - page 174**

## PCVJ USA, LLC AND LA GROUP MASTER SERVICES AGREEMENT

This Master Services Agreement ("Agreement") dated _____6/18/13____ is entered into by and between PCVJ USA, LLCa Delaware Limited Liability Company (hereinafter "PCVJ") and Amit Nemanim, Guy Koren and Amir Jacoby (whom are collectively referred to as the "LA Group").

### RECITALS

WHEREAS, PCJVwishes to contract with the LA Group to provide management and strategic experience and expertise.

WHEREAS, the LA Group agrees to provide Services to PCJV as delineated within this Agreement.

NOW, THEREFORE, the Parties hereby agree as follows:

Services:

1. The LA Group shall faithfully, diligently and efficiently exercise the following obligations and responsibilities:
    a. Conduct management, operations, marketing, establishment, maintenance, licensing and sub-licensing activities with respect to the Potato Corner outlets/stores in the Territory.
    b. Use best efforts at all times to operate and maintain the Potato Corner outlets/stores in the Territory according to the highest standards achievable, consistent with the overall plan of PCJV Management.
    c. Comply with the rules, policies and procedures approved by PCJV Management.
    d. Advertise, market, and promote the Potato Corner outlets/stores with the goal of causing public knowledge, awareness and patronage of the Potato Corner outlets/stores.
    e. Maintain a comprehensive system of records, books and accounts, with respect to the licensing and sub-licensing activities, operation, establishment, management, maintenance and other activities of the Potato Corner outlets/stores in the Territory with the assistance of the PCJV Corporate Secretary.
    f. No later than the twentieth (20th) day of each month, with respect to the preceding month, LA Group shall render a statement of receipts and disbursements, a schedule of accounts receivable and payable, and a schedule of fees collected and distributed, together with a reconciled bank statement as of the last day of the month with the assistance of the PCJV Corporate Secretary.
    g. No later than three (3) months after the end of a fiscal year, the LA Group, with the assistance of the PCJV Corporate Secretary and an external accountant

Exhibit 73 - page 175

hired by PCJV Management, cause PCJV to issue audited financial statements, and shall provide a copy of the same to all members of PCJV Management.

h. To the extent that the LA Group is able to do so, the LA Group shall take such action as may be necessary to comply promptly with any and all laws, ordinances, orders or other requirements of any federal, state, county or municipal authority having jurisdiction of PCJV and affecting PCJV.

i. The LA Group shall have a fiduciary duty to exercise the duty of care and shall, at all times, ensure that all corporate opportunities consistent with the objectives of PCJV shall be pursued. As such, with respect to the establishment of PCVJ-owned stores, whenever potential locations are identified by any member of the LA Group, it shall be promptly brought to the attention of PCJV Management. At all times, and within thirty (30) days from receipt of this information, PCJV Management shall decide whether or not to build a PCJV-owned store at the identified location. In the event PCJV chooses to build a PCJV-owned store at the identified location, it shall have the right to do so, to the exclusion of the LA Group. However, in the event that PCJV decides not to build a PCJV-owned store at the identified location, it shall notify the LA Group of its decision in writing. In such case, the LA Group shall have the right to build a store at the identified location, provided that it shall enter into a franchising agreement with PCJV, and shall pay franchise fees and ongoing royalty fees as set forth in PCJV's standard franchising agreement.

2. Territory for the purposes of this Agreement is defined as the United States of America and Israel, except in the County of Los Angeles, USA and the County of San Francisco, USA and Tanforan Mall.

3. The LA Group shall maintain and protect the Confidential Information belonging to PCJV, and such undertaking shall apply to all of its partners, officers, employees, or agents.

4. In consideration for the provision of its Services the LA Group shall be entitled to a service fee equal to thirty (30%) percent of all initial/franchise fees and continuing royalty fees paid to/collected by PCJV.

5. All withholding and other applicable taxes levied by any authority on the payments by PCJV to the LA Group under this Agreement shall be borne solely by PCJV.

Confidential Information:

1. The Parties acknowledge that from time to time, one Party (the "Discloser") may disclose to the other Party (the "Recipient") information : a) relating to the Potato Corner outlets and stores; b) relating to the Potato Corner Intangible Property Rights; c) Potato Corner product specifications and related information; d) which is marked with "confidential" or a similar legend; e) which is described orally and designated as confidential; or f) which would, under the circumstances, be understood by a reasonable person to be confidential ("Confidential Information").

Exhibit 73 - page 176

2. Upon subsequent disclosure of previously disclosed Confidential Information to the Recipient by the Discloser, the information will remain Confidential Information even if not identified as Confidential Information at the subsequent disclosure.

3. Recipient shall retain such Confidential Information in confidence, and shall not disclose it to any Third Party or use it for other than the purposes of this Agreement without the Discloser's prior written consent.

4. Each Party shall use at least the same procedures and degree of care with respect to such Confidential Information which it uses to protect its on confidential Information of like importance, and in no event less than reasonable care. The Recipient will immediately give written notice to the Discloser of any unauthorized use or disclosure of the Discloser's Confidential Information, and the Recipient will assist the Discloser in remedying such unauthorized use or disclosure.

### Duration of Agreement:

1. This Agreement shall become effective from the date of execution hereof and shall continue indefinitely unless terminated by a) mutual written agreement by the Parties or b) breach of any provision of this Agreement by either Party which will result in termination of this Agreement unless cured by the breaching Party within twenty (20) days from the date of the breach.

### General Provisions:

1. This Agreement may not be altered, changed, supplemented or modified except by a written instrument duly signed by the Parties.

2. The invalidity of any portion of this Agreement will not render the entire Agreement void, nor affect the validity of the rest of the provisions of this Agreement.

3. This Agreement shall be governed by the laws of the State of California

4. Neither Party shall assign any of its rights or obligations under this Agreement without the prior written consent of the other Party.



5. The failure of any Party at any time to require performance by the others of any provision of this Agreement shall not affect, in any way, the right of such Party to require performance of that or any provision, and any waiver by any Party of any breach of this Agreement shall not be construed as a waiver of any continuing or succeeding breach of such provision, or a waiver of any other right under this Agreement.

**Exhibit 73 - page 177**

IN WITNESS WHEREOF,

PCJV USA, LLC

_____          $6/18/12$
                                          Date

Name: José P. Magsaysay

Title:   CEO

LA Group

_____          $06/18/12$
Amit Nemanim                              Date

_____          $6/18/12$
Guy Koren                                 Date

_____          $6/18/12$
Amir Jacoby                               Date

PCJV USA, LLC and LA Group Master Services Agreement
Page 4 of 4

Exhibit 73 - page 178

# EXHIBIT H

**Exhibit 73 - page 179**



April 3, 2018

Jo Mag
Board of Directors
PCJV, LLC

Re: PCJV & PCIT Transfer of Bank Accounts

Dear Jo Mag,

Per our telephone conversation last week, I am writing now to confirm that I have transferred the PCJV and PCIT bank accounts from Wells Fargo to Chase Bank. I just want to reiterate that these accounts have been established at Chase under the same entity names and were transferred to protect them from unauthorized access.

I will provide you and any other requested Cinco members with full access to these accounts as necessary or requested. I have additionally transferred all the Company stores to Chase as a matter of operational efficiencies since Chase has offered us management solutions and certain beneficial services better suited for our needs.

I apologize for not giving you formal written notice until now but I was under the impression that the information discussed in our telephone conversation would be shared with the other members. I want you to know that I made the decision to transfer these funds, primarily for security reasons, based on my position as majority member and sole managing member of the PCJV Los Angeles group. As you know, I have always acted in the best interest of PCJV and the brand. I believed it was necessary to make these changes only as a security precaution to prevent the unauthorized withdrawal of funds which Amir has caused to happen on prior occasion from our PCJV Los Angeles group accounts.

Contrary to the letter by Amir's attorney, I have made sure that all funds have been accounted for and that there have been no NSF checks or any payments otherwise rejected. I have always made every effort to keep all of our accounts in good standing and have no reason to think they are any less secure now than before the transfer. In fact, the banking circumstances are an improvement, especially from an operational point of view, than those previously maintained at Wells Fargo. Again, I will be providing to you, under separate cover, direct user and password access to the PCJV accounts. I welcome you to confirm that these accounts are in good standing and are being used as authorized and for the best interest of our group and its members.

Although your attorney has requested that the Wells Fargo accounts be reestablished, I strongly suggest the accounts be maintained at Chase where they are secure from any unauthorized access. As you are well aware, Amir is not involved operationally with PCJV and has not been actively involved in the daily business affairs of the company for quite some time now. All of the activities associated with these

**Exhibit 73 - page 180**

accounts have been done in a totally transparent manner to the extent that I invite you to review them to your satisfaction. However, if you insist that the Wells Fargo accounts be reestablished please advise me accordingly.  My point of view is that there is a substantial risk of compromising these accounts, as well as our operational stability if access to our financial accounts is not absolutely secure.

The Board has elected me to be the Managing Member.  I have always and will continue to act in good faith for the best interest of the company and our members.  I am confident that my actions regarding our accounts was necessary and likewise in the best interest of the company and our members.  I am just as confident that upon review of the totality of circumstances that you will conclude the same.

Best regards,

Guy Koren

Guy Koren
President & Managing Member
PCJV, LLC
dba Potato Corner USA

Exhibit 73 - page 181

# EXHIBIT I

**Exhibit 73 - page 182**

On Mar 27, 2018, at 3:09 AM, Jose Magsaysay, Jr. <jomag28@gmail.com> wrote:

To our LA Partners,

We would like to request for a Member's meeting on Monday, April 9, 2018, 5:30pm (LA Time) via teleconference primarily to discuss the Letter of Intent that was sent to the LA Group last week.

AGENDA

1. Call to Order.

2. Determination of Quorum/ Attendance.

3. Welcome.

4. Guy Koren: To report 2017;
a) Business Development highlights (new territories, store growth, topline growth, franchise)
b) Store Operations highlights
c) Logistics and Supply Chain operational highlights
d) Marketing and Brand highlights
e) Administration updates
f) Other Matters

5. Inbal Jacoby: To Report on 2017 (and 2016) financial performance

6. Guy Koren and/or Amir Jacoby: To Present 5-year plan for PCJV.

7. Letter of Intent.

8. Matters for Approval.

9. Election of the Board of Directors and Officers of the Board.

10. Other Matters.

11. Adjourment.

4

**Exhibit 73 - page 183**

Thank you,

Joe

5

Exhibit 73 - page 184

# EXHIBIT J

Exhibit 73 - page 185



DLA Piper LLP (US)
401 B Street, Suite 1700
San Diego, California 92101-4297
www.dlapiper.com

Kellin M. Chatfield
kellin.chatfield@dlapiper.com
T  619.699.2637
F  619.764.6837

April 10, 2018
*Via E-Mail (mhare.mouradian@rmkb.com)*

Mhare O. Mouradian
RMKB Lawyers
445 S. Figueroa St., Suite 300
Los Angeles, CA 90071-1619

**Re:    Cease and Desist and Demand that Guy Koren Cease Any and All Actions on Behalf of
PCJV USA, LLC**

Dear Mr. Mouradian:

As you know, my firm and I represent the Cinco Corporation and Potato Corner International (collectively,
"Cinco Group") and have been retained to represent Cinco Group with regards to Mr. Koren's
unauthorized withdrawal of approximately $1 million from the Wells Fargo bank accounts (the "Withdrawn
Funds") for PCJV USA, LLC ("PCJV") on March 26, 2018 and his subsequent refusal to step down as
President, notwithstanding a vote by the majority of PCJV's voting members (over 75%) relieving Mr.
Koren of his title, duties, and obligations as officer and President of PCJV.

Specifically, a meeting of the Managers was held on April 9, 2018, during which the LA Group and Guy
Koren were removed from management by a majority vote (85%) of the Managers and Membership
interests. Mr. Koren was therefore relieved of his duties as an officer and President of PCJV. Although
both the Joint Venture and Operating Agreements allow for removal of an officer without cause, Mr.
Koren's removal was based upon his recent breaches of his contractual and fiduciary duties to PCJV and
to Cinco Group, by, among other things: (1) emptying PCJV accounts without approval on March 26,
2018; (2) entering a lease on behalf of PCJV without approval of the majority of the Members; and (3)
failing to provide a five-year strategic plan, or otherwise account for his actions on behalf of PCJV, in
violation of his duties under the Joint Venture Agreement. Mr. Koren's conduct shows a blatant disregard
for his fiduciary duties to Cinco Group and the other Members. His conduct poses immediate and
substantial risks to Cinco Group's goodwill in the Potato Corner brand and franchise.

Notwithstanding his removal by majority vote, we understand Mr. Koren has refused to step down as
President of PCJV and that he removed representatives of PCJV's newly appointed officers from the
PCJV offices the afternoon of April 10, 2018. Mr. Koren has no authority to take such action.

Accordingly, we write to demand that Mr. Koren immediately step down and vacate the PCJV offices. We
further demand that Mr. Koren immediately cease and desist any action dissipating PCJV assets and
cease and desist all action on behalf of PCJV and Cinco Group. We further demand that Mr. Koren
cease and desist any conduct that would interfere in Cinco Group's management of PCJV. We also
demand that Mr. Koren immediately surrender all PCJV books, accounts, records, and inventory.

**Exhibit 73 - page 186**



Mhare O. Mouradian
April 10, 2018
Page Two

If we do not receive confirmation that Mr. Koren will cease all dissipation of PCJV funds; cease all action on behalf of PCJV and Cinco Group; surrender the offices, inventory, and records of PCJV; and cooperate in the transition of management by **noon on April 11**, then we will take immediate steps to protect Cinco Group's interests.

We will be serving Mr. Koren with a copy of our complaint based upon the above-identified breaches of fiduciary duty and will send you a courtesy copy once service is complete.

If you have any questions, you may contact me by telephone or email.

Very truly yours,

**DLA Piper LLP (US)**

Kellin M. Chatfield
Associate

Admitted In California Bar

KMC:lw

WEST\281134512.1

**Exhibit 73 - page 187**

# EXHIBIT K

Exhibit 73 - page 188

## MINUTES OF SPECIAL MEETING
## OF MANAGERS OF
## PCJV USA, LLC,
A Delaware Limited Liability Company

### APRIL 23, 2018

On April 23, 2018, at 5:11 PM PDST, the Board of Managers of PCJV USA, LLC ("PCJV" or the "Company") held, via telephone conference, a special meeting of Managers of PCJV pursuant to Section 4.14.3 of the Limited Liability Company Agreement of PCJV USA, LLC (the "Agreement") and Notice of Special Meeting, which was mailed on April 18, 2018.

The participants in the meeting were: Guy Koren; Alon Koren; Tom Hodgson; Jose Magsaysay, Jr.; Marivic del Pilar; Marco del Pilar; Ricardo Enrique K. Montelibano; John Edward Hernandez; Amir Jacoby; and Inbal Jacoby. Robert Brownlie of DLA Piper LLP (US) and Myrose Victor observed the meeting. Mr. Brownlie acted as secretary of the meeting.

John Edward Hernandez acted as the Chair of the meeting. At the outset of the call, Mr. Hernandez confirmed that the participants in the call could hear each other. Mr. Hernandez held proxy for any Managers of the Company appointed by Cinco Group and/or Potato Corner International, Inc.

### Explanatory Note

Before April 9, 2018, the Managers of PCJV consisted of the following individuals: Jose P. Magsaysay; Marivic del Pilar; John Edward Hernandez; Ricardo Enrique K. Montelibano; Guy Koren; Amir Jacoby; and Inbal Jacoby. These individuals are referred to as the "Prior Board."

On April 9, 2018, the Members of PCJV held a meeting to, among other things, elect new Managers. The individuals elected to represent Potato Corner International, Inc. / Cinco Group as Managers of PCJV USA, LLC were: Jose P. Magsaysay; Marivic del Pilar; John Edward Hernandez; and Marco del Pilar. The individuals elected to represent the LA Group as Managers of PCJV USA, LLC were: Amir Jacoby and Inbal Jacoby. For the purposes of these minutes, the "April 9 Board" refers to Jose P. Magsaysay; Marivic del Pilar; John Edward Hernandez; Marco del Pilar; Amir Jacoby and Inbal Jacoby.

By a letter, dated April 11, 2018, counsel for Guy Koren objected to the election of Amir Jacoby and Inbal Jacoby as Managers to represent the LA Group. Through his counsel, Mr. Koren asserted that the individuals who represent the interests of the LA Group as Managers of PCJV USA, LLC were: Guy Koren; Alon Koren; and Tom Hodgson. For the purposes of these minutes, the "April 11 Board" refers to Jose P. Magsaysay; Marivic del Pilar; John Edward Hernandez; Marco del Pilar; Guy Koren; Alon Koren; and Tom Hodgson.

WEST\281304421.1

Exhibit 73 - page 189

## REMOVAL OF CURRENT OFFICERS AND SUBORDINATE OFFICERS

The Chairman announced that the first item of business was to consider the removal of all of the Company's officers, including its Chairman of the Board of Members, President, Corporate Secretary, and Treasurer, and subordinate officers pursuant to Section 4.11.4 of the Agreement. A motion was duly made to remove of all of the Company's officers, including its Chairman of the Board of Members, President, Corporate Secretary, and Treasurer, and subordinate officers. The motion was seconded, and a discussion ensued. After the discussion, by a roll call vote, the motion was passed unanimously by the April 9 Board, by a majority of the Prior Board with Guy Koren dissenting, and a by a majority of the April 11 Board with Guy Koren, Alon Koren, and Tom Hodgson dissenting. Therefore, regardless of whether the Managers consisted of the Prior Board, April 9 Board, or April 11 Board, the motion passed.

## ELECTION OF NEW OFFICERS

The Chairman announced that the next item of business was to consider the election of new officers of the Company, including its Chairman of the Board of Members, President, Corporate Secretary, and Treasurer. A motion was duly made to elect the following individuals to serve as officers of the Company:

| | |
|---|---|
| Chairman of the Board: | John Edward P. Hernandez |
| President: | Amir Jacoby |
| Treasurer: | Marivic del Pilar |
| Corporate Secretary: | Ben Olivas |

The motion was seconded, and a discussion ensued. After the discussion, by a roll call vote, the motion was passed unanimously by the April 9 Board, by a majority of the Prior Board with Guy Koren dissenting, and a by a majority of the April 11 Board with Guy Koren, Alon Koren, and Tom Hodgson dissenting. Therefore, regardless of whether the Managers consisted of the Prior Board, April 9 Board, or April 11 Board, the motion passed.

## ELECTION OF NEW SUBRORDINATE OFFICER

The Chairman announced that the next item of business was to consider the election of a subordinate officer of the Company. A motion was duly made to elect Jose Magsaysay as the Chief Operating Officer of the Company. The motion was seconded, and a discussion ensued. After the discussion, by a roll call vote, the motion was passed unanimously by the April 9 Board, by a majority of the Prior Board with Guy Koren dissenting, and a by a majority of the April 11 Board with Guy Koren, Alon Koren, and Tom Hodgson dissenting. Therefore, regardless of whether the Managers consisted of the Prior Board, April 9 Board, or April 11 Board, the motion passed.

## TERMINATION OF THE SERVICES AGREEMENT

The Chairman announced that the next item of business was to consider the Services Agreement by and between Potato Corner Joint Venture also known as PCJV USA, LLC, on the one hand,

Exhibit 73 - page 190

and Guy Koren and Amir Jacoby, known as the LA Group, on the other hand, dated January 1, 2017 (the "Services Agreement"), pursuant to Section 5 of the Services Agreement. A motion was duly made to terminate the Service Agreement. The motion was seconded, and a discussion ensued. After the discussion, by a roll call vote, the motion was passed unanimously by the April 9 Board, by a majority of the Prior Board with Guy Koren dissenting, and a by a majority of the April 11 Board with Guy Koren, Alon Koren, and Tom Hodgson dissenting. Therefore, regardless of whether the Managers consisted of the Prior Board, April 9 Board, or April 11 Board, the motion passed.

## THE COMPANY'S BANKING RELATIONSHIPS

The Chairman announced that the notice of meeting allowed the consideration of other items of business. One such matter has arisen as result of the removal and replacement of the Company's officers, which relates to the Company's banking relationships because among the individuals who were removed as officers were those who were the authorized signatories on the Company's bank accounts. A motion was duly made to:

1) Close the Company's current banking relationships;

2) Authorize the Company's officers to open new accounts at Citibank and ratify all actions that have been taken in that regard;

3) Require two signatures for the Company's checks and withdrawals; and

4) Authorize the following signatories for the Company's bank accounts: Jose Marco de Pilar; Jose P. Magsaysay, Jr.; Ricardo Enrique K. Montelibano; Marivic H. del Pilar; John Edward Hernandez; Chad Dominic Hernandez; Myrose April Victor; Inbal P. Jacoby; and Ben Olivas.

The motion was seconded, and a discussion ensued. After the discussion, by a roll call vote, the motion was passed unanimously by the April 9 Board, by a majority of the Prior Board with Guy Koren dissenting, and a by a majority of the April 11 Board with Guy Koren, Alon Koren, and Tom Hodgson dissenting. Therefore, regardless of whether the Managers consisted of the Prior Board, April 9 Board, or April 11 Board, the motion passed.

## ADJOURNMENT

After a motion duly made, seconded and approved, the meeting was adjourned on 5:34 PM.

JOHN EDWARD HERNANDEZ

CHAIRMAN OF PCJV USA, LLC

ROBERT W. BROWNLIE

ACTING SECRETARY

WEST\281304421 1

**Exhibit 73 - page 191**

# EXHIBIT L

**Exhibit 73 - page 192**



Emily Garcia
PCJV USA, LLC
6380 Wilshire Blvd., Suite 1100
Los Angeles, CA 90048

Dear Emily,

This is to inform you that PCJV USA, LLC ("PCJV") held a Members' meeting on April 9, 2018 and, by a majority vote of 75% of the Membership Interests, voted to remove Mr. Guy Koren as a Manager, and also relieve him of his duties as President of PCJV, effective immediately. Mr. Koren's removal was due to his breach of his fiduciary and contractual duties to PCJV and its Members.

Going forward, the following are designated duly-authorized representatives of PCJV, effective immediately:

- Ms. Inbal Jacoby (Member and Manager of PCJV);

- Ms. Myrose Victor (Chief Financial Officer of Cinco Philippines, Inc.); and

- Ben R. Olivas (Corporate Secretary of PCJV).

PCJV, through these authorized representatives, will reach out to you and address any concerns and questions you may have during this time. Your continued role in day-to-day management affairs of PCJV is essential to the continued success of our venture. As such, PCJV and Cinco Philippines, Inc. are committed to supporting you, and ensuring that there are no disruptions to your role during the transition to a new management team.

We will reach out to you in the next few days, to schedule a meeting to address your questions or discuss any concerns you may have. We thank you for your kind understanding.

Very truly yours,

Amir Jacoby, Manager

Inbal Jacoby, Manager

Ben R. Olivas, Corporate Secretary

PCJV USA, LLC
6380 Wilshire Blvd. Suite 1100 Los Angeles, CA 90048
www.potatocornerusa.com | Office: 323-951-1155 | Fax: 888-810-1174

**Exhibit 73 - page 193**

# EXHIBIT M

**Exhibit 73 - page 194**

---------- Forwarded message ---------
From: Hillard, Sarah <Sarah.Hillard@dlapiper.com>
Date: Thu, May 3, 2018, 3:12 PM
Subject: Letter to PCJV Franchisees
To: Seattle@potatocornerusa.com <Seattle@potatocornerusa.com>, radavlai@gmail.com
<radavlai@gmail.com>
Cc: Myrose Victor <myrose.victor@potatocorner.com>, Amir Jacoby <ajacoby88@gmail.com>, Olivas, Ben
<Ben.Olivas@dlapiper.com>

Kindly see the attached letter regarding the change of management of PCJV USA, LLC; this was also sent to
you via certified mail. If you have any questions or wish to discuss further, please feel free to contact Mr. Amir
Jacoby, President of PCJV (mobile: 877-323-9788).

Best regards,

**Sarah Hillard**
Legal Practice Specialist

T +1 650.833.1578
F +1 650.833.2001
E sarah.hillard@dlapiper.com



DLA Piper LLP (US)
2000 University Avenue
East Palo Alto, California 94303-2215
United States
www.dlapiper.com

Please consider the environment before printing this email.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended
recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure,
dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this
communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to
postmaster@dlapiper.com. Thank you.

**Exhibit 73 - page 195**



April 26, 2018
Via Certified Mail

Vannrada Lai
Beyond Business, Inc.
2800 Southcenter Mall
Seattle, WA 98188

Dear Vannrada,

This is to inform you that PCJV USA, LLC ("PCJV") held a Managers' meeting on April 23, 2018. At the meeting, the Board of Managers voted to remove Mr. Guy Koren as President of PCJV, effective immediately.

In the same meeting, the following were elected as officers of PCJV:

- John Edward Hernandez    Chairman of the Board

- Amir Jacoby             President

- Jose Magsaysay, Jr.     Chief Executive Officer

- Marivic del Pilar       Treasurer

- Ben Olivas              Corporate Secretary

Also, PCJV appointed the following as duly-authorized representatives of PCJV, effective immediately:

- Ms. Inbal Jacoby (Member of PCJV);

- Ms. Myrose Victor (Chief Financial Officer of Cinco Corporation); and

- Ben Olivas (Corporate Secretary of PCJV).

PCJV, has appointed the following individual as your contact person on this matter. He will reach out to you and address any concerns and questions you may have during this time:

- Mr. Amir Jacoby (President of PCJV; mobile: 877-323-9788).

PCJV and Cinco Corporation are committed to providing continued support to your operations, and will work to provide that there are no disruptions to your business during the transition to a new management team. These actions were undertaken with the support of PCJV's majority owner, Cinco Corporation, through its wholly-owned U.S. subsidiary, Potato Corner International, Inc. ("PC-International"). Cinco Corporation, as the registered owner of the

**Exhibit 73 - page 196**

"Potato Corner" trademark and tradename, is committed to ensure your continued growth and success.

We will reach out to you in the next few days, to schedule a meeting to address your questions or discuss any concerns you may have. If you would like to contact the new management team, please call Amir Jacoby at the number provided above. We thank you for your kind understanding.

Very truly yours,

John Edward Hernandez, Chairman of the Board

Amir Jacoby, President

Ben Olivas, Corporate Secretary

**Exhibit 73 - page 197**

**1**      ## PROOF OF SERVICE

**2**   **STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

**3**      At the time of service, I was over 18 years of age and **not a party to this action**. I am
employed in the County of Los Angeles, State of California. My business address is 1888 Century
**4**   Park East, Suite 1900, Los Angeles, California 90067.

**5**      On October 10, 2018, I served true copies of the following document(s) described as
**VERIFIED FIRST AMENDED CROSS-COMPLAINT** on the interested parties in this action
**6**   as follows:

**7**                                    ## SERVICE LIST

**8**   Michael D. Murphy, Esq.                       *Attorneys for Plaintiff and Cross-Defendant*
Ervin Cohen & Jessup LLP                      *CINCO CORPORATION and Defendant*
**9**   9401 Wilshire Boulevard, 9th Floor            *POTATO CORNER INTERNATIONAL, INC.*
Beverly Hills, CA 90212-2974
**10**  Tel: (310) 281-6336
Fax: (310) 887-6838
**11**  *mmurphy@ecjlaw.com*

**12**  Robert A. Levinson, Esq.                      *Attorneys for Cross-Defendants*
David Krol, Esq.                              *AMIR JACOBY and INBAL JACOBY*
**13**  LEVINSON ARSHONSKY & KURTZ, LLP
15303 Ventura Blvd., Suite 1650
**14**  Sherman Oaks, California 91403
Telephone: (818) 382-3434
**15**  Facsimile: (818) 382-3433
*rlevinson@laklawyers.com*
**16**  *dkrol@laklawyers.com*

**17**

**18**     **BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the
persons at the addresses listed in the Service List and placed the envelope for collection and
**19**  mailing, following our ordinary business practices. I am readily familiar with Freeman, Freeman &
Smiley, LLP's practice for collecting and processing correspondence for mailing. On the same day
**20**  that the correspondence is placed for collection and mailing, it is deposited in the ordinary course of
business with the United States Postal Service, in a sealed envelope with postage fully prepaid.
**21**

**22**     I declare under penalty of perjury under the laws of the State of California that the
foregoing is true and correct.

**23**     Executed on October 10, 2018, at Los Angeles, California.

**24**

**25**                                   *Maria Villagran*

**26**                                   Maria Villagran

**27**

**28**

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**Exhibit 73 - page 198**