Electronically FILED by Superior Court of California, County of Los Angeles on 11/12/2019 05:27 PM Sherri R. Carter, Executive Officer/Clerk of Court, by V. Delgadillo,Deputy Clerk

1  TODD M. LANDER (BAR NO. 173031)
todd.lander@ffslaw.com
2  ARASH BERAL (BAR NO. 245219)
arash.beral@ffslaw.com
3  FREEMAN, FREEMAN & SMILEY, LLP
1888 Century Park East, Suite 1900
4  Los Angeles, California 90067
Telephone:  (310) 255-6100
5  Facsimile:  (310) 255-6200

6  Attorneys for Defendants and Cross-
Complainants GUY KOREN and THOMAS
7  HODGSON, and Defendants GK CAPITAL
GROUP, LLC, ALON KOREN, and
8  EMILY GARCIA

9         SUPERIOR COURT OF THE STATE OF CALIFORNIA

10        COUNTY OF LOS ANGELES, CENTRAL DISTRICT

11

12  CINCO CORPORATION, a Philippines
corporation; POTATO CORNER
13  INTERNATIONAL, INC., a Delaware
corporation,

14              Plaintiffs,

15        vs.

16

17  GUY KOREN, an individual; NKM
CAPITAL GROUP, LLC, a California limited
18  liability company; J & K AMERICANA,
LLC, a California limited liability company;
19  J & K CULVER, LLC, a California limited
liability company; J&K LAKEWOOD, LLC,
20  a California limited liability company; J&K
OAKRIDGE, LLC, a California limited
21  liability company; J&K VALLEY FAIR, LLC,
a California limited liability company; J & K
22  CAPITAL 2, LLC, a California limited
liability company; J & K ONTARIO, LLC, a
23  California limited liability company; J&K PC
TRUCKS, LLC, a California limited liability
24  company; J&K CONSULTANTS GROUP,
LLC, a California limited liability company;
25  GK CAPITAL GROUP, LLC, a California
limited liability company; POTATO CORNER
26  LA GROUP, LLC, a California limited
liability company; and DOES 1 through 25,
27  inclusive,

28              Defendants.

Case No. BC701075
[Related with Case No. BC706000]

**CROSS-COMPLAINANT GUY KOREN'S VERIFIED THIRD AMENDED CROSS-COMPLAINT FOR:**

1.    **BREACH OF THE JACOBY-KOREN AGREEMENT;**
2.    **INDUCING BREACH OF CONTRACT;**
3.    **INTENTIONAL MISREPRESENTATION;**
4.    **NEGLIGENT MISREPRESENTATION;**
5.    **FALSE PROMISE;**
6.    **ACCOUNTING; AND**
7.    **INDEMNITY**

**Assigned for All Purposes to the Hon. Rafael Ongkeko, Dept. 73**

Action Filed:     April 10, 2018
Trial Date:       April 27, 2020

*(vertical left margin)* FREEMAN, FREEMAN & SMILEY, LLP   1888 CENTURY PARK EAST, SUITE 1900   LOS ANGELES, CALIFORNIA 90067   (310) 255-6100

4350401.1

GUY KOREN'S VERIFIED THIRD AMENDED CROSS-COMPLAINT

Exhibit 1421 - 0001

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

– and –

PCJV USA, LLC, a Delaware limited liability company,

Nominal Defendant.

PCJV USA, LLC, a Delaware limited liability company; PCI TRADING LLC, a Delaware limited liability company; POTATO CORNER LA GROUP, LLC, a California limited liability company; NKM CAPITAL GROUP, LLC, a California limited liability company; J & K AMERICANA, LLC, a California limited liability company; J&K LAKEWOOD, LLC, a California limited liability company; J & K CULVER, LLC, a California limited liability company; J&K OAKRIDGE, LLC, a California limited liability company; J&K VALLEY FAIR, LLC, a California limited liability company; J & K CAPITAL 2, LLC, a California limited liability company; J & K ONTARIO, LLC, a California limited liability company; J&K PC TRUCKS, LLC, a California limited liability company; J&K CONSULTANTS GROUP, LLC, a California limited liability company; GK CAPITAL GROUP, LLC, a California limited liability company; GUY KOREN, an individual; ALON KOREN, an individual; THOMAS HODGSON, an individual; EMILY GARCIA, an individual; ASHLEY GRUDNOWSKI, an individual,

Cross-Complainants,

vs.

CINCO CORPORATION, a Philippines corporation; POTATO CORNER INTERNATIONAL, INC., a Delaware Corporation; HIGHFIVE CORPORATION, a Philippines corporation; JOSE P. MAGSAYSAY, JR., an individual; JOSE MIGUEL MA. MONTINOLA, an individual; RICARDO ENRIQUE K. MONTELIBANO, an individual; MA. VICTORIA O. BERMEJO, an individual; BEN OLIVAS, an individual; JOHN EDWARD HERNANDEZ, an individual; CHAD DOMINIC HERNANDEZ, an individual; MIGUEL RAYMUNDO HERNANDEZ, an individual; MYROSE VICTOR, an individual; MARIVIC

Exhibit 1421 - 0002

<div style="text-align: left; border: 1px solid;">

1 | DEL PILAR, an individual; JOSE MARCO DEL PILAR, an individual; DIA LACABA, an individual; NICARDO FALCIS, an individual; AMIR JACOBY, an individual; INBAL JACOBY, an individual; and ROES 1 through 500, inclusive,

2 |

3 |

4 |

5 | Cross-Defendants.

</div>

6       Cross-Complainant Guy Koren ("Koren" or "Cross-Complainant")[1] complains of the

7 following Cross-Defendants (collectively, "Cross-Defendants", and each a "Cross-Defendant"):

8       i.    Amir Jacoby ("Jacoby") and Inbal Jacoby (collectively, the "Jacobys");

9       ii.   Cinco Corporation ("Cinco"), Jose P. Magsaysay, Jr. ("Magsaysay"), Jose Miguel

10            Ma. Montinola ("Montinola"), Ricardo Enrique K. Montelibano ("Montelibano"),

11            Ma. Victoria O. Bermejo ("Bermejo") (collectively, the "Cinco Group");

12      iii.   Ben Olivas ("Olivas");

13      iv.   John Edward Hernandez, Chad Dominic Hernandez, Miguel Raymundo

14            Hernandez, Myrose Victor, Marivic Del Pilar, Jose Marco Del Pilar, Dia Lacaba,

15            Nicardo Falcis, and ROES 1 through 200, inclusive (collectively, the "Hernandez

16            Group")[2]; and

17      v.    ROES 201 through 500, inclusive, and allege as follows:

18

19

20 [1] This Third Amended Cross-Complaint is filed pursuant to the Court's Orders of October 7, 2019 and November 5, 2019. This pleading supersedes only Koren's prior operative complaint and is not intended to supersede any allegation or claim by any other cross-complaining party to the First Amended Cross-Complaint. Koren is informed and believes that the remaining cross-complainants to this action will file their amended cross-complaint in due course, with the exception that in September 2019, Cross-Complainants GK Capital Group, LLC, Alon Koren, Emily Garcia, and Ashley Grudnowski decided not to pursue their cross-claims without prejudice.

24 [2] On September 24, 2019, Cinco first disclosed to Koren in a sealed filing (and subject to a stipulated protective order) the identities of the Hernandez Group buyers. On October 16, the parties addressed the inability for Koren to identify these "secret" parties in a pleading if their names were sealed subject to a protective order. Counsel for Cinco/PC International represented to the Court that Koren could obtain the identities of the parties through the discovery process. On October 22, Koren served Cinco with two targeted interrogatories requesting the identification of these "secret" parties. The time for Cinco to respond to those interrogatories has not yet arrived. Koren will file ROE amendments after Cinco discloses the identities of the "secret" parties.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

Exhibit 1421 - 0003

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**THE PARTIES**

1.      Cross-Complainant Koren is, and at all relevant times was, an individual residing in the County of Los Angeles, State of California.

2.      Cross-Complainant is informed and believes, and thereupon alleges, that Cross-Defendant Amir Jacoby is, and at all relevant times was, an individual residing in Los Angeles, California.

3.      Cross-Complainant is informed and believes, and thereupon alleges, that Cross-Defendant Inbal Jacoby is, and at all relevant times was, an individual residing in Los Angeles, California.

4.      Cross-Complainant is informed and believes, and thereupon alleges, that Cross-Defendant Cinco is, and at all relevant times was, a corporation organized and existing under the Republic of the Philippines, and that it conducts business in the United States, including in the County of Los Angeles, State of California.

5.      Cross-Complainant is informed and believes, and thereupon alleges, that Cross-Defendant Magsaysay is, and at all relevant times was, an individual residing in the Republic of the Philippines who routinely maintains contacts with the United States including with the County of Los Angeles, State of California.

6.      Cross-Complainant is informed and believes, and thereupon alleges, that Cross-Defendant Montinola is, and at all relevant times was, an individual residing in the Republic of the Philippines who routinely maintains contacts with the United States including with the County of Los Angeles, State of California.

7.      Cross-Complainant is informed and believes, and thereupon alleges, that Cross-Defendant Montelibano is, and at all relevant times was, an individual residing in the Republic of the Philippines who routinely maintains contacts with the United States including with the County of Los Angeles, State of California.

8.      Cross-Complainant is informed and believes, and thereupon alleges, that Cross-Defendant Bermejo is, and at all relevant times was, an individual residing in the Republic of the

4350401.1

4

GUY KOREN'S VERIFIED THIRD AMENDED CROSS-COMPLAINT

Exhibit 1421 - 0004

Philippines who routinely maintains contacts with the United States including with the County of Los Angeles, State of California.

9.      Cross-Complainant is informed and believes, and thereupon alleges, that Cross-Defendant Olivas is, and at all relevant times was, an individual residing in Belmont, California.

10.     Cross-Complainant is informed and believes, and thereupon alleges, that Cross-Defendant John Edward Hernandez is, and at all relevant times was, an individual residing in the Republic of the Philippines who routinely maintains contacts with the United States including with the County of Los Angeles, State of California.

11.     Cross-Complainant is informed and believes, and thereupon alleges, that Cross-Defendant Chad Dominic Hernandez is, and at all relevant times was, an individual residing in the Republic of the Philippines who routinely maintains contacts with the United States including with the County of Los Angeles, State of California.

12.     Cross-Complainant is informed and believes, and thereupon alleges, that Cross-Defendant Miguel Raymundo Hernandez is, and at all relevant times was, an individual residing in the Republic of the Philippines who routinely maintains contacts with the United States including with the County of Los Angeles, State of California.

13.     Cross-Complainant is informed and believes, and thereupon alleges, that Cross-Defendant Myrose Victor is, and at all relevant times was, an individual residing in the Republic of the Philippines who routinely maintains contacts with the United States including with the County of Los Angeles, State of California.

14.     Cross-Complainant is informed and believes, and thereupon alleges, that Cross-Defendant Marivic del Pilar is, and at all relevant times was, an individual residing in the Republic of the Philippines who routinely maintains contacts with the United States including with the County of Los Angeles, State of California.

15.     Cross-Complainant is informed and believes, and thereupon alleges, that Cross-Defendant Marco del Pilar is, and at all relevant times was, an individual residing in the Republic of the Philippines who routinely maintains contacts with the United States including with the County of Los Angeles, State of California.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

4350401.1

5

GUY KOREN'S VERIFIED THIRD AMENDED CROSS-COMPLAINT

Exhibit 1421 - 0005

16.     Cross-Complainant is informed and believes, and thereupon alleges, that Cross-Defendant Dia Lacaba is, and at all relevant times was, an individual residing in the Republic of the Philippines who routinely maintains contacts with the United States including with the County of Los Angeles, State of California.

17.     Cross-Complainant is informed and believes, and thereupon alleges, that Cross-Defendant Nicardo Falcis is, and at all relevant times was, an individual residing in the Republic of the Philippines who routinely maintains contacts with the United States including with the County of Los Angeles, State of California.

18.     Cross-Complainant is ignorant of the true names and capacities of the cross-defendants sued herein as ROES 1 through 500, inclusive, and therefore sue said cross-defendants by said fictitious names.  Cross-Complainant will amend this Third Amended Cross-Complaint to allege their true names and capacities when ascertained.

19.     Cross-Complainant is informed and believes, and thereupon alleges, that each of the fictitiously named cross-defendants is responsible in some manner for the occurrences herein alleged and that Cross-Complainant's damages were proximately caused thereby.  Cross-Complainant is informed and believes, and thereupon alleges, that at all relevant times herein, each of the ROE cross-defendants and the named Cross-Defendants were the agents and/or employees of one or more of the other cross-defendants, were acting within the course and scope of said agency and/or employment, and that each cross-defendant has aided and assisted one or more of the other cross-defendants in committing the wrongful acts herein alleged.

20.     Cross-Complainant is informed and believes, and thereupon alleges, that cross-defendants, and each of them, conspired and agreed among themselves to do the acts complained of herein and were, in doing the acts complained of herein, acting pursuant to said conspiracy, and that each cross-defendant sued herein is jointly and severally responsible and liable to each cross-complainant for the damages alleged herein.

## **ALTER-EGO ALLEGATIONS**

21.     Cross-Complainant is informed and believes, and thereupon alleges, that there is a unity of interest and ownership between and among the following parties, such that any

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

Exhibit 1421 - 0006

individuality and separateness between them never existed or has ceased, and that said parties are alter egos of one another:

Cinco and Potato Corner International, Inc. ("PC International")

    a)  PC International was conceived, intended, and/or used by the Cinco Group and Hernandez Group as a device for the purpose of defrauding others, including Cross-Complainant;

    b)  The Cinco Group and Hernandez Group exercised dominion and control over the finances of PC International and treated PC International's finances as their own;

    c)  The Cinco Group and Hernandez Group used the corporate form of PC International for their own purposes as though it was their own, and did not follow proper corporate formalities; and

    d)  Adherence to the fiction of the separate existence of PC International as an entity distinct from the Cinco Group and Hernandez Group would permit an abuse of the corporate privilege and would sanction fraud.

The Cinco Group

    e)  Cinco was conceived, intended, and/or used by Magsaysay, Montinola, Montelibano, and Bermejo as a device for the purpose of defrauding others, including Cross-Complainant;

    f)  The Cinco Group exercised dominion and control over the finances of Cinco and treated Cinco's finances as their own;

    g)  Magsaysay, Montinola, Montelibano, and Bermejo used the corporate form of Cinco for their own purposes as though it was their own, and did not follow proper corporate formalities; and

    h)  Adherence to the fiction of the separate existence of Cinco as an entity distinct from Magsaysay, Montinola, Montelibano, and Bermejo would permit an abuse of the corporate privilege and would sanction fraud.

ROES 101 through 200, Inclusive

    i)  ROES 101 through 200, inclusive, were conceived, intended, and/or used by the

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**Exhibit 1421 - 0007**

Hernandez Group as a device for the purpose of defrauding others, including Cross-Complainant;

j) The Hernandez Group exercised dominion and control over the finances of ROES 101 through 200, inclusive, and treated the finances of ROES 101 through 200, inclusive, as their own;

k) The Hernandez Group used the corporate form of ROES 101 through 200, inclusive, for their own purposes as though they were their own, and did not follow proper corporate formalities; and

l) Adherence to the fiction of the separate existence of ROES 101 through 200, inclusive, as entities distinct from the Hernandez Group would permit an abuse of the corporate privilege and would sanction fraud.

## KOREN'S RELEVANT POSITIONS, TITLES, CAPACITIES

22.     Koren is on the Board of Managers of PCJV, the entity formed in 2010 to act as the master franchisor of Potato Corner's operations in the United States and Israel, and has served in that capacity since PCJV's inception in or about 2010. Koren is also the President of PCJV and has served in that capacity since at least on or about October 16, 2012; although Koren regularly performed the duties of President prior to October 16, 2012, Koren was not formally named PCJV's President until that date. In addition to PCJV, Koren also serves as President of PCI Trading LLC ("PCI Trading") and has held this title since PCI Trading's inception.

23.     Koren is presently also the majority member (holding 61.3% of its equity ownership interest) and manager of Potato Corner LA Group, LLC (the "LA Group LLC"), which was formerly a partnership known as PCJV-LA Group (the "LA Group Partnership") from on or about March 1, 2013 through on or about July 22, 2015 for which Koren was the sole managing partner, and prior to that an association of three individuals: Koren, Amit Nemanim ("Nemanim"), and Jacoby (the "LA Group Association"). The LA Group LLC, the LA Group Partnership, and the LA Group Association are collectively referred to herein as the "LA Group". The LA Group currently holds a 40% equity ownership interest in PCJV and is and has always been charged with PCJV's (and PCI Trading's) management.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

24.     Koren is also a member and manager of various other entities, including NKM Capital Group, LLC ("NKM") and other entities involved in this litigation and which names begin with the prefix "J & K" or "J&K" (collectively, the "NKM/JK Entities").

## FACTUAL ALLEGATIONS

### Koren Brings "Potato Corner" to the United States

25.     As a young teenage resident of the Philippines in the early 1990s, Koren – who was then living in the Far East by virtue of his father's work for the Israeli Embassy in Manila – imagined the day he could live in the United States and pursue the American dream.  And, while in the Philippines, he fell in love with an icon of American culture – the french fry.  More particularly, he became enamored of a seasoned french fries business known as "Potato Corner" and, as the years passed, became determined to bring Potato Corner to this country.

26.     By late 2008, Koren had realized his ambition of living and working in the United States, and was a successful entrepreneur in Los Angeles.  At around that time, he sat down with Magsaysay, the CEO of Cinco (the company that owned the Potato Corner brand), for an in-person meeting in Los Angeles.  During that meeting, the two bonded, discussing their respective backgrounds, mutual friends and relationships (particularly those in the Philippines), and Magsaysay's history with Potato Corner.  At the time of this meeting, Koren was 28 years old.  Magsaysay, approximately 20 years older than Koren, told Koren that he – Magsaysay – was excited about Koren's relative youth – as Magsaysay was looking to retire at some point in the future and in search of a successor.

27.     As the talks progressed, Magsaysay inquired of Koren whether Koren was ready to devote his life to Potato Corner, and Koren certainly was.  Magsaysay informed Koren that he had received many inquiries from the United States, but he had decided that none of those prior inquiries were worth pursuing.  Magsaysay also mentioned that Potato Corner had dabbled in the United States before and maintained some presence in San Francisco at the Tanforan Mall through another licensee, but for various reasons, that other licensee was not a good candidate to be given a larger role.  Ultimately, Magsaysay decided that Koren was the right candidate and told Koren in no

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

Exhibit 1421 - 0009

1    uncertain terms: "it makes me feel safe to award you the rights to the U.S." ("Magsaysay Statement

2    No. 1").

3    **NKM Receives a Master License Agreement in April 2009**

4    28.    As the Koren-Magsaysay talks progressed, both sides became enamored with the

5    prospect of Koren expanding Potato Corner's footprint.  One particular condition Magsaysay raised

6    that was of critical importance to him was that he – Magsaysay – wanted the relationship to be more

7    than that of mere business partners; he wanted to kindle a family-type connection.  Magsaysay was

8    thus adamant that any business arrangement would carry with it a restriction on transfers or

9    assignments of interests in order, at first, to protect him from having to do business with some third

10    party.  He didn't want, as he described, to do business with a "Joe Schmo" ("Magsaysay Statement

11    No. 2").  And, in order to further entice Koren to agree to this condition, Magsaysay began to lay

12    the groundwork for his future promises that Koren would ultimately take over Magsaysay's

13    position as chief executive of Potato Corner's global interests; indeed, Magsaysay told Koren at this

14    early juncture that he – Magsaysay – may look to Koren to take over his CEO position one day

15    ("Magsaysay Statement No. 3").  Excited about potentially taking over all of Potato Corner's global

16    operations, Koren agreed to Magsaysay's condition restricting transfers of interest.

17    29.    Another particular condition of Magsaysay's involved Koren's team having to cover

18    all store costs because Magsaysay said that he had no desire to pay for any costs for the opening of

19    any U.S. outlet, nor did he have a desire to take ownership interests in any U.S. outlet ("Magsaysay

20    Statement No. 4").  Koren accepted this condition.

21    30.    In or about March 2009, Magsaysay forwarded a draft Master License Agreement

22    (the "NKM License Agreement") for Koren's and Nemanim's signatures.  The NKM License

23    Agreement identifies Magsaysay as the President of Potato Corner Global Company Limited, Hong

24    Kong,[3] and Koren as the CEO and President of NKM.

25    31.    Upon review of the NKM License Agreement, on or about April 2 or 3, 2009, Koren

26    sent an email to Magsaysay addressing its various terms, including the restriction of transfer clause.

27    _____

28    [3] In later agreements, "Cinco Corporation" is identified as the party-in-interest.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

4350401.1

GUY KOREN'S VERIFIED THIRD AMENDED CROSS-COMPLAINT

Exhibit 1421 - 0010

1   Confirming Magsaysay Statement No. 2, Koren's email to Magsaysay stated: "In regard with rights

2   to assign shareholding within our company, you know we are here for the long term, at the same

3   time with assigning shares of our company, we need complete control. We abviously [sic]

4   understand your concern of one day dealing with 'joe shmo' so we can base this one [sic] the

5   premise that Guy and Amit will always maitain [sic] <[sic]51% of the Inc. at all times unless agreed

6   by all parties."

7          32.     On April 16, 2009, Magsaysay forwarded a revised version of the NKM License

8   Agreement, which was subsequently executed.  The NKM License Agreement is fairly

9   straightforward: it provides that Koren (through NKM) would initially get the exclusive rights to

10  open up to ten Potato Corner stores in Los Angeles County with the option to expand his exclusive

11  geographical territory to all of California upon certain terms, provided that Koren pay to Magsaysay

12  50% of the total agreed-to license fees for all ten outlets in advance.  Koren could also open more

13  than ten outlets anywhere (including both within and outside the exclusive geographical territory)

14  provided that Koren pays a $3,000 license fee in advance for each additional outlet.  The NKM

15  License Agreement further provides Koren (through NKM) could sublicense rights and split all

16  royalties paid by any sub-licensee of Koren's choosing 50/50 with Magsaysay.  At some point after

17  executing the NKM License Agreement, Koren remitted 50% of the total agreed-to license fees to

18  enable him to open 10 (ten) Potato Corner outlets pursuant to the terms of the parties' agreement.

19  A true and correct copy of the NKM License Agreement is attached as **Exhibit "A"** to this Third

20  Amended Cross-Complaint, and incorporated by reference hereto.

21          **Koren Identifies the Westfield Santa Anita Mall for his First Flagship Store**

22          33.     Having the NKM License Agreement in place, Koren next turned his attention to

23  opening his first Potato Corner store.  After conducting a heavy amount of due diligence and with

24  an eye towards launching the first store in an attention-grabbing environment (that would not only

25  help ensure Koren's success but would also help Magsaysay market Potato Corner's

26  groundbreaking U.S. expansion, which was a huge deal in the Philippines), Koren identified the

27  Westfield Santa Anita mall as a prime location to launch NKM's flagship store due to the mall's

28  special characteristics.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

34.     While Koren led the efforts in opening a store at Westfield Santa Anita, working 12-16 hour days while negotiating favorable terms and dealing with all aspects of the store's opening, Magsaysay kept a watchful eye.  Unfortunately, there was little Magsaysay could do to assist Koren in opening his first store as Magsaysay was not used to that level of "red tape".  Indeed, Magsaysay was unfamiliar with the legal and regulatory hurdles in launching a food store in America.

**While Koren was Occupied with Launching the Santa Anita Store, Magsaysay Insists on Transforming the Relationship into a "Franchise-Model" Business Arrangement**

35.     While Koren and his team were heavily invested and engaged in opening their first store in Santa Anita, in or about late 2009 or early 2010 (and before the Santa Anita store opened), Magsaysay approached Koren to inform him that he had conferred with his high school classmate and long-time friend, Olivas, and that Olivas or his law firm had advised Magsaysay that according to American law, there was a requirement to establish a U.S.-based *franchise* business ("Magsaysay Statement No. 5").

36.     While Koren had no legal background whatsoever, he also had no reason to doubt Magsaysay; Koren placed all of his faith and confidence in him.  Besides, the idea of franchising was appealing to Koren (and, in fact, in some ways already contemplated by the "sublicense" provisions that existed in the NKM License Agreement), so Koren was eager to learn about it so long as it didn't frustrate all of the time and work Koren had put in to date and did not suddenly deny him the exclusivity he had negotiated for before.

37.     To start, Magsaysay told Koren that he was very pleased with Koren's hard work and thrilled to have connected with him.  Magsaysay said that his feeling about Koren had come true and wanted nothing but to continue their "partnership".  Magsaysay said that with this new proposed franchise relationship, Koren would get even *more* rights and geographical reach insofar as *all* of the United States would be included as part of the deal ("Magsaysay Statement No. 6").  In other words, not only would Koren gain the rights to become a franchisor of Potato Corner but to also have the *exclusive rights to franchise Potato Corner to the entire United States*.  Magsaysay told Koren that he had entered into partnership relationships like these in other countries, such as Indonesia, whereby the Indonesian partner received a 70% stake in the business and had total

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

control of all operations in the country.  Magsaysay said that he wanted to simulate the same structure with Koren.

38.     Koren asked Magsaysay several questions, including, what exactly would this new business structure look like, what would happen with the ten+ stores that Koren had already purchased rights for, who would manage this new business, how it would be operated, and the like. Magsaysay responded that he wanted the parties to jointly create a new business to act as the master Potato Corner franchisor of the U.S., in which business Koren and his group would control a majority equity interest and which Koren (or somebody Koren designates) would exclusively operate.  Koren sought to confirm that his group would get a 70% equity stake like Magsaysay's Indonesian partner but Magsaysay said that because the U.S. market has large potential, he'd only be comfortable with giving Koren's group 60%.  At the same time, Magsaysay also proposed putting in place a board structure whereby overarching decisions would be voted on by members of the board and that Koren's side, by virtue of its 60% stake, would have majority control of the board.

39.     With respect to the rights NKM had already purchased as a Potato Corner licensee, Magsaysay said that Koren could keep those rights and, because Koren's group was going to be the franchisor in the U.S., Koren could provide his group and his entities whatever geographical exclusivity he wanted.  It would be completely up to Koren, Magsaysay said, and that as the "future Potato Corner CEO" [Magsaysay's words], running the entire U.S. operations would help get Koren the experience Koren needed to run the global operations one day.  ("Magsaysay Statement No. 7.")

40.     Koren and Magsaysay had several further discussions concerning this new proposed arrangement.  Koren asked Magsaysay whether Magsaysay would include Israel in the deal, and Magsaysay said he would.  Koren asked Magsaysay what kind of assistance the Manila team would provide, and Magsaysay replied that the Manila team would do anything and everything it takes, specifically, that he and his team would provide Koren all legal and regulatory assistance, training, operational support, marketing, accounting, advertising, sourcing of goods, business development, strategic growth activities, franchising, brand management, guidelines, etc. ("Magsaysay Statement No. 8").  Despite the fact that Koren had already negotiated and put in place the NKM License

4350401.1

GUY KOREN'S VERIFIED THIRD AMENDED CROSS-COMPLAINT

**Exhibit 1421 - 0013**

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1 Agreement that effectively gave Koren exclusive rights to "sub-license" Potato Corner across

2 California and own 100% of those rights (with additional non-exclusive rights across the United

3 States), having full control as franchisor, expanding that exclusive geographical reach to the United

4 States and Israel, and in one day taking over the entire Potato Corner global operations, appealed to

5 him.

6       41.    At the same time that Magsaysay and Koren were discussing this potential franchise

7 business in the U.S., many friends and acquaintances of Koren's had approached Koren to invest.

8 Indeed, because Magsaysay led Koren to believe that Koren's side would have four votes on the

9 would-be seven-person board that would come to oversee this new business venture, Koren was on

10 the lookout for potential investors and board members.  One particular contact of Koren's, Mark

11 Tung ("Tung"), was exceedingly interested in Potato Corner and offered to invest $600,000.  Others

12 also showed interest in investing.

13                   **Jacoby Induces Koren to Allow Jacoby's Investment**

14       42.    On a specific date currently unknown, in or about April 2009 (when the NKM

15 License Agreement was executed) and May 2009, Koren met Jacoby at Jacoby's business office on

16 Ventura Blvd. – Jacoby was and still is a general contractor – to pick up payment for a low voltage

17 wiring project that Koren had performed for Jacoby.  At the time of this meeting, Jacoby – who had

18 become enamored with Koren and Koren's work – inquired of Koren whether Koren was interested

19 in performing additional low voltage wiring projects for Jacoby, and Koren respectfully declined.

20 When Jacoby inquired as to the reason why Koren could not take on additional projects, Koren told

21 Jacoby that Koren was opening a new business and would not have any time to devote to any other

22 projects.

23       43.    Jacoby, for his part, insisted and demanded to learn about Koren's new business.

24 "What is it?  Tell me about it," Jacoby inquired.  Koren told Jacoby that he preferred not to say, but

25 that this business could be big and that he – Koren – was in the process of raising money and

26 talking to his friends who'd wanted to invest.  "Tell me what it is," Jacoby said, "maybe I'll be your

27 investor."  Drawn by Jacoby's interest in investing in the business, Koren disclosed the Potato

28 Corner opportunity to Jacoby and he – Jacoby – immediately informed Koren about his family's

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  involvement in food service in the past and his desire to invest in such a business.  "I love it … I'm

2  interested … I want to be your investor," Jacoby pronounced.

3      44.    Within one week after this meeting, Jacoby met Koren and Nemanim at Nemanim's

4  parents' home in Beverly Hills.  At that second meeting involving Jacoby regarding Potato Corner,

5  Koren showed Jacoby the NKM License Agreement and informed him about the efforts that he –

6  Koren – had undertaken to obtain that agreement.  Over time, the three discussed Potato Corner

7  further and, ultimately, the terms of the NKM License Agreement that Koren had negotiated

8  appealed to Jacoby as did, later, the potential for obtaining an interest in the franchisor entity

9  (PCJV).[4]  Jacoby followed through with his interest in investing in the business.

10      45.    Initially, Jacoby invested $25,000 in exchange for a 3% stake in NKM.  Over time,

11  Jacoby brought in his uncle (Danny Shalom) and his brother (Ron Yacobi) to also invest $25,000

12  each in exchange for a 3% stake in NKM for each of them.  As time progressed and the need for

13  further capital arose, Jacoby invested an additional $15,000, bringing his total investment to

14  $40,000, for which he received additional membership units (bringing his total stake to 4.8%).

15  When all was said and done, NKM was capitalized with the following investments and investors,

16  each of whom received Class B membership units in NKM, which class of membership units

17  accounts for 13.26% of NKM's total ownership units (the remaining 86.74% is held in Class A

18  membership units, in which, as discussed below, Jacoby also received shares):

19      • Amir Jacoby: $40,000

20      • Ron Yacobi: $25,000

21      • Danny Shalom: $25,000

22      • Mark Tung: $60,000

23      • Guy Koren: $3,000

24      • Amit Nemanim: $5,000

25

26

27  [4] At the time the LA Group was formed, the parties intended to have the NKM owners also
28  become the LA Group owners.

Exhibit 1421 - 0015

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

46.     In return for bringing in his uncle, brother, and himself, Jacoby demanded and received a "finder's fee" – additional percentage points (through Class A membership units) granted him in exchange for bringing in this investment.  And, as further time progressed, Koren and Nemanim granted Jacoby even more Class A membership units in NKM as Jacoby took more of an in interest in Potato Corner.  Over time, as Jacoby induced Koren with false promises (as discussed below), Jacoby's ownership percentage in NKM increased from 4.8% all the way up to, as he alleges, 42% (for which he and the other investors have been reaping financial rewards).  In addition, through his investment in NKM, Jacoby came to hold an ownership interest in the LA Group.

**Koren Proceeds to Open the Potato Corner Santa Anita Location in February 2010**

47.     With the above investments in place and despite various challenges, NKM finally succeeded in opening its first American Potato Corner store in February 2010.  Magsaysay and his team heavily advertised the fact of Potato Corner's American expansion here and abroad and this became a major topic of discussion in the Filipino news cycle.  Some of that advertising is still accessible through www.youtube.com by searching "Potato Corner Grand Opening in LA" which YouTube links the Manila team used to entice additional licensees/franchisees and begin to establish Potato Corner's global reputation.  There was a renewed fervor over Potato Corner in the Philippines because any Filipino company's expansion into the U.S. is viewed with great honor and exuberance in that country.  Indeed, very few Filipino companies have ever successfully broken into the American market.

48.     Many Filipino news articles tout that Potato Corner's U.S. expansion was due to Koren's efforts and unique connection to the Philippines.  For example, a December 2016 article in the Philippine Star (for which Magsaysay was the principal contributor) recounts:

> In 2010, they brought the brand to the United States.  It was also another student whose father used to head the security of the Israeli Embassy here who was instrumental in bringing Potato Corner to the land of French fries. The student who studied at the International School and lived in a condo along Ayala Avenue used to walk every day to Glorietta to buy from Potato Corner and wanted to bring it to the US. Joe and his group studied the market there and talked with a marketing guru in the US who actually advised him against it, likening the prospect of selling ice cream to an ice cream house. Their group, however, had

Exhibit 1421 - 0016

more faith in his gut feel and went ahead with Potato Corner's invasion of the land of French fries.

49.     To cite another example, a July 11, 2018 article in the Filipino press includes a direct quote from *Dom Hernandez* (who is part of the Hernandez Group that allegedly came to acquire Cinco's interests in 2017 and had no involvement in Potato Corner whatsoever in 2010) misleadingly attempting to take credit for Koren's endeavor in expanding Potato Corner to the U.S.: "COO Dom Hernandez narrates, 'Our US franchise, for instance. We were approached by the son of an expat who lived in Pacific Plaza (along Ayala Avenue, Makati). He told us how he skateboarded to Glorietta every day to get his Potato Corner fries.'"  Remarkably, this article was published *after* Dom Hernandez and his family (who allege to have acquired Cinco Corporation's interests in 2017) effectuated Koren's removal from PCJV and instituted this lawsuit against him.

50.     As Potato Corner was a new concept to the American public, Koren and his team were constantly researching, developing, testing, advertising, pricing, and marketing ideas.  Koren worked 70-80 hour workweeks without any compensation just to get Potato Corner off the ground.  Koren was broke and at some point, couldn't even afford to pay his rent.  While the Santa Anita store had yet to reach profitability (and was well below the break-even point), Koren's efforts did lead to growing revenues and repeat customers (and additional press among the Filipino community in the United States and abroad).  At the same time, Magsaysay witnessed how difficult it was to break into the U.S. market and open stores here.  In spite of the fact that NKM was losing money each month, Koren stayed committed to pleasing Magsaysay.

**The LA Group and Cinco Group Have Meetings and Discussions in April-May 2010 to Discuss the Proposed Franchise-Model Business Arrangement**

51.     In the latter part of April 2010, Magsaysay, Montelibano, Montinola, and Bermejo – each a 25% shareholder of Cinco – flew to California with Erlinda S. Bartolome ("Bartolome" or "Lyndah") of GMB Franchise Developers (the Cinco Group's global franchise consultant) to meet with Koren, Nemanim, and Jacoby.  At around the same time, the Cinco Group was dealing with a series of potential violations with the California Department of Business Oversight ("DBO").  Koren was informed that the Cinco Group had possibly run afoul of regulatory rules when they

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

Exhibit 1421 - 0017

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1    licensed rights to the Tanforan Mall and, potentially, to NKM without first having franchise

2    disclosure documents in place.  As such, discussions centered on ways for the Cinco Group to avoid

3    DBO liability, such as treating those stores as "company stores" so that no disclosure documents

4    would be necessary or exempting them from the franchisor's reach altogether by carve-out.[5]

5    52.    Beyond the DBO issues, the parties also discussed the new franchise business.  At

6    the outset of these meetings, Koren did not lose sight of the fact that their side outnumbered his in

7    person and he found it suspicious that all of a sudden all of Cinco's four shareholders (a couple of

8    whom, i.e., Montelibano and Montinola, Koren was told had little motivation to do anything

9    relating to Potato Corner) along with their long-time franchise consultant made the trip to California

10   to meet face-to-face.

11   53.    At an early point in these meetings, Magsaysay turned to Koren and said that he

12   would require that Koren along with Nemanim and Jacoby sign a joint venture agreement in their

13   individual capacities so that it is crystal clear that neither one of them could assign or transfer their

14   interests in this new company – regardless of whether those interests were held in their individual

15   capacity or in an LLC – without Magsaysay's approval.  The minutes of the parties' April 19, 2010

16   meetings reflect this very communication: "Incorporators for the JV Company shall be Amit, Guy

17   and Amir in their individual capacity since Potato Corner would like to establish a lasting

18   relationship with these individuals.  They could invite other investors in their own LLC company

19   but the JV will always be with them individually."

20   54.    Koren found it a bit concerning that Magsaysay made this statement, not so much for

21   its substance – Koren was in it for the long haul anyway and he had already agreed to the same

22

23   _____

     [5] The Cinco Group and DLA Piper ultimately chose to pursue a combination of both options
24   (treating Koren's stores as company stores because there was common ownership between the
     would-be-franchisees [Koren's entities] and would-be-franchisor [what came to be PCJV], *and*
25   exempting the County of Los Angeles [where NKM had opened] and San Francisco
     County/Tanforan Mall [where Potato Corner already had a presence] from PCJV's reach),
26   although the parties in the end decided to issue notices of violations to all concerned anyway in
     cooperation with the DBO.  Fortunately, and due to Koren's efforts and the relationships he came
27   to build with franchisees, no party ever raised liability contentions against the Cinco Group or
     PCJV or sought to rescind any franchise agreement.  On May 2, 2017, a person associated with
28   Cinco sent an email proposing that the Cinco Group "send a letter of appreciation to Guy".

Exhibit 1421 - 0018

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

provision in the NKM License Agreement – but because Magsaysay identified only the three of them as the individuals with whom he'd like to establish a "lasting relationship". Koren was, of course, still under the impression at that time that he would have a majority 60% equity stake in the business and entitled to designate the majority of the members of the board, as Magsaysay had promised him months before. Koren began to suspect, however, that Magsaysay may be angling towards reneging on that promise and trying to influence Koren through a show of force, i.e., strength in numbers, to agree to a shift in the equity and voting interests in this new business favoring Magsaysay and his group. To try and preempt him, Koren made sure to remind Magsaysay and all those present that Tung had already formed PCE Management LLC and PCE Trading LLC and was ready to join Koren's group as their fourth member and invest $600,000. Indeed, there's a reference to that specific announcement in the April 20, 2010 minutes: "Mark will come in with 600K and shall own 15% of PCE."

55. Magsaysay, however, later went on to demand that the two groups flip the percentages the other way: 60% to Magsaysay's group and 40% to Koren's group. This request was a major problem from Koren's perspective because the negotiations had from the outset been based on the assumption that Koren would exercise majority control. This proposal, however, would result in Koren being in the minority. As a result, Koren seriously considered rejecting this new proposed franchise-model business, relying only on the rights he had negotiated before in connection with the NKM License Agreement moving forward.

56. Magsaysay, however, in the face of potential franchise law violations, aggressively attempted to convince Koren to move forward with the franchise-model business. While Koren was visibly upset about this sudden change in position regarding equity percentage, over the course of the next several hours and days, Magsaysay attempted to soothe his concerns, telling Koren not to worry, and that Koren and his group would have all management and operational control, that sooner or later Koren would replace Magsaysay as the "Potato Corner CEO", and that Koren would come to control all of Potato Corner's global operations one day ("Magsaysay Statement No. 9"). "This is *your* company, Guy," ("Magsaysay Statement No. 10"), Mr. Magsaysay repeatedly told Koren. "You have all control and control over your own stores," ("Magsaysay Statement No. 11"),

Exhibit 1421 - 0019

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

he said in sum and substance, "you are free to exempt your stores from any fee and royalty requirements should you wish … you could provide yourself whatever territorial exclusivity you want" ("Magsaysay Statement No. 12").  And, in a showing of good faith, Magsaysay later, over the course of those two weeks said that he would agree to waive all royalties and further license fees ("Magsaysay Statement No. 13").  The following statement in the April 19, 2010 minutes partly confirms the above agreement: "While the LA Team likewise is the Master Licensee for California, the 50% retention was removed in view of the JV for the entire US."

57.     In the ensuing years, Magsaysay groomed Koren to take over all of Potato Corner's global operations.  For example, Magsaysay directed Koren to work with an area developer in Panama who wanted exclusive rights to franchise Potato Corner in Panama.  Koren did a majority of the legwork with this developer and assisted with arranging Potato Corner's expansion in Panama.  Potato Corner's presence in Panama still exists to this day.  In the next few years, Koren met an even larger developer, one whose team had major food industry holdings in all of the Middle East and was connected to a wealthy sheikh.  Koren met with this gentleman multiple times in Los Angeles (at Magsaysay's direction) and worked out the terms of a term sheet.  This developer wanted to initially develop 100 Potato Corner locations in eight or so countries in the Middle East.  With the term sheet in place (that Koren negotiated on behalf of Potato Corner) and a $100,000 deposit from the area developer, Koren led the efforts in helping this developer open their first location in Dubai. While the Middle East developer ultimately decided to move on from Potato Corner because he felt that he could not trust Magsaysay, Koren was a pivotal member in helping lead this expansion.  These examples demonstrate that not only did Magsaysay lead Koren to believe that he would succeed him through his words, he also did so through his actions.

58.     While Koren appreciated Magsaysay's promises, Koren needed reassurances that the basic structure Magsaysay and Koren had agreed upon would remain.  Specifically, the "just us" nature of the business relationship became of paramount importance to Koren, because if Koren were now going to be a minority interest-holder it was critical that Koren have certainty that Magsaysay and the Cinco Group (as then constituted) would remain his business partners.  Simply put, Koren trusted Magsaysay and was prepared to move forward only so long as he – Magsaysay –

4350401.1

GUY KOREN'S VERIFIED THIRD AMENDED CROSS-COMPLAINT

Exhibit 1421 - 0020

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  remained the controlling interest-holder in the Cinco Group.  At that point, Koren became the one

2  insisting that no other "Jo Schmo" would become to acquire any interest (equity, voting,

3  management, or otherwise) in this partnership, which covenant Koren ultimately received.

4        59.    During the course of those two weeks in April-May 2010, Koren met with potential

5  franchisees and, relying on Magsaysay's promises, Koren even agreed to allow these third parties to

6  open Potato Corner stores within the exclusive geographical territory that Koren had previously

7  negotiated for himself.  Because of the impending reformulation of the business relationship, and

8  believing that there were long-term protections in place that would benefit him, Koren's goals had

9  effectively shifted from opening his own stores to franchising Potato Corner to third parties.  In

10  other words, based on Magsaysay's promises, Koren was willing to have others enjoy the benefits

11  of the bargains that he had previously obtained for himself.

**The Parties Continue to Discuss and Negotiate a "Joint Venture Agreement"; the Terms of**

**the Joint Venture Agreement were Modified Through Subsequent Words and Conduct**

14        60.    On or about April 20, 2010, Bartolome forwarded a "working draft" of a "Joint

15  Venture Agreement" to Koren and Nemanim.  That first draft included within it a provision (at

16  Paragraph 2.3) as follows: "The Parties hereby agree that Cinco, Jose P. Magsaysay, Jr., Jose Maria

17  Montinola, Ma. Victoria O. Bermejo and Ricardo K. Montelibano shall collectively own sixty

18  (60%) of the Company while Amit Nenamin [sic], Guy Koren and Amir Jacoby shall collectively

19  own the remaining forty (40%) percent."  Tung was excluded from this draft.  Moreover, the

20  document conspicuously omitted who would serve on the Board and which side will have the right

21  to name the majority – four members – to the Board.  This first draft also allowed for the Cinco

22  Group to gain its proposed 60% ownership interest without any capital contribution from them and

23  restricted the company's right to issue a capital call for ten years.  The agreement also excluded

24  "the County of Los Angeles, USA and the County of San Francisco, USA and Tanforan Mall" for

25  the potential franchise law liability concerns addressed above.  The agreement also contained a

26  similar restriction on transfer clause (at Paragraph 2.5.2) as the NKM License Agreement:

27        The _____(LA group) shall not assign any of its/their rights or obligations under
         this Agreement without the prior written consent of Cinco. Any change in the

28

4350401.1

GUY KOREN'S VERIFIED THIRD AMENDED CROSS-COMPLAINT

Exhibit 1421 - 0021

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

shareholding or partnership or sole proprietorship or control or management of
the \_\_\_\_(LA group)\_\_\_\_ shall be considered an assignment.

There was no right of first refusal provision included in this first draft.

61.     As a side-note, Olivas and DLA Piper were ultimately charged with establishing this new business entity and seeing to it that all of the necessary legal work and documentation was correctly put in place.  In an email dated May 11, 2010 concerning issues raised with the first draft of the Joint Venture Agreement, Magsaysay wrote: "We will let our USA lawyers, DLA Piper do all our contracts so that they will marry seamlessly with our franchise direction, specially [sic] because DLA Piper are the ones setting up our Franchise system laws/requirements."  On May 15, 2010, Magsaysay sent a further email stating: "Using DLA Piper with it's [sic] prestige and credibility will be good for us, short and long term.  Whatever DLA Piper will do for us they will defend it in a US court of Law with all their might …" ("Magsaysay Statement No. 14").

62.     On May 18, 2010, Magsaysay sent an email informing Koren that the Joint Venture Agreement was being done by the "SF attorneys" (DLA Piper's San Francisco office, from which office Olivas worked out of) and that, according to Mr. Magsaysay, "… we are so happy to with such sharp people and hard working partners like you" ("Magsaysay Statement No. 15").

63.     On or about May 30, 2010, the parties conducted a "board meeting" of sorts at the Santa Anita mall.  At that meeting, each of the individuals was asked to provide their individual thoughts "on the partnership forged between the two groups".  Koren shared that he was thankful for the opportunity and of Magsaysay.  Magsaysay stated: "we were forewarned by people about partnership with Jews.  But the decision to partner with you was an out-of-the-box decision.  We have managed to grow Potato Corner since we always seek new ways of looking at things.  At Potato Corner, we reinvent, we do not survive in looking for what other companies have done but we grow by taking the untrodden path to decisions and partnerships.  We found the right partners." ("Magsaysay Statement No. 16").

64.     On June 1, 2010, Magsaysay forwarded a revised version of the Joint Venture Agreement that was sent to him by Olivas the day before.  This June 1, 2010 version of the Joint Venture Agreement reflected that the new company would solely be between Cinco (the entity

alone), on the one hand, and Nemanim, Jacoby, and Koren, on the other hand, with the ownership interest in the new franchisor company to be held 60% by Cinco and 40% by LA Group. The draft agreement also modified the restriction on transfer clause (Paragraph 2.d.) including now, a right of first refusal provision providing Cinco the right to purchase any transfer-prohibited shares upon trigger of the right of first refusal at an agreed-to formula. It also deleted the following provision that was included in earlier agreements, presumably, replacing it with the right of first refusal provision: "Any change in the shareholding or partnership or sole proprietorship or control or management of the _____(LA group)_____ shall be considered an assignment."

65.     Koren addressed the right of first refusal provision (and a variety of other issues) with Magsaysay. Koren told Magsaysay that just like he – Magsaysay – did not want to do business with some "Jo Schmo", neither did Koren. Therefore, Koren said, if Koren were going to agree to give Magsaysay the majority equity interest in addition to the voting interest in this new company, then Koren must have similar protections in place such that neither Cinco nor its individual shareholders could sell their interests without first offering Koren and his group a right of first refusal. Magsaysay, for his part, was sympathetic to Koren's position and responded in substance: "Guy, rest assured that we're only going to do business with you … it will be just us" ("Magsaysay Statement No. 17").

66.     In the ensuing days, there was discussion regarding the tax consequences for the Cinco Group concerning this proposed venture. Cinco preferred to have a corporation for the "joint venture" to limit its potential tax exposure. In a June 10, 2010 email, Olivas advised Bartolome (and Magsaysay) to have the joint venture form a limited liability company and for Cinco to form "a US corporation to hold its 60% interest in the LLC". Olivas explained that this structure would allow Cinco to save on U.S. taxes "[s]ince it will not be owning the LLC interest directly" and if any distributions are made by the LLC to Cinco's separate U.S. corporation, that U.S. corporation "could choose not to make a dividend distribution and keep/invest the income here in the US." Magsaysay said that he liked that idea and said that he was "inclined to use" it.

67.     On June 11, 2010, Bartolome circulated a further revised version of the Joint Venture Agreement that she intended to send to Olivas to make the additional proposed changes.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

Exhibit 1421 - 0023

One proposed change included adding Tung as an "Independent/non-voting Director". Another change included making Paragraph 2.d. (which included the right of first refusal clause) mutual.

68.     On June 14, 2010, Magsaysay rejected adding Tung as an "Independent/non-voting Director" because he – Magsaysay – contended that he could not place his trust in Tung the same way he placed his trust in Koren and his group. In Magsaysay's own words:

> I am now leaning towards changing my mind about [Tung] being part of the board of the JV company when to this point he has not proven, to my satisfaction, that he thinks like us and the LA Group (Amit, Guy and Amir). We begun [sic] on mutual trust and this will be a key value the the [sic] JV company shall have. Any person bringing distrust to start a relationship with the JV company should be looked at with concern. The time we proffesionalize [sic] and have proffesianal [sic] managers running things for us is the time we should let contracts and agreements with lawyers concern be ahead of trust. That's why to those who join our journey at this point when all we have is trust, I value them and their partnership and we should reep [sic] the benefits if trusting as blindly. ("Magsaysay Statement No. 18")

Koren respected Magsaysay's decision and responded to his email agreeing that the partnership was built on trust and that when Magsaysay told Koren that it would be "just us" (because of his various concerns of letting outsiders in), Koren understood him completely.

69.     By June 28, 2010, Olivas had made further changes to the Joint Venture Agreement per the Cinco Group's directions, and it was forwarded for review. Olivas confirmed in an email dated June 28, 2010 the substantive changes he had made including that he "added the 4 individuals as signatories to the Agreement," specifically referring to Cinco's four shareholders. Indeed, that June 28, 2010 draft reflected an agreement between the Cinco Group (Cinco *and its four shareholders*), on the one hand, and the LA Group, on the other. **It also made Paragraph 2.d. of the Agreement (the prohibited transfer/right of first refusal provision) mutual such that the Cinco Group, or any of them, could not assign or sell any interests to any party outside of the Cinco Group, and the LA Group, or any of them, could not assign or sell any interests to any party outside of the LA Group without consent and without offering a right of first refusal.**

70.     On July 2, 2010, Bartolome circulated the Cinco Group's comments to this latest draft including comments such as imposing supermajority voting requirements (75%) on certain actions "so that at least there will be two (2) from their side", specifically referencing the amount of

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  manager votes needed from the LA Group in order to pass a resolution requiring a 75% vote.  In

2  other words, to pass a resolution that requires a 75% vote, the Cinco Group would have to get at

3  least two of the LA Group board votes to join the four Cinco Group board votes in passing such a

4  resolution (6 of 7 board votes needed).[6]

5      71.     In or about August or September 2010, Bartolome drafted an informational report

6  concerning PCJV's corporate structure and ownership for use in PCJV's franchise disclosure

7  statement.  In that report, Bartolome declared that the equity ownership breakdown of PCJV was as

8  follows: Cinco Corporation – 56%, Jose P. Magsaysay – 1%, Jose Miguel Ma. G. Montinola – 1%,

9  Ricardo Enrique Kilayko Montelibano – 1%, Maria Victoria O. Bermejo – 1%, Amit Nemanim –

10  16.4%, Guy Koren – 16.4%, Amir Jacoby – 7.2%.  Indeed, even *after* PC International's formation,

11  this document shows that the "Cinco Group" – Cinco and its four owners (Magsaysay, Montinola,

12  Montelibano, and Bermejo) – were to collectively hold 60% of PCJV's equity interest.  Many

13  iterations of this document were exchanged among the parties and DLA Piper over the course of the

14  next several months, all of which included the same ownership breakdown as per above.

15      72.     Later, prompted by an email from Bartolome sent on September 7, 2010 asking for

16  Olivas' review of the Cinco Group's comments to the draft agreement, Olivas, on September 14,

17  2010, sent a further draft of the Joint Venture Agreement, which Bartolome circulated on

18  September 16, 2010.  This document, prepared two months after PC International's formation,

19  again evidences an intent for the *Cinco Group* to hold ownership and voting interests in PCJV.

20  Magsaysay responded to Bartolome's email the same day confirming: "I am ok with this".

21      73.     The parties had several further discussions concerning the Joint Venture Agreement

22  over the ensuing two years and, upon information and belief, the Joint Venture Agreement was not

23

24  _____

[6] Cinco's attempt to remove Koren as PCJV's President was a source of immense friction early in
25  this litigation, with each side arguing over whether a 75% vote referred to a vote of equity
percentages or board votes. Although the Court ultimately got the result right, it could have made
26  quick work of Cinco's and DLA Piper's false and misleading interpretation of the joint venture
agreement if it had this email at its disposal in May 2018 (which it did not).  This email clearly
27  stated: "Amit is suggesting 75% so that at least there will be two (2) from their side."  This is clear
and unequivocal evidence demonstrating that the reference to a percentage vote always
28  contemplated board votes, i.e., 6 of 7 votes to carry a 75% resolution.

Exhibit 1421 - 0025

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1   executed until 2012, likely on or about August 8, 2012.  Although the Joint Venture Agreement was

2   unsigned for some time, the parties conducted and comported themselves in accordance with its

3   principal terms (with some exceptions).  For instance, while the Joint Venture Agreement contained

4   a stock provision concerning a reference to potential "Company-owned stores", the Cinco Group

5   repeatedly informed Koren and the LA Group that they had no intent to fund or open any stores

6   under PCJV.  An October 1, 2010 email from Kim Lambert of DLA Piper to Koren and others

7   confirms this very fact: "Also please confirm that the audit will be of the franchisor entity which

8   will not hold any assets of any stores."  As another example, Magsaysay sent an email on August

9   18, 2011 stating: "Let me clarify one thing.  In franchising or why we do franchising.  1). *Because*

10  *we lack financial resources to put up our own stores* and we need other people's money …"

11  (Emphasis added) ("Magsaysay Statement No. 19").

12      74.    Beyond informing the LA Group that they had no expectation to open any stores or

13  that there was any expectation on the LA Group to provide the Cinco Group any first right to open

14  any stores on behalf of the franchisor entity (because they did not want to open or fund any such

15  stores), as discussed above, Koren had rights through NKM to open up to ten stores under the NKM

16  License Agreement and, when Magsaysay approached Koren to create PCJV, Magsaysay told

17  Koren that Koren could open as many stores as he wanted and give himself as much exclusivity as

18  he wanted, including fee and royalty waivers (which are common in the industry when there is

19  commonality of ownership or management between franchisor and franchisee).  In discussions

20  concerning the Joint Venture Agreement which called for capital contributions from the Cinco

21  Group of $30,000 and the LA Group of $20,000, Koren told Magsaysay and the Cinco Group that

22  $50,000 is much too low to capitalize this business and that the business would need much more

23  capital.  In response, Magsaysay told Koren that he did not want to put in any more money and that

24  Koren should just "figure it out" ("Magsaysay Statement No. 20").  The Cinco Group simply had

25  no desire to invest any substantial sum of money in the U.S.

26      75.    As yet another example of how this joint venture arrangement came to be developed,

27  at some point the LA Group announced its desire to hold all of the LA Group's membership

28  interests (including its rights to voting and management) in an entity, rather than in individual

4350401.1

26

Exhibit 1421 - 0026

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

capacities.  There was no objection to this request; in fact, Olivas believed that the request was appropriate and so advised the Cinco Group.  In a January 4, 2011 email, for instance, Olivas emailed Bartolome and Magsaysay and wrote: "… the LA Group intends to invest in PCJV through NKM … From PCJV's perspective, it does not make a difference if the LA Group's investment is made through NKM.  Furthermore, from the LA Group's perspective, their U.S. tax treatment remains the same, as if they invested in PCJV as individuals.  This is because NKM is an LLC and its pro rata share of income (or losses) from PCJV will go directly to its investors.  Amit and I spoke about this, and we both agree that this should affect the JV arrangements."  In later discussions that Koren had with Magsaysay, Magsaysay also agreed on behalf of the Cinco Group to allow the LA Group to hold its interests in an entity.  Magsaysay was initially concerned regarding whether the LA Group individuals would still be bound by the right of first refusal and transfer restrictions should they elect to hold the LA Group's interests in an entity.  As soon as Magsaysay discovered that those first-refusal, transfer restriction terms, etc. would not be affected if the LA Group individuals were to hold certain of the LA Group's interests in an entity, Magsaysay consented to that request.  As such, and as alleged above, a partnership was later formed in 2013 and then, in 2015, that partnership was converted to an LLC, all of which was disclosed to the Cinco Group and no objection was ever lodged by any member of the Cinco Group to that ministerial change.  With respect to the right of first refusal, the individual owners of the LA Group could choose to exercise that right either through their entity or, if there was a deadlock, through their individual capacity.

**DLA Piper Marshals PCJV Through its Initial Franchise Disclosure Document and Audits Necessitating Executed Documents Between the Cinco Group and LA Group including a Trademark License Agreement, Master Services Agreement, Joint Venture Agreement, and LLC Agreement; PCJV incurs DBO Violations**

76.     Being a franchise operation, PCJV goes through a stringent yearly audit and other regulatory review processes.  In January 2011, PCJV's auditors Singer Lewak (whom Olivas recommended the LA Group to engage on behalf of PCJV) were working with DLA Piper in connection with PCJV's first audit and financial statements.  During that process, Bartolome

4350401.1

27

GUY KOREN'S VERIFIED THIRD AMENDED CROSS-COMPLAINT

Exhibit 1421 - 0027

forwarded to Koren a copy of PCJV's first financial statement which described PCJV's members as the Cinco Group and LA Group.

77.    DLA Piper also prepared PCJV's first Franchise Disclosure Document ("FDD"), which was issued on or about February 7, 2011.  That first FDD makes no reference whatsoever to PC International.  Rather, Cinco is mentioned numerous times.  For example, page 9 of the FDD states: "We relied on Cinco's approximately 18 years of operating stores in the Philippines to compile these estimates plus conducted preliminary due diligence in the United States."  Page 11 states: "We will issue and modify standards and specifications based on our, Cinco's, and our franchise owners' experience in operating Potato Corner Stores."

78.    In or about 2011, PCJV was cited for various DBO violations, and DLA Piper was charged with interfacing with the DBO to assist the parties with these violations.  A major problem was that the company was so undercapitalized, and there was nothing Koren could do about it at the time because the Cinco Group had no desire to inject any more capital into the company.  Ultimately, the responsibility fell on Koren's shoulders to get the company out of trouble (something he never bargained for) and, therefore, Koren led the efforts in notifying franchisees of the violations and assisting the company in dodging *all* contingent liabilities – in the millions of dollars – by 2017.

79.    While DLA Piper was working on PCJV's first FDD, financial statements, etc., there became a need to document an intellectual property license agreement, which DLA Piper directed to be titled a "Trademark, Copyright, and Know-How License Agreement" (the "Trademark License Agreement").  The Trademark License Agreement was entered between PCJV and Cinco and made effective on October 1, 2010.  Koren signed the document on behalf of PCJV.

80.    While this process was ongoing and there were multiple exchanges of emails with DLA Piper, on February 27, 2011, Bartolome emailed Lambert of DLA Piper and confirmed that "no royalty payments have been made from the start" concerning the Santa Anita store and "no monthly royalty payments" would be made in connection with a Topanga store.  The email also confirmed that the Cinco Group had not collected any monthly royalties in connection with a separate, pre-existing franchise in San Francisco.  That same email communication also includes

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

Exhibit 1421 - 0028

comments from Bartolome stating, "Can we request non issuance of the Notice of Violation on the grounds that the Directors/Shareholders of NKM are also Directors/Shareholders of PCJV. Indirectly, the store is owned by the Franchisor considering the shareholders involved.  Santa Anita was used as the prototype to precisely develop the Franchise Business Model of Potato Corner in the US.  It will be the training store also of PCJV."

81.    On April 10, 2011, Bartolome emailed Med Quiambao – a CPA and friend of Magsaysay's who was assisting the parties with accounting for a short period of time – to describe the ownership of PCJV.  Bartolome specifically wrote:

> PCJV USA LLC :  60% breakdown: 56% Cinco Corporation, all other directors like Potato Corner International - 1- share each.  40% breakdown: 16.4% Amit Nemanin, 16.4% Guy Koren and 7.2% Amir Jacoby.

82.    DLA Piper and Olivas in particular were critical participants throughout the LA Group's business relationship with the Cinco Group.  Not only did they perform legal services for the Cinco Group, they also came to perform legal services for PCJV, PCI Trading, NKM, the LA Group (and its individuals), and many of the other parties involved in this case.

83.    Olivas and DLA Piper were also instrumental in utilizing PCJV to assist Magsaysay in his pursuit of obtaining an L1A Visa.  In September and October 2011, various exchanges of emails among Olivas, Magsaysay, Bartolome, Pia Dyquiangco (an immigration attorney, "Dyquiangco"), and others reveal that Olivas created certain PCJV membership certificates solely for the purpose of facilitating Magsaysay's L1A Visa application.  On October 5, 2011, after Dyquiangco's September 27, 2011 request for stock certificates showing "that stocks held in the LLC so 60% to Cinco and 40% to LA Group" and other PCJV documents, Olivas sent an email to his colleague at DLA Piper, Susan Reynholds, asking Ms. Reynholds to "confirm if we already have issued stock certificates (or the equivalent for an LLC) to both Cinco Corporation (60%) and the LA Group (40%)".  This email exchange ultimately led to Olivas forwarding stock certificates to Nemanim for signature so as to help facilitate Magsaysay's L1A Visa application.

84.    On February 28, 2012, Koren discussed with Olivas certain disputes of the LA Group with Nemanim and proposed restructuring the LA Group.  Olivas sent Koren an email that

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

Exhibit 1421 - 0029

day confirming that telephone discussion that Cinco and the Cinco Group were entitled to the 60% profits in PCJV. Olivas specifically wrote: "With respect to the 40% profits in PCJV (determined after paying the 30% management fee to the LA Group, and the 30% license fee to Cinco), as stated in the JV agreement, this will be shared 60% for the Cinco group, and 40% for the LA Group, but only after the operating expenses are deducted." With respect to any future stores Koren was to open (up to 9 additional), Olivas confirmed that "[n]o additional payments will be due to Cinco …": "I understand that the existing license agreement included an initial payment by NKM LLC to Cinco of $15k for the right to open up to 10 stores in the LA territory. Thus far, only one (Santa Anita) has been opened by NKM. The existing license agreement will further be amended so that the rights to open 9 new stores in the LA territory will be transferred by NKM LLC to J&K LLC. No additional payments will be due to Cinco for these rights, apart from those already stated in the existing license agreement."

85. On or about June 18, 2012, a Master Services Agreement between the LA Group and PCJV was documented.

86. On June 29, 2012, Kim Lambert of DLA Piper emailed Olivas and copied Koren to request a signed operating agreement for PCJV "that shows the equity of each partner" for the auditors.

87. On July 23, 2012, Bartolome emailed Koren to request certain papers "for the Cinco Board" and confirmed that "Ben is sending me the signature blocks for the Operating Agreement and will send to you as soon I as I receive it."

88. On August 7, 2012, Singer Lewak emailed Koren and others a draft audit report for the year ended 2011 and demanded a "signed LLC Agreement" before it would be able to issue the audit report. Page 12 of the audit report states that the Cinco Group and the LA Group are the members of PCJV and further provides that "[t]he Cinco Group contributed $30,000 and owns sixty (60) percent of PCJV's capital accounts."

89. As Singer Lewak was consistently pressuring the LA Group and Cinco Group to send them a "signed LLC Agreement" so that it could issue an audit report, Olivas and DLA Piper scurried to put one together based on the Joint Venture Agreement (which Koren is informed and

GUY KOREN'S VERIFIED THIRD AMENDED CROSS-COMPLAINT

4350401.1

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

Exhibit 1421 - 0030

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1   believes was still unsigned at the time). As the Court became well aware during the injunction

2   proceedings last year, the end result – PCJV's Limited Liability Company Agreement (the "LLC

3   Agreement") – is not exactly a model of clarity but it does, however, capture many of the Joint

4   Venture Agreement's salient points including that, according to Paragraph 3.1, "Pursuant to the

5   Joint Venture Agreement entered into by the Members on 8.8.12, the Members shall be classified

6   and designated as either part of the Cinco Corporation (Philippines) group (the "Cinco Group") or

7   the LA group (the "LA Group"). Both the Cinco Group and the LA Group agreed to the specific

8   rights and obligations granted to each group, and undertake to fully observe the rights vested to

9   each group under the Operating Agreement." The reference to "8.8.12" leads Koren to believe that

10  the Joint Venture Agreement (and very likely also the LLC Agreement) were executed on August 8,

11  2012 (a day after Singer Lewak's August 7, 2012 email) in accordance with the need to provide

12  executed documents to the auditors at that time. A true and correct copy of the executed Joint

13  Venture Agreement is attached as **Exhibit "B"** to this Third Amended Cross-Complaint, and

14  incorporated by reference hereto. A true and correct copy of the executed LLC Agreement is

15  attached as **Exhibit "C"** to this Third Amended Cross-Complaint, and incorporated by reference

16  hereto.

17      90.    Of note, the Joint Venture Agreement at Paragraph 2.d. states:

18      Neither Party shall assign any of its rights or obligations under this Agreement
        nor his/its member interests in the Company without the prior written consent of
19      the other Party. In the event either Party desire to transfer or sell his/its pro rata
        members interest in the Company to a person other those specifically named in
20      Section 1(a) of this Agreement, such Party shall be obligated to sell the same first
        to the other Party, which has have thirty (30) days within which to exercise its
21      rights of first refusal from the date of receipt of a written notice to sell. For this
        purpose, the Parties hereby agree that the right of first refusal may be exercised in
22      accordance with the following formula: The average of the Company's earnings
        before interest, depreciation, taxes and amortization (EBITDA) for the last two
23      (2) years multiplied by 5 times, and further multiplied by the percentage of
        member interest subject to such right of first refusal over total outstanding
24      member interests.
25

26      The above provision formed the bedrock principle on which their relationship would rely,

27  i.e., that they would only do business with each other. Again, all of the individuals to the Joint

28  Venture Agreement agreed to this provision – in their individual capacity – so that it was clear that

4350401.1

31

GUY KOREN'S VERIFIED THIRD AMENDED CROSS-COMPLAINT

Exhibit 1421 - 0031

1  neither Cinco nor any of its shareholders or any one of the LA Group members could transfer any

2  interests without consent or without offering the other side a right of first refusal.

3      91.    For its part, the LLC Agreement also captured the right of first refusal (Paragraph

4  3.3), transfer restrictions (Paragraph 3.7), and assignment of interests (Paragraph 8.1).  The right of

5  first refusal (at Paragraph 3.3) states:

> A Member of the Cinco Group or the LA Group shall not assign any of its rights
> or obligations nor his/its Member Interests in the Company outside of the Cinco
> Group and the LA Group, without the prior written consent of the non-assigning
> group.  In the event a Member of either the Cinco Group or the LA Group desire
> to transfer or sell his/its pro rata members interest in the Company to a person
> other those in either the Cinco Group or the LA Group, such Member shall be
> obligated to sell the same first to the existing Members, which has have thirty (30)
> days within which to exercise its rights of first refusal from the date of receipt of a
> written notice to sell.  For this purpose, the Parties hereby agree that the right of
> first refusal may be exercised in accordance with the following formula: The
> average of the Company's earnings before interest, depreciation, taxes and
> amortization (EBITDA) for the last two (2) years multiplied by 5 times, and
> further multiplied by the percentage of member interest subject to such right of
> first refusal over total outstanding Member Interests.

15     92.    Paragraph 8.1 of the LLC Agreement explicitly provides: "An Economic Interest is

16  assignable in whole or in part, provided, however, that no Membership Interest may be assigned to

17  any Person … without the consent of Members required pursuant to Section 3.7."  In other words,

18  even if the right of first refusal did not exist, Paragraph 8.1 served as a backstop to ensure that only

19  an "Economic Interest" (defined in Paragraph 1.18 to mean "A Person's right to share in the

20  income, gains, losses, deductions, credits or similar items of, and to receive Distributions from, the

21  Company, exclusive of any other rights of a Member including, without limitation, the right to vote

22  or to participate in management, or any right to information concerning the business and affairs of

23  the Company") may potentially be assignable but not any other rights of a Member, such as the

24  right to vote, participate in management, or right to information.

25  / / /

26  / / /

27  / / /

28  / / /

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

GUY KOREN'S VERIFIED THIRD AMENDED CROSS-COMPLAINT

Exhibit 1421 - 0032

**Koren and Jacoby's Relationship with Nemanim Deteriorates; Jacoby Induces Koren to Provide Jacoby Additional Ownership Units in Various Entities in Exchange for Jacoby to Fund 100% of Koren's Capital Contributions Going Forward**

93.     Beginning in or about February 2011, Koren and Jacoby's relationship with Nemanim began to sour.  Nemanim was not following through with certain assignments, took extended vacations, and generally seemed apathetic.  Nemanim's work effectively fell on Koren's shoulders.  Indeed, Koren and Jacoby were not happy with Nemanim's effort.  And Nemanim, for his part, ultimately agreed to part ways with Koren and Jacoby.  Recognizing an opportunity to obtain some of Nemanim's shares in NKM and the LA Group, Jacoby requested a meeting with Koren.

94.     Sometime in or about April 2012 (at or about the time Jacoby was leaving to celebrate Passover in Israel or was just returning from that vacation), Jacoby called Koren and told Koren that he wanted to talk.  The two met that same month at Koren's father's home in Los Angeles for an afternoon/evening meeting.  They took turns shooting baskets at a basketball hoop at the home and later sat down to discuss Potato Corner.  "Potato Corner has the potential to be huge, like conglomerate huge," Jacoby told Koren.  "I know," Koren retorted.  "I don't think you understand me … if we do this right, everything you've told me that you want – your wish list, your house in the Philippines, your house in Israel, playing polo – everything you've ever wanted, you could have in 10-15 years," Jacoby continued.  "I know, I always felt that this could be big," Koren told Jacoby, desirous to know exactly what Jacoby was getting at.  That conversation that same day continued, in sum and substance, as follows:

| | |
|---|---|
| Jacoby: | "You're right.  The second you told me, you had me sold.  Where do you see the business going?" |
| Koren: | "I see us growing and having locations all over California." |
| Jacoby: | "We can have at least 20 good ones in LA … I want to be a bigger part of it.  Now with Amit out of the picture, obviously there's more equity.  Obviously, you're going to need more money.  Obviously, you'll need to find investors." |
| Koren: | "Won't be a problem.  I'll get them.  I know people." |

4350401.1

33

GUY KOREN'S VERIFIED THIRD AMENDED CROSS-COMPLAINT

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

Exhibit 1421 - 0033

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

Jacoby:     "I know you do, but I don't want you to do that.  I want to be your bank.
You will not have to worry about money.  Think about that.  Think about the
20 stores you could have and you don't have to worry about the money part.
I believe you can raise the money, but it won't be that easy.  Here, basically
I'll be your bank and you find your locations and you and I will be equal
partners.  I want to have this conversation one time and one time only, and
then we're off running."

Koren:      "Ok, Amir.  I'm down.  Just remember that all I have are my shares.  Once I
give you my shares, I don't have anything else to give.  If I give you
everything I have right now, I'm trusting you not to screw me."

95.     Through this conversation arose a verbal agreement between Jacoby and Koren, the
terms of which were simple: Jacoby would fund 100% of Koren's capital contributions in any
Potato Corner-related business going forward in exchange for an equal stake in such business (the
"Jacoby-Koren Agreement").  And, due to Jacoby's promises, Koren agreed to provide Jacoby an
even larger stake in the LA Group (discussed further below).

**Koren, Jacoby, and Tung Open Two Additional Stores in 2012, Both of Which Fail;**
**Jacoby Threatened to Modify the Jacoby-Koren Agreement But Ultimately Agreed to Work**
**Things Out**

96.     While Koren and his team were still struggling with the Santa Anita location and his
focus had suddenly turned to assisting the Cinco Group with the creation of this U.S.-based
franchise business to help them avoid liability, and in keeping his promise to Magsaysay to help
grow the brand, Koren utilized his contacts and connections within Westfield (connections he made
through his lengthy discussions and negotiations with Westfield concerning the Santa Anita store)
and proceeded to negotiate and open, in 2012, two additional Potato Corner outlets in the Westfield
Valencia Town Center in Santa Clarita, California and Westfield Fashion Square Mall in Sherman
Oaks, California.

97.     With regard to these two stores, Koren had anticipated that he and Jacoby would be
the only owners and Jacoby would fund 100% of the capital contributions for both of them.  Jacoby,

Exhibit 1421 - 0034

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1 however, had another idea: why not invite a third investor (i.e., Tung) to participate and sell that

2 investor shares in the new businesses in exchange for a bigger investment?  What was ultimately

3 decided was that Tung would fund 50% of all capital needed for these two stores and would receive

4 a 30% stake in the businesses.  Koren and Jacoby would split the remaining 70% equally.  In effect,

5 Jacoby received a discount and was only required to fund 50% of the capital contributions, which

6 he did in accordance with the Jacoby-Koren Agreement.

7        98.      The Potato Corner Valencia and Potato Corner Fashion Square stores were not

8 profitable, however.  Indeed, Koren, Jacoby, and Tung suffered losses of approximately $1 million,

9 if not well more than that, due to these stores and were forced to cut their losses and move on.  The

10 Valencia store was closed on December 31, 2013 and the Fashion Square store was closed on

11 January 8, 2017.  The Fashion Square location in Sherman Oaks was near and dear to Jacoby's

12 heart.  That location was closest to his home and he was the principal driver in influencing the

13 group to open a Potato Corner outlet in that mall.  Unfortunately, due in large part to the losses they

14 incurred at Valencia and Fashion Square, Koren's relationship with Jacoby was never quite the

15 same after that.  In light of the failed investment in these stores, Jacoby threatened to modify the

16 Jacoby-Koren Agreement.

17        99.      To be specific, in or about 2014, a Potato Corner location at the Americana mall

18 came up for sale.  Jacoby and Koren were interested in purchasing it, and Jacoby authorized Koren

19 to offer no more than $220,000 for it.  Jacoby also informed Koren that he would like to have a

20 third party investor (i.e., Di Xie) to pay 50% like the same arrangement they had with Tung in

21 connection with the Valencia and Sherman Oaks locations.  Regarding Jacoby's obligation to fund

22 Koren's capital contribution, the following conversation between Jacoby and Koren took place (in

23 sum and substance):

24       Jacoby:    "I can't put the money for you, but I'll loan you the money interest free."

25       Koren:     "What?  We had a deal.  You already have the percentage in the other

26                  companies.  Are you going to give me back the percentage?"

27       Jacoby:    "Things change.  No, I don't want to give you back the percentage."

28       Koren:     "Let's go back to the beginning."

4350401.1

GUY KOREN'S VERIFIED THIRD AMENDED CROSS-COMPLAINT

Exhibit 1421 - 0035

1      Jacoby:      "No way …. Ok, we'll work out something.  We'll see how Americana and

2      future stores do, and we'll decide later."

3      100.    Jacoby was obviously concerned about his failed investment in Valencia and

4 Sherman Oaks.  He suddenly threatened to change the deal he had made with Koren, but ultimately

5 agreed to work it out later depending on the performance of Americana and other stores.

6      101.    Over the course of the following year, if not longer, Koren pursued Jacoby to

7 confirm the details of their arrangement.  Jacoby delayed having this discussion, however.  "We'll

8 figure it out," Jacoby kept telling Koren.  In arguments over this issue, Jacoby threatened to

9 withdraw funding and to "collapse the business" in attempting to persuade Koren to agree to

10 modify the Jacoby-Koren Agreement.  But throughout this time, Jacoby continued to fund Koren's

11 capital contributions and promised to fund additional ventures.

12      102.    Koren attempted to work things out with Jacoby.  To avoid conflict, Koren began

13 advancing some payments to Jacoby in or about 2015 with the understanding that the two would sit

14 down to discuss a potential formal modification to the Jacoby-Koren Agreement.  Jacoby accepted

15 these payments on the understanding that they were a mere accommodation, and that any long-term

16 revisions to the relationship would need to be negotiated.  While negotiations ensued, and emails

17 exchanged over the subject in or about October 2015, Jacoby and Koren never reached an

18 agreement to modify the Jacoby-Koren Agreement.

19      **The Parties Execute an Amended Joint Venture Agreement**

20      103.    Beyond the losses incurred with the stores, the various DBO violations that exposed

21 the LA Group – and Koren personally (because they had yet to shield the LA Group through an

22 entity) – to millions of dollars of contingent liability, and the fact that Koren was not making any

23 money in this venture, as discussed above, Koren's and Jacoby's relationship with Nemanim

24 deteriorated.  Koren and Jacoby ultimately resolved their disputes with Nemanim through a

25 settlement agreement and Nemanim exited the venture.

26      104.    The Cinco Group and LA Group held a PCJV board meeting on October 16, 2012, at

27 which time it was decided by a unanimous vote to require, among other things, that Koren formally

28 be named as PCJV's President and that a 75% vote of the 7 voting representatives would be

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

Exhibit 1421 - 0036

1    required to replace the President (Koren), the Corporate Secretary (Bartolome), and the Treasurer

2    (Bermejo) from then forward.

3       105.    On or about the next day, October 17, 2012, the parties entered into the First

4    Amendment to the Joint Venture Agreement (the "Amended JV Agreement").  The Amended JV

5    Agreement included the modified provisions discussed above and, in some places, made reference

6    to Cinco's shell corporation, PC International and the "PCI Group" (defined collectively as PC

7    International and the four Cinco shareholders).  In other places, the Amended JV Agreement made

8    reference to "Cinco" and the "Cinco Group", i.e., in the fourth "whereas" clause ("WHEREAS,

9    Cinco may assign …"), Paragraph 2.b. ("… the Cinco Group shall contribute …"), Paragraph 3.a.

10   ("… the Management shall be composed of seven (7) members, four (4) of whom shall be

11   designated by the Cinco Group …"), Paragraph 3.g. ("… Master License Agreement with Cinco

12   …"), Paragraph 3.g.ii.1. ("Payments shall be made to Cinco …").  For all intents and purposes, the

13   Cinco Group continued to exercise voting and management rights in PCJV and, aside from having

14   PC International formally recognized as the Cinco Group's arm to shield them from potential tax

15   exposure, there was no change to the relationship between the Cinco Group and the LA Group.  To

16   be clear, neither Koren nor the LA Group agreed then nor did it even occur to them that by inserting

17   PC International into this agreement, the Cinco Group would one day contend that they could get

18   around the right of first refusal by transacting shares outside of PC International.  Had they

19   disclosed this fact to Koren, Koren would not have agreed to allow them to effectively render the

20   right of first refusal a nullity.  As far as Koren was concerned, he was still dealing with the same

21   people, the Cinco Group, and he had received prior assurances that it would always be "just us."  A

22   true and correct copy of the Amended JV Agreement is attached as **Exhibit "D"** to this Third

23   Amended Cross-Complaint, and incorporated by reference hereto.

24      106.    In light of Nemanim's exit, Jacoby approached Koren and requested that Koren

25   allow Jacoby's wife, Inbal Jacoby, to replace Nemanim as a voting representative on the PCJV

26   board.  Koren, desiring to maintain harmony within his group, obliged though he was and remained

27   concerned about the effort to have Mrs. Jacoby – who'd had no previous high-level involvement in

28   the business – into a voting role.  But given that Koren, as the controlling interest-holder of the LA

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

4350401.1

37

GUY KOREN'S VERIFIED THIRD AMENDED CROSS-COMPLAINT

Exhibit 1421 - 0037

1  Group, could always replace LA Group's voting representatives in PCJV if the need ever arose, he

2  accommodated Jacoby's request.

3  **The LA Group Memorializes a Partnership Agreement and Later Converts the Partnership**

4  **into an LLC**

5       107.    Initially, Koren and Nemanim collectively held 76% of the equity ownership

6  interests in the LA Group, with Jacoby holding the remaining 24%.  Upon Nemanim's exit, the

7  ownership interests in the LA Group changed, such that Koren came to hold a 61.3% equity interest

8  and Jacoby came to hold a 38.7% interest.  Again, Koren granted this additional equity interest to

9  Jacoby based on the promises Jacoby had made to Koren.  On or about March 1, 2013, Jacoby and

10  Koren executed the PCJV-LA Group Partnership Agreement (the "Partnership Agreement")

11  memorializing the LA Group relationship.  Paragraph 13 of the Partnership Agreement states in no

12  uncertain terms that Koren, as the LA Group's Managing Partner and majority percentage interest

13  holder, would have the sole management and authority to act on behalf of the partnership, including

14  making compensation decisions for the partners (Paragraph 15).  A true and correct copy of the

15  Partnership Agreement is attached as **Exhibit "E"** to this Third Amended Cross-Complaint, and

16  incorporated by reference hereto.

17       108.    In light of concerns over potential liability, especially given the ongoing issues with

18  the DBO, Koren and Magsaysay discussed the need for the LA Group to convert the Partnership

19  into a shielded entity.  Magsaysay and Koren talked about this repeatedly and Magsaysay's only

20  objection to the conversion to an entity involved the question of whether Koren and Jacoby would

21  still be bound by the right of first refusal.  Once Koren assured Magsaysay that it made no

22  difference whether the LA Group held PCJV interests in a partnership or an LLC, and that Koren

23  and Jacoby would be bound by the right of first refusal either way, Magsaysay consented to the

24  conversion into an LLC.  Thus, on or about July 22, 2015, the LA Group Partnership was converted

25  to the LA Group, LLC (Potato Corner LA Group, LLC), and rather than creating a new set of

26  operating agreements, Koren and Jacoby agreed to remain bound by the Partnership Agreement that

27  they had executed in March 2013 in connection with the LLC and they governed themselves by the

28  Partnership Agreement's terms.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

4350401.1

GUY KOREN'S VERIFIED THIRD AMENDED CROSS-COMPLAINT

**Exhibit 1421 - 0038**

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**In 2015, the Cinco Group and LA Group Engage in Buyout Talks and Agree on a Contingent Agreement for the LA Group to Acquire all of PCJV's Interests; the Cinco Group Infuses its 60% Portion of Capital into PCJV**

109.    In early 2015, differences between the Cinco Group and the LA Group had materialized concerning undercapitalization and multiple inquires by the DBO, among many other things.  PCJV was suffering due to the mounting fees needed to defend the DBO inquiries which were amplified by the Cinco Group's general apathy towards PCJV, refusal to assist with PCJV's governance, refusal to support the LA Group's efforts in growing PCJV, and their refusal to properly capitalize PCJV.

110.    Throughout this time, it became apparent that the Cinco Group intended to rid themselves of any and all responsibilities and duties involving PCJV.  Therefore, the LA Group made a good faith offer to purchase the Cinco Group's PCJV shares.  In response, on or about May 25, 2015, the Cinco Group (through Olivas) made a counter-offer proposing to sell "Cinco's 60% equity interest in PCJV for $750,000."

111.    What transpired next was a meeting between Koren and Olivas to discuss the terms of Cinco's counter-offer and several further discussions with the Cinco Group.  Out of those discussions arose an agreement in principle to transfer the Cinco Group's 60% interest in PCJV to the LA Group in exchange for a licensing agreement provided that PCJV was cleared of its then-existing DBO violations and potential contingent liabilities.  Koren agreed to this condition.

112.    On or about August 8, 2015, Montelibano of the Cinco Group sent a letter to Jacoby and Koren stating that he was writing "[o]n behalf of the Cinco Board of Directors" concerning franchise law violations.  Montelibano alleged: "We note that when these potential violations occurred, the Cinco directors who represented Cinco's interests in PCJV had no knowledge of the potential franchise violations."  The suggestion that the Cinco directors did not know about the potential franchise violations was false, of course, but what is noteworthy about this letter is that Montelibano concedes that Cinco maintains the interests in PCJV.

113.    On or about November 4, 2015, Jacoby and Koren sent a detailed letter to the Cinco Group (through Bartolome) setting forth, among other things, the LA Group's issues with the Cinco

Group and its lack of support, both financial and otherwise, to the company along with the various

DBO and undercapitalization issues of the company, and the negligent legal advice provided from

the start through lawyers that the Cinco Group insisted they use.  As part of that letter, Koren and

Jacoby specifically made clear that:

> It has now been clearly documented that the Company was and up until now has
> been clearly undercapitalized.  No reasonable person would consider $50,000
> sufficient initial capital to conduct a formal franchising operation.
> Undercapitalization is one of the key determining factors to permit a claimant to
> "pierce the veil" of limited liability that might otherwise exist with a limited
> liability company.  As a result, failure to provide adequate additional capital will
> likely result in direct personal liability to the members of the Company.  Public
> policy mandates that the Company's members provide additional capital or
> personally absorb any liability claims.  The LA Group has provided its share of
> what has been reasonably projects as a "minimum" additional capital
> contribution, which means that if Cinco Group does not provide its proportional
> capital contribution or permit the Company to raise that capital from other
> sources, that the Cinco Group and its members will be exposed to personal
> liability for any unmet obligations of the Company.

114.    On or about November 12, 2015, PCJV held a "members meeting" to address the

DBO issues and PCJV's contingent liabilities.  The meeting was somewhat contentious, and of the

Cinco Group, only Bermejo attended without a proxy.  Magsaysay, Montinola, and Montelibano

attended through proxies, two of whom delegated their votes to Olivas.  Bartolome, Koren, and

Jacoby were also present.  With respect to a $500,000 capital call (to help get PCJV out of trouble

with the DBO), the Cinco Group ultimately decided to meet its capital call requirements.

Accordingly, in 2015, the Cinco Group contributed $300,000 in capital (circuited through PC

International) and the LA Group contributed $200,000.  Among other things, the meeting minutes

of that November 2015 meeting show that Koren and Jacoby expected PCJV to need $2 million in

operating capital per 45 stores, that the breakeven point for PCJV would be 125 stores in 7 to 10

years, and that once PCJV had 250 stores under contract, PCJV could then give substantial

dividends to its members.

/ / /

/ / /

/ / /

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

4350401.1

40

**Exhibit 1421 - 0040**

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**Internal Turmoil Rocks the Cinco Group in 2016 and Koren was Given "Priority" to Purchase Cinco's Shares and Become Cinco's CEO as was Promised to Him Years Earlier**

115.    In or around mid-2016, it was discovered that Magsaysay was having an affair with Bermejo.  (One of Cinco's original founders was Bermejo's husband, who passed away thus leaving his Cinco shares to Bermejo.  Bermejo is also the sister of Montelibano, another Cinco shareholder.)  This affair caused some internal turmoil within Cinco, mostly for Bermejo as Montelibano (Bermejo's brother) and others came to cast the blame on Bermejo for the affair.  The affair further heightened the issues the LA Group was already having with the Cinco Group.

116.    In the ensuing chaos, Koren learned that Magsaysay was interested in selling Cinco altogether.  Koren spoke with Magsaysay about the proposed transaction on September 26, 2016, **and Magsaysay agreed with Koren that Koren must have priority in purchasing Cinco.**  Koren noted that the proposed sale would necessarily include the transfer of an equity interest in PCJV, given the Cinco Group's 60% ownership interest of that entity, as well as all other global interests.

117.    Accordingly, Magsaysay introduced Koren to Lito Sibayan, Mabuhay Capital's President.  Between September 28, 2016 and December 10, 2016, Koren exchanged multiple emails with Magsaysay and representatives of Mabuhay concerning the potential transaction.  On October 28, 2016, Koren participated in a telephone conference with Lito Sibayan and two of his colleagues, Barbie Torres and Miki Chua.  During that call, the parties discussed the proposed transaction and Koren requested Cinco's financials before he and a third party investor could submit a fair offer.  Rather than provide the financials as requested, Mabuhay emailed Koren a draft Letter of Intent ("LOI") demanding that Koren sign it before engaging in any due diligence effort.  The asking price was well over market value.

118.    Koren continued to communicate with Mabuhay during the course of the following few weeks.  On December 10, 2016, Koren expressed his concern that Mabuhay was improperly demanding that he execute the LOI before signing a non-disclosure agreement ("NDA") and reviewing Cinco's financials.  Koren had expected to sign the NDA, receive the financials, perform due diligence, thereafter submit an LOI and initial term sheet, conduct further diligence and finally, draft and sign a final agreement.  Accordingly, Koren suggested the parties either follow the

4350401.1

41

GUY KOREN'S VERIFIED THIRD AMENDED CROSS-COMPLAINT

Exhibit 1421 - 0041

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

process he outlined or that Koren would sign the LOI if the section concerning the price was stricken, to allow for a review of Cinco's financials before agreeing to a price calculation.

119.    On December 10, 2016, Lito Sibayan followed up on Koren's proposal, specifically stating that "[w]e fully agree with you on the process you outlined. We would likely have pursued a similar process if Joe had not wanted us to give you priority, on the basis that his desired EV/EBITDA multiple of 10x for 75% is acceptable." Lito Sibayan went on to state his apparent basis for the calculation, concluding that he would keep me "posted on process when we get new directions from Joe in the next few weeks." Koren patiently waited but did not hear from Magsaysay, Mabuhay, or anyone after this communication.

120.    After not hearing back from Magsaysay, Mabuhay, or anyone, in or about February-March 2017, Koren grew concerned that they may be shopping Cinco's shares on the open market. Thus, Koren wrote the Cinco Group to remind them of their obligations under the PCJV governing documents. Koren also exercised the contractual right to purchase any shares that the Cinco Group may desire to sell at the agreed-to formula under the PCJV governing documents.

121.    A few weeks later, Koren received a response to his letter (strangely from Montelibano) denying that there was any intent to transact any shares. Montelibano specifically stated, "there has been no attempt to sell any of its membership interest in PCJV" ("Montelibano Statement No. 1"). The representations in Mr. Montelibano's March 2017 letter turned out to be false. According to declarations and pleadings filed in this action, sometime in mid-2017, the Cinco Group sold 55% of their shares to the Hernandez Group, without any advance notice to Koren, without his consent, and without providing Koren the right of first refusal.

**The Cinco Group Surreptitiously Engage in Transactions with the Hernandez Group in 2017; The Cinco Group, LA Group, and Hernandez Group Enter into a Settled Agreement, but Jacoby Steals Money and he and his Wife Interfere with that Agreement; The Cinco/Hernandez/Jacoby Groups Along with Olivas then Conspire to Remove Koren**

122.    The Cinco Group worked hand in hand with the Hernandez Group to conceal their transactions, very finite details of which were only disclosed to Koren *in September 2019 shortly before the filing of this Third Amended Cross-Complaint*. Nevertheless, although Koren objected to

Exhibit 1421 - 0042

the Hernandez Group's involvement, Koren agreed to have discussions with them under a reservation of rights. The respective parties eventually came to discuss how they could possibly work together to resolve the ownership and right of first refusal issues, among other things. In those discussions, members of the Hernandez Group agreed with Koren that the LA Group should come to own 100% of PCJV. Thus, in light of the Hernandez Group's willingness to provide complete ownership of PCJV to the LA Group, Koren agreed to work with them to resolve these issues. For their part, the Hernandez Group sought additional information about PCJV's operation, which Koren provided to them per the Cinco Group's direction and consent.

123.    Out of these discussions arose lengthy discussions with the Hernandez Group concerning how PCJV conducted its affairs. In particular, the Hernandez Group requested access to PCJV's Quickbooks, Financial Statements, Tax Returns, and FDDs, all of which Koren granted to them solely in connection with the negotiations to resolve the aforementioned issues. On September 14, 2017, Koren sent an email copying Chad Dominic Hernandez, Marco Del Pilar, and Myrose Victor (all of the Hernandez Group) specifically explaining (in an email below that) how Koren and Jacoby as members of the LA Group collectively held over 50% interests in stores which were "used for franchisee training, product R&D and any & all operational testing & development for PCJV. The company stores do not pay royalties …"

124.    On October 21, 2017, Chad Dominic Hernandez sent Koren an email copying Magsaysay, Myrose Victor, Nicko Falcis, and Marco Del Pilar (in response to an email Koren sent him on October 11, 2017). In Koren's October 11, 2017 email, Koren reiterated that PCJV's members were the Cinco Group and LA Group and that no formal or official notice had been given to PCJV to address the modification of any of PCJV's board members. Koren's email also referred to the "conversion of the relationship" between the Cinco Group and LA Group directly referencing Koren's first meeting with Hernandez when "we had agreed that the first order of business is to restructure PCJV USA through one of two possible options: The First Option, the LA Group would acquire majority control over PCJV USA (Approx 80%-90%) and redo the operating agreement; or Second Option, change the shared operation of PCJV USA to a Master License Agreement between Cinco Group and PCJV USA, with the LA Group as the 100% owner of PCJV USA. We Agreed to

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

Exhibit 1421 - 0043

1    complete this restructure in December before the end of the year." In response to that email,

2    Hernandez confirmed that "Cinco" had agreed in 2015 to invest another $300,000 in PCJV "to

3    preserve its 60% equity ownership": "… the reason why Cinco agreed to invest another $300k in

4    2015 was to preserve its 60% equity ownership upon a capital call by the LA Group, and

5    notwithstanding the requests for Cinco to turn over its equity ownership".

6         125.    Following the Hernandez Group's "due diligence" and substantial back-and-forth

7    (during which time Koren was completely transparent with them and they came to learn the

8    complete ins and outs of PCJV and its operations), an agreement was entered in principle in

9    November 2017 calling for all interests in PCJV to be transferred to the LA Group. In exchange,

10   Cinco (then allegedly controlled by the Hernandez Group) would receive certain fees. Koren

11   agreed to the proposal, and agreed to memorialize it in a further long-form agreement. The

12   agreement in principle is captured in PCJV's November 28, 2017 "meeting minutes":

13       IV. Discussion of Wayforward for PC USA

14       **All attendees have agreed that option "C"  (100% Ownership of PCJV by the LA Group + Master License Agreement between Cinco Corporation (PH Company) and PC USA) will be the best option to proceed with.**

16   Next steps:

17   - LA group will draft a Master License Agreement for the Cinco group to review and prepare comments.

18   - After Agreement is reached both groups will meet at the LA office for signatures.

20   - Simultaneously, all aspects of changing ownership of PCJV and PCIT will be addressed by both parties attorneys

21   - The time line both parties are committing for the completion of the finalization of the Master License Agreement is no later then February 2018

23   A. Status Quo (60% Cinco Group, 40% LA Group)

24   1) Drafting of Master License Agreement between Cinco Corporation and PCJV

25   2) Drafting of revised JV Agreement (including appointment of Officers)

25   3) Drafting of PCJV Operating Agreement and PCIT Sourcing Agreement

26   B. Change in Ownership (60% LA Group, 40% Cinco Group)

27   1) Drafting of Master License Agreement between Cinco Corporation and PCJV

28   2) Drafting of revised JV Agreement (including appointment of Officers)

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**Exhibit 1421 - 0044**

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

3) Drafting of PCJV Operating Agreement and PCIT Sourcing Agreement

**C. 100% Ownership of PCJV by the LA Group + Master License Agreement between Cinco Corporation (PH Company) and PC USA**

**Drafting of Master License Agreement between Cinco Corporation and PC USA entity**

(Emphasis added on Option "C") (the "November 2017 Settled-in-Principle Agreement"). Notably, while the parties were discussing the LA Group acquiring 100% ownership of PCJV and went on to agree and memorialize that agreement in writing in these informal "meeting minutes", there is not a single mention or reference to PC International in these minutes. Rather, the references are all to "Cinco Corporation" and "Cinco Group". Indeed, the parties all believed that the Cinco Group and Cinco were the true parties in interest in connection with the relationship vis-à-vis PCJV, especially when it came to transferring PCJV's interests.

126. On January 31, 2018, Myrose Victor (a member of the Hernandez Group) followed up with Koren concerning the formal memorialization of the November 2017 Settled-in-Principle Agreement. Certainly by that point, the Hernandez Group appeared eager to consummate the transaction. On February 13, 2018, Koren delivered a draft term sheet with the general terms of the proposed agreement. The February 2018 term sheet reflected the agreement the parties had agreed to in principle, i.e., the LA Group would own 100% of PCJV and certain fees off gross revenues would be paid to Cinco going forward.

127. Around the same time, in or about February 2018, Koren and Jacoby's disputes came to ahead. At or about this time, Jacoby first informed Koren that he no longer had any intent in trying to "work things out" concerning the Jacoby-Koren Agreement, and that all investments Jacoby had made will be treated as a loan to Koren. The two also had disputes concerning salaries that the two were drawing from the LA Group. Up until then, Koren was distributing, i.e., gifting, a large portion of his salary (that the LA Group was receiving from PCJV and PCI Trading) to Jacoby, while Jacoby was not working for any of those businesses, but was rather focused on his own full-time construction business. Having devoted his life to the Potato Corner businesses, Koren was rightly concerned that Jacoby was receiving monies as compensation for work performed for PCJV and PCI Trading whereas Jacoby was not actually performing that work.

4350401.1

45

GUY KOREN'S VERIFIED THIRD AMENDED CROSS-COMPLAINT

Exhibit 1421 - 0045

128.    Accordingly, rather than draw additional salary from PCJV or PCI Trading, Koren told Jacoby that he – Koren – intended to reduce the funds he was sharing with Jacoby because Koren felt that Jacoby was not entitled to that compensation, however that Jacoby would be entitled to any distributions any of the companies were to make by virtue of his ownership interests. Wrongfully distressed, Jacoby went on to unilaterally and unlawfully withdraw money from the LA Group's and J&K Consultants Group LLC's bank accounts.  To be specific, Jacoby unilaterally and unlawfully withdrew $37,500 (in two $15,000 and $22,500 withdrawal transactions) on or about February 22, 2018 from the LA Group's bank account, $3,600 (in equal $1,800 withdrawal transactions) on or about March 2, 2018 from J&K Consultants Group's bank account, $4,000 on or about March 9, 2018 from J&K Consultants Group's bank account, and $10,000 on or about March 9, 2018 from the LA Group's bank account.  In all, Jacoby withdrew $55,100 from the accounts over the period of 15 days (from February 22, 2018 through March 9, 2018) (collectively, the "Unauthorized Jacoby Withdrawals").  He has yet to return those funds.

129.    As Koren has now come to discover through documents produced by Jacoby in this litigation, on March 8, 2018, Jacoby wrote an email to the Cinco Group and Hernandez Group (without Koren's knowledge) seeking to "address troubling developments in PCJV USA, LLC", lodging false accusations against Koren and clearly seeking to effectuate Koren's removal from PCJV.  Jacoby wrote: "It is possible that the requirements for the management of PCJV USA, LLC at this stage of its development may require engaging more experienced upper management in addition to or in place of current staff in PCJV USA, LLC or LA Group … I am unable to force Guy to become more accountable … Guy has now requested and unilaterally elected to increase his salary … Please let me know whether Cinco Group, under its current management, is willing to take a more affirmative role … and to hold the current management accountable …"

130.    What exactly ensued before and after this March 8, 2018 email is a source of mystery as none of the parties in this litigation have yet to produce a complete copy of all of the email correspondence.  Jacoby, for his part, took it upon himself to redact complete portions of contemporaneously- exchanged emails.  Documents produced by Jacoby in this litigation, bates-stamped AJ 00081-00085 demonstrate this concerted effort to hide evidence.  Those documents

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

4350401.1

46

**Exhibit 1421 - 0046**

1  also show that the Jacobys together engaged in a surreptitious campaign to provide confidential

2  information to members of the Hernandez Group without Koren's knowledge or authority.  In one

3  email, bates-stamped AJ 00085, Jacoby admits that he had "voiced [his] concern" to Olivas,

4  suggesting that Olivas or his law firm may have been behind this whole scheme.  Jacoby also

5  produced a privilege log in this litigation asserting privilege over a variety of emails including

6  emails with Olivas.

7      131.  Of significant note, sometime later in 2018 (after the Court issued injunctive relief in

8  Koren's favor), Koren and his team discovered a March 2018 email from Magsaysay to Mrs.

9  Jacoby's old Potato Corner email account stating: "noted in this Inbal … lets talk soon. **will share**

10  **with you and Amir our plans before the April 9 Members meeting**.  joe"  (Emphasis added.)

11  This email was sent before Koren was even told about any purported April 9 meeting and clearly

12  demonstrated that there were "plans" in place among these various conspirators seeking to do

13  Koren harm.

14      132.  According to documents produced by Mrs. Jacoby in this litigation, a week

15  following Mr. Jacoby's March 8, 2018 email, Mrs. Jacoby sent an email of her own to the

16  Cinco/Hernandez Groups.  Mrs. Jacoby's March 16, 2018 email which, upon information and belief

17  was not written by her, follows the same theme of Mr. Jacoby's March 8 email.  Following the slew

18  of false narrative against Koren directly (calling Koren out by name in several places), Mrs. Jacoby

19  states: "… I thought you should be aware that the level of reporting and accountability that may

20  have historically been enjoyed by PCJV USA and PCIT USA may soon be changing should you

21  feel it is incumbent upon Cinco Group and/or the Managers to take action to preserve the status quo

22  or at least create a standstill until Cinco Group and its Managers have an opportunity to evaluate

23  what may be best for PCJV USA."

24      133.  Interestingly, as the document bates-stamped AJ 00040 from Mrs. Jacoby's

25  production shows, on the morning of March 19, 2018, Magsaysay responded to Mrs. Jacoby's email

26  stating: "Our legal counsel has been in touch with Amir last week at LA."  Following that email

27  there's a big black box, reflecting a redaction that the Jacobys made before producing this

28  document.  The Jacobys have refused to produce whatever it is that was redacted from this

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

4350401.1

47

GUY KOREN'S VERIFIED THIRD AMENDED CROSS-COMPLAINT

Exhibit 1421 - 0047

document.  In any event, Magsaysay's email reference to their legal counsel being "in touch with Amir last week" further leads Koren to believe that Olivas – as the Cinco Group's counsel – assisted and participated with Jacoby to help effectuate this scheme against Koren.

134.    Later on March 20, 2018, and in a clear attempt at repudiating the November 2017 Settled-in-Principle Agreement, Dom Hernandez circulated a draft non-binding Letter of Intent for Koren's review.  Much to Koren's surprise, the Hernandez/Cinco Groups had suddenly injected a demand that (beyond the licensing fee that was agreed to before), the LA Group pay for the Cinco Group's PCJV interests in the exorbitant amount of *$7,000,000*, a term which the parties never contemplated or agreed upon during the November 28, 2017 meeting.  The Letter of Intent contained other onerous demands that the Cinco and Hernandez Groups knew Koren could not and would not accept, and demanded a response by no later than March 27, 2018.

135.    While the Jacobys and the Cinco/Hernandez Groups were secretly concocting some elaborate scheme to remove Koren from PCJV and otherwise harm Koren, Koren was still mostly concerned about potential harm to the companies by Jacoby's raiding the bank accounts.  At that time, tensions had escalated and Koren did not know (or want to find out) to what ends Jacoby would go to cause the companies (and Koren's livelihood) to falter.  Therefore, on March 26, 2018, and solely in an effort to safeguard PCJV's and PCI Trading's funds from Jacoby's continuing raid, Koren transferred the bank accounts that were held at Wells Fargo to J.P. Morgan Chase Bank.  Koren contemporaneously called Magsaysay to inform him of the reasons for the transfer and to reassure him that the new accounts would be established in the same entity names and that the Cinco Group will obtain full access to the new accounts.  On April 3, 2018, Koren sent Magsaysay a letter memorializing the discussion they had regarding the account transfers and the reasons why Koren had to take the action that he did.  As Koren knows now (but did not know back then), Magsaysay had already forged an alliance with Jacoby and thus insisted that Koren return the funds to Wells Fargo.  Koren agreed to do so provided that the Cinco Group would take action against Jacoby should he – Jacoby – withdraw any money from PCJV's accounts.  Magsaysay agreed ("Magsaysay Statement No. 21") and Koren returned the accounts to Wells Fargo.

/ / /

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

GUY KOREN'S VERIFIED THIRD AMENDED CROSS-COMPLAINT

**Exhibit 1421 - 0048**

136.    On or about March 27, 2018, Magsaysay called a PCJV member's meeting to take place on April 9, 2018.  The proposed topics of discussion seemed innocuous; mainly, the notice signified the intent to elect officers and directors.  In truth, however, the April 9, 2018 meeting was a setup.  The Cinco Group, Hernandez Group, and Jacobys all conspired to remove Koren from PCJV altogether (both as an officer and voting manager).  Indeed, the Hernandez Group affirmatively voted to remove Koren as President and from PCJV's board, despite the fact that they have no voting right whatsoever in PCJV.  Koren thus objected and took action to protect himself, including to remove the Jacobys as LA Group managers and replace them with Thomas Hodgson and Alon Koren.

137.    The very next morning, Cinco – and Cinco alone – initiated this action (through DLA Piper) and sought TRO relief against Koren (which Koren did not know about at the time because they refused to give him notice, but came to discover nearly a month later).  According to the Court's register of actions, that TRO/injunctive relief request was denied.  Also on that day, on April 10, 2018, Myrose Victor, the Jacobys, and at least one attorney ambushed PCJV's offices, demanding that PCJV staff accede to a transition of power and claiming that Koren no longer had any power or control over any business matters whatsoever.  Koren arrived later and objected to the unannounced visit and blatant efforts to interfere with his management and operations of the business.

138.    That same day, April 10, 2018, DLA Piper also sent a cease and desist letter to Koren contending that "a meeting of the Managers was held on April 9, 2018, during which the LA Group and Guy Koren were removed from management by a majority vote (85%) of the Managers and Membership interests."  The reference to 85% could only refer to 6 out of 7 voting representatives in PCJV purportedly voting to oust Koren.  Koren responded to the April 10, 2018 letter asserting his position as to why the April 9, 2018 vote was improper insofar as it was improperly noticed and that Koren's request to appoint new LA Group voting representatives was ignored.  Koren also asserted his position as to why the grounds for the purported termination were baseless and appeared to be a pretext.  (Additionally, the votes by members of the Hernandez Group was ineffectual.)

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

139.    The Cinco Group eventually conceded that they had no proper grounds to remove Koren as a voting representative of the LA Group or to dictate who the LA Group designates as its 3 voting representatives in PCJV.  Therefore, the Cinco Group assented to Koren's replacing the Jacobys as voting representatives of the LA Group with Alon Koren and Thomas Hodgson.  Then, knowing that the April 9 meeting was completely artificial and objectionable, the Cinco Group decided to hold another meeting to try and oust Koren again.

140.    On Friday, April 20, 2018, DLA Piper informed Koren's then-attorney that PCJV had purportedly called a special meeting, this one to take place the very next business day, on Monday, April 23, 2018.  Again, over Koren's objections, the April 23, 2018 meeting proceeded and the Cinco/Hernandez/Jacoby Groups attempted to remove Koren as an officer of PCJV.  The new LA Group voting representatives voted against the initiative to remove Koren as an officer of PCJV.  Despite that, and despite the fact that a 75% vote (at least 6 of 7) was necessary to remove Koren as an officer of PCJV, the purported Chairman (Hernandez) and DLA Piper partner, Mr. Robert W. Brownlie, as Acting Secretary, erroneously and improperly concluded that enough votes were cast to remove Koren from his officerial role in the company.  At that same meeting, the Cinco-aligned parties audaciously decided to change PCJV's banking relationship from Wells Fargo to Citibank and authorized one another (including Olivas, Brownlie's law partner) to be the signatories on the new accounts.

141.    Following the April 9, 2018 meeting and continuing after the April 23, 2018 meeting, the Cinco parties set out on a crusade to publicly disparage Koren and cast doubt on his authority and role within PCJV.  In one example, the Cinco parties sent a letter to Emily Garcia (PCJV employee) to inform her that Koren was removed as a manager and President "due to his breach of his fiduciary and contractual duties to PCJV and its Members."  The letter states that the authorized representatives for PCJV were changed to Inbal Jacoby, Myrose Victor, and Olivas.

142.    Moreover, these same parties also set out to remove Koren from PCJV's office and warehouse, and to discontinue Koren's Potato Corner USA email access (along with the email access of third parties, including franchisees, who were viewed to be loyal to Koren), thus further disrupting Koren's and the LA Group's ability to manage PCJV and comply with their duties and

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1    obligations.  Despite that, Koren was, at the time, continuing to manage PCJV's day-to-day

2    operations from his apartment, and was constantly on the phone with franchisees and others to

3    assist them with their ongoing needs.

4    **The Cinco/Hernandez/Jacoby Groups Prepared PCJV's 2018 FDD Clearly Establishing that**

5    **Cinco/PC International's Claims Against Koren in this Litigation are a Ruse**

6        143.    While there were management items Koren could perform from his apartment, the

7    Cinco/Hernandez/Jacoby groups prevented Koren from complying with other of his duties as

8    President.  One such duty involved working with PCJV's attorneys and accountants to prepare

9    PCJV's 2018 Franchise Disclosure Document.  Interestingly, on or about May 3, 2018 (while

10   Koren was still prevented from performing the majority of his duties), PCJV finalized its Franchise

11   Disclosure Document (the "2018 FDD").  Myrose Victor of the Hernandez Group is named in the

12   2018 FDD as a general PCJV contact.  Olivas is designated as the person to contact at PCJV's Los

13   Angeles office to "discuss the availability of disclosures in different formats."

14       144.    Of significance and in establishing that Cinco and PC International's claims against

15   Koren are nothing more than a pretext to gain some sort of false leverage in this litigation, the 2018

16   FDD (prepared and finalized by persons who are accusing Koren in this lawsuit of wrongdoing,

17   alleging that Koren improperly caused fee waivers for franchisee entities in which Koren has a

18   minority interest in or that Koren improperly caused PCJV to pay himself a salary, and the like)

19   clearly discloses at "Note 7 – Related Party Transactions" to the "Notes to Financial Statements"

20   the following:

- Certain members of the Company who own approximately 40% of the Company's member interests also own and operate 6 franchise locations as of December 31, 2017. No initial franchise fee was paid and monthly royalties have been waived as the stores provide services to the franchisor, including training for new franchise employees and testing new menu items.

- The Company's management has determined these franchisee entities are not variable interest entities required to be consolidated in the Company's financial statements. The Company believes the ongoing value of the services obtained from the use of these franchise locations approximates the value of the initial franchise fee and waived royalties.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

51

GUY KOREN'S VERIFIED THIRD AMENDED CROSS-COMPLAINT

Exhibit 1421 - 0051

- The Company has a contractual obligation to remit 30% of all initial franchise fees and continuing royalty fees collected to certain members who own approximately 40% of the Company and provide management services on behalf of the Company. Additionally, the Company has a contractual obligation to remit 30%, as licensing fees, of all initial franchise fees and continuing royalty fees collected to certain members who own approximately 60% of the Company. Both obligations have been waived by the respective parties for the years ended December 31, 2017, 2016 and 2015.

- The Company is required to pay an annual service fee with certain members who own approximately 40% of the Company. Under the terms of the related agreement, annual service fees for 2017, 2016 and 2015 were $240,000, $181,200 and $181,200, respectively. During the years ended December 31, 2017 and 2016, the Company has paid $240,000 and $181,200, respectively, to these members for the services performed. During the year ended December 31, 2015, the Company has paid $108,300 to these members for the services performed and the remaining $72,900 was waived by the members.

145.    To further expand on the last bullet point above, within approximately two years following PCJV's formation, Nemanim and Koren began drawing minimal salaries from PCJV (approximately $1,500/month).  Over the years, as PCJV's and PCI Trading's cash flow position improved and after Nemanim's exit, Koren began to share his salary with Jacoby, this despite the fact that Jacoby was not working very much for PCJV and had a side full-time construction business.  Beginning in or about 2015, rather than being paid to Koren and Jacoby directly, the salaries began to be distributed to the LA Group, from which they drew their salaries.  While the 2018 FDD describes these payments as "annual service fees", they were really, in essence, Koren's salary, a large portion of which Koren shared with Jacoby.  These payments were no secret to anyone and were approved by the Cinco Group.  Among other things, the Cinco Group had access to Quickbooks software, received annual financial statements, audits, and FDDs, which disclosed these payments.  Despite the contentions made in this lawsuit, these were far from "self-interested transactions".  This was simply compensation for work.

**Jacoby Gets an "Executive Employment Agreement" from the Hernandez Group**

146.    Koren has come to discover through documents produced in this litigation by Jacoby that, on or about May 9, 2018, Myrose Victor of the Hernandez Group sent Jacoby a document

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1   titled "PCJV – Executive Employment Agreement – Amir Jacoby_05092018.pdf".  The Jacobys

2   have refused to produce this agreement; and neither has Cinco or PC International.  Even without

3   the attachment, the May 9, 2018 email in itself shows that a transaction took place or, at the very

4   least, was contemplated between Jacoby, on the one hand, and the Hernandez Group, on the other,

5   and that Myrose Victor sent the agreement "for [Mr. Jacoby's] signature".

**The Cinco/Hernandez Groups Embark on a Campaign of Retaliation, Sabotage, and**

**Interference**

8   147.    Having lost the Preliminary Injunction in June 2018, the Cinco/Hernandez Groups

9   set their sights on ways to retaliate, sabotage, and undermine Koren.  In one instance, on or about

10  August 31, 2018, the Cinco/Hernandez Groups caused a notice to be sent to PCI Trading noting that

11  effective September 1, 2018, there will be a "new price for all Potato Corner Products that we

12  supply to you."  The price sheet attached to the notice reflected a *300% increase* in prices.  This

13  unilateral, unauthorized and transparently retaliatory price increase on goods that PCJV and PCI

14  Trading had been purchasing from the Cinco Group for years departs from a longstanding

15  agreement that the goods would be sold to PCJV and PCI Trading at cost.  Having failed to remove

16  Koren through a Court order, the Cinco/Hernandez Groups plainly attempted to facilitate the same

17  result through economic warfare and ambush.

18  148.    In further attempts of sabotage, and among various other things, the

19  Cinco/Hernandez Groups began to run promotions and marketing schemes without Koren's

20  knowledge or consent, lay claim to funds held in accounts belonging to PCI Trading, mysteriously

21  maintain an office in Los Angeles, and maintain spy software on PCJV's servers.

**FIRST CAUSE OF ACTION**

**(BREACH OF THE JACOBY-KOREN AGREEMENT)**

**By Koren Against Jacoby**

25  149.    Koren re-alleges and incorporates herein by this reference all previous allegations as

26  though set forth herein in full.

27  150.    As alleged above, Koren and Jacoby entered into the Jacoby-Koren Agreement,

28  which was partly oral, partly written, and partly implied-in-fact.

4350401.1

Exhibit 1421 - 0053

151.    Jacoby breached the Jacoby-Koren Agreement in refusing to acknowledge his capital contribution obligations and instead insisting that Koren treat such payments as loans and in other respects refusing to fund those agreed-to capital contributions in the first place.

152.    Koren has performed all conditions, covenants, and promises required by him on his part to be performed in accordance with the terms and conditions of the Jacoby-Koren Agreement except those obligations that Koren was prevented or excused from performing.

153.    Koren has suffered monetary and non-monetary damages legally caused by Jacoby's breaches of the Jacoby-Koren Agreement in the nature and amount to be proven at trial, but that well exceeds the jurisdictional minimum of this Court.

## SECOND CAUSE OF ACTION

### (INDUCING BREACH OF CONTRACT)

### By Koren Against the Hernandez Group

154.    Koren re-alleges and incorporates herein by this reference all previous allegations as though set forth herein in full.

155.    As alleged above, Koren enjoyed the benefits of particular contractual relations which were governed primarily by the PCJV Governing Documents.

156.    Koren alleges that the Hernandez Group had knowledge of the PCJV Governing Documents and intended to induce the parties to those contracts (in particular, the Cinco Group and PC International) to breach the contracts. Despite that knowledge, Koren alleges that the Hernandez Group took specific action to induce the breaches of these contracts, in order to further each of their own special interests.

157.    Koren has suffered monetary and other non-monetary damages legally caused by the Hernandez Group's inducing breaches of the PCJV Governing Documents in the nature and amount to be proven at trial, but that well exceeds the jurisdictional minimum of this Court.

158.    Koren further alleges that in doing the things described above, the Hernandez Group, and each of them, acted with the intent to deprive Koren of his legal rights and to injure him such that the Hernandez Group's actions constitute fraud, oppression, or malice within the meaning of Civil Code § 3294. The Hernandez Group's conduct was and continues to be

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

4350401.1

Exhibit 1421 - 0054

despicable, oppressive, and outrageous, justifying the imposition of punitive and exemplary

damages against the Hernandez Group to make an example of the Hernandez Group and to deter

such conduct in the future in an amount that proof at trial may indicate is appropriate.

### THIRD CAUSE OF ACTION

### (INTENTIONAL MISREPRESENTATION)

### By Koren Against the Cinco Group and Jacoby

159.    Koren re-alleges and incorporates herein by this reference all previous allegations as

though set forth herein in full.

<u>As to the Cinco Group</u>

160.    As alleged above, certain representations were made to Koren over time that induced

Koren to make various decisions.  Those representations include Magsaysay Statement Nos. 1-21

and Montelibano Statement No. 1 (collectively, the "False Representations").  Koren alleges that

the False Representations were made on behalf of and with the authority of the Cinco Group.

161.    The following False Representations induced Koren to believe that:

a.   He would come to succeed Magsaysay one day as Cinco's CEO (Magsaysay
     Statement Nos. 1, 3, 7, 9, 10, 11, 12, 15, 16).

b.   The parties to the business relationship would remain as is (Magsaysay Statement
     Nos. 2, 9, 14, 15, 16, 17, 18, and Montelibano Statement No. 1).

c.   The Cinco Group did not have any expectation of funding or opening Potato Corner
     stores in the U.S. (Magsaysay Statement No. 4, 11, 12, 13, 19, 20).

d.   Koren's agreement to establish and help run PCJV would render a benefit to the
     Cinco Group in return for which he would have full control, full support, and long-
     term protections in place (Magsaysay Statement Nos. 5, 6, 7, 8, 10, 11, 12, 13, 15,
     16, 17, 18).

e.   The Cinco Group would take action against Jacoby in connection with any
     unauthorized withdrawals of funds (Magsaysay Statement No. 21).

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

Exhibit 1421 - 0055

162.    The above categories of representations made to Koren were false and the Cinco Group knew that the representations were false when they authorized Magsaysay and Montelibano to make them.  If not made intentionally, the above representations were made recklessly and without regard for their truth.  The actual truth was:

    a.   The Cinco Group had no intent to allow Koren to take over Cinco's global operations upon reasonable terms.

    b.   The Cinco Group had no intent to honor the "just us" nature of the agreement and had no qualms about allowing outsiders in.

    c.   The Cinco Group (according to allegations in this lawsuit) had an expectation for PCJV to open company stores.

    d.   The Cinco Group did not intend for Koren to have full control, full support, and long-term protections in place.

    e.   The Cinco Group had aligned themselves with Jacoby and had no intent to take any action against him.

163.    In making the False Representations, the Cinco Group intended for Koren to rely on them.  Indeed, Koren reasonably and justifiably relied on the False Representations.  In reliance thereon, Koren changed his position including, but not limited to, dedicating his career to Potato Corner, providing third parties rights to open stores in exclusive territories that he had previously negotiated for himself, devoting his time and attention to a multitude of issues and concerns raised by the prospect of creating and running a franchisor company at the exclusion of exercising his rights under the NKM License Agreement, allowing the Cinco Group to take the majority equity interest in PCJV and board control, returning PCJV's and PCI Trading's funds back to Wells Fargo, etc.

164.    Koren was unaware of the falsity of these representations.  Had he known the truth, he would not have agreed to, among other things, dedicate his substantial time, effort, and expense to expand Potato Corner in the United States nor enter into the PCJV Governing Documents.

/ / /

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

Exhibit 1421 - 0056

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

165.    As a direct and proximate result of the Cinco Group's conduct, Koren has suffered monetary and other non-monetary damages legally caused by the Cinco Group's False Representations in the nature and amount to be proven at trial, but that well exceeds the jurisdictional minimum of this Court.  Koren is also entitled to equitable relief addressing the Cinco Group's fraud, including the retroactive restoration of Koren's majority equity stake in PCJV and majority control of the board.  Koren also requests that the Court exercise its powers in equity to issue appropriate order(s) governing the parties' rights, interests, duties, and obligations, including but not limited to necessary injunctive relief.

166.    Koren further alleges that in doing the things described above, the Cinco Group acted with the intent to deprive Koren of his legal rights and to injure him such that the Cinco Group's actions constitute fraud, oppression, or malice within the meaning of Civil Code § 3294. The Cinco Group's conduct was and continues to be despicable, oppressive, and outrageous, justifying the imposition of punitive and exemplary damages against the Cinco Group to make an example of them and to deter such conduct in the future in an amount that proof at trial may indicate is appropriate.

As to Jacoby

167.    As alleged above in Paragraphs 42-46 and 93-102, Jacoby induced Koren to enter into the Jacoby-Koren Agreement based on the representations that Jacoby would fund 100% of Koren's required capital contributions in NKM and on any future Potato Corner related entities that they may together open, in which future franchisee businesses Koren and Jacoby would each acquire an equal share so long as Jacoby funds all of Koren's required capital contributions.  All of these representations were made by Jacoby in his individual capacity.

168.    In reliance on the foregoing representations, Koren provided Jacoby an equity stake in NKM and the LA Group, and in every other subsequent business entity in which each of them was involved, i.e., the J&K Entities.  Koren also agreed to increase Jacoby's equity stake in NKM and the LA Group based on Jacoby's representations.

169.    Koren alleges that Jacoby's representations were false and that they were made with the intent to induce Koren to relinquish certain interests in his entities to Jacoby.  In fact, the

Exhibit 1421 - 0057

1    truth was – as Koren first discovered in or about February 2018 – that Jacoby did not intend to

2    fund Koren's capital contributions or that he intended to do so only under the right conditions,

3    which were concealed from Koren.

4         170.    Indeed, Koren was unaware of the falsity of Jacoby's representations and

5    reasonably relied on them to his detriment.  Had Koren known the truth, he would not have

6    transferred any equity stake in any of the businesses to Jacoby.

7         171.    As a direct and proximate result of Jacoby's conduct, Koren has suffered monetary

8    and other non-monetary damages legally caused by Jacoby's false representations in the nature

9    and amount to be proven at trial, but that well exceeds the jurisdictional minimum of this Court.

10   Koren is also entitled to rescission of all documents and instruments that provide for the transfer

11   of any equity interest to Jacoby in any business which Koren is involved as well as the retroactive

12   restoration of Koren's respective equity stakes in said businesses.

13        172.    Koren further alleges that in doing the things described above, Jacoby acted with the

14   intent to deprive Koren of his legal rights and to injure him such that Jacoby's actions constitute

15   fraud, oppression, or malice within the meaning of Civil Code § 3294.  Jacoby's conduct was and

16   continues to be despicable, oppressive, and outrageous, justifying the imposition of punitive and

17   exemplary damages against Jacoby to make an example of him and to deter such conduct in the

18   future in an amount that proof at trial may indicate is appropriate.

19                        **FOURTH CAUSE OF ACTION**

20                      **(NEGLIGENT MISREPRESENTATION)**

21                   **By Koren Against the Cinco Group and Jacoby**

22        173.    Koren re-alleges and incorporates herein by this reference all previous allegations as

23   though set forth herein in full.

24        As to the Cinco Group

25        174.    As alleged above, certain representations were made to Koren over time that induced

26   Koren to make various decisions.  Those representations include Magsaysay Statement Nos. 1-21

27   and Montelibano Statement No. 1 (collectively, the "False Representations").  Koren alleges that

28   the False Representations were made on behalf of and with the authority of the Cinco Group.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

4350401.1

58

Exhibit 1421 - 0058

175.    The following False Representations induced Koren to believe that:

a.    He would come to succeed Magsaysay one day as Cinco's CEO (Magsaysay Statement Nos. 1, 3, 7, 9, 10, 11, 12, 15, 16).

b.    The parties to the business relationship would remain as is (Magsaysay Statement Nos. 2, 9, 14, 15, 16, 17, 18, and Montelibano Statement No. 1).

c.    The Cinco Group did not have any expectation of funding or opening Potato Corner stores in the U.S. (Magsaysay Statement No. 4, 11, 12, 13, 19, 20).

d.    Koren's agreement to establish and help run PCJV would render a benefit to the Cinco Group in return for which he would have full control, full support, and long-term protections in place (Magsaysay Statement Nos. 5, 6, 7, 8, 10, 11, 12, 13, 15, 16, 17, 18).

e.    The Cinco Group would take action against Jacoby in connection with any unauthorized withdrawals of funds (Magsaysay Statement No. 21).

176.    The above categories of representations made to Koren were false and the Cinco Group knew that the representations were false when they authorized Magsaysay and Montelibano to make them.  If not made intentionally, the above representations were made recklessly and without regard for their truth.  Alternatively, while the Cinco Group may have honestly believed that the False Representations were true, they had no reasonable grounds for believing that the False Representations were true when they made them.  The actual truth was:

a.    The Cinco Group had no intent to allow Koren to take over Cinco's global operations upon reasonable terms.

b.    The Cinco Group had no intent to honor the "just us" nature of the agreement and had no qualms about allowing outsiders in.

c.    The Cinco Group (according to allegations in this lawsuit) had an expectation for PCJV to open company stores.

/ / /

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

Exhibit 1421 - 0059

d.   The Cinco Group did not intend for Koren to have full control, full support, and long-term protections in place.

e.   The Cinco Group had aligned themselves with Jacoby and had no intent to take any action against him.

177.   In making the False Representations, the Cinco Group intended for Koren to rely on them.  Indeed, Koren reasonably and justifiably relied on the False Representations.  In reliance thereon, Koren changed his position including, but not limited to, dedicating his career to Potato Corner, providing third parties rights to open stores in exclusive territories that he had previously negotiated for himself, devoting his time and attention to a multitude of issues and concerns raised by the prospect of creating and running a franchisor company at the exclusion of exercising his rights under the NKM License Agreement, allowing the Cinco Group to take the majority equity interest in PCJV and board control, returning PCJV's and PCI Trading's funds back to Wells Fargo, etc.

178.   Koren was unaware of the falsity of these representations.  Had he known the truth, he would not have agreed to, among other things, dedicate his substantial time, effort, and expense to expand Potato Corner in the United States nor enter into the PCJV Governing Documents.

179.   As a direct and proximate result of the Cinco Group's conduct, Koren has suffered monetary and other non-monetary damages legally caused by the Cinco Group's False Representations in the nature and amount to be proven at trial, but that well exceeds the jurisdictional minimum of this Court.  Koren is also entitled to equitable relief addressing the Cinco Group's fraud, including the retroactive restoration of Koren's majority equity stake in PCJV and majority control of the board.  Koren also requests that the Court exercise its powers in equity to issue appropriate order(s) governing the parties' rights, interests, duties, and obligations, including but not limited to necessary injunctive relief.

180.   Koren further alleges that in doing the things described above, the Cinco Group acted with the intent to deprive Koren of his legal rights and to injure him such that the Cinco Group's actions constitute fraud, oppression, or malice within the meaning of Civil Code § 3294.

GUY KOREN'S VERIFIED THIRD AMENDED CROSS-COMPLAINT

4350401.1

Exhibit 1421 - 0060

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  The Cinco Group's conduct was and continues to be despicable, oppressive, and outrageous,

2  justifying the imposition of punitive and exemplary damages against the Cinco Group to make an

3  example of them and to deter such conduct in the future in an amount that proof at trial may

4  indicate is appropriate.

5        <u>As to Jacoby</u>

6        181.    As alleged above in Paragraphs 42-46 and 93-102, Jacoby induced Koren to enter

7  into the Jacoby-Koren Agreement based on the representation that Jacoby would fund 100% of

8  Koren's required capital contributions in NKM and on any future Potato Corner related entities

9  that they may together open, in which future franchisee businesses Koren and Jacoby would each

10  acquire an equal share so long as Jacoby funds all of Koren's required capital contributions.  All of

11  these representations were made by Jacoby in his individual capacity.

12        182.    In reliance on the foregoing representations, Koren provided Jacoby an equity stake

13  in NKM and the LA Group, and in every other subsequent business entity in which each of them

14  was involved, i.e., the J&K Entities.  Koren also agreed to increase Jacoby's equity stake in NKM

15  and the LA Group based on Jacoby's representations.

16        183.    Koren alleges that Jacoby's representations were false and that they were made

17  with the intent to induce Koren to relinquish certain interests in his entities to Jacoby.  In fact, the

18  truth was – as Koren first discovered in or about February 2018 – that Jacoby did not intend to

19  fund Koren's capital contributions or that he intended to do so only under the right conditions,

20  which were concealed from Koren.  Alternatively, while Jacoby may have honestly believed that

21  his representations were true, he had no reasonable grounds for believing that his representations

22  were true when he made it.

23        184.    Indeed, Koren was unaware of the falsity of Jacoby's representations and

24  reasonably relied on them to his detriment.  Had Koren known the truth, he would not have

25  transferred any equity stake in any of the businesses to Jacoby.

26        185.    As a direct and proximate result of Jacoby's conduct, Koren has suffered monetary

27  and other non-monetary damages legally caused by Jacoby's false representations in the nature

28  and amount to be proven at trial, but that well exceeds the jurisdictional minimum of this Court.

Exhibit 1421 - 0061

1    Koren is also entitled to rescission of all documents and instruments that provide for the transfer

2    of any equity interest to Jacoby in any business which Koren is involved as well as the retroactive

3    restoration of Koren's respective equity stakes in said businesses.

4        186.    Koren further alleges that in doing the things described above, Jacoby acted with the

5    intent to deprive Koren of his legal rights and to injure him such that Jacoby's actions constitute

6    fraud, oppression, or malice within the meaning of Civil Code § 3294.  Jacoby's conduct was and

7    continues to be despicable, oppressive, and outrageous, justifying the imposition of punitive and

8    exemplary damages against Jacoby to make an example of him and to deter such conduct in the

9    future in an amount that proof at trial may indicate is appropriate.

10    <u>**FIFTH CAUSE OF ACTION**</u>

11    **(FALSE PROMISE)**

12    **By Koren Against the Cinco Group and Jacoby**

13        187.    Koren re-alleges and incorporates herein by this reference all previous allegations as

14    though set forth herein in full.

15        <u>As to the Cinco Group</u>

16        188.    As alleged above, certain promises were made to Koren over time that induced

17    Koren to make various decisions.  Those promises include Magsaysay Statement Nos. 1-21 and

18    Montelibano Statement No. 1 (collectively, the "False Promises").  Koren alleges that the False

19    Promises were made on behalf of and with the authority of the Cinco Group.

20        189.    The following False Promises induced Koren to believe that:

21        a.    He would come to succeed Magsaysay one day as Cinco's CEO (Magsaysay

22            Statement Nos. 1, 3, 7, 9, 10, 11, 12, 15, 16).

23        b.    The parties to the business relationship would remain as is (Magsaysay Statement

24            Nos. 2, 9, 14, 15, 16, 17, 18, and Montelibano Statement No. 1).

25        c.    The Cinco Group did not have any expectation of funding or opening Potato Corner

26            stores in the U.S. (Magsaysay Statement No. 4, 11, 12, 13, 19, 20).

27    / / /

28

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

4350401.1

62

GUY KOREN'S VERIFIED THIRD AMENDED CROSS-COMPLAINT

Exhibit 1421 - 0062

d.   Koren's agreement to establish and help run PCJV would render a benefit to the Cinco Group in return for which he would have full control, full support, and long-term protections in place (Magsaysay Statement Nos. 5, 6, 7, 8, 10, 11, 12, 13, 15, 16, 17, 18).

e.   The Cinco Group would take action against Jacoby in connection with any unauthorized withdrawals of funds (Magsaysay Statement No. 21).

190.   The Cinco Group did not intend to perform any of the False Promises. The actual truth was:

a.   The Cinco Group had no intent to allow Koren to take over Cinco's global operations upon reasonable terms.

b.   The Cinco Group had no intent to honor the "just us" nature of the agreement and had no qualms about allowing outsiders in.

c.   The Cinco Group (according to allegations in this lawsuit) had an expectation for PCJV to open company stores.

d.   The Cinco Group did not intend for Koren to have full control, full support, and long-term protections in place.

e.   The Cinco Group had aligned themselves with Jacoby and had no intent to take any action against him.

191.   In making the False Promises, the Cinco Group intended for Koren to rely on them. Indeed, Koren reasonably and justifiably relied on the False Promises. In reliance thereon, Koren changed his position including, but not limited to, dedicating his career to Potato Corner, providing third parties rights to open stores in exclusive territories that he had previously negotiated for himself, devoting his time and attention to a multitude of issues and concerns raised by the prospect of creating and running a franchisor company at the exclusion of exercising his rights under the NKM License Agreement, allowing the Cinco Group to take the majority equity interest in PCJV and board control, returning PCJV's and PCI Trading's funds back to Wells Fargo, etc.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

192.     Koren was unaware of the falsity of these promises.  Had he known the truth, he would not have agreed to, among other things, dedicate his substantial time, effort, and expense to expand Potato Corner in the United States nor enter into the PCJV Governing Documents.

193.     As a direct and proximate result of the Cinco Group's conduct, Koren has suffered monetary and other non-monetary damages legally caused by the Cinco Group's False Promises in the nature and amount to be proven at trial, but that well exceeds the jurisdictional minimum of this Court.  Koren is also entitled to equitable relief addressing the Cinco Group's fraud, including the retroactive restoration of Koren's majority equity stake in PCJV and majority control of the board.  Koren also requests that the Court exercise its powers in equity to issue appropriate order(s) governing the parties' rights, interests, duties, and obligations, including but not limited to necessary injunctive relief.

194.     Koren further alleges that in doing the things described above, the Cinco Group acted with the intent to deprive Koren of his legal rights and to injure him such that the Cinco Group's actions constitute fraud, oppression, or malice within the meaning of Civil Code § 3294. The Cinco Group's conduct was and continues to be despicable, oppressive, and outrageous, justifying the imposition of punitive and exemplary damages against the Cinco Group to make an example of them and to deter such conduct in the future in an amount that proof at trial may indicate is appropriate.

As to Jacoby

195.     As alleged above in Paragraphs 42-46 and 93-102, Jacoby induced Koren to enter into the Jacoby-Koren Agreement based on the promise that Jacoby would fund 100% of Koren's required capital contributions in NKM and on any future Potato Corner related entities that they may together open, in which future franchisee businesses Koren and Jacoby would each acquire an equal share so long as Jacoby funds all of Koren's required capital contributions.  All of these promises were made by Jacoby in his individual capacity.

196.     In reliance on the foregoing promises, Koren provided Jacoby an equity stake in NKM and the LA Group, and in every other subsequent business entity in which each of them was

4350401.1

GUY KOREN'S VERIFIED THIRD AMENDED CROSS-COMPLAINT

Exhibit 1421 - 0064

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  involved, i.e., the J&K Entities.  Koren also agreed to increase Jacoby's equity stake in NKM and

2  the LA Group based on Jacoby's representations.

3      197.    Koren alleges that Jacoby did not intend to perform his promises.  In fact, the truth

4  was – as Koren first discovered in or about February 2018 – that Jacoby did not intend to fund

5  Koren's capital contributions or that he intended to do so only under the right conditions, which

6  were concealed from Koren.

7      198.    Indeed, Koren was unaware of the falsity of Jacoby's promises and reasonably

8  relied on them to his detriment.  Had Koren known the truth, he would not have transferred any

9  equity stake in any of the business to Jacoby.

10      199.    As a direct and proximate result of Jacoby's conduct, Koren has suffered monetary

11  and other non-monetary damages legally caused by Jacoby's false representations in the nature

12  and amount to be proven at trial, but that well exceeds the jurisdictional minimum of this Court.

13  Koren is also entitled to rescission of all documents and instruments that provide for the transfer

14  of any equity interest to Jacoby in any business which Koren is involved as well as the retroactive

15  restoration of Koren's respective equity stakes in said businesses.

16      200.    Koren further alleges that in doing the things described above, Jacoby acted with the

17  intent to deprive Koren of his legal rights and to injure him such that Jacoby's actions constitute

18  fraud, oppression, or malice within the meaning of Civil Code § 3294.  Jacoby's conduct was and

19  continues to be despicable, oppressive, and outrageous, justifying the imposition of punitive and

20  exemplary damages against Jacoby to make an example of him and to deter such conduct in the

21  future in an amount that proof at trial may indicate is appropriate.

22  <div align="center">**SIXTH CAUSE OF ACTION**</div>

23  <div align="center">**(ACCOUNTING)**</div>

24  <div align="center">**By Koren Against Cinco**</div>

25      201.    Koren re-alleges and incorporates herein by this reference all previous allegations as

26  though set forth herein in full.

27      202.    Koren alleges that Cinco has profited a million dollars or more since 2010 by

28  causing the sale of products and ingredients to PCJV and PCI Trading at prices well above their

4350401.1

GUY KOREN'S VERIFIED THIRD AMENDED CROSS-COMPLAINT

**Exhibit 1421 - 0065**

1  cost.  This is in spite of the fact that the parties had a long-standing agreement to sell products and

2  ingredients at cost plus shipping.

3       203.    The amount of profits generated by this scheme by the Cinco is unknown and could

4  only be ascertained through an accounting.

5       204.    Additionally, Koren alleges that Cinco or one of its agents maintains a bank

6  account belonging to PCI Trading which Cinco has thus far refused to turn over to PCI Trading as

7  required.  Koren thus demands an accounting of all funds belonging to PCI Trading.

8                    **SEVENTH CAUSE OF ACTION**

9                         **(INDEMNITY)**

10          **By Koren Against Olivas, the Jacobys, and the Hernandez Group**

11      205.    Koren re-alleges and incorporates herein by this reference all previous allegations as

12  though set forth herein in full.

13      206.    Koren alleges that the disputes at the center of the controversy of this litigation arose

14  out of tortious conduct by Olivas, the Jacobys, and the Hernandez Group.  Regarding Olivas, a

15  majority of the disputes among the parties concern the drafting and ambiguities underlying the

16  PCJV Governing Documents, which Olivas was in charge of drafting and completing.  In light of

17  those ambiguities and questions concerning the drafting of these documents, Koren has now found

18  himself in litigation over the meaning and interpretation of these contract documents.

19      207.    Koren further alleges that the controversies in this litigation additional arose in

20  light of the Jacobys' and the Hernandez Group's tortious conduct, all of which is alleged above.

21  Moreover, Cinco and PC International have directly or indirectly asserted various claims against

22  Koren, but have neglected to name the Jacobys in their lawsuit.

23      208.    Koren alleges that in light of the foregoing, Olivas, the Jacobys, and the Hernandez

24  Group must indemnify Koren for all attorneys' fees, expenses, expert fees, and costs incurred by

25  him.  Koren further alleges that Olivas, the Jacobys, and the Hernandez Group are responsible and

26  liable for all losses that Koren has incurred and will incur in the future in connection with this

27  matter.

28  / / /

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

209.    Koren further alleges that, should Cinco or PC International prevail in this litigation, any injuries or damages to Cinco or PC International were caused solely through the negligence and carelessness and/or fault and/or tortious conduct of Olivas, the Jacobys, the Hernandez Group, and each of their agents, and not due to any action on the part of Koren or his agents.  Therefore, if Koren is held liable to Cinco or PC International, or any party affiliated and/or associated with Cinco or PC International, said liability will be solely of a vicarious and ultimately secondary nature predicated upon the facts set forth herein, and that by reason of the foregoing facts, Koren is entitled to full and complete indemnification from Olivas, the Jacobys, and/or the Hernandez Group.

**PRAYER FOR RELIEF**

WHEREFORE, Koren prays for judgment against Cross-Defendants, and each of them, jointly and severally, as follows:

1.    For general, special, actual, compensatory, consequential, and/or nominal damages in an amount to be proved at trial;

2.    For rescission;

3.    For specific performance;

4.    For restitution;

5.    For punitive and exemplary damages;

6.    For a temporary restraining order, preliminary injunction, and permanent injunction;

7.    For declaratory relief;

8.    For constructive trusts;

9.    For an award of attorneys' fees, costs and expenses;

10.    For prejudgment and post-judgment interest as allowed by law; and

11.    For such other and further relief that the Court deems just and proper.

/ / /

/ / /

/ / /

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

4350401.1

GUY KOREN'S VERIFIED THIRD AMENDED CROSS-COMPLAINT

Exhibit 1421 - 0067



1  DATED: November 12, 2019          FREEMAN, FREEMAN & SMILEY, LLP

2

3                                    By: _____

4                                        TODD M. LANDER
                                         ARASH BERAL
5                                        Attorneys for Defendants and Cross-Complainants
                                         GUY KOREN and THOMAS HODGSON, and
6                                        Defendants GK CAPITAL GROUP, LLC,
                                         ALON KOREN, and EMILY GARCIA
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

4350401.1                                68
                GUY KOREN'S VERIFIED THIRD AMENDED CROSS-COMPLAINT

Exhibit 1421 - 0068

**VERIFICATION**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

    I have read the foregoing **CROSS-COMPLAINANT GUY KOREN'S VERIFIED THIRD AMENDED CROSS-COMPLAINT** and know its contents.

    I am a party to this action. The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

    Executed on November 12, 2019, at Las Vegas, Nevada.

    I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

GUY KOREN
Print Name of Signatory

Signature

4349266.1 26859-800

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**Exhibit 1421 - 0069**

# EXHIBIT "A"

Exhibit 1421 - 0070

**Potato Corner**
**Master License Agreement**

Agreement made and executed at _Beverly Hills, Los Angeles County_, this _28th_ day of _April_, 2009, by and between: _California_

    **Potato Corner Global Company Limited, Hong Kong,** a corporation duly organized and existing under and by virtue of Hong Kong laws, with principal office situated at unit 8 19/F Cheuk Nang 21st Century Plaza, 250 Hennessy Rd., Wanchai, Hong Kong, represented herein by its President, Jose P. Magsaysay, Jr., and hereinafter referred to as the "Licensor;"

   -  and –

_NKM Capital group LLC_, a corporation duly organized and existing under and by virtue of the laws of _California US_ with principal office at _1478 S crest Dr, LA, CA 90035_, represented herein by its _CEO_, _Guy Koren_, and hereinafter referred to as the "Licensee".

Whereas:

    WHEREAS, Licensor is the owner of trademark "**Potato Corner and Device**" and owns proprietary know-how relating to and has created, designed, and developed a chain of **Potato Corner** outlets specializing in the marketing, preparation, and sale of French Fries, potato varieties and other food products.

    WHEREAS, the Licensor has developed and has exclusive rights and authority to use the trademark "**Potato Corner and Device**" and to the other service marks, trademarks, logos, and trade secrets (hereinafter referred to as "Trademarks") used in conjunction therewith.

    WHEREAS, the Licensee desires to acquire from Licensor, and Licensor is willing to grant Licensee a master license to operate "**Potato Corner**" outlets (hereinafter called as "Outlets") and to use the Trademarks, upon the terms and conditions hereinafter set forth.

    NOW, THEREFORE, for and in consideration of the foregoing premises and the covenants and stipulations hereinafter stated, the Licensor hereby grants unto the Licensee, the license to establish and operate Outlets, sell "**Potato Corner**" food lines, use the Trademarks, under the following terms and conditions, to wit:

Exhibit 1421 - 0071

1. **Territory.** The license herein granted shall be exercised or availed of within the County of Los Angeles, USA (the "Territory"), subject to the terms and conditions of this Agreement.

2. **Term of License.** This Agreement shall commence only upon the execution of the following: a) signing of this Agreement by both parties and b) payment to the Licensor of US$ 15,000.00 by the Licensee US$ 5,000.00 upon the signing of this Agreement and US$ 10,000.00 thirty (30) days before the scheduled opening of the first outlet. Should Licensee fail to make the foregoing payments this Agreement shall commence on the fifth month from the date of the signing of this Agreement. This Agreement shall expire upon the expiration of the term of the License granted herein the term of the License granted herein shall be for ten (10) years. For purposes of computing the ten (10) year period, it shall commence upon the date of the formal opening of the first outlet or 5 months from the date this Agreement was signed by the Licensee whichever comes first. Licensor shall have the option to renew this Agreement for another term of ten (10) years, subject to such terms and conditions as prescribed in this and the new Agreement.

3. **Grant of Sub-Licensee.** Licensee may be entitled to appoint Sub-Licensees to operate other Outlets under the Trademarks. This right shall be granted to Licensee after the opening of the 5th Outlet and based on its performance as Licensee for the first 6 months of this Agreement. However, upon mutual agreement by the parties herein contained in a subsequent written document, the Licensee may appoint Sub-Licensee even before the opening of the 5th Outlet based on its performance

   Licensee acknowledges and agrees that its appointment of a Sub-Licensee is entirely at Licensee's own risk and that Licensor will not be responsible in any way for the conduct or performance of any Sub-Licensee.

   The appointment of any Sub-Licensee shall not diminish or affect any of the Licensee's obligations owed to Licensor.

   All Sub-License fees that are non-hard asset in nature such as service fees and management fees, and fees for use of property right and trademarks and the like paid by any Sub-Licensee shall be split 80/20. 80% going to the Licensee and 20% going to the Licensor. However, the monthly fee per Outlet of the Sub-Licensees of US $200.00 or 5% (whichever is higher) of the Outlet sales, whichever is higher, shall be split 50/50 between the Licensor and Licensee.

   The Licensee shall, within ten (10) business days from execution of any Sub-License

NOTARIAL CERTIFICATE ATTACHED

Exhibit 1421 - 0072

Agreement, furnish the Licensor with a duly executed copy of said agreement, together with the fees mentioned in the next preceding paragraph.

In the event that a Sub-License Agreement with any Sub-Licensee is terminated for any reason, resulting in Licensee not being in compliance with its continuous operation, Licensee will use its best efforts to find a new Sub-Licensee as expeditiously as possible, without prejudice to the right of Licensor to terminate this Contract. The Sub-License Agreement shall contain the terms and conditions of this Agreement and shall not exceed the term hereof. Licensee shall see to it that its Sub-Licensees comply with the terms and conditions of the Sub-License Agreement.

4. **Location.** Licensee shall build and operate Outlets, including those of the Sub-Licensees, only in locations approved by the Licensor that will maintain an image and reputation of high quality and uniformity consistent with the image and reputation of the Trademarks as approved by the Licensor.

5. **Obligations of Licensor.** During this Agreement, Licensor shall:

Use reasonable and diligent efforts to register the Trademarks in the Territory. However, Licensee understands and acknowledges that there is no assurance that the Licensor will succeed in obtaining such registration.

Grant Licensee the license to use the Trademarks and sell products bearing the Trademarks in the Territory, subject to the terms and conditions of this Agreement.

Provide consultation and advice to Licensee in connection with the usage of the Trademarks and sale of products bearing the Trademarks in the Outlets.

Visit the Licensee's Outlets once a year for the purpose of audit and confirming royalty payments, at Licensor's expense

6. **Obligations of Licensee.** During this Agreement, the Licensee will:

Sell products with due regard for the suggested retail price for such products in the region.

Purchase all proprietary and non proprietary blends, flavorings, sauces, raw materials, paper, and packaging products only from Licensor or its accredited supplier, subject of an accreditation agreement, to ensure product quality

Purchase other consumable raw, uncooked, cooked semi-cooked, semi-finished

NOTARIAL CERTIFICATE ATTACHED        03/24/09

Potato Corner License Agreement

3

Exhibit 1421 - 0073

or finished materials from local suppliers that has been accredited  by the Licensor, subject of an accreditation agreement .

Buy equipment needed for the proper operation of the Outlets, with guidance from Licensor and in accordance with all applicable laws and regulations.

Procure all necessary insurance for the Outlets as provided for in this Agreement.

Secure all required licenses and permits necessary for the operation of the Outlets.

Keep appropriate records of all sales transactions as provided for in this Agreement and required by pertinent law and regulations.

Provide right wages and benefits to employees of the Outlets as mandated by pertinent laws and regulations.

Oversee the day to day operations of the Outlets and ensure clean, sanitary, attractive, and efficiently operated Outlets offering high quality food products and courteous and helpful service.

Develop marketing and branding plans for the Trademarks and Outlets in accordance with Licensor's guidelines for advertising its Trademarks.

Set up a minimum of six (6) Outlets in the Territory within the first two (2) years of the term of this Agreement.

Use the Trademarks exclusively for the operation of the licensed Outlets.

Immediately notify the Licensor of any infringement of the Trademarks.

Refrain from utilizing the Trademarks or any part thereof or any similar names or marks as part of its own name (including domain name) or style.

Send monthly sales, individual and corporate (Licensor's company) financial reports, financial statements, income statements, product movements/mix reports not more than 30 days after the end of the month, submit a yearly marketing and business plan two months before the start of the years plans. Submit sub-licensee's reports similar to the ones the Licensee submits to the Licensor.

Refrain from representing itself as being Licensor or an agent or partner of

NOTARIAL CERTIFICATE ATTACHED

Exhibit 1421 - 0074

Licensor.

At the Licensee's expense send a representative from the Licensor, at least once a year, to do operational, marketing, training and financial check-ups and conduct business reviews with the Licensor. One visit every year starting July 2010 until the validity of this agreement.

7. **Annual Review and Audit.**

    **Annual Review** – Once each calendar year, at a time designated by Licensor, Licensee's representative shall be obligated at Licensee's expense to meet with representatives of Licensor at Licensor's principal office, for the purpose of discussing and reviewing Licensee's use of the Trademarks. Licensee shall likewise conduct an annual review with respect to its Sub-Licensees. This may be done via teleconference.

    **Licensor's Right to Audit** – Licensor shall have the right once a year, during business hours, to inspect and audit, or cause to be inspected and audited, the business records, bookkeeping and accounting records, sales and income tax records and returns, and other records of the Outlets for the purpose of confirming royalty payments. Licensee and its Sub-Licensees shall fully cooperate with representatives of Licensor and independent accountants hired by Licensor to conduct such inspection or audit.

8. **Records.** The Licensee and its Sub-Licensees shall make its records available to scrutiny and inspection by the Licensor's representatives during the latter's annual visit for the purpose of confirming royalty payments.

9. **Trademarks**

    **Ownership and Goodwill** – Licensee and its Sub-Licensees acknowledge that their right to use the Trademarks and to sell products via the Outlets is derived solely from this Agreement and is limited to the conduct of business by Licensee and its Sub-Licensees pursuant to and in compliance with this Agreement and all applicable standards and specifications prescribed by Licensor from time to time during the term of this Agreement.

    **Limitations on Use of the Trademarks** – Licensee and its Sub-Licensees agree to use the Trademarks as the sole identification of the Outlets, provided that they shall identify themselves as the independent owner thereof in the manner prescribed by Licensor. Licensee and its Sub-Licensees shall not use the

NOTARIAL CERTIFICATE ATTACHED

Exhibit 1421 - 0075

Trademarks as part of any corporate or trade name or with any prefix, suffix, or other modifying words, terms, designs, or symbols (other than logos licensed to Licensee hereunder), or in any modified form, nor may Licensee and its Sub-Licensees use any Trademarks in any manner not expressly authorized in writing by Licensor. Licensee and its Sub-Licensees agree to prominently display products and other supplies and packaging materials. All Trademarks shall be displayed in the manner prescribed by Licensor.

**Modification/Discontinuance of Use of Trademarks** – Licensor shall not be obligated to compensate Licensee and its Sub-Licensees for any costs incurred in connection with such modification should it become advisable at any time, in Licensor's sole discretion, for Licensor to modify the use of any Trademark, and/or use one or more additional or substitute trade or service directions to modify the use of such Trademark within reasonable time after notice thereof by Licensor. The foregoing also applies to the discontinuance of the use of the Trademark in extraordinary cases in consultation with the Licensee.

**Preservation of Trademarks** – In order to preserve and protect the image and the goodwill associated with the Trademarks, Licensee and its Sub-Licensees shall refrain from any act or omission that impairs or threatens to impair the image, goodwill, or stature or reputation of the Trademarks or Licensor's business.

10. **Right of First Refusal.** Licensor shall give Licensee the first option to obtain exclusive licenses of the entire state of California; provided Licensee complies with the following:

Licensee has opened six (6) Outlets within the Territory during the first 2 years of the term of this Agreement and Licensee pays the license fees for the 6th up to the 10th Outlets during the first 2 years of the term of this Agreement . Licensee has established a good working relationship with Licensor.

Licensee has achieved an average daily sale per Outlet of at least US$ 350.00 over a period of one year for all opened Outlets.

The grant of an exclusive license for the entire state of California in favor of the Licensee shall be covered by a separate Agreement under terms and conditions to be mutually agreed by the parties herein.

11. **Fees.** In consideration of the license and other rights granted hereunder, the Licensee shall pay to the Licensor a license fee of US$ 30,000 for ten (10) outlets to be opened within the first 2 years of this Agreement, which is US$ 3,000 per Outlet. Upon signing of

NOTARIAL CERTIFICATE ATTACHED

Exhibit 1421 - 0076

this Agreement, Licensee shall pay Licensor US$ 15,000 representing 50% of the license fee for ten (10) outlets.

**For the 6th up to the 10th Outlets to be opened within the first 2 years of this Agreement, Licensee shall pay the corresponding license fee thereto prior to the opening of said Outlets.**

Licensee shall pay Licensor a license fee of US$3,000 prior to the opening of each Outlet beyond the initial ten (10) outlets provided for in this Agreement.

Licensee shall also pay Licensor an on-going monthly fee per Outlet of US$200 or 5% of Outlet sales, whichever is higher. For Outlets of Sub-Licensees, the said fee shall be split 50-50. The foregoing fee shall be paid to the Licensor every 20th day of the succeeding month.

All withholding and other taxes levied by any authority on the payments by the Licensee to the Licensor under this Agreement shall be borne solely by the Licensee.

All payments made under this agreement shall be made by wire transfer using a bank or other financial institution specified by Licensor, except as expressly provided in this agreement, any and all fees and monies paid by Licensee to the Licensor shall not be withheld, set off, or deducted, and shall not be refunded to the Licensee under any circumstances whatsoever.

12. **Indemnity.** In the event that either party to this Agreement is required to employ legal counsel or to incur other expense to enforce any obligation of any party hereunder, or to defend against any claim, demand, action, or proceeding by reason of any of the parties' failure to perform any obligation imposed by this Agreement, and provided that legal action is filed and such action establishes a party's default hereunder; then the aggrieved party shall be entitled to recover in said action from the defaulting party the amount of all reasonable attorneys' fees of such counsel and all other expenses incurred in enforcing such obligation, or in defending against such claim, demand, action, or proceeding, whether incurred prior to, or in preparation for, or in contemplation of the filing of such action or thereafter.

13. **Right to Assign.** Licensee shall not assign any of its rights or obligations under this Agreement without the prior written consent of the Licensor. Any change in the shareholding or partnership or sole proprietorship or control of management of the Licensee shall be considered an assignment.

NOTARIAL CERTIFICATE ATTACHED

Exhibit 1421 - 0077

14. **Termination.**  This agreement shall be terminated upon its expiry date and may be terminated at any time, with notice of at least thirty (30) days to the other party:

By either party, if the other party hereto breaches any of the terms and conditions hereunder or fails to perform any of its obligations or covenants contained in this agreement and that breach or failure to perform is not remedied within thirty (30) days after written notice of such breach or failure to perform has been given to it; or

By the Licensor, if the Licensee is dissolved, shall become bankrupt, insolvent, or go into liquidation, whether compulsorily or voluntarily, or enter into any arrangement or composition with its creditors, or has a receiver or similar officer appointed over any part of its assets or undertaking.

15. **Effects of Termination.**  Upon termination of this Agreement for any reason whatsoever:

The Licensee and Sub-Licensees shall immediately thereafter cease to use the Trademarks.

Licensee and Sub-Licensees must return all items with proprietary trademarks to Licensor.

The Licensor and/or Licensee shall accordingly notify in writing the Sub-Licensees of the termination of this Agreement, the terms and conditions of which form part of the Sub-Licensees' agreement with the Licensee.

16. **Restrictions.**  On termination of this agreement, the Licensee shall not:

At any time after the termination of this agreement reveal or use, for its own benefit or for the benefit of any third party, any trade secret or confidential information of Licensor or any other trade secret or confidential information acquired from the Licensor in connection with this agreement;

For a period of one (1) year thereafter solicit, interfere with, or endeavor to entice away, employ, or contract for the provision of services of any employee or consultant of the Licensor or any employee of or person who has entered into a contract with the Licensor.

NOTARIAL CERTIFICATE ATTACHED

**Exhibit 1421 - 0078**

During the period of this agreement, the Licensee shall not be involved, directly or indirectly in any way, in any business which competes with, or is similar to, or in any way can be mistaken for or thought to be related to Licensor, the Trademarks, or Outlets.

Except for the rights expressly granted herein during the term of this agreement, the Licensee undertakes that it will not, as well as ensure that none of its officers, employees, or agents will, at any time, either during the term of this agreement or after termination of this agreement or the concerned employee's employment with the Licensee (as the case may be), use or register any of the Trademarks or the trade name or any trademark, tradename, logo, symbol, device, or other item whatsoever which is in any way similar to, competitive, or in conflict with any of the Trademarks or the trade names, or otherwise in any way resemble or attempt to pass off as any of the Trademarks or trade names for any purpose whatsoever.

17. **Option to Renew.** Upon the expiry of the term of this Agreement, the Licensor may, upon written request of the Licensee made not less than six (6) months before the expiry date of this agreement, renew the agreement, covered by a new agreement under terms and conditions stated therein, for another ten (10) years, taking into consideration the following :

> There is no breach of any of the terms of this agreement by the Licensee, either during the term of this Agreement or at its expiration;

> The Licensee has performed satisfactorily during the term of this Agreement; and

> Licensee has established at least fifty (50) Outlets within the term of this Agreement.

However, upon mutual agreement by the Licensor and Licensee, they may renegotiate the terms and conditions of this Agreement at the end of the 5th year of the term of this Agreement.

18. **Joint and Several Liability.** Should Licensee consist of more than one person, the liability of such persons to Licensor shall be joint and several.

19. **Illegality.** If, for any reason, any provision herein is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation, such shall not impair the operation of or affect the remaining provisions of this Agreement, and the latter will continue to be given full force and effect and bind the parties hereto; and said invalid

Potato Corner License Agreement                    9                              03/24/09

NOTARIAL CERTIFICATE ATTACHED

**Exhibit 1421 - 0079**

provisions shall be deemed not part of this Agreement; Provided, however, that if Licensor determines that said finding of illegality adversely affects the basic consideration of this Agreement, Licensor may, at its option, terminate this Agreement.

20. **Force Majeure.** Whenever a period of time is provided in this Agreement for either party to do or perform any act or thing, except the payment of monies, neither party shall be liable or responsible for any delays due to strikes, lockouts, casualties, acts of God, war, governmental regulation or control, or other causes beyond the reasonable control of the parties, and in any event, said time period for the performance of an obligation hereunder shall be extended for the amount of time of the delay. This clause shall not apply or not result in an extension of the term of this Agreement.

**Waiver.** No failure of Licensor / Licensee to exercise any power reserved hereunder, or to insist upon strict compliance with any obligation or condition hereunder, and no custom or practice of the parties in variance with the terms hereof, shall constitute a waiver of their right to demand exact compliance with the terms of this Agreement.

21. **Confidentiality.** At all times and notwithstanding the termination of this agreement, all information relating to the Outlets and Trademarks, whether written or oral, supplied or made known directly or indirectly by the Licensor to the Licensee, shall be retained in strict confidence and shall not, except with the prior written approval of the Licensor and for purposes in accordance with this agreement, be used or divulged to any other person, firm, or company. Licensee will keep, and will ensure that its officers, employees, and agents keep, such information, techniques, and know-how strictly confidential at all times.

All product specifications and trademark usage issued by the Licensor shall throughout the period of this Agreement and thereafter remain the property of Licensor and may not be reproduced in any way by the Licensee or any of its officers, employees, or agents.

22. **Rules and Regulations.** The Licensee shall comply with the existing and subsequent rules and regulations of the Licensor in connection with its trademarks and products and such rules and regulations shall bind the Licensee upon and from the date on which notice in writing thereof is given to the Licensee by the Licensor, unless otherwise stated by the Licensor. Any breach by the Licensee of any of the said rules and regulations shall be deemed to be a breach of the terms and conditions of this agreement.

NOTARIAL CERTIFICATE ATTACHED

Exhibit 1421 - 0080

23. **No Partnership.**  This Agreement is an agreement between two distinct and different entities or personalities and does not create a fiduciary relationship between the parties, nor does it constitute Licensee as an agent, legal representative, joint venturer, partner, employee, or servant of Licensor for any purpose whatsoever. It is understood between the parties hereto that Licensee shall be an independent contractor and is in no way authorized to make any contract, agreement, warranty, or representation on behalf of Licensor, nor to incur any debt, or to create any obligation, express or implied, on behalf of Licensor.  Likewise, the Licensor shall not be responsible for the conduct of the employees and/or personnel of the Licensee.

24. **Notice.**  Any notice required to be given hereunder shall be in writing and shall be either mailed by certified mail, return receipt requested, or delivered by a recognized courier service, receipt acknowledged.

    Alternatively, any report, notice, request, demand, or other communication required or permitted under this Agreement shall be deemed to be have been properly given by the sender and received by the addressee (1) if personally delivered; (2) if a confirmation receipt is faxed back containing the signature of an authorized person, when sent by fax; or (3) if an email reply is sent back by the receiver confirming receipt, when emailed.  Notices and correspondence through facsimile or email requiring the transmission of original documents must be followed by such transmission of original copies via courier mail.

    Any notice to comply with the provisions shall be deemed to be given five (5) business days after mailing, or on the date of receipt, whichever is earlier. Each party shall have the right to designate any other address or addressee for such notices by giving notice thereof in the foregoing manner, and in such event all notices to be mailed after receipt of such notice shall be sent to such other address or addressee.

    All email notices as provided for in this Agreement shall be sent to the following email addresses:

    Licensor: josemagsaysay@yahoo.com
    Licensee: guyk23@hotmail.com
    damitneman@yahoo.com

25. **Entire Agreement.**  This Agreement, along with any exhibit attached hereto, and the documents referred to herein, shall be construed together and constitute the entire, full, and complete agreement between Licensor and Licensee concerning the subject matter hereof; and supersedes all prior agreements. No amendment, change, or variance from this Agreement shall be binding on either party, unless executed in writing by both

NOTARIAL CERTIFICATE ATTACHED

Exhibit 1421 - 0081

parties.

26. **Governing Law and Jurisdiction.** This agreement shall be interpreted and construed under the laws of the Hong Kong Special Administrative Region, People's Republic of China.

Any action sought to be brought by either party shall be brought before the Hong Kong courts, which shall have exclusive jurisdiction, and the parties do hereby waive all questions of personal jurisdiction or venue for the purposes of carrying out this provision.

27. **Arbitration.** If any matter, dispute or claim cannot be settled amicably between the parties within thirty (30) days after the same has been discussed by their authorized representatives, then the matter, dispute, or claim will be submitted for arbitration to the Hong Kong International Arbitration Centre, in accordance with the rules of the United Nations Commission on International Trade Law (UNCITRAL). Nothing contained herein shall, however, be construed to limit or to preclude Licensor from bringing any action in any court of competent jurisdiction for injunctive or provisional relief as Licensor deems to be necessary or appropriate to compel Licensee to comply with its obligations hereunder or to protect Licensor's rights. In addition, nothing contained herein shall be construed to limit or to preclude Licensor from joining with any action for injunctive or provisional relief all monetary claims that Licensor may have against Licensee which arise out of the acts or omissions giving rise to the action for injunctive or provisional relief. The arbitration provision shall be deemed self-executing, and in the event that Licensee fails to appear at any properly noticed arbitration proceeding, award may be entered against Licensee notwithstanding Licensee's failure to appear.

Nothing herein contained shall bar the right of the parties to seek and obtain temporary injunctive relief from a court of competent jurisdiction in accordance with applicable laws against threatened conduct that will cause loss or damage, pending completion of the arbitration.

The arbitration proceedings shall be held in Hong Kong Special Administrative Region, People's Republic of China at such venue within as may be specified by the arbitrator.

The arbitration proceedings shall be conducted in the English language.

The decision and award of the arbitrator shall be final and binding on the Parties.

Potato Corner License Agreement                NOTARIAL CERTIFICATE ATTACHED            03/24/09

Exhibit 1421 - 0082

**28. Insurance.** Licensee shall, at Licensee's expense and no later than upon commencement of the business contemplated by this Agreement, procure and maintain in full force and effect throughout the term of this Agreement all types of insurance as may be required by Licensor under this or subsequent agreements, or as mandated by government agencies, which shall be for a minimum period of one (1) calendar year and in such amounts as Licensor or a government agency may require from time to time, and shall designate Licensor as an additional name insured. The types of insurance may include, but is not limited to, Fire, Theft and Broadwater Damage Insurance, and Comprehensive General Liability Insurance;

Licensee shall make timely delivery of certificates of all required insurance to Licensor, each of which shall contain a statement by the insurer that the policy will not be cancelled or materially altered without at least thirty (30) days prior written notice to Licensor.

Should Licensee, at any time, fail or refuse to maintain in effect any insurance coverage required by Licensor or a government agency pursuant to this Agreement, or to furnish satisfactory evidence thereof, Licensor may, but is not obligated to, obtain such insurance coverage on Licensee's behalf. Licensee must then promptly pay upon Licensor's demand any costs and premiums Licensor has incurred in this respect. The payment of these costs is non-refundable.

**29. Acknowledgements.** Licensee hereby acknowledges the exclusive rights of Licensor to the products and Trademarks.

Licensee further acknowledges that Licensor does not give any guarantee or warranty in connection with profitability or any other aspect of the proposed business.

Licensee acknowledges that it has been advised by the Licensor to seek other appropriate independent advice and that the decision to enter into this agreement has been taken solely on the basis of the personal judgment and experience of the Licensee and its having taken such independent advice. Accordingly, the Licensee acknowledges that no representation, warranty, inducement or promise, express or implied, has been made by Licensor to induce Licensee to enter into this agreement, save for those written, annexed to, and incorporated in this agreement.

It is hereby expressly agreed between the parties that each of the restrictions contained in this agreement is reasonably necessary for the protection of the Licensor and its other licensees, the trade names and the Trademarks, and does not unreasonably interfere with the freedom of action of the Licensee who enters into this agreement with benefit of legal advice in full knowledge of all the provisions hereof; and the Licensee acknowledges that all such provisions are fair and reasonable.

Potato Corner License Agreement                 13  NOTARIAL CERTIFICATE ATTACHED        03/24/09

Exhibit 1421 - 0083

Licensee further acknowledges that to the best of the Licensor's information, knowledge and belief, none of the Trademarks infringe upon any rights of any third party and that the Licensor has given no warranty as to the validity of any rights in any of the Trademarks in the Territory.

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound here-by, have duly executed, sealed and delivered this Agreement in triplicate the day and year first above written.

**Potato Corner Global Company Limited**

BY:

Jose P. Magsaysay, Jr.
President

_NKM Capital Group LLC_

_Guy Koren_
President

Signed in the Presence of:

Guy Koren

Amit Nemanim

**ACKNOWLEDGEMENT**

BEFORE ME, a Notary Public for the City of _Beverly Hills_, personally appeared the following persons:

| Name | Identification Card No. | Date and Place of Issue |
|---|---|---|
| Guy Koren | DL# 34924397 | California 03-27-09 |
| Amit Nemanim | DL# A9480000 | CA  05/29/11 |

known to me and to me known to be the same persons who executed the foregoing License Agreement consisting of __14__ (__) pages, including the page where this Acknowledgement is written, and they acknowledged that the same is their true and voluntary act and deed and that of the corporation which they represent.

WITNESS MY HAND SEAL, this __29th__ day of 2009 at __April__.

Potato Corner License Agreement                    14                    03/24/09

**NOTARIAL CERTIFICATE ATTACHED**

Exhibit 1421 - 0084

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of Los Angeles

On April 29th 2009 before me, Todd E. Peters "Notary Public"
Date                                Here Insert Name and Title of the Officer

personally appeared Amit Nemanim and Guy Koren
Name(s) of Signer(s)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

TODD E. PETERS
Commission # 1690486
Notary Public - California
Los Angeles County
My Comm. Expires Aug 29, 2010

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Place Notary Seal Above

Signature _____
                   Signature of Notary Public

---------------------------------- **OPTIONAL** ----------------------------------

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Description of Attached Document**

Title or Type of Document: Potato Corner Master License Agreement

Document Date: April 29th 2009          Number of Pages: 14 pgs And Certificate Attached

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: Amit Nemanim
☐ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☒ Other: Managing Member

RIGHT THUMBPRINT
OF SIGNER
Top of thumb here

Signer Is Representing: _____

Signer's Name: Guy Koren
☐ Individual
☒ Corporate Officer — Title(s): President
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

RIGHT THUMBPRINT
OF SIGNER
Top of thumb here

Signer Is Representing: _____

©2007 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org   Item #5907   Reorder: Call Toll-Free 1-800-876-6827

Exhibit 1421 - 0085

ACKNOWLEDGMENT

REPUBLIC OF THE PHILIPPINES )
        MAKATI CITY                    )       S.S.


        BEFORE ME, a Notary Public, in and for the City of Makati, on this day personally appeared Jose P. Magsaysay Jr., with his Philippine Passport No. PP 0753283 issued on January 26, 2005 at Manila and valid until January 26, 2010 known to me and to me known to be the same person who executed the foregoing Master License Agreement consisting of 16 pages, including the page where this Acknowledgement is written, and acknowledged to me that the same is his own free will and voluntary act and deed and that of the corporation he represents.

WITNESS MY HAND AND SEAL this 20th day of May 2009 at Makati City.


Doc. No.:       8
Page No.:       3
Book No.:       I
Series of :     2009

                                                    NOTARY PUBLIC

                                                    Felicite C. Cordero
                                            Notary Public for Makati City
                                        Appt. No. M-133 until December 31, 2010
                                    2nd Floor SEDCCO Bldg. Rada cor. Legaspi Sts.
                                            Attorney's Roll no. 56041
                                    PTR No. 1572293 – 01/07/09 – Makati City
                                    IBP No. 769758 – 01/07/09 – Makati City
                                            TIN No. 187-221-693

Exhibit 1421 - 0086

# EXHIBIT "B"

Exhibit 1421 - 0087

## POTATO CORNER USA
## JOINT VENTURE AGREEMENT

This Joint Venture Agreement (the "Agreement") dated _effective 10/1/09_ is made and entered into on ___immediately___, by and between:

Cinco Corporation, a corporation duly existing and registered by virtue of and under the laws of the Republic of the Philippines with office address at 869 Katarungan Street, Plainview Mandaluyong City, Philippines 1550, represented herein by its duly authorized representative, Jose P. Magsaysay (hereinafter "Cinco"), and its directors, Jose P. Magsaysay, Jr., Jose Miguel Ma. G. Montinola, Ma. Victoria O. Bermejo, Ricardo K. Montelibano, all of whom are Philippine citizens and resident, and collectively referred to as the "Cinco Group";

-and-

AMIT NEMANIM, GUY KOREN, AMIR JACOBY, all of whom are U.S. citizens and residents and collectively referred to as the "LA Group:

### RECITALS

WHEREAS, the Parties hereto have agreed to form a limited liability company (hereinafter referred to as the "Company") under the laws of the State of Delaware, with the primary purpose of engaging in the business of establishing, operating, managing, licensing and franchising "Potato Corner" stores/outlets in the United States of America and Israel, except in the County of Los Angeles, USA and the County of San Francisco, USA and Tanforan Mall (hereinafter, "Territory").

WHEREAS, the Parties herein have agreed to enter into this Agreement which sets forth the terms and conditions with respect to the organization, incorporation, operation and management of the Company and defines their respective rights, duties and obligations of the parties to this Agreement.

WHEREAS, the Parties agree that the LLC operating agreement to be entered by them shall reflect the terms and conditions as set forth in this Agreement.

WHEREAS, Cinco may assign and or all of its rights to the joint venture company formed under this Agreement to a wholly-owned subsidiary as it deems fit.

NOW, THEREFORE, for and in consideration of the foregoing premises, the Parties hereby agree as follows:

1) ORGANIZATION AND FORMATION OF THE COMPANY

    a) Within ten (10) days from the Effective Date of this Agreement, the Parties herein agree to organize and form, a limited liability company to be called "PCJV USA" ( hereinafter referred to as the Company) for the primary purpose of engaging in the business of establishing, operating, managing, licensing and franchising "Potato Corner" stores/outlets in the Territory.

WEST\222455823.2

**Exhibit 1421 - 0088**

b) The initial members of the Company shall be the following:

    i) Cinco Group
        (1) Cinco
        (2) Jose P. Magsaysay, Jr.
        (3) Jose Miguel Ma. G. Montinola
        (4) Ma. Victoria O. Bermejo
        (5) Ricardo K. Montelibano

    ii) LA Group
        (1) Amit Nemanim
        (2) Guy Koren
        (3) Amir Jacoby

c) The principal office of the Company shall be at    1729 Santee St., Los Angeles, California 90015.

d) The annual general meeting of the members of the Company shall be held every year at the principal office of the Company.    The members may, at their discretion, invite non-members to join the annual general meeting, but only as non-voting observers.  Further, to the extent allowed by the financial condition of the Company, and as agreed upon by a majority of all member interests, the Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses incurred by the following members in attendance of the annual members' meeting: Jose P. Magsaysay, Jr., Jose Miguel Ma. Montinola, Ma. Victoria O. Bermejo and Ricardo K. Montelibano.

e) The fiscal year of the Company shall begin on January 1 and end on December 31 of each year.

f) The Company shall immediately upon formation obtain a "Liability Insurance" for the Company the amount and scope of coverage to be determined by the managers.

g) All costs, fees and expenses incurred in connection with the organization and formation of the Company shall be for the account of the Company.

h) The operating agreement of the Company shall reflect the terms and conditions set forth in this Agreement between the Parties.

2) CAPITALIZATION/OWNERSHIP OF THE COMPANY

a) At the time of formation, the Company shall have a total capital account of Fifty Thousand Dollars (US$50,000) which shall be fully subscribed and paid.

b) Unless other agreed to in writing, at the commencement of this Agreement, the Parties hereby agree that the Cinco Group shall contribute Thirty Thousand Dollars (US$30,000) and own sixty (60%) percent of the Company's capital accounts, while the LA Group shall contribute Twenty Thousand Dollars (US$20,000) and own the remaining forty (40%) percent.



2

WEST\222456823.2

**Exhibit 1421 - 0089**

c) The Parties hereby agree any increase in the capital account shall require an affirmative vote of 75% of all of the members' percentage interests in the Company. In the event an increase in the Company's capital accounts is approved by the members, both Parties shall have rights of pre-emption so that their pro rata ownership share in the Company shall be maintained, provided that, either Party shall have thirty (30) days within which to confirm in writing that it is willing and able to subscribe and fully pay its pro rata share of the increase in capital.

d) Neither Party shall assign any of its rights or obligations under this Agreement, nor his/its member interests in the Company without the prior written consent of the other Party. In the event either Party desire to transfer or sell his/its pro rata members interest in the Company to a person other those specifically named in Section 1(a) of this Agreement, such Party shall be obligated to sell the same first to the other Party, which has have thirty (30) days within which to exercise its rights of first refusal from the date of receipt of a written notice to sell. For this purpose, the Parties hereby agree that the right of first refusal may be exercised in accordance with the following formula: The average of the Company's earnings before interest, depreciation, taxes and amortization (EBITDA) for the last two (2) years multiplied by 5 times, and further multiplied by the percentage of member interest subject to such right of first refusal over total outstanding member interests.

3) MANAGEMENT OF THE COMPANY

a) As will be provided in the Operating Agreement, the business and affairs of the Company shall be managed and all of the Company powers shall be exercised by or under the direction of the managers (collectively referred to as "Management"). Unless otherwise agreed to by the parties, the Management shall be composed of seven (7) members, four (4) of whom shall be designated by the Cinco Group, and three (3) designated by the LA Group. Upon the formation of the Company, the following shall be named managers: Jose P. Magsaysay, Jr., Jose Miguel Ma. Montinola, Ma. Victoria O. Bermejo, Ricardo K. Montelibano, Amit Nemanim, Guy Koren, and Amir Jacoby.



b) The Management shall regularly meet on a monthly basis. The regular monthly board meeting may be done via teleconference or through the internet. The members may, at their discretion, invite non-members to join member meetings, but only as non-voting observers. Further, to the extent allowed by the financial condition of the Company, and as agreed upon by a majority of all member interests, the Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses incurred by the members named in Section 1(d) in attendance of said meetings.

c) Upon the formation of the Company, it shall have the following executive officers: President, Corporate Secretary and Treasurer, and the following shall be elected by the members to serve these positions:

i) Chairman of the Board of Members – Jose P. Magsaysay

3

WEST\222455823.2

**Exhibit 1421 - 0090**

ii) President – At any given time, the President shall be any one of the following members: Amit Nenamin, Guy Koren or Amir Jacoby, and the first president will be Amit Nemanim

iii) Corporate Secretary – Erlinda Bartolome.

iv) Treasurer – Jose Miguel Ma. Montinola

    (1) The Treasurer shall have oversight functions over the Accounting and Finance Departments that shall be exercised independent of the President.

d) Additional executive officers may be appointed by Management as it may deem necessary.

e) It is hereby agreed that the rights and responsibilities of the Management shall include the following:

    i) Approval of the compensation package for the managers, executive offices and key personnel.

    ii) Approval of the Accounting System/Procedures/Software/Method to be used by the Company.

    iii) Approval of the operating budget of the Company, and any changes to it.

    iv) Approval of all franchising agreements, and lease agreements.

    v) Approval of all purchases and disbursements in excess of $10,000, provided that such amount may be changed or modified by Management as it deems necessary.

f) The executive officers shall manage the business and property of the Company, and to market the business, in accordance with and pursuant to the directives of and policies set by the Management of the Company. The Management of the Company can recall and/or withdraw the appointment of any executive officer, as it deems necessary.

g) The Company shall enter into a Master License Agreement with Cinco (or an affiliated company to be designated by Cinco) which shall include the following terms and conditions:

    i) The Company agrees to license the "POTATO CORNER" intellectual property rights from Cinco or an affiliated company to be designated by Cinco) consisting of (i) the trademark, service mark and trade name "POTATO CORNER"; and (ii) various trademarks, service marks, trade names, slogans, designs, insignias, emblems, symbols, color schemes, package features, logo and other propriety identifying characteristics used in relation and in connection with the "Potato Corner" Products and the System; and (iii) as well as other intellectual property rights in connection with the "POTATO CORNER" intellectual property rights, for use in the Territory.

    ii) The Company agrees to pay, as an arm's length license fee, the following amounts:

        (1) With respect to the licensing / sub-licensing or franchising the "POTATO CORNER" intellectual property rights in connection with the "POTATO CORNER" outlets/stores, an amount equal to thirty percent (30%) of all

4

Exhibit 1421 - 0091

initial/franchise fees and ongoing royalty fees paid to/ collected by the Company. Payments shall be made to Cinco (or an affiliated company to be designated by Cinco) by wire transfer using a bank or other financial institution specified by it within thirty (30) days from receipt of the fees by the Company.

(2) All withholding and other applicable taxes levied by any authority on the payments by the Company shall be borne solely by the Company.

h) The Company agrees to engage the LA Group to provide management and strategic experience and expertise during the duration of this Agreement. The Company shall enter into a Master Services Agreement with the LA Group (or a corporation to be designated by the LA Group) which shall include the following terms and conditions:

i) In consideration for the provision of its services under the Master Services Agreement, the LA Group shall be entitled to a services fee equal to thirty (30%) percent of all initial/franchise fee and continuing royalty fees paid to/ collected by the Company .

ii) All withholding and other applicable taxes levied by any authority on the payments by the Company to the LA Group under this Agreement shall be borne solely by the Company.

iii) The LA Group shall faithfully, diligently and efficiently exercise its obligations and responsibilities under the Master Services Agreement.

iv) The LA Group shall maintain and protect the Confidential Information belonging to Cinco or the Company, and such undertaking shall apply to all of its partners, officers, employees, or agents.

i) The President of the Company shall render the following services and shall perform the following duties for the Company in a faithful, diligent and efficient manner:

i) The President shall be responsible for all management, operational, marketing, establishment, maintenance, licensing and sub-licensing activities with respect to the "Potato Corner" outlets/stores in the Territory. He shall use his best efforts at all times during the term of this Agreement to operate and maintain the "Potato Corner" outlets/stores in the Territory according to the highest standards achievable consistent with the overall plan of the Management of the Company. The President shall comply with the rules, policies and procedures approved by the Management of the Company from time to time.

ii) The President shall advertise market and promote the "Potato Corner" outlets/stores with the goal of causing public knowledge, awareness and patronage of the "Potato Corner" outlets/sites.

iii) The President shall maintain a comprehensive system of records, books and accounts, with respect to the licensing and sub-licensing activities, operation,



5

Exhibit 1421 - 0092

establishment, management, maintenance and other activities of the "Potato Corner" outlets /stores in the Territory with the assistance of the Corporate Secretary.

iv) No later than the twentieth (20th) day of each month, with respect to the preceding month, the President shall render a statement of receipts and disbursements, a schedule of accounts receivable and payable, and a schedule of fees collected and distributed, together with a reconciled bank statement as of the last day of the month with the assistance of the Corporate Secretary.

v) No later than three (3) months after the end of a fiscal year, the President shall, with the assistance of the Corporate Secretary and external accountant hired by Management, cause the Company to issue audited financial statements, and shall provide a copy of the same to all the members of Management.

vi) To the extent the President is lawfully able to do so, the President shall take such action as may be necessary to comply promptly with any and all laws, ordinances, orders or other requirements of any federal, state, county or municipal authority having jurisdiction of the Company and affecting the Company.

j) Consistent with its fiduciary duty to the Company, the members and managers shall exercise the duty of care and shall, at all times, ensure that all corporate opportunities consistent with the objectives of this Agreement shall be pursued on behalf of, and for the benefit of the Company. As such, with respect to the establishment of Company-owned stores, whenever potential locations are identified by any member or manager, it shall be promptly brought to the attention of the Management. At all times, and within thirty (30) days from receipt of this information, the Management shall decide to either build a Company-owned store at the identified location. In the event the Company chooses to build a Company-owned store at the identified location, it shall have the right to do so, to the exclusion of any of the members or managers. However, in the even the Company decides not to build a Company-owned store at the identified location, it shall notify the members and managers of its decision in writing. In such case, the LA Group shall have the right to build a store at the identified location, provided that it shall enter into a franchising agreement with the Company, and shall pay the franchise fees and ongoing royalty fees as set forth in the Company's standard franchising agreement.

4) DURATION OF AGREEMENT

a) This Agreement shall become effective from the date of execution hereof and shall continue indefinitely unless otherwise terminated by (i) an affirmative vote of 75 percent (75%) of all member interests, or (ii) upon mutual agreement by the Parties in writing.

b) Upon termination of this Agreement, the effects of termination shall be as follows:

6

WEST\222455623.2

Exhibit 1421 - 0093

i) All rights granted under the Master License Agreement shall terminate and the Company shall cease the use of the Potato Corner Intellectual Property Rights, and Confidential Information, provided however, that the Company shall be permitted to use any of the foregoing as is reasonably required in order to comply with its obligations under its sub-licensing or franchising agreements, but only to the extent of the duration of sub-licensing or franchising agreements in existence at the time of the termination of this Agreement.

ii) The LA Group shall be subject to a non-compete arrangement and hereby agrees that, within two (2) years from the date of termination of this Agreement, it shall not engage in the business of establishing, operating, managing, licensing and franchising identical or similar products sold by the Company, using the intellectual property rights identical or similar to those used by the Company, at the time of the termination of this Agreement.

5) GENERAL PROVISIONS

a) This Agreement may not be altered, changed, supplemented or modified except by a written instrument duly signed by the Parties.

b) The Parties shall use their best efforts to cooperate for the success of the business of the Company. The Parties further agree to perform all acts and execute and deliver all documents or instruments required or necessary to fully implement or consummate the transactions contemplated in and the intent underlying this Agreement.

c) The Parties shall, to the extent feasible, cause the operating agreement of the Company to reflect the mutual covenants and provisions contained in this Agreement.

d) All notices and other communications required or permitted to be given hereunder shall be given in writing (and for this purpose shall include emails or fax transmissions) and shall be addressed to the appropriate Party at the address of such Party as heretofore designated, or at such address as such Party may designate subsequently in writing.

e) The failure of any Party at any time to require performance by the others of any provision of this Agreement shall not affect, in any way, the right of such Party to require performance of that or any other provision, and any waiver by any Party of any breach of this Agreement shall not be construed as a waiver of any continuing or succeeding breach of such provision, or a waiver of any other right under this Agreement.

f) This Agreement shall constitute the entire agreement between the Parties and shall supersede any previous agreements, written or otherwise, with respect to the same subject matter which may have been made by the Parties prior hereto.

g) The invalidity of any portion of this Agreement will not and shall not render the entire Agreement void, nor affect the validity of the rest of the provisions of this Agreement.



7

WEST\222455823.2

8

WEST\222455823.2

Exhibit 1421 - 0094

IN WITNESS WHEREOF, the parties have executed this Agreement on the date and in place first mentioned.
**Cinco Group:**

Cinco Corporation (Philippines)

Name: Jose P. Magsaysay

Title:   CEO

Jose P. Magsaysay, Jr.,

José Miguel Ma. G. Montinola

Ma. Victoria O. Bermejo

Ricardo K. Montelibano,

**L.A. Group:**

Amit Nemanim

Guy Koren

Amir Jacoby

SIGNED IN THE PRESENCE OF:

ADAM MANDEL

9

WEST\222455823.2

**Exhibit 1421 - 0095**

ACKNOWLEDGMENT

10

WEST\222455823.2

Exhibit 1421 - 0096

# EXHIBIT "C"

Exhibit 1421 - 0097

**LIMITED LIABILITY COMPANY AGREEMENT**

of

**PCJV USA, LLC**

A Delaware Limited Liability Company

THE INTERESTS CREATED BY THIS OPERATING AGREEMENT HAVE NOT BEEN
REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE
SECURITIES ACT OF 1933, AS AMENDED, OR WITH THE SECURITIES AUTHORITIES
OF ANY STATE UNDER ANY STATE SECURITIES LAWS, AND MAY NOT BE SOLD
OR OTHERWISE TRANSFERRED UNLESS REGISTERED UNDER SUCH LAWS OR
UNLESS AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF SUCH
LAWS IS AVAILABLE. THE SALE OR TRANSFER OF SUCH INTERESTS IS SUBJECT
TO CERTAIN ADDITIONAL RESTRICTIONS DESCRIBED IN THIS OPERATING
AGREEMENT.

WEST\224283219.2

Exhibit 1421 - 0098

## TABLE OF CONTENTS

Page

ARTICLE I        DEFINITIONS ........................................................................................1

ARTICLE II       FORMATION ........................................................................................4

2.1    Purpose ........................................................................................4
2.2    Powers ........................................................................................4
2.3    Formation and Name ........................................................................................4
2.4    Principal Place of Business ........................................................................................4
2.5    Registered Office and Registered Agent ........................................................................................4
2.6    Records to be Maintained ........................................................................................5
2.7    Term ........................................................................................5

ARTICLE III      MEMBERS ........................................................................................5

3.1    Classification of Members........................................................................................5
3.2    Admission of Additional Members ........................................................................................5
3.3    Right of First Refusal ........................................................................................6
3.4    Amendment of Member Listing ........................................................................................6
3.5    Payment of Costs........................................................................................6
3.6    Limited Liability of Members ........................................................................................6
3.7    Voting Rights........................................................................................6
3.8    Meetings of Members........................................................................................7
3.9    Right of Inspection; Provision of Records to Members ........................................................................................10
3.10   Representations and Warranties ........................................................................................12

ARTICLE IV       MANAGEMENT ........................................................................................12

4.1    Management ........................................................................................12
4.2    Number and Qualifications of Managers ........................................................................................14
4.3    Election of Managers........................................................................................14
4.4    Removal of Managers........................................................................................14
4.5    Resignation of Managers........................................................................................14
4.6    Term of Office as Manager ........................................................................................14
4.7    Authority of Multiple Managers........................................................................................14
4.8    Fiduciary Duties Owed by Managers ........................................................................................15
4.9    Conduct of Meetings of Managers ........................................................................................15
4.10   Regular Monthly Meetings........................................................................................15
4.11   Officers ........................................................................................15
4.12   Indemnification and Liability Insurance........................................................................................17
4.13   Actions of the Managers........................................................................................18
4.14   Meetings of Managers ........................................................................................18
4.15   Compensation of Manager ........................................................................................19
4.16   Authority of Members to Bind the Company........................................................................................19
4.17   Specific Arrangements with the Cinco Group........................................................................................20
4.18   Specific Arrangements with the LA Group ........................................................................................20

WEST\274283219.1

**Exhibit 1421 - 0099**

**TABLE OF CONTENTS**
(continued)

Page

ARTICLE V    CAPITAL ........................................................................... 21

5.1    Initial Capital Contributions ..........................................21
5.2    Capital Accounts ............................................................21
5.3    Adjustment for Distributions in Kind..........................21
5.4    Interest............................................................................21
5.5    Deficit Capital Account..................................................22
5.6    Return of Capital ...........................................................22
5.7    Optional Adjustments to Capital Accounts.................22

ARTICLE VI    INCOME AND LOSSES ......................................22

6.1    Allocations......................................................................22
6.2    Qualified Income Offset.................................................22
6.3    Minimum Gain Chargeback............................................22
6.4    Contributed Property and Revaluations......................22
6.5    Timing .............................................................................23

ARTICLE VII    DISTRIBUTIONS ...............................................23

7.1    Operating Distributions ................................................23
7.2    Generally Pro Rata.........................................................23
7.3    Liquidating Distributions...............................................23

ARTICLE VIII    ASSIGNMENT OF INTERESTS .......................23

8.1    Assignment of Interests ................................................23
8.2    No Dissolution upon Assignment..................................24
8.3    Information Regarding Assignee....................................24
8.4    No Release of Liability of Assignor...............................24
8.5    Pledge of Membership Interest......................................24
8.6    Exercise of Rights upon Death or Incompetency .......24
8.7    Exercise of Rights upon Dissolution or Termination ..24

ARTICLE IX    DISSOLUTION AND WINDING UP....................24

9.1    Dissolution......................................................................24
9.2    Effect of Dissolution......................................................25

ARTICLE X    TAX AND ACCOUNTING MATTERS .................25

10.1    Characterization as a Partnership ..............................25
10.2    No Partnership Intended for Nontax Purposes ..........25
10.3    Fiscal Year.....................................................................26
10.4    Accounting Method ......................................................26
10.5    Tax Information.............................................................26
10.6    Basis Adjustment..........................................................26
10.7    Other Elections .............................................................26
10.8    Taxes of Taxing Jurisdictions.....................................26
10.9    Tax Matters Partner .....................................................26

Exhibit 1421 - 0100

## TABLE OF CONTENTS
### (continued)

Page

ARTICLE XI       DISSOCIATION OF A MEMBER ...................................................... 27

    11.1    Dissociation ........................................................................ 27
    11.2    Rights of Dissociating Member ...................................... 27

ARTICLE XII      MISCELLANEOUS PROVISIONS ................................................ 28

    12.1    Amendment of Operating Agreement ............................ 28
    12.2    Entire Agreement ............................................................. 28
    12.3    Interpretation ................................................................... 28
    12.4    Rights of Creditors and Third Parties under Operating Agreement ...................... 28
    12.5    Valuation of Non-Cash Consideration .......................... 28
    12.6    Counterpart Execution .................................................... 28
    12.7    Remedies ........................................................................... 28
    12.8    Successors and Assigns ................................................... 29
    12.9    Severability ....................................................................... 29
    12.10   Governing Law ................................................................. 29

WEST\242432219.2

Exhibit 1421 - 0101

## LIMITED LIABILITY COMPANY AGREEMENT
### of
### PCJV USA, LLC

The Limited Liability Company Agreement is made and entered into as of the Effective Date by the Members listed below for the purpose of forming a Delaware limited liability company in accordance with the provisions hereinafter set forth.

### ARTICLE I

### DEFINITIONS

The following terms, as used herein, shall have the following respective meanings:

1.1    Act – The Delaware Limited Liability Company Act, 6 Del.C. §18-101, et seq., as amended from time to time.

1.2    Additional Member – A member other than an Initial Member or a Substitute Member who has acquired a Membership Interest from the Company.

1.3    Assignee – A transferee of a Membership Interest who has not been admitted as a Substitute Member.

1.4    Assignor – A transferor of a Membership Interest.

1.5    Business Day – Any day other than Saturday, Sunday or any legal holiday observed in the State of Delaware.

1.6    Capital Account – The account maintained for a Member or Assignee determined in accordance with Article V.

1.7    Capital Contribution – Any contribution actually made to the capital of the Company pursuant to Section 5.1 by or on behalf of a Member or Assignee. The initial Capital Contribution of the Members shall be US$50,000 which shall be fully subscribed and paid.

1.8    Certificate – The Certificate of Formation of the Company.

1.9    Company – The company named in the introductory paragraph of this Operating Agreement, and any successor thereof.

1.10    Company Liability – Any enforceable debt or obligation for which the Company is liable or which is secured by any Company Property.

1.11    Company Minimum Gain – The extent to which a nonrecourse liability exceeds the adjusted tax basis of the Company Property it encumbers. The amount of Company Minimum Gain shall be determined in accordance with Regulations Section 1.704-2(d) by substituting the terms *"Company"* and *"Holder"* for the terms *"partnership"* and *"partner,"* respectively, in each place they appear therein.

WEST\24283219.2

**Exhibit 1421 - 0102**

1.12   Company Property – Any Property owned by the Company.

1.13   Contribution – A contribution as defined by the Act.

1.14   Disposition (Dispose) – Any sale, assignment, transfer, exchange, mortgage, pledge, grant, hypothecation, or other transfer, absolute or as security or encumbrance (including dispositions by operation of law)..

1.15   Dissociation – Any action which causes a Person to cease to be Member as described in Article XI hereof.

1.16   Dissolution Event – An event, the occurrence of which will result in the dissolution of the Company under ARTICLE IX unless the Members agree to the contrary.

1.17   Distribution – A distribution of Money or Property made pursuant to this Operating Agreement.

1.18   Economic Interest – A Person's right to share in the income, gains, losses, deductions, credits or similar items of, and to receive Distributions from, the Company, exclusive of any other rights of a Member including, without limitation, the right to vote or to participate in management, or any right to information concerning the business and affairs of the Company.

1.19   Effective Date – The date the Certificate is filed with the Delaware Secretary of State.

1.20   Holder – A Person holding an Economic Interest, whether as a Member or as an Assignee.

1.21   Income and Losses – With respect to a taxable year of the Company (or other period for which Income or Losses must be computed), the Company's taxable income or loss for federal income tax purposes, as determined by the tax advisors employed by the Company for this purpose, except that: (1) any tax-exempt income of the Company as described in IRC Section 705(a)(1)(B) shall be treated as gross income of the Company, (2) any nondeductible noncapital expenditures as described in IRC Section 705(a)(2)(B) shall be treated as a deduction of the Company, and (3) if any Company property is reflected on the books of the Company at a value ("*Book Value*") different from the adjusted tax basis of such property, any item of Income or Loss with respect to such property shall be computed by reference to such Book Value.

1.22   Initial Capital Contribution – The Capital Contribution agreed to be made by the Initial Members as described in Section 5.1.

1.23   Initial Members – Those persons identified on Exhibit A attached hereto and made a part hereof by this reference who have executed the Operating Agreement.

1.24   IRC – The Internal Revenue Code of 1986, as amended.

Exhibit 1421 - 0103

1.25    Majority — The affirmative vote or consent of Members having Percentage Interests in excess of one-half of the Percentage Interests of all the Members entitled to vote on a particular matter. Assignees and, in the case of approvals to withdrawal where consent of the remaining Members is required, Dissociating Members shall not be considered Members entitled to vote for the purpose of determining a Majority. In the case of a Member who has Disposed of that Member's entire Membership Interest to an Assignee, but has not been removed as provided below, the Percentage Interest of such Assignee shall be considered in determining a Majority and such Member's vote or consent shall be determined by such Percentage Interest.

1.26    Management Right — The right of a Member to participate in the management of the Company, including the rights to information and to consent or approve actions of the Company.

1.27    Manager — A manager selected to manage the affairs of the Company as provided under Article IV hereof.

1.28    Member — A member as defined by the Act, including all Initial Members, Substitute Members and Additional Members (but not including any Assignee or any Member who has Dissociated).

1.29    Membership Interest — A membership interest as defined by the Act.

1.30    Money — Cash or other legal tender of the United States, or any obligation that is immediately reducible to legal tender without delay or discount. Money shall be considered to have a fair market value equal to its face amount.

1.31    Notice — Except as otherwise expressly provided herein, all Notices shall be in writing. Notice to the Company shall be considered given when mailed by first class mail postage prepaid addressed to any Manager in care of the Company at the address of the principal place of business of the Company. Notice to a Member shall be considered given when mailed by first class mail postage prepaid addressed to the Member at the address reflected in the Operating Agreement unless the Member has given the Company a Notice of a different address.

1.32    Operating Agreement — This Limited Liability Company Agreement and all amendments thereto adopted in accordance with this Limited Liability Company Agreement and the Act.

1.33    Organization — A Person other than a natural person. Organization includes, without limitation, corporations (both non-profit and other corporations), partnerships (both limited and general), trusts, joint ventures, limited liability companies, and unincorporated associations, but the term does not include joint tenancies and tenancies by the entirety.

1.34    Percentage Interest — With respect to a Member, the percentage set forth opposite such Member's name on Exhibit A hereto, as such Exhibit is amended from time to time in accordance with Section 3.3 hereof, and with respect to a Holder not a Member, the Percentage Interest or part thereof corresponding to the portion of a Member's Economic Interest such Holder has acquired.

Exhibit 1421 - 0104

1.35    Person – A person as defined by the Act.

1.36    Proceeding – Any judicial or administrative trial, hearing or other activity, civil, criminal or investigative, the result of which may be that a court, arbitrator, or governmental agency may enter a judgment, order, decree, or other determination which, if not appealed and reversed, would be binding upon the Company, a Member or other person subject to the jurisdiction of such court, arbitrator, or governmental agency.

1.37    Property – Any property real or personal, tangible or intangible, including money and any legal or equitable interest in such property, but excluding services and promises to perform services in the future.

1.38    Regulations – Except where the context indicates otherwise, the permanent, temporary or proposed regulations of the Department of the Treasury promulgated under the IRC as such regulations may be amended from time to time.

1.39    Taxing Jurisdiction – Any state, local, or foreign government that collects tax, interest or penalties, however designated, on any Member's share of the income or gain attributable to the Company.

1.40    Term – As specified in Section 2.7.

## ARTICLE II

### FORMATION

2.1    Purpose.. The purpose of the Company is to engage in any lawful act or activity for which a limited liability company may be organized under the Act or the laws of any other jurisdiction in which the Company may do business.

2.2    Powers. The Company shall have all powers necessary to accomplish its purposes without the necessity of their specific enumeration herein including, without limitation, all powers described in Section 18-106 of the Act.

2.3    Formation and Name. The Members have caused to be formed a limited liability company under the name of PCJV USA, LLC (the "*Company*"), by the filing of the Certificate pursuant to the provisions of Section 18-201 of the Act. The Members desire to govern the affairs of the Company by entering into this Operating Agreement.

2.4    Principal Place of Business. The principal place of business of the Company shall be located at Suite 1110, 6380 Wilshire Blvd, CA 90048 USA, unless changed by the Managers.

2.5    Registered Office and Registered Agent. The Company's registered office is at 615 South DuPont Highway, City of Dover, County of Kent 19901 and the name of its initial registered agent at such address is National Corporate Research, Ltd. The Company may change the registered office and/or the registered agent at such times and from time to time as the Managers may deem advisable.

WEST\224283219.7                                      -4-

Exhibit 1421 - 0105

2.6    Records to be Maintained. The Company shall maintain the following records at its principal place of business:

2.6.1    A current list of the full name and last known business or residence address of each Member and Assignee set forth in alphabetical order, together with a schedule showing the Capital Contribution and Percentage Interest of each Member and Assignee;

2.6.2    A current list of the full name and business or residence address of each Manager, if any;

2.6.3    A copy of the Certificate and all amendments thereto, together with any powers of attorney pursuant to which the Certificate or any amendments thereto were executed;

2.6.4    Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six most recent taxable years;

2.6.5    A copy of this Operating Agreement and any amendments hereto, together with any powers of attorney pursuant to which this Operating Agreement or any amendments hereto were executed;

2.6.6    Copies of the financial statements of the Company, if any, for the six most recent fiscal years;

2.6.7    The books and records of the Company as they relate to the internal affairs of the Company for at least the current and past four fiscal years; and

2.6.8    Any other records to be maintained pursuant to the Act.

2.7    Term. The Term of this Operating Agreement shall commence upon the date the Certificate is filed and shall continue indefinitely unless otherwise terminated by (i) an affirmative vote of 75 percent (75%) of all member interests; or (ii) upon mutual agreement by the Parties in writing.

### ARTICLE III

### MEMBERS

3.1    Classification of Members. Pursuant to the Joint Venture Agreement entered into by the Members on ___8.8.12___, the Members shall be classified and designated as either part of the Cinco Corporation (Philippines) group (the "Cinco Group") or the LA group (the "LA Group"). Both the Cinco Group and the LA Group agreed to the specific rights and obligations granted to each group, and undertake to fully observe the rights vested to each group under the Operating Agreement.

3.2    Admission of Additional Members. Additional Members may be admitted to the Company upon the consent of the Members required pursuant to Section 3.7, which such consent

Exhibit 1421 - 0106

may be granted in their sole discretion. The Capital Contribution of any Additional Member shall be determined by the Members consenting to the admission. Each Additional Member shall execute a counterpart of this Operating Agreement, agreeing thereby to be bound by all of the terms and provisions hereof.

3.3   Right of First Refusal. A Member of the Cinco Group or the the LA Group shall not assign any of its rights or obligations nor his/its Member Interests in the Company outside of the Cinco Group and the LA Group, without the prior written consent of the non-assigning group. In the event a Member of either the Cinco Group or the LA Group desire to transfer or sell his/its pro rata members interest in the Company to a person other those in either the Cinco Group or the LA Group, such Member shall be obligated to sell the same first to the existing Members, which has have thirty (30) days within which to exercise its rights of first refusal from the date of receipt of a written notice to sell. For this purpose, the Parties hereby agree that the right of first refusal may be exercised in accordance with the following formula: The average of the Company's earnings before interest, depreciation, taxes and amortization (EBITDA) for the last two (2) years multiplied by 5 times, and further multiplied by the percentage of member interest subject to such right of first refusal over total outstanding Member Interests.

3.4   Amendment of Member Listing. Upon admission of an Additional Member, the Member listing required by Section 2.6 and Exhibit A hereto shall be amended accordingly.

3.5   Payment of Costs. All reasonable expenses, including attorneys' fees, incurred by the Company in connection with the admission of an Additional Member shall be borne by such Additional Member.

3.6   Limited Liability of Members. Members shall not be personally liable for the liabilities of the Company.

3.7   Voting Rights. All Members shall be entitled to vote on any matter submitted to a vote of the Members. Unless otherwise specified herein, actions to be taken by Members require the consent of a Majority of the Percentage Interests represented at a duly held meeting of the Members or, if such action is taken by written consent, by a Majority of all of the Percentage Interests. Notwithstanding the foregoing, the following actions require the consent described below:

| Action | Consent Required |
|---|---|
| Decision to dissolve the Company. | 75% of all Membership Interests |
| Decision to continue the business of the Company after a Dissolution Event. | 75% of all Membership Interests |
| Approval of the transfer of a Membership Interest and admission of an Assignee as a Substitute Member of the Company. | Prior written consent of the other Member |

6

Exhibit 1421 - 0107

| Action | Consent Required |
|--------|------------------|
| Approval of the withdrawal and Dissociation of a Member of the Company. | Prior written consent of the other Member |
| Any amendment of the Certificate or this Operating Agreement. | 75% of all Membership Interests |
| Agreement of merger as defined in Section 17551 of the Act. | 75% of all Membership Interests |
| Disposition by the Company of all or substantially all of the Company's assets. | 75% of all Membership Interests |
| Confession of a judgment against the Company in excess of Ten Thousand Dollars. | 75% of all Membership Interests |

3.8    Meetings of Members.

3.8.1    Place of Meetings. Meetings of Members may be held at any place, selected by the Person or Persons calling the meeting. If no other place is stated or fixed, all meetings shall be held at the principal place of business of the Company.

3.8.2    Calling of Meetings. A meeting of the Members may be called at any time by any Manager or by one or more Members with an aggregate Percentage Interest of more than ten percent (10%) for the purpose of addressing any matter on which the Members may vote.

3.8.3    Notice of Meetings. Whenever Members are required or permitted to take any action at a meeting, a Notice of the meeting shall be given not less than ten (10) calendar days nor more than sixty (60) calendar days before the date of the meeting to each Member entitled to vote at the meeting. The Notice shall state the place, date, and hour of the meeting and the general nature of the business to be transacted. No other business may be transacted at such a meeting.

3.8.4    Means of Providing Notice of Meetings. Any Notice of a meeting of the Members shall be given either personally or by mail or other means of written communication, charges prepaid, addressed to the Member at the address of the Member appearing on the books of the Company or given by the Member to the Company for the purpose of Notice, or, if no address appears or is given, at the place where the principal place of business of the Company is located or by publication at least once in a newspaper of general circulation in the county in which the principal place of business is located. The Notice shall be deemed to have been given at the time when delivered personally or deposited in the mail or sent by other means of written communication. An affidavit of mailing of any Notice in accordance with the provisions of this section, executed by a Manager or Member, shall be prima facie evidence of the giving of the Notice.

Exhibit 1421 - 0108

Upon written request to a Manager by any Person entitled to call a meeting of Members, the Manager shall immediately cause Notice to be given to the Members entitled to vote that a meeting will be held at a time requested by the Person calling the meeting, not less than ten (10) calendar days nor more than sixty (60) calendar days after the receipt of the request. If the Notice is not given within twenty (20) calendar days after receipt of the request, the Person entitled to call the meeting may give the Notice or, upon the application of that Person, the superior court of the county in which the principal place of business of the Company is located, or if the principal place of business is not in this state, the county in which the Company's address in this state is located, shall summarily order the giving of the Notice, after Notice to the Company affording it an opportunity to be heard.

The Members may, at their discretion, invite non-Members to join, but only as non-voting observers. Further, to the extent allowed by the financial condition of the Company, and as agreed upon by a majority of all member interests, the Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses incurred by the Members in attendance.

3.8.5    Adjourned Meetings. When a Members' meeting is adjourned to another time or place, unless the Certificate or this Operating Agreement otherwise requires, and, except as provided in the Act, Notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken. At the adjourned meeting, the Company may transact any business that may have been transacted at the original meeting. If the adjournment is for forty-five (45) calendar days or more, or if after the adjournment a new record date is fixed for the adjourned meeting, a Notice of the adjourned meeting shall be given to each Member entitled to vote at the meeting.

3.8.6    Validation of Meeting Held Without Proper Call or Notice. The actions taken at any meeting of Members, however called and noticed, and wherever held, have the same validity as if taken at a meeting duly held after regular call and notice, if a quorum is present either in person or by proxy, and if, either before or after the meeting, each of the Members entitled to vote, not present in person or by proxy, signs a written waiver of Notice or consents to the holding of the meeting or approves the minutes of the meeting. All waivers, consents, and approvals shall be filed with the Company records or made a part of the minutes of the meeting. Attendance of a Member at a meeting shall constitute a waiver of Notice of the meeting, except when the Member objects, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Attendance at a meeting is not a waiver of any right to object to the consideration of matters required by this title to be included in the Notice but not so included, if the objection is expressly made at the meeting. Neither the business to be transacted nor the purpose of any meeting of Members need be specified in any written waiver of Notice, unless otherwise provided in the Certificate or this Operating Agreement, except as provided in subsection 3.8.8.

3.8.7    Participation Through Telecommunications Equipment. Members may participate in a meeting of the Company through the use of conference telephones or similar communications equipment, so long as all Members participating in the meeting

Exhibit 1421 - 0109

can hear one another. Participation in a meeting pursuant to this provision constitutes presence in person at that meeting.

3.8.8    Notice of General Nature of Meeting. Any action approved at a meeting, other than by unanimous approval of those entitled to vote, shall be valid only if the general nature of the proposal so approved was stated in the Notice of meeting or in any written waiver of Notice.

3.8.9    Quorum.

3.8.9.1    Members holding in excess of one-half of the Percentage Interests represented in person or by proxy shall constitute a quorum at a meeting of Members.

3.8.9.2    The Members present at a duly called or held meeting at which a quorum is present may continue to transact business until adjournment, notwithstanding the loss of a quorum, if any action taken after loss of a quorum, other than adjournment, is approved by the requisite Percentage Interests of Members specified in the Certificate, this Operating Agreement, or the Act.

3.8.9.3    In the absence of a quorum, any meeting of Members may be adjourned from time to time by the vote of a majority of the Membership Interests represented either in person or by proxy at such meeting, but no other business may be transacted, except as provided in subparagraph 3.8.9.2 above.

3.8.10    Action Without a Meeting.

3.8.10.1    Any action that may be taken at any meeting of the Members may be taken without a meeting if a consent in writing, setting forth the action so taken, is signed and delivered to the Company within sixty (60) calendar days of the record date for that action by Members having not less than the minimum number of votes that would be necessary to authorize or take that action at a meeting at which all Members entitled to vote thereon were present and voted.

3.8.10.2    Unless the consents of all Members entitled to vote have been solicited in writing, (A) Notice of any Member approval of an amendment to the Certificate or this Operating Agreement, a dissolution of the Company, or a merger of the Company, without a meeting by less than unanimous written consent shall be given at least ten (10) calendar days before the consummation of the action authorized by such approval, and (B) prompt Notice shall be given of the taking of any other action approved by Members without a meeting by less than unanimous written consent, to those Members entitled to vote who have not consented in writing.

3.8.10.3    Any Member giving a written consent, or the Member's proxyholder, may revoke the consent by a writing received by the Company prior to the time that written consents of Members having the minimum number of votes that would be required to authorize the proposed action have been received

Exhibit 1421 - 0110

by the Company, but may not do so thereafter. This revocation is effective upon its receipt at the principal place of business of the Company.

3.8.11 Proxies. Every Member entitled to vote shall have the right to do so in person or by one (1) or more agents authorized by a written proxy executed by such Member or his duly authorized agent and filed with the Company. Any proxy executed is not revoked and continues in full force and effect until (i) a writing stating that the proxy is revoked or a duly executed proxy bearing a later date is filed with the Company prior to the vote pursuant thereto, (ii) the Member executing the proxy attends the meeting and votes in person, or (iii) written Notice of the death or incapacity of the maker of such proxy is received by the Company before the vote pursuant thereto is counted; provided that no proxy shall be valid after the expiration of eleven months from the date of its execution, unless the person executing it specifies therein the length of time for which such proxy is to continue in force.

3.8.12 Record Date. In order that the Company may determine the Members of record entitled to Notices of any meeting or to vote, or entitled to receive any Distribution or to exercise any rights in respect of any other lawful action, a Manager, or Members representing more than ten percent (10%) of the Percentage Interests, may fix, in advance, a record date, that is not more than sixty (60) calendar days nor less than ten (10) calendar days prior to the date of the meeting and not more than sixty (60) calendar days prior to any other action. If no record date is fixed:

3.8.12.1   The record date for determining Members entitled to Notice of or to vote at a meeting of Members shall be at the close of business on the business day next preceding the day on which Notice is given or, if Notice is waived, at the close of business on the business day next preceding the day on which the meeting is held.

3.8.12.2   The record date for determining Members entitled to give consent to Company action in writing without a meeting shall be the day on which the first written consent is given.

3.8.12.3   The record date for determining Members for any other purpose shall be at the close of business on the day on which the Managers adopt the resolution relating thereto, or the sixtieth day prior to the date of the other action, whichever is later.

3.8.12.4   The determination of Members entitled to Notice of or to vote at a meeting of Members shall apply to any adjournment of the meeting unless a Manager or the Members who called the meeting fix a new record date for the adjourned meeting, but the Manager or the Members who called the meeting shall fix a new record date if the meeting is adjourned for more than forty five (45) calendar days from the date set for the original meeting.

3.9     Right of Inspection, Provision of Records to Members.

Exhibit 1421 - 0111

3.9.1    Right of Inspection. Each Member, Manager and Assignee has the right, upon reasonable request, for purposes reasonably related to the interest of that Person as a Member, Manager, or Assignee, to each of the following at the expense of the Company:

3.9.1.1    To inspect and copy during normal business hours any of the records required to be maintained by Sections 2.6.1, 2.6.2, 2.6.3 and 2.6.4 above; and

3.9.1.2    To obtain from a Manager, promptly after becoming available, a copy of the Company's federal, state, and local income tax or information returns for each year.

3.9.2    Additional Rights. So long as the Company has more than 35 Members:

3.9.2.1    A Manager shall cause an annual report to be sent to each of the Members not later than one hundred twenty (120) calendar days after the close of each fiscal year. That report shall contain a balance sheet as of the end of the fiscal year and an income statement and statement of changes in financial position for the fiscal year.

3.9.2.2    Members with an aggregate Percentage Interest of at least five percent (5%), or any three or more Members, may make a written request to a Manager for an income statement of the Company for the initial three-month, six-month, or nine-month period of the current fiscal ended more than thirty (30) calendar days prior to the date of request, and a balance sheet of the Company as of the end of that period. The statement shall be delivered or mailed to the Members within thirty (30) calendar days thereafter.

3.9.2.3    The financial statements referred to in this section shall be accompanied by the report thereon, if any, of the independent accounts engaged by the Company or, if there is no report, the certificate of the Treasurer of the Company that the financial statements were prepared without audit from the books and records of the Company.

3.9.3    Copy of Amendment of Certificate and Operating Agreement. A Manager shall promptly furnish to a Member a copy of any amendment to the Certificate or this Operating Agreement executed by that Manager pursuant to a power of attorney from the Member.

3.9.4    Tax Information. The Company shall send or cause to be sent to each Holder within ninety (90) calendar days after the end of each taxable year such information as is necessary to complete their respective federal and state income tax or information returns, and, if the Company has thirty-five (35) or fewer Holders, a copy of the Company's federal, state, and local income tax or information returns for the year.

3.9.5    Relationship with Act. Nothing in this Section 3.9 shall be construed as in any way limiting a Member's right of inspection as set forth in Section 18-305 of the Act.

Exhibit 1421 - 0112

3.10    Representations and Warranties.  Each Member hereby represents and warrants to the Company and each other Member that:

3.10.1  If that Member is a organization, that it is duly organized, validly existing, and in good standing under the law of its state of organization and that it has full organizational power to execute and agree to the Operating Agreement to perform its obligations hereunder;

3.10.2  Such Member is acquiring its interest in the Company for its own account for investment purposes only and not with a view to the resale or distribution of all or any part of such interest and such Member has no present intention, agreement or arrangement to divide its participation with others or to sell, assign, transfer or otherwise dispose of all or any part of such interest.  Such Member is aware that the interests have not been registered under the Securities Act of 1933, or any state securities laws, and that such interests may not be resold or otherwise disposed of unless they are registered thereunder or an exemption from registration is available.  Accordingly, each Member is aware that it must bear the economic risk of investment in the Company for an indefinite period of time.  Each Member is capable of bearing that risk.

## ARTICLE IV

## MANAGEMENT

4.1    Management.  Subject to the limitations of the Certificate, the Act, and this Operating Agreement as to actions to be authorized or approved by the Members, the business and affairs of the Company shall be managed and all the Company powers shall be exercised by or under the direction of the Managers.  The Managers may delegate the management of the day-to-day operation of the business of the Company to the officers of the Company or other persons provided that the business and affairs of the Company shall be managed and all powers shall be exercised under the ultimate direction of the Managers.  Without prejudice to such general powers, but subject to the same limitations, the Managers shall have the following powers:

4.1.1  To approve compensation packages for the managers, executive offices and key personnel.

4.1.2  To approve the Accounting System/Procedures/Software/Method to be used by the Company.

4.1.3  To approve the operating budget of the Company, and any changes to it.

4.1.4  To approve all franchising agreements, and lease agreements.

4.1.5  To approve all purchases and disbursements in excess of Ten Thousand Dollars ($10,000), provided that such amount may be changed or modified by Management as it deems necessary.

4.1.6  To institute, prosecute, and defend any Proceeding in the Company's name;

Exhibit 1421 - 0113

4.1.7   To purchase, receive, lease or otherwise acquire and deal with the Property, wherever located;

4.1.8   To sell, convey, mortgage, pledge, lease, exchange, or otherwise Dispose of Property;

4.1.9   To lend money, invest and reinvest the Company's funds, and receive and hold Property as security for repayment, including, without limitation, the loaning of money to Members, officers, employees, and agents;

4.1.10  To borrow money and incur indebtedness for the purposes of the Company, and to cause to be executed and delivered therefor in the Company name promissory notes, bonds, debentures, deeds of trust, mortgages, pledges, hypothecations or other evidences of debt and securities therefor;

4.1.11  To change the principal place of business of the Company from one location to another as provided in Section 2.3 hereof, and to fix and locate from time to time one or more subsidiary offices of the Corporation;

4.1.12  To prescribe the forms of Membership Certificates, and to alter the form of such Membership Certificates from time to time as in their judgment they deem best, provided such Membership Certificates shall at all times comply with provisions of law;

4.1.13  To select and remove all of the officers, agents and employees of the Company, to prescribe such powers and duties for them as may not be inconsistent with law, with the Certificate or this Operating Agreement, to fix their compensation, and to require from them security for faithful service;

4.1.14  To pay pensions and establish pension plans, pension trusts, profit sharing plans, and benefit and incentive plans for all or any of the current or former Members, employees, and agents of the Company;

4.1.15  To make donations to the public welfare or for religious, charitable, scientific, literary or educational purposes;

4.1.16  To purchase insurance on the life of any of the Members or Company employees for the benefit of the Company;

4.1.17  To participate in partnership agreements, joint ventures, or other associations of any kind with any person or persons; and

4.1.18  To authorize the issuance of Additional Membership Interests from time to time upon such terms as may be lawful in consideration of money paid, labor done, services actually rendered to the Company or for its benefit or in its formation or reorganization, debts or securities cancelled, and tangible or intangible property actually received either by the Company or any one of its wholly-owned subsidiaries, if any, or future services.

Exhibit 1421 - 0114

4.2   <u>Number and Qualifications of Managers</u>. Until changed by amendment of the Certificate or an amendment to this section:

4.2.1   The agreed-upon and authorized number of Managers shall be seven (7), four (4) of whom shall be designated by the Cinco Group, and three (3) designated by the LA Group.

4.2.2   Upon the formation of the Company, the following shall be named and designated as managers:

4.2.2.1   For the Cinco Group: Jose P. Magsaysay, Jr., Jose Miguel Ma. Montinola, Ma. Victoria O. Bermejo, and Ricardo K. Montelibano.

4.2.2.2   For the LA Group: Amit Nemanim, Guy Koren, and Amir Jacoby.

4.3   <u>Election of Managers</u>.

4.3.1   <u>Election at Meeting of Members</u>. In any election of Managers at a meeting of Members duly called and noticed, the Cinco Group shall be entitled to elect four (4) Managers, while the LA Group shall be entitled to elect three (3) Managers. Interests entitled to be voted for them up to the number of Managers to be elected by such Members shall be elected. Elections for Managers need not be by ballot unless a Member demands election by ballot at the meeting and before the voting begins.

4.3.2   <u>Election by Written Consent</u>. Managers may alternatively be elected by a written consent action of Members made pursuant to Section 3.8.10 executed by a Majority of the Members.

4.4   <u>Removal of Managers</u>. Any Managers may be removed, with or without cause, by the vote of a Majority of the Members by written consent or at a meeting of Members called expressly for that purpose. Any removal shall be without prejudice to the rights, if any, of the Manager under any contract of employment.

4.5   <u>Resignation of Managers</u>. Any Manager may resign as a Manager at any time upon written Notice to the Company, without prejudice to the rights, if any, of the Company under any contract to which the Manager is a party.

4.6   <u>Term of Office as Manager</u>. Each Manager shall serve until the earliest to occur of (i) the resignation of the Manager; (ii) the removal of the Manager; or (iii) the election of a successor.

4.7   <u>Authority of Multiple Managers</u>. If, pursuant to Section 4.2 above, more than one manager is authorized, then any one or more Managers may take any action permitted to be taken by any one or more other Managers, unless this Operating Agreement or the Act requires the consent of more than one Manager.

Exhibit 1421 - 0115

4.8    Fiduciary Duties Owed by Managers. Managers shall owe fiduciary duties to the Company and the Members in the manner prescribed in the Act and under applicable case law.

4.9    Conduct of Meetings of Managers. The Managers may adopt such rules and regulations for the conduct of its meetings and the management of the Company not inconsistent with this Operating Agreement or applicable law

4.10    Regular Monthly Meetings. The Managers shall meet at least on a monthly basis, and may be done in person, via teleconference or through the internet. The Managers may, at their discretion, invite non-Members to join, but only as non-voting observers.

4.11    Officers.

4.11.1    Officers. The officers of the Company, if any, shall include the following: Chairman of the Board of Members, President, Corporate Secretary, and Treasurer. The Company may also have, at the discretion of the Managers, one or more vice-presidents, one or more assistant secretaries, one or more assistant financial officers, and such other officers as may be appointed in accordance with the provisions of this Operating Agreement. Any number of offices may be held by the same person. Officers need not be Members.

4.11.2    Election. The officers of the Company, except such officers as may be appointed in accordance with the provisions of Section 10.3, shall be chosen by the Managers, and each shall hold his office until he or she shall resign or shall be removed by the Managers or otherwise disqualified to serve, or his successor shall be elected and qualified.

4.11.3    Subordinate Officers. The Managers may appoint, and may empower the President to appoint, such other officers as the business of the Company may require, each of whom shall hold office for such period, have such authority and perform such duties as the appointing authority may designate, subject to any limitations imposed by resolution of the Managers.

4.11.4    Removal. Any officer may be removed, either with or without cause, by the Managers, at any regular or special meeting thereof or, except in case of an officer chosen by the Managers, by any officer upon whom such power of removal may be conferred by the Managers (subject, in each case, to the rights, if any, of an officer under any contract of employment).

4.11.5    Resignation. Any officer may resign at any time by giving Notice to the Managers or to the President or to the Secretary of the Company, but without prejudice to the rights, if any, of the Company under any contract to which such officer is a party. Any such resignation shall take effect at the date of the receipt of such Notice or any later time specified therein; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective

Exhibit 1421 - 0116

4.11.6 <u>Vacancies</u>. A vacancy in any office because of death, resignation, removal, disqualification or any other cause shall be filled in the manner prescribed in this Operating Agreement for regular appointments to such office.

4.11.7 <u>President</u>. The President shall be the chief executive officer of the Company and shall, subject to the control of the Managers, have general supervision, direction and control of the business and officers of the Company. The President shall preside at all meetings of the Members and the Managers. He or she shall have the general powers and duties of management usually vested in the office of the President of a corporation, and shall have such other powers and duties as may be prescribed by the Managers or this Operating Agreement. As agreed upon by the Members, at any given time, the President shall be any of the following: Amit Nemanim, Guy Korean, and Amir Jacoby. The initial President of the Company shall be Amit Nemanim. The President of the Company shall render the following services and shall perform the following duties for the Company in a faithful, diligent and efficient manner:

4.11.7.1    The President shall be responsible for all management, operational, marketing, establishment, maintenance, licensing and sub-licensing activities with respect to the "Potato Corner" outlets/stores in the Territory. He shall use his best efforts at all times during the term of this Agreement to operate and maintain the "Potato Corner" outlets/stores in the Territory according to the highest standards achievable consistent with the overall plan of the Management of the Company. The President shall comply with the rules, policies and procedures approved by the Management of the Company from time to time.

4.11.7.2    The President shall advertise market and promote the "Potato Corner" outlets/stores with the goal of causing public knowledge, awareness and patronage of the "Potato Corner" outlets/sites.

4.11.7.3    The President shall maintain a comprehensive system of records, books and accounts, with respect to the licensing and sub-licensing activities, operation, establishment, management, maintenance and other activities of the "Potato Corner" outlets /stores in the Territory with the assistance of the Corporate Secretary.

4.11.7.4    No later than the twentieth (20th) day of each month, with respect to the preceding month, the President shall render a statement of receipts and disbursements, a schedule of accounts receivable and payable, and a schedule of fees collected and distributed, together with a reconciled bank statement as of the last day of the month with the assistance of the Corporate Secretary.

4.11.7.5    No later than three (3) months after the end of a fiscal year, the President shall, with the assistance of the Corporate Secretary and external accountant hired by Management, cause the Company to issue audited financial statements, and shall provide a copy of the same to all the members of Management.

Exhibit 1421 - 0117

4.11.7.6    To the extent the President is lawfully able to do so, the President shall take such action as may be necessary to comply promptly with any and all laws, ordinances, orders or other requirements of any federal, state, county or municipal authority having jurisdiction of the Company and affecting the Company.

4.11.8 Secretary. The Secretary shall record or cause to be recorded, and shall keep or cause to be kept, at the principal place of business of the Company and such other place or places as the Managers may order, a book of minutes of actions taken at all meetings of Managers, committees and Members, with the time and place of holding, whether regular or special, and, if special, how authorized, the Notice thereof given, the names of those present at Managers' and committee meetings, the Percentage Interest present or represented at Members' meetings, and the proceedings thereof.

The Secretary shall keep, or cause to be kept, at the principal place of business those records referenced in Section 2.6 above and, if the Company has issued Membership Certificates, a register showing the number and date of each Membership Certificate, and the number and date of each Membership Certificate surrendered for cancellation.

The Secretary shall give, or cause to be given, Notice of all the meetings of the Members and the Managers required by this Operating Agreement or by the Act to be given, and shall have such other powers and perform such other duties as may be prescribed by the Managers or by this Operating Agreement.

4.11.9 Treasurer. The Treasurer shall keep and maintain, or cause to be kept and maintained, adequate and correct accounts of the properties and business transactions of the Company, including accounts of its assets, liabilities, receipts, disbursements, income, losses, changes in financial position, Capital Accounts, and retained earnings.

The Treasurer shall deposit all moneys and other valuables in the name and to the credit of the Company with such depositories as may be designated by the Managers. He or she shall disburse the funds of the Company as may be ordered by the Managers, shall render to the President and the Managers whenever they request it, an account of all of his transactions as Treasurer and of the financial condition of the Company, and shall have such other powers and perform such other duties as may be prescribed by the Managers or this Operating Agreement.

4.12    Indemnification and Liability Insurance.

4.12.1  The Company may provide indemnification to its Managers, officers and agents to the fullest extent permitted by Delaware law.

4.12.2  The Company shall have the power to purchase and maintain insurance on behalf of any Manager or officer against any liability asserted against or incurred by a Manager or officer in that capacity or arising out of that person's status as a Manager or officer of the Company.

Exhibit 1421 - 0118

4.13    Actions of the Managers. Each Manager has the power to bind the Company as provided in this ARTICLE IV. If there is more than one Manager, decisions of the Managers shall be made by majority vote of the Managers if at a meeting, or by unanimous written consent. No act of a Member in contravention of such a determination shall bind the Company to Persons having knowledge of such determination.

4.14    Meetings of Managers.

4.14.1  Place of Meetings. Meetings of Managers may be held at any place, selected by the person or persons calling the meeting. If no other place is stated or fixed, all meetings shall be held at the principal place of business of the Company.

4.14.2  Calling of Meetings. A meeting of the Managers may be called at any time by the President or any two Managers.

4.14.3  Notice of Meetings. Notice of the time and place of meetings of Managers shall be personally delivered to each Manager or communicated to each Manager by telephone or mail, charges prepaid, addressed to the Manager's address as is shown upon the records of the Company, or if it is not so shown on such records or is not readily ascertainable, at the place at which the meetings of Managers are regularly held. In the case Notice is mailed, it shall be deposited in the United States mail at least ninety-six (96) hours prior to the time of the holding of the meeting. In the event Notice is delivered personally or communicated by telephone, it shall be so delivered or communicated at least forty-eight (48) hours prior to the time of the holding of a meeting.

Except as otherwise provided by the Act or this Operating Agreement, a Notice need not specify the purpose of the meeting of the Managers. Whenever any Manager has been absent from any meeting of the Manager for which Notice has not been dispensed with, an entry in the minutes to the effect that Notice has been duly given shall be conclusive and incontrovertible evidence that due Notice of such meeting was given to such Manager.

4.14.4  Participation Through Telecommunications Equipment. Managers may participate in a meeting of the Company through the use of conference telephones or similar communications equipment, as long as all Managers participating in the meeting can hear one another. Participation in a meeting pursuant to this provision constitutes presence in person at that meeting.

4.14.5  Adjourned Meetings. When a Managers' meeting is adjourned to another time or place, unless the Certificate or this Operating Agreement otherwise requires, and, except as provided in the Act, Notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken. At the adjourned meeting, the Managers may transact any business that may have been transacted at the original meeting. If the adjournment is for forty-eight hours or more, a Notice of the adjourned meeting shall be given to each Member entitled to vote at the meeting.

18

Exhibit 1421 - 0119

4 14.6  Validation of Meeting Held Without Proper Call or Notice.  The actions taken at any meeting of Managers, however called and noticed, and wherever held, have the same validity as if taken at a meeting duly held after regular call and notice, if a quorum is present either in person or by proxy, and if, either before or after the meeting, each of the Managers signs a written waiver of Notice or consents to the holding of the meeting or approves the minutes of the meeting.  All waivers, consents, and approvals shall be filed with the Company records or made a part of the minutes of the meeting. Attendance of a Manager at a meeting shall constitute a waiver of Notice of the meeting, except when the Manager objects, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.

4.14.7  Participation Through Telecommunications Equipment.  Managers may participate in a meeting of the Managers through the use of conference telephones or similar communications equipment, as long as all Managers participating in the meeting can hear one another.  Participation in a meeting pursuant to this provision constitutes presence in person at that meeting.

4.14.8  Quorum.

4.14.8.1   A majority of the Managers in attendance or represented by proxy shall constitute a quorum at a meeting of Managers.

4.14.8.2   The Managers present at a duly called or held meeting at which a quorum is present may continue to transact business until adjournment, notwithstanding the loss of a quorum, if any action taken after loss of a quorum, other than adjournment, is approved by the requisite number of Managers specified in the Certificate, this Operating Agreement, or the Act.

4.14.8.3   In the absence of a quorum, any meeting of Managers may be adjourned from time to time by the vote of a majority of the Managers in attendance, but no other business may be transacted, except as provided in subparagraph 4.14.8.2 above.

4.14.9  Action Without a Meeting.  Any action required or permitted to be taken by the Managers may be taken without a meeting if all the Managers shall individually or collectively consent in writing to such action.  Such consent or consents shall be filed with the minutes of the proceedings of the Managers and shall have the same force and effect as a unanimous vote of the Managers.

4.15   Compensation of Manager.  Each Manager shall be reimbursed all reasonable expenses incurred in managing the Company and shall be entitled to compensation in an amount, if any, to be determined from time to time by the affirmative vote of a Majority of the Members.

4.16   Authority of Members to Bind the Company.  The Members hereby agree that only the Managers and authorized agents of the Company shall have the authority to bind the Company.  No Member other than a Manager shall take any action as a Member to bind the Company, and each Member shall indemnify the Company for any costs or damages incurred by the Company as a result of the unauthorized action of such Member.

Exhibit 1421 - 0120

4.17    Specific Arrangements with the Cinco Group. As agreed upon in the Joint Venture Agreement, the Company shall enter into a Master License Agreement with Cinco Corporation (Philippines), Inc. (or an affiliated company designated) which shall include the following terms and conditions:

4.17.1    The Company agrees to license the "POTATO CORNER" intellectual property rights from Cinco Corporation (Philippines), Inc. (or an affiliated company designated) consisting of (i) the trademark, service mark and trade name "POTATO CORNER"; and (ii) various trademarks, service marks, trade names, slogans, designs, insignias, emblems, symbols, color schemes, package features, logo and other propriety identifying characteristics used in relation and in connection with the "Potato Corner" Products and the System; and (iii) as well as other intellectual property rights in connection with the "POTATO CORNER" intellectual property rights, for use in the Territory.

4.17.2    The Company agrees to pay, as an arm's length license fee, the following amounts: (i) With respect to the licensing / sub-licensing or franchising the "POTATO CORNER" intellectual property rights in connection with the "POTATO CORNER" outlets/stores, an amount equal to thirty percent (30%) of all initial/franchise fees and ongoing royalty fees paid to/ collected by the Company. Payments shall be made to Cinco (or an affiliated company to be designated by Cinco) by wire transfer using a bank or other financial institution specified by it within thirty (30) days from receipt of the fees by the Company; and (ii) All withholding and other applicable taxes levied by any authority on the payments by the Company shall be borne solely by the Company.

4.18    Specific Arrangements with the LA Group. As agreed upon in the Joint Venture Agreement, the Company agrees to engage the LA Group to provide management and strategic experience and expertise during the duration of this Agreement. The Company shall enter into a Master Services Agreement with the LA Group (or a corporation to be designated by the LA Group) which shall include the following terms and conditions:

4.18.1    In consideration for the provision of its services under the Master Services Agreement, the LA Group shall be entitled to a services fee equal to thirty (30%) percent of all initial/franchise fee and continuing royalty fees paid to/ collected by the Company.

4.18.2    All withholding and other applicable taxes levied by any authority on the payments by the Company to the LA Group under this Agreement shall be borne solely by the Company.

4.18.3    The LA Group shall faithfully, diligently and efficiently exercise its obligations and responsibilities under the Master Services Agreement.

4.18.4    The LA Group shall maintain and protect confidential information belonging to Cinco or the Company, and such undertaking shall apply to all of its partners, officers, employees, or agents.

Exhibit 1421 - 0121

## ARTICLE V

## CAPITAL

5.1    Initial Capital Contributions. Upon execution of this Agreement, each Member shall assign, convey and transfer their respective Initial Capital Contribution to the Company. Each Member represents and warrants to the Company that (i) the Member's Shares are free of any mortgage, pledge, lien, security, interest or other encumbrance of any kind or nature, (ii) such Member is the lawful beneficial and record owner of, and has good and marketable title to, the Member's Shares, and (iii) to the best of such Member's knowledge, the Member's Shares are duly authorized, validly issued, fully paid and nonassessable. Additional Members shall make Capital Contributions in the amount, at the time and on the terms determined by the Members consenting to the admission pursuant to Section 3.1 hereof.

5.2    Capital Accounts. The Company shall establish and maintain a Capital Account for each Holder in accordance with Regulations Section 1.704-1(b)(2)(iv). Accordingly, a Holder's Capital Account shall be increased by (1) the amount of money the Holder contributes to the Company, (2) the fair market value of property the Holder contributes to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under IRC Section 752, and (3) allocations to the Holder of Income (or items thereof), including Income and gain exempt from tax and gain as computed for book purposes in accordance with Regulations Section 1.704-1(b)(2)(iv)(g) but excluding any gain separately computed for tax purposes as described in Regulations Section 1.704-1(b)(4)(i). A Holder's Capital Account shall be decreased by (1) the amount of money the Company distributes to the Holder, (2) the fair market value of property the Company distributes to the Holder (net of any liabilities secured by such distributed property that the Holder is considered to assume or take subject to under IRC Section 752), (3) allocations to the Holder of the Company's nondeductible, noncapital expenditures, and (4) allocations to the Holder of Losses (or item thereof), including loss and deduction as computed for book purposes in accordance with Regulations Section 1.704-1(b)(2)(iv)(g) but excluding nondeductible, noncapital expenditures and loss and deduction separately computed for tax purposes as described in Regulations Section 1.704-1(b)(4)(i). A Holder's Capital Account in all events shall be adjusted in accordance with the additional rules set forth in Regulations Section 1.704-1(b)(2)(iv). In the event a Holder transfers all or any portion of his interest in the Company, the transferee shall succeed to the individual Capital Account balance of the transferor to the extent such individual Capital Account balance relates to the transferred interest.

5.3    Adjustment for Distributions in Kind. Any asset of the Company distributed to the Holders in kind shall be valued according to its fair market value. An item of Income or Loss shall be computed as if such asset had been sold at its fair market value, such hypothetical item shall be allocated as provided in Section 6.1, and each Holder's Capital Account shall be credited or charged, as the case may be, with the Holder's share of such hypothetical item prior to any such distribution of assets.

5.4    Interest. No Capital Contribution or Capital Account balance shall bear interest.

WEST\22424\3219.2                                            21

Exhibit 1421 - 0122

5.5    Deficit Capital Account. No Holder shall be obligated to restore a Capital Account having a balance of less than zero.

5.6    Return of Capital. Except as otherwise provided in this Operating Agreement, no Holder shall have any right to withdraw or make a demand for Distribution or withdrawal or return of any Capital Contribution or Capital Account balance.

5.7    Optional Adjustments to Capital Accounts. Upon (i) a contribution of cash or property (which shall be valued at its fair market value) to the Company by a new or existing Holder for a Membership or Economic Interest, or (ii) a distribution by the Company to a retiring or continuing Holder for a Membership or Economic Interest, the Company may, in the discretion of the Members, increase or decrease the Capital Accounts of the Holders to reflect a revaluation of Company Property on the books of the Company, in accordance with the provisions of Regulations Section 1.704-1(b)(2)(iv)(f).

## ARTICLE VI

### INCOME AND LOSSES

6.1    Allocations. Except as otherwise provided in this Article VI, Income and Losses, and each item thereof, of the Company shall be allocated to the Holders in proportion to their Percentage Interests.

6.2    Qualified Income Offset. A Holder whose Capital Account is unexpectedly reduced on account of an adjustment described in Section 1.704-1(b)(2)(ii)(d)(4) of the Regulations, an allocation described in Section 1.704-1(b)(2)(ii)(d)(5) of the Regulations, or a distribution described in Section 1.704-1(b)(2)(ii)(d)(6) of the Regulations, shall be allocated that Holder's pro rata portion of each item of Company income, including gross income, and gain in an amount and manner sufficient to eliminate such deficit balance as quickly as possible.

6.3    Minimum Gain Chargeback. Notwithstanding any other provision herein, if there is a net decrease in Company Minimum Gain during any taxable year, items of Company income and gain shall be allocated in accordance with the provisions of Regulations Section 1.704-2(f). This provision is intended to comply with Regulations Section 1.704-2(e)(3).

6.4    Contributed Property and Revaluations. In accordance with IRC Section 704(c), income, gain, loss and deduction with respect to property contributed to the Company by a Holder shall be allocated solely for tax purposes among the Holders so as to take account of any variation between the adjusted basis of the property to the Company and its fair market value on the date of the Contribution. Further, if the book value of any Company asset is adjusted as described in Regulations Section 1.704-1(b)(2)(iv)(f), subsequent allocations for tax purposes of income, gain, loss and deduction with respect to such asset shall take into account any variation between its adjusted tax basis and its adjusted book value. In either case, the Managers shall determine such allocations using a method that qualifies as reasonable within the meaning of Regulations Section 1.704-3. No Holder's Capital Account shall be adjusted for allocations made under this Section.

22

Exhibit 1421 - 0123

6.5    Timing. All allocations of Income or Losses shall be made to the Persons shown on the records of the Company to have been Holders as of the end of business on the last day of the Company's taxable year for which the allocation is made. Notwithstanding the foregoing, upon the transfer of an Economic Interest or the admission of an Additional Member during a taxable year of the Company, the Income or Losses shall be allocated between the former Holder and the successor, or to the Additional Member, as the case may be, according to the number of days during such year each was a Holder.

## ARTICLE VII

## DISTRIBUTIONS

7.1    Operating Distributions. The Managers from time to time may determine, in their reasonable judgment, that: (i) there is an excess of cash on hand beyond the Company's current and anticipated requirements, including, without limitation, cash flow and reserve requirements, and (ii) a distribution of such excess cash on hand, if any, is permissible under Section 18-607 of the Act. In that event, the Managers may, in their sole and absolute discretion, make a distribution of all or a part of such excess (an "*Operating Distribution*") to the Holders, provided that no such Distribution shall be declared and paid unless, after such Distribution, the assets of the Company will exceed all liabilities of the Company. Such Distributions may be made in cash or Property or partly in both, as determined in the sole and absolute discretion of the Managers.

7.2    Generally Pro Rata. Except as provided in Section 7.3 below, Distributions shall be allocated to Holders in proportion to their Percentage Interests.

7.3    Liquidating Distributions. Upon the dissolution of the Company, liquidating distributions in all cases shall be made in accordance with the positive Capital Account balances of the Holders, as determined after taking into account all Capital Account adjustments for the Company's taxable year during which such dissolution occurs (other than those made pursuant to this section), by the end of such taxable year or, if later, within ninety (90) days after the date of such dissolution.

## ARTICLE VIII

## ASSIGNMENT OF INTERESTS

8.1    Assignment of Interests. An Economic Interest is assignable in whole or in part, provided, however, that no Membership Interest may be assigned to any Person (including any assignments for security purposes or other form of pledge) without the consent of Members required pursuant to Section 3.7. Upon admission, the Assignee shall become a Substitute Member, and shall have the rights and benefits, and is subject to the restrictions and liabilities, of a Member under the Certificate, this Operating Agreement, and the Act. A Substitute Member is also liable for the obligations of the Assignor to make Capital Contributions, and to return any unlawful distributions made to the Assignor under Chapter VI (commencing with Section 18-601) of the Act. However, the Substitute Member is not obligated for liabilities unknown to the Substitute Member at the time the Substitute Member became a Member and that could not be ascertained from the Certificate or this Operating Agreement.

Exhibit 1421 - 0124

8.2    No Dissolution upon Assignment.  An assignment of an Economic Interest does not of itself dissolve the Company or, except as otherwise set forth herein, entitle the Assignee to vote or participate in the management and affairs of the Company or to become or exercise any rights of a Member.  An assignment of an Economic Interest merely entitles the Assignee to receive, to the extent assigned, the Income, Losses, Distributions and similar items to which the Assignor would be entitled.

8.3    Information Regarding Assignee.  Upon the assignment of all or part of an Economic Interest, the Assignor shall provide the Manager or Member of the Company responsible for maintaining the books and records with the name and address of the Assignee, together with details of the interest assigned.  Upon receipt of that Notice, the Company shall amend the list required by Section 2.6 accordingly.  Until the Assignee becomes a Substitute Member, the Assignor continues to be a Member and to have the power to exercise any rights and powers of a Member, including the right to vote which, in the case of a Member who has assigned his or her its entire Economic Interest in the Company, shall include the right to vote in proportion to the Percentage Interest that the assigning Member would have, had the assignment not been made.

8.4    No Release of Liability of Assignor.  The Assignor is not released from liability as a Member solely as a result of the Assignment.  Whether or not an Assignee becomes a Substitute Member, the Assignor is not released from the Assignor's liability to the Company under Subchapter V (commencing with Section 18 501) and Subchapter VI (commencing with Section 18-601) of the Act.

8.5    Pledge of Membership Interest.  The pledge of, or granting of, a security interest, lien, or other encumbrance in or against any or all of the Membership Interest of a Member shall not cause the Member to cease to be a Member or to grant to anyone else the power to exercise any rights or powers of a Member.

8.6    Exercise of Rights upon Death or Incompetency.  If a Member who is a natural person dies or is adjudged by a court of competent jurisdiction to be incompetent to manage the Member's person or property, the Member's executor, administrator, guardian, conservator, or other legal representative may exercise all of the Member's rights for the purpose of settling the Member's estate or administering the Member's property, including any power the Member had under the Certificate or this Operating Agreement to assign its Membership Interest.

8.7    Exercise of Rights upon Dissolution or Termination.  If a Member which is an Organization is dissolved or terminated, the powers of that Member may be exercised by its legal representative or successor.

### ARTICLE IX

### DISSOLUTION AND WINDING UP

9.1    Dissolution.  The Company shall and may only be dissolved, and its affairs wound up, upon the first to occur of the following events (which, unless the Members agree to continue the business, shall constitute Dissolution Events):

Exhibit 1421 - 0125

9.1.1    the expiration of the Term, unless the business of the Company is continued with the consent of those Members required pursuant to Section 3.7;

9.1.2    the vote of such number of Members as is required pursuant to Section 3.7;

9.1.3    the Dissociation of a Member under Article XI, unless the business of the Company is continued with the consent of those Members required pursuant to Section 3.7 within ninety (90) calendar days after such Dissociation; or

9.1.4    the entry of a decree of judicial dissolution pursuant to the Act.

9.2      Effect of Dissolution.  Upon dissolution, the Company shall be dissolved and wound up in accordance with the Act, and the Company Property shall be distributed in accordance with Section 7.3.  In addition, upon dissolution, the following shall immediate apply:

9.2.1    All rights granted under the Master License Agreement shall terminate and the Company shall cease the use of the Potato Corner intellectual property rights, and confidential information, provided however, that the Company shall be permitted to use any of the foregoing as is reasonably required in order to comply with its obligations under its sub-licensing or franchising agreements, but only to the extent of the duration of sub-licensing or franchising agreements in existence at the time of the termination of this Operating Agreement.

9.2.2    The LA Group shall be subject to a non-compete arrangement and hereby agrees that, within two (2) years from the date of termination of this Operating Agreement, it shall not engage in the business of establishing, operating, managing, licensing and franchising identical or similar products sold by the Company, using the intellectual property rights identical or similar to those used by the Company, at the time of the termination of this Operating Agreement.

## ARTICLE X

## TAX AND ACCOUNTING MATTERS

10.1     Characterization as a Partnership.  The Members intend that the Company be classified as a partnership for federal and state income tax purposes.  Accordingly, this Operating Agreement is written and shall be construed in a manner consistent with such intent.

10.2     No Partnership Intended for Nontax Purposes.  The Members have formed the Company under the Act, and expressly do not intend hereby to form a partnership under either the Delaware Uniform Partnership Law or the Delaware Revised Uniform Limited Partnership Act.  The Members do not intend to be partners one to another, or partners as to any third party.  To the extent any Member, by word or action, represents to another person that any other Member is a partner or that the Company is a partnership, the Member making such wrongful representation shall be liable to any other Member who incurs personal liability by reason of such wrongful representation.

Exhibit 1421 - 0126

10.3    Fiscal Year.  The fiscal year of the Company shall end on the last day of December of each year.  The Managers may at any time change the fiscal and taxable year of the Company, subject to any applicable limitation of law or regulation.

10.4    Accounting Method.  The Managers shall select the method of accounting by which the Company books of account shall be maintained and its income, gains, losses, deductions and credits shall be reported, for both financial and tax accounting purposes.  The Managers may at any time change the financial and tax accounting method of the Company, subject to any applicable limitation of law or regulation.

10.5    Tax Information.  As soon as reasonably practicable after the end of the Company fiscal year, the Managers shall cause each Holder to be furnished with a Schedule K-1 for such year and any other schedule or statement required by federal income tax law.

10.6    Basis Adjustment.  In the case of a Distribution of Company Property or a transfer of a Membership Interest, the Managers may cause the Company to file an election under IRC Section 754 to adjust the basis of the Company Property.  As a result of this election, the Managers shall have the right to require, as a condition to the granting of consent to any transfer, the reimbursement of expenditures made by the Company for any legal and accounting fees incurred to make any such basis adjustment.  The Managers shall have the right, in their sole and absolute discretion, to decline to make such an election; and further, the failure to make any election under the IRC in connection with any particular transfer of an interest in the Company shall not affect the right of the Managers to make, or refuse to make, such an election with respect to any subsequent transfer of an interest in the Company.

10.7    Other Elections.  The Company shall have the right, in the sole and absolute discretion of the Managers, to make any other elections or determinations required or permitted for federal or state income tax or other tax purposes.  The Managers may rely upon the advice of the Company's accountants or tax attorneys with respect to the making of any such election.

10.8    Taxes of Taxing Jurisdictions.  To the extent that the laws of any Taxing Jurisdiction requires, each Holder requested to do so by the Managers will submit an agreement indicating that the Holder will make timely income tax payments to the Taxing Jurisdiction and that the Holder accepts personal jurisdiction of the Taxing Jurisdiction with regard to the collection of income taxes attributable to the Holder's income, and interest, and penalties assessed on such income.  If the Holder fails to provide such agreement, the Company may withhold and pay over to such Taxing Jurisdiction the amount of tax, penalty and interest determined under the laws of the Taxing Jurisdiction with respect to such income.  Any such payments with respect to the income of a Holder shall be treated as a distribution to such Holder for purposes of ARTICLE VII.  The Company may, where permitted by the rules of any Taxing Jurisdiction, file a composite, combined or aggregate tax return reflecting the income of the Company and pay the tax, interest and penalties of some or all of the Holders on such income to the Taxing Jurisdiction, in which case the Company shall inform the Holders of the amount of such tax, interest and penalties so paid.

10.9    Tax Matters Partner.  The Managers shall designate one of their number or, if there are no Managers eligible to act as tax matters partner any other Member, as the tax matters

Exhibit 1421 - 0127

partner of the Company pursuant to IRC Section 6231(a)(7). Any Member designated as tax matters partner shall take such action as may be necessary to cause each other Member to become a notice partner within the meaning of IRC Section 6223. Any Member who is designated tax matter partner may not take any action contemplated by IRC Sections 6222 through 6232 without the consent of the Managers.

## ARTICLE XI

### DISSOCIATION OF A MEMBER

11.1    Dissociation.  A Person shall cease to be a Member upon the happening of any of the following events:

11.1.1  the withdrawal of a Member with the consent of such number of Members as is required pursuant to Section 3.7;

11.1.2  the bankruptcy (as defined by the Act) of a Member;

11.1.3  in the case of a Member who is a natural Person, the death of the Member or the entry of an order by a court of competent jurisdiction adjudicating the Member incompetent to manage the Member's personal estate;

11.1.4  in the case of a Member who is acting as a Member by virtue of being a trustee of a trust, the termination of the trust (but not merely the substitution of a new trustee);

11.1.5  in the case of a Member that is a separate Organization other than a corporation, the dissolution and commencement of winding up of the separate Organization;

11.1.6  in the case of a Member that is a corporation, the filing of a certificate of dissolution, or its equivalent, for the corporation or the revocation of its charter; or

11.1.7  in the case of an estate, the distribution by the fiduciary of the estate's entire interest in the Company.

11.2    Rights of Dissociating Member.  In the event any Member dissociates prior to the expiration of the Term:

11.2.1  if the Dissociation causes a dissolution and winding up of the Company, the Member shall be entitled to participate in the winding up of the Company to the same extent as any other Member except that any Distributions to which the Member would have been entitled shall be reduced by the damages sustained by the Company as a result of the Dissolution and winding up;

11.2.2  if the Dissociation does not cause a dissolution and winding up of the Company, the Member shall not be entitled to receive any amount in consideration of the Member's Membership Interest on account of such Dissociation, unless such Member no

Exhibit 1421 - 0128

longer holds the corresponding Economic Interest. Otherwise, the Dissociated Member shall continue as Holder of an Economic Interest only.

## ARTICLE XII

## MISCELLANEOUS PROVISIONS

12.1    Amendment of Operating Agreement. This Operating Agreement may be modified upon the vote of Members required pursuant to Section 3.7. No Member or Manager shall have any vested rights in the Operating Agreement which may not be modified through an amendment to the Operating Agreement.

12.2    Entire Agreement. The Operating Agreement represents the entire agreement among all the Members and between the Members and the Company.

12.3    Interpretation. To the extent any provision of this Operating Agreement is prohibited or ineffective under the Act, the Operating Agreement shall be considered amended to the smallest degree possible in order to make the agreement effective under the Act. In the event the Act is subsequently amended or interpreted in such a way to make any provision of the Operating Agreement that was formerly invalid valid, such provision shall be considered to be valid from the effective date of such interpretation or amendment.

12.4    Rights of Creditors and Third Parties under Operating Agreement. This Operating Agreement is entered into among the Company and the Members for the exclusive benefit of the Company, its Members, and their successors and assignees. This Operating Agreement is expressly not intended for the benefit of any creditor of the Company or any other Person. Except and only to the extent provided by applicable statute, no such creditor or third party shall have any rights under this Operating Agreement or any agreement between the Company and any Member with respect to any Capital Contribution or otherwise.

12.5    Valuation of Non-Cash Consideration. For purposes of this Operating Agreement, the procedure for valuing any non-cash consideration shall be as follows: If the parties cannot otherwise agree, each party shall select a qualified appraiser and the appraisers so selected shall jointly select an appraiser, and the valuation of the appraiser so selected shall be binding on all parties. Such valuation shall be based on an arm's length cash sale of the assets. If the non-cash consideration being valued is real property, the selected appraiser shall be an MAI appraiser.

12.6    Counterpart Execution. This Operating Agreement may be executed in any number of identical counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same instrument when each party has signed one (1) such counterpart.

12.7    Remedies. The parties hereto recognize and agree that the breach of any term, provision, or condition of this Operating Agreement may cause irreparable damage, the amount of which is difficult to ascertain and that the award of damages may not be adequate relief to the party aggrieved; the parties therefore agree that, in addition to all other remedies available in the event of a breach of any of the terms or conditions of this Operating Agreement, the party

Exhibit 1421 - 0129

aggrieved shall have the right, in addition to all other remedies available in the event of a breach of this Operating Agreement, to injunctive or other equitable relief (from any court or other body having appropriate jurisdiction).

12.8    Successors and Assigns.  Except as herein otherwise specifically provided, this Operating Agreement shall be binding upon and inure to the benefit of the parties and their legal representatives, heirs, administrators, executors, successors and assigns.

12.9    Severability.  If any provision of this Operating Agreement, or the application of such provision to any Person or circumstance, shall be held invalid, the remainder of this Operating Agreement, or the application of such provision to Persons or circumstances other than those to which it is held invalid, shall not be affected thereby.

12.10    Governing Law.  This Operating Agreement shall be governed by and construed and enforced in accordance with the laws of the State of California without regard to the principles governing conflicts of laws.

IN WITNESS WHEREOF, this Operating Agreement is entered into as of the Effective Date.

INSERT SIGNATURE BLOCKS

Exhibit 1421 - 0130

IN WITNESS WHEREOF, the parties have executed this Agreement on the date and in place first mentioned.

Cinco Group:

Cinco Corporation (Philippines)

Name: Jose P. Magsaysay

Title:  CEO

Jose P. Magsaysay, Jr.

Ma. Victoria O. Bermejo

Ricardo K. Montelibano

L.A. Group:

Amit Nemanim

Guy Koreni

Amir Jacoby

SIGNED IN THE PRESENCE OF:

November 30, 2010

Exhibit 1421 - 0131

# EXHIBIT "D"

Exhibit 1421 - 0132

## PCJV USA LLC
## JOINT VENTURE AGREEMENT
(FIRST AMENDMENT TO THE JV AGREEMENT)

This Joint Venture Agreement (the "Agreement") is made and entered into on OCTOBER 17, 2012 at its Principal Office , Suite  #1100, 6380 Wilshire Blvd Los Angeles, CA 90048 by and between:

> POTATO CORNER INTERNATIONAL, a corporation duly existing and registered by virtue of and under the laws of the State of Delaware, US with office address at 92 Corporate Park Suite C-332, Irvine, California, USA 92606, represented herein by its duly authorized representative, Jose P. Magsaysay (hereinafter "PCI"), and its directors, Jose P. Magsaysay, Jr., Jose Miguel Ma. G. Montinola, Ma. Victoria O. Bermejo, Ricardo K. Montelibano, all of whom are Philippine citizens and resident, and collectively referred to as the "PCI Group";

-and-

> GUY KOREN, AMIR JACOBY AND INBAL JACOBY all of whom are U.S. citizens and residents and collectively referred to as the "LA Group:

### RECITALS

WHEREAS, the Parties hereto have agreed to form a limited liability company (hereinafter referred to as the "Company") under the laws of the State of Delaware, with the primary purpose of engaging in the business of establishing, operating, managing, licensing and franchising "Potato Corner" stores/outlets in the United States of America and Israel, except in the County of Los Angeles, USA and the County of San Francisco, USA and Tanforan Mall (hereinafter, "Territory").

WHEREAS, the Parties herein have agreed to enter into this Agreement which sets forth the terms and conditions with respect to the organization, incorporation, operation and management of the Company and defines their respective rights, duties and obligations of the parties to this Agreement.

WHEREAS, the Parties agree that the LLC operating agreement to be entered by them shall reflect the terms and conditions as set forth in this Agreement.

WHEREAS, Cinco may assign and or all of its rights to the joint venture company formed under this Agreement to a wholly-owned subsidiary as it deems fit.

NOW, THEREFORE, for and in consideration of the foregoing premises, the Parties hereby agree as follows:

1) ORGANIZATION AND FORMATION OF THE COMPANY

    a) Within ten (10) days from the Effective Date of this Agreement, the Parties herein agree to organize and form, a limited liability company to be called "PCJV USA" ( hereinafter referred to as the Company) for the primary purpose of engaging in

WEST\222455823.2

Exhibit 1421 - 0133

the business of establishing, operating, managing, licensing and franchising "Potato Corner" stores/outlets in the Territory.

b) The initial members of the Company shall be the following:

    i) Potato Corner International (PCI)
        (1) Jose P. Magsaysay, Jr.
        (2) Jose Miguel Ma. G. Montinola
        (3) Ma. Victoria O. Bermejo
        (4) Ricardo K. Montelibano

    ii) LA Group
        (1) Guy Koren
        (2) Amir Jacoby
        (3) Inbal Jacoby

c) The principal office of the Company shall be at   Suite 1100, 6380 Wilshire Blvd. Los Angeles, CA 90048 USA.

d) The annual general meeting of the members of the Company shall be held every year at the principal office of the Company.   The members may, at their discretion, invite non-members to join the annual general meeting, but only as non-voting observers.  Further, to the extent allowed by the financial condition of the Company, and as agreed upon by a majority of all member interests, the Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses incurred by the following members in attendance of the annual members' meeting: Jose P. Magsaysay, Jr., Jose Miguel Ma. Montinola, Ma. Victoria O. Bermejo and Ricardo K. Montelibano.

e) The fiscal year of the Company shall begin on January 1 and end on December 31 of each year.

f) The Company shall immediately upon formation obtain a "Liability Insurance" for the Company the amount and scope of coverage to be determined by the managers.

g) All costs, fees and expenses incurred in connection with the organization and formation of the Company shall be for the account of the Company.

h) The operating agreement of the Company shall reflect the terms and conditions set forth in this Agreement between the Parties.

2) CAPITALIZATION/OWNERSHIP OF THE COMPANY

a) At the time of formation, the Company shall have a total capital account of Fifty Thousand Dollars (US$50,000) which shall be fully subscribed and paid.

b) Unless other agreed to in writing, at the commencement of this Agreement, the Parties hereby agree that the Cinco Group shall contribute Thirty Thousand Dollars (US$30,000) and own sixty (60%) percent of the Company's capital

2

G. k

Exhibit 1421 - 0134

accounts, while the LA Group shall contribute Twenty Thousand Dollars (US$20,000) and own the remaining forty (40%) percent.

c) The Parties hereby agree any increase in the capital account shall require an affirmative vote of 75% of all of the members' percentage interests in the Company.  In the event an increase in the Company's capital accounts is approved by the members, both Parties shall have rights of pre-emption so that their pro rata ownership share in the Company shall be maintained, provided that, either Party shall have thirty (30) days within which to confirm in writing that it is willing and able to subscribe and fully pay its pro rata share of the increase in capital.

d) Neither Party shall assign any of its rights or obligations under this Agreement, nor his/its member interests in the Company without the prior written consent of the other Party. In the event either Party desire to transfer or sell his/its pro rata members interest in the Company to a person other those specifically named in Section 1(a) of this Agreement, such Party shall be obligated to sell the same first to the other Party, which has have thirty (30) days within which to exercise its rights of first refusal from the date of receipt of a written notice to sell.  For this purpose, the Parties hereby agree that the right of first refusal may be exercised in accordance with the following formula:  The average of the Company's earnings before interest, depreciation, taxes and amortization (EBITDA) for the last two (2) years multiplied by 5 times, and further multiplied by the percentage of member interest subject to such right of first refusal over total outstanding member interests.

3) MANAGEMENT OF THE COMPANY

a) As will be provided in the Operating Agreement, the business and affairs of the Company shall be managed and all of the Company powers shall be exercised by or under the direction of the managers (collectively referred to as "Management").  Unless otherwise agreed to by the parties, the Management shall be composed of seven (7) members, four (4) of whom shall be designated by the Cinco Group, and three (3) designated by the LA Group.  Upon the formation of the Company, the following shall be named managers: Jose P. Magsaysay, Jr., Jose Miguel Ma. Montinola, Ma. Victoria O. Bermejo, Ricardo K. Montelibano, Guy Koren, Amir Jacoby and Inbal Jacoby.

b) The Management shall regularly meet on a monthly basis. The regular monthly board meeting may be done via teleconference or through the internet.  The members may, at their discretion, invite non-members to join member meetings, but only as non-voting observers.  Further, to the extent allowed by the financial condition of the Company, and as agreed upon by a majority of all member interests, the Company shall shoulder the expenses for the air fares, hotel accommodation and incidental expenses incurred by the members named in Section 1(d) in attendance of said meetings.

c) Upon the formation of the Company, it shall have the following executive officers; President, Corporate Secretary and Treasurer, and the following shall be elected by the managers/members to serve these positions.  Any change in these mentioned executive officers will require a vote of 75% of members' interest.

3

G.k  AJ

Exhibit 1421 - 0135

i) Chairman of the Board of Members – Jose P. Magsaysay
ii) President – At any given time, the President shall be any one of the following members: Guy Koren or Amir Jacoby or Inbal Jacoby and the first president will be Amit Nemanim now replaced by Guy Koren
iii) Corporate Secretary – Erlinda S. Bartolome.
iv) Treasurer – Maria Victoria O. Bermejo
   (1) The Treasurer shall have oversight functions over the Accounting and Finance Departments that shall be exercised independent of the President.

d) Additional executive officers may be appointed by Management as it may deem necessary. Replacement and removal will require Managers simple majority vote.

e) It is hereby agreed that the rights and responsibilities of the Management shall include the following:

i) Approval of the compensation package for the managers, executive offices and key personnel.
ii) Approval of the Accounting System/Procedures/Software/Method to be used by the Company.
iii) Approval of the operating budget of the Company, and any changes to it.
iv) Approval of all franchising agreements, and lease agreements.
v) Approval of all purchases and disbursements in excess of $10,000, provided that such amount may be changed or modified by Management as it deems necessary.

f) The executive officers shall manage the business and property of the Company, and to market the business, in accordance with and pursuant to the directives of and policies set by the Management of the Company. The Management of the Company can recall and/or withdraw the appointment of any executive officer, as it deems necessary.

g) The Company shall enter into a Master License Agreement with Cinco (or an affiliated company to be designated by Cinco) which shall include the following terms and conditions:

i) The Company agrees to license the "POTATO CORNER" intellectual property rights from Cinco or an affiliated company to be designated by Cinco) consisting of (i) the trademark, service mark and trade name "POTATO CORNER"; and (ii) various trademarks, service marks, trade names, slogans, designs, insignias, emblems, symbols, color schemes, package features, logo and other propriety identifying characteristics used in relation and in connection with the "Potato Corner" Products and the System; and (iii) as well as other intellectual property rights in connection with the "POTATO CORNER" intellectual property rights, for use in the Territory.

ii) The Company agrees to pay, as an arm's length license fee, the following amounts:

4

Exhibit 1421 - 0136

(1) With respect to the licensing / sub-licensing or franchising the "POTATO CORNER" intellectual property rights in connection with the "POTATO CORNER" outlets/stores, an amount equal to thirty percent (30%) of all initial/franchise fees and ongoing royalty fees paid to/ collected by the Company. Payments shall be made to Cinco (or an affiliated company to be designated by Cinco) by wire transfer using a bank or other financial institution specified by it within thirty (30) days from receipt of the fees by the Company.

(2) All withholding and other applicable taxes levied by any authority on the payments by the Company shall be borne solely by the Company.

h) The Company agrees to engage the LA Group to provide management and strategic experience and expertise during the duration of this Agreement. The Company shall enter into a  Master Services Agreement with the LA Group (or a corporation to be designated by the LA Group) which shall include the following terms and conditions:

i) In consideration for the provision of its services under the Master Services Agreement, the LA Group shall be entitled to a services fee equal to thirty (30%) percent of all initial/franchise fee and continuing royalty fees paid to/ collected by the Company .

ii) All withholding and other applicable taxes levied by any authority on the payments by the Company to the LA Group under this Agreement shall be borne solely by the Company.

iii) The LA Group shall faithfully, diligently and efficiently exercise its obligations and responsibilities under the Master Services Agreement.

iv) The LA Group shall maintain and protect the Confidential Information belonging to Cinco or the Company, and such undertaking shall apply to all of its partners, officers, employees, or agents.

i) The President of the Company shall render the following services and shall perform  the following duties for the Company in a faithful, diligent  and  efficient manner:

i) The President shall be responsible for all management, operational, marketing, establishment, maintenance, licensing and sub-licensing activities with respect to the "Potato Corner" outlets/stores in the Territory.  He shall use his best efforts at all times during the term of this  Agreement  to operate and maintain the "Potato Corner" outlets/stores in the Territory according to the highest standards  achievable  consistent with the overall plan of the Management of the Company. The President shall comply with the rules, policies and procedures approved by the Management of the Company from time to time.

ii) The President shall advertise market and promote the "Potato Corner" outlets/stores with the goal of causing public knowledge, awareness and patronage of the "Potato Corner" outlets/sites.

5

Exhibit 1421 - 0137

iii) The President shall maintain a comprehensive system of records, books and accounts, with respect to the licensing and sub-licensing activities, operation, establishment, management, maintenance and other activities of the "Potato Corner" outlets /stores in the Territory with the assistance of the Corporate Secretary.

iv) No later than the twentieth (20th) day of each month, with respect to the preceding month, the President shall render a statement of receipts and disbursements, a schedule of accounts receivable and payable, and a schedule of fees collected and distributed, together with a reconciled bank statement as of the last day of the month with the assistance of the Corporate Secretary.

v) No later than three (3) months after the end of a fiscal year, the President shall, with the assistance of the Corporate Secretary and external accountant hired by Management, cause the Company to issue audited financial statements, and shall provide a copy of the same to all the members of Management.

vi) To the extent the President is lawfully able to do so, the President shall take such action as may be necessary to comply promptly with any and all laws, ordinances, orders or other requirements of any federal, state, county or municipal authority having jurisdiction of the Company and affecting the Company.

j) Consistent with its fiduciary duty to the Company, the members and managers shall exercise the duty of care and shall, at all times, ensure that all corporate opportunities consistent with the objectives of this Agreement shall be pursued on behalf of, and for the benefit of the Company. As such, with respect to the establishment of Company-owned stores, whenever potential locations are identified by any member or manager, it shall be promptly brought to the attention of the Management. At all times, and within thirty (30) days from receipt of this information, the Management shall decide to either build a Company-owned store at the identified location. In the event the Company chooses to build a Company-owned store at the identified location, it shall have the right to do so, to the exclusion of any of the members or managers. However, in the even the Company decides not to build a Company-owned store at the identified location, it shall notify the members and managers of its decision in writing. In such case, the LA Group shall have the right to build a store at the identified location, provided that it shall enter into a franchising agreement with the Company, and shall pay the franchise fees and ongoing royalty fees as set forth in the Company's standard franchising agreement.

4) DURATION OF AGREEMENT

a) This Agreement shall become effective from the date of execution hereof and shall continue indefinitely unless otherwise terminated by (i) an affirmative vote of 75 percent (75%) of all member interests, or (ii) upon mutual agreement by the Parties in writing.

6

Exhibit 1421 - 0138

b) Upon termination of this Agreement, the effects of termination shall be as follows:

    i) All rights granted under the Master License Agreement shall terminate and the Company shall cease the use of the Potato Corner Intellectual Property Rights, and Confidential Information, provided however, that the Company shall be permitted to use any of the foregoing as is reasonably required in order to comply with its obligations under its sub-licensing or franchising agreements, but only to the extent of the duration of sub-licensing or franchising agreements in existence at the time of the termination of this Agreement.

    ii) The LA Group shall be subject to a non-compete arrangement and hereby agrees that, within two (2) years from the date of termination of this Agreement, it shall not engage in the business of establishing, operating, managing, licensing and franchising identical or similar products sold by the Company, using the intellectual property rights identical or similar to those used by the Company, at the time of the termination of this Agreement.

5) GENERAL PROVISIONS

a) This Agreement may not be altered, changed, supplemented or modified except by a written instrument duly signed by the Parties.

b) The Parties shall use their best efforts to cooperate for the success of the business of the Company. The Parties further agree to perform all acts and execute and deliver all documents or instruments required or necessary to fully implement or consummate the transactions contemplated in and the intent underlying this Agreement.

c) The Parties shall, to the extent feasible, cause the operating agreement of the Company to reflect the mutual covenants and provisions contained in this Agreement.

d) All notices and other communications required or permitted to be given hereunder shall be given in writing (and for this purpose shall include emails or fax transmissions) and shall be addressed to the appropriate Party at the address of such Party as heretofore designated, or at such address as such Party may designate subsequently in writing.

e) The failure of any Party at any time to require performance by the others of any provision of this Agreement shall not affect, in any way, the right of such Party to require performance of that or any other provision, and any waiver by any Party of any breach of this Agreement shall not be construed as a waiver of any continuing or succeeding breach of such provision, or a waiver of any other right under this Agreement.

f) This Agreement shall constitute the entire agreement between the Parties and shall supersede any previous agreements, written or otherwise, with respect to the same subject matter which may have been made by the Parties prior hereto.

7

Exhibit 1421 - 0139

g) The invalidity of any portion of this Agreement will not and shall not render the entire Agreement void, nor affect the validity of the rest of the provisions of this Agreement.

h) This Agreement shall be governed by the laws <u>of the State of California.</u>

i) Parties acknowledge that, from time to time, one Party (the "Discloser") may disclose to the other Party (the "Recipient") information: (a) relating to the Potato Corner outlets and sites; (b) relating to the Potato Corner Intangible Property Rights; (c) Potato Corner product specifications and related information; (d) which is marked with "confidential" or a similar legend; (e) which is described orally and designated as confidential; or (f) which would, under the circumstances, be understood by a reasonable person to be confidential ("Confidential Information"). Upon subsequent disclosure of previously disclosed Confidential Information to the Recipient by the Discloser, the information will remain Confidential Information even if not identified as Confidential Information at the subsequent disclosure. Recipient shall retain such Confidential Information in confidence, and shall not disclose it to any Third Party or use it for other than the purposes of this Agreement without the Discloser's prior written consent. Each Party shall use at least the same procedures and degree of care with respect to such Confidential Information which it uses to protect its own confidential information of like importance, and in no event less than reasonable care. The Recipient will immediately give written notice to the Discloser of any unauthorized use or disclosure of the Discloser's Confidential Information, and the Recipient will assist the Discloser in remedying such unauthorized use or disclosure.

[The Remainder of This Page is Left Intentionally Blank]



8

Exhibit 1421 - 0140

IN WITNESS WHEREOF, the parties have executed this Agreement on the date and in place first mentioned.

**POTATO CORNER INTERNATIONAL GROUP:**

_____
Jose P. Magsaysay, Jr.,

_____
Jose Miguel Ma. G. Montinola

_____
Ma. Victoria O. Bermejo

_____
Ricardo K. Montelibano,

**L.A. Group:**

_____
Inbal Jacoby

_____
Guy Koren

_____
Amir Jacoby

SIGNED IN THE PRESENCE OF:

_____          _____

**ACKNOWLEDGMENT**

9

Exhibit 1421 - 0141

# EXHIBIT "E"

Exhibit 1421 - 0142

## PCJV-LA GROUP

### PARTNERSHIP AGREEMENT

#### Preamble

This Partnership Agreement ("Agreement") is made March 1, 2013, to memorialize the partnership activities and relationship of the partners executing this Partnership Agreement, who shall be referred to in this Agreement individually as a "Partner" and collectively as "Partners."

### RECITALS

A.   The Guy Koren ("Koren"), Amit Nemanim ("Nemanim"), and Amir Jacoby ("Jacoby") collectively initiated negotiations to work together as a group with the individuals constituting the Cinco Group to establish, operate, manage, license and franchise "Potato Corner" stores/outlets in the United States and Israel (other than Los Angeles and San Francisco Counties and Tanforan Mall), pursuant to the terms of the Potato Corner USA Joint Venture Agreement executed on or about  11/2009  ("JV Agreement"), which JV Agreement was subsequently replaced by the PCJV USA, LLC Limited Liability Company Agreement made effective  10/2010  ("PCJV Agreement").

B.   Pursuant to the PCJV Agreement, Koren, Nemanim, and Jacoby were invited to participate in PCJV USA, LLC as the "LA Group", by making a Capital Contribution (as defined in the PCJV Agreement) of $20,000 to PCJV USA, LLC and executing and performing services for PCJV USA, LLC pursuant to a Master Services Agreement ("Master Services Agreement").

C.   This Agreement is intended to memorialize in writing the election by Koren, Nemanim and Jacoby to continue the partnership relationship they initially established in connection with the negotiation of the JV Agreement, to accept the offer made to the LA Group to purchase and hold of a 40% membership interest in PCJV USA, LLC and to accept the offer made by PCJV USA, LLC to the LA Group to provide the services described in the Master Services Agreement.

#### Type of Business

1.   The Partners have associated to form a General Partnership for the purpose of holding a membership interest in PCJV USA, LLC and providing services on behalf of PCJV USA, LLC pursuant to the Master Services Agreement, and to engage in such other activities as may be permitted by law and approved by a majority of the Partners.

#### Partnership Name

2.   The Partnership name shall be "PCJV-LA Group".

#### Partnership Term

3.   .   The Partnership shall be deemed to have commenced as of the execution of this Agreement by the Partners, and shall continue until dissolved by agreement of the Partners or terminated under the provisions of this Agreement.

915753.1/81153.08003

**Exhibit 1421 - 0143**

## Place of Business

**4.**     The Partnership's principal place of business shall be: 8950 West Olympic Boulevard, Suite 563, Beverly Hills, CA 90211, California 90035. The Partnership shall maintain any other place or places of business agreed upon by the Partners.

## Initial Capital

**5.**     The Partners shall each be required to contribute to the Partnership their proportional share of the $20,000 Capital Contribution made by the Partnership to PCJV USA, LLC in and for their interest in the Partnership. The Partnership has offered Partnership interests in the Partnership to the following individuals in proportion to their respective capital contributions to the Partnership., as set forth in Exhibit A to this Agreement. Only those persons contributing a proportion share of this Capital Contribution shall be deemed a continuing Partners of the Partnership, in proportion to their actual contribution.

| | | |
|---|---|---|
| **5.1** | Guy Koren | $7,600 |
| **5.2** | Amit Nemanim | $7,600 |
| **5.3** | Amir Jacoby | $4,800 |

The failure of any Partner to pay their required contribution to this Partnership shall be deemed in default. If the default is not cured following 30 days prior written notice, the other Partners may advance the capital contribution as (i) a loan to the defaulting Partner to bear interest at the rate of 10% per annum until paid in full and secured by the Partner's interest in the Partnership and/or distributions made to such Partner with respect to such interest or (ii) a purchase from the Partnership of the defaulting Partner's allocated interest (or any part thereof) and a corresponding cancellation of such Partner's opportunity to continue as a Partner.

        The Partners will prepare an Exhibit A to this Agreement to reflect the actual contributions made and the proportional Partnership interest thereby obtained.

## Service Commitment

**6.**     Subject to the allocation of responsibility among the Partners for the performance of the services required of the Partnership under the terms of the Master Services Agreement, each of the Partners shall be responsible for providing a proportional share of the services required (as determined by the Partners). Alternatively, the Partners may agree to compensate individual Partners for the service obligations required under the Master Services Agreement that have been assigned to and assumed and performed by them on behalf of the Partnership.

## Capital Withdrawals

**7.**     No Partner shall withdraw any portion of the Partnership capital without the other Partners' express written consent.

**Exhibit 1421 - 0144**

## Profits and Losses

8.    Net profits and net losses will be allocated to the Partners, and net cash available for distribution by the Partnership will be distributed in proportion to the respective percentage interests of the Partners in the Partnership as described on Exhibit A to this Agreement.  The term "net profits," as used in this Agreement, shall mean for tax purposes the Partnership net profits as determined by the accounting method generally and consistently applied by the Partnership, and for purposes of determining the cash available for distribution by the Partnership to the Partners the term "net profits" shall mean the net cash available to the Partnership after establishing such cash reserves as the Partners may determine to be prudent for working capital and any contingent liabilities.

## Books of Account

9.    Partnership books of account shall be accurately kept and shall include records of all Partnership income, expenses, assets, and liabilities. The Partnership books of account shall be maintained on a cash basis.  Each Partner shall have the right to inspect the Partnership books during normal business hours at the principal office of the Partnership.

## Fiscal Year

10.    The Partnership's fiscal year shall end on December 31 each year.

## Accountings

11.    Complete accountings of the Partnership affairs at the close of business on the last days of March, June, September, and December of each year shall be rendered to each Partner within thirty (30) days after the close of each such month or as soon thereafter as may be practical with regard to the availability of such information from PCJV USA, LLC.  At the time of each accounting, the net profits of the Partnership, if any, shall be distributed to the Partners as provided in this Agreement. Except as to errors brought to the Partners' attention within 15 days after it is rendered, each accounting shall be final and conclusive.

## Time Devoted to Partnership

12.    The Partners shall be required to devote such time and attention to the Partnership business as may be necessary for the Partnership to fulfill its obligations under the Master Services Agreement. Except as the service responsibilities may otherwise be allocated or delegated by the Partners, each of the Partners is required to provide a proportional amount of the service time required by the Master Services Agreement relative to their respective percentage interest in the Partnership. Failure to provide the time required to perform or to perform their respective share of the services required of the Partnership or otherwise allocated or delegated to a Partner shall constitute a breach of the Partnership Agreement.  A Partner shall not be deemed in breach of their obligation to provide services on behalf of the Partnership unless and until the Partnership has provided such Partner with at least 30 days prior written notice of the alleged default or breach, and the default or breach as gone uncured during that notice period.

915753.1/81153.08003

Exhibit 1421 - 0145

In addition to the services to be provided by the Partners in fulfillment of the Partnership's responsibilities under the Master Services Agreement, the Partners may be individually designated by the Partnership to serve as a Manager of PCJV USA, LLC. If so designated, a Partner shall fulfill their Manager responsibilities on behalf of the Partnership, and if unable or unwilling to do so a Partner shall so advise the Partnership so that they may designate someone else to serve in that capacity. The Partnership shall appoint its Manager designees to PCJV USA, LLC by Majority Approval (as defined below).

### Management and Authority

**13.**    Partnership decisions and the actions of the Partners shall be determined and approved by the vote or written consent of Partners holding a majority in percentage interest of the Partnership ("Majority Approval"). Individual Partners may not bind the Partnership without obtaining the Majority Approval of the Partners. Any obligation incurred in violation of this provision may be charged to and collected from the Partner who incurred the obligation. Subject to the above authorization requirement, any individual Partner may execute a document on behalf of the Partnership.

Guy Koren has been initially granted the title of "Managing Partner" on behalf of the Partnership in expectation that he will execute documents on behalf of the Partnership.

### Statement of Partnership

**14.**    The Partners will cause to be filed with the California Secretary of State a Statement of Partnership Authority pursuant to California Corporations Code Section 16303 on form GP-1 in effect at the time of the filing. The Partnership shall cause a Statement of Partnership Authority to be recorded in every county in which the Partnership owns, or contemplates owning, real property.

### Partners' Salaries

**15.**    Although no salaries are contemplated with respect to a Partner's services as a Manager of PCJV USA, LLC, the Partners providing services on behalf of the Partnership in fulfillment of the Partnership's obligations under the Master Services Agreement shall be entitled to such compensation as may be approved by the Partners by Majority Approval. If the Partnership is unable to pay for the services performed by a Partner, by Majority Approval the Partners the compensation otherwise payable may be accrued and thereafter paid from the first funds made available to the Partnership from PCJV USA, LLC. Compensation payable to a Partner for services provided may be paid as a guaranteed payment as provided under IRC Section 707(c), as payment made to a Partner irrespective of the Partner's percentage interest in Net Profits, the payment of which shall reduce the Net Profits allocable to the Partners in accordance with the Partners' percentage interests. In addition to compensation for their time, Partners shall be entitled to reimbursement for their reasonable business expenses incurred in furtherance of the Partnership business, so long as approved by the Partners by Majority Approval. Any compensation paid to a Partner and any business expenses reimbursed shall be deducted ordinary business expenses prior to computing net profits.

### Withdrawal of Partner

915753.1/81153.08003

Exhibit 1421 - 0146

**16.**     Upon thirty (30) days written notice of intent to the other Partners, a Partner may dissociate from the Partnership by withdrawing as a Partner.

### Option to Purchase Dissociated Interest

**17.**     On dissociation of a Partner by death, withdrawal, or other act, the remaining Partners may continue the Partnership business by purchasing the outgoing Partner's interest in the Partnership assets and goodwill. The remaining Partners shall have the option to purchase the dissociated Partner's interest by paying to the outgoing Partner or the appropriate personal representative the value of the dissociated Partner's interest as determined under Paragraph 18 of this Agreement. If the remaining Partners do not exercise this option, the Partnership shall be dissolved as provided under Paragraph 21 of this Agreement, unless the remaining Partners have elected to convert the Partnership into an other business entity form and the withdrawing Partner's interest in such other entity is in proportion and comparable to the interest held by the withdrawing Partner immediately prior to withdrawal as provided in Paragraph 21A.

### Purchase Price of Partnership Interest

**18.**     On exercise of the option described in Paragraph 17 of this Agreement, the remaining Partners shall pay to the dissociated Partner or appropriate personal representative the value of the dissociated Partner's Partnership interest as determined by the last regular accounting preceding the effective date of the withdrawal plus the full unwithdrawn portion of the dissociated Partner's share in net profits earned between the date of that accounting and the date of dissociation. The Partnership shall have the right to offset against the purchase price otherwise payable for a withdrawing Partner's interest the Partner's share of any existing liabilities and accounts receivable incurred prior to the effective date of the withdrawal.

### Liability of Deceased Partner's Estate

**19.**     If on the death of one Partner, the surviving Partners exercise their option to purchase the deceased Partner's interest under Paragraphs 17 and 18, the liability of the deceased Partner's estate for Partnership obligations incurred during the period of continuation shall be limited to the amount that the deceased Partner had invested or the net value of the Partner's interest in the Partnership at the time of death (and including the unwithdrawn portion of net profits earned since the last accounting), whichever is greater.

### Duties of Purchasing Partners

**20.**     On any purchase and sale made pursuant to Paragraphs 17, 18, or 19 of this Agreement, the remaining Partners shall assume all Partnership obligations (subject to the right to offset a proportional amount against the purchase price). The remaining Partners shall hold and defend the withdrawing Partner or the deceased Partner's estate and personal representative, as well as any property belonging to either a withdrawing or deceased Partner, free and harmless from all liability for Partnership obligations beyond those reflected in the calculation of the purchase price payable. Immediately upon purchase of a withdrawing or deceased Partner's interest, the remaining Partners shall prepare, file, serve, and publish all notices required by law to protect the withdrawing Partner or the deceased Partner's estate and personal representative from liability for future Partnership obligations. All costs incident to the requirements of this Paragraph shall be borne by the remaining Partners.

915753.1/81153.08003

**Exhibit 1421 - 0147**

### Dissolution

**21.**    When: (1) the Partnership is dissolved by agreement of the Partners; or (2) a remaining Partner or Partners decline(s) to exercise the option to purchase a dissociated Partner's interest under Paragraph 17; or (3) it is otherwise required by law, the Partnership affairs shall be wound up, the Partnership assets liquidated, its obligations to creditors, including, to the extent permitted by law, Partners who are creditors, shall be paid, and the surplus divided among the Partners according to their rights of distribution of their Partnership accounts.

### Conversion

21A.    Upon the occurrence of an event resulting in a dissociation of a Partner, within 90 days of such event the remaining Partners may elect to convert the Partnership into an other business entity form for which the dissociated Partner's interest will be afforded limited liability from any liability arising after such conversion. Conversion to an other entity form shall be in lieu of the exercise of the option to purchase the dissociated Partner's interest in the Partnership and in lieu of the Partnership dissolution. The dissociated Partner shall receive an interest in the other entity form adopted by the remaining Partners that is proportional and comparable to the held by the dissociated Partner's interest in the Partnership prior to the dissociation event; provided, however, that the dissociated Partner's interest in the other entity need only be in a form that is comparable economically and need not include any voting rights or authority to act on behalf of the other entity in a manner comparable to that held as a Partner (e.g. comparable to an "economic interest" in a limited liability company, as defined in Cal Corp Code Section 17001(o)).

### Notices

**22.**    All notices between the Partners shall be in writing and shall be deemed served when personally delivered to a Partner, or when deposited in the United States mail, certified, first-class postage prepaid or by overnight courier, addressed to a Partner at the Partner's address set forth on the signature page to this Agreement or to such other place as may be specified in a notice given pursuant to this Paragraph as the address for service of notice on that Partner. Notices may also be deemed duly provided if delivered by e-mail to an e-mail address specified by the receiving Partner and the party giving notice concurrently places a copy thereof in the United States mail (as described above) or delivers a copy by overnight courier, in which event notice shall be deemed given on the date of the delivery of the e-mail.

### Consents and Agreements

**23.**    All consents and agreements provided for or permitted by this Agreement shall be in writing. Signed copies of all consents and agreements pertaining to the Partnership shall be kept with the Partnership books.

### Governing Law

**24.**    This Agreement shall be governed by the California Uniform Partnership Act of 1994, as amended, and shall in all respects be a contract under California law.

### Attorney Fees

Exhibit 1421 - 0148

25.    As between the parties to this Agreement, the prevailing party in any dispute arising from or relating to this Agreement shall be awarded costs and attorney fees whether or not the matter is resolved by trial or appeal.

Exhibit 1421 - 0149

### Sole Agreement

26.     This instrument contains the Partners' sole agreement relating to their Partnership. It correctly sets out the Partners' rights and obligations. Any prior agreements, promises, negotiations, or representations not expressly set forth in this instrument have no force or effect.

Executed by the undersigned with effect as of the Effective Date defined above, at Orange County, California.

[See Counterpart Signature Pages of the Partners attached hereto]

915753.1/81153.08003

**Exhibit 1421 - 0150**

## EXHIBIT A

### PARTNER CAPITAL CONTRIBUTIONS AND PERCENTAGE INTERESTS
(Proposed)

| PARTNER NAME AND ADDRESS | CAPITAL CONTRIBUTION | PERCENTAGE INTEREST |
|---|---|---|
| GUY KOREN<br>1478 S. Crest Dr<br>LA, CA 90035 | $7,600 | 38% |
| AMIT NEMANIM | $7,600 | 38% |
| AMIR JACOBY<br>14320 Ventura Bl #115<br>Sherman Oaks, CA 91423 | $4,800 | 24% |

915753.1/81153.08003

Exhibit 1421 - 0151

## EXHIBIT A

### PARTNERS, CAPITAL CONTRIBUTIONS AND PARTNERSHIP INTERESTS

(Amended and Updated March 22, 2013)

| NAME OF PARTNER AND ADDRESS | CAPITAL CONTRIBUTION | PARTNERSHIP PERCENTAGE INTEREST |
|---|---|---|
| GUY KOREN | 12,258.04 | 61.3 |
| AMIR JACOBY | 7,741.96 | 38.7 |

915753.1/81153.08003

Exhibit 1421 - 0152

**PCJV-LA GROUP,**
**a California general partnership**

### MEMBER COUNTERPART SIGNATURE PAGE

The undersigned, desiring to enter into the Partnership Agreement made effective March 1, 2013 (the "Agreement") for PCJV-LA GROUP, a California general partnership (the "Company"), hereby agrees to all of the terms and provisions thereof. The undersigned hereby joins and executes the Agreement as a Partner of the Partnership, and hereby authorizes this Signature Page to be attached thereto in evidence of this joinder.

WITNESS, the execution hereof by the undersigned, as a Partner of PCJV-LA GROUP:

_____
Signature of Partner

Address: 14320 Ventura BL #115
Sherman Oaks, CA 91423

### Spousal Consent

The undersigned is the spouse of the above general partner. I have read and understood the terms and conditions of the Partnership Agreement of PCJV-LA Group and agree to be bound by its terms. I agree that my spouse shall have the sole and exclusive power to manage the partnership interest created by the foregoing Agreement, regardless of whether that interest was acquired with community property, quasi-community property, or separate property assets, however so titled or characterized. I further acknowledge and agree that my spouse may, from time to time, or at any time, amend, restate, sell, transfer, assign or hypothecate his Partnership interest in any manner whatsoever, with or without my further consent.

Executed at  LA _____ County, California.

_____        Date: 3/1/2013

912600.1/01927.99001

**Exhibit 1421 - 0153**

**PCJV-LA GROUP,**
**a California general partnership**

### MEMBER COUNTERPART SIGNATURE PAGE

The undersigned, desiring to enter into the Partnership Agreement made effective March 1, 2013 (the "Agreement") for PCJV-LA GROUP, a California general partnership (the "Company"), hereby agrees to all of the terms and provisions thereof. The undersigned hereby joins and executes the Agreement as a Partner of the Partnership, and hereby authorizes this Signature Page to be attached thereto in evidence of this joinder.

WITNESS, the execution hereof by the undersigned, as a Partner of PCJV-LA GROUP:

Signature of Partner

Address: _1478 S. Crest Dr_
_LA, CA 90035_

912600.1/01927.99001

**Exhibit 1421 - 0154**

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**<u>PROOF OF SERVICE</u>**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and **not a party to this action**. I am employed in the County of Los Angeles, State of California. My business address is 1888 Century Park East, Suite 1500, Los Angeles, California 90067.

On November 12, 2019, I served true copies of the following document(s) described as **CROSS-COMPLAINANT GUY KOREN'S VERIFIED THIRD AMENDED CROSS-COMPLAINT** on the interested parties in this action as follows:

**SEE ATTACHED SERVICE LIST**

**BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with Freeman, Freeman & Smiley, LLP's practice for collecting and processing correspondence for mailing. On the same day that the correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on November 12, 2019, at Los Angeles, California.

_____
Maria Villagran

4350401.1

GUY KOREN'S VERIFIED THIRD AMENDED CROSS-COMPLAINT

**Exhibit 1421 - 0155**

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1

## SERVICE LIST

2

Michael D. Murphy, Esq.
Banu S. Naraghi, Esq.
3  Siobhan Amin, Esq.
Ervin Cohen & Jessup LLP
4  9401 Wilshire Boulevard, 9th Floor
Beverly Hills, CA 90212-2974
5  Tel:  (310) 281-6336
Fax: (310) 887-6838
6  mmurphy@ecjlaw.com
bnaraghi@ecjlaw.com
7  samin@ecilaw.com

*Attorneys for Plaintiffs and Cross-Defendants*
*CINCO CORPORATION and POTATO*
*CORNER INTERNATIONAL, INC.*

8

James S. Cooper, Esq.
9  LEVINSON ARSHONSKY & KURTZ, LLP
15303 Ventura Blvd., Suite 1650
10  Sherman Oaks, California 91403
Telephone: (818) 382-3434
11  Facsimile:  (818) 382-3433
jcooper@laklawyers.com
12  llord@laklawyers.com

*Attorneys for Cross-Defendants*
*AMIR JACOBY and INBAL JACOBY*

13  Frances M. O'Meara, Esq.
Stephen M. Caine, Esq.
14  Holly M. Teel, Esq.
THOMPSON, COE & O'MEARA, LLP
15  12100 Wilshire Boulevard, Suite 1200
Los Angeles, CA 90025
16  Tel:  (310) 954-2400
Fax: (310) 954-2345
17  fomeara@thompsoncoe.com
scaine@thompsoncoe.com
18  hteel@thompsoncoe.com

*Attorneys for Defendant and Cross-*
*Complainant PCJV USA, LLC and Cross-*
*Complainant PCI TRADING, LLC*

19  Eric R. McDonough, Esq.
VEDDER PRICE LLP
20  1925 Century Park East, Suite 1900
Los Angeles, California 90067
21  Tel: (424) 204-7700
Fax: (424) 204-7702
22  emcdonough@vedderprice.com
jgimble@vedderprice.com
23  dhedley@vedderprice.com

*Attorneys for Defendants and Cross-*
*Complainants POTATO CORNER LA GROUP,*
*LLC, NKM CAPITAL GROUP, LLC, J & K*
*AMERICANA, LLC, J&K LAKEWOOD, LLC, J*
*& K CULVER, LLC, J&K OAKRIDGE, LLC,*
*J&K VALLEY FAIR, LLC, J & K CAPITAL 2,*
*LLC, J & K ONTARIO, LLC, J&K PC*
*TRUCKS, LLC and J&K CONSULTANTS*
*GROUP, LLC*

24

25

26

27

28

4350401.1

GUY KOREN'S VERIFIED THIRD AMENDED CROSS-COMPLAINT

**Exhibit 1421 - 0156**