UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

SHAKEY'S PIZZA ASIA
VENTURES, INC.,

       Plaintiff,

v.

PCJV USA, LLC et al.,

       Defendants.

Case No. 2:24-cv-04546-SB-AGR

ORDER ON CROSS-MOTIONS
FOR SUMMARY JUDGMENT
[DKT. NOS. 309, 312]

In 2022, Plaintiff Shakey's Pizza Asia Ventures, Inc. (SPAVI) purchased registered trademarks for "Potato Corner" from Cinco Corporation (Cinco), a Filipino company that developed the Potato Corner brand of flavored french fries. SPAVI attempted to negotiate a licensing agreement with Defendant Guy Koren, who controls PCJV USA, LLC (PCJV), an entity he formed with Cinco to open Potato Corner franchises in the United States. After the negotiations failed, SPAVI filed this trademark-infringement action against PCJV, Koren, and numerous related entities. The Court granted SPAVI's motion for a preliminary injunction, preventing Defendants from continuing to use SPAVI's marks. Defendants, in turn, filed counterclaims and third-party claims against SPAVI, Cinco, and related entities, alleging interference with Defendants' rights.

The parties largely neglected to engage in discovery, and their trial filings were woefully inadequate, reflecting both carelessness and an inability to cooperate that have plagued this case to an extraordinary degree. Despite missing the summary-judgment deadline, both sides belatedly recognized that judicial resolution of key legal issues would be helpful. In its effort to narrow the issues for trial, the Court invited the parties to identify legal questions on which a judicial ruling might streamline the case and permitted them to file expedited summary-judgment motions limited to those issues. The Court cautioned that it "expect[ed]

the parties to exercise judgment in focusing on the most relevant evidence, recognizing that requesting the Court to examine many hundreds of pages of exhibits will negate the purpose of an expedited motion." Dkt. No. 308 at 3. The parties then filed cross-motions for summary judgment with briefing and evidence that total more than 3,700 pages. Although the length of the parties' filings has prolonged their adjudication, the Court will consider them. The Court held a hearing on November 14, 2025, and finds that neither side has shown entitlement to summary judgment on the claims, counterclaims, or defenses, but makes findings on some disputed issues pursuant to Rule 56(g).

I.

The Court begins with (1) a brief background of the key facts, (2) the procedural history of the case, and (3) a ruling on the evidentiary objections. The parties are thoroughly familiar with the record in this case—much of which the Court has previously discussed and need not repeat here—but the facts pertinent to the parties' disputes will be developed in the analysis of their arguments.

A.

The Potato Corner brand of flavored french fries was established in the Philippines in 1992 by a group of individuals who operated first as Quattro Corporation and later, after the addition of a fifth member, as Cinco Corporation. Dkt. No. 257 ¶ 2 (stipulated facts). Jose Magsaysay, Jr. is the CEO of Cinco. *Id*. ¶ 3. It is undisputed that beginning in 2010, Cinco applied to register with the U.S. Patent and Trademark Office (PTO) certain marks, including a service mark for the brand's logo, a "Potato Corner" character mark, and a character mark for the slogan "World's Best Flavored French Fries." *Id*. ¶¶ 12–13. The PTO issued registrations for the marks. *Id*. ¶ 14. Also in 2010, Defendant PCJV, which stands for "Potato Corner Joint Venture," was founded as a limited liability company to serve as the master franchisor of Potato Corner restaurants in the United States. *Id*. ¶¶ 4–5, 7.

PCJV was established as a collaboration between Cinco, on the one hand, and Defendant Guy Koren and his associates, on the other. The relationship between Koren and Cinco deteriorated, and they became embroiled in a dispute over control of the U.S. operations that led to protracted litigation in California state court from April 2018 until dismissal in May 2024 pursuant to a settlement agreement executed the month before. The litigation is discussed in more detail in this Court's November 14, 2024 order granting a preliminary injunction and

2

largely denying Defendants' motion to dismiss the original complaint. Dkt. No. 56. As a result of the 2024 settlement, Koren now wholly owns—individually and through his entities, Potato Corner LA Group, LLC (LA Group) and GK Capital Group, LLC (GK Capital)—both PCJV and the related company PCI Trading LLC (PCIT), which managed the supply chain for PCJV in the United States. Dkt. No. 257 ¶¶ 6, 9–11.

It is undisputed that PCJV and Koren never paid Cinco royalties for the use of the Potato Corner marks, although Koren executed at least three contracts agreeing that PCJV would enter into a master license agreement with Cinco that would include the payment of fees. The parties hotly dispute the meaning of those agreements, the parties' expectations and understandings, and the rights and obligations surrounding PCJV's use of the marks, as will be discussed further below.

In March 2022, while the state litigation was ongoing, Cinco sold its rights to the global Potato Corner brand to SPAVI for approximately $45 million. Ex. 46 ¶ 61 (Magsaysay decl.); Ex. 1439 ¶ 12 (decl. of SPAVI CEO and president Vicente Gregorio).[1] SPAVI does not claim to have acquired any ownership interest in PCJV—it bought only Cinco's intellectual-property rights, including the U.S. trademarks. After the purchase, SPAVI attempted to negotiate the terms of a license agreement with Koren for approximately two years. As late as February 2024, Koren sent SPAVI an email apologizing for his delay, providing PCJV's financial information, and asking to "discuss the terms of a new license agreement" with mutually acceptable terms. Ex. 26 at 1. The April 2024 settlement agreement in the state-court litigation between Cinco and Koren recited that "SPAVI and Koren have attempted to negotiate the terms of a license, including payment terms, which negotiations have been unsuccessful to date." Ex. 1172 at 2.

On May 31, 2024, three days after the state-court lawsuit was dismissed pursuant to the parties' settlement, SPAVI sent Koren a notice terminating the

---

[1] Most of the summary-judgment record consists of trial exhibits that had already been produced electronically to the Court and that have now been filed on the docket as attachments to Dkt. Nos. 309, 310, 311, 314, and 315. Like the parties, the Court cites to them by their designated trial exhibit number. Exhibits 1–107 are SPAVI's trial exhibits, and Exhibits 1001–1599 are Defendants' trial exhibits, although both sides produce some of the other's trial exhibits on summary judgment.

license and demanding that PCJV cease using the Potato Corner marks. SPAVI
filed this action the same day.

### B.

SPAVI's original complaint alleged trademark infringement and related
claims against PCJV, PCIT, Koren, and a dozen affiliated entities. Dkt. No. 1.
Once Defendants appeared, the parties quickly launched into vigorous litigation,
resulting in nearly 300 docket entries over the 13 months following issuance of a
case management order.[2] The Court denied Defendants' request for a temporary
restraining order that would have required SPAVI to provide supplies to
Defendants based on an unpleaded breach-of-contract theory. Dkt. No. 39.
Defendants then moved to dismiss the complaint, and SPAVI moved to
preliminarily enjoin Defendants from continuing to use the trademarks. The Court
largely denied the motion to dismiss and preliminarily enjoined Koren, PCJV, and
PCIT from using the Potato Corner marks without SPAVI's permission. Dkt. No.
56 (PI Order). Defendants then filed multiple ex parte applications for
reconsideration or modification of the PI Order, which the Court denied. Dkt. Nos.
64, 80. The Ninth Circuit denied Defendants' request for a stay and later affirmed
the PI Order, rejecting Defendants' argument that the state court action had
litigated PCJV's rights to use the trademarks, that PCJV had a superior claim of
ownership to the marks, or that the PCJV had a written perpetual license to use the
marks. Dkt. Nos. 78, 178.

Meanwhile, SPAVI filed a first amended complaint (FAC) that added claims
for quantum meruit, misappropriation of trade secrets, and breach of confidence.
Dkt. No. 65. The Court granted Defendants' motion to dismiss the last of these but
denied their frivolous motion to strike under California's Strategic Lawsuit Against
Public Participation (anti-SLAPP) statute, awarding attorney's fees to SPAVI.
Dkt. No. 99. The Court also initiated contempt proceedings and ultimately found
Defendants in contempt for continuing to use the trademarks in violation of the PI
Order. Dkt. Nos. 100, 155. For both the anti-SLAPP fees and the civil contempt
sanctions, the Court awarded substantially lower fees than SPAVI sought because

---

[2] The parties' filings have been remarkable not only for their volume but also for
the parties' inability to cooperate professionally and the frequency of missed
deadlines and other violations of the Court's orders. These violations are the
subject of outstanding orders to show cause re sanctions—some of which have
been referred to a special master for recommendation—and will be addressed
separately.

of SPAVI's failure to adequately meet and confer with Defendants, timely produce billing records, or otherwise meet its burden.  Dkt. Nos. 118, 155.

Although Defendants directly control many of the french-fry stores opened in the United States through PCJV, others are owned by independent third parties operating under franchise agreements with PCJV.  After obtaining the preliminary injunction, SPAVI contacted the third-party franchisees to offer them separate arrangements that would allow them to continue using the Potato Corner name.  In February 2025, Defendants filed a counterclaim and third-party complaint, seeking a declaration that they own or have the right to use the Potato Corner marks; alleging that SPAVI improperly interfered with Defendants' contracts and business relationships; alleging that both SPAVI and Cinco breached their fiduciary and contractual duties; and alleging quantum meruit and accounting claims against SPAVI, Cinco, and two additional SPAVI affiliates:  PC International Pte Ltd. (PCIPL) and SPAVI International USA, Inc. (SPAVI USA).  Dkt. No. 108.

SPAVI's counsel, who had also represented Cinco in the state action, stated his intention to accept service and accelerate the appearance of the third-party defendants, but they did not answer until April 15—after the fact discovery deadline had passed.  Dkt. Nos. 124, 156.  Despite having long believed that a continuance would be necessary, SPAVI and the third-party defendants (together, the SPAVI Parties) did not seek a continuance before the close of discovery, before the motion hearing deadline, before the post-settlement status conference, or even before the first set of pretrial filings were due.  Instead, they filed the first set of pretrial filings and then—more than four months after Defendants filed their counterclaim—filed an ex parte application for a six-month continuance of the trial date and a reopening of discovery and motions practice.  Dkt. No. 202.  Defendants opposed the untimely request, claiming prejudice.  Based on the SPAVI Parties' failures to comply with the requirements for seeking both ex parte relief and a continuance of the case management order (CMO), as well as their utter lack of diligence,[3] the Court denied the untimely continuance request.  Dkt. No. 208.  Separately, the Court found that SPAVI had failed to comply with discovery orders but denied Defendants' motion for sanctions both because it was untimely and

---

[3] Although the Court at the time did not know the full extent of SPAVI's lack of diligence, it later learned that SPAVI had waited more than five months after issuance of the CMO to propound its first and only written fact discovery—a single set of requests for productions—a month before the close of fact discovery.  Dkt. No. 294 at 1 n.1.

because Defendants did not want the additional discovery suggested by the magistrate judge. Dkt. No. 213. Given the parties' continuing failures to cooperate or comply with orders, the Court appointed a special master to investigate and recommend appropriate sanctions and referrals. *Id.*

The parties' trial filings reflected the same pattern of carelessness, disregard for the Court's instructions, and failure to cooperate. The Court struck the parties' motions in limine, which they failed to file jointly in violation of the Court's requirements, and expanded the existing order to show cause (OSC) re sanctions, noting that "[t]his case has likely set a record for the number of times the court has had to caution counsel about their violations of the court's orders and failures to cooperate." Dkt. No. 223 at 2. The second set of pretrial filings was severely deficient: "the parties failed to *timely* file any of the required joint submissions, even after repeated extensions; they failed entirely to file some of the required filings (the proposed PTC order and proposed jury instructions); and they failed to adequately cooperate and comply with the court's substantive requirements for the joint documents they did file." Dkt. No. 238 at 3 (subsequent OSC order). These failures made it impossible for the Court to prepare for trial effectively.

Given the serious deficiencies in the parties' trial findings, the Court repeatedly ordered amended filings. *Id.* at 4; Dkt. Nos. 254, 275, 289, 294. In some of the later filings, which still reflected major disagreements about even the scope of trial, the parties suggested that rulings on certain discrete legal issues might be necessary or at least helpful for focusing the issues. The Court permitted the parties to identify the narrow issues on which they believed a ruling would be most helpful. Dkt. No. 300 ("Although the Court is reluctant to delay trial any longer than necessary, it appears possible that allowing time for the parties to file concise, expedited briefing on discrete legal issues may be in the interest of judicial economy, given the large gap between the parties' positions and the work that remains to be done to prepare this case for trial."). The Court then allowed the parties to file expedited summary-judgment briefs on the issues they had identified, excusing them from compliance with the Court's ordinary rules for joint filings "[t]o minimize delay and avoid the problems that have arisen nearly every time the parties in this case have been ordered to cooperate." Dkt. No. 308 at 3.

The parties have now filed expedited cross-motions for summary judgment. Dkt. Nos. 309, 312. The SPAVI Parties seek summary judgment on Defendants' claims and affirmative defenses, and Defendants seek summary judgment on SPAVI's claims.

C.

Defendants raise a blanket objection to the SPAVI Parties' motion, arguing that it should be denied because the SPAVI Parties did not file a statement of uncontroverted facts or declarations authenticating the trial exhibits.  Dkt. No. 314 at 5.  They also object to "the lack of a separate summary judgment record," object to all declarations as constituting hearsay, and object to SPAVI's request for judicial notice to the extent the exhibits are relied on for the truth of their contents. *Id*.  The SPAVI parties object to portions of Defendants' supplemental declarations and "object to the declarations in their entirety to the extent they were used to circumvent the Court's page limit."  Dkt. No. 318 at 7.  They also filed evidentiary objections in their separate response to Defendants' statement of undisputed facts, in violation of the Court's instructions, prompting the Court to allow Defendants additional pages to respond separately.  Dkt. Nos. 317-1, 319, 321.

The objections are for the most part overruled.  To avoid delay when it allowed expedited cross-motions, the Court excused the parties from following its ordinary summary-judgment procedures and instead instructed each side to file a separate motion "accompanied by an appendix of evidence containing all the exhibits on which it relies," which "shall be identified by the exhibit number they have been assigned for trial."  Dkt. No. 308 at 3.  The Court did not require the parties to file a statement of undisputed facts.  Moreover, every assertion by Defendants in their "Statement of Undisputed Facts" is disputed by SPAVI, so it does not appear likely that a similar filing by SPAVI would have been especially helpful.  Dkt. Nos. 309-42, 317-1.  As the Court intended, the parties have relied principally on their trial exhibits, including those offered by the other side.  Most of these exhibits are not among the challenged exhibits listed in Dkt. No. 298—a list the parties have narrowed through multiple rounds of negotiations.

Half of the SPAVI Parties' summary-judgment exhibits are Defendants' own trial exhibits.  To the extent Defendants object to those exhibits, for lack of authentication or otherwise, the objections are overruled.  Similarly, the Court overrules Defendants' objection on summary judgment to any of SPAVI's trial exhibits to which they have not objected in the Joint Second Amended Challenged Exhibits Table.  And even if not waived, Defendants' hearsay objections to all declaration testimony fail on the merits. *See Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 666 (9th Cir. 2021) ("If the contents of a document can be presented in a form that would be admissible at trial—for example, through live testimony by the author of the document—the mere fact that the document itself might be

excludable hearsay provides no basis for refusing to consider it on summary judgment.").

The SPAVI Parties' global objection to the supplemental declarations produced by Defendants is overruled; the Court did not preclude supplemental declarations, and it is not clear that Defendants have improperly attempted to circumvent the Court's page limits through the declarations.  To the extent Defendants' declarants purport to summarize or characterize written documents— for example, by claiming to explain the parties' understanding when they executed various agreements—such testimony cannot overcome the plain meaning of the written contracts.  For example, Adam Mandel, PCJV's COO, states that the relevant agreements "included numerous provisions confirming PCJV's intellectual property rights" and "expressly [had] an indefinite duration as well as vested rights to use Potato Corner intellectual property."  Dkt. No. 309-6 ¶ 16.  But Defendants identify no provisions in the contracts giving them ownership of the trademarks or a vested right to use the marks indefinitely.  SPAVI's objections to the improper summaries or interpretations of the contracts are therefore sustained.  SPAVI's relevance objections are overruled.  *See id.* at 665 ("[O]bjections for relevance are generally unnecessary on summary judgment because they are duplicative of the summary judgment standard itself.") (cleaned up).

As for the remaining objections, to the extent the Court relies on evidence to which an evidentiary objection was raised, the Court overrules the objection, having found the contents of the evidence could be admitted at trial.

## II.

Summary judgment is appropriate where the record, taken in the light most favorable to the opposing party, shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255.  The moving party has the initial burden of establishing that there are no disputed material facts.  *Id*. at 256.  "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may . . . consider the fact undisputed."  Fed. R. Civ. P. 56(e)(2).  Furthermore, "Rule 56[(a)] mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and

on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A dispute about the meaning of contract terms does not preclude summary judgment if the terms are clear and unambiguous. *United States v. King Features Ent., Inc.*, 843 F.2d 394, 398 (9th Cir. 1988). Both the interpretation of a contract and whether its terms are ambiguous are legal questions. *Id*. "Under California law, even if the written agreement of the parties is clear and unambiguous on its face, the trial judge must consider relevant extrinsic evidence that can prove a meaning to which the language of the contract is reasonably susceptible," but if the court finds the language "is not reasonably susceptible to the asserted interpretation and is unambiguous, extrinsic evidence cannot be received for the purpose of varying the terms of the contract." *Id*. (citations omitted).

III.

A few causes of action have already been adjudicated or voluntarily dismissed. The claims that remain are described below.

In the FAC, SPAVI alleges against all Defendants claims for: trademark infringement and contributory infringement in violation of 15 U.S.C. § 1114 (Counts 1 and 4); false designation of origin and contributory infringement in violation of 15 U.S.C. § 1125(a) (Counts 3 and 5); common-law trademark infringement (Count 6); and violations of California's Unfair Competition Law (UCL) (Count 7). SPAVI also alleges against only PCJV claims for declaratory relief (Count 8) and quantum meruit (Count 9). Dkt. No. 65.

In their counterclaim and third-party complaint, a subset of Defendants—PCJV, PCIT, LA Group, GK Capital, NKM Capital Group LLC, and Koren—allege claims for: declaratory relief (Count 1); inducing breach of contract (Count 2); intentional interference with contractual relations (Count 3); intentional and negligent interference with prospective economic relations (Counts 4 and 5); aiding and abetting torts (Count 6); breach of fiduciary duty (Count 7); breach of contract (Count 8); breach of the implied covenant of good faith and fair dealing (Count 9); UCL violations (Count 10); and quantum meruit (Count 11). Dkt. No. 108. All claims are alleged against SPAVI; Counts 7–9 are also alleged against Cinco, and Counts 1, 10, and 11 are alleged against all four SPAVI Parties. For simplicity's sake, the Court refers to the counterclaim and third-party complaint together as the counterclaims and does not distinguish between Defendants as a whole and the subset of Defendants who bring the counterclaims.

IV.

Each side moves for summary judgment on the other's claims in their entirety (and SPAVI also moves for summary judgment on Defendants' affirmative defenses), but they frame their arguments largely in terms of issues rather than claims. The Court first addresses Defendants' motion and then turns to the SPAVI Parties' motion.

A.

Defendants argue that they are entitled to summary judgment on SPAVI's remaining claims for three reasons: (1) SPAVI cannot prove the "without consent" element of any of its trademark claims, (2) SPAVI cannot establish that it obtained valid ownership of the marks through its transaction with Cinco, and (3) Plaintiff is barred from relitigating licensing and authorization issues.

1.

Section 1114 of the Lanham Act precludes use of a registered trademark "without the consent of the registrant." 15 U.S.C. § 1114(1). Although § 1125 does not contain this language, SPAVI does not dispute Defendants' assertion that consent to use the trademarks would defeat all of SPAVI's trademark claims. Defendants argue that both the relevant agreements governing PCJV and the stipulations and other evidence in the record establish that Defendants had consent to use the Potato Corner marks, entitling them to summary judgment on the trademark claims.

Defendants' argument largely attacks a straw man. As SPAVI makes clear in its opposition, there is no dispute that at PCJV's founding and during the time before SPAVI's acquisition of the marks, PCJV had Cinco's consent to use the marks. Dkt. No. 317 at 12 ("SPAVI agrees that there was consent prior to May 31, 2024[.]"); *id*. at 15 ("SPAVI and Cinco agree that PCJV did have authority to use" the Potato Corner marks until SPAVI's revocation). The parties' dispute lies in whether PCJV—and the other Defendants—still had consent to use the marks *after* SPAVI purported to revoke the license on May 31, 2024. *See* Ex. 1437 at 2 ("[SPAVI] hereby officially terminates any license held by [PCJV] and [PCIT] to use any Potato Corner Intellectual Property and Proprietary Information, effective immediately."). To be entitled to summary judgment based on consent, therefore, Defendants must show as a matter of law that they had a preexisting right to continue using the marks indefinitely, which SPAVI lacked authority to terminate.

Neither the written agreements nor the other evidence on which Defendants rely
support that conclusion.

a.

Defendants look to four separate agreements—the October 1, 2009 Joint
Venture Agreement (JVA); PCJV's LLC Agreement signed November 30, 2010;
the June 18, 2012 Master Services Agreement (MSA); and the October 17, 2012
amendment to the JVA (AJVA).  Defendants argue that all four agreements must
be read together, relying on the statement in the April 2024 settlement agreement
between the Cinco parties and the Koren parties that "PCJV is governed by a set of
agreements" including the JVA, LLC Agreement, and AJVA.  Ex. 1172 at 1.
SPAVI disagrees, pointing to Defendants' judicial statement under oath that the
AJVA "modified all prior agreements and constitutes the operative agreement
governing PCJV's affairs."  Ex. 73 ¶ 68; *see also* Ex. 57 ¶ 31 (Koren's declaration
that the AJVA "was and is the operative agreement governing PCJV").  Although
the Court in connection with the SPAVI Parties' motion determines that the AJVA
displaced the prior agreements, the dispute is immaterial for purposes of
Defendants' motion, as neither the AJVA nor any of the other agreements creates
an irrevocable, perpetual, royalty-free license to use the Potato Corner marks.

The key language in the AJVA—which had also been included verbatim in
the JVA—provides:

> The Company [PCJV] shall enter into a Master License Agreement
> with Cinco (or an affiliated company to be designated by Cinco)
> which shall include the following terms and conditions:
>
> (i)   The Company agrees to license the "POTATO CORNER"
>       intellectual property rights from Cinco or an affiliated company
>       to be designated by Cinco consisting of (i) the trademark, service
>       mark and trade name "POTATO CORNER"; and (ii) various
>       trademarks, service marks, trade names, slogans, designs,
>       insignias, emblems, symbols, color schemes, package features,
>       logo and other propriet[ar]y identifying characteristics used in
>       relation and in connection with the "Potato Corner" Products and
>       the System; and (iii) as well as other intellectual property rights
>       in connection with the "POTATO CORNER" intellectual rights,
>       for use in the Territory.
>
> (ii)  The Company agrees to pay, as an arm's length license fee, the
>       following amounts:

11

> (1) With respect to the licensing / sub-licensing or franchising the "POTATO CORNER" intellectual property rights in connection with the "POTATO CORNER" outlets/stores, an amount equal to thirty percent (30%) of all initial/franchise fees and ongoing royalty fees paid to/ collected by the Company. . . .

Ex. 1053 § 3(g) (AJVA); Ex. 1050 § 3(g) (JVA). Defendants argue that the mandatory language in this provision created a present, binding obligation that entitled PCJV to use the marks in perpetuity. Their argument fails for at least three reasons.

First, both this Court and the Ninth Circuit have squarely rejected Defendants' argument that the AJVA created a license agreement. As this Court explained in granting SPAVI's motion for a preliminary injunction, § 3(g) contained an agreement to enter into a license agreement, which the parties never completed:

> § 3(g) required PCJV to enter into a master license agreement with Cinco, which among other things would require PCJV to pay to Cinco 30 percent of the licensing, franchise, and royalty fees it received from sub-franchising the Potato Corner brand. It is undisputed that PCJV never executed the required master license agreement, although both Cinco and SPAVI attempted to negotiate a license with Koren. The parties offer competing accounts of the negotiations and who is to blame for their failure, but there is no evidence that PCJV ever obtained a written license to use the trademarks.

Dkt. No. 56 at 3, 15 (record citations omitted). The Ninth Circuit affirmed, explaining that "the AJVA contained an agreement to enter a *future* Master License Agreement, not a 'perpetual license' like PCJV claims." Dkt. No. 178 at 4. Defendants dispute the characterization of § 3(g) as an agreement to agree, but their motion offers no authority explaining why they (and this Court) are not bound by the law of the case. *United States v. Jingles*, 702 F.3d 494, 499 (9th Cir. 2012) ("Under the 'law of the case' doctrine, a court is ordinarily precluded from reexamining an issue previously decided by the same court, or a higher court, in the same case.") (citation omitted). Although preliminary-injunction decisions generally do not constitute law of the case, "conclusions on pure issues of law . . . are binding." *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agr.*, 499 F.3d 1108, 1114 (9th Cir. 2007). While Defendants

12

elsewhere argue that the Court made only preliminary findings based on a limited record, the interpretation of the plain language of the AJVA is a legal question, and the contract language has not changed.

Second, even if the Court were considering the issue in the first instance, it would reach the same conclusion. The AJVA plainly required a future license agreement. And while Defendants produce declarations attesting to their understanding that an agreement had been reached, a jury could certainly find on this record—including the undisputed fact that Koren continued to negotiate the terms of a license agreement with Cinco and later with SPAVI—that no license agreement was ever reached.

Third, the terms required by § 3(g) for the future license agreement included fees to be paid to Cinco for use of the marks.[4] It is undisputed that PCJV never paid Cinco any fees—let alone "thirty percent . . . of all initial/franchise fees and ongoing royalty fees" received by PCJV. Ex. 1053 § 3(g)(ii)(1). Nor have Defendants produced evidence of any subsequent written agreement excusing PCJV from paying royalties. *Cf. id.* § 5(a) ("This Agreement may not be altered, changed, supplemented or modified except by a written instrument duly signed by the Parties."). Thus, even if Defendants were correct that § 3(g) of the AJVA constituted a license agreement rather than an agreement to agree, then PCJV has been in breach of that agreement since the outset, and SPAVI was entitled to rescind the license. *Rano v. Sipa Press, Inc.*, 987 F.2d 580, 586 (9th Cir. 1993), as amended (Mar. 24, 1993) ("[U]nder federal and state law a material breach of a licensing agreement gives rise to a right of rescission which allows the nonbreaching party to terminate the agreement."); *2Die4Kourt v. Hillair Cap. Mgmt., LLC*, 692 F. App'x 366, 368 (9th Cir. 2017) (affirming preliminary injunction against trademark licensee who failed to pay royalties because "[a] party to a contract cannot both refuse to perform its obligations and continue to avail

---

[4] Defendants have advanced, and continue to advance, a variety of conflicting positions in this litigation, including that: (1) they have an indefinite, irrevocable, royalty-free license; (2) the terms of the license are indeterminate and must be decided by the Court; (3) there is a 30-percent royalty fee required by the AJVA, leaving nothing to be negotiated or decided; and (4) they own the marks, making any license unnecessary. All four of these theories are mutually exclusive, and Defendants have alternated among them as they find it convenient. To the extent these are permissible alternative legal theories rather than inconsistent factual assertions, Defendants' inability to pick one undermines their assertion that they are entitled to judgment as a matter of law on any particular theory.

itself of the contract's benefits"); *Jay Bharat Devs., Inc. v. Minidis*, 167 Cal. App. 4th 437, 444 (2008) ("[A]ppellants breached the [franchise agreement] by failing to make royalty payments and failing to pay advertising fees. Despite their breaches, appellants still wanted to use the . . . trademarks. They cannot do so.").

Defendants also reference § 4(b)(i) of the AJVA, which contemplated that upon termination of the agreement, "[a]ll rights granted under the Master License Agreement shall terminate and [PCJV] shall cease the use of the Potato Corner Intellectual Property Rights," except that PCJV "shall be permitted to use any of the foregoing as is reasonably required in order to comply with its obligations under the sub-licensing or franchising agreements, but only to the extent of the duration of sub-licensing or franchising agreements in existence at the time of the termination." *Id*. § 4(b)(1). Had a master license agreement been executed, this provision would have permitted the franchisees to use the Potato Corner marks for the duration of their franchise agreements. Having failed to enter into a master license agreement or to pay the royalties associated therewith as required by § 3(g), however, PCJV has not shown that § 4(b)(i) provides it with any ongoing rights.

None of the other three prior agreements on which Defendants rely requires a contrary conclusion, even if they were not displaced by the AJVA. The JVA and LLC Agreement each contain a provision materially identical to § 3(g) of the AJVA, establishing only an agreement to agree and contemplating payment of royalty fees to Cinco in the forthcoming license agreement. Ex. 62 § 4.17; Ex. 1050 § 3(g). Nor have Defendants identified any other provision of the JVA, AJVA, LLC Agreement, or MSA[5] that provides Defendants with indefinite, irrevocable rights to use the Potato Corner marks. Defendants argue that PCJV's president and the L.A. Group were "expressly given the right and responsibility to control the intellectual property," but none of the contract provisions they cite mentions any right to use the marks. Dkt. No. 309-1 at 9 (citing Ex. 62 § 4.11.7; Ex. 1045 at 1; Ex. 1050 § 3(i)).

In sum, the written agreements expressly require a further licensing agreement—including payment of royalties by PCJV to Cinco—and do not confer an indefinite, irrevocable right to use the Potato Corner marks, let alone for free.

---

[5] The MSA addressed management of PCJV and made no mention of trademarks. Ex. 1045.

b.

Defendants' arguments from other parts of the record fare no better. First, they invoke the parties' stipulated facts that "PCJV was established in 2010 to serve as the master franchisor of Potato Corner restaurants in the United States" and that "[e]ach Potato Corner franchised restaurant in the United States obtained its rights to use Potato Corner marks from PCJV." Dkt. No. 257 at 3. But it is undisputed that Cinco consented to PCJV's use of the marks from 2010 until the sale of the marks to SPAVI in 2022. The stipulated facts say nothing about any agreement for PCJV or its subfranchisees to continue using the marks in perpetuity—particularly if PCJV failed to execute a master license agreement or pay royalties to Cinco as contemplated by the AJVA.

Second, Defendants argue that PCJV's structure and history reflect an indefinite license because the parties rejected a fixed term for PCJV's existence, and the right to authorize use of the marks is inherent in the operation of a franchise system. To be sure, a jury could find on this record that the parties expected PCJV to continue using the marks indefinitely and to enter into franchise agreements on that understanding. But a jury could also find that the parties expected PCJV to pay for that use and to enter into a written license agreement providing for such payment, as required by the AJVA and the other agreements discussed above. *See, e.g.*, Ex. 46 ¶¶ 44–48 (describing Magsaysay's willingness to defer entering into a license agreement based on Koren's request to defer paying fees); Ex. 48 (decl. of Yiow Leong Tan describing SPAVI's negotiations with Koren from February 2023 to October 2024, seeking agreement on royalty terms for a license agreement). Defendants have not shown that the structure of PCJV enshrined a right for PCJV to elect not to pay royalties but nevertheless to continue using them indefinitely.

Third, Defendants argue that SPAVI's conduct confirms that PCJV had a perpetual right to use the Potato Corner marks because SPAVI did not purport to revoke PCJV's license until two years after its purchase of the marks from Cinco. But SPAVI produces evidence that it was negotiating with Koren for most of that time over the amount PCJV would need to pay for royalties and the duration of the license, and that Koren never asserted during the negotiations that he believed PCJV had a perpetual, irrevocable license. Ex. 48 ¶¶ 24–25. Indeed, Koren in February 2024 sent SPAVI new PCJV financial information and stated his hope that they would "agree on the terms of a new license agreement." Ex. 26 at 1. The April 2024 settlement agreement to which Defendants were parties likewise represented that "SPAVI and Koren have attempted to negotiate the terms of a

license, including payment terms, which negotiations have been unsuccessful to date." Ex. 1172 at 2. Under these circumstances, SPAVI's attempt to negotiate terms of payment before revoking PCJV's license does not require a finding that PCJV was entitled to use the Potato Corner marks indefinitely without paying for them.

Fourth, Defendants contend that Cinco's sworn statements in state court "are dispositive" and "prove that Defendants always were authorized to use, had long-term rights, and were allowed to grant those long-term rights to franchisees." Dkt. No. 309-1 at 8. Although Cinco's prior statements reflect the undisputed fact that it authorized PCJV to use the marks before the sale to SPAVI, Defendants have not identified any statement by Cinco representing that PCJV's right to use the marks was perpetual, irrevocable, or royalty-free. To the contrary, Cinco expressly alleged in its pleadings that it "agreed to license the 'Potato Corner' Intellectual Property to [PCJV], *in exchange for a license fee* [with the terms stated in the JVA]." Ex. 1077 ¶ 31 (emphasis added); *accord* Ex. 1078 ¶ 34. Thus, Defendants have not shown that any of Cinco's statements in the state proceedings are inconsistent with SPAVI's position in this action.

Finally, Defendants raise a series of legal arguments about contract interpretation and franchise law in California, in which they again argue that PCJV's governing documents created an integrated scheme in which PCJV had operational and licensing authority, and the parties could not assign or transfer rights without a supermajority vote. But the requirement that PCJV "shall enter into a Master License Agreement with Cinco (or an affiliated company to be designated by Cinco) which shall include" the designated royalty fees is clear and unambiguous. Ex. 1053 § 3(g). PCJV argues that an interpretation that leaves it unable to guarantee its franchisees the right to continue using the Potato Corner marks is inconsistent with the intended structure of franchise agreements in California. But PCJV's inability to guarantee use of the trademarks arises from its failure to negotiate the master licensing agreement or pay royalties as required by the AJVA, not from an unreasonable interpretation of the AJVA by SPAVI. Defendants have not identified any contract language—or any principle of California law—that even arguably provided PCJV the right to continue using the Potato Corner marks in perpetuity if it refused to pay the royalty fees required by the master licensing agreement contemplated in the AJVA (as well as in the JVA and LLC Agreement, to the extent they are relevant).[6]

---

[6] At the hearing, Defendants disputed that PCJV has refused to pay royalty fees, contending instead that Cinco waived them. It is undisputed that PCJV has not

Defendants are correct that under California law, an agreement without an express duration provision may be found to have an implied duration. *See Thomson v. Hodgson*, 150 F.4th 1097, 1103 (9th Cir. 2025) ("[I]f the contract does *not* contain an express duration provision, courts determine whether one can be implied from the nature and surrounding circumstances of the contract."). In *Thomson*, a copyright case, the Ninth Circuit found that an agreement among band members apportioning each member's royalty shares was not terminable at will but would exist as long as the royalties continued to flow. *Id.* at 1105. Here, however, Defendants do not seek merely to add an implied duration term to an otherwise express license with established terms. Instead, they seek to disregard the provision in the AJVA requiring PCJV to enter into a license agreement that includes payment of royalty fees, assert an implied license to use the marks *without* paying fees, and then imply an indefinite duration (and irrevocability) to *that* implied license. Defendants identify no legal authority supporting this remarkable argument.[7]

In sum, it is undisputed that Defendants had consent—first from Cinco and then from SPAVI—to use the marks until May 31, 2024. But Defendants have not shown as a matter of law that, now that SPAVI has withdrawn its consent, they remain entitled by an express or implied license to continue using the Potato Corner marks indefinitely and without paying royalties to the marks' owner.

2.

Defendants next argue that SPAVI cannot prevent it from using the marks because Cinco's assignment was invalid under the assignment-in-gross doctrine, which precludes an assignment of a trademark without the associated goodwill, so SPAVI never acquired ownership of the marks. "The law is well settled that there are no rights in a trademark alone and that no rights can be transferred apart from

---

paid fees, and a jury could find on this record that Defendants have refused to pay reasonable royalties.

[7] For purposes of Defendants' motion, it is unnecessary to decide whether—or when—Cinco or SPAVI would have been entitled to prevent Defendants from using the marks if PCJV *had* paid royalties as contemplated in the AJVA. On this record, a jury could find that PCJV has acted in bad faith and refused to comply with its own obligations, negating Defendants' arguments grounded in equity or the duty of good faith and fair dealing.

the business with which the mark has been associated." *Mister Donut of Am., Inc. v. Mr. Donut, Inc.*, 418 F.2d 838, 842 (9th Cir. 1969); 15 U.S.C. § 1060(a) ("A registered mark . . . shall be assignable with the good will of the business in which the mark is used, or with that part of the good will of the business connected with the use of and symbolized by the mark."). A bare recitation in the assignment that goodwill is being transferred generally is not controlling; "courts instead conduct a case-by-case analysis to determine whether an assignee's use of a mark maintains sufficient continuity with the prior use." *Glow Indus., Inc. v. Lopez*, 273 F. Supp. 2d 1095, 1108 (C.D. Cal. 2003) (collecting cases).

a.

In its opposition, SPAVI characterizes assignment in gross as a type of abandonment and therefore treats it as an affirmative defense. Exemplifying the counterproductive rhetoric the Court has repeatedly cautioned the parties to avoid, SPAVI accuses Defendants of "apparently not having read" the Court's September 9 order, which purportedly "specifically confirmed" that assignment in gross is an affirmative defense rather than an element for SPAVI to prove. Dkt. No. 317 at 9. In fact, the order stated the opposite, explaining that "the Court does not intend to . . . instruct the jury on assignment in gross beyond the language in model instruction 15.15 describing what Plaintiff must prove to establish ownership." Dkt. No. 296. The Court set a deadline for any party who disagreed to "file a written objection, supported by legal authority establishing that assignment in gross is an affirmative defense, and attaching a proposed jury instruction clearly explaining what Defendants must prove to establish the defense" and provided that failure to do so "will be deemed consent to the Court's intended approach." *Id*. No party filed an objection. SPAVI's reliance in its summary-judgment briefing on two out-of-circuit district court decisions that appear to have treated assignment in gross as an affirmative defense comes too late.

In any event, the Lanham Act defines abandonment as either (1) the discontinuation of use of a mark with intent not to resume the use or (2) causing the mark to become generic. 15 U.S.C. 1127. SPAVI has not shown that an invalid assignment of a mark without its associated goodwill falls into either category of abandonment. To be sure, there may be circumstances where an assignment in gross may result from abandonment, such that the doctrines are intertwined. For example, in *Mister Donut*, the prior owner of a mark disposed of his doughnut business in 1951, stopped using the mark, and then died. 418 F.2d at 842. An unrelated business purchased an assignment of the mark from the decedent's estate five years later, in 1956, with "no pretense that the estate

transferred any customer lists, merchandise, equipment, recipes, decals or other goods." *Id*. at 841–42. Thus, the Ninth Circuit affirmed the district court's conclusion that the assignment did not confer goodwill and was ineffective under the assignment-in-gross doctrine. *Id*. at 842. No similar circumstances are present here, and SPAVI has not shown—particularly after consenting to the Court's treatment of assignment in gross as part of its burden—that Defendants' challenge to the assignment amounts to a claim of abandonment.

b.

Turning to the merits of the argument, Defendants have not shown as a matter of law that the assignment was invalid. SPAVI produces evidence of an assignment of the marks "together with the goodwill of the business symbolized thereby" from Cinco to SPAVI in February 2022. Ex. 4 at 3. Defendants challenge the reliability of the assignment but have not shown that any doubt goes to admissibility rather than weight.[8] Nor have Defendants shown that SPAVI's purchase of the marks without purchasing an ownership interest in PCJV means that SPAVI cannot have acquired any goodwill associated with the marks. As this Court and the Ninth Circuit have repeatedly stated, "in the licensor-licensee context, a licensee's use of a trademark inures to the benefit of the licensor-registrant." Dkt. No. 178 at 4 (9th Circuit order affirming preliminary injunction); *accord* Dkt. No. 56 at 22. Both sides agree that Cinco authorized PCJV to use the marks in the United States and to allow franchisees to use them, and the AJVA recognized Cinco's ownership of the marks by requiring PCJV to enter into a licensing agreement with Cinco and pay royalties to Cinco. Thus, the goodwill obtained by PCJV through its use of Cinco's marks inured to the benefit of Cinco. Defendants therefore have not shown that Cinco did not own the goodwill associated with PCJV's authorized use of the marks.[9] Although the third-party

---

[8] Although they did not include it as a summary-judgment exhibit, Defendants cite to Ex. 6, which is a trademark assignment cover sheet signed in August 2024. The two cover sheets involve different marks: Ex. 4 reflects assignment of the "Potato Corner" word and logo marks, among others, while Ex. 6 reflects assignment of the slogan mark. Ex. 6 lists March 5, 2022 as the date of the conveyance, and it attaches a deed of assignment dated March 5, 2022 but notarized in August 2024. While the differing dates raise questions that SPAVI may need to address at trial, Defendants have not shown that the existence of Ex. 6 renders Ex. 4 inadmissible.

[9] In their reply, Defendants argue that SPAVI failed to rebut their "*prima facie* case that PCJV is both the senior user and the sole continuous user of the U.S. trademarks," such that Cinco had no goodwill to transfer. Dkt. No. 320 at 3. The

franchisees and PCJV agreed that, as between them, PCJV would own the goodwill associated with the franchise, Defendants have not shown that those agreements prevent that goodwill from being imputed from PCJV to Cinco by operation of law.

Defendants also have not shown that either Cinco or SPAVI abandoned use of the marks.  Although Koren effectively interfered with Cinco's ability to control PCJV during much of the state-court litigation, SPAVI produces evidence that both Cinco and later SPAVI continued to negotiate with Koren for a license agreement, which the AJVA required PCJV to obtain.  Ex. 46 ¶¶ 59–60; Ex. 1439 ¶¶ 31–70.  During this time, the Potato Corner stores in the United States continued operating under the same branding.  And shortly after SPAVI obtained a preliminary injunction, it contacted the third-party franchisees to offer them short-term licenses to continue using the Potato Corner mark.  Ex. 1154; *see also* Dkt. No. 153-1 at 19 (Defendants' assertion that "[b]ecause PCJV is enjoined until trial from using the Potato Corner brand, most of PCJV's franchisees claimed to have left PCJV and joined SPAVI's organization").  Defendants contend that SPAVI's contact with the third-party franchisees was wrongful, but they have not shown on this record that a rational jury necessarily would have to find that Cinco or SPAVI lacks any goodwill in the brand or any involvement in the use of the marks in the United States.  *Mister Donut* is not "directly on point," as Defendants contend (Dkt. No. 309-1 at 17); there has been no lapse in the use of the Potato Corner mark for the sale of flavored french fries in the United States, let alone a five-year abandonment of the business.[10]  Given the continuity of use, it is plausible that any Potato Corner

---

only reference in their motion to being the senior user is a footnote stating that the parties dispute whether Cinco exercised quality control over PCJV's use of the marks so as to establish continuous use by a senior user—which "the Court need not adjudicate" for purposes of the motion.  Dkt. No. 309-1 at 5 n.5.  Defendants offer no support for their suggestion that SPAVI forfeited its claim to ownership by not responding to a footnote identifying an issue they said need not be resolved.

[10] Moreover, while the Court's focus is on domestic use, it is also undisputed that SPAVI's Potato Corner stores worldwide have continuously operated with the same logo, name, slogan, and flavors used by the Potato Corner stores in the United States before the injunction in this case.  Given the consistent, continuous use of the marks both domestically and internationally, it is conceivable that customers in the United States associate the domestic brand with the global brand.  That association with an established global brand is presumably why Defendants sought a franchise agreement in the first place rather than starting a new brand.

stores opened or operated by SPAVI or its authorized franchisees would benefit from the goodwill Cinco obtained through PCJV's use of Cinco's marks. *See Glow Indus.*, 273 F. Supp. 2d at 1108 (when evaluating whether an assignment included goodwill, courts ask "whether the goods offered under the mark post-assignment are substantially similar, to those previously associated with it, or at least sufficiently similar to prevent customers from being misled from established associations with the mark") (cleaned up).

On this record, Defendants have not shown that they are entitled to summary judgment based on a finding that SPAVI's purchase of the marks was an invalid assignment in gross.

3.

Defendants' third argument is that SPAVI "should either be bound by the settlement or estopped from challenging it." Dkt. No. 309-1 at 20. Defendants claim that SPAVI is contractually bound by Cinco's release of all known and unknown licensing claims on behalf of its successors, affiliate, and assigns—which Defendants contend include SPAVI. Ex. 1172 at 3, 6. Defendants also invoke estoppel. Their arguments fail for multiple reasons.

First, Defendants have not shown SPAVI is contractually bound by the settlement, to which it was not a party. Absent SPAVI's involvement, any release by Cinco in 2024 could not have narrowed or constrained the trademark rights it had sold to SPAVI two years earlier, in which Cinco no longer had any interest. That SPAVI is Cinco's successor-in-interest with respect to the trademark rights it acquired in 2022 does not mean that Cinco retroactively bound SPAVI (or had authority to do so) when it entered into a settlement that bound its successors in 2024.

Defendants argue that SPAVI is contractually bound because "Plaintiff's Myrose Victor (formerly with Cinco)" and "Plaintiff's subsidiary or affiliate, Highfive Corporation" were signatories and because the attorney who negotiated the settlement agreement for Cinco also represents SPAVI. Dkt. No. 309-1 at 18. Defendants cite no evidence for their assertions about Victor and Highfive. They do not identify Victor's role or suggest that she was a representative of SPAVI at the time she signed the agreement. As for Highfive, Defendants produce a declaration of Alon Koren stating that he "believe[s] that SPAVI acquired Highfive Corporation or its relevant operations given the continuity of [an employee's] role in handling [PCJV's] supply orders both before and after SPAVI's acquisition."

Dkt. No. 309-3 ¶ 3.  SPAVI's objection to this speculative statement based on lack of personal knowledge is sustained.  Cinco's Magsaysay signed the settlement agreement for Highfive (Ex. 1172 at 10), and Defendants produce no admissible evidence that Highfive was an affiliate or subsidiary of SPAVI at the time of the settlement.  Nor do they cite any authority for the suggestion that a nonparty to an agreement may be bound by it based only on having retained the same counsel as a party to the agreement.

Defendants' estoppel argument is unclear.  They do not explain how they believe SPAVI is attempting to "challenge" the settlement agreement.  Nor have they shown that Cinco—let alone SPAVI—misled them as to the facts of the settlement agreement.  This Court and the Ninth Circuit have squarely rejected Defendants' attempts to characterize the state litigation as addressing the trademark dispute at issue here.  Dkt. No. 56 at 6 (state proceedings "focused on control of PCJV, not whether PCJV owned or had a right to use the trademarks registered in Cinco's name"); *accord* Dkt. No. 178 at 3.  And Defendants have not identified any statement in the settlement agreement that conflicts with SPAVI's claims here.  The agreement included clear representations that SPAVI had purchased the Potato Corner marks and was now the licensor to PCJV and PCIT; that SPAVI was not a party to the settlement agreement; that SPAVI was not claiming ownership in PCJV, Cinco, or any other related entity; and that SPAVI and Koren had been negotiating the terms of a license:

> Cinco represents that in 2022, [SPAVI]—which is not a party to any of the actions referred to herein, nor this Agreement—acquired all of the Potato Corner intellectual property, and, as such became the licensor to PCJV and PCI Trading.  Cinco further represents that SPAVI did not acquire any ownership rights or equity (membership interests, shares, etc.) in PC International, Cinco, nor PCN or PCI Trading.  SPAVI has never taken the position, or represented, or taken any action indicating that it is claiming any ownership interest or equity in PCN, PCI Trading, PCI, or Cinco.  SPAVI and Koren have attempted to negotiate the terms of a license, including payment terms, which negotiations have been unsuccessful to date.

Ex. 1172 at 2.  The settlement also excluded from its release claims arising out of the sale of the marks to SPAVI.  *Id.*  In light of the agreement's clear disclosures, Defendants' contention that they were misled into believing that Cinco was the real party in interest as to licensing claims is unavailing.

In sum, Defendants have not shown that the settlement agreement entitles them to summary judgment on any of SPAVI's claims.

### 4.

In their opposition to Plaintiff's summary-judgment motion, Defendants raise an additional argument that, although unresponsive to Plaintiff's motion, would be relevant to their own—namely, that PCJV owns the Potato Corner marks. Defendants once again make this argument based on the framework in *Sengoku Works Ltd. v. RMC International, Ltd.*, a case involving a trademark dispute between a foreign manufacturer and a U.S. distributor. 96 F.3d 1217 (9th Cir. 1996). The Court previously questioned the relevance of *Sengoku* to this case, which does not involve a manufacturer–distributor relationship. Dkt. No. 56 at 9, 20. Defendants still have not shown that *Sengoku* provides the appropriate test for determining superior rights based on senior use, especially given the Ninth Circuit's rule—which it has repeated in this case—that "in the licensor-licensee context, a licensee's use of a trademark inures to the benefit of the licensor-registrant." Dkt. No. 178 at 4. Defendants cite only a single district court decision involving franchises that quotes *Sengoku* once for the unremarkable proposition that "[i]n determining the trademark rights of the parties, the Court 'will look first to any agreement between the parties regarding trademark rights.'" *Precision Door Serv., Inc. v. Bell*, No. 02-CV-01108, 2002 WL 655053, at *6 (N.D. Cal. Apr. 18, 2002). That narrow proposition is consistent with this Court's approach, which relies on the fact that the AJVA acknowledged Cinco's ownership of the marks and required PCJV to enter into a licensing agreement and pay royalties for their use.

Thus, even if the Court considers Defendants' *Sengoku* argument in connection with their own motion, they have not shown as a matter of law that SPAVI's claims fail because PCJV owns the marks.

### B.

The SPAVI Parties move for summary judgment on Defendants' claims and affirmative defenses.

### 1.

In their notice of motion, the SPAVI Parties raise five grounds on which they seek summary judgment, but not all those grounds are developed in the

motion itself.[11]  Moreover, the SPAVI Parties do not address the counterclaims individually, and it is not self-evident that their arguments—if accepted—would defeat all counterclaims or affirmative defenses.  For example, they have not shown how the existence of a contractual or fiduciary relationship with SPAVI or Cinco is relevant to Counts 4 and 5, which allege that SPAVI interfered with Defendants' relationships with their suppliers.  *Cf. Green Hills Software, Inc. v. Safeguard Scis. & SPC Priv. Equity Partners*, 33 F. App'x 893, 894 (9th Cir. 2002) (listing elements for intentional interference with prospective economic relations).  In their notice of motion, the SPAVI Parties conclusorily assert that these counterclaims—and others—fail because they "are predicated on the existence and validity of the [AJVA] as well as the Master License Agreement" (Dkt. No. 312 at 4), but this argument is not developed in the motion itself.

Defendants' filings add to the confusion.  First, the counterclaims themselves are generally vague and fail to identify which contractual provisions and economic relations among which parties are at issue,[12] although the SPAVI Parties neither raised a pleading challenge nor move for summary judgment on that basis.  Second, Defendants' opposition focuses heavily on their argument that SPAVI does not own the marks, which is the subject of their own summary-judgment motion but unresponsive to the SPAVI Parties' challenge to the existence

---

[11] For example, the notice of motion asserts that PCIPL and SPAVI USA are entitled to summary judgment because "[t]he Counterclaim fails to allege a single claim for relief" against them, but the motion itself makes no mention of PCIPL or SPAVI USA. Dkt. No. 312 at 5.  The SPAVI Parties devote two sentences in their reply to this issue, for the first time explaining the basis of their contention, but it comes too late.  *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.").

[12] Defendants attempted to clarify the scope of their claims in response to the Court's inquiry and proposed that all counterclaims could be assigned to PCJV to simplify matters—a proposal they had suggested to SPAVI for consideration.  Dkt. No. 297 at 14 & n.7.  The Court twice ordered the parties to file a joint report on the status of any agreement.  Dkt. Nos. 300, 305.  The parties failed to comply; defense counsel filed two declarations reporting SPAVI's counsel's nonresponsiveness (Dkt. Nos. 306, 307); SPAVI has not addressed the failure in any way; and the long-overdue joint report still has not been filed.

of contractual or fiduciary relationships.  Very little of Defendants' opposition addresses the arguments SPAVI raises.

Given the state of the briefing, the Court limits its analysis to the two arguments contained in the argument section of the SPAVI Parties' motion: (1) that Cinco is entitled to summary judgment on all counterclaims because the claims were released in the settlement agreement and Cinco was not a party to the AJVA and owed no contractual or fiduciary duty to any Defendant, and (2) that SPAVI is entitled to summary judgment on all counterclaims and affirmative defenses because it is not Cinco's successor-in-interest and owed no contractual or fiduciary duty to any Defendant.  Because the SPAVI Parties have not adequately tied these arguments to the elements of any counterclaims or defenses, the Court will analyze them under Rule 56(g), as both sides request in the alternative.[13]  *See* Fed. R. Civ. P. 56(g) ("If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact . . . that is not genuinely in dispute and treating the fact as established in the case.").

2.

In their first series of arguments, the SPAVI Parties contend that Cinco is entitled to summary judgment because the claims against it were released in the settlement agreement and it has no contractual or fiduciary duties to any Defendant.

a.

First, the SPAVI Parties make a conclusory argument that under the settlement agreement, the only claims that may be alleged against Cinco are those that arise out of the sale of the marks to SPAVI in March 2022.  In the settlement agreement, the "Koren Parties"—including all Defendants in this case who allege counterclaims—broadly released all claims against Cinco, known and unknown, relating to matters that were raised or could have been raised in the state litigation. Ex. 1172 at 4.  Expressly excluded from the release, however, were "claims arising out of the sale of Potato Corner IP to SPAVI, including declarations of rights by the Koren Parties as to the Potato Corner IP and claims that Cinco breached

---

[13] Defendants argue that "Plaintiffs' Rule 56(g) request is improper" because the SPAVI Parties have not met their burden but that "if any facts are established, they should be those supported by Defendants' undisputed evidence."  Dkt. No. 314 at 22.

contractual or other duties owed to the Koren Parties as a result of the acquisition by SPAVI of the Potato Corner IP as well as any related declarations of rights by Cinco should such proceedings be initiated by the Koren Parties." *Id*. at 2.

Neither side addresses the scope of the exclusion language, and the SPAVI Parties in their notice of motion merely assert that "some or all" of the claims against Cinco are barred by the settlement agreement. Dkt. No. 312 at 4. In the broadest sense, all the counterclaims arguably might be said to arise from Cinco's sale of the marks to SPAVI, as that sale was a but-for cause of the entire dispute in this case. Because Cinco has neither identified the particular claims it contends are barred by the settlement agreement nor addressed how the release language applies to those claims, it is not entitled to summary judgment on the basis of the release. Without the benefit of argument from either side, the Court does not decide the scope of the release or find that the counterclaims are excluded; it merely concludes that the application of the release to the counterclaims is not self-evident on this record and that Cinco has not met its summary-judgment burden.

b.

Cinco next argues that it is not a party to any executed written contract with any counterclaimant, other than the settlement agreement. It is undisputed that Cinco was a party and signatory to both the LLC Agreement and the JVA. Cinco maintains, however, that (1) the AJVA superseded those agreements and (2) it is not a party to the AJVA. Defendants dispute both premises.

Cinco invokes principles of preclusion and estoppel, pointing out that in the prior action, the state court ruled that "it is . . . reasonable to interpret the AJVA as the operative agreement among the parties, superseding the Operating Agreement and the JVA" and that, relying on that ruling, Defendants then alleged that the AJVA "modified all prior agreements and constitutes the operative agreement governing PCJV's affairs." Ex. 73 ¶ 68; Ex. 1135 at 13. But as Defendants have pointed out, the April 2024 settlement agreement to which Cinco was a signatory asserted that "PCJV is governed by a set of agreements" including the JVA, LLC Agreement, and AJVA. Ex. 1172 at 1. Because each side asserted at times in the prior litigation a position at odds with its current position, it would be inequitable to apply judicial estoppel against only one side to resolve the dispute. *See Ah Quin v. Cnty. of Kauai Dep't of Transp.*, 733 F.3d 267, 270 (9th Cir. 2013) (explaining that judicial estoppel "is an equitable doctrine invoked by a court at its discretion . . . to protect the integrity of the judicial process by prohibiting parties from

deliberately changing positions according to the exigencies of the moment") (cleaned up).

Even without estoppel, however, the Court agrees with the state court that the AJVA superseded the prior agreements. The AJVA's integration clause provides that "[t]his Agreement shall constitute the entire agreement between the Parties and shall supersede any previous agreements, written or otherwise, with respect to the same subject matter which may have been made by the Parties prior hereto." Ex. 1053 § 5(f). This plain language is unambiguous.

Defendants rely on the declaration of Erlinda Bartolome, PCJV's secretary who was involved in discussions, prepared minutes of board meetings, and circulated the draft AJVA. Bartolome asserts that, like the First Amendment to the U.S. Constitution, the AJVA was intended to add to the JVA, not to replace it. Dkt. No. 314-1 ¶¶ 9–10. Bartolome's interpretation is impossible to square with the agreements she attempts to characterize. The AJVA is not an addendum that references the JVA and adds additional terms; it duplicates the full agreement, with most provisions (such as § 3(g), discussed above) remaining verbatim identical, and makes a few substantive changes, such as replacing Cinco with Potato Corner International, Inc. (PCI). *Compare* Ex. 1050, *with* Ex. 1053. Moreover, the board meeting notes prepared by Bartolome, on which Defendants rely identify specific "change[s]" and "replace[ments]" to provisions of the JVA that plainly are not additive. Ex. 1052 at 3. For example, the AJVA changed the individuals designated as president and treasurer of PCJV. The suggestion that the JVA also remained in effect and the individuals named in the JVA as president and treasurer continued to serve in those roles alongside their replacements is absurd. Thus, the nature of the amendment, coupled with the integration clause expressly stating that the AJVA supersedes all previous agreements on the same subject matter, clearly and unambiguously establishes that the AJVA replaced the JVA. Because the AJVA is not "reasonably susceptible" to Bartolome's interpretation, her declaration does not alter the Court's analysis. *King Features*, 843 F.2d at 398.

Determining that the AJVA supersedes prior agreements is not the end of the inquiry, however. To be sure, Cinco is not itself a signatory to the AJVA. Magsaysay declares that in 2010, "PCI, the wholly owned subsidiary of Cinco, became the 60% equity holder of membership interests in PCJV," and that he "caused all of Cinco's rights arising from [the JVA], and all membership interests in PCJV . . . to be assigned and transferred to PCI." Ex. 46 ¶ 34; *see also id.* ¶ 35 ("As a result of my causing Cinco to assign to PCI all of Cinco's rights in and to PCJV, Cinco ceased to have any rights whatsoever in the management,

governance, operations, of PCJV.  Cinco's sole relationship with PCJV was as a licensor of the Potato Corner Intellectual Property.").  Defendants dispute Magsaysay's testimony, pointing to the absence of any written agreement assigning Cinco's rights to PCI as well as Cinco's conduct after the purported assignment.

It is not clear on this record that the corporate distinction between Cinco and PCI was preserved and that Cinco extracted itself from the joint venture through the AJVA.  For one thing, the AJVA retained multiple references to Cinco.  *See* Ex. 1053 at 1 (Cinco may assign its rights to a subsidiary); *id*. § 2(b) (Cinco Group shall contribute $30,000 and own 60 percent of PCJV's capital accounts); *id*. § 3(a) (Cinco Group shall designate four of the seven managers); *id*. § 3(g) (requiring license agreement with and payment of fees to Cinco or an affiliate designated by Cinco).  Even more significantly, despite Magsaysay's declaration that Cinco transferred its ownership interest in PCJV to PCI in 2010 and thereafter had no rights in its management, Cinco filed the state lawsuit against Koren in April 2018—eight years later—alleging that Cinco (also defined as Cinco Group) "owns 60% of PCJV" and seeking to remove Koren from control of PCJV.  Ex. 1076 at 1; *see also id.* at 2–3 ("Cinco Group held a 60% interest in [PCJV] through Cinco Group's wholly owned subsidiary, Potato Corner International, Inc.  Plaintiff Cinco Group *is and at all times was* a Member of PCJV, a joint venture between Cinco Group, on the one hand, and [the L.A. Group], on the other hand . . . .") (emphasis added).  These sworn allegations are inconsistent with Cinco's new position that it ceased to be a joint venturer or owner of PCJV in 2010.  They also raise serious questions about whether Cinco continued to hold itself out as the 60-percent owner of PCJV and whether the corporate distinction between Cinco and PCI was meaningful.  *Cf. Laird v. Cap. Cities/ABC, Inc.*, 68 Cal. App. 4th 727, 742 (1998) ("To justify piercing the corporate veil on an alter ego theory in order to hold a parent corporation liable for the acts or omissions of its subsidiary, a plaintiff must show that there is such a unity of interest and ownership between the two corporations that their separate personalities no longer exist, and that an inequitable result would follow if the parent were not held liable.").

Cinco has not adequately addressed these inconsistencies.  It merely asserts that there are no signed agreements between it and Defendants (other than the settlement agreement) and argues that because Defendants raised theories in the state litigation that depended on veil-piercing and those claims were dismissed with prejudice pursuant to the settlement, they are forever barred from challenging the corporate separateness of PCI and Cinco.  On this record, given Cinco's own position in the state litigation conflating itself and PCI and claiming to still be a

joint venturer and owner of PCJV at least as late as 2018, Cinco has not shown as a matter of law that it is not bound to the AJVA.

c.

Along with their argument that Cinco is not bound by the AJVA, the SPAVI Parties also argue that the AJVA does not support Defendants' claim to an irrevocable, indefinite license. For the reasons discussed in connection with Defendants' motion, the Court finds as a matter of law that neither the AJVA nor any other written agreement conferred on PCJV or Defendants an irrevocable license to use the Potato Corner marks in perpetuity or without paying royalties. To the contrary, the AJVA acknowledged Cinco's ownership of the marks and expressly required a further licensing agreement that included payment of royalties by PCJV to Cinco. Thus, to the extent Cinco may have had obligations under the AJVA that could support Defendants' counterclaims, those obligations did not include providing PCJV with ongoing free use of the marks.

d.

Cinco briefly argues that it could not have a fiduciary duty to Defendants because it had no special relationship with them. Cinco concedes—as its own authority establishes—that a joint venture is the type of special relationship that gives rise to fiduciary duties. *City of Hope Nat'l Med. Ctr. v. Genentech, Inc.*, 43 Cal. 4th 375, 386 (2008); *accord Galardi v. State Bar*, 43 Cal. 3d 683, 691 (1987) ("It is . . . well established that a joint venturer owes fiduciary duties to his coventurers."). Cinco conclusorily argues, however, that Defendants have not shown it was a joint venturer. Defendants do not respond to this argument, but the Court nevertheless examines the record to determine whether Cinco is entitled to judgment as a matter of law. *Adriana's Ins. Servs. Inc. v. Auto Int'l Ins. Agency*, Inc., 687 F. Supp. 3d 992, 1000 (C.D. Cal. 2023); *see also* L.R. 7-12 (unlike other motions, "a motion pursuant to F. R. Civ. P. 56 may not be granted solely based on the failure to file an opposition").

For the reasons discussed above, Cinco has not shown as a matter of law that it exited the joint venture (in which it was undisputedly a founding member under the JVA) through the substitution of its subsidiary PCI in the AJVA in 2012, particularly given its assertion in 2018 that it "is and at all times was a Member of PCJV, a joint venture between Cinco Group, on the one hand, and [the L.A.

29

Group], on the other hand."  Ex. 1076 at 3.  Accordingly, on this record, Cinco has
not shown as a matter of law that it did not owe Defendants any fiduciary duty.[14]

3.

Finally, the SPAVI Parties argue that SPAVI is entitled to summary
judgment because (1) it was not in contractual privity with any Defendant and is
not Cinco's successor-in-interest and (2) even if SPAVI was Cinco's successor-in-
interest, Cinco did not owe any duties to any Defendant.

a.

Defendants produce no evidence of any contract or agreement between
SPAVI and any Defendant.  Nor have they produced any evidence suggesting that
SPAVI stands in the shoes of Cinco as its successor-in-interest in the joint venture.
SPAVI has never claimed any ownership interest in or control of PCJV, and the
settlement agreement expressly stated Cinco's position that "SPAVI did not
acquire any ownership rights or equity (membership interests, shares, etc.) in PC
International, Cinco, nor PCN or PCI Trading" and that "SPAVI has never taken
the position, or represented, or taken any action indicating that it is claiming any
ownership interest or equity in PCN, PCI Trading, PCI, or Cinco."  Ex. 1172 at 2;
*see also* Dkt. No. 178 at 3 (Ninth Circuit order explaining that "SPAVI does not
claim any of the contractual rights that were at issue in the state court action").
Instead, SPAVI's claims rest solely on its ownership of the Potato Corner marks.
Defendants produce no contrary evidence or authority.  Accordingly, SPAVI is
entitled to summary adjudication of the fact that it is not Cinco's successor-in-
interest as to Cinco's role in the joint venture.

That said, Defendants are correct that when a trademark is assigned, "the
assignee steps into the shoes of the assignor" and therefore "acquires not only all
the rights and priorities of the assignor, but also any burdens and limitations on use
that were incumbent on the assignor."  *Russell Rd. Food & Beverage, LLC v.
Spencer*, 829 F.3d 1152, 1156 (9th Cir. 2016) (quoting *ICEE Distribs., Inc. v. J&J*

---

[14] Koren is the only Defendant who was a party to the AJVA.  In their September
10 joint statement clarifying their claims, Defendants suggested that they bring
their claims for breaches of contract and of fiduciary duties "either as signatories,
successors, owners, or beneficiaries of the agreements."  Dkt. No. 297 at 14.  The
parties do not address these theories in their summary-judgment filings, instead
treating all Defendants collectively for purposes of their arguments.

*Snack Foods Corp.*, 325 F.3d 586, 593 (5th Cir. 2003)).  Thus, if Cinco's ownership of the Potato Corner marks was subject to a contractual obligation to negotiate a license with PCJV, that obligation did not disappear when SPAVI purchased the marks.  Of course, if Cinco was excused from that obligation because PCJV refused to negotiate in good faith or to pay the royalties required by the AJVA, that obligation may no longer have existed at the time of sale.  Likewise, if Koren and PCJV are at fault for refusing to agree to reasonable royalties during their negotiations with SPAVI, SPAVI may be excused from any further duty to negotiate.  But the parties have not presented those issues for resolution on summary judgment, and the Court does not decide on this record whether either side was solely at fault for the breakdown in negotiations.

### b.

SPAVI's second argument—that even if it was Cinco's successor-in-interest, Cinco owed no duties to Defendants—is derivative of Cinco's arguments.  Because the SPAVI Parties have not proven as a matter of law that Cinco did not owe any duties to Defendants, SPAVI is not entitled to summary judgment on this basis.

### 4.

As discussed above, the SPAVI Parties have not tied their arguments to the elements of any specific counterclaims or affirmative defenses.  Thus, they have not shown that they are entitled to summary judgment on any particular claims or defenses.  The application of the Court's findings under Rule 56(g) remains to be determined.

### V.

The parties' cross-motions for summary judgment are denied as to all claims, counterclaims, and defenses.  The Court finds under Rule 56(g) that (1) the AJVA superseded prior agreements and governed its parties' rights and obligations in PCJV; (2) Defendants do not have a perpetual, irrevocable right to use the Potato Corner marks without paying royalties to the marks' owners; and (3) SPAVI is not Cinco's successor-in-interest for purposes of the joint venture.

Although this order does not expressly resolve any claims or defenses, the parties have represented that a ruling on these issues would facilitate resolution or narrowing of their disputes.  As a practical matter, the Court's ruling may foreclose theories or claims the parties intended to present at trial.  The parties have also represented that they have been engaged in ongoing settlement discussions in

parallel with the summary-judgment briefing.  Dkt. No. 326 at 4.  Accordingly, the parties shall promptly meet and confer in person or by videoconference to attempt in good faith to resolve their dispute.  If unsuccessful, the parties shall thoroughly discuss:  (1) the application of this order to every claim, counterclaim, and defense asserted; (2) whether any claims, counterclaims, or defenses should be withdrawn or narrowed; (3) how the remaining disputes may be narrowed for presentation to the jury (for example, by assigning all counterclaims to PCJV, as the parties previously discussed); and (4) what amendments to the pretrial filings the parties believe are necessary.[15]  No later than November 26, 2025, the parties shall file a joint report describing in detail both their meet-and-confer efforts and the substance of the parties' agreements and remaining disputes as to each of the enumerated matters.

Date: November 19, 2025

_____
Stanley Blumenfeld, Jr.
United States District Judge

---

[15] If the case is not fully resolved, the Court expects to order amended pretrial filings, but it will defer deciding their scope until it reviews the parties' submissions.