UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

| | |
|---|---|
| SHAKEY'S PIZZA ASIA VENTURES, INC, Plaintiff, vs. PCJV USA, LLC, ET AL, Defendants. | CASE NO: 2:24-cv-04546-SB-AGR<br>CIVIL<br>Los Angeles, California<br>Friday, August 15, 2025<br>(9:35 a.m. to 10:29 a.m.) |

FINAL PRETRIAL CONFERENCE

BEFORE THE HONORABLE STANLEY BLUMENFELD, JR.,
UNITED STATES DISTRICT JUDGE

APPEARANCES: SEE PAGE 2

Court Reporter: Recorded; CourtSmart

Courtroom Deputy: Lynnie Fahey

Transcribed by: Exceptional Reporting Services, Inc.
20079 Stone Oak Pkwy., Ste 1105-237
San Antonio, TX 78258
361 949-2988

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

**APPEARANCES:**

For Plaintiff: MATTHEW R. FOLLETT, ESQ.
MICHAEL DONNELLY MURPHY, ESQ.
Fox Rothschild
10250 Constellation Boulevard
Suite 900
Los Angeles, CA 90067

For Defendants: TODD MATTHEW MALYNN, ESQ.
ARASH BERAL, ESQ.
JAMISON GILMORE, ESQ.
Blank Rome
2029 Century Park East
6th Floor
Los Angeles, CA 90067

**Los Angeles, California; Friday, August 15, 2025; 9:35 a.m.**

--oOo--

**THE CLERK:** Calling item 9, 24-cv-4546-SB-AGR, Shakey's Pizza Asia Ventures, Inc. versus PCJV USA, LLC, et al. Counsel, please state your appearance.

**MR. MURPHY:** Good morning, Michael Murphy and Matt Follett on behalf of the plaintiff, the counter claimant as well as the third party defendants.

**MR. BERAL:** Good morning, Your Honor, Arash Beral, alongside Todd Malynn and Jamison Gilmore, we're on the defense side.

**THE COURT:** And this is matter here for a continued pretrial conference. Let me start with Mr. Murphy at the lectern and you could address to the Court the status of all of the outstanding items.

**MR. MURPHY:** So the claims and defenses' document, what's filed we believe there was an issue with the -- there was a miscommunication on the filing of it, so we have an updated version that was filed yesterday with a notice of errata and that is done.

We have the witness or the exhibit list has been pared down with respect to objections, as of yesterday morning it's that, you know, maybe 10 or 15 each. Well, I think defendants have categories of objections, but it's the same objection to a variety of documents.

There was also this communication about the filing of that one, which I'm getting to the bottom of, I just saw the declaration last night, but whatever it is, it can be resolved which is then an updated errata sheet, but it's the same documents that are in dispute.

We have our --

**THE COURT:** Is it your position, Mr. Murphy, that you have or you have not complied with the Court's order with respect to challenged exhibits?

**MR. MURPHY:** With respect to what, Your Honor?

**THE COURT:** Challenged exhibits.

**MR. MURPHY:** The -- I have -- I just need to find out from my co-counsel regarding the actual manual, two sided paper instruction. I did not -- I have not received confirmation from my co-counsel that that has been completed, that was -- but my understanding is that other than the timing problem, which has been an issue, and I will concede that, that we have, yes.

**THE COURT:** And so you're representing to the Court that the parties have filed completely the challenge to exhibits and have done so jointly?

**MR. MURPHY:** Mr. Follett.

**THE COURT:** Mr. Murphy --

**MR. MURPHY:** Yeah.

**THE COURT:** -- you should understand I'm going to

order you to read the Court's jury trial and pretrial conference order.

**MR. MURPHY:** I did, Your Honor.

**THE COURT:** And you're going to be ordered to reread it and you're ordered to comply with it. And that includes, I believe it's in there, that you don't speak to your own counsel or anyone else, when you're up at the lectern, you're looking at the Court and having a discussion with the Court, not anybody else. And I expect you to be prepared. You're lead counsel in this case.

**MR. MURPHY:** Thank you, Your Honor.

**THE COURT:** Have the parties jointly completed the challenged exhibits and filed it with the Court?

**MR. MURPHY:** Yes, Your Honor.

**THE COURT:** All right. So you're representing as an officer of the court that the docket will demonstrate that I have received the challenged exhibit document that I have ordered, correct?

**MR. MURPHY:** Your Honor, I do -- there was an issue with the filing, I just saw this declaration last night. So I have to find out what we have to correct with respect to that document. So that is one issue that I just found out about last night and I'm getting, you know, I've exchanged e-mails with colleagues to try to find out what the issue is.

But so we would file an updated version, once I'm

able to confer with my opposing counsel, they filed it last night. I didn't get an e-mail from them, so I've had to kind of do that on my own.

So the challenged exhibit list will be filed with an errata sheet, just to update as to whatever the miscommunication was last night.

**THE COURT:** And incidentally, I don't intend this morning to get into the obvious non-compliance with the Court's orders. It's not enough to say putting aside timeliness and it's not enough to say that we'll file information, that clearly isn't complete, isn't well done, to be as gentle as I can, and we'll just file an errata. That's just not what the Court has ordered and it's creating chaos with our preparation of this case.

But putting that aside, because that will be the subject of an SOC, one of the many. This case, as the parties probably understand, you've seen other cases where parties appear before the Court on violations. In my many years of doing this, no case even comes close to the number of violations that I've seen in this case. By orders of magnitude greater, the parties violate the Court's order more frequently than it does comply with it. But we'll get to that at another time.

Are there any other items that the Court has ordered that you have not -- are there any items that the Court has

ordered that you have not produced?

**MR. MURPHY:** We have the statement regarding discovery, which is -- we have a final draft, I think the order now has been filed on Monday.

**THE COURT:** It is.

**MR. MURPHY:** So.

**THE COURT:** All right. And with regard to the parties' position, the Court is going to address a number of matters to see if I can at least get a better understanding of the parties' relevant positions.

What is the -- what is your client's position with regard to whether a trademark license existed and if it existed, in what form did it exist and what were the contents of the license?

**MR. MURPHY:** There was no written license in place. And as of May 31, 2024 there was an implied revocable at will license to use the trademarks at issue. And once that terminated, that license expired.

**THE COURT:** And give me an offer of proof as to the implied revocable license as of, you said May of 2024.

**MR. MURPHY:** Yes, Your Honor. The offer of proof is really in the negative. There are two documents that have been relied upon by the defendants as some sort of evidence of a written license, are not a written license agreement, but there's one document which was a -- it was a -- it's a -- it

has all the bells and whistles, except it doesn't have the consideration and there's actually note written where the consideration is supposed to be, which is a scribner's note asking what the consideration is and it's unsigned.

Mr. Koren testified in a declaration with this Court that there was no basis to have any belief that the document had been signed by the then owner of the marks, Cinco Corporation. So that can't be the document. Mr. Koren has said he acted as if that was the licensing, he honored it, despite that lack of a signature but there's no dispute that it was not signed. Plus it would not be enforceable anyway because it's illusory. Cinco doesn't get anything out of it.

The second document is the amended joint venture agreement. And in Section 3(g) there's a provision for an agreement to agree on a soon -- on a not yet upon agreed master license agreement. That document had not been drafted yet.

The language in the amended joint venture agreement in Section 3(g) is -- actually mirrors -- it mirrors it, it's exactly like another provision in that same agreement that has an agreement to agree on a master services agreement. That was a separate document that was negotiated and signed evidencing that everyone believed that this was an agreement for something that will happen in the future.

The parties to the amended joint venture agreement are not Cinco Corporation, it's the members of the LA Group and

four shareholders of Potato Corner International, which is a subsidiary of Cinco Corporation. So Cinco is not even a party to that document. The party that would be the licensee, which is PCJV, they are not a party to the amended joint venture agreement, in fact, everyone testified -- Joe -- Mr. Magsagsaysay (phonetic) testified -- Guy Cordon (sic) testified that indeed that document was -- acted as the operating agreement among the members of PCJV and it's common that -- it's a lot of law on this, that the entity is not a party to operating agreements unless it actually signs.

**THE COURT:** Mr. Murphy --

**MR. MURPHY:** Yeah.

**THE COURT:** -- first of all, Koren is K-O-R-E-N, what is the name of the other witness and spell it please.

**MR. MURPHY:** The other -- oh, I'm sorry, it's Jose P. Magsagsaysay, M-A-G-M-A-G -- I'm sorry, no, I'm sorry. M-A-G-S-A-G-S-A-Y-S-A-Y, Magsagsaysay.

**THE COURT:** And so, Mr. Murphy, as I understand it to cut to the chase is that there was no written agreement ever to license the trademarks, but there was an implied revocable license that sprung into existence as of May 24, 2025 in connection with the parties essentially agreeing to negotiate a license agreement, correct?

**MR. MURPHY:** That's correct, Your Honor.

**THE COURT:** All right. And when was it revoked?

**MR. MURPHY:** On May 31st of 2024.

**THE COURT:** And with -- so it was in existence for one week?

**MR. MURPHY:** No, no, sorry, Your Honor. So PCJV has been operating since 2010 and it's never had a written license. And it's kind of a regime that it was operating under.

**THE COURT:** Mr. Murphy, I'm trying to get the most basic pin down of positions. So there was an implied revocable license to use Shakey's trademarks, yes?

**MR. MURPHY:** Up until May 31st, 2024, yes.

**THE COURT:** And when was -- when did the license come into existence? When did the implied license come into existence?

**MR. MURPHY:** I would -- I mean, it -- from -- with the outset, I mean when the first use of the mark, which was when the Santa Anita store opened in 2012, I think the registrations identified 2010. So, you know, the e-mail communications indicate that there was authority given to use the marks to fill up the brand here. And they never got to signing a signed agreement.

**THE COURT:** And you use the word illusory, because no consideration was given to it. So the implied license was an illusory agreement?

**MR. MURPHY:** Well, Your Honor, this is a -- no. The illusory agreement is found in what was represented to the

public as being the license agreement. The FTDs every year reported that the license to provide these franchises derives from a 20-year license renewable up to 50 years.

**THE COURT:** All right. I now understand.

**MR. MURPHY:** Yeah.

**THE COURT:** So you don't contend that the implied license is illusory.

**MR. MURPHY:** No.

**THE COURT:** What you contend -- let me please ask the question before you answer. What you contend is that the purported written agreement is illusory and doesn't exist.

**MR. MURPHY:** That's correct, Your Honor.

**THE COURT:** And so is an implied license a license?

**MR. MURPHY:** Well, you know, the -- there's not a lot of law on this, Your Honor, because I did a lot of searching. But there -- an implied license -- when you are using something, using a -- property and you have consent of the licensor, then you have a -- it is an implied license.

When you don't have terms written, you have an implied license that is revocable and there's the case law -- is it when you have nothing and -- but you have that consent, particularly when you're negotiating over an extended period of the terms, then it is an implied license and it is revocable, it's permission.

**THE COURT:** And are there any obligation owing on

behalf of the licensee under the implied license that you're asserting in this case?

**MR. MURPHY:** Well, this is the difficulty. So in -- up until 2024, actually I'll go 2022, the -- you had PCJV was a -- it was an -- it's an LLC and you had, you know, the licensors subsidiary as a member and you have the LA Group as a member, so each owes each other duties.

There was an expression of a belief by the Cinco parent that there was an assumption of a treatment of these -- of the intellectual property as you would as if you were an owner, as a fiduciary almost. So there was always an understanding that the treatment of the intellectual property would be by PCJV, you know, in the language that's in the -- that Guy Koren has signed on to in a variety of agreements, where he says he will make sure he protects the marks, he won't make derivations of the marks, he will prosecute infringement of the marks.

So that -- you know, the -- when Spavi took over and was negotiating, there -- right out of the gate the terms that were being exchanged as to what would be expected were the very types of terms that you would see in any negotiation, so it was an assumption they stepped in the shoes of Cinco and we are now going to negotiate the terms of a license that includes the expectation that you will protect the mark.

**THE COURT:** Were there any consideration obligations

by the licensee under the implied license?

**MR. MURPHY:** It was assumed by Shakey's that we would negotiate the license and then he would start paying, and it would -- you know, you pay obviously for what we haven't received, but the expectation by Cinco was that eventually they would get a master license agreement that would either be 30 percent of the royalties or some other consideration.

The agreement to agree in the amended joint venture agreement did identify an expected consideration that would be eventually agreed to, it was kind of a mandatory deal term.

**THE COURT:** And let me see and what would be most helpful, Mr. Murphy, is if I can just get a simple answer to a simple question. So just a yes or no, under the implied license did the licensee have any financial obligation to pay for the license?

**MR. MURPHY:** Yes.

**THE COURT:** And what was the amount that the licensee owed?

**MR. MURPHY:** Well, it's a reasonable royalty if you can't come to an agreement on what the actual amount is and that's why we're here.

**THE COURT:** And so you're defaulting, as I understand it, to what you believe is a legal default when the parties haven't agreed to price, that it would be a reasonable price, is that --

**MR. MURPHY:** That's correct.

**THE COURT:** -- your client's position?

**MR. MURPHY:** Up -- well, up until May 31 of 2024, yes.

**THE COURT:** And then how about subsequent to that?

**MR. MURPHY:** Well, subsequently we -- the license was terminated. We had absolutely no acknowledgement that it had been terminated and they kept using it. So that's when you get into disgorgement. Actually we're now in the land of counterfeiting, in my opinion.

**THE COURT:** All right. And with regard to the issue of seeing your use, it's your position which was confirmed by this Court or it's Spavi's position that because of the implied license, assuming there was an implied license here, that the use of the trademarks in the United States inure to the benefit of your client ultimately, correct?

**MR. MURPHY:** Yes.

**THE COURT:** And with regard to moving on to another subject that your client has recently raised, trade dress. There is no trade dress claims in the first amended complaint or in the proposed pretrial order; is that correct?

**MR. MURPHY:** Yes, we didn't -- we're not alleging trade dress. It's the 1125 has a -- in its unfair competition language and the language of the case law that it's kind of the totality of what your registered marks and everything else

you're presenting to the public, what that presents as far as a connection to the source.

**THE COURT:** So to be clear, your client does not intend and is not asserting and has not asserted in the first amended complaint any trade dress claims?

**MR. MURPHY:** Well, remember we're filing -- we're talking about as of filing May 31st, 2024, you know, it's not a trade dress claim, it's just a calling off issue.

As this has developed, the undercover fries competitor is now in a situation where we believe a trade dress claim could be alleged. So it's an evolving issue, but as far as of May 31st, 2024 that is correct.

**THE COURT:** Well, it's not in this lawsuit.

**MR. MURPHY:** That's correct.

**THE COURT:** All right. And so --

**MR. MURPHY:** We could file a new lawsuit, Your Honor, right now I think if we wanted to.

**THE COURT:** Mr. Murphy, I think you know how to proceed in this case and what you've just stated is outside the bounds. I don't care what you do in another lawsuit. It's not in this lawsuit and that's the Court's question, correct?

**MR. MURPHY:** Correct.

**THE COURT:** And you understand we're at pretrial and trial starts next week and so we need to get down to business.

**MR. MURPHY:** I agree.

**THE COURT:** And what are the waiver and assignment and Gross legal disputes between the parties?

**MR. MURPHY:** Well, the assignment -- I mean, these are abandonment allegations. May I get a water out of my bag, Your Honor?

**THE COURT:** Yes.

**MR. MURPHY:** Thank you. The assignment in Gross is an abandonment defense that relates to the question as to whether or not the good will was actually transferred and it is correct that you can't just say it's been transferred, but the burden of proof is higher here and also the -- Spavi has -- is prepared to present testimony and it's obvious that their goal is to promote the brand.

So they have a deed notarized that says the good will has been assigned in totality and we have a party that is intending to promote the brand. So that is -- there's no real actual factual dispute there.

As to the waiver, the -- there has been a battle to -- there was a battle to try to figure out how to govern PCJV. This started in 2018 and from that moment forward, there has been efforts to try to take control.

When Spavi came onto the scene in 2022, it dropped into a negotiation that was presumed that there would be a license, written license that would permit Koren to proceed forward and my client is prepared to testify that they were

very -- they believed very much that there would be one, an agreement.

So I don't think that any party took a position, at least Cinco and Spavi took a position that induced Guy Koren or the defendants to believe that they would never have to pay a license. The waiver goes the other direction, in that Spavi and Cinco -- well, Cinco initially, when they were trying to negotiate a settlement agreement and the agreement was designed to be well, let's just get a written license agreement.

And then when Spavi took over the negotiation, their settlement discussions continued separately and Spavi never heard one word out of Guy Koren as to his belief that he doesn't need a license agreement, I've got an irrevocable permanent free license. I would think that would be something that would come up and it didn't, other than maybe one offhand remark from counsel to counsel that I think has been alleged but Guy Koren engaged in that negotiation and never once refuted that a license was necessary.

**THE COURT:** So waiver is an intentional relinquishment of a known right, correct?

**MR. MURPHY:** That's right, uh-huh.

**THE COURT:** So tell me what is the known right, whose right is it and how it was intentionally relinquished?

**MR. MURPHY:** Based upon the belief, my belief as to the facts, what the facts will show?

**THE COURT:** Yes, give me your offer of proof very briefly, tell me what is the known right.

**MR. MURPHY:** The known right is Guy Koren's belief that he could challenge the sale of the intellectual property from Cinco to Spavi and that the end result is that he had a irrevocable permanent free license and he -- I'm sorry.

**THE COURT:** Is the right his belief?

**MR. MURPHY:** The right is that it's a claim. I mean, he essentially had a claim. In 2022 or to challenge the sale or to insist that in negotiations that he doesn't need to negotiate anything, so it's a claim.

**THE COURT:** So he has a claim that the rights were not transferrable to Spavi, is that what the right is?

**MR. MURPHY:** It changes every once in a while, but I think that's the -- essentially the -- there's a provision in the amended joint venture agreement that has been pointed to as being a prohibition on transferring rights and they have -- they believe this falls into that, yes.

**THE COURT:** All right. You're going to be -- well, first of all before I indicate that, is the waiver and assignment and Gross issues, are those triable by jury or by the Court?

**MR. MURPHY:** Those are Court -- well, the facts I believe are so intertwined with the other claims that I think a jury would be deciding the facts and the Court would be

deciding the law.

**THE COURT:** And so tell me, what are the facts in dispute, the known right or the intentional relinquishment or both?

**MR. MURPHY:** Well, I don't think they're in dispute. I think that the third party plaintiffs and counter claimants believe that the known right is a right arising out of the joint venture agreement, which they believe is binding on my clients.

**THE COURT:** All right. You're going to be required to provide the Court by Monday morning at 9 a.m. an offer of proof as to what the known right is and what the intentional relinquishment was, what facts support the positions of what the known right was, what the intentional relinquishment was and provide the Court with legal authority that supports your position that this is, in fact, a viable waiver issue as -- I'm not sure that I frankly understand what your waiver argument is and it's certainly not clear to me that it's legally viable.

**MR. MURPHY:** So, Your Honor, just to be clear, we're talking about Shakey's and Cinco's affirmative defense of waiver as to the Guy Koren and defendant's claims arising out of the sale of the brand. I just want to make sure because we've got competing waiver claims.

So the -- because I can't make an offer of proof as to the defendant's claim that there was a waiver or assignment

in Gross because I'm not making it.

**THE COURT:** We're referring to whatever your defense is --

**MR. MURPHY:** Thank you.

**THE COURT:** -- with regard to waiver.

**MR. MURPHY:** Thank you.

**THE COURT:** All right. With regard to immunity and privilege, which you've asserted as affirmative defenses, those are being abandoned I take it.

**MR. MURPHY:** No, we have a privilege in our -- in the claims and defenses. The privilege is the privilege to protect your legal rights arising out of a contract.

**THE COURT:** And are these -- I take it these are equitable claims for the Court to decide?

**MR. MURPHY:** Yes, there is one additional privilege issue, but it has been -- it hasn't boiled up yet, but I get a sense that it's going to. And that asserts a big litigation privilege issue, and that I think there's going to be evidence presented at trial that Spavi interfered with the franchise agreements when it offered licenses through correspondence that said there's going to be an injunction. If you want to protect yourself, contact us and we can help you, essentially what the letter said.

I believe that's going to be talked about in there, so that privilege -- litigation privilege issue is also there

and that's also a determination for the Court as to whether something is privileged.

**THE COURT:** Have you provided the Court with pertinent jury instructions that address immunity and privilege?

**MR. MURPHY:** I believe they're in there, in the instructions.

**THE COURT:** I'm not aware that they are.

**MR. MURPHY:** Okay.

**THE COURT:** And so if they're not in there, I'm going to deem them waived as the Court previously had indicated.

**MR. MURPHY:** Your Honor --

**THE COURT:** I'm assuming that these are affirmative defenses for the Court to decide if you have not provided the Court with jury instructions.

**MR. MURPHY:** Your Honor, the defendants have never come right out and said that the interference is with the franchise agreements. So it's kind of been bubbling under I think because they know about the litigation privilege, so it's not been something I could have raised. When I filed this complaint it wasn't even an issue.

**THE COURT:** All right. So this is not part of this lawsuit, because I don't care what's not part of this lawsuit.

**MR. MURPHY:** A strict application of accrual and filing it is true that that is not part of this case. A lot of

times people -- you know, kind of things bleed over, which is kind of what we have in this case the bleeding over.

**THE COURT:** All right. So the Court is going to find based upon that, that there are no immunity and privilege defenses, affirmative defenses by Spavi in this case. If you have another lawsuit, you have another lawsuit.

What legal disputes does the Court have to resolve? Any?

**MR. MURPHY:** Yes, Your Honor. I mean, I think, you know, the common law trademark claim is a legal dispute. And so to the extent that there was ever any finding or ruling regarding ownership or validity of the trademarks then we would then go down to common law trademark infringement and it's alleged at the same time, that is a legal claim. And so I think that is still pending.

**THE COURT:** All right. And that's it? So that's the only legal issue for the Court to resolve?

**MR. MURPHY:** Well, I view the word issue, Your Honor, as actually a dispute. There are many claims alleged in the third party complaint and counterclaim that are legal claims, breach of contract, interference claims, those are actually -- those are legal claims since we've been defending them and prepared to, but I don't think they're actually at issue because I don't think they get proven.

**THE COURT:** All right. I'm going to hear from --

briefly I'll hear from defense and counterclaimants in a moment. But the parties are also to meet and confer and provide me with an amended verdict form that I can see as to what's going to the jury and you're to do that by no later than 9 o'clock on Monday.

**MR. MURPHY:** And, Your Honor, if I may make one more comment about that issue. I mean we have the -- there are a variety of facts that I believe the parties have stipulated to that even if not claims, that we have asked essentially to have the jury decide, because it's so intermingled with the other issues, that as almost as an advisory, you know, that can be done, you know, you've got your trademark cases and you've got all the elements presented to a jury and some of the determinations at the end are Court determinations. It's kind of the interplay that we have to deal with here.

**THE COURT:** I'm not sure I understand a word that you've just stated, or at least the consequence of it. But the parties might do well to meet and confer and see whether you really want to have a jury trial in this case. I have no desire frankly to preside over a bench trial in this case. This case is the messiest case, I keep saying of all the cases that I've ever had, I can't emphasize to you, that's not exaggeration. I have done hundreds of trials, I've never seen a case as poorly pre-tried as this case, and as poorly ready for trial as this case. I don't think the lawyers know what

the issues are, I really don't.

**MR. MURPHY:** Your Honor, I --

**THE COURT:** I think some -- no, Mr. Murphy, you're done. Please take a seat.

So the parties may want to meet and confer and see if you could spare yourselves and the jury of the mess that this trial is going to be and it's going to be one mess, big mess. Probably with some very significant Rule 50 issues, since the parties didn't pre-try this case, as a practical matter. I'll see what you did in discovery, but the best I can tell the parties did not do a great deal of discovery, but we'll see how much discovery they did. I know you didn't do the pretrial work that I would expect in terms of presenting the Court with summary judgment motions to pare this case down, to make it manageable, to even see what are the material fact disputes that a jury might have to decide. So the parties are going to have one big mess.

And so I'm not even suggesting to you that I necessarily would conduct a bench trial here, certainly don't in any way savor that prospect. But the parties may want to consider whether given the state of this case and the lawyers' preparedness to go to trial in this case whether you want to make such a request.

But let me hear from -- I'll hear from lead counsel for the other side.

**MR. BERAL:** Your Honor, technically Mr. Malynn has been designated lead counsel, but we're acting in a co-lead capacity. Is it okay if I --

**THE COURT:** You can. You cannot serve as co-lead counsel, but you certainly can appear. State your appearance for the Court when you have multiple lawyers.

**MR. BERAL:** Arash Beral for the defendants and counterclaimants.

**THE COURT:** Mr. Beral, first of all, let me get your side as to whether there was a license. The Court has not made any decisions, other than in the context of the preliminary injunction and there are or may be some triable issues.

I still struggle to understand what the license is in this case. Your position is that there's some type of written license.

**MR. BERAL:** Yes, Your Honor.

**THE COURT:** And the Court has already looked at that and perhaps, and I'm not prejudging because I haven't been presented with a summary judgment motion, but I'm sure you've contemplated whether that's going to past a Rule 50(a) motion and I'm not telling you that I know the answer to that question. But it's obviously a fairly big question.

So tell me, because based upon the documents that I saw it seems to me there's going to be a legal question. Does at least the written documents that I have seen constitute a

written license?

Now, you may be seeking to present some additional evidence that the Court has not seen, and so I'm not in a position to make any determination, but tell me what the offer of proof is that's going to suggest there was a written license in this case?

**MR. BERAL:** Absolutely, Your Honor. So I'd like to start with the root of the problem in this case has been the fact that the other side just doesn't want to hear what the operators of this business in the United States have been doing for 15 years, so I just want to offer that to the Court first to start.

Second, offer of proof. These parties met in 2008 first. They agreed to give Mr. Koren the rights to the United States. They then attempted to document a relationship, which they called a master license agreement at the time. So in 2009 both parties signed a document called a master license agreement.

In that document, they recognize that there are no trademarks that have been registered in the United States, in fact, the party who was a signatory to that document said that we're going to make best efforts to register the trademarks, but if we can't do it we can't do it and you're taking the risk and we're taking the risk and all that sort of stuff.

They signed this document. My client then goes out

and tries to open up its first location. They spend I think a million dollars trying to open this location in Santa Anita, at which point the other side comes back to my client and says, oh, we screwed up, we need to transform this relationship into a franchise relationship because our lawyers at DLA Piper are saying we need to have a franchise. And you know what, this is going to be mutual beneficial for us because we're going to be partners in this.

They create a partnership in 2009. They have discussions, communications, everything is about partnership, partnership, partnership. As part of that partnership, Cinco gives its authorization for the LA Group to use the trademarks. They call it or in the Philippines, and this is another thing that's been lost in translation here, they have various terms of art that they use in the Philippines, one term of art is a master license.

We get confused as United States lawyers as to what that means, but what their intentions are in their minds, are that a master license is a grant of use rights. Master means, you get the entire territory that we're giving you, you get to do whatever you want to do in that territory.

There's actually documentation on this. They have a board meeting long before PCJV is ever formed. They have board meetings, discussions, we're partnering, and in the first ever iteration of the joint venture agreement, the draft joint

venture agreement that is exchanged between the parties, long before PCJV is formed, they recognize that Cinco is granting its rights to the United States in exchange for a 60 percent interest in PCJV or what was going to be PCJV. All right.

As a further component of that, as the drafting process went along, the components of this relationship was, we're granting you these rights and we're going to get 30 percent, you're going to serve as the master servicer of all of the United States operations and you're going to get 30 percent as well.

So the critical component of this partnership is, we're in it together, we're going to have 30/30 rights. They also as the drafting process goes, they agree that initially Cinco wanted a 10 year term, that turned into an indefinite term. The parties did not want at will relationships or at will rights, in fact, you're going to hear testimony and -- there's going to be communications about making this relationship last forever. It was going to be indefinite and they made consent provisions mutual so that neither party could transfer their consent -- transfer their rights or obligations under this fundamental document without the consent of the other party.

They believed they were in a relationship together and the fundamental document was the joint venture agreement that they were relying on initially. They start using, they

start authorizing, they start franchising --

**THE COURT:** Mr. Beral, let me just --

**MR. BERAL:** Yes, Your Honor.

**THE COURT:** -- give you a time to shoot within.

**MR. BERAL:** I appreciate it, Your Honor.

**THE COURT:** You've got one more minute to answer the Court's question.

**MR. BERAL:** The fundamental thing is, these parties documented a relationship together in this joint venture agreement, they created an LLC operating agreement, they don't sign these documents until 2012, they were operating as if they all had long term rights, they were in a partnership together. And when it came down to the trademark license agreement it was originally drafted as the trademark copyright and know how license agreement by DLA Piper. It was required for an audit, Cinco and DLA Piper presented it to Mr. Koren, Mr. Koren signed it at their request. He had no idea whether they'd signed it, whether or not, but it was represented in the FDDs that the parties had entered into a trademark license agreement.

Now I will also add that that's important because the joint venture agreement doesn't require an executed trademark license agreement. All it requires is the parties enter into a trademark license agreement and it has the specific terms that are supposed to be included in that license agreement.

Those specific terms are then turned around and put

into the FDDs that both parties approved when they got filed with various regulators. You have a writing, there's no requirement for execution under the joint venture agreement, those FDDs say you get 20 years plus three 10-year terms. Strong.

**THE COURT:** So your client's position is that at -- when you look at the tapestry of written documents between the parties, the weaving of that tapestry leads to a written license agreement.

**MR. BERAL:** Correct, Your Honor.

**THE COURT:** And so your position is, your client's position is there's a written agreement, your client's not relying upon an oral agreement, correct?

**MR. BERAL:** Correct, Your Honor.

**THE COURT:** And your client's not relying upon an implied license, but rather is claiming that there is an express license here.

**MR. BERAL:** It's an expressed license, however, is an implied license by estoppel as well, so there's two different theories there because the parties were operating for 15 years with the understanding that the terms in the JVA and the terms in the FDDs all applied.

**THE COURT:** I think I understand, but let's make sure that we're exactly on the same page. Your client's position is in the alternative there's a written agreement, there's an

express license. Factually there is only a written agreement. Factually there is only an express license, but legally speaking and equitably speaking if there's a determination that there is no express license pursuant to a written agreement, that there is an implied license by estoppel, which is a legal concept.

**MR. BERAL:** And implied in fact course of performance, yes, Your Honor.

**THE COURT:** All right. Try not to throw these other things in there with a yes. So is the answer to my question yes or is it not quite?

**MR. BERAL:** Not quite.

**THE COURT:** All right. And so tell me what the additional part of it is that I haven't captured?

**MR. BERAL:** There's an express license that is our position, however if the express license for whatever reason lacks a signature or it requires signature, they're certainly are estopped from denying the existence of the license by virtue of the fundamental nature of the agreements and by virtue of the best efforts clauses in the joint venture agreement that require a signature.

If there is nothing, if there's no writing at all, then certainly there is one that should be implied by law as a result of the parties' course of performance and conduct and the representations that were made.

**THE COURT:** And who makes that determination, assuming that there isn't a written agreement?

**MR. BERAL:** I believe that's a jury.

**THE COURT:** And the written agreement issue is for the jury as well?

**MR. BERAL:** I believe so, Your Honor.

**THE COURT:** All right. Tell me what your position is with a brief offer of proof, you have just a couple of minutes, so cut to the chase, please, with regard to waiver and assignment and Gross.

**MR. BERAL:** The waiver issues are multiple waiver issues, but as it exists with regard to the trademarks, we got wind of the fact that there was a transaction between Spavi and Cinco some time in 2021. Okay. We brought this issue up in the mediation settings. What we got back was a letter from Spavi saying whatever you do with Cinco, whatever deal you make with Cinco, we will comply with it, we will abide by it. We made a deal with Cinco two years later. And now they're saying, no, we're not going to comply with it, that's the waiver.

There are also waiver issues with respect to seasonings and the trade secret issues that have been brought up but --

**THE COURT:** What I'm going to do because time is short is both sides are going to have to provide the Court in

writing by 9 a.m. on Monday. And the reason I'm requiring it then incidentally is that I have to make quick determinations as to where we are in this trial. The parties should be prepared to go to trial on Monday. I'm going to reflect further where we are. But the parties are ordered back here on Monday at 8:30 for trial.

But I'm going to want on Monday at 9 o'clock, or actually I guess by 8:30, so since you'll be here by 8:30, I'll need it by 8:30. The offer of proof as to your respective positions on waiver and assignment and Gross. And by respective positions, you can provide this separately, so you don't have to do it in a joint document.

You're to provide the Court with every single waiver and assignment and Gross issue that you are contending is going to be presented by your client, respective client. And the Court wants an offer of proof that includes for every single waiver or assignment and Gross argument that you have. All of the material facts and all of the evidence that supports those facts, including the witnesses. And that needs to be filed by 8:30 on Monday.

And the verdict form also needs to be filed by 8:30 and this is going to be a joint document. The Court should have received a useable verdict form, which it clearly has not weeks ago. The verdict form is not unimportant. Lawyers tend to treat them at times as unimportant, they're the most

important. That's the guideline to what the jury is going to be doing. And right now the verdict form you provided to the Court is not even useable and it was provided before the parties really even narrowed to some extent some of the issues in the case. And I say to some extent, it's been to a very limited extent.

So with that, I am going to conclude this matter unless there's anything further you wish to address, counsel, with regard to matters that I discussed with Mr. Murphy?

**MR. BERAL:** Your Honor, the issues with the declarations last night and the filing, I would respectfully ask the Court to strike the filings from last night from Mr. Murphy's office.

Your -- the Court's document No. 254, which is an order addresses electronic exhibits. Plaintiff's Exhibit 1 through 106 and Defense Exhibits with 1500 to 1599 we've discovered now there's an additional plaintiff exhibit, 107 and as part of our set of exhibits there might have been some exhibits that did not make it to the courtroom, so I brought a flash drive that includes all of the exhibits, including all the ECF headers eliminated, so with the Court's permission I'd like to provide that to the Court.

Beyond that, I don't --

**THE COURT:** Was there a joint challenged exhibit document as ordered by the Court provided to me? The Court

knows that it was not received timely and the Court received something last night that I have not had an opportunity to review.

**MR. BERAL:** There is not, Your Honor.

**THE COURT:** All right. So the parties have violated the Court's order once again in that regard; is that correct? Putting aside fault.

**MR. BERAL:** Unfortunately, yes.

**THE COURT:** All right. How many violations would you suggest have occurred in this case? How many court orders do you think have been violated?

**MR. BERAL:** Probably five or six, perhaps more.

**THE COURT:** All right. I think five or six have been violated just in the recent pretrial filings deadlines. Are you including the timeliness of the various pretrial filings?

**MR. BERAL:** I don't recall, Your Honor, but it could be more than that. I was thinking over the course of the case, I was thinking the original joint filings that weren't made on time and plus what has transpired this week, but it could be more than that, Your Honor.

**THE COURT:** All right. And again, I am certainly frustrated as obvious to the parties and I'm trying to resist going into those matters now because there will be time for that and the Court has business to do with regard to the trial.

But it is to say the least troubling that even when I

order you to do something that you should have done weeks ago with regard to the pretrial filings, they're still not being done. They're not being done timely and I continue to get basically placeholders until the parties get to a point where they're not at currently, to actually have given me what they should have given me weeks ago.

The parties are ordered to provide me by no later than 8:30 on Monday morning the previously ordered challenged exhibit document and I am going to likely strike the unilateral submission filed by Spavi. And I'm going to take a look and remind myself as to what Mr. Murphy's representations were to the Court. I'll look at the docket to see if he made misrepresentations as an officer of the Court with regard to the status of the various submissions.

But you're representing to the Court, counsel, that in fact there was not a joint challenged exhibit list with challenged exhibits in a matter that I described provided to the Court last night, correct?

**MR. BERAL:** I don't understand the Court's question.

**THE COURT:** The Court's question is, did you comply by last night with the Court's order concerning the challenged exhibits?

**MR. BERAL:** We complied, but what was filed was not authorized by us and it included additional information that we didn't authorize, plus it manipulated the document by excluding

our portions of our position statements and including something else. So it was non-compliant as a result of something that happened in plaintiff's office.

**THE COURT:** All right. So then what you're telling me is that you need to meet and confer to revise the document that has been filed to include only what the parties had agreed to?

**MR. BERAL:** Correct, with the addition of this Exhibit 107 that we intend to object to, that's the only addition, but yes.

**THE COURT:** All right. So the parties are to provide that to me then by 4 p.m. today, not by Monday morning. The Court since it didn't have an opportunity to review what was belatedly filed yesterday didn't have an opportunity to review it to see whether there was compliance. But it sounds like you're fairly close at least to getting the document that you intended to get to me filed. So you need to do so by no later than 4 p.m. today.

**MR. BERAL:** Yes, my only issue with that, Your Honor, is that there's additional material that was supplemented by the plaintiff that we will need time to respond to. So there's a few issues, one is our position statements, anticipating theirs were not included. Second, they added additional material that we never had a chance to review and respond to so I would respectfully, if I may, Your Honor, if I'd ask for the

8:30 Monday deadline to be in place.

**THE COURT:** All right. I'll provide you until 8:30 on Monday. We are in recess on this matter. You can provide the Court with the disk drive that you have. This is an updated one that -- have you provided this to Mr. Murphy? Sit down, Mr. Murphy.

**MR. BERAL:** Mr. Murphy's office, Mr. Follett, Mr. Gilmore communicated about this yesterday. Their exhibits are included in here, our exhibits are included in here. If they want a chance to review them, I'm happy to have them review it before it gets submitted.

**THE COURT:** You are ordered to have the other side review the documents, you do not submit to the Court on an ex parte basis information. So meet and confer with Mr. Murphy. You're to have a driver return to the Court and -- by 4 o'clock today provide at the clerk's office a copy of an agreed upon flash drive that contains all of the exhibits, which again should have been done previously.

We're in recess. The parties are ordered back at 8:30 on Monday.

**(Proceedings concluded at 10:29 a.m.)**

*** * * * ***

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

April 2, 2026

Signed Dated

*TONI HUDSON, TRANSCRIBER*